**Marquis Aurbach**
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
canderson@maclaw.com
    Attorney for Defendants LVMPD, Kerry Kubla, Brice Clements, Alex Gonzales, Russell
    Backman, James Rothenburg, James Bertuccini and Melanie O'Daniel

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LATIA ALEXANDER, individually as heir of ISAIAH T. WILLIAMS, and in her capacity as Special Administrator of the Estate of ISAIAH T. WILLIAMS, <br><br> Plaintiffs, <br><br> vs. <br><br> LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; KERRY KUBLA, in his individual capacity; BRICE CLEMENTS, in his individual capacity; ALEX GONZALES, in his individual capacity; RUSSELL BACKMAN, in his individual capacity; JAMES ROTHENBURG, in his individual capacity; JAMES BERTUCCINI, in his individual capacity; MELANIE O'DANIEL, in her individual capacity and DOES I-XX, inclusive, <br><br> Defendants. | Case Number: <br> 2:24-cv-00074-APG-NJK |

## LVMPD DEFENDANTS' INITIAL EXPERT REPORT OF SPENCER FOMBY (ECF NO. 38-6)

Defendants Las Vegas Metropolitan Police Department ("LVMPD"), Kerry Kubla,

Brice Clements, Alex Gonzales, Russell Backman, James Rothenburg, James Bertuccini and

Melanie O'Daniel ("LVMPD Defendants"), by and through their counsel, Marquis Aurbach,

///

///

Page 1 of 2

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

hereby file the Initial Expert Report of Spencer Fomby (ECF No. 38-6) pursuant to this Court's Order (ECF No. 48).

Dated this 11th day of April, 2025.

MARQUIS AURBACH

By: s/Craig R. Anderson
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorney for Defendants LVMPD, Kerry
Kubla, Brice Clements, Alex Gonzales,
Russell Backman, James Rothenburg,
James Bertuccini and Melanie O'Daniel

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing **LVMPD DEFENDANTS' INITIAL EXPERT REPORT OF SPENCER FOMBY (ECF NO. 38-6)** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 11th day of April, 2025.

☒ I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

☒ I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants: N/A

s/Sherri Mong
An employee of Marquis Aurbach

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC: 14687-428 (#5850118.1) 4/11/2025 3:53 PM

# Exhibit A – Redacted Initial Expert Report of Spencer Fomby (ECF No. 38-6)

IN THE UNITED STATES UNITED STATES DISTRICT COURT
DISTRICT OF NEVADA
Case No.  2:24-cv-00074-APG-NJK

LATIA ALEXANDER, individually as heir of ISAIAH T. WILLIAMS and in her
capacity as Special Administrator of the Estate of ISAIAH T. WILLIAMS,
Plaintiff,
v.
LAS VEGAS METROPOLITAN POLICE DEPARTMENT, *et al.*: Defendants,

**Report of Spencer Fomby**

**QUALIFICATIONS AND BACKGROUND**

1. My name is Spencer Fomby. I am a retired police Captain. I was most recently employed as the Captain of the Boise Police Department Training, Education, and Development Division in Boise, Idaho. I have been a sworn police officer for 22 years. I previously worked for the Berkeley Police Department in California for 20 years. I have held primary assignments in patrol, narcotics, and community-involved policing. I was assigned to the Berkeley Police Department's SWAT team (SRT) for 16 years. I was the Team Leader, Team Commander, and lead tactical instructor for nine years. During my career, I have been involved in over 1000 high-risk tactical operations. I have been involved in 4 officer-involved shootings precipitated by the suspect ambushing officers.

2. I have extensive training in the various tactics and concepts required for individual SWAT members and the best practices for SWAT teams. I attended Basic SWAT in 2004 and then received 20 hours of dedicated SWAT training each month for the next 16 years. The monthly training covered firearms, defensive tactics, negotiations, de-escalation, chemical agents, active shooter response, high-risk warrant service, barricaded subjects, less lethal weapons, K9 operations, technology integration, open area searches, maritime operations, linear assaults, breaching techniques, tactical medicine, dignitary protection, public order, and hostage rescue operations. I have extensive experience teaching all aspects of tactical response including hostage rescue.

3. I am a tactical instructor and use of force subject matter expert for the National Tactical Officers Association (NTOA). I am the NTOA Public Order Section Chair. I coordinated the creation of the NTOA Public Order Operations Standard that was released in June 2023, the NTOA Public Order Basic Command Course, and the NTOA Public Order Grenadier Workshop. I previously taught the NTOA Police Counter Ambush Course.

4. I have extensive experience training the specific tactics police officers use to clear buildings. This training includes tactics used to approach a structure, breach doors and windows, enter the structure, and clear the structure as a team. I have taught the theoretical concepts and principles for building clearing. I have taught entry tactics for barricaded subjects, search warrant service, active shooter, and hostage rescue. I have

1

trained officers using inert weapons, marking cartridges, and in a live-fire shoot house. I assisted in developing the NTOA Advanced Response Police Officer Course (ARPO). The ARPO course was created to bridge the knowledge gap from a patrol officer to a SWAT officer. The course included instruction on advanced firearms skills, tactical medicine, counter-ambush, vehicle tactics, active shooter response, and building clearing.

5.  For eight years, I participated in the Urban Shield SWAT competition and evaluated other teams for two years. The competition was a 48-hour non-stop event with over 30 realistic scenarios. Many of the scenarios were based on actual events. The scenarios focused on active threat response and hostage rescue operations.

