**ADAM J. BREEDEN, ESQ.**
Nevada Bar No. 008768
**BREEDEN & ASSOCIATES, PLLC**
7432 W. Sahara Ave., Suite 101
Las Vegas, Nevada 89117
Phone: (702) 819-7770
Fax: (702) 819-7771
Adam@Breedenandassociates.com

**CORRINE P. MURPHY, ESQ.**
Nevada Bar No. 10410
**MURPHY'S LAW, PC**
2620 Regatta Dr., Suite 102
Las Vegas, NV 89128
Phone: (702) 820-5763
Fax: (702) 665-7345
cmurphyslawattorney@gmail.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LATIA ALEXANDER, individually as heir of ISAIAH T. WILLIAMS and in her capacity as Special Administrator of the Estate of ISAIAH T. WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; KERRY KUBLA, in his individual capacity; BRICE CLEMENTS, in his individual capacity; ALEX GONZALES, in his individual capacity; RUSSELL BACKMAN, in his individual capacity; JAMES ROTHENBURG, in his individual capacity; JAMES BERTUCCINI, in his individual capacity; MELANIE O'DANIEL, in her individual capacity; DOES I-XX, inclusive, <br><br> Defendants. | CASE NO. 2:24-cv-00074-APG-NJK <br><br> **PLAINTIFF'S MOTION TO MODIFY STIPULATED PROTECTIVE ORDER BETWEEN THE PARTIES** <br><br> **FILED UNDER SEAL** |

Plaintiff, LATIA ALEXANDER, individually as heir of ISAIAH T. WILLIAMS and in her capacity as Special Administrator of the Estate of ISAIAH T. WILLIAMS, by and through her

counsels of record Adam J. Breeden, Esq. of BREEDEN & ASSOCIATES, PLLC, and Corrine P. Murphy, Esq. of MURPHY'S LAW, hereby submits her Motion to Modify the Stipulated Protective Order Between the Parties to allow for third party disclosure to the public of the Critical Incident Review Team report ("CIRT Report"). *See* attached **Exhibit "1"** the CIRT Report.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

### I.    INTRODUCTION

Plaintiff Latia Alexander ("Plaintiff") respectfully moves this Court to modify the Stipulated Protective Order entered on March 12, 2024 (ECF No. 21) ("the Protective Order"). The Protective Order, as presently structured, allows blanket confidentiality over documents, shielding them from public scrutiny, including records of significant public interest such as the CIRT Report.

The CIRT Report is an internal investigative report that generally, Las Vegas Metropolitan Police Department ("LVMPD") will disclose to the public. LVMPD has not done that here, apparently because the CIRT Report is critical of LVMPD's actions which led to this fatal police shooting and essentially agrees with Plaintiff's lawsuit; decedent ISAIAH T. WILLIAMS' ("Mr. Williams") civil rights were violated when Mr. Williams, a non-suspect merely sleeping in an acquaintance's apartment, was fatally shot during a botched SWAT raid on the apartment. **In other words, LVMPD's own, internal investigation of this incident <u>agrees</u> with the basic allegations of Plaintiff's Complaint.** This is why LVMPD has hid this report from the public for two years.

Following the fatal shooting by police of yet another innocent black man - in an election year where the Sheriff was running for governor no less - LVMPD engaged in what can only be described as a public relations campaign cover up and has refused to publicly release the CIRT Report. Rather, LVMPD disclosed only the Fatal Investigation Team report ("FIT Report"), which entirely blames Mr. Williams for this incident and conveniently absolves LVMPD of all responsibility in the lead up, and the improper execution of the property only search warrant. *See* **Exhibit "2"** FIT Report. LVMPD also released an Office of Internal Investigation Oversight Review Report ("OIO Report") which purportedly summarizes in part the CIRT Report. *See* **Exhibit "3"** OIO Report. However, the OIO Report leaves off key details regarding constitutional violations and instead focuses on more administrative items. This can only be described as a coverup. Where LVMPD is issuing a report

"summarizing" the CIRT Report, there are no legitimate privacy interests present. Finally, in reverse order of publication, LVMPD issued a press release framing Mr. Williams as ambushing police. The press release includes, "[t]his is an ongoing investigation. An examination of this incident is being conducted by the LVMPD Critical Incident Review Team. This review focuses on policy, tactics, and training as it relates to this use of force." *See* **Exhibit "4"** LVMPD Press Release. Again, the CIRT process is referenced, implying a report will be publicly provided.

Plaintiff seeks to remove the CIRT Report from the current cloak of the Protective Order. Plaintiff's position is that the public's right to access information about governmental actions, particularly those involving allegations of constitutional violations and law enforcement accountability, outweigh any interests LVMPD may assert over the content of the CIRT Report. The FIT Report, the OIO Report and the Press Release do not accurately reflect what CIRT concluded regarding this matter, although they reference and purport to summarize the CIRT Report. The public is entitled to know.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Underlying Shooting Facts

This case arises from the fatal shooting of Mr. Williams by LVMPD officers during a botched SWAT operation on January 10, 2022. LVMPD SWAT officers failed to adhere to basic Constitutional principles of knock and announce when serving a search warrant in the early morning hours of January 10, 2022, resulting in a deadly shoot-out.

The search warrant being served sought ***only property*** related to a November 18, 2021 murder. Mr. Williams was not a suspect in that murder and had no relation to it in any way. The search warrant was for 3050 S. Nellis Boulevard, apartment 1125 – a ground floor apartment. The police suspected this was a "flop-house" with no regular tenant and had no reliable surveillance of who was actually inside. The morning of the shoot-out, the 19-year-old Mr. Williams was only sleeping there because he missed curfew. He was engaged in no criminal activity and, in fact, none of the items set forth in the search warrant were located in the apartment either.

