**Marquis Aurbach**
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
canderson@maclaw.com
  Attorneys for Defendants LVMPD, Kerry Kubla, Brice Clements, Alex Gonzales, Russell
  Backman, James Rothenburg, James Bertuccini and Melanie O'Daniel

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LATIA ALEXANDER, individually as heir of ISAIAH T. WILLIAMS, and in her capacity as Special Administrator of the Estate of ISAIAH T. WILLIAMS,<br><br>                    Plaintiff,<br><br>          vs.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; KERRY KUBLA, in his individual capacity; BRICE CLEMENTS, in his individual capacity; ALEX GONZALES, in his individual capacity; RUSSELL BACKMAN, in his individual capacity; JAMES ROTHENBURG, in his individual capacity; JAMES BERTUCCINI, in his individual capacity; MELANIE O'DANIEL, in her individual capacity and DOES I-XX, inclusive,<br><br>                    Defendants. | Case Number:<br>2:24-cv-00074-APG-NJK<br><br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

        Defendants Las Vegas Metropolitan Police Department ("LVMPD"), Kerry Kubla,

Brice Clements, Alex Gonzales, Russell Backman, James Rothenburg, James Bertuccini and

Melanie O'Daniel (collectively "Defendants"), by and through their attorneys of record,

Marquis Aurbach, hereby file their Motion for Summary Judgment.  This Motion is made and

based upon the Memorandum of Points & Authorities, the pleadings and papers on file herein

and any oral argument allowed by counsel at the time of hearing.

# **TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................1

II.     THE UNDISPUTED FACTS. ...........................................................................2

        A.      THE PARTIES. ......................................................................................2

                1.      PLAINTIFF. ............................................................................. 2

                2.      DEFENDANTS. ........................................................................ 3

        B.      THE SUBJECT INCIDENT. .................................................................4

                1.      LVMPD'S HOMICIDE UNIT OBTAINS A SEARCH WARRANT FOR THE APARTMENT. .................................... 4

                2.      SWAT AGREES TO SERVE THE WARRANT. ............................ 6

                3.      SWAT SERVES THE WARRANT ON THE APARTMENT. ........ 12

        C.      LVMPD'S CRITICAL INCIDENT REVIEW PROCESS...........................16

                1.      OVERVIEW OF THE CIRP. ...................................................... 16

                2.      CIRP AND THE SUBJECT CASE................................................ 17

III.    LEGAL STANDARDS ......................................................................................20

        A.      SUMMARY JUDGMENT STANDARDS. ....................................................20

        B.      GENERAL § 1983 AND QUALIFIED IMMUNITY STANDARDS...........22

IV.     EVIDENTIARY ISSUES. ..................................................................................23

        A.      EXPERTS AND LAY WITNESSES CANNOT MAKE LEGAL DETERMINATIONS. .........................................................................23

        B.      LVMPD'S INTERNAL FINDINGS ARE IRRELEVANT AND INADMISSIBLE. .................................................................................25

                1.      POLICIES AND PROCEDURES DO NOT SET THE STANDARD OF CARE........................................................................ 25

                2.      CIRP'S CONCLUSIONS, OPINIONS, AND RECOMMENDATIONS ARE IRRELEVANT................................ 26

V.      LEGAL ARGUMENT........................................................................................28

        A.      DECEDENT'S § 1983 FOURTH AMENDMENT AND RELATED NEVADA STATE LAW CLAIMS FAIL AS A MATTTER OF LAW (FIRST, THIRD, AND FOURTH COA)........................................................28

i

1.    THE OFFICERS USED REASONABLE FORCE UNDER BOTH THE FOURTH AMENDMENT AND NEVADA STATE LAW. ... 29

2.    THE OFFICERS' SERVICE OF THE HIGH-RISK SEARCH WARRANT WAS IN COMPLETE COMPLIANCE WITH FEDERAL AND STATE LAW KNOCK-AND-ANNOUNCE REQUIREMENTS. ........................................................ 30

3.    THE OFFICERS HAVE QUALIFIED IMMUNITY ON THE FOURTH AMENDMENT CLAIMS AND DISCRETIONARY IMMUNITY ON THE ARTICLE 1, SEC. 18 CLAIMS.................. 50

B.    PLAINTIFF'S § 1983 FOURTEENTH AMENDMENT FAMILIAL RELATIONSHIP CLAIM (SECOND COA)....................................54

1.    RELEVANT FOURTEENTH AMENDMENT LAW. ..................... 54

2.    ANALYSIS OF PLAINTIFF'S DEPRIVATION OF FAMILIAL RELATIONSHIP CLAIM.................................................... 55

C.    PLAINTIFF'S *MONELL* CLAIM FAILS (SEVENTH COA)......................56

1.    GENERAL MONELL LAW. ............................................... 57

2.    ANALYSIS OF PLAINTIFF'S *MONELL CLAIMS*. ...................... 57

D.    PLAINTIFF'S STATE LAW WRONGFUL DEATH/SURVIVORSHIP CLAIMS (FOURTH, FIFTH, AND SIXTH COA)........................................59

1.    ASSAULT AND BATTERY CLAIMS. ......................................... 60

2.    NEGLIGENCE. ................................................................ 60

3.    EMOTIONAL DISTRESS CLAIMS. .............................................. 65

VI.    CONCLUSION.....................................................................66

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

MAC: 14687-428 (#5866484.2)

**<u>TABLE OF AUTHORITIES</u>**

**Cases**

*A.D. v. Cal. Highway Patrol*,
   712 F.3d 446 (9th Cir. 2013) ........................................................ 51, 54, 55, 56

*Abdujllah v. Fetrow*,
   2007 WL 2844960, *8 (M.D.Pa. Sept. 26, 2007).......................................... 38

*Aguilar v. City of Los Angeles*,
   853 F.App'x 92 (9th Cir. 2021) ................................................................... 27

*Albright v. Oliver*,
   510 U.S. 266 (1994)..................................................................................... 22

*Alexander v. City & Cnty. of S.F.*,
   29 F.3d 1355 (9th Cir.1994) ........................................................................ 63

*Amie v. Cnty. of Los Angeles*,
   2015 WL 13916130 (C.D. Cal. Dec. 30, 2015)...................................... 36, 64

*Armstrong v. Asselin*,
   734 F.3d 984 (9th Cir. 2013) .............................................................. 36, 58, 64

*Ashcroft v. al-Kidd*,
   563 U.S. 731 (2011)............................................................................... 22, 23

*Berry v. City of Detroit*,
   25 F.3d 1342 (9th Cir. 1994) ....................................................................... 24

*Block v. City of Los Angeles*,
   253 F.3d 410 (9th Cir. 2001) ....................................................................... 21

*Borunda v. Richmond*,
   885 F.2d 1384 (9th Cir. 1989) ..................................................................... 22

*Boyd v. Benton Cnty.*,
   374 F.3d 773 (9th Cir. 2004) ................................................ 41, 42, 43, 51, 59

*Braun v. O'Brien*,
   2006 WL 8458557 (E.D. Cal. Feb. 27, 2006)............................................... 24

*Bravo v. City of Santa Maria*,
   665 F.3d 1076 (9th Cir. 2011) ........................................................... 36, 47, 63

*Burkhart v. Wash. Metro. Transit Auth.*,
   112 F.3d 1207 (D.C. Cir. 1997)................................................................... 24

*Butera v. District of Columbia*,
   235 F.3d 637 (D.C. Cir. 2001) .................................................................... 55

MAC: 14687-428 (#5866484.2)

**MARQUIS AURBACH**
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

*Case v. Kitsap Cnty. Sheriff's Dep't*,
   249 F.3d 921 (9th Cir. 2001) ............................................................. 25, 26

*Celotex v. Catrett*,
   477 U.S. 317 (1986).............................................................................. 21

*City & Cty. of San Francisco v. Sheehan*,
   575 U.S. 600 (2015)......................................................................... 24, 44

*City of Los Angeles v. Heller*,
   475 U.S. 796 (1986).............................................................................. 57

*Clouthier v. Cnty. of Contra Costa*,
   591 F.3d 1232 (9th Cir. 2010) .............................................................. 57

*Cook v. City of Minneapolis*,
   2007 WL 1576122 (D. Minn. May 31, 2007)........................................... 5

*Cruz v. City of Anaheim*,
   765 F.3d 1076 (9th Cir. 2014) .............................................................. 30

*Daniels v. Williams*,
   474 U.S. 327 (1986).............................................................................. 39

*Davis v. Sherer*,
   468 U.S. 183 (1984)................................................................... 26, 53, 62

*DeMerrell v. City of Cheboygan*,
   206 Fed. Appx. 418 (6th Cir. 2006) ...................................................... 24

*Devereaux v. Abbey*,
   263 F.3d 1070 (9th Cir. 2001) .............................................................. 21

*Dukes v. Deaton*,
   852 F.3d 1035 (11th Cir. 2017) ............................................................ 40

*Ernst v. City of Oregon*,
   903 F.Supp.2d 1172 (D. Or. 2012) ....................................................... 42

*Estate of Brenes v. Las Vegas Metro Police Dep't*,
   136 Nev. 806 (2020) ....................................................................... 28, 30

*Estate of Escobedo v. Bender*,
   600 F.3d 770 (7th Cir. 2010) .................................................... 40, 51, 59

*Estate of Hernandez-Rojas ex rel. Hernandez v. U.S.*,
   62 F. Supp. 3d 1169 (S.D. Cal. 2014).................................................... 21

*Estate of Millender v. Cnty. Of Los Angeles*,
   2012 WL 3655515 (August 24, 2012) ................................................... 36

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

*Estate of Wilson by Wilson v. Las Vegas Metro. Police Dep't,*
   2021 WL 4395045 (D. Nev. Sept. 23, 2021) ................................................. 61

*Falline v. GNLV Corp.,*
   823 P.2d 888 (Nev. 1991) ................................................................................ 62

*Fonseca v. Sysco Food Servs. of Ariz., Inc.,*
   374 F.3d 840 (9th Cir. 2004) .......................................................................... 21

*Franchise Tax Bd. Of Cal. v. Hyatt,*
   335 P.3d 125 (Nev. 2014) ................................................................................ 65

*Fraser v. Goodale,*
   342 F.3d 1032 (9th Cir. 2003) ........................................................................ 21

*Gagne v. City of Galveston,*
   805 F.2d 558 (5th Cir.1986) ...................................................................... 25, 26

*Galvin v. Hay,*
   374 F.3d 739 (9th Cir. 2004) .......................................................................... 62

*Gardner v. Howard,*
   109 F.3d 427 (8th Cir.1997) ............................................................................ 25

*George v. Morris,*
   736 F.3d 829 (9th Cir. 2013) .......................................................................... 30

*Gonzalez v. Las Vegas Metro Police Dep't.,*
   2013 WL 7158415 (Order of affirmance, Nov. 21, 2013) ............................... 53

*Graham v. Connor,*
   490 U.S. 386 (1989) ................................................................................... 29, 30

*Greer v. Cnty. of San Diego,*
   127 F.4th 1216 (9th Cir. 2025) ....................................................................... 27

*Harlow v. Fitzgerald,*
   457 U.S. 800 (1982) ......................................................................................... 22

*Hayes v. Cty. of San Diego,*
   736 F.3d 1223 (9th Cir. 2013) ........................................................................ 57

*Herrera v. Aguilar,*
   2013 WL 5354518 (W.D. Texas Sept. 24, 2013) ........................................... 27

*Herring v. Keenan,*
   218 F.3d 1171 (10th Cir. 2000) ...................................................................... 26

*Hinton v. Clark Cnty. by and through Las Vegas Metro. Police Dept.,*
   2005 WL 8161410 (D. Nev. May 12, 2005) .................................................... 33

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

*Howell v. Polk*,
  532 F.3d 1025 (9th Cir.2008) ................................................. 46, 50, 51

*Hughes v. Rodriguez*,
  31 4th 1211 (9th Cir. 2022) ...................................................... 21, 24

*In re Oracle Corp. Securities Litigation*,
  627 F.3d 376 (9th Cir. 2010) ........................................................... 26

*Jama v. City of Seattle*,
  446 Fed.Appx. 865 (2011) ...................................................... 46, 50, 51

*Jimenez v. Sambano*,
  2009 WL 2382622 (S.D. Cal. July 31, 2009) ..................................... 24

*Jones v. Las Vegas Metro. Police Dep't*,
  873 F.3d 1123 (2017) .......................................................... 53, 54, 55

*King v. State*,
  998 P.2d 1172 (Nev. 2000) .................................................. 37, 58, 63

*Krause v. Jones*,
  765 F.3d 675 (6th Cir. 2014) ......................................................... 43

*Lal v. California*,
  746 F.3d 1112 (9th Cir. 2014) .............................................. 22, 24, 44

*Lugtu v. California Highway Patrol*,
  26 Cal. 4th 703, 110 Cal. Rptr. 2d 528, 28 P.3d 249 (2001) ............... 62

*Mack v. Williams*,
  522 P.3d 434 (Nev. 2022) ......................................................... 28, 50

*Maddox v. City of Los Angeles*,
  792 F.2d 1408 (9th Cir. 1986) ....................................................... 27

*Maduike v. Agency Rent-A-Car*,
  953 P.2d 24 (Nev. 1998) ............................................................... 65

*Malley v. Briggs*,
  475 U.S. 335 (1986) ...................................................................... 23

*Martinez v. Maruszczak*,
  168 P.3d 720 (Nev. 2007) .............................................................. 53

*Mattos v. Agarano*,
  661 F.3d 433 (9th Cir. 2011) ......................................................... 50

*Maturi v. Las Vegas Metro Police Dep't.*,
  871 P.2d 932 (Nev. 1994) .............................................................. 53

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

vi

*McClure v. U.S.*,
  332 F.2d 19 (9th Cir.1964) ........................................................................ 45

*McCurdy v. Dodd*,
  352 F.3d 820 (3d Cir. 2003) ...................................................................... 55

*Mendez v. Cnty. of Los Angeles*,
  897 F.3d 1067 (9th Cir. 2018) .............................................................. 30, 31

*Messerschmidt v. Millender*,
  565 U.S. 535 (2012).................................................................... 36, 58, 64

*Milender v. County of Los Angeles*,
  620 F.3d 1016 (9th Cir. 2010) ................................................ 46, 47, 50, 51

*Molina ex rel. Molina v. Cooper*,
  325 F.3d 963 (7th Cir. 2003) .................................................. 37, 38, 40, 51, 58

*Monell v. Dept of Soc. Svcs.*,
  436 U.S. 658 (1978).................................................................... 1, 57, 59

*Moreland v. Las Vegas Metro Police Dep't.*,
  159 F.3d 365 (9th Cir. 1998) .............................................................. 28, 54

*Napouk v. Las Vegas Metro. Police Dep't*,
  124 F.4th 906 (9th Cir. 2024) ................................................ 51, 53, 54, 55, 56

*Napouk v. Las Vegas Metro. Police Dep't*, 669 F.Supp.3d 1031 (D. Nev. 2023), *aff'd.*
  *Napouk v. Las Vegas Metro. Police Dep't.*, 123 F.4th at 924 .......................................... 53

*Opbroek v. City of Portland*,
  2023 WL 4424758 (D. Or. Apr. 26, 2023) .................................................. 42

*Orr v. Bank of Am., NT & SA*,
  285 F.3d 764 (9th Cir. 2002) .............................................................. 21, 26

*Ortega v. Reyna*,
  953 P.2d 18 (Nev. 1998)............................................................................ 53

*Pearson v. Callahan*,
  555 U.S. 223 (2009)................................................................................... 22

*Pena v. Leombruni*,
  200 F.3d 1031 (9th Cir. 1999) ................................................................ 24

*Plumhoff v. Rickard*,
  572 U.S. 765 (2014).................................................................................. 22

*Porter v. Osborn*,
  546 F.3d 1131 (9th Cir. 2008) ................................................................ 55

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

vii

*Ramirez v. City of Reno*,
    925 F. Supp. 681 (D. Nev. 1996) ................................................. 28, 30, 60

*Rice v. City of North Las Vegas*,
    2009 WL 10710042 (D. Nev. 2009) ........................................................ 24

*Richards v. Wisconsin*,
    520 U.S. 385 (1997) .............................................. 18, 32, 33, 34, 44, 45

*Rivas-Villegas v. Cortesluna*,
    595 U.S. 1 (2022) .................................................................................. 50

*Rocky Mountain Produce Trucking Co. v. Johnson*,
    369 P.2d 198 (Nev. 1962) ...................................................................... 60

*Rodriguez v. Jackson*,
    574 P.2d 481 (Az. 1977) ........................................................................ 62

*Russ v. Watts*,
    414 F.3d 783 (7th Cir. 2005) .................................................................. 55

*S.R. v. Browder*,
    929 F.3d 1125 (9th Cir. 2019) ................................................................ 55

*Sabbe v. Washington Cnty. Bd. Of Comm'snrs*,
    84 F.4th 807 (9th Cir. 2023) .................................................................. 50

*Sanchez v. State*, 743 P.2d 726 (Nev. 1987) ............................................ 63

*Sandoval v. Las Vegas Metro Police Dep't.*,
    756 F.3d 1154 (9th Cir. 2014) ................................................................ 53

*Scott v. Harris*,
    550 U.S. 371 (2007) ........................................................................ 21, 24

*Scott v. Smith*,
    109 F.4th 1215 (9th Cir. 2024) .............................................................. 56

*Shafer v. Cty. of Santa Barbara*,
    868 F.3d 1110 (9th Cir. 2017) ................................................................ 50

*Smith v. Casey*,
    2008 WL 2570855 (D. Nev. June 24, 2008) ............................................ 27

*Smith v. City of Hemet*,
    394 F.3d 689 (9th Cir. 2005) ............................................................ 29, 51

*Sprecht v. Jensen*,
    863 F.2d 700 (10th Cir. 1998) ................................................................ 27

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

viii

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

*Stanley v. McCarver*,
   92 P.3d 849 (Az. 2004) ........................................................................... 61

*State v. Garcia-Hernandez*,
   837 P.2d 624 (Wash. App. 1992) ............................................................ 46

*State v. Huff*,
   793 A.2d 1190 (Conn. 2002) ................................................................... 51

*State v. Kofoed*,
   208 P.3d 278 (Idaho 2009) ...................................................................... 46

*State v. Pruitt*,
   967 So.2d 1021 (Fla. 2007) ..................................................................... 51

*State v. Wakefield*,
   977 P.2d 941 (1999) ................................................................................. 51

*Tanberg v. Sholtis*,
   401 F.3d 1151 (10th Cir. 2005) ............................................................... 27

*Terebesi v. Torreso*,
   764 F.3d 217 (2d Cir. 2014) ....................................................... 39, 40, 59

*Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe. Cnty.*,
   768 F.2d 1186 (10th Cir. 1985) ............................................................... 55

*U.S. v. Ankeny*, 502 F.2d 829 (9th Cir. 2007) ......................................... 41, 42, 43, 51

*U.S. v. Banks*,
   282 F.3d 699 (9th Cir. 2002)
   reversed on other grounds, 540 U.S. 31 (2003) ................................ 36, 39

*U.S. v. Banks*,
   540 U.S. 31 (2003) .................................... 2, 18, 32, 33, 34, 35, 44, 45, 46, 47, 49, 50, 51

*U.S. v. Boulanger*,
   444 F.3d 76 (1st Cir.),
   cert. denied, 549 U.S. 906 (2006) ........................................................... 40

*U.S. v. Caceres*,
   440 U.S. 741 (1979) ................................................................................ 26

*U.S. v. Chavez-Miranda*,
   306 F.3d 973 (9th Cir. 2002) .................................................................. 36

*U.S. v. Cline*,
   349 F.3d 1276 (10th Cir. 2003) ............................................................... 46

*U.S. v. Combs*,
   394 F.3d 739 (9th Cir. 2005) ....................... 2, 37, 38, 39, 45, 48, 49, 51, 58

MAC: 14687-428 (#5866484.2)

*U.S. v. Folks*,
  236 F.3d 384, 388 (7th Cir.),
  cert. denied, 534 U.S. 830 (2001) .......................................................................... 40

*U.S. v. Granville*,
  222 F.3d 1214 (9th Cir. 2000) ................................................................... 32, 45, 51

*U.S. v. Morris*,
  349 F.3d 1009 (7th Cir. 2003) ................................................................................ 40

*U.S. v. Myers*,
  106 F.3d 936 (10th Cir.),
  cert. denied, 520 U.S. 1270 (1997) ........................................................................ 40

*U.S. v. Rizzi*,
  434 F.3d 669 (4th Cir. 2006) .................................................................................. 63

*U.S. v. Spikes*,
  18 F.3d 913 (6th Cir. 1998) ............................................... 37, 38, 39, 45, 48, 51, 58

*U.S. v. Villasenor*,
  608 F.3d 467 (9th Cir. 2010) .................................................................................. 58

*Valdivieso Ortiz v. Burgos*,
  807 F.2d 6 (1st Cir. 1986) ....................................................................................... 55

*White v. Pauly*,
  580 U.S. 73 (2017) ................................................................................................. 50

*Wilkinson v. Torres*,
  610 F.3d 546 (9th Cir. 2010) ......................................................................... 21, 54, 56

*Williams v. City of Sparks*,
  112 F.4th 635 (9th Cir. 2024) ................................................................................ 60

*Wilson v. Arkansas*,
  514 U.S. 927 (1995) ........................................................................... 2, 26, 32, 51, 60

*Youngbey v. March*,
  676 F.3d 1114 (D.C. Cir. 2012) ............................................................................. 63

*Zabeti v. State*,
  96 P.3d 773 (Nev. 2004) .......................................... 32, 37, 38, 45, 47, 50, 51, 54, 62

**Constitutional Provisions**

Nevada Constitution, Art. I, Sec. 18 ............................................................... 1, 28, 50

Nevada State Constitution ............................................................................................ 29

U.S. Const., First Amendment ..................................................................................... 55

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC: 14687-428 (#5866484.2)

U.S. Const., Fourteenth Amendment ................................................. 1, 54, 55, 56

U.S. Const., Fourth Amendment ........................................................ *passim*

**Rules**

Fed. R. Cir. P. 56 ............................................................................ 20

Fed. R. Civ. P. 56(a) ...................................................................... 20

Fed. R. Evid. 407 ...................................................................... 26, 27

FRE 403 ................................................................................... 27, 28

FRE 701 ......................................................................................... 27

FRE 702 ......................................................................................... 28

**Statutes**

18 U.S.C. § 3109 ....................................................... 32, 37, 38, 45

42 U.S.C. § 1983 ...................... 1, 21, 22, 24, 25, 26, 28, 30, 31, 39, 50, 52, 54, 57

NRS 41.032 .............................................................................. 53, 54

NRS 41.032(2) ............................................................................... 53

NRS 41.100(3) ............................................................................... 28

NRS 179.045(d) ...................................................................... 36, 63

NRS 179.055 .......................................................... 32, 37, 38, 45

**Treatises**

Graham, Handbook of Federal Evidence § 407:1 (9th ed.) ................................. 27

Radley Balko, Flashbangs Under Fire, Reason, Feb. 17, 2010 ......................... 39

Restatement (Second) of Torts § 282 (1965), cmt. d ...................................... 60

Restatement (Second) Torts § 285 ........................................................... 61

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

<div style="text-align:left; writing-mode: vertical">

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

</div>

# MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

This 42 U.S.C. § 1983 lawsuit involves an officer involved shooting during the service of a high-risk search warrant. On January 10, 2022, LVMPD's SWAT team served the high-risk warrant at 3050 S. Nellis Boulevard, Apt. #1125 ("the Apartment"). Prior to service, the team learned the Apartment was a gang "flophouse" where the occupants were likely armed and dangerous. The information proved correct. Less than one-second after the officers entered the Apartment, Isaiah Williams ("Decedent") greeted them with eighteen rounds from a Glock 22, .40-caliber handgun. Several of Decedent's rounds struck and severely wounded defendant officer Kerry Kubla ("Ofc. Kubla"). In response, four officers (including Ofc. Kubla) returned fire, killing the Decedent.

