# Exhibit A - Deposition of Plaintiff Latia Alexander

```
 1                    CERTIFICATE OF REPORTER
 2    STATE OF NEVADA  )
                       )
 3    COUNTY OF CLARK  )
 4            I, Mickey Marez, a duly commissioned and licensed court
 5    reporter, Clark County, State of Nevada, Registered Professional
 6    Reporter and Certified Realtime Reporter with the National Court
 7    Reporters Association, do hereby certify:  That I reported the taking
 8    of the deposition of the witness, LATIA ALEXANDER, commencing on
 9    Friday, August 23, 2024, at 10:33 a.m.;
10            That prior to being examined, the witness was, by me, duly
11    sworn to testify to the truth.  That my said shorthand notes were
12    thereafter transcribed into typewriting and that the typewritten
13    transcript of said deposition is a complete, true, and accurate
14    transcription of said shorthand notes.
15            I further certify that I am not a relative or employee of an
16    attorney or counsel or any of the parties, nor a relative or employee
17    of an attorney or counsel involved in said action, nor a person
18    financially interested in the action; that a request has been made to
19    review the transcript.
20            IN WITNESS THEREOF, I have hereunto set my hand in my office
21    in the County of Clark, State of Nevada, this 6th day of September,
22    2024.
23
24            Mickey Marez, RPR, CRR, NV CCR No. 950
25
```

```
1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3  LATIA ALEXANDER, individually ) Case No.: 2:24-cv-00074-APG-NJK
   as heir of ISAIAH T. WILLIAMS,)
4  and in her capacity as Special) DEPOSITION OF LATIA ALEXANDER
   Administrator of the Estate of)   FRIDAY, AUGUST 23, 2024
5  ISAIAH T. WILLIAMS,           )      LAS VEGAS, NEVADA
                                 )
6                                )
                                 )
7                 Plaintiff,     )
                                 )
8           vs.                  )
                                 )
9  LAS VEGAS METROPOLITAN        )
   POLICE DEPARTMENT, a          )
10 political subdivision of the  )
   State of Nevada; KERRY KUBLA, )
11 in his individual capacity;   )
   BRICE CLEMENTS, in his        )
12 individual capacity; ALEX     )
   GONZALES, in his individual   )
13 capacity; RUSSELL BACKMAN, in )
   his individual capacity;      )
14 JAMES ROTHENBURG, in his      )
   individual capacity; JAMES    )
15 BERTUCCINI, in his individual )
   capacity; and DOES I-XX,      )
16 inclusive,                    )
                                 )
17                Defendants.    )
   _____)
18 KERRY KUBLA,                  )
                                 )
19           Counterclaimant,    )
                                 )
20        vs.                    )
                                 )
21 LATIA ALEXANDER in her        )
   capacity as Special           )
22 Administrator of the Estate   )
   of ISAIAH T. WILLIAMS,        )
23                               )
              Counterdefendant.  )
24 _____)
   Reported by: Mickey Marez, RPR, CRR, NV CCR No. 950
25 Firm No.: Mamba Reporting, #119F
   Job No.: 1011
```

2

```
 1              DEPOSITION OF LATIA ALEXANDER, held at Marquis Aurbach,

 2   located at 10001 Park Run Drive, Las Vegas, Nevada, on Friday, August

 3   23, 2024, at 10:33 a.m., before Mickey Marez, Registered Professional

 4   Reporter and Certified Realtime Reporter with the National Court

 5   Reporters Association, Certified Court Reporter, in and for the State

 6   of Nevada

 7

 8   APPEARANCES:

 9   FOR THE PLAINTIFF:

10   BY: CORRINE P. MURPHY, ESQ.

11   MURPHY'S LAW

12   2620 REGETTA DRIVE, SUITE 102

13   LAS VEGAS, NEVADA 89128

14   TELEPHONE: (702)820-5763

15   FAX: (702)665-7345

16   E-MAIL: cmurphyslawattorney@gmail.com

17

18

19   FOR THE DEFENDANTS:

20   BY: CRAIG R. ANDERSON, ESQ.

21   10001 PARK RUN DRIVE

22   LAS VEGAS, NEVADA 89145

23   TELEPHONE: (702)382-0711

24   FAX: (702)382-5816

25   E-MAIL: canderson@maclaw.com
```

3

```
1                         INDEX

2    WITNESS:  LATIA ALEXANDER

3    EXAMINATION                              PAGE

4    BY CRAIG R. ANDERSON, ESQ.                 4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    LAS VEGAS, NEVADA;
                  FRIDAY, AUGUST 23, 2024
2                      10:33 A.M.
                       * * * * *
3    Whereupon,

4              (Off-the-record discussion held prior to the

5              commencement of the proceedings, counsel

6              agreed to waive the court reporter's

7              requirements under Rule 30(b)(5) of the

8              Nevada Rules of Civil Procedure.)

9                    LATIA ALEXANDER,

10   having been sworn to testify to the truth, the whole truth, and

11   nothing but the truth, was examined and testified under oath as

12   follows:

13                       -oOo-

14                    EXAMINATION

15   BY CRAIG ANDERSON, ESQ:

16       Q.   Could I get you to state your name for the

17   record.

18       A.   Latia Alexander.

19       Q.   Do you mind if I call you Ms. Alexander and

20   call Isaiah "Isaiah," just for clarity?

21       A.   That's fine.

22       Q.   Okay.

23            Ms. Alexander, have you ever had your

24   deposition taken before?

25       A.   No.  But as a prior police officer, I had to
```

1    go through many recordings and also lie detector tests.

2        Q.    Okay.    That will be helpful.    So, you have a

3    general understanding as to what we're doing here

4    today; correct?

5        A.    Yes.

6        Q.    Okay.    Have you had a chance to speak with

7    your attorney about what we're going to do here today?

8        A.    Yes.

9        Q.    Okay.    And I'm sure the chief has gone over

10   the rules of what we're doing.    But just very briefly,

11   what this is, is my one opportunity to speak with you

12   about the lawsuit you filed on behalf of yourself and

13   your son against the Las Vegas Metropolitan

14   Police Department and several officers.    Do you

15   understand that?

16       A.    Yes.

17       Q.    Okay.

18            What this will be is a question-and-answer

19   period where I ask questions and you give answers.    To

20   my right is a court reporter.    He is taking down

21   everything you and I say.

22            So, although we're going to end up in a

23   conversation and I'm going to ask questions where you

24   know exactly where I'm going or what information I'm

25   seeking, please allow me to finish my question and I'll

```
 1   allow you to finish your answer before we talk over
 2   each other.  Okay?
 3        A.   Yes.
 4        Q.   And that's for the benefit of the court
 5   reporter.  Because it's hard if we get talking over one
 6   another.
 7             The same thing is if you ever shake your head
 8   or nod, I may understand what you're saying, but I will
 9   say, "Was that a 'yes,' was that a 'no,'" simply so he
10   gets a verbal response to the question.  Okay?
11        A.   Yes.
12        Q.   When the deposition is done, you'll be
13   provided a copy of what we talked about here today.
14   And you can make any changes to that deposition you
15   want.  But I would caution you that if you make any
16   substantive changes, which means like an important
17   change to an answer, I would be able to comment on that
18   at the time of trial or arbitration and either say that
19   it reflects poorly upon your credibility or your
20   memory.  Does that make sense to you?
21        A.   Yes.
22        Q.   Okay.
23             So, when I ask you a question and because
24   you're also testifying on behalf of Isaiah, I may ask
25   you questions that you don't know the answer to.  It's
```

1  perfectly fine to say, "I don't know," or, "I don't
2  remember."  Okay?
3      A.    Yes.
4      Q.    If you do answer the question, I'm going to
5  assume that that's based upon personal knowledge.
6  Okay?
7      A.    Yes.
8      Q.    So, don't guess, don't speculate.  If
9  something -- you don't know the answer to or you don't,
10  you know, have any personal information, just say, "I
11  don't know," or, "I don't have any information."  Okay?
12      A.    Okay.  Yes, understood.
13      Q.    I do not take long depositions.  This may go
14  two hours.  Okay?  But if at any time during this
15  process you want to use the restroom, speak with your
16  attorney, step outside for a minute, just let me know
17  and we can make that happen.  Okay?
18      A.    Yes.
19      Q.    You understand that you've taken an oath to
20  tell the truth?
21      A.    Yes.
22      Q.    Okay.  And that's the same oath that you
23  would take in a court of law.  Okay?
24      A.    (Moving head up and down.)
25      Q.    Now, there's not a judge here to rule upon my

```
1    questions or your answers.  But your attorney may lodge
2    objections during this deposition.  If she speaks, let
3    her state exactly what she wants to say and then she
4    and I can talk about it, but you will likely have to
5    answer the question unless she tells you not to.  Okay?
6        A.   Yes.
7        Q.   And I understand that we're going to be
8    speaking about some sensitive topics here.  It is
9    certainly not my intent to embarrass you.  It is not my
10   intent to make you sad.  But because of the nature of
11   this litigation, there will be difficult moments.  And
12   so, I just hope you know, I don't intend to pry or be
13   unduly burdensome on you.  Okay?
14       A.   Okay.  Thank you.
15       Q.   And along those lines, if you ever, you know,
16   need to take a break to collect yourself, just let me
17   know.  We can stop at any time.
18       A.   (Moving head up and down.)
19       Q.   Do you have any questions about what we're
20   going to do here today?
21       A.   Not at the moment.
22       Q.   Okay.
23            Are you on any medication?
24       A.   No.
25       Q.   Okay.  Have you drank any alcohol today?
```

```
 1        A.    No.
 2        Q.    Okay.  Have you taken any drugs?
 3        A.    No.
 4        Q.    Do you have any trouble understanding me?
 5        A.    No.
 6        Q.    If I do ask a question that doesn't make
 7   sense, just tell me that.  Say, "I don't understand
 8   your question," okay, then I'll rephrase it in a form
 9   hopefully that you'll be able to understand.  Okay?
10        A.    Okay.
11        Q.    Let's start with you.  What is your date of
12   birth?
13        A.    __.
14        Q.    What is your current address?
15        A.
16
17        Q.    How long have you lived at that address?
18        A.    About five years.
19        Q.    Okay.  Were you living there at the time of
20   the incident?
21        A.    Yes.
22        Q.    Okay.  If anyone, who was living with you at
23   the time of the incident?
24        A.    Four kids -- four of my kids and myself.
25        Q.    How long have you lived in Las Vegas?
```

| | | |
|---|---|---|
| 1 | A. | Eight years. |
| 2 | Q. | So, you came here in roughly -- |
| 3 | A. | 2016. |
| 4 | Q. | 2015 -- '16?  Okay. |
| 5 | | Where were you born? |
| 6 | A. | Cleveland, Ohio. |
| 7 | Q. | Have you ever been married? |
| 8 | A. | Yes. |
| 9 | Q. | How many times? |
| 10 | A. | One. |
| 11 | Q. | And what was the name of your husband or -- |
| 12 | A. | Harold Johnson. |

13      Q.    Okay.  When did -- how did the marriage --
14  how did the marriage to Harold end?

15      A.    I divorced him.

16      Q.    Okay.  What year did you divorce?

17      A.    2020.

18      Q.    Okay.  And then how many children do you
19  have?

20      A.    Six.

21      Q.    Okay.  And I'm not going to -- this isn't a
22  test, but can you give me their names and ages?  I got
23  six brothers and sisters, too.  Okay?  So, I'm
24  sympathetic to this question.

