# Exhibit B - Deposition of Lt. Melanie O'Daniel

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 117

1                    REPORTER'S CERTIFICATE

2

STATE OF NEVADA          )
3                        )  SS
COUNTY OF CLARK          )

4

5         I, Sarah Safier, a duly certified court
reporter licensed in and for the State of Nevada, do
6 hereby certify:

7         That I reported the taking of the deposition
of the witness, MELANIE O'DANIEL, at the time and
8 place aforesaid;

9         That prior to being examined, the witness was
by me duly sworn to testify to the truth, the whole
10 truth, and nothing but the truth;

11        That I thereafter transcribed my shorthand
notes into typewriting and that the typewritten
12 transcript of said deposition is a complete, true and
accurate record of testimony provided by the witness
13 at said time to the best of my ability.

14        I further certify (1) that I am not a
relative, employee or independent contractor of
15 counsel of any of the parties; nor a relative,
employee or independent contractor of the parties
16 involved in said action; nor a person financially
interested in the action; nor do I have any other
17 relationship with any of the parties or with counsel
of any of the parties involved in the action that may
18 reasonably cause my impartiality to be questioned;
and (2) that transcript review pursuant to NRCP 30(e)
19 was not requested.

20        IN WITNESS WHEREOF, I have hereunto set my
hand in the County of Clark, State of Nevada, this
21 6th day of January, 2025.

22

23

24        _____
            SARAH SAFIER, CCR 808
25

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3    LATIA ALEXANDER,                )
     individually as heir of         )
4    ISAIAH T. WILLIAMS and in       )
     her capacity as Special         )    Case No.
5    Administrator of the            )    2:24-cv-00074-
     Estate of ISAIAH T.             )    APG-NJK
6    WILLIAMS,                       )
                                     )
7                     Plaintiff,     )
                                     )
8    vs.                             )
                                     )
9    LAS VEGAS METROPOLITAN          )
     POLICE DEPARTMENT, a            )
10   political subdivision of        )
     the State of Nevada; KERRY      )
11   KUBLA, in his individual        )
     capacity; BRICE CLEMENTS,       )
12   in his individual               )
     capacity; ALEX GONZALES,        )
13   in his individual               )
     capacity; RUSSELL BACKMAN,      )
14   in his individual               )
     capacity; JAMES                 )
15   ROTHENBURG, in his              )
     individual capacity; JAMES      )
16   BERTUCCINI, in his              )
     individual capacity;            )
17   MELANIE O'DANIEL, in her        )
     individual capacity; DOES       )
18   I-XX, inclusive,                )
                                     )
19                    Defendants.    )
                                     )
     _____)

20

           VIDEOTAPED DEPOSITION OF MELANIE O'DANIEL
21

            Taken on Tuesday, December 17, 2024
22   By a Certified Court Reporter and Legal Videographer
                    At 10:26 a.m.
23       At 400 South Seventh Street, Suite 400
                 Las Vegas, Nevada 89101
24

