# Exhibit C - Deposition of Sgt. Russell Backman

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 124

1                    CERTIFICATE OF COURT REPORTER

2

    STATE OF NEVADA        )
3                          )  ss:
    COUNTY OF CLARK        )

4

5          I, Heidi K. Konsten, Certified Court Reporter

6    licensed by the State of Nevada, do hereby certify

7    that I reported the deposition of RUSSELL BACKMAN,

8    commencing on October 3, 2024, at 1:10 p.m.

9          Prior to being deposed, the witness was duly

10   sworn by me to testify to the truth.  I thereafter

11   transcribed my said stenographic notes via

12   computer-aided transcription into written form,

13   and that the transcript is a complete, true and

14   accurate transcription and that a request was not

15   made for a review of the transcript.

16        I further certify that I am not a relative,

17   employee or independent contractor of counsel or

18   any party involved in the proceeding, nor a person

19   financially interested in the proceeding, nor do I

20   have any other relationship that may reasonably

21   cause my impartiality to be questioned.

22        IN WITNESS WHEREOF, I have set my hand in my

23   office in the County of Clark, State of Nevada,

24   this October 21, 2024.

25                    _____
                      Heidi K. Konsten, RPR, CCR No. 845

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1              UNITED STATES DISTRICT COURT

2                    DISTRICT OF NEVADA

3                      * * * * *

4    LATIA ALEXANDER,              )
     individually as heir of       )
5    ISAIAH T. WILLIAMS and in     )
     her capacity as special       )
6    administrator of the Estate   )
     of ISAIAH T. WILLIAMS,        )
7                                  )
           Plaintiff,              )
8                                  )
           vs.                     )         CASE NO.
9                                  )    2:24-cv-00074-APG-NJK
     LAS VEGAS METROPOLITAN        )
10   POLICE DEPARTMENT, a          )
     political subdivision of      )
11   the State of Nevada; KERRY    )
     KUBLA, in his individual      )
12   capacity, et al.,             )
                                   )
13         Defendants.             )
     _____)

14

15              VIDEOTAPED DEPOSITION OF

16                  RUSSELL BACKMAN

17              Taken on October 3, 2024

18                   at 1:10 p.m.

19            By a Certified Court Reporter

20                  Las Vegas, Nevada

21

22

23            Stenographically reported by:
              Heidi K. Konsten, NV CCR 845, RPR
24            JOB NO. 57948 - Firm No. 116F

25

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**2**

```
 1              Videotaped deposition of RUSSELL BACKMAN,
 2    Volume I, stenographically taken at 400 South
 3    Seventh Street, Suite 300, Las Vegas, Nevada, on
 4    Thursday, October 3, 2024, at 1:10 p.m., before
 5    Heidi K. Konsten, Certified Court Reporter in and
 6    for the State of Nevada.
 7
 8              APPEARANCES OF COUNSEL
 9    For the Plaintiff:
10              CORRINE MURPHY, ESQ.
                Murphy's Law
11              2620 Regatta Drive
                Suite 102
12              Las Vegas, Nevada 89128
                (702) 820-5763
13              (702) 665-7345 Fax
14    For the Defendants:
15              CRAIG R. ANDERSON, ESQ.
                Marquis Aurbach
16              10001 Park Run Drive
                Las Vegas, Nevada 89145
17              (702) 382-0711
                (702) 382-5816 Fax
18
      Also present:
19
                Dawn Beck, Videographer
20
21              * * * * * *
22
23
24
25
```

---

**3**

```
 1                    INDEX
 2                                            Page
 3    RUSSELL BACKMAN
 4    Examination by Ms. Murphy               5
 5              * * * * *
 6
 7                  EXHIBITS
 8    No.            Description              Page
 9    Exhibit 1    Notice of deposition       6
10              * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**4**

```
 1              LAS VEGAS, NEVADA
 2           Thursday, October 3, 2024
 3                 1:10 p.m.
 4        DEPOSITION OF RUSSELL BACKMAN
 5              * * * * * *
 6
 7        THE VIDEOGRAPHER:  Good afternoon.  We
 8  are now on the record.  This begins the videotaped
 9  deposition of Russell Backman.  Today's date is
10  October 3rd, 2024.  The time on the video monitor
11  is 1:10 p.m.
12        We are located at 400 South Seventh
13  Street in Las Vegas, Nevada.  This case is
14  entitled Latia Alexander, et al., versus Las Vegas
15  Metropolitan Police Department, et al.  The case
16  number is 2:24-cv-00074-APG-NJK in the United
17  States District Court, District of Nevada.
18        My name is Dawn Beck, legal
19  videographer.  The court reporter is Heidi
20  Konsten.  We represent Lexitas.
21        Will counsel please state your
22  appearance for the record and whom you represent.
23        MS. MURPHY:  Good morning -- or good
24  afternoon.  Corrine Murphy, Bar Number 10410, on
25  behalf of plaintiff.
```

---

**5**

