# Exhibit D - Deposition of Sgt. Garth Findley

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 131

1                    CERTIFICATE OF REPORTER

2

3        I, Dana J. Tavaglione, a Certified Court
Reporter, licensed by the State of Nevada, do hereby
4    certify:

5        That I reported the deposition of the witness,
GARTH FINDLEY, commencing on February 5, 2025, at
6    9:05 a.m.;

7        That prior to being examined, the witness was by
me first duly sworn to testify to the truth, the
8    whole truth, and nothing but the truth; that I
thereafter transcribed my related shorthand notes
9    into typewriting and that the typewritten transcript
of said deposition is a complete, true and accurate
10   record of testimony provided by the witness at said
time.

11

12       I further certify (1) that I am not a relative
or employee of an attorney or counsel of any of the
parties, nor a relative or employee of any attorney
13   or counsel involved in said action, nor a person
financially interested in the action; and (2) that
14   pursuant to Rule 30(e), transcript review by the
witness was requested.

15

16       IN WITNESS HEREOF, I have hereunto set my hand,
in my office in the County of Clark, State of
Nevada, this 14th day of February 2025.

17

18       _Dana J. Tavaglione_

19       _____
         DANA J. TAVAGLIONE, RPR, CCR NO. 841

20

21

22

23

24

25

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1                    UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4    LATIA ALEXANDER, individually  )
     as heir of ISAIAH T. WILLIAMS  )
5    and in her capacity as Special )
     Administrator of the Estate    )
6    of ISAIAH T. WILLIAMS,         )
                                    )
7             Plaintiff,            ) CASE NO.
                                    )
8       vs.                         ) 2:24-cv-00074-APG-NJK
                                    )
9    LAS VEGAS METROPOLITAN POLICE  )
     DEPARTMENT, a political        )
10   subdivision of the State of    )
     Nevada; KERRY KUBLA, in his    )
11   individual capacity; BRICE     )
     CLEMENTS, in his individual    )
12   capacity; ALEX GONZALES, in    )
     his individual capacity;       )
13   . . . . . .                    )
     . . . . . .                    )
                                    )
14

15

16        VIDEO RECORDED DEPOSITION OF GARTH FINDLEY

17        Taken on Wednesday, February 5, 2025

18              At 9:05 a.m.

19        At the Offices of Lexitas

20        400 South Seventh Street

21            Las Vegas, Nevada

22

23

24   REPORTED BY:    DANA TAVAGLIONE, RPR, CCR 841

25              Job No. 59730, Firm No. 116F

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**Page 2**

```
1    . . . . . .
     . . . . . .
2
     RUSSELL BACKMAN, in his       )
3    individual capacity; JAMES    )
     ROTHENBURG, in his individual )
4    capacity; JAMES BERTUCCINI,   )
     in his individual capacity;   )  CASE NO.
5    MELANIE O'DANIEL, in her      )
     individual capacity; DOES     )  2:24-cv-00074-APG-NJK
6    I-XX, inclusive,              )
                                   )
7              Defendants.         )
                                   )
8
9         VIDEO RECORDED DEPOSITION OF GARTH FINDLEY
10
11            Taken on Wednesday, February 5, 2025
12                      At 9:05 a.m.
13              At the Offices of Lexitas
14                 400 South Seventh Street
15                    Las Vegas, Nevada
16
17
18
19
20
21
22
23
24   REPORTED BY:   DANA TAVAGLIONE, RPR, CCR 841
25                  Job No. 59730, Firm No. 116F
```

**Page 4**

```
1                    I N D E X
2
   WITNESS:  GARTH FINDLEY
3
   EXAMINATION                              PAGE
4
   Examination by Mr. Breeden                 6
5
6
7
8
9         E X H I B I T S
   FINDLEY/PLAINTIFF'S                      PAGE
10  1     LVMPD Special Weapons and Tactics  95
          printout, Bates No. LVMPD-001490
11
   2      Commission on Peace Officer       109
12         Standards and Training
           Performance Objective Reference
13         Material, Bates WILLIAMS-000809
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 3**

```
1    APPEARANCES:
2
   For the Plaintiff:
3
          BREEDEN & ASSOCIATES, PLLC
4         BY:  ADAM J. BREEDEN, ESQ.
          7432 West Sahara Avenue
5         Suite 101
          Las Vegas, Nevada 89117
6         702.819.7770
          adam@breedenandassociates.com
7
8  For the Defendants:
9         MARQUIS AURBACH, CHTD
          BY:  CRAIG ANDERSON, ESQ.
10        10001 Park Run Drive
          Las Vegas, Nevada 89145
11        702.382.0711
          canderson@maclaw.com
12
13  Also Present:
14        Samuel Camacho, Videographer
15
16
17
18
19
20
21
22
23
24
25
```

**Page 5**

