# Exhibit E - Deposition of Ofc. Kerry Kubla

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 130

1                    CERTIFICATE OF REPORTER

2    STATE OF NEVADA       )
                           )SS
3    COUNTY OF CLARK       )

4        I, Holly Larsen, a duly certified court reporter
     licensed in and for the State of Nevada, do hereby
5    certify:

6        That I reported the taking of the deposition of
     the witness, Kerry Kubla, at the time and place
7    aforesaid;

8        That prior to being examined, the witness was by
     me duly sworn to testify to the truth, the whole
9    truth, and nothing but the truth;

10       That I thereafter transcribed my shorthand notes
     into typewriting and that the typewritten transcript
11   of said deposition is a complete, true, and accurate
     record of testimony provided by the witness at said
12   time to the best of my ability.

13       I further certify (1) that I am not a relative or
     employee of counsel of any of the parties; nor a
14   relative or employee of the parties involved in said
     action; nor a person financially interested in the
15   action; nor do I have any other relationship with any
     of the parties or with counsel of any of the parties
16   involved in the action that may reasonably cause my
     impartiality to be questioned; and (2) that transcript
17   review pursuant to FRCP 30(e) was waived.

18       IN WITNESS HEREOF, I have hereunto set my hand in
     the County of Clark, State of Nevada, this 23rd day of
19   October, 2024.

20

21

22

23                              *Holly Larsen*

24                    _____

25                    HOLLY LARSEN, CCR NO. 680

Kerry Kubla      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2                DISTRICT OF NEVADA

 3

 4   LATIA ALEXANDER,              )
     individually as heir of      )
 5   ISAIAH T. WILLIAMS and in    )
     her capacity as Special      )
 6   Administrator of the Estate  )
     of ISAIAH T. WILLIAMS,       )
 7                                 )
                   Plaintiff,      )
 8                                 )
     vs.                          )Case No.
 9                                 )2:24-cv-00074-APG-NJK
     LAS VEGAS METROPOLITAN        )
10   POLICE DEPARTMENT, a          )
     political subdivision of the)
11   State of Nevada, et al.,      )
                                   )
12                 Defendants.     )
     _____)
13

14

15      VIDEOTAPED DEPOSITION OF KERRY KUBLA

16       Taken on Friday, October 11, 2024

17   By a Certified Stenographer and Legal Videographer

18               At 10:02 a.m.

19          At 400 South Seventh Street

20               Las Vegas, Nevada

21

22

23          Stenographically reported by:

24      Holly Larsen, NV CCR 680, CA CSR 12170

25           Job No. 57950 - Firm No. 116F
```

Case 2:24-cv-00074-APG-NJK    Document 55-7    Filed 05/16/25    Page 4 of 36

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**2**

```
 1   APPEARANCES:
 2   For the Plaintiff:
 3       MURPHY'S LAW, PC
         BY:  CORRINE MURPHY, ESQ.
 4       2620 Regatta Drive
         Suite 102
 5       Las Vegas, Nevada 89128
         702.820.5763
 6
 7   For the Defendants:
 8       MARQUIS AURBACH
         BY:  CRAIG ANDERSON, ESQ.
 9       10001 Park Run Drive
         Las Vegas, Nevada 89145
10       702.382.0711
11
     For the Deponent:
12
         COOK & KELESIS
13       BY:  GEORGE KELESIS, ESQ.
         517 South Ninth Street
14       Las Vegas, Nevada 89101
         702.737.7702
15
16   The Legal Videographer:
17       DAWN BECK
18
19
20
21
22
23
24
25
```

**3**

```
 1              I N D E X
 2   WITNESS                            PAGE
 3   KERRY KUBLA
 4       Examination by Ms. Murphy         5
 5
 6
 7
 8
 9            E X H I B I T S
10   NUMBER                            PAGE
11   Exhibit 1    Notice of Deposition      6
12   Exhibit 2    Critical Incident Review  53
                  Team document
13
     Exhibit 3    Diagram                   128
14
15
16
17
18
19
20
21
22
23
24
25
```

**4**

```
 1            P R O C E E D I N G S
 2              -oOo-
 3
 4       THE VIDEOGRAPHER:  Good morning.  We are
 5   now on the record.  This begins the video-recorded
 6   deposition of Kerry Kubla.
 7       Today's date is October 11, 2024.  The
 8   time on the video monitor is 10:02 a.m.  We are
 9   located at 400 South 7th Street in Las Vegas,
10   Nevada.
11       This case is entitled Latia Alexander,
12   et al., versus Las Vegas Metropolitan Police
13   Department, et al.  The case number is
14   2:24-cv-00074-APG-NJK in the United States District
15   Court, District of Nevada.
16       My name is Dawn Beck, legal video
17   specialist.  The court reporter is Holly Larsen.  We
18   represent Lexitas.
19       Will counselors please state your
20   appearances.
21       MS. MURPHY:  Good morning.  Corrine
22   Murphy, Bar Number 10410, on behalf of plaintiff.
23       MR. ANDERSON:  Craig Anderson on behalf
24   of the defendants.
25       THE VIDEOGRAPHER:  Thank you.
```

**5**

