# Exhibit F - Deposition of Ofc. Brice Clements

Brice Clements    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 87

1                CERTIFICATE OF COURT REPORTER

2

STATE OF NEVADA        )
3                            )  ss:
COUNTY OF CLARK        )

4

5       I, Heidi K. Konsten, Certified Court Reporter

6    licensed by the State of Nevada, do hereby certify

7    that I reported the deposition of BRICE CLEMENTS,

8    commencing on October 7, 2024, at 10:04 a.m.

9          Prior to being deposed, the witness was duly

10   sworn by me to testify to the truth.  I thereafter

11   transcribed my said stenographic notes via

12   computer-aided transcription into written form,

13   and that the transcript is a complete, true and

14   accurate transcription and that a request was not

15   made for a review of the transcript.

16       I further certify that I am not a relative,

17   employee or independent contractor of counsel or

18   any party involved in the proceeding, nor a person

19   financially interested in the proceeding, nor do I

20   have any other relationship that may reasonably

21   cause my impartiality to be questioned.

22       IN WITNESS WHEREOF, I have set my hand in my

23   office in the County of Clark, State of Nevada,

24   this October 21, 2024.

25              _____
                Heidi K. Konsten, RPR, CCR No. 845

Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                    DISTRICT OF NEVADA

 3                      *  *  *  *  *

 4   LATIA ALEXANDER,              )
     individually as heir of      )
 5   ISAIAH T. WILLIAMS and in     )
     her capacity as special      )
 6   administrator of the Estate  )
     of ISAIAH T. WILLIAMS,       )
 7                                 )
         Plaintiff,               )
 8                                 )
         vs.                       )      CASE NO.
 9                                 )  2:24-cv-00074-APG-NJK
     LAS VEGAS METROPOLITAN        )
10   POLICE DEPARTMENT, a          )
     political subdivision of      )
11   the State of Nevada; KERRY    )
     KUBLA, in his individual      )
12   capacity, et al.,             )
                                   )
13       Defendants.              )
     _____)

14

15             VIDEOTAPED DEPOSITION OF

16                  BRICE CLEMENTS

17             Taken on October 7, 2024

18                  at 10:04 a.m.

19           By a Certified Court Reporter

20                Las Vegas, Nevada

21

22

23           Stenographically reported by:
         Heidi K. Konsten, NV CCR 845, RPR
24          JOB NO. 57949 - Firm No. 116F

25
```

Brice Clements    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

2

```
 1          Videotaped deposition of BRICE CLEMENTS,
 2  Volume I, stenographically taken at 400 South
 3  Seventh Street, Las Vegas, Nevada, on
 4  Monday, October 7, 2024, at 10:04 a.m., before
 5  Heidi K. Konsten, Certified Court Reporter in and
 6  for the State of Nevada.
 7
 8          APPEARANCES OF COUNSEL
 9  For the Plaintiff:
10          CORRINE MURPHY, ESQ.
            Breeden & Associates, PLLC
11          7432 West Sahara Avenue
            Suite 101
12          Las Vegas, Nevada 89117
            (702) 508-9250
13          (702) 508-9365 Fax
14  For the Defendants:
15          CRAIG R. ANDERSON, ESQ.
            Marquis Aurbach
16          10001 Park Run Drive
            Las Vegas, Nevada 89145
17          (702) 382-0711
            (702) 382-5816 Fax
18
    Also present:
19
            Dawn Beck, Videographer
20
21              * * * * * *
22
23
24
25
```

3

```
 1                  INDEX
 2                              Page
 3  BRICE CLEMENTS
 4  Examination by Ms. Murphy        5
 5              * * * * *
 6
 7              EXHIBITS
 8  No.          Description      Page
 9  Exhibit 1    Notice of Deposition   6
10              * * * * *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
 1              LAS VEGAS, NEVADA
 2            Monday, October 7, 2024
 3                10:04 a.m.
 4          DEPOSITION OF BRICE CLEMENTS
 5              * * * * * *
 6
 7          THE VIDEOGRAPHER:  Good morning.  We
 8  are now on the record.  This begins the
 9  video-recorded deposition of Brice Clements.
10  Today's date is October 7, 2024.  The time on the
11  video monitor is 10:04 a.m.  We are located at 400
12  South Seventh Street in Las Vegas, Nevada.
13          This case is entitled Latia Alexander,
14  et al., versus Las Vegas Metropolitan Police
15  Department, et al.  The case number is
16  2:24-cv-00074-APG-NJK in the United States
17  District Court, District of Nevada.
18          My name is Dawn Beck, legal video
19  specialist.  The court reporter is Heidi Konsten.
20  We're representing Lexitas.
21          Will counsel please state your
22  appearance for the record and whom you represent.
23          MS. MURPHY:  Good morning.  Corrine
24  Murphy, Bar Number 10410, on behalf of plaintiff.
25          MR. ANDERSON:  Craig Anderson on
```

5

