# Exhibit G - Deposition of Ofc. Alex Gonzales

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 118

1                    CERTIFICATE OF COURT REPORTER

2      STATE OF NEVADA        )
                              )  ss:
3      COUNTY OF CLARK        )

4           I, Heidi K. Konsten, Certified Court Reporter

5      licensed by the State of Nevada, do hereby certify

6      that I reported the deposition of ALEX GONZALES,

7      commencing on July 8, 2024, at 9:55 a.m.

8           Prior to being deposed, the witness was duly

9      sworn by me to testify to the truth.  I thereafter

10     transcribed my said stenographic notes via

11     computer-aided transcription into written form,

12     and that the transcript is a complete, true and

13     accurate transcription and that a request was not

14     made for a review of the transcript.

15          I further certify that I am not a relative,

16     employee or independent contractor of counsel or

17     any party involved in the proceeding, nor a person

18     financially interested in the proceeding, nor do I

19     have any other relationship that may reasonably

20     cause my impartiality to be questioned.

21          IN WITNESS WHEREOF, I have set my hand in my

22     office in the County of Clark, State of Nevada,

23     this July 23, 2024.

24          _____
            Heidi K. Konsten, RPR, CCR No. 845
25

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3                  * * * * *

4   LATIA ALEXANDER,                )
    individually as heir of         )
5   ISAIAH T. WILLIAMS and in       )
    her capacity as special         )
6   administrator of the Estate     )
    of ISAIAH T. WILLIAMS,          )
7                                    )
          Plaintiff,                 )
8                                    )
          vs.                        )        CASE NO.
9                                    )  2:24-cv-00074-APG-NJK
    LAS VEGAS METROPOLITAN          )
10  POLICE DEPARTMENT, a            )
    political subdivision of        )
11  the State of Nevada; KERRY      )
    KUBLA, in his individual        )
12  capacity, et al.,               )
                                     )
13        Defendants.                )
                                     )
14  _____)

15          VIDEOTAPED DEPOSITION OF

16              ALEX GONZALES

17         Taken on July 8, 2024

18            at 9:55 a.m.

19      By a Certified Court Reporter

20            Las Vegas, Nevada

21

22

23      Stenographically reported by:
    Heidi K. Konsten, NV CCR 845, RPR
24      JOB NO. 56848 - Firm No. 116F

25

Alex Gonzales                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**Page 2**

```
 1              Videotaped deposition of ALEX GONZALES,
 2    Volume I, stenographically taken at 400 South
 3    Seventh Street, Suite 400, Las Vegas, Nevada, on
 4    Monday, July 8, 2024, at 9:55 a.m., before Heidi K.
 5    Konsten, Certified Court Reporter in and for the
 6    State of Nevada.
 7
 8              APPEARANCES OF COUNSEL
 9    For the Plaintiff:
10              CORRINE MURPHY, ESQ.
                Breeden & Associates, PLLC
11              7432 West Sahara Avenue
                Suite 101
12              Las Vegas, Nevada 89117
                (702) 508-9250
13              (702) 508-9365 Fax
14    For the Defendants:
15              CRAIG R. ANDERSON, ESQ.
                Marquis Aurbach
16              10001 Park Run Drive
                Las Vegas, Nevada 89145
17              (702) 382-0711
                (702) 382-5816 Fax
18
      Also present:
19
                Scott Beck, Videographer
20              Hannah Gagow
21              * * * * * *
22
23
24
25
```

**Page 3**

```
 1                      INDEX
 2                                            Page
 3    ALEX GONZALES
 4    Examination by Ms. Murphy                   5
 5              * * * * *
 6
 7                    EXHIBITS
 8    No.         Description                   Page
 9    Exhibit 1   Notice of Deposition            6
10    Exhibit 2   Defendant Gonzales'            15
                  Answers to Plaintiff's
11                First Set of
                  Interrogatories
12
      Exhibit 3   Defendant Gonzales'            15
13                Responses to Plaintiff's
                  First Set of Requests
14                for Production of
                  Documents
15
      Exhibit 4   Critical Incident Review       86
16                Team excerpt
17    Exhibit 5   Critical Incident Review      113
                  Team excerpt
18
      Exhibit 6   Critical Incident Review      114
19                Team excerpt
20              * * * * *
21
22
23
24
25
```

**Page 4**

```
 1              LAS VEGAS, NEVADA
 2          Monday, July 8, 2024
 3              9:55 a.m.
 4      DEPOSITION OF ALEX GONZALES
 5              * * * * * *
 6
 7          THE VIDEOGRAPHER:  Good morning.  We
 8    are now on the record.  Today's date is July 8,
 9    2024.  The time is 9:55 Pacific.
10          We are located at 400 South Seventh
11    Street, Las Vegas, Nevada.  This case is entitled
12    Latia Alexander, et al., versus Las Vegas
13    Metropolitan Police Department, et al.  This is
14    case Number 2:24-cv-00074-APG-NJK.  It's in the
15    United States District Court, District of Nevada.
16          My name is Scott Beck.  I'm a legal
17    video specialist representing Lexitas.  The court
18    reporter is Heidi Konsten, also with Lexitas.
19          Would counsel please identify
20    themselves for the record and whom you represent,
21    starting with the noticing attorney, please.
22          MS. MURPHY:  Good morning.  Corrine
23    Murphy, Bar Number 10410, on behalf of plaintiff.
24          MR. ANDERSON:  Craig Anderson on
25    behalf of the defendants, with Hannah Gagow.
```

**Page 5**

```
 1          THE VIDEOGRAPHER:  Thank you.
 2          Our court reporter can swear in the
 3    witness, please.
 4
 5    Whereupon,
 6          ALEX GONZALES,
 7    was called as a witness, and having been first duly
 8    sworn to testify to the truth, was examined and
 9    testified as follows:
10
11              EXAMINATION
12    BY MS. MURPHY:
13      Q   Good morning.  My -- as I said briefly,
14    my name is Corrine Murphy.  I'm counsel for
15    plaintiff.
16          Please let the record reflect that this
17    is the time and the place of the deposition of
18    Alex Gonzales in of the matter of Latia Alexander,
19    et al., versus Las Vegas Metropolitan Police
20    Department, et al.,
21    Case Number 2:24-cv-00074-APG-NJK.
22          Mr. Gonzales, as I said before, my name
23    is Corrine Murphy.  I'm an attorney.
24          And can you please state and spell your
25    full name for the record?
```

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1     A   Yes.  Alex Gonzales, A-L-E-X,
2  G-O-N-Z-A-L-E-S.
3     Q   Do you have a middle name?
4     A   Yes.
5     Q   What's your full -- can you please state
6  and spell your full legal name for the record?
7     A   Alex Emiliano Gonzales, A-L-E-X,
8  E-M-I-L-I-A-N-O, G-O-N-Z-A-L-E-S.
9     Q   Okay.  And you received a notice to be
10  here today; correct?
11    A   Yes.
12         MS. MURPHY:  Okay.  I don't have a
13  copy of the notice with me, but I will send that
14  to you separately, and I would ask that we make
15  that Exhibit 1 to today's deposition transcript.
16         (Exhibit 1 was identified.)
17  BY MS. MURPHY:
18    Q   And you understand that you're here
19  today to discuss the shooting of Isaiah Williams;
20  correct?
21    A   Yes.
22    Q   Okay.  Is there anything that would
23  prevent you from giving your best and most honest
24  testimony here today?
25    A   No.

7

1     Q   Have you taken any type of medication or
2  have you had any personal issues that would
3  prevent you from giving your best and most honest
4  testimony here today?
5     A   No.
6     Q   If you have -- and I don't want to know
7  what it is, but have you taken any medication
8  today?
9     A   No.
10    Q   Okay.  Have you given a deposition
11  before?
12    A   No.
13    Q   Okay.  I'm sure that your attorney ran
14  through some instructions for you prior to today's
15  deposition.  The biggest one that I want to
16  reiterate is that the oath that you took here
17  today is the same oath that you would take as if
18  you were in a court of law.  So although there's
19  not a judge and jury here, the same potential
20  penalties of perjury apply.
21         Do you understand that?
22    A   Yes.
23    Q   Would you prefer that I call you
24  Mr. Gonzales or Alex?
25    A   Alex is fine.

8

1     Q   Okay.
2         I'm going to try to go as quickly as
3  possible, but more than likely the deposition will
4  take several hours.  If at any point in time
5  during this deposition you need to take a break
6  for whatever reason -- if you need to take a phone
7  call, if you want to use the bathroom, if you just
8  want to take a break -- please let me know, and
9  we'll take whatever breaks you would like to
10  accommodate you.  Okay?
11    A   Yes, ma'am.
12    Q   The only thing that I'll ask you is that
13  if I have posed a question, that you answer the
14  question, and then we'll go on break.  Okay?
15    A   Yes, ma'am.
16    Q   And at some point in time, your
17  attorney, Mr. Anderson, may make some -- some
18  objections for the record.  There's no judge to
19  rule on the objections here, so please just allow
20  Mr. Anderson to make his objections.  And unless
21  he tells you specifically not to answer, please
22  let him state his objection and then please answer
23  my question.
24    A   Yes, ma'am.
25    Q   Do you understand that instruction?

9

1     A   Yes.
2     Q   And you're doing very well at it so far.
3  The court reporter can't take down both of us
4  talking at the same time.  So as much as you're
5  able to, please allow me to finish my question
6  before you answer, and I will do the same for you.
7  Okay?
8     A   Yes, ma'am.
9     Q   Can you please tell me everything that
10  you did to get ready for today's deposition?
11    A   I reviewed the reports that were
12  provided to me.  I met with my attorney, Craig
13  Anderson.
14    Q   And I don't want to know what -- I'm not
15  entitled to know what you and Mr. Anderson spoke
16  about, but I am entitled to know how -- how long
17  you met for and when you met for.
18         Did you have more than one meeting with
19  Mr. Anderson to prepare for today's deposition?
20    A   We had two meetings.
21    Q   Okay.  Can you tell me the approximate
22  length of those meetings?
23    A   The first one was in a group setting.
24  It was probably about 15 minutes or so.
25    Q   And who -- who else -- I'm sorry.  I

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1 should have let you finish.
2    Go ahead.
3    A    And then the second one was probably
4 about an hour or so in his office.
5    Q    Okay. In the group setting, who was
6 present for that meeting?
7    A    So Officer Rothenburg, Officer Clements,
8 and Sergeant Backman. And I believe -- and
9 myself. And I think that was it.
10   Q    I'm sorry. I thought you said earlier
11 that there was about 15 people there.
12        Did I mishear you on that -- or, sorry,
13 it was 15 minutes?
14   A    Yes, ma'am.
15   Q    And -- sorry.
16        And so other than the -- yourself and
17 the four officers you've just listed, were there --
18 and excluding either Mr. Anderson or anyone else
19 from his staff, was there anyone else present for
20 that meeting?
21   A    No. That was it.
22   Q    Okay. And the --
23        MR. ANDERSON:  There was one other
24 person. It was Ruth Miller, who is general
25 counsel for the police department.

11

1        MS. MURPHY:  Okay. All right. Thank
2 you, Craig.
3        MR. ANDERSON:  Yeah.
4 BY MS. MURPHY:
5    Q    Mr. Anderson understands that I'm trying
6 to get at if there was anyone who isn't either an
7 attorney or a defendant there.
8    A    No.
9    Q    All right. And so then with the meeting
10 between you and Mr. Anderson, can you tell me when
11 that was?
12   A    I don't know the exact date.
13   Q    You can give me an approximation. And
14 that's actually a good point.
15        There's going to be times that I ask you
16 questions and you're not going to know the exact
17 answer. I am entitled to your best approximation.
18 I don't want a guess. You're under oath, so
19 guessing doesn't help anyone. But I am entitled
20 to your best approximation. And I'll give you a
21 perfect example of that.
22        So, like, if you were to say to me you
23 knew that the meeting was last month, but you
24 couldn't remember exactly when, you can say, hey,
25 I remember it was exactly -- I remember it was

12

1 last month, but I don't remember exactly when.
2 That's an appropriate approximation I'm entitled
3 to.
4    A    Okay.
5    Q    Do you understand kind of what I'm going
6 at there?
7    A    Right.
8    Q    Okay. So if you can give me your best
9 approximation of when you think the meeting was.
10   A    Last month.
11   Q    Okay. Was it -- was it within -- we
12 are, what, July 8th.
13   A    We're July now.
14   Q    Okay. Was it maybe in the last couple
15 weeks of June? If you don't remember, that's
16 okay.
17   A    Yeah, I don't remember exactly --
18   Q    Okay.
19   A    -- when the group meeting was.
20   Q    No, no, no. Not the group meeting. The
21 individual meeting. Sorry.
22   A    Oh, that was last week.
23   Q    Last week. Okay.
24        Okay. And you said that you looked at
25 some reports. I know that you probably didn't

13

1 memorize the title of the reports. If you do know
2 the title of the reports, if you can please tell
3 me those. If you don't, if you can please give me
4 your best description of them so that I can figure
5 out which reports they were.
6    A    Yeah, it was my CIRT statement that I
7 gave.
8    Q    Anything else?
9    A    That was it.
10   Q    Okay. And where --
11   A    And we reviewed body-worn camera.
12   Q    Okay. And we will probably go over both
13 of those things today.
14        Did you -- outside of the meeting that
15 you had with Mr. Anderson, did you rereview your
16 CIRT report at all?
17   A    Yes.
18   Q    And approximately how many times have
19 you looked at that?
20   A    I looked at it last night.
21   Q    Okay. And going through -- we're going
22 to go through the CIRT report -- or, sorry, your
23 CIRT statement.
24        Was there anything, as you were reading
25 it, that you were, like, that didn't -- "That's

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1  not how I remember it now" or "Now I disagree with
2  that"?  Do you understand the context of the
3  question I'm asking?
4      A   I think so, yes.
5      Q   Okay.  So with that -- so was there
6  anything that you saw that maybe, like, now -- as
7  we're sitting here today, because it's a couple
8  years later --
9      A   Right.
10     Q   -- anything, like, "Oh, that's not how I
11 remembered it" or "I don't agree with that now"?
12         Was there anything that, kind of, came
13 up to you as you were reading that statement?
14     A   No, ma'am.
15     Q   Okay.  And did you have an opportunity
16 at all to -- do you remember doing what are called
17 interrogatory answers and requests for production
18 answers?
19     A   Were those sent to me?
20     Q   Yeah.  And I have copies of them right
21 here too, so I'm not going to -- so you can, kind
22 of, take a look at them.  And the first -- I'm
23 going to have this marked as Exhibit 2 to today's
24 deposition.  It's your answers to interrogatories.
25     A   Thank you.

