# Exhibit I - Deposition of Ofc. James Rothenburg

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
 1                    REPORTER'S CERTIFICATE

 2     STATE OF NEVADA        )
                              ) ss
 3     COUNTY OF CLARK        )

 4

 5          I, Tracy A. Manning, a duly certified court
       reporter licensed in and for the State of Nevada, do
 6     hereby certify:

 7          That I reported the taking of the deposition of
       the witness, James Rothenburg, at the time and place
 8     aforesaid;

 9          That prior to being examined, the witness was
       by me duly sworn to testify to the truth, the whole
10     truth, and nothing but the truth;

11          That I thereafter transcribed my shorthand
       notes into typewriting and that the typewritten
12     transcript of said deposition is a complete, true
       and accurate record of testimony provided by the
13     witness at said time to the best of my ability.

14          I further certify (1) that I am not a relative,
       employee or independent contractor of counsel of any
15     of the parties; nor a relative, employee or
       independent contractor of the parties involved in
16     said action; nor a person financially interested in
       the action; nor do I have any other relationship
17     with any of the parties or with counsel of any of
       the parties involved in the action that may
18     reasonably cause my impartiality to be questioned;
       and (2) that transcript review pursuant to
19     FRCP 30(e) was waived.

20          IN WITNESS WHEREOF, I have hereunto set my hand
       in the County of Clark, State of Nevada, this 28th
21     day of July 2024.

22

23

24                        _____
                          Tracy A. Manning, CCR 485
25
```

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2                   DISTRICT OF NEVADA

 3

 4   LATIA ALEXANDER, individually as heir)
     of ISAIAH T. WILLIAMS and in her     )
 5   capacity as Special Administrator of )
     the Estate of ISAIAH T. WILLIAMS,    )
 6                                         )
                    Plaintiff,            )CASE NO.
 7                                         )2:24-cv-00074-
     v.                                    )APG-NJK
 8                                         )
     LAS VEGAS METROPOLITAN POLICE         )
 9   DEPARTMENT, a political subdivision   )
     of the State of Nevada; KERRY KUBLA,  )
10   in his individual capacity; BRICE     )
     CLEMENTS, in his individual capacity;)
11   ALEX GONZALES, in his individual      )
     capacity; RUSSELL BACKMAN, in his     )
12   individual capacity; JAMES            )
     ROTHENBURG, in his individual         )
13   capacity; JAMES BERTUCCINI, in his    )
     individual capacity; DOES I-XX,       )
14   inclusive,                            )
                                           )
15                  Defendants.           )
                                           )
16

17      VIDEOTAPED DEPOSITION OF JAMES ROTHENBURG

18          Taken on Wednesday, July 17, 2024

19                 At 10:16 a.m.

20          At 400 South Seventh Street

21                Las Vegas, Nevada

22

23

24   Job No. 56850, Firm No. 116F

25   Reported by:  Tracy A. Manning, CCR 785
```

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

2

```
1    APPEARANCES:
2
3    For the Plaintiff:
4    MURPHY'S LAW, PC
     BY:  CORRINE MURPHY, ESQ.
5    2620 Regatta Drive
     Suite 102
6    Las Vegas, Nevada  89128
     cmurphyslawattorney@gmail.com
7    (702) 820-5763
8
9    For the Defendants:
10   MARQUIS AURBACH
     BY:  CRAIG R. ANDERSON, ESQ.
11   10001 Park Run Drive
     Las Vegas, Nevada  89145
12   canderson@maclaw.com
     (702) 382-0711
13
14
15   The Videographer:  Dawn Beck
16
17
18
19
20
21
22
23
24
25
```

3

```
1              I N D E X
2    WITNESS                           PAGE
3    JAMES ROTHENBURG
4
5
6       Examination by Ms. Murphy          5
7
8
9            E X H I B I T S
10   NUMBER                            PAGE
11   1    Notice of videotaped deposition of    6
          James Rothenburg, 3 pages
12
     2    Excerpt of Las Vegas Metropolitan    32
13        Police Department, Special Weapons and
          Tactics, Bates stamped LVMPD 001490 -
14        LVMPD 001491, 2 pages
15   3    Excerpt of CIRT report, 1 page       92
16   4    Excerpt of CIRT report, Bates stamped  93
          LVMPD 004271, 1 page, marked
17        confidential
18   5    Excerpt of CIRT report, Bates stamped  96
          LVMPD 004405, 1 page, marked
19        confidential
20
21
22
23
24
25
```

4

```
1              WEDNESDAY, JULY 17, 2024
2
3         THE VIDEOGRAPHER:  Good morning.  This
4    begins the video recorded deposition of James
5    Rothenburg.  Today's date is July 17th, 2024.  The
6    time on the video monitor is approximately
7    10:16 a.m.  We are located at 400 South Seventh
8    Street in Las Vegas, Nevada.
9         This case is entitled Latia Alexander, et
10   al. versus Las Vegas Metropolitan Police Department,
11   et al.  The case number is 2:24-cv-00074-APG-NJK in
12   the United States District Court, District of
13   Nevada.
14        My name is Dawn Beck, legal videographer.
15   The court reporter is Tracy Manning.  We represent
16   Lexitas.
17        Would counselors please state your
18   appearance for the record and whom you represent?
19        MS. MURPHY:  Good morning.  Corrine
20   Murphy, Bar No. 10410 on behalf of plaintiff.
21        MR. ANDERSON:  Craig Anderson on behalf of
22   the defendants.
23        THE VIDEOGRAPHER:  Thank you.
24        Would the court reporter please swear in
25   the witness.
```

5

```
1         JAMES ROTHENBURG
2         having been duly sworn,
3         was examined and testified as follows:
4
5              EXAMINATION
6    BY MS. MURPHY:
7    Q.  Let the record reflect this is the time
8    and the place of the deposition of James Rothenburg
9    in the matter of Latia Alexander, et al., versus
10   Las Vegas Metropolitan Police, et al.
11        Mr. Rothenburg, my name is Corrine Murphy,
12   and I'm an attorney.  And I -- as I just stated, I
13   represent plaintiff Latia Alexander in this case.
14        Could you please state and spell your full
15   name for the record?
16   A.  James Rothenburg, J-a-m-e-s
17   R-o-t-h-e-n-b-u-r-g.
18   Q.  Do you have a middle name?
19   A.  I do.  Ernest, E-r-n-e-s-t.
20   Q.  Okay.  Have you ever been known by any
21   other names?
22   A.  No.
23   Q.  Okay.  And we have noticed you to be here
24   today.  Have you -- did you ever have an opportunity
25   to review the notice of deposition that was served
```

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1 on you?
2     A. I have.
3     Q. Okay.
4        And can we attach that? I don't have one
5 with me, but can we attach that as Exhibit 1 to
6 today's deposition transcript?
7        THE REPORTER: Yes.
8        MS. MURPHY: I'll provide that later.
9        (Exhibit No. 1 was marked at a later time.)
10 BY MS. MURPHY:
11     Q. And that you are -- you understand that we
12 are here today to discuss the officer-involved
13 shooting of Isaiah Williams that occurred on
14 January 10, 2022?
15     A. Yes.
16     Q. Have you ever given a deposition before?
17     A. Yes.
18     Q. When -- when are the other instances
19 you've given a deposition?
20     A. Various court cases throughout my career.
21     Q. In the last five years have you given a
22 deposition?
23     A. Five years, no.
24     Q. Okay. So when was the last time that you
25 remember giving a deposition?

7

1     A. 2015, I believe.
2     Q. Okay. And what was your involvement in
3 that case?
4     A. I was arresting officer.
5     Q. And so were you named as a defendant?
6 Were you a party in the case or were you simply the
7 arresting officer?
8     A. No, just the arresting officer.
9     Q. Okay. And do you remember what that case
10 name was?
11     A. I don't recall.
12     Q. So would it be fair to qualify you as a
13 witness in that case?
14     A. Yes.
15     Q. Okay. All right. And other than that
16 case, in the last -- well, that was almost nine
17 years ago, are there -- in the last ten years, have
18 there been any other cases where you were called
19 providing your deposition?
20     A. No.
21     Q. Have you testified in the last ten years?
22 Have you testified in court?
23     A. Ten years. I do not believe so.
24     Q. Okay. Is there any reason today that you
25 would not be able to understand my questions and

8

1 give your best and most truthful testimony?
2     A. No.
3     Q. Okay. Are you -- and I'm going to
4 follow -- are you under any medications or anything
5 that would inhibit your ability to give honest and
6 reliable testimony today?
7     A. No.
8     Q. Can you please tell me everything that you
9 did to prepare for today's deposition?
10     A. I reviewed some of the files that was
11 given to me, talked to my legal counsel. We
12 reviewed some body-worn camera video from the
13 incident. Briefly reviewed the transcripts from
14 previous interviews I had given.
15     Q. Okay. And I don't want to know what you
16 talked about with Mr. Anderson. That's
17 attorney-client privilege. But I just want -- but
18 what I am entitled to know and what I do want to
19 know is just a specific rundown of which documents
20 you looked at.
21        So, there was a couple different
22 interviews that you provided. Did you look at both
23 the FIT interview and the CIRT interview?
24     A. Yes.
25        MS. MURPHY: And that's F-I-T, it's an

9

1 acronym, and it's C-I-R-T.
2     Q. You reviewed both those transcripts?
3     A. Yes.
4     Q. Okay. In reviewing those transcripts, as
5 we sit here today, was there anything that when you
6 reviewed them did not recollect with -- did not
7 coincide with your memory as you sat -- as when
8 you -- sorry, strike that. Let me ask it again.
9        As you reviewed those transcripts recently
10 of your interviews for CIRT and for FIT, was there
11 anything that you did not remember or you were
12 surprised as you read it?
13     A. No.
14     Q. So the -- is it fair for me to assume that
15 the transcripts you read were consistent with your
16 memory as we sit here today?
17     A. Yes.
18     Q. Other than the body-worn camera, the FIT
19 interview, and the CIRT interview, were there any
20 other documents that you reviewed in preparation for
21 today's deposition?
22     A. Yeah. Las Vegas Metropolitan Police
23 Department policy on search warrants.
24     Q. And when you say "policy on search
25 warrants," do you mean the policy on search warrants



James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1  or do you mean the policy on, like, CET entry or
2  knock and announce or was it just the policy on
3  search warrants?
4      A.  The policy on search warrants, which
5  encompasses some of that information.
6      Q.  Okay.  Any other documents?
7      A.  And then a -- an older copy, because I
8  don't have a current one, of the SWAT section
9  manual, I believe it was from 2019, that outlines
10  search warrant services.
11      Q.  Okay.  And do you understand that part of
12  our case, part of plaintiff's case in this matter,
13  is that this search warrant was improperly served?
14      A.  I'm aware.
15      Q.  Okay.  What's your position on that?
16      A.  I mean, it depends on what's being argued
17  for the service exactly, specifically.
18      Q.  Do you think that the manner in which the
19  search warrant was served was in compliance with the
20  laws as it was in 2022?
21      A.  Yes.
22      Q.  Okay.  Did you bring any documents --
23  sorry.  Were there any other documents that you
24  reviewed?
25      A.  No.

11

1      Q.  Okay.  And like I said, I'm not entitled
2  and I don't want to know what you spoke about with
3  your lawyer, but I am entitled to know, and I do
4  want to know how long you met with Mr. Anderson for.
5  He can't answer for you.
6      A.  Hour?
7      Q.  An hour?  Okay.
8      A.  Probably -- no, probably two.
9      Q.  Okay.  He -- Mr. Anderson, not that he's
10  trying to be evasive or non- --
11      A.  No, I know, I know.  I've got to answer,
12  yeah.
13      Q.  It's -- although this is an informal
14  setting to a certain degree, it's still like --
15      A.  It's still -- yeah.
16      Q.  It's like you're up on the witness stand
17  and you've got to answer the questions.
18          All right.  Did you discuss -- other than
19  Mr. Anderson or anyone from his office, did you
20  discuss today's deposition with anyone else?
21      A.  No.
22      Q.  Okay.  Does your supervisor know that
23  you're here today?
24      A.  Yes.
25      Q.  Okay.  So you obviously discussed it with

12

1  your supervisor, then.
2      A.  Yes, that I had a deposition, yeah.
3      Q.  Okay.  We have taken the deposition of a
4  couple other SWAT officers.  Have you discussed
5  their deposition with them at all?
6      A.  No.
7      Q.  Okay.  Do you still work with -- we
8  have -- I've deposed Alex -- Alex Gonzales, and then
9  my co-counsel deposed Officer Bertuccini.  Have
10  you -- did you discuss their depositions with them
11  at all?
12      A.  No.
13      Q.  Okay.  Did you bring any of the documents
14  that you reviewed with you today?
15      A.  No.
16      Q.  Okay.  Did you review any of the -- the
17  statements of any of the other police officers in
18  this case?
19      A.  No.
20      Q.  I'm going to go down -- do you remember
21  answering interrogatories and Requests For
22  Productions?
23      A.  Yes.
24      Q.  Okay.  Did you review those documents at
25  all to prepare for today's deposition?

13

1      A.  Yes.
2      Q.  Okay.  And so, I know it's hard to keep
3  track, but I'm going to ask one more time.  You can
4  take a moment to think about it.
5          Were there any other documents that you
6  may have -- that you -- that you reviewed to prepare
7  for today's deposition?
8      A.  No.
9      Q.  Okay.  In having reviewed both the answers
10  to the interrogatories -- your answers to the
11  interrogatories and your answers to the Request For
12  Production, as we sit here today, is there anything
13  that you wanted to change or modify in those
14  answers?
15      A.  No.
16      Q.  Okay.  So, now I'm going to go over some
17  background questions --
18      A.  Okay.
19      Q.  -- that kind of were in your
20  interrogatories.  But I want to -- I'm creating the
21  record, so I'm going to march over some familiar
22  ground on that, okay?
23      A.  Okay.
24      Q.  Where are you from?
25      A.  I'd call New York home, upstate New York.

14

1    Q.  How long ago did you move to Nevada?
2    A.  16 -- 16 and a half years ago.
3    Q.  Okay.  And you're currently living here in
4  Nevada; is that correct?
5    A.  Yes.
6    Q.  And do you have any intention of moving?
7    A.  No.
8    Q.  Okay.  Were you -- if you moved here 16
9  years ago, where did you go to high school?
10    A.  In New York.
11    Q.  Okay.  And you have -- you have -- you
12  have advanced educational -- you got -- sorry,
13  strike that.
14        You have education beyond high school,
15  correct?
16    A.  Correct.
17    Q.  Can you please lay out for me your
18  educational background beyond high school?
19    A.  I have a Bachelor's degree in business
20  management, and then I have a Master's degree in
21  administrative leadership.
22    Q.  And what is administrative leadership?
23    A.  It just covers varying leadership
24  philosophies in administrative setting, government
25  setting.

15

1    Q.  And where did you obtain that Master's
2  from?
3    A.  University of Oklahoma.
4    Q.  Okay.  Did you actually attend there or
5  did you do it remotely?
6    A.  Remote.
7    Q.  Okay.  And when did you obtain your
8  Master's?
9    A.  2017, I believe.  August of 2017, I
10  believe I finished.
11    Q.  Okay.  And are you -- do you have any
12  other -- other than those two degrees, do you have
13  any other type of, like, certifications?  And let
14  me -- let me clarify that, because I have
15  reviewed -- you've taken, like, ten million courses
16  through SWAT and LVMPD.  So I don't mean maybe,
17  like, you know, I'm not asking if you're, like,
18  certified in first aid.  I'm asking if you have any,
19  like, specific certifications for anything that
20  would allow you to do your job that is beyond, like,
21  a couple-week course.  Do you know what -- do you
22  want me to give you an example?
23    A.  Sure.  Give me an example.
24    Q.  Okay.  So, like, some of the -- some of
25  the other -- another officer that I -- that I

16

1  deposed in this court, he was -- he previously was
2  part of the explosives team.  So he had some
3  certifications about explosive handling.
4    A.  Oh, yes.  Yeah.
5    Q.  Okay.
6    A.  Yeah.
7    Q.  Do you have any, like, specialized
8  certifications like those?  Beyond just, like --
9  like I said, I've seen that you've done a lot of
10  continuing education --
11    A.  Yeah.
12    Q.  -- but any, like, specific certifications?
13    A.  Yeah.  As far as explosive -- explosive
14  breach and stuff goes, yes, quite --
15    Q.  Okay.
16    A.  -- quite a few.
17    Q.  Okay.  Is it fair to say that you're
18  comfortable doing explosive breaches?
19    A.  Yes.
20    Q.  Okay.  Are you a member of any
21  professional organizations related to your
22  profession?
23    A.  (Indiscernible.)
24        THE REPORTER:  Pardon me?
25        THE WITNESS:  Fraternal Order of Police,

17

1  FOP.
2  BY MS. MURPHY:
3    Q.  Is that like a union membership or --
4    A.  Association, yes.  More or less.
5    Q.  And can you please tell me what is your
6  current -- current position?
7    A.  Police sergeant.
8    Q.  Are you still on SWAT?
9    A.  No.
10    Q.  Okay.  When did you leave SWAT?
11    A.  I left in May of '23, last year.
12    Q.  And why did you leave?
13    A.  I was promoted to sergeant.
14    Q.  And what unit are you currently serving
15  in?
16    A.  Internal Affairs Bureau.
17    Q.  Okay.  And prior to your promotion to
18  sergeant and your transfer to Internal Affairs, how
19  long had you been with SWAT?
20    A.  Previous to that, just under eight years.
21  Would have been seven years and eight months.
22    Q.  That is a very specific answer.
23    A.  Nine months?  Nine months?  Yeah.  I just
24  remember it was end of September in 2015.  So, yeah.
25  May '23.

