Exhibit P - Deposition of Rule 30(b)(6) Witness Lt. Adrian Beas (LVMPD's SWAT policies and procedures)

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 171

1                    CERTIFICATE OF COURT REPORTER

2

     STATE OF NEVADA        )

3                           )   ss:

     COUNTY OF CLARK        )

4

5          I, Heidi K. Konsten, Certified Court Reporter

6    licensed by the State of Nevada, do hereby certify

7    that I reported the deposition of ADRIAN BEAS,

8    commencing on March 28, 2025, at 9:04 a.m.

9          Prior to being deposed, the witness was duly

10   sworn by me to testify to the truth.  I thereafter

11   transcribed my said stenographic notes via

12   computer-aided transcription into written form,

13   and that the transcript is a complete, true and

14   accurate transcription and that a request was not

15   made for a review of the transcript.

16         I further certify that I am not a relative,

17   employee or independent contractor of counsel or

18   any party involved in the proceeding, nor a person

19   financially interested in the proceeding, nor do I

20   have any other relationship that may reasonably

21   cause my impartiality to be questioned.

22         IN WITNESS WHEREOF, I have set my hand in my

23   office in the County of Clark, State of Nevada,

24   this April 1, 2025.

25                    _____
                      Heidi K. Konsten, RPR, CCR No. 845

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 3 of 46

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

```
1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3                     *  *  *  *  *

4    LATIA ALEXANDER,              )
     individually as heir of      )
5    ISAIAH T. WILLIAMS and in    )
     her capacity as special      )
6    administrator of the Estate  )
     of ISAIAH T. WILLIAMS,       )
7                                  )
          Plaintiff,              )
8                                  )
          vs.                     )        CASE NO.
9                                  )  2:24-cv-00074-APG-NJK
     LAS VEGAS METROPOLITAN        )
10   POLICE DEPARTMENT, a          )
     political subdivision of     )
11   the State of Nevada; KERRY    )
     KUBLA, in his individual     )
12   capacity, et al.,            )
                                   )
13        Defendants.             )
     _____)

14

15            VIDEOTAPED DEPOSITION OF

16                   ADRIAN BEAS

17        30(b)(6) for Las Vegas Metropolitan

18                 Police Department

19              Taken on March 28, 2025

20                  at 9:04 a.m.

21          By a Certified Court Reporter

22                 Las Vegas, Nevada

23

24           Stenographically reported by:
         Heidi K. Konsten, NV CCR 845, RPR
25          JOB NO. 60239 - Firm No. 116F
```

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 4 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**Page 2**

```
 1            Videotaped deposition of ADRIAN BEAS,
 2   stenographically taken at 400 South Seventh Street,
 3   3rd Floor, Las Vegas, Nevada, on Friday, March 28,
 4   2025, at 9:04 a.m., before Heidi K. Konsten,
 5   Certified Court Reporter in and for the State of
 6   Nevada.
 7
 8            APPEARANCES OF COUNSEL
 9   For the Plaintiff:
10            ADAM J. BREEDEN, ESQ.
              Breeden & Associates, PLLC
11            7432 West Sahara Avenue
              Suite 101
12            Las Vegas, Nevada 89117
              (702) 508-9250
13            (702) 508-9365 Fax
14   For the Defendants:
15            CRAIG R. ANDERSON, ESQ.
              Marquis Aurbach
16            10001 Park Run Drive
              Las Vegas, Nevada 89145
17            (702) 382-0711
              (702) 382-5816 Fax
18
     Also present:
19
              Vance Wharton, Videographer
20
21            * * * * * *
22
23
24
25
```

**Page 3**

```
 1                   INDEX
 2                                            Page
 3   ADRIAN BEAS
 4   Examination by Mr. Breeden                  5
 5            * * * * *
 6
 7                  EXHIBITS
 8   No.       Description                     Page
 9   Exhibit 1   Notice of Deposition           11
10   Exhibit 2   SWAT manual excerpt -          98
                 Bates Numbers LVMPD
11               001490 through LVMPD
                 001491
12
     Exhibit 3   Commission on Peace           114
13               Officer Standards and
                 Training Performance
14               Objective Reference
                 Material - Bates Numbers
15               Williams 000809 through
                 Williams 000810
16
     Exhibit 4   Critical Incident Review      168
17               Team report excerpts -
                 Bates Numbers LVMPD
18               004440 through LVMPD
                 004443
19            * * * * *
20
21
22
23
24
25
```

**Page 4**

```
 1                 LAS VEGAS, NEVADA
 2              Friday, March 28, 2025
 3                   9:04 a.m.
 4            DEPOSITION OF ADRIAN BEAS
 5                 * * * * * *
 6
 7            THE VIDEOGRAPHER:  Today is
 8   March 28th, 2025.  The time is approximately
 9   9:04 a.m.  Your court reporter is Heidi Konsten,
10   and I am your videographer, VN Wharton.  We are
11   here on behalf of Lexitas.
12            The witness today is Lieutenant Adrian
13   Beas as a 30(b)(6) designee for Las Vegas
14   Metropolitan Police Department.  And we are here
15   in the case Latia Alexander, individually, as heir
16   of Isaiah T. Williams and in her capacity as
17   special administrator of the estate of Isaiah T.
18   Williams, plaintiff, versus Las Vegas Metropolitan
19   Police Department, a political subdivision of the
20   State of Nevada, et al., defendants.
21            Will counsel please state your
22   appearances, and the court reporter will
23   administer the oath.
24            MR. BREEDEN:  This is Attorney Adam
25   Breeden on behalf of the plaintiff.
```

**Page 5**

```
 1      MR. ANDERSON:  Craig Anderson on
 2   behalf of the defendants and the witness.
 3
 4   Whereupon,
 5        ADRIAN BEAS,
 6   was called as a witness, and having been first duly
 7   sworn to testify to the truth, was examined and
 8   testified as follows:
 9
10        EXAMINATION
11   BY MR. BREEDEN:
12   Q   Good morning, sir.
13       Can you please state your name for the
14   court reporter, and go ahead and spell your name
15   as well.
16   A   It's Adrian Beas, A-D-R-I-A-N, B-E-A-S.
17   Q   Okay.  And, sir, are you currently a
18   lieutenant with the Las Vegas Metropolitan Police
19   Department?
20   A   Yes, I am.
21   Q   Okay.  My name is Adam Breeden, and I'm
22   the attorney for Latia Alexander.  She has filed a
23   lawsuit against the Las Vegas Metropolitan Police
24   Department and several of its SWAT officers
25   following a fatal shooting of her son, which
```

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 5 of 46

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1  occurred on January 10th of 2022.
2      Do you understand the reason why you're
3  here this morning is to give deposition testimony
4  on behalf of the Las Vegas Metropolitan Police
5  Department in that case?
6    A  Yes.
7    Q  Okay.  Have you ever given a deposition
8  before?
9    A  No.
10   Q  Okay.  So given that it's your first
11 time, there's several rules for the deposition, or
12 we sometimes call them admonitions or -- or
13 instructions, regarding how we're going to proceed
14 today so we're on the same page.
15     First of all, understand that the oath
16 that was administered to you by the court reporter
17 is the same oath that you would take in a court of
18 law as if you were in front of a judge and a jury,
19 and it obligates you to tell the truth today under
20 penalty of perjury.
21     Do you understand that?
22   A  Yes.
23   Q  Your deposition is being videotaped
24 today, and that video may be played to the judge
25 or the jury if this matter goes to trial.

7

1      Do you understand that?
2    A  Yes.
3    Q  Okay.  The court reporter to my left and
4  your right is taking down everything that's said
5  during today's deposition, all of my questions and
6  your answers and any other comments that are made
7  in the room.  After the deposition is completed,
8  she will put all of those questions and answers in
9  a booklet or transcript form.  You'll actually
10 have the right to review that transcript and make
11 changes to your testimony if you wish.
12     However, I would like to explain to you
13 in advance that if you say one thing here today
14 during your deposition and then later you try to
15 change your testimony in a meaningful or
16 substantive way, as opposed to just correcting a
17 typographical error or something of that nature,
18 that I would have the right to comment on the fact
19 that you said one thing during today's deposition
20 and then later you changed your testimony.
21     Do you understand that?
22   A  Yes.
23   Q  It is very important for us to make a
24 good record today, so there's several things I'll
25 ask you to do for me.  First of all, if you don't

8

1  understand any of my questions, please ask me to
2  repeat or rephrase them, and I'll be happy to do
3  so for you.
4      During today's deposition, you need to
5  give an audible or verbal or out-loud response,
6  such as a "Yes" or a "No," as opposed to shaking
7  your head up and down or side to side or using
8  slang terms such as "Uh-huh" or "Huh-uh" if you
9  mean yes or no.
10     The reason I ask you to do that is
11 because those types of nonverbal responses or
12 slang responses, they don't show up well, if at
13 all, on the transcript.  So during today's
14 deposition, it's very common for people the first
15 time they go through this process to say "Huh-uh"
16 or they just shake their head.  I might ask you,
17 "Did you mean yes, or did you mean no?" because I
18 have to have something stated out loud on the
19 record for the court reporter.
20     Do you understand that?
21   A  Yes, I do.
22   Q  Additionally, you've done an excellent
23 job so far, but during today's deposition, as a
24 general rule, we have to avoid speaking at the
25 same time anyone else is speaking.  We'll all

9

1  afford you the same courtesy.  One of the reasons
2  we have to do that is it is very difficult for the
3  court reporter to accurately take down what two
4  people are saying at the same time.
5      So even if you believe you know the
6  answer to my question before I've completely
7  finished the sentence, please wait for me to
8  completely finish speaking before you begin your
9  response.
10     Can you do that for me?
11   A  Yes.
12   Q  During today's deposition, your
13 attorney, Mr. Anderson, may make an objection to
14 one or more of my questions.  I want to explain to
15 you how objections work during the deposition
16 process, because they work a little differently
17 than what you may have seen on TV or in a
18 courtroom.
19     During a deposition, you can see we
20 don't have a judge here to immediately rule on
21 objections.  So what we do during a deposition
22 is -- if I ask a question and Mr. Anderson wants
23 to make an objection for some reason, he will
24 state so on the record, and then we will still
25 look to you to give your response.  And then,



Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 6 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1   later, if a judge needs to go back and look at the
2   transcript, he or she can do so and make a ruling
3   at that time based on the transcript whether your
4   response is admissible.
5       So I explain that to you because it
6   confuses many witnesses the first time. Sometimes
7   they think they hear an objection so they're not
8   supposed to respond, but generally the opposite is
9   true. If I ask you some question that is truly
10  protected by a privilege or there's some other
11  reason Mr. Anderson thinks you are not legally
12  obligated to respond to it, I'm sure he'll make
13  that very clear.
14      Otherwise, you can essentially ignore
15  the objections and just let Mr. Anderson state
16  them for the record, and then we'll -- we'll
17  continue with your response.
18      Do you understand how objections will
19  work today?
20  A   Yes.
21  Q   Okay. Have you consumed any alcoholic
22  beverages in the last 24 hours?
23  A   No.
24  Q   Have you taken any drugs -- that would
25  include prescription medications -- within the

11

1   last 48 hours?
2   A   No.
3   Q   Do you have any sort of medical
4   condition -- an extreme example would be dementia
5   or Alzheimer's disease -- that may affect your
6   memory or your ability to testify here today?
7   A   I do not.
8   Q   Okay. Your deposition or this
9   deposition was set today pursuant to Federal Rule
10  of Civil Procedure 30(b)(6), and that's a special
11  rule that says if we have sued a legal entity,
12  like the Las Vegas Metropolitan Police Department,
13  we can serve a list of topics, and then it's up
14  for the department to present a witness who is
15  educated about and can speak about those topics in
16  a manner that binds the police department.
17      So, to be clear on this transcript as we
18  begin, I did not specifically request that you
19  come here today to testify. You were -- you're
20  being presented on behalf of the police
21  department. So what we've done is we've taken the
22  deposition notice and we've marked it as
23  Exhibit 1. I will pass that to you.
24      (Exhibit 1 was identified.)
25

12

1   BY MR. BREEDEN:
2   Q   And on page four of this exhibit,
3   there's a list of topics, and I've highlighted the
4   ones in yellow where you've been designated to
5   testify here today. So that was a long
6   introduction to this question.
7       But my question is: Prior to today's
8   deposition, have you reviewed this list of topics?
9   A   I have.
10  Q   And you are aware of the topics you've
11  been designated to testify today?
12  A   Yes.
13  Q   Okay. What, if anything, did you do to
14  prepare for the deposition? And when I ask that,
15  I mean, what documents have you reviewed? What
16  witnesses or defendants have you spoken to?
17  Explain to me what you've done.
18  A   Well, first, Craig Anderson notified me
19  that I was going to do this deposition, so I've
20  met with Craig Anderson on two personal times at
21  his office, probably an hour or two each time.
22  We've had numerous phone calls, texting back and
23  forth regarding this case.
24      I've reviewed the CIRT report reference
25  Mr. Williams and this case. I've reviewed

13

1   depositions from Lieutenant O'Daniel,
2   Officer Bertuccini, Sergeant Russ Backman, and
3   Detective Roth. I've read the search warrants
4   related to the Nellis apartment, as well as Jimmy
5   Durante, the residence, and the IAP associated to
6   this.
7       I also reviewed reports regarding
8   Jasmine King case; reviewed past SWAT manuals
9   back -- dated back in 2021 -- prior to 2021, the
10  incident, the SWAT manuals as far as -- and as
11  well as the current SWAT manual; reviewed policy
12  on search warrants as it lies today in our policy.
13  Q   Other than --
14      MR. ANDERSON: Body-worn camera.
15      THE WITNESS: Oh, I'm sorry. Reviewed
16  body-worn camera from multiple angles,
17  Sergeant Russ Backman, Officer Bertuccini, a
18  view -- a couple of different angles, but I
19  reviewed body-worn camera of that incident.
20  BY MR. BREEDEN:
21  Q   Okay. In preparing for the deposition,
22  did you review any documents or find any documents
23  that you believe had not already been produced in
24  this case?
25  A   I did not.



Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 7 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1    Q    Okay.  And --
2    A    Can -- can I ask for a tissue?
3         MR. ANDERSON:  Yeah, tissue.
4         THE WITNESS:  I'm sorry.
5         MR. BREEDEN:  Sure.  Well, let's go
6    off the record briefly.
7         THE VIDEOGRAPHER:  The time is
8    9:15 a.m.  We are off the record.
9         (Whereupon, a recess was taken.)
10        THE VIDEOGRAPHER:  The time is
11   9:17 a.m.  We are on the record.
12   BY MR. BREEDEN:
13   Q    Okay.  So, Lieutenant Beas, we're back
14   on the record now.
15        Other than reviewing other depositions
16   that were taken in this case, did you have any
17   personal conversation with any of the Metro police
18   officers who have been sued individually?
19   A    I have.  Previous to this, back when I
20   took over the SWAT team, I did have conversations
21   regarding this incident.  It's just something you
22   learn from.  So I've spoken with
23   Officer Bertuccini, Officer Jake Warner, Russ
24   Backman.  Those are the three main -- Sergeant
25   Alex Gonzales, Chris Latham.  Those are about the

15

1    main ones I can remember that were involved in
2    that incident.  Kerry Kubla -- I mean, obviously.
3    They all work for me.
4    Q    Okay.  And is it fair to say, though,
5    that you had no personal involvement in the
6    planning or execution of this SWAT action on
7    the -- on January 10 of 2022 at the time that it
8    happened?
9    A    I did not.
10   Q    Okay.  Were you on Las Vegas' SWAT team
11   or in the SWAT department at all at that time?
12   A    I was not.
13   Q    Okay.  So -- and we're going to get into
14   your employment here in just a second or two,
15   so --
16        Have you reviewed any expert reports
17   that have been produced in this litigation?
18   A    Other than those reports that I just
19   stated, no other reports.
20   Q    Okay.  And, I mean, just to clarify,
21   there's been police practices experts.  We have
22   produced reports by a Greg Gilbertson, as well as
23   a former Metro SWAT member whose -- whose name,
24   for some reason, I can't come up with right now.
25        MR. ANDERSON:  Tom Milton.

16

1    BY MR. BREEDEN:
2    Q    Tom Milton.
3         Have you reviewed those reports?
4    A    I did not.
5    Q    Okay.  Do you know Mr. Milton, by the
6    way?
7    A    I do.
8    Q    Okay.  Did you know him personally from
9    his time on the police force?
10   A    I knew him personally from the police
11   force, just from interactions on the department.
12   Q    Okay.  Was he -- would you call him a
13   friend or a personal acquaintance of yours?
14   A    I would say a work acquaintance.
15   Q    Okay.  And then there's been a defense
16   police practices expert also produced.  And,
17   again, for some reason, I can't come up with that
18   gentleman's name.
19        MR. ANDERSON:  Spencer Fomby.
20   BY MR. BREEDEN:
21   Q    Spencer Fomby.
22        Have you reviewed Mr. Fomby's report?
23   A    I did not.
24   Q    Have you spoken to Mr. Fomby?
25   A    I don't know who he is.

17

1    Q    Okay.  Well, let's -- let's talk a
2    little bit about your background and experience
3    with Las Vegas Metro.
4         First of all, what is your current title
5    or rank?
6    A    My current rank is a lieutenant on the
7    Las Vegas Metropolitan Police Department, and I'm
8    currently assigned to the SWAT section as the
9    tactical commander.
10   Q    And are you essentially the second in
11   command at SWAT?
12   A    Yes.  I have a captain who is above me
13   who is the SWAT commander.
14   Q    Okay.  And who is the current captain?
15   A    Hector Cintron, C-I-N-T-R-O-N.
16   Q    How long has Captain Cintron been the
17   SWAT captain?
18   A    I believe he came on around October of
19   last year.
20   Q    And how long have you been the -- would
21   you say it's the -- the tactical lieutenant?
22   A    Tactical commander, yeah.
23   Q    Tactical commander.
24   A    Same -- same thing.
25   Q    How long have you been the tactical

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1  commander or lieutenant, then, at SWAT?
2      A   I took over officially July 8th of 2023.
3      Q   And so let's get a little bit of an idea
4  about your background then.
5          What's the extent of your education?
6      A   I have an associate's degree at the
7  College of Southern Nevada in criminal justice.
8      Q   What year did you obtain that degree?
9      A   I believe it was 2003.
10     Q   Have you lived in Clark County, Nevada,
11 your whole life?
12     A   I have.
13     Q   And when did you first join Las Vegas
14 Metro?
15     A   I joined Las Vegas Metro on July 27th of
16 1998.
17     Q   Have you been continuously employed with
18 Metro since 1998?
19     A   I have.
20     Q   And, you know, we'll just say as an
21 adult -- and I realize that's a little vague, but
22 as an adult, have you always worked as a police
23 officer, or have you held other positions?
24     A   Prior to 1998, I joined the United
25 States Marine Corps in 1994 after graduating high

19

1  school.  I served four years in the Marine Corps.
2      Q   Okay.  So I'm just trying to -- to get a
3  timeline here.  It sounds like you graduated high
4  school.  You went into the Marine Corps for four
5  years.  After leaving the Marine Corps, you joined
6  Metro.
7          And then, apparently, while you were
8  employed by Metro, you were also getting a
9  criminal justice degree?
10     A   Yes, I started College of Southern
11 Nevada as a -- already employed with Metro.  In
12 between the United States Marine Corps, I worked
13 at the MGM as a security guard/EMT for two months
14 waiting to get hired on to Metro.
15     Q   When you were in the Marines, were you
16 military police?
17     A   I was a firefighter.
18     Q   When you were first hired by Metro, what
19 department or what assignment did you receive?
20     A   When I started Metro in 1998, after the
21 academy, after field training, I was in patrol.  I
22 finished field training, and I was stationed at
23 Northeast Area Command as a patrol officer.
24     Q   And so it might be easier just -- just
25 for you to explain it, but why don't you give me

20

1  an idea of your advancement through the department
2  up until the time that you became a lieutenant for
3  the SWAT team.
4      A   Okay.  Like I said, 1998, graduated the
5  academy in December, started field training, and
6  then I worked patrol officer.  Became an FTO,
7  field training officer, at the Northwest Area
8  Command.  In 2000 -- I believe it was '4, I became
9  a detective in the vice unit.  I was a vice
10 detective.  In 2007, I left the vice unit and went
11 to the surveillance section.
12         In 2008, November 1st, I was promoted to
13 sergeant and worked Bolden Area Command as a
14 graveyard sergeant.  I believe in 2012, I went
15 back to the vice section as a sergeant.  I moved
16 to the -- it was then called career criminal
17 repeat offenders program, which is now called
18 major violators section, as a sergeant in 2014.
19         A couple of years later, 2017, I went to
20 the narcotics section, where I worked the FBI Safe
21 Street gang task force.  Stayed in narcotics until
22 I promoted in 2019 as a lieutenant and became a
23 watch commander in June of 2019.  In February of
24 '20, I was moved to the counterterrorism section
25 as the lieutenant.  In December of '22, I moved

21

1  to -- to the major violators section as a
2  lieutenant.  And then in July of '23, I took over
3  as tactical commander of the SWAT team.
4      Q   Who was the prior tactical commander for
5  SWAT that you took over for?
6      A   His name was Lieutenant Joey Herring.
7      Q   Is Lieutenant Herring still with the
8  force?
9      A   He is -- he retired.
10     Q   And then, to your knowledge, prior to
11 Lieutenant Herring, was it Lieutenant O'Daniel who
12 was the SWAT lieutenant tactical commander?
13     A   Yes, she was.
14     Q   Okay.  And Lieutenant O'Daniel also
15 retired; right?
16     A   Yes.
17     Q   When did she retire?
18     A   I believe December -- sometime late '22
19 or early '23.  I believe Joey took over in
20 December of -- or January of '23.
21     Q   Have you ever been sued personally or
22 individually as a result of your employment at
23 Las Vegas Metropolitan Police Department?
24     A   I was taken to -- I don't know if it was
25 sued, but it was a diversity issue.

