# Exhibit R - Deposition of Defendants' Police Practices Expert Spencer Fomby

Spencer Fomby          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 79

```
1                    REPORTER'S CERTIFICATE

2    STATE OF NEVADA )
                     ) ss:
3    COUNTY OF CLARK )

4         I, Blanca I. Cano, CCR No. 861, RPR, do hereby
     declare:
5         That I reported the taking of the deposition of
     SPENCER FOMBY, commencing on Tuesday, February 18, 2025.
6
          That prior to being examined, the witness was
7    by me duly sworn to testify the truth, the whole truth,
     and nothing but the truth;
8
          That I thereafter transcribed my said shorthand
9    notes into typewriting and that the typewritten
     transcript of said deposition is a complete, true, and
10   accurate record of testimony provided by the witness at
     said time to the best of my ability.
11
          I further certify (1) that I am not a relative,
12   employee, or independent contractor of counsel of any of
     the parties; nor a relative, employee or independent
13   contractor of the parties involved in said action; nor a
     person financially interested in the action; nor do I
14   have any other relationship with any of the parties or
     with counsel of any of the parties involved in the
15   action that may reasonably cause my impartiality to be
     questioned; and (2) that transcript review pursuant to
16   FRCP 30(e) was not requested.

17        IN WITNESS WHEREOF, I have set my hand in my
     office in the County of Clark, State of Nevada, this 2nd
18   day of March, 2025.

19
                         Blanca I. Cano
20                  _____
                    Blanca I. Cano, CCR No. 861, RPR
21

22

23

24

25
```

Spencer Fomby                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1                        UNITED STATES DISTRICT COURT

2                              DISTRICT OF NEVADA

3

4     LATIA ALEXANDER,                    )
      individually as heir of            )
5     ISAIAH T. WILLIAMS and in          )
      her capacity as Special            )
6     Administrator of the Estate        )   CASE NO.:
      of ISAIAH T. WILLIAMS,             )   2:24-CV-00074-APG-NJK
7                                         )
              Plaintiff,                  )
8                                         )
         vs.                              )
9                                         )
      LAS VEGAS METROPOLITAN              )
10    POLICE DEPARTMENT, a                )
      political subdivision of the       )
11    State of Nevada; KERRY             )
      KUBLA, in his individual          )
12    capacity; BRICE CLEMENTS, in       )
      his individual capacity;           )
13    ALEX GONAZALES, in his             )
      individual capacity; RUSSELL       )
14    BACKMAN, in his individual         )
      capacity; JAMES ROTHENBURG,        )
15    in his individual capacity;        )
      JAMES BERTUCCINI, in his           )
16    individual capacity; MELANIE       )
      O'DANIEL, in her individual       )
17    capacity; DOES I-XX,               )
      inclusive,                         )
18                                        )
              Defendants.                 )
19    _____)

20

            VIDEOCONFERENCE DEPOSITION OF SPENCER FOMBY

21

            Taken on Tuesday, February 18, 2025

22

                   At 10:03 a.m.

23

24

      Reported by:  Blanca I. Cano, CCR No. 861, RPR
25    Job No.: 59779, Firm No.: 116F

Spencer Fomby          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

2

```
1   APPEARANCES:
2   For the Plaintiff:
3            BREEDEN MALPRACTICE & INJURY LAW
             BY:  ADAM J. BREEDEN, ESQ.
4            7432 West Sahara Avenue
             Suite 101
5            Las Vegas, Nevada 89117
             (702) 819-7770
6
    For the Defendants:
7
             MARQUIS AURBACH CHTD.
8            BY:  ANDREW D. YATES, ESQ.
             10001 Park Run Drive
9            Las Vegas, Nevada 89145
             (702) 382-0711
10
11                I N D E X
12  WITNESS:  SPENCER FOMBY
    EXAMINATION                            PAGE
13    BY MR. BREEDEN                        3
14
15            E X H I B I T S
16  NUMBER                               MARKED
17
18            (No exhibits were marked.)
19
                    * * * * *
20
21
22
23
24
25
```

3

```
1    LAS VEGAS, NEVADA; TUESDAY, FEBRUARY 18, 2025;
2             10:03 A.M.
3             -oOo-
4
5        (Prior to the commencement of the
6        deposition, all of the parties present
7        agreed to waive the court reporter
8        requirements under Rules 30(b)(5)(A) and
9        30(b)(5)(C) of the NRCP/FRCP.)
10
11  Thereupon,
12            SPENCER FOMBY,
13  was called as a witness, and having been first duly
14  sworn, was examined and testified as follows:
15
16            EXAMINATION
17  BY MR. BREEDEN:
18    Q.  Good morning, sir.  Can you please state your
19  name for the court reporter and go ahead and spell your
20  name as well.
21    A.  Good morning.  It's Spencer Fomby,
22  S-p-e-n-c-e-r, F, as in Frank, o-m, as in Mary, b-y.
23    Q.  Okay.  Mr. Fomby, my name is Adam Breeden.  I'm
24  the attorney for a woman, Latia Alexander, who has
25  filed a lawsuit against several law enforcement officers
```

4

```
1   and the Las Vegas Metropolitan Police Department over a
2   police fatal shooting involving her son, Isaiah
3   Williams, which occurred on January 10th of 2022.
4        Do you understand the reason why you are here
5   today is to give deposition testimony about your expert
6   opinions in that case?
7     A.  Yes, sir.
8     Q.  Let me ask you, Mr. Fomby, you're a black man;
9   correct?
10    A.  Yes, sir.
11    Q.  Do you think there are problems between law
12  enforcement and black men?
13    A.  Well, that's kind of a general statement and
14  obviously something I wasn't asked to opine on.  It's
15  not the subject of my opinion.
16    Q.  Do you think there's problems with some law
17  enforcement agencies overenforcing or using overly
18  aggressive tactics in black neighborhoods?
19    A.  It's been the subject of debate, but, again,
20  it's not part of my opinion in this case.
21    Q.  All right.  I notice that you have given
22  deposition testimony a number of times, but I'm going to
23  go through the ground rules for today's deposition with
24  you.
25        Understand that the oath that was administered
```

5

```
1   to you by the court reporter here is the same oath that
2   you would take as if you were in a court of law in front
3   of a judge and a jury, and it obligates you to tell the
4   truth under penalty of perjury.
5        Do you understand that?
6     A.  Yes, sir.
7     Q.  The court reporter's taking down everything
8   that's said today -- all of my questions and your
9   answers and any other comments or objections -- and
10  afterwards she's going to put everything into a booklet
11  or a transcript form, and you'll have the opportunity to
12  review that and make changes to your testimony, if you
13  wish to do so.
14        I just caution you in advance that if you
15  choose to make a change to your testimony after today, I
16  would have the right to comment on the fact that you
17  said one thing during your deposition and then later you
18  tried to change it, if the change was something in a
19  meaningful way.
20        Do you understand that?
21    A.  Yes, sir.
22    Q.  It is important for us to get a good record
23  today, so there are several things I will ask you to do
24  for me.
25        If you don't understand any of my questions,
```

Spencer Fomby                  Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**6**

1  please ask me to repeat or rephrase them.  I'll be happy
2  to do so.  During today's deposition, I need you to give
3  an audible answer such as a "yes" or a "no."  Please
4  don't merely shake your head up and down or side to side
5  if you mean "yes" or "no" or use slang terms such as
6  "uh-huh" or "uh-uh" if you mean "yes" or "no."  If you
7  do any of that, I'll probably just politely ask you if
8  you meant "yes" or "no" or some other response so that
9  we have a good record today.
10      Additionally, you've done an excellent job so
11  far, but as a general rule during a deposition, we need
12  to all make sure that we are not speaking at the same
13  time as anyone else because it's very difficult for the
14  court reporter to accurately take down what two people
15  are saying at the same time, especially in a Zoom
16  setting like we have today here if we start talking over
17  one another.
18      So can you do all of that for me?
19  A.  Yes, sir.
20  Q.  During today's deposition, one of the other
21  attorneys may make an objection to my question.  I want
22  to explain to you how objections work during a
23  deposition process if you're unfamiliar.
24      Obviously, we do not have a judge here on the
25  videoconference to immediately rule on objections, so

**7**

1  what we do during a deposition is if I ask a question
2  and the other attorney wishes to state an objection for
3  the record, they may do so, and then we simply wait for
4  you to give your response as if there had been no
5  objection.  Then later if a judge needs to review my
6  question and your answer and whether it is admissible in
7  court, the judge can do so at a later time.
8      I explain this because it confuses many people
9  who are deposed.  They hear an objection and they think
10  they're not supposed to respond, but generally the
11  opposite is true.
12      Do you understand that?
13  A.  I understand.
14  Q.  All right.  Have you consumed any alcoholic
15  beverages in the last 24 hours?
16  A.  No.
17  Q.  Have you taken any drugs, including
18  prescription medications, in the last 48 hours?
19  A.  No.
20  Q.  Do you have any sort of medical condition -- an
21  extreme example would be like dementia or Alzheimer's
22  disease -- that may affect your memory or ability to
23  testify here today?
24  A.  No.
25  Q.  Now, I know because you've been disclosed as an

**8**

1  expert, a very long list of documents that you reviewed
2  was disclosed.
3      Have you reviewed anything else since you
4  prepared your reports in this case?
5  A.  Yes, sir.  I saw Mr. Gilbertson's deposition
6  transcript, so I have reviewed that.
7  Q.  There's also been some other witness
8  depositions taken since your reports were prepared.
9      Have you reviewed those?
10  A.  I believe I've reviewed a few.  I can't
11  remember the officer -- or the officer's name -- was the
12  lead investigator.  I saw his deposition testimony also.
13  Q.  Would that be Officer Findley?
14  A.  No.  Officer Findley was the team leader for
15  the SWAT team.  Is it Roach or --
16  Q.  Roth.
17  A.  Roth, yeah.
18  Q.  Yeah.  Detective Roth, who was the lead CIRT
19  investigator, that's who you're referring to?
20  A.  Yes, sir.
21  Q.  Okay.  Have you ever met or spoken to any of
22  the defendants or the witnesses that have been deposed?
23  A.  I know a couple of the officers that were
24  involved in the incident.
25  Q.  You know them personally?

