Exhibit S - Deposition of Plaintiffs' Police Practices Expert Gregory Gilbertson

CERTIFICATE OF REPORTER

STATE OF NEVADA )
               )
COUNTY OF CLARK )

       I, Mickey Marez, a duly commissioned and licensed court reporter, Clark County, State of Nevada, Registered Professional Reporter and Certified Realtime Reporter with the National Court Reporters Association, do hereby certify:  That I reported the taking of the deposition of the witness, GREGORY GILBERTSON, commencing on Tuesday, January 21, 2025, at 9:07 a.m.;

       That prior to being examined, the witness was, by me, duly sworn to testify to the truth.  That my said shorthand notes were thereafter transcribed into typewriting and that the typewritten transcript of said deposition is a complete, true, and accurate transcription of said shorthand notes.

       I further certify that I am not a relative or employee of an attorney or counsel or any of the parties, nor a relative or employee of an attorney or counsel involved in said action, nor a person financially interested in the action; that a request has not been made to review the transcript.

       IN WITNESS THEREOF, I have hereunto set my hand in my office in the County of Clark, State of Nevada, this 3rd day of February, 2025.

_____
Mickey Marez, RPR, CRR, NV CCR No. 950

Mamba Reporting, #119F                    (702) 401-3985
www.mambareporting.com          mambareporting@gmail.com

1          UNITED STATES DISTRICT COURT

2              DISTRICT OF NEVADA

3  LATIA ALEXANDER, individually ) Case No.:  2:24-cv-00074-APG-NJK
   as heir of ISAIAH T. WILLIAMS,)
4  and in her capacity as        )
   Special Administrator of the  )
5  Estate of ISAIAH T. WILLIAMS, )
                                 )        **CERTIFIED COPY**
6              Plaintiff,        )
                                 )
7      vs.                       )
                                 )
8  LAS VEGAS METROPOLITAN        )
   POLICE DEPARTMENT, a          )
9  political subdivision of the  )
   State of Nevada; KERRY KUBLA, )
10 in his individual capacity;   )
   BRICE CLEMENTS, in his        )
11 individual capacity; ALEX     )
   GONZALES, in his individual   )
12 capacity; RUSSELL BACKMAN, in )
   his individual capacity;      )
13 JAMES ROTHENBURG, in his      )
   individual capacity; JAMES    )
14 BERTUCCINI, in his individual )
   capacity; MELANIE O'DANIEL,   )
15 in her individual capacity    )
   and DOES I-XX, inclusive,,    )
16                               )
               Defendants.       )
17 _____)

18

19 VIDEOCONFERENCED/ZOOM DEPOSITION OF GREGORY GILBERTSON

20          ALL PARTIES APPEARING REMOTELY

21          TUESDAY, JANUARY 21, 2025

22

23 Reported by: Mickey Marez, RPR, CRR, NV CCR No. 950

24 Firm No.: 119F, Mamba Reporting

25 Job No.: 1032

```
 1            VIDEOCONFERENCED/ZOOM DEPOSITION OF GREGORY GILBERTSON, on
 2   Tuesday, January 21, 2025, at 9:07 a.m., before Mickey Marez,
 3   Registered Professional Reporter and Certified Realtime Reporter with
 4   the National Court Reporters Association, Certified Court Reporter, in
 5   and for the State of Nevada
 6
 7   APPEARANCES:
 8   FOR THE PLAINTIFF:
 9   BY: ADAM J. BREEDEN, ESQ.
10   BREEDEN & ASSOCIATES PLLC
11   7432 WEST SAHARA AVENUE, SUITE 101
12   LAS VEGAS, NEVADA 89117
13   TELEPHONE: (702)819-7770
14   FAX: (702)819-7771
15   E-MAIL: adam@breedenandassociates.com
16
17
18   FOR THE DEFENDANTS:
19   BY: CRAIG R. ANDERSON, ESQ.
20   10001 PARK RUN DRIVE
21   LAS VEGAS, NEVADA 89145
22   TELEPHONE: (702)382-0711
23   FAX: (702)382-5816
24   E-MAIL: canderson@maclaw.com
25                   * * * * *
```

3

```
 1                            INDEX

 2   WITNESS:  GREGORY GILBERTSON

 3   EXAMINATION                                    PAGE

 4   BY CRAIG R. ANDERSON, ESQ.                       4

 5   BY ADAM J. BREEDEN, ESQ.                         93

 6   FURTHER BY CRAIG R. ANDERSON, ESQ.              103

 7   FURTHER BY ADAM J. BREEDEN, ESQ.                104

 8

 9

10                          EXHIBITS

11   NUMBER          DESCRIPTION            MARKED

12   EXHIBIT 1      BATES GILBERTSON000001-27        6

13

14   EXHIBIT 2      BATES GILBERTSON000052-65        6

15

16

17

18

19

20

21

22

23

24

25
```

```
1              ALL PARTIES APPEARING REMOTELY;
                TUESDAY, JANUARY 21, 2025
2                      9:07 A.M.
                       * * * * *
3    Whereupon,

4             (Off-the-record discussion held prior to the

5             commencement of the proceedings, counsel

6             agreed to the witness being sworn in via

7             Zoom, and also agreed to waive the court

8             reporter's requirements under Rule 30(b)(5)

9             of the Nevada Rules of Civil Procedure.)

10                 GREGORY GILBERTSON,

11   having been sworn to testify to the truth, the whole truth, and

12   nothing but the truth, was examined and testified under oath as

13   follows:

14                      -oOo-

15                   EXAMINATION

16   BY CRAIG ANDERSON, ESQ.:

17        Q.   Mr. Gilbertson, can I get you to state your

18   full name for the record.

19        A.   Yes, sir.  Gregory Gene Gilbertson.

20        Q.   And we were talking before.  You said it was

21   okay for me to call you Greg.  And you can call me

22   Craig.  Is that fine?

23        A.   That's perfectly fine with me, sir.

24        Q.   Okay.

25             You've had your deposition taken before?
```

1        A.    Yes, sir.

2        Q.    About how many times?

3        A.    Over 60 -- between 60 and 70 times, I'd say.

4        Q.    Okay.  So, you're comfortable with the

5    process, I don't need to go over the rules or what

6    we're going to do?

7        A.    Correct.

8        Q.    Okay.  But you do understand you've taken an

9    oath to tell the truth?

10       A.    I do.

11       Q.    Is there any reason you cannot give truthful

12   testimony today?

13       A.    No.

14       Q.    Okay.

15             Are you on any medication?

16       A.    No, sir.

17       Q.    Okay.  Have you had any alcohol to drink?

18       A.    No.

19       Q.    Okay.

20             And I asked you this before we went on, too.

21   You have a copy of your expert report in the Isaiah

22   Williams matter and rebuttal expert report in the

23   Isaiah Williams matter with you; is that correct?

24       A.    Yes, sir.  I have them right here.

25       Q.    Okay.  And at the end of the deposition, I'll

1    send them to the court reporter and we will mark your

2    initial report, which is Bates stamped GILBERTSON1 to

3    27, as Exhibit 1; and your rebuttal report,

4    GILBERTSON52 to 65 as Exhibit 2.  And those are what

5    I'm going to refer to today.

6                (Deposition Exhibits 1-2 were marked for

7                identification.)

8    BY CRAIG ANDERSON, ESQ.:

9        Q.    What is your current occupation?

10       A.    My current occupation is I'm self-employed as

11   an expert witness consultant.  I retired from teaching

12   college after 22 and a half years in -- on -- what was

13   it, March 18th of 2022.  So, I'm semi-retired.  But

14   pretty much a full-time employee as an expert witness.

15       Q.    Okay.  And when you were teaching college,

16   what topics did you teach?  What was your expertise?

17       A.    Criminal justice.

18       Q.    Okay.  Did any of the courses you taught

19   involve SWAT tactics?

20       A.    Not specifically SWAT tactics, no.

21       Q.    Okay.

22             And when you say you're an expert witness,

23   you're an expert witness in police procedure -- you're

24   a police practices expert witness; correct?

25       A.    Correct.

1      Q.    Okay.   And how long have you worked as a
2  police practices expert?
3      A.    I -- I took on my first case at the end of
4  2000- -- November of 2013, January -- between November
5  and January 2013 -- 2013, 2014 to present day.
6      Q.    Okay.   So, you've been doing it a little over
7  11 years?
8      A.    Yes, sir.   That's correct.
9      Q.    Okay.
10          And the last time that you were -- and you
11  were a police officer at one point in your life;
12  correct?
13      A.    Yes, sir.
14      Q.    Okay.   And that was from roughly 1988 to
15  1996?
16      A.    That's correct.
17      Q.    Okay.   And the last time you were a
18  commissioned police officer was 1996?
19      A.    Correct.
20      Q.    Okay.
21          In your eight years as a police officer, did
22  you ever discharge your firearm in the line of duty?
23      A.    One time.
24      Q.    Okay.   Was that a -- at a person?
25      A.    I -- actually, I was -- I fired a warning

```
1    shot.
2        Q.   Okay.  And so, would that have been
3    considered an officer-involved shooting in your
4    department or was that warning shot something
5    different?
6        A.   I don't think it was considered an
7    officer-involved shooting.  It was probably -- it was
8    considered -- actually, it was a violation -- it was a
9    violation policy at the time.  And so, it was not
10   considered an officer-involved shooting, no.
11       Q.   Okay.  Yeah, I had never heard -- I mean,
12   warning shots are typically not allowed; correct?
13       A.   Typically.  But, actually, now in some --
14   some general order -- I think I read an IACP article
15   recently where they're now -- you know, in some
16   instances, they're now actually revisiting that issue.
17   So -- but, yeah, typically they're not.  You're
18   correct.
19       Q.   Okay.
20            Does any part of your expert consulting work
21   include training police officers in the United States?
22       A.   No.
23       Q.   Have you ever trained any law enforcement
24   organization in the use of force?
25       A.   No, not train -- not personally train, no.
```

1    Q.    Okay.  Does any part of your consulting work
2    involve policy drafting for police departments?
3    A.    No.  I've worked on policy in other
4    countries, but not in the United States.
5    Q.    Specific to this case, have you ever trained
6    a SWAT team in the United States?
7    A.    No.
8    Q.    Have you ever served as an expert witness in
9    any other cases involving SWAT tactics?
10   A.    I believe this is the first case.  But I've
11   had almost 200 cases.  I'm trying to recall.  I
12   don't -- I believe this is the first case that I've had
13   where, you know, the -- the use of force was involving
14   an actual SWAT team.  I believe this is the first one.
15   Q.    What --
16   A.    I take that back.  I take that back.  I
17   recently did write a report regarding SWAT tactics for
18   the -- that were employed by the City of Seattle.  I
19   take that back.  There was a -- there was a -- a -- a
20   SWAT team was deployed and ended up -- one of the SWAT
21   officers ended up shooting and killing a suspect in the
22   City of Seattle.  I -- I have -- I have to -- I just
23   recalled that.  So...
24   Q.    And were your -- your opinions in that case,
25   were they strictly limited to use of force or did they

```
1    involve SWAT tactics, as well?
2         A.    In that particular case, it was just use --
3    it was the use of -- the use of deadly force.
4         Q.    Okay.
5              And prior to your law enforcement career, you
6    served in the military in the army; correct?
7         A.    That's correct.
8         Q.    Okay.  Did any of your time in the army
9    involve performing law enforcement functions?
10        A.    No.
11        Q.    And then you worked for the Atlanta Police
12   Department from 1988 to 1991; correct?
13        A.    Correct.
14        Q.    Okay.  And you attended a police academy to
15   get certified as a commissioned officer to work in
16   Atlanta; correct?
17        A.    Yes, it was the Atlanta Police Academy.
18        Q.    Okay.
19              And for the two and half years you worked for
20   Atlanta, you were a patrolman?
21        A.    Correct.
22        Q.    And I know that's a short period of time.
23   But you never promoted at Atlanta; correct?
24        A.    No.
25        Q.    And you did not perform any SWAT functions
```

1    with the Atlanta Police Department?

2        A.   No.

3        Q.   What was the reason you left the Atlanta

4    Police Department?

5        A.   That's an interesting story.  I was offered

6    the opportunity to transition to the LaGrange Police

7    Department.  I attended graduate college with the chief

8    of police in LaGrange.  And he actually helped me get

9    the job with the Atlanta Police Department.

10           And after two and a half years with Atlanta,

11   I just decided it would be -- I felt that the

12   opportunity to work there would be more beneficial than

13   staying in Atlanta.

14       Q.   Is the LaGrange Police Department also in

15   Georgia?

16       A.   Yes, it is.

17       Q.   Okay.  So, did your academy for the Atlanta

18   Police Department transfer over?

19       A.   Yes, sir.

20       Q.   How -- when you were a police officer in

21   LaGrange, how big was the city?

22       A.   The city was approximately around 30, 35,000

23   people I'd say.

24       Q.   How many commissioned officers were on the

25   LaGrange Police Department?

Mamba Reporting, #119F
www.mambareporting.com                    (702) 401-3985
                                  mambareporting@gmail.com

1    A.    At that time, I believe it was around --

2    right around 80 -- somewhere between 80, 82.  Something

3    of that nature.

4    Q.    Okay.  And you worked in LaGrange -- and

5    how -- is it LaGrange or LaGrange?

6    A.    LaGrange.

7    Q.    Okay.  You worked in LaGrange from

8    February 1991 until April '96?

9    A.    Correct.

10    Q.    Okay.  And you promoted from patrolman to

11    corporal at one point; correct?

12    A.    That's correct.

13    Q.    What exactly is the difference between a

14    patrolman and a corporal in that police department?

15    A.    It would be the equivalent of going from

16    police officer to senior police officer.  I would say

17    that would be the easiest way for me to describe it.

18    Q.    Okay.  So, did that allow you to, like, train

19    new recruits; like, be a field training officer?

