Exhibit V - Deposition of Rule 30(b)(6) witness Chief Reggie Rader (LVMPD's CIRP Process)

30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 149

1                    CERTIFICATE OF COURT REPORTER

2

    STATE OF NEVADA        )
3                          )  ss:
    COUNTY OF CLARK         )

4

5        I, Heidi K. Konsten, Certified Court Reporter

6    licensed by the State of Nevada, do hereby certify

7    that I reported the deposition of REGGIE RADER,

8    commencing on February 21, 2025, at 9:08 a.m.

9        Prior to being deposed, the witness was duly

10   sworn by me to testify to the truth.  I thereafter

11   transcribed my said stenographic notes via

12   computer-aided transcription into written form,

13   and that the transcript is a complete, true and

14   accurate transcription and that a request was not

15   made for a review of the transcript.

16       I further certify that I am not a relative,

17   employee or independent contractor of counsel or

18   any party involved in the proceeding, nor a person

19   financially interested in the proceeding, nor do I

20   have any other relationship that may reasonably

21   cause my impartiality to be questioned.

22       IN WITNESS WHEREOF, I have set my hand in my

23   office in the County of Clark, State of Nevada,

24   this March 4, 2025.

25                    Heidi K. Konsten
                      Heidi K. Konsten, RPR, CCR No. 845

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 3 of 41

30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1              UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3                    *  *  *  *  *

4    LATIA ALEXANDER,                    )
     individually as heir of            )
5    ISAIAH T. WILLIAMS and in          )
     her capacity as special            )
6    administrator of the Estate        )
     of ISAIAH T. WILLIAMS,             )
7                                        )
            Plaintiff,                   )
8                                        )
            vs.                          )          CASE NO.
9                                        )   2:24-cv-00074-APG-NJK
     LAS VEGAS METROPOLITAN             )
10   POLICE DEPARTMENT, a               )
     political subdivision of           )
11   the State of Nevada; KERRY         )
     KUBLA, in his individual           )
12   capacity, et al.,                  )
                                         )
13          Defendants.                  )
     _____)

14

15              VIDEOTAPED DEPOSITION OF

16                   REGGIE RADER

17        30(b)(6) for Las Vegas Metropolitan

18               Police Department

19        Taken on February 21, 2025

20              at 9:08 a.m.

21        By a Certified Court Reporter

22              Las Vegas, Nevada

23

24        Stenographically reported by:
     Heidi K. Konsten, NV CCR 845, RPR
25        JOB NO. 59663 - Firm No. 116F

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**2**

```
 1              Videotaped deposition of REGGIE RADER,
 2  Volume I, stenographically taken at 400 South
 3  Seventh Street, 3rd Floor, Las Vegas, Nevada, on
 4  Friday, February 21, 2025, at 9:08 a.m., before
 5  Heidi K. Konsten, Certified Court Reporter in and
 6  for the State of Nevada.
 7
 8              APPEARANCES OF COUNSEL
 9  For the Plaintiff:
10          ADAM J. BREEDEN, ESQ.
            Breeden & Associates, PLLC
11          7432 West Sahara Avenue
            Suite 101
12          Las Vegas, Nevada 89117
            (702) 508-9250
13          (702) 508-9365 Fax
14  For the Defendants:
15          CRAIG R. ANDERSON, ESQ.
            Marquis Aurbach
16          10001 Park Run Drive
            Las Vegas, Nevada 89145
17          (702) 382-0711
            (702) 382-5816 Fax
18
    Also present:
19
            Samuel Camacho, Videographer
20
21              * * * * * *
22
23
24
25
```

**3**

```
 1                   INDEX
 2                                            Page
 3  REGGIE RADER
 4  Examination by Mr. Breeden                  5
 5              * * * * * *
 6
 7                 EXHIBITS
 8  No.          Description              Page
 9  Exhibit 1    Notice of Videotaped       4
                 Deposition
10
    Exhibit 2    January 3, 2023, LVMPD     4
11               Interoffice Memorandum
12  Exhibit 3    January 31, 2023, LVMPD    4
                 Interoffice Memorandum
13
    Exhibit 4    January 10, 2022, Force    4
14               Investigation Team Report
15  Exhibit 5    Office of Internal         4
                 Oversight Review Key
16               Findings, Conclusions,
                 and/or Recommendations of
17               an Officer-Involved
                 Shooting
18              * * * * * *
19
20
21
22
23
24
25
```

**4**

```
 1              LAS VEGAS, NEVADA
 2          Friday, February 21, 2025
 3              9:08 a.m.
 4      DEPOSITION OF REGGIE RADER
 5              * * * * * *
 6      (Exhibits 1 through 5 were
 7      marked.)
 8
 9      THE VIDEOGRAPHER:  Today is
10  February 21st, 2025.  The time is approximately
11  9:08 a.m.  Your court reporter is Heidi Konsten,
12  and I'm your videographer, Samuel Camacho.  We are
13  here on behalf of Lexitas.
14      The witness today is Reggie Rader, a
15  30(b)(6).  And we are here in the case of Latia
16  Alexander, et al., versus Las Vegas Metropolitan
17  Police Department, et al.
18      Will counsel please state your
19  appearances, and the court reporter will
20  administer the oath.
21      MR. BREEDEN:  This is Attorney Adam
22  Breeden for the plaintiff.
23      MR. ANDERSON:  Craig Anderson for the
24  defendants.
25
```

**5**

```
 1  Whereupon,
 2              REGGIE RADER,
 3  was called as a witness, and having been first duly
 4  sworn to testify to the truth, was examined and
 5  testified as follows:
 6
 7              EXAMINATION
 8  BY MR. BREEDEN:
 9      Q   Good morning, sir.  Can you please state
10  your name for the record, and go ahead and spell
11  your name for the court reporter, as well.
12      A   My name is Reggie Rader, R-E-G-G-I-E,
13  Rader, R-A-D-E-R.
14      Q   Okay.  And, Mr. Rader, what's your
15  position currently at the Las Vegas Metropolitan
16  Police Department?
17      A   I am a deputy chief over the homeland
18  security division.
19      Q   Okay.  And you understand that you are
20  here in today's litigation to testify on behalf of
21  Las Vegas Metropolitan Police Department regarding
22  an officer-involved shooting that resulted in the
23  death of Isaiah Williams which occurred on
24  January 10 of 2022; is that correct?
25      A   It is.
```

---

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1    Q   All right.  First of all, does Metro
2  expect that its officers will follow Metro's own
3  internal policies, procedures, and training?
4    A   Yes.
5    Q   And does Metro expect its officers and
6  employees to conduct themselves so that they do
7  not infringe on the civil rights of the public?
8    A   Yes.
9    Q   Okay.  Frankly speaking here, in this
10  officer-involved shooting, were mistakes made by
11  Metro in the policy, planning, or execution of
12  this search warrant?
13    A   On the administrative level?
14    Q   On any level.
15    A   Yes.
16    Q   I'll ask you about that in more detail
17  as we go through this deposition, but let me back
18  up a little bit.  First of all, I want to go
19  through the deposition process a little bit with
20  you.
21       Have you ever been deposed before?
22    A   Yes.
23    Q   How many times?
24    A   One time.
25    Q   All right.  I'll ask you about that

7

1  in -- more in just a couple of seconds here.
2       But understand that the oath that was
3  just administered to you by the court reporter is
4  the same oath that you would take in a court of
5  law as if you were in front of a judge and a jury
6  today, and it obligates you to tell the truth
7  under penalty of perjury.
8       Do you understand that?
9    A   I do.
10    Q   Your deposition is being videotaped and
11  your testimony may be read or played for the jury
12  later in this case.
13       Do you understand that?
14    A   I do.
15    Q   The court reporter is taking down
16  everything that's said during today's deposition.
17  Afterwards, she will put everything in a booklet
18  or a transcript form.  You'll have the right to
19  review that transcript and make changes to your
20  testimony if you wish.
21       But I want to caution you that if you
22  make a substantive change in your testimony -- in
23  other words, you say one thing here today and then
24  later you try to change your testimony, I would
25  have the right to comment on the fact that you

8

1  tried to later change it.
2       Do you understand that?
3    A   I do.
4    Q   It is important for us to make a good
5  record during today's deposition.  So there's
6  several -- there are several things I will ask you
7  to do for me.
8       First of all, if you don't understand
9  any of my questions, please ask me to repeat or
10  rephrase them, and I'll be happy to do so for you.
11       During today's deposition, you always
12  need to give an audible or out loud or verbal
13  response to my questions, such as a simple "yes"
14  or "no."  Please avoid shaking your head up and
15  down or side to side if you mean yes or no or
16  using slang terms such as "uh-huh" or "huh-uh,"
17  because those sort of nonverbal responses don't
18  show up well, if at all, on the transcript when we
19  go back and look at it.
20       Can you do that for me?
21    A   I can.
22    Q   You've done an excellent job so far for
23  me, but as a general rule during the deposition,
24  try not to speak at the same time anyone else is
25  speaking.  We will all afford you the same

9

1  courtesy.  And one of the reasons why I ask you to
2  do that is because it is very important -- very
3  difficult for the court reporter to accurately
4  take down what two people are saying at the same
5  time.
6       Do you understand that?
7    A   I do.
8    Q   During today's deposition, your attorney
9  may object to one or more of my questions.  I want
10  to explain to you how objections work during the
11  deposition process, because they work a little
12  differently than what you might have seen on TV or
13  in a courtroom.
14       As you can tell today, we do not have a
15  judge present here in this conference room to
16  immediately rule on objections.  So what we do
17  during a deposition, is if I ask a question and
18  the other attorney wants to state an objection,
19  they will do so clearly for the record and state
20  the basis, and then we will still look to you to
21  give your response.  Then later, if the judge
22  needs to go back on the transcript and rule
23  whether your response is admissible, the judge can
24  do so.
25       I explain this to you before we begin,

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

10

1  because this confuses many people when they're new
2  to this process.  They hear deposition [sic], and
3  they think, oh, I'm not supposed to answer
4  because -- they hear an objection, and they think
5  they're not supposed to answer, but generally the
6  opposite is true during a deposition.
7        Do you understand that?
8     A  I do understand.
9     Q  Okay.  Have you consumed any alcoholic
10 beverages in the last 24 hours?
11    A  No.
12    Q  Have you taken any drugs, including
13 prescription medications, in the last 48 hours?
14    A  No.
15    Q  Do you have any sort of medical
16 condition -- an extreme example would be dementia
17 or Alzheimer disease -- that may affect your
18 memory or your ability to testify here today?
19    A  I do not.
20    Q  Okay.  Now, in front of you is
21 Exhibit 1.  Can you please turn to that exhibit.
22       Your deposition here today was requested
23 under Federal Rule of Civil Procedure 30(b)(6).
24 And this is a rule where if a corporate or
25 governmental entity is sued, we can serve a

---

11

1  deposition notice with a list of topics, and then
2  it's up to the entity -- in this case, Las Vegas
3  Metropolitan Police Department -- to produce a
4  witness who can testify as to those topics in a
5  manner that binds Metro.
6        So I did not specifically ask that you
7  be here today, only that a witness as to certain
8  topics be produced.
9        Do you understand that?
10    A  I do.
11    Q  Okay.  Now, looking at Exhibit 1, which
12 is -- it's the deposition notice followed by the
13 list of topics, have you seen that prior to today?
14    A  I have.
15    Q  Okay.  And then I have taken the liberty
16 on Exhibit 1 of highlighting in yellow the topics
17 that I believe you are here to testify regarding
18 today.
19       Will you please take a moment and
20 confirm to me that you are prepared to testify as
21 to those topics in a manner that binds Metro.
22    A  I am prepared for it.
23    Q  Okay.  Now, under Federal Rule of Civil
24 Procedure 30(b)(6), the witness who is produced
25 wouldn't necessarily have to have personal

---

12

1  knowledge about the incident.  But in this
2  particular case, you do have some personal
3  knowledge because you were actually a member of
4  the Tactical Review Board that reviewed this
5  officer-involved shooting; correct?
6     A  Correct.
7     Q  Did you have any other personal
8  involvement in the planning or execution of this
9  search warrant?
10    A  No.
11    Q  All right.  So your first involvement or
12 the first time you heard of this was after it
13 occurred?
14    A  Correct.
15    Q  All right.  I want to sort of know the
16 universe of documents that you have reviewed and
17 people that you have spoken to in order to prepare
18 yourself to testify today.  So let's start with
19 documents.
20       What documents have you reviewed?
21    A  I have reviewed the Critical Incident
22 Review Team findings from the use-of-force board
23 and the Tactical Review Board.  I have reviewed
24 the LVMPD policy on the critical incident review
25 process.  And I reviewed the memorandum and then

---

13

1  the addendum to the memorandum that was the final
2  conclusions of the board that was sent up to the
3  sheriff.
4     Q  Okay.  Have you spoken with anyone else,
5  other than your attorneys, regarding preparation
6  for your testimony or what you intend to testify
7  to here today?
8     A  No.
9     Q  Have you ever spoken to any of the
10 individual officers that have been sued?
11    A  Spoken to them individually?  Yes.
12    Q  Okay.  Was that as part of the Tactical
13 Review Board investigation?
14    A  It was.  And then just in passing, there
15 was conversations, but not -- no questions
16 regarding this, outside of the board, short of
17 just having seen them at work and talked to them.
18 I -- I don't know if I'm answering that correctly.
19    Q  Well, I'll ask you some follow-up
20 questions here more specifically.
21       When is the last time you saw or spoke
22 to Defendant Kerry Kubla?
23    A  Months, if not over a year.
24    Q  Did you speak to him about the fact that
25 you might have to give deposition testimony --

---

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 7 of 41

30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

```
1     A   No.
2     Q   -- in this matter?
3         When is the last time you spoke to Brice
4   Clements?
5     A   I do not remember.  It has been over a
6   year.
7     Q   When is the last time you spoke -- saw
8   or spoke to Alex Gonzales?
9     A   At the board, maybe.  I don't remember
10  talking to him outside of that.
11    Q   When is the last time you saw or spoke
12  to Russell Backman?
13    A   At least a year, if not more.
14    Q   When is the last time you saw or spoke
15  to James Rothenburg?
16    A   At least over a year.  I'm not --
17  nothing is coming to memory.
18    Q   When is the last time you saw or spoke
19  to James Bertuccini?
20    A   That would, again, be at least a year.
21    Q   When is the last time you saw or spoke
22  to Melanie O'Daniel?
23    A   The last time would have been at this
24  board.  I don't think I've talked to her since.
25    Q   Okay.  Lieutenant O'Daniel is now
```

15

```
1   retired; correct?
2     A   Correct.
3     Q   And to your knowledge, the other
4   individual officers that we just discussed, are
5   they still employed by Metro?
6     A   I know Sergeant John Scott is retired.
7   I believe all of the other involved officers are
8   still currently employed.
9     Q   All right.  There's been some experts
10  that have been disclosed in this litigation by
11  both sides who have commented on what occurred and
12  prepared reports.
13        Have you reviewed those reports?
14    A   On the other experts?
15    Q   Yes, any -- any expert reports.
16    A   No, I have not.
17    Q   Okay.  And there have been a lot of
18  different depositions taken in this case already
19  before yours, probably -- maybe ten, possibly
20  more.
21        Have you reviewed any of those
22  deposition transcripts?
23    A   I have not.
24    Q   Okay.  Let's talk a little bit about
25  your background and history with the Las Vegas
```

16

```
1   Metropolitan Police Department, which -- well,
2   before we do that, though, I guess we may be using
3   some acronyms in this case, and I just want to
4   make sure, on the record, you know, I ask you
5   about them and you indicate what they stand for.
6         So TRB, what does that stand for?
7     A   That is the Tactical Review Board.
8     Q   And then CIRT, C-I-R-T, what does that
9   stand for?
10    A   That is the Critical Incident Review
11  Team.
12    Q   And then OIO, what does that stand for?
13    A   The officer -- Office of Internal
14  Oversight.
15    Q   And then OIS?
16    A   That is an officer-involved shooting.
17    Q   Okay.  And then FIT, F-I-T?
18    A   That's a Force Investigations Team.
19    Q   Now, let me ask you some -- some general
20  questions here.
21        What -- what is the association and
22  interplay between TRB, CIRT, OIO, and FIT?
23    A   So they all comprise our critical
24  incident review process.  And our critical
25  incident review process is how the Las Vegas
```

17

```
1   Metropolitan Police Department, along with the
2   civilian community members, do thorough, in-depth
3   administrative reviews of officer-involved
4   shootings or deadly uses of force.
5         And in there, there are two boards that
6   are comprised of some of the same individuals, but
7   with a little different functions.  So if you want
8   me to break that down, I would be happy to right
9   now.
10    Q   Yeah, go ahead.  And then I will have
11  some other follow-up questions for you.
12    A   So the -- the boards are the
13  Use-of-Force Review Board, and then the other
14  board is the TRB, which is the Tactical Review
15  Board.
16        Now, both of these boards, a CIRT
17  detective will be the one -- the lead case agent
18  that will be presenting their findings of that
19  incident and -- to the board to make their final
20  decisions, which is done by a vote.
21        The Use-of-Force Board is comprised
22  of -- an assistant sheriff is the chair of the
23  board, and that is somebody that is selected by
24  the sheriff to serve in that function.  On the
25  Use-of-Force Board, that chair is not a voting
```

Reggie Rader                     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1  member. They're just there to procedurally make
2  sure that everything is adhered to and oversee
3  that board.
4        The voting members of that board would
5  be the involved individual officers' bureau
6  commander, which is the captain rank; another
7  captain or higher on the department; and a peer
8  member of equal rank to that individual officer
9  that used force.
10       So if it was an officer, it would be a
11  peer officer. If it was a sergeant, it would have
12  to be a sergeant level officer. And they would be
13  the voting commission members on that board.
14  Additionally, there are four civilian members that
15  are on that board that are all voting members on
16  that board.
17       So they have four civilian members that
18  vote on that use of force versus the three
19  commissions members on that use of force. And
20  the -- that board, after hearing all of the facts
21  and reviewing the case, would then make their
22  determination by a vote on an administrative
23  approval of the officer-involved shooting, which
24  would mean that everything was fine with that
25  shooting; training and tactics -- or, I'm sorry,

19

1  tactics and decision-making, where the use of
2  force was still within LVPD's policy of being
3  objectively reasonable, however, the officers'
4  decisions or tactics implemented may have
5  contributed to the outcome in a different way.
6        And the way I kind of explain that is if
7  an officer is searching somebody for weapons and
8  they recover a knife off this individual and they
9  put that knife on the hood of the patrol car
10  without securing the individual in handcuffs, and
11  the individual breaks free, grabs the knife, turns
12  around and tries to stab the officer and that
13  officer uses deadly force, it's still objectively
14  reasonable force; however, the tactics that he
15  implemented contributed to that. So that would be
16  an outcome that they could do.
17       There is policy training failure, where
18  the outcome might not have been the desired
19  result; however, there was a training gap or a
20  policy failure that was identified. And then the
21  final thing they can vote on would be
22  administrative disapproval, where the shooting was
23  not within LVPD policy or -- or training
24  standards.
25       Once that board is concluded, then it

20

1  transitions to the Tactical Review Board. The
2  Tactical Review Board has a lot of the same
3  members. The only difference being the chair of
4  the board, meaning that assistant sheriff, is now
5  a voting member and still presiding over the
6  board. There is still the voting member that is
7  the captain of the involved officer that used
8  force. There is another captain or above that is
9  a voting member on there.
10       There is the peer member that is still
11  there as a voting member, and then there is a
12  tactical expert on those boards that usually comes
13  from ODB, which is the Organizational Development
14  Bureau, and that's just what we call our training
15  section. So it's usually a lieutenant or a
16  captain assigned to that bureau that can weigh in
17  on some of the training things.
18       The four civilian members that were
19  there for the Use-of-Force Board are still able to
20  be there as observers; however, they are not
21  voting members for the Tactical Review Board.
22  Q    Thank you for that description.
23       Is every officer-involved shooting, by
24  definition, reviewed as part of the critical
25  incident review process?

