Exhibit W - Deposition of Rule
30(b)(6) witness Justin Roth
(LVMPD's CIRT Report)

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 260

1                        CERTIFICATE OF REPORTER

2      STATE OF NEVADA        )
                              )SS
3      COUNTY OF CLARK        )

4          I, Holly Larsen, a duly certified court
       reporter licensed in and for the State of Nevada, do
5      hereby certify:

6          That I reported the taking of the deposition of
       the witness, Detective Justin Roth, at the time and
7      place aforesaid;

8          That prior to being examined, the witness was
       by me duly sworn to testify to the truth, the whole
9      truth, and nothing but the truth;

10         That I thereafter transcribed my shorthand
       notes into typewriting and that the typewritten
11     transcript of said deposition is a complete, true,
       and accurate record of testimony provided by the
12     witness at said time to the best of my ability.

13         I further certify (1) that I am not a relative
       or employee of counsel of any of the parties; nor a
14     relative or employee of the parties involved in said
       action; nor a person financially interested in the
15     action; nor do I have any other relationship with
       any of the parties or with counsel of any of the
16     parties involved in the action that may reasonably
       cause my impartiality to be questioned; and (2) that
17     transcript review pursuant to FRCP 30(e) was
       requested.
18
           IN WITNESS HEREOF, I have hereunto set my hand
19     in the County of Clark, State of Nevada, this 20th
       day of January, 2025.

20

21

22

23                                    *Holly Larsen*

24                            _____

25                            HOLLY LARSEN, CCR NO. 680

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4     LATIA ALEXANDER,              )
      individually as heir of      )
5     ISAIAH T. WILLIAMS and in    )
      her capacity as Special      )
6     Administrator of the Estate  )
      of ISAIAH T. WILLIAMS,       )
7                                  )
                     Plaintiff,    )
8                                  )
      vs.                          )Case No.
9                                  )2:24-cv-00074-APG-NJK
      LAS VEGAS METROPOLITAN       )
10    POLICE DEPARTMENT, a         )
      political subdivision of the )
11    State of Nevada, et al.,     )
                                   )
12                   Defendants.   )
      _____)

13

14

15         VIDEOTAPED DEPOSITION OF DETECTIVE JUSTIN ROTH

16              Taken on Wednesday, January 8, 2025

17      By a Certified Stenographer and Legal Videographer

18                      At 9:12 a.m.

19               At 400 South Seventh Street

20                   Las Vegas, Nevada

21

22

23           Stenographically reported by:

24       Holly Larsen, NV CCR 680, CA CSR 12170

25            Job No. 59091 - Firm No. 116F

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

2

```
1   APPEARANCES:
2   For the Plaintiff:
3       MURPHY'S LAW, PC
        BY:  CORRINE MURPHY, ESQ.
4       2620 Regatta Drive
        Suite 102
5       Las Vegas, Nevada 89128
        702.820.5763
6
7   For the Defendants:
8       MARQUIS AURBACH
        BY:  CRAIG ANDERSON, ESQ.
9       10001 Park Run Drive
        Las Vegas, Nevada 89145
10      702.382.0711
11
    The Legal Videographer:
12
        NEKITA TAYLOR
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1            P R O C E E D I N G S
2                  -oOo-
3
4        THE VIDEOGRAPHER:  Today is
5    January 8, 2025.  The time is approximately
6    9:12 a.m.  Your court reporter is Holly Larsen, and
7    I am your videographer, Nekita Taylor.  We are here
8    on behalf of Lexitas.
9        The witness today is Detective Justin
10   Roth, and we are here in the case Latia Alexander,
11   et al., versus Las Vegas Metropolitan Police
12   Department, et al.
13       Will counsel please state your
14   appearances, and the court reporter will administer
15   the oath.
16       MS. MURPHY:  Good morning.  Corrine
17   Murphy, Bar Number 10410, on behalf of plaintiff.
18       MR. ANDERSON:  Craig Anderson on behalf
19   of the defendants.
20   Whereupon,
21           DETECTIVE JUSTIN ROTH,
22   having been first duly sworn to testify to the
23   truth, was examined, and testified as follows:
24
25       MS. MURPHY:  Let the record reflect this
```

3

```
1              I N D E X
2   WITNESS                                PAGE
3   DETECTIVE JUSTIN ROTH
4       Examination by Ms. Murphy            5
5
6
7
8             E X H I B I T S
9   NUMBER                                 PAGE
10  Exhibit 1    Notice of Videotaped         6
                 Deposition of Detective
11               Justin Roth
12  Exhibit 2    Critical Incident Review     28
                 Team Administrative Report
13
    Exhibit 3    Pages 187 and 188 of         46
14               Critical Incident Review
                 Team Administrative Report
15
    Exhibit 4    NRS 179.055                  128
16
    Exhibit 5    Overall layout of Apartment  130
17               1125
18  Exhibit 6    Tactical Review Board CIRT   248
                 Conclusions
19
    Exhibit 7    LVMPD Interoffice Memorandum 253
20
21
22
23
24
25
```

5

```
1    is the time and the place of the deposition of
2    Justin Roth in the matter of Latia Alexander,
3    et al., versus Las Vegas Metropolitan Police
4    Department, et al., Case Number 2:24-cv-00074.
5
6             EXAMINATION
7    BY MS. MURPHY:
8        Q.    Mr. Roth, my name is Corrine Murphy, and
9    I'm an attorney.  I represent the plaintiff, Latia
10   Alexander, in this case.
11       Can you please state and spell your full
12   name for the record.
13       A.    It's Justin Roth.  J-u-s-t-i-n R-o-t-h.
14       Q.    Do you have a middle name, Mr. Roth?
15       A.    It's Ray, R-a-y.
16       Q.    And would you prefer that I call you
17   Mr. Roth or Justin?
18       A.    Justin is fine.
19       Q.    And, Justin, you've been noticed to be
20   here today; correct?
21       A.    Yes.
22       MS. MURPHY:  I'm going to attach the
23   Notice of Videotaped Deposition of Justin Roth as
24   Exhibit 1 to today's deposition.
25   ///
```

LEXITAS

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1  BY MS. MURPHY:
2     Q.    And, Justin, you'll be able to look
3  at this too. Whenever I'm going to ask you to
4  look at a document today, I'm going to first
5  ask -- hand it to the court reporter, she's going
6  to mark the exhibit number on it, and then at the
7  end of the deposition, when she compiles a
8  transcript of today's hearing, she'll attach all
9  those documents. So make sure and don't leave with
10  any documents today.
11     A.    Okay.
12     Q.    Give them all back to her at the end of
13  the day.
14     A.    Came with nothing; I will leave with
15  nothing.
16     Q.    Okay. Thank you.
17        (Exhibit 1 marked.)
18  BY MS. MURPHY:
19     Q.    And, Justin, you understand that you're
20  here today to discuss the shooting of Isaiah
21  Williams?
22     A.    I do.
23     Q.    Have you ever given your deposition
24  before?
25     A.    No.

7

1     Q.    Have you ever testified in court before?
2     A.    Yes.
3     Q.    Okay. In what court cases have you
4  testified?
5     A.    I could not tell you off the top of my
6  head. I've been on the department for 16 years, so
7  a few. But nothing off the top of my head.
8     Q.    And so "a few" could mean a few
9  different things to a few different people.
10        Does "a few" mean -- would you say that
11  it's been more than five or less than five?
12     A.    If we're talking about full testimony
13  inside of a jury court or versus a preliminary
14  hearing testifying -- which one are we talking about
15  here?
16     Q.    Let's talk with a trial, with a jury
17  trial.
18     A.    One or two, to my recollection.
19     Q.    And in the prelims, I'm assuming that
20  you were there as an arresting officer, an
21  investigating officer. Is that fair?
22     A.    Yes, ma'am.
23     Q.    Okay. And how many of those do you
24  think you've testified?
25     A.    Dozens.

8

1     Q.    Have you ever given testimony, either
2  in a deposition or at court, in your capacity as a
3  CIRT -- and that's C-I-R-T -- investigator?
4     A.    I have not.
5     Q.    Okay. Is there any reason that you
6  would not be able to answer and understand my
7  questions today and give your best and most accurate
8  testimony?
9     A.    No.
10     Q.    Are you under any medications that would
11  inhibit your ability to give reliable testimony
12  today?
13     A.    No.
14     Q.    Have you had any recent personal or
15  professional issues pop up that would inhibit your
16  ability to give reliable testimony today?
17     A.    No.
18     Q.    Can you please tell me everything that
19  you did to prepare for today's deposition?
20     A.    I went over my report that was authored
21  and my conclusions that were written through the
22  section.
23     Q.    And when you say your report, I have a
24  220-page report. Is that the report you're
25  referring to?

9

1     A.    Correct.
2     Q.    And you read the whole thing again from
3  start to finish?
4     A.    I did not from start to finish. I have
5  a very good recollection of that report given that
6  the investigation took approximately a year to
7  complete on our side, an administrative
8  investigation.
9        I read over the conclusions again,
10  which, again, are the, I guess, summary of the body
11  of the report, and a few notes I took in my head
12  reference the body of the report.
13     Q.    Okay. So is it fair -- so you said a
14  few notes that you took in your head.
15        Did you -- did you do any actual
16  handwritten notes as you reviewed?
17     A.    No.
18     Q.    And just one thing, Justin. The court
19  reporter is taking down everything we say. I know
20  that you're anticipating the end of my question, but
21  just let me finish it so that she can write it down.
22     A.    Yes, ma'am.
23     Q.    She has a tough time writing down what
24  two people say at the same time.
25     A.    Understandable.



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1    Q.    And I'll try to do the same for you.
2    A.    Okay.
3    Q.    If I start into a question and you have
4    not finished answering it, please let me know.
5    Because sometimes I can go kind of quickly too. I
6    don't want to cut you off; I want to give you every
7    opportunity to give your full testimony today.
8    Okay?
9    A.    Would you like me to put up my hand
10   or -- and somehow indicate it or just speak up?
11   Q.    Just speak up. If I start talking or
12   asking the next question and you're not finished
13   with your answer, just say, "I'm not quite done."
14   Okay?
15   A.    Yes, ma'am.
16   Q.    So other than -- were there any other
17   written documents aside from the CIRT report that
18   you reviewed in preparation for today's deposition?
19   A.    No.
20   Q.    Okay. Did you meet with anyone in
21   preparation for today's deposition?
22   A.    Craig Anderson.
23   Q.    Okay. And I -- how long did you meet
24   with Craig for?
25   A.    Approximately half an hour, 45 minutes.

11

1    Q.    Was that the only meeting that you had
2    with Craig about this deposition?
3    A.    Yes.
4    Q.    Did you review any documents during that
5    meeting?
6    A.    I don't believe we did.
7    Q.    Okay. Other than Craig or anyone from
8    Craig's office, was anyone else present for that
9    meeting?
10   A.    Ruth Miller.
11   Q.    And who's Ruth Miller?
12   A.    I believe that she's the head of
13   litigation for the department, or assistant.
14   MR. ANDERSON: She's general counsel for
15   the police department. Assistant general counsel.
16   MS. MURPHY: Okay. What firm -- do you
17   know what firm -- is she, like -- does she work for
18   the --
19   MR. ANDERSON: In-house, yeah. So she
20   is one of four attorneys for the police department
21   that handles litigation. So she's kind of like my
22   supervisor on these cases.
23   MS. MURPHY: Okay. Okay.
24   BY MS. MURPHY:
25   Q.    And I'm assuming that you probably --

12

1    and you tell me if I'm right or wrong. And, I mean,
2    this is a very in-depth report. So I'm assuming you
3    had, like, notes and that kind of stuff that you had
4    compiled in order to create this final report.
5    Did you review any of those, or do you
6    even have access to them anymore?
7    A.    We do have access to our H drive. It's
8    essentially a virtual folder that we did hand over
9    to our legal once it was completed, which also
10   entails something called IA Pro, which is kind of an
11   online resource that is -- you can't delete out of
12   it. Essentially, once you put something in there,
13   that's where it stays.
14   And everything from my case, to include
15   transcriptions, was placed into that H drive and
16   into IA Pro.
17   Q.    And did you review any of that to
18   prepare for today's deposition?
19   A.    Outside of the report that we previously
20   mentioned, no.
21   Q.    And so the final report is also included
22   in the H drive?
23   A.    Correct.
24   Q.    Okay. Do you know approximately how big
25   the H drive is?

13

1    A.    No.
2    Q.    Okay. Is it because it's so big?
3    A.    There's multiple sections that work out
4    of our H drive; OIO and FIT. OIO is our non-deadly
5    use-of-force reviewing section. And then FIT is our
6    force investigation team, which does the criminal
7    side of officer-involved shootings or critical
8    incidents, and we all share the same H drive.
9    Q.    And so is the H drive specific to the
10   matter, or is it just like a whole, like, inter --
11   like, inter-department thing?
12   A.    It's all of our case files for the year
13   that are open, and then there is a section for
14   closed cases up to, I believe, 2012, when the
15   inception of CIRT and OIO became existing.
16   Q.    And so how would this -- Mr. Isaiah
17   Williams' case, would that be qual -- is that -- is
18   that a closed case or an open case as we sit here
19   today?
20   A.    It is a closed case from the
21   administrative side. I cannot speak on the criminal
22   side. We don't handle that side of it.
23   Q.    And by "criminal side" -- I just want to
24   make sure. Because I know that -- and we'll talk
25   about it a little bit more in depth lately -- or

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1  later -- there's kind of the difference between what
2  you did, which was kind of like the civil analysis,
3  and then there was a criminal investigation about
4  the officer-involved shooting; correct?
5      A.    There was a criminal investigation done
6  from the Force Investigation Team.  Our section
7  doesn't do the civil side of it.  Our section is the
8  administrative side of it.  So policy, training,
9  tactics, those sorts of things.
10         And essentially, after the end of that,
11  it goes to a use-of-force board and a tactical
12  review board, which has -- the use-of-force board --
13  four civilians and three department members voting
14  on the outcome of the use of force.
15      Q.    So when you say you don't know if it's
16  opened or closed, is it with any of those
17  departments it could still be open, or do you mean
18  the actual -- like, a different, like, underlying
19  investigation?
20      A.    The only investigations that are opened
21  up on our department as far as this case is
22  concerned, to my knowledge, is from FIT and CIRT.
23         I cannot speak on FIT's side.  I do not
24  work for FIT.
25         But on our CIRT side, yes, it is closed.

15

1      Q.    Okay.  And so when you're saying it may
2  still be open, you're kind of saying, I don't know
3  what's going on with FIT?
4      A.    Correct.  I can't speak one way or the
5  other.
6      Q.    Okay.  Had you ever -- okay.  I don't
7  want to jump ahead too far.
8         Can you -- I want to kind of ask some
9  questions about your professional background.
10         You mentioned earlier you've been with
11  the department for 16 years; is that correct?
12      A.    Correct.
13      Q.    Okay.  Can you tell me -- can you kind
14  of walk me through your career arc with the
15  Las Vegas Metropolitan Police Department?
16      A.    Sure.  A patrol officer for
17  approximately -- overall, approximately eight years,
18  I would say.  I did a year as an FTO, which is a
19  field training officer.
20         I also did a year in property crimes,
21  which is an old section that has now been dissolved,
22  as a detective there.
23         And then I believe it was three years in
24  PD, which is patrol detective.  It's essentially a
25  detective position within patrol.

16

1         And then the last three have been in
2  CIRT -- sorry.  The last six have been in CIRT.  And
3  then -- sorry, what I previously forgot to mention
4  was PSU, which is the problem-solving unit.  I was
5  there for about a year.
6      Q.    What is PSU?
7      A.    Essentially it's a patrol function out
8  of an area command.  Goes between plainclothes and
9  uniform just depending on what the needs of the
10  station are to do either various plainclothes
11  operations or uniformed details.
12      Q.    And so how did you end up in CIRT?
13      A.    My partner in PD suggested that I come
14  do a TDY.  And this was back in -- a temporary
15  assignment.  This was back in 2019, very beginning.
16  I want to say January.
17         And he suggested I come up because they
18  were having openings.  And I came up and did a TDY
19  for approximately three months before becoming
20  full-time in July of 2019.
21      Q.    What's a TDY?
22      A.    A temporary assignment.
23      Q.    And so what's the purpose of a temporary
24  assignment?
25      A.    For our section it kind of determines if

17

1  you can do the job.  We're all police officers, and
2  we should have the knowledge of department training
3  and policies, but it goes a little bit farther.  You
4  have to have the ability to write well.  You have to
5  have the ability to public speak.  A lot of our job
6  is giving long presentations.
7         In this case I gave a 12-hour
8  presentation to executive staff, to the use-of-force
9  board, tactical review board.  That is difficult for
10  some people to do, to speak in public settings,
11  especially in front of high-ranking people in our
12  department.
13         And then also just have the knowledge of
14  tactics and training and policy within the
15  department.
16      Q.    And so the 12-hour presentation, in
17  some of the -- some of the documents that Craig
18  has produced, I saw some -- some PowerPoint
19  documents.
20         Is that the 12-hour presentation
21  you did?
22      A.    Correct.
23      Q.    Okay.  And in what context did you give
24  that 12-hour presentation?
25      A.    The use-of-force board and the tactical

LEXITAS

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1  review board.
2     Q.    And what are those two different boards?
3     A.    They're two separate boards. They're
4  done the same day. And essentially there's a
5  PowerPoint presentation that is completed which kind
6  of gives you the entirety of the case, which is
7  essentially the report that is given, that 222-page,
8  I believe it is, report, in a PowerPoint form, where
9  you hear the testimony from officers, or sometimes
10 civilians, but anybody that gave a quote. That is
11 in that report. Essentially it's presented with
12 movement slides, video to illustrate and give a full
13 picture of the essence of the report and the case.
14 And then there's a break.
15        The -- would you like me to go into,
16 like, exactly everything that happens in the
17 use-of-force board?
18    Q.    Yeah. Absolutely, yeah.
19    A.    There's a break so the people who can
20 vote on the board, which, again, are four civilian
21 members and three department members, will have a
22 deliberation on whether or not it falls into
23 separate categories of our voting criteria. I
24 believe it is administrative approval, tactics and
25 decision-making, policy training failure, and

19

1  administrative disapproval are the four categories
2  it can fall into.
3        Once those individuals make their vote,
4  everybody comes back in, they go over the findings
5  of the use-of-force board, and then it goes into the
6  tactical review board, which are the conclusions
7  that you read in the back of that presentation -- or
8  the report.
9     Q.    Okay. So just so that -- when you say
10 the conclusions that you read in the back of the
11 report, do you mean the CIRT report?
12    A.    Correct.
13    Q.    Okay. Because -- so I've looked over
14 the tactical review board.
15    A.    Correct.
16    Q.    And is this -- and so is my
17 understanding -- well, walk me through -- they -- so
18 when they're saying, like, approved, like they've
19 got these checkmarks where it says, like, approve
20 [sic], modify, overturn, is this a result of your
21 presentation?
22    A.    Correct. So the tactical review board
23 is essentially -- it's been -- not restricted but,
24 for lack of better terms, shrunk down as far as
25 time.

20

1        Back in 2022, when we did this, we
2  read every single word of the conclusion as it
3  read on the back of the report. As you can
4  imagine, with the amount of conclusions that was
5  in this case, it was a lot of reading. And
6  essentially I read the conclusions into the record,
7  and then the board votes on that. And the board in
8  this case are no civilians because they are not
9  expected to have any experience in our tactics,
10 training, and policy.
11    Q.    Okay. And so -- sorry. I'll get back
12 to it later. I don't -- I don't want to jump around
13 too much.
14        Other than your -- so you've got your
15 16 years coming into your -- working as a -- working
16 at LVMPD.
17        Do you have any -- what's your highest
18 level of education?
19    A.    I have a bachelor's degree in
20 communications.
21    Q.    And where did you get that from?
22    A.    University of the Cumberlands in
23 Kentucky.
24    Q.    Okay. And do you have any specialized
25 training or certifications related to your current

21

1  profession?
2     A.    Are you talking about profession as a
3  police officer or --
4     Q.    Yes.
5     A.    -- we've -- I can tell you there's been
6  countless hours of training that I've received in my
7  time on the department. I couldn't tell you.
8     Q.    So let me give you a better example, and
9  perhaps it will make it easier to answer the
10 question.
11        Sometimes when people such as yourself
12 answer that they will say, Oh, I did, like, a
13 month-long course in explosive breaches or, like,
14 some other kind of, like, specialized certification
15 that's over and above.
16        I know that you guys are doing training
17 all the time. But do you -- so do you have
18 anything, as we sit here today -- if you're like,
19 Hey, it's just so many -- but do you have any other,
20 like, specialized certifications that, like, if you
21 went and applied for a job, like, you would list
22 off?
23        Do you know what I mean?
24    A.    Kind of. I would say that just
25 based on the description of my position of the

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1    Critical Incident Review Team, you have to have a
2    vast knowledge or access to the department
3    procedures, policy, and training that we currently
4    implement.
5            I would say that's all of my training
6    that I've received in my time in the department.
7    There's no specific training that I could say would
8    be, like, Oh, this is a qualifier, this isn't a
9    qualifier, because, in essence, everything that I've
10   done, from blue-on-blue training for plainclothes
11   operations to just your regular certification as a
12   police officer, comes into play when you're talking
13   about looking at an incident from an administrative
14   investigation in its entirety.
15   Q.    And so is that what you -- you've been
16   with CIRT for 16 years now.  Is this what you --
17   A.    Six years.
18   Q.    Sorry.  Six years.
19           Is this what you do all day every day?
20   A.    Yes, ma'am.
21   Q.    Okay.  And you touched on it a little
22   bit, but can you describe to me with more
23   particularity what exactly your position at CIRT
24   entails?
25   A.    I can give you an example.

23

1            Essentially we do administrative
2    investigations on critical incidents, to include
3    any high-risk incidents, deadly force, in-custody
4    deaths, those sorts of things that are deemed
5    high risk and critical incidents on the department.
6            Example would be, if we have an
7    officer-involved shooting, we interview the involved
8    officers and the witnesses; we conduct briefings to
9    executive staff, subject matter experts, captains,
10   lieutenants; and then finally we do the use-of-force
11   board, tactical review board, and complete the
12   detailed report, which you have an example in front
13   of you.
14   Q.    And so -- sorry -- what's the difference
15   between the use-of-force and the tactical review
16   boards?
17   A.    So use-of-force only looks at the use of
18   force specifically, not any of the tactics or
19   training or policy that are attached to it outside
20   of our use-of-force policy.
21           Essentially it is at the moment, the
22   time that force was used, did it meet our policy
23   and law.
24   Q.    Okay.  Well, not policy; just the law.
25   Correct?

24

1    A.    Well, policy is also weaved into -- or
2    law is weaved into policy.
3            So you're talking about Graham versus
4    Connor and threat assessment for ability,
5    opportunity, and then jeopardy and preclusion.
6            Those are standards that are set
7    forth from the supreme court that we have in our
8    policy.
9    Q.    And you are currently an investigator
10   with CIRT; correct?
11   A.    Yes.
12   Q.    And have you always held the position of
13   investigator for the six years you've been with
14   CIRT?
15   A.    Yes.  Detective.  I'm sorry.
16   Investigator, detective.  I guess same thing.
17   Q.    If I -- I'm not in it every day like you
18   are, and some of the nomenclature can be very
19   specific.  So if I use a term improperly, feel free
20   to correct me on it.
21   A.    Sure.  It wasn't -- if we're talking
22   about titles.
23   Q.    No, no, no.  I want the record to be as
24   accurate as possible.
25   A.    Sure.

25

1    Q.    In fairness, it does list you in the
2    report as a -- like, a detective, but also an
3    investigator.
4            Yeah, Detective Roth, and you're listed
5    as the -- on the Critical Incident Review Team.
6            And my understanding is that you are
7    part of the -- you are an investigator; correct?
8    A.    Yes.
9    Q.    Okay.  Is there any -- and so what's
10   the -- what are the different -- how many other
11   people are on CIRT?
12   A.    That's a -- so are you talking about
13   current status right now or where it was in 2022?
14   Q.    Let's talk about it in 2022.
15   A.    I believe we were at that point at seven
16   detectives, one sergeant, one corrections officer
17   detective, and one corrections officer sergeant.  I
18   believe that's where we were at.
19           We also have two executive support staff
20   which are civilians.
21           That varies from time to time.  Of
22   course over the year I believe we had one TDY come
23   through because I was taken off of an assignment to
24   handle this exclusively.  So my spot in the rotation
25   with a gap, you can imagine with only six or seven

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1   people, with the amount of caseload we get usually
2   is between 52 and 70 a year, that can become pretty
3   daunting for a six-person unit.
4       Q.    Okay.  And who -- do you have a
5   supervisor within the unit?
6       A.    I do.  A sergeant and a lieutenant.  But
7   a sergeant is my direct supervisor.
8       Q.    Okay.  And who was it -- who was it at
9   the time that this was created in 2022?
10      A.    Sergeant Shawn Smaka.
11      Q.    And then who was the lieutenant?
12      A.    I believe it was Lieutenant Kurt
13  McKenzie.
14      Q.    Okay.  And I've seen a couple -- was
15  there any other -- other than the people that you
16  were directly reporting to, Sergeant Smaka and
17  Lieutenant McKenzie, were there any other CIRT
18  detectives that were working alongside of you on
19  this, or were -- was this your only -- were you solo
20  on this project?
21      A.    So there's no solo in CIRT.
22      Q.    Okay.
23      A.    When I say I was pulled off of this to
24  handle this exclusively, so I wouldn't -- because of
25  the amount of interviews -- I believe I interviewed

27

1   somewhere north of 20 individuals in this case.
2   That's pretty rare.  And in all those interviews,
3   usually you have to have another detective and your
4   supervisor along that.
5       So when you're talking about our
6   workweek and then getting those interviews done,
7   preparing for those interviews, and actually doing
8   those interviews, it's a lot of work.
9       CIRT in itself is a team effort, to
10  include from our SMEs, all those individuals
11  that are listed in the left column of that
12  report that you're referencing.  It's never
13  Justin Roth's opinion.  It's never Shawn Smaka's
14  opinion.  It's collectively as a group when it comes
15  to the investigators, our chain of command, as well
16  as the SMEs that we bring in as part of the CIRT
17  process, to ensure that all bases are covered and we
18  get an accurate representation of our policy and
19  training.
20      Q.    Okay.  And I know what an SME is, but
21  just for the record can you say?
22      A.    Subject matter expert.
23      Q.    And so what are the -- what are the --
24  what's an SME?  I mean, a subject matter -- but if
25  you can kind of explain to me what it is.

28

1       A.    So essentially in our -- they are people
2   in our organization that we show the investigation
3   to through a PowerPoint.  The -- and they're
4   responsible for training on our department.
5       So you have AOST, which is Advanced
6   Officers Skills Training, and then RBT, which is
7   Reality-Based Training, and the academy.
8       You also have individuals from --
9   leadership from firearms that come out.  If you have
10  a specialty case like SWAT or Major Violators or
11  sections that wouldn't deal specifically with
12  patrol, then you would find somebody who had
13  recently either promoted out of there or left the
14  unit to weigh in on that.
15      Q.    Okay.  And so you referenced the left
16  side of the -- you're going to have to excuse me.
17  I'll give you the first page of this.  And it got a
18  little wrinkled in my bag.
19      A.    Sure.
20      (Exhibit 2 marked.)
21  BY MS. MURPHY:
22      Q.    You referenced the left-side column.
23      Is this the front page of the report and
24  the left-side column you were referring to?
25      A.    Correct.

29

1       MS. MURPHY:  Let the record reflect, and
2   we'll ask to attach this as Exhibit 2, this is the
3   first page of the Critical Incident Review Team
4   Administrative Report, and it's Bates LVMPD 4255.
5   BY MS. MURPHY:
6       Q.    And so it's -- looking down at it -- so
7   the subject matter experts, the first grouping is
8   "Office of Internal Oversight."
9       What is that?
10      A.    That is our section, CIRT and OIO.
11  Notwithstanding on FIT.  They do not have access to
12  our information.
13      So FIT is completely separated from any
14  administrative review for purposes of their criminal
15  investigation and 289 protection.  Talking about
16  NRS 289.  Because the officers who come in, their
17  statements cannot be used against them criminally
18  because they're being compelled to give those
19  statements.  So they don't have access to our
20  information.
21      Q.    Okay.  So who is Office of Internal
22  Oversight?  Is that FIT or CIRT?
23      A.    That's CIRT and OIO.
24      Q.    Okay.  Yeah, because you're listed on
25  here as well; correct?

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1    A.    Yes.
2    Q.    Okay. So the Office of Internal
3  Oversight, for lack of a better term, that's CIRT?
4    A.    CIRT and OIO.
5    Q.    What's -- okay.
6    A.    Office of Internal Oversight.
7          So they handle -- the two detectives at
8  this point would be -- looks like just one detective
9  on there. They were probably in a transitional
10  phase. But that would be Tim McAteer. I'm not sure
11  how to say his name too well. Sometimes I just call
12  him Tim. But it's the third one from the bottom,
13  above the sheriff's office executives. That would
14  be a detective from OIO, not from our section. And
15  Sergeant Patrick Hughes would also be the OIO
16  sergeant that is listed on here.
17    Q.    Okay. That's an office -- but why are
18  you listed under Office of Internal Oversight if
19  you're CIRT?
20    A.    It's the same thing. So it's a blanket
21  section. So our section is the Office of Internal
22  Oversight and Constitutional Policing. That's our
23  whole umbrella section of CIRT, FIT, and OIO. IOCP.
24          The Office of Internal Oversight,
25  because it's internal oversight, not criminal, would

31

1  be OIO because they handle non-deadly-force
2  incidents such as tasers. They review all those
3  non-deadly-force incidents. And then Critical
4  Incident Review Team also falls under the Office of
5  Internal Oversight as far as use of deadly force and
6  critical incidences.
7    Q.    And, I'm sorry. You said something
8  about Office of the Constitution. Sorry. Can you
9  say that one more time?
10    A.    It is the -- IOCP is the acronym. It's
11  the -- now I just lost it. I know I just said it on
12  the record.
13          Office of Internal Oversight and
14  Constitutional Policing, I believe it is.
15    Q.    And so that is the umbrella that CIRT --
16  that you operate under in CIRT; correct?
17    A.    Correct. That would be CIRT, FIT, and
18  OIO are a part of IOCP.
19          I know Metro with their acronyms,
20  sometimes it can get confusing.
21    Q.    And so what is -- what is the overall
22  umbrella organization then? Not the name of it, but
23  what's the purpose?
24          I think the purpose is kind of spelled
25  out in the title, but I'd like you to explain it

32

1  to me.
2    A.    Sure. So I believe it was back in 2011
3  the DOJ came in and had a list of requests to -- for
4  Metro to improve themselves. One of them was to
5  have a bifurcated system of criminal and
6  administrative review of critical incidents, to
7  include officer-involved shootings.
8          And that's when -- I believe it was
9  2011 was when CIRT was stood up. It was either that
10  or 2012.
11    Q.    And if -- was part of the purpose to
12  determine whether or not somebody's -- to determine
13  if somebody's constitutional rights were violated
14  or not?
15    A.    No. The purpose was to do a complete
16  administrative investigation as far as CIRT, and
17  also have a unilateral -- I guess that would be the
18  correct term maybe -- of the criminal investigation
19  with FIT.
20          So two separate investigations going at
21  the same time. One criminal; one administrative.
22    Q.    And who does the criminal?
23    A.    FIT. The Force Investigation Team.
24    Q.    Sorry to go through all this.
25    A.    It's fine.

