**ADAM J. BREEDEN, ESQ.**
Nevada Bar No. 008768
**BREEDEN & ASSOCIATES, PLLC**
7432 W. Sahara Ave., Suite 101
Las Vegas, Nevada 89117
Phone: (702) 819-7770
Fax: (702) 819-7771
Adam@Breedenandassociates.com

**CORRINE P. MURPHY, ESQ.**
Nevada Bar No. 10410
**MURPHY'S LAW, PC**
2620 Regatta Dr., Suite 102
Las Vegas, NV 89128
Phone: (702) 820-5763
Fax: (702) 665-7345
cmurphyslawattorney@gmail.com
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| LATIA ALEXANDER, individually as heir of ISAIAH T. WILLIAMS and in her capacity as Special Administrator of the Estate of ISAIAH T. WILLIAMS, <br><br> Plaintiff, <br><br> v. <br><br> LAS VEGAS METROPOLITAN POLICE DEPARTMENT, a political subdivision of the State of Nevada; KERRY KUBLA, in his individual capacity; BRICE CLEMENTS, in his individual capacity; ALEX GONZALES, in his individual capacity; RUSSELL BACKMAN, in his individual capacity; JAMES ROTHENBURG, in his individual capacity; JAMES BERTUCCINI, in his individual capacity; MELANIE O'DANIEL, in her individual capacity; DOES I-XX, inclusive, <br><br> Defendants. | CASE NO. 2:24-cv-00074-APG-NJK <br><br><br> **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY AND CAUSATION** |

Plaintiff, LATIA ALEXANDER, individually as heir of ISAIAH T. WILLIAMS, and in her capacity as Special Administrator of the Estate of ISAIAH T. WILLIAMS, by and through her counsels of record Corrine P. Murphy, Esq. of MURPHY'S LAW and Adam J. Breeden, Esq. of

BREEDEN & ASSOCIATES, PLLC, hereby submits her Motion for Summary Judgement, pursuant to FRCP 56, together with the below memorandum of points and authorities, the attached exhibits, counsel's declaration, and any oral argument this Court may allow.

Dated this 16th day of May, 2025.

**BREEDEN & ASSOCIATES, PLLC**

/s/ Adam J. Breeden

ADAM J. BREEDEN, ESQ.
Nevada Bar No. 008768
7432 W. Sahara Ave., Suite 101
Las Vegas, Nevada 89117
Phone: (702) 819-7770
Fax: (702) 819-7771
Adam@Breedenandassociates.com
and
CORRINE P. MURPHY, ESQ.
Nevada Bar No. 10410
MURPHY'S LAW, PC
2620 Regatta Dr., Suite 102
Las Vegas, NV 89128
Phone: (702) 820-5763
Fax: (702) 665-7345
cmurphyslawattorney@gmail.com
*Attorneys for Plaintiff*

1

## TABLE OF CONTENTS

2   TABLE OF CONTENTS ............................................................................................ iii

3   TABLE OF AUTHORITIES ...................................................................................... v

4   MEMORANDUM OF POINTS AND AUTHORITIES ........................................... 1

5      I.     INTRODUCTION ................................................................................. 1

6

7      II.    FACTUAL BACKGROUND ................................................................ 2

8         A. Facts leadings up to the Fatal January 10, 2022 Warrant Service ................. 2

9         B. Investigation Following the Fatal Warrant Service ....................................... 4

10        C. Analysis of Officers' Body Worn Camera Footage ...................................... 5

11           1.  Officer Clements' BWC (at the front door) ........................................ 7

12           2.  Officer Rothenburg's BWC (at the rear window) .................................. 15

13        D. Analysis of Deposition Testimony ................................................................ 22

14           1.  Sargeant Russell Backman (Defendant) ................................................ 22

15           2.  LVMPD FRCP 30(b)(6) Designee-Deputy Chief Reggie Rader ............ 24

16

17           3.  LVMPD FRCP 30(b)(6) Designee-Lt. Adrian Beas .............................. 27

18           4.  Officer Brice Clements (Defendant) ....................................................... 31

19           5.  Officer James Bertuccini (Defendant) .................................................... 33

20           6.  Officer Kerry Kubla (Defendant) ........................................................... 36

21           7.  Sergeant James Rothenburg (Defendant) ................................................ 39

22           8.  SWAT Lt. Melanie O'Daniel (Defendant) .............................................. 42

23        E. Restatement of Uncontested Facts Supporting Summary Judgement & The Timing of the Entry ................................................................................. 44

24

25     III.   LEGAL STANDARD ........................................................................ 46

26        A. Standard for Summary Judgement ................................................................ 46

27        B. Legal Standard for Knock and Announce ..................................................... 47

28

IV.  LEGAL ARGUMENT ........................................................................ 50

    A.  Plaintiff is Entitled to Summary Judgment as to Liability ............................ 50

    B.  Plaintiff is Entitled to Summary Judgment as to Causation.......................... 53

    C.  Plaintiff's Human Factors Expert's Opinions are Uncontested in this Matter, Which Support Plaintiff's Request for Summary Adjudication .............................. 56

        1.  FINDINGS: LVMPD officers' assertion that Williams should have understood that police officers were serving a search warrant and that Williams intentionally shot at police officers is unscientific and unreliable ............................... 57

        2.  Williams' ability to understand the situation as it unfolded was impaired because LVMPD SWAT abruptly awakened him from sleep using the battering ram and flash bang devices ...................................................................... 57

        3.  LVMPD SWAT's use of flash bang devices impaired Williams' ability to hear, see, and process the events preceding the SWAT entry into the apartment as they unfolded. ............................................................................ 58

        4.  Williams' ability to gran his gun and fire on the officers as they entered the apartment is not a valid or reliable indication that he was fully aware of the fact that police officers were attempting to serve a search warrant .............. 59

        5.  Williams' responses in firing on LVMPD SWAT officers as they entered the apartment is consistent with the known psychological effects of being abruptly awakened from sleep and from being exposed to a flash bang grenade in an enclosed space. ...................................................................... 59

V.  CONCLUSION ................................................................................ 60

iv

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Liberty Lobby, Inc.*
   477 U.S. 242, 248, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (*1986*) ............................46, 47

*Blankenhorn v. City of Orange,*
   485 F.3d 463, 481, n. 12 (9th Cir. 2007)..............................................................................52

*Boyd v. Benton County*
   374 F.3d 773, 779, 780 (9th Cir. 2004)..........................................................................50, 52

*Chew v. Gates*
   27 F. 3d 1432, 1441 n. 5 (9th Cir. 1994)..............................................................................51

*Cty. of Los Angeles v. Mendez,*
   581 U.S. 420 (2017)..............................................................................................................54

*Cunningham v. Gates,*
   229 F.3d 1271, 1289 (9th Cir. 2000).....................................................................................52

*Graham v. Connor*
   490 U.S. 386, 397, 104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989) ....................................50, 51

*Hudson v. Michigan,*
   547 U.S. 586, 594, 126 S. Ct. 2159, 2165, 165 L. Ed. 2d 56, 66 (2006) .........................48

*Johnson v. Duffy,*
   588 F.2d 740, 743 (9th Cir. 1978).........................................................................................52

*Jones v. Williams,*
   297 F.3d 930, 935 (9th Cir. 2002).........................................................................................52

*Jackson v. City of Bremerton,*
   268 F. 3d 646, 651 (9th Cir. 2001)........................................................................................50

*King v. Ubbens, et. al.,*
   Case No. 2:21-cv-01426 (US Dist. Nev.)..............................................................................6

*LaLonde v. Cty. of Riverside,*
   204 F.3d 947, 959 (9th Cir. 2000).........................................................................................51

*Lipscomb By & Through DeFehr v. Simmons,*
   884 F.2d 1242, 1244 (9th Cir. 1989).....................................................................................51

*Malley v. Briggs,*
   475 U.S. 335, 344 n.7, 106 S. Ct. 1092 (1986) ...................................................................53

*Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp.*
    475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) ....................................... 46, 47

*McDonald v. United States,*
    335 U.S. 451, 460-461 (1948) ........................................................................................ 54

*Mendez v. Cty. of L.A.,*
    897 F.3d 1067 (9th Cir. 2018) ................................................................................. 53, 55

*Miller v. United States*
    357 U.S. 301, 307, 2 L. Ed. 2d 1332, 78 S. Ct. 1190 (1958) ............................................ 48

*Monroe v. Pape,*
    365 U.S. 167, 187, 81 S. Ct. 473 (1961) ......................................................................... 53

*Paroline v. United States,*
    572 U.S. 434, 134 S. Ct. 1710, 1719, 188 L. Ed. 2d 714 (2014) ...................................... 54

*Richards v. Wis.,*
    520 U.S. 385, 393, 117 S. Ct. 1416, 1421 (1997) ........................................................... 48

*Scott v. Harris,*
    550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007) ........................................ 46

*Taylor v. List,*
    880 F.2d 1040, 1045 (9th Cir. 1989) .............................................................................. 52

*United States v. Banks,*
    282 F.3d 699, 703-05 (9th Cir. 2002) ........................................................................ 48, 49

*United States v. Banks,*
    540 U.S. 31, 41, 124 S. Ct. 521, 428 (2003) ................................................................ 48, 49

*United States v. Bustamante-Gamez,*
    488 F. 2d 4, 9 (9th Cir. 1973) ........................................................................................ 48

*United States v. Contreras-Ceballos,*
    999 F.2d 432, 435 (9th Cir. 1993) ................................................................................... 50

*United States v. Combs,*
    394 F.3d 739, 743 (2005) ................................................................................................ 9

*United States v. Granville,*
    222 F.3d 1214, 1218, 1219 (2000) ....................................................................... 48, 49, 50

*United States v. Jones,*
    214 F.3d 836, 837-38 (7th Cir. 2000) .............................................................................. 50

*United States v. Koon,*
    34 F.3d 1416, 1447 n.25 (9th Cir. 1994) ......................................................................... 52

*United States v. Little,*
    753 F. 2d 1420, 1435 (9th Cir. 1984) ................................................................ 50

*United States v. Mendonsa,*
    989 F.2d 366, 370 (9th Cir. 1993) .................................................................... 48

*VHT, Inc. v. Zillow Grp. Inc.,*
    461 F. Supp. 3d 1025, 1034 (W.D. Wash. 2020) *opinion clarified*, No. 15-cv-1096, 2021 U.S.
    Dist. LEXIS 45171, 2021 WL 913034 (W.D. Wash. Mar. 10, 2021) ..................................... 46

*Waldron v. Roark,*
    292 Neb. 889, 900, 874 N.W.2d 850, 861 (Nev. 2016) ..................................... 56

*Wheeler v. City of Santa Clara,*
    894 F. 3d 1046, 1057 (9th Cir. 2018) ................................................................ 51

*Wilson v. Arkansas,*
    514 U.S. 927, 934, 115 S. Ct. 1914, 1918, 131 L. Ed. 2d 976, 982 (1995) ...................... 47

*Withey v. Fed. Bureau of Investigation,*
    477 F. Supp. 3d at 1171 (W.D. Wash. 2020) ......................................... 46, 47

*Yada v. Simpson,*
    112 Nev. 254, 256 (1996) ................................................................ 51

*Zabeti v. State,*
    120 Nev. 530, 96 P.3d 773 (2004) ..................................... 50

**CONSTITUTIONAL PROVISIONS**

Nevada Constitution Art. I Sec. 18 ................................................................ 52

U.S. Const., Second Amendment ................................................................ 54

U.S. Const., Fourth Amendment .............................................. 2, 47, 50, 52, 53, 55

U.S. Const., Fourteenth Amendment ...................................... 2, 51, 53

**RULES**

FRCP 56 ................................................................ ii, 46

FRCP 56(a) ................................................................ 46

**STATUTES**

18 U.S.C. § 3109 ................................................................ 2, 47

42 U.S.C. § 1983 ................................................................ 50, 52, 53

NRS § 171.1455 ........................................................................................... 51

NRS § 179.055 ....................................................................................... 2, 47

NRS § 179.055(1) ................................................................................47, 50

**TREATISES**

Fedele, Bhatt and Morrison (2021) ...................................................... 58

Madhavan and Dobbins (2018) ............................................................. 58

Mojica, A., Bartak, C., Mitchell, J., and Ashworth, A. (2023) "Using an Approach-Avoidance Framework to Understand the Relationship between Non-Lethal Weapons and Performance." *Journal of Human Performance in Extreme Environments,* Vol. 18: Iss. 1, Article 4 ......... 59

1       **MEMORANDUM OF POINTS AND AUTHORITIES**

2       **I.    INTRODUCTION**

3       This case concerns the death of a 19-year-old black man, Isaiah Williams, who by all

4   appearances mistook SWAT officers forcefully entering an apartment where he was staying, for

5   intruders. As police disregarded federal and state knock and announce requirements for serving a

6   search warrant, they hurriedly gave token announcements at the front door. Then, police immediately

7   broke through a window next to the young man who was sleeping, detonated an explosive device

8   emitting a gunshot like noise and plumes of smoke inside the unit, while also detonating flashbang

9   devices outside the unit with one officer next to the broken window yelling instructions about the

10  explosive devices, simultaneously the police were battering the door. At best Mr. Williams was given

11  only seconds **_during_** the announcements to assess the situation while police were breaking down his

12  front door, shattering through a window next to his head, and deploying several distraction devices

13  which sound like gunshots in an intentional effort to confuse Mr. Williams.

14      In this chaos created by the Defendants, the young man hastily picked up a firearm he was

15  sleeping next to which he fired in self-defense at police believing them to be intruders. When SWAT

16  officers returned fire, the victim Mr. Williams was shot 17 times, including twice to the heart. Mr.

17  Williams became yet another young, black man needlessly killed by aggressive, unconstitutional

18  police tactics.

19      Everyone should respect law enforcement. Law enforcement has a difficult job. Indeed, the

20  Plaintiff in this case, LATIA ALEXANDER the mother of decedent, used to be a police officer who

21  would go on SWAT missions. However, in this case law enforcement disregarded the Constitutional

22  rights of the decedent when the Defendants used excessive force in derogation of the Constitutional

23  knock and announce rule to serve a search warrant.

24      As explained below, Las Vegas Metropolitan Police Department's ("LVMPD") own internal

25  investigation and its Rule 30(b)(6) deponents in this case agree that both (1) the very use of military-

26  style entry tactics used to forcefully enter the apartment conflicted with Constitutional knock-and-

27  announce requirements, and (2) the SWAT officers violated Mr. Williams' civil rights by failing to

28  wait a reasonable amount of time following their announcements before forcefully entering the

1

1 apartment, leading to Mr. Williams' death.

2      This Motion for Partial Summary Judgment seeks to impose liability and causation on the

3 Defendants for Plaintiff's First and Second Causes of Action (42 USC § 1983, Fourth and Fourteenth

4 Amendment violations), Third Cause of Action (state Constitution violations), Fourth Cause of

5 Action (battery), and Seventh Causes of Action (*Monell*), leaving a trial for damages.

6                    **II.    FACTUAL BACKGROUND**

7      **A.  Facts Leading up the Fatal January 10, 2022 Warrant Service**

8      At the time of the January 10, 2022 botched SWAT operation which lead to Mr. Williams'

9 death, LVMPD officers were investigating a homicide which occurred on November 18, 2021.[1] Mr.