6.  I have been a police use of force instructor for seventeen years. I am a certified Force Science Analyst and Force Science Realistic De-escalation Instructor. I have also attended the Force Encounters Analysis course and Officer Involved Shootings and Use of Force Investigations course. I have been a certified instructor in the following disciplines: firearms (pistol, shotgun, and carbine), weaponless defense, impact weapons, ground fighting, active shooter, ALICE, chemical agents, flash bangs, public order tactics, public order command, less lethal weapons, live-fire shoot house, and tactical de-escalation. I created two CA POST (California Commission on Peace Officer Standards and Training) approved tactical de-escalation courses.

7.  I was the Berkeley Police Department lead departmental public order instructor; responsible for equipment selection, tactical training, less lethal weapon selection, chemical agent selection and deployment, and mission planning. I was a squad leader in more than 75 protest events including:

    Oscar Grant Protest            (Oakland Ca)- January 2009
    Mehserle Verdict               (Oakland Ca)- July 2010
    Occupy Oakland/Berkeley        (Oakland/Berkeley Ca)- October 2011
    Eric Garner/BLM                (Berkeley Ca)- December 2014
    Pro Trump Protests 2017        (Berkeley Ca)- February 1, March 4, April 15, April 27,
                                   August 27, September 24-27
    George Floyd Protests 2020     (Oakland Ca)- May/June 2020

8.  I have presented on public order best practices and extremist activity at multiple recent law enforcement conferences including:

    NACOLE Conference Panel- Public Order Policing: A Modern Approach, 2024
    California Force Instructors Association- NTOA Public Order Use of Force, 2024
    Western States Public Order Conference- NTOA Force Trends, 2024
    Daigle Law Group First Amendment Summit- Public Order Response Standards, 2022, 2023, 2024
    Daigle Use of Force Summit- Public Order Use of Force, 2022
    California Association of Tactical Officers Conference- NTOA Standards and Public Order Use of Force, 2022
    National Tactical Officers Association Virtual Conference- Public Order Best Practices, 2022

2

Daigle Use of Force Summit- Public Order Best Practices with NTOA Standards, 2021
National Tactical Officers Association Annual Conference- Public Order, 2021, 2020, 2019, 2018
NTOA Panel Discussion- Less Lethal Munitions in Crowd Control Operations, 2021
National Asian Peace Officers Association Conference- Public Order Policing Best Practices, 2021
Daigle Law Group First Amendment Summit- Modern Crowd Control Issues, 2021

9. As Captain of the Boise Police Department Training, Education, and Development Division, I managed the development and implementation of department training and education programs through an annual organizational needs assessment. I designed, developed, and implemented an annual training plan and evaluated training results. I developed, planned, managed, and implemented police training activities and programs, including the recruit academy, field training program, quarterly training, and leadership development. I coordinated testing, evaluation and purchase of department equipment. I was responsible for training reviews of all Boise Police Department officer involved shootings.

10. I participated in development of the following departmental policies: use of force update, body cameras, handcuffing and restraint devices, firearms, foot pursuits, probation and parole searches, public order, chemical agent deployment, armored vehicle deployment, use of spit hoods and restraint devices, de-escalation, and use of less lethal weapons.

11. I supervised the Berkeley Police Department Community Involved Policing unit and collaborated with community organizations, social service agencies, city staff, and merchants' associations to resolve complex issues. I was assigned to the City of Berkeley Problem Properties Team (PPT), a multi-disciplinary nuisance abatement team for eight years. The PPT included the following City of Berkeley agencies: Fire Marshal, Code Enforcement, Building and Safety, Environmental Health, and the City Manager's Office.

12. I was assigned to the Berkeley Police Department Drug Task Force for two years as an officer and then supervised the unit for two years as a sergeant. I was responsible for disrupting street-level narcotics activity in Berkeley and investigating regional drug trafficking cases with a nexus to Berkeley. I worked with a team of officers to generate felony cases through self-initiated stops. I participated in surveillance operations, undercover operations, buy/bust operations, and sex trafficking investigations. I also participated in over 1000 high-risk tactical operations including search warrant services, fugitive recovery, probation searches, and parole searches.

13. I was selected as a subject matter expert in civil disturbance for a National Institute of Justice Special Technical Committee. I am a subject matter expert in police equipment and tactics for the Department of Homeland Security First Responder Resource Group. I was also a Visiting Fellow in Police Science at the University of Derby, U.K. I earned a Bachelor of Arts degree in Administration of Justice from Howard University.

14. I am the author of the chapter on public order use of force in the international public order book, *"Public Order Policing A Professional's Guide to International Theories, Case Studies, and Best Practices; 2023."*

15. I have testified as an expert at ten depositions and two trials. I have testified as an expert in public order, the use of less lethal weapons, and the use of deadly force during officer-involved shootings.

16. See attachment A for my record of trial testimony and depositions.

17. I am being compensated $350 per hour for my time reviewing evidence and completing an expert report.

## METHODOLOGY

18. The policing profession is not a hard science in which the generally accepted best practices are clearly established by a governing body and verifiable by following a defined scientific methodology. Generally accepted policing practices are established by the collective training and experience of practitioners, academic research, court decisions, after-action reviews, and model policies and standards established by credible professional organizations. Examples of credible professional organizations are the International Association of Chiefs of Police (IACP), the Police Executive Research Forum (PERF), the Major Cities Chiefs Association (MCCA), and the National Tactical Officers Association (NTOA). State Peace Officers Standards and Training (POST) organizations establish training standards for individual states.

19. My opinions are based on my background as a police officer and instructor, my collaborations with academics specializing in police science, a thorough review of the relevant evidence, insights from contemporary academic theories, and the standards and model policies set by professional organizations.

20. I begin my process by reviewing the complaint and identifying the allegations. I review the available evidence and determine if there is additional evidence that I need before forming an opinion. I research related topics in publications, standards, and model policies created by professional organizations in the policing industry. Based on this evaluation, I render an opinion on whether the actions and decisions of the involved officers were consistent with generally accepted policing practices.