What discovery uncovered - and as is meticulously admitted by LVMPD in its own CIRT Report which it is trying to hide from the public - is a series of critical mistakes and policy failures,

starting far before January 10, 2022, but ultimately concluding in Mr. Williams' death. The warrant application was a Frankenstein document pieced together in a series of emails and submissions. The investigation on the apartment units prior to service was short and haphazard, missing key details of the physical structure of the Nellis apartment. There were two (2) murder suspects in the November 18, 2021. Neither suspect was conclusively connected to either apartment in the incomplete investigation leading up to the SWAT raid.  Further, one of the suspects had an ankle monitor so it was feasible to determine his location. A first time SWAT sergeant who never attended SWAT school was in charge of the service. The lieutenant approving certain tactics was out on Covid. Finally, the Team Leader was out on vacation during planning.

Despite all the errors in planning the SWAT operation, the true coup de grace was LVMPD's own conclusion that its officers violated Mr. Williams' civil rights when failing to abide by the Constitutional and state law requirements of the knock and announce rule. The entry method tactics ultimately approved were for a Controlled Entry Tactic ("CET"). That involves breaking into a domicile after announcing police presence. If issues arise during a CET, SWAT officers are to call a "tactical" which means they stop, pull back and re-group. An alternative way of serving this warrant would have been a Surround and Call Out ("SACO"). That is where officers find a location, announce their presence and instruct any individuals to come out of a domicile so they may search it for the items listed in the search warrant. Further, several Noise Flash Diversionary Devices ("NFDD") were approved to be used during the CET. The name of the device itself – diversionary - demonstrates it is contrary to the principle of knock and announce that occupants be informed police seek entry. **LVMPD's own CIRT report concluded that CET SWAT entry is/was incompatible with the Constitutional knock and announce rule because CET aims to swiftly enter a residence and quickly overwhelm occupants, while knock and announce requires officers to wait a reasonable amount of time after knocking and announcing for persons to come to the door, ascertain it is police with a valid warrant, and provide them entry. In fact, LVMPD banned CET entry on all but no-knock warrants after Mr. Williams' death exactly because it is unconstitutional and violative of Nevada state law.**

The service of the search warrant not only failed to comply with constitutional principles or

case law, but was chaotic and confusing. The SWAT officers neither actually knocked on the apartment nor, nor did not properly announce their presence. They made entry into the unit within seconds of starting their deficient announcements via breaking through a window next to the slumbering Mr. Williams, as was pre-planned to occur regardless of what anyone inside the apartment did. After breaking and raking the window, SWAT officers inserted one of their NFDDs which mimics the sounds of gunfire. While that was going off in the unit, and creating not just noise, but blinding smoke and a pressure wave, SWAT detonated another NFDD outside the unit sounding like nine consecutive gunshots. As that was occurring, SWAT was ramming the door to the apartment, but it would not open as the unit had not been properly investigated and there was a brass wrap on the door inhibiting the secondary entry through the door.

At that time a tactical ought to have been called. But it was not. Instead, officers continued entry into the unit and were met with gunfire from Mr. Williams who was confused and disoriented and apparently believed criminal intruders were shooting at him. SWAT returned fire, shooting Mr. Williams 17 times (twice to the heart) and killing him that morning.

LVMPD's actions violated Mr. Williams' constitutional rights, including his Fourth Amendment Rights to Search and Nevada state law requiring officers to knock, announce and wait a reasonable amount of time for persons inside to come to the door, ascertain the identity of the police and allow them entry. The officers all ignored these laws and essentially performed a no-knock warrant, even though they lacked such a warrant.

Interestingly, discovery showed many of the same officers were successfully sued for civil rights violations a year before Mr. Williams was killed under similar circumstances where an innocent woman was seriously injured while attempting to answer the door during a SWAT CET entry. The officers pre-planned a so-called "short count" where force was used to break down the door before occupants could respond. Instead of learning from this error, the officers repeated it and this time a young black man was killed.

**B. The CIRT Report**

*i. The Protective Order*

During discovery, Plaintiff requested internal investigative reports from LVMPD. LVMPD's

1  disclosures contained the CIRT Report. *See* Exhibit "1." Defendants designated the CIRT Report and

2  other critical materials as "Confidential" under the Protective Order.

3       While this Court entered the Protective Order, this Court also issued a subsequent Order on

4  March 12, 2024, addressing the Protective Order. (ECF No. 22). In the March 12, 2024, Order this

5  Court made clear, "[t]he Court has approved the blanket protective order to facilitate discovery

6  exchanges. But **there has been no showing, and the Court has not found, that any specific**

7  **documents are secret or confidential**." *See* Order (ECF No. 22), at p. 1:19-21. This Court further

8  ordered:

9       The Ninth Circuit has held that there is a presumption of public access to judicial
        files and records, and that parties seeking to maintain the confidentiality of
10      documents attached to nondispositive motions must show good cause exists to
        overcome the presumption of public access. *See Kamakana* 447 F.3d at 1179.

11

12 *Id.* at p. 1:24-27.

13                      *i.    CIRT Report Background*

14      CIRT's purpose is to investigate occurrences involving LVMPD, then issue a report outlining

15 the facts and circumstances uncovered, any conclusions CIRT came to, as well as issue

16 recommendations for LVMPD to modify or institute new policies and procedures. Once CIRT issues

17 its conclusions and recommendations, the matter is passed to the Tactical Review Board ("TRB").