Decedent's mother, Latia Alexander ("plaintiff"), is now suing LVMPD, several SWAT team members, and the SWAT team tactical commander, Lt. Melanie O'Daniel ("Lt. O'Daniel"). The First Amended Complaint ("FAC")[1] asserts the following claims:

- 42 U.S.C. § 1983 Fourth Amendment excessive force (First Claim for Relief ("COA")).

- 42 U.S.C. § 1983 Fourth Amendment unreasonable search and seizure (First COA).

- 42 U.S.C. § 1983 Fourteenth Amendment deprivation of familial association rights (Second COA).

- Violation of the Nevada Constitution, Art. I, Sec. 18 for unlawful service of the high-risk search warrant and excessive force (Third COA).

- *Monell*[2] claims against defendant LVMPD.

- Nevada state law wrongful death and survivorship claims alleging assault/battery, emotional distress, and negligence (Fourth, Fifth and Sixth Causes of Action).

---

[1] First Amended Complaint ("FAC"), ECF No. 26.

[2] *Monell v. Dept of Soc. Svcs.*, 436 U.S. 658 (1978).

MAC: 14687-428 (#5866484.2)

The gravamen of plaintiff's lawsuit is the officers violated the Fourth Amendment and Nevada state law by failing to comply with the knock-and-announce rule.[3] According to plaintiff, the officers failed to both adequately "declare their presence and purpose" and "wait to allow a reasonable opportunity for persons inside [the] dwelling to ascertain the identity of the officers and comply with the request for admittance prior to using any force to enter[ing] [the] dwelling."[4] According to plaintiff, the knock-and-announce rule "is more accurately described as the knock-and-announce-and-wait rule."[5] Plaintiff's interpretation of the knock-and-announce rule is incorrect. For decades courts have recognized an exigency exception to the knock-and-announce rule. This exception allows for "a relatively short delay before a forced entry" if the officers have a reasonable belief a threat of physical violence against law enforcement exists.[6] When such an exigency exists, courts allow immediate forced entry or periods as short as five seconds. Here, the officers unquestionably had reasonable belief justifying "a relatively short delay."[7] The officers' belief was proven to be not only reasonable, but accurate; as officers encountered the Decedent lying on a couch, facing the door, and pointing a loaded firearm. In this case all of the officers' actions complied with current federal and state law and summary judgment is appropriate on all claims.

## II.    THE UNDISPUTED FACTS.

### A.    THE PARTIES.

#### 1.    Plaintiff.

Plaintiff is the mother of the Decedent and is suing in both her individual capacity and as the special administrator of the Decedent's estate.[8] At the time of his death, Decedent was

---

[3] FAC at ¶20. *See e.g., Wilson v. Arkansas*, 514 U.S. 927 (1995) (The knock-and-announce rule is a common law principle, incorporated into the Fourth Amendment, that requires law enforcement officers to announce their presence and purpose before entering a residence to execute a search or arrest warrant, unless there are exigent circumstances.)

[4] FAC at ¶¶28-29.

[5] *Id.*

[6] *U.S. v. Combs*, 394 F.3d 739, 744 (9th Cir. 2005) (citing *U.S. v. Banks*, 540 U.S. 31, 35-39 (2003)).

[7] *Id.*

[8] FAC at ¶2.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC: 14687-428 (#5866484.2)

an unemployed 19-year-old high school graduate who was on probation for vehicle theft.[9] On December 21, 2021, City of North Las Vegas Police Department executed a warrant on plaintiff's home in response to Decedent's criminal activity,[10] but plaintiff had already kicked decedent out of her home due to his criminal activity[11]. Plaintiff has no personal knowledge about the actual shooting.[12]

### 2. **Defendants.**

Defendants are LVMPD, a municipality in Clark County, Nevada[13], and seven individual LVMPD SWAT officers.[14] The following summarizes each individual defendant's role in the subject event:

- Lt. O'Daniel was the SWAT lieutenant and the unit's tactical commander.[15] Lt. O'Daniel had COVID and was not present during the service of the search warrant.[16] As the SWAT commander, she was responsible for approving the SWAT Assistant Team Leader's tactical plan and approved the officers' use of two Noise Flash Diversionary Devices ("NFDDs").[17]

- Russell Backman ("Sgt. Backman") was one of two SWAT sergeants present for the execution of the warrant.[18] He was in training under the SWAT Team Leader, non-party Sgt. Garth Findley ("Sgt. Findley").[19] He was the fourth SWAT officer to enter the Apartment and used deadly force against the Decedent.

- Ofc. Kubla was the first SWAT officer to enter the Apartment. The Decedent shot Ofc. Kubla in the right arm, left arm, and right hip.[20] (He was also shot in the chest, but his ballistic vest stopped the bullet.) Ofc. Kubla used deadly force against Decedent.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

---

[9] Alexander Deposition at 29:19-33:1, 36:5-17, 40:4-10, 43:15-21; **Exhibit A**.

[10] *Id.* at 42:19-43:14.

[11] *Id.* at 36:9-38:2.

[12] *Id.* at 58:13-19.

[13] FAC at ¶3.

[14] FAC at ¶¶4-10.

[15] O'Daniel Deposition at 13:21-14:21, **Exhibit B**.

[16] *Id.* at 28:17, 35:21-36:5.

[17] *Id.* at 37:21-38:2, 42:6-43:21.

[18] Backman Deposition at 33:1-37:8, **Exhibit C**.

[19] *Id.* at 33:1-8, 49:15-25, 103:14-104:4; Findley Deposition at 6:8-18, **Exhibit D**.

[20] Kubla Deposition at 65:19-75:3; **Exhibit E**.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

- Brice Clements ("Ofc. Clements") was the second SWAT officer to enter the Apartment.[21] He used deadly force against the Decedent and was grazed by one of Decedent's bullets.[22]

- Alex Gonzales ("Ofc. Gonzales") was the fifth SWAT officer in the stack that entered the Apartment.[23] He used deadly force against the Decedent.

- James Bertuccini ("Ofc. Bertuccini") deployed an NFDD from a "stun stick" through the Apartment's back window to distract any occupants before the other officers made entry.[24] Ofc. Bertuccini *did not* use deadly force or fire his weapon.[25]

- James Rothenburg ("Ofc. Rothenburg") provided cover for Ofc. Bertuccini while he deployed the NFDD.[26] At least one of the Decedent's rounds struck Ofc. Rothenburg's protective shield causing Ofc. Rothenburg to return fire.[27]

## B.    THE SUBJECT INCIDENT.

### 1.    LVMPD's Homicide Unit obtains a search warrant for the Apartment.

On November 18, 2021, Nicholas Thomas was shot and killed at the Sam's Town Hotel & Casino on Boulder Highway.[28] LVMPD Homicide Detective (non-party) Jarrod Grimmett ("Det Grimmett") was assigned the case. Det. Grimmett identified two suspects using video surveillance and released a Crime Stoppers Notification with a link to the video.[29] Citizen Janetta Rembert contacted the Homicide Bureau, reported one of the suspects was her stepson, Wattsel Rembert ("Rembert") and provided information suggesting the second suspect was Corvell Fisher ("Fisher").[30] Janetta said Rembert and Fisher were staying at the

---

[21] Clements Deposition at 84:18-85:14; **Exhibit F**.

[22] *Id.* at 51:2-7.

[23] Gonzales Deposition at 49:10-16-51:7; **Exhibit G**.

[24] Bertuccini Deposition at 42:18-44:4; **Exhibit H**.

[25] *Id.* at 161:8-10.

[26] Rothenburg Deposition at 56:4-10; **Exhibit I**.

[27] *Id.* at 86:11-91:2.

[28] 1/7/22 signed Application and Affidavit for Search Warrant, **Exhibit J**.

[29] *Id.* at p.4.

[30] *Id.* at p.5.

MAC: 14687-428 (#5866484.2)

Apartment with "several other armed, recreational drug users."[31] She also provided social media information showing Fisher holding an assault rifle.[32] During the investigation, Det. Grimmett learned from LVMPD's Gang Unit that Rembert and several others were involved in a separate December 18, 2021 gang-related shooting in the same complex as the Apartment. Rembert fired 20 rounds from a submachine gun in that separate shooting.[33] During that investigation, LVMPD Gang Unit officers recovered a MP5 submachine gun from the floorboard of Rembert's vehicle.[34] All of this information would eventually be relayed to the SWAT team.

In late December 2021, Det. Grimmett drafted a high-risk search warrant[35] for the Apartment. Due to the considerable danger associated with the service, Det. Grimmett requested "a nighttime service . . . [because] there would be a lower amount of citizen's outside, which would also reduce the risk of injury to those citizens in the surrounding area."[36] The warrant acknowledged "[t]his is NOT a no-knock warrant"[37] and sought the seizure of the following property: (1) any and all firearms; (2) firearms related paraphernalia to include ammunition, cartridge cases, holsters, magazines, gun boxes, gun parts, paperwork, and/or cleaning kits; (3) cellular phones; (4) electronic surveillance equipment; (5) clothing; and (6) limited personal property to establish identity and control of the premises.[38] The warrant was approved by District Attorney Pam Weckerly and signed by Eighth Judicial District Court Judge Linda Bell.[39] On January 7, 2022 after the Homicide Bureau conducted additional surveillance on the Apartment, Detective Grimmett re-submitted the same search warrant.

---

[31] *Id.*

[32] *Id.*

[33] *Id.*

[34] *Id.* at pg. 5-6; *see also,* Findley Depo. at 98:3-10, Ex. D.

[35] "A high-risk search warrant is a writ authorizing law-enforcement officers to make a search that may involve potential violence directed at the officers." *See Cook v. City of Minneapolis*, 2007 WL 1576122, *1 (D. Minn. May 31, 2007).

[36] 1/7/2022 Search Warrant at pgs. 5-6, Ex. J.

[37] *Id.* at p. 6.

[38] *Id.* at pgs. 1-2.

[39] 12/31/2021 Search Warrant at p. 7, **Exhibit K**.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    District Attorney Weckerly again approved the warrant and a different district court judge,

2    Michael Villani, signed it.[40] This lawsuit does not contest the legality of the search warrant.[41]

3        Because the warrant was high-risk due to the substantial potential for violence,

4    LVMPD policy required that SWAT serve the warrant.[42] LVMPD's SWAT Manual defines a

5    search warrant as "high-risk" when "there may be a confrontation involving; the need for

6    forced entry, a suspect possessing exceptional weaponry, a suspect who has  a documented

7    violent history, involving a fortified structure, or other situations that may exist that require

8    specialized personnel, training, and/or equipment."[43] Per LVMPD policy, Detective Grimmett

9    then drafted an Incident Action Plan ("IAP"). An IAP provides reasonable articulation for the

10   necessity of a SWAT search warrant service and provides intelligence to SWAT leadership

11   so that decisions can be made on the appropriate tactics to use based on the circumstances of

12   each case.[44]

13       **2.**    **SWAT agrees to serve the warrant.**

14           **a.**    **The IAP.**

15       Pursuant to LVMPD policy, before SWAT agrees to serve a high-risk search warrant,

16   the SWAT Commander must review the Application and Affidavit for Search Warrant, the

17   actual search warrant, the IAP, and "[a]ny special concerns or recommendations."[45] In this

18   case, non-party Captain Brian Cole ("Cpt. Cole") reviewed the IAP.[46] Cpt. Cole rejected the

19   first three proposed IAPs as they were not on the proper template. On January 9, 2022, Cpt.

20   Cole approved the IAP and confirmed SWAT service.[47]

21

22

23   _____

24   [40] 1/7/2022 Search Warrant at p.7, Ex. J.

25   [41] *See generally* plaintiff's FAC.

26   [42] LVMPD SWAT Manual (selected pages) at p. 12, **Exhibit L**.

27   [43] *Id.* at Policy 3.14 at p. 42, Ex. L.

28   [44] Incident Action Plan, **Exhibit M**.

[45] Policy 9.01 at p. 108, Ex. L.

[46] O'Daniel Depo. at 98:5-15, Ex. B.

[47] Incident Action Plan, Ex. M.

         MAC: 14687-428 (#5866484.2)

The IAP informed SWAT of the Sam's Town homicide and the information connecting Rembert and Fisher to the crime.[48] It included the suspects' significant criminal histories and the fact "Fisher was observed on Facebook possessing numerous firearms."[49] Further, the IAP characterized the Apartment as a "flop house" where "different people come and go from the property."[50] The IAP stressed "[i]t is believed that firearms would be present . . . Fisher is observed on Facebook with different firearms" and "an MP5 styled rifle was recovered in a search warrant from a car registered to Rembert" and that "[b]oth Fisher and Rembert have been observed with high caliber rifles."[51] Also, the IAP noted "the use of patrol [officers] and or Major Violators [officers] was not viable due to the high propensity of violence that could occur and SWAT is trained and equipped for warrant service."[52] Finally, the IAP stressed exigency existed to serve the warrant due to the dangerousness of the involved individuals and recommended an early morning service raid "would be greatly beneficial for safety reasons."[53] None of the named defendants played any role or had any participation in the creation or approval of the IAP.

b.    **SWAT accepts service of the warrant and formulates a plan.**

After approval of the IAP, the SWAT team took over the service of the warrant. The SWAT team knew the following information:

- The warrant was deemed high-risk.

- The warrant involved a violent homicide investigation where the murder weapon was still outstanding.

- The Apartment was a gang "flophouse" where the occupants were likely armed and dangerous.[54]

---

[48] *Id.* at LVMPD 001603.

[49] *Id.*

[50] *Id.* at LVMPD 001608.

[51] *Id.* at LVMPD 001609.

[52] *Id.* at LVMPD 001611.

[53] *Id.* at LVMPD 001613.

[54] 1/7/2021 Search Warrant at pg. 5-6, Ex. J; O'Daniel Depo. at 54:11-18, Ex. B.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

- Suspect Fisher had social media posts where he brandished firearms.[55]

- Suspect Rembert had recently participated in a shooting in the same 3050 S. Nellis apartment complex where he fired 20 rounds from an MP5 submachine gun.[56]

- Both suspects had significant criminal histories.

- Two neutral magistrates separately agreed to the high-risk nature of the warrant and the appropriateness of the nighttime service.

Non-party Sgt. Findley was assigned the Team Leader assignment and non-party officer Jacob Werner ("ATL Werner") was named the Assistant Team Leader ("ATL").[57] Sgt. Backman, a SWAT sergeant in training, assisted with the service planning under Sgt. Findley's supervision.[58] At the time, Sgt. Backman had just been assigned to SWAT and was still waiting on attending LVMPD's SWAT school which was scheduled for later in the year.[59] Still, Sgt. Backman had significant training and experience serving warrants.[60] LVMPD did not have a policy prohibiting Sgt. Backman's supervised involvement despite his not attending SWAT school.[61] And Lt. O'Daniel was comfortable with Sgt. Backman's participation due to his significant experience.[62]

ATL Werner created the service plan.[63] He first ordered reconnaissance of the apartment complex.[64] After conducting reconnaissance, Sgt. Backman, ATL Werner, and the reconnaissance team met and discussed the best and safest method to serve the search warrant. Per the LVMPD SWAT Manual, the team had three service options[65]:

---

[55] Incident Action Plan at LVMPD 001603, Ex. M.

[56] O'Daniel Depo. at 49:14-52:7, Ex. B.

[57] Findley Depo. at 6:8-18 & 40:14-21, Ex. D; Backman Depo at 33:1-35:9, Ex. C.

[58] Backman Depo. at 33:1-14, Ex. C.

[59] *Id.* at 113:3-114:5.

[60]*Id.* at 15:9-16:9

[61] *Id.* at 117:23-118:8 (likewise there is no constitutional requirement that a peace officer undergo "SWAT School" before serving a search warrant).

[62] O'Daniel Depo. at 39:21-42:21, Ex. B; Findley Depo. at 42:11-44:22, Ex. D.

[63] O'Daniel Depo. at 37:21-38:2, Ex. B.

[64] Backman Depo. at 34:4-37:8, Ex. C.

[65] SWAT Manual, Procedure 9.01 at pp. 108-111, Ex. L; Findley Depo. at 38:23-40:6, Ex. D.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

- **Surround and Call Out ("SACO") -** The SWAT team surrounds and establishes containment of the target location before attempting to contact the occupants. Its design is to facilitate a subsequent callout of those occupants in a controlled manner.

- **Control Entry Tactic ("CET") -** This is a dynamic entry "and is a viable and time-prove option." The tactic is used "to lessen the risks, and to enhance officer, citizen and suspect safety." The tactic is designed to surprise and overwhelm the suspects, and to quickly take them into custody and thereby prevent them from taking up arms, hardening their defensive position, fleeing the premises and possibility endangering others, harming hostages or destroying evidence. A CET is designed to surprise and overwhelm occupants "which can be very effective in de-escalating a possible violent situation." Entry is made after the officers have identified themselves and advised occupants of the search warrant "and a lawful right to be on the premises." A CET is allowed during a warrant for property if there is a threat of an armed and dangerous subject inside.

- **No-Knock Search Warrant –** A no knock warrant is only allowed "for felony offenses that involve significant and imminent threat to public safety and will not be used for the preservation of evidence. It must be approved by the SWAT Commander, a Deputy Chief, and approved by a magistrate.

After discussion, Sgt. Findley, Sgt. Backman, and ATL Werner all agreed a CET entry the best option.[66] Although the team first considered a SACO, it determined a CET the better option due to the significant safety concerns involved.[67] First, the officers noted their inability to get an armored BearCat vehicle into position to cover the windows and doors of the Apartment in the event suspects fired out of the Apartment.[68] Second, the layout was not conducive to a SACO due to the close proximity of an ARCO gas station and metal fencing.[69] Third and finally, the assessed likelihood of SWAT encountering armed resistance (which they eventually did) weighed in favor of a CET.[70] The entire chain of command agreed the

---

[66] Backman Depo. at 51:8-52:17, Ex. C.

[67] Findley Depo. at 45:20-47:16, Ex. D; Bertuccini Depo. at 110:13-115:15, Ex. H.

[68] Backman Depo. at 52:2-17, Ex. C.

[69] O'Daniel Depo. at 43:14-45:4, Ex. B.