25      A.    Okay.  So, we're going to start with

```
 1    Christopher Sutton.  That's the oldest.
 2         Q.   Okay.
 3         A.   He's 25.
 4         Q.   And did you say Sutton?
 5         A.   Sutton, S-u-t-t-o-n.
 6         Q.   Okay.
 7         A.   Oh, did you get the age, 25.
 8         Q.   25.   Thank you.
 9         A.   And then you have Isaiah.
10         Q.   Okay.  And he's Williams?
11         A.   Correct.  And he was 19.
12         Q.   Okay.
13         A.   Then you have Ta'nya.  It's T-a, apostrophe,
14    -n-y-a.
15         Q.   Okay.
16         A.   Johnson.  She is 20.
17         Q.   Okay.
18         A.   And then you have Chasity, C-h-a-s-i-t-y,
19    Johnson.  She is 18.
20         Q.   Okay.
21         A.   Then you have Rashad, R-a-s-h-a-d, Jones.
22    He's 14.
23         Q.   Okay.
24         A.   And then you have Sean, S-e-a-n, Johnson.
25    And he is six.
```

12

| | | |
|---|---|---|
| 1 | Q. | Okay.  What was Harold's last name? |
| 2 | A. | Johnson. |
| 3 | Q. | Okay.  Who is Isaiah's father? |
| 4 | A. | Kemal Johnson.  K-e-m-a-l, Johnson. |

5    Q.    And is your maiden name -- how does -- how
6  did Isaiah get the last name Williams?

7        A.    So, my mom's last name is Williams.  So,
8  growing up, until I was 18, I went by Williams.  Then
9  when I went to get my driver's license, they said, "Oh,
10  your Social Security card says Alexander, you need to
11  go by Alexander."  So, he was already born before I did
12  the whole license thing.

13    Q.    Okay.

14      A.    And then he ended up with the Williams with
15  my mom.

16    Q.    Okay.

17          Is it Kemal?

18    A.    Kemal.

19    Q.    Kemal.  Okay.  Is he still alive?

20    A.    Yes.

21    Q.    Okay.  Did he have any involvement in
22  Isaiah's life?

23    A.    He did.

24    Q.    Okay.  Is he aware of this lawsuit?

25    A.    Yes, he is.

1    Q.    Okay.  How involved was he in Isaiah's life?

2    A.    So, I'm -- before I moved to Vegas in 2016,

3    he would go spend the weekends and, you know,

4    periodically pick him up from school.  Just weekends.

5    Q.    Okay.  And was that -- what city was that in?

6    A.    Cleveland.

7    Q.    Cleveland?  Okay.

8    A.    Yes.

9    Q.    So, he -- Mr. Johnson lives in Cleveland?

10    A.    Correct -- well, Akron, Ohio right now.

11    Q.    Okay.  So, he had, like, a weekend

12    relationship with Isaiah?

13    A.    Correct.

14    Q.    And then when -- that ceased when you moved

15    to Las Vegas?

16    A.    Correct.

17    Q.    Did he have any orders for child support or

18    anything that he -- for you?

19    A.    Yes.

20    Q.    Okay.  And was he up on those?

21    A.    Yes.

22    Q.    Kind of?

23    A.    Yeah.

24    Q.    And just if you know:  Did he have any

25    interest in joining this lawsuit?

```
 1        A.    No.
 2        Q.    Okay.  But he's aware it's going on?
 3        A.    Yes.
 4        Q.    Do you have regular contact with him?
 5        A.    Yes.
 6        Q.    Okay.  Are any of your other children from
 7   Mr. Johnson?
 8        A.    Yes.
 9        Q.    Okay.
10        A.    Ta'nya and Chasity.
11        Q.    Okay.  Who were the four children living with
12   you at the time of this incident?
13        A.    Ta'nya, Chasity, Rashad, and Sean.
14        Q.    Okay.  Now, you may not know the answer to
15   this, so if you don't know the answer, say "I don't
16   know," do you intend on calling any of them as
17   witnesses in this lawsuit on your behalf?
18        A.    No.
19        Q.    Okay.
20              And so, Ta'nya and Chasity would have been
21   full brother and sister -- full siblings --
22        A.    Correct.
23        Q.    -- with Isaiah?  Okay.
24              And then Rashad and Sean would be half
25   siblings?
```

```
 1        A.    Correct.

 2        Q.    Kind of?

 3        A.    They don't have the same dad, yes.

 4        Q.    Okay.  Did they have any type of independent

 5   relationship with Isaiah?  Like, did they -- with their

 6   brother?

 7        A.    Independent?  Can you be more --

 8        Q.    Like, were they close?

 9        A.    Yes, very close.

10        Q.    Okay.

11              Who, if anyone, still lives with you now?

12        A.    Just Rashad and Sean.

13        Q.    And at the time of this incident, were you

14   the sole provider for that family?

15        A.    Yes.

16        Q.    What's the highest level of education that

17   you've received?

18        A.    Some college.

19        Q.    Okay.  Graduate high school, then?

20        A.    Yes.

21        Q.    Okay.  In Cleveland?

22        A.    Yes.

23        Q.    What year did you graduate?

24        A.    20- -- 2006.

25        Q.    And then where did you attend college?
```

1    A.    I went to multiple colleges.

2    **Q.    Okay.**

3    A.    Last college is CSN.  So, here in Las Vegas.

4    **Q.    Have you obtained any degrees or**

5    **certificates?**

6    A.    Certificates, I graduated from the police

7    academy.  That was in 2012.  Nursing assistant, that

8    was in 2007.  That's it.

9    **Q.    I believe you have a real estate license,**

10   **too?**

11   A.    I do have a real estate license.

12   **Q.    Okay.  I was going to say, you have quite a**

13   **colorful employment history.**

14   A.    Thank you.

15   **Q.    Yes, yes.  Very interesting.**

16   **You're currently employed?**

17   A.    Yes.

18   **Q.    And where do you work at?**

19   A.    I'm a flight attendant and I just enlisted

20   with the United States Army.

21   **Q.    Good for you.  Why did you enlist in the --**

22   **this probably has nothing to do with the lawsuit.  But**

23   **why did you enlist in the army?**

24   A.    Well, Isaiah was going to enlist in the army.

25   And so, I just thought about it and said I'll just go

```
1    for it and live on his --
2         Q.    So, do you go to basic training and all that
3    now?
4         A.    I do.  I leave on the 9th.
5         Q.    Okay.  Where are you going to go to basic
6    training?
7         A.    Fort Sill.  So, Oklahoma.
8         Q.    Oh.  Enjoy that.
9               What's the endgame with that?  What do you
10   hope to do with the army?
11        A.    I intend to be a pilot and fly.  That's the
12   endgame.
13        Q.    Good deal.
14              Now, just -- if you don't know, you don't
15   know -- are you making any type of lost wages claim in
16   this lawsuit?  So, let me explain that to you.  Are you
17   claiming that as a result of Isaiah's passing, you were
18   unable to work or unable to pursue certain career
19   goals?
20        A.    No.
21        Q.    Okay.
22              At the time of Isaiah's death, what job were
23   you working?
24        A.    Real estate.
25        Q.    Okay.
```

```
 1        A.    Just real estate.
 2        Q.    And when you go to basic training, do your
 3   kids go with you?
 4        A.    No.
 5        Q.    So, what are they going to do?
 6        A.    They're going to stay at home.
 7        Q.    Okay.
 8        A.    Yeah.
 9        Q.    Who's going to take care of them?
10        A.    So, I'm married.
11        Q.    Oh, okay.
12        A.    So, the husband.
13        Q.    What's your husband's first name?
14        A.    Jeremy.
15        Q.    Okay.  Did you know Jeremy prior to Isaiah's
16   passing?
17        A.    Yes.
18        Q.    Okay.  How long have you been with Jeremy?
19        A.    About a year.
20        Q.    And so, how did he know Isaiah prior to the
21   incident?
22        A.    We were friends first.
23        Q.    Okay.  Did he have any relationship with
24   Isaiah?
25        A.    He did.
```

1      Q.    And how would you describe that relationship?

2      A.    They were close.  Because Jeremy just --

3 again, he was just a -- just a friend, at first.  So,

4 he would talk to Isaiah a lot, give him a lot of

5 advice.  But they were close.

6      Q.    Just if you know, do you intend to call

7 Jeremy as a witness in this lawsuit?

8      A.    No.

9      Q.    So, although your employment career is rather

10 interesting, I'll skip most of it because I just don't

11 think it's relevant.  But tell me about your life as a

12 police officer.  How long were you a police officer

13 with the City of East Cleveland?

14      A.    Four and a half years.

15      Q.    Why did you become a police officer?

16      A.    Community policing, really.  Just wanted to

17 do the whole community policing thing.

18      Q.    Did you have to go through an academy?

19      A.    I did.

20      Q.    How long was the academy?

21      A.    About four and a half, five months.

22      Q.    And was that in Cleveland?

23      A.    Yes.  Cleveland Heights.

24      Q.    Okay.  And you passed and became a police

25 officer?

```
 1        A.    Yes.
 2        Q.    Okay.  And how long -- and you worked as a
 3   police officer for four and a half years?
 4        A.    Correct.
 5        Q.    What was the highest rank you obtained?
 6        A.    Just patrol.
 7        Q.    Okay.  I wouldn't say just patrol.
 8        A.    Well, patrol.
 9              CORRINE MURPHY, ESQ.:  Craig represents a lot
10   of police officers.
11              CRAIG ANDERSON, ESQ:  Patrol's the hardest
12   job.  Okay?
13              THE WITNESS:  Yeah.
14              CORRINE MURPHY, ESQ.:  It's the dirtiest one.
15   BY CRAIG ANDERSON, ESQ:
16        Q.    So, you did calls for service, all the fun
17   stuff, huh?
18        A.    I did calls for service.  I also did SWAT.
19   Because it was a smaller police department, so we had
20   our hands in everything.  We was pretty much all hands
21   on deck.
22        Q.    Yes, okay.  So, how many commissioned
23   officers were there in the City of East Cleveland?
24        A.    I'm not sure.
25        Q.    Okay.  Under 100?
```

1    A.    Under 100.

2    Q.    Okay.  And so -- and I understand how those

3    departments work.  So, you had -- wore many hats?