25   Reported by:  Sarah Safier, CCR No. 808
     Job No. 58707, Firm No. 116F

Melanie O'Daniel            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**2**

```
 1    APPEARANCES:
 2    For the Plaintiff:
 3            CORRINE P. MURPHY, ESQ.
              Murphy's Law, PC
 4            2620 Regatta Drive
              Suite 102
 5            Las Vegas, Nevada 89128
 6    For the Defendants:
 7            CRAIG R. ANDERSON, ESQ.
              Marquis Aurbach
 8            10001 Park Run Drive
              Las Vegas, Nevada 89145
 9
      Also Present:
10
              GIANA CAMACHO, Videographer
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1                    I N D E X
 2    WITNESS                              PAGE
 3    MELANIE O'DANIEL
 4        Examination by Ms. Murphy          5
 5
 6
 7
 8                 E X H I B I T S
 9    NUMBER        DESCRIPTION            PAGE
10    Plaintiff's
11      1 - Notice of Deposition            6
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

1          P R O C E E D I N G S
2          THE VIDEOGRAPHER:  Today is December 17,
3    2024.  The time is approximately 10:26 a.m.
4          Your court reporter is Sarah Safier and I am
5    your videographer, Giana Camacho.  We are here on
6    behalf of Lexitas.
7          The witness today is Melanie O'Daniel and we
8    are here in the case of Latia Alexander, et al.,
9    versus Las Vegas Metropolitan Police Department, et
10   al.
11         Will counsel state your appearances and the
12   court reporter will administer the oath.
13         MS. MURPHY:  Corrine Murphy, Bar No. 10410
14   on behalf of Plaintiff.
15         MR. ANDERSON:  Craig Anderson on behalf of
16   the Defendants.
17               MELANIE O'DANIEL
18         having been first duly sworn, was
19         examined and testified as follows:
20         MS. MURPHY:  Let the record reflect this is
21   the time and place of the deposition of Melanie
22   O'Daniel in the matter of Latia Alexander, et al.,
23   versus Las Vegas Metropolitan Police, et al., Case
24   No. 2:24-cv-00074.
25         ///

**5**

1               EXAMINATION
2    BY MS. MURPHY:
3         Q   Ms. O'Daniel, my name is Corrine Murphy and
4    I'm an attorney.  I represent the plaintiff, Latia
5    Alexander, in this case.
6         Could you please state and spell your full
7    name for the record.
8         A   Melanie O'Daniel.  M-E-L-A-N-I-E, O,
9    apostrophe, D-A-N-I-E-L.
10        Q   And would you prefer that I call you
11   Melanie, Ms. O'Daniel, or Sergeant O'Daniel -- it's
12   sergeant, correct?
13        A   Lieutenant.
14        Q   Lieutenant, sorry, sorry, sorry.
15        A   Melanie is fine.
16        Q   Okay.  And Melanie, you understand that
17   you've been noticed to be here today, correct?
18        A   Yes.
19        Q   And you had an opportunity to review that
20   notice and that you understand that you are here
21   today to discuss the shooting of Isaiah Williams?
22        A   Yes.
23        Q   Okay.
24        MS. O'DANIEL:  And Madam Court Reporter, I
25   don't have it with me, but I will e-mail it to you

Melanie O'Daniel    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**6**

1 later. I would like to attach the notice of
2 deposition as Exhibit 1.
3     (Plaintiff's Exhibit 1 was deemed
4     marked for identification.)
5 BY MS. MURPHY:
6   Q  Have you ever given a deposition before?
7   A  Yes.
8   Q  Which other cases have you given a
9 deposition in?
10     MR. ANDERSON: Jasmine King.
11     THE WITNESS: Jasmine King.
12     MR. ANDERSON: Is that the only one?
13     THE WITNESS: Yes.
14     MR. ANDERSON: Okay.
15 BY MS. MURPHY:
16   Q  And I noticed in your answers to
17 interrogatories you had identified two other cases
18 that you were involved in.
19     MR. ANDERSON: They're the same case.
20 BY MS. MURPHY:
21   Q  Okay. Well, one was -- one was, I think,
22 settled and one was dismissed, correct?
23     MR. ANDERSON: What were they?
24     MS. MURPHY: Hold on. Let me look.
25     MR. ANDERSON: One was King.

**7**

1 BY MS. MURPHY:
2   Q  One was Cottle versus Gillespie, and you
3 said you got a summary judgment in your favor; and
4 the other one was King versus Ubbens.
5   A  Yeah, I did not give a deposition in that.
6   Q  Okay. Can you please tell me what the --
7 well, the -- so the King versus Ubbens, I'm assuming
8 that's Jasmine King versus Ubbens, and that one was
9 settled, correct?
10   A  Yes.
11   Q  Okay. Can you just kind of walk me through
12 just the basic facts of the King versus Ubbens case?
13   A  We served a warrant for -- and, again, I've
14 been retired for a couple of years, so it's not top
15 of my head -- but essentially her boyfriend at the
16 time, I believe -- I could be wrong -- but we were
17 serving a warrant for a kidnapping, sexual assault,
18 you know, holding her for several days, and -- at
19 that residence where we believed him to be.
20     We served the warrant and we did an
21 explosive breach and she, tragically, was at the door
22 looking through the peephole when the breach went, so
23 she was injured and that was what the settlement was
24 for, for her injuries.
25   Q  Okay. And I understand having read your

**8**

1 interview that there was a change in policy following
2 that case as well; is that correct?
3   A  Not necessarily a change that was written
4 down; it was more of a verbal to not use explosive
5 breaches on search warrants more so. But nothing
6 physically documented and changed in our SOPs or
7 policy manual.
8   Q  Okay. Given -- how long ago was it that you
9 gave your deposition?
10   A  I've been retired for two years. So three,
11 four years ago.
12   Q  Okay. So I'm just going to run through some
13 basics. Because that was a little while ago, I'm
14 going to just run through some basic deposition
15 instructions.
16     The biggest thing being the oath that you
17 gave at the beginning of the deposition that the
18 court reporter administered, that's the same oath
19 that you would give if you were in a court of law.
20 It requires you to answer all questions that I ask
21 today truthfully under the penalty of perjury.
22     In other words, was I able to demonstrate
23 that you either lied or misled me on any material
24 fact, it would subject you to the crime of perjury.
25     Do you understand that?

**9**

1   A  Yes.
2   Q  Okay. And I want to outline in your prior
3 answer what you did correctly and what I'm going to
4 ask you to do for the rest of the day. Sometimes I
5 may ask you a question that you don't have a complete
6 memory of, but what you need to do is give me your
7 best answer.
8     So, for example, when I asked you about the
9 Jasmine King case, you said, hey, that was a few
10 years ago, I don't remember everything, but let me
11 tell you what I do remember. So that was the
12 correct, truthful way to answer my question.
13     Is there any reason that you won't be able
14 to continue to do that as we go through the
15 deposition here today?
16   A  No.
17   Q  Okay. Did you -- a couple other ground
18 rules.
19     The court reporter is taking down everything
20 we say. For that reason -- and you're already doing
21 a very good job of it -- please let me finish
22 answering [sic] my question and then I will let you,
23 to the best of my ability, answer your question.
24     If, for any reason, I'm accidentally
25 interrupted or you had more to say, please stop me

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1  and say, I'm not finished answering my question,
2  okay?
3     A   Yes.
4     Q   Your attorney may raise some objections
5  during the deposition. Unless your attorney
6  specifically instructs you not to answer, please let
7  Craig state his objection for the record and then
8  answer the question.
9     A   (Witness nods head.)
10    Q   Are you under any medications that would
11 prevent you from giving your best and most accurate
12 testimony here today?
13    A   No.
14    Q   And I will tell you because I had this
15 happen in a case before:  Have you had any personal
16 issues that have arisen in the last few days that
17 would prevent you from giving your best and most
18 accurate testimony today?
19    A   No.
20    Q   I ask that because I had another case where
21 two weeks later he said I got served with divorce
22 papers that morning, you can't rely on any of my
23 testimony.
24        Okay.  And I'm going to ask you some
25 questions about what you did to prepare for today's

11

1  deposition and I'm entitled to facts such as whether
2  or not you met with Craig, how long you met with
3  Craig, what documents you reviewed; but I'm not
4  entitled to know about what you and Craig discussed.
5  That falls under the auspices of attorney-client
6  privilege; and when I ask any questions about any
7  preparation you did, I don't want you to tell me
8  about what you and Craig talked about specifically.
9     A   Okay.
10    Q   Do you understand the distinction between --
11 I'm going to ask you, hey, did you look at any
12 documents and that's a fact and you can tell me what
13 documents you looked at, but I don't want you to tell
14 me, and then Craig told me X, Y, and Z.
15        Do you understand the distinction?
16    A   I do.
17    Q   Excellent. So I'm going to ask you, then,
18 can you please tell me what you did to prepare for
19 today's deposition?
20    A   I reviewed documents -- I met with Craig
21 twice -- in the initial meeting that a deposition was
22 going to transpire.  And then as we got closer, we
23 met yesterday again, too.
24        So I received documentation on -- I was
25 given my CERT interview transcriptions, two of them,

12

1  when I was a witness employee and then the subject
2  employee.  I was given the CERT report, which I
3  believe is like 225 pages and I was given the IAP,
4  the four versions of the IAP.
5     Q   Okay.  Did you review -- you had answered
6  some written questions like answers to
7  interrogatories and requests for production.
8        Did you go over those at all?
9     A   Yes.
10    Q   And how long did you meet with Craig for
11 yesterday?
12    A   40 minutes.
13    Q   Okay.  Have you reviewed any of the other
14 deposition transcripts of any of the other parties
15 that have been taken in this case?
16    A   No.
17    Q   Okay.  Have you reviewed the witness
18 statements or interviews done by any of the other
19 officers involved in this case?
20    A   No.
21    Q   Okay.  Did you bring any documents that you
22 reviewed with you here today?
23    A   No.
24    Q   Okay.  Have you discussed your deposition
25 with any of the codefendants?

13

1     A   No.
2     Q   Okay.  And -- okay.  Melanie, I'm going to
3  go over just some basic background questions.  I
4  mean, I understand quite a bit from having reviewed
5  the other interviews in your written discovery, but
6  we're just going to go ahead on the record and make
7  the record here today as well, okay?
8     A   Okay.
9     Q   Are you currently working for Metro?
10    A   No, I'm retired.
11    Q   When did you retire?
12    A   December 2022.
13    Q   So approximately within -- at the end of the
14 year involved in this incident, correct?
15    A   Yeah.  December, like, 30th, I want to say.
16 I don't have the exact date.
17    Q   And I'm going to represent to you that the
18 date of this incident was January 10, 2022.  Is that
19 consistent with your memory?
20    A   Yes.
21    Q   Okay.  And what position did you retire at?
22    A   Lieutenant of SWAT.
23    Q   Okay.  And how long had you held that
24 position for?
25    A   As the primary SWAT tactical commander,



Case 2:24-cv-00074-APG-NJK    Document 55-4    Filed 05/16/25    Page 7 of 32

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1  three and a half years.  And then I was the backup
2  SWAT commander for about 19 months.
3      Q    What is the difference -- what are the
4  differences in those two positions?
5      A    Well, you're still taught the job, you go
6  through SWAT school, you still get your credentials,
7  but it's -- I fill in that position when the primary
8  goes on vacation or if he has, you know, hey, I can't
9  make it today, can you cover for me for today for a
10  dentist appointment.
11     Q    And just so I understand, did the backup
12  position come first or after?
13     A    It was first.
14     Q    Okay.
15     A    So you're essentially learning the position
16  and then you -- I became primary.
17     Q    And I'm sorry, how long did you have that
18  backup position for?
19     A    19 months.
20     Q    19 months, okay.  And so that -- okay.  So
21  that's roughly about four or five years.
22         What position did you hold prior to that?
23     A    During that time as a backup, since that
24  wasn't my primary job, I was the Homeland Security
25  Saturation Team lieutenant.

15

1      Q    What does that mean?
2      A    We handled protests, major events.  Say if
3  there's a UFC match and there might be a threat,
4  we'll send my team down there to handle that.
5         Laughlin River Run, anything that the
6  sheriff deems that we need extra resources.  Mainly
7  it's protests or any -- say you have the -- we do
8  dignitary protection, so if you have the president
9  come in town, vice president, any dignitaries, we
10  also handle that role, so multifunctional.
11     Q    And if I understood some of your interview
12  correctly, there was also a policy change while you
13  were holding that position, correct, about -- was
14  it -- you're nodding your head, so I think you know
15  what I'm talking about.
16     A    I remember reading about it.  I can't
17  remember exactly what the policy change was and then
18  not being -- being retired and not having access to
19  that and then, again, it's two years, I can't
20  remember what that was.  And I don't think I said
21  what it was in my interview.
22     Q    I'll refresh your recollection that my
23  understanding of having read your interview, that it
24  had something to do with doing -- with shooting
25  something into a crowd.

16

1      A    Oh, yes, for the protest.  So during the
2  protest, they were shooting Ferret Rounds, gas, into
3  the crowd and instead of just indiscriminately
4  firing, you had to have someone who actually had a
5  rock or some missile projectile in their hand and you
6  had to identify that to fire that Ferret Round or
7  throw the gas.
8      Q    Okay.  And you've walked through some pretty
9  specialized positions that you held.  Did you have to
10  do specialized training or certification to hold
11  those positions?  And if the answer is yes, can you
12  walk me through what was for each?
13     A    For SWAT, I had to go through the SWAT
14  school, and I had to essentially go on numerous
15  trainings as I was becoming the backup.  I had to
16  shadow the primary SWAT commander, or SWAT tactical
17  commander, at the time, go on all these events and
18  then eventually, you know, you're kind of shadowed as
19  you take primary over the incident.
20         I went to the National Tactical Officers
21  Association, you know, SWAT leadership.  I don't
22  remember the exact name, but it was a SWAT leadership
23  school for that.
24     Q    How -- sorry, I'm going to interrupt you
25  real fast.  How long was that SWAT leadership school

17

1  for?
2      A    A week.
3      Q    Sorry, keep going.
4      A    So about 40 hours.  And then I have attended
5  some other SWAT leadership, kind of to do with the
6  day-to-day, how to do documentation, how to write
7  your SWAT manual.  I received that training a week
8  long as well.
9         And just through those four or five --
10  several, you attend the breacher school.  You know,
11  you don't become breacher certified, but you're
12  witnessing, you're viewing, you're participating and
13  -- all the various techniques of SWAT.
14     Q    And what -- so, sorry, you did or didn't
15  attend breacher school?
16     A    I did not get a certification for breacher
17  school, but I did -- you know, you attend, you watch,
18  you observe.  It wasn't 100 percent, 99 percent
19  attendance.  It was, you know, coming and going, but
20  I have, you know, attended it.
21     Q    Okay.  Can you tell me what breacher school
22  is?
23     A    It's a long process where they learn how to,
24  you know, use forcible entry and use explosive
25  breachings, and the parameters of when you would use



Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1  it, when you would not.  It's very technical.
2  There's some math involved in it, how to identify
3  doors and which type of different breaches, how much,
4  you know, explosives you're going to put on it.  So
5  it's a very technical school.
6      Q    And was that school primarily focused on the
7  actual physical aspects of how to do the breach or
8  did you guys go over any of -- any constitutional
9  rules like knock and announce, Fourth Amendment?  Did
10  you guys review any of that stuff?
11     A    Yes.
12     Q    Okay.  So can you tell me what your
13  understanding of knock and announce is?
14     A    Knock and announce is essentially you're
15  there for a legal and lawful warrant and you're
16  announcing your presence, that we're police officers,
17  we have a warrant, you know, we have a right to be
18  here.  And you give the occupants, you know, that
19  time, depending on the situation, every one's --
20  every situation is different, and either come to the
21  door or we make entry into the residence.
22     Q    Okay.  And what is the -- to your
23  understanding, what is the purpose of that rule?
24     A    The purpose of a knock and -- the main
25  purpose is to let them know that this is police, that

20

1  today, is it your opinion -- sorry, your position
2  that the way that this search warrant was
3  administered was in compliance with Mr. Williams'
4  Fourth Amendment rights?
5      A    Yes.
6      Q    Okay.  You believe that the way that the
7  knock and announce was made was in compliance with
8  the Fourth Amendment?
9      A    Yes.
10     Q    You believe that the way the window was
11  broken open with the distract device was in
12  compliance with Mr. Williams' Fourth Amendment
13  rights?
14     A    Yes.
15     Q    As we sit here today, just to -- you believe
16  that the number and the way that the announcements
17  were made was in compliance with Mr. Williams' Fourth
18  Amendment rights?