```
 1        MR. ANDERSON:  Craig Anderson for the
 2  defendants.
 3        THE VIDEOGRAPHER:  Will the court
 4  reporter please swear in the witness.
 5
 6  Whereupon,
 7        RUSSELL BACKMAN,
 8  was called as a witness, and having been first duly
 9  sworn to testify to the truth, was examined and
10   testified as follows:
11
12           EXAMINATION
13  BY MS. MURPHY:
14     Q   Let the record reflect this is the time
15  and place of the deposition of Russell Backman in
16  the matter of Latia Alexander, et al., versus
17  Las Vegas Metropolitan Police Department, et al.,
18  Case Number 2:24-cv-00074.
19        Mr. Backman, my name is Corrine Murphy,
20  and I'm an attorney.  I represent the plaintiff,
21  Latia Alexander, in this case.
22        Can you please state and spell your full
23  name for the record?
24     A   Yes.  It's Russell Backman.  And it's
25  R-U-S-S-E-L-L, Backman, B-A-C-K-M-A-N.
```

---

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1    Q    Do you have a middle name?
2    A    Yes.
3    Q    What's your middle name?
4    A    Leo, L-E-O.
5    Q    And you have been -- I'm assuming that
6    you have seen a copy of the notice of today's
7    deposition --
8    A    Yes.
9    Q    -- requiring you to be here.
10        MS. MURPHY:  And I don't have that
11   with me, Madam Court Reporter, but I'll get that.
12   And if we can please mark that as Exhibit 1.
13        (Exhibit 1 was identified.)
14   BY MS. MURPHY:
15   Q    And that -- you understand that today
16   we're here to discuss the officer-involved
17   shooting of Isaiah Williams?
18   A    Yes.
19   Q    Have you ever given your deposition
20   before?
21   A    No.
22   Q    And is there any reason, as we sit here
23   today, that you would not be able to understand my
24   questions and give your best, most truthful
25   testimony?

7

1    A    No reason.
2    Q    Okay.  Are you any -- are you under any
3    medications or anything that would inhibit your
4    ability to provide truthful and reliable --
5    reliable testimony today?
6    A    No.
7    Q    Okay.  Can you please state your address
8    for the record?
9
10
11   Q    Thank you.
12        Could you please tell me everything that
13   you did to prepare for today's deposition.
14   A    As far as preparation, I met with
15   Mr. Anderson.
16   Q    And I don't want to know how long -- I
17   don't want to know what was discussed between you
18   and Mr. Anderson.  I'm not entitled to know that.
19   That's confidential, attorney-client privilege --
20   or, sorry, privileged information.
21        But I would like to know how long you
22   met with Mr. Anderson and how many times.
23   A    I met with Mr. Anderson two times,
24   approximately 45 minutes, probably, each time.
25   Q    Okay.  And did you meet with anyone else

8

1    from Mr. Anderson's office to prepare for today's
2    deposition?
3    A    No.
4    Q    Okay.  And other than meeting with
5    Mr. Anderson, what else did you do to prepare for
6    today's deposition?
7    A    I read my CIRT statement.
8    Q    And if I -- if -- just to -- I believe
9    that I have that one as well.  That was
10   approximately 75 pages.
11        Are you talking about your recorded
12   statement?
13   A    Yes, ma'am.
14   Q    Okay.  And how -- okay.  And other than
15   reviewing your -- your CIRT statement, did you
16   review anything else?
17   A    Yes.  I reviewed the final CIRT report.
18   Q    Okay.  And that report is pretty
19   lengthy.
20        Did you read that entire report?
21   A    I went through a lot of it, yes.
22   Q    Okay.  And did you read all of the
23   conclusions, which is, I think, approximately the
24   last 20 pages?
25   A    Yes, I read it.

9

1    Q    Okay.  And I'll ask you more about those
2    later.
3        Is that a complete list of what you did
4    to prepare for today's deposition?
5    A    I also read another statement that was
6    given prior to -- by Officer Bertuccini.
7    Q    Okay.
8        THE COURT REPORTER:  I'm sorry.  I'm
9    going to have to have you speak up, sir.  By
10   officer whom?
11       THE WITNESS:  Bertuccini.  Bertuccini.
12   BY MS. MURPHY:
13   Q    And was it his CIRT statement that
14   you -- his recorded statement that you read?
15   A    It was the statement from here.
16   Q    Oh, his deposition transcript?
17   A    Yeah.
18   Q    Okay.  And having gone through
19   Officer Bertuccini's deposition transcript, was
20   there anything in there that surprised you?
21   A    No.
22   Q    Was there anything that you disagreed
23   with?
24   A    I'm not -- no.
25   Q    Okay.  Did you bring any of the

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1  documents that you reviewed with you here today?
2      A    No.
3      Q    Okay.  And other than
4  Officer Bertuccini's statement -- or deposition
5  transcript, have you read any of the other
6  officers' deposition transcripts?
7      A    No.
8      Q    Okay.  Have you discussed the
9  deposition -- your deposition here today with any
10  of the codefendants?
11      A    No.
12      Q    Is your supervisor aware that you're
13  here today?
14      A    Yes.
15      Q    Is this part of your normal working
16  schedule?
17      A    Yes.
18      Q    Okay.  So you got a day off today to
19  come do this deposition?
20      A    Yeah.
21      Q    I don't know which one is better or
22  worse.
23      A    We'll find out.
24      Q    Correct.
25          Okay.  And so I'm going to ask you some

11

1  background questions now.
2          And do you prefer that I call you
3  Russell or Sergeant Backman?
4      A    You can call me Russ?  That's cool.
5      Q    Russ.  Okay.
6          Russ, you're currently living in
7  Henderson.
8          How long have you lived here for?
9      A    In Las Vegas or in Henderson?
10      Q    Well, both.
11      A    I've been in the valley since 1997.
12      Q    Okay.  And how long have you been at
13  your Henderson address?
14      A    Since 2019.
15      Q    And is it fair for me to assume that you
16  have no intention of moving currently?
17      A    No, I don't have any intention.
18      Q    All right.  What's your highest level of
19  education?
20      A    Some college.
21      Q    Okay.  Where did you attend some
22  college?
23      A    CSN.
24      Q    Okay.  And what -- what partial degree
25  did you obtain there?  Like, what was your focus?

12

1      A    It was just general studies.
2      Q    Okay.  And when -- are you a member of
3  any professional organizations related to your
4  profession?
5      A    As far as?
6      Q    I don't -- like a shooting club or like
7  an officers -- you know, pride club or --
8      A    No.
9      Q    Okay.
10      A    No.
11      Q    All right.  And what's your current
12  position?
13      A    I'm a sergeant assigned to the SWAT
14  team.
15      Q    Okay.  And you're still on SWAT?
16      A    Yes, ma'am.
17      Q    And so is it fair for me to assume that
18  you're in the same position as you were when this
19  officer-involved shooting occurred?
20      A    Yes.
21      Q    Okay.  And can you please run me through
22  your positions prior to that.
23      A    Positions prior to that, I was a --
24  well, if you want to start backwards -- or do you
25  want to go chronologically?  I can go either.

13

1      Q    Why don't we start at the beginning and
2  then lead up to --
3      A    Okay.
4      Q    -- your positions with --
5      A    In the beginning, obviously I started
6  off as a patrol officer, like every other officer
7  does on the police department.  I was then
8  assigned, after several years, to a
9  problem-solving unit.
10          From that problem-solving unit, I was
11  assigned to the vice section.  From the vice
12  section, I was assigned to the narcotics section,
13  where I spent five years.  And then I was also
14  assigned to the criminal intelligence section
15  after that as a detective.
16          And then after the criminal intelligence
17  section, I went back to patrol for a period.
18  After that, I went back to the major violator
19  section, which is -- used to be called repeat
20  offenders, but it's major violators now -- as a
21  detective.
22          And I promoted out of there as a
23  sergeant.  Went back to patrol for a brief period.
24  And then after my patrol time and -- my patrol
25  time, I went back to major violators as a sergeant

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1   for about -- approximately 11 months.  And then
2   after that, I was assigned to the SWAT team where
3   I am currently -- currently at now.
4       Q   Okay.  And you had gone back to patrol
5   because you had a DUI issue; correct?  There were
6   some drinking issues?
7       A   (Nodding head.)
8       Q   Okay.  Is that correct?
9       A   Yeah.
10      Q   Okay.  What is -- what's a
11  problem-solving unit?
12      A   Basically it's the plainclothes unit
13  that's assigned -- is assigned to do any type of
14  follow-up investigations as far as investigative
15  issues within the area command that you work.
16  Like, you know, there's different area commands.
17  And you're assigned there to investigate anything
18  from property crimes, robberies, violent crimes,
19  street-level crimes, street-level narcotics, stuff
20  like that.  It's a plainclothes unit usually.
21      Q   Okay.  And prior to your position in
22  SWAT, is -- did you do any CET entries or serve
23  any search warrants as part of -- in part of your
24  duties in these other units?
25      A   Years ago in narcotics, yes.

15

1       Q   Okay.  And how long -- and so narcotics,
2   based on the chronology that you have given me,
3   was very early on in your career.
4           What years did you work for narcotics
5   during?
6       A   2006 to 2010.
7       Q   Okay.  And so I asked a double question,
8   so I'm going to split it up.
9           Did you do CET entries as part of the --
10  any search warrants that you served --
11      A   Do you mean --
12      Q   -- for narcotics?
13      A   Explain --
14      Q   Sorry.  The control -- the C-E-T,
15  controlled entry tactic, the --
16      A   The controlled entry tactic, at that
17  time, I never knew anything about that.
18      Q   Okay.  And so what -- when you served
19  search warrants as part of the narcotic unit, how
20  would you serve those?
21      A   That would be done at the squad level,
22  depending on how big the structure was.  And it
23  would be under the supervisor of -- the narcotics
24  sergeant at that time and whoever was the case
25  agent and the detective.

16

1       Q   Okay.  And so I guess my -- if I worded
2   the question poorly, like -- was it, like, knock
3   and announce and that kind of thing?
4       A   Yes.
5       Q   Okay.  Did you do, like, explosive
6   entries or --
7       A   No.
8       Q   Okay.
9       A   No, no, no.
10      Q   Okay.  Do you have any specialized
11  certification?
12      A   For what?
13      Q   For your job.  Do you have any, like --
14  I mean, other than being a SWAT officer.  I know
15  that in and of itself is a specialized
16  certification.
17      A   Right.
18          Specialized certification as far as?
19      Q   So I'll give you an example.
20          Some of the other gentlemen that I have
21  deposed in this case, they've talked about they
22  had -- one gentleman, I think he had, like, a
23  specialized certification for explosive entries.
24  They had some -- that kind of specialized
25  certification.

17

1       A   No, I don't have anything like as far as
2   that, no.
3       Q   Okay.
4       A   I'm not -- I'm not -- no.
5       Q   Okay.  Okay.  Can you please explain to
6   me what "knock and announce" means to you.
7       A   Knock and announce, are you talking --
8   which -- which way we going, state or federal,
9   here?
10      Q   Well, so all -- that's a really good
11  question, and I'm glad you asked me that.  And
12  that allows me to, kind of, give us some
13  groundwork for how I want you to answer the
14  questions for the deposition.
15          You were serving this at a state level;
16  correct?  I mean, the way that you were serving
17  this -- this search warrant, obviously you're
18  acting within the state of Nevada; correct?
19      A   Uh-huh.
20      Q   And so it would be the -- it would be
21  the parameters on the state level -- you tell me.
22          What -- as you were serving this
23  warrant --
24      A   Right.
25      Q   -- what parameters applied to you, state

Russell Backman         Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1  or federal?
2      A   As far as -- for -- under both.
3      Q   Okay.
4      A   Yeah.
5      Q   Okay.  So then if you can give me both,
6  then, what does -- what does "knock and announce"
7  to you mean under the state standard and under the
8  federal standard?
9      A   Okay.  The federal standard is being a
10 reasonable amount of time for someone to come
11 to -- come answer the door.  State standard, which
12 is an NRS, and I believe it's -- which one is the
13 NRS you're talking about?  Because there's a
14 couple in there.
15     Q   You -- we can just say NRS.  I don't
16 know the code number.
17     A   Okay.  All right.
18     Q   I don't even think Craig does.
19     A   Yeah.  And for -- NRS, it means after
20 you've notified your presence and authority and
21 your intent to serve a search warrant, it would be
22 there's no answer at the door, they don't know
23 that you're there.
24     Q   Okay.  But, of course, I mean -- well,
25 you tell me.

19

1          Is it your understanding that ultimately
2  the federal standard is the one that prevails?
3      A   Federal always supersedes state, I
4  believe, if I'm correct.
5      Q   Okay.  So is it -- so then was it your
6  understanding that the standard of a reasonable
7  amount of time applied the day that you were
8  serving this search warrant?
9      A   Yes.
10     Q   Okay.  And by the day, of course I mean
11 January 10, 2022.
12     A   Yes, ma'am.
13     Q   Okay.  And so -- okay.  And can you tell
14 me what parameters -- and so you -- you
15 articulated both the state and the federal
16 standard really well.
17         Was that part of your training for SWAT,
18 that you were educated on that, or did you know
19 that already?
20     A   Gosh, I'm trying to think.  I was
21 assigned to the SWAT team 29 days.  If I received
22 that training while I was there, I don't -- I'm
23 trying to think if I -- I don't recall that part.
24     Q   Okay.  Would it -- let me ask the
25 question a little bit differently.

20

1      A   You know, you would have to look at my
2  training record.  Maybe it's on there.  I --
3      Q   No, no, no.  That's --
4      A   I apologize.
5      Q   -- totally okay.  Let me ask it a little
6  bit differently.
7          Do you think -- as we sit here today, do
8  you think that you were likely aware of these
9  standards on the -- on January 10th, 2022?
10     A   Yes.
11     Q   Okay.  And you said "a reasonable amount
12 of time."
13         To your knowledge, is there any, like,
14 minimum amount of time?  Like, is there any
15 parameter of, like, hey, it can't be less than
16 this?
17     A   No.  It's a reasonable amount of time
18 based on -- you know, is there exigency or what
19 type of crime you have?  Is there a propensity of
20 violence?  Is there a violent individual in there?
21 Are they willing to take up arms -- arms?  Are
22 they heavily armed?  Are they -- can they fortify
23 themselves inside that structure with it?
24         There's -- there's a bunch of different
25 parameters that can come into play with that --

21

1      Q   Okay.
2      A   -- as far as, like, a hostage situation
3  or something.  That's totally different.  But
4  that's -- that's a situation where that's
5  life-threatening exigency.
6      Q   Okay.  And can you explain to me --
7  we've kind of gone over it a little bit, but I
8  kind of want -- I wanted, like, a real statement
9  from you.
10         What is your understanding of the
11 purpose of knock and announce?
12     A   The purpose of knock and announce is to
13 notify the occupants that you're there to serve a
14 search warrant and notify them of your presence,
15 authority, and your purpose.
16     Q   Do you understand that it is part of a
17 person's constitutional right to have clear notice
18 of a police officer's intent to enter?
19     A   Do I understand that?
20     Q   Yeah.
21     A   Yes.
22     Q   Okay.  What's the first and most
23 important constitutional right that any individual
24 has?
25     A   Well, they're all important.  Right?

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1    Q    Uh-huh.
2    A    I think they are.
3    Q    Do you think that there's one that's the
4  most important?
5    A    Fourth Amendment.
6    Q    That's what you think is the most
7  important?
8    A    Well, I mean, Fourth Amendment and the
9  First Amendment.
10    Q    Right.
11    A    Freedom of speech, press, and religion.
12  I think that's probably the most important.
13    Q    Okay.  In performing your job as a
14  police officer, do you agree with me that you have
15  a duty to conduct yourselves such that you do not
16  violate the civil or constitutional rights of
17  members of the public?
18    A    Yes.
19    Q    Do you agree that if you see other
20  officers violating the civil or constitutional
21  rights of a member of the public, you have a duty
22  to intervene and stop that officer?
23    A    Yes.
24    Q    What is a no-knock warrant?
25    A    Well, a no-knock warrant is a search

23

1  warrant -- and I'll go through the process of it,
2  of how it's actually done, because I think that's
3  where you're going with this.
4        Am I correct?
5    Q    Uh-huh, yes.
6    A    So it's -- essentially a no-knock
7  warrant is a search warrant that -- it would be --
8  on the SWAT section would be a -- an affidavit
9  would be prepared by a detective.  They would
10  articulate the verbiage in the no-knock search
11  warrant for it to be a no-knock search warrant.
12        And they would get approval from their