```
1       LAS VEGAS, NEVADA; WEDNESDAY, FEBRUARY 5, 2025;
2            9:05 A.M.
3            -oOo-
4   Thereupon --
5       THE VIDEOGRAPHER:  Today is January 5th,
6   2025.  The time is approximately 9:05 a.m.  The
7   court reporter is Dana Jo Tavaglione; and I'm your
8   videographer, Samuel Camacho.  We are here on behalf
9   of Lexitas.  The witness today is Officer Garth
10  Findley, and we are here in the case of Latia
11  Alexander, et al., vs. Las Vegas Metro Police
12  Department, et al.
13       Will Counsel please state your appearances,
14  and the court reporter will administer the oath.
15       MR. BREEDEN:  This is Adam Breeden for the
16  plaintiff.
17       MR. ANDERSON:  Craig Anderson on behalf of
18  the defendants.
19
20  Thereupon --
21       GARTH FINDLEY,
22  having been first duly sworn to testify to the
23  truth, was examined and testified as follows:
24  ///
25  ///
```

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1          EXAMINATION
2    BY MR. BREEDEN:
3       Q.   Okay.  Good morning, sir.  Can you please
4    state your full name, for the record, and go ahead
5    and spell your first and last name as well.
6       A.   It's Garth Findley.  And it's G-A-R-T-H,
7    Findley, F-I-N-D-L-E-Y.
8       Q.   Okay.  Is it Officer Findley?  Sergeant
9    Findley?
10      A.   Sergeant.
11      Q.   Okay.  Sergeant Findley, on January 10th of
12   2022, you were an officer assigned to the Las Vegas
13   Metropolitan Police Department SWAT team; correct?
14      A.   Correct.
15      Q.   And on that date, you were the team leader
16   at a SWAT operation that was performed at
17   3050 South Nellis Boulevard, Apartment 1125; correct?
18      A.   Correct.
19      Q.   All right.  You agree, in your performance
20   as a law enforcement officer, you have a duty to
21   conduct yourself such that you do not violate the
22   civil rights of members of the public?
23      A.   Yes.
24      Q.   And you also agree that if you see other
25   officers violating civil rights of the public, you

7

1    have a duty to intervene?
2       A.   Yes.
3       Q.   Okay.  Have you ever given deposition
4    testimony before?
5       A.   Yes.
6       Q.   How many times?
7       A.   One time.
8       Q.   And I may as well just ask you, since
9    there's only one other time.  I'll ask you right now,
10   why -- how long ago was that?
11      A.   That was about three years ago.
12           Right?
13           MR. ANDERSON:  Yeah.
14   BY MR. BREEDEN:
15      Q.   And what kind of case was that?
16      A.   That was a search warrant that we conducted
17   for narcotics.
18      Q.   Was that the Jasmine King matter?
19      A.   Yes.
20      Q.   Okay.  All right.  Even though you've been
21   deposed before, I want to go some of the ground rules
22   to today's deposition so you know what to expect.
23   The oath that you were just administered by the court
24   reporter is the same oath that you would take in a
25   court of law, as if we were in front of a judge and a

8

1    jury today.  It obligates you to tell the truth under
2    penalty of perjury.
3       Do you understand that?
4       A.   Yes.
5       Q.   Your deposition today is also being
6    videotaped, and your testimony may be played or read
7    for the jury at trial.
8       Do you understand that?
9       A.   Yes.
10      Q.   The court reporter is taking down everything
11   that is said during today's deposition, all of my
12   questions and your answers and any other objections
13   or comments, and after today's deposition, she'll put
14   everything in a booklet or a transcript form.  After
15   the deposition, you can review that transcript, and
16   you can make changes to your testimony, if you wish.
17      But I'd like to caution you in advance that
18   if you choose to make a change, I can comment on the
19   fact that you said one thing here during your
20   deposition and then, later, you changed your
21   testimony.
22      Do you understand that?
23      A.   Yes.
24      Q.   It's important for us to make a good record
25   today for this court proceeding.  So there's several

9

1    things I will ask you to do:  If you don't understand
2    any of my questions, please just ask me to repeat or
3    rephrase them, and I'll be happy to do so for you.
4      During today's deposition, you always need
5    to give a audible or out loud or verbal answer to my
6    questions, such as a "yes" or a "no."  If you do
7    things like you shake your head up and down or side
8    to side, if you mean "yes" or "no," or if you use
9    slang terms such as "uh-huh" or "huh-uh," those sort
10   of responses do not show up well, if at all, on the
11   transcript.  So we may ask you "Did you mean 'yes' or
12   did you mean 'no'" if you use some sort of nonverbal
13   response.
14      Do you understand that?
15      A.   Yes.
16      Q.   Also, you've done a good job so far.
17   But as a general rule, during the deposition, try not
18   to speak at the time, at the same time anyone else is
19   speaking.  We will all afford you the same courtesy.
20   One of the many reasons why we ask you to do that is
21   it is difficult for the court reporter to accurately
22   take down what two people are saying at the same
23   time.  So please try not to speak over anybody else
24   during the deposition.
25      Do you understand that?

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1    A.  Yes.
2    Q.  During today's deposition, the attorney,
3  Mr. Anderson, may have an objection to one or more of
4  my questions.  I want to explain to you how
5  objections work during a deposition because they work
6  a little differently than what you may have seen on
7  TV or in a courtroom.
8        As you can see, today we don't have a judge
9  here present to immediately rule on objections.  So
10  what we do during a deposition, I ask a question, if
11  Mr. Anderson wants to make an objection, he will
12  state the objection, for the record.  We then still
13  look to you to give a response; and then later, if a
14  judge needs to review the transcript and rule on the
15  objection as to whether your response is admissible
16  in court, the judge can do so.
17        But I explain this to you because it
18  confuses many people.  They hear an objection and
19  they think they are not supposed to respond.
20  Generally speaking, the opposite is true during a
21  deposition.
22        Do you understand that?
23    A.  Yes.
24    Q.  Okay.  Do you have any questions for me
25  before we begin the deposition?

11

1    A.  No.
2    Q.  Have you consumed any alcoholic beverages in
3  the last 24 hours?
4    A.  No.
5    Q.  Have you taken any sort of drug, including
6  prescription medication, in the last 48 hours?
7    A.  No.
8    Q.  Okay.  Do you have any medical condition?
9    A.  No.  Sorry.
10    Q.  An extreme example would be -- that's
11  all right.  An extreme example would be dementia or
12  Alzheimer's disease that may affect your memory or
13  your ability to testify here today.
14    A.  No.
15    Q.  What, if anything, have you done to prepare
16  for today's deposition?
17    A.  I was given the CIRT recommendations, and
18  then I was also given Sergeant Backman's statements.
19    Q.  Who were you given those by?
20    A.  By Craig Anderson.
21    Q.  Okay.  Does Mr. Anderson, is it your
22  understanding he is acting as your attorney here
23  today?
24    A.  Yes.
25    Q.  Okay.  You said that you were provided the

12

1  CIRT report.  How long ago was that?
2    A.  Well, we met last week.
3    Q.  Is that the first time you had ever read the
4  CIRT report regarding this incident?
5    A.  Yes.
6        MR. ANDERSON:  And just to clarify, I -- he
7  just had the Conclusions and Findings, not the
8  report.
9        MR. BREEDEN:  Okay.  So --
10        MR. ANDERSON:  That's what he said, but I
11  just want to make sure you understood.
12  BY MR. BREEDEN:
13    Q.  So the full report is 222 pages.  You did
14  not review the full report?
15    A.  No.
16    Q.  Okay.  And you've not reviewed any of the
17  other witness statements or depositions, other than
18  Mr. Backman's?
19    A.  Correct.
20    Q.  I should say "Sergeant Backman," shouldn't
21  I?
22    A.  Yes.
23    Q.  And did you read his deposition transcript
24  taken in this case?
25    A.  Yes.

13

1    Q.  Did you review any of the other interviews
2  he gave, like his CIRT interview, regarding this
3  incident?
4    A.  No.
5    Q.  Okay.  Have you discussed what you recall or
6  your anticipated testimony with any of the other
7  officer defendants?
8    A.  No.
9    Q.  How -- how well do you know the defendants
10  in this case?  So let's see if I can recall them, off
11  the top of my head:  There's Rothenburg, Bertuccini,
12  Kubla, Backman, and I'm sorry.  I'm forgetting at
13  least one other one.
14        MR. ANDERSON:  Gonzales.
15        THE WITNESS:  Alex Gonzales.
16        (Reporter request.)
17        THE WITNESS:  Sorry.  Alex Gonzales.
18        MR. ANDERSON:  Gonzales, and then who?
19        MR. BREEDEN:  Gonzales, and then who?
20        MR. ANDERSON:  Melanie O'Daniel.
21        MR. ANDERSON:  That's it.
22  BY MR. BREEDEN:
23    Q.  And then there's -- well, there's one that
24  was the primary shooter as well.  I'm sorry.  I
25  can't -- I can't think of his name here.



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1    Do you -- are these people that you know
2    well? You worked with them for some time?
3    A.  Yes.
4    Q.  Okay. You all work together on SWAT; right?
5    A.  Yes.
6    Q.  Well, I think one of the other officers said
7    "SWAT is like a band of brothers." Those are your
8    brothers that you work with; right?
9    A.  Yes.
10   Q.  Okay. Have you been to some of their
11   houses, personally?
12   A.  Yes.
13   Q.  And have you met their families?
14   A.  Yes.
15   Q.  Okay. So, in fairness, you probably don't
16   want to see the outcome of this lawsuit be that your
17   brothers that you work with every day are forced to
18   pay a lot of money; is that fair?
19       MR. ANDERSON: Objection. Form. Go ahead
20   and answer.
21       THE WITNESS: That's correct.
22   BY MR. BREEDEN:
23   Q.  Okay. But, also, you understand what
24   perjury is and that you need to testify honestly
25   today; right?

15

1    A.  Yes.
2    Q.  Okay. I'm just going to start with some
3    background information as to you. What's your age?
4    A.  45.
5    Q.  How long have you lived in Las Vegas?
6    A.  Since 2002.
7    Q.  And where did you live prior to 2002?
8    A.  Washington state.
9    Q.  And were you born and raised in Washington
10   state?
11   A.  Yes.
12   Q.  You ever been convicted of a crime?
13   A.  No.
14   Q.  Can you summarize your education for me?
15   A.  Graduated from high school.
16       MR. ANDERSON: Sorry. Sorry. Okay.
17       THE WITNESS: Went on to attend Western
18   Washington University, graduated with a Bachelor of
19   Science degree in Sociology, minored in Psychology.
20   BY MR. BREEDEN:
21   Q.  Do you have any, I would say formal
22   education or college classes past that?
23   A.  No.
24   Q.  Okay. Do you have any legal background,
25   such as a paralegal or legal assistant?

16

1    A.  No.
2    Q.  Do you have any medical background?
3    A.  No.
4    Q.  You have to receive some sort of medical
5    training to be on SWAT?
6    A.  Correct. We'll take like a basic medical
7    class, Patrol Medicine.
8    A.  CPR.
9    A.  CPR, yes.
10   Q.  Okay. At what point in your life did you
11   join Las Vegas Metro Police Department?
12   A.  It was 2007.
13   Q.  And what did you do for a living prior to
14   joining Metro?
15   A.  I'm sorry. Two-thousand -- 03/05 is 2005.
16   Q.  Well, you know, I'll be honest with you, I
17   was surprised by your response because I thought
18   that, in your CIRT interview, you had said that you
19   worked for Metro for 16 years prior to this incident.
20   A.  Correct. So I'm coming up on 20 years now.
21   Q.  Okay. Great. And I'm sorry. So 2004?
22   A.  So it was 03/05. So March of 2005.
23   Q.  And what did you do for a living prior to
24   joining the force?
25   A.  When I came down to Vegas, I ended up

17

1    working at RC Willey.
2    Q.  What made you want to become a police
3    officer?
4    A.  Something that I was always looking at
5    doing even when I was young.
6    Q.  Any members of your family in law
7    enforcement?
8    A.  No.
9    Q.  What attracted you to the Las Vegas
10   Metropolitan Police Department then?
11   A.  When I was down here, I was doing
12   ride-alongs with them and decided it was a good
13   career choice.
14   Q.  Okay. Well, that's a bit unusual that you
15   would do ride-alongs before you joined the force.
16   How did that happen?
17   A.  It was something, like I said, that I was
18   wanting to get into for a career. I was deciding
19   whether I was going to go through Henderson or
20   Las Vegas Metropolitan Police Department. I ended
21   up choosing Metro.
22   Q.  Okay. So when you first joined Metro, I
23   assume you have to go to some sort of basic officer
24   training course?
25   A.  Yes.

Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1    Q.  And how long does that last?
2    A.  So your academy lasts a pretty long time.
3  It's like six, six months.
4    Q.  And I just want to talk about sort of your
5  progression through Metro.  So when you originally
6  completed the academy, what was your first
7  assignment?  Were you patrol, or?
8    A.  First assignment was patrol.
9    Q.  Okay.  How long were you on patrol?
10   A.  I was in patrol for quite, quite a long
11  time.  So just to kind of break it down, I was on
12  graveyard for about two years; and then after that,
13  I went to a dayshift squad for probably about six
14  months.  From there I ended up going to a saturation
15  team where I spent a good four years there.  That is
16  a proactive unit still on patrol; and from there, I
17  went to the homeland team and spent a year there.
18  That's still in patrol.
19       And then from there, I ended up becoming a
20  field training officer.  So I spent a year doing
21  that; and then from there, I ended up promoting to
22  sergeant, where I worked regular patrol for another
23  almost a year there, took over a neighborhood
24  engagement team, still working patrol.  I took over
25  gangs, did that for two and a half years.  Again,

19

1  all that's pretty much patrol.  Gangs is -- took
2  over more of a investigative aspect to it; and then
3  from there, I ended up moving over to SWAT.
4    Q.  What year did you move over to SWAT?
5    A.  So that was 2019, July.
6    Q.  When you joined SWAT, what additional
7  training did you have to go through?
8    A.  So it's quite a bit of training.  I tested
9  for, I would say three times, and then the third
10  time, I actually ended up getting it.  But there is
11  quite a bit of a very intensive regiment as far as
12  the training that you do once you are assigned to
13  SWAT and then completing that.
14   Q.  So -- so tell me how that works.  You said
15  there -- there was testing and you actually had to do
16  it three times before you were accepted into SWAT.
17  Is this physical testing?  Classroom testing?
18  What kind of testing?
19   A.  So testing starts with a, a shoot, which is
20  pistol, rifle.  From there, you go on to a physical
21  test and then which is an obstacle course; and then
22  from there, you go over to another obstacle course;
23  and then from that, you do some, it was some
24  scenarios; and the last part of it is going to be an
25  oral board.

20

1    Q.  All right.  Was there any particular reason
2  why the first two times you applied for SWAT, you
3  were not accepted?
4    A.  So first time, I ended up failed it,
5  failing the oral board, and so that was just I -- I
6  was brand new to it, and so someone from the outside
7  that has limited knowledge on it.  Then, you know,
8  that's what you're expected -- it's you need to know
9  a lot of the policy that's involved because you have
10  Metro's policy, and then you have the SWAT policy as
11  well.
12   Q.  Yeah, there's very different SWAT policies;
13  right?
14   A.  Correct.
15   Q.  Okay.  And even then, once you're accepted
16  onto the SWAT team, you have to go undergo more
17  specific SWAT training; right?
18   A.  Yes.
19   Q.  Okay.  And how long does that take in terms
20  of hours or months?
21   A.  Well, you're always training and then
22  always qualifying every year.  So you always have to
23  stay up on that.
24   Q.  Okay.  But how about when you're initially
25  accepted into SWAT?

21

1    A.  Initially accepted into SWAT, you're going
2  to be taking a -- a -- several classes, just to be
3  proficient before you become operational; and then
4  within that year time frame, you're going to be
5  completing a SWAT school.
6    Q.  Okay.  And is the SWAT school, is that just
7  classroom hours, or does it include classroom and
8  field?
9    A.  It's classroom and training.  It's not like
10  you're going to be going on a live mission and
11  that's counting as a SWAT school.  So it's
12  specifically classroom portion, training.
13   Q.  Okay.  And do you teach any of those
14  classes?
15   A.  No.
16   Q.  Okay.  Who's the -- who's the primary SWAT
17  instructor then?
18   A.  Back then?
19   Q.  Yes.
20   A.  So back then, it was quite a few
21  instructors.  So one of them was Dwayne Ferrin.  We
22  had Carl Knolls.  Those were some of the instructors.
23   Q.  Okay.  Do you think that additional SWAT
24  training, that that has value?
25   A.  Yes.



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1    Q.  Do you think that it's important that
2  officers be specifically trained on SWAT policies and
3  procedures before they join SWAT?
4    A.  Yes.
5    Q.  Okay.  Would you recommend that they undergo
6  that and complete that training before they go on
7  live missions?
8    A.  So, yes.
9    Q.  Okay.  I want to talk a little bit about the
10  structure of SWAT.  First of all, though, I guess,
11  let me ask an additional background.
12      Within -- well, okay, the structure of SWAT.
13  Okay.  There are people on SWAT, and then amongst
14  those officers, some are team leaders and assistant
15  team leaders; is that accurate?
16    A.  Yes.
17    Q.  And so how is a team leader and assistant
18  team leader selected?
19    A.  So team leaders are going to be your
20  sergeants, and so what you do is you go through that
21  testing process.  So if an individual, a prior
22  sergeant, ends up leaving, moving on to some --
23  something else or ends up promoting, then we always,
24  every year, will have a, basically a selection
25  process.  So that hiring process, testing for it.

23

1  So then that team leader, whoever is chosen, will
2  fill that vacancy.  Same things goes for operators
3  as well.  So it's a testing process.
4    Q.  Okay.  And at what point did you become a
5  team leader for SWAT?
6    A.  So July of 2019 is when I was selected.  I
7  was one of several other sergeants that tested.
8    Q.  Okay.  So essentially you beat out other
9  sergeants for the position?
10    A.  Yes.
11    Q.  Okay.  Were any of the other people then
12  that were -- you were promoted over, did they remain
13  on SWAT in other capacities?
14    A.  Say that again.
15    Q.  Well, yeah.  So these people who were not
16  given a team leader position on SWAT, did they remain
17  on SWAT?
18    A.  No.  So if you're testing for SWAT, you're
19  not on SWAT.
20    Q.  Okay.
21    A.  Yeah.
22    Q.  So, again, just to talk a little bit about
23  the structure.  My understanding is, at this time, in
24  January of 2022, there was a Silver Team and a
25  Gold Team for SWAT; is that correct?

24

1    A.  Correct.
2    Q.  All right.  Just two teams?
3    A.  Correct.
4    Q.  And I don't know how familiar you are with
5  this, but not every police department in the country
6  has full-time SWAT officers; correct?
7    A.  Correct.
8    Q.  Okay.  Are you aware that Las Vegas is
9  considered a Tier 1 SWAT team?  Have you ever heard
10  that term before?
11    A.  Yes.
12    Q.  Okay.  What does Tier 1 indicate?
13    A.  Tier 1 is basically you are going to be,
14  that is your primary position.  So other agencies,
15  whether they're small in size and they have regional
16  teams, so you have multiple areas that comprise and
17  make up a SWAT team.  So they can be regular patrol,
18  and if they need to serve a warrant, then everybody
19  gets together who is part of that team, and that's
20  your regional team.
21    Q.  But a Tier 1 team, like Las Vegas Metro
22  Police Department has, those are all full-time SWAT
23  officers?
24    A.  Correct.
25    Q.  And there -- there's actually two teams so

25

1  that there's 24 hour SWAT coverage for the police
2  force; correct?
3    A.  Correct.
4    Q.  Now, as the team leader then and a sergeant,
5  when there's a SWAT operation -- I would call it a
6  "SWAT raid."  Do you call it a "SWAT operation"?
7  What do you call it?
8    A.  SWAT operation, SWAT mission.
9    Q.  Okay.  Well, we'll say "mission."  When
10  there's a SWAT mission, as the team leader, are you
11  the most senior SWAT person onsite when the mission
12  happens?
13    A.  No.
14    Q.  Okay.  Who would that be, and how is that
15  determined then?
16    A.  So there's roughly -- and I don't know the
17  exact number right now because I've been out of SWAT
18  for six months.  So there's 33, 34 SWAT operators,
19  and then you have your four sergeants.  So within
20  that team, there's a wide range of experience and
21  wide range of who's been on.  You know, some have
22  been on over ten years.  So for me, back then, you
23  know, I was only on for two-and-a-half years.
24  There -- there's operators who have been on ten,
25  ten-plus years in SWAT.

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1    Q.  Oh, okay.  But -- but I mean, in terms of
2  chain of command, would you, as the sergeant team
3  leader, be the person in charge?
4    A.  Yes.  Unless there's a lieutenant there or
5  if there's a senior sergeant there.
6    Q.  Is it unusual for a lieutenant to be there
7  for a typical SWAT mission?
8    A.  No, it's not unusual.
9    Q.  Okay.  For this particular operation, on
10  January 10th of 2022, was there any lieutenant
11  physically present?
12    A.  Not a SWAT lieutenant.
13    Q.  Yeah, you're right.  I should have limited
14  it to SWAT.  So limited to SWAT, you -- you were the
15  sergeant in charge; is that correct?
16    A.  Correct.
17    Q.  All right.  And, in particular, there was
18  another sergeant who had recently joined SWAT, and
19  that was Sergeant Backman; correct?
20    A.  Correct.
21    Q.  And were you the direct supervisor of
22  Sergeant Backman during the operation?
23    A.  Correct.  And then there was one other
24  sergeant, Sergeant Casey Clarkson.