```
 1       Will the court reporter please swear in
 2   the witness.
 3       Whereupon,
 4              KERRY KUBLA,
 5   having been first duly sworn to testify to the truth,
 6   was examined, and testified as follows:
 7
 8       MS. MURPHY:  Let the record reflect this
 9   is the time and place for the deposition of Kerry
10   Kubla in the matter of Latia Alexander, et al.,
11   versus Las Vegas Metropolitan Police Department,
12   et al., Case Number 2:24-cv-00074.
13
14              EXAMINATION
15   BY MS. MURPHY:
16       Q.    Mr. Kubla, my name is Corrine Murphy,
17   and I'm an attorney.  I represent the plaintiff,
18   Latia Alexander, in this case.
19       Could you please state and spell your
20   full name for the record.
21       A.    It's Kerry Paul Kubla.  K-e-r-r-y
22   P-a-u-l K-u-b-l-a.
23       Q.    You have been requested to be here today
24   to have your deposition taken.
25       Did you have an opportunity -- have you
```

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1  reviewed the notice of deposition?
2      A.    Yes, ma'am.
3            MS. MURPHY: Okay. Can we mark that as
4  Exhibit 1, please.
5            (Exhibit 1 marked.)
6  BY MS. MURPHY:
7      Q.    And you understand that you're here
8  today to discuss the officer-involved shooting of
9  Isaiah Williams?
10     A.    Yes, ma'am.
11     Q.    Have you ever given your deposition
12 before?
13     A.    No, ma'am.
14     Q.    Okay. I'm sure that your attorney
15 walked you through the basic instructions. The only
16 one that I'm going to remind you of is that the oath
17 you took at the beginning of this deposition is the
18 same oath that you would take if you were in a court
19 of law. So although we're not in a formal courtroom
20 with a judge, the same penalties of perjury apply.
21           Do you understand that?
22     A.    Yes, ma'am.
23     Q.    Is there any reason that you would not
24 be able to understand my questions and give truthful
25 and accurate testimony today?

7

1      A.    No, ma'am.
2      Q.    Do you understand that I'm entitled to
3  your best and fullest answer to all of my questions?
4      A.    Yes, ma'am.
5      Q.    Are you under any medications or
6  anything that would inhibit your ability to provide
7  your best and truthful testimony today?
8      A.    No, ma'am.
9      Q.    Okay. Can you please state your address
10 for the record?
11     A.    ˹
12
13     Q.    Can you please tell me everything that
14 you did to prepare for today's deposition?
15     A.    Reviewed -- went over some of the stuff
16 that I had prior, reviewed that.
17           I met with Craig Anderson and just kind
18 of caught up on the case itself a little.
19     Q.    Okay. And I'm not entitled to know what
20 you and Craig talked about, but I am entitled to
21 know how many times you met with him and for
22 approximately how long.
23     A.    Met once. Maybe one to two hours, I
24 believe.
25     Q.    Okay. And when was that?

8

1      A.    Just two days ago.
2      Q.    Okay. And you said that you reviewed
3  the prior stuff.
4            Can you tell me what that was?
5      A.    I read over my interview, my interview
6  from work that I had given, my CIRT interview, and
7  just went over just the address stuff, different
8  stuff, you know, making sure that -- it's been two
9  years, so making sure I was up to date on that.
10     Q.    And did you review your answers to
11 interrogatories or your request for production of
12 documents?
13     A.    I'm sorry. I don't --
14     A.    That's okay.
15     A.    I'm not sure I understand.
16     Q.    We use names for different stuff.
17           So they kind of look like this. These
18 are Brice Clements', but they kind of look like
19 this. Interrogatories, requests for production.
20           If you don't remember something --
21     A.    I don't remember, ma'am.
22     Q.    So that's actually a really good thing.
23 I want to talk about that for a second.
24           I want to go over briefly what the
25 difference is between "I don't remember" and a

9

1  guess.
2            If you really don't remember anything --
3  look, this happened two years ago. It's normal not
4  to remember stuff sometimes. Your honest answer is
5  "I don't remember," don't tell me "no" or "I don't
6  think so" if the answer is actually "I don't
7  remember." Okay?
8      A.    Yes, ma'am.
9      Q.    You're under oath, and if we go to trial
10 we need to be able to rely on the testimony you give
11 today. So "I don't know" is an appropriate answer,
12 but under no circumstances do I want you guessing.
13 Okay?
14     A.    Yes, ma'am.
15     Q.    Would you prefer that I call you Kerry
16 or Officer Kubla?
17     A.    Kerry is fine, ma'am.
18     Q.    Other than your own CIRT statement, did
19 you read the deposition transcript of any other
20 officers?
21     A.    No, ma'am.
22     Q.    Did you read the CIRT statements of any
23 other officers?
24     A.    No, ma'am.
25     Q.    Did you review your body-worn camera?

Kerry Kubla                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1    A.    I have reviewed that before, ma'am, yes.
2    Q.    Okay.  And did you review any of the
3    other officers' body-worn camera?
4    A.    Yes, ma'am.
5    Q.    Okay.  And I discussed it briefly before
6    we got on the record.  Because I don't have my
7    computer system here with me here today we won't be
8    reviewing the body-worn camera, but I will be asking
9    you very specific questions about it.
10        Before we kind of get into everything
11   else, reviewing your body-worn camera -- when you
12   reviewed your body-worn camera recently, two years
13   past the incident, was there anything that jogged
14   your memory or surprised you when you reviewed the
15   video?
16   A.    No, ma'am.
17   Q.    Okay.  Was reviewing the video
18   consistent with what you remember recounting to the
19   CIRT interview two years ago?
20   A.    Yes, ma'am.
21   Q.    Okay.  Have you discussed this
22   deposition with any of your codefendants?
23   A.    No, ma'am.
24   Q.    Have you discussed your deposition here
25   today -- other than with Craig, have you discussed

11

1    your deposition with anyone else?
2    A.    No, ma'am.
3    Q.    What's your usual work schedule?
4    A.    My normal schedule is basically 3
5    o'clock to 12 o'clock -- or 2 o'clock to 12 o'clock.
6    Q.    That's 2:00 p.m.?
7    A.    Yeah.  1400 hours to 0000.
8    Q.    And what days?
9    A.    My off days, my RDOs, would be Thursday,
10   Friday, Saturday.
11   Q.    So this is one of your off days; is that
12   correct?
13   A.    Yes, ma'am.
14   Q.    Okay.  Now, Kerry, I'm going to ask you
15   some questions about your professional background.
16        What's your highest level of education?
17   A.    Graduated high school.  I took a couple
18   of classes in community college, but nothing that
19   I -- just got a couple credits here and there.
20   Q.    Okay.  And what community college was
21   that?
22   A.    Nevada, Clark County Community College.
23   Q.    And what is your current position with
24   Metro?
25   A.    I'm a Police Officer 2, and I'm

12

1    currently working the SWAT bureau.
2    Q.    What's SWAT bureau?
3    A.    That would be the special weapons and
4    tactics.  We're in the Homeland Security division.
5    Q.    And how is that different from what you
6    were working at the time of this incident on
7    January 10, 2022?
8    A.    It's the same position, ma'am.
9    Q.    Okay.  And how long have you been in
10   that position for?
11   A.    I've been in that position coming up on
12   six years.
13   Q.    And can you kind of walk me through your
14   professional background with Metro, like when you
15   got hired and the different positions you held up to
16   the one that you currently hold?
17   A.    I hired on the department in February
18   of 2008.  From there I went through the academy,
19   which is a six-month academy.
20        After that I went to patrol.  I worked
21   Northeast Area Command as a patrol officer.
22   Completed my field training there.
23        Then I stayed working over there for the
24   next approximately ten years.  I worked primarily on
25   graveyard.  Probably 90 percent of that time was on

13

1    graveyard.
2        While I was over there working, I did go
3    into another squad, which was like a swing-shift
4    squad, and that was on a gang enforcement team, kind
5    of like within the detective side of it, where we
6    did gang enforcement stuff.
7    Q.    And how close in time from when you were
8    working the gang enforcement to your transition over
9    to SWAT?
10   A.    It was a couple of years.  I was in a
11   vehicle accident during that time, whenever I was
12   assigned to that position.  I left there due to an
13   injury.  Went through -- workman's comp-related.  I
14   went through that, and I transitioned.
15        I was at the fusion center while I was
16   light duty.  So I went to the fusion center, and I
17   was up there for approximately -- I would say a year
18   maybe, working up there.  And then whenever I left
19   there, went back to my position and started testing
20   for SWAT.
21   Q.    Okay.  And what drew you to SWAT?
22   A.    Just something I always wanted to do.
23   The comradery, the brotherhood of everybody, the
24   team, working as a team together.  That was pretty
25   much what I was looking for position-wise within the

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1 department.
2    Q.    Okay. And so as we sit here today,
3 you're still holding the same SWAT position that you
4 were at the time of the incident. And so is it fair
5 for me to assume that you were familiar with serving
6 these type of warrants, given that you -- sorry.
7 Hold on. Let me do the math.
8        So at the time of this incident, you had
9 been with SWAT for what? Four years? Three years?
10    A.    Yes, ma'am, three years.
11    Q.    Okay. So is it fair for me to assume
12 then at the time of this incident you were fairly
13 familiar with serving warrants through SWAT?
14    A.    Yes, ma'am. I would say a few hundred
15 at least. I mean, we typically do 3 to 400 warrants
16 a year, so it's quite active. Now, I might not do
17 all 300 to 400 because we have full-week coverage.
18 But we do work a lot of time on our off days as
19 well.
20    Q.    So when you say 3 to 400, do you mean
21 that for, like, the whole SWAT unit?
22    A.    Our SWAT unit is divided into two squads
23 which cover the full seven-week coverage. We have
24 one day in common.
25    Q.    So your squad does 3 to 400 of these

15

1 search warrant service a year; correct?
2    A.    No, ma'am.
3    Q.    Sorry.
4    A.    Our division, our section, does --
5 basically we're one big team, and we're split into
6 two smaller coverage teams that cover for the
7 seven-week coverage.
8    Q.    And why is it a seven-week coverage?
9    A.    Just so that we have coverage throughout
10 the whole Valley, throughout the whole Valley for
11 the entire week. We respond to everything, and
12 we're on call 24/7.
13        So within the unit the only time we're
14 off is if we're on vacation and out of town. Other
15 than that, we're responding to different calls.
16    Q.    And so at the time of this incident in
17 2022, did you have the same work schedule? The
18 2:00 p.m. to 12:00 p.m. with Thursday, Friday,
19 Saturday off?
20    A.    I believe at that time, ma'am, we were
21 3:00 to 1:00 at that time, our hours were.
22    Q.    3:00 p.m. to 1:00 a.m.?
23    A.    Yes, ma'am.
24    Q.    So the service of the warrant was I
25 think roughly what? 4 o'clock in the morning?

16

1        That would have been outside your normal
2 work hours; correct?
3    A.    Yeah. It was planned for 5:00 a.m.
4    Q.    Sorry, 5:00 a.m.?
5    A.    Yes, ma'am.
6    Q.    Kerry, can you tell me, what does
7 "knock-and-announce" mean to you?
8    A.    A knock-and-announce is a warrant where
9 we are obligated to announce what we're there for,
10 who we are, what we're there for, and make knocks on
11 a door prior to making entry, giving the suspect or
12 giving whoever we're serving, the residents at the
13 warrant, the opportunity to come to the door.
14    Q.    Okay. And as we sit here today, was
15 your understanding of what knock-and-announce meant
16 the same as it was in 2022?
17    A.    Yes, ma'am.
18    Q.    Okay. And so if I understand your
19 testimony correctly, part of the purpose of
20 knock-and-announce is to give the person or people
21 on the other side of the door the opportunity to
22 come answer the door; correct?
23    A.    Yes, ma'am. There's different
24 mitigating factors as far as what that timeline
25 would be.

17

1    Q.    If you won't mind, Kerry, if you can
2 walk me through what those mitigating factors are.
3    A.    It might be the -- how do I explain
4 that?
5        So one would be --
6    Q.    Don't worry about using formal language.
7 Just tell me like we weren't in a deposition. Just
8 walk me through it. Don't worry about saying
9 exactly the right words. Just explain, like, from
10 your point of view this is what it is.
11    A.    What the normal times are traffic's been
12 seen in and out of the residence.
13        The time, what time it is, time of day
14 it is.
15        How many people are outside at the time.
16        Officer safety issues as far as where
17 we're located, if we're out in the middle someplace
18 where there's no place to provide cover.
19        Whether the subject is armed or could be
20 armed inside the residence.
21        What the subject's priors are. What the
22 crime is that we're going for.
23        A lot of things mitigate how long we're
24 going to sit out there and announce on a
25 knock-and-announce.

LEXITAS

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1    It could be different types of tactical
2  plans that we put together as far as how we're going
3  to serve the warrant.
4    Q.    To your knowledge, Kerry, is there any
5  amount of time that you must wait following the
6  knock before entering?  Like, is there a minimum
7  amount of time?
8    A.    It's a reasonable amount, ma'am.
9    Q.    Can you tell me -- I know you walked
10  through some of those parameters for me, Kerry.  But
11  in an instance like this, although not exactly --
12  I'm just going to do a hypothetical.
13    In an instance similar to this, what
14  would you consider a reasonable amount of time?
15    A.    A reasonable amount of time on this one
16  is going to be a lot shorter than others due to the
17  fact that we were looking for homicide suspects.
18  There were firearms involved.  There were multiple
19  incidents involving other shootings within the
20  complex where subjects were seen going towards that
21  building, that apartment.
22    It was somewhat known to be a flophouse
23  for gang members that were in and out of there, and
24  they were seen with guns prior.
25    The crime was a homicide that had taken

19

1  place a couple of months prior to that where they
2  shot and killed somebody, for the suspects that we
3  were in question -- looking for at that residence.
4  As well as other -- you know, there were other
5  gang-affiliated that were in and out of that
6  residence.
7    Q.    Okay.  And so if I understand correctly,
8  a lot of what you would base to be a reasonable
9  amount of time -- either this incident or an
10  incident similar to it, is because of who you
11  believe to be on the other side of the door; is that
12  correct?
13    A.    That is a big part of it.
14    The other thing are environmental
15  factors.  So close proximity to other citizens that
16  are in the area.  It could be our cover where we
17  have to be at as far as for cover.
18    On this particular search warrant was a
19  controlled entry that we did on there due to the
20  fact that we were unable to park armored vehicles in
21  a location where we could basically contain the
22  entire apartment.  That was cut off due to the fact
23  that there was no way to get armor back to where
24  that apartment was because of the wall that was
25  around there.

20

1    And there were citizens that were
2  directly above the target's residence.  Not only
3  above them, but on the rear side, the two corners of
4  the apartment, where a subject that was in there
5  could very easily -- I've seen it a hundred times,
6  where they could very easily kick through, and now
7  we have a suspect in the neighboring apartment with
8  citizens that are in there that it could create a
9  hostage situation.
10    Then there's also the -- right across
11  that wall, which was about approximately a 5-foot
12  block wall, cinderblock wall, with 3 feet of iron on
13  top of it that you could see through, and that was a
14  24-hour Arco gas station.  So the only place we
15  would be able to park armor would be in that gas
16  station parking lot, and you're going to have
17  citizens in and out of there, in the line of fire,
18  while we were out there attempting to serve that
19  warrant.
20    Along with the other side of that
21  residence was basically on Nellis Boulevard, which
22  was a very thorough street at that time in the
23  morning.  There's going to be a lot of traffic out
24  there, a lot of people walking down the sidewalk,
25  which would put them approximately maybe 20 yards --

21

1  15 to 20 yards from the front of that residence and
2  the windows of there.
3    So we wouldn't be able to contain that
4  position there.  So that obviously would take a lot
5  longer as far as us knocking and announcing.
6    Q.    Can you walk me through, what's the
7  difference between -- I know that the acronym for it
8  is "CET."
9    What's the difference between a
10  controlled entry tactic and a surround and callout?
11    A.    So a surround and callout, I'll briefly
12  explain.  We're going to surround and contain that
13  structure prior to making announcements.  We're
14  going to basically set up containment so we know we
15  have a full perimeter around there.  Keeping access
16  from the suspect being able to get out and break our
17  perimeter or, like I said, break into another
18  neighboring apartment.
19    Then once we do that, we're going to
20  start with announcements.  We would call the
21  suspects out over our PA system and continue to make
22  announcements to try and get the suspect to come
23  out.
24    If that didn't take place and they
25  weren't responding, then we would use other



Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1 de-escalating factors of maybe going to a distract
2 plan by dropping noise-flash diversionary devices,
3 which might cause a loud noise, to kind of, like,
4 provide a little bit more -- without doing any harm
5 to them, but put a little more pressure on there to
6 get them to answer.
7          We would keep doing that until
8 eventually we're going to have to go into that
9 residence. So we would eventually get to a point in
10 time where the team leader and the -- assistant team
11 leader and the team leader would make a plan to go
12 up and we're either going to have to manually breach
13 the door, or we might have to -- in certain
14 circumstances that might turn into a semi-barricaded
15 subject if we know that they're in there. Then we
16 might have to go to different options as far as
17 breaching, ballistic breaching.
18    Q.    Let me loop back for a second, because
19 I've heard from a lot of officers the concern about
20 kicking through the doors to get to people in the
21 apartment.
22          Why not just go in through the other
23 apartment then?
24    A.    Into the --
25    Q.    Why not say to the residents, like, Hey,

23

1 we're serving a search warrant and we need to come
2 in here and make sure -- is that a dumb -- I really
3 don't know. Everyone has talked about this and
4 you're, like -- you seem to be familiar with it, so
5 I'm going to ask you.
6    A.    One, you probably wouldn't be
7 comfortable with somebody coming in and ripping your
8 walls out to go through them to get to a neighboring
9 apartment. They're not going to let you just come
10 in and give you consent to do that.
11    Q.    Sorry. That's not what I meant. So
12 let's say -- I don't know quite how else to ask it.
13 Because I've heard this answer over and over again.
14 Part of the basis from your guys' point of view as
15 officers in the field about what a reasonable amount
16 of time is is also this concern that a suspect, if
17 given too much time, can kick through an apartment
18 wall and get into the other apartment of the person
19 next to them.
20    A.    Yes, ma'am.
21    Q.    Let me ask the question more artfully.
22          Why not when serving the search warrant,
23 if it's certain the suspects may kick through the
24 wall, go to the other apartment and say, Hey, we're
25 serving a search warrant next door. We're just

24

1 going to be in here to make sure nobody kicks
2 through your door or does anything like that?
3          Is that a reasonable question?
4    A.    Yes, ma'am. 100 percent.
5          To answer that question, if we're on a
6 barricade, we do do that. We evacuate people in
7 those residences to make sure there isn't a
8 kick-through.
9          On a search warrant it is a little
10 different because the time of day, to be able to
11 contact people. To be honest with you, some
12 citizens just aren't going to answer the door, or
13 they are going to say, Hey, I'm not leaving. I'm
14 staying here. We have that sometimes.
15          We do make entry through those on
16 certain calls. Hostage rescues we will do that.
17 We'll go through that wall to get in various entry
18 points to get into that target residence.
19    Q.    Just to clarify though, to your
20 knowledge there's no minimum amount of time you must
21 wait when executing a knock-and-announce warrant;
22 correct?
23    A.    Just a reasonable amount depending on
24 the circumstances that are articulated.
25    Q.    Okay. Do you understand it is part of a

25

1 person's constitutional rights to have clear notice
2 of a police officer's intent to enter?
3          MR. ANDERSON: Objection to form.
4          Go ahead and answer.
5          THE WITNESS: On a no-knock warrant you
6 would not need that.
7 BY MS. MURPHY:
8    Q.    Thank you for making that clarification.
9          On a knock-and-announce you do
10 understand that it is part of a person's
11 constitutional rights to have clear notice of a
12 police officer's intent to enter?
13          MR. ANDERSON: Objection. Form.
14          Go ahead and answer.
15          THE WITNESS: Yes, ma'am.
16 BY MS. MURPHY:
17    Q.    What is the first and most important
18 constitutional right that any individual has?
19    A.    Their --
20    Q.    In your opinion.
21    A.    Well, their freedom.
22    Q.    Okay. In performing your job as a
23 police officer, do you agree with me that you have a
24 duty to conduct yourself such that you do not
25 violate the civil or constitutional rights of

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1  members of the public?
2      A.    Yes, ma'am.
3      Q.    Do you also agree that if you see other
4  officers violating the civil or constitutional
5  rights of a member of the public, you have a duty to
6  intervene and stop that officer?
7      A.    Yes, ma'am.
8      Q.    And we talked about it.  You just hit on
9  it.  But what is a no-knock warrant?
10     A.    A no-knock warrant would be applied for
11  by the detectives.  They would apply for that.
12          On a no-knock warrant you would need to
13  have circumstances and be able to articulate the
14  reasons for that.
15          And then whenever they would apply for
16  that, basically we would not need to knock and
17  announce prior to making that entry.  Now, once we
18  make entry, we will be announcing, This is the