```
 1  behalf of defendants.
 2          THE VIDEOGRAPHER:  Thank you.
 3          Will the court reporter please swear
 4  in the witness.
 5
 6  Whereupon,
 7          BRICE CLEMENTS,
 8  was called as a witness, and having been first duly
 9  sworn to testify to the truth, was examined and
10  testified as follows:
11
12              EXAMINATION
13  BY MS. MURPHY:
14      Q   Good morning, Mr. Clements.  My name is
15  Corrine Murphy.
16          Let the record reflect this is the time
17  and place for the deposition of Brice Clements in
18  the matter of Latia Alexander, et al., versus Las
19  Vegas Metropolitan Police Department, et al., Case
20  number 2:24-cv-00074.
21          Would you prefer that I call you
22  Mr. Clements or Brice?
23      A   Brice is fine.
24      Q   Okay.  Can you please state and spell
25  your full name for the record?
```

Case 2:24-cv-00074-APG-NJK    Document 55-8    Filed 05/16/25    Page 5 of 25

Brice Clements    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1    A    Yes.  Brice John Rollin Clements.
2    That's B-R-I-C-E, J-O-H-N, R-O-L-L-I-N,
3    C-L-E-M-E-N-T-S.
4        Q    And, Brice, you have been -- you had
5    your deposition noticed for today.
6        Did you have an opportunity to review
7    the deposition notice?
8        A    Yes.
9        MS. MURPHY:  Okay.  And I'm going to
10   ask the court reporter -- this is the first
11   amended notice of videotaped deposition --
12   videotaped deposition of Brice Clements.  Can we
13   please mark that as Exhibit 1 to today's
14   deposition transcript.
15       (Exhibit 1 was identified.)
16   BY MS. MURPHY:
17       Q    And you understand that you're here
18   today to discuss the officer-involved shooting of
19   Isaiah Williams?
20       A    Yes.
21       Q    Have you ever given your deposition
22   before?
23       A    No.
24       Q    Okay.  I'm not going to go -- I'm sure
25   that you've been prepared by your attorney.  I'm

7

1    not going to go into a lot of instructions.  The
2    only instruction I'm going to provide is that the
3    oath that you just took is the same oath that you
4    would give if you were in a court of law and the
5    same penalties of perjury apply, even though we're
6    not in a court of law.
7        Do you understand that instruction?
8        A    I understand.
9        Q    Okay.  Is there any reason that you
10   would not be able to understand my questions and
11   give your best and truthful testimony today?
12       A    No.
13       Q    Are you under any medications or any
14   other issue that would inhibit your ability to
15   provide reliable testimony today?
16       A    No.
17       Q    Okay.  Can you please tell me everything
18   you did to prepare for today's deposition.
19       A    Spoke with Craig Anderson, read my CIRT
20   interview, and just reflected on the actual call
21   through memory.
22       Q    Okay.  And I don't -- I'm not entitled
23   to know what you spoke about with Craig.  That's
24   attorney-client privilege.  But I am entitled to
25   know how long you met with Craig for and how many

8

1    times.
2        A    I believe two times.  The first one was
3    a group setting at his office for approximately an
4    hour to an hour and a half.  The second one was in
5    his office for approximately 30, 40 minutes.
6        Q    And what date was the 30- to 40-minute
7    meeting on?
8        A    That was last week on Wednesday, I
9    believe.
10       Q    And the group setting meeting,
11   approximately how long ago was that?
12       A    That was back in probably June.
13       Q    And I know that you -- I can see that
14   you brought your CIRT statement with you, and you
15   just listed that as one of the things that you
16   reviewed for today's deposition.
17       Are there any other documents that you
18   reviewed in preparation for today's deposition?
19       A    Yes.  I was given the court info and I
20   think just the litigation as far as why we're
21   here.
22       Q    Okay.  And, Brice, you completed what
23   are called interrogatories and requests for
24   production of documents.
25       Do you remember doing those at all?

9

1    A    Yes.
2        Q    Okay.  Did you review those in
3    preparation for today's deposition?
4        A    Yes.
5        Q    Okay.  Are there any other documents
6    that you may have reviewed -- that you did review
7    for -- in preparation for today's deposition?
8        A    No.
9        Q    Okay.  Other than your own statement,
10   have you reviewed the statements of any of the
11   other police officers?
12       A    Yes.
13       Q    Okay.  Who else's statement did you
14   review?
15       A    Gonzales.  Alex Gonzales.
16       Q    Okay.  And when you say "statement," do
17   you mean his CIRT -- his recorded CIRT statement,
18   or did you review his deposition transcript?
19       A    His deposition transcript.
20       Q    Okay.  And did you read the entire
21   deposition transcript?
22       A    No.
23       Q    Okay.  How much of it did you read?
24       A    Bits and pieces.  I didn't read the
25   whole thing.

Brice Clements        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1    Q    Okay.  In reviewing Officer Gonzales's
2  deposition transcript, was there any information
3  that you found surprising?
4    A    No.
5    Q    Okay.  Did you agree -- with the items
6  that you read in Officer Gonzalez's deposition
7  transcript, were you mostly in agreement with
8  them?
9    A    Yes.
10   Q    Can you give me a brief description of
11 what parts of Officer Gonzalez's deposition
12 transcript you reviewed?
13   A    The first couple of questions
14 reference -- the questions that you're asking
15 right now, and a little bit into questions related
16 to the actual shooting.
17   Q    Okay.  Anything else?
18   A    No.
19   Q    Did you read any parts of Officer
20 Gonzalez's deposition transcript where he talked
21 about what he might have done differently or what
22 the cause of this incident was, in his opinion?
23   A    No.
24   Q    Okay.  And so we've kind of gone over
25 some stuff.  Every time I ask you, you're giving

11

1  me more items that you reviewed.
2        It is your responsibility in this
3  deposition to give me complete and whole answers,
4  so I'm going to ask you one last time.  And if you
5  want to take a moment to think about it, please do
6  that.
7        Did you review anything else to prepare
8  for today's deposition?
9    A    That was the only extra thing.
10       MR. ANDERSON:  Well, you said
11 documents.  We watched body cam.
12       MS. MURPHY:  Okay.  Okay.
13 BY MS. MURPHY:
14   Q    Why did you not list off the body cam
15 when I asked you what you did to prepare for
16 today's depositions?
17   A    I just figured documents.  I mean, I've
18 reviewed the --
19   Q    Well, my first question was "tell me
20 everything you did to prepare for today's
21 deposition."
22       Is that fair?
23   A    Yes.
24   Q    So why didn't you tell me you reviewed
25 the body cam?

12

1    A    It didn't pop up into my head.
2    Q    And I'm going to go over the
3  instruction one more time.
4        It is your responsibility today to give
5  me your best, whole answers.
6        Do you understand the nature of that
7  instruction?
8    A    Yes, I do.
9    Q    Okay.  Is your -- what are your normal
10 work hours?  As we sit here today, what are your
11 normal work hours?
12   A    My work hours as we sit today are 6:30
13 to 4:30, Monday through Friday -- Monday through
14 Thursday.
15   Q    Okay.  Is that 6:30 a.m.?
16   A    Yes.
17   Q    Okay.  And Monday through Thursday, so
18 this would normally be during your working time;
19 is that correct?
20   A    That is correct.
21   Q    Okay.  And you got today off to do the
22 deposition?
23   A    No.  I was actually in class.
24   Q    What kind of class were you in?
25   A    Supervisor's class.

13

1    Q    What's a supervisor's class?
2    A    It's a POST two-week class basically to
3  give insight on how to be a good leader.
4    Q    Okay.  Are you up for a promotion
5  currently?
6    A    Already promoted.
7    Q    Oh, congratulations.
8    A    Thank you.
9    Q    What were you promoted to?
10   A    Sergeant.
11   Q    And when did that happen?
12   A    May 13 of '23.
13   Q    Okay.  And are you -- as we sit here
14 today, are you still with SWAT?
15   A    No, I'm not.
16   Q    Who are you with now?
17   A    Patrol.
18   Q    So you are a sergeant in a patrol -- in
19 the patrol unit.
20       Am I saying that accurately, or should
21 it be said differently?
22   A    No, patrol.
23   Q    Okay.
24   A    Yeah, patrol division.
25   Q    Did your transfer out of SWAT, was that

Case 2:24-cv-00074-APG-NJK    Document 55-8    Filed 05/16/25    Page 7 of 25

Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1    in any way related to this incident?
2        A    No.
3        Q    Okay.  And so why did you transfer out
4    of SWAT?
5        A    To promote.
6        Q    Okay.  And so I'm going to -- Brice, I'm
7    going to go over some background.  And so let me
8    ask you, at the time of the incident, do you
9    remember what your work schedule was?  And I --
10   just for the record, I know you know, but I have
11   to say it for the record.
12           When I refer to "the incident," I'm
13   talking about the officer-involved shooting on
14   January 10th, 2022.
15       A    Yes.
16       Q    Okay.  At the time of the incident, what
17   was your work schedule?
18       A    I worked Sunday through Wednesday and
19   swing shift.  It changed a couple of times.  If I
20   remember correctly, I believe it was 2:00 to
21   midnight at that time.
22       Q    Okay.  Was it almost like a -- if I call
23   it a wobbler schedule --
24       A    I mean, I was on call 24/7.
25       Q    Okay.  And so was the -- it's a little

15

1    early in the morning for me.
2            Was the execution of this warrant during
3    your normal work hours?
4        A    No.
5        Q    Okay.  So you were -- if I say "called
6    in" for this, is that accurate?
7        A    Called out.
8        Q    Called out.
9            That's what you call it, a call-out?
10       A    Uh-huh.
11       Q    Okay.  Why were you called out for this?
12       A    Because it wasn't during our regular
13   work hours.
14       Q    Okay.  And do you have the option of,
15   like, accepting a call-out, or do you just get
16   called out and you have to show up?
17       A    When it's on your workdays, which this
18   was, you have no -- there's no option.  You --
19   those are your workdays.  You go in.
20       Q    Okay.  All right.  So if I understand
21   correctly, you have, like, normal shift hours, but
22   any -- for something like this, a search warrant
23   like this, if it falls on your workday, then you
24   get called -- you get called out for it?
25       A    Yes.

16

1        Q    Okay.  All right.  Now, Brice, I'm going
2    to ask you some background questions.
3            What's your highest level of education?
4        A    I have a bachelor's degree in chemistry,
5    biochemistry, with an emphasis in forensic
6    chemistry.
7        Q    Is it a dumb question for me to ask how
8    you ended up being a police officer?  Because that
9    seems like headed towards med school.
10       A    I came down here to do forensics with
11   the department.  It was 2007.  So the fall of --
12   if you remember, in 2008, we had a major issue
13   with the government and jobs were hard to find.
14   In 2007 I decided to try law enforcement, and I'm
15   happy that I did.
16       Q    Okay.  And where did you receive your
17   BA?
18       A    Eastern Washington University.
19       Q    Okay.
20       A    I also have an associate's degree from
21   Columbia Basin College, which I got at the same
22   time that I graduated high school.
23       Q    And what was your -- what was your
24   associate's degree in?
25       A    Just general associate's.

17

1        Q    Okay.  Are you a member of any
2    professional organizations related to your
3    profession currently?
4        A    In what -- like examples?
5        Q    Yeah.  So sometimes when I ask that
6    question, some people will tell me, you know, oh,
7    I'm -- I belong to, like, an officer -- like, a --
8    like an officer support group or, like, with
9    sometimes in military and stuff -- what's it
10   called?  The -- oh, gosh.  The organization for
11   veterans or like a -- sometimes -- sometimes
12   officers are maybe involved in, like, a shooting