15

1          MS. MURPHY:  Sorry.  Here you go,
2  Craig.
3          MR. ANDERSON:  Thanks.
4          MS. MURPHY:  I'm sorry.  I actually
5  should have handed that to the court reporter
6  first.  She's going to put a little sticker on
7  that.
8          THE WITNESS:  Thank you.
9          (Exhibit 2 was identified.)
10         MS. MURPHY:  And then also I'm going
11 to hand you the request for production of
12 documents.  I'm going to ask that that be marked
13 as Exhibit 3 to today's deposition transcript.
14         (Exhibit 3 was identified.)
15 BY MS. MURPHY:
16     Q   And, Alex, just so you understand -- and
17 I want to give this instruction before I forget.
18         When you leave here today, please make
19 sure and give the documents with the court
20 reporter's sticker back to the court reporter.
21 Those are attached as, like, the actual exhibit
22 numbers that she binds together with the
23 transcript from today's deposition.
24     A   Okay.
25     Q   And so, Alex, are these some of the --

16

1  do you remember preparing these documents?
2      A   Yes, ma'am.
3      Q   And you -- as -- you, kind of, quickly
4  read through the interrogatories, which are the
5  written answers to specific questions.
6          Is there anything, as we sit here today,
7  that you would want to change or amend in any of
8  those answers?  And if you would like more time to
9  read them, just tell me.  We're -- this isn't a
10 racehorse.  We get to go exactly whatever speed
11 you're comfortable with.
12     A   No, ma'am, not that I can see.
13     Q   Okay.  I just want to confirm one thing,
14 is that -- if we go to page six of seven, there's
15 a verification page on there.
16         Alex, is that your signature on the
17 verification page?
18     A   Yes, ma'am.
19     Q   Excellent.
20         Okay.  And we'll -- as we go through
21 today's deposition, we'll kind of retread over
22 some of the information that's asked in here.  But
23 one of the specific questions I wanted to ask --
24 and I understand that you only answered these a
25 couple of months ago, so they're more than likely

17

1  very up to date.
2          But it asked if you had received any
3  complaints -- oh, I'm sorry.  That's actually the
4  request for production.  My apologies.
5          If we can switch over to the request for
6  production.  And one of the questions -- sorry.  I
7  lost my spot -- Request for Production Number 17,
8  which is on page five of eight, it asks for the
9  production of any citizen complaints that may have
10 been made against you, and I just want to
11 double-check.  It looks like the last one that was
12 listed on here was from February 18, 2024.
13         Since the date of these requests for
14 production, which are dated May 17, 2024, are you
15 aware of any additional citizen complaints?
16     A   No, ma'am.
17     Q   Okay.  Have -- oh, sorry.  Read as long
18 as you would like.
19         Okay.  Alex, did you bring -- other than
20 the documents I've handed you, did you bring any
21 documents with you here today?
22     A   I have my CIRT statement.
23     Q   Okay.  You have that with you?
24     A   Yes, ma'am.
25     Q   Okay.  Have you discussed today's



Alex Gonzales                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1 deposition with any of the -- excluding the
2 15-minute meeting with Mr. Anderson, that group
3 meeting, have you discussed today's deposition
4 with any of the other defendants?
5     A   No, ma'am.
6     Q   Okay.  Is this one of your normal
7 working days?
8     A   Yes.  I work graveyard right now.
9     Q   Okay.  Are you going to work tonight?
10    A   Tonight I will.
11    Q   Okay.  All right.  Is your supervisor
12 aware that you're here today?
13    A   Yes, ma'am.
14    Q   Okay.  And so now I'm going to go into
15 just some more background questions.  And these
16 kind of go over in your interrogatory, but can you
17 kind of lay out your educational background?
18    A   Sure.  I graduated -- graduated high
19 school from Cimarron -- Cimarron Memorial High
20 School, 2021.  And then I have an Associate's of
21 Arts in criminal justice from the College of
22 Southern Nevada.  That's as far as it goes for my
23 education.
24    Q   Do you have any, like, special -- I
25 thought I remembered seeing that you were some

19

1 type of -- you're some type of expert on the --
2 explosive entry.
3         Do you have any, like, special
4 certification -- other than SWAT, which I'm aware
5 of.
6         But do you have any other kind of, like,
7 specializations or certifications at all?
8     A   Yeah.  So on the team, I was a master
9 breacher.  I went through that certification,
10 which certified me in manual, ballistic,
11 hydraulic, thermal, and explosive breaching.
12    Q   Okay.  And how long did that
13 certification take you?
14    A   Two weeks.
15    Q   And where was it -- where did you take
16 it?
17    A   Here in Las Vegas.
18    Q   And then other than the -- that -- that
19 breaching certification and your SWAT
20 certification, do you have any other
21 certifications?
22    A   Like, are you just talking about, like,
23 training in general or --
24    Q   Yeah.  Yeah.  Any specialized
25 certifications.

20

1     A   I think that's it.  I would have to
2 check my training record, but --
3     Q   Okay.  And then can you, kind of, walk
4 me through, what was the SWAT training?
5     A   So initially to get into SWAT, you have
6 to go through a basic SWAT school.  Once you
7 complete that -- and then you obviously test and
8 go through the whole process.  And then you're
9 assigned to a team, if you make it onto one of the
10 teams.
11        Through there, you get sustainment
12 training throughout the year on all of the tactics
13 that we use.
14    Q   Okay.  And have you had sustainment
15 training on the -- if I -- I'm going to start off
16 by saying, what is -- and I know what it means.
17        But for the record, I'm going to ask
18 you, what does -- what does CET mean?
19    A   Controlled entry tactic.
20    Q   And can you briefly explain, what's your
21 understanding of what that is?
22    A   Yeah.  So a controlled entry tactic is
23 basically the same as a dynamic entry.  So when we
24 serve a search warrant, what we use on those
25 tactics is speed, surprise, and overwhelming

21

1 action.  Typically we use them in places where we
2 can't properly contain it, we can't get armored
3 vehicles in, where there's a threat either -- or,
4 like, basically when the safety of the public
5 could be in danger because we -- like I said, we
6 can't contain it.
7        The whole goal is to get inside the
8 residence and control it as soon as possible.
9 What we do is we plan on two-man entries for every
10 room that's inside of the apartment.  So typically
11 we'll have -- depending on the size of the
12 structure, you plan for two people to enter every
13 room of the structure.
14    Q   Okay.  And what is the purpose of the
15 speed, surprise, and overwhelming action?
16    A   The purpose is -- is for the safety of
17 obviously us, as well as the people inside.  The
18 idea is to overwhelm them and get them in custody
19 as soon as possible to prevent them from either,
20 kind of, barricading themselves, gaining access to
21 weapons, possibly destroying evidence, possibly
22 taking someone hostage, those -- those kind of
23 scenarios.
24        MS. MURPHY:  Sorry.  Can we go on
25 break for just a second?

LEXITAS

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1      THE VIDEOGRAPHER:  We are off the
2  record, and the time is 10:13 a.m.
3          (Whereupon, a recess was taken.)
4      THE VIDEOGRAPHER:  We are back on the
5  record, and the time is 10:14 a.m.
6  BY MS. MURPHY:
7      Q    And so, Alex, right before we took a
8  really brief break, you were talking about the
9  purpose of the CET or dynamic entry.  And one of
10  the things that you said that you took into
11  consideration is what items were being sought in
12  the search warrant; is that correct?
13      A    Yes, ma'am.
14      Q    So what kind of items would call for a
15  CET entry?
16      A    Well, it's not necessarily the items.
17  It's the totality of what we're doing.  Mainly
18  involved is -- like, the crime plays a big role in
19  whether or not, for us, it deems a dynamic entry
20  or a CET.
21      Q    Okay.  And I had -- and I'll get back to
22  my outline in just a second.  But before I forget,
23  when I was reading your CIRT statement, I think at
24  one point in time you said "Let me check my notes"
25  or -- when you appeared for -- to give your CIRT

23

1  interview, did you have notes with you?
2      A    Yes, ma'am.
3      Q    Okay.  Did you give a copy of those
4  notes to anybody?
5      A    I don't believe so.
6      Q    Okay.  And had anyone instructed you to
7  make those notes?
8      A    No, ma'am.
9      Q    Okay.  Can you kind of walk me through
10  what -- what were -- to the best of -- do you
11  still have a copy of those notes?
12      A    I -- I would have to check at home.
13      Q    Okay.  If -- whether you do or don't, to
14  the best of your memory, can you please describe
15  to me, what were in those notes?
16      A    Yeah.  So I wrote down the basic
17  information as far as address, time, location, my
18  responsibility, what I was assigned to do.  And
19  then I believe it was, like, key elements of
20  deadly force, Graham versus Conner.  I believe
21  that was basically -- from what I can remember,
22  that was kind of what I wrote down.
23      Q    If you can remember, approximately how
24  many pages were your notes?
25      A    Oh, it was just one page.

24

1      Q    Okay.  All right.  Okay.  And I'll --
2  I'll get back to the background questions now.
3      Are you a member of any professional
4  organizations related to your profession?
5      A    No, ma'am.
6      Q    Okay.  And what is your current
7  position?
8      A    Sergeant.
9      Q    Okay.  When -- were you a sergeant at
10  the time of this incident?
11      A    No, ma'am.
12      Q    Okay.  When did you get your promotion?
13      A    July of last year.
14      Q    Okay.  Congratulations.
15      A    Thank you.
16      Q    And are you still on SWAT?
17      A    No, ma'am.
18      Q    Okay.  What is your -- sorry.  I
19  understand sergeant is your current position.
20      What -- what -- what branch of the -- of
21  the LVMPD are you working for?
22      A    I'm a patrol sergeant at Convention
23  Center Area Command.
24      Q    Okay.  And just so that I can briefly
25  understand, what does that, kind of, entail?

25

1      A    So it's a patrol squad of about ten --
2  ten people.  And then my job is to oversee and
3  supervise basically our area, which is the strip.
4  So responding to calls for service, doing all of
5  those types of things.
6      Q    Okay.  And at the time of this incident,
7  what position did you hold?
8      A    I was an entry man.
9      Q    Okay.  And that was with SWAT; correct?
10      A    Yes, ma'am.  Police officer.
11      Q    Okay.  What prompted you to make the
12  change?
13      A    I -- at that point, when I left, I had
14  been in SWAT almost eight years, so it was time
15  for -- to do something else.
16      Q    Did this incident have any motivation
17  for you to change at all?  Was this --
18      A    No, ma'am.
19      Q    Okay.  And how long have you been with
20  LVMPD in total?
21      A    Eighteen years.
22      Q    And when did you go through SWAT school?
23      A    I believe it was 2014.
24      Q    So at the -- if it was -- and I
25  understand that's an estimation.

26

1    If it was 2014 or thereabouts, so at the
2  time of this incident, you would have been with
3  SWAT for eight years, is that correct, if this was
4  2022?
5    A   I believe I was with -- at the time of
6  this incident, I believe it was six years --
7    Q   Okay.
8    A   -- that I had been with SWAT.
9    Q   Okay.  Can you please explain to me what
10  knock and announce means to you?
11    A   Yes.  Knock and announce gives the
12  individuals time to recognize that it's the
13  police, that we have a search warrant.  Basically
14  identifying ourselves as the police and, like I
15  said, giving them time to understand that we're
16  the police.
17    Q   And from your understanding of having
18  been on SWAT for those numbers of years, how --
19  what do you need to do to give somebody an
20  understanding?
21    A   Typically what we use is the bullhorn.
22  Usually it's one of the sergeants that has it.
23  And then depending on what type of tactic we're
24  using, we'll make announcements either from the
25  bullhorn or some type of PA system, announcing

27

1  that we're the police.  We give the target address
2  so that they know it's the address that we're
3  going to, and we try and give several of those
4  announcements.
5    Q   Okay.  And have you received any
6  training through SWAT on what -- you have
7  explained your understanding of that.
8    Did you receive any training through
9  SWAT or LVMPD about what knock and announce is?
10    A   We take search and seizure classes every
11  year.
12    Q   And during any of those search and
13  seizure classes, have they ever gone over what the
14  Supreme Court requirements or the Nevada Supreme
15  Court requirements are?
16    A   I believe so, ma'am, yes.
17    Q   Okay.  As we're sitting here today, do
18  you remember what those were?
19    A   I would have to kind of do -- state them
20  directly and I have to go over it, but --
21    Q   Okay.  As you were functioning in your
22  day-to-day duties in 2022 as a SWAT officer, is it
23  fair for me to assume that your understanding of
24  what knock and announce required was for you to
25  give an announcement of the address and to

28

1  introduce yourself as police officers?  Is that
2  accurate?
3    A   Yes, ma'am.
4    Q   Okay.  Was there -- to your
5  understanding, was there any other requirement?
6    A   No, just that we announce our presence,
7  who we are, the target address.
8    Q   Okay.  If somebody didn't live at the
9  target address but they were just a visitor there,
10  would it be -- could it be that they -- that that
11  announcement of the address would not indicate to
12  them that you were there to search their address?
13    MR. ANDERSON:  Objection.  Form.
14    Go ahead and answer.
15    THE WITNESS:  Sorry.  Can you repeat
16  that?
17  BY MS. MURPHY:
18    Q   That was kind of a clumsily worded
19  question, so let me rephrase it.
20    If somebody was a visitor at an address
21  and perhaps didn't know the address, would it be
22  fair to assume that your announcement of the
23  address would not be meaningful to them?
24    A   It's possible, yes.
25    Q   Okay.  And did you have any training on

29

1  the number of times you needed to make an
2  announcement or the amount of time you needed to
3  make an announcement?
4    A   Yes, ma'am.
5    Q   What was the training?  What did it
6  entail?
7    A   Basically we would try and -- for us,
8  it's like a timing of trying to get enough
9  announcements out.  That way -- because part of it
10  is we don't want to be stuck in front of a door
11  announcing where someone could shoot at us or
12  potentially hurt us or something like that.
13    So the training involved making
14  announcements and trying to time that to where we
15  had enough announcements out before we actually
16  make entry.
17    Q   And so do you remember what the timing
18  of that ended up being?  Was it -- like, when you
19  say "timing," are you talking about the number of
20  announcements or the actual time frame for -- to
21  make --
22    A   Both for us.  We try to get out three --
23  typically three.  It kind of depends on the
24  layout, the environment, where we're at, how we
25  can kind of get there and stuff like that.  For --

Alex Gonzales         Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1  for a dynamic entry, anyway, CET, typically it was
2  about three.
3      Q   As we sit here today, do you think that
4  a CET entry is not conducive to the
5  knock-and-announce rule or adverse to the
6  knock-and-adverse rule?
7          MR. ANDERSON: Objection. Form.
8          Go ahead and answer.
9          THE WITNESS: What do you mean by
10 adverse?
11 BY MS. MURPHY:
12     Q   So the purpose -- so the way that you've
13 described knock and announce, right, is to
14 recognize that we have a search -- we need to
15 announce and recognize that we have a search
16 warrant and that we're -- that we're police.
17         Then you have also said, though, that
18 you want to -- you want to use speed, surprise,
19 and overwhelming action.
20         Aren't those two concepts contrary to
21 each other?
22     A   Yes and no. It sounds like it on the
23 front end. But when we're trying to secure the
24 residence with someone we know to be inside that's
25 violent, we're trying -- we are trying to do both.