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1    Q.  And what -- and I know that there's, like,
2  some different team colors and different positions.
3  You know, I'm a layperson.  So can you kind of walk
4  me through, like, what your team -- as best as you
5  can to a layperson, what kind of team you were on
6  and kind of what your day-to-day looked like being a
7  member of the SWAT team in 2022.
8    A.  There's just -- there's -- there was two
9  teams, red and blue.  But the colors have changed a
10  couple times over the years, just depending on the
11  leadership in place.  So, typically it's been red
12  team, and those are just associated with the days
13  off.  So, the other team is blue.  So I'd primarily
14  been on red team the entire time.  I think
15  previous -- or after red team, initially it was gold
16  team and then it went back to red.
17    Q.  So the color classifications have to do
18  with your days on and day off --
19    A.  Correct.
20    Q.  Not, like, duties within SWAT.
21    A.  Correct, yeah.
22    Q.  Okay.  Did you have -- were you -- would
23  it be qualified as you're a SWAT officer or is there
24  any subspecialty within SWAT?
25    A.  Yeah.  So, SWAT officer, and then one of

19

1  the explosive breachers or breachers.  Yeah.
2    Q.  And were you an explosive breacher for the
3  entire seven years and nine months you were on SWAT?
4  Or had you gained that specialty, like, kind of
5  sub-position as you were going through?
6    A.  Yeah, I gained it after about two years
7  there.
8    Q.  Okay.  So, would it be fair for me to --
9  for me to assume that for about five years and nine
10  months you had that kind of subspecialty?
11    A.  Yes.
12    Q.  Okay.
13    A.  Yeah.
14    Q.  And on January 10, 2022, the day of the
15  officer-involved shooting, you also had that
16  subspecialty, correct?
17    A.  Correct.
18    Q.  Okay.  And prior to being on SWAT, what
19  position did you hold at Las Vegas Metropolitan
20  Police Department?
21    A.  I was a Field Training Officer and then
22  patrol officer.
23    Q.  What's a Field Training Officer?
24    A.  Field Training Officer basically is you're
25  teaching new officers how to be a police officer,

20

1  more or less.  Handle the day-to-day, out in the
2  street, kind of on-the-job training, more or less.
3    Q.  And so -- Field Training Officer, so does
4  that mean that you would be, like, on patrol and
5  then you would bring training police officers with
6  you?
7    A.  Correct.
8    Q.  Okay.  And then you went to being a patrol
9  officer; is that correct?
10    A.  Patrol officer first, then Field Training
11  Officer.
12    Q.  Okay.
13    A.  Yeah.
14    Q.  Oh, sorry.  All right.  How long were you
15  a patrol officer for?  And by the way --
16    A.  About six years.
17    Q.  I was going to say, you're doing an
18  excellent job giving me very specific answers.  But
19  you can also give me rough estimates to the best of
20  your memory.  Okay.
21    A.  So six years.  And how long have you been
22  with LVMPD total?
23    A.  In about three weeks it will be 16 years.
24  Two weeks it will be 16 years.
25    Q.  Okay.  And you were patrol for six years,

21

1  and then how long, approximately, were you a Field
2  Training Officer?
3    A.  About a year and a half.
4    Q.  Okay.  And from there were you promoted to
5  SWAT?
6    A.  Yes.
7    Q.  And when I say promoted, that's a fair
8  assumption for me to assume, correct?  That's a
9  promotion to get on SWAT?
10    A.  It's a testable position, so, yeah.
11    Q.  Okay.  What did you have to do in order to
12  test to get on SWAT?
13    A.  At the time, it involved shooting test, so
14  shooting qualification test, (indiscernible) test,
15  confined --
16    THE REPORTER:  Wait.  It sounded like pie?
17  BY MS. MURPHY:
18    Q.  Did you say height test?
19    A.  Yeah.  Height test.  Like, going to the
20  top of a tower and looking over kind of thing, yeah.
21    Q.  I was, like, do you have to be a certain
22  height to be on SWAT?
23    A.  Repelling, stuff like that.  Yeah,
24  regarding that.  So there's a height test, which I
25  know they've since removed.  They actually did a

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1 balance test, confined space test. There was a
2 physical fitness test, an obstacle course. There
3 was also an assessment center, which was scenario
4 based. And then the final part was a panel
5 interview. Or oral board.
6     Q. Did you have to take any, like, written
7 tests?
8     A. No.
9     Q. Okay. So is it fair to say that it was --
10 well, you tell me. Is it mostly, like, it's --
11 based on what you described, it seems like they want
12 to make sure that you have a certain level of
13 physicality, for lack of a better term, and ability
14 to act within the field; is that fair?
15     A. Correct.
16     Q. Okay. Is it competitive to get on SWAT?
17     A. Very.
18     Q. Okay. So with that in mind, I would like
19 you to tell me what -- and if it's different today
20 than it was in 2022, I want you to tell me what your
21 understanding was in 2022. If it differs from
22 today, then I'll ask you what it was today -- what
23 it is today. Can you please tell me what knock and
24 announce means to you?
25     A. So, knock and announce, the way that I

23

1 interpret it, is knocking, physically knocking.
2 Whether that be -- well, knocking, you know, using a
3 PA system, you know, alerting somebody of your
4 presence, right? So knocking and then announcing --
5 also announcing your presence.
6     Q. Okay.
7     A. So, hey, we're here. It's the police.
8 That type of thing.
9     Q. And as we sit here today, do you have any
10 understanding of any parameters for how often or how
11 long you have to announce your presence?
12     A. Says a reasonable time, but that's
13 debatable what that time frame is, I believe. Given
14 the circumstance.
15     Q. Okay. And I just want to make sure.
16 Because we're a couple years from the incident. If
17 you say reasonable time, is that your same
18 understanding of -- in 2022?
19     A. Yes.
20     Q. Okay. Did you ever have any specific
21 training through either LVMPD or SWAT that there --
22 that there had to be certain timelines that were
23 met, or was it just a reasonable amount of time?
24     A. Just reasonable.
25     Q. And can you please explain to me what

24

1 reasonable meant to you -- or means to you?
2     A. I guess reasonable, what's commonly
3 accepted, what everybody would think is commonly
4 accepted. You know, a reasonable time to act on
5 something. If something -- something was occurring.
6     Q. Okay. And so -- and I know that these
7 questions are a little all encompassing.
8     A. No problem.
9     Q. And so I'm kind of trying to drill down a
10 little bit --
11     A. Okay.
12     Q. -- and I'd like your help with that.
13         So when you say reasonable amount of time,
14 were you ever given, like, a minimum amount of time
15 that you had to wait? Were you ever --
16     A. No.
17     Q. Okay. And so, is it fair for me to
18 assume -- was there any -- did you ever get any
19 training on, like, hey, depending on what you're
20 going after or who you're going after, the
21 reasonable scope of time may be different?
22     A. Yes.
23     Q. Okay. And so can you kind of walk me
24 through what your understanding of that was?
25     A. I mean, it would depend -- again, it's --

25

1 I think it's all scenario dependent, scenario based,
2 given what it is. Is -- you know, is there a, you
3 know -- what is the threat or what is happening, you
4 know? Is there -- do we need to move faster or do
5 we need to move slower based off the circumstance.
6     Q. Okay. And I'm going to walk you through
7 the entire incident. We're going to watch the
8 video, too. But I know that you have reviewed all
9 these different documents and the video in order to
10 prepare for today's deposition.
11         Having reviewed all those different pieces
12 of evidence, do you think that there was a
13 reasonable amount of time between the first knock
14 and when the door was breached in this case?
15     A. Yes.
16     Q. Okay. And was the amount of time
17 consistent with the training that you had been given
18 through LVMPD and SWAT?
19     A. Yes.
20     Q. And I just want to confirm one more time.
21 To your knowledge, you were never provided any
22 training that there had -- there was a minimum
23 amount of time that you had to wait; is that
24 correct?
25     A. That's correct.



James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1    Q.  Okay.  And you explained to me kind of
2  what knock and announce means to you.  But can you
3  tell me, from your understanding as a police
4  officer, what's the purpose of knock and announce?
5        MR. ANDERSON:  Objection, form.
6        Go ahead, sir.  Just ignore me when I
7  object.  I'm here for the record.
8        THE WITNESS:  Got you --
9        MR. ANDERSON:  -- to answer questions.
10 BY MS. MURPHY:
11   Q.  Yeah, sorry.  Just to let you know,
12 there's no judge here.  I'm sure --
13   A.  Right, right.
14   Q.  Yeah.  You've been in court.  And
15 normally, when an attorney will object, a judge will
16 comment on it right away.  We don't have a judge
17 here.
18       So what happens is, Mr. Anderson says his
19 objection for the record.  Later, if necessary, we
20 can fight over it with a judge.
21   A.  Okay.
22   Q.  But he's just going to state his objection
23 and then you answer.  If he wants you not to answer,
24 he'll tell you.  So just assume he's saying his
25 objection, and then you can go ahead and answer the

27

1  question.
2    A.  Okay.
3    Q.  Okay.  And sorry, just to state that one
4  more time, what is your understanding of the purpose
5  of knock and announce?
6    A.  To notify somebody of our presence.
7    Q.  Does a citizen have a right to know that a
8  police officer is trying to gain entry?
9    A.  In a knock and announce, yes.
10   Q.  Okay.  Does a citizen have a right to open
11 a door or to allow a police officer entry -- entry
12 before the property is destroyed?
13   A.  Say that again, I'm sorry.
14   Q.  Let me rephrase that.
15   A.  Yeah.
16   Q.  Does a citizen have a right to allow entry
17 before property is destroyed?  And by property, I
18 mean -- I don't mean, like, evidence that the police
19 officers are trying to -- sorry, you're saying no?
20   A.  Correct, no.  Yeah.
21   Q.  Okay.  But you do understand that part of
22 a person's constitutional and civil rights is to
23 have clear notice of a police officer's intent to
24 enter, correct?
25   A.  Correct.

28

1    Q.  In performing your job as a police
2  officer, do you agree with me that you have a duty
3  to conduct yourself such that you do not violate the
4  civil or constitutional rights of members of the
5  public?
6    A.  Yes.
7    Q.  Okay.  Do you also agree that if you see
8  other officers violating the civil or constitutional
9  rights of the members of the public, you have a duty
10 to intervene and stop that officer?
11   A.  Yes.
12   Q.  And can you tell me, as a -- kind of as a
13 contrast, what is a no-knock warrant?
14   A.  So, a no-knock is not giving the person or
15 subjects any notice that it's the police whatsoever.
16   Q.  And why would some warrants be no-knock
17 and some be knock and announce?
18   A.  It would depend on the severity of the
19 crime, what the investigation is for.  I mean,
20 there's numerous factors.
21   Q.  Okay.  In your experience, are property
22 only search warrants ever no-knock?
23   A.  No.
24   Q.  Okay.  So would it be fair -- and I know
25 that I'm kind of asking you some broad questions,

29

1  and so I'm going to try to drill on it a little bit
2  more.
3        So no-knock would only be for, like, an
4  arrest warrant, correct?
5    A.  I wouldn't say just that.  I mean, it
6  could be -- it could be several things.
7    Q.  Okay.
8    A.  Yeah.
9    Q.  But it wouldn't be a warrant that was for
10 property search and seizure only, correct?
11   A.  Not likely, no.
12   Q.  And we're going to lay the groundwork for
13 this.  I know you've talked about it in part of the
14 CIRT and FIT interview.  But what is a CET entry?
15 And CET is an acronym, it's C-E-T.
16   A.  What is a CET entry?
17   Q.  Correct.
18   A.  Controlled Entry Tactic.
19   Q.  Oh, is it -- I don't -- I always thought
20 it was pronounced -- I just thought it was called
21 CET, like --
22   A.  No, CET is --
23   Q.  My bad.
24   A.  Yeah.  I was, like, CET?  I was, like,
25 uh-oh.  I don't know that one.

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1    Q.  This is a test.
2    Controlled Entry Tactic.
3    Q.  Okay.  Can you please tell me what is a --
4  what is a Controlled Entry Tactic?
5    A.  It's basically what it means.  I mean,
6  we're making a controlled entry into a premise.
7    Q.  Okay.
8    A.  Whether that be a business, house,
9  apartment.
10    Q.  And so what -- sorry.  What is a
11  controlled entry?  How is that different than just
12  entering as a police officer, like, just walk
13  through the door?
14    A.  Well, it's different than walking through
15  the door.  We kind of have an idea of where we're
16  going and what we're doing.  There's already been a
17  plan put in place of where you're going to go and
18  what you're going to do.
19    Q.  Okay.
20    A.  So that's why it's controlled.  It's not
21  just we're walking in or just running in and
22  figuring it out as we go.
23    Q.  Can you use a CET entry on a knock and
24  announce -- on a knock and announce warrant?
25    A.  Yes.

31

1    Q.  Okay.  Is there no conflict between knock
2  and announce and a CET entry?
3    A.  No conflict between a knock and announce
4  and a CET?
5    Q.  Yes.
6    A.  No.
7    Q.  Okay.  And is part of CET -- you know, in
8  this case, right, the windows were broken open,
9  there were devices, the explosive -- what are they
10  called?  The distracts --
11    A.  Distracts.
12    Q.  -- were thrown in.
13    A.  Yeah.
14    Q.  And so is that part of a CET entry?
15    A.  Yes.
16    Q.  What's the purpose of the distracts and
17  the devices?
18    A.  To create distraction.
19    Q.  To surprise; is that correct?
20    A.  Yeah, surprise.
21    Q.  Give me one second.  And so perhaps it
22  will help me have you answer the questions a little
23  bit more in a flowing fashion, can you please tell
24  me the difference between a Control Entry Tactic and
25  a Surround and Callout?

32

1    A.  Yeah.  So Controlled Entry is -- we're
2  going to make entry into the premise beforehand.  We
3  know we're going to.  And then a Surround and
4  Callout would be, again, surrounding whatever it is,
5  the structure, and calling the occupants out before
6  making an entry.
7    Q.  Okay.  And to confirm in this case, with
8  the service of the warrant on this apartment, this
9  was a CET entry, correct?
10    A.  Correct.
11    Q.  Okay.  And so I'm going to -- I'm going to
12  hand -- when we do exhibits, what happens is, is I
13  give it first to the court reporter.  She puts a
14  little sticker on it to mark what exhibit number it
15  is, and then she'll hand it to you.
16        And please make sure you don't leave today
17  and take any of the exhibits with you.
18    A.  Okay.
19        (Exhibit No. 2 was marked.)
20  BY MS. MURPHY:
21    Q.  So --
22        THE REPORTER:  Wait, wait.
23        MS. MURPHY:  You can't do those at the
24  same time?
25    Q.  So, James, what I've just handed you is --

33

1  we're going to mark as Exhibit 2 to today's
2  deposition transcript, and this is the Las Vegas
3  Metropolitan Police Department, Special Weapons and
4  Tactics.  Mine says that this is kind of the
5  internal policy on it.
6    A.  Uh-huh.
7    Q.  And the copy that I've given you, I put a
8  tiny little mark, a highlighter mark, because I want
9  to read to you part of the description of controlled
10  entry, and I want you to be able to follow along
11  with me.
12        And for the record, it is Bates LVMPD
13  001490.  And just so that you know, James, there --
14  on every -- almost every exhibit that I hand you,
15  there will be an alpha numeric number down in the
16  right-hand corner.
17    A.  Okay.
18    Q.  Those are the numbers your attorney has
19  put on every document that we received so that we
20  have kind of our own pagination system so that we can
21  keep track of all the documents.
22    A.  Okay.
23    Q.  So, under Controlled Entry Tactic, it
24  reads, "This tactic can be dynamic in nature, and is
25  a viable and time-proven option.  LVMPD should use a



Case 2:24-cv-00074-APG-NJK    Document 55-11    Filed 05/16/25    Page 12 of 41

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1   CET to execute search warrants in those cases to
2   lessen the risks and to enhance officer, citizen,
3   and suspect safety.  The goal of a CET is not to
4   surround and call the subject out to SWAT officers.
5   This tactic is meant to surprise and overwhelm the
6   suspects."
7          Now, as we sit here today, is the conc- --
8   I'm going to ask you your opinion.  Is the concept
9   of surprising and overwhelming suspects, does that
10  conflict with the purpose of no-knock -- or sorry,
11  the purpose of knock and announce, which is to allow
12  people the opportunity to understand and evaluate
13  that it's a police officer trying to gain entry?
14     A.   You're going to have to give that to me
15  one more time.
16     Q.   No problem, no problem.  So -- and I'll
17  just read the last line one more time, and then I'll
18  ask the question again.
19     A.   Yeah.
20     Q.   "This tactic is meant to surprise and
21  overwhelm the subjects."  In your opinion, is
22  surprising and overwhelming a suspect at odds with
23  the concept of the knock and announce rule that a
24  citizen is entitled to know and understand that it
25  is a police officer trying to gain entry?

35

1      A.   For the surprise and overwhelming, no.
2      Q.   Why not?
3      A.   Because we just need to alert them that
4   it's the police.  And, yes, they'll be surprised.
5   But if we're there to serve a search warrant, we're
6   going to overwhelm that premise because of the
7   reasons listed above.  Which, you know, lessen the
8   risk, enhance officer and citizen safety, also
9   safely take the suspect into custody as well.  So
10  that way there's not time for them to, you know, arm
11  themselves, take up a better defensive position, or
12  even, you know, flee the area.
13     Q.   In this case, do you think the way that
14  this warrant was served lessened the risks and
15  enhanced officer safety?
16     A.   Yes.
17     Q.   How did it enhance officer safety?
18     A.   So, for us, I believe that it enhanced it
19  because we were able to quickly get into the
20  apartment and to address the suspect in this case
21  who was shooting at officers.  And then also
22  shooting through the rest of the apartment, which
23  was a multi-unit apartment building.  So...
24     Q.   As we sit here today, do you have any
25  evidence or facts that would indicate Mr. Williams

36

1   understood it was police officers coming through
2   that unit?
3      A.   I would assume based off of the
4   announcements given.
5      Q.   You think that six seconds of
6   announcements is sufficient to give a sleeping
7   person inside an apartment notice and the time to
8   understand that police officers are coming through
9   the door?
10     A.   I believe so, yes.
11     Q.   Okay.  And you think that especially --
12  that six seconds, then it is also punctuated with a
13  distract device and what they call it, the nine
14  banger going off, you think that that's also
15  sufficient time for somebody to understand that?
16     A.   Yes.
17     Q.   Okay.  You don't think that perhaps
18  Mr. Williams was surprised and couldn't have enough
19  time to understand who was coming through the door?
20         MR. ANDERSON:  Objection, form.
21         Go ahead.
22         THE WITNESS:  I mean, I believe he was
23  surprised, yes.
24  BY MS. MURPHY:
25     Q.   As we sit here today, do you think it was

37

1   Mr. Williams' intention to shoot at police officers?
2          MR. ANDERSON:  Objection, form.
3          THE WITNESS:  I'm unsure.
4   BY MS. MURPHY:
5      Q.   Okay.  As we sit here today, can you do a
6   CET entry on a property only search warrant?
7      A.   I believe so, given the -- you know,
8   the -- again, it's circumstantial.  Is it -- is it
9   preferred?  No.  But if it's the only way, based off
10  of, you know, all the other information that's being
11  looked at, then, yes.
12     Q.   Okay.  Were you aware that part of the
13  internal investigation concluded that the policy
14  should be changed, and that CET entries should not
15  be used on property only search warrants?
16     A.   Are you talking a policy review?
17     Q.   Yes.
18     A.   Prior to this or --
19     Q.   Sorry --
20     A.   -- after this?
21     Q.   Following this, because of this incident.
22     A.   Okay.  So what was the question again
23  exactly?
24     Q.   No problem.  I'll ask it again.
25          Were you aware that following the

James Rothenburg            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1  investigation regarding this incident, the
2  officer-involved shooting on January 10th, 2022 with
3  Mr. Williams, were you aware that a recommendation
4  was made for a policy change that CET entries no
5  longer be used for property only search warrants?
6      A.  I believe that was a finding that they
7  concluded, yes.
8      Q.  Okay.  As we sit here today, do you have
9  any knowledge or awareness of whether or not that
10  policy was adopted by LVMPD?
11      A.  I believe it has been.
12      Q.  Okay.
13      A.  Yes.
14      Q.  And, like I said, we'll get into the --
15  the actual entry itself and we'll go through all of
16  that.
17      A.  Okay.
18      Q.  But as we sit here today, do you believe
19  that the search warrant could have been served as a
20  Surround and Callout rather than a CET entry?
21      A.  No.
22      Q.  But as we sit here today, based on the
23  updated policy of LVMPD, this search warrant would
24  have to be served as a Surround and Callout,
25  correct?