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 9 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1    Q    Have you ever had use-of-force
2    complaints made against you?
3    A    No.
4    Q    Did you ever go on the SWAT missions
5    prior to being promoted to tactical commander?
6    A    Starting in May of '23, I started to
7    ride along with SWAT, shadowing Lieutenant Joey
8    Herring.  So I would go on search warrants and
9    callouts, shadowing him as the tactical commander,
10   but not as an operator.
11   Q    Would you do -- I mean, SWAT and major
12   violators probably worked together on occasion.
13         Would you go on SWAT as part of major
14   violators?
15   A    Major violators, when -- sorry, when I
16   was in major violators as a sergeant and as a
17   lieutenant, we were mostly -- I won't say mostly,
18   but we did all the time -- it was either a PC
19   arrest or an arrest warrant for a subject, which
20   is totally opposite of search warrants for the
21   residence to search a place.  But we would deal
22   with SWAT frequently if a suspect or a subject
23   would not leave their residence.
24   Q    Have you ever been one of the SWAT team
25   members in the line, though, so to speak?  In

23

1    other words, doing the entry?
2    A    No, I was never an operator.
3    Q    Okay.  And just to talk a little bit
4    about some of the individual defendants, you know
5    Kerry Kubla; correct?
6    A    I do.
7    Q    Is he still on your SWAT team?
8    A    He is.
9    Q    Okay.  Is he someone that you see
10   frequently at work, then?
11   A    I work with Kerry Kubla, I believe,
12   three of his four days.
13   Q    Okay.  And then Officer Brice Clements,
14   is he still on SWAT?
15   A    He is not.
16   Q    Okay.  Why is he not on SWAT any longer?
17   A    I do not know.  He left prior to myself
18   getting up there.
19   Q    Is he still on the force?
20   A    Oh, I'm sorry.  I think Brice promoted
21   out of the SWAT.
22   Q    Okay.  Do you know what department he's
23   with, then?
24   A    He's in patrol.  He's on a patrol squad.
25   Q    Okay.  Is he somebody that you -- you

24

1    have spoken to in the past?
2    A    I've said hi to him a few times, and
3    that's about the extent of my talk with him.
4    Q    But he's somebody, if he walked into
5    this room, you would recognize him?
6    A    I would, yes.
7    Q    Okay.  Alex Gonzales -- is
8    Officer Gonzales still on SWAT?
9    A    Yeah, Alex promoted to sergeant, and he
10   is now a team leader on the SWAT team.
11   Q    Okay.  And so he's somebody that you see
12   frequently and work with frequently at work?
13   A    Again, I work with him three days of his
14   four days.
15   Q    Okay.  Russell Backman.
16   A    Russell Backman retired a few months
17   ago, and then Sergeant Alex Gonzales took his
18   spot.
19   Q    Okay.  And so Russell Backman is no
20   longer on the force, but did he retire while he
21   was on SWAT?
22   A    He did.
23   Q    Okay.  So he was somebody, at least for
24   a period of time, you worked with as well?
25   A    Exactly.

25

1    Q    Okay.  And he's somebody, if he walked
2    in here, you would recognize him?
3    A    I've known Sergeant Russ Backman since
4    we were in vice, detectives together, so I've
5    known him for a long time.
6    Q    Is that more than 15 years, then?
7    A    Yes.
8    Q    Okay.  James Rothenburg -- is
9    Officer Rothenburg still on SWAT?
10   A    He is not.
11   Q    Okay.  When did he depart SWAT?
12   A    I couldn't tell you.  I know he promoted
13   as a sergeant and went back to patrol.
14   Q    Okay.  So he's a patrol sergeant now?
15   A    I do not know where he's located --
16   where his duties are now, but ...
17   Q    Okay.  And then Officer Bertuccini -- is
18   he still on SWAT?
19   A    Yes, he is.
20   Q    Okay.  And is he somebody, then, that --
21   that you work with frequently at Metro?
22   A    Yes.
23   Q    Okay.  And then Lieutenant O'Daniel, my
24   understanding is she's retired now; correct?
25   A    She is.

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1    Q    Is she somebody, when she worked for the
2  force, you knew her?
3    A    Yes.
4    Q    Okay.  So if she walked in here today,
5  you would recognize her as well?
6    A    Yes.
7    Q    Okay.  Have you had any discussions with
8  her specifically about what happened with either
9  the Jasmine King or the Isaiah Williams matters?
10    A    No, not at all.
11    Q    Okay.  To your knowledge, have any of
12  those individual defendants been disciplined or
13  received any sort of retraining as a result of
14  what happened in Mr. Williams' matter?
15    A    Through the reports that I've read, I do
16  not believe any of them were disciplined
17  internally for this incident.
18    Q    And, in fact, as you just testified,
19  several of them have been promoted, despite the
20  incident; right?
21    A    Yes.
22    Q    As part of your job with Las Vegas
23  Metro, have you testified in court before?
24    A    Yes, I have.
25    Q    How many times?

27

1    A    In front of a jury, at least two times.
2  Not more than three or four.
3    Q    Okay.  And those were instances where
4  you or Metro was not being sued; those are in
5  association with a criminal investigation?
6    A    It was.
7    Q    Okay.  It seems like you remembered two
8  occasions pretty clearly.
9        Can you describe those to me?
10    A    The first occasion I remember was my
11  first time.  It was reference a -- a subject that
12  had connected his ex-girlfriend at her home, took
13  her in a vehicle, and it became a vehicle pursuit
14  that went out to Indian Springs and ended in an
15  accident where they rolled over, and he was
16  arrested for kidnapping, and I was the arresting
17  officer.
18    Q    And what's the second occasion you're
19  thinking of?
20    A    The second occasion is when I was a vice
21  detective and we arrested a subject for pandering.
22    Q    Have you ever testified in court
23  relating to a SWAT action?
24    A    No.
25    Q    What involvement do you have with

28

1  training SWAT officers?
2    A    As the tactical commander, I oversee
3  everything from day to day that happens in the --
4  the SWAT section.  As part of the section, we have
5  a -- a squad that's called a training section, and
6  it's led by a sergeant, Sergeant Brett Brosnahan,
7  and three operators.
8        These three operators are senior
9  officers that have shown the ability -- not only
10  the experience and knowledge, but the ability to
11  also teach.  And they are responsible for all
12  training to all of our operators.  And this is --
13  includes SWAT school, weekly training, all of the
14  lesson plans to make sure they're current,
15  teaching lesson plans, and coming up with new
16  training based on new things that we see
17  throughout the year.
18    Q    And do you personally teach any of those
19  classes?
20    A    I do not.
21    Q    Okay.  That's left to Sergeant Brosnahan
22  and others?
23    A    And his team, yes.
24    Q    Okay.  Do you take part, though, in
25  changing or updating the instruction?

29

1    A    Yes.  Since I have been tactical
2  commander, we have created a leadership team.
3  It's composed of the SWAT commander, myself, all
4  four team leaders, all four assistant team
5  leaders, and the training section.
6        If we see that there's a new way of
7  doing things, a new tactic, a new tool, a new
8  piece of equipment, we talk about it as a group,
9  and it's -- through a committee, we either agree
10  to adopt that new tactic, buy that new piece of
11  equipment, or buy that new piece of -- a vehicle
12  or something like that.
13        So myself and the SWAT commander have
14  the final say in if we're going to move that
15  direction.
16    Q    So part of what you do as the tactical
17  commander for SWAT, though, is to review the
18  instruction to make sure it's adequate; right?
19    A    Yes.
20    Q    Okay.  When we talk about standards and
21  training for SWAT, would you agree with me that
22  there are department standards, then there are
23  state or national standards, and then there's
24  constitutional standards?  Do you agree with that?
25    A    As in tactics or in, like, laws?



30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1    Q   Just -- yeah, generally speaking,
2  regarding policies for SWAT and how SWAT actions
3  are to be conducted.
4    A   I could agree with you.
5    Q   Okay.  And you agree with me that all
6  Metro's policies need to comply with the
7  United States Constitution; correct?
8    A   Correct.
9    Q   And they need to comply with the Nevada
10  state constitution as well; right?
11    A   Correct.
12    Q   They need to comply with Nevada state
13  law as well; right?
14    A   Correct.
15    Q   And then there are some national or --
16  or state standards.
17       Are you familiar with Nevada POST?
18    A   I am.
19    Q   Okay.  Would you consider that to be an
20  organization that is reliable in the standards
21  that it's published?
22    A   It oversees our certification as law
23  enforcement officers, so yes.
24    Q   Are Metro's department policies required
25  to comply with POST?

31

1       MR. ANDERSON:  Objection.  Form.
2       Go ahead and answer.
3       THE WITNESS:  I believe -- I don't --
4  I couldn't answer.  I don't know if they have to
5  require to -- everything POST says, because POST
6  is a standard of law enforcement training and
7  standardization, so I do not meet the -- I don't
8  know if they meet the threshold for state law or
9  U.S. law.
10  BY MR. BREEDEN:
11    Q   Yeah.  So let -- so let me phrase it
12  this way.
13       Is it your understanding that Nevada
14  POST, if they publish some sort of a training, is
15  that a recommendation or a requirement that Metro
16  follow that?
17    A   A requirement.
18    Q   Okay.
19    A   As far as training hours.
20    Q   So you think it's -- so you think it's
21  mandatory?
22    A   I don't believe everything that POST
23  publishes is mandatory, but it's a -- it's a
24  threshold.
25    Q   Okay.  Well, what -- what do you mean

32

1  by -- by "threshold"?
2    A   Like --
3    Q   Do you mean that it -- that the
4  department's policies should at least meet POST's
5  policies?
6    A   At least meet the POST policies, yes.
7    Q   Okay.  So I would say, then, that what
8  you're describing is that Metro's policies, in
9  your opinion, should be at least as -- they should
10  require at least as much as Nevada POST, and they
11  can even exceed that.  Is that what you're saying?
12       MR. ANDERSON:  Objection.  Form.
13       Go ahead.
14       THE WITNESS:  Yes.
15  BY MR. BREEDEN:
16    Q   Okay.  And then let's see here.
17       So in terms of constitutional standards,
18  does Metro provide its SWAT officers any
19  instruction on particular court cases and
20  requirements from those decisions?
21    A   In search warrant planning and tactical
22  planning, we do cover some case law that regards
23  to search warrants and U.S. law and -- and state
24  law.
25    Q   Okay.  We're going to talk about some

33

1  specific cases a little later in your deposition,
2  but I want to ask you -- you know, you're the SWAT
3  tactical commander -- are you familiar with the
4  United States Supreme Court case of Wilson v.
5  Arkansas?
6    A   I am.
7    Q   Okay.  And so can you generally describe
8  what that case discusses?
9    A   The -- it's a case that kind of cements
10  the knock and announce -- the announcement of the
11  police to the property, the defendant, from a
12  common law to actually a case law -- to give them
13  a reasonable amount of time to submit, given
14  the -- their -- their authority and position of
15  the officers before the search warrant.
16    Q   Is there anything -- well, it's before
17  force can be used to enter when serving a warrant;
18  right?
19    A   Correct.
20    Q   Okay.  And that case actually says that
21  that is a constitutional requirement under the
22  Fourth Amendment; right?
23    A   Yes.
24    Q   Okay.  There's some decisions applying
25  Wilson v. Arkansas from the Ninth Circuit Court of

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 12 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1  Appeals. One of them is United States v.
2  Granville.
3        Are you familiar with that case?
4    A   Not offhand.
5    Q   Okay. There's another case called
6  United States v. Banks.
7        Are you familiar with that case?
8    A   I am, because it's a -- it's a North
9  Las Vegas case and -- yes, I'm familiar with that.
10   Q   Okay. And what's your understanding,
11  just to describe it to a layperson, what that case
12  discusses?
13   A   Again, it goes to announcing your
14  authority and purpose prior to making forcible
15  entry. In U.S. v. Banks, they went on to describe
16  timing of reasonableness for that specific case.
17   Q   Okay. In the training that's provided
18  to SWAT officers, is Wilson v. Arkansas ever
19  specifically mentioned or cited in the training?
20   A   Yes, and it's also in our policy manual.
21   Q   Okay. And is United States v. Granville
22  specifically mentioned?
23   A   I don't recall.
24   Q   Is United States v. Banks specifically
25  mentioned?

35

1    A   I don't believe so prior to this
2  incident. It has been recently, though.
3    Q   Okay. So prior to January 10 of 2022,
4  to your knowledge, training that Metro gave SWAT
5  did not specifically include United States v.
6  Banks?
7    A   I couldn't be 100 percent, but the
8  documents that I've been reviewing prior to this
9  case, I can't find U.S./Banks.
10   Q   Okay. And just generally speaking,
11  would you agree with me that for Metro to
12  effectively train its SWAT officers on knock and
13  announce, it should be training them on the major
14  court decisions that they have to comply with?
15       MR. ANDERSON: Objection. Form.
16  Go ahead and answer.
17       THE WITNESS: They should be trained
18  on everything that's associated with knock and
19  announce and search warrants, correct.
20  BY MR. BREEDEN:
21   Q   And would you agree with me that, at
22  least in that respect, prior to the incident in
23  this case, Metro failed in that job?
24       MR. ANDERSON: Objection. Form.
25       THE WITNESS: I can't say that they

36

1  failed, because -- just because it's not
2  documented, I can't -- I can't speak to the fact
3  that it wasn't informally talked about, because it
4  is a local case and I'm sure the -- the tactical
5  commander -- well, they would know that and talk
6  with that. But I just -- in my research, I could
7  not find that in previous formal documents.
8  BY MR. BREEDEN:
9    Q   Okay. There's no evidence in writing
10  that there was instruction given; correct?
11   A   Correct.
12   Q   Okay. And would you agree with me,
13  then, that if it -- in the verbal instruction as
14  well, there was no instruction on those cases,
15  that would be a failure of training?
16       MR. ANDERSON: Objection. Form.
17       THE WITNESS: I don't know if it would
18  be a complete failure of training, as -- as long
19  as they're touching parts that are -- that are
20  critical to the search warrant with U.S. and
21  Nevada state law.
22  BY MR. BREEDEN:
23   Q   Okay. I'm going to skip around a little
24  bit -- well, look, I don't want to dwell on this
25  subject.

37

1        But as you sit here today, you can't
2  tell me any of that training occurred, can you?
3    A   I do know that they discuss in the
4  search warrant planning and tactical planning case
5  law. I can't find documentation of every single
6  incidence, what they were trained of, but there is
7  lesson plans that cite certain cases, Wilson v.
8  Arkansas being one of them. I'm sorry, the --
9    Q   Yeah, but -- but you yourself aren't
10  even familiar with United States v. Granville, and
11  you can't find anything in the training materials
12  that specifically mentions United States v. Banks
13  either; correct?
14   A   Prior to this incident, no.
15   Q   Prior to this incident. Okay.
16       I'm going to skip around in the topics
17  just a little bit here.
18       First of all, when we talk about
19  warrants and how warrants are to be served, we
20  have no-knock warrants and then other warrants,
21  which I guess you could call regular warrants, or
22  knock-and-announce warrants.
23       What -- what term would you use for
24  that?
25   A   For other warrants that are not no-knock



30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**38**

1  warrants?
2      Q    Correct.
3      A    Well, just to go back a little bit,
4  they're all search warrants in a sense.  They're a
5  search warrant signed by a judge, approved by a
6  district attorney, written by a detective or an
7  officer.  When we get those search warrants, if
8  they specifically requested a no-knock search
9  warrant, that's just a tactic that the SWAT team
10  uses in serving those search warrants.
11      So I would say a no-knock search warrant
12  is -- it's different in a case, because it gives
13  us authority to not knock and announce our
14  presence prior to making forcible entry.  But
15  those would be tactics in serving a search
16  warrant.  So if you're asking specifically about
17  tactics, we do have different tactical options in
18  serving search warrants.
19      Q    Okay.  So one of those tactics is a
20  no-knock warrant; correct?
21      A    Correct.
22      Q    And you agree that the warrant in this
23  particular case was not a no-knock warrant.
24      A    It was not a no-knock warrant, correct.
25      Q    Okay.  So it was a warrant that had to

---

**39**

1  be served according to the knock and announce
2  rule?
3      A    Correct.
4      Q    Okay.  And so what does the knock and
5  announce rule actually require of officers?  Like,
6  if you'll just regurgitate for me the -- the legal
7  definition of it.
8      A    Again, prior to making forcible entry,
9  the SWAT officers or officers in general have to
10  announce their presence and authority and purpose
11  to the occupants in that dwelling, and they have
12  to fail to surrender prior to making forcible
13  entry.
14      Q    Okay.  Do you agree with me that one of
15  the requirements of the knock and announce rule is
16  to knock?
17      A    I do not agree with you on that.
18      Q    Do you agree one of the requirements is
19  that the police announce their presence and
20  purpose -- purpose meaning, for example, to serve
21  a search warrant?
22      A    Yes.
23      Q    And then do you agree with me that one
24  of the requirements of knock and announce is that
25  Metro wait a reasonable amount of time for persons

---

**40**

1  inside the residence to come to the door,
2  ascertain the officers' identity and purpose, and
3  allow them entry?
4      A    SWAT officers should wait a reasonable
5  amount of time, yes.
6      Q    Okay.  And officers are required to
7  comply with knock and announce before forcefully
8  entering a residence; correct?
9      A    They have to comply with the knock and
10  announce law by reasonably giving them
11  announcements, reasonably giving them time before
12  the forcible entry, yes.
13      Q    Okay.  Based on the court decisions,
14  what is the rationale behind requiring the knock
15  and announce rule?
16          MR. ANDERSON:  Objection.  Form.
17      Go ahead and answer.
18          THE WITNESS:  It goes back to common
19  law of just announcing our presence prior to
20  making forcible entry so they know we have a
21  lawful search warrant.
22  BY MR. BREEDEN:
23      Q    Okay.  Does Metro consider one of the
24  reasons behind that rule to reduce the risk of
25  harm to both the officers and the occupants inside

---

**41**

1  the residence when the warrant is served?
2      A    Those are two main factors, and the
3  third would be the citizens around there.
4      Q    Okay.  Are there certain factors -- you
5  know, when we talk about a reasonable amount of
6  time for officers to wait under the knock and
7  announce rule, are there certain factors that
8  affect what the officer should consider to be
9  reasonable?
10      A    Oh, there's several factors.  It could
11  fluctuate your reasonableness of time.
12      Q    Can you explain those factors to me?
13      A    Size of the -- the structure; the area
14  of where it's presented, if it's a tight apartment
15  complex, townhomes, also if it's in a rural area;
16  subjects inside, if you know they could be armed
17  or violent; proximity to citizens; the ability to
18  contain the structure; belief that evidence could
19  be destroyed.  Those are -- those of some of the
20  factors.
21      Q    Okay.  And I don't think -- there's one
22  that I don't think you mentioned, which is the
23  time of day that the warrant is served.
24      A    Oh.
25      Q    Do you --

---

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1      A    Time of day could affect reasonableness
2   of time.
3      Q    Okay.  You agree with that as well?
4      A    Yes.
5      Q    Okay.  And does Metro agree that knock
6   and announce is required by the Fourth Amendment
7   to the United States Constitution?
8      A    Is a requirement by the U.S.
9   Constitution?
10     Q    Yes.
11     A    Correct, yes.
12     Q    And then are you familiar with NRS
13  Section 179.055?
14     A    I am.  That's the NRS that governs
15  search warrants and the service of search
16  warrants.
17     Q    And so does that Nevada state law also
18  incorporate the knock and announce rule?
19     A    It does.
20     Q    Okay.  And, in fact, it requires -- I'll
21  just read it to you.  It says, quote, "The officer
22  may break open any outer or inner door or window
23  of a house or any part of the house or anything
24  therein to execute the warrant if, after notice of
25  authority and purpose, the officer is refused