**9**

1  A.  I know them professionally.
2  Q.  And who do you know?
3  A.  I have met Bertuccini and Hancock.
4  Q.  When and how did you meet them?
5  A.  When I worked in Boise, Idaho, as the director
6  of training for the Boise Police Department and I was
7  also a commander for the SWAT team there, and we had
8  them come there as a private contractor to do training
9  for the SWAT team.
10  Q.  Okay.  So at least those two officers,
11  Bertuccini and Hancock, you trained them previously?
12  A.  No.  We hired them to train our SWAT team.
13  Q.  I see.
14      So they trained you and your SWAT team?
15  A.  I was a commander, so I wasn't involved in
16  receiving training.  I was -- I basically wrote the
17  checks to have people come train our team.
18  Q.  Okay.  But you did get to meet them and you had
19  met them before the incident in this case?
20  A.  Yes.  I believe that was several months before
21  this incident.
22  Q.  Okay.  How many times did you personally see
23  them before the incident?
24  A.  I think I saw them about two different days.
25  So the day they arrived and briefed the team, I met them

10

1 and welcomed them and then listened to them introduce
2 themselves to the students who are all members of our
3 SWAT team.
4     And then I think on a separate day, I came out
5 during training -- I was pretty busy, but I came out to
6 watch the training and see what they were doing.
7     Q. Okay. And did you have discussions with both
8 of them?
9     A. No.
10     Q. Just observation?
11     A. Yes, sir.
12     Q. Okay. Let me ask you, you've been retained in
13 this case to give opinions, at least as I would phrase
14 it, on police standards and SWAT standards.
15     Do you think that's fair?
16     A. Yes, sir.
17     Q. What sort of sources or treatises or
18 organizations are out there that you would consider to
19 be reliable in that field?
20     A. I guess the main one would be the National
21 Tactical Officers Association, or the NTOA, which is a
22 trade organization, a nonprofit that works to create
23 national standards for all types of tactical operations.
24 So that would be everything from SWAT team response to
25 active shooter response and even response to protests.

11

1     It's -- I've been an instructor with them for
2 about seven years teaching high-risk patrol tactics and
3 help develop certain courses. And I'm currently the
4 lead for the public order section for the NTOA, which
5 means I work with experts in protest response from
6 around the world and create national standards for the
7 response to protests.
8     And then in any state you typically will find a
9 state organization that is kind of equivalent. So in
10 California, we have the California Association of
11 Tactical Officers, or CATO. So many states have similar
12 organizations that work to professionalize SWAT
13 response.
14     Q. And, like, the NTOA, is that something that
15 individual officers join or is that something that
16 police departments join?
17     A. Individual officers can join and teams can also
18 join. There's a team membership.
19     Q. And specifically for Las Vegas Metro Police
20 Department, do you know that department or any of their
21 officers to be a member of NTOA?
22     A. I don't know specifically their membership
23 status.
24     Q. And you said that some states have their own
25 similar organizations.

12

1 Does Nevada?
2     A. I'm not sure that Nevada has one. I believe
3 I've seen members of Nevada SWAT teams attend CATO and
4 other state organization conferences.
5     Q. So Nevada does have something called the State
6 of Nevada Commission on Peace Officer Standards and
7 Training.
8     Would you consider that to be reliable
9 resource?
10     A. Yes. Most states have a similar organization,
11 what we call POST organizations. And so in California
12 we had California POST, Idaho had Idaho POST. So, yes,
13 that is an organization that looks to create minimal
14 standards for what is considered a peace officer and
15 then establishes baselines for police academies and then
16 ongoing training throughout a peace officer's career.
17     Q. And so if a state POST has issued some sort of
18 reference materials or standards, is that legally
19 binding on departments or is that aspirational?
20     A. Maybe binding in the state, but as it applies
21 to a best practice, a generally accepted policing
22 practice, and then especially in civil court, it may not
23 be relevant.
24     Q. Do you have any legal training, like a
25 paralegal, lawyer, anything like that?

13

1     A. No, sir.
2     Q. Have you ever attended classes at law school?
3     A. No, sir.
4     Q. Have you ever attended legal classes not
5 offered through a law school?
6     A. Not a legal class, no, sir.
7     Q. Okay. You were retained in this case by the
8 law office of Marquis Aurbach; correct?
9     A. Yes, sir.
10     Q. And when you were retained by that law firm,
11 you knew that that law firm represented the defendant
12 officers and the Las Vegas Metropolitan Police
13 Department; correct?
14     A. Yes, sir.
15     Q. So it's not as if you were handed an assignment
16 blind and you didn't know who was retaining you. You
17 knew that in advance; right?
18     A. That's correct.
19     Q. How much did you charge for your document
20 review and preparation of your reports? I guess in
21 terms of what your hourly is but also in, like, the
22 total number of hours or total number of dollars.
23     A. I charge $350 an hour for all of that process,
24 and then I believe I billed about 70 hours' worth of
25 work for two reports.

Spencer Fomby        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1    Q.   And so I guess I can do the quick math, but do
2  you know in terms of total number of dollars how much it
3  is?
4    A.   Over $20,000.
5    Q.   I'm just going to put it into a calculator here
6  so we have it.
7        So if you've billed approximately 70 hours at
8  $250 an hour, that's going to be 17,500, and you think
9  that's probably the minimum you've billed; correct?
10   A.   To correct the record, it's $350 per hour.
11   Q.   Oh, I'm sorry.  I misunderstood you.
12       Okay.  So at that point, it would be a little
13 over 20,000?
14   A.   Yes, sir.
15   Q.   All right.  And then is there anything other
16 than this deposition that you've been asked to do or
17 review in the future?  In other words, are you preparing
18 an additional report at the moment?
19   A.   No, not that I know of, unless there is some
20 additional expert from the plaintiff's side that I'm
21 asked to review and potentially rebut.
22   Q.   How much do you charge for appearance at trial?
23 Many experts will charge a flat fee for the day or the
24 half day.
25       What do you charge?

15

1    A.   $3,500 a day on a day that I testify.
2    Q.   I was looking at your CV before today's
3  deposition, and educationwise you have a bachelor of
4  arts in justice administration from Howard University;
5  correct?
6    A.   Yes, sir.
7    Q.   And is that your highest degree of education
8  achieved?
9    A.   Yes, sir.
10   Q.   You do not hold a master's degree in criminal
11 justice or any other field for that matter; right?
12   A.   That's correct.
13   Q.   And you have never been a tenured professor on
14 issues of criminal justice; correct?
15   A.   No.  Just a visiting fellow on police science
16 at the University of -- we say Derby, they say Derby --
17 in the UK.  And so I've traveled there for about three
18 different -- three years to give guest lectures on
19 policing practices, but I was not a professor.
20   Q.   Okay.  Would you agree with me that at the time
21 this happened in 2022, Las Vegas Metro Police Department
22 was considered a Tier 1 SWAT team?
23   A.   Based on the NTOA standards, yes.
24   Q.   Yeah.  And so based on those standards, what
25 does it mean to have a Tier 1 SWAT team?

16

1    A.   A Tier 1 SWAT team essentially means that you
2  have a certain number of members.  I can't recall the
3  exact number off the top of my head, but NTOA
4  established these standards to give guidelines on
5  different types of teams based on their capabilities.
6        So a Tier 1 would be the most capable team, and
7  that team has a certain number of people -- you know, I
8  think it's in the range of 20 people -- and then they
9  have certain capabilities.  So the capability to respond
10 to a hostage rescue is the most important thing and then
11 certain equipment.  So they have armored vehicles, they
12 have night vision equipment, and they have the
13 capability to use explosive breaching.
14   Q.   Now, most of your law enforcement experience on
15 SWAT comes from the Berkeley California Police
16 Department; is that correct?
17   A.   That's correct.
18   Q.   And their SWAT team is not a Tier 1 team, is
19 it?
20   A.   That's correct.  The Tier 1 -- the difference
21 between my team, which at the time was a Tier 2, and a
22 Tier 1 team was -- at the time we did not have explosive
23 breaching and we did not have night vision goggles.  And
24 so the team currently has night vision and I believe
25 they're working toward the explosive breaching program.

17

1  But those were the two gaps in our capabilities that I
2  was working to improve, but that was the difference
3  between those two tiers.
4    Q.   Now, when you were on SWAT at the Berkeley
5  Police Department, were you assigned full time to SWAT
6  or did you have nonSWAT duties as well?
7    A.   In the United States, there's only a handful of
8  teams that are full-time SWAT teams, and so my team
9  fell into the part-time or ancillary duty category.  So
10 all of us were police officers who had regular jobs as
11 detectives or patrol or narcotics, and then we trained
12 twice a month and we responded when called out to
13 emergencies as a SWAT team.
14   Q.   And so that was different for Berkeley, your
15 SWAT duties were part time versus in Las Vegas there's a
16 full-time unit; right?
17   A.   That's correct.
18   Q.   Okay.  So have you ever had a lawsuit filed
19 against you relating to your job as law enforcement?
20   A.   Yes, sir.
21   Q.   How many?
22   A.   I believe two.
23   Q.   Why don't you just tell me about the first one
24 chronologically.
25       When was that filed?

18

1    A.  I don't know the dates.  I know there is a case
2  maybe -- I don't know.  I'm just guessing -- 2014 to
3  2016.  It's Decaprio versus the City of Berkeley, and
4  that case involves a squatter.
5       So there was a group of people who were looking
6  to take over abandoned properties in the Bay Area
7  through adverse possession, and my job was -- I was
8  working as a crime prevention officer, and so I was
9  alerted to this group of people breaking into an
10  abandoned house and eventually coordinated with the
11  patrol officers to remove them multiple times over the
12  course of a year.
13       Arrested him, Mr. Decaprio, for trespass, and
14  then I worked with the City manager's office and the
15  prosecutor to charge him with trespass, and then
16  eventually went to trial, he was convicted, and then he
17  filed a lawsuit against the City and named me as a
18  defendant.
19    Q.  And what was the resolution of that lawsuit?
20    A.  The case was dismissed.
21    Q.  Did he allege that you or the City had violated
22  his civil rights?
23    A.  He alleged that, yes.
24    Q.  Okay.  What civil rights did he allege you had
25  violated?