20    Things like that?

21    A.    It -- it afforded me some, you know,

22    seniority over -- yes, seniority over basic patrol

23    officers.  So, if -- if there was -- you know, if there

24    was no supervisor available and there was a -- a

25    decision that needed to be made or some guidance given

1  or something of that nature, then, you know, that
2  would -- that would be, basically, the --
3      Q.   So, I know -- oh, sorry.
4           I know at the Las Vegas Metropolitan
5  Police Department, you know, there's police officer,
6  sergeant, you know, lieutenant, captain.  But there's
7  also detectives who are, like, patrolman with a
8  specialized skill set.  Is that kind of what a corporal
9  is?
10     A.   I would say that's fair, yeah.
11     Q.   Okay.
12          And two years of your time with LaGrange were
13  served with the juvenile court as a school resource
14  officer and a juvenile court investigator; correct?
15     A.   That is correct.
16     Q.   And from 1992 to 1993, you worked with the
17  City of LaGrange's SWAT team?
18     A.   Actually, it was 1992 through -- it was four
19  years that I was on the SWAT team at LaGrange.
20     Q.   Thank you.  So, you have four years on the
21  LaGrange SWAT team?
22     A.   Correct.
23     Q.   Okay.  When you were on the SWAT team, was
24  that a dedicated unit or did you still do your corporal
25  functions but would do SWAT functions, if necessary?

1      A.    SWAT functions, if necessary.

2      **Q.    Okay.   So, what would you have to do to get**

3   **on the LaGrange SWAT team?**

4      A.    Well, there was a selection process for that.

5   It was a competitive selection process.   You had to

6   have at least one year of service with the department,

7   be -- you know, have -- successfully completed your

8   probationary period.   And then you -- there was an

9   application process and physical testing, things of

10  that nature, overall evaluation of your job performance

11  to date.

12         And then you were required to complete a

13  number of, oh, physical assessments.   You know, a

14  fairly rigorous -- as I recall, a fairly rigorous,

15  physical fitness test and things of that nature,

16  weapons qualifications, this and that and the other.

17  And I think it was about a week-long process --

18  application process, as I recall.

19      **Q.    And so, the City of LaGrange did not have a**

20  **dedicated SWAT team, they had officers who qualified to**

21  **work SWAT when the need arose?**

22      A.    That's right.   And we would train at least on

23  a monthly, if not twice a month basis.   We would go to

24  training -- do various trainings and attend specialized

25  schools through various sponsor -- you know, sponsoring

1    organizations, things of that nature.  So, we -- we got

2    a lot more specialized training than, you know,

3    traditional, regular police officers within -- that the

4    department received.

5        Q.    Okay.  And to be a member of SWAT, you had to

6    undergo a specific 40-hour course that was exclusive to

7    SWAT; correct?

8        A.    Correct.  And then we attended -- after the

9    basic certification -- that was at the Georgia Public

10   Safety Training Center.  And then after that, we

11   attended a secondary SWAT certification school through

12   the United States Army Military Police School.

13       Q.    Okay.  And the reason that you stopped being

14   a SWAT officer was because the unit disbanded in 1995;

15   is that correct?

16       A.    Correct.

17       Q.    Okay.

18       A.    We had a new chief of police who

19   disbanded the -- disbanded the unit.

20       Q.    Was there any reason why he disbanded it?

21       A.    He never gave us one.

22       Q.    Okay.

23             And the last time you received SWAT training

24   was in 1993?

25       A.    That sounds about -- well, that formal

1  training -- like I said, we would train twice monthly,
2  you know, through the -- through the -- as long as the
3  unit was active, we would train monthly.  But, yeah,
4  that would be the last probably formalized training
5  through -- through the Georgia Public Safety Training
6  Center that was available to us.
7      Q.    Okay.  And you have not taken any SWAT
8  training since that time?
9      A.    No, sir.
10     Q.    Was the SWAT team in LaGrange organized with
11 team leaders, assistant team leaders, those sort of
12 classifications?
13     A.    Yes.
14     Q.    Okay.  Were you ever a SWAT team leader?
15     A.    No.
16     Q.    Okay.  Were you ever a SWAT assistant team
17 leader?
18     A.    No.
19     Q.    Did the LaGrange SWAT team work -- that the
20 team leader and assistant team leader would formulate
21 the opinion and then the other -- in conjunction with
22 the other SWAT team members, you would fulfill that
23 plan?
24     A.    Yes.
25     Q.    Okay.

1          Were you ever a SWAT instructor with the

2   LaGrange Police Department?

3          A.   No.

4          Q.   Were you ever tasked with reviewing SWAT

5   tactics and use of force with respect to incidents at

6   the LaGrange Police Department?

7          A.   No, sir.

8          Q.   So, what type of calls would SWAT handle in

9   the LaGrange Police Department?

10         A.   Well, IRS felony -- or high-risk warrant

11  service was one of the tasks that we certainly

12  performed.  We -- high-risk search warrants, as this

13  was -- as this case was classified.  We would go out

14  and -- if there was an active shooter or an active --

15  or a -- in the area, active shooter cases that we would

16  have.

17          We had cases where one cop -- one case I

18  recall, pretty distinctly, was we had -- a subject

19  assaulted one of our officers -- assault one of our

20  officers and actually -- actually stole his firearm.

21  And that was -- they activated us for that -- we were

22  activated for that.  And we had to put in -- that

23  was -- actually, we pursued that individual for a

24  number of hours around the city until we actually

25  apprehended him.

1          So, those types of things.  You know, what --
2   what you would consider your standard -- what I would
3   consider high to moderate risk situations.
4          Q.   I would imagine that you handled barricades?
5          A.   Yes.
6          Q.   Okay.  Arrest warrants for dangerous
7   individuals?
8          A.   Absolutely.  Yes.
9          Q.   And you had mentioned this.  But you would
10  also do high-risk search warrants like we had in the
11  Isaiah Williams matter; correct?
12         A.   Yes, sir.
13         Q.   Okay.  So, you did serve warrants similar to
14  the one at issue in this case that you reviewed?
15         A.   Yes, sir.
16         Q.   And I take it -- I know about the warning
17  shot.  You never used lethal force as a SWAT officer;
18  correct?
19         A.   No, sir.
20         Q.   So, the warning shot incident was not part of
21  your SWAT duties?
22         A.   No, that was with the City of Atlanta.
23         Q.   Okay.
24              Were you ever trained in control -- in
25  controlled entry tactics?

1    A.    Yes.

2    Q.    Okay.  Did you serve warrants where

3 controlled entry tactics were used?

4    A.    Yes.

5    Q.    Okay.

6    A.    Arrest warrants -- we served arrest warrants

7 for controlled -- we didn't serve any search warrants

8 for controlled entry.  We served arrest warrants for

9 controlled entry tactics we used.

10    Q.    Okay.  So, if you had a high-risk warrant

11 that was not for arrest, you've never used a controlled

12 entry tactic?

13    A.    If we had a high-risk -- I don't -- I don't

14 recall -- no, we -- when we had -- we had a -- if it

15 was a search warrant that we were serving, we would --

16 we did not use a controlled entry tactic technique.  We

17 would use a surround-and-callout technique.

18    Q.    Okay.  So, in your time on the LaGrange SWAT

19 team, you never use a controlled entry tactic for a

20 high-risk search warrant?

21    A.    Not to my recollection, no.

22    Q.    Okay.  And just if you know -- I understand

23 it's been a long time -- do you know how many high-risk

24 warrants you were involved in, in search warrant

25 service?

1        A.    High-risk arrest warrants?

2        **Q.    Let's start with high-risk search warrants.**

3        A.    Search warrants.

4              Oh.  Probably 6 to 10 -- I'd say --

5   probably -- less than 12.  Probably around 8 to 10 I'd

6   say, as I recall.  It's been a long time.  I don't -- I

7   don't have -- you know, that seems about right.  It

8   wasn't -- it wasn't nearly as frequent as the arrest

9   warrant service that we would perform.

10       **Q.    Okay.  And how many high-risk arrest**

11  **warrants?  And I know it's a long time ago.  But can**

12  **you estimate?**

13       A.    Probably 15 to 20.

14       **Q.    Now, with the City of LaGrange controlled**

15  **entry tactics, did -- were you guys trained in**

16  **explosive breaches?**

17       A.    We were.

18       **Q.    Okay.  And in the case that you reviewed, a**

19  **battering ram was used.  Were you trained in the use of**

20  **a battering ram?**

21       A.    That was the most common technique that we

22  used, was the battering ram.

23       **Q.    Were you ever involved in a no-knock search**

24  **warrant?**

25       A.    Not to my recollection.

1    Q.   Okay.

2         Are you aware of any organization that sets

3    the national standards for the tactical use of SWAT?

4    A.   Well, there's the -- there's the National

5    Tactical Officers Association.  I know that they have a

6    great deal of influence in that arena.

7    Q.   Okay.

8    A.   And I know that the International Association

9    of Chiefs of Police have authored -- have authored

10   policy papers on that topic -- on SWAT topics and

11   things of that nature.  I don't -- and I know that

12   Lexipol and CALEA, they offer -- you know, they have

13   written SOPs and things of nature, policies and

14   procedures on SWAT.  So, that goes -- I go -- those are

15   probably the four that -- that I'm most familiar with.

16   Q.   Okay.  And I think you're correct.  But would

17   you agree or disagree that the National Tactical

18   Officers Association is generally known as the industry

19   standard in the SWAT world?

20   A.   I would -- yeah, I would say that's fair.

21   Q.   Are you aware of what today's National

22   Tactical Officers Association recommended training is

23   for SWAT officers?

24   A.   I haven't seen their curriculum, so I'm

25   not -- I'm not familiar with it.

Mamba Reporting, #119F
www.mambareporting.com                    (702) 401-3985
                                    mambareporting@gmail.com

1      Q.    Okay.  And so, you're not -- and if I say
2   "NATO," you know what I'm referring to?
3      A.    Yes, sir.
4      Q.    Okay.  And you're not a member of NATO;
5   correct?
6      A.    No, I'm not.
7      Q.    Okay.  Do you know what the NATO standards
8   are for safe conduct when it comes to SWAT?
9      A.    Again, I haven't reviewed any of their -- any
10  of their doctrine or curriculum.  I probably -- I'm
11  sure we did years ago, but I have -- it's been so many
12  years, I -- I haven't reviewed any of that in recent --
13  in recent years.
14     Q.    Okay.  So, you would not know what the
15  national standards are expected of SWAT officers by
16  NATO for conducting a controlled entry tactic?
17     A.    I don't.
18     Q.    Okay.
19           Have you ever published any articles on SWAT
20  tactics?
21     A.    No.
22     Q.    Okay.  Have you ever published any articles
23  on use of force, in general?
24     A.    No.
25     Q.    Do you do seminars or teaching on use of

23

1    force?

2        A.    No.

3        Q.    Do you do teaching or seminars on SWAT

4    tactics?

5        A.    No.

6        Q.    I kind of asked you this earlier.  And you

7    brought up the Seattle case, which I believe was a

8    hostage situation.  Have you ever rendered an expert

9    opinion in any other case involving a controlled entry

10   technique?

11       A.    No.

12       Q.    What percentage of your expert work is

13   plaintiff and defendant?

14       A.    It's primarily plaintiff.  I -- I would say

15   overwhelmingly plaintiff.  I've -- yes, I would say

16   it's overwhelmingly plaintiff.  I -- right now, I'm

17   representing -- or I'm consulting -- I'm not

18   representing -- I'm consulting on a case with three

19   police officers in the state of Ohio, who are charged

20   with excessive force.

21            But that's the first police case I've had in

22   the last couple of -- last year and a half or

23   two years.  I had one previously in the state of

24   Louisiana where a police officer was accused of

25   excessive force.  And -- but that was a federal trial.

```
1     It was in a federal civil rights trial.  So, in the
2     couple -- I've had two in the last couple of years.
3          Q.   Were those civil or criminal cases you
4     consulted on?
5          A.   They were both civil -- one -- one -- pardon
6     me, I misspoke.  The one in Louisiana was a criminal
7     case.  And the one that I'm currently consulting on is
8     a civil case.
9          Q.   Do you have any knowledge as to how SWAT
10    officers were trained pursuant to industry standards in
11    2021 or 2022?
12         A.   No.
13         Q.   Do you agree that SWAT is one of the most
14    specialized areas of policing?
15         A.   Yes.
16         Q.   Do you agree that SWAT officers perform some
17    of the most dangerous tasks required of police
18    officers?
19         A.   Yes.
20         Q.   Do you agree that SWAT instructors, team
21    leaders, and commanders develop expertise beyond the
22    normal SWAT team officer?
23         A.   I would say in some cases they do and -- and
24    some cases they may not.  I think it's dependent upon
25    the -- the agency and the team and the training that's
```

1    available to them.

2        Q.    **Do you have criticisms in this case as to how**

3    **the Las Vegas Metropolitan Police Department trained**

4    **its SWAT members?**

5        A.    Yes, I do.

6        Q.    **Okay.**

7        A.    One -- one, in particular, I do.

8        Q.    **Okay.  Did you --**

9        A.    I wouldn't say how they trained.  I would

10   say -- I don't know -- I don't know if it's how -- I

11   don't know that it's accurate to say how they trained.

12   But one of the officers involved in this particular

13   case had not completed his certification training.  So

14   that would be my criticism.

15       Q.    **Okay.  And that's referring to**

16   **Sergeant Backman; correct?**

17       A.    That's correct.

18       Q.    **Okay.  Did you review the Las Vegas**

19   **Metropolitan Police Department SWAT training materials**

20   **and policies?**

21       A.    Some of the policies I did.  I didn't -- I

22   didn't -- I wasn't provided -- I didn't say a copy of

23   their -- their training curricula.

24       Q.    **Okay.**

25       A.    So, I didn't see their curricula.  But I did

1  review some policies, yes.

2      Q.   Okay.  And so, you -- in this case, you're

3  not rendering any opinions regarding the sufficiency of

4  Metro's policies and trainings, you're critical of the

5  fact that Sergeant Backman had not received in the

6  course of the time he was involved in this incident?

7      A.   That's one of my criticisms, yes.

8      Q.   Okay.  And we'll talk about that later.

9      How much have you charged the plaintiff to

10  date in this case?

11      A.   I believe it's $12,400.

12      Q.   What's your -- are you hourly?

13      A.   $275.

14      Q.   Okay.

15      Have you ever testified in court in a SWAT

16  tactics case?

17      A.   No, I haven't.

18      Q.   And are the only two reports you've drafted

19  in this case the initial report and then the rebuttal

20  report?

21      A.   Yes, sir.

22      Q.   At this point, do you have any plans on

23  amending either of your reports?

24      A.   Not at this time, I don't.  No.

25      Q.   Okay.

1      What was the scope of your retention in this

2  case, to your understanding?

3      A.    Well, initially, the scope was to review the

4  discovery filed in the case and all the facts and

5  circumstances that led up to this -- you know, led up

6  to the death of Isaiah Williams and offer analysis and

7  opinion regarding my review of the discovery -- which

8  was voluminous in this particular case -- regarding,

9  you know, the -- the original triggering event, all the

10 way up through the death of -- of Mr. Williams.