21

1  A    It is.
2  Q    And an officer-involved shooting, is the
3  definition of that any time an officer discharges
4  his weapon, or would that include times when a
5  member of the public discharges their weapon at
6  the officer but the officer doesn't shoot?
7  A    For us, an officer-involved shooting
8  would be when the officer is discharging their
9  weapon. And the Force Investigative Team would be
10  the ones that are criminally investigating that
11  shooting.
12       They also investigate if deadly force is
13  used against one of our officers. So that
14  wouldn't be an officer-involved shooting, per se.
15  But if an officer was stabbed, shot, shot at,
16  someone tried to run them over, that would still
17  be investigated by that Force Investigative Team.
18  Q    Okay. Now, are the -- is the critical
19  incident review process and these different boards
20  that are involved, are those mandated by Nevada or
21  federal law?
22  A    Not that I'm aware of.
23  Q    Okay. These are internal policies and
24  procedures to Metro?
25  A    They are.

30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1    Q   Are they recommended by any national
2   organizations?
3    A   I'm -- I'm not aware if they're
4   recommended or not.  I do know it's fairly common,
5   like I said, on some of these boards to have other
6   law enforcement agencies observe it so they can
7   try to take that back to their own agencies.
8        And then I'm aware that when we went
9   through a collaborative reform process, there were
10  some recommendations made in the way that we can
11  look into things and our transparency.  And I
12  believe that's what really bred this process for
13  us.  But I don't -- I don't know about a national
14  standard for it.
15   Q   Was there any guide or model that Metro
16  looked to for the formation of its critical
17  incident review process?
18   A   I'm not aware, as when it was created, I
19  wasn't involved in that process.
20   Q   And that was actually going to be my
21  next question.
22       Do you know when the current critical
23  incident review process was adopted?
24   A   I don't.  I sat on the process as a
25  lieutenant when I was in ODB training and also as

23

1   a captain, and that spans back six years now.  So
2   without giving you a date, it would be more than
3   five years, but I don't have an exact date for
4   you.
5    Q   Okay.  And so the critical incident
6   review process consists of multiple boards.
7   There's the Use-of-Force Review Board and the
8   Tactical Review Board, but those share many
9   members?
10   A   Yes.
11   Q   Okay.  And then the -- the FIT report
12  that's produced, which one of those boards
13  produces the FIT report?
14   A   So the boards do not have anything to do
15  with the FIT report.  The boards are
16  administrative and internal reviews of what
17  occurred.  The FIT report is a criminal report
18  done by the investigators investigating the crime
19  of the officer-involved shooting.
20   Q   And so in -- for this officer-involved
21  shooting of Mr. Williams, who prepared the FIT
22  report?  And it's in front of you, if you care to
23  look.  It's Exhibit 4.
24   A   If you'll give me a moment.
25   Q   Sure.  I think it's -- you know, look,

24

1   I'll guide you a little bit.  If you look at the
2   first page of it, it looks like it was submitted
3   and approved by Detective Scott Mendoza and
4   Lieutenant Damon Young.
5        Do you see that?
6    A   I do see that.
7    Q   Are those homicide detective and
8   lieutenant?
9    A   No, those are FIT investigative -- Force
10  Investigative Team detectives.
11   Q   Okay.  So the Force Investigative Team
12  that's separate from the Use-of-Force Review Board
13  and the Tactical Review Board?
14   A   Yes.
15   Q   Do they share any members?
16   A   They do not.
17   Q   Is it intentional that they do not share
18  members?
19   A   It is.
20   Q   Similar questions to the CIRT team.  Do
21  they share any members with any of the other teams
22  or boards reviewing an officer-involved shooting?
23   A   Can you say that one more time?  I just
24  want to make sure I understand it.
25   Q   Yeah.

25

1        The CIRT, does that share any members
2   with any of the other boards or teams that
3   investigate officer-involved shootings?
4    A   No.
5    Q   And that is intentional by design?
6    A   It is.
7    Q   And is the idea that you -- you want
8   multiple people with potential angles or
9   viewpoints looking at an officer-involved
10  shooting?
11   A   Well, it's important, because there's
12  different rights afforded to an individual when
13  they are being looked at criminally versus
14  administratively.  And in a criminal proceeding, a
15  subject being looked at criminally has a right to
16  the Fifth Amendment they can evoke where they
17  don't have to give a statement.
18       On an administrative hearing with an
19  officer, we are able to compel that statement, but
20  that cannot be used against them criminally.  So
21  there's two very deliberate lanes, but also where
22  they would end up on a criminal investigation with
23  the FIT team, that ultimately the facts are going
24  to be presented to the DA's office and then the

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

26

1  determination would be made if any crime has
2  occurred or not.
3        The administrative side, which would be
4  the CIRT side of the house, is going to be where
5  we can examine all of the tactics, procedures, the
6  policies, the management of the incident by
7  supervisors involved was up to standards with our
8  policy and if the best outcomes are reached or
9  other ways we can get better internally so we
10 don't repeat any mistakes that are made.  Or if
11 there are better ways of doing things identified,
12 we can do that to make not only our officers
13 safer, but the community safer as well.
14    Q    Okay.  So let me -- I just want to make
15 sure that I've understood you and state things in
16 kind of a summary manner.
17        The Force Investigation Team is actually
18 a team that is investigating Metro's own officers
19 that were involved in the shooting to determine
20 whether they should be criminally charged; is that
21 correct?
22    A    Correct.
23    Q    All right.  And then does the force --
24 so the Force Investigation Team investigates
25 independently of the CIRT or TRB; correct?

---

27

1    A    Correct.
2    Q    All right.  And is the main reason for
3  that because the officers have certain criminal
4  rights -- for example, the right to remain
5  silent -- in front of the FIT team that they do
6  not for the CIRT team and the TRB?
7    A    Yes.
8    Q    Okay.  Now, you agree that the Force
9  Investigation Team concluded that none of the
10 officers should be criminally charged?
11    A    Correct.
12    Q    Do you agree, though, that what the
13 Force Investigation Team looked at was whether the
14 officers were justified in shooting once they
15 entered the apartment and they were confronted with
16 Mr. Williams, but they did not concern themselves
17 with the initial decision to use a CET entry and
18 the force that that required or the constitutional
19 knock-and-announce principles that plaintiff
20 alleges were violated?
21        That was not part of the FIT team's
22 review, was it?
23    A    It was not.
24    Q    Okay.  Why wasn't it?
25    A    Because the FIT team is looking at the

---

28

1  time of the trigger pull and if that officer was
2  in deadly force and utilized the threshold there,
3  being the subject had the ability, the
4  opportunity, the officers were in imminent
5  jeopardy, and preclusion did not allow them to
6  back up.
7        So the -- to really boil it down simply,
8  the incident as a whole is looked at by the
9  Critical Incident Review Team.  The trigger pull
10 and moment of deadly force is looked at criminally
11 by the Force Investigative Team.
12    Q    Why wouldn't the Force Investigation
13 Team include a broader picture, like the decisions
14 on what force to use; in other words, a CET entry
15 or how long the officers had to wait?  Because
16 those are -- those are constitutional issues as
17 well; right?
18        MR. ANDERSON:  Objection.  Form.
19        Answer.
20        THE WITNESS:  I don't see it that way.
21 I see the -- you know, if you're doing a homicide
22 investigation and somebody, you know, provokes
23 somebody else, you're not looking at all of those
24 things.  You're looking at the time the homicide
25 occurred.

---

29

1        And for us, we really boil it down to
2  that trigger pull when the officers utilized
3  deadly force, and all of those other things are
4  handled administratively.
5  BY MR. BREEDEN:
6    Q    Can officers be criminally charged for
7  violating a member of the public's civil rights
8  resulting in their death?
9        MR. ANDERSON:  Objection.  Form.
10        Answer.
11        THE WITNESS:  Can you please say that
12 one more time?
13 BY MR. BREEDEN:
14    Q    Yeah.
15        The question is, you know,
16 hypothetically, can officers be charged if they --
17 criminally if they are found to have violated a
18 person's civil rights such that it caused their
19 death?
20    A    They can.
21    Q    Okay.  And is that under state -- Nevada
22 state law or is that under federal law or is that
23 under both?
24    A    It would be under both.
25    Q    Okay.  So even though the FIT team says,

---

LEXITAS

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 11 of 41
30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1  "Well, at the moment of the trigger pulls, that
2  was justified," it didn't review what happened
3  leading up to those trigger pulls to see if
4  criminal charges were appropriate?
5      A   Correct.
6      Q   Okay.  We kind of jumped around a little
7  bit, because I wanted to ask you about those --
8  well, you know, we may as well finish this up
9  too.  So we've talked a little bit about TRB and
10  FIT and CIRT.
11         OIO, what is its role and how does --
12  how does it factor into this process?
13      A   The Office of Internal Oversight is part
14  of the -- the full name is Office of Internal
15  Oversight and Constitutional Policing where --
16  where these sections are housed.  And they have a
17  bureau captain over them and then separate section
18  lieutenants and some clerical staff that help with
19  all of the -- the paperwork.
20      Q   Does OIO -- basically what it does, does
21  it just take the CIRT and the TRB reports and put
22  them in a format for public release?
23      A   I -- I think that's an
24  oversimplification.  There's more things that that
25  section is responsible for as well, as well as in

31

1  addition to the deadly uses of force, they review
2  all uses of force to see if there's any patterns
3  or trends, if there's -- for instance, if we have
4  an electronic control device, a TASER, that
5  there's several instances where the officer has
6  been trying to use it and it's not getting the
7  effective compliance that we need, they can look
8  at, is that a training issue?  So there's other
9  things they do besides just compile the findings
10  for those two boards.
11      Q   Do they actually conduct new or
12  additional investigation into officer-involved
13  shootings, or they -- or they just take the
14  investigation that the TRB and the CIRT has
15  already done?
16      A   They take the investigation that CIRT
17  and FIT have already done.
18      Q   Okay.  So they don't do any independent
19  investigation?
20      A   No.
21      Q   Okay.  But they do have the role of --
22  you know, it's in their name -- of ensuring that
23  there's been constitutional policing.  In other
24  words, that officers haven't violated the
25  constitution; right?

32

1      A   Right.
2      Q   Okay.  So let's back up a little bit
3  here and let's talk about you particularly, your
4  experience, work history, and education.
5         So first of all, how long have you lived
6  in Clark County, Nevada?
7      A   My whole life.
8      Q   Okay.  Born and raised.
9  Congratulations.
10         How long have you worked for the
11  Las Vegas Metropolitan Police Department?
12      A   I'm in my 27th year.
13      Q   Okay.  And when you were originally
14  hired, were you just hired as a patrol officer?
15      A   So I was hired at 18 as a cadet, and
16  that's where you join the police department and
17  you are a civilian and you learn all of the
18  paperwork and all of the codes.  And you are able
19  to do that until you turn 21, because in the state
20  of Nevada, you have to be 21 to be a police
21  officer.
22         And then when you turn 21, you go into
23  the police academy.  So the first three years of
24  my employment was as a civilian doing paperwork
25  and learning the different forms and procedures.

33

1  And then at '21, I was -- in the year '21, I went
2  into the police academy and became a police
3  officer.
4         Upon graduating the police academy, I
5  was a patrol officer for a few years and then went
6  to the problem-solving unit, which is kind of a --
7  detectives for the individual area commands.  Then
8  I did four years in the gang crimes bureau, which
9  is an investigative assignment, before promoting
10  to sergeant.
11         As a sergeant, I was assigned to patrol
12  again for a year, then went back to the gang unit
13  for another two years before promoting to
14  lieutenant.
15         And then lieutenant, you -- I would -- I
16  went back to patrol -- kind of every time you
17  promote, you end up going back to patrol for a
18  year -- in the downtown area command.  Then I was
19  an investigative administrative lieutenant for a
20  year in the southwest part of town.
21         Then I went to the Organizational
22  Development Bureau, which is training, and I was
23  the training lieutenant for a little over a year.
24  And then finally went back to the gang crimes
25  bureau as a lieutenant before promoting to

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

34

1  captain.
2        And in 2019 -- the end of 2019, I
3  promoted to captain, where I was a patrol area
4  command captain in the southeast part of town for
5  two years. And then my third year as a captain, I
6  went back to the Organizational Development
7  Bureau, which oversees training, which is the
8  academy, driver's training, range, everything
9  really comprising training on the department.
10       And then from there, I was appointed to
11 a deputy chief where I was a patrol deputy chief
12 for two years. And then my current capacity --
13 it's been about seven months -- I got moved over
14 to the homeland security division as the deputy
15 chief.
16    Q    When this officer-involved shooting
17 happened in January of 2022, were you still a
18 captain or were you a deputy chief at that time?
19    A    I was a captain.
20    Q    Okay. Have you ever worked homicide?
21    A    I have not.
22    Q    Have you ever worked SWAT?
23    A    I have not.
24    Q    Have you ever developed training
25 policies or procedures for SWAT?

---

35

1     A    I have not.
2     Q    Have you ever developed training
3  policies or procedures just for general execution
4  of search warrants?
5     A    I have not.
6     Q    And same question, specifically as to
7  knock-and-announce principles.
8     A    As far as creating policy or training?
9     Q    Yes. Any policy, procedures, or
10 training that you have developed for
11 knock-and-announce procedures?
12    A    No, I have not.
13    Q    Okay. Have you ever worked for any
14 other law enforcement organization?
15    A    I have not.
16    Q    In your time in law enforcement, have
17 you ever had any lawsuits filed against you for
18 violation of civil rights?
19    A    I have.
20    Q    Okay. How many?
21    A    One.
22    Q    Okay. So who filed that lawsuit?
23    A    It was early 2000s as a patrol officer,
24 and it was a -- I had a use of force involving a
25 TASER where the individual died of excited

---

36

1  delirium. And from what I recall, there was a
2  lawsuit. I was deposed and then issued summary
3  judgment.
4     Q    In your favor?
5     A    In my favor.
6     Q    There was no settlement with the family
7  of the person who died or the plaintiff?
8     A    Not that I'm aware of.
9     Q    Okay. Is that the only other time you
10 have been deposed then?
11    A    It is.
12    Q    Okay. Do you remember the name of the
13 individual who died?
14    A    William Lomax.
15    Q    Did you receive any discipline from the
16 department as a result of Mr. Lomax's death?
17    A    I did not.
18    Q    Did you receive any retraining or
19 anything of that nature?
20    A    I did not.
21    Q    You have never taken part in a SWAT CET
22 entry then?
23    A    No.
24    Q    Just to -- to very generally discuss
25 some of the structure at the Las Vegas

---

37

1  Metropolitan Police Department, the head -- first
2  of all, the department is considered its own
3  political subdivision under Nevada law; correct?
4     A    I don't know about political
5  subdivision, but I can tell you the structure. We
6  have an elected sheriff. So if that would
7  constitute political, because he is an elected
8  political figure, the sheriff of Clark County.
9     Q    Okay. And then at the time this
10 officer-involved shooting happened, that was Joe
11 Lombardo, who is our current governor; right?
12    A    Correct.
13    Q    And then Sheriff McMahill was an
14 undersheriff at that time -- now Sheriff McMahill?
15    A    He is now Sheriff McMahill. There -- he
16 left the department for a little while. He
17 retired and then came back to be the sheriff. I
18 don't have the exact date that he left the
19 department. That's something I would have to
20 check on.
21    Q    Well, let's -- I guess I just want to
22 talk more generally from the top down.
23       So there's the sheriff?
24    A    Correct.
25    Q    And then below the sheriff, there are

---

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 13 of 41
30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1  undersheriffs?
2      A    There is one undersheriff.  And then
3  there are assistant sheriffs and then deputy
4  chiefs.  And those are the commission rank
5  structure for the executive staff.
6      Q    For SWAT specifically, is the highest
7  ranking officer within the department assigned
8  only to SWAT, is that the SWAT captain?
9      A    Yes.
10     Q    And at the time of this OIS, that was
11 Capital Cole; correct?
12     A    It was.
13     Q    And then the next level below Captain
14 Cole would be SWAT lieutenant; correct?
15     A    Correct.
16     Q    And at this time, that was Lieutenant
17 O'Daniel.
18     A    It was.
19     Q    Is there only one SWAT captain?
20     A    There is only one SWAT captain.
21     Q    Is there only one SWAT lieutenant?
22     A    There is.
23     Q    Everybody below lieutenant is either a
24 SWAT officer or a team leader or assistant team
25 leader; right?