33

1    Q.    So you don't have any involvement with
2  FIT; is that correct?
3    A.    Correct.
4    Q.    Okay. And is part -- is part of your
5  administrative review in CIRT to determine whether
6  the actions -- whatever actions you're investigating
7  complied with constitutional requirements?
8    A.    I don't know -- I'm trying to track
9  where you're going on that.
10    Q.    Sure. Let me -- strike that and let me
11  ask it better.
12          Are you looking -- is part of your
13  determination whether the actions of whichever
14  police officer -- officers you're investigating,
15  if they complied with the constitutional
16  requirements of administrating -- executing their
17  job duties?
18    A.    Yes and no.
19    Q.    Okay.
20    A.    The "yes" part would be if that's woven
21  into our policy, procedures. I'm not a lawyer, so I
22  can't speak to a lot of some of the case law.
23  That's why we do have individuals who look at that.
24          However, my job specifically is a fact
25  finder. I gather all the information that I have

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1  available, to include transcriptions, interviews,
2  what our practices were from a department procedure
3  at the time of the incident.  Not two months down
4  the road, not three months down the road, not
5  practices from two years ago; what the officers and
6  supervisors were operating on at the time of the
7  incident.  And then make a decision based on those
8  policies, training, and tactics.
9         It's not my opinion that is ever
10  interjected.  My opinion is never interjected.  It
11  is a strict fact-finding of our department policies,
12  procedures, and training.
13      Q.    But there -- we'll get to some of the
14  conclusions later on in the deposition.  There are
15  some conclusions about Fourth Amendment and "knock
16  and announce."
17         Did you have any part in developing
18  those conclusions?
19      A.    As far as being involved in the meetings
20  with -- I believe you're talking about Anthony
21  Bandiero's involvement in this from Blue to Gold is
22  that I was there present for the meeting.  We did
23  have discussions on those things.  That's why his
24  input was put in there, because he is an SME.  I
25  don't have any law training.

35

1      Q.    Okay.  And who is Anthony -- Anthony
2  Bandiero?
3      A.    I believe he is the -- I don't know
4  his exact title, but he is a legal expert with
5  Blue to Gold.
6      Q.    What's Blue to Gold?
7      A.    It's a -- I believe it's a firm that
8  the department utilizes to go over many things as
9  far as law when it comes -- I think his specialty is
10  Fourth Amendment.
11      Q.    Is the actual name of the firm
12  Blue to Gold?
13      A.    Correct.
14      Q.    Okay.
15      A.    To my knowledge.
16      Q.    No problem.
17         And he was the -- was he the subject
18  matter expert on constitutionality?
19      A.    It's -- so for -- constitutionality, I'm
20  not sure what the -- how that question weaves --
21      Q.    Strike that.  Strike it.  Let me ask it
22  in a more direct way.
23         Was Mr. Bandiero the subject matter
24  expert on the Fourth Amendment?
25      A.    Not entirely.

36

1      Q.    Okay.
2      A.    It's, again, a collaborative effort
3  between everybody in that section, people that we
4  reached out to as SMEs.
5         One of those individuals was Anthony
6  Bandiero, who gave his legal opinion on the "knock
7  and announce" specifically.
8      Q.    And how did Mr. Bandiero provide his
9  legal opinion on "knock and announce"?
10      A.    I believe we had a meeting, and -- over
11  several meetings, and he gave me a written account
12  of it, and I -- is why it is in italics in the
13  report, as I did not write that.  So that was his
14  legal opinion.
15         And I prefaced that in the report,
16  saying this is a -- from Anthony Bandiero from
17  Blue to Gold, just how I would if I was using a
18  quote inside of a section.
19      Q.    And give me one moment.  The report's
20  long, and I've read it.
21         Do you remember what part of the report
22  Mr. Bandiero was quoted in?
23      A.    I don't.  I couldn't tell you a page
24  number.  I can tell you it's probably in the
25  mid-100s.  It's in the section prior to use of

37

1  deadly force.
2      Q.    "Service of the Search Warrant - 3050
3  South Nellis Boulevard"?
4      A.    That could probably be a good starting
5  point because it goes into when the announcements
6  start to happen.  I believe that's when his section
7  is in there.
8      Q.    Okay.  Give me one moment.  I'm going to
9  pull it up on my computer, and then I can search the
10  document.
11         Do you know how to spell Mr. Bandiero's
12  last name?  Maybe I'm spelling it wrong.
13      A.    Not entirely.  But I guess if you search
14  "knock-and-announce," you'd probably get -- it would
15  probably be one of the first ones that would come up
16  reference "knock-and-announce," if you search the
17  document.
18      Q.    Okay.
19         MR. ANDERSON:  I've got his name if you
20  want.
21         MS. MURPHY:  Oh, yeah.  How do you spell
22  it?  Sorry.  Thanks, Craig.
23         MR. ANDERSON:  B-a-n-d-i-e-r-o.
24  BY MS. MURPHY:
25      Q.    Okay.  All right.  And so that's on

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1  page 187. Give me just a moment.
2          I'll give you the pages in just a
3  moment, but it says, "CIRT consulted with
4  search-and-seizure attorney Anthony Bandiero, the
5  Senior Legal Instructor with Blue to Gold, who
6  assisted in analyzing the following."
7          Is that the section you're referring to?
8  A.    Correct, yes.
9  Q.    Okay. And then it says -- it reviews
10 the SWAT Section Manual regarding Control Entry
11 Tactic, which we'll call "CET" for the remainder of
12 the deposition.
13         And so I'll hand you this. Because I
14 don't see that it's in italics. Or maybe it is.
15 Rather than -- we can pull the pages out afterwards
16 and make them part of the record. I'm just going to
17 hand you right here.
18 A.    Okay.
19 Q.    And so where it refers to Mr. Bandiero,
20 it starts at page 187 of the report, and that's
21 Bates LVMPD 4441.
22 A.    Thank you.
23         Okay. So this is the conclusion of
24 where you're at. You're not in the body. You're in
25 the conclusion table for, I believe, officers

39

1  approach, the general conclusion for "knock and
2  announce."
3  Q.    Okay. So this was the only thing that
4  popped up for Mr. Bandiero.
5  A.    Do I have your permission to go through
6  this?
7  Q.    Absolutely. Absolutely.
8          And I'll just represent to you,
9  that's the copy of the report without my notes in
10 it. So you can do whatever you want. That's
11 essentially your version. You can do whatever you
12 want with it.
13 A.    I guess I'm referencing then that
14 section where we -- I made the conclusion where --
15 that was on there. But that was referencing those
16 pages in the service of the search warrant in the
17 body.
18 Q.    Okay. So if you could -- and take as
19 much time as you want.
20 A.    Sure.
21 Q.    If you could find the part -- because I
22 was having a little bit of difficulty with that.
23 But, yeah, I guess the part where -- I'll put in
24 "knock and announce" too. The part where --
25 A.    So I believe I start to talk about it in

40

1  the report at page 132. It goes into the SWAT
2  Section Manual following -- referencing the use of
3  CET. Goes into CET, and then into NRS Chapter 179,
4  Section 1, a "no knock" warrant.
5  Q.    Yes.
6  A.    Correct. And then U.S. versus Banks,
7  which is an LVMPD Ninth Circuit Court case.
8  Q.    And so -- I'm not trying to cut you off.
9          So we're on page -- sorry?
10 A.    133.
11 Q.    -- 133.
12         And the italicized portion of that, is
13 that from Mr. Bandiero's report?
14 A.    No. That one specifically is from the
15 findings on the court case itself.
16 Q.    So that's a direct quote from the
17 court case?
18 A.    Correct.
19 Q.    Okay.
20 A.    The same with 134 on Zabeti versus
21 State, which again is also a LVMPD jurisdiction
22 Ninth Circuit Court holding.
23         Yeah, I don't think I mention Anthony
24 Bandiero until the conclusion table.
25 Q.    Okay. And so just going forward to

41

1  page 135 though, it's at the top of the page, "The
2  technique is used when it is safest to dominate
3  suspects with surprise, speed, and overwhelming
4  action. A dynamic flooding technique is used to
5  clear the structure."
6          Then it goes on to state, "However,
7  per United States v. Banks." Is this from -- is
8  this -- is this -- sorry, the italicized portion of
9  this, is this a quote from the case, or is this
10 Mr. Bandiero's -- likely his analysis?
11 A.    So whenever -- you have to read the
12 lead-in of that.
13         So specifically you were talking about
14 which paragraph?
15 Q.    I'm talking about -- I'm sorry. On
16 page 135, it's the first full paragraph.
17 A.    I'm missing 135.
18 Q.    Oh. Here. You can use my page.
19 A.    I go 134 to 136.
20 Q.    I must have used it in a different
21 deposition. My apologies.
22 A.    So I'm assuming the portion where you
23 have highlighted here? Or which -- what were we
24 talking about again?
25 Q.    Sorry. It's the first full paragraph at



Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1  the top of the page that begins, "However, per
2  United States v. Banks."
3      A.    Yes.  So it starts with not italicized.
4  So, "However, per United States v. Banks."  Then it
5  goes into italicized once I get past "Banks."  That
6  is from the holding itself.
7      Q.    Okay.  So -- okay.  And so in reading
8  your report, if it's either in quotes or italicized,
9  that means it's pulling from a different source;
10  right?
11      A.    Correct.
12      Q.    Sorry, just to confirm.  I just want to
13  make sure I understand.
14          Although your recollection before having
15  gone through the report is that you had quoted
16  Mr. Bandiero earlier in the body of the report, but
17  now kind of flipping through -- I get how big the
18  report is --
19      A.    Sure.
20      Q.    -- and you haven't memorized it.  But
21  kind of as we're flipping through the report now,
22  you're kind of amending that statement and saying, I
23  think I just referred to Mr. Bandiero's -- you know,
24  quoted from his memo or conclusion in the conclusion
25  section of the CIRT report?

43

1      A.    I believe so.  If it's not -- if you
2  searched for his name in there and it's not -- like
3  I said, three years ago, on top of being a 222-page
4  report, hard to memorize the entirety of it, and
5  sometimes it blends together, especially when you're
6  talking about the intricacies that went into this
7  investigation.
8      Q.    As we sit here today though, and
9  you've had kind of the opportunity to kind of go
10  through this, if you can kind of walk me through,
11  what do you remember Mr. Bandiero's conclusions
12  being?
13      A.    Strictly law-based.  He does not have
14  the knowledge of our policies, training, and
15  procedures.  He was strictly looking at it from a
16  legal aspect and not a department member, what
17  they're trained on, and what their department
18  manual says.
19      Q.    Thank you.
20          And regarding his conclusions as
21  looking at it from just a legal perspective, do you
22  remember what -- do you remember what he relayed his
23  conclusions as being?
24      A.    Whatever was written in there.  I can
25  read it for you if you'd like.  I can't tell you,

44

1  like, a verbatim on our meeting as far as --
2      Q.    I -- sorry.  Go ahead.
3      A.    -- as far as what Mr. Bandiero said
4  specifically.  But anything that he said I took as
5  what he meant, and that was his input as an SME.  I
6  didn't change it.  I didn't -- yeah, it's exactly
7  what I wrote in there, and that's why it's in
8  italics.
9      Q.    And so if you can go to page 188.
10      A.    Okay.
11      Q.    And this kind of -- this is -- did you
12  write this report?
13      A.    I did.
14      Q.    Okay.  You authored the entire thing?
15      A.    Correct.
16      Q.    Okay.  And so -- and we're in the
17  paragraph -- it's the one, two, three -- it's the
18  fourth full paragraph, that starts with the word
19  "Looking."
20      A.    Okay.  So while this is not in
21  italics, and that's probably just an in-house
22  error, but because I said he analyzed "the
23  following" on the previous, I believe this is still
24  all his statement, up until the point where it says
25  "certain SMEs."

45

1      Q.    Can you just point to me on the page
2  where it says he analyzed "the following"?
3      A.    So it would be on page 187, and it is,
4  "CIRT consulted with search-and-seizure attorney
5  Anthony Bandiero, senior legal instructor with Blue
6  to Gold, who assisted in analyzing the following."
7      Q.    Okay.  And so if I understand your
8  testimony, as we're going through page 187 and 188,
9  where -- even though it's not in italics, where it
10  is doing an analysis, like looking at the totality
11  of the circumstances, like that dialogue, that is
12  actually pulled from Mr. Bandiero's opinions or
13  whatever report he provided to you?
14      A.    Correct.
15      Q.    Okay.  And as we sit here today, just so
16  I understand, as you're telling me, Hey, this is
17  pulled all from him, it should have been in italics,
18  but it's not?
19      A.    As his analysis, yes.
20      Q.    Okay.  So this was -- even though you
21  wrote -- even though you wrote the report, this
22  isn't your analysis; this is the analysis --
23  although you're incorporating it into the report,
24  this is the analysis of the subject matter expert
25  Mr. Bandiero?



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1    A.    Correct.  And the reason why it was
2  placed in there the way it was is because, again,
3  SMEs in this matter were split on their opinion
4  was on whether or not this constituted a "no knock"
5  warrant or if it was reasonable.  And SMEs were
6  pulled from previous SWAT operators as well as
7  Mr. Bandiero.  And in fairness, and, again, in
8  fact-finding, everything that was put into those
9  were put into the report for the board to make a
10  decision, again, without my opinion.
11    Q.    And so, Justin, if you could -- I
12  apologize.  I have read this report quite a few
13  times.  But can you point out to me in this --
14        MS. MURPHY:  Actually, before we move
15  on, can we make page 187 and 188 -- we're going to
16  make that Exhibit 3 to today's deposition
17  transcript.
18        (Exhibit 3 marked.)
19  BY MS. MURPHY:
20    Q.    So, Justin, can you point me to another
21  place in the report where you quoted a different
22  SME that had come to an alternate conclusion than
23  Mr. Bandiero?
24    A.    So part of that would be the supreme
25  court cases of United States versus Banks and Zabeti

47

1  versus State, which, I believe -- I said, "SMEs
2  referenced the United States Supreme Court case
3  United States versus Banks, which held the
4  appropriate amount of time which is deemed to be
5  reasonable before entering with force was 15 to
6  20 seconds.  However, this determination was
7  case-specific to United States versus Banks."
8        That was the first time I referenced
9  their opinion on that.  And that's a little bit
10  higher than halfway on the page of page 187.
11        And then the next paragraph is,
12  "Further, SMEs also referenced Nevada Supreme Court
13  case Zabeti versus State, which held the totality of
14  the circumstances which were presented at the time
15  made it reasonable to wait less than 10 seconds
16  before entering the structure."
17        I then wrote, "This too was also
18  case-specific."
19        And then the next paragraph is, "It
20  should be noted that SMEs believed the totality of
21  the circumstances known to the SWAT officers and the
22  time frame allotted by SWAT operators before
23  entering 3050 South Nellis Boulevard, Apartment
24  1125, by force after giving verbal announcements via
25  the bullhorn was reasonable."

48

1        And that's specifically to those SWAT
2  SMEs and the SMEs that we utilized on this case.
3        And then it goes into the analysis from
4  Anthony Bandiero in Blue to Gold, and it was why
5  there was that split of their references.
6    Q.    Okay.  And so Mr. Bandiero thought -- if
7  I understand his conclusion, he thought that it
8  wasn't a sufficient amount of time; correct?
9    A.    Correct.
10    Q.    Okay.  But when you say "SWAT SMEs," do
11  you mean that's, like, guys from SWAT?
12    A.    Not -- not -- not actively in SWAT.
13  They would have no involvement in this
14  investigation.
15    Q.    Okay.  So they are former SWAT members?
16    A.    Correct.
17    Q.    Okay.  And do you remember who those
18  were?
19    A.    I don't.  There should have been a
20  sign-in sheet that was in the record.  If there
21  wasn't, that means we didn't do them back then.
22  Again, it's six years of this.  We've changed how we
23  do things at some points.
24        But one of them was TJ Jenkins.  He was
25  a sergeant who had just previously retired.  And I

49

1  remember the other one was a retired sergeant, Andy
2  Pennucci.
3        Those were two specific individuals that
4  were called in.
5    Q.    And were they on the tactical review
6  board, or are they part of CIRT?
7    A.    No.  They're neither.  They
8  actually both were retired.  TJ Jenkins was
9  recently -- he retired out of SWAT a short time
10  after, so he had knowledge of their current
11  procedures and tactics.
12        Sergeant Pennucci had not been there for
13  five or six years, I want to say.  Maybe even
14  longer.  And we were getting his perspective just
15  from an overall aspect.
16    Q.    Okay.  But their perspective is as a
17  SWAT operator, not as trained legal analysis;
18  correct?
19    A.    Correct.
20    Q.    Can I -- as I've gone through this --
21  and I kind of want to know if you know or not.
22        Does the time that you're supposed to
23  start -- the time in these court cases and the time
24  that you start counting, do you start counting at
25  the very beginning of the announcement or when the

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50

1  announcement is concluded?
2      A.     There's no reasonable -- I mean, there's
3  no standard set forth. And that's part of the
4  problem is you can look at Zabeti versus State and
5  you can look at United States versus Banks, and
6  while there are seconds and examples of when it's
7  appropriate or when it's reasonable to make an entry
8  into a structure after announcements are given,
9  there's not specifics on this is exactly when this
10  should happen, regardless of the case.
11          Like I said before in the report, Banks
12  was 15 to 20 seconds is what they found reasonable.
13  And then in Zabeti it was less than 10 seconds was
14  found reasonable.
15          So I believe when Anthony Bandiero
16  looked at this, he looked at the totality of the
17  circumstances from a legal perspective, not
18  necessarily from a department's perspective, on how
19  we have our -- or how we had our manual.
20          And that's why this conclusion, when it
21  was written at the end of this investigation, was it
22  was a policy and training failure.
23      Q.     But let me -- let me -- let me go back
24  to one statement you just said.
25          You said "after announcements are

51

1  given," and that's the point of my question.
2          Do you start counting after the
3  announcements are given or from the second the
4  announcements start?
5      A.     We start ours from, I believe -- I
6  couldn't tell you exactly just from what we did.
7  But if we replayed the video, I could tell you
8  exactly. But I believe it was from the start of
9  those announcements. And I can maybe reference it
10  inside of the report when I lead in.
11      Q.     Sure. We'll get to that in a minute.
12  My point was a little bit different though.
13          After having concluded this
14  investigation and having gotten the opinion from the
15  different SMEs, is it your understanding that when
16  the cases count the seconds, when you guys are
17  talking about seconds within the report -- because
18  the term you just said was "after announcements are
19  given." So do you count from the time the
20  announcement ends, or do you count from the time
21  when the first word comes out of their mouth?
22      A.     I believe it was from the first word is
23  when we started our count on that one.
24      Q.     And where did you come up with that's
25  when you should start counting?

52

1      A.     When there is a megaphone that is
2  amplified sounds at 5:00 in the morning on a search
3  warrant.
4      Q.     I under -- thank you for that answer. I
5  understand the factual -- I understand kind of the
6  factual outline of it. My question is a little bit
7  different to you.
8          My question is, when you're analyzing
9  this and you start counting the seconds -- and we'll
10  go over all that. You have written a very detailed
11  report. I have no doubt when you started doing
12  anything on anything in this investigation. But my
13  question is a little bit different, and I will try
14  to ask it better so that it's clearer.
15          Where did you come up -- how was it
16  determined that the counting should start when the
17  first word comes out versus when the announcements
18  are concluded?
19      A.     So I don't know what the decision was on
20  that. My kind of recollection would be once the
21  announcements start, that is an announcement. Just
22  because it's finished within a second or two seconds
23  doesn't mean that that's a full announcement. The
24  announcements had started. I believe they started
25  with "Police department, search warrant," or

53

1  something along those lines. But from the start of
2  the announcements is what we went with.
3          And -- does that answer your question?
4      Q.     Yeah. To your recollection, was there
5  any debate or discussion of, like, do we start
6  counting when they start the announcement, or do we
7  start counting when -- like, when they get through
8  the first couple, It's the police department; we're
9  here to serve a search warrant?
10          Was there any discussion about that?
11      A.     I don't recall one way or the other.
12      Q.     Okay. So was it fair for me to think
13  though, based on the answers that you've just given,
14  that if you don't recall, then you just kind of took
15  it as this is when we start counting?
16      A.     Sure. In the same way that when we look
17  at a use-of-force investigation and we'll talk about
18  the start of a shooting, I don't say that the person
19  started shooting after the last round was fired. I
20  start my investigation when -- the second the first
21  round is fired.
22          So in the same respect, that's how I
23  believe I interpreted the announcements.
24      Q.     Okay. You understand -- what's your
25  understanding of the purpose of "knock and



Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1  announce"?
2      A.    As Anthony Bandiero put in there, the
3  reasonable amount of time for a person to submit
4  to -- or give the person a reasonable amount of time
5  to submit to the service of the search warrant.  I
6  guess -- I believe he wrote in here, "to save his
7  door," which I feel is a legal term.  It's not in
8  our policies, our procedures.  But I believe "save
9  his door" was mentioned.
10     Q.    And I'll just represent to you, Justin,
11  that's a term that's kind of used through some
12  different cases.
13     A.    Sure.
14     Q.    So -- but -- so just to confirm, as we
15  sit here today, the counting starts when the first
16  word comes out of their mouth?
17     A.    Sure.  Yes.
18     Q.    And that was your understanding of
19  that's how we count, and that's consistent with the
20  case law that was -- analyzed these items?
21     A.    Correct.
22     Q.    Okay.
23     A.    And in that same, I guess, statement is
24  that was never corrected if that was not the case by
25  Anthony Bandiero.  His assumption, again, too, when

55

1  he analyzed it, when we talk about the 6 seconds
2  from when the stun stick goes in the window and then
3  the 16 seconds overall from a time lapse of the time
4  of announcements to time of body entry was also done
5  from that same standpoint.  So the legal expert also
6  went with that same conclusion.
7      Q.    Okay.  And so you talk about the six
8  seconds.  And we'll get into the real -- the
9  timeline that you've outlined in here.  That's when
10  the stun -- that's when the first entry is made into
11  the apartment; correct?
12     A.    That's when the stun stick is made into
13  the apartment.  There is no body entry.  However,
14  there is an entry of one of our devices, which is a
15  stun stick.
16     Q.    All right.  How long did it take you to
17  write this report?
18     A.    Roughly -- roughly a year.  There was a
19  lot -- there was a lot of interviews that were
20  completed.  I want to say 22.  But when you get
21  those interviews, especially when you're talking
22  about a five-shooter -- in this case, there were
23  five officers who shot -- those are very long
24  interviews usually.  At least two hours.
25          After you prep for those interviews,

56

1  then you complete those interviews, then you have to
2  go back and listen to those interviews and then
3  proof those interviews as a -- you do it usually
4  yourself.  You do have assistance from people on the
5  team on some of the ones that maybe necessarily I
6  don't need to hear through its entirety again.  But
7  I participated in every single one of the
8  interviews.  Then those have to be determined what
9  goes in the report, what doesn't go in the report.
10          So it's a lengthy -- it's a lengthy
11  process.
12     Q.    I'm familiar.
13          What -- you didn't lead -- did you lead
14  every single interview?
15     A.    I believe I did, yes.
16     Q.    Okay.  And about how much time would it
17  take -- just give me a ballpark.  I know each one is
18  going to be different.  I'm going to pull out a
19  couple of specific ones.
20          But on average, like, how long did it
21  take to prepare for each interview?
22     A.    When you're talking about an operator
23  who has a body-worn camera, you have to review all
24  the body-worn camera.  Go over the radio traffic
25  that was given.  Any of the prearrival stuff, when

57

1  you talk about the plan -- when we're talking
2  specifically here about SWAT, go over their plan to
3  make sure that their plan was sound when they had --
4  on the way to make entry, to make sure everybody was
5  on the same page.
6          Outside of whether or not it was good,
7  bad, or indifferent, looking at every -- all the
8  interpersonal communications so you can ask
9  questions on that.
10          On these, it's probably a couple of
11  days per person on the front end.
12     Q.    And I should have asked this before.
13          How did you get assigned this case?
14     A.    I volunteered.  Very smart of me,
15  wasn't it?
16     Q.    Walk me through the -- walk me through
17  the thought process of volunteering for this and why
18  it was open to volunteer.
19     A.    It was not open to volunteer.
20     Q.    That's a two-part question.
21     A.    It never is open to volunteer.
22          In this case, I had extensive knowledge
23  of search warrants, and the person who was up in our
24  rotation did not have the same experience in search
25  warrants that I had, and it was just an executive

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58

1   decision to make me the case agent.
2       Q.    And we went through -- we went through
3   your professional background earlier in the
4   deposition.  And I am not an expert in this, so walk
5   me through.
6           What about what you've done, either in
7   CIRT or your other roles in LVMPD, what made you an
8   expert in search warrants?
9       A.    I've authored dozens of search warrants
10  for narcotics, for property, for bodies of
11  individuals through PSU, through property crimes,
12  and through PD.  So almost five years of experience.
13          And sometimes in patrol, because I had
14  that experience and then went back to patrol at a
15  certain time to be an FTO, I did utilize some of
16  those search warrant skills, to include buccal
17  swabs, those type of search warrants, when
18  detectives weren't available.  During our time when
19  I was in Bolden area command, we had three days out
20  of the four that we were in operation where we did
21  not have access to detectives, so I was de facto
22  detective and FTO.
23      Q.    So tell me if I'm right or wrong.  This
24  kind of popped -- like, it's a six- or seven-person
25  team; right?  So it's like you guys are aware of

59

1   what the other ones are working on.  Is that fair?
2       A.    Yes.
3       Q.    So you were kind of aware of this
4   Alexander case and that it has to do with, you know,
5   a search warrant --
6       A.    Alexander?
7       Q.    Sorry.  Well, Isaiah Williams.
8       A.    Okay.
9       Q.    Sorry.  You were aware of the Isaiah
10  Williams case.
11          If you can tell me, if you can
12  recollect, kind of, when you then said "volunteer,"
13  what was it about Mr. Williams' case that made you
14  think it was going to be related to search warrants
15  and you would be the appropriate -- you would
16  probably be the best person on the team to handle
17  this investigation?
18      A.    It was a SWAT search warrant for a
19  homicide subject and the weapons used in a homicide.
20  And when it -- I didn't go to the callout that night
21  or that morning.  That was a different team.  Our
22  callout rotation doesn't work hand in hand with
23  who's up.
24      Q.    What's -- what's -- sorry.  I'm going to
25  interrupt you, and I'll try not to do it again.

60

1           What's the callout?
2       A.    So at that point I believe we had a
3   four-team rotation with -- because I believe we had
4   seven at the time.  We had one person that would be
5   on their own on the rotation.  So we go week-to-week
6   rotations.
7           So for an example, last week I was up,
8   but I wasn't up for a case.  So if we had any
9   callouts for CIRT -- which we did, we had a CIRT
10  callout -- I would respond as that responding
11  detective to get a preliminary investigation, to
12  admonish any of the individuals who were involved,
13  and to review body-worn camera before, as a
14  preliminary investigation, to see if it does meet
15  our criteria to become a CIRT case.
16      Q.    Okay.  But this one, if I understand,
17  you weren't on the callout on Mr. Williams' case?
18      A.    Correct.
19      Q.    Sorry.  I interrupted you before.  You
20  were walking me through why it was -- kind of, like,
21  what your understanding of the case was and why you
22  volunteered.
23      A.    Sure.  So after that callout happens,
24  the team that went out, usually two detectives,
25  sergeant, lieutenant, and our captain, among

61

1   everybody else -- DA's office, FIT, DIO -- all of
2   these entities that go on an officer-involved
3   shooting came back to our office, and that's where
4   we were at during our normal course of duties.  We
5   log on at 7:00.
6           And we started reviewing what we knew of
7   the case at that point.  We knew that there was a
8   search warrant service.  And because I had
9   experience and I was next up, that we just decided
10  to swap with the detective who was currently up just
11  so I could have that knowledge and bring that
12  knowledge to the investigation.
13      Q.    So you volunteered for this.  At the
14  time you volunteered -- and I -- if you can
15  remember, did you anticipate this would be such an
16  undertaking, or did you have -- did you have kind
17  of -- do you know what I mean?
18      A.    Every officer-involved shooting that
19  we handle is an undertaking.  You're dealing with
20  an officer, worst day on their career.  Whether
21  or not -- no matter what the circumstances are,
22  that officer used deadly force.  So that's never
23  taken lightly.  That's never taken with an
24  understanding that this is an easy case or this is a
25  hard case.

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1     The fact that I looked at was, when we
2 were game-planning on how we were going to start our
3 interviews, how we were going to conduct this
4 investigation. Because it was the SWAT service of a
5 search warrant and I had experience with that from
6 an investigator side, I -- I volunteered to take it.
7     Q.    And you just said that you were
8 game-planning on how to start the interviews.
9     What thought process goes into that, and
10 what do you mean by "game-planning"?
11    A.    Well, we're expected to do an initial --
12 we used to call it a 72-hour brief. That's what FIT
13 does. FIT briefs executive staff within 72 hours of
14 the investigation, and that then becomes the YouTube
15 clip you see as part of the transparency of the
16 department, where we show body-worn camera that we
17 have. Usually it's done by an assistant sheriff or
18 the undersheriff. Sometimes, if one of those are
19 available, a deputy chief. But somebody
20 representing Kevin McMahill, the sheriff. Or at
21 this time -- this time it was Joe Lombardo. I'm
22 sorry. Kevin was not here at that point.
23    But that's when they have the press
24 conference. They go over the case and the details
25 as we know it at the time. That's the 72 from the

63

1 FIT side.
2     We have a 72, in quotes, on our side.
3 It's usually within a week after the initial
4 presentation from FIT. And what we try to do is get
5 all of the shooters, at a minimum, interviewed so
6 it's fresh in their memory, and then present those
7 facts to executive staff based on the administrative
8 investigation.
9     Because in most cases, I would say
10 90 percent of cases, 95 percent of cases, officers
11 are not required to talk to FIT, and they don't.
12 However, they are required to talk to us if they're
13 given 48 hours of notice. That's per NRS, but
14 that's also per our department policy, that they're
15 compelled to do so.
16    So we give executive staff a briefing on
17 why they made a decision to utilize deadly force.
18 That's part of the game plan is getting those
19 interviews done initially and first.
20    Again, when you're talking about five
21 officers on one shooting, it is a lot of work, a lot
22 of preparation, a lot of time, even spending your
23 off time coming in and making sure that you're
24 prepared for those.
25    Because, again, you're dealing with five

64

1 individuals who just had the worst night of their
2 life. They had to take someone's life. And in this
3 case two officers got shot, one very badly. So
4 it's -- you have to prepare them and prepare
5 yourself to make that. So that's part of that
6 preparation.
7     Q.    And then, Justin, I'm going to ask you
8 just one follow-up question, and then let's take a
9 brief break.
10    A.    Okay.
11    Q.    Okay. You talked about, kind of, the
12 YouTube video and the initial press release or the
13 initial statement given by the police department.
14    That -- and I want to make sure I
15 understand your testimony here. That would be
16 something that, kind of, like, FIT was more involved
17 in, not CIRT?
18    A.    Correct. We don't even have -- we have
19 zero involvement in that.
20    I usually watch the press conferences
21 from my phone when they go live to see what their
22 presentation is. Sometimes we are allowed in the
23 room for the FIT presentation. But, again, we have
24 no -- it's stuff that we already know. They're
25 looking at it from a very rudimentary point of they

65

1 have no interviews from any of the officers, they
2 have no -- all they have to operate on essentially
3 is witness statements from individuals who are
4 nearby.
5     In this case I believe they went off
6 statements on the upstairs neighbors and then any
7 witness officers, who are compelled to talk to FIT.
8 But if they're deemed to be a subject, they don't
9 talk usually.
10    And this is basically their presentation
11 of what happened on the use of deadly force, not on
12 tactics, training, and policy.
13    MS. MURPHY: Okay.
14    THE VIDEOGRAPHER: Off the record at
15 10:22 a.m.
16    (A break was taken.)
17    THE VIDEOGRAPHER: On the record at
18 10:36 a.m.
19 BY MS. MURPHY:
20    Q.    All right. So, Justin, before we took a
21 break, we were talking briefly about the initial
22 press release involving FIT.
23    And I understand based on your prior
24 testimony you don't have anything -- you watched the
25 press conference too?