10 Williams was not a suspect in that murder and had no relation to it in any way.[2] The search warrant

11 was for 3050 S. Nellis Boulevard, apartment 1125 – a ground floor apartment. The warrant was a

12 regular search warrant, as opposed to a no-knock warrant, meaning officers would have to abide by

13 statutory and Constitutional knock and announce principles when serving the warrant.[3] There was no

14 arrest warrant for any suspect, let alone one for Mr. Williams who just happened to be sleeping at the

15 apartment.[4]

16      The police suspected this was an apartment used for criminal activity with no regular tenant.

17 However, police had no reliable surveillance or intelligence as to who was actually inside.[5] No

18 surveillance was conducted for eleven (11) days prior to the operation, meaning there was no

19

20 _____

21 [1] The CIRT report itself is confidential, but was filed under seal as **Exhibit 1** to Plaintiff's Motion to

22 Modify Protective Order filed under seal on February 4, 2025, and referred to hereinafter at Exhibit 1. The cited portion is at pg. 8, LVMPD 004262.

23 [2] CIRT Report Exhibit 1 at pg. 8, LVMPD 004262; *see also* pg. 222, at LVMPD 004476

24 [3] CIRT Report Exhibit 1 at pg. 57, LVMPD 004311; *see also* 18 U.S.C.S. § 3109 "The officer may

25 break open any outer or inner door or window of a house, or any part of a house, or anything therein, to execute a search warrant, if, ***after*** notice of his authority and purpose, he is refused admittance or

26 when necessary to liberate himself or a person aiding him in the execution of the warrant. [Emphasis added.]" Nevada has a state law similar to 18 U.S.C.S. § 3109 at NRS § 179.055

27 [4] CIRT Report Exhibit 1 at pg. 57, LVMPD 004311.

28 [5] Deposition of K. Kula, **Exhibit 2** at pg. Id., at pg. 50:1-3; *see also Id.*, at p. 79:24-80:12.

2

1   dependable intelligence.[6] Surveillance of the apartment in advance was so poor that SWAT did not

2   know there was a brass wrap reinforcement on the door or solar screens on the windows until they

3   were literally at the apartment seconds from using force.[7]

4         The morning of his death around 5:00 a.m., the 19-year-old Mr. Williams was only sleeping

5   at the apartment with a friend because he missed curfew.[8] He was engaged in no criminal activity. In

6   fact, none of the items set forth in the search warrant were actually located in the apartment, and

7   neither murder suspect was in the apartment either.[9] On information and belief, in 2025, LVMPD

8   detectives arrested three (3) completely different individuals for the homicide they were investigating.

9   Meaning the apartment never had any relation to the crime nor the suspects at the time. Mr. Williams

10   is truly an innocent victim who was in the wrong place at the wrong time.

11         The planning and approval of the SWAT operation was fraught with problems even prior to

12   January 10, 2022. There was no intelligence or surveillance of who was actually inside the

13   apartment,[10] meaning innocent people could be inside and at risk if forceful tactics were used. There

14   was no specific information anyone inside would be armed,[11] or that the suspects even lived there.

15   The raid was intentionally planned to occur at 5:00 a.m. so as to catch occupants off guard and

16   sleeping.[12]

17         The SWAT Incident Action Plan (IAP) was submitted several different times and ultimately

18   signatures from older versions were re-used,[13] a polite way of saying the final IAP was forged and

19   had not actually been signed off by all needed personnel.  The SWAT tactical commander at the time,

20

---

21   [6] CIRT Report Exhibit 1 at pg. 207, LVMPD 004461.

22   [7] CIRT Report Exhibit 1 at pg. 136, LVMPD 004390. Deposition of J. Bertuccini, Ex. 3 at pg. 140:3-141:6.

23   [8] Deposition L. Alexander, **Exhibit 4** at pg. 56, ln. 14-25.

24   [9] Deposition J. Rothenburg, **Exhibit 5** at pg. 68:15 – 69:4.

25   [10] Deposition J. Rothenburg, Exhibit 5 at pg. 68:15 – 69:4.

26   [11] Deposition of K. Kubla, Exhibit 2 at pg. 50:1-3; see also Deposition of K. Kubla, Exhibit 2 at pg. 79:24-80:12.

27   [12] Deposition of J. Bertuccini, **Exhibit 3** at pg. 66:22 – 67:20.

28   [13] CIRT Report Exhibit 1 at pg. 179, LVMPD 004433.

1    Defendant Lt. Melanie O'Daniel, had never personally served a warrant as a SWAT officer in her

2    entire career and was the LVMPD lieutenant to approve the IAP.[14] The regular SWAT sergeant team

3    leader was out of town on vacation, so as part of the operation Defendant Sgt. Backman was given a

4    senior role despite the fact that he had only been on SWAT 29 days. This would be his first SWAT

5    field operation ever, and he had never completed SWAT basic training.[15]

6        In the hour leading up to the shooting, the SWAT team assembled and briefed at a nearby

7    casino parking lot.[16] There and in advance, it was pre-planned that ***regardless*** of whatever occurred

8    from occupants inside the apartment that after two quick announcements, SWAT officers would begin

9    forcefully entering the apartment by breaking a back window and inserting noise flash diversionary

10   devices (NFDDs),which sound like gunshots, and a flash bang to confuse and distract all apartment

11   occupants, while simultaneously breaking the front apartment door down with a battering ram device.

12   SWAT neither discussed nor planned any aspect of a reasonable amount of time officers should wait

13   after the announcements for any occupants to come to the door and allow the officers admittance

14   before breaking /entering through the window to insert an explosive device. This was a military-style

15   operation from the planning stage with token efforts, if any, to comply with the knock and announce

16   rule.

17        **B.  Investigation Following the Fatal Warrant Service**

18       The fatal shooting of an innocent young black man  prompted the most thorough investigation

19   into the incident of which deposed LVMPD witnesses were aware.[17] Eventually, LVMPD would

20   determine there were at least 22 failures of policy, training and execution in the SWAT action.[18]

21   However, the most critical planning error of all and the crux of this case is the pre-planned use of

22   what is known as a Controlled Entry Tactic (CET) for SWAT to enter the apartment.

23

24   ―――――――――――――――

25   [14] Deposition of M. O'Daniel, **Exhibit 6** at pg. 94:4-9; *see also* pg. 95:10-22.

     [15] Deposition of R. Backman, **Exhibit 7** at pg. 49 ln.10-21.

26   [16] CIRT Report Exhibit 1 at pg. 26, LVMPD 004282.

27   [17] Deposition of J. Roth, Exhibit 5 at pg. 109, ln. 19 – pg. 110, ln. 8.

28   [18] CIRT Report Exhibit 1 at pg. 214-222, LVMPD 004468-004475.

1    A CET is also sometimes called a "dynamic" entry by law enforcement. It is a military-style,

2    pre-planned use of force to enter a residence and relies on surprise and overwhelming force by law

3    enforcement to quickly overwhelm any occupants before they have an opportunity to react.[19] LVMPD

4    determined that allowing CET for a knock and announce warrant was a policy failure because CET

5    is incompatible with Constitutionally-required knock and announce principles.

6    LVMPD also determined that the amount of time the SWAT officers waited between

7    announcements and use of force—which LVMPD concedes as no more than six seconds but was

8    actually zero—was not "reasonable" and also violated Mr. Williams' knock and announce civil

9    rights. By LVMPD's own admissions in this case, its officers engaged in multiple acts which violated

10   Mr. Williams' civil rights and caused his death.

11   **C. Analysis of Officer's Body Worn Camera Footage**

12   The actions of the Defendants that morning were clearly captured on multiple body worn

13   cameras (BWC), so there is little doubt as to what officers did and how Mr. Williams died.[20] However,

14   some further background should be provided to the Court.   At one time, LVMPD SWAT policy

15   specifically required that SWAT officers wait 10 seconds after the announcements before using force

16   to enter a residence to serve a warrant.[21] Shortly prior to the events in this case, however, Lt. O'Daniel

17   changed that policy such that officers needed to only wait a "reasonable" time  - discussed further

18   below in the deposition analysis.[22] There was no other training to officers on this issue or how to

19   interpret "reasonable."

20   Indeed, the only written training on knock and announce in the SWAT manual at all consisted

21   of a few pages of generalized statements.[23] LVMPD has acknowledged, however, that Nevada POST

22   standards circulated suggest that a wait of one minute will be reasonable, but that time should be

---

23   [19] CIRT Report Exhibit 1 at pg. 112, LVMPD 004365, citing to LVMPD SWAT Manual, "CET

24   utilizes surprise and speed to overwhelm the occupants..."

25   [20] Generally see BWC footage, **Exhibits 13-18**.

26   [21] Deposition of G. Findley, **Exhibit 12** at pg. 58 ln. 18- 24.

27   [22] Deposition of G. Findley, Exhibit 12 at pg. 58 ln. 24- pg. 59 ln. 2.

28   [23] LVMPD SWAT manual, **Exhibit 19**.

1  longer if, as in this case, the warrant is served as a time occupants are likely to be asleep.[24]

2      To put this dangerous, unconstitutional use of force in Mr. Williams' case in context, almost

3  exactly one year prior to the fatal shooting of Mr. Williams, many of the same Defendants participated

4  in a property-only search warrant SWAT action where officers also failed to comply with the knock

5  and announce rule.[25] Instead, officers prematurely used explosives on the front door, severely injuring

6  a non-suspect named Jasmine King who was coming to the door to let the officers in. Defendants

7  Bertuccini, Rothenburg, O'Daniel and LVMPD were also sued over that botched SWAT operation

8  as well specifically for violating the knock and announce rule, *see King v. Ubbens, et. al.* Case No.

9  2:21-cv-01426 (US Dist. Nev.). King survived that Constitutional violation with serious injuries, but

10  she lived and received a settlement of $1.8 million. Mr. Williams, however, was not so lucky.

11      One difference between the King matter and Williams' fatal shooting was that Sgt. Russel

12  Backman was given a major role in planning and execution of this warrant. Backman was only

13  assigned to SWAT for 29 days and had not completed even the basic 120-hour SWAT training

14  course,[26] but inexplicably was given a leading role in the operation. As explained below, Backman

15  would (a) erroneously plan for a CET, (b) botch the first announcement by not giving the apartment

16  number, (c) ignore the reasonable wait time requirement, (d) failed to ever attempt a physical knock

17  on the front door[27] and botched the first announcement by not giving the specific apartment number

18  the warrant concerned.[28]

19      After exhaustive review of the BWC,[29] the following timeline of the officer's events has been

20  _____

21  [24] Nevada POST manual excerpt on knock and announce, Ex. 20.

22  [25] Deposition of G. Findley, Exhibit 12 at pg. 33 ln. 3 – pg. 34 ln. 2.

23  [26] Deposition of R. Backman, Exhibit 7 at pg. 49 ln.10-21.

24  [27] BWC of R. Backman, Exhibit 13.

25  [28] Explained herein below from BWC of R. Backman, Exhibit 13.

26  [29]    The time recorded on the videos is in what is called "Zulu" or Greenwich Mean Time (GMT) and
27  <u>not</u> the US Pacific Time Zone where the incident occurred. Zulu time (a military term) is 8 hours
ahead of Nevada time, thus the incident happens on the videos at 13:00 Zulu time, which is 05:00
(a.m.) Nevada time. Additionally, the time stamp of the BWC videos is not perfectly synchronized
28  from officer to officer. Even LVMPD in its Force Investigation Team (FIT) report recognizes this
(footnote continued)

1  constructed which cannot reasonably be contested:

2  **1.  Officer Clements' BWC (at the front door)**

3  **04:59:14 [Clements]**          Officers temporarily group in the apartment's parking lot. Shortly
4  after, approximately 10-15 officers begin to deploy. A few officers go
   around the left side of the building to reach the apartment's rear porch
5  and living room window. However, most officers move to the right
   side of the building where two officers (ROTHENBURG carrying a
6  tactical shield and BERTUCCINI carrying a window-breaking stun
   stick device) continue around the right side of the building to reach
7  the same porch and window. Most officers stop and gather at the front
8  door which is partially under stairs to an upstairs unit.



18  _____

19  and refers to this phenomenon as "time drift." The time drift is in some cases substantial and can
20  approach 20 seconds.  For example, on the CLEMENTS video the first knock and announce begins
    at 4:59:55, but on the ROTHENBURG video this same announcement begins at 05:00:09, a whole
    *14 seconds of difference*.  Therefore, it is helpful when creating a *reliable*, detailed timeline (unlike
21  the one in LVMPD's FIT report) to rely primarily on *one officer's* video for the time when important
    events occurred. This is because referring to the time an event happened without revealing which
22  officer's video is being used is highly misleading and can be used to "cherry pick" or slant certain
    time periods to be longer or shorter than they really were. Therefore, Plaintiff has chosen to refer
23  mostly to officer CLEMENTS' BWC video time to create a reliable timeline. While the choice of
    this officer's camera is somewhat arbitrary, it also makes the most logical sense because officer
24  CLEMENTS is heavily involved in the incident, his camera shows a good view nearly every critical
25  event regarding the shooting, and he is firing what appear to be the fatal shots at WILLIAMS.
    However, to the extent another officer's camera must be examined, one can best determine the
26  number of seconds of so-called time drift by finding the initial and very bright initial deployment of
    the noise flash device. This event is very bright, travelled at the speed of light and is visible on all
27  BWC cameras so it is an excellent peg or marker to measure the time drift between the CLEMENTS
28  time and another officer, if necessary.

1  **04:59:52-53 [Clements]**    As officers approach the front door of the apartment, an officer quietly
2                                verbally reminds BACKMAN to "announce, announce."



14  **04:59:55 [Clements]**    Sgt. BACKMAN *begins* the knock-and-announce. In total,
15                             everything he initially says is "Occupants of 3050 South Nellis, Police
16                             Department Search Warrant." This is insufficient and beneath
17                             LVMPD's own practices because BACKMAN does not announce the
                               *specific unit number* of the apartment they are there to search.

18  **04:59:59 [Clements]**    At this point, BACKMAN has finished the first announcement of
19                             "police officer search warrant."

1    **05:00:00 [Clements]**    BACKMAN begins a second announce, this time remembering to reference the apartment number he omitted the first time, and says "1125, police department, search warrant."

At this point, we can hear an announcement, but where is the knock on the front door? Officer Hancock's video shows the front door view the best at this time. We clearly see on Hancock's video that ***no officer performs the knock requirement on the front door prior to forcibly using the battering ram to gain entry***.[30] In the photo below (corrected to be upright since this officer's BWC is upside down) we are looking at exactly 13:00:00 [Hancock] and we can see from his video around this time that no officer ever performs the Constitutional knock requirement on the front door prior to use of the battering ram. The officer with battering ram is officer Hoskins.



21    **05:00:01-02 [Clements]**    BACKMAN finishes the second "police officer search warrant" announcement and simultaneously the breaking of the living room glass by officers is heard. This was pre-planned according to all officers, i.e., force was pre-planned to be used immediately after the second "police, search warrant announcement"). ***Thus, the time officers gave WILLIAMS to respond to the knock and announce***

---

[30] Plaintiff acknowledges that the failure to physically knock is not dispositive of this issue, but is clearly a strong factor in favor of Plaintiff. *United States v. Combs*, 394 F.3d 739, 743 (2005) ("A physical knock is only one factor to be considered in the reasonableness inquiry and is not determinative.").