21. To determine whether the actions or decisions of the involved officers are consistent with generally accepted policing practices, I apply the reasonable police officer (or commander) standard in order to properly contextualize the analysis. This standard grounds the analysis from the perspective of the police officer or commander as they respond to events in real-time. The standard asks what information was known to the police officer or commander at the time the decision at issue was made.

22. The decisions of a police commander must be objectively reasonable. A police commander's decisions should be evaluated based on what a reasonable police commander versed in generally accepted policing practices would do in the same or similar circumstances. This determination must be based on the information known to

4

the police commander at the time the decision was made and without the benefit of 20/20 hindsight.

23. When police officers use force, the reasonableness of their actions is determined using the reasonable officer standard. The reasonable officer standard evaluates whether a reasonable officer on scene with training in generally accepted policing practices would take the same or similar action, based on the same or similar circumstances. This determination must be based on the information known to the officer at the time the force was applied and without the benefit of 20/20 hindsight. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 397 (1989).

## OPINION(S)

24. My opinions are based upon my education, training, and experience as a law enforcement officer/trainer in the area of active shooter response, patrol operations, public order, security, tactical operations, SWAT, and the facts of the case presented and materials reviewed.

25. Please note that I am not an attorney; though my opinion may contain references to statutory and case law, nothing in this opinion should be construed as a "legal" opinion or to infringe on the role of a competent court or legal arbitrator. Any reference in my opinion to law is to illustrate how the law is interpreted in the law enforcement industry, how it is taught to officers, and how a reasonable officer might be expected to comport his or her behavior with the industry's understanding of the law.

26. Attorney Craig R. Anderson has asked me to render an expert opinion on whether Las Vegas Metropolitan Police Department (LVMPD) officers' execution of a high-risk search warrant and the subsequent use of deadly force was consistent with generally accepted policing practices.

27. I presently hold the following opinions to a reasonable degree of professional certainty:

## I. Factual Background[1]

28. 

---

[1] The factual background is based on the Final Investigative Report from the Las Vegas Metropolitan Police Department CIRT Report, [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final)..

29. 

30.

31.

32.

33.







## II. **Opinion #1 Las Vegas Metropolitan Police Officers' Tactics for Serving a High-Risk Search Warrant Were Consistent with Generally Accepted Policing Principles**

34. It is my opinion that the Las Vegas Metropolitan Police Officers' tactics were consistent with generally accepted policing principles for serving a high-risk search warrant related to a homicide involving firearms. The purpose of the search warrant service was to secure an apartment that was used by suspects who were known gang members and were suspected of committing a murder using a firearm. There was probable cause to believe evidence, including firearms, related to the murder would be found in the apartment. Although the police were hoping to locate evidence, the SWAT team was needed because of the threat level and the nature of the underlying offense. The decisions of the SWAT commander and SWAT team leader were consistent with generally accepted policing practices.

In his deposition testimony, Sgt. Backman described the purpose of the warrant and the need to use the SWAT team:

·2· · · · Q· · But my understanding -- you tell me if
·3· ·I'm right or wrong -- the way that it was actually
·4· ·administered or executed -- or whatever word you
·5· ·want to use -- was that it was really an arrest
·6· ·warrant.
·7· · · · · · ·You were going to arrest individuals
·8· ·that you felt were involved in a homicide;
·9· ·correct?
10· · · · A· · It was the understanding at the briefing
11· ·that there was no -- there was two suspects
12· ·involved in a shooting prior to.· There was a
13· ·couple of other incidents where we knew that these
14· ·two individuals that were involved in it had
15· ·access to weapons.· One of them was a -- they were
16· ·each both documented gang members.
17· · · · · · ·These gang members were documented with
18· ·having a MP5 style rifle removed from their
19· ·vehicle prior to -- prior to this.· And there was
20· ·another incident where there was an AR-15 that was
21· ·recovered from another incident too, as well, by
22· ·the gang unit.
23· · · · · · ·The individuals that were supposed --
24· ·that were -- we thought that would be inside the
25· ·structure were Rembert and a Corvel Fisher.
·1· · · · Q· · Okay.
·2· · · · A· · And they were both documented gang
·3· ·members, and they had a prior criminal history for
·4· ·narcotics.· And Rembert's stepmother had told the
·5· ·homicide detective that that was a narcotics
·6· ·flophouse and they were armed.[2]

35. Within the SWAT community, there has been a vigorous debate about the tactics used to clear a structure during the service of a high-risk search warrant. Specifically, the debate has focused on using dynamic entry tactics versus surround and callout. No organization dictates the tactics that SWAT teams use. Trade organizations like the National Tactical Officers Association (NTOA) and the California Association of Tactical Officers (CATO) guide promising practices and best practices, but these organizations cannot dictate which tactics a SWAT team must use to conduct a search warrant service. A police agency can create policies that are more restrictive than the guidance provided by trade organizations or a state Peace Officers Standards and Training (POST) board.

---

[2] 2024-10-03 Deposition Transcript of Russell Backman(5664026.1), page 39-40.

36. Experts within the SWAT discipline may have different preferences, but the real focus should be on principles, legal restrictions, and the actions of a reasonable officer, reasonable commander, and a reasonable SWAT team. Most modern SWAT teams use a mission-based movement philosophy that focuses on available intelligence to dictate the method of entry and the speed of movement inside the structure. The SWAT team should conduct a threat assessment to evaluate objective factors that could increase the threat to the officers, bystanders, uninvolved members of the public, and the suspect.