18 The TRB votes on adopting, modifying or declining the CIRT Report recommendations – if any.

19      CIRT is comprised of investigators – approximately seven (7) – whose job it is to investigate

20 various LVMPD matters. It is not the same as Internal Affairs Investigations. CIRT is not trying to

21 uncover corruption or misconduct. The CIRT investigators are police officers. The investigating

22 officers may also receive input from Subject Matter Experts ("SME"). Those are individuals having

23 expertise in certain areas, outside the scope of a CIRT Investigator. For example, in this matter, a

24 SME included an attorney knowledgeable about knock and announce and the 4th Amendment - who

25 contributed to the CIRT conclusions officers violated Mr. Williams' civil rights by failing to abide

26 by the knock and announce rule. *See* Exhibit "1" CIRT Report at p. 216, quoted *infra* at p. 7:22-8:5,

27 Conclusion 3.8.

28      Usually, a CIRT investigator will have several case files and ongoing investigations. Here,

1  the CIRT investigator, Detective Justin Roth, was pulled off his other investigations and instructed

2  to focus solely on this matter.

3      Following a lengthy investigation including investigating the underlying warrant application,

4  murder investigation, detailed process of how the plan was set up to serve this warrant, interviewing

5  every officer involved in this matter, Detective Roth issued a 222-page CIRT Report. *See* Exhibit "1"

6  CIRT Report. Even Plaintiff's experts describe this as the most detailed internal report on a police

7  shooting they have ever seen. It is not a positive report for the Defendants.

8      The CIRT Report itself is detailed and reflective of the significant time Detective Roth

9  dedicated to investigating this matter. The CIRT Report carefully walks through all the facts leading

10  up to Mr. Wiliams' January 10, 2022, shooting.

11                    *ii.    CIRT Report Conclusions*

12      The last eight pages of the CIRT Report are conclusions, and corresponding

13  recommendations. Some of the conclusions, and corresponding recommendations were as follows:

14      3.4 CIRT recognized the problems surrounding having a new sergeant in SWAT
        participate in live missions and in various positions; however, CIRT concluded
15      SWAT and Sergeant Backman were in compliance with their section manual at the
        time of the incident and were within standardized LVMPD tactics, training and
16      policy. *(SWAT Section Manual – 4.03 – New Sergeant Training Program) (Pages
        181-182)*
17

18  *Id.* at p. 215.

19      9.4 Reference conclusion 3.4, General – SWAT Training: CIRT recommends phase
        one of FTEP for sergeants in SWAT be extended to one month. Additionally, CIRT
20      recommends new sergeants will become familiar with all entry duties during phase
        two; however, they will perform these entry duties in a training environment. Any
21      involvement of a new sergeant in FTEP during a live mission will only be in the
        capacity of a supervisor role and under the guidance of an on-scene sergeant.
22      *(Pages 181-182; 213)*
23

24  *Id.* at p. 220.

25      3.6 CIRT concluded, while the SWAT Section Manual contained verbiage allowing
        for SWAT operators to conduct a CET for property when there is a threat of an
26      armed and dangerous subject, it was not appropriate given the amount of unknowns
        associated with Apartment 1125. There were numerous amounts of unknown
27      factors, to include who was actually staying in the apartment and if there were
        children, elderly or vulnerable individuals present inside of the apartment. SWAT's
28

decision to serve the 3050 South Nellis Boulevard search warrant as a CET, was a policy/training failure and not within standardized LVMPD tactics, training and policy. *(LVMPD SWAT Section Manual – 1.00, 3.14 and 9.01) (Pages 183-186)*

*Id.* at 215.

9.6 Reference conclusion 3.6, General – SWAT Planning – Use of a Control Entry Tactic: CIRT recommends the LVMPD recategorize the use of the CET to only be utilized when a No-Knock Search Warrant is approved by the LVMPD and has judicial pre-approval. CIRT recommends the current SWAT training, SWAT Section Manual and department policy be updated to reflect the standard. *(Pages 183-186; 213)*

*Id.* at p. 220.

3.8 CIRT and SMEs concluded SWAT's execution of the warrant did not constitute a "no-knock" warrant under Nevada law because SWAT announced their authority and purpose before making a forced entry. However, the SMEs consulted were not unanimous as to whether SWAT adhered to the knock and announce principles. The question was whether waiting six seconds before inserting the stun stick, and then waiting another ten seconds before making a forced entry, satisfied the requirement that officers wait a reasonable amount of time to provide occupants an opportunity to peacefully submit to the search (see United States v. Banks and Zabeti v. State). ***CIRT found that under the conditions present here, six seconds was insufficient to allow occupants time to answer the door, let alone submit to the search. Additionally, deployment of the CET contradicted the knock and announce principles. The CET is intended, in part, to surprise and overwhelm occupants inside the residence. Yet, the intent of knock and announce is to provide an opportunity to comply before a forced entry is made***; thus is a policy and training failure and not within LVMPD standards. *(SWAT Lesson Plans – Basic SWAT School, LVMPD Policy 5/200.01 Search and Seizure – Section 9 – No-Knock Search Warrants, SWAT Section Manual – 9.01 Procedure, Wilson v Arkansas, 1995, USSC., Zabeti v. State, 120 Nev. 530, and United States v. Banks, 540 U.S. 2004, NRS 179.055) (Pages186-189)* [emphasis added].

*Id.* at p. 216.