[70] Backman Depo. at 51:19-54:22, Ex. C.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

1  CET the best option.[71] Per policy, Lt. O'Daniel gave prior approval[72] and she agreed a CET

2  the best option.[73]

3     After agreeing upon a CET entry, ATL Werner planned the service. He recommended

4  having two sets of NFDDs deployed to assist with surprising and disorienting any individuals

5  inside the Apartment.[74] According to LVMPD policy, NFDDs "may be considered whenever

6  the use of a less-lethal diversion would facilitate entry, enable arrest, or potentially reduce the

7  risk of injury."[75] Use of such devices is specifically allowed during high-risk warrant service

8  and situations where the authorizing person "deems their use necessary to safely resolve the

9  incident."[76] Sgt. Findley, Sgt. Backman, and ATL Werner all agreed on using a Def Tec 25[77]

10  NFDD inside the residence and a separate 9-bang distract device outside.[78] LVMPD policy

11  requires officers deploying NFDD's be certified in their application.[79]

12     Because the plan called for deployment of the Def Tec 25 inside the Apartment, ATL

13  Werner ordered the use a "stun stick." A stun stick is a device that holds an NFDD and allows

14  the officer to control the timing and location of its detonation.[80] The purpose of the stun stick

15  is to ensure the NFDD is not thrown blindly into a dwelling as the stick gives the operator

16  "direct control of where that distract body goes."[81] At deployment, the stun stick "is inserted

17  into the window and pushed as high as possible with the room its [sic] being insert[ed] into"

18  to ensure the NFDD "is not detonated within the head or face of people that may be inside the

19

20  [71] O'Daniel Depo. at 41:12-45:4, Ex. B.

21  [72] Id. at 37:21-38:2; 69:8-14, Ex. B; Findley Depo. at 99:23-100:9, Ex. D.

22  [73] See e.g., O'Daniel Depo. at 37:21-38:2; 42:6-46:4 &69:8-14, Ex. B; Bertuccini Depo. at 110:13-111:6, Ex. H; Lt. Beas Depo. at 53:19-55:14, **Exhibit P**.

23  [74] Bertuccini Depo. at 52:16-54:18.

24  [75] SWAT Manual at p. 69, Ex. L; Bertuccini Depo. at 149:11-25, Ex. H; Lt. Beas Depo. at 61:1-63:24 & 65:19-22, Ex. P.

25  [76] SWAT Manual at Policy 11.01 at p.127, Ex. L.

26  [77] Lt. Beas (Rule 30(b)(6)) Depo. at 68:18-24, Ex. P.

26  [78] Backman Depo. at 54:23-56:17; 56:25-61:17, Ex. C.

27  [79] Bertuccini Depo. at 33:9-34:15; 45:9-23, Ex. H.

28  [80] See Photos of Stun Stick, **Exhibit N**.

    [81] Bertuccini Depo. at 37:8-11, Ex. H.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   room."[82] The operator also carries a fire extinguisher should the NFDD malfunction or cause

2   a fire.[83] The nine-banger is a distract device used outside a dwelling to deter any individual

3   from fleeing.[84] The device deploys nine different sounds at half-second intervals.[85] Lt.

4   O'Daniel approved both distract devices and the plan in general.[86] With the plan approved,

5   the SWAT team moved to serve the search warrant.

### c.    The briefing.

7        The SWAT team served the warrant during the early morning on January 10, 2022.

8   On that day, at 4:00 a.m., the SWAT team met in Sam's Town Casino parking lot for a required

9   briefing. ATL Werner conducted the briefing[87] and briefed the team on the search warrant,

10  the address, the Apartment structure, the suspects, the suspects' propensities for violence, and

11  each team members' assignment.[88] The officers learned that although the search warrant only

12  sought property, probable cause existed to arrest the suspects for other violent crimes.[89] [As

13  an aside, SWAT does not typically make arrests. The SWAT team's role is to clear the

14  property, detain anyone inside, and then turn all detained individuals over to the requesting

15  agency (in this case homicide and gangs) to determine what arrests, if any, are to be made.[90]]

16       ATL Werner assigned the team members specific roles. Non-party officer Kai Hoskins

17  received the assignment of breaching the door with a battering ram while non-party officer

18  Jasper Washington provided cover with a ballistic shield.[91] The entry team consisted of

19

20  ────────────────

    [82] LVMPD Stun Stick training at LVMPD 009812, **Exhibit O**.

21  [83] Bertuccini Depo. at 141:1-6, Ex. H.

22  [84] *Id.* at 156:17-157:10.

    [85] *Id.* at 158:16-23.

23  [86] O'Daniel Depo. at 111:23-112:3, Ex. B; Bertuccini Depo. at 52:16-54:18; 148:23-149:25, Ex. H.

24  [87] Kubla Depo. at 64:10-20, Ex. E; Bertuccini Depo. at 109:21-25, Ex. H; SWAT Manual Policy 9.02
    at p. 117, Ex. L.

25  [88] Backman Depo. at 47:18-48:9, Ex. C; Clements Depo. at 44:12-48:4, Ex. F; Rothenburg Depo. at
26  54:13-56:3, Ex. I; Gonzales Depo. at 45:7-47:16, Ex. G; Bertuccini Depo. at 88:16-92:11, Ex. H.

27  [89] Kubla Depo. at 52:11-52:24, Ex. E; Clements Depo. at 39:3-13, Ex. F; Gonzales Depo. at 31:21-
    32:3, Ex. G.

28  [90] Bertuccini Depo. at 98:23-99:12, Ex. H.

    [91] Kubla Depo. at 67:14-21, Ex. E.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  defendants Ofc. Kubla (position #1); Ofc. Clements (position #2); Ofc. Gonzales (position

2  #5); and Sgt. Backman (position #6).[92] Sgt. Backman was assigned announcing the officers'

3  presence via a bullhorn. The plan called for: (1) Sgt. Backman to issue two full

4  announcements, (2) Ofc. Bertuccini to then deploy the stun stick at the rear of the Apartment[93]

5  with Ofc. Rothenburg providing cover,[94] (3) non-party officer Chris Latham to deploy the

6  nine-banger,[95] and (4) after additional commands, Ofc. Hoskins to breach the door.[96] The plan

7  also included takedown officers[97] (at stack numbers 14 and 15), rear containment officers, and

8  a K9 officer.

9         After the briefing, the team drove to the Apartment.[98]

10               **3.    <u>SWAT serves the warrant on the Apartment.</u>**

11               **a.    The officers breach the door and enter.**

12         The SWAT team drove to 3050 S. Nellis and positioned themselves around the target

13  Apartment. Utilizing a bullhorn, Sgt. Backman started the announcements stating:

14         Occupants of 3050 South Nellis, police department, search warrant, 1125,
       police department, search warrant, 1125, Metro police, search warrant.[99]

15  Simultaneously, every member of the stack began yelling, "Police department, search

16  warrant."[100] Six seconds after the announcements began, Ofc. Bertuccini raked the rear

17  window, braking it, and inserted the stun stick holding the NFDD.[101] After breaking the

18  window but prior to deploying the NFDD, Ofc. Bertuccini cleared the area by looking for any

---

[92] *Id.* at 65:22-66:8, Ex. E, Clements Depo. at 84:18-85:14, Ex. F; Gonzales Depo. at 49:17-50:7, Ex. G.

[93] Bertuccini Depo. at 88:4-15, 100:16-24, 101:15-21, 108:10-16, 101:15-21, & 108:10-16, Ex. H.

[94] Rothenburg Depo. at 56:4-10, Ex. I.

[95] Lt. Beas (SWAT Rule 30(b)(6)) Depo. at 69:12, Ex. P.

[96] Bertuccini Depo. at 101:15-21 & 108:10-109:10, Ex. H.

[97] Kubla Depo. at 66:9-11, Ex. E.

[98] Backman Depo. at 61:23-62:8, Ex. C.

[99] Backman BWC at T12:59:55Z, **Exhibit Q**.

[100] *Id.*

[101] Bertuccini BWC at T12:59:44Z, Ex. Q.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

people, shadows, or toys.[102] Officers are trained five feet is a sufficient distance to safely detonate an NFDD.[103] Confident he was not deploying the NFDD over anyone's person or within five feet of anyone (which he was not), Ofc. Bertuccini raised the stun stick high to the ceiling and discharged the NFDD.[104] The NFDD gave the entry team a tactical advantage – especially since the entry team eventually got "hung up on the door."[105] Seconds later, Ofc. Latham deployed a 9-banger distract outside of the Apartment.[106] There is no evidence Decedent was physical harmed by the NFDDs.

Three seconds after Ofc. Bertuccini deployed the NFDD, Ofc. Hoskins began to strike the door with the ballistic ram.[107] Due to a reinforced metal door wrap, it took Ofc. Hoskins five seconds and several strikes to breach the door.[108] Two seconds after the door was breached, Ofc. Kubla made entry into the Apartment.[109] In total, almost seventeen seconds elapsed from the time Sgt. Backman began his announcements until the first officer entered the Apartment.[110]

### b. Decedent fires 18 rounds at the officers and the shooting officers fire back in self-defense.

#### (1) <u>Officer Kubla.</u>

As Ofc. Kubla stepped into the Apartment, he turned to his right, facing a couch in the corner about eight feet away. On the couch, Decedent was laying on his right side, wrapped in a red blanket and pointing a black handgun at Ofc. Kubla.[111] Decedent began firing less

---

[102] Bertuccini Depo. at 141:7-142:5; 145:6-13; 150:21-152:2, Ex. H.

[103] *See* Defendants' Expert Spencer Fomby Depo. at 43:10-20 & 61:2-63:11, **Exhibit R** (NTOA recommends not detonating a stun stick within five feet of an individual); Plaintiff's expert Gregory Gilbertson Depo. at 66:2-13, **Exhibit S**; Lt. Beas Depo. at 68:18-24, Ex. P.

[104] Bertuccini Depo. at 43:7-14; 46:11-21; 142:13-19, Ex. H.

*[105] Id.* at 54:8-18, Ex. H.

[106] *Id.* at 16:17-157:10, Ex. H.

[107] Hoskins BWC at T13:00:04Z, Ex. Q.

[108] *Id.* at T13:00:09Z.

[109] Kubla BWC at T13:00:12Z, Ex. Q.

[110] *See* Plaintiff's Expert Gregory Gilbert's Depo. at 82:1-21, Ex. S (For knock-and-announce purposes, entry is determined when an officer physically enters a domicile).

[111] Kubla BWC at T13:00:13-15Z, Ex. Q.

    MAC: 14687-428 (#5866484.2)

than one second after Ofc. Kubla's entry and fired seven rounds at Ofc. Kubla in less than two seconds.[112] Ofc. Kubla attempted to return fire, but his "body wasn't working."[113] He could see Decedent shooting at him, but his own rifle was not coming up as his arm "was flopping like a fish."[114] Despite being shot several times, Ofc. Kubla was able to prop his arm up and return fire.[115] Eventually, it was learned Decedent's bullets struck Kubla in the left arm, left forearm (shattering his radius bone), right arm, inner thigh, left side, and chest (stopped by his ballistic vest).[116]

### (2)    **Ofc. Clements.**

Ofc. Clements entered the Apartment directly behind Ofc. Kubla.[117] He immediately recognized Decedent was firing and returned fire.[118] Ofc. Clements was struck by ricochet to his right forearm.[119] He fired thirteen rounds at Decedent.[120] After firing, he immediately began to attend to Ofc. Kubla.[121]

### (3)    **Ofc. Gonzales.**

Ofc. Gonzales was the fifth member of the entry team stack.[122] As he approached the door, he could hear gunshots, and when he entered, he saw Decedent firing at the other officers.[123] Ofc. Gonzales fired three rounds at Decedent.[124]

---

[112] *Id.*; *see also* Kubla Depo. at 70:11-71:25, Ex. E.

[113] Kubla Depo. at 72:11-22, Ex. E.

[114] *Id.* at 72:23-73:2.

[115] LVMPD FIT Report at pgs. 37-38, **Exhibit U.**

[116] *Id.* at 97:10-102:7.

[117] Clements' Depo. at 45:20-46:11, Ex. F; Clements BWC at T13:00:11Z, Ex. Q.

[118] Clements Depo. at 50:18-51:22, Ex. F.

[119] *Id.*

[120] Clements BWC at T13:00:15-20Z, Ex. Q; Clements Depo. at 60:5-18, Ex. F.

[121] *Id.*

[122] Gonzales BWC at T13:00:13-20Z, Ex. Q; Gonzales Depo. at 49:17-50:7, Ex. G.

[123] Gonzales Depo. at 69:12-71:4, Ex. G.

[124] Gonzales BWC at T13:0015Z, Ex. Q; Gonzales Depo. at 71:5-9, Ex. G.

*MARQUIS AURBACH*
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### (4)    Sgt. Backman.

Sgt. Backman entered and saw rapid gunfire coming from the muzzle of Decedent's handgun.[125] When Decedent pointed his firearm in Sgt. Backman's direction, the sergeant returned fire.[126] Sgt. Backman fired three rounds at Decedent. After firing his three rounds, Sgt. Backman grabbed another subject, Kwame Crockett, and escorted him to the ground where other officers took him into custody.[127]

### (5)    Ofc. Rothenburg.

Ofc. Rothenburg was positioned at the back window providing cover for Ofc. Bertuccini.[128] As the shooting started, Ofc. Rothenburg moved his shield into place to protect Ofc. Bertuccini.[129] At some point, Decedent fired in the direction of the window and one of his bullets struck Ofc. Rothenburg's shield.[130] In response, Ofc. Rothenburg fired three rounds at Decedent.[131]

### c.    Post-incident.

On-scene paramedics declared Williams deceased. Post-incident, LVMPD's Force Investigative Team ("FIT") investigation found Sgt. Backman fired three times, Ofc. Kubla fired one time, Ofc. Clements fired thirteen times, Ofc. Gonzales fired three times, and Ofc. Rothenburg fired three times.[132] Decedent fired eighteen rounds at the officers and into the occupied upstairs apartment.[133]

---

[125] Backman Depo. at 68:25-69:9, Ex. C; Backman BWC at T13:00:13-20Z, Ex. Q.

[126] *Id.*

[127] Backman Depo. at 122:6-20, Ex. C.

[128] Rothenburg BWC at T13:00-15-35Z, Ex. Q; Rothenburg Depo. at 79:8-82:11, Ex. I.

[129] Rothenburg Depo. at 84:23-85:3, Ex. I.

[130] *Id.* at 86:9-87:5 & 90:8-12; Photos of Ofc. Rothenburg's shield, **Exhibit T**.

[131] Rothenburg Depo. at 90:13-91:2, Ex. I.

[132] LVMPD FIT Report at pgs. 33-38, Ex. U.

[133] Backman Depo. at 26:4-14; 75:4-76:1, Ex. C.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### C.    LVMPD'S CRITICAL INCIDENT REVIEW PROCESS.

As with all LVMPD officer involved shootings, LVMPD thoroughly and critically investigated the subject incident. LVMPD's internal review is called the Critical Incident Review Process ("CIRP"). [134]

#### 1.    Overview of the CIRP.

CIRP involves two separate, but related investigations - the FIT investigation and the CIRT investigation. First, LVMPD's Force Investigative Team ("FIT") investigates whether any crimes occurred.[135] FIT's final report is provided to the Clark County District Attorney and the public in general.[136] Based on the FIT Report, the District Attorney decides whether to press charges against the officers. FIT is exclusively criminal in nature. Second, after FIT is complete, LVMPD's Critical Incident Response Team ("CIRT") investigates the incident and creates a report evaluating the entire event against LVMPD's internal policies, procedures, and training.[137] CIRT determines whether, with the benefit of hindsight, LVMPD's training and policies incorporate the industry's best practices. CIRT is hyper-critical as its task is to ensure LVMPD is operating at the highest law enforcement standards and exceeding constitutional requirements.[138] Because CIRT investigators are not legally trained or constitutional scholars, they are not qualified to determine whether the involved officers violated the Constitution.[139] CIRT only decides whether the officers acted within LVMPD's policy and training. Still, CIRT may consult individuals with legal training (and it did so in this case).[140] After CIRT finishes its investigation, it creates a CIRT Report that includes conclusions and recommendations.

---

[134] Rader (Rule 30(b)(6)) Depo. at 16:6-21:5, **Exhibit V**.

[135] *Id*. at 21:2-30:5.

[136] FIT Report, Ex. U.

[137] Rader Depo. at 21:9-11, Ex. V; Justin Roth (Rule 30(b)(6)) Depo. at 29:6-33:3; **Exhibit W**.

[138] Rader Depo. at 74:4-76:19, Ex. V.

[139] Roth Depo. at 255:15-256:12, Ex. W.

[140] *Id*. at 34:13-38:18; 43:8-18; 50:15-22.

    MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

After the CIRT Report is completed, the next step in the CIRP process is a two-part hearing overseen by LVMPD's Office of Internal Oversight.[141] The first part is the Use of Force Review Board ("UFRB").[142] The UFRB is comprised of officers and citizens who look solely at whether the officers' use of force was reasonable at the moment it was used.[143] UFRB evaluates only the actions of the officer(s) who used deadly force and determines whether the force, at the moment it was used, was reasonable.[144] The UFRB does not address tactical issues and does not evaluate policy. After the UFRB, the Tactical Review Board ("TRB") meets and determines whether any "policy training failure[s]" exist with respect to the tactics utilized by the officers.[145] The TRB evaluates the tactics employed during an officer involved shooting and evaluates the performance of any employee involved.[146] The TRB then accepts, rejects, or modifies CIRT's findings and presents them to the Sheriff.

## 2.    CIRP and the subject case.

CIRT detective Justin Roth ("Det. Roth") performed a thorough and exhaustive review of the Isaiah Williams case. In fact, plaintiff's expert, Gregory Gilbertson ("Expert Gilbertson"), essentially plagiarized the CIRT Report in drafting his own expert report.[147] In evaluating the case, CIRT consulted several subject matter experts with SWAT experience and an individual with legal training - Anthony Bandiero ("Mr. Bandiero") a senior legal instructor with a company called Blue to Gold.[148] Mr. Bandiero conducted a high-level and general analysis of the United States Supreme Court and Nevada Supreme Court cases to provide "his legal opinion on the 'knock and announce'" rule.[149] Mr. Bandiero opined the knock-and-announce rule is designed to give an occupant a reasonable amount of time to

---

141 Rader Depo. at 31:11-20, Ex. V.

142 Roth Depo. at 247:21-248:7, Ex. W.

143 *Id.*

144 Rader Depo. at 17:21-19:24, Ex. V; Roth Depo. at 247:21-248:7, Ex. W.

145 Rader Depo. at 19:25-20:21, Ex. V.

146 *Id.*

147 Gilbertson Depo. at 28:1-31:17; 76:14-21, Ex. S.

148 Roth Depo. at 34:19-35:10, 38:2-6; Ex. W.

149 *Id.* at 36:2-7; 43:13-18; 46:20-48:25.

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

submit to the service of a search warrant "to save his door."[150] Det. Roth noted Mr. Bandiero's interpretation of the rule was "not in [LVMPD's] polices, and procedures."[151] As discussed in detail below, Mr. Bandiero's legal opinion is flawed and overly simplistic as the principles he espoused only apply to generic knock-and announce entries lacking any exigency. When exigencies - such as the potential for violence exist - standard knock-and-announce principles "give way" to such concerns as officer safety and evidence preservation[152] Several SWAT subject matter experts did not agree with Mr. Bandiero's opinions.[153] CIRT acknowledged the differing opinions regarding knock-and-announce requirements in the report.[154] However, CIRT relied heavily on Mr. Bandiero's incorrect position.

After conducting its fact-finding mission, CIRT created a report. In the report, CIRT found the shooting officers used reasonable force.[155] CIRT was critical of portions of the homicide detectives' investigation and SWAT's pre-shooting actions. CIRT made twenty-nine findings and conclusions on these issues. Relevant to this litigation, CIRT made the following criticisms:[156]

- CIRT was concerned Sgt. Backman had not attended SWAT school. Still, it found he did not violate LVMPD's tactics, training, or policy because he was willing to attend - the school just had not been offered yet. CIRT recommended a new policy making the training available sooner to new officers joining SWAT.[157]

- Although LVMPD's SWAT Manual allowed SWAT to conduct a CET entry, CIRT found in this case it was not appropriate *per LVMPD policy* given the amount

---

[150] *Id.* at 54:2-9. Mr. Bandiero's quote "save his door" comes from *U.S. v. Banks*, 540 U.S. at 41.

[151] *Id.*

[152] *See Banks,* 540 U.S. at 36 ("the obligation [to give time to "save his door"] gives way when officers 'have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile . . .'") (quoting *Richards v. Wisconsin*, 520 U.S. 385, 394 (1997).

[153] Roth Depo. at 43:1-48:5.

[154] *Id.* at 46:1-10.

[155] Rader Depo. at 217:21-218:5, Ex. V.

[156] CIRT issued other opinions regarding the homicide investigation, the search warrant application, and IAP process. However, none of the individuals involved in those events are named defendants.