4    A.    Correct.

5    Q.    Okay.  And did you say that you were on the

6    SWAT team?

7    A.    I was a part of the SWAT team.  I wouldn't

8    say I was on the SWAT team.  But I did two maneuvers --

9    two SWAT -- we call them SWAT maneuvers.

10    Q.    Okay.  And would those be raids or service of

11    warrants?  What were the two maneuvers that you did?

12    A.    One was a raid.

13    Q.    Okay.

14    A.    As a matter of fact, it was three SWAT

15    maneuvers.  But one was a raid for drugs.  The other

16    one was -- it just happened to be the same day.  We got

17    a call that somebody was shooting.  And then we ended

18    up responding to that and surrounding the house for

19    that.

20    Q.    Okay.

21    A.    And then the other one was a patient -- a

22    mental -- mental illness.

23    Q.    Okay.  Now, to be part of the SWAT team, did

24    you have to undergo specific SWAT training?

25    A.    Yes.

22

1    Q.    Okay.

2    A.    Yeah, just qualifying with your weapon more.

3    Q.    I'm sorry?

4    A.    Qualifying with your weapon.

5    Q.    Okay.  Qualifying with your weapon.

6          Did you receive any training on the service

7    of warrants or no-knock warrants?

8    A.    No.

9    Q.    Okay.

10         In the three SWAT tasks you performed --

11   well, let me just back that up.  Strike that question.

12         In your four and a half years, did you ever

13   have to fire your weapon?

14   A.    No.

15   Q.    On the SWAT raid for drugs you were talking

16   about, did you forcefully enter a premises?

17   A.    They did.

18   Q.    Did that occur day or night?

19   A.    Night.

20   Q.    Okay.  And was that a successful operation?

21   A.    Yes.

22   Q.    And what was your role in that operation?

23   A.    I was the officer that was in the front of

24   the house.  Basically, my role was to -- if the suspect

25   was to run out, then we would apprehend.  And then

1    after we entered the home, there was kids that was in

2    the home.  I sat with the kids.

3        Q.    Okay.  So, you were not part of the entry

4    team, you were part of the containment team?

5        A.    Correct.

6        Q.    Okay.

7              Why did you cease to be a police officer with

8    the City of East Cleveland?

9        A.    I moved to Las Vegas.

10       Q.    What was the reason you moved to Las Vegas?

11       A.    Weather.

12       Q.    I don't think anyone ever says they're going

13   to move to Las Vegas; right?

14       A.    Yeah.

15       Q.    So, just one day you decided to move here

16   because it's hot?

17       A.    Yes.  Exactly.  I came here and visiting, I

18   was like, "Oh, it's nice."

19       Q.    We have one attorney here from Cleveland and

20   that's kind of what he said, too.  So...

21             So, did you know anybody in Las Vegas?

22       A.    I did not.

23       Q.    Okay.  Any part of the job that you -- did

24   you like being a police officer?

25       A.    I did.

24

```
1        Q.    Okay.  When you moved out here, did you think
2   about being a police officer?
3        A.    I did.
4        Q.    Did you take any steps to do that?
5        A.    I did.
6        Q.    What did you do?
7        A.    I applied for North Las Vegas Police
8   Department.  I did the physical.  And then the
9   background check, I got disqualified.  I applied for
10  Metro.  I did not go past the written exam and state --
11  no, Deputy Marshal, I actually had applied.  I was in
12  the hiring process before I moved to Las Vegas with
13  them.  And then I didn't get -- I got disqualified from
14  them, as well.
15       Q.    What was the reason for the disqualification?
16       A.    They said something about -- in the lie
17  detector test, they asked me a question, it didn't come
18  back the way they wanted it to come back.  So, they
19  disqualified me for that.
20       Q.    Hmm.  Okay.
21       A.    And then North Las Vegas was -- then I got
22  pulled over by a police officer for running a red light
23  and I -- that disqualified me.
24       Q.    Really?
25       A.    (Moving head up and down.)
```

25

1       Q.    I guess I can't be a cop.  No, I know it's
2   crazy.  The lie detecter test is crazy, too, huh?  The
3   questions they ask you?
4       A.    Yeah.
5       Q.    Yeah, I don't know that I can pass that.
6   Even telling the truth.
7             Okay.  And so, kind of given up on that?
8       A.    Yes.
9       Q.    Okay.
10            Ever been convicted of a felony?
11      A.    No.
12      Q.    Okay.  Besides traffic citations, ever been
13  arrested?
14      A.    No.
15      Q.    Okay.
16            Prior to the incident we're here to talk
17  about, did you ever have any encounters with anything
18  from just the Las Vegas Metropolitan Police Department?
19      A.    No.
20      Q.    Ever been pulled over, anything?
21      A.    Pulled over, yes.  I don't think that was
22  before the incident, though.  It might have been after.
23  That was definitely after the incident.
24      Q.    For just, like, a traffic infraction?
25      A.    Yes.

1    Q.    Okay.

2    A.    Yes.

3    Q.    Anything unusual -- since it was after the

4    incident, did they know who you were?

5    A.    No.

6    Q.    Okay.  And anything about your personal

7    interactions with the Las Vegas Metropolitan

8    Police Department, excluding what we're here to talk

9    about, that you had any complaints with prior to the

10   incident?

11   A.    You said prior to the incident?

12   Q.    Prior to, yeah.

13   A.    No.

14   Q.    Okay.  Excluding our incident, and I'll give

15   you a chance to talk all you want about it, have you

16   had any negative experiences with the Las Vegas

17   Police Department outside of Isaiah's incident?

18   A.    Besides the traffic stop that I had?  Yeah,

19   but I had a conversation with the officer.  That was

20   pretty negative.  Because he was yelling and screaming

21   for me to put my hands on the steering wheel and roll

22   my windows down.  And I didn't understand what was the

23   point of that.

24        And I asked him, did he run my plate and he

25   said no.  I didn't understand, "How did you -- why were

1    you so aggressive and you hadn't even ran the plate

2    yet." Yeah, that was pretty much the only negative.

3        Q.  Okay.  Did you receive a ticket for anything

4    on that?

5        A.  I did not.

6        Q.  Okay.  And do you -- why did he pull you

7    over?

8        A.  He claims that I ran a stop sign.

9        Q.  Oh, okay.

10        A.  Which I did not.  Because I had to stop and

11    make a complete stop.  Because it was foggy that day

12    and I couldn't see.  So, I stopped because I couldn't

13    see where we were at, if I could go left or right.  It

14    was kind of, like, blocked.  And so, yeah.

15        Q.  Okay.  But he let you go, but was rude to you

16    during the stop?

17        A.  Oh, yes.

18        Q.  Well, just so you know, I got stopped once

19    during a deposition doing this.  I went to lunch, got

20    stopped, didn't have my insurance with me.  They told

21    me -- and I even said I was doing a -- can you drive me

22    back --

23                  CRAIG ANDERSON, ESQ:  Here go off the record.

24                  (Pause in the proceedings.)

25                  CRAIG ANDERSON, ESQ:  Back on.  Sorry.

```
 1              CORRINE MURPHY, ESQ.:  Sorry.  No, you're
 2    good.
 3    BY CRAIG ANDERSON, ESQ:
 4         Q.   Have you ever filed any prior lawsuits?
 5         A.   Yes.
 6         Q.   Okay.  What for?
 7         A.   I was in, like, the eighth grade and the
 8    waitress spit in our food.
 9         Q.   Oh, okay.  And so, that was, like, a family
10    lawsuit against the --
11         A.   Yes.
12         Q.   Okay.  Any -- but you never had to give a
13    deposition?
14         A.   No.
15         Q.   Okay.  And was that in Cleveland?
16         A.   Yes.
17         Q.   Okay.  Any other lawsuits?
18         A.   No.
19         Q.   Ever been sued?
20         A.   No.
21         Q.   When you were on the police department, were
22    you ever involved in an incident that a lawsuit
23    followed?
24         A.   No.
25         Q.   So, now I want to get some information on
```

29

```
 1   Isaiah's background.  Okay?
 2       A.   Okay.
 3       Q.   So, if you don't know the information, just
 4   say, "I don't know."  What was his full name?
 5       A.   Isaiah, I-s-a-i-a-h, Tyree Williams.
 6       Q.   Okay.  Where was he born?
 7       A.   Cleveland, Ohio -- well, Akron, Ohio.
 8       Q.   And did he live continuously with you in Ohio
 9   until you moved to Las Vegas?
10       A.   Yes.
11       Q.   Okay.  He lived with you his whole life until
12   roughly November of 2021; right?
13       A.   Yes.
14       Q.   Did he go by any nicknames?
15       A.   Zay, Z-a-y.
16       Q.   Is that a family nickname or a friend
17   nickname?
18       A.   Friend nickname.
19       Q.   What was his date of birth?
20       A.
21       Q.   So, was he 19 years old?
22       A.   He was 19, correct.
23       Q.   What was the highest level of education
24   Isaiah received?
25       A.   High school diploma.
```

30

```
 1   Q.   Where from?

 2   A.   C.O. Bastian, B-a-s-t-i-a-n.

 3   Q.   And is that here in Las Vegas?

 4   A.   It's in Nevada.

 5   Q.   Okay.  What type of high school is that?

 6   A.   It's a juvenile detention high school.

 7   Q.   Where did Isaiah start high school?

 8   A.   Mojave, Mojave High School.

 9   Q.   Okay.  And how long did he attend Mojave?

10   A.   Two years.

11   Q.   And what was his reason for leaving Mojave?

12   A.   We moved down the street.

13   Q.   Okay.  And then where did he go?

14   A.   Legacy High School.

15   Q.   How long did he attend Legacy?

16   A.   One year.

17   Q.   And --

18   A.   But then he went back to Mojave.

19   Q.   Okay.  And how did he end up at Bastian?

20   A.   Joyriding.

21   Q.   Okay.

22   A.   With a group of friends.

23   Q.   Is that the stolen car incident?

24   A.   Yes.

25   Q.   Okay.
```

31

```
 1        A.    Are you -- the stolen car incident from when
 2   he was a juvenile?
 3        Q.    Yes, the juvenile one.
 4        A.    Okay.  Yes.
 5        Q.    Okay.  So, there was an incident where he was
 6   in a car that was stolen; right?
 7        A.    Correct.
 8        Q.    Okay.  And is that the reason that he had to
 9   go to the juvenile detention high school?
10        A.    Yes.
11        Q.    Okay.  Did he plead guilty to that?  Did he
12   go to trial?
13             CORRINE MURPHY, ESQ.:  I'm sorry, I'm just
14   going to do one objection as to relevance and the
15   scope, just because he was a juvenile then.
16   BY CRAIG ANDERSON, ESQ:
17        Q.    Understood.  Yeah.
18             CORRINE MURPHY, ESQ.:  But you still answer,
19   sorry.
20   BY CRAIG ANDERSON, ESQ:
21        Q.    Yeah, and this is where I'm not trying to
22   pry, I'm just trying to get a foundation for stuff.
23   Okay?  I'm not going to go deep into this stuff.  And
24   we can probably do it this way:  As a juvenile, he was
25   arrested for being in a stolen car; correct?
```

```
 1        A.    Yes.
 2        Q.    Okay.  And then he was put on some form of
 3   probation?
 4        A.    Yes.
 5        Q.    Okay.
 6              How old was he when that happened?
 7        A.    About 17.
 8        Q.    Okay.  Was he still on probation at the time
 9   of our incident?
10        A.    Yes.
11        Q.    Okay.  Do you know how long his probation was
12   for?
13        A.    I do not.
14        Q.    Do you know if he was in compliance with his
15   probation?
16        A.    He was.  He -- he had just got on probation,
17   like, in -- he never got to even see his probation
18   officer because this incident happened.
19        Q.    Was there ever any other time before November
20   of 2021 that he moved out of your house?
21        A.    No.
22        Q.    And did Isaiah ever work a job, to your
23   knowledge?
24        A.    No.
25        Q.    Okay.  So, you were his full support?
```

1    A.    Yes.

2    Q.    Now, I noticed in some of the text messages

3    between you and Isaiah that he offered to give you

4    money at times.  Do you know where he received that

5    money?