19     A    Yes.
20     Q    Okay.  And you believe that the way that the
21  door was breached was in compliance with
22  Mr. Williams' Fourth Amendment rights?
23     A    Yes.
24     Q    Okay.  Can you walk me through -- what's the
25  difference between a knock-and-announce and a

19

1  we are police, we are here for a legal and lawful
2  search warrant.
3      Q    Why do you have to let them know that?
4      A    We don't want them to think that -- we want
5  them to know, "Hey, we're here, we have a legal right
6  to -- the law states that we are allowed to be here.
7  You can't deny us," so to speak, and say, "Yeah, no,
8  I'm just going to hide and not answer the door" is
9  the main reason.
10     Q    Does it have anything to do with an
11  individual's Fourth Amendment rights?
12     A    Yes, every citizen has the right to an --
13  from unreasonable searches.  And we need a search
14  warrant or there's some exigent circumstances, you
15  know, search incident to arrest, plain view, and
16  there's some others.  I don't have it in front of me,
17  but they -- we need to have a legal and lawful
18  warrant that describes the person or place to be
19  searched and the items to be seized.
20     Q    Okay.  You understand this case concerns
21  allegations of the Fourth Amendment, correct?
22     A    Yes.
23     Q    We will get into the very specifics of the
24  case and all the underlying different issues
25  surrounding what happened here, but as we sit here

21

1  no-knock warrant?
2      A    A no-knock warrant is done stealth.  There's
3  no announcement, they're just going in the door, not
4  announcing, "Hey, it's the police, we have a search
5  warrant."  It's quiet and -- up until they do the
6  breach and they just go in and get hands on the
7  subjects.
8      Q    And why would one be used over the other?
9      A    Based on the crime, the violence of the
10  crime.  I know with our agency, we -- we don't do
11  knock -- we have done them in the past.  It's highly
12  discouraged not to do them and I know there was a
13  change later on that we had to go up to get a judge
14  to declare that we could do a no-knock.
15     Q    Okay.  And so just -- I wanted to clarify,
16  when you're saying that they're highly discouraged,
17  you're talking about the no-knock warrants, correct?
18     A    Yes.
19     Q    Okay.  As we sit here today -- oh, sorry,
20  and what is a -- and I keep saying it wrong, I've
21  seen CET, and that's the entirety of it, right?
22  That's controlled entry tactic?
23     A    Yes.
24     Q    But I think there was a little bit of change
25  in nomenclature right at the end, right?



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

22

1    A   Not while I was there.
2    Q   Okay. So can you please tell me what -- and
3  just for ease of reference, we'll be saying CET for
4  the remainder of the deposition -- what is a CET?
5    A   So a CET is -- there's numerous factors that
6  go into deciding whether to do a CET. So the threat
7  behind the door, a suspect that may be armed, the
8  suspects inside have violent tendencies, a violent
9  history.
10       We have to have the ability to dominate,
11  which essentially means that we can get in there
12  pretty quick, if it's a one-bedroom apartment, a
13  loft, a two-bedroom apartment. We couldn't do it on
14  a 3,000 square feet home. We wouldn't have the
15  ability to dominate and get in there quickly.
16       So those factors are what would authorize a
17  CET.
18    Q   Okay. Can you tell me -- can you explain to
19  me what a CET is?
20    A   So a CET is essentially the officers are
21  going to have the legal and lawful search warrant.
22  They're going to make announcements that it's the
23  police, search warrant, the address and that.
24  They're going to -- depending on the situation,
25  they're going to have distracts and they're going to

---

23

1  do a breach. It could be an explosive breach, it
2  could be a forcible breach or the citizen could come
3  to the door, open the door and surrender.
4       And if that is not the case, then we go
5  inside and we take people in the custody, clear the
6  residence, make it safe for the detectives to come
7  in.
8    Q   Is there any rule about when distracts can
9  be used in terms of -- in terms of it overlapping or
10  interrupting the announcement of a police being
11  present?
12    A   No.
13    Q   Why not?
14    A   A lot of times if we have armed and
15  dangerous subjects who want to take up arms, a
16  distract could kind of pull their attention away and
17  it's more disorienting. So a lot of times they will
18  just -- they'll surrender. They'll give up. That
19  loud noise, it startles them or scares them and they
20  will just give up. They're -- and we can take them
21  into custody.
22    Q   If somebody is disoriented or is startled,
23  how are they able to understand that the police are
24  telling them that they're there under a lawful
25  presence -- of the lawful premise of having a search

---

24

1  warrant?
2    A   Well, again, we reiterate multiple times,
3  you know, police, search warrant, we have a -- you
4  know, make those announcements over and over and
5  over, even when they're entering.
6       So 99 percent of the time, they just
7  surrender, they just freeze what they're doing and we
8  take them into custody. Or they open the door, come
9  out, have their hands up and it's a peaceful taking
10  into custody.
11    Q   Okay. My question was a little bit
12  different. And so you're saying 99 percent of the
13  time. Is it your position as we sit here today that
14  disorienting somebody doesn't violate their Fourth
15  Amendment rights if it's made in the middle of an
16  announcement?
17    A   No.
18    Q   But the purpose of the distracts is to
19  disorient, correct?
20    A   Yes, to prevent them from taking up arms, to
21  not -- if they're sleeping in bed and they have that
22  gun on that dresser, not to grab it, take up arms,
23  and to surrender.
24    Q   And as we sit here today, obviously that's
25  not what happened in this case, correct?

---

25

1    A   Correct.
2    Q   Why don't you think that it was effective in
3  this case?
4       MR. ANDERSON: Objection. Form.
5       Go ahead and answer.
6       THE WITNESS: Why it wasn't effective? I
7  think he was lying in wait there on the couch with
8  the gun in hand and he waited until Kubla entered and
9  his intent was to shoot the officers, to kill the
10  officers. Even after he saw that the police were
11  there, he continued to fire until he was finally
12  deceased and stopped.
13  BY MS. MURPHY:
14    Q   So it's your position that he was lying in
15  wait and that he intended to kill police officers?
16    A   Yes.
17    Q   Okay. If he is disoriented or confused, how
18  could he formulate that kind of plan that quickly?
19       MR. ANDERSON: Objection to form.
20       Go ahead.
21       THE WITNESS: We don't know what he was
22  thinking. All we know is he was in the corner with
23  the gun. A plausible explanation, if someone's
24  scared or startled right away, before police even
25  enter, you're going to have rounds being fired.

---

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1  You're scared, you're just firing.  Those rounds go.
2        He waited for the, you know, 17, 18 seconds
3  before we got in, till he saw Kubla, and then fired
4  those rounds, even when we were still saying,
5  "Police, search warrant, officers are coming in."
6        So his intent -- and he did not stop until
7  he was injured where he can no longer return fire.  I
8  think he fired 18 rounds.
9  BY MS. MURPHY:
10    Q    And so just to confirm, though, I mean,
11  you've made a couple conflicting statements, because
12  you're saying, hey, I don't know what he was
13  thinking, but this was what I was thinking.  You
14  understand you just made those conflicting --
15    A    Yes, yes.
16    Q    And so part of you saying that, hey, this is
17  what I think he was thinking is because you want to
18  justify the actions that were taken in this case,
19  correct?
20    A    No.
21    Q    Then why are you making that conflicting
22  statement?
23    A    We took six rounds before we returned fire.
24  They made announcements over and over, even the
25  neighbors and the neighborhood heard those

27

1  announcements with the distract going.
2        So when you're saying "Police, we have a
3  search warrant," and you fire rounds and you see
4  officers coming in still saying, "Search warrant,"
5  and you continue to fire those rounds, it's a logical
6  conclusion.
7    Q    Have you ever been under fire?
8    A    No.  Well, yes, I have never been in an OIS.
9  I have been under fire many times.
10    Q    Okay.  Tell me how -- when in the -- tell
11  me -- if you don't mind, if you could walk me through
12  the instances where you were under fire.
13    A    We were doing a knock and talk with a
14  domestic violence victim -- and this was years ago --
15  and a subject was in there, he was acting nervous.
16  We asked him to leave so we could talk to her to get
17  her story.  He refused to leave.  He started reaching
18  for a gun, and my partner was in a struggle with him.
19  The rounds were going off and he was able to get the
20  gun out of his hand and take him into custody.
21    Q    Okay.
22    A    And I've been on numerous barricades where
23  they're firing rounds, you're hiding behind cover.
24  And search warrants with weapons involved.  You've
25  had people with the gun, that you, you know, give

28

1  them commands, "Hey, drop the gun," they've dropped
2  the gun.
3        So numerous ones and I'm sure I haven't even
4  touched, you know, 50 percent of those calls.
5    Q    Okay.  Have you ever been either in your
6  home or someone else's home on a couch and had
7  somebody come in and start shooting?
8    A    Have I?
9    Q    Yeah.
10    A    No.
11    Q    Okay.  So that would be when you're -- when
12  you are -- sorry, when you are suggesting what that
13  person might be thinking, that's a hypothetical for
14  you, correct, because you've never been in that
15  situation?
16    A    No.
17    Q    Okay.  And to confirm, you were not present
18  at -- you weren't present for this, correct?
19    A    No.
20    Q    Okay.  Did you watch the body-worn camera
21  footage later?
22    A    I did see some body-worn cameras.  Not every
23  single individual, but what CERT revealed to me
24  during -- before my interviews.
25    Q    Okay.  And as we sit here today, do you

29

1  remember which officers they showed you?
2    A    I don't remember which officer it was
3  exactly.
4    Q    Let me ask it a little bit differently.
5  This might be easier for you to remember.
6        Do you remember, like, what positions they
7  showed you?
8    A    Yes, during the Tactical Review Board, I
9  mean, they pulled multiple body-worn cameras together
10  so you can see, you know, Kubla going in, Kubla going
11  down, Brice Clements going in, and then the return of
12  fire.  And I don't know which camera was which
13  person.
14    Q    That's fair.  I guess I asked about the
15  position because that might be a little easier to
16  remember.  So having reviewed all of that -- and
17  we'll look at it again today, I'm not asking you to
18  remember something from four years ago -- but you
19  seem to be pretty confident about the times, because
20  you've -- as we sit here today, can you walk me
21  through what your positions are like on the times?
22    A    On the times, as far as?
23    Q    In terms of when they started knocking, when
24  they entered.
25    A    I don't have that off the top of my head.

Melanie O'Daniel         Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1    Q   Okay.  Well, didn't you just offer
2   16 seconds?
3    A   From the time that they made entry, yeah;
4   but I don't know, you know, the distract went off at
5   this time and, you know, the -- when they were
6   breaching at what second it was that the breach went
7   in.  I just know -- and I believe it's rough, 15 to
8   18 seconds before they made entry.
9    Q   And so I just want to -- and we're going to
10  go through everything.  I just kind of want to
11  understand what your thought process is.  That's why
12  I'm asking this question.
13         When you say 15 to 18 seconds, are you
14  talking about from when they started -- what's -- is
15  it your understanding that's from when they started
16  the announcement to when they breached the door or
17  are you saying that that's when they ended the
18  announcement and then they breached the door?
19   A   The start of the announcement until they
20  breached -- the breach was successful and they went
21  inside.
22   Q   Okay.  And so let me back up a little bit.
23  And like I said, we are going to go over the videos,
24  but as we -- if you can kind of walk me through, as
25  we sit here right now, what your understanding is of

31

1   how this unfolded, because we've kind of -- you've
2   pulled from a couple different things, so I think
3   what would be more fair for me is just to say to you
4   walk me through what your understanding is.
5       MR. ANDERSON:  Objection to form,
6   foundation.
7       Go ahead.
8       THE WITNESS:  As far as the service of the
9   search warrant or how we got there in the first
10  place?
11  BY MS. MURPHY:
12   Q   We're going to go over everything, but as we
13  sit here right now, what I'm asking for is, like, the
14  actual service of the search warrant.
15   A   So they have surveillance done, you know, an
16  hour, two hours beforehand.  They have a briefing.
17  Text us, we're there, if anything's changed.  They go
18  over the plan, everyone understands the plan.  They
19  reiterate information during that briefing.
20         They make sure everyone knows the plan,
21  everyone knows what's going to happen, and then once
22  everyone is good with that, then they'll move to the
23  apartment.
24         They'll make their approach and they'll set
25  up at the door.  The supervisor will make the

32

1   announcement, "SWAT, search warrant," say the
2   address.  And they will do a distract and then they
3   will conduct the breach and breach the door.
4         Once the door is breached, then they will
5   proceed inside.
6    Q   Okay.  And so I'm actually asking you to
7   walk through what happened in this situation, to
8   your -- as we sit here today.
9    A   That's from my understanding, that's what
10  transpired.  They had the briefing.  They made the
11  announcements.  They did the distract.  They did the
12  breach.  And they went inside and then the shooting
13  occurred.
14   Q   Okay.  As we sit here today -- and I know
15  that you're retired now, but to the best of your
16  memory -- actually, sorry, let me strike that.  Let
17  me ask it differently.
18         Did you ever receive any training while you
19  were with SWAT about elements of knock and announce
20  and the CET entries in terms of the Fourth Amendment?
21   A   There is a classroom portion during SWAT
22  school that we receive, during the breachers, through
23  all the training, there is, and it always covers
24  Fourth Amendment.
25   Q   And what was that training?  What did the

33

1   training tell you?
2    A   I can't remember verbatim.
3    Q   And that's okay if you can't remember
4   verbatim.  If you just want to walk me through what
5   you do remember.
6    A   As far as --
7    Q   The Fourth Amendment training that you
8   received.
9    A   Fourth Amendment, like I said, people are
10  protected from unreasonable searches.  You can't --
11  you need the exception and then you need a search
12  warrant, a legal and lawful search warrant,
13  describing the place to be searched and items to be
14  seized.
15   Q   Okay.  And so that has more to do with the
16  underlying -- and I'll fine-tune my question, then,
17  because what you've answered, I think, is about the
18  actual, like, mechanics of the warrant itself and
19  what needs to be in there.
20         Were you ever provided any training, to your
21  memory?  And if so, what was it, in terms of, hey,
22  this is how long you have to wait, or this is the
23  kind of announcement that you need to make in order
24  to provide the person or persons on the other side of
25  the door appropriate notice under the Fourth

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1  Amendment?
2      A   During that -- we're aware of the U.S. v
3  Banks, you know, and it's based on the totality of
4  the circumstances. There's even another case -- I
5  don't know if it's U.S. -- it's McCracken. I don't
6  know the other -- if it's U.S. or someone else versus
7  that, but essentially they said 10 seconds.
8         But it's also based on the totality of the
9  circumstances. It could be five seconds based on the
10  crime, what they're seeing, what the guys are
11  observing, weapons involved, that violent history,
12  the surrounding areas.
13         So it's based on the circumstances out
14  there.
15     Q   Okay. And the 10 seconds or five seconds
16  that vary in time, is that from the end of the
17  announcement or is that from the beginning of the
18  announcement?
19     A   I don't think we've covered that
20  specifically.
21     Q   Okay. And in covering that, did you guys
22  ever discuss using distracts during the announcement
23  and how that might implicate somebody's fair warning?
24     A   No, the guys are shouting loud enough,
25  sometimes the distract is done on the rear side --

35

1  which I think they did it on the rear side. I wasn't
2  out there on the scene.
3         But we've served in -- you know, we have
4  documentation that we've served like 1,487 warrants;
5  90 percent of those warrants or 57 percent of those
6  warrants were CETs. So we've had success in this,
7  this is how we're trained, they've modified -- we
8  never had a, hey, they didn't hear because of the
9  distract.
10        And 99.9 percent of those, the individuals
11  surrender, peacefully taken into custody. We've had
12  no officer-involved shootings or no mistakes on
13  those, so to speak.
14     Q   There was a lot of -- well, you tell me if
15  I'm right or wrong, because you're listing off, hey,
16  we did all these other ones. My understanding of
17  having reviewed this is there were a lot of things