13  supervisor and their chain of command for a
14  no-knock search warrant.  In order for that --
15  approval for that search warrant, that goes to
16  them at their level.  And then the -- for the SWAT
17  side, it would be approved by the sergeant.  But
18  at the time, it was the captain.  So it was a
19  little -- the approval process was different.
20        But in order to have that search warrant
21  approved, it would have to be approved all the way
22  up the chain of command to the deputy chief on --
23  on the no-knock search warrant.  And then it would
24  obviously have to be DA approval and signed by a
25  judge.

24

1    Q    Okay.  And this may seem like a basic
2  question and in itself explanatory, but I still
3  want your answer on the record for it.
4        What's the difference between a no-knock
5  warrant and a knock warrant?
6    A    A no-knock warrant means prior to
7  entering the structure, there's no announcements.
8  It's a no-knock.  You don't make those
9  announcements until you actually enter the
10  threshold of the structure itself.
11    Q    Okay.  Can you get a no-knock warrant on
12  property-only search warrants?
13    A    No.  Not that I -- well, I -- I should
14  say depending on how it was articulated, but I
15  would say no.
16    Q    Okay.
17    A    I would say that was -- no, correct.
18    Q    And so when are no-knock warrants used
19  generally then?
20    A    No-knock warrants are used for somebody
21  that's an extremely violent individual that is
22  heavily armed, that would have the ability to
23  possibly take arms up, harm an individual inside
24  the actual structure itself or wherever it's at.
25        A no-knock could also be utilized for --

25

1  depending on if it's a violent individual that's
2  heavily armed or somebody that's very violent,
3  when the officers are serving it -- their
4  positions versus where the suspect would possibly
5  be located at and if they would be in harm's way
6  or not.
7    Q    Okay.  And I always say it wrong.  I
8  think it's "set," but is it actually C-E-T?  Do
9  they call it "set" or C-E-T?
10    A    C-E-T.
11    Q    CET.  All right.  I always call it
12  "set."  Sorry.
13        What is a CET?
14    A    It's a controlled entry tactic.
15    Q    And can you tell me what the purpose of
16  a CET is?
17    A    The purpose of a controlled entry
18  tactic, there's obviously some parameters -- the
19  purpose of the controlled entry tactic is to enter
20  a structure or dwelling dynamically in order to
21  overwhelm and take people into custody prior to
22  them taking up arms, destroying evidence, before
23  taking up arms.
24        It's for -- it's for a safety issue, the
25  essential part of the CET.  And that tactic is

Russell Backman         Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1  utilized to flood that structure -- flood that
2  structure and deem it -- dynamically to make it
3  safe.
4     Q   In this case, was the structure flooded
5  and dynamically made safe?
6     A   Dynamically and made safe?
7     Q   Was it?
8     A   It was afterwards. After we got shot at
9  18 times.
10    Q   Right. But upon the entry, was this
11 dynamically made safe?
12    A   Upon entry, we were fired upon 18 times.
13    Q   Right. So it's a yes-or-no answer.
14    A   The answer was after the shooting.
15    Q   No. My answer -- my question is, when
16 you entered the unit, was this -- did this CET
17 entry make the unit dynamically safe?
18        MR. ANDERSON: Objection. Form.
19        Go ahead and answer.
20        THE WITNESS: No. I mean --
21 BY MS. MURPHY:
22    Q   Can you use a CET entry on a
23 knock-and-announce warrant?
24    A   A CET is a -- at that time, that was a
25 knock-and-announce warrant.

27

1     Q   Okay. As we sit here today, can you use
2  a CET entry -- can you use a CET entry on a
3  knock-and-announce warrant?
4     A   No.
5     Q   Okay. In your opinion, do you think
6  that there was a conflict between knock and
7  announce and a CET?
8     A   In my opinion at the time?
9     Q   Yes.
10    A   At that time?
11    Q   Yes.
12    A   No.
13    Q   Okay. What about your opinion today?
14    A   My opinion today, after being trained
15 and going through some other things, depending on
16 what it's for and how it's articulated and what
17 the -- what the intel sheet report would -- would
18 dictate on that exact answer.
19        It's all situational, depending on the
20 type of intelligence is there. And is there a
21 violent person in there? Is -- are they -- do
22 they have the ability to take up arms? Those
23 would all be the factors of the CET with the
24 knock-and-announce part.
25    Q   Okay. And what is a call-out and

28

1  announce?
2     A   A call-out -- you're talking about the
3  surround and call-out?
4     Q   Yes.
5     A   Okay. A surround and call-out --
6     Q   And, listen, I've been in this case, but
7  I still get some of the acronyms and names mixed
8  up a little. So feel free to correct me on
9  everything so that the record is accurate.
10    A   Okay. So a surround and call-out -- a
11 surround and call-out is basically we
12 surround the outer part of the structure,
13 establishing containment on it with BearCats,
14 which will be our armored vehicles. We'll place
15 them in positions either in front of the house, on
16 both of the corners, establish containment. We'll
17 also put officers on the rear of the residence and
18 on each side of the residence.
19        Once we have sufficient containment on
20 the exact structure itself of the residence and
21 everybody is set in place and it's -- we're not
22 seeing any movement or anything -- or anything
23 that's making us -- give us any alarms, we'll
24 start the announcement process via the PA or the
25 LRAD that's attached to the BearCat.

29

1        We'll give the announcements for several
2  minutes, depending on what the case may be. And
3  if we're not getting a response from inside, we'll
4  usually go with a plan. We also try to telephone
5  call-in as well, if we have a phone number for the
6  individuals that are inside.
7        And that's all situational, based on the
8  intelligence that we get from the detectives. And
9  then we just go through our progressives. And
10 then after that, we would start our breaching plan
11 if we got no response.
12    Q   Okay. And because you were the -- you
13 have given two very good descriptions of them.
14 But because you were the sergeant on this, I want
15 to ask you, for the record, to state, what is the
16 difference between a CET and a call-out -- or the
17 call-out?
18    A   A controlled entry tactic is a dynamic
19 movement inside the structure to where we're going
20 to take people into custody -- right? -- after a
21 knock and announce -- after the announcements.
22        The difference between that and a
23 surround and call-out is we're trying to get
24 inside that structure to deem it safe, because we
25 know that there could be a violent individual in

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1  there that could potentially take up arms. On a
2  surround and call-out, with that case like that
3  and as far as the CET -- let me back up here.
4        There's also some environmental factors
5  along with the CET. You could look at the
6  positioning. Was it -- is it a single-story
7  apartment complex? Is it a two-story apartment
8  complex? Is it a single-story house or a
9  two-story house? Where is it located at? Is it
10  an apartment complex where there's an apartment
11  with an interior hallway?
12        Those are all mitigating factors on
13  whether or not you can sufficiently contain an
14  actual structure or an actual residence or house
15  or whatever you're trying to serve the search
16  warrant at.
17        Q   And just specifically for this
18  incidence, it was a -- or incident -- sorry -- it
19  was a CET; correct?
20        A   Yes. We utilized the controlled entry
21  tactic.
22        Q   As we sit here today, LVMPD policies
23  would not allow for this type of CET to be used
24  for this type of warrant; correct?
25        A   As it sits now, we'd have to get

31

1  authorization and approval from the SWAT
2  commander.
3        Q   Well, didn't you have to get
4  authorization and approval for this back in 2021?
5        A   Yes.
6        Q   Or 2022. Sorry.
7        A   Yes. Yes.
8        Q   Okay. But as we sit here today, haven't
9  LVMPD policies been changed so that you could not
10  serve this type of warrant with a CET?
11        A   Correct.
12        Q   Okay. All right. And so now we're
13  going to -- we've kind of danced around it a
14  little bit, but now we're going to jump into the
15  actual facts. And we'll start with -- and I know
16  you've read your statement. You -- you gave that
17  within days of the incident itself.
18        And you were very detailed in there, so
19  I'm assuming that you're going to be detailed --
20  you've been detailed so far. So I'm just going to
21  ask you some background questions, and we'll get
22  into the facts.
23        So when was the -- your first awareness
24  of the warrant?
25        A   First awareness of the warrant would

32

1  have been a day off. I saw it hit the SWAT
2  warrants, but I didn't -- I just kind of figured
3  it was being worked out by the people above me.
4        THE COURT REPORTER: I need you to
5  keep your voice up, please.
6        THE WITNESS: Okay.
7  BY MS. MURPHY:
8        Q   And so you were -- would it be fair for
9  me to say you were kind of peripherally aware? So
10  a warrant came in, but --
11        A   Yeah, you get the email notification on
12  your phone. It doesn't go away, even though
13  you're off.
14        Q   Okay.
15        A   It's always on.
16        Q   Fair enough.
17        And then what -- when did you
18  become, like, familiar with -- with the actual
19  warrant? Do you know what I mean by that?
20        A   When was approval to be served? It
21  would have been, I believe, Sunday when I went
22  back into work.
23        Q   Okay.
24        A   If I recall correctly. It was either
25  Saturday or Sunday.

33

1        Q   Okay. And at that time, were you part
2  of the -- there was recon that was done on this;
3  correct?
4        A   Yes. We went into work. We knew that
5  we had a search warrant to serve. I got with the
6  ATL, Jake Warner -- because I was a
7  sergeant-in-training, and the actual sergeant --
8  team sergeant at the time was Garth Findley.
9        He was off that day, so I was getting
10  the warrant preparation parts done. So Jake
11  Warner -- I talked to Jake Warner and said we had
12  a warrant to serve. And then we got recon
13  officers assigned to go out and conduct the
14  recon --
15        Q   And --
16        A   -- for that --
17        Q   Sorry.
18        A   -- for that -- yeah.
19        Q   I'll try not to interrupt you.
20        A   Go ahead.
21        Q   Sorry.
22        A   Go ahead.
23        Q   No, no, no. I don't want to interrupt
24  you ever.
25        A   Go ahead.



Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1    Q   If you're not done answering, say "I'm
2  not done."
3    A   Go ahead.
4    Q   So in terms of -- so when you say
5  "ATL" -- does that mean assistant team leader?
6    A   Yes, assistant team leader, and that
7  assistant team leader --
8        THE COURT REPORTER:  Okay.  I need you
9  both to slow down and talk one at a time.
10  BY MS. MURPHY:
11   Q   When I say "ATL," does that mean
12  assistant team leader?
13   A   Yes.
14   Q   Sorry.  I know.  Sorry.
15       All right.  And, so, for the record, can
16  you please just make that statement one more time
17  so the court reporter can get it?
18   A   Assistant team leader is ATL.
19   Q   Okay.
20   A   Yes.
21   Q   And so explain to me kind of what
22  position the -- what does ATL mean?
23   A   It's an assistant to the team leader.
24   Q   Sorry.  That was a bad question.
25       What is their role in terms of, like,

35

1  functioning with what you're doing and how they're
2  involved with --
3    A   They assist with the day-to-day planning
4  and operational -- anything that comes in
5  operationally, they -- they assist with putting --
6  they put the plans together.  They get guys
7  moving.  They assist with the team and the actual
8  assignments of where the guys are going and what
9  needs to be done.
10   Q   Okay.  And so the ATL was working with
11  you to come up with a plan on how to serve this
12  warrant; is that --
13   A   The ATL formulated the plan.
14   Q   The ATL formulated the plan?
15   A   Yeah, essentially, and then I sat -- go
16  ahead.
17   Q   No, no, no.  Go ahead.
18   A   Follow up with your question.
19   Q   No, no, no.  Go ahead.
20   A   The ATL assigned the recon guys to go
21  out before we came up with the plan, yes.
22   Q   Okay.  And so we've kind of gone over it
23  a few times, but I like to sometimes rephrase
24  stuff, because I want to make sure I understand it
25  exactly.

36

1    A   Okay.
2    Q   You -- at this point in time, you had
3  only been a sergeant in SWAT for a couple of
4  weeks; correct?
5    A   Yes.
6    Q   Okay.  And so you're sitting down with
7  the ATL to kind of say, "Hey, this warrant's come
8  in.  We're going to get a plan together for it";
9  correct?
10   A   Correct.
11   Q   Okay.  If you had been out of the
12  training period, would you have also still sat
13  down with the ATL to put the plan together?
14   A   Of course.
15   Q   Okay.  I'm just trying to figure out
16  exactly what the functions look like.
17       And so would you have been the one that
18  was kind of saying, "Hey, this is how I'm going to
19  put it together," or would it still have been the
20  ATL that said, "This is how we're going to put it
21  together"?
22   A   They come back -- they go out and they
23  do the recon.  They go out.  They look at the
24  structure.  They look at all of the -- the
25  environmental factors:  Where the doors are at,

37

1  where it's located at, all of that stuff like
2  that.
3        And they bring it back, and then they
4  start formulating the draws and they start putting
5  it together, the recon guys do.  And then they
6  give that information to the ATL, and then we look
7  at -- the ATL looks at, kind of, like, how to
8  approach that structure from a tactical position.
9    Q   Okay.  And at the time that you were
10  formulating the plan with the ATL or the ATL was
11  formulating the plan with you, did you understand
12  that -- what the search warrant was looking for?
13   A   Yes.
14   Q   What was your understanding?
15   A   The search warrant -- my understanding
16  of the search warrant, it was a murder
17  investigation, and they were looking for firearms.
18  There was clothing listed on the search warrant
19  itself.  There was a -- I think a cell phone that
20  was listed on -- I -- I would have to look at the
21  search warrant again to go over all the items that
22  we searched.
23       But there was also information that
24  there was a suspect inside that residence that
25  would -- that was involved in a shooting prior to

Case 2:24-cv-00074-APG-NJK    Document 55-5    Filed 05/16/25    Page 13 of 34

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1  from the gang unit. And there was also a
2  potential -- suspects in there that were heavily
3  armed with the intelligence that we had.
4      Q    And what intelligence was it that you
5  had that indicated there were -- could potentially
6  be heavily armed suspects inside the unit?
7      A    There was a statement given -- there
8  was -- the homicide detectives received -- on the
9  search warrant itself, it said that it was a
10  narcotic flophouse, that there -- people were
11  armed in there. And it also mentioned that the
12  affidavit -- in the affidavit, the search warrant
13  itself, that Rembert -- Rembert was involved in a
14  shooting -- involved in an illegal shooting.
15      Q    Okay. And Rembert, Wattsel, also had
16  a -- was he the one that had the ankle monitor;
17  correct?
18      A    I believe it was Corvel Fisher.
19      Q    Okay. So did you believe that Rembert
20  was likely inside the unit?
21      A    From reading the search warrant, yeah.
22      Q    Okay. But the indication for the search
23  warrant, it was a property-only search warrant;
24  correct?
25      A    It was a property-only search warrant

39

1  for that part, right.
2      Q    But my understanding -- you tell me if
3  I'm right or wrong -- the way that it was actually
4  administered or executed -- or whatever word you
5  want to use -- was that it was really an arrest
6  warrant.
7          You were going to arrest individuals
8  that you felt were involved in a homicide;
9  correct?
10      A    It was the understanding at the briefing
11  that there was no -- there was two suspects
12  involved in a shooting prior to. There was a
13  couple of other incidents where we knew that these
14  two individuals that were involved in it had
15  access to weapons. One of them was a -- they were
16  each both documented gang members.
17          These gang members were documented with
18  having a MP5 style rifle removed from their
19  vehicle prior to -- prior to this. And there was
20  another incident where there was an AR-15 that was
21  recovered from another incident too, as well, by
22  the gang unit.
23          The individuals that were supposed --
24  that were -- we thought that would be inside the
25  structure were Rembert and a Corvel Fisher.

40

1      Q    Okay.
2      A    And they were both documented gang
3  members, and they had a prior criminal history for
4  narcotics. And Rembert's stepmother had told the
5  homicide detective that that was a narcotics
6  flophouse and they were armed.
7      Q    But for one of them, you had pinned his
8  ankle monitor right before this incident; correct?
9      A    Correct.
10      Q    And he was not located inside this --
11  what you want to call a flophouse; correct?
12      A    Correct.
13      Q    Okay. But I -- let me loop back to my
14  prior question.
15          The way that it was being served was
16  more akin to an arrest warrant; correct?