25    Q.  Okay.  And so talking, again, a little bit

27

1  more about the structure, above you, in the chain of
2  command, as a sergeant, would be a SWAT lieutenant;
3  correct?
4    A.  Yes.
5    Q.  And is the only lieutenant, at that time,
6  Lieutenant O'Daniel?
7    A.  Yes.
8    Q.  Okay.  And what was her actual title at that
9  time?
10    A.  Lieutenant, and then they also call
11  "tactical commander."
12    Q.  So she was tactical commander at that time.
13  What does that mean to you?
14    A.  In charge of SWAT missions, when you're out
15  there, tactical commander.
16    Q.  And then going up the chain, above
17  Lieutenant O'Daniel, who was that, at the time?
18    A.  It would be Captain Brian Cole.
19    Q.  And Captain Cole, is he then the most senior
20  officer at LVMPD, at that time, that is exclusively a
21  SWAT, assigned to SWAT?
22    A.  Correct.  It would be the highest ranking.
23    Q.  Okay.  And if we went over Captain Cole,
24  would -- would we get to the undersheriffs at that
25  point?

28

1    A.  Deputy chiefs.
2    Q.  Deputy chief.  Then undersheriff?
3    A.  Correct.
4    Q.  Then sheriff?
5    A.  Yes.
6    Q.  Okay.  Do you happen to know who the deputy
7  chief that Captain Cole would report to at that time?
8    A.  No.
9    Q.  Now, by the way, I just wanted to back-up a
10  moment or two.  You said that you are no longer on
11  the SWAT; is that accurate?
12    A.  Correct.
13    Q.  And when did you leave SWAT?
14    A.  Back in July.
15    Q.  July of 2024?
16    A.  Correct.
17    Q.  Why did you leave SWAT?
18    A.  There's a five year cap for sergeants, and
19  they have a ten year cap for operators.  So my time
20  there expired.  So I had to leave.
21    Q.  And so where were you reassigned?
22    A.  Currently, I'm at the airport right now.
23    Q.  All right.  Have you ever held any
24  professional licenses or certifications?
25    A.  No.

29

1    Q.  Have you ever tested for some kind of
2  promotion and it was denied?  And I think we talked
3  about there were twice that you applied for SWAT
4  and -- and that was denied.  Is there anything else?
5    A.  No.
6    Q.  Have you ever been suspended or reprimanded
7  at Las Vegas Metro Police Department?
8    A.  No.
9    Q.  Not even over the Jasmine King incident?
10    A.  Received a contact, which is just a
11  informal conversation.
12    Q.  And what was the contact regarding?
13    A.  Regards to like a chain of command.
14    Q.  And how about over this incident, I mean, it
15  was a fatal shooting of Mr. Williams.  Were you given
16  any suspension, reprimand, or contact over that?
17    A.  No.
18    Q.  Let's talk a little about the Jasmine King
19  incident.  Just for the record, that happened on
20  January 15, 2021, almost exactly one year before the
21  fatal shooting of Mr. Williams.  What happened?
22    A.  Served a search warrant for narcotics at
23  that location.  We ended up utilizing a Control
24  Entry Tactic with a -- with an explosive breach.  As
25  soon as we conducted the explosive breach,

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1  Ms. Jasmine King was right next to the door. She
2  sustained a little bit of injury to her eye; and
3  then ended up clearing the residence and got Jasmine
4  King out there, got her her medical.
5     Q.  Okay.  And Ms. King, she was not a suspect
6  and she was committing no crime at the time; right?
7     A.  No.
8     Q.  Do you mean I'm correct?
9     A.  Oh.  Correct.
10    Q.  Okay.  And so you were also the team leader
11  on that operation; correct?
12    A.  Correct.
13    Q.  And you had called for what you called a
14  "short count" or a "quick count" on that CET entry;
15  right?
16    A.  Correct.
17    Q.  And what does that mean to you?
18    A.  So that is a -- how we're going to go
19  through the breach count, which you need to make
20  sure that -- because we have a couple different
21  types of breaches.  So whether it's a long breach;
22  whether it's a breach, 3-2-1 breach; or just stand
23  by, breach-breach-breach.  So that's the person who
24  has the plunger to detonate the charge.
25    Q.  Okay.  And that was a Property-Only Search

31

1  Warrant you were executing at that time; right?
2     A.  Correct.
3     Q.  Through SWAT?
4     A.  Correct.
5     Q.  And that was also investigated by Internal
6  Affairs; correct?
7     A.  Yes.
8     Q.  And what conclusions did Internal Affairs
9  come to regarding what SWAT had done on that
10  occasion?
11       MR. ANDERSON:  Objection.  Form.  Go ahead
12  and answer.
13       THE WITNESS:  So as far as I.A. goes, I
14  don't know what the conclusion was, the findings
15  that they -- they produced.  It was, through SWAT,
16  how it affected us was limited the times that we
17  would utilize a explosive breach on search warrants.
18  BY MR. BREEDEN:
19    Q.  Okay.  So that was a regular search warrant
20  as opposed to a No Knock Warrant; correct?
21    A.  Correct.  That was a Knock and Announce
22  warrant.
23    Q.  Yeah.  And so you understand that, during a
24  regular warrant, you must abide by Knock and Announce
25  principles?

32

1     A.  Correct.
2     Q.  Is it your understanding that Knock and
3  Announce is part of Nevada State law?
4     A.  Correct.
5     Q.  Is it your understanding that Knock and
6  Announce is actually part of federal constitutional
7  requirements under the Fourth Amendment?
8     A.  Correct.
9     Q.  Okay.  And so did Internal Affairs conclude
10  that you had violated the Knock and Announce rule in
11  the King matter?
12    A.  I don't -- like I said, I don't remember
13  what I.A., their conclusions were.
14    Q.  Okay.  And Ms. King was blinded, at least
15  temporarily, in -- in one of her eyes as a result,
16  wasn't she?
17    A.  From what I was told, yes.
18    Q.  And did she also have a burst eardrum?
19    A.  I don't know.
20    Q.  Did it appear to you that Ms. King was
21  attempting to answer the door at the time the
22  explosive went off?
23       MR. ANDERSON:  Objection.  Form.  Go ahead.
24       THE WITNESS:  Standing at that door, at
25  that time frame, probably, yes, she was getting

33

1  ready to answer the door.
2  BY MR. BREEDEN:
3     Q.  Okay.  So you were actually personally sued,
4  along with several other members of the SWAT team, by
5  Ms. King following the incident; correct?
6     A.  Yes.
7     Q.  And you're aware of that part of her lawsuit
8  was that you and other members of the SWAT team
9  failed to abide by the Knock and Announce rule?
10    A.  Correct.
11    Q.  And that case was resolved on your behalf,
12  wasn't it?
13    A.  Yes.
14    Q.  And do you know the amount that was paid to
15  Ms. King?
16    A.  No.
17    Q.  Do you know, was there any finding in the
18  lawsuit that the officers had violated the Knock and
19  Announce rule?
20    A.  I don't remember the findings.
21    Q.  Looking back on it, do you believe you
22  failed to abide by the Knock and Announce rule in
23  that case?
24       MR. ANDERSON:  Objection.  Form.  Go ahead
25  and answer.



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1    THE WITNESS: Looking back, I think we
2  could have gave more announcements, more time.
3  BY MR. BREEDEN:
4    Q. Okay. And you were actually the -- the team
5  leader that helped plan that and the -- the explosive
6  short count; right?
7    A. No.
8    Q. Who was it?
9    A. That was Sergeant Young, who was in charge
10  of that operation.
11    Q. Okay. Was that operation, was the IAP, was
12  that also approved by Lieutenant O'Daniel?
13    A. Yes.
14    Q. Okay. Would Lieutenant O'Daniel have to
15  approve all SWAT IAPs at that time?
16    A. Yes.
17    Q. And explain to me your understanding of what
18  changes to SWAT policies and procedures were made as
19  a result of the King incident.
20    A. So as far as the policies, we would need
21  higher approval as far as utilization of a explosive
22  breach; and we, at that point in time, from that
23  result, were limited on using explosive breach for
24  that type of search warrant.
25    Q. Meaning a Property-Only Search Warrant?

35

1    A. Correct.
2    Q. And by the way, it's your understanding that
3  the search warrant for this incident that we're
4  discussing today, on January 10th of 2022, where
5  Mr. Williams was sought -- shot, that was a
6  Property-Only Search Warrant as well; right?
7    A. Correct. Accompanied with the subjects
8  listed in the PC statement.
9    Q. Okay. But the warrant was a Property-Only
10  Search Warrant?
11    A. Correct. Recover the evidence of the
12  homicide.
13    Q. There was no arrest warrant; correct?
14    A. No.
15    Q. I'm sorry. When I say "correct" and you say
16  "no" --
17    A. Oh.
18    Q. -- some people might interpret that as you
19  believe my statement is incorrect. So we just need
20  to clean that up a little bit.
21    Is it correct that there was not a arrest
22  warrant?
23    A. That is correct. There was no arrest
24  warrant.
25    Q. All right. And is it your understanding

36

1  that, as a result of the King incident, that CET
2  entries for property-only search warrants were banned
3  by Metro?
4    A. They weren't banned by Metro. We were
5  still allowed to do CETs for that type of search
6  warrant, and as long as there -- their -- the
7  factors met that there was violent individuals
8  inside who had access to weapons.
9    Q. That's your understanding of the policy
10  change?
11    A. From that point in time, yes, that we could
12  utilize a CET for that type of a search warrant.
13    Q. So your understanding was that, as a result
14  of the King incident, Metro's policies and procedures
15  changed such that CET entry was only allowed on
16  property-damage search warrants if there were violent
17  individuals with weapons inside?
18    A. So if it met the -- the requirement of a
19  high risk search warrant. So if there is a forced
20  entry that we're going to be utilizing, if it's
21  unknown or violent individuals outside, if there's
22  likelihood that they'll have access to weapons, then
23  yes, we can utilize a CET for that service of the
24  search warrant.
25    Q. Is it your understanding that using

37

1  explosives to knock down a door, that that was banned
2  for property-only search warrants?
3    A. I don't think it was absolutely,
4  100 percent, banned. But we would need a higher
5  level of approval in order to utilize a CET -- or
6  sorry -- that explosive breach.
7    Q. Okay. Did anyone come to you, at some point
8  after the Jasmine King incident, and say: "Look, as
9  a result of this incident, our SWAT policies and
10  procedures have changed, here's how they're different
11  today"?
12    A. No.
13    Q. So how did you learn that there was any
14  change in the policies and procedures?
15    A. Just conversations that we had with our
16  lieutenant and because we're having to make those
17  policy changes within our SWAT policy.
18    Q. That would be Lieutenant O'Daniel?
19    A. Correct.
20    Q. Okay. And what did -- what did Lieutenant
21  O'Daniel explain to you?
22    A. That following the incident were your --
23  the CIRT recommendations from that incident, we're
24  having to change some of the verbiage in the -- into
25  the policy.

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1   Q.   Okay.  And did that policy change take
2   effect prior to the incident in this case, on
3   January 10th of 2022?
4   A.   So prior to this incident, yes, it
5   occurred.
6   Q.   Okay.  Do you recall how long before the
7   Williams' incident the policy change was?
8   A.   No.
9   Q.   Okay.  Have you ever been sued by anyone
10  else in connection with your employment at LVMPD?
11  A.   No.
12  Q.   Are you aware of any times, other than the
13  Williams' incident or the King incident, that it's
14  been alleged that you violated Knock and Announce or
15  used excessive force in conducting a SWAT mission?
16  A.   No.
17  Q.   Did Mr. Anderson also represent you in the
18  King matter?
19  A.   Yes.
20  Q.   Has he represented you for any other legal
21  matters, other than the King matter and this matter?
22  A.   No.
23  Q.   Explain the concept of a CTE entry and how
24  that, "CET" entry I should say, and how that differs
25  from a SACO.

39

1   A.   So Controlled Entry Tactic, we are going to
2   be utilizing that on a servicing of a search
3   warrant, as I mentioned before, if it's a high risk
4   search warrant.  So if there's the indication that
5   we have or the intel that we have, that we're going
6   to be using a forced entry if it's a unknown or
7   violent individual inside, if they have access to
8   any type of weapons, we also take those
9   considerations into account.
10  Also, besides the structure, the location,
11  the time of day, what type of evidence is involved,
12  the likelihood of that destruction of evidence, and
13  then if we can safely use that speed, surprise,
14  overwhelming action to get in there and dominate a
15  structure very quickly.
16  And then -- and then you said you wanted a
17  SACO, a Surround and Callout?
18  Q.   Yes.
19  A.   So exactly -- it's exactly what it sounds
20  like or what it says is you're calling the person
21  out to us.  So with a SACO, you're going to be
22  safely surrounding the structure, if we can.  And a
23  good example is, on a large house, maybe like a
24  two-story house, we cannot safely dominate that
25  structure very quickly.  It would take too long, too

40

1   many bodies.  If there is enough room around the
2   structure to where we can put our armor, whether on
3   the 1-2, 1-4, and then on the backside of the
4   structure, we can utilize those armored vehicles as
5   our protection, once we have the residence safely
6   contained, and then we can call the person out to us.
7   Q.   Now, for this particular incident with
8   Mr. Williams, the decision to use a CET entry, had
9   that already been made by the time you got involved?
10  A.   Yes.
11  Q.   And, ultimately, was that Lieutenant
12  O'Daniel that made that decision?
13  A.   Correct.
14  Q.   Okay.  Are you aware of anyone else that
15  assisted her in that decision?
16  A.   Sergeant Backman was relaying the
17  information with his assistant team leader; that was
18  Jake Warner, with all the intel that they gathered
19  from that, that residence and that search warrant,
20  and they relayed that information to Lieutenant
21  O'Daniel.
22  Q.   Why was Sergeant Backman involved as opposed
23  to yourself?  You were the team leader or intended
24  team leader.
25  A.   Correct.  I was out of town.

41

1   Q.   Okay.  That's the only reason?
2   A.   Well, once I was out of town, I advised
3   Sergeant Back-- -- Sergeant Bonkavich and also
4   Sergeant Casey Clarkson that I'd be leaving on
5   vacation; they would be helping assist with
6   Sergeant Backman.  And, again, going back to this is
7   a team environment.  He's not solo.  And so Sergeant
8   Backman is 20-some years of a sergeant, or an
9   officer and then as a sergeant.  So he has a lot of
10  experience, a lot of experience in narcotics, a lot
11  of experience with dealing with search warrants.  He
12  came from major violators.  He's dealt with
13  Surround and Call Out incidences before.
14  And then as far as him being operational,
15  so he had quite a bit of experience with that
16  because as soon as he came to the team, he was given
17  a 40 hour SWAT school.  So with that, he became
18  operational.  He had a very good ATL, which is that
19  Assistant Team Leader, Jake Warner.  He also had the
20  rest of the team, so additional ATLs, Levi Hancock,
21  all those subjects were there to assist him in the
22  intel gathering, the recommendations, and then
23  giving that information to Lieutenant O'Daniel.
24  Q.   Okay.  So I've heard your CIRT interview
25  that you gave in this case, and I'm just going to



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**42**

1 kind of summarize some of these things here. You
2 tell me if I'm wrong. My understanding is you first
3 learn about this search warrant and SWAT mission on a
4 Friday and then the mission was to occur the
5 following Monday, after the weekend; is that correct?
6    A. Yes.
7    Q. Okay. And you had just preplanned to be out
8 of town with your family. You were going hunting
9 that weekend; right?
10    A. Correct.
11    Q. All right. So instead of you being
12 personally involved in some of these issues with the
13 IAP, instead, that was deferred to Sergeant Backman;
14 right?
15    A. Correct.
16    Q. And Sergeant Backman, at that time, had not
17 even been on SWAT for 30 days; correct?
18    A. Correct.
19    Q. And he had not completed the basic SWAT
20 training at that time either, had he?
21    A. The -- that would be incorrect. So for
22 him, in his first week, he was introduced with a
23 one-on-one modified SWAT school specifically for
24 him. That was December 13th through the 16th. So
25 40 hours. In that class, he gets search warrant

---

**43**

1 training. He gets close quarter tactics. He gets
2 an NFDD, which is a Noise Flash Diversionary
3 Devices. He gets patrol medicine. Everything that
4 he needs in order to be operational at that point in
5 time.
6    Q. Okay. But the Williams' SWAT mission, that
7 was going to be the very first SWAT mission he ever
8 went on in the field; right?
9    A. No.
10    Q. No? How many other SWAT missions had he
11 been on before Williams?
12    A. So during his time frame, he was being sent
13 out, he was supposed to respond to any barricade,
14 any search warrant that came up. He was also --
15 went on a hostage rescue situation where we use a
16 CET tactic. So he had, has done quite a bit of the
17 missions and tactics before this incident.
18    Q. My understanding is this incident with
19 Mr. Williams was the first time he had been involved
20 with a SWAT mission using a CET tactic. Do you
21 believe that to be untrue?
22    A. So as far as an H.R., hostage rescue, he
23 was on that incident, and we used a CET. That is
24 that, that tactic that we use in order to make entry
25 on a hostage rescue. So, more than likely, confused

---

**44**

1 but forgot about the same tactic that's being used
2 on hostage rescue.
3    Q. Okay. Do you agree that he had not
4 completed his SWAT training at the time this incident
5 occurred?
6    A. Well, he completed that modified SWAT
7 school for him. And then what you're referring to
8 as far as a "SWAT school" would have been later on
9 in his time frame.
10    Q. And so he had not completed that additional
11 training at the time this occurred?
12    A. Not that long SWAT school.
13    Q. Okay. Is that 120 hour course? How many
14 hours?
15    A. Yes. About. I would have to guess, but
16 yes, about that time frame.
17    Q. And did you have any concerns about allowing
18 somebody who had not completed all the SWAT training
19 and had been on SWAT for less than 30 days to have
20 such a crucial role in the planning and
21 implementation of this?
22    A. No. Because as far as his role in planning
23 it, again, this is that team environment where you
24 have your recon teams who have been there for
25 five-plus years, which was Kai, and the rest of the

---

**45**

1 team that are going out doing the recon, doing the
2 planning, giving that information to Jake Warner,
3 who's the assistant team leader, who has over five
4 years of -- of being up in SWAT, as long -- as well
5 as you have Levi Hancock, who has been in SWAT for,
6 back then, almost ten years.
7        So this is a lot of planning that they do,
8 and then they had the assistant of Sergeant Clarkson
9 and Sergeant Bonkavich as well, if they needed to.
10 So this isn't Sergeant Backman being all his
11 mission. This is a -- that team environment which
12 they create. Here's the plan. This is the safest
13 plan. There you go, so.
14    Q. Well, knowing how this turns out, do you
15 think this was a safe SWAT operation?
16       MR. ANDERSON: Objection. Form. Go ahead.
17       THE WITNESS: At the time, it would be the
18 safest that we did.
19 BY MR. BREEDEN:
20    Q. Well, you mentioned a SACO. It was
21 certainly feasible to do a SACO for service of this
22 search warrant, wasn't it?
23    A. No.
24    Q. Okay. What are all the reasons why you
25 don't think it was feasible?

---

Garth Findley        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1    A.  The reason why we couldn't do a Surround
2  and Callout is because on a multi-housing complex,
3  the person has a lot of avenues of escape.  So
4  whether internally, if you give them that
5  opportunity to escape, because it's been -- I've
6  been on a bunch of missions before where people
7  start burrowing through walls, and that's what we
8  don't want is murder suspects who have guns going
9  into other apartments.
10       Now, as far as that internally, then you
11  look externally, then he has more access into other
12  apartments.  There is that brick wall, wrought iron
13  fence that goes around the entire complex.  So we
14  couldn't get our armor into position.  Now, if you
15  sit there and say:  Well, it's a busy road on Nellis
16  to park armor in, well, that's too far away, and if
17  the subject does come out and resist in any way, we
18  can't implement that lethal plan.  You have that
19  barrier there.  You can't put our guys directly in
20  there, on the inside, without any type of armor and
21  protection.  That's the reason why we couldn't do a
22  Surround and Callout on that.
23    Q.  Okay.  So you believe it was not feasible to
24  do a Surround and Callout on that particular
25  apartment at 3050 South Nellis, No. 1125?

47

1    A.  No.
2    Q.  Has SWAT ever done Surround and Callout for
3  apartments?
4    A.  We have.
5    Q.  It's probably happened in the history of
6  SWAT, hasn't it?
7    A.  Correct.
8    Q.  Even if there's some risk of tunneling,
9  right, going into another apartment?
10    A.  Correct.  Then, again, you evaluate the
11  circumstances of who you're dealing with.  So what
12  type of search warrant is it; are we dealing with
13  someone who is not a flight risk, that is not going
14  to be doing that type of burrowing through the
15  Walls, he doesn't have access to weapons at all?
16  Then you can sit there and evaluate that.
17    Q.  Okay.  Let me ask you, this search warrant
18  was intended to be performed at 5:00 a.m.; correct?
19    A.  Yes.
20    Q.  Who made that decision?
21    A.  The assistant team leader, Jake Warner,
22  decided this would be a good opportunity, at that
23  time frame, to do it at that point, and then as well
24  as Sergeant Backman reviewing it and saying yes.
25    Q.  And then Lieutenant O'Daniel also reviewed

48

1  it and approved it?
2    A.  Correct.  They review it as well.  There's
3  also the recommendations from the person that, the
4  affiants, who is homicide, their saying it would be
5  a good time frame to do it at that time.
6    Q.  And so first of all, let's -- let's talk a