19  police department with a search warrant.
20          But prior to that we could basically
21  breach that door by what means we decided in our
22  tactical plan, whether it be ramming the door,
23  whether it be a ballistic breach, an explosive
24  breach, different tactics that we would use to get
25  into that residence.

27

1          That would be the difference between a
2  no-knock and a knock-and-announce warrant.
3      Q.    Okay.  And my understanding, Kerry, and
4  you tell me if I'm right or wrong, for it to be a
5  no-knock there's kind of some rigorous steps that
6  the homicide detectives would have to go through to
7  get that judicial approval; correct?
8      A.    Yes, ma'am.  Well, that goes way above
9  me and the detectives.  But yes, ma'am.  They would
10  have to apply for that, and that would have to go
11  through our department, all the way up the chain.
12     Q.    So you just kind of clarified that, and
13  I'm glad you did, Kerry.
14          You just get the warrant; right?  You're
15  not involved in deciding whether it's going to be
16  knock or no-knock, and you're not doing what they
17  call the IAP?  You're not involved in any of that;
18  correct?
19     A.    Correct, ma'am.
20     Q.    But in this instance you did do part of
21  the recon; correct?
22     A.    Yes, ma'am.
23     Q.    We'll get to that in a minute.
24          Do you have any understanding about when
25  a no-knock warrant would be used versus when a

28

1  knock-and-announce warrant would be used?
2      A.    Do I have an understanding of when?
3      Q.    Yes.
4      A.    Yes.  I would say that the nature of the
5  crime.  You know, the suspect's priors, what he's
6  done before.  If there's guns involved, what the
7  crime is.  There's a lot of mitigating factors that
8  would reach to that for a no-knock.
9          It might be just where the subject is,
10  where the residence is, where we can't physically
11  get, you know, to that area.  We're going to be
12  basically in an open area up there, whether it might
13  be -- I don't know.  There could be -- you know,
14  whether it's a fatal-funnel-type thing, where
15  officers are going to be standing there just in a
16  long hallway with no other access, and if somebody
17  was to start shooting rounds through the walls or
18  come out shooting, we're just stuck in a fatal
19  funnel.
20          So there's a lot of different things
21  that go into that as far as a no-knock.
22          And then for that no-knock warrant you
23  would have to justify all that and then push that
24  up, and then, you know, it would have to be approved
25  all the way up through the chain.

29

1      Q.    Okay.  And my understanding of this
2  incident is that there was approval for a CET on a
3  knock-and-announce warrant; correct?
4      A.    Yes, ma'am.
5      Q.    As we sit here today, are you aware of
6  any change of policy within LVMPD that you can no
7  longer use a CET on a knock-and-announce warrant?
8      A.    No.  No, ma'am.  Not on a -- well, if we
9  had a CET, it would be a no-knock warrant.
10     Q.    So just to clarify, because things can
11  look a little weird on paper when we read it back.
12     A.    Yes.
13     Q.    I just want to clarify, as we sit here
14  today you understand that in order to have a CET it
15  would have to be a no-knock warrant; correct?
16     A.    Yes, ma'am.  Unless there was, like, an
17  exigent circumstance, like, say, a hostage rescue or
18  something.  We're not waiting for that prior to.
19  That's exigent.
20     Q.    Of course.  But here there was no
21  hostage situation?
22     A.    No, ma'am.
23     Q.    Okay.  In your professional opinion,
24  somebody who's been working on SWAT for this many
25  years and have served this many warrants, do you

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1  believe that there was a conflict between
2  knock-and-announce and a CET?
3      A.    During this event?
4      Q.    In general. I'm asking for your
5  professional opinion.
6      A.    I'm sorry.
7      Q.    No. Is there a conflict?
8      A.    A conflict?
9      Q.    Yeah.
10      A.    No. I think we're still -- we're still
11  doing a due diligence of announcing ourselves, not
12  only letting whoever's inside, but letting neighbors
13  know that we're out there and we're serving a
14  warrant just so they kind of know what's going on.
15          You know, like on this very incident,
16  whenever we were out there knocking and announcing,
17  somebody else from a neighboring apartment stepped
18  out asking, Hey, you know, we're down here. We're
19  serving a warrant down here. Go back inside.
20          So somebody did hear we were out there,
21  which brought them to step out to see what was going
22  on out there.
23      Q.    And that happened in this incident?
24      A.    As far as I remember, yes, ma'am.
25      Q.    Okay. Can you walk me through that?

31

1          All I have is the body-worn cameras, so
2  can you walk me through that a little bit more?
3      A.    Whenever we were on approach, going to
4  the front door, we started announcements. As we
5  were making announcements, obviously there's a short
6  timeline, but a couple announcements came out.
7  There was a stun stick that was involved, so that
8  went off.
9          Somebody from -- I remember hearing
10  somebody upstairs poking out, like out on the
11  landing, to see what was going on. And somebody
12  saying, Hey, go back inside. We're downstairs.
13      Q.    Okay.
14      A.    I couldn't tell you who that was. I
15  just remember hearing that. I was focused on
16  looking towards the door.
17      Q.    And did you agree -- you had no
18  involvement in the IAP; correct?
19      A.    No. Other than looking at it. But no
20  involvement with writing it or putting anything in
21  there, no, ma'am.
22      Q.    You weren't involved with the kind of
23  multiple versions going in; correct?
24      A.    No, ma'am.
25      Q.    When you got the IAP and -- because you

32

1  went and did the recon for this?
2      A.    Yes, ma'am.
3      Q.    But when you got the IAP, were you aware
4  of any kind of the background of it being submitted
5  several times and different versions and that kind
6  of thing?
7      A.    No, ma'am. We normally don't get
8  something until it's vetted and it's gone through
9  the chain back and forth. So whatever happens on
10  that end, it could take a couple minutes. It could
11  take a couple days. It just depends on what goes
12  through. That's above our grade. Whether it's at
13  the sergeant level or the lieutenant level or even
14  the captain level at that time, different things
15  could be requested or asked for and different things
16  done.
17          Once we get it, it's pretty much done,
18  and, you know, we're pretty much ready to serve the
19  warrant, so the recon goes out to conduct the
20  reconnaissance.
21      Q.    We talked about the change in policy,
22  but I just want to confirm.
23          As we sit here today, LVMPD policies
24  would not allow this type of warrant to be served as
25  a CET; correct?

33

1      A.    I'm sorry. Can you repeat that?
2      Q.    Sure. As we sit here today, based on
3  the change of policies that we discussed earlier,
4  LVMPD policies would not allow for this type of
5  warrant to be served as a CET; correct?
6      A.    Correct.
7      Q.    So now I'm going to actually ask you
8  about the warrant a little bit.
9          Do you remember when you first became
10  aware of the warrant?
11      A.    It would have been the night before,
12  which would have been 1/9 of '22.
13      Q.    Do you have any -- I mean, I know that
14  you know kind of how these come in and stuff.
15          Do you have any independent recollection
16  of that?
17      A.    How it came in?
18      Q.    Yeah.
19      A.    The assistant team leader, who was Jake
20  Werner that evening or that day, notified us that
21  there was a warrant that needed to be served. It
22  was actually -- at first it was going to be a
23  simultaneous warrant where we hit both residences at
24  the same time related to the same crime of homicide.
25          He needed reconnaissance officers to go

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1  out, so he assigned myself and Brett /KOZ to 4475
2  Jimmy Durante, and then he assigned Kai Hoskins and
3  Mark Eshe to the 3050 South Nellis address.
4        Due to the fact that this was going to
5  be a simultaneous warrant, it ended up changing that
6  it wasn't going to be a simultaneous; we were going
7  to conduct a search warrant on one residence and
8  then immediately go to the following residence.
9     Q.    Sometimes I'm a bad interrupter. If
10 you're not done talking, just tell me.
11    A.    No. Go ahead. I might ramble.
12    Q.    That's okay. That's okay.
13          I thought that you had done recon on
14 this 3550 [sic] South Nellis. That's what I kind of
15 took away.
16          Did you not do any of the recon on 3550?
17    A.    Maybe because I was rambling I didn't
18 get to that because it took me a while.
19          So whenever we went out to do the
20 reconnaissance of both residences, we went and got
21 one vehicle for us to take so we weren't going --
22 because we were going to have a route from our brief
23 spot to this location, from this location to the
24 next. We have to drive that route. So we all went
25 together in one vehicle.

35

1          So our assistant team leader, which was
2  Jake Werner, Mark Eshe, Kai Hoskins, myself, and
3  Brett Brosnahan all went in the same van, vehicle,
4  drove to that location. We pulled up to the front.
5  Mark Eshe and Kai Hoskins exited the vehicle. They
6  did walk by us through the residence, did what they
7  needed to complete their reconnaissance.
8          After that we drove -- left that
9  complex, pulled into the gas station real quick that
10 was just across from there so we can kind of see
11 what the front was. Just because where that target
12 residence was, it was very hard -- unless you were
13 going to that apartment, there was no reason for you
14 to be back there. So it was very hard to get back
15 there unless you were in that bottom apartment or
16 the top apartment. So somebody, if they seen you
17 back there, they would probably wonder why you were
18 back there.
19          So we did drive around to the Arco,
20 stopped at the gas station, got out. I think
21 somebody might have got out, walked inside the gas
22 station, came back out.
23          We stayed in there looking over there
24 just to kind of get a rough look at it real quick.
25          Then we left there and went to the 4475

36

1  Jimmy Durante residence.
2     Q.    Okay. So do you know if any of the
3  other two officers, do you know if they went back
4  and did more recon at 3350 South Nellis, or was that
5  the totality of it?
6     A.    At 3050?
7     Q.    Yes.
8     A.    I do not know if they went back out
9  there or not. I focused on the residence we did a
10 reconnaissance on.
11    Q.    That's kind of the -- that's kind of the
12 takeaway I'm getting from your dialogue about this,
13 and you tell me if I'm right or wrong, because
14 sometimes I misunderstand things.
15          You guys went out there together. You
16 were personally in the Arco, but really it was the
17 other two officers that were walking around. It was
18 their task to kind of do the recon on 3350.
19          Am I mistaken or correct on that?
20    A.    Yes, ma'am. I believe 3050, right?
21    Q.    Sorry. Am I saying 3350?
22    A.    Yeah.
23    Q.    Sorry. I'll just call it South Nellis.
24    A.    Perfect.
25    Q.    That's easier for the court reporter.

37

1          So for the Nellis apartment, although
2  you were in the car with them, you weren't actively
3  doing recon on the Nellis apartment, were you?
4     A.    No. Personally, I was looking at
5  things. Because we're all going to be serving that
6  warrant together. So in my mind, I'm looking to
7  see, okay, how far is it from here to there, what
8  the outside surrounding areas look like.
9          So I was looking, but I wasn't doing --
10 like, I would normally do a thorough reconnaissance.
11          Just because of the fact that it's more
12 than likely, with the high volume of people in and
13 out over there and the people that were conducting
14 business, I would say, on a day-to-day operation, it
15 would look very odd for four or five of us out
16 walking around, strolling through this neighborhood.
17 So we keep it to, depending on the circumstances and
18 where we're at, as minimal as possible footprint.
19    Q.    I want to make sure. There was a lot of
20 dialogue. I'm going to cherry-pick some parts, and
21 I do want to make sure I understand.
22          As we sit here you don't know if the
23 other recon officers went back and did more recon.
24 Is that fair? Or you do know?
25    A.    I do not know, ma'am.

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1     Q.    I'm sorry if I asked this and I didn't
2   catch it -- if you answered and I didn't catch it.
3         Do you know approximately how long you
4   were there for?
5     A.    During the reconnaissance?
6     Q.    Yeah.
7     A.    I would say it probably took an hour for
8   both residences.  Probably approximately around
9   there.  I'm not a hundred percent on that.
10    Q.    And that's just on that -- sorry.
11    A.    No, go ahead.
12    Q.    That's just on that car trip; right?
13    A.    Yes, ma'am.  Yes.
14    Q.    Okay.  And having reviewed the CIRT
15  report, it would appear that you guys did some
16  detailed -- you tell me if I'm right or wrong -- you
17  guys did some detailed recon on the Jimmy Durante
18  apartment; correct?
19        Like, you have pictures of potential
20  suspects in the parking lot?  Like, you were trying
21  to connect people with the Jimmy Durante apartment?
22  Like, is that fair for me to say, or am I wrong?
23    A.    We didn't do as thorough, I wouldn't
24  say.  I mean, they are both thorough.  I won't say
25  they're not thorough.

39

1         We probably spent less time at the Jimmy
2   Durante residence than what we did over there just
3   due to the fact we were going to do a surround and
4   callout over there.  We didn't need an approach,
5   like to walk it for an approach, to walk through
6   there.
7         But we did have intel.  The suspect
8   vehicle was parked out there in the parking lot.
9     Q.    I'm sorry.  When you say "in the parking
10  lot," you're talking about the Jimmy Durante?
11    A.    The Jimmy Durante.  It looked like -- we
12  didn't have eyes on it over there, but I think
13  whenever we talked to -- it might have been the
14  detectives -- I can't give you exact name on that --
15  they witnessed the vehicle was parked over there in
16  that parking lot and it hadn't moved.  It's been
17  seen over there parked in the same lot for quite a
18  while.
19        We were checking that residence because
20  there were known to be a child at that residence.
21    Q.    I'm sorry.  It gets a little confusing
22  on paper.
23        When you say "that residence," you're
24  talking about Jimmy Durante?
25    A.    Yes, ma'am.  Yes, ma'am.  Jimmy Durante.

40

1     Q.    Sorry.  Keep going.
2     A.    So once we completed that reconnaissance
3   of that residence, whenever we went back, there was
4   a lot more involved with the reconnaissance.  We
5   still do a lot of planning.  We pull up photos.  We
6   pull up different stuff that we use to draw a plan
7   of the residence.  So we do more of that after the
8   reconnaissance, like afterwards.
9         So that hour was just doing the drive-by
10  and the walk-through, and then after that it was
11  probably a couple hours at least that we went back
12  and going over the planning phase of that.
13    Q.    But you tell me.  You were doing that
14  for Jimmy Durante, not Nellis; correct?
15    A.    Yes, ma'am.
16    Q.    Okay.  So in terms of what happened for
17  Nellis and the other two officers, you weren't
18  involved in them doing the follow-up, like, whatever
19  additional information they were collecting; is that
20  correct?
21    A.    No, ma'am.
22    Q.    That wasn't part of your task; correct?
23    A.    No, ma'am.
24    Q.    And so do you think -- I know that you
25  did it for the Jimmy Durante one.

41

1         Do you think that your recon and your
2   follow-up work to prepare for serving that warrant,
3   do you think that that was sufficient?
4     A.    It would have been nice to find out.
5   Yeah.  But other than that, I think it would have
6   been, related to where it was and parking the
7   vehicles in there.  We had plenty of room to park
8   two armored vehicles in front of there containing
9   it.  We'd be able to get close enough because it was
10  an open parking lot, so we could get as close as
11  needed to keep suspects from exiting there and
12  getting into a neighborhood apartment.  We could
13  contain it on both sides of the building, contain
14  both those sides.
15        There was a child in that residence as
16  well, that was known to be in there.  We had
17  confirmed that.  So doing other things, like, as far
18  as using a stun stick over there probably wouldn't
19  have been involved over there due to that fact,
20  knowing that there could be a child in there.
21        And we could slow that one down a bit
22  and go from there on that residence.  It would be
23  easy to contain that fully with armor.
24    Q.    I'm going to skip around a little bit,
25  and I'll get into the specific -- I will also follow

Case 2:24-cv-00074-APG-NJK    Document 55-7    Filed 05/16/25    Page 14 of 36

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**42**

1  up later on with the specific conclusion and the
2  CIRT report. But I will tell you part of it was
3  there was essentially insufficient recon done on the
4  Nellis apartment; that there was a lot of unknowns
5  surrounding the Nellis apartment.
6          But I want to confirm, that would not
7  have fallen within your tasks? That wasn't part of
8  your duty related to the search warrant; is that
9  correct?
10   A.    Not on the -- no, ma'am, not on the
11  reconnaissance. If that was the case, I would have
12  been walking it myself on that.
13          So there's a lot of things that I
14  wouldn't have picked up on that reconnaissance by
15  just being in the car and being from the parking lot
16  across the way.
17   Q.    Okay. So if I ask you you're part of
18  the recon team, you're part of the recon team for
19  the execution of this warrant but not specifically
20  for the Nellis apartment?
21   A.    Yes, ma'am.
22   Q.    What was your understanding of the type
23  of warrant this was?
24   A.    What type of warrant?
25   Q.    Yeah. Like, what were they looking for?

**43**

1   A.    Homicide suspects. Related to a
2  homicide.
3   Q.    Was this an arrest warrant?
4   A.    It was -- for the homicide suspects in
5  there, under my understanding is that the homicide
6  did not have PC on arresting suspects in there.
7          However, the -- and I don't want to
8  speak out to which detectives. I think it might
9  have been the gang detectives, but it might not have
10  been. It might have been some other detectives.
11  That they had probably cause due to the fact that
12  the suspects self-incriminated them. I think the
13  stepmother had talked to them, and they incriminated
14  themselves as far as what they had done.
15          And that was done during that --
16  whatever investigation that they -- that whoever it
17  was that we talked to.
18          I'm not a hundred percent, like I said
19  on -- because it was so long ago and I can't
20  remember who it was we spoke to as far as who the
21  detective was that had that intel and information.
22  So I thought that they had PC for suspects in there.
23          Of course on our plan and everything on
24  there it doesn't say PC on there, on our written
25  plan. So I'm not a hundred percent on that.

**44**

1          Now, on our written plans now we do have
2  a PC spot on there, whether they have PC or do not
3  have PC.
4   Q.    On the plans, has that changed to
5  have -- that, like, section about whether they have
6  PC or not have PC, was that changed in the form
7  related to this incident?
8   A.    To be honest with you, I don't know.
9   Q.    But there has been a change in the form;
10  is that correct?
11   A.    It's not a form per se. It's -- if
12  you've seen the pictures of it -- so I'm sure you've
13  seen the pictures of it -- we draw that. So some
14  draw better than others. But there's a list down
15  there that we put down there for children, elderly,
16  fortification, cameras, any cameras up there.
17  There's a list we put up there. Pets, dogs,
18  children, that's all listed in there.
19          Now we also add PC on there from the
20  detectives as far as if they have PC or they do not
21  have PC.
22   Q.    Okay. And I'm really sorry, I didn't
23  bring my computer, so we're not going to be able to
24  look at the body-worn cameras. But I think maybe I
25  have pictures of it.

**45**

1          Are you talking about, like, the kind of
2  diagrams that you guys do and the drawing you did
3  and you post up on the side of the car?
4   A.    Yes, ma'am. So the information page,
5  which is the first page -- well, you wouldn't have
6  the first page. But the page that's usually to the
7  left, the information page, is going to have the
8  address of the target residence. In this case it
9  was two residences. It will have an event number.
10  We had an event number for this event. We didn't
11  pull an event -- I don't remember pulling an event
12  for the other address because we didn't go to that
13  yet.
14          And then it has suspects listed, other
15  occupants listed, and their priors, whether there's
16  guns involved. All that stuff is listed on that
17  information page.
18          And then the next intel sheet would be a
19  draw of the structure, and that would go over the
20  structure, surrounding area, number of windows,
21  number of doors, which way the doors swing, whether
22  there's fortification on there.
23          And then the third page would be our
24  tactical lineup or our entry team depending on which
25  option we're going with, whether it's surround and

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1 callout or it's an entry. It lists operators
2 involved on that one.
3     Q.    Okay. Give me just a moment. I'm
4 trying to find -- because I know that I've seen
5 something like that in the CIRT report. I'm just
6 trying to see if we're talking about the same thing.
7           Just to confirm, there's now, for lack
8 of a better term, a little PC check box; correct?
9     A.    Yes, ma'am. We put PC on there. It
10 lets others know there, along with, like, K-9, for
11 instance. If we're going into a structure and we
12 don't have PC for the suspect and suspect gets out
13 and runs, that K-9 doesn't have PC. Unless he can
14 generate his own PC to send his dog on that person,
15 whether it's because he sees a weapon, he sees
16 something else, he's not going to deploy a dog on
17 somebody that he doesn't have PC on. If he has PC
18 on that person, on that subject, and that person is
19 out and on the go, then more than likely, depending
20 on the crime, he's going to be able to utilize that
21 dog as a low-lethal option.
22     Q.    Okay. Found it. All right.
23           So, Officer Kubla -- sorry, Kerry, I'm
24 pulling out a couple of pages from the CIRT report.
25 And I believe that these are what you were talking

47

1 about in terms of the plan. So if you wouldn't mind
2 just taking a minute and looking those over.
3           Sorry. I should have asked you what
4 page number is that before I handed them to you.
5           MR. ANDERSON: Read the bottom Bates