13   club or something like that.
14       A    No.
15       Q    Okay.  And we went over this briefly.
16           So I understand your current position is
17   sergeant in patrol, and you were promoted in May
18   of 2023; correct?
19       A    Correct.
20       Q    Okay.  How is that going?
21       A    Good.
22       Q    Okay.  Can you kind of walk me through
23   your -- your professional background with LVMPD
24   leading up to this incident?
25       A    Sure.  I was hired in -- June 18th,

18

1  2009. Finished the academy and graduated in
2  December of same year. Did patrol up until
3  approximately four years on, where I tested for
4  field training officer. Passed that. Was a field
5  training officer for approximately five to five
6  and a half years before I went to SWAT.
7      Q    And what does a field training officer
8  do?
9      A    They train the officers that come out of
10  the academy. So they get their, like, on-the-job
11  training.
12      Q    Okay. And so you're going to -- if some
13  of my questions seem a little awkward, it's
14  because I'm not a police officer, so I don't know
15  what --
16      A    I understand.
17      Q    Yeah. So is it -- if I understand
18  the -- the chronology that you just gave me, you
19  were a field training officer. And from that,
20  where you're training other officers, you then
21  went into SWAT; is that --
22      A    That is correct.
23      Q    So you weren't, like, on patrol or part
24  of, like, a narcotics unit or anything like that
25  prior to being on SWAT?

19

1      A    No. Patrol.
2      Q    Okay. And so can you kind of tell me,
3  like -- you have given me a little bit of a
4  description. But can you kind of walk me through,
5  like, what kind of stuff would you do field
6  training for? Like, what did the training look
7  like or provide for? You weren't training.
8      A    The field training would provide the new
9  officers on-the-job training for various calls,
10  paperwork, understanding criminal law,
11  understanding the defensive tactics, understanding
12  the use of force, and any questions related to
13  that.
14      Q    And so that's actually really
15  interesting. You're the first police officer that
16  I've talked to that has a background in training
17  other officers in criminal law and use of force.
18          So can you kind of walk me through,
19  like, what would that training look like?
20      A    You go through some of the laws that
21  pertain to an officer using force like -- related
22  to, you know, a fleeing felon, things like that.
23      Q    Okay. And how would you train officers
24  in that?
25      A    By reading the laws.

20

1      Q    Okay.
2      A    Which they have already been -- to be
3  honest, been trained on in the academy.
4      Q    I would hope so.
5          So I guess I'm trying to figure out --
6  and I'm trying to figure out, like, would you
7  actually -- like, out in the field would you say,
8  "Okay. You need to do X, Y, and Z in order to --
9  you know, comply with this case law"? Or is it
10  more, like, you would sit down and have a study
11  session? I guess that --
12      A    Study sessions. But also the department
13  puts on study sessions via -- what we call our
14  UMLV.
15      Q    What's UMLV?
16      A    University of Metro Las Vegas. So it's
17  a program that the department puts out with
18  various training videos or training in general.
19      Q    And as part of UMLV or your training of
20  other officers, did you go over what knock and
21  announce means?
22      A    In patrol, you don't do search warrants.
23  So briefed over things like that, but that's not
24  what a daily patrol officer does.
25      Q    And so -- and, I'm sorry, I know you

21

1  told me, but I -- I didn't make a note of it as
2  well as I should have.
3          How long had you been in SWAT before
4  this incident occurred?
5      A    Approximately three years. But I was
6  doing training with SWAT, meaning role-playing
7  and/or going through SWAT schools and testing.
8  I've been through, I believe, four SWAT schools.
9  And the last one that I went through was
10  completely graded.
11      Q    What does "completely graded" mean?
12      A    It means for the four weeks of the SWAT
13  school, every day you are graded on it. And that
14  was to be placed on the list.
15      Q    And what does "the list" mean?
16      A    The list is the -- is ranked. And then
17  dependent on where you are in positions opening
18  wise, then you get pulled from that list.
19      Q    And how were your grades?
20      A    I was number one on the list.
21      Q    And is that the normal way that you
22  would qualify for SWAT?
23      A    It has changed over my career, but for
24  the most part, yes. You have a physical test,
25  a -- which is an obstacle course to include

Brice Clements      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1 shooting. And you also have a qualification for
2 your handgun and your rifle.
3      Then you move on to an actual, like,
4 physical fitness test. And then after that are
5 scenarios, and then the SWAT school.
6   Q  Okay. And so you -- had you been
7 through four SWAT schools by the time of this
8 innocent -- incident?
9   A  Yes.
10   Q  Okay. And can you tell me -- I'm going
11 to ask the question in two parts, and if it's the
12 same, then tell me it's the same.
13      I'm going to ask you what knock and
14 announce mean to you, what your understanding as a
15 SWAT officer is, what that knock-and-announce rule
16 means. And I'm going to ask you what it means for
17 you here today. And if that is different, than
18 how -- what it meant for you in 2022 at the time
19 of this incident.
20   A  Okay. So knock and announce is a tactic
21 that we use where we would announce our intentions
22 to somebody inside of a building/residence related
23 to the search warrant.
24   Q  Okay. To your -- and I'm assuming that
25 that's the same as what you understood it to be as

23

1 in 2022?
2   A  Absolutely.
3   Q  Okay. To your knowledge, is there any
4 amount of time that you must wait before entering
5 the unit after you've made your -- your first
6 knock and announce?
7   A  There's time that is wished it to be,
8 but time varies.
9   Q  Okay. And I think I understand what you
10 mean by "wished it to be," which means -- these
11 are called dynamic entries, right, where there's a
12 lot of stuff changing?
13   A  Yes.
14   Q  So can you tell me what the "wished for"
15 amount of time is?
16   A  At the time, I think it was
17 approximately around ten seconds. And if I
18 remember correctly, entry was at 17 and a half
19 seconds.
20   Q  Okay. But entry was at 17 and a half
21 seconds through the window; correct?
22   A  I have no idea.
23   Q  Okay. And can you tell me, what is the
24 purpose of knock and announce?
25   A  To announce our intentions, that we have

24

1 a search warrant, which is why we announce
2 "Police, search warrant."
3   Q  And why do you have to do that?
4   A  To announce our intentions to the people
5 that are inside.
6   Q  And why does the person inside get to
7 understand -- get to -- sorry. Strike that.
8      Why does the person inside get to hear
9 the announcement of your intention?
10   A  Because we're going into their
11 residence.
12   Q  Okay. Are there any rights that are
13 triggered -- does the person inside have any kind
14 of rights or do you have any type of duties to
15 make those announcements?
16   A  Yeah, through the Fourth Amendment.
17   Q  Okay. And can you kind of walk me
18 through what your understanding of that is?
19   A  Yes. You can't just enter somebody's
20 house just to enter somebody's house.
21   Q  Why not?
22   A  Because it's an intrusion on their
23 liberties.
24   Q  Okay. And so I asked a little bit
25 earlier about the time that you need to provide.

25

1 What's your understanding of why you need to
2 provide time? We talked about the difference
3 between the wished-for time and what actually
4 happens in the field.
5      What is your understanding of why that
6 has to occur?
7   A  To allow that person to hear and
8 understand the intention of the police that are
9 coming in and that they have a search warrant.
10   Q  And so as we sit here today, you
11 understand, correct, that it is a person's
12 constitutional right to have clear notice of a
13 police officer's intent to enter?
14   A  Yes.
15   Q  Okay. Do you -- and we will get into
16 the specifics of this actual incident itself.
17      In terms of the young man that was shot,
18 Isaiah Williams, do you think that he had a clear
19 notice of your -- your unit's intent to enter the
20 apartment?
21   A  Absolutely.
22   Q  Why do you say that?
23   A  Because the patrons in the apartment
24 above heard our announcements.
25   Q  How do you know that?

Brice Clements    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1    A    Because they testified to it.
2    Q    When did they testify to it?
3    A    When they were interviewed by -- I'm
4    assuming CIRT or FED.
5    Q    And what was your understanding of their
6    testimony?
7    A    That they heard us yelling and yelling
8    "Police, search warrant" and the apartment and the
9    apartment number.
10    Q    Okay.  The apartment number was yelled?
11    A    Uh-huh.
12    Q    Okay.  And, Brice, as we sit here today,
13    do you think that perhaps the experience of the
14    people above you could be different than the
15    experience of Mr. Williams?
16        MR. ANDERSON:  Objection.  Form.
17        You can answer.  When I object, always
18    answer --
19        THE WITNESS:  Okay.
20        MR. ANDERSON:  -- unless I tell you
21    not to.
22        THE WITNESS:  What's that now?  Can
23    you repeat the question?
24        MS. MURPHY:  Would you mind rereading
25    the question?

27

1        THE COURT REPORTER:  Sure.
2        MS. MURPHY:  I ask her to re-read it
3    because -- sorry.  Off the record for just a
4    second.
5        (Discussion off the record.)
6        (Whereupon, the record was read.)
7        MR. ANDERSON:  Absolutely.
8    BY MS. MURPHY:
9    Q    Okay.  And that could be also because
10    their windows weren't being broken; correct?
11    A    Yes.
12    Q    They didn't have a distraction device
13    being inserted through their windows; correct?
14    A    Correct.
15    Q    They didn't have a 9 banger going off in
16    close proximity to them; correct?
17    A    Yes.
18    Q    Okay.  In -- in your opinion, what is
19    the first and most important constitutional right
20    that any individual has?
21    A    A right to their person and property.
22    Q    In performing your job as a police
23    officer, do you agree with me that you have a duty
24    to conduct yourselves such that you do not violate
25    the civil or constitutional rights of members of

28

1    the public?
2    A    Absolutely.
3    Q    Do you also agree that if you see other
4    officers violating the civil or constitutional
5    rights of a member of the public, you have a duty
6    to intervene and stop that officer?
7    A    Absolutely.
8    Q    And can you please tell me, Brice -- and
9    if it's -- when I ask questions about, like,
10    definitions, it will be a standing instruction,
11    but I'll clarify it each time.
12        If your understanding of a definition or
13    parameter that I'm asking you for is different
14    today than it was in 2022, can you please identify
15    what differences they may be?
16    A    Sure.
17    Q    Okay.  So I'm going to ask you, what is
18    a no-knock warrant?
19    A    A no-knock warrant would be essentially
20    a no-knock warrant.  You're not knocking.  You're
21    not announcing.  You're immediately going in.
22    Q    And I'm going to ask the question,
23    because I want a -- because I want it for the
24    record, although I know it's somewhat
25    self-explanatory.

29

1        What's the -- what are -- what's the
2    difference between a no-knock and a knock and
3    announce?
4    A    You're announcing.
5    Q    And what type of warrants would you get
6    a no-knock warrant for?
7    A    Something high profile, I would say.
8    Something that would be extremely dangerous to the
9    officers or it could be extremely dangerous for
10    the person who is inside.
11    Q    And to clarify, this was a knock and
12    announce warrant; correct?
13    A    Yes, it was.
14    Q    Can you get a no-knock warrant for a
15    property-only search warrant?
16    A    Not that I know -- not that -- I