31

1  We're trying to let them know we are the police,
2  we're outside, we have a search warrant for the
3  residence. But we're also limiting the amount of
4  time for them to get access to weapons, to fortify
5  their location, to possibly kick through to
6  another residence, and to maybe take someone
7  hostage.
8      Q   All right. And so let me ask this,
9  then. So on the CET entry, that was being used
10 for a -- the warrant that you were serving on this
11 incident --
12     A   Yes, ma'am.
13     Q   -- was a property warrant; correct?
14     A   Yes, ma'am.
15     Q   Okay. What you're describing to me
16 sounds like an arrest warrant, where you assume
17 that there's suspects on the other side.
18         Do you understand the difference?
19     A   I do.
20     Q   Okay.
21     A   But for clarification, I think part of
22 it -- like I said, the totality of the
23 circumstances is it was connected to a murder. So
24 even though the search warrant was for property,
25 the crime that was committed was a murder. So

32

1  when we were briefed, we were -- we were told that
2  the people involved were involved with -- in a
3  murder.
4      Q   Okay. And I'm going to go through
5  everything actually step-by-step.
6      A   Okay.
7      Q   But you'll have to excuse me, because my
8  mind kind of jumps around a little bit.
9      A   No worries. Okay.
10     Q   Thank you for -- for keeping pace.
11         To your knowledge, since this incident,
12 has there been any change in LVMPD policy about
13 using CET entries for search and seizure warrants?
14     A   Yes.
15     Q   What's the change been?
16     A   The change now is for -- they changed it
17 over to a dynamic entry, CET, like the name of it.
18 But now it's -- a no-knock warrant will be -- we
19 need a no-knock warrant before we can do the
20 dynamic entry.
21     Q   And to your understanding, why did they
22 make that change?
23     A   For the knock and announce, I believe to
24 kind of just make things a little more black and
25 white.

33

1      Q   And you having been on SWAT at the time
2  of this incident, did you find any of the policies
3  gray or did you find that there was not -- it was
4  not black and white at the time of this incident
5  in 2022?
6      A   For us -- for me, it wasn't, no.
7      Q   Sorry. It wasn't black and white or it
8  wasn't gray?
9      A   Sorry. It wasn't gray.
10     Q   Okay. You felt that it was a clear
11 policy?
12     A   Yes, ma'am.
13     Q   To your understanding, did this
14 specific incident on January 10, 2022, involving
15 Isaiah Williams, did that prompt the change in
16 that policy?
17     A   I believe it was a factor, yes, ma'am.
18     Q   Okay. And so we've jumped around a
19 little bit, so I'm going to try to go now towards
20 a timeline.
21     A   Okay.
22     Q   And I'm going to ask you some questions
23 about when you first became aware of the warrant
24 for this matter. So can you, kind of, walk me
25 through the timeline of that?

Alex Gonzales                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1    A    Yes, ma'am.  I forget the exact day.  I
2    know it was January 10th.  I forget what day of
3    the week it was.  But the day prior to that, we
4    were notified by our assistant team leader that we
5    had a warrant come in.  At that point, he
6    assigned -- because there was two addresses.
7          He assigned four officers to do what we
8    call the reconnaissance of it.  Their job is to go
9    out in plain clothes in the -- in the area and
10   verify all the information on the search warrant,
11   that it's correct, that the address is correct,
12   that -- that the premise description is correct.
13   Also to identify any, like, tactical information
14   that would help us develop a plan.
15   Q    And my understanding, Alex, is that you
16   were not part of that recon team; is that correct?
17   A    Correct.
18   Q    Okay.
19   A    No, I wasn't.
20   Q    And so you weren't part of the -- have
21   you done those before?
22   A    Yes, ma'am.
23   Q    Okay.  And is it usually just kind of
24   one go-around or something more -- for -- and let
25   me -- actually, let me phrase this more

35

1    specifically.
2          When dealing with what you guys thought
3    you were dealing with here, which was a homicide
4    and potential homicide suspects, is it usually
5    kind of one go-around, or is it usually something
6    more -- some more level of intense reconnaissance
7    before doing the search warrant?
8    A    So that depends.
9    Q    Okay.
10   A    It's a case-by-case basis.  And it
11   really depends on the layout of the structure,
12   where it's at, how well we can, I guess, get eyes
13   on it.  Particularly, like, if we can do it from a
14   vehicle, if we can do it from a location far away.
15         I know in this instance, the
16   reconnaissance was tough because there were so
17   many people out.  And we had gotten information,
18   the detectives, that they had gotten -- they were
19   on surveillance earlier -- I believe it was
20   earlier in the week or sometime -- in that someone
21   from that location approached them while they were
22   in a car.
23   Q    I'm sorry, so -- and I'm sorry to
24   interrupt.
25         Just for the record, there's two

36

1    locations; right?
2    A    Yes, ma'am, there was two locations.
3    Q    There's this.  There's the Nellis
4    location where this actual incident took place.
5    A    Yes, ma'am.
6    Q    And then there's the Jimmy Durante
7    apartment; correct?
8    A    Correct.
9    Q    Okay.  So when you say "this location,"
10   you're talking about the Nellis Boulevard
11   apartment; correct?
12   A    Yes, ma'am.
13   Q    Sorry.  I just wanted to clarify the
14   record.
15         Please keep going.
16   A    I forgot where I was at.
17   Q    So you said that they were approached by
18   somebody for this location.
19   A    Yes.  So basically it will depend on the
20   location, where it's at, how easily we can get in
21   and see it, on how many times we'll go around.
22   And then you may get -- you may come back from the
23   recon, and there may be a question about something
24   else, the door, where they saw something, where a
25   window is located, whether they saw any kids'

37

1    toys, whether -- any --
2          There could be a variety of questions
3    that come, and then that would prompt you to go
4    out again and try to locate specific intel about
5    it.
6    Q    Okay.  And so as we sit here today, do
7    you have a better understanding or knowledge about
8    what level of recon and intelligence they did and
9    had prior to this incident than you did at the
10   time of the incident?
11   A    As far as better knowledge, yeah, I
12   believe so, because we debriefed the whole
13   incident.
14   Q    And so was there anything -- during the
15   debriefing following this, was there anything that
16   you were surprised to learn about?
17   A    Not that I can remember.
18   Q    Okay.
19   A    Nothing offhand that I can remember
20   being surprised about.
21   Q    Okay.  Some of the things -- being that
22   your background was actually in the explosive
23   entry, I'm assuming that you probably did a lot of
24   recon missions that were pretty intense.
25         Is that fair for me to assume?

Case 2:24-cv-00074-APG-NJK    Document 55-9    Filed 05/16/25    Page 13 of 33

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1    A   Yes, ma'am.
2    Q   Okay.  And so some of the things -- you
3  kind of listed it off before, but some of the
4  things are, like, if there's any type of barricade
5  or something on the door; correct?
6    A   Correct.
7    Q   If there's any kids around; correct?
8    A   Yes, ma'am.
9    Q   If there's any other people that would
10  be in the unit; correct?
11    A   Yes, ma'am.
12    Q   Okay.  If the actual suspects that
13  you're looking for or think are connected to the
14  crime are in the unit; correct?
15    A   Yes, ma'am.
16    Q   Okay.  As we sit here today, do you have
17  a -- opposed to on your way to go serve the
18  warrant, as we sit here today, you have a better
19  understanding of what they did and did, in fact,
20  not know at the point in time; correct?
21    A   Yes, ma'am.
22    Q   Okay.  And so are you aware that they
23  didn't know if there was any kids in the
24  apartment?
25    A   Can --

39

1    Q   Do you want me to rephrase it?
2    A   Yes, please.
3    Q   Okay.  As we sit here today, do you have
4  any information or knowledge of whether or not
5  they ruled out any kids being present in the
6  apartment?
7    A   We did not know if there were any kids
8  in the apartment.
9    Q   Okay.  Did you know that they had ruled
10  out if there was any elderly people in the
11  apartment?
12    A   To their knowledge, they didn't see
13  anything that would give them any --
14    Q   Did they rule in that any of the
15  suspects had been around or in the apartment?
16    A   From what I remember, they remember
17  seeing people inside that fit the description of
18  the suspect going in.  I don't think they
19  positively ID'd them as the suspect, but it was a
20  possible.
21    Q   Okay.  And if I -- if I were to
22  represent to you that that was perhaps the Jimmy
23  Durante apartment and not the Nellis Boulevard
24  apartment that this incident actually occurred in,
25  would that be a surprise to you?

40

1    A   Yes, ma'am.
2    Q   Okay.
3    A   From my knowledge, I thought it was
4  the -- the Nellis one that they saw people going
5  in.
6    Q   Were you aware that one of the suspects
7  that was related to this crime actually had an
8  ankle monitor?
9    A   I learned that after the fact.
10    Q   Okay.  And to your knowledge, had they
11  done any type of reconnaissance that might have
12  established who -- other than the suspects, were
13  they aware of who else could have been in the
14  apartment?
15    A   No, ma'am.
16    Q   Okay.  Having -- being that your
17  background is in the -- the -- what's -- I
18  think --
19    A   Explosives.
20    Q   Explosive entry.
21    A   Or -- yeah, sorry.
22    Q   No, no, no.  Correct me.  Tell me how
23  I'm saying it wrong.
24    A   Is that -- I'm not sure what you're
25  asking.

41

1    Q   I was going to say that you're -- I
2  mean, if I call you and Craig wants -- I'm not
3  trying to, like, turn you into a quasi-expert.
4      But that said, that you have, like,
5  an -- extensive training because you did the
6  explosive entry; right?
7    A   Yeah.
8    Q   Is that fair to say?  Okay.
9    A   Explosive breaching.
10    Q   I'm sorry.  Explosive breaching.
11  Explosive breaching.
12      And kind of the list that we -- and so
13  explosive breaching is only kind of -- would only
14  be used in the most extreme cases; is that
15  correct?
16    A   Yes, ma'am.  Typically we use them on
17  hostage recuses and barricades.
18    Q   Okay.  And so having -- as we sit here
19  now and we're kind of talking about things that
20  they did and didn't know, being that your
21  background is in the explosive breaching, that
22  you've done so many recon missions on this, do you
23  think that they should have done initial recon
24  before they served the search warrant on
25  January 1st, 2022 -- or, sorry, January 10th,

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1  2022?
2      A   No, ma'am.  Because there's a fine line
3  of getting information and then also what we call
4  burning it, where we get identified and people may
5  notice that the police are -- or kind of make it.
6  And then either we leave there or go somewhere
7  else or -- we don't want to let them know,
8  typically, that we're coming.
9      Q   Okay.
10     A   So if you do it too many times, then it
11 can get really suspicious, and that can be
12 dangerous for us --
13     Q   Okay.
14     A   -- as we make our approach.
15     Q   And as we sit here today, are you aware
16 of -- if there were any of the suspects actually
17 related to this homicide in that apartment that
18 evening or that morning?
19     A   No.
20     Q   Yeah.  Was there any of the evidence
21 that they were looking for located inside the
22 apartment?
23     A   I don't believe so, ma'am.
24     Q   Okay.  And so in terms of the warrant
25 itself, did you ever read the warrant?

43

1      A   No, ma'am.
2      Q   Is that usual for you to not read the
3  warrant?
4      A   Yes, ma'am.
5      Q   Okay.  Why is -- why don't you read the
6  warrant?
7      A   Because we serve so many warrants, so we
8  rely on those reconnaissance officers.  They're
9  the ones that read the warrants to make sure that
10 they're good.  It also goes through a progression
11 of our chain of command.  So there's -- typically
12 the sergeants read the warrants, the lieutenant
13 reads the warrant, the captain.
14         They all read those and sign off on it,
15 so it would -- for -- we wouldn't be able to read
16 every warrant that we serve, just because we get
17 so many of them, that you just rely on the
18 reconnaissance officer and that process of
19 acknowledgment from our chain of command.
20     Q   I'm going to represent to you that one
21 of the indicators from the Supreme Court rulings
22 about knock and announce and what a reasonable
23 amount of time is is what type of evidence you're
24 looking for and whether or not it can be
25 destroyed.