39

1      A.  I -- unless there's an exception to that
2  policy, then, yes.
3      Q.  Okay.  And I'm sorry, I didn't tell you
4  before, if you want to take a break at any time, no
5  matter what for.  If you need to take a phone call,
6  go to the restroom, whatever, you just tell me and
7  we'll take a break immediately.
8      A.  Okay.
9      Q.  Okay.  All right.  Now we're going to get
10  into -- and I actually offered -- if you want, we
11  can take a short break now, because now I'm going to
12  get into the actual, like, mechanics.  And I'd like
13  to flow through that as kind of -- without taking a
14  break.  So if you want, we can take a five- or
15  ten-minute break now.
16      A.  I'm good.
17      Q.  Okay.
18      A.  Let's do it.
19      Q.  Great.  We'll keep going.
20          So, can you please tell me when you first
21  became aware of the search warrant in this case?
22      A.  I believe it was the night prior, or less
23  than 12 hours prior to.  Yeah.
24      Q.  Okay.  And how did you become aware?
25      A.  Through texts, text message.

40

1      Q.  And is that normally how you find out
2  about warrants?
3      A.  Yeah, that's our primary means to
4  communicate with the team.
5      Q.  Okay.  And I -- I know it was a couple
6  years ago, but to the best of your memory, can you
7  tell me what was in the text that you received?
8      A.  It's kind of a standard text.  It's just
9  the other -- the other team that's working, they'll
10  ask for additional officers to come in to
11  supplement -- supplement their team for service of a
12  search warrant.
13      Q.  And so if I understand correctly, James,
14  you actually were not -- you were just brought in
15  kind of as extra because they were short to serve
16  this warrant, correct?
17      A.  Correct, yeah.
18      Q.  And you said it's kind of like the
19  standard text.  And I'm sorry, I don't -- if you
20  could kind of walk me through, like, what does the
21  text that you -- like, what's the standard text look
22  like?  You don't have -- if you don't remember this
23  one specifically, it's fine, but if you can just
24  kind of tell me, this is usually what the text says.
25      A.  It will usually say, blue team needs five

41

1  or six bodies for a 0500 search warrant briefing.
2  It's going to be at Santa Fe Station.  That's it.
3      Q.  Okay.
4      A.  Typically.
5      Q.  And do you have the -- do you volunteer
6  for this or is it, like, you're up next to do this?
7      A.  That's a little bit of both, yeah.
8  There's a -- there's a running list.
9      Q.  Okay.
10      A.  So -- and then you say, hey, yeah, I'm --
11  based off what you have because it's a -- it's a day
12  off.  So, if you have nothing going on, then you can
13  say, yeah, I'm available.  And then depending on
14  where you fall on the list, if you make it, you make
15  it; if you don't, you don't.
16      Q.  Okay.  I mean, I have to tell you that I
17  personally -- you can tell me if this is different.
18  I -- and I don't know -- and I'm kind of just trying
19  to figure out how it works and, you know -- so
20  you'll have to excuse me if some of my questions are
21  a little bit clumsy.
22          But, like, I -- I'm a 4:00 a.m. warrant
23  service seems kind of intense.  Was that normal for
24  you guys or -- do you kind of get what I'm getting
25  at?

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1   A. Yeah.
2   Q. Okay.
3   A. It's normal.
4   Q. Okay.
5   A. Yeah.
6   Q. So that wouldn't be, like, I'm not doing a
7   4:00 a.m. search warrant, because this -- it was not
8   that unusual; is that fair to say?
9   A. Correct. Yeah. Yeah.
10  Q. Okay. And you were not part of the recon
11  team for this warrant --
12  A. No.
13  Q. -- correct?
14  Okay. Have you -- you've done recon for
15  warrants before, though, correct?
16  A. Yes.
17  Q. So I understand that you weren't part of
18  the recon team for this warrant, but you -- can you
19  kind of walk me through when you are part of the
20  recon team, kind of, what does that look like?  What
21  do you do?
22  A. So, you'll typically receive the search
23  warrant and then investigative material, basically
24  pretty much everything that the detectives have
25  compiled for the case. Well, depending on what they

43

1   send over. Sometimes you have to ask for more.
2   Some are very thorough, send everything. Some only
3   send the required stuff.
4   But you'll review all that. You'll review
5   the search warrant, make sure, you know, it meets
6   all the, you know, normal stuff that needs to be in
7   a search warrant. So, review that.
8   Then you'll find where the location is at,
9   where you're going to go. So determine that. From
10  there, we'll determine a rally point, more or less,
11  where, you know, it's less than a five-minute drive
12  to the target, per se. So that way -- like a
13  staging spot so everybody can meet there and stage.
14  And then from there, usually just two
15  officers, sometimes it's three, sometimes it's four,
16  go out and actually do the recon. Which if it's in
17  a house, they'll pull it up on Google and kind of --
18  layout of the area, see what it looks like, you
19  know. See what's around there. And then go
20  actually out, confirm the information that's listed
21  in the premise, or the search warrant, that it
22  matches, you know, what we're seeing with -- with
23  eyes on it.
24  You know, then obviously once we get
25  there, too, we're looking at all the -- all the

44

1   associated factors that -- that we look for. You
2   know, is there fortifications on the house? Are
3   there cameras? Are there dogs? You know, are there
4   children present, visible? You know, window
5   coverings. There's -- there's a laundry list of
6   things.
7   Also, we're looking at kind of the
8   surrounding area, too. The houses, you know, next
9   to those, the target location, as well. Because
10  we're also going to probably send out containment
11  positions. So making sure they have good avenues to
12  kind of get where they need to go. You know, unlock
13  gates or a neighbor has a large dog or something
14  like that. Anything that would take a few minutes
15  for them to get back there.
16  And then we'll take all that information,
17  we'll kind of come up with a game plan of what we
18  think. And again, I'm using the house in this
19  situation, but it could be an apartment. And then
20  kind of present a plan to the Assistant Team Leader
21  or the team leader, who they've kind of already
22  looked at this information as well. And then kind
23  of formulate the plan of what we're going to do and
24  how we're going to serve it.
25  Q. Okay. And so in this -- and so about --

45

1   if there is an average, you tell me, because I don't
2   know. But, like, what is the -- is there, like, an
3   average time that you would spend on the recon? Do
4   you know what I mean by that question?
5   A. Yeah.
6   Q. Like -- like, oh, usually we'll spend,
7   like, one to two hours or half an hour, or is there
8   kind of an average that you're comfortable with
9   based on your experience and your service of search
10  warrants?
11  A. Is there a time? I'm not -- it's hard to
12  say. I mean, depends on kind of -- we're calling
13  officers available from all over the city, right?
14  So, depending on what side of town you've got to go
15  to. We -- we, I think, would average about three
16  hours, I believe, prior to the service for the
17  recon. Which doesn't mean it has to be done then.
18  It could be done a couple days before, it could be
19  done the night before. I mean, yeah, we could look
20  at it kind of whenever. And then plan when we're
21  going to -- when they're going to conduct the
22  service.
23  Q. Following this January 10, 2022 incident,
24  did you have any opportunity to kind of further
25  review the recon, based on what was actually

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1  physically presented -- physically occurring when
2  you came -- came into the apartment?  And if I've
3  asked that question awkwardly, tell me to rephrase
4  it.
5      A.  Yeah.
6      Q.  Sure.  So, you -- so -- actually let me
7  ask it differently.
8          During the -- there was a briefing at
9  Sam's Town, correct?
10     A.  Right.
11     Q.  Right.
12     A.  That's -- yeah, I was just thinking -- I
13  was, like, okay.  Kind of left that part out, but I
14  could explain that part.
15     Q.  And I'll have you get that -- to that in
16  just a second, yeah.
17         So the briefing at Sam's Town, you get
18  kind of delivered what the recon team has found,
19  right?
20     A.  Yes.
21     Q.  Okay.  So having actually gone through
22  this incident, been part of the officer-involved
23  shooting, been briefed at Sam's Town, were there
24  things that you found out about the recon that had
25  been conducted that you later found out to be

47

1  inaccurate or poorly done?
2      A.  I'm trying to think.  As far as the recon
3  goes, I would say no.  I mean, I felt we got a good
4  briefing.  I mean, a standard search warrant service
5  briefing.
6      Q.  Okay.  But to --
7      A.  There's always -- I'm sorry.
8      Q.  No, no, no.  You finish.
9      A.  There -- there's always unknown or
10  variables that -- that happen.
11     Q.  Okay.
12     A.  That can't be planned for or that
13  aren't -- that are not caught on a recon that you
14  kind of got to deal with on the fly.  So...
15     Q.  In this case, you listed off four
16  different things that you would want recon to look
17  for:  Window coverings, dogs, children, and
18  fortification.
19     A.  Cameras.
20     Q.  Sorry, cameras.  Okay.
21     A.  Elderly.
22     Q.  Right.  And so in this case, looking back
23  on it from your point of view today, knowing
24  everything that you know now, do you understand that
25  the recon failed to assess that there was a

48

1  fortification on the door?
2      A.  Yes.
3      Q.  Okay.  Do you understand that the recon
4  failed to rule out that there were any children
5  present in the unit?
6      A.  I believe we determined there was no
7  children present.
8      Q.  Correct.  But having looked back on it
9  now, do you understand that part of the
10  investigation found they hadn't ruled out that there
11  were children, elderly, compromised people there at
12  all?  They really didn't know who was associated
13  with the apartment.  Do you understand that as we
14  sit here today?
15     A.  I mean, based off of the recon, I believe
16  that there was no indication that those people were
17  there.  So I would say it was ruled out at the time.
18     Q.  Okay.  And then there was also an issue
19  with window coverings when -- specifically for your
20  position, correct?
21     A.  Correct, yeah.
22     Q.  And that wasn't accurately relayed to you
23  before the actual service of the search warrant,
24  correct?
25     A.  That would have been -- that was very

49

1  clear that would have been something we would have
2  been told, I believe.
3      Q.  Okay.  If you had done the recon
4  on -- do you have -- you do have knowledge as we sit
5  here today about the recon that was done, correct?
6      A.  Yes.
7      Q.  As we sit here today, would you have done
8  the recon the same way or would you have done it
9  differently?
10         MR. ANDERSON:  Objection, form.
11         THE WITNESS:  I would have -- I probably
12  would have done it the same way.  Based off of
13  everything that I know, it was done within -- within
14  standard.  You know, sometimes they're -- they're
15  very difficult, especially in apartment complexes.
16  They're extremely difficult.
17  BY MS. MURPHY:
18     Q.  What if I were to represent to you that
19  LVMPD's internal investigation found that the recon
20  was not done within standard?
21     A.  I'm sorry, if you presented that to me?
22     Q.  Yeah.  What if I represent -- are you
23  surprised if I represent to you that the internal
24  investigation found that the recon was not done
25  consistent with LVMPD standards?

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50

1    A.  Which investigation --
2    Q.  Sorry --
3    A.  -- the CIRT investigation?
4    Q.  Yes.
5    A.  Would it surprise me?
6    Q.  Yeah.
7    A.  No.
8    Q.  Why not?
9    A.  I don't know how I would answer that.  Can
10   I --
11   Q.  I want you to speak -- yeah, you answer it
12   how you want to tell me.
13   A.  Well, I -- I believe -- I'm trying to
14   think how I would -- how I would phrase this is, how
15   did, one, CIRT come to that conclusion?  What did
16   they use to base their conclusion -- what did they
17   use, right?  The information.  And who did they
18   obtain that information from?  Because there's
19   varying -- varying sorts of opinion.
20       I mean, you can ask anybody in the
21   tactical SWAT world, search warrant world, and there
22   are 1,000 ways to do everything.  So for them to
23   come up with that conclusion?
24       Actually, I believe it's more of a
25   recommendation than it -- than an actual conclusion,

51

1    which is something they could certainly recommend,
2    right?  I mean, you could find -- you could find
3    fault in almost anything.  But I would question how
4    they came to that determination.
5    Q.  Okay.
6    A.  So...
7    Q.  And you tell me if I'm right or wrong.  As
8    I'm kind of reading you and hearing your answer, are
9    you aware of some of the recommendations or
10   conclusions that CIRT came to?
11   A.  I am.
12   Q.  Do you think that they're unfair or
13   biased?
14       MR. ANDERSON:  Objection, form.
15       Go ahead.
16       THE WITNESS:  I think they could have been
17   done better.
18   BY MS. MURPHY:
19   Q.  And what does that -- what does that mean
20   to you?  If you could explain to me what you mean by
21   that.
22   A.  Well, obviously, being, you know, an
23   involved officer, I had to go through that entire
24   process, right?  Which is fairly lengthy and it's --
25   it's extremely detailed and in depth.

52

1        And these recommendations were based off
2    of a couple different factors.  Mainly department
3    policy, right, SOPs, operating procedures.  And then
4    the SMEs, Subject Matter Experts, which I disagree
5    with some of the ones that they -- the department
6    had used or brought in to make those
7    recommendations.
8    Q.  Do you feel that they unfairly assessed
9    your guys' actions as the officers with their actual
10   feet on the ground?
11   A.  I wouldn't say unfairly.  I would say
12   incorrectly.
13   Q.  Okay.
14   A.  And then I'll just add to that -- let me
15   add to that.
16       Just because I -- you know, I said
17   incorrectly.  But, the reason why is, this -- this
18   type of job requires a high level of skill, a high
19   level of training, and it's consistent training.  So
20   when you leave that environment, even for a short
21   period of time, things change very quickly.  So, if
22   you're not involved in that, let's say, for a period
23   of a year.
24       My situation, I left last year.  I come
25   back, there would be quite a bit of things for me to

53

1    catch up on, where I feel I wouldn't be a subject or
2    expert any more because the tactics change, the
3    situations change, the rules change.  There's a lot
4    of varying things to make, you know, an opinion and
5    conclusion of kind of what they -- what was
6    ultimately founded, I guess.
7    Q.  Okay.  And this is my understanding of
8    what you just said to me, and you tell me if I'm
9    right or wrong.
10       Do you think that some of the SMEs that
11   they brought in were a little out of touch with how
12   things needed to be done on the day that you served
13   that warrant?
14   A.  Yes.
15   Q.  Okay.  And I'm sorry, I should have asked
16   this before.
17       In your career in SWAT, how many warrants
18   do you think you've served?
19   A.  Probably well over 1,000.
20   Q.  And how many do you think were -- if you
21   can just give me a rough estimate, how many of those
22   were the -- were the CET entry?
23   A.  60 percent.
24   Q.  So this type of CET entry was something
25   that you were very comfort- -- and you tell me if

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  I'm right or wrong. This is something that you were
2  very well versed in and very comfortable doing,
3  correct?
4      A.  Yes.
5      Q.  As much as you're comfortable doing your
6  job, which is uncomfortable.
7      A.  Yes, yeah.
8      Q.  All right. I've kind of asked you some
9  basic questions, and I said I was going to talk
10  about the actual thing that happened. Now I'm going
11  to get to the actual thing that happened.
12      A.  Okay.
13      Q.  So you got -- you got the -- you received
14  notification about the warrant, you weren't on the
15  recon team, and so then you show up to Sam's Town,
16  correct?
17      A.  Uh-huh.
18      Q.  Can you kind of walk me through that?
19      A.  So, show up -- showed up to Sam's Town.
20  Kind of normal. Get there, you know, 15 or so
21  minutes before the briefing, the briefing time.
22  Which is typically a hard time.
23          The recon officers will have, you know,
24  the information just kind of written out on a couple
25  butcher block sheets of paper. You know, you'll

55

1  have the -- the kind of overall info, you know,
2  location, address, all that, the number. Some of
3  the details.
4          They'll have a -- they'll do a -- like a
5  rough sketch of the area where we're going, you
6  know, the structure and stuff like that, the
7  surrounding landscape.
8          And then the third one will be essentially
9  the plan, more or less, where you're at, what your
10  job is, and what you're doing.
11          So showed up, take a look at that, see
12  where I'm at, see what I'm doing. From there,
13  depending on what it is, I'll go prep whatever
14  equipment I need to prep for that specific job. And
15  then we'll -- we'll conduct the briefing.
16      Q.  And so for this one specifically where you
17  went at Sam's Town, you got there 15 minutes early,
18  and then can you walk me through your memory to
19  the -- as you remember it today, kind of the
20  briefing that you got, the outline you got, and what
21  your role on the -- like, what your duties were
22  going to be.
23      A.  Yeah. So, from what I recall is, it was a
24  homicide-related investigation. And we were serving
25  a controlled entry warrant at 3050 Nellis, which

56

1  we're up and down Nellis pretty regularly, so it's
2  a -- it's a common area, a common style apartment
3  complex.
4          And then I was assigned as the shield
5  officer for the window team, or the stun stick team,
6  which is a win- -- the window -- window, slash, stun
7  stick team. So I knew in that situation I'd be
8  carrying a shield and a pistol, and I'd be providing
9  coverage for Officer Bertuccini, who was actually on
10  the -- the actual stun stick.
11      Q.  And, so -- and I just want to confirm, you
12  said -- because I was going to ask you this, but I
13  just want to confirm, like, you're familiar with
14  this area, correct?
15      A.  Yes.
16      Q.  Had you -- do you -- do you know if you
17  served any other search warrants in this apartment
18  building before? Obviously not this apartment, but
19  this apartment building?
20      A.  In that complex? Probably -- likely.
21  Yeah. Not 100 percent.
22      Q.  And I should have asked this before. Is
23  this the only officer -- have you been involved in
24  any other officer-involved shootings?
25      A.  As?