43

1   admittance," end quote.
2         So Nevada state law actually uses the
3   phrase that officers must be "refused admittance."
4         Do you understand that?
5      A    I do.
6      Q    Okay.  And do you believe that
7   requirement under state law, the refusal of
8   admittance, do you believe that is essentially the
9   same as the Fourth Amendment's knock and announce
10  rule, or do you believe that that is a -- is a
11  greater protection?
12         MR. ANDERSON:  Objection.  Form.
13         Go ahead and answer.
14         THE WITNESS:  It's essentially the
15  same, but they just structure it and word it
16  different, the -- or the submitting.
17  BY MR. BREEDEN:
18     Q    Okay.  So it's Metro's position that
19  there's no practical difference between the state
20  law and the federal knock and announce rule?
21     A    The state law is more restrictive than
22  the -- the U.S. law.
23     Q    How is it more restrictive?
24     A    But putting those words in there of
25  actually submitting -- or, I'm sorry, failure

44

1   to -- what was the exact --
2      Q    It would be the officer's refused
3   admittance.
4      A    Refused admittance.  The actual verbiage
5   of refused admittance.
6      Q    Okay.  And in Metro's position, what is
7   necessary to establish that the officer has been
8   refused admittance?
9      A    Refused admittance could be many
10  factors.  It could be a suspect looking out a
11  window and not opening the door during the
12  announcements.  It could be you hearing noises
13  inside that you know -- you hear movements.  Or it
14  could simply just be nobody is at the door,
15  opening the door, submitting to your request of --
16     Q    Well, if it just meant nobody was at the
17  door, then that refusal of admittance requirement
18  wouldn't mean anything; right?  That would --
19  under that construction, Metro could just burst
20  through any door where somebody wasn't standing
21  right there to -- to open it.  So it must mean
22  something more than that.
23     A    I believe you still have to give a
24  reasonable amount of announcements, because there
25  could clearly not be anybody home during the

45

1   service of the search warrant and then no door
2   open, but equal to be somebody could be inside
3   fortifying their position or becoming armed or
4   destroying evidence and not opening the door or
5   looking out a window.
6      Q    When we talk about SWAT tactics, what is
7   a CET?
8      A    CET is a controlled entry tactic.
9      Q    And so what -- what does that mean?
10     A    That's essentially -- it's a type of
11  service, a tactic during a search warrant.  It's a
12  dynamic search warrant.  It's where they get
13  information.  Again, it has to fit the criteria
14  based on size, suspects, crime.
15         There's numerous factors that -- if the
16  CET tactic is approved to use.  They establish
17  containment.  They establish the announcing of the
18  search warrant prior to them making forcible entry
19  if that's needed.  And once forcibly -- forcibly
20  entering or a door is opened, an entryway is
21  opened, they flood that structure, and they take
22  it room by room to overwhelm that structure to
23  make it safe for the service of the search
24  warrant.
25     Q    The very concept behind a CET entry is



30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**46**

1  that SWAT is supposed to use surprise and
2  overwhelming force in entering the structure;
3  correct?
4      A   Speed, surprise, and overwhelming
5  action, yes.
6      Q   And so given that CET requires speed,
7  surprise, and overwhelming action, whereas the
8  knock and announce rule requires that officers
9  wait a reasonable amount of time after they've
10 announced their presence for somebody to come to
11 the door and allow them entry, does Metro consider
12 CET to be in conflict with the knock and announce
13 rule?
14     A   After this incident, they did see that
15 there was a conflict in the language of the CET
16 based on the reasonableness of time.
17     Q   Okay.  And so it took this incident for
18 Metro to realize that?
19     A   I don't think it was just this incident.
20 It was various incidents throughout the U.S.
21 during that time period, very high profile cases
22 with SWAT and search warrants.  There was a new –
23 I guess a law expert that was hired by Las Vegas
24 Metropolitan Police Department that agreed that it
25 was in conflict and made recommendations, as well

---

**48**

1  officers, and/or the suspects that we deal with.
2      And at this case, they took a look at,
3  based on recommendations by CIRT and Anthony
4  Bandiero -- I can't -- I don't know if I'm saying
5  his name right -- to change the tactic based on
6  the language that we're using, the speed,
7  surprise, and overwhelming action, to make that a
8  no-knock search warrant.
9  BY MR. BREEDEN:
10     Q   Yeah, so CET should only be used on a
11 no-knock warrant; is that correct?
12         MR. ANDERSON:  Objection.  Form.
13         Are you talking about Fourth Amendment
14 or policy?
15         MR. BREEDEN:  Well, we can break it
16 down.
17 BY MR. BREEDEN:
18     Q   So under department policy, is it true
19 that CET should only be used on a no-knock
20 warrant?
21     A   As it currently sits today, we actually
22 took the -- we call it a dynamic search warrant,
23 but it's essentially the same as a CET.  It can
24 only be used if we have a no-knock search warrant,
25 and that's based on police policy, our

---

**47**

1  as CIRT recommendations.  The new sheriff, as well
2  as the new director of SWAT, changed that
3  language.
4      Q   Okay.  But it wasn't because the knock
5  and announce rule or how it was defined changed.
6  It's just that Metro had a policy in place, and
7  then, as a result of this incident, it realized
8  it's -- the CET policy was not in compliance with
9  knock and announce; correct?
10         MR. ANDERSON:  Objection.  Form.
11         THE WITNESS:  Yeah, that CET was in
12 place for 20-plus years.  It was a tried and true
13 method of a tactical that -- it was a national
14 standard through National Tactical Officers
15 Association, through numerous SWAT teams that used
16 it on a daily basis, and Las Vegas Metropolitan
17 Police Department used it thousands of times.
18         And, yes, this incident, as well as
19 other incidents that the Metropolitan Police
20 Department was involved in, they took a look at
21 it:  Is there a better way that we can do things?
22 And just like anything in policing, they want to
23 take a look.  It doesn't mean it's a violation of
24 any law.  It's just could we do something better
25 to protect the citizens of Las Vegas, the

---

**49**

1  department's policy, not on case law.
2      Q   And so the next question, then, is:  Is
3  it the department's position that under the Fourth
4  Amendment, CET entry as it was being used by Metro
5  conflicted with the knock and announce rule?
6          MR. ANDERSON:  Objection.  Form.
7          Go ahead and answer.
8          THE WITNESS:  I think they could not
9  come to a full agreement.  The -- the CET still
10 complied with the knock and announce rule as far
11 as service of the search warrant.  The tactic,
12 again, was used for 20-plus years.
13         After reviewing this incident, they
14 started looking into national trends, national
15 SWAT teams changing their tactics.  Hundreds of
16 SWAT teams have changed their tactics going away
17 from the CET or dynamic search warrants to a more
18 what we would call "surround and call out" or a
19 modified CET.
20         When that consultant said that the
21 language of speed, surprise, and overwhelming
22 action conflicted with giving reasonable
23 announcements, the department took that and asked
24 us to change it.  But it took, I would say, at
25 least a year after that CIRT report to -- to

---

50

1  finally make that change, and it was through a new
2  director, a new sheriff, and a new tactical
3  commander that it changed.
4  BY MR. BREEDEN:
5     Q   Okay.  So just to sort of summarize
6  here, after this incident, there was an
7  investigation of what occurred and whether there
8  was a failure in policy; correct?
9     A   Correct.
10    Q   Specifically as it pertained to CET
11 entry and whether CET entry complied with state
12 and federal knock and announce requirements;
13 correct?
14    A   Correct.
15    Q   There was a legal consultant who was of
16 the opinion that it did not; correct?
17    A   He stated that the language used in that
18 policy conflicted with the -- the knock and
19 announce reasonableness of time.
20    Q   And then the critical incident review
21 team, or CIRT, came to the same conclusion;
22 correct?
23    A   Yes, but the basis of it is -- is the
24 actual language of speed, surprise, and
25 overwhelming action.  It's not the tactic itself.

51

1     Q   Okay.  Well, speed, surprise, and
2  overwhelming action was used to enter the
3  apartment where Mr. Williams was on January 10th
4  of 2022; correct?
5     A   Correct, the CET was used.
6     Q   Okay.  And then the CIRT findings were
7  also reviewed by the tactical review board or the
8  TRB; correct?
9     A   Correct.
10    Q   And TRB agreed with CIRT's findings;
11 correct?
12    A   Correct.
13    Q   Okay.  And so is Metro today taking a
14 position that, for some reason, the tactical
15 review board and the CIRT review and the CIRT team
16 were incorrect in their conclusions?
17        MR. ANDERSON:  Objection.  Form.
18        THE WITNESS:  What we agreed upon,
19 that the CIRT recommendations that keeping the
20 language of speed, surprise, and overwhelming
21 action, that tactic would be a no-knock search
22 warrant.
23 BY MR. BREEDEN:
24    Q   In the SWAT world, what is a SACO
25 technique?

52

1     A   SACO, SACO, surround and call out.
2     Q   Okay.  And so what does that mean, and
3  how is it different from a CET?
4     A   A SACO is, again, another tactic used in
5  service of a search warrant.  If -- if a -- a
6  tactic of CET is not authorized or doesn't fit,
7  based on some of the criteria I spoke about
8  earlier about the size of the property, the
9  suspects, the crime, what we're going after, if we
10 can contain that to protect the officers, the
11 citizens, and the occupants, and we can safely
12 contain that 360 -- we call one, two, three, and
13 four sides -- we can contain all four sides safely
14 without any regards to possibly escape or going
15 into another residence.
16        Simply a surround and call out is just
17 what it kind of says, is we surround it, contain
18 it, and then we start our announcements once it's
19 contained and surrounded.
20    Q   So you're going to surround the area
21 that is the subject of the warrant, and then
22 you're going to make an announcement that says
23 something like "Las Vegas Metropolitan Police.
24 Search warrant.  Please exit the residence."
25        You know, how does it go?

53

1     A   It's essentially that.  "Las Vegas
2  Metropolitan Police Department SWAT team.  We have
3  a search warrant for resident A, B, C.  Please
4  come out with your hands up."  It -- there --
5  there is no clear magical words or dedicated
6  lines, but that's essentially what we want to say.
7  We want to announce that we're the Las Vegas
8  Metropolitan Police Department SWAT team, we have
9  a search warrant, and what the residence is.
10    Q   Does Metro believe that surround and
11 call out is in conflict with the knock and
12 announce rule?
13    A   No.
14    Q   Can you describe for me all the reasons
15 why surround and call out was not used for the
16 January 10, 2022, incident regarding Mr. Williams
17 and who made that decision as to why surround and
18 call out would not be used?
19    A   Okay.  That's a long question.
20        But just to say, I have never been to
21 that location.  But through all my reading and
22 reports and looking up that address and reading
23 the reports of the -- the recommendation for the
24 use of the CET, I would say, first, the ATL that
25 day comes up with the plans to present to his team

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  leader. The ATL will come up with options.
2       In speaking with now-Sergeant Jacob
3  Warner, he did have both options available. The
4  best option that he believed was the CET option
5  for the tactical option.
6       He presented that to both Garth Findley
7  and Russ Backman. I believe Garth Findley was on
8  vacation during the planning process of this, and
9  it was presented to Russ Backman, who then had to
10 get it approved through the tactical commander,
11 Melanie O'Daniel.
12      The reasoning for the CET and not to go
13 to the SACO on that, again, it was a corner
14 building apartment that it was tight to bring in
15 armored vehicles, our BearCats, large vehicles.
16 It had an AMPM -- I don't know the direction, but
17 I'm -- so I'm going to call it the sides that I
18 know. So the building, on the four side, would be
19 an AMPM with a small wall with some wrought iron
20 gates.
21      And then to the three side would be
22 Nellis, kind of an open main thoroughfare. And
23 they had a wraparound, a -- the apartment complex.
24      It was a small apartment. I believe it
25 was a one-bedroom, 750 square feet, if I'm

55

1  correct, somewhere around that range, with
2  suspects that are believed to be armed and have
3  violent priors.
4       Based on all of those factors and the
5  factors, they believed they could not contain it
6  by a surround and call out, given that -- the
7  closeness of neighboring apartments, the violence
8  associated with the crime being investigated, the
9  area itself in general, like I said, the open
10 areas of the AMPM and Nellis Boulevard, we
11 couldn't contain it fully, they -- they decided on
12 the surround and call out, which was ultimately
13 approved by the tactical commander, Melanie
14 O'Daniel.
15      Q    I think you may have misspoken. I think
16 you meant -- you said they agreed on surround and
17 call out. I think you meant they agreed on CET.
18      A    I'm sorry. I apologize. I -- they
19 agreed on the CET, controlled entry tactic, which
20 was approved by Melanie O'Daniel. That was
21 briefed to her by Russ Backman.
22      Q    And I want to make a distinguishment
23 here.
24      Is it Metro's position that either CET
25 or SACO was feasible, but CET was preferred, or is

56

1  Metro saying SACO was not even feasible due to
2  certain factors; the only thing we could use here
3  was CET?
4       A    Metro as a whole -- so if you're talking
5  about Metro, the department -- leaves it up to the
6  SWAT section, the tactical commander at the time,
7  to make a decision on what tactic to use. Again,
8  going back to everything that an ATL had seen on
9  the recon, had seen on the overlay of the maps,
10 based on his training, experience being up there,
11 being an ATL, believed that the CET was a better
12 tactic to use than the -- the SACO.
13      Q    Okay. So it was -- either one in
14 Metro's position was available for use; it is just
15 that SWAT preferred CET; is that --
16      A    I -- I believe that night, that
17 incident, it was overwhelmingly better for them to
18 use the CET than the SACO based on what they --
19 they believed they had at hand.
20      Q    Okay. But was SACO a viable option?
21      A    I wouldn't use viable. I would use an
22 option.
23      Q    Okay. So it was at least an option, but
24 it was not used?
25      A    Correct.

57

1       Q    And are you aware that Nevada law
2  actually requires de-escalation techniques?
3       A    Correct.
4       Q    Okay. De-escalation is the concept that
5  law enforcement should be using the least
6  confrontational option; correct?
7       MR. ANDERSON: Objection. Form.
8       THE WITNESS: It's not always the
9  least amount, but in progressions, correct.
10 BY MR. BREEDEN:
11      Q    Okay. Do you believe that use of the
12 CET is compliant with de-escalation?
13      A    Yes.
14      Q    Okay. So that would seem to be
15 contradictory, because CET is a much more
16 confrontational. It involves much more use of
17 force. It involves speed, surprise, and
18 overwhelming force, versus a SACO.
19      So why does Metro consider a CET over
20 SACO to be compliant with de-escalation?
21      A    Number one would be safety factors, not
22 only for the occupant inside the residence, the
23 citizens and officers involved. And
24 de-escalation, again, it doesn't mean you always
25 have to use the lowest amount of force needed,

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

1  because sometimes you're presented with a higher
2  level of force and you have to come -- come back
3  with a -- a level of force that is equal to amount
4  to that.
5          The CET, again, the speed, surprise, and
6  overwhelming action is based on taking that
7  structure, once inside, with speed, surprise, and
8  overwhelming actions to make sure that, again, the
9  officers are safe, the citizens are safe in the
10 residence next door, and the occupants.
11         They verbalize their announcements to
12 give a reasonable amount of time. They use
13 different options prior to hitting the door and
14 verbalizing their announcements all the way
15 through. So, again, I believe it still complies
16 with de-escalation; it's just not the same as a
17 SACO. Two separate and distinguished options to
18 use during search warrants.
19    Q   Well, with due respect to you, you talk
20 about the CET being used for safety. Mr. Williams
21 was shot and killed during this.
22         It certainly didn't ensure his safety,
23 did it?
24         MR. ANDERSON: Objection. Form.
25         THE WITNESS: Again, Mr. Williams'

59

1  death is tragic, and that's not what we plan to do
2  when we do the search warrants. Again, we
3  scrutinize our plans. They're briefed through an
4  ATL, through a team leader to a tactical
5  commander. They're briefed to the team. And none
6  of this -- again, we go through training, we go
7  through the planning phase of the briefing to make
8  it safe. That is beforehand.
9          Once we made entry, again, tragically,
10 Mr. Williams decided to shoot 18 times at the
11 officers making entry, so ...
12 BY MR. BREEDEN:
13    Q   Does Metro believe that if it had used a
14 SACO instead of a CET, that this incident more
15 likely than not would not have occurred?
16         MR. ANDERSON: Objection.
17 Speculation.
18         Go ahead and answer.
19         THE WITNESS: Obviously, a SACO being
20 different in -- in tactics, we would not have
21 Officer Kubla inside that quickly. I cannot say
22 if Mr. Williams would have come out and used that
23 firearm or once we made entry -- because,
24 eventually, we have to make entry on a SACO --
25 that it still wouldn't have occurred. But it

60

1  wouldn't have been that same timing.
2  BY MR. BREEDEN:
3     Q   Well, the -- the firefight that occurred
4  that resulted in Mr. Williams' death and -- and
5  you mentioned, you know, the times that he
6  fired -- Mr. Williams was shot 17 times by police.
7          More likely than not, SACO would have
8  avoided that result --
9          MR. ANDERSON: Objection.
10 Speculation.
11 BY MR. BREEDEN:
12    Q   -- do you agree?
13         MR. ANDERSON: I'm sorry. Objection.
14 Speculation.
15         THE WITNESS: I agree to the point of
16 that incident. But, again, even in a SACO, we
17 have to make entry at a certain point, so I cannot
18 speculate on whether Mr. Williams would have been
19 inside there and still did that. But, yes, it
20 wouldn't have happened that way.
21 BY MR. BREEDEN:
22    Q   I want to talk about noise flash
23 diversionary devices. Sometimes we've been
24 calling them NFDDs for short.
25         Just explain generally what an NFDD is.

61

1     A   Again, a NFDD is a low-level use of
2  force option that we have. We use them
3  predominately on all of our callouts to barricades
4  or hostage situations and search warrants as a
5  means to cause -- they're a couple different
6  purposes.
7          We can use them, again, to alert that we
8  are out there, to get their attention, that there
9  were police. They're used like -- they're a
10 diversionary device to disorientate, confuse
11 somebody inside a residence to give them that
12 split second pause so we have -- again, we have
13 overwhelming action -- we have the upper hand. It
14 takes away a -- a visual and auditory just for a
15 slight second, again, to get the upper hand.
16         So it's more of a tactic to give that --
17 give us the tactical advantage. And when we
18 either have to go in on a hostage situation, a
19 search warrant, that's when we use them, on all
20 operations.
21    Q   So NFDDs come in different kinds, but
22 some of them create a very bright flash; correct?
23    A   We use -- today we use three different
24 kinds of NFDDs, correct.
25    Q   Okay. But -- and some of them create a

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

62

1  bright flash; correct?
2      A    Correct. I'm sorry. Yeah.
3      Q    Have you ever been near one of those
4  when it -- when the flash went off?
5      A    Yes.
6      Q    How long would you say that that affects
7  your vision?
8      A    Half a second. A second.
9      Q    Half a second?
10     A    If you're -- if you're looking directly
11  at it. I mean, we try not to -- we train not to
12  look at them. But it's a bright, quick flash of
13  light.
14     Q    Well, what if you happen to be looking
15  directly at it when it went off, how long do you
16  think that would affect your vision?
17         MR. ANDERSON: Objection.
18  Speculation.
19         Go ahead.
20         THE WITNESS: A second or two.
21  BY MR. BREEDEN:
22     Q    And then do you think it would be longer
23  if that went off in a dark environment? In other
24  words, the room is totally dark and it goes off,
25  versus it was the daytime and it went off.

---

63

1          Do you think it would affect a person's
2  vision longer if it was deployed in the dark?
3      A    I think, naturally, any light that hits
4  your eyes at dark, it takes you a little longer to
5  refocus, so it doesn't matter how bright. I
6  mean -- but I would agree, I mean, essentially,
7  any light that gets flashed in your eyes at night
8  is -- takes you a second more to -- or I
9  wouldn't -- I wouldn't give a time, but it's
10  longer at night because you're not used to --
11     Q    Your eyes have to adjust --
12     A    Yes.
13     Q    -- to the sudden brightness and darkness
14  change; right?
15     A    Yes.
16     Q    Okay. Some of them also give off a
17  pressure wave; right?
18     A    They all do.
19     Q    In other words, you can feel them.
20         Like, if you -- even if you were deaf
21  and blind, you would be able to feel them?
22     A    There is some slight overpressure, yes,
23  caused by the detonation -- ignition of the
24  flash -- or the powder inside.
25     Q    And then they're also designed to make

---

64

1  an audible noise; right?
2      A    Yes.
3      Q    And the noise resembled a gunshot?
4      A    I would say that's true.
5      Q    Okay. Would you say that laypeople
6  frequently confuse those noises with gunshots?
7         MR. ANDERSON: Objection. Form.
8         THE WITNESS: It could be -- it could
9  be similar to a gunshot noise.
10  BY MR. BREEDEN:
11     Q    Okay. And, in fact, in this particular
12  case, I don't know if you saw it on the video, but
13  I believe it's Officer Rothenburg or
14  Officer Bertuccini who was even confused. He
15  heard the nine banger and wasn't sure whether that
16  was gunshots or the nine banger.
17         Were you aware of that?
18     A    I'm aware through reading the reports
19  that there was some -- somebody -- like you said,
20  I believe it was Officer Rothenburg that said that
21  to Officer Bertuccini, and that was reference to
22  the nine bang NFDD, which is different than the 25
23  and the audible.
24     Q    The -- the nine banger and the stun gun,
25  those are designed to mimic gunshots; right?