19

1    A.  Well, he alleged that we deprived him of his
2  property rights because he had paid the property taxes
3  and we removed him physically, arrested him for
4  trespass, and he alleged that we violated his civil
5  rights by removing him from a property that he
6  rightfully owned.
7    Q.  And you say that the case was dismissed, but
8  was it dismissed involuntarily by the Court or was it
9  dismissed because some sort of settlement or other
10  resolution was reached?
11    A.  Well, I know the City didn't settle with him,
12  and I don't know technically how it was resolved, but I
13  know that he did not win and we did not settle.
14    Q.  Okay.  And the second occasion that you're
15  thinking of, when approximately was that?
16    A.  I believe it was after 2014.  I believe it was
17  a protest case, and I don't recall the specifics.  But I
18  was named as an individual defendant in a case where
19  people sued the City of Berkeley for our response to a
20  protest.
21    Q.  And was that filed in United States District
22  Court?
23    A.  I don't know for sure.  I believe it was a 1983
24  action, but I don't know for sure.
25    Q.  Okay.  And so it was alleged that you used

20

1  excessive force during a protest?
2    A.  I was one of the leaders and planners, so I
3  believe the allegation against me was that I was
4  involved in planning an operation that led to First
5  Amendment violations.
6    Q.  Okay.  And what was the resolution of that
7  lawsuit?
8    A.  My understanding is that case was also
9  dismissed.
10    Q.  And it was not settled, it was dismissed
11  involuntarily?
12    A.  That's correct.
13    Q.  Okay.  Have you had any use of force complaints
14  against you in your career, even if a lawsuit wasn't
15  filed?
16    A.  No.
17    Q.  How many internal affairs investigations of you
18  are you aware of during your law enforcement career?
19    A.  I don't know.  I know the only -- I have one
20  sustained complaint in my career and that was for using
21  profanity during an incident, and that's it.  I don't
22  know of -- I can't recall any other allegations.  And
23  that is the only sustained complaint that I ever had.
24    Q.  In your time on SWAT units during your law
25  enforcement career, did you ever use CET entries?

21

1    A.  That's exclusively for most of my career.
2    Q.  So you say you exclusively used CET entries
3  during your career?
4    A.  Almost exclusively until the later part of my
5  career.  CET, or what we call dynamic entry, was our
6  bread and butter kind of baseline tactic for high-risk
7  search warrants.
8    Q.  I was looking over your -- I'm going to share
9  it here on the screen so that we can look at the same
10  thing.
11       So I was provided -- I think this is on your
12  screen.
13       Can you see it?
14    A.  I can see it.
15    Q.  Yeah.  So this is your testimony and deposition
16  list that my office was provided.  It looks like you've
17  listed 11 prior times that you've given deposition or
18  trial testimony.  The last looks like it was in June of
19  2024.
20       Have you given any other testimony or testified
21  at trial since then?
22    A.  I have given a deposition on January 24th, I
23  believe, in a case.  It's a District of Columbia DC
24  Metro case.
25    Q.  Okay.  And so when we look at this list of

Spencer Fomby           Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1  trial and deposition testimony that you've given, did
2  you represent the law -- or were you retained on behalf
3  of the law enforcement agency in each one of these?
4      A.  So No. 6, I was actually retained by the
5  hospital, who they were suing, Ammon Bundy, the militia
6  leader, so I testified on behalf of the hospital.
7          And then Erma Johnson, that case I testified
8  for the plaintiff, alleging that an Arizona DPS trooper
9  used excessive force when he shot an unarmed motorist.
10         And then the Mayor and City Council of
11 Baltimore versus Purdue Pharma, I represented CVS.  So
12 the City of Baltimore sued CVS alleging that CVS
13 contributed to the opioid crisis by allowing diverted
14 prescription opioids to flood the drug market in
15 Baltimore.  And so I evaluated Baltimore PD and I gave
16 an opinion that their actions were inconsistent with
17 generally accepted policing practices.
18         And the other two cases are defense cases also.
19     Q.  Okay.  So of this list of 11, there's one, and
20 that's the Johnson case, that you believe you
21 represented plaintiff or the person filing the case?
22     A.  Yes, that's correct.
23         And then, you know, No. 6 is also a plaintiff's
24 case, not a police case.
25     Q.  Okay.  Understood.  But that doesn't -- that

23

1  doesn't concern -- well, did that concern law
2  enforcement standards?
3      A.  It did, but it was not a suit against the
4  police.
5      Q.  Okay.
6      A.  And just to clarify the record, that is my
7  deposition and trial testimony.  I'm currently retained
8  in 14 different plaintiff's cases that are police use of
9  force cases, and then I also work on cases with the King
10 County inquest process.  So in King County, Washington,
11 any time there's an in-custody death or an
12 officer-involved shooting, the coroner calls an inquest.
13         And so I've represented the decedent's family
14 in three different inquests where my opinion was
15 critical of the police.
16     Q.  Did you author reports in those cases?
17     A.  In a couple of those cases, I authored reports,
18 and then I was also retained by the inquest
19 administrator as a neutral party between the union, the
20 officer, the family, and the administrator and gave an
21 opinion -- testified during the inquest, and my opinion
22 in that case was critical of the police actions.
23     Q.  On how many occasions have you been retained by
24 Attorney Craig Anderson or his law firm, Marquis
25 Aurbach?

24

1      A.  This is the first case.
2      Q.  In terms of what you do in your life right now
3  for income, is it solely litigation expert reviews or do
4  you do other work?
5      A.  I also work with the National Tactical Officers
6  Association, the NTOA, so running the public order
7  section and teaching best practices around the country
8  is one source of income.
9          I do consulting work and expert litigation, so
10 I also consult -- I am currently retained by the City of
11 Akron to review their protest policy.  And I've been
12 asked by -- I've been recently asked by the City of
13 Hartford to act as a consultant on an internal affairs
14 investigation.  So I reviewed the actions of the officer
15 and wrote a report on a case where it looks like the
16 officer is likely to be charged criminally.
17         So some of the work is civil litigation, some
18 of it is criminal.  Some of it is internal affairs and
19 some of it is consulting.
20     Q.  Let's say in the last two years, what
21 percentage of your income has come from litigation
22 consulting versus other sources?
23     A.  Probably 60 percent.
24     Q.  So at this point most of what you do in your
25 career is serving as a litigation expert on police

25

1  practices?
2      A.  That's correct.
3      Q.  Okay.  What do you believe your role is as an
4  expert when you're retained in these cases?
5      A.  Ultimately my role is to educate the trier of
6  fact, whether the judge or the jury, on generally
7  accepted policing practices and, you know, give opinions
8  that might help them reach the ultimate conclusion.
9      Q.  I want to give you an example of something to
10 preface my next question.  Imagine if you had a police
11 department and they had a policy that said if an unarmed
12 suspect is fleeing police, that it is acceptable for
13 police to subdue that suspect by shooting them in the
14 back.
15         Now, my question is -- and I think such a
16 policy would be an example of this -- you can have a
17 local policy or a national policy, but ultimately what
18 will decide this case is the constitutional standard of
19 whether excessive force was used.
20         Do you agree with that?
21     A.  I would agree.  The officers would be trained
22 and the officers should understand Graham versus
23 Connor -- in this case, Tennessee versus Garner -- the
24 reasonable use of deadly force against a violent fleeing
25 felon is established by the Supreme Court, and so the



Spencer Fomby          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1   officers and agency should understand that.
2       If they had a policy that was not consistent
3   with the constitutional standard, that is in their -- up
4   to their discretion, but that could still expose them to
5   certain liability.
6       Q.   Yeah.  And so, I mean, are you trying -- do you
7   intend to testify on the ultimate excessive force
8   constitutionality issue in this case or are you limiting
9   your opinions in this case to the police standards?
10      A.   Well, I'm not drawing legal conclusions.  What
11  I would talk about is the way that officers are trained,
12  the generally accepted policing practices for the use of
13  force and for the actions of a SWAT team and how a
14  reasonable SWAT team would comport themselves with those
15  standards.
16      Q.   And even though this matter resulted in the
17  death of a 19-year-old black man who appears to have
18  been unrelated to the search warrant and the crime that
19  was being investigated and he died, you believe that
20  SWAT did a good job here?
21      A.   It's not about whether they did a good job.
22  It's about whether their actions were consistent with
23  generally accepted policing practices and whether a
24  reasonable SWAT team would have acted the same way under
25  similar circumstances.

27

1       Q.   And so you think they complied with that?
2       A.   Yes, sir.
3       Q.   Do you think your role as a litigation expert
4   is to advocate?
5       A.   No, sir.
6       Q.   What professional licenses or certifications do
7   you hold for law enforcement or otherwise?
8       A.   Well, I've been an instructor, and I can't say
9   that all of my instructor certifications are current,
10  but I have been a certified instructor for firearms --
11  so pistol, shotgun, rifle -- the use of less lethal
12  weapons, so everything from pepper spray to tear gas,
13  less lethal impact munitions, the use of flash bangs in
14  their various forms.
15      I have been a certified deescalation instructor
16  and written two courses that are certified in the state
17  of California.  I think those are -- those are the
18  general certifications that I have.
19      Q.   Have you ever tested for a professional license
20  or accreditation and it's been denied?
21      A.   No, sir.
22      Q.   When did you first start doing litigation
23  expert consulting work?
24      A.   My first case was in 2017 when I was working in
25  Berkeley.  I was working as a patrol sergeant, and I

28

1   received a cold call from City of Portland, the Portland
2   City Attorney's Office, and they -- I was on duty,
3   jumped in my patrol car, and they put me on speaker
4   phone with their firm and -- or with the law office --
5   City Attorney's Office, I should say.  And they said
6   they wanted to run a fact pattern past me.
7       So they gave me the fact pattern and I gave
8   them my opinion, and they said that they wanted to
9   retain me as an expert.  And I didn't really know what
10  that meant.  I had not been exposed to the expert
11  witness world, so I ended up working with them on that
12  case.  It was a protest-related case.  That was the
13  first case that I did.
14      And then I worked a couple other cases while I
15  was still a full-time police officer, and then really
16  started working as a litigation expert when I retired in
17  January of 2023.
18      Q.   In your approximately eight years of litigation
19  expert work, are you aware of any time that a court has
20  excluded in whole or in part any of your opinions?
21      A.   No, sir.
22      Q.   And I want to come back to this question I
23  asked you a little earlier.
24      We would agree that in this field -- or would
25  you agree with me, that there are department standards

29

1   for police departments that the local departments
2   (indiscernible), there are national standards that
3   national organizations may put out, and then there are
4   constitutional standards that courts put out.
5       Do you agree with that?
6       A.   I would agree.
7       Q.   And you agree with me that sometimes there can
8   be conflicts?  In other words, a local department
9   standard may not comport with the constitutional
10  standard; right?
11      A.   That's correct.
12      Q.   That's what lawsuits are made of; right?
13      A.   I see it pretty often, yes.
14      Q.   Yeah.
15      This lawsuit involves something that's called
16  knock and announce.
17      What are -- what is your understanding of knock
18  and announce requirements?
19      A.   So knock and announce refers to a requirement
20  that under the Fourth Amendment that officers, when they
21  are attempting to make entry into a private residence,
22  will notify the occupants who they are, their intent,
23  and then demand entry.
24      And so there's lots of different case law that
25  guides the actions of police agencies on how to comport

Spencer Fomby        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1 with the constitutional requirements. But I think one
2 of the biggest misunderstandings is how that knock and
3 announce is actually executed and what the requirements
4 are.
5    Q. And so what reliable sources have you seen
6 about how to properly execute knock and announce?
7    A. Well, actually, you know, most responsible
8 police agencies and police instructors will pay
9 attention to any court rulings, so there's different
10 places where you can find information on what the courts
11 in your circuit have ruled or any Supreme Court
12 decisions on knock and announce.
13       And then organizations like the NTOA and even
14 state POST organizations can put out guidance on
15 compliance with knock and announce.
16    Q. Now, would you agree with me that police
17 departments need to reasonably train SWAT officers on
18 relevant case law from courts in their circuit about
19 knock and announce?
20    A. I would expect that, yes, sir.
21    Q. Okay. Now, your experience as a law
22 enforcement officer, you were in California, and that's
23 the Ninth Circuit Court of Appeals; right?
24    A. That's correct. Idaho and California are in
25 the ninth circuit.