11     Q.    Okay.

12     A.    And the triggered -- by "the triggering

13 event," I mean the homicide which prompted the

14 investigation into the -- I believe it was Nicholas

15 Thomas, I believe is what his name was -- all the way

16 up through the actual service of the search warrant.

17     Q.    Okay.  And you evaluated all of that;

18 correct?

19     A.    I tried -- I did my best, yeah.

20     Q.    I mean, it's a lot.

21     A.    Yeah, it was a lot.  Yeah, it was a lot.  I

22 mean, as I say in my report, I relied -- I mean, a lot

23 of this -- a lot of -- I mean, there was thousands and

24 thousands of -- as I'm sure you're well aware, pages of

25 it.  And I relied -- I wouldn't say entirely -- not

1    entirely, but, you know, heavily upon the CIRT report

2    of LVMPD.  And I say it -- I state that in my report.

3         Q.    Okay.  And just for the court reporter:  When

4    you say "CIRT," you're referring to C- --

5         A.    Critical Incident Review Team report.

6         Q.    Yeah, okay.  So, the Critical Incident Review

7    Team report.  And we'll call it the CIRT report; is

8    that fair?

9         A.    Yes, sir.

10        Q.    Okay.

11              If you would just look at your rebuttal

12   report, the very last page.  It's Gilbertson Bates

13   stamp 65.  It lists all the documents that you

14   reviewed.  And tell me if that is still accurate.

15        A.    Yes.  It looks -- it appears to be, yes.

16        Q.    Okay.  So that is all of the documents you

17   reviewed in reaching the opinions in your initial

18   report and rebuttal report?

19        A.    Yes, sir.

20        Q.    Okay.

21              You did not review any national standards for

22   SWAT officers in drafting your report; correct?

23        A.    No.

24        Q.    And according to that Page 65, you did not

25   review any Las Vegas Metropolitan Police Department

```
 1  policies or training; is that correct?
 2      A.   Other than those that were included in the
 3  CIRT report, no.
 4      Q.   Okay.
 5      A.   The ones that were referenced in the CIRT
 6  report, of course, I did look at those.  But other than
 7  those, no.
 8      Q.   Did you look at them in the context of the
 9  CIRT report where they're quoted --
10      A.   Yes.
11      Q.   -- or did you go pull the policy?
12      A.   I believe I did both.
13      Q.   Okay.
14           And as you've already stated -- and it's in
15  your report -- most of your facts of the case come from
16  the CIRT report; correct?
17      A.   Yes.
18      Q.   And do you agree that the CIRT team did a
19  thorough and complete investigation?
20      A.   It's the most thorough investigation I've
21  seen.
22      Q.   So, you're not critical of the CIRT
23  investigation?
24      A.   Not at all.
25      Q.   And what is your understanding of the purpose
```

1    of the CIRT report?

2        A.   My understanding the purpose of the CIRT

3    report was to review this incident from start to finish

4    and to do, basically, an after-action analysis of all

5    the facts and circumstances and events that transpired

6    that led up to and including the death of Isaiah

7    Williams.

8        Q.   And CIRT teams or analysis teams are

9    relatively new to police departments within the last

10   ten years.  The reason I say that is:  When you were a

11   police officer, did your agencies have teams similar to

12   the CIRT team?

13           ADAM BREEDEN, ESQ.:  I'm just going to make

14   an objection to form there.  Assumes facts not in

15   evidence.

16           But you can answer.

17           THE WITNESS:  I would -- I would say -- well,

18   I was never involved in a -- I was never involved in a

19   critical incident like this one.  Typically, when I was

20   a police officer, if there -- if there was an

21   officer-involved shooting, my experience was that that

22   would initially be investigated by the agency itself

23   and then work -- or the County prosecutor may ask a --

24   you know, another local agency to investigate it, if

25   the case may be.

1        But, no, I would agree with you that -- that

2    this -- you know, this report certainly reflects the

3    most comprehensive review of any police-involved

4    shooting that I've ever -- that I've seen.  And I've --

5    I've seen quite a number.  Because I -- the vast

6    majority of my civil casework involves use of force.

7        Q.   **And the CIRT team in this case evaluated the**

8    **Isaiah Williams shooting against the Las Vegas**

9    **Metropolitan Police Department's training and policies;**

10   **is that correct?**

11       A.   That's my understanding, yes.

12       Q.   **Okay.  So, the CIRT team looks at an incident**

13   **and determines whether the officer's actions complied**

14   **or did not comply with the department's policies and**

15   **training?**

16       A.   With department policy and training, yes, I'd

17   say that's accurate.  And -- and I think that -- and I

18   don't -- you know, again, this report was 200 pages

19   long -- well, I believe that it was over 200 pages

20   long.  But I don't -- yeah, that's my -- that's my

21   recollection, yes.

22       Q.   **Okay.**

23            **And do you agree the police departments'**

24   **policies and trainings can exceed constitutional**

25   **minimums?**

1    A.   Yes, I do.

2    Q.   **And so, hypothetically, an officer who**

3    **violates -- who does not violate the constitution could**

4    **still be disciplined by their agency for failing to**

5    **comply with their policies and procedures?**

6    A.   Yes.

7    Q.   **Before we get into the opinions in your**

8    **report, can you generally tell me what you understand**

9    **your role as an expert to be?**

10       ADAM BREEDEN, ESQ.:  I'll just object as

11   overly broad and vague.

12       But the witness can answer.

13       THE WITNESS:  My role as an expert is to --

14   in any case -- is to review the facts and circumstances

15   of a case; whether it's a use of force case, a false

16   arrest case, or whatever they -- you know, whatever the

17   topic may be involving law enforcement officers, and

18   offer an objective -- objectively reasonable opinion --

19   analysis and opinion of that incident based upon my

20   understanding of both -- of constitutional and case

21   law -- controlling constitutional and case law and the

22   agency's policies and procedures.  And, of course,

23   state and federal law, as well.

24       So, to try to offer a -- as concise as

25   possible analysis and opinion and come to some type of

Mamba Reporting, #119F
www.mambareporting.com                (702) 401-3985
                                      mambareporting@gmail.com

1    reasonable conclusion regarding the actions of the

2    officers involved.

3    BY CRAIG ANDERSON, ESQ.:

4        Q.    Do you agree that a police practices expert

5    role is to look at all the facts and then determine

6    whether the officers acted in conformity or outside of

7    industry standards and practices?

8        A.    I'd say that's fair, yes.

9        Q.    Do experts make credibility determinations?

10       A.    No.

11       Q.    Okay.  Do experts guess or speculate as to

12   what individuals are thinking or doing?

13       A.    No.

14       Q.    In your opinion, should an expert ever

15   speculate or guess as to a suspect or officer's

16   motives?

17       A.    No.

18       Q.    In your report -- and I can tell you where,

19   if you want, but I don't think you'll disagree with

20   me -- you make representations -- representations that

21   Mr. Williams was sleeping -- he was asleep at the time

22   the officers began their announcements.

23            Is that a -- is that guessing?

24       A.    I believe I read that in the CIRT report.

25   It's my understanding it was in the CIRT report.

1      Q.    Okay.  Did you see any evidence in this case,
2   outside of the CIRT report, that it was known that
3   Mr. Williams was actually sleeping?
4      A.    Do I see any evidence outside of the CIRT
5   report that Mr. Williams was sleeping?
6      Q.    Well, I'm wondering what you're relying on.
7   It's my understanding we don't know what Mr. Williams
8   was doing at the time they initiated their contact --
9      A.    They know where -- they know where he was
10  located.  He was located on the sofa and appeared to be
11  in a prone position on the sofa.  I can't say to a
12  degree -- I can't say to a degree of absolute certainty
13  that he was sleeping.  It just seemed to be a
14  reasonable inference to me that that, in all
15  likelihood, was what he was doing at the time.
16     Q.    Fair enough.
17          And then I -- and I'll read you your exact
18  quote.  It's on Page 22 of your report.  You stated
19  (as read):
20          "The repeated strikes of the battering ram
21  also contributed to difficulty of Mr. Williams in
22  hearing the officers over the battering ram and other
23  distraction devices."
24          Is that speculation that Mr. Williams could
25  not hear or was distracted?

Mamba Reporting, #119F
www.mambareporting.com
(702) 401-3985
mambareporting@gmail.com

1      A.    On Page 20- -- you're on Page 22 of my
2   report?
3      Q.    **Yes, yes.  I'm on Page 22.**
4      A.    What paragraph is that in, sir?
5      Q.    **Let me see.**
6           **It's at the very top -- oh, wait -- oh, you
7   know what, I think I have the wrong page.  I mean, it
8   was -- oh, wait, it's on 70.  Paragraph 70.**
9      A.    Paragraph 70.  Okay.
10      Q.    **Yeah, the last sentence of 70.**
11      A.    Okay.  Let me read -- if you don't mind, I'll
12   just --
13      Q.    **No, no.  Take your time.**
14      A.    I say, "Over the battering ram and other
15   distraction devices."  It's my understanding that
16   within -- within three to four seconds after
17   Sergeant Backman made his second announcement, the
18   distraction devices were inserted through the window
19   and were in the process of detonating at the same time
20   the battering ram is going down.
21           So, I would say it would be a combination of
22   the two.  I say it's "likely."  I'm not saying it's
23   with certainty.  I say -- I said, "The repeated strikes
24   of the battering ram likely also contributed."
25           Now, I don't -- I don't know -- I don't know

1    if they did or not.  I'm just saying, you know, to a

2    degree of more likely than not, I think they probably

3    did, you know, contribute to the confusion and his

4    inability to ascertain exactly what was going on.

5        Q.    Okay.  **So that statement, then, is based on**

6    **your personal experience in having been involved in**

7    **these things, that these devices can have an impact;**

8    **but we're not aware as to what impact they had in this**

9    **case?**

10       A.    It's been my personal experience, having been

11   exposed to these devices myself and having participated

12   in a number of operations where they were -- both were

13   employed that, yes, they -- they can have that impact.

14       Q.    **Okay.**

15             **Were you ever involved in any controlled**

16   **entry tactic service of warrants where you were shot**

17   **at?**

18       A.    No.  Not where I was actually shot at, no.

19       Q.    **And not just you, where a suspect shot at the**

20   **officers.**

21       A.    No.

22       Q.    **And so, in instances where you've been**

23   **involved where distraction devices were used, they did**

24   **not lead to officer-involved shootings?**

25       A.    They did not.

Mamba Reporting, #119F
www.mambareporting.com                    (702) 401-3985
                                          mambareporting@gmail.com

1    Q.    Okay.

2          On the very next page at the very top.  So,

3    we're on Page 23 of your initial report.

4    A.    Okay.  Let me get there, please.

5    Q.    Oh, yeah.  Take your time.

6    A.    Okay.  I'm there.

7    Q.    Okay.  First of all, just for the record,

8    what do you mean when you say "NFDD"?

9    A.    Noise flash distraction devices.

10   Q.    Okay.  (As read):

11         "The NFDDs likely caused Mr. Williams to

12   believe that he was already being shot at and led him

13   to grab his gun in self-defense."

14         Do you believe that's a proper expert

15   opinion?

16         ADAM BREEDEN, ESQ.:  I'm just going to

17   object.  That calls for a legal opinion or a legal

18   statement from the witness.

19   BY CRAIG ANDERSON, ESQ.:

20   Q.    You can go ahead and answer.

21   A.    I'm -- I'm -- I will.  I'm just thinking --

22   I'm thinking about my answer.  You -- you -- I'm sorry,

23   I was a little distracted.  Could you say the question

24   one more time, please?  I'm sorry.

25   Q.    Yes.

1          Okay.  With the objection pending:  Do you

2   believe that your last sentence of Paragraph 76 on

3   Page 23 of your report at the top is a valid expert

4   opinion where you state, "Mr. Williams -- generally,

5   Mr. Williams believed he was already being shot at,

6   misled him to grab his gun in self-defense"?

7        A.   I think it's a reasonable -- I think it's a

8   reasonable -- again, I use the word "likely."  I'm not

9   saying it is.

10         Is it a proper opinion?  Based upon my life

11  experience and my experience with noise flash

12  distraction devices, both as a police officer and in

13  the military where we used them as well, yes, I

14  would -- those devices oftentimes do sound like

15  gunshots or -- or -- or rifle shots or shotgun blasts

16  or whatever the case.  They can be confused, yes.

17       Q.   Okay.  And you used NFDDs in your time as

18  SWAT; correct?

19       A.   That's correct.

20       Q.   Okay.  And no one ever shot at you or your

21  team in self-defense, in your experience?

22       A.   Thank God they didn't, no.

23       Q.   Okay.  Thank you.

24         Now, on Page 27 of your report -- let's see,

25  I'm wrong on that.

```
1              ADAM BREEDEN, ESQ.:  I object, then.
2              CRAIG ANDERSON, ESQ.:  Yes, yes.  Or you
3    should sustain it.
     BY CRAIG ANDERSON, ESQ.:
4
5         Q.   There's -- and I have the page wrong.  But
6    your statement was (as read):
7              "That the two individuals inside the
8    apartment did not have an objectively reasonable
9    opportunity to comprehend what is happening."
10        A.   Uh-huh.
11        Q.   Okay.  And what did you mean by that, "That
12   the two individuals inside the apartment did not have
13   an objectively reasonable opportunity to comprehend
14   what is happening"?
15             ADAM BREEDEN, ESQ.:  Craig, I'm sorry.  Do
16   you have an actual paragraph citation that you're
17   reading from so the expert can look at what was written
18   verbatim?
19             CRAIG ANDERSON, ESQ.:  I'll have to find it.
20   So, I'll come back to that.
21             ADAM BREEDEN, ESQ.:  Again, I'm -- just for
22   the record, I'm going to object to form on that,
23   that --
24             CRAIG ANDERSON, ESQ.:  Yeah.
25             ADAM BREEDEN, ESQ.:  -- it may
```

1    mischaracterize the statement in the report.

2                CRAIG ANDERSON, ESQ.:  Yeah, we'll come back

3    to it, Counselor.

4    BY CRAIG ANDERSON, ESQ.:

5        Q.    Okay.  So, I want to move on to, more

6    specifically, your opinions right now.  So, in this

7    case, you were tasked with examining, as you basically

8    said, from the entire situation -- from the time of the

9    murder of the Thomas individual up and through the

10   shooting of Isaiah Williams; correct?