39

1      A    Correct.  And then for rank structures,
2  the team leaders are sergeants.  And then the
3  assistant team leaders are officers that have been
4  picked to be assistant team leaders.
5      Q    Okay.
6      A    But when you say team leader, it's
7  the -- the rank is sergeant, which falls right
8  underneath lieutenant.
9      Q    As a deputy chief, who is your immediate
10 supervisor?
11     A    An assistant sheriff.
12     Q    Which one specifically?
13     A    Right now, it's Assistant Sheriff Dori
14 Koren.
15     Q    And then as a deputy chief, what are
16 your day-to-day job duties?
17     A    So a deputy chief oversees bureaus.
18 Bureaus are led by captains.  So every deputy
19 chief has three to five bureaus under them where
20 you're overviewing the high level things going on
21 in that -- in that section.
22          So for a patrol deputy chief, you're
23 going to be getting briefed and briefing up on
24 shootings, homicides, vehicle fatalities, large
25 personnel issues.  In my current assignment for

40

1  homeland security, we had, you know, a cyber truck
2  bombing that happened here.  That was a big CT
3  investigation.
4          I oversee our counterterrorism division,
5  our special events section -- which you know we do
6  quite a few events here, so I'm usually in the
7  command structure working those events -- our
8  special investigations sections, as well as our
9  airport division.
10         But the -- the deputy chief level is the
11 high level oversight of those bureaus that then
12 provides information to the assistant sheriffs,
13 the undersheriff, and the sheriff on our weekly
14 staff briefings.
15     Q    And you would agree with me that your
16 current assignment -- assignment at homeland
17 security -- that really doesn't relate or
18 associate with SWAT and the officer-involved
19 shooting in this particular case.  It's a
20 different department?
21     A    It is a different department.
22     Q    Okay.  Other than sitting here today
23 during this deposition, have you ever been
24 represented in any other matter by Attorney Craig
25 Anderson or the law firm that he's with, which is

41

1  Marquis Aurbach?
2      A    No.
3      Q    Okay.  The next topic that you've been
4  designated to testify regarding is topic number
5  five, which deals with the Tactical Review Board,
6  its composition, and its findings regarding
7  Mr. William's officer-involved shooting.
8          So marked for this deposition as
9  Exhibit 2 is something which just says at the top
10 left "LVMPD Interoffice Memorandum."
11         Do you see that?
12     A    I do.
13     Q    Okay.  Is this the memorandum with the
14 findings of the Tactical Review Board?
15     A    This is.  And there was an additional
16 attachment to that as well that is Exhibit 3.  But
17 together those two comprise the -- the memorandum
18 that was sent to the sheriff.
19     Q    Okay.  And then the -- the sheriff in
20 this case at that time was Sheriff McMahill?
21     A    Correct.
22     Q    And so the members of the Tactical
23 Review Board, are they all listed there on the
24 first page of Exhibit 2?
25     A    They are.

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1    Q   Okay.  I'm just going to read them off.
2  Assistant Sheriff Walsh, Deputy Chief Prosser,
3  Deputy Chief Larkin, Deputy Chief LaRochelle,
4  Captain Rader -- which is you -- Captain Holmes,
5  Sergeant Celaya, Officer Jackson, and then there's
6  a nonvoting secretary, Kellcy Sullivan.
7      Are those the only board members that
8  took part in any consideration of this
9  officer-involved shooting by the TRB?
10   A   Yes.
11   Q   Okay.  And so at the time this
12 memorandum was prepared, CIRT's report was
13 available to the TRB; correct?
14   A   Yes.
15   Q   And is CRB's -- or, I'm sorry.  Is TRB's
16 real purpose just to review the CIRT report to
17 determine what needs to be done at a tactical
18 level?
19   A   What is -- well, their job is twofold.
20 It's to review the CIRT report and all of the
21 recommendations and then to sit through the
22 presentation for the Tactical Review Board and
23 then have the opportunity to ask questions to
24 the -- the presenter and also ask any clarifying
25 questions to the involved officers.

43

1    Q   So are you still on the Tactical Review
2  Board?
3    A   No.  I have been, but just
4  situationally.  If -- I have gone back if I've had
5  involved employees that were involved in
6  officer-involved shootings.  But I was on the
7  board this time because I was the captain over the
8  Organizational Development Bureau.
9      So the -- the board's composition
10 changes based on what sections are involved in the
11 officer-involved shooting and then what
12 assignments different department members have.
13   Q   Well, how many officer-involved
14 shootings have you reviewed as part of the TRB?
15   A   As a lieutenant and as a captain and
16 then as a deputy chief, I would say at least ten.
17   Q   Have you ever been on CIRT?
18   A   No.
19   Q   So tell me a little bit about the TRB
20 process.
21     When does it start following an
22 officer-involved shooting?  What type of
23 investigation occurs?  And, you know, what is the
24 ultimate purpose of TRB's review?
25   A   Well, the process starts on the day of

44

1  the officer-involved shooting.  When the -- the
2  Critical Incident Review Team responds to the
3  officer-involved shooting to start gathering all
4  the facts.  And the citizen review board members,
5  while not part of the Tactical Review Board --
6  they're part of the Use-of-Force Review Board --
7  they are actually able to respond to the scene as
8  well and get a scene walk-through so they can have
9  a better frame of reference when that board
10 happens.
11     After the initial officer-involved
12 shooting, they notice the involved employees that
13 they're going to be bringing them in for
14 interviews for the administrative process.  And
15 then over the next several weeks and months, they
16 are conducting their interviews with those
17 involved members, meeting with subject matter
18 experts -- which we call SMEs -- and finding out
19 if the -- what the officers are saying and what
20 they're seeing are in line with the policies and
21 the training that we have as a department.  And
22 that -- that's when it starts.
23     And I forget the rest of your question.
24   Q   Well, yeah, and, you know, I have some
25 follow-up questions here for you.

45

1      But the ultimate goal or end of the TRB
2  process is simply to send a memorandum to the
3  sheriff for the sheriff's review and any further
4  assessment that needs to be done?
5    A   So the ultimate goal is for us to make
6  sure we're doing things the best way to keep our
7  officers and the community safe.  The ultimate
8  goal is to be able to find if there's better ways
9  to do things, if -- if mistakes were made, was
10 there an -- an issue with the supervisory
11 management of that incident?
12     But it's all an administrative, thorough
13 deep dive to see why everything occurred and if
14 there's a better way to do that.
15   Q   For this TRB investigation, was it
16 Assistant Sheriff Andrew Walsh who was in charge?
17   A   Yes, Assistant Sheriff Walsh at the time
18 was the chair.
19   Q   And he actually signed this report, if
20 you look at the last page of it, which is
21 LVMPD 4859.  He's the person who ultimately signed
22 off on this memorandum; correct?
23   A   Correct.
24   Q   Now, is it Assistant Sheriff Walsh who
25 is actually typing up this report, or did some

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1  other member of the review board actually draft
2  it, and then Assist Sheriff Walsh simply reviewed
3  it and signed off?
4      A    I don't know -- I couldn't tell you who
5  drafted it. I know that they have a secretary on
6  the board taking notes, but I -- if I -- my
7  assumption would be that the chair does not draft
8  it. They review it and then approve it and sign
9  it, but that would be a question for
10  Sheriff Walsh.
11     Q    Okay. You mentioned that one of the
12  things the TRB does is discuss the issues in the
13  shooting with subject matter experts.
14         In this case, were those the same
15  subject matters experts that the CIRT team
16  consulted?
17     A    Can you -- can you say that again? I'm
18  getting a little confused on your -- the way you
19  phrased that.
20     Q    Yeah.
21         So if you look in the CIRT report, you
22  know, it lists different subject matter experts.
23  And then you mentioned that TRB also consults
24  subject matter experts.
25         Are those the same subject matter

47

1  experts, or were they different?
2      A    So I think -- I mean, if I said it that
3  way, that was a mischaracterization. The critical
4  incident review process, the CIRT team gets with
5  all of the subject matter experts when they're
6  coming up with their findings on everything.
7  Those findings are then presented -- the Tactical
8  Review Board itself does not have -- it's really
9  the same thing. It's the same subject matter
10  experts that are providing the feedback to the
11  CIRT investigation team.
12         And you mentioned before -- I was the
13  captain over our training section; however, never
14  worked SWAT. So they would bring in subject
15  matter experts that would have that knowledge base
16  on SWAT, because those are special tactics. But
17  that's all part of the critical incident review
18  process on how they're coming up with their
19  findings.
20     Q    In your opinion, did Metro take the
21  investigation of this officer-involved shooting
22  seriously?
23     A    Yes.
24     Q    In your opinion, did they do a thorough
25  job?

48

1      A    In my opinion, yes, they did.
2      Q    The CIRT report, in particular, is 222
3  pages long.
4          Have you seen any longer CIRT reports in
5  your career?
6      A    Not that I can recall.
7      Q    And the TRB memorandum itself is 34
8  pages.
9          Have you ever seen a longer TRB
10  memorandum?
11     A    I do not recall seeing one longer.
12     Q    Okay. So when we look at this list here
13  on the first page of the TRB memorandum, which is
14  LVMPD 4826, which one of -- which ones of those
15  board members -- I don't know if I said that
16  right. Let me rephrase it.
17         Which of these board members are
18  permanent members on the TRB and which were
19  assigned just for this officer-involved shooting?
20     A    The chair is a permanent member. The
21  deputy chief of professional standards is a
22  permanent member.
23     Q    Hold on. I'm sorry. Who is that
24  specifically?
25     A    I'm sorry. At that time, it would have

49

1  been Deputy Chief Jamie Prosser. So those two are
2  permanent members.
3          Deputy Chief Sasha Larkin was the deputy
4  chief that SWAT was comprised in. So she was on
5  the board because members in her chain were
6  involved. Deputy Chief James LaRochelle was a
7  board member because he was over the investigative
8  services division, and one of the things looked at
9  was homicides, so that involved his section. I
10  was on this board because I was the captain over
11  training.
12         So those are -- those are the ones that
13  get brought in because of the sections involved in
14  the Tactical Review Board. But the -- the
15  permanent positions would have been -- Assistant
16  Sheriff Andrew Walsh is the chair, and then the
17  professional standards deputy chief Jamie Prosser
18  at the time.
19     Q    But why was Captain Holmes on this
20  board?
21     A    Captain Holmes was on this board because
22  he was the captain over homicide at the time of
23  the incident.
24     Q    And I'm not sure how to pronounce this
25  last name, but why was Sergeant Celaya on the



Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

50

1   board?
2       A    You know what, I do not -- I do not know
3   why -- what role Sergeant Celaya had.
4       Q    And then the peer board member was
5   Officer Tremayne Jackson.
6            Do you see that?
7       A    I do see that.
8       Q    And so, what, was Officer Jackson
9   assigned to SWAT or some other department?
10      A    No.  So the way the peer board members
11  work is the -- there's officers that volunteer to
12  be peer board members at different ranks, and then
13  they go through some training on the composition
14  of the board.  But it's really to get somebody at
15  that same level to vote on if what they saw was
16  consistent with the training and tactics.  But I
17  couldn't tell you Officer Tremayne Jackson's
18  background.
19      Q    Well, and the idea of the peer board
20  member is that it will be the same rank as the
21  officers being investigated; right?
22      A    Yes.
23      Q    And so actually the -- it would seem
24  that the highest ranking officer being
25  investigated -- well, frankly, if you look under

---

51

1   there, it says "Officers Involved," and it
2   includes Captain Cole, Lieutenant O'Daniel.
3            But Sergeant Backman would have been the
4   highest ranking sergeant on the scene; right?
5       A    Right.
6       Q    And, in fact, he was in charge of the
7   announcements; right?
8       A    Correct.
9       Q    And he actually entered the apartment
10  and discharged his firearm too, didn't he?
11      A    Yes.
12      Q    Why wouldn't there be a sergeant peer
13  board member?
14      A    That may be what Sergeant Celaya was
15  there for.  It's not indicated in the report, and
16  I don't specifically remember if that was what
17  that sergeant's role was on the board or not.
18      Q    So TRB, to get to the point where it
19  produces a 34-page memorandum of its findings or
20  opinions, how many times does it meet?
21      A    With the subject matter experts?
22      Q    Just all -- all board members.
23      A    So the Tactical Review Board members,
24  the board comes together one time for -- for this
25  process.  The case agents, the detectives of the

---

52

1   Critical Incident Review Team have several
2   meetings in the months leading up to this board
3   with the subject matter experts.
4            As -- as you identified, you know, if
5   somebody wasn't in SWAT or the peer -- the board
6   member, you know, if they were in SWAT or not, the
7   subject matter experts are the ones that are
8   breaking down if the tactics and decision-making
9   done fits what their policies and procedures are.
10           So there's a lot of meetings that happen
11  before the board, but the board just meets for one
12  time on the day of the board.
13      Q    And in this case, when I was reviewing
14  the documents produced by Metro, there's an audio
15  recording of a meeting I think lasted six
16  hours or more.
17           Is that the recording of the one and
18  only TRB board meeting?
19      A    I mean, without hearing it, I -- I know
20  we record the meetings, so if that's what it's
21  labeled, yes.  But there's -- I mean, they record
22  interviews with officers as well.  But the
23  administrative boards are recorded, both the use
24  of force board and the training -- or the Tactical
25  Review Board.

---

53

1       Q    And do you remember this board meeting
2   being a six hour or more meeting?
3       A    It was several years ago.  I remember it
4   being very long, but I don't remember the exact
5   time.
6       Q    Okay.  And do you remember whether
7   during that meeting, involved persons such as
8   Lieutenant O'Daniel appeared and -- and testified
9   in front of the board?
10      A    I do remember Lieutenant O'Daniel being
11  there.  As far as testifying to the board, I don't
12  remember if she was asked any questions or not.
13  And the -- every involved officer is given an
14  opportunity to speak if they want to add
15  something, but they don't always speak.
16           So as far as testimony given, I can't
17  tell you if she did or not that day.  But I do
18  remember seeing her at the board.
19      Q    If officers do choose to speak in front
20  of the board, is it under oath?
21      A    It is under our -- it's not under oath
22  per court terms, but it's under oath for our --
23  our honesty and integrity policy, where if they
24  give any false statements, if they -- if they lie
25  about anything, that can be used for discipline up

---

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  to and including termination.
2      Q    When we look at the first page of this
3  memorandum here, which is Exhibit 2, the officers
4  involved there -- and it lists several, you know,
5  officers -- sergeant, lieutenant, captain -- are
6  there any you can recall specifically that
7  declined to appear in front of the board?
8      A    I believe John Scott retired and
9  declined to appear in front of the board.
10     Q    To your recollection, then, did all of
11  the officers involved appear?
12     A    As far as I can remember, yes.
13     Q    You mentioned earlier in your testimony
14  that one of the things the TRB does is it votes.
15         Do you recall saying that?
16     A    Yes.
17     Q    Are those votes recorded?
18     A    They are.
19     Q    And they would be on the audio recording
20  of the meeting, or are they recorded in some other
21  manner?
22     A    They are recorded and in writing.  When
23  the deliberation occurs -- after the case agent
24  presents the case, questions are able to be asked
25  to the involved officers.  The officers are then

55

1  excused from the room and the recording is turned
2  off, and then the board discusses everything.
3         And then they make their recommendations
4  on a sheet of paper, and they have three different
5  options:  They can validate the findings, they can
6  modify the findings, or they can overturn those
7  findings.
8      Q    And so part of the meeting is
9  audio-recorded.  But for the deliberation part or
10  the voting part, the recording is turned off?
11     A    Yes.
12     Q    But there are written records on how
13  specific board members voted on certain issues?
14     A    Yes.
15     Q    Okay.  And if I wanted to get those,
16  where would those be today?  Who would have
17  custody of them?
18     A    I'm not sure where those are housed.
19     Q    Okay.  Do you recall any of the findings
20  listed in this memorandum as being something other
21  than unanimous by the board?
22     A    I don't recall if they were unanimous or
23  not.  I can tell you, though -- by looking at the
24  report, I can tell you the -- the findings that --
25  that passed or were overturned, because it is by a

56

1  majority vote.  But I don't recall if they were
2  all unanimous or not.
3      Q    Okay.  So sitting here today, as we go
4  through them one by one, you will not -- well, I
5  will ask you as we go through whether you have a
6  specific recollection.
7      A    Okay.
8      Q    Now, just another thing, too, about the
9  TRB report.  There are parts of it in red and then
10  parts of it in blue.
11         Why were different colors used?
12     A    So the red indicates the -- the negative
13  conclusions, the blue were the positive
14  conclusions.
15     Q    Okay.  And let's see here.  Turning to
16  page three of the report, which is 4828, 29
17  general conclusions from CIRT were reviewed by
18  TRB; correct?
19     A    Correct.
20     Q    And of those 29, 22 were validated.
21         That means that TRB agreed with CIRT and
22  made no changes; correct?
23     A    Correct.
24     Q    Five were modified, and then two were
25  overturned; correct?