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1    A.    Correct.
2    Q.    Okay. And so -- and, I'm sorry, you
3    told me earlier, and now I don't remember. You have
4    a goal to get, like, the officers-involved
5    statements done within how long after the shooting
6    itself?
7    A.    So we try as soon as possible, but
8    officers are required a 48-hour notice of interview
9    per law before we interview them. So at a minimum,
10    48 hours. But you still have to talk about the time
11    it takes to prepare for that. And if I have any
12    type of allegations of misconduct, I have to put
13    that on the notice that is given to them. Again,
14    part of that 48-hour notice. So that does take up
15    time, to see if there are any issues we see from an
16    administrative investigation.
17    So usually, to answer your question,
18    we try to do it within the week with the shooter
19    and any direct witnesses. Sometimes after that.
20    It's just based on time and availability for our
21    section.
22    Q.    Okay. And if I remember correctly,
23    these got all done within about a week and a half of
24    the actual shooting; correct?
25    A.    That sounds about right. And it's

67

1    because they're also on administrative leave, so
2    then they become available to us Monday through
3    Friday, on our schedule, so we don't have to worry
4    about shift-adjusting people or people coming in on
5    their days off when they're not required to.
6    When they're in an administrative
7    investigation because they're involved in a
8    shooting, we have kind of carte blanche to set up
9    those interviews, as long as they have
10    representation availability.
11    Q.    And who was the -- and I -- I've
12    reviewed all the interviews, so I'm going to ask you
13    some questions just because I want to make a clean
14    record on this.
15    A.    Okay.
16    Q.    Who is it -- who is it that -- who is it
17    that's present with the officers?
18    A.    It varies. You're talking about, in
19    this case, two different unions. You have -- and
20    I'm not sure if one guy was not union. I don't
21    know -- I can't remember if Rothenburg, Officer
22    Rothenburg, was union back then. I'd have to look
23    on the record of those transcripts of who his
24    representatives were.
25    But for officers or sergeants, it can be

68

1    the PPA, which is the LV -- the Las Vegas Police
2    Protective Association. And then for supervisors,
3    in this case Sergeant Backman would have been the
4    PSMA, which is Patrol Supervisors Management
5    Association, I believe is what they are. And that
6    can vary in whoever represents them.
7    So it's not specifically two people or
8    one person that goes every single time. It could be
9    various individuals within those organizations.
10    Q.    Okay. And part of the reason -- and you
11    referenced it before, but I just want to confirm.
12    Part of the reason that they have representation
13    there is because they are compelled to testify;
14    correct?
15    A.    Yes. And everything that we notice them
16    in the lead-in to the interview in our script, which
17    says, "Anything you say can be used against you in a
18    civil proceeding," and they acknowledge that, but
19    they cannot be used against them in a criminal
20    proceeding, per Garrity.
21    Q.    And so I noticed as part of the closing
22    of either all or most of your interviews you kind of
23    went through a list of the deadly force assessment;
24    correct?
25    A.    Correct.

69

1    Q.    Okay.
2    A.    If they're involved as a subject officer
3    in the shooting.
4    So if they were a witness, we do not go
5    on their perspective of what they thought the use of
6    force was.
7    Q.    And so is that part of, like -- like, do
8    you have, like, an -- do you have, like, a script
9    for that?
10    Like, every time there's an
11    officer-involved shooting, you ask them these, like,
12    delineated questions about use of force?
13    A.    Yes. And that specifically is the
14    threat assessment, and then Graham versus Connor,
15    which are -- by law we're only required to ask the
16    three -- the first three questions of that. But
17    we've expanded it to eight questions, five
18    additional, per LVMPD policy.
19    Q.    Okay. And it looked like most of the
20    interviews were about an hour or two.
21    Is that accurate, to your recollection?
22    A.    Subject officers, usually around two
23    hours.
24    Witness officers, especially when you're
25    talking about SWAT operators that were on the stack

70

1    that didn't utilize force or were not involved in
2    the planning, then we're just trying to get their
3    perspective of what happened, probably an hour.
4    Because it was a short time lapse of time from the
5    time that they started their planning process
6    outside, they made their travel, and then they
7    landed at the apartment complex and continued with
8    the service of the search warrant. We're talking
9    about maybe less than an hour, so it's just their
10   perspective on that. So it usually takes less than
11   an hour for those individuals.
12       Q.    Okay. I know from my own experience as
13   a lawyer that sometimes how a transcript reads and
14   how it seems when you're sitting there are two very
15   different things.
16       A.    Sure.
17       Q.    And so most of the interviews, with the
18   exception of Melanie O'Daniel's, seemed like they
19   were -- maybe friendly is not the right word, but
20   open perhaps is a better word, or cordial.
21            I mean, what was the -- kind of, did the
22   affect -- with the exception of Melanie O'Daniel's,
23   did the affect of any of the officers stand out to
24   you at all?
25       A.    So I'll say one thing first is that I

71

1    don't think Melanie O'Daniel's interviews -- we did
2    two with her -- were adversarial at all. Maybe it
3    has that tone from the -- from the words. I don't
4    think it was adversarial.
5            We have the responsibility to ask tough
6    questions. Sometimes officers or supervisors take
7    offense to that because they believe they were doing
8    what they believed was right. And a lot of times
9    that is the case. However, our responsibility of
10   CIRT is to ask those tough questions. So it does
11   come off sometimes that we're maybe being the bad
12   guys. However, those questions need to be asked.
13            I don't think that -- I know for a fact
14   that this did weigh on a lot of the operators'
15   conscience a lot. A couple of them broke down into
16   tears, especially when seeing -- I'm not sure if
17   you've seen all the video with this case, but seeing
18   Kerry Kubla shot multiple times, his arm mangled,
19   that does take a huge toll out on -- those guys, you
20   know, are all, for the most part, like best friends.
21   You know, they train together 24/7. They go out on
22   callouts all the time together. And to see one of
23   your friends on the verge of death after, you know,
24   doing your job is not something anybody wants to
25   see. So it does weigh on those guys a lot.

72

1            I remember specifically in this case --
2    I don't remember who -- I remember maybe Brice
3    Clements, I believe we had to stop his interview
4    because he was getting emotional.
5            But even that, they took a human life,
6    and that doesn't weigh -- I mean, that weighs very
7    heavily on all those guys. Regardless of the
8    criminal background or the reason why they're there,
9    it's a hard thing for a human being to -- to, you
10   know, deal with.
11       Q.    Okay. And you talked a little bit
12   earlier about you have to ask some key questions in
13   this matter.
14            I've read the -- I've read all the
15   interview transcripts. But, as we sit here today,
16   if you could maybe list, like, the top two or
17   three, what did you think were really the vital
18   questions that you needed to ask the officers
19   involved in this case?
20       A.    Well, why did you fire your firearm?
21   That's the biggest one. Why did you make the
22   decision to use deadly force? That's the biggest
23   question.
24            And everything else stems off of that
25   because then you have all the follow-up questions

73

1    for your threat assessment and your Graham versus
2    Connor questions. But essentially why did you make
3    the decision to utilize deadly force?
4        Q.    And in terms of Melanie O'Daniel's
5    case -- now, obviously she wasn't actually on the
6    stack. She wasn't involved in the shooting?
7        A.    Correct. She had COVID at the time.
8        Q.    Well, even if she hadn't had COVID, my
9    understanding is that --
10       A.    The tactical commander.
11       Q.    Right. So she's not involved in ever
12   executing these warrants?
13       A.    Correct.
14       Q.    She came with a lot of stats to her
15   interview. Did that surprise you?
16       A.    Not at all. We've interviewed -- I've
17   personally been in interviews with Lieutenant
18   O'Daniel upwards of, I would say, probably ten times
19   in the time that she was there, because we do have
20   questions on every SWAT shooting of what the
21   planning was and why the planning was the way it was
22   constructed. So a lot of times that tactical
23   commander has to be brought in either as a subject
24   or as a witness to determine that investigation's
25   tactical planning.

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1    Q.    In your experience as a CIRT
2  investigator, were there any other -- were there any
3  other cases where you came to the conclusion --
4  sorry. I know you're not the one coming to the
5  conclusion, so let me rephrase that. Strike that.
6        In your work as a detective, CIRT
7  investigator, were there any other reports that you
8  have drafted where the conclusion came that they
9  needed to revamp LVMPD policies, whether it had to
10  do with "knock and announce" or search warrants?
11    A.    Not in my time, no. I believe there was
12  a case before I was up there where they did
13  recommendations. And if you look in my report, it's
14  Section 9. And those are associated with whatever
15  section it is.
16        So if you're talking about preplanning,
17  which is Section 3, there were a lot of
18  recommendations that were associated with those that
19  were voted on in a TRB, which I believe most of them
20  got approved. And they actually got implemented,
21  which was good to see. When we had different
22  leadership take over, those were implemented very
23  quickly.
24        And that's the purpose of CIRT. And
25  what a lot of officers don't understand is we're not

75

1  trying to necessarily get you in trouble. We have
2  to ask the tough questions to make the department
3  better and to avoid officer-involved shootings.
4        If we had -- if we had a year where we
5  had zero officer-involved shootings and I was just
6  bored in my office, I did my job extremely well. I
7  would be very less stress-free because I
8  know that -- and sometimes obviously you can't
9  control those scenarios, but at least we're limiting
10  our resources or limiting our --
11    Q.    And so, Justin, I want to ask you about
12  that a little bit more. I want you to expand on
13  that. Because one of the questions I was going to
14  ask you was what is the purpose of CIRT. And so you
15  kind of, like, briefly described it right then.
16        Can you really, kind of with a little
17  bit more detail, explain to me specifically, what is
18  the purpose of this division?
19    A.    To analyze training, to analyze events
20  that happened, and determine if our current
21  practices are viable and current and practical and
22  reasonable. And if there are any deficiencies
23  noted, make those corrections to make our department
24  a better agency and a safer agency for both the
25  department and the community.

76

1    Q.    And in terms of -- you said a little bit
2  earlier -- we'll talk about it more in depth as
3  we -- when we step back into the actual report.
4        Is it my understanding -- because you
5  talked about it briefly, the implementation of the
6  recommendations.
7        My question is, if they are accepted,
8  then you are aware whether or not they're
9  implemented; is that correct?
10    A.    So that's where OIO comes into play.
11  So they'll take those recommendations, and they
12  will draft a formal, I guess, workup of that
13  recommendation. That does come through our
14  shop. We have a form we file for these
15  recommendations now, after this case specifically,
16  that when those recommendations are put into place,
17  that they make sure they follow up with those
18  specific sections.
19        Now, if it's patrol, it's a lot easier,
20  because that's a global aspect. When we are talking
21  about specialized units such as SWAT, then we have
22  to make those adjustments with that deputy chief who
23  is in charge of SWAT, and then the tactical
24  commander and the captain of the section.
25    Q.    And so if I -- do I understand

77

1  correctly, even how it's related to IOI has changed
2  as a result of this incident?
3    A.    OIO?
4    Q.    OIO. Sorry.
5    A.    Yes. We have done a -- well, I can't
6  speak very much on their side of it. While they are
7  in the same office, just on the other side, I don't
8  really pay too much attention to what they do.
9        If they ask me, Hey, I need your
10  recommendations on this, I need to put this into
11  wording, and then how would you like to handle it?
12  then yes, I'll send it over to them, if they have
13  any questions about it.
14        But I believe when this came out and we
15  had I want to say it's 12 recommendations or
16  something like that, I don't know the exact number
17  off the top of my head, it was a lot more than we've
18  ever had previously to where something could just be
19  changed, like a policy or procedure. We've revamped
20  our system. So nine of them. So it went up to 9.9.
21        We also have to look at ourselves too.
22  Again, it's Critical Incident Review Team, but
23  it's -- we still work for LVMPD. And if we can be
24  more efficient and we can help the department in a
25  greater way, then doing stuff like recommendations

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

|  | 78 |
|---|---|
| 1 | in this manner where the board is voting on them and |
| 2 | it's just not our section saying, Hey, this needs to |
| 3 | change and here's why, now you have a tactical |
| 4 | review board full with an assistant sheriff, a |
| 5 | deputy chief, a captain of training, and then peer |
| 6 | officers and supervisors who are saying, Yes, we |
| 7 | should do this based on what we saw in this case. |
| 8 | Q.    And so -- and I know that the |
| 9 | recommendations are kind of laced throughout here. |
| 10 | Is it fair -- and my understanding having reviewed |
| 11 | this, but if there's another specific section |
| 12 | perhaps I missed -- the recommendations are laced |
| 13 | throughout the conclusions; correct? |
| 14 | A.    "Laced" is -- |
| 15 | Q.    Well, how would -- |
| 16 | A.    Included, I would say.  They're not |
| 17 | hidden. |
| 18 |        After every conclusion, where usually it |
| 19 | will read certain SMEs conclude that, whether it's |
| 20 | reasonable, not reasonable, within department |
| 21 | standards, or policy failure, at the end of those |
| 22 | conclusions, before moving on to the next |
| 23 | conclusion, there will be a notation. |
| 24 |        I'll find one just for example. |
| 25 |        On page 208, this is dealing with |

|  | 79 |
|---|---|
| 1 | approval of the IAPs, just for an example.  After |
| 2 | the conclusion was listed, there is a paragraph |
| 3 | afterwards that reads: Currently, there is no |
| 4 | approval form associated with the approval of search |
| 5 | warrants or the tactics utilized.  All requests for |
| 6 | tools, et cetera, of Sierras -- all requests for |
| 7 | tools and tactics, Sierras -- which are SWAT |
| 8 | snipers -- Stun Sticks, 9-Bang, Explosive Breach, |
| 9 | CET, and SACO -- which is "surround and callout" -- |
| 10 | et cetera, can be completed verbally or even via |
| 11 | text messages, as was the case in this incident. |
| 12 | CIRT recommends that LVMPD create an official |
| 13 | approval form for the service of a SWAT search |
| 14 | warrant -- it goes on with a conclusion. |
| 15 |        So that's where we identify a verbal |
| 16 | affirmation of, yes, I want to -- I want all these |
| 17 | tactics, or through a text message, or whatever the |
| 18 | case may be, email.  We thought it was not |
| 19 | sufficient enough to have that.  It should be a form |
| 20 | saying, yes, check box, check box, here's a |
| 21 | signature, and go forward with your operation.  That |
| 22 | was our recommendation on that one. |
| 23 |        Which, again, is a conclusion number on |
| 24 | the back of that table, which is then voted on the |
| 25 | board at the TRB. |

|  | 80 |
|---|---|
| 1 | Q.    Okay.  I guess -- so that's what I was |
| 2 | trying to kind of figure out, the interplay in the |
| 3 | report. |
| 4 |        So it's throughout the dialogue of the |
| 5 | report, and then it's also there's |
| 6 | recommendations -- not every conclusion has a |
| 7 | recommendation? |
| 8 | A.    Correct.  And that's done at the back of |
| 9 | those conclusions too for continuity, so you know |
| 10 | exactly what we're referencing when we talk about |
| 11 | that recommendation. |
| 12 | Q.    Okay.  Okay. |
| 13 | A.    And, again, to speak on the point of |
| 14 | what does CIRT do, that's part of our goal is to |
| 15 | make the department better.  So if those nine things |
| 16 | are implemented, we feel that that would make the |
| 17 | department better. |
| 18 |        And to my knowledge I believe most of |
| 19 | them, if not all of them, were done. |
| 20 | Q.    Okay.  You said that it took you almost |
| 21 | a year to compile this report. |
| 22 |        Are there any -- other than trying to |
| 23 | get the -- which sounds like it's kind of a -- it's |
| 24 | more of a goal than a hard deadline -- to get the |
| 25 | officers involved interviewed as soon as possible, |

|  | 81 |
|---|---|
| 1 | are there any other, like, internal deadlines that |
| 2 | you're supposed to meet when preparing these |
| 3 | reports, or preparing this report? |
| 4 | A.    There's deadlines that are set based on |
| 5 | the availability of staff.  If you were giving an |
| 6 | initial sheriff brief, for example, it's set at X |
| 7 | date, usually a week after the FIT presentation.  In |
| 8 | this case it was probably two weeks just because |
| 9 | they knew that we had five involved officers that we |
| 10 | had to interview.  So that is something that's set |
| 11 | case-to-case basis as far as that meeting or -- that |
| 12 | meeting, that presentation. |
| 13 |        However, you also then have then a date |
| 14 | set for your captain's/lieutenant's brief, which is |
| 15 | more along the lines of a global -- like, how can we |
| 16 | fix this globally. |
| 17 |        In this case we didn't do a |
| 18 | captain's/lieutenant's brief because it was a SWAT |
| 19 | operation, and that's not something that needs to be |
| 20 | fixed on a patrol level, and that's the purpose of |
| 21 | that one. |
| 22 |        And then the SME brief, usually we try |
| 23 | to get that done in a reasonable amount of time, |
| 24 | after all interviews are completed, to get the |
| 25 | officers back to work who are able to go back to |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1   work that are cleared by doctors at that point.
2           So once the SME brief happens, then
3   those officers can be cleared if they've been
4   cleared and properly trained for the return-to-duty
5   training.
6       Q.    Okay.  And we talked about it a little
7   bit more briefly.  I want to kind of go through --
8   based on what you testified to here today, I want to
9   go through what I think your investigation process
10  can -- like, has, and you tell me if I've left
11  anything out or if this is accurate.
12      A.    Okay.
13      Q.    So there's the initial callout; correct?
14      A.    Correct.
15      Q.    And that's when you would actually go to
16  the scene of the officer-involved shooting?
17      A.    Correct.  And that's -- just to kind of
18  piggyback on that, it's the callout team.
19          So the sergeant and lieutenant on an OIS
20  will always go out, unless they're out of town.
21  Obviously if they're in California, they can't come
22  back.  And then the callout team.
23          The next up for a case has the option to
24  respond but is not necessary.  Again, if you have
25  family things and it's 3:00 in the morning and

83

1   you're not available, you're not available.
2           Once that happens, then we go to your
3   next part.  So it's a -- it's a very fluid dynamic
4   based on the amount of people we have because we
5   don't have a lot of people.
6       Q.    Okay.  So let's talk about -- like, you
7   know, I'll be asking, I guess, in a hypothetical,
8   but it really is geared towards this.
9           So there's the callout, which you didn't
10  go to?
11      A.    Correct.
12      Q.    Okay.  And then from there -- sorry.
13  Let me backtrack.
14          What -- what do you guys do at the
15  callout?  And what is -- what does a CIRT
16  investigator such -- a CIRT detective investigator
17  such as yourself, what would you do at the callout?
18      A.    So at the callout we are required by
19  state law to do breath and urine on all involved
20  officers.  So the first thing we do is we go into
21  whatever respective area the officers are being
22  held, whether it be one of the buses from the
23  unions, a patrol vehicle if they're not part of a
24  union, and we utilize our PBT that's assigned to us,
25  our preliminary breath test, to determine if they're

84

1   impaired via breath.
2           After that's done, we have a call out to
3   a guy who comes out and does the urine test, usually
4   on one of the union buses.  That is a third-party
5   system.  And that's sent off to testing.  I can't
6   speak too much on the fact that he just comes out
7   and collects urine.  That's all I know from that.  I
8   don't know where it goes from that point.
9           Then we get a briefing from the
10  investigator in charge of that.  Usually it's a
11  sergeant or a PD detective who is just out there.
12  They compile everything they know at the time to
13  give a brief of who's involved and why we're out
14  there.
15          Once that brief is completed, we
16  determine who our involved officers are and who our
17  witness officers are, people who just saw the event,
18  and we admonish them.  The admonishment is
19  essentially, Don't discuss this, for anticipated
20  testimony purposes, with each other.
21          Once we admonish them, we note that on a
22  piece of paper.  We have a piece of paper that has
23  the names and it has the admonishment.  So we read
24  it to them.  We have them either sign it, or, if
25  they're not available to sign it -- like in this

85

1   case Kerry Kubla got shot in both his arms.  He
2   can't sign that.  And he was at the hospital.  We
3   ended up calling him on the phone, once he was out
4   of surgery and he was coherent, and just admonished
5   him over the phone, wrote his name down, and marked
6   the time that he was admonished.
7           After that is done, we'll go through all
8   body-worn camera in the TOC, which is the tactical
9   operations center.  It's a big RV-looking thing that
10  has a bunch of TVs and computers so we can load up
11  those cameras and watch them in real time.
12          At this time FIT is also conducting
13  their investigation.  They're the leads of the
14  investigation.  We're just -- we are background.
15          FIT is doing interviews with all witness
16  officers.  And then they will do the countdown of
17  the officers' weapons and the walk-throughs with the
18  officer and their representation.  We're not there
19  for any of that.
20          So once we get the video, we see
21  everything that happens, we wait for our four
22  involved citizens.  So we have our citizen review
23  board that comes out that's part of the use-of-force
24  board that votes on it.  They come out there that
25  night, and they get a walk-through of the scene

86

1  outside of the red tape. So they're not permitted
2  to walk inside the scene, but they get as close as
3  possible, and they get the details that we know at
4  the time of the incident.
5         This is usually done by the CIRT
6  sergeant or lieutenant. In some cases the senior
7  detective on the squad who was out there will have
8  to do it, based on availability. But we just give
9  them an overview of, like, this is why we are out
10 here. We had five officers fire. And this is the
11 apartment. Do you guys have any questions?
12        And a lot of it is preliminary
13 questions. A lot of it is stuff we don't know, if
14 they ask any questions.
15        And then we try to keep those same
16 individuals in the use-of-force board. Sometimes
17 from availability that's not possible. That's why
18 we have citizens who are on, like, reserve that can
19 fill in if the citizens available is not there.
20        But that concludes pretty much our
21 investigation, outside of making our IA Pro case,
22 which is done back at the office or on a laptop on
23 the scene, and making our H drive file, which is
24 just our generic case file. And then we start
25 loading up things like CAD, which is computer-aided

87

1  dispatch.
2         By that point, usually body-worn cameras
3  aren't available yet because they have to download
4  and then be available on evidence.com, which doesn't
5  happen until FIT gets back in the office and puts
6  their cameras on the dock, and usually it's a couple
7  of hours after that.
8    Q.    When you say you have to make the IA Pro
9  case, what do you mean by that?
10   A.    Essentially it's the virtual case file
11 in our systems which any -- essentially, FIT -- not
12 FIT, sorry -- any CIRT or IA investigation just
13 documents anybody's involvement in any of those.
14   Q.    And I saw some -- I've seen throughout
15 the case file there are photos where it kind of
16 recreates -- some of it you -- some of it is
17 referenced in some of your report, where it talks
18 about, like, this person was standing this far from
19 the couch and was located here.
20        Is it FIT that kind of does all that?
21   A.    No. So that's our crime scene analysts
22 that do that.
23        So there's twofold to that. I believe
24 in this case was one of the first cases I used
25 TruView on, which is the kind of grainy-looking

88

1  photos that are on there.
2         Essentially what TruView is is every
3  scan they take is a million data points, and it
4  takes a 360-degree picture of whatever it's at.
5  Used on fatal traffic accidents, on homicides.
6  You've probably seen similar technology in, like,
7  movies and TV shows, where you're like, Oh, why
8  didn't they just scan the scene?
9         I know they did it at October 1, for
10 that scene, where they scanned the entirety of that
11 fairgrounds so they would have real-time data.
12        It gives you exact measurements of where
13 people are based on where they drop their cone
14 during that walk-through. Or if you have body-worn
15 camera, you can put them into a certain area based
16 on their body-worn camera, kind of fly through the
17 scene, get your measurements. It's a very useful
18 tool.
19   Q.    Okay. And so now we're through the --
20 now we're through the callout. You created the case
21 file. And then what happens -- what's the next step
22 in the investigation process?
23   A.    Once the body-worn camera is uploaded --
24 usually audio from dispatch is pretty quick.
25 They're really good about putting that into a shared

89

1  file. Then we can pull it over into our H drive.
2         But in this case there was not a lot of
3  radio traffic because it was the -- I forget who.
4  It might have been Sergeant Findley who got on the
5  air and said, Hey, we're going to be in Southeast
6  serving a search warrant.
7         And then the next audio is a 444, which
8  is an emergency of an officer, officer down.
9         So there wasn't a lot of radio traffic
10 to listen to and monitor that we could do any type
11 of analysis on or determine if there's any missteps
12 or good work.
13        So we had to wait for the body-worn
14 camera in this specific case to load up. And,
15 again, you're talking about an entire SWAT team of
16 operators, and that's, I want to say, 17 or 18
17 cameras that we had to wait to load.
18        But based on the detectives who went out
19 there, we start discussing what we know at the time
20 with the entire team.
21        Once we get the body-worn cameras, we
22 start looking at the shooters' cameras first, only
23 because they are the people we're going to interview
24 first, so we want to get a good understanding of
25 everything they did.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90

1        In this case -- I'll use an example of
2    something that we would put on a notice that would
3    be a negative would be, when we were watching Kerry
4    Kubla's body-worn camera, after he got shot, he goes
5    to the ground. Obviously his camera stays on. They
6    ended up turning it off. But at the time they were
7    unaware if he fired or not.
8        We have the video evidence that shows
9    that he does and his round count showed that he did.
10   But during the course of the investigation, it was
11   determined that one of the SWAT operators cleared
12   his weapon because it was dangling unsafe from his
13   body as they were trying to tend to his wounds,
14   which per policy you're not supposed to do.
15       Now, this is one of those things where
16   we talked to SMEs later on and say, Hey, was this
17   reasonable given the circumstances of Kerry being
18   shot? And they determined it was just because they
19   wanted to get that gun out of play, and they weren't
20   necessarily sure if he shot.
21       But that would be something we'd look
22   for on a notice to where now, up top of the subject
23   notice that we would have to give these officers, if
24   we see any allegations of misconduct, not
25   necessarily saying that there's something wrong with

91

1    it, but we identified it as possibly being an issue,
2    and we need to talk to you about it, but we can't do
3    so without putting it into the notice for NRS.
4        So in this case we would have -- I
5    forget who the officer was that did that. But in
6    his notice it would read, You were the witness to
7    this. However, you're a subject, and here's your
8    allegation of misconduct.
9        So that's kind of where we would go at
10   that point would be the involved officers' body-worn
11   cameras, and kind of breaking down all of that to
12   see if there was any allegations of misconduct
13   within those individuals outside of accusing them of
14   being in an officer-involved shooting, which is why
15   they're required to talk to us in the first place.
16   Q.    So then you get through the initial --
17   you get through the initial interviews, which I
18   think happened in about the first week and a half.
19   And then what are you doing next?
20   A.    Preparing for the sheriff brief, the
21   initial sheriff. Preparing for that brief. Getting
22   the threat assessment done for each of those
23   officers, and the Graham versus Connor, which are a
24   lot of -- very tenuous. Because you have to go back
25   and listen to the interview, you have to surmise

92

1    their statements in a short enough time period to
2    where we're not sitting there all day reading their
3    exact transcription, and then preparing for that
4    presentation.
5        Once that's done, then I'm assuming your
6    question is after --
7    Q.    And sorry. Just -- I'm going to
8    interrupt you just for a second.
9    A.    Yeah.
10   Q.    Is that the 12-hour presentation with
11   the slideshow?
12   A.    No.
13   Q.    Okay. Sorry. Keep going.
14   A.    We have multiple presentations as part
15   of CIRT investigations. But this is the initial
16   brief. I want to say this one probably was around
17   45 minutes to an hour.
18   Q.    If you remember, or not, at that point
19   in time were you aware that there were issues with,
20   like, the search warrant and the IAP? Were you
21   aware of any of that?
22   A.    Yes. So we get all those documents from
23   SWAT at that time, and we start putting together an
24   investigation.
25       But, again, this is a preliminary

93

1    investigation, where we are on the investigation
2    itself. A lot of that tactics and paperwork stuff
3    comes after.
4        The first thing that we want to -- that
5    we're required to do as CIRT is advise staff on the
6    shooters in this case and what were their responses
7    to the questions that were asked about their use of
8    deadly force.
9        In previous years, and this has not
10   happened in, I want to say, five years, we did
11   30-day updates. I believe we did a 45-day update on
12   this one, which was just going into a lot of the
13   stuff that we were finding from the investigation
14   that you see in the report, just to update staff.
15   But initially we mentioned it as areas of concern,
16   but we hadn't fully investigated it.
17       So it's one of those things where you
18   mention, Hey, this is what we identified, but we're
19   still looking into it. We haven't interviewed the
20   people, so we can't give the reasons why this was
21   done this way or that way.
22       But that's why we do the initial --
23   Q.    Is it fair to say that there were early
24   areas of concern in this case?
25   A.    In every case there's always areas of

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1  concern.  No OIS is perfect.  On the surface it
2  could look like the absolute cleanest, and there's
3  always one minute factor -- body-worn camera,
4  someone is missing a piece of gear that's
5  nonessential -- there's always some little detail.
6        So that's our job, to make sure we find
7  those little details.  Because if we don't find
8  those little details in the case, then it never gets
9  fixed.
10   Q.     And I'm sorry if you said this before.
11  I just want to backtrack and ask again.
12        Did this have more recommendations than
13  any other case you'd ever worked on?
14   A.    Yes.
15   Q.     And they were further implemented as --
16  it not only had the most recommendations, but there
17  was the most implementations of the recommendations;
18  correct?  To your knowledge.
19   A.    I can't speak on that one way or the
20  other as far as the eight years or seven years
21  previous to CIRT.
22   Q.     I'm sorry.  I'm just talking about in
23  your experience.
24   A.    In my experience, yes.
25   Q.     Okay.  And that's a fair distinction.

95

1  So I'm just asking about your experience.  Okay.
2  All right.
3        So, sorry, I shouldn't have interrupted
4  you.  We're doing preliminary reports.  You know, in
5  this case it was 45 days instead of 30.
6        Then what's going on then?
7   A.    Then we're going over who needs to be
8  interviewed.  So everybody is usually helping out on
9  this process, especially when you have multiple
10  body-worn cameras.
11        If you have a simpler, quote-unquote,
12  shooting, where, let's say, it's a car stopped and
13  there's only two officers that are involved and no
14  one else gets there until the guy is in custody,
15  then obviously the list of people you need to
16  interview diminishes quite a bit.
17        But when you're talking about a SWAT
18  team here with multiple individuals being involved,
19  and then multiple individuals clearing a house,
20  medical being rendered to both the suspect and
21  officers on-scene, there's a lot of hands in there.
22  Especially when you're talking about now IAPs and
23  investigations.
24        So we determined who needs to be, like,
25  the most pressing to get the best information and

96

1  where we make a determination of where we need to go
2  next.
3        In this case I believe Lieutenant
4  O'Daniel was one of those key figures.  Sergeant
5  Findley.  Officer Jake Warner because he was the
6  ATL, the assistant team leader.  Those are some
7  individuals that we would want to interview before
8  we get to somebody else who may not have as deep of
9  involvement.
10        But we're in the planning structure of
11  this and kind of work backwards from the shooting to
12  the planning to how do we operate as a department.
13  So it's kind of working backwards from the time of
14  the incident.
15   Q.     Okay.  And you had mentioned this
16  before, and I just wanted to ask you about this
17  since you brought it up.  You know, that CIRT --
18  one of the reasons that you were assigned this
19  case -- or, sorry, you volunteered for this case was
20  because you had a lot of experience with search
21  warrants.
22        And so can you kind of -- and you told
23  me, like, in what areas or departments you had the
24  experience in.  But can you tell me about, like,
25  what is your -- like, were you drafting -- like,

97

1  when you say a lot of experience with search
2  warrants, can you explain that to me a little bit
3  more in terms of the actual mechanics of what you
4  were doing?
5   A.    Sure.  The affiant of the legal document
6  that is the search warrant, and then also being the
7  secondary on a lot of cases where you're required to
8  sign as the secondary on that affiant page.
9        But, yes, authoring and being the
10  affiant of search warrants.
11   Q.     Did you have a lot of experience in your
12  prior professional background for Las -- in
13  executing search warrants?
14   A.    As being an operator in SWAT, zero.
15  I've never been in SWAT.
16   Q.     Okay.  But even -- sorry -- outside of
17  SWAT, did you ever execute search warrants as part
18  of your role in any of the other --
19   A.    No.  So the -- back in, I believe it
20  was, 2012 or '13, we stopped the practice of having
21  detectives serve their own search warrant if there
22  was minimum danger.  Any search warrant that needed
23  to be -- needed to be served on a dwelling or any
24  kind of structure that was not frozen -- and frozen
25  in this aspect of having police officers inside and

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98

1    it being completely secured -- would be then
2    conducted by SWAT.
3        Q.    So I guess can you explain that to me
4    a little bit more? Because I saw some
5    conversation about why wasn't Major Violators
6    involved. So does Major Violators serve those, or
7    is it just SWAT?
8        A.    No. I guess maybe -- was that from my
9    testimony you're discussing?
10        Q.    It was within the report somewhere, a
11    discussion about Major Violators, in terms of them
12    executing the search warrant, and were they
13    considered or not.
14        A.    So that was not necessarily the
15    execution of the search warrant. That would be
16    conducting the arrest of the individual.
17            So a lot of times Major Violators will
18    be tasked with getting search warrants or the body
19    for a search warrant, to include, like, an arrest
20    affidavit as well. And then once they have that
21    probable cause and have that signed warrant for
22    arrest and search warrant, then they would go find
23    that person, whether it be through electronic
24    resources or visual resources as far as, like,
25    stakeouts, I guess would be, like, the layman's term

99

1    for it. And they would try to apprehend that
2    individual outside of the house as opposed to inside
3    the house.
4            If it had ever gone to an
5    inside-the-house, where they were either barricaded
6    or refuse to come out, always SWAT. Major Violators
7    would never serve a search warrant.
8        Q.    Okay. Thank you for explaining that.
9            And where in the report -- we'll get
10    back to the thing -- what your next steps are.
11            Where in the report would I find -- is
12    there, like, a listing of subject matter experts?
13        A.    The standard subject matter experts are
14    going to be on that page 1 that you gave me. It's
15    this -- I think I have your page now. You have it
16    there too?
17            The -- I can't remember if we started
18    implementing a sign-in list after this case, because
19    there was a little bit of controversy during the
20    use-of-force board where Lieutenant O'Daniel
21    attempted to have TJ Jenkins be her representative,
22    and he was one of the SMEs that was used for SWAT.
23            In general we don't put the specialized
24    units out of there onto that list. Those were our
25    general people that were there for training.