1
2

***and provide them entry before using force (breaking the window) to enter the apartment was <u>no more than three (3) seconds.</u>***

3
4
5
6

The glass is being broken by officer BERTUCCINI with a stun stick around the corner and thus can be heard but not seen on CLEMENTS' BWC video. On BERTUCCINI's camera, the time is 04:59:44 [Bertuccini], a time drift of approximately 17 seconds, emphasizing the confusion the time drift causes if the video time references are not all from the same officer camera.

7

[remainder of page blank]

8
9
10
11
12
13
14
15
16
17



18
19
20

**05:00:02-03 [Clements]**      The first of five hits of the battering ram on the front door is heard. This is ***no more than four (4) seconds*** after the first "police, search warrant" announcement was completed.

21
22
23
24
25
26
27
28



**05:00:07 [Clements]**     A sudden flash from the flash bangs deployed at the rear of the apartment can be seen and heard, sounding like a shotgun blast. In the photo below, the flash is seen from the crack in the apartment door as the battering ram hits it the fourth time. There are no other lights on inside the apartment, only the flash bang device.



**05:00:08 [Clements]**     After five hits of the front door with the battering ram, the front door is breached. Nine further gunshot-like noises from the flash bang go off in succession at approximately 1 second intervals so, to WILLIAMS, it would sound like he was already being fired on at this point.

11



**05:00:09 [Clements]**   As the front door to the apartment flings open, an officer yells "get it in" and officers KUBLA and CLEMENTS begin to run through the open door being the first two officers through the door.



**05:00:11 [Clements]**   CLEMENTS enters the apartment through the door as the second officer inside. Every officer testified that up to this point, they had neither seen nor heard anything WILLIAMS did, and did not even know he was inside. On CLEMENTS' camera we actually see the second exterior window breaking as he is now inside the apartment

and turning to face WILLIAMS. This second window, again, was broken out by officer BERTUCCINI and is seen on his BWC video at 04:59:55 [Bertuccini] (substantial time drift). KUBLA is in front of CLEMENTS. A bright light in WILLIAMS' face from the officer's weapons is seen, which would have blinded him having just woken up and otherwise the apartment being in darkness. WILLIAMS could not have reasonably visually recognized the officers as police or read any police or swat signs on their uniforms as his eyes adjusted from being woken up in total darkness to having a flashlight shown directly at his eyes. WILLAMS is in the frame below in red on the right, we see KUBLA's weapon with a flashlight on the end pointed at him. The window breaking in the background is causing glass shards to fly around.



**05:00:12 [Clements]**    WILLIAMS has not even had time to sit up on the couch. Believing he was already under attack and being fired on from the breaking of the window, the door and the many "shots" he heard from the noise flash device, he fires at KUBLA. WILLIAMS must have effectively been blind at this point just shooting at the bright light. Gunshots now begin in rapid succession from both sides for the next 8 seconds or so.

13



**05:00:13-20 [Clements]** It appears that CLEMENTS is firing multiple rounds directly at WILLIAMS at a distance of perhaps 6-8 feet as WILLAMS lays on the couch. We can see WILLIAMS trying to hide his face and cover with a blanket instinctively during the shooting and many of his later shots are fired with his weapon pointing upward and toward the apartment ceiling. He holds the weapon in his right hand while his left arm tries to cover his face/head. Firing from both sides is heard for around seven seconds although CLEMENTS appears to fire the last several shots directly into WILLIAMS.

**05:00:15 [Clements]** We see CLEMENTS firing directly at WILLIAMS while WILLIAMS fires in the direction of the window that had been busted out. At this point, WILLIAMS does not even appear to be looking where he is firing.



1           **2.** **Officer Rothenburg's BWC (at the rear window)**

2         To provide the alternative perspective of the window breaching team, Officer Rothenburg's

3  BWC is offered as follows:

4  **5:00:00 am [Rothenburg]**[31]  Officers are walking towards the apartment.



**5:00:09 am [Rothenburg]**       BACKMAN can be heard beginning the announcement from the front door location. "Occupants of 3050…" ROTHENBURG is still walking around the apartment to come to the window.



---

[31] As described *supra* the time settings on the BWCs are not synced up, so the time stamps are not identical between the cameras.

1    5:00:13 am [Rothenburg]    ROTHENBURG takes his position along the window.



11    5:00:14 am [Rothenburg]    As BACKMAN is on the other side of the building from ROTHENBURG now the exact words of the announcement cannot be easily deciphered, but BACKMAN's voice can be heard and he is still announcing.



23    5:00:15 am [Rothenburg]    BACKMAN's voice can be heard and he is still announcing.



**5:00:16 am [Rothenburg]**    BACKMAN can still be heard announcing. The glass shattering drowns out Backman's announcement. The glass spiderwebbing can be seen on the video snapshot. There is no time break between Officer Backman making his announcement and the glass shattering.



**5:00:17 am [Rothenburg]**    The rake/stun stick partially going through the window can be seen – see red arrow below.

1
2
3
4
5
6
7
8
9
10
11
12
13



14  **5:00:18 am [Rothenburg]**    The window is gone.

15
16
17
18
19
20
21
22
23
24



25  **5:00:19 am [Rothenburg]**    ROTHENBURG is turning towards BERTUCCINI and telling him to
26                                                  "hit it, hit it…" What any person on the other side of the window
27                                                  would hear is that, not 'police, we are here to serve a search warrant.'
28



**5:00:20 am [Rothenburg]**     ROTHENBURG is turning towards BERTUCCINI and telling him to "pull, pull, pull…" referring to the NFDD BERTUCCINI was trying to deploy in the unit (which initially misfired).



**5:00:21 am [Rothenburg]**    The flashbang NFDD goes off in the apartment, filling it with a gun like noise, a flash and smoke. For less than a second the flash affects the camera. Below are snapshots from the same second showing the flashbang's impact.



**5:00:22 am [Rothenburg]**    A shot is fired.



**5:00:23 am - 5:00:23 am [Rothenburg]**    Gunfire exchange and smoke.



**5:00:25 am [Rothenburg]**    There is gunfire exchange. What can be seen partially through ROTHENBURG's shield is a smoke-filled apartment.



**5:00:26-27 [Rothenburg]** There is gunfire exchange.



**5:00:28 am [Rothenburg]**    There is gunfire exchange. WILLIAMS can be seen partially wearing red.



1  **5:00:34 a.m. [Rothenburg]**  The gunfire ceases. The apartment is dark and smoky. Presumptively,

2                    WILLIAMS is dead, or unconscious and about to die.

3       **D.  Analysis of Deposition Testimony**

4       Numerous depositions were taken in this case, including two FRCP 30(b)(6) witnesses from

5  LVMPD. The salient testimony explaining everyone's roles and their factual concessions supporting

6  this motion for summary judgment are below:

7          **1.  Sergeant Russell Backman (Defendant)**

8       Sgt. Russell Backman testified that at the time of the shooting, he was a Sergeant assigned to

9  the SWAT team.[32] At the time of the fatal shooting, he had only been assigned to the SWAT team for

10  29 days.[33] He conceded that the knock and announce rule required waiting for a reasonable amount

11  of time after the announcement, also considering the time of day the warrant was being served.[34] He

12  acknowledged the purpose of the knock and announce is to notify the occupants that officers are there

13  to serve a search warrant and notify occupants of police presence, authority and purpose.[35]

14       Sgt. Backman acknowledged they were serving a property-only search warrant, and therefore,

15  a no-knock warrant could not be obtained for it.[36] He was well aware this was a property-only search

16  warrant requiring knock and announce.[37]

17       Sgt. Backman described a CET as having "the purpose of entering a structure or dwelling

18  dynamically in order to overwhelm and take people into custody."[38] He acknowledged that as of the

19  time of his deposition, CET could not be used on a knock and announce warrant.[39] He testified that

20  LVMPD's policies changed since the Williams' shooting, such that they cannot use a CET for service

21

22  [32] Deposition of R. Backman, Exhibit 7 at pg. 12 ln. 11-20.

23  [33] *Id.,* at pg. 19 ln. 13-23; pg. 50 ln. 9-15.

24  [34] *Id.,* at pg. 19 ln. 1-11.

25  [35]  *Id.,* at pg. 21 ln. 10-15.

26  [36] *Id.,* at pg. 24 ln. 4-15; pg. 27 ln. 24-25.

    [37] *Id.,* at pg. 42 ln. 10-12.

27  [38] *Id.,* at pg. 25 ln. 7-23; pg. 29 ln. 18-pg. 30 ln. 16.

28  [39] *Id.,* at pg. 27 ln. 1-4.

1    of a knock and announce warrant currently.[40]

2        During his deposition, he extensively described how the planning and use of the CET entry

3    came about. Sgt. Backman was heavily involved in the planning despite not being on SWAT even a

4    month because the team leader, Lt. Garth Findley, was on vacation at the time.[41] He dealt directly

5    with Defendant Lt. O'Daniel at this time, who also approved the CET.

6        Sgt. Backman also recounted that he requested, and Lt. O'Daniel approved, using a stun stick

7    and other NFDDs in addition to CET.[42] He acknowledged that the very purpose of the stun stick was

8    to disorient persons inside, in this case as it turned out, Mr. Williams.[43] He admitted that, unlike a

9    narcotic case, there was no risk of destruction of the property they were seeking in the warrant, which

10   was primarily a gun and cell phone, and thus could not be easily discarded such as, for example,

11   flushing the evidence down a toilet.[44]

12       On the morning of the shooting, the SWAT team arrived at the nearby Sam's Town Hotel and

13   Casino at approximately 4 a.m. to stage and brief. They generally discussed how SWAT intended to

14   serve the warrant.[45] He stated that SWAT Sgt. Findley was in charge of the active, actual tactical

15   operation, but Sgt. Backman's role was to operate the bullhorn and handle the announcements. He

16   acknowledged that he was there for training purposes (a live SWAT operation that resulted in a fatal

17   shooting!).[46]

18       Sgt. Backman acknowledged he was the fourth officer in the stack or line of officers at the

19   front door of the apartment as they approached it.[47] Sgt. Backman acknowledged that Mr. Williams

20

21   _____

22   [40] *Id.,* at pg. 31 ln. 8-11.

23   [41] *Id.,* at pg. 32 ln. 8- pg. 41 generally; pg. 51 ln. 18-pg. 53 ln. 11.

24   [42] *Id.,* at pg. 54 ln. 23- pg. 56 ln. 24.

     [43] *Id.,* at pg. 58 ln. 9-13.

25   [44] *Id.,* at pg. 82 ln. 12-24.

26   [45] *Id.,* at pg. 47

27   [46] *Id.,* at pg. 49 ln.10-21.

28   [47] *Id.,* at pg. 65 ln. 4-21.

1  did nothing to refuse admittance before force was used to enter the apartment.[48] He stated he did not

2  know if Mr. Williams was awake or asleep at the time the knock and announce was made.[49] He

3  acknowledged that he did not hear Mr. Williams say anything in response to the announcement.[50]

4  However, it is not Mr. Williams' duty to do so.

5  ### 2.  LVMPD FRCP 30(b)(6) Designee– Deputy Chief Reggie Rader

6  Perhaps the most important deposition in this matter is the deposition of the FRCP 30(b)(6)

7  deponent for the Las Vegas Metropolitan Police Department, Deputy Chief Reggie Rader. Chief

8  Rader had no personal involvement in the January 10, 2022 SWAT action, but has testified in a

9  manner binding LVMPD.

10  Chief Rader explained that the department uses several boards or committees to comprise its

11  critical incident review process. He explained that one step of the process is called the Critical

12  Incident Review Team, or CIRT for short. CIRT is composed of subject matter experts, both inside

13  and outside of LVMPD. CIRT conclusions and recommendations are then expressed to a tactical

14  review board or TRB at LVMPD, which is composed of senior-level members of LVMPD who

15  review CIRT conclusions and recommendations and may affirm, modify or reject them.[51]

16  Both boards investigated the SWAT actions leading up to Mr. Williams' fatal shooting. In

17  this instance, TRB unanimously accepted or upheld most of CIRT's findings and conclusions. Chief

18  Rader was personally on the TRB at this time.[52]

19  Chief Rader explained that at the time of the shooting SWAT structure was that it was led by

20  Cpt. Cole with the next most senior officer being Defendant Lt. O'Daniel. Lt. O'Daniel was the only

21  lieutenant supervisor, sometimes called tactical commander, at that time on SWAT.[53]

22

---

23  [48] *Id.,* at pg. 74 ln. 21-pg 75 ln. 3.

24  [49] *Id.,* at pg. 77 ln. 12-24. Although he said he did not know for certain, he constantly referred to

25  Williams having been sleeping at the time SWAT arrived.

[50] *Id.,* at pg. 78 ln. 16-25.; pg. 79 ln. 8-15.

26  [51] Deposition of R. Rader, Exhibit 9 at pg. 16 ln. 6 – pg. 21 ln. 25.

27  [52] *Id.,* at pg. 41 ln. 8 – pg. 42 ln. 10.

28  [53] *Id.,* at pg. 38 ln. 6-25.

Chief Rader testified that in his opinion, CIRT took this officer-involved shooting seriously and did a thorough job investigating it.[54] He also could not recall seeing a longer TRB memorandum. CIRT made 29 general conclusions which were areas where there were policy, training or execution issues to address. In turn TRB completely validated 22 of those.[55]

During his deposition, Chief Rader extensively testified regarding critical conclusions and admissions of LVMPD which had been set forth in the CIRT report and the TRB memorandum.[56] As background, many of the 22 validated issues concerned failure of LVMPD or its officers of an important nature, but not necessarily of a nature that led to Mr. Williams death. For example, LVMPD determined that the application for the search warrant, even though it had been approved by a judge, did not identify the items to be searched for with enough specificity under department policy, and for that reason should not have been submitted to begin.[57]

LVMPD, however, through its Rule 30(b)(6) designated witness, freely admitted to many failures of crucial aspects of this case. Chief Rader admitted that LVMPD determined there had been multiple failures of policy and training by the department.[58]

LVMPD admitted that there had been a failure of training by allowing Sgt. Backman, who had only been on SWAT for 29 days and had not completed the 120-hour basic SWAT school, to participate in the SWAT operation to the extent he did.[59] LVMPD further determined that SWAT should **not** have used CET when serving the search warrant and this was also a failure of policy.[60] In fact, Chief Rader acknowledged that prior to September 2021, there had been a ban on using CET for a property only search warrant. For some reason it was dangerously changed a few months before the

---

[54] *Id.,* at pg. 47 ln. 20- pg. 48 ln. 11.

[55] *Id.,* at pg. 56 ln. 15 – pg. 57 ln. 5.

[56] Generally discussed at Deposition of R. Rader, Exhibit 9 beginning at pg. 62.

[57] *Id.,* at pg. 74 ln. 10 – pg. 76 ln. 7.

[58] *Id.,* at pg. 70 ln. 75-19.

[59] *Id.,* at pg. 93 ln. 2 – pg. 94 ln. 4.

[60] *Id.,* at pg. 94 ln. 5.