The National Tactical Officers Association described the SWAT principles including mission-based movement as follows:

**Principle-Based SWAT**
• Team has trained the tactics and techniques.
• Team knows their philosophy and doctrine.
• Team picks tactics based on the mission and situation at hand.
• Team is tested during training and performs during missions.[3]

37. SWAT officers are taught tactical principles that have been developed through the collective experience of officers in the SWAT community and the overall policing profession. These principles help SWAT officers use tactics that will provide a tactical advantage, minimize danger to officers, members of the public, and the suspect, and mitigate the risk posed by the suspect.

38. The NTOA teaches that the following are generally accepted options for serving a high-risk search warrant. Each approach has pros and cons. A reasonable SWAT commander could choose any of these options depending on the specific circumstances of the operation.

**Warrant Service Options**
Warrant Service
• Methods of service – based on the mission or object of the warrant
• Controlled Entry, Contain and Call-Out, Breach & Hold, Limited Penetration, & Take-Down Away[4]

**Surround & Call-Out: Pros**
• Safer for SWAT Team members as it allows for better use of cover
• Allows the Team to determine suspects' intentions prior to being confronted
• Best containment of site
• Allows for controlled evacuation of area
• Best application of supporting weapons and rapid application of preplanned contingencies
• Lack of mobility for suspect

**Surround & Call-Out: Cons**
• High probability of evidence destruction
• Allows suspect time to prepare/defend

---

[3] Training-Strategy-and-Mission-Planning-2016, page 25.
[4] SWAT TL Complete notebook, page 350.

• Gives suspect initiative, team becomes reactive
• Possible change in conditions (e.g., traffic congestion, schools, high media activity)
• If ruse/diversion is used, must be supported by tactical solution
• When do we know surprise is lost?

**Take-Down Away: Pros**
• Takes support group away from the suspect
• Limits numbers of suspects to be dealt with
• Generally limits amount of weapons and ammunition immediately available to suspect at time of confrontation
• If applied properly it is a rapid capture of key suspect(s)
• Can provide for least involvement of innocent civilians

**Take-Down Away: Cons**
• High mobility often causes extreme risk to innocent civilians
• May create greater incident (hostage situation?) if takedown not accomplished
• Requires extensive planning, training and rehearsals
• Counter-surveillance may notify suspect(s) of impending operation
• May result in loss of evidence, such as items thrown from fleeing vehicle[5]

**Service Options**
• Breach & Hold
• Breach and dominate an entry point
• Non-destructible evidence[6]

**Service Options**
• Limited Penetration
• Control a portion of the target site at a controlled pace, then call occupants out
• Dominate points of destruction with porting teams if necessary

**Service Options**
• Controlled Entry / Deliberate Movement
• Mission-based with controlled movement
• How long until we go to slow deliberate?

**Movement**
• Breach & Hold, Limited Penetration and Deliberate Movement may still use a dynamic breach
• **Don't confuse entry and speed of movement[7]**

**Movement**
• You can use a dynamic breach and still call people out to the team
• **Dynamic only refers to the method of breaching and entry point (not speed of**

---

[5] SWAT TL Complete notebook, page 344.
[6] SWAT TL Complete notebook, page 205.
[7] SWAT TL Complete notebook, page 206.

**movement)[8]**

## Search Warrant Timing

39. The time of the search warrant service can create tactical advantages or operational challenges. SWAT teams will often conduct planned search warrant services in the early morning. Early morning warrants minimize the number of innocent bystanders in the area of the target location. A morning service also increases the chance that the suspects will be at the target location. Serving the warrant later in the day can lead to issues with vehicle and pedestrian traffic, school-age kids in the area, and the suspect calling for friends or criminal associates to come to the scene. It is my opinion that LVMPD SWAT's decision to serve the warrant at 5 a.m. was consistent with generally accepted policing practices.

## Approach to the Target

40. SWAT teams try to make a quiet approach without being compromised, cover threat areas, and prepare for knock and announce, breaching, and entry into the structure. Once the team is in place around the target location, they are exposed to potential gunfire through the front door and windows around the structure. SWAT teams will often utilize ballistic shields to provide limited protection while they prepare for entry. LVMPD SWAT officers approached the target location with a breaching team equipped with a ram and breaching shotgun, an entry team with a ballistic shield, and two distraction teams. One distraction team had a ballistic shield and a bang pole (stun stick) with a Noise Flash Diversionary Device (NFDD) attached and positioned near the living room window. The second distraction team (rear containment) had a CTS 9-bang NFDD.

## Breaching Operation

41. The LVMPD SWAT team identified the primary breach point as the front door. The door was a metal door with a wood frame. Based on the team's experience, they decided to use a manual breach, battering ram, to make entry. Once the LVMPD SWAT team was in place, the breacher realized that the primary breach point, the front door, was reinforced by a brass wrap. Officers were not able to get a close look at the primary breach before the operation because the target location was in a non-permissive environment.

42. During the CIRT investigation,



---

[8] SWAT TL Complete notebook, page 207.

During his CIRT interview,



43. If during the planning phase, the SWAT team learned that the primary breach point was reinforced, they would have opted for a different method of entry. The team had used explosive breaching successfully for many years, but explosive breaching was not an option for a search warrant service. During her CIRT interview, Lieutenant O'Daniel explained the circumstances.



Lieutenant O'Daniel continued:

44. In his deposition testimony, Sergeant Backman agreed that an explosive breach would have been a better option if they were aware that the door was reinforced before the operation:

17· · · · Q· · That you thought -- looking back on it
18· ·now, one of the things that you would have changed
19· ·is you thought this should have been an explosive
20· ·entry; correct?· I'm telling you what you gave --
21· ·what statement you gave in your -- in your -- in
22· ·your recorded statement.
23· · · · A· · With a brass-wrapped door with a tactic
24· ·like that, knowing -- if we would have known that

⁹ [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 109.
¹⁰ [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 122.