9.7 Reference conclusion 3.8, General – Knock and Announce:
    A) CIRT recommends SWAT structure new training to be in line with case law and national standards.
    B) CIRT recommends removing the passage on page 109 of the SWAT Section Manual which stated, "When utilizing a CET, the team leader will ensure that the associated 'Knock and Announce' tactic allows for a 'reasonable amount of time' based upon the circumstances of the warrant." As CET will only be utilized when there was judicial pre-approval for a No-Knock Search Warrant. Additionally, CIRT recommends the SWAT School lesson plan also reflect the same changes, to include changing the name of the

tactic from "Controlled Entry Technique" to "Control Entry Tactic" as it is uniformly referred to throughout the SWAT Se

C) ction Manual. *(Pages 186-189; 213)*

*Id.* at p. 220-221.

3.9 While SMEs recognized the "tactical" call was a judgement call to be made by SWAT operators during the execution of a Control Entry Tactic (CET), officers immediately lost the elements of a CET of utilizing speed to surprise and overwhelm the suspect, per their manual, by being stuck at the door and hitting it multiple times prior to entering the residence. Because there were no SWAT operators who recognized this and the lack of clarity in the lesson plan for when and when not to utilize a "tactical" call, CIRT concluded there was a policy and training failure. *(SWAT Lesson Plans – Basic SWAT School, SWAT Section Manual – 9.01 Procedure) (Pages 189-190)*

*Id.* at p. 216.

9.8 Reference conclusion 3.9, General – SWAT's Approach – Tactical Call on Exterior: CIRT recommends the SWAT Section Manual and Basic SWAT School expand their reasons for a "tactical" call, in writing, to ensure SWAT operators have a full understanding of the use of a "tactical" call. *(Pages 189-190; 213)*

*Id.* at p. 221.

5.5 CIRT and SMEs concluded Lieutenant O'Daniel did not use proper discretion when she approved the use of a Stun Stick through the west facing window. Lieutenant O'Daniel did not have actionable intelligence which would lead her to believe there was a low probability of affecting an innocent civilian, child or elderly person by inserting a Stun Stick through the west window of 3050 South Nellis Boulevard, Apartment 1125. In reviewing supervisory response, Lieutenant O'Daniel's management of tactics for the requested approval of tactics and tools, as the Tactical Commander, was not within standardized LVMPD tactics, training and policy. *(SWAT Section Manual 11.01 – Noise/Flash Distraction Device (NFDD), SWAT Section Manual 9.00 - Search Warrant Service, LVMPD Policy 2/102.01 – Use of Discretion, LVMPD Policy 5/213.06 Major Incident and All Hazard Plan, SWAT Section Manual, Basic SWAT School Lesson Plan - 2021) (Pages 204-206)*

*Id.* at p. 218.

Reference conclusion 5.6, Approval of Homicide IAP and Search Warrants for the Use of SWAT Service – Captain Cole and Lieutenant O'Daniel: Currently, there is no approval form associated with approval of search warrants or the tactics utilized. All requests for tools and tactics (Sierras, Stun Stick, 9-Bang, Explosive Breach, CET, SACO; etc.) can be completed verbally or even via text messages, as was the case in this incident. CIRT recommends the LVMPD create an official approval form for the service of a SWAT search warrant service. On this form, there should

> be an indication there was an approved IAP and search warrant, which tactics were being requested and the justification of why they were requested. This form should be signed by the ATL, Team Leader, Tactical Commander and SWAT Commander prior to the service of any warrant. If a No-Knock Search Warrant was requested, a Deputy Chief's signature would be required. *(Pages 207-209; 213)*

*Id.* at p. 221.

### C. TRB Process

Following the CIRT Report the matter was sent to the TRB. TRB issued several policy and procedure changes related specifically to this incident. TRB issued a memo outlining which CIRT recommendations is adopted, modified, or declined. *See* **Exhibit "5"** TRB Memo. Most importantly for this matter, TRB modified how LVMPD would serve search warrants like this in the future. CET would no longer be used for knock and announce warrants specifically because it was found that CET entry is inconsistent with the knock and announce Constitutional and State law requirement. **The TRB Memo advised, "[b]y using a CET to surprise and overwhelm the occupants of the structure, it inherently contradicts the knock and announce rule which requires officers to wait a reasonable amount of time set forth by United States Supreme Court Case Law and Nevada Revised Statutes (NRS)."** *Id.* at p. 13.

### D. Other Documents LVMPD Published Regarding Mr. Williams' Shooting Mischaracterize this Incident and Shift all Blame to Mr. Williams

Following this incident, LVMPD issued a press release, which stated in part:

> On January 10, 2022 at approximately 5:01 a.m., LVMPD SWAT officers were serving a search warrant at an apartment in the 3000 block of South Nellis Boulevard. This was part of a followup investigation for a murder that occurred in November 2021. While officers were serving the search warrant, there was an exchange of gunfire between the officers and a suspect. Two officers were struck by gunfire and transported to UMC with non-life-threatening injuries. The suspect sustained multiple gunshot wounds and was pronounced deceased at the scene.

*See* Exhibit "4" Press Release. Mr. Williams was not a murder suspect and had no relation to the crimes the police were investigating. This press release infers police tried to capture a murder suspect, who was then shot. That is not what occurred.