[157] Roth Depo. at 226:4-227:2, Ex. W.

of unknowns associated with the Apartment including whether there were children, elderly or vulnerable individuals present.[158]

- CIRT noted a dispute between various subject matter experts as to whether the timing of the SWAT team's entry complied with knock-and-announce principles.[159]

- CIRT found the use of CET did not comply with LVMPD's standards as it conflicted with a strict reading of knock-and-announce language.[160]

CIRT's findings were then presented to the UFRB and TRB.[161] The UFRB also found the officers used reasonable force. The TRB reviewed CIRT's twenty-nine findings and recommendations and validated twenty-two, modified five, and overturned two.[162] The Sheriff agreed and approved TRB's findings.[163] Relevant to this lawsuit, the following findings were made:

- TRB identified a policy failure by LVMPD only holding SWAT school once a year. Since SWAT school had yet to be offered, and Sgt. Backman was willing to attend, he was found to be within policy but a policy change was needed.[164]

- TRB concluded SWAT's decision to use a CET entry was a policy and training failure and not within LVMPD's standards. The board found the CET to be reasonable, but not the best practice. SWAT's policy was changed to only allow CET entries during no-knock warrants. TRB found the CET was not the best tactic due to unknown factors such as whether children or vulnerable persons were present.[165]

- TRB found SWAT's manual allowed for SWAT to conduct a CET for property when (like here) a threat of armed or dangerous subjects existed.[166]

- TRB had an internal dispute as to whether the use of the CET conflicted with knock-and-announce requirements.[167] TRB ultimately concluded the use of the

---

[158] *Id.* at 227:3-228:22. (Despite this criticism it is undisputed that no children, elderly or vulnerable individuals present in the Apartment.)

[159] *Id.* at 46:1-10.

[160] *Id.* at 229:18-231:14.

[161] *Id.* at 17:5-20:21.

[162] *Id.* at 56:15-57:1.

[163] *Id.* 61:7-22.

[164] *Id.* at 89:6-94:4.

[165] *Id.* at 94:5-98:19.

[166] *Id.* at 97:21-98:19.

[167] *Id.* at 105:25-107:3.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

CET during a knock-and-announce "seemed" to not work together.[168] TRB found the six-second wait before inserting the stun stick did not give occupants time to come to the door. TRB found a policy failure in SWAT's internal manual.[169]

As a result of these findings, LVMPD instituted the following new policies and procedures: (1) SWAT school must be offered within two weeks of SWAT transfers[170], (2) CET entries would only be allowed during service of no-knock search warrants[171], and (3) further evaluation was needed regarding the timing of entry on knock-and-announce search warrants.[172]

Currently, per policy, LVMPD does not utilize CET's for property search warrants.[173] However, the National Tactical Officers Association ("NTOA"), the agency that sets SWAT national industry standards, still trains departments across the country to use CET entries during high-risk warrants because they are the "bread and butter baseline tactic for high-risk search warrants."[174] In other words, LVMPD's current policies and procedures are much more conservative and restrictive than the Constitution and current industry standards.

## III.   **LEGAL STANDARDS**

### A.     SUMMARY JUDGMENT STANDARDS.

Under Rule 56 of the Rules of Federal Procedure, "[a] party may move for summary judgment, identifying each claim or defense - - or the part of each claim or defense - - on which summary judgment is sought [and] [t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[175] The purpose of summary judgment "is to isolate and

---

[168] *Id.* at 107:18-19.

[169] *Id.* 108:16-109:6.

[170] *Id.* at 123:2-5.

[171] *Id.* at 126:16-125:13.

[172] *Id.* at125:18-126;10.

[173] Roth Depo. at 196:4-198:22, Ex. W.

[174] Fomby Depo. at 20:24-21:7, Ex. R; Gilbertson Depo. at 21:2-28:23, Ex. S (agreeing NTOA sets industry standards).

[175] Fed. R. Civ. P. 56(a).

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    dispose of factually unsupported claims."[176] The rule, however, is not a "procedural short cut,"

2    but a "principal tool [] by which factually insufficient claims or defenses [can] be isolated and

3    prevented from going to trial with the attendant unwarranted consumption of public and

4    private resources."[177] The moving party bears the initial burden of demonstrating the absence

5    of a genuine dispute as to material fact.[178]

6         According to the Supreme Court, in § 1983 use of force cases, a court should use video

7    evidence when available in deciding reasonableness.[179] And, although a court must "view the

8    facts and draw reasonable inferences 'in the light most favorable to the party opposing the

9    [summary judgment] motion,'" the court need not credit facts "unsupported by the record such

10   that no reasonable jury could believe them, [and] need not rely on those facts for purposes of

11   ruling on the summary judgment motion."[180]

12        "A trial court can only consider admissible evidence in ruling on a motion for summary

13   judgment."[181] However, at the summary judgment stage, district courts can consider evidence

14   with content that would be admissible at trial, even if the form of the evidence would not be

15   admissible at trial.[182] "The focus is on the admissibility of the evidence's contents, not its

16   form."[183]

17

18

19

20

---

21   [176] *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986).

     [177] *Id.*

22   [178] *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

23   [179] *Scott v. Harris*, 550 U.S. 371, 380 (2007); *Hughes v. Rodriguez*, 31 4th 1211, 1218-19 (9th Cir. 2022).

24   [180] *Wilkinson v. Torres*, 610 F.3d 546, 550 (9th Cir. 2010) (quoting *Scott*, 550 U.S. at 378-80).

25   [181] *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002).

26   [182] *See Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) (explaining that at summary judgment, "a party does not necessarily have
27   to produce evidence in a form that would be admissible at trial").

     [183] *Estate of Hernandez-Rojas ex rel. Hernandez v. U.S.*, 62 F. Supp. 3d 1169, 1174 (S.D. Cal. 2014)
28   (first citing *Fonseca v. Sysco Food Servs. of Ariz., Inc.*, 374 F.3d 840, 846 (9th Cir. 2004); and then citing *Fraser*, 342 F.3d at 1036).

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## B.    GENERAL § 1983 AND QUALIFIED IMMUNITY STANDARDS.

Section 1983 is not itself a source of substantive rights, but merely the procedural vehicle by which to vindicate federal rights elsewhere conferred.[184] To make out a prima facie case under § 1983, a plaintiff must show that a defendant: (1) acted under color of law, and (2) deprived the plaintiff of a constitutional right.[185] The officers do not dispute they acted under color of law. Therefore, the first task of this court is to determine whether the defendant officers violated the Constitution.[186] In addition, the officers have raised the affirmative defense of qualified immunity.

"In determining whether an officer is entitled to qualified immunity, [a court] consider[s] (1) whether there has been a violation of a constitutional right; and (2) whether that right was clearly established at the time of the officer's alleged misconduct."[187] The Supreme Court has advised lower courts construing claims of qualified immunity to "not to define clearly established law at a high level of generality."[188] The import of that instruction is, as the Supreme Court has explained, that "doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced."[189] The Supreme Court has explained that "[t]he doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known'."[190] "Qualified immunity gives government officials breathing room to make reasonable but

---

[184] *See Albright v. Oliver*, 510 U.S. 266, 271 (1994).

[185] *See Borunda v. Richmond*, 885 F.2d 1384, 1391 (9th Cir. 1989).

[186] *See Albright*, 510 U.S. at 271.

[187] *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted).

[188] *Plumhoff v. Rickard*, 572 U.S. 765, 729 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)).

[189] *Id.*

[190] *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

    MAC: 14687-428 (#5866484.2)

mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law'."[191]

## IV.    **EVIDENTIARY ISSUES.**

It is anticipated plaintiff's briefing will rely heavily upon LVMPD's CIRP investigation and, particularly, the CIRT report. Throughout discovery, plaintiff operated as if LVMPD's internal investigation findings established a constitutional violation and, therefore, liability is established. Indeed, Expert Gilbertson essentially admits he just copied LVMPD's CIRT report.[192] In actuality, as set forth directly below, LVMPD's internal investigation and its conclusions are not admissible and have no relevance to this case and, therefore, should not be considered in these summary judgment proceedings.

### A.    **EXPERTS AND LAY WITNESSES CANNOT MAKE LEGAL DETERMINATIONS.**

CIRP is designed to facilitate frank and critical discussion regarding LVMPD's internal policies, training, and tactics based upon information learned post-incident. The CIRP's purpose is not to determine the constitutionality or the legality of any officer's action.[193] As discussed above, the CIRT detectives utilized a legal consultant, Mr. Bandiero, to look at potential search and seizure issues.[194] Mr. Bandiero (whose qualifications have never been vetted or disclosed) provided his opinion as to what knock-and-announce rules require. His opinions are plainly legal conclusions. Although, CIRT detectives included these opinions in their report, other subject matter experts strongly disagreed.[195] Any legal opinion by a lay witness and/or expert witness is inadmissible evidence.

Allowing an attorney and/or self-proclaimed expert to determine or opine as to the constitutionality of an officer's actions, would usurp the responsibilities of this court. Courts, including the Supreme Court, regularly hold expert opinions regarding the constitutionality of

---

[191] *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

[192] Gilbertson Depo. at 28:1-31:17; 76:14-21, Ex. S.

[193] Likewise, the FIT detectives make no criminal conclusions and leave the criminal decisions up to the District Attorney.

[194] Roth Depo. at 34:13-35:25, Ex. W.

[195] *Id.* at 46:1-47:25 & 54:2-255:15.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    an officer's actions have no value at the summary judgment stage[196] – especially when video

2    of the event exits.[197] This is because in the context of a § 1983 case, a police-trained witness

3    may discuss professional standards, but cannot state whether the officer did or did not violate

4    the Constitution.[198] The Sixth Circuit has stated that an expert opinion which merely expresses

5    a legal conclusion as to whether an officer's actions were objectively unreasonable is properly

6    excluded because objective reasonableness, the precise legal standard to be used in § 1983

7    excessive force cases, is properly decided by the court.[199]

8         Both the Supreme Court and Ninth Circuit routinely hold that, when the facts are not

9    disputed, the Court is the correct entity to decide whether a constitutional violation occurred

10   – not a retained expert or lay witness.[200] Expert legal conclusions (i.e., opinions on an ultimate

11   issue of law) cannot properly assist the trier of fact to understand the evidence or to determine

12   a fact in issue and thus are not otherwise admissible. Plus, "each courtroom comes equipped

13   with a 'legal expert,' called a judge"[201] Thus, any legal conclusions or opinion regarding the

14   constitutionality of the officers' actions must not be substituted for this Court's own opinion.

15

16   _____

     [196] *See City & Cty. of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015) (simply producing an expert

17   report does not create an issue of fact in Fourth Amendment cases); *see also Lal*, 746 F.3d at 1118
     (recognizing Ninth Circuit precedent prevents "a plaintiff from avoiding summary judgment by simply

18   producing an expert's report that an officer's conduct leading up to a deadly confrontation was
     imprudent, inappropriate, or even reckless.")

19   [197] *See Scott*, 550 U.S. at 378-80; *Hughes*, 31 F.4th at 1218-19.

20   [198]*See Pena v. Leombruni*, 200 F.3d 1031, 1034 (9th Cir. 1999) (holding that trial judge properly
     excluded expert testimony in an excessive force case where the issue was whether the danger posed

21   by the suspect was sufficiently lethal and imminent to justify the use of deadly force and this issue was
     "within lay competence"); *see also Jimenez v. Sambano*, 2009 WL 2382622, *2 (S.D. Cal. July 31,

22   2009) (excluding defendants' use of force expert where the determination of "whether the force
     Defendants used was applied in good faith effort to maintain or restore discipline, or maliciously and

23   sadistically for the very purpose of causing harm" was within the jury's knowledge, did not involve
     complex facts, and ultimately, was a credibility determination for the jury).

24   [199] *DeMerrell v. City of Cheboygan*, 206 Fed. Appx. 418 (6th Cir. 2006) (citing *Berry v. City of Detroit*,

25   25 F.3d 1342 (9th Cir. 1994) ("When the rules speak of an expert's opinion embracing the ultimate
     issue, the reference must be to stating opinions that *suggest* the answer to the ultimate issue or that

26   give the jury all the information from which it can draw inferences as to the ultimate issue.").

     [200] *Sheehan*, 575 U.S. at 616; *Lal*, 746 F.3d at 1118.

27   [201] *Rice v. City of North Las Vegas*, 2009 WL 10710042, *4 n.1 (D. Nev. 2009) (quoting *Burkhart v.
     Wash. Metro. Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997)); *see also Braun v. O'Brien*, 2006

28   WL 8458557, *4 (E.D. Cal. Feb. 27, 2006) (prohibiting attorney expert witness from making legal
     conclusions).

Finally, as set forth below, Mr. Bandiero's opinion is simply wrong under the facts and circumstances of this case. Mr. Bandiero not only provided a very conservative interpretation of the knock-and-announce rule, he also failed to consider the well-established exceptions to the rule. This Court should not permit plaintiff to substitute Mr. Bandiero's (or her expert's) incomplete analysis for its reasoned judgment based on the undisputed facts and law here.

**B.    LVMPD'S INTERNAL FINDINGS ARE IRRELEVANT AND INADMISSIBLE.**

CIRP identified several internal policy and training failures. Plaintiffs took the depositions of Deputy Chief Reggie Rader and CIRT lead investigator Det. Roth regarding LVMPD's CIRP process and the specific findings of this case. Both officers testified the sole purpose of the process is to determine whether LVMPD's internal policies and procedures were violated, and, if so, what better training and tactics could be employed in the future.[202] These internal criticisms are inadmissible for summary judgment purposes, and the Court should disregard any use of CIRP's investigation or conclusions by the plaintiff.

**1.    Policies and procedures do not set the standard of care.**

According to the plaintiff's First Amended Complaint, the officers breached various duties and at least some of those duties are "established by the United States and the Nevada constitutions, federal and law [sic] statutes, *LVMPD internal policies and procedures*, and other industry standards for police conduct."[203] Plaintiff is wrong.

For over 40 years, courts have consistently held that internal policies and findings of policy violations play no role in determining whether a constitutional violation occurred.[204] Administrative policies and procedures do not (and cannot) define whether a constitutional

---

[202] Roth Depo. 255:15-256:12, Ex. W; Rader Depo. at 70:15-19, Ex. V.

[203] FAC at ¶115.

[204] *Case v. Kitsap Cnty. Sheriff's Dep't*, 249 F.3d 921, 930 (9th Cir. 2001) (quoting *Gardner v. Howard*, 109 F.3d 427, 430 (8th Cir.1997) ("[T]here is no § 1983 liability for violating prison policy. [Plaintiff] must prove that [the official] violated his constitutional right ...."); *see also Gagne v. City of Galveston*, 805 F.2d 558, 560 (5th Cir.1986) ("[A]llegations about the breach of a ... regulation are simply irrelevant to the question of an official's eligibility for qualified immunity in a suit over the deprivation of a constitutional right.").

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

violation has occurred. This is a function of the courts.[205] According to the Ninth Circuit, in § 1983 cases, determining whether police officers violated an internal department policy "is not the focus of our inquiry."[206] In short, it is the duty of this Court to determine whether the officers violated the Constitution, and whether the officers violated LVMPD's internal policies and procedures plays no role in that determination. [207]

### 2. CIRP's conclusions, opinions, and recommendations are irrelevant.

Plaintiff cannot rely upon LVMPD's post-incident critical findings to support liability because the findings are inadmissible under Federal Rule of Evidence ("FRE") 403 and FRE 407. The court can only consider admissible evidence in ruling on a motion for summary judgment.[208] Parties seeking admission of evidence on a motion for summary judgment bear the burden of proof to show its admissibility.[209] Subsequent remedial measures taken by a party after an injury or harm allegedly caused by an event, that if taken previously would have made the injury or harm less likely to occur, may not be introduced to prove negligence or culpable conduct.[210] The rationale for FRE 407 is that because remedial measures may be motivated by a desire to exercise the highest care, they should never be considered an

---

[205] *See U.S. v. Caceres*, 440 U.S. 741, 751-52 (1979) (noting that "violations of agency regulations face . . . do not raise any constitutional questions").

[206] *See Case*, 249 F.3d at 929-30 (citing *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995) ("violation of a police department regulation is insufficient for liability under §1983."); *see also Gagne*, 805 F.2d at 560 ("[A]llegations about the breach of a statute or regulation are simply irrelevant to the question of an official's illegibility for qualified immunity in a suit over the deprivation of a constitutional right.")

[207] *Case*, 249 F.3d at 929-30, citing *Davis v. Scherer*, 468 U.S. 183, 194 n.12 (1984) ("Official suit for constitutional violations do not lose their qualified immunity merely because their conduct violates some statutory or administrative provision" unless the statute or regulation violated gives rise to the cause of action brought.); *see also Herring v. Keenan*, 218 F.3d 1171, 1180 (10th Cir. 2000) (finding qualified immunity; "[W]ithout a stronger indication . . . that a reasonable . . . officer . . . would have known that [he] was violating . . . constitutional rights . . . rather than simply violating an internal policy, we cannot say that [the officer] violated [the plaintiff's] clearly established constitutional right. . . .")

[208] *Orr*, 285 F.3d 764.

[209] *In re Oracle Corp. Securities Litigation*, 627 F.3d 376 (9th Cir. 2010).

[210] *See* Fed. R. Evid. 407.

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

admission of culpable conduct.[211] Furthermore, the taking of corrective steps is likely to be overvalued by the jury and prejudicial to the party taking remedial measures.[212] Relatedly, FRE 403 allows courts to exclude relevant evidence if its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.[213] The admission of party's remedial measures would create the exact prejudice that FRE 403 was drafted to prevent.

The Ninth Circuit has held that internal affairs investigations and measures taken as a result of those investigations are remedial measures and thus inadmissible at trial.[214] Earlier this year, the Ninth Circuit issued its precedential *Greer v. Cnty. of San Diego* decision affirming the privileged nature of police departments' internal affairs investigation reports like LVMPD's CIRP's documents, and in so doing, both the majority and dissent acknowledged the remedial purposes inherent in such reports.[215] Moreover, this district has previously reasoned that while such reports are discoverable, the conclusions, opinions, and recommendations therein may not be admissible based on FRE 403 and FRE 407.[216]

Also, such conclusions, opinions, and recommendations are inadmissible lay testimony under FRE 701, as such testimony is not based on personal observations of the

---

[211] *See* Graham, Handbook of Federal Evidence § 407:1 (9th ed.).

[212] *Id.*

[213] *See* Fed. R. Evid. 403.

[214] *See Maddox v. City of Los Angeles*, 792 F.2d 1408, 1417-18 (9th Cir. 1986) (plaintiff tried to use subsequent investigation by department as evidence as liability but Ninth Circuit found department's investigation and opinions "had little probative value."); *Aguilar v. City of Los Angeles*, 853 F.App'x 92, 95 (9th Cir. 2021) (If department findings prompt disciplinary action, policy changes, or the like, then evidence of those subsequent remedial actions is inadmissible.) *Sprecht v. Jensen*, 863 F.2d 700, 701-02 (10th Cir. 1998) (department opinion that officers exercised poor judgment and should be disciplined inadmissible pursuant to Fed. R. Evid. 407); *Tanberg v. Sholtis*, 401 F.3d 1151 (10th Cir. 2005) (evidence that officer violated standard operating procedure and that department attempted to discipline officer inadmissible in civil rights actions due to unfair prejudice); *Herrera v. Aguilar*, 2013 WL 5354518, *3 (W.D. Texas Sept. 24, 2013) (same).

[215] *See Greer v. Cnty. of San Diego*, 127 F.4th 1216, 1224 (9th Cir. 2025).

[216] *Smith v. Casey*, 2008 WL 2570855 at *8 (D. Nev. June 24, 2008) (reasoning that circuit court holdings support the conclusion that opinions and recommendations of internal affairs investigators will not be admissible at trial due to their prejudicial effect and because such proceedings constitute remedial measures under Fed. R. Evid. 407).

MAC: 14687-428 (#5866484.2)

incident and is indistinguishable from expert testimony under FRE 702.[217] In short, the conclusions, opinions, and recommendations made during CIRP are inadmissible pursuant FRE 403, 407, and 701. As a result, plaintiff cannot rely on those materials in opposing summary judgment.

## V.    LEGAL ARGUMENT

### A.    DECEDENT'S § 1983 FOURTH AMENDMENT AND RELATED NEVADA STATE LAW CLAIMS FAIL AS A MATTTER OF LAW (FIRST, THIRD, AND FOURTH COA).

Plaintiff's first and third COA's allege the individual officers violated both the Fourth Amendment and Article 1 Sec. 18 of the Nevada Constitution by both using excessive force and by performing an unreasonable search and seizure. The fourth COA alleges state law assault and battery.[218] The § 1983 claims are held by the Decedent's Estate and are against the individual officers.[219] The analogous state law constitutional and assault/battery claims are part of plaintiff's wrongful death claim and are against all Defendants. Generally, the same legal standards apply to the federal and state law constitutional claims with the only exception being there is no qualified immunity under Nevada state law.[220] And, plaintiff's battery claim is duplicative of her state law excessive force claim.[221]

Although this lawsuit involves an officer involved shooting, it is not a typical excessive force/wrongful death claim. Everyone agrees that, at the moment the shooting officers fired, deadly force was reasonable. Plaintiff's own expert, Gilbertson, agrees the officers "had no choice but to defend themselves".[222] The dispute centers on whether the

---

[217] See id.