6    A.    Yeah.  So, Isaiah would do -- like, he would

7    help people move, they would pay him.  There was a guy

8    down the street, he would help clean out his garage, he

9    would pay him.

10    Q.    So, just odd jobs?

11    A.    So, just odd ends, yeah.

12    Q.    What type of student was Isaiah?

13    A.    Excellent student.  He got good grades.  He

14    always -- he was the student that -- he didn't have to

15    study and he would pass his tests.

16    Q.    Do you have any of his high school

17    transcripts or any of that?

18    A.    I don't.

19    Q.    Okay.  Would you be willing to sign a release

20    so we could obtain those?

21    A.    Yes.

22    Q.    Okay.  And so, when you say "good grades," As

23    and Bs, Cs and Bs?

24    A.    Cs and -- Cs and Bs average.

25    Q.    Was he ever put on any type of academic

1    **probation?**

2         A.   Not that I could remember.  But I know he did

3    class -- class clown.  He would get in trouble for

4    certain things.

5         **Q.   So, discipline for acting up, huh?**

6         A.   Yes.

7         **Q.   Yeah?  Okay.  Did you ever have to go to the**

8    **school and meet with somebody about his behavior?**

9         A.   Once.  So, long story.  He had a -- I had my

10   bullets in the bag when I moved to Las Vegas and they

11   were, like, tied into a bag at the top of the closet.

12   No weapon, just -- just the bullets.

13           And I guess one of them fell in his shoe, in

14   one of his gym shoes.  So, he had it in his bag.  So,

15   when he pulled the gym shoe out, the bullet fell out

16   the gym shoe and, of course, everybody made a big scene

17   about it and he got in trouble for that.

18        **Q.   For just having a bullet, huh?**

19        A.   Yeah.

20        **Q.   Did he have a gun on him?**

21        A.   No gun.

22        **Q.   Maybe he could throw it.**

23           **Any other discipline that you were aware of**

24   **for -- after high school?**

25        A.   Not that I can remember, no.

1    Q.    Okay.  But he did finish high school?

2    A.    Yes, he did.

3    Q.    Now, did he get a diploma or a GED?

4    A.    A diploma.

5    Q.    And just if you know, did he graduate on

6    time, like, when he normally would?

7    A.    Maybe a few months off.

8    Q.    Okay.

9    A.    Yes.

10    Q.    Understanding that -- well, what year did he

11    graduate?

12    A.    '21.

13    Q.    Okay.

14    A.    So, right before.

15    Q.    Okay.  So, he really didn't have time to

16    start his life; correct?

17    A.    Correct.

18    Q.    Okay.  Did he ever talk to you about what he

19    hoped to do with his life or what his aspirations were?

20    A.    He was going to the army, actually.  He took

21    the practice ASVAB.  He was supposed to go take the

22    real ASVAB and then he caught COVID.

23    Q.    Did he ever tell you what he wanted to be

24    when he became an adult or --

25    A.    Engineer.

36

1      Q.   Did you ever have to call the police on

2  Isaiah?

3      A.   No.

4      Q.   Okay.

5         And let's see.  I think his juvenile arrest,

6  was that in August of 2021?

7      A.   August of '21, no.

8      Q.   Okay.

9         What was the reason that Isaiah left your

10  home in November of 2021?

11      A.   We got into a dispute about a neighbor down

12  the street, and he left with the neighbor down the

13  street.  I thought it would blow over and he would come

14  home.  But the incident happened, so...

15      Q.   Are you aware of any other arrests of Isaiah

16  besides the stolen car incident?

17      A.   No.

18      Q.   Okay.  And what was the problem with the

19  neighbor?

20      A.   So, my daughter and her daughter got into a

21  fight.  And Isaiah was being a -- a boy, and he was

22  kind of instigating the fight.  And, yeah, the lady

23  came to my house after the fight, because we stayed,

24  again, four doors down from each other, and it just

25  kind of got escalated from there.

1    Q.    And what was your problem with Isaiah
2    where -- did you kick him out of the house?
3    A.    It more was like -- if you want to go be with
4    them, go be with them, then, and he chose to go be with
5    them.
6    Q.    So, like, a mutual parting?
7    A.    A mutual parting.
8    Q.    Okay.  Where in the heat of a moment, you're,
9    like, get out of here, well, I want to go, that sort of
10   thing?
11   A.    Yes.
12   Q.    Okay.
13        Prior to him leaving the home, were you ever
14   concerned about the friends or who he was hanging out
15   with?
16   A.    Yes.
17   Q.    To your knowledge, was Isaiah ever associated
18   or part of a gang?
19   A.    No.
20   Q.    And what were your concerns with his friends?
21   A.    Just -- the friends just to me were bad
22   apples.  Just -- like I said, the joyriding thing,
23   right there, that was -- you don't need to be around
24   them.  Things like that.
25   Q.    Okay.  And, I mean, was he a normal teenage

1  boy who pushed back on that?

2      A.   Of course, yes.

3      Q.   Okay.  Was he ever disrespectful to you?

4      A.   Never.

5      Q.   How would you describe him -- your

6  relationship with him?

7      A.   Me and Isaiah was really, really, really

8  close.  Like, he was almost, like, kind of the man of

9  the household.  I didn't have to ask him to cook,

10  clean.  He baby-sat my -- the youngest -- my youngest

11  son.  He put everything together; bookshelves,

12  anything.  Anything he would put -- he could put

13  together.  Yeah, very, very close.  Very close.

14      Q.   How was he as an older brother?

15      A.   Great older -- great older brother.  It's

16  amazing the amount of videos that they -- that they had

17  together.  Yeah, they were super close.

18      Q.   What type of hobbies and things did Isaiah

19  enjoy doing?

20      A.   Skating.  He loved basketball -- even though

21  he couldn't play basketball, he loved, loved

22  basketball.

23      Q.   Why couldn't he play basketball?

24      A.   He just was bad.

25      Q.   Oh.

Mamba Reporting, #119F
www.mambareporting.com                    (702) 401-3985
                                    mambareporting@gmail.com

39

```
 1        A.    He was just bad.
 2        Q.    Okay.  So, he was not a good basketball
 3   player, but he enjoyed it?  Okay.
 4        A.    But he loved basketball.  Yeah.
 5        Q.    Yeah.
 6              And did you and him have any, like, special
 7   hobbies or things you enjoyed to do together?
 8        A.    Amusement parks.  We had just, actually, went
 9   to kings and -- is it -- Castles N' Coasters in
10   Arizona.  We had drove up to Arizona as a family and we
11   had went to the amusement park.  So, that would be our
12   thing.  We would go to -- even in Cleveland, we would
13   go to Cedar Point.  And -- and I would trick him onto
14   rides that I knew he would be scared to ride.  So,
15   yeah.
16        Q.    But you could get him on, huh?
17        A.    I could -- yeah.  And then we would be going
18   up the hill, he was like, "You told me" -- I'm like,
19   "Yep, too late now, son."
20        Q.    So, around the house, what responsibilities
21   did Isaiah have, if anything?
22        A.    Everything.  He just -- he was just naturally
23   responsible when it came to being around the house.
24   Keeping his room clean, watching after his siblings.
25   Like I said, washing dishes, putting things together.
```

40

1    He just -- even -- it was -- I would be out, like,

2    messing with the battery, "Mom, move, I got it."  He

3    would even try to work on the car.

4        Q.    Now, I think I may have asked you.  I was

5    wrong on the date about the joyriding.  Are you aware

6    as to whether he was arrested in August of 2021 for

7    possession?

8        A.    Yes.

9        Q.    Okay.  And do you have any -- did he ever

10   tell you about that arrest?

11       A.    He was not specific.  But, of course, I knew

12   about it because he was living with me.

13       Q.    Okay.  Was that for possession of drugs?

14       A.    No, no, no, no.

15       Q.    Was that --

16       A.    Oh, for the -- for the vehicle.

17       Q.    Oh, for the vehicle.  Okay.  I'm with you.

18   Okay.

19       A.    No drugs.

20       Q.    Okay.  Did you ever know Isaiah to use drugs?

21       A.    No.

22       Q.    Okay.  Did he have a problem with stealing

23   cars?

24       A.    No.

25       Q.    Okay.  How -- what did he tell you about the

1    joyride incident?  Was he part of the people that took

2    the car or did he just end up in the car?

3        A.    So, the people -- somebody else took the car

4    and then he was -- they was taking turns driving the

5    car.

6        Q.    Okay.

7            Now, we've received some records from the

8    North Las Vegas Police Department about Isaiah after he

9    left your home.  Had you reviewed those?

10       A.    No.

11       Q.    Okay.  There are allegations in there that he

12   was involved in car thefts in December of 2021.  Do you

13   have any information on that?

14       A.    No.

15       Q.    Did you ever have concerns that he was doing

16   criminal activity?

17       A.    No.

18       Q.    Now, you produced your text messages between

19   you and Isaiah.  And you're aware of that; correct?

20       A.    Yes.

21       Q.    Between August 16th of 2021 and

22   November 22nd of 2021, there was no text messages.  But

23   there's a lot before and after.  Was there a reason

24   there was no contact between you and him?  Because he

25   would have been living with you at that time.

42

1      A.    Yes.   So, he lost his phone every other day.

2      Q.    **Okay.**

3      A.    And I had to keep getting him some cards or

4  getting him new phones.   So...