18  that were a little bit different along the way in
19  this incident. And I'll walk you through what some
20  of them were.
21        You were out on COVID, correct?
22     A   Yes.
23     Q   Okay. And then was it Findley, he was also
24  out on vacation, correct?
25     A   Yeah, the night of the warrant, he was

36

1  there.
2      Q   Okay. But during the buildup and the
3  authorization and all this other stuff, he was on
4  vacation, correct?
5      A   Yes.
6      Q   So you were out sick, he was on vacation.
7  And then Sergeant Backman, this was his first time
8  out running a SWAT team on a CET, correct?
9      A   No.
10     Q   No?
11     A   He -- during December, we had been on 22
12  barricades with him --
13     Q   Mm-hm.
14     A   -- two hostage rescue incidents with him.
15     Q   Okay.
16     A   He was in major violator, so they serve
17  warrants all the time. They do surrounded calls all
18  the time. So I believe this -- we had several
19  warrants, I can't -- if you know the number, please
20  share.
21     Q   No, I'm not trying to trip you up on the
22  number.
23     A   So he wasn't new by any sense. He wasn't in
24  charge. He was in the steps -- he's taken the
25  overall inside, but Garth Findley was in charge. He

37

1  was aware. That's why we do the briefing as well.
2         You could have -- say I was on vacation. I
3  come in that day. I get everything I need to know at
4  that briefing and I review materials.
5         So you don't have to have been there when
6  the plan was being formed. And the plan could have
7  changed at briefing. Something changed, some other
8  new information could stop, halt, either we're not
9  serving the warrant, we could take a different
10  approach, we could do something else.
11        So him being fully briefed at that and he
12  knew ahead of time was right in line with -- I had no
13  problems with that.
14     Q   Okay. My question was a little bit
15  different.
16        MR. ANDERSON: Slow down a little bit for
17  the court reporter.
18        THE WITNESS: Okay.
19  BY MS. MURPHY:
20     Q   My question was a little bit different. So
21  Sergeant Backman was the one that kind of created the
22  plan, did the IAP, and all that stuff, correct?
23     A   The assistant team leaders, the ATLs, create
24  the plan.
25     Q   Okay.

LEXITAS

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1    A    And they approve it and go over it and then
2    I give the final authority on it.
3    Q    Okay. This was Sergeant Backman's first CET
4    as part of SWAT, correct?
5    A    I don't have that for sure. I don't. I
6    can't recall.
7    Q    Okay. So you had listed off some barricades
8    and surrounds and callouts. Those are different,
9    correct?
10   A    Not necessarily, no.
11   Q    Why aren't they different?
12   A    Well, we had two hostage rescues, which
13   essentially your patrol is out there. We have, you
14   know, someone in danger of their life being lost and
15   we breach the door, we go in, and we take people into
16   custody.
17   Q    Well, those are essentially no-knock, right?
18   A    No, the police are out there, bull-horning,
19   they've been talking to them on the phone, they've
20   had full notice, "Hey, I'm not coming out," and
21   they've had communication. And the police had been
22   surrounding it until we get there.
23   Q    Okay. Here there was no communication
24   beforehand, correct?
25   A    No, they'd made the announcement, "Metro

39

1    Police, search warrant."
2    Q    I guess -- and so let me refine my question.
3    In the hostage situation, there was no doubt
4    that the person on the other side of the door knew
5    that it was the police coming through, correct?
6    A    Hopefully.
7    Q    Yeah. And that there was some kind of --
8    there was communication beyond a 10-second
9    announcement, correct?
10   A    Well, I would have to have the information
11   on those hostage rescues. Not all the time as
12   police -- there are sometimes we're called ahead of
13   time that we're told, "Hey, I've got information on
14   this tip line that this lady is being there," and we
15   will do it just -- and there will be no
16   announcements, and we'll breach the door, make the
17   announcements once we're inside, "Police sergeant,"
18   and go in and save the life.
19   So it depends. I don't recall what those
20   two hostage rescue situations were.
21   Q    Okay. So when you're offering that these
22   would be sufficient training for Sergeant Backman in
23   order to do this CET, that's actually speculation,
24   now, correct? Because you don't know what the
25   underlying factors were in the hostage situation, so

40

1    you can't make a direct line and say, hey, this
2    properly prepped him for this, correct?
3    A    The training we give them as well?
4    Q    No, I'm talking about those -- the
5    instances --
6    A    I believe he went on another CET. I think
7    it's in one of my documents that he did go on one or
8    two more CETs that he had been on.
9    Q    Okay.
10   A    It's in my transcripts.
11   Q    Did he go to SWAT school?
12   A    No.
13   Q    Okay. And so you're out on COVID, Findley
14   is on vacation, and Sergeant Backman had never been
15   to SWAT school?
16   A    SWAT school was not a parameter to go on any
17   barricades; the training was, and he did receive that
18   training that I denoted in my transcripts.
19   Q    And now they have to do more training,
20   correct? That was another policy change after that,
21   correct?
22   A    I don't know. I wasn't there.
23   Q    Okay. So there was definitely some things
24   that were different about this than would normally
25   happen, correct?

41

1    A    No.
2    Q    No? So that's normal for Findley to be on
3    vacation, you to be out on COVID, and for the person
4    running it not to have ever been to SWAT school?
5    Those are normal parameters?
6    A    Yes, because SWAT school is only given once
7    a year. And, like I said, maybe it's in March, and
8    maybe he gets there in May, so what we do is
9    extensive one-on-one tutoring and training, which is
10   even better, Listed in my transcripts is -- it's more
11   one-on-one.
12   Q    That's your opinion, correct?
13   A    It's absolutely. When I get one-on-one
14   training, it's absolutely better because he is the
15   focus of everything. He also had those 22 barricades
16   where he shadowed a little bit and then he was given
17   authorization to go in as he improved.
18   He is in next step. So we're reviewing him
19   and as I stated he was far and beyond. It was a busy
20   December.
21   When I took over as SWAT commander, I only
22   hard 13 barricades under my belt; he had 22 in one
23   month. Not to mention he was in major violators,
24   which everything they -- they have arrest warrants
25   where they're going after a suspect. So he was well

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1  above-and-beyond trained.
2       So being on vacation doesn't -- and not
3  being part of the plan, he is still reviewing the
4  plan. You can change things in that moment that can
5  stop and negate it.
6       I spoke to Russ on the phone, and I knew
7  from talking to other individuals that the plan was
8  going to be a CET. I wanted to hear because he was
9  new that he fully understood what a CET was. Just
10  say, "Hey, it's a training moment, tell me why we're
11  doing a CET. Explain to me why we can't do a
12  surround and callout."
13       So we spent time on that phone and he
14  articulated everything, didn't need help, he fully
15  understood. And once he understood, I said, "Okay,
16  put that in a text message," and he sent it to me and
17  the approval was given.
18       Garth, when he shows up on scene, he has to
19  read the search warrant, he has to get familiarized
20  with everything going on, looks at the plan, and he
21  okays it or not okays it. He can say yep, nope,
22  we're not doing that. Or he can continue and he
23  continued.
24       No one there had a problem with doing the
25  CET and it was the best tactic to use at the time.

43

1  Q  Why do you say "at the time"?
2  A  Well, I haven't been there, I've been
3  retired for two years, so I don't know what they're
4  doing now, if things have changed, if tactics have
5  changed. But in that moment, that was the best
6  tactic to use at the time.
7  Q  Do you have any understanding that they
8  have, in fact, changed it? If they were to serve a
9  similar warrant today, it would be a surround and
10  callout?
11  A  No, like I said, I'm retired. I don't keep
12  in touch with the gentlemen still on the team. I
13  know a lot of them have promoted and retired.
14  Q  Okay. And so is it your position that the
15  CET was optimal or the only way that this could have
16  been served?
17       Do you understand the difference?
18  A  The CET was the only way you could serve
19  that warrant. And there had been, in the history of
20  serving warrants at that apartment complex, 3050
21  South Nellis, has always been a CET.
22  Q  Okay. And so if I told you that as we sit
23  here today, that the Metro policy changed and today
24  that would be -- I'll stop saying surround and call,
25  they call it an SACO, if that's easier.

44

1  A  SACO.
2  Q  SACO. If I represented to you that as we
3  sit here today, that this would be served as a SACO
4  and not a CET, would that change your opinion at all
5  whether it could only be served via CET?
6       MR. ANDERSON: Objection to form.
7       Go ahead.
8       THE WITNESS: SACO is not the safer way to
9  do that. And based on the parameters of -- that they
10  could not land BearCats, there was that metal
11  fencing, the ARCO gas station there and a
12  non-friendly apartment complex, numerous people
13  going.
14       So it is -- today the CET should be the
15  optimal method to use. I know -- just because they
16  change policy doesn't take away that that's still the
17  better way to serve that warrant.
18  BY MS. MURPHY:
19  Q  Okay. I guess my question is -- and so I'm
20  going to refine my question -- is it your position as
21  we sit here today that a SACO could not have been
22  done on that?
23  A  No. If we were going to do a SACO, I would
24  have turned it into a barricade and we would have
25  handled it as a barricade. So we could take that

45

1  fence down, evacuate people, cause damage inside the
2  apartment, get the neighboring residents out and take
3  them out. And it would have been more of a package.
4  It would have been handled as a barricade.
5  Q  Mr. Williams is dead and a police officer
6  was shot. Do you think this was a safe way to serve
7  this warrant?
8       MR. ANDERSON: Objection to form.
9       Go ahead.
10       THE WITNESS: Yes. As I stated, the CET is
11  the safer method. The surround and callout is not
12  feasible. We would have had to do it as a barricade,
13  so if you're serving a warrant, the CET is the best
14  method. Yes, it's tragic that the individual died,
15  it's tragic that my officer was shot --
16  BY MS. MURPHY:
17  Q  His name is Isaiah Williams.
18  A  My apologies. That Mr. Williams is deceased
19  and that Officer Kubla has, you know -- his injuries,
20  and not to mention the toll, the mental toll and the
21  psychological toll on the families and the officers.
22       But CET is the safer method to serve that
23  warrant.
24  Q  But it wasn't in this case, correct?
25       MR. ANDERSON: Objection to form.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1    THE WITNESS:  Mr. Williams decided to fire
2   at officers coming in the door.  So he made that
3   decision and continued to fire until he was no longer
4   able to.
5   BY MS. MURPHY:
6    Q   Well, just to confirm your earlier
7   testimony, Mr. Williams obviously decided to fire,
8   but whether or not he knew that those were police
9   officers is speculation, correct?
10   A   Yes, we -- he is deceased.  He was not able
11   to give a statement.
12   Q   Okay.  All right.  And so as we sit here
13   today, do you have any understanding of how -- of any
14   of the policy changes that were implemented following
15   this incident?
16   A   No.
17   Q   Okay.  Do you have any understanding of the
18   recommendations that CERT made to change policy?
19   A   I think CERT, and this is from reading
20   the --
21   Q   I'm sorry, CERT is C-E-R-T.
22   A   CERT made some recommendations that the CET
23   would be done for no-knocks.  And I know at the
24   time they were saying SWAT should be used as the last
25   resort; and when I left, I think SWAT was serving

47

1   everything again.
2    And those are the ones that I'm familiar
3   with.
4    Q   Do you have any understanding about their
5   recommendations about changing the use of distracts?
6    A   No.
7    Q   Okay.  Do you have any understanding about
8   their criticisms of any of the work that you did on
9   this case?
10   A   Not directly.
11   Q   What is your understanding, then, directly
12   or indirectly?
13   A   I know when we went to the Tactical Review
14   Board and they had the -- they said we should not
15   have done a stun stick and that we shouldn't have
16   done a CET, I went through the Tactical Review Board,
17   defended that position and I was not sustained on any
18   of that.  I did not receive any discipline or --
19   essentially, they agreed with the conclusion that
20   after the explanation, CET was good at the time and
21   the stun stick was good at the time.
22   And I believe one of the officers said that
23   saved his life, too, the distraction, because Isaiah
24   started shooting at -- I believe it was Rothenburg
25   and Bertuccini at the window.

48

1    Q   Yeah, where the window was broken and what
2   sounded a lot like gunshots came through, correct?
3    MR. ANDERSON:  Objection to form.
4    THE WITNESS:  I wasn't there.  I don't know
5   that.
6   BY MS. MURPHY:
7    Q   All right.  Have you heard these stun sticks
8   go off before?
9    A   Yes.
10   Q   What does it sound like to you?
11   A   It's a noise, loud noise, that -- I don't
12   know how many decibels it is, but it's a loud noise
13   that goes off like every half a second.  I believe
14   that was nine loud noises that go off.
15   Q   Okay.  And I'm sorry, I'm going to loop back
16   to something you just said.  So you defended all
17   the positions.  You defended the various positions
18   during the tactical review and you understood that
19   none of your -- that your positions weren't
20   sustained, correct?
21   A   Yeah.
22   Q   Okay.  But as we sit here today, that
23   doesn't -- you're still defending everything and that
24   doesn't change your position on anything, correct?
25   A   No, that was the training that I received at

49

1   the time, the information that we had at the time,
2   and it basically stops right there.  I was retired
3   afterwards.  The TRB was, like, my last day at work
4   and then I was retired.
5    Q   Sorry.  What was --
6    A   The Tactical Review Board.  When they
7   finished their report and then they present their
8   findings and then we're able to go in.
9    Q   And I know what most of the acronyms mean,
10   but I'm just trying to keep it a clean record.
11   Sorry.
12   A   Sorry.
13   Q   That's okay.  All right.
14   Can you kind of walk me through what was
15   your understanding of the purpose of the warrant?
16   A   So the search warrant was to further an
17   investigation of a homicide.  The detectives had a
18   homicide that occurred, Mr. Thomas.  He was at a bus
19   stop and two subjects went up there and shot him.  He
20   died of his gunshot wounds.
21   The homicide investigators did a Crime
22   Stoppers, a tip came out, and the stepmom asked to
23   speak with homicide and revealed that she believes
24   her stepson, Wattsel Rembert, and Corvell Fischer
25   were involved.

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50

1    So they did a lengthy interview with that
2    and why she thinks it was him. And she said she had
3    a phone call with him and fronted him out and while
4    she was talking to Wattsel, he said, "They captured
5    us on film," which, to her, alluded to the fact that
6    he didn't say, "Hey, it wasn't me, I was in Texas."
7    He said, "Hey, they captured us on film," while she
8    was on the phone. And the other family members also
9    said yes, that's Wattsel. They recognized his walk
10   and then Corvell Fischer.
11       So she said he is living at 3050 South
12   Nellis, Apartment 1125. I believe she showed a photo
13   of that apartment complex.
14       Shortly after that homicide, there was a
15   shooting, a 415A, which is assault with a gun; and it
16   was at that same complex. Approximately 20 rounds
17   were fired and they found Wattsel's BMW with an MP5.
18       They did photo lineups with the two victims
19   there, a female and a male, and apparently this was
20   over a traffic accident that happened a few days
21   prior at the complex. They both were shown the photo
22   lineup at the same time, and they both identified
23   Wattsel as the suspect, so they had probable cause
24   for Wattsel, in addition to also being a person of
25   interest in the homicide of Thomas.

51

1    Corvell Fischer was also seen in the
2    complex. There was a report of a guy with an assault
3    rifle on his back and that lined up with the house
4    arrest information. They actually can show you a
5    photo and he had an ankle bracelet on that really
6    shows he was really in Apartment 1125.
7        So that corroborated Wattsel being there.
8    They said it was a flophouse, that numerous subjects
9    were coming and going, and they were using drugs.
10   And this is per stepmom and family. And that they
11   were armed, and that they had weapons. And, again,
12   we saw Corvell Fischer with the assault rifle and it
13   all lined up.
14       So they had the search warrant. They had
15   probable cause for Wattsel for that shooting and they
16   had the search warrant for that residence. They did
17   surveillance and they saw numerous people coming and
18   going.
19   Q   But none of them were Corvell or Wattsel,
20   the actual suspects, correct?
21   A   Yeah.
22   Q   Sorry, go ahead.
23   A   And so they had the probable cause based on
24   the mom, based on the -- I was able to corroborate
25   that. And I do believe when they took Rembert into