17      A    I would say we -- no. I would say
18  that -- that that warrant was being served because
19  of the propensity of violence, them having arms
20  inside that structure. And knowing that
21  Rembert was also involved in an illegal shooting,
22  but there was not an arrest warrant. Detectives
23  just had probable cause to arrest him. And that's
24  what we were notified of prior to the brief.
25      Q    Sorry. Back up. So -- just because I

41

1  want to understand this a little bit better.
2          Prior to the briefing on this incident,
3  you guys were informed right before the -- the
4  briefing on this incident that they did have
5  probable cause to arrest him?
6      A    They had probable cause on one of the
7  individuals, being Rembert, that he was involved
8  in an illegal shooting.
9      Q    Okay. But you guys weren't actually
10  executing an arrest warrant; correct?
11      A    We didn't have an arrest warrant.
12      Q    Okay. Why -- did you think it was weird
13  you didn't have an arrest warrant?
14      A    At the time, the detectives said if he's
15  there, we're going to arrest him. They didn't
16  explain to us why.
17      Q    Okay. And you thought he would be
18  there; correct?
19      A    Correct.
20      Q    Okay. So this property search warrant
21  was being looked at similar to an arrest warrant;
22  correct?
23      A    I would say that the property search
24  warrant was looked at -- no. I would say it was
25  looked at because we had violent individuals

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1  inside that apartment complex -- inside that
2  apartment that was a 650-square-foot apartment,
3  one bedroom, one bath. And they were heavily
4  armed inside there.
5         And that's how we looked at that search
6  warrant, who -- what we thought would -- we knew
7  that we'd -- we'd encounter -- that could be a
8  possibility to encounter, and that's why we served
9  that -- that's how we served that search warrant.
10    Q    Okay. But you were aware that it was a
11  property only search warrant; correct?
12    A    For firearms, yes.
13    Q    Okay. Were there -- obviously this
14  went -- this didn't go as you guys had planned for
15  a variety of reasons.
16         In terms of when you're serving a -- a
17  warrant like this, with this type of entry, are
18  there certain things that you need to know or rule
19  out about the -- like whatever -- whatever
20  structure you're going into?
21    A    Know or rule out? Can you please --
22    Q    Sure.
23    A    -- explain?
24    Q    Do you need to know or rule out if
25  there's kids present? If there's elderly present?

43

1  If there's animals present? Like, are there
2  certain things that you're supposed to rule out
3  before doing this type of --
4     A    Right. You would also take into
5  consideration, for tactical purposes, whether or
6  not there's children there, vicious dogs, elderly,
7  stuff like that, absolutely.
8     Q    Was any of that known prior to serving
9  this warrant?
10    A    What we do -- did know prior to serving
11  the warrant per -- pursuant to what the detectives
12  had told me, that they had never seen any kids
13  there while any surveillance was conducted by the
14  surveillance teams. And that it was a narcotics
15  flophouse, and that there were numerous gang
16  members that were associated with that place, is
17  what I was told by detectives.
18    Q    Okay. And as we sit here today, do you
19  know how much surveillance was done on this unit,
20  what -- in a buildup to serving this warrant?
21    A    I know there were several dates where
22  there was a squad out there -- a surveillance
23  squad specifically that was out there doing
24  surveillance on that apartment. I don't -- I
25  can't -- I don't recall the exact specific dates.

44

1         I can recall and I can tell you that
2  while they were out there doing surveillance, they
3  were burned. And I believe somebody came out from
4  the area of where that apartment was and went over
5  to the surveillance vehicle and knocked on the
6  window.
7     Q    Okay. And so my earlier question still
8  stands, though: Do you know how much -- well, do
9  you know how much time was spent actually
10  surveilling the unit?
11    A    Look, I would have to refer to that
12  report. But I would say it was probably -- there
13  were several days that they went out there. I
14  think several different occasions they went out
15  there.
16    Q    Okay. But I guess my question --
17    A    Maybe a couple -- a couple shifts. I
18  don't know exactly how much -- how long they
19  spent. You would have to ask the detective
20  that -- that led the case on that. I was just
21  there for the -- to serve the actual search
22  warrant.
23    Q    Okay. So it's -- so it's fair for me to
24  assume, then, as we sit here today -- and probably
25  it was the same way back then -- you didn't -- you

45

1  don't know if they went out there and sat there
2  for ten minutes or eight hours?
3     A    Right. I was -- that wasn't relayed to
4  me by the -- the detective. He just told -- he
5  just relayed to me that they had surveillance out
6  there before.
7     Q    Would that have made a difference to
8  you?
9     A    Would it have made a difference to me as
10  far as what?
11    Q    In relying on their information.
12    A    As far as what information?
13    Q    That there weren't kids present. There
14  wasn't dogs present. That there was -- that there
15  was -- potentially that the actual suspects you
16  were looking for were there?
17    A    Yeah. I mean, obviously you're going to
18  always take that information for what they give
19  you, and you're going to use that as actionable
20  intelligence, absolutely.
21    Q    Okay. And in terms of the actual
22  physical structure itself, are there certain key
23  items that you want to know about the physical
24  structure? For instance, like, is there a
25  barricade on the door? Are there window blinds?

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1   Those types of things.
2       A   Of course.
3       Q   Okay. And it's -- as we sit here today,
4   were there a few different unknowns that were not
5   known when you approached the unit, you can --
6   that you're now aware of in hindsight?
7       A   Where at on the unit are you
8   specifically asking?
9       Q   Well, was it known that there was a --
10  that there was a kick plate on the door?
11      A   You mean a brass wrap?
12      Q   I'm sorry. A brass wrap.
13      A   Yes. Not -- not at the time of --
14  actually, once the guys
15  got up to the door as far as the breaching
16  element, I'm sure they noticed it.
17      Q   Yeah, was that something that ought to
18  have been known beforehand?
19      A   Ought to be known?
20      Q   Yes.
21      A   Usually most cases, you always want to
22  look at the front door, absolutely, and get a good
23  look at it. I do -- I did understand that while
24  they were conducting the recon, that the suspects
25  had hopped the wall and actually went into the

47

1   door, and I think the door was open at the time
2   that they did their walk-by on the --
3       Q   I'm sorry. When you say "suspects," are
4   you talking about --
5       A   I mean -- I'm sorry. Individuals, but
6   they -- they called them that to me. I'm sorry.
7   It's -- I'm just recalling the verbiage that was
8   sent to me.
9           But there were several males that hopped
10  the wall and went inside that apartment, 1125,
11  while they were doing the actual walk-by of the
12  recon of the structure.
13      Q   Okay. And why would that be relevant or
14  important for you to know that information?
15      A   Because our apartment was occupied.
16      Q   Okay. All right. So now I'm going to
17  get into the actual, kind of, mechanics of it.
18          So you arrive at Sam's Town; correct?
19  What is it? Around 4:00 a.m.?
20      A   Sam's Town, yes.
21      Q   Isn't that where you guys, like --
22      A   Briefed, yeah.
23      Q   -- briefed. Yeah. I'm sorry.
24          So you arrived at Sam's Town.
25          And can you, kind of, walk me through

48

1   what happens there?
2       A   That's where -- you know, the whole team
3   showed up. We had our personnel, our manpower
4   there. And we put our drawings up. The guys put
5   their drawings up, and we had everybody together
6   and we did the briefing --
7       Q   Okay.
8       A   -- along with the detectives.
9       Q   And to the best of your knowledge, can
10  you walk me through what the briefing entailed?
11  The best of your memory, as we sit here today, can
12  you walk me through what the briefing entailed?
13      A   Obviously the briefing entailed the
14  address, the structure we were going to. It went
15  down the potential targets that would be in there:
16  Their names, their criminal histories.
17          And during that, there was Corvel
18  Fisher, who had the ankle monitor on. And then
19  there was Rembert. His prior history was there.
20  They were both -- they're documented gang members.
21  And it went into whether there were kids there,
22  dogs there -- et cetera, et cetera, et cetera --
23  on the draw itself.
24          And then there was also another draw
25  with -- where there was the planning of how we

49

1   were going to arrive and the route we were taking.
2   And everybody's role and assignments was also up
3   there as well, about who was doing what.
4           And then there was an actual briefing
5   to -- what everybody's assignments were, and there
6   was a brief back, everybody understanding it as
7   well. And then there was detectives present, too,
8   to enlighten everybody there on what their case
9   was about.
10      Q   Okay. And what was your role on the
11  team?
12      A   I was the -- I was the sergeant on the
13  team in training. My role for the search warrant
14  was I was operating the bullhorn.
15      Q   Okay. And were you -- were you in
16  charge of this operation?
17      A   Sergeant Findley was in charge of the
18  actual tactical operation.
19      Q   Okay. And so then what was -- so were
20  you there just for training purposes?
21      A   I was there in training.
22      Q   Okay.
23      A   Yeah. He was -- he was the trainer.
24      Q   Okay.
25      A   But, yes, I was there.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50

1    Q   Sorry.  I know I'm saying "okay" over
2  and over again.
3         And so would it be fair for me to say,
4  then, that it was actually -- I'm just going to
5  repeat back what you said to me.
6         It was actually Sergeant Findley that
7  was in charge of this operation?
8    A   Yes.
9    Q   Okay.  And so -- and I think -- I know
10  I've read it in your report several times.
11         But how long had you been on SWAT for
12  when you -- for this incident?
13    A   29 days.
14    Q   29 days?
15    A   Somewhere where it's --
16    Q   Okay.  But it -- you were the one doing,
17  kind of, the communicating; correct?  Like, you
18  were the one that sat down with the team -- the
19  ATL.  You were the one that said, "We're going to
20  do this kind of unit."  You're the one -- or this
21  kind of entry.
22         You're the one that was contacting
23  different people to get authority to -- for
24  different items; correct?
25    A   Yes.  And I believe I assisted -- I

51

1  can't speak for them, but I thought Jake Warner
2  also contacted Garth, who was off that day, and
3  talked to him and spoke with him on the phone of
4  what the -- what the plan was.
5    Q   Okay.
6    A   So Garth was aware of what -- of it, as
7  well.
8    Q   Okay.  So leading up to the actual
9  execution of the -- of the search warrant, you
10  were taking the command role; correct?
11    A   Prior to the execution of the search
12  warrant?
13    Q   Yeah.  So sorry.  And let me ask it --
14    A   The day before I was there helping
15  facilitate, getting manpower, getting certain
16  things done.  And then I requested the CET to the
17  SWAT lieutenant.  Yes, I did.
18    Q   So let's back up a little bit.
19         Can you walk me through the -- the
20  process of -- of requesting the CET?
21    A   Requesting the CET?
22    Q   Yeah.
23    A   Yes.  In order to request for the CET,
24  you have to notify your lieutenant, and the
25  lieutenant approves whether or not the CET is

52

1  approved or not per section policy.
2    Q   And who was your lieutenant at the time?
3    A   That would have been Lieutenant Melanie
4  O'Daniel.
5    Q   And to the best of your memory, as we
6  sit here today, can you walk me through the
7  communications that you had with Lieutenant
8  O'Daniel regarding getting the CET authorized?
9    A   I spoke with Lieutenant O'Daniel on the
10  phone, and I -- we explained to her that it was a
11  small apartment; we couldn't contain it with
12  BearCats due to the environmental factors.
13    Q   Sorry.  Who is "we"?
14    A   I did.  But that was because of -- we
15  had gathered from the recon guys and the ATL, we
16  had received that information that we couldn't
17  sufficiently contain that structure itself.  The
18  propensity of violence of the individuals that
19  were in there, knowing that they were heavily
20  armed potentially, with the prior weapon stops
21  that they had with the AR-15 and the MP5.
22         And due to the fact that Wattsel
23  Rembert's mother said that there was a narcotics
24  flophouse -- I know through my training and
25  experience, a narcotics flophouse means that

53

1  there's going to be guns in there usually.  That's
2  usually how it rolls.
3         Narcotic sellers and dealers are --
4  protect their product, and they have guns.  That's
5  just -- that's -- that's what happens in --
6  sometimes in these cases.
7         So that was the explanation that I gave
8  to Lieutenant O'Daniel, was there was the
9  violent -- propensity of violence, and we were
10  going after a murder suspect.  And there was a --
11  there was an outstanding gun.
12    Q   Okay.  And so I'm glad that you brought
13  that up, because I want to understand your point
14  of view as well.
15         So part of your point of view, as having
16  worked these prior units, is that if you hear
17  narcotic flophouse, you think automatically
18  there's going to be guns --
19    A   I didn't say automatically.
20    Q   Oh, well, I --
21    A   I said I knew -- I knew from my training
22  and experience that there's a possibility they
23  could be there.
24    Q   And so if I say possibility or
25  probability, do you understand the difference

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  between those two?
2      A   I would say probability, because drug
3  dealers, they protect their product.  And how are
4  they going to protect their products?  They
5  protect them with guns.
6      Q   So in the day before executing the
7  search warrant, you thought that it would be a
8  probability that there would be armed and
9  dangerous individuals in the unit; is that
10  correct?
11      A   Due to the intelligence that we had,
12  absolutely, with the prior stops and the -- the
13  two suspects that were listed on the incident and
14  accident plan.
15      Q   And that is part --
16      A   They were documented gang members as
17  well.
18      Q   And that is part of what -- what you --
19  that is part of what you communicated to
20  Lieutenant O'Daniel when you were discussing your
21  request to have a CET; correct?
22      A   Yes.
23      Q   And in addition to the CET, you also had
24  some distraction device -- they're called
25  distraction devices; right?

55

1      A   Yes.
2      Q   Okay.  Can you walk me through what
3  you -- what you also had on this -- for the -- to
4  execute the search warrant?
5      A   I also had to have approval from
6  lieutenant -- Lieutenant O'Daniel to utilize a
7  stun stick, which is a distract device on a stick.
8          MS. MURPHY:  We've been going a little
9  under an hour.  Why don't we take a short break.
10          THE VIDEOGRAPHER:  We are going off
11  record at 1:52 p.m.
12          (Whereupon, a recess was taken.)
13          THE VIDEOGRAPHER:  We are back on
14  record at 1:59 p.m.
15  BY MS. MURPHY:
16      Q   And, Russ, we just took a short break.
17  But I just want to confirm, the -- the oath that
18  you took before we went on break still applies.
19          You understand you're still under oath;
20  correct?
21      A   Yes, ma'am.
22      Q   Okay.  And we were -- we had just begun
23  talking about the distract devices that you got
24  approval for to use on this -- this search
25  warrant.

56

1      Q   Can -- can we kind of go back to that,
2  and can you walk me through what -- what -- what
3  distracts you got and what approvals were
4  necessary for those?
5      A   Okay.  Yes.  We used the distract on a
6  stun stick, 25 -- Def Tec 25 on the stun stick.
7  And then we also used the -- it's called the
8  9 bang distract, which is essentially a 25 that
9  goes off nine times as -- as well on this
10  operation.  And the stun stick had to have
11  approval from Lieutenant O'Daniel.
12      Q   And did the 9 bang have to have
13  approval?
14      A   The nine bang itself?
15      Q   Yeah.
16      A   No.  It was just a -- it's just a
17  normal -- it's just a distract that we use.
18      Q   Okay.  Why does the stun stick have to
19  have approval and the nine bang doesn't?
20      A   The stun stick itself was inserted into
21  the residence.  So any time that you insert a stun
22  stick into a residence, you have to have approval
23  from the lieutenant, which would be, at the time,
24  the SWAT commander.
25      Q   Okay.  And why did you -- why did you

57

1  think that it was necessary to have a stun stick
2  for this search warrant?
3      A   Well, looking at the structure itself
4  and then looking at the -- the people that
5  potentially we thought would be in there, as far
6  as we're going after a murder suspect.  We know
7  that they have -- they're heavily armed.  We have
8  intelligence that they're heavily armed.