7  little bit about that.  Homicide doesn't tell SWAT
8  how to do their job, does they?
9    A.  No.  What they do is they give
10  recommendations giving for time frames, this is when
11  we observe this person being most active, and so we
12  could sit there and say, okay, most active at this
13  time and they could maybe give a time frame around
14  there.
15    Q.  What's the purpose of doing this at
16  5:00 a.m.?  Why -- why was it approved in that
17  manner?
18    A.  So what you have to do is take into
19  consideration the location.  Nellis is very busy at
20  that, at that intersection.  So at 5:00 in the
21  morning, you're not going to have that much traffic
22  on the roadway.  You're -- you're limiting the -- as
23  far as like the time of -- time of day for school,
24  the kids are out and about, that is -- I'm very
25  familiar with the complex.  It's very active

49

1  throughout the day.  So at 5:00 a.m., it's less
2  active.  So we want to keep people out.  That was
3  the reason why.
4    Q.  Was it part of the purpose that you wanted
5  to do this SWAT mission at a time of day when you
6  thought people inside the apartment were likely to be
7  asleep?
8    A.  Either asleep or less active.
9    Q.  Okay.  And that would make it easier to
10  surprise and overwhelm them with the CET?
11    A.  Correct.
12    Q.  And so was that formal or informal policy of
13  LVMPD, at that time, to perform search warrants on a
14  CET at those times of day, for that purpose?
15    A.  That's not like a SOP where it's like we do
16  it at a certain time frame to, like you said:
17  "They're going to be asleep; let's surprise them,
18  overwhelm them," that's not in our standard
19  operating procedures.
20    Q.  Well, why isn't it?  Is that because it's
21  more dangerous to do it that way?
22       MR. ANDERSON:  Objection.  Form.
23       THE WITNESS:  I don't think it's more
24  dangerous to do it at that time.
25  ///



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50

1   BY MR. BREEDEN:
2      Q.   Why, for this particular operation, was that
3   selected then?
4      A.   Because it's less opportunity for people on
5   the outside.  They're not going to be as active.
6   That complex, like I said, is very busy, and you
7   keep people out that way.
8      Q.   Well, why not -- why not perform it at
9   9:00 p.m. then?
10     A.   That's when it starts to become busy, and
11  especially on Nellis.  That's where people are
12  heading to work.
13     Q.   Okay.  How has the policies and procedures
14  for SWAT and CET entry, particularly as it relates to
15  search warrants, changed since the Williams'
16  incident?
17     A.   So it would be accompanied with a No-Knock
18  Warrant.
19     Q.   I'm sorry?
20     A.   For now?
21     Q.   For --
22     A.   From this incident?
23     Q.   Yeah, as a result of this incident.
24     A.   So you're going to, in order to conduct a
25  CET, you're going to need a No-Knock Warrant.

51

1      Q.   So as we sit here today, to your knowledge,
2   CET is reserved only for no-knock warrants?
3      A.   Correct.
4      Q.   And when did that change?
5      A.   After this incident.  I don't know when it
6   was implemented though, like a time fame.
7      Q.   Do you believe it changed specifically
8   because of the Williams' incident?
9      A.   I believe so.
10     Q.   And why do you believe that?
11     A.   Because the individual that was killed, the
12  family that is in the process of suing it, that's
13  the reason why.
14     Q.   Okay.  Was there ever any training or
15  instruction provided by Metro, to SWAT on the new
16  policy then?
17     A.   We would talk about it, as far as the
18  policy that was implemented with Lieutenant
19  O'Daniel, and then make sure that all the guys knew
20  about it.
21     Q.   And so what did Lieutenant O'Daniel then
22  relay to you about the policy change?
23     A.   As far as at what time frame though?
24     Q.   Well, after the Williams' incident.
25          In other words, do you remember a specific

52

1   conversation you had with Lieutenant O'Daniel?
2      A.   No.
3      Q.   Okay.  So there was never any specific
4   verbal or written retraining on the new policy?
5      A.   No.  As far as the policy that is now in
6   effect, that we will not be utilizing a CET for a
7   Knock and Announce, that wasn't in effect or took --
8   took effect until I was gone.
9      Q.   So to the best of your understanding, when
10  would -- when did that policy change happen?
11     A.   I don't know.  Because I know it was
12  recent, but I've been gone for about seven months.
13     Q.   Okay.  You mentioned earlier in your
14  testimony that you felt a Surround and Callout, or a
15  SACO, was not feasible for this particular apartment;
16  but due to the policy change, if this warrant were
17  served today, you would have to use SACO, wouldn't
18  you?
19     A.   You would have to, or you would find a
20  different way or just not serve the search warrant.
21     Q.   Right.  But when we talk about what would
22  happen with this warrant today, if you -- you could
23  not do a CET, if it was done today?
24     A.   Correct.
25          MR. ANDERSON:  Objection.  Form.

53

1          THE WITNESS:  So as it stands today, yeah,
2   you wouldn't be able to utilize a CET for this type
3   of search warrant, unless you get a no-knock service
4   of a warrant.
5   BY MR. BREEDEN:
6      Q.   Can you explain to me what calling a
7   "tactical" is in SWAT jargons.
8      A.   So calling "tactical," that can be utilized
9   during a Controlled Entry Tactic, and that is
10  slowing the momentum or stopping the momentum of
11  your team, and that's when you have some type of
12  recognition or that a danger is occurring.  So
13  preventing your team from moving further down, say,
14  a hallway.  So you're stopping that momentum.  Your
15  officers are taking cover and positions of
16  advantage, and so once that occurs, then you gather
17  the intel.  So who called the tactical and -- and
18  what are the reasons why.  So gather the intel, work
19  the problem; utilize your resources, so get your
20  shields up, if you need to.
21          Calling a tactical, anybody can call it.
22  So once it's called, the momentum stops.  Everybody
23  reverberates that tactical call.  So an example
24  would be is if you make entry into a residence, you
25  see a subject that was on the couch take off down

LEXITAS™

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  the hallway and ducks into the last room, we're
2  going to call "tactical" because maybe a continued
3  movement down there would be dangerous for your
4  team.  Maybe the subject's back there grabbing a
5  firearm.  He's doing something that could harm your
6  team, harm others, or harm that person who's back
7  there.
8       So, again, that's where you work the
9  problem.  You could sit there, once you have it
10  safely contained.  As far as on the outside, you
11  give announcements.  Maybe that person does come
12  out, or if you hear maybe a gun rack or something
13  like that, we can slowly back the team out and work
14  it from the outside.  So that would be an example of
15  calling a tactical.  And so once we do call a
16  tactical, that's when that spree, that speed,
17  surprise, and overwhelming action has stopped.
18  We're not going to reengage that CET, at that point,
19  and that is your tactical call.
20       Q.  On January 10th, 2022, during the SWAT
21  mission at 3050 South Nellis Boulevard, did you ever
22  hear any officer, at any time, call a tactical?
23       A.  Once the shooting was over, the tactical
24  call came out.
25       Q.  Okay.  So prior to the fatal shooting of

55

1  Mr. Williams, no tactical was ever called?
2       A.  Prior to the shooting, no.
3       Q.  Okay.  And then I assume someone called for
4  a tactical just because, at that point, it appears
5  there's been a fatality and so somebody called it?
6       A.  Because of the shooting that occurred, we
7  called a tactical.
8       Q.  Do you know which officer was the first to
9  call the tactical?
10       A.  Don't know.
11       Q.  During the SWAT mission, and I brought some
12  pictures to illustrate the point, Metro officers
13  appear to be wearing what I would call "blackout" or
14  dark SWAT and Police information on their uniform as
15  opposed to an alternate uniform where there's a
16  bright gold.
17       Who made the decision that the darker or
18  blackout uniforms would be used?
19       A.  Don't know.  When I came up, we were
20  utilizing the black.  We also had a -- like a,
21  almost like a purple, and then we ended up going to
22  these.  So I don't know.  I wasn't on SWAT, at that
23  time, for that.
24       Q.  So at no time that you served on SWAT they
25  were using the -- the brighter gold lettering?

56

1       A.  No.
2       Q.  Do you agree with me that in, you know, what
3  I would call the -- the black or the "blackout"
4  version, it's more difficult to see the word "SWAT"
5  or "Police" on the uniform?
6       MR. ANDERSON:  Objection.  Form.  Go ahead.
7       THE WITNESS:  Yes.
8  BY MR. BREEDEN:
9       Q.  Would there be any reason why SWAT officers
10  wouldn't want to clearly identify themselves as
11  police officer?
12       A.  Don't know why.
13       Q.  Certainly wouldn't be a reason on a Knock
14  and Announce Warrant, would there?
15       A.  No.
16       Q.  Okay.  Are you saying, then, that the dark
17  or the blackout uniforms were the only uniforms in
18  use at that time?
19       A.  Those are your uniforms that we had, that
20  were supplied to us, along with the patches that
21  were supplied to us.
22       MR. BREEDEN:  Okay.  Can you push that my
23  direction.
24       Just for the record, we could attach it as
25  an exhibit, if opposing counsel wants.  But I was

57

1  showing the witness what's been Bates-labeled as
2  MELTON-14 and 15.  There's just some pictures of
3  alternate SWAT uniforms on those pages.
4  BY MR. BREEDEN:
5       Q.  Let's talk about Knock and Announce.
6       What are the requirements under the law of
7  Knock and Announce?
8       A.  Reasonable amount of time, as well as
9  you're letting the individual comply or submit.
10       Q.  And did you receive training on Knock and
11  Announce as part of your SWAT training?
12       A.  Yes.
13       Q.  Who trained you on it?
14       A.  We had classes, PowerPoints, that were
15  taught throughout the time frame.
16       Q.  Okay.  And, specifically, what were you
17  taught about the amount of time that's reasonable to
18  wait after the Knock and Announce?
19       A.  So as far as reasonable amount of time,
20  what you're going to be doing is considering the --
21  who you're dealing with, the location, size of the
22  structure, the violent history.  You're also taking
23  in consideration access to weapons.  So all those
24  factors come into play when you're looking at what
25  is a reasonable amount of time and then as

58

1    accompanied with the submitting or the complying.
2       Q.   Have you ever heard any time limit, like
3    1 minute or 30 seconds or 10 seconds, that's like a
4    rule of thumb to be applied?
5       A.   So you're not going to find any hard fast
6    rule. I know certain cases, they've talked about a
7    10 second rule on up, as far as, say, 30 seconds.
8    But, again, when it comes to a hard fast rule on --
9    on which one we're going to utilize, we went with a
10   reasonable amount of time.
11      Q.   Okay.  So has -- has there ever been any
12   formal or informal policy at Metro regarding like a
13   minimum number of seconds you should wait?
14              (Reporter clarification.)
15   BY MR. BREEDEN:
16      Q.   A minimum number of seconds you should wait
17   after knocking and announcing before using force.
18      A.   Prior to me coming up to SWAT, they
19   utilized a 10 Second Rule, and then when I was
20   there, we and Melanie O'Daniel ended up changing it
21   to a reasonable amount of time.
22      Q.   Okay.  So the 10 Second Rule, was that
23   actually in writing?
24      A.   Yes.
25      Q.   And to your knowledge, Melanie

59

1    O'Daniel personally made the decision to change that?
2       A.   I believe she ended up changing it.
3       Q.   Okay.  Why?
4       A.   I don't -- I don't know.
5       Q.   Okay.  Prior to this SWAT mission -- I don't
6    know, I may not use the right terminology.  But there
7    was a "staging" or a "briefing" at the parking lot of
8    the Sam's Town Hotel & Casino; right?
9       A.   Correct.
10      Q.   I'm kind of curious, what's the reason
11   Sam's Town was chosen?
12      A.   What we ended up using or the reason we
13   used Sam's Town is we -- we want a, kind of a large
14   structure that can kind of conceal us.  So if we're
15   serving search warrants within a certain area that
16   is a high crime area and if they see SWAT trucks,
17   the armor, then everybody within that neighborhood
18   starts letting other people know.  So it could tip
19   that person off.
20          So what we do is we try to select areas
21   that have a large parking lot because there is quite
22   a bit of vehicles that we -- that we bring.  Our
23   own -- the -- our own work trucks as well as the --
24   the armor.  Plus we have the Search and Rescue comes
25   out with us.  You also have detectives who come out

60

1    there as well.  So we need a large area that we can
2    put all of our vehicles, and then we were in that
3    parking lot of Sam's Town.  So we're pretty much
4    concealed in there.
5       Q.   Is it just a coincidence that the underlying
6    murder that was being investigated also happened at
7    Sam's Town?
8       A.   Coincidence.  It was -- what we do is we
9    take in consideration what would be a good route as
10   well.  So from that point, it's a good location,
11   which it being at the Sam's Town, in that parking
12   garage, and from there, we can just exit and go
13   straight up Nellis.
14      Q.   Did you conduct any portion of the -- the
15   briefing?
16      A.   No.
17      Q.   Who did?
18      A.   That was going to be the assistant team
19   leader, Jake Warner, and then he was working that
20   with Sergeant Backman.
21      Q.   Okay.  Did any of the homicide people speak
22   as well?
23      A.   They did.
24      Q.   Would that be Detective Grimmett?
25      A.   Yes.

61

1       Q.   Is there anyone you could recall, other than
2    Detective Grimmett?
3       A.   You had gang detectives there.  Edgar
4    Nahum.
5       Q.   How long was the briefing in terms of
6    minutes?
7       A.   I'd -- I'd be guessing.  Maybe 20 minutes.
8       Q.   I've not seen any body camera video of
9    briefing.  Are you aware of anybody who had their
10   body-worn camera activated during the briefing?
11      A.   No.  Because that's on our helmets.
12      Q.   Well, why would it not be activated during a
13   briefing?
14      A.   Because we don't record the briefings, and
15   those are -- those recording devices are attached to
16   our helmets.
17      Q.   Well, I mean, it's sort of part of your
18   investigation or mission, the briefing.  So why
19   wouldn't a record be made of that?
20      A.   It's on paper.
21      Q.   You mean the IAP?
22      A.   IAP, as well as the -- the draw as well.
23      Q.   Yeah, so when you refer to "the draw," I've
24   seen a photograph somewhere that there's like a giant
25   piece of paper, and there's a bunch of handwritten



Garth Findley        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1    notes on it. Is that what you're referring to?
2    A.  Correct.
3    Q.  So who did the draw?  Whose handwriting is
4    on that?
5    A.  That is going to be the recon team.  So
6    they create the draw, and then the assistant team
7    leader, Jake Warner, is going to position people as
8    far as the lineup goes, and then where the
9    containment positions are as well.
10    Q.  What happened to the draw?  Where is it
11    today?
12    A.  It should have been just photographed and
13    then put into -- on base.
14    Q.  Would it physically be destroyed, or is it
15    sitting somewhere?  Do you know?
16    A.  I don't know what they do with it, if it's
17    just destroyed, but we have a photo, photograph of
18    it.
19    Q.  Okay.  Who took that photograph?
20    A.  It would be the person who had the camera.
21    I don't know who it was.
22    Q.  Okay.  You don't know if it was Backman or
23    Warner or another officer?
24    A.  No.
25    Q.  How long have you known Lieutenant O'Daniel?

63

1    A.  I've worked a short period of time at
2    South Central when I was new, not with her.  I knew
3    she was on another squad.  I just knew her by face,
4    by name; and then when I went to SWAT, it was that
5    time frame, from the July '19 until she left.
6    Q.  When did she leave?
7    A.  I don't know the exact date.
8    Q.  Do you know why she left?
9    A.  I would say for personal reasons.  She had
10    time to retire.
11    Q.  Did she feel that she might be terminated if
12    she didn't retire?
13    MR. ANDERSON:  Objection.  Form.
14    THE WITNESS:  I don't know.
15    BY MR. BREEDEN:
16    Q.  Are you aware of any discipline, reprimand,
17    or contact that she received because of the Williams'
18    incident?
19    A.  No.
20    Q.  What -- when you first met her, what squad
21    was she on, if not SWAT?
22    A.  Your -- say that again.
23    Q.  When you first met her, was she assigned to
24    SWAT, SWAT?
25    A.  No.  When I first met her, I remember her

64

1    being at South Central Area Command when I was
2    there.
3    Q.  How many SWAT missions were you ever on
4    where Lieutenant O'Daniel was onsite, onsite when the
5    mission was performed?
6    A.  Quite a few.
7    Q.  Okay.  Was that typical for her to be
8    onsite?
9    A.  For barricades, hostage rescues, yes.
10    For search warrants, that would be a "yes"
11    and a "no" to where she would only come out if there
12    was a high likelihood that like the subject would be
13    fighting us or resisting us or it was a major case
14    is what it would be for.
15    Q.  Was she ever a ser- -- a SWAT sergeant
16    before she was made lieutenant?
17    A.  No.
18    Q.  Was she ever one of the SWAT operators, like
19    somebody in the line, before she became SWAT
20    lieutenant?
21    A.  No.
22    Q.  Are you aware of anyone else who applied for
23    the position of SWAT lieutenant and wasn't selected?
24    A.  No.
25    Q.  Okay.  So when the job of SWAT lieutenant

65

1    comes open, you're not aware of anybody, other than
2    Lieutenant O'Daniel, who applied?
3    A.  From what I remember is the position that
4    she held was over the homeland saturation team, and
5    they were the backup lieutenant to SWAT, and so she
6    was getting those repetitions in that now the
7    current lieutenant, I believe, ended up leaving, and
8    then she filled that position.
9    Q.  Okay.  But are you aware of anybody else who
10    wanted the position or applied for it?
11    A.  I don't know.
12    Q.  Okay.  Did you think she was the most
13    qualified person for that position?
14    A.  She had the reps, yes.
15    Q.  Okay.  What did you think of her as a
16    lieutenant, her ability?
17    MR. ANDERSON:  Objection to form.  Go ahead.
18    THE WITNESS:  It was good.
19    BY MR. BREEDMAN:
20    Q.  Do you think that the fact that she was
21    female played a role in her getting that position?
22    MR. ANDERSON:  Objection to form.
23    THE WITNESS:  No.
24    BY MR. BREEDEN:
25    Q.  No?  At any point, prior to the SWAT



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1  mission, did Detective Grimmett tell you that there
2  was probable cause to make an arrest?
3      A.  Yes.
4      Q.  Okay.  And why wasn't there an arrest
5  warrant then?
6      A.  Because we had a search warrant for that
7  residence.  He was listed in the PC statement, as
8  far as our two subjects that were involved, which is
9  Rembert and Fisher.
10     Q.  Okay.  Do you believe better reconnaissance
11 or surveillance could have occurred on this mission?
12         MR. ANDERSON:  Objection.  Form.
13         THE WITNESS:  We -- we could have done or
14 homicide could have done more.  But, again, we're
15 limited on a time frame of dealing who -- with the
16 subject because it is kind of the, I wouldn't
17 necessarily say it's exigent circumstances, but you
18 have someone who is a violent individual that
19 committed a homicide, and those two subjects, the
20 intel that we had, were in those apartments.
21         And there was prior incidences leading up
22 to that to where, even in that specific location at
23 3050 Nellis, there was prior incidences of shootings
24 that were occurring, and those two subjects were
25 involved.

67

1  BY MR. BREEDEN:
2      Q.  All right.  But on the morning in question
3  that this happened, SWAT had no idea who was inside;
4  right?
5      A.  We had intel that those two subjects, which
6  was Rembert and Fisher, were inside.  And then right
7  before the brief, they gave an update saying Fisher,
8  who was on an ankle monitor, was not in there.
9      Q.  Okay.  So who specifically told you that
10 they believed that the subjects were inside?
11     A.  Homicide detectives were saying that, that
12 those subjects were inside.  That was the intel that
13 they had.
14     Q.  Okay.  And, you know, I just ask a very
15 specific question.  Were -- were they -- was it your
16 understanding that they were telling you they had
17 specific information that, at that time, when SWAT
18 was going to arrive, they were inside or just that,
19 generally, they believe they might be inside?
20     A.  Per the IAP, also listed in the search
21 warrant is the family members who were indicating
22 that that is the apartment that Rembert and Fisher
23 were in.  So that was the information that we were
24 given.
25     Q.  Were you aware that one of those suspects

68

1  was wearing an ankle monitor?
2      A.  Yes.
3      Q.  So pretty easy to figure out where that
4  gentleman is, isn't it?
5      A.  Correct.
6      Q.  And it wasn't that apartment; right?
7      A.  No.  So prior to us serving the search
8  warrant, they gave us an update saying Fisher was
9  not pinging inside that apartment.
10     Q.  Well, what was your understanding then about
11 whether there could be other people inside the
12 apartment -- women, children, innocent people?
13     A.  We were given no information that there was
14 any children, no elderly, no dogs, as far as at that
15 apartment.  We were given information that this was
16 a flophouse, indications of, you know, it's a drug
17 house, violent individuals inside, as well as access
18 to weapons.  There was evidence of a homicide that
19 was inside that residence.
20     Q.  Well, let's -- let's talk about the access