6 stamps. LVMPD 4378.
7           THE WITNESS: 123 page of 222?
8           MR. ANDERSON: Go to this number here on
9 the bottom right. LVMPD --
10          THE WITNESS: 4377.
11 BY MS. MURPHY:
12    Q.    Kerry, I'll tell you -- you've probably
13 seen it a little bit in this case already --
14 oftentimes we end up producing thousands and
15 thousands and thousands of pages of documents, and
16 it gets a little confusing when we refer to the
17 internal page document. So as lawyers what we do is
18 we mark all the documents with what we call Bates
19 numbers. It's that alphanumeric number down at the
20 bottom. It's like a page number for the entire
21 case, for every single document that's been
22 produced. That is page 4,378. That's what Craig
23 was referring to. We call it a Bates number.
24    A.    Yes, ma'am.
25    Q.    Just to get back on track though, that

48

1 is -- when you talked about the briefing -- or the
2 thing that you now add PC to, is that what -- is
3 that what you were talking about?
4     A.    Yes, ma'am.
5     Q.    Okay.
6     A.    And to be honest, it's very hard to see
7 on this picture. But on the very bottom left of
8 this picture that was taken, where it's listed on
9 there as far as -- it's listed on there as far as
10 guns, children, elderly, all that stuff is listed
11 down there on the bottom left, which would be for --
12 they're actually separated on here. One side is for
13 the 3050 South Nellis and the other is Jimmy
14 Durante. So there's a list for each of those
15 because of the fact that there were two on this
16 plan.
17    Q.    Just to confirm, that's Bates 4377;
18 correct?
19    A.    Yes, ma'am. LVMPD 004377.
20    Q.    Yeah. Because there's three
21 different -- it's 77, 78, and 79.
22          So the one you're talking about
23 specifically is the chart that's on 4377?
24    A.    Yes, ma'am.
25    Q.    And I see exactly what you're talking

49

1 about. Yeah, down at the bottom there's like --
2 there's two stacks where there's the Nellis one
3 and -- it is a little hard to read. But, yeah, it
4 says Nellis and Jimmy Durante.
5           That's what you were pointing out to me;
6 correct?
7     A.    Yes, ma'am.
8     Q.    So in terms of, like, kids, dogs, it's,
9 like, all saying no, no, no, no, no, for Nellis;
10 correct?
11    A.    Yes. There is a thing on there for
12 guns --
13    Q.    Okay.
14    A.    -- listed. But the others were listed
15 as noes.
16    Q.    And just -- and I want to -- based on
17 your earlier testimony, the information supplied for
18 all of this would come from the other two officers
19 that were on the recon team because they were tasked
20 with Nellis; correct?
21    A.    Yes, ma'am. I mean, we would all kind
22 of have an understanding of that a little bit from
23 reading the warrant and what's going on and talking,
24 hearing from the detectives. So, like, I might have
25 heard the detectives say one thing over another.

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50

1    The gun I knew because of the warrant,
2  reading the warrant, that there was a small-framed
3  handgun that was involved.
4    And then there was also related -- that
5  wasn't just in here, but there was also a related
6  call where the -- I want to say -- sorry. Corvell
7  had priors for the firearms, prohibited person
8  firearm. And he also had -- I want to say Rembert?
9  Is it Rembert? Rembert was stopped prior in a
10  vehicle, and he had what appeared to be -- not a
11  hundred percent, but it was either an MP5 or a
12  short-barrel pistol -- rifle, like AR-style rifle,
13  and a handgun that he was stopped with on a previous
14  stop. So he was known to have weapons as well.
15    Q.    As we sit here today, other than the
16  phone call with the aunt or the grandma -- I can't
17  remember if it was aunt or grandma -- like over a
18  month before, to your awareness, other than that
19  comment, were you aware if it was ever confirmed
20  that Corvell or Rembert -- I always get them
21  confused --
22    A.    It's Fisher and Rembert.
23    Q.    Yeah, Fisher and Rembert.
24    To your knowledge, were they ever, like,
25  associated with this apartment?

51

1    A.    Just the stepmother that had stated that
2  they were in and out over here and it was a
3  flophouse.
4    And to be honest, I can't remember if
5  there was anything else in there in the follow-up or
6  if the detectives had sighted them over there or
7  seen them over there or if there might have been a
8  car related over there. I can't go on record to say
9  a hundred percent, but I thought that the vehicle
10  that he was stopped in came from that area, that he
11  was stopped with the firearms in.
12    Q.    Okay.
13    A.    And that was due to a relationship, I
14  think, because of the shooting that took place in
15  there where multiple subjects were seen running to
16  that apartment.
17    Q.    Okay. If I understand your earlier
18  testimony, just to clarify, the chart on page 4377,
19  now there is a little section that's added, like PC;
20  is that correct?
21    A.    Yes. In that list that we normally put
22  on there we'll add PC on there. We will check and
23  confirm with the detectives, the detectives that are
24  there, just in case something changed from the time
25  that the warrant came up or whatever the case was.

52

1  Or if they had PC, if they're arresting them, not
2  arresting them.
3    We don't actually do the arresting. We
4  detain the suspects or subjects that are inside. We
5  detain everybody that's in there, and then we hand
6  them off to the detectives and they do their
7  investigation as far as what they're going to follow
8  up with.
9    Q.    And so I just want to make sure I
10  understand.
11    In terms of this incident, your
12  understanding was they didn't have PC for the
13  homicide they were executing the property search
14  warrant for, but they did have PC from other
15  investigations to arrest the suspects, had they been
16  present?
17    A.    Yes, ma'am. That was my understanding.
18    Q.    So was this an arrest warrant, or was it
19  a search warrant for property, or both?
20    A.    The search warrant was for the evidence
21  and the property of the --
22    Q.    But the intent was also to arrest the
23  suspects; is that correct?
24    A.    Yes, ma'am.
25    Q.    I'm going to ask you to hand that to the

53

1  court reporter, because she's actually going to mark
2  that as Exhibit 2.
3    (Exhibit 2 marked.)
4  BY MS. MURPHY:
5    Q.    Kerry, turning to page 4378, can you
6  tell me what that's a photo of?
7    A.    This one would be a photo of the Nellis
8  address, 3050 South Nellis.
9    Q.    And then the next page, 4379?
10    A.    4379, that would be the -- our entry and
11  lineup team, our officer page, which has all the
12  officers listed in there involved, what the vehicle
13  package is, the entry line formation. All that
14  stuff is listed on that one.
15    And there's -- there might be -- I don't
16  know if there's another picture or if this --
17  there's somewhat of a picture of the Jimmy Durante
18  residence just to the right in this picture. It
19  doesn't show the whole thing, but there's partial of
20  that in there.
21    The actual target to that Jimmy Durante
22  would be on the southwest corner of that Building 6
23  that's in the bottom of this picture, which is not
24  in this photo.
25    Q.    I'll represent to you, I don't think



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  that they took a picture of that one too, because
2  that warrant was never served.
3         So do you know who makes these drawings?
4     A.    I don't want to admit to it, but, yeah,
5  we make the drawings.
6     Q.    Listen, the handwriting is much nicer
7  than mine.
8         On this instance did you do these
9  charts, or do you know who did them?
10    A.    No.  The officer lineup will be done by
11  Jake Werner, who is assistant team leader.  He would
12  have done the draw -- the planning phase for that
13  and issued all the assignments for all the officers
14  involved, between him and the team leader or the
15  sergeant that night.
16         And the information page and the draw of
17  the residence would be done by the reconnaissance
18  officers.
19    Q.    And so you were part of the -- well, you
20  were part of the recon, so did you provide the
21  information for the -- did you do the Jimmy Durante
22  part?
23    A.    Yes, ma'am.
24    Q.    Okay.  On the first page.
25         But you didn't do the Nellis part;

55

1  correct?
2     A.    No, ma'am.
3         MS. MURPHY:  We've been going for a
4  little while, going for about an hour.
5         THE VIDEOGRAPHER:  We are going off
6  record at 11:00 a.m.
7         (A break was taken.)
8         THE VIDEOGRAPHER:  We are back on record
9  at 11:11 a.m.
10  BY MS. MURPHY:
11    Q.    Kerry, we took a brief break, but just
12  to confirm, although we have taken a break, the oath
13  that you took at the beginning of the deposition
14  still applies.
15         Do you understand that?
16    A.    Yes, ma'am.
17    Q.    Okay.  On break I saw you talking to
18  Craig.  Did you call anyone or talk to anyone else
19  while on break?
20    A.    No, ma'am.  My phone was in here,
21  actually.
22    Q.    So we've gone over the photos that you
23  had at the briefing.
24         As we sit here today, I know that you've
25  read your own CIRT statement.  Have you read the

56

1  actual CIRT report itself?
2         And it's C-I-R-T.
3     A.    I did go over that briefly just to go
4  over it, yes.
5     Q.    What parts -- listen.  It's 222 pages.
6  What parts did you go over?
7     A.    Yes.  I didn't go over the whole page of
8  everything in there, no, ma'am.
9     Q.    Did you read the conclusions?
10    A.    I went through some of those, yes, I
11  did.
12    Q.    And I'll ask you specifically about --
13  I'll ask you specifically about some of the
14  conclusions later.
15         When you did go through the conclusions,
16  were there any that you were surprised by or
17  disagreed with?
18    A.    Not that I could remember, no.
19    Q.    Do you remember that -- do you remember
20  any of the conclusions addressing that there was
21  actually a series of unknown facts about the Nellis
22  apartment?
23    A.    Yes, briefly.  And I wasn't sure if that
24  was stuff that wasn't -- I don't know if it wasn't
25  put in the warrant itself, but it was talked about

57

1  amongst detectives and information from there.  I
2  don't know if that was --
3     Q.    Sorry, not about the -- not about the
4  warrant.  But when I say unknowns about the
5  apartment, like, although we looked over that photo
6  earlier that had all the items listed, like dogs,
7  no; kids, no, in fact, that stuff wasn't -- one of
8  the conclusions that CIRT came to was that that
9  stuff wasn't known; that there was insufficient
10  recon.
11         So I guess I'm asking you, did you
12  review any part of that conclusion in the CIRT
13  report, or were you aware of that?
14    A.    Just that it said about the recon
15  being -- however they worded it, whether it was
16  insufficient or -- yes, I did see that.
17    Q.    Okay.  And do you have any thoughts on
18  that?
19    A.    Some of the stuff in there I don't think
20  you're going to be able to know.  If there's not,
21  you know, power set in somebody's name, if there's
22  not different things, you know, utilities in
23  somebody's name, I don't think anybody is going to
24  know, unless you have surveillance on a residence
25  24 hours a day, if somebody's in there, not in

Case 2:24-cv-00074-APG-NJK    Document 55-7    Filed 05/16/25    Page 18 of 36

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

1  there. Some of the stuff, you know, you can find
2  out during a reconnaissance, but other things we
3  don't have, you know, days and days to perform this,
4  so there's some stuff that's not going to be able to
5  get on there. But I'm not sure what all findings
6  there were that weren't, you know, found to be in
7  there.
8      Q.    So is it my understanding, based on the
9  comments you just made, that you think it's not
10 possible to have all that information before serving
11 a search warrant?
12     A.    I think some of the stuff could be done
13 by detectives. Yes, they could spend more time out
14 there. They could do more follow-up stuff and do
15 that prior to applying for the search warrant. So I
16 think some of that stuff can be dug up. You can dig
17 into that stuff a lot more.
18         I don't think that we have the ability
19 as SWAT operators conducting a recon of a residence
20 to be able to put in that much seat time, which
21 would be applicable or more for the detectives to
22 do, just due to the fact we have a very limited
23 amount of time prior to that and then whenever the
24 warrant is going to be served.
25     Q.    I think I know, but tell me, what does

59

1  "seat time" mean?
2      A.    Like being out there, for instance.
3  Being able to go out there and set, you know,
4  surveillance on a residence for hours throughout the
5  night to see patterns of life, different stuff like
6  that. We don't have that in our unit.
7         Detectives might have that. I'm not
8  saying that they do have that time, but we really
9  don't have time to set on a place and put in that
10 amount of time to basically get a lot of that
11 patterns of life and contacting, you know, different
12 areas, whether it be schools to find out if there's
13 kids related to the target residence.
14     Q.    So do you think the CIRT conclusion
15 places an unfair burden or unrealistic expectation
16 of what the SWAT recon can know before serving a
17 search warrant?
18         MR. ANDERSON: Object to form.
19         Go ahead and answer.
20         THE WITNESS: I don't know exactly what
21 they had issues with. So if it was specifically
22 certain things, there's certain things we can get,
23 certain things that we -- I would say that we can't
24 get.
25         I've been to residences before, where,

60

1  for instance, a door, like a target residence, it's
2  very hard or we're not going to go up to a target
3  residence door to see what that door is made out of.
4         We can -- some residences we can see by
5  looking at from a distance. We can check other
6  doors throughout the complex. Whenever I perform
7  reconnaissance, I take a magnet with me and I check
8  doorframes and doors to other apartments throughout
9  the complex, because I'm not going to get -- I'm not
10 going to, you know, be noticed by the suspect or
11 whoever is in that target because I'm at a different
12 apartment.
13         So we can check others to do that. But
14 to go up to the actual target residence would be
15 very, very hard to do, and you're jeopardizing, you
16 know, losing everything as far as the mission and
17 compromising that we're out there by doing that.
18 BY MS. MURPHY:
19     Q.    So you kind of alluded to it, and I
20 wanted to make sure.
21         The door here, you know there was an
22 issue with the door here; correct?
23     A.    Yes, ma'am.
24     Q.    And what's your understanding of what
25 the issue with the door was?

61

1      A.    The issue -- well, the main issue with
2  it was there was a brass wrap on the door. The
3  brass wrap, if you were able to get up there and get
4  good eyes on the door, you would see there's a brass
5  wrap on there. Not saying that a brass-wrapped door
6  is impenetrable. However, it is going to be a
7  little bit harder to breach than a door that doesn't
8  have a brass wrap, because it's keeping that locking
9  mechanism from bending or deforming because of that
10 wrap that wraps around the locking mechanism.
11         Now, if that was a wooden frame, with a
12 brass wrap on a wood-framed door, more than likely
13 the wood frame -- it is not very hard to snap a wood
14 frame, and that wood frame is going to be
15 compromised prior to that door being compromised.
16         So that would have something that
17 obviously was missed or obviously would be missed in
18 there, so I see that being an issue. Because you
19 should be able to get by that and get a closer look
20 just by walking by, without actually going up to the
21 door and being able to see that.
22         And that would -- I'm not going to say a
23 hundred percent it would change the plan, but you
24 would know that that door is going to be a little
25 bit stouter. So it might take an extra hit on the



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1  door. It might take a ballistic breach of -- using
2  a ballistic round from a shot clock prior to hitting
3  the door. It could be using an explosive breach on
4  the door. Different options that we would have.
5          We would still have to get those,
6  basically, options approved by going up through our
7  chain, but different options that we would have that
8  we could throw out there.
9          So not having that information, that
10 could have changed things.
11    Q.    Okay. But it wasn't your responsibility
12 to determine something like -- it wasn't part of
13 your recon assignment to determine what kind of door
14 it was or if there was a brass wrap; correct?
15    A.    Correct, ma'am.
16    Q.    Okay. And -- okay. And so let's kind
17 of get into the incident itself.
18          And so, Kerry, I know that you were the
19 first one through the door. If any of this
20 testimony is difficult for you to get through and
21 you want to take a break, you just tell me. We can
22 take a break. If it's fine for you to just power
23 through, that's good. But if you feel at any point
24 in time like, Hey, this is a little difficult for me
25 to talk about. I want to take a break. You just

63

1  tell me. Okay?
2     A.    Yes, ma'am.
3     Q.    We looked at it briefly. We looked at
4  the photos -- or the drawings from Sam's Town.
5          Can you kind of walk me -- and I know
6  that you -- I'm assuming it's fresh in your memory
7  because you recently watched the video; correct?
8     A.    Yes, ma'am.
9     Q.    So if you can kind of walk me through
10 your dialogue of, okay, you arrive at Sam's Town,
11 and then what happens?
12    A.    So I left my house in my work truck,
13 arrived over there at Sam's Town to start putting up
14 the papers and get everything ready. So I got there
15 a little bit early from whenever the actual brief
16 was, due to the fact I was a reconnaissance officer.
17          Got over there for the address 4475
18 Jimmy Durante, but I was a part of that plan.
19 Whenever I was over there, I ended up getting a
20 detective car and driving Officer Adam and Sergeant
21 Clarkson at the time, I drove them both by both
22 residences, because one was going to be a sniper or
23 a Sierra unit, so he was going to need to see that
24 target and see what would be the best location for
25 him, so he went with me. And Sergeant Clarkson was

64

1  driving one of the BearCats on the Jimmy Durante
2  target, so he was going to be driving one of the
3  BearCats over there to that -- actually, he drove
4  for the 3050 actually also. So I drove him by so he
5  knew the route going in there, so he wasn't confused
6  with it, and he's actually seen where he's supposed
7  to land at with the vehicle and going over all that
8  stuff with them. So I drove them by real quick to
9  do that in the morning.
10          We conducted the briefing of the ATL.
11 Assistant Team Leader Jake Werner conducted the
12 briefing. Went over that.
13          And I believe that one of the detectives
14 was asked to talk about the -- basically the warrant
15 a little bit, because some officers that --
16 obviously you might have K-9 there. They don't
17 know -- they haven't seen the warrant. They don't
18 know anything about it. So it gives them an
19 opportunity to just briefly go over what this is
20 for. It's for a homicide due to the fact that a
21 couple months ago, I believe it was in November, two
22 suspects shot and killed somebody who ended up dying
23 at the bus stop. Well, he left the bus stop, but he
24 ended up dying from that.
25          They briefly go over that with them, and

65

1  then we go over the planning phase as far as the
2  assistant team leader goes over the plan and what
3  everybody's duties are throughout the plan.
4          Once that's done, then we basically
5  kitted up, but we got all of our gear on.
6     Q.    If it's called "kitted up," that's fine.
7     A.    We put all our gear on, whether it be
8  our vests, our helmets, all the equipment we needed.
9  We do that. We get everything done.
10          Meet back at our location -- not our
11 location, but meet back at the vehicle package that
12 we're driving over there. Then we basically load
13 onto the vehicle the way we're supposed to, because
14 everybody has got a certain position on there. Then
15 we drive over to the target residence location.
16          Keep going through everything?
17    Q.    Yeah. If you're good with keeping
18 going, keep on going.
19    A.    So we get to the target location. We
20 unload off the BearCat, and the other vehicles get
21 in their positions. We get into a double-stacked
22 formation. We had an entry line on one side, who
23 consisted of Jasper Williams -- I'm sorry -- Jasper
24 Washington, who was in front of me. He was on a
25 shield, which was going to lead up. I was going to

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1  be number-one entry behind him.  He was going to
2  shield going up there.  And then the lineup went
3  from there back.
4          I'd have to look at the list to be a
5  hundred percent.  I know it was Jasper, myself, it
6  was Brice Clements, and then back -- from there back
7  it might have got a little bit -- I'm not a hundred
8  percent on that.  I'd have to look at that.
9          On the right side there was two takedown
10 officers that were leading up over there, which was
11 Brett Brosnahan and Blake Dixon.
12         There was also a floor side containment
13 that was going over there for the window on the
14 other side where the stun stick was being deployed,
15 which would have been Officer Rothenburg and Officer
16 Bertuccini.  Officer Rothenburg had a shield, the
17 shield up as well.
18         So we make our approach up to the
19 apartment.  We go down the sidewalk that's going to
20 it.  We come around the corner, wrap the corner.
21 Once we get to that corner wrap, the other guys get
22 set over in their position.  We're set at that
23 point.
24         Sergeant Russ Backman called out and
25 gave the announcements.  The plan was to give out

67

1  two announcements, and then the stun stick was to --
2  supposed to give out two full announcements of the
3  residence, and after the full two announcements,
4  then we were going to -- was going to go off with a
5  stun stick, and the breach was going to go off of
6  that.
7  Q.    I understand that's the plan.  Tell me
8  what actually happened.
9  A.    So we came over there.  As soon as we
10 landed in that position, Jasper Washington was there
11 with the shield.  Announcements came out giving who
12 we were, when we were there for the search warrant.
13 Those announcements came out.
14         Jasper Washington moved up to -- he
15 shielded the window that was just to the right,
16 which would have been to the east of the door that
17 was facing west.  So he shielded that window.  Kai
18 Hoskins, who was on the breach team, which was in
19 that other stack that was to the right, he moved up
20 with the ram.  He moved up to basically key the door
21 or hit the door with the ram.
22         So once he got to the front door, I was
23 basically held back, so I'm approximately
24 probably -- if I had to guess, probably 6 feet,
25 7 feet away from the front door, giving him room to

68

1  get up there.  He went up there, and the stun stick
2  was inserted.