17    couldn't tell you, off the top of my head right
18    now.
19    Q    Okay.  That's fair.  If you -- if you
20    don't know the answer, then just -- thank you for
21    being candid about that.
22        And I'm going to ask you some more
23    specifics about it later.  But as we sit here
24    today, do you have an understanding of what type
25    of search warrant you were executing that day?

Case 2:24-cv-00074-APG-NJK    Document 55-8    Filed 05/16/25    Page 11 of 25

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1    A   Yes. It was a homicide warrant.
2    Q   Was it a property or person?
3    A   Both.
4    Q   Okay. And, Brice, can you please tell
5    me -- I always say this wrong -- what is a CET?
6    A   It is a controlled entry tactic.
7    Q   Okay. And can you tell me, what is a
8    controlled entry tactic?
9    A   Yes. You use speed and surprise in
10   order to safely get into an apartment and clear it
11   quickly and safely.
12   Q   In this case, did you think that the --
13   that yourself and the other officers got into this
14   unit safely?
15   A   When the door opened?
16   Q   Yes.
17   A   Yes.
18   Q   Okay. And why do you think that you got
19   in safely?
20   A   Because the door opened and --
21   Q   I'm trying -- I'm sorry. She can only
22   take down one person at a time, and I'm trying not
23   to interrupt you. So if I interrupt you, I'm
24   going to pull back. And please finish saying what
25   you're saying.

31

1    A   Okay. At the time of the door opening,
2    yes, I believe it was a safe entry. As of the
3    time that I entered, it was not safe.
4    Q   And so why do you -- Brice, why do you
5    distinguish between those two -- those two --
6    because those seem pretty close in proximity
7    time-wise to me. So why do you make that -- that
8    distinguishing comment?
9    A   Because we weren't fired upon until we
10   entered.
11   Q   Do you think there was a possibility you
12   could have been fired on before entering?
13   A   Yes. There's always that possibility.
14   Q   Okay. And so upon entering, though,
15   once the doors opened, you would make the -- you
16   would make the change in your assessment of safety
17   as it being unsafe; correct?
18   A   Based off the circumstances as you
19   enter.
20   Q   Okay. So in this case, the CET did not
21   meet its intention of allowing you to safely be in
22   the unit; correct?
23   A   Due to Mr. Williams.
24   Q   Okay. And you place all of that blame
25   on Mr. Williams. Is that fair to say?

32

1    A   I believe that we made enough of an
2    announcement and -- and any reasonable person
3    would understand that announcement.
4    Q   And as we sit here today, I know that
5    you've read your CIRT statement.
6        Have you read the CIRT report itself?
7    A   I was there when they presented it.
8    Q   And you understand that CIRT does not
9    believe that this was a proper entry; is that
10   correct?
11   A   Not that I remember.
12   Q   Okay.
13   A   It was a long time ago.
14   Q   Okay. And later on in the deposition,
15   I'll read some of their conclusions for you, and
16   we'll get into that a little bit more.
17   A   Okay.
18   Q   Can you use a CET on a
19   knock-and-announce warrant?
20   A   Yes.
21   Q   Okay. As we sit here today, there's
22   been no policy change on that?
23   A   They have changed the policy, I
24   believe --
25   Q   What --

33

1    A   -- within the department.
2    Q   What's your -- and it doesn't need to be
3    a perfect --
4    A   What I will say is that at the time, a
5    CET was appropriate for the apartment. And the
6    reasoning for that is that we could not safely
7    surround it, based off of our tactics at the time.
8        When you think about doing a surround
9    and call-out, the whole purpose of that is to be
10   able to surround it safely on all sides. We
11   couldn't do that with the apartment. The
12   apartment was down below a little bit from street
13   level, and there was a business behind. There's
14   also an apartment above.
15   Q   Okay.
16   A   BearCats are not able to get in there,
17   which is a tool that we use in order to call
18   people out.
19   Q   Okay. And you have made the -- you've
20   made the distinction between then and now.
21       As we sit here today, this would -- if
22   you had a similar -- and I understand that I'm
23   asking you to look backwards, and sometimes that
24   can be an unfair, you know, standard.
25       But as we sit here today, if you're --



Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1  if SWAT were -- were tasked with serving this
2  search warrant again today -- the same type of
3  search warrant, the same type of physical
4  parameters of the unit -- would they be able to do
5  a CET, or would they have to do a surround and
6  call-out?
7    A   That would be a decision not made by me.
8    Q   Okay.  Based on your understanding of
9  what the current policies of what LVMPD are, do
10 you have any position on what it would be?
11   A   No.
12   Q   Okay.  So if I were to represent to you
13 that, as we sit here today, based on the policies
14 of LVMPD, this would have to be a surround and
15 call-out, that's new information to you?
16   A   Again, I haven't been in SWAT, so the
17 policies have changed since I've been there.
18   Q   Okay.  That's fair.
19       Do you believe that there's any conflict
20 between knock and announce and a CET?
21   A   Any conflict?
22   Q   Yeah.
23   A   In what meaning?
24   Q   That the purpose of knock and announce
25 is to -- based on how you've just described it to

35

1  me, the purpose of knock and announce is to give
2  the person on the other side of the door the --
3  the information or knowledge of the police
4  officer's intention to enter the unit.
5       And so my question to you is, being --
6  and you've described what the purpose of knock and
7  announce is, being -- what your understanding of
8  that is.
9       Do you think that there is a conflict
10 between that intention and doing a CET?
11   A   At the time, no.
12   Q   Okay.  What about as we sit here today?
13   A   I wouldn't change what we -- I wouldn't
14 change the CET.
15   Q   And so my question was a little bit
16 different.  It's not whether you would change it
17 or not.  I'm not asking you to rewrite history.
18       I'm just asking, in your personal
19 opinion, based on your training, your field
20 experience, everything that you have gone through
21 as a police officer, do you think that there's any
22 type of conflict between knock and announce and a
23 CET, or do you believe that those two things can
24 coexist?
25   A   I think they can coexist.

36

1    Q   Okay.  Okay.  And, Brice, I'm going to
2  ask you -- now I'm going to kind of go through,
3  more in a chronological way, about what happened.
4       Can you please give me your -- your
5  first awareness of when -- your first awareness of
6  this warrant.
7    A   Yes.  It was put out on Sunday that
8  there was a possible warrant being worked on by
9  homicide.
10   Q   Okay.  And how did you become aware of
11 that?
12   A   Through text message.  That's how we'd
13 communicate through the team.  We have a group
14 text message.
15   Q   Okay.  If I call it a group thread --
16   A   A group thread.
17   Q   Okay.  And so what kind of information
18 comes through on the group thread?
19   A   It can be anything from what we are
20 tasked with for that day, who gets tasked with a
21 search warrant if we have it.  And by that I mean,
22 who goes out and does a recon.
23       It could be, "Hey, meet at this place,
24 because we're training.  Hey, be at the office,
25 because we have to do this, this, or that."  It

37

1  just depends.
2    Q   Okay.  And were you part of the recon
3  team on this -- on this warrant?
4    A   I was not.
5    Q   Can you kind of tell me what -- were you
6  ever on the recon -- are you ever on a recon
7  team -- sorry.  Strike that.
8       In terms of executing warrants, did
9  you -- were you -- not just this warrant, but
10 warrants in general -- were you ever tasked with
11 being part of the recon team?
12   A   Yes.
13   Q   Okay.  But you weren't on this one;
14 correct?
15   A   It's not considered a recon -- there's
16 not specific people that do recons.  We, as SWAT
17 operators, we all do recons.  It just depends on
18 who gets tasked with it.
19   Q   Okay.  And so -- but on this particular
20 one, you were not tasked with it; correct?
21   A   I was not.
22   Q   Okay.  Prior to meeting at Sam's Town,
23 did you have any interaction with whomever did the
24 recon or any awareness?
25   A   Nope.

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1    Q   Okay.  So you get the text message
2  Sunday.  You find out that you've got to be at
3  Sam's Town very, very early in the morning; is
4  that fair?
5    A   Yes.
6    Q   Okay.  And did you ever see the warrant?
7    A   No.
8    Q   Did you ever -- and it's -- I'll ask it
9  duplicatively.
10       Did you ever read the warrant?
11    A   No.
12    Q   Did you ever have any understanding of
13  what it was you were going in there to look for?
14    A   Just people and evidence.
15    Q   Okay.  And what made you -- what --
16  what -- what foundation did you have -- what were
17  you relayed that made you think that you were
18  looking for people too?
19    A   Because there was suspects put on the --
20  on the brief.
21    Q   Okay.
22    A   So -- so before every warrant, we have a
23  brief, which consists of why we're there, where
24  we're going, apartment or house number, what we're
25  looking for, what the warrant is actually for.

39

1       But as officers that aren't on the recon
2  team, we're not looking at the -- the warrant.
3    Q   And so did you have an understanding of
4  whether this was a property only or an arrest
5  warrant, or did you think it was both?
6    A   We had two properties that we were going
7  to search -- that we had search warrants for from
8  homicide, and there's a possibility that the
9  suspects were at either one.
10    Q   Okay.  And if the suspects had been at
11  either one, they would have been arrested; is that
12  correct?
13    A   Yes.
14    Q   Okay.  And so at -- I guess I'm trying
15  to -- I'll try to phrase my question better.
16       At the time that you were getting ready
17  to execute this warrant, did you have any
18  understanding of whether there was a -- it was
19  just an arrest warrant or it was just a search and
20  seizure warrant?  Am I saying that correctly?
21    A   A search warrant for property.
22    Q   Okay.  Did you have any understanding if
23  it was one, both, or --
24    A   At the time, I believed it was both,
25  because there was two -- two properties, so -- and

40

1  the suspects were associated with both.
2    Q   Okay.  Did you -- were you -- were you
3  relayed any information that one of the suspects
4  had an ankle monitor?
5    A   I believe that may have been brought up
6  in the brief.  But that was homicide that was
7  dealing with that portion.
8    Q   Okay.  And do you have -- and so if
9  you -- and so that's kind of one of the things, is
10  if you remember, you remember.  If you don't, then
11  just say "I don't remember."
12       Do you have -- did you have any
13  awareness that they had pinged the -- the ankle
14  monitor shortly before?
15    A   For one of them?
16    Q   Yes.
17    A   I believe so, yes.
18    Q   Okay.  Did you have any information
19  about what that ping showed up as?
20    A   It was somewhere else than the first
21  warrant.
22    Q   Okay.  And did that -- did you -- and I
23  know sometimes when you're in high-stress
24  situations -- which I'm assuming executing a
25  search warrant is a high-stress situation.

41

1    A   Yeah.
2    Q   Sometimes you get information and you
3  just kind of think, "Okay, that's the
4  information," and then sometimes you assess it.
5       When you found out that the -- the guy's
6  ankle monitor had been pinged somewhere else, did
7  you assess that?  Like, "Okay.  Well, that rules
8  him out for being at the unit."  Or was it just,
9  kind of, like, "Okay, that's one piece of
10  information, but I'm still proceeding as if he
11  were in there"?
12    A   There's two suspects.  So, yeah, I'm
13  proceeding as if somebody is still going to be in
14  there --
15    Q   Okay.
16    A   -- or other people.
17       I've served search warrants that people
18  were supposed to be in there and nobody was there,
19  and I've served search warrants where nobody was