44

1          With that in mind, I just want to
2  confirm, you didn't know what kind of evidence
3  they were -- they were looking to find; is that
4  correct?
5      A   No.  I believe they were looking for
6  evidence of the murder, as well as a handgun.
7      Q   Oh, okay.  So you -- okay.  So one of
8  the things is you knew, going in to -- to serve
9  that, is that they were looking for a handgun; is
10 that --
11     A   Yes, ma'am.
12     Q   Is that fair?
13         Okay.  I'm sorry.  I didn't understand
14 your testimony then before, so I just want to make
15 sure that I do understand that.
16     A   Yes, before we do the -- I don't know if
17 this is getting too far in it, but before we do --
18     Q   No, no, no.  Go as far in as you want.
19         (Interruption by the court
20          reporter.)
21     Q   Sorry.
22     A   Oh, sorry.
23         We get a brief, so it's -- we do a whole
24 briefing of everything involved before we actually
25 go serve a search warrant.

45

1      Q   Okay.  So even though you hadn't read
2  the search warrant -- and I'm sorry if I'm getting
3  confused or I'm making you confused --
4          Did you understand, basically, what
5  evidence you were going to try to -- or what --
6  sorry.  Let me rephrase that.
7          You're not the one doing the search;
8  right?
9      A   Correct.
10     Q   You're serving the warrant?
11     A   Yes, ma'am.
12     Q   Okay.  So serving the warrant, although
13 you didn't read the warrant, did you have some
14 kind of understanding about what evidence they
15 were looking for?
16     A   Yes, ma'am.
17     Q   How did you come to know about that
18 evidence?
19     A   Through our briefing.
20     Q   Okay.  And so to your knowledge, what
21 did they indicate to you they were looking for?
22     A   Evidence of a homicide, as well as the
23 murder weapon.
24     Q   Okay.  And so that's not evidence that
25 could be easily destroyed, is it?

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1      A    By "easily" --
2      Q    I'll give you a comparison. Let's
3  compare it to cocaine.
4      A    Cocaine is a lot easier to destroy than
5  a handgun, correct.
6      Q    Okay. And so a gun or something like
7  that -- and setting aside -- I know we've talked
8  about the safety issues. But just in terms of the
9  actual evidence itself, I'm going to look at it
10 like a lawyer, and I'm going to ask you to look at
11 it like that for a second too.
12     A    Okay.
13     Q    That's not something that can be
14 destroyed; correct?
15     A    No, ma'am.
16     Q    Okay. And can you kind of go -- you
17 kind of talked about it briefly, and you talked
18 about it in your CIRT interview too. But as we
19 sit here today, can you kind of walk me through,
20 to the best of your memory, the -- the briefing
21 meeting that you had.
22     A    Yes, ma'am. So --
23     Q    And sorry. And that was -- just to
24 clarify, can you start at approximately what time
25 and where that was, if you remember.

47

1      A    I believe it was 4:00 in the morning at
2  Sam's Town. So we meet there -- so we meet at a
3  different location, obviously, prior to the
4  warrant. And then we go through a full briefing
5  where the reconnaissance officers brief the whole
6  team.
7          They give the information as far as
8  event number, the target address, the suspects
9  involved, the crime, any type of priors or
10 criminal history that the suspects may have, any
11 vehicles that are involved that we know of. And
12 then we go through any fortifications, whether or
13 not we know there's guns involved.
14         Again, like the questions earlier,
15 elderly, children, fortifications that we know of,
16 any surveillance that we've seen on top of that.
17         And then the second officer typically
18 will go over -- what we do is a draw of the actual
19 structure. So we kind of just map it out as best
20 as we can, identifying what we call the sides of
21 the house. So the front side would be the one
22 side, to the left would be two, the rear would be
23 the three side, and to the right would be the
24 fourth side.
25         And they identify any kind of

48

1  information that we need as far as entry points,
2  windows, bars, anything that would kind of -- that
3  we would need information about, they identify it
4  and go throughout the structure.
5          They also kind of go over a general
6  overview of the area, where the apartment is
7  located, inside of the complex, whether or not
8  there's -- what major streets are nearby. Kind of
9  just give a general description of the area.
10         And then after that, the assistant team
11 leader takes over. He goes over all the
12 assignments and basically the plan of how we're
13 going to do it, each individual's job, what number
14 they are for doing a dynamic entry, what number
15 they are in the stack.
16         He goes over all of the contingency
17 plans as far as what happens if we can't get in.
18 He goes over our medical plan in case someone does
19 get hurt, where we're going to drag back to, where
20 we're going to have the ambulance at, what
21 hospital we're going to go to, what route we're
22 going to take.
23         And then once that's completed, we go
24 back through, and then we go through every single
25 person that's on the list that's going to be a

49

1  part of the warrant. They'll call out your name.
2  You identify if you have any questions, what your
3  responsibilities are.
4          And then once that's all done, then we
5  will load up and serve the warrant.
6      Q    Okay. And did you kind of -- and I'm
7  assuming -- I -- I -- if you do remember this
8  briefing specifically, you can talk -- tell me
9  about it.
10         But I assume that everything you just
11 listed off happened here; is that correct?
12     A    Yes, ma'am.
13     Q    Can you -- do you remember what position
14 you were?
15     A    I was the number five -- fifth man in
16 the entry stack.
17     Q    And so that would be -- it's two -- it's
18 two guys each; right?
19     A    So you work in a two-man cell.
20     Q    Okay.
21     A    So, yeah, but it goes in two-man
22 teams --
23     Q    And so it --
24     A    -- so I was number five.
25     Q    I'm sorry. Go ahead.

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50

1     A   No.  I'm sorry.  I was just --
2     Q   So is it, like, two -- two guys -- two,
3   then two guys behind them, and two guys, or are
4   you all in a single --
5     A   It's a single stack.
6     Q   Okay.  So you're number five; correct?
7     A   Yes, ma'am.
8     Q   And what are -- what were your duties
9   for this warrant?
10    A   So I was obviously number five to make
11  entry in the stack.  Typically the way we do it
12  is -- this may get a little complicated, but -- so
13  you --
14    Q   If you want to take a piece of paper and
15  draw anything, you're free to do that too.
16    A   Okay.
17    Q   If you want a piece of paper and a --
18  and a marker, if that will be easier for you to
19  explain it.
20    A   I'll just -- I'll try and explain.
21    Q   Okay.
22    A   I may need that eventually.
23    Q   Sure.
24        MR. ANDERSON:  Do you need your pen?
25  Because I can give him one.

51

1        MS. MURPHY:  No, that's my felt pen.
2   I've got another pen.
3        THE WITNESS:  So you work in two-man
4   entries to secure a room.  So the number one man
5   is really responsible for getting you to the
6   location.  We do what's called a take it as it
7   comes.  As you enter in the residence, you try and
8   take the initial rooms first.  You don't want to,
9   like, bypass anything to get to something.  So if
10  you're a number one, your job is to find the next
11  opening or the next room that we're going to
12  clear.
13        What we call the number two man who is
14  your partner that goes with you, he's responsible
15  for really scanning the area, making sure that
16  anything that you can't see while you're making
17  entry into -- like, say you're going down a
18  hallway or in a big open area, his responsibility
19  is to really cover you, scan, and make sure that
20  you don't miss anything that could potentially
21  hurt you or anything like that.
22        So as number five, I would be the
23  fifth man going into that looking for what room
24  was next to be cleared.  I also had the additional
25  responsibility of the rake and break.  For a

52

1   contingency plan, if we couldn't get in, my
2   responsibility was break out one of the windows so
3   we could potentially get eyes in.
4   BY MS. MURPHY:
5     Q   Okay.  Did you throw in any -- and I
6   don't think you did, but you didn't throw in
7   any -- you didn't -- did you actually do a rake
8   and break on this --
9     A   No.
10    Q   -- entry?
11        Okay.  And you didn't throw any of
12  the -- like the --
13    A   Distracts?
14    Q   Yeah.
15    A   No.
16    Q   Okay.  And is it -- did you have any --
17  when you called out -- when you guys kind of did
18  your roll call and called out your positions, did
19  you have any questions?
20    A   No, ma'am.
21    Q   Okay.  Have you worked with -- are
22  you -- let me ask this generally.  Are you
23  familiar with that area?
24    A   Yes, ma'am.
25    Q   Okay.  Are you there frequently serving

53

1   warrants?
2     A   Yes, ma'am.
3     Q   Okay.  Had you worked with this team
4   before?  Some like, you know, amalgamation of this
5   team?
6     A   My team?
7     Q   Yeah.
8        Is this your team?  Like, is this always
9   the team that you guys go out and do -- serve
10  warrants on?
11    A   Yes, ma'am.
12    Q   Okay.  And how long had you been working
13  on this team for?
14    A   I had been on that team the whole time I
15  had been on SWAT.
16    Q   Okay.
17    A   So about -- at that point, I think it
18  was five or six years --
19    Q   Okay.
20    A   -- I had been there.
21    Q   But the lead guy -- was it Sergeant
22  Backman -- he hadn't been lead before, had he?
23    A   He was new to the team.
24    Q   Okay.  And before today -- before the
25  warrant that was served on January 10th, had you

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  worked with him?
2      A   Yes, ma'am.
3      Q   How often?
4      A   I don't remember the exact date he came
5  up. I know he was new. I don't know when he
6  came -- I forget what -- when he came up.
7      Q   Could you give me an estimate? Do you
8  think it was more or less than a month or more or
9  less than six months or --
10     A   It was less than six months, for sure.
11     Q   Okay.
12     A   I know he was new at that point.
13     Q   Okay. And in terms of being new,
14 though, had you ever worked with him where he was
15 the lead on a SWAT before -- or lead on serving a
16 warrant for SWAT before?
17     A   I don't know -- not that I can remember.
18 We'd been on -- I know we had been on barricades
19 before and hostage rescues together, but I don't
20 know specifically if he was designated as the lead
21 on any of those.
22     Q   Okay. And I just want to confirm -- you
23 said it, but I just want to confirm.
24         You understood that likely one or both
25 suspects would be there; correct?

55

1      A   Yes, ma'am.
2      Q   Okay. And so was this, kind of, like a
3  quasi-arrest warrant too? Your understanding of
4  it.
5      A   What do you mean by quasi-arrest
6  warrant?
7      Q   Well, did you guy go -- you guys thought
8  that the suspects were going to be there and you
9  thought you were going to detain them as well;
10 correct?
11     A   Yes, ma'am.
12     Q   That sounds like an arrest warrant to
13 me.
14         Am I mistaken on that?
15     A   Well, we secure the premises, so anybody
16 that's involved in there will be detained. And
17 then it's up to the detectives to further their
18 investigation who is there and to identify them
19 and all of that stuff.
20     Q   So let me ask -- thank you for that
21 clarification. So let me ask that a little more
22 artfully.
23     A   Okay.
24     Q   It was -- it was your understanding of
25 part of the intention of serving that was to

56

1  detain the -- that the murder suspects would
2  likely be there and that you would be detaining
3  them; correct?
4      A   They would be detained, correct.
5      Q   Okay. Would you have approached -- with
6  your background and knowledge, would you have
7  approached -- and I know that you weren't the team
8  leader.
9          But with your background and knowledge,
10 if you were the team leader, if you knew the
11 suspects were not there, would you have approached
12 this warrant service differently?
13         MR. ANDERSON: Objection. Form.
14 Go ahead and answer.
15         THE WITNESS: Not at that point. I
16 mean, if -- no, because we knew that potentially
17 anybody involved in this could be very dangerous.
18 We had intel I believe in that complex that
19 someone related to the apartment -- I don't
20 remember if it was the exact suspect or not --
21 they had seen on camera getting -- I believe it
22 was either -- some kind of semiautomatic weapon.
23 They were getting it out of the trunk of their
24 car.
25         So based on everything that we knew at

57

1  the time, I believe the dynamic entry would have
2  been the safest route for everybody.
3  BY MS. MURPHY:
4      Q   Okay. But sorry. Let me -- let me ask
5  that a little bit differently.
6          Setting aside the -- the -- if you knew
7  that there was no suspects -- no murder suspects
8  inside the apartment, would you have done the same
9  type of entry?
10     A   It's hard to say.
11     Q   Okay.
12     A   Because the big problem is we don't --
13 we didn't really have, like, what we would -- the
14 alternative would be a surround and call out.
15         Where that location was, it was not, in
16 my opinion, good for a surround and call out.
17 There was nowhere for us to really be safely. We
18 would have had to rely solely on, like, a one-man
19 shield. And that would cause potentially a lot of
20 problems as far as people -- kids coming in and
21 out, the neighborhood, a lot of those factors.
22     Q   And -- but as we sit here today, you
23 couldn't do a CET entry on this type of warrant,
24 can you?
25     A   Correct.

58

1    Q   Okay.  You would have to do a surround
2  and call out today; is that accurate?
3    A   Unless they applied, correct, for a no
4  knock.
5    Q   Okay.  But they couldn't get a no knock
6  warrant for only -- for a property search and
7  seizure; correct?
8    A   I'm not fully aware of, like, the whole
9  investigation of whether --
10   Q   If you don't -- I don't -- if you --
11       THE COURT REPORTER:  Wait, wait, wait.
12  You guys are both talking at the same time.
13       THE WITNESS:  Oh, sorry.
14       MS. MURPHY:  Off the record.
15       (Discussion off the record.)
16  BY MS. MURPHY:
17   Q   Okay.  If you don't know and it's just
18  a -- back on the record.  Sorry.
19       If you don't know and it's just a guess,
20  that's okay.
21       But you -- as we sit here today, though,
22  you do know that if you were to do this property
23  search and seizure, that you would have to do a
24  surround and call out; correct?
25   A   Correct.