57

1      Q.  As an officer?
2      A.  The one shooting?
3      Q.  Other than this one, January 10th, 2022,
4  have you ever been involved in any other
5  officer-involved shootings?
6      A.  No.
7      Q.  Okay.
8      A.  But present for quite a few. Yeah.
9      Q.  Okay. To the best of your memory, can you
10  tell -- when was the nearest one that you were
11  involved in to this incident? And sorry, sorry, let
12  me -- let me clarify. Because I think -- and you
13  tell me if I'm right or wrong, if I'm understanding
14  this correctly.
15          You're talking about, if I understand it,
16  you're making a distinction between being on a team
17  but not pulling the trigger; is that correct?
18      A.  Correct, yes, yeah.
19      Q.  Okay. So yeah. You've been -- you've
20  been on the team where there has been an
21  officer-involved shooting, but this is the only one
22  where you discharged your weapon?
23      A.  Correct, yes.
24      Q.  Okay. Can you tell me about the other
25  instances where you were on the team but you were

James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

```
1    not the one that discharged your weapon?
2        A.  Several.
3        Q.  And if you could --
4        A.  Yeah.
5        Q.  Sure.  If -- and I understand that some of
6    this stuff is nearer and closer in time.  When you
7    say several, could you give me a range?  Is that
8    between, like, five and ten?  Is that two to three?
9    If you could give me kind of a range.
10       A.  Probably five to ten.
11       Q.  Okay.
12       A.  I believe.  Somewhere around there.  Yeah.
13       Q.  And were you -- for the -- for when you
14   were present for other officer-involved shootings as
15   you were part of the team, was that always when you
16   were on SWAT?
17       A.  Yes.  Yeah.
18       Q.  Okay.  And can you tell me if you can
19   remember, the nearest one in time to this incident?
20       A.  Nearest one in time.
21       Q.  The nearest one -- actually, let me -- let
22   me back that -- strike that.  Let me ask this
23   instead.
24           Do you remember the one that occurred
25   closest in time before this?
```

59

```
1        A.  Closest in time before.  January of '22.
2    I don't.  I know, sorry.  They're all kind of
3    blending in with the time frames.  I can't --
4        Q.  Okay.
5        A.  I can't say with 100 percent certainty.
6        Q.  And I don't need you to say with
7    100 percent certainty.  Just about this, if you
8    could, to the best of your memory, tell me -- maybe
9    we don't do before or after.  If you could just tell
10   me the other officer-involved shooting that you were
11   present for closest in time to this one.
12           And I don't need -- you are excellent at
13   giving very exact details in your answers.  You
14   don't have to give me that exact detail.  If you can
15   just give me your best estimate, that's what I'm
16   asking for.
17       A.  I know there was one in November.  I can't
18   recall if it was the year prior or the year after.
19   Hostage rescue thing.  Guy murdered a couple people,
20   had a hostage in a vehicle.  We ended up tracking
21   him down and kind of boxing the vehicle in and --
22   and the truck that I was in, my partner jumped out
23   and ended up getting involved in the shooting.
24       Q.  Okay.  And let me ask you if -- were
25   any -- and I think it's fair to say that that's
```

60

```
1    probably -- that's a different type of scenario than
2    what happened here.
3        A.  Correct.
4        Q.  Right.  And so let me ask you, if you can
5    remember, do you remember if any of the
6    officer-involved shootings that you were present for
7    involved service of a warrant?
8        A.  I think that could be -- so, service of a
9    warrant.  I mean, we --
10       Q.  And I'm a layperson, so --
11       A.  Yeah.
12       Q.  -- if I'm --
13       A.  So we have to have --
14       THE REPORTER:  Excuse me.
15       THE WITNESS:  Oh, sorry.
16   BY MS. MURPHY:
17       Q.  She can't us take down both --
18       A.  Got you.
19       Q.  -- at the same time.
20           But if I'm using the wrong terms, feel
21   free to correct me or clarify it.
22           Sorry, go ahead.
23       A.  Are you asking in the instance of a CET or
24   a Surround and Callout?
25       Q.  Let me ask a CET first.
```

61

```
1        A.  Okay.
2        Q.  So, were you present, or do you remember
3    were you present for an officer-involved shooting
4    that involved a CET entry?
5        A.  No.
6        Q.  Okay.  What about a Surround and Callout?
7        A.  Yes.
8        Q.  Okay.  Can you walk me through what
9    happened in that?
10       A.  That one.  Give me a second; let me think
11   about it.  I believe it was a barricaded subject who
12   was shooting at -- that would have been -- I take
13   that back.  I'm getting -- I'm getting confused.  It
14   would have been -- that would have been a barricaded
15   person, so that would -- that would have been a call
16   out, not an actual warrant.  But it's -- we have to
17   have a warrant first before we can typically do
18   anything.  So that's -- yeah.
19       Q.  Even --
20       A.  My confusion.
21       Q.  No, no, no, that's okay.  And listen, I
22   know that we're talking about stuff that happened
23   years ago.  And so I'm just asking for your -- you
24   know, for the -- for your best memory.
25           And so the barricaded -- so if somebody
```

Case 2:24-cv-00074-APG-NJK    Document 55-11    Filed 05/16/25    Page 19 of 41

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1  was barr- -- had you been -- had your team been
2  trying to serve a warrant?  And the person
3  barricaded themselves in as a result?
4      A.  This was -- been more of a -- patrol would
5  have called us.  Because they were dealing with it,
6  yeah.  They were trying to take somebody into
7  custody or trying to apprehend somebody who then
8  became barricaded and then started shooting.
9      Q.  Okay.  And then SWAT gets called in for
10  that, correct?
11      A.  Correct, yeah.  Yeah.
12      Q.  And my understanding, in terms of the
13  service of the warrant, if you are not on the recon
14  team, you don't -- do you get much information about
15  the warrant itself?
16      A.  No.
17      Q.  Okay.
18      A.  Just an overview.
19      Q.  And is -- if -- this is my understanding,
20  and you tell me if I'm right or wrong.
21          The purpose of SWAT is to kind of just go
22  in there, serve the warrant, and then the detectives
23  come in after, correct?
24      A.  Correct, yeah.
25      Q.  And so, in this instance, did you know

63

1  what the warrant was seeking?
2      A.  I don't -- I don't remember.
3      Q.  Okay.  In this instance, was it your
4  understanding that one or both of the suspects could
5  be present in the apartment?
6      A.  Yes.
7      Q.  Okay.  And what was your -- how did you
8  come to that understanding?  One or both?  Was it
9  one or both?
10      A.  I believe it was looking -- again, details
11  are a little foggy.  Because I know we -- so
12  typically when we do do the briefing for the
13  warrants, we'll have a detective from the
14  investigative unit come out and kind of give us a
15  rundown.
16      Q.  Was a detective present at this briefing
17  at Sam's Town?
18      A.  I believe he was.
19      Q.  Okay.
20      A.  So, depending on what unit it is and the
21  detectives, some of those briefings are very good
22  and thorough; some are very generic, broad
23  overviews.  Typically homicide is -- is more generic
24  and broad.  Hey, we're looking for, you know, this
25  person or that person or these people related to a

64

1  homicide investigation.
2      Q.  Okay.
3      A.  Or evidence of the homicide.  That's
4  usually what we're told.  So...
5      Q.  Which -- and this is just out of -- out of
6  curiosity.
7          Which areas of LVMPD would give you more
8  detailed rundowns?  Like, which units?
9      A.  Narcotics typically give very -- very
10  detailed information.  Patrol station, Flex teams,
11  also.
12      Q.  What's a Flex team?
13      A.  PSU, Flex.  It changes names throughout
14  the years.  So, like, a plain clothes investigative,
15  street enforcement teams.
16      Q.  And so just to confirm, because you talked
17  earlier that -- that you have now -- you're now on
18  Internal Affairs, and you wouldn't be comfortable
19  coming back, even for the short time that you've
20  been gone, you wouldn't be comfortable coming back
21  and commenting on how a SWAT unit did something,
22  correct?
23      A.  I don't feel, no, no.  That I...
24      Q.  Okay.  And so is it fair for me to assume
25  that as part of your duties as a sergeant in IA, you

65

1  no longer serve search warrants?
2      A.  Correct.
3      Q.  All right.  Okay.  So, in this case, do
4  you remember the homicide detective being there
5  specifically, or do you just think I assume he was
6  there?
7      A.  I believe there was one there.
8      Q.  Okay.
9      A.  I believe there was.
10      Q.  Okay.  And, to confirm, so was part of the
11  intention, as you understood it, of serving the
12  search warrant to apprehend either one or both of
13  the murder suspects?
14      A.  Yes.  I believe we were going for a
15  suspect and a -- evidence related to a homicide.  So
16  a firearm.
17      Q.  Did you have an understanding if this
18  search warrant was an arrest warrant and a search
19  warrant for property, or did you have -- did you
20  have any understanding of that?
21      A.  I just know it was a search warrant for
22  anybody in the premise, property, that's it.
23      Q.  Okay.
24      A.  I didn't ask specifics.
25      Q.  But the purpose of -- was your



James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1  understanding, as you were given that briefing at
2  Sam's Town, that part of the purpose of serving the
3  warrant was also to apprehend the suspects?
4      A.  Well, we would take anybody that's --
5  that's present into custody.  So whether you were
6  involved or not, you're getting taken into custody.
7  And that's for the investigative unit, once we turn
8  it over then, to determine, hey, we have our suspect
9  we're looking for, or this person is not related.
10  Let's go ahead and send them on their way.
11      Q.  And so then explain to me, what's the
12  difference, then, between a search warrant and an
13  arrest warrant?
14      A.  So, arrest warrant, you're looking for
15  somebody specifically.  A search warrant is giving
16  you that authorization to go into the premise to
17  look for that person, look for evidence.  I mean, it
18  could be --
19      Q.  And then if you --
20      A.  -- numerous factors.
21      Q.  Right.  And then anyone who's there is
22  going to be detained, correct?
23      A.  Correct, yeah.
24      Q.  Okay.  So just to loop back to my prior
25  question, then, was part of your understanding of

67

1  the purpose of serving the search warrant was to
2  apprehend the suspects in this murder?
3      A.  You could get technical and say that, yes.
4  Yeah.
5      Q.  Okay.  We are getting technical.
6      A.  Yeah.  I mean, we could say, yeah, that
7  anybody involved -- anybody -- the way I understood
8  it, anybody -- or -- there was a person inside that
9  apartment that was involved in a potential homicide
10  investigation.
11      Q.  Okay.
12      A.  So, yes.
13      Q.  And so as we sit here today, do you
14  understand that nobody involved in the homicide was
15  present in that apartment?
16      A.  I found that out later, yes.
17      Q.  Okay.  Were you -- what was your position
18  when you found that out later?  How did you react to
19  that?
20      A.  React?  As?
21      Q.  What was your feeling about it?
22      A.  I actually thought it was weird we didn't
23  find anybody involved.  The homicide we were going
24  there for, because we ended up taking gunfire.  We
25  had an officer shot.  We ended up shooting and

68

1  killing a suspect.  So that typically never happens
2  in those type of situations.
3      Q.  Well, to be clear, Mr. Williams was not a
4  suspect in this homicide, correct?
5      A.  Correct.
6      Q.  Okay.  He wasn't a suspect in any kind of
7  homicide, correct?
8      A.  No.  But he shot at the police.  Yeah.
9      Q.  Right.  And so I'm skipping ahead a little
10  bit.  But, also, there was no evidence related to
11  this murder recovered at this residence, either, was
12  there?
13      A.  I don't -- I'm not -- I don't know if
14  there was or wasn't.
15      Q.  Okay, okay.  If I were to represent to you
16  that no evidence related to this homicide was
17  recovered at this residence, would you also qualify
18  that as weird?
19      A.  I wouldn't -- no.  No.  Because the other
20  thing that I understood, it was -- it was a
21  flophouse, so a lot of people came and went and kind
22  of used it to transition through.  So, typically,
23  when that happens, people take everything they bring
24  with them, they take it with them.  Because if they
25  leave it, it's going to disappear.

69

1      Q.  And when did you learn that this was a
2  flophouse?
3      A.  I believe that was said during the -- the
4  briefing.  Is they knew that -- they knew people
5  were transitioning in and out of the apartment.  I
6  believe on the recon, they said when they were out
7  on the recon, they observed people standing out
8  front.
9          So, I think it was a one- or two-bedroom
10  apartment, which those places -- typically -- if
11  you're not on the lease you're not supposed to be
12  there.  So not saying you can't have people over.
13  But what I gathered is, it was -- people were coming
14  in and out of the apartment, staying there, that
15  probably weren't associated with the apartment.
16      Q.  And if I understand correctly, and you
17  tell me if I'm right or wrong, there was actually
18  two apartments that they intended to serve search
19  warrants on, correct?
20      A.  Yes.  I believe we were going to serve a
21  warrant on the first one and then go to a second
22  one.
23      Q.  Were you going to be involved in the
24  second one?
25      A.  I don't think I was, actually.  I think

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1  they had enough manpower -- yeah, I think they had
2  enough manpower, where they were actually going to
3  send Officer Bertuccini and I home. They were going
4  to keep the other officer that came in with us.
5      Q. And so when you qualified this as a
6  flophouse and that your memory is that somehow that
7  was relayed to you during this briefing, was that
8  relied to you about this apartment or the second
9  apartment?
10     A. We only talked about this first apartment.
11 We didn't -- we didn't brief or plan or go over the
12 second apartment. We would have done that after we
13 handled this one.
14     Q. Okay. So your testimony here today is
15 that the briefing at Sam's Town only involved this
16 apartment, not the second --
17     A. Correct.
18     Q. -- apartment? Okay.
19     A. We were told there was a second apartment
20 that we would handle after this one was secured and
21 handled.
22     Q. Okay. So, we've come up to the point
23 where -- where you've done the briefing at Sam's
24 Town. And it's your testimony here today that you
25 were relayed information that this was some type of

71

1  flophouse and that there might have been people
2  standing out front, correct?
3      A. Uh-huh.
4      Q. And it's your memory as we sit here today
5  that only information about the apartment, the first
6  apartment, was gone over at the briefing, correct?
7      A. Yes.
8      Q. Okay. And that it was -- just to confirm,
9  it was your understanding -- it was relayed to you
10 that likely, the suspect from the murder that they
11 were investigating would be present at this first
12 apartment, correct?
13     A. Correct.
14     Q. Okay. And also just to confirm, in fact,
15 that suspect was not present, correct?
16     A. I believe after they (indiscernible).
17        THE REPORTER: You believe after?
18        THE WITNESS: After he wasn't -- that he
19 wasn't.
20 BY MS. MURPHY:
21     Q. And -- sorry. And so let me ask your
22 opinion, because you talked about it a little
23 earlier. You said look -- you tell me if I
24 misunderstood your testimony. You said, hey, look,
25 with a flophouse, people don't leave stuff behind,

72

1  correct?
2      A. Uh-huh.
3      Q. Okay. So it was your understanding based
4  on this briefing that it was going to -- it was a
5  flophouse. But the intention of the warrant as you
6  understood it was to obtain evidence related to a
7  homicide; is that -- or did you not have any
8  understanding of that?
9      A. Any I understanding of?
10     Q. What the intent of the warrant was.
11     A. As far as evidence --
12     Q. Yeah.
13     A. -- goes?
14     Q. Yes.
15     A. I don't believe so. I just -- I know -- I
16 know for a fact we were serving a warrant on this
17 apartment related to a homicide. Whether --
18 whatever evidence was listed, I -- I don't recall.
19        So -- and then same with the suspects.
20 They'll some -- we'll typically have detailed
21 suspect information. But at the end of the day,
22 that really doesn't concern me. Because as the SWAT
23 team, we're going to take everybody that's --
24 everybody that's in that premise can be taken into
25 custody under the search warrant. So we're going to

73

1  take those people into custody and we're just going
2  to hand them over to the detectives. And that's
3  their job, then, to figure them out. So whether
4  there was one person in there or 15, we're going to
5  take everybody. Because our job is to make the
6  scene safe and then let them determine it. So, the
7  way that I would look at it would -- would be that
8  way.
9      Q. Okay. All right. So now we've gone
10 through what occurred at the -- at the Sam's Town
11 briefing.
12     A. Okay.
13     Q. If you can kind of walk me through what
14 happened following the briefing. And like -- I
15 mean, I made the offer again, do you want to take a
16 quick break? Because I know this will be a long,
17 long dialogue.
18        THE REPORTER: I would.
19        MR. ANDERSON: She's all that matters.
20        MS. MURPHY: The queen has spoken.
21        THE VIDEOGRAPHER: Off record at 11:28.
22        (Off record.)
23        THE VIDEOGRAPHER: We are back on record
24 at 11:39 a.m.
25 ...



James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1  BY MS. MURPHY:
2      Q.  Prior to taking our short breaks, we had
3  gone through the briefing at Sam's Town.  And now if
4  you could kind of walk me through what happened --
5  and we can break it up however you want, or if you
6  want to go through the whole dialogue, that's fine.
7  But if you want to -- so the briefing's concluded at
8  Sam's Town, and then what happens?
9      A.  After the briefing, at that point --
10     Q.  Sorry, I will try not to interrupt you
11  going forward.
12         We're going to review the body-worn camera
13  footage, too, so I'm not trying to do a memory test
14  to you, I just want you to walk me through --
15     A.  That's fine.
16     Q.  -- and then we're going to review the BWC
17  too.
18     A.  Very simple.  After the briefing, we'll --
19  we'll typically go load -- or help load up any
20  equipment that we need to bring along.  Bring a lot
21  of standard equipment with us and stuff.
22         I think in this situation, or in this
23  specific instance, we were taking my vehicle, my
24  SWAT vehicle, my SWAT truck, Bertuccini and I.
25         So we dressed out, loaded up, loaded our

75

1  equipment up in my truck, and then we kind of have
2  a -- you know, a little vehicle package that leaves
3  Sam's Town.  So we're -- we're briefed the route and
4  which way we're going, how we're getting there, you
5  know, where our -- where we're turning, where we're
6  stopping and all that.
7         I remember we left Sam's Town, came out,
8  went -- where did we go?  Right -- northbound right
9  on Nellis, right into the apartment complex.  We
10  pulled in to the left, went down a couple hundred
11  feet, parked the truck, stopped, got out.  From
12  there, went to get out --
13     Q.  Sorry, what -- and I said I wasn't going
14  to interrupt you and I'm interrupting you.  But what
15  does "dressed out" mean?
16     A.  So, we'll throw on our -- you know, our
17  vest, helmet, you know, get any of our -- you know,
18  make sure our weapons are good, you know, everything
19  is loaded.  Make sure the -- basically, all our
20  equipment is good, right?  We have all our equipment
21  on, all the stuff that we need.  You know, whether
22  that's personal equipment or team equipment,
23  basically.
24     Q.  And you said that there will be a car
25  package.  I think I know what you meant by that, but

76

1  can you explain that to me?
2      A.  I believe in this incidence we had what --
3  we had one of the armored vehicles with us, so we'll
4  typically have one of those vehicles that will lead,
5  followed by the other trucks, right?  So -- because
6  in this instance -- I can't remember how many
7  officers we had, but we didn't have enough to fit in
8  the armored vehicle.
9      Q.  You mean you had too many to fit in there
10  or not enough?
11     A.  I wouldn't say that.  I'd say it's
12  probably between the equipment and you typically
13  ride on the outside of it.  So we don't like to
14  overload that in case, you know, get in an accident
15  or somebody hits us --
16     Q.  Sorry, maybe I misunderstood.  When you
17  said -- you meant that you had too many for everyone
18  to ride in the armored vehicle, right?  Or you had
19  too --
20     A.  Yeah.  There was just -- yeah, too many
21  officers.  I mean --
22     Q.  All right.
23     A.  -- we fit -- try to fit six or eight on an
24  armored vehicle, which isn't a lot.  But everybody
25  else -- because we -- I think they only -- we only

77

1  brought one armored truck -- typically bring two.
2  So -- but in that case, we had -- some of the other
3  plain SWAT vehicles like mine, just plain, unmarked
4  truck.  And then we usually have K-9 with us in
5  their vehicle, because they have the dog in the
6  back.  And then medical, so AMR, medical --
7  whatever, community ambulance.  And then the
8  detective vehicles will -- will trail behind.  So
9  that's kind of the vehicle package.
10     Q.  Okay.  And I thought I knew what you meant
11  by that, but I just wanted to make sure.
12     A.  No, no worries.
13     Q.  So, sorry.  Keep going.  So you guys
14  arrived, right?
15     A.  Yeah.  So we get there, park the truck, we
16  get out.  Grab the equipment out of the back seat
17  because it's kind of big and cumbersome.  Can't
18  drive holding it.  We get that.  From there, we'll
19  all kind of just line up real quick.  And we
20  already -- everybody kind of already knows their
21  place, where they're going.
22         So we'll get lined up in that kind of
23  order, right?  So, yeah, like, your -- your breach
24  team first, then your entry team, and then your
25  containment teams on the side or in the back.  Just

James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

1  depend on which -- where we're going exactly.
2      So from there, we'll just kind of line up
3  in the order that we need to go. So once we get to
4  where we're going we can -- everybody is, like --
5  breaks off into their respective spots.
6      So we do that. And then we start our
7  approach on foot to the target --
8      Q. Sorry, let me just stop you right there.
9  I want to ask. And I think I know what you mean by
10  these terms, but I just want a clean record.
11     A. Sure.
12     Q. What's the breach team?
13     A. The breach team. Whoever is going to open
14  the door, break the window, that kind of thing.
15     Q. And what's -- so I'm going to ask you the
16  difference, what's the difference between that and
17  the entry team?
18     A. So, the breach team, their sole
19  responsibility is to gain the access, right?
20  Whether that's ramming the door. In this case, ram
21  the door, right? And then they're not going to ram
22  the door and run in. They're going to ram the door,
23  move out of the way, let the entry team come in, and
24  by the time the last guy comes in, they're going to
25  fall in on the back.