---

65

1      A    The stun stick is not. The -- the nine
2  banger, due to its rhythmic cycle of the nine
3  bangs, was built to mimic fire, or some people
4  believe it's mimicking gunfire.
5      Q    And --
6      A    Because of the unusual rhythm of -- it's
7  not just bang, bang, bang, bang.
8      Q    And that could have been designed in a
9  different way. For example, you could design a
10  device that sounded just like a police siren, and
11  that wouldn't resemble gunfire, and it would still
12  distract people.
13         But the noise flash diversionary devices
14  used for Mr. Williams' case, those resembled
15  gunfire; correct?
16         MR. ANDERSON: Objection. Form.
17         Go ahead and answer.
18         THE WITNESS: Again, they're --
19  they're a high-decibel diversionary device that we
20  use to divert their attention to wherever we're
21  directing our team to enter. We're not using it
22  to mimic gunfire.
23  BY MR. BREEDEN:
24     Q    But it does sounds like gunfire; right?
25     A    To laypeople, like you said, to some

---

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                  Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1  people, it could.
2      Q    Okay.  And is it Metro's position that
3  deployment of NFDDs is inconsistent with the knock
4  and announce rule?
5      A    No.
6      Q    Well, if the goal of knock and announce
7  is to allow people a reasonable time to come to
8  the door and ascertain that it's police officers
9  and allow them entry, why would Metro, during the
10  time that's supposed to be happening, deploy a
11  noise flash diversionary device that sounds like
12  the person is under gunfire?
13      A    So during the announcements, we won't
14  deploy the NFDDs.  But if we're going to use a
15  tactical option of taking a window or opening a
16  door, the teams may choose to use the NFDDs just
17  as they're entailed to be used as -- to divert
18  their attention away from what they're doing.
19          So in this situation of the CET, they
20  used those -- they used a 25 Def Tec on a stun
21  stick to introduce it into a window and a
22  CTS 9-Bang NFDD on the two side to divert their
23  attention away from them using the manual breach
24  on the front door.
25      Q    If the knock and announce rule requires

67

1  giving Mr. Williams time to come to the front door
2  and allow officers entry, why would they be
3  deploying a nine banger across the apartment,
4  outside a window, to distract his attention?
5      A    Again, at that time, after those set of
6  announcements were given, the plan was to manually
7  breach the door and then eventually make entry.
8  If, prior to that announcements, the door would
9  have been opened, they would not -- they would
10  have delayed on making that NFDD.  But at that
11  time, they chose the -- the plan was after those
12  announcements that were given after the insertion
13  of the stun stick, they would begin to manually
14  breach the front door and, once that door is open,
15  make entry.
16          The NFDDs were used to distract -- if
17  somebody was still inside, to divert their
18  attention from either arming themselves or trying
19  to escape while the team is entering.
20      Q    Well, the plan of SWAT that morning was
21  to deploy the -- to break out the rear window and
22  to deploy the stun stick inside the apartment
23  immediately on conclusion of the second
24  announcement; correct?
25      A    I believe that was the plan.  After the

68

1  second announcement, Bertuccini would insert the
2  stun stick in the two-side window and initiate the
3  25.
4      Q    There was no time preplanned into that
5  between the announcement and insertion of the
6  sun -- stun stick for Mr. Williams to get up and
7  come to the door and allow officers inside, was
8  there?
9      A    Still, there was six seconds for him to
10  come to the front door to give him announcements
11  or to give him announcements that we were going to
12  come in and to surrender.
13      Q    So there were -- there were two types of
14  NFDDs used here.  There was what I would call a
15  nine banger and what I would call a stun stick.
16          Can you give me the exact make and model
17  of those two different kinds?
18      A    So -- so the stun stick itself is just
19  the implementation tool that we use to extend the
20  Def Tec 25.  And the Def Tec 25 is just -- it's a
21  12-gram NFDD that we use.  It's roughly around --
22  when it -- when it goes off, it's about 175
23  decibels, and we try to keep it -- the
24  manufacturer says 5 feet away from an individual.
25          The nine bang is a CTS 9-Bang.  I

69

1  believe it's 43 grams, and it's got nine different
2  audible sounds, like, that are about 180 decibels.
3      Q    And these are deployed -- you know,
4  they're, like, little canisters, and they have a
5  pin like a grenade that is removed before they --
6      A    Yeah, it's like a smoke canister that
7  you would see.  Again, it's got a pin and a -- and
8  a spindle that comes off, and then it ignites
9  within half a second.
10      Q    Who was the officer that actually
11  deployed the nine banger that morning?
12      A    Officer Chris Latham.
13      Q    Who was the officer that deployed the
14  stun stick and the charge in the stun stick?
15      A    Officer James Bertuccini.
16      Q    And so I know from prior testimony that
17  Officer Bertuccini was to deploy the stun stick
18  and its charge immediately after the second
19  announcement.
20          What was the plan as to when the nine
21  banger was to be deployed?
22      A    I don't recall reading or getting
23  briefed on the plan of the nine banger.  But just
24  knowing what I do now, based on our tactics, is
25  the nine banger would go off the -- Bertuccini's

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1  ignition of his 25.
2    Q   So --
3    A   But they're in succession.
4    Q   Okay.  So you believe, then, that
5  Officer -- I think you said it was Latham.
6    A   Latham.
7    Q   -- that Officer Latham was to deploy the
8  nine banger once the charge of the stun stick was
9  deployed?
10   A   Again, I'm just basing it off what I do
11 know now based on tactics and planning, because
12 reviewing their plan, I seen the draw up of their
13 plan prior to their brief, and next to Latham's
14 name, it says nine bang.
15   Q   Okay.  And -- but you believe, you know,
16 to -- to Metro's knowledge, that the plan was to
17 deploy the nine banger contemporaneously with the
18 stun stick?
19   A   Yes, based on just tactics.  Again, I
20 wasn't at the briefing and I don't have a
21 dictation of the briefing because they're not
22 recorded and there's no -- I'm just basing it off
23 of what I seen on the drawings of the plan.  Based
24 on tactics, it could be -- I believe it was
25 used -- after the 25 was initiated, the nine

71

1  banger would go off, or it would be a call by the
2  ATL to say, set the nine bang off.
3        But I don't recall, after watching the
4  body-worn cameras, that there was an actual
5  command to Chris Latham to throw the nine bang.
6  So that's why I base it that it was briefed that
7  he would throw it after the 25.
8    Q   The nine bang, that was deployed before
9  Mr. Williams fired his weapon; correct?
10   A   I believe so.  I -- I would have to
11 review that video again, but I do believe so.  It
12 was after the 25, because there was no gunshots
13 before the 25 or after the 25, and the nine bang
14 went right after the 25.
15   Q   And then do you believe the nine bang
16 was deployed before the officers took their first
17 shots?
18   A   Yes.
19   Q   And do you believe the nine banger had
20 fully deployed all nine shots before Mr. Williams
21 fired any round from his weapon?
22   A   I don't recall based on when I watched
23 the video.  I would have to watch it again and
24 just to hear it, if all of them successfully
25 deployed, all nine, prior to entry and prior to

72

1  the shots being fired.
2    Q   You --
3    A   I'm sorry, I couldn't -- I couldn't
4  answer that.
5    Q   You agree with me that at least some of
6  the deployments of the nine banger occurred before
7  Mr. Williams fired his weapon?
8    A   Yes, I would agree with you on that.
9        THE VIDEOGRAPHER:  Mr. Beas, would you
10 be so kind as to slide your water six inches.
11 Thank you.  Thank you.
12 BY MR. BREEDEN:
13   Q   We're going to transition here into the
14 department's policies regarding knock and announce
15 and how it's supposed to be performed by officers,
16 including SWAT.
17        First of all, what are all of Metro's
18 rules, policies, or procedures concerning knock
19 and announce?  Where -- where are they contained?
20   A   When you first start talking -- when you
21 start talking about search warrants, you have
22 search warrant and prep class, the classes you
23 take to either -- to start authorizing -- or I'm
24 sorry, not authorizing, being the affiant of a
25 search warrant.  You go through training that is

73

1  given by Metro.
2        And in that training, they do talk
3  about, again, Wilson v. Arkansas and some other
4  cases.  And I haven't taken it for probably 15, 20
5  years.  But I -- I would say that a newer case
6  would involve the Banks case and other associated
7  cases with knock and announce.
8        That's when you first start learning
9  that, if not also in the academy, of case law,
10 U.S. constitutional law, and Nevada state law.
11 Prior to a couple of years ago, when SWAT took
12 over all service of the search warrants, some
13 sections were authorized to serve warrants.  When
14 those sections, like, narcotics, vice, gangs, were
15 authorized to serve search warrants, they had to
16 go to a tactical class, a service of search
17 warrant tactical class.  I believe it was a
18 ten-hour case.  And, again, those cases and
19 those -- talking about announcements, the knock
20 and announce, would be given in that class.
21        Now the department has moved to just
22 SWAT.  So, again, when we brief every case, prior
23 to briefing, we talk about how many announcements,
24 how long it's going to take prior to us making
25 entry.  And we base that on the knock and announce

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1    state law and the U.S. Constitution.
2        Q   Has there ever been a written or
3    unwritten policy about how many seconds or minutes
4    officers are supposed to wait between the
5    announcements and the use of force to enter the
6    residence?
7        A   In my research, I could not find any
8    written -- and, again, any unwritten. Because you
9    have to take every case by its singular case,
10   based on what is presented, what intel do you have
11   on that particular search warrant.
12           Because every search warrant is going to
13   be different, so you base reasonableness off --
14   the reasonableness of the time based on the
15   factors that are presented to you. And in that
16   case, again, I went through tons of factors that
17   were presented to them that when -- moved them to
18   the CET and moved them to what announcements or
19   how many announcements they would give prior to
20   making forcible entry.
21       Q   So there's been some reference in the
22   CIRT report and I believe one of the other
23   witnesses mentioned that at one time there was a
24   ten-second rule.
25           Are you aware of any time or any written

75

1    or unwritten policy or procedure that officers
2    were to wait at least ten seconds before using
3    force after the announcements?
4        A   I mean, there is -- there's different
5    case law that talk about ten seconds or less than
6    ten -- sorry, ten seconds. There's also case law
7    that talks about 15 to 20 seconds. I could not
8    look at anything in our SWAT manual, our SWAT
9    lesson plans that specifically state the exact
10   seconds that you would need. Everything goes back
11   to the reasonableness based on your intel that you
12   have on that search warrant.
13           MR. BREEDEN: Okay. I noticed we've
14   been going for about an hour and a half. Why
15   don't we take a five-minute break.
16           MR. ANDERSON: Yeah.
17           THE VIDEOGRAPHER: The time is
18   10:36 a.m. We are off the record.
19           (Whereupon, a recess was taken.)
20           THE VIDEOGRAPHER: The time is
21   10:46 a.m. We are on the record.
22   BY MR. BREEDEN:
23       Q   Okay. So I want to make sure that I
24   understand your testimony on behalf of Metro
25   regarding the last topic.

76

1        Your testimony is that Metro has never
2    had any formal or informal policies as to how many
3    seconds or minutes officers are supposed to wait
4    between announcements and using force to enter a
5    residence under the knock and announce rule.
6        Is that your testimony?
7        A   That there's a specific amount of time
8    prior to making forcible entry?
9        Q   Yes.
10       A   No, there's nothing written. Again, it
11   goes back to even when you look at all of the case
12   laws, they're different. And it just -- we base
13   it on you have to make the announcements of the
14   authority and purpose and then give them a
15   reasonable time to come and submit or --
16           Based on the factors of the search
17   warrant that you have, everything in totality is
18   based -- bases your reasonableness of time. So
19   every search warrant could be -- it will be
20   different about that reasonableness of time.
21       Q   Well, in Metro's opinion, is one second
22   ever reasonable?
23           MR. ANDERSON: Objection. Form.
24           THE WITNESS: Again, I -- I don't
25   believe it would be one second, because then

77

1    you're -- you're touching into the -- almost the
2    no-knocks. It could be one second if -- based on
3    circumstances that you see once you are
4    presented -- you get up there. If you see an
5    obvious sign of escape or somebody -- that door is
6    open and somebody visually sees you and your
7    authority, and they're backing up into the
8    residence. So it could be one second.
9        But we wouldn't say, "Hey, we're only
10   going to give one-second announcements and bang
11   the door." I mean, everything is on the totality
12   of the circumstances that are presented prior to
13   the event, based on the details, and then, going
14   up to the door, what you see.
15   BY MR. BREEDEN:
16       Q   Well, I want to use the -- the following
17   factual scenario, then, is that there are
18   announcements and then there is literally nothing
19   that is seen or heard inside the residence.
20           Would you agree, on behalf of Metro,
21   that waiting just one second between the
22   announcement and the use of force when there's
23   nothing seen or heard from inside the residence
24   would be unreasonable?
25       A   It would be unreasonable if -- if you

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 23 of 46

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

1  make that determination prior, saying we're giving
2  one second and then we're banging the door with --
3  without having anything presented, any factors.
4  And, again, it goes back to also what you are
5  going to -- projected to foresee inside there, if
6  you're going to expect to encounter armed
7  individuals or immediate destruction of evidence
8  or an escape.
9      So, I mean, I don't know where you're --
10  I mean, I don't know what you're asking about the
11  one second. We'd never factor in the one second
12  in training. It's all based on reasonableness --
13  based on state and U.S. laws, the reasonableness
14  of giving our announcements, and then based on is
15  it a CET tactic or is it a SACO tactic, what is
16  going to be the safest for, again, the officers,
17  the citizens around there, and the occupants.
18     Q   Well -- well, let me start this. Let --
19  let me do it this way.
20     Most people would probably concede that
21  if officers knocked and announced and then waited
22  an hour and there were no activities or anything
23  inside the residence, that, at that point, it
24  would be reasonable for them to use force to
25  enter. Okay?

79

1      So we -- somewhere between zero seconds
2  and one hour, there's an amount of time that Metro
3  should likely not consider to be reasonable under
4  any circumstances.
5      So what amount of time is that? Is it
6  one second? Two seconds? Three seconds?
7      MR. ANDERSON: Objection. Form.
8      Go ahead.
9      THE WITNESS: Again, it's based on the
10  totality of the incident. I mean, I can't -- you
11  can't put a time on every single search warrant.
12  You can't say, "This is going to be a one-second
13  search warrant or a five-second." Obviously,
14  going into the planning, one second would be
15  unreasonableness -- or unreasonable. But if
16  factors present themselves and you only have one
17  second, it could become reasonable.
18  BY MR. BREEDEN:
19     Q   Okay.
20     A   But there is no -- I'm sorry to cut you
21  off. But there is no formalized in writing how
22  many seconds you have to wait. We base it on case
23  law, state and U.S. law, and those cases that we
24  mentioned prior, that every one of them are
25  different in the timings of -- of announcements.

80

1      So the ATL and TL take those factors in
2  based on what they're given and then what they're
3  given at the time of the service of the search
4  warrant.
5      Q   Okay. Well, even before they got to the
6  site for Mr. Williams' case, they preplanned to
7  use force to break out the back window and deploy
8  the stun stick immediately after the second
9  announcement; correct?
10     A   Correct.
11     Q   So they planned for zero amount of time
12  or maybe as long as one second after the second
13  announcement before they would use force; correct?
14     MR. ANDERSON: Objection. Form.
15     THE WITNESS: The -- the plan for that
16  specific -- specific raid, for that CET was two
17  announcements, and then they would introduce the
18  stun stick to deploy the 25 distract, the NFDD,
19  prior to manually breaching the front door to make
20  entry.
21  BY MR. BREEDEN:
22     Q   And do you agree that -- that that
23  morning, on January 10th of 2022, that the first
24  use of force to enter the premises was the
25  breaking of the window to insert the stun stick?

81

1      A   Yes, that's a low-level use of force and
2  intrusion into the apartment, was the introduction
3  of the stun stick and the 25.
4      Q   And that occurred almost simultaneously,
5  as well, with the first use of the battering
6  device on the front door; correct?
7      MR. ANDERSON: Objection. Form.
8      THE WITNESS: I believe it was three
9  seconds after the -- that initiation of the 25 was
10  the first battering of the manual breach.
11  BY MR. BREEDEN:
12     Q   Okay. Well, we'll look at the video --
13     A   Yeah.
14     Q   -- to see what it is. My recollection
15  is it was essentially at the same time, but the
16  video will show.
17     A   Okay.
18     Q   You keep saying in some of your
19  responses that, no, there's no -- there's no
20  policy in writing.
21     Is there any unwritten policy or
22  practice?
23     A   Again, the unwritten would be the
24  planning phases of each particular search warrant
25  and what you have, the -- the structure, the size,

82

1   the occupants, the citizens' safety. We take that
2   all in account and base it off of how long we want
3   to wait before we use a NFDD or before we want to
4   manually breach to make entry.
5       Q   Okay. Well, let me -- because you
6   mentioned factors, and you say to -- totality of
7   the circumstances, and that's fair, because that's
8   legal phrasing from case law.
9       A   Uh-huh.
10      Q   Okay? But let's apply it specifically
11  to Mr. Williams' case, where officers are on both
12  sides of a small apartment at 5:00 in the morning
13  when it is likely people inside are asleep, and as
14  they make the announcements, they hear and see
15  nothing from inside the apartment.
16          What is Metro's position on how long is
17  reasonable for officers to wait until they begin
18  forcefully entering that apartment?
19      A   Again, I don't believe the -- the
20  department has a position on giving the tactical
21  team a specific amount of time to wait. It -- it
22  depends on the tactic used. So that night, they
23  used the CET tactic.
24          At -- after the second announcement,
25  which I believe was six seconds, they introduced

83

1   the stun stick and then started manually breaching
2   the front door, still giving announcements as
3   they're doing that. And then when they finally
4   made entry into the threshold of the apartment,
5   still giving announcements.
6           They based their reasonableness amount
7   of time based on officer safety. They didn't want
8   to wait a long time out there because they knew
9   there was possibly -- could be armed suspects in
10  there, and the nature of the crime that they
11  were -- that the warrant was for.
12      Q   Well, I don't want to argue with you,
13  but officers could sit behind a BearCat for hours
14  while they did a surround and call out; right?
15  There's no risk to the officers in doing that, is
16  there?
17          MR. ANDERSON: Objection. Form.
18          THE WITNESS: Even in a SACO, we
19  wouldn't wait an hour. But I agree with you,
20  there's -- the officers are afforded more cover
21  and concealment and safety behind an armored
22  BearCat. But that -- based on the plan, the
23  armored BearCat could not be used on the one side
24  by the front door on that incident.
25

84

1   BY MR. BREEDEN:
2       Q   But several of the officers actually on
3   the ground when this happened had ballistic
4   shields as well; right?
5       A   Yes. I believe a ballistic shield was
6   used by Officer Rothenburg on the two-side window
7   where the stun stick was used, and I'm sure they
8   had one up -- I believe they did have one up front
9   in front of the door.
10          Again, those ballistic shields are a
11  safety factor that we use. They provide minimal
12  coverage. They don't -- those are pistol-rated
13  shields. They're not as safe as a BearCat, and
14  they don't provide the whole team with coverage.
15      Q   Metro agrees that its own CIRT review,
16  which was agreed by the Tactical Review Board,
17  found that officers had only waited six seconds
18  between the announcement and use of force to enter
19  the apartment.
20          Do you -- do you agree?
21      A   That was the timing of the -- the stun
22  stick, yes.
23      Q   Okay. And plaintiff actually disputes
24  that number of seconds, the six seconds figure.
25  We think it's less. Ultimately, a jury may have

85

1   to look at it and determine.
2           But even the six seconds, CIRT and TRB
3   both determined that that was not a long enough
4   amount of time to comply with the knock and
5   announce rule.
6           Does Metro acknowledge that?
7           MR. ANDERSON: Objection. Form.
8           Go ahead.
9           THE WITNESS: CIRT had their
10  recommendations. I believe they said, based on
11  Anthony's recommendation, that it wasn't long
12  enough, but SMEs in there still conflicted with if
13  that was reasonableness or not, the timing for the
14  announcements.
15  BY MR. BREEDEN:
16      Q   But TRB also reviewed that conclusion
17  and upheld it; correct?
18      A   I believe so, yes.
19      Q   And TRB is formed solely of people who
20  are Metro employees, as opposed to outside
21  consultants; correct?
22      A   The TRB, I believe they don't have any
23  outside. I think it's just the use-of-force
24  board.
25      Q   And TRB unanimously sustained that