31

1    Q. Yeah. And just, I guess, by coincidence,
2 Nevada is in the ninth circuit as well.
3       You're aware of that; right?
4    A. That's correct.
5    Q. Are you familiar with the ninth circuit case of
6 United States versus Granville?
7    A. I'm not sure I know that case specifically.
8    Q. How about United States versus Mendonsa?
9    A. I don't know the case specifically, no.
10    Q. Are you aware that the ninth circuit cases,
11 when they talk about knock and announce, they appear to
12 divide it into four parts.
13       The first part is the knock itself; right?
14    A. Was that a question?
15    Q. Yeah.
16    A. Well, yes. And the -- I guess one of the
17 issues is what is required or what is considered the
18 knock; right? So the knock can actually be an
19 announcement or an alert, and in this -- you know, in
20 some cases, that knock is actually done at a distance
21 and is not a physical knock on the door.
22    Q. All right. Well, we're going to go through
23 them one by one, but I want to sort of establish the
24 elements with you first.
25       So, first, we have the knock; second, we have

32

1 the announce; and then we have the passage of a
2 significant amount of time for officers to use force to
3 enter the residence. And then we have kind of an
4 additional factor which is other unusual things that may
5 shorten or lengthen the waiting time.
6       Do you agree with all of that?
7    A. I generally agree. I don't know if I agree
8 with the term "significant," but I agree with that
9 sequence.
10    Q. Well, are you aware that in United States
11 versus Granville, the ninth circuit specifically stated
12 there must be a lapse of, quote, a significant amount of
13 time, end quote, before officers may forcibly enter?
14    A. Again, I don't know that case specifically.
15    Q. Okay. So are you saying officers shouldn't
16 wait a significant amount of time after knocking and
17 announcing before using force to enter a residence?
18    A. What I've always been taught and what I've
19 always instructed and the way that I have led teams in
20 the field is that we would wait a reasonable amount of
21 time based on the totality of circumstances before
22 forcing entry.
23       So that term "significant" versus "reasonable,"
24 I see a difference there in the interpretation.
25    Q. All right. Let's go back and sort of talk

33

1 about each of those requirements individually.
2       Regarding knocking, will you agree with me that
3 officers did not physically announce -- I'm sorry, they
4 did not physically knock on the front door of the
5 apartment?
6    A. That's correct.
7    Q. And they did not physically knock on any
8 window; right?
9    A. Correct.
10    Q. Okay. Do you agree with me that officers, when
11 they reasonably can do so, should physically knock on
12 the door or window?
13    A. Again, it depends on the circumstances. If the
14 officers are -- the purpose is to alert people inside of
15 the structure, inside of the target location that the
16 police are outside with a warrant and demanding entry.
17 So that can be accomplished in many different ways, and
18 the Nevada POST guidelines talk about knocking or
19 announcing in some other way.
20       So even in the Nevada POST guidelines, there is
21 an allowance for notification that does not actually
22 require a physical knock at the door.
23    Q. Right. But do you believe it's reasonable for
24 officers to physically knock when they can do so?
25    A. It is -- it's a typical tactic. It is not a

Spencer Fomby        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1 requirement.
2    Q.  Well, what is Las Vegas Metropolitan Police
3 Department's formal, informal, or standing operating
4 procedure regarding actually knocking?
5    A.  Well, there's obviously different ways they've
6 gone about that over the years.  It seems that they
7 knock at times.  They also, in this case, used a
8 bullhorn, which is, in my opinion, something that
9 exceeds generally accepted policing practices.  Most
10 agencies don't do that.
11      So the purpose is to alert people inside of the
12 target location that the police are outside with a
13 warrant and demanding entry.  It seems that they are
14 taking certain actions to make sure that that is clear,
15 and using a bullhorn is one of those tactics.
16    Q.  Was there anything in this particular case that
17 you believe made it unsafe or unreasonable for officers
18 to attempt to physically knock on the door?
19    A.  Unsafe?  I mean, there's -- one can make the
20 argument that a person -- one of the officers could have
21 walked up and knocked on the door.  It's my opinion that
22 it did not change -- or change the outcome of the event,
23 and it did not keep people inside of the location from
24 being alerted to the presence of the police.
25    Q.  Well, you've planned services of knock and

35

1 announce warrants before; right?
2    A.  Yes, sir.
3    Q.  And when you planned them, did you plan them so
4 that one of the officers would physically knock on the
5 door?
6    A.  Depending on circumstances.  Sometimes I had a
7 person knock on the door and announce.  Sometimes I had
8 a person knock on the window and announce.  There are
9 other times where we stayed behind cover and announced
10 from a distance, and there were times that we used other
11 technology to announce our presence.  It just depends on
12 the circumstance.
13    Q.  Would you agree with me that under the specific
14 circumstances of this case, officers approached the
15 door, there was no physical impediment, and there did
16 not appear to be anybody who was immediately aware of
17 their presence that might be a danger to them?
18    A.  Well, there's a reason they were carrying
19 ballistic shields as they approached the window and the
20 front door because they were concerned about potentially
21 being shot at.  So I can't say that it was, you know --
22 they felt safe when they approached the door.
23      The determination of whether they physically
24 knocked or not, I don't know if they intended to knock,
25 but it, in my opinion, doesn't make a difference in the

36

1 outcome of this incident.
2    Q.  All right.  So you gave me a little earlier in
3 your answer an example of something that's called a
4 generalized risk.  I mean, we can say on any warrant
5 that there's a risk there will be somebody who is a
6 danger to officers there.  But I'm asking you was there
7 some specific risk that officers specifically observed
8 at that time that led them to believe it would be unsafe
9 for them to knock?
10    A.  I haven't seen anything in the record that said
11 they made that determination as they approached the
12 door.
13    Q.  Yeah, because by all accounts, they approached
14 the door, it was dark inside, they had every reason to
15 believe people inside were sleeping; right?
16    A.  There's no way for them to determine the
17 condition of the people inside as they approach the
18 residence.
19    Q.  Okay.  But they certainly didn't hear or see
20 anybody moving inside; right?
21    A.  I didn't see any evidence that they knew or
22 believed people were moving around.
23    Q.  All right.  If you were planning execution of
24 this search warrant, would you plan for an officer to
25 physically knock if reasonably safe?

37

1    A.  Again, I don't think that the knock is the
2 biggest issue.  The biggest issue is whether they
3 announced their presence, that they had a warrant and
4 demanded entry.  So there's different ways to do that.
5      One way is to knock on the door and have a
6 person yell without amplified sound.  Another way is to
7 have the person with a bullhorn using amplified sound
8 stand back and announce their presence, their purpose,
9 and demand entry.  It's the same thing.  The knock to me
10 is inconsequential.
11    Q.  So let's move on to the announce requirement,
12 then.
13      The -- the residence was an apartment in an
14 apartment complex; right?
15    A.  Yes.
16    Q.  Do you think the standard when announcing when
17 you're in an apartment complex is to announce the unit
18 or apartment number that you're referring to?
19    A.  That's correct.
20    Q.  All right.  Now, in this case, there were two
21 main announcements.  The first was made by Sergeant
22 Backman.
23      Do you agree?
24    A.  Yes, sir.
25    Q.  And do you agree with me that when Sergeant

Spencer Fomby        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1 Backman made the first announcement, he failed to give
2 the apartment or unit number?
3    A. That's correct.
4    Q. Okay. So you would agree with me that that is
5 below standard for an announce on an apartment; is that
6 right?
7    A. He could have done a better job on the first
8 announcement, yes, sir.
9    Q. And he does state the apartment number on the
10 second announcement.
11       Now, let me ask you. The next requirement is
12 the waiting period. Do you believe the waiting period
13 should be measured from the beginning of the
14 announcement or the end of the announcement?
15    A. It always starts at the first announcement. So
16 as soon as the officers start to announce their
17 presence, that is when the time starts because that is
18 when there is a potential compromise of the team, that
19 is when the potential threat from anybody inside begins,
20 as soon as you announce your presence.
21    Q. Are you relying on any court decision for that
22 answer?
23    A. No. I don't know that there's a specific court
24 decision that talks about when you start the time, but
25 that is the generally accepted policing practice in the

39

1 United States.
2    Q. Are you relying, then -- if you can't come up
3 with a court decision, are you relying on any particular
4 written standard, like, from a POST organization or some
5 other organization of that nature?
6    A. No. I mean, it would make no sense for the
7 officers to knock and announce and then start the clock
8 on what is reasonable. The decision on what is
9 reasonable begins at the time that the officers are
10 making announcements, compromising their position, the
11 fact that they are outside, and then determining when it
12 is reasonable to force entry into the unit.
13    Q. When this case -- since Sergeant Backman did
14 not properly announce the apartment number in the first
15 announcement, do you think the waiting period should
16 start from the first announcement or the second
17 announcement which got the apartment number in it?
18    A. I mean, with 20/20 hindsight and, you know,
19 sitting back and reviewing things after the fact, it's
20 easy to make these assessments. The real question is:
21 What did the officers do at the time and was that
22 reasonable and consistent with generally accepted
23 policing practices?
24       It's my opinion that the way they conducted
25 that knock and announce and then the breaching operation