11       A.    Yes, sir.

12       Q.    Okay.

13             And you would agree that the homicide

14   detectives obtained a valid search warrant for the

15   apartment of 3050 South Nellis Boulevard or do you

16   dispute that?

17       A.    It was a legal search warrant.  But as I said

18   in my report, it fell below the agency's standards per

19   the CIRT report when it was reviewed by not only the

20   investigator, but other individuals that reviewed that

21   report.  And -- and so -- you know, so it fell below

22   their departmental or agency standard.

23       Q.    Okay.  But you would agree that a judge

24   signed the search warrant and a district attorney

25   approved the search warrant?

```
1         A.    Best of my understanding, yes.
2         Q.    Okay.  And so, although Metro had -- or
3   Las Vegas Metropolitan Police Department has higher
4   standards, the search warrant was valid and could be
5   executed?
6         A.    Yes.
7         Q.    Okay.
8         A.    Yes.
9         Q.    Now, as a SWAT team, when they get the search
10  warrant, they don't go back and reinvestigate the facts
11  that led to the search warrant, correct, they trust the
12  document that was signed by the judge?
13        A.    Yes.
14        Q.    And in this case, SWAT captain, Brian Cole,
15  approved that SWAT would actually serve the search
16  warrant; correct?
17        A.    Ultimately he did.
18        Q.    Okay.  Yes.  And I mean, there was a lot of
19  back-and-forth; correct?
20        A.    A lot of back-and-forth.
21        Q.    And that's a good thing; right?
22        A.    Not in this particular case it wasn't.
23        Q.    Okay.  Why not?
24        A.    Well, because the officers that were
25  preparing the -- the search -- the IAP, the incident
```

42

1   action -- or had -- the two detectives, Grimmett and

2   Solano, had not been trained in the new SWAT IAP.

3            And I think it went back for revision -- was

4   ordered back by Captain Cole at least three or four

5   times for additional work and additional revisions.

6   And there were lots of issues surrounding whether or

7   not -- there -- there was a great -- you know, from

8   reading the CIRT report and the other statements that

9   I -- or certainly in the CIRT report, it talks about

10  the back-and-forth that went between homicide and SWAT

11  regarding whether or not this warrant was appropriate

12  for SWAT to serve.

13           So, there was -- there was -- I think it's

14  fair to say there was substantial disagreement about

15  that particular issue.

16       Q.   Okay.  And that's good dialogue to have

17  between departments, right, to express concerns and to

18  resolve those concerns and not just rubber stamp

19  things?

20       A.   Correct.

21       Q.   And eventually Cole did approve that SWAT

22  would search the -- would serve the search warrant?

23       A.   He did.

24       Q.   Okay.

25           And then, once the captain approved that the

1  warrant's going to be served, then a SWAT team is

2  assembled and the team then determines the best method

3  to serve that warrant; is that your understanding?

4      A.   Yes, sir.

5      Q.   And is that standard SWAT protocol and

6  training?

7      A.   I don't know that I would say it's standard.

8  I think that goes agency by agency as to exactly what

9  tactics will or -- or won't be used.  I can tell you

10 that, in my experience, once the -- there would be

11 discussion between the chief of police and the SWAT

12 team commander regarding -- I don't think that's

13 uncommon at all in agencies.

14         Or if it's not the chief or the sheriff, it's

15 certainly one of the command-level officers.  So, I

16 think it goes -- I think that's a variable that may

17 differ from agency to agency, quite honestly.

18     Q.   Okay.  And do you have any criticisms of the

19 hierarchy and protocol the Las Vegas Metropolitan

20 Police Department had in place?  Not the decisions in

21 this case, but the protocol that they had in place to

22 execute a search -- or to serve a search warrant.

23     A.   I was surprised -- I don't -- I don't know if

24 I call it a criticism.  But I will tell you that I was

25 surprised that a deputy -- at least a deputy chief

1   didn't review -- didn't review the incident accident

2   plan.

3          Q.    Okay.

4          A.    I was surprised by that.  I -- you know,

5   again, I'm -- I'm not familiar with enough with the

6   LVMPD chain of command.  But I'm -- I'm surprised that

7   it -- that responsibility did not have a higher level

8   review.

9          Q.    Okay.  And so, that's not necessarily a

10  criticism or saying it's outside of standard practice,

11  it was just surprising to you based on your experience?

12         A.    I found it unusual, yes.

13         Q.    Okay.

14                And do you agree that this was a high-risk

15  search warrant?

16         A.    Actually, I don't.

17         Q.    Okay.

18         A.    I don't -- I don't agree with that.

19         Q.    Why not?

20         A.    Because the lack of actionable intelligence

21  that the officers -- the -- the -- the detectives

22  developed and that the SWAT team had at the time.  I

23  didn't -- I didn't feel that -- the action -- that

24  there was sufficient intelligence to support -- that

25  would support the use of a SWAT team in this particular

Mamba Reporting, #119F
www.mambareporting.com                    (702) 401-3985
                                          mambareporting@gmail.com

1   case.

2       Q.    Okay.  So, in your opinion, SWAT should not

3   have even served -- should not have even been serving

4   the warrant?

5       A.    I'm not saying SWAT shouldn't have -- what

6   I'm saying is:  The SWAT team had no idea who was

7   inside that apartment or they had no -- they -- and not

8   that it was necessarily -- you know, I felt, quite

9   honestly, that Captain Cole made an egregious error by

10  approving this IAP based upon the inefficiency or

11  deficiency of actionable intelligence that was

12  available at the time.

13      Q.    And when you said you were critical of the

14  fact that they did not know who was in the apartment,

15  that's not uncommon when search warrants are served;

16  correct?

17      A.    Well, they were there looking for two -- they

18  were there looking for a firearm, is my understanding.

19  And perhaps two individuals, as Wattsel, Rembert, and

20  Corvell Fisher.

21          Okay.  So, they were looking for a small

22  caliber handgun that was alleged -- allegedly used for

23  the Nicolas Thomas homicide.  And even though they had

24  no arrest warrants -- warrants for Mr. -- Mr. Rembert

25  or Mr. Corvell Fisher, he -- they were certainly

1  subjects that they were interested in locating.

2          And I saw -- as I read through the CIRT

3  report and other documents related to this case, I just

4  couldn't connect the dots as to why they believed --

5  why these detectives believed or that they established

6  to a degree of more likely than not that they would

7  find that particular weapon or either one of these

8  individuals inside that apartment.  I didn't see a

9  link.

10      **Q.    Okay.  And who characterized the warrant as a**

11 **high-risk search warrant?  Who made that determination?**

12      A.    I believe the detectives that were -- I don't

13 know who made the final decision that it was.  I don't

14 think it should have been a -- considered a high risk.

15 But I believe the detectives, Grimmett and Solano, put

16 this forward and that they believed -- they -- they --

17 their narrative was -- their narrative during the

18 course of their investigation, as I recall -- and it's

19 been a while since I've read the entire file, so I hope

20 I'm -- I'm -- I'm remembering this correctly -- but

21 the -- the narrative of Grimmett and Solano was that

22 these are bad actors, that Rembert and Fisher are bad

23 guys, they're -- they're -- they're outlaws, okay, and

24 they're dangerous guys.

25          There was some conversation of -- and during

1   the course of their investigation, they linked Rembert

2   to another shooting in an apartment complex where he --

3   where he allegedly shot up another drug dealer's car.

4   And there was also another -- so that was the only

5   thing that I saw, other than Janetta Rembert and her --

6   Ty'Shawn -- her son, Ty'Shawn, saying that he thought

7   that they were using that apartment as a flophouse.

8       Q.    Correct.

9       A.    Okay.  So -- so, as I recall the -- the --

10  the facts of the case -- so, we have Wattsel -- you

11  know, we got Ty'Shawn -- I don't know if -- is his last

12  name Rembert or did he have a different last name?  But

13  you know who I'm talking about.

14      Q.    Yeah.

15      A.    When -- when Grimmett and Solano interviewed

16  Janetta, she was sitting in front of them.  But

17  Ty'Shawn wasn't.  He's on the telephone.  And so,

18  they're getting this information from Ty'Shawn, a

19  person they don't even see.

20           But Ty'Shawn's saying, "Okay.  I think

21  Wattsell hangs out there."  I think -- I -- he didn't

22  use the word "hang out."  But that Wattsell frequents

23  that apartment; right?

24           And then there was evidence they had from

25  Corvell Fisher's ankle monitor that he had one time

1    been at that apartment for approximately one hour.  And

2    that -- also that Corvell Fisher was alleged to have

3    been seen in that apartment complex carrying a military

4    style rifle at some point in time.  Okay?

5           So, based upon those two pieces of

6    information, it's my recollection that

7    Detectives Grimmett and Solano characterized this as a

8    high-risk -- that this was a high-risk situation.  And

9    even though they had not established probable cause to

10   arrest either one of them, they certainly were hoping

11   to find one or both of them in that apartment, even

12   though they had done no additional research or

13   investigation to link either one of these individuals.

14          In other words, they hadn't -- they hadn't

15   approached the apartment complex management or

16   interviewed anybody else that lived in and around or

17   worked in or around to see if these guys were actually

18   there.

19       **Q.    Okay.**

20       A.    Okay?  So, the -- the -- so, I disagree --

21   getting back to your original question.  I want to

22   come -- so, I want to come back around to your original

23   question.

24          I disagree that this was a high-risk search

25   warrant.  Because they simply did not have adequate

1  evidence, in my opinion, to establish a clear

2  connection between Wattsell, Rembert, and Corvell

3  fisher in Apartment 1125.

4      **Q.    Okay.  And so, that's a criticism against the**

5  **homicide detectives?**

6      A.    Yes, it is.

7      **Q.    Okay.  And by the time the warrant gets to**

8  **SWAT, it is characterized as a high-risk search**

9  **warrant?**

10      A.    It is.

11      **Q.    Okay.**

12      A.    And I think it was inaccurately

13  characterized -- or inaccurately characterized as a

14  high-risk warrant.  I don't think it should have been

15  characterized as a high-risk warrant.

16      **Q.    But the SWAT team is entitled to rely upon**

17  **that because they don't go back and redo the**

18  **investigation; correct?**

19      A.    No, the SWAT team -- see, this is -- and this

20  is a failure of Captain Cole and Lieutenant O'Daniel.

21  Because I believe they were in the loop of this

22  back-and-forth that was going on between homicide and

23  SWAT in the development of the IAP.

24          And they were certainly aware -- or should --

25  either knew or should have known and should have looked

1  at the detectives' investigation and said, "Wait a

2  minute -- wait a minute, I don't see -- I don't see

3  this" -- and I think that there was -- I don't think

4  it's in the CIRT report, I don't think anybody's

5  admitted to it, but I think there was certainly

6  some concern on the part of Cole and O'Daniel as to

7  whether or not this really was an appropriate SWAT

8  mission.

9      Q.    Okay.  And so, Captain Cole, as the ultimate

10  decision-maker for SWAT, it's your opinion should have

11  caught that and either not served it or not accepted

12  the high-risk classification?

13      A.    Either he or Lieutenant O'Daniel.  Both,

14  quite honestly.  I think that -- I think that they

15  absolutely should have had a face-to-face sitdown

16  meeting with these homicide detectives and the

17  homicide -- and really drilled down on what evidence do

18  we have that either -- what -- you know, I'm not

19  dismissing the fact that Watsell Rembert and

20  Corvell Fisher are bad guys or dangerous guys.

21      Q.    Right.

22      A.    I'm not dismissing that at all.  I think they

23  clearly were.  I just don't think there was any

24  evidence linking them to -- I don't think there was

25  sufficient evidence linking them to that apartment.

1    And that should have been caught by Captain Cole and
2    Lieutenant O'Daniel.
3         Q.    Okay.   And so, when any officer's determining
4    whether to characterize a search warrant as a high-risk
5    search warrant, what factors should they be looking at?
6    What takes a regular search warrant to a high-risk
7    search warrant?
8         A.    The potential for violence.
9         Q.    Okay.
10        A.    Or the level of resistance.   I mean, there's
11   four levels of resistance.   If -- there's passive,
12   active, aggressive, and aggravated-aggressive are the
13   four levels of resistance.   If they're expecting
14   aggravated-aggressive resistance, which would involve
15   use of weapons or certainly assault of individuals --
16   violent individuals, then I think yes.   Then it -- you
17   know, if it -- it rises to that level of aggravated --
18   you know, that they're expecting -- or they expect
19   there's certainly a potential for aggravated-aggressive
20   resistance when they serve the warrant, then I think
21   that it -- that it does rise to the level of a
22   high-risk warrant.   Absolutely.
23        Q.    Okay.   So, the potential for violence is what
24   transforms a routine search warrant to a high-risk
25   search warrant?

```
1        A.    Certainly.

2        Q.    Okay.

3        A.    Now, if they had developed -- and I just want

4   to be sure -- I want to be very clear on this

5   particular point.  Because I think it's key to my

6   analysis and opinions that I've rendered in this.

7              If -- if -- if -- if a -- if these detectives

8   and -- you know, had established a very clear link

9   between these guys -- either one of these guys and this

10  apartment, then, yes, I think it would have risen --

11  risen to a level of high risk.  But they didn't.

12  And -- O'Daniel and Capital Cole -- Lieutenant

13  O'Daniel, she is the tactical commander and Captain

14  Cole is the bureau commander, that's their job, is to

15  catch that kind of stuff, is to review these incident

16  action plans and say, "Hey, we don't see this here."

17             Because, you know, when you put a

18  paramilitary unit like a SWAT team out there with these

19  types of weapons and these types of resources, that is

20  where -- is why we're here today.  Horrible things can

21  happen.

22       Q.    Okay.  And so, just to summarize -- and so,

23  correct me if I'm wrong -- your criticism of

24  classifying it as a high-risk search warrant was

25  because there was not sufficient information to put
```

1    either of the two aspects in the apartment at the time
2    of the service?
3         A.    Yes.
4         Q.    Okay.
5              So, understanding that opinion, assuming -- I
6    mean, well, we do know they served it as a high-risk
7    search warrant.  So, there's multiple ways to serve a
8    high-risk search warrant; correct?
9         A.    Yes, sir.
10        Q.    And what --
11        A.    Before we -- before we go to the next
12   question, can I take a bathroom break real quick?
13        Q.    Yeah, let's take -- it's been an hour.  Let's
14   take -- you want to take five, ten minutes?
15        A.    Five minutes is all I need.  Thank you, sir.
16        Q.    No problem.
17             (Pause in the proceedings.)
18   BY CRAIG ANDERSON, ESQ.:
19        Q.    Mr. Gilbertson, you understand you're still
20   under oath; correct?
21        A.    I do, sir.
22        Q.    Okay.  So, we had just gotten to the point --
23   we're going to start talking about the service of the
24   high-risk search warrant.  And you agreed that there's
25   multiple ways to serve a high-risk search warrant;

Mamba Reporting, #119F
www.mambareporting.com                    (702) 401-3985
                                  mambareporting@gmail.com

54

```
 1   correct?
 2        A.   Yes, sir.
 3        Q.   Okay.  And what the SWAT team's job is to
 4   serve the warrant in a way that is reasonable; do you
 5   agree with that?
 6        A.   Yes.
 7        Q.   Okay.
 8             And in this case, the two options that have
 9   been discussed a lot is they could have served it as
10   either a surround-and-callout, also known as a SACO, or
11   a controlled entry technique -- or a controlled entry
12   technique known as a CET; is that correct?
13        A.   Yes, sir.
14        Q.   Are there other ways they could have served
15   the warrant -- well, I mean, I know there are.  But are
16   there other options that you would put that the SWAT
17   team should have considered?
18        A.   Not for -- not for -- for high risk, if it
19   were -- if this -- again, we've already discussed this.
20   But those are the two primary means you'd serve a
21   high-risk warrant.  So, I'll just leave it at that.
22        Q.   And it's your opinion that this warrant
23   should have been served as a SACO or a
24   surround-and-callout warrant?
25        A.   That's correct, sir.
```

1        Q.    Okay.    And what is the basis for that

2    opinion?