57

1      A    Correct.
2      Q    Would you say that overwhelmingly, TRB
3  agreed with the findings and conclusions of the
4  CIRT report?
5      A    Yes.
6      Q    On page two of the report, 4827, I found
7  something unusual here.  If you look, the -- one,
8  two -- third paragraph down, the last sentence, it
9  refers -- it refers to the underlying homicide as
10  being a, quote, gang-related shooting that
11  occurred in December of 2021, end quote.
12         That homicide has never been solved;
13  correct?
14     A    Well, there's the -- it references a
15  homicide and then it references a gang shooting.
16  I believe that homicide has recently been solved.
17  I'm not sure about the gang shooting that -- are
18  we talking about at the time of the board or to
19  this day right now?
20     Q    Well, let's -- let's talk about right
21  now.  So I see here -- you know, thank you for
22  clarifying a little bit, because I may have
23  misunderstood this section.  But let's go back,
24  and we'll talk about the underlying homicide.
25         And that homicide occurred at the Sam's

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

1  Town Hotel and casino; correct?
2       A   I believe it was across the street, if
3  memory serves me right.  But in that -- in that
4  area, yes.
5       Q   You believe that homicide was recently
6  solved?
7       A   I believe so.
8       Q   Has there been a conviction?
9       A   I don't know.
10      Q   Has there been an arrest?
11      A   I know an arrest warrant was issued, and
12  I thought that an individual was picked up, but
13  I -- I couldn't tell you for certain.
14      Q   When do you believe that arrest warrant
15  was issued?
16      A   Recently, but I couldn't tell you if
17  that was a month or three months.
18      Q   Was the person arrested any of the
19  suspects who were being investigated when the
20  search warrant that resulted in this
21  officer-involved shooting occurred?
22      A   I'm not sure.
23      Q   Okay.  Do you know if it was Wattsel
24  Rembert?
25      A   I do not.

59

1       Q   Do you know if it was Corvell Fisher?
2       A   I do not.
3       Q   Do you know if it was Arial Soto?
4       A   I do not.
5       Q   And is it your testimony that you just
6  do not know one way or the other, or you're saying
7  those -- those names, it was not those names?
8       A   It could be those names.  I do not know
9  one way or the other.
10      Q   And so you're saying the gang-related
11  shooting is a shooting separate from the homicide?
12      A   My recollection is, yes, it was a
13  separate thing from the homicide -- or a separate
14  incident.
15      Q   For the gang-related shooting, to your
16  knowledge, has anyone been arrested or convicted?
17      A   I'm not aware of either way.
18      Q   I would like to go through the TRB
19  report and address certain conclusions and then
20  how they were validated, modified, or overturned
21  by TRB.
22      A   Okay.  Am I able to take a quick
23  bathroom break?
24          MR. BREEDEN:  Oh, yeah.  Let's --
25  we've been going an hour and 15 minutes or so.

60

1  Let's take a 15-minute break.  Perfect.
2          THE VIDEOGRAPHER:  Going off the
3  record at 10:15 a.m.
4          (Whereupon, a recess was taken.)
5          THE VIDEOGRAPHER:  We're back on the
6  record.  The time is 10:26 a.m.
7  BY MR. BREEDEN:
8       Q   Okay.  Deputy Chief Rader, we took a
9  short break.  We're back on the record now, and
10  we're getting ready to look over the TRB
11  memorandum or report.
12          I just want to go back, though.  You
13  know, this memorandum is sent to the sheriff, who
14  at that time was Kevin McMahill.
15          And does the sheriff formally respond to
16  this in any way?
17      A   The -- I don't know if the sheriff
18  formally responds.  The sheriff does the -- he
19  gets the report, and then we put out our key
20  findings -- for transparency, that's another one
21  of your exhibits, for reference -- on the things
22  that we've identified and could have done better.
23  I know that part comes out.  But I don't -- I
24  don't understand -- or I'm not aware of a formal
25  response, I guess.

61

1       Q   Okay.  So, in other words, there's
2  nothing Sheriff McMahill goes through and says
3  agree, disagree?  There's nothing like that?
4       A   Well, he's the sheriff, so if he wanted
5  to do something, he could.  I'm just not aware of
6  what happens when that memo does get to him.
7       Q   Okay.  Also here on Exhibit 2, the front
8  page to the right of Sheriff McMahill's name,
9  there's some handwriting there, and it looks like
10  maybe K3448M, possibly.
11          Do you know what that indicates?
12      A   So that -- for memos, that's -- when
13  somebody gets the memo, that's their sign-off on
14  that memo.  So there is no signature line for him,
15  because it was done up through Assistant Sheriff,
16  at the time, Walsh as the chair of the board.
17          And then that would be the sheriff
18  putting his initial and P number, which is his
19  personnel number, that -- that he has that memo.
20      Q   Okay.  So it's at least verified that
21  Sheriff McMahill saw this?
22      A   Yes.
23      Q   Okay.  Let's talk about -- I want to
24  start by talking about the two conclusions of CIRT
25  which TRB overturned.  So the first one, as I went

30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1  through this report, was Conclusion 5, which
2  begins on page six of the report and -- but most
3  of it is on page seven. It's very brief -- very
4  brief.
5          So in the TRB report, there's a little
6  strike-through of the conclusion, and that's to
7  indicate that it was overturned or -- or modified
8  by TRB; correct?
9      A   Correct.
10     Q   And so the CIRT conclusion was that
11  homicide's investigation into the underlying
12  murder up to the officer-involved shooting was
13  conducted appropriately and within Metro's
14  standards. And that was overturned by TRB.
15         Why?
16     A   So on this particular issue, we had a
17  policy for the case management and utilizing the
18  case management system, which is P1, that we were
19  under the impression all of our officers were
20  utilizing that.
21         Well, homicide section was in
22  consultation with the district attorney's office,
23  and their relationship would utilize the P1 system
24  once the case was -- was finished, but while
25  working the case, would do a running OR and then a

63

1  very comprehensive final OR.
2          And the DA's liked that for court,
3  because it was -- it allowed for more thorough
4  documentation and information for the homicide
5  report.
6          So that was one of those things where
7  they were doing their own thing that wasn't within
8  policy, but it was at the request of the deputy
9  district attorney's office and in -- with approval
10  of the leadership in homicide.
11     Q   And was failure of homicide to use the
12  P1 system the only reason why that conclusion was
13  overturned?
14     A   To my knowledge, yes.
15     Q   Now, I can probably go through this
16  homicide investigation and pick out a dozen or
17  more criticisms that I have of it. But, for
18  example, one criticism would be that there seems
19  to have been a failure of intelligence, meaning a
20  failure to know who was actually inside the
21  apartment at the time the warrant was served.
22         But do you consider that to be a
23  homicide issue or a SWAT issue?
24     A   Well, that's something where the two can
25  kind of cross. And that was one of the things

64

1  that was also discussed on -- on the search
2  warrants for the SWAT service, where the entire
3  chain of the homicide section reviews that, as
4  well as the entire chain of the homicide section
5  reviews that before the SWAT team signs off or
6  goes and executes that search warrant.
7          The homicide investigation is really
8  focused solely on the -- really the who done it,
9  to put it in simple terms, of that investigation.
10  The apprehension phase is -- in this component was
11  going to be completed by the SWAT section.
12         But SWAT also doesn't have the -- the
13  manpower or some of the equipment to do lengthy
14  surveillances, so it couldn't just be put on one
15  or the other. Some of that responsibility would
16  be on -- a cross section of both.
17     Q   Okay. So what you're really saying is,
18  hey, some of these issues that Metro identified,
19  they're kind of mixed among the departments. But
20  the -- the reason why we overturned this
21  particular finding, number five -- or Conclusion
22  Number 5 was because homicide was not using the P1
23  system as they should have?
24     A   I believe that's why that one was
25  overturned. I -- I remember that being a

65

1  discussion point on the case management component
2  of that.
3      Q   Do you remember whether the decision to
4  overturn Conclusion Number 5 was unanimous?
5      A   I do not.
6      Q   The next one that was overturned is
7  Issue Number 12, which begins on page 14,
8  LVMPD4839. Now, this conclusion refers to the
9  fact that as officers approached the front door of
10  Apartment 1125 to serve the search warrant, they
11  encountered a reinforced brass wrap on the door.
12  And that creates problems, because their plan is
13  to use a battering device on the door, and the
14  reinforced brass wrap is going to impair that.
15  And this was investigated by CIRT to determine
16  whether a tactical should have been called.
17         And CIRT ultimately concluded that
18  whether that tactical should have been called at
19  that time was a judgment call to be made by SWAT.
20  And CIRT determined that there was a lack of
21  clarity in the lesson plan as to when a tactical
22  call should be utilized. That conclusion was
23  overturned by TRB.
24         Why was that done?
25     A   So one of the things that we can never

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

66

1  do is really have a policy that covers everything.
2  There has to be -- there really has to be room in
3  there, and what we truly operate off of all of our
4  tactics is a reasonableness standard for officers.
5        And if you say there's a brass wrap on
6  the door, you can't -- or what we didn't want to
7  do is limit the options available to that team,
8  because there still might be a reason to not go
9  tactical and try to breach that door.
10       So the discussion I remember on that
11 point was that while it's easy for -- sitting
12 behind a desk for months after the incident to try
13 to make that determination, when you have a team
14 of officers moving up to a dynamic situation,
15 something that could be a -- a deadly force
16 situation and there's all of the elements out
17 there -- I believe there was a gas station,
18 occupied apartments surrounding this -- you can't
19 overpolicize the ability for that team to make
20 that judgment call. And the -- to my
21 recollection, that's why that one was overturned.
22    Q    So there was sort of two elements there.
23 One is the issue of whether a tactical should have
24 been called at all.
25       And did TRB believe that a tactical

---

67

1  should have been called at that point when they
2  encountered the brass wrap?
3     A    The discussion I remember having is
4  if -- particularly with this complex, one of the
5  issues in the deliberation was the surround and
6  call out or going up for the -- the controlled
7  entry, is that there was a lot of exposure to the
8  team members just because of the configuration of
9  the apartment. It butted up against -- there was
10 kind of a weird angle with the wall, so you
11 couldn't really get a BearCat or any of the armor
12 in there.
13       And that was, again, one of those things
14 where you have to allow the boots on the ground,
15 the people that have eyes on that section to be
16 able to make that call, and you can't overpolicize
17 that for fear of inaction when action needs to
18 happen, which could result in officers or civilian
19 members getting killed.
20    Q    Okay. Well, I understand -- you know,
21 I'm going to talk about the policy issue here in a
22 second.
23       But on the -- sort of the threshold
24 issue, does TRB think a tactical should have been
25 called when the brass wrap was encountered? What

---

68

1  was the conclusion on that issue?
2     A    That, no, the brass wrap in itself would
3  not make you call a tactical or -- or tell you to
4  press forward. It would be a judgment call.
5     Q    Now, you would agree that Metro should
6  have policies that are clear to officers; correct?
7     A    I believe -- and in my 27 years of
8  experience, you can give pillars to guide
9  behind -- or to guide you by, and you can't
10 possibly predict every potential scenario, because
11 policing would be very easy if we could.
12       And the officers have to get the
13 training the best way that we can train them, and
14 they have to make those connections by themselves.
15 Because I don't know if this SWAT officer had
16 encountered brass wraps before and there were no
17 issues. There was a myriad of things that could
18 have played into the decision for them to not call
19 tactical.
20       So, yes, it is very important to have
21 policies, but we'll never be able to policize
22 everything just because we're dealing with the
23 unknown and human nature. That also highlights
24 the importance of having the Critical Incident
25 Review Team and the Tactical Review Board so we

---

69

1  can learn about these things and try to have --
2  identify if -- have we been lucky on other
3  incidents, or have we been good and are there
4  better ways to do it?
5        So I agree with your statement that it
6  is important to have clear policies, but I also do
7  not want to overgeneralize that you could have
8  policies for every single thing.
9     Q    So Metro agrees, generally speaking,
10 that the policies -- you know, if you have a
11 choice between multiple ways of wording a policy,
12 the policy that is the clearest for the officers
13 is generally the best choice.
14       But Metro's position on this particular
15 issue was it was just too difficult to draft a new
16 policy that would encompass all issues?
17    A    Not -- I'm not -- I'm not sure what --
18 what you mean by that.
19       We give some latitude to the officers
20 having to make split-second decisions in the
21 moment. And when you have a team of operators or
22 SWAT folks or officers going up to an unknown
23 threat area and you have to make that call,
24 there's so many different things that could affect
25 it.

---

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 21 of 41
30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

70

1    And, you know, you could have a child
2 playing outside which would change it.  You could
3 hear something inside that would change it.
4    So we thought -- my recollection is that
5 we were not going to put in there, "If this
6 happens, you'll do this; if this happens, you'll
7 do that."  It will just be handled in SWAT
8 training, and they would look at this as a case
9 review and -- and have those discussions when
10 training.
11    Q    Did TRB, on behalf of Metro, actually
12 consider any specific amended language for that
13 policy?
14    A    Not that I recall.
15    Q    All right.  When Metro, through the TRB,
16 investigated this officer-involved shooting, it
17 found there had been multiple failures of policy
18 and training; correct?
19    A    There were some, yes.
20    Q    I would like to talk about Conclusion
21 Number 2, which begins on page three, LVMPD4828.
22    A    And you said 2?  Conclusion 2?
23    Q    Yes, which begins on page three.
24    A    Okay.
25    Q    Now, this is the conclusion that speaks

71

1 about homicide's failure to use the P1 notes,
2 which stands for Premier 1; correct?
3    A    Correct.
4    Q    And that was validated by Metro through
5 the TRB board; correct?
6    A    Correct.
7    Q    Did Metro believe that that made any
8 difference ultimately into how this search warrant
9 was planned or executed?
10    A    No.  This was one of those things that
11 came up with the review.  And it was a policy
12 failure, but I don't remember us saying it had a
13 direct correlation to the officer-involved
14 shooting.
15    Q    And so if homicide isn't using the P1
16 case notes and SWAT, when they're reviewing the
17 IAP or planning the SWAT operation, wants to
18 review the P1 case notes, there simply aren't any
19 to review; correct?
20    A    Well, so the case notes are specific
21 just for that section, so SWAT would not have
22 access to review those case notes.  The pertinent
23 information would be put in the SWAT IAP, and then
24 the search warrant application and affidavit.
25    So that, I don't believe, would have any

72

1 bearing one way or the other, because that's not
2 something that existed then or exists now, where a
3 tactical unit would go review the investigative
4 case notes in the P1 system.
5    Q    So based on Metro's policies, which
6 continue to this day, SWAT, if they wanted to look
7 more in-depth into the underlying investigation --
8 which in this was a homicide -- they would be
9 unable to.  They would only have the information
10 that homicide put on the IAP?
11    A    Yeah, the information in the homicide
12 IAP and the search warrant.  And that's why
13 there's a dual approval process now, where the
14 homicide chain of command up to the captain signs
15 off on that, as well the SWAT captain.  And then
16 if there's questions or -- or concerns, then those
17 sections talk to each other.
18    And if SWAT did have a question about
19 something, they could discuss that.  But the
20 tactical section would not have access to the case
21 notes.
22    Q    Metro, through TRB, did conclude that
23 this had been a failure of tactics, training, and
24 policy; correct?
25    A    Yes.  This was a -- a policy failure,

73

1 because policy stated all detective investigative
2 units would be utilizing P1, and homicide was not.
3    Q    And do you recall whether this was a
4 unanimous conclusion by TRB?
5    A    I do not recall.
6    Q    And what, if any, response by the
7 sheriff or anyone else at Metro occurred as a
8 result of this finding?
9    A    So further discussions were had with the
10 district attorney's office on the need to have the
11 homicide case files done differently than, let's
12 say, a -- a car burglary, just because of the
13 complexities of that case and all of the forensics
14 and multiple interviews that would have to happen.
15 And they elected to policize but keep the process
16 that they were doing.
17    So update it so they were not out of
18 policy and homicide can still be in compliance
19 with what the prosecuting district attorney would
20 want for their -- for their attorneys going
21 forward on that case and in a way that they can
22 still accomplish the same things outside of P1
23 with their rolling officer's reports on all of the
24 investigative steps.
25    Q    So what happened was Metro looked at

74

1  this and they said, well, let's just change our
2  policy for homicide so they don't have to use P1?
3      A   Well, no, it was let's see if there's a
4  reason for it.  And that's why we discussed with
5  the district attorney's office on why there is a
6  need and could that still have been facilitated by
7  going through P1.  Which the joint consensus was,
8  no, that actually was a better way of doing things
9  and that's why they were doing it that way.
10     Q   Moving on to Conclusion Number 4, that
11 was validated by Metro through the TRB; correct?
12     A   Correct.
13     Q   And I'm paraphrasing, and if you
14 disagree with this, tell me.  But basically this
15 conclusion was that even though the search warrant
16 that resulted in this officer-involved shooting
17 was approved by a judge, the search warrant was
18 not to Metro's internal policies and standards,
19 because the description of what was to be sought
20 in the search warrant was too vague in some
21 instances; correct?
22     A   Correct.
23     Q   Okay.  For example, clothing was sought,
24 but that wasn't limited to, you know, clothing
25 seen by the suspects or worn by the suspects or

75

1  known to be in possession of the suspects.  And
2  then cellular phones were sought, but virtually
3  everybody has a cellular phone, and there was no
4  cellular phone specifically used.  Like, a
5  cellular phone wasn't the murder weapon in the
6  underlying homicide.
7      And these were failures of policies and
8  procedures in how the search warrants were filled
9  out; correct?
10     A   Correct.
11     Q   All right.  And so as far as Metro's
12 internal policies and procedures are concerned,
13 the search warrant that led to Mr. Williams'
14 shooting never should have even been submitted to
15 a judge for those reasons?
16     MR. ANDERSON:  Objection.  Form.
17     Go ahead.
18     THE WITNESS:  No.  What we're saying,
19 almost like the -- we just talked about with the
20 homicide P1, the homicide P1 mistakes that
21 occurred had no bearing on the end result of the
22 officer-involved shooting.  This was another one
23 of those things where, how can we get better?
24     The warrant was still legal and
25 lawful, having been signed by a judge.  But we

76

1  identified that, for best practices, we needed to
2  be adhering to the policy of specifically listing
3  those items to be sought and seized.  So the --
4  the department didn't say it was a bad search
5  warrant, it should have never been served.  It
6  was, it could have been written with more
7  specifics on the items sought to be seized.
8  BY MR. BREEDEN:
9      Q   Well, isn't Metro just saying, look,
10 this warrant was not properly filled out, but a
11 judge didn't catch that?
12     MR. ANDERSON:  Objection.  Form.
13     THE WITNESS:  So what I will say is we
14 hold ourselves to a higher standard most times
15 than the -- the legal standard that the law
16 allows.  And that's because policies can change
17 quicker than laws can change, and we can control
18 our policies, where we don't obviously create the
19 law.
20     So when we are able to come up with
21 best practices on how to do things -- and this is
22 just one of those areas that we identified where
23 the better practice would have been to be more
24 specific than what he listed, and that's why the
25 board upheld that finding.