100

1        Q.    So I guess let me ask the question a
2    little bit differently.
3            For instance, I don't see Mr. Bandiero
4    on this list.
5        A.    Correct.
6        Q.    He's a subject matter expert; right?
7        A.    Again, yes.
8        Q.    So why isn't he listed on here?
9        A.    I couldn't tell you one way or the other
10    as far as our procedural goes. But from my
11    understanding is that that is our baseline
12    essential. Those are our everyday SMEs that conduct
13    training, tactics throughout AOST, RBT, the academy.
14            Anything else that's mentioned as an SME
15    as far as specifics, like Anthony Bandiero on there,
16    would be mentioned as an SME in the report, but it
17    wouldn't be in that sidebar. If we got to the
18    point, especially on this case, there wouldn't be,
19    one, enough room for it. But, two, it's a internal
20    briefing that's not made to be -- most SME briefs
21    are not made to be on the record. It is to assist
22    the investigating detective with the guidance on
23    tactics and training, what we do.
24        Q.    So are there any SMEs -- if they're not
25    meant to be on -- okay -- sorry --

101

1        A.    There should be a sign-in list that was
2    in our case file of SMEs for the SWAT side and the
3    search warrant side. Which is how we knew that
4    TJ Jenkins was an SME and how we could prove it, why
5    he was not allowed to represent Melanie O'Daniel
6    during the use-of-force board.
7        Q.    Related to this case or related to a
8    different case?
9        A.    Related to this case. She tried to have
10    him as an SME -- not an SME, sorry. As a
11    representative.
12        Q.    But he was an SME on this case?
13        A.    Correct. So we did not allow that.
14        Q.    And what does Mr. Jenkins do?
15        A.    He was a SWAT sergeant. He is now
16    retired.
17        Q.    So when you say "represent," I guess I
18    just always assume lawyer.
19            How can a SWAT sergeant represent
20    somebody?
21        A.    Per NRS you are allotted two
22    representatives of your choosing. It does not have
23    to be anybody. I can be a representative of
24    somebody. If I were to leave CIRT -- obviously it
25    would be a conflict of interest if I did it now.

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1 But if I were to leave CIRT and be just a regular
2 patrol officer, and somebody would like me to
3 represent them at the use-of-force board or in an
4 interview, they could pick me. It does not matter
5 who they pick. Most of the times it's union
6 representatives. Very seldom is it a lawyer. David
7 Rogers sometimes comes in on cases. Dan Ko, who is
8 a lawyer, but he was also a lieutenant, is a PMSA
9 representative who comes in from time to time with
10 people who are represented by the PMSA.
11      But for the most part, the officers are
12 represented by members of the LVPPA and the PMSA and
13 PPACE, which I don't know the acronym for, I'm
14 sorry, but it's the civilian union, if there's,
15 like, dispatchers or call-takers that need to be
16 represented during use-of-force boards. But those
17 are all officers, detectives, sergeants,
18 lieutenants.
19      Q.    I'm trying to authenticate the content
20 of the report in terms of the use of the SMEs.
21      So not -- the SMEs, you know, the
22 outside experts, they're not listed on this front
23 page? Like Mr. Bandiero, they are not listed on the
24 front page?
25      A.    Correct.

103

1      Q.    If you relied on them specifically,
2 you're going to include that notation within the
3 report. Is that fair to say?
4      A.    Fair.
5      Q.    Okay. And we went over that one part
6 that should have been italicized. That was from
7 Mr. Bandiero's report.
8      But as we sit here today, that was from
9 his memo or whatever you want to call it?
10      A.    Yes. From that meeting, the list of
11 meetings or the various meetings that we've had.
12      Q.    And then it's actually the sign-in page
13 that's going to tell me exactly who the SMEs in
14 addition to the ones listed on the front page are?
15      A.    Correct.
16      Q.    And were they all present for that
17 12-hour slideshow presentation?
18      A.    No.
19      Q.    Okay. Were they present for the other,
20 like, updates?
21      A.    No.
22      Q.    Okay.
23      A.    They're specifically brought in there as
24 they get a PowerPoint presentation of the facts that
25 we know and usually after all the interviews have

104

1 been concluded.
2      In this case, I think we did a couple
3 afterwards because of orders from executive staff.
4      Q.    Sorry. What do you mean by "a couple"?
5 A couple of interviews or a couple of updates?
6      A.    Correct. A couple of interviews after
7 the SME briefs. In general we try to get everyone
8 done prior to that. It doesn't happen every single
9 time. But for the most part, we try to get
10 everybody involved.
11      In this case, because there was such a
12 wide net of people that we needed to interview and
13 time and resources, I don't believe we got in
14 everybody. In fact, I know we got -- we interviewed
15 Melanie O'Daniel, and then we had to re-interview
16 her based on information we learned later on.
17      Q.    Okay. And so the SME briefing is
18 something different. That's kind of midway point
19 through; is that correct?
20      A.    Midway is a fair way to say it.
21      Q.    Okay.
22      A.    It's just another check in the steps it
23 takes to finish one of these reports.
24      Q.    And then after they have the briefing,
25 you talked about several meetings with Mr. Bandiero.

105

1 So after you have that initial briefing, then are
2 you meeting with them again to see if they have any
3 comments or --
4      A.    They -- anybody who is an SME on the
5 department, which usually goes out to everybody on
6 that list on the side column, is given a report via
7 BlueTeam, which is one of our internal resources, to
8 review. If they have any issues with the report
9 itself, that will be notated.
10      In most cases there's nothing that is
11 said. I don't deal with that side of it. That's on
12 our executive staff side of it. I just get the,
13 Hey, this is their question. Can you answer it?
14      Q.    Oh, okay. So you're not even part of
15 that meeting?
16      A.    As far as the --
17      Q.    You just get, like, the follow-up;
18 like, Hey, they have questions about this, this, and
19 this?
20      A.    When it comes down to sending out the
21 final report, there's no meeting. It's sent out.
22 They read it on their own, and then they send their
23 feedback.
24      Then I'm given the feedback, and I can
25 call them up or email them and say, Here are your

LEXITAS

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

106

1   concerns, and here's why this decision was made
2   based on this. If you have any questions, call me.
3       Q.    Okay. So we're midway -- sorry. I keep
4   pulling you around. We're midway through. We're
5   at, like, the SME briefing. Then what happens from
6   there?
7       A.    You start writing the report. In this
8   case, 222 pages, a lot. So it took quite a lot of
9   time to, one, go through a structure of how I want
10  to present this. And most times we want to go
11  chronological order. And then what quotes you want
12  to use.
13          Usually I just -- the way I operate is I
14  just kind of think of how I've done it in the past
15  and how I should mirror that and how it looks as far
16  as chronological. So I know I wanted to talk about
17  certain things first and then go into, you know, the
18  operational side of it last. And always last would
19  be officer-involved-shooting part because it's the
20  last thing that happened. Usually it becomes static
21  after that.
22      Q.    Okay. And so then is it fair for me to
23  assume that you have some level of -- you can -- you
24  have some level of autonomy in how you're going to
25  organize the report?

107

1       A.    There's a structure we like to follow.
2   I don't finish my report, then hand it to SMEs and
3   say, Hey, you guys good with this?
4           In this case we round-tabled it, went
5   through page by page with the entire squad.
6           But in general for an OIS, if my partner
7   gets an OIS, he gets done with his report, it goes
8   to me. I look at it for spelling, grammar, and then
9   also for content.
10          After I give him my corrections, then
11  that usually goes to one more detective to see if
12  that can -- I missed anything. Because -- sometimes
13  you read a lot of the same things over and over
14  again, sometimes you do miss things.
15          That is then double-checked by a second
16  detective.
17          It then goes to the sergeant of the
18  section and to one of our executive staff officers,
19  one of the civilians. And they look -- the
20  executive staff looks for -- civilians look for
21  grammar specifically, try to get it as dialed in as
22  possible as far as grammar and spelling.
23          We do miss things from time to time. I
24  was reading back in this, and I get very nit-picky
25  on things, and I noticed one of my paragraphs wasn't

108

1   justified, and it drove me crazy. It's not
2   something that messes with the content of the
3   report. But as trying to be as much of a
4   perfectionist as possible, as I was rereading this
5   recently, I saw that I had a paragraph that was not
6   justified, and it just absolutely drove me crazy.
7           But then it goes to our sergeant, our
8   lieutenant, and then our captain reads it.
9       Q.    And so you said in this particular case
10  that it was the whole team that round-tabled this;
11  correct?
12      A.    Correct.
13      Q.    Why did the whole team round-table
14  this one?
15      A.    Just from the complexity of it. Five
16  shooters, the IAP, the investigation itself. All
17  the aspects that make this a 222-page report is a
18  lot for one individual to compile that information
19  themselves. Especially when you're writing in your
20  own voice -- and I'm sure you've had similar
21  instances where you're writing in your own voice,
22  and sometimes, either when you're rereading your
23  stuff, you know what you were saying but you didn't
24  put it on paper correctly, or there might have been
25  a question on whether we're going to put both sides.

109

1   Like, if there was any kind of divide, to make sure
2   we put both sides of that into the investigation,
3   like the "knock and announce" that we did.
4           But in this case, because it was so
5   in-depth, because at the time I only had three years
6   on in the section, I was kind of middle of the road
7   when it came to seniority there, it was important
8   for the section to -- it's always important for the
9   section to get everything right and give the best
10  work product that we can.
11          So at this point our command staff --
12  our sergeant, lieutenant, and captain -- thought it
13  would be prudent to go over it as a group and make
14  sure that we were all on the same page, as opposed
15  to handing a 222-page report to one detective and
16  wait and then another detective and wait.
17      Q.    You said this one was particularly
18  important. Why was this particularly important?
19      A.    Did I say important? As far as it was
20  particularly important to get this done because of
21  the size of the investigation. Like we've discussed
22  previously, 222 pages is not our normal work
23  product. Usually it's between 60 and 80 pages.
24          There was a lot of deficiencies noted,
25  which were put in our recommendations, that we

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1  wanted to make sure that we were squared away on as
2  far as, when you're talking about that Section 9 of
3  our recommendations, we're changing the department.
4  We're trying to improve the department.  And we're
5  making those recommendations to be voted on by a
6  tactical review board.  So we want to make sure
7  they're articulated in a way that the reader and the
8  voting members would understand.
9      Q.    When you're recommending -- or when part
10  of the report, you know, the purpose is to change
11  the department, that assumes that things can be done
12  differently; correct?
13     A.    Yeah.
14     Q.    So if officers, when I deposed them,
15  made assertions that certain things couldn't be
16  done differently that you had recommended -- or
17  that CIRT had recommended changing, that would be
18  refuted by the fact that CIRT recommended a change;
19  correct?
20     A.    From a department standpoint, yes.
21  However, to the officer's defense, on either our
22  interviews or whatever -- I obviously don't have
23  access to your depositions of those individuals,
24  but they were operating on the information they had
25  at the time and the policy, tactics, and training

111

1  that they were given that was approved by our
2  department.
3          What we're talking about as far as
4  making improvements or changing things is we saw
5  what happened, not necessarily good outcome or bad
6  outcome on this case or any other case, but how can
7  we make it so it is even better.
8      Q.    Well, I mean, you're saying "even
9  better," but there were conflicts within the
10  policies themselves; correct?
11     A.    Absolutely.
12     Q.    Okay.
13     A.    But not -- in the manual.  Not the
14  policies.  The manual.  The department manual for
15  SWAT.  Not policies.
16     Q.    What's the difference?
17     A.    One is a policy manual, and one is a
18  section manual.
19     Q.    What's the difference between a policy
20  manual and a section manual?
21     A.    Section manuals have to have -- they
22  can't violate policy, but they go into more detail
23  of what that section does.  It would -- I'm not sure
24  if you've seen our policy manual, but it's about the
25  size of that binder, if not even bigger.

112

1          If you were to put every different
2  section into our policy manual -- vice, narcotics,
3  SWAT, air unit, everybody -- CIRT -- the manual
4  would stack up to the roof.
5          So essentially it's an extension of
6  policy with their own set of, I guess, tactics and
7  training that they utilize, whether it be from their
8  SWAT school or Major Violator school or whatever
9  they put on to train their individuals, if that
10  makes sense.
11     Q.    Yes.
12          We talked about it quite a bit, but just
13  to clarify, in the initial part of your -- of the
14  CIRT report, you make a distinction between your
15  administrative review and the review for the
16  criminal review; correct?
17     A.    Yes.
18     Q.    Okay.  And part of the administrative
19  review is to determine what we've all kind of talked
20  about globally and we're going to dig into more
21  specifically, the policies and procedures, the
22  training, and whether the officers acted reasonably
23  under those conditions; correct?
24     A.    Yes.
25     Q.    Which is different than an analysis of

113

1  whether or not they were justified in shooting;
2  correct?
3      A.    Correct.
4      Q.    And one of the -- you tell me if I -- is
5  it correct that one of the parameters of
6  reasonableness is that it still must be within the
7  Constitution, their actions must be within outlines
8  of the Constitution and how they have to do
9  different --
10     A.    So, again, we don't deal with -- I'm not
11  a lawyer, so I can't speak on constitutional law.
12          What I can speak on is to the set of
13  NRS and -- or supreme court decisions of Graham
14  versus Connor that fit into what we investigate.
15          We look at specifically Graham versus
16  Connor.  That is the legal binding for use of deadly
17  force specifically.
18          Then we have our threat assessment
19  of the ability, opportunity, imminent jeopardy,
20  and preclusion that we analyze our uses of force on.
21     Q.    Sorry.  Thank you for clarifying that.
22          But I am talking -- and so -- but in
23  terms of, like, the Fourth Amendment, search
24  and seizure, people's individual rights under
25  the Fourth Amendment, that the reasonableness of

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1   an officer is still -- no matter whether or not
2   they seem reasonable, certain actions must fall
3   within the parameters of the case law and what the
4   supreme court has said officers must comply with
5   in order to recognize people's Fourth Amendment
6   rights; correct?
7       A.    If you're speaking of the Fourth
8   Amendment rights of that -- that use of deadly force
9   is what you're speaking to?
10      Q.    Yes.
11      A.    Then yes.
12      Q.    Okay.  And so we've talked a little bit
13  about -- and so, okay.  Sorry.  I'm going to loop
14  back, and then we'll go forward.
15           In terms of the investigation, you
16  issued the final CIRT report; correct?
17      A.    Correct.
18      Q.    Okay.  In this case it's been
19  round-tabled; everyone's looked it over; it gets put
20  out.
21           Then did you get any questions back
22  about this report?
23      A.    I don't recall how many questions, if I
24  got any, on this case from anybody who saw the final
25  product.  I don't recall.

115

1       Q.    Were there drafts going out the whole
2   time?
3       A.    There's not drafts going out.  We
4   never send out a draft of the report until it's
5   final.  Once it's finalized, then it would be
6   sent out.
7           However, the team has access to all the
8   drafts.  So as we're doing this report, if I get to
9   a certain section, Hey, how does this sound?  Can we
10  round-table this?  Or, Hey, can I get an opinion on
11  how I wrote this?  Then the team has access to those
12  drafts.
13           But never a draft, like, unfinished
14  version of this has ever gone out to anybody outside
15  of our unit.
16      Q.    Okay.  And I understand -- you seem to
17  be an individual, Justin, that takes pride in their
18  work.  Is there -- but it seems like there has been
19  a lot -- based on what you've told me, there's been
20  a lot of focus within the CIRT unit.
21           Why is it -- why is there such a focus
22  on the way it's drafted, to make sure that there are
23  no typo errors, to have, like, this level of review?
24  Why is that important for the department?
25      A.    I think it's important in every aspect

116

1   of the department because everything that we do is a
2   legal document.  When it comes -- when we talk about
3   a traffic citation, that's a legal document.  I
4   don't want spelling errors or grammatical errors on
5   the back of a citation of why I gave this individual
6   a citation.
7           The same thing goes for an arrest report
8   or even when you deal with something as detailed as
9   a CIRT report.  There's still that aspect of not
10  turning in a sloppy product and having pride in your
11  work, because you should have, as an officer in this
12  department -- I'm not saying it happens with
13  everybody.  But for me, since I've been a member of
14  this department for 16 years, I pride myself on the
15  fact that I can write well enough to get into a unit
16  like this to where my input is valued.
17      Q.    Do you think that the primary -- do you
18  think your primary role is as a writer?
19      A.    Well, I mean, primary role is a Swiss
20  Army knife.  You can't really point to one aspect of
21  my thing, this is what you do, you are a presenter,
22  you are a writer.
23           There's definitely an aspect of it that,
24  yes, you have to be able to clearly articulate
25  whatever you are trying to convey in the report to

117

1   where it is, one, able to be read by somebody who's
2   not a department member.  That's very important,
3   because civilians are reading this from a
4   use-of-force level because they're voting on it to
5   determine if it's a reasonable use of force.  So you
6   have to write in almost a simpler version, but also
7   have to write it in a way that lays out all of our
8   department policies and tactics and training and be
9   able to cite those correctly.  And also interpret
10  the investigation and utilize the quotes inside of
11  it properly.
12      Q.    Other than your prior kind of come-up
13  experience and your come-up experience through the
14  department and your communications degree, have you
15  had any other training offered through LVMPD or
16  through CIRT about writing?
17      A.    I know there's been report-writing
18  classes I've taken.  But, I mean, we're talking over
19  a span of 16 years.  There's no specific CIRT, like,
20  writing classes.  That's something that's learned
21  over time as far as how to write.  We try not to use
22  the word "that" and "there."  That's one of the
23  specifications I mentioned, the justification on the
24  reports.
25           When I see anything that's not justified

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

118

1  in any aspect of my life anymore, it triggers me a
2  bit to like, I need that justified. But just
3  overall the sentence structure.
4         I can see where I was at this point
5  three years in my career when I read this and I go,
6  I probably would have done something grammarly
7  different there -- grammatically. See. I even
8  messed up that.
9         But it's all about growing. And a
10 one-year CIRT detective writing a report is not
11 going to look like my report now being there six
12 years and a senior detective on the unit.
13        MS. MURPHY: Do you want to take another
14 break?
15        THE VIDEOGRAPHER: Off the record at
16 11:37 a.m.
17        (A break was taken.)
18        THE VIDEOGRAPHER: On the record at
19 11:47 a.m.
20 BY MS. MURPHY:
21     Q.    Justin, I'm just going to ask you some
22 more basic background questions about the report,
23 and then we're going to get into the content of the
24 report itself. Okay?
25     A.    Okay.

119

1      Q.    Okay. Based on what you've just told
2  me, it is your understanding that this report's
3  going to be widely circulated; is that correct?
4      A.    Widely circulated how?
5      Q.    Well, that it's going to be seen by
6  civilians. That this is considered a legal
7  document. This is not like an internal report
8  that's only seen by CIRT or only within, like, a few
9  branches of LVMPD; is that correct?
10     A.    No. So this is an internal report.
11 This is not a published report like a FIT report.
12        Any FIT report -- and to my knowledge,
13 you can look up online and Google it and it's on
14 there.
15        But for purposes -- when I say that
16 civilians are going to read this, those are going to
17 be the civilians that are going to be voting on the
18 use-of-force board. So those four civilians.
19        It's not available department-wide.
20 It's not available to anybody who wants to read it.
21 It is a very secure document.
22     Q.    Okay. But part of the purpose is to
23 determine if changes should be made; correct?
24     A.    It's part of the purpose.
25     Q.    Okay. What's the other purpose?

120

1      A.    To identify things that we're doing
2  right and to just complete a full administrative
3  investigation to see -- again, I mean, yes, there
4  are going to be some deficiencies noted, but there
5  are also going to be a lot of positives that come
6  from this, where you see that things are working;
7  that training is working; that if things are done
8  correctly within training and policy and tactics,
9  that those are done for a reason, and those do end
10 up mostly in successful officer-involved shootings.
11     Q.    I didn't see -- I mean, in terms of the
12 administrative aspect, not in terms of the criminal
13 aspect, I didn't really note any things where you
14 guys were saying this was done right in here.
15        I mean, can you point me out to parts of
16 the report where you were saying this was done
17 correctly?
18     A.    Any time there is a conclusion in there
19 that does not say that it was within -- that was
20 within LVMPD policy and tactics -- any of the
21 conclusions that are inside of the report that say
22 that they were within department policy, training,
23 and tactics are considered good.
24        Again, that's just from a personal
25 standard, from me saying good. We're not saying,

121

1  Oh, that's a great job there. It's saying you were
2  within tactics, training, and policy.
3      Q.    But it's not just -- I mean, you made
4  it very clear to me earlier, this isn't your opinion
5  in here?
6      A.    Correct.
7      Q.    Okay. This is the result of the SMEs
8  round-tabling with other people within CIRT. It's a
9  collective assessment of the different actions
10 related to this officer-involved shooting; correct?
11     A.    Correct.
12     Q.    And so if it says -- in the conclusions
13 if it says, you know, Conclusion, this was found to
14 be within LVMPD training, policies -- or whatever
15 the verbiage is, that's the way of saying this was
16 done correctly?
17     A.    I'll call that a positive, for lack of a
18 better term.
19     Q.    Okay. Okay.
20        And in terms of the document itself, you
21 tell me if I'm right or wrong. This is kept in a
22 certain drive; correct?
23     A.    Yes.
24     Q.    As we sit here today -- and I've given
25 you a copy of what I have if you want to leaf

Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

122

1   through it. But as we sit here today, to the best
2   of your knowledge, this is an accurate copy of what
3   you drafted back in 2022; correct?
4       A.    Correct. 122 [sic] pages. I remember
5   the number pretty specifically.
6       Q.    And there's no reason to believe that
7   the content in here is not reliable in any way, in
8   terms of it being the final product of what you
9   created after a year; correct?
10      A.    Correct.
11      Q.    And you have done your best in compiling
12  this, aside from the one issue that we had with
13  Mr. Bandiero. But for the most -- in terms of if
14  you're quoting somebody or something, or you're
15  putting it in italics, that is a cite from another
16  source that you cite within the report itself;
17  correct?
18      A.    Correct.
19      Q.    And those -- the citations for those --
20  you know, excluding, say, like, case law, the
21  citations for those -- for the interviews and stuff
22  like that, that's easily -- we're able to easily
23  authenticate that by looking at the report -- or
24  interview itself; correct?
25      A.    Yes.

123

1       Q.    And you've gone to great pains to ensure
2   that if you quote something, cite something,
3   italicize it, however you do it, that that is also
4   an accurate quote or citation from whatever other
5   source you're pulling from; correct?
6       A.    Correct.
7       Q.    You tell me if I'm right or wrong.
8   Part of the round table or the administrative
9   review, do they also check that? Like, check your
10  cites? Do they do that kind of stuff? Or is that
11  all on you?
12      A.    Well, if we're talking about an
13  officer quote, I'm not going to get it from
14  anywhere else.
15           So -- and the source material policy,
16  stuff that's derived from policy or manuals or case
17  law, was then put into our drive under a certain
18  folder which was put into our binders and whatever
19  is in front of you there, which would be part of
20  the, I guess, evidence as part of this case.
21      Q.    Okay. And in terms of -- like I
22  said, we're gonna -- in a few minutes we'll get into
23  the actual content of the report and stuff like
24  that.
25           You talked to me that you are -- that,

124

1   you know, part of your professional background,
2   that you're very familiar with search warrants,
3   but you had never executed one because you weren't
4   on SWAT?
5       A.    Correct.
6       Q.    Have you become -- in your execution of
7   a detective investigator through CIRT, have you now
8   become somewhat fairly or somewhat -- however you
9   want to qualify it, familiar with SWAT, the SWAT
10  manual, tactics, those types of things?
11      A.    Familiar how? Are you saying can I join
12  a stack right now and be part of an entry team?
13      Q.    No. And thank you for clarifying
14  because my question is a little bit different.
15           What I mean is, is, like, you're, like,
16  Yeah, the manual says this, this, and this. This is
17  their policies.
18           Like, are you fairly familiar with those
19  types of issues now?
20      A.    Familiar in a respect of some of the
21  highlights. But I'm not required to know it, like,
22  head to toe like they are required to know it. I
23  use it. I reference it. As part of CIRT, you're
24  supposed to have access to everything in the
25  department. I can't possibly have every section

125

1   memorized.
2           So I'm familiar with what I've
3   investigated on that day. And then if I have
4   another SWAT case, I'll become familiar with the
5   aspects related to that case that reference SWAT.
6   But to say I'm completely familiar with the
7   manual -- I believe it's 100-and-some-odd pages -- I
8   don't know it head to toe, top to bottom.
9       Q.    Is it your -- I mean, you put a lot of
10  time and effort -- part of your job -- and I'm
11  assuming on different cases, not just this one, but
12  it would appear that you put a lot of time and
13  effort into developing the recommendations and very
14  carefully analyzing the verbiage within the SWAT
15  manual; is that -- any manual you're analyzing, but
16  I guess in terms of this case, the SWAT manual; is
17  that correct?
18      A.    Can you rephrase?
19      Q.    Sure. When you are drafting the report
20  and you're forming these recommendations, you're
21  looking very careful at the manual -- carefully at
22  the manual; correct?
23      A.    Yes.
24      Q.    And it is your expectation that, as you
25  go through and make these recommendations, that --

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

126

1   sorry, you're not the one making the
2   recommendations -- but as recommendations are made,
3   that the other people looking at it will carefully
4   consider the changes, even if they're just slight
5   changes in the verbiage; correct?
6       A.    Well, they're not going to consider
7   changes, like, as a recommendation. They're not
8   going to be like, Okay, we'll take that into
9   consideration.
10           At this point it was because they are
11  recommendations, because they got voted on at the
12  board, they are now going to happen. So now it's
13  about the implementation of those recommendations
14  based on whatever they were.
15           So if there's a specific verbiage about
16  the SWAT manual needing to be updated to conform
17  with something, then that was a specific notation
18  and a recommendation that was required to because it
19  was voted on and approved as -- I forgot the three
20  categories for conclusions. I think it's on your
21  voting sheet that you had there. But it's
22  something, modify, and overturn.
23      Q.    And/or approve.
24      A.    Okay, so it is approve.
25      Q.    Do you expect the SWAT guys to be

127

1   familiar with the SWAT manual?
2       A.    Absolutely.
3       Q.    And I guess that's a roundabout way of
4   me asking the question too. You put so much time
5   and effort into issuing recommendations that they
6   look at. I mean, part of that is that you expect
7   the operators to be familiar with the manual and
8   rely on it; correct?
9       A.    I would think that they would assume the
10  same for me, reference the CIRT manual. But they
11  wouldn't have really any reference to it because
12  they don't do my job. But they would expect that I
13  would have a vast knowledge of my CIRT manual.
14      Q.    Okay. All right. Let's talk about the
15  report itself.
16           Before we get into the actual report,
17  I'm just going to do two preliminary items.
18           You reference NRS 179.055 throughout
19  your report.
20      A.    Okay.
21           MS. MURPHY: If we could mark this
22  Exhibit 4.
23           THE WITNESS: And that's "no knock";
24  correct?
25           MS. MURPHY: What?

128

1           THE WITNESS: Is that "no knock"?
2           MS. MURPHY: Yeah, officer may break
3   door to serve warrant.
4           (Exhibit 4 marked.)
5   BY MS. MURPHY:
6       Q.    So this is actually NRS 179.055. This
7   is actually the "knock and announce" statute.
8       A.    Yeah.
9       Q.    And so I'll represent to you that I
10  pulled this off the internet.
11      A.    Okay.
12      Q.    But you cite it throughout -- a couple
13  of times in the report. And I just wanted to
14  confirm the verbiage.
15           It says, "The officer may break open any
16  outer or inner door of a window or a house."
17           Is that what you read as well? In
18  Section 1?
19      A.    Page number 1? Yes.
20      Q.    Actually, sorry. Justin, let me give
21  you a -- if you want to just take a second to just
22  read the whole thing. It's not very long. If you
23  want to just read it and then let me know --
24      A.    I didn't know if you were talking about
25  reading the title of it or if you were at Number 1

129

1   there.
2           So you're asking if the -- if it read,
3   "The officer may break open any outer or inner door
4   or window of a house"?
5           Yes, that's what it says.
6       Q.    And so the statute itself includes both
7   the breaking of a door and a window; correct?
8       A.    Yes.
9       Q.    Okay. So by the plain language of the
10  statute, whether it's a door or a window, once
11  there's entry made, it's being broken into; correct?
12      A.    Yes.
13      Q.    For the purpose of serving a search
14  warrant?
15      A.    Yes.
16      Q.    Okay. And then the other thing that I
17  am going to have you -- I'm just going to kind of
18  keep this to the side. And, Justin, I'll represent
19  to you that this is the -- basically the layout of
20  the apartment that I pulled from your report.
21      A.    Yep.
22      Q.    And I'm just going to give that to you,
23  because I think as we go through the report we talk
24  about different positions or things that happened.
25  So I think it will make it easier if we are working

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

130

1    off the same grid.
2    A.    Okay.
3        MS. MURPHY:  So if we could please mark
4    that.  This is pulled from the report at LVMPD 4389.
5        (Exhibit 5 marked.)
6    BY MS. MURPHY:
7    Q.    Does that look like your work?
8    A.    It is.
9    Q.    Okay.  All right.  So let's get into the
10   actual report itself.
11       So the very beginning of the report,
12   Justin -- actually, I'll skip to page 13.  That's
13   Bates 4267.
14   A.    Okay.
15   Q.    And these are photos of the officers
16   that were involved; correct?
17   A.    Correct.  Well, this one specifically is
18   Sergeant Backman.
19   Q.    Do you know where this picture came
20   from?  Was this, like, the day of the shooting, or
21   was this --
22   A.    Correct, yes.  So after officer-involved
23   shootings -- I don't remember where this was taken
24   because I wasn't out there and I wasn't told where
25   it was taken.  Usually it's taken at a secure

131

1    location, usually inside one of the vans -- sorry,
2    the buses run by the unions.
3        So they take an overall -- multiple
4    pictures -- this is just one of those pictures -- of
5    how they were at the time of the incident so you can
6    show that they were readily identifiable, that they
7    had all their proper gear on.  It just shows them
8    how they were at the time.
9    Q.    Okay.  And then turning the pages to
10   page 14 and 15, they're just headshots of Officer
11   Kubla and Officer Clements; correct?
12   A.    Correct.
13   Q.    They were already -- they'd already
14   left?
15   A.    They were in the hospital.  So Officer
16   Kubla was in surgery at the time.  Officer Clements
17   was at the hospital for his abrasion to his arm.  He
18   had taken off all of his gear.  That gear was
19   photographed on the ground, inside the bag where it
20   was located at.
21   Q.    Then turning to page 16 and -- sorry.
22   16 is Officer Gonzalez?
23   A.    Correct.
24   Q.    And it's your understanding that this
25   was also taken at the scene; correct?