1    Williams' event.[61]

2         At that time, Lt. O'Daniel would have been in charge of making changes to such policy and

3    procedure. (Lt. O'Daniel admitted to amending or what she framed as "clarifying" the policy during

4    her deposition, discussed *supra*.)[62] Part of the reason CET should not have been used during this

5    warrant service was because there were too many unknown factors, including the presence of women,

6    children or other vulnerable or innocent people (i.e., Mr. Williams) inside the apartment.[63]

7         LVMPD expressly concluded that CET was inherently Constitutionally incompatible with

8    service of a knock and announce warrant.[64] He acknowledged that the knock and announce rule is

9    both a federal and state requirement and violation of the knock and announce constitutes excessive

10   force.[65] LVMPD admitted there was a policy and training failure to allow CET entry on knock and

11   announce warrants because the purpose of CET entry is to surprise and overwhelm people; whereas

12   knock and announce requires alerting people inside the residence and giving them time to come to

13   the door and allow admittance to the officers.[66] When asked, "[s]o Metro determined that a CET entry

14   is constitutionally inconsistent with knock and announce principles?" Chief Rader responded, "Yes"

15   and acknowledged that those two concepts "contradict" each other.[67]

16        In an additional finding of a similar nature, LVMPD concluded SWAT had allowed only six

17   (6) seconds between the announcements and the use of force, and that this was not an adequate

18   amount of time or a reasonable time to comply with the knock and announce constitutional

19   requirements.[68] Thus, even though Plaintiff contends less time elapsed between announcement and

20

21   _____

22   [61] *Id.,* at pg. 100 ln. 12-22.

     [62] *Id.,* at pg. 101 ln. 8-17.

23   [63] *Id.,* at pg. 102 ln. 24 – pg. 104 ln. 5.

24   [64] *Id.,* at pg. 104 through 105.

25   [65] *Id.,* at pg. 104 ln. 21-pg. 105 ln. 22.

26   [66] *Id.,* at pg. 105 ln. 23- pg. 107 ln. 3. (We did identify and agree with the conflicting ideologies of
     these two different concepts.)

27   [67] *Id.,* at pg. 107 ln. 4-19.

28   [68] *Id.,* at pg. 107 ln. 21- pg. 109 ln. 6.

1    entry, even accepting LVMPD's count, LVMPD concedes six (6) seconds was Constitutionally

2    insufficient.

3        Chief Rader admitted that in performing knock and announce, none of the officers bothered

4    to physically knock on the apartment door.[69] He stated that LVMPD does not have a formal policy

5    on whether an actual physical knock should be performed, [70] (which is a gross failure of training and

6    policy in and of itself). Although Sgt. Backman's first announcement did not include the actual

7    apartment number of the apartment, Chief Rader conceded that LVMPD's policy is when serving a

8    warrant on an apartment is that the announcement should include the full address and apartment

9    number.[71] This concession essentially admits that Sgt. Backman's first announcement was

10   insufficient and contrary to department policy.

11       Again, the critical admissions through LVMPD's own rule 30(b)(6) designee Deputy Chief

12   Rader was that there is an inherent conflict between the use of CET and knock and announce

13   principles. Therefore, LVMPD, by its own admission, maintains a policy that violates the

14   Constitution by allowing CET for knock and announce warrants. In addition, LVMPD freely admits

15   that what it determined was six (6) seconds between the announcement and the first use of force was

16   not a reasonable amount of time for officers to allow Mr. Williams to respond. Thus, Mr. Williams'

17   civil rights under the knock and announce rule were violated.

18                      **3.  LVMPD FRCP 30(b)(6) Designee– Lt. Adrian Beas**

19       LVMPD's other designated FRCP 30(b)(6) deponent was current SWAT Lt. Adrian Beas. Lt.

20   Beas was not on SWAT on January 10, 2022,[72] but at the time of his deposition he was the SWAT

21   tactical commander lieutenant for LVMPD, having the second-in-command role at SWAT which

22   Defendant Lt. O'Daniel held at the time of this shooting.[73]

23

24   _____

25   [69] *Id.,* at pg. 110 ln. 5-21.

     [70] *Id.,* at pg. 110 ln. 22- pg. 111 ln. 3.

26   [71] *Id.,* 9 at pg. 111 ln. 24-pg. 112 ln. 4.

27   [72] Deposition of A. Beas, Exhibit 10 at pg. 15 ln. 4-12.

28   [73] *Id.,* at pg. 17 ln. 4- pg. 18 ln. 2.

On behalf of LVMPD, Lt. Beas correctly acknowledged that officers were required as part of the knock and announce to, "announce their presence and authority and purpose to the occupants in that dwelling, and they have to fail to surrender prior to making forcible entry."[74] He openly acknowledged, "SWAT officers should wait a reasonable amount of time, yes" to allow persons inside a residence to ascertain the officers' identity and purpose, and allow them entry.[75] He acknowledged on behalf of LVMPD that knock and announce was both a constitutional and a state law requirement.[76] However, on behalf of LVMPD, he acknowledged that Nevada state law was more restrictive than federal law because it specifically required some refusal of admittance prior to use of force,[77] which plainly did not occur here.

Lt. Beas acknowledged that the very concept and purpose behind CET is "speed, surprise, and overwhelming action."[78] On behalf of LVMPD, he admitted that there was a "conflict in the language of the CET based on the reasonableness of time" - meaning that the CET conflicted with the knock and announce rule.[79] He indicated that LVMPD's current position is that CET or dynamic entry may only be used on a no-knock warrant.[80]

Lt. Beas was specifically asked whether LVMPD at the time of his deposition was taking a position that for some reason, the TRB and CIRT were incorrect in their conclusions. He indicated "[w]hat we agreed upon, that the CIRT recommendations that keeping the language of speed, surprise, and overwhelming action, that tactic would be a no-knock search warrant." He did not indicate in his deposition that LVMPD was taking any position in this litigation, contrary to the findings of CIRT and TRB.[81]

---

[74] *Id.,* at pg. 39 ln. 4-13.

[75] *Id.,* at pg. 39 ln. 23- pg. 40 ln. 5.

[76] *Id.,* at pg. 42 ln. 5-19.

[77] *Id.,* at pg. 43 ln. 6- pg. 44 ln. 15.

[78] *Id.,* at pg. 45 ln. 25- pg. 46 ln. 5.

[79] *Id.,* at pg. 46 ln. 5- pg. 48 ln. 8.

[80] *Id.,* at pg. 48 ln. 48- pg. 49 ln. 1.

[81] *Id.,* at pg. 51 ln. 6-22.

Lt. Beas acknowledged that SWAT allowed no preplanned time between the announcement and the insertion of the stun stick for Mr. Williams to get up and come to the door to allow officers inside, he only said that as it played out, six (6) seconds were allowed.[82] He also acknowledged that deploying the noise flash diversionary devices (NFDDs) can sound like a gunshot to a person.[83] He acknowledged that the NFDDs (which he admitted sound like gunfire) were deployed **before** Mr. Williams fired his weapon.[84] This means that Mr. Williams would have had every reason to believe he had **already** been fired upon multiple times by the people trying to enter the apartment by the time he fired.

Lt. Beas acknowledged officers had pre-planned to use force to break out the back window and deploy the stun stick immediately after the second announcement, thus planning no amount of time or zero seconds to pass between the second announcement and the use of force.[85] He also acknowledged on behalf of LVMPD that the officer's act of breaking the rear window with the stun stick was the first act of force.[86]

When specifically pressed for pages of his deposition transcript as to whether LVMPD was going to dispute the findings of the CIRT or TRB in this litigation, Lt. Beas testified as follows:

> Q: Okay. And does Metro now acknowledge that that was incorrect and that was an unreasonable amount of time [to allow Williams]?
>
> A: The findings were that, based on that incident, it was an unreasonable amount of time. That's what the CIRT and Tactical Review Board had stated.
>
> Q: And -- and that is Metro's position?
>
> A: Ultimately, it's Metro's position based on those reports.[87]

Later in his deposition, he confirmed a second time that in this litigation, LVMPD was not disputing six (6) seconds was an improper amount of time, as the findings indicated in the CIRT

---

[82] *Id.,* at pg. 68 ln. 4-12.

[83] *Id.,* at pg. 64 ln. 1-9.

[84] *Id.,* at pg. 71 ln. 3-18.

[85] *Id.,* at pg. 80 ln. 5-20.

[86] *Id.,* at pg. 80 ln. 22- pg. 81 ln. 10; pg. 148 ln. 23- pg. 149 ln. 3.

[87] *Id.,* at pg. 88 ln. 12-21.

report.[88] Therefore, LVMPD's own FRCP 30(b)(6) designee repeatedly indicated LVMPD in this litigation would not take any position to dispute those crucial CIRT and TRB findings.[89]

Lt. Beas testified as to the deployment of NFDDs that, "I would agree with you that he [Bertuccini] did not know where Mr. Williams or any other occupant was at inside the structure."[90] He was asked whether Mr. Williams was considered a "innocent bystander" and responded "[h]e was an occupant inside the structure that was not named in the search warrant, I agree with you."[91] He was specifically asked whether LVMPD disputed the CIRT and TRB findings that Lt. O'Daniel's approval of the stun stick was not within department policy, and he indicated LVMPD did not dispute that finding in this litigation.[92]

On the topic of why officers did not perform an actual physical knock, he said it was not LVMPD's official policy that the knock would be literally performed, but it was within the officer's discretion if they felt it was safe to do so. However, he was not able to identify any reason as to why officers would not have attempted to knock when serving the actual warrant, since it is acknowledged there was no movement or sound from inside the residence prior to the use of force.[93] He further acknowledged it was LVMPD's policy that if a knock and announce was to be performed at an apartment, the actual apartment number should be named in the announcement.[94] His official position was that the first announcement was proper, but when he was asked whether an announcement of "3050 South Nellis, search warrant" would be sufficient, he said no, given it did not list the apartment number.[95]

---

[88] *Id.,* at pg. 144 ln. 3-8.

[89] *Id.,* at pg. 153-154.

[90] *Id.,* at pg. 91 ln. 24- pg. 92 ln. 3.

[91] *Id.,* at pg. 93 ln. 17-23.

[92] *Id.,* at pg. 153 ln. 12-18.

[93] *Id.,* at pg. 101 ln. 18- pg. 104 ln. 10. LVMPD acknowledges it was preplanned by SWAT that there would be no knock.

[94] *Id.,* at pg. 105 ln. 5- pg. 106 ln. 20.

[95] *Id.,* at pg. 108 ln. 11-17.

30

Regarding NFDDs, he acknowledged Lt. O'Daniel and Sgt. Backman had done the planning for deployments of the NFDDs. He admitted the purpose of NFDDs was to stun, disorient, and confuse people inside.[96] This means that on a knock and announce warrant, where Mr. Williams should be getting clear announcements and requests, LVMPD officers were using devices intentionally to confuse and disorient him.

He acknowledged CIRT and TRB determined the deployment of NFDDs in this case violated LVMPD's own policies because there was not enough information regarding occupants in the apartment. When asked whether LVMPD in this litigation agreed that the deployment of the NFDDs was against its policies, Lt. Beas responded, "[b]ased on CIRT's recommendation that there was not enough pre surveillance, yes."[97]

Lastly, Lt. Beas acknowledged that during the CET, officers were wearing what are called "subdued patches" Meaing that the words, SWAT or POLICE, on their uniform are blacked out and thus harder to see.[98]

### 4. Officer Brice Clements (Defendant)

Officer Clements testified that on the morning of the shooting, he was not working his regular work hours, and he was called out specifically for the SWAT operation.[99] He had been a police officer since 2009.[100] He testified that when performing a knock and announce, there is a time that they "wished it to be" between the announcements and the use of force, which he testified was approximately 10 seconds, somewhat consistent with what other officers testified.[101]

This is relevant because even LVMPD admits that no more than six (6) seconds passed

---

[96] *Id.,* at pg. 158 ln. 4-21.

[97] *Id.,* at pg. 111 ln. 3-23.

[98] *Id.,* at pg. 161 ln. 25 – pg. 162 ln. 24.

[99] Deposition of B. Clements, Exhibit 11 at pg. 15 ln. 2-25.

[100] *Id.,* at pg. 17 ln. 25- pg. 18 ln. 6.

[101] *Id.,* at pg. 23 ln. 3-22.

between the announcements and the first use of force. In fact, during the deposition, Officer Clements said he believed 17 seconds lapsed from the first announcement before use of force. He was surprised to hear that it was actually six (6) seconds per the LVMPD count.[102]

Officer Clements admitted CET is used to, "use speed and surprise" to enter an apartment and clear it.[103] He mistakenly believed they had a search warrant **and** an arrest warrant that morning. Apparently still not knowing after two (2) years it was only a property search warrant.[104]

Officer Clements' role was to be the number two (2) person in the entry stack, just behind Officer Kubla.[105] He acknowledged that after entering, he discharged his firearm at Mr. Williams.[106] Officer Clements fired his firearm a total of 13 times into Mr. Williams.[107]

Officer Clements was fully aware of the plan to deploy both a stun stick and a nine bang noise flash diversionary device.[108] He said, "[i]n this case, we didn't know who or if anybody was inside, but we still used the tactics to safely go in."[109] During his deposition, Officer Clements tacitly agreed that Mr. Williams was likely sleeping at the time of entry when he described him as "somebody who is sleeping with a firearm next to them…"[110]

When asked what Mr. Williams did to refuse the officers' admittance prior to their use of force, he acknowledged there was no indication Mr. Williams was going to refuse entry.[111] Officer

---

[102] *Id.,* at pg. 54 ln. 7-17.

[103] *Id.,* at pg. 30 ln. 7-11.

[104] *Id.,* at pg. 30 ln. 2-3.

[105] *Id.,* at pg. 45 ln. 18-22.

[106] *Id.,* at pg. 46 ln. 12-17.

[107] *Id.,* at pg. 60 ln. 4-8.

[108] *Id.,* at pg. 50 ln. 1-14.

[109] *Id.,* at pg. 50 ln. 12-14.

[110] *Id.,* at pg. 59 ln. 11-12.

[111] *Id.,* at pg. 65 ln. 14 – pg. 66 ln. 2

1    Clements acknowledged the purpose of the stun stick is so that people are "stunned and or blinded

2    temporarily" by the stun stick.[112] Officer Clements also acknowledged that the stun stick and NFDDs

3    distract and confuse people.[113] He acknowledged that the use of CET was purportedly for officer

4    safety, not because officers were concerned there was potential evidence inside the apartment that

5    could be destroyed.[114]

6

7        **5.  Officer James Bertuccini (Defendant)**

8        Officer Bertuccini testified that at the time of the incident he was a police officer assigned to

9    the SWAT unit of LVMPD.[115] He had been with LVMPD since 2004.[116]

10        He described himself as an Assistant Team Leader, an entry man and explosive breacher.[117]

11   Officer Bertuccini acknowledged that for the SWAT operation, Sgt. Backman was one of the

12   sergeants in charge. The lieutenant in charge was Defendant Lt. O'Daniel.[118]

13        Officer Bertuccini acknowledged having taken part in a prior SWAT action, which resulted

14   in serious injury to a member of the public, Jasmine King, a year prior to the Williams' incident.