25· ·there was a brass wrap on that door, that would
·1· ·have been definitely an option for a better tactic
·2· ·and a safer tactic for us.· And also for the
·3· ·people there, to get that door down without
·4· ·having -- putting officers up front of it in
·5· ·harm's way, knowing that there's automatic weapons
·6· ·inside that residence with the possibility -- and
·7· ·we're going after a murder suspect too, you know.
·8· · · · · · ·So, yes, a brass wrap on that door
·9· ·would -- there -- a better tactic would be to
10· ·utilize an explosive breach on that, after the
11· ·fact, knowing this now.[11]

45. Once the breacher realized that the door didn't open on the first two hits, he had the discretion to call for a different method of entry, shock lock[12], but he chose to continue with the manual breaching tool. It is a generally accepted practice in SWAT that the breacher who is working on the door has the discretion to decide when there is a failed breach, or if there is a need to switch breaching techniques. ████████████████████ ████████[13] It is my opinion that the failure to fully scout the primary breach point was understandable in this situation, the use of the ram was reasonable, and it would have taken more time to switch to the shock lock instead of hitting the door a couple of extra times. Once the breacher started working on the door, it took a couple of extra hits, but the door was defeated in 5 seconds. The decision to continue with the battering ram is consistent with generally accepted policing practices for SWAT operations.



46. In his deposition testimony, Officer Kubla described why a couple of extra hits from the ram were faster than calling for the secondary breaching option, the shock lock.

22· · · ·Q.· · · In this case was the entry taking too
23· ·long?
24· · · ·A.· · · I don't feel -- myself, I don't feel
25· ·that we lost that -- that, I would say, surprise, or

---

[11] 2024-10-03 Deposition Transcript of Russell Backman(5664026.1), page 101-102.
[12] A shock lock is a shotgun with special ballistic rounds which are meant to defeat reinforced doors. The special ballistic round was designed to penetrate the locking mechanism and cause a minimum amount of fragmentation.
[13] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 132.
[14] [LVMPD 004813] CONFIDENTIAL CIRT2022-002 UFRB – Actual, page 108.

1· ·maybe that overwhelming action, due to the fact that
·2· ·we still had -- those flash-bangs were still going
·3· ·out there.
·4· · · · · · ·So to me, I felt the plan was that if we
·5· ·went up there and Kai hit the door, if he called for
·6· ·a shock and a shock came up, that shock would have
·7· ·to come up, introduce a couple of rounds into that
·8· ·lock, fall back, and if the door still came open, we
·9· ·would still be good to go on a CET, to still make
10· ·that entry.
11· · · · · · ·In my mind, that extra hit on the door
12· ·was going to be less time than having him step up,
13· ·shock that door, step back out, and then him step up
14· ·to hit the door again.[15]

**Distraction Devices**

47. It is my opinion that the use of Noise Flash Diversionary Devices (NFDD) during a high-risk search warrant service is a generally accepted policing practice. NFDDs can alert, distract, and potentially disorient a dangerous suspect and create a tactical advantage for the SWAT team. The use of a bang pole (stun stick) or exterior deployment of the NFDD can mitigate any risk to occupants of the structure. The stun stick is used to place the device inside of the structure, usually through a window, and deflagrate the device near the ceiling in a controlled manner. NFDDs should be delivered in a manner that allows the operator to see the device deflagrate, or physically control the device with a bang pole or similar tool. LVMPD used NFDDs in a way that was consistent with generally accepted practices for SWAT operations.



16

---

[15] 2024-10-11 Deposition Transcript of Kerry Kubla(5666187.1), page 79-80.
[16] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 119.

16

48. The National Tactical Officers Association provided the following guidance on the use of NFDDs:

**Flash Sound Diversionary Device**
• A device creating a bright flash and loud report designed to temporarily divert the attention of persons in the immediate vicinity, giving tactical teams a window of opportunity to exploit to their advantage

**Criteria for FSDD Use**
• Generally, when a less lethal diversion is necessary to enable an entry/arrest team to make entry and gain control of a suspect[17]

**Criteria for FSDD Use**
• Barricade or hostage situation
• High-risk warrant service
• Apprehension of unarmed felony/violent mental subject
• Potential life-threatening Situations
• Other situations where the use may increase chance of safe resolution
• Diversionary devices help prevent shootings[18]

**Compromise or Tactical Call**

49. SWAT teams create protocols to handle situations that create an immediate threat to the team or the success of the mission. These protocols are often referred to as compromise procedures. Examples of things that may compromise the team or the mission include spotters or lookouts, the suspect or another person leaving the target location, the suspect or another person spotting the team and running into the target location, and a person who fails to comply with lawful commands. LVMPD SWAT had standard operating procedures for near and far compromise situations. Near and far compromise refers to the distance the team was to the target when the compromise occurred.

Officer Hoskins described the plan for a near compromise on this operation:



50. LVMPD SWAT's protocol for holding the team, moving to cover, and assessing threats was called "tactical." Any team member who observed a threat to the team or the mission

---

[17] SWAT TL Complete notebook, page 175.
[18] SWAT TL Complete notebook, page 176.
[19] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 130.

could call a tactical. This is a basic protocol that any SWAT team should have to control the actions of team members during a dynamic and rapidly evolving tactical operation.

Per the CET portion of the Basic SWAT School Lesson plan (last updated in 2021), a 'tactical' call is described and taught as:

"If surprise speed and overwhelming action is lost, 'Tactical!' can be called. A tactical call is used to stop the teams as quick as they can in a safe area. Once the 'tactical' call is made everyone should repeat it so that everyone knows to no longer continue a dynamic clear of the structure.