Thereafter, LVMPD issued the FIT Report. *See* Exhibit "2" Fit Report. Again, the police infer Mr. Williams was a murder suspect and expressly stated had he lived Mr. Williams would have been

charged with serious crimes. The FIT Report included:



**Suspect**

Name:                       **Isaiah Tyree Williams**
Also Known As (AKA):        "Zay"
DOB:                        ███02
SSN:
ID number:                  ████
Race:                       Black
Height/Weight:              5'9"/155 pounds
Hair/Eyes:                  Black/Brown
Address:                    3050 South Nellis Boulevard #21-1125
                            Las Vegas, NV 89121

Weapon
    Make:                   Glock
    Model:                  22
    Caliber:                .40
    Serial number:          GVP970

Criminal charges/offenses:
  • Attempted murder with use of a deadly weapon on a first responder – three counts
  • Battery with a deadly weapon, substantial bodily harm on a first responder
  • Assault with a deadly weapon on a first responder
  • Discharging a firearm into an occupied structure — three counts

*Id.* at p. 5.

The FIT Report also included a "description" of the incident implicitly placing all blame on Mr. Williams and failed to address the serious constitutional violations occurring during this incident.

> After several announcements of their presence before making entry, the breach officer began ramming the door. Officers Rothenberg and Bertuccini were positioned outside of the west window of the apartment and deployed a stun stick device through the window and activated a distract towards the living room roof. After five attempts with the ram, the SWAT team was able to make entry through the front door. As the team made entry, Isaiah Williams, who was lying on the living room couch, fired a handgun that was equipped with an extended magazine, at the entry team officers. Officer Kubla was the first officer to enter the apartment. Officer Kubla was shot multiple times and fell to the ground. Officer Clements was the second officer to enter, and he sustained a graze injury to his right arm due to a bullet fragment. Officers exchanged gunfire with Williams as he continuously fired his handgun towards the officers inside. Officers Bertuccini and Rothenberg held their positions outside of the West window. Williams aimed his firearm and fired his handgun towards officer Rothenberg, striking the ballistic shield that officer Rothenberg was holding for cover. Officer Rothenberg returned fire towards William's direction. Williams was struck multiple times by gunfire. Williams became incapacitated and was taken into custody. Medical personnel were called for all injured.

*Id.* at p. 10-11.

Thereafter, LVMPD publicly issued the OIO Report. In the OIO Report preamble, "[t]he purpose of this report is to publish key findings, conclusions, and/or recommendations of the Las Vegas Metropolitan Police Department's (LVMPD) internal review of this incident." *See* Exhibit "3"

OIO Report. The OIO Report also plainly references the CIRT Report and the TRB Process. *Id.* at p.

1. However, The OIO Report left off any issues about the CET used on this warrant violating

constitutional principles. Instead, the OIO stated, that it was a "policy failure."

> The SWAT Section Manual contained verbiage allowing SWAT operators to conduct a controlled entry tactic (CET) for property when there was a threat of an armed and dangerous subject. CIRT determined the CET was not an appropriate tactic for this incident, given the number of unknowns associated with Apartment 1125. • The administrative review determined SWAT's decision to serve the 3050 South Nellis Boulevard search warrant as a CET, was a policy/training failure and not within standardized LVMPD tactics, training, and policy.

*Id.* at p. 7. In fact, what CIRT concluded was, "[a]dditionally, deployment of the CET contradicted

the knock and announce principles. The CET is intended, in part, to surprise and overwhelm

occupants inside the residence. Yet, the intent of knock and announce is to provide an opportunity to

comply before a forced entry is made…" *See* Exhibit "1" CIRT Report at p. 216.

### E.  Defense Expert's Heavy Reliance on the CIRT Report

Notably, experts were disclosed in this matter. That includes defense expert Spencer Fomby.

Mr. Fomby is a retired police captain. Throughout Captain Fomby's report, he regularly pulls snippets

from the CIRT report. There are approximately 30 references in Captain Fomby's Report to the CIRT

Report. *See* **Exhibit "6"** Report of Spencer Fomby. Including, in part the following which

demonstrate how regularly Captain Fomby uses the CIRT Report:

- FN1 "The factual background is based on the Final Investigative Report from the Las Vegas Metropolitan Police Department CIRT Report, [LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final)." *See* Exhibit "1" at p. 5.

- "During the CIRT investigation, the involved officers provided details of the surveillance

- operation and the failure to identify the reinforced door:" *Id.*at p. 13

- "During her CIRT interview, Lieutenant O'Daniel explained the circumstances." *Id.* at p. 14.

- FN9 "[LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final), page 109." *Id.*at p. 14.

- FN10 "[LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final),

1      page 122." *Id.*

2      -   FN13 "[LVMPD 004255-004476] CONFIDENTIAL 2022-01-22 CIRT Report (Final),

3      page 132." *Id.*at p. 15.

4      FN14 "[LVMPD 004813] CONFIDENTIAL CIRT2022-002 UFRB – Actual, page 108."

5      *Id.*

### III.    POINTS AND AUTHORITIES

"A trial is a public event. What transpires in the courtroom is public property." *Craig v. Harney*, 331 U.S. 367, 374 (1947). There is a "presumption that the public and the press have a right of access to criminal proceedings and documents filed therein." *CBS, Inc. v. United States Dist. Court for Cent. Dist.*, 765 F.2d 823, 825 (9th Cir. 1985). This access is presumed to include pre-trial, trial, and post-trial matters. *Id.*, (citing *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 606 (1982)). However, there are limited categories of documents that have traditionally been kept from public view, such as "grand jury transcripts and warrant materials in the midst of a pre-indictment investigation." *Kamakana v. City & County of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006), (citing *Times-Mirror Co. v. United States*, 873 F.2d 1210, 1219 (9th Cir. 1989)).