[218] FAC at ¶¶48, 52, 75, and 91-99.

[219] See Moreland v. Las Vegas Metro Police Dep't., 159 F.3d 365, 369-70 (9th Cir. 1998); NRS 41.100(3) (In Nevada, only a decedent's estate can pursue claims on behalf of a decedent who suffered an alleged Fourth Amendment violation).

[220] See Mack v. Williams, 522 P.3d 434, 442, 451 (Nev. 2022) (the standard governing the claim mirrors the federal court analysis of an excessive force claim brought pursuant to the Fourth Amendment but there is no qualified immunity for state law claims).

[221] See Estate of Brenes v. Las Vegas Metro Police Dep't, 136 Nev. 806, *1 (2020) (unpublished) (citing Ramirez v. City of Reno, 925 F. Supp. 681, 691 (D. Nev. 1996) (recognizing that a state-law battery claim is governed by same standard as § 1983 excessive force claim)).

[222] Gilbertson Depo. at 90:3-91:12, Ex. S.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

officers' manner of service of the high-risk warrant violated the Fourth Amendment and Nevada State Constitution and, if so, whether that violation was the proximate cause[223] of Decedent's death. Therefore, the excessive force-based claims are easily disposed of and the focus is whether the officers violated knock-and-announce rules.

### 1. The officers used reasonable force under both the Fourth Amendment and Nevada state law.

The framework governing traditional excessive force claims is well-established in *Graham v. Connor*[224] and its progeny. In evaluating a Fourth Amendment excessive force claim, a court asks "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them."[225] "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation."[226] Reasonableness "must [therefore] be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[227] The Supreme Court has identified three factors that courts should consider in evaluating an officer's use of force: "(1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape."[228] "[W]here a suspect *threatens* an officer [or others] with a weapon such as a gun or a knife, the officer is justified in using deadly force."[229] "If

---

[223] The defendants concede that for summary judgment purposes proximate cause is likely an issue of fact under these circumstances. Therefore, proximate cause is not addressed in this motion. As set forth in detail, the court need not even get to that issue as no constitutional violation occurred.

[224] *Graham v. Connor*, 490 U.S. 386 (1989).

[225] *Id.* at 397 (1989).

[226] *Id.* at 396-97.

[227] *Id.* (citation omitted).

[228] *Id.* at 396.

[229] *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (emphasis added) (collecting cases).

MAC: 14687-428 (#5866484.2)

the person is armed - or reasonably suspected of being armed - a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat."[230]

Here, the officers' use of deadly force, at the moment it was used, is not controversial. Plaintiff's own expert, Gilbertson, agrees the officers "had no choice but to defend themselves" and their use of deadly force meets the *Graham v. Connor* criteria.[231] Therefore, the officers are entitled to summary judgment on the excessive force-based claims and the state law battery claim.[232] This does not end the Court's § 1983 and state law wrongful death analysis. Plaintiff can still prevail on these claims if she can show the officers committed a separate constitutional violation that is the proximate cause of the Decedent's death. As set forth below, she cannot.

> **2.**    **The officers' service of the high-risk search warrant was in complete compliance with federal and state law knock-and-announce requirements.**

> **a.**    ***Mendez v. Cty. of Los Angeles* and the separate constitutional violation doctrine.**

Federal law allows a plaintiff to pursue a wrongful death claim if *a separate constitutional violation* was the proximate cause of a decedent's death - i.e., a wrongful death claim survives if a separate constitutional violation proximately caused the need for otherwise justifiable force.[233] The leading Ninth Circuit case on this issue is *Mendez v. Cty. of Los Angeles*, a case decided on remand from the United States Supreme Court.[234] In *Mendez*, "officers violated the Fourth Amendment by engaging in an unconstitutional [warrantless] entry into the Mendez' home."[235] When they did so, they woke one of the plaintiffs, Angel

---

[230] *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013); *see also Cruz v. City of Anaheim*, 765 F.3d 1076, 1078 (9th Cir. 2014) ("[i]t would be unquestionably reasonable for police to shoot a suspect . . . if he reaches for a gun in his waistband, or even reaches there for some other reason.").

[231] Gilbertson Depo. at 90:3-91:12, Ex. S.

[232] *Ramirez*, 925 F. Supp. at 691 (citations omitted) (police officers entitled to use reasonable force and state law standard "mirrors" federal law standard); accord *Est. of Brenes*, 468 P.3d 368.

[233] *See Mendez v. Cnty. of Los Angeles*, 897 F.3d 1067 (9th Cir. 2018) (although officer's shooting was reasonable under *Graham*, officers still liable if a separate constitutional violation was the proximate cause of the plaintiff's injury).

[234] *Id.*

[235] *Id.* at 1074.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    Mendez, who picked a BB gun up from the futon on which he had been sleeping in order to

2    place it on the floor.[236] Misperceiving Mendez's action as a threat, the officers opened fire.[237]

3    Given the threat reasonably perceived by the officers at the time of the shooting, the plaintiffs

4    did not have a claim for excessive force.[238] Nonetheless, the plaintiffs were able to recover for

5    their shooting-related damages to the degree that they were proximately caused by the

6    unwarranted entry.[239] The Court reasoned "[a] § 1983 claim creates a species of tort liability,

7    with damages ... measured in terms of 'compensation for the injury caused to plaintiff by

8    defendant's breach of duty.'"[240] "Under this analysis, [courts] must first determine what act

9    or omission constituted the breach of duty and then ask whether that act was the but-for and

10   proximate cause of the plaintiff's injuries."[241] "[P]laintiffs can - subject to qualified immunity

11   - generally recover damages that are proximately caused by any Fourth Amendment

12   violation."[242] "[T]he touchstone of proximate cause in a § 1983 action is foreseeability."[243]

13   An unannounced, unconsented-to entry coinciding with a physical struggle makes

14   confrontation with other residents foreseeable. Indeed, "the risk of injury posed by the entry

15   of an armed stranger into a residence is one of the reasons the Fourth Amendment prohibits

16   entry except under defined specific conditions."[244]

17          Therefore, the primary issue here is whether the officers unconstitutionally served the

18   search warrant in a manner that proximately caused the Decedent's death.

19

20

21

22   _____

23   [236] *Id.* at 1072.

     [237] *Id.*

24   [238] *Id.* at 1072-73.

25   [239] *Id.* at 1076-79.

     [240] *Id.* at 1074.

26   [241] *Id.*

27   [242] *Cty. of Los Angeles v. Mendez*, 581 U.S. 420, 430-31 (2017).

28   [243] *Mendez*, 897 F.3d at 1076.

     [244] *Id.* at 1077.

**b.    Relevant Fourth Amendment and Nevada state knock-and-announce law.**

Federal and Nevada state courts evaluate the reasonableness of the service of a search warrant by examining the totality of the circumstances.[245] In *Wilson v. Arkansas*, the Supreme Court "held that the Fourth Amendment incorporates the common law requirement that police officers entering a dwelling must knock on the door and announce their identity and purpose before attempting forcible entry."[246] Since *Wilson*, courts have reiterated that the knock-and-announce principle is part of the totality of the circumstances reasonableness inquiry rather than a prerequisite for constitutional entry.[247] Both federal and Nevada law have codified a form of the knock-and-announce rule. 18 U.S.C. § 3109 provides that in executing a search warrant, a police officer "may break open any outer or inner door or window of a house, or any part of a house, or anything therein ... if, after notice of his authority and purpose, he is refused admittance."[248] Nevada has codified § 3109 at NRS 179.055.[249] Nevada law is interpreted identical to federal law.[250] Instead of setting bright-line, rigid knock-and-announce rules, the Supreme Court has "treated reasonableness as a function of the facts of cases so various that no template is likely to produce sounder results than examining the totality of the circumstances in a given case" because "it is too hard to invent categories without giving short shrift to details that turn out to be important in a given instance, and without inflating marginal ones."[251] Based on current case law, knock-and-announce search warrant services can be separated into three  categories: (1) standard service; (2) "no-knock" service; and (3) "high-risk" service.

---

[245] *U.S. v Banks*, 540 U.S. 36, 41 (2003); *Zabeti v. State*, 96 P.3d 773, 776 (Nev. 2004).

[246] *Wilson v. Arkansas*, 514 U.S. 927 (1995); *U.S. v. Granville*, 222 F.3d 1214, 127 (9th Cir. 2000).

[247] *Banks*, 540 U.S. at 35-36 (noting that the Court has "fleshed out" the option of reasonable execution on a "case-by-case" basis "largely avoiding categories and protocols for searches.").

[248] 18 U.S.C. § 3109 (2000).

[249] NRS 179.055(1) provides: "The officer may break open any outer or inner door or window of a house, or any part of the house, or anything therein, to execute the warrant, if, after notice of his authority and purpose, he is refused admittance."

[250] *Zabeti*, 96 P.3d at 776-77 (indicating Nevada law mirrors federal law).

[251] *Banks*, 540 U.S. at 36; *see also Richards v. Wisconsin*, 520 U.S. 385 (1997) (rejecting categorial exception to the knock-and-announce requirement and favoring case-by-case analysis).

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    The first category, the standard search warrant service, involves the service of a

2   warrant "in the case with no reason [for the officers] to suspect an immediate risk of frustration

3   or futility in waiting at all."[252] During the service of such a warrant, the officers should provide

4   sufficient time "to give a person inside the chance to save his door."[253] In the second category,

5   the "no-knock" warrant service, the police must have a reasonable suspicion that knocking

6   and announcing their presence, under the particular circumstances, would be dangerous or

7   futile, or that it would inhibit the effective investigation of the crime.'"[254] *The "showing [for*

8   *a no-knock warrant] is not high."*[255] The third and final type, the high-risk warrant service, is

9   a hybrid of standard and no-knock. During a high-risk search warrant, "[t]he standards bearing

10  on whether officers can legitimately enter after knocking are the same as those for requiring

11  or dispensing with knock-and-announce altogether."[256] While officers must knock and

12  announce their presence, the goal that an occupant receive enough time to "save his door"

13  "gives way" to safety and evidentiary concerns.[257] Again, the showing to justify a high-risk

14  warrant "is not high."[258]

15    The seminal case governing high-risk search warrants is the Supreme Court's decision

16  in *U.S. v. Banks*.[259] In *Banks*, federal and local law enforcement officers executed a search

17  warrant for cocaine in the two-bedroom apartment of a man they suspected was selling cocaine

18  from his home. After arriving at about 2:00 p.m., on a Wednesday afternoon, the officers

19  posted on the front, called out "police search warrant", and knocked loudly on the front door.

20  After waiting 15 to 20 seconds with no answer, the officers broke open the front door with a

21

22  [252] *Id.* at 41.

23  [253] *Id.*

    [254] *Richards*, 520 U.S. at 394.

24  [255] *Id.* (emphasis added); *see also Hinton v. Clark Cnty. by and through Las Vegas Metro. Police Dept.*,

25  2005 WL 8161410, *11-12 (D. Nev. May 12, 2005) (deference to officer's discretion is seeking a no-
    knock warrant).

26  [256] *Banks*, 540 U.S. at 31 (2003).

27  [257] *Id.* at 36.

    [258] See fn. 255.

28  [259] *Id.* at 31.

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  battering ram. Banks testified that he was in the shower and did not hear the officers knock-

2  and-announce their presence. The officers found weapons, crack cocaine, and other evidence

3  of drug dealing. Banks moved to suppress the evidence, arguing that the officers waited an

4  unreasonably short time before forcing entry and, thus, violated the knock-and-announce rule.

5  The district court denied the motion, and Banks pled guilty, reserving his right to challenge

6  the search on appeal.[260] The Ninth Circuit reversed and ordered suppression of the evidence.[261]

7  The Supreme Court "granted certiorari to consider how to go about applying the standard of

8  reasonableness to the length of time police with a warrant must wait before entering without

9  permission after knocking and announcing their intent in a felony case."[262]

As an initial matter, the *Banks* Court "start[ed] with a word about standards for

11  requiring or dispensing with a knock-and-announcement, since the same criteria bear on when

12  the officers could legitimately enter after knocking."[263] The Court emphasized that it had

13  "treated reasonableness as a function of the facts of cases so various that no template is likely

14  to produce sounder results than examining the totality of the circumstances in a given case

15  ...."[264] Next, the Court clarified its previous holding that the knock-and-announce "obligation

16  gives way when officers 'have a reasonable suspicion that knocking and announcing their

17  presence, under the particular circumstances, *would be dangerous or futile*, or ... would inhibit

18  the effective investigation of the crime by, for example, allowing the destruction of

19  evidence[.]' "[265]

Moving to the facts of the case, the *Banks* Court importantly recognized that, like a

21  no-knock entry case, "this case turns on the significance of exigency revealed by

22  circumstances known to the officers[.]"[266] As to their exigency, the officers argued that "a risk

23

---

24  [260] *Id.* at 33.

25  [261] *Id.* at 34.

26  [262] *Id.* at 35 (citation omitted).

  [263] *Id.*

27  [264] *Id.* at 36.

28  [265] *Id.* (quoting *Richards*, 520 U.S. at 394) (emphasis added).

  [266] *Id.* at 37.

of losing evidence arose shortly after knocking and announcing" because "the danger of disposal had ripened."[267] Finding it reasonable for the officers to "suspect imminent loss of evidence after the 15 to 20 seconds [they] waited prior to forcing their way," the Court addressed Banks' argument that the 15 to 20 seconds was too short for him to have come to the door.[268] After rejecting Banks' argument as "ignor[ing] the very risk that justified prompt entry," the Court recognized an important distinction between circumstances relevant to a case where officers claim exigent circumstance and those relevant to cases where there is no exigency:

> True, if the officers were to justify their timing here by claiming that Banks's failure to admit them fairly suggested a refusal to let them in, Banks could at least argue that no such suspicion can arise until an occupant has had time to get to the door, a time that will vary with the size of the establishment, perhaps five seconds to open a motel room door, or several minutes to move through a townhouse. In this case, however, the police claim exigent need to enter, and the crucial fact in examining their actions is not the time to reach the door but the particular exigency claimed.
>
> ...
>
> [W]hen circumstances are exigent because a pusher may be near the point of putting his drugs beyond reach, it is imminent disposal, not travel time to the entrance, that governs when the police may reasonably ....[269]

Based upon the officers' claimed exigency of destruction of evidence, the *Banks* Court upheld the officers' 15–to–20–second wait as reasonable and, accordingly, upheld the search as constitutional.[270]

Finally, Ninth Circuit courts evaluating the service of a high-risk warrant have held that "[w]hen evaluating reasonableness, [courts] consider such circumstances as (1) the size and layout of the residence; (2) the time of day; (3) the nature of the suspected offense; (4) the

---

[267] *Id.* at 38.

[268] *Id.* at 38-39.

[269] *Id.* at 39-40.

[270] *Id.* at 40-41.

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

1   evidence demonstrating guilt; and (5) the officers' other observations that would support

2   forced entry."[271]

### c.   The officers' service of the high-risk search warrant complied with federal and Nevada state law.

Both federal and Nevada state law allow for the nighttime service of a high-risk search

warrant if exigent circumstances exist.[272] Exigent circumstances "include when officers 'have

a reasonable suspicion that knocking and announcing their presence [or, presumably,

executing a search during the day], under the particular circumstances, *would be dangerous*

or futile . . .' "[273] Here, the homicide detectives' warrant application specified a legitimate and

particularized concern for the SWAT team's safety. A district attorney and two magistrate

judges agreed. Due to the magistrate's agreement, no legitimate dispute exists whether the

SWAT team reasonably treated the warrant as high-risk.[274]

According to plaintiff, the SWAT team violated the knock-and-announce principles

because (1) the officers failed to physically knock on the door; (2) Sgt. Backman's

announcements were unreasonable; (3) the officers' CET plan utilizing NFDDs violated the

principles because its design was to confuse and disorient occupants, rather than encourage

them "to save his door;" and (4) the officers did not wait a reasonable amount of time after

announcing before entering.[275] Each of plaintiff's arguments is easily refuted.

---

[271] *U.S. v. Banks*, 282 F.3d 699, 703-05 (9th Cir. 2002) reversed on other grounds, 540 U.S. 31, (2003); *U.S. v. Chavez-Miranda*, 306 F.3d 973, 980 (9th Cir. 2002) (internal citation omitted); *Amie v. Cnty. of Los Angeles*, 2015 WL 13916130, *11 (C.D. Cal. Dec. 30, 2015).

[272] *See* NRS 179.045(d) (". . . the warrant be served between the hours of 7 a.m. and 7 p.m., unless the magistrate, upon a showing of good cause therefor, inserts a direction that the warrant be served at any time."); *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1086 (9th Cir. 2011).

[273] *See Estate of Millender v. Cnty. Of Los Angeles*, 2012 WL 3655515, *4-5 (C.D. Cal. Aug. 24, 2012) (emphasis added).

[274] *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'") (citation omitted); *Armstrong v. Asselin*, 734 F.3d 984, 992-93 (9th Cir. 2013) (qualified immunity for officers relying on search warrant); *Amie v. Cnty. of Los Angeles*, 2015 WL 13916130, *11 (C.D. Cal. Dec. 30, 2015) (officer acted reasonably in executing warrant at night because it was "endorsed for nighttime service.").

[275] FAC at ¶20, 21, 23, 25, 26, 28, and 52.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

### (1) **A physical knock on the door is not required.**

Plaintiff first complains the officers only verbally announced and never physically knocked on the door. The parties agree NTOA sets SWAT industry standards.[276] Defendants' expert, Spencer Fomby ("Expert Fomby"), a current NTOA trainer, testified a physical knock is not required.[277] Plaintiff's expert, Gilbertson, testified "I know there's case law . . . that a physical knock is required."[278] Gilbertson is wrong, as there is no law mandating a physical knock on the door. In fact, the case law contradicts him. In *Zabeti*, the Nevada Supreme Court held that yelling " '[p]olice officer search warrant' in a loud voice . . . satisfies the 'knock and announce' requirement" even though the officers in *Zabeti* never physically knocked.[279] This is consistent with federal law. "The focus of the 'knock-and-announce' rule is properly not what 'magic words' are spoken by the police, or whether the police rang the doorbell, but rather on how these words and other actions of the police will be perceived by the occupant."[280] The inquiry is not focused on whether a physical knock occurred, but rather, "what, if any, notice the police gave before entry and the likelihood that the notice alerted those inside the home to the officer's presence and purpose."[281] Thus, "[a] physical knock . . . is not dispositive."[282]

---

[276] Gilbertson Depo. at 71:25-72:20, Ex. S. (Plaintiff's Expert agrees that NTOA sets the industry standards for SWAT, but also admits he is unfamiliar with their standards.)

[277] Fomby Depo. at 31:10-21; 33:2-34:15, Ex. R.

[278] Gilbertson Depo. at 71:25-72:20, Ex. S.

[279] *See e.g., Zabeti,* 96 P.3d at 776-77 (failure to physically knock on the door did not violate 18 U.S.C. § 3109 or NRS 179.055).

[280] *Combs*, 394 F.3d at 744-45 (literal knock not necessary) (quoting *U.S. v. Spikes*, 18 F.3d 913, 925 (6th Cir. 1998)); *see also Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 972 (7th Cir. 2003) (screaming and yelling commands constituted a knock under knock-and-announce principles).

[281] *Id.*; *see also King v. State*, 998 P.2d 1172, 1177-78 (Nev. 2000) (officers substantially complied with state knock-and-announced statue when they "announced their presence by yelling something to the effect of 'Police officer. Search warrant,' prior to penetrating the premises.").

[282] *Combs,* 394 F.3d at 744-45.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    Here, the officers made the decision to announce their presence verbally via

2    bullhorn.[283] According to Expert Fomby, the use of the bullhorn exceeds industry standards.[284]

3    The bullhorn alerted the Apartment that the police were outside and that they wanted entry.

4    Any officer familiar with *Zabeti* would believe Sgt. Backman's use of the bullhorn reasonably

5    complied with "knock-and-announce" principles. Plaintiff may argue an issue of fact exists as

6    to whether the Decedent understood the announcements. However, this does not create a

7    genuine issue of fact as to whether the officers satisfied the purely legal requirements under

8    knock-and-announce case law. Any argument a genuine issue of fact exists as to whether the

9    officers knocked and announced raises only a "metaphysical doubt as to the material facts."[285]

10    **(2)    Sgt. Backman's actual announcements complied with knock-and-announce standards.**

11    Plaintiff next claims Sgt. Backman's actual announcements were unreasonable.[286] Sgt.

12    Backman, using a bullhorn, announced "Occupants of 3050 South Nellis, police department,

13    search warrant, 1125, police department, search warrant, 1125, Metro police, search warrant."

14    Almost simultaneously, every member of the stack team began yelling, "Police department,

15    search warrant." Plaintiff claims Sgt. Backman's failure to announce the apartment number at

16    the start of the announcement is unreasonable. The law does not support this argument. In

17    *Zabeti*, the announcing officer never announced the actual address and only yelled "Police

18    officer search warrant." The Nevada Supreme Court found this announcement satisfied the

19    requirements of 18 U.S.C. § 3109 and NRS 179.055.[287] The more specific announcement here

20    was thus undisputedly sufficiently specific. Again, "[t]he focus of the 'knock-and-announce'

21    rule is properly not what 'magic words' are spoken by the police . . . but rather on how these

22

23

---

24    [283] *See Spikes*, 158 F.3d at 927 (cited favorably in *Combs*, 394 F.3d at 745 (considering the police's bullhorn announcement an important factor in the favor of reasonableness)).