5      Q.    **Okay.   So, it was a lack of a phone, then?**

6      A.    Yes.

7      Q.    **Okay.   This seemed to be because, I mean,**

8  **there was plenty of texts between you.**

9            **At the time of his passing, North Las Vegas**

10  **was looking for him in an incident where allegedly he**

11  **stole a car and was stealing shoes from people.   He**

12  **would meet people to buy their Nikes and steal them.**

13  **And they had Isaiah as a suspect for that.   Do you have**

14  **any information about that?**

15      A.    No.

16      Q.    **Okay.**

17            **Have you ever seen any of those records?**

18      A.    No.

19      Q.    **Okay.   But they did do a search warrant on**

20  **your home on December 21st; correct?**

21      A.    Yes.

22      Q.    **Did they tell you why they did a search**

23  **warrant on your home?**

24      A.    They were not specific, but they did say

25  something about some shoes and that they were looking

43

```
 1   for shoes.  And that was pretty much it.

 2        Q.   Okay.  Did you reach out to Isaiah after

 3   that?

 4        A.   I did.

 5        Q.   Okay.  Did he tell you what was going on?

 6        A.   No.

 7        Q.   All right.  Was that concerning to you?

 8        A.   Yes.

 9        Q.   Okay.  And it was North Las Vegas that raided

10   your house; correct?

11        A.   Yes.

12        Q.   Okay.  Any complaints about the way they

13   handled that situation?

14        A.   No.

15        Q.   Okay.  Do you know if they found anything?

16   Did they take anything?

17        A.   They didn't find anything, no.

18        Q.   Okay.  And you told them that you had kicked

19   Isaiah out and that his belongings were in the garage;

20   correct?

21        A.   Yes.

22        Q.   Okay.  And, again, this is not -- you know,

23   I'm not meaning to pry or -- I got kids, okay?  So -- I

24   got one I don't talk to.

25             At that point in time, was it just a cooling
```

1    off period between you and Isaiah or were you done with
2    him?  What was your thought process around that period?
3         A.    Cooling off period.
4         Q.    Okay.  Because you still remained in contact
5    with him; correct?
6         A.    Yes.
7         Q.    Okay.
8               And, I mean, obviously, you were concerned
9    about the life he was living?
10        A.    I was concerned about the people that he was
11   hanging with.
12        Q.    Okay.  And is that the situation you're
13   talking about with the neighbor where it was, like,
14   pick the friends or our family and like a teenager, he
15   picked his friends?
16        A.    Yes.
17        Q.    Okay.
18              Now, you also told the police on the body cam
19   video that you were the one who turned Isaiah in for
20   stealing the car; correct?
21        A.    So, no.
22        Q.    Okay.
23        A.    I found a bunch of credit cards.
24        Q.    Okay.
25        A.    And I just handed them the credit cards.

45

1        Q.    Oh, okay.   That Isaiah had?

2        A.    Yeah -- I don't know who -- he has friends

3    over, I don't know whose credit cards they were.   But I

4    didn't want them in my home, so I gave them to the

5    officers.

6        Q.    And so, were you concerned about Isaiah being

7    in a life of crime at this point or did you think he

8    was just the victim of bad friends?

9        A.    Victim of bad friends, for sure.

10       Q.    And were you ever able to have conversations

11   with him that were productive about his friends?

12       A.    Yes.

13       Q.    Okay.   And what was his response?

14       A.    "Mom, they're not that bad."   "They are bad."

15   But, yes, he would tell me that his friends were not

16   that bad, they weren't doing anything.   "We -- all we

17   do is play video games and play basketball."

18       Q.    And did the police -- the North Las Vegas

19   police ever give you any information on Isaiah, why

20   they were looking for him, what they thought he had

21   done?

22       A.    Just stealing the shoes.

23       Q.    Okay.   And did they ever follow up with you?

24       A.    No.

25       Q.    Did they damage any property in your house?

1      A.   No.

2      Q.   Did you ask Isaiah whether he was robbing

3   people for their shoes?

4      A.   No.

5      Q.   Okay.  You never had a conversation with him?

6      A.   No.  I actually called him after the incident

7   and I was like, "What are you doing, what's going on?"

8   And he said, "I didn't do anything.  I don't know why

9   they were there."  So, he denied the allegations.

10     Q.   Did you believe him?

11     A.   Yes.

12     Q.   Now, to your knowledge, when you lived with

13  Isaiah, did he ever have firearms?

14     A.   No.

15     Q.   Okay.  Did you keep guns in the house?

16     A.   I have one.

17     Q.   Okay.  A former cop with only one gun, that's

18  not a lot.  You must have an arsenal.

19     A.   I did not want to have any more guns, really,

20  after that.  Yeah.

21     Q.   Okay.  Did you ever talk to Isaiah about

22  guns?

23     A.   Yes.

24     Q.   Okay.  In what capacity?  What did you say to

25  him?

1      A.   Just that, you know, be careful, don't, you

2  know, have guns, don't be around guns, accidents can

3  happen.  It's dangerous.  You don't have a CCW, you

4  have to be careful.  You could just -- as a black man

5  walking the street, you have a gun on you, not carrying

6  it properly, police can detain you, you can get shot.

7  We had multiple conversations about that.

8      **Q.   Okay.  And -- but you never personally saw**

9  **Isaiah with a gun?**

10     A.   Correct.

11     **Q.   Okay.  Did you ever take him out shooting**

12  **with your gun or train him in gun use?**

13     A.   No.

14     **Q.   Did you ever see him on social media with**

15  **firearms?**

16     A.   Yes.

17     **Q.   Okay.  When?**

18     A.   I don't know specific dates.  I just know

19  that it was him and a group of friends.

20     **Q.   And was that concerning?**

21     A.   Yes.

22     **Q.   Did you talk to him about that?**

23     A.   Yes.

24     **Q.   What did he say, if anything?**

25     A.   "It wasn't my gun.  We just was playing with

```
 1    it."  I'm like, "No, so many incidents where people,
 2    you know, accidentally shoot themselves and their
 3    friends."
 4         Q.   Now, when North Las Vegas went through his
 5    Instagram, they found numerous messages from Isaiah
 6    bragging about stealing cars and shoes.  Were you aware
 7    of those?
 8         A.   I'm not.
 9         Q.   Okay.
10              And so, to your knowledge, you had no
11    information about any types of criminal activity he was
12    involved in, besides the one car he stole as a
13    juvenile; correct?
14         A.   Correct.
15         Q.   And with respect to this -- the credit cards
16    that were not his, you don't know if those were his or
17    a friend's, but they ended up in your house?
18         A.   Correct.
19         Q.   Okay.  And you turned those over to the
20    police?
21         A.   Yes.
22         Q.   And you were never accused of any wrongdoing?
23         A.   No.
24         Q.   Okay.
25              When was the last time you physically saw
```

1    Isaiah?

2        A.    In November.

3        Q.    And was that when the final straw -- where he

4    left?

5        A.    Yes.

6        Q.    Okay.  And was that a bad parting?  Did you

7    leave on bad terms?

8        A.    Yes.

9        Q.    Okay.  But then you kind of -- it kind of

10    softened; right?

11        A.    Yes.

12        Q.    Okay.  And then you had a text message

13    relationship?

14        A.    And talking on the phone, yes.

15        Q.    Okay.  How often would you talk with him on

16    the phone after he left?

17        A.    He didn't really have a phone -- well, he had

18    a phone, but he had a SIM card, again, so he had to

19    talk on Wi-Fi.  But we were talking about maybe once or

20    twice a week.

21        Q.    So, when you would talk to him during that

22    time period, what type of topics would you cover?

23        A.    Just how you're doing, what you doing, are

24    you okay, are you safe.  He'd say, yes.

25        Q.    Is there -- let's see, so it would have been

1    about five or six weeks before his passing that he
2    left; correct?
3        A.    Yes.
4        Q.    Okay.  So, it was five or six weeks that you
5    didn't see him?
6        A.    Correct.
7        Q.    Is there a reason why you didn't see each
8    other, meet up for lunch or anything?  Did it just work
9    out that way or...
10       A.    It just worked out that way.  No specific
11   reason.  He was actually supposed to meet with me to
12   come get a SIM card, but -- yeah.
13       Q.    What about the holidays, Christmas and
14   New Year's, was that unusual that you didn't spend
15   Christmas with him?
16       A.    It is.
17       Q.    Okay.  Was that the only Christmas you didn't
18   spend with him?
19       A.    That's the only Christmas.
20       Q.    Okay.  Did you ever ask him to come spend
21   Christmas with you?
22       A.    I didn't.
23       Q.    Okay.  Did he ever ask you to come spend
24   Christmas?
25       A.    He didn't.

```
 1        Q.    Okay.

 2              Do you know where Isaiah was staying during

 3   those five or six weeks?

 4        A.    With Kwame Crockett.

 5        Q.    Kwame?

 6        A.    Kwame.  He was the other person in the

 7   apartment.

 8              (The court reporter requested clarification

 9              of the prior testimony.)

10              THE WITNESS:  Kwame is K-w-a-m-e.

11   BY CRAIG ANDERSON, ESQ:

12        Q.    And in the 3050 South Nellis apartment?

13        A.    Correct.  But that's not where they were

14   living, that's just where they were together.

15        Q.    Okay.  But Kwame is the individual who was

16   with him on the day of the incident?

17        A.    Yes.

18        Q.    Okay.  Where were him and Kwame staying, if

19   you know?

20        A.    With his mom.

21        Q.    Kwame's mom.

22        A.    Kwame's mother.

23        Q.    Do you have a relationship with Kwame's mom?

24        A.    I do not.

25        Q.    Okay.  Prior to the incident, did you?
```

1          A.    No.

2          Q.    Okay.

3                Do you know how Isaiah was supporting himself

4     during those five to six weeks?

5          A.    I don't.

6          Q.    Okay.  Did he ask you for money during that

7     time?

8          A.    He did not.

9          Q.    Okay.

10                Besides the raid in December with the

11    North Las Vegas, did any police officers ever come to

12    your home and ask you about Isaiah or talk to you on

13    other occasions?

14         A.    You said after the raid?

15         Q.    Well, not counting the raid.  I know that you

16    had contact --

17         A.    Okay.

18         Q.    -- with the police on that day.  Other than

19    that day, did any police officers ever come to your

20    home before his passing?

21         A.    Oh, before his passing?

22         Q.    Yeah.

23         A.    No -- before his passing -- well, when they

24    arrested him for the juvenile.

25         Q.    Okay.  But they never came to your home

1   looking for him --

2       A.   No.

3       Q.   -- during the month of December?

4       A.   After the raid.

5       Q.   After his passing?

6       A.   Before his passing.

7       Q.   Okay.

8       A.   So, the raid, that happened in December, of

9   my home.

10      Q.   Okay.

11      A.   The officer came by -- he didn't come looking

12  for Isaiah specifically, he just came to see if -- they

13  wanted to ask me if they could search my -- like, where

14  he -- where his common areas was, even though he wasn't

15  there to see if they could find a key fob.  And I let

16  them in.