52

1    custody a few days later, he did admit to being at
2    3050 South Nellis as well.
3    Q   Obviously he wasn't there when they executed
4    the warrant, correct?
5    A   So they the PC for that, but they were
6    looking for the -- the evidence was a gun and
7    clothing.
8    Q   And what is the difference between a warrant
9    for property and an arrest warrant?
10   A   Arrest warrant is for that individual. They
11   are -- they have the -- take him into custody.
12       For property, they're going to look for, you
13   know, items listed for that property.
14   Q   Does how the warrant is executed change
15   based on whether it's an arrest warrant or a warrant
16   for property?
17   A   No. I've spoken extensively on this. And
18   the warrant being served is based on the threat
19   behind the door, armed subjects, having guns -- it's
20   corroborated -- unfriendly police presence.
21       The suspects or other individuals involved,
22   their violent tendencies, their violent history,
23   having a gun involved in the commission of a crime
24   and that they're still outstanding.
25       So that's what we're looking for before we

53

1    serve the warrant.
2        Now, I've explained thoroughly, I'm sure
3    you've read it, that it is for property, but it is
4    not strictly for property. It's what else is going
5    on inside that apartment. And let me give you an
6    example.
7        If we were just doing for a pedophile and we
8    just wanted his laptop for evidence and the pedophile
9    was not home -- or a drug dealer, an armed and
10   dangerous drug dealer, who is walking into 7-Eleven
11   and we take him into custody, we interview him and
12   he's like, "My grandma is inside," we still need to
13   get the narcotics or whatever else, but we do not
14   believe she's a threat. We just want to go in there
15   and get the property, whether it's dope, laptop, a
16   gun. We're not going to do a CET for that because
17   she is not a threat.
18       Now, if the subject is in there and he has a
19   violent history, violent tendencies, they -- Rembert
20   told his stepmom that "They'll never get me,"
21   something along those lines and that he had -- he
22   knew that we were after him as well, to willfully
23   surrender, and he was still a threat to the public.
24   And him having a traffic accident a few days ahead of
25   time showing that he lives there, him having a

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1   shooting there with other residents, he is a threat
2   to that public.
3       So it's not just for the property solo,
4   absent anyone inside; it's who else is inside that
5   door, inside that residence.
6       Q   But when they went to go serve the warrant,
7   they didn't have any reliable information on who was
8   there; isn't that correct?
9       A   We don't need to have 100 percent.  It's not
10  in case law, 100 percent reliability.
11      Q   They didn't even have 50 percent reliable.
12      A   We had him committing crimes, told by his
13  family that he is staying there, that it's a
14  flophouse, and he had a shooting there.  So it
15  corroborates it.  We need probable cause.  We don't
16  need beyond a reasonable doubt.
17      You're asking for beyond a reasonable doubt.
18  We don't need that, we need probable cause.
19      Q   And one of the individuals did have an ankle
20  monitor, correct?
21      A   Yes.
22      Q   And it was pinged that he wasn't there at
23  the time that the warrant was executed, correct?
24      A   Correct.  But we were still told it was a
25  flophouse and numerous subjects still armed and dangerous

55

1   and Wattsel was still outstanding, meaning not in
2   custody.
3       Q   What was your understanding of how much
4   recon they did on this beforehand?
5       A   I can't give you a time frame.  I know we
6   recon every place they go and they get an eye and
7   they try and get as much information as they could.
8       I know that the criminal intelligence
9   section, surveillance team, did some surveillance on
10  there and they felt uncomfortable.  I think they
11  believe they were made, they were discovered,
12  and they stopped doing the surveillance.
13      Q   Okay.  And so -- sorry, this is kind of --
14  why don't we just take a quick break.
15      THE VIDEOGRAPHER:  Going off the record at
16  11:19 a.m.
17      (Whereupon, a recess was taken.)
18      THE VIDEOGRAPHER:  We're back on the record.
19  The time is 11:28 a.m.
20  BY MS. MURPHY:
21      Q   All right.  We took a brief break and having
22  taken a brief break, I'm pretty sure I know the
23  answer to this, but I'll ask anyway.
24      Is there any of the testimony that you gave
25  before our break that now you've had a chance to take

56

1   a break or think about it that you want to change or
2   amend at all?
3       A   No.
4       Q   Okay.  I'm going to try to pull up some of
5   the videos because I wanted to ask you some questions
6   about those.
7       And if you'll just bear with me, I also had
8   brought these on the zip drive, but something is
9   wrong with my Zip drive reader on my laptop.  I'm
10  going to try to cue it up to the best of my
11  abilities, but if it pauses or skips, we'll just redo
12  it.
13      A   Okay.
14      Q   And I don't want to watch the whole video,
15  there's just really only about a minute and a half I
16  would like to go over.
17      And I'm just going to make sure it runs
18  through cued up and then I'll turn it around and
19  you'll watch it.
20      A   Okay.
21      Q   And so Melanie, if it's okay, I'm going to
22  move this over right next to you.
23      Is it okay if I stand next to you?
24      A   Yes.
25      Q   I'm going to hit pause.  I just want to make

57

1   sure you're not uncomfortable.
2       MR. ANDERSON:  She's armed.
3       THE WITNESS:  No, I'm not, actually.  I'm
4   retired.  But I was leery about not having anything.
5   BY MS. MURPHY:
6       Q   And I'm just going to play it through just
7   to kind of walk you through it.  I'm just going to
8   play it through this spot, this minute.  And this is
9   the approach as they come up and then the shooting.
10      MR. ANDERSON:  Whose camera is this?
11      MS. MURPHY:  This is Rothenburg.  I'm going
12  to look at two different.  This one is -- actually,
13  I'm sorry, I think this is --
14      THE WITNESS:  It's Rothenburg.
15      MS. MURPHY:  Yeah, it's Rothenburg.
16      (Video played/video stopped.)
17  BY MS. MURPHY:
18      Q   So now I'm going to go through and stop it
19  at a couple critical points, because that kind of
20  gets up to the entry and the breach.
21      Okay.  So hold on.  Okay.  And so we're
22  going to play up through another couple seconds and
23  then when we first hear the announcement, I'm going
24  to pause it and then we're going to look at the
25  timestamp, okay.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

1    (Video played/video paused.)
2  BY MS. MURPHY:
3    Q    So my understanding -- and I'm trying to get
4  it as close as I can to this -- but what does that
5  timestamp say up there?
6    A    13:00.09.
7    Q    Okay.  And so that, would you agree with me,
8  that's when you can kind of first hear?
9    A    Yeah, maybe a little bit before.
10   Q    Yeah, either 08, or 09, right?
11   A    Yeah.
12   Q    Okay.
13       (Video played/video paused.)
14  BY MS. MURPHY:
15   Q    And so then we have the glass breaking and
16  what's the timestamp say up there?
17   A    13 and then 16.
18   Q    So it was probably like 15 or 16, correct?
19   A    (Witness nods head.)
20   Q    Okay.  So either taking it from 09 to 15 or
21  08 to 16, that's six to seven seconds, correct?
22   A    Yes.
23   Q    Okay.  It's not -- if you want a pen and a
24  piece of paper to do the math, that's okay.
25       And so do you have any understanding as we

59

1  sit here today where that window was relative to
2  where Mr. Williams was?
3    A    No.
4    Q    Okay.  Would it surprise you to learn that
5  that window was essentially right next to the sofa
6  that he was on?
7    A    No.
8    Q    Okay.  As we sit here today, do you think
9  that entry at six or seven seconds after the
10  announcement first starts being made, do you think
11  that complies with Mr. Williams' Fourth Amendment
12  rights?
13       MR. ANDERSON:  Objection to form.
14       THE WITNESS:  Depends on the totality of the
15  circumstances.  So Bertuccini could explain why he
16  did it at that time based on what he's seen.  I was
17  not there, so I could not give an opinion on that.
18  BY MS. MURPHY:
19   Q    Sorry, just for clarity, this was
20  Rothenburg.
21   A    But Bertuccini was the one that had the stun
22  stick.
23   Q    Okay.  So as we sit here today, I just want
24  to make sure I understand, because my only next time
25  to ever talk to you again is going to be at trial.

60

1    When you go to trial, you're going to say "I
2  have no position on whether entering the unit, the
3  apartment at six to seven seconds from the beginning
4  of the announcement violates Mr. Williams' Fourth
5  Amendment rights"?
6    A    No, I would have to know what Bertuccini was
7  thinking, what they saw, what made that decision.  So
8  it would have to come from there.  I'm not there, I'm
9  home with COVID.  So if I was on the scene, I would
10  have, you know, the mics cued up, information.  I do
11  not know.  So I cannot make an informed decision.
12   Q    Okay.  All right.
13       (Video played/video paused.)
14  BY MS. MURPHY:
15   Q    And so you hear him say, "Hit it, hit it,
16  pull," correct?
17   A    Uh-huh.
18   Q    Okay.  And so that's either at -- I'm sorry,
19  can you read the timestamp up there for me?
20   A    13 and 20.
21   Q    Okay.  So it's -- I'm not perfect at
22  stopping.
23   A    Yeah, I understand.
24   Q    Okay.  And so, "Hit it, hit it, pull, pull,"
25  that is not a police presence announcement, correct?

61

1    A    No, the announcements are coming from the
2  sergeant.
3    Q    Right.  But you understand, as we look --
4  and I'm just asking you, I know that you're saying,
5  hey, I wasn't there, but what we're viewing on this
6  body-worn camera is the window being broken and then
7  the announcement of, "Pull, pull, hit it, hit it,"
8  being made next to the broken window, correct?
9    A    Yes.
10   Q    Okay.  And I'm going to ask you the same
11  question and if you answer me the same every single
12  time, that's fine.  As we sit here -- and so I'm
13  going to -- that's approximately 10 to 11 seconds
14  after the first -- after the announcement is starting
15  to be made, okay.  Would you agree with that math?
16   A    Yeah.  And announcements should be done
17  throughout, as they enter, search warrant.
18   Q    And so as we sit here today, do you believe
19  that 10 seconds from the beginning of an announcement
20  to breaking open a window and making nonpolice
21  announcements, do you think that that complies with
22  Mr. Williams' Fourth Amendment right to be given an
23  opportunity and awareness that police are trying to
24  enter the unit?
25       MR. ANDERSON:  Objection to form.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1      THE WITNESS: You can hear the announcements
2  being made. So the announcements were being made
3  by -- I believe it's Sergeant Backman. So, again, I
4  cannot comment. I wasn't there. I don't know what
5  they were thinking, what they saw, or the decisions
6  that were made.
7  BY MS. MURPHY:
8      Q   Okay. Okay. And can you read that
9  timestamp up there for me?
10     A   23. So 13 and 23.
11     Q   Okay. So it's 22, 23, okay.
12         So looking at that, then we know whether
13 it's, you know, eight or nine when the announcement
14 starts being made. We then have within 23 seconds
15 and the announcement's still being made. And then
16 the flashbang goes off, correct?
17     A   Yes.
18     Q   Okay. And your earlier testimony was the
19 purpose of the flashbang is to disorient and
20 surprise, correct?
21     A   Yes.
22     Q   Okay. Do you think that a flashbang going
23 off while an announcement of police presence is still
24 going off complies with my client's Fourth Amendment
25 right to be given -- to first notice that police are

63

1  present and the opportunity to answer the door?
2      MR. ANDERSON: Objection to form.
3      Go ahead.
4      THE WITNESS: Yes.
5  BY MS. MURPHY:
6      Q   Okay. All right. Now, we're going to look
7  at Officer Kubla.
8          Thanks for bearing with me on my slow
9  computer.
10     A   It's all good.
11     Q   Craig will tell you, I've tried to do this
12 eight different ways and each way has been slow.
13     A   You could get an AP or an Apple.
14     Q   Oh, yeah.
15         And I'm going to cue this up. I'm going to
16 put it just --
17         (Video played/video paused.)
18 BY MS. MURPHY:
19     Q   Sorry, I know you can see it down here, but
20 just for the record, I think I said it, but I want to
21 make it clear, we're looking at Kerry Kubla's
22 body-worn camera.
23     A   Correct.
24         (Video played/video paused.)
25     ///

64

1  BY MS. MURPHY:
2      Q   Similar to last time, I'm going to let this
3  minute run through and then we'll go back and stop,
4  okay?
5      A   Okay.
6          (Video played/video paused.)
7  BY MS. MURPHY:
8      Q   Okay. So I'm going to scroll back. We're
9  going to look at the announcement. Sorry.
10         Okay.
11         (Video played/video paused.)
12 BY MS. MURPHY:
13     Q   All right. What does that timestamp say
14 over there?
15     A   12:59 and 57.
16     Q   And I'm going to say -- I think it starts at
17 around 56 or 57.
18     A   Correct.
19     Q   And so we agree that that's the time of the
20 announcement, based on this --
21     A   Yeah, and it could be within a second margin
22 or millisecond.
23     Q   And I'll represent to you that I've watched
24 all of these a few times and I like to go by the
25 timestamp on each individual because I think a couple

65

1  of them are off by a couple of seconds.
2      A   Okay.
3      Q   Based on this one, though, we agree that
4  Kerry Kubla is at 56 or 57?
5      A   Yes.
6      Q   Okay. And that's when the announcement
7  starts being made, correct?
8      A   Yes.
9      Q   Okay.
10         (Video played/video paused.)
11 BY MS. MURPHY:
12     Q   Can you -- did you hear the glass break
13 around the corner? Did you want me to replay that?
14     A   No, I believe I heard it.
15     Q   Okay. And that's -- what time is that at?
16     A   13 and 04.
17     Q   Okay. And if you want me to replay it, it's
18 fine.
19     A   No.
20     Q   Well, I'm going to ask you the next
21 question. You may say, hey, hey, I want to re-watch
22 it again.
23         Had they made two full announcements when
24 the glass broke?
25     A   I believe so.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1    Q    All right.  Let's watch it one more time.
2    And let me ask you this foundational question:  What
3    does an announcement have to have in it?
4    A    That we're the police and that we have a
5    search warrant.
6    Q    Do you have to list the address?
7    A    We do do that and they have, but it's not
8    the requirement.  We want them to know, hey, it's
9    police, we have a search warrant.
10    Q    Okay.  So if you -- and how many times do
11    you -- is there a requirement of how many times?
12    A    I believe they say it all throughout, even
13    when we're, you know, on other incidents.  They just
14    continue to say, "Police, police, Metro Police.
15    Q    Okay.  All right.
16         (Video played/video paused.)
17    BY MS. MURPHY:
18    Q    Sorry, I did it a little slow again, but we
19    agree, right, that he starts hitting the door?
20    A    Yes.
21    Q    Okay.  And can you tell me what that
22    timestamp is up there?
23    A    13 and 08.
24    Q    Okay.
25         (Video played/video paused.)

67

1    BY MS. MURPHY:
2    Q    Do you know what that noise was?
3    A    No.
4    Q    Okay.
5         (Video played/video paused.)
6    BY MS. MURPHY:
7    Q    And, sorry, so then the door -- I did that a
8    little slow.  I'll go back from when the door comes
9    open.  Sorry about that.
10         (Video played/video paused.)
11    BY MS. MURPHY:
12    Q    Do you know what that was?
13    A    No.
14    Q    Okay.  But it seems to be a flash from
15    inside the unit, correct -- inside the apartment,
16    correct?
17    A    Yeah.
18         (Video played/video paused.)
19    BY MS. MURPHY:
20    Q    Okay.  Can you read me the timestamp up
21    there?
22    A    13 and 12.
23    Q    Okay.  And that seems to be -- in that one
24    or two seconds, that's when the door comes open,
25    correct?

68

1    A    Yes.
2    Q    Okay.  So as we sit here today, based on the
3    totality of circumstances, we've got the announcement
4    being made; we've got the window being broken within
5    six to seven seconds; we've got an announcement of,
6    "Pull, pull, pull, get it in," within 10 seconds; and
7    then based on this video, we have the entry at about
8    15 seconds there at the very beginning of the
9    announcement.
10         That totality of circumstances, do you
11    believe that that complied with my client's --
12    Mr. Williams' Fourth Amendment rights?
13         MR. ANDERSON:  Objection to form.
14         THE WITNESS:  Yes.
15    BY MS. MURPHY:
16    Q    Okay.  At any point here, do you think my
17    client had an opportunity to submit to the police?
18    A    I wasn't out there, so I can't make an
19    informed decision on that or in his mindset and he
20    wasn't interviewed.
21    Q    Okay.  So I just want to make sure, when we
22    go to trial, that's going to be your same position,
23    correct?
24    A    Yes.
25    Q    Okay.  Fine.  Thank you for bearing with me

69

1    on that.
2    A    No problem.
3    Q    Give me one second to get reorganized over
4    here.
5         And we've gone over -- we've kind of brushed
6    on it, but I want to really kind of dig into it.  In
7    terms of -- we know that you weren't out there.  Can
8    you please explain to me your position and what that
9    entailed relative to this incident?  What were you in
10    charge of, what were you doing?  If you could kind of
11    walk me through that.