9          We're going after the crime of murder.
10  They have priors -- violent priors, and they also
11  are documented gang members.
12          In order to insert that stun stick and
13  clear out that window, the window that we used
14  would -- we knew that that would be the living
15  room.  And that living room itself, if we can
16  clear that out, we had a breach point, which would
17  have been the front door, which would have
18  assisted us in -- with clearing out that window
19  and letting us know, if we got hung up at the
20  door, where -- you know, the guys there could
21  actually provide cover for us, and then also
22  provide intelligence of what we had inside if we
23  got hung up at the door or anything like that as
24  well.
25          And the purpose of the stun stick would

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

1  be if there was somebody in there that was trying
2  to do something that was violent or whatever,
3  there was that distract device itself in there
4  that could go off and that would disorient them if
5  they were -- if they were going to do something,
6  whether they were trying to run deep into the
7  structure, into another room, or they were trying
8  to move, grab something, or do anything like that.
9      Q   So your understanding of the purpose of
10  the stun stick is, in fact, to disorient; correct?
11     A   The stun stick, yeah, it emits a --
12  yeah, it disorientates -- disorientate -- excuse
13  me -- disorients somebody, yes.
14     Q   Okay.  And so I'm going to actually ask
15  you, to the best of your knowledge, like, can you
16  kind of walk me through what a stun stick
17  actually, like, looks like?  Like, how it's
18  employed?
19     A   It's a device that has a hood.  It has
20  the actual dis -- 25 depth -- 25 distract on it.
21  And it can extend out.  And it is utilized to
22  insert through a window.  And you insert it up at
23  a high angle.  And whoever is operating it itself,
24  prior to would attempt to clear the area.
25         And then if they see somebody that is

59

1  right there or whatever -- if there's a kid or
2  something, obviously they're not going to utilize
3  it.  And utilize that device in order to help the
4  entry team basically disorientate or distract
5  those individuals and draw their attention back
6  towards that in order to go in there and actually
7  safely take them into custody.
8      Q   Okay.  And you weren't the one that
9  actually had the stun stick at the --
10     A   No.
11     Q   Okay.  And so tell me then also, can
12  you -- the title is a little self-explanatory, but
13  I'm going to ask you to walk me through it anyway.
14         What's the nine bang?
15     A   The nine bang is essentially a distract
16  device that has nine ports, and it lets off nine
17  distracts -- 25 distracts.  It's a -- repetitive.
18     Q   And so what's the bang -- what's the --
19  I mean, we've got the video, so I know.
20         But how would you describe the bang?
21     A   It's -- it's -- it's similar to the
22  Def Tec 25.  It's -- it's just nine ports, and it
23  just goes off nine times in a rhythm, boom, boom,
24  you know.
25     Q   Okay.  And what did you -- what was your

60

1  conversation with the lieutenant -- to the best of
2  your memory, what was your conversation with the
3  lieutenant in order to get the use of the stun
4  stick authorized?
5      A   Just like I explained before.
6      Q   Okay.
7      A   We had those two -- we had the
8  intelligence of the violent individuals inside the
9  apartment itself, that they were heavily armed,
10  and we were also looking for a murder suspect.
11  And the mother -- stepmother of those two -- one
12  of those individuals had identified both of them
13  as being the ones that were involved in the
14  murder.
15     Q   Okay.  So is it fair for me to assume,
16  the reason to do this CET and the reason to use
17  the stun stick were the same?
18     A   Correct, essentially.  I mean --
19     Q   Yeah.
20     A   -- the -- insert a stun stick is not
21  necessarily on any CET or all CETs, so -- I mean,
22  that is utilized in order to help out the entry
23  team, whether they get hung up or if there's
24  somebody in there, to distract them or to, you
25  know, keep them from fleeing, going into a back

61

1  room, or gathering something like that itself.
2         It's there to disorient somebody, if
3  needed, and that's also on the individual operator
4  itself --
5      Q   Okay.
6      A   -- on who is operating it.
7      Q   What's a break and rake?
8      A   A break and rake?
9      Q   Uh-huh.
10     A   That's a device that's used to clear out
11  an actual window itself.
12     Q   Okay.  And so what is inserted first
13  through the window for this?  Is it the stun stick
14  or the break and rake?
15     A   I wasn't back there.  I don't know
16  exactly what -- what they used or how they cleared
17  the out that window --
18     Q   Okay.
19     A   -- in the back.
20     Q   All right.  And so -- and so let's
21  actually walk through the -- sorry.  We went
22  through the -- the briefing.
23         Then can you kind of walk me through
24  what happened after that?  So did you guys have
25  the briefing at Sam's Town?



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1    A    Okay.
2    Q    And then what happens next?
3    A    After the briefing, we loaded up on the
4    BearCats.
5    Q    Okay.
6    A    Got dressed, got our tactical equipment
7    or. And we got on the BearCats, and we started
8    heading towards 3050 South Nellis, 1125.
9    Q    And what -- what tactical equipment did
10   you have -- sorry.
11        What tactical equipment did you have on?
12   A    A ballistic helmet, a ballistic vest,
13   belt, gloves, tourniquet, stuff like that.
14   Q    What were you armed with?
15   A    I had two guns on me at that time. I
16   had a GLOCK 34, and I was also armed with an M4.
17   Q    Is that standard?
18   A    What do you mean "standard"?
19   Q    Is that what's standard -- like, if
20   you're -- if you were serving -- that's a fair
21   question.
22        If you were serving this kind of
23   warrant, is that, like, what you would wear as a
24   standard?
25   A    Could be, depending on the operation,

63

1    depending on what type of tactic we're using,
2    where you're at in the line. Depending on what
3    type of operation it is, you could utilize two
4    handguns instead -- instead of having a M4. It's
5    just -- it's situational.
6    Q    And, sorry, we talked about --
7    A    And that's up to the operator itself --
8    the SWAT operator itself on what they prefer.
9    Q    Okay. And, sorry, we kind of -- I just
10   wanted to -- this goes back a little -- goes back
11   a little bit.
12        But in terms of the CET -- the CET, the
13   time that you had been on SWAT, you had never done
14   a CET before; is that correct?
15   A    Not on the SWAT team, no.
16   Q    Okay. Had you done it not on SWAT?
17   A    No. Because that tactic didn't --
18   that's the first time I had ever heard of the
19   tactic, is when I was assigned to SWAT.
20   Q    Okay. So -- okay. So I want to make
21   sure I understand that statement correctly.
22        You had never even heard of this tactic
23   before until you had been assigned to SWAT; is
24   that correct?
25   A    Essentially, right. Yeah, I didn't know

64

1    that that's what it was called.
2    Q    Okay.
3    A    Dynamic -- yeah.
4    Q    Okay. And so you get on the BearCats.
5    And then kind of -- I mean, I -- it's -- I'm going
6    to ask you to give me the dialogue. Obviously --
7    like, you get on the BearCats.
8        Then what?
9    A    We started heading towards -- we had
10   body cams. Everybody -- I think I came on the
11   radio and said, "Hey, everybody activate their
12   body cameras." Everybody activated their body
13   cameras, and we proceeded the route that was on
14   the draw itself to the location.
15   Q    Okay. And why did you activate -- is
16   there, like, a certain policy for LVMPD of -- as a
17   point in time when you have to activate the body
18   cams?
19   A    There's a certain point, I guess, when
20   everybody is ready to go and you're starting the
21   tactical operations and you're loading on the
22   BearCats, in SWAT, we activate our body cameras.
23   Q    Okay. And so you load on the BearCats.
24   And you get to the actual apartment building.
25        Can you walk me through what happens

65

1    then?
2    A    We disembarked the BearCats and got in
3    the line.
4    Q    Okay. And can you walk me through, to
5    your memory, what -- what -- what did the line
6    consist of?
7    A    The actual stack itself, we had our
8    breaching element with Officer Hoskins and Levi
9    Hancock. And then we had our line, which was --
10   Officer Kubla was number one. Number two was
11   Brice Clements. Number three was Jake Warner. I
12   was number four, myself. And then Alex Gonzalez,
13   who is now a sergeant, was number five.
14        Number six -- I would have to look back
15   at the draw, but, I mean, for -- it's -- all of
16   the rest -- the rest of the guys on the team --
17   Q    Okay.
18   A    -- were in that line too.
19   Q    And where were you relative to everyone
20   else?
21   A    I was number four.
22   Q    Okay. So were you in actually the
23   lineup in front of the door, or were you off to
24   the side?
25   A    At that point in time, because of the --

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1  how we lined up, the door was recessed back. I
2  was off to the side.
3      Q    Okay. And who gave the announcement?
4      A    For the target apartment, I did. I had
5  the bullhorn.
6      Q    Okay. Why don't we stop here, and then
7  we'll actually play the video.
8      A    Okay.
9          MS. MURPHY: Okay. Give me just -- if
10  we want to go off the record, give me just a
11  minute to pull up the video.
12         THE VIDEOGRAPHER: We are going off
13  the record at 2:09 p.m.
14         (Whereupon, a recess was taken.)
15         THE VIDEOGRAPHER: We are back on
16  record at 2:11 p.m.
17         THE WITNESS: Is that mine?
18  BY MS. MURPHY:
19      Q    Yeah. Tell me -- it should be yours.
20      A    I'm asking you.
21      Q    Okay. It's the one that's marked as
22  yours.
23      A    It was two years ago.
24      Q    The sound should be coming on. Give me
25  one second.

67

1      A    Okay.
2          (Video played.)
3          THE WITNESS: I didn't touch it. It
4  stopped. My hands are right here.
5  BY MS. MURPHY:
6      Q    Were you on the BearCat?
7      A    Yes.
8          MS. MURPHY: Did it stop again?
9  Yikes. All right. Thank you.
10         (Video played.)
11  BY MS. MURPHY:
12      Q    Are you okay? Do you want to take a
13  break?
14      A    I'm good.
15      Q    Are you sure?
16      A    Yeah.
17      Q    Okay. We can -- we can totally take a
18  break. There's no problem at all.
19         THE WITNESS: Do you need to take a
20  break?
21         MR. ANDERSON: I don't need to take
22  one. But if you do, take it.
23         THE WITNESS: No.
24  BY MS. MURPHY:
25      Q    Do you want to take a break?

68

1          And so, Russ, I think you gave me the
2  list of things that you had reviewed beforehand.
3  And I don't remember, I'm sorry, even though it
4  was just a couple of hours ago.
5          Had you reviewed that video to prepare
6  for today's deposition?
7      A    Yes, I --
8      Q    Okay.
9      A    -- reviewed it before. Yeah.
10      Q    Okay. All right. Okay. Is it hard for
11  you to watch that video?
12      A    Hard?
13      Q    Yeah.
14      A    Unfortunately, there's a human life
15  involved. Anybody in -- in any type of incident
16  like that -- would be probably hard for them.
17  Absolutely, it's hard, yeah.
18      Q    Okay.
19      A    But, I mean, it's just lucky to know
20  that I'm alive and the rest of the team guys
21  are -- letting them -- you know, it brings back a
22  lot of emotions. But, yeah, I'm glad that we came
23  out of there alive.
24      Q    Okay. And can you kind of tell me -- if
25  it's not too hard for you, can you kind of tell

69

1  me, like, what kind of emotions is it bringing up
2  for you to watch that video?
3      A    To know that we all took a -- that --
4  all of those rounds, 18 of them, I believe, and
5  none of us got hit. And then looking at that
6  muzzle flash pointed directly at me, I was able to
7  go to work, do my job, and then come out alive.
8      Q    Okay.
9      A    Very fortunate.
10      Q    And did you do any -- did you do any,
11  like, treatment following this incident? Like any
12  treatment with a therapist, a psychologist,
13  anything like that?
14      A    Yes, I went to --
15      Q    Okay. How long did you do that for?
16      A    Oh, gosh. I forget the exact length of
17  it, but it was -- I don't know, standard time,
18  whatever -- whatever that was. Like a month and a
19  half, two months.
20      Q    And did you have any -- were you -- were
21  you put on, like, administrative leave or anything
22  like that?
23      A    Yes.
24      Q    How long were you put on leave for?
25      A    Oh, I was on administrative leave, I

Case 2:24-cv-00074-APG-NJK    Document 55-5    Filed 05/16/25    Page 21 of 34

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1  believe, almost four months.
2     Q   Okay. And since coming back, have you
3  had any -- do you have any, like, ongoing mental
4  health or psychological issues related to being
5  involved in this officer-involved shooting?
6     A   No.
7     Q   Okay. Does it change how -- what
8  happened -- does what happened here change how you
9  serve search warrants today?
10    A   You mean what happened on that incident?
11    Q   Correct.
12        MR. ANDERSON: Can I just clarify?
13  Are you asking the department, or him personally?
14        MS. MURPHY: Him personally. That's a
15  fair clarification. Thank you, Craig.
16        THE WITNESS: Yeah, because I was
17  confused. Thank you.
18        Me personally, you know, when you look
19  at anything like that and you look -- at any time
20  you go into the unknown, you want to always be
21  prepared as much as you can. And with my training
22  and -- that day, I relied on it and it came
23  through.
24        Does that change anything as far as my
25  opinion? I'm there to do a job, regardless if

71

1  it's serving a search warrant, a hostage rescue,
2  whatever. So when I have to go to work and I do
3  my job, I have to be as most -- I have to be as
4  proficient as possible and have a clear head.
5        So does it change my opinion on my job
6  and my tactics and what I do? No.
7  BY MS. MURPHY:
8     Q   And, sorry, maybe I asked the question a
9  little unartfully. I'm not asking if it changed
10  your opinion on things. But I'm asking if it --
11  well, maybe you answered it, the last part, but I
12  just want to clarify.
13        In, kind of, like how -- how you do --
14  how you execute search warrants today, did -- did
15  this incident change anything, the way that you --
16  you actually, like, do anything? Like, some of
17  the other officers have answered, like, that --
18  they have answered, like, they modified certain
19  things or they're more aware. Like, it has had an
20  impact on how they serve search warrants today.
21        Is that question more clear, or do you
22  want me to rephrase it?
23    A   Yes. Yeah, it's -- you know -- you
24  know, I see your -- do you modify things?
25  Absolutely. Any time you have a tragic event like

72

1  that, you always go back to the -- go back and
2  look at what -- you know, what you can improve on,
3  how you get better. Not individually, but also as
4  my position as -- the team.
5        So you have to take all of those -- all
6  of that into consideration and always learn from
7  the outcome of that. There was -- unfortunately,
8  there was a human life involved, and it's tragic
9  that there's a gentleman that's deceased now. And
10  for his family, I feel bad for his family.
11        Doing things differently? I would say
12  you train harder. You work harder and make sure
13  to be always prepared for the unknown and never to
14  give up. And don't let off the gas pedal just
15  because you think you know everything. That would
16  be -- you need to always train and keep training
17  harder, because you never know what you're going
18  to encounter when you go through a door.
19        And obviously right there, we
20  encountered a gentleman that shot at us 18 times
21  and tried to kill us.
22    Q   And one of the -- we can back up and
23  kind of talk about the actual mechanics of it as
24  well.
25        There was an issue with getting through

73

1  the door; correct?
2     A   After watching the video, yeah.
3     Q   Yeah.
4     A   It took a little while.
5     Q   And so what was the issue with getting
6  through the door?
7     A   After reading the reports and seeing
8  that, the brass wrap obviously kept us from
9  ramming that door -- can somebody ram the door one
10  time? Yes, depending on their technique, how big
11  and strong they are. But, you know, it's also
12  technique.
13        I don't know what -- you know, he used
14  the best technique he could, and that door -- door
15  got opened after five hits.
16    Q   Okay. When I say "call a tactical,"
17  what does that mean to you?
18    A   So tactical -- tactical --
19    Q   That -- sorry. In terms of this
20  incident. It may have meaning in a variety of
21  other ways that I'm unaware of.
22    A   Yeah, because I was, like -- okay. Yes.
23        So in that incident right there, for
24  that particular part at the door, calling tactical
25  would mean we would pull back. That would -- that



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1  would be a -- absolutely, that's -- and anybody
2  can call it in the line, whoever is seeing
3  whatever -- you need somebody behind -- you know,
4  if there was somebody squirting out the window or
5  somewhere else or something else going on, anybody
6  on the operation could call tactical.
7        And that's where we pull back to cover.