21 to weapons.  I mean, it's easy to say:  "Oh, I think
22 this guy is a drug dealer so he probably has a gun";
23 right?  That's just kind of a general statement.
24         For the particular time that you were there
25 on January 10th of 2022, in that morning, did anyone

69

1  actually see any weapons or firearms from prior to
2  entry of the apartment?
3      A.  Prior to entry, no.
4      Q.  Okay.  Also, this particular apartment had a
5  brass wrap on the front door; right?
6      A.  Correct.
7      Q.  And that affects what you do as SWAT because
8  that means it's going to be much harder to do a
9  forced entry on the front door, knock it down; right?
10     A.  Correct.
11     Q.  Okay.  Do you think that was a failure of
12 surveillance or reconnaissance, not to notice that
13 there was a brass wrap prior to when you're actually
14 there in front of the door?
15         MR. ANDERSON:  Objection to form.  Go ahead.
16         THE WITNESS:  So going up to the residence,
17 obviously that would have been a good indicator.
18 But I recognize that, during the recon, found out
19 later that -- again, that's going back to how busy
20 of a time frame that apartment is with those
21 individuals, a bunch of individuals walking through
22 there.  I know that Officer Hoskins tried to get a
23 good look at that door and was almost confronted by
24 subjects that were walking into that apartment.  So
25 he ended up walking by.



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1    BY MR. BREEDEN:
2      Q.  Well, okay.  But don't you think that would
3    be part of basic reconnaissance, if your IAP says
4    we're going to use a battering device to knock down
5    the front door, to know whether that's a reinforced
6    door?
7      A.  Yes.
8          MR. BREEDEN:  Okay.  You know, I think I'm
9    at a decent stopping point.
10         Let's take a five minute break.
11         MR. BREEDEN:  Going off the record at
12   10:21 a.m.
13         (Pause in the proceedings.)
14         THE VIDEOGRAPHER:  We're back on the
15   record.  Time is 10:33 a.m.
16   BY MR. BREEDEN:
17     Q.  All right.  Sergeant Findley, I want to talk
18   a little bit about NFDDs or Noise Flash Diversionary
19   Devices.  Is it your understanding that SWAT has
20   total discretion to use them whenever they wish?
21         MR. ANDERSON:  Objection.  Form.
22         THE WITNESS:  So we don't just use them
23   whenever we wish.  There's going to be a certain
24   purpose for utilizing a NFDD.
25   ///

71

1    BY MR. BREEDEN:
2      Q.  What was the purpose for using NFDDs on
3    January 10th of 2022?
4      A.  So we used a stun stick, and that was going
5    to be inserted into the window, on that fourth side
6    of the residence, and then we used a nine banger on
7    that fourth side as well.
8      Q.  Yeah, but what's the purpose of those?
9      A.  It's to distract, disorient the people that
10   are involved.
11     Q.  Okay.  And we can agree that those NFDDs,
12   they were deployed before anyone said or did anything
13   or moved or reacted at all inside the apartment;
14   right?
15     A.  I don't know.
16     Q.  Okay.  Well, was it planned that they would
17   be automatically deployed, or was somebody in charge
18   of whether or not they were deployed?
19     A.  Yeah, so whoever's in charge of the stun
20   stick, once they insert it, make sure that you
21   clear, visually clear, and then you can set the
22   distract off.
23     Q.  Now, in your CIRT interview, you refer to
24   NFDDs as an "Option 2."  Do you recall that?
25     A.  Correct.

72

1      Q.  So "Option" implies to me that they may or
2    may not be used.  Is that what you mean?
3      A.  No.
4      Q.  Oh, okay.  So how do you use that term?
5      A.  That's the way it's written on our card is
6    called a, just our "options" that we have.  I don't
7    know.  I wasn't in charge of making the verbiage for
8    that.
9      Q.  Okay.  So when it says Option 2, it wasn't
10   meant an option that -- that somebody had discretion
11   whether or not they would be used; they were
12   preplanned to be used?
13     A.  Preplanned.  And then, again, whoever's
14   deploying them, especially on the insertion, you
15   have to make sure it's safe to do so.  So in that
16   instant, you put it through the window, up high,
17   into the ceiling.
18     Q.  And those had been preplanned to be used on
19   the IAP; correct?
20     A.  Not on the IAP, just on the tactical plan.
21     Q.  Okay.  But Lieutenant O'Daniel had approved
22   NFDDs, didn't she?
23     A.  Correct.
24     Q.  Okay.  And would Warner and Backman have
25   also been aware of that and approved it?

73

1      A.  Correct.  So they developed the plan, which
2    was Officer Warner, Sergeant Backman, and then they
3    relayed that information to Lieutenant O'Daniel, who
4    gave the authorization for that.
5      Q.  Okay.  If this is a Knock and Announce
6    Warrants, why are we using NFDDs at all?
7      A.  We're using NFDDs as a distraction device.
8    So depending on who the individual is inside, if
9    we're dealing with a violent individual homicide
10   warrant, in this case, who does have those access
11   for weapons, then what we want to do is to, in a
12   way, distract that person so if they do decide to
13   take up arms and try to shoot at officers coming
14   through the door, it's going to disrupt their
15   OODA loop and take away from that fine motor skills
16   of doing fire.
17     Q.  Well, why are you trying to distract anyone
18   on the inside of the apartment if you're required to
19   give that person time to wake up and go to the front
20   door and ascertain it's police and provide them
21   admittance so -- into the apartment?
22     A.  So give them a reasonable amount of time.
23   We give them announcements.  We give them
24   opportunity to comply, to surrender within that time
25   frame.  So if they do decide to do the opposite

LEXITAS™

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1   which, in a lot of cases, we deal with people who
2   are unreasonable. So what we do is, to prevent them
3   from doing any type of harm, then we use a distract.
4   And then in this case, we ended up doing a distract
5   to the inside, up high.
6       Q. So it was preplanned, wasn't it, during the
7   briefing, that Officer Bertuccini would have the
8   stun stick and then immediately upon the end of the
9   second announcement, he would break the rear window
10  and deploy the stun stick inside the apartment?
11  Wasn't that preplanned?
12      A. Correct.
13      Q. And so by preplanning that, how does that
14  give somebody time to comply and wake up and walk to
15  the door and open the door and allow police to come
16  inside?
17      A. Well, again, your -- your question is kind
18  of loaded to where you're saying that they will
19  comply; and, again, what we deal with, people who
20  are unreasonable, who are not going to comply.
21  "Complying" in my regards is to -- they don't
22  necessarily have to come to the door. "Complying"
23  means sitting in place with your hands up.
24  "Complying" means announcing "Hey, I'm here." That
25  is compliance to us. So they don't necessarily have

75

1   to come to the door. Compliance is exactly that,
2   they can sit in place and with their hands up.
3   That's compliance.
4       Q. Okay. Well, Jasmine King appears to have
5   been trying to comply and let officers into her
6   living structure, and she was injured when the
7   explosives went off in that case; right?
8       A. Correct. And we don't know that's what
9   she's trying to do.
10      Q. And you realize, don't you, that -- that
11  it's unlawful or it violates Knock and Announce if
12  people are not given a reasonable amount of time to
13  come to the front door and allow the police entry?
14      MR. ANDERSON: Objection.
15  BY MR. BREEDEN:
16      Q. Is that your understanding?
17      MR. ANDERSON: Objection. Form. Answer.
18      THE WITNESS: So my understanding is a
19  reasonable amount of time. So what is a reasonable
20  amount of time for, in this instance, Isaiah
21  Williams to come to the door, who's sitting on the
22  couch, who's five feet away? Again, I don't --
23  didn't know that, but you're saying six seconds, and
24  that's just on the assertion; right?
25      So in six seconds, you can get up off the

76

1   couch, walk five feet to the door. In six seconds,
2   you can sit there and say "Hey, I'm complying. I'm
3   here." "Compliance" is, like I said, sitting still
4   with your hands up. "Compliance" isn't, to me,
5   where you grab a gun and start shooting.
6   BY MR. BREEDEN:
7       Q. So --
8       A. He also had 17 seconds to get up and walk
9   to the door if, if he wanted to, to comply. But,
10  again, we deal with people who are not reasonable
11  and will not cooperate.
12      Q. So you had preplanned this operation with
13  the assumption that people inside the apartment would
14  not comply; right?
15      A. We --
16      MR. ANDERSON: Objection. Form. Go ahead.
17      THE WITNESS: So what we do is work off of
18  experience. So a lot of these plans are that type
19  of experience we have with dealing with this type of
20  situation. We're dealing with someone who is wanted
21  for murder, who has those access to weapons. So
22  what we do is try to plan the safest route, to have
23  those contingency plans in place. So if the person
24  does come to the door with a gun, we have that
25  option to distract them.

77

1       So, again, the law says, well, giving the
2   person a reasonable amount to comply, to come to the
3   door. But, again, in our world that we deal with,
4   we don't deal with reasonable people. We deal with
5   violent individuals who will do quite the opposite.
6   So we have to have those mitigating factors,
7   those -- those contingency plans to prevent that to
8   be safe.
9   BY MR. BREEDEN:
10      Q. Are you saying then that you think
11  Knock and Announce doesn't require you -- because you
12  talk about compliance. Are you saying you think
13  that's satisfied, not by an amount of time for
14  somebody to come to the front door and allow entry
15  but enough time for somebody to yell out "Okay. Come
16  in? Something like that?
17      A. Correct. In my reasonable amount of time,
18  it doesn't take that long to say "Okay. I give up.
19  I'm coming to the door"; or to comply, just to stand
20  there, sit there, have their hands up. That's
21  compliance.
22      Q. Well, so since much of this, of what was
23  done was preplanned in terms of the use of force,
24  how much time was preplanned to allow any occupant
25  inside that apartment to come to the front door,

Garth Findley            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

1  ascertain it was police with a warrant, and provide
2  them entry?
3     A.  Sounds like it was, from videotapes, all
4  that, it was 17 seconds to the time of entry.
5     Q.  Well, now, that -- that's very interesting
6  that -- that you say 17 seconds.  I think the video
7  is very clearly going to disprove that.
8     A.  Uh-huh.
9     Q.  But the -- the time that was planned, it was
10  planned that, immediately on the end of the second
11  announcement, the -- the back window would break and
12  the stun stick would be inserted and simultaneously
13  at the front door, that would be knocked down with a
14  battering device.  That's what the plan was; right?
15     A.  Correct.
16     Q.  Okay.  So as fast as I can yell "Police,
17  search warrant, police search warrant," (Counsel
18  snaps fingers), that was the preplanned amount of
19  time; right?
20        MR. ANDERSON:  Objection to form.
21        THE WITNESS:  It's longer than that because
22  he gave out the entire address.
23  BY MR. BREEDEN:
24     Q.  Okay.  So going to ask you some more
25  questions specifically on Knock and Announce.

79

1  All right.  Well, actually, first of all, let me
2  back-up and finish with the NFDDs.
3        Okay.  The stun stick, have you ever been in
4  the same room when a stun stick was deployed?
5     A.  Yes.
6     Q.  Okay.  Would you agree with me that it's
7  quite bright?
8     A.  If you're looking at it, yes.
9     Q.  Would you agree to me that, even if your
10  eyes are closed, you're -- you're going to see a
11  bright flash?
12     A.  You'll see not obviously a bright flash,
13  but you're going to have a little bit of a flash,
14  yes.
15     Q.  Okay.  And if your eyes happened to be open,
16  would you agree with me that that, that would be
17  blinding?
18     A.  If you're looking at it, you'll have a
19  bright spot for momentarily, few seconds.
20     Q.  Yeah.  And would you agree with me that it's
21  quite loud when it deploys?
22     A.  Yes.
23     Q.  Would you agree with me that it's so loud
24  that it would temporarily impair your hearing?
25     A.  I don't know how long "temporarily" would

80

1  be.  Are you talking seconds?
2     Q.  At least seconds.
3     A.  I could see it being for a couple seconds,
4  yeah.
5     Q.  Okay.  And would you agree with me that
6  there's also like a physical element to it, like you
7  feel a pressure wave?
8     A.  You'll have a little bit of a pressure
9  wave.
10     Q.  Yeah.  And before a stun stick is deployed,
11  the person deploying it is supposed to make sure that
12  the area is clear, right, because we don't want it to
13  be deployed too close to a person?
14     A.  Correct.
15     Q.  And what's your understanding of how far
16  "clear" is?  Does "clear" mean no one in the same
17  room?
18     A.  Immediate area, within like a three-foot
19  radius.
20     Q.  So you think it's three feet?
21     A.  Immediate area, yeah.
22     Q.  So you think it's safe to deploy one of
23  those within three feet of somebody?
24     A.  It's going to be up high.  That was the
25  plan, into the ceiling.

81

1     Q.  Well, doesn't matter if it's up high or up
2  low.  You're saying it's just three feet?
3     A.  I've been standing next to distracts as
4  they go off, yes.
5     Q.  Okay.  Now, there was also a nine banger
6  used.  Why use a nine banger and a stun stick?
7     A.  So part of the plan was to implement that
8  nine banger; and it's, again, to distract that
9  person.
10     Q.  Who actually deployed the nine banger?
11     A.  I don't remember who.
12     Q.  And was it deployed only on the outside of
13  the apartment, or was it thrown inside?
14     A.  No.  Outside.
15     Q.  Okay.  Would you agree with me that a nine
16  banger sounds like gunfire?
17     A.  To the untrained, yes.
18     Q.  Okay.  Well, even sometimes to the trained,
19  right, because actually in the video in this case,
20  Officer Bertuccini, I believe, has to ask Rothenburg
21  "Was that a nine banger?"  And he was confused about
22  when the gunshots started.
23        Have you seen that?
24     A.  No, I didn't see that.
25     Q.  Okay.  But you certainly agree, at least to

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1  layperson like Mr. Williams, if he hears a nine
2  banger going off, he might believe he was already
3  under gunfire?
4      A.  Possibly.
5      Q.  Okay.  I mean, do you think for a layperson,
6  that would be a logical assumption?
7          MR. ANDERSON:  Objection.  Form.
8          THE WITNESS:  For a who person?
9  BY MR. BREEDEN:
10     Q.  For a layperson.
11     A.  A "lay"?
12     Q.  Nonlaw, nonlaw enforcement.
13     A.  Oh.
14     Q.  Who does not have experience with nine
15 bangers.
16     A.  Yes.
17     Q.  Okay.  Now, I think what you're saying is --
18 you correct me if I'm wrong.  You're saying he was a
19 law enforcement person, you could tell the difference
20 if we had some sort of experiment where we threw a
21 nine banger and then we just had somebody fire a gun
22 nine times, you could tell the difference between
23 those two.
24         But for an ordinary member of the public,
25 without your law enforcement experience, they might

83

1  confuse a nine banger for gunfire?
2      A.  Possibly, yes.
3      Q.  Okay.  And, in fact, especially if a window
4  had been broken out simultaneous with deployment of
5  that nine banger, that might lead somebody to believe
6  that they were actually shooting through the window;
7  right?
8          MR. ANDERSON:  Objection to form.
9          THE WITNESS:  I don't know.
10 BY MR. BREEDEN:
11     Q.  Okay.  Well, do you think that's one
12 possible assumption somebody could make?  Their
13 window explodes right next to them and they hear nine
14 sounds that sound like gunfire, do you think somebody
15 might believe, in a few seconds that they have to
16 ascertain the situation, that they could be being
17 shot at through the window?
18     A.  Possibly.
19     Q.  Okay.  So Knock and Announce.  First part of
20 Knock and Announce is the knock part.  Okay.  Who was
21 in charge of the knock part?
22     A.  Nobody was.
23     Q.  Okay.  Is it formal or informal policy of
24 Metro that somebody, when doing Knock and Announce,
25 should physically knock on the front door?

84

1      A.  There's no policy that says that we need to
2  physically knock on the door.  So I would say it was
3  informal, like you said.
4      Q.  So you believe there was, at least, an
5  informal policy that somebody should physically knock
6  on the door?
7      A.  We never physically knocked on door.
8      Q.  Okay.  So you're saying the informal policy
9  was not to physically knock on the door?
10     A.  Like I said, we've never gone up and
11 knocked on the door.  We announced or identified
12 ourselves and our intentions every time.
13     Q.  Okay.  So would you say that Standard
14 Operating Procedure for SWAT, at that time, was to
15 never physically knock on the door?
16     A.  Correct.  We never physically knocked on
17 the door.
18     Q.  So it was preplanned then that no physical
19 knock on the front door would occur?
20     A.  Correct.
21     Q.  All right.  Do you know why that is?
22     A.  From case law, what they're saying is that
23 we don't need to physically go up there and knock on
24 the door once announcements have been made because
25 you have announced who you are; you have identified

85

1  yourself and as -- as far as your intentions go.  So
2  that is Peterson vs. U.S. Ninth Circuit up in
3  Washington state.
4      Q.  Okay.  And was there anything specific about
5  Apartment 1125 that morning, though, that led any
6  officer to believe that it would be unsafe to knock?
7      A.  No.
8      Q.  And, in fact, on the video, we could see
9  officers are staging right out in front of the front
10 door.  Would you agree with me that it wouldn't have
11 taken a lot of effort for one of those officers just
12 to rap on the door?
13     A.  They could have.
14     Q.  Okay.  But Metro chooses, Metro SWAT chooses
15 not to do that; right?
16     A.  Correct.
17     Q.  Okay.  Now, after "knock," there's
18 "announce."  So let's -- let's talk about "announce."
19 For the SWAT operation when Mr. Williams was killed,
20 who was in charge of the announcements?
21     A.  Sergeant Backman.
22     Q.  And we've already talked about Sergeant
23 Backman.  He's got less than 30 days on SWAT, and he
24 hasn't even completed the full SWAT training;
25 correct?

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86

1     MR. ANDERSON:  Objection.  Form.
2     THE WITNESS:  So you're almost implying
3  that he's like a brand new person, a brand new
4  officer.  So Sergeant Backman's been 23-plus years,
5  and he's been a sergeant for a long time.  He's been
6  in a lot of different units, specialized units.  So
7  narcotics.  He's been in major violators.  He's --
8  he's done surround and callouts numerous times.
9         He, when he came up to SWAT, he was given
10  that 40-hour class, one on one.  So he had that
11  training, and he was competent in that position.  He
12  was in Phase 2 of our SWAT policy in regards to a
13  new sergeant program, and at that time frame, he is
14  at the position of little to no supervision as far
15  as me.  So he's being almost on his own, very
16  competent in -- in the position.  And it's not
17  difficult to be on a bullhorn and call out an
18  address.  So any officer, a brand new officer, is
19  able to do that.
20  BY MR. BREEDEN:
21     Q.  Okay.  Now, to your knowledge, was this the
22  first time, during a SWAT where a CET was used, that
23  Sergeant Backman would conduct the announcement?
24     A.  For that position, yes.  And then in
25  training, bunch of times, we do that.

87

1     Q.  Okay.  Now, a bullhorn was used, but is --
2  is that official or informal policy of Metro SWAT to
3  use a bullhorn for the announcement?
4     A.  It wasn't in our policy, and what we were
5  doing is we wanted to make sure, with the bullhorn
6  that's very loud, verbal announcements -- kind of
7  the issue that we always had with bullhorns is that,
8  during the CETs, the guys would just drop them and
9  they would constantly break.  So we're always
10  constantly replacing those.  But in that instant,
11  yes, this is part of the plan.  We utilized a
12  bullhorn.
13     Q.  Okay.  So was there anything particular
14  about that morning that caused the bullhorn to be
15  used or that was just Standard Operating Procedure?
16     A.  We started to implement the bullhorn due to
17  the fact that, again, we did have a brand new
18  bullhorn and then it was not broken.
19     Q.  Okay.  Now, what announcement was intended
20  to be given?
21     A.  So the announcements are going to be
22  "Police, search warrant," address of this, and then
23  the -- that was -- that's your full announcement.
24  So "Police, search warrant," the residence, whatever
25  it's going to be.

88

1     Q.  Okay.  And so for an apartment, is it the
2  official or unofficial or Standard Operating
3  Procedure that when you're doing a search warrant on
4  an apartment, that the announcements should include
5  the apartment number?
6     A.  I don't think you're going to find it in
7  the, like an SOP or in a policy.  But as far as what
8  should happen if it is an apartment, then yes, give
9  the correct apartment number.
10     Q.  Yeah, because if you just walk around in the
11  middle of an apartment complex and you scream
12  "Police officer, search warrant" or you just say, you
13  give the address but not the apartment number, well,
14  there's people in a dozen different apartments that
15  could hear you; right?
16     A.  Correct.
17     Q.  Okay.  Was it intended that day that when
18  Sergeant Backman gave his announcements, that he
19  would also give the apartment number in the
20  announcement?
21     A.  So, yes, it would be intended to give the
22  number.
23     Q.  Are you aware that when he did the first
24  announcement, he did not include the apartment
25  number?

89

1     A.  No.
2     Q.  Okay.  Now, when an officer is giving the
3  announcement, like let's say I get up there, I'm