3          Stun stick went off, which was one --
4  the stun stick is a noise-flash diversionary device
5  which was attached to a rake that was inserted
6  through the window.  Whenever they inserted that
7  through the window, rendered the area clear in
8  there, then they initiated that.
9          Kai Hoskins stepped up to start
10 breaching the door.  He hit the door.  The plan
11 was -- in the details before, the plan was going to
12 be he was going to hit the door.  If he called for a
13 shock to come up, then Officer Hancock, Levi
14 Hancock, would step up.  He had a shot clock, which
15 is like a small shotgun, issues compressed copper.
16 He would go up there and hit the locking mechanism
17 to try and soften that up.  If that softened it up,
18 he stepped out, he was able to get the door open and
19 we still had time on our side, then we would make
20 entry into the residence.
21         So Kai hit the door a couple times.  I
22 think he hit it on the third time.  It started to --
23 I could see from where I was that whenever he hit it
24 I could see, like, a little bit of light through the
25 edge of the door, so I knew it was starting to

69

1  become compromised.  So in my mind, I was thinking
2  he was going to have more likely another hit, one
3  hit at the most, to open up the door.
4          He hit the door.  At this time, whenever
5  he was hitting the door, the other, which was -- it
6  was another noise.  A flash-bang, basically, that
7  was going off, which is a nine-bang.  So those go
8  off for approximately a half second to a second.
9  One that is -- over the stun stick it's delayed
10 approximately a second to a second and a half,
11 delayed on whenever it goes off, whenever they
12 deploy it.  So you have that second and a half that
13 that goes off.  Then about every half to a second
14 after that -- they're not a hundred percent at that
15 time, it could be three-quarters, whatever, but it's
16 a half to a second -- there's nine bangs that go on.
17 So the first one, then there's eight additional.
18 They just randomly keep going consistently.  So
19 those were going off at the same time as Kai was --
20 as Hoskins was attempting to breach the door.
21         So whenever the door finally -- I seen
22 it come open, and then he just -- on the last one
23 just kind of gave it a push to open it because it
24 didn't fling open.
25         Because of the fact that the flash-bangs



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1  were still going off that were still over there, in
2  my mind we had adequate -- we still had somewhat of
3  a diversionary device that was drawing -- anybody in
4  there, it was drawing their attention to what was
5  going on out there. So attempted to make entry.
6          With the attempt, I made entry,
7  seeing -- through the threshold of the door I could
8  see down the hallway, which was dark in there.
9  Obviously I had a light, so I illuminated the light
10  on my rifle going in.
11          As I wrapped into the door, my
12  unknown -- which the door opened up right to left.
13  My unknown corner would have been the corner to the
14  right.
15          So as I stepped in, I started to turn to
16  the right. There was a couch that was up against
17  the wall that protruded out into the room, so that
18  kind of stopped me from going down that wall to
19  clear that corner all the way. So whenever I came
20  in and hit that, I noticed that I was being engaged.
21  I was getting hit with -- hard to explain. I
22  couldn't feel, like, pain. I could just -- it was
23  almost like, I would say, a ghost smacking, like, my
24  arms and my rifle, like, out of my hand. So I was
25  trying to engage, but it was kind of like it was

71

1  getting moved around. So I couldn't, like, get on
2  target.
3          So I kept pushing just past the couch,
4  which extended probably, if I had to guess, maybe
5  6 feet maybe. It continued that way. It was kind
6  of like -- the shape of the couch was kind of like
7  an L-shape-type.
8          So as I pushed to the end of that, I was
9  just -- I could tell that gunshots were going off at
10  this point.
11          Being inside, there's a lot different
12  sound than, like, flash-bangs going on outside.
13  It's a lot different.
14      Q.   How is it different?
15      A.   Well, if I dropped a firecracker right
16  here, you're probably going to -- you could probably
17  compare that. It would sound different than if I
18  dropped one outside that door.
19          I could tell these were coming from
20  inside the residence. They were basically shots. I
21  could also see flashes coming from what -- I
22  couldn't -- I could see somebody curled up on a
23  couch over there facing that way, and I could see
24  flashes, a muzzle flash as the shots were coming
25  off.

72

1          So once I got over there to the edge of
2  the couch, obviously I was pushed in far enough the
3  other operators behind me, the rest of the team, or
4  partial of the team -- not everybody, but partial,
5  the rest of the team that were making entry, they
6  realized the same thing, that shots were coming from
7  that location, so they started engaging from
8  behind -- not from behind me, but from towards the
9  opening of the door from where I was, because I kind
10  of paralleled along that couch.
11          Once I got over to the edge of the
12  couch, I came to a stop position, like to a
13  stationary position, and attempted to -- I was
14  thinking in my mind that I was trying to shoot
15  whenever I was moving across there, but, again, like
16  I said, my mind is telling me to shoot, but I
17  couldn't, like -- nothing was working, basically.
18          So whenever I got to the edge of the
19  couch, I got a stationary position, same thing, I
20  could see shots going; I can see flashes coming out
21  of the barrel. I was like, Hey, address this. You
22  know, raise my rifle.
23          Well, I couldn't see -- my rifle wasn't
24  coming up. So I looked down, and my arm was
25  basically -- it was flopped like a fish, so it was

73

1  hanging down. Because a shot had went through
2  there, broke the bone.
3          So I took my forearm and kind of put it
4  under my rifle and lifted my rifle up to shoot, and
5  then right like immediately after that something
6  dropped me to my knees.
7          So I think at that point I took a shot
8  in my leg, which dropped me down. So I dropped down
9  on my hands and knees.
10          Once I dropped down to my hands and my
11  knees, stuff was still going on. And then
12  eventually I heard -- obviously somebody yelled out
13  "Tactical." That was reverb'd a couple of times by
14  other officers yelling out, "Tactical, tactical."
15          Which on a tactical call, whenever we're
16  going in, we stop where we're at and hold position
17  and kind of slow everything down and go from there,
18  do what we need to do.
19          So rather than -- typically, if we were
20  making a CET, we would have bodies go to this room,
21  bodies go to this room, bodies go down the hall, go
22  to this room, go to this room. We would flood the
23  apartment, and literally -- an apartment that size,
24  because it was so small, probably in, I would say,
25  eight seconds probably you'd have operators in every

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1  single room in there.
2          So a tactical call was called. I yelled
3  out that I was hit, and somebody started to drag me,
4  because -- I can't remember who it was -- it might
5  have been Levi Hancock saying, "Hey, drag him out.
6  Drag him out."
7          So somebody grabbed me from behind me,
8  and I was on my hands -- well, my knees and my hand.
9  My rifle was, like, laying down, but my hand was --
10  it was kind of like my nub was on the ground.
11          Somebody grabbed my vest, started
12  pulling to pull me towards the door. Well, as he's
13  pulling me, I'm trying to, like, hobble, and I'm
14  200 pounds, and with my vest I'm probably 250, so he
15  wasn't very easily dragging me, but I was kind of,
16  like, shuffling along. I was like, "Hey, just stand
17  me up, stand me up."
18          At that point Jiyair Brown was there.
19  He helped lift me, got me back to my feet. Then we
20  walked out through the door, went back to the
21  BearCat.
22          Once we got back to the BearCat, then
23  we -- got me back there, asked where I was hit. I
24  told him I was hit in my right arm, hit in my left
25  arm. Well, I told him I was hit in my left arm

75

1  because I could see it was broke. Told him I could
2  feel pressure in my right arm, my right arm was hit,
3  and then my leg was hit.
4          They basically got back to the BearCat
5  where medical was at, started pulling off
6  everything, ripping stuff off, applying tourniquets,
7  put all the tourniquet stuff on, did all that.
8          And then I think whenever they were
9  putting the tourniquet on my leg, whenever they were
10  applying that, that might have -- either that or the
11  difference of going from standing to going down to
12  laying down, one or the other, blood issues or
13  whatever, but I passed out for a minute there.
14          And then basically after that I was back
15  up, came to. Medical was already staged in the
16  complex because they roll out with us. So they were
17  staged just to the south of us, at the front of the
18  complex, at the front office. So they backed up,
19  AMR backed up, loaded me onto the AMR unit, and then
20  we left there, from there, left to UMC.
21      Q.    So I'm going to go back and kind of --
22  I'm going to go back and kind of parcel that up a
23  little bit.
24      A.    Uh-huh.
25      Q.    So you were number one in the stack;

76

1  correct?
2      A.    I was number one entry going into the
3  residence.
4      Q.    Yeah.
5      A.    Jasper was in front of me initially.
6  Yes, ma'am.
7      Q.    Correct. Because Jasper was the one
8  that breached the door; correct?
9      A.    No. Jasper Washington had a shield. He
10  was going to shield the window to the left of the
11  door, to provide cover for -- if anybody was looking
12  out that window, to provide cover for the team and
13  then for Kai Hoskins, who was basically breaching
14  the door.
15          So he stepped over to there, which was,
16  in my lineup, like my entry, he was just in front of
17  me. I was right behind him.
18          Then on the other side would have been
19  the first two, Brosnahan and Blake Dixon, would
20  have -- because they were takedown. Nobody was out
21  there to take down, so they would have stepped out.
22          Then immediately behind them, I
23  believe -- I'd have to look at the lineup, but I
24  believe Kai Hoskins and Levi Hancock were behind
25  them, and that would leave room for Kai Hoskins to

77

1  come up -- after the announcements were given, he
2  would come up and then breach the door.
3      Q.    Just to confirm though, you were the
4  first guy through the door, but you weren't
5  breaching the door; correct?
6      A.    Correct.
7      Q.    You understand that -- we talked a
8  little about it before, the brass wrap.
9          Do you remember seeing -- strike that.
10          When you approached the door, the brass
11  wrap was physically -- you could see it; correct?
12      A.    I did not notice it, to be honest with
13  you, whenever I was up there, no.
14      Q.    Okay. And so it's talked about quite a
15  bit in the CIRT report. What's a "tactical"? You
16  talked about it a little bit in your dialogue, but
17  just to confirm, what's a "tactical"?
18      A.    On a CET entry, the only thing that
19  stopped us from going in there was we have a
20  tactical call. That can be made by anybody.
21  Whether -- anybody in the lineup that's going in,
22  whether it is something is taking too long, whether
23  we have -- overwhelmed with, like, say the structure
24  is too big, we run out of bodies and now we're at a
25  stalemate where we don't have bodies to fill the

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

1  rest of the rooms.  We might see somebody that comes
2  out and runs.  If we see anybody running in there,
3  we call a tactical, because we're not going to chase
4  somebody into an unknown room that they're running
5  into, in case they're either going in there to fight
6  or going in there to arm themselves.  So we are not
7  going to run in there at that point.  We'll call
8  tactical, go back to the front door, use a shield
9  there, and then slow it down at that point into --
10  at that point it would be like a breach and hold.
11       So that tactical call can be called by
12  anybody that is in there depending on what they see
13  the need to call it for.  Whenever that person calls
14  it, he would give out the reason for it.  So it
15  might be, "Tactical, Tactical," and, "I seen a guy
16  running down the hallway to a back bedroom."
17       Everybody else relays that and starts
18  saying "Tactical, Tactical" so it's heard throughout
19  everybody that's in the lineup, the entry team and
20  also people on the outside, so they're all aware of
21  that.
22       Q.    In this case was the entry taking too
23  long?
24       A.    I don't feel -- myself, I don't feel
25  that we lost that -- that, I would say, surprise, or

79

1  maybe that overwhelming action, due to the fact that
2  we still had -- those flash-bangs were still going
3  out there.
4       So to me, I felt the plan was that if we
5  went up there and Kai hit the door, if he called for
6  a shock and a shock came up, that shock would have
7  to come up, introduce a couple of rounds into that
8  lock, fall back, and if the door still came open, we
9  would still be good to go on a CET, to still make
10  that entry.
11       In my mind, that extra hit on the door
12  was going to be less time than having him step up,
13  shock that door, step back out, and then him step up
14  to hit the door again.
15       Q.    But you could have also then called a
16  tactical?  It wouldn't necessarily have been to do
17  an explosive breach through the door; you guys could
18  have also just retreated; right?  And then retreated
19  and then done a surround and callout; correct?
20       A.    We could have.  We would have had to
21  pull back all the way off the structure and down the
22  side.  We couldn't stay up there and have eyes on
23  the door.  I mean, we could, but ...
24       Q.    Is the purpose of the flash-bang to
25  disorient and confuse?

80

1       A.    Well, it's a noise-flash diversionary
2  device.  Basically it's something that's flashing
3  on.  If something went off outside this window, I
4  am -- everybody in here is going to focus their
5  attention over here.  So if they're focused over
6  there and we're coming in over there, that gives a
7  perfect distraction.  That's one of the things, why
8  it's called a distract, is because it's going to
9  divert their attention to something else as we're
10  coming in over here, which is also going to put that
11  back on our side as far as having that going off
12  over there.
13       We wouldn't necessarily -- we wouldn't
14  drop and do a distract outside the front door unless
15  it was a surround and callout because we don't want
16  to draw attention to where we are making entry at.
17  So that's why it is put on another location, to draw
18  somebody's attention to that.  It might be a back
19  bedroom window that's towards the back of the
20  residence, to get their attention out there.  It
21  might be -- just to take their attention away from
22  where we're coming in at.
23       Q.    In this instance it was put through a
24  window that was right next to where Mr. Williams
25  was; correct?

81

1       A.    Ultimately, yes.  Unknown that he was
2  going to be in that room.  But it ended up, yes,
3  being in that room is where that first one was
4  deployed.  Which was the first distract.  It's one
5  bang.  That's inserted, it's pushed up to the
6  ceiling, so it's against the ceiling up there, and
7  it's flashed off in a high corner of a room.
8       That's where we train putting it is in
9  the high corner of the room where somebody -- the
10  most likelihood, nobody is going to be up in that
11  corner, up in a room up there, and it's
12  approximately -- I'd say 8 feet or the height of the
13  ceiling is where it is up there.
14       It's also attached to that pole so it
15  doesn't come down, it doesn't land on the ground, it
16  doesn't emit any flash or anything that can cause
17  fire, because it's up away from everything, up by
18  the corner of the wall.
19       And then the additional, the nine-bang
20  flash-bang that was going off outside, was another
21  distraction that was diverting attention outside of
22  that side of the house, which would have been where
23  the sliding door was that might have been related --
24  the sliding door and the other window that was out
25  there, that was outside.

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1    Q.    But the purpose of these devices, the
2  nine-bang or the other one, it's also to disorient
3  whoever's inside the apartment; correct?
4    A.    Yeah. I would say it's going to
5  disorient you, yes.
6    Q.    And, Kerry, when you talked a little bit
7  earlier about kind of coming through the residence
8  and, you know, what was going on with your arm and
9  how you felt you were being hit by a ghost, is it
10  fair for me to say that it took you a few seconds to
11  figure out what was going on?
12    A.    It took -- I mean, I would say we're
13  talking like a second to realize. I mean, literally
14  within one to two steps of going through that
15  threshold, the doorway. It wasn't like I entered a
16  room and went all the way across the room. It was
17  literally within one to two steps that I was -- I
18  knew I was getting engaged by something over there.
19  And then I could -- like I said, I could see that
20  the flashes were going. I just couldn't address
21  that. I was trying to address it, but I couldn't
22  address it at that point. I kept moving across
23  there, across the couch, another probably maybe
24  4 more feet to get to the edge of that, to get to
25  the edge of the couch.

83

1    Q.    And your ability even within one or two
2  steps, which is a few seconds, like, that's also
3  based on your years and years and years of training
4  as a SWAT officer; correct?
5    A.    As far as how far I went, or --
6    Q.    No. As far as how long it took you to
7  assess what was going on inside the apartment.
8    A.    Well, whenever we make an entry on a
9  CET, it's a very dynamic entry into the -- into the
10  threshold. So whenever you're making that move in
11  through the threshold, it's very dynamic in nature.
12  We're moving very fast.
13        And then we are moving -- from there
14  we're moving at a pace that we can fire from. So we
15  train that we can shoot as we're moving. Obviously
16  you can only move so fast whenever you're doing
17  that. But you're not -- you're not just a walking
18  pace. It's a little bit faster than a walking pace
19  going through there.
20    Q.    So my question was a little bit
21  different. You kind of hit on it a little bit. But
22  part of your ability to walk in, to assess, to
23  figure out, to respond, that's also based on your
24  years of training as a SWAT officer; correct?
25    A.    Yes, ma'am.

84

1    Q.    And you would agree with me that you
2  have SWAT training and ability to respond that is
3  far in excess of what a normal person would have;
4  correct?
5    A.    Yes. 100 percent.
6    Q.    Okay. And just to kind of loop back
7  again, we talked about it a little bit before, but,
8  again, part of the -- you talked about the
9  diversionary element of these devices. But, again,
10  it is also to disorient and confuse; correct?
11    A.    Yes.
12    Q.    So that you can overwhelm them; correct?
13    A.    Yes.
14    Q.    Do you think that the delay in getting
15  through the door caused essentially a failure to
16  overwhelm and instead just disoriented and confused?
17    A.    I think it would have given us more time
18  to get through the door. Obviously if we didn't
19  have those going off and the door was still getting
20  hit multiple times and there was nothing else,
21  somebody might have been coming to the door at that
22  point.
23        I think it could disorient somebody in
24  there. I mean, it is -- you know, it's a loud
25  audible in there. Outside it's not quite as loud

85

1  because it's outside the residence.
2        But that's what they're designed for is
3  to disorient and ...
4    Q.    Kerry, I'm going to read you a section
5  of the CIRT report. And it says, "If after
6  notice" -- it talks about the legal elements for
7  knock-and-announce. And it says, "If after notice
8  of his authority and purpose an officer is refused
9  admittance." It talks about kind of like what the
10  purpose of what knock-and-announce is.
11        Can you tell me what Mr. Williams did to
12  refuse admittance while the door was closed?
13    A.    While the door was closed?
14    Q.    Correct.
15    A.    We had no -- we weren't aware that he
16  was in there at that point, so he did nothing.
17    Q.    Okay. And do you think there was
18  sufficient time between the announcement and when
19  the side window's broken to allow Mr. Williams to
20  get up and walk to the front door to allow the
21  officers admittance, including yourself?
22    A.    It might have. But he could also call
23  out. So it doesn't take very long, if you're laying
24  there, to say, Hey -- you know, to say anything in
25  there. Hey, I'm in here. Who are you?

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86

1      There was nothing of any of that.
2      And like I said before, somebody else
3  came out and approached before we went in there that
4  got -- they came out and had enough time to come to
5  their door or stick their head out.
6      Q.    But they weren't inside the apartment
7  like Mr. Williams was; correct?
8      A.    Yeah.
9      Q.    Because you even pointed -- you even
10 pointed out a little bit earlier that how it's going
11 to sound and feel inside the apartment is going to
12 be very different from what it is outside the
13 apartment.
14     A.    Yes. It wouldn't be as loud in a
15 neighboring apartment. They are going to hear
16 something going on out there, but they're not going
17 to hear it as much as somebody inside there if we're
18 hitting on that door and the stun stick that was
19 introduced in there going off.
20     Q.    And so I'm going to -- I'm going to read
21 to you part of what was quoted in the CIRT report
22 about a reasonable amount of time based on the items
23 sought.
24     Because we've gone over the type of
25 arrest warrant. I just want to make sure I

87

1  understand correctly -- sorry, not arrest warrant,
2  search warrant -- that this was a search warrant for
3  items.
4      You looked at the warrant itself;
5  correct?
6      A.    Yes, ma'am.
7      Q.    Because you were part of the recon team,
8  so you knew which items were sought out?
9      A.    Yes, ma'am.
10     Q.    Based on my understanding of your prior
11 testimony, you thought -- this was also kind of like
12 an arrest warrant too; you thought you were going to
13 find suspects and detain them. Correct?
14     A.    Yes.
15     Q.    You thought that, based on what the
16 homicide officers had told you, was that they didn't
17 have PC for this incident, but they did have PC for
18 other incidents, so they were going to be arrested;
19 correct?
20     A.    Yes.
21     Q.    And so let's kind of parcel out that, in
22 terms of just the warrant itself for the items,
23 there was nothing in the warrant that you would have
24 been concerned about being able to be destroyed or
25 in some other way altered before entry in the unit;

88