20  supposed to be in there and there's people in
21  there.  I don't assume anything when it comes
22  to search warrants.
23    Q   What's the difference, then, between,
24  like, executing a search warrant and executing an
25  arrest warrant?



Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1     A   Well, you need a search warrant to
2  execute an arrest warrant if somebody is inside.
3     Q   Okay. And in this case, it was your
4  understanding that you had a search warrant and an
5  arrest warrant?
6     A   Again, I didn't read the search
7  warrants, but that's what I assumed.
8     Q   Okay. If it had been a search warrant
9  only, would that have changed anything you had
10  done?
11     A   No, because we're still entering the
12  residence.
13     Q   Okay. And can you -- I know that you
14  weren't on the recon team, but can you walk me
15  through, what is the purpose of the recon team?
16     A   Absolutely. So you get tasked with the
17  recon. You search -- or you read the search
18  warrant. You ensure that everything in the search
19  warrant, as far as information goes, is accurate.
20     So we go out and we ensure that the
21  residence is correct, the numbers are correct, the
22  description of the residence is correct.
23     But also we are looking for whether or
24  not the house has bars on windows. Where are the
25  windows located? How many doors? Is the door

43

1  barricaded or is it -- does it have a, like,
2  screen on it? And there's various screens.
3     There's a simple screen that is very
4  easy to open up, and then there's barred screens
5  which are very hard to open up. That determines
6  basically what tactics are going to use in
7  order to execute the search warrant.
8     Q   And are there any things that you --
9  you've talked about it a little bit, but I'm going
10  to use the concept of "rule out."
11     Are there any things that you need to
12  rule out in order to make sure that the entry team
13  is safe? And, sorry, not the entry team, but the
14  potential occupants are safe.
15     A   Yeah. I mean, you're looking at various
16  instances that -- you know, are we able to use
17  certain tools effectively? Can we surround it?
18  Are we -- you know, is there dogs that we see? Is
19  there any inclination that there's kids or
20  children in the residence, elderly?
21     Just because, again, we're going to
22  utilize various tools, depending on the structure.
23     Q   Okay. And as we sit here today, do you
24  have any understanding about there being
25  additional unknowns that -- that the recon team

44

1  had not ruled out?
2     A   In reference to?
3     Q   The door. The brass wrap on the door.
4  Whether there were elderly. Whether there were
5  kids. Whether there was a dog.
6     A   From what I gathered from the brief,
7  normally all of that stuff is put down.
8     Q   Okay. All right. So you arrive at
9  Sam's Town very early in the morning on Monday
10  morning. We talked about the briefing a little
11  bit.
12     But to the best of your memory, can you
13  walk me through what occurred at the briefing?
14     A   Absolutely. So normally at briefings,
15  you look at where you are in stack or what your
16  job is, and then we go through an actual brief.
17  So the recon officers go over what our tasks are,
18  what -- you know, where we're going, who is going
19  to lead, who is driving, what tools we need, and
20  who we're going after or what we're going after.
21     Q   Okay. And so to your -- thank you for
22  clarifying for me what the briefing goes over.
23     In this particular instance -- I know it
24  was several years ago, but can you tell me, to the
25  best of your memory, what they discussed in the

45

1  brief?
2     A   Yes. They discussed a little bit of --
3  I believe homicide discussed a little bit about
4  their case, suspect description, the residences,
5  obviously. The tactics that we're going to use,
6  which, again, is -- that's determined by the
7  assistant team leader and the team leader --
8     Q   And do you remember --
9     A   -- and the recon officers.
10     Q   Do you remember who the ATL, the team
11  leader, and the recon officers were in this
12  instance?
13     A   I believe it was -- Jake Werner was the
14  ATL. Garth Findley was the TL, and Kerry Kubla
15  was one of the recon officers. And I also believe
16  that the other one was -- just give me a second --
17  Kia Hoskins.
18     Q   Okay. And they went over who was going
19  to do what.
20     What was your role on the team?
21     A   I was a -- I was number two entry behind
22  Kubla. I was also a low-lethal officer.
23     Q   And what does that means?
24     A   It means I carried low-lethal tools,
25  which could be a TASER, which I carry all the

Brice Clements        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1  time. In this case, it was a 40 mil -- 40mm
2  less-lethal launcher.
3      Q   I'm sorry. What was the last part?
4      A   Like, launcher.
5      Q   What's a -- what's a -- what's a 40mm
6  less-lethal launcher?
7      A   So it's a -- we utilize that tool at a
8  certain distance. It's got basically a foam tip.
9  There's different rounds that we utilize,
10 depending on -- depending on distances and/or what
11 we want to accomplish.
12     Q   In this case, you did discharge your
13 weapon; correct?
14     A   Firearm.
15     Q   Firearm. Sorry.
16         You did discharge your firearm; correct?
17     A   Yes.
18     Q   You did not discharge any of your
19 low-lethal tools, weapons?
20     A   Didn't have an opportunity. I was being
21 shot --
22     Q   Okay.
23     A   -- and shot at.
24     Q   And so you told me that you're number
25 two entry.

47

1          So what's the purpose of number two
2  entry?
3      A   Number two entry is a safeguard to the
4  number one. Meaning that as number one enters,
5  I'm looking for any -- anything that's behind his
6  back or further on into a room, depending on the
7  structure.
8          In this case, I was looking back
9  towards, like, a kitchen/dining room area.
10     Q   Okay. All right. So I've been -- we're
11 going to get back to the chronology I said we were
12 going to do before.
13         So you do the briefing. And then if you
14 want to just do it in a full dialogue -- if you
15 want to walk me through, like, "Hey, we did the
16 briefing, and then this is what happened" or you
17 want to cut it up, however you're more comfortable
18 testifying about it.
19     A   Yeah, I'll start with the -- the
20 briefing.
21         Show up and look at where my job is.
22 Look who I'm paired up with. Address, description
23 of the address, windows, doors. Is it a, you
24 know, one-bedroom apartment, two-bedroom
25 apartment?

48

1          And then you go through the actual brief
2  that the recon officers did. They go through what
3  they saw and what the plan is to best execute the
4  search warrant.
5          After that, they go through and ask
6  everybody -- they basically, again, go through
7  what your task is and ask if there's any
8  questions. Once you ask or don't ask questions,
9  depending on the search warrant or whatever you're
10 tasked with, you go and get dressed out.
11         And "dressed out" meaning you don your
12 protective wear, like your heavy vest, helmet.
13 You ensure that your camera is working. You
14 ensure that your radio is working. You ensure
15 that all of your tools are functioning in the
16 sense of, hey, I have a round in the chamber.
17 My -- my magazine is seated correctly.
18         I have the low-lethal tools. The
19 low-lethal tools are operational. Does my light
20 work on my firearm? Does the light work -- or the
21 red dot on my low-lethal work?
22         And then you head to the BearCats.
23 Because they went over where your position is on
24 the BearCat and the route. Once you get on the
25 BearCat, they ensure that everybody is ready to

49

1  go. If there's people that need to go out and do
2  observation on the apartment or the house, those
3  people are usually sent out early.
4          In this case, I can't remember who it
5  is, but I believe we sent out a two-man team to
6  observe the apartment to see if anybody is coming
7  in or out.
8          Once we get on the BearCat, they say,
9  "Hey, we're ready to go." We turned on our
10 cameras, and we start rolling to the apartment or
11 house or wherever we're serving the search
12 warrant -- serving the search warrant.
13         When we are one minute out from entry,
14 that's where you're basically, like, honing in on
15 what your job is and knowing that, hey, it's
16 coming up. Get ready to disembark off the
17 BearCat.
18         We show up into the apartment complex
19 and head straight to where our drop-off is. We
20 walk up quietly to the apartment, get into
21 positions so everybody is in position. Once we
22 are all in position, then we do our announcements.
23         Once we do a couple of announcements --
24 and it's usually determined at the briefing
25 whether it's, hey, we're going to start to work

50

1  the door off of the -- you know, the second or
2  third announcement or, hey, off of this
3  announcement, we're going to use a flash bang or a
4  9 bang, depending on every search warrant.
5       In this case, we had a stun stick that
6  goes through the window, which had a flash bang
7  attached to it. We also had a 9 bang that was to
8  be tossed on the outside, all of which -- those
9  help provide us with a little bit of time to
10  safely enter just in case there is people inside
11  or whether or not we know people inside.
12       In this case, we didn't know who or if
13  anybody was inside, but we still used the tactics
14  to safely go in.
15       Officer Hoskins started to work the door
16  with the ram. It took a few hits. During that
17  entire time, we're announcing, "Hey, we're the
18  police. We have a search warrant." Officer
19  Hoskins gets the door open. As Kerry enters, I
20  immediately hear what sounds to be gunshots.
21       I don't go in front of him. I looked
22  behind him, just in case there's anybody that is
23  behind him or us or if anybody is in the dining
24  room. As that happens, I feel Kerry starting to
25  move in a -- in a not normal way, and I'm still

51

1  hearing gunshots.
2       I feel something hit my right forearm as
3  I perceived to be what was a bullet. As I look
4  over, I see a muzzle flashes. As that's
5  happening, Officer Kubla is starting to move to
6  his left. And at that point, I engage the subject
7  on the couch.
8       As I am engaging, the subject is still
9  shooting. As that happens, I see Officer Kubla
10  fall to the ground. I start to approach slowly to
11  the couch while still rounds from the subject on
12  the couch are being fired.
13       I observe officers to my right starting
14  to engage, so I back up a couple of steps and
15  continue to engage, because rounds are still being
16  fired. When rounds stop, I holster, I look down.
17  Kerry Kubla is bleeding. At the time, I believed
18  that I was also shot in the forearm.
19       And immediately I tend to Officer Kubla,
20  not worried about my forearm at the time. We get
21  Officer Kubla outside, and he is shot in both
22  forearms and one in his leg.
23       I helped to apply a tourniquet. We have
24  tac docs that come with us on every search warrant
25  just in case something like this does happen.

52

1  They start working on Kerry. At that time, I
2  started self-assessing, along with Sergeant
3  Clarkson, who was driving one of the BearCats.
4       He assessed and notices that I have a
5  perfect circle of a round on my forearm, and my
6  forearm is starting to swell up.
7       Since then, I've had nerve damage, and
8  my pinky stays (indicating) from the nerve damage
9  of that round being hit on my forearm. I tore my
10  labrum pulling Officer Kerry out.
11       And once that happened, everything got
12  shut down because it was a shooting. Medical, I
13  believe -- I wasn't inside, but I believe they
14  attempted medical on Mr. Williams, and he was
15  pronounced deceased on the scene.
16       I was sent to the hospital, got
17  evaluated along with Kerry.
18       MS. MURPHY: I'm going to ask you some
19  follow-up questions on that, but we've been going
20  a little while. We've been going about an hour.
21       Why don't we take just a quick
22  ten-minute break, and we can give the reporter --
23       THE VIDEOGRAPHER: We are going off
24  record at 10:57 a.m.
25       (Whereupon, a recess was taken.)

53

1       THE VIDEOGRAPHER: We are back on
2  record at 11:05 a.m.