59

1    Q   Okay.  Okay.  And so you have led me up
2  to Sam's Town.  And I know I keep interrupting
3  you.
4        So you finish the briefing, and then if
5  you could please go from there.
6    A   As far as?
7    Q   To then execute the search warrant.
8    A   Okay.  So once we get done with that,
9  everybody kind of goes through their equipment.
10  You get your gear on.  You kind of do a check of
11  all of your stuff.  And then we load up on
12  whatever vehicles we're going to take to serve the
13  search warrant.
14       Typically it's a BearCat or one of our
15  vans that we have rails on.
16   Q   What's a BearCat?
17   A   A BearCat is an armored vehicle that we
18  have.
19   Q   Sorry.  Keep going.
20   A   Yeah, so it's just -- it's an armored
21  vehicle that we have.
22       And then once we -- so you get -- you
23  get checked, and then you load up on the BearCat.
24  And typically you have an assigned position on the
25  BearCat where you load on.  So based on the entry

60

1  and the flow and where things are going to be, you
2  get assigned kind of where you're going to be.
3        Once we get on there, we do what we call
4  a radio check.  And then we do a call sign check
5  just to make sure everybody is on.  Once we get
6  loaded up, we make our way to the target
7  residence.
8        Once we get close, one of the recon
9  officers will let us know one minute out.  That
10  way we kind of know relatively how close we're
11  going to be to the apartment.
12       Once we get to the apartment -- or once
13  we get to the location, we land.  We'll dismount
14  the vehicles.  We'll get -- make sure that, again,
15  we're in the right position.  And then we do what
16  we call a squeeze.  The last man in the line will
17  squeeze the person in front of him to make sure
18  that he's ready to go.  So once that makes it to
19  the front, that person in the front knows he's
20  good to go for his approach.
21       And then -- so once we get there, we
22  unload.  We make our approach.  Once we make our
23  approach, Sergeant -- I believe it was Backman
24  started making the announcements announcing,
25  obviously, that we had a search warrant, target

61

1  address.
2        Once those announcements were going --
3  oh, we go -- do you want me to go into the --
4    Q   Here is what I'm going to suggest.  I
5  saw you look at your watch really briefly.  Why --
6  I know -- and I know that's a long dialogue.
7        Why don't we take a brief break.  Why
8  don't we take a short break, and then we'll pick
9  up right as we get to the door.
10   A   Okay.
11       MS. MURPHY:  Okay.  I think you want
12  to take a break too.
13       THE VIDEOGRAPHER:  We are off the
14  record at 10:52 a.m.
15       (Whereupon, a recess was taken.)
16       THE VIDEOGRAPHER:  We are back on the
17  record, and the time is 10:58 a.m.
18  BY MS. MURPHY:
19   Q   And, so, Alex -- I'm sorry -- right
20  before we took a break, we were kind of -- do you
21  remember where we were right before we took a
22  break?
23   A   Yes.
24   Q   Okay.  If you would like to just
25  continue, please.

Case 2:24-cv-00074-APG-NJK    Document 55-9    Filed 05/16/25    Page 19 of 33

Alex Gonzales        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1    A    So we were making our approach to the
2    door.  We made the announcements, and that let
3    Officer Hoskins know to start the breach with the
4    ram.
5        Before that, either -- the stun stick
6    was introduced into the -- I believe it was the
7    one side window off the front.  And then
8    Officer Hoskins began to ram the door.  I believe
9    he rammed the door approximately four times before
10   making entry.
11       And then from that point, once we were
12   making entry, I heard the distracts going off.
13   And then as I was making my approach to the door,
14   I could hear what I believe was gunshots.  So I
15   could hear gunfire coming in from inside the
16   apartment.
17       As I came in through the threshold, I
18   wrapped the corner to the right.  There was, like,
19   a couch right along that where I kind of
20   positioned from there.  I saw an individual on the
21   couch laying down.  He was firing what I believed
22   to be a handgun at us and then, kind of, like, in
23   an upward motion.
24       From that point, I discharged my -- my
25   duty weapon, which was a -- an AR, trying to stop

63

1    the individual from continuing to shoot at us.
2        Once that -- once he stopped firing, I
3    heard, "He's down.  He's down."  At that point, I
4    had -- could kind of see that Officer Kubla was
5    down in -- kind of to the left of me in the living
6    room.  And then we immediately, kind of, went into
7    our down officer protocols.
8        I went to the suspect, covered on him.
9    And then me and my partner ended up taking him
10   into custody.  Then they effected the down officer
11   rescue on Officer Kubla, got him out, got him to
12   medical attention and to the hospital as soon as
13   possible.
14       At that point, I could -- started to
15   scan around, and I could see somebody else that
16   was kind of moving behind us that was going
17   towards the -- like a balcony, almost, door.  I
18   flagged him for the rest of the team to see, and
19   he was -- ended up being taken into custody.
20       From that point on, I kind of held my
21   position while the rest of the team cleared the
22   rest of the residence.
23   Q    Okay.  And so I'm going to ask you some
24   questions about that.  And I have the body-worn
25   camera -- body-worn footage.  At some point in

64

1    time, we'll -- we can take a break and we'll watch
2    it.
3    A    Okay.
4    Q    And, you know, this isn't -- my
5    intention is not to give you a memory test.  I
6    want to really, kind of, hear how you're going to
7    describe it.  And we're going to look over all of
8    this stuff as well.  Okay?
9    A    Okay.
10   Q    So one of the issues, though, is that --
11   my understanding -- and you tell me if I'm right
12   or wrong -- is there was a problem with ramming
13   the door; correct?
14   A    It took four times to get in, yes.
15   Q    Okay.  And would that qualify as a
16   problem?
17   A    Depends.
18   Q    Okay.  What does it depend on?
19   A    On -- we can't -- I mean, obviously it's
20   not ideal.  Has it happened before?  It does
21   happen, depending on -- when it comes to
22   breaching, there's several factors that we don't
23   know.  Basically, like, the construction of the
24   door, whether it was fortified, what kind of
25   screws were in it.

65

1        There's no way for us to actually know
2    it until someone actually puts the ram to the
3    door, to know whether it will be successful or
4    not.
5    Q    Couldn't you see the brass wrap on the
6    door from the outside?
7    A    You could.  But I've hit plenty of doors
8    with brass wraps on one hit, and it's gone in on
9    the first time.  So that's not like a sole
10   indicator.  It does tell you that it's a little
11   bit fortified, but it doesn't give you any kind of
12   clue that a ram wouldn't be successful.
13   Q    But the ram wasn't successful, was it,
14   on the first --
15   A    On the first one.  It wasn't successful
16   on the first one.
17   Q    Correct.
18       And is four hits standard procedure, or
19   should there have been a tactical called?
20   A    It's not standard procedure.  A tactical
21   call comes -- it's more nuanced than just whether
22   it's four hits or not.  It's on a variety of
23   circumstances, whether we can tell that we're
24   gaining entry, whether it's working, whether
25   we're -- kind of, what we feel is compromised.

66

1   If we can hear somebody inside, if we
2 can tell that it -- we see somebody running to the
3 back, any of those types of things would --
4         (Indiscernible crosstalk.)
5   Q   And so in this case, though, there was a
6 brass wrap. But if I understand your testimony
7 here today, you're saying that you still didn't
8 find that of a concern, that there was a
9 fortification on the door, because you've had
10 cases with other brass wraps and the door gave way
11 right away; correct?
12  A   It's an indicator. It -- it definitely
13 lets us know. It kind of cues in the ram guy that
14 he's going to need to hit it pretty hard. But
15 it's not like a -- a definite you wouldn't use a
16 ram on that.
17  Q   Okay. And if -- when -- and so I kind
18 of jumped ahead.
19      For the record, can you please explain
20 to me what a tactical call is?
21  A   So, yeah, a tactical call stops anything
22 we're doing. So anytime we're in the process of
23 serving a search warrant, anybody on the team can
24 call a tactical call. And what it does is it
25 freezes the whole team and stops us from

67

1 continuing to make entry.
2      Or if we're already inside the
3 structure, you basically hold what you have. And
4 then from that point, we start to communicate why
5 there was a tactical call. And that can be from,
6 you know, somebody seeing some -- like I said,
7 somebody running deep, we ran out of manpower,
8 someone got hurt. Anything that would -- where we
9 would feel it would start to compromise officer
10 safety, we would stop it.
11     And then from that point, you have to
12 determine how you're going to proceed. And that
13 becomes pretty nuanced as well as far as
14 understanding where we're at in the structure, how
15 many rooms have been cleared, how many people we
16 have, whether we can actually get everybody
17 outside, whether we have anybody in custody at
18 that point or not. If there is a safe place for
19 us to actually pull out from there and where we
20 can go from that point would be somewhat safe
21 for us.
22  Q   Okay. And having gone through the
23 body-worn camera, there's somebody at some point
24 in time that's saying, like, "Get it open" or "Get
25 it in"; right? Do you remember that?

68

1   A   Yes, ma'am. I remember hearing it from
2 the -- I believe it got brought up in the CIRT
3 interview as well.
4   Q   Okay. And do you know who said that?
5   A   I don't remember, no.
6   Q   But that would indicate to me -- and you
7 tell me if I'm right or wrong -- there was some
8 frustration on the team that they weren't
9 breaching the door right away; correct?
10  A   It's always -- yes.
11  Q   Okay.
12  A   There's always -- we always want to get
13 it in one hit and get in -- once we make that
14 breach plan, get in as soon as possible.
15  Q   Okay. And then did you have any problem
16 distinguishing in the very beginning the
17 difference between the gunshots and the distracts?
18  A   Initially, once I started to hear --
19 because you're hearing two things, obviously, and
20 they're coming from different locations. To say
21 that I instantly recognized the first gunshot from
22 a distract, I couldn't tell you that. But as it
23 started progressing, I can definitely tell that
24 there was distinct gunfire.
25  Q   And so that's with your years of

69

1 training and use of these tactical and explosive
2 entries, that even you had a difficulty
3 understanding at first the difference between a
4 gunshot and a distract; is that correct?
5   A   I don't know that I would say
6 "difficulty."
7   Q   Maybe "difficulty" is the wrong word.
8       But you at first couldn't distinguish
9 between the two; correct?
10  A   No, initially I knew it was the
11 distracts going off.
12  Q   Okay. You said -- I'm going to read
13 back to you what you said. "I could hear what I
14 thought were distracts in the beginning."
15  A   Yes.
16  Q   So could you hear the first gunshot go
17 off, or was it a little bit -- it took you --
18  A   No, the distracts were going first.
19  Q   Right.
20  A   So I could hear the distracts. And then
21 once that was going, I could -- like I said, I
22 couldn't tell you exactly when the first gunshot
23 happened, because the distracts were going. But
24 you could definitely tell the difference as I was
25 getting closer to the door.



Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1    Q    As you were getting closer to the door,
2   you could tell the difference.
3          But at first, you had difficulty telling
4   the difference, correct, or no?
5    A    Yeah, I mean, it -- in between the two.
6    Q    Yes.
7    A    Yes.
8    Q    Okay.  And that's with all of your years
9   of training; correct?
10    A    Yes, ma'am.
11    Q    Okay.  So somebody who didn't have all
12  of that training, maybe they couldn't tell the
13  difference between a distract and a gunshot.
14  Would that be fair to say?
15    A    It's possible.
16    Q    Okay.  Okay.  And so you actually did
17  discharge your weapon; correct?
18    A    Yes, ma'am.
19    Q    How many -- and I know that we talked
20  about it briefly, but if we could kind of go over
21  that.  To the best of your memory, just tell me as
22  much detail as you can about discharging your
23  weapon.
24    A    So, as I said, I -- as I approached
25  inside, I could see the firing.  I could see

71

1   basically, like, the weapon getting discharged.
2   You could see, kind of, the fire coming out of it,
3   letting me know that -- I could see him -- the
4   person on the couch firing.
5          At that point, I fired my weapon.  At
6   the time, I believed it was two times.  I think
7   through the investigation, they found out it was
8   three times.  Basically to stop the action of him
9   shooting at us.
10    Q    And other than this one incident, have
11  you ever been involved in any other
12  officer-involved shootings?
13    A    No, ma'am.
14    Q    And that's the correct terminology;
15  correct?
16    A    Yes, ma'am.
17    Q    Okay.  Did you get any -- following this
18  officer-involved shooting, did you receive any
19  counseling or any mental health help?
20    A    Yes, ma'am.
21    Q    Okay.  Can you walk me through -- and I
22  don't want to know specifically what you talked
23  about with your medical provider.  But can you
24  kind of walk me through what type of mental health
25  professional it was and, kind of, the duration of

72

1   whatever treatment you went through.
2    A    I know her name is Trudy.  I don't
3   remember exactly what her title is or what
4   exactly -- like her -- I guess what you would call
5   her as far as --
6    Q    And you don't have to use the exact
7   right term.  Why don't you just tell me how you
8   would describe her, what your understanding -- use
9   your words.
10    A    So basically -- I mean, so once you --
11  we get an officer-involved shooting, you go see --
12  I believe it's a doctor, and you have a series of
13  visits with that person obviously to check on you,
14  make sure you're okay and everything.
15    Q    Have you had any adverse effects from
16  this off -- being part of this officer-involved
17  shooting?
18    A    Not to my knowledge.
19    Q    Okay.  And approximately -- and we can
20  just call her Trudy, that's fine, or the doctor,
21  whatever it may be.
22          How long did you see Trudy for?
23    A    I believe it was three or four visits.
24    Q    Okay.  And was that mandated by the
25  department?

73

1    A    Yes, ma'am.
2    Q    Okay.  And I just want to confirm, other
3   than seeing Trudy for those three or four visits,
4   you haven't had any other type of psychological or
5   mental help -- help or evaluation; is that
6   accurate?
7    A    Correct.
8    Q    Okay.  And as we sit here today, you
9   don't think that you have any lasting issues
10  being -- related to being involved in this
11  officer-involved shooting?
12    A    No.
13    Q    Okay.  And so going back over -- kind of
14  going back to a little bit more the --
15  Mr. Williams stopped shooting, and then you
16  approached him; correct?
17    A    Yes, ma'am.
18    Q    Okay.  And kind of -- can you walk --
19  and I'm asking -- we have the body-worn camera
20  footage, and I -- so I'm not trying to do a memory
21  test on you.  I really want to know what it
22  appeared like from your vantage point.
23          So to the best of your memory, you
24  approached Mr. Williams.  And what do you see as
25  you approach him?



Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1    A    He had a -- from what I remember, there
2  was a blanket on top of him.  He had the gun in
3  his hand.  And as I approached, the gun fell down
4  onto the floor.  From what I remember, I think I
5  pulled the blanket off to make sure that there was
6  no other weapons or anything like that.
7        And then I remember, I think,
8  Officer Dixon came up beside me.  He tried to help
9  me, make sure I was okay.  And then I think we
10  put -- placed handcuffs on him.
11    Q    Okay.  Do you remember seeing -- did he
12  have any signs of life?  Did you perceive him as
13  still being alive?  Did you think he was passed
14  away?  Anything like that?
15    A    I was unsure.  I mean, I was assuming,
16  based on us shooting at him, him stopping his
17  actions, that obviously he had been hit several
18  times.  But I don't know -- I mean, I think I was
19  looking to see if there were signs of life or
20  anything like that.  I couldn't really tell as far
21  as that goes.
22    Q    Okay.  And so is it fair for me to
23  assume that -- and you tell me if I'm right or
24  wrong here.
25        So you're putting him in cuffs and stuff

75

1  like that.  Is that because that's standard
2  operating procedure, or you couldn't tell if he
3  was dead or alive?
4    A    No.  That's standard operating
5  procedure.
6    Q    Okay.  And so it wasn't based on an
7  assessment of whether you thought he was still a
8  threat or still alive; is that correct?
9    A    Correct.
10    Q    Okay.  And so then what happened once he
11  was in handcuffs?  One of your fellow officers
12  asked you if you were okay.
13        What happened after that?
14    A    So we needed to secure the residence to
15  make sure nobody else was in there.  I believe the
16  team started doing that.  And then as soon as
17  possible, we called in our tact medics to provide
18  any kind of life-saving measures that they could.
19    Q    Okay.  Life-saving measures for who?
20  For Mr. Williams --
21    A    Yes.
22    Q    -- or Officer Kubla?
23    A    For Mr. Williams.
24    Q    Okay.  And did you have any -- and if I
25  call them EMTs, is that right or is that wrong?

76

1  Are they a higher level?
2    A    I don't know the exact -- so we -- what
3  we have are -- we have what we call tact doctors.
4    Q    Yeah.
5    A    Our search and rescue team, they always
6  come out with us.  So it's usually a search and
7  rescue guy and then some type of volunteer tact
8  medic.  Sometimes they're actual doctors from UMC;
9  sometimes they're firefighters.  You know, but
10  they have some level of medical that they go
11  through.  I think search and rescue puts them
12  through actual courses as well.
13    Q    I have to ask, what doctors from UMC are
14  volunteering for this?
15    A    Yeah, pretty high -- like the surgeons
16  and -- they come out.
17        MR. ANDERSON:  It used to be Joe Heck.
18        MS. MURPHY:  Oh, okay.
19        MR. ANDERSON:  That was years ago.
20        MS. MURPHY:  Sorry.  Sorry.  Slightly
21  off base.
22        THE WITNESS:  So yeah.
23        MS. MURPHY:  We'll get back on track.
24  I apologize.
25        MR. ANDERSON:  They like to do it.

77

1  That's the funny thing.
2  BY MS. MURPHY:
3    Q    Okay.  And so is -- and so in terms of,
4  like, the medical personnel there that -- that
5  morning, you're not sure if it was a doctor, an
6  EMT, a paramedic.  You just knew them as, like,
7  the medical personnel; is that correct?
8    A    Correct.
9    Q    Okay.  Following the medical personnel,
10  kind of, like take -- like, you step away from the
11  suspect -- or, like, from Mr. Williams; correct?
12    A    Yes.
13    Q    Who you perceived to be -- you think
14  he's a homicide suspect.  Not including the actual
15  incident that occurred right there, but you think,
16  more than likely, he's one of the suspects related
17  to the homicide; correct?
18    A    Correct.
19    Q    Okay.  You step away from Mr. Williams.
20        Did you have any further interaction
21  with any of the medical personnel regarding
22  Mr. Williams?
23    A    No, ma'am.
24    Q    Okay.  And then what happens to you
25  following that?



78

1    A   So I get, kind of, sequestered pending
2  everybody coming out and talking to me. They
3  assigned me to a witness officer that kind of
4  stays with me.
5    Q   What's the purpose of the witness
6  officer?
7    A   That's a good question. Basically I
8  think just to make sure I'm okay and wait for --
9  basically everybody is going to come out as far as
10  detectives, the CIRT team, the FIT team, to make
11  sure that we're okay and that we don't start
12  talking to people before they come and question
13  us.
14    Q   Start talking to what people? Sorry.
15    A   Other people or anybody else on the team
16  or --
17    Q   So is the purpose of sequestering you to
18  kind of keep your memory fresh, for lack of a
19  better term? Like, not to be influenced by
20  anybody else?
21    A   Correct.
22    Q   Okay. And just to confirm, you've never
23  been involved in an officer-involved shooting
24  before. So you had never gone through any of that
25  process before; correct?

79

1    A   Correct.
2    Q   Had you ever done it for anyone else?
3    A   Yes, ma'am.
4    Q   Oh, who else have you done it for?
5    A   Officer Ferrante, I've done it for him.
6  I've done it a few times for other officers.
7    Q   Okay. And that was other SWAT team
8  members?
9    A   Yes, ma'am.
10    Q   Okay. All right. And so how long were
11  you sequestered for?
12    A   I'm not quite sure. I know you wait
13  there. And then, like, the union comes out, and
14  they're usually the first people that talk to you.
15  And you kind of just stay with them until they
16  give a brief to CIRT and FIT and all of those
17  guys. And then -- I don't know how long it was.
18  A while.
19    Q   And so I'm going to -- I'm going to kind
20  of -- do you -- so my understanding, this warrant
21  was served around, like, 4:00 or 5:00. It was
22  really early in the morning.
23      Do you remember what part of the day you
24  finally left the scene? Like, was it, like,
25  morning? Mid-morning? Afternoon? I'm trying to

80

1  gauge, like, was it, like, 20 minutes? Two hours?
2  Four hours?
3    A   No, it was --
4    Q   Eight hours?
5    A   Yeah, it's about four hours or so. Four
6  to six hours.
7    Q   Okay. That you remained on the scene?
8    A   About four hours probably, yeah,
9  somewhere around there.
10    Q   Okay. All right. And so did you work
11  your normal shift? Did -- you were supposed to
12  work a shift the next day; correct?
13    A   Yes, ma'am.
14    Q   Did you work your normal shift the next
15  day?
16    A   No, ma'am.
17    Q   How -- did you -- did you get, like --
18  is it required that you take time off or suggested
19  or --
20    A   You get placed on administrative leave.
21    Q   How long were you on administrative
22  leave for?
23    A   I believe three months.
24    Q   And was that during the pendency of the
25  investigation?

81

1    A   Yes, ma'am.
2    Q   Okay. And then how did you find out
3  that you were off administrative leave?
4    A   They give you a call and then tell you
5  that you can start your return-to-duty training.
6    Q   Okay. And what does the return-to-duty
7  training entail?
8    A   You get with the training cadre. You go
9  through your firing qualifications, make sure
10  you're up to date on that. And then you do
11  scenario-based training to make sure that you're
12  okay.
13    Q   And is it -- is it fair for me to assume
14  that you passed all of that with no problems?
15    A   Yes, ma'am.
16    Q   Okay. And what was your understanding
17  of the outcome of the -- the investigation that
18  occurred while you were on administrative leave?
19    A   As far as -- we weren't -- you go
20  through -- are you talking about the department
21  or --
22    Q   Give me all of the -- because I --
23  there's a couple different investigations that
24  occurred; correct?
25    A   Correct.



Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1    Q   So if you could, kind of, walk me
2  through your understanding of all of the different
3  investigations that occurred and what your
4  understanding was of their outcomes.
5    A   So the FIT team -- investigative team,
6  they do the criminal aspect as far as whether we
7  did anything criminal, which they found that we
8  didn't.
9        And then you go through -- they call it
10 the CIRT, I guess, process, where they go through
11 any type of training or tactics that either can be
12 improved or that you might have done differently.
13 I guess it's more of, like, a training thing for
14 the department.
15   Q   Is your understanding that any of these
16 investigations have anything to do with the safety
17 of the public?
18   A   As far as --
19   Q   Do you -- is it your understanding that
20 any of the purposes of these investigational
21 bodies are to determine that -- to view whether
22 the -- the public was in danger or whether they
23 should change things?
24   A   Oh, yes, ma'am.
25   Q   Okay.

83

1    A   I think that's one of the major
2  components of --
3    Q   Of what one?
4    A   Of the CIRT --
5    Q   Okay.
6    A   -- the CIRT process.
7    Q   Do you know what CIRT's conclusions
8  were?
9    A   I don't remember them specifically of
10 what all was -- it was a -- I remember it was a
11 long day. I don't remember exactly what all the
12 findings were.
13   Q   And so when you say -- and I don't
14 expect you to list off what all of the findings
15 are. But if you can, kind of, tell me, from your
16 perspective, using your words, what your
17 understanding of their outcome or findings were.
18   A   I do remember there was -- with the --
19 what we call an IAP, instant action plan, as far
20 as signatures went off of that. I don't remember
21 exactly what the other findings were. I would
22 have to look through --
23   Q   Do you remember any findings that they
24 found that perhaps the knock-and-announce rule was
25 not complied with?

84

1    A   I don't remember them specifically
2  stating that. But I could be wrong.
3    Q   Okay. And you said it's a lot -- it was
4  a long day.
5        What did you mean by that?
6    A   So it goes -- I mean, ours I think went
7  the entirety of -- maybe, like, eight or ten hours
8  of interviews and statements and, like --
9  basically they just go over everything. So the
10 CIRT team provides, like, a presentation.
11       And then I guess there's a board that
12 goes over everything. And then they'll ask
13 additional questions and stuff like that.
14   Q   Okay. So I'm going to break it up so
15 that I understand it a little bit better. I want
16 to make sure that I'm distinguishing this
17 accurately.
18       There's the day that you actually gave
19 your statement -- your CIRT statement.
20       Do you remember that day?
21   A   Yes, ma'am.
22   Q   Okay. And when you say that was a long
23 day, you're not referring to that day, are you?
24   A   No, ma'am.
25   Q   Okay. Because I don't think that that

85

1  took eight to ten hours to give that statement --
2    A   No, no.
3    Q   -- right?
4        Okay. So there was an actual different
5  day where the CIRT board gave an entire
6  presentation on their findings; is that accurate?
7    A   Yes, ma'am.
8    Q   Okay. And when you say that was a long
9  day, that's the day you're referring to; is that
10 correct?
11   A   Correct.
12   Q   That was -- that was somewhere between
13 eight to ten hours?
14   A   Yes, ma'am.
15   Q   And so were you questioned at all during
16 that -- that presentation?
17   A   I believe I gave, like, general
18 statements of what happened. I don't remember,
19 like, specific questions that were asked of me.
20   Q   Okay. All right. And -- okay. I want
21 to -- I want to read you one of the CIRT team
22 conclusions, and I want to ask your opinion about
23 it. It states -- and, you know, let me give you
24 the page too. Hold on. I'll pull the page for
25 you.

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86

1        MS. MURPHY:  And, I'm sorry, Craig, I
2 just have one copy.
3        And we'll mark this as Exhibit 4,
4 please.  And this is page 2016, Bates Number LVMPD
5 004470, and it is Conclusion 3.9.
6        (Exhibit 4 was identified.)
7 BY MS. MURPHY:
8    Q   And if you look at 3.9, and do you see
9 that paragraph?
10   A   Yes, ma'am.
11   Q   Okay.  And so if you go probably about a
12 quarter of the way through the paragraph, it says
13 that -- you see the word "CET" in parentheses.
14 And then I want to read this -- this passage to
15 you and ask you about it.
16       It states, "Officers immediately lost
17 the element of a CET of utilizing speed to
18 surprise and overwhelm the suspect, per their
19 manual, by being stuck at the door and hitting it
20 multiple times prior to entering the residence."
21       Do you have any opinion on CIRT's
22 conclusion on that?
23   A   Yes, ma'am.
24   Q   What's your opinion?
25   A   I don't believe that you immediately

87

1 lose all elements of speed, surprise, and
2 overwhelming action based on four hits on the
3 door.
4    Q   Okay.  So in terms of the conclusion
5 made by the CIRT review team, you dis -- in short,
6 you disagree with their conclusion; is that
7 correct?
8    A   Yes, in my opinion.
9    Q   Okay.  And I want to go up to the
10 paragraph right above it --
11   A   Okay.
12   Q   -- which is paragraph 3.8, and it's
13 about middle of the way through the paragraph.  In
14 parentheses it says, "See United States v. Banks
15 and Zabeti v. State."  And it reads, "CIRT found
16 that under the conditions present here, six
17 seconds was insufficient to allow occupants time
18 to answer the door, let alone submit to a search.
19       "Additionally, deployment of CET
20 contradicted the knock-and-announce principle.
21 The CET is intended, in part, to surprise" -- oh,
22 sorry.  I'm going to stop right there.
23   A   Okay.
24   Q   So those -- that -- those two sentences,
25 do you have any opinions on CIRT's conclusions?

88

1    A   Yes.  Let me just -- and I would have to
2 kind of re-go over --
3    Q   If you want to read it --
4    A   -- U.S. versus Banks.
5    Q   Obviously, I'm not trying to rush you.
6 If you want to read that two or three times over,
7 you read it as many times as you want and you tell
8 me when you're ready to answer.
9    A   Okay.  I mean, just on the face of it,
10 the CET contradicting the knock-and-announce
11 principles, we did announce our presence through
12 the bullhorn several times before we made entry,
13 as well as -- I mean, I think afterwards we
14 learned that the upstairs neighbor, as well, heard
15 our announcements.
16   Q   How did you find out that the upstair
17 neighbors heard the announcement?
18   A   I believe it was told to me -- I forget
19 where or when, but it -- someone knew.
20   Q   Would it be fair to assume that the
21 upstairs neighbor who wasn't having glass broken
22 and explosions going off in front of them probably
23 had a different experience recognizing the
24 announcements than Mr. Williams did?
25       MR. ANDERSON:  Objection.  Form.