79

1      Q. Okay. And then what's the difference
2  between the entry team and the containment team?
3      A. So, the containment teams are -- what they
4  are, kind of contain kind of the area. So the entry
5  team is the one actually going inside, the
6  containment team is holding the outer -- the
7  outside, more or less.
8      Q. And so what team, as -- I know you were
9  holding the shield and you were on a group with
10  Bertuccini. But were you part of the breach team,
11  entry team, or containment team?
12     A. So, that would have been the window --
13  we'll use different terms. That one was the window
14  containment team. So -- because we knew we were
15  going to window, we were going to take out that
16  window. But at the same time, we're going to
17  contain it, too. So -- you know, so nobody can jump
18  out of the open window we created.
19     Q. Okay. And I'm sorry, keep going.
20     A. No. So we get there. We start making the
21  approach on foot. And then we all break off in our
22  respective positions. And go -- go to work.
23     Q. Okay.
24     A. Wait for the plan to be initiated, more or
25  less.

80

1      Q. All right. And so -- and I'm going to
2  jump around a bit. I'm going to hold off on
3  going into the actual incident itself.
4      A. Sure.
5      Q. But as a result of this incident, did you
6  have to do, like, any counseling or therapy through
7  LVMPD?
8      A. After?
9      Q. Yeah.
10     A. Uh-huh.
11     Q. What did you have to do?
12     A. See a department psychologist.
13     Q. And how long?
14     A. How many visits did I have? I'm not sure.
15  Probably a handful.
16     Q. Okay.
17     A. Yeah.
18     Q. Maybe between five and six or somewhere in
19  that range?
20     A. Probably in that range, yeah.
21     Q. Okay. And did you have any emotional
22  impact or effect as a result of being involved in
23  this officer-involved shooting?
24     A. No.
25     Q. Okay.

81

1      A. No.
2      Q. All right. So, I'm sorry. So, you're --
3  if you can actually talk me through, you guys get up
4  to the unit. And --
5      A. Uh-huh.
6      Q. -- you -- you and Bertuccini are on what
7  you described to me as kind of a containment team,
8  right? Even though technically you are kind of
9  breaching the apartment, too, because you're --
10     A. Correct.
11     Q. -- yeah, you're breaking the window. And
12  so if you can kind of walk me through -- and so the
13  window was on the side of the apartment, correct?
14     A. Correct.
15     Q. Like, along the wall. You guys weren't
16  standing next to the door, correct?
17     A. Right. It was, like, kiddy corner to the
18  door, yes, on the other side.
19     Q. Perfect. It was on the other side.
20     A. Right.
21     Q. Okay. All right. So, sorry, go ahead.
22     A. That's -- we take our respective
23  positions, and -- I mean, sometimes the plans, in
24  this case, too, the plan was being started as we
25  were getting to our final position.

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1    Q.  So what does that mean?  What did -- the
2  plan is getting started as we get to our final
3  position?
4    A.  So we will -- they'll make a determination
5  of how the plan will start.  I know in this instance
6  it was, hey, as soon as we land, when we say land,
7  that means we're getting there, right?  So as soon
8  as -- as soon as the breach team lands, so that
9  means the breach team is there at the front door and
10 they're getting prepared to use the ram and hit the
11 front door, the entry team is already stacked up.
12 So, hey, as we land, we're going to give out the
13 announcements.  So bullhorn, hey, it's Metro police,
14 you know, give the address, location, whatever, or
15 yell out, police with a search warrant.
16        They'll -- we'll kind of hustle around if
17 we're not already there, but make sure we're in our
18 position.  And then I believe in this incidence, it
19 was on the -- I actually can't recall exactly, but I
20 believe it was on the second -- it's typically the
21 second or third announce is when we'll deploy our
22 little two-man plan with Officer Bertuccini and I of
23 inserting the stun stick into the window, breaking
24 out the window.  And then I would step in with the
25 shield and cover the window.

83

1        So that kind of all came fairly quick,
2  right?  So as -- I think -- as we were walking up
3  they started initiating the plan of, hey, we're
4  going to give out the police -- search warrant,
5  police search warrant, we hear that twice.  We enact
6  our plan, they ram them door, go in.
7    Q.  And so I read, you know, quite a bit --
8  I've read a lot of different interviews.  I know
9  you've only read your interview.
10        But what keeps coming up as I read these
11 is that the -- if I understand it correctly, kind of
12 the -- like, what was agreed or what your normal
13 course of action was, is that you guys had to wait
14 two announcements and then you could start the
15 breach, correct?
16    A.  Okay.  Is it -- is it two?  I -- it's
17 usually two to three, yeah.
18    Q.  Okay.  And so -- and that was, like, no
19 matter how fast those two or three announcements
20 comes out, that was kind of what you guys would wait
21 for, right?  Is, like, okay, wait for at least two
22 or three announcements and then we breach, correct?
23    A.  Uh-huh.
24    Q.  Okay.  Sorry, keep going.  So you're up at
25 the -- so you --

84

1    A.  Yeah.
2    Q.  Okay.  So if I understand kind of what
3  you're telling me, was that you kind of heard, like,
4  what, like a couple -- you heard two announcements
5  and then what happens?
6    A.  We enact -- we enact our plan.
7    Q.  Okay.  And tell me in this case
8  specifically, describe to me what your plan was and
9  how you enact -- or describe to me the enactment of
10 your plan.
11    A.  For Officer Bertuccini and I?
12    Q.  Correct.
13    A.  Okay.  So, on the second announcement,
14 that means he was going to break the window with the
15 stick, right?  Insert it, and then deploy it, right?
16 So get the distract device to go off.  And then at
17 the same time, he'll use that same stick and pull
18 the window out, like, the window coverings, you
19 know, the curtains, stuff like that.  Whatever -- I
20 think -- I think there was mini blinds, in there
21 pull those down at the same time.  Get a majority of
22 the glass out of the window.
23        And then he'll move back, and then I --
24 I'll step in with the shield.  Because I know the
25 team is also -- excuse me -- coming in as well,

85

1  right?  So I have the shield, so there's not -- you
2  know, we can mitigate the crossfire issue of anybody
3  getting hit with crossfire.
4        And then, essentially, I'll fill the
5  window with the shield more or less, and see, you
6  know, what's going on in this case, you know.  In
7  this instance, as soon as he pulled out of the
8  window and I stepped up, there was gunfire going
9  off.
10    Q.  Okay.  And how -- how big is the shield?
11    A.  It's 24 by 36 inches.
12    Q.  How heavy is it?  You don't have to know
13 exact weight.  If you could just kind of describe
14 it.
15    A.  Ten to twelve pounds.
16    Q.  Okay.
17    A.  Yeah.
18    Q.  And I'm going to ask you, when I was
19 reading your CIRT interview, you said, then I
20 stepped up with the shield.  I just kind of laid it
21 off.  I didn't fill the window completely, which I'm
22 glad I didn't.
23    A.  Uh-huh.
24    Q.  Why were you -- and I really want to know,
25 why were you -- I didn't understand that statement.

Case 2:24-cv-00074-APG-NJK    Document 55-11    Filed 05/16/25    Page 25 of 41

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86

1  Why were you glad you didn't fill the window
2  completely?
3      A.  So, when I say "fill the window", I don't
4  mean, like, actually replacing the window with the
5  shield.  I mean just -- presenting the majority of
6  the shield in the window, right?  Because the goal
7  is, is the shield has a little view port in it,
8  right?  Is to look through there to see, you know,
9  what's going on, right?  In this case, it was taking
10  gunfire.
11      So, had I been up to the window where
12  Williams was, because he turned back and fired at
13  me, which the shield was struck by his gunfire.  Had
14  I been -- I was kind of can- -- my body was kind of
15  canted.  Had I been, like, traditionally standing up
16  in front of it like this, instead of more like, you
17  know, standing off to the side position, I would
18  have been struck by his gunfire.  So that's what I
19  meant when I made that statement.
20      Q.  And we'll go through it, too.  But --
21  because you just mentioned it -- I kind of wanted to
22  get some clarification on that.
23      Reading your prior interviews, it wasn't
24  clear to me, did you feel that Williams was shooting
25  at you specifically, or did you feel like he was

87

1  just arcing his gun?
2      A.  He shot at me specifically.  Because I
3  could see the muzzle flashes from his gun.  That
4  means he's shooting -- shooting at me.  Plus, I
5  could feel the bullet hit the shield.
6      Q.  Right.  I guess my question is a little
7  bit different.  I don't mean is he shooting at
8  your -- in your direction.  You talked about turning
9  your light on and off and how you thought that drew
10  his attention to -- in that direction -- in your
11  direction, correct?
12      A.  Yes.
13      Q.  So when I say shooting at you directly,
14  what -- I guess what I'm trying to dial in a little
15  bit more is, do you feel that he was shooting at you
16  specifically as an officer, or do you think that he
17  was just shooting around, and then also the light of
18  your gun distract -- pulled his attention?  Do you
19  understand the difference I'm making?
20      A.  I mean -- yeah, we kind of -- really lead
21  up to that point with the whole light coming on and
22  off type thing.
23      Q.  Right.  I jump around.  Thank you for
24  bearing with me.
25      A.  But -- I don't know what his intent was.

88

1  I would -- if I had to guess, and this is my guess,
2  is the light did draw his attention and that's why
3  he turned.  And when I say turned, I mean, he was
4  laying on a couch.  All he had to do was move his
5  hand over.  So...
6      Q.  Right.
7      A.  And then shot out -- shot out at the
8  window where I was.
9      Q.  Right.  But you hadn't -- you hadn't --
10  you hadn't pulled your trigger of your gun at that
11  point in time, had you, when you just flashed the
12  light on and off?
13      A.  No.
14      Q.  Okay.  And thank you for bearing with me.
15  I know I jump around, but you mentioned it, so I
16  wanted to get to that.
17      A.  Okay.
18      Q.  So, you guys come up to the -- if you
19  could kind of walk me through.  You come up to the
20  window, you hear two announcements, and then -- I
21  know we've kind of covered it, but I'd like to hear
22  your whole narrative.
23      So you come up to the window, and then
24  please walk me through what happened.  At that point
25      A.  So I come up to the window.  At that point

89

1  the window is already taken out, Bertuccini has kind
2  of stepped back off to my back left.
3      Q.  Yeah, so, sorry.  I guess I was going
4  to -- I should have asked before.  Is he to your
5  left or to your right?
6      A.  Left.
7      Q.  Okay.  So he goes to the window, steps
8  back, and then you pull up, right?
9      A.  Uh-huh.
10      Q.  Is it -- I don't --
11      A.  Step up, walk up.
12      Q.  Okay.  So, sorry, go ahead.
13      A.  So I -- he steps out, I step up.  Because
14  of the distract device, when it goes off, especially
15  inside of a structure, it creates a lot -- you know,
16  it's designed to create smoke and flash and noise.
17  It creates quite a bit of smoke.  And where it's
18  deployed, that smoke is pretty heavy.
19      So, the vacuum effect or the air flow at
20  that time when they hit the front door open with the
21  window being broken, it created all that smoke to
22  kind of get pushed out of the window.  So as I
23  stepped up, I kind of was stepping up into the
24  smoke, of the distract device going off.
25      So I stepped up -- I could hear the

Case 2:24-cv-00074-APG-NJK    Document 55-11    Filed 05/16/25    Page 26 of 41

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90

1  gunfire, but I couldn't really see where it was
2  from. So I clicked on the light, the pistol that I
3  have has a light on it. I clicked it on and
4  immediately was blinded because of all the smoke.
5  So, that smoke, you know, dissipates real quick. I
6  mean, it -- you know, it's not like it hangs around
7  for ten minutes, right?
8          So, in that time from clicking my light
9  off, it -- or clicking it on and then clicking it
10 off, that's when I saw the muzzle flashes and felt
11 the shield getting hit. And I was, like, okay, the
12 guy is right here. He's right in front of me.
13         So, I -- and I knew the officers -- I had
14 seen them kind of come out and go -- you know, come
15 along this way in the apartment. So, I was able to,
16 you know, quickly realize, like, okay, he's right
17 here, kind of in this corner. So then I clicked
18 light back on the second time, the smoke had already
19 kind of dis- -- you know, cleared out, clicked on
20 the light, saw him shooting, and so I had to return
21 fire and shoot -- shoot back.
22     Q.  Okay.
23     A.  So...I ended up firing three rounds. And
24 then at that point, I -- I assessed that, okay, he's
25 not moving any more. He's deceased, right? So,

91

1  stop -- I stopped firing. I believe everybody else
2  did, too, at kind of the same time.
3          So at that point, I stayed in the window
4  because that's my job. Just kind of observe what
5  was going on real quick, make sure everybody was
6  good. I didn't realize anybody had really been shot
7  yet. So I know I had, right, the shield -- well,
8  the shield had that I was holding, so I kind of
9  stepped back real quick and look and -- I looked at
10 the shield, and I was, like, oh, man, you know, the
11 shield took a couple rounds.
12         And then I know Bertuccini and I asked,
13 hey, are you okay? Are you good? Let's check
14 yourself. Check yourself, cool. We both realized
15 we -- we weren't struck by gunfire.
16         And then after that, it's -- just the --
17 kind of the FIT and CIRT process that follows, you
18 know. And that's -- right? Treating the injured
19 officer, containing the scene, locking it down. You
20 know, kind of the police response to shootings,
21 right? You know, isolating the -- the officers who
22 shot, right, and all that.
23     Q.  Let's take -- let's kind of pause there,
24 and we'll get into the rest of it. I just want to
25 go back over -- I've got some photos and stuff like

92

1  that. We're just going to go over that stuff.
2          And so in terms of the shield -- hold on
3  one second. I'm going to tear this off. Okay. I'm
4  going to hand you pictures of what I understand are
5  the shield. If we could please mark these as?
6          THE REPORTER:  3.
7          MS. MURPHY:  3, Exhibit 3.
8          (Exhibit No. 3 was marked.)
9  BY MS. MURPHY:
10     Q.  And I know that you don't have a
11 photographic memory, but if I present this to you,
12 that this has been put in the report that this was
13 the shield that you used at the time of the
14 officer-involved shooting, is that consistent with
15 your memory?
16     A.  Uh-huh. Yes.
17     Q.  And it shows the -- I guess it's the
18 bullet point, it's marked as A1 right here. Do you
19 see that? Is that -- is that -- I'm assuming
20 they're trying to --
21     A.  Yes.
22     Q.  -- call that out.
23     A.  Yeah.
24     Q.  And so this is the shield, and that's
25 the -- they also called it out as the round impact,

93

1  correct?
2      A.  Yes.
3      Q.  All right. And then I'm going to ask --
4  this is another page from the report, and it's Bates
5  LVMPD 004271. We'll mark this as Exhibit 4.
6          (Exhibit No. 4 was marked.)
7  BY MS. MURPHY:
8      Q.  James, is this you?
9      A.  That's me.
10     Q.  All right.
11     A.  Yup.
12     Q.  And so when you said earlier "dressed
13 out", is this what you meant? You're -- I would
14 call it suited up, but...
15     A.  Yes, yeah.
16     Q.  And this is taken from the -- is this
17 photo taken from the day of the incident, to the --
18 do you know -- if you can --
19     A.  Yes, it was. Yeah.
20     Q.  And so this is all the equipment that you
21 were wearing on the day of the incident, correct?
22     A.  Correct.
23     Q.  Okay. And there's also a picture of a --
24 what I understand is a Glock 17 on here. Was this
25 your service weapon the day of this incident?