LEXITAS

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 25 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86

```
1   finding, didn't they?
2       A   I would have to relook at the TRB, but
3   I -- if you're saying that's on the record, then I
4   agree with you.
5       Q   Is Metro in this litigation now going to
6   dispute the findings of CIRT and TRB that SWAT did
7   not allow a reasonable amount of time to comply
8   with the knock and announce rule?
9           MR. ANDERSON:  Objection.  Form.
10          THE WITNESS:  The findings by the CIRT
11  review board and the Tactical Review Board were
12  based on department policy and if they found it
13  reasonableness of six seconds, given those
14  factors.  They ultimately decided that the SWAT
15  six-second announcements was not reasonable based
16  on that incident, but it did not -- again, there's
17  factors when you're talking about department
18  policy, state policy, and U.S. law.
19          At the time of the incident, the SWAT
20  operators, the ATLs, the team leader, and then
21  ultimately the tactical commander, who was not out
22  there, agreed that the two announcements would --
23  equated to the six seconds was adequate enough.
24  BY MR. BREEDEN:
25      Q   Okay.  I want to make sure that I
```

87

```
1   understand your testimony.
2           Are you saying Metro is now taking a
3   position in this litigation, now it -- that it's
4   been sued, that CIRT and TRB got it wrong?
5           MR. ANDERSON:  Objection.  Form.
6           THE WITNESS:  I don't want to say they
7   got it wrong, but CIRT can come up with
8   recommendations that still can get overturned
9   because it's based on what they believe department
10  policy should be.
11  BY MR. BREEDEN:
12      Q   Well, that's right.  And the board that
13  can overturn them is the Tactical Review Board,
14  and they chose not to on that reasonableness
15  finding; correct?
16      A   Again, I would have -- I -- I read the
17  CIRT review board findings.  I don't recall the
18  Tactical Review Board, but it -- but, again, if
19  you're saying that that's on the record, that's
20  their belief at the time, it was unreasonable.
21      Q   So you're saying that was their belief
22  at the time, that it was unreasonable, that the
23  knock and announce rule had not been complied
24  with.
25          So my question is:  Is Metro now
```

88

```
1   disputing that conclusion, or do they stand by
2   that earlier conclusion?
3       A   They're not disputing the findings of
4   the CIRT review or the Tactical Review Board.
5   Again, I think when you're talking about
6   reasonableness of -- of time, there's many factors
7   that go into it.  And at the time, that SWAT team
8   that conducted that raid on that mission believed
9   that they were within state and U.S. law to use
10  the six seconds prior to introducing the stun
11  stick.
12      Q   Okay.  And does Metro now acknowledge
13  that that was incorrect and that was an
14  unreasonable amount of time?
15      A   The findings were that, based on that
16  incident, it was an unreasonable amount of time.
17  That's what the CIRT and Tactical Review Board had
18  stated.
19      Q   And -- and that is Metro's position?
20      A   Ultimately, it's Metro's position based
21  on those reports.
22      Q   Okay.  Prior to this incident in January
23  of 2022, Metro's official policies allowed a CET
24  to be used for knock and announce warrants;
25  correct?
```

89

```
1       A   Correct.
2       Q   Okay.  And that policy was later
3   revised; true?
4       A   It's been revised a couple of times
5   language wise, but it -- it -- yes, it has been
6   revised --
7       Q   Okay.
8       A   -- several times.
9       Q   And we'll -- we'll talk about that --
10      A   Okay.
11      Q   -- and the revisions and when and why
12  they occurred.  But I just want to establish for
13  now that, prior to this incident, CET was being
14  used by Metro's SWAT for knock and announce
15  warrants.
16          That's true; correct?
17      A   It's been used for 20-plus years and
18  thousands -- thousands of warrants, yes.
19      Q   Okay.  And at least prior to this
20  incident, it was Metro's policy that NFDDs also
21  complied with knock and announce principles?
22      A   Yes.
23      Q   Okay.  Was it Metro's policy at that
24  time that blind insertion of NFDDs complied with
25  the Fourth Amendment?
```



90

1    A    The blind insertion of it is a
2    procedural policy that -- that when we introduce
3    a -- well, two different factors.  So when we're
4    introducing one into the structure, they want you
5    to visually clear the area to make sure it's not
6    going to go off right in front of somebody's face.
7         In the outside, they want to make sure
8    your -- your area is clear for fire hazards or
9    obstructions like small rocks that could propel.
10   So two different instants, if either it's going to
11   be an outside deployment or inside deployment.
12   But, yes, there is procedural policies in our
13   manual that dictate clearing of the area.
14        Q    Are those also constitutional
15   requirements under the Fourth Amendment?
16        MR. ANDERSON:  Objection.  Form.
17        THE WITNESS:  Of the clearing of the
18   area?
19   BY MR. BREEDEN:
20        Q    Yes.
21        A    I don't believe so.
22        Q    Okay.  So you're the current SWAT
23   tactical commander, and you're in charge of
24   training SWAT on these issues.
25        A    Was that your question?  I'm sorry.

91

1         Q    Yeah.  I'm sorry.
2         A    Oh.
3         Q    I'm looking at my notes here.
4         Q    Okay.
5         Q    So just to -- to restate the question I
6    was about to ask, you believe -- does Metro
7    believe that the Constitution would allow it to
8    simply blindly deploy or throw into a residence an
9    NFDD?
10        A    No, because if we blindly throw it
11   without any control of it, we would have --
12   without visually clearing the inside structure,
13   there could -- it could cause injury to any
14   occupants in there.  That's why the stun stick was
15   used, so we can have control of where that
16   deployment of that 25 was deployed once it was
17   inserted.
18        Q    Now, I've seen the video, you've seen
19   the video of the deployment of the stun stick.
20        Do you agree with me that when that was
21   deployed, when the charge on the stun stick was
22   deployed, officers had no idea who was inside the
23   apartment or where they were in the apartment?
24        A    When Officer Bertuccini inserted the
25   stun stick, he was aware nobody was directly

92

1    behind the window, but I would agree with you that
2    he did not know where Mr. Williams or any other
3    occupant was at inside the structure.
4         Q    Well, there was actually a closed blind
5    there; right?  People could not see inside.
6         A    It was closed prior to the insertion,
7    but when you insert it, there -- there -- you
8    would be able to see that nobody was directly
9    behind it.  But I agree with you that he couldn't
10   see inside that structure to where -- if anybody
11   else was in there.
12        Q    And you agree that deployment of these
13   NFDDs close to somebody's person, that those can
14   potentially harm the person?
15        A    If it's directly next to them based on
16   the -- the fire -- or the -- I don't want to say
17   explosion, but the powder being ignited could burn
18   a person if they're directly next to it, and it's
19   also a more overpressure that could -- it's a
20   higher PSI, more overpressure.
21        Q    It's against department policy to deploy
22   NFDDs too close to a person; right?
23        A    Yes.
24        Q    And what is the amount of inches or feet
25   that the department considers to be too close?

93

1         A    In the Def Tec 25, the manufacturer is
2    5 feet.  And that's what we use when we insert and
3    also deploy on the outside.  So we want it to be
4    about 5 feet -- around 5 feet.
5         Q    Are you familiar with the Ninth Circuit
6    case Boyd v. Benton County?
7         A    I don't know it if you -- just off those
8    names, but --
9         Q    Okay.  So in Boyd v. Benton County, the
10   Ninth Circuit wrote, quote, "Given the inherently
11   dangerous nature of the flash-bang device, it
12   cannot be reasonable use of force under the Fourth
13   Amendment to throw it blind into a room occupied
14   by innocent bystanders," end quote.
15        So there is a constitutional requirement
16   that covers NFDDs and how they're deployed.
17        Would you agree with me that
18   Mr. Williams was an innocent bystander in this
19   operation?
20        MR. ANDERSON:  Objection.  Form.
21        THE WITNESS:  He was an occupant
22   inside the structure that was not named in the
23   search warrant, I agree with you.  But, again, the
24   deployment of the 25 was not thrown into the
25   structure where they didn't have control over it,

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1  so that's -- there's two different -- differences
2  on the deployment of actually throwing it into an
3  unknown occupied structure or the stun stick,
4  where you have control of it and positioning of
5  it.
6  BY MR. BREEDEN:
7     Q    And I want to talk about Metro's
8  distinction here. So Metro's official position
9  is, "We couldn't blindly physically throw an NFDD
10  into a room where we didn't know where people
11  were, but if we had it on a stun stick and we
12  deployed it, we can just deploy it blindly through
13  a window."
14        Is that what Metro's position is?
15        MR. ANDERSON: Objection to form.
16        THE WITNESS: Again, it's not blindly
17  throwing it in there. When he -- when
18  Officer Bertuccini inserted the stun stick into
19  that two-side window, he could tell that there was
20  nobody directly behind that window, and he
21  believed he had the -- a 5-feet distance to
22  anybody that he could see, and it's deployed at
23  the top of the ceiling to give it the most
24  distance away from any occupant that could be in
25  there.

95

1  BY MR. BREEDEN:
2     Q    Well, and, in fact, Mr. Williams was
3  sleeping right on the other side of the window;
4  right?
5        MR. ANDERSON: Objection. Form.
6        THE WITNESS: He was to the left of
7  the window on the couch, based on what --
8  reviewing the reports.
9  BY MR. BREEDEN:
10     Q    How many feet do you believe he was from
11  that charge when it was deployed?
12     A    I believe he was within the safe
13  distance, beyond the 5 feet. Because, again,
14  you're deploying it to the top of the ceiling, and
15  he was closer to the ground.
16     Q    So how high were the ceilings?
17     A    I don't know.
18     Q    Was the stun stick actually touching the
19  top of the ceiling?
20     A    In the deployment and planning of the
21  deployment, you want to get it closest to the --
22  the top of the ceiling. I would have to review
23  photos of the actual inside, and we could see burn
24  marks or something like that that would dictate
25  how close it was to the top of the ceiling.

96

1     Q    And then where Mr. Williams' head was --
2  if he had actually been sleeping in a horizontal
3  position, his head would have been at least a
4  couple of feet off the ground.
5        Do you agree?
6     A    If he was sleeping sitting down?
7     Q    Laying down.
8     A    Laying down. Again, I don't know the
9  distance of the ceiling to Mr. Williams, but,
10  again, it would still be within the recommended
11  distance of the 25, given that -- the 175 decibel
12  and the PSI level.
13     Q    Would Metro concede that if a jury heard
14  this case and felt that the NFDD was deployed
15  within 5 feet of Mr. Williams, that that would
16  violate his constitutional rights?
17        MR. ANDERSON: Objection. Form.
18        THE WITNESS: I don't believe it would
19  violate his constitutional rights. It's just how
20  much more overpressure or decibel levels that he
21  would succumb to. Now, if he was directly behind
22  the window and we knew that and we still deployed
23  the 25, that could constitute.
24  BY MR. BREEDEN:
25     Q    Would Metro concede if a jury felt that

97

1  the 25 was deployed in less than 5 feet from
2  Mr. Williams, that that would violate department
3  policy?
4        MR. ANDERSON: Objection. Form.
5        Go ahead.
6        THE WITNESS: Again, the recommended
7  distance given by the manufacturer is 5 feet based
8  on decibel and PSI level. The -- again, going
9  back to clearing directly behind it and the belief
10  that Officer Bertuccini believed he had enough
11  distance from anybody he could see, he believed
12  that he had enough distance to deploy the NFDD.
13  BY MR. BREEDEN:
14     Q    Okay. Well, whether he believed that or
15  not, if, in fact, he deployed it in less than
16  5 feet from Mr. Williams, that would be against
17  the manufacturer's recommendation; correct?
18     A    Yes.
19     Q    And has Metro adopted the manufacturer's
20  recommendation as its policy as well?
21        MR. ANDERSON: Objection. Form.
22        THE WITNESS: We follow the
23  recommendations of the manufacturer to do it -- to
24  deploy it inside a structure, yes --
25        MR. BREEDEN: Okay. Now, I'm going to

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1  hand you something that we'll have marked -- I
2  think this will be Exhibit 2 to today's
3  deposition.
4              (Exhibit 2 was identified.)
5  BY MR. BREEDEN:
6     Q   Exhibit 2 is an excerpt from Las Vegas
7  Metropolitan Police's SWAT manual, and it's been
8  produced in this litigation as LVMPD1490 and 1491.
9         Have you ever seen this portion of the
10 manual before?
11    A   What -- what year was this?  Because I
12 reviewed the one that was dated prior to this
13 incident, so is this the one that was --
14             MR. ANDERSON:  This is 2021, yeah.
15             THE WITNESS:  2021.  Okay.
16 BY MR. BREEDEN:
17    Q   Yeah, I think this is the one that was
18 in effect when this incident occurred.
19    A   Okay.  Yes, I did review it.
20    Q   Okay.  I will let you know that, you
21 know, there's -- there's probably 20,000 pages of
22 documents that have been produced in this
23 litigation, and this is the only document that I
24 can find that discusses knock and announce and
25 Wilson v. Arkansas and anything that might be

99

1  considered training on those subjects.
2         Are you aware of something other than
3  this document that has been used to train SWAT
4  officers on knock and announce principles?
5     A   Yes, I -- again, it goes -- we have a
6  PowerPoint lesson plan on tactical planning and
7  service of search warrants that, again, covers all
8  of these factors.  I would have to review the date
9  again to see if it was -- I believe it was '21.  I
10 just don't know if it was prior to this incident.
11    Q   Okay.  And the -- the topic actually
12 requests that if you are aware of other documents,
13 that you be able to reference the specific Bates
14 number, which is an identifier used for this
15 litigation.
16         I'm sure that you don't have a
17 photographic memory, but are you aware of a
18 specific Bates number for that training you
19 referred to?
20    A   No.
21    Q   Okay.  So will you agree with me that
22 Exhibit 2 by itself is insufficient training as to
23 the knock and announce rule?
24             MR. ANDERSON:  Objection.  Form.
25             THE WITNESS:  Just this document in

100

1  and of itself --
2  BY MR. BREEDEN:
3     Q   Yes.
4     A   -- would not be enough --
5     Q   Yes.
6     A   -- documentation.  But this isn't the
7  only training or times that they're taught about
8  in -- in the totality of learning about search
9  warrants, planning them, and serving them.
10    Q   Do you agree that this is the only area
11 of the SWAT manual -- the specific SWAT manual
12 that mentions knock and announce?
13    A   In the SWAT manual?
14    Q   Yes.
15    A   Yes.  And this is under the -- I believe
16 this section is a cutout from the -- the service
17 of search warrants tactical planning.
18    Q   Okay.  And this portion of the SWAT
19 manual, it doesn't mention other applicable,
20 more-detailed cases like the Banks or the
21 Granville case, and it doesn't give any guidance
22 as to the amount of seconds or minutes that's
23 reasonable under those cases.
24         Do you agree with that?
25    A   I do agree with that, that they only

101

1  cite the Wilson v. Arkansas.
2     Q   Yeah.
3         Does Metro even provide the Wilson v.
4  Arkansas case to SWAT members so they can actually
5  read the case?
6     A   The -- the whole case in entirety, I
7  couldn't answer that question, but it -- the
8  summary, I believe they should talk about it in
9  the tactical planning service of search warrant
10 class.
11    Q   Okay.  But sitting here today, you have
12 no information that the actual case is provided to
13 officers to read?
14    A   No.
15    Q   Okay.  So, again, we're talking about
16 the policies and procedures which were in effect
17 prior to January 10, 2022.
18         And so, at that time, what was the
19 department's formal or informal policy or practice
20 as to the issue -- the following issue:  When
21 knock and announce is performed when serving a
22 warrant, is there to be an actual physical knock
23 on the door?
24    A   No.
25    Q   So it was Metro's official policy not to



30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1  even attempt a physical knock?
2      A    The policy dictates you have to give
3  announcements, but it doesn't specifically cite
4  that it has to be an actual knock and announce,
5  but as long as you give an announcement of your
6  purpose and authority.
7      Q    Okay.  Was Metro's policy to ever
8  attempt a physical knock?
9      A    Again, citing the -- what is written,
10  there's no policy that says you have to physically
11  knock, because we base it off U.S. and state law
12  where there is no mention of an actual physical
13  knock as long as you still verbalize your
14  authority and purpose.
15      Q    Well, the rule is literally called knock
16  and announce, not knock or announce; right?  But
17  you're telling me that Metro's policy was not to
18  even attempt the knock portion?
19      A    So going to the knock and announce,
20  actually coming from common law going to U.S. law
21  and -- and state law, it doesn't specifically
22  announce in any case law that there is an actual
23  physical knock needed for the announcements.  We
24  based our policy on those factors.
25          If there's an opportunity to make a

103

1  knock, the -- the tactical team, when they briefed
2  it, if they thought it was safe to do so, if there
3  was timing, they would do so.  It's -- it's not
4  that they would never do it.  But based on case
5  law, they said -- or they believed just the
6  announcements and the -- announcing their purpose
7  would satisfy the knock and announce.
8      Q    So it was Metro's official policy that
9  the knock did not necessarily have to be
10  performed?
11      A    Correct.
12      Q    And so whose discretion was that left to
13  as to whether the knock would actually be
14  performed?
15      A    It would be up to the assistant team
16  leader who is making the plan, the team leader who
17  reviews it, and the tactical commander that
18  approves it.
19      Q    Now, in Mr. Williams' particular case,
20  you know, I -- I've seen the video, and there's
21  probably at least three officers within 2 or
22  3 feet of the front door when this happens.
23          For this particular operation, why did
24  no one attempt a knock?
25      A    I couldn't tell you why these -- they

104

1  planned to not knock on it.  The -- the planning
2  was to give the two announcements prior to the
3  insertion of the stun sticks, and -- and that
4  satisfied the knock and announce part of it.
5          I could not tell you why Jake Warner or
6  Russ Backman or Garth Findley decided not to
7  knock.
8      Q    But Metro acknowledges it was preplanned
9  that there would be no knock?
10      A    Yes.
11      Q    There wasn't any factor that, like, they
12  were planning to knock, and then they got there
13  and they thought, "Oh, it might be dangerous for
14  this reason or that reason to knock, so we're not
15  going to do it"?
16      A    I don't know if they had that in mind.
17  But based on reviewing the documents of the
18  planning phase of this, it was -- the two
19  announcements would satisfy the knock and
20  announce.
21      Q    Does Metro have any policy, training, or
22  guidance to its SWAT officers as to when they
23  should knock?
24      A    There's no guidance to the actual
25  physical knock.  It's just, again, based on the

105

1  principles of the knock and announce that we
2  believe that it doesn't have to be a physical
3  knock as long as you give announcements to your
4  authority and purpose.
5      Q    Okay.  At that time, what was the
6  department's formal or informal policy or practice
7  as to the following:  When knock and announce is
8  to be performed on an apartment, should the
9  announcement include the actual apartment number?
10      A    The physical address should always be
11  announced, no matter if it's a residence, a
12  single -- a family residence or an apartment.  You
13  would have to state the actual property of the
14  search warrant.
15      Q    And so for an apartment, that would
16  include the apartment number?
17      A    Correct.
18      Q    Okay.  Do you recall hearing the first
19  and second announcements from Sergeant Backman?
20      A    Yes, I do.
21      Q    Okay.  And do you recall whether the
22  first announcement mentioned the apartment number?
23      A    I believe the first announcement, he
24  said the apartment number at the end of his first
25  phrase and again at the end of the second phrase,

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

106

1  but I do know it was said after -- it wasn't in
2  conjunction with the actual property address off
3  of Nellis, but it was said in that phrase of
4  the -- the announcement.
5       Q   Okay. Would Metro agree that if the
6  first announcement did not include the apartment
7  number, that that announcement was improperly
8  performed?
9           MR. ANDERSON: Objection. Form.
10          THE WITNESS: It would not be
11 improperly performed, because I still believe the
12 apartment number was given. It was not given
13 directly with the actual Nellis address, but as
14 long as he got the apartment address out during
15 his announcements, it was -- it would satisfy the
16 announcement.
17 BY MR. BREEDEN:
18      Q   Okay. Do you recall the apartment
19 number only being mentioned in the second
20 announcement but not the first?
21      A   I believe -- was -- was the apartment
22 1120?
23      Q   1125.
24      A   1125 was stated prior to the second
25 announcement.

107

1       Q   So along with the second announcement?
2       A   So when he gave his first one -- I would
3  have to read the exact verbiage, but I believe he
4  gave the address, and then they had a police
5  search warrant, and then he said 1125. And then
6  he reinstituted that same announcement.
7       Q   Okay. Does Metro believe that the first
8  announcement was properly given?
9       A   Yes.
10      Q   It believes that the first announcement
11 complied with its own internal policies?
12      A   Yes.
13      Q   Well, hypothetically, if the first
14 announcement didn't include the apartment number,
15 would Metro concede that that announcement was
16 against department policy?
17          MR. ANDERSON: Objection. Incomplete
18 hypothetical.
19          Go ahead.
20          THE WITNESS: Again, as long as Russ
21 Backman got out the apartment number, our -- the
22 purpose to announce is to give them, again, our
23 authority and purpose for being out there. So
24 Russ Backman did, in this case, give out the --
25 the apartment number, but ...