40

1 was consistent with SWAT principles in the United
2 States.
3    Q. So the wait requirement, do you agree that that
4 requires the officers to perform the announce and then
5 wait a significant amount of time so that persons inside
6 can come to the door, ascertain that it actually is
7 police officers with a valid warrant, and provide them
8 admittance? Do you agree with that statement of the
9 law?
10    A. So there's case law that spells the requirement
11 in that way, but then you also have to consider the
12 totality of the circumstances.
13       So if some IRS agents are going to arrest
14 somebody for tax evasion on a white collar crime, and
15 they go to a really nice suburb in a gated community and
16 they walk up with windbreakers on, they may handle the
17 knock and notice in that way.
18       If you are going into an apartment complex with
19 a bunch of gang activity and armed gangbangers who are
20 wanted for murder and it is a nonpermissive environment,
21 then your time to wait is going to be different.
22    Q. Well, what bothers me about the way that you
23 phrased that is that it implies that people who live in
24 affluent or nice neighborhoods have more constitutional
25 rights than people who might have to live in

41

1 crime-ridden or dangerous neighborhoods.
2       Don't we all have the same constitutional
3 rights?
4    A. I'm not talking about socioeconomic background.
5 I'm talking about the level of risk.
6    Q. You've reviewed the officer body-worn camera
7 videos in this matter; right?
8    A. Yes, sir.
9    Q. And so there's sort of differences of opinion
10 as to how long officers waited between the announcement
11 and their first use of force to enter the apartment.
12       Do you agree that the first use of force was
13 breaking out the back window?
14    A. Well, I saw that discussion in Mr. Gilbertson's
15 deposition, and I don't necessarily agree with the
16 use -- the term "use of force" to describe a method of
17 entry or a breaching technique. So I know that was part
18 of the discussion in Mr. Gilbertson's deposition, but,
19 no, I would not agree that that is a use of force in the
20 same way that we would discuss a use of force against a
21 person.
22    Q. Yeah. So I am not talking about the force
23 against a person. I'm talking about forcefully entering
24 the apartment.
25       What was the first act of officers you believe

Spencer Fomby          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1  was an act to forcefully enter the apartment?
2      A.  Yeah.  The first breaching technique that was
3  used was what we would call a break and rake of the
4  window in the living room and the insertion of a stun
5  stick.
6      Q.  And then that was very closely followed by use
7  of a battering device on the apartment door; right?
8      A.  That's correct.  So when the announcements
9  started, I believe there's three to four announcements
10  before the breacher started using the ram.
11      Q.  Now, if the first attempt to forcibly enter the
12  apartment was breaking and raking the back window, in
13  your analysis of the videos, how many seconds had
14  elapsed between the announcement and the breaking of the
15  back window?
16      A.  From the record and from the CIRT report, it
17  looks like six seconds.
18      Q.  Okay.  So you're the defense expert, and even
19  you admit that waiting time was no more than six
20  seconds; right?
21      A.  From the record, that appears to be the time.
22      Q.  So you actually agree with the CIRT report's
23  analysis on that issue?
24      A.  Well, it's just a matter of time.  So you can
25  look at a video and it appears that that insertion of

43

1  the stun stick occurred around that time.
2      Q.  And also you would agree with me that that stun
3  stick, as it so happened, was deployed within ten feet
4  of where Mr. Williams physically was in the apartment;
5  right?
6      A.  I don't have the exact measurements, but it was
7  used in a way -- the way that it's supposed to be, and
8  it's inserted through the window to the -- in an angle
9  towards the ceiling of that room.  And so then, you
10  know, based on NTOA standards and manufacturer
11  standards, you would want that device to deflagrate
12  really no closer than five feet from anybody who's
13  inside of that structure.
14      Q.  You say no closer than five feet, but anybody
15  in that room is going to get an enormously loud sound,
16  an enormously bright flash, and they're going to feel a
17  pressure wave from the detonation of that stun stick;
18  right?
19      A.  They're going to hear a loud boom.  There's
20  going to be a bright light.  The effect of any pressure
21  wave is going to depend on the proximity to the device.
22      Q.  Now, let's go back to this waiting period issue
23  here because we're jumping around a little bit, and I
24  want to finish that topic.
25      So you are saying that it appears that officers

44

1  waited six seconds.  You're measuring those six seconds
2  from the beginning of the announcements, correct, rather
3  than the end?
4      A.  Correct.
5      Q.  And are you measuring the six seconds from the
6  beginning of the first announcement where the apartment
7  number wasn't even mentioned?
8      A.  Yes.  That would be the normal practice.
9      Q.  Have you done an analysis of the time that
10  elapsed from the end of the second announcement, which
11  is the first announcement where the apartment number was
12  given?
13      A.  No.
14      Q.  Okay.  You would agree with me that would be
15  significantly less time than six seconds?
16      A.  Yes, but it also would not be consistent with
17  generally accepted policing practices on how you assess
18  the time.
19      Q.  Well, I'm not sure that your assessment of when
20  that time is measured from is accurate.  Ultimately a
21  Court may have to do that.  But you would agree that if
22  the measurement is from the end of either the first or
23  the second announcement, that the actual amount of time
24  would be less than six seconds; right?
25      A.  Well, unless you can show me some court ruling

45

1  or some objective authority, like the NTOA or CATO, that
2  says that you're supposed to start the time at the end,
3  I'm very confident that my opinion is consistent with
4  generally accepted policing practices.  Otherwise, a
5  SWAT team would move up to the door, make one
6  announcement, and then start the time.
7      The reason that they continue to make
8  announcements is to make sure that the people inside are
9  alerted, and so that's what they're doing in this case.
10  They're making announcements, continuing to make
11  announcements.  Other officers who are approaching the
12  window are also making announcements, "Police search
13  warrant," and they're continuing to do that, and then
14  they're counting off until they decide to start the
15  breaching operation.
16      So you can't penalize them for continuing to
17  make announcements and then say, "Well, you shouldn't
18  start the time until the last announcement is over."
19      Q.  In this case, wasn't the testimony from the
20  officers that it had been preplanned that regardless of
21  what occurred inside of the apartment, at the end of the
22  second announcement, they would insert the stun stick in
23  the back window?
24      A.  I'm not sure if that's exactly what they said,
25  but I'm sure that they had some sequence.  It would be

Spencer Fomby       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1  normal to plan a knock and announce and breaching
2  sequence as part of the planning process. There are
3  some things that would change the plan. So if they
4  started announcing and, you know, somebody opened the
5  door before they started using distraction devices, then
6  that may change the plan.
7       But having a sequence of action from knock and
8  announce to breaching and distraction devices is a
9  normal planning process.
10  Q.  So you believe it's acceptable that the
11  officers preplanned to use force to enter the apartment
12  at the end of the second announcement regardless of
13  anything else that occurred? That would be within
14  police standards for you?
15  A.  Well, again, depending on the totality of the
16  circumstances in this case where they were going after
17  two suspects who were wanted for a murder using a
18  firearm, they were in a nonpermissive environment, they
19  believed the people inside of the unit may be armed, you
20  know, they decided they wanted to use distraction
21  devices.
22       I also think there's a difference between
23  inserting a distraction device and making entry. So
24  inserting a distraction device into a window and having
25  a controlled deflagration of a flash bang is not

47

1  physically entering the structure.
2  Q.  But it is forcefully entering the apartment;
3  right? I mean, they inserted a physical object inside
4  of the apartment.
5  A.  They inserted a distraction device into the
6  apartment, but the officers were not entering the
7  structure when they did that.
8       So the time of entry is different from the time
9  of using a distraction device.
10  Q.  Are you familiar with any court opinions or
11  police standards that recommend a certain minimum number
12  of seconds that officers should wait between the
13  announcements and forcefully entering the residence?
14  A.  If you saw my expert report, I refer to several
15  different cases, and I gave an opinion that there is no
16  bright line on the amount of time officers need to wait,
17  and there are differences in opinion in various courts
18  about how much time the officers need to wait, and it's
19  always based on the circumstances.
20  Q.  Are you aware of any police standard that
21  officers generally need to wait at least ten seconds?
22  A.  No, sir.
23  Q.  Are you aware that at one time Las Vegas
24  Metropolitan Police Department actually had such a
25  standard?

48

1  A.  I haven't seen that in the record.
2  Q.  Are you aware that in the ninth circuit
3  Grandville case, the ninth circuit itself said that it
4  has never upheld as constitutional any wait time of less
5  than ten seconds?
6  A.  Well, in this case, it looks like they made
7  entry at 16 seconds, so that would be consistent with
8  the ninth circuit.
9  Q.  Well, now -- now you're making a moving target.
10  We're not talking about physical entry. We're talking
11  about use of force. And that use of force first
12  occurred with the break and rake of the back window at
13  well less than ten seconds; right?
14  A.  Well, again, it's based on the totality of the
15  circumstances, and in this situation with the level of
16  threat that the officers were facing, with the potential
17  for violence, and the totality of circumstances, it's my
18  opinion that their actions were consistent with what a
19  SWAT team in the United States would have done in the
20  same or similar circumstances.
21  Q.  So, again, you've described generalized
22  risks, but when we talk about what officers specifically
23  encountered that morning, they encountered an apartment
24  at 5:00 in the morning that had no lights on and they
25  did not see or hear anybody moving inside before they

49

1  used force to enter the apartment; right?
2  A.  I would agree with that.
3  Q.  Okay. Do you agree with me that it's more
4  likely than not that the occupants of the apartment were
5  asleep at 5:00 in the morning?
6  A.  I have no idea what they were doing just prior
7  to the operation, and anybody who says they know what
8  they were doing is speculating.
9  Q.  Well, are you aware in the press release from
10  Las Vegas Metropolitan Police Department, their public
11  information officer got up there and said, "We served
12  these warrants at this time so that people are asleep
13  and there's less risk"?
14  A.  I have not seen that.
15  Q.  Okay. I mean, look, just based on your own
16  experience, if I were to call you at 5:00 in the
17  morning, would you more likely than not be asleep than
18  awake?
19  A.  With my lifestyle, sure. Now, in my
20  experience, there are people that are up all night.
21  There are people that are just coming in at 4 o'clock in
22  the morning. There is no way for the officers to know
23  exactly the condition of every person inside the
24  structure as they approach.
25  Q.  Well, I agree with that. Officers had no