3        A.    Well, even if, you know, the -- even in

4    the -- in the CIRT report, it cites the fact that

5    surround-and-calloutout is inherently safer for the

6    SWAT -- for everyone concerned, quite honestly.

7    Because, again, you're not making a forceable entry

8    into a domicile.

9              I can tell you that making a forceable entry

10   into a domicile is probably one of the most dangerous

11   things a police officer ever does other than perhaps

12   a -- a traffic stop.    But, certainly, it's because

13   you're entering somebody's domicile by force.    And just

14   the very nature of that, I think most of us would

15   expect you're probably going to encounter some

16   resistance of some type.

17       Q.    Okay.

18             And in reaching your opinion that you

19   believed the SACO was the more appropriate method, did

20   you rely on any national standards or policies in

21   reaching that opinion?

22       A.    I read through the IACP SWAT policy -- the

23   SWAT paper through the IACP and they talk about -- you

24   know, they talk about that in there.    But just based

25   upon -- you know, we had those -- you know, we had --

```
1    not that much -- I mean, it's been a long time since
2    I -- a very long time -- it doesn't seem like it's
3    been -- but it's been a long time since I did SWAT.  It
4    seems like it was yesterday.
5              But be that as it may, it's just -- it just
6    is a much safer -- because, again, you're -- you're
7    bringing people out to you, you're not entering into
8    their domicile.  You're not -- you're not going into
9    the -- the cave -- the bear's cave.  You know what I'm
10   saying?  I mean, you're calling them out to you.  It's
11   a much more controlled situation and -- yeah.
12             The other thing, too, is it -- it just
13   pose -- it just poses less risk to the people that
14   you're there to arrest or search, it poses less risk to
15   the officers, it poses less risk to anybody who might
16   be exposed.
17        Q.   Okay.
18             And is it your opinion in this case -- help
19   me understand -- that the SACO was just a better option
20   than the CET or that the CET violated industry
21   standards and practices?
22        A.   Well, I guess that depends on who you talk
23   to.  Because I've seen it couched both ways.
24        Q.   Okay.  So, it's a discretionary decision that
25   the SWAT team -- or the SWAT team leader makes?
```

```
 1        A.    It's a -- it's a tactical -- actually, it's
 2   up to the -- I think it's up to the bureau commander.
 3   A team leader would forward their IAP, I would think,
 4   to the tactical commander for review; and then the
 5   tactical commander would either accept it or reject it.
 6   And if they accept -- I would still think they would --
 7   the bureau commander would -- would be in the
 8   decision -- you know, the final authorization, the
 9   final decision-maker as to whether or not it was going
10   to be a CET or whether -- whether it was or it wasn't.
11        Q.    Okay.  And I'll represent to you that
12   Lieutenant O'Daniel approved the CET.  Is that your
13   understanding or do you have a different understanding?
14        A.    That's my understanding.
15        Q.    Okay.
16        A.    I'm not -- but I don't know that Captain Cole
17   approved it.  I believe she approved it.  I don't know
18   that Captain Cole necessarily approved that.
19        Q.    Yeah, and I think you're correct.  I mean,
20   I'm not speaking either.  But I do believe you're
21   correct.
22        A.    And certainly no one above a captain -- no
23   one above Captain Cole -- again, as we discussed
24   earlier -- reviewed -- reviewed that IAP prior to it --
25   again, no deputy chief or someone on -- you know, in
```

1    the direct command and staff, chain of command reviewed

2    that, to my understanding.

3        Q.    Okay.  So, if a SWAT team was looking at

4    executing a high-risk search warrant -- I'm making a

5    hypothetical here.

6            So, a SWAT team is looking at executing a

7    high-risk search warrant and they're deciding between a

8    SACO and a CET, what factors do they look at to

9    determine which is the better option?

10       A.    Well, certainly the threat level they're

11   facing and -- well, the environment that they're --

12   they're serving it in.  I know there was discussion --

13   one of the considerations they had here was the fact

14   that they were afraid that -- they used a phrase

15   "tunneling" from one apartment to the next.

16           I didn't find that to be a -- a compelling

17   argument.  That could have easily been overcome by

18   simply -- since this was a ground floor apartment,

19   they -- there's -- there was only one other apartment

20   that they could have possibly tunneled to, unless they

21   were going to go up above.  But even if they decided to

22   go -- whether they were going to go to the side or up,

23   that would have taken -- you know, two patrol officers

24   could have been positioned in those apartments to

25   safeguard against that possibility.

1    Q.    Okay.

2    A.    The other, you know -- so, again, it -- it

3    just befuddles me to try to figure out why -- why they

4    didn't do a surround-and-callout.

5    Q.    Okay.  So, **explain to me -- not with the**

6    **facts of this case.  But when would a CET be a better**

7    **option than a SACO?**

8    A.    I have to go to the door for just one second.

9    Just give me one minute, please.

10    Q.    **Yeah.**

11    A.    And then I'll be right back.  Okay?

12          (Pause in the proceedings.)

13          (The court reporter read back the prior

14          question and answer prior to going back on

15          the record.)

16          THE WITNESS:  Well, the one that comes

17    immediately to mind would be a hostage rescue.  If --

18    if someone were being held against their will, I

19    believe in that particular situation and -- and -- so,

20    you know, if you had innocent life, it was a verified

21    kidnapping or other type of hostage situation, I think

22    a CET would be a preferred option.

23          If you had actionable intelligence -- that

24    would be No. 1.  No. 2 would be if you had actionable

25    intelligence that the subjects in the domicile -- if

1    it's going to a domicile -- which I'm just going to

2    presume that we are -- if they're -- if they are

3    heavily armed -- if they are heavily armed, then I

4    think that a CE- -- but not in all instances, but

5    certainly in some instances -- most instances, I think

6    a CET at that point would also be -- you know, you

7    would want the element of surprise and shock and awe

8    going in, overwhelm the suspects with police presence

9    and show of force.  So, those are the two that come

10   immediately to mind.

11   BY CRAIG ANDERSON, ESQ.:

12       Q.   Okay.  So, these are judgment calls that the

13   SWAT team is making using their discretion and training

14   and experience for each time they serve one; correct?

15       A.   My understanding.

16       Q.   Okay.

17            Now, what is your under- -- who -- based upon

18   your review of the record, who was the team leader in

19   this case?

20       A.   It was the -- what was his name?

21       Q.   Is it -- do you agree it's Garth Findley?

22       A.   I believe that is the name.  I -- I believe

23   that is the person, yes.

24       Q.   Okay.  And I'm -- the reason -- I mean, this

25   isn't a memory test.  But it's my understanding that

1    Sergeant Findley was the team leader and the assistant

2    team leader was Jake Werner.  Is that --

3         A.   That's -- that's the name I was looking -- it

4    was -- I knew -- yeah, Werner was the assistant team

5    leader, correct.

6         Q.   And then it's also my understanding that

7    Sergeant Backman was training as a sergeant under

8    Findley.  So, he was working with Findley.  Do you

9    agree with that?

10        A.   Yes.

11        Q.   Okay.

12             And so, it's my understanding that the team

13   leaders formulated the plan, determined that a CET was

14   the best option, and ran that up to Lieutenant O'Daniel

15   for approval, which was granted.  Is that your

16   understanding as to how this worked?

17        A.   Yes, sir.

18        Q.   Now, when you're part of a SWAT team and

19   you're not a team leader or an assistant team leader,

20   do you have obligations to also review the plan and

21   provide your input or do you rely upon your team

22   leaders to make the best decisions for the team?

23        A.   Well, I think that depends upon the culture

24   of that team.

25        Q.   Okay.

```
1         A.    I think you have some -- I think in how --
2    you know, the hierarchy involved, I think it goes down
3    to individual agency culture.
4         Q.    Okay.  And when you -- since you were never
5    like a -- the official team leader on a SWAT search
6    warrant, would you have then -- would you have reviewed
7    the plans and made your opinions as to how it should be
8    executed or did you rely on your team leaders?
9         A.    No, I would -- we all reviewed the plan.  We
10   were all expected to review the plan.  And if we had
11   concerns -- you know, in -- in the culture that I
12   worked in, if we had concerns about our plan, we had
13   the opportunity to share those concerns --
14        Q.    Okay.
15        A.    -- prior to executing the mission.
16        Q.    Okay.  I want to move onto the approval of
17   the noise distract devices.  Okay?
18        A.    Yes, sir.
19        Q.    Lieutenant O'Daniel approved the use of a
20   stun stick and a 9 Banger; is that correct?
21        A.    It's my understanding, yep.
22        Q.    Okay.  In your time as a SWAT officer, did
23   you ever use a stun stick?
24        A.    No, I didn't use a stun stick.
25        Q.    Okay.  Did you use anything similar to a stun
```

1    stick?

2        A.    Well, we used -- our -- our traditional --

3    our noise -- noise flash distraction devices were

4    typically canister size, about six inches tall, you

5    know, pretty -- pretty traditional, pretty basic.  So,

6    I don't have any personal experience -- you know, but

7    the -- the effect is the same.  You get one, large

8    explosion, but the -- I didn't use those two particular

9    items, those -- I don't -- I don't have experience with

10   those two particular devices.  But I certainly

11   understand and I've looked at them online and --

12       Q.    And you testified that your time in SWAT

13   seems like yesterday, but I guess we're all getting

14   older.  It's been 31 years; correct?

15       A.    I guess so, yeah.

16       Q.    Yeah.

17       A.    Yeah, thanks for reminding me.

18       Q.    Hey, I --

19            ADAM BREEDEN, ESQ.:  I object to the

20   harassment and battering of this witness.

21   BY CRAIG ANDERSON, ESQ.:

22       Q.    Well, I --

23       A.    Yeah, is that -- is that witness abuse at

24   some point?

25       Q.    It's elder abuse.  Okay.  But I graduated

1    college in '93, so it's hard for me to say that, too.

2    Okay?

3              So, I mean, the only point I'm making is SWAT

4    munitions and tactics and what's available to them have

5    changed in that time; correct?

6        A.    They have evolved, yes.

7        Q.    Yes, they have evolved.

8              And you've never been trained in the use of a

9    stun stick?

10       A.    No.

11       Q.    Okay.  And you've never been trained in the

12   use of a 9 Bang?

13       A.    No.

14       Q.    And why are you critical of the uses of

15   the -- we'll just call them the distraction devices.

16   What's your problem with them?

17       A.    Well, it's -- it was noted in the CIRT

18   report.  The -- they didn't know -- these are explosive

19   devices.  And even in ideal circumstances, they can

20   be injurious to people.  Just -- it would be -- if --

21   if the exposure -- if -- if they're placed too close to

22   human flesh, they -- I've -- I was aware of another

23   agency in Georgia at the time when I -- we were using

24   just traditional grenade -- what we called the

25   flash-bang grenades.

1      Q.    Yeah.

2      A.    And some -- a guy threw in -- one in through

3   a window and it -- it landed on a person's abdomen.

4   There was -- laying in bed and it blew him wide open.

5   I mean, these things can be horribly injurious.

6          And, again, the CIRT report criticized the

7   use of -- the use of these devices and I concur with

8   the criticism in that they didn't know if they were

9   elder people, if there were children in the apartment,

10  if there was disabled people in the apartment.

11         You know, they didn't know how many people

12  were there.  There was just too much opportunity for

13  things to go wrong.  Because you have to be careful how

14  you deploy these -- these -- these devices to avoid

15  injuring -- potentially -- to -- to avoid injuring

16  anyone, but certainly innocent bystanders that may be

17  present.

18     Q.    Okay.  Are you critical of using the 9 Banger

19  outside the apartment?

20     A.    I'm not critical of -- of it being outside.

21  I'm critical of the device that was inserted into

22  the -- into the apartment.

23     Q.    Okay.  So, your criticism is of

24  Officer Bertuccini's insertion of the stun stick on

25  a -- with the pole into the window?

1    A.    Yes.

2    Q.    **Do you know what standard SWAT guidelines**

3  **recommend for how far those should be deployed away**

4  **from an individual?**

5    A.    I'm sure it's several feet.  I don't know the

6  exact footage.  But I'm sure -- I'm sure it's several

7  feet away.  Because it was years ago and they weren't

8  nearly as sophisticated as they are today.

9    Q.    **Okay.  The National Tactical Officers**

10 **Association says five feet.  Do you --**

11   A.    I'd say that's very reasonable, yes.  I was

12 going to -- I didn't want to guess.  So, I -- but I

13 think five to six feet would be reasonable, yes.

14   Q.    **Okay.  And do you understand that the use of**

15 **the pole is to make sure that distance is maintained,**

16 **regardless of whether an individual could be located?**

17   A.    That's what I would presume.  That's why it's

18 on a pole, yeah.  Or a stick, yeah.

19   Q.    **So, would you agree or disagree that**

20 **Officer Bertuccini complied with the industry standards**

21 **set forth in the National Tactical Officers Association**

22 **by inserting the stun stick the way he did?**

23   A.    I don't think there's any evidence the stun

24 stick itself caused anyone injury.