77

1  BY MR. BREEDEN:
2      Q   Was that a unanimous finding?
3      A   I do not recall.
4      Q   Do you recall what the response from the
5  sheriff or anyone else at Metro was to this
6  conclusion?
7      A   I do remember we pushed out training for
8  all of the department.  And in the search warrant
9  class and the refresher classes, it is a point of
10 emphasis.
11     Q   I would like to talk next about
12 Conclusion Number 6.  This begins on page seven,
13 LVMPD4832.
14     Were there numerous problems that were
15 found with the IAP and how it was completed?
16     A   Yes.
17     Q   And just for the record, IAP, what does
18 that stand for?
19     A   An IAP is an incident action plan.
20     Q   And an IAP is required to be filled out
21 by SWAT for every SWAT search warrant execution?
22     A   So the incident action plan is filled
23 out by the requesting bureau, and then there's a
24 portion that SWAT will then fill out as well.  So
25 it's done in conjunction, but it originates with,

**78**

1  in this instance, the homicide section.
2      Q   Do you agree with me that at least the
3  portion of the IAP that discusses whether a CET or
4  a SACO should be used, that that should be in
5  SWAT's judgment?
6      A   Yes.
7      Q   Homicide should not be dictating to SWAT
8  whether a CET or a SACO is used; correct?
9      A   Agreed. I would agree with that.
10     Q   So this conclusion was validated by
11  Metro; correct?
12     A   Correct.
13         And then if -- if I may, so the -- the
14  reason SWAT gets the request and then the captain
15  has to approve it is for that very fact that you
16  mentioned, so a -- I guess you could call it
17  competing interests.
18         A narcotics detective might want a SWAT
19  team to go in there very quickly to recover
20  narcotics before they could be flushed or
21  discarded, but there could be an undue risk to the
22  SWAT team in that instance. So while the
23  investigating -- or originating entity, in this
24  case being homicide, might want a certain tactic
25  to be used, it's the SWAT team that's going to

**79**

1  make that determination on how they're going to
2  proceed with that tactic.
3      Q   And ultimately Metro determined, through
4  the TRB, that there had been a policy and training
5  failure regarding use of the IAPs and how they
6  were completed; correct?
7      A   Correct.
8      Q   And so why don't you go back and, just
9  in your own words, summarize for me the ways in
10  which the IAP that led to this -- how this search
11  warrant was executed were policy and training
12  failures.
13     A   So there was a standardized incident
14  action plan that was used, an LVMPD form, and the
15  SWAT captain wanted some additional things in the
16  IAP. So he had pushed out an updated form to some
17  of the investigative sections that used them a lot
18  to start using.
19         When the initial form was sent over,
20  the -- the wrong form -- or the older form was
21  used; however, that was still the official LVMPD
22  form. You have the SWAT captain that wanted some
23  additional information and wanted the additional
24  form that was used.
25         This was also compounded by signatures

**80**

1  needed at the captain level with some COVID
2  exposures, where people were not able to
3  physically be at work because of -- because of
4  contracting COVID.
5         So the IAP got sent to the SWAT
6  Captain Cole and kicked back on three separate
7  occasions where he wanted the additional
8  information. The initial signatures were
9  obtained, but there was -- I might have the page
10  numbers wrong, but if it was initially a 14-page
11  form, that turned into a 17-page form. You know,
12  there could be two or three additional forms that
13  needed to be filled out where they were then
14  inserted and given back to Captain Cole.
15         So it still had signatures, but it had
16  the additional information, which led to some
17  misaligned page numbers on there. And that's why
18  there was confusion and a policy failure on there.
19         And what should have happened is that
20  form was approved and replaced the old department
21  form so everybody would only be using that one
22  instead of a -- kind of a blended approach that
23  happened in this instance.
24     Q   The IAP for this search warrant called
25  for a CET entry, didn't it?

**81**

1      A   My recollection is that that was
2  requested and that was what the SWAT team, after
3  recon, elected to do.
4      Q   It was requested by homicide and
5  approved by SWAT; correct?
6      A   If I remember correctly, yes.
7      Q   And that IAP was rejected three
8  different times before a fourth IAP was approved;
9  correct?
10     A   Correct.
11     Q   One of the issues with the ultimate
12  IAP -- or I should say the different versions of
13  the IAP is that they differed in whether there was
14  an exigent need to serve this warrant; correct?
15     A   Correct.
16     Q   Do you agree with me that whether the
17  warrant should be served in an exigent manner
18  would affect whether a CET or a SACO should be
19  selected?
20     A   Can you say that one more time?
21     Q   Yes.
22         Whether this is exigent service, would
23  that play any role in the determination of whether
24  CET or SACO techniques should be used?
25     A   Yes, that would be a factor.

Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1    Q   And in every iteration of the IAP except
2  for the last one, the exigent box was checked no;
3  correct?
4    A   Correct.
5    Q   But then in the final one, somebody
6  said, "Well, let's check that box yes," and then
7  they gave a little generic description that says
8  there's a threat to the community by having these
9  individuals remain out of custody.
10       Do you believe that was to Metro's
11 policies, standards, and training, the way the
12 exigency box was checked?
13   A   I don't dispute that they believed there
14 was a threat to the community, but I -- I do agree
15 that it wasn't to our standards by utilizing the
16 two different forms and not having another
17 signature, because a captain was out with COVID.
18   Q   Well, just the generic description here
19 that there's a threat to the community by having
20 these individuals remain out of custody, I mean,
21 that could be said for almost any sort of crime or
22 search warrant; correct?
23       MR. ANDERSON: Objection. Form.
24       THE WITNESS: So it may. But one of
25 the other considerations for the SWAT team is, how

83

1  can they safely or as safe as possible serve a
2  search warrant with the environmental factors that
3  are around them?  And that also was one of the
4  things that played into the SWAT team ultimately
5  going with the CET for that service, some of the
6  environmental factors that were there and
7  outlined.
8  BY MR. BREEDEN:
9    Q   It describes as a reason for exigency
10 that the individuals are remaining out of custody.
11 But there wasn't even an arrest warrant here, was
12 there?
13   A   From my -- from my recollection, there
14 was not an arrest warrant.  However, there was PC
15 based off of a family member identifying a
16 suspect.  I also remember there being discussions
17 for the gang shooting that North Las Vegas Police
18 Department had PC to make an arrest as well, but
19 I -- I do not recall that an arrest warrant was
20 active.
21   Q   Okay.  And so the reason for the
22 exigency that was given is that these people need
23 to be taken into custody, but there was no arrest
24 warrant to take them into custody, was there?
25   A   Not that I'm aware of.  But somebody can

84

1  still be a danger to the public and can still be
2  arrested on probable cause without an arrest
3  warrant, so I -- I don't think that's universally
4  true.
5    Q   What is Metro's understanding then as to
6  whether -- like, let's say one of the suspects was
7  found at the apartment.
8        Could they have been taken into custody?
9    A   Depending on who the individual was,
10 yes.
11   Q   So you believe that you can just arrest
12 anybody on the street without an arrest warrant as
13 long as somebody at Metro says, well, there was
14 probable cause?
15   A   Of course not.  If the -- the burden to
16 arrest somebody would be probable cause, and
17 there's different ways of doing that.  Probable
18 cause, if fresh, an officer has reason to believe
19 there are takable facts, they would be able to
20 effect that arrest.  Another way of doing that is
21 with an arrest warrant.
22       So it's -- we don't arrest people just
23 for arrest warrants.  We can make an arrest on
24 probable cause as well.
25   Q   Well, if you -- I mean, is there

85

1  unfettered discretion, in Metro's opinion, to
2  arrest on probable cause?  Because if that was the
3  standard, why would you ever bother to seek an
4  arrest warrant?  What's the difference between,
5  you know, the line at which Metro thinks an arrest
6  warrant is needed?
7    A   Well, if I'm looking for an individual
8  and I have a search warrant and believe that
9  individual can be inside, and I encounter that
10 individual and have probable cause to make an
11 arrest, I would be able to make that arrest.
12       If I'm looking for an individual or
13 don't know where they're at, another avenue is to
14 obtain an arrest warrant so any officer that
15 encounters that individual would be able to make
16 that arrest.
17   Q   Did Metro conclude that the failure to
18 get an arrest warrant for this IAP was a failure
19 of policies, standards, or training?
20   A   I don't believe so.
21   Q   Was -- were the officers here, were they
22 using a search warrant as a substitute for an
23 arrest warrant?
24   A   I don't believe so.
25   Q   Are you aware that there's some

30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86

1 testimony that SWAT officers were told if they
2 encountered the suspects, they were to arrest
3 them?
4   A   I am not aware if that happened or not.
5   Q   Okay. If that did occur, would that be
6 against Metro's policies, standards, and training?
7   A   That if SWAT saw an individual, to
8 arrest them?
9   Q   If they were told in the course of
10 executing the search warrant that if they
11 encountered the suspects, they were to arrest
12 them.
13   A   Well, a search warrant -- I think
14 we're -- we're maybe confusing some verbiage here.
15 The search warrant signed by a judge gives us
16 authorization to go into a place and seize that
17 property, that structure, and the people present
18 to make it safe to do so. SWAT officers don't
19 typically make arrests.
20       They do the tactical clearing of the
21 structure, and then once it is deemed safe, they
22 turn that over to the investigative or originating
23 unit.
24       So could a SWAT officer make an arrest?
25 They could, because they're a commissioned police

87

1 officer. But it would be the -- normally it would
2 be the detective or the originating entity that
3 would come over, take over custody of the house
4 from SWAT. And they would be making any arrests
5 or doing any interviews or continuing their
6 investigation.
7   Q   For the fourth IAP, which is the one
8 that was ultimately approved, there had been
9 signature pages from prior IAPs that were reused
10 even though the IAP had changed; correct?
11   A   Correct.
12   Q   And that's a failure of policies,
13 standards, and training?
14   A   Yes.
15   Q   Also, one of the things that occurred
16 was that the anticipated team leader,
17 Sergeant Findley, he happened to be out of town --
18 I think he was on a hunting trip with his son --
19 when the fourth IAP was drafted.
20       Were you aware of that?
21   A   I'm just aware he was out on vacation.
22 I don't know any of the particulars, but I am
23 aware he was out -- or not working here in town
24 when that did occur.
25   Q   And for that reason, Sergeant Backman

88

1 filled in in his place for that IAP; correct?
2   A   Correct.
3   Q   Is that against policies, standards, and
4 training for Metro?
5       MR. ANDERSON: What part?
6       MR. BREEDEN: The part specifically
7 with Sergeant Backman assisting in the IAP.
8       MR. ANDERSON: Go ahead and answer.
9       THE WITNESS: No. And, you know,
10 policing is a 24/7/365 thing that happens. So we
11 have redundancies and -- and sister squads and
12 other sergeants for a reason, so when days off do
13 occur or if somebody is out on vacation, they
14 would be able to still come in and be the sergeant
15 for that, even if that's not their regular squad
16 that they're overseeing. There's still a sergeant
17 that's in that section.
18 BY MR. BREEDEN:
19   Q   So -- and we'll talk about this here in
20 a few minutes.
21       Metro did conclude that there had been a
22 failure of training in that Sergeant Backman had
23 not completed the 120-hour SWAT basic training
24 course; correct?
25   A   Correct.

89

1   Q   But Metro did not conclude that it was
2 unacceptable for a SWAT sergeant, who hadn't
3 completed basic training, to assist with
4 completion of the IAP?
5   A   No, not that I'm aware of.
6   Q   So Metro believes that a member of SWAT
7 who has not been completely trained should be
8 assisting in the planning of the operation?
9 That's Metro's position?
10   A   Well, Metro's position was they
11 identified a gap. And without going to the
12 specific finding, Sergeant Backman, when he went
13 up to the SWAT section, they were only doing the
14 SWAT school one time a year. And there was
15 additional training that was still given to him,
16 and part of that training was shadowing other
17 supervisors and seeing how that process plays out.
18       So while he did not have the SWAT school
19 with a -- that all of the operators would have
20 had -- that's something that's been rectified --
21 there was nothing prohibiting him from being able
22 to step out and help out another sergeant with the
23 training that he did have up to that point.
24   Q   What did Sheriff McMahill or anyone else
25 at Metro do regarding this conclusion?

**90**

1    A   I know that as a result of this
2    conclusion, the SWAT school is offered multiple
3    times a year. And when operators and sergeants
4    are on the list to come up, even if they're not in
5    the section, they can go through that school.
6        And then anything more specific than
7    that, you might want to ask your SWAT SME. But I
8    do know it was addressed by the reopening of the
9    school being offered. I believe they even
10   extended the time frame of the school, so it even
11   encompasses more hours. And also getting folks --
12   or selected members up to that school even before
13   they transitioned or transferred to that position.
14       Q   Surely as a peace officer who has been
15   in charge of training officers before, you agree
16   that training has value to officers; right?
17       A   I do.
18       Q   And we train officers because we want
19   them to perform their job in a safe manner;
20   correct?
21       A   Correct.
22       Q   And we train them because they want --
23   we want officers to perform their job in a manner
24   that complies with state and federal law; correct?
25       A   Yes.

**91**

1    Q   All of that is part of training; right?
2    A   It is.
3    Q   And Sergeant Backman didn't have that
4    training when he was on this SWAT operation, did
5    he?
6    A   He did not have the SWAT school, which
7    encompasses a lot of different things. However,
8    he did have some other institutional training and
9    on-the-job training from his time there. But
10   he -- all I know that -- today, what occurred
11   there is he did not have the 100 and however many
12   hours of SWAT school when the shooting did occur.
13       Q   And we'll talk about Conclusions 7 and 8
14   next. They're kind of related, but I guess I'll
15   break it down.
16       Conclusion 7 was that CIRT recognized
17   there were some problems in having a new
18   sergeant -- that would Sergeant Backman --
19   participate in live missions. But ultimately they
20   concluded that Sergeant Backman's actions had been
21   within LVMPD's tactics, training, and policy, at
22   least what he did in the field.
23       Is that a fair summary?
24   A   Yes.
25   Q   Okay. So that was validated by Metro

**92**

1    through the TRB; correct?
2    A   Correct.
3    Q   And specifically when it says "Problems
4    surrounding having a new sergeant in SWAT
5    participate in live missions," what problems are
6    being referred to?
7    A   I don't -- I don't recall. What I take
8    that as is just having a newer SWAT sergeant come
9    up there, but also the situation could be case
10   specific. If you had a prior SWAT operator that
11   came up and had already been through all of those
12   trainings, then that learning curve would be less.
13   But I don't remember exactly what it's referring
14   to when this says "problems."
15       Q   Were some of the specific problems that
16   he had a role in the planning and the drafting of
17   the IAP?
18       A   Not that I'm aware of.
19       Q   Were some of the problems that even
20   though he was new and had not completed SWAT
21   training, that he was given a lead role, for
22   example, to do the announcements?
23       A   Not that I'm aware of.
24       Q   And was the validation of that
25   conclusion unanimous?