132

1    A.    Taken at a secure location.  Either -- I
2    don't remember where it was taken.  It was at the
3    same day.
4    Q.    Thank you for that clarification.
5        And then same thing with page 17.
6    That's Officer Rothenburg.
7        Let me rephrase the question more artfully.
8        This is the uniform he was wearing --
9    this picture represents the uniform that he was
10   wearing at the time he was involved in the shooting?
11   A.    Yes, correct.
12   Q.    And then the following pages that we
13   have, the additional employees that were involved,
14   but these aren't shooters; correct?
15   A.    These are -- so this page specifically,
16   and I believe it's the next page -- because there
17   were a lot of interviewees on this.  So the next
18   three pages that were interviewed by
19   CIRT.  So they're additional employees that were
20   interviewed by CIRT.
21       If there were any other employees that
22   were not interviewed by CIRT, that were interviewed
23   by FIT only, they would be notated at the bottom
24   here as interviewed by FIT only.  However, I think
25   we did substantially more interviews than FIT did.

133

1    I think we covered all of them by this point.
2    Q.    Well, most people turn down FIT;
3    correct?  Or all the --
4    A.    If you were involved as a subject -- if
5    you're notated as a subject in a shooting, then you
6    have the option to not speak with FIT.
7        However, if you are a witness officer
8    and they deem you a witness officer, you are
9    required to give a statement to FIT.
10   Q.    And these are -- I mean, it's --
11   it's -- it's -- it's spelled out here, but just to
12   confirm.
13       These are employees specifically; they
14   don't include civilian witnesses or anyone else?
15   A.    No.  Civilian witnesses are located on
16   page 20, and it's just the FIT report.  So see the
17   FIT report that's attached.
18   Q.    So you didn't interview any of the
19   civilian witnesses?
20   A.    No.  Because that's not our purview as
21   far as an administrative investigation goes.
22   They're not required to talk to us.
23       There are circumstances that CIRT does
24   interview civilian witnesses, but it also would
25   hinder the criminal investigation as far as getting

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

134

1   a sworn statement from somebody else that could
2   contradict.
3       Q.      Okay.  And then the following page,
4   page 21, this is Isaiah Williams; correct?
5       A.      Yes.
6       Q.      Okay.  And then page 22, tell me what
7   this is.
8       A.      I'm just -- curiosity for me, just
9   before, because we spoke on this was unaltered.  It
10  shows his birthday blacked out.  I did not black out
11  his birthday on there.
12      Q.      So when we get provided the document
13  from Craig, there's -- even though he's technically
14  our client, there's certain things that they always
15  black out to protect people's privacy interests.
16          So as we go through here -- I don't
17  think there's any Social Security numbers, but it's
18  just the practice of attorneys, when we have Social
19  Security numbers or birthdays, stuff like that, we
20  just -- they redact it before they provide it to us.
21      A.      Okay.  I just want to make that clear,
22  that I did not redact a birthday on here.
23      Q.      Yeah, I know.  And I don't know if there
24  will be any more.  But if we come through a passage
25  in here where it's a black mark like that, it's

135

1   Craig's office that did it.
2       A.      Okay.
3       Q.      And then what's the following page, 22?
4       A.      That would be Officer Kubla's injuries
5   that he sustained during the incident.
6       Q.      And -- okay.  And then the same thing
7   on -- or, sorry.
8          What's page 23?
9       A.      Photographs of Officer Kubla's gear, to
10  include his injuries to his arms, his leg, and then
11  the bullet entries into his vest and holster.
12      Q.      And you didn't take these -- none of the
13  photos you took; correct?
14      A.      No.  That's all done by our crime scene
15  analysts.
16      Q.      And you have access to this through
17  the -- what was it called?  Not P drive.  H drive?
18      A.      So this does not go into our H drive.
19  This is on OnBase, which is a system the
20  department uses to document reports and photographs.
21          So if you are given the access to
22  critical incidences like this -- so not everybody
23  could look up this report number, this event number,
24  and see who -- or see all the pictures.  Only people
25  with certain access to certain cases could get that.

136

1   But it's done through a system called OnBase.
2       Q.      Okay.  And then the following page,
3   what's this?
4       A.      Officer Clements' injuries.
5       Q.      Okay.  And then the following page?
6       A.      Isaiah Williams' injuries.
7       Q.      Okay.  And, again, this is done by the
8   crime scene investigators; correct?
9       A.      So this -- the diagram that you are
10  seeing right here is done by FIT.  So this is from
11  the FIT report, as it says, I think, on the second
12  line above.  It says "Per the FIT report."
13          They attend autopsy.  We do not attend
14  autopsies.  So we are going based on the information
15  that was gathered from FIT.
16      Q.      And the autopsy -- because as we go down
17  the page, there's a toxicology report.
18          So that's straight from the autopsy;
19  correct?
20      A.      From the FIT report.  I can't speak on
21  the fact it was done specifically from the autopsy.
22  But from my understanding is that it was just in the
23  FIT report, and that's what we're going on.
24      Q.      Again, the FIT report, that is actually
25  published; correct?

137

1       A.      Correct.  I believe so.  So I'll give
2   you a 90 percent sure.
3       Q.      That's fair.  All right.
4          And so then turning on to page 27, did
5   you put this chronology together?
6       A.      Yes, ma'am.
7       Q.      Okay.  How long did this take you to do?
8       A.      It's relative to the case.  I can't tell
9   you how long it took me to do.
10          As far as this is usually what I do
11  toward the end of a report, to where I make sure
12  that anything that is relevant to the actual report
13  itself is notated in the timeline.  That way if
14  there's any discussion on when something happened
15  that's referenced to the report, it's in there.
16          I don't want to put -- just for an
17  example, let's say, if we're talking about what
18  happened after this OIS, I'm not going to put when
19  Sergeant X arrived that was part of Southeast Area
20  Command because there's no relevance to it.
21          So I can't tell you exactly how long it
22  took, but this is just a culmination of the entire
23  report.
24      Q.      And so if I understand your prior -- the
25  testimony you just provided, this is also a timeline

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

138

1  of what you think relative time points are
2  throughout the case; correct?
3      A.    Throughout the report.
4      Q.    Sorry.  Throughout the report.
5      A.    Yes.
6      Q.    Okay.  And so if we now want to turn to
7  page -- we'll skip ahead to 30.  Because we're going
8  to talk about the timeline, so we won't actually go
9  through that now.
10     A.    Okay.
11     Q.    And I want to clarify.
12         So it seems like in the investigative
13  narrative, you open it by kind of making a
14  distinction between -- there's an active
15  investigation.  So I took that to mean that you
16  might have more information now, but in terms of
17  what's in this investigative report, or in this CIRT
18  report, is that you put in what was known at the
19  time?
20     A.    Correct.  And that's from -- so from my
21  understanding, I don't even know if this homicide
22  was ever closed.  We have no -- I guess jurisdiction
23  would be a term to use.  But we have no reason to
24  look into a homicide case.  We're basing everything
25  off of what these officers knew at the time.

139

1         So I don't know if this homicide
2  investigation has been closed, been solved, been
3  cold-cased.  I have no idea one way or the other.
4      Q.    Okay.  And -- okay.
5         And so this photo in here, this is the
6  underlying Mr. -- sorry.  This is Mr. Thomas' --
7  this is the video from Sam's Town of Mr. Thomas'
8  homicide; correct?
9      A.    Not of the homicide.  This is at some
10  point he had walked to the casino and then
11  collapsed.  This is body-worn camera from the
12  first-arriving officer who arrived as medical units
13  or security medical were attempting to, I guess, put
14  pressure on the wound or CPR.
15         But this is not where the homicide took
16  place, or at least the shooting took place.
17     Q.    If you go to the next page, page 31 --
18     A.    Okay.
19     Q.    -- where did you pull this map from?
20     A.    This was from our understanding -- so
21  this is from Google Earth.
22         Is that the question?
23     Q.    Yes.
24         And so let's turn the page then to
25  page 32.  And this is the -- do you know if this has

140

1  been -- like, is this what the officers -- the
2  officers investigating the homicide, is this the
3  quality and nature of the video they would have seen
4  at the time?
5      A.    Well, it's significantly more grainy on
6  this, which is a -- on black-and-white photograph,
7  not in the same resolution that you would see.
8         I will say that the video that was
9  obtained from that Chase Bank was put out on
10  LVMPD YouTube, and it was not at a high quality.  It
11  was the same quality in the report and in the videos
12  that we had that we released.
13         I don't know the exact quality.  I'm not
14  really proficient on P&I when it comes to clarity of
15  videos or photographs in color.
16     Q.    Unfortunately, I can't make it part of
17  the record.  But I will show you a color photograph
18  because I have it on my computer in color.
19     A.    Now you just turned off.  But I can tell
20  you -- I can tell you that that is a screenshot --
21     Q.    Okay.
22     A.    -- from the highest resolution available
23  to me at the time.
24     Q.    Okay.
25     A.    If that makes sense.

141

1      Q.    Yes.  But I guess my question, was this
2  the highest resolution of what the officers -- like,
3  is this what the -- is this the highest resolution
4  of what the officers would have had too?
5      A.    Of -- yes, of any video.  There was no
6  clearer version of that.
7      Q.    Okay.  And so that would be the same
8  thing then on the following page; correct?
9      A.    Correct.
10     Q.    And this -- I'll turn this around and
11  show you.  This is the color version.
12         And to the best of your memory, this
13  accurately represents --
14     A.    Outside of me putting the tags on there,
15  the red tags and the circles, that is a screenshot
16  of the video itself in a still frame.
17     Q.    And so are you -- are you the one taking
18  the screenshots?
19     A.    Yes.
20     Q.    Okay.  Do you remember why you chose
21  these frames?
22     A.    It clearly, as best possible, showed the
23  subjects involved in this homicide as best possible,
24  as you said.  They're not exactly the most
25  high-definition photographs or videos.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

142

1    But the homicide itself, the individual
2  that is circled to the farthest right, where the
3  line is pointing to it, it says "Unknown Suspect" --
4  not the one that says "Thomas and Unknown
5  Suspect" -- "Unknown Suspect" I believe goes in
6  front of a tree right before the homicide.
7    So this just shows the same person
8  wearing the same clothing was pictured from this
9  angle, to the best of the ability to illustrate to
10 somebody that doesn't have access to the video,
11 that's just reading the report, that this is the
12 same person that was shown on the previous page, of
13 page 32.
14 Q.    But it's a different --
15 A.    Different angle from the bank.
16 Q.    Okay.  Then the following page,
17 page 35 -- sorry.  A few pages up.
18    And my -- normally, when you're doing a
19 CIRT report, would you include this much discussion
20 about the underlying homicide investigation?
21 A.    No.
22 Q.    Why was that included in this report?
23 A.    I was ordered to.
24 Q.    By whom?
25 A.    By, I'm assuming, executive staff.

143

1    I explained my concerns, as being in the
2  unit for three years, of not focusing narrowly on
3  the actual application of use of force and the
4  tactics that were involved with it.  However, when
5  that was run up the chain of command -- my captain
6  at the time was Carlos Hank.  He relayed those
7  concerns, and we were told to go into the homicide
8  investigation.
9    I don't know who made that decision.  At
10 the time the executive staff was under Joe Lombardo,
11 and Chris Darcy was the undersheriff.  I can't tell
12 you who made that decision for us to do that, but
13 that was what was determined.
14 Q.    Okay.  And so then if we turn to page 35
15 of the report, that's a traffic stop; correct?
16 A.    Correct.
17 Q.    And that was based off the license?
18 A.    I believe so --
19 Q.    I don't see a license.
20 A.    So it might have been a front plate.
21 I'm not exactly sure how this was -- I know that it
22 was in their case notes as far as the homicide
23 investigation was going, completed by the IS, which
24 is investigative specialist.
25    This was maybe -- you know what this

144

1  was?  It was a stop.
2    So this traffic officer probably got the
3  information of the car, whether it be a temporary
4  tag or prior registration or current insurance, and
5  then inputted that into the citation, which would
6  trigger then a previous event.
7  Q.    And then going to the next page,
8  page 36, I understand from having read the content
9  of the report -- I wanted to kind of ask though --
10 so these -- what are these called?  They're just --
11 are they cameras around town that capture people's
12 license plates?
13 A.    Automatic -- sorry.  Automatic license
14 plate readers.  They're at fixed positions.
15    A lot of tow trucks actually have
16 them on the front.  We have access to those.
17 And those get compiled into a database, and I
18 believe Fusion Watch, which is a section of our
19 department, gets notification if there's a hit on
20 the plate, whether it be a stolen vehicle or
21 anything like that.
22 Q.    But it's also searchable; correct?
23 A.    It's also searchable, yes.
24 Q.    And then if you can turn to the
25 following page, page 37, can you tell me what

145

1  that is?
2  A.    This looks like a PIO, which is the
3  Office of Public Information.  Their immediate
4  release referenced the homicide detectives looking
5  for help.  It's just a one-page memo asking for help
6  from the community.
7  Q.    And then we'll skip ahead a couple of
8  pages to page 39.
9  A.    Okay.
10 Q.    I'm sorry.  If we can go back to 38,
11 please.  Sorry.
12    Can you tell me what that is?
13 A.    So this was a call for service that
14 happened at the area of 3050 South Nellis, where the
15 service of the search warrant eventually happened.
16 This was a call for service, referenced an
17 individual in a white Ford, I believe it was.  And
18 he had an AR-15 on his back, and the person
19 reporting noted that he was wearing an ankle
20 bracelet.
21    So this is tracking from Corvell Fisher,
22 who was the individual who was tracked on that ankle
23 bracelet, and kind of his movements per that
24 electronic monitoring system that correlated with
25 the events that the person reporting gave to

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

146

1  officers.
2      Q.     So they were able to track Corvell's
3  location; correct?
4      A.     Yes.
5      Q.     And they --
6      A.     On that -- sorry.  On that day.  I don't
7  remember if it had gone dead or if he cut it off at
8  that point.  But I know at one point it wasn't
9  showing or something.  But at that day and time,
10  yes, it was recording.
11      Q.     Okay.  And then on page 39, you're
12  talking about the surveillance requested at
13  4475 Jimmy Durante Boulevard.  And in the center of
14  the page you state, "The surveillance objectives on
15  the surveillance request were listed as," and then
16  you list them off.
17          Why did you include that section in your
18  report?
19      A.     It was factual.  It was what they were
20  identifying they were looking for, for those
21  individuals.
22      Q.     Okay.  And then the following page,
23  what's that?
24      A.     Two photographs.  One of Ariel Soto.  I
25  believe she was the registered owner of that vehicle

147

1  they were looking into.  And an unknown male is the
2  second photograph with her.  And this is just going
3  to their surveillance for the days that they were
4  looking at that Jimmy Durante address.
5      Q.     And this is related to the underlying
6  homicide; correct?
7      A.     Correct.
8      Q.     Okay.  And then the next page?
9      A.     This is a photograph of an unknown male.
10  Again, related to the apartment numbers that Soto
11  was frequenting.  I'm not sure -- I think this male
12  went to the Circle K maybe, without reading it.
13          It was just outlining of the photographs
14  of the person who they were taking a photo of.
15      Q.     Okay.  And then the next page, page 42.
16      A.     This is individual, again, photographed
17  that was frequenting the car or the apartment that
18  was frequented by Soto.
19      Q.     This turned out to be somewhat of a
20  controversial photo or suspect, didn't it?
21      A.     Yes.
22      Q.     Okay.  And why was that?
23      A.     This individual had a shaved head.  I
24  have "Unknown Subject" there because there was a
25  controversy of is this a male or a female.  It's

148

1  undetermined from that point from investigators if
2  that was a male or a female.
3          There was also a sweatshirt that was in
4  question that was identical in nature as far as it
5  being a Puma sweatshirt, hooded sweatshirt.
6  However, it was a different color than the one that
7  was worn on the night of the homicide.
8      Q.     In your personal opinion, does that look
9  like a man or a woman?
10      A.     Are you saying as far as this report
11  goes?
12      Q.     Yeah, I'm asking for your personal
13  opinion.
14      A.     It's a shaved-head individual.  Without
15  saying -- it's hard to tell from it.  I can't say
16  one way or another if it was a male or a female or
17  not.  There's no identifying markers.  You can't
18  see.  It's not an exposed shirt.  It's a hooded
19  sweatshirt.  It's an individual with a shaved head.
20          Could I see an argument for both ways?
21  Yes.  But there's no way to definitively -- I
22  wouldn't say it's definitively a male.  I wouldn't
23  say it's definitively a female.  I would say it's
24  unknown is the way I presented it.
25      Q.     And then if you -- if you turn to

149

1  page 43.
2      A.     Okay.
3      Q.     And these are just more individuals
4  that they saw coming and going from the unit;
5  correct?
6      A.     Correct.  And they identified Devonte
7  Reynolds as one of these individuals, and I don't
8  know how they identified him as that.  But that's
9  why he's not pictured as "Unknown Male."  He's
10  "Devonte Reynolds."
11      Q.     Okay.  And turning then to page 44,
12  there's an outline of a shooting at 3050 South
13  Nellis; correct?
14      A.     Correct.
15      Q.     And you talked about that briefly
16  before, when we looked over the photo of the
17  location of his ankle monitor; correct?
18      A.     These were two separate instances.
19      Q.     Okay.
20      A.     The one on the 12th was where Corvell
21  Fisher or a subject described as a black male
22  wearing a white T-shirt and black shorts, I believe
23  it was, had a rifle over his shoulder or strapped to
24  his back, and he had an ankle monitor on.  This is a
25  different case from that.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

150

1    Q.    Okay.  And what was this case?
2    A.    This was a shooting that took place I
3    believe over road rage inside that same apartment
4    complex.  The event happened six days after the
5    event that you were just speaking of on the 12th
6    with the rifle over the back.
7          And this individual, I believe it was in
8    Wattsel Rembert's car that was recovered later that
9    was involved in the road rage traffic accident,
10   where the individual that was fighting with the
11   victim of this shot up the apartment complex.
12   Multiple rounds were fired.  I believe in the 20s if
13   I had to go off memory.  I can't find it right here.
14         But in the back of that car, after a
15   search warrant was done of the vehicle, after it was
16   determined to be unoccupied, this MP5-style pistol,
17   which looks like a rifle but is legally a pistol,
18   was recovered in the back.
19   Q.    And so these -- I mean, as we kind of
20   talk about these different incidents, not including
21   the actual surveillance itself, but as we talk about
22   the different incidents and stuff, these are all
23   part of, like, public record; correct?  Because
24   there would be, like, police reports associated with
25   them?

151

1    A.    Yes.
2    Q.    And so now if we can please turn to
3    page 45.
4    A.    Okay.
5    Q.    And so who is Janetta Rembert?
6    A.    That would be the stepmother of Wattsel
7    Rembert.  Or some relation.  I don't believe it's
8    her blood son, but his relation -- she says she was
9    his mother, but I think there was some confusion on
10   that.  I think eventually it was like stepmother or
11   something like that.
12   Q.    Did you listen to the actual interview
13   itself?
14   A.    I watched the whole thing.  It was a
15   video-recorded interview.
16   Q.    And my understanding is that she
17   had made some inference at the end that Wattsel
18   was saying that the police weren't going to get him.
19         I mean, did she come out and say that,
20   or did she make some inference about it?
21   A.    I don't recall.
22   Q.    And you tell me if I'm right or
23   wrong.  If you turn to page 48 -- because you're
24   citing the interview with who we presume to be
25   Wattsel's stepmother, and she's saying she can

152

1    identify him from the video.  You then take the
2    snapshot of the video again; correct?  And this is
3    the same snapshot you had earlier in the report;
4    correct?
5    A.    Correct.
6    Q.    And then you also then -- I mean, you
7    interviewed -- I mean, you interviewed Detective --
8    is it Grimmett or --
9    A.    Grimmett.
10   Q.    Yeah, Grimmett.
11         You yourself interviewed Detective
12   Grimmett; correct?
13   A.    Yes.
14   Q.    Okay.  And so you talked about during
15   the CIRT interview, when you pulled this -- this
16   is -- this is excerpts from Dr. -- Detective
17   Grimmett's actual interview with you?
18   A.    Correct.
19   Q.    And it would appear that part of your
20   discussion or cross-examination, for lack of a
21   better term, with Detective Grimmett was whether or
22   not he felt that Janetta Wattsel [sic] was a
23   reliable informant; is that correct?
24   A.    Correct.
25   Q.    And why were you trying to determine

153

1    that?
2    A.    Because we were tasked with breaking
3    down the homicide investigation of where it was at
4    that point, and it was important for me to get the
5    full story of why he believed that individual was a
6    reliable source.
7    Q.    And then you walk through the LVMPD --
8    so this isn't the SWAT policy, though.  This is --
9    A.    Which page?
10   Q.    Sorry.  I'm sorry.  Page 50.
11   A.    Okay.
12   Q.    And this is the actual LVMPD policy
13   about relying on informants; correct?
14   A.    Correct.
15   Q.    Okay.  So if you turn to page 51, if we
16   go down, it's the -- hold on.  It's this paragraph
17   right here (indicating).
18   A.    Okay.
19   Q.    The last full paragraph before the end
20   of the page.
21         It talks about Janetta and Ty'Shawn, and
22   it says "were reliable witnesses coming forward
23   without provocation."
24         Is this your analysis?
25   A.    I believe that was the analysis of the

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

154

1   section. Not specifically my opinion, but it was
2   the analysis of the section that they were reliable
3   witnesses coming forward without provocation. And
4   that met the policy and the statutes.
5       Q.    Okay. And so then if we turn to
6   page 52 --
7       A.    Okay.
8       Q.    -- it talks about -- this talks about a
9   surveillance -- what's TASS?
10      A.    TASS is a -- the technical -- again,
11  acronyms with our department. Essentially they do a
12  lot of -- they're responsible for the surveillance,
13  covert surveillance, with electronic devices.
14          So if you needed cameras put up
15  somewhere that were either covert or overt, they
16  would be the unit to do that. We don't have access
17  to them as detectives just randomly. You have to go
18  through TASS to get that equipment put up, and they
19  have procedures on how they are able to do that or
20  not do that.
21      Q.    And so is it just putting up cameras, or
22  is it also doing surveillance?
23      A.    TASS doesn't do the surveillance
24  necessarily. Those are specialized units within the
25  department. Criminal Intel I believe is what they

155

1   are. TASS will just get the equipment in place.
2       Q.    But no equipment was put in place
3   regarding this investigation -- sorry, regarding the
4   surveillance at 3050 South Nellis; correct?
5       A.    Correct. And -- I'll reserve that. If
6   you ask about it, it's more technical jargon.
7       Q.    And so then turning the page to page 53,
8   are these the photos of when the surveillance team
9   at 3050, for lack of a better term, got burned? Is
10  that how you would say it?
11      A.    Yes. And that was from their notes from
12  the CIS, which is that Criminal Intelligence
13  Section, while they were conducting the
14  surveillance, that an unknown male was peeking into
15  cars, and they felt like that was
16  counter-surveillance on their position.
17      Q.    And this was the rough -- this was the
18  totality of like an hour and a half of surveillance
19  on this entire -- on the South Nellis Boulevard
20  unit; correct?
21      A.    I don't remember the time exactly, but
22  it's around there.
23      Q.    You have it in your timeline.
24          If we go to page --
25      A.    So, yeah, about an hour and a half.

156

1       Q.    Yeah.
2       A.    Yep.
3       Q.    And so if you turn to page 54, the very
4   last sentence. This is the sentence from the CIRT
5   report.
6           "This was the only surveillance
7   operation conducted at 3050 South Nellis Boulevard,
8   Apartment 1125. Wattsel and Fisher were never
9   identified inside of or around the apartment."
10          And that's your synopsis of the outcome
11  of the surveillance; correct?
12      A.    Correct.
13          THE WITNESS: Before we get into this
14  next section, can I take a quick break?
15          MS. MURPHY: Absolutely.
16          THE VIDEOGRAPHER: Off the record at
17  12:31 p.m.
18          (A break was taken.)
19          THE VIDEOGRAPHER: On the record at
20  12:52 p.m.
21  BY MS. MURPHY:
22      Q.    And so, Justin, before we took a break,
23  I think we were roughly on page 55 -- that seems to
24  be the same page you're on -- on the CIRT report.
25          And so can you just tell me what

157

1   this is?
2       A.    This is a picture I believe from the
3   second day of surveillance on the Jimmy Durante
4   address of two unknown individuals exiting one of
5   the apartments associated with the vehicle
6   belonging to Soto.
7       Q.    Okay. And turn the page to page 56.
8       A.    Same -- same thing. Individuals who are
9   associated with either the vehicle or the apartment,
10  that were going in and out of that apartment or
11  vehicle.
12      Q.    And the CIRT investigation didn't have a
13  problem, other than the potential misidentification
14  of the woman, but the CIRT investigation didn't have
15  a problem with the amount or -- the amount of
16  surveillance that was done on Jimmy Durante;
17  correct?
18      A.    Not necessarily. "Problem" is maybe the
19  wrong word. Obviously having the more surveillance
20  the better.
21          But what they determined was they had
22  sufficient evidence of that vehicle being
23  associated to Jimmy Durante because that individual
24  was going in and out of the apartment and operating
25  the vehicle they believed to be a part of the

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

158

1    homicide.
2         As far as the other address, again,
3    perfect world, you would like to see -- and I'm not
4    sure if we've gotten to it yet. We haven't gone
5    past it yet. But the CIS team, Criminal Intel
6    Section, especially Team 5, I believe, is the team
7    that is the super-secret team --
8    Q.    Is that its official title?
9    A.    Not their official title. But they're
10   people who don't even -- they don't associate with
11   cops. They are very, very undercover. They were
12   the team that got burnt on this.
13   Q.    "On this" you mean the 3050; right?
14   A.    On the 3050, correct.
15        And when there's -- the way that
16   apartment complex was situated, where that door was
17   situated, it was extremely difficult to get live
18   eyes on that door because of the angles.
19        It was also difficult -- not difficult,
20   but also borderline impossible, based on TASS's
21   requirements when it comes to getting cameras up,
22   because of power sources needed to be available.
23   Q.    We're going to get to all that. Don't
24   worry.
25   A.    Okay.

159

1    Q.    It's in your report.
2    A.    Sure. But I'm going with the --
3    Q.    Okay.
4    A.    -- surveillance part of it.
5    Q.    Okay.
6    A.    So could you have done more
7    surveillance? I'm not sure. I'm not -- I'm not
8    part of that CIS squad.
9    Q.    But when you talk about "more," you're
10   talking about 3050; right?
11   A.    Correct.
12   Q.    Okay.
13   A.    I'm not sure if that would be something
14   that would be reasonable. Because of the way it's
15   angled and because they had just previously -- the
16   best team we have on the department just got burned.
17   I'm not sure if that would be reasonable enough to
18   continue to do that for officer safety purposes, if
19   that makes sense --
20   Q.    It does.
21   A.    -- as far as the surveillance goes.
22   Q.    No, I get that. But regardless, there
23   were still a bunch of unknowns; correct?
24   A.    Sure.
25   Q.    That made their decision on the tactics

160

1    improper, based on the number of unknowns they had;
2    correct?
3    A.    And there are other ways to determine
4    identities outside of surveillance. So surveillance
5    isn't the only key.
6         So to say there wasn't enough
7    surveillance for this operation is subjective based
8    on what the outcome was. It's not the end-all,
9    be-all of how we get intelligence of who's living
10   where.
11   Q.    But they didn't do the other
12   intelligence mechanisms either; correct?
13   A.    I guess we'll get to that when we
14   read it.
15   Q.    Correct.
16   A.    But as far as -- not all of them that
17   were available to them.
18   Q.    Okay. And so now if we turn to
19   page 57 --
20   A.    Okay.
21   Q.    -- this has to do with the search
22   warrant itself.
23        And, again, your knowledge of
24   completing and filling out search warrants, as you
25   testified to earlier, was the foundation for you

161

1    volunteering to be the CIRT investigator on this
2    case; correct?
3    A.    Correct.
4    Q.    Okay. And in where you are citing --
5    where you are citing the content of the 3050 South
6    Nellis Boulevard search warrant, you have several
7    items that are highlighted and bolded.
8         Why did you bold those items?
9    A.    I think the "Any and all firearms" might
10   have been bolded due to them being involved in the
11   homicide.
12        "Cellular phones" would be something
13   that you could track somebody with.
14        And the "Clothing" was specifically
15   mentioned inside of the statement.
16        I'm not sure if those were bolded on the
17   actual content. If they are -- do you have a copy
18   of the actual search warrant? They might have been
19   bolded on there. I might not have bolded them.
20   Q.    I don't -- I'll represent -- I am going
21   to try to refresh -- I'll see if I can find the
22   actual search warrant.
23        But my understanding of why you bolded
24   these is because there were issues with the
25   descriptions -- the descriptions themselves.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

162

1      Like, you go on to say why "Any and all
2  firearms" is not -- it's improperly vague, the
3  "Cellular phones" is improperly vague, and the
4  "Clothing" is improperly vague, based on the
5  standard of how somebody is supposed to fill out a
6  search warrant.
7     A.   Okay.
8     Q.   I'll refresh your recollection and keep
9  going.
10    A.   Sure.  I just wasn't sure.
11    Q.   No, that's okay.
12         And so, like, if you go down right to
13  the bottom of the page, like on the last line, last
14  paragraph -- or the second-to-last line, right, you
15  talk about Thomas -- the murder -- the body -- was a
16  small caliber, possibly a .22 or .25 caliber, per
17  the IAP and officer's reports.
18         So the understanding is the Number 1,
19  "Any and all firearms," they actually know what
20  caliber firearms they're looking for?
21    A.   Correct.
22    Q.   So in that context, would any -- "Any
23  and all firearms" is an improper way to fill out a
24  search warrant; correct?
25    A.   So improper?  No.