15   Officer Bertuccini was later sued for failing to abide by constitutional knock and announce rules

16   regarding Ms. King.[119]

17        Officer Bertuccini was the officer who performed the initial use of force to enter the

18   apartment. That was the use of a stun stick to break the rear window of the apartment, feet away from

19   Mr. Williams' head where he was sleeping.[120] He testified the reason for using the stun stick was to

20   _____

21   [112] *Id.,* at pg. 67 ln. 15-21.

22   [113] *Id.,* at pg. 68 ln. 7-8.

23   [114] *Id.,* at pg. 71 ln. 7-21.

24   [115] Deposition of J. Bertuccini, Exhibit 3 at pg. 5 ln. 12-15.

25   [116] *Id.,* at pg. 16 ln. 10-11.

     [117] *Id.,* at pg. 17 ln. 14-21.

26   [118] *Id.,* at pg. 21 ln. 10-14.

27   [119] *Id.,* at pg. 25 ln. 5-pg. 30 ln. 4.

28   [120] *Id.,* at pg. 35 ln. 5- pg. 40- ln. 9; pg. 43 ln. 19- pg. 44 ln. 4.

1  "disrupt and disorient the people that are inside. Causing a major -- a large flash and an initiation

2  explosive" as well as a pressure wave that persons can feel.[121] Officer Bertuccini acknowledged that

3  the stun stick when discharged is extremely bright, and the noise was known to confuse people into

4  thinking a gun or weapon was fired.[122]

5      Officer Bertuccini specifically testified that other suspects they had arrested in unrelated

6  operations said "we thought those were gunshots" regarding the stun stick.[123] Indeed, Bertuccini was

7  wearing eye protection and noise canceling headphones to protect his senses while Mr. Williams had

8  none.[124]

9      Officer Bertuccini discussed CET. He acknowledged that today CET is permitted only when

10  there is a no-knock warrant.[125] Officer Bertuccini acknowledged that the 5 a.m. service time for the

11  warrant was selected specifically because it was hoped that people inside would be asleep.[126]

12      When asked about any training on a Nevada specific statute that stated that officers are not

13  permitted to use force until they have been refused admittance, he said he had never been trained on

14  that state law.[127] Officer Bertuccini had never seen or been trained on the State of Nevada

15  Commission on Peace Officer Standards and Training, Performance Objective Reference Material

16  which recommends a one (1) minute rule of thumb for a safe period for officers to wait between

17  announcements and use of force.[128]

18      Officer Bertuccini acknowledged that as the SWAT officers approached the apartment, they

19  had no idea who was inside the apartment or whether they were awake.[129] Critically to this motion,

20  _____

21  [121] *Id.,* at pg. 43 ln. 1-24.

22  [122] *Id.,* at pg. 44 ln. 5-23.

23  [123] *Id.,* at pg. 45 ln. 20- pg. 46 ln. 8.

24  [124] *Id.,* at pg. 48 ln. 2- pg. 49 ln. 12.

25  [125] *Id.,* at pg. 64 ln. 6-14.

   [126] *Id.,* at pg. 67 ln. 12-20.

26  [127] *Id.,* at pg. 77 ln. 16-24.

27  [128] *Id.,* at pg. 81 ln. 13- pg. 82 ln. 8.

28  [129] *Id.,* at pg. 82 ln. 9-14.

1  he described that during the earlier SWAT briefing, he was selected for use of the stun stick, and it

2  was preplanned the stun stick would be deployed at the end of the second announcement. In other

3  words, force would automatically be used to enter the apartment in question "after the second

4  announcement."[130] He openly acknowledged that it was preplanned that there would be no delay

5  between the second announcement and deployment of the stun stick.[131]

6      Officer Bertuccini stated the intended announcement would be the entire address and then the

7  police department search warrant announcement, which conflicts with the actual announcement given

8  by Sgt. Backman which omitted the apartment number originally.[132] Officer Bertuccini specifically

9  acknowledged the importance of announcing the actual apartment number, which was not originally

10  done with the first announcement.

11      During the tactical briefing, no one ever discussed the time in seconds that should be left to

12  elapse between announcements to allow somebody to admit the officer's entry.[133] SWAT literally

13  planned on allowing no response from occupants. Officer Bertuccini acknowledged that it was his

14  act of breaking the window that was the first use of physical force to enter the apartment[134] and that

15  all of that was preplanned. Officer Bertuccini acknowledged that if the same SWAT action occurred

16  today, it would likely be done with a surround and callout rather than CET.[135]

17      Officer Bertuccini acknowledged that as he approached the rear window, the blinds were

18  closed, creating a problem because he could not see if occupants were on the other side of the

19  window.[136] Nevertheless, he proceeded even though he acknowledged official policy was to know

20  whether someone was on the other side and how close they were to the window in order to deploy

21

22  _____

23  [130] *Id.,* at pg. 101 ln. 15-21.

24  [131] *Id.,* at pg. 103 ln. 18-22.

25  [132] *Id.,* at pg. 101 ln. 22- pg. 102 ln. 20.

   [133] *Id.,* at pg. 106 ln. 14-20.

26  [134] *Id.,* at pg. 108 ln. 1-9.

27  [135] *Id.,* at pg. 118 ln. 6- pg. 119 ln. 5.

28  [136] *Id.,* at pg. 141 ln. 7-16.

1    the stun stick. (The Jasmine King lawsuit where they deployed an explosive device as she was looking

2    through the peephole of a door evidently had no impact on him as he proceeded 'blind' again to

3    deploy an explosive device.) Indeed, he also encountered a solar screen on the window but proceeded

4    regardless. The officers had so little reliable surveillance that they failed to know that there were

5    blinds or a solar screen on the window until the seconds before they were supposed to breach.

6         Officer Bertuccini acknowledged that before his use of force to insert the stun stick through

7    the window he never saw anyone moving inside or heard anyone speaking.[137] He also acknowledged

8    that the SWAT manual states that the stun stick is not to be used only to preserve evidence, as in a

9    search warrant for property only, but he proceeded anyway.[138] He also admitted that from Mr.

10   Williams' perspective, he could understand how Mr. Williams might confuse the stun stick distraction

11   and the nine banger deploys for gunshots.[139]

12         **6.  <u>Officer Kerry Kubla (Defendant)</u>**

13        Officer Kerry Kubla holds the position of Police Officer 2, working the SWAT bureau, special

14   weapons and tactics, homeland security division. Kubla has been in that position for 6 years and was

15   on the date of this shooting.[140] Officer Kubla is highly familiar with serving warrants. Typically,

16   SWAT serves 300 to 400 warrants a year, and he is involved in many of those services.[141]

17        Officer Kubla was on the recon team for this warrant, but only drove over to the Nellis

18   Boulevard unit. Officer Kubla was primarily involved in investigating the other unit at Jimmy

19   Durante.[142] Officer Kubla agreed the recon team focused on the Nellis apartment failed to ascertain

20   that there was a brass wrap on the door, agreeing that knowledge, "could have changed things."[143]

21

22   _____

23   [137] *Id.,* at pg. 145 ln. 14-22.

24   [138] *Id.,* at pg. 148 ln. 20- pg. 149 ln. 25.

25   [139] *Id.,* at pg. 158 ln. 3- pg. 159 ln. 12.

     [140] Deposition of K. Kubla, Exhibit 2 at pg. 11:25-12:12.

26   [141] *Id.,* at pg. 14:14-24.

27   [142] *Id.,* at pg. 35:8-36:1.

28   [143] *Id.,* at pg. 62:10.

Officer Kubla properly described knock and announce concluding, it requires "giving the suspect or giving whoever we're serving, the residents at the warrant, the opportunity to come to the door."[144] Officer Kubla was the only officer deponent when describing knock and announce who included the second part of the requirement – to give an occupant time to grant or deny entrance – without being prompted.

Officer Kubla insisted during his deposition this warrant had to be served using a CET.[145] Officer Kubla acknowledged that based upon the change in policy, if this warrant were served today, it would be a surround and call out as this was not a no-knock warrant.[146] But Officer Kubla argued if this warrant were to be served today, an application for a no-knock ought to be made. (A property only search warrant, would never be approved for a no-knock warrant).

Officer Kubla testified SWAT internally changed their policy on how to map out their pre-warrant form to include whether they had "PC" – probable cause – to arrest a suspect when preparing for service. Officer Kubla was unsure if it was related to this matter, but confirmed the policy changed following this incident.[147] Officer Kubla did know that following this incident, the overall acceptance of pre-warrant vetting by SWAT changed, he testified:

> Yes. I'd say that we're much more thorough in vetting that and pushing back on units to have that stuff done. If they don't have something in there, then we push it back. Hey, you need to get this. You need more time out there. You need a PID. You might need to do a phone pin. There's different things that we might push back. Not that I'd push back. That's above my pay grade. But I know that we do vet that stuff a lot more now.[148]

///

///

---

[144] *Id.*, at pg. 16 ln. 8-13.

[145] *Id.*, at pg. 30 ln. 10-22.

[146] *Id.*, at pg. 29 ln. 5-22.

[147] *Id.*, at pg. 44 ln. 4-21.

[148] *Id.*, at pg. 114 ln. 18 – pg. 115 ln.9.

1      Officer Kubla testified they knew from the warrant both suspects were linked to guns[149] and

2 the intent was to arrest both suspects.[150] However, Officer Kubla confirmed the only way the murder

3 suspects were associated with the Nellis apartment was, "[j]ust the stepmother that had stated that

4 they were in and out over here and it was a [alleged] flophouse."[151]

5      Officer Kubla confirmed the plan was to make the announcements, then immediately insert

6 the stun stick.[152] When describing how long it would take the SWAT team to make their way through

7 the apartment, Officer Kubla estimated it would take eight (8) seconds to get through the "small"

8 apartment.[153] That is less time than they gave anyone inside to answer even accepting LVMPD's six

9 (6) second count.

10      Officer Kubla agreed the intent of the CET and NFDDs was to surprise and overwhelm.[154]

11 Officer Kubla acknowledged the stun stick went off right next to where Mr. Williams was sleeping.[155]

12      Officer Kubla acknowledged Mr. Williams did nothing to refuse admittance while the door

13 was closed.[156] Officer Kubla confirmed they did not know who was in the apartment, stating "[s]o

14 unknown on who all was going to be in there."[157]

15      Officer Kubla could not answer on what a "reasonable" amount of time was related to knock

16 and announce.[158] Officer Kubla agreed they were not seeking evidence that could be destroyed or

17 discarded.[159] Officer Kubla testified regarding Mr. Williams, "I have no idea of what his capacity

18

19

20 [149] *Id.,* at pg. 49.

[150] *Id.,* at pg. 52 ln. 11-24.

21 [151] *Id.,* at pg. 50 ln. 1-3; *see also* pg. 79 ln. 24 – pg. 80 ln. 12.

22 [152] *Id.,* at pg. 66 ln. 25 – pg. 67 ln. 6.

23 [153] *Id.,* at pg. 73 ln. 19 – pg. 74 ln. 1.

24 [154] *Id.,* at pg. 77 ln. 22 – pg. 78 ln. 3; *see also* pg. 82 ln. 1-5

[155] *Id.,* at pg. 80 ln. 23 – pg. 81 ln. 5.

25 [156] *Id.,* at pg. 85 ln. 4-16.

26 [157] *Id.,* at pg. 91 ln. 7-24.

27 [158] *Id.,* at pg. 95 ln. 5-18.

28 [159] *Id.,* at pg. 89 ln. 1-5.

1    was. He could be blind or deaf for all I'm aware of. I have no idea."[160]

2    **7.  Sergeant James Rothenburg (Defendant)**

3        Sgt. James Rothenburg – formerly Officer Rothenburg - is no longer on SWAT. He transferred

4    to IA after he was promoted to Sergeant. Prior to transfer he was with SWAT for 8 years.[161] Sgt.

5    Rothenburg has served "well over a thousand" warrants with SWAT.[162] About 60% were CET.[163] He

6    was an explosive breacher specialist on SWAT.[164] Before SWAT he was a field training officer and

7    patrol officer.[165] He was "teaching officers how to be a police officer."[166] He has been with LVMPD

8    for 16 years.[167]

9        Sgt. Rothenburg described knock and announce as:

10       So, knock and announce, the way that I interpret it, is knocking, physically knocking.
         Whether that be -- well, knocking, you know, using a PA system, you know, alerting
11       somebody of your presence, right? So knocking and then announcing -- also
         announcing your presence.[168]
12

13       Sgt. Rothenburg omitted the critical element of giving occupants time to admit or deny entry.

14   Sgt. Rothenburg, like other defendants affirmed he was given training thru SWAT on knock and

15   announce, but could not give a cognizable answer about what a 'reasonable' amount of time was:

16       I mean, it would depend -- again, it's -- I think it's all scenario dependent, scenario
         based, given what it is. Is -- you know, is there a, you know -- what is the threat or
17       what is happening, you know? Is there -- do we need to move faster or do we need
         to move slower based off the circumstance.[169]
18

19

20   _____

     [160] *Id.,* at pg. 104 ln. 18 – pg. 105 ln. 1.

21   [161] Deposition of J. Rothenburg, Exhibit 5 at pg. 17 ln. 8-21.

22   [162] *Id.,* at p. 53 ln. 17-19.

23   [163] *Id.,* at pg. 53 ln. 23.

24   [164] *Id.,* at pg. 19 ln. 6-7.

     [165] *Id.,* at pg. 19 ln. 21-22.
25
     [166] *Id.,* at pg. 19 ln. 24-25.

26   [167] *Id.,* at pg. 20 ln. 23-24.

27   [168] *Id.,* at pg. 22 ln. 23-23:5.

28   [169] *Id.,* at pg. 24 ln. 17-25:5.

When asked further, Sgt. Rothenburg acknowledged his understanding of knock and announce relative to how long to wait before making a forceful entry was related to the announcements:

Q: As we sit here today, what we've discussed before was that your understanding of knock and announce was that it had to be -- or it should have been two or three announcements before the breach was made, correct?

A. Yes.[170]

Sgt. Rothenburg confirmed property only search warrants are never no-knock warrants.[171] Sgt. Rothenburg confirmed the entry through the window was the first entry. The purpose of that window entry was to "gain the access."[172]

Sgt. Rothenburg confirmed their CET plan included using NFDDs and the purpose of those was to "create distraction" and "surprise."[173] Sgt. Rothenburg described the stun stick – which was inserted into the apartment where Mr. Williams was lying on the couch:

It's a very loud explosion. I mean, it's light, flash, sound. Most people when they hear that stuff, they drop to the ground because they don't know if something is exploding over them or -- you know, they don't -- they really don't know what's happening.[174]

Regarding the NFDDs, Sgt. Rothenburg described them as:

Because of the distract device, when it goes off, especially inside of a structure, it creates a lot -- you know, it's designed to create smoke and flash and noise. It creates quite a bit of smoke. And where it's deployed, that smoke is pretty heavy. So, the vacuum effect or the air flow at that time when they hit the front door open with the window being broken, it created all that smoke to kind of get pushed out of the window. So as I stepped up, I kind of was stepping up into the smoke, of the distract device going off.[175]

Sgt. Rothenburg acknowledged the policy change following this incident; CET could no

---

[170] *Id.,* at pg. 139 ln. 1-11.

[171] *Id.,* at pg. 28 ln. 21-23.

[172] *Id.,* at pg. 78 ln. 12-25.