Officers should not continue to clear but move to the closest clear spot and hold that area. Once the teams have 'stopped', the officer who called tactical should tell the team what he saw why he called tactical. The team at that time can determine the best course of action for resolving the situation. Once 'tactical' is called we do not reinstate a CET."

Further, the Basic SWAT School lesson plan gives the reasons a SWAT operator can utilize a 'tactical' call:

- Shots fired during the service of the search warrant;
- Suspect running into a room deep in the structure;
- Suspect seen with a weapon deep in the structure;
- Overwhelmed by the layout or suspect.


"[20]

51. The CIRT investigation concluded that ███████████████████████████████ ███████████████████████████████████████████████████████ The decision to call a compromise or "tactical" is up to the discretion of the officers on the scene based on the mission and their collective training and experience. No accepted protocol would require a change in the operation just because the door had a brass wrap. The decision to ram the door is up to the discretion of the trained breacher. It took 5 seconds to breach the reinforced door using a battering ram. Transitioning to a surround and callout would not have guaranteed that Williams wouldn't ambush the SWAT team. The officers were exposed directly outside of the structure with limited cover and concealment. Williams was armed and would have been able to ambush the officers through the window or the closed door. The officers were not able to move a Bearcat into position because of the terrain.

---

[20] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 138.

The CIRT investigation found the following:

"███████████████████████████████████████████
████████████████████████████████
█████████████████"21

52. In his deposition testimony, Officer Kubla explained the potential issues with the brass wrap and that the reinforced door did not present a huge challenge for the team.

24· · · ·Q.· · · And what's your understanding of what
25· ·the issue with the door was?
·1· · · ·A.· · · The issue -- well, the main issue with
·2· ·it was there was a brass wrap on the door.· The
·3· ·brass wrap, if you were able to get up there and get
·4· ·good eyes on the door, you would see there's a brass
·5· ·wrap on there.· Not saying that a brass-wrapped door
·6· ·is impenetrable.· However, it is going to be a
·7· ·little bit harder to breach than a door that doesn't
·8· ·have a brass wrap, because it's keeping that locking
·9· ·mechanism from bending or deforming because of that
10· ·wrap that wraps around the locking mechanism.
11· · · · · · ·Now, if that was a wooden frame, with a
12· ·brass wrap on a wood-framed door, more than likely
13· ·the wood frame -- it is not very hard to snap a wood
14· ·frame, and that wood frame is going to be
15· ·compromised prior to that door being compromised.
16· · · · · · ·So that would have something that
17· ·obviously was missed or obviously would be missed in
18· ·there, so I see that being an issue.· Because you
19· ·should be able to get by that and get a closer look
20· ·just by walking by, without actually going up to the
21· ·door and being able to see that.
22· · · · · · ·And that would -- I'm not going to say a
23· ·hundred percent it would change the plan, but you
24· ·would know that that door is going to be a little
25· ·bit stouter.· So it might take an extra hit on the
·1· ·door.· It might take a ballistic breach of -- using
·2· ·a ballistic round from a shot clock prior to hitting
·3· ·the door.· It could be using an explosive breach on
·4· ·the door.· Different options that we would have.
·5· · · · · · ·We would still have to get those,
·6· ·basically, options approved by going up through our
·7· ·chain, but different options that we would have that
·8· ·we could throw out there.
·9· · · · · · ·So not having that information, that

---

21 [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 137.

10· ·could have changed things.[22]

## Entry and Clearing Tactics

53. SWAT teams have multiple acceptable options for serving a high-risk search warrant. The decision on which tactics to use should be based on available intelligence, well-established tactical principles, and the collective training and experience of the team. The evaluation of a tactical decision should be based on what a reasonable SWAT commander, SWAT officer, or SWAT team would have done in the same or similar circumstances without the benefit of 20/20 hindsight.

54. Once the decision is made to secure a structure using a SWAT team, the tactical options begin with the method of entry. There is a difference between a dynamic entry and a dynamic building clearance. Dynamic entry refers to the use of breaching tools to gain access to the structure. Once access is gained, the team can hold at the breach, make a controlled entry and clear the structure, conduct a limited penetration into the first room and assess, or move away from the structure to a position of cover.

The National Tactical Officers Association provides the following guidance on this subject:

**Service Options**
• Controlled Entry / Deliberate Movement
• Mission-based with controlled movement
• How long until we go to slow deliberate?

**Movement**
• Breach & Hold, Limited Penetration and Deliberate Movement may still use a dynamic breach
• **Don't confuse entry and speed of movement**[23]

**Movement**
• You can use a dynamic breach and still call people out to the team
• **Dynamic only refers to the method of breaching and entry point (not speed of movement)**[24]

55. The National Tactical Officers Association described the speed of movement from slowest to fastest as follows:

**Principle-Based SWAT**

Speed of Movement

---

[22] 2024-10-11 Deposition Transcript of Kerry Kubla(5666187.1), page 60-62.
[23] SWAT TL Complete notebook, page 206.
[24] SWAT TL Complete notebook, page 207.

&bull; Covert
&bull; Stealth Probe to Contact
&bull; Warrant Speed
&bull; Crisis Entry Speed
&bull; Hostage Rescue Speed[25]

56. LVMPD SWAT used a tactic called Control Entry Tactic (CET). CET is a combination of a knock and announce and a dynamic breaching technique followed by a controlled entry into the structure. This tactic has been used for decades by SWAT teams all over the United States and is consistent with generally accepted policing practices. LVMPD SWAT's manual described the tactic in a manner that is consistent with accepted SWAT principles.

"The next method of search warrant service is called Control Entry Tactic (CET). A CET is defined in the SWAT Section Manual as:

This tactic can be dynamic in nature and is a viable and time-proven option. LVMPD SWAT should use a CET (Control Entry Tactic) to execute search warrants in those cases to lessen the risks, and to enhance officer, citizen and suspect safety. The goal of a CET is not to surround and call the subject out to SWAT officers.