To overcome the presumption of access, a party must articulate a basis upon which denial of access is necessary to preserve some competing interest. *Press-Enterprise Co. v. Superior Court of California*, 464 U.S. 501, 510 (1984) ("Press-Enterprise I"). When presented with a motion to seal or restrict access, the court must weigh the competing interests and determine if any less restrictive means could achieve the same purpose without infringing on the right to access. The court must also make specific findings to allow a reviewing court to assess the propriety of the order. *Id.*

"It is well established that the fruits of pretrial discovery are, in the absence of a court order to the contrary, presumptively public." *San Jose Mercury News v. U.S. Dist. Court*, 187 F.3d 1096, 1103 (9th Cir. 1999). Similarly, "as a general rule, the public is permitted 'access to litigation documents and information produced during discovery.'" *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424 (9th Cir. 2011). This presumption does not, however, mean that the public or the press has a First Amendment or common law right of access to discovery materials equivalent to their presumed right of access to judicial proceedings and documents.

Protective orders covering discovery materials are generally not subject to the same constitutional or common law scrutiny as judicial records. *United States v. Smith*, 985 F. Supp. 2d 506, 519-20 (S.D.N.Y. 2013), citing *Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 178 F.3d 943, 945 (7th Cir. 1999). Discovery is considered a private process intended solely to assist trial preparation, and historically, discovery materials were not available to the public or press. *United States v. Anderson*, 799 F.2d 1438, 1441 (11th Cir. 1986), (citing *Seattle Times v. Rhinehart*, 467 U.S. 20, 32-34 (1984)). Nonetheless, a party seeking to withhold discovery materials from public view must demonstrate "good cause" under Rule 16(d)(1) of the Federal Rules of Criminal Procedure, showing that disclosure would result in a "clearly defined, specific, and serious injury." *United States v. Smith*, 985 F. Supp. 2d at 523, quoting *In re Terrorist Attacks on September 11, 2001*, 454 F. Supp. 2d 220, 222 (S.D.N.Y. 2006).

While courts often find good cause before issuing protective orders, stipulated protective orders like the one in this case do not require initial findings of good cause. However, once a party seeks to modify or challenge a protective order, the burden shifts to the party opposing disclosure to demonstrate that good cause continues to justify the order. *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d at 424. "The central concern in determining whether access should be granted to documents sealed under a protective order is whether that order was relied upon in the decision to produce documents." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d at 1137-38.

In this case, the Stipulated Protective Order does not meet the specific and articulated standards of good cause required to continue shielding discovery materials of public significance, particularly the CIRT report documenting allegations of excessive force and constitutional violations.

## IV.    LEGAL ARGUMENT

### A.    The Protective Order Fails to Meet the Good Cause Standard and this Matter is Easily Distinguishable from Cases Where a Court has Denied a Request to Unseal a Document

Protective orders serve an essential purpose in litigation, balancing the need for confidentiality against the public's right to access court documents and information. To maintain such an order, particularly in matters of significant public interest, the party seeking to shield discovery materials

must meet the "good cause" standard by demonstrating specific harm or prejudice that would result from disclosure. *Kamakana*, 447 F.3d 1172, 1178. However, blanket protective orders, like the one in this case, often fail to withstand scrutiny under Federal Rules of Civil Procedure Rule 26(c), as they lack the individualized assessment of harm required by the Ninth Circuit. *Id.* This Court addressed that exact issue in the subsequent March 12, 2024 Order, wherein this Court advised, "there has been no showing, and the Court has not found, that any specific documents are secret or confidential." (ECF No. 22)

In *United States v. Benzer*, the court upheld two stipulated protective orders concerning pretrial discovery materials due to specific and compelling reasons presented by the government. *United States v. Benzer*, No. 213CR00018JCMGWF, 2015 WL 9200365, at *5 (D. Nev. Dec. 15, 2015). The protective orders were justified based on the personal privacy of individuals, potential reputational harm, and the need to safeguard sensitive investigative materials that did not result in criminal charges. *Id.* The court emphasized the government's reliance on these protective orders when deciding to disclose certain materials to defense counsel for limited purposes, and it was clear that disclosure to the public would not serve any greater public interest. *Id.*

The circumstances in *Benzer* are notably different from the present case. In *Benzer*, the documents were primarily of an investigatory nature, involving uncharged individuals whose reputations could be unfairly damaged. *Id.* In contrast, the present case involves materials of significant public interest—specifically, the CIRT Report, which directly pertains to constitutional violations and governmental accountability in the use of deadly force by law enforcement. Unlike the investigation materials in *Benzer*, the CIRT Report is not merely tangential or peripheral to the matter at hand; it is central to understanding systemic issues in law enforcement conduct contributing to these events. That is easily demonstrated when examining how often it is cited by Defendants' own expert, Captain Fomby. *See* Exhibit "6."

Moreover, while the *Benzer* court found that a Freedom of Information Act (FOIA) request was a more appropriate mechanism for accessing the information sought, such an alternative is less viable in this case. *Id.* The CIRT Report is integral to the litigation itself and has already been produced under the stipulated protective order. Public access to these materials is necessary to ensure

transparency and accountability, and the public's right to know outweighs any speculative or generalized concerns about reputational harm.

LVMPD issued a variety of documents regarding this matter, and they are ***not*** transparent about what occurred. The documents implicitly put the blame entirely on Mr. Williams and further fail to address in any way the policy changes brought about because of Mr. Williams' death. *See* Exhibit "4" Press Release; *see also* Exhibit "2" FIT Report; *see also* Exhibit "3" OIO Report.