25    [284] Fomby Depo. at 10:20-11:13; 34:2-37:10, Ex. R; *see also* Lt. Beas Depo. at 39:14-17, Ex. P.

26    [285] *Molina*, 325 F.3d at 972 (argument that sleeping individual may not have recognized it was officers announcing not a genuine issue of material fact); *Abdujllah v. Fetrow,* 2007 WL 2844960, *8 (M.D.Pa. Sept. 26, 2007) (same).

27    [286] *See e.g.*, FAC at ¶35(b).

28    [287] *Zabeti*, 96 P.3d at 776-77.

MAC: 14687-428 (#5866484.2)

words and other actions of the police will be perceived by the occupant."[288] In *Banks*, the Ninth Circuit found (and the Supreme Court affirmed) that stating the phrase "police search warrant" was sufficient.[289] Thus, the Supreme Court, Supreme Court of Nevada, and Ninth Circuit all agree that an officer only need to announce the police are outside the door. A specific address and/or apartment number is not required at all, much less at the beginning of an officer's announcement.[290] Sgt. Backman's inclusion of the Apartment number exceeded what the law requires.

### (3)    Use of the CET tactic with NFDDs did not violate knock-and-announce principles for serving high-risk warrants.

Plaintiff's third argument is the officers use of the CET tactic and particularly the NFDDs violated knock-and-announce principles.[291] According to plaintiff, the officers' decision to use the CET and NFDDs contradicted the purpose of knock-and-announce rules because it distracted and confused the Decedent rather than allowing him an opportunity to "save his door." In other words, plaintiff is arguing knock-and-announce and CET entries are incompatible. The Fourth Amendment disagrees.

Despite LVMPD's current internal ban on CET entries, the use of CETs and NFDDs is still trained nationally and is a very common method of serving high-risk knock-and-announce search warrants.[292] The purpose of NFDDs is to surprise and overwhelm occupants to minimize the potential for violence or escape. NFDDs "detonate with a blinding flash of light and a deafening explosion. Their function is to temporarily stun people in a targeted building until police or military personnel can get inside."[293] The Fourth Amendment imposes

---

[288] *Combs*, 394 F.3d at 744-45 (quoting *Spikes*, 158 F.3d at 925).

[289] *U.S. v. Banks*, 282 F.3d 699, 702, 705 (9th Cir 2002), reversed on other grounds, 540 U.S. 31 (2003).

[290] At the very most, the announcements were negligent, and negligence cannot be the basis for a § 1983 claim. *Daniels v. Williams*, 474 U.S. 327 (1986).

[291] FAC at ¶26, 37, 52, 80.

[292] Fomby Depo. 20:24-21:7; 57:16-58:3; 61:2-63:11, Ex. R.

[293] *Terebesi v. Torreso*, 764 F.3d 217, 236 (2d Cir. 2014) (quoting Radley Balko, Flashbangs under Fire, Reason, Feb. 17, 2010).

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

no blanket prohibition on the use of NFDDs during the service of search warrants.[294] NFDDs are reasonable when reliable information exists a residence may be occupied by dangerous individuals who might have access to weapons[295] or "if the subject of the search or arrest is known to pose a high risk of violent confrontation."[296] Only when officers fail to articulate a valid exigency for deviating from standard service rules do the courts frown upon such tactics.[297]

Here, it cannot be reasonably disputed the officers possessed the necessary exigency to justify the CET entry and use of NFDDs. The officers knew they were serving a search warrant in a violent homicide investigation and the murder weapon was still outstanding. In addition, the location was a gang "flophouse" and reliable information existed dangerous and violent individuals (including armed gang members) could be inside. Two separate magistrates agreed the potential for violence justified a nighttime high-risk service. The SWAT team had legitimate concerns about their ability to secure the Apartment adequately and safely due to its location and layout. Due to these exigencies, the element of surprise was particularly important and the use of the NFDDs increased the odds of the SWAT team

---

[294] *See, e.g., U.S. v. Boulanger*, 444 F.3d 76, 84-85 (1st Cir.), cert. denied, 549 U.S. 906 (2006); *U.S. v. Morris*, 349 F.3d 1009, 1012-13 (7th Cir. 2003); *Molina*, 325 F.3d at 973; *U.S. v. Folks*, 236 F.3d 384, 388 n. 2 (7th Cir.), cert. denied, 534 U.S. 830 (2001); *U.S. v. Myers*, 106 F.3d 936, 940 (10th Cir.), cert. denied, 520 U.S. 1270 (1997).

[295] *Molina*, 325 F.3d at 973 (use of flash bang reasonable because Molina had a criminal history that included aggravated assault, was alleged to be the head of a drug distribution organization, was associated with gangs, was home and had access to weapons); *Estate of Escobedo v. Bender*, 600 F.3d 770, 784-85 (7th Cir. 2010); *Dukes v. Deaton*, 852 F.3d 1035, 1044 (11th Cir. 2017) ("In *Boyd*, for example, the Ninth Circuit ruled that the detonation of a flashbang in a room with up to eight bystanders without first looking was unconstitutional, but that the right was not clearly established.").

[296] *Terebesi*, 764 F.3d at 238; *Molina*, 325 F.3d at 973 (suspect had record of aggravated assault and access to weapon). Fomby Depo. at 61:2-63:21, Ex. R.

[297] *Terebesi*, 764 F.3d at 236-39 (collecting cases) (denying qualified immunity to officers who used stun grenades when there was no suggestion that the suspect had immediate access to weapons.); *Est. of Escobedo v. Bender*, 600 F.3d 770, 784-86 (7th Cir. 2010) ("[T]he use of a flash bang grenade is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher.").

executing the warrant safely and effectively. Indeed, the fact Decedent was lying in wait on a couch facing the door with a loaded firearm suggests as much.[298]

The fact the law clearly allowed for the use of NFDDs does not end the Court's analysis. It is also Defendants' burden to satisfy this Court "the officers took all appropriate and available measures to reduce the risk of injury" when using NFDDs.[299] The officers did.

The law requires officers deploy NFDDs in a cautious and safe manner. The seminal NFDD case in the Ninth Circuit is the 1997 case of *Boyd v. Benton County*[300]. In that case, the Ninth Circuit addressed the use of NFDDs during the execution of a high-risk search warrant. The officers executed a search warrant on an apartment where they believed "five to eight people," including "an armed robbery suspect," may have been located.[301] They used "a flash-bang device ... to gain entry and secure the premises."[302] To minimize the risk to "someone sleeping," the officers "determined that the flash-bang should be deployed against the apartment's front wall and near the door."[303] They did just that. Boyd, who was sleeping on the floor, "suffered burns on her forearm" from the flash bang.[304] The Ninth Circuit did not denounce the use of the flash-bang but held that it violated Boyd's right to be free from excessive force.[305] Specifically, the Court held that, "given the inherently dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth Amendment to throw it 'blind' into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury."[306] Still, the Court recognized that there may be "circumstances in which a risk to

---

[298] *See U.S. v. Ankeny*, 502 F.2d 829, 836 (9th Cir. 2007).

[299] *Id.* at 837.

[300] *Boyd v. Benton Cnty.*, 374 F.3d 773 (9th Cir. 2004).

[301] *Id.* at 777.

[302] *Id.*

[303] *Id.*

[304] *Id.* at 778.

[305] *Id.* at 779.

[306] *Id.*

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

officers' safety would make the use of a flash-bang device appropriate."[307] *Boyd* thus established that a NFDD cannot be "blindly" thrown into a room with innocent bystanders "absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury."[308]

In another NFDD case, *U.S. v. Ankeny*[309], the defendant sought to suppress evidence on grounds that law enforcement officers used excessive force in executing a search warrant. Officers had entered a home with a battering ram, threw two flash-bang devices into the home, and shot out windows with rubber bullets.[310] The Ninth Circuit found it a "close question" whether such force was reasonable (and never resolved the issue because "suppression is not appropriate in any event").[311] In favor of reasonableness the Court noted the "[d]efendant had a substantial criminal record, which included violent crimes; there was reliable evidence that he was armed and aggressive; there were several other people in the house, including a former prison inmate; and certain physical characteristics of the house made it difficult to secure."[312] On the other hand, the Court stressed that "the extent of the property damage," and the fact a flash-bang "*seriously injured* a Defendant, weigh in favor of a conclusion of unreasonableness."[313] Thus, the Court clearly acknowledged that use of distraction devices is allowed in serving warrants to distract dangerous occupants. The issue, in *Ankeny*, like *Boyd*, focused on whether "the officers took all appropriate and available measures to reduce the risk of injury here."[314]

---

[307] *Id.*

[308] *Id.*; *Opbroek v. City of Portland*, 2023 WL 4424758, *1 n.1 (D. Or. Apr. 26, 2023) (*Benton* prohibits "blindly" throwing a cannister into a room with known innocent bystanders.).

[309] *See Ankeny*, 502 F.3d at 836-37.

[310] *Id.* at 833.

[311] *Id.* at 837.

[312] *Id.* at 836.

[313] *Id.* (emphasis added).

[314] *Id.* at 837; *see also Ernst v. City of Oregon*, 903 F.Supp.2d 1172, 1183 (D. Or. 2012) (critical of throwing flash-bang blindly into room).

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

The Ninth Circuit decided *Boyd* over twenty-five years ago. Due to *Boyd* and other similar cases, the deployment of NFDDs has significantly evolved, as demonstrated by the facts of this case. Here, the officers used a stun stick - an instrument designed specifically to solve the problem of blind insertion *Boyd* identified. Ofc. Bertuccini waited until after Sgt. Backman's second announcement and then inserted the stun stick through the rear window. Unlike the blind toss in *Boyd*, Ofc. Bertuccini visually cleared the area after inserting the stun stick, but prior to deploying the NFDD, Ofc. Bertuccini then inserted the stun stick pole high enough to touch the ceiling to ensure no one on the ground would be hurt.[315] The stun stick gave Ofc. Bertuccini "direct control of where the distract goes" and when it detonated.[316] The NFDD remained under Ofc. Bertuccini's control always and he did not "blindly" throw the NFDD into the room. All knowledgeable witnesses (including plaintiff's own expert) agree the industry standard suggests five-feet is sufficient distance to safely detonate the NFDD.[317] Importantly, the stun stick gave the entry team a tactical advantage – especially since they got "hung up on the door."[318] Finally, it is undisputed the NFDDs did not cause any injury, which was the precise concern weighing in favor of unreasonableness in *Ankeny*.[319] Expert Fomby testified the NFDD was deployed just as NTOA recommends.[320]

In short, it was reasonable to perform the CET entry with NFDDs and the officers used the NFDDs just as the law requires. There can be reasonable dispute the NFDD's use was reasonable based on Ninth Circuit predicant and the undisputed facts of this case.

---

[315] Bertuccini Depo. at 43:7-14; 46:11-21; 142:13-19, Ex. H.

[316] *Id.* at 37:1-11.

[317] Lt. Beas Depo. at 68:18-24, Ex. P; Gilbertson Depo. at 66:2-13, Ex. S; Fomby Depo. at 43:10-20 & 61:2-63:11, Ex. R.

[318] Bertuccini Depo. at 54:8-18, Ex. H.

[319] *Krause v. Jones*, 765 F.3d 675, 679 (6th Cir. 2014) (reasonable to use flash bang to gain entry into bedroom in which subject of arrest warrant was hiding and had threatened to shoot police. Device gave police a chance to act before suspect could act.).

[320] Fomby Depo. at 62:10-63:21, Ex. R; Lt. Beas Depo. at 91:5-17, Ex. P.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

**(4)** **The SWAT team waited a reasonable amount of time before entering the Apartment.**

Plaintiff's fourth and main argument is the officers, after announcing, did not wait a reasonable amount of time to enter the Apartment.[321] Admitting he does not know industry standards, Expert Gilbertson guessed knock-and-announce principles require individuals have enough time "to wake up, get up out of bed – or wherever they were - and to actually proceed to the door and have an opportunity to make a reasonable effort to identify who was outside their door"[322] and 20-30 seconds would have been reasonable based upon the totality of the circumstances in this case.[323] Expert Gilbertson's opinion is essentially lifted from the opinion of CIRT's legal consultant, Mr. Bandiero.[324] Mr. Bandiero opined the knock-and-announce rule requires occupants have time to "save his door."[325]As already established above, and explained further below, Gilbertson and Mr. Bandiero misunderstand the law when it comes to high-risk warrant service.

**(a)** **The officers did not need to give the Decedent time to "save his door."**

The subject case is the exact situation envisioned by *Banks*, where the obligation to give time to save one's door "gives way" due to a particularized risk of violence. Here, the officers were serving a high-risk search warrant on a gang "flophouse" where the officers had reliable information that firearms, armed and dangerous suspects, and other dangerous gang members might be present.[326] These concerns were validated when the Decedent greeted the entering officers by firing a firearm at them eighteen times. In such situations, the Supreme Court is clear it is the "significance of exigency revealed by circumstances known to the

---

[321] FAC at ¶52; Gilbertson Depo. at 76:21-77:16, Ex. S; *but see Sheehan*, 575 U.S. at 616; *Lal*, 746 F.3d at 1118 (plaintiff cannot avoid summary judgment by simply producing an expert report).

[322] Gilbertson Depo. at 77:8-16, Ex. S.

[323] *Id.* at 77:17-78:4.

[324] Roth Depo. at 54:2-9, Ex. W.

[325] *Id.*

[326] To justify a "no-knock" warrant officers need only the reasonable suspicion that occupants may be a danger to the officers. *See Richards*, 520 U.S. at 394.

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

officers" that governs reasonableness - not saving one's door.[327] In fact, for decades, courts have acknowledged certain exigent circumstances can excuse an entry that would otherwise violate § 3109 and NRS 179.055.[328] Therefore, the real issue is, based upon the facts and circumstances of this case, how much time the officers needed to wait to comply with high-risk search warrant principles.

**(b)    The officers' 16-to-17-second wait time was reasonable.**

The knock-and-announce timing requirement is determined on a case-by-case basis.[329] There is no consensus as to how much time officers must wait before entering a dwelling. However, there is consensus the officers must consider the totality of the circumstances when determining how long to wait.[330] When executing a warrant, a law enforcement officer may break open any outer or inner door or window, if the officer is not admitted inside following an announcement of authority and purpose. Officers can infer constructive refusal to admit from silence, but only after a "significant amount of time."[331] The time elapsed must be reasonable considering the particular circumstances of the situation.[332] Furthermore, police can more readily infer their refused admittance when they have reason to believe the occupants are armed and/or have taken measures to defend themselves.[333]

The *Banks* Court recognized that "this case turns on the significance of exigency revealed by circumstances known to the officers."[334] Based upon the officers' claimed exigency (the destroying of drugs), the *Banks* Court upheld the officers' 15-to-20-second wait

---

[327] *Banks*, 540 U.S. at 37.

[328] *Zabeti*, 96 P.3d at 536 (citing *Banks* favorably).

[329] *See Richards*, 520 U.S. at 392.

[330] *Banks*, 540 U.S. at 31; *Combs*, 394 F.3d at 744.

[331] *Granville*, 222 F.3d at 1218 (internal quotation marks omitted); NRS 179.055.

[332] *See U.S. v. Banks*, 282 F.3d 699, 703-05 (9th Cir.2002); *McClure v. U.S.*, 332 F.2d 19, 22 (9th Cir.1964) (concluding that a 4 to 5 second wait was justified when police heard someone running away from door).

[333] *Spike*s, 158 F.3d at 926-27.

[334] *Banks,* 540 U.S. at 37-38.

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

as reasonable and, accordingly, upheld the search as constitutional.[335] The Supreme Court did not concern itself with whether the occupants had time to answer or "save" the door, but rather the time in which an occupant could frustrate the officer's lawful purpose.[336] In light of *Banks* and other high-risk warrant cases, officers have been held to have complied with knock-and-announce requirements in executing a search warrant for a residence when the entry was made within various amounts of time after a valid announcement, including durations of: 15 to 20 seconds[337]; 10 seconds[338]; five seconds[339]; and four seconds[340]. However, some courts have held three seconds and five seconds to be an insufficient amount of time to wait after an announcement of identity before breaking down a suspect's door. Relevant to our case, the *Banks* Court theorized that "perhaps five seconds" might be sufficient for a small dwelling like the Apartment in this case.[341]

The Ninth Circuit has issued several decisions allowing very short wait periods. In *Jama v. City of Seattle*, the Court held only five to ten seconds after knocking and announcing is reasonable if further delay may be dangerous, futile, or ineffective.[342] In *Howell v. Polk,* the court said waiting only five to ten seconds after knocking and announcing is reasonable where waiting longer may give the occupants a chance to arm themselves.[343] *Milender v. County of Los Angeles* held waiting only two to nine seconds after knocking and announcing before

---

[335] *Id.* at 40-41.

[336] *Id*. at 32, 38-40; Lt. Beas Depo. at 44:23-45:5, Ex. P.

[337] *Banks*, 540 U.S. 31.

[338] *U.S. v. Cline*, 349 F.3d 1276 (10th Cir. 2003).

[339] *State v. Garcia-Hernandez*, 837 P.2d 624 (Wash. App. 1992).

[340] *State v. Kofoed*, 208 P.3d 278 (Idaho 2009) (noting that evidence could have been destroyed if the officers had waited longer).

[341] *Banks*, 540 U.S. at 40 (a time that will vary with the size of the establishment, perhaps five seconds to open a motel room door).

[342] *Jama v. City of Seattle*, 446 Fed.Appx. 865, 866-67 (2011) (holding that an eight to ten second wait was reasonable because occupants of the house were members of a drug conspiracy who constantly used cell phones to communicate any police tip-off, and other occupants of house saw officers before knock-and-announce).

[343] *Howell v. Polk*, 532 F.3d 1025, 1026-27 (9th Cir.2008) (finding that starting to forcibly enter a dwelling five to ten seconds after knocking and announcing and nothing is heard from within the dwelling and the door may be hard to breach, giving time for the occupants to arm themselves, was reasonable).

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  forcibly entering is reasonable if the suspect is dangerous, has a criminal record, and has a

2  history of violence.[344] But in *Bravo v. City of Santa Maria,* it found the forcible entry of law

3  enforcement officers after they waited only three seconds before entering a dwelling to be

4  unreasonable because the suspect was in prison and clearly not at the home.[345]

5      The Ninth Circuit's decisions mirror the Supreme Court of Nevada's holding in *Zabeti*

6  *v. State*. In *Zabeti*, the Court held the entering of a residence by police officers *less than* 10

7  seconds after announcing their presence to execute a search warrant was reasonable under

8  both the Fourth Amendment and Nevada state law.[346] The Court noted the totality of the

9  circumstances must be considered when deciding whether a search was reasonable and

10 stressed the police officers knew the two occupants of the residence had prior arrests, had

11 observed the open garage door and the two-story residence. This information led the officers

12 to reasonably believe if they physically knocked on the door, and prolonged the delay before

13 entering, the officers' safety could be compromised. While the court acknowledged that

14 entering the residence less than 10 seconds after the officers announced their presence was a

15 very brief period of time, the court concluded that it was sufficient given the concerns for

16 officer safety.[347]

17     Turning to this case, the officers clearly met the constitutional requirements for wait

18 time. First, the "significance of exigence" greatly exceeds that of *Banks*. The defendant

19 officers' exigency did not involve losing drug evidence but rather suffering serious injury or

20 loss of life. It cannot be disputed the officers had probable cause to believe they were likely

21 to encounter armed and violent suspects who, due to the small layout of the apartment, could

22 easily arm themselves and harm the officers upon entry.[348] Therefore, if 10-15 seconds was

23 reasonable in *Banks*, that amount of time would certainly be reasonable in this case.

24

25

26  [344] *Milender v. County of Los Angeles*, 620 F.3d 1016, 1022-23 (9th Cir. 2010).

    [345] *Bravo*, 665 F.3d at 1081-82.

27  [346] *Zabeti*, 96 F.3d at 776-77.

    [347] *Id.*

28  [348] *Id.* at 38-40.

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

The parties disagree on two issues: (1) when a court starts counting seconds for entry purposes and (2) when actual entry occurs. Plaintiff claims counting started *after*[349] Sgt. Backman's announcements ended, and entry occurred when Ofc. Bertuccini inserted the stun stick through the window. The Defendants disagree and argue counting started when Sgt. Backman began his announcements and entry occurred when Ofc. Kubla physically entered the Apartment. The law and the evidence support Defendants' position on both disputes.