17      Q.   Okay.  And you let them search?

18      A.   Yeah, I let them search it.

19      Q.   Okay.

20           So, before we get into the incident, let me

21  give you a fair opportunity to talk about Isaiah.

22  Because I understand the last month of his life would

23  have been rough between the two of you; correct?  Not

24  the best?

25      A.   I mean, at that point, of January, we were

1  fine.

2      Q.   Okay.

3      A.   Like, we were supposed to be meeting up and

4  probably would have had a conversation about him coming

5  home.  And, yeah -- so, we were -- we were fine.

6      Q.   Okay.  So, ignoring that time period, okay,

7  before he moved out or you kicked him out, you've kind

8  of touched on it.  But what would you like to tell me

9  about Isaiah as a person?

10     A.   Oh, man.  He was a sweetheart.  He helped

11 everybody in the community.  He always wanted to help,

12 like, his friends -- like, they got kicked out or they

13 were having problems at home, "Mom, can they come live

14 with me?"  So, he was just -- he just helped everybody.

15 Just -- that was his -- always been his personality.

16 He would see some older lady with some trash, he'd get

17 the trash for her.  Just --

18     Q.   What was his personality like?  Was he

19 serious, was he jovial?

20     A.   Always joking.  Always got jokes.

21     Q.   Did he have significant others or dating

22 relationships?

23     A.   He did.

24     Q.   Okay.  Anyone steady?

25     A.   One.

1    Q.    Okay.

2    A.    One girl.

3    Q.    **And how long was he with her?**

4    A.    I'm not sure how long they were together.

5    Q.    **Okay.  Did you meet her?**

6    A.    I did.

7    Q.    **Okay.  So, did you see him interact with her?**

8    A.    Once.

9    Q.    **Okay.  What other things did he enjoy?  Did**

10   **he enjoy video games, hunting, fishing, you know,**

11   **bowling?**

12   A.    Video games for sure.  He would play video

13   games all day and night.  And, again, he liked going

14   skating.  He would go skating, museum parks.

15   Q.    **When you say skating, like, roller skating?**

16   A.    Roller skating.  Yeah, he used to go roller

17   skating.  Let's see, what else?  Basketball, again.

18   What else did he do?

19          Oh, he'd draw.  He -- he was a really -- he

20   used to draw really, really good.  So, he was very

21   artistic.  He would, like, make these stickers that you

22   can, like -- like, of movies, like the -- the -- the

23   front cover of a movie and he would put them on a wall.

24   So, he did a lot of stuff.

25   Q.    **What video games did he like to play?**

```
 1        A.    Let's see.  What is it?  The military one
 2   where they be shooting -- I don't know the name of
 3   them.  I don't remember.
 4        Q.    And did he have any friends you liked?
 5        A.    No.
 6        Q.    Okay.  What about Kwame, what's -- do you
 7   know Kwame?
 8        A.    I did not know Kwame before the incident.
 9        Q.    Okay.  Do you know him now?
10        A.    I do.
11        Q.    Has Kwame ever told you what happened the day
12   of the incident?
13        A.    He will not talk about it.
14        Q.    Okay.  Did he -- ever tell you why they were
15   at that apartment?
16        A.    No -- oh, why Kwame and Isaiah was there?
17        Q.    Yeah.
18        A.    Yes.
19        Q.    Why they were at the 3050 Nellis Boulevard --
20        A.    Yes.
21        Q.    Why were they were?
22        A.    Because they had a curfew.  Their curfew was
23   I believe 9:30.  They didn't make curfew.  They called
24   mom at 10:30 p.m. and mom said, "Y'all did not make
25   curfew," so she stuck to her no.
```

1    Q.    So, the curfew restriction was placed on by
2  Kwame's mom?
3    A.    Correct.
4    Q.    Okay.  It wasn't, like, part of his
5  probation?
6    A.    No.
7    Q.    Okay.
8          And do you know who was renting that
9  apartment, who the -- the person on the lease was?
10    A.    I do not.
11    Q.    Do you know how they had access to it?
12    A.    I do not.
13    Q.    Okay.  And Kwame has never told you about
14  that?
15    A.    No.
16    Q.    Okay.  And has Kwame ever talked to you at
17  all about the incident?
18    A.    No.
19    Q.    Okay.  He's never told you what he heard or
20  what he saw?
21    A.    He said he didn't hear anything, he didn't
22  see anything.
23    Q.    Okay.
24          Are you still in contact with Kwame?
25    A.    His mom.

```
 1        Q.   Okay.  How old's Kwame, if you know?
 2        A.   I think he's a year younger than Isaiah.  So,
 3   he would be 20.
 4        Q.   And did he provide any information about what
 5   he and Isaiah were doing that day, why they missed
 6   curfew, like, what type of activities they were doing?
 7        A.   No.
 8        Q.   Okay.  Have you met Kwame?
 9        A.   I have.
10        Q.   Okay.  And is it that he won't talk to you --
11   what's your impression as to why he won't talk to you?
12        A.   I really do not know.
13        Q.   And you would agree with me that the date of
14   the incident is January 10, 2022?
15        A.   Yes.
16        Q.   And kind of a stupid question, but an
17   important one.  You were not present at the moment --
18   at the time of the shooting; correct?
19        A.   No.
20        Q.   Okay.  When was the last time that you would
21   talk to Isaiah before January 10, 2022?
22        A.   January 5th.
23        Q.   And just if you recall, what was the nature
24   of that conversation?
25        A.   We were talking about Christmas,
```

59

```
 1   Thanksgiving, what we both did.  New Year's -- he was
 2   asking what did we do for New Year's Eve, and then how
 3   he was doing, how I was doing, how was his siblings
 4   doing, if he was looking for a job.
 5        Q.   Was -- in your conversations with Isaiah, did
 6   he ever tell you that he was concerned for his own
 7   safety?
 8        A.   No.
 9        Q.   There was one text message where you and he
10   have a dialogue about him parking away from the house
11   and him saying that he didn't want people to know where
12   he lived.  Do you remember that?
13        A.   Yes.
14        Q.   Was he concerned for his safety?
15        A.   No.
16        Q.   Okay.  Why would he not want people to know
17   where he lived?
18        A.   Probably because -- again, the type of --
19   type of people he was hanging around.  But I always
20   told him, do not -- do not have people in my home.  So,
21   maybe that was why.  But yeah.
22        Q.   Well, and you know his personality.  If he
23   was doing something concerning, would he want to
24   protect his siblings and you from people?
25        A.   No.
```

1     Q.    He wouldn't want to protect you?

2     A.    I mean, he would, but he would --

3     Q.    Yeah, how --

4     A.    How can I word it -- yeah, he would.

5     Q.    Let me word my question differently.  Because

6  it's a horrible question.  I'm just -- I'm trying to --

7     A.    Yeah.

8     Q.    -- we're talking about a thought process of

9  someone we don't know.  But to me, he seems like the

10  type of person that would not want to --

11     A.    Correct.

12     Q.    -- endanger his siblings and you.  So, do you

13  believe he was that type of a person?

14     A.    Yes.

15     Q.    Okay.  And I was just wondering what that was

16  about, where he didn't want people to know where he

17  lived.

18          So, on January 10th, you did not know that he

19  was staying in the 3050 Nellis apartment; correct?

20     A.    I did not know.

21     Q.    Okay.  Had you ever been to that apartment?

22     A.    No.

23     Q.    Okay.  How far was that apartment from your

24  home?

25     A.    About 25, 27 minutes.

1      Q.    Okay.  So, a decent distance?

2      A.    Yes.

3      Q.    And we know now that Isaiah was in possession

4  of a firearm on that day; correct?

5      A.    Yes.

6      Q.    That wasn't your gun, was it?

7      A.    No.

8      Q.    Okay.  Do you know where he got that gun?

9      A.    I do not know.

10     Q.    Okay.

11            Had you -- did you know of Kwame before this

12  date?

13     A.    No.

14     Q.    Okay.

15            Besides Kwame, have you ever talked to anyone

16  who knew why he was at that apartment?

17     A.    No.

18     Q.    Have you talked to any witnesses as to what

19  happened that day besides Kwame?

20     A.    No.

21     Q.    Okay.  Have any of the other neighbors ever

22  spoken with you?

23     A.    The neighbors of -- at the 3050 --

24     Q.    3050, correct.

25     A.    No.

1    Q.   Okay.

2         How did you learn -- because you showed up on

3    scene; correct?

4    A.   Yes.

5    Q.   Okay.  So, just walk me through what happened

6    that night.

7    A.   So, it started circulating on social media.

8    I guess rest in peace to Zay.  Kwame contacted the

9    neighbor that we got into the dispute about and told

10   them that Isaiah was killed by the police.  After he

11   was released out of the police custody.  And then the

12   neighbor came down and told me.

13   Q.   So, how long after the incident was this?

14   Was it hours?

15   A.   Yes.  9:00 a.m.

16   Q.   Okay.  So, when you went there, the scene was

17   very static, like, they were just investigating?

18   A.   Yes.

19   Q.   And so, you -- what time did it happen?

20   A.   At about 5:00 a.m.

21   Q.   Okay.  So, about four hours after?

22   A.   Yes.

23   Q.   Okay.  And you learned from a neighbor who

24   learned from Kwame?

25   A.   Correct.  And then I had my sister -- well,

```
 1   my best friend go to the scene because she works at the
 2   post office directly across the street.  Because she
 3   was at work, so she went across the street.  And then
 4   she asked one of the -- the officers about -- was there
 5   a kid dead, and they were, like, "No, there's no one
 6   dead in the house."
 7         And she was like, "No, I know for sure
 8   there's someone that's dead in the house -- or the
 9   apartment."  And he kept denying it.  So, then I ended
10   up sending her a copy of his ID -- Isaiah's ID.
11   Because I had his ID.
12         And then at that point, the officer was like,
13   "Okay, wait, let me get a supervisor."  And then they
14   got a supervisor and I was on speaker.  Supervisor --
15   she asked, like, basically, what was going on and then
16   he just kept saying, like, "She can come to the scene,
17   she can come to the scene."
18         Q.   What -- so, let me back up a little bit.
19   When your neighbor comes to the house, what do they
20   tell you?  What do they know?
21         A.   Isaiah was killed by the police.
22         Q.   Okay.  So, they just came and said your son
23   was just killed?
24         A.   Yes.
25         Q.   Any other information as to how it happened?
```

1      A.    No.

2      Q.    Okay.  And so, then you get in touch with --
3   I'm sorry, is it your --

4      A.    My -- my best friend.

5      Q.    Your best friend.  Okay.  And she goes to the
6   scene?

7      A.    Yes.

8      Q.    Okay.  And ends up in some dialogue with the
9   police where they get you in contact with her and they
10  ask you to come to the scene?