12    A    I'm in charge of approving the tactics,
13    obviously reading the warrant and approving the
14    tactics.
15    Q    Okay.  And so I kind of asked it to you
16    before in a kind of a compound way, but I'll ask it
17    for you again.
18         I will represent to you that one of the
19    legal elements of knock and announce is after notice
20    of his authority and purpose, an officer is refused
21    admittance.
22         Having reviewed those videos -- we can watch
23    them all over again if you want and the other ones as
24    well if you feel like you need more information --
25    but based on watching those videos, what did



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1  Mr. Williams do to refuse admittance while the door
2  was closed?
3      A    Not answering the door or saying, "Hey, I
4  give up, I surrender," something along those lines.
5      Q    And you think that he could have done that
6  in under 10 seconds?
7      A    Absolutely.
8      Q    Okay.  How could he have done that in under
9  10 seconds?
10     A    I had UPS at the door the other day.  I'm
11 sitting there right by the couch, boom, he knocks, I
12 get up, it's half a second, one second, 1.5 seconds,
13 I answer the door.
14     Q    Was he at your door at 5 a.m.?
15     A    No.  But he also wasn't in the back bedroom,
16 he was right there by the door as well, on the couch
17 by the door in the front room.
18     Q    No, he was by the window.
19     A    Yeah, but he is still -- he is not upstairs
20 in the bedroom or on the bathroom down the way.
21     Q    Why are these warrants served at 5 a.m.?
22     A    Because it's much safer for us.  If you have
23 a vehicle pursuit, it's much safer to have a vehicle
24 pursuit at 3 a.m. where there's no road traffic,
25 people aren't out, citizens are usually in bed

71

1  sleeping.  So it's safer for us as opposed to doing
2  it during rush hour.  You don't want a vehicle
3  pursuit during rush hour when people are out,
4  vehicles are out, it's just too many --
5      Q    But this isn't a vehicle pursuit case.
6      A    Correct, this is just an analogy.
7      Q    Okay.  So why are these warrants served at 5
8  a.m.?
9      A    This particular warrant was served at 5 a.m.
10 because we believed Wattsel committed the crime at
11 like 3 a.m. or somewhere in the early morning hours,
12 the other day, too, but it's also safer.  This was a
13 very active complex that had several people coming
14 and going.
15         So that's not safe to have people out and
16 about.  And that was the time that they believed that
17 he would possibly be there, so to lessen the risk to
18 the community, having people safely inside the
19 residence and not out walking and about.
20         It's also Nellis is a major road, cars
21 coming and going.  There's less likely to have that,
22 and that ARCO is not going to be as occupied as it is
23 going to be at noon, in the middle of the day.
24     Q    Is part of the purpose also to catch people
25 asleep?

72

1      A    Not necessarily asleep, home.  But it's
2  really the major factor is the threat to the
3  community.
4      Q    Okay.  I'm going to -- you referenced U.S. v
5  Banks a little bit earlier and I'm going to read you
6  a passage from that.
7          And it says, "After 15 to 20 seconds without
8  a response, officers could have fairly have suspected
9  that Banks would flush away the cocaine if they
10 remained reticent."
11         Here there was no 15 to 20 seconds between
12 the announcements and the entry, correct?
13     A    There was -- say that one more time.
14     Q    Sure.
15     A    Just the last part.
16     Q    Sure.  Here there was no 15 to 20 seconds
17 between the end of the announcements and the entry,
18 correct?
19     A    I think they made entry at 15 seconds is
20 what we said.
21     Q    I think so, yeah.
22     A    So, yeah, they made the entry at 15 seconds.
23     Q    From the beginning of the announcement,
24 correct?
25     A    Yes.

73

1      Q    Okay.  So there was no pause during any --
2  there was no pause.  There was no time frame from
3  which they stopped making the announcements to where
4  they waited, correct?
5      A    No.  I mean, they're moving through, so it's
6  not -- it's fluid.
7      Q    Right.  And here, I understand -- you know,
8  one of the -- you know, one of the issues with U.S. v
9  Banks -- you said you were familiar with the case and
10 I'll represent to you --
11     A    I don't know it 100 percent, like I said.
12 It's been a while.
13     Q    If you don't know any part of it, you can
14 just tell me.  And if I'm lying, Craig will call me
15 out on it, too.
16         So in U.S. v Banks, one of the issues --
17 I'll represent to you one of the issues they were
18 concerned about was the destruction of evidence
19 because they were going after cocaine.
20         Here there was no -- well, you tell me, do
21 you think there was any concern about potential
22 destruction of evidence when they were serving this
23 warrant?  Given that they were going after a gun, a
24 gun can't be flushed down a toilet?
25     A    No.  No.

Case 2:24-cv-00074-APG-NJK    Document 55-4    Filed 05/16/25    Page 22 of 32

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**74**

1    Q   Okay.  And so is it fair for me to -- is it
2  fair to say that destruction of evidence wasn't a
3  concern serving this warrant?
4    A   Correct.
5    Q   Okay.  Now, I'm going to go over some stuff.
6  Hold on.  Some of the CERT stuff.
7        And as we sit here today, do you understand
8  that CERT had -- we'll go over a number of their
9  criticisms, but do you understand that one of the
10  criticisms that CERT had was the limited amount of
11  recon that was done before this search warrant was
12  served?
13    A   That their concern was, yes.
14    Q   Yes.  And do you understand what elements
15  that CERT felt that they had not kind of ruled out
16  before serving this warrant?
17    A   No.  Police --
18    Q   Okay.  So according to CERT, that for the
19  3050 South Nellis Boulevard warrants --
20    A   Yeah.
21    Q   -- and I'm quoting directly from the report,
22  it's at Page LVMPD 4461, "Additionally, in the 3050
23  South Nellis Boulevard warrant, the suspects were
24  never physically seen or confirmed in the apartment."
25        Do you understand?

**75**

1    A   Yeah, I understand.
2    Q   "Further, there was never a determination of
3  the possibility of kids, elderly, pets, or vulnerable
4  persons present in the apartment.  While it was
5  determined there were enough factors from the
6  homicide investigation to place the suspects and/or
7  the evidence of the homicide, there were enough
8  unknown factors to cause Captain Cole and Lieutenant
9  O'Daniel to recognize the most prudent tactics to
10  serve this warrant should have been a SACO."
11        Do you have a position on CERT's conclusion
12  on that?
13    A   Yeah, they're wrong.  And one of the issues
14  we've always had is CERT's making these
15  recommendations and they have no idea what a -- I
16  have to go into the meeting and explain what a SACO
17  is or explain what a CET is.
18        So the surveillance, so they tried to do
19  surveillance.  It's not a requirement.  We don't
20  have, you must -- we've tried in the past, hey, you
21  must do eight hours of surveillance or you must --
22  it's not an arrest warrant where it has something
23  that says beyond a reasonable doubt, he will be in
24  there.  We don't have that in our policy or SOP.
25        So what's a reasonable amount of time?  And

**76**

1  it was tried.  We were unable to continue the
2  surveillance because the officers felt they were at
3  risk.  So not having kids or elderly, we were
4  correct, there was no kids, there was no elderly
5  based on the information we had.
6        So there's no set time and I don't know of
7  any case law that says you must do this amount of
8  surveillance or you must know this.  We had probable
9  cause.  We had a mom coming in unprovoked, the crime
10  of the assault with the gun shooting, him being
11  there.  So we had enough probable cause that the
12  subject was there.
13        We also had the crimes continuing to be
14  happening, the threat to the community.  We have a
15  responsibility to, you know, serve the search
16  warrant, get him into custody, or prove or disprove
17  that he is actually the one involved with Mr. Thomas'
18  death.
19    Q   But to be clear, you didn't arrest
20  either Wattsel -- you didn't arrest either one of the
21  suspects, correct?
22    A   No, they weren't there at the time.
23    Q   And there was also -- none of the evidence
24  related to the homicide was there either, correct?
25    A   No, but we still have a duty to check that,

**77**

1  to further the investigation.
2    Q   And so you essentially ruled out that any of
3  the evidence was there or that the suspects were
4  there?
5    A   I don't know exactly what they found or
6  anything.  Obviously, you know, SWAT is there to
7  serve the warrant.  What the detectives found or what
8  they determined or their conclusion -- and, again, I
9  did retire, so I didn't stay on top of that.
10        But for CERT to say that they didn't feel we
11  had enough and based on, what, did we violate a
12  policy?  Did they say you must have that subject in
13  that apartment before you can serve it?
14        We believed we had probable cause that he
15  was in that apartment.
16    Q   Okay.  And so I will say that according to
17  CERT, they did find that there was a violation and
18  I'll read this to you.  And this is 3.6 from the
19  report Bates LVMPD 4469.
20        "CERT concluded while the SWAT section
21  manual contained verbiage allowing for SWAT operators
22  to conduct a CET for property when there is a threat
23  of an armed and dangerous subject, it was not
24  appropriate given the amount of unknowns associated
25  with Apartment 1125.



Case 2:24-cv-00074-APG-NJK    Document 55-4    Filed 05/16/25    Page 23 of 32

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

1    "There were numerous amounts of unknown
2  factors to include who was actually staying in the
3  apartment and if there were children, elderly, or
4  vulnerable individuals present inside the apartment.
5    "SWAT's decision to serve the 3050 South
6  Nellis Boulevard search warrant as a CET was a policy
7  training failure and not within standardized LVMPD
8  tactics, training, and policy."
9    And then they cite LVMPD SWAT section manual
10  1.0, 3.14, and 9.01, Pages 183 to 186.
11    It was your decision and your authorization
12  to do the CET, correct?
13    A   Correct.
14    Q   So when CERT is saying that it was a
15  violation -- a policy violation training, they're
16  talking about your decision, correct?
17    A   Correct. And that was the same information
18  I had to go into my Tactical Review Board and I was
19  able to explain why we did it to the board -- there's
20  two civilian citizens on there -- and I was not found
21  sustained on those.
22    Q   Sorry, what does "not found sustained" mean?
23    A   Basically I proved to them that we were
24  authorized CET. It was within our policy and
25  procedures. It did meet it. And that's why that

79

1  tactic was used. They didn't overrule it, they
2  didn't say nope.
3    If they did anything, they could change
4  policy later, but that wasn't saying it was a policy
5  violation at the time. That was their conclusion
6  that I was able to disprove at the Tactical Review
7  Board.
8    Q   You were the one that wrote the policy,
9  right?
10    A   No, this policy came from years on down the
11  line. The thing I added was "absent a threat,"
12  because there was confusion.
13    Q   Okay. Sorry. Let me state that better,
14  then.
15    You were the one who rewrote the policy,
16  correct?
17    A   I didn't rewrite it. I just wrote that
18  "absent a threat" inside that policy because they
19  weren't understanding.
20    Again, we have people interviewing us who
21  have no idea about SWAT tactics and that came up in a
22  previous incident, so we had to clarify it. So it
23  was clarified, not changed.
24    Q   Okay. And so just for the sake of the
25  record, I mean, I know the facts, but I want to make

80

1  sure the record is clear.
2    You were involved in modifying or
3  amending -- I'm not trying to parse words or get you
4  to say a certain way, but you had added -- sorry, you
5  had added or changed some verbiage and I think it was
6  in September of 2021, correct?
7    A   Possibly, yeah. I don't have the exact
8  date, but I'll --
9    Q   I'm not trying to trip you up.
10    A   I was ordered and as part of my duty as a
11  lieutenant and tactical commander to clarify that
12  policy. Not change it, but clarify it.
13    Q   Why did it need to be clarified?
14    A   Because people were thinking, like, we serve
15  narcotics, they were just thinking, oh, dope is
16  property and you can't do a CET for dope. And we
17  were saying yeah, you can, because everyone in SWAT
18  understood that you can serve that warrant for dope
19  and do it as a CET because there was a threat, the
20  guy was armed and dangerous. We had to have some
21  other factors, it wasn't clarified.
22    So we knew what was going on, but these
23  outside entities, again, who have no SWAT training
24  are reading and they're like "Oh, wait, you can't do
25  it for property." Yeah, we can, because there's a

81

1  threat.
2    And I explained that to them, they
3  understood it, and it was not sustained.
4    Q   Okay. And you were the one that kind of
5  amended that in 2021, related to a different
6  incident. What was the other incident?
7    A   I think it was -- I believe it was the
8  Jasmine King incident.
9    Q   Okay. Okay. And as we sit here -- I know
10  I've asked you this a couple of times, but in this
11  line of questioning I just want to make it clear, as
12  we sit here today, you're unaware if they have or
13  have not changed or further amended --
14    A   I don't know what's going on there.
15    Q   And so it's fair for me to assume if there
16  was, that you weren't involved?
17    A   Yeah, I wasn't involved in that.
18    Q   Okay. But you do understand as we sit here
19  today that CERT said, one, it wasn't within LVMPD
20  training and policy; and two, that they recommended
21  changing some of the policies, correct?
22    A   Yes, and I was able to disprove that.
23    Q   You were able to disprove that how?
24    A   That it was within policy and it was within
25  the SOP.



Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1    Q    Okay.  But you can't disprove that they
2    modified the policy after?
3    A    Yeah, they can make any changes they want
4    later on, unbeknownst to me.
5    Q    Right.
6    A    And just because they change it doesn't mean
7    it was wrong.  They -- like we used to have the LVNR,
8    they took it away.  Doesn't mean it was the wrong
9    tactic.  It was just used in the wrong way and
10   tragically, someone died.
11   Q    And so then we had gone over the timing and
12   I will read to you some of CERT's conclusions about
13   the timing in terms of inserting the stun sick,
14   breaching the door, that kind of thing.  And this is
15   3.8 and it's LVMPD 4470.
16        "The question was whether waiting six
17   seconds before inserting the stun stick and then
18   waiting another 10 seconds before making a forced
19   entry satisfied the requirement that officers wait a
20   reasonable amount of time to provide occupants an
21   opportunity to peaceably submit to a search."
22        And they say, "See United States v Banks and
23   the Betty v State."  I think that's the Nevada case.
24   A    Yeah, I don't know that one.
25   Q    CERT found that, "Under the conditions

83

1    present here, six seconds was insufficient to allow
2    occupants time to answer the door, let alone to
3    submit to a search."
4        And my understanding of your prior
5    testimony -- you tell me if I'm right or wrong -- is
6    that you actually think that was sufficient time, but
7    you are not willing to provide an opinion on this
8    specific set of events because you weren't there.
9    A    Correct.
10   Q    Okay.  So it's a distinction where you're
11   saying, hey, I think in a vacuum, you know, based on
12   circumstances it could be enough, but I'm not going
13   to give an opinion on this specific issue because I
14   wasn't there?
15   A    Yeah.  And I don't know what's going on in
16   the officers' minds.  You'd have to ask those
17   officers why they did it in that moment.
18   Q    Okay.  They also said, "Additionally,
19   deployment of the CET contradicted the
20   knock-and-announce principles."
21        Do you understand what they mean by that?
22   A    Do they further elaborate?
23   Q    Yes.
24   A    Okay.
25   Q    "The CET is intended, in part, to surprise

84

1    and overwhelm occupants inside the residence.  Yet
2    the intent of a knock and announce is to provide an
3    opportunity to comply before a forced entry is made,
4    thus is a policy and training failure and not within
5    LVMPD standards."
6    A    So the surprise and overwhelm is where they
7    surrender.  They're not going take up arms, they're
8    not going to take hostages, they're not going to
9    flee.  They're just going to surrender, so...
10   Q    Well, it's also to confuse and distract
11   them, correct?
12   A    To, one, so they're, "You got me, I'm not
13   going to do anything, I surrender," as opposed to
14   saying -- you know, without that distract, there's a
15   potential for the suspects to go, "I'm going to go
16   down with a gun, I'm going to take them out."
17        So the distract causes that confusion that
18   they'll just surrender.  And that has happened
19   99.9 percent of the time.
20   Q    I'm going to read to you part of your CERT
21   interview when you described the purpose of the
22   distraction.  And this is from -- because there's
23   two -- sorry, give me one second.
24        This is from your first interview and this
25   is Page 12 of the document Bates LVMPD 718.

85

1        You said, "And that's to give that
2    distraction that, for your senses, that deprivation,
3    that not knowing what's going on, where they just
4    kind of freeze.  It's almost like spotlighting an