8  We reassess, we find out what's going on, slow
9  things down, and then formulate a plan from there.
10      Q   Okay.  And having seen the video,
11  knowing everything that you know now, do you think
12  that a tactical ought to have been called that
13  day?
14      A   Yeah, I think that we -- that would have
15  been -- looking at it now, yes, I would agree with
16  that, yeah.
17      Q   And I want to read you the legal element
18  for knock and announce.  And it is that if after
19  notice of its authority and purpose, an officer is
20  refused admittance.
21        Can you tell me, having watched that
22  video, what Mr. Williams did to refuse admittance
23  while the door was closed?
24      A   Refuse admittance --
25      Q   Yeah.

75

1      A   -- while the door was closed?
2        He didn't answer the door.  We made our
3  announcement.
4      Q   Okay.  Do you think that there was
5  sufficient time for Mr. Williams to wake up, get
6  up, walk to the door, and open the door within the
7  amount of time between your announcement and the
8  window being broken open?
9      A   You say wake up?
10      Q   Yeah.
11      A   How do you know he was sleeping?
12      Q   Well --
13      A   I'm asking.
14      Q   Okay.  That's fair.
15        We know that he was lying on the couch
16  in a reposed position; correct?
17      A   I would say he was -- he was in a
18  defensive position in a deep corner of a room when
19  we entered and ambushed us, yeah.  I would say --
20  he shot at us 18 times.
21      Q   Okay.  So you think that there's a
22  potential that he might have been awake at the
23  time?
24      A   I would say -- I would -- from what I
25  can gather, after watching that, absolutely.  I

76

1  think it was an ambush.
2      Q   Okay.  And so walk me through your --
3  your thought process on that a little bit more.
4      A   The minute Officer Kubla went through
5  that door, he started taking rounds immediately.
6  That gun was pointed directly at him.  There's --
7  I mean, you can see the muzzle flash.
8      Q   Had --
9      A   Anybody that's in a dead sleep -- and
10  I -- I mean, I've -- I've never been in this.  But
11  anybody that's startled in a -- or comes out of --
12  awake from a dead sleep and can shoot like that
13  and place rounds like that that fast, they're one
14  hell of a marksman.
15      Q   Have you watched -- have you watched
16  the -- have you watched the videos from the other
17  angles?
18      A   I've watched a couple.
19      Q   Which other videos have you watched?
20      A   I think I've seen Kubla's.  I saw
21  Alex -- Sergeant Gonzalez's, and I think I saw
22  Officer Clements' -- sorry.  No.
23      Q   Okay.
24        MR. ANDERSON:  And Rothenburg; right?
25        THE WITNESS:  Yes, and Roth.

77

1  BY MS. MURPHY:
2      Q   Okay.
3      A   Yes, I'm sorry.  James.
4      Q   Okay.
5      A   He's a sergeant too, as well, now.
6      Q   Right.  And so, listen, this is my only
7  chance to speak to you until we go to trial, and I
8  really do want to understand what you're going to
9  go -- what you're going to -- what your intention
10  is, if the case goes to trial, what you're going
11  to say.  And so I want to be really clear.
12        Is it your testimony, as we sit here
13  today, that you think that Mr. Williams was awake
14  at the time that knock and announce was made?
15        MR. ANDERSON:  Objection.  Form.
16        Go ahead and answer.
17        THE WITNESS:  I don't know if the man
18  was awake or not.
19  BY MS. MURPHY:
20      Q   Okay.
21      A   But you said he was sleeping.
22      Q   Correct.
23      A   I'm just answering it, like, how do we
24  know he was sleeping?
25      Q   Okay.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

1    A   Because of where he was positioned at in
2  that corner and the time it -- those rounds
3  started firing off as we made entry, that was
4  pretty fast.  That guy was there -- that guy was
5  actively shooting at us.  He was there to kill us.
6    Q   Okay.  And do you think that there's any
7  possibility -- but you -- okay.  So there's the
8  possibility he was either awake or asleep.
9        Being either awake or asleep, do you
10 think that he had sufficient -- was there any
11 indication before the door was -- was -- before
12 the door was rammed open that he was going to
13 refuse admittance to the officers?
14   A   We gave a reasonable -- a reasonable
15 amount of time to serve the search warrant.
16   Q   Okay.
17   A   That's a 650-square-foot apartment, one
18 bedroom.  He was right there in that front
19 bedroom.  He never announced or said, "Hey, I'm
20 coming to the door."
21   Q   Do you think that that was his duty, to
22 say "I'm coming to the door"?
23   A   I wouldn't say it's his duty, but most
24 people -- I've seen it happen before, that most
25 people said, yeah, I'm to the -- I mean --

79

1    Q   Okay.
2    A   I mean, that's unless you have something
3  to hide or you're, you know, setting something up.
4  Then obviously you wouldn't.  I mean --
5    Q   And so I'm going to go back to my
6  earlier question, because I just want to clarify
7  this one more time.
8        Before the door -- while the door was
9  closed, other than Mr. Williams saying, "Hey, I'm
10 coming to the door," did he provide any indication
11 to any of you or the other officers outside that
12 he was going to refuse admittance?
13   A   Refuse admittance?
14   Q   Yes.
15   A   I didn't hear him say anything, no.
16   Q   Okay.  And so we talked a little bit
17 about what the reasonable amount of time is.  And
18 as we sit here today, my understanding is that you
19 don't -- based on your training, your experience,
20 you don't think that there's, like, a guideline
21 for a number of seconds or anything like that;
22 correct?
23   A   I've never seen anything that's a
24 guideline that says that there's a certain amount
25 of time.

80

1    Q   Okay.  Do you think that -- we talked
2  about it a little bit before, but I want to, kind
3  of, grind into it a little bit more.
4        One of the issues that you talked about
5  in terms of reasonability of time was what the
6  search warrant was seeking; correct?
7    A   We were going after a murderer.
8    Q   You were -- and, sorry.  And in this
9  case, I just want to clarify.  I understand your
10 comment, but sometimes it comes out a little bit
11 different on paper.
12       That part of your assessment of what a
13 reasonable time was, because you were going after
14 a murderer; correct?
15   A   The totality of the circumstances, the
16 size of the structure.
17   Q   Okay.
18   A   Right?  The -- knowing that there are
19 gang members in there.  Knowing that the
20 stepmother said it's a narcotics flophouse.
21 Knowing that they're heavily armed, that they've
22 been -- they've recovered firearms previously from
23 them on previous stops, knowing all of that.
24   Q   Okay.  And so, Russ, I'm going to
25 represent to you that there's some case law out

81

1  there that indicates that a reasonable amount of
2  time can also be based on what the search warrant
3  is seeking.  And so, for example -- and I'll read
4  you an excerpt from a -- from a -- from a case.
5        "After 15 to 20 seconds without a
6  response, officers could fairly have suspected
7  that Banks would flush away the cocaine if they
8  remained reticent."  And for the record, that's
9  from page one -- that's case law cited from
10 page 133 of the CIRT report.
11       And so one of the issues that it talked
12 about in the CIRT report was a reasonable amount
13 of time is also predicated on what type of
14 evidence they're going after.  So a reasonable
15 amount of time will be lesser for something that
16 could -- like cocaine, that can be flushed away in
17 a toilet, or otherwise destroyed.
18   A   Correct.
19   Q   Is that consistent with your knowledge,
20 or am I telling you something new?
21   A   That's consistent.
22   Q   Okay.  Because you were -- you were on
23 units before where you were going for narcotics;
24 correct?
25   A   Yes, ma'am, that's correct.  I worked

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1   there for five years.
2       Q   Yeah.  And so you're aware that somebody
3   can run to the bathroom and dump cocaine in the
4   toilet and flush it?
5       A   I've seen all kinds of crazy things,
6   yes.
7       Q   All right.
8       A   I've seen that, actually, yes.
9       Q   Okay.
10      A   I've seen run somebody to the back
11  bathroom.
12      Q   Okay.  But to confirm, in this case,
13  although you had said that part of the totality of
14  circumstances was that you believed that you were
15  also going after a murderer, there was no evidence
16  on that search warrant that could have been
17  destroyed; correct?  The gun can't be destroyed.
18  The cell phone can't be destroyed.  So there were
19  no concerns like that; correct?
20      A   No, there was not.
21      Q   Okay.  And the totality of the
22  circumstances and the reasonableness of the amount
23  of time goes back to the elements that you listed
24  earlier; correct?
25      A   Right.  The size of the structure, the

83

1   propensity for violence, the violent individuals
2   being inside, yes, all of that stuff.
3       Q   Prior to this search warrant, had you
4   received any training about what elements you had
5   to comply with under both U.S. and Nevada law for
6   a proper knock-and-announce entry?
7       A   Proper knock-and-announce entry?
8   Specific training?  I would have to refer back to
9   my training record.  I know the -- I know that
10  with the -- how that goes.  But official training,
11  I think there was training in SWAT.  I don't know
12  if it was before this incident, but I know we had
13  some training afterwards.
14      Q   What was the subsequent training you
15  had?
16      A   The subsequent training was -- it went
17  over the CETs, the surround and call-outs, the
18  announcements, all of that stuff.
19      Q   And how do they go over it?  Can you
20  give me a little more --
21      A   Just went over it on a PowerPoint.
22      Q   And what did the PowerPoint -- what
23  information did the PowerPoints contain?
24      A   Captain Cole went over it after he came
25  back from NTOA.

84

1       Q   What's NTOA?
2       A   National Tactical Officers Association.
3       Q   And how soon after this incident did
4   Captain Cole come back and give training on CET?
5       A   He went to a conference, and I don't
6   know the exact date.  I was out of work.  I don't
7   know.
8       Q   You don't have to give me exact date.
9   If you can give me a time frame, to the best of
10  your knowledge, like within --
11      A   I don't -- I don't have the specific
12  time he went.
13      Q   If I said within a month or two --
14      A   I don't know.
15      Q   Okay.
16      A   I was off work.
17      Q   So -- so if you were off work, then it
18  was within that four months; correct?
19      A   Or maybe it was directly right after he
20  went, and then he put it on.  I -- I don't
21  remember.
22      Q   That's okay.
23      A   Yes.
24      Q   Were -- were you part of that -- did you
25  participate in that, or did you hear about it

85

1   after?
2       A   The whole team was there.  We
3   participated in part of it.  Yeah, I think --
4   yeah, I sat through some of it.
5       Q   To the best of your memory, was there
6   any new information that was relayed about CETs or
7   knock and announces during Capital Cole's
8   presentation?
9       A   I don't -- no, I don't think so.
10      Q   Okay.  Then so what was the purpose --
11  to your understanding, what was the purpose of the
12  presentation?
13      A   It was just to refresh everybody.
14      Q   Okay.  Was there any discussion about
15  a -- what a reasonable amount of time constitutes?
16      A   I don't recall.
17      Q   Okay.  Was there any discussion about
18  when a CET can be used -- or C-E-T can be used?
19      A   A CET?  There was discussions --
20  discussions about the CET and why we used the
21  tactic, but it's still the same stuff that we've
22  talked about.
23      Q   Okay.  And so obviously -- I mean, my
24  next question is, what was your training about CET
25  before this incident?

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86

1    A    The training before, you know, was -- it
2  was all about notifying our presence out front,
3  verbalizing everybody in the stack, you know,
4  that's out in front of the structure.  In training
5  it was, you know, prior to making entry, everybody
6  would verbalize very loudly, "Police department,
7  search warrant" so that way the occupants inside
8  would know, and also it would let the surrounding
9  citizens know as well.
10   Q    Okay.
11   A    And to that point, CET also protects not
12 only people inside a residence, but it could also
13 protect citizens in -- in other -- other places
14 too, as well.
15   Q    Okay.  And so do you think that there
16 was any possibility that Mr. Williams could have
17 been confused by the distracts and not been aware
18 that it was police officers coming through the
19 door?
20       MR. ANDERSON:  Objection.  Form.
21       THE WITNESS:  I -- I wasn't -- I
22 don't -- I don't know what the man thought.
23 BY MS. MURPHY:
24   Q    Okay.
25   A    I couldn't tell you if he was -- I don't

87

1  know.
2    Q    Okay.  So then it goes both ways.  You
3  don't know if he was intending to murder police
4  officers; correct?
5    A    What I saw is, he was shooting at me.
6    Q    Okay.  But I -- and that's fair.  So let
7  me ask it a little bit differently.
8        There was no indication -- he never gave
9  you --
10   A    I wouldn't say he was trying to shoot
11 me.  I'm sorry.  He was trying to kill me --
12   Q    Okay.
13   A    -- straight up.
14   Q    Okay.  But as we sit here today, do you
15 have any knowledge -- can you identify or say
16 anything that he was aware that you were a police
17 officer?
18   A    Can he say?
19   Q    Could he -- sorry.  Let me ask the
20 question a little bit better.  I know I'm skipping
21 over my words a little bit.
22       What you -- what you have testified to
23 up to this point in time was that your feeling --
24 and I don't mean like that pejoratively.  I'm
25 really saying, like, your thought, your feeling --

88

1    A    When you asked me my opinion --
2    Q    Yes, was that he was trying to kill you
3  and your team members; correct?
4    A    That was my opinion, yes.
5    Q    Yes.
6        And so my question is, as we sit here
7  today, are you able to give me any information
8  that would indicate that Mr. Williams was aware
9  that you were police officers at the time of that
10 shooting?
11   A    We gave him the announcements on the
12 bullhorn.
13   Q    While also detonating distracts;
14 correct?
15   A    Well, the announcements were made prior
16 to the distracts going off, some of them.
17   Q    One announcement was made; correct?
18   A    I would have -- you would have to put
19 back and -- and if you're going to be specific,
20 you know, and how many exact announcements were
21 made, but there were a lot of announcements being
22 made.
23   Q    Okay.  And I'm going to -- I'm going to
24 cite to your -- your statement that you made, the
25 recorded statement.

89

1        And so you were reading from your
2  statement on page 35, Bates LVMPD802.  This is
3  from your statement, open quote, "The combination
4  of these effects produce a psychological or
5  sensory overload that can temporarily stun an
6  individual," close quote.
7        What does stun -- to your understanding,
8  what does stun mean?
9    A    Stun -- having been around these
10 distracts in training, there's a lot of
11 overpressure from the distract itself.  The light
12 itself, if you look at the distract, will cause
13 you to look away.  That would be -- most people
14 would be stunned from that.  And that's also part
15 of the manufacturer -- it comes from the
16 manufacturer that it's a -- it's called a stun
17 stick.  It's for a stun.
18       It's to disorientate somebody.  To get
19 them to stop what they're doing, to temporarily
20 disorientate them, and then actually safely take
21 them into custody and get them to stop doing
22 whatever they're trying to do -- like, whatever
23 violent type of thing they're trying to do while
24 you're deploying it.
25   Q    It can also confuse them; correct?



Russell Backman    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90

1    A    Very temporarily.
2    Q    Okay.  And what's your definition of
3  "very temporarily"?  I know it's hard to quantify
4  these amounts, but I have to ask you --
5    A    Each -- each person is different.
6    Q    Right.
7    A    And I would say I can't really put a
8  specific time on that, because what would affect
9  me would affect you differently or it would affect
10  anybody in this room differently.
11        A second, half second, you know, two
12  seconds.  It's just -- everybody -- it's -- it's
13  to temporarily disorientate somebody,
14  temporarily -- it's -- I don't have a set time I
15  can give you.
16    Q    Okay.  In this case, it would be fair to
17  say that this did not cause Mr. Williams to become
18  compliant; correct?
19    A    I would say that he was not compliant.
20  He was shooting at us after they went off.  He
21  shot at us 18 times.
22    Q    And do you think that being stunned
23  could interfere with somebody's ability to
24  understand that it was police coming through the
25  door?

91

1    A    Prior to that, we gave him announcements
2  that we were the police; we were serving a search
3  warrant.  Could it?  I mean, I -- we won't know
4  because -- I don't know.
5    Q    So my question was a little bit
6  different, though.  It was "could it."  Could
7  it -- could being stunned prevent somebody from
8  understanding that it's the police coming through
9  the door?
10    A    It's a possibility, yeah.  It could,
11  yeah.
12    Q    Okay.  All right.  All right.  And so,
13  Russ, I'm going to -- I'm going to skip around a
14  little bit, but I'm going to read some of the