4  doing the announcement and I say:  "Everyone, this is
5  Sergeant Adam Breeden of the Las Vegas Metropolitan
6  Police Department, occupants of 3050 South Nellis
7  Boulevard, Apartment 1125, we have a search warrant,
8  please open the door," let's say that that's the
9  announcement, that's given.
10        In terms of how long you wait for somebody
11  to come to the door, the reasonable amount of time,
12  would you start that time from the beginning of the
13  announcement, when I first start speaking, or you
14  would you judge that from the end of the
15  announcement?
16     A.  So once you start the announcements is
17  you're, basically, would be starting the clock of
18  when we're going to go.  So if we're going to get
19  about two announcements, that's your first
20  announcement, second announcement, conclusion.
21  Conclusion.
22     Q.  Okay.  So are you saying that's written,
23  unwritten, SOP, or informal policy of Metro as to how
24  they assess that time, from the beginning of the
25  announcement rather than from the end?

LEXITAS™

Garth Findley    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90

1    A. So yes. You're not going to find it in a
2    SOP. Your -- what we go off of is the reasonable
3    amount of time. So what we're going to do with part
4    of the tactical plan is going to be, we're going to
5    give out a couple of these announcements, and then
6    after that, this is what we're going to do, so
7    following that.
8    Q. Okay. So why would it make any sense to
9    start that time from the beginning because I haven't
10   finished speaking? I haven't announced the apartment
11   number; I haven't said "Police, search warrant" yet.
12   How could somebody understand what was intended if
13   you measure that time in seconds from the beginning?
14   A. I would say that if you're dealing with
15   someone who is a homicide suspect, they know they
16   just committed a murder and they hear police outside
17   their door, yelling on a bullhorn, they would
18   probably have a good indication that they -- we're
19   there for them.
20   Q. All right. But it wasn't a homicide suspect
21   in this time. It was an innocent young man who
22   hadn't committed any homicide; right?
23   A. Well, he wasn't innocent. He had several
24   shooting cases that North Town was looking at.
25   Q. You believe he had shooting cases?

91

1    A. Yeah.
2    Q. Who told you that?
3    A. That was after the fact, yes. So he --
4    you're saying he's innocent. He -- he was linked to
5    a couple of shooting cases up in North Town. So our
6    gang investigations team was able to give that
7    information out.
8    Q. Do you believe he was part of a gang?
9    A. I don't know.
10   Q. Okay. Well, you didn't know anything about
11   Mr. Williams being inside before he was shot; right?
12   A. No.
13   Q. And, in fact, even after he was shot, you
14   assumed it was one of the suspects, Mr. Rembert or
15   Mr. Fisher, and then it turned out not to be; right?
16   A. Correct.
17   Q. Okay. So in terms -- going back to Knock
18   and Announce, so the third requirement of Knock and
19   Announce is for a reasonable amount of time to pass
20   for somebody to come to the door and ascertain that
21   it truly is officers and provide them admittance.
22   Who was in charge of that that day?
23   A. You say that I can be. I'm the team leader
24   on that incident.
25   Q. Okay. And you -- you had not preplanned for

92

1    there to be any certain amount of time in seconds;
2    correct?
3    A. As far as seconds go, no. We're going off
4    of the size of the structure, how small it was, the
5    apartment, who we're dealing with, all those
6    mitigating factors; and then, again, applying that
7    to case law, which is a reasonable amount of time to
8    come to the door or to comply.
9    Q. Regarding the announcement, do you believe
10   that the announcement requirement is met? Let's
11   assume this was just a single family residence, not
12   an apartment. Do you think that's met by the simple
13   announcement "Police, search warrant"?
14   A. So say that question again.
15   Q. Yeah. So if -- if I were doing, executing a
16   search warrant of a single family residence and I
17   just walked up to the front door and I announced
18   "Police, search warrant," do you think that is a
19   legally sufficient announcement?
20   A. No. I mean, you're going to have to
21   identify the address of a police search warrant,
22   residence of this location.
23   Q. Okay. So if the announcement in this case
24   were just "3050 South Nellis Boulevard, No. 1125,
25   police, search warrant," do you think that's

93

1    sufficient?
2    A. Yes.
3    Q. So do you believe as fast as I can yell that
4    two times, that immediately upon the ending of the
5    second announcement, that force can be used to enter
6    that apartment?
7    A. Depending on the structure that you're
8    applying and who you're dealing with, those would be
9    the factors that you also have to consider.
10   Q. So let's say it's a super dangerous person
11   wanted for a homicide, you think you do not have to
12   wait any longer than however fast you can yell
13   "3050 South Nellis Boulevard, No. 1125, police,
14   search warrant"?
15   A. And what's the size of this apartment?
16   Q. Well, we'll assume it's like a 700-square
17   foot apartment.
18   A. Yes.
19   Q. Okay. And your testimony earlier was that,
20   at least at one time, there was a ten second waiting
21   requirement.
22   A. Correct.
23   Q. Okay. And then it just changed to
24   "reasonable"?
25   A. Correct.

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1    Q.   And I mean, just hypothetically, do you
2   think one second is a reasonable amount of time to
3   wait?
4    A.   No.
5    Q.   How about three seconds?
6    A.   No.
7    Q.   How about seven seconds?
8    A.   Now you're getting into small apartment, so
9   yeah.
10    Q.   Okay.  So I'm trying to figure out where you
11   draw the line in terms of seconds.  Do you draw the
12   line at five seconds?
13    A.   You're saying "seconds," and so what we do
14   is go off of your announcement.  So what is a
15   reasonable amount of time, again, going back to
16   compliance, surrendering, submitting, all those
17   factors.  You're assuming every time that you ask
18   this question that someone does come to the door.  I
19   don't know that.  A lot of times they don't come to
20   the door.
21        So how long do a give a murder suspect to
22   sit inside?  Because that's what we have to consider
23   is our safest tactic for our officers as well as
24   everybody else.  So the more time you give a murder
25   suspect to figure out if he wants to resist, grab a

95

1   weapon, run away, take someone hostage, you also
2   have to apply those factors.  You just can't sit
3   there and look at a reasonable amount of time to
4   come to the door.  There's other factors that we
5   take in consideration.
6    Q.   But under Knock and Announce, don't you have
7   to provide the people inside with the same reasonable
8   amount of time, whether it's a murder suspect or a
9   littering suspect?
10    A.   So we give them that reasonable amount of
11   time, and then we also apply those factors that I
12   mentioned before.
13        MR. BREEDEN:  All right.  I'd like to
14   provide you, we'll have this marked as Exhibit 1 to
15   this deposition.
16        (Whereupon Findley/Plaintiff's Exhibit
17        No. 1 was marked for identification.)
18   BY MR. BREEDEN:
19    Q.   Have you ever seen this before?
20    A.   So it's going to be our SWAT policies.
21    Q.   And just for the record, these are SWAT
22   policies and procedures related to Controlled Entry
23   Tactics, and it's LVMPD-1490 and 1491.
24        Now, I will represent to you that, you know,
25   there's probably been 20,000 pages of documents

96

1   produced in this litigation, and these two pages are
2   really the only thing that I would describe as
3   written training on Controlled Entry Tactics and
4   Knock and Announce that I've been able to find in
5   SWAT's training materials.  Are you aware of
6   something other than this?
7    A.   No.
8    Q.   Okay.  Now, it does mention one case,
9   Wilson vs. Arkansas.  This is on 1491.  Do you happen
10   to know Wilson vs. Arkansas and what the holding was
11   in that case?
12    A.   Not the exact court case and the details of
13   it, but I remember reading it.  I just can't say
14   "recall" because there's a bunch of them.
15    Q.   Were you ever trained on the Ninth Circuit
16   case of United States vs. Banks?
17    A.   So I've heard that case before.
18    Q.   Okay.  Can you tell me, from memory, what
19   that case said or what it required?
20    A.   Not to my recollection.
21    Q.   There's another case United States vs.
22   Granville.  Have you ever been trained on that case?
23    A.   No.  I haven't heard of Granville.
24    Q.   Okay.  So you wouldn't be able to tell me
25   what the decision was in United States vs. Granville

97

1   and how that relates to Knock and Announce?
2    A.   No.
3    Q.   Okay.  Would you agree with me that, prior
4   to officers using force to enter the apartment, that
5   no one inside the apartment said or did anything or
6   reacted in any way?
7    A.   So prior to entry, we did not hear anybody
8   say anything.  No announcements from inside of the
9   apartment.
10    Q.   So no one can come along in this case and
11   say: "Oh, heard a guy yell 'Get a gun'; I heard a
12   guy yell 'Police, run out the back'"?
13        Nothing like that happened; right?
14    A.   We did not hear that.
15    Q.   And other than a generalized suspicion,
16   there was nothing any officer actually observed that
17   morning to lead them to believe that there were any
18   weapons inside?
19    A.   I wouldn't say that you're -- the way you
20   say it, as far as a "general suspicion."  It's
21   your -- you got the entire SWAT team that's been --
22   has a lot of experience in not only the SWAT tactics
23   but as -- as in patrol and then dealing with these
24   type of situations where you're dealing with a
25   flophouse, dealing with someone who has, say,



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1  committed that homicide. So you have those
2  indications that there is access to weapons.
3      You're being told by the detectives that
4  there's prior cases of these two individuals who
5  were in that specific complex on with Fisher, having
6  a rifle slung to his back. You have Rembert with
7  his vehicle being towed where there was an MP5 that
8  was in the vehicle. You have that shooting that
9  occurred, accompanied with the homicide. So there
10  is a lot of indication that there is going to be
11  some access to weapons inside.
12      Plus it's a flophouse. It's a narcotics
13  house. So going off our experience, that's what we
14  go off of. So it's just not a general suspicion.
15  It's -- it's we go off of, yeah, it's a pretty good,
16  going off our experience, that there's going to be
17  some type of weapon inside, and we were correct
18  because there was a gun in there.
19      Q. Well, with due respect though, I think that
20  you've legally just described what is literally
21  called "general suspicion." I mean, for example, the
22  mere fact that I saw on somebody's Facebook page a
23  picture of them with a gun, two or three months
24  earlier, that doesn't mean that they automatically
25  have that gun with them at all times; right?

99

1      MR. ANDERSON: Objection to the form of the
2  question. Go ahead and answer.
3      THE WITNESS: Well, I would say if
4  they're -- if they have pictures of a gun, then
5  they're going to be associated with the gun.
6  There's going to be access to that gun.
7  BY MR. BREEDEN:
8      Q. You -- you would admit that, before police
9  used force to enter the apartment, no gun was
10  specifically seen or heard?
11      A. We had information that both of those
12  subjects, Fisher and Rembert, both, were in
13  possessions of firearms. So Fisher had a firearm
14  strapped to his back; and then on the secondary
15  date, there was a gun, MP5, that was in his BMW that
16  was towed later.
17      Q. But you're talking about things that were
18  observed weeks or months earlier. You're not talking
19  about anything that particular day; correct?
20      A. Not that specific day.
21      Q. Okay. And, in fact, neither of the suspects
22  was even inside the house or the apartment that day;
23  right?
24      A. After the fact, no. We found out they
25  weren't in there.

100

1      Q. Now, you're aware that, under the -- the
2  reasonable amount of time analysis for Knock and
3  Announce, that what is reasonable can vary depending
4  on certain factors. For example, you've already
5  mentioned one of them, which is the size of the
6  apartment; right?
7      A. Correct.
8      Q. Okay. And isn't one of the factors whether
9  or not someone is likely to be asleep inside?
10      A. I don't think that's necessary that if
11  they're asleep.
12      Q. So do you believe that one of the factors
13  affecting the reasonableness is that, if a person is
14  likely to be asleep inside, they should be given a
15  longer time to respond?
16      MR. ANDERSON: Objection. Form. Go ahead.
17      THE WITNESS: Well, it depends on what
18  their actions are going to be. Are they going to
19  come to the door? I don't know. So give them a
20  reasonable amount of time. I give them a reasonable
21  amount of time.
22  BY MR. BREEDEN:
23      Q. Have you been trained on that, that the --
24  the amount of time that is considered reasonable
25  should be longer if people inside are likely asleep?

101

1      A. Not formal training.
2      Q. Okay. How about informal?
3      A. Not informal training.
4      Q. All right. So as far as your personal
5  experience is, Las Vegas Metro Police Department has
6  never trained you on that issue?
7      A. As far as if someone's asleep and comes to
8  the door, no. Just going off the case law as far as
9  what we have here, which is give them a reasonable
10  amount of time, and also the other factors of if
11  they can submit, if they can comply.
12      Q. Now, you would agree with me that,
13  hypothetically, if somebody were asleep, first of
14  all, you would need just kind of some general time to
15  wake up; right? And then, second of all, you would
16  need some time maybe to make yourself decent. I
17  mean, you might be sleeping without clothes or in
18  your underwear and you don't want to come to the door
19  in that way; and then, third, you might be moving a
20  little slower, in general, when you first wake up.
21      Would you just agree that all that is kind
22  of generally accurate?
23      MR. ANDERSON: Objection to form. Go ahead.
24      THE WITNESS: So in this case, I don't
25  know. I don't know if they're asleep. I don't know



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1  what their condition is.
2  BY MR. BREEDEN:
3     Q.  Okay.  That -- that kind of leads me to my
4  next point.  Do you think it is more likely than not
5  that Mr. Williams was asleep when this SWAT mission
6  began?
7        MR. ANDERSON:  Objection.  Form.
8        THE WITNESS:  I don't know his condition.
9  BY MR. BREEDEN:
10    Q.  Well, you say that.  But, first of all, the
11 very fact that it's 5:00 a.m. suggests that the
12 occupants inside would probably be asleep; right?
13    A.  I don't know.  This is a 24-hour town.
14 People have all sorts of odd shifts.
15    Q.  You agree with me that the majority of
16 people are still sleeping at 5:00 a.m. in a county?
17    A.  I wouldn't agree with you.
18    Q.  Okay.  And then as it actually turns out,
19 the way that Mr. Williams was found inside the
20 apartment, he was laying down.  He had his head on a
21 pillow, on a futon.  He had a blanket over him.
22        Did he appear that he had been sleeping,
23 based on those facts?
24        MR. ANDERSON:  Objection.
25        THE WITNESS:  I don't know.  I didn't see

103

1  him.
2  BY MR. BREEDEN:
3     Q.  When you assessed the reasonable amount of
4  time that it would take somebody to come to the door,
5  ascertain that it was police and provide them entry
6  for that search warrant, did you consider at all the
7  fact that people were likely to be asleep inside?
8     A.  So we're not going to -- I'm not going to
9  sit there and say that the subject is going to be
10 automatically sleeping or sleeping at the time.
11 Again, like I referred to, a 24-hour day town.  So I
12 don't know what the -- if that person is, what their
13 condition is, if they're sleeping or not.  So we
14 let -- as far as the reasonable amount of time,
15 that's what we're going off of, the amount.
16    Q.  Okay.  Incidentally, not everybody who bangs
17 on the front door and says "Police, open up" are
18 actually police; right?
19    A.  I don't know.
20    Q.  Well, have you ever heard of incidents where
21 maybe somebody, a burglar or a home invasion, to get
22 people to open the doors, claimed they were police
23 and they were not?
24    A.  They've probably done that before.
25    Q.  Yeah.  So if you lived in a rough

104

1  neighborhood, you might not automatically assume that
2  people at the front door are police merely because
3  they say "Police"; right?
4     A.  And I don't think they'd be using a
5  bullhorn.
6     Q.  Do you think this was a rough neighborhood
7  or a rough apartment complex?
8     A.  Yes.
9     Q.  Are you aware of gang activity in that area?
10    A.  Yes.
11    Q.  Do you believe it might be reasonable for a
12 young man to have a firearm for his own self-defense?
13        MR. ANDERSON:  Objection to form.
14        THE WITNESS:  I would say, within that
15 neighborhood, a lot of people carry guns.  A lot of
16 people who are criminals carry guns.
17 BY MR. BREEDEN:
18    Q.  Some of them carry the guns because they're
19 criminals, and some of them carry guns for
20 self-defense; right?
21    A.  Correct.
22    Q.  I don't know that I've ever met a law
23 enforcement officer that didn't frequently carry a
24 gun for their own self-defense.  Do you do that?
25    A.  Yes.

105

1     Q.  At your own home, do you sleep in an area
2  where maybe you have a gun in a nightstand or a gun
3  that you could easily access if intruders came into
4  your home?
5     A.  Yes.
6     Q.  And that's loaded?
7     A.  Yes.
8     Q.  And if somebody believes that someone is
9  unlawfully breaking into their home, they do have a
10 right, in the State of Nevada, to use deadly force,
11 don't they?
12        MR. ANDERSON:  Objection.  Form.
13        THE WITNESS:  Yes.
14 BY MR. BREEDEN:
15    Q.  Have you ever been trained on Nevada Revised
16 Statute 179.055?
17    A.  What's the -- what is it?
18    Q.  Well, and that was kind of my first
19 question, and I -- I know, you probably don't have
20 the entire Nevada Revised Statutes memorized.
21    A.  No.
22    Q.  But -- but does that ring a bell when I say
23 that?
24    A.  Not just a number, no.
25    Q.  Okay.  So that is a statute pertaining to

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

106

1    when officers can use force to enter a dwelling to
2    execute a warrant. Are you aware that that statute
3    contains the specific phrase that officers cannot use
4    force until they are, quote, "refused admittance,"
5    end quote?
6        A.   Yes.
7        Q.   In this particular case with the search
8    warrant and Mr. Williams, what actions of
9    Mr. Williams led you to believe that he was refusing
10   admittance to officers?
11       A.   Well, first off, we didn't know Mr. Williams
12   was in there. Second of all, we did not hear
13   anybody inside actually comply, saying that they
14   were inside, that they're coming to the door. We
15   re- -- we waited a reasonable amount of time and
16   then conducted the breach of the door.
17       Q.   Okay. But there isn't anything specific you
18   could point to that any occupant inside did or said
19   that led you to believe that they would refuse
20   admittance, is there?
21       A.   Not anything specific.
22       Q.   For example, no one inside yelled "We're not
23   coming out"; right?
24       A.   No.
25           (Reporter request.)

107

1           THE WITNESS: I said "no."
2    BY MR. BREEDEN:
3        Q.   That particular morning, did you know how
4    many people, specifically, were inside the apartment?
5        A.   We were being told by homicide that it
6    would be Rembert inside. We were advised, prior to
7    the servicing, that Fisher, who had the ankle
8    monitor, was pinging not there. Going off of
9    factors that it's a flophouse, going off the recon
10   that Officer Hoskins conducted prior to several
11   subjects walking by him going into that apartment,
12   we had a safe indicator and I would say experience
13   that there would be multiple subjects inside.
14       Q.   And it actually turned out to be wrong.
15   Mr. Rembert was not inside; right?
16       A.   Correct.
17       Q.   And individuals inside the apartment, other
18   than Mr. Rembert, you had no idea who those
19   individuals were; right?
20       A.   Correct. I didn't know who Mr. Williams
21   was or the secondary subject.
22       Q.   Did you have any idea of the floor plan or
23   the layout of the apartment?
24       A.   We had a floor plan, two floor plans we
25   were considering. We had the -- the printout of

108

1    both of them and were looking that it was possibly
2    the larger floor plan.
3        Q.   As far as you knew, could the occupants
4    inside have been women or children?
5           MR. ANDERSON: Objection. Form.
6           THE WITNESS: So we had no indication from
7    the homicide detectives that there would be women or
8    children inside there.
9    BY MR. BREEDEN:
10       Q.   But don't you have to consider that that
11   might be the case, that there might be innocent
12   people -- women, children, elderly people -- inside
13   when you serve these warrants?
14       A.   Again, going off of what they provided us,
15   there was no indication of, positive indication that
16   there was any women or children, elderly inside.
17   You can always kind of have that factor in mind, in
18   the back of your head, that there could be.
19       Q.   Well, I mean, literally a year before this,
20   Ms. King was inside her apartment. She was in there
21   with her children; right?
22       A.   Correct.
23       Q.   And you believed there were dangerous
24   suspects inside, and there were none; right?
25       A.   Correct.

109

1        Q.   And she was pretty severely injured because
2    of that, wasn't she?
3        A.   Yes.
4        Q.   In -- in terms of use of force, you never
5    used any kind of force or deployed your firearm that
6    morning, did you?
7        A.   I had my firearm out. I wouldn't say like