1  correct?
2      A.    To be honest with you -- step back on
3  there -- one, the detectives, I'm not a hundred
4  percent that it was a homicide detective that said
5  they had PC. Just because I want to be clear on I
6  don't know a hundred percent it was a homicide
7  detective. It could have been a gang detective,
8  because they were involved with the investigation
9  there as well.
10     Q.    We can just say "detective" for the
11 record.
12     A.    Okay. The other was the items that were
13 sought to be found, that they were looking for, I'm
14 not a hundred percent, so I'd have to see that again
15 to see. But I believe it was for a small-caliber
16 firearm and for clothing.
17     Q.    And so I'm going to read to you some
18 case law that's cited in the CIRT report, and it
19 talks about the standard for what is a reasonable
20 amount of time based on the items sought.
21     What it says is, "After 15 to 20 seconds
22 without a response, officers could fairly have
23 suspected that Banks would flush away the cocaine if
24 they remained reticent." That's from page 133 of
25 the CIRT report.

89

1      In this case you guys weren't trying to
2  execute a search warrant for any items that you were
3  concerned could be destroyed or flushed away;
4  correct?
5      A.    Correct.
6      Q.    As we sit here today, do you have any
7  knowledge or memory or any position on how long you
8  think was between the first announcement and when
9  entry was made into the unit?
10     A.    How long it was?
11     Q.    Uh-huh.
12     A.    I would say six to -- I thought it was
13 nine seconds whenever I viewed something before.
14 But around there.
15     Q.    In your professional opinion as a SWAT
16 officer, do you think that that was a reasonable
17 amount of time?
18     A.    Based on the circumstances and what we
19 were going for -- it wasn't that we were -- I
20 understand that we were going for -- the search
21 warrant was for property that could have been, you
22 know, the evidence. The other mitigating factors
23 would have been the fact that there were known
24 firearms that were associated to the residence.
25 They were known to be armed. Not only armed, but

Case 2:24-cv-00074-APG-NJK    Document 55-7    Filed 05/16/25    Page 26 of 36

Kerry Kubla                     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90

1  they were known to have shot, you know, possibly
2  from that residence in illegal shootings. And, you
3  know, that they used a firearm to basically fire at
4  somebody and commit, you know, a homicide.
5          So those mitigating factors I think is
6  where part of that comes into the effect of how long
7  it takes.
8          I know, like, talking U.S. v. Banks,
9  you're talking about somebody that was in there for
10 selling drugs or whatnot and he was in the shower
11 and there's -- yeah, that time might not be.
12         But not knowing that he's in the shower,
13 on a small apartment, to be honest with you,
14 depending on the size of the apartment, it doesn't
15 take very long at all to come and answer the door.
16         We have people that go up -- detectives
17 that go to doors, and whenever they do buys on
18 targets, the person is coming to the door within
19 three to five seconds a lot of times. So that's
20 somebody knocking, them coming to the door, and then
21 bringing them in to sell them narcotics.
22         So depending on the size of the
23 structure, which this wasn't an overwhelmingly large
24 structure. It was a very small apartment. So I
25 guess to what you're saying, I don't know that it

91

1  was too short of an amount of time.
2          I think that's subject to the mitigating
3  factors and our articulation as far as what all is
4  involved.
5          I know typically the search warrant
6  is -- like you're saying, it's for evidence that
7  we're looking for. However, the evidence that's in
8  there is related to subjects that are known to
9  shoot, that have firearms, and they're able to shoot
10 back at us.
11     Q.    So this warrant was being served like an
12 arrest warrant; correct?
13     A.    That somebody was in there?
14     Q.    Yes.
15     A.    In my mind -- like I said, I don't know
16 a hundred -- my mind, they had probable cause for
17 the two suspects, and we didn't know if those
18 suspects were in there or they were not in there.
19         And then there were other subjects
20 involved that were known to also be affiliated, like
21 gang affiliation, and known to carry firearms.
22         So unknown on who all was going to be in
23 there. It was just a flophouse for a lot of gang
24 members.
25     Q.    But this warrant was being served like

92

1  an arrest warrant; correct?
2      A.    Yes.
3      Q.    And if I understand your dialogue
4  before, it's your position that six to nine seconds
5  was a reasonable amount of time; correct?
6      A.    For that size of a structure, I would
7  say.
8      Q.    Okay. So that's a yes?
9      A.    Yes.
10     Q.    Okay. Prior to serving the search
11 warrant, had you received any training about what
12 elements you had to comply with under both U.S. law
13 and Nevada law for a proper knock-and-announce
14 entry?
15     A.    What requirements?
16     Q.    Yes.
17     A.    We give out two full announcements, and
18 it's an articulated amount of time, a reasonable
19 amount of time for somebody to come to the door --
20     Q.    Okay. And -- sorry.
21     A.    -- or refusal. Unless that person --
22 unless somebody basically comes out and they refuse
23 by running back in. You know, they see the door,
24 they open the door, they close the door, and they
25 refuse. At that time it's a refusal.

93

1      Q.    So is it your position that, based on
2  your training leading up to this incident on
3  January 10, 2022, that two what you would call "full
4  announcements" meets the standard for the elements
5  for knock-and-announce?
6      A.    The two full announcements and then the
7  amount of time it took after that, after the
8  announcements.
9      Q.    Well, what if there's no amount of time?
10 Do you think that two full announcements is
11 sufficient?
12     A.    If that time was adequate for the size
13 of the structure and everything that was going on,
14 two full announcements and then making entry,
15 there's -- we're also not making -- those
16 announcements continue to go on. So even after
17 those first two announcements, it's not two full
18 announcements and then everything is stopped at that
19 point. We're still continuing to make
20 announcements: "Police department, search warrant;
21 police department, search warrant."
22         Everybody even up until that point that
23 that door was opened -- which that's where I think I
24 said it was six seconds to possibly nine seconds. I
25 think the door came open, possibly might have



Kerry Kubla            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1  been -- and I'd have to review again to see a
2  hundred percent, but I believe that whenever the
3  door actually opened was around nine seconds,
4  because it was six seconds for the starting of that
5  and then nine seconds for the door to open, and at
6  that time we're still giving announcements. I'm
7  giving an announcement before I walk through the
8  door. Everybody else in the line is giving
9  announcements, the same thing. And as we're going
10 in, we're still giving those announcements.
11     Q.    And so let me ask the question a little
12 bit differently then.
13           Prior to the search warrant, what
14 training had you received about what elements you
15 had to comply with under U.S. and Nevada law for
16 proper knock-and-announce entry?
17     A.    To give our attention -- to state who we
18 are, what the address was, to give our attention of
19 why we're there, serving a search warrant. We
20 obviously identify ourselves, and then give a
21 reasonable amount of time for somebody to answer the
22 door or refuse.
23     Q.    And so what was your training about what
24 a reasonable amount of time was?
25           I don't want you to walk me through what

95

1  you consider it based on the circumstances here.
2  But what I'm asking more specifically is what
3  training were you provided to say this is what a
4  reasonable amount of time is?
5      A.    Just going over the overall factors. If
6  the house is very large, it's going to need a little
7  bit more time.
8            When it is, what time it is, what time
9  of the day it is.
10           Whether -- I would say the structure,
11 the size of the structure, adds a big factor of it,
12 where somebody could be deep in a bedroom if it's a
13 five-bedroom house, or it might be upstairs. It
14 might be a two-story residence. It's going to take
15 longer. So you're not going to use that same amount
16 of time on that as you are a one-bedroom studio
17 Segal Suite or something. That time is going to be
18 a lot shorter.
19     Q.    And how did you receive this training,
20 Kerry?
21     A.    Just through training through our TSD
22 section, our training coordinators, which would have
23 been senior officers that are in our division.
24     Q.    And as we sit here today, do you think
25 that the amount of time that the team waited before

96

1  entering the unit, do you think that was reasonable
2  and in compliance with controlling case law?
3            MR. ANDERSON: Objection. Form.
4            Go ahead and answer.
5            THE WITNESS: I think with what we had
6  as far as the factors, I don't think it was too
7  short -- you know, that it was not long enough or
8  too short of an amount of time, just from my opinion
9  from serving warrants.
10 BY MS. MURPHY:
11     Q.    So it's your opinion that the amount of
12 time between the announcements and the entry into
13 the unit was reasonable based on controlling law; is
14 that correct?
15     A.    Yes.
16           MS. MURPHY: Actually, before I get into
17 some of the CIRT conclusions, were you placed on
18 administrative leave following this incident?
19           THE WITNESS: I was off that time, yes,
20 ma'am.
21 BY MS. MURPHY:
22     Q.    Okay. How long were you off for?
23     A.    I don't know exactly -- I mean, I was
24 off for a year. But I'm not aware -- because
25 administrative leave, I was also off because of

97

1  injuries. So I don't know what the parameter was
2  where you'd be off at this time but I wasn't
3  because --
4      Q.    Let me ask the question a little
5  differently.
6      A.    I came back a year after. Right at a
7  year after the incident is when I came back to work.
8      Q.    Okay. And what is -- you kind of talked
9  about it when you walked through it.
10           Can you walk me through what injuries
11 you sustained?
12     A.    Yes. I took a gunshot wound to my left
13 arm, the middle of my forearm, which shattered the
14 radius bone on my arm. That came out the top of my
15 arm, which tore all the tendons -- dislocated or
16 tore all the tendons that were in that arm.
17           And then the right arm I was shot, which
18 was probably about 6 to 8 inches down from my wrist.
19 That round entered my arm, and it traveled up my arm
20 to the rear of my tricep, the upper of my tricep.
21 That one caused just a lot of -- I know it caused a
22 lot of nerve damage going up that far, and the
23 swelling was obviously, like, enormous because of it
24 going up there. That bullet stayed lodged in the
25 back of my arm.



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1    The bullet that was in this arm
2  (indicating), part of it is still lodged in -- it
3  could be all of it.  I don't know.  Just from an
4  X-ray, you can see that the round is still inside
5  there.
6    I took a round that was through my inner
7  thigh, just -- I don't know how far down that is.
8  But my inner thigh, it entered there, and it came
9  out the outer of that leg, which caused damage to
10  muscle and tendons that were in there.  But it went
11  through there.  That came out the outside of my leg,
12  which ultimately hit my firearm holster, and it also
13  came -- I think because there was a wallet in my
14  pocket, like a metal money clip, and the bullet
15  went, it hit that and went through it.  So whenever
16  it hit that, it basically shrap -- basically the
17  bullet broke up into pieces, so there's a lot of
18  pieces that are still inside there in my hip and leg
19  area that are small fragments that they can't go in
20  there -- it would cause more damage to try and go in
21  there and fish them out.
22    Same with the left arm.
23    The right arm they were able to go in
24  through the back of my tricep like six months or so
25  after that and make an incision, because it was

99

1  close enough to the surface to make an incision to
2  extract that.
3    I was hit once in the chest, which was
4  probably a couple inches above the middle of my
5  chest, on the left side, but that was stopped by my
6  ballistic vest.
7    I was hit on my left side, where I had a
8  knife that was in a holster that was on there, and
9  that hit off my vest and hit the holster and the
10  knife and broke the knife, which was just in the
11  threshold of the door, after -- at least whenever I
12  was walking out, whenever we were going out, I
13  remember seeing it on the ground there in the
14  doorway.  And pictures afterwards from the CI that
15  came out there to take all the photographs, I seen
16  it laying there.  It was actually hit and broke in
17  half.
18    Then I had a round that hit the front of
19  my rifle, the very tip of my rifle.  It hit straight
20  on with that and indented that.  Didn't cause it to
21  break, but it indented -- you can see where it
22  indented the front of that from deflecting off the
23  very front of my rifle.
24    Those were the ones that I had from
25  there.

100

1    So I have a lot of nerve damage.
2  Obviously they connected all the tendons back
3  together on this arm, on the left arm.
4    Bone, there's a rod, titanium rod,
5  that's in there from my wrist to my forearm crease,
6  which is -- I think it's around 9 inches, something
7  like that.  So that's in there for the radius.
8    And then the right arm has significant
9  amount of nerve damage.  I lost the use of my -- not
10  the use, but my index finger has no -- I would say
11  no feeling.  I could stick it on a stove right now,
12  and I wouldn't -- I think there's a superhero that
13  had that, or some people have that.  But I've burned
14  it multiple times not knowing.  Just later in the
15  evening I'll find it's got a big huge ball on there
16  because I blistered it because I set it on something
17  too hot.  So there's no feeling in this finger
18  (indicating).  It's kind of dead.  Like, smack it
19  with a hammer, it doesn't -- and it doesn't -- and
20  the way the tendon is, it doesn't operate -- like, I
21  can't make a complete fist with it.
22    So due to that fact, I primarily
23  switched hands to my left hand to be able to operate
24  with that hand as my primary firearm with my pistol.
25    I can still shoot with this hand, but I

101

1  can't use my index finger.  I use my middle finger.
2  So I can still shoot my rifle with my middle finger.
3  I can shoot with my left hand as well, but I just
4  transitioned my primary firearm to my left hand.
5    Those are pretty much -- a lot of nerve
6  damage.
7    Hip area, same thing.  A lot of -- I
8  don't know if it's like a type of an arthritis or
9  nerve injury stuff, but same thing.  Like, that -- I
10  guess it's -- hard to explain nerve damage, but it's
11  like an electric burn.  So, like, my leg feels -- my
12  thigh just feels sunburnt all the time, like a
13  burning -- burning feeling.
14    Both arms are the same way.
15    These two -- my index finger and my
16  middle finger and my thumb, same thing.  Those burn
17  all the time.  There's no -- and there's slight --
18  not as much as the middle finger.  I can still feel
19  on these.  But it's very -- it's almost like if you
20  wake up and your arm is asleep, it's got that
21  feeling on the other fingers.  That's always there.
22  It never goes away.
23  Q.    How many times were you shot?
24  A.    Technically, a total, I guess, six times
25  I was hit.  Whether it be me, the tip of my rifle,

LEXITAS

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1  that was six times that I was hit.
2     Q.    How many times was your body hit?
3     A.    My body was it -- well, three that
4  entered. I had one that was in my chest, but that
5  didn't enter. But I had three that entered. One
6  through this arm, one through this arm, and then one
7  through my leg (indicating).
8     Q.    Okay. And did you -- have you received
9  any psychological or mental health treatment related
10 to this incident?
11    A.    Oh, yeah. For the full year or whatever
12 I was off, yeah. I was seen --
13    Q.    Are you still -- sorry.
14    A.    -- immediately.
15          No, go ahead.
16    Q.    Are you still undergoing any of that?
17    A.    No. I still have the ability to. I
18 just don't really find -- I haven't had anything
19 that's came up that I need to see anybody about or
20 talk to about. So ...
21    Q.    Okay. And then is it your position that
22 you believe that Mr. Williams knew he was firing on
23 police officers?
24    A.    I don't know what his thoughts were.
25          I mean, we were -- everybody that was

103

1  there was yelling, "Police department, search
2  warrant."
3          I had -- you know, my ballistic vest has
4  "Police" and "SWAT" patches on the front. It's got
5  a "Police SWAT" patch on the shoulder. We have a
6  helmet. We stand out pretty well, I would say, with
7  the gear that we wear.
8          And, again, like I said, we were --
9  everybody that was coming in that door -- I'm sure
10 pretty much everybody, because that's normally how
11 we train -- we yell out "Police department, search
12 warrant" before we make entry into the front door or
13 other doors going into other rooms back in the
14 residence.
15    Q.    To confirm, though -- and I appreciate
16 that you've made that distinction.
17          To confirm, as you sit here today,
18 you're saying, Hey, I don't know if he knew or not;
19 that would be speculation on my part?
20    A.    I have no idea what his thought process
21 was, other than that whenever he was shooting, he
22 was -- he didn't stop shooting. He kept shooting
23 until, you know, he was stopped.
24    Q.    Until he was dead; correct?
25    A.    But he didn't stop shooting. He shot

104

1  rounds through the wall, through the ceiling, to the
2  upstairs apartment, through the -- both walls, and
3  just continued to shoot. So -- and it was a -- you
4  know, continual shots going off. So it wasn't
5  something that he stopped.
6     Q.    He wasn't, like, a marksman; right?
7  Like even how you're describing it, it's a spray of
8  bullets; correct?
9     A.    No, he doesn't -- well, obviously, I
10 mean, most people in that -- they're not accountable
11 for where their rounds are going. So disregard for
12 anybody that's in the, you know, apartment that's
13 neighboring or the apartment upstairs. Which I know
14 rounds went through both walls, that wall, the
15 ceiling, up into the neighboring apartment.
16          But there was no -- it was just a
17 continual shots going off.
18          But I can't attest to what his thinking
19 was other than, you know, he was -- he might have
20 been thinking that he's just going out with a fight,
21 or he might have -- I don't know.
22    Q.    Been confused and not know who was
23 coming through the door; correct?
24    A.    I have no idea of what his capacity was.
25 He could be blind or deaf for all I'm aware of. I

105

1  have no idea.
2     Q.    And so that's actually an interesting
3  point. I'd like to ask you about that.
4          As we sit here today, do you have any
5  knowledge of who Mr. Williams is, or was?
6     A.    Leading up to, no.
7     Q.    Not leading up to the incident.
8          Like, so since the incident have you
9  come to learn anything about Mr. Williams?
10    A.    No. I don't dig into people. I
11 don't -- it's not in my -- you know, I'm not going
12 to look into or dig into anything.
13          I knew what it was at that time. And --
14 I don't know. I'm just not -- there's nothing for
15 me to dig into --
16    Q.    Okay. Let me ask it a little bit
17 differently.
18          As we sit here today, do you have any
19 knowledge about whether Mr. Williams was or wasn't
20 associated with the crimes that were associated with
21 these search warrants?
22    A.    To be honest, I have no idea.
23    Q.    So you have no idea at all?
24    A.    No.
25    Q.    Okay. Have you been involved in any

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

106

1  other officer-involved shootings?
2      A.    Not as a shooter, no, ma'am.
3      Q.    How have you been involved?
4      A.    Like, witness officer. I mean, we've
5  been in other shootings. As a witness officer,
6  where I was on-scene. I didn't shoot, but I
7  witnessed, you know, whenever somebody was shot.
8      Q.    And what were those other incidents?
9      A.    We've had a few. We had one that was a
10 hostage rescue, a vehicle hostage rescue, where one
11 of our sniper units ended up shooting. That was --
12 I can't give you the exact timeline. It was
13 probably a year or so ago or a couple of years ago.
14     Q.    So was it before or after this incident?
15 Because we're -- what are we? Two years out?
16     A.    Yeah. You know, I'm not a hundred
17 percent on that, to be honest with you. I think it
18 was after. I think it was after. I think the last
19 one was after that, after the incident.
20          We had one, same thing, in Laughlin,
21 where, you know, incident officer -- I didn't shoot,
22 but I was right there, where there was a guy that
23 basically shot at security in Laughlin, robbed a
24 casino, shot at officers, was in a barricade in the
25 vehicle.

107

1          We were out there. He came running
2  towards us, and officers shot that were literally,
3  like, right in front of me and to the side of me,
4  and a sniper ultimately took a shot as well that
5  stopped him.
6          But there were officers in front of me.
7  I had no shot because of where they were located at.
8          I don't know. There's multiple times
9  where I witnessed somebody or, you know, been there.
10 Not where I've actually fired, though.
11     Q.    Have you been named in any other
12 lawsuits?
13     A.    No, ma'am.
14     Q.    Okay. Did you receive any retraining
15 following this incident? Related to this incident.
16 I'm sure you've had training since this incident.
17 But related to this incident have you received any
18 retraining?
19     A.    Yeah, I received training. We receive
20 training all the time. But I received -- coming
21 back I received training. After the interview we go
22 through a training process and we run through
23 different scenarios. Some are based somewhat the
24 same. Like, I don't know what they are. They run
25 me through scenarios before I, you know, come back

108

1  to work basically. So they'd run me through
2  scenarios before I came back. And then continuing
3  from then, you know, we train all the time.
4          So I couldn't tell you exactly this
5  training's for this incident or is not for this
6  incident. I know that after the incident, whenever
7  I came back, those were specifically -- not every
8  one of them, but some of them were related the same
9  way. You know, related. Kind of like the same.
10 Obviously it wasn't completely reenacted, but that
11 kind of enactment there is kind of the training we
12 do on a day-to-day basis.
13     Q.    Okay. And I'm going to review some of
14 the CIRT conclusions, and I want to ask your
15 opinions about them.
16          In terms of listing off the unknown