3  BY MS. MURPHY:
4    Q   And so, Brice, before we took a brief
5  break, you walked me through the entire process
6  of -- of executing this search warrant and the
7  officer-involved shooting. I want to kind of loop
8  back and ask you some specific questions about
9  some of it now. And later we'll probably review
10  the video from your body-worn camera as well.
11    A   Okay.
12    Q   And so there's been some discussion in
13  this case about the brass wrap on the door.
14       Are you familiar with that?
15    A   Yes.
16    Q   Okay. Can you tell me, as we sit here
17  today, what's your understanding of the issue with
18  the brass wrap on the door?
19    A   That the brass wrap adds a little bit
20  more of a rigidity to the door, making it a little
21  bit more difficult to get in.
22    Q   And is that something that the recon
23  team should have picked up on, that there was a
24  brass wrap, prior to executing this warrant?
25    A   I would say yes.

Brice Clements    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1    Q    Okay. But, in fact, they didn't pick up
2    on it; correct?
3    A    No.
4    Q    Okay. And there was a delay getting
5    through the door because of that brass wrap;
6    correct?
7    A    A delay? I wouldn't say necessarily a
8    delay. I've had warrants where there was no brass
9    wrap, and it took three to four hits to get in
10   still.
11   Q    How many hits did it take here?
12   A    I believe four.
13   Q    Okay. And in your experience as an
14   LVMPD officer, a tactical training -- or a field
15   training officer, a member of the SWAT team, do
16   you think that the amount of time it took to get
17   through the door here was appropriate?
18   A    Yes.
19   Q    Okay. Do you think a tactical should
20   have been called at all?
21   A    No.
22   Q    What's a tactical?
23   A    A tactical would be there is something
24   that an officer sees that would hinder or disrupt
25   the -- hinder or disrupt the execution of the

55

1    search warrant to be safe.
2    Q    Okay. And you don't think that the
3    delay of getting the door open here hindered the
4    safety?
5    A    No.
6    Q    Okay. And would you have been able to
7    call a tactical?
8    A    Anybody can call a tactical.
9    Q    Okay. And so you talked a little bit
10   about going through -- kind of going through the
11   door.
12       Can you -- can you kind of -- you walked
13   me through what you saw and -- like, in terms of
14   Officer Kubla going down and everything.
15       Can you kind of tell me, like, when you
16   first became aware of gunfire. Was it from the
17   flash of the muzzle, or was it from hearing it?
18   A    Hearing it.
19   Q    Okay. And in your mind, do you think
20   that there's a distinction -- did you have -- did
21   it take a second to identify what it was, or did
22   you know immediately?
23   A    Once I entered the door, yeah, I knew
24   that Officer Kubla was taking fire.
25   Q    And so did you know that from the muzzle

56

1    flash? From the sound? From seeing him go down?
2    Like, how were you able to immediately assess
3    that?
4    A    His body language as we went in and the
5    sound.
6    Q    And what was his body language as you
7    went in?
8    A    He put himself into a posture and just
9    his movements. Officer Kubla and I have worked
10   together for the entire time that I was in SWAT --
11   Q    And so --
12   A    -- and he came up the same day as me.
13   Q    And what was it about his movements and
14   your familiarity with Officer Kubla that made you
15   know that his body language indicated he was being
16   shot -- that he had been shot?
17   A    Based off of his platform, his movements
18   were definitely different than if it was just a --
19   go in and there was nobody inside the room.
20   Q    Okay. And so I know sometimes it's hard
21   to paint a picture with words, but you're on video
22   too, so you can -- if you want to use your body to
23   kind of demonstrate to me, that's fine as well.
24       What was it about his movements exactly
25   that was, like, nonstandard that made you think,

57

1    like, "Hey, I think he's been shot"?
2    A    He pushed a little bit back on me.
3    Q    And he'd never done that before?
4    A    No.
5    Q    And just for the record, you had never
6    been in an officer-involved shooting with Officer
7    Kubla before; correct?
8    A    No.
9    Q    Okay. All right. And so him just
10   pushing back on you made you know, "Hey, I
11   think" -- made you know -- or made you suspect
12   that he had been shot?
13   A    I believed that he was -- what we call
14   "going to work," which means that something has
15   caused him to react differently than he normally
16   would. I was also hearing gunfire.
17   Q    And so normally he would keep going. Is
18   it -- you tell me if I'm right or wrong.
19       Based on what you're telling me, what
20   kind of -- I'm putting --
21   A    It's a smooth movement through a room.
22   Q    Yeah.
23       And the fact that he was recoiling, for
24   lack of a better term, made you know, like, "Hey,
25   he's been" --

Case 2:24-cv-00074-APG-NJK    Document 55-8    Filed 05/16/25    Page 18 of 25

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

1    A    Something was up.
2    Q    Okay.  And how many -- to your memory,
3    how many announcements were made before you
4    entered the unit?
5    A    Numerous, because every officer in the
6    stack was announcing.
7    Q    Okay.  And as we sit here today, your
8    prior testimony is that you believe that there was
9    17 seconds that elapsed from the -- from the first
10   announcement to entry of the unit; is that
11   correct?
12   A    Yes.
13   Q    Okay.  If I were to represent to you
14   that it was actually six seconds, would that -- or
15   that it could be around six seconds, would that be
16   a surprise to you?
17   A    Yes.
18   Q    Okay.  Had you -- and I know you'd been
19   on SWAT for three years.
20       Had you done this type of search warrant
21   execution -- if I'm saying "execution," is that
22   the right way to describe it?
23   A    Uh-huh.
24   Q    Okay.  Had you done this type of search
25   warrant execution before?

59

1    A    A few hundred times.
2    Q    Okay.  Had you ever had an outcome like
3    this before?
4    A    Not one.
5    Q    Okay.  Why do you think the outcome here
6    was different than the other instances?
7    A    Because of the person on the couch.
8    Q    Okay.  That's the -- that's the total
9    difference, is that it was Mr. Williams on the
10   couch?
11   A    I believe that somebody who is sleeping
12   with a firearm next to them, with an extended mag
13   in an apartment that's associated with homicide
14   suspects, yeah, I don't think that that's a normal
15   person.
16   Q    But hadn't you executed -- well, to be
17   clear, Mr. Williams was not a homicide suspect;
18   correct?
19   A    No, he was not on the homicide warrant.
20   Q    He's not a -- he's not a suspect in any
21   type of homicide; correct?
22   A    Unknown.
23   Q    Okay.  And so hadn't you executed this
24   type of warrant on an actual homicide -- actual
25   homicide suspects before?

60

1    A    I would have to go back and look and see
2    what those warrants were, but I would probably say
3    yes.
4    Q    Okay.  And so -- okay.
5        How many times did you fire your weapon?
6    A    Thirteen times.
7    Q    And how do you know that?
8    A    Because of my CIRT interview.
9    Q    What was it about -- did they inform you
10   in the CIRT interview?
11   A    Nope.  We download our weapons after a
12   shooting to count the amount of rounds.  The
13   reason we do that is just in case -- an example,
14   you fire down the road and there's cars and people
15   and houses.  If there is an officer that says,
16   "Hey, I only shot this amount of times," but he
17   shot more, then we've got to look for those extra
18   rounds.
19   Q    Okay.  And you talked a little bit
20   earlier about your -- the -- the injury that you
21   sustained in this officer-involved shooting.
22       Can you tell me, was the -- the
23   bullet -- do you know what bullet hit you?  Let me
24   ask it --
25   A    Out of the 18 rounds that were fired?

61

1    Q    As soon as I said the question, I
2    realized that it wasn't a good question.  Let me
3    ask it slightly differently.
4        Do you know if it was a -- was it a
5    direct hit?
6    A    No.
7    Q    Okay.  What was it, to the best of your
8    knowledge?  I mean, I know that you --
9    A    It was a ricochet from Officer Kubla's
10   suppressor.
11   Q    Okay.  And I'm going to jump around just
12   a little bit.
13       As we -- did you have to do a workers'
14   comp claim because of the nerve damage?
15   A    I did a workers' comp claim for my
16   shoulder, my finger, and -- well, my forearm and
17   PTSD.
18   Q    Okay.  And as we sit here today, are you
19   still receiving treatment for any of those three
20   items that you just mentioned:  The labrum, the
21   nerve damage, or the PTSD?
22   A    Yes, I still see a therapist for my
23   PTSD.
24   Q    Okay.  And I want to be delicate in how
25   I ask these questions.  I want to be respectful of



Case 2:24-cv-00074-APG-NJK   Document 55-8   Filed 05/16/25   Page 19 of 25

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1  what you've gone through, and I don't want you to
2  feel like I'm not understanding or trying to be
3  sensitive to it.
4       Can you -- to the best of your ability
5  and however you're comfortable, can you kind of
6  explain to me what it is about this incident that
7  has you still struggling with PTSD a few years
8  later?
9    A  It's traumatic. You're dealing with
10  people's lives. I saw a partner that came up with
11  me the same day, who I worked with every day
12  because we were on the same squad, and I saw him
13  bleeding out. And I saw him pass out, and I
14  thought he died.
15       And I took a human life. And that's
16  tough. And you have the residual damage of
17  something that I can see every day, which is a
18  memory that something traumatic happened.
19    Q  And where -- you're on camera, but I
20  just want to make sure. You say you have the
21  residual damage that you can see every day.
22       Are you referring to the ongoing nerve
23  damage that you have in your hand?
24    A  My pinky, yeah.
25    Q  Okay. Has that --

63

1    A  And -- and constant pain in my shoulder.
2  Even though it's fixed, you still always will have
3  pain.
4    Q  And so you have -- so you have -- so
5  okay. So you have chronic pain in your shoulder;
6  is that correct?
7    A  Uh-huh.
8    Q  On a scale of one to ten, where would
9  you put that pain scale?
10    A  Depending on the day, depending on the
11  workout, anywhere from a one to a three.
12  Sometimes maybe a little bit higher than that.
13    Q  Okay. And so is it fair -- based on
14  what you've just testified to, I'm assuming that
15  that also is a constant reminder of this incident;
16  is that correct?
17    A  Absolutely.
18    Q  Okay. And so as we sit here today, you
19  know, some of the other officers have testified
20  that they were unaffected long-term by this
21  incident.
22       My understanding of your testimony --
23  and you tell me if I'm right or wrong -- is that
24  you were deeply affected by this incident; is that
25  correct?

64

1    A  Yes.
2    Q  And you continue to be affected by it
3  to -- to this day; correct?
4    A  Those officers didn't see Officer Kubla.
5  They were still inside. So I can't attest to
6  whether or not -- what their affectedness is, but
7  I can tell you that I was affected.
8    Q  Okay. And we talked about it a little
9  bit earlier. In terms of -- when you went through
10  the door, did you assess the information, or did
11  you think the person in the unit must be one of
12  the murder suspects we're looking for? Did you
13  even go through that, or were you just reacting to
14  your --
15    A  I was reacting to somebody firing their
16  weapon or firing a weapon at not only me,
17  Officer Kubla, and the other members of the entry
18  team, to include out the window.
19    Q  Do you have guilt over Mr. Williams'
20  death?
21    A  Guilt?
22    Q  Yeah.
23    A  No. I did what I had to do to protect
24  not only my life, but the lives of my team
25  members.

65

1    Q  But you're still affected by having
2  taken a human life; is that correct?
3    A  I don't think that you go through life