89

1        Go ahead.
2        THE WITNESS:  Yes.
3 BY MS. MURPHY:
4    Q   All right.  And then the -- the -- so --
5 so I want to make sure that I understand.
6    A   Okay.
7    Q   Your position -- your opinion about the
8 CIRT conclusion is that you don't think the CET
9 entry contradicts knock and announce; correct?
10   A   Correct.
11   Q   Okay.  And then if we go to the next
12 paragraph, also on 3.8, it says, "The CET is
13 intended, in part, to surprise and overwhelm
14 occupants inside the residence, yet the intent of
15 knock and announce is to provide an opportunity to
16 comply before a forced entry is made, thus is a
17 policy and training failure and not within LVMPD
18 standards."
19       As we have talked about it -- do you
20 have an opinion on that conclusion?
21   A   Can I read it again real quick?
22   Q   You take -- Alex, again, take as long as
23 you want and read it as many times as you would
24 like.
25   A   Okay.  Thank you.

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90

1      Sorry.  What was the -- I forgot the
2  question.
3    Q   What's your opinion on that conclusion?
4    A   On?
5    Q   Well, let's -- let's --
6    A   Sorry.
7    Q   -- let's dice it up for the first
8  sentence.
9    A   Okay.  Thank you.
10    Q   "The CET is intended, in part, to
11  surprise and overwhelm occupants inside the
12  residence," do you agree with that statement?
13    A   Yes.
14    Q   Okay.  Then CIRT goes on to conclude,
15  "Yet the intent of knock and announce is to
16  provide an opportunity to comply before a forced
17  entry is made."
18      Was that your understanding of what
19  knock and announce was to do?
20    A   Yes.
21    Q   How was Mr. Williams given an
22  opportunity to comply?
23    A   By our announcements.
24    Q   But how does that allow him to comply?
25    A   Because we're stating we're the police

91

1  department, we have a search warrant for the
2  residence, stating our authority, and that we have
3  a legal reason to be there.  Allows him to
4  determine whether or not they're going to comply
5  with us.
6    Q   Okay.  Did it give him time to answer
7  the door?
8    A   I -- I guess it depends on -- I mean,
9  based on where he was at from the couch, I think
10  potentially he could, but I --
11    Q   You think that six seconds with stuff
12  being thrown -- you think six seconds is enough
13  time to get up from -- from being asleep to go
14  answer a front door?
15      MR. ANDERSON:  Objection.  Form.
16      Go ahead.
17      THE WITNESS:  I never timed myself.  I
18  know it's a short amount of time, but I don't know
19  if it's possible or not.
20  BY MS. MURPHY:
21    Q   Do you think that Mr. Williams had
22  opportunity to refuse you guys entry into the
23  unit?
24    A   I mean, that -- I think technically he
25  probably did --

92

1    Q   Okay.
2    A   -- by shooting at us.
3    Q   Okay.  And prior to your entering the
4  unit, what indicated that Mr. Williams was
5  refusing entry into the unit?
6    A   Prior to us --
7    Q   Yeah.
8    A   I don't --
9    Q   So you're at the door.  The door is
10  closed.
11    A   Correct.
12    Q   What indicators, when you're at -- the
13  door is closed for six seconds.
14      What indicators did you receive that
15  Mr. Williams was refusing entry into the unit?
16    A   None.
17    Q   Okay.  And do you understand, as we sit
18  here today, that that contradicts the intent and
19  purpose of knock and announce?
20      MR. ANDERSON:  Objection.  Form.
21      THE WITNESS:  Say -- sorry.  Say that
22  again.  So --
23  BY MS. MURPHY:
24    Q   If Mr. Williams -- if there was no
25  indication that Mr. Williams was refusing entry

93

1  within that six seconds, do you understand that
2  then to go through the door is contrary to the
3  entire purpose of knock and announce?
4      MR. ANDERSON:  Same objection.
5      THE WITNESS:  Yes.
6  BY MS. MURPHY:
7    Q   Okay.  And as we sit here today, you
8  don't serve search warrants like this anymore;
9  correct?
10    A   Correct.
11    Q   Okay.  Did you learn anything about
12  Mr. Williams following this incident?
13    A   As far as him not being one of the
14  suspects that were involved?
15    Q   Anything that you may have learned about
16  him, so -- and let me -- let me ask this
17  differently.
18      At the time you thought that he was one
19  of the murder -- or one of the suspects related to
20  the murder case; correct?
21    A   Correct.
22    Q   Okay.  So in addition to that, have you
23  learned -- as we sit here today, you know that
24  that's not correct; right?
25    A   Correct.

94

1    Q   Have you learned anything else about
2  Mr. Williams?
3    A   Not that -- I mean, not anything
4  specific.
5    Q   Okay.  Did you learn that he had no
6  history of violent criminal actions?
7    A   I haven't looked into his history at all
8  or any -- any of that.
9    Q   As we sit here today, did you think that
10 perhaps he did have a history of violent
11 criminal -- I'm sorry.  I think "offenses" is the
12 right word; right?
13   A   Sorry.  Say that again.
14   Q   I'll ask it better.
15       As we sit here today, do you have any
16 idea about what Mr. Williams' criminal background
17 is?
18   A   I don't.
19   Q   Okay.  As we sit here today, do you have
20 any idea about what Mr. Williams' family
21 background is?
22   A   I know his mom was on scene, but that's
23 about the extent that I know.
24   Q   His mom was on the scene?
25   A   She, I think, came to the scene.

95

1    Q   Okay.  And do you have any idea about
2  her professional background or anything like that?
3    A   I think I was told at one point she may
4  have been a police officer somewhere.  I don't
5  know exactly where.
6    Q   Okay.  And we kind of talked about kind
7  of the difference in policy, how you guys serve
8  these property warrants today in terms of doing
9  the -- the surround and call-out rather than the
10 CET entry.
11       Up to this officer-involved shooting,
12 would you say that how this warrant was served was
13 how you would -- let me strike that.  Let me ask
14 it again.
15       Leading up to this, you had several
16 years in the SWAT; correct?
17   A   Yes, ma'am.
18   Q   Okay.  And you had served -- the way you
19 described it -- and you tell me if I am wrong.
20 You probably -- at this -- leading up to this,
21 you'd probably served hundreds of these warrants;
22 is that accurate?
23   A   Yes, ma'am.
24   Q   Okay.  And in terms of a CET entry for a
25 property search warrant, was this the -- was this

96

1  how they normally went, excluding the
2  officer-involved shooting?
3        Do you want me to ask it better?
4    A   Yeah.
5    Q   Okay.
6    A   I'm kind of confused on the question.
7    Q   That's okay.  It's a bad question.
8        In terms of, like, the day-to-day
9  operations, you've served hundreds of these
10 warrants?
11   A   Correct.
12   Q   And, you know, in terms of -- you
13 probably served many that were the -- the property
14 warrants that were CET entry; correct?
15   A   Correct.
16   Q   And in terms of -- I know we've kind of
17 gone down, like, you know, the brass wrap on the
18 door and some other nuance stuff.
19       But in general, is this how they were
20 normally served leading up to that point?  Like,
21 do two announcements, break the windows, throw
22 stuff in, that's -- do you understand what I'm
23 asking about?
24   A   Yeah.  Yes, it's -- so I don't think we
25 applied -- we try not to apply, like, this is the

97

1  way we always do it.  It's based on -- it's very
2  much based on intelligence that we gather from the
3  investigation on what tools we'll use.  So it's
4  not like a one-size-fits-all type of thing.
5        We very much cater each individual
6  mission to the intelligence we have, the
7  environment that's there, access to breach points.
8  All of those types of things I think go into play.
9  The only thing that's -- like a -- depending on
10 what the circumstances are or what tools we'll
11 use.
12   Q   Okay.  So let me ask the question a
13 little bit more specifically then with kind of the
14 understanding -- okay.  So we're going to take,
15 like, a similar -- have you had -- have you served
16 search warrants in similar situations before?
17   A   Yes, ma'am.
18   Q   Okay.  And taking into account those
19 similar situations, was this normally how you
20 would serve the search warrant?
21   A   Yes, ma'am.
22   Q   Okay.  So the time to do the knock and
23 announce, the time that you would throw in the
24 distracts, all of that was how -- leading up to
25 this January 10, 2022, that was all kind of



Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1  normally how you would do something with similar
2  intelligence in a similar environment for a
3  similar warrant; correct?
4      A    Yes, ma'am.
5      Q    Okay.  All right.  And the purpose of
6  the CET was to surprise and overwhelm; correct?
7      A    Yes, ma'am.
8      Q    Okay.  And that was written into -- was
9  that -- I've heard everyone say it, and I've read
10  so many policies at this point in time.
11          I'm assuming that that's literally
12  written into the policies.
13      A    Yes, ma'am.
14      Q    Okay.
15      A    I believe so.
16      Q    And that you had gone over the
17  policies -- how often do you go over the policies?
18      A    As -- kind of case by case, I guess, as
19  you need it.
20      Q    Okay.  And so would it be fair to say
21  that probably you reviewed them following this
22  officer-involved shooting?
23      A    Yes, ma'am.
24      Q    Okay.  Knowing everything that you know
25  today, do you think anything should have been

99

1  different -- done differently on this search
2  warrant?
3          MR. ANDERSON: Objection.  Form.
4          THE WITNESS: I mean, based --
5  obviously the policy changed.  That would be the
6  only difference as far as the way we would serve
7  the warrant.
8  BY MS. MURPHY:
9      Q    And so I'm actually -- and thank you for
10  clarifying that.  I'm not asking about the policy
11  change.
12          I'm talking about, in your opinion, do
13  you think anything should have been done
14  differently here?
15      A    No, ma'am, based on the totality of
16  everything.
17      Q    So do you disagree with the policy
18  change that's been instituted by LVMPD following
19  this officer-involved shooting?
20      A    No, ma'am.
21      Q    So you agree with the policy change?
22      A    As far as them making it, yes.
23      Q    Okay.  And so then would it be fair to
24  say that if you agree with the policy change, that
25  one of the things that should have been done

100

1  differently is it shouldn't have been a CET entry?
2      A    I don't necessarily agree with that
3  based on, like, the safety and, like, the totality
4  of it, all of the environmental issues, like I
5  said before.  I know that sounds kind of
6  contradicting, but from an operator standpoint,
7  no.
8      Q    Okay.
9      A    If that makes sense.
10      Q    But to be clear, this wasn't safe;
11  right?  The -- Officer Kubla wasn't safe, was he?
12      A    That's more dependent on I think the
13  individual inside's compliance than it is with
14  what we're doing.
15      Q    And you're --
16      A    We've done --
17      Q    Sorry.
18      A    Oh, sorry.
19      Q    Nope.  Go ahead.
20      A    I think we've done a lot of these where
21  it has been safe and it has been successful.
22      Q    But in this instance, Officer Kubla was
23  shot; correct?
24      A    Correct.
25      Q    And Mr. Williams is deceased; correct?

101

1      A    Correct.
2      Q    And there was no recovery of any
3  meaningful evidence; correct?
4      A    Correct.
5      Q    And no suspects were apprehended.  Also
6  correct?
7      A    I believe they were apprehended later.
8      Q    But not --
9      A    But not at this place.
10      Q    Correct.
11          So in totality, would you -- would you
12  agree with me that this was a failure?
13          MR. ANDERSON: Objection.  Form.
14          THE WITNESS: As far as -- that's a
15  tough question to ask as far as a failure.
16  BY MS. MURPHY:
17      Q    Would you say that it was a success to
18  have an officer shot, a citizen deceased, no
19  evidence recovered, and no suspects detained?  Is
20  that a successful mission?
21      A    No, that's not.
22      Q    Okay.  So the opposite of that would be
23  a failure; correct?
24          MR. ANDERSON: Objection.  Form.
25          THE WITNESS: Yeah, I believe -- I

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1  mean, it's tough to -- like, our job is to serve
2  search warrants to protect the community and make
3  it safer.
4  BY MS. MURPHY:
5     Q   Do you think the community --
6     A   That's what we were --
7     Q   -- was protected and made safer by how
8  this search warrant was served?
9     A   By how -- I don't think necessarily how
10  it was served had an effect. I think it was more,
11  in my opinion, the individual inside's actions
12  that made it unsafe.
13     Q   What if Mr. Williams didn't know it was
14  police officers coming through the door?
15        MR. ANDERSON: Objection. Form.
16        Go ahead.
17        THE WITNESS: I -- I don't know. I
18  mean, I can't speak to his knowledge and what he
19  was. I just know that he did open fire on us.
20  BY MS. MURPHY:
21     Q   Okay. Let's do a hypothetical that a
22  person is sleeping on a couch, and all of a sudden
23  a door busts open and there's flashlights,
24  banging, things that sound like gunshots.
25        How would you react to that?