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1     A.   Correct.
2     Q.   And this is -- is this the weapon that you
3  discharged?
4     A.   Correct.
5     Q.   And you talked about the light that you
6  turned on.  Is this -- I mean, it looks to me like
7  a -- like a little flashlight underneath.  Is that
8  what you had turned on?
9     A.   Yes.
10    Q.   Okay.  Do you know what kind of flashlight
11 that is, by any chance?
12    A.   It's called a Modlite, M-o-n- -- or
13 M-o-d-l-i-t (sic).
14    Q.   And you seem to know about it pretty well.
15 Can you tell me, is there, like, something special
16 about that kind of light?
17    A.   It's just a higher quality light.
18    Q.   And you tell me if I'm -- what do you mean
19 by higher quality?  Sorry.  Like, brighter or more
20 focused?
21    A.   Just, knowing it, you know, through kind
22 of tactical industry, that it's a -- it's a
23 well-known brand.  Like, it's, you know, military
24 uses it, stuff like that.  Just a robust -- you
25 know, it's --

95

1     Q.   If I --
2     A.   You can drop it more than once.  Battery
3  life is good.
4     Q.   If I called this a military-grade light,
5  would you agree with that?  If you don't, that's
6  fine.
7     A.   I would say that they use it.
8     Q.   Okay.
9     A.   But, yeah.
10    Q.   Okay.  So is -- would it be fair if I said
11 that this is a light that is commonly used by -- by
12 either police officers or military; is that
13 accurate?
14    A.   Correct, yeah.  Uh-huh.
15    Q.   And does the gun -- I don't know anything
16 about the guns.  Does the gun come like this or do
17 you put it on there?
18    A.   No, the light and then the sight up there
19 on the top is after.  That's -- doesn't come with
20 the gun.
21    Q.   Okay.  And is it -- is this standard,
22 though, that they -- the police force for SWAT
23 modifies these Glocks like this?  Or is it just
24 for -- sorry, strike that.  Let me ask this again.
25       Is this standard for all officers, or is

96

1  this something special for SWAT?
2     A.   This is standard for Metro overall, yeah.
3     Q.   Okay, all right.  And then I'm going to
4  hand you some other photos, and I'm going to ask
5  that we mark this as Exhibit 5.  This is another
6  page with a photo of the actual -- I believe the
7  apartment building, and it's Bates LVMPD 004405.
8           (Exhibit No. 5 was marked.)
9  BY MS. MURPHY:
10    Q.   And this has been described in the report
11 as Officer Rothenburg's perspective.  Would you
12 agree with that?
13    A.   Yeah, yes.
14    Q.   Okay.  As we sit here today, and the
15 shield's sitting there, too.  As we sit here today,
16 is this the window that, to your recollection,
17 Officer Bertuccini had put the stun stick through
18 and then you put the shield --
19    A.   Yes.
20    Q.   -- in front of?
21       All right.  And so I see -- you tell me if
22 I'm right or wrong.  I see that the shield was still
23 there.  So when you left this area, you just left
24 the shield there; is that correct?
25    A.   Yes.

97

1     Q.   Okay.  Is that, like, standard protocol?
2  Like, if you would have a piece of equipment like
3  that and there's an officer-involved shooting, you
4  just leave it there?
5     A.   Yeah.  It was considered a piece of
6  evidence at that point, yeah.
7     Q.   Okay.  And I guess that's a better way for
8  me to ask that, is that was, like, is it normal,
9  something's considered a piece of evidence that you
10 just leave it on the scene?
11    A.   Yes.
12    Q.   But you didn't leave your gun on the
13 scene, did you?
14    A.   No.
15    Q.   Did you hand that over to somebody
16 immediately?
17    A.   Not initially, no.
18    Q.   Okay.
19    A.   But they did take it, yeah.
20    Q.   How soon after did they take it?
21    A.   Couple hours.
22    Q.   Okay.  And, so, we kind of walked through
23 the actual incident itself.  And like I've said a
24 few times, we're going to watch the BWC as well.
25 But if we can kind of -- we'll loop back to that.

Case 2:24-cv-00074-APG-NJK    Document 55-11    Filed 05/16/25    Page 28 of 41

James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1  If I can -- you can kind of tell me about what
2  happened in the hours after the incident.
3      A.  Okay.
4      Q.  So obviously -- not obviously.  But,
5  they -- just to confirm, you weren't on the breach
6  team.  You didn't go through the front door,
7  correct?
8      A.  Correct.
9      Q.  Okay.  And so everything kind of -- would
10  they -- would you call it securing the apartment?
11  As far as?
12      A.  As far as.
13      Q.  Like, everyone -- like, everyone is kind
14  of accounted for, Kubla's been taken out.
15      A.  Securing the area, yeah.
16      Q.  Okay.  So the area has been secured.  And
17  so then what happens then?
18      A.  At that point, we're just kind of waiting
19  for the notifications to be made to all the
20  respective investigative units.  This, I believe, is
21  five-something in the morning.  So they're probably
22  still -- I would assume they were still asleep.  So,
23  you know, have to wait for them to get up, get
24  dressed, respond to where we were at.  So it takes a
25  little while.
26      And then also with it being an

99

1  officer-involved shooting, they have to get, you
2  know, the criminalistic section out there, right?
3  CSI to come out and process the scene.  So, there's
4  interviews involved, there's body camera review.  So
5  it's a fairly lengthy process initially.
6      Q.  Okay.  And that occurs at the scene,
7  correct?
8      A.  Yes.
9      Q.  And so if you can remember, to the best of
10  your memory, if you can give me your best estimate,
11  too, approximately how long after the actual
12  officer-involved shooting did you remain on the
13  scene for?
14      A.  About six hours.
15      Q.  Okay.  And is it fair for me to assume
16  that that six hours kind of involved you getting
17  interviewed, providing evidence, them doing these
18  types of things?  Or tell me -- is that correct?
19      A.  Yes.
20      Q.  Okay.  Did they do things, like, did they
21  swab your hands for gun powder?  I really don't
22  know.  I'm asking.
23      A.  No.  So they'll -- I had to write -- you
24  know, I'm entitled to representation at that point.
25  So, I was waiting for my attorney to arrive.  He

100

1  arrived.
2      Q.  Is that a PPA attorney?
3      A.  FOP.
4      Q.  FOP, okay.
5      A.  FOP attorney.
6      In the meantime, they -- while waiting to
7  be interviewed, because they had -- you know, there
8  was quite a few officers involved, I believe I
9  conducted an interview with the Force Investigation
10  Team first, FIT.
11      And then from there, I waited -- they gave
12  me a Breathalyzer test, right, to see if I had
13  consumed any alcohol previously.  And then also
14  conducted a urinalysis as well.  They took that.
15  Then I met with the PEEP representatives,
16  employee -- Police Employee Assistance Program.  So,
17  talked to them.
18      And then I went and did the actual
19  criminalistics process, which -- that's when they
20  take -- take my handgun, right?  Take the handgun in
21  this case.  They took it, photographed it, wrote
22  down all the serial numbers.  They took all the
23  ammunition that I had, that I was carrying, and
24  counted it all down.  How many kind of bullets were
25  there, to make sure that, you know, I said I fired

101

1  three rounds, that three rounds were expended.
2      And then they noticed me for the
3  investigation, you know, for the -- the CIRT
4  interview and all that stuff.
5      And then released -- basically released me
6  back to SWAT, SWAT team, right?  So we had to
7  collect up all the equipment and stuff that we had.
8  And then leave -- leave the scene eventually.
9      Q.  Did you go back to work the next day or
10  did you have a certain amount of time off relative
11  to the -- being involved in the officer-involved
12  shooting?
13      A.  No.  They make you take time off, yeah.
14      Q.  Do you remember approximately how long you
15  took off?
16      A.  I believe I was off for close to six
17  months.
18      Q.  Okay.
19      A.  Almost, yeah.
20      Q.  And was that -- do you understand -- do
21  you know why you were off for that length of time?
22      A.  Just -- it's just the length of the
23  investigation, more or less.  That, and coupled with
24  the -- meeting with the psychologist, right?  And
25  their assessment of when they determine you're

James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1  mentally fit to go back to work. So...
2      Q. Okay. And having reviewed what I think is
3  actually the -- the CIRT interview, there was two --
4  and we talked about it a little bit. There was two
5  interviews, right? There's the FIT interview and
6  then there's the CIRT interview, correct?
7      A. Correct.
8      Q. Okay. And so the FIT interview was taken
9  that same day, correct?
10     A. (The witness moved his head up and down.)
11  Yes.
12     Q. But it wasn't on the scene, you went
13  somewhere. Did you go down to, like, an office?
14  You went down to an office, correct?
15     A. No, it was on -- it was on scene.
16     Q. Okay.
17     A. Yeah. In the parking lot.
18     Q. Okay. All right. And then my
19  understanding, having reviewed the CIRT -- your CIRT
20  statement is that that was nine days later; is that
21  consistent with your recollection?
22     A. I believe so. I don't remember how many
23  days or far apart it was.
24     Q. It was -- was it fair to say that -- well,
25  you tell me. Is your memory that it was kind of

103

1  fairly soon thereafter?
2      A. Yes, yes.
3      Q. And these interviews seem pretty intense.
4  What was your feeling -- what was your experience
5  going through these interviews?
6      A. It's just very thorough.
7      Q. Okay. And did you make any notes that you
8  took with any -- to any of the interviews with you?
9      A. No.
10     Q. Okay. All right. And we'll see it in the
11  body-worn camera footage, too.
12        But was there an issue with Officer
13  Bertuccini having a problem with the stun stick?
14     A. Initially, I just kept telling him to
15  pull. I kept saying pull, pull, pull. Because it
16  was a newer -- it was a newer stun stick that we
17  were using. So, take -- get it to actually deploy,
18  it's -- I don't know -- it's not difficult, but it
19  required -- you know, it's a plunger-type system.
20  But you have to release it because it's -- it's
21  spring-loaded.
22        So if you pull it down and then let it
23  ride up, like -- it's got to hit a -- basically a
24  shotgun primer. So if you try to ride it up, it
25  won't engage the primer which will start the chain

104

1  reaction for it to deploy. You have to pull it down
2  and then let go of it, right?
3        So the first couple times people use it,
4  they tend to, like, let the handle ride, which is
5  not enough force to hit the shotgun primer. So
6  that's why I kept saying pulling it, pull it. Or if
7  they don't pull it all the way down, then that will
8  also create that kind of malfunction, more or less.
9      Q. Do you think that there's an actual
10  problem with how this is designed?
11     A. No.
12     Q. Okay.
13     A. No.
14     Q. But do you think that -- you tell me if
15  this is right or wrong. Do you think Bertuccini
16  kind of fumbled with it a little bit?
17     A. No, not that he fumbled with it. I mean,
18  he just had to release it. That's it.
19     Q. Okay.
20     A. So...
21     Q. And then --
22     A. But they're also -- I'm sorry.
23     Q. No, no, keep going. Please keep going.
24     A. There also is a delay, too. Right? So
25  there's, like, a -- I think a one-and-a-half second

105

1  delay on it.
2        So sometimes they'll already pull it, and
3  you're already, like, hey, pull, pull. And they've
4  already done it, you're just kind of waiting for it
5  to go off. So it could have been a little bit of
6  that, too.
7      Q. Now, maybe this is a dumb question. How
8  does this not blow up in your hands?
9      A. It's on top of a stick.
10     Q. Okay.
11     A. Yeah.
12     Q. That's where the actual firing mechanism
13  is? Or, like, where the gun powder is loaded?
14     A. The distract device is at the top, yeah.
15     Q. Okay, all right. And then I wanted to --
16  you talked about it a little bit, but I wanted to go
17  back to this. Because what you said in your CIRT
18  statement was, so when I shined my light into the
19  smoke, it basically -- it blinded me. I couldn't
20  see anything, like, shining or headlights in the
21  fog.
22     A. Uh-huh.
23     Q. And so we talked about it a little bit
24  before, and I just want to confirm. Yeah, when you
25  turned that light on, it actually created an

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

106

1  atmosphere where nothing could be kind of seen; is
2  that correct?
3      A.  Correct.
4      Q.  Okay.  And as we sit here today, your
5  testimony is that you think that the shining of the
6  light drew Mr. Williams' attention to your
7  direction, correct?
8      A.  Uh-huh.  Correct.
9      Q.  Okay.  And I apologize if I've asked this.
10  But just so that I understand.  You didn't
11  understand what the -- did you know what the actual
12  search warrant was looking for?
13     A.  Just the homicide suspect.
14     Q.  Okay.
15     A.  Yeah.  Not identified specifically.
16     Q.  Okay.  Do you think that it's necessary
17  for you to know what items a search warrant is
18  looking for?
19     A.  No.
20     Q.  Okay.  Do you -- and I know that you're
21  saying no, but I'm going to ask you a follow-up
22  question.
23     A.  Uh-huh.
24     Q.  So wouldn't you -- is -- is your approach
25  different if the items are something that can

107

1  perhaps be easily destroyed versus not easily
2  destroyed?
3      A.  I guess, yeah.
4      Q.  So then wouldn't it be important to know
5  what the search warrant is looking for?
6      A.  I mean, in this case, you know, like,
7  narcotics, we know we're looking for narcotics.  In
8  this case, it was homicide.  We know we're looking
9  for a person, right?  Or evidence of the homicide,
10  which that could be anything.  It could be a weapon,
11  it could be clothing, it could be a knife.  I mean,
12  it could be...
13     Q.  Nothing, though, that can be destroyed,
14  correct?
15     A.  Depends.
16     Q.  Let me -- let me -- let me ask this in a
17  better way.
18         If -- if you're doing a narcotic search
19  warrant and you're going after cocaine, you know
20  that that's something that can be destroyed, right?
21     A.  Depending on how much it is, yeah, right.
22     Q.  Let's say it's a destroyable amount.
23     A.  Okay.
24     Q.  Okay.  And so that's going to be different
25  than if you're looking for a gun or knife or other

108

1  hard, physical evidence that can't easily be
2  destroyed, correct?
3      A.  Correct.
4      Q.  And so you tell me if I'm right or wrong.
5  You knew that this was a homicide warrant, correct?
6      A.  Uh-huh.
7      Q.  And so was your -- did you even think
8  about it, or was just the assumption, like, well,
9  we're looking for homicide-type stuff, like a gun or
10  knife or something like that.
11     A.  Yes.
12     Q.  Okay.  But you were also looking for the
13  suspects, correct?
14     A.  Correct.
15     Q.  And the intention was to detain them,
16  correct?
17     A.  Yes.
18     Q.  Okay.  And they asked you about it in the
19  CIRT interview, but I don't -- I just want to
20  confirm, because you -- are you aware that there's
21  an -- you're aware that there's an issue with the
22  brass wrap on the door, correct?
23     A.  Yes.
24     Q.  Okay.  But you weren't on the team that
25  was breaching at the door, correct?

109

1      A.  Correct.
2      Q.  Yeah.  And so at the time that that may or
3  may not have been going on, were you aware of that
4  at all?
5      A.  No.
6      Q.  Okay.  And you were part of the explosive
7  breach unit, correct?
8      A.  Uh-huh.
9      Q.  Would you --
10     A.  Yes.
11     Q.  Sorry.  Yes?
12     A.  Yes.
13     Q.  Okay.  And would you have to do recons to
14  serve those breach -- or the explosive breach
15  warrants?
16     A.  Yeah, they would typically -- we would
17  typically take somebody that's -- their specialty
18  and bring them along, yes.
19     Q.  Okay.
20     A.  If that was what they decided to do or
21  use.
22     Q.  Okay.  And knowing kind of like the
23  totality of all the circumstances here, do you think
24  that this warrant could have been served any
25  differently?

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1    A.  I mean, we could have -- based off the
2  totality, we could have used an explosive breach on
3  the door or the window or both.  But as far as
4  serving it, I believe we were -- everything else was
5  in line with our normal procedures and how we've
6  done it in the past.
7    Q.  And that's in line as it was in 2022,
8  correct?
9    A.  Correct.
10   Q.  Okay.  And you were involved in a prior
11 incident with an explosive breach, correct?
12   A.  Yes.
13   Q.  And can you kind of walk me through what
14 happened in that?
15   A.  Which one?
16   Q.  All of them.  If there's more than one.  I
17 thought there was only one.
18   A.  Well, I mean, when you say involved in an
19 incident, are you talking about deploying one --
20   Q.  Yes.
21   A.  -- on a barricade or --
22   Q.  No, I'm talking -- my understanding was
23 that there was one where a lady was standing behind
24 the door, correct?
25   A.  Yes.

111

1    Q.  Okay.  Can you kind of walk me through
2  that?
3    A.  So, I wasn't one of the -- even though I
4  am one of the breachers on the team, or my team, the
5  red team, I wasn't one of the breachers assigned to
6  that specific role that day.  I was just one of the
7  entry officers.
8        So, I know in that situation, we had
9  elected to use an explosive breach on the door.  And
10 when they went to deploy explosive breach, the
11 female was looking through the peephole of the door
12 as it went off.  So...
13   Q.  Did that result in a lawsuit?
14   A.  It did.
15   Q.  And there was a -- was there -- there was
16 a change in policy after that incident, too,
17 correct?
18   A.  Yes.
19   Q.  Okay.  And was part of that change in
20 policy meant that you couldn't -- as it was served
21 on October 10, 2022, you couldn't have used an
22 explosive breach entry on this type of warrant,
23 correct?
24   A.  It -- you could have, but I believe it
25 would require different approval at that point, a

112

1  higher level of approval than the SWAT lieutenant at
2  the time.
3    Q.  Okay.  And I -- again, I understand that
4  you weren't part of the breach team at the door, but
5  you understand -- but you understand that there was
6  some question about calling a tactical related to
7  the brass wrap on the door and difficulty getting
8  through the door, correct?
9    A.  Yes.
10   Q.  Okay.  What's your position on that?  Do
11 you think a tactical - knowing what you know now,
12 do you think a tactical should have been called?
13       MR. ANDERSON:  Objection, form.
14       Go ahead.
15       THE WITNESS:  As we're trying to get in
16 the door or...
17 BY MS. MURPHY:
18   Q.  Well, at any time.
19   A.  Before we see it?  Because if we see it, I
20 would -- no, no.  Because -- just because there's a
21 brass wrap on the door doesn't mean that they're --
22 we're going to make a tactical call at that point.
23 Because it could still be defeated, right?  It's not
24 a -- it's not one of those things that's going to
25 greatly affect anything at the end of the day.  Like

113

1  if that's something I said -- like I said before, if
2  we -- something that was missed or, you know,
3  something unexpected that we come across, we'll kind
4  of just work through it at that point.  So it's not
5  something we would call tactical for.
6    Q.  And --
7    A.  In my opinion.
8    Q.  And I'm asking for your opinion.
9    A.  Yeah.
10   Q.  And so once, though, that there's these
11 multiple hits on the door and the door is not giving
12 way, in your opinion, do you think a tactical ought
13 to have been called then?
14   A.  So that also would involve a conversation
15 with the breach team, kind of what they would have
16 decided.  I know typically, when I was involved in
17 that, or part of the ram or something, we would say,
18 hey, we're going to hit it four times.  On the
19 fourth time, if I don't get it, I'm going to move
20 out of the way.
21       And then typically -- the plan would
22 typically be to step up with a shotgun to shoot the
23 lock, get the door open, and then at that time enact
24 a tactical plan.
25       But just because we call tactical doesn't

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1  mean we're going to stop -- typically, not trying to
2  open the door. We want to get the door open first.
3  Because that's the entry point for the search
4  warrant.
5      Q.  And so I've kind of seen tactical used --
6  the term tactical used in kind of some varying ways
7  throughout all these interviews.
8      A.  Right.
9      Q.  So if you can explain to me what a
10  tactical is so I can better understand that.
11      A.  Right. It's not a hard or fast rule, it's
12  a judgment call. So, typically it's designed for
13  when we, you know, lose that speed or surprise or
14  you see a subject run off, right? The door gets
15  breached open and you see somebody run down the
16  hallway into another bedroom or something. Or we
17  run out of sufficient manpower. So, like, a larger
18  structure where, you know, there's still rooms that
19  need to be cleared but everybody else is already --
20  we just ran out of officers to put in those rooms.
21  And then you would -- then you would call it. Such
22  as calling out for more people.
23      Q.  Okay. And, so, prior to your deposition
24  here today, my understanding of a tactical was that
25  if a tactical is called, everyone kind of pulls