108

1  BY MR. BREEDEN:
2       Q   The question is: Did he give it out in
3  the first or the second announcement? And I
4  believe it was the second.
5           Is that your testimony?
6       A   No, I believe it's still within the
7  first announcement. He just gave the apartment
8  number at the end. He -- it did -- it was not the
9  number of Nellis, Nellis, apartment this, and then
10 search warrant. It -- he broke it up.
11      Q   You would agree that, hypothetically, if
12 you just went to the apartment complex and you
13 said, "3050 South Nellis, search warrant," that's
14 not enough information for people in the apartment
15 complex to understand whether their apartment is
16 the subject of the warrant?
17      A   For that specific apartment, no.
18      Q   Okay. At that time, what was the
19 department's formal or informal policy or practice
20 as to preplanning the use of NFDDs for search
21 warrants?
22      A   Again, the policy to use the NFDDs would
23 be based on the search warrant itself. And in
24 this case, it was the CET. The -- the use of the
25 NFDDs were a tactical advantage option. They used

109

1  two different NFDDs, one to insert it into the
2  window and another on the two side, the nine bang,
3  to distract the occupants away from the front
4  door, which they were about to breach.
5       Q   Were -- were NFDDs authorized for the
6  use in any search warrant?
7       A   It would -- based -- again, it would be
8  factors that determine, and then there would be
9  factors when we couldn't use them.
10      Q   Okay. Who were the people that made the
11 decision on this particular search warrant to use
12 NFDDs?
13      A   So, again, all plans are -- start with
14 the assistant team leader on -- based on what his
15 options are throughout the service of the search
16 warrant. He briefs it to the team lead, who
17 then -- the tactical commander has to give
18 approval for the insertion of an NFDD but not for
19 the outside implementation of an NFDD. So in this
20 case, they inserted one, so she had to improve the
21 insertion of the NFDD.
22      Q   So, specifically, you're referring to
23 Lieutenant O'Daniel?
24      A   Yes.
25      Q   And also Sergeant Backman reviewed and

110

1  approved that; correct?
2     A   Sergeant Backman, and I believe
3  ultimately Sergeant Findley as well the day of.
4     Q   Is it Metro's position that the NFDDs
5  were properly deployed on January 10, 2022?
6     A   The -- the insertion -- I believe the
7  CIRT's review said that they could not properly
8  clear the entirety of that structure prior to the
9  insertion, and also there was not enough evidence
10  or presurveillance to say if there was going to be
11  young children or elderly adults that we would
12  want to stay away from.  That was their position.
13     Q   So that was CIRT's position, that the
14  NFDD had been improperly used, and TRB agreed or
15  sustained that conclusion; correct?
16     A   Based on the -- the unknown factors that
17  they cited.
18     Q   And is that Metro's position in this
19  litigation, or is Metro going to disagree with its
20  own CIRT and TRB report?
21        MR. ANDERSON:  Objection.  Can you
22  clarify as to whether you're talking policy or
23  constitution?
24        MR. BREEDEN:  Yeah.  I can ask it --
25        MR. ANDERSON:  Does that make sense?

111

1        MR. BREEDEN:  I can ask it as both.
2  BY MR. BREEDEN:
3     Q   So is it Metro's position that insertion
4  of the NFDDs violated its own policies?
5     A   So CIRT stated that there was not enough
6  information on the occupants after reviewing the
7  facts after the case.  The planning of the
8  insertion of the NFDDs was based on what they knew
9  at that time.  Jake Warner, being the ATL, and
10  Sergeant Russ Backman believed they did not have
11  enough intel to tell them that there was going to
12  be those factors of young children or elderly in
13  that structure, so they believed they were well
14  within policy to insert and deploy the 25.
15        CIRT disagreed with that based on there
16  wasn't enough surveillance -- presurveillance to
17  ascertain if there was going to be young kids or
18  elderlies inside that residence.
19     Q   And so does -- does Metro agree, then,
20  that that deployment of NFDDs was against its own
21  policies?
22     A   Based on CIRT's recommendation that
23  there was not enough presurveillance, yes.
24     Q   Okay.  And does Metro believe that, from
25  a constitutional standpoint, that insertion of the

112

1  NFDDs was improper?
2     A   Not on a constitutional level.  It was
3  based on the -- the policy of the insertion for --
4  to keep it away from young children and adult --
5  elderly.
6     Q   Okay.  Well -- and, I mean, when you say
7  "young children," would a 19-year-old man fall
8  into the category of people who need to be safe?
9     A   We're -- when we're -- the policy is
10  more for young children that are developing their
11  eardrums, because it's the decibel level, so we're
12  talking about toddler age, small children that are
13  still developing in the -- in the eardrums.
14     Q   But the policy on NFDDs is really for
15  everyone's safety inside; right?  I think it --
16  the case law refers to innocent bystanders.
17     A   So -- so when the -- when you're talking
18  about the innocent occupants inside, it's for the
19  free throwing of a distract.  So we have more of a
20  leverage when we use a stun stick and we can
21  control that deployment.
22        And, again, going back to what the team
23  leaders and ATL believed at that time, was there
24  wasn't any factors that would limit them from
25  introducing the 25, and it was ultimately approved

113

1  by Lieutenant O'Daniel.
2     Q   Are you saying, then, it's Metro's
3  position that if they physically tossed this NFDD
4  at the ceiling, they couldn't constitutionally do
5  that, but if they just have it on the end of a
6  stick and do the same thing, that is permissible?
7     A   No.  Again, those are both policies that
8  we try to mitigate injury, so we -- we don't want
9  to deploy into something that we haven't fully
10  cleared.  So if we went into that room and we
11  could fully see that it was clear and we wanted to
12  deploy the distract, we could freely do that.
13        Now, to insert it into something with
14  closed blinds, if you could clear behind the
15  blinds and -- and you believed at the time, or
16  Officer Bertuccini, that there was nothing within
17  that distance of deploying it on the stun stick,
18  he was within the SWAT policy at the time.
19     Q   And the next topic, I think we've
20  already spoken about this some.
21        But you're saying, at that time, there
22  was no formal or informal policy or practice as to
23  how long in seconds or minutes officers were
24  supposed to wait between the announcement and
25  using force to enter a residence.

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 32 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1        Is that Metro's position?
2    A    On -- given the exact time before, no.
3    Q    Okay. I'll hand you what we've marked
4  as Exhibit 3.
5        (Exhibit 3 was identified.)
6  BY MR. BREEDEN:
7    Q    Just for the record, Exhibit 3 is some
8  guidance from the Nevada Commission on Peace
9  Officers Standing -- Standards and Training, or
10  Nevada POST, and it's been produced in this
11  litigation as Williams 809 and 810.
12        Have you ever seen this document before?
13    A    I have.
14    Q    Okay. Would you agree with me that
15  somebody who's in charge of tactics and training
16  of SWAT officers should be familiar with POST's
17  guidance on those issues?
18        MR. ANDERSON: Objection. Form.
19        THE WITNESS: Again, our -- our SWAT
20  policy covers state and federal law, and then it
21  comes to -- there's some standards that -- in the
22  POST that not every officer may read every single
23  section of a POST requirement.
24  BY MR. BREEDEN:
25    Q    Well, okay.

115

1        But you would agree with me that if you
2  were in charge of training and running a SWAT team
3  in the state of Nevada, that it would be a good
4  idea to familiarize yourself with what Nevada POST
5  says about that?
6    A    It would be a good standard to know what
7  Nevada POST says on a topic, but you don't -- we
8  won't base everything based on POST. But your
9  question -- your -- I guess your question was,
10  should persons be -- in the training, be familiar
11  with everything that constitutes our deployment.
12  I would agree with you.
13    Q    Prior to the incident in this case, were
14  officers trained on this Nevada POST guidance
15  about knock and announce?
16    A    Prior to, I couldn't -- can't recall. I
17  don't -- through my research of looking at the
18  manual and lesson plans, I don't believe that this
19  was instituted in any training prior to this
20  incident.
21    Q    And so Nevada POST, at the bottom of the
22  first page here in a little note, it states that,
23  you know, the time that is considered reasonable
24  is going to depend on the circumstances, but then
25  it says approximately one minute would be

116

1  considered in -- safe in most cases.
2        That guidance was never provided to SWAT
3  officers before Mr. Williams' shooting; correct?
4    A    Where -- where -- what paragraph is
5  that?
6    Q    I'm sorry. It's at the very bottom here
7  in this notes section on the first page.
8    A    Okay.
9    Q    You would agree with me that SWAT
10  officers before the -- Mr. Williams' shooting were
11  never trained on this one-minute standard?
12    A    Correct.
13    Q    Do you think that's a good standard
14  there? It says, "Approximately one minute would
15  be a safe period in most cases, but it can be
16  less, especially if peace officers know that
17  somebody is aside -- inside and awake."
18        Do you agree with that?
19    A    I don't know who came up with the one
20  minute, because, again, through any case law,
21  state law, there isn't any specific mentioning of
22  you have to wait one minute in most cases, like
23  this refers to. I don't know who would -- who put
24  this in here, where it originated from, how long
25  it's been in there.

117

1        But, again, I think they're using the
2  one minute as reasonableness, and then they leave
3  it open to in most cases. So -- and then it says,
4  "But it can be less," so I don't -- again, it's
5  still ambiguous, because it leaves what's less.
6    Q    Well, it gives at least some guidance to
7  officers; right?
8    A    This POST standard?
9    Q    Yes.
10    A    It would -- yes, based on that language.
11    Q    And does Metro want to do the bare
12  minimum to comply with the constitutional
13  standards, or does Metro want to do what's safest
14  for its own officers and members of the public?
15        MR. ANDERSON: Objection. Form.
16        THE WITNESS: Again, we base our
17  tactics on every situation. There could be some
18  situations that we wait one minute. There would
19  be some situations where we wait six seconds, like
20  this incident was.
21  BY MR. BREEDEN:
22    Q    And the example given here in the Nevada
23  POST for when less time might be appropriate is if
24  peace officers know that someone is inside and
25  awake.



30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

118

1     But that was not the case with
2 Mr. Williams; correct?
3     A   Based on what the POST is saying here,
4 if -- if they're giving a factor of less than one
5 minute if someone is inside and awake, I don't
6 know if the operators outside would know that at
7 that time.  They could not know that.
8     Q   Well, yeah, because, in fact, they --
9 they didn't know if -- they didn't know who the
10 occupants were, if any, and they didn't know where
11 they were inside, and they didn't know whether
12 they were asleep or awake.
13     Isn't that all true?
14     A   I would say that's true.
15     Q   Now, knock and announce says that
16 officers have to at least perform the announcement
17 and then wait a reasonable amount of time for
18 somebody to come to the door and provide them
19 admittance.
20     What is Metro's position on whether or
21 not the amount of time is measured from the
22 begin -- beginning of the announcement or the end
23 of the announcement?
24     A   Metro's position would be the -- at the
25 very onset of the first announcement is when the

119

1 time starts.
2     Q   Okay.  So if the idea is for the
3 announcement to give somebody an idea of who is
4 outside their door and why they're there, how
5 could somebody know that at the beginning of the
6 announcement before the announcement is completed?
7     A   The -- the announcement -- the beginning
8 of the announcement gives the verbal announcement
9 of authority and purpose, and then it's given
10 throughout the entirety of the search warrant.  So
11 we base our time, again, on the start of the
12 announcements --
13     Q   Okay.
14     A   -- for the reasonableness of time, based
15 on when -- what the tactic is dictating.
16     And then we -- going back to this case,
17 it was a CET, and they planned for the two
18 announcements prior to the introduction -- the
19 introduction of the stun stick and then the manual
20 breach to enter the residence.
21     Q   So I want to give a hypothetical -- a
22 hypothetical fact here to make sure that we're on the same
23 talking about the same thing and we're on the same
24 page.
25     A   Mm-hmm.

120

1     Q   I want you to imagine that the
2 announcement maybe was rather long and drawn out
3 and maybe the announcement was, "This is
4 Sergeant Backman of the Las Vegas Metropolitan
5 Police Department.  I am here for 3050 South
6 Nellis Boulevard, Apartment 25.  We are police,
7 and we have a search warrant."  That's the
8 announcement.
9     So it's Metro's position, then, that you
10 would start counting the reasonable amount of time
11 from when the word "this" was said at the
12 beginning of that announcement, versus when the
13 announcement is complete?
14     A   So the reasonable amount of time -- the
15 time that we start is, yes, at the start of the
16 announcements.
17     Q   Okay.  So, in my example -- which is
18 kind of a long announcement, admittedly --
19 theoretically, three or four seconds could go by,
20 and I'm still not even done with the announcement.
21     A   I don't understand the question.
22     Q   Well, Metro is saying -- let's say
23 Metro's policy is, "Well, we're going to do the
24 announcement and wait three seconds before we use
25 force."  If I start to say, "This is

121

1 Sergeant Backman of the Las Vegas Metropolitan
2 Police force," and I -- and I say it in a slow
3 manner, three seconds might go by before I've even
4 finished the announcement.
5     And it's Metro's position that that's
6 okay?
7     A   Again, we're going back to -- to
8 constitutional law and state law of
9 reasonableness, the amount of time.  We still
10 are -- don't have any specific guidance that it
11 says you need exactly when to -- to start your
12 counting of your -- of the timing of before or
13 after.  They used the reasonable amount of time at
14 the start, and they used two announcements prior
15 to insertion of the stun stick.
16     Q   Well, they actually used as their
17 trigger the end of the second announcement; right?
18 I mean, it was preplanned that they would break
19 out the back window on the end of the second
20 announcement; right?
21     A   Correct.
22     Q   Okay.  Why wouldn't they have said,
23 "Well, we'll -- we'll preplan at the -- at the
24 beginning of the second announcement"?
25     A   I'm sorry.  I didn't -- the -- why

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

122

1  wouldn't they plan?  I'm sorry.  Can you --
2      Q    Yeah.  Well -- well, the answer seems to
3  me -- and I don't mean to be argumentative.
4      A    No.
5      Q    But they waited for the announcement to
6  end because even they thought it was reasonable
7  that they should wait until at least the
8  announcement was finished.
9          Isn't that what they actually did?
10     A    So the plan that was -- that was briefed
11  was they would give two announcements of the
12  authority and purpose prior to the insertion of
13  the stun stick, prior to them making the manual
14  breach to enter the residence, correct.
15     Q    Okay.  So you're here saying today,
16  well, we would measure that time from the
17  beginning of the announcement, but Metro's own
18  trigger that day or that morning was the end of
19  the second announcement; right?
20     A    The -- the option to deploy the stun
21  stick was -- was a tactical planning at the end of
22  the second announcement.
23     Q    At the time, what were Metro's policies
24  and procedures as to how it determined when
25  warrants were high risk?

---

123

1      A    High risk would -- would be the crime
2  itself, if they're likely to be armed.  There's
3  some other factors.  I'm just drawing a blank.
4  I'm sorry.
5      Q    Well, the crime that they were
6  investigating -- and, incidentally, as it turned
7  out, they -- they weren't even investigating the
8  people who committed this crime.  They had the
9  wrong suspects, apparently, because they've
10  arrested somebody else for the crime now.  But we
11  were investigating a homicide.
12         Is it Metro's policy or practice that
13  any homicide warrant service is considered high
14  risk?
15     A    If we were going -- so that's -- that's,
16  like, a -- a huge question.  Like, any homicide
17  investigation, it depends what we were going
18  after.  If we were going after documents in a
19  building that would help the detectives in their
20  investigation, could be not deemed high risk
21  because we were going after documents at a
22  different facility.
23         This particular incident, there was
24  belief that there may be a suspect still that they
25  believed was a person of interest that was

---

124

1  involved in the homicide they were investigating
2  that was not accounted for and believed to have
3  been staying at that residence.
4      Q    But I'm -- I'm trying to figure out why
5  the -- the warrant in this particular case was
6  considered high risk.
7          Was it merely because a homicide was
8  being investigated, or were there other factors?
9      A    The factors that it was deemed high risk
10  is because the person that they -- the individuals
11  that they believed were the suspects at the time
12  of the homicide both had violent histories and
13  known to carry weapons, and they did not know if
14  they were going to be inside or not.
15     Q    Now, almost a year prior to
16  Mr. Williams' death, there was another incident on
17  January 5th of 2021 which occurred at 27 East
18  Agate Avenue, and it involved a woman named
19  Jasmine King.
20         Just generally, what -- what occurred
21  during that incident?
22     A    From my reading of the reports -- again,
23  I was not assigned to the SWAT section, but they
24  used a CET on the service of a search warrant.  It
25  stemmed from a sexual assault investigation.  They

---

125

1  utilized an explosive breach of the front door.
2  The explosive breach was initiated and ended up
3  injuring -- severely injuring a female that was
4  behind the door.
5      Q    And that female was Jasmine King?
6      A    Yes.
7      Q    And so, like in Mr. Williams' case,
8  members of SWAT were accused of violating the
9  knock and announce rule and not waiting a
10  reasonable amount of time for somebody to come to
11  the door and provide them admittance; is that
12  true?
13     A    They were deemed at the -- the
14  initiation of the charge was before the reasonable
15  amount of time.  It was -- it was given too early.
16     Q    And, in fact, Ms. King, she was not a
17  suspect in any crime; correct?
18     A    I don't believe so.  She was not named
19  in the --
20     Q    She was an innocent bystander; right?
21     A    Yes.  She was an occupant of the
22  residence.
23     Q    She was inside a residence with
24  children, wasn't she?
25     A    I believe she had one child in there.

---

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

126

1    Q    And the suspect wasn't even inside, was
2  he?
3    A    No.
4    Q    And Ms. King was actually trying to
5  answer the door to see, you know, police and --
6  and let them inside when this happened; right?
7    A    Yes, after the first announcement. And,
8  again, it goes back to the ignitiation [sic] of
9  the charge was not properly utilized, which was
10  briefed prior to. It would be at the second
11  announcement.
12    Q    Do you know how long in seconds between
13  the announcement and when that charge went off was
14  allowed?
15    A    After -- the actual incident itself?
16    Q    Yes.
17    A    The -- it was immediately after the
18  first announcement.
19    Q    So no time?
20    A    I believe there was no time after.
21    Q    Okay. And Ms. King was significantly
22  injured as a result?
23    A    Yes.
24    Q    Okay. Do you know, because I -- I only
25  know, like, what's in the public filings, but what

127

1  were the extent of her injuries?
2    A    Again, I don't know. I know -- I
3  believe injury to one of her eyes.
4    Q    Was she permanently blinded?
5    A    I don't know. I didn't read her medical
6  records. But I believe she had significant damage
7  to one of her eyes.
8    Q    And that incident, another incident a
9  year prior, where the SWAT team has been accused
10  of failing to abide by the knock and announce
11  rule, that involved many of the same people who
12  are defendants in this case; right?
13    A    I --
14         MR. ANDERSON: Objection. Form.
15         Go ahead.
16         THE WITNESS: I do know Garth Findley
17  was there and James Bertuccini.
18  BY MR. BREEDEN:
19    Q    And Melanie O'Daniel as well; right?
20    A    Correct. Melanie O'Daniel was the
21  tactical commander.
22    Q    Okay. And then, ultimately, that case
23  was resolved through a settlement for a
24  substantial amount of money; is that true?
25    A    It was settled.

128

1    Q    Okay. In investigating the Jasmine King
2  incident, did Metro determine that officers had
3  violated her civil rights?
4         MR. ANDERSON: Objection. Form.
5         THE WITNESS: They evaluated that the
6  initiation of the -- of the explosive breach was
7  not consistent with the preplanning of the two
8  announcements.
9  BY MR. BREEDEN:
10    Q    Okay. So, you know, the question,
11  again, just to state it more bluntly: They found
12  that the complaint that alleged her civil rights
13  had been violated had merit?
14         MR. ANDERSON: Objection. Form.
15         THE WITNESS: Again, I don't think
16  that it was a CIRT process in this incident, so
17  I -- I don't recall reading a report that
18  distinguished otherwise. I do know that it was
19  brought to court based on her injuries. But,
20  again, I can't answer to what the findings were,
21  because there wasn't a similar investigation as in
22  Mr. Williams' case.
23  BY MR. BREEDEN:
24    Q    Was there any discipline of any of the
25  SWAT officers involved in the King incident?