Spencer Fomby          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50

1  specific information as to whether anybody inside was
2  asleep or awake; correct?
3      A.  Correct.
4      Q.  Now, are you aware that the ninth circuit has
5  held that when warrants are served at times when people
6  are most likely asleep, that is a factor that should
7  elongate the amount of time that officers use before --
8  officers wait before they use force?
9      A.  I understand the general logic, but I also note
10 that the courts have found that it is reasonable for
11 officers to shorten that time based on potential
12 threats, based on intel and information the officers
13 knew as they are approaching that structure.
14     Q.  Okay.  But, again, you're giving me
15 generalizations that, hey, they were investigating a
16 homicide.  We can't set aside all constitutional
17 requirements simply because a homicide is being
18 investigated.
19         Do you agree with that?
20     A.  Well, I would disagree with your
21 characterization as generalized.  Everything that they
22 considered is specific to this incident.  All the intel
23 that they had, everything that they used to develop
24 their tactical plan is specific to this incident.  It's
25 not generalized.  If that -- using that logic, SWAT

51

1  officers would never even have to do an intel workup or
2  do surveillance.  They would just use the same exact
3  tactics on every structure.
4      Q.  Let me give you an example from the actual
5  court decision.  One of the cases, the fact pattern was
6  the officers were approaching the front door.  They were
7  getting ready to do the knock and announce, and then
8  just by chance, somebody actually opens the front door,
9  like, to walk outside.  They see it's police officers,
10 and then they slam the door and they turn around and
11 they yell, "Police," for other occupants of the
12 apartment or the residents where they were.
13         Now, those are the kind of unique circumstances
14 that have been held to shorten the amount of time.  In
15 this case, officers observed nothing of that kind;
16 correct?
17     A.  That's correct.
18     Q.  Until they actually entered the apartment,
19 officers never observed anybody inside; right?
20     A.  That's correct.
21     Q.  And officers never observed any weapons?  It's
22 not like they looked through a window and they saw a
23 handgun on a kitchen counter or something like that;
24 right?
25     A.  That's not how that normally works and that

52

1  wouldn't be the thing that drives decision-making.  What
2  drives the decision-making is the information they knew
3  ahead of time:  the underlying offense, the
4  associated -- people associated with the target unit,
5  whether weapons are involved, what kinds of weapons.
6  Those are the things that would determine the tactics
7  they use on the operation, not necessarily what they see
8  as they approach.
9      Q.  So do you think it comports with general police
10 practices that officers had preplanned to use noise
11 flash diversionary devices?
12     A.  It's a normal tactic that is used on high-risk
13 search warrants.  So any time you would do a search
14 warrant involving homicide suspects, especially when you
15 believe they had firearms, it's a normal tactic to use
16 flash bangs or noise flash diversionary devices.
17         In this case, they used them the way that they
18 were designed and consistent with national standards by
19 using one exterior 9 banger and then using the other in
20 a controlled manner using a stun stick instead of
21 breaching the door and randomly throwing flash bangs
22 inside.
23     Q.  Are you familiar with Nevada Revised Statute
24 Section 179.055?
25     A.  I'm not sure.

53

1      Q.  Did you consider that statute in preparing your
2  opinions or your report?
3      A.  I'm not sure about that specific statute.
4      Q.  Okay.  I'm going to share it here on my screen
5  with you.
6          So this is a Nevada-specific statute, and
7  referring here to subsection 1, it specifically says,
8  "The officer may break open any outer or inner door,
9  window of a house or any part of a house or anything
10 therein to execute the warrant if, after notice of
11 authority and purpose, the officer is refused
12 admittance."
13         What specifically did Mr. Williams do to refuse
14 officers admittance that morning?
15     A.  Well, again, this is a state statute that may
16 be more restrictive than constitutional standards or
17 national standards.
18         For any SWAT team, if they approach and knock
19 and notice and they don't get any response, and they
20 don't get affirmative response in the sense of
21 somebody's actually coming to the door, somebody's
22 acknowledging their presence, then at a certain point
23 they're going to start the breaching operation.
24         So refusing admittance, you know, I'd like to
25 see how that is clearly defined because that could be

Spencer Fomby        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  seen as a person affirmatively saying that they aren't
2  going to open the door or hearing somebody pushing items
3  against the door that, you know, gives the officers a
4  belief that people are barricading.
5        But in my experience and based on all my work
6  on the national level, that is not the standard, that
7  the officers would stand there and wait for somebody to
8  say, "I'm not going to open the door."
9    Q.  Do you agree with me that Mr. Williams on that
10  morning did nothing physically or audibly to tell
11  officers he was not going to provide them admittance
12  before they began forcefully entering the apartment?
13    A.  I would agree.
14    Q.  In other words, he didn't do something like,
15  you know, "We're never opening up"?  He never made any
16  sort of sound like that; right?
17    A.  That's correct.
18    Q.  All right.  Have you reviewed the Nevada POST
19  guidance on how to properly perform the knock and
20  announce requirement?
21    A.  I have.
22    Q.  I'm going to go ahead and share this on the
23  screen here.
24        So this has been produced in this case as
25  Williams 809.  This is page 12.  And it talks about the

55

1  State of Nevada Commission on Peace Officer Standards
2  and Training for POST guidance on this issue.
3        And it says, you know, when executing a search
4  warrant, there's a specific requirement that before
5  forcing entry peace officers must be refused admittance.
6  Refusal may be based on, one, a verbal statement.
7        We agree that there was no verbal statement
8  from Mr. Williams; right?
9    A.  Correct.
10    Q.  And then, two, individual conduct.  We can
11  agree that there was no individual conduct on
12  Mr. Williams' part, like slamming a door or trying to
13  run out the window or trying to flush evidence, nothing
14  like that occurred; right?
15    A.  Or there also could be a lack of conduct, a
16  lack of coming to the door could be individual conduct.
17    Q.  Well, yeah.  So I think that you're actually
18  referring to the third category here which is the
19  passage of a reasonable amount of time.  So officers
20  knock, a reasonable amount of time expires, and no one
21  has come to the door to provide them admittance.
22        That's the third category here; right?
23    A.  Yes, that is correct.
24    Q.  And this note at the bottom, I'm just going to
25  read it.  It says, "Note:  The amount of time that is

56

1  considered reasonable will depend on all the
2  circumstances.  Approximately one minute would be a safe
3  period in most cases, but it can be less, especially if
4  peace officers know that someone is inside and awake."
5        So, first of all, you agree that officers did
6  not wait for anything close to one minute, which is the
7  recommended safe period by Nevada POST.
8        You agree with that?
9    A.  No.  There was not a minute that passed, but I
10  also -- this is general knock and notice requirements
11  for all search warrants, not just the most high risk,
12  which, you know, in the situation we're talking about is
13  one of the most high-risk circumstances that officers
14  face.
15        So if you are generally talking about, again,
16  property crimes and white collar crimes and putting all
17  of those in the same category, I don't think that that
18  is a reasonable way to look at this because you have to
19  consider the most high-risk incidents also.
20    Q.  So the example here that is actually given in
21  the POST training or POST policies is that if officers
22  know somebody is inside and awake, but officers didn't
23  have that information in Mr. Williams' particular case;
24  right?
25    A.  That's correct.

57

1    Q.  Do you remember, did they know whether there
2  was anybody inside at all?
3    A.  Well, I guess the only way they would have
4  known that is if they had constant surveillance from the
5  night prior and watched people come and go leading up to
6  the operation, which is rarely done because it's
7  extremely personnel-intensive to do that.
8    Q.  CIRT ultimately concluded in this case that
9  Mr. Williams' constitutional rights had been violated
10  because CET entry is simply inconsistent with the knock
11  and announce rule.
12        Do you agree with that finding?
13        MR. YATES:  Objection.  Form.
14        THE WITNESS:  No.  I don't agree.
15  BY MR. BREEDEN:
16    Q.  Would you agree with me that the purpose of
17  knock and announce is so that people can come to the
18  door and ascertain that it actually is police there with
19  a warrant and comply with the warrant?
20    A.  That is the general concept of the purpose of
21  knock and announce.  The thing you have to also consider
22  is the circumstances of actually serving high-risk
23  search warrants and what people typically do.
24        So that's where, you know, in my experience of
25  doing, I don't know, over a thousand high-risk search

Spencer Fomby                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

1  warrants, I can only think of a handful of times where
2  after knock and announce somebody just opened the door.
3  That is a rare occurrence.
4      Q.  Well, even if practically speaking it's rare,
5  there's still constitutional requirements; right?
6      A.  Correct.  And that's why the courts have
7  allowed much less time to pass before making entry based
8  on the totality of circumstances of each case.
9      Q.  I want you to assume that Mr. Williams at the
10  time the knock and announce was performed was asleep on
11  the living room couch, which appears to be where
12  officers found them when they finally got entry inside.
13      Do you think six seconds is enough time for
14  Mr. Williams to wake up, ascertain his surroundings,
15  walk to the front door, tell that it's police, that they
16  have a valid warrant, and provide them entry?
17      A.  Well, again, you're using the six-second
18  number.  I think if you take 16 seconds before they
19  actually made entry, physical entry into the unit, I
20  think any reasonable person who was listening to a
21  bullhorn and multiple people yelling, "Police search
22  warrant," hearing a flash bang, and then hearing a door
23  rammed five times, he had enough time to get up.  And
24  even if he didn't decide to go to the door, he had
25  enough time to comply with the officers when they came

59

1  in.  But that's not the decision that he made.
2      Q.  Do you agree with me that a person's ability to
3  perceive sounds and voices might be distorted or
4  lessened by the fact that they are asleep?
5      A.  That's something a police practices expert
6  would typically opine on, so...
7      In my experience, the level of noise that was
8  being made by the officers, any person, even if they
9  were asleep, would have been suddenly awakened by that
10  noise.
11      Q.  You know what the scientific or medical
12  phenomenon of sleep inertia is?
13      A.  No, sir.
14      Q.  You're not going to give any opinions in this
15  case that Mr. Williams was not suffering from sleep
16  inertia, are you?
17      A.  No, sir.  It's outside my scope of expertise.
18      Q.  And you say that Mr. Williams had an ability to
19  hear police, but certainly the noise flash diversionary
20  devices, those make very loud noises that might impair
21  someone's ability to hear people outside of the
22  apartment.
23      Would you agree with that?
24      A.  Well, the announcements are at least four
25  announcements before the first flash bang.  So I've seen