25   Q.    **Correct.  Okay.  Thank you.**

1    Now, you're critical in your report of
2  Lieutenant O'Daniel allowing Sergeant Backman to
3  participate in the planning and execution; correct?
4       A.   Yes.
5       Q.   Okay.  Now, you would agree that he was, for
6  lack of a better term, shadowing or following
7  Garth Findley; correct?
8       A.   No.  I think he was an active participant in
9  the plan -- in both the planning and the execution.  I
10 don't think -- I think his role was -- of -- of all the
11 things about this case that troubled me -- and there
12 are -- are many -- Sergeant Backman's participation,
13 especially in the planning and both -- in both and -- I
14 mean, the planning -- just is shocking to me that he
15 was involved in the planning at all.
16      If he had simply been there, not as a
17 participant but let's say as an observer -- but he
18 wasn't -- he wasn't an observer.  He had a critical
19 mission in the execution -- either both the planning
20 and the execution of -- of this event.  So, I -- I'm
21 just shocked by it, quite honestly.
22      Q.   Okay.  And based upon your review of the
23 record, were all of his decisions and opinions reviewed
24 by Sergeant Findley and Lieutenant O'Daniel?
25      A.   Well, I don't know.  I -- I don't know if

1    they did or they didn't.

2         **Q.    Okay.  What --**

3         A.    I didn't -- I didn't say any conclusion -- I

4    mean, I know that Lieutenant O'Daniel supposedly -- or

5    reports that she reviewed the IAP.  I'm -- I'm puzzled

6    that she approved it.  Very puzzled that she approved

7    it.  I don't know -- I presume Sergeant Findley did.

8    And I'm puzzled that he put it forward -- that he

9    allowed it to go forward.  So, I mean, I -- I just

10   fundamentally disagree with -- with the IAP in this

11   particular mission.

12        **Q.    Okay.  And what you disagree with the IAP was**

13   **that it was served as a CET and that the distractive**

14   **devices were used?  That those should have been caught**

15   **by the -- by Lieutenant O'Daniel and --**

16        A.    Well, there's -- yeah, I -- I mean, I think

17   that -- the -- the flash -- the noise flash distraction

18   devices.  I mean, the other thing they admit is a lot

19   of smoke.  They admit smoke.  And so, if you -- if

20   you're -- I just think, you know, they're -- they're an

21   explosive device.  And I -- again, just along with the

22   CET, I mean, battering down the door, I mean, I just --

23   I -- I just think it was -- all around it was

24   excessive.

25             I mean, both the use of the battering ram --

1  I believe -- it's my opinion -- analysis and opinion

2  that the use of the battering ram and the use of

3  noise/flash distraction devices were both excessive

4  measures.

5    **Q.    And when you performed high-risk search**

6  **warrants, did you ever use battering rams in**

7  **conjunction with distraction devices?**

8    A.    No.  Not in conjunction, no.  We very rarely

9  used noise/flash distraction devices.  Even if it

10  was -- even if it was what we considered to be a risky

11  or -- or -- or an increased risk operation.  We very

12  rarely used them.

13    **Q.    Do you know why that was?**

14    A.    They're dangerous.  They're very -- they can

15  start -- well, not only are they dangerous to humans,

16  but they've been known to start fires, as well.

17    **Q.    Okay.  And --**

18    A.    At least -- at least back in the Stone Age

19  when I was doing it, they were known to -- you know,

20  not just dangerous but also to be incendiary.

21    **Q.    And I would agree with you, flash-bangs were**

22  **known to be incendiary and start fires and they were**

23  **difficult to control.  Because you just threw them in;**

24  **correct?**

25    A.    Correct.

1     Q.   And you would agree that these tactical

2  devices have changed over the last 31 years?

3     A.   To some degree.

4     Q.   And you're not trained or familiar with the

5  changes that are made or what the capabilities of these

6  devices are currently?

7     A.   Well, I've looked at -- I've looked at them

8  online and I've looked at them being -- you know, being

9  demonstrated.  And, I mean, yes, I would say -- I don't

10  know that they're as incendiary as they once were, but

11  they certainly are -- they certainly do -- I -- I --

12  it -- in my analysis and opinion, these types of

13  devices should only be used in the most extreme cases

14  like I talked about earlier.  You know, where you know

15  the individuals are heavily armed or perhaps it is some

16  type of a hostage situation -- a hostage rescue

17  situation.

18     Q.   Hypothetical:  If they knew that the two

19  suspects were in the apartment -- they knew that --

20  would you be critical of the manner in which the search

21  warrant was executed?

22     A.   Is your -- if -- if they had -- if they had

23  had actionable intelligence that Wattsell and

24  Rembert -- fresh actionable intelligence -- and by

25  "fresh," I mean within let's just say 24 hours -- that

1    these individuals were actually occupying or at that

2    apartment, then no, I would not.

3        Q.   Okay.  So, your criticism, again, is similar

4    to the use of the CET, that they lacked sufficient

5    information to justify the use of these tactics because

6    they did not know whether or not anyone or who was in

7    the apartment?

8        A.   Correct.  And Sergeant Findley, being a

9    sergeant, being a trained supervisor, and also being a

10   SWAT tactical officer, should have -- should have

11   recognized that fact.  He should have -- as he's

12   developing that, he should have recognized that the --

13   that the intelligence that they had was literally

14   nonexistent.  And so should Lieutenant O'Daniel and so

15   should Captain Cole, you know, right -- right on up the

16   line.

17       Q.   Okay.  I'm ready to move on.  Have I given

18   you an opportunity to express all of your opinions

19   regarding the distraction devices --

20       A.   Yes, sir.

21       Q.   -- or do you -- okay.

22            So, now, let's move to the execution of the

23   knock and announce.  Okay?

24       A.   Okay.

25       Q.   Now, one thing you point out is that they

1    failed to physically knock on the door; correct?

2        A.    Correct.

3        Q.    Is it your understanding, based upon current

4    SWAT training and practice, that a physical knock is

5    required?

6        A.    Yes.

7        Q.    Where is that from?

8        A.    Case law that I've seen.

9        Q.    And it's not a test, but do you know the

10   names of any cases that require that?

11       A.    I'd have to go back and look at it.  But I --

12   I know that there's case law on that particular -- I

13   know there's case law on that and that a physical knock

14   is required.  That's why they call it "knock and

15   announce."

16       Q.    Okay.  And so, part of your opinion in this

17   case is that they failed to physically knock on the

18   door and it's your understanding that that is a legal

19   requirement found in case law?

20       A.    Yes.

21       Q.    Okay.

22             Now, assuming that to be correct, would you

23   agree that the first use of the battering ram

24   constituted a knock?

25       A.    No.

```
 1        Q.    Why not?
 2        A.    Because it's not a knock.  It's a -- it's --
 3   the knock and announce is to give the -- whoever is
 4   inside the domicile the opportunity to understand --
 5   to -- to recognize and understand that the people that
 6   are outside the door are law enforcement officers.
 7             Any thug or hoodlum can come batter your door
 8   down.  They're not going to announce -- they're not
 9   going to knock and announce.  Any burglar or home
10   invader could come and knock down your door, which is
11   why it's critical in these types of warrant services
12   that not only that you do knock and clearly announce
13   and identify yourself of who you are, but that you
14   give -- you give the occupants time to, for example, to
15   look out the window or look out their peephole and
16   actually visually verify that they're not opening the
17   door to a home invader or some other nefarious
18   individual.
19        Q.    And you were critical of the first
20   announcement because the actual unit number was not
21   read; correct?
22        A.    That's correct.  And he -- and he -- and he
23   didn't knock.
24        Q.    Okay.  Understood.
25             And he was using a bullhorn; correct?
```

74

```
 1        A.    That's my understanding.
 2        Q.    And is that a good thing?
 3        A.    Yeah, that's a good -- that's -- yeah.
 4   There's nothing wrong with that.
 5        Q.    Now, the officers began the dynamic entry by
 6   striking the door after the second announcement; is
 7   that correct?
 8        A.    That's my recollection.  I believe that is --
 9   I believe after the -- I believe -- the first blow from
10   the battering ram came as the second announcement was
11   ending.
12        Q.    Correct.  And you state that is below law
13   enforcement standards?
14        A.    What paragraph are we referring to?
15        Q.    Let me see.  On Page -- I'm on Page 19 of
16   your initial report.
17        A.    Okay.  Let me get there, please.
18        Q.    Me too.
19        A.    Pardon me.  I'm sorry.  I was looking at the
20   wrong report.  Let me get there.  Page 19, Paragraph
21   No. --
22        Q.    I think we're on Paragraph 58.
23        A.    Okay.  Let me read it real quick.
24        Q.    Yeah, go ahead and read it.
25        A.    (As read):
```

1    "Concluded at 4:59 while two to three seconds
2    later, 51 -- the first use of force by breaking a
3    window" -- okay.  I've read it -- I read it.  Your
4    question, again, sir, was?
5         Q.   Okay.  Did you read onto the next page where
6    the last sentence says, "This falls below law
7    enforcement standards"?
8         A.   Yes, I did.
9         Q.   Okay.  What standards are you referring to?
10        A.   Well, the -- this is -- typical -- my
11   understanding from the -- from the -- you know, from
12   looking -- reviewing this, they were representing that
13   at least 16 seconds -- I saw -- I believe it was in the
14   other expert's report -- that they were trying to claim
15   it was 16 seconds allowed.
16        My understanding of law enforcement's
17   standards on this is that giving someone at least 20
18   to -- you know, at 5:00 o'clock in the morning, can a
19   person reasonably get to the door if they're awaken
20   from sleep, be woken -- to be woken up and reasonably
21   rouse themselves, perhaps get dressed and get to a door
22   and open the door, you know, look out, try to visually
23   inspect who's at their door, and reasonably open that
24   door?
25        I mean, they're hitting that -- they're

```
 1    hitting that door two to three seconds or almost
 2    simultaneously with the ending of the second
 3    announcement.  It's just -- that -- I've never seen
 4    anywhere in any of my experience or in any of my
 5    reading regarding this case or any of the other, you
 6    know, papers on SWAT that I've read -- and I've read a
 7    few -- where that's the industry standard.
 8              The industry standard, to my understanding,
 9    is at least 20 -- the person has to have anywhere from
10    at least 20 to 30 seconds to rouse themselves at
11    5:00 a.m. and get to the door and have an objectively
12    reasonable opportunity to see who's outside and -- and
13    admit them into the domicile.
14        Q.   Okay.  And do you know where you're getting
15    that 20-second industry standard from?
16        A.   I believe it was even talked about in the
17    CIRT report.
18        Q.   Okay.  And -- but do you disagree that the
19    officers physically entered at about 16 or 17 seconds?
20        A.   I don't disagree -- I -- I don't disagree
21    with that.  I disagree with the fact that the --
22    that -- that Mr. Williams and Kwame -- is his last name
23    Crockett?  Is that -- was that his last name?  Kwame --
24        Q.   I believe so.
25        A.   I disagree -- I disagree that they had 16
```

1    seconds to respond.  I -- I -- I mean, I -- I think

2    that the response time -- I think it took -- I think

3    from the time of the first announcement to the final --

4    the time they finally got the door down and actually

5    entered -- or when the first officer entered that was

6    so horribly wounded, it was about that period of time,

7    yes.

8        **Q.   And so, you're critical of the knock and**

9    **announce that they -- they didn't physically knock on**

10   **the door, they didn't give enough time for the**

11   **individuals inside the apartment to look out --**

12       A.   To wake up -- to wake up, get up out of

13   bed -- or wherever they were -- and to actually proceed

14   to the door and have an opportunity to make a

15   reasonable effort to identify who was outside their

16   door, yes, sir.

17       **Q.   Okay.  So, you would say that the industry**

18   **standard would have required a physical knock and then**

19   **at least 20 seconds?**

20       A.   From the time of the second -- you know, from

21   the time of the second announcement to the time that

22   they -- they actually began to batter that door down, I

23   think the minimum amount of time that should have been

24   afforded to them was between 20 and 30 seconds.

25       **Q.   Okay.  And you believe that's an industry**

1    standard, but you don't know where; is that correct?

2        A.    I just can't recall right now exactly where I

3    read it.  But I -- I'll go back and -- and check on

4    that.

5        Q.    Okay.

6              Is it your understanding, as an expert, that

7    there are hard-and-fast rules as to what timing is

8    reasonable when it comes to entry?

9        A.    Hard-and-fast rules?

10       Q.    Yes.  Like, are there -- like, you just said

11   20 seconds.  Like, is that, you know, an absolute that

12   if you enter faster than 20 seconds, you've acted

13   unreasonably?

14       A.    I think it depends on the totality of the

15   circumstances.  It depends on the totality of the

16   circumstances.  And, again, the level of -- you know,

17   what type -- this is -- we're talking about a search

18   warrant.  We're not talking about a hostage rescue

19   here.

20       Q.    Correct.

21       A.    And what they were specifically -- I -- and I

22   read -- I -- I read an analysis the other day talking

23   about, you know, can you enter more quickly on a drug

24   search warrant than you can on a -- you know, for

25   example, what they were looking for here was not drugs,

1   they were looking for an item -- a pistol, you know,

2   that we would presume would be made of some type of a

3   metal or alloy.

4            It's not going to be easily destroyed.  Okay?

5   If they're there to look for a handgun, that's not an

6   item that you're going to flush down the toilet or

7   throw in a fireplace and burn it up or something of

8   this nature.  You know what I mean?

9            So, I think it really depends -- I don't know

10  if there's a hard -- like I say, you know, I think

11  the -- you know, when we talk about industry

12  standards -- you know, we're talking about guidelines.

13  I don't know that there is a hard-and-fast rule for --

14  because, I mean, there was so many different opinions

15  on this particular issue.

16       **Q.   And I think you're correct.  I mean, I think**

17  **it's the totality of the circumstances depending on a**

18  **multitude of factors.**

19       A.   Right.  And so, I think that the totality of

20  the circumstances guides the -- you know, guides the

21  urgency that you need to make -- that you actually need

22  to enter the domicile.

23       **Q.   And if I understood earlier testimony -- so,**

24  **correct me here if I'm wrong because I want to try to**

25  **rephrase something you said -- if, hypothetically, SWAT**

1    is entering a domicile where they reasonably believe

2    they're going to face armed resistance, there is a

3    value in going in quickly to overwhelm, was that

4    correct or did I misunderstand you?