**93**

1    A   I do not remember if it was or not.
2    Q   Okay. So let's talk about number eight.
3    This more specifically discusses the failure of
4    Sergeant Backman to complete basic SWAT school
5    prior to this officer-involved shooting.
6        First of all, Sergeant Backman had only
7    been on SWAT for 29 days when this occurred;
8    correct?
9    A   Correct.
10   Q   He had not completed the 120-hour basic
11   SWAT school; correct?
12   A   Correct.
13   Q   And Metro concluded through the TRB that
14   that was a failure of training for Sergeant
15   Backman; correct?
16   A   Correct.
17   Q   Was that a unanimous finding?
18   A   I do not remember.
19   Q   What did Sheriff McMahill or anyone else
20   at Metro do in response to this finding?
21   A   With this finding, like I previously
22   talked about, the SWAT school is offered multiple
23   times a year now. And if we can predict or
24   forecast projected openings with people retiring
25   or promoting or moving on, we are able to get

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1  those positions -- or the subjects that are going
2  to fill those positions through that SWAT school
3  before they transfer up to the unit or immediately
4  after transferring.
5      Q   The next one I would like to discuss is
6  Conclusion Number 9, which appears on page nine,
7  LVMPD4834. This is a rather long one, and we're
8  going to spend some time on this one. But this
9  concerns SWAT's decision to use a CET tactic
10  during this search warrant; correct?
11     A   Correct.
12     Q   Have you heard CET also referred to as
13  dynamic entry?
14     A   I have.
15     Q   Why does Metro use the term "CET" as
16  opposed to "dynamic entry"?
17     A   From my recollection, CET was a term
18  coined by Lieutenant Melton when he was in SWAT,
19  and that -- that name had just stuck from his time
20  there and what he had implemented.
21     Q   Okay. And ultimately Metro, through the
22  TRB, concluded that the use of CET for this search
23  warrant was a policy and training failure and not
24  to -- not within standardized tactics at Metro;
25  correct?

95

1      A   Correct.
2      Q   So the issue here is whether a CET or a
3  SACO should have been used.
4          We haven't really explained much on the
5  record what SACO is, S-A-C-O. But can you explain
6  what that stands for?
7      A   A SACO stands for surround and call out.
8      Q   Is it Metro's position that a surround
9  and call out just simply could not have been used
10  for service of this search warrant?
11     A   Can you say that one more time?
12     Q   Is it Metro's position that a surround
13  and call out just simply could not have been used
14  for service of this search warrant? I'll say, it
15  would seem to me that that's probably not Metro's
16  conclusion, because it concluded that the use of
17  CET was improper.
18         So the only other alternative would be
19  surround and call out; correct?
20         MR. ANDERSON: Objection. Form.
21         THE WITNESS: So the board looked at
22  the CET, and the SWAT team's decision to do that
23  was still reasonable. But the benefit we have as
24  an administrative board is we're not just going
25  off of a reasonableness -- objectively reasonable

96

1  standard. We're going off of a best practice
2  standard.
3          And the board determined the best
4  practice standard for that -- in that decision
5  would not have been the CET.
6  BY MR. BREEDEN:
7      Q   It would have been a surround and call
8  out?
9      A   A surround and call out or waiting
10  another day, continued surveillance. There was a
11  few other things, but yes.
12     Q   Okay. Now, in coming to this conclusion
13  that a CET should not have been used, Metro in the
14  TRB considered recent changes to SWAT's policies
15  and procedures; correct?
16     A   Correct.
17     Q   So shortly before this officer-involved
18  shooting, official policy was, quote, using a
19  controlled entry tactic for the sole purpose of
20  recovering narcotics or property will never be
21  considered as an acceptable practice, end quote.
22         Do you see that?
23     A   I do.
24     Q   And so would you agree with me, under
25  that policy, since this was a property search

97

1  warrant only, that that policy would clearly bar a
2  controlled entry tactic from being used?
3      A   Can you say that one more time, please?
4      Q   Yeah.
5          So this -- the policy, as it existed in
6  February of 2021, was that CET was simply banned
7  for property-only search warrants; correct?
8      A   Correct.
9      Q   All right. So under the policy as it
10  existed in February of 2021, SWAT should not have
11  done a CET for this search warrant; correct?
12     A   The board found that the CET -- a
13  surround and call out would have been the better
14  approach to serving the search warrant.
15     Q   Well, under the older policy -- and it
16  did change a little bit. But under the older
17  policy, there was no discretion. It just -- CET
18  simply could not be used for property-only search
19  warrant; correct?
20     A   Correct.
21     Q   Okay. Now, that policy changed in
22  September of 2021, just a few months before
23  Mr. Williams' officer-involved shooting; right?
24     A   Correct.
25     Q   And the new policy that was in effect,

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1  it gives a general rule, but then it still gives
2  the example that using a controlled entry tactic
3  for the purpose of recovering narcotics or
4  property will never be considered as an acceptable
5  practice. It's slightly different language. Let
6  me just read it.
7        So the policy in effect at the time was,
8  quote, "A CET will not be used when the primary
9  suspect is in custody and there is no articulable
10  information of a threat inside the residence.
11  I.e., a controlled entry tactic will not be used
12  for the sole purpose of recovering narcotics or
13  property and there is an absent threat of an armed
14  and dangerous subject inside," end quote.
15    Q    Is it Metro's position that even under
16  the new policy, CET was banned for property-only
17  search warrants?
18    A    Absent any articulable threat inside the
19  residence, yes.
20    Q    What was the specific articulable threat
21  for Mr. Williams' case?
22    A    I believe they reference that. We
23  talked about it before being the -- the danger to
24  the public, if I recall correctly.
25    Q    So I'll let you know, my understanding

99

1  of the law is that would be an example of a
2  general nonspecific threat, and that that is not
3  sufficient under the law. I'm just telling you my
4  understanding. Mr. Anderson may disagree.
5        But that instead you would have to have
6  a specific articulable threat. In other words,
7  like somebody looked through a window and they saw
8  Mr. Williams there with -- with a gun drawn ready
9  to fire in advance of this happening. Nothing
10  like that occurred here; right? No specific
11  articulable threat?
12        MR. ANDERSON: I will object to the
13  question as, he is correct, I disagree. I'll
14  sustain that part.
15  BY MR. BREEDEN:
16    Q    Okay. So he'll -- he will object to my
17  statement of the law.
18        But did -- do you have anything that I
19  would consider to be a specific articulable
20  threat?
21    A    From what I can remember, without having
22  it written out right in front of me, their
23  justification was the violent nature of the
24  events, the citizen source who was a family member
25  identifying that that subject stayed there, the

100

1  challenges for the officers when trying to do
2  surveillance on -- countersurveillance in a
3  hostile environment, coupled with the gas station
4  located right behind there with a small wall with
5  a lot of community exposure, and it being in a
6  multi-family unit complex. Those are the things
7  I'm remembering, without being able to read it,
8  that all compounded further reason to need to do
9  the CET, to get in there quickly, overwhelm and
10  dominate that residence to safely take anyone in
11  custody.
12    Q    So the policy changed -- in the year
13  prior to Mr. Williams' death, the policy changed
14  from complete ban on CET for a property-only
15  search warrant to, okay, CET is okay under some
16  limited circumstances for a property damage search
17  warrant -- or a property-only search warrant; is
18  that correct?
19    A    Yes.
20    Q    Okay. Who made that change?
21    A    I don't remember. I don't recall at
22  this time.
23    Q    Well, if SWAT policies and procedures
24  are to be changed, who would have been in charge
25  of that in 2021?

101

1    A    In 2021, I know the chain of command was
2  Captain Brian Cole, and Deputy Chief Sasha Larkin
3  would have been the -- the deputy chief over that.
4        But without talking to them or having
5  any -- anything written down, I couldn't tell you
6  specifically who did it or who approved it or how
7  it was approved.
8    Q    Well, at that time, the SWAT lieutenant
9  over tactical for SWAT was Lieutenant O'Daniel;
10  correct?
11    A    Correct.
12    Q    Would you agree with me that if that
13  policy and procedure is to be changed -- and, you
14  know, according to Metro it was -- that
15  Lieutenant O'Daniel and Captain Cole would have to
16  approve that?
17    A    I would assume that, yes.
18    Q    Okay. What is the process for -- let's
19  just say hypothetically, Lieutenant O'Daniel wants
20  to change an official SWAT policy.
21        What is the process for doing that?
22    A    Recommendation has to be drafted. It
23  goes up through the chain of command, and then it
24  goes over to our general counsel section that then
25  reviews all of that. And then there's an approval

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 29 of 41

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1  process with executive staff members weighing in
2  and approving that before policy change can occur.
3      Q   Would there be memos regarding the
4  policy change and the reasons why?
5      A   I wasn't a part of changing policy then.
6  I know in my current position, I see those now,
7  that those come through and there are memos.
8      Q   Why did that change occur in September
9  of 2021?
10     A   I couldn't tell you.
11     Q   Do you agree that the change made things
12 less safe for the public?
13         MR. ANDERSON:  Objection.  Form.
14         THE WITNESS:  No, I don't think that
15 the change made it less safe.  In discussing what
16 I talked about a little earlier, we have to give
17 some leeway, and the law even allows for officers
18 to be able to make those discretionary judgment
19 calls when they are there in person seeing,
20 smelling, hearing, observing all of those things
21 that would dictate the tactics that they're going
22 to try to implement.
23 BY MR. BREEDEN:
24     Q   Metro, through the TRB, did conclude
25 that there were simply too many unknown factors in

103

1  order to justify a CET for service of this
2  warrant; correct?
3      A   Correct.
4      Q   And some of the unknown factors included
5  whether there were children or elderly people or
6  vulnerable individuals inside the apartment;
7  correct?
8      A   Correct.
9      Q   In fact, when the search warrant was
10 served, there was no information of any kind as to
11 who was actually inside; correct?
12     A   Well, information -- there was
13 information based on who stays there, but we had
14 no -- or I'm not aware of any information for, at
15 that moment in time, who would be inside.
16     Q   Yeah.  There hadn't even been any type
17 of surveillance for 11 days before the search
18 warrant was served; correct?
19     A   Correct.
20     Q   All right.  So Metro agreed that CET
21 should not have been authorized for this
22 particular warrant execution.
23         What, if anything, did Sheriff McMahill
24 or anyone else at Metro do regarding that finding?
25     A   That's probably a question better asked

104

1  by the SWAT commander that's coming in.  I am
2  aware of the new leadership there and utilizing
3  the surround and call out a lot more frequently.
4  But that would be a question I think better asked
5  of that expert.
6      Q   Okay.  And I -- and I'll ask that
7  individual.
8          But to your knowledge, did the policy
9  change back to CET being banned for a
10 property-only search warrant?
11     A   I'm not aware.
12     Q   Well, let's talk a little bit about
13 Conclusion Number 11 then, which begins on
14 page 12, LVMPD4837.
15         This is a discussion of CET and how CET
16 relates to knock and no-knock warrants; correct?
17     A   Correct.
18     Q   The warrant in this case was a regular
19 or knock-and-announce warrant; right?
20     A   Correct.
21     Q   Okay.  And does Metro acknowledge that a
22 knock-and-announce is part of the Fourth Amendment
23 to the United States Constitution?
24     A   Yes.
25     Q   And does Metro agree that a violation of

105

1  the Fourth Amendment's knock-and-announce
2  principles is, by legal definition, excessive
3  force?
4          MR. ANDERSON:  Objection.  Form.
5          Go ahead.
6          THE WITNESS:  I would say it could be
7  excessive force.
8  BY MR. BREEDEN:
9      Q   Okay.  Does Metro acknowledge that
10 violation -- or let me rephrase.
11         Does Metro acknowledge that knock and
12 announce is also required by Nevada state law?
13     A   Yes.
14     Q   What position does Metro take regarding
15 whether knock and announce is part of the Nevada
16 Constitution's search and seizure protections?
17         MR. ANDERSON:  Objection.  Form.
18 BY MR. BREEDEN:
19     Q   In other words, is knock and announce
20 constitutionally required by the Nevada
21 constitution as well?
22     A   Yes.
23     Q   So I will paraphrase here, and if you
24 disagree, let me know.
25         But CET reviewed what occurred here, and

Reggie Rader            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

106

1  they concluded that there was a policy and
2  training failure allowing CET entry for
3  knock-and-announce warrants, because the purpose
4  of CET entry is to surprise and overwhelm people
5  who might be inside the structure to be searched,
6  whereas knock and announce requires alerting the
7  people and giving them time to come to the door
8  and allow admittance to the officers.
9        Do you agree that that -- that's what
10 CET concluded?
11       MR. ANDERSON: Objection. Form.
12       THE WITNESS: Can you actually ask
13 that one more time, please?
14 BY MR. BREEDEN:
15    Q   Yeah. I'm sorry it has to be so long,
16 because we're using a lot of legal terms. Right?
17 I'll try to put it more in a nutshell or more
18 brief to you.
19       The conclusion of CET was that if
20 officers have to perform knock and announce, that
21 it would be inconsistent with the constitution to
22 do a CET entry, because CET entry requires
23 surprise and overwhelming response, whereas knock
24 and announce, you know, requires something
25 different.

---

107

1    A   We did identify and agree with the
2  conflicting ideologies of those two different
3  concepts, yes.
4    Q   So Metro determined that a CET entry is
5  constitutionally inconsistent with knock and
6  announce principles?
7    A   I'm sorry. One more time.
8    Q   Yes.
9        Metro did conclude that CET entry is
10 inconsistent with constitutional knock and
11 announce principles?
12       MR. ANDERSON: Objection. Form.
13       THE WITNESS: The board recognized the
14 difference with CET being more of a dynamic tactic
15 and knock and announce being a tactic where
16 you're giving an individual time to know you're
17 there and come answer the door. And that there
18 was -- in using one tactic over the other, they
19 seemed to contradict each other.
20 BY MR. BREEDEN:
21    Q   Okay. And even further analyzing how
22 knock and announce was used in this case by the
23 officers -- and I'm not saying I agree with this,
24 but the conclusion was that officers had waited
25 only six seconds for Mr. Williams to come to the

---

108

1  door, ascertain it was police officers with a
2  warrant, and provide them entry. And the
3  conclusion was six seconds, given the totality of
4  the circumstances, was not an adequate amount of
5  time.
6        Do you agree with that? We're looking
7  here at page 14, the second paragraph.
8    A   So the -- there were some disagreements
9  on -- on that time. It was accepted that -- or
10 believed that it was not a no knock -- it did not
11 constitute a no-knock warrant because the
12 advisements were made and knocking did occur;
13 however, the disagreement was the time allowed to
14 that individual to be able to come answer that
15 door.
16       So that's why the board upheld it as a
17 policy failure based on the SWAT manual having
18 those two different options that -- that
19 contradict each other and cause confusion, and
20 that's why the decision was upheld -- or the
21 finding was upheld.
22    Q   Metro, through TRB, agreed or validated
23 both the decision to use CET for a knock and
24 announce warrant itself was improper, and then
25 also the fact that only -- they only waited six

---

109

1  seconds for Mr. Williams to respond was improper;
2  correct?
3    A   Correct.
4    Q   Okay. Now, was that a unanimous
5  validation by the TRB?
6    A   I do not remember.
7    Q   What, if anything, did Sheriff McMahill
8  or other members of Metro do as a result of this
9  finding?
10    A   That would be a question for your SWAT
11 expert that's coming in.
12    Q   Okay. To your knowledge, you don't know
13 of anything that was done as a result of that
14 finding?
15    A   I do not know.
16       And when there is a natural pause, can
17 we take one more break?
18       MR. BREEDEN: Yeah, let's take a break
19 here, and then we can -- we'll go off the record
20 at this time.
21       THE VIDEOGRAPHER: Going off the
22 record at 11:46 a.m.
23       (Whereupon, a recess was taken.)
24       THE VIDEOGRAPHER: We're back on the
25 record. The time is 12:28 p.m.

---

30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1  BY MR. BREEDEN:
2      Q    All right. Deputy Chief Rader, we took
3  a lunch break. We're back on the record now, and
4  you'll still under oath.
5          I wanted to ask you a question. During
6  the -- since we were talking about CET entry and
7  knock and announce, are you aware that during the
8  execution of the search warrant, nobody ever
9  physically knocked on the front door of the
10  apartment?
11     A    Well, I know that there was multiple
12  attempts with the ram. I mean, when officers
13  knock on doors, sometimes I would use my baton.
14  So I think it's a vernacular of knocking with
15  knuckles or your hand or there were knocks on the
16  door with the ram. But -- so -- I will agree
17  that, yes, no one walked up and knocked with their
18  hand.
19     Q    The first contact with the door was with
20  the battering ram?
21     A    Yes.
22     Q    What -- what is Metro's policy on where
23  or when officers should attempt to physically
24  knock with their hand on the door as part of a
25  knock and announce?

111

1      A    I'm not aware that we indicate using
2  your hand or not or clearly spell that out. I'm
3  not aware that we do.
4      Q    Does Metro have a policy, practice, or
5  procedure that the knock should actually be
6  attempted?
7      A    Well, for -- for what? In reference to
8  what?
9      Q    On a knock and announce search warrant.
10     A    I know that it says advisements will be
11  made, but I don't know if it physically says or is
12  written down "use your hand or will knock." I
13  don't -- I can't answer that today on what it says
14  to physically do.
15     Q    Okay. You can't answer that.
16         Who would be the better person to ask
17  that question?
18     A    The -- I would ask the SWAT expert that.
19     Q    Okay. I have a similar question. You
20  know, during the announcement of the search
21  warrant -- this was at an apartment complex, and
22  the original announcement by Sergeant Backman did
23  not provide the apartment number.
24         What is Metro's policy, when knock and
25  announce is performed in an apartment complex, as

112

1  to whether the announcement should include the
2  specific apartment number?
3      A    It should include the address and the
4  apartment number.
5      Q    Okay. I would like to move on here to
6  Issue Number 15, and this is on page 17 of the TRB
7  memorandum. That's LVMPD4842.
8          So this indicates that public safety
9  statements were recorded on body-worn cameras, and
10  that is contrary to department policy.
11         Is that a fair statement?
12     A    It is.
13     Q    Okay. And so let's back up a little
14  bit.
15         First of all, what are public safety
16  statements?
17     A    So a public safety statement is
18  something that was contractually negotiated with
19  the bargaining unions for the police officers and
20  the supervisors. And it has to do with -- we
21  talked a little bit before about an officer being
22  investigated for a crime has the same rights
23  afforded to them as any other person in that
24  position where they could remain silent. But
25  there's, in this instance, also a need for public

113

1  safety to ensure that there's no outstanding
2  individuals, there's no longer a threat. Did the
3  suspect get away? Did your rounds go in a certain
4  direction and somebody could have been impacted?
5          So what we came up with, mutually agreed
6  upon, was the public safety statement. So after
7  an officer-involved shooting, a supervisor will
8  ask a series of questions to the involved officer
9  that they have to answer. And it's questions on,
10  "Did you discharge your firearm? Which direction?
11  Is there anyone in need of medical attention?"
12         So it's -- it's -- not community
13  care-taking, but it's something that the officers
14  have to do to provide us some information on if
15  anybody else could be in danger or at least what
16  we're dealing with, without going into the
17  specifics of anything that would infringe up their
18  constitutional rights of -- of pleading the Fifth.
19     Q    So the public safety statements are
20  required by Metro's contact with the -- contract
21  with the police union?
22     A    Yes.
23     Q    And are these public safety statements
24  considered part of a criminal investigation
25  against the officer?