163

1      I will say this:  Is that these
2  detectives met the minimum requirements that were
3  established by policy and by their department
4  manual.
5      I will say that I did have several
6  questions about those vague mentionings of "Any and
7  all firearms," "Cellular phones," and "Clothing,"
8  which I would have loved to interview the DA that
9  approved it and the judge who signed it.  However,
10  that wasn't in our purview, being an administrative
11  investigation.
12         At the end of the day, it met the
13  minimum requirements for LVMPD as far as the content
14  of the search warrant, and it was signed by a judge
15  and a district attorney.
16         So as far as arguing the validity of the
17  search warrant, we can say that it should have been
18  more specific to those items.  And, again, I can't
19  inject my personal opinion into this.  But we're
20  just pointing out the obvious of what was mentioned
21  in those reports, like I mentioned in this report.
22  But it was determined that this was minimum
23  requirements of LVMPD, and it was signed by a judge
24  and signed by a district attorney.
25         And my assumption would be that they got

164

1  the same information, they read the same search
2  warrants, and were present with the detectives when
3  those were signed.
4      So that's -- when we talk about
5  improper, if it was improper, then I feel like
6  that's more of a legal standpoint.  But as far as
7  LVMPD is concerned, they met the minimum
8  requirements.
9     Q.   So just listing off "Any and all
10  firearms" meets the requirement of describing with
11  particularity the items or things to be considered
12  under LVMPD Policy 5/200.01, Section B [sic]?
13    A.   Again, it was hard for us to say that
14  was improper when a judge and a DA said it was
15  acceptable.
16         And I get we're talking about policy
17  versus law, but a lot of our policy is constructed
18  off of NRS.  So when we're discussing those aspects,
19  I wish I could have asked those questions to the DA
20  and to the judge, because that would help me with a
21  little bit of clarity of had they known that that
22  was -- specifically when we talk about the
23  sweatshirt and -- later on in the report, and
24  firearms.
25         Now, I will say that putting "Any and

165

1  all firearms" is something that is common because
2  bullets can get degraded in bodies when they go
3  through the trauma of bullets.  So they can fragment
4  off.  They can look smaller than they appear.  It's
5  not uncommon.  So "Any and all firearms" is
6  something that would be acceptable from, again, that
7  minimum standard.  Because without the gun
8  specifically there with you, you can say it's a
9  smaller caliber, but do we really know?
10    Q.   Well, you describe it as "too vague" in
11  here.
12    A.   Correct.  Our -- our unit came through
13  as saying "too vague."
14         But at the end of the day -- and I
15  believe the conclusion reflects this, and correct me
16  if I'm wrong -- it seemed to be reasonable on the
17  search warrant, if I'm correct.
18    Q.   Okay.
19    A.   So we identified that it is vague.  And
20  that's why we interviewed those two detectives.
21         And I'd like to determine that real
22  quick that that's what the conclusion meant,
23  because, again, it has been a second.
24    Q.   Justin, however you want -- that report,
25  that's your version, so however you want to flip

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

166

1  through it to give your best and most accurate
2  testimony, please feel free.
3      A.     Okay.  So my mistake.  I would like to
4  strike all that, what I said.  I was giving my
5  interpretation of that policy as it was written
6  through legal's aspect as far as being a good
7  search warrant.
8          We did say that it was not acceptable.
9      Q.     Okay.  No worries.  Listen, what I -- my
10  whole -- I'm really not trying to trick you on
11  anything.  So however you need to do this to give me
12  your best and accurate testimony -- I know I already
13  said that, but that's a -- I really want you to do
14  that.
15     A.     Sure.  And just to explain.
16         Again, team effort.  So looking at
17  things, sometimes the -- my recollection of things,
18  obviously being a -- somebody who's done search
19  warrants was why I had an issue with it being too
20  vague.
21         However, I guess where I got maybe
22  tripped up was is it a good search warrant.
23         So yes, it's still a good search
24  warrant, based on the fact that it was signed by a
25  DA and a judge.

167

1      Q.     Okay.  And that's fair.
2          So if we can skip ahead to page 61.  And
3  the paragraph right over the -- I think this is --
4  right over the photo.
5      A.     Okay.  61?  I'm sorry.
6      Q.     Yeah.  You pull out the statement --
7  sorry.  You pull out the end of the probable cause
8  statement provided by Dr. Grimmett.  Open quote,
9  "One of the males was observed wearing clothing like
10  the clothing worn by the shooter, a Puma brand
11  sweatshirt with a vertical stripe down both
12  sleeves."
13     A.     Correct.
14     Q.     And so you highlight then, is that this
15  the -- as Detective Grimmett describes the male,
16  this is in fact described as a female in the
17  surveillance logs; correct?
18     A.     Correct.
19     Q.     And then the following -- the following
20  page, page 62, that's you interviewing -- or that's
21  you, yeah, interviewing Detective Grimmett about
22  that; correct?
23     A.     I was in the interview.  I'm not sure if
24  this was me actually asking the questions.  But,
25  yes, I was part of this.  It could be me asking the

168

1  questions.  But yes.
2      Q.     Okay.  Well, sorry.  That's fair.
3          This is part of the CIRT interview;
4  correct?
5      A.     Yes.
6      Q.     Yeah.  And he's essentially justifying
7  why he felt it could go either way; correct?
8      A.     Yeah.
9      Q.     Okay.  But as is later discussed within
10  the report, the sweatshirt itself is also different?
11     A.     Correct.
12     Q.     And if you turn to page 64, you created
13  this side-by-side; correct?
14     A.     Correct.
15     Q.     And what was your purpose in creating
16  the side-by-side?
17     A.     To show that the sweatshirts are
18  similar, meaning that they are from the same brand,
19  the same style, the same everything, except they are
20  reverse color-schemed.  Which -- and, again, the
21  explanation was something along the line of gang
22  members buy multiples of the same shirts in
23  different colors was, I believe, their testimony on
24  that.
25         But to show that we're talking about a

169

1  specific sweatshirt here did not match the actual
2  sweatshirt that was inside of the surveillance
3  photo -- or video, sorry.
4      Q.     Correct.  Okay.  Thank you.
5          And then there's -- I'll represent -- I
6  don't think we need to go over it.  I'll represent
7  to you it's pages and pages of Detective Grimmett
8  fighting with whoever the CIRT interviewer was.
9      A.     Probably me.
10     Q.     Probably you.
11         And this is described as -- in your
12  CIRT report -- sorry, in the CIRT report, on
13  page 80 -- sorry, on page 68, it says, "The omitted
14  information was exculpatory evidence, and the color
15  of the sweatshirt and alleged sex of the unknown
16  subject, as observed by surveillance detectives in
17  the surveillance logs, should have been added in the
18  warrant."
19     A.     Correct.
20     Q.     And was that part -- and I'm sorry,
21  there's so many conclusions now, I don't remember
22  off the top of my head.
23         Was that -- was that something that was
24  effected as a recommendation, that they should start
25  including exculpatory evidence in the warrant

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

170

1  applications?
2      A.    I don't know if that was a
3  recommendation.  I think it was something that
4  should have been done either way.  I believe it was
5  in policy.  If not, I can look through there, but
6  I'm not sure -- again, you talk about the reason why
7  I took this case is search warrant experience.  And
8  I can't put my personal of what I would have done on
9  there because I have to be very objective on what is
10  in front of me and why was it done.
11          At the end of the day, the
12  determination was that color should have been
13  added to the warrant because we don't know if the
14  judge or the DA had access to the pictures that
15  would show it otherwise not.  That was our concern,
16  but we couldn't confirm that because we weren't
17  allowed to talk to them.
18      Q.    Okay.
19      A.    I'm just trying to find your -- the
20  question referenced the --
21      Q.    We can actually put a pin in that and
22  come back to it at the end.
23      A.    No, there is.  It's Section B of 9.2,
24  "Current training and policy does not mandate
25  detectives to include exculpatory evidence when

171

1  completing a search warrant.  CIRT recommends
2  verbiage be added to the Search Warrant lesson plan
3  and Department policy," which I think has been done.
4  And that was obviously a concern of ours.
5      Q.    Okay.  And then if you want to turn to
6  page 70.  You can skip all the fighting between you
7  and Detective Grimmett.
8      A.    It wasn't necessarily fighting.
9      Q.    Intense discussions?
10      A.    Differences -- differences of opinion.
11      Q.    Fair enough.
12          So page 70.  So this is the "Search
13  Warrant Incident Action Plan"?
14      A.    Correct.
15      Q.    And so this is the -- what we call --
16  this is the IAP that we refer to throughout -- I
17  mean, this is going to be the next --
18      A.    I believe this is Version 1 of the IAP.
19      Q.    Yeah.  And so, I mean, we can -- I think
20  on the IAP -- we'll weave through the report as
21  well, but it seems that you're very familiar with
22  these issues.  So if you just want to briefly walk
23  me through, what were the issues with the IAP?
24      A.    Well, specifically, the IAP had changed,
25  and there was no administrative notice to any

172

1  detectives that it had changed.
2          One of the people who was responsible
3  for that change was Lieutenant Johansson, who is on
4  the search warrant committee, who was one of the
5  authors or one of the signatures on this page.
6          So when this got to him to approve it, I
7  believe from his statement, just off memory, that he
8  recognized it.  Or maybe it was Captain Cole.
9  Somebody recognized that it wasn't the new 14-page
10  document, which is very similar but just asked for
11  more questions to help SWAT make a determination.
12  And this was only 11 pages long.
13          The reason why this was something,
14  11 versus 14, is there was a reproduction of
15  pages that was denied.  Yeah, so it was
16  Captain Cole who said, Please resubmit on the new
17  SWAT IAP that was provided to all lieutenants a
18  couple weeks ago.
19          So it was just him, after he got it as
20  the SWAT commander, recognizing that it wasn't the
21  new one that was finalized but not pushed through
22  the department, just through the lieutenants.
23          So when it was returned through, what
24  caught our eye, and it was not caught by the
25  reviewers of this, was that at one point I believe

173

1  it was page 7 that was duplicated, but it was page 7
2  of 11 and then page 7 of 14.
3          Which, again, if you're reading this on
4  a phone, on a tablet, you're not looking for page
5  numbers; you're looking for content.  So I can see
6  how that was missed.  But then you would have seen
7  that it was part of the old IAP.
8          So essentially what they did was, to
9  save time, they blended the old IAP with the
10  current IAP.
11      Q.    So Frankenstein?
12      A.    Frankenstein's monster.
13      Q.    And so that was one of the issues;
14  correct?
15          Like I said, we'll get to the
16  recommendations as well.  But one of the
17  recommendations was to provide training to everyone
18  on this; correct?
19      A.    Correct.  And that has happened.  We've
20  gotten several IAPs since then, which are all on the
21  document that was ...
22      Q.    Are you proud of the work that you did
23  on this case?
24      A.    In what respect?
25      Q.    Are you proud of the work product?  I

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

174

1    mean, are you proud of the outcome of it?  Are you
2    proud of the work product?
3        A.      The -- obviously with this being such a
4    very detailed, long presentation -- 12 hours on the
5    use-of-force board and tactical review board is
6    about six hours longer than anyone has ever been
7    through CIRT -- it was extremely stressful.
8             So to say that I'm proud is a
9    double-edged sword, because I try to put my all.
10   That's why I'm still here.  I should have left, if I
11   was really smart about it, just for my own mental
12   well-being.  But I kind of put it aside and I pushed
13   through, and I'm glad I pushed through, because I
14   really care about this section.  I feel like this
15   section is one of the most important pieces of this
16   department, to make sure that our department is
17   getting better.
18            Now, the question is am I proud of
19   this report?  There are some things that I wish
20   that we would have handled differently as far as
21   some of those contentious interviews that you
22   mentioned.
23            My view from outside of our office of
24   people's view on CIRT is usually not very good.  And
25   then you hear a lot of the stories or the rumors

175

1    about this case that circle around about how people
2    are being treated, which is not the case.
3             But, again, we have to ask those
4    tough questions.  So that's stressful for anybody in
5    our unit.
6        Q.      What are the rumors about how people are
7    being treated?
8        A.      Well, you said it yourself, that it
9    seemed like we were fighting on that interview.
10   Which it was a contentious interview because
11   Detective Grimmett cares about his job as well.  And
12   if somebody is asking you tough questions about your
13   performance on that job, sometimes people get
14   defensive.
15       Q.      So are there rumors that the officers
16   involved in this or the officers leading up to this
17   have been treated differently or --
18       A.      No.  No.  And every time I see the guys
19   who were involved in this, they're very friendly
20   with me.
21            It was -- the section that I believe
22   CIRT should not have handled was the homicide
23   section should have been processed through IA.  If
24   there are policy violations that are not related to
25   a use of force -- and I get it, that's why we're

176

1    there, but that whole section should have been
2    pushed off to IA like we requested.  That should
3    have been an internal investigations investigation,
4    and then this should have been just the tactics,
5    decision-making, and training related to the use of
6    force and the officer-involved shooting.
7        Q.      Okay.
8        A.      The fact that we were ordered to do it
9    otherwise was stressful because it's outside of the
10   scope of our investigation for the most part.
11            So when you say, Are you proud of this?
12   I'm proud of every word that I put on the page.  My
13   name is attached to it because I put my everything
14   into it.  I'll never say that I gave 90 percent.  I
15   always give a hundred percent.  So I'm proud of that
16   fact.
17       Q.      Are you proud of the changes that this
18   report has helped --
19       A.      Absolutely.  I think it's saved lives on
20   both sides of the coin.
21       Q.      Okay.  And so we can kind of skip ahead.
22   Oh, if we can go to page 80.
23            Are you the one creating -- what do you
24   call it?  The callout boxes?
25       A.      Where it says "Handgun magazine"?

177

1        Q.      Yes.  Is this all your handiwork?
2        A.      Yes.
3        Q.      All right.  And the one on page 80 for
4    Corvell or -- yeah, CJ.
5        A.      Yep.
6        Q.      And so this is where they -- in the --
7    in the -- in the search -- in the IAP, they were
8    talking about he's seen with a gun.  You actually
9    circled it.
10            That's not technically a gun; that's
11   just a magazine.  Correct?
12       A.      "Handgun magazine" is what's pictured
13   there.  So, again, dealing in factual -- in the
14   factual realm, I can't say for certain that that is
15   a gun.  It is the assumption that it is a firearm
16   because it is seated in his pocket.  Like, if you
17   put a magazine in your pocket and you place it at a
18   90-degree angle, it's going to fall out of your
19   pocket.  It's attached to something, and most likely
20   it is a gun.  But that picture right there is
21   depicting a handgun magazine.
22       Q.      And it seems like you raised -- sorry.
23   If we turn to page 82, it seems like you kind of
24   raise the issue of whether there should have been
25   separate IAPs for the two different locations.  And

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

178

1    within that, though, you kind of dismiss that,
2    saying, like, no, they're saying it should just be
3    one.
4        A.    Who? I'm on page 82.
5        Q.    Yeah, 82. Sorry. This is from at the
6    end of Captain Cole's interview. You quote him as
7    saying, "Uh, so moving forward, multiple locations,
8    separate IAPs for every location."
9            And then as we go through though, it
10   seems like you kind of -- not kind of, but through
11   your interviews with other people, they kind of say,
12   No, if it's -- if it's one matter, even if it's
13   separate locations, it should be one IAP.
14       A.    So that was me asking Captain Cole, who
15   was the SWAT commander at the time, if having
16   separate IAPs for two different locations, even
17   though later it would be beneficial for his section
18   specifically.
19           So then when he -- I believe I did
20   Captain --
21       Q.    Is it Koren?
22       A.    Koren, yes. He's now Assistant Sheriff
23   Koren.
24           But yes, Captain Koren was then asked,
25   and he -- again, I'm doing all this based on the

179

1    notion that I know that Captain Cole had told me
2    that two probably would have been better. And these
3    are just their opinions on what they believe based
4    on their training and experience.
5            And their answers are their answers.
6    I mean, Sergeant Scott was on for 33 years, I
7    think he was, before he retired before this board
8    went. Captain Koren has been on longer than me.
9    He's now a sheriff. And Captain Cole is a captain
10   and SWAT commander. So people with a lot of
11   experience, and I was just relaying their opinions
12   on the matter.
13       Q.    And then turning to page 84. And this
14   is where you seem to start discussing alternative
15   surveillance methods to -- that could have
16   determined who was associated with the South Nellis
17   Boulevard apartment?
18       A.    Correct.
19       Q.    And as we discussed before, kind of as
20   you went through, you raised other alternative
21   surveillance options, but Detective Grimmett had not
22   availed himself of any of those; correct?
23       A.    Correct.
24       Q.    And then -- and then this is -- I
25   don't know if you remember or not. I read -- so if

180

1    we turn to page 90, there seems to be some
2    controversy about they split up the team to do
3    surveillance at the same time. If you read the very
4    last of it.
5        A.    Which? Where are you looking at?
6        Q.    Sorry. That's fair.
7            So this is from Detective Solano.
8    During this interview he was asked if he was
9    concerned.
10           And at the very end he says, "To me, it
11   appeared that they were kind" -- "they were
12   trying" -- sorry. Strike it.
13           "To me, it appeared that they were kind
14   of trying to knock out two birds with one stone over
15   here on that day. I don't know. They are questions
16   better asked for those guys."
17           So it seems like there's some discussion
18   about that they had split up the surveillance team,
19   so when they got burned there wasn't a backup team
20   there?
21       A.    So that's not something that is
22   commonplace, to have a team fill in if one team gets
23   burnt, especially on those -- that team that does
24   those high-profile surveillances. Once you're
25   burned -- it's an officer-safety thing -- once you

181

1    believe you were burned anyway, you're not going to
2    replace a team with the possibility of now there's
3    harsh counter-surveillance to where that team could
4    be in jeopardy of safety, if that makes sense.
5            Does that answer your question?
6        Q.    It did. But it seems, based on what
7    Detective Solano is saying, is that -- I mean, he
8    said, "My question is, Why was their team split up
9    that day? They had half their team at Jimmy
10   Durante, the other half at 3050 South Nellis."
11           "Like I said, in my six years in
12   Criminal Intel, that never happened. It was
13   always -- was usually -- 'cause the squad's a large
14   squad."
15           Do you remember this at all?
16       A.    I do remember the conversation. When he
17   says "large squad," they're like six, I want to say.
18   That's not a large squad.
19       Q.    It's the size of your squad.
20       A.    Exactly. It's definitely not a large
21   squad.
22           The idea of what I believe happened was
23   they probably had a tail vehicle or a chase vehicle.
24   In case somebody left the apartment and left in a
25   vehicle, one would then go off with that. So you'd



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

182

1   have two detectives and you'd have one still on the
2   house as an eye.
3           However, when you're talking about a
4   one-directional-facing apartment where there's no
5   back door, you don't need more than two to three
6   individuals to get surveillance on that.  So I don't
7   understand why he would say that.  But that was
8   essentially his answer to the question that I gave
9   him and his explanation.  I can't speak to why he
10  believed that if they did things different six
11  years ago.
12      Q.    Okay.  If we turn to page 94, this is
13  just a Google Earth photo.
14          Did you pull this from Google Earth?
15      A.    Correct, yes.
16      Q.    Did you ever go down to the unit itself?
17      A.    I was down there at one point.
18      Q.    Okay.  Did you take any photos or --
19      A.    No.
20      Q.    What was your -- I probably know the
21  answer, but I'm going to ask it anyway.
22          What was your purpose in going down to
23  the unit?
24      A.    In general, like I said before, the case
25  agent has the option to go out night of or day of,

183

1   of an officer-involved shooting, just to kind of get
2   an overview of the entirety of the structure.  You
3   can see enough from Google Earth and all these other
4   things, but you really can't get a full picture
5   until you put eyes on it yourself.
6           Like I said, this wasn't my case
7   initially, so I was never given the option to go out
8   there day of.  So I did make a trip over there just
9   to -- I actually went in the gas station just to see
10  how it was positioned actually based on, like, my
11  two eyes, when we were talking about the options of
12  where to go for TASS and if those were reasonable
13  options.
14      Q.    And what were your personal observations
15  when you went down there?
16      A.    So not reflective of the report?  Just
17  of what I saw from an officer's -- reasonable
18  officer's standpoint?
19      Q.    Correct.
20      A.    It was a difficult situation as far as
21  surveillance goes.
22          I know from previous operations I've
23  been a part of when I was not in CIRT that you would
24  need either permission or a court order to affix
25  your cameras to a business, which would be the gas

184

1   station there.  That can get kind of dicey if there
2   are friendlies in there.  You don't want to alert a
3   potential homicide investigation of -- that they're
4   getting eyes on.  Especially when you don't have
5   them completely locked up of where they're at.  If
6   they leave, then you have no other record of where
7   they're at.  That becomes a problem.
8           I thought about the light pole there
9   because there's power at the light pole, but in
10  Clark County they run on intermittent power.  So
11  they actually don't have live power to the actual
12  power unit until it's nighttime.  So you would have
13  power, but only for nighttime surveillance on that
14  camera.  Which then you'd have to explain the lapses
15  for, you know, 12 to 13 hours of no surveillance on
16  that.
17          And still, even if you have a camera on
18  that, you're facing windows.  You still don't have a
19  look at the front door or the parking lot.  It
20  becomes very difficult to get actual video
21  surveillance of at where they were in 2022.
22      Q.    And the next five or six pages talks
23  about Major Violators, but we've already covered
24  that.
25          So on page 98, it's really SWAT who

185

1   dictates the way that -- they're the ones who decide
2   how the warrant is served; correct?
3       A.    Correct.  I believe one of the quotes in
4   here was a specialized unit is not going to dictate
5   my tactics.  I forgot who said that, but it was an
6   operator or -- the information that they get from
7   the IAP is supposed to give you an idea of all the
8   threats and let you place yourself into the
9   different boxes that you have as far as your policy
10  and procedures goes.
11      Q.    Okay.  So -- and I guess we haven't
12  talked about that.
13          So that's really the purpose of the IAP
14  then?
15      A.    Yes.  To give a detailed synopsis of
16  what you're looking for, what your threats are.
17          In this case, the apartment was
18  identified to Wattsel and Fisher.  That's all the
19  operators have to work on.  They're not going to go
20  back and fact-check that.  They're not going to go
21  do their own investigation.  That is going to be
22  information that is known to the SWAT operators.
23          They're looking for things like
24  firearms.  They're looking for any mentions of
25  counter-surveillance, like cameras, bars on the



186

1 window, things like that.
2 Q. Okay. And then now turning to
3 page 101, here it talks about the change of the
4 exigency box.
5 Because as we go through these different
6 iterations, they not just incorporated some new
7 pages in, but they also changed the exigency box;
8 correct?
9 A. Uh-huh. Correct.
10 Q. And, again -- well, not again, but
11 there's no re-signing of the IAP; it's just the
12 same signature page attached again and again;
13 correct?
14 A. Correct.
15 Q. And there's no context under which that
16 complies with LVMPD policy; correct?
17 A. So the -- well, can you rephrase? The
18 context of?
19 Q. LVMPD policy doesn't have -- LVMPD
20 policy doesn't allow -- there's nothing in LVMPD
21 policy that would enable, where a form has to be
22 signed by certain individuals, to just reuse the
23 signature page again and again; correct?
24 A. Correct. There's nothing there that
25 says that that is either acceptable or not

187

1 acceptable.
2 Q. Okay. In fact, Captain Cole defended
3 that position; correct?
4 A. I believe so. Can you tell me what page
5 that was on, where he -- a lot of these interviews
6 kind of blend together in my head a bit.
7 Page 104?
8 Q. Correct.
9 A. So yeah. Based on his conversations
10 with Captain Koren and Lieutenant Johansson, and he
11 believed they were legitimate signed documents even
12 though they were from a previous document.
13 And I guess one of the caveats to that
14 would be the fact that Captain Koren was on COVID-19
15 and couldn't physically sign the new pages per, I
16 guess, our policy. I think we implemented a policy
17 of -- contact policy when COVID was going around
18 that said that he couldn't have any contact with
19 individuals. And we didn't have any documentation
20 for electronic signatures.
21 Q. That's since been implemented though;
22 correct?
23 A. I believe so.
24 Q. Okay. Is there not, like -- if somebody
25 is out, like if somebody needs to sign one of these

188

1 reports is out for whatever reason, don't they have,
2 like, a backup person to sign it?
3 A. You'd have to -- that might be more of
4 a -- like captain-to-captain thing. That's not
5 something that's set in policy.
6 I know that there's coverage that
7 happens between captains, lieutenants in different
8 sections, but that's a little bit over my purview,
9 as far as covering for each other and assignments on
10 who's covering.
11 If the SWAT commander and the lieutenant
12 who is covering homicide made that determination
13 that they were okay with the signatures, and in this
14 instance that was their decision -- again, we made
15 that something that we changed to make sure that
16 doesn't happen like that again. Doesn't mean it was
17 acceptable or unacceptable, but it just means we
18 needed to fix that problem.
19 Because at the end of the day I don't
20 think that by him saying it was a legitimate
21 signature made the document illegitimate. He was
22 saying that that was still their signature, and it
23 was a legitimate document based on the fact he
24 talked to them, if I recall that.
25 Q. And then SWAT just goes by, to kind of

189

1 do a quick -- I mean, they do their own
2 recognizance, but it's pretty brief; correct?
3 A. It's not for people. It's for
4 structure. So they need to know if they can fit
5 armor back there. They need to know if there's any
6 counter-surveillance or countermeasures that are a
7 part of that door. Which in this case they ended up
8 missing because there were individuals that were
9 counter-surveilling or just hanging outside.
10 Q. Well, they didn't -- okay.
11 A. But the -- their surveillance is more
12 along the lines of making sure -- did you need me
13 to stop?
14 Q. No.
15 A. Sorry.
16 Their surveillance was to make sure that
17 they could -- where they were going to enter from;
18 where they're going to put their Sierra units, which
19 are snipers; if they were going to deploy snipers or
20 if they were going to be standing by as observers.
21 One of those things to look for was a
22 brass wrap, which in this case, like I said, was not
23 noted because the door was open the entire time.
24 And had Officer Hoskins, who was the forward
25 observer on that surveillance operation, stopped and

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

190

1  checked that, they would have been blown and
2  potentially he would have been in a compromising
3  situation with three suspects.
4      Q.    Okay.
5      A.    Also operating on the fact that to their
6  knowledge these -- anybody who was there is a
7  possible armed homicide suspect. So he has no body
8  armor. He's dressed in basketball shorts and a
9  T-shirt.
10     Q.    All right. So then we'll skip ahead
11  to page 110, where it starts discussing "SWAT Makes
12  a Plan."
13         Do you come up with these headings?
14     A.    I do.
15     Q.    Okay. And so this is all -- sorry. If
16  we turn to page 111, this is all in italics, so this
17  is all quoted -- this is all quoting from the SWAT
18  Section Manual; correct?
19     A.    Correct.
20     Q.    I noticed in here -- was there any part
21  of the SWAT Section Manual that gave any kind of
22  training or outline to parameters of "knock and
23  announce"?
24     A.    I can't recall. I feel like there was a
25  section on there. But we were specifically dealing

191

1  with the CET because that's what they chose.
2         I do believe there was an aspect on that
3  iteration of "knock and announce," but the CET was
4  the method that they chose on that, so that's what
5  we focused on.
6      Q.    Okay. And so just for -- it's -- just
7  for clarity of the record, we've got two different
8  types of entrance in this case.
9         We've got what's called the CET, which
10  is the controlled entry tactic, or the SACO,
11  S-A-C-O, which is the "surround and callout";
12  correct?
13     A.    Correct.
14     Q.    Very briefly, tell us what's the
15  difference between a CET and a SACO.
16     A.    Well, a SACO is exactly what it is.
17  It's "surround and callout." You surround the -- in
18  this case the apartment, all of the exits that you
19  could get. A lot of times you'll do evacuations at
20  that point. That way this is being treated as a
21  barricade until that individual comes out of the
22  apartment. And then you call that person out to
23  whatever unit you have, whether it be an armored
24  vehicle, operators with tactical shields for cover.
25  They call them out and secure the residence after it

192

1  is confirmed all individuals are out.
2      Q.    Okay. And looking down at the last
3  passage from the SWAT manual that you quoted here,
4  it said, "When utilizing a CET, the team leader will
5  ensure that the associated 'Knock and Announce'
6  tactic allows for a 'reasonable amount of time'
7  based upon the circumstances of the warrant."
8         Then it cites Wilson versus Arkansas at
9  1995, USSC.
10         So that's directly from the SWAT manual;
11  correct?
12     A.    Correct.
13     Q.    But earlier it says the purpose of the
14  CET is "meant to surprise and overwhelm the
15  suspects"; correct?
16     A.    Correct. And, yes, I acknowledge that
17  that is a direct contradiction.
18     Q.    And so turning to page 112, another
19  section that you pulled out of the "no knock"
20  search warrant -- sorry. Another section that
21  you pulled out of the LVMPD SWAT Section Manual on
22  "No Knock" states, "No-knock search warrants will
23  only be authorized for felony offenses that involve
24  a significant and imminent threat to public safety
25  and will not be used for the preservation of

193

1  evidence."
2         As we sit here today, at the time that
3  this warrant was served, this was for property only;
4  correct?
5      A.    Correct.
6      Q.    And is that preservation of evidence?
7      A.    I'm sorry. What's the question?
8      Q.    So for property only, that means, like,
9  you're seeking evidence; right?
10     A.    Correct.
11     Q.    Okay. And as we sit here -- sorry.
12         As we sit here today, if the policy is
13  that a "no knock" warrant will not be used for a
14  property-only search warrant, they could not have
15  obtained a "no knock" warrant for this search
16  warrant; correct?
17     A.    Correct. And they did not get a
18  "no knock" warrant. They did not receive that.
19     Q.    Right. But if it was suggested that
20  they ought to have as an alternative, that's not a
21  viable alternative; correct?
22     A.    No. Unless you have the body of the
23  individual on that search warrant.
24         An alternative to that would be if there
25  was probable cause to arrest Wattsel or Fisher for

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

194

1  that homicide and you had those arrest warrants in
2  hand.
3          The difference on this would be they
4  had an arrest warrant on hand for the gang case
5  that we mentioned previously for Corvell Fisher and
6  Wattsel -- sorry, Wattsel Rembert with that
7  MP5-style pistol.
8      Q.    But not for the search warrant for the
9  property related to the homicide; correct?
10     A.    Correct. So they had -- they had a -- I
11 guess the distinction would be they told the SWAT
12 that there was an arrest warrant for Wattsel -- and
13 I believe that was in the IAP -- for the gang case.
14 So there was a body warrant for him. However, it
15 was not for the same case that they were referencing
16 for the homicide.
17     Q.    How often are "no knock" warrants
18 issued?
19     A.    I can't remember any since I've been up
20 at CIRT. And I've never been a part of one in my
21 operation.
22     Q.    Okay. So it's fair to say that they're
23 fairly uncommon; is that correct?
24     A.    That's correct.
25     Q.    And so, Justin, if we turn then to

195

1  page 113.
2          And is this another Google Earth?
3      A.   This is.
4      Q.    Okay. And what is this a Google Earth
5  image of?
6      A.    That would be the apartment complex of
7  3050 South Nellis Boulevard. And I specifically
8  have highlighted with an arrow Apartment 1125, which
9  is on the northwest corner of that building that is
10 centered in the photograph.
11     Q.    Okay. And this was -- is this -- is
12 this to kind of depict -- because, you know, we
13 talked -- there's so much discussed in the -- in the
14 interviews from the different officers that it's
15 this kind of weird angle; is that correct?
16     A.    Yes. It's very oddly placed into that
17 piece of property where I don't understand why
18 they would do it at an angle like that just
19 practically, which allows no room for the size of
20 the BearCats, the armored vehicles that LVMPD has,
21 to go through there. Practically you don't have the
22 room to fit those armored vehicles through those
23 openings.
24     Q.    Okay. And so that was part of the
25 foundation of the decision to do a CET instead of a

196

1  SACO; correct?
2      A.    That was Lieutenant O'Daniel's
3  explanation.
4      Q.    Okay. But as we sit here today, with a
5  property-only search warrant, they would not get
6  authorization to do a CET; correct?
7      A.    Correct. But we don't do CETs anymore,
8  per our recommendation.
9      Q.    They don't do them at all?
10     A.    No. Now -- and, again, I'm going off
11 memory, but I believe we went to a "knock and
12 announce" and a surround and -- like a hold.
13         Essentially what it is is you make entry
14 to the structure. However, you hold, and there's a
15 viable area of entry. You can then move your team
16 or robots through at a slower pace to clear the
17 residence of any people or threats and subsequently
18 move through the process.
19         I think CETs are only used now for
20 crisis entries or "no knock" warrants, as part of
21 our recommendation.
22     Q.    Okay. Thank you.
23         And so this -- okay.
24     A.    "Breach and hold."
25     Q.    "Breach and hold"?