[173] *Id.,* at pg. 31 ln. 1-20.

[174] *Id.,* at pg. 120 ln. 5-22.

[175] *Id.,* at pg. 89 ln. 13-24.

1    longer be used on property only search warrants and that, if served today, this warrant would be

2    served using a SACO.[176]

3         Sgt. Rothenburg testified a detective from the homicide unit was present at the pre-service

4    Sam's Town briefing. Sgt. Rothenburg testified the homicide detectives' briefings are "more generic

5    and broad" compared to other units like narcotics, which "give very – very detailed information.

6    Patrol station, Flex teams."[177] Sgt. Rothenburg acknowledged the intent of the service was to

7    apprehend murder suspects.[178] Sgt. Rothenburg testified he was not surprised no evidence related to

8    the murder was recovered as a result of this search warrant.[179]

9         Sgt. Rothenburg admitted the plan was to wait no time between the announcements and the

10    initial entry through the window.[180]

11         A: I could hear the first one saying, police, search warrant, and I could hear the
     second one. I could hear the, police, search warrant. Which would be the cue to insert

12         the stun stick and start the plan.[181]

13    Sgt. Rothenburg acknowledged that waiting no time between deploying NFDDs at the conclusion of

14    two announcement was SWAT's standard operating procedure at that time.[182]

15         Sgt. Rothenburg acknowledged Mr. Williams provided no indication he would have refused

16    admittance before entry through the door.[183] Sgt. Rothenburg, when asked if he thought Mr. William's

17    intention was to shoot at police, after Sgt. Rothenburg acknowledged Mr. Williams was "surprised,"

18    testified, "I'm unsure."[184]

19    ///

20    _____

21    [176] *Id.,* at pg. 37 ln. 25 – p pg. 39 ln. 2.

22    [177] *Id.,* at pg. 63 ln. 3 – pg. 64 ln. 11.

23    [178] *Id.,* at pg. 66 ln. 24 – pg. 67 ln. 4.

24    [179] *Id.,* at pg. 68 ln. 15 – pg. 69 ln. 4.

25    [180] *Id.,* at pg. 82 ln. 18 - pg. 83 ln. 6.

    [181] *Id.,* at pg. at p. 134 ln. 3-11.

26    [182] *Id.,* at pg. 84 ln. 2-22.

27    [183] *Id.,* at pg. 138 ln. 13-20.

28    [184] *Id.,* at pg. 36 ln. 17-23; *see also* pg. 36 ln. 25 – pg. 37 ln. 3

1        **8.  <u>SWAT Lt. Melanie O'Daniel (Defendant)</u>**

2        Lt. O'Daniel is retired now.[185] She was also involved in the earlier ill-fated Jasmine King

3   case.[186] Regarding the King case, Lt. O'Daniel agreed there was a change in policy to not use

4   explosive breaches on search warrants anymore.[187] Lt. O'Daniel was the primary SWAT commander

5   for 3.5 years and the backup SWAT commander about 19 months.[188] Lt. O'Daniel attended SWAT

6   school, and the National Tactical Officers Association – SWAT leadership.[189] Lt. O'Daniel also

7   attended training for "how to write your SWAT manual."[190] Lt. O'Daniel attended breacher school -

8   although she didn't attend it "100%" she was "coming and going."[191]

9        For this matter, Lt. O'Daniel was in charge of reading the warrant and approving the tactics.[192]

10  Lt. O'Daniel did not go out into the field on the actual warrant services, and never had. "I'm in the

11  command post, in the RV, if you will, at a distance."[193] "That's not my role."[194]

12       Lt. O'Daniel was out on Covid when she approved the service tactics.[195] Lt. O'Daniel

13  acknowledged Lt. Findley was also out on vacation when this warrant service was approved.[196]

14  Lt. O'Daniel acknowledged Sgt. Backman never went to SWAT school prior to service.

15       Lt. O'Daniel acknowledged the purpose of knocking and announcing is to give the occupants

16  time to "either come to the door or we make entry into the residence."[197] Lt. O'Daniel acknowledged

17  _____

18  [185] Deposition of M. O'Daniel, Exhibit 6 at pg. 7 ln. 13-14.

19  [186] *Id.,* at pg. 7 ln. 20-24.

20  [187] *Id.,* at pg. 8 ln. 3-7.

    [188] *Id.,* at pg. 13 ln. 25 – pg. 14 ln. 2.

21  [189] *Id.,* at pg. 16 ln. 13-19.

22  [190] *Id.,* 6 at pg. 17 ln. 4-9.

23  [191] *Id.,* at pg. 17 ln. 18-20.

24  [192] *Id.,* at pg. 69 ln.12-14.

    [193] *Id.,* at pg. 94 ln. 4-9.
25
    [194] *Id.,* at pg. 95 ln. 10-22.
26
    [195] *Id.,* at pg. 35 ln. 21-22.
27
    [196] *Id.,* at pg. 35 ln. 21-22.
28
    [197] *Id.,* at pg. 18 ln. 14 – pg. 19 ln. 9.

1    no knock warrants are "highly discouraged."[198]

2    On CET, Lt. O'Daniel acknowledged the standard operating procedure for SWAT then was

3    to make announcements, deploy distracts, then do a breach, and that there was no prohibition on using

4    – per Lt. O'Daniel – distracts overlapping announcements.[199] Lt. O'Daniel confirmed her statement

5    made during the CIRT interview, where she compared occupants of a dwelling to animals, when

6    describing NFDDs' effects:

7          And that's to give that distraction that, for your senses, that deprivation, that not
             knowing what's going on, where they just kind of freeze. It's almost like
8          spotlighting an animal where they just freeze. They don't know what's going on and
             -- and that was authorized based on the crime at hand."[200]
9

10    Lt. O'Daniel claimed she did not know about the policy change on prohibition for using CET

11    for a property only search warrant because of this incident, as she retired during the LVMPD

12    investigation of the shooting. [201] However, Lt. O'Daniel acknowledged she was the one that amended

13    the prior CET policy.[202] (That amendment allowed – improperly – the CET tactic to be used on this

14    property only search warrant.) Lt. O'Daniel acknowledged neither murder suspect was ever seen

15    coming or going from the Nellis Boulevard apartment.[203]

16    Lt. O'Daniel acknowledged her count for time to wait was from the start of the

17    announcement,[204] as opposed to the end of it (a grossly incorrect proposition). She claimed when

18    asked again whether the counting starts at the beginning or end of the announcements, "I don't think

19    we've covered that specifically."[205] Lt. O'Daniel was in a leadership position and in charge of

20    approving critical tactics used on all SWAT services and she did not know the basics of the mechanics

21    _____

22    [198] *Id.,* at pg. 231 ln. 15-18.

23    [199] *Id.,* at pg.  22 ln. 18 – pg. 24 ln. 23.

24    [200] *Id.,* at pg. 84 ln. 24 – pg. 85 ln. 19.

25    [201] *Id.,* at pg. 48 ln. 15 – pg. 49 ln. 4.

26    [202] *Id.,* at pg. 80 ln. 2-12.

        [203] *Id.,* at pg. 51 ln. 14-21.

27    [204] *Id.,* at pg. 30 ln. 13-21.

28    [205] *Id.,* at pg. 33 ln. 20 – pg. 34 ln. 20.

1  of how to count under controlling United States Supreme Court and Nevada Supreme Court case law,

2  or under the plain language of federal and state law.

3      Lt. O'Daniel acknowledged she did not know what Mr. Williams' state of mind was during

4  this warrant service. When Lt. O'Daniel tried to argue how she would have reacted, she conceded:

5      Q: Okay. So that would be when you're – when you are -- sorry, when you are
   suggesting what that person might be thinking, that's a hypothetical for you, correct,
6      because you've never been in that situation?

7      A: No.[206]

8
   **E.   Restatement of Uncontested Facts Supporting Summary Judgement & The Timing
9      of the Entry**

10      Because the amount of time passing between the announcements and the use of force to enter

11  the apartment is critical to the Court's analysis, Plaintiff will start with what LVMPD concedes in

12  this litigation and explain that (a) even LVMPD's calculation violated Mr. Williams' civil rights, but

13  (b) in reality, the time allowed Mr. Williams between announcements was much less.

14      According to LVMPD's Rule 30(b)(6) witness, the Defense agrees that ***no more than six (6)***

15  ***seconds*** expired between the announcements and first use of force to enter the apartment.[207] LVMPD

16  also agrees that the first use of force was the breaking of the rear window with the stun stick which

17  was done by officer Bertuccini.[208] However, the videos show that the first use of the battering ram at

18  the front door was essentially simultaneous with the breaking of the rear window.[209]

19      LVMPD has counted these six (6) seconds by counting from (a) the first syllable of (b) the

20  first of two announcements made by Sgt. Backman, but neither of these positions have merit. No case

21  has ever found that under knock and announce that officers may make entry *while in the process of*

22  *announcing their presence*, or that a count begins from the first syllable uttered. Instead, the count

23

24  _____

25  [206] *Id.,* at pg. 25 ln. 6 – pg. 28 ln. 16.

26  [207] Deposition of R. Rader, Exhibit 9 at pg. 107 ln. 21- pg. 109 ln. 6.

27  [208] Deposition of A. Beas, Exhibit 10 at pg. 80 ln. 22- pg. 81 ln. 10; pg. 148 ln. 23- pg. 149.

28  [209] Multiple BWC videos show this, including Backman, Exhibit 13 and Clements, Exhibit 14. The
   windows breaking can be heard on their videos.

1   begins at the conclusion of the announcements or "after" them. To hold otherwise would disregard

2   the plain use of the word 'after' in both the knock and announce statute and case law.

3        If six (6) seconds seems like a short amount of time to allow the sleeping Williams to ascertain

4   it was, in fact, police at the door with a warrant and provide them admittance, a closer examination

5   shows that it was likely less than six (6) seconds.  As stated above, if one counts from the *end* of

6   Sgt. Backman's first announcement, officers afforded Williams **no more than three (3) seconds**. If

7   the Court considered—as LVMPD does—the first announcement to have been flawed because it did

8   not state the apartment number, then the first use of force breaking the window is simultaneous with

9   the end of the second announcement, in other words **no time** was afforded to Williams at all. LVMPD

10  has to absurdly start their counting from the beginning of the first syllable of the flawed first

11  announcement to even get to six (6) seconds, a time even LVMPD admits is not reasonable. As matter

12  of law no time frame of six (6) seconds or less would ever be sufficient to allow Williams who was

13  (a) sleeping at 5:00 a.m. to (b) gather himself and make himself decent/clothed, so he could (c) wake

14  up and walk to the door, (d) confirm the people at the door were actually police officers with a

15  warrant, and (e) provide them admittance.

16       LVMPD fully agreed with Plaintiff's position. In its CIRT report,[210] it wrote of the use of

17  CET and the time allowed of Williams to respond that:

18  > Looking at the totality of the circumstances of the warrant being served at 0500
19  > hours, the structure being a 650 square foot one-bedroom apartment, it was
    > unreasonable to believe an occupant could answer the door, asleep or not, within
20  > six seconds. Furthermore, ***SWAT's manual and training when utilizing a CET to
    > surprise and overwhelm the occupants of a structure directly contradicts allowing
21  > a reasonable amount of time for an individual to answer the door or to refuse
    > officers admittance to the residence.***
22

23  > CIRT and SMEs concluded SWAT's execution of the warrant did not constitute a
    > "no-knock" warrant under Nevada law because SWAT announced their authority
24  > and purpose before making a forced entry. However, the SMEs consulted were not
    > unanimous as to whether SWAT adhered to the knock and announce principles.
25  > The question was whether waiting six seconds before inserting the stun stick, and
    > then waiting another ten seconds before making a forced entry, satisfied the
26  > requirement that officers wait a reasonable amount of time to provide occupants an

27  ───────────────

28  [210] *See* CIRT Report Exhibit 1 at pg. 188 of the report, Bates labelled LVMPD 0004442.

opportunity to peacefully submit to the search (see *United States v. Banks* and *Zabeti v. State*). ***CIRT found that under the conditions present here, six seconds was insufficient to allow occupants time to answer the door, let alone submit to the search. Additionally, deployment of the CET contradicted the knock and announce principles. The CET is intended, in part, to surprise and overwhelm occupants inside the residence. Yet, the intent of knock and announce is to provide an opportunity to comply before a forced entry is made; thus is a policy and training failure and not within LVMPD standards.***

Even if the Court found the CIRT or TRB reports were inadmissible in this matter, Plaintiff took the deposition of two FRCP 30(b)(6) designees of LVMPD who, as previously cited, acknowledged the findings and indicated they were not going to take a position in this litigation contrary to the CIRT and TRB reports.

Having set forth the testimony and admissions of LVMPD and its officers, Plaintiff now turns to the knock and announce rule and why she is entitled to summary judgment.

### III.    LEGAL STANDARD

#### A. Standard for Summary Judgement

Pursuant to FRCP 56, the Court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* FRCP 56(a). Under this standard, a fact is "material" where it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute of material facts is "genuine" where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* Overall, there is no genuine issue for trial where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

In reviewing a motion for summary judgment, the Court is required to "view the facts and draw reasonable inferences in the light most favorable to the [nonmoving] party." *VHT, Inc. v. Zillow Grp., Inc.*, 461 F. Supp. 3d 1025, 1034 (W.D. Wash. 2020), *opinion clarified*, No. 15-cv-1096, 2021 U.S. Dist. LEXIS 45171, 2021 WL 913034 (W.D. Wash. Mar. 10, 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007)). In doing so, the Court "may not weigh evidence or make credibility determinations" as these are functions for the jury. *Id.* (citing *Anderson*,

1   477 U.S. at 255). The moving party "bears the initial burden of establishing the absence of a genuine

2   issue of material fact." *Withey v. Fed. Bureau of Investigation*, 477 F. Supp. 3d 1167, 1171 (W.D.

3   Wash. 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265

4   (1986)). If the moving party is able to make its initial showing, the burden shifts to the nonmoving

5   party to "come forward with specific facts showing that there is a genuine issue for trial." *Withey*, 477

6   F. Supp. 3d at 1171 (quoting *Matsushita Elec.*, 475 U.S. at 587). Decisions on summary judgement

7   are reviewed de novo.

8   **B. Legal Standard for Knock and Announce**

9       The knock and announce rule allows an officer to "break open any outer or inner door or

10  window of a house, or any part of a house, or anything therein, to execute a search warrant, if, after

11  notice of his authority and purpose, he is refused admittance." 18 U.S.C. § 3109, accord NRS §

12  179.055(1) (Nevada knock and announce statute).[211] Although originally an English common law

13  concept, the United States Supreme Court has held that the Fourth Amendment's reasonableness

14  requirement incorporates the knock and announce rule, making adherence to the rule a Constitutional

15  requirement. *Wilson v. Arkansas*, 514 U.S. 927, 934, 115 S. Ct. 1914, 1918, 131 L. Ed. 2d 976, 982

16  (1995). ("Our own cases have acknowledged that the common-law principle of announcement is

17  'embedded in Anglo-American law,' but we have never squarely [previously] held that this principle

18  is an element of the reasonableness inquiry under the Fourth Amendment. We now so hold.").