This tactic is meant to surprise and overwhelm the suspect(s), and to quickly take them into custody and thereby prevent them from taking up arms, hardening their defensive position, fleeing the premises and possibly endangering others, harming hostages or destroying evidence. A CET utilizes surprise and speed to overwhelm the occupants which can be very effective in de-escalating a possible violent situation.

A CET should be considered when the circumstances associated with the search warrant service dictate that a SACO (Surround and Callout) is not the optimal tactic. Considerations to utilize a CET is based on the anticipated threat expected to be inside the structure at the time of the execution of the search warrant. Other factors include, but are not limited to: size of the structure/ability to dominate the structure; suspect violent tendencies; weapons involved; surrounding environment (unfriendly to large prolonged police presence) etc. A CET should not be confused with a SACO (Surround and Callout). Officers will make entry after announcements have been given that identify us as police officers and advise the occupants that we have a search warrant and a lawful right to be on the premises. In deciding when to enter the premises, the entry time will be based on the totality of the circumstances to include the following:

&bull; Size and location of the residence
&bull; Location of the officers in relation to the suspect
&bull; Time of day
&bull; Nature of the suspected offense, suspect priors, associated weapons

---

[25] Training-Strategy-and-Mission-Planning-2016, page 22.

• Other observations triggering the senses of the officers that reasonably would lead one to believe that immediate entry was necessary. (McClure V. United States 9th Cir. 1964)"[26]

57. There has been a strong push in the SWAT community to use surround and callout (SACO) tactics more often for high-risk search warrants. SACO is a viable tactic under the right circumstances. LVMPD SWAT officers considered using SACO on this operation but decided to use CET based on several objective factors. The area was difficult to contain and there was no access for armored vehicles. It would have been difficult to evacuate the neighboring apartments in the early morning if the suspect(s) barricaded. They didn't have known suspects/occupants and phone numbers to call. A SACO could allow a suspect to plan an ambush or attempt to escape. The suspect could also attempt to access a neighboring apartment, endangering uninvolved members of the public.

In her CIRT interview, Lieutenant O'Daniel explained 



[27]

"

[26] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 111.
[27] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 114-115.

22



"28

58. All members of the SWAT team who were interviewed by CIRT concluded ████████ ████████

"29

"30

59. The first issue identified for conducting a SACO at 3050 South Nellis Boulevard was the inability to get the armored Bearcats into a position where the windows and doors of the apartment were covered in case the suspect fired out of them. This was due to the size of the Bearcats and the relative opening in which the driver could maneuver the vehicle into position.



**Overhead view of 3050 South Nellis Boulevard.**[31]

[28] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 115.
[29] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 115.
[30] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 121.
[31] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 113.



**Street view from Nellis Boulevard of Apartment 1125.[32]**

60. Once the SWAT team breached the front door, they made entry into the front room. The officers followed the basic principles of clearing a structure. They minimized their time standing in the frame of the front door. SWAT officers are taught that doorways and hallways can create a tactical disadvantage. Suspects can use the door frame as an aiming point and easily hit officers who are in a static position. SWAT officers are taught to either take a defensive position and cover threat areas from these chokepoints or move through them quickly to a better position. Officer Kubla made entry and cleared the immediate area inside of the room and then cleared the hard corners as he kept moving to allow his teammates room to enter. Because Officer Kubla kept moving, it likely minimized the number of rounds that hit him and also allowed more officers to enter the room and address the threat by creating overlapping fields of fire. The tactics LVMPD SWAT used to make entry into the front room of the apartment are consistent with generally accepted policing practices.

### III. Opinion #2 LVMPD Officers' Knock and Announce was Consistent with Generally Accepted Policing Practices

61. It is my opinion that the LVMPD SWAT team conducted a knock and announce and waited a reasonable amount of time based on the level of threat. The decision to begin the manual breach after standing at the door for six seconds was consistent with generally accepted policing practices for executing a high-risk search warrant where the suspects are wanted for violent crimes involving firearms. A total of sixteen seconds elapsed from the first announcement until Officer Kubla made entry. Any reasonable person would have recognized that the police were demanding entry and complied once the officers started clearing the apartment.

62. There is no hard and fast rule on how long officers have to wait to enter a private residence after knocking and announcing. SWAT officers are taught that they must wait a reasonable

---

[32] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 114.

amount of time based on the totality of the circumstances and any perceived failure to comply. Based on the nature of the crimes (murder), the available intelligence related to firearms, the involvement of violent gang members, and the lack of cover and concealment, it was reasonable to begin breaching after 6 seconds.

63. "The Supreme Court has suggested that the police need not hold off for more than 15 or 20 seconds. *United States v. Banks*, 540 U.S. 31, 37-38 and n. 5, 124 S.Ct. 521, 157 L.Ed.2d 343 (2003). Maybe 10 seconds are enough. *United States v. Cline*, 349 F.3d 1276, 1288-90 (10th Cir. 2003). Maybe less, as in *United States v. Markling*, 7 F.3d 1309, 1318 (7th Cir. 1993) (7 seconds), where the knock was on the door of a small room in a motel, or *United States v. Crippen*, 371 F.3d 842, 843-44 (D.C. Cir. 2004) (4 seconds), where the police were afraid that the occupant had a rocket launcher; if a launcher were fired at an officer 'standing in the doorway . . . [the rocket] would go straight through [him].'"[33]

64. "Once the officers have notified the occupants of their intentions, they must allow those inside a reasonable chance to act lawfully.[34] The time required varies from case to case. Many courts have permitted officers to enter after waiting more than five seconds. Likewise, many courts have found entry at five seconds or less to be unreasonable. However, no such "bright line" five-second rule exists."[35]

65. In his deposition testimony, Officer Kubla explained some of the considerations that go into a reasonable time for knock and announce.