In *In re Roman Catholic Archbishop of Portland in Oregon*, the Ninth Circuit evaluated the propriety of a protective order involving discovery materials containing sensitive allegations against non-party clergy members in the context of a bankruptcy proceeding. *In re Roman Catholic Archbishop of Portland in Oregon*, 661 F.3d 417, 424–25 (9th Cir. 2011). The court emphasized the need for "good cause" to justify continued confidentiality of such materials and required the balancing of public and private interests to determine whether the protective order should remain in place. *Id.*

*Roman Catholic Archbishop* is distinguishable from this matter in several significant ways. In *Roman Catholic Archbishop*, the discovery materials in question implicated non-parties - Father M and Father D - who were not defendants in the underlying litigation. *Id.* Their personnel files were disclosed during the bankruptcy discovery process, and the allegations contained therein were not litigated or substantiated in a court of law. *Id.* The Ninth Circuit emphasized the potential harm to the non-parties' reputations and privacy interests weighed heavily in favor of continued confidentiality, especially given the lack of judicial determination regarding the allegations. *Id.* at 427–28.

In contrast, this case involves discovery materials directly related to the governmental defendants and their conduct in the use of deadly force, which is central to the underlying litigation. Unlike the personnel files in *Roman Catholic Archbishop*, the CIRT Report pertains to official actions by public officials, not private individuals, and directly addresses issues of public accountability and constitutional rights. Additionally, the CIRT Report was the foundation for serious policy overhauls, and LVMPD issued a "summary" of the CIRT Report in the OIO Report, but withheld from the public that the prior policy violated United States Supreme Court law and Nevada Revised Statutes. *See* Exhibit "3" OIO Report at p. 7.

As the Ninth Circuit repeatedly recognized, the public's interest in understanding and

1  scrutinizing the conduct of government actors is at its apex in cases involving allegations of

2  constitutional violations. See *Roman Catholic Archbishop* at 425 (noting the importance of balancing

3  public and private interests). The documents LVMPD published paint a slanted and untrue story. *See*

4  Exhibit "4" Press Release; *see also* Exhibit "2" FIT Report; *see also* Exhibit "3" OIO Report.

5      In *Roman Catholic Archbishop*, the court found that narrowly tailored redactions of sensitive

6  personal information were appropriate to protect privacy interests while still allowing for public

7  disclosure of relevant information. *Roman Catholic Archbishop* at 426. Similarly, here, any legitimate

8  privacy concerns regarding the personal identifying information of officers or witnesses can be

9  addressed through redactions without denying the public access to the substance of the CIRT Report,

10  including most importantly, the final conclusions.

11      While *Roman Catholic Archbishop* underscores the importance of protecting sensitive third-

12  party information, it supports the principle that good cause must be demonstrated for continued

13  confidentiality and that transparency should prevail where public accountability is at stake. Those are

14  key issues in this matter.

15  **B.  The Protective Order is Overbroad as it is Being Applied Currently to the CIRT**

16      **Report**

17      The Protective Order, in this case, broadly designates all materials produced by the

18  Defendants as "Confidential" without requiring individualized justification for such designations.

19  This approach contravenes the Ninth Circuit's requirement that the party opposing public disclosure

20  bears the burden of proving good cause by demonstrating specific prejudice or harm that will result

21  from disclosure. *Foltz*, 331 F.3d 1122, 1130. Blanket protective orders are inherently insufficient to

22  meet this standard. *San Jose Mercury News v. U.S. Dist. Court*, 187 F.3d 1096, 1103 (9th Cir. 1999).

23      The Defendants have not articulated any specific, narrowly tailored interests justifying

24  withholding the CIRT Report, from public view. Defendants will be particularly pressed to elucidate

25  a meaningful good cause interest where LVMPD references the CIRT Report in the OIO Report, and

26  purports to summarize it for the public. *See* Exhibit "3" OIO Report, at p. 7.

27      Additionally, Defendants provided the CIRT Report to their own expert who used it

28  extensively throughout his report. *See* Exhibit "6" Fomby Report. Instead, the Protective Order

17

1   creates an undue presumption of confidentiality, undermining the public's right to access discovery
2   materials that shed light on allegations of government misconduct. Absent a compelling, articulated
3   interest supported by evidence, the Protective Order cannot withstand scrutiny under F.R.C.P. Rule
4   26(c) or Rule 16(d), as it applies to the CIRT Report.

5       **C.  The Public has Significant Interest in the CIRT Report**

6       The CIRT Report contains findings regarding LVMPD's use of force and alleged
7   constitutional violations in Mr. Williams' fatal shooting. *See* Exhibit "1" at p. 218.
8   These materials are essential to understanding the actions of law enforcement officers and assessing
9   the adequacy of LVMPD's internal accountability mechanisms. Courts have consistently recognized
10  that public access to government records is a cornerstone of accountability, particularly in cases
11  involving police conduct. *Las Vegas Metropolitan Police Dep't v. Ctr. for Investigative Reporting,*
12  *Inc.*, 136 Nev. 122, 460 P.3d 952 (2020); *In re Roman Catholic Archbishop of Portland in Oregon*,
13  661 F.3d 417, 424 (9th Cir. 2011).

14      The CIRT Report's findings are not merely internal assessments but are critical to the public's
15  evaluation of whether systemic reforms are necessary to prevent future constitutional violations.
16  Denying public access to such information under a blanket protective order unjustifiably prioritizes
17  the Defendants' interests over the public's right to transparency and accountability.