First, with respect to the start of counting, there is no evidentiary or legal support for plaintiff's position. NTOA trains officers to begin counting at the start of the announcements.[350] Expert Gilbertson candidly admits he does not know the industry standards.[351] Courts agree with the NTOA that counting starts when an officer *begins* to announce the officers' presence.[352] Second, for knock-and-announce purposes, entry means physical entry. The video establishes the stun stick was introduced at about six seconds and that Ofc. Kubla's physical entry occurred at 16 to 17 seconds after the commencement of announcements. Both Expert Gilbertson and Expert Fomby agree that for knock-and-announce determinations, entry occurred when Ofc. Kubla physically entered the Apartment.[353] Expert Gilbertson testified that the stun stick only constituted an "intrusion" and Expert Fomby agreed.[354] Therefore, the issue is whether the physical entry at 16 to 17 seconds was reasonable.

Having established the officers waited 16 to 17 seconds to enter, the next issue is whether that constitutes a reasonable amount of time. Again, reasonableness is based on the

---

[349] *See e.g.*, FAC at ¶35.

[350] Fomby Depo. at 38:11-39:12, Ex. R.

[351] Fomby Depo. at 43:25-45:4, Ex. R; Gilbertson Depo. 77:25-78:4, Ex. S; *see also* 21:2-20, 22:4-17, and 94:4-10 (NTOA sets national standards, and he does not know them).

[352] *Combs*, 394 F.3d. at 742 ("Service of the warrant *commenced* when Lieutenant Smith parked his marked police car, with the overhead lights flashing, in front of the house and began making announcements regarding the warrant service over the public address system in the front grill of the vehicle." (Emphasis added); *Spikes*, 158 F.3d 913 ("time to be measured from when the officer first announced over the police bullhorn).; *U.S. v. Soria*, 965 F.2d 436 (7th Cir. 1992).

[353] Gilbertson Depo. at 81:17-82:21, Ex. S (stun stick constituted an "intrusion" and not an entry. Entry requires a physical person or K9); Fomby's Depo. at 46:22-48:8, Ex. R.

[354] *Id.*

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   totality of the circumstances, including but not limited to the officers' safety, the time of day,

2   the destructibility of evidence, the size of the residence, the nature of the offense, and any

3   other observations by law enforcement that would support a forced entry.[355]

4          Here, the undisputed facts demonstrate the officers observed a multitude of factors

5   weighing in favor of a short waiting period before forcing entry. First, the Apartment was a

6   very small, one-bedroom apartment with an easily navigable layout, and it would have taken

7   no more than a few seconds to respond to the knocking and announcing. According to *Banks*,

8   in such a small dwelling as little as "perhaps five-seconds" is reasonable.[356] (Thus, even if the

9   Court chooses to find a six-second entry here, the officers still acted reasonably.) Second, the

10  location and layout of the Apartment reasonably concerned the officers. Officers could not

11  utilize a BearCat armored vehicle to protect themselves from potential gunfire. The location

12  of the Apartment allowed easy egress to the gas station and street directly behind the

13  Apartment. And, waiting too long could allow the occupants to easily fortify and, if escape

14  was their desire, burrow to a neighboring apartment and take a hostage. Third, the suspected

15  crime easily weighed in the officers' favor. The investigation involved a violent homicide,

16  and the search sought the firearm used to commit the homicide. Fourth, the officers had

17  reasonable suspicion to believe the suspects had committed the murder and probable cause to

18  arrest Rembert for the gang shooting. Fifth, both suspects had violent criminal histories. Sixth,

19  the officers knew that violent gang members used the Apartment as a flophouse. The officers

20  reasonably believed they could encounter armed resistance (a fact that turned out to be true).

21  The only factor weighing against the officers is the early morning service of the warrant. But,

22  looking at the totality of the circumstances, any reasonable officer would conclude the exigent

23  circumstances justified a quick entry. Under the totality of the circumstances, the factors easily

24  weigh in favor of reasonableness (even if entry occurred at six seconds). When compared to

25  other Ninth Circuit cases, the officers' wait time exceeded the time allowed in the less-

26

27  ────────────────

28  [355] *Combs*, 394 U.S. at 744-45 (citations omitted).

    [356] *Banks*, 540 U.S. at 40.

dangerous cases of *Jama*, *Howell*, *Milender*, and *Zabeti*.[357]

**3.    The officers have qualified immunity on the Fourth Amendment claims and discretionary immunity on the Article 1, Sec. 18 claims.**

Assuming the Court finds plaintiff can demonstrate a constitutional violation at trial, the officers would still be entitled to summary judgment. On the federal law claims, the officers are entitled to qualified immunity, and, with respect to the state law claims, the officers enjoy discretionary immunity.

**a.    The officers have qualified immunity for the § 1983 claims.**

Under the second prong of the qualified immunity analysis, a court evaluates whether the officers' conduct violates clearly established statutory or constitutional rights of which a reasonable officer would have known.[358] "It is the plaintiff who bears the burden of showing the rights allegedly violated were clearly established."[359] Qualified immunity does not apply to plaintiff's state constitution or battery claims.[360] Plaintiff must satisfy this Court that the Decedent's allegedly violated Fourth Amendment rights were clearly established at the time of the service and every reasonable officer should have recognized the unconstitutionality of their decisions.[361]

On the excessive force claim, there is no constitutional law prohibiting the officers use of force in this case as it is obviously reasonable to use deadly force to stop a deadly threat.[362]

---

[357] *See Banks*, 282 F.3d at 703-05; *Jama*, 446 Fed.Appx. at 866-67; *Howell*, 532 F.3d at 1026-27; *Milender*, 620 F.3d at 1022-23.

[358] *Rivas-Villegas v. Cortesluna*, 595 U.S. 1 (2022) (citing *White v. Pauly*, 580 U.S. 73, 78 (2017)).

[359] *Shafer v. Cty. of Santa Barbara*, 868 F.3d 1110, 1118 (9th Cir. 2017) (internal quotation marks and citation omitted).

[360] *See Mack*, 522 P.3d at 452.

[361] *See e.g., Mattos v. Agarano*, 661 F.3d 433, 452 (9th Cir. 2011) (despite alleging constitutional violations, officers entitled to qualified immunity because "not every reasonable officer at the time of the respective incidents would have known—beyond debate—that such conduct violates the Fourth Amendment."

[362] *Sabbe v. Washington Cnty. Bd. Of Comm'snrs*, 84 F.4th 807, 817 (9th Cir. 2023).

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    And, there is no clearly established law prohibiting an officer from defending themselves

2    when an individual attempts to kill them during the service of a valid search warrant.[363]

3         With respect to the claim the officers violated knock-and-announce principles, no

4    cases support any of plaintiff's claimed violations. First, there is no clearly established law

5    the officers must physically knock on the door.[364] Second, there is no clearly established law

6    prohibiting the officers from performing a CET entry to serve a high-risk search warrant. With

7    respect to the NFDDs, *Boyd* and *Ankeny* only prohibit throwing them blindly and recklessly

8    into an apartment. Here, the NFDD was controlled on a stun stick and was intentionally placed

9    high towards the ceiling where it could harm no one.[365] Third, there is no clearly established

10   law prohibiting the officers' 16 to 17 (o six) second entry. Currently, waits of 6 to 10 seconds

11   have been held constitutional under similar circumstances, and only waits of under 5 seconds

12   have been found unconstitutional in circumstances where no exigencies existed.[366]

13        Plaintiff may attempt to rely on *U.S. v. Granville*[367] where, the Ninth Circuit, pre-

14   *Banks*, found a five-second entry unreasonable. In *Granville*, police arrived at the home of a

15   suspected drug trafficker's apartment at 7 a.m. to execute a search warrant. The lead officer

16   knocked loudly three times, and announced, "Oakland police officer, search warrant, open the

17

18   ───────────────

19   [363] *Napouk v. Las Vegas Metro. Police Dep't*, 124 F.4th 906, 923 (9th Cir. 2024) (self-defense is a legitimate law enforcement objective) (citing *A.D. v. Cal. Highway Patrol*, 712 F.3d 446, 454 (9th Cir. 2013)).

20

21   [364] *Smith*, 63 F.3d at 962 (noting that "[a]lthough the principle is commonly referred to as 'knock-and-announce,' the Court's holding in *Wilson* requires only an announcement"); *Combs*, 394 F.3d at 744-45 (literal knock noy always necessary) (quoting *Spikes*, 18 F.3d at 92); *see also Molina*, 325 F.3d at 972 (screaming and yelling commands constituted a knock under knock-and-announce principles).

22

23   [365] *Boyd*, 374 F.3d at 778-80 (the Ninth Circuit ruled that the detonation of a flashbang in a room with up to eight bystanders without first looking was unconstitutional); *Molina*, 325 F.3d at 973 (use of flash bang reasonable because Molina had a criminal history that included aggravated assault, was alleged to be the head of a drug distribution organization, was associated with gangs, was home and had access to weapons); *Bender*, 600 F.3d at 784-85; Lt. Beas Depo. at 91:5-17, Ex. P.

24

25   [366] *Jama*, 446 Fed.Appx. at 866-67; *Howell*, 532 F.3d at 1026-27; *Milender*, 620 F.3d at 1022-23; *Zabeti*, 96 P.3d 773 (less than 10 seconds reasonable where concerns for officer safety existed); *State v. Huff*, 793 A.2d 1190 (Conn. 2002) (several seconds reasonable where search included weapons); *State v. Pruitt*, 967 So.2d 1021 (Fla. 2007) (twelve seconds reasonable because suspect known to use an assault rifle); *State v. Wakefield*, 977 P.2d 941 (1999) (possible weapons justified officers noncompliance with a ten-second rule).

26

27

28   [367] *U.S. v. Granville*, 222 F.3d 1214 (9th Cir. 2000).

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

door."[368] Police waited five seconds. Hearing no response from inside, they breached the door. The Ninth Circuit concluded that the entry was unreasonable as a matter of Fourth Amendment law.[369] The court agreed with the officers that police can sometimes legitimately infer refusal to provide entry from a suspect's silence but stated that police must generally wait "a significant amount of time" before forcibly entering. The Ninth Circuit concluded: "Under the facts of this case, five seconds cannot be considered a 'significant amount of time.'"[370] This was especially true, the court found, because the warrant was executed in the early-morning hours, "when it was likely that the occupants ... would be asleep[,]" and because police had failed to demonstrate reasonable suspicion of any exigency whatsoever.[371] The officers' supposed exigency was based on "generalizations and stereotypes."[372] Here, the officers had substantial factors supporting exigency. The suspects had long criminal histories for violent crimes and known access to weapons. Thus, this case is easily distinguishable.

There is no clearly established law that would have put the officers on notice any portion of their entry was unconstitutional. Even if the Court denies summary judgment as to the Defendants' argument that no Fourth Amendment violation occurred, it should grant summary judgment on the § 1983 claims on the basis of qualified immunity.

### b. The officers have discretionary immunity for the state law search claims.

On plaintiff's Nevada constitution claim, the officers are immune from state law liability for their tactical decisions. Nevada has generally waived its sovereign immunity.[373] One statutory exception to that waiver is that no action may be brought against an officer or employee of Nevada "[b]ased upon the exercise or performance or the failure to exercise or perform a discretionary-function or duty on the part of the State or any of its . . . political

---

[368] *Id.* at 1217.

[369] *Id.* at 1218–19.

[370] *Id.* at 1218.

[371] *Id.*

[372] *Id.* at 1219.

[373] *See* NRS 41.031(1) ("The State of Nevada hereby waives its immunity from liability and action . . . except as otherwise provided in [certain statutory sections, including NRS 41.032].").

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

subdivisions or of any officer . . . of any of these, whether or not the discretion involved is abused."[374] Nevada's discretionary-function statute mirrors the Federal Court Claims ACT ("FTCA").[375] As a result, the Supreme Court of Nevada looks to federal decisional law on the FTCA for guidance on what type of conduct discretionary immunity protects.[376] The Supreme Court of Nevada has held the decision of whether to seize a suspect - a police function plainly within the purview of the Fourth Amendment - is a discretionary function covered by NRS 41.032.[377] Further, the Supreme Court of Nevada implied that other Fourth Amendment activities - essentially, seizures other than uses of force - are covered by NRS 41.032.[378] The Ninth Circuit has also considered NRS 41.032 and held that "[a]n officer's decision as to how to accomplish a particular seizure or search is generally considered discretionary under Nevada law, and officers are therefore immune from suit as to state-law claims arising therefrom in most cases."[379] Thus, officers only lose this immunity from state-law claims when they act in bad faith or act with willful or deliberate disregard for the rights of a particular citizen.[380]

Here, the officers' service decisions fall within the discretionary function as applied by Nevada Courts. Therefore, the officers' decisions on how to perform the search is clearly

---

[374] *See* NRS 41.032(2).

[375] *See Martinez v. Maruszczak*, 168 P.3d 720 (Nev. 2007).

[376] *Id.* at 168 P.3d at 727.

[377] *See Gonzalez v. Las Vegas Metro Police Dep't.*, 2013 WL 7158415, *3 (Order of affirmance, Nov. 21, 2013) ("decision to arrest or detain [suspect on a warrant] was part of a policy consideration" that invoked NRS 41.032).

[378] *See Maturi v. Las Vegas Metro Police Dep't.*, 871 P.2d 932, 934 (Nev. 1994) (decision of how to handcuff discretionary); *see also Ortega v. Reyna*, 953 P.2d 18, 23 (Nev. 1998) (decision to stop and to arrest motorist discretionary).

[379] *Napouk*, 123 F.4th at 924 (pre-deadly force tactics discretionary and absent showing of bad faith, officers are immune under Nevada state law); *Davis v. City of Las Vegas*, 478 F.3d 1048, 1060 (9th Cir. 2007); *Jones v. Las Vegas Metro. Police Dep't*, 873 F.3d 1123, 1123 (2017); *see also Sandoval v. Las Vegas Metro. Police Dep't.*, 756 F.3d 1154, 1168 (9th Cir. 2014) (police officers "exercise[ ] discretion and [are] thus generally immune from suit where the act at issue require[s] personal deliberation, decision, and judgment, rather than obedience to orders, or the performance of a duty in which the officer is left no choice of his own.").

[380] *See Jones*, 873 F.3d at 1133; *see also Davis*, 478 F.3d at 1060; *Napouk v. Las Vegas Metro. Police Dep't*, 669 F.Supp.3d 1031, 1046-47 (D. Nev. 2023), *aff'd. Napouk v. Las Vegas Metro. Police Dep't.*, 123 F.4th at 924.

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

discretionary and protected by NRS 41.032. And, there is no evidence of bad faith or willful disregard as the officers' actions complied with the Supreme Court of Nevada's decision in *Zabeti*.[381] This court should recognize the officers' discretionary immunity and deny summary judgment on the plaintiff's state law claims here.

## B.    PLAINTIFF'S § 1983 FOURTEENTH AMENDMENT FAMILIAL RELATIONSHIP CLAIM (SECOND COA).

The FAC's Second Cause of Action alleges the individual officers violated plaintiff's constitutional rights by depriving her of a familial relationship with her son.[382] This claim is brought under the Fourteenth Amendment's due process clause. It fails because the officers did not target the plaintiff's familial relationship with the Decedent.

### 1.    <u>Relevant Fourteenth Amendment law.</u>

The Ninth Circuit recognizes that certain family members have standing to pursue § 1983 claims on behalf of relatives killed by law enforcement.[383] Only "[o]fficial conduct that 'shocks the conscience' in depriving parents of that interest is cognizable as a violation of due process."[384] There are two types of shocks the conscience cases.[385] Conscience shocking actions are those either taken with (1) "deliberate indifference" or (2) a "purpose to harm . . . unrelated to legitimate law enforcement objectives."[386] The lower "deliberate indifference" standard applies to circumstances where "actual deliberation is practical."[387] The "purpose to harm" standard is more demanding and applies when an officer cannot practically deliberate, such as where "a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if

---

[381] *See Napouk*, 123 F.4th at 924 (discretionary immunity for officers regarding their pre-shooting actions).

[382] FAC at ¶¶61-72.

[383] *Moreland*, 159 F.3d at 370 (mother and children of plaintiff allegedly killed by officer's excessive force lacked standing to assert a survival action under § 1983 and Fourth Amendment but could pursue a Fourteenth Amendment due process claim); *see also Jones*, 873 F.3d 1132-33.

[384] *Id.* at 1132-33 (citing *Wilkinson*, 610 F.3d at 554).

[385] *See e.g.*, *A.D.*, 712 F.3d at 453.

[386] *Id.*

[387] *Id.* (citing *Wilkinson*, at 554).

he acts with a purpose to harm unrelated to a legitimate law enforcement objective."[388] "The purpose to harm standard is a subjective standard of culpability."[389] In this case, the officers' use of force is governed by the purpose to harm standard and the SWAT teams' entry decisions covered by the deliberate indifference standard.

## 2.    Analysis of Plaintiff's deprivation of familial relationship claim.

### a.    Plaintiff lacks standing to pursue this claim.

The Decedent was a legal adult at the time of his death and no longer living with his mother. Almost every circuit addressing such a situation has found no Fourteenth Amendment right exists.[390] Although the Ninth Circuit currently recognizes Plaintiff has standing to pursue her Fourteenth Amendment claim, it is almost certain the Ninth Circuit has this wrong.[391] Still, the officers acknowledge this Court cannot deviate from current Ninth Circuit authority and raise this issue just to preserve it for appeal, if necessary.

### b.    There is no evidence suggesting the officers acted with a purpose to harm or with deliberate indifference.

First, plaintiff's allegations of excessive force are untenable as a matter of law. It is undisputed the officers used deadly force in self-defense only after the Decedent began firing 18 shots at the officers. The officers' use of deadly force was a split-second decision in response to an attempt to seriously injury or kill them, which is subject to the purpose to harm standard. And, there is no evidence the shooting officers fired for any reason other than a legitimate law enforcement objective.[392]

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

---

[388] *Id.*; *see also Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008); *Jones*, 873 F.3d at 1133.

[389] *S.R. v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) (citing *A.D.*, 712 F.3d at 453).

[390] *See Valdivieso Ortiz v. Burgos*, 807 F.2d 6, 8-9 (1st Cir. 1986), *McCurdy v. Dodd*, 352 F.3d 820, 829 (3d Cir. 2003), *Russ v. Watts*, 414 F.3d 783, 791 (7th Cir. 2005), *Robertson v. Hecksel*, 420 F.3d 1254, 1259–60 (11th Cir. 2005), and *Butera v. District of Columbia*, 235 F.3d 637, 656 (D.C. Cir. 2001) (all finding no such substantive due process right); cf. *Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe. Cnty.*, 768 F.2d 1186, 1188-89 (10th Cir. 1985) (finding right to familial relations under the First, not the Fourteenth, Amendment).

[391] *See Sinclair v. City of Seattle*, 61 F.4th 674, 678-79 (9th Cir. 2023); *Napouk*, 123 F.4th at 924-25 (R. Nelson, J. concurring).

[392] *Napouk*, 124 F.4th at 923 (self-defense is a legitimate law enforcement objective) (citing *A.D.,* 712 F.3d at 454 (9th Cir. 2013)).

Second, the officers were not deliberately indifferent in their service of the warrant. Defendants acknowledge the officers deliberated, debated, and discussed how to serve the warrant. As discussed in detail above, the officers' decisions regarding their announcements, timing, and execution were consistent with current federal and state law based upon the specific facts of this case. There is no evidence the officers were deliberately indifferent to the law or the Decedent's rights or that their conduct shocks the conscience. Also, there is no dispute the officers' actions were in furtherance of legitimate law enforcement objectives of serving a valid search warrant. There is no evidence the officers attempted to "bully" Decedent or "get even" with the Decedent.[393] Thus, even under the lower deliberate indifference standard, summary judgment is appropriate.

At a minimum, there is no clearly established law putting the officers on notice their actions in this case could violate the Fourteenth Amendment.[394] Therefore, the officers are entitled to qualified immunity on this claim regardless of whether the purpose to harm or deliberate indifference standard is applied.

### C.    PLAINTIFF'S *MONELL* CLAIM FAILS (SEVENTH COA).

Plaintiff's seventh COA alleges "LVMPD had a policy, practice or custom that caused the Constitutional deprivation.[395] The alleged unconstitutional practices and/or customs here include: (1) serving warrants in the early morning hours and not physically knocking on the door,[396] (2) using a CET entry for knock-and-announce warrants,[397] and (3) failure to properly train and supervise because Sgt. Backman was allowed to participate in the mission before completing LVMPD SWAT school.[398]

---

[393] *Wilkinson*, 610 F.3d at 554.

[394] *See Scott v. Smith*, 109 F.4th 1215, 1228-30 (9th Cir. 2024) (qualified immunity granted to officers for prolonged use of bodyweight that Court found to violate Fourth Amendment).

[395] FAC at ¶127-130

[396] *Id.* at ¶128.

[397] *Id.* at ¶131.

[398] *Id.* at ¶134.