11     A.    Yes.

12     Q.    And you did?

13     A.    Yes.

14     Q.    And that took about a half hour to get there?

15     A.    Yes.

16     Q.    Tell me what happens when you get to the
17  scene.

18     A.    I get to the scene.  A lady comes up to me,
19  once I, you know, addressed who I was.  She was the
20  investigator for -- I believe the body-cam footage.
21  She talked to me.  She just basically said they don't
22  know what happened, they were investigating, and all I
23  could say was, "Was your body cam on?"  That's all I
24  wanted to -- that's all I wanted to know.  I didn't
25  care about nothing else but that because at that point

```
 1   the incident was already done.
 2           At that point, they pulled me to the side.
 3   They had an officer put me in a car in the -- they were
 4   parked in the parking lot of the post office.  And he
 5   pretty much started interrogating me, asking me why
 6   Isaiah was there, why would he pull a gun out, what
 7   school did he go to, where did he live.  Just -- did he
 8   have -- have you ever seen him with a gun.  Just those
 9   type of questions.
10       Q.   And this was recorded; correct?
11       A.   This was recorded.
12       Q.   Okay.  And do you have any complaints with
13   the way that officer treated you?
14       A.   I honestly feel like that wasn't the time and
15   the place to handle that situation like that.  Because
16   he -- he kind of forced me -- while he understood that
17   I was emotional and I don't think that that should have
18   happened in that -- in that aspect.  Other -- he was
19   trying to be as polite as he could possibly be.  Yeah.
20       Q.   Okay.  So, your complaint about that is that
21   it was the timing of the --
22       A.   It was the -- and he was trying to force me
23   to say things that I didn't know.
24       Q.   Okay.  Like, what did you feel like he was
25   trying to force you to say?
```

1      A.    Why he was there, is he in any -- oh, any

2  gangs.  Yeah, why he was shooting a gun, did he live

3  there, how did he know Kwame.  He was asking me

4  about -- I'm assuming Wattsel Rembert, the guy they

5  were looking for.

6      **Q.    Yes.**

7      A.    And so, they kept saying, "Do you know?"

8          "No."

9          "Do you know him?  You sure you don't know

10  him?"

11          "No."  So...

12      **Q.    And in hindsight, did you ever know**

13  **Wattsel Rembert?**

14          (The court reporter requested clarification

15          of the prior testimony.)

16          CRAIG ANDERSON, ESQ:  Wattsel, W-a-t-t-s-e-l.

17          THE WITNESS:  Yes.  Or it's W-a-t-s-e-l.

18          CORRINE MURPHY, ESQ.:  Yeah, I think it's one

19  T, two Ls.

20          CRAIG ANDERSON, ESQ.:  One T, two Ls.

21  Wattsel Rembert, R-e-m-b-e-r-t.

22  BY CRAIG ANDERSON, ESQ:

23      **Q.    And since this incident, have you ever met or**

24  **talked to Wattsel Rembert?**

25      A.    No.

1    Q.    Okay.  And so, if I understand your testimony
2  correctly, you felt like they were trying to force you
3  into connecting Isaiah to Wattsel?
4    A.    Yes.
5    Q.    And just if you know, do you know if Isaiah
6  knew Wattsel?
7    A.    He -- as far as me asking friends, no.
8    Q.    Did any of his friends ever tell you why they
9  used that apartment?
10    A.    No.
11    Q.    Okay.  I've been told by the police that it
12  was a flophouse where people hung out.  Have you ever
13  heard that?
14    A.    No.
15    Q.    Now, did you say they took Kwame to jail?
16    A.    They detained him --
17    Q.    Okay.
18    A.    -- for questioning, I believe.
19    Q.    And did you see Kwame at the scene?
20    A.    No.
21    Q.    And when you first spoke with the officer who
22  you said was in charge of body cam, was she wearing a
23  body cam?
24    A.    I do not remember.
25    Q.    Was she in uniform or in plain clothes?

68

1    A.    She -- she might have been in some type of
2    uniform.  But I don't remember.
3    Q.    **Okay.**
4          **And did they tell you what happened?**
5    A.    They did not.
6    Q.    **Okay.**
7          **Any other conversations with any Metro**
8    **officers that day besides the interview and your**
9    **conversation with the first officer you spoke to?**
10   A.    No.
11   Q.    **Okay.  Did you have subsequent conversations**
12   **with them?**
13   A.    No.
14   Q.    **Did they ever bring you in to watch the body**
15   **cam or ask you more questions?**
16   A.    They did.
17   Q.    **Okay.  Did you go?**
18   A.    Yes.
19   Q.    **Okay.  How long after the event was that?**
20   A.    About three days.
21   Q.    **Okay.  And tell me what happened then.**
22   A.    They scheduled me a time to come in and
23   review the body cam.  I got to the -- I guess it's the
24   main district down on MLK.
25   Q.    **MLK.  So, you had, like, the building A on --**

69

```
 1        A.    It was the first building.
 2        Q.    Yes.
 3        A.    It was the -- yes.  So, they escorted me.
 4   They said I could have three people.  So, it was me, my
 5   sister, and Kwame's mom.  They told me that they were
 6   going to show me the body cam, but they showed me only
 7   a portion -- so, basically, what they -- they released
 8   to the news press is what they showed me.  So, they
 9   didn't show me the full body-cam footage.
10        I asked them could I purchase it or could I
11   get a copy of it, and then they told me that it was
12   $200 an hour for me to have the body cam.  So, they
13   only showed me, like, each officer body worn cameras.
14   And then just the -- like I said, basically what was
15   released, like, the first few seconds.  They didn't go,
16   really, past the shooting part.
17        Q.    Okay.
18              Did they narrate the video, did they give you
19   information, or did they just let you watch it?
20        A.    They just let me watch it.
21        Q.    Okay.  Did they allow you to ask questions?
22        A.    They did.
23        Q.    Okay.  And did they answer them?  Like, what
24   type of questions did you ask them?  What did they say?
25        A.    I do not remember.
```

1    Q.    Okay.  And in watching the body cam, did you

2    have any thoughts?

3    A.    Yes.  My thoughts were, "Why were they there?

4    How did this start?  Why did they go in so aggressive?"

5    Yeah, those were my main concerns.

6    Q.    Okay.  And did -- and those are your

7    thoughts.  Did you ask those questions to the officers?

8    A.    I don't remember if I asked the questions or

9    not.

10    Q.    Okay.

11    A.    Yeah.

12    Q.    I mean, this is still close in time to the

13    passing; correct?

14    A.    Yes.

15    Q.    Like, you're still in shock?

16    A.    Yes.

17    Q.    Okay.  How long were you there?

18    A.    Not long.  Maybe an hour.

19    Q.    Okay.  Do you have any complaints about the

20    way they treated you that day?

21    A.    No.

22    Q.    Okay.  Did you feel like they were trying to

23    cover up anything or --

24    A.    At that time, no.

25    Q.    Okay.  At any time, did you feel like they

1    were -- the Las Vegas Metropolitan Police Department

2    attempted to cover up any of this?

3        A.    Yes.

4        Q.    Okay.  When?

5        A.    So, I actually went and tried to get a copy

6    of the policies and procedures for the search warrants.

7    They kept -- "Oh, it was a search warrant, it was an

8    arrest warrant, it was a search warrant."  They -- they

9    was not clear about whether it was a search warrant or

10   an arrest warrant.

11           At that point, they wouldn't give me a copy

12   of the policies and procedures.  He told me I had to go

13   online and request it.  And then that particular --

14   that was one of the officers in charge.  He told me --

15   he asked me, "Did you watch the full body cam?"  And I

16   said -- and I do not know that officer's name.

17           And I said, "They wouldn't let me watch the

18   full.  They only gave me a -- parts of it."  And he

19   said, "You need to watch it."  And then, at that point,

20   I tried to request records for the body cam.  They

21   wouldn't release it.  Then we -- we asked for the

22   actual warrant.  We kept asking, they would not release

23   it.

24           I had to get a lawyer to try to help with

25   getting the warrant.  They still wouldn't release it.

1    They kept saying that the warrant was sealed.  And so,

2    because it was tied to a homicide, they were unable to

3    release that warrant to me.

4            And so, at that point, I figured something

5    was wrong with the warrant.  Because why would you not

6    release it.  And then if you left a copy of that

7    warrant, as you're supposed to at the scene, then it

8    would have been public record if somebody had a copy of

9    that warrant.

10        **Q.   And you knew this from your police**

11   **training --**

12        A.   Correct.

13        **Q.   -- or the basics from your police training;**

14   **correct?**

15        A.   Correct.

16        **Q.   Had you ever served a warrant in your time as**

17   **a police officer?**

18        A.   No.

19        **Q.   Okay.**

20            **Let me back up real quick.  When you left the**

21   **police department, are you eligible for rehire there?**

22        A.   No.

23        **Q.   Okay.  Were you ever disciplined as a police**

24   **officer?**

25        A.   No.

1          Q.    And I might have asked you this.  Were you
2     ever sued as a police officer?
3          A.    You asked me that.  No.
4          Q.    Okay.
5                And so, you're trying to find this
6     information and you felt like at that point they're
7     stonewalling you?
8          A.    Yes.
9          Q.    Okay.
10               Did you attend the public fact finding review
11    of the shooting?
12         A.    I did.
13         Q.    Okay.  And I've watched that.  Is there
14    anything about that that stood out to you that you
15    thought was dishonest, wrong, or something you didn't
16    know?  Just any feelings on that?
17         A.    The fact that they did the FIT report -- and,
18    again, I -- I did ask the question of, "Where's the
19    warrant?"  They said that they couldn't -- again, it
20    was sealed.  And then I said, "Well, can you explain to
21    me why you were there," and then they said, "Because we
22    had a warrant."  They wouldn't give me specific details
23    on why -- why they were there.
24         Q.    Okay.
25               And was there a family representative that

1   handled your questions at the public fact finding

2   review?

3        A.   No.  I was able to ask those questions.

4        Q.   Yourself?

5        A.   Yeah.

6        Q.   Oh, okay.

7             And with utilizing your experience as a

8   police officer -- and I just want your opinions -- what

9   do you think the police did wrong with respect to their

10  handling of the situation?

11       A.   So, again, going into the unit that

12  aggressive on a search warrant, for one; the fact that

13  you didn't give him time to even come to the door.  So,

14  the whole knock and announce was improperly done.

15            The fact that I also watched the body-cam

16  footage -- I'm trying -- where the officer knocked out

17  the window, he kind of came to the -- to the left.  He

18  never looked in.  So, he couldn't see anything.  So

19  that was your job, as an officer, to be able to see

20  everything inside the unit.

21            He -- he did not do that.  Yeah.  When they

22  were announcing, they didn't say the -- the unit number

23  the first time.