5    animal where they just freeze.  They don't know
6    what's going on and -- and that was authorized based
7    on the crime at hand."
8        Do you think it's appropriate to liken a
9    suspect to an animal?
10   A    No.
11   Q    Okay.  But based on this statement in here,
12   the intention is to freeze them, right, to surprise
13   them, to overwhelm them?
14   A    Yes.  And then, again, based on our training
15   and experience, based on the, you know, over 1,400
16   warrants we served, they just surrender.  Like, "I'm
17   just going to give up, I'm not going to fight you,
18   I'm not going to run, I'm not going to shoot at you,
19   I'm going to surrender."
20   Q    Okay.  And so I'm just going to loop back to
21   my original question, though.  Do you understand --
22   first, I want to make sure that you understand the
23   CERT's conclusion and then I want to ask you if you
24   agree or disagree with it.
25        So what CERT is saying, based on my



Melanie O'Daniel       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86

1  understanding -- and I've read it to you -- is that
2  the distractions, because they can confuse, that it
3  contradicts the concept of knock and announce,
4  because the purpose of knock and announce is to give
5  somebody fair notice.
6       Are you with me?
7   A   Yes.
8   Q   So if you distract and confuse them, that
9  contradicts giving somebody fair notice?
10  A   It's not meant to -- the distract and
11 confuse doesn't make them so oblivious that they're
12 not able to make a decision.
13      And what we see is when we throw the
14 distract, when we use the distract, they hear it and
15 they, instead of running, instead of fleeing, instead
16 of shooting, they JUST give up.  They see we're the
17 police and they understand.
18      So it's not to oblivion of a distract, but
19 it's just to stop them from thinking to take all --
20 something where we need to use less lethal, something
21 where they're going fight us, they just give up.
22  Q   But that didn't work here, right?
23  A   No, he decided to shoot at Officer Kubla.
24  Q   As you sit here today, you don't know if he
25 was aware that it was police officers coming through

87

1  the door?
2   A   Nor do you guys know.
3   Q   What we do know, and you'll agree with me,
4  right, is he was on a couch that was next to a window
5  that was broken open within six seconds of an
6  announcement made outside of a locked door?
7   A   Correct.
8   Q   And that within a few seconds of that, what
9  he would have heard closest to him is not, "Hey, this
10 is the police," it would have been, "Pull, pull,
11 pull, go."  Correct?
12  A   We don't know that.
13     MR. ANDERSON:  Objection to form.
14     THE WITNESS:  We do not -- because they were
15 making announcements beforehand.  For that six
16 seconds he did hear those announcements.
17 BY MS. MURPHY:
18  Q   But we agree the window was broken and that
19 that's what the officers were saying right next to
20 the window?
21  A   Yeah, but we don't know what he heard.  You
22 don't know and we don't know.
23  Q   Is "Pull, pull, pull, go," part of a police
24 announcement?
25  A   They were shouting and you can hear them --

88

1   Q   That wasn't --
2   A   -- during a search warrant.  That was
3  communication between the two operators right there.
4   Q   Correct.  Being yelled outside a broken
5  window, correct?
6   A   Yes, between Bertuccini and Rothenburg.
7   Q   Okay.  Is that part of a police
8  announcement?
9   A   No.  The announcements were being made by
10 the people who were entering.
11  Q   Is there any way, as we sit here today,
12 based on your years of experience -- I understand you
13 have lots of SWAT experience, you've done hundreds of
14 these search warrants -- is there any way that -- in
15 your vast experience, is there any way that, "Pull,
16 pull, pull, go," could be interpreted by anybody to
17 be informative that the police were trying to come
18 through the door?
19  A   We've had much success as I've stated.
20 We've never had that incident.  So what he was
21 thinking, you don't know and I don't know; but what
22 we do know is once the police entered the door,
23 shouting "Police, search warrant," that he fired six
24 rounds before we even returned fire.
25  Q   So my question was a little bit different.

89

1  My question was:  Based on your years of experience,
2  is "Pull, pull, pull, go," would that give anyone
3  reasonable notice that police were on the other side
4  of a broken window?
5   A   "Police, search warrant," would let them
6  know that.
7   Q   I didn't ask about that.  I asked about --
8   A   I don't know.
9   Q   -- "Pull, pull, pull, go."
10  A   I don't know.  I know that the announcements
11 were being made, so I can't make that determination.
12  Q   You can't tell me whether or not --
13  A   I don't know if he heard that on the inside
14 or not.  I know these two operators are communicating
15 and they're able to communicate.  That's authorized.
16 And that they're saying it's a search warrant,
17 Metro Police at the front.
18     So they're allowed to communicate.  They're
19 allowed to have words and to talk.  So we don't know
20 what Isaiah heard or what he was thinking.
21  Q   And I'm not asking you to qualify what
22 Isaiah heard or not.  What I'm asking you is based on
23 your years of experience -- and you have served all
24 kinds of warrants like this -- is the term "Pull,
25 pull, pull, go," based on your years of experience,

Melanie O'Daniel      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90

1  would that indicate to somebody -- if they did hear
2  it -- that it was police officers?
3      A   It's conversation between those two guys.
4      Q   That's not what I asked.
5      A   Well, I can't answer to that.  It's a
6  nonsensical question to me.
7      Q   Okay.
8      A   These guys are having a conversation.  We
9  don't know what he heard or he didn't hear.  But I
10  know they were making announcements as that was going
11  on.
12     Q   So your position is that --
13     A   So they're not allowed to just be numb and
14  don't say anything.  They have to communicate.  So
15  the announcements were being made.  That wasn't the
16  only thing going on at that time.
17         So I can't answer.  They're allowed to
18  communicate.  That's within policy, common sense, to
19  communicate.
20         We don't know if he heard that.  We don't
21  know.  So how can I make a solid decision on that?
22  We don't know.
23     Q   So as we sit here today, the question I've
24  asked four times now is whether or not "Pull, pull,
25  pull, go" would give, based on your experience, a

91

1  citizen fair notice that it was police on the other
2  side and you're saying "I can't take a position on
3  that"?
4      A   I'm saying to let them know that the police
5  are on the other side, they're hearing, "Police,
6  search warrant."
7      Q   I'm asking you about "Pull, pull, pull, go."
8      A   I'm saying that's a conversation.  You're
9  saying he wouldn't know that.  I'm saying that's a
10  private conversation.  We don't know if he heard it
11  or not.  They're allowed to have private
12  conversation.
13     Q   Melanie, let me correct you here.  I'm not
14  asking you to take a position on what Isaiah did or
15  didn't hear.  What I'm asking you is, based on your
16  years of experience and all these things serving, if
17  someone did hear it, if someone heard "Pull, pull,
18  pull, go," based on your years of experience --
19     A   I would say yeah, several warrants we've had
20  we say, "Hey, watch out for that brick" while they're
21  still making announcements.  There's a multitude of
22  angles you could go with that.
23         So you saying that Isaiah was right there at
24  the window and he heard, "Pull, pull, go, go," and
25  that's not police language or a "Police, search

92

1  warrant" is wrong.  They were making announcements.
2  These guys are allowed to have conversation.
3         And suspects, a lot of them have had
4  experience and they know what's going on.  They know
5  when they hear certain things, they hear us walking
6  on the rocks, oh, police are coming.
7         We don't know that, but I do know
8  announcements were being made and that several
9  subjects around the complex heard, "Police, search
10  warrant.  Metro Police, search warrant."
11     Q   And so it's your position that "Pull, pull,
12  pull, go," is part of the police announcement?
13     A   It's a conversation, a private conversation
14  between those guys.
15     Q   Okay.  All right.
16     A   And that's my position.  It's a conversation
17  between them at the same time "Police, search
18  warrant" was being made.
19     Q   Okay.  All right.
20         You understand that there was -- if I
21  told -- if I represented to you that one of CERT's --
22  well, were you aware that one of CERT's
23  recommendations was that CET only be utilized when a
24  no-knock search warrant was approved?
25     A   After?

93

1      Q   Yeah.
2      A   No, I wasn't aware of that.
3      Q   Okay.  We didn't watch the video for this
4  specific issue, but do you understand that -- and if
5  you want to re-watch it, you can tell me -- do you
6  understand there was an issue with them breaching the
7  door because of the brass wrap?
8      A   Yes.
9      Q   What's your understanding of that?
10     A   I wasn't out there, so I am not going -- all
11  I know is during some officer testimony they said
12  they weren't aware that there was a brass wrap.
13     Q   We watched the video and I'm happy to play
14  it for you again.
15     A   That's okay.
16     Q   You see them hitting the door multiple
17  times, right?
18     A   Yes.
19     Q   If you had been present that day, would you
20  have called a tactical and withdrawn?
21     A   No.
22     Q   Why not?
23     A   It's not my decision.  I would have been in
24  the command post.  It's something they would do in
25  that moment, that the officers there would do at that

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1  moment. So there's nothing, no line in the sand
2  absolutely you have to call a tactical on this. It's
3  a judgment call.
4     Q   And so, Melanie let me ask you, have
5  you been at --
6     A   No.
7     Q   You've never been at the front --
8     A   I'm in the command post, in the RV, if you
9  will, at a distance.
10    Q   Okay.
11    A   And I don't have access to the body-worn
12 camera. I'm on the outskirts with a camera up above
13 and sometimes I have drone or robot footage, but I
14 don't have that. So, therefore, it's a decisions
15 that those officers make in that moment and it's up
16 to them.
17    Q   And so that I actually didn't understand.
18 So I just kind of want to make sure. That part I
19 didn't understand.
20        I had assumed that you were -- I want to --
21 like, have you ever been, like, part of that group
22 that serves it?
23    A   No.
24    Q   Okay.
25    A   I'm stepped back at the command post.

95

1     Q   Okay.
2     A   Most of the time it's two blocks away down
3  the street.
4     Q   Okay. So then that's a very fair question.
5  So when I'm saying, hey, would you have called a
6  tactical, that's a -- you say, "Hey, I've never been
7  in that position, so I don't want to give an opinion
8  on that"?
9     A   Correct.
10    Q   Okay. All right. Even -- and so let me ask
11 you, as part of your training for the position that
12 you took, had you ever, like, gone with the group to
13 serve these warrants?
14    A   No. That's not my role. I would -- you
15 should never be -- you should have that distance. I
16 am a lieutenant, I'm the incident commander or the
17 tactical commander. I'm always stepped aside so you
18 have that overall perspective.
19        I'm not wearing a vest, I don't have a gun,
20 I'm never issued -- besides my police duty weapon,
21 but I am not a SWAT operator; I'm the incident
22 commander.
23    Q   Okay. You guys know the ins and outs of
24 this and I don't know.
25    A   Okay.

96

1     Q   So now I understand a little bit better the
2  distinction between operations and then you're
3  tactical?
4     A   Yes.
5     Q   Okay. All right. Sorry, I'm just going
6  over my notes.
7     A   It's okay. Gives me a chance to drink
8  water.
9     Q   Do you want to -- can we just take a --
10    A   No. Or do you need --
11    MR. ANDERSON: I'm good. Don't worry about
12 me.
13 BY MS. MURPHY:
14    Q   All right. And so we talked about it a
15 little bit before, but I will represent to you
16 another one of the -- another one of the
17 recommendations that CERT made -- and I'll read it to
18 you. I'm just going to read part of it. If you want
19 me to read the whole paragraph, I can.
20        But it says, "Any involvement of a new
21 sergeant in FTEP during a live mission will only be
22 in the capacity of a supervisory role and under the
23 guidance of an on-scene sergeant."
24        My understanding is that they had criticisms
25 about Russ Backman -- if I say running it, but do you

97

1  disagree with me if I say running it?
2     A   He wasn't running it.
3     Q   Okay.
4     A   Garth Findley was running it and he is like
5  me, on the outside, getting the overall picture and
6  then we send Russ in to kind of control the inside.
7     Q   But do you understand that they're saying
8  that essentially he didn't have enough training or
9  that they wouldn't have done it that way again?
10    A   They could have changed it after the fact,
11 but, again, I was able to provide the evidence and
12 prove -- and there was never a policy violation that
13 said he will absolutely go through SWAT -- SWAT
14 school is a big to-do task to get individuals
15 through. Especially they have to be new.
16    Q   Okay. Do you understand that one of the
17 recommendations was that LVMPD created an official
18 approval form for the service of a SWAT search
19 warrant service?
20    A   Approval form for like -- no, I'm not aware
21 of that, so I can't speak to it. I would have to
22 ask, like, okay, who's approving because we already
23 had Captain Cole approve the serve warrant service.
24    Q   And I'll represent to you I think part of it
25 was the unstructured way that it went back and forth



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1  between, like, text messages and e-mails. And there
2  was stuff -- you understood --
3      A   Yeah. So we have official documentation,
4  yeah, but that wasn't there when I was doing it.
5      Q   I understand. And you understand that there
6  was an issue with the IAP, kind of being, for lack of
7  a better term, like Frankensteined together?
8      A   Yes, that was Captain Cole. I don't approve
9  the IAP. That's up to the SWAT commander.
10     Q   Anything regarding the IAP, you're like,
11  hey, that's --
12     A   Yeah, at that time, they said the captain
13  will do it and does approval, as you know, you've
14  read it, speaks through the chain, has the
15  conversation, does all that.
16     Q   Okay. One of the things that you talked
17  about in one of your CERT interviews -- and I wanted
18  to ask you about this -- is that you refer to a
19  YouTube video by, what is it, the National
20  Tactical -- is it NTOA?
21     A   Yeah, National Tactical Officers
22  Association.
23     Q   Yeah, I tried to find it myself and
24  couldn't. So I was wondering if maybe you could give
25  me some cues, because I really -- because I know that

99

1  you played the video during this and you were saying,
2  "Hey, look, they did this, this, and this like this,
3  and this is why I think we're in line with it."
4          So I wanted to ask your help today to see if
5  I could figure out which video you were looking at.
6      A   I just Googled it, "NTOA" and "methods to
7  serve a search warrant."
8      Q   That's not the search thing I put in. So
9  let me -- if you'll just bear with me, I wanted to
10  try that.
11     A   But I'm not going to remember -- you know,
12  you could have 15 things that come up. I'm not going
13  to remember verbatim what that video was.
14     Q   And I'll say to you mostly what came up was
15  a bunch of plaintiffs' lawyers stuff, so I'm pretty
16  sure we can -- that you weren't relying on there.
17     A   No, no. It was just an example because, you
18  know, NTOA does things differently than we do. Like
19  I said, they actually throw blind -- at that time, I
20  don't know what they're doing today, tactics
21  change -- but at that time, they call it a bang,
22  which is a distract, and they would actually throw it
23  inside the residence, which is something we don't do.
24  Our distracts are -- you know, we throw it on the
25  ground or we use the stun stick. But we're not just

100

1  in the back bedroom throwing a flashbang in there.
2      Q   And so sorry, if you could -- what search
3  term did you put, it was "NTOA" --
4      A   "Service of a search warrant." And, you
5  know, I don't know the specifics at the time, but I
6  know -- like I said, I had to in the interview to
7  show them, like, here, here is how they were doing it
8  to give them an example.
9      Q   Right.
10     A   And searches from -- and I don't know if I
11  named like, hey, when that video was. So you might
12  get something for today, which isn't applicable to
13  what we were doing in 2023.
14     Q   I was just -- yeah, no, no, no, and I get
15  that, but you had talked about the YouTube video
16  quite a bit and I had gone directly to YouTube and
17  put in some search stuff. All that came up was,
18  like, plaintiffs' lawyers stuff and I was positive
19  that's not what you were citing in your standards.
20     A   Yeah.
21     Q   Sorry.
22     A   CERT would have all that. I mean, you know,
23  you do the interview and you show them stuff, so they
24  should -- yeah.
25     Q   I was just wondering if you could help me,

101

1  if we can find it, but I can look for it afterwards,
2  too, on YouTube.
3      A   And that would be the main thing that you
4  would see, is, you know, they make the announcements,
5  do the distract, breach, go in, and then you'll see
6  those bangs. So if you find that video.
7      Q   Yeah. Give me one second. And I know this
8  was years ago and all the algorithms change.
9      A   And I don't even know if I did it on
10  YouTube. You know, you can Google it and it shows you
11  YouTube and stuff like that.