15  conclusions in the CIRT report --
16    A    Okay.
17    Q    -- and I'm going to ask your opinion on
18  them.
19        And just to clarify, you read -- we
20  discussed at the very beginning of the deposition,
21  you did read the -- read most of the CIRT report;
22  correct?
23    A    Yes, ma'am, that's correct.
24    Q    Yeah.  And I'm assuming -- you tell me
25  if I'm right or wrong.  It's a thick report, and

92

1  it's hard to get through.
2    A    It is quite long, yes, it is.
3    Q    Yeah.  But you probably read the -- all
4  the conclusions.  Is that fair to say?
5    A    It's fair to say, yes.  Yes, ma'am.
6    Q    Okay.  All right.  So I'm going to read
7  to you the part -- it's the 3.6, and it's page
8  215.
9    A    Okay.
10    Q    CIRT concluded, "While the SWAT section
11  manual contained verbiage allowing for SWAT
12  operators to conduct a CET for property when there
13  is a threat of an armed and dangerous subject, it
14  was not appropriate, given the amount of unknowns
15  associated with Apartment 1125.  There were
16  numerous amounts of unknown factors, to include
17  who was actually staying in the apartment and if
18  there were children, elderly, or vulnerable
19  individuals present inside the apartment.
20        "SWAT's decision to serve the 3050 South
21  Nellis Boulevard search warrant as a CET was a
22  policy/training failure and not within the
23  standardized LVMPD tactics training and policy,"
24  end quote.
25        And so, Russ, I want to ask you about a

93

1  couple of things.  We talked earlier in the
2  deposition about some of the unknowns.  And what
3  you had indicated to me was that your memory was
4  that the recon had ruled out that there was no
5  children, no elderly, no vulnerable.  And, in
6  fact, based on the CIRT report, they had not ruled
7  any of those things out.
8    A    I would say on the recon, they didn't
9  see a kid's toy out front; being a small bike, a
10  tricycle, a Big Wheel, something like that, or any
11  toys -- any children's toys on the patio or
12  anything like that that would indicate that there
13  were children there.  That's what the recon
14  brought back.
15    Q    Okay.  In terms of elderly or vulnerable
16  individuals, they had also not ruled those out
17  either; correct?
18    A    Well, you could say that would be more
19  on the investigative side on whether that was
20  ruled out or not, not on the SWAT section, on the
21  recon guys.
22    Q    Okay.  And then also who was actually
23  staying in the apartment, there was no knowledge
24  of who was actually staying there; correct?
25    A    Except for the statement that the

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1  homicide detectives got in reference -- Rembert's
2  stepmother saying that's where he lived.
3      Q    And hadn't she said that he had stayed
4  there months earlier, and she wasn't sure where he
5  was now?
6      A    If that's what it says in the search
7  warrant.
8      Q    Okay. Not in the -- okay.
9          And then what's your opinion where it
10 concludes that this was a policy training failure
11 and not within standardized LVMPD tactics?
12     A    Well, and that's obviously the SMEs, and
13 I don't know who they were or how they drew all of
14 their conclusions to those certain factors that
15 you just pointed out.
16         I would say everybody has an opinion.
17 Right?
18     Q    I think I know where you're going with
19 the rest of that statement, but let's keep it
20 clean for the transcript.
21     A    You know, in -- looking at this as an
22 opinion, were we within policy of the section at
23 the time of the section? Everything that I did
24 that I relayed to my boss was within section
25 policy, yes.

95

1      Q    Okay. All right.
2      A    I did -- and I relayed everything to
3  her, the information that I had, and said, "Hey,
4  this is what we have and this is where -- this is
5  the tactic that we want to use," and she approved
6  it.
7          Was that within -- without being in
8  standards of LVMPD policy? I don't -- that's --
9  that's the question -- that's a million-dollar
10 question there. I mean, that's very, very
11 debatable there.
12     Q    Okay.
13     A    I mean, different people are going to
14 have different -- you know, different viewpoints.
15 And I would say it's the -- we'll use the word
16 viewpoints.
17         But my -- my viewpoint on this is, we
18 can always get better. And there's some things
19 that you can -- you always learn from any incident
20 that you're a part of or on. And we could have
21 sent the recon team back out again. They could
22 have said, "Hey we did this and" -- you know, that
23 could have happened again, stuff like that.
24         So, I mean, there are some things that
25 could be done better, yes. There's some things --

96

1  I mean, and that's looking at it now after the
2  fact. That's not knowing, you know, after this
3  had happened before.
4      Q    And so my --
5      A    As far as the brass wrap door, I mean,
6  there's other stuff too, you know.
7      Q    What's the other stuff?
8      A    That's -- that's it. You know, the
9  brass wrap door, knowing that.
10     Q    And so part of my -- my -- part of my
11 understanding about what you've just said is that
12 you kind of -- if we're going to call this, like,
13 a -- to use a simple analogy, this whole thing is
14 a pie. Right?
15     A    Right.
16     Q    And you're saying, hey, for my slice of
17 the pie, I operated within policy and procedure.
18 Is that fair to say?
19     A    I did the best I could with all of the
20 facts that I had.
21     Q    Okay. And I'm going to read you another
22 conclusion, and it's 3.8 from page 216. Open
23 quote, "Under the conditions present here, six
24 seconds was insufficient time to allow occupants
25 time to answer the door, let alone submit to a

97

1  search," end quote.
2          Having -- you have extensive experience
3  working for LVMPD. Although this was the first
4  time you had done a CET, I think that you
5  testified earlier that you have served search
6  warrants and other -- you know, in other areas and
7  other units.
8          Do you agree or disagree that six
9  seconds was insufficient to allow time -- to allow
10 sufficient time for an occupant to answer the
11 door?
12     A    That structure was a one-bedroom,
13 one-bath apartment, a narcotics flophouse where
14 people are up 24/7. From my experience --
15     Q    And --
16     A    -- of being narcotics, dealers, gang
17 members, six seconds, knowing now how -- how this
18 transpired, that was a -- we did what we could
19 under a reasonable amount of time, and there's no
20 set time. It's what's objectively reasonable at
21 that time with the facts that you have.
22         So I don't -- whoever came up with that,
23 is that -- was that an SME? Or where did that
24 come from?
25     Q    That -- and I'm happy to show it to you

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1  too. It's -- give me one second. Let me pull up
2  the -- it's conclusion --
3      A    Because that seems like an opinion-based
4  thing as well. Right?
5      Q    Give me one second.
6          CIRT and SMEs. So it was both CIRT and
7  SMEs that concluded that.
8      A    Okay.
9      Q    Okay. And that's from Section 3.8, and
10  it cites case law as well. I'm happy to let
11  you --
12      A    Okay. I understand what you're saying.
13      Q    Trust me, I'm not trying to misrepresent
14  anything to you.
15      A    Right. Yeah.
16      Q    All right. And so if understand your --
17  sometimes I like to read -- like I explained to
18  you before, I like to read and write things,
19  because I want to make sure I really understand
20  them.
21          As we sit here today, it's your position
22  that six seconds was -- based on the totality of
23  circumstances, including the size of the
24  apartment, that six seconds was sufficient time to
25  allow him to -- to allow whomever inside the

99

1  apartment to let you guys gain access
2  nonforcefully? I don't know if that's the right
3  term.
4      A    Six -- we went inside the door at 15
5  seconds. The six seconds -- and you're asking an
6  opinion-based question.
7      Q    Uh-huh.
8      A    Could it have been reasonable for what
9  the person saw there at the time when they did
10  that? Knowing that there was a -- we're going
11  after a murderer and a murder suspect and they're
12  heavily armed, it could be reasonable, yeah.
13      Q    Okay. And then conclusion three -- part
14  of Conclusion 3.9, open quote, "Officers
15  immediately lost the elements of a CET, of
16  utilizing speed to surprise and overwhelm the
17  subject per their manual by being stuck at the
18  door and hitting it multiple times prior to
19  entering the residence," close quote.
20          And we talked about that a little bit
21  before. And as we sit here today, you agree with
22  that, don't you?
23      A    Well, that's an opinion from an SME.
24  Right? A viewpoint, you would say.
25      Q    Correct.

100

1      A    That is a call that's not -- that is a
2  call that you make at the time while you're there.
3  And the point I would make is, okay, there's been
4  one hit on the door with the ram. Is it flexing?
5  Is -- are they getting flexion? Does it look like
6  it's going to get ready to get open? Do you -- do
7  you understand what I'm saying?
8      Q    I do understand.
9          And based on the video, I don't think it
10  was flexing.
11      A    Okay. That was -- that was my video.
12      Q    Right.
13      A    That I watched, I didn't see that.
14      Q    Okay.
15      A    Fair?
16      Q    Yeah, no, no, no. Fair.
17          I'm telling you, from my point of view,
18  I didn't see that it looked like --
19      A    The guys up front would make that call.
20      Q    Okay. And so -- okay. So then -- so
21  then is it your position that the guys that are
22  really right at the door, you would rely on them
23  to call the tactical?
24      A    Absolutely.
25      Q    Okay.

101

1      A    You've got to rely on your people to do
2  their jobs.
3      Q    Okay. And so going back to the
4  statement itself, though, do you agree or disagree
5  that you lost the elements of the CET by not doing
6  an immediate breach?
7      A    Any time that you have an immediate
8  breach, you're obviously going to have the element
9  of speed, surprise, and overwhelming action on
10  your side when it's -- when it's -- when it comes
11  open with one hand. It was delayed.
12      Q    And, Russ, based on -- having read
13  your -- the statement that you gave as part of
14  this, one of the issues -- and you -- you read
15  your statement recently.
16      A    Yeah.
17      Q    That you thought -- looking back on it
18  now, one of the things that you would have changed
19  is you thought this should have been an explosive
20  entry; correct? I'm telling you what you gave --
21  what statement you gave in your -- in your -- in
22  your recorded statement.
23      A    With a brass-wrapped door with a tactic
24  like that, knowing -- if we would have known that
25  there was a brass wrap on that door, that would

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1  have been definitely an option for a better tactic
2  and a safer tactic for us. And also for the
3  people there, to get that door down without
4  having -- putting officers up front of it in
5  harm's way, knowing that there's automatic weapons
6  inside that residence with the possibility -- and
7  we're going after a murder suspect too, you know.
8      So, yes, a brass wrap on that door
9  would -- there -- a better tactic would be to
10 utilize an explosive breach on that, after the
11 fact, knowing this now.
12     Q   Right. And so in your -- in your
13 recorded statement, you said -- and I'm not trying
14 to -- one of the statements, the most
15 explosive -- when they asked you, "What you would
16 do differently?" and your response was -- part of
17 it was, "Explosive breach is the main one."
18     A   That's one of the things -- and I guess
19 I was answering that from an after-the-fact
20 tactical spot of what I knew then and with the
21 door having the brass wrap, after the fact.
22     Q   Okay. And -- okay. And I -- if I've
23 already asked this, you're going to have to --
24 you're going to have to excuse me. I'm going to
25 ask it one more time.

103

1      Do you think that a tactical ought to
2  have been called?
3      A   Ought to have been called?
4      Q   Yes.
5      A   In this situation?
6      Q   Yes.
7      A   It could have been. But the guys up
8  front that saw it didn't make the tactical call.
9  I was at the back, so I couldn't see what they
10 were seeing. So for me to sit here and say -- to
11 give it what they saw and what -- I can't say --
12 yeah, five hits is a lot, because there's a lot of
13 time on target.
14     However, I was -- they were trusted by
15 Sergeant Findley, because he was the team leader
16 at the time, that, hey, we're going to -- he --
17 he's trusting them to make the call up front.
18 Different SMEs, different peoples of opinion will
19 probably say, yeah, that's a lot of time on
20 target. That's a lot of time up front.
21     Other people would say, hey, no. We
22 were there. We saw the door. We saw we were
23 getting -- we were making headway, and they --
24 they saw the door flexing, and they knew that it
25 would come open.

104

1      It's -- it's all based on the person's
2  thought and what they thought at the time and what
3  they knew at the time based on what they saw at
4  that time, which I didn't see.
5      Q   Okay. The other thing that you said in
6  terms of when -- during your recorded statement,
7  the things that you thought they should do
8  differently, is you thought this should have been
9  a no-knock search warrant; is that correct?
10     A   Yes, ma'am, that's correct.
11     Q   Okay. Could -- could this type of
12 property-only search warrant have been approved
13 for a no-knock warrant?
14     A   Well, I'll back up on that.
15     Q   You tell me -- like I said, other than
16 trial, this is my only opportunity to talk to you.
17 So you tell me exactly what you think and what
18 your opinions are, because I want to know.
19     A   Opinions of the case, I would say that
20 the gang unit had probable cause for a shooting
21 with Mr. Rembert, and he was a shooter, which
22 would take that and actually be a -- that's a
23 felony, shoot -- you know, shooting at somebody.
24 You know, there's a victim, whether it's, you
25 know, assault with a deadly weapon, shooting at --

105

1  you know, we could go on and on and on.
2      Q   Okay.
3      A   So that would -- that could have changed
4  some things with the case, knowing the
5  relationship of the violent individuals in there,
6  that we're also investigating a murderer, there's
7  an outstanding murder weapon, that they have a
8  high propensity of violence, and they're gang
9  members, you know, on a drive-by recon that there
10 was a brass wrap door on some stuff, yeah,
11 absolutely, this could have been -- you know, this
12 could have been a possibility on the investigative
13 side, not on the SWAT side.
14     Q   To do a no-knock -- to do a no-knock --
15     A   They would have drafted that. We don't
16 do that. That's -- that's -- that's -- that's on
17 the investigative end.
18     Q   Do you think that they ought to have
19 done that?
20     A   Do I think they ought to have?
21     Q   Yeah.
22     A   I don't have all of the facts --
23     Q   Okay.
24     A   -- pursuant to everything as far as the
25 investigative side, because I wasn't there. I'm

LEXITAS

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

106

1  saying it could have been an option.
2      Q   Okay.  So -- but as we sit here today,
3  based on the type of search warrant that this was,
4  it -- and I -- maybe you said it to me, and I just
5  don't understand.
6          Based on the type of search warrant, is
7  it your understanding that they could have
8  obtained a no-knock warrant?
9      A   They -- you would -- I would -- you
10  would have to ask the investigative detail on
11  that, specifically on what they had --
12      Q   Okay.
13      A   -- and all of the facts.  Because, like
14  I said, I don't know all of their facts on what
15  crimes and -- and all the details of all of the
16  actual specifics on that -- you know, on that
17  part.  I do -- you know, and even on the murder
18  part, you know.  There's -- there's probably some
19  facts there that could have been articulated as
20  well.
21      Q   And then also from 3.9 on page 220, open
22  quote, "CET only to be utilized when a no-knock
23  search warrant is approved by the LVMPD and has
24  judicial preapproval," close quote.
25          As we sit here today, is it your

107

1  understanding that the policy at LVMPD has been
2  altered so that a CET can only be utilized when --
3  when executing a no-knock warrant?
4      A   Yes.
5      Q   All right.  And so if this same search
6  warrant were to be executed today, it would be a
7  surround and call-out; correct?
8      A   Yes.
9      Q   And then from the conclusion, 5.5, page
10  218, "CIRT and SMEs concluded Lieutenant O'Daniel
11  did not use proper discretion when she approved
12  the use of a stun stick through the west-facing
13  window."  Portion omitted.  "Lieutenant O'Daniel's
14  management of tactics for the requested approval
15  of tactics and tools, as the tactical commander,
16  was not within standardized LVMPD tactics training
17  and policy."
18          And, Russ, I understand that you may not
19  want to comment on whether or not Lieutenant
20  O'Daniel did her job correctly.
21          But do you have any position on that
22  statement?
23      A   Position as far as what?
24      Q   Opinion on it.
25      A   Opinion.  Viewpoint/opinion.

108

1      Q   Correct.
2      A   I think Lieutenant O'Daniel got the
3  facts relayed to her, and I thought she made the
4  decision based off of what she knew at the time.
5  And I -- I think that she did her job and the --