8    I deployed it. It was -- it was out and I didn't
9    use it.
10          MR. ANDERSON: I'd like to show you what
11   we'll have marked as Exhibit 2 for your deposition.
12          (Whereupon Findley/Plaintiff's Exhibit
13          No. 2 was marked for identification.)
14   BY MR. BREEDEN:
15       Q.   Take just a second, look that over, and let
16   me know if you've ever seen that document before.
17       A.   (Witness complies.) Haven't seen that, but
18   the material that's in it is familiar from policy.
19       Q.   Okay. So this is a policy from the
20   State of Nevada Commission on Peace Officers
21   Standings (sic) and Training. It's Performance
22   Objective Reference Material, and it refers
23   specifically to the Knock and Announce requirement.
24          It's your testimony that you've never seen
25   this document prior to today?

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1    A.  No, not this document.
2    Q.  And would you agree with me that you've
3  never been given any training by Las Vegas Metro
4  Police Department on Knock and Announce, at least as
5  this specific document describes it?
6    A.  No.  As far as someone coming in and -- and
7  showing this document and -- no.
8    Q.  Yeah.  So if we go down to this Wait/Refusal
9  requirement, it says refusal could be based on a
10  verbal statement.  But in this case with
11  Mr. Williams, nobody gave any verbal statement of any
12  kind, refusing officers entry before force was used;
13  correct?
14    A.  Correct.
15    Q.  And it says that individual conduct -- you
16  know, for example, if you saw maybe somebody inside
17  running to grab a gun or take a defensive position,
18  you know, that that might justify a shorter amount of
19  time.  But nothing like that occurred for this
20  particular search warrant; correct?
21    A.  Prior to, no.
22    Q.  Yeah.  And then so the last one is the
23  passage of a reasonable amount of time.  And here,
24  the Commission on Peace Officer Standards and
25  Training give some guidance, and it says, quote:

111

1      "Note:  The amount of time that is
2  considered reasonable will depend on all the
3  circumstances.  Approximately one minute would be a
4  safe period in most cases, but it can be less,
5  especially if police officers know that someone is
6  inside and awake," end quote.
7      Have you ever, until this deposition, heard
8  that one minute rule?
9    A.  No.
10    Q.  Can we agree with you that when officers
11  showed up, when SWAT showed up to serve this warrant,
12  they did not intend to wait one minute after
13  announcements were given?
14    A.  Correct.
15    Q.  The example that it gives when that time
16  might be less is when peace officers know that
17  someone is inside and awake in the dwelling.  But in
18  Mr. Williams' particular case, you had no information
19  whether he was asleep or awake at the time; right?
20    A.  Correct.
21    Q.  So at least on under this standard, you
22  would not be able to argue that the time could be
23  less than a minute because officers knew someone was
24  inside and awake because you had no such information;
25  correct?

112

1      MR. ANDERSON:  Objection.  Form.
2      THE WITNESS:  Correct.  We didn't know
3  Mr. Williams was in there.
4  BY MR. BREEDEN:
5    Q.  Would you agree that, at least under this
6  written standard, SWAT did not wait a reasonable
7  amount of time before using force to enter?
8      MR. ANDERSON:  Objection.  Form.  Go ahead.
9      THE WITNESS:  We did not wait a minute,
10  which is according to this document here.  I believe
11  we waited a reasonable amount of time.
12  BY MR. BREEDEN:
13    Q.  Okay.  So you waited what you believe was a
14  reasonable amount of time, but according to that
15  written standard, what was not the minute that was
16  recommended; is that what your testimony is?
17      MR. ANDERSON:  Objection.  Form.
18      THE WITNESS:  Correct.  We did not wait a
19  minute, but I -- we waited what a reasonable amount
20  of time is and after the two announcements.
21  BY MR. BREEDEN:
22    Q.  I think we mentioned earlier in this
23  deposition that neither suspect, Fisher or Rembert,
24  were actually found inside the apartment after all
25  the dust cleared; right?

113

1    A.  Correct.
2    Q.  And, in fact, you were there to execute a
3  search warrant for certain property, and none of that
4  property was found inside the apartment either;
5  correct?
6    A.  I don't know about it.
7    Q.  You don't know, one way or another?
8    A.  No.  I wasn't told if there was a gun in
9  there or any evidence that was found in there.
10  We -- I never was -- that was homicide's thing.
11    Q.  The firearm that Mr. Williams used, was that
12  the firearm used in the homicide that was being
13  investigated?
14    A.  I don't know.
15    Q.  And you agree that prior to January 10th of
16  2022, you had never heard of Isaiah Williams or
17  investigated him; correct?
18    A.  Correct.
19    Q.  Do you recall what type of property was
20  sought in the search warrant?
21    A.  There was going to be the clothing that was
22  worn during that, that day.  They were looking for a
23  firearm, paraphernalia related to firearms, like
24  ammo, and as well as cellular devices.
25    Q.  Okay.  Now, in some search warrants, like a

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1  search warrant for narcotics, there's a concern by
2  police that the narcotics could be easily disposed
3  of. For example, they could be flushed down a
4  toilet.
5      A. Yes.
6      Q. Well, was there any such concerns for the
7  items listed in this search warrant?
8      A. Yes.
9      Q. Okay. Have you ever heard of a .22 or a
10 .32 caliber handgun being flushed down a toilet?
11     A. You probably couldn't flush it down the
12 toilet, but you could definitely alter it to where
13 it wouldn't be matched towards any type of evidence
14 relating to -- to the crime.
15     Q. Okay. Well, let me ask you that just the
16 nature of the things that you are searching for,
17 clothing and a handgun, would you agree with me that
18 those could not be as easily disposed of as, for
19 example, narcotics?
20     A. Clothing, you could definitely destroy
21 fairly quickly as well as cellular devices, you
22 could destroy pretty quick.
23     Q. Well, how? How would you destroy clothing?
24     A. Burn it.
25     Q. Any other -- any other way you could think

115

1  of?
2      A. You could throw them in the oven and start
3  burning it. You could throw some type of acid on
4  there, some type of bleach, to get rid of that some
5  of that DNA that could link you to the crime.
6      Q. When you say the cellular devices, that
7  somebody could destroy them, you just mean maybe they
8  could step on them? Smash them?
9      A. Yeah. I mean, cellphones can be destroyed.
10 Hilary Clinton was able to do pretty good. But yes,
11 cell, cellular devices can be destroyed.
12     Q. Okay. Give me just a second to look over my
13 notes here. Did you ever see a physical copy of the
14 search warrant?
15     A. Yes.
16     Q. To your knowledge, was it ever left at the
17 apartment scene?
18     A. I don't know.
19     Q. Who would be in charge of that?
20     A. Would be homicide.
21     Q. The CIRT report contains the following
22 statement here, quote: "Six seconds after starting
23 his announcement, Officer Bertuccini inserted the
24 stun stick through the western facing window," end
25 quote. That's actually contained at LVMPD-4386.

116

1      Now, it says "six seconds" there. I believe
2  that's in dispute. I believe that the video shows it
3  was even fewer amount of seconds. But would you
4  agree that it was no longer than six seconds?
5      MR. ANDERSON: Objection to form.
6      THE WITNESS: I don't know as far as the
7  time frame. I know that Officer Bertuccini was
8  supposed to, by the plan, insert it after that
9  announcement.
10 BY MR. BREEDEN:
11     Q. All right. Well, let -- let me phrase it a
12 little differently: Las Vegas Metro Police's own
13 CIRT report concluded that the wait time had only
14 been six seconds. Do you disagree with that? Do you
15 think it was longer?
16     A. As far as the insertion?
17     Q. As far as the amount of time, from when the
18 announcement started, to when the stun stick was
19 inserted through the window.
20     A. So they -- yes, it was -- I've read that
21 report. It said six seconds. Yes.
22     Q. And do you believe that six seconds was a
23 long enough time for Mr. Williams to wake up, walk to
24 the door, ascertain that it was police, and provide
25 them lawful entry?

117

1      A. You're saying that he needs to wake up. I
2  don't know if he needs to wake up. Right next to
3  the door is where he was at, which is just several
4  feet away. So six seconds is plenty of time to
5  announce, to comply, and to come to the door, and
6  that was just off a insertion of a -- the stun
7  stick.
8      Q. I'm not going to do this, okay, because I'm
9  not going to personalize this. But if I came to your
10 home at 5:00 a.m. and you were sleeping somewhere in
11 your home and I started knocking, wanting you to come
12 to the door, do you think you would do that within
13 six seconds?
14     MR. ANDERSON: Objection. Form.
15     THE WITNESS: Not at my house.
16 BY MR. BREEDEN:
17     Q. When we look at this, Mr. Williams did draw
18 a firearm, and he fired it on a group of people. It
19 turned out to be police officers. Would you agree
20 with me that, if Mr. Williams believed those were
21 police officers, that would be a pretty dumb thing
22 for him to do?
23     A. I would say that he had full intentions on
24 what his plans were, given the fact that he was a
25 violent individual. And, again, this is learning

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

118

1  after the fact and learning that he's wanted for
2  robberies up in North Town, that he probably thought
3  that we were coming for him, and so that was his
4  intention was to shoot at officers as they came in.
5     Q.  Well, would you agree with me that that
6  would essentially be suicide by cop?
7     A.  I don't think it would be suicide by cop.
8  I think he -- he figured that he was going to shoot
9  officers as they came in.  I don't know what his
10 plan was, if it was suicide by cop.
11    Q.  Well, I mean, look, if I opened fire on a
12 group of probably 12 SWAT officers who are fully
13 armed, coming into my home, don't you think that
14 that's suicidal to do?
15       MR. ANDERSON:  Objection to form.
16       THE WITNESS:  It could be suicide by cop.
17 BY MR. BREEDEN:
18    Q.  Would you agree with me that the fact that
19 Mr. Williams did that tends to suggest that he did
20 not properly understand who was coming through the
21 front door?
22       MR. ANDERSON:  Objection.  Form.
23       THE WITNESS:  No.
24 BY MR. BREEDEN:
25    Q.  Did you ever see any officer providing

119

1  medical aid to Mr. Williams?
2     A.  Yes.
3     Q.  Who?
4     A.  It would be our TAC medical doctors.
5     Q.  Who is that?
6     A.  We had Will Bridges, and then we also had a
7  trauma doctor as well, but I believe the SAR, one of
8  the SAR guys ended up attending to him.
9     Q.  What, if anything, did they do?
10    A.  I don't know.  I didn't see what they did.
11 I just saw guys, which was looked like SAR, working
12 on Mr. Williams.
13    Q.  At some point, did you enter the apartment
14 and see Mr. Williams?
15    A.  I stepped in, saw that Mr. Williams was
16 down, right at the living room area, and I was
17 stepping out because I was very busy, running dual
18 cons, which is dual radios, talking to the area
19 command, coordinating that, as well as talking with
20 the guys, all the SWAT officers.
21    Q.  So when you saw Mr. Williams, he had been
22 placed on the floor?
23    A.  Correct.
24    Q.  Were -- were you ever made aware, or when
25 were you made aware of the fact that when he was

120

1  actually shot, he was laying down on the couch or
2  futon?
3     A.  I was made aware of that after the fact.
4     Q.  Okay.  When you saw Mr. Williams, how many
5  seconds or minutes was it after the shooting?
6     A.  I would say probably about 30, 40 seconds.
7  It took -- it took quite a bit of time because the
8  team got bogged down coming into the threshold of
9  the residence.  I was at the -- the back.  They
10 ended up taking Officer Kubla out of there, and I
11 had to verify to make sure that he was injured, that
12 he was shot, and so then I stood outside and started
13 coordinating that there was an officer down.  They
14 advised me that the subject inside was shot, which
15 was Mr. Williams.
16       So as far as that time frame, I don't know
17 how long that was, and then I was able to peak my
18 head in and see that Mr. Williams' head now was at
19 the -- in the living room.
20    Q.  And he was laying on his back, on the floor?
21    A.  Yes.
22    Q.  Did he appear to be deceased to you?
23    A.  I don't know.  I didn't get a good look.
24    Q.  Looking back on this operation that you were
25 the team leader, is there anything that you would

121

1  change about it?
2        MR. ANDERSON:  Objection.  Form.
3        THE WITNESS:  So there's -- there's quite a
4  few things that we would change.  And after every
5  mission, you know, we sit there and debrief what we
6  could have done better, and there's obviously some
7  stuff that -- that we need to look at and do better.
8        I know that homicide is kind of constrained
9  on what they could do.  But looking up some
10 surveillance, making sure that the target is in
11 there; utilization of different techniques, whether
12 it's a shock lock or something on the locking
13 mechanism or even a breach going after a No Knock
14 Warrant so we could go with the breaching capability.
15 So those are just some things that we could throw
16 out there; or if it comes down to it, you don't
17 serve it.  You can do a take -- takeaway with
18 different units, so.
19 BY MR. BREEDEN:
20    Q.  Is one technique to get some surveillance on
21 the apartment, wait until everybody leaves, and then
22 go to serve it?
23    A.  No.  But if you see maybe the target that
24 you're looking for, again, take him away.  If you
25 have information that he is the only person inside,

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

122

1  that would be a good, good technique, and then you
2  know that nobody else is inside.  You can safely
3  serve that search warrant.
4     Q.  Now, you know, I asked you if you thought
5  there were things that could be done better or could
6  have been changed, and you mentioned:  Well, we could
7  have done surveillance a little differently; we could
8  have possibly used a shock lock; we could have
9  applied for a No Knock Warrant.
10       Have you ever served a No Knock Warrant?
11    A.  No.
12    Q.  Would you agree with me that they are very
13  rarely, if ever, used by Las Vegas Metro Police
14  Department?
15    A.  I know that kind of the -- as far as what
16  SWAT has to do now is go through the application of
17  a No-Knock Warrant.  Just because we get a No-Knock
18  Warrant doesn't mean that we serve it as a No Knock.
19  We can still put out those announcements as well.
20    Q.  Okay.  So do you believe that if you had
21  applied for a No-Knock Warrant for this search
22  warrant, it would have been granted?
23    A.  I have no idea.
24    Q.  Okay.  Do -- is there an informal policy at
25  Metro, right now, that no-knock warrants will not be

123

1  issued?
2     A.  No.  There's no --
3     Q.  Or sought?
4     A.  Yeah, there's no like a formal policy,
5  informal policy, that no knocks will not --
6  that's -- what they're doing now is, if they, if --
7  nowadays, they will need to get a No Knock in order
8  to utilize a Controlled Entry Tactic.
9     Q.  So did you ever use a Controlled Entry
10  Tactic for a No Knock when you were on SWAT?
11    A.  No.
12    Q.  Who is the lieutenant that replaced
13  Lieutenant O'Daniel?
14    A.  Adrian Beas.
15    Q.  Can you spell the last name for me?
16    A.  B-E-A-S?
17       MR. ANDERSON:  Not sure.
18       THE WITNESS:  I'd have to look at my phone.
19       MR. ANDERSON:  I think you're right,
20  B-E-A-S.
21  BY MR. BREEDEN:
22    Q.  So we mentioned surveillance.  We mentioned
23  possible use of a shock lock.  Possible application
24  for a No-Knock Warrant or possibly just don't serve
25  it.  What other things do you think could have been

124

1  changed about service of this warrant that would have
2  made it safer for officers or the member of the
3  public?
4     A.  That would be, probably be my -- my picks
5  right there.
6     Q.  Is it your understanding that Las Vegas
7  Metro Police Department now considers CET entry to be
8  in conflict with the constitutional Knock and
9  Announce requirement?
10       MR. ANDERSON:  Objection to form.
11       THE WITNESS:  I don't know if they view it
12  as in conflict.  I just know that what they're doing
13  is going away and going towards if you are going to
14  utilize that technique, you'll have to get a
15  No-Knock service.  And, again, going off of that
16  doesn't mean that we'll serve it as a No Knock.
17  BY MR. BREEDEN:
18    Q.  You gave a CIRT interview.  Have you
19  given -- and this deposition obviously.
20       Have you given out any other recorded
21  statements about what occurred?
22    A.  No.
23    Q.  Have you ever asserted your Fifth Amendment
24  right to remain silent, to refuse to answer questions
25  about this incident?

125

1     A.  No.
2     Q.  Do you have any remorse or regrets about
3  what happened to Mr. Williams?
4     A.  Yes.  I'm sure that, you know, looking at
5  this, this mission, there was some good things and
6  bad things that occurred.  Obviously, an individual
7  was killed; and then obviously some officers were
8  injured.  So looking at hindsight, you're -- we're
9  always trying to do better, better tactics, and
10  learn from it and -- and move on.
11    Q.  Do you agree that this was preventable and
12  Mr. Williams didn't have to die?
13       MR. ANDERSON:  Objection to form.
14       THE WITNESS:  I wouldn't be able to answer
15  that.
16  BY MR. BREEDEN:
17    Q.  You just have no opinion on it or -- or you
18  think that -- I don't understand your response.
19    A.  My personal opinion is that learning from
20  his prior history, what he was doing, carrying the
21  firearm, I know that our gang unit was actively
22  looking for him.  I know that North Town had active
23  cases on him.  I believe that Mr. Williams, going
24  off of just kind of history, experiences, that he
25  would have been hurt by someone out there.  He would



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| 126 |
| --- |

1  have been involved in some type of shooting.  I
2  think -- I think the safest thing would have been
3  for North Town to put a case on him and him to be in
4  jail at that time.
5      Q.  Hypothetically, if instead of believing
6  that Mr. Rembert was inside that apartment and,
7  instead, the information was that two unknown black
8  males were inside, what would have been done
9  differently?
10     MR. ANDERSON:  Objection to form.  Go ahead.
11 BY MR. BREEDEN:
12     Q.  Would CET have been used at all?
13     A.  Going off of we have no idea who these
14 people are and we're going after their property?
15     Q.  Correct.
16     A.  That would be up to the tactical commander.
17 I mean, we could sit there and give the options of
18 like we can go the CET route.  We don't know who
19 these people are inside, or we can wait a little bit
20 further and see if homicide, or whoever in this
21 scenario is, is to figure out who these people are
22 inside.
23     Q.  Well, which would you have recommended
24 hypothetically?  Would you have recommended "Let's do
25 this anyway with a CET," or would you have

| 127 |
| --- |

1  recommended a different route?
2      A.  I think we could have dug a little bit more
3  and figured out who was inside.
4      Q.  Because it was -- it was dangerous to do
5  this on a CET without knowing for certain who was
6  inside, wasn't it?
7      A.  Correct.  But we had the -- the only
8  information that we had was saying, from homicide,
9  that subjects were inside, which was Fisher,
10 Rembert; and then we also had their family, a step
11 mother, advising that's where they were at.
12     Q.  And that, that turned out to be bad
13 information, at least for this particular morning?
14     A.  For this particular morning, correct.
15     Q.  Do you know if either of the suspects
16 were -- were actually the lessor of the apartment?
17     A.  I don't know if they were.  But in the IAP,
18 it was saying it was just a flophouse, and I believe
19 that they weren't the lessee to it.
20     Q.  Why wouldn't all the officers in the line
21 have a ballistic shield?
22     A.  Because we, how we train, we'll just
23 usually have it up, up front or on the containment
24 positions.  It's very large, cumbersome.  So you
25 have to position it in a certain way that would be

| 128 |
| --- |

1  best for the team.
2      Q.  Officer Kubla was intended to be the first
3  man in; right?
4      A.  Correct.
5      Q.  Why wouldn't he have a ballistic shield?
6      A.  Again, that -- that's -- he was carrying a
7  rifle.  So it wouldn't have been possible to -- to
8  carry a shield.  It could have been part of the plan
9  to where the first subject goes in is carrying a
10 shield.  But more than likely, what you want to do
11 is carry a shield going through some type of
12 hallway, not necessarily through the entry point of
13 a residence like that.  So with a shield, again,
14 you're -- you're limited; you're cumbersome, and
15 then your -- your vision is limited.
16     Q.  Is it common for the first man in to have a
17 ballistic shield?
18     A.  No, it's not common.
19     MR. BREEDEN:  Okay.  Sergeant Findley, I
20 think those are all my questions.
21     Do you have anything, Mr. Anderson?
22     MR. ANDERSON:  No questions.
23     MR. BREEDEN:  All right.  We will go off
24 the record at this time.
25     THE VIDEOGRAPHER:  Before we go off, Craig,

| 129 |
| --- |

1  are you going to need the video?
2      MR. ANDERSON:  I do not need the video, but
3  I will order a copy.
4      THE REPORTER:  Thank you.
5      THE VIDEOGRAPHER:  This concludes today's
6  deposition given by Garth Findley, consisting of one
7  disc.  The time is 11:45 a.m.  Thank you.
8      MR. BREEDEN:  All right.  Craig.
9      MR. ANDERSON:  Appreciate it.
10     MR. BREEDEN:  I'll see you around.
11     THE REPORTER:  Do you have to leave so
12 quickly?  I have some questions.
13     Is an e-tran good for you?
14     MR. ANDERSON:  Yes, that's fine.
15     THE REPORTER:  Thank you.
16
17     (The deposition concluded at 11:45 a.m.)
18                  -oOo-
19
20
21
22
23
24
25

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

130