17 factors related to the Nellis apartment, they
18 included who was actually staying at the apartment;
19 if there were children, elderly, or vulnerable
20 individuals present inside the apartment.
21          Were you able to -- you were able to
22 identify those items related to the Jimmy Durante
23 apartment; correct?
24     A.    Who was in there?
25     Q.    Yeah.

109

1      A.    I don't know who was in there. I can't
2  confirm that this is --
3      Q.    Sorry. Let me ask it a little bit
4  differently then.
5          In terms of your recon -- not the Nellis
6  apartment, but the Jimmy Durante apartment, the one
7  you were tasked with doing recon on -- you were able
8  to identify whether there were children, elderly, or
9  vulnerable individuals within the apartment;
10 correct?
11     A.    I could go off what I seen at that time.
12 So the time that I had out there, yes, I could
13 confirm that there was a child related -- well,
14 confirm that there was a child related, one, because
15 there was children-type toy stuff that was directly
16 in front of that, like bicycles and stuff like that,
17 that there would be a child in there.
18          As far as the occupants in there, other
19 than what we knew of as far as, like, who was
20 related to that residence, I can't say a hundred
21 percent, like, yeah, I know that this male, this
22 female, is inside this residence or, you know, a
23 hundred percent in there.
24          And I don't think you could at any place
25 really a hundred percent, unless you really had eyes



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1   on, positively identified the suspect, and you know
2   they're going in there and you don't lose track of
3   that or lose sight of that until an operation was
4   performed.
5       Q.    Give me just one second.
6             I'll read you the specific language from
7   the CIRT conclusion.
8             "While the SWAT section manual contained
9   verbiage allowing for SWAT operators to conduct a
10  CET for property when there is a threat of an armed
11  and dangerous subject, it was not appropriate given
12  the amount of unknowns associated with
13  Apartment 1125. There were numerous amount of
14  unknown factors, to include who was actually staying
15  in the apartment and if there were children,
16  elderly, or vulnerable individuals present inside
17  the apartment. SWAT's decision to serve the 350
18  South Nellis Boulevard search warrant as a CET was a
19  policy/training failure and not within standardized
20  LVMPD tactics, training, and policy."
21            And so we looked over a little bit
22  earlier the photos that were drawn out of the plan.
23  And in fact in terms of elderly, children, who was
24  associated with the apartment, those items were all
25  written into that -- into the -- what do you call

111

1   it?
2       A.    Information page.
3       Q.    Information page.
4       A.    Yes, ma'am.
5       Q.    But, in fact, after having now reviewed
6   everything, those were actually not known. You
7   understand that; right?
8       A.    Yes. Hundred percent.
9       Q.    Okay. And so do you agree or disagree
10  with CIRT's conclusion that to serve the CET was a
11  policy/training failure related in part to the
12  amount of unknowns actually associated with this
13  apartment?
14      A.    It's hard to say that because I don't
15  know where it says that we can't do a controlled
16  entry if there's an elderly person in there or if
17  there's a child in there.
18      Q.    Well, and the way that I read this,
19  Kerry, is a little bit different. It wasn't just
20  one of those things. It was a variety of unknown
21  factors, to the point where it becomes, like -- I
22  don't know if you're familiar with appellate law.
23  They talk about, like, one error by itself, even if
24  it doesn't affect the outcome of the case, isn't a
25  big deal. But when you have a variety of errors,

112

1   even if they're small errors, after a while the
2   number of small errors itself becomes voluminous and
3   becomes its own error.
4             Do you understand that concept?
5       A.    Yes.
6       Q.    Okay. And so here, the way I read this,
7   although I'm not the CIRT conclusion -- and I really
8   am asking for your opinion -- it says -- it says
9   specifically there were numerous amount of unknown
10  factors.
11            So it's not each individual factor on
12  its own; it's that there were all these unknown
13  factors.
14            Do you have a position or an opinion on
15  that?
16            MR. ANDERSON: Objection. Form.
17            Go ahead and answer.
18            MS. MURPHY: That was a terrible-worded
19  question. It's a good objection. I don't know how
20  else to frame it.
21            THE WITNESS: I'm sorry. I don't
22  know -- like, the CIRT, whenever they're putting out
23  their stuff, I don't know that they have the
24  information or they knew these other factors that
25  were in there as far as, like, the suspects that

113

1   were stopped from there that were coming and going.
2   I don't know what all they had prior to that.
3   BY MS. MURPHY:
4       Q.    Kerry, I'll represent to you they had
5   everything.
6       A.    No, I understand that. After the
7   incident was -- after the incident took place and
8   everything, they had all that.
9             But I'm aware that they -- you know, if
10  they said that was a policy failure and that is --
11  you know, we need more than that, then that's what
12  it is. We're going to have to add those.
13      Q.    Okay. And I guess I'm asking, what's
14  your opinion on that? Do you agree or disagree?
15      A.    I think a lot of factors can change that
16  to where you wouldn't need all of those factors
17  listed for a controlled entry.
18            If we had a homicide suspect or whatever
19  the case was, we had that suspect that was in a
20  place and we didn't know all this, you know,
21  different pertinent information that was related to
22  that, I guess that's where it comes down to I think
23  that we definitely need more -- like I said
24  before -- I don't want to say seat time again, but
25  something the detectives probably need to follow up

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1  more on as far as on their investigation to be able
2  to list that stuff to say, Hey, we have this, that.
3          Which is kind of what we do now.  We
4  have -- if they don't have seat time out there, if
5  they don't have certain things that are locked in
6  place that, Hey, we know that this person comes and
7  goes.  He's been seen in here -- a lot of times
8  we'll know, Hey, we have him in there right now.
9  He's in there.  We have a positive ID on him.  We
10  seen him enter.  We've had the place, you know,
11  under surveillance, and they're doing the search
12  warrant at that time.  Those I think are the things
13  that we've changed as far as, you know, making sure
14  that all that stuff is done and not just, you know,
15  pushed up on other -- doing a warrant, especially
16  due to the fact this was a CET.  So that wouldn't be
17  done again from that.
18      Q.      And so how it's done today is different
19  than how it was done at this point in time back in
20  2022; right?
21      A.      Yes.  I'd say that we're much more
22  thorough in vetting that and pushing back on units
23  to have that stuff done.  If they don't have
24  something in there, then we push it back.  Hey, we
25  need to get this.  You need more time out there.

115

1  You need a PID.  You might need to do a phone pin.
2  There's different things that we might push back.
3          Not that I'd push back.  That's above my
4  pay grade.  But I know that we do vet that stuff a
5  lot more now.
6      Q.      And to your knowledge is that change in
7  how it's vetted, is that related in part or at all
8  to this incident?
9      A.      I'm sure part of it is, yes.
10      Q.      Okay.
11      A.      That, and I think the overall -- the
12  world, the way everything's going now, it's not --
13  everything is getting pushed back as far as some of
14  that stuff, where we're not doing the same things.
15      Q.      And I'm going to ask you about
16  Conclusion 3.8, just part of it.  I'll read it to
17  you.
18          "CIRT found that under the conditions
19  present here, six seconds was insufficient to allow
20  occupants time to answer the door, let alone submit
21  to the search."
22          Do you have any position on that
23  statement?
24      A.      Nah.  If that's what they found, that's
25  what they're assigned to do, and that's what they

116

1  found in their mind, it was not sufficient.  So I
2  don't have anything.
3      Q.      And then it goes on to say,
4  "Additionally, deployment of the CET contradicted
5  the knock-and-announce principles.  The CET is
6  intended in part to surprise and overwhelm occupants
7  inside the residence.  Yet, the intent of
8  knock-and-announce is to provide an opportunity to
9  comply before a forced entry is made; thus, is a
10  policy and training failure and not within LVMPD
11  standards."
12          I asked you about it a little bit
13  before, but I'm going to ask you about it now more
14  specifically.
15          Do you have an opinion on CIRT's
16  conclusion that CET contradicts knock-and-announce
17  principles?
18      A.      I think it -- depending on the timeline
19  that's there, I wouldn't say that it contradicts it.
20  But depending on the timeline and what the
21  articulable facts are there, I think that what
22  they're going with is a no-knock warrant -- you
23  know, if we did a no-knock warrant on that, then
24  that would bypass the whole thing.  So --
25      Q.      Absolutely.  But they didn't go through

117

1  the steps of getting a no-knock warrant here, did
2  they?
3      A.      No, they did not.  No.
4      Q.      Okay.  And you agree, though, that CET
5  is intended in part to surprise and overwhelm
6  occupants inside the residence; correct?
7      A.      Yes, ma'am.
8      Q.      Okay.  And you agree too that the
9  purpose, though, of knock-and-announce is to allow
10  somebody the opportunity to comply before forced
11  entry is made; correct?
12      A.      Yes, ma'am.
13      Q.      And do you understand and see the
14  contradiction between surprise and overwhelm and
15  allow opportunity to comply?
16          MR. ANDERSON:  Objection.  Form.
17          Go ahead.
18          THE WITNESS:  Yes.  I see that there's a
19  difference of somebody not coming up to comply.  But
20  complying can be different than coming to the door
21  and answering the door.
22          We've done CET warrants.  I've done
23  hundreds of them.  And I've went into a residence
24  where there's a guy with a gun sitting on his lap
25  and his hands are up, put his hands behind his head.

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

118

1    He obviously didn't come to the door and
2   answer the door.  But he was armed, he was sitting
3   there, and we made a controlled entry tactic on
4   that, and we went in.  That's happened numerous
5   times.
6        Sitting on the coffee table there's a
7   firearm.  On their lap is a firearm.  In the seat
8   cushion next to them.  But -- I've taken people into
9   custody that had a firearm in their hand.  They
10  weren't pointing it at us, but they had it in their
11  hand.
12       So I think that they are still -- at
13  that point they're still complying; they're just
14  caught, overwhelmed.  But they're caught there, and
15  they're still complying with us stating we're the
16  police and we're there serving a search warrant.
17  BY MS. MURPHY:
18   Q.    I'm going to read you from 3.9, part of
19  it.
20       "Officers immediately lost the elements
21  of a CET of utilizing speed to surprise and
22  overwhelm the suspect per their manual by being
23  stuck at the door and hitting it multiple times
24  prior to entering the residence."
25       Do you think that -- do you agree or

119

1   disagree with that statement?
2    A.    Well, it's hard to -- I mean, it's hard
3   to -- I don't think that we were stuck there overly
4   long or for too long.
5    Q.    So is it fair for me to say then that
6   you disagree with that conclusion?
7    A.    Well, it kind of goes back and forth.
8   Because you have one turn they're saying we're out
9   there -- we're not giving enough time, but on the
10  other hand we're going too fast.  So what is it?
11  Are they saying that those knocks on the door, those
12  are breaches because we haven't opened the door yet?
13  Or are we able to go up there and hit that ram 15
14  times on the door and then they're going to say,
15  Well, that's too long?
16       Well, it took 15 seconds to hit the
17  thing 15 times.  We didn't open it, but we opened it
18  on that 15th time.  That would give more time.  But
19  did that leave us out of there?
20       My mind was -- to that fact as far as
21  having that time on our side still was because we
22  were still -- distracts were still going off at that
23  time, and I thought that we were still providing
24  that diversion out there.
25       Now, if those distracts weren't going

120

1   off and they were just hitting that door and hitting
2   the door and hitting the door and there was nothing
3   else going on that would have been able to do that,
4   I would say, yeah, that might have been a time to
5   shut it down at that point.
6    Q.    Do you think that Mr. Williams'
7   constitutional rights were violated?
8        MR. ANDERSON:  Objection to form.
9        Go ahead and answer.
10       THE WITNESS:  No, I do not, ma'am.  I
11  received multiple gunshots before anybody even fired
12  on him.  So I don't know that we acted in a way --
13  that we acted on him other than that.
14  BY MS. MURPHY:
15   Q.    And then in terms of the recommendation,
16  we talked about it quite a bit, but I'll just kind
17  of -- I'll close the loop.
18       From the CIRT report, Conclusion 9.6, it
19  was a recommendation that CET to only be used when a
20  no-knock search warrant is approved by the LVMPD and
21  has judicial preapproval.
22       As we sit here today you understand that
23  that has been a policy change related to this
24  incident; correct?
25   A.    Yes, ma'am.

121

1    Q.    Okay.  Do you think anything could have
2   been done differently here?
3        MR. ANDERSON:  Objection.  Form.
4        Go ahead and answer.
5        THE WITNESS:  I mean, a lot of things
6   could have been done differently.  I don't disagree
7   with the plan of conducting a controlled entry on
8   this residence due to the factors.  So I don't think
9   that could have been changed as far as that.
10  BY MS. MURPHY:
11   Q.    Well, to be clear, LVMPD disagrees with
12  you, because they have in fact changed the policy.
13  You understand that; right?
14       MR. ANDERSON:  Objection.  Form.
15       THE WITNESS:  Yes.
16  BY MS. MURPHY:
17   Q.    But as we're sitting here today, it's
18  your testimony that you would not have done anything
19  differently; correct?
20   A.    I mean, we could have done a lot of
21  things differently.  You know, hindsight, we could
22  have done a lot of things, after the fact.
23       But during that time -- I mean, we could
24  have tried to do a surround and callout on there,
25  and somebody might have came out, and they might



Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

122

1  have done something.  However, somebody could have
2  came out and went into a neighboring apartment and
3  caused an issue or we could have hurt a citizen by
4  doing that.
5      Q.     Today you would have to do a surround
6  and callout; correct?
7      A.     No.  They could have applied for a
8  no-knock warrant.
9      Q.     Sorry.  Okay, correct.
10         If taking the hypothesis that it was a
11 knock-and-announce, you would have to do a surround
12 and callout; correct?
13     A.     I can't speak because I don't make those
14 decisions.  But I think today, if this warrant came
15 in and they had all the seat time and everything was
16 in there, that they would go for a no-knock warrant,
17 and we would go that route to serve the warrant.
18         That's on this circumstance.  That's
19 what I am --
20     Q.     No problem.  So that's a really fair
21 answer.  I'm going to close the loop on that as
22 well.
23         When I asked you if you would do
24 anything differently, your answer then is, Hey, I
25 think this should have been a no-knock warrant.  Is

124

1  say a hundred percent they would have.  But we could
2  have pushed up the fact that we could go up there
3  quietly, we could have placed a charge on there, we
4  could pull back, and then we could make
5  announcements.  Then if nobody is coming to the
6  door, we can give more time there.
7         We could also place -- whenever we do
8  those with ballistic breaches, we have trackers that
9  we put on the wall that they'll light up if somebody
10 is on the other side of the door.
11         So with those in place, we could have
12 effectively placed that charge, pulled back, gave an
13 amount of time, and then moved in the door and went
14 that route.
15     Q.     And, Kerry, you talked a little bit
16 earlier about when you're actually walking, like,
17 the units and you are the one doing the recon and
18 it's your habit to bring magnets and to check other
19 doors.
20         So you think -- I understand that this
21 is a hypothetical question, but do you think that if
22 you would have been tasked with doing the recon on
23 Nellis that you would have been able -- that you
24 would have figured out there was a brass wrap on the
25 door prior to SWAT showing up to serve the warrant?

123

1  that fair to say?
2         MR. ANDERSON:  Objection.  Form.
3         THE WITNESS:  At this time, yes.
4  BY MS. MURPHY:
5      Q.     Do you consider this operation a
6  failure?
7      A.     Yeah, it's a failure.
8      Q.     I know it seems like an obvious
9  question, but I need to ask it.
10     A.     Yeah.
11     Q.     Why do you think it was a failure?
12     A.     Well, there's the circumstances.  I'm
13 living proof.  I got hurt as an officer.  Somebody
14 lost their life.  Other people that were in that
15 neighborhood could have lost their life.  He could
16 have shot other people as well.  He was shooting
17 recklessly throughout the complex, other apartments
18 that were occupied at that time.  So somebody else
19 could have been hurt as well.  So I believe that was
20 a failure.
21         The brass wrap on the door, things
22 could have changed as far as that.  Because we might
23 have -- if we knew that that brass wrap was there,
24 there might have been other plans that we could have
25 pushed up that might have been approved.  I can't

125

1         MR. ANDERSON:  Objection.  Form.
2         THE WITNESS:  I can't speculate that I
3  would have.  If I didn't get a good look at the
4  door, I'd probably try, if I didn't know a hundred
5  percent, do something to go out there and try and
6  get close enough to where I could identify something
7  that was there.
8  BY MS. MURPHY:
9      Q.     Because your earlier testimony was that
10 it's your practice that, if you can't get to the
11 actual door -- which I understand is not advisable
12 for a variety of reasons -- that you'd probably go
13 look at another door in the complex; correct?
14     A.     Well, I think on every recon I've done
15 I've checked like doors.  So I always check the like
16 door.  I check the frame, I check the door, just to
17 see.  Because nine times out of ten -- a brass wrap
18 is not the same, because anybody -- you can install
19 one in your house in, you know, probably 15 minutes.
20 So anybody can install that themselves.  It's not
21 something that's standard protocol on apartments.
22 But you have certain things that are.
23         The metal doors -- and that's not a
24 hundred percent, but a metal door, if it's a metal
25 door and a metal frame, nine out of ten every door

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

126

1  in there is going to be metal on metal. You're
2  going to know that by checking those.
3       There might be somebody that put up a
4  dead man behind it or they might have put a brass
5  wrap on there or did something on their own to
6  reinforce that door.
7       But that takes a lot of that out of
8  there -- you know, I wouldn't say a hundred
9  percent -- by not checking the actual apartment
10  door, but I would have 90 percent going in knowing,
11  okay, these doors are all, you know, metal.
12       Now, if every single one that I checked
13  had a brass wrap, that would change things as well.
14  And I don't believe -- well, I can't
15  attest to that. I don't think that there was brass
16  wraps on every door in there, but I'm not going to
17  say a hundred percent because I didn't go and walk
18  it and look at it.
19  Q.    Okay. But you don't know if the recon
20  officers did a check for like doors either; correct?
21  A.    To be honest, no, I don't.
22       MS. MURPHY: Okay. All right. If you
23  want to give me just a minute, I'm going to go over
24  my notes. I think we might be done.
25       THE VIDEOGRAPHER: We are going off

127

1  record at 12:35 p.m.
2       (A break was taken.)
3       THE VIDEOGRAPHER: We are back on record
4  at 12:39 p.m.
5  BY MS. MURPHY:
6  Q.    Kerry, this is just to clean up the
7  record a little bit.
8       We talked about your position relative
9  to it, and I was able to find a diagram within the
10  CIRT report which kind of shows the various
11  individuals.
12       And that's --
13  A.    LVMPD 04389?
14  Q.    Correct. And based on how you kind of
15  described that to me before, the diagram within the
16  CIRT report is consistent with how you described it;
17  correct?
18       I think you may have identified some
19  different officers. But in terms of, like, the
20  actual positioning of the officers, irrespective of
21  their names, that is consistent with how you kind of
22  described to me the different positioning of the
23  SWAT officers around the unit and the actual layout
24  of the unit itself; correct?
25  A.    Yes, ma'am. There's just -- Bertuccini

128

1  is not listed, but he's over here.
2  Q.    So I'm going to hand you a pen.
3  A.    And somebody else is over here.
4  Q.    I'm going to hand you this pen. If you
5  want to just draw in who is missing. And we're
6  going to make this an exhibit to the report as well,
7  or the transcript.
8       There's a couple that aren't identified.
9  A.    That aren't identified?
10  Q.    That are not identified. They don't
11  identify everybody. Like, they've got all the
12  badges to indicate police officers, but they don't
13  identify all of them.
14  A.    Okay. Yeah, that's what I was looking
15  for on here.
16       I don't a hundred percent know. He's on
17  the lineup on here. Do you still want me to put
18  him?
19  Q.    Yeah, go ahead.
20  A.    Those are the only two I see listed that
21  aren't on there.
22       MS. MURPHY: So we'll just mark this as
23  Exhibit 3.
24       (Exhibit 3 marked.)
25       MS. MURPHY: That will be an exhibit.

129

1  BY MS. MURPHY:
2  Q.    Kerry, thank you so much for your
3  testimony here today. At this time I don't have any
4  other questions except to say did I allow you the
5  opportunity to answer all my questions?
6  A.    Yes, ma'am.
7       MS. MURPHY: Excellent.
8       MR. ANDERSON: I have no questions.
9       THE VIDEOGRAPHER: This concludes the
10  video-recorded deposition of Kerry Kubla taken on
11  October 11, 2024. We're going off the video record,
12  and the time is 12:43 p.m.
13       THE COURT REPORTER: Do you want a copy?
14       MR. ANDERSON: Yes. No video. Waive.
15       (Proceedings concluded at 12:44 p.m.)
16
17
18
19
20
21
22
23
24
25

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

130