4  and that is not something that is affected. I --
5  I am affected by taking somebody's life, yeah.
6  It's not what I signed up to do this job. But I
7  know that that's part of the job, and I did what I
8  needed to do.
9    Q  Okay. And we've kind of jumped around a
10  little bit, but I want to confirm, as we sit here
11  today, despite this outcome, is there anything
12  that you would have done differently?
13    A  No.
14    Q  Okay. And so I'm going to give you the
15  legal element for knock and announce. And this is
16  from page 133 of the CIRT report. Open quote, "If
17  after notice of his authority and purpose of an
18  officer is refused admittance," close quote.
19       Prior to entering into the unit, what
20  did Mr. Williams do to refuse admittance while the
21  door was closed?
22    A  Reask the question.
23    Q  Sure.
24       Was there any indication, prior to going
25  through the door, that Mr. Williams was going to



Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1  refuse entry?
2      A   At the time, no.
3      Q   Okay.  Do you think that Mr. Williams
4  had sufficient time to indicate whether he would
5  or would not allow entry?
6      A   Yes.
7      Q   Why do you -- do you think that -- and
8  why do you think that?
9      A   Because the police are announcing
10 outside, they give the apartment number, and that
11 it's a search warrant.
12     Q   Okay.  So what could Mr. Williams have
13 done from inside the unit within those few seconds
14 to indicate that he would or wouldn't -- what
15 could he have done to either allow or deny entry?
16     A   I mean, sufficient time to possibly come
17 to the door or be compliant.
18     Q   So you think that Mr. Williams had
19 enough time to wake up, get up, and walk to the
20 door to allow the police entry?
21     A   Based off the 17 and a half seconds,
22 yes, or comply.
23     Q   What about six seconds?
24     A   I think that's enough time to understand
25 that the police are outside your door.

67

1      Q   Okay.  As we sit here today -- this is
2  my only opportunity to talk with you, absent
3  trial.
4          As we sit here today, is it your
5  intention to -- if we go to trial, is it your
6  intention to appear at trial and testify that it
7  is your opinion that Mr. Williams knew it was
8  police officers coming through the door?
9      A   Yes.
10     Q   What's that based on?
11     A   Based off the numerous announcements,
12 based off early morning and normal people don't --
13 meaning the public don't inset a stun stick with a
14 flash bang on it.
15     Q   What's the purpose of a stun stick?
16     A   Provide time for the officers, but also
17 to stun anybody on the inside to make it not only
18 safe for them, but safe for us in a sense of if
19 somebody wants to grab a firearm or attempt to
20 grab a firearm, they're stunned and/or blinded
21 temporarily.
22     Q   They would also be confused; correct?
23     A   I mean, you would have to ask somebody
24 who has experienced that.
25     Q   I'm asking you as a police officer

68

1  that's executed hundreds of these warrants and has
2  done CET, has done surround and call-outs, has
3  used these distraction devices, is it your
4  experience as a police officer that sometimes
5  people are confused by use of these distraction
6  devices?
7      A   I mean, you want them to be distracted.
8  So I guess, yes, confusion could be a word used.
9      Q   Okay.  Do you think confusion would make
10 it difficult for somebody to assess clearly that
11 it's being announced that police officers are
12 seeking entry into a unit?
13     A   In this case, no, because we announced
14 numerous times outside, including using a
15 bullhorn.  And it's 5:00 in the morning and it's
16 very quiet.  There's not, you know, kids yelling,
17 traffic going by.  It's very quiet, and it was
18 very quiet up until we announced.
19     Q   What if the person is sleeping?
20     A   The people upstairs were also sleeping,
21 and they were woken up.
22     Q   They didn't have their windows broken
23 open though, did they?
24     A   We didn't break the windows until after
25 we made announcements.

69

1      Q   How many announcements do you think you
2  made before the window was broken open?
3      A   I couldn't tell you.
4      Q   What if I represented to you it was half
5  of one?
6      A   I don't think that that -- again, I
7  couldn't tell you what the amount of time was.
8      Q   Okay.  And just to loop back to your
9  earlier testimony, you've never received training
10 that you had to wait a certain amount of time
11 before -- before entering on a knock and announce;
12 correct?
13     A   We -- we were trained to give a couple
14 of announcements.  That depended on the ATL, or
15 assistant team leader, and the TL, based off of
16 the search warrant, based off of, you know,
17 whatever deemed necessary through the recon.
18     Q   Okay.  And we talked about it a little
19 bit earlier.  We talked about it a little
20 earlier in terms of -- you said, you know, wished
21 for and you talked about, hey, there's different
22 circumstances that go into these entries and what
23 you're supposed to do.
24         Do you have any understanding that
25 there's a standard for a reasonable time based on

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1  the items that are sought?
2      A   I know that there's a reasonable time.
3  I didn't -- I couldn't tell you if the Supreme
4  Court has defined what that time is.
5      Q   Okay.
6      A   Just "reasonable."
7      Q   All right.  What if I told you that
8  there's a case that indicated that a reasonable
9  response time would also be linked to what type of
10  evidence they're seeking?
11     A   Okay.
12     Q   Okay.  And so I'm going to read to you a
13  snippet from case -- a case that was cited in the
14  CIRT report.  It said, "After 15 to 20 seconds
15  without a response, officers could fairly have
16  suspected that Banks would flush away the cocaine
17  if they remained reticent."  And that's from
18  page 133 of the CIRT report.
19         As we sit here today, you didn't think
20  that you guys were seeking anything that could
21  have been easily destroyed; correct?
22     A   That referenced drugs.  I don't believe
23  we were looking -- I couldn't tell you what -- if
24  that was --
25     Q   Let me ask the question, though -- let

71

1  me ask the question a little more artfully.
2          If I have a bag of cocaine, I can flush
3  it down the toilet.  I probably can't flush a gun
4  down the toilet; correct?
5      A   No, you can't flush a gun down the
6  toilet.
7      Q   Right.  And so it was your
8  understanding -- I understand that you didn't look
9  at the search warrant, but that you had a basic
10  concept of what you guys were looking for;
11  correct?
12     A   Uh-huh.
13     Q   And so you guys -- as -- sorry.  I
14  shouldn't say "you guys."
15         You, Brice, didn't have a concern about,
16  hey, we need to get in there in a certain amount
17  of time, because there's potentially evidence on
18  the other side of this door that they could
19  destroy?
20     A   No.  We used the CET tactic to be safe,
21  not only for officers, but for people inside.
22     Q   In this instance, the CET wasn't safe
23  for the person inside or the officers; correct?
24         MR. ANDERSON:  Objection.  Form.
25         Go ahead.

72

1          THE WITNESS:  Well, there was another
2  person inside who didn't come out firing at us.
3  BY MS. MURPHY:
4      Q   That wasn't my question though.
5          My question was, in this instance, the
6  CET wasn't safe for the officers or for the
7  person -- or for Mr. Williams; correct?
8          MR. ANDERSON:  Same objection.
9          THE WITNESS:  This would be the first
10  time in my time in SWAT -- and I believe even
11  years prior -- that we executed a CET warrant and
12  somebody fired at us.
13  BY MS. MURPHY:
14     Q   Okay.  So that doesn't quite answer the
15  question I asked.
16         My question was, in this --
17     A   It's the safest tactic at the time.
18     Q   Okay.  It wasn't safe in this instance,
19  was it?
20     A   Well, I mean, that -- I would say that
21  that's kind of Monday-morning quarterbacking.  At
22  the time, that was the safest, and I would use the
23  same tactic again today.
24     Q   But you can't use the same tactic again
25  today, can you?  Haven't they -- hasn't LVMPD

73

1  changed their policy so you could not use a CET on
2  this kind of search warrant anymore?
3      A   Again, that's not a decision that I
4  made.
5      Q   Okay.
6      A   And I can't say what happens after that.
7  At the time, that was the best tactic at the time.
8      Q   Okay.  And I understand the distinction
9  between best and safest, but I'm going to ask you
10  to answer my question.
11     A   Yes.  Go ahead.
12     Q   Was this safe for Officer Kubla?
13     A   It's the safest tactic used and utilized
14  at the time.
15     Q   Okay.  You're not answering my question.
16  I'm going to ask it again.
17         Was this safe for Officer Kubla, yes or
18  no?
19     A   I mean, he got shot, yes.  So safe?
20  That's kind of a weird question, I -- I would say.
21  In my opinion, I believe Officer Kubla, even being
22  shot, would have said that's the safest tactic to
23  utilize.
24     Q   Okay.  Do you think that being shot is
25  safe?

Brice Clements        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1      MR. ANDERSON: Objection. Form.
2      THE WITNESS: We get shot at every
3  day. So, you know, that's -- as a police officer,
4  and especially being a SWAT officer, yeah, there's
5  the notion that you might get shot at. And I have
6  been.
7  BY MS. MURPHY:
8      Q    Okay. I'm asking you one -- I'm going
9  to ask you again.
10      Was Officer Kubla being shot at safe for
11  Officer Kubla?
12      A    Well, no. I don't think being shot at
13  is safe at all.
14      Q    Okay. And so was Mr. Williams being
15  killed inside that apartment, was that safe for
16  him?
17      MR. ANDERSON: Objection. Form.
18      THE WITNESS: He shot first.
19  BY MS. MURPHY:
20      Q    That wasn't my question.
21      A    Okay. What do you -- what is your
22  question again?
23      Q    Was Mr. Williams being killed inside
24  that apartment safe for him?
25      A    I mean, he got shot and he died, so, you

75

1  know, his own personal safety, I guess no, it
2  wasn't safe.
3      Q    Okay. I'm going to read you some other
4  conclusions from the CIRT report, and I'm going to
5  ask you opinion about them.
6      So -- and this is from page 215, 3.6.
7  CIRT concluded, "While the SWAT section manual
8  contained verbiage allowing for SWAT operators to
9  conduct a CET for property when there is a threat
10  of an armed and dangerous subject, it was not
11  appropriate, given the amount of unknowns
12  associated with Apartment 1125.
13      "There were numerous amount of unknown
14  factors, to include who was actually staying in
15  the apartment and if there were children, elderly,
16  or vulnerable individuals present inside the
17  apartment. SWAT's decision to serve the 3050
18  South Nellis Boulevard search warrant as a CET was
19  a policy/training failure and not within the
20  standardized LVMPD tactics training and policy."
21      A    Okay.
22      Q    Okay. It's a -- it's a loaded
23  statement, and there's a lot in there, and so I
24  want to ask you, Brice, your opinion on CIRT's
25  conclusion.

76

1      A    That's an after-the-fact -- after the
2  fact. I believe that the people making those
3  decisions are the lieutenant and captain, and also
4  in conjunction with homicide.
5      Q    I'm sorry. In conjunction with what?
6      A    Like, homicide detectives.
7      Q    Okay.
8      A    Because they're the ones that got the
9  search warrant.
10      Q    And so I think I understand what you
11  mean by that, but I'm going to ask you to draw it
12  out a little bit more.
13      You don't agree with that conclusion, do
14  you?
15      A    Which part?
16      Q    The part that -- well, yeah, let's break
17  it up. So we'll start at the bottom.
18      That serving -- that serving the search
19  warrant as a CET was a policy/training failure, do
20  you agree or disagree with that statement?
21      A    I disagree. I believe that the CET at
22  the time was the best tactic to use.
23      Q    Okay. And what about CIRT's conclusion
24  that the -- it was not within standardized LVMPD
25  tactics training and policy?

77

1      A    I would have to see what training