103

1        MR. ANDERSON: Objection. Form.
2        THE WITNESS: I -- I have never had it
3  done to me, so I wouldn't obviously know. But I
4  know we've done, like you said, hundreds of these
5  where it has happened and people have complied
6  with us.
7  BY MS. MURPHY:
8     Q   Okay. And so my -- I'm going to ask
9  the -- so as we sit here today, you don't know how
10  you would react. Is that fair to say?
11     A   Correct.
12     Q   But you couldn't rule it out that if
13  somebody came barging through your door and you
14  heard gunshots, that you wouldn't react by also
15  shooting, could you?
16     A   Correct.
17        MR. ANDERSON: Objection. Form.
18  BY MS. MURPHY:
19     Q   And in terms of the safety of the
20  public, the neighbors weren't safe either, were
21  they?
22     A   Correct.
23     Q   Correct?
24        And -- and is it -- is it my
25  understanding and -- this is my only chance to

104

1  talk to you, other than trial.
2     Q   So if we go to trial, is it your intent
3  to testify that you believe Mr. Williams intended
4  to shoot at police officers?
5        MR. ANDERSON: Objection. Form.
6        THE WITNESS: Yes, ma'am.
7  BY MS. MURPHY:
8     Q   Okay. But I asked you earlier about
9  what he may have seen, and you said, "I don't
10  know, I wasn't" -- you don't actually know what
11  his state of mind is, do you?
12     A   Correct.
13     Q   Okay. So you don't know if that was his
14  intent or not, do you?
15     A   I don't.
16     Q   Okay. And let's pretend somehow we
17  could know what Mr. Williams' intentions were and
18  that he thought that the apartment that he was
19  just staying in was being broken into and there
20  was gunfire. Would that change your opinion on
21  how this search warrant was served?
22        MR. ANDERSON: Objection. Form.
23        THE WITNESS: If he knew -- sorry.
24  BY MS. MURPHY:
25     Q   No, no, no, if -- I want to make sure

105

1  the record is clear, so if you want me to reask,
2  no problem.
3     A   Please.
4     Q   Okay. So we talked about what
5  Mr. Williams' intent was. And up to this point in
6  time, you've been pretty confident about, well, I
7  think it was Mr. Williams' intent to shoot at
8  police officers; fair?
9     A   Yes, ma'am.
10     Q   Okay. And so then I'm saying, well,
11  what if we -- you know, I'm raising the issue of,
12  well, perhaps we don't know what his intent was.
13     A   Correct.
14     Q   Maybe he was surprised and confused;
15  correct?
16     A   Yes, ma'am.
17     Q   Okay. So if he was surprised and
18  confused and didn't understand that it was police
19  officers coming through the door, would that
20  change your opinion of why he shot?
21     A   Would it change my opinion on why he
22  shot?
23     Q   Yeah. Because your opinion is that he
24  intended to shoot at police officers; correct?
25     A   Yes.

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

106

1     Q    Okay.
2     A    So if I didn't know that -- if we knew
3  that he --
4     Q    Was confused and surprised?
5     A    Yes.
6     Q    Yeah.
7          Do you think that there's a possibility,
8  as we've sat here and discussed all of these
9  things today, that perhaps he didn't know it was
10 police officers coming through the door?
11         MR. ANDERSON: Objection. Form.
12         THE WITNESS: It's a possibility, yes.
13 BY MS. MURPHY:
14    Q    Okay. And would that change your
15 opinion on Mr. Williams' actions?
16         MR. ANDERSON: Objection. Form.
17         THE WITNESS: Yes.
18         MS. MURPHY: Okay. Can -- Craig, can
19 I just take about five minutes to just go over my
20 notes?
21         MR. ANDERSON: Absolutely.
22         MS. MURPHY: Yeah, if we want to just
23 take a quick break.
24         THE VIDEOGRAPHER: We are off the
25 record at 11:46 a.m.

---

107

1          (Whereupon, a recess was taken.)
2          THE VIDEOGRAPHER: We are back on the
3  record at 12:24 p.m.
4  BY MS. MURPHY:
5     Q    And, Alex, we took a little bit of a
6  break here, and we just review -- we watched -- or
7  you watched your body -- can I just call it BWC?
8     A    Yeah.
9     Q    Yeah. You watched your BWC.
10         And I'd asked you about it beforehand.
11 If I understand -- if I remember -- we've been
12 here a couple of hours now -- you reviewed this in
13 preparation for today's deposition too; correct?
14    A    Yes.
15    Q    Okay. And so we reviewed it, and I just
16 had some questions about some of the stuff that
17 was in there.
18         At the very beginning, there's some
19 discussions where it said, "Called it too early.
20 Rusty on the one minute. Need training."
21         What were you guys talking to?
22    A    So on our approach to the target
23 residence, typically when we're about -- we say a
24 minute, but somewhere in there, someone -- like I
25 said before, the guy on the recon calls out "one

---

108

1  minute." And that lets the team know, all right,
2  we need to start, kind of, getting ready, making
3  sure equipment is there, any last things you've
4  got to, kind of, do. But it kind of preps you to
5  dismount off the BearCats.
6     Q    And who is Apple?
7     A    The --
8     Q    It said, "Apple always knows."
9     A    The --
10    Q    Is that, like, Apple watch?
11    A    Yeah.
12    Q    Oh, okay.
13    A    Because he was --
14    Q    It's not like somebody's nickname?
15    A    No.
16    Q    Oh, okay.
17    A    So he was -- what happened was he had it
18 on his -- the route on his phone --
19    Q    Okay.
20    A    -- and he called one minute too early.
21 And so there was a big gap in time between -- so
22 we were messing with him.
23    Q    Okay. And then once the entry in the
24 apartment is made, I don't think it was you, but I
25 hear other officers saying, "Don't fucking move."

---

109

1          My review of that -- but you're actually
2  the one there -- is they're talking to the other
3  individual in the apartment; correct? Do you know
4  what I'm talking about?
5     A    Yeah, I think that was actually me.
6     Q    Okay. Was -- I wasn't sure if it was
7  you or somebody else.
8     A    Yeah, I think it was me --
9     Q    Okay.
10    A    -- talking to the individual on the
11 couch.
12    Q    Yeah.
13         Oh, talking to the -- to Mr. Williams?
14    A    Yes.
15    Q    Okay. But at that point in time, he
16 wasn't showing any signs of movement; correct?
17    A    Correct.
18    Q    Okay. And then there was talk about
19 dragging him off the couch.
20         You and another officer took -- pulled
21 him off the couch; correct?
22    A    Yes.
23    Q    And at that point, although he was
24 restrained at that point in time, did you think
25 that there was any ongoing threat from him?

---

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1    A   No.
2    Q   Okay. And I hear, "He's down. He's
3  good."
4        Tell me, from your understanding of
5  being a SWAT officer, what that means.
6    A   So I believe they were referencing
7  Kubla, that he went down. "Good" means he's -- he
8  wasn't, like, incapacitated at that point, that we
9  knew of. Typically you just ask each other if
10 you're good.
11   Q   Okay. And then when you actually placed
12 Mr. Williams on the ground, my review of it is
13 that his arm is very awkwardly pinned underneath
14 him.
15       Do you know what I'm talking about?
16   A   Yes, ma'am.
17   Q   Okay. If you had thought Mr. Williams
18 was still alive at that point in time, would you
19 have placed him like that?
20   A   If he was --
21   Q   If you thought that there was --
22   A   I think he had -- the way he was
23 handcuffed, that that's the way he kind of had to
24 go.
25   Q   Okay. You don't think that his shoulder

111

1  was pinned underneath him? That if he had still
2  been alive, that would have led to, like, a
3  rotator cuff injury or something similar to that?
4  I'm really asking your opinion, so tell me.
5    A   Not really.
6    Q   Okay.
7    A   I didn't think it was -- no.
8    Q   Okay. At that point in time -- because
9  I don't know what's inside your head -- did you
10 think that there was a possibility he was still
11 alive? Or had you in your mind -- or had you not
12 even thought about it? I'm really asking for your
13 point of view.
14   A   Yeah. At that point, I think we had so
15 much going on, I think in my mind I was thinking
16 there could be a possibility he was alive.
17   Q   Okay.
18   A   But I wasn't certain at all.
19   Q   Would it be fair for me to assume at
20 that point in time your adrenaline is rushing.
21 You're, like, in a really -- would it be fair for
22 me to say that you're probably in a heightened
23 state of awareness or like a heightened state of
24 input? How would you -- let me back that up.
25       How would you describe your state of

112

1  mind at that point in time?
2    A   I think it's two-fold. You're trying to
3  process everything that's going on, trying to make
4  sure that you're doing your job correctly. So
5  you're -- I mean, and dealing with the adrenaline
6  and everything else going on.
7    Q   Okay. Is part of using -- is it your
8  understanding that part of using the distracts is
9  to disorient somebody?
10   A   Yes.
11   Q   Okay.
12   A   Distract, disorient.
13   Q   And I had read in here earlier that you
14 declined the FIT interview.
15       Do you remember doing that?
16   A   Yes.
17   Q   Why did you do that?
18   A   We were advised by our union.
19   Q   Okay. As we've looked at everything
20 here today -- we've gone over the video, we've
21 gone over some portions of the CIRT report, and
22 we've walked through everything pretty carefully.
23       Do you have any criticisms of your
24 fellow officers?
25   A   No.

113

1    Q   What about the recon?
2    A   Not that I'm aware of anything that
3  stands out that I -- I think they did -- for a
4  recon, they did their job.
5    Q   Okay. And then I'm going to ask you to
6  look at just a couple of pages from the CIRT
7  report. Because we talked about it a little bit,
8  so I just wanted to -- on -- the first one is a
9  photo of the door with the brass wrap, and it's
10 page 109. It's Bates-stamped LVMPD 004363.
11       (Exhibit 5 was identified.)
12 BY MS. MURPHY:
13   Q   And looking at -- I mean, it's got a
14 title on it too.
15       But looking at that, what's your
16 understanding that's a photo of?
17   A   The target door.
18   Q   Okay. And the -- it has the brass wrap
19 that we talked about; correct?
20   A   Correct.
21   Q   Okay. And then also if we can -- I
22 guess --
23       MS. MURPHY: Is this 5?
24       THE COURT REPORTER: Yes. No, I'm
25 sorry. 6.

Case 2:24-cv-00074-APG-NJK   Document 55-9   Filed 05/16/25   Page 32 of 33

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1      MS. MURPHY:  6.  Okay.
2      And if we can also look at page 167 of
3  the CIRT property.  It's Bates LVMPD 004421.
4      (Exhibit 6 was identified.)
5      THE WITNESS:  Thank you.
6  BY MS. MURPHY:
7      Q    And what is that a photo of?
8      A    This was --
9      Q    I mean, I know that there's a title in
10  there, but --
11     A    This one's a photo of my duty weapon.
12     Q    Okay.  And is that the weapon you
13  discharged?
14     A    Yes, ma'am.
15     Q    And that's the one you discharged three
16  times?
17     A    Yes, ma'am.
18     Q    Can you -- and I should have -- it kind
19  of raises the point.  And if you could kind of
20  walk me through, what were you -- what was your
21  uniform that day?
22     A    So I was wearing our standard-issued BDU
23  Crye uniform.
24     Q    What's a Crye uniform?
25     A    That's the company that makes it.

115

1      Q    Oh, okay.
2      A    I have -- so my typical dress top that
3  has badges on the side of each arm.  I was wearing
4  my helmet with a body-worn camera attached to the
5  left side.  I had my tactical vest on that had
6  police identifiers on both the front and the back.
7      On top of that, I had my handgun that
8  was affixed to my tactical vest.  I had medical
9  equipment as far as tourniquets inside my admin
10  pouch.  I don't remember if that -- I don't
11  remember exactly all of it, but I think that's
12  most of it.
13     Q    Is that, like, the standard SWAT
14  uniform?
15     A    Yes, ma'am.
16     Q    Okay.  And then I wanted to ask a
17  question.  In your body-worn camera footage, the
18  angle is off a little bit.  Why was it -- like,
19  it's kind of at a slant.
20     A    Just because my -- like, the way the
21  helmet is, it contours that way.  So it kind of,
22  like, sits at an angle on the side.
23     Q    Okay.
24     A    We use, like, a Velcro patch so -- it
25  can kind of get -- sometimes gets a little messed

116

1  up.
2      MS. MURPHY:  Okay.  All right.  Hold
3  on.  I think that may be it.
4      Alex, I'm going to -- I'm going to
5  pass you as a witness.
6      MR. ANDERSON:  Oh, I have no
7  questions.
8      MS. MURPHY:  That's it.
9      THE VIDEOGRAPHER:  Anything before we
10  go off the record, Counsel?
11     MS. MURPHY:  I'm sorry.  What?
12     THE VIDEOGRAPHER:  Anything before we
13  go off the record?
14     MS. MURPHY:  No, thank you.
15     Oh, did you want to do a read and
16  review?
17     MR. ANDERSON:  So you have the
18  opportunity to read it and then make any changes
19  to it if you want.  I don't think there's -- I
20  can't think of anything that would be -- we'll
21  waive, unless you want to.
22     Are you, like, a thorough person who
23  wants to read everything and make sure I didn't
24  screw you up?
25     We'll waive.

117

1      THE VIDEOGRAPHER:  This will conclude
2  the video deposition of Alex Gonzales, and we are
3  off the record at 12:33 p.m.
4      THE COURT REPORTER:  Counsel, do you
5  need a copy of the transcript?
6      MR. ANDERSON:  I do want a copy.
7      (Wherefore, the deposition
8       concluded at 12:33 p.m.)
9      * * * * *
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Alex Gonzales          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

118

```
 1              CERTIFICATE OF COURT REPORTER
 2    STATE OF NEVADA     )
                          )  ss:
 3    COUNTY OF CLARK     )
 4         I, Heidi K. Konsten, Certified Court Reporter
 5    licensed by the State of Nevada, do hereby certify
 6    that I reported the deposition of ALEX GONZALES,
 7    commencing on July 8, 2024, at 9:55 a.m.
 8         Prior to being deposed, the witness was duly
 9    sworn by me to testify to the truth.  I thereafter
10    transcribed my said stenographic notes via
11    computer-aided transcription into written form,
12    and that the transcript is a complete, true and
13    accurate transcription and that a request was not
14    made for a review of the transcript.
15         I further certify that I am not a relative,
16    employee or independent contractor of counsel or
17    any party involved in the proceeding, nor a person
18    financially interested in the proceeding, nor do I
19    have any other relationship that may reasonably
20    cause my impartiality to be questioned.
21         IN WITNESS WHEREOF, I have set my hand in my
22    office in the County of Clark, State of Nevada,
23    this July 23, 2024.
24              _____
                Heidi K. Konsten, RPR, CCR No. 845
25
```