115

1  back, and then this would have then converted to a
2  Surround and Callout. So as you're explaining to
3  me, that's actually not accurate; is that correct?
4      A.  So, in this case, if we called tactical
5  outside -- the plans were -- the breach plans were
6  still supposed to be enacted. But once those
7  happened, then we would -- we would stop. We
8  wouldn't push the entry. Tactical call is -- it's
9  not a pull back type thing, it's more a, hey, let's
10  stop, assess what we have. But at that time when
11  you stop, you know, you just want to be out in the
12  open, you want to move to a position of advantage,
13  right? So you can see something until you determine
14  why that call was made and who made it and for what,
15  you know. So...
16      Q.  So I -- I am really trying to understand.
17  So my understanding of calling the tactical was
18  that, yeah, that they would stop trying to do the
19  breach, too. But if I understand how you're
20  explaining it to me right now, they would have still
21  breached through the door, but then pulled back to a
22  tactical advantage area.
23      A.  Right, yes, yes.
24      Q.  All right. And then one of the things you
25  talked about in your CIRT interview when they asked

116

1  you about your experience being on recon, is that
2  you said sometimes the recon will be covert or
3  sometimes it will be more overt.
4      A.  Uh-huh.
5      Q.  And I wanted to ask you, why would you
6  want overt recon? Like, what's the point of making
7  your presence known?
8      A.  Overt?
9      Q.  Yeah, you -- I'll -- and I'm not trying to
10  trick you, I'm really interested. And so I'll read
11  you the sentence that you wrote. There's two
12  sentences. Um, and then we'll coordinate with them,
13  how they want to do the recon. If it's, you know,
14  kind of a little more covert or overt type thing,
15  you know, if they want us to use their vehicles or
16  want us to use our vehicles.
17      A.  Oh. So in that -- in that case, I meant,
18  like, the investigative unit, if they wanted us to
19  use their vehicles, they're typically covert
20  vehicles. I mean, you don't really -- you would
21  normally look at it and be, like, this is not a
22  police car, right? So SWAT, I have a Ford F350
23  truck, four-door truck, that has visible -- not
24  red -- not red and blue lights, but little light
25  bars on it all over it. Most people know, and

117

1  especially in some of the certain areas of the city,
2  they know that that truck is associated with the
3  SWAT team. So that's what I meant in that case.
4          And then as far as the covert part goes,
5  the detectives will usually tell us, like, hey,
6  we'll take our car, okay? We don't want to -- we
7  don't want to alert them to our presence. Whereas
8  an overt one may be, okay, we're just going to drive
9  through the neighborhood, right? It's a house or a
10  business or something like that. So that's what I
11  meant when I made that statement.
12      Q.  Okay. And then one of the other things
13  you said is that -- and this is what your sentence
14  said. When they asked you about getting assigned
15  the recon.
16      A.  Okay.
17      Q.  You said, um, and then from there, two
18  guys will get assigned the recon. Actually, it's
19  three now. Why did it go from two to three?
20      A.  So, I think at that point in time, they
21  decided to use three -- I know we had some newer
22  officers come up. And then -- I just -- I believe
23  it was just an operational change based off of how
24  the recon's conducted. Because of the -- the
25  Assistant Team Leader is -- they're the ones

Case 2:24-cv-00074-APG-NJK    Document 55-11    Filed 05/16/25    Page 33 of 41

James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

118

1  formulating the plan. And them and the team leader
2  are approving the plan more or less, or finalizing
3  the plan. So they talked about including the two
4  officers with the Assistant Team Leader. Because
5  they're -- they're going to formulate the plan, so
6  why don't they go, too.
7     Q.  And so you use the term Assistant Team
8  Leader, and I see ATL all over this stuff. Even
9  though they're called assistant, that's actually the
10  guy running the show, correct?
11     A.  More or less, yes.
12     Q.  Okay. Is the team leader, like -- that's
13  kind of like a sergeant, like, they oversee --
14     A.  Correct, yes.
15     Q.  Okay. So you're, like, a team leader now.
16     A.  Yes, yeah.
17     Q.  All right. And so one of the things that
18  you said in your CIRT interview was, the purpose of
19  that recon is for SWAT to be able in the most safe
20  way, serve that search warrant. And my question
21  about that statement is, do you believe that the
22  recon in this case that was collected enabled you,
23  as a member of the SWAT team, to serve that search
24  warrant in the most safe way?
25     A.  Yes.

119

1     Q.  And so you said -- you talked about the
2  stun stick, too. You talked about the shotgun
3  primer. Does it sound like a shotgun going off?
4     A.  No, it's just -- just the primer.
5     Q.  What's the difference between the shotgun
6  primer and the sound of a shotgun?
7     A.  So, the shotgun primer is just igniting a
8  little bit of powder. And the primer -- an actual
9  shotgun round is igniting the primer and all the
10  powder in there, depending on what type of round it
11  is. So it's significantly louder.
12     Q.  Okay. And are you aware of that based on
13  your years of experience shooting as a police
14  officer?
15     A.  Yes.
16     Q.  Okay. And it was -- was it -- based on
17  your testimony, my understanding is, is that it
18  was -- you stopped shooting because you perceived
19  the witness as being -- or sorry, Mr. Williams as
20  being deceased, correct?
21     A.  Correct.
22     Q.  Okay. But to confirm, you shot three
23  times before you made the assessment that he was
24  likely deceased, correct?
25     A.  After I -- yes. Yeah.

120

1     Q.  Okay. And to your knowledge, did your
2  three rounds hit him?
3     A.  From where I was standing at, I believe
4  so, yes.
5     Q.  Okay. And you talked in your CIRT
6  interview about your experience with people
7  encountering the stun stick. And I'll read you your
8  statement on that. And you said, I've just seen it
9  so many times where people that encounter the stun
10  stick just drop to the ground immediately. So, same
11  with the distracts outside. I'm going to ask you in
12  your opinion, based on your experience as a SWAT
13  officer, why do they drop to the ground?
14     A.  It's a very loud explosion. I mean, it's
15  light, flash, sound. Most people when they hear
16  that stuff, they drop to the ground because they
17  don't know if something is exploding over them or --
18  you know, they don't -- they really don't know
19  what's happening.
20     Q.  Right. They don't know what's happening,
21  correct?
22     A.  It's creating a distraction.
23     Q.  Right. And so they don't know if they're
24  being shot at, either, correct?
25     A.  It doesn't sound like a gunshot, so I

121

1  would assume they don't -- would not --
2     Q.  Well, I'm asking --
3     A.  -- think they would be shot at.
4     Q.  Right. But you're saying that your
5  experience is that they drop to the ground
6  because -- and I'm -- they perceive some type of
7  danger, correct?
8     A.  Correct.
9     Q.  Okay. And then you also said in your CIRT
10  interview -- I'll read the sentence to you and then
11  I want to ask you about it. And then that -- that
12  also creates surprise on the suspects, uh, and as
13  well, you know, when the front door gets blown open
14  or gets knocked down, um, they're usually focused on
15  that and what -- trying to process what's happening.
16  And so my question to you is, is it your experience
17  as a SWAT officer regularly serving warrants that
18  people have trouble processing what's happening?
19     A.  I wouldn't say they have trouble
20  processing what's happening. I would say that
21  they -- they may not know what's happening, it's not
22  that they're not processing it. It's just their
23  reaction, whatever it is, is to that stimulus. You
24  know, whether they're going to kind of hold fight or
25  flight type thing.

Case 2:24-cv-00074-APG-NJK    Document 55-11    Filed 05/16/25    Page 34 of 41

James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

122

1    Q.  Right.  So they don't know what's
2  happening.
3    A.  I -- I guess you could say that.  I mean,
4  they know that -- they know that there's something
5  going on.
6    Q.  Right.
7    A.  They're just not 100 probably percent what
8  it is.  I mean -- and it's hard to tell.  If they
9  heard, hey, the police, right, or police search
10  warrant and then they hear an explosion, they are
11  probably going to drop -- they'll most likely drop
12  to the ground.  At least that's my experience in all
13  the search warrants that I've served.
14    Q.  Okay.  But the purpose of doing these
15  distracts is to stun them and surprise them and
16  disorient them, correct?
17    A.  Yes, uh-huh.
18    Q.  Okay.  And I asked you before and I'll ask
19  you again, don't you think that that contradicts the
20  whole concept of knock and announce?
21    A.  No.
22    Q.  Okay.
23    A.  No.
24    Q.  And I know I -- I kind of asked you in a
25  roundabout way earlier, and I'm going to -- but I'm

123

1  going to ask you in a more straightforward way this
2  time.  Looking back on this incident, is there
3  anything that you would have done differently?
4  Looking at the whole team, is there anything that
5  you would have said, hey, either I personally would
6  have done differently or I think this should have
7  been done differently on the team?
8    MR. ANDERSON:  Objection, form.
9    THE WITNESS:  Yeah, I mean, there's so
10  many factors to look at.  I mean, you're -- just the
11  nature of our job is we're just critical of -- of
12  everything.  Critical of yourself, of your
13  teammates, the planning process.  I mean, that's how
14  you learn and get better, is to take that critical
15  look and analyzing everything.  So, yeah, there
16  would be -- definitely be things that --
17  BY MS. MURPHY:
18    Q.  Can you walk -- can you walk me through
19  what things you think could be improved or on what
20  things you would have done differently?
21    A.  In this specific instance, I mean,
22  obviously we brought -- we talked about it was the
23  brass wrap, right?  Whether tactical -- the tactical
24  call, the deciding factors, that was a lot of stuff
25  that was also talked about after.  You know, there's

124

1  the -- the timing, right, of the search warrant.  So
2  those type of factors, yeah.
3    Q.  Okay.  And -- sorry.  When you say timing
4  of the search warrant, do you mean you would have
5  served it at a different time or what do you mean --
6  or how long -- what do you mean by timing?  Sorry, I
7  just want to make sure I understand what you mean.
8    A.  The whole -- when I say that, I'm talking
9  about the debate of the no knock, the knock and
10  announce, the reasonableness time, that.  Because
11  that is a common thing that typically -- that
12  typically comes up, right?  We talk about it all the
13  time, we try to train for it and mitigate it, and,
14  you know, determine, hey, what's in a -- what's a
15  reasonable amount of time?  How long do we think
16  that it's going to take?  And, like, in this
17  instance, the suspect to arm themselves and to shoot
18  at us.  Or just to give up.  Or move to another
19  position or better position.  All those different
20  factors, looking at all those.
21    Q.  Okay.  And so as we sit here today, then,
22  are -- and I want to make sure that I understand
23  your testimony correctly.  As we're sitting here
24  today and you've just gone over this, have you,
25  then, gone back and forth about whether or not the

125

1  announcement was an appropriate amount of time?
2    A.  I believe that it was appropriate, yes.
3    Q.  Okay.  And -- but you said that there's
4  been debate about it; is that accurate?
5    A.  Yes.
6    Q.  Between whom?
7    A.  I mean, it's -- you hear it on the news,
8  you talk -- we talk about it amongst our team
9  members.  You know, within our own agency.  When
10  they talk about policy changes.  I mean, we -- it's
11  a fairly -- something that's brought up --
12    Q.  Okay.
13    A.  -- and talked about.
14    Q.  And my understanding -- we've talked about
15  it a lot in this deposition, so thank you for
16  bearing with me.  But my understanding, you know,
17  and we talked about it, like I said, quite a few
18  times, is that on January 10, 2022, the position and
19  how you guys operated, it was that, hey, it's not
20  really in a reasonable amount of time you have to
21  get off two -- it's not the time, the actual
22  timeline, but kind of the standard operating
23  procedure was, you need to get off a certain number
24  of announcements, correct?
25    A.  So, the number of announcements were,

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

126

1  enacting the another plans, so, yes, in a sense.
2  But if you're asking what, like, the total overall
3  announcements would be, it's more than two. Because
4  every word -- everybody's typically yelling police,
5  search warrant, when the first one starts.
6      Q.  But here it wasn't more than two, correct?
7      A.  More than two for?
8      Q.  There was two announcements and then the
9  door was breached, correct?
10     A.  Right.  But also, during that time, police
11 are -- officers are still yelling, police, search
12 warrant.
13     Q.  Do you think it's a reasonable expectation
14 that somebody who's inside a small room full of
15 smoke and having nine bangers and a stun stick go
16 off would continue to be able to assess and
17 understand announcements that are being made?
18         MR. ANDERSON:  Objection, form.
19         Go ahead.
20         THE WITNESS:  Yes.
21 BY MS. MURPHY:
22     Q.  Okay.  So even though you testified
23 earlier than the intent is to distract somebody, to
24 surprise them, to overwhelm them, you think that
25 they would still have the mental capacity to be able

127

1  to understand announcements that are being made?
2      A.  Off of my experience, yes.
3      Q.  Okay.  But you said that people would drop
4  to the ground.  Why do you think they drop to the
5  ground?
6      A.  I mean, when I say drop to the ground, I
7  mean, I guess I could be more specific in that case.
8  It's not like they're just falling to the ground and
9  laying out with their hands behind their back.  I
10 mean, they're also ducking and diving, right?
11     Q.  They're taking cover, correct?
12     A.  Right.  They're moving, you know.  They're
13 maybe laying down on a couch or moving from a seated
14 position to a laying down position, right?  They're
15 typically ducking.
16     Q.  Yeah.  They're taking cover, correct?
17     A.  More or less.
18     Q.  Okay.  All right.  Let's -- let's go off
19 the record for just a second.  I'm going to set up
20 the video.
21         THE VIDEOGRAPHER:  We are going off record
22 at 12:38 p.m.
23         (Off record.)
24         THE VIDEOGRAPHER:  We are back on record
25 at 1:08 p.m.

128

1  BY MS. MURPHY:
2      Q.  And if the -- just to let the record
3  reflect, we took a break and we watched what is your
4  body-worn camera footage.  And the -- we watched the
5  entirety of the video, which is approximately --
6  well, it's not approximately, it's 20 minutes and 51
7  seconds long.
8      A.  Yes.
9      Q.  And you confirm that this is your
10 body-worn camera footage, and this is what you
11 remember from the date of the incident, correct?
12     A.  Correct.
13     Q.  Okay.  And so I wanted to ask you a couple
14 questions about some -- some of the dialogue and
15 some of the things that we saw on the body-worn --
16 the BWC.
17     A.  Yes.
18     Q.  Okay.
19         THE VIDEOGRAPHER:  I'm sorry, can you
20 slide your mike up just a little bit, just because
21 your arms are hitting it.  Thank you.
22         THE WITNESS:  Yeah.
23         THE VIDEOGRAPHER:  Thanks.
24 BY MS. MURPHY:
25     Q.  The majority of the BWC is really you and

129

1  Bertuccini driving to the...
2      A.  Incident.
3      Q.  Yeah, the incident.  And so there's a
4  little bit of dialogue between you and Bertuccini
5  that I wanted to ask you about.
6      A.  Okay.
7      Q.  Just give me one second and I'll pull it
8  up.
9          I'm going to start at about six minutes
10 and 20 -- and 15 seconds.  Sorry.
11     A.  Okay.
12         (Video played.)
13 BY MS. MURPHY:
14     Q.  Yeah.  And so I wanted to -- when you --
15 when you're talking about Back, are you talking
16 about -- are you talking about Backman, Sergeant
17 Backman?
18     A.  So we're talking about actually all the
19 sergeants.
20     Q.  Okay.
21     A.  Yeah.  But I know in that case, Sergeant
22 Backman, he was newer to the unit, so he was trying
23 to gain experience.
24     Q.  And if I heard correctly, I think it was
25 you that said, why are you running this?  You were



James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

130

1  talking about Sergeant Backman, correct?
2      A.  Yes.
3      Q.  And why were you questioning Sergeant
4  Backman's ability to run this?
5      A.  I wasn't questioning his ability, I was
6  just questioning why he was doing it.  I knew he was
7  in training.  And I'm trying to remember if at the
8  time -- because this was a blue -- well, silver team
9  search warrant.  At the time blue team, old blue
10  team.  I believe he was assigned to our team.
11      So typically, the team who's running the
12  search warrant, or the day that they're working,
13  their sergeant will run the search warrant.  But I
14  believe, if I remember correctly in this case,
15  Backman was on our team, but he was running the
16  search warrant, which is not very common.
17      So -- and the fact that there were three
18  sergeants there as well, which typically there never
19  is.  There's usually only two.  And when I said Back
20  does that all the time, he'll get the notification
21  because he's a sergeant, right, he's in the
22  leadership texts that they have going, he'll get the
23  notification and he'll just show up.  Which he can,
24  because he's a supervisor.  But it's, like, you
25  know, if one of the officers did that, they'd be,

131

1  like, what are you doing here, you know?  So that's
2  why we were talking about it in that instance.
3      Q.  And did it -- and I took away from that,
4  too, and you just mentioned it earlier, that he also
5  was in training, right?  So why is he running this
6  operation?  You were aware that he hadn't finished
7  SWAT school, right, or that he was still in
8  training?
9      A.  Yeah.  So I knew they hadn't run him
10  through a -- because -- yeah.  Because the time he
11  came up, he didn't go through an official SWAT
12  school.  They were doing more of a -- like a
13  condensed training type thing.  I can't remember how
14  long he had been in SWAT prior to that.  If he was
15  still in training.
16      So, I mean, a lot of it's on-the-job
17  training.  But I just -- I questioned that, like,
18  okay -- or I was questioning why they were there.
19  And then I was, like, oh, it's because Backman's in
20  training, like, that's why -- that's why he's doing
21  it, you know.
22      Q.  Okay, all right.
23      A.  Getting the experience.
24      Q.  Do you think it's appropriate for somebody
25  who's in training to run a SWAT search warrant

132

1  service like this?
2      A.  This one is a pretty standard one.  I
3  would say yes, up until we encountered the shooting.
4      Q.  Right.  You had to go through a full SWAT
5  school.  You didn't get a condensed version, did
6  you?
7      A.  No.
8      Q.  Okay.
9      MR. ANDERSON:  That's a double negative.
10  No, you didn't have to go through?  Yes --
11  BY MR. MURPHY:
12      Q.  Correct.  Sorry, let me ask it in two
13  ways.
14      You went through full SWAT school,
15  correct?
16      A.  I went through it a couple times,
17  actually, yeah.
18      Q.  You didn't get a condensed version,
19  correct?
20      A.  No, I did not.
21      Q.  All right.  And then -- if a sergeant
22  shows -- are the sergeants also paid kind of by
23  hour, so if they show up for extra SWAT warrants, do
24  they get paid more?
25      A.  Yes.