129

1    A    I believe Garth Findley received a
2  contact for failing to wait for the second
3  announcement to deploy the explosive breach.
4    Q    Okay. And Sergeant Findley was actually
5  the -- was he the team leader or assistant team
6  leader on Mr. Williams' warrant?
7    A    He would be a team leader on
8  Mr. Williams.
9    Q    Okay. So Sergeant Williams, the team
10  leader who was physically there and he's -supposed
11  to be the one in charge of Mr. Williams' incident,
12  only a year prior, he had been found that he made
13  some policy violations and some errors that
14  resulted in Ms. King's injuries; correct?
15         MR. ANDERSON: Objection. Form.
16         Go ahead and answer.
17         THE WITNESS: Sergeant Findley, yes.
18         MR. ANDERSON: Just for the record,
19  you said "Sergeant Williams" a couple of times.
20         MR. BREEDEN: Oh, I'm so sorry.
21         MR. ANDERSON: Yeah, I know you meant
22  Sergeant Findley.
23         MR. BREEDEN: Yeah, I meant
24  Sergeant Findley.
25         THE WITNESS: Sergeant Findley, yes,

130

1   he was disciplined at the Jasmine King, referenced
2   the early deployment of the explosive breach, and
3   he was a team leader at the Mr. Williams incident.
4   BY MR. BREEDEN:
5       Q   As a result of the Jasmine King
6   incident, what policies, procedures, or practices
7   were changed at SWAT?
8       A   There were several based on the
9   deployment of the explosive breach. It was
10  solidified that it would not go prior to the two
11  announcements. We utilize a technology called the
12  WolffTracker that we deploy prior to hanging an
13  explosive breach charge to kind of tell us if
14  there's movement behind the door of the structure
15  that we're putting the charge on, and I believe it
16  had to be approved at a higher level.
17      Q   Weren't there changes to the SWAT manual
18  about CET and when it could be used?
19      A   I believe there was verbiage changed --
20  I believe there was a word "never" changed, but I
21  don't believe the -- there was much change other
22  than some verbiage of when you could -- I think
23  that was the change for the property.
24      Q   What happened around this time regarding
25  SWAT's policies and procedures as to using CET for

131

1   a property-only search warrant?
2       A   I believe the change was there had to
3   be -- when we're talking about property only, it
4   had to be other mitigating factors to use CET, so
5   it had to be the likelihood of the armed -- armed
6   subjects inside.
7       Q   Was CET at any point completely banned
8   for a property-only search warrant?
9       A   CET should not be used for property-only
10  search warrants if you don't have mitigating
11  factors.
12      Q   Okay. And so what are the mitigating
13  factors?
14      A   You don't have a --
15      Q   I think maybe you mean aggravating
16  factors.
17      A   Or aggravating factors. The likelihood
18  of suspects being armed, violent -- violent
19  suspects, prior history, stuff like that.
20      Q   And the search warrant regarding the
21  residence where Mr. Williams was ultimately
22  killed, that was a property-only search warrant;
23  right?
24      A   The search warrant for Mr. Williams, it
25  was for the recovery of evidence related to a

132

1   homicide, but it also named two -- two individuals
2   who, one was on a monitor, monitoring through
3   CCDC, Clark County Detention Center, so we knew he
4   wasn't at that residence. And the other suspect
5   who had a violent history, who had been
6   investigated by gangs for an outstanding
7   shooting -- he was wanted in an outstanding
8   shooting -- possible could be in there. So we
9   still had knowledge that there could be a violent
10  criminal inside that residence, but --
11      Q   Okay. But the warrant itself was a
12  property-only search warrant?  There was no arrest
13  warrant?
14      A   The -- the -- there was no arrest
15  warrant, and the arrest -- the search warrant did
16  not name a body up to seize.
17      Q   Okay. So what -- what policy changes,
18  then -- you know, I just want to make sure that
19  we've discussed them all.
20          What are all of the policy changes that
21  happened because of the Jasmine King incident?
22      A   The Jasmine King was more of an
23  explosive breaching policy changing of when we
24  would utilize the explosive breaching, how we
25  would announce explosive breaching. We added in

133

1   factors of staying away from the door, and we
2   added in technology to try to ascertain if there
3   was somebody standing behind the door. And then
4   the approval process.
5           MR. BREEDEN:  Let's go off the record
6   for a moment.
7           THE VIDEOGRAPHER:  The time is
8   12:00 p.m.  We are off the record.
9           (Whereupon, a recess was taken.)
10          THE VIDEOGRAPHER:  The time is
11  12:59 p.m.  We are on the record.
12  BY MR. BREEDEN:
13      Q   Okay. Lieutenant Beas, we're back on
14  the record now, and we want to talk some about
15  Metro's post-incident knock and announce policies.
16          I'm going to go through some particular
17  subjects, but how have Metro's policies regarding
18  knock and announce and CET service of warrants
19  changed since the Williams shooting incident?
20      A   Again, when CIRT reviewed the case with
21  their legal consultant, they said that some
22  language in the CET policy, specifically the
23  speed, surprise, and overwhelming action, kind of
24  contradicted the reasonableness of time. They
25  wanted to move the CET option to a no knock.

134

1     And after then-Director Peterson
2 consulted with them, we changed the policy to a
3 CET to be only allowed when a no-knock search
4 warrant is approved, and it has been to be
5 approved by the captain or director of SWAT.
6     Q   Even under the policies at the time, if
7 Metro had sought a no-knock warrant for the search
8 warrant at the apartment where Mr. Williams was
9 staying, do you think that would have been
10 approved as a no-knock warrant?
11    A   The -- the detective that was typing
12 it -- this Detective Grimmett that was the affiant
13 of the search warrant would have to ask the court
14 for a no knock.  I don't know what his -- the full
15 investigation of it was, but the severity of
16 crime, if -- I don't know if this one would be
17 just based on the details that were put into this
18 search warrant after reading it.
19    Q   So are you familiar with the case of
20 Breonna Taylor?
21    A   Yes, the national case?
22    Q   Yes.
23    A   Yes.
24    Q   It's a national case, I think out of
25 Kentucky.

135

1     A   Kentucky.
2     Q   And in that case, there was a lot of
3 criticism of law enforcement's use of a no-knock
4 warrant; would you agree?
5     A   Yes, no knocks were criticized, but I
6 don't believe Breonna was a no knock, but that
7 was -- it brought the no-knock search warrants to
8 light.
9     Q   And so there had been some changes after
10 that incident to Nevada law in order to limit
11 no-knock warrants; right?
12    A   Yes.
13    Q   Okay.  And at the time the Williams
14 incident occurred, were no-knock warrants very
15 common, used by Metro?
16    A   No, no-knock warrants have never been
17 really common, and especially here in -- in Metro.
18    Q   Is there sort of a -- an informal policy
19 that they are not to be used?
20    A   No.  I just think the way that the
21 process is for the search warrant -- because a
22 no-knock search warrant would be more of a tactic,
23 and when they -- when the affiant of a section or
24 a bureau that's authoring the -- the search
25 warrant, sometimes they don't meet with SWAT prior

136

1 to the implementation of the warrant, so they
2 wouldn't know that we may want a no-knock search
3 warrant because it's not approved -- or it's not
4 requested by us; it would be requested by the
5 detective.
6     I don't see anything that was formal or
7 informal with the department saying they did not
8 want to do them.  They're just very uncommon.
9     Q   When is the last time you, as SWAT
10 tactical commander, have approved a no-knock
11 warrant?
12    A   I have never approved a no-knock
13 warrant.  Or let me back up.  Again, I don't
14 know -- I don't approve the -- the application for
15 a no-knock warrant.  If it came as a warrant to me
16 to approve for the service of it and it said no
17 knock, then I would have to prove that tactic, but
18 I've never had a warrant come to me as a no-knock
19 search warrant.
20    Q   Okay.  Are you aware of the last time
21 SWAT did serve a warrant as a no-knock warrant?
22    A   I can't recall.
23    Q   Would you agree with me that the smaller
24 the amount of time that officers wait between
25 announcements and use of force, the closer it gets

137

1 to being, in practical effect, a no-knock warrant?
2     A   I would say they're two distinguished
3 tactics.  The no knock is zero announcements, zero
4 time before manually breaching the door.  And then
5 when you get to the CET or a SACO, the
6 reasonableness of time is based on your incident
7 at the time, your information, your intel that you
8 have.
9     Q   But if I went to serve a warrant and,
10 you know, on my way kicking down the front door, I
11 just said, "Police, search warrant," that's
12 essentially a no-knock warrant, isn't it?
13    A   It would be still an announcement.  The
14 reasonableness of time would be you would have to
15 articulate why you kicked it after really quick
16 announcement.
17    Q   Yeah, there -- that would be sort of
18 token efforts to give the announcement; right?
19    A   Based on your -- your hypothetical, yes.
20    Q   Yeah.
21     And Metro doesn't want token efforts to
22 comply with the law.  They want to comply with the
23 law; right?
24    A   Yes.
25    Q   They want to comply with the

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 38 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

138

1  Constitution and the spirit of the law; correct?
2      A   Correct.
3      Q   You indicated that after the Williams
4  event, the policy on CET was changed then and CET
5  is now only to be used with the no-knock warrants.
6          Were there any other changes to policy
7  that were implemented?
8      A   Reference to CETs or SACOs or --
9      Q   CET, SACO, or how knock and announce is
10 performed.
11     A   No.  Other than moving the CET to a no
12 knock, we just have more discussion about
13 reasonableness of time given certain factors.
14 It's still -- we still abide by the same
15 pre-policies prior to it, but now that we -- we
16 have not used a CET post this incident, most -- or
17 I don't want say most -- all of our search
18 warrants have been either that SACO or a modified
19 SACO that gives us more time to announce, just
20 based on how far away we are and the actual tactic
21 of not going in.
22     Q   So if SWAT served the warrant involved
23 in this case, there would be no dispute,
24 this would simply be served as a SACO?
25     A   It would -- if it was served today, it

139

1  probably would be either a SACO, because it was
2  no -- a no-knock search warrant, or a breach and
3  hold, where we would not enter the threshold with
4  bodies.
5      Q   Okay.  And let's talk about some of
6  those other options.
7          First of all, there's a no-knock warrant
8  or -- well, no, I should phrase it this way.
9          There's a CT -- CET entry, which is now
10 reserved only for no-knock warrants; correct?
11     A   Correct.
12     Q   There's SACO.
13         There's an option, if officers don't
14 feel they can safely serve the warrant, to simply
15 not execute the warrant at that moment; right?
16 That's always an option?
17     A   That's always -- that's always been an
18 option, even previously.  If -- if we believe that
19 there's other options for -- to surveil the
20 suspect out and get them into custody, based on
21 probable cause or an arrest warrant, to take them
22 into custody and then now serve that with the
23 suspect away.  That was -- that's an option before
24 and now.
25     Q   And you said there's a breach and hold

140

1  option.  So explain what that option is and when
2  that would be used.
3      A   Again, that's another tactic used in
4  service of search warrants where environmental
5  factors and -- that limit our -- unable to contain
6  it safely for the citizens and officers, that we
7  would get up to the threshold and breach a door
8  and/or window to kind of get a foothold into the
9  structure without actually making entry into the
10 structure with bodies.
11         But, again, that's based on size of the
12 structure, the case, what the search warrant is
13 for.  Obviously, you couldn't do it for a
14 3000-square-foot house, because there's no way to
15 have fully contained that house on a breach and
16 hold.  So it's case-by-case basis.
17         But it gives you an option, if you can't
18 properly -- because there's some apartment
19 complexes, townhouses, condominiums that you can't
20 safely SACO it.  That gives them -- operators
21 another tactic without using a dynamic entry.
22     Q   Would -- would breach and hold have been
23 an option for the warrant involved in this case?
24     A   I don't believe the -- the SWAT manual,
25 they trained breach and holds.  Their options were

141

1  CET or SACO at the time.  There might have been
2  some informal breaching and holding, but I don't
3  know if they trained it and formalized it in
4  the -- or in the SWAT manual.
5      Q   But at least at the time this incident
6  occurred, a breach and hold was at least a --
7  informally could be used?
8      A   I don't believe they trained it as -- to
9  the point where they were implementing that tactic
10 at the time.
11     Q   Okay.  Given that they didn't know who
12 was inside, and I don't even think they knew
13 whether people were inside, why wouldn't they
14 maybe use a breach and hold here so that, you
15 know, people inside would have time to come out
16 willingly?
17     A   Again, I think it goes back to that
18 wasn't a trained tactic that was put into policy
19 or our SWAT manual, and their options that they
20 used at the time were CET or SACO, and those were
21 the ones they trained and were comfortable with
22 and were tried and true methods.
23     Q   Okay.  The Ninth Circuit has listed the
24 time of day that the warrant is served as a factor
25 into how long it is reasonable for officers to



30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

142

1  wait between the announcements and the time that
2  they use force to enter a residence to serve a
3  warrant.
4       Metro accepts that as a legal factor to
5  apply here; correct?
6    A   Correct.
7    Q   And is that specifically taught to SWAT
8  officers?
9    A   Yeah, that is in -- it's in the manual.
10 Time of day is a factor in any service of search
11 warrants, along with all of the other facts that
12 we've talked about.
13   Q   And the way the factor applies is that
14 if the time of day is a time where people are
15 likely to be asleep, the amount of time that
16 officers should wait should be longer; is that
17 true?
18   A   Minus any information that -- given a
19 24-hour town, minus any information that the
20 occupants that you're seeking to encounter are not
21 that type of individual that, you know, have that
22 pattern of life. That's something to factor in,
23 correct.
24   Q   Okay. And also we have the problem like
25 if these warrants are served when people are

143

1  likely to be asleep, like the early hours of the
2  morning, some people sleep naked or in a state of
3  undress that they wouldn't necessarily want to
4  just jump up out of bed and come to the door
5  first.
6       Does Metro acknowledge that?
7    A   Again, that would be factored into the
8  time of day, yes.
9    Q   Okay. Is -- do you remember the actual
10 facts of the Banks case?
11   A   That he was in the shower at the time of
12 North Las Vegas SWAT serving the search warrant,
13 and he believed he didn't have enough reasonable
14 time to get out of the shower and answer the door.
15   Q   Yeah. So -- so that -- that factor is
16 literally the factor from Banks, right, that
17 police ought to wait long enough for people to get
18 decent and come to the door; right?
19   A   Again, in that case, I think it -- it --
20 it alluded to the reasonableness of time to -- to
21 announce minus anything -- factors of destruction
22 of evidence, possible escape, and any other
23 factors that they -- that they come into encounter
24 with.
25   Q   And does Metro acknowledge that the six

144

1  seconds, then, that was afforded Mr. Williams
2  was -- was not a reasonable amount of time?
3    A   In the CIRT review, they -- they note
4  that -- that the six seconds and the time of day
5  probably wasn't proper.
6    Q   And you're not disputing that finding
7  here today?
8    A   No.
9    Q   Okay. Another one of the factors that
10 is mentioned in the Banks case is the officer's
11 other observations that would support forced
12 entry. In Mr. Williams' specific case, and I --
13 I've -- me and my law partners have taken many
14 depositions in this case, and not one witness has
15 testified that they saw or heard anyone moving or
16 doing anything inside the apartment before force
17 was used to enter it.
18       So would you agree with me that that
19 factor, the officer's other observations, that
20 would not support a shorter amount of time?
21   A   The -- going off the statements of the
22 officers that you had deposed, that they said they
23 didn't hear anything or see anything that would
24 speed up that six seconds, again, it goes back to
25 the preplanning of the actual briefing of the

145

1  search warrant was the information that there
2  could be occupants in there that were armed with
3  firearms.
4       And they used the two announcements.
5  And, again, we explained the stun stick so they
6  didn't give them time to arm themselves or
7  barricade or do any other factors.
8    Q   Is there any period of time in seconds
9  that Metro considers, per se, meaning in and of
10 itself, not to be a reasonable amount of time to
11 wait?
12   A   Again, it would be -- it would be based
13 on the incident in itself and the factors that
14 the -- the operators, the ATL, the TL see at the
15 time of the service that would factor in, if it
16 would need more time than prior briefings or less
17 time.
18   Q   And, you know, the reason why that
19 factor is there so that if police go to serve the
20 warrant and then, all of a sudden, like, they see
21 somebody peeking behind a curtain with a gun and
22 they say, like, "Oh, it's police; hide," or, "Oh,
23 it's police; jump out the back," then that's --
24 that's the type of factor that would encourage a
25 shorter amount of time; right?

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

146

1    A    Shorter amount of time than was briefed,
2  yes.
3    Q    Yes.
4        And so, even though there could be later
5  changes to what is considered reasonable, is there
6  some amount in seconds that Metro considers, at
7  least at the planning stage, that officers need to
8  wait at least that amount of time?
9    A    Again, there's nothing formally written
10  or within U.S. or state law that -- that mandates
11  a -- a specific time. Again, it's based on the
12  preplanning of the actual search warrant of what
13  they're -- potentially could encounter, based on
14  the investigation, that the ATLs and TLs come up
15  with their plan of how many announcements.
16        And in this case, they gave two
17  announcements, which was pretty much accepted
18  announcements, prior to making any forcible entry
19  or start the process of entry.
20    Q    Are you aware of any amount of time that
21  the Ninth Circuit Court of Appeals has itself
22  stated it has never upheld entry in a shorter than
23  that amount of seconds as constitutional?
24    A    Ninth Circuit does cite -- in the Banks
25  case, it cites 15 to 20 seconds. That was that

147

1  case specific. And then there's also cases that
2  less than five seconds is not reasonable.
3    Q    Okay. Has any Ninth Circuit case ever
4  held that less than ten seconds was reasonable --
5        MR. ANDERSON: Objection. Form.
6  BY MR. BREEDEN:
7    Q    -- as far as you are aware?
8    A    Off the -- offhand right now, I know
9  I've read some stuff, but I can't recall the
10  actual case.
11    Q    And in Banks, there was reference to a
12  15- to 20-second delay, and Metro would agree that
13  less than 15 to 20 seconds was used in the
14  Williams matter? In fact, the -- six seconds is
15  the figure Metro is giving; correct?
16        MR. ANDERSON: Objection. Form.
17        THE WITNESS: So six seconds was the
18  stun stick entry, and then the entry was after
19  that. So I believe breaking the threshold and
20  entry was after 15 seconds.
21  BY MR. BREEDEN:
22    Q    Okay. But -- but let's be clear.
23        Metro understands that the first use of
24  force to enter the apartment was when the back
25  window was broken with the stun stick? Does Metro

148

1  agree with that?
2    A    Correct. Correct.
3    Q    Okay. Does Metro agree that mistakes
4  were made when the warrant was served on the
5  apartment that Mr. Williams was in?
6        MR. ANDERSON: Objection. Form.
7        THE WITNESS: You would have to be
8  more specific as far as "mistakes."
9        At the service from SWAT or the -- or
10  the search warrant itself?
11  BY MR. BREEDEN:
12    Q    I'm happy to clarify for you, but -- but
13  I want to ask the question very broadly.
14    A    Okay.
15    Q    Okay?
16        Does Metro in this litigation admit that
17  there were any failures of training, policy,
18  planning, or execution regarding this warrant?
19  And, if so, what are they?
20    A    Well, again, the CIRT -- in reading the
21  CIRT report, there was findings, again, going back
22  to the -- sorry -- the verbiage of the CET
23  contradicted that they said reasonableness of
24  time. That's why it was changed. I know they
25  said that Melanie O'Daniel's approval of the stun

149

1  stick was not in line with policy, given that they
2  believed they couldn't clearly see what was behind
3  that window.
4        There was some talks about there wasn't
5  enough surveillance to ascertain who was actually
6  going to be in that residence, if there was going
7  to be young children or older adults and who was
8  in the residence prior.
9    Q    Does --
10    A    So things like that.
11    Q    Does Metro agree there were failures of
12  surveillance?
13    A    They said there should have been more
14  surveillance needed.
15    Q    Yeah.
16        Because when this was actually served,
17  Metro had no idea who was actually in the
18  apartment; right?
19    A    So the surveillance was conducted, and
20  the surveillance team that conducted the
21  surveillance believed that it was too, I guess --
22  I don't want to use the word "dangerous," but they
23  were compromised believing there was too many
24  lookouts. Believing that this was a dope house
25  for sale, and they had a lot of lookouts, they

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 41 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

150

1   couldn't use physical surveillance. There wasn't
2   technology to use based on the -- the layout of
3   the residence.
4           And, yes, they -- they did not know
5   fully who would be in there. There was knowledge
6   based on the -- the suspected person at the
7   time's, I believe, stepmother that she said that
8   he stayed there, but he was never seen on
9   surveillance.
10      Q    Yeah, so one suspect they were looking
11  for, he was wearing an ankle monitor, so they knew
12  he was not there; right?
13      A    Correct.
14      Q    And the other suspect had never actually
15  been seen there by surveillance; they just had
16  information from his stepmother from some months
17  before that he might be at that apartment?
18      A    That information and then the
19  information that he was involved in a shooting in
20  the same complex, yes.
21      Q    But police surveillance never actually
22  had eyes on him at that apartment at any time, let
23  alone the morning of the shooting; right?
24      A    Correct.
25      Q    Okay. And Metro does not dispute the