60

1  that argument throughout this case, but I don't think
2  that he did not have an opportunity to hear police
3  announce their presence, their purpose, and demand entry
4  multiple times before the flash bang.
5      Q.  Do you agree with me that the 9 banger that was
6  used can be confused with gunfire by members of the
7  public?
8      A.  It gives what we call a loud report, loud
9  bangs, so I'm not going to speculate on what people
10  might consider that.  Some people have said they clearly
11  knew that those were flash bangs when we use those in an
12  urban environment, and, you know, I can see where some
13  people might argue that it sounds like gunshots.
14      Q.  Are you aware that one of the officers in this
15  case -- I think it might have been Officer Bertuccini or
16  Officer Rothenburg -- is actually on the body-worn
17  camera afterward asking whether the 9 banger, whether it
18  was a 9 banger or whether it was gunshots, that even
19  that officer was confused?
20      A.  I don't recall seeing that.  I would not be
21  surprised that officers were misperceiving things that
22  were happening in an extremely stressful situation in
23  the immediate aftermath of an officer-involved shooting
24  where two officers were shot and a suspect was killed.
25      So in my experience, officers' perceptions can

61

1  be distorted in the immediate aftermath.
2      Q.  Do you think it was reasonable here for the
3  officers to simply automatically deploy the stun stick
4  into the rear window without any further action from
5  Mr. Williams?
6      A.  Again, it is based on the intel, based on the
7  level of threat, the circumstances as they approach, you
8  know, based on everything that -- the information that
9  was available to them as they were planning and serving
10  this warrant, I believe that that was reasonable use of
11  a distraction device.
12      Q.  Do you think it was an excessive force for the
13  officers to preplan to deploy that stun stick through
14  the back window without knowing who was inside or where
15  they were inside of the apartment?
16      MR. YATES:  Objection.  Form.
17      THE WITNESS:  And just to clarify, you said do
18  I believe it was excessive force?  Was that your
19  question?
20  BY MR. BREEDEN:
21      Q.  Yes.
22      A.  Well, again, if you're going to use it -- if
23  you're going to use the term "excessive force," then,
24  you know, you're looking at it as a Graham analysis, and
25  if you're taking the totality of circumstances, then no,

Spencer Fomby    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1 because you look at the severity of the crime, you know,
2 any potential and immediate threat, and people
3 potentially resisting arrest or not complying.
4     So in a situation where you're serving a
5 high-risk search warrant for a murder suspect where you
6 believe the suspects may be armed and that you may deal
7 with an armed and dangerous suspect, as soon as you make
8 contact with them using a less lethal distraction device
9 in those circumstances is not excessive force.
10    Q.  Are you familiar with the ninth circuit case of
11 Boyd versus Benton County?
12    A.  Yes.  It's a case we refer to when evaluating
13 the reasonableness of the use of flash bangs.
14    Q.  And the ninth circuit in that case writes,
15 quote, Given the inherently dangerous nature of the
16 flash bang device, it cannot be a reasonable use of
17 force under the Fourth Amendment to throw it blind into
18 a room occupied by innocent bystanders, end quote.
19    You agree that's the standard that the ninth
20 circuit has set forth; correct?
21    A.  That's correct.  And that's why the NTOA and
22 other credible organizations -- and as a flash bang
23 instructor, we would always train officers to place the
24 bang, meaning watch it, place it in a place where you
25 can visually see the bang and watch it deflagrate.  Or

63

1 use it on the exterior in a way that Las Vegas Metro PD
2 SWAT used the 9 banger or use a bang pole, as what it's
3 typically called.  Vegas Metro calls it a stun stick.
4     But use a pole where you attach the flash bang
5 device to the pole, and then you deflagrate the device
6 in a controlled manner where you are holding it and
7 there's no chance that that device will land on a person
8 or -- or impact a person because you blindly throw it.
9     So in this case, Las Vegas Metropolitan PD SWAT
10 used flash bangs in a way that was consistent with that
11 case law.
12    Q.  So you're saying the difference to you, the
13 reason why you don't think that case was violated is
14 because they didn't physically throw the device, they
15 attached it to a stun stick?
16    A.  That is literally what that case has led to.
17 All around the country organizations and instructors
18 like myself training SWAT officers to use flash bangs in
19 a way that comports with the Court's ruling, which means
20 do not take the flash bangs and blindly roll them into
21 rooms without seeing where they're going.
22    Q.  Now, you would admit for a service of a knock
23 and announce warrant, police are not intended to be
24 hiding their identity.  They should be clearly
25 announcing and indicating that they are police officers

64

1 seeking to execute a search warrant.
2     Do you agree with that?
3    A.  Yes, sir.
4     THE COURT REPORTER:  Mr. Breeden, when it's
5 convenient, may I have a break?
6     MR. BREEDEN:  Oh, yes.  Let me ask this
7 question and then we can take a very short break.  But I
8 really think we can finish around noon, I think.
9 BY MR. BREEDEN:
10    Q.  So are you aware that Las Vegas SWAT had
11 alternate uniforms, some of which indicated "Police" in
12 bright gold lettering, and then they have uniforms that
13 they actually used for Mr. Williams' case, which I would
14 call blackout uniforms, where the lettering indicating
15 they're police is in black and much more difficult to
16 see from a distance?
17    A.  Is your question did I know they had different
18 uniforms?
19    Q.  Yes.  Did you know that?
20    A.  I'm not sure that I knew they had different
21 uniforms.
22    Q.  Why if they're executing a warrant where they
23 have to clearly indicate that they're police would they
24 wear uniforms making it harder for people to see and
25 read that?

65

1    A.  Well, I think the practice and what the courts
2 have found is that, you know, would a reasonable person
3 believe that these were police officers.  And so I think
4 if you had officers who were approaching the scene, not
5 clearly identifiable as police, and then conducting a
6 no-knock warrant where they didn't identify themselves,
7 and then they snuck into some person's residence, I can
8 see the argument that how would a reasonable person
9 believe that these people were the police.  Those aren't
10 the facts of this case.
11    In this case, they're wearing a typical SWAT
12 uniform, and my team's worn a very similar uniform with
13 very similar indicia.  You know, it's not always bright
14 fluorescent green lettering or something that is high
15 profile that says "Police."  And I think in the culture
16 of this country, any reasonable person who saw that
17 group of people dressed the way they were dressed would
18 believe that they were the police.
19    MR. BREEDEN:  Okay.  We'll go ahead and take a
20 break.  We'll go off for a moment here.
21    (A short recess was taken from 11:36 a.m.
22    to 11:42 a.m.)
23 BY MR. BREEDEN:
24    Q.  Mr. Fomby, we're back on the record now after a
25 short break.



Spencer Fomby          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1    Have you ever heard of instances where
2  criminals will pose as police officers in order to gain
3  entry or pull over a vehicle or something like that in
4  order to commit their crime?
5    A.  I've heard of situations like that, yes.
6    Q.  Yeah.  Because somebody's at your front door
7  saying, "Hey, we're police officers," that doesn't
8  necessarily mean they're police officers; right?
9    A.  I guess hypothetically, sure.
10    Q.  Yeah.
11    In fact, there's a famous incident where
12  somebody was impersonating a California Highway Patrol
13  officer to pull over women in remote areas and then he
14  would abduct them and commit crimes.
15    Are you familiar with that?
16    A.  I've heard of similar incidents, yes.
17    Q.  Okay.  And would you agree with me that part of
18  the purpose behind the waiting requirement of the
19  constitution of knock and announce rule is that people
20  can come to the door and actually ascertain that it is
21  police officers?
22    A.  Again, I understand the principles behind that,
23  but, you know, we're also talking about the reality of
24  serving high-risk search warrants against people who are
25  armed and are willing to use force against the police.

67

1    Q.  Well, yeah, but you agree with me that you
2  can't just toss the constitutional requirements aside
3  just because you're serving a homicide warrant; right?
4    A.  Like I said before, the courts have allowed for
5  shortened periods of time before entry based on certain
6  risk factors.  And in this case, this case is a perfect
7  example of why officers are allowed to use short periods
8  of time to make entry when they're dealing with an armed
9  and dangerous suspect.
10    Q.  Well, so there's a lot to unpack there that I
11  would maybe disagree with you on, but you would agree
12  this was not an arrest warrant.  It was a property-only
13  search warrant; correct?
14    A.  Well, property evidence used in a homicide.
15    Q.  Yeah.  It was a property-only search warrant.
16    Do you agree with me that there was no specific
17  intelligence that either of the two suspects were inside
18  the apartment that morning?
19    A.  There was probable cause to believe that the
20  suspects frequented that location, had access and
21  control over that location, and were likely storing
22  firearms used in a homicide at that location, so that's
23  the intel that the officers had.
24    Q.  No specific information about where they were
25  that morning, and police actually thought this was kind

68

1  of a transient location used by multiple people; right?
2    A.  They didn't know exactly who was inside of the
3  location just prior to the operation.
4    Q.  Yeah.  In fact, one of the suspects they were
5  looking for was actually wearing an ankle monitor, and
6  it hadn't pinged anywhere near the apartment that
7  morning; correct?
8    A.  Not aware of that.
9    Q.  Well, I guess I'm telling you now, then.
10    You certainly wouldn't worry about the suspect
11  being inside if he was wearing an ankle monitor and it
12  showed him being someplace else, would you?
13    A.  Well, again, you're talking about multiple
14  suspects, and it also doesn't eliminate the potential
15  threat at that location.  If it is a gang member
16  flophouse, as it was described in the record, there is
17  potential that other people who are armed and dangerous
18  are likely inside of that structure.
19    Q.  But there was a complete lack of intelligence
20  as to who was specifically inside that morning; right?
21    A.  Well, as I indicated in my report, it would be
22  great if SWAT teams had perfect intelligence about who
23  they were going to encounter or what their motivations
24  were and if they were likely to resist or not, but that
25  is not the reality.