5         A.   No, I think that -- that's -- that's correct.

6    But that -- but that belief -- the belief that they're

7    going to encounter armed resistance needs to absolutely

8    be based on fresh, actionable intelligence.  I just

9    want to qualify that.

10        Q.   It would have to be objectively reasonably?

11        A.   Yes.

12        Q.   And you would agree that the size of the

13   dwelling is important to the totality of the

14   circumstances, like, whether you're knocking on a

15   mansion door or a motel room of 600 feet?

16        A.   Yeah, yeah, yeah.  It -- you know, everything

17   is -- all of those things, you know, go -- you know, go

18   into the -- go into the equation as to -- but

19   certainly -- but, again, certainly it's -- on -- on a

20   search warrant -- which is not an arrest warrant -- the

21   search warrant has -- I think has a much higher

22   threshold for caution -- to exercise caution than let's

23   say a high-risk arrest warrant for a -- a person that

24   they have actionable intelligence it's likely -- are

25   they know to be armed or you're going -- you know, I

```
 1   mean, the exigency for a search warrant is much lower
 2   than it is for those other -- those other -- those
 3   other missions that we discussed previously.
 4        Q.   But you would agree that each case is
 5   determined on a case-by-case basis?  Because you could
 6   have a search warrant for a property that said -- you
 7   know, is for AK-15s and, you know, scary; and you could
 8   have an arrest warrant for a tax evader who you know is
 9   likely not armed.  And so, you look at each case
10   differently?
11        A.   I think that that's fair.
12        Q.   And that was a horrible question.  So,
13   I'll sustain the objection out of basis.
14             ADAM BREEDEN, ESQ.:  Objection.
15             CRAIG ANDERSON, ESQ.:  Yeah.
16   BY CRAIG ANDERSON, ESQ.:
17        Q.   Now, do you roughly agree that the stun stick
18   was inserted into the window at about six seconds after
19   the first announcement?
20        A.   I think that's about right.
21        Q.   And --
22        A.   And there's -- and, you know, there's time --
23   I mean, there's time drift in here on this thing.  But
24   I'd say, you know, four to six seconds after the first
25   announcement, yes.
```

1    Q.    And then my question on that is:  In your

2    role as an expert, do you believe that constitutes an

3    entry into the apartment?

4    A.    No.

5    Q.    Okay.

6    A.    I believe it constitutes an intrusion into

7    the apartment.  But when I -- when I -- in -- in my

8    thought process at entry -- I mean, some people may

9    call it an entry.  I would call it an intrusion.

10   Q.    Because it's not a physical entry into a

11   person?

12   A.    It's not a -- it's not the entry -- when I

13   talk -- when I think of "entry," I'm thinking you're --

14   you're either putting a person or a K-9 in the door.

15   Q.    Okay.

16   A.    I may have -- I don't know if I used the word

17   "entry" when I was talking about the stun stick.  I may

18   have used it.  But if I did, a more accurate descriptor

19   of that would be, you know, that it was an intrusion --

20   it was a physical intrusion into the -- into the

21   domicile, though.

22   Q.    Okay.  Correct.

23         Now, I want to go back a little bit to the --

24   a surround-and-callout option.  Were you ever involved

25   in a surround-and-callout where someone fired from the

1    domicile onto the SWAT team?

2        A.    No.

3        Q.    Is that a concern during a SACO, that the

4    suspect may barricade in the apartment and fortify

5    himself and fire out at the officers or others?

6        A.    It is a concern.  It can be a concern -- I

7    mean, it -- again, it depends upon -- it depends upon

8    the intelligence that you have about who's in -- you

9    know, who's there and what type of -- you know, what

10   type of individual are they; are they a tax varied; or

11   are they a violent felon?  You know...

12       Q.    And so, there are legit concerns -- safety

13   concerns with also performing a surround-and-callout;

14   correct?

15       A.    Law enforcement's risky business.

16       Q.    And you don't -- and since you don't know

17   exactly who's in the apartment, you could cause a

18   hostage situation by performing a surround-and-callout?

19       A.    You could.  It's -- it's -- it's conceivable.

20       Q.    And, now, when we talk about the concern of

21   him burrowing into the next apartment, to put two

22   patrol officers in the next apartment would require

23   consent from the homeowners; correct?

24       A.    Yes.  Unless you -- you know, if that was

25   truly a concern -- if that was truly a concern, it

```
 1   would require -- yes, either you'd -- you'd have to
 2   have a search warrant or you would have to have their
 3   consent, yes.
 4       Q.   Now, the SWAT team in our case decided
 5   against the SACO for several reasons.  One is they felt
 6   the area was difficult to contain.  Do you agree or
 7   disagree with that reasoning?
 8       A.   I -- I looked at the photos of that apartment
 9   building and that general complex, and I didn't see any
10   particular, significant challenges to containing that
11   area, quite honestly.  I just -- so I would disagree
12   with that.
13       Q.   And they also stated that they preferred to
14   have an armored vehicle, you know, roll up to the door
15   for protection, and they didn't have that access.  Do
16   you agree or disagree with that reasoning?
17       A.   I don't disagree -- I don't -- you know,
18   armored vehicle, I mean -- again, I -- I believe an
19   armored vehicle could have been positioned and other
20   forms of cover used to provide the officers with
21   adequate safety where a surround-and-callout -- I
22   don't -- I -- I disagree with the premise surround --
23   the -- that the -- that the landscape there or whatever
24   you want to call around the building -- you know, that
25   the position of the building precluded that.  I
```

1    disagree with that -- that premise.  I believe
2    a surround-and-callout was possible and could have been
3    safely executed.
4         **Q.   Okay.  We're almost done.**
5              **I want to talk to you about your opinion**
6    **regarding tactical, once they noticed the brass wrap on**
7    **the door.**
8         A.   Okay.
9         **Q.   Your opinion is that once they realized --**
10   **well, first, your opinion is that they should have**
11   **known there was a brass wrap on the door, correct,**
12   **before they even went?**
13        A.   Absolutely.
14        **Q.   Okay.  And why do you believe -- I mean, did**
15   **you read the officers' reasons for not noticing**
16   **the brass -- why they said they didn't notice the brass**
17   **wrap?**
18        A.   Yeah, they were afraid the -- the two
19   officers -- I believe they were surveillance officers
20   that walked by the door -- and I just -- I just
21   advised -- or I didn't -- personally, I found their
22   claim that they were afraid of being discovered
23   inconsistent with my experience as a police officer.
24   I'll just leave it at that.
25        **Q.   Okay.**

```
 1        A.    I -- I don't think there was any -- I don't
 2   think there was anything that prevented them -- if
 3   they -- if they -- the way I understood it:  They
 4   come -- walking down the breezeway of the apartment,
 5   and just as they're about to get to the apartment, a
 6   couple of other guys that they -- that they perceived
 7   to be -- let's say unfriendly to law enforcement --
 8   came around the corner and that prevented them from
 9   glancing over at the door -- because they felt that
10   they glanced at the door, that that would somehow give
11   away -- why -- I'm presuming these undercover officers
12   were not in uniform, that they probably had the
13   appearance of someone that would not be unusual to be
14   seen at that apartment complex.
15             So I just -- that, to me, did not ring true.
16   I'm not going to opine on the credibility.  But even if
17   he -- taking them at their word, why didn't somebody go
18   back later, then, and take a second look or peek under
19   the -- I mean, I saw -- I saw a photo where somebody
20   could have actually looked under the fence and, you
21   know, from a position -- position of concealment and
22   seen -- had -- had eyes on the door.  So, I -- I
23   just -- that just doesn't pass muster with me.
24        Q.    Okay.  And then when we get to the more
25   important part of when they approached the door for the
```

1   entry and they recognized it, why do you believe they
2   should have called tactical at that point?
3        A.   Because that brass -- have you ever hit a
4   door with a brass wrap with a battering ram?
5        Q.   I have not.
6        A.   I have.  It works.  It -- it -- well, it
7   doesn't -- obviously, it's not foolproof because
8   they -- they -- they got in.  But it definitely will
9   slow you down.  And you will definitely lose the
10  element of surprise.
11       Q.   And so, the reason they should have performed
12  a tactical is because by continuing to stand at the
13  door hitting it, they created a more dangerous
14  situation for themselves?
15       A.   And, obviously, for the occupants as well.
16  For everyone.
17       Q.   And how did it create a more dangerous
18  situation for the occupants now that it was giving the
19  occupants more time to do whatever they were going to
20  do?
21       A.   Because the occupants doesn't -- doesn't --
22  as we discussed before, the -- the announcement -- in
23  my view, the announcement was deficient.  The time
24  of -- the time of early morning hours when this warrant
25  was served, they -- they expected -- they -- they

```
 1   expected the occupants to be asleep.
 2            I read the other expert's -- Dr. Grugle's
 3   report -- which I quoted extensively in my rebuttal --
 4   and she talks about -- and it's -- you know, her --
 5   where she's qualified as a human factors expert to talk
 6   about, but basically -- you know, coincided with my
 7   experience that when you go on -- you know, it just
 8   takes people some time to wake up and figure out what's
 9   going on and to understand what's happening.
10            And so, I just -- you know, that brass
11   wrap -- and they talk about, "Well, why didn't you
12   call" -- and, you know, there was a lot of discussion
13   back and forth.  You know, nobody called it -- but I
14   think -- you know, the -- the CIRT report was -- was
15   actually quite critical of that.
16            And I thought the criticism was -- was -- was
17   warranted.  So, it's not just me saying it.  I mean --
18   and -- and the CIRT report.  What I would also say is
19   they don't identify who their subject -- but they
20   apparently -- from reading the CIRT report, they don't
21   say how many subject matter experts they had.  But they
22   certainly consulted with subject matter experts.  And
23   this wasn't just a detective, sergeant, lieutenant with
24   no -- with no SWAT experience making -- you know,
25   making -- you know, they talk about SMEs repeatedly
```

1    throughout that report.  So --

2        Q.    Yeah.

3        A.    -- I concur with that analysis.

4        Q.    **And would you agree or disagree that when you**

5    **encounter something like the brass wrap and a tactical**

6    **is in play, that at that point it becomes a**

7    **discretionary decision for the officers and the people**

8    **right there have more information to make that decision**

9    **than someone with 20/20 hindsight?**

10       A.    Well, I'm not -- I -- I don't mention 20/20

11   hindsight in my report.  I -- I was -- I was shocked

12   that when they got to the door -- I was shocked that

13   they didn't conduct surveillance on the door; and I was

14   shocked that when they encountered the brass wrap, that

15   they didn't call a tactical.

16       Q.    **Okay.  And when you say "call a tactical,"**

17   **you mean back out and do a surround-and-callout?**

18       A.    Back out and do a surround-and-callout or go

19   to an alternative method of entry.  If they still felt

20   that CET was appropriate, then they could have done

21   an -- they could have used an explosive device to -- to

22   dislodge the door.

23       Q.    **But the reason that the brass wrap was so**

24   **problematic is that it delayed entry?**

25       A.    Yes, it delayed entry -- it -- it did delay

1    entry, yeah.  And -- it -- it did delay entry.

2        Q.    Now, like I said, we're almost done.

3              Now, one thing your report does not address

4    is the use of lethal force; correct?

5        A.    What -- in -- in what regard, sir?

6        Q.    Well, it -- there's not an opinion regarding

7    whether the use of force was reasonable or not

8    reasonable.  And I -- and I'm going to be fair to you

9    here, is that I -- I think I understand the opinion,

10   is -- I mean, first of all -- so, let me back up and

11   just get some background.

12             I mean, the use of force that a police

13   officer uses is generally governed by the Graham

14   factors: severity of the crime, immediate threat, and

15   whether the suspect is actively resisting arrest; is

16   that correct?

17       A.    Correct.  And other -- and -- and other --

18   depending on what -- and other factors, as well.

19       Q.    Sure.  Those are the general factors?

20       A.    Yes.  The general ones, yes, sir.

21       Q.    And in a very general sense, it would

22   be reasonable for an officer to use lethal force

23   against a suspect who is shooting at him?  In a general

24   sense; correct?

25       A.    Yes.

```
 1        Q.    Okay.
 2              And so, if I understand your opinion in this
 3   case, it would be that the SWAT team's tactical
 4   deficiencies and choices led to a situation where they
 5   had to use, otherwise, justifiable lethal force --
 6   or -- yeah -- is that correct?
 7        A.    I would say the -- the deficiencies in
 8   planning and execution -- which we've discussed --
 9   created a situation where these officers had no choice
10   but to use deadly force.  Which is why I didn't -- I
11   don't -- once they're there and it's happening, they
12   had no choice but to defend themselves.
13        Q.    Okay.  And I think we agree on that; that the
14   issue is -- I mean, the force was reasonable once the
15   time came -- but whether their actions prior to that
16   caused the need for that force?
17        A.    That's where we disagree -- yeah, that's --
18   that's the issue.
19        Q.    Okay.
20        A.    You just hit the nail on the head, yeah.
21        Q.    Okay.
22              Let's take a five-minute break.  I'm going to
23   go over my notes, but I think I'm done.  Okay?
24        A.    Absolutely.
25              ADAM BREEDEN, ESQ.:  Craig, did you want --
```

1    while you're doing that, do you want me to ask some
2    follow-up questions?  Or do you generally just want to
3    take a little break before we -- well, I guess we
4    should conclude your portion --
5              CRAIG ANDERSON, ESQ.:  Yeah, just give me
6    five minutes.  I may have a few other questions, I may
7    not.
8              ADAM BREEDEN, ESQ.:  Okay.  Fair enough.
9              CRAIG ANDERSON, ESQ.:  Okay.
10             (Pause in the proceedings.)
11   BY CRAIG ANDERSON, ESQ.:
12        **Q.   Mr. Gilbertson, have I given -- are all the**
13   **opinions you intend to render in this case, have you**
14   **talked about today and/or are included in your reports?**
15        A.   Yes, they are.
16             ADAM BREEDEN, ESQ.:  I'm just going to object
17   to form.  And it's overly broad and vague.  But the
18   witness can --
19             THE WITNESS:  Well, again, I say -- I would
20   say all the opinions that I have at this time -- again,
21   if I were called to testify at court and I was asked a
22   question, it would be up to the judge to decide if the
23   question was an appropriate question -- if your
24   question was deemed appropriate and I was asked to
25   answer it, I'll answer the question.

```
1   BY CRAIG ANDERSON, ESQ.:
2       Q.   Okay.  Fair enough.
3            And have I given you a fair opportunity to
4   answer all the questions I've asked?
5       A.   You certainly have, sir.
6       Q.   Okay.  And do you feel that I have attempted
7   to manipulate or trick you in any way?
8            ADAM BREEDEN, ESQ.:  Objection.  Overly broad
9   and vague.
10           THE WITNESS:  No.
11           CRAIG ANDERSON, ESQ.:  Okay.  Thank you very
12  much for your time and I have no further questions.
13           ADAM BREEDEN, ESQ.:  I have a few follow-up
14  questions here before we conclude the deposition.
15                        EXAMINATION
16  BY ADAM BREEDEN, ESQ.:
17      Q.   Mr. Gilbertson, you, of course, know me.  My
18  name is Adam Breeden.  I represent the plaintiff in
19  this case, Ms. Alexander, who is the mother of the
20  deceased, Mr. Williams.  I just want to clear up or
21  touch on a few things that were discussed during
22  today's deposition.
23           First of all, as a police practices expert,
24  you, of course, consider for your reports and opinions
25  local police internal policies, meaning Las Vegas
```

```
1    Metropolitan Police Department's own policies and
2    procedures; is that correct?
3         A.    Correct.
4         Q.    And do you consider national or industry
5    standards as well, for example, standards that might go
6    out through the National Tactical Officers Association
7    or the Nevada -- I think it's called the Association of
8    Police Chiefs -- you consider nonlocal industry
9    standards, as well; correct?
10        A.    I do.
11        Q.    And also in any use of force case, do you
12   consider the Graham versus Connor standard from the
13   U.S. Supreme Court?
14        A.    I absolutely do.
15        Q.    And do you agree with me that even if you
16   have, for example, local policy and procedure, it's
17   entirely possible that that local policy or procedure
18   is somehow deficient and does not satisfy the excessive
19   force provisions in the constitution?
20             CRAIG ANDERSON, ESQ.:  Objection.  Form.
21             Answer.
22             THE WITNESS:  Yes, I do.
23   BY ADAM BREEDEN, ESQ.:
24        Q.    Okay.  And just to clarify:  Did you also
25   consider Nevada's state law on use of force -- the
```

1   knock-and-announce rule and use of force when executing

2   warrants?