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 32 of 41

30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1      A   I'm not sure. And I -- I think the way
2  they were formed was so the officer would have to
3  answer it, but wouldn't also incriminate himself
4  if something else were to happen. So I -- I don't
5  really know how to answer if that would be part of
6  the -- the criminal investigation or not. I
7  just -- I don't know.
8      Q   Are they available to the FIT team when
9  they prepare their report?
10     A   Yes, it would be available to the FIT
11  team. So I would say that it -- actually, I can't
12  even answer that. I don't -- I don't -- I might
13  be confusing with the CIRT and the FIT. That
14  would be something I couldn't answer you today. I
15  don't know definitively one way or the other.
16     Q   But the officers, when asked to give a
17  public safety statement, do not have the right to
18  refuse under the bargaining agreement?
19     A   Right.
20     Q   And the questions that they're asked --
21  because I think I've seen these on the video and
22  they're -- are they read off from, like, a piece
23  of paper?
24     A   Yeah. The supervisors are all issued
25  cards, and they can pull them out so they can say

115

1  them exactly verbatim so they're not infringing on
2  any, you know, officer's right to incriminate, but
3  still getting the necessary information that we
4  need as a department, that the community would
5  expect us to get, while investigating that
6  incident.
7      Q   And -- and you may have answered this
8  already. But do the officers have the ability to
9  refuse to give the public safety statement?
10     A   No, they do not.
11     Q   Well, if they did refuse, would they be
12  terminated?
13     A   It is in policy, so, yes -- well, it
14  would be subject to discipline, which could be
15  progressive discipline, but I don't know where
16  that falls in on our discipline matrix. But they
17  would be subjected to disciplinary action for not
18  complying.
19     Q   And since these are required by the --
20  or these were invented as part of the bargaining
21  agreement with the police union, under what
22  circumstances are the public safety statements to
23  be made by officers?
24     A   I'm sorry. Can you say that again?
25     Q   Yeah. And I'm sorry if it was

116

1  confusing.
2      But, you know, what triggers public
3  safety statements to even be asked of officers?
4  For example, is it only officer-involved
5  shootings? Is it other incidents?
6      A   It is, it's officer-involved shootings,
7  when an officer intentionally discharges their
8  firearm as a use of force.
9      Q   What is the policy regarding how soon
10  after the officer-involved shooting the officers
11  are supposed to be given the public safety
12  statements?
13     A   I don't know the exact time frame, but
14  it's very quickly. So the -- obviously scene
15  stabilization is the main priority, life, safety.
16  But when the sergeant gets there and the scene is
17  deemed safe, there's no outstanding immediate
18  threats right there in the area, it's supposed to
19  be relatively quickly that the sergeant gets that
20  statement.
21     Q   So ideally, as soon as the scene is
22  secure, the officer should be asked to give a
23  public safety statement on scene?
24     A   Yes.
25     Q   And in this case, the only issue with

117

1  CIRT and TRB was that Metro found that these were
2  properly given to the officers, but they should
3  not have been recorded by body-worn camera?
4      A   Correct.
5      Q   How should they be recorded then?
6      A   The supervisor writes down the response.
7      Q   Well, why not just record them on
8  body-worn camera?
9      A   I wasn't part of that negotiation. I
10  don't know. I believe it would have to do with
11  the union's agreeing to having the officers
12  cooperate in providing that information. And I
13  couldn't tell you how we came upon that, but I
14  just know it was something that was mutually
15  agreed upon by the union. And our policy is to
16  not record it on body-worn camera.
17     Q   Okay. Because it just seemed a little
18  unusual to me that the answers are to be recorded,
19  but we don't keep a verbatim video copy of the
20  responses.
21     So are you -- are you aware of the exact
22  reason for that, other than it was a negotiation
23  with the union?
24     A   I don't. From my -- from my time on, I
25  know that sometimes people can maybe do some

118

1  excited utterances. I really don't know the
2  reason or the thought behind that, because it was
3  negotiated before -- long before I was ever in my
4  current position now.
5      Q    And that conclusion was validated by
6  TRB.
7          Did Sheriff McMahill, or anyone else at
8  Metro, take any action as a result of the
9  recording on body-worn camera of the public safety
10 statement?
11     A    Not that I'm aware of. I just know that
12 it's -- it continues to be our policy and taught
13 in the supervisor schools.
14     Q    Conclusion Number 18 begins on the next
15 page, coincidentally 18 of the TRB memorandum,
16 Las Vegas -- LVMPD4843. And this refers to the
17 fact that after the shooting, officer -- and I
18 believe the officer's name is pronounced Eshe,
19 E-S-H-E -- that Officer Eshe manipulated
20 Officer Kubla's firearm.
21         What was that about? What did
22 Officer Eshe do?
23     A    So Officer Kubla was injured
24 significantly in this incident by gunfire. And in
25 part of the -- securing the scene, you don't want

120

1      Q    And was there any action taken by
2  Sheriff McMahill or anyone else associated with
3  Metro regarding the manipulation of the firearm?
4      A    Not that I'm aware of.
5      Q    Moving on to Conclusion Number 23, CIRT
6  had recommended that the new 14-page IAP be
7  distributed to -- I guess a way to phrase this is
8  just additional department personnel for their
9  use.
10         Is that fair?
11     A    Right.
12         You're talking about finding 23?
13     Q    Yes.
14     A    Right. The recommendation was to really
15 formalize this IAP. So everybody had it. They
16 would be using the same form. It would be pushed
17 out on the Internet where forms can be accessed,
18 as well our online training, which is UMLV,
19 University of Metro Las Vegas. So every single
20 officer, whether they're senior, tenured, a
21 brand-new one, would know the right form to use.
22     Q    And Metro, through TRB, validated or
23 agreed with that; correct?
24     A    Correct.
25     Q    And really the reason why this was

119

1  to leave any firearms that are around. So
2  Officer Eshe recovered the firearm and didn't want
3  that firearm to be in battery. If you're slinging
4  a weapon that -- or you don't have a holster for
5  it, you don't want to have an accidental or
6  negligent discharge.
7          So the officer did what we
8  administratively refer to as make safe, where you
9  would remove the magazine or remove the round that
10 is in the chamber. We don't want to see that
11 happen on an officer-involved shooting, because
12 that does -- you know, that firearm is a piece of
13 evidence.
14         But at the time, it was reasonable, with
15 the totality of the circumstances going on and
16 having to do a down officer rescue and securing
17 another individual inside the apartment, to have a
18 need to make that firearm safe. So that's why the
19 board agreed with that conclusion, that while not
20 ideal, it was still reasonable that he did that,
21 not knowing that it was used in an
22 officer-involved shooting.
23     Q    Okay. And Metro, through TRB, agreed or
24 validated that finding?
25     A    Yes.

121

1  recommended is there were problems with the IAP
2  that were identified with the officer-involved
3  shooting; correct?
4      A    There were.
5      Q    Wrong forms were being used; correct?
6      A    I would say outdated forms and the older
7  form. And I mentioned it earlier, the newer form
8  had not been distributed department-wide, which
9  caused the confusion. It was still the same form;
10 however, the newer form had additional pages on
11 there, so not out -- or not up-to-date form.
12     Q    Yeah. And so if officers are using
13 outdated forms, then, by definition, they haven't
14 been trained properly on the correct form; right?
15     A    Yes, there definitely is -- is an issue
16 there.
17     Q    Okay. I would like to talk next about
18 Conclusion Number 24. That's on page 19,
19 LVMPD4844.
20         CIRT had recommended and Metro validated
21 a conclusion that phase one of FTEP for sergeants
22 in SWAT be extended to one month.
23         Now, what does that mean, and what is
24 FTEP?
25     A    So FTEP is field training and evaluation

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

122

1   program. It's something, when somebody gets a new
2   assignment -- it was really for when officers come
3   out of the academy, there's a field training
4   program. But it can be utilized in instances like
5   this too, where somebody is new to a section, they
6   have a training and evaluation period.
7       Q    And so what was the old period, if not
8   one month?
9       A    I'm not familiar with it. That might be
10  another question for the SWAT expert coming in.
11      Q    To your knowledge, was there any FTEP
12  period then for people coming onto SWAT?
13      A    I could not tell you yes or no. I'm
14  unaware of it either way.
15      Q    Okay. Are you aware of any actions or
16  changes that were made by Sheriff McMahill or
17  other personnel at LVMPD regarding this
18  conclusion?
19      A    Just that they have formalized the FTEP
20  process now for sergeants going to the unit.
21      Q    But was that to your -- and if you don't
22  know, you don't know.
23           But was that actually implemented?
24      A    It was. But how it was implemented, I
25  would -- again, I would defer to the SWAT

---

123

1   commander that I believe will be coming in.
2       Q    Okay. Moving on, same page, Conclusion
3   Number 25, this concluded -- this conclusion was
4   validated or upheld by Metro through TRB; correct?
5       A    Correct.
6       Q    And this recommendation was that the
7   120-hour basic SWAT school should be available and
8   scheduled within two weeks of a SWAT transfer list
9   becoming certified; correct?
10      A    Correct.
11      Q    What was the old standard?
12      A    The old standard was it was offered one
13  time a year. And if you transferred after that,
14  you would just get on-the-job stuff until the next
15  SWAT school came about.
16      Q    And so at the time the officer-involved
17  shooting with Mr. Williams occurred, when was the
18  one time of year that it was offered? Like, July?
19      A    If memory serves me correctly, I thought
20  it was March. That's sticking out to me. But
21  without looking at it on a piece of paper, I
22  couldn't be positive.
23      Q    Okay. And our SWAT person may know more
24  about that?
25      A    I think they should.

---

124

1       Q    Okay. This recommendation was a direct
2   result of the fact that Sergeant Backman had not
3   completed the 120-hour basic SWAT school, was it
4   not?
5       A    It was.
6       Q    And was this recommendation implemented
7   by Metro?
8       A    I believe it was. And from what I've
9   heard, they've even added hours. It's over 120
10  hours now.
11      Q    How many hours is it now?
12      A    I thought the number I heard was 160,
13  but I wouldn't want you to quote me on that.
14  That's another one the SWAT expert would be able
15  to tell you.
16      Q    So the next few we're going to discuss
17  involve situations where the conclusions of CIRT
18  were modified by Metro and the TRB. So I would
19  like you to look at Conclusion Number 26, which
20  begins on page 19 of the TRB memo, LVMPD4844.
21           And so the recommendation here from CIRT
22  or how it was originally written up was that CIRT
23  recommended that LVMPD recategorize the use of CET
24  to only be utilized when a no-knock search warrant
25  is approved and has judicial preapproval.

---

125

1            And really Metro, through the TRB,
2   agreed with that conclusion. They just reworded
3   it a little bit that it should be evaluated and
4   considered; is that fair?
5       A    That's fair.
6       Q    And was that determination by Metro and
7   the TRB unanimous?
8       A    I don't remember.
9       Q    And then was that issue actually
10  evaluated and considered following this
11  recommendation?
12      A    You would have to follow up with the
13  SWAT expert.
14      Q    Do you know if any changes to CET to
15  restrict it to no-knock search warrants only, was
16  that ever implemented?
17      A    I'm not aware if it was or was not.
18      Q    Okay. A similar issue with Conclusion
19  Number 27. This essentially adopted by Metro
20  through the TRB, but, again, modified the language
21  from CIRT to just say that this issue needs to be
22  evaluated as to whether this should occur;
23  correct?
24      A    Correct.
25      Q    In other words, CIRT said it should

---

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

126

1  occur, and TRB said, well, we should evaluate it
2  further whether it should occur; correct?
3     A   Correct.
4     Q   All right.  And that, again, concerned
5  the knock and announce and the reasonable time to
6  respond requirement; correct?
7     A   It does.
8     Q   Was the validation or modification of
9  this conclusion, was that unanimous by the TRB?
10    A   I do not remember.
11    Q   Are you aware of any time in Metro's
12 history where there was either a formal or
13 informal policy about the number of seconds or
14 minutes that officers should wait after the
15 announcements before using force?
16    A   I'm not aware either way.
17    Q   Okay.  I recently took Team Leader
18 Sergeant Findley's deposition.  And he indicated
19 at one time, Metro SWAT had a policy written right
20 into the policies that said ten seconds was
21 reasonable.
22        Are you -- do you have any knowledge
23 about that?
24    A   I do not.
25    Q   Do you have any knowledge about how the

127

1  policy, in terms of the amount of time that
2  officers should wait before using force to enter
3  the premises, has changed in the last ten years?
4     A   I'm not aware.
5     Q   Okay.  Just going to Conclusion 29,
6  which is on page 21 of the memorandum at
7  LVMPD4846, what was the conclusion of SWAT there
8  and what did Metro, through the TRB, validate or
9  modify?
10    A   This had to do with the tools and
11 tactics being utilized, one of those being snipers
12 or stun sticks, the explosive breaching equipment.
13 The CET or surround and call out could be verbally
14 improved on, and the board wanted it --
15 implementing it to if the department should create
16 an approval form for that in a search warrant
17 service, and then determine on the form who
18 approved it and the justification for why they
19 were requesting it and then determine if it should
20 be signed by the -- the assistant team leader, the
21 team leader, to what level that it should go up
22 to.
23        And then also determine if a no-knock
24 search warrant was requested and approved, a
25 deputy chief would need to sign that.

128

1     Q   And one of the reasons Metro came to
2  this conclusion was there was question in the
3  Williams' officer-involved shooting as to whether
4  NFDDs should have been deployed at all and whether
5  they should have been deployed in the manner that
6  they were; is that fair?
7     A   Yes.
8     Q   Okay.  And specifically there was a
9  question that the NFDD, at least the stun stick,
10 was inserted through a window and deployed
11 essentially blind, without knowing who was on the
12 other side; correct?
13    A   There was some disagreement on that.
14 When we say "blind," the tactic -- from what was
15 explained to us, is you do it in the upper corner
16 of the window and you raise it up into the room to
17 keep it away from anybody's -- at eye level or
18 anybody that would be standing there, because
19 there would really be no reason for somebody to be
20 high up in a room.
21        So blind until the aspect of not being
22 able to see it.  But there's also, like, a
23 rake-and-break component that the SWAT expert
24 would be able to explain better than me.  So I
25 don't know if "blind" would be the right word for

129

1  it or not.
2     Q   Okay.  I'll reserve that for the SWAT
3  expert, because I think that's on that person's
4  topics.
5        But was -- regarding Conclusion Number
6  29, was that unanimous by the TRB?
7     A   I don't remember.
8     Q   And are you aware of any changes made by
9  Sheriff McMahill or anyone else as a result of the
10 conclusions in number 29?
11    A   I would not be the one to speak on that.
12 That would be the SWAT expert.
13    Q   Okay.  Because it concerns a specific
14 swat IAP?
15    A   Well, yes.  The board makes the
16 recommendations, and then the implementation of
17 that is done through the chain of command.
18    Q   Right after number 29 it says,
19 "Recommended action," and then highlighted in
20 yellow it says "TBD," which I assume stands for to
21 be determined; correct?
22    A   It does.
23    Q   Why was that left uncompleted in this
24 memorandum?
25    A   I am not sure.

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 36 of 41

30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

130

1    Q   Well, whose job was it to make those
2  determinations?
3    A   After the recommendation is made for
4  them to consider implementing that, it would be a
5  group of people in that chain of command to
6  discuss about what the options are and then what
7  level they should go to, but I'm not sure why that
8  is there.
9    Q   Well, was it anticipated that somebody
10  would go back and complete this section of the TRB
11  memorandum?
12    A   I'm not sure.
13    Q   Also, you know, there's sort of another
14  recommendation that was -- was made here that's
15  not -- not really numbered, but I want you to skip
16  to page 33, which is LVMPD4858.
17        In reviewing what happened with this
18  search warrant, did Metro determine that the way
19  these IAPs were submitted and approved was in need
20  of change?
21    A   There's a lot on this page.
22        What are you specifically referencing,
23  sir?
24    Q   Well, specifically, if you look at the
25  second paragraph from the bottom, it talks about

131

1  what is called a top-down approval of IAPs.  And
2  it was decided that that was not effective and
3  that IAPs should start with the team leader and
4  then should go upward in the chain of command.
5        In other words, the team leader works on
6  the IAP, then it goes up to Lieutenant O'Daniel
7  and then up to Captain Cole for approval.
8    A   Correct.
9    Q   Do you see that?
10    A   I do see that.
11    Q   Okay.  And so Metro concluded that the
12  top-down method should not be used.
13    A   Correct.
14    Q   And why is that?
15    A   The people with the most information are
16  going to be the assistant team leader and then the
17  team leader.  They're going to be really the ones
18  that are going to build the foundational
19  justification for why they want to do the tactical
20  plan the way that they're doing that.  They're
21  often the ones that have the direct line of
22  communication with the requesting entities,
23  whether -- in this instance, it would be homicide.
24  They're the ones doing a lot of the back and
25  forth.