197

1      A.    "Breach and hold" is what it's called.
2      Q.    And so how would -- so if you can
3  kind of -- because I think I understand what you
4  mean, but if you can kind of walk me through. How
5  would a "breach and hold" -- let's say they're doing
6  a "breach and hold" on this unit today. Right?
7  They're going to go serve this -- whenever --
8  tonight.
9          How would the "breach and hold" --
10 looking at -- I don't know if this is a good use
11 of this, but how would the "breach and hold"
12 look now?
13     A.    It would be very similar to this,
14 without the number of officers. You'd either have a
15 water charge on the door, and you would blow that
16 door after there's already been announcements. You
17 would give the person -- essentially it would start
18 as a "surround and callout," and then it would move
19 to a "breach and hold."
20         So if there was either no communication
21 with a potential suspect in there, whether they
22 escaped before we were able to get a perimeter or
23 they're just not responding -- sometimes this
24 happens on individuals who are barricaded and end up
25 committing suicide, where obviously we're not going

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

198

1  to have communication with somebody who shot
2  themselves.
3        So when you "breach and hold," you
4  breach the door, whether it be manual or with a
5  water charge, and then it's more announcements to
6  try to get that person to come to the door
7  peacefully.
8        If there's no communication and there is
9  believed to be the subject's down or not in there,
10  then there's slow, methodical clearing with either
11  operators or some type of drone, whether it be
12  robots -- I think we have like a robot dog now --
13  and aerial drones that can maneuver inside of
14  apartments to get a visual of the area.
15        And then if it's determined to be clear,
16  the operators will slow and methodically clear the
17  apartment or house or whatever structure.
18        And that is, again, off of memory.
19  That's not citing the new SWAT manual that was
20  changed after this.  That is my interpretation as
21  Justin Roth as he sits in front of you from just
22  memory.
23        Q.    I get it.  But what I can rely on,
24  Justin, is that the policy -- is the policy was
25  changed as a result of this incident; correct?

199

1        A.    The manual was changed.
2        Q.    Sorry.  The manual was changed?
3        A.    Correct.
4        Q.    And then kind of going on the next few
5  pages, you talk about there was a -- there was a
6  slight modification of the language of the policy
7  between -- I think it was 2020 and 2021.
8        A.    '21 and '22, I believe.
9        Q.    Okay.  And that was the inclusion of the
10  word -- what was that -- "Using a controlled entry
11  tactic for the sole purpose of recovering narcotics
12  or property will never be considered as an
13  acceptable practice."
14        A.    What page are you on?
15        Q.    I'm sorry.  Page 116.  It's the last
16  sentence in the first full paragraph at the top of
17  the page.
18        A.    Okay.  I see it.
19        Q.    That was the language that was -- that
20  was changed?
21        A.    Correct.
22        Q.    That wasn't the one that was in force at
23  the time of this incident.
24        And then if we -- and so there was a
25  minor change; correct?

200

1        A.    Yes.
2        Q.    I don't think it alleviated any of the
3  confusion, did it?
4        A.    What do you mean, the "confusion"
5  specifically?
6        I'm just trying to get on the same page.
7        Q.    Correct.
8        A.    Did the word "never" being taken out
9  alleviate confusion?
10        Q.    So if you -- it's from Lieutenant
11  O'Daniel's email that she wrote.  It's saying --
12  and this is midway through -- "Now that the
13  investigation is concluded, we will make changes
14  to SOP and ensure there is clarity with the
15  explanations so that there is no misrepresentations
16  to outside entity and internal players.  Attached is
17  some of the recommended changes and the
18  clarifications that will be added to SOP."
19        A.    Okay.
20        Q.    And ultimately the recommendations --
21  according to what you have in this report, the
22  recommendation was adopted?
23        A.    Correct.
24        Q.    Okay.  There does seem to be -- if we
25  then turn to page 117.  Because it does seem that

201

1  Deputy Chief Larkin was not aware of the change?
2        A.    That was their statement, yes.  And
3  there was no -- there was no checks and balances put
4  in place electronically to do that.
5        As we were in the scenario we were in, I
6  want to say -- I forget when this interview took
7  place, but it had to be after August, I'd say maybe
8  September, October -- we were implementing a new
9  policy manual, virtual policy manual.  Any changes
10  that would be done would have to be approved with
11  electronic signatures.  And this is, of course,
12  after the fact.
13        So any changes now that are done through
14  our department, whether it be a small change to a
15  word or two, has to be done through -- I think it's
16  called PowerDMS.  And that information -- so that
17  wasn't done at the time, so we had no way to know if
18  that was the case.  But that was her statement.
19        Q.    On 118 we start talking about the NFDDs,
20  which is the noise/flash diversionary devices?
21        A.    Correct.
22        Q.    And there were -- do you recall which
23  NFDDs were used on this warrant?
24        A.    Yes.  It was a 9-bang, a handheld
25  grenade essentially.

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

202

1          It's not a grenade in the fact of it has
2   explosives that will injure.  It's designed not to
3   injure or fragment.  It's designed to have a loud
4   noise and loud flashes.
5          And then a stun stick, which is
6   essentially the same thing; however, it's on a pole
7   that is inserted into a house and is designed to
8   disorient individuals inside of a room.
9      Q.     And so if we can just quickly look at
10  the layout of the apartment, 1125.
11     A.     Yep.
12     Q.     If we look at this area right here,
13  you've got this large -- you've got this kind of
14  oval, and that represents Mr. Williams; correct?
15     A.     Correct.
16     Q.     Okay.  Do you want to -- if you can, for
17  the camera --
18     A.     Point to it?
19     Q.     Yes, please.
20     A.     Right here (indicating).
21     Q.     Over here to the side we have
22  Officer Rothenburg, and he was the one that
23  inserted the -- no?
24     A.     No.  Officer Bertuccini did, who is the
25  badge that is directly north of his position, on the

203

1   exterior.
2      Q.     Okay.  So Officer Rothenburg held the
3   shield?
4      A.     Correct.
5      Q.     And then Officer Bertuccini is the one
6   that inserted the stick?
7      A.     Correct.
8      Q.     And then looking at the diagram, the
9   window is right next to the sofa that Mr. Williams
10  was on; right?
11     A.     Correct.
12     Q.     Okay.  And just -- we talked about it
13  briefly in the beginning, but the stick was inserted
14  through the window; correct?
15     A.     Yes, it was.
16     Q.     On page 119 you quote the Section 11.01,
17  NFDD.  You again quote from the SWAT Section Manual,
18  and it reads -- this is your quotation --
19  "Diversionary devices are designed to gain
20  compliance, distract, or disorient an individual."
21          And that's the purpose; correct?
22     A.     Correct.
23     Q.     And so then if we then go to page 120,
24  again you're quoting from the SWAT Section Manual.
25  And I'll just read it to you.

204

1          "Prior to deploying NFDDs, personnel
2   shall consider available intelligence information
3   and circumstances.  This intelligence information
4   should include the presence of children, elderly
5   persons, innocent individuals, and the risk of
6   injury occurring to those not involved in the
7   arrest."
8          And so as we sit -- one of the facts
9   that you outlined in -- that was outlined in the
10  CIRT report is that when Lieutenant O'Daniel
11  confirmed or authorized the request for this,
12  they had not ruled out presence of children; they
13  had not ruled out presence of elderly person; they
14  had not ruled out presence of innocent individuals;
15  correct?
16     A.     Correct.
17     Q.     This was, in fact, qualified as a
18  flophouse, so it was known that there was people
19  coming and going; correct?
20     A.     Correct.
21     Q.     So then the last paragraph on page 120,
22  if you -- it states, "Based on the facts, the SWAT
23  Team did not have actionable intelligence to
24  consider the use of any NFDD due to the fact that
25  there was only 90 minutes of surveillance completed

205

1   where only one subject was observed."
2          And so that is -- that is a part of
3   later the CIRT conclusion; correct?
4      A.     That is a part of the CIRT conclusion,
5   yes.  Specifically for Lieutenant O'Daniel's use of
6   discretion.
7      Q.     And then if you want to turn the page
8   to 123.
9      A.     Okay.
10     Q.     And the next few pages, what are
11  these -- what are these pictures of?
12     A.     This is a picture of Officer Hancock's
13  shock lock.
14          A shock lock is a device that is used
15  for defeating dead bolts or any type of locking
16  mechanism.  Essentially pushed up to the door and
17  fired, and it is a non-fragmenting round -- or a
18  fragmenting round, I believe -- minimal amount of
19  fragmentation is what is designed to penetrate the
20  locking mechanism.
21     Q.     And if we turn to page 124.
22     A.     Back?
23     Q.     Yes, please.  Sorry.
24     A.     I am without pages 123 and 124.
25     Q.     I can't give you 123, but I'll give you

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

206

1  my 124. And if you want to read that highlighted
2  portion.
3      A.    Sure. Out loud?
4      Q.    Sure. Yes, please.
5      A.    "Multiple SWAT operators remembered
6  hearing Detective Grimmett brief the group that
7  there was probable cause to arrest Wattsel. Some
8  SWAT operators perceived this statement to mean
9  they had probable cause for a homicide. However,
10  Detective Grimmett clarified that he meant there was
11  probable cause to arrest Wattsel from a shooting
12  being investigated by GVB" -- which is the Gang Vice
13  Bureau -- "detectives."
14      Q.    When you say that he clarified, you
15  mean that he clarified that later to the CIRT;
16  correct?
17      A.    Correct.
18      Q.    Okay. And then if you turn to page 128,
19  could you please -- it starts the discussion here,
20  but can you please explain to me the issue with the
21  amount of training Sergeant Backman had received?
22      A.    So that was essentially the operators --
23  in the section of the manual there is a lesson plan,
24  essentially, of how to indoctrinate new SWAT
25  operators and SWAT supervisors. And part of that is

207

1  to learn in training scenarios and also be a part of
2  different positions within the stack during live
3  operations.
4          Since then, I believe that has been
5  changed to include more static training prior to
6  being involved in live action when you are
7  relatively new.
8          I'm not sure how that -- how that goes
9  through with operators who have tested for sergeant,
10  having already been operators on SWAT. I can't
11  speak to their manual of how it reads, but I know it
12  was changed to where there was more time of static
13  training.
14      Q.    But to confirm, at the time that
15  Sergeant Backman was in charge of this search
16  warrant, of executing this search warrant, he had
17  not completed SWAT school; correct?
18      A.    I believe he had not completed SWAT
19  school.
20      Q.    Yeah, sorry. He hadn't attended it at
21  all; correct?
22      A.    Yes.
23      Q.    If we can please turn to page 133.
24          So you are citing -- I believe that
25  you're citing directly from the case United States

208

1  v. Banks here; is that correct?
2      A.    The second paragraph down?
3      Q.    Yes. I'm sorry. Yes.
4      A.    Yes.
5      Q.    Okay. And one of the things that you
6  included in this was the discussion of exigency in
7  terms of entering after knocking. And in the
8  language that you included from the case
9  United States versus Banks it states, "Once the
10  exigency had matured, the officers were not bound to
11  learn anything more or wait any longer before
12  entering, even though the entry entailed some harm
13  to the building."
14          Now, this case dealt with the exigency
15  involved in destroying cocaine; correct?
16      A.    I believe so. I'm familiar with the
17  case, but I'm not familiar with the intricacies in
18  the case. However, I was utilizing it for purposes
19  of entry time and reference points for that and
20  comparables. I didn't dig too deep into the actual
21  cases themselves, if that answers your question.
22      Q.    These cases were more than likely
23  provided by Mr. Bandiero; correct?
24      A.    Yes.
25      Q.    And so if we go then to page 134,

209

1  there's also a section, yeah -- last sentence. "The
2  Supreme Court has also held that a 15- to 20-second
3  wait after police officers announced their presence
4  was reasonable under the Fourth Amendment and
5  Section 3109."
6          So as we talked about it at the very
7  beginning of the -- of the deposition, the amount of
8  time that you have counted the seconds from when
9  they start -- sorry. Strike that.
10          The way that the seconds have been
11  counted in this CIRT report is from the time the
12  officers begin making their announcement; correct?
13      A.    I believe so.
14      Q.    So then going down to the lower part of
15  the page -- and I'll hand this to you, and I'll ask
16  you to read the highlighted portion at the bottom of
17  page 134.
18      A.    "By conducting a CET to surprise and
19  overwhelm the occupants of the structure, it
20  inherently contradicts the 'knock and announce' rule
21  which requires officers to wait a reasonable amount
22  of time set forth by the United States Supreme Court
23  case law and Nevada Revised Statutes."
24      Q.    And that's later -- that's later
25  outlined in the conclusions of this report as well;

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

210

1  correct?
2     A.    Correct.
3     Q.    And that was -- that conclusion was come
4  to based on the facts that you compiled, the round
5  tables you did, and discussions with the subject
6  matter experts; correct?
7     A.    Correct.
8     Q.    I'm going to ask you -- page 136. I'm
9  going to ask you to read the part that is
10  highlighted in pink.
11    A.    "Six seconds elapsed from the time of
12  the first announcement by Sergeant Backman, to the
13  western window being broken out, the blinds being
14  cleared, and the stun stick being inserted. Three
15  seconds later, Officer Hoskins began to utilize the
16  ram on the front door."
17    Q.    And as I went through the CIRT
18  investigation report, there was an issue with the
19  stun stick, the blinds being up there; correct?
20    A.    Correct.
21    Q.    They couldn't really see -- well, not
22  really. They could not see what was on the other
23  side of the window; correct?
24    A.    No.
25    Q.    So at the time that they inserted that,

211

1  they were not aware that the window was right here
2  and Mr. Williams was right here (indicating);
3  correct?
4     A.    Correct. Did not know that at the time.
5     Q.    And according to -- as you've cited,
6  according to LVMPD policy within the CIRT report,
7  they needed to be able to see in that window to
8  insert that stun stick; correct?
9     A.    Correct.
10    Q.    Do you think that's a training failure,
11  that they didn't do that?
12    A.    Yeah, I would say so. They are trained
13  to do a "rake and break" is what it's called. So
14  rake the window and the blinds and then insert.
15          Now, the camera is very dark on there
16  just because of the time of day and the resolution
17  of our body-worn cameras. I can't remember if
18  Officer Rothenburg or Bertuccini, when we
19  interviewed them, said that they did conduct a rake
20  on that. That would have been the procedure is to
21  clear it and then insert it. I'd have to look back
22  at their interviews again. But yes.
23    Q.    And then if we then turn to page 137,
24  down at the bottom of the page the issue then comes
25  up to the brass wrap.

212

1          And based on the content of your --
2  based on the content of your report, it seems like
3  there was controversy about whether or not they
4  should have called the tactical when the brass wrap
5  was identified; correct?
6     A.    Controversy between two SMEs, two sides
7  of the table essentially. However, it's not very
8  controversial when it comes to looking and analyzing
9  the specifics of the case. Their manuals say it's a
10  judgment call.
11          And when I interviewed every operator on
12  that stack, they said that they felt comfortable not
13  calling a tactical at that point. And that's what I
14  have to go off of as an investigator is their
15  judgment call based on the fact that they see --
16  they recognize that there's a brass wrap there,
17  they're seeing Officer Hoskins hit the door, and
18  they recognize that there's daylight is what they --
19  a lot of them said, and that door is giving. So
20  they believed a tactical did not need to be called.
21          And we can have SMEs say yes/no to that,
22  but when we're talking about individuals' judgment,
23  that can't be something that -- you can't speak on
24  my judgment as long as it's something that is
25  outlined in the manual. Like all italics should be

213

1  in -- all quotes should be in italics, if your
2  judgment is I shouldn't do that but it says so in my
3  briefing --
4     Q.    Yeah. And I think, Justin, you tell me
5  if you understand the difference or not. The
6  difference is when you and I are talking -- and I'm
7  a lawyer. I write things all the time. But when
8  you and I are kind of going through the report --
9  and it's a lengthy report. To be honest, I don't
10  think I could write a 200-page report and not have
11  some formatting errors in it, despite my best
12  efforts.
13    A.    Sure.
14    Q.    But there's a difference between that --
15  that's a subjective mistake -- and then the issues
16  about mistakes that then impinge on somebody's
17  constitutional rights for unfair search and seizure.
18  Right? So it's like we're talking about a different
19  thing here.
20          So, you know, as you go through -- you
21  know, it's like, okay, well, the purpose of the stun
22  stick is to distract and disorient. Correct? And
23  at the same time, we've got banging on the door that
24  is supposed to be giving somebody their
25  constitutional right to know that it's the police

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

214

1  coming through the door.
2       You understand -- I mean, you -- you
3  have outlined in this very report that these seem to
4  be in conflict; correct?
5    A.   I've said it about an hour ago, that it
6  was a direct contradiction, and that was our finding
7  in the report.
8    Q.   Okay.
9    A.   I was more speaking on the tactical call
10 of that it wasn't so controversial as far as there
11 are documents saying that you will call a tactical
12 at this point or this point. It is a judgment call
13 based on the operators who are at the door.
14   Q.   And if they had called a -- let's just
15 do an alternative. Right? So they call a tactical.
16 Then they pull back and they do a surround and
17 call -- they do a SACO; right?
18   A.   Uh-huh.
19   Q.   So a SACO is possible?
20   A.   That would be their procedure, yes.
21   Q.   Okay. And so the "rake and break," just
22 so that I understand a little bit better, it's to
23 break open -- they take off -- I think they took off
24 a screen; correct?
25   A.   I believe so, yeah.

215

1    Q.   And then they break the window with the
2  actual stick; correct?
3    A.   I believe so, yeah. That's the "rake"
4  part of that, yeah.
5    Q.   Then they're supposed to pull off the
6  blinds too; correct?
7    A.   With it, yes.
8    Q.   So that's an entry into the unit;
9  correct?
10   A.   Yes.
11   Q.   And then --
12   A.   I'm sorry. So I will say that the entry
13 into the unit is the entry of the stun stick into
14 the apartment utilizing our tools.
15      The entry into the unit is not breaking
16 the glass and pulling it out. I would say the entry
17 of the stun stick is entry to the unit.
18   Q.   But somebody could have stepped through
19 that broken window; correct? If it's done the way
20 it's supposed to be done, where the screen is taken
21 off, the window is broken, the blinds are pulled
22 down -- if we're looking at page 144 -- and this is
23 well after the fact, but somebody could step through
24 that window; correct?
25   A.   Sure. But the -- somebody could have.

216

1  There was no intention for any officer or operator
2  to move through that window, period.
3    Q.   But we don't know if that was
4  Mr. Williams' perception of that; correct?
5    A.   Sure. I don't know his perception of
6  anything.
7    Q.   And as we even see in this photo right
8  here, the broken -- I mean, this is a different
9  vantage point, but the broken-out window was right
10 next to the sofa Mr. Williams was on; correct?
11   A.   Yes.
12   Q.   And that was from page 144 of the CIRT
13 report.
14      And then for the next few pages -- I
15 mean, having reviewed this, the next few pages are
16 talking about the officers' awareness of the
17 backdrop, which we're going to skip over.
18      But what I do want to talk about is --
19 if we go to page 148.
20   A.   Okay.
21   Q.   And I think that this is -- on page 148
22 it says "Officer Rothenburg." And then it says,
23 "When the stun stick was placed in the window,
24 the first few ignitions of the distracts caused a
25 large puff of smoke in the interior of the living

217

1  room."
2       And so this was based on not -- I mean,
3  not just your review of the body-worn camera
4  footage, but also Officer Rothenburg's kind of
5  recitation of what he perceived at the time;
6  correct?
7    A.   Yes. That was his statement, that he
8  could not see initially because of the smoke, and
9  then once the door was breached, it kind of vacuumed
10 out to where he could see more.
11   Q.   Okay. But he had tried to turn a
12 flashlight on, and he turned it off immediately;
13 correct?
14   A.   I believe so.
15   Q.   Okay. So the remainder is just the
16 investigation -- is kind of the post-shooting
17 investigation, until we get up to about page 170.
18 So we'll skip through that. That's your recitation
19 of facts about the post-scene analysis.
20   A.   Okay.
21   Q.   And turning to page 169, it discusses
22 "The Administrative Analysis of the Use of Deadly
23 Force."
24      And just to confirm, from an
25 administrative perspective, that's different than

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

218

1  the criminal perspective, but also from an
2  administrative perspective it was found that the
3  officers' use of force was reasonable based on what
4  they were perceiving at the exact time; correct?
5      A.    Correct.
6      Q.    And so a lot of the report -- the
7  remainder of the report is the specific dialogue
8  about the conclusions.  So rather than walk through
9  that, because you've done such an excellent job of
10 creating this table at the end, I would just rather
11 go forward to the table, the conclusion section, and
12 we can talk about those.
13           Unless there's anything in there that
14 you really want to highlight for me.
15     A.    So I guess it will just be questions
16 based on what you have to respond to that -- to the
17 actual conclusion table itself.  Because the
18 conclusion table is legitimately the last paragraph
19 of every conclusion.  It does not encapsulate the
20 entirety of the body of the conclusion.
21     Q.    As we go through the conclusions, we can
22 certainly loop back to any things that you think are
23 necessary.
24     A.    Okay.
25     Q.    My understanding of what you testified

219

1  to at the beginning of this deposition was that you
2  had specifically reviewed the conclusions in
3  preparation for today's deposition.
4      A.    Correct.
5      Q.    Did you review the dialogue -- because
6  you said you actually didn't review the whole
7  report.
8           Did you review the dialogue portion of
9  the conclusions?
10     A.    Yes.  But, again, we're talking about
11 50 pages of a lot of stuff that runs congruent with
12 each other.  So to get exact quotes and exact
13 recollection.
14     Q.    Well, here's what we'll do.  Some of the
15 conclusions I think are somewhat benign or -- you
16 know, they're benign.  So those ones we can kind of
17 go through.  And the ones -- the more ones that are,
18 you know, highly relevant for this case, we can then
19 loop back to the full discussion.
20     A.    Works for me.
21     Q.    Just a couple of facts I wanted to lay
22 the groundwork first.
23           There were -- some of the facts you laid
24 out so far is there were some discrepancies with the
25 search warrant; correct?

220

1      A.    Yes.
2      Q.    Okay.  There was an issue with the IAP
3  kind of being put together, cobbled together, to
4  have its final version; correct?
5      A.    Yes.
6      Q.    We haven't talked about it yet, but also
7  O'Daniel, while she approved the use of the NFDDs,
8  she was actually out on COVID during that time;
9  correct?
10     A.    Correct.
11     Q.    Sergeant Backman had not attended SWAT
12 school; he had only done 29 days of essentially
13 on-the-job training.  Correct?
14     A.    Yes.
15     Q.    And there was somebody else out on
16 either vacation or --
17     A.    Sergeant Findley.
18     Q.    Okay.  And that whole lead-up, had you
19 ever -- I mean, those are a lot of, kind of, off --
20 those are a lot of -- strike that.
21           Those are a lot of unusual circumstances
22 related to the execution of a single warrant.  Would
23 that be fair to say?
24     A.    I think COVID put a strain on a lot of
25 aspects of how we did things, just on resources

221

1  alone and having a lot of people out.  This was
2  different times for a couple of years when we dealt
3  with the pandemic from an operational standpoint.
4  So there were a lot of oddities with that.
5      Q.    Well, the search warrant oddity wasn't
6  related to COVID; correct?
7      A.    Sure.
8      Q.    And the issues with the IAP weren't
9  related to COVID; correct?
10     A.    To a certain extent.  Captain Koren at
11 the time was on COVID, could not re-sign those.  So
12 there was an issue of they couldn't -- one of the
13 quotes was couldn't slide it under his door and get
14 a re-signature.  Because we didn't have electronic
15 signature at that time.  So there was a certain
16 aspect to that that was relevant.
17     Q.    But he was just one of the six
18 signatures on there; correct?
19     A.    Correct.  But a mandatory signature
20 nonetheless.
21     Q.    Okay.  And Sergeant Backman only having
22 29 days and not attending SWAT school, that wasn't
23 related to COVID at all, was it?
24     A.    Correct.  But that was their operating
25 procedure prior to COVID as well.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

222

1    Q.    Okay. And that has specifically been
2    changed as a result of this incident; correct?
3    A.    I believe so, yes.
4    Q.    And Lieutenant -- and just to confirm, I
5    understand that Lieutenant O'Daniel was out as a
6    result of COVID. But also -- we've discussed it
7    already, but just to confirm -- she couldn't -- as
8    we sit here today, it would no longer be reading the
9    request on a cell phone; correct?
10    A.    I believe so. I can't speak to that a
11    hundred percent. But I do not believe they review
12    on cell phones.
13    Q.    But at the time they did, and she was
14    out on COVID?
15    A.    Correct.
16    Q.    Okay. All right. Let's get into the
17    conclusions. And we will bounce back and forth
18    however you want. I've stated it many times. I'll
19    state it one more. However you want to review the
20    document. I'm not trying to rush you through
21    anything. If you want time to say, Let me loop back
22    to the conclusion, or, I think we need to read this
23    section, then you tell me that. Okay?
24    A.    Okay.
25    Q.    The "Information Sharing," I think we

223

1    can go through that pretty fast.
2    A.    Okay.
3    Q.    That just has to do with the P1 case.
4    I actually didn't even really
5    understand. If you want to explain it to me.
6    A.    Essentially it's just communication via
7    radio traffic and -- the stuff with P1, as far as
8    the reference, that's just utilization of some of
9    our programs that weren't really relevant, but
10    that's part of the policy that it was in.
11    This was just speaking to just radio
12    traffic communication, information-sharing
13    reference, like post-OIS procedures.
14    Q.    That's both 1 and 2; correct? The
15    "MetroComm" is the traffic communication --
16    A.    So 1.1 is more along the lines of
17    radio communication between dispatch, other
18    supervisors.
19    P1 is 1.2, and that deals with the
20    utilization of case notes in the homicide section,
21    which I believe there were none.
22    Q.    Sorry. I'm talking about 2.1.
23    A.    2.1, okay.
24    2.1 is, yes, because there's really no
25    dispatcher or call-taker. There was no call-taker

224

1    on this. But there was very, very little use of a
2    dispatcher.
3    Q.    Okay. And then in terms of the 3.1 --
4    and we talked about it quite a bit, and you alluded
5    to it earlier -- that ultimately a DA and a judge
6    signed the search warrant; right?
7    A.    Correct.
8    Q.    But despite that, in terms of LVMPD's
9    search warrant policy, it still did not meet LVMPD's
10    policy; correct?
11    A.    Correct.
12    Q.    And based on my understanding, on the
13    next page, 215, the part that you have bolded and
14    italicized is that Detective Grimmett was counseled
15    on this issue; correct?
16    A.    Correct. And the -- again, talking
17    about the purview of CIRT and what we do when it
18    comes to use of deadly force, this is the first case
19    and the only case I've dealt with in six years that
20    has gone so far outside of the actual use of deadly
21    force that he was counseled via the -- I believe it
22    was either contact or supervisor intervention.
23    That's more of a labor issue. We don't really deal
24    with that.
25    But he got that negative conclusion.

225

1    And because of the way our board is set up, it's not
2    necessarily tactics. It wasn't -- he wasn't
3    required to be at the board.
4    Q.    And would you remember approximately the
5    timeline when you found out that you would also be
6    looking into the -- kind of the underlying homicide
7    investigation issues?
8    A.    Almost immediately. I pled my case to
9    stay narrowly focused to the use of force and any
10    discrepancies that we found along the way that was
11    reference to a homicide investigation should have
12    been put to IAB.
13    But, again, I can only go up my chain of
14    command, and my chain of command can only send me
15    back the message that it was given.
16    Q.    Okay. And then 3.2, I mean,
17    essentially -- 3.2, if I understand, having read it,
18    is that the underlying homicide investigation, there
19    was no issues with it?
20    A.    Correct.
21    Q.    And then 3.3 has to do with the IAP;
22    correct?
23    A.    Yes.
24    Q.    And we've talked about that quite a bit.
25    And we talked about -- according to

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

226

1   Conclusion 3.3, the IAP was not within LVMPD's
2   standards; correct?
3      A.    Correct.
4      Q.    Okay.  And then can you explain to me
5   what the conclusion -- the 3.4 conclusion was?
6      A.    I believe that was the conclusion, as I
7   read it now, of Sergeant Backman's training, in
8   reference to being new to SWAT.  I believe it was
9   within standardized LVMPD tactics, training, and
10  policy based on being in compliance with their
11  section manual.
12     Q.    And so to be fair, even though he had
13  been on for 29 days, it was in compliance with the
14  way the section manual was written at that point
15  in time?
16     A.    Correct.
17     Q.    And when we go down to 3.5, that the
18  policy was -- I mean the recommendation was that the
19  policy be -- sorry -- that the availability of SWAT
20  school be changed so that somebody who is newly -- a
21  sergeant newly on SWAT has the ability to go to SWAT
22  school; correct?
23     A.    Correct.
24     Q.    And that was actually -- I mean, that
25  was one of the things that was changed as a result

227

1   of this incident; correct?
2      A.    I believe so, yes.
3      Q.    And then can you explain to me 3.6?
4      A.    So that's dealing with the verbiage
5   contained in the SWAT manual, reference the CET for
6   property, when there's a threat to -- a threat of an
7   armed and dangerous suspect was not appropriate in a
8   given time.
9          So essentially -- I'll have to go
10  back and read this in a second, but essentially that
11  was what we discussed previously, if I'm not
12  confused, about not having the actual intelligence
13  of children and -- is that a reference to the
14  tactical call?
15     Q.    3.6?
16     A.    No.  Sorry.  I skipped one.
17     Q.    No.  It's the -- it's conduct a CET for
18  property and the amount of unknowns.
19     A.    I don't know if I'm missing pages.
20     Q.    And I think it's page 183, "General -
21  SWAT Planning - Use of Control Entry Tactic."
22     A.    You said 183?
23     Q.    Yes.
24     A.    I don't want to misspeak because I
25  know we went over it.