19      The knock and announce rule provides that prior to using force to enter a residence to enforce

20  a search warrant, law enforcement must: (1) Knock; (2) Announce their presence and purpose; and

21  (3) Wait a reasonable amount of time for persons inside to come to the door, ascertain the officer's

22  identity and allow them entry. The knock and announce rule serves the purposes of "(a) reducing the

23  risk of harm to both the officer and the occupants of the house to be entered; (b) helping to prevent

24  the unnecessary destruction of private property; and (c) symbolizing respect for individual privacy

25

26  _____

27  [211] 18 U.S.C. § 3109 is technically only applicable to federal officers. However, this is irrelevant to
    this case because the Fourth Amendment and NRS § 179.055 apply the same principles to the
28  Defendants in this action.

1    summarized in the adage that 'a man's house is his castle.'" *United States v. Bustamante-Gamez*, 488

2    F.2d 4, 9 (9th Cir. 1973) (*quoting Miller v. United States*, 357 U.S. 301, 307, 2 L. Ed. 2d 1332, 78 S.

3    Ct. 1190 (1958)). Well-accepted in the law is that "[o]ne of those interests [in the knock and announce

4    rule] is the protection of human life and limb, because an unannounced entry may provoke violence

5    in supposed self-defense by the surprised resident. *Hudson v. Michigan*, 547 U.S. 586, 594, 126 S.

6    Ct. 2159, 2165, 165 L. Ed. 2d 56, 66, (2006).

7          There is no established time police must wait; instead, the time lapse must be reasonable

8    considering the particular circumstances of the situation. *United States v. Banks*, 282 F.3d 699, 703-

9    05 (9th Cir. 2002) overruled on other grounds by *United States v. Banks*, 540 U.S. 31, 124 S. Ct. 521

10   (2003). A refusal to comply with an officer's order to "open up" can be inferred from silence, but

11   there must be a lapse of "a significant amount of time" before officers may forcibly enter the premises.

12   *Granville*, 222 F.3d at 1218, *citing United States v. Mendonsa*, 989 F.2d 366, 370 (9th Cir. 1993).

13         When evaluating reasonableness, the Ninth Circuit also considers such circumstances as (1)

14   the size and layout of the residence; (2) the time of day; (3) the nature of the suspected offense; (4)

15   the evidence demonstrating guilt; and (5) the officers' other observations that would support forced

16   entry. *Banks*, 282 F.3d at 704. However, the most important of these factors appears to be whether

17   occupants are likely to be sleeping when officers arrive, since this will require a *longer* amount of

18   time for the occupant to (1) wake up and recover from the groggy state of sleep, (2) dress or make

19   themselves decent, and (3) walk to the door to allow entry. *United States v. Granville*, 222 F.3d 1214,

20   1218 (2000) (finding a five second delay unreasonable "especially apparent in light of the fact that

21   the warrant was executed early in the morning when it was likely the occupants of the…apartment

22   would be asleep."); *Hudson*, 547 U.S. at 594, 126 S. Ct. 2159 at 2165 (referring to "'The brief

23   interlude between announcement and entry with a warrant may be the opportunity that an individual

24   has to pull on clothes or get out of bed.' In other words, it assures the opportunity to collect oneself

25   before answering the door." *citing Richards v. Wis.*, 520 U.S. 385, 393, 117 S. Ct. 1416, 1421 (1997).

26   *United States v. Banks*, 540 U.S. 31, 41, 124 S. Ct. 521, 528 (2003) ("in the case with no reason to

27   suspect an immediate risk of frustration or futility in waiting at all, the reasonable wait time may well

28   be longer when police make a forced entry, since they ought to be more certain the occupant has had

1    time to answer the door.").

2    Generalized concerns of law enforcement that occupants may be dangerous or have weapons

3    are insufficient to bypass the knock and announce rules because the same could be argued or feared

4    of virtually any search warrant; instead some sort of specific information is needed. *Granville*, 222

5    F.3d 1214, 1219 ("All we have are generalized fears that apply to all drug dealers. These

6    generalizations are not sufficient to demonstrate exigent circumstances.").

7    In *United States v. Banks*, 282 F.3d 699, 703-05 (9th Cir. 2002), the Ninth Circuit found a

8    totality of factors to assess the reasonableness of an intrusion were "(1) the officers heard no sound

9    coming from the small apartment that would suggest a refusal of admittance, (2) there were no exigent

10    circumstances, and (3) the officers "had no specific knowledge of any facts or reasonable expectations

11    from which they could reasonably have believed that entry into Banks' residence would pose any risk

12    greater than the ordinary danger of executing a search warrant on a private residence." *Id*. at 704-05,

13    overruled on other grounds by *United States v. Banks*, 540 U.S. 31, 124 S. Ct. 521 (2003).

14    However, the most instructive Ninth Circuit case on this issue is *United States v. Granville*,

15    222 F.3d 1214 (2000). In *Granville*, police were serving a search warrant at 7:00 a.m., a time most

16    people are likely to be asleep. After knocking on the door of the apartment, the officer announced

17    "Oakland Police Officer, search warrant, open the door." Then, after five (5) seconds the door was

18    forced open. The sleeping occupant inside believed he was being robbed and opened fire on officers,

19    identical to the present case. The Ninth Circuit held as a matter of law that the officer had violated

20    the knock and announce rule.

21    In great detail, the Ninth Circuit reviewed the history of the rule, reiterating that "[t]he shortest

22    wait we have upheld is ten seconds…[u]sually, the wait is much longer," and that police must allow

23    more time when a warrant is served at early hours when occupants are likely to be sleeping. *Id*. The

24    Ninth Circuit further explained that "[t]he reasons for adhering to precedent and requiring officers to

25    wait a reasonable amount of time before forcibly entering a person's home, however, are clear and

26    persuasive. As we have repeatedly noted, a reasonable wait "protects citizens and law enforcement

27    officers from violence; it protects individual privacy rights; and it protects against needless

28    destruction of private property." *Id*. at 1218-1219, *citing United States v. Contreras-Ceballos*, 999

1    F.2d 432, 435 (9th Cir. 1993) (emphasis added); *see also United States v. Little*, 753 F.2d 1420, 1435

2    (9th Cir. 1984).

3        Additionally, it is likely that the Nevada Supreme Court would similarly find that knock and

4    announce is part of the Nevada Constitution. However, Nevada has also statutorily enacted the knock

5    and announce rule in NRS § 179.055(1) as follows:

6        The officer may break open any outer or inner door or window of a house, or any part of
         the house, or anything therein, to execute the warrant, if, after notice of authority and
7        purpose, the officer is refused admittance.

8    There appears to be no substantive difference between this statute and the Fourth Amendment/

9    common law knock and announce rule. *Zabeti v. State*, 120 Nev. 530, 96 P.3d 773 (2004) (giving the

10   same analysis to federal and state knock and announce principles.

11       Lastly, on the issue of use of NFDD's the Ninth Circuit has clearly held that blind deployment

12   of NFDDs is excessive force as a matter of law, even more so when innocent people may be sleeping

13   inside the residence. *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004) ("given the inherently

14   dangerous nature of the flash-bang device, it cannot be a reasonable use of force under the Fourth

15   Amendment to throw it 'blind' into a room occupied by innocent bystanders.") *citing United States*

16   *v. Jones*, 214 F.3d 836, 837-38 (7th Cir. 2000) ("police cannot automatically throw bombs into drug

17   dealers' houses, even if the bomb goes by the euphemism 'flash bang device' ").

18                      **VI.    LEGAL ARGUMENT**

19   **A.   Plaintiff is Entitled to Summary Judgment as to Liability**

20       A private right of action exists against police officers who, acting under color of state law,

21   violate federal constitutional or statutory rights. 42 U.S.C. § 1983. "Under the Fourth Amendment,

22   officers may only use such force as is 'objectively reasonable' under the circumstances." *Jackson v.*

23   *City of Bremerton*, 268 F.3d 646, 651 (9th Cir. 2001) (*citing Graham v. Connor*, 490 U.S. 386, 397,

24   104 L. Ed. 2d 443, 109 S. Ct. 1865 (1989)). "Determining whether force used in making an arrest is

25   excessive or reasonable 'requires careful attention to the facts and circumstances of each particular

26   case, including the severity of the crime at issue, whether the suspect poses an immediate threat to

27   the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade

28

50

1    arrest by flight.'" *LaLonde v. Cty. of Riverside*, 204 F.3d 947, 959 (9th Cir. 2000) (*citing Graham*,

2    490 U.S. at 396)."These factors, however, are not exclusive. Rather, [the court will] examine the

3    totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular

4    case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010)

5    (*quoting Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).

6        The Ninth Circuit has refined the *Graham* standard by adding additional considerations. First,

7    the inquiry should begin with an assessment of "the quantum of force used." *Davis v. City of Las*

8    *Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007). This is so "because the factors articulated in *Graham*,

9    and other factors bearing on the reasonableness of a particular application of force are not to be

10   considered in a vacuum but only in relation to the amount of force used to effect a particular seizure."

11   *Id*. (internal quotation and citation omitted). In addition, the Ninth Circuit has stated that in assessing

12   the reasonableness of an officer's actions, "the availability of alternative methods of capturing or

13   subduing a suspect may be a factor to consider." *See Chew v. Gates*, 27 F.3d 1432, 1441 n.5 (9th Cir.

14   1994).

15       Regarding the companion state law claims in this case, the Nevada Supreme Court has found

16   that "a police officer who uses more force than is reasonably necessary to effect a lawful arrest

17   commits a battery upon the person arrested." *Yada v. Simpson*, 112 Nev. 254, 256 (1996).

18   Additionally, by statute Nevada law also requires law enforcement officers to "use de-escalation

19   techniques and alternatives to the use of force whenever possible," and to "use only the level of force

20   that is objectively reasonable under the circumstances to bring an incident or person under control

21   and safely accomplish a lawful purpose." NRS § 171.1455. In other words, de-escalation techniques

22   are not merely department policy; they are required by Nevada state law.

23       Additionally, the Fourteenth Amendment encompasses a "constitutional right to associate

24   with family members." *Lipscomb By & Through DeFehr v. Simmons*, 884 F.2d 1242, 1244 (9th Cir.

25   1989). "A decedent's parents and children generally have the right to assert substantive due process

26   claims under the Fourteenth Amendment" for the wrongful death of their loved one. *Wheeler v. City*

27   *of Santa Clara*, 894 F.3d 1046, 1057 (9th Cir. 2018).

28   ///

51

1        When officers act in concert, they are all liable for the consequences. The Ninth Circuit has

2 made clear that "[l]iability under section 1983 arises…upon a showing of personal participation by

3 the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989)) This requires that a plaintiff must

4 "establish the 'integral participation' of the [defendant] in the alleged constitutional violation." *Jones*

5 *v. Williams*, 297 F.3d 930, 935 (9th Cir. 2002). The "integral participation" requirement, however, is

6 interpreted broadly by the Ninth Circuit. The Ninth Circuit has held that "'integral participation' does

7 not require that each [defendant's] actions themselves rise to the level of a constitutional violation."

8 *Boyd v. Benton County*, 374 F.3d 773, 780 (9th Cir. 2004). Instead, integral participation only requires

9 "some fundamental involvement in the conduct that allegedly caused the violation." *Blankenhorn v.*

10 *City of Orange*, 485 F.3d 463, 481, n. 12 (9th Cir. 2007). "A person 'subjects' another to the

11 deprivation of a constitutional right, within the meaning of section 1983, if he does an affirmative

12 act, participates in another's affirmative acts, or omits to perform an act which he is legally required

13 to do that causes the deprivation of which complaint is made." *Johnson v. Duffy*, 588 F.2d 740, 743

14 (9th Cir. 1978). One an officer has personally participated in an excessive force event, they are jointly

15 and severally liable to the victim.

16        It is also well established that "[P]olice officers have a duty to intercede when their fellow

17 officers violate the constitutional rights of a suspect or other citizen." *Cunningham v. Gates*, 229 F.3d

18 1271, 1289 (9th Cir. 2000) (internal quotation marks and citations omitted). An officer who fails to

19 intervene when a fellow officer uses excessive force would be responsible, just as the fellow officer,

20 for violating the Fourth Amendment's requirement that police may use only such force as is

21 objectively reasonable under the circumstances. *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th

22 Cir. 1994).

23        Knock and announce is a constitutional and statutory requirement and violation of that

24 requirement is unreasonable or excessive force under the Fourth Amendment and Nevada

25 Constitution Art. I Sec. 18. The facts of this case establish that as a matter of law, that LVMPD and

26 its officers violated Mr. Williams' Constitutional rights. Indeed, LVMPD through its own binding

27 FRCP 30(b)(6) witnesses has confirmed that:

28                    • Its official policy of allowing CET entry on knock and announce warrants was

1      inconsistent with the Constitutional requirements of knock and announce;

2      • CET was improperly used during the service of the warrant; and

3      • A reasonable amount of time was not allows for Mr. Williams to come to the door and

4          allow officers admittance, in direct violation of his civil rights under the Fourth

5          Amendment/knock and announce rule.

6      Respectfully, summary judgment should be entered on Plaintiff's First and Second Causes of

7  Action (42 USC § 1983, Fourth and Fourteenth Amendment violations), Second Cause of Action

8  (state Constitution violations), Fourth Cause of Action (battery), and Seventh Causes of Action

9  (*Monell*),

10     **B.**  **Plaintiff is Entitled to Summary Judgment as to Causation**

11     The United States Supreme Court has emphasized that 42 USC § 1983 "should be read against

12 the background of tort liability that makes a man responsible for the natural consequences of his

13 actions." *Malley v. Briggs*, 475 U.S. 335, 344 n.7, 106 S. Ct. 1092 (1986) (quoting *Monroe v. Pape*,

14 365 U.S. 167, 187, 81 S. Ct. 473 (1961)). Causation between the unlawful entry of the SWAT team

15 (failure to knock and announce/excessive force) and the fatal shooting of Williams is also established

16 as a matter of law based on the clear Ninth Circuit precedent found in *Mendez v. Cty. of L.A.*, 897

17 F.3d 1067 (9th Cir. 2018). *Mendez* involved a similar factual scenario to the present case. In *Mendez*,

18 two officers searching for a parolee at large reported to be in the area lacked a warrant but went onto

19 the rear of a main home on a property and encountered a modest, one room structure where someone

20 clearly lived due to it having a power connection and air conditioning. Despite having no warrant and

21 without knocking and announcing their presence, the officers suddenly entered the structure and

22 found Mendez and his girlfriend, who had been sleeping. Mendez, believing the officers to be

23 intruders, picked up a BB gun to defend himself, his family and his home from perceived intruders.

24 In response, officers shot Mendez ten (10) times, resulting in severe injuries and the loss of his leg.

25 *Id*. at 1071-1072. The main legal issue on appeal was causation between the officers' unlawful entry

26 and the shooting.

27     The Ninth Circuit originally affirmed a $4,000,000 judgment against police based on the

28 "prior provocation" doctrine. On appeal, the US Supreme Court reversed and instructed the Ninth

1 Circuit to instead use a different causation analysis. *See*, *Cty. of Los Angeles v. Mendez*, 581 U.S. 420

2 (2017) (vacating earlier opinion and remanding for a new determination of causation). On remand,

3 the Ninth Circuit clarified the law of causation in such cases where unlawful entry occurs and an

4 occupant responds in self-defense. In doing so, the Ninth Circuit analyzed both the cause-in-fact and

5 proximate cause of the unlawful entry versus the harm to the occupant. As to cause-in-fact, the Ninth

6 Circuit held that this causation easily existed as a matter of law because "[i]f the officers had not

7 entered, Mr. and Ms. Mendez would not have been shot while lying in bed. That is the quick end of

8 analysis of cause in fact." *Id*. at 1076.