·1· · · ·Q.· · · If you won't mind, Kerry, if you can
·2· ·walk me through what those mitigating factors are.
·3· · · ·A.· · · It might be the -- how do I explain
·4· ·that?
·5· · · · · · · ·So one would be --
·6· · · ·Q.· · · Don't worry about using formal language.
·7· ·Just tell me like we weren't in a deposition.· Just
·8· ·walk me through it.· Don't worry about saying
·9· ·exactly the right words.· Just explain, like, from
10· ·your point of view this is what it is.
11· · · ·A.· · · What the normal times are traffic's been
12· ·seen in and out of the residence.
13· · · · · · · ·The time, what time it is, time of day
14· ·it is.
15· · · · · · · ·How many people are outside at the time.
16· · · · · · · ·Officer safety issues as far as where
17· ·we're located, if we're out in the middle someplace
18· ·where there's no place to provide cover.
19· · · · · · · ·Whether the subject is armed or could be
20· ·armed inside the residence.

---

[33] *U.S. v. Collins*, 510 F.3d 697, 699 (7th Cir. 2007).
[34] *U.S. v. Dice*, 200 F.3d 978 (6th Cir. 2000)
[35] THE KNOCK AND ANNOUNCE RULE: "KNOCK, KNOCK, KNOCKING ON THE SUSPECT'S DOOR" John P. Besselman, Senior Legal Instructor, FLETC.

21· · · · · · ·What the subject's priors are.· What the
22· ·crime is that we're going for.
23· · · · · · ·A lot of things mitigate how long we're
24· ·going to sit out there and announce on a
25· ·knock-and-announce.
·1· · · · · · ·It could be different types of tactical
·2· ·plans that we put together as far as how we're going
·3· ·to serve the warrant.
·4· · · ·Q.· · To your knowledge, Kerry, is there any
·5· ·amount of time that you must wait following the
·6· ·knock before entering?· Like, is there a minimum
·7· ·amount of time?
·8· · · ·A.· · It's a reasonable amount, ma'am.[36]

## 66. CIRT Findings



68. It is my opinion that based on the totality of circumstances, the knock and announce
conducted by LVMPD SWAT was consistent with generally accepted policing principles

[36] 2024-10-11 Deposition Transcript of Kerry Kubla(5666187.1), page 17-18.
[37] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 186.
[38] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 187.
[39] [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 188.

for a high-risk search warrant involving armed murder suspects. ██████████
████████████████████████████████ The decision to initiate the breach is at the discretion of the SWAT team leader based on the perceived threat, lack of cover and concealment, intelligence on firearms, and the potential of taking fire through the door before breaching the door. The evaluation of that decision should be based on what a reasonable SWAT team leader in the field would have done. It is my opinion that the suspect, Mr. Williams, was alerted to the presence of the officers, decided to arm himself, and shot 18 rounds at officers who had a lawful right to enter the apartment. Even if Mr. Williams did not have time to open the door, he had every opportunity to comply.

## IV. Opinion #3 LVMPD Officers' Use of Deadly Force Was Consistent with Generally Accepted Policing Practices.

69. It is my opinion that LVMPD officers' use of force to protect themselves from death or serious bodily injury was consistent with generally accepted policing practices.

70. The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The language in *Graham v. Connor* accounts for the challenge that police officers face in these circumstances. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."[40]

Officers are taught the "Graham Factors" including:

- The severity of the crime at issue
- Whether the suspect poses an immediate threat to the safety of the officers or others
- Whether he is actively resisting arrest or attempting to evade arrest by flight

71. The first consideration is the information the involved officers knew at the time the force was applied. The LVMPD SWAT officers knew they were serving a search warrant to secure an apartment that was related to a murder via firearms. Known gang members had been using the location to hang out and potentially stash weapons. LVMPD officers had recovered an assault pistol from one suspect and were aware that another one of the suspects was seen with an AR-15 rifle in the area of the target location. When officers made entry, they were met with 18 rounds fired from a semi-automatic pistol.

72. Any evaluation of the officers' actions must consider the Graham Factors.

**The severity of the crime:** Mr. Williams attempted to kill multiple SWAT officers using a firearm. Mr. Williams committed the following violations during this incident.

---

[40] Graham v. Connor, 490 U.S. 386 (1989)

- Attempted Murder with the Use of a Deadly Weapon on a First Responder (Three counts)
- Battery with a Deadly Weapon – Substantial Bodily Harm on a First Responder
- Assault with a Deadly Weapon on a First Responder
- Discharging a Firearm into an Occupied Structure (Three counts).

**Whether the suspect poses an immediate threat to the safety of the officers or others:**
Mr. Williams fired 18 rounds in close quarters and struck multiple officers with gunfire.

**Whether he is actively resisting arrest or attempting to evade arrest by flight:**
Mr. Williams was not only non-compliant and resisting arrest. He was doing so by using deadly force.

73. Mr. Williams attempted to kill multiple LVMPD SWAT officers with a firearm. Any reasonable officer would have used deadly force to stop Mr. Williams' actions.

## V.  Reference Material

I generally relied on the following documents in forming my opinions. These documents provide guidance on generally accepted policing practices. Many of these documents have multiple versions and are updated periodically.

- CA POST Tactical De-escalation Course
- National Tactical Officers Association Counter Ambush Course
- National Tactical Officers Association Advanced Response Police Officer Course
- National Tactical Officers Association SWAT Team Leader Course

Spencer Fomby
Date: November 5, 2024

28