18      **D.  Narrowly Tailored Redactions Can Address Legitimate Privacy Concerns**

19      As discussed more below, Plaintiff recognizes certain categories of information demand
20  protection, such as:

21      1.      Personal identifying information of LVMPD officers and witnesses, including
22          addresses, dates of birth, and contact information;

23      2.      Details of ongoing investigations unrelated to the incident at issue;

24      3.      Sensitive medical or disciplinary records unrelated to the claims and defenses in this
25          case; and

26      4.      Weapons information and serial numbers.

27      Narrowly tailoring confidentiality, and appropriately redacting that content, to these specific
28  categories would adequately protect legitimate privacy interests without overbroad suppression of

1  materials critical to public understanding of the case. This approach aligns with the Ninth Circuit's

2  mandate that protective orders must be narrowly tailored to serve specific needs. *Foltz*, 331 F.3d at

3  1131.

4       **E.  Continued Confidentiality Requires a Heightened Showing of Good Cause**

5       When a party seeks to challenge an existing protective order, the burden shifts to the party

6  opposing modification to establish good cause for continued confidentiality. *In re Roman Catholic*

7  *Archbishop*, 661 F.3d at 424. Here, Defendants must demonstrate specific, identifiable harm that

8  would result from the disclosure of the CIRT Report, redacted to remove any personal information,

9  as detailed *supra*. Generalized claims of harm or embarrassment are insufficient to justify the ongoing

10  suppression of discovery materials. *Kamakana*, 447 F.3d 1172, 1178.

11       The central question in determining whether access should be granted is whether the

12  Protective Order was relied upon in the production of documents. *Foltz*, 331 F.3d at 1137-38. While

13  Defendants may argue they relied upon the Protective Order to produce the CIRT Report, in other

14  matters, LVMPD publishes the CIRT Report. That ought to occur here as well. Even with a meager

15  reliance, LVMPD cannot demonstrate a specific showing of harm. There is no basis for continuing

16  to shield these materials from public access.

17       **F.  Plaintiff would Agree to Redact Some portions of the CIRT Report**

18       To be clear, Plaintiff agrees types of information should be redacted from the CIRT Report

19  once released to the public. Plaintiff would agree that: (1) Personal information of officers and

20  witnesses should be redacted (birth dates, SSN's, home addresses) and (2) information relating to the

21  investigation of the underlying homicide which is not already in the public domain (internal

22  discussion of suspects, unreleased witness statements); and (3) information regarding weapons, such

23  as serial numbers, et c. Below is in an example of how LVMPD redacted the FIT Report upon

24

25

26

27

28

releasing it:

| LOCATION | PERSON CONTACTED | INFORMATION OBTAINED |
|---|---|---|
| ■■■■■■■■ | Tiffany Jefferson | Consent card signed to process her residence for bullet impact evidence. Did not witness the incident. |
| ■■■■■■■■ | None | Photographed a bullet impact to exterior pillar of balcony. |
| ■■■■■■■■ | None | No impacts into the residence. |
| ■■■■■■■■ | Jaime Carillo Jr. | Conducted a recorded interview. Signed consent card to process the residence for bullet and bullet impact evidence. |
| ■■■■■■■■ | Janeth Lopez-Quezada | Conducted a recorded interview. |

*See* Exhibit "2" Fit Report, at p. 45.

With appropriate redactions, the CIRT Report should be publicly disclosed so the public can learn the truth.

## V.   CONCLUSION

The Protective Order (ECF No. 21) broadly defines "Confidential" to include various categories of sensitive information, but its scope fails to distinguish between legitimate privacy interests and matters of significant public concern. Plaintiff now seeks a modification to limit the confidentiality designation to specific privacy-related information while permitting public access to documents that inform the public about government accountability, namely the full CIRT Report. For the foregoing reasons, Plaintiff respectfully requests that this Court grant her Motion to Modify the Protective Order.

Dated February 4, 2025.

BREEDEN & ASSOCIATES, PLLC

*/s/ Adam J. Breeden*

ADAM J. BREEDEN, ESQ.
Nevada Bar No. 8768
7432 W. Sahara Ave., Suite 101
Las Vegas, NV 89117-2782
Phone: (702) 819-7770
Fax: (702) 819-7771
Adam@Breedenandassociates.com
*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of February, 2025, I served a copy of the foregoing legal document **PLAINTIFF'S MOTION TO MODIFY PROTECTIVE ORDER** via the method indicated below:

| | |
|---|---|
| **X** | Through the Court's ECF/CM system on all registered users |
| | Pursuant to FRCP 5, by placing a copy in the US mail, postage pre-paid to the following counsel of record or parties in proper person:<br><br>Craig R. Anderson, Esq.<br>**MARQUIS AURBACH**<br>10001 Park Run Drive<br>Las Vegas, NV 89145<br>*Attorney for Defendants* |
| **X** | Via receipt of copy (proof of service to follow) |

An Attorney or Employee of the following firm:

*/s/ Kirsten Brown*
_____
**BREEDEN & ASSOCIATES, PLLC**

# INDEX OF EXHIBITS

| # | Description |
|---|---|
| 1. | Critical Incident Review Team Administrative Report |
| 2. | Force Investigation Team Report |
| 3. | Office of Internal Oversight Review: Key Findings, Conclusions and/or Recommendations of an Officer-Involved Shooting: Fatal |
| 4. | Las Vegas Metropolitan Police Department Press Release |
| 5. | Tactical Review Board LVMPD Interoffice Memorandum |
| 6. | Initial Report of Defense Expert, Spencer Fomby |