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382.0711 FAX: (702) 382-5816

1    **1.    General Monell law.**

2    Under *Monell v. Dep't. of Soc. Svcs.*, a municipality is liable for constitutional torts

3    that its employees commit pursuant to a municipal policy.[399] The Ninth Circuit has explained

4    that a litigant may recover from a municipality under § 1983 on three different theories:

5    commission, omission, or ratification.[400] "Commission" refers to a local government

6    implementing its official policies or established customs that are deliberately indifferent to a

7    constitutional right, which includes, for example, the inadequate training of government

8    officials. "Omission" refers to the government's omission to an official policy. "Ratification"

9    refers to an authorized policymaker's purposeful approval of a subordinate's unconstitutional

10   conduct. *Id.*

11   **2.    Analysis of plaintiff's *Monell* claims.**

12   Plaintiff's *Monell* claims are easily defeated. First, if the Court has already concluded

13   that the officers did not violate the Plaintiffs' constitutional rights, then the *Monell* claim fails

14   as a matter of law.[401] Second, discovery in this case revealed LVMPD's policies, training and

15   customs complied with constitutional mandates as a matter of law.

16   ***Serving nighttime warrants***

17   There is no federal or state law prohibition on serving nighttime warrants. Here, the

18   nighttime warrant sought by the non-party homicide detectives was granted by a neutral

19   magistrate. The SWAT officers could lawfully rely both on the homicide detectives'

20   representations[402] and the magistrate's determination[403]. There is no evidence in the record

21

---

22   [399] *Monell*, 436 U.S. at 698.

22   [400] *See Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1249-50 (9th Cir. 2010).

23   [401] *See City of Los Angeles v. Heller*, 475 U.S. 796 (1986) ("If a person has suffered no constitutional
24   injury at the hands of the individual police officer, the fact that the departmental regulations might
      have authorized the [constitutional violation] is quite beside the point."); *see Hayes v. Cty. of San
25   Diego*, 736 F.3d 1223, 1231 (9th Cir. 2013) (constitutional violation required to support *Monell*
      liability).

26   [402] *U.S. v. Villasenor*, 608 F.3d 467, 475 (9th Cir. 2010) (Collective knowledge doctrine "allows courts
      to impute police officers' collective knowledge to the officer conducting a stop, search, or arrest.").

27   [403] *Messerschmidt*, 565 U.S. at 546 ("Where the alleged Fourth Amendment violation involves a search
      or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest
28   indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it,
      in 'objective good faith.'") (citation omitted); *Armstrong*, 734 F.3d at 992-93 (same).

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    the warrant was unconstitutionally obtained. Thus, the SWAT officers' reliance on the search

2    warrant, and its allowance for a nighttime execution cannot be said to have occurred due to

3    an unconstitutional policy, practice or custom.

4       **_Physical Knock at the door_**

5       The evidence in this case established LVMPD's SWAT team does not always

6    physically knock on the door when serving a knock-and-announce warrant. Each search

7    warrant is different and LVMPD allows the SWAT officers to exercise their discretion. This

8    custom is in complete compliance with current federal and state case law.[404] Here, it is

9    undisputed the officers "knocked and announced" by using a bullhorn to inform the occupants

10   of the officers' presence and purpose. In addition, once the announcements began, all of the

11   officers began yelling announcements. Thus, LVMPD's custom of not always physically

12   knocking on the door is not unconstitutional.

13      With respect to entry timing, LVMPD trains its officers consistently with the Fourth

14   Amendment that officers must wait a reasonable amount of time based on the circumstances

15   of each individual case.[405] This is exactly what the Constitution requires.

16

17

18      **_Controlled Entry Technique_**

19      Plaintiff alleges a CET entry violates the Constitution because it is inconsistent with

20   knock-and-announce principles. This argument derives from CIRT legal consultant Mr.

21   Bandieros.  However, the CIRP finding evaluated the use of a CET against LVMPD's policies

22   and procedures. As discussed _ad nauseum_ above, CETs and NFDDs are allowed when serving

23   high-risk search warrants. NTOA currently trains officers to use CET entries and NFDDs in

24   similar situations to the subject case. Because this case involves a high-risk warrant, the use

25

26   [404] _Combs_, 394 F.3d at 744-45 (literal knock not always necessary) (quoting _Spikes_, 18 F.3d 913); _see also Molina_, 325 F.3d at 972; (screaming and yelling commands constituted a knock under knock-

27   and-announce principles); _King_, 998 P.2d at 1177-78 (officers substantially complied with state knock-and-announce statue when they "announced their presence by yelling something to the effect of 'Police

28   officer. Search warrant,' prior to penetrating the premises.").

[405] Lt. Beas Depo. at 72:13-80:4, Ex. P.

of CET entries and NFDDs to perform a dynamic entry was in complete harmony with the law and industry standards.[406] As explained above, both the magistrate and all involved personnel characterized this as a high-risk search warrant where the SWAT team faced a credible threat of armed and dangerous occupants.[407]

### Sgt. Backman's failure to attend SWAT school

Plaintiff's final *Monell* claim is a failure to train claim involving Sgt. Backman's failure to attend SWAT school due to it not being offered prior to his joining the squad. First, there is no constitutional requirement a seasoned officer must attend SWAT school before serving search warrants. Second, there is no evidence Sgt. Backman's failure to attend SWAT school was the cause of any alleged constitutional violations. Sgt. Backman was under the direct supervision of the Team Leader Sgt. Garth Findley, and all of Sgt. Backman's actions and decisions were also closely monitored by Lt. O'Daniel and ATL Werner. Third, and most importantly, plaintiff cannot establish a *Monell* claim by simply showing one officer was allegedly improperly trained. "[T]he Ninth Circuit has unequivocally stated that 'evidence regarding the failure to train a single officer is insufficient to establish' liability against a municipality; instead, the Ninth Circuit requires 'a program-wide inadequacy in training.'"[408] Finally, there is no evidence that Sgt. Backman's failure to attend SWAT school was the moving force behind any alleged constitutional violation.

### D.    PLAINTIFF'S STATE LAW WRONGFUL DEATH/SURVIVORSHIP CLAIMS (FOURTH, FIFTH, AND SIXTH COA).

Plaintiff's fourth, fifth, and sixth COA's assert the wrongful death/survivorship claims based upon state claims for assault/battery, emotional distress, and negligence.

---

[406] *Boyd*, 374 F.3d at 779; *Terebesi*, 764 F.3d at 238; *Bender*, 600 F.3d at 784-86 ("[T]he use of a flash bang grenade is reasonable only when there is a dangerous suspect and a dangerous entry point for the police, when the police have checked to see if innocent individuals are around before deploying the device, when the police have visually inspected the area where the device will be used and when the police carry a fire extinguisher.")

[407] *See e.g.*, Lt. Beas Depo. 47:11-48:8, Ex. P.

[408] *De Beltran v. City of Fullerton*, 2011 WL 13227790, *5 (C.D. Cal. Mar. 31, 2011) (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 484-85 (9th Cir. 2007)); *Sutton v. Dep't of Parks and Rec.*, 2025 WL 240956, *4 (N.D. Cal. Jan. 17, 2025).

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    **1.    Assault and battery claims.**

2        The assault and battery claims are governed by the same standards governing the

3    excessive force claims."[409] As set forth in the excessive force argument, there is no dispute

4    the officers were privileged to use deadly force once the Decedent began shooting at them.[410]

5    Thus, summary judgment is appropriate on the intentional tort claims.

6    **2.    Negligence.**

7        Plaintiff's negligence claim is based on the allegation the "officers breached their duty

8    by negligently performing their search and seizure through negligent tactical conduct

9    preceding their use of deadly force."[411]

10    **a.    Relevant negligence law.**

11        A claim for negligence requires plaintiff satisfy four elements: (1) an existing duty of

12    care, (2) breach, (3) legal causation, and (4) damages.[412] Plaintiff's negligence claim fails as

13    a matter of law. A negligence claim cannot be based on an intentional act.[413] The Supreme

14    Court of Nevada agrees with the Restatement (Second).[414]

15    **b.    Analysis of plaintiff's negligence claim.**

16        Plaintiff alleges the officers breached the standard of care by negligently serving the

17    warrant and "this duty of care is established by the United States and Nevada constitutions,

18    federal and [state] law statutes, and other industry standards for police conduct."[415]

19    Specifically, plaintiff alleges the following negligent acts:

20

21

22    [409] *Ramirez*, 925 F.Supp. at 691 (citations omitted); *Estate of Wilson v. Las Vegas Metro. Police Dep't*,
      2020 WL 6930099, *7 (D. Nev. Nov. 24, 2020); *Williams v. City of Sparks*, 112 F.4th 635, 646-47
23    (9th Cir. 2024) (quoting *Ramirez*).

24    [410] *See* §(V)(A)(1).

      [411] FAC at ¶116.
25
      [412] *Turner v. Mandalay Sports Entertainment, LLC*, 180 P.3d 1172 (Nev. 2008)).
26
      [413] *See* Restatement (Second) of Torts § 282 (1965), cmt. d (stating that negligence "excludes conduct
27    which creates liability because of the actor's intention to invade a legally protected interest of the
      person injured or a third person").

28    [414] *See Rocky Mountain Produce Trucking Co. v. Johnson*, 369 P.2d 198, 201 (Nev. 1962).

      [415] *Id.* at ¶115.

- Negligent tactical conduct proceeding the use of force

- Failing to confirm the suspect was in the apartment or regularly used the apartment

- Conducting the raid at 5:00 a.m. in darkness

- Deploying the NFDDS

- Failing to perform "a legal knock and announce by not allowing a reasonable opportunity for persons inside . . . to ascertain the identity of the officers and comply …."[416]

Each of plaintiff's arguments is easily defeated.

First, plaintiff's assertion LVMPD's internal policies and procedures and "other industry standards" can establish the standard of care is wrong. The law is clear that an internal policy cannot establish a standard of care. The Restatement (Second) Torts § 285 provides that a standard of care may be defined by a stature, ordinance, or regulation. The logical predicate is that such a legislative pronouncement be made. Indeed, Restatement (Second) Tort § 285, comments b and c, talk exclusively about the standard of conduct created by "legislative enactment" or the regulations promulgated by legislative "boards or commissioners." And neither a police department's internal policies, nor a police industry standard, meet the requirements necessary to create a duty of care under the Restatement (Second) Torts § 285. In 2021, this Court rejected this same argument in another police shooting case.[417]

Second, with respect to plaintiff's specific allegations, plaintiff's negligence claim fails because the officers did not act with bad faith or violate the constitution.

### *Negligent tactical conduct proceeding the use of force*

---

[416] FAC at ¶116.

[417] *See Estate of Wilson by Wilson v. Las Vegas Metro. Police Dep't*, 2021 WL 4395045, *2 (D. Nev. Sept. 23, 2021) (internal policies can be considered in a case but cannot be used to establish the requisite standard of care); *see also Stanley v. McCarver*, 92 P.3d 849, 855 n.6 (Az. 2004) ("While the rules of professional conduct may provide evidence of how a professional would act, they do not create a duty to establish a standard of care as a matter of law."); *Rodriguez v. Jackson*, 574 P.2d 481 (Az. 1977) (manual only a guideline and did not equate to a "standard of care."); *Lugtu v. California Highway Patrol*, 26 Cal. 4th 703, 110 Cal. Rptr. 2d 528, 28 P.3d 249 (2001) ("The manual cannot be read to establish the standard of care, because there is no indication that the manual was adopted pursuant to the state (or federal) Administrative Procedures Act.").

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711  FAX: (702) 382-5816

Plaintiff's assertion that negligent conduct in tactics and planning how to serve the search warrant here fails because there is no evidence of bad faith or unconstitutional conduct. The Defendants have immunity for their tactical decisions here because all of the tactical decisions preceding service of the search warrant were discretionary acts. Generally, a decision by a police officer on how to perform a search is discretionary under Nevada law, and Defendants are entitled to discretionary immunity for any discretionary acts.[418] Only acts committed in bad faith or acts that violate the Constitution are not protected under discretionary immunity.[419] Thus, unless plaintiff can show the officers acted in bad faith or violated the constitution, plaintiff's negligence claims fails as a matter of law for the reasons set forth *supra* in §IV(A)(3)(b). Here, there is no evidence of bad faith or unconstitutional acts, as all of the officers' decisions and actions are in complete harmony with the Supreme Court of Nevada's *Zabeti* decision. Plaintiff's negligence claim as to Defendants' tactics thus fails.

### *Failing to confirm the suspect was in the apartment or regularly used the apartment*

Plaintiff's argument the officers were negligent in failing to confirm the shooting suspects were in the apartment fails because the presence of the suspects was irrelevant to the purpose of the warrant. There is no dispute the basis of the search warrant was lawful and valid. None of the Defendants played any role in obtaining the search warrant nor is there any allegation any of the Defendants attempted to influence the two magistrates who signed the warrant. Furthermore, the search warrant was not a warrant for a homicide suspect; it only sought the physical evidence connected to a violent homicide. The search warrant's value was not tied to whether the suspects were at the Apartment, because the purpose of the warrant was to find physical evidence connected to the homicide. Thus, whether the suspects were or were not inside the apartment is of no value to plaintiff's argument. There can be no reasonable allegation the officers operated in bad faith or in took unconstitutional actions in failing to

---

[418] *See Davis v. City of Las Vegas*, 478 F.3d 1048, 1059 (9th Cir. 2007).

[419] *Falline v. GNLV Corp.*, 823 P.2d 888, 891-92 (Nev. 1991) (bad faith); *Galvin v. Hay*, 374 F.3d 739, 758 (9th Cir. 2004) (unconstitutional).

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   ensure that suspects *not named in a warrant* were at the subject residence. Even absent

2   discretionary immunity, the Defendants did not breach any duty as they were lawfully serving

3   a valid search warrant for property, and they had no duty to ensure that persons not subject to

4   the search warrant were at the Apartment at the time of service. Plaintiff's argument here fails.

5          ***Serving the search warrant at night***

6          Both federal and Nevada state law allow for the nighttime service of search

7   warrants.[420] Still, the deployment of a SWAT team in the dark with weapons drawn may be

8   considered unreasonable in light of the totality of the circumstances. In addressing the service

9   of nighttime *no-knock* warrant, the Ninth Circuit has stated a "nighttime incursion by a SWAT

10  force is a far more serious occurrence than an ordinary daytime intrusion pursuant to a regular

11  warrant and therefore requires higher justification beyond mere probable cause to search."[421]

12  But Plaintiff must show the officers were acting in bad faith or violating the constitution to

13  preclude the officers' entitlement to discretionary immunity, and the officers here operated in

14  good faith as a matter of law.

15         Here, the *non-party homicide detectives* informed the magistrates a nighttime warrant

16  was necessary, and the magistrates agreed.[422] The nighttime service was sought due to the fact

17  (1) the investigation involved a violent homicide with a firearm; (2) it was believed the

18  suspects shared the Apartment "with . . . several other armed, recreational drug users," (3)

19  one suspect had Facebook video posts "holding what appears to be an assault rifle," and (4)

20

21  ――――――――――――――
    [420] *See* NRS 179.045(d) (". . . the warrant be served between the hours of 7 a.m. and 7 p.m., unless the
22  magistrate, upon a showing of good cause therefor, inserts a direction that the warrant be served at any
    time.").

23  [421] *Bravo v. City of Santa Maria*, 665 F.3d 1076, 1086 (9th Cir. 2011) ("SWAT officers' nighttime
    searches ... constitute much greater intrusions on one's privacy than ordinary daytime searches and
24  carry a much higher risk of injury to persons and property"); *Alexander v. City & Cnty. of S.F.*, 29
    F.3d 1355, 1366-67 (9th Cir.1994) (explaining that a jury might conclude that deployment of a SWAT
25  team for the purpose of inspecting property was excessive); *but see Youngbey v. March*, 676 F.3d
    1114, 1124-26 (D.C. Cir. 2012); *U.S. v. Rizzi*, 434 F.3d 669, 675 (4th Cir. 2006) (nighttime searches
26  are not subject to different Fourth Amendment standards than daytime searches.)

27  [422] *Sanchez v. State*, 743 P.2d 726, 728 (Nev. 1987) (citations omitted) ("Absent an abuse of discretion,
    a magistrate's finding of a reasonable necessity for night-time service should not be disturbed."); *King
28  v. State*, 998 P.2d 1172, 1177 (Nev. 2000) (nighttime service reasonable where affidavit indicated that
    five people, within ten minutes, entered and left King's apartment for the purpose of purchasing
    drugs.).

suspect "[Rembert] Watsell and several others [had] fired several rounds at a vehicle" in the same apartment complex.[423] The officers were also concerned if served during the daytime, it was likely children and innocent bystanders might be present. Thus, the homicide detectives provided the magistrate with legitimate and particularized concern for officer safety"[424] Two magistrates reviewed the warrant and agreed probable cause existed to serve the warrant at nighttime. The magistrate's approval justifies and immunizes the officers for serving the high-risk warrant at nighttime; they objectively acted in good faith in serving the warrant here within the magistrate's parameters.[425]

### Use of the NFDDs

Plaintiff next argues negligence in the officers' use of NFDDs. But as set forth *supra* in §(V)(A)(2)(c)(3), the officers' use of the NFDDs complied with the applicable standard of care for serving a high-risk search warrant. Defendants adopt those arguments here. Further, there is no evidence of bad faith or unconstitutional conduct with respect to the NFDDs as their use in this case complied exactly with what the law requires. Once again, plaintiff's argument here fails.

### Failure to perform a lawful knock and announce

As set forth in *supra* in §(V)(A)(2)(c), the officers' actions in this case complied with both federal and state law knock-and-announce requirements. Defendants adopt those arguments establishing the officers' clear adherence to knock-and-announce requirements here. Further, the officers are entitled to discretionary immunity as there is no evidence of bad faith or unconstitutionally as to the officers' knock-and-announce procedure or timeline.

---

[423] *See* 1/7/2022 Search Warrant at pgs. 4-6, Ex. J; *see also* 12/20/2021 Search Warrant, Ex. K.

[424] *See Estate of Millender*, 2012 WL 3655515, *4-5.

[425] *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) ("Where the alleged Fourth Amendment violation involves a search or seizure pursuant to a warrant, the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'") (citation omitted); *Armstrong v. Asselin*, 734 F.3d 984, 992-93 (9th Cir. 2013) (qualified immunity for officers relying on search warrant); *Amie v. Cnty. of Los Angeles*, 2015 WL 13916130, *11 (C.D. Cal. Dec. 30, 2015) (officer acted reasonably in executing warrant at night because it was "endorsed for nighttime service.").

    MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    Each of Plaintiff's arguments in support of negligent conduct fails. Not only did the

2  officers' conduct not fall below the standard of care here, but further, the officers' conduct is

3  protected by discretionary immunity. Plaintiff cannot present any evidence that would permit

4  a jury to find negligence, much less bad faith or unconstitutional conduct here. This Court

5  should grant summary judgment on plaintiff's negligence claim.

6              **3.    Emotional distress claims.**

7    Plaintiff's emotional distress claims the Decedent suffered "extreme emotional

8  distress as a result of being shot at least 17 times." [426]

9              **a.    IIED law.**

10    To prevail on a claim for IIED in Nevada, a plaintiff must prove that the defendant

11  engaged in extreme and outrageous conduct that intentionally or recklessly causes severe

12  emotional distress or bodily harm.[427] To be extreme and outrageous, the conduct must be

13  "outside all possible bounds of decency and regarded as utterly intolerable in a civilized

14  community."[428] "[P]ersons must necessarily be expected and required to be hardened to

15  occasional acts that are definitely inconsiderate and unkind."[429]

16              **b.    Plaintiff has failed to generate any evidence of extreme or
                        outrageous conduct.**

17

18    First, plaintiff's emotional distress claims is derivative and intertwined with the

19  plaintiff's excessive force and unreasonable search claims. As discussed above, the

     Defendants did not violate any of the Decedent's rights. Therefore this claim fails.

20

21    Second, assuming *arguendo*, this court concludes issues of material fact preclude

22  summary judgment on the constitutional claims, there is no evidence of extreme or outrageous

23  conduct. Admittedly, using deadly force is a serious issue. However, police officers are tasked

24  with the unenviable duty of making split-second decisions in rapidly evolving situations to

25  protect the lives of both them and others. In this case, the video establishes that the officers

26  _____

[426] FAC at ¶ 103.

27  [427] *Franchise Tax Bd. Of Cal. v. Hyatt*, 335 P.3d 125, 147 (Nev. 2014).

28  [428] *Maduike v. Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (citations omitted).

     [429] *Id.*

MAC: 14687-428 (#5866484.2)

only fired because the Decedent was shooting at them. No reasonably jury could find the officers intentionally shot the Decedent to cause him emotional harm as everyone agrees the officers only fired to protect themselves – an act that, in no universe, can be viewed as extreme and outrageous. This shooting does not rise to the level of outrageous conduct that exceeds all bounds usually tolerated in a civilized society.

## VI.    CONCLUSION

Based upon the above, the Defendants request summary judgment on all claims.

Dated this 16th day of May, 2025.

MARQUIS AURBACH


By *s/Craig R. Anderson*
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorneys for Defendants LVMPD, Kerry
Kubla, Brice Clements, Alex Gonzales,
Russell Backman, James Rothenburg,
James Bertuccini and Melanie O'Daniel


## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **DEFENDANTS' MOTION FOR SUMMARY** with the Clerk of the Court for the United States District Court by using the court's CM/ECF system on the 16th day of May, 2025.

☒    I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

☒    I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants: n/a

*s/Sherri Mong*

MAC: 14687-428 (#5866484.2)

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

an employee of Marquis Aurbach

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MARQUIS AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816