24            (The court reporter requested clarification

25            of the prior testimony.)

```
 1              THE WITNESS:  They did not say the unit
 2    number the first time.  They didn't say it until the
 3    second.
 4              THE COURT REPORTER:  "They didn't say it" --
 5              CORRINE MURPHY, ESQ.:  They did not say it
 6    until the second.  Yeah.
 7    BY CRAIG ANDERSON, ESQ:
 8        Q.   And, again, I apologize if I asked you.  Is
 9    it -- when you were in police training, did you ever
10    receive training on how to do knock and announce
11    warrants?
12        A.   No.
13        Q.   Okay.  And did you ever receive any training
14    on dynamic entry search warrants?
15        A.   No.
16        Q.   Did you ever receive training on how to get a
17    search warrant?
18        A.   No.
19        Q.   Okay.
20             Okay.  So, when you got to the scene that
21    day, had Isaiah's body already been removed?
22        A.   No.
23        Q.   It was still inside?
24        A.   Correct.
25        Q.   Okay.  Did they let you in to identify him?
```

```
 1        A.    No.

 2        Q.    Okay.  Did you want to?  Kind of -- kind of

 3   an unfair question.

 4        A.    If I would have been allowed to, I would

 5   have.

 6        Q.    Okay.  So, where was Isaiah eventually taken?

 7        A.    Straight to the coroner's office.

 8              CRAIG ANDERSON, ESQ:  We've been going about

 9   an hour and 15 minutes.  I'm almost done.  But we're

10   probably now to the part that will be the most

11   difficult.  I'm just going to ask you about the impact

12   on you, you know, damages-type questions.  Would you

13   like to take a break?  Probably have, like, another

14   half hour maybe.

15              THE WITNESS:  We can continue.

16   BY CRAIG ANDERSON, ESQ:

17        Q.    Did you ever personally visualize Isaiah's

18   body, like, at the morgue or somewhere?

19        A.    Yes.

20        Q.    Okay.

21              Did you have a funeral?

22        A.    I did.

23        Q.    Okay.  Where?

24        A.    At Jones Funeral Home.

25        Q.    And I believe you produced this, but did you
```

```
 1    have out-of-pocket expenses for that funeral?  Like,
 2    you paid money?
 3         A.    Just for the obituaries.
 4         Q.    Okay.
 5               Did you ever set up a GoFundMe or anything
 6    for Isaiah?
 7         A.    I did not.
 8         Q.    And what type of funeral or memorial did you
 9    have for Isaiah?
10         A.    It was a funeral at a -- like, a really big
11    church, flowers.  It was a nice service.
12         Q.    How many people came?
13         A.    About 200.
14         Q.    Did his father?
15         A.    No.
16         Q.    Why not?
17         A.    He was incarcerated.
18         Q.    Oh, okay.
19               Jeremy, is that who you're currently married
20    to?
21         A.    Yes.
22         Q.    Did he come?
23         A.    No.
24         Q.    Okay.  Why didn't he come?
25         A.    Because he was in Louisiana.
```

```
 1        Q.    Okay.  Was Isaiah's siblings there?
 2        A.    Yes.
 3        Q.    Okay.  Is Isaiah -- did you bury him or
 4   cremate him?
 5        A.    I cremated him.
 6        Q.    Okay.  Where are his ashes?
 7        A.    On the side of the bed.
 8        Q.    Do you have all the ashes or did you divide
 9   them up?
10        A.    I have all the ashes.
11        Q.    Besides the obituary money we just talked
12   about, do you have any out-of-pocket expenses
13   associated with Isaiah's death?
14        A.    No.
15        Q.    At the time of Isaiah's death, you were not
16   helping him with his finances?
17        A.    No.
18        Q.    Okay.  And he was not helping you with your
19   finances?
20        A.    Okay, I was paying his cell phone bill.
21        Q.    Okay.
22              Did Isaiah have any life insurance?
23        A.    No -- oh, yes, he did.
24        Q.    Okay.  I've never had anyone answer yes to
25   that question.
```

```
1         A.    Yes.

2         Q.    Why did he have life insurance?

3         A.    My grandmother got life insurance on all of

4    my older kids when they were born.

5         Q.    Oh, okay.  How much was the policy?

6         A.    About 20,000.

7         Q.    Okay.  And did you receive that money?

8         A.    My grandmother.

9         Q.    Oh, she got it?

10        A.    My grandmother got the money.

11        Q.    Your grandmother?

12        A.    My grandmother.

13        Q.    So, it skipped you and your mother and went

14   to the grandmother?

15        A.    Yeah.

16        Q.    Good for her.

17              Did Isaiah have any bank accounts?

18        A.    No.

19        Q.    Any stocks?

20        A.    No.

21        Q.    And you have not had any conversations with

22   any of Isaiah's friends, what he was doing that night,

23   why he was at the apartment; correct?

24        A.    No.

25        Q.    Okay.  Have any come forward with information
```

1    about Isaiah's life in the month prior to his passing

2    that you didn't know about?

3        A.   No.

4        Q.   Have we covered all of Isaiah's hobbies that

5    he enjoyed doing?

6        A.   Yes.

7        Q.   Okay.  And you said he wanted to be an

8    engineer?

9        A.   Yes.

10       Q.   And what did he want to do with that?

11       A.   He just said engineering.  I'm assuming build

12    buildings.  Because he talked about architecture a lot.

13       Q.   Have you sought any counseling or psychiatric

14    care as a result of this incident?

15       A.   No.

16       Q.   Do you intend on it?

17       A.   Maybe in the future.

18       Q.   Okay.

19           Have any of your children received any

20    psychiatric care or counseling as a result of this

21    incident?

22       A.   Yes.

23       Q.   Which ones?

24       A.   Ta'nya.

25       Q.   And --

Mamba Reporting, #119F
www.mambareporting.com
(702) 401-3985
mambareporting@gmail.com

```
 1        A.   Chasity.

 2        Q.   I'm sorry.

 3        A.   I'm sorry.

 4             And Rashad.

 5        Q.   Okay.  And what type of counseling did they

 6   receive?

 7        A.   They just went and talked to a counselor.

 8   That was pretty much --

 9        Q.   Do they know what happened?

10        A.   Yes.

11        Q.   Okay.  Have they watched the body cam?

12        A.   Yes.

13        Q.   Have you incurred any other out-of-pocket

14   expenses?  Like, money that you had to pay as a result

15   of this incident?

16        A.   No.

17        Q.   This is an incredibly unfair question.  So,

18   we will try to work through it.  But can you tell me

19   how this has impacted your life.

20        A.   I can't sleep.  I haven't slept in, really,

21   two years.  I have the visions of him laying on the

22   floor, how they handled the body, him being on the

23   table at the coroner's office.  Like, I can't -- it'll

24   just be, like -- it'll be a regular day and I'm a

25   flight attendant so I'm in the air with no service a
```

```
 1    lot, so I think -- and the flashes of the body.
 2            Man, I went through watching videos of -- on
 3    YouTube of how does it feel to die because I want to
 4    know, like, was he in pain.  So, yeah.  I've just --
 5    also, you know, my children -- oh my God -- for months,
 6    they couldn't sleep.  So, they would run in my room
 7    screaming and crying.  And my daughter, Ta'nya, they're
 8    birthday twins, birthday -- on the exact same day,
 9    exactly one year apart.  So, she took it --
10        Q.   Ta'nya and Isaiah?
11        A.   Ta'nya and Isaiah.
12        Q.   Oh, okay.
13        A.   Yeah.  She took it really hard.  Really,
14    really hard.  So, it was -- many nights where they
15    slept in the bed -- all -- all of them, the last three
16    would sleep with me.  Nightmares, the dreams that I
17    have that he telling me he loved me.  Just him not
18    being in the house.  Sorry.
19        Q.   No, you're fine.
20             Do you have any personal items of Isaiah that
21    you keep?
22        A.   I do.
23        Q.   Okay.  And what are those items?
24        A.   I have his outfit for his first interview
25    that he ever had.  I have his earrings the day he died.
```

1    All his shoes, all his clothes that was left at my

2    home.  I have those.  I have his blanket that he had,

3    his favorite blanket.

4           I just -- just parted from his bed.  It's

5    because it's pretty hard for me to --

6    **Q.   Did you kind of -- did he have his own room**

7    **at your house?**

8    A.   He did.

9    **Q.   Now, I know you boxed up his belongings and**

10   **placed them in the garage; correct?**

11   A.   Uh-huh.

12   **Q.   Okay.  Do you still have those belongings?**

13   A.   I do.

14   **Q.   Okay.**

15   **Any other way that it has impacted you that**

16   **we have not talked about?**

17   A.   Besides the fact that I can't sleep, huh-uh.

18   **Q.   Do you --**

19   A.   Very emotional.

20   **Q.   Do you ever take medication for sleeping?**

21   A.   No medication.

22   **Q.   Just tough it out?**

23   A.   Yes.

24   **Q.   When did you get married?**

25   A.   We got married July 22nd of this year.

1    Q.    Okay.  Is that a good thing?  Has that helped
2    at all or...
3    A.    He's very supportive.
4    Q.    Okay.
5    A.    He just -- he just -- because he -- he was,
6    like, in a lot of shock.  So, he just shared his
7    moments today and watched the body-cam footage.
8    Q.    Have you had any other contact with the
9    Las Vegas Metropolitan Police Department besides the
10   incidences we've already talked about?  Has anyone come
11   and seen you, answered your questions or --
12   A.    No.
13   Q.    Okay.
14         Did anyone from the Las Vegas Metropolitan
15   Police Department ever tell you personally anything
16   that they felt they had done wrong for this incident?
17   A.    No.
18   Q.    Have you spoke about this incident with any
19   of your law enforcement acquaintances?
20   A.    Yes.
21   Q.    Okay.  Have any of them provided you any
22   insight into what happened?
23   A.    No.  So, one of the officers that's actually
24   SWAT, he was military and -- many years, and he just
25   pretty much told me there's a lot of things that

```
 1    they've done wrong.  He didn't get into specifics to
 2    it.
 3        Q.    Okay.  And just to get -- have you spoke to
 4    any expert witnesses that have been retained for this
 5    lawsuit?  Have you personally spoken to any of them?
 6        A.    No.
 7        Q.    Okay.  I think I'm almost done.  Let me just
 8    check real quick.
 9            During the five weeks that you and him were
10    estranged, where you didn't physically see him, did his
11    siblings ever see him, to your knowledge?
12        A.    Not that I know of.
13        Q.    Okay.
14            Ms. Alexander, I really appreciate your time.
15    I'm sorry to meet you under these circumstances, but I
16    appreciate the way you've handled this.  And I'm all
17    done.
18        A.    Thank you.
19            THE COURT REPORTER:  No questions, Counsel?
20            CORRINE MURPHY, ESQ.:  No, thank you.
21            CRAIG ANDERSON, ESQ:  Thank you.
22            THE COURT REPORTER:  Did you want a copy,
23    Ms. Murphy?
24            CORRINE MURPHY, ESQ.:  Yes, please.  E-tran.
25            (Proceedings concluded at 11:56 AM.)
```