12     Q   You said YouTube in here several times. I
13  get it.
14     A   The video comes out on YouTube, but you know
15  when you're doing the search engine.
16     Q   Yeah.
17     A   I could have been using that search engine
18  of Google, and then Google can provide you -- say,
19  hey, here is actually a YouTube video.
20          But I wasn't searching on YouTube for that
21  video, if that helps.
22     Q   Okay. That does. Yeah, I don't see
23  anything that seems to be -- I was hoping something
24  would pop up.
25     A   Yeah, I know I did extensive research in

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1   preparation for my interview, so I can't give you the
2   100 percent.
3       Q    If you brought the video with you, do you
4   think it's maybe -- do you have it saved anywhere?
5   Did you e-mail it to anyone?
6       A    No, it would have been just pulled up on a
7   department laptop, "Hey, here it is," and that's it.
8   Nothing of my own.
9       Q    Yeah, I mean, because based on the
10  interview -- and, I mean, I can find out if CERT
11  still has the video, too -- but based on what you
12  said during the interview, my understanding was that
13  you were kind of like, "Hey, watch this video and how
14  the guys did it was in line with that." So I was
15  wanting to see the video.
16      A    Yeah, and we're not 100 percent in line with
17  it. We're actually more restrictive. Like I said,
18  we don't throw those flashbangs into the room.
19      Q    And one of the other things, one of the
20  criticisms was that it was a covered window.
21          Did you understand the criticisms on that?
22      A    Yes.
23      Q    What was your understanding of that
24  criticism?
25      A    Again, CERT doesn't have the training in

103

1   tactics. We do the stun sick on a distract, put it
2   up to the -- you know, 10 feet, 11 feet so it's away
3   from individuals. The guys can rake out those blinds
4   and it's up to the operators there to clear that
5   area, too, you know, as they see it.
6          The authorization of a stun stick, like I
7   said in my interview, it can stop -- if you went up
8   there and something changed, if they were doing that
9   surveillance ahead of time and, "Hey, the subject
10  left," there's other parameters in place. But the
11  officer has to make that decision. He has
12  authorization, but something could change that he
13  could say, "Yeah, I'm not going to it, it doesn't
14  meet the -- I don't feel comfortable, we tipped a guy
15  off," or they gained some additional intelligence
16  right before the service.
17      Q    Okay. And one of the things -- sorry, I'm
18  just kind of jumping around because I'm looking at my
19  notes here.
20          We talked about the Jasmine King case, and
21  one of the things is that you said in your CERT
22  interview, one of the reasons that you amended or
23  modified the policy in 2021 is because you said
24  internal investigation was doing an investigation on
25  tactics.

104

1       A    Exactly.
2       Q    What was your understanding of why IA was
3   doing an investigation on tactics?
4       A    It came from someone higher up. They're not
5   supposed to do tactics. That was one thing that was
6   wrong from the beginning. That's not their job, and
7   it may have even -- I know I did in the post
8   conversations with the administration, like why is IA
9   doing this? This is clearly wrong. CERT should be
10  doing it and did not agree with that. None of us
11  did, because it's not their job.
12      Q    And if I -- you know, I've read a lot, so,
13  and if this is incorrect, this is just pulled from my
14  memory. I do remember you saying in here somewhere,
15  where they kind of also asked you, "Hey, why is IA
16  doing this?" You were like, "I can't comment on an
17  active investigation."
18          As we sit here today, I mean, I doubt
19  there's still an active investigation, but you're
20  saying -- which is kind of what I thought, although
21  I'm not educated like you are -- what was your
22  understanding of why IA was looking at this?
23      A    They were ordered to --
24      Q    Do you know --
25      A    -- look at it.

105

1       Q    I'm sorry. I shouldn't have interrupted
2   you. I'm sorry.
3       A    They were ordered to do the
4   investigation from -- CERT is fully aware of what
5   happened beforehand. They didn't feel the need to
6   review it or take on that investigation. Some of the
7   upper administration was not happy with that, so --
8   and they were also in charge of internal affairs, so
9   they ordered internal affairs to do it.
10      Q    Okay. And as we sit here today, because
11  this didn't kind of come through clearly for me, what
12  was IA looking at?
13      A    If there was -- obviously, if there was
14  something we did that was contrary to policy, that
15  contradicted policy, that was a violation of --
16  because basically that's all they can look at. They
17  look at our SOPs, our manual, and see if we violated
18  it.
19          Again, we weren't sustained on any of that.
20  I think there was -- I can't remember -- something
21  minor that was sustained on, like having a beard or
22  something, you know, frivolous, not something, you
23  know, you violated this SOP.
24      Q    Okay.
25      A    And then again, they, at that time, they

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

106

1  were like, "Well, you clearly can't serve this for
2  property." I'm like, "Yes, we can, and this is why."
3  And they're like, "Well, it doesn't say that."
4        So that's why when the investigation was
5  over, I said, "I need to fix that so you guys
6  understand when you read it." And they said
7  "Absolutely," and once the -- everything was
8  finished, we changed -- I was ordered to change that
9  so it was more clear for those outsiders who don't
10  understand SWAT tactics.
11      Q   Okay. One of the things that you talked
12  about, and I'll read you your exact sentence -- and
13  this is from your second interview, Page 21, Bates
14  LVMPD 690, "And the majority of the recommendations
15  that have been changed since I've been there have
16  come from CERT."
17      And so, and I kind of wanted to ask you a
18  little bit about that more. So you have been -- and
19  I don't want to get into the actual background of
20  other policy changes that are in no way related to
21  this case -- but part of my understanding is when you
22  were talking about your role, part of your role is
23  that you would at times rewrite or modify policies,
24  correct?
25      A   I would be ordered to rewrite it based on

107

1  conclusions of executive staff or CERT findings or
2  even IOCP. I know we had some assistant sheriffs
3  that went to those conferences and they make
4  recommendations, so they would review our manual and
5  say change that, and I would change it.
6      Q   And just for the record, what is IOCP?
7      A   It's international -- it's a chiefs
8  conference. I don't know all of that. I haven't
9  been to any of them, but it's basically training and
10  learning, these conferences, at the chief level, the
11  higher-up level.
12      Q   Okay. But based on this, this testimony you
13  just gave, that "the majority of the recommendations
14  that have been changed" -- that's what you said --
15  "since I've been here," have come from CERT?
16      A   Correct.
17      Q   Okay. And that didn't -- I mean, this was
18  within so close -- I mean, I think this second
19  interview was -- was December -- or, sorry,
20  October 12th, so it was literally 45 days before you
21  retired?
22      A   Yeah.
23      Q   Okay. And so if even 45 days before you
24  retired, most of the time when there's, like, a
25  tweaking or amendment to a policy, it comes from

108

1  CERT?
2      A   Yeah, and that's their role. They see if
3  there's something that needs clarification, taken
4  out, and we abide.
5      Q   Okay. And one of the policy changes that
6  you talked about as well is, I think that there --
7  you tell me if I'm right or wrong -- you had a long
8  paragraph of dialogue, I'm trying to understand it.
9      You talked about a policy change from FNUs
10  and LNUs?
11      A   First name unknown, last name unknown.
12      Q   Okay. And you kind of -- do you remember
13  talking about that?
14      A   Yes.
15      Q   Okay. Can you kind of walk me through -- I
16  didn't completely -- I didn't completely understand
17  what you were talking about. Could you kind of
18  explain that to me a little bit?
19      A   In the past, we had -- mainly for
20  narcotics -- that we would serve a -- they would want
21  a search warrant for a particular place, but they
22  didn't know who was inside. And they would do a --
23  they call it LNU/FNU, last name unknown, first name
24  unknown. And we changed from that and said, no, we
25  need to know, you know, who's the occupants here.

109

1  Give us as much as you can.
2      Now, it didn't totally exclude serving the
3  search warrant, it's depending on the crime.
4  Narcotics, yeah, we're going to ask more from you.
5  Pedophilia, we may not have all that. Maybe they're
6  just going after the computer hard drive. So we
7  would still serve that warrant.
8      So it just would depend on what we were
9  going after, but we would not just take that as a --
10  you show us your due diligence, show us that you did
11  X, Y, and Z, and you absolutely -- all they know him
12  as is Scooby-Doo. Hey, what's Scooby-Doo's name? We
13  don't know, but we know Scooby-Doo.
14      So we would put more -- okay, we're going to
15  need to have this, this, this, and this. And they
16  can go through all that and they still may not know.
17  We still may serve it, we may not serve it. But that
18  wasn't just a catchall, boom, and we wouldn't ask any
19  further questions.
20      Q   Okay. All right. Have you come to learn
21  anything about Mr. Williams since this incident?
22      A   Since I've been retired on this?
23      Q   Well, since the officer-involved shooting.
24  Since the officer-involved shooting until today.
25      A   I think the mother -- there was video, North

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1  Las Vegas came forward and said, hey, we were looking
2  for him for some robberies, I believe. And there was
3  some interview from the mom on body-worn camera that
4  she was talking not in a good light, saying, you
5  know, he's a problem, he's kicked out, I only have a
6  few items.
7       So that came forward after the fact, once
8  North Las Vegas Police Department found out that we
9  had this officer-involved shooting with Isaiah
10 Williams.
11     Q   And did North Las Vegas give that to Metro?
12     A   Yes.
13     Q   Okay. When did that happen?
14     A   Oh, I can't tell you. I know it was
15 afterwards. All I know it was after the OIS.
16     Q   Sorry, let me ask the question more
17 artfully.
18        Were you still working there?
19     A   Yes.
20     Q   Okay. And do you remember how it was
21 transmitted to you guys?
22     A   I can't recall specifically.
23     Q   Okay. All right. Have you come to learn
24 anything else about Mr. Williams?
25     A   No.

111

1      Q   Do you think, as we sit here today, is there
2  anything that you would have changed about how -- is
3  there anything that you would have changed regarding
4  your role in this? Not that you wouldn't be involved
5  at all, that's not what I mean.
6         Do you understand the nature of my question?
7      A   Yeah. Make no mistake, it's a tragedy.
8  Someone lost their life. It's the last thing we want
9  to do. And we have officers that hold that mental
10 trauma, PTSD, from that event. And we have one who's
11 debilitated from -- but based on the information we
12 had at the time, it was a homicide, the search
13 warrant needed to be served, and that was the best
14 tactic at the time.
15        So based on everything we know, yeah, it's
16 tragic. We needed to go forward, they needed to
17 further their investigation. They were a threat to
18 the community, there was an assault with a weapon,
19 him shooting out in public, 20 rounds.
20        So we needed to further that investigation,
21 whether it exonerates him or gives him the evidence
22 they need for justice of Mr. Thomas.
23        So based on everything we knew at the time,
24 I would still approve the CET, I would still approve
25 the stun stick. Yes, it's a tragedy. It's

112

1  unfortunate. It wasn't a mistake-of-fact shooting,
2  though. He fired at us six times and ultimately
3  fired 18 rounds at us.
4      Q   Okay. We went over the video. Does it look
5  like he is aiming at anyone? We can re-watch it.
6         Does it look like he is aiming or does it
7  look like he's covering himself?
8      A   It looks like he is aiming at -- he is not
9  like, hey, there's Kerry Kubla, let me shoot Kerry
10 Kubla. So he is firing at the officer and he hit
11 Kubla. Kubla went down. Kubla can't get a round
12 off. He hit the police officers.
13     Q   Do you see him covering his own face?
14     A   Probably from when they returned fire,
15 trying not to get the rounds at him, but he continued
16 to fire and fire 18 rounds from that weapon. He
17 fired at the officers.
18     Q   Let me ask you the other question a little
19 bit differently.
20        Based on everything that you know today --
21 and I'm asking you to do the unfair thing of looking
22 back with 20/20 vision with everything that
23 happened -- do you feel that any of the policies
24 of -- any of the Metro policies ought to have been
25 changed following this incident?

113

1      MR. ANDERSON: Objection to form.
2      Go ahead.
3      THE WITNESS: I would say no. I'd say
4  sometimes they have a knee-jerk reaction and take
5  something away from you, a tool away from you. But
6  all our decisions are calculated decisions. There is
7  risk, it's not an absolute. There is risk with that.
8  We're SWAT, we're serving a homicide warrant with a
9  violent subject, there's a victim there.
10        So based on all the facts that we had known
11 at the time -- I don't do 20/20 hindsight. There are
12 a few things, yeah, we can change policies. But
13 based on CET needed to be served; SACO was not
14 optimal, having Russ go in, that's part of -- I've
15 had a sergeant go in number two in the stack.
16        So everything was in line with what we did.
17 We didn't say, oh, whoopsie, it was remote control,
18 not a gun. There wasn't any of that whoopsie stuff.
19        Now, those officers, they might have a
20 different perspective, but based on me, at home,
21 COVID, approving that warrant, approving those
22 tactics, that was the best decision with the training
23 and policies in place that we had at the time.
24 BY MS. MURPHY:
25     Q   Let me ask the question a little bit

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**114**

1 differently, then.  If the answer is the same, the
2 answer is the same.
3       Based on what happened here, did you change
4 how you did anything?
5    A   No.
6       MS. MURPHY:  Okay.  All right.  I don't have
7 any more questions.
8       THE WITNESS:  Okay.
9       MR. ANDERSON:  No questions.
10      THE VIDEOGRAPHER:  Before we go off the
11 record, does anyone want the video?
12      MS. MURPHY:  No, thank you.
13      MR. ANDERSON:  No, thank you.
14      THE VIDEOGRAPHER:  This concludes the
15 deposition of Melanie O'Daniel, consisting of one
16 disc.  The time is 12:38 p.m. and we are off the
17 record.
18      THE REPORTER:  Did you want a copy of the
19 transcript?
20      MR. ANDERSON:  Yes.
21      THE REPORTER:  And read?
22      MR. ANDERSON:  So you have the opportunity
23 to read this and make sure everything is transcribed
24 right, whether it's --
25      THE WITNESS:  Maybe before trial.

---

**115**

1       MR. ANDERSON:  So, you know, if there's
2 anything wrong you can change it now.  Like, if they
3 spell your name wrong or something, but if they said
4 you said you didn't but you said you did, something
5 like that -- do you have any interest in reading it
6 or you're fine going with the transcript?
7       THE WITNESS:  I'm fine with going with the
8 transcript.
9       MR. ANDERSON:  We will waive.
10      (Thereupon, the videotaped deposition
11       was concluded at 12:38 p.m.)
12
13           * * * * *
14
15
16
17
18
19
20
21
22
23
24
25

---

**116**

1              CERTIFICATE OF WITNESS
2 PAGE   LINE    CHANGE                       REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19           * * * * *
20      I, MELANIE O'DANIEL, witness herein, do hereby
   certify and declare under penalty of perjury the
21 within and foregoing transcription to be my
   deposition in said action; that I have read,
22 corrected and do hereby affix my signature to said
   deposition.
23
24      _____    _____
        MELANIE O'DANIEL            DATE
25

---

**117**

1            REPORTER'S CERTIFICATE
2 STATE OF NEVADA    )
                     )  SS
3 COUNTY OF CLARK    )
4      I, Sarah Safier, a duly certified court
5 reporter licensed in and for the State of Nevada, do
6 hereby certify:
7      That I reported the taking of the deposition
  of the witness, MELANIE O'DANIEL, at the time and
8 place aforesaid;
9      That prior to being examined, the witness was
  by me duly sworn to testify to the truth, the whole
10 truth, and nothing but the truth;
11     That I thereafter transcribed my shorthand
  notes into typewriting and that the typewritten
12 transcript of said deposition is a complete, true and
  accurate record of testimony provided by the witness
13 at said time to the best of my ability.
14     I further certify (1) that I am not a
  relative, employee or independent contractor of
15 counsel of any of the parties; nor a relative,
  employee or independent contractor of the parties
16 involved in said action; nor a person financially
  interested in the action; nor do I have any other
17 relationship with any of the parties or with counsel
  of any of the parties involved in the action that may
18 reasonably cause my impartiality to be questioned;
  and (2) that transcript review pursuant to NRCP 30(e)
19 was not requested.
20     IN WITNESS WHEREOF, I have hereunto set my
  hand in the County of Clark, State of Nevada, this
21 6th day of January, 2025.
22
23      _____
24      SARAH SAFIER, CCR 808
25

---