6  that's obviously a very opinionated question
7  coming from somebody on there as far as SME.
8          Am I correct on that?
9      Q   Yeah, it's from the -- it's from the
10  CIRT conclusion, so I think it's certain --
11          (Indiscernible crosstalk.)
12      A   Yeah, you would have to ask more
13  in-depth of Lieutenant O'Daniel of what she
14  thought and why she -- why she, you know, did what
15  she did with that and made -- made the calls that
16  she made.  I can't give you an exact explanation
17  of what she thought and what she knew at the
18  time -- you know, what her thought was.
19      Q   Okay.  And then I will -- from Section
20  5.5, "Captain Cole and Lieutenant O'Daniel's
21  approval of homicide IAP and search warrant for
22  the use of SWAT service was not within
23  standardized LVMPD tactics training and policy."
24          Do you have any position or opinion on
25  that?

109

1      A   You would have to refer to what they did
2  and -- what they did at the time.  They made the
3  decisions that they made because they were in
4  those positions, about information that they were
5  given, either through the affiant or through the
6  affiant supervision or the case agent from
7  homicide.
8          So I don't know exactly, you know, how
9  they came to that conclusion or what all the facts
10  are.  I don't know on that one.
11      Q   Okay.  And as we sit here today, have
12  you come to learn anything about Mr. Williams
13  since this incident?
14      A   Learned anything about Mr. Williams
15  since this incident?
16      Q   Let me ask a -- a better predicate
17  question.
18          As we sit here today, you probably
19  assumed that that was either Wattsel or -- is it
20  Corvel?
21      A   Fisher.
22      Q   -- Fisher at the time that you were
23  executing the search warrant; correct?
24      A   Yeah.
25      Q   If you even had that thought.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1       Did you?
2    A    I thought -- yeah, I thought that was --
3    Q    Okay.
4    A    You're getting shot at when you roll
5  into a room. I mean, yeah.
6    Q    And so as we sit here today, you
7  understand that it was actually Isaiah Williams,
8  not either of the two murder suspects?
9    A    After the fact, yes.
10   Q    Okay. Other than understanding that he
11  was neither -- he was not one of the two murder
12  suspects, do you know anything else about
13  Mr. Williams, as we sit here today?
14   A    I know that he had a mother. I feel bad
15  for her, the family. Yeah. I mean, he's got --
16  he's -- I mean, there's a mother involved here
17  that doesn't have her son.
18   Q    Yeah.
19   A    But we're all alive as well.
20   Q    Aside from Mr. Williams having a mother,
21  do you know anything else about Mr. Williams?
22   A    I've seen a picture of him, you know, I
23  had -- after the fact. I knew nothing about him
24  though.
25   Q    Okay. And as we sit here today, in

111

1  fact, having gone to execute this search warrant,
2  none of the items that were being sought in that
3  search warrant were actually present in the unit;
4  correct?
5    A    You would have to ask the homicide
6  detectives that did the search warrant. I don't
7  know what --
8    Q    You have no knowledge about whether or
9  not they recovered anything?
10   A    I don't have firsthand knowledge of what
11  they recovered right now, no.
12   Q    Okay. So -- okay. Okay. You do have
13  firsthand knowledge that neither of the two murder
14  suspects were within the unit; correct? The
15  apartment unit.
16   A    Obviously, yeah.
17   Q    Okay. As we sit here today, would you
18  qualify the execution of this -- this warrant,
19  would you qualify it as a -- as a success or a
20  failure?
21       MR. ANDERSON: Objection. Form.
22       Go ahead.
23       THE WITNESS: There's a human life
24  here. What's successful about that, a mother that
25  doesn't have her kid? That's an absolute failure.

112

1       The success is, I'm sitting here today
2  to be able to tell you about it, because I came
3  out alive. Because I got shot at numerous times
4  by that man. My kid still has a dad. Those other
5  cops that I was in that room with, my partners, my
6  teammates are still alive, who are all dads. And
7  they're able to go home to their kids.
8       That's a success there. Because we're
9  still alive. He chose that. He made that happen
10  as a failure. He shot at us. That failure is
11  him. He failed us. He shot at us 18 times.
12  BY MS. MURPHY:
13   Q    Okay. Other than the items that we have
14  already discussed, whether it is using the -- an
15  explosive breach, having a no-knock warrant, is
16  there anything else that you would have done -- in
17  hindsight, that you would have done differently?
18   A    Prayed more for that kid not to be there
19  and shot at us.
20   Q    Okay. That's fair. If that's your
21  answer, that's your answer.
22   A    Yeah, I wish that kid wouldn't have been
23  in there and shot at us. If he wouldn't have shot
24  at us, this wouldn't have happened.
25   Q    Yeah. All right. I'm just going to go

113

1  through -- I think I might -- oh, the other thing
2  I wanted to ask you about is -- and we have -- you
3  know, we need to cover it, Russ, is that you had
4  not attended SWAT school; correct?
5    A    Correct.
6    Q    Okay. And can you -- as we sit here
7  today, did you ever attend SWAT school?
8    A    After the fact, yes.
9    Q    Okay. And did you have to attend that
10  before you went back on SWAT?
11   A    Yeah. I attended it right when I came
12  off administrative leave.
13   Q    Okay. And can you kind of walk me
14  through why you didn't -- why you had not attended
15  SWAT at the time of this -- SWAT school, sorry, at
16  the time of this incident?
17   A    That would -- that was Lieutenant
18  O'Daniel. They run a -- at that time, how the
19  training section worked -- and this is -- this was
20  at that time -- what was revealed to me by her was
21  we run the SWAT school every March, and it was a
22  timing thing.
23       Because according to what
24  Lieutenant O'Daniel explained to me -- because I
25  even asked her -- was it was because it's

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1  labor-intensive. There's a lot of bodies. It
2  takes -- it's a manpower-intensive school.
3  It's -- you know, it's very intense, and they did
4  it every March. And it just was the timing issue,
5  because I transferred to the unit in December.
6      Q    Why -- why did you transfer -- why did
7  you transfer in December?
8      A    Because that's when the opening was
9  there.
10     Q    Okay. Did you -- did you fill in
11 somebody else's position?
12     A    Yes.
13     Q    Okay. And had you -- I mean, had you --
14 I mean, I know that SWAT is very prestigious.
15         Had you wanted -- obviously, had you
16 wanted to join SWAT?
17     A    Of course.
18     Q    Okay. I'm going to ask you -- I'm going
19 to -- I think I've covered almost everything. I
20 just wanted to ask you about some of the stuff in
21 your discovery responses.
22         Did you -- for -- in preparation for
23 today's deposition, did you go over -- let me show
24 it to you too. We call them interrogatories and
25 requests for production.

115

1      A    Yes, I've seen that.
2      Q    Okay. All right. And I'm going to ask
3  you about the citizen complaints. I'm just going
4  to allow you a little bit more time and space
5  to -- you've outlined them in response to Request
6  for Production Number 17, which asks, "Produce a
7  copy of all citizen complaints regarding the
8  defendant" -- that's you -- "to which these
9  requests were -- were directed."
10         And so I have -- one, two, three,
11 four -- I have four citizen complaints.
12         Do you remember all of these, or did you
13 want this to refresh your recollection?
14     A    I might need to look at that to
15 refresh --
16     Q    Part of it is highlighted on the second
17 page.
18     A    Okay.
19     Q    I'll just hand you those right now.
20 Sorry, that's the first page. You just flip them.
21 That's the page before. No, no, no. Sorry.
22     A    You got two of them here. You said
23 there's four.
24     Q    No, no, no. Sorry. There's four
25 incidents. So one, two, three, four, in response

116

1  to Request Number 17. One, two, three, four.
2      A    Okay.
3      Q    Can you kind of briefly explain those
4  different incidents for me?
5      A    Oh, yeah. Embarrassing, at least two of
6  them are.
7          I got an off-duty incident where I was
8  intoxicated and found in possession of a firearm
9  was one. That was embarrassing. And then I
10 received an off-duty DUI in 2015 while I was
11 assigned to the organized crime bureau, criminal
12 intelligence section. And that's when I was
13 returned to patrol, and I gave you that statement
14 in chronological order of my timeline in my
15 career.
16         The next one, the citizen complaint that
17 I stole money and whatnot, I'm trying to recall
18 that. The defendant was one of the officers.
19 That was the Larry Ronetti [phonetic spelling]
20 incident. I think that was -- I had nothing to do
21 with that. I don't think I was actually there for
22 that. I don't know how my name is -- but -- but
23 okay.
24         And then the property owner complained
25 about being on his property, and we -- there was

117

1  no policy violation, obviously, on that. That was
2  a patrol incident when I was a patrol sergeant
3  with one of the guys.
4      Q    Okay.
5      A    But, yeah, those -- the first two are
6  embarrassing, and I grew and learned from them.
7  And I made a mistake, but that was over almost ten
8  years ago. One of them was over ten years, and
9  the one is almost going to be ten years next
10 February.
11         MS. MURPHY: Okay. All right. Can I
12 take those back? Thank you.
13         All right. And if you can just --
14 hopefully I'm going to wrap up. Why don't we go
15 off for five minutes. I'm just going to review my
16 notes.
17         THE VIDEOGRAPHER: We are going off
18 record at 3:19 p.m.
19         (Whereupon, a recess was taken.)
20         THE VIDEOGRAPHER: We are back on
21 record at 3:24 p.m.
22 BY MS. MURPHY:
23     Q    Russ, one of the things you talked about
24 in your recorded statement was you being on the
25 stack. And they asked you if you were aware of

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

118

1  any policy that said you couldn't -- standard
2  operating procedure that you cannot be on an entry
3  team until you've completed SWAT school.
4         As we sit here today, do you have any
5  knowledge of that?
6     A   That you can't complete entry unless
7  you've completed the SWAT school?  I had no
8  knowledge of that, no.
9     Q   Okay.  And also, Russ, you talked about
10 providing some screenshots of text messages
11 between you and Lieutenant O'Daniel regarding
12 getting authorization for this -- this -- this
13 search warrant.
14        Did you ever provide those?
15    A   I believe I gave them -- oh, God, it's
16 been so long.  I believe I gave them to the CIRT
17 guys.  It would have been Roth.
18    Q   Okay.
19    A   I think I gave them to him.  I
20 thought -- I thought I did.  But I know that he --
21 it's been so long, I can't tell -- I don't -- I
22 thought I did is my answer.  Yeah.
23    Q   So, Russ, you talked about -- and quite
24 a few people have talked about it.
25        One of the reasons to use the CET was an

119

1  incident where a guy kicked through an
2  apartment -- the apartment stucco into another
3  unit.
4         Do you remember talking about that?
5     A   Can you -- refer a little bit more,
6  please?
7     Q   Sure.  I'll read you a quick quote.  And
8  it's from page 42 --
9     A   Okay.
10    Q   -- of your statement.  "I've seen it
11 even in NV.  Guys will kick through -- through the
12 apartment stucco and go into the next apartment,
13 and then we could create a potential hostage
14 situation."
15    A   Okay.
16    Q   End quote.
17    A   Okay.
18    Q   Can you explain -- several of the SWAT
19 guys have brought up that situation.
20        Can you tell me more about that?
21    A   That situation or, like, are you
22 implying, like, that we have seen that happen
23 before on previous operations?
24    Q   Yes.
25    A   So -- and I think I'm referring to the

120

1  statement when I was in major violators as a
2  detective, and I was also there as a sergeant.
3  Any time that you have a wanted, armed individual
4  that does not want to be apprehended or captured
5  that's in an apartment complex or even sometimes
6  in a condominium, where there's two different
7  types of structures -- a townhouse -- you can
8  see -- we have seen and we do know from our
9  experience, and we have seen it live, where people
10 will actually kick through an apartment wall to
11 escape and go into another apartment or dwelling.
12        And you could potentially create a
13 hostage situation with something like that,
14 because they're trying to flee.  They are armed.
15 They have a gun.  Those people don't know them.
16 You don't know what that individual's mindset is
17 going to be.
18        So that -- that -- that's a very, very,
19 very critical piece there, to ensure that you try
20 to avoid having that happen, because of those poor
21 people that are there in that other residence.
22 That's a safety issue.  Especially when you know
23 you're dealing with somebody that's got a
24 propensity for violence, that's also committed the
25 crime of murder or -- and we're looking for a

121

1  murder weapon and they're gang members, so --
2     Q   In your -- so have you seen that more
3  than one time?
4     A   Oh, yes.  I've seen somebody kick
5  through a wall more than once, yeah.
6     Q   How long does that take?
7     A   Depends on how good they are and how --
8  if they can tunnel through -- if they hit the
9  studs, they might have to kick it again.  Because
10 you know how houses are built in Las Vegas or
11 apartment homes.  You -- usually they're -- you
12 know, depending on how they frame it and, you
13 know, how the walls are built -- I can't tell you,
14 because I'm not in construction.
15        But, you know, if -- they can kick
16 through and they can tunnel through anything.  If
17 someone wants to escape bad enough, they can get
18 through -- they can create a hole and get through,
19 especially skinny guys.  They can -- they can
20 really tunnel through some stuff and -- and create
21 some serious havoc.
22    Q   And so my question was -- if you know,
23 you know; if you don't, you don't -- what's the
24 fastest you have seen somebody tunnel through --
25 kick through a wall?

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**122**

1    A    I couldn't tell you how fast it took
2    them, because I didn't know how -- I didn't -- I
3    wasn't there to see them actually do it.  But I
4    can say that they can move ratherly [sic] quick if
5    needed in order to escape and flee.
6        Q    Okay.  I wanted to ask you really
7    briefly about the second individual in the unit.
8        Do you remember there being a second
9    individual?
10   A    Yes, I do.
11   Q    And what happened with that individual?
12   A    As far as?
13   Q    Did you -- was it you who apprehended
14   him, or somebody else?
15   A    I grabbed him off the wall.
16   Q    Okay.
17   A    I apprehended him.
18   Q    And as you sit here today, do you have
19   any idea who he is?
20   A    No.
21   Q    Okay.  Russ, I don't think I have any
22   other questions.
23       Russ, having -- now we've sat here for a
24   couple of hours.  Are there any answers that you
25   have given today that you wanted to go back or

**123**

1    change or modify?
2    A    No.
3    Q    I've allowed you time to answer all of
4    my questions; correct?
5    A    Correct.
6        MS. MURPHY:  All right.
7        MR. ANDERSON:  No questions.
8        THE VIDEOGRAPHER:  Okay.  One moment.
9        This concludes the video-recorded
10   deposition of Russell Backman taken on
11   October 3rd, 2024.  We are going off the video
12   record, and the time is 3:30 p.m.
13       THE COURT REPORTER:  Counsel, do you
14   need a copy of the transcript?
15       MR. ANDERSON:  Yes, please.
16       (Whereupon, the deposition
17       concluded at 3:30 p.m.)
18       * * * * *
19
20
21
22
23
24
25

**124**

1        CERTIFICATE OF COURT REPORTER
2
STATE OF NEVADA      )
                     )  ss:
COUNTY OF CLARK      )
4
5    I, Heidi K. Konsten, Certified Court Reporter
6    licensed by the State of Nevada, do hereby certify
7    that I reported the deposition of RUSSELL BACKMAN,
8    commencing on October 3, 2024, at 1:10 p.m.
9        Prior to being deposed, the witness was duly
10   sworn by me to testify to the truth.  I thereafter
11   transcribed my said stenographic notes via
12   computer-aided transcription into written form,
13   and that the transcript is a complete, true and
14   accurate transcription and that a request was not
15   made for a review of the transcript.
16       I further certify that I am not a relative,
17   employee or independent contractor of counsel or
18   any party involved in the proceeding, nor a person
19   financially interested in the proceeding, nor do I
20   have any other relationship that may reasonably
21   cause my impartiality to be questioned.
22       IN WITNESS WHEREOF, I have set my hand in my
23   office in the County of Clark, State of Nevada,
24   this October 21, 2024.
25       _____
         Heidi K. Konsten, RPR, CCR No. 845

**125**

1        DECLARATION OF DEPONENT
2        I, RUSSELL BACKMAN, deponent herein,
3    do hereby declare under penalty of perjury that I
4    have read the within and foregoing transcription of
5    my testimony taken on October 3, 2024, at Las
6    Vegas, Nevada, and that the same is a true record
7    of the testimony given by me at the time and place
8    hereinabove set forth, with the following
9    exceptions:
10
11       ERRATA SHEET
12   PAGE  LINE   SHOULD READ:       REASON FOR CHANGE:
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____