```
1              CERTIFICATE OF DEPONENT
2      PAGE   LINE   CHANGE            REASON
3      _____
4      _____
5      _____
6      _____
7      _____
8      _____
9      _____
10     _____
11     _____
12     _____
13     _____
14     _____
15     _____
16              *    *    *    *    *
17        I, GARTH FINDLEY, deponent herein, do hereby
          certify and declare the within and foregoing
18        transcription to be my deposition in said action;
          under penalty of perjury; that I have read,
19        corrected and do hereby affix my signature to said
          deposition.
20
21
22        _____
           GARTH FINDLEY      Deponent      Date
23
24
25
```

131

```
1              CERTIFICATE OF REPORTER
2
3        I, Dana J. Tavaglione, a Certified Court
     Reporter, licensed by the State of Nevada, do hereby
4    certify:
5        That I reported the deposition of the witness,
     GARTH FINDLEY, commencing on February 5, 2025, at
6    9:05 a.m.;
7        That prior to being examined, the witness was by
     me first duly sworn to testify to the truth, the
8    whole truth, and nothing but the truth; that I
     thereafter transcribed my related shorthand notes
9    into typewriting and that the typewritten transcript
     of said deposition is a complete, true and accurate
10   record of testimony provided by the witness at said
     time.
11
         I further certify (1) that I am not a relative
12   or employee of an attorney or counsel of any of the
     parties, nor a relative or employee of any attorney
13   or counsel involved in said action, nor a person
     financially interested in the action; and (2) that
14   pursuant to Rule 30(e), transcript review by the
     witness was requested.
15
         IN WITNESS HEREOF, I have hereunto set my hand,
16   in my office in the County of Clark, State of
     Nevada, this 14th day of February 2025.
17
18                    Dana J. Tavaglione
19       _____
         DANA J. TAVAGLIONE, RPR, CCR NO. 841
20
21
22
23
24
25
```