```
 1              CERTIFICATE OF REPORTER
 2    STATE OF NEVADA      )
                           )SS
 3    COUNTY OF CLARK      )
 4         I, Holly Larsen, a duly certified court reporter
      licensed in and for the State of Nevada, do hereby
 5    certify:
 6         That I reported the taking of the deposition of
      the witness, Kerry Kubla, at the time and place
 7    aforesaid;
 8         That prior to being examined, the witness was by
      me duly sworn to testify to the truth, the whole
 9    truth, and nothing but the truth;
10         That I thereafter transcribed my shorthand notes
      into typewriting and that the typewritten transcript
11    of said deposition is a complete, true, and accurate
      record of testimony provided by the witness at said
12    time to the best of my ability.
13         I further certify (1) that I am not a relative or
      employee of counsel of any of the parties; nor a
14    relative or employee of the parties involved in said
      action; nor a person financially interested in the
15    action; nor do I have any other relationship with any
      of the parties or with counsel of any of the parties
16    involved in the action that may reasonably cause my
      impartiality to be questioned; and (2) that transcript
17    review pursuant to FRCP 30(e) was waived.
18         IN WITNESS HEREOF, I have hereunto set my hand in
      the County of Clark, State of Nevada, this 23rd day of
19    October, 2024.
20
21
22
23                  Holly Larsen
                 _____
24
                 HOLLY LARSEN, CCR NO. 680
25
```