2  tactics and policy they're referring to.
3      Q    Don't you already know as a SWAT
4  officer?
5      A    Our training policy and tactics --
6      Q    Regarding --
7      A    -- with the department --
8      Q    Yes.
9      A    -- is like 1500 pages, and it's even
10  more -- no, I don't know it by heart.
11      Q    What about for a CET?
12      A    In reference to the CET, what are you
13  asking?
14      Q    That they're saying that serving this as
15  a -- serving this search warrant as a CET was not
16  within LVMPD tactics training and policy.
17      A    I disagree.
18      Q    Okay. And then let's also talk about
19  the amount of unknowns, that there was -- that
20  the -- and this is the CIRT conclusion, that there
21  were the unknown factors to include who was
22  actually in the apartment, if there were children,
23  elderly, vulnerable individuals.
24      As a SWAT officer, did you think that
25  there was a failure to have not assessed any of

Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

1  those?
2      A   I wasn't on the recon.
3      Q   Okay.  And so I know that you weren't on
4  the recon, so I'm not asking you to talk about
5  your -- I understand you're not on the recon.
6          But having been the officer that was
7  number two in the stack, seeing officer go --
8  Officer Kubla go down, do you think the recon team
9  ought to have ruled those out or known those
10  before you guys went in there?
11      A   I mean, even if they did rule those out,
12  I don't think the outcome would have changed.
13      Q   So even if they had known who was in the
14  apartment, you don't think the outcome would have
15  changed?
16      A   Based off of our tactics at the time, we
17  still would have conducted a CET.
18      Q   Okay.  I'm going to read you another --
19  another conclusion.  This is Conclusion 3.8, page
20  216.  "Under the conditions present here, six
21  seconds was insufficient to allow occupants time
22  to answer the door, let alone submit to a search."
23          Do you think that six seconds was enough
24  time to answer the door or submit to a search?
25      A   Yes, I believe that's a reasonable time.

79

1      Q   Okay.  I'm going to ask you about
2  Conclusion 3.9.  "Officers immediately lost the
3  elements of a CET, of utilizing speed to surprise
4  and overwhelm the suspect, per their manual, by
5  being stuck at the door and hitting it multiple
6  times prior to entering the residence."
7          Do you agree or disagree with that
8  statement?
9      A   I disagree.  And I'll say that I've been
10  on numerous CETs where it took more than one hit
11  to get through the door, and we still executed it
12  as a CET.
13      Q   Okay.  And then from page 220, "CET only
14  to be utilized when a no-knock search warrant is
15  approved by the LVMPD and has judicial
16  preapproval."
17          Now, you and I talked about it.  As we
18  sit here today -- as we as you sit here today,
19  you're not aware of any policy change; correct?
20      A   Reference to?
21      Q   Allowing a CET to be used on a -- on a
22  knock-and-announce warrant.
23      A   I believe that the department went away
24  from CETs and utilized a different tactic.
25      Q   As a result of this incident; correct?

80

1      A   Yes.
2      Q   Okay.  And so then I'm going to read you
3  the Conclusion 5.5.  "CIRT and SMEs concluded
4  Lieutenant O'Daniel did not use proper discretion
5  when she approved the use of a stun stick through
6  the west-facing window."
7          Do you think that use of the stun stick
8  through the west-facing window was appropriate?
9      A   Yes.
10      Q   Why?
11      A   Because it allows a little extra time
12  for officers to be safe, make a safe entry.  And,
13  again, the -- the stun stick is used to disorient
14  anybody who is on the inside.  Which is safe for
15  them, because it usually means that they don't
16  grab a weapon.
17      Q   Okay.  Lieutenant -- and I'll -- this
18  was another part of it.  "Lieutenant O'Daniel's
19  management of tactics for the requested approval
20  of tactics and tools, as the tactical commander,
21  was not within standardized LVMPD tactics training
22  and policy."
23          Do you have a position on whether or not
24  Lieutenant O'Daniel's approval was within the
25  standardized LVMPD tactics training and policy?

81

1      A   I do not have an opinion on that.
2      Q   All right.  5.6, "Captain Cole and
3  Lieutenant O'Daniel should have recognized the
4  unknown factors involved in this case and assured
5  their team utilized the proper tactics when
6  serving the search warrant.
7          "Captain Cole and Lieutenant O'Daniel's
8  approval of homicide IAP and search warrant for
9  the use of the SWAT service was not within
10  standardized LVMPD tactics training and policy."
11          Do you have any opinion on that?
12      A   No opinion.
13      Q   Conclusion 9.7, page 220, "CIRT
14  recommends SWAT structure new training to be in
15  line with case law and national standards."
16          Did you ever undergo any updated
17  training to -- from your understanding, that was
18  to be in line with case law or national standards?
19      A   They were going through a process as I
20  was off for five months from the shooting, while I
21  was testing for sergeant, which was a, like,
22  two-month process.  And then I had shoulder
23  surgery.
24          But, yes, they were starting to revamp
25  things while I was there.  And then I left, so I

Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1  couldn't tell you exactly what they do now.
2      Q    You had a lot going on.  Is that fair to
3  say?
4      A    Yes.
5      Q    Yeah.  Okay.
6          Do you think that they should have used
7  an explosive device on the door?
8      A    No opinion on that.
9      Q    No opinion on that?
10     A    No.
11     Q    Because in your CIRT statement, you
12  actually said "no."
13         So now your position is no opinion?
14     A    Using an explosive breach I do not
15  believe would have changed the outcome.
16     Q    Okay.
17     A    I don't make those decisions on the
18  explosive breach.  That is the ATL, the TL, and
19  the officers on the recon.
20     Q    And so my understanding, Brice -- and
21  you tell me if I'm right or wrong.  Kind of what
22  I've learned through deposing some other officers
23  is although those types of tactics and, you know,
24  what they should or shouldn't use are developed by
25  the ATL and the team leader, that part of the

83

1  briefing is if anyone has an issue or thinks
2  anything should be done differently, they're
3  supposed to voice their concerns; correct?
4      A    Yes.
5      Q    And when you went through the briefing
6  and you had all of the information, I'm assuming
7  that you didn't voice any concerns; correct?
8      A    I was confident with the plan.
9      Q    Okay.  And I know that you went over it
10  in your CIRT statement, but I just want to
11  confirm.  As we sit here today -- you've testified
12  to it over and over again, but I just want a plain
13  statement about it.
14         As we sit here today, knowing everything
15  that we know, everything that's happened to you,
16  you still wouldn't do anything differently;
17  correct?
18     A    No.
19         MS. MURPHY:  Okay.  If we -- can we go
20  off the record?
21         THE VIDEOGRAPHER:  One moment.
22         We are going off record at 11:41 a.m.
23         (Whereupon, a recess was taken.)
24         THE VIDEOGRAPHER:  We are back on
25  record at 11:55 a.m.

84

1  BY MS. MURPHY:
2      Q    And so just so the record reflects, we
3  watched a portion -- a couple of different
4  portions of the video.  There were some issues
5  downloading it, but we did watch the portion of
6  the video where, Brice, you come up to the door,
7  the announcements are made, and then there's entry
8  into the unit; correct?
9      A    Correct.
10     Q    Okay.  And you had watched that video,
11  as well, in preparation for today's deposition;
12  correct?
13     A    Yes.
14     Q    Okay.  So there wasn't anything that
15  jogged your memory or you didn't remember, because
16  you recently watched that entire video?
17     A    Yes.
18     Q    Okay.  And so your video, your body-worn
19  camera, you are -- you were, like, number two
20  behind Officer Kubla entering into the unit;
21  correct?
22     A    Correct.
23     Q    So you're -- if I understand the actual,
24  like, physical layout of the building, it's kind
25  of like a little entryway; correct?

85

1      A    Correct.
2      Q    Okay.  And then, like, for instance, the
3  other officer -- and now I can't remember his
4  name -- oh, Officer -- Sergeant Backman, he made
5  the announcements.  He was kind of around the
6  corner a little bit; correct?
7      A    He was number six in the stack, if I
8  remember correctly.
9      Q    So he wasn't in that little, tiny front
10  alcove with you; right?  If you don't remember,
11  that's fine.
12     A    I don't -- I couldn't tell you how far
13  back he was, based off of spacing.  I just know
14  that he was number six in the stack.
15     Q    Fair enough.
16         And then the other -- there was also an
17  officer kind of around on the side where the
18  window was; correct?
19     A    Yes.
20     Q    But that was on the other side of the
21  unit from you; correct?
22     A    There was an officer that had a shield
23  on the window next to the front door, and then
24  there was a team of officers on the other side.
25     Q    Okay.  And they were at the side -- kind

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**86**

1  of the side wall where there was another window
2  leading into the unit; correct?
3      A   Correct.
4      Q   Okay.  All right.  Do you think that
5  Mr. Williams' constitutional rights were violated
6  here?
7          MR. ANDERSON:  Objection.  Form.
8          Go ahead.
9          THE WITNESS:  No.
10         MS. MURPHY:  I don't think I have
11  anything else to ask.
12         Craig, do you have any follow-up
13  questions?
14         MR. ANDERSON:  No questions.
15         MS. MURPHY:  All right.  Thank you
16  very much, Brice.
17         THE WITNESS:  Appreciate it.
18         THE VIDEOGRAPHER:  This concludes the
19  video-recorded deposition of Brice Clements taken
20  on October 7, 2024.  We're going off record, and
21  the time is 11:57 a.m.
22         THE COURT REPORTER:  Counsel, do you
23  need a copy of the transcript?
24         MR. ANDERSON:  Yes.
25      (The deposition concluded at 11:57 a.m.)

**87**

1              CERTIFICATE OF COURT REPORTER
2
    STATE OF NEVADA    )
3                      )  ss:
    COUNTY OF CLARK    )
4
5      I, Heidi K. Konsten, Certified Court Reporter
6  licensed by the State of Nevada, do hereby certify
7  that I reported the deposition of BRICE CLEMENTS,
8  commencing on October 7, 2024, at 10:04 a.m.
9      Prior to being deposed, the witness was duly
10  sworn by me to testify to the truth.  I thereafter
11  transcribed my said stenographic notes via
12  computer-aided transcription into written form,
13  and that the transcript is a complete, true and
14  accurate transcription and that a request was not
15  made for a review of the transcript.
16      I further certify that I am not a relative,
17  employee or independent contractor of counsel or
18  any party involved in the proceeding, nor a person
19  financially interested in the proceeding, nor do I
20  have any other relationship that may reasonably
21  cause my impartiality to be questioned.
22      IN WITNESS WHEREOF, I have set my hand in my
23  office in the County of Clark, State of Nevada,
24  this October 21, 2024.
25                    _____
                      Heidi K. Konsten, RPR, CCR No. 845

**88**

1              DECLARATION OF DEPONENT
2      I, BRICE CLEMENTS, deponent herein, do
3  hereby declare under penalty of perjury that I have
4  read the within and foregoing transcription of my
5  testimony taken on October 7, 2024, at Las Vegas,
6  Nevada, and that the same is a true record of the
7  testimony given by me at the time and place
8  hereinabove set forth, with the following
9  exceptions:
10
11              ERRATA SHEET
12  PAGE  LINE  SHOULD READ:        REASON FOR CHANGE:
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25

**89**

1              ERRATA SHEET
2  PAGE  LINE  SHOULD READ:        REASON FOR CHANGE:
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  Date:  _____  _____
                            BRICE CLEMENTS
24
25