133

1      Q.  Okay.
2      A.  The standard call-out pay, four-hour
3  minimum.
4      Q.  Okay.  And then I'm going to go right
5  before the incident.  Hold on.  I'm just going to --
6      (Video played.)
7  BY MS. MURPHY:
8      Q.  I didn't go back quite far enough, sorry.
9      (Video played.)
10  BY MS. MURPHY:
11      Q.  That's okay.  I have to make sure I'm
12  preserving the record.
13      And so as those announcements were played
14  from your vantage point, could you hear both the
15  announcements clearly or were they muffled?
16      A.  I could here them clearly.
17      Q.  You could hear both announcements clearly.
18      A.  Uh-huh.
19      Q.  Let's play that again.
20      (Video played.)
21  BY MS. MURPHY:
22      Q.  Could you hear -- is it your testimony
23  that we've just reviewed this, and you could
24  distinctly hear the words clearly in both
25  announcements, or could you hear basically the first

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

134

1  announcement clearly and the second announcement
2  you -- it was muffled?
3      A.   I could hear the first one saying, police,
4  search warrant, and I could hear the second one.  I
5  could hear the, police, search warrant.  Which would
6  be the cue to insert the stun stick and start the
7  plan.
8      Q.   Okay.  So the -- and I want to make -- so
9  that was standard operating procedure, that went the
10 way it was supposed to?
11     A.   Yes.
12     Q.   You were the first -- sorry.
13     A.   Yes.
14     Q.   Yes.  So it was, police officer, search
15 warrant, and then when you heard the second police
16 officer, which you're saying you heard clearly, that
17 was time to go, for lack of a better term, correct?
18     A.   Yes.
19     Q.   Okay.  And then if you want to hit --
20 sorry.  If you can hit play, we'll just go a few
21 seconds up from that.
22     A.   Okay.
23          (Video played.)
24 BY MS. MURPHY:
25     Q.   Okay.  As we sit here today and you're

135

1  listening to this, are -- is it your position that
2  the noise between the nine banger and the gunfire
3  are easily distinguishable, or do they sound
4  similar?
5      A.   So, at the time -- I mean, listening to
6  it, it's -- it's more clear.  But at the time it was
7  hard -- it's a little bit harder to tell, actually.
8      Q.   And just to understand -- and it's a
9  little difficult to see -- I don't think you were
10 trying to modify the record in any way, but it is a
11 little bit difficult to tell exactly what your
12 vantage point is.  Because what we see is right --
13 the top of the shield kind of cuts off half of that.
14     A.   Right.
15     Q.   But is it -- you tell me if I'm right or
16 wrong.  My understanding is that he had broken the
17 window, and then you were yelling pull, pull, pull,
18 right?
19     A.   Yes.
20     Q.   Okay.  So from Mr. Williams' vantage point
21 inside, a window is broken, and then he hears pull,
22 pull, pull, and then it starts -- the distraction
23 devices start, correct?
24     A.   Correct.  Or the -- probably in this case,
25 listening to it or watching it, is the -- the train

136

1  had already been started for the distract.  It was
2  just waiting for it to go.  Because I said pull,
3  pull, pull.  By the time I said that it was going
4  off.  So I was maybe jumping the gun a little bit on
5  that, too.
6      Q.   Okay.
7      A.   That's --
8      Q.   That's actually the only stuff I wanted --
9  and then -- I don't think we -- you remember as we
10 watched this, you -- well, you already testified
11 about it, that as the video goes on, you talk about
12 the confusion -- you even experienced confusion
13 between the nine banger and the shots, correct?
14     A.   Right.  So initially, the other guys kind
15 of behind us, further -- a little bit further down
16 by the patio, where they had tossed it.  So they
17 tossed it pretty -- kind of close to us, which is
18 okay.  But it kind of caught me off guard.  Because
19 we wear the electronic ear -- ear protection.  So it
20 just -- it's designed to muffle those loud crack
21 noises, like gunshots.  So even the distracts.  So
22 when you hear that, it's really hard -- if I heard
23 it with just my regular -- you know, without any --
24 without that on I could tell.
25          But with those on, it's hard to kind of

137

1  tell at first what -- where it's coming from.
2  Especially when they -- I'm outside and they
3  deployed it outside with me right there.  So had I
4  been inside when they deployed it, I -- would have
5  been a lot easier to tell.
6      Q.   But that's also from your vantage point of
7  being an officer for 13 years and having been at gun
8  ranges for 13-plus years as well, correct?  You're
9  not a civilian.
10     A.   Correct, yeah.
11     Q.   And I want to -- I want to -- we're done
12 with the video.  Sorry, I'm not -- yeah, you can
13 close it.  Thank you, yeah.
14          I want to read you one of the standard --
15 thank you, thank you, very much, James.  I want to
16 read you one of the standards for knock and
17 announce.  And this comes from a United States
18 Supreme Court case.  If, after notice of his
19 authority and purpose, an officer is refused
20 admittance, then the Supreme Court goes on to say
21 it's okay to breach the door.
22          Having watched this video, can you tell me
23 at any point in time where Mr. Williams refused you
24 or anyone on that team admittance into the
25 apartment?  Before the breach.

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

138

1      A.  What was the --
2      Q.  No problem.
3      A.  -- the court case again?  What did the
4  Supreme Court say?
5      Q.  That if, after notice of his authority and
6  purpose, an officer is refused admittance.
7      A.  Okay.
8      Q.  What did Mr. Williams do to refuse you or
9  anyone on your team admittance prior to the breach?
10     A.  Having the door closed and locked?  Is
11  that what we're talking about?  Or giving him the
12  time to answer the door?
13     Q.  Well, the Supreme Court says that he gets
14  time to answer the door, or time to indicate that
15  he's going to refuse you admittance.  So was there
16  any indication that Mr. Williams was going to --
17  before entry through the door, was there any
18  indication that Mr. Williams would have refused you
19  admittance?
20     A.  Not up until that point, no.
21     Q.  Okay.  And there's also a Supreme Court
22  case that says that the Supreme Court has held that
23  a 15- to 20-second wait after police officers
24  announce their presence was reasonable under the
25  Fourth Amendment and Section 3109.

139

1         As we sit here today, what we've discussed
2  before was that your understanding of knock and
3  announce was that it had to be -- or it should have
4  been two or three announcements before the breach
5  was made, correct?
6      A.  Yes.
7      Q.  Okay.  And that is irrespective of the
8  amount of time -- the amount of seconds that passes,
9  correct?
10     A.  I would say it's about that time, but,
11  yes.
12     Q.  Well, in this case, there was one and a
13  half or two announcements, and six seconds went by.
14     A.  Okay, yeah.
15     Q.  So that's clearly not 15 to 20 seconds,
16  correct?
17     A.  Well, I would say that's from when the
18  window was breached.  But that wasn't our entry
19  point; the front door was.
20     Q.  I will -- I will represent to you that
21  even the -- own internal investigation found there
22  was six seconds between the beginning of the
23  announcement and the breach of the door.
24     A.  Okay.  All right.
25     Q.  Okay?  I want to read you one of the

140

1  conclusions that was made, and I want to ask your
2  opinion on it.
3      A.  Uh-huh.
4      Q.  By conducting a CET to surprise and
5  overwhelm the occupants of the structure, it
6  inherently contradicts the knock and announce rule
7  which require officers to wait a reasonable amount
8  of time set forth by United States Supreme Court
9  case law and the Nevada Revised Statutes.  Do you
10  agree or disagree with that conclusion?
11     A.  The reasonable -- what is the reasonable
12  amount of time?
13     Q.  No, sorry.  Let me read it one more time.
14     A.  Yeah, sorry.  I missed the first part.
15     Q.  No, no, no.  By conducting a CET --
16     A.  Okay.
17     Q.  -- to surprise and overwhelm the occupants
18  of the structure, it inherently contradicts the
19  knock and announce rule, which requires officers to
20  wait a reasonable amount of time set forth by the
21  United States Supreme Court case law and the Nevada
22  Revised Statutes.  Is it -- do you agree or disagree
23  that by conducting a CET to surprise and overwhelm,
24  that contradicts the knock and announce rule?
25     A.  Yeah, I would say I don't agree with that.

141

1  Because it's a knock and announce.  You're just
2  announcing your presence, more or less.  Whether
3  it's six seconds or 20 seconds.  The main question
4  is, what's reasonable to get to the door and open
5  the door, and how fast can you do that?
6      Q.  Okay.  And so is the purpose, then, of
7  giving the announcements to just rattle them off and
8  get through the door as quickly as possible?
9      A.  I wouldn't say rattle them off.  I mean,
10  you know, the goal is, the point is, to make them
11  loud and clear that it's the police and we're there
12  to serve a search warrant.
13     Q.  Okay.
14     A.  Yeah.
15     Q.  Do you think somebody that's sleeping
16  inside an apartment that they don't normally live at
17  can automatically assess within seconds what kind of
18  announcement is being made?
19     A.  Off of my previous experience, yes.
20     Q.  Okay.  And that's part of your experience
21  of serving these and your understanding of what the
22  policies and procedures for LVMPD are?
23     A.  Correct.
24     Q.  Okay.  And that you under- -- do you
25  understand that both the Nevada Supreme Court, the

James Rothenburg        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

142

1  Nevada Revised Statute, and the United States
2  Supreme Court disagrees that six seconds is a
3  sufficient amount of time?
4      A.  Yes, okay.
5      Q.  Okay.  You'll take my word for it, is
6  that --
7      A.  Yeah.
8      Q.  Okay, all right.  I think -- oh, yeah, I
9  just wanted to ask you some follow-up questions
10  about your interrogatories.
11      I just wanted to confirm, one of the
12  interrogatory questions asked you to describe any
13  retraining, discipline, demotions, or other adverse
14  employment action taken against you as a result of
15  this incident.  And your response was none.  Is that
16  correct.
17      A.  Correct.
18      Q.  So that includes not just discipline, but
19  there was no retraining, either; is that accurate?
20      A.  As in?
21      Q.  Was there any --
22      A.  Because of the incident?
23      Q.  Correct, yes.
24      A.  Retraining?  Personally for me?  No.  But,
25  I mean, we learned from the incident.

143

1      Q.  Okay.  What did you guys -- sorry.  What
2  did you learn from the incident?
3      A.  I mean, again, like I explained earlier,
4  everybody's critiquing themselves, they're
5  critiquing the incident, what could have been done
6  better, you know, was there -- you know, did we
7  recognize points of failure?
8      Which, I mean, obviously we don't need the
9  CIRT team to point that out, we can look at our own
10  internal mechanisms and figure it out and look at
11  ourselves and figure it out.  And that's as simple
12  as, did I go left when I should have went right, you
13  know?
14      So, individually, I know a lot of guys
15  will look at that as a tool.  So when you say
16  retrain, in the -- as a form of, this was messed up,
17  or a disciplinary thing or anything like that, no.
18  But we did train in the sense to get better, right?
19      Q.  And so how have you gotten better since
20  this incident?
21      A.  Well, I know they made some policy
22  revisions, right, as a whole.  I know that certain
23  calls were -- well, not calls, but certain tactics
24  were cleaned up, right, as far as breaching of the
25  door goes.  The use of the tactical call.  You know,

144

1  deployment of distracts.  You know, and then several
2  changes from the actual department, right, of
3  policy -- department policy.
4      Q.  And so -- thank you for that very detailed
5  answer.  And I wanted to be a little bit more
6  specific, and so let me ask it a little bit better.
7      In terms of you and how you function, have
8  you changed any ways that you function, based on
9  this incident?  And I -- and I don't doubt that
10  you've been very critical of yourself.  I'm not
11  trying to imply that you weren't.  But I'm asking
12  for you opinion, have you personally done -- like,
13  have you modified your practice or anything that
14  you've done as a result of this incident?
15      A.  As of now, no.  I'm no longer on the SWAT
16  team.
17      Q.  Sorry, so let me clean that question up
18  even more.
19      When you were still on the SWAT team, as a
20  result of this incident, was there anything that you
21  changed how you did?
22      A.  Yeah, yeah, I did, yeah.
23      Q.  What did you change?
24      A.  So, this was a good -- good case or, you
25  know, good incident for me.  I've been involved

145

1  in -- I -- probably well over 1,000 search warrants
2  at that point.  Callouts, shootings, just about
3  everything.
4      And I realized something as -- you know,
5  this seemed just like a normal, run of the mill
6  search warrant.  We've done this hundreds of times
7  at this hour, these locations, similar locations.
8      But this one was different because we
9  ended up taking gunfire and had officers shot.  And
10  in turn, had to shoot.  And it was the first time
11  I've had to, you know, discharge my firearm in the
12  course of, you know, the line of duty, more or less.
13  So, there's quite a few things to take away from it,
14  yeah.
15      Q.  And so I'm asking you, what did you take
16  away from it?  What did you change while you were
17  still on SWAT?
18      A.  Just -- I mean, I think that's a pretty
19  broad question.  I mean, it's a lot, you know.
20  Like, took kind of -- boils down to even my
21  mentality going in there.  Like, hey, let's -- you
22  know, the heightened state, right?  Like, okay, we
23  need to treat this as a high level -- we may be
24  involved in a shooting, people may get shot.  So,
25  you know, that's probably one of the highest things,

James Rothenburg       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

146

1  right?
2        Not saying that this incident was, you
3  know -- it was a nothing until something actually
4  happened, right?  I mean, it was -- we still treated
5  it how we would -- how we would normally.  But it
6  makes you realize, this was a significant incident
7  with significant injuries to people.
8        So, moving forward, you just realize,
9  like, okay, I'd better take things very serious,
10  right?  So -- and that boils down to a laundry list
11  of stuff.  Your weapons, your firearms, how you
12  carry things, right?  Preplanning in your head what
13  you're going to do the next incident this happens.
14  I mean, there's -- you could make a list of them.
15     Q.  And so let me kind of cut to the chase,
16  and you tell me if I'm right or wrong in my
17  understanding.
18        When you talk about that you have changed
19  as a result of this incident, you're talking about
20  your frame of mind, how you're approaching them, are
21  you taking it seriously -- and I know what you're
22  trying to say, and I'm not trying to put you in a
23  place.  But you're saying --
24     A.  Okay.
25     Q.  -- that probably every one, you're

147

1  taking -- not, like, oh, it's -- you're not
2  approaching every one, like, oh, this is the
3  standard warrant any more.  Is that fair -- is
4  that -- when you were on SWAT.
5     A.  Right.
6     Q.  Okay.  So -- and I appreciate your
7  detailed explanation of that.
8        Setting that issue aside, is there
9  anything in your day-to-day functioning, aside from
10  you have a different mentality about this, is there
11  anything in your day-to-day functioning as when you
12  were still a SWAT officer that you changed as a
13  result of this incident?  Do you understand the
14  distinction I'm getting at?
15     A.  Yeah, I mean, you're -- I mean, day-to-day
16  function as in --
17     Q.  So I'll --
18     A.  -- give me an example?
19     Q.  I will give you an example of what I --
20  from something that happened as a lawyer, right?
21  And Craig will probably back me up on this.
22        That we always send confirming letters and
23  e-mails after a phone call with either a client or
24  opposing counsel.  You only have that, for lack of a
25  better -- blow up in your face one time before

148

1  you're, like, oh, I'll never go to court and argue
2  about what was said on a phone call again.  I'll
3  always send some kind of confirming e-mail.
4        So that's something in kind of our
5  day-to-day practice that we learn as we get, you
6  know, through incidents and we become more seasoned.
7        So that's an example I could give you.  Do
8  you have anything like, in kind of your day-to-day
9  functioning that you modified or changed as a result
10  of this incident?
11     A.  I wouldn't say my day-to-day functioning,
12  but --
13     Q.  Okay.
14     A.  -- I would say how -- you know, how things
15  were done, you know, in that situation.  Like, being
16  a recon officer, right?  Things to look for, stuff
17  like that.
18        But, a lot of the things that happened in
19  this specific incidence have happened before.  So,
20  you know, brass wraps have been missed, right?
21  Announcements have been shorter.  Some have been
22  longer.  So, I would say based off the situation.
23  But for me personally, did I change anything
24  different?  I don't -- I don't think so.
25     Q.  Okay.

149

1     A.  Yeah.
2     Q.  All right.  And just to confirm, we've
3  gone through all -- thank you for sitting through
4  and going through all this.  We've gone through it
5  in so much detail.
6        Just to confirm, although you have come
7  through it with a different state of mind, as we sit
8  here today, there's not anything that you would do
9  differently, correct?
10     A.  No.
11     Q.  Okay.  I think that's it.
12     MR. ANDERSON:  I have no questions.
13     THE VIDEOGRAPHER:  One moment.
14     MS. MURPHY:  Do we want to do sign and
15  review -- or read and review?  Sorry.
16     MR. ANDERSON:  You have the opportunity to
17  read this, make sure everything is accurate, make
18  sure she doesn't make any mistakes, which she will
19  not.  Because it's on video, I don't think you need
20  to.  But if you want the opportunity to read it and
21  make sure everything is okay before it's finalized,
22  you can do that.  Do you have a preference?
23        We'll waive.
24     MS. MURPHY:  Off the record.
25     THE VIDEOGRAPHER:  This concludes the

James Rothenburg          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**150**

1   video-recorded deposition of James Rothenburg taken
2   on July 17th, 2024.  We're going off the video
3   record, and the time is 1:35 p.m.
4           MR. ANDERSON:  I will order a copy.
5           (Proceedings concluded at 1:35 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**151**

1                  CERTIFICATE OF DEPONENT
2   PAGE       LINE       CHANGE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19                  *  *  *  *  *
        I, James Rothenburg, deponent herein, do hereby
20   certify and declare under penalty of perjury the
        within and foregoing transcription to be my
21   deposition in said action; that I have read,
        corrected and do hereby affix my signature to said
22   deposition.
23
                James Rothenburg
24              Witness
25

---

**152**

1                  REPORTER'S CERTIFICATE
2   STATE OF NEVADA        )
                            ) ss
3   COUNTY OF CLARK        )
4
5       I, Tracy A. Manning, a duly certified court
    reporter licensed in and for the State of Nevada, do
6   hereby certify:
7       That I reported the taking of the deposition of
    the witness, James Rothenburg, at the time and place
8   aforesaid;
9       That prior to being examined, the witness was
    by me duly sworn to testify to the truth, the whole
10  truth, and nothing but the truth;
11      That I thereafter transcribed my shorthand
    notes into typewriting and that the typewritten
12  transcript of said deposition is a complete, true
    and accurate record of testimony provided by the
13  witness at said time to the best of my ability.
14      I further certify (1) that I am not a relative,
    employee or independent contractor of counsel of any
15  of the parties; nor a relative, employee or
    independent contractor of the parties involved in
16  said action; nor a person financially interested in
    the action; nor do I have any other relationship
17  with any of the parties or with counsel of any of
    the parties involved in the action that may
18  reasonably cause my impartiality to be questioned;
    and (2) that transcript review pursuant to
19  FRCP 30(e) was waived.
20      IN WITNESS WHEREOF, I have hereunto set my hand
    in the County of Clark, State of Nevada, this 28th
21  day of July 2024.
22
23
24              _____
                Tracy A. Manning, CCR 485
25

---