151

1   findings of the CIRT report, that there were
2   failures in surveillance?
3       A    They noted that there was -- there
4   should have been more surveillance done, correct.
5       Q    Does Metro dispute the findings of the
6   CIRT report that the IAPs were improperly handled?
7       A    No.
8       Q    Does Metro dispute the findings of the
9   CIRT report that there was inadequate training in
10  the sense of Sergeant Backman, who had not
11  completed basic SWAT training course at the time
12  this happened?
13          MR. ANDERSON: Objection. Form.
14          THE WITNESS: I believe they did state
15  that he should have been through a SWAT school,
16  but I believe Melanie O'Daniel had offered him
17  some other training, and given his background and
18  experience, he was in that foreposition.
19  BY MR. BREEDEN:
20      Q    Yeah, he had -- he had somewhat of a
21  leading role in this, didn't he? Like, it was his
22  job to do the announcements; right?
23      A    Correct.
24      Q    And he actually took on a planning role
25  as well with Lieutenant O'Daniel, because the

152

1   regular team leader, Sergeant Findley, was on
2   vacation; correct?
3       A    He -- he was -- the initial planning was
4   the ATL, and he gets the -- he approves that
5   planning, and then he briefs it up to
6   Lieutenant O'Daniel, correct.
7       Q    Because Sergeant Backman had not even
8   completed the basic SWAT training course, he
9   wouldn't have even seen Exhibit 2, would he?
10          MR. ANDERSON: Objection. Form.
11          THE WITNESS: No, part of the -- part
12  of his role as a team leader, he should be aware
13  of all section policies, even day one.
14  BY MR. BREEDEN:
15      Q    Well, do you know for a fact that he had
16  seen that, or are you just speculating?
17      A    I don't know for a fact, but I'm just
18  saying, based on any position that you take to --
19  for a new position, you should know what you're
20  entailing, and that's part -- part of that is
21  reading the section manual.
22      Q    But we know, because he hadn't completed
23  the training, he wouldn't have seen any of the
24  PowerPoints used during the basic training and he
25  wouldn't have received any of the verbal

153

1   instruction given during the basic training on
2   knock and announce; true?
3       A    Again, I think Melanie O'Daniel stated
4   that he had some training, some one-on-one
5   training, so I don't know what that entailed, if
6   he had to see some PowerPoints or he had to read
7   the manual. But I know she alluded to that he did
8   have some one-on-one training. I believe it was
9   40 hours. But you are correct, he did not go
10  through the full SWAT school, the 120 that was
11  offered at that time.
12      Q    And CIRT had found that
13  Lieutenant O'Daniel's approval of the stun stick
14  and the charge that was in the stun stick was not
15  to department policy.
16          Does Metro dispute that in this
17  litigation?
18      A    No.
19      Q    Okay. CIRT had found that use of the
20  CET entry was contrary to knock and announce
21  principles.
22          Does Metro dispute that conclusion in
23  this litigation?
24      A    I think the findings were they did not
25  believe it was within the SWAT policy to use the

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 42 of 46

30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

154

1  CET, correct.
2     Q   Okay.  And ultimately, related to that,
3  CIRT concluded that officers had not waited a
4  reasonable amount of time when conducting the --
5  the knock and announce portion of the warrant
6  service.
7        Does Metro dispute that in this
8  litigation?
9     A   I believe that came from the legal
10 consultant and was ultimately put into the report,
11 so, yes, they -- they took that report.
12    Q   Okay.  Metro, in this litigation, is not
13 disputing that?
14    A   No.
15    Q   Is the SWAT manual updated or revised
16 annually?
17    A   I can't say, prior to the -- me taking
18 over, if it was yearly.  The department does want
19 you to review the section manual yearly to see if
20 there needs to be any changes.  There has been,
21 since I've been there, two versions of it, and as
22 we go and implement new -- new pieces of
23 equipment, new tactics, we add in those policies.
24    Q   Okay.  So the version in effect at the
25 time of the search warrant in this case was the

155

1  2021 version?
2     A   Yes, it would be the '21 version.
3     Q   And so what are the later versions?  Is
4  it 2022 and 2023?
5     A   I believe '22 it changed.  And then '24
6  was a change, and then we -- it twice changed in
7  '24.  It changed in January and then again in May.
8     Q   Okay.  And would they refer to that,
9  then, as version, like, 1/2024 and version 5/2024?
10 How is that distinguished?
11    A   So they would refer to it as the month
12 that it was changed.  So right now we're 5/24.
13    Q   Okay.  And so how are the -- the later
14 versions of the SWAT manual different?  I know we
15 spoke about the change regarding CET, and that's
16 now reserved for no-knock warrants.
17        What were the other changes?
18    A   We really did a revamp, because, again,
19 when -- in March or so of '23, we had a new
20 director come in, and he wanted to overhaul the
21 whole manual.  So we went page by page.  We took a
22 lot of stuff that didn't need to be in there out.
23        I would have to, I mean, go -- it was a
24 full change.  Nothing in particular, other than
25 the CET language that we're dealing with this.

156

1  Dealing with tactics, that was changed to no
2  knock.  And then we added the breach and hold into
3  the manual.
4     Q   And so have there been any changes to
5  knock and announce principles or how knock and
6  announce is supposed to be performed?
7     A   Still we abide by the laws that govern
8  search and -- search warrants and knock and
9  announce, but there's no specific -- we didn't add
10 any specific time that needed to be implemented
11 prior to entry.
12    Q   Did you read Sergeant Findley's
13 deposition?
14    A   I did not.
15    Q   Dr. -- I'm sorry, Sergeant Findley seems
16 to reference that at one point in time, there was
17 something in writing that said at least ten
18 seconds should be allowed for a reasonable amount
19 of time to wait, and that that was changed at some
20 point.
21        Do you have any information about when
22 that changed and who changed it?
23    A   I do not have any recollection of it
24 being in there that I read, but I don't -- I
25 wouldn't be able to answer that if it was in there

157

1  and who changed it.
2     Q   So do you have any information as to why
3  it was changed?
4     A   No, sir.
5     Q   Do you have any information as to
6  whether it was changed to allow for longer or
7  shorter waiting times?
8     A   I -- I couldn't under -- I don't know
9  when it was changed or if it was in there, so I
10 couldn't answer that.
11    Q   Okay.  Have any of the department's
12 policies on what constitutes a high-risk warrant
13 changed since the time this warrant was served?
14    A   No.
15    Q   Since the time this warrant has served,
16 has Metro made any effort to relay the information
17 from Nevada POST to SWAT, which suggests that one
18 minute is a safe period to wait in most cases?
19    A   Again, we -- we know that that is in
20 there.  We don't know why it's in there or who put
21 it in there, but, again, we go back off of
22 reasonableness of U.S. Constitution and state law.
23    Q   What position does Metro take in this
24 litigation as to the effect that the NFDD
25 deployments had on Mr. Williams' ability to see



30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

158

1  and hear officers?
2        MR. ANDERSON:  Objection.  Form.
3        Go ahead.
4        THE WITNESS:  I can only answer to
5  what the intended use of an NFDD when it's
6  inserted into a structure, what we intend it to
7  cause, and that's to disorientate them and to take
8  his attention away from what we're actually doing.
9  I don't know -- I could not say if that was
10  actually the cause that happened to Mr. Williams.
11  BY MR. BREEDEN:
12    Q    And I think you stated earlier, one of
13  the reasons you deploy an NFDD is to confuse
14  people inside the residence; is that true?
15    A    To stun and disorientate them, yes.  And
16  that's in the sense to take his attention away
17  from the breach at the front door.
18    Q    Do you recall specifically using the
19  word "confuse" earlier in your deposition?
20    A    I don't, but confusion is part of the
21  stun and disorientate them.
22    Q    Okay.  We have retained an expert in
23  this case who has testified that the NFDDs would
24  have impaired Mr. Williams' ability to see
25  officers in his surroundings.

159

1        Does -- does Metro dispute that?
2    A    At the time that the stun stick was
3  deployed, there was no officers in there for him
4  to see, so I -- I don't know what the -- I
5  couldn't answer if he was -- could not see
6  officers from the outside where his positioning
7  was.
8    Q    And the same expert is prepared to
9  testify that the NFDDs impaired Mr. Williams'
10  ability to hear officers.
11        Does Metro dispute that?
12    A    No.  Again, that's the intention of the
13  distract, is to momentarily debilitate his vision
14  and hearing.
15    Q    In fact, at least as the officers are --
16  are entering, you know, they're saying things like
17  "Police, search warrant," but that's at the same
18  time the NFDDs are going off; right?
19    A    That's the nine bang at the -- on the
20  outside on the four side -- or the two side.
21    Q    What is Metro's position in this
22  litigation on whether Mr. Williams was impaired by
23  any substance at the time of his death?
24    A    I believe the CIRT report and his
25  toxicology stated that he had marijuana in his

160

1  system that was consistent with smoking it
2  recently.
3    Q    And recreational marijuana is legal;
4  correct?
5    A    Correct.
6    Q    In your experience as a police officer,
7  is it unusual to find people who have smoked
8  marijuana recently?
9    A    To find them -- like, encounter people
10  that had smoked marijuana?
11    Q    Sure.
12    A    No, it wouldn't be unreasonable.
13    Q    You could probably walk down on Fremont
14  Street and smell marijuana on half the people;
15  right?
16    A    Correct.
17    Q    So I say that jokingly, but do you
18  recall, like, the exact nanograms per deciliter
19  that -- of THC in his system that was tested?
20    A    No.  I would have to refer back to the
21  CIRT report, the toxicology.
22    Q    Okay.  Did you -- did you ever review
23  that section of the CIRT report, the toxicology?
24    A    It was in the -- it was in the CIRT
25  report.  I remember seeing it.

161

1    Q    Did -- did you find the levels to be
2  highly unusual?
3    A    I don't know levels of intoxication
4  based on nanograms.  I'm sorry.
5    Q    Okay.  And you agree there was no
6  alcohol involved.
7    A    I don't recall seeing alcohol in --
8    Q    Okay.
9    A    -- in the report.
10    Q    Is Metro going to take the position that
11  Mr. Williams' marijuana consumption caused or
12  contributed to this incident at all?
13    A    I don't think that contributed to him
14  firing on officers.
15    Q    Okay.  Are you -- is Metro going to take
16  the position that that caused or contributed to
17  his inability to perceive and -- and react to what
18  was going on around him?
19        MR. ANDERSON:  Objection.  Form.
20        THE WITNESS:  I don't -- it was never
21  in the report that that would keep him from going
22  to the door or submitting or giving him a -- a
23  clear mind frame.
24  BY MR. BREEDEN:
25    Q    Okay.  I have seen two alternate

Case 2:24-cv-00074-APG-NJK    Document 55-18    Filed 05/16/25    Page 44 of 46
30(b)(6) for Las Vegas Metropolitan Police Department
Adrian Beas                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

162

1  versions of the SWAT uniform and how lettering
2  appears on the uniform. One is with bright gold
3  lettering that says SWAT on it, and the other is
4  what I would call a blackout uniform that the SWAT
5  lettering is in black and therefore is much more
6  difficult to see, especially from a distance.
7        In this case, the officers were wearing
8  what I would call the -- the blackout uniforms.
9        Why was that done?
10    A   We call that the subdued patches. And,
11  again, it's just a tactical advantage. When we're
12  doing hostage rescues and we have to stealth in or
13  we're doing search warrants where we have to walk
14  up to the front door, we want -- we don't want to
15  be backlit, because those other reflective patches
16  may compromise our positions with people on the
17  four side or the two side or the three side and on
18  the approach. But it's just mainly for a tactical
19  advantage reason.
20    Q   Okay. It's to assist in the CET and the
21  surprise and overwhelming response; right?
22    A   It's in totality of just really the
23  tactical advantage of giving us the -- not being
24  seen when we're trying to be stealthy.
25    Q   Well, under knock and announce

163

1  principles, part of it is that the person inside
2  the residence has to be afforded an opportunity to
3  come to the door and reasonably ascertain that it
4  is officers at the door with a warrant and -- and
5  provide them entry.
6        Don't you think that that process is
7  more delayed with the blackout or subdued
8  uniforms, as opposed to the bright gold lettering?
9    A   I don't, because the numerous search
10  warrants we have done that we have been able to
11  announce and get people to come to the door
12  doesn't diminish their ability to recognize the
13  verbal announcements that we are the police and we
14  have a search warrant.
15    Q   Well, that assumes that the person heard
16  and understood those instructions; right?
17    A   Yes.
18    Q   What if it was a deaf person?
19    A   They wouldn't have been able to hear us.
20    Q   And what if it was a person who had
21  their hearing impaired like through NFDDs?
22    A   But verbal -- I mean, the subdued
23  patches and the patches that the SWAT officers
24  wear is not -- is not the only thing that
25  announces our presence. Again, it's the visual

164

1  presence, it's the lights, it's the verbalization,
2  NFDDs. So it's in totality, so it's not one
3  factor that would have recognized us as police
4  officers.
5    Q   Would you agree that when officers
6  actually breached the front door of the apartment
7  and physically went into the apartment, that many
8  of them had lights on the end of their weapons?
9    A   I believe most of them should be
10  carrying lights. I just don't recall how many
11  had -- had them on, but there was -- there was
12  several of them on.
13    Q   It's essentially like having a little
14  flashlight on the tip of your firearm; right?
15    A   Correct.
16    Q   Okay. How many of those do you think
17  were shining into Mr. Williams' face as police
18  came through?
19    A   Again, I don't recall the number, but
20  there was flashlights.
21    Q   Multiple lights; right?
22    A   Correct.
23    Q   Okay. Do you believe those would have
24  impaired Mr. Williams' ability to see the
25  officers?

165

1        MR. ANDERSON: Objection. Form.
2        THE WITNESS: Again, I think with the
3  number of bodies we had in there and the number of
4  announcements that were given prior to making
5  entry and during entry, that's our announcements
6  for authority and purpose.
7  BY MR. BREEDEN:
8    Q   But at the time the shooting occurred,
9  he was essentially staring into multiple
10  flashlights on his face; right?
11        MR. ANDERSON: Objection. Form.
12        THE WITNESS: I couldn't say what he
13  was staring at at the time that he fired the
14  weapon at the officers.
15  BY MR. BREEDEN:
16    Q   Does Metro think it -- the most likely
17  scenario is that when the announcements were
18  given, Mr. Williams was asleep?
19        MR. ANDERSON: Objection. Form.
20        THE WITNESS: Again, based on the
21  reports, there's no way to know if he was asleep
22  prior to the announcements. All we can say is he
23  was awake when officers made entry, because he
24  fired on officers.
25



166

1  BY MR. BREEDEN:
2     Q   Isn't the reason why 5:00 a.m. was
3  chosen for this service of this warrant was
4  because it was a time he would most likely be
5  asleep, or any occupants inside?
6     A   There's -- there's several factors that
7  go into an early morning hit.  Being a
8  multi-family apartment complex, the closeness to
9  Nellis Boulevard, and AMPM, we want to reduce the
10 risk to citizens.  But also, we don't want them
11 staring out the windows at us either as we're
12 making our approach.
13    Q   Okay.  Are you aware that a question
14 similar to that was asked at a press conference of
15 the public relations officer for Metro, and he
16 said that these are served in the early hours of
17 the morning when there's -- people are likely to
18 be asleep or not active inside?
19    A   I don't recall that -- listening to that
20 press conference.
21    Q   Do you agree that that's a factor that
22 Metro considers when they assess what time of day
23 they should serve these warrants?
24    A   I would agree.
25    Q   Is that official policy by Metro?

167

1     A   No.
2     Q   So what is Metro's policy as to why it
3  would serve a warrant at 5:00 a.m. versus serving
4  it at noon?
5     A   Again, it goes -- based -- it's -- it's
6  really the safety of the community when you're
7  serving a warrant different times of the day,
8  whether you're going to do it late at night, early
9  in the morning, or during the day.  We want to try
10 to lessen the citizens that are walking around,
11 kids that are going to school, and -- and also a
12 factor of the cover of darkness to give us a
13 better stealth approach to the search warrant.
14       So there's many factors other than just
15 believing that he may be asleep or not as alert as
16 the middle of the day.  Again, it goes to factors
17 to the occupants, what kind of structure it is?
18 Are they -- are they a late-at-night dope sales?
19 Is it we know that they work a 9:00 to 5:00?  So
20 all of those factors go into the determination of
21 when we want to serve the search warrant.
22    Q   Ultimately, no evidence that was sought
23 in the search warrant was found inside the
24 apartment; correct?
25    A   Reading the reports, I don't believe so,

168

1  yes.  No, nothing was found.
2     Q   And I referenced it earlier, and I'm not
3  sure if you -- you knew it or not, but, in fact,
4  the -- the two suspects that were considered at
5  that time that might be at the residence, Metro
6  has now arrested individuals completely
7  unassociated with them for the crime.
8        Were you aware of that?
9     A   I'm aware that the two individuals that
10 they identified as the persons of interest that
11 were given to -- by the stepmother that may be
12 involved, based on surveillance video, were not
13 the two individuals that were arrested.
14    Q   Have you seen the surveillance video?
15    A   I've seen pictures of it.
16    Q   It's pretty -- pretty grainy and -- and
17 difficult to make out any particular features.
18       Wouldn't you agree?
19    A   If it wasn't my kid, it would be hard.
20    Q   I'm going to provide you what we'll mark
21 as Exhibit 4.
22       (Exhibit 4 was identified.)
23       THE WITNESS:  Thank you.
24 BY MR. BREEDEN:
25    Q   Exhibit 4 are several pages from the

169

1  CIRT report.  It's just an excerpt.  They have
2  been Bates labeled LVMPD4440 through 4443.
3        These are excerpts from the CIRT report
4  that we've been talking about during your
5  deposition, and basically I -- I just want you to
6  take a few seconds to review them and let me know
7  if Metro, in this litigation, is taking any
8  position that the findings and conclusions on
9  these pages are not correct.
10    A   Do you want me to start at the general
11 SWAT approach at the very top?
12    Q   Yes.
13    A   Okay.  Do you want me to read the whole
14 thing?
15    Q   Well, I want you to -- to read it at
16 least to the extent that you're comfortable
17 testifying that Metro does not dispute any of the
18 findings on those pages.
19       And I don't mean to interrupt you, but
20 then my question would be if -- if Metro intends
21 to dispute any of these findings, I need to know
22 what they are and why they are disputing them.
23    A   Okay.
24       So this was the CIRT findings based on
25 our department policy, so --

30(b)(6) for Las Vegas Metropolitan Police Department

Adrian Beas                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**170**

1    Q   So, in this litigation, is Metro
2  disputing these findings?
3    A   That they're -- no, on the findings of
4  the policy violations.
5        MR. BREEDEN:  Okay.  I think those are
6  all of my questions.
7        Do you have anything, Mr. Anderson?
8        MR. ANDERSON:  I don't.
9        THE VIDEOGRAPHER:  Okay.  Just
10  briefly, Mr. Anderson, would you like a copy of
11  the video and transcript?
12        MR. ANDERSON:  I do want a copy of the
13  transcript.  I don't need a copy of the video at
14  this time.
15        MR. BREEDEN:  Thank you.
16        MR. ANDERSON:  Unless you want one to
17  remember this day.
18        THE WITNESS:  No.
19        THE VIDEOGRAPHER:  This concludes the
20  deposition of Lieutenant Adrian Beas as a 30(b)(6)
21  designee for Las Vegas Metropolitan Police
22  Department consisting of four clips.  The time is
23  1:53 p.m.  We are off the record.
24      (The deposition concluded at 1:53 p.m.)
25             * * * * *

**171**

1          CERTIFICATE OF COURT REPORTER
2
   STATE OF NEVADA      )
3                       )  ss:
   COUNTY OF CLARK      )
4
5       I, Heidi K. Konsten, Certified Court Reporter
6  licensed by the State of Nevada, do hereby certify
7  that I reported the deposition of ADRIAN BEAS,
8  commencing on March 28, 2025, at 9:04 a.m.
9       Prior to being deposed, the witness was duly
10  sworn by me to testify to the truth.  I thereafter
11  transcribed my said stenographic notes via
12  computer-aided transcription into written form,
13  and that the transcript is a complete, true and
14  accurate transcription and that a request was not
15  made for a review of the transcript.
16       I further certify that I am not a relative,
17  employee or independent contractor of counsel or
18  any party involved in the proceeding, nor a person
19  financially interested in the proceeding, nor do I
20  have any other relationship that may reasonably
21  cause my impartiality to be questioned.
22       IN WITNESS WHEREOF, I have set my hand in my
23  office in the County of Clark, State of Nevada,
24  this April 1, 2025.
25
            Heidi K. Konsten, RPR, CCR No. 845

**172**

1            DECLARATION OF DEPONENT
2       I, ADRIAN BEAS, deponent herein, do
3  hereby declare under penalty of perjury that I have
4  read the within and foregoing transcription of my
5  testimony taken on March 28, 2025, at Las Vegas,
6  Nevada, and that the same is a true record of the
7  testimony given by me at the time and place
8  hereinabove set forth, with the following
9  exceptions:
10
11               ERRATA SHEET
12  PAGE  LINE  SHOULD READ:        REASON FOR CHANGE:
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
25  _____

**173**

1               ERRATA SHEET
2  PAGE  LINE  SHOULD READ:        REASON FOR CHANGE:
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22
23  Date: _____  _____
                  ADRIAN BEAS
24
25