69

1    The reality is that SWAT teams use the best
2  available intel, develop a plan based on certain
3  tactical principles, and then conduct that operation and
4  evaluate things as those threats unfold.  And rarely
5  does a SWAT team know exactly who's inside of a
6  structure prior to the operation.
7    Q.  Well, the counter reality is they had
8  preplanned to use all of this force to enter the
9  apartment, and they had no idea if women or children or
10  innocent people were inside; right?
11    A.  Again, if the intel suggested that this was a
12  location where people involved in gang activity had
13  access to that location -- even during the surveillance,
14  a couple of the suspects in a homicide were identified
15  coming and going from that unit, left the door open, so
16  there was no indication that there were old people,
17  little kids, women and children inside of that location.
18    Q.  Did you review or consider Nevada Revised
19  Statute Section 171.1455 at all in your analysis?
20    A.  I'm not sure what statute that is.
21    Q.  That's Nevada State statute on deescalation
22  techniques.
23    A.  I believe I may have seen it, but I am not sure
24  that I referred to it directly.
25    Q.  Did you do a Graham versus Connor analysis or

Spencer Fomby          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1  refer to Graham versus Connor in your report? I'm not
2  sure that I saw such a section.
3      A.  I typically do it any time I'm talking about
4  use of force. So if I discussed the use of deadly
5  force, I'm sure I did a Graham analysis.
6      Q.  Do you agree with me that if I were inside my
7  home sleeping in the early hours of the morning and I
8  felt a person was trying to break into my home, that I
9  would have the right to use deadly force to defend
10  myself and my home?
11     A.  Again, it's a hypothetical, so if a reasonable
12  person believes that there were intruders, people have a
13  right to self-defense.
14     Q.  Yeah. And actually, specifically in Nevada,
15  they have the automatic right to use deadly force, don't
16  they?
17     A.  I am not sure about the Nevada statute.
18     Q.  Okay. Well, are you aware that at least in
19  some states, all it would take is somebody entering your
20  home before you had the right to use deadly force?
21     A.  Yeah. Castle doctrine.
22     Q.  Yes. That's a term that's often used for it.
23         And so do you know one way or the other whether
24  Nevada has the castle doctrine?
25     A.  My understanding is that applies in Nevada,

71

1  yes.
2      Q.  Okay. And so even further into the
3  hypotheticals, if I was in my home and I thought that
4  intruders who had already fired gunshots at me nine
5  times and broken out my back window where I was only
6  three or four feet from, if I believed that was a
7  situation, I would have the right to use deadly force to
8  defend myself; right?
9      A.  Well, if you're referring to this case, the
10  question is: Would a reasonable person in Mr. Williams'
11  position believe that the police were at that location
12  or that this was some organized coordinated home
13  invasion? And it's my opinion that no reasonable person
14  would believe that this was an organized coordinated
15  home invasion by a team of people who were using flash
16  bangs and battering rams to make entry.
17     Q.  But Mr. Williams had six seconds to ascertain
18  that; right?
19     A.  16 seconds before the entry.
20     Q.  All right. Six seconds before the force and
21  the window and the deployment of the noise flash
22  diversionary device; correct?
23     A.  That's correct, which would have woken him up
24  if he was asleep.
25     Q.  Do you agree with me, at least under the

72

1  constitutional case law, the fact that people inside the
2  residence may be sleeping at the time the warrant is
3  served requires that police wait a longer amount of
4  time? In other words, a longer amount of time is a
5  reasonable amount of time.
6      A.  Again, it's up to -- it's based on the totality
7  of circumstances, and so even the courts have not been
8  able to clearly define what that time is, and each case
9  should be evaluated based on the circumstances of that
10  case.
11     Q.  Have you been made aware of the Jasmine King
12  incident that occurred approximately a year prior to
13  Mr. Williams' case?
14     A.  Not based -- not in this case. I don't recall
15  seeing that name.
16     Q.  Okay. Are you aware of any changes to
17  department policy that came about because of the Jasmine
18  King incident?
19     A.  I don't know that name. Is that the incident
20  involving supposed breaching?
21     Q.  Yeah. So Jasmine King was a woman. A SWAT
22  team came to serve a warrant on a residence where she
23  was with her children. They did an announce. Ms. King
24  was actually coming to the door to answer it and comply
25  with police when they discharged an explosive breach,

73

1  seriously injuring Ms. King.
2          Having explained all of that, were you aware of
3  that incident?
4      A.  Only from news coverage, but not because of
5  this case.
6      Q.  Okay. And were you aware of any changes made
7  to department policies as a result of that incident?
8      A.  My understanding is that explosive breaching
9  was restricted at some point prior to this incident and
10  was not available for high-risk search warrants.
11     Q.  Well, we can call it explosive breach, but the
12  problem and what was alleged in a later lawsuit is that
13  they failed to abide by the knock and announce rule.
14         Are you aware of that?
15     A.  No, I was not.
16     Q.  Have you seen that prior lawsuit that was filed
17  against the departments and several members who were
18  also involved in Mr. Williams' incident?
19     A.  No, I have not.
20     Q.  Are you aware that that suit was later settled
21  by the defendants?
22     A.  No. I was not aware.
23     Q.  Do you think that may factor into your analysis
24  as to the knowledge and training and what is reasonable
25  to these officers, that several of them were already

Spencer Fomby        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

74

1  sued for violating the knock and announce rule and had
2  to settle a civil rights case against them for that?
3      A.  Well, I don't want to speculate on the details
4  of that case.  I don't know -- you're just saying it's a
5  knock and announce rule, but that's, again, a very
6  complex area of law, so I don't know exactly what was
7  alleged or why the City settled the case.
8      Q.  Are you aware of any changes in the last ten
9  years to Metro's policies and procedures for knock and
10  announce or CET entries either before or after the
11  Williams incident?
12      A.  I don't know if there were any specific
13  changes.  It would not surprise me that an agency was
14  evaluating their tactics and training and standard
15  operating procedures on a constant basis and updating
16  those.  So if there were changes, I would expect for an
17  agency to make updates to their training and their
18  policy.
19      Q.  Is it your opinion that a surround and callout
20  method was not feasible for the particular warrant
21  execution here, that CET entry was the only feasible
22  method of entry?
23      A.  Well, again, there are differing opinions about
24  tactics in the SWAT world, and if you get a bunch of
25  SWAT officers together, you know, they can go down a

---

75

1  rabbit hole about which tactics they prefer.  The
2  question is:  Would a reasonable SWAT team use the same
3  or similar tactics in the same or similar circumstance?
4      So in this operation where they had two
5  separate locations, there's the Duran location and then
6  the South Nellis.  You know, South Nellis they decided
7  to use CET, and at the other location, they actually
8  decided to use a surrounded callout.
9      And one of the things I was looking at when I
10  reviewed this case was any evidence that the team
11  refused to use certain tactics or had predetermined that
12  they would always use a CET on an operation, and so what
13  I found is that they actually decided to use a
14  surrounded callout on a related operation based on
15  available intel and the terrain.
16      Q.  I think, though, that you just answered or kind
17  of reworded my question in a slightly different way.
18      My question is this:  When they're planning to
19  execute the search warrant for the apartment where
20  ultimately Mr. Williams is found inside and killed, they
21  had a choice as to whether they could do that as a CET
22  entry or a SACO, meaning a surround and callout entry.
23  They chose CET entry.
24      Do you believe that was simply the discretion
25  of the officers or do you believe that considering all

---

76

1  factors, a SACO just was not feasible for service of
2  that particular warrant at that particular location?
3      A.  Well, based on my review of the evidence, I
4  believe that it was reasonable that the commanders and
5  the team leaders believed that a callout was not the
6  best option on South Nellis because of the multiunit
7  apartment complex with the wrought iron gate around it,
8  which wouldn't allow them to pull their armor close to
9  the front door in positions where they can contain the
10  target location.
11      And so the only other option, if they did try
12  to do a surrounded callout, was to have the officers
13  standing without any kind of cover and no place to
14  retreat to which would expose them to potential gunfire.
15  And so I believe it was a reasonable decision to change
16  tactics and use a CET versus a surrounded callout on the
17  South Nellis target.
18      Q.  But do you believe those circumstances actually
19  made the surround and callout not feasible?
20      A.  Yes.  I believe if you look at the landscape,
21  you know, the only place they could pull the armor was
22  onto the street, which was a far distance from the
23  primary breach point.  There was no way for them to get
24  it close to the door, which is where a SWAT team would
25  always want the armor to be in case something goes

---

77

1  wrong.  And there was no place around the other sides of
2  the structure for the officers to hide if they decided
3  to contain it without armor.
4      MR. BREEDEN:  All right.  Mr. Fomby, those are
5  all of my questions that I have.
6      Andrew, do you have anything in follow-up?
7      MR. YATES:  No, nothing from me.
8      MR. BREEDEN:  Okay.  We will go off the record
9  at this time.
10      THE COURT REPORTER:  Mr. Yates, do you need a
11  copy of the transcript?
12      MR. YATES:  Please.
13      (The proceedings concluded at 12:00 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

---

Spencer Fomby    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

```
 1              CERTIFICATE OF DEPONENT
 2   PAGE   LINE   CHANGE              REASON
 3        _____
 4        _____
 5        _____
 6        _____
 7        _____
 8        _____
 9        _____
10        _____
11        _____
12        _____
13        _____
14        _____
15        _____
16
17                  * * * * *
18         I, Spencer Fomby, deponent herein, do
     certify and declare under penalty of perjury the within
19   and foregoing transcription to be my deposition in said
     action; that I have read, corrected and do hereby affix
20   my signature to said deposition.
21
22                  SPENCER FOMBY, Deponent
23
          This ____ day of _____, 2025.
24
25
```

79

```
 1              REPORTER'S CERTIFICATE
 2   STATE OF NEVADA )
                     ) ss:
 3   COUNTY OF CLARK )
 4         I, Blanca I. Cano, CCR No. 861, RPR, do hereby
     declare:
 5         That I reported the taking of the deposition of
     SPENCER FOMBY, commencing on Tuesday, February 18, 2025.
 6
           That prior to being examined, the witness was
 7   by me duly sworn to testify the truth, the whole truth,
     and nothing but the truth;
 8
           That I thereafter transcribed my said shorthand
 9   notes into typewriting and that the typewritten
     transcript of said deposition is a complete, true, and
10   accurate record of testimony provided by the witness at
     said time to the best of my ability.
11
           I further certify (1) that I am not a relative,
12   employee, or independent contractor of counsel of any of
     the parties; nor a relative, employee or independent
13   contractor of the parties involved in said action; nor a
     person financially interested in the action; nor do I
14   have any other relationship with any of the parties or
     with counsel of any of the parties involved in the
15   action that may reasonably cause my impartiality to be
     questioned; and (2) that transcript review pursuant to
16   FRCP 30(e) was not requested.
17         IN WITNESS WHEREOF, I have set my hand in my
     office in the County of Clark, State of Nevada, this 2nd
18   day of March, 2025.
19
20                  _____
                    Blanca I. Cano, CCR No. 861, RPR
21
22
23
24
25
```