3        A.   Yes.

4        Q.   Okay.  And did you also conclude that the

5   actions of the officers in this case violated Nevada

6   state law?

7        A.   If I didn't specifically state it, it did --

8   as I recall, it -- it did.  But I -- if it's not

9   specifically stated in my report, I do recall that

10  and -- and it did.

11       Q.   Okay.

12            You were asked some questions about

13  Mr. Williams and whether he was sleeping at the time

14  this occurred.  Is it your opinion, based on all

15  factors that you have seen in this case, that is more

16  likely than not that Mr. Williams was sleeping at the

17  time police began this SWAT operation?

18            CRAIG ANDERSON, ESQ.:  Objection.  Form.

19            Go ahead and answer.

20            THE WITNESS:  Yes.

21  BY ADAM BREEDEN, ESQ.:

22       Q.   Now, you've seen the video of the entry and

23  the photographs of the scene that were taken during and

24  just after this event; correct?

25       A.   Yes.

1    Q.    Did those show to you that Mr. Williams was
2    in a laying down position on a futon or sofa with his
3    head on a pillow and a blanket over him?
4         A.    That's my recollection as to how he appeared,
5    yes.
6         Q.    And do you believe more likely than not that
7    indicates he was sleeping?
8              CRAIG ANDERSON, ESQ.:  Objection.  Form.
9              THE WITNESS:  Yes.
10   BY ADAM BREEDEN, ESQ.:
11        Q.    And do you remember reading a statement of
12   the other occupant of the apartment, Kwame Crockett?
13        A.    Yes, I do.
14        Q.    What was Mr. Crockett doing when the SWAT
15   team arrived?
16        A.    He was sleeping.
17        Q.    You indicated earlier -- or there was some
18   testimony about use of a battering ram by police.  Do
19   you recall how many different strikes from the
20   battering ram it took to open the front door?
21        A.    I believe it was five.
22        Q.    Now, in your time on SWAT or the police
23   department, in general, you have seen a battering ram
24   used in actual operations?
25        A.    I've actually used it myself, yes.

1      Q.   Okay.  Do you agree with me that it makes

2  loud noise?

3      A.   Yes.

4      Q.   Do you agree with me that it could impair

5  people from hearing things that officers are saying at

6  the time the battering ram is being used?

7      A.   Yes.

8      Q.   Would you alike it, the sound of the

9  battering ram -- in terms of its noise level, would you

10  alike it to the sound of a gunshot?

11      A.   It certainly could be.

12      Q.   Yeah.

13      You indicated earlier in your testimony that

14  you believe when performing the knock-and-announce rule

15  that officers should literally, physically knock on the

16  front door of -- in this case -- the apartment.

17      Do you remember that testimony?

18      A.   Yes.

19      Q.   I have sort of a two-part question in follow

20  up to that testimony to you.  If for some reason that

21  is not a technical requirement under the law for the

22  knock-and-announce rule, do you still believe that that

23  is either best practices or industry standard for

24  police to actually perform a physical knock on the

25  door?

1     A.    Yes.

2     Q.    And so, do you -- do you think both -- you

3  think it's both industry standard and best practice or

4  one or the other?

5     A.    I believe it's both.

6     Q.    You were asked some questions about use of

7  the stun stick.  And there were some questions that I

8  think split a fine hair as between physical entry and

9  other types of entry or force used to enter the

10 apartment.

11         My question to you is:  What is the first use

12 of force that officers used that fateful morning?

13    A.    The stun stick.

14    Q.    Yeah.

15    A.    Well, the -- the first use of force

16 against -- against a human being or against -- because

17 there was force used against the -- the door.  So, are

18 we talking about force against property or force

19 against human beings?

20    Q.    Well -- and see, this is what I'm getting at.

21 Because I think that Mr. Anderson was trying to make a

22 distinction between those.  But I'm talking about any

23 use of force to the person or property.  Because the

24 legal standard doesn't make a difference.  It just

25 refers to use of force.  So that could be on property,

1    like knocking at the window or knocking down the door,

2    or it could be against a person.  Which, in this case,

3    was shooting Mr. Williams.

4            So, if we go back in time, you know, when was

5    the first actual use of force by police?  What was

6    that?

7            CRAIG ANDERSON, ESQ.:  Objection to the form

8    of the question.

9            THE WITNESS:  I believe it would be the first

10   blow of the battering ram, would be the first actual

11   use of force against property.  And then the second --

12   the -- followed closely by the breaking of the window

13   and the insertion of the stun -- stun stick would

14   follow that almost -- virtually immediately.

15   BY ADAM BREEDEN, ESQ.:

16       Q.   But both of those are uses of force to enter

17   the apartment, would you agree?

18       A.   Yes.

19       Q.   And we can actually look on the video to see

20   which one of those came first, whether the first

21   battering ram strike or the breaking out of the rear

22   window; right?

23       A.   Yes.

24       Q.   Okay.  Either of those, in your opinion,

25   constitutes force used to enter the apartment; correct?

     A.    They both constitute force, yes.

     Q.    Okay.  So, if I were to ask you a question
like, "Hey, after the first announcement is completed,
how many seconds was it before force was used to enter
the apartment," you would judge that by when either the
battering ram was first used or when the rear window
was broken out, as opposed to when police actually
breached the front door and physically entered the
apartment; is that fair?

          CRAIG ANDERSON, ESQ.:  Objection to form.

          THE WITNESS:  That is correct, yes.  And in
that scenario -- now that you mention it, I believe the
stick was inserted before the door was breached.  And
it was -- the stick was inserted almost -- as I
recall -- if I'm recalling correctly, the stick was
inserted almost immediately upon completion of the
second announcement.  Which would have made that the
first use of force before even the -- the door was
struck, as I recall.

BY ADAM BREEDEN, ESQ.:

     Q.    And do you recall that's literally what the
SWAT officers had planned -- that regardless of
anything else that occurred, any response of anybody
inside, that they preplanned that that use of force
would be used to break out the back window simultaneous

1    with the second announcement?  Do you recall that?

2    A.    Yes, I do.  And I believe that was actually

3    an issue addressed in the CIRT report, as well.

4    Q.    And so, do you believe that that preplanning

5    also fell beneath police standards and practices?

6    A.    Oh, absolutely.  I believe the -- the

7    planning of this service -- warrant service was

8    deficient -- egregiously deficient.

9    Q.    And you agree that use of force to enter the

10   apartment was not compliant with the Graham versus

11   Connor standard?

12          CRAIG ANDERSON, ESQ.:  Objection.  Form.

13          THE WITNESS:  Yes, I do.  I believe it was --

14   I believe that -- I -- I believe the use of these

15   explosive, noise, flash-diversion devices was

16   excessive.

17   BY ADAM BREEDEN, ESQ.:

18   Q.    And if we actually ran all of that through

19   the Graham versus Connor scenario, Mr. Williams was not

20   suspected of committing any crime; correct?

21   A.    No, he was not -- he was not suspected -- at

22   that point in time, they didn't know Mr. Williams was

23   there.  And he certainly wasn't -- one of the people

24   they were looking for.  He was never a suspect in the

25   Thomas homicide.

1    Q.    And at the point that officers entered the

2    apartment at that exact point in time, had Mr. Williams

3    resisted in any way prior to their entry?

4    A.    Prior to their entry?

5    Q.    Correct.

6    A.    No.  No, he had not resisted.

7    Q.    In fact, no one inside the apartment had

8    responded at all at that point when use of force came

9    about; correct?

10    A.    No.  Force wasn't used until the officer --

11    no, Mr. Williams didn't use any force until he was

12    confronted with -- by the armed officers.  And I think

13    that there's -- in the totality of the circumstances

14    that existed at that point in time, I don't know that

15    Mr. -- and I believe I said this in my report -- I

16    don't -- I believe one could reasonably infer that

17    Mr. Williams didn't know who was entering this

18    apartment.

19    Q.    And when we talk about the immediate threat

20    factor:  Before officers physically entered the

21    apartment, they had no indication that there was anyone

22    even inside, let alone armed inside; correct?

23    A.    That is correct.

24    Q.    Okay.  I think those are all the issues I

25    wanted to touch up with you, Mr. Gilbertson.  I'll pass

1    the witness, if Mr. Anderson has any follow-up.

2        A.    Yeah.

3                      FURTHER EXAMINATION

4    BY CRAIG ANDERSON, ESQ.:

5        Q.    Just quick follow-up on your understanding of

6    Graham versus Connor.  Use of force against property is

7    different than use of force against a person; correct?

8        A.    Yes.

9        Q.    Okay.  And --

10        A.    Well, depending -- it depends on -- it

11    depends on if the property is occupied or not.  At what

12    time -- at -- for example, if a police officer says --

13    if a police officer -- if a police officer uses force

14    against an occupied automobile or an occupied domicile

15    or whatever the case may be, then, you know, you -- one

16    could reason -- objectively and reasonably infer that

17    that is not just against the property, it's against the

18    person that's occupying the property.

19        Q.    Correct.  So, if Mr. Williams had been harmed

20    by the flash-bang -- or I mean the stun stick -- or the

21    battering ram, if he had suffered a physical injury,

22    then Graham v. Connor would apply; correct?

23        A.    Yes.

24        Q.    But in this case, he was not injured by

25    either device; correct?

1    A.    I've seen no evidence that the device

2 actually caused him physical injury.

3    Q.    Okay.  And Graham v. Connor only covers

4 intentional acts of force against an individual;

5 correct?  Like, it does not cover accidental

6 discharges, accidental uses of force?

7    A.    It doesn't cover accidents, no.

8    Q.    Okay.

9         And in this case, the only force intended to

10 be used against Isaiah Williams that harmed him was the

11 use of the firearms?

12    A.    Yes.

13         CRAIG ANDERSON, ESQ.:  Nothing further.

14         ADAM BREEDEN, ESQ.:  I have a few follow-ups

15 to that.

16                    FURTHER EXAMINATION

17 BY ADAM BREEDEN, ESQ.:

18    Q.    You have reviewed the report of the human

19 factors expert, Dr. Grugle; correct?

20    A.    Yes, I have.

21    Q.    And you yourself have seen the effect of

22 these noise flash diversionary devices on people;

23 correct?

24    A.    Yes.  I've seen it after the fact, yes.  I've

25 never -- I've seen what -- what they can do, yes.

Mamba Reporting, #119F
www.mambareporting.com                    (702) 401-3985
                                    mambareporting@gmail.com

1    Q.    Do you agree that they impart a noise on

2    individuals -- that individuals physically perceive

3    that and it affects their ability to hear?

4    A.    Yes.

5    Q.    Would you agree that some of these devices,

6    including the device used on Mr. Williams, that makes a

7    very bright flash, that affects people and their

8    physical ability to see?

9    A.    Yes, it -- it has an auditory and a visual

10   incapacitating element -- incapacitation to it, yes.

11   Q.    And, in fact, the -- there's also a third

12   effect.  The pressure wave or pressure shock from

13   deployment of the device that was in the stun stick,

14   are you aware of that, as well?

15   A.    Yes.

16   Q.    Would you agree that all three of those

17   factors would have a physical effect on Mr. Williams?

18   A.    It's designed to impair, yes.

19   Q.    And, in fact, use of such a device on an

20   individual, that's considered use of force in the

21   police industry, isn't it?

22             CRAIG ANDERSON, ESQ.:  Objection.  Form.

23             THE WITNESS:  Yes.

24   BY ADAM BREEDEN, ESQ.:

25   Q.    I mean, if I was just standing on the street

1    corner and I threw one of these devices at somebody,
2    everybody in the country would agree that that's use of
3    force on that individual, wouldn't they?
4        A.    That would -- that would be considered an
5    assault, yes.
6        Q.    Okay.  Thank you.  Those are all the
7    follow-up questions that I have.
8            CRAIG ANDERSON, ESQ.:  I'm done.  Thank you
9    very much.  It was nice to meet you.
10            THE WITNESS:  Nice to meet you, sir.  Have a
11   good day.
12            THE COURT REPORTER:  Mr. Breeden, did you
13   want a copy?
14            ADAM BREEDEN, ESQ.:  Yes, I'll take a copy at
15   this time.
16            (Proceedings concluded at 11:29 AM.)
17
18
19
20
21
22
23
24
25

Mamba Reporting, #119F
www.mambareporting.com                          (702) 401-3985
                                        mambareporting@gmail.com