132

1        And then they're the ones able to --
2  with a thorough understanding of what has
3  occurred, being able to fill that out.  And then
4  it goes up to the captain to review the entire
5  plan, the plan in its entirety.
6        Also have the higher levels of
7  leadership, we get -- we don't really -- our hope,
8  as an agency, is the higher up you go, that
9  there's more experience there.  The frequency in
10  which you've done those things, you will have
11  learned from maybe mistakes made in the past, and
12  you could see any potential pitfalls or dangers or
13  unattended consequences to that plan.  So that's
14  why it would be from a ground-up approach all the
15  way up to the captain.
16    Q   And so Metro determined that the
17  top-down approach that was being used was a
18  failure of policy?
19    A   It wasn't ideal, because it's the
20  opposite of what we just talked about.  They might
21  have the -- a summary of what was going to happen
22  or the summary of who they were going after, but
23  then not have all of the specifics all the way
24  down to the ATL.
25        So I don't know if you want to call it a

133

1  policy failure or just a better way of doing
2  things, which is the whole intent of the
3  administrative process, and that's what we
4  identify.
5    Q   Well, which did Metro determine it was?
6    A   That it would be better going from the
7  bottom up.
8    Q   But did Metro consider that to be a
9  policy failure or a training failure?
10    A   I believe we just said it was not
11  effective the way it was currently being done.
12  But in policing, there's a lot of different ways
13  to do things.  And that's why we're always trying
14  to evaluate and reevaluate and come up with the
15  best plan to do things.  And when incidents
16  happen, we want to look at them and see if there's
17  takeaways to make ourselves better.
18    Q   Now, the TRB memorandum then sort of
19  turns into discussing the actions of particular
20  officers that were involved.  And Metro, through
21  the TRB, determined that Sergeant Scott had not
22  complied with policies and training; correct?
23    A   Correct.
24        But what page are you on now?
25    Q   Yeah, let me get to that.  It's going to

134

1  be Bates Number 4851, page 26 of the report or
2  memorandum.
3         So Sergeant Scott, what was his title or
4  job at the time of this shooting?
5     A   I believe Sergeant Scott was a homicide
6  sergeant.
7     Q   And because he's -- was a homicide
8  sergeant, he was one of the people who had to
9  review and sign off on the IAP; correct?
10    A   Correct.
11    Q   And according to Metro's own
12  investigation, it essentially determined that
13  Sergeant Scott had done so without reading the
14  entire case, including the surveillance logs;
15  correct?
16    A   Correct.
17    Q   And that was a failure or improper by
18  Sergeant Scott; right?
19    A   Yes.
20    Q   And for lack of a better word or to
21  state it differently, maybe I should say, Sergeant
22  Scott just rubber-stamped this IAP without really
23  reviewing it, didn't he?
24    A   Without -- "rubber-stamp" is an
25  all-encompassing word.  I will tell you he did not

135

1  do all of the things that we would have expected
2  him to do in his duties for reviewing this.
3     Q   And he might have been disciplined, but
4  he had retired by the time this occurred, the TRB
5  report was final; right?
6     A   That is my understanding.
7     Q   Okay.  And it did go -- or this finding
8  did go into his personnel file though?
9     A   Yes.
10    Q   Because sometimes you have people retire
11  and they come back; right?
12    A   I'm not sure of the labor laws in effect
13  with it.  But I do know if you leave in the middle
14  of an investigation and the investigation is
15  completed, that does go in your file whether
16  you're still working with us or not.
17    Q   And then we see this a lot of places in
18  the memorandum, but again here, under the section
19  about Sergeant Scott, it says "Recommended action
20  to be determined."
21         So who was to determine that recommended
22  action?
23    A   I'm not sure why that was there.
24    Q   Was there any action taken, other than
25  just putting this finding in Sergeant Scott's

136

1  personnel file?
2     A   Not that I'm aware of.
3     Q   And then I would like you to look at
4  pages 27 through 33.  And this is where actions
5  and findings as to Lieutenant O'Daniel and Captain
6  Cole are discussed; correct?
7     A   Correct.
8     Q   Now, the findings that are mentioned
9  here, they are identical for those two officers;
10  right?  Take a look at them, because what it looks
11  to me like is there were similar conclusions as to
12  both Lieutenant O'Daniel and Captain Cole, but
13  they're being addressed separately in the TRB
14  report.
15    A   Yes.
16    Q   Okay.  And so Metro, through the TRB,
17  agreed with those findings as to Captain Cole but
18  overturned them as to Lieutenant O'Daniel;
19  correct?
20    A   They agreed with one of the findings
21  with Captain Cole and, you are correct, did not
22  agree with the findings on -- with
23  Lieutenant O'Daniel.
24    Q   Okay.  And really -- and this is at the
25  bottom of page 33.  It was determined by Metro

137

1  that Captain Cole should have recognized that
2  there were too many unknown factors and should not
3  have approved the IAP for this warrant; correct?
4     A   Correct.
5     Q   The IAP that included CET entry?
6     A   Correct.
7     Q   And did that also include the fact that
8  NFDDs were to be automatically deployed?
9     A   I'm not aware of that, if that's yes or
10  no.
11    Q   Why were these findings verified or
12  approved by TRB as to Captain Cole but not
13  Lieutenant O'Daniel?
14    A   If memory serves me correct, there
15  were -- Lieutenant O'Daniel was out with COVID and
16  not able to respond or be there.  She was actually
17  in quarantine.  And in that instance, when you
18  lose that middle level of leadership, then it's
19  incumbent upon the captain to take on those
20  responsibilities.
21         And then the captain is the bureau
22  commander and the -- really the final authority in
23  everything that happens.  So because -- my memory
24  was that Lieutenant O'Daniel was out with COVID
25  and quarantined and really not in this, and that



30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

138

1  it then fell on the captain's shoulders. And then
2  he even admitted that as much in the -- his turn
3  to talk in the Tactical Review Board.
4      Q   Give me just a moment to look at
5  something.
6          Was that a unanimous decision by the
7  TRB, that Captain Cole would be found responsible
8  but not Lieutenant O'Daniel?
9      A   I don't remember.
10     Q   What actions, if anything, were taken
11 against Captain Cole as a result of this finding?
12     A   I'm not sure.
13     Q   Who would know that?
14     A   His chain of command at the time.
15     Q   So you don't know whether he was
16 disciplined or retrained in any way?
17     A   If -- if you can give me one moment. I
18 believe that was addressed on Exhibit 3, if I can
19 slide over to that.
20     Q   Yeah, so that's a pretty good
21 transition. So let's look at Exhibit 3 now. This
22 is a one-page interoffice memorandum that is -- it
23 says, "Subject: TRB memo addendum."
24         So using this addendum then, what action
25 was taken against Captain Cole?

139

1      A   It says, "Captain Cole's negative
2  finding was addressed during the Tactical Review
3  Board." So his acknowledgment of his failures on
4  that day were addressed by the board, but I -- I
5  do not know if any discipline came down from it as
6  a result of it. That would have been his chain of
7  command that would be doing that.
8      Q   He acknowledged and Metro agreed that he
9  should not have approved this IAP?
10     A   Correct.
11     Q   One of the recommendations in this
12 addendum is that the Office of Internal Oversight
13 create and maintain a matrix to document and
14 update the status of each recommendation in the
15 TRB memorandum to ensure completion. And then it
16 says, "Upon completion of the recommendations, the
17 finalized matrix will be attached to this
18 addendum."
19         Do you see that?
20     A   Where is that at?
21     Q   Well, this is on Exhibit 3. This is the
22 first recommended action.
23     A   Okay. I do see that.
24     Q   Do OIO ever prepare such a matrix?
25     A   I do not know if they did or not.

140

1      Q   Have you ever seen it?
2      A   I have not.
3      Q   Would you agree with me that it's not
4  attached to the addendum?
5      A   I do agree.
6      Q   If the OIO matrix was never prepared,
7  would Metro agree that that's another failure in
8  oversight in this case?
9          MR. ANDERSON: Objection. Form.
10         Go ahead.
11         THE WITNESS: It's a recommendation
12 made by Office of Internal Oversight that was put
13 in a memorandum up through the chain of command to
14 the sheriff for recommendation and implementation,
15 but I do not know if that was implemented or not.
16 BY MR. BREEDEN:
17     Q   So we have a longer memorandum dated
18 January 3rd, 2023, and then we have this one-page
19 addendum dated January 31, 2023.
20         This one-page addendum, was that the end
21 of the TRB process?
22     A   For my involvement, the TRB process was
23 the conclusion of that day when the board convened
24 and recommendations were made. I would not know
25 the -- what happens after that with the chair and

141

1  the memo that is -- is sent up.
2      Q   In the TRB records, you know, for this
3  investigation, what documents would exist other
4  than these two memorandums, which are Exhibits 2
5  and 3? And then we discussed, there's an audio
6  recording of at least part of the TRB board
7  meeting.
8          What other documents or recordings would
9  exist?
10     A   Specific to the TRB?
11     Q   Yes.
12     A   None that I'm aware of.
13     Q   Well, didn't you say that there are some
14 written recordation of the votes?
15     A   They do record the -- the votes. The
16 members are given the sheets with all of the
17 findings, very similar to the way that you saw it
18 in the red and the blue for the positive and
19 negative outcomes. And then every member votes on
20 it by checking the boxes and then signs the
21 bottom. And then those forms are collected, but I
22 don't know what happens to them from there.
23     Q   Okay. So the last you saw them was when
24 the TRB board meeting occurred?
25     A   Yes.

Case 2:24-cv-00074-APG-NJK    Document 55-24    Filed 05/16/25    Page 39 of 41
30(b)(6) for Las Vegas Metropolitan Police Department
Reggie Rader                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

142

1        MR. BREEDEN:  Were you going to say
2   something?
3        MR. ANDERSON:  I was going to say, you
4   do have them.  You know that; right?
5        MR. BREEDEN:  Well, I'll look for
6   them.
7        MR. ANDERSON:  I can tell you the
8   Bates stamps.
9        MR. BREEDEN:  Yeah, please do.
10       MR. ANDERSON:  LVMPD004512 through
11   004773.
12       MR. BREEDEN:  I'll let you know that
13   in preparing for this deposition, I actually
14   noticed that we were missing some of the
15   Bates-labeled documents.
16       MR. ANDERSON:  Okay.
17       MR. BREEDEN:  And I'm going to have to
18   have my staff follow up with you regarding that.
19   I don't know if they were Bates-labeled and never
20   sent to us or they were sent to us and didn't make
21   it into our system.  I haven't determined that.
22   But I will let you know that we noticed we are
23   missing some of the documents.
24       MR. ANDERSON:  Whatever you need.
25

143

1   BY MR. BREEDEN:
2    Q    Okay.  The next document I would like to
3   discuss has been labeled Exhibit 5 for this
4   deposition.  This is the OIO.  It says, "Key
5   findings, conclusions, or recommendations."
6        Have you seen this document prior to
7   today?
8    A   I have.
9    Q    Did you take any part in preparing this
10   document personally?
11   A   I did not.
12   Q    Who prepared it?
13   A   I believe it comes out of the Office of
14   Internal Oversight, and then our general counsel
15   looks at it.  And then it is put out on their --
16   their web page.
17   Q    Yeah.  The OIO key findings,
18   conclusions, and recommendations, these are meant
19   to be released to the public; correct?
20   A   Correct.
21   Q    Why is this particular document -- if I
22   were to look up this OIS on Metro's website, why
23   is it not available through the website?
24   A   I was able to have our general counsel
25   pull it up for me yesterday.  I believe it is on

144

1   our website.  Well, I know it's on our website,
2   because she was able to navigate it and get that
3   for me yesterday.
4    Q    Okay.  Would you agree with me that this
5   OIO report doesn't mention any of the acknowledged
6   failures by Captain Cole?
7    A   I am aware.
8    Q    Are you aware of any reason why it
9   wouldn't list those important findings?
10   A   Well, this is an administrative process,
11   and much like our other internal investigations,
12   we don't release names.  The names you do see
13   mentioned here are the names of the officers
14   involved in the shooting, because those names have
15   already come out in the FIT report and in the
16   72-hour briefing.
17       And as a part of executive privilege,
18   the sheriff is able to look at things that were
19   discussed in an effort to make ourselves better
20   and be able to critique and criticize things that
21   we did and make internal improvements with that
22   and not put people's names for administrative
23   issues or finding out to the public.
24   Q    In this entire document, does it ever
25   use the phrase "knock and announce"?

145

1    A   I don't know.  I could go through it,
2   but I'm not familiar if it does or not.
3    Q    I'll represent to you when I reviewed
4   it, it doesn't use that term.
5        Don't you think it's an important
6   finding of TRB and CIRT that the officers did not
7   allow a sufficient time after the announcement for
8   Mr. Williams to come to the door?
9    A   I know that the concerns we had and
10   looked at administratively were addressed
11   internally and through policy.  And we have the
12   ability to push out information to the public, and
13   this is what we decided to push out.
14       We don't always get into the specifics
15   of SWAT tactics or police operations, just because
16   this is publicly available and anybody could look
17   at that and it could cause harm to our officers in
18   the future if they had to go do something like
19   that.  So we're very -- I think we're very
20   consistent with the information that we do put out
21   on internal investigations.
22       And this is the same thing where we're
23   going to put out certain findings on there, but we
24   also have the executive privilege and the sheriff
25   is able to address internal administrative issues



30(b)(6) for Las Vegas Metropolitan Police Department

Reggie Rader          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

146

1  internally as well.
2      Q   Why does Metro not release the TRB
3  report or memorandum?
4      A   Because the TRB is an internal document
5  as a result of an administrative process, and we
6  do not release our internal investigations as a
7  police department.
8      Q   Do you agree that some of the
9  information in the TRB memorandum is simply
10  factual information?
11      A   I agree that administrative
12  investigations can contain factual information,
13  much like an internal affairs investigation.  And
14  we do not release those or make those public,
15  because they are part of an administrative process
16  looked at our standard, which is higher than what
17  is required by the law, and allows us to really
18  look at those and see if there is any issues or
19  ways to improve and to be able to do it on a
20  constant basis of a self-assessment and a review.
21      But in being consistent with our other
22  products that we put out, administrative hearings
23  and investigations, the information does not go
24  out to the public, those reports.
25      Q   Why is the FIT report released to the

147

1  public then?
2      A   Because the FIT report is a criminal
3  investigation, and criminal investigations are
4  part of public record.  And that is submitted to
5  the district attorney's office.  So that is a
6  completely different thing than an internal
7  administrative board or function.  That's no
8  different than any other criminal report that we
9  do that is subject to public record.
10      MR. BREEDEN:  Just a moment.
11      Okay.  Deputy Chief, thank you for
12  your time here today.  I think those are all of my
13  questions.
14      Mr. Anderson, do you have anything?
15      MR. ANDERSON:  No, I don't have any
16  questions.  Thank you.  My voice is gone.  I
17  didn't say a word and lost my voice.
18      THE WITNESS:  Thank you.
19      THE VIDEOGRAPHER:  This concludes the
20  deposition of Reggie Rader, a 30(b)(6), consisting
21  of one disk.  The time is 1:22 p.m.  We're off the
22  record.
23      THE COURT REPORTER:  Mr. Anderson, do
24  you need a copy of the transcript?
25      MR. ANDERSON:  I do want a copy.

148

1  (Whereupon, the deposition
2  concluded at 1:22 p.m.)
3  * * * * *

149

1              CERTIFICATE OF COURT REPORTER
2
   STATE OF NEVADA      )
3                       )  ss:
   COUNTY OF CLARK      )
4
5      I, Heidi K. Konsten, Certified Court Reporter
6  licensed by the State of Nevada, do hereby certify
7  that I reported the deposition of REGGIE RADER,
   commencing on February 21, 2025, at 9:08 a.m.
8
9      Prior to being deposed, the witness was duly
10  sworn by me to testify to the truth.  I thereafter
11  transcribed my said stenographic notes via
12  computer-aided transcription into written form,
13  and that the transcript is a complete, true and
14  accurate transcription and that a request was not
15  made for a review of the transcript.
16      I further certify that I am not a relative,
17  employee or independent contractor of counsel or
18  any party involved in the proceeding, nor a person
19  financially interested in the proceeding, nor do I
20  have any other relationship that may reasonably
21  cause my impartiality to be questioned.
22      IN WITNESS WHEREOF, I have set my hand in my
23  office in the County of Clark, State of Nevada,
24  this March 4, 2025.
25

                        Heidi K. Konsten, RPR, CCR No. 845

150

```
1              DECLARATION OF DEPONENT
2           I, REGGIE RADER, deponent herein, do
3    hereby declare under penalty of perjury that I have
4    read the within and foregoing transcription of my
5    testimony taken on February 21, 2025, at Las Vegas,
6    Nevada, and that the same is a true record of the
7    testimony given by me at the time and place
8    hereinabove set forth, with the following
9    exceptions:
10
11              ERRATA SHEET
12   PAGE  LINE   SHOULD READ:        REASON FOR CHANGE:
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25
```

151

```
1              ERRATA SHEET
2    PAGE  LINE   SHOULD READ:        REASON FOR CHANGE:
3    _____
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21
22
23   Date: _____    _____
                      REGGIE RADER
24
25
```