228

1          Okay.  So this is the discrepancy
2   that we discussed between the surprise and also
3   giving them reasonable amount of time to answer
4   the door.
5      Q.    Yeah, that's technically -- that's
6   technically 3.8.  3.6 --
7      A.    What's the question then again?  I'm
8   sorry.
9      Q.    We discussed what the conclusion was at
10  3.6 and the recommendations, and you said that you
11  wanted to go back.  But, yeah, it had to do with the
12  unknowns.
13     A.    Yeah, I mean, I guess -- obviously it
14  was not within standardized LVMPD training, tactics,
15  and policy, but then the recommendation attached to
16  it is that we recommend that LVMPD recategorize the
17  use of the CET to only be utilized when a "no knock"
18  search warrant is approved by the LVMPD and has
19  judicial preapproval.
20          And CIRT recommends the current SWAT
21  training, SWAT Section Manual, and department policy
22  be updated to reflect the standard.
23     Q.    So then if we go back to the
24  conclusions, we can go -- we just did 3.6.  We can
25  go 3.7.  The approach to the door is fine, so we can

229

1   skip that.
2      A.    I'm missing -- I'm missing 216.  That's
3   why I kept on getting confused.  So I was
4   referencing the page number on this.
5      Q.    I'm sorry.
6      A.    It's hard to read page numbers
7   sometimes.
8      Q.    As we know.
9          We'll talk about 3.8.  That's kind of
10  the big one right there.
11     A.    Okay.  3.7, approach -- good -- or
12  within standards?
13     Q.    Correct.
14     A.    I'm sorry.  Are you waiting for me to
15  respond?
16     Q.    Yes.  So explain to me the conclusion
17  of 3.8.
18     A.    3.8 was the conclusion with the
19  execution of the warrant.  We concluded that it
20  did not constitute a "no knock" warrant under Nevada
21  law because SWAT announced their authority for
22  purposes of making a forced entry.  However, SMEs
23  concluded -- sorry, consulted, were not unanimous
24  whether SWAT adhered to the "knock and announce"
25  principles.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

230

1        And this is where we consulted both SMEs
2    from the department and also Anthony Bandiero.
3    Yeah, I'm saying his name right.  And that's where
4    he wrote this section on page 187, reference
5    analyzing the SWAT Section Manual reference CETs.
6        Ultimately the conclusion was determined
7    to be a policy and training failure and was not
8    within LVMPD department policy.
9        Q.    And so -- and that is a result -- that
10    conclusion is a result of you outlining the facts in
11    the report, what the United -- what the other --
12    what the cases cited said, and also with -- with
13    consulting with your own -- with the subject matter
14    experts; correct?
15        A.    Correct.  Like I said before though,
16    there was split.  There were some who thought it was
17    okay.  However, in the effort of transparency, we
18    put both opinions on there.
19        However, because there's any question of
20    what we said, it was not within policy and training,
21    and it was a policy and training failure.
22        Q.    Okay.  And ultimately they changed the
23    policy itself; correct?
24        A.    Correct.
25        Q.    And so that would indicate that after

231

1    review it was agreed that this is not within the
2    constitutional guidelines of how -- regarding this
3    execution of this warrant; correct?
4        A.    I'm not a part of those discussions.
5    After my report is done and my presentation is over,
6    once I give those recommendations, those are just
7    strict recommendations on how we would like it to be
8    handled.  I know that it was handled.  I don't know
9    the discussions that were made during the
10    search-and-seizure committee or any rewording of the
11    SWAT manual.  I'm not privy to that.
12        Q.    Okay.  But you are aware that it was
13    changed; correct?
14        A.    Yes.
15        Q.    Okay.  And then if we could go to 3.9.
16        A.    Okay.
17        Q.    Sorry.  If you could hand me back 3.8
18    just for a moment.  Sorry.
19        A.    3.9 is on there too.
20        Q.    Okay.  Sorry.  I'll pull it up on my
21    computer.  Give me just one moment.
22        A.    While you're opening that, I'll just
23    kind of go over that.  Is that fair?
24        Q.    Absolutely.
25        A.    So, again, this goes with the tactical

232

1    call and the exterior of the apartment.
2        And, again, taking from both sides of
3    this argument of the SMEs, when the officers lost
4    the element of surprise of a CET, of utilizing speed
5    and surprise to overwhelm the suspect per their
6    manual, by being stuck on the door and hitting the
7    door multiple times by entering the residence is
8    what you had highlighted there, we call this is a
9    policy and training failure, and our conclusion was
10    based on the fact, if there was controversy on that,
11    it should not be a judgment call.  There should be
12    things outlined on it, and we need to outline that
13    in the manual of when it was appropriate to do a
14    tactical call.
15        Q.    But based on -- sorry.  Thank you.
16        And so included in this conclusion
17    though is that waiting six seconds before inserting
18    the stun stick did not provide the occupant an
19    opportunity to peaceably submit to the search, and
20    that's pursuant to United States v. Banks; correct?
21    That was part of the conclusion in 3.8?
22        A.    Oh, I was talking about 3.9.
23        Q.    I'm sorry.  I went back.  I looped back
24    to 3.8.  My apologies.
25        But that was pursuant to the analysis of

233

1    the controlling case law; correct?
2        A.    Correct.  From -- from Anthony Bandiero.
3        Q.    Okay.  And I'm sorry, going forward to
4    3.9.
5        A.    So, again, do you want me to repeat what
6    I just said?
7        Q.    No.  It's part of the record.
8        A.    Summation, officers were not wrong by
9    not calling a tactical, but we thought there should
10    be some kind of definition form of tactical brought.
11        And I can't tell you off the top of my
12    head if that was specifically changed.  I know our
13    recommendation was to specifically change that.  I
14    believe it was, but I can't tell you for sure on
15    that one.
16        Q.    Okay.  And so sorry.  I'm just going to
17    loop back up to 3.8 really quickly.
18        We are talking -- you are citing
19    based -- so when you talk about the LVMPD standards
20    and the opportunity to comply before a forced entry
21    is made, you cite SWAT lessons, basic SWAT school,
22    LVMPD policy, search-and-seizure Section 9,
23    no-search search warrants, SWAT Section Manual 9.0.
24        As we go -- as we've kind of looked
25    through all of this, I still haven't been able to



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

234

1  locate a part of the -- like, the SWAT manual where
2  it talks about you have to wait this long or this is
3  the reasonable standard.
4        I mean, I just --
5    A.    There isn't.
6    Q.    Okay.
7    A.    There wasn't.  Sorry.
8    Q.    Okay.  There is now?
9    A.    I cannot tell you definitively, but I
10  believe that was part of our -- was to recommend a
11  reasonable time, but I'm not sure if that was placed
12  in there or not.  I'm not sure on that.
13        I know CET was changed, but I don't know
14  if there was a reasonable time set because there
15  still has not been a reasonable time set by the
16  courts.
17    Q.    Okay.  Okay.  And then just -- you
18  briefly summarized the 3.9.  But basically, hey,
19  being stuck at the door means that you can't
20  surprise and overwhelm; right?
21    A.    Correct.  But, again, the officers did
22  not do anything outside of their training because
23  they were trained to call a tactical when they
24  believed that there was an issue.  Every single
25  tactical operator in this said the same thing.

235

1    Q.    Okay.  And so then that -- that then
2  goes to 3.10, which I don't think we need to go
3  over.  Because there was a tactical called inside
4  the apartment once the other --
5    A.    Correct.  Once they saw it.
6    Q.    Then 3.11, it's standard LVMPD.
7        And then 3.12, the cover and
8  concealment was -- and that was kind of their
9  post-shooting actions; correct?
10    A.    That deals with -- specifically 3.11 or
11  3.12?
12    Q.    Both of them actually.
13    A.    So, again, moving -- for these to be
14  general conclusions, the contact cover and cover and
15  concealment, those are -- for any OIS we look at all
16  of those.  So in order to keep a consistency we
17  include those.
18        Contact cover was really never
19  established here.  And that's along the lines of if
20  you're, like, a two-officer unit on patrol, one
21  officer is conducting the interview; the other
22  office is providing overwatch and looking for
23  threats.
24        So without taking that out, because it's
25  a part of our conclusion, it's more or less saying

236

1  that everything they did leading up to it was within
2  standardized training.
3    Q.    Leading up to the cover and concealment,
4  once they're inside the unit?
5    A.    So -- so I know these are confusing.
6        Contact and cover is kind of a general
7  conclusion as far as I guess you would consider the
8  lead person into the room would be the contact
9  officer.  The cover officer would be the secondary
10  person into the room essentially, looking for
11  additional threats.
12        It's trying to stay consistent with
13  reports.  That's a general conclusion that's in
14  every one of our reports.  Making it fit into a SWAT
15  search warrant isn't exactly -- it doesn't exactly
16  fit.  However, for consistency we keep it in there.
17  It's more geared toward patrol.
18        But in this aspect, if you want to,
19  like, break it down completely, Officer Kubla would
20  the contact officer, initially contacts, and then
21  his officers who come in are the cover officers.
22        And that kind of gets confused with
23  3.12, which is cover and concealment, because you
24  see the same word in there.
25        Cover and concealment deals with what

237

1  cover and concealment did you have at the time that
2  you used force.  At this point, because they're
3  entering a home on a search warrant and a CET, they
4  didn't have any contact or cover, and there was no
5  expected cover and concealment in there.
6    Q.    Okay.  So then we can go to 4.1 --
7  sorry.  All four used has to do with a threat
8  assessments at the time of -- and their assessment
9  of the backdrop; right?
10    A.    Correct.  That is all use-of-force
11  related.
12    Q.    And by then they've already come in the
13  unit?
14    A.    Correct.
15    Q.    Then if we can go to Section 5,
16  "Incident Management."
17    A.    Okay.  Sergeant Werner being the ATL,
18  assistant team leader, was within accordance of the
19  LVMPD SWAT manual in his handling of his duties as
20  the ATL.  His plan was the CET.  His plan was
21  everything that we went through, but it was approved
22  by his lieutenant.
23        And that was part of that discretion
24  with the use of those noise -- the flash bangs and
25  the stun stick.  He asked for them.  Her discretion

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

238

1   should have been to say no. And that's just a
2   chain-of-command thing. So his planning was within
3   the standardized training, if that makes sense.
4       Q.    Yes, it does.
5             And then 5.2, that has to do with
6   Sergeant Findley; correct? That's on page --
7       A.    5.2. Correct. I believe that -- I
8   believe that goes into the same standard that
9   in general these operators, the ATL and the
10  sergeants, make that plan, and then it is given to
11  the tactical commander. And the tactical commander
12  is overall --
13      Q.    So where we stop seeing, like, within
14  policy is when we actually get to Lieutenant
15  O'Daniel; correct?
16      A.    Correct.
17      Q.    And that's -- sorry -- 5.3, that
18  Sergeant Scott did not -- I mean, that has to do
19  with the assessment of the IAP; correct?
20      A.    Correct.
21      Q.    Okay.
22      A.    And then 5.4 is with Sergeant Clarkson.
23  Essentially he did the public safety statement with
24  his camera, which is against policy.
25      Q.    Correct.

239

1             And then going to 5.5, that has -- we
2   talked about that quite a bit, but that has to do
3   with Lieutenant O'Daniel approving the NFDDs;
4   correct?
5       A.    Correct.
6       Q.    And the issue is that she had
7   insufficient information to approve the NFDDs;
8   correct?
9       A.    Correct.
10      Q.    And LVMPD policy has since been changed
11  as a result of that; correct?
12      A.    Correct.
13      Q.    And then going to 5.6 --
14      A.    I believe so. As far as my knowledge,
15  yes.
16      Q.    And that's fair. If you want to make
17  that qualification, that's totally fine.
18            And then 5.6, that has to do with
19  Captain Cole and also Lieutenant O'Daniel. They
20  ought to have been aware of the issues with the IAP
21  and the search warrant; correct?
22      A.    Correct. They should have recognized
23  the discrepancies with the page numbers and the
24  discrepancies with the search warrant.
25      Q.    And 5.7 just has to do with reusing

240

1   the -- the signature page; correct?
2       A.    Correct. My apologies, I'm losing my
3   voice. Sorry.
4       Q.    That's okay.
5             And reusing the -- although we talked
6   about -- I mean, you said it wasn't one way or the
7   other, but according to 5.7, reusing the signature
8   page was not within standardized LVMPD tactics;
9   correct?
10      A.    Correct. And that was -- when we had
11  that discussion, that was based off Captain Cole's
12  interview of what he believed was appropriate or
13  not. So that was his belief, but that was not the
14  conclusion.
15      Q.    Okay. And then 5.8 is kind of like a
16  catchall basically. You tell me if I'm right or
17  wrong. That, like, hey, the other commanders, we
18  don't really have a problem with how they responded
19  to this?
20      A.    So response to the incident post-OIS.
21      Q.    Correct.
22      A.    So setting up command posts and doing
23  all our procedures was within standard.
24      Q.    Okay. And then 6.1 is the medical
25  response post-OIS; correct?

241

1       A.    Correct.
2       Q.    Okay. And then we talked about this.
3   The 7.1 and 7 -- 7.1 had to do about racking Officer
4   Kubla's firearm; correct?
5       A.    Correct. They cleared his firearm
6   because he was getting medical treatment and was
7   moving all over the place. So in an effort to
8   secure that firearm from going off, Officer Eshe
9   made that weapon safe.
10      Q.    Okay. And that was found that, based on
11  the totality of circumstances, that was fine;
12  correct?
13      A.    Yes. Correct.
14      Q.    And then 7.2, the equipment, firearms,
15  and ammunition were all within LVMPD standardized
16  tactics, training, and policy; correct?
17      A.    Correct. Everybody used department
18  ammo, and everything was okay with that.
19      Q.    Okay. No training deficiencies.
20            And then going to 9.1, that's the P1
21  thing. We don't really need to talk about that;
22  correct?
23      A.    Correct. Honestly, I do not know what
24  resulted on that. I know it was a conclusion that
25  was voted on. I can't remember if it was voted to

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

242

1    approve, modify, or overturn at that point. But
2    yeah, I don't recall what the result of that one
3    was.
4        Q.    Okay. And then going to 9.2, you
5    recommended basically that the -- that officers have
6    a search warrant refresher; correct?
7        A.    Correct.
8        Q.    I think that was -- that was accepted,
9    wasn't it?
10       A.    I believe so.
11       Q.    And then the second part is that you're
12   recommending that exculpatory evidence should be
13   included in the search warrant; correct?
14       A.    Yes.
15       Q.    And as we sit here today you don't know
16   if that was accepted or not?
17       A.    I believe it has been. I cannot tell
18   you for certainty. We don't -- I can tell you a lot
19   of the SWAT ones, based on just having conversations
20   with OIO sergeant and previous SWAT cases of
21   noticing its change. But we do not -- once we make
22   those recommendations, as CIRT detectives we don't
23   get privy to what happens afterwards, to include
24   discipline and stuff like that. We intentionally
25   get kept in the dark on that stuff.

243

1        Q.    Okay. And then one of your -- and then
2    the final, the (C), the 9.2(C), is that you just
3    said, Hey, we essentially -- and tell me if I'm
4    right or wrong -- you just said that we think they
5    should look at these two warrants like as a training
6    opportunity; is that correct?
7        A.    Yes.
8        Q.    And that's still part of the homicide
9    investigation, that you were like, I don't even want
10   to look at this?
11       A.    Not that I didn't want to look at it. I
12   just didn't feel like it met our mission as CIRT.
13       Q.    Okay. And then 9.3 just has to do
14   with -- you tell me if I'm right or wrong -- it has
15   to do with the recommendation that the new 14-page
16   IAP should be distributed; correct?
17       A.    Correct. It was only distributed to
18   lieutenants of the ISD section, which is
19   Investigative Services Bureau. And that was the
20   email that Captain Cole referenced when he said it
21   was only sent out to lieutenants.
22            We recommended that it be something that
23   is signed off on UMLV, which is our internal
24   training system.
25       Q.    And then the next one, 9.4. I think the

244

1    issue -- you tell me if I'm right or wrong on this
2    one -- is that Sergeant Backman had only been on for
3    29 days. And based on the recommendation of this,
4    they're saying like, Hey, they shouldn't be doing
5    any live stuff within the first 30 days; is that
6    correct?
7        A.    Correct. I believe that was the
8    understanding of that.
9        Q.    Okay. And then the 9.5 has to do -- we
10   talked about it before, but 9.5 has to do with the
11   availability of SWAT school; correct?
12       A.    Correct, yes.
13       Q.    And then 9.6 is the one that as we sit
14   here today has been -- to your knowledge, it has
15   been adopted that CET is only to be utilized for a
16   "no knock" search warrant?
17       A.    Correct.
18       Q.    And we've gone over the reasons for
19   that. Is there anything else you want to add to
20   that?
21       A.    No. Just that I haven't seen a CET done
22   since then.
23       Q.    Okay.
24       A.    Outside of hostage rescues, which don't
25   count. Those are extenuating circumstances.

245

1        Q.    Of course. Of course.
2            And then 9.7, in regards to "knock and
3    announce," and we talked about this a little bit
4    briefly, this had to do with kind of new training so
5    that the SWAT officers are trained to do "knock and
6    announce" in line with case law and national
7    standards; correct?
8        A.    Correct.
9        Q.    And as we sit here today your
10   understanding is this has been implemented; correct?
11       A.    Yes. And I know that one for a fact
12   because in 2023, in the middle, we got a new
13   lieutenant who organized with the new SWAT tactical
14   commander for us to do a training op with -- or go
15   do essentially like a mini SWAT school with them.
16   They were very vocal with the fact that they are
17   doing "knock and announce," and we actually were in
18   the houses of the SWAT houses when they did their
19   entries, and they were doing them in accordance.
20   They were waiting a very long time before actually
21   entering the house.
22       Q.    And then -- so 9.7 has two -- it has (A)
23   and (B).
24            And so (B) -- can you explain to me what
25   the (B) section is?

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

246

1    A.    I believe that is reverting the section
2    manual to what it was prior to them changing it to
3    the -- they changed it from the "never." They took
4    that word out and made it -- changed the CET to
5    where they could do that if there was extenuating
6    circumstances with the -- what do you call it? --
7    threats inside the building. Those checkmarks
8    inside the manual.
9        And from my recollection, I
10   believe all of that was incorporated almost
11   simultaneous with the 9.6 as like a full overhaul in
12   the manual.
13   Q.    And then -- okay. And then 9.8 -- and
14   this has to -- we talked about this a little bit
15   earlier. And your understanding as we sit here
16   today and what you testified to before is they've
17   kind of done some expanded training on how to call a
18   tactical; correct?
19   A.    Correct.
20   Q.    Okay. And that's 9.8.
21       And then 9.9, you talk about it more in
22   the body of the report. It's not necessarily
23   captured in here. It seems to me there's two
24   different issues; one, how the search order is
25   actually sent over to SWAT, and then how it's

247

1    approved. Is that accurate?
2    A.    Yes.
3    Q.    And the changes that CIRT recommended in
4    terms of, Hey, it should go to the lieutenant first
5    so that they know what's being -- and then it should
6    go bottom down instead of top up, that's been
7    implemented; correct?
8    A.    I believe so.
9    Q.    All right. Let's look at the -- and
10   so I've got some tactical review board conclusions.
11       And so kind of what -- we -- we -- we
12   talked about what happens up through creating the
13   report. And so once the report is created, then it
14   goes to the tactical review board?
15   A.    Correct.
16   Q.    Correct?
17       And that has -- that has the SMEs and
18   civilians?
19   A.    No.
20   Q.    No. Okay. Who does it have on it?
21   A.    So first there's the use-of-force board.
22   It's essentially the same personnel. The
23   use-of-force board has four civilian members and
24   three individuals from our department who vote on
25   that use of force.

248

1        Specifically for the officers, there's a
2    peer officer who votes -- that's an officer of the
3    same rank -- there is a tactics expert, and then
4    there is a -- I believe it's the deputy chief that
5    votes. Those are the three voting individuals from
6    our department, and then four civilians. That's
7    specifically only on the deadly force.
8        When it comes to the tactical review
9    board, all the same people are in there. You still
10   have your peer officer, your peer sergeant in this
11   case. Because Lieutenant O'Daniel was -- had
12   conclusions, there was a peer lieutenant. And I
13   believe there was also a peer captain. It was a
14   packed room that day. Usually it's not that bad.
15   But because Captain Cole got conclusions, there was
16   a peer captain that was responding on this one, on
17   this tactical review board.
18   Q.    And so I actually have the Tactical
19   Review Board CIRT Conclusions for Lieutenant
20   O'Daniel.
21   A.    Okay.
22       MS. MURPHY: And so I am going to hand
23   these over to you. We're going to mark these as
24   Exhibit 6.
25       (Exhibit 6 marked.)

249

1    BY MS. MURPHY:
2    Q.    Before you preface anything, I'm going
3    to ask the question, and you can tell me if you
4    want.
5        Have you ever seen this document before?
6    A.    No.
7    Q.    Okay. So this is -- were you present,
8    though, for, like, whatever the tactical review
9    board meeting was? Because you kind of talked about
10   how many people were there.
11   A.    Correct. So I am present for that. I
12   have no say in that. I gave my presentation. After
13   my presentation, every member of the board -- these
14   are the peer officers, sergeant, lieutenant,
15   captain -- get to -- and training experts, deputy
16   chief, assistant sheriff -- everybody who's on the
17   board has a chance to ask me specific questions
18   about this case.
19   Q.    It's -- sorry.
20   A.    Go ahead.
21   Q.    No. Go ahead.
22   A.    Once that portion is done, then I am
23   done for the remainder of my involvement in this
24   case.
25   Q.    Do you actually leave the room, or --



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

250

1   A.    No. I am there present. I'm not there
2   for deliberations on when these conclusions are
3   made. I exit the room for that.
4       Q.    Okay.
5       A.    So I don't have any weight on what was
6   said or why things were overturned or approved or
7   modified.
8           When they finish all their questioning
9   of all the officers, of the people that were
10  involved, everybody exits except for the board
11  members, and they go over this.
12          And then I come back in and I learn
13  the same way everybody else does what the results
14  were.
15      Q.    Okay. And so is it, like, a closed
16  hearing? Is it an open hearing?
17      A.    Closed hearing.
18      Q.    And sorry -- sorry. You listed off the
19  people that can attend. They're all
20  people related -- sorry.
21          You listed off the people that can
22  attend. So, like, a member of the public can't
23  come?
24      A.    No.
25      Q.    Okay. But you said that this one was

251

1   much more packed than usual; correct?
2       A.    Because normally we don't have
3   conclusions for every ranking member of this
4   department outside of appointed members.
5       Q.    And so looking at the Tactical Review
6   Board CIRT Conclusions, if we were to turn to -- and
7   we'll just -- I think we'll reference what's called
8   the Bates number.
9           See the alphanumeric number down here at
10  the bottom?
11      A.    Okay.
12      Q.    So turning to page 4574, it just has
13  checked "Overturn."
14      A.    Okay.
15      Q.    But you weren't privy to the discussions
16  about what that means, how they're going to
17  implement it; nothing?
18      A.    Correct. For the entirety of this --
19  this is all done with voting sheets, and then these
20  are for the -- I believe it's for the sheriff. This
21  is outside of the purview of a CIRT detective. We
22  do not see these, handle these whatsoever.
23      Q.    Okay. And so in looking through -- even
24  though you seem to have some level of familiarity
25  with the document, although I know you can't tell me

252

1   about the deliberations. So it seems like, in terms
2   of the one for Lieutenant O'Daniel, you flipped --
3   there's different signature pages, so it's like the
4   three provisions that applied to her.
5           And are you given this at the end? Do
6   you see this at all?
7       A.    No.
8       Q.    Okay. And so when you come back into
9   the meeting and you hear what happened, what do
10  you hear?
11      A.    So they'll go -- they'll start the tapes
12  again, and they'll say, We had X amount of
13  conclusions for Officer Roth. There were three
14  general conclusions. All were validated. They --
15  you had four specific conclusions. Three were
16  validated; one was overturned.
17          And then they would say, The one that
18  was overturned is blah, blah, blah. Would you like
19  an explanation of why?
20      Q.    Did you ask, when you heard that any of
21  them were overturned -- I mean, we just went through
22  Lieutenant O'Daniel's, but there's also, like --
23      A.    I don't get the opportunity to speak. I
24  am done. The second that they are done asking me
25  questions in the room, I sit off to the side, and my

253

1   involvement, outside of stopping and starting my
2   tape recorder, from deliberations to starting the --
3   resuming the tactical review board, is completed.
4       Q.    Okay.
5       A.    And I believe these are more for the
6   board member of -- so, again, I see then Deputy
7   Chief Prosser's signature on some of these. I saw
8   then Assistant Sheriff Walsh's, now undersheriff
9   Walsh's, signature under them. These are given to
10  them to affirm because they are the chair and
11  co-chair.
12      Q.    Okay.
13      A.    So, again, I have zero recollection --
14  not recollection. I have zero involvement with this
15  document.
16      Q.    And then -- so I will then -- thank you
17  for clarifying that.
18          I'll have you look at this one too. So
19  this -- this is starting at LVMPD 4826. This is
20  LVMPD Interoffice Memorandum. It kind of gives a
21  summary of the findings. But there seems -- sorry,
22  I'll give this to you and I'll ask.
23          MS. MURPHY: Can you mark this as
24  Exhibit 7, please.
25          (Exhibit 7 marked.)

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

254

1      THE WITNESS: Again, this is stuff that
2  is out of my purview. I don't ever see this. I've
3  never seen any one of these after my cases. These
4  are specifically for what these look like. So these
5  being struck out are the ones that are probably
6  overturned or modified.
7  BY MS. MURPHY:
8      Q.    But you're guessing on that? You're
9  not --
10     A.    I'm guessing on that.
11     Q.    Okay.
12     A.    Like, we don't have any control over
13  this. By this point, when this comes out and when
14  this is completed, I'm already on my next case,
15  grinding out interviews and doing my next
16  investigation. We never see this, or we never have
17  access to this. This is not put into our case file.
18  This is not in IA Pro, to my knowledge.
19         MS. MURPHY: Okay. Let me -- keep that
20  in that stack. Give me just a couple minutes to
21  review my notes.
22         THE VIDEOGRAPHER: Off the record at
23  2:54 p.m.
24         (A break was taken.)
25         THE VIDEOGRAPHER: On the record at

255

1  2:56 p.m.
2  BY MS. MURPHY:
3      Q.    In performing your job -- Justin, in
4  performing your job duties as a police officer,
5  do you agree with me that you have a duty to
6  conduct yourself such that you do not violate the
7  civil or constitutional rights of any members of the
8  public?
9      A.    Yes.
10     Q.    Do you also agree that if you see other
11  officers violating these civil or constitutional
12  rights of a member of the public you have a duty to
13  intervene and stop that officer?
14     A.    Yes.
15     Q.    After having conducted the detailed
16  investigation you did in this matter, do you believe
17  that Mr. Williams' civil or constitutional rights
18  were violated?
19         MR. ANDERSON: Objection. Form.
20         Go ahead and answer.
21         THE WITNESS: I am not a constitutional
22  expert. While we deal with aspects of the
23  Constitution, honestly, I don't know if I can speak
24  to that.
25         I know that we probably -- if we were

256

1  conducting CETs like we do today, there possibly
2  could have been a difference in the outcome -- of
3  the outcome. But that doesn't say that there might
4  be. Mr. Williams could have responded in the same
5  way. There's really no way to tell.
6      I know there were some deficiencies
7  within our department policy and procedures and how
8  SWAT operated in 2022, specifically that day and
9  prior to. But as far as specifically speaking on
10  the constitutional knowledge, I don't have the
11  in-depth that you have. And I hope that answers the
12  question.
13  BY MS. MURPHY:
14     Q.    Don't you think as an officer you
15  actually should have a pretty strong working
16  knowledge of search-and-seizure requirements as it
17  relates to a citizen's rights?
18         MR. ANDERSON: Objection. Form.
19         THE WITNESS: And, again, I will go back
20  to my knowledge of what my policy and my training
21  goes. Yes, there are aspects of that that have
22  legal ramifications for that, which are outlined in
23  policy, and we do go through classes for search and
24  seizure. And yes, there is an obligation to have
25  that knowledge.

257

1      In that same respect, I don't have the
2  same knowledge that you have, as you don't have the
3  same knowledge that I have as far as police
4  procedures. You have an idea having gone through
5  probably multiples of these, but I don't have the
6  vast knowledge of, say, a lawyer would have.
7  BY MS. MURPHY:
8      Q.    I'm not asking you to have a JD. I'm
9  asking you, in your experience as a police officer,
10  do you believe that Mr. Williams' constitutional
11  rights were violated, or do you believe they were
12  not violated?
13         MR. ANDERSON: Objection. Form.
14         Go ahead.
15         THE WITNESS: I don't know how to answer
16  that. I honestly don't know how to answer that. I
17  can't tell you one way or the other.
18         What I can tell you is my report was
19  drafted, and my conclusions met the investigation of
20  my department policies and procedures. I do not
21  know if I can say with an absolute fact that -- one
22  way or the other.
23  BY MS. MURPHY:
24     Q.    In Section 3.8 it's written, "CIRT found
25  that under the conditions present here,

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

258

1  six seconds" -- sorry.  Strike that.  I'll start
2  over again.
3      "CIRT found that under the conditions
4  present here, six seconds was insufficient to allow
5  occupants time to answer the door, let alone submit
6  to a search."
7      As we've discussed here today, the
8  ability to answer the door and submit to a search is
9  a constitutional right; correct?
10      MR. ANDERSON:  Objection.  Form.
11      THE WITNESS:  Can you rephrase the
12  question, please?  Or, sorry, repeat the question?
13  BY MS. MURPHY:
14  Q.   Sure.
15      "CIRT found that under the conditions
16  present here, six seconds was insufficient to allow
17  occupants time to answer the door, let alone submit
18  to the search."
19      The right to answer the door and submit
20  to a search is a constitutional right; correct?
21      MR. ANDERSON:  Objection.  Form.
22      THE WITNESS:  Yes.
23  BY MS. MURPHY:
24  Q.   Okay.  So if Mr. Williams was not given
25  sufficient time to answer the door or submit to a

259

1  search, then his constitutional rights were
2  violated; correct?
3      MR. ANDERSON:  Objection.  Form.
4      THE WITNESS:  Based on your explanation
5  of how that reads in that report, then yes.
6      MS. MURPHY:  Okay.  I don't have any
7  other questions.
8      MR. ANDERSON:  No questions.
9      THE VIDEOGRAPHER:  Counsel, will anyone
10  need the video?
11      MS. MURPHY:  I won't need the video.
12      MR. ANDERSON:  No thank you at this
13  time.
14      THE VIDEOGRAPHER:  This concludes the
15  deposition of Detective Justin Roth, consisting of
16  two discs.  The time is 3:01 p.m., and we are off
17  the record.
18      THE COURT REPORTER:  Would you like the
19  transcript?
20      MR. ANDERSON:  Yes.  We'll do a
21  read-and-sign.
22      (Proceedings concluded at 3:01 p.m.)
23
24
25

260

1                CERTIFICATE OF REPORTER
2  STATE OF NEVADA    )
                       )SS
3  COUNTY OF CLARK    )
4      I, Holly Larsen, a duly certified court
   reporter licensed in and for the State of Nevada, do
5  hereby certify:
6      That I reported the taking of the deposition of
   the witness, Detective Justin Roth, at the time and
7  place aforesaid;
8      That prior to being examined, the witness was
   by me duly sworn to testify to the truth, the whole
9  truth, and nothing but the truth;
10      That I thereafter transcribed my shorthand
   notes into typewriting and that the typewritten
11  transcript of said deposition is a complete, true,
   and accurate record of testimony provided by the
12  witness at said time to the best of my ability.
13      I further certify (1) that I am not a relative
   or employee of counsel of any of the parties; nor a
14  relative or employee of the parties involved in said
   action; nor a person financially interested in the
15  action; nor do I have any other relationship with
   any of the parties or with counsel of any of the
16  parties involved in the action that may reasonably
   cause my impartiality to be questioned; and (2) that
17  transcript review pursuant to FRCP 30(e) was
   requested.
18
19      IN WITNESS HEREOF, I have hereunto set my hand
   in the County of Clark, State of Nevada, this 20th
20  day of January, 2025.
21
22
23           _Holly Larsen_
24           _____
25           HOLLY LARSEN, CCR NO. 680

261

1                    ERRATA SHEET
2
3  I declare under penalty of perjury that I have read
4  the foregoing _____ pages of my testimony, taken on
5  _____ (date) at _____ (city),
6  _____ (state), and that the same is a true
7  record of the testimony given by me at the time and
8  place herein above set forth, with the following
9  exceptions:
10
11  Page  Line  Should read:      Reason for change:
12  ___  ___  _____    _____
13  ___  ___  _____    _____
14  ___  ___  _____    _____
15  ___  ___  _____    _____
16  ___  ___  _____    _____
17  ___  ___  _____    _____
18  ___  ___  _____    _____
19  ___  ___  _____    _____
20  ___  ___  _____    _____
21  ___  ___  _____    _____
22  ___  ___  _____    _____
23  ___  ___  _____    _____
24  ___  ___  _____    _____
25  ___  ___  _____    _____

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
                                                              262
 1                        ERRATA SHEET (Continued)
 2      Page  Line     Should read:      Reason for change:
 3      ____  ____   _____   _____
 4      ____  ____   _____   _____
 5      ____  ____   _____   _____
 6      ____  ____   _____   _____
 7      ____  ____   _____   _____
 8      ____  ____   _____   _____
 9      ____  ____   _____   _____
10      ____  ____   _____   _____
11      ____  ____   _____   _____
12      ____  ____   _____   _____
13      ____  ____   _____   _____
14      ____  ____   _____   _____
15      ____  ____   _____   _____
16      ____  ____   _____   _____
17      ____  ____   _____   _____
18      ____  ____   _____   _____
19      ____  ____   _____   _____
20
21      Date: _____       _____
22                            Signature of Witness
23
                              _____
24
                              Name Typed or Printed
25
```