9      As to proximate cause, although the analysis was different the result was the same, i.e. that

10 proximate cause under such cases is also ***established as a matter of law***. The Ninth Circuit

11 acknowledged that "[p]roximate cause is often explicated in terms of foreseeability or the scope of

12 the risk created by the predicate conduct." *Id*. at 1076 *citing Paroline v. United States*, 572 U.S. 434,

13 134 S. Ct. 1710, 1719, 188 L. Ed. 2d 714 (2014). The Ninth Circuit continues that "the risk of injury

14 posed by the entry of an armed stranger into a residence is one of the reasons the Fourth Amendment

15 prohibits entry except under defined specific conditions." The Court continued to explain that

16 "historical sources suggest that the Fourth Amendment was ratified not just to protect privacy

17 interests, but also out of a concern that governmental trespass to property could lead to subsequent

18 physical harms. In modern times, the same concern was voiced in Justice Jackson's concurrence in

19 *McDonald*. Justice Jackson was concerned that unlawful entries can invite precisely the sort of

20 violence that occurred here, where 'an officer seeing a gun being drawn on him might shoot first.'"

21 citing *McDonald v. United States*, 335 U.S. 451, 460-461 (1948). The *Mendez* court continued to

22 explain the applicable case law from other circuits and other contexts such as intrusion from burglars

23 that supported proximate cause between the illegal entry and the shooting. Lastly, the Ninth Circuit

24 highlighted that in light of the Second Amendment's protections that "it can be expected that some

25 individuals will keep firearms in their homes to defend themselves against intruders. Under these

26 conditions, armed officers entering a house will necessarily present a substantial risk to anyone in the

27 house they perceive as being armed. ***It is all the more important that officers in such cases abide by***

28 ***their duties under the Fourth Amendment***" and "[e]specially where officers are armed and on alert,

1   violent confrontations are foreseeable consequences of unlawful entries. *Id*. (emphasis added). In

2   explaining why proximate cause existed as a matter of law, the Ninth Circuit explained:

> Important social interests are served by minimizing interactions between armed police
> officers on high alert and innocent persons in their homes, precisely because such
> interactions can foreseeably lead to tragic incidents where innocent people are injured or
> killed due to a split-second misunderstanding. One way the Constitution serves these
> interests is by adopting a rule that restricts officer entry into a residence except in certain
> limited circumstances. And it is obviously foreseeable that fewer tragic incidents like this
> one would occur under an enforced regime where officers will not enter homes without
> sufficient justification, as compared to one where officers enter without adequate
> justification. Especially where officers are armed and on alert, violent confrontations are
> foreseeable consequences of unlawful entries.

*Id*. at 1077.

For good measure, the Ninth Circuit in *Mendez* also addressed the fine distinction between unlawful entry and unlawful *mode* of entry. It did so because the officers in that case had argued that they had qualified immunity for the unlawful *mode* of entry (violation of knock and announce).[212] Yet, the Ninth Circuit expressly held that "both the entry ***and the failure to knock and announce*** were proximate causes of the Mendezes' injuries." *Id*. (emphasis added). Therefore, *Mendez* establishes causation of damages as a matter of law in the event of a shooting which occurred after an unlawful failure to knock and announce. Plaintiff is entitled to summary judgment on the issue of causation, leaving only general, special and punitive damages for the jury to determine.

Similarly, the Defendants cannot argue that Mr. Williams' actions of firing his weapon absolves them of liability. *Waldron v. Roark*, 292 Neb. 889, 900, 874 N.W.2d 850, 861 (Nev. 2016)

---

[212] It is important to note that the officer's qualified immunity claims in *Mendez* for knock and announce do not apply to the present case. In *Mendez*, there was a unique situation where apparently officers had permission to search from a resident of the main house, but not the smaller rear structure where Mendez lived. Thus, the officers had been granted qualified immunity because there was no prior case holding they must knock and announce under those circumstances. This is dissimilar to the present case where both sides concede that officers held a regular search warrant requiring compliance with knock and announce principles. *Id*. at 1079 ("the officers' legal position in the earlier appeal was that they had no duty to knock and announce before entering the inhabited shed, as they had done so at the door of the main house. We rejected that position, but agreed that there was no clearly established law requiring a second knock and announce at the doorway of a second occupied building on the same property.").

1    ("the knock-and-announce requirement serves to protect the safety of police officers by preventing

2    the occupant from taking defensive measures against a perceived unlawful intruder. Moreover, it

3    protects occupants of the home from similarly being harmed by officers who react to measures of

4    self-defense against perceived intruders."). LVMPD and its officers have conceded that the very point

5    of a CET is to surprise and confuse the occupants such as Mr. Williams, and the NFDDs were

6    specifically used to confuse and disorient the occupants. Indeed, after Mr. Williams died, LVMPD

7    interviewed witness Crockett[213] who said he was asleep, did not hear the announcements, and was

8    roused by sounds like gunfire. Lest the Court think this is a bias statement by Crockett, who was

9    Williams' friend, LVMPD also interviewed an upstairs neighbor, Janeth Lopez-Quezada,[214] who

10   similarly stated she had been sleeping in the apartment upstairs with her husband and had not been

11   awakened by the police announcements but rather what sounded like gunshots and heard no shouting

12   before the shots. Literally, those two witnesses present that morning failed to hear the announcements

13   prior to the use of force by SWAT.

14       **C.  <u>Plaintiff's Human Factors Expert's Opinions are Uncontested in this Matter, Which</u>**
15           **<u>Support Plaintiff's Request for Summary Adjudication</u>**

16           Plaintiff has also disclosed a report from Human Factors expert, Dr. Nancy Grugle.[215] As the

17   Defense has not disclosed any Human Factors (or medical) expert, her testimony is unrebutted. Her

18   key findings are as follows:

19   ///

20   ///

21   ///

22   ///

23   ───────────────────────

24   [213] Exhibit 21 Statement of Crockett at WILLIAMS 000058.

25   [214] Exhibit 22 Statement of Lopez-Quezada at WILLIAMS 000039. "Uh, I just remember waking up
     to my boyfriend holding me, pushing me. Um, I heard gunshots. I remember that. I don't remember
26   really hearing the cop, but I do remember my boyfriend holding me, holding my baby, and then, uh,
     I just remember the gunshots." "Okay, so you just remember the gunshots. Did you hear any - any,
27   uh, voices or anything?" "No, not before."

28   [215] *See* **Exhibit 23** Human Factors Report, dated 10/28/2024, by Nancy L. Grugle, Ph.D, CHFP.

1.  **FINDING: LVMPD officers' assertion that Williams should have understood that police officers were serving a search warrant and that Williams intentionally shot at police officers is unscientific and unreliable.[216]**

The timing of the SWAT raid (i.e., at 5 a.m., while Williams was asleep) and LVMPD's deployment of flash bang devices impaired Williams' ability to perceive and process what was happening.[217]

The announcement was likely not loud enough to wake Williams, or if it did, Williams still would not have been able to understand the announcements.[218] "during sleep, there is no impact of reasoning on the interpretation of noise."[219] All Williams would have been able to understand is he was hearing noise. That is consistent with the other individual in the apartment who stated he did not know why the police were at the residence and never heard anything before being woken up by police.[220]

2.  **Williams' ability to understand the situation as it unfolded was impaired because LVMPD SWAT abruptly awakened him from sleep using the battering ram and flash bang devices.[221]**

The inability to understand anything during sleep would also be coupled with "sleep inertia," Which is, "temporary disorientation and decline in performance and/or mood after awakening from sleep."[222] Immediately following awakening, people exhibit transitory hypovigilance (reduced vigilance), confusion, disorientation of behavior, and impaired cognitive and sensory-motor performance. The magnitude of sleep inertia is dependent on several factors including prior sleep duration, sleep stage prior to awakening, and the existence of prior sleep deprivation. Sleep inertia is

---

[216] *Id.*, at pg. 17, bates GRUGLE 000018.

[217] *Id.*, at pg. 6, bates GRUGLE 000007.

[218] *Id.*

[219] *Id.*

[220] *Id.*

[221] *Id.*, at pg. 17, bates GRUGLE 000018.

[222] *Id.*, at pg. 7, bates GRUGLE 000008.

1  also dependent on the time of day when awakening occurs.[223] "Perceiving and understanding a forced

2  entry by LVMPD would be considered a situation requiring a high attentional load."[224]

3      Because Williams was asleep prior to the SWAT raid and was abruptly awakened by the use

4  of the battering ram and/or flash bang devices, it is more likely than not that Williams' higher-order

5  cognitive function (e.g., his ability to process and understand what was happening) was impaired by

6  sleep inertia. As a result, it is unlikely that Williams would have understood who was attempting to

7  enter the apartment (i.e., LVMPD) or why someone was attempting to enter the apartment (i.e., to

8  serve a search warrant). Thus, Williams' response to LVMPD SWAT's entry into the apartment

9  would not have been based on a complete or accurate understanding by him of the circumstances or

10  the events as they unfolded.[225]

11      **3. LVMPD SWAT's use of flash bang devices impaired Williams' ability to hear, see,
12         and process the events preceding the SWAT entry into the apartment as they
           unfolded.[226]**

13      Flash bang devices are used to disorient and confuse and slow reaction speed.[227] There are

14  three main components of a flashbang. (1) a flash of light, the (2) bang, and (3) blast overpressure.[228]

15  Dr. Grugle cited to a study by Fedele, Bhatt and Morrison (2021), explaining the visual and auditory

16  effects combine with a person's stress response to disorient and confuse targeted individuals.[229]

17  Including, "[t]he flash effect impairs vision and potentially disturbs concentration, which translates

18  to disrupted behavior (e.g., disorientation and confusion)."[230] Dr. Grugle cited to a path analysis by

19  Madhavan and Dobbins (2018)[231] documenting there are several effects, including overpressure

20  _____

21  [223] *Id.*

22  [224] *Id.*

23  [225] *Id.*

24  [226] *Id.*, at pg. 17, bates GRUGLE 000018.

25  [227] *Id.*, at pg. 7, bates GRUGLE 000008.

26  [228] *Id.*, at pg. 7-8, bates GRUGLE 000008-9.

    [229] *Id.*, at pg. 8, bates GRUGLE 000009.

27  [230] *Id.*

28  [231] *Id.*, at pg. 9, bates GRUGLE 000010.

1  effects, hearing effects, vision effects, startle effects, and affective/emotional shift, elicited by using

2  flashbangs.

3      Dr. Grugle also cited to Mojica, A., Bartak, C., Mitchell, J., and Ashworth, A. (2023) "Using

4  an Approach-Avoidance Framework to Understand the Relationship between Non-Lethal Weapons

5  and Performance." *Journal of Human Performance in Extreme Environments,* Vol. 18: Iss. 1, Article

6  4, which discussed how differently people can respond, including, "***the fear of death or serious bodily***

7  ***injuries could cascade into a fear-potentiated response, resulting in cognitive impairments that***

8  ***drastically reduce environmental awareness and rational decision-making.***"[232]

9  **4. Williams' ability to grab his gun and fire on the officers as they entered the
10     apartment is not a valid or reliable indication that he was fully aware of the fact that
       police officers were attempting to serve a search warrant.**

11     It is also unlikely Williams would have been able to see the officers' uniforms, or comprehend

12  who was coming through the door because of the flashbang, but also the police officers' use of

13  flashlights.[233] "it is likely that the flash bang devices induced a negative emotional reaction (e.g., fear,

14  anger) to which Williams responded by firing his gun as officers entered the apartment."[234]

15  **5. Williams' response in firing on the LVMPD SWAT officers as they entered the
16     apartment is consistent with the known physiological and psychological effects of
17     being abruptly awakened from sleep and from being exposed to a flash bang grenade
       in an enclosed space.**

18     To the contrary, Williams' actions in grabbing and firing his gun are consistent with a person

19  who was abruptly awakened from sleep, experienced the effects of sleep inertia, experienced the

20  disorienting physiological and psychological effects of the flash bang device including a negative

21  emotional response, and reacted by successfully performing a simple motor task with relative

22  speed.[235]

23  ///

24

---

25  [232] *Id.*, at pg. 16, bates GRUGLE 000017.

26  [233] *Id.*

27  [234] *Id.*

28  [235] *Id.*, at pg. 17, bates GRUGLE 000018.

1    Again, no opposing expert was disclosed by the Defense to oppose these opinions. Lastly,

2    every case on the topic of the rationale behind knock and announce is that persons inside the home

3    need time to assess the situation lest they wrongly believe police are intruders and use force to defend

4    themselves. Therefore, the fact that Mr. Williams actually did the very thing (hurriedly used force to

5    protect himself mistakenly) which knock and announce is meant to prevent is not a superseding cause.

6    Indeed, *Mendez* tells us that such actions are not intervening and superseding causes which remove

7    the causation between the officers' unlawful entry and the shooting.

8                                    V.    **CONCLUSION**

9    This is a tragic case. Whatever respect the Court has for law enforcement, the inescapable

10   conclusion in this case is that law enforcement, by LVMPD's own admission, violated the

11   Constitutional knock and announce rule and otherwise pre-planned the use of excessive force to enter

12   the apartment that day. Evidence shows that this was a known, dangerous habit and LVMPD's

13   officers were simply choosing to disregard the civil rights of others. They might have done this a

14   thousand times before with no tragic result, but the law of averages caught up to them when an

15   innocent, 19-year old black man was suddenly awoken to what sounded to him like persons breaking

16   into the apartment where he slept. Confused by the suddenness and chaos of the situation which was

17   intentionally designed to surprise, confuse and disorient him, he fired in self-defense on what he must

18   have believe were intruders. The results were that the young man was shot seventeen (17) times and

19   tragically killed.

20   Respectfully, summary judgment should issue at this time.

21   Dated May 16, 2025.

22                                    **BREEDEN & ASSOCIATES, PLLC**

23

24   */s/ Adam J. Breeden*
     _____
25   **ADAM J. BREEDEN, ESQ.**
     Nevada Bar No. 8768
26   7432 W. Sahara Ave., Suite 101
     Las Vegas, NV 89117-2782
27   Phone: (702) 819-7770
     Adam@Breedenandassociates.com
28   *Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 16th day of May, 2025, I served a copy of the foregoing legal document **PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT** via the method indicated below:

| | | |
|---|---|---|
| X | | Through the Court's ECF/CM system on all registered users |
| | | Pursuant to FRCP 5, by placing a copy in the US mail, postage pre-paid to the following counsel of record or parties in proper person:<br><br>Craig R. Anderson, Esq.<br>**MARQUIS AURBACH**<br>10001 Park Run Drive<br>Las Vegas, NV 89145<br>*Attorney for Defendants* |
| | | Via receipt of copy (proof of service to follow) |

An Attorney or Employee of the following firm:

*/s/ Kirsten Brown*
_____
**BREEDEN & ASSOCIATES, PLLC**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28