# Exhibit 2

# Exhibit 2

Kerry Kubla                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1                   UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3

4    LATIA ALEXANDER,              )
     individually as heir of       )
5    ISAIAH T. WILLIAMS and in     )
     her capacity as Special       )
6    Administrator of the Estate   )
     of ISAIAH T. WILLIAMS,        )
7                                   )
                        Plaintiff,  )
8                                   )
     vs.                           )Case No.
9                                  )2:24-cv-00074-APG-NJK
     LAS VEGAS METROPOLITAN        )
10   POLICE DEPARTMENT, a          )
     political subdivision of the  )
11   State of Nevada, et al.,      )
                                    )
12                      Defendants. )
     _____)

13

14

15          VIDEOTAPED DEPOSITION OF KERRY KUBLA

16             Taken on Friday, October 11, 2024

17   By a Certified Stenographer and Legal Videographer

18                     At 10:02 a.m.

19             At 400 South Seventh Street

20                   Las Vegas, Nevada

21

22

23            Stenographically reported by:

24        Holly Larsen, NV CCR 680, CA CSR 12170

25            Job No. 57950 - Firm No. 116F

```
                                                              Page 2
  1    APPEARANCES:

  2    For the Plaintiff:

  3             MURPHY'S LAW, PC
                BY:  CORRINE MURPHY, ESQ.
  4             2620 Regatta Drive
                Suite 102
  5             Las Vegas, Nevada 89128
                702.820.5763
  6

  7    For the Defendants:

  8             MARQUIS AURBACH
                BY:  CRAIG ANDERSON, ESQ.
  9             10001 Park Run Drive
                Las Vegas, Nevada 89145
 10             702.382.0711

 11
       For the Deponent:
 12
                COOK & KELESIS
 13             BY:  GEORGE KELESIS, ESQ.
                517 South Ninth Street
 14             Las Vegas, Nevada 89101
                702.737.7702
 15

 16    The Legal Videographer:

 17             DAWN BECK

 18

 19

 20

 21

 22

 23

 24

 25
```

Page 3

1                    I N D E X

2   WITNESS                                    PAGE

3   KERRY KUBLA

4        Examination by Ms. Murphy               5

5

6

7

8

9                  E X H I B I T S

10  NUMBER                                     PAGE

11  Exhibit 1      Notice of Deposition          6

12  Exhibit 2      Critical Incident Review      53
                   Team document
13
    Exhibit 3      Diagram                     128
14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                    P R O C E E D I N G S

2                              -oOo-

3

4              THE VIDEOGRAPHER:  Good morning.  We are

5    now on the record.  This begins the video-recorded

6    deposition of Kerry Kubla.

7              Today's date is October 11, 2024.  The

8    time on the video monitor is 10:02 a.m.  We are

9    located at 400 South 7th Street in Las Vegas,

10   Nevada.

11             This case is entitled Latia Alexander,

12   et al., versus Las Vegas Metropolitan Police

13   Department, et al.  The case number is

14   2:24-cv-00074-APG-NJK in the United States District

15   Court, District of Nevada.

16             My name is Dawn Beck, legal video

17   specialist.  The court reporter is Holly Larsen.  We

18   represent Lexitas.

19             Will counselors please state your

20   appearances.

21             MS. MURPHY:  Good morning.  Corrine

22   Murphy, Bar Number 10410, on behalf of plaintiff.

23             MR. ANDERSON:  Craig Anderson on behalf

24   of the defendants.

25             THE VIDEOGRAPHER:  Thank you.

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 5

1                   Will the court reporter please swear in

2       the witness.

3       Whereupon,

4                           KERRY KUBLA,

5       having been first duly sworn to testify to the truth,

6       was examined, and testified as follows:

7

8                   MS. MURPHY:  Let the record reflect this

9       is the time and place for the deposition of Kerry

10      Kubla in the matter of Latia Alexander, et al.,

11      versus Las Vegas Metropolitan Police Department,

12      et al., Case Number 2:24-cv-00074.

13

14                          EXAMINATION

15      BY MS. MURPHY:

16          Q.      Mr. Kubla, my name is Corrine Murphy,

17      and I'm an attorney.  I represent the plaintiff,

18      Latia Alexander, in this case.

19                  Could you please state and spell your

20      full name for the record.

21          A.      It's Kerry Paul Kubla.  K-e-r-r-y

22      P-a-u-l K-u-b-l-a.

23          Q.      You have been requested to be here today

24      to have your deposition taken.

25                  Did you have an opportunity -- have you

Page 6

1    reviewed the notice of deposition?

2        A.      Yes, ma'am.

3            MS. MURPHY:  Okay.  Can we mark that as

4    Exhibit 1, please.

5            (Exhibit 1 marked.)

6    BY MS. MURPHY:

7        Q.      And you understand that you're here

8    today to discuss the officer-involved shooting of

9    Isaiah Williams?

10       A.      Yes, ma'am.

11       Q.      Have you ever given your deposition

12   before?

13       A.      No, ma'am.

14       Q.      Okay.  I'm sure that your attorney

15   walked you through the basic instructions.  The only

16   one that I'm going to remind you of is that the oath

17   you took at the beginning of this deposition is the

18   same oath that you would take if you were in a court

19   of law.  So although we're not in a formal courtroom

20   with a judge, the same penalties of perjury apply.

21           Do you understand that?

22       A.      Yes, ma'am.

23       Q.      Is there any reason that you would not

24   be able to understand my questions and give truthful

25   and accurate testimony today?

Page 7

1      A.      No, ma'am.

2      Q.      Do you understand that I'm entitled to

3   your best and fullest answer to all of my questions?

4      A.      Yes, ma'am.

5      Q.      Are you under any medications or

6   anything that would inhibit your ability to provide

7   your best and truthful testimony today?

8      A.      No, ma'am.

9      Q.      Okay.  Can you please state your address

10   for the record?

11      A.      424 Ralph Mosa Street, Las Vegas,

12   Nevada 89138.

13      Q.      Can you please tell me everything that

14   you did to prepare for today's deposition?

15      A.      Reviewed -- went over some of the stuff

16   that I had prior, reviewed that.

17             I met with Craig Anderson and just kind

18   of caught up on the case itself a little.

19      Q.      Okay.  And I'm not entitled to know what

20   you and Craig talked about, but I am entitled to

21   know how many times you met with him and for

22   approximately how long.

23      A.      Met once.  Maybe one to two hours, I

24   believe.

25      Q.      Okay.  And when was that?

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 8

1        A.        Just two days ago.

2        Q.        Okay.  And you said that you reviewed

3    the prior stuff.

4                  Can you tell me what that was?

5        A.        I read over my interview, my interview

6    from work that I had given, my CIRT interview, and

7    just went over just the address stuff, different

8    stuff, you know, making sure that -- it's been two

9    years, so making sure I was up to date on that.

10       Q.        And did you review your answers to

11   interrogatories or your request for production of

12   documents?

13       A.        I'm sorry.  I don't --

14       Q.        That's okay.

15       A.        I'm not sure I understand.

16       Q.        We use names for different stuff.

17                 So they kind of look like this.  These

18   are Brice Clements', but they kind of look like

19   this.  Interrogatories, requests for production.

20                 If you don't remember something --

21       A.        I don't remember, ma'am.

22       Q.        So that's actually a really good thing.

23   I want to talk about that for a second.

24                 I want to go over briefly what the

25   difference is between "I don't remember" and a

Page 9

1   guess.

2           If you really don't remember anything --

3   look, this happened two years ago.  It's normal not

4   to remember stuff sometimes.  Your honest answer is

5   "I don't remember," don't tell me "no" or "I don't

6   think so" if the answer is actually "I don't

7   remember."  Okay?

8       A.      Yes, ma'am.

9       Q.      You're under oath, and if we go to trial

10  we need to be able to rely on the testimony you give

11  today.  So "I don't know" is an appropriate answer,

12  but under no circumstances do I want you guessing.

13  Okay?

14      A.      Yes, ma'am.

15      Q.      Would you prefer that I call you Kerry

16  or Officer Kubla?

17      A.      Kerry is fine, ma'am.

18      Q.      Other than your own CIRT statement, did

19  you read the deposition transcript of any other

20  officers?

21      A.      No, ma'am.

22      Q.      Did you read the CIRT statements of any

23  other officers?

24      A.      No, ma'am.

25      Q.      Did you review your body-worn camera?

Page 10

1      A.      I have reviewed that before, ma'am, yes.

2      Q.      Okay.  And did you review any of the

3  other officers' body-worn camera?

4      A.      Yes, ma'am.

5      Q.      Okay.  And I discussed it briefly before

6  we got on the record.  Because I don't have my

7  computer system here with me here today we won't be

8  reviewing the body-worn camera, but I will be asking

9  you very specific questions about it.

10            Before we kind of get into everything

11  else, reviewing your body-worn camera -- when you

12  reviewed your body-worn camera recently, two years

13  past the incident, was there anything that jogged

14  your memory or surprised you when you reviewed the

15  video?

16     A.      No, ma'am.

17     Q.      Okay.  Was reviewing the video

18  consistent with what you remember recounting to the

19  CIRT interview two years ago?

20     A.      Yes, ma'am.

21     Q.      Okay.  Have you discussed this

22  deposition with any of your codefendants?

23     A.      No, ma'am.

24     Q.      Have you discussed your deposition here

25  today -- other than with Craig, have you discussed

Page 11

1    your deposition with anyone else?

2        A.        No, ma'am.

3        Q.        What's your usual work schedule?

4        A.        My normal schedule is basically 3

5    o'clock to 12 o'clock -- or 2 o'clock to 12 o'clock.

6        Q.        That's 2:00 p.m.?

7        A.        Yeah.  1400 hours to 0000.

8        Q.        And what days?

9        A.        My off days, my RDOs, would be Thursday,

10   Friday, Saturday.

11       Q.        So this is one of your off days; is that

12   correct?

13       A.        Yes, ma'am.

14       Q.        Okay.  Now, Kerry, I'm going to ask you

15   some questions about your professional background.

16                 What's your highest level of education?

17       A.        Graduated high school.  I took a couple

18   of classes in community college, but nothing that

19   I -- just got a couple credits here and there.

20       Q.        Okay.  And what community college was

21   that?

22       A.        Nevada, Clark County Community College.

23       Q.        And what is your current position with

24   Metro?

25       A.        I'm a Police Officer 2, and I'm

Page 12

1    currently working the SWAT bureau.

2        Q.      What's SWAT bureau?

3        A.      That would be the special weapons and

4    tactics.  We're in the Homeland Security division.

5        Q.      And how is that different from what you

6    were working at the time of this incident on

7    January 10, 2022?

8        A.      It's the same position, ma'am.

9        Q.      Okay.  And how long have you been in

10   that position for?

11       A.      I've been in that position coming up on

12   six years.

13       Q.      And can you kind of walk me through your

14   professional background with Metro, like when you

15   got hired and the different positions you held up to

16   the one that you currently hold?

17       A.      I hired on the department in February

18   of 2008.  From there I went through the academy,

19   which is a six-month academy.

20              After that I went to patrol.  I worked

21   Northeast Area Command as a patrol officer.

22   Completed my field training there.

23              Then I stayed working over there for the

24   next approximately ten years.  I worked primarily on

25   graveyard.  Probably 90 percent of that time was on

Page 13

1   graveyard.

2           While I was over there working, I did go

3   into another squad, which was like a swing-shift

4   squad, and that was on a gang enforcement team, kind

5   of like within the detective side of it, where we

6   did gang enforcement stuff.

7       Q.      And how close in time from when you were

8   working the gang enforcement to your transition over

9   to SWAT?

10      A.      It was a couple of years.  I was in a

11  vehicle accident during that time, whenever I was

12  assigned to that position.  I left there due to an

13  injury.  Went through -- workman's comp-related.  I

14  went through that, and I transitioned.

15          I was at the fusion center while I was

16  light duty.  So I went to the fusion center, and I

17  was up there for approximately -- I would say a year

18  maybe, working up there.  And then whenever I left

19  there, went back to my position and started testing

20  for SWAT.

21      Q.      Okay.  And what drew you to SWAT?

22      A.      Just something I always wanted to do.

23  The comradery, the brotherhood of everybody, the

24  team, working as a team together.  That was pretty

25  much what I was looking for position-wise within the

Page 14

1   department.

2        Q.      Okay.  And so as we sit here today,

3   you're still holding the same SWAT position that you

4   were at the time of the incident.  And so is it fair

5   for me to assume that you were familiar with serving

6   these type of warrants, given that you -- sorry.

7   Hold on.  Let me do the math.

8              So at the time of this incident, you had

9   been with SWAT for what?  Four years?  Three years?

10       A.      Yes, ma'am, three years.

11       Q.      Okay.  So is it fair for me to assume

12  then at the time of this incident you were fairly

13  familiar with serving warrants through SWAT?

14       A.      Yes, ma'am.  I would say a few hundred

15  at least.  I mean, we typically do 3 to 400 warrants

16  a year, so it's quite active.  Now, I might not do

17  all 300 to 400 because we have full-week coverage.

18  But we do work a lot of time on our off days as

19  well.

20       Q.      So when you say 3 to 400, do you mean

21  that for, like, the whole SWAT unit?

22       A.      Our SWAT unit is divided into two squads

23  which cover the full seven-week coverage.  We have

24  one day in common.

25       Q.      So your squad does 3 to 400 of these



Page 15

1    search warrant service a year; correct?

2         A.      No, ma'am.

3         Q.      Sorry.

4         A.      Our division, our section, does --

5    basically we're one big team, and we're split into

6    two smaller coverage teams that cover for the

7    seven-week coverage.

8         Q.      And why is it a seven-week coverage?

9         A.      Just so that we have coverage throughout

10   the whole Valley, throughout the whole Valley for

11   the entire week.  We respond to everything, and

12   we're on call 24/7.

13            So within the unit the only time we're

14   off is if we're on vacation and out of town.  Other

15   than that, we're responding to different calls.

16        Q.      And so at the time of this incident in

17   2022, did you have the same work schedule?  The

18   2:00 p.m. to 12:00 p.m. with Thursday, Friday,

19   Saturday off?

20        A.      I believe at that time, ma'am, we were

21   3:00 to 1:00 at that time, our hours were.

22        Q.      3:00 p.m. to 1:00 a.m.?

23        A.      Yes, ma'am.

24        Q.      So the service of the warrant was I

25   think roughly what?  4 o'clock in the morning?

Page 16

1          That would have been outside your normal

2   work hours; correct?

3      A.     Yeah.  It was planned for 5:00 a.m.

4      Q.     Sorry, 5:00 a.m.?

5      A.     Yes, ma'am.

6      Q.     Kerry, can you tell me, what does

7   "knock-and-announce" mean to you?

8      A.     A knock-and-announce is a warrant where

9   we are obligated to announce what we're there for,

10  who we are, what we're there for, and make knocks on

11  a door prior to making entry, giving the suspect or

12  giving whoever we're serving, the residents at the

13  warrant, the opportunity to come to the door.

14     Q.     Okay.  And as we sit here today, was

15  your understanding of what knock-and-announce meant

16  the same as it was in 2022?

17     A.     Yes, ma'am.

18     Q.     Okay.  And so if I understand your

19  testimony correctly, part of the purpose of

20  knock-and-announce is to give the person or people

21  on the other side of the door the opportunity to

22  come answer the door; correct?

23     A.     Yes, ma'am.  There's different

24  mitigating factors as far as what that timeline

25  would be.

Page 17

```
 1      Q.       If you won't mind, Kerry, if you can
 2  walk me through what those mitigating factors are.
 3      A.       It might be the -- how do I explain
 4  that?
 5               So one would be --
 6      Q.       Don't worry about using formal language.
 7  Just tell me like we weren't in a deposition.  Just
 8  walk me through it.  Don't worry about saying
 9  exactly the right words.  Just explain, like, from
10  your point of view this is what it is.
11      A.       What the normal times are traffic's been
12  seen in and out of the residence.
13               The time, what time it is, time of day
14  it is.
15               How many people are outside at the time.
16               Officer safety issues as far as where
17  we're located, if we're out in the middle someplace
18  where there's no place to provide cover.
19               Whether the subject is armed or could be
20  armed inside the residence.
21               What the subject's priors are.  What the
22  crime is that we're going for.
23               A lot of things mitigate how long we're
24  going to sit out there and announce on a
25  knock-and-announce.
```

Page 18

1            It could be different types of tactical
2    plans that we put together as far as how we're going
3    to serve the warrant.
4        Q.      To your knowledge, Kerry, is there any
5    amount of time that you must wait following the
6    knock before entering?  Like, is there a minimum
7    amount of time?
8        A.      It's a reasonable amount, ma'am.
9        Q.      Can you tell me -- I know you walked
10   through some of those parameters for me, Kerry.  But
11   in an instance like this, although not exactly --
12   I'm just going to do a hypothetical.
13            In an instance similar to this, what
14   would you consider a reasonable amount of time?
15       A.      A reasonable amount of time on this one
16   is going to be a lot shorter than others due to the
17   fact that we were looking for homicide suspects.
18   There were firearms involved.  There were multiple
19   incidents involving other shootings within the
20   complex where subjects were seen going towards that
21   building, that apartment.
22            It was somewhat known to be a flophouse
23   for gang members that were in and out of there, and
24   they were seen with guns prior.
25            The crime was a homicide that had taken

LEXITAS

Page 19

1    place a couple of months prior to that where they

2    shot and killed somebody, for the suspects that we

3    were in question -- looking for at that residence.

4    As well as other -- you know, there were other

5    gang-affiliated that were in and out of that

6    residence.

7        Q.      Okay.  And so if I understand correctly,

8    a lot of what you would base to be a reasonable

9    amount of time -- either this incident or an

10   incident similar to it, is because of who you

11   believe to be on the other side of the door; is that

12   correct?

13       A.      That is a big part of it.

14              The other thing are environmental

15   factors.  So close proximity to other citizens that

16   are in the area.  It could be our cover where we

17   have to be at as far as for cover.

18              On this particular search warrant was a

19   controlled entry that we did on there due to the

20   fact that we were unable to park armored vehicles in

21   a location where we could basically contain the

22   entire apartment.  That was cut off due to the fact

23   that there was no way to get armor back to where

24   that apartment was because of the wall that was

25   around there.



Page 20

1                    And there were citizens that were

2    directly above the target's residence.  Not only

3    above them, but on the rear side, the two corners of

4    the apartment, where a subject that was in there

5    could very easily -- I've seen it a hundred times,

6    where they could very easily kick through, and now

7    we have a suspect in the neighboring apartment with

8    citizens that are in there that it could create a

9    hostage situation.

10                   Then there's also the -- right across

11   that wall, which was about approximately a 5-foot

12   block wall, cinderblock wall, with 3 feet of iron on

13   top of it that you could see through, and that was a

14   24-hour Arco gas station.  So the only place we

15   would be able to park armor would be in that gas

16   station parking lot, and you're going to have

17   citizens in and out of there, in the line of fire,

18   while we were out there attempting to serve that

19   warrant.

20                   Along with the other side of that

21   residence was basically on Nellis Boulevard, which

22   was a very thorough street at that time in the

23   morning.  There's going to be a lot of traffic out

24   there, a lot of people walking down the sidewalk,

25   which would put them approximately maybe 20 yards --

Page 21

 1    15 to 20 yards from the front of that residence and

 2    the windows of there.

 3              So we wouldn't be able to contain that

 4    position there.  So that obviously would take a lot

 5    longer as far as us knocking and announcing.

 6       Q.     Can you walk me through, what's the

 7    difference between -- I know that the acronym for it

 8    is "CET."

 9              What's the difference between a

10    controlled entry tactic and a surround and callout?

11       A.     So a surround and callout, I'll briefly

12    explain.  We're going to surround and contain that

13    structure prior to making announcements.  We're

14    going to basically set up containment so we know we

15    have a full perimeter around there.  Keeping access

16    from the suspect being able to get out and break our

17    perimeter or, like I said, break into another

18    neighboring apartment.

19              Then once we do that, we're going to

20    start with announcements.  We would call the

21    suspects out over our PA system and continue to make

22    announcements to try and get the suspect to come

23    out.

24              If that didn't take place and they

25    weren't responding, then we would use other



Page 22

1    de-escalating factors of maybe going to a distract

2    plan by dropping noise-flash diversionary devices,

3    which might cause a loud noise, to kind of, like,

4    provide a little bit more -- without doing any harm

5    to them, but put a little more pressure on there to

6    get them to answer.

7              We would keep doing that until

8    eventually we're going to have to go into that

9    residence.  So we would eventually get to a point in

10   time where the team leader and the -- assistant team

11   leader and the team leader would make a plan to go

12   up and we're either going to have to manually breach

13   the door, or we might have to -- in certain

14   circumstances that might turn into a semi-barricaded

15   subject if we know that they're in there.  Then we

16   might have to go to different options as far as

17   breaching, ballistic breaching.

18        Q.      Let me loop back for a second, because

19   I've heard from a lot of officers the concern about

20   kicking through the doors to get to people in the

21   apartment.

22              Why not just go in through the other

23   apartment then?

24        A.      Into the --

25        Q.      Why not say to the residents, like, Hey,

Page 23

1   we're serving a search warrant and we need to come

2   in here and make sure -- is that a dumb -- I really

3   don't know.  Everyone has talked about this and

4   you're, like -- you seem to be familiar with it, so

5   I'm going to ask you.

6        A.       One, you probably wouldn't be

7   comfortable with somebody coming in and ripping your

8   walls out to go through them to get to a neighboring

9   apartment.  They're not going to let you just come

10  in and give you consent to do that.

11       Q.       Sorry.  That's not what I meant.  So

12  let's say -- I don't know quite how else to ask it.

13  Because I've heard this answer over and over again.

14  Part of the basis from your guys' point of view as

15  officers in the field about what a reasonable amount

16  of time is is also this concern that a suspect, if

17  given too much time, can kick through an apartment

18  wall and get into the other apartment of the person

19  next to them.

20       A.       Yes, ma'am.

21       Q.       Let me ask the question more artfully.

22                Why not when serving the search warrant,

23  if it's certain the suspects may kick through the

24  wall, go to the other apartment and say, Hey, we're

25  serving a search warrant next door.  We're just

LEXITAS™

Page 24

1    going to be in here to make sure nobody kicks

2    through your door or does anything like that?

3                Is that a reasonable question?

4    A.        Yes, ma'am.  100 percent.

5                To answer that question, if we're on a

6    barricade, we do do that.  We evacuate people in

7    those residences to make sure there isn't a

8    kick-through.

9                On a search warrant it is a little

10   different because the time of day, to be able to

11   contact people.  To be honest with you, some

12   citizens just aren't going to answer the door, or

13   they are going to say, Hey, I'm not leaving.  I'm

14   staying here.  We have that sometimes.

15               We do make entry through those on

16   certain calls.  Hostage rescues we will do that.

17   We'll go through that wall to get in various entry

18   points to get into that target residence.

19   Q.        Just to clarify though, to your

20   knowledge there's no minimum amount of time you must

21   wait when executing a knock-and-announce warrant;

22   correct?

23   A.        Just a reasonable amount depending on

24   the circumstances that are articulated.

25   Q.        Okay.  Do you understand it is part of a

Page 25

1   person's constitutional rights to have clear notice

2   of a police officer's intent to enter?

3              MR. ANDERSON:  Objection to form.

4              Go ahead and answer.

5              THE WITNESS:  On a no-knock warrant you

6   would not need that.

7   BY MS. MURPHY:

8      Q.     Thank you for making that clarification.

9              On a knock-and-announce, do you

10  understand that it is part of a person's

11  constitutional rights to have clear notice of a

12  police officer's intent to enter?

13             MR. ANDERSON:  Objection.  Form.

14             Go ahead and answer.

15             THE WITNESS:  Yes, ma'am.

16  BY MS. MURPHY:

17     Q.     What is the first and most important

18  constitutional right that any individual has?

19     A.     Their --

20     Q.     In your opinion.

21     A.     Well, their freedom.

22     Q.     Okay.  In performing your job as a

23  police officer, do you agree with me that you have a

24  duty to conduct yourself such that you do not

25  violate the civil or constitutional rights of

Page 26

1    members of the public?

2        A.       Yes, ma'am.

3        Q.       Do you also agree that if you see other

4    officers violating the civil or constitutional

5    rights of a member of the public, you have a duty to

6    intervene and stop that officer?

7        A.       Yes, ma'am.

8        Q.       And we talked about it.  You just hit on

9    it.  But what is a no-knock warrant?

10       A.       A no-knock warrant would be applied for

11   by the detectives.  They would apply for that.

12               On a no-knock warrant you would need to

13   have circumstances and be able to articulate the

14   reasons for that.

15               And then whenever they would apply for

16   that, basically we would not need to knock and

17   announce prior to making that entry.  Now, once we

18   make entry, we will be announcing, This is the

19   police department with a search warrant.

20               But prior to that we could basically

21   breach that door by what means we decided in our

22   tactical plan, whether it be ramming the door,

23   whether it be a ballistic breach, an explosive

24   breach, different tactics that we would use to get

25   into that residence.

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 27

1          That would be the difference between a

2    no-knock and a knock-and-announce warrant.

3          Q.     Okay.  And my understanding, Kerry, and

4    you tell me if I'm right or wrong, for it to be a

5    no-knock there's kind of some rigorous steps that

6    the homicide detectives would have to go through to

7    get that judicial approval; correct?

8          A.     Yes, ma'am.  Well, that goes way above

9    me and the detectives.  But yes, ma'am.  They would

10   have to apply for that, and that would have to go

11   through our department, all the way up the chain.

12         Q.     So you just kind of clarified that, and

13   I'm glad you did, Kerry.

14             You just get the warrant; right?  You're

15   not involved in deciding whether it's going to be

16   knock or no-knock, and you're not doing what they

17   call the IAP?  You're not involved in any of that;

18   correct?

19         A.     Correct, ma'am.

20         Q.     But in this instance you did do part of

21   the recon; correct?

22         A.     Yes, ma'am.

23         Q.     We'll get to that in a minute.

24             Do you have any understanding about when

25   a no-knock warrant would be used versus when a

Page 28

1    knock-and-announce warrant would be used?

2        A.      Do I have an understanding of when?

3        Q.      Yes.

4        A.      Yes.  I would say that the nature of the

5    crime.  You know, the suspect's priors, what he's

6    done before.  If there's guns involved, what the

7    crime is.  There's a lot of mitigating factors that

8    would reach to that for a no-knock.

9              It might be just where the subject is,

10   where the residence is, where we can't physically

11   get, you know, to that area.  We're going to be

12   basically in an open area up there, whether it might

13   be -- I don't know.  There could be -- you know,

14   whether it's a fatal-funnel-type thing, where

15   officers are going to be standing there just in a

16   long hallway with no other access, and if somebody

17   was to start shooting rounds through the walls or

18   come out shooting, we're just stuck in a fatal

19   funnel.

20             So there's a lot of different things

21   that go into that as far as a no-knock.

22             And then for that no-knock warrant you

23   would have to justify all that and then push that

24   up, and then, you know, it would have to be approved

25   all the way up through the chain.

Page 29

1      Q.      Okay.  And my understanding of this

2   incident is that there was approval for a CET on a

3   knock-and-announce warrant; correct?

4      A.      Yes, ma'am.

5      Q.      As we sit here today, are you aware of

6   any change of policy within LVMPD that you can no

7   longer use a CET on a knock-and-announce warrant?

8      A.      No.  No, ma'am.  Not on a -- well, if we

9   had a CET, it would be a no-knock warrant.

10     Q.      So just to clarify, because things can

11  look a little weird on paper when we read it back.

12     A.      Yes.

13     Q.      I just want to clarify, as we sit here

14  today you understand that in order to have a CET it

15  would have to be a no-knock warrant; correct?

16     A.      Yes, ma'am.  Unless there was, like, an

17  exigent circumstance, like, say, a hostage rescue or

18  something.  We're not waiting for that prior to.

19  That's exigent.

20     Q.      Of course.  But here there was no

21  hostage situation?

22     A.      No, ma'am.

23     Q.      Okay.  In your professional opinion,

24  somebody who's been working on SWAT for this many

25  years and have served this many warrants, do you

Kerry Kubla                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 30

 1   believe that there was a conflict between

 2   knock-and-announce and a CET?

 3       A.      During this event?

 4       Q.      In general.  I'm asking for your

 5   professional opinion.

 6       A.      I'm sorry.

 7       Q.      No.  Is there a conflict?

 8       A.      A conflict?

 9       Q.      Yeah.

10       A.      No.  I think we're still -- we're still

11   doing a due diligence of announcing ourselves, not

12   only letting whoever's inside, but letting neighbors

13   know that we're out there and we're serving a

14   warrant just so they kind of know what's going on.

15               You know, like on this very incident,

16   whenever we were out there knocking and announcing,

17   somebody else from a neighboring apartment stepped

18   out asking, Hey, you know, we're down here.  We're

19   serving a warrant down here.  Go back inside.

20               So somebody did hear we were out there,

21   which brought them to step out to see what was going

22   on out there.

23       Q.      And that happened in this incident?

24       A.      As far as I remember, yes, ma'am.

25       Q.      Okay.  Can you walk me through that?

Page 31

1            All I have is the body-worn cameras, so
2   can you walk me through that a little bit more?
3       A.      Whenever we were on approach, going to
4   the front door, we started announcements.  As we
5   were making announcements, obviously there's a short
6   timeline, but a couple announcements came out.
7   There was a stun stick that was involved, so that
8   went off.
9            Somebody from -- I remember hearing
10  somebody upstairs poking out, like out on the
11  landing, to see what was going on.  And somebody
12  saying, Hey, go back inside.  We're downstairs.
13      Q.      Okay.
14      A.      I couldn't tell you who that was.  I
15  just remember hearing that.  I was focused on
16  looking towards the door.
17      Q.      And did you agree -- you had no
18  involvement in the IAP; correct?
19      A.      No.  Other than looking at it.  But no
20  involvement with writing it or putting anything in
21  there, no, ma'am.
22      Q.      You weren't involved with the kind of
23  multiple versions going in; correct?
24      A.      No, ma'am.
25      Q.      When you got the IAP and -- because you

Page 32

1    went and did the recon for this?

2       A.      Yes, ma'am.

3       Q.      But when you got the IAP, were you aware

4    of any kind of the background of it being submitted

5    several times and different versions and that kind

6    of thing?

7       A.      No, ma'am.  We normally don't get

8    something until it's vetted and it's gone through

9    the chain back and forth.  So whatever happens on

10   that end, it could take a couple minutes.  It could

11   take a couple days.  It just depends on what goes

12   through.  That's above our grade.  Whether it's at

13   the sergeant level or the lieutenant level or even

14   the captain level at that time, different things

15   could be requested or asked for and different things

16   done.

17            Once we get it, it's pretty much done,

18   and, you know, we're pretty much ready to serve the

19   warrant, so the recon goes out to conduct the

20   reconnaissance.

21      Q.      We talked about the change in policy,

22   but I just want to confirm.

23            As we sit here today, LVMPD policies

24   would not allow this type of warrant to be served as

25   a CET; correct?

Page 33

1      A.      I'm sorry.  Can you repeat that?

2      Q.      Sure.  As we sit here today, based on

3   the change of policies that we discussed earlier,

4   LVMPD policies would not allow for this type of

5   warrant to be served as a CET; correct?

6      A.      Correct.

7      Q.      So now I'm going to actually ask you

8   about the warrant a little bit.

9              Do you remember when you first became

10  aware of the warrant?

11     A.      It would have been the night before,

12  which would have been 1/9 of '22.

13     Q.      Do you have any -- I mean, I know that

14  you know kind of how these come in and stuff.

15             Do you have any independent recollection

16  of that?

17     A.      How it came in?

18     Q.      Yeah.

19     A.      The assistant team leader, who was Jake

20  Werner that evening or that day, notified us that

21  there was a warrant that needed to be served.  It

22  was actually -- at first it was going to be a

23  simultaneous warrant where we hit both residences at

24  the same time related to the same crime of homicide.

25             He needed reconnaissance officers to go

Page 34

1    out, so he assigned myself and Brett /KOZ to 4475

2    Jimmy Durante, and then he assigned Kai Hoskins and

3    Mark Eshe to the 3050 South Nellis address.

4            Due to the fact that this was going to

5    be a simultaneous warrant, it ended up changing that

6    it wasn't going to be a simultaneous; we were going

7    to conduct a search warrant on one residence and

8    then immediately go to the following residence.

9        Q.        Sometimes I'm a bad interrupter.  If

10   you're not done talking, just tell me.

11       A.        No.  Go ahead.  I might ramble.

12       Q.        That's okay.  That's okay.

13           I thought that you had done recon on

14   this 3550 [sic] South Nellis.  That's what I kind of

15   took away.

16           Did you not do any of the recon on 3550?

17       A.        Maybe because I was rambling I didn't

18   get to that because it took me a while.

19           So whenever we went out to do the

20   reconnaissance of both residences, we went and got

21   one vehicle for us to take so we weren't going --

22   because we were going to have a route from our brief

23   spot to this location, from this location to the

24   next.  We have to drive that route.  So we all went

25   together in one vehicle.



Page 35

1          So our assistant team leader, which was

2     Jake Werner, Mark Eshe, Kai Hoskins, myself, and

3     Brett Brosnahan all went in the same van, vehicle,

4     drove to that location.  We pulled up to the front.

5     Mark Eshe and Kai Hoskins exited the vehicle.  They

6     did walk by us through the residence, did what they

7     needed to complete their reconnaissance.

8          After that we drove -- left that

9     complex, pulled into the gas station real quick that

10    was just across from there so we can kind of see

11    what the front was.  Just because where that target

12    residence was, it was very hard -- unless you were

13    going to that apartment, there was no reason for you

14    to be back there.  So it was very hard to get back

15    there unless you were in that bottom apartment or

16    the top apartment.  So somebody, if they seen you

17    back there, they would probably wonder why you were

18    back there.

19         So we did drive around to the Arco,

20    stopped at the gas station, got out.  I think

21    somebody might have got out, walked inside the gas

22    station, came back out.

23         We stayed in there looking over there

24    just to kind of get a rough look at it real quick.

25         Then we left there and went to the 4475

Page 36

1    Jimmy Durante residence.

2        Q.        Okay.  So do you know if any of the

3    other two officers, do you know if they went back

4    and did more recon at 3350 South Nellis, or was that

5    the totality of it?

6        A.        At 3050?

7        Q.        Yes.

8        A.        I do not know if they went back out

9    there or not.  I focused on the residence we did a

10   reconnaissance on.

11       Q.        That's kind of the -- that's kind of the

12   takeaway I'm getting from your dialogue about this,

13   and you tell me if I'm right or wrong, because

14   sometimes I misunderstand things.

15             You guys went out there together.  You

16   were personally in the Arco, but really it was the

17   other two officers that were walking around.  It was

18   their task to kind of do the recon on 3350.

19             Am I mistaken or correct on that?

20       A.        Yes, ma'am.  I believe 3050, right?

21       Q.        Sorry.  Am I saying 3350?

22       A.        Yeah.

23       Q.        Sorry.  I'll just call it South Nellis.

24       A.        Perfect.

25       Q.        That's easier for the court reporter.

Page 37

1          So for the Nellis apartment, although
2    you were in the car with them, you weren't actively
3    doing recon on the Nellis apartment, were you?
4        A.    No.  Personally, I was looking at
5    things.  Because we're all going to be serving that
6    warrant together.  So in my mind, I'm looking to
7    see, okay, how far is it from here to there, what
8    the outside surrounding areas look like.
9          So I was looking, but I wasn't doing --
10   like, I would normally do a thorough reconnaissance.
11         Just because of the fact that it's more
12   than likely, with the high volume of people in and
13   out over there and the people that were conducting
14   business, I would say, on a day-to-day operation, it
15   would look very odd for four or five of us out
16   walking around, strolling through this neighborhood.
17   So we keep it to, depending on the circumstances and
18   where we're at, as minimal as possible footprint.
19       Q.    I want to make sure.  There was a lot of
20   dialogue.  I'm going to cherry-pick some parts, and
21   I do want to make sure I understand.
22         As we sit here you don't know if the
23   other recon officers went back and did more recon.
24   Is that fair?  Or you do know?
25       A.    I do not know, ma'am.

Kerry Kubla              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 38

1      Q.      I'm sorry if I asked this and I didn't
2   catch it -- if you answered and I didn't catch it.
3              Do you know approximately how long you
4   were there for?
5      A.      During the reconnaissance?
6      Q.      Yeah.
7      A.      I would say it probably took an hour for
8   both residences.  Probably approximately around
9   there.  I'm not a hundred percent on that.
10     Q.      And that's just on that -- sorry.
11     A.      No, go ahead.
12     Q.      That's just on that car trip; right?
13     A.      Yes, ma'am.  Yes.
14     Q.      Okay.  And having reviewed the CIRT
15  report, it would appear that you guys did some
16  detailed -- you tell me if I'm right or wrong -- you
17  guys did some detailed recon on the Jimmy Durante
18  apartment; correct?
19             Like, you have pictures of potential
20  suspects in the parking lot?  Like, you were trying
21  to connect people with the Jimmy Durante apartment?
22  Like, is that fair for me to say, or am I wrong?
23     A.      We didn't do as thorough, I wouldn't
24  say.  I mean, they are both thorough.  I won't say
25  they're not thorough.

LEXITAS

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 39

1              We probably spent less time at the Jimmy

2    Durante residence than what we did over there just

3    due to the fact we were going to do a surround and

4    callout over there.  We didn't need an approach,

5    like to walk it for an approach, to walk through

6    there.

7              But we did have intel.  The suspect

8    vehicle was parked out there in the parking lot.

9         Q.     I'm sorry.  When you say "in the parking

10   lot," you're talking about the Jimmy Durante?

11        A.     The Jimmy Durante.  It looked like -- we

12   didn't have eyes on it over there, but I think

13   whenever we talked to -- it might have been the

14   detectives -- I can't give you exact name on that --

15   they witnessed the vehicle was parked over there in

16   that parking lot and it hadn't moved.  It's been

17   seen over there parked in the same lot for quite a

18   while.

19             We were checking that residence because

20   there were known to be a child at that residence.

21        Q.     I'm sorry.  It gets a little confusing

22   on paper.

23             When you say "that residence," you're

24   talking about Jimmy Durante?

25        A.     Yes, ma'am.  Yes, ma'am.  Jimmy Durante.

Page 40

1    Q.      Sorry.  Keep going.

2    A.      So once we completed that reconnaissance

3    of that residence, whenever we went back, there was

4    a lot more involved with the reconnaissance.  We

5    still do a lot of planning.  We pull up photos.  We

6    pull up different stuff that we use to draw a plan

7    of the residence.  So we do more of that after the

8    reconnaissance, like afterwards.

9            So that hour was just doing the drive-by

10   and the walk-through, and then after that it was

11   probably a couple hours at least that we went back

12   and going over the planning phase of that.

13   Q.      But you tell me.  You were doing that

14   for Jimmy Durante, not Nellis; correct?

15   A.      Yes, ma'am.

16   Q.      Okay.  So in terms of what happened for

17   Nellis and the other two officers, you weren't

18   involved in them doing the follow-up, like, whatever

19   additional information they were collecting; is that

20   correct?

21   A.      No, ma'am.

22   Q.      That wasn't part of your task; correct?

23   A.      No, ma'am.

24   Q.      And so do you think -- I know that you

25   did it for the Jimmy Durante one.

Page 41

1              Do you think that your recon and your

2    follow-up work to prepare for serving that warrant,

3    do you think that that was sufficient?

4         A.        It would have been nice to find out.

5    Yeah.  But other than that, I think it would have

6    been, related to where it was and parking the

7    vehicles in there.  We had plenty of room to park

8    two armored vehicles in front of there containing

9    it.  We'd be able to get close enough because it was

10   an open parking lot, so we could get as close as

11   needed to keep suspects from exiting there and

12   getting into a neighborhood apartment.  We could

13   contain it on both sides of the building, contain

14   both those sides.

15              There was a child in that residence as

16   well, that was known to be in there.  We had

17   confirmed that.  So doing other things, like, as far

18   as using a stun stick over there probably wouldn't

19   have been involved over there due to that fact,

20   knowing that there could be a child in there.

21              And we could slow that one down a bit

22   and go from there on that residence.  It would be

23   easy to contain that fully with armor.

24        Q.        I'm going to skip around a little bit,

25   and I'll get into the specific -- I will also follow

Page 42

1    up later on with the specific conclusion and the

2    CIRT report.  But I will tell you part of it was

3    there was essentially insufficient recon done on the

4    Nellis apartment; that there was a lot of unknowns

5    surrounding the Nellis apartment.

6            But I want to confirm, that would not

7    have fallen within your tasks?  That wasn't part of

8    your duty related to the search warrant; is that

9    correct?

10    A.        Not on the -- no, ma'am, not on the

11    reconnaissance.  If that was the case, I would have

12    been walking it myself on that.

13            So there's a lot of things that I

14    wouldn't have picked up on that reconnaissance by

15    just being in the car and being from the parking lot

16    across the way.

17    Q.        Okay.  So if I ask you you're part of

18    the recon team, you're part of the recon team for

19    the execution of this warrant but not specifically

20    for the Nellis apartment?

21    A.        Yes, ma'am.

22    Q.        What was your understanding of the type

23    of warrant this was?

24    A.        What type of warrant?

25    Q.        Yeah.  Like, what were they looking for?

Page 43

1      A.      Homicide suspects.  Related to a

2  homicide.

3      Q.      Was this an arrest warrant?

4      A.      It was -- for the homicide suspects in

5  there, under my understanding is that the homicide

6  did not have PC on arresting suspects in there.

7              However, the -- and I don't want to

8  speak out to which detectives.  I think it might

9  have been the gang detectives, but it might not have

10  been.  It might have been some other detectives.

11  That they had probably cause due to the fact that

12  the suspects self-incriminated them.  I think the

13  stepmother had talked to them, and they incriminated

14  themselves as far as what they had done.

15              And that was done during that --

16  whatever investigation that they -- that whoever it

17  was that we talked to.

18              I'm not a hundred percent, like I said

19  on -- because it was so long ago and I can't

20  remember who it was we spoke to as far as who the

21  detective was that had that intel and information.

22  So I thought that they had PC for suspects in there.

23              Of course on our plan and everything on

24  there it doesn't say PC on there, on our written

25  plan.  So I'm not a hundred percent on that.

Page 44

1            Now, on our written plans now we do have

2    a PC spot on there, whether they have PC or do not

3    have PC.

4        Q.      On the plans, has that changed to

5    have -- that, like, section about whether they have

6    PC or not have PC, was that changed in the form

7    related to this incident?

8        A.      To be honest with you, I don't know.

9        Q.      But there has been a change in the form;

10   is that correct?

11       A.      It's not a form per se.  It's -- if

12   you've seen the pictures of it -- so I'm sure you've

13   seen the pictures of it -- we draw that.  So some

14   draw better than others.  But there's a list down

15   there that we put down there for children, elderly,

16   fortification, cameras, any cameras up there.

17   There's a list we put up there.  Pets, dogs,

18   children, that's all listed in there.

19            Now we also add PC on there from the

20   detectives as far as if they have PC or they do not

21   have PC.

22       Q.      Okay.  And I'm really sorry, I didn't

23   bring my computer, so we're not going to be able to

24   look at the body-worn cameras.  But I think maybe I

25   have pictures of it.



Page 45

1              Are you talking about, like, the kind of

2    diagrams that you guys do and the drawing you did

3    and you post up on the side of the car?

4        A.        Yes, ma'am.  So the information page,

5    which is the first page -- well, you wouldn't have

6    the first page.  But the page that's usually to the

7    left, the information page, is going to have the

8    address of the target residence.  In this case it

9    was two residences.  It will have an event number.

10   We had an event number for this event.  We didn't

11   pull an event -- I don't remember pulling an event

12   for the other address because we didn't go to that

13   yet.

14              And then it has suspects listed, other

15   occupants listed, and their priors, whether there's

16   guns involved.  All that stuff is listed on that

17   information page.

18              And then the next intel sheet would be a

19   draw of the structure, and that would go over the

20   structure, surrounding area, number of windows,

21   number of doors, which way the doors swing, whether

22   there's fortification on there.

23              And then the third page would be our

24   tactical lineup or our entry team depending on which

25   option we're going with, whether it's surround and

LEXITAS™

Page 46

1  callout or it's an entry.  It lists operators

2  involved on that one.

3        Q.        Okay.  Give me just a moment.  I'm

4  trying to find -- because I know that I've seen

5  something like that in the CIRT report.  I'm just

6  trying to see if we're talking about the same thing.

7                Just to confirm, there's now, for lack

8  of a better term, a little PC check box; correct?

9        A.        Yes, ma'am.  We put PC on there.  It

10  lets others know there, along with, like, K-9, for

11  instance.  If we're going into a structure and we

12  don't have PC for the suspect and suspect gets out

13  and runs, that K-9 doesn't have PC.  Unless he can

14  generate his own PC to send his dog on that person,

15  whether it's because he sees a weapon, he sees

16  something else, he's not going to deploy a dog on

17  somebody that he doesn't have PC on.  If he has PC

18  on that person, on that subject, and that person is

19  out and on the go, then more than likely, depending

20  on the crime, he's going to be able to utilize that

21  dog as a low-lethal option.

22        Q.        Okay.  Found it.  All right.

23                So, Officer Kubla -- sorry, Kerry, I'm

24  pulling out a couple of pages from the CIRT report.

25  And I believe that these are what you were talking

Page 47

1    about in terms of the plan.  So if you wouldn't mind

2    just taking a minute and looking those over.

3            Sorry.  I should have asked you what

4    page number is that before I handed them to you.

5            MR. ANDERSON:  Read the bottom Bates

6    stamps.  LVMPD 4378.

7            THE WITNESS:  123 page of 222?

8            MR. ANDERSON:  Go to this number here on

9    the bottom right.  LVMPD --

10           THE WITNESS:  4377.

11   BY MS. MURPHY:

12       Q.      Kerry, I'll tell you -- you've probably

13   seen it a little bit in this case already --

14   oftentimes we end up producing thousands and

15   thousands and thousands of pages of documents, and

16   it gets a little confusing when we refer to the

17   internal page document.  So as lawyers what we do is

18   we mark all the documents with what we call Bates

19   numbers.  It's that alphanumeric number down at the

20   bottom.  It's like a page number for the entire

21   case, for every single document that's been

22   produced.  That is page 4,378.  That's what Craig

23   was referring to.  We call it a Bates number.

24       A.      Yes, ma'am.

25       Q.      Just to get back on track though, that

Page 48

1   is -- when you talked about the briefing -- or the

2   thing that you now add PC to, is that what -- is

3   that what you were talking about?

4        A.      Yes, ma'am.

5        Q.      Okay.

6        A.      And to be honest, it's very hard to see

7   on this picture.  But on the very bottom left of

8   this picture that was taken, where it's listed on

9   there as far as -- it's listed on there as far as

10  guns, children, elderly, all that stuff is listed

11  down there on the bottom left, which would be for --

12  they're actually separated on here.  One side is for

13  the 3050 South Nellis and the other is Jimmy

14  Durante.  So there's a list for each of those

15  because of the fact that there were two on this

16  plan.

17       Q.      Just to confirm, that's Bates 4377;

18  correct?

19       A.      Yes, ma'am.  LVMPD 004377.

20       Q.      Yeah.  Because there's three

21  different -- it's 77, 78, and 79.

22               So the one you're talking about

23  specifically is the chart that's on 4377?

24       A.      Yes, ma'am.

25       Q.      And I see exactly what you're talking

Page 49

 1    about.  Yeah, down at the bottom there's like --

 2    there's two stacks where there's the Nellis one

 3    and -- it is a little hard to read.  But, yeah, it

 4    says Nellis and Jimmy Durante.

 5              That's what you were pointing out to me;

 6    correct?

 7         A.     Yes, ma'am.

 8         Q.     So in terms of, like, kids, dogs, it's,

 9    like, all saying no, no, no, no, no, for Nellis;

10    correct?

11         A.     Yes.  There is a thing on there for

12    guns --

13         Q.     Okay.

14         A.     -- listed.  But the others were listed

15    as noes.

16         Q.     And just -- and I want to -- based on

17    your earlier testimony, the information supplied for

18    all of this would come from the other two officers

19    that were on the recon team because they were tasked

20    with Nellis; correct?

21         A.     Yes, ma'am.  I mean, we would all kind

22    of have an understanding of that a little bit from

23    reading the warrant and what's going on and talking,

24    hearing from the detectives.  So, like, I might have

25    heard the detectives say one thing over another.

Page 50

1              The gun I knew because of the warrant,

2    reading the warrant, that there was a small-framed

3    handgun that was involved.

4              And then there was also related -- that

5    wasn't just in here, but there was also a related

6    call where the -- I want to say -- sorry.  Corvell

7    had priors for the firearms, prohibited person

8    firearm.  And he also had -- I want to say Rembert?

9    Is it Rembert?  Rembert was stopped prior in a

10   vehicle, and he had what appeared to be -- not a

11   hundred percent, but it was either an MP5 or a

12   short-barrel pistol -- rifle, like AR-style rifle,

13   and a handgun that he was stopped with on a previous

14   stop.  So he was known to have weapons as well.

15        Q.      As we sit here today, other than the

16   phone call with the aunt or the grandma -- I can't

17   remember if it was aunt or grandma -- like over a

18   month before, to your awareness, other than that

19   comment, were you aware if it was ever confirmed

20   that Corvell or Rembert -- I always get them

21   confused --

22        A.      It's Fisher and Rembert.

23        Q.      Yeah, Fisher and Rembert.

24              To your knowledge, were they ever, like,

25   associated with this apartment?

Page 51

```
 1      A.      Just the stepmother that had stated that
 2   they were in and out over here and it was a
 3   flophouse.
 4              And to be honest, I can't remember if
 5   there was anything else in there in the follow-up or
 6   if the detectives had sighted them over there or
 7   seen them over there or if there might have been a
 8   car related over there.  I can't go on record to say
 9   a hundred percent, but I thought that the vehicle
10   that he was stopped in came from that area, that he
11   was stopped with the firearms in.
12      Q.      Okay.
13      A.      And that was due to a relationship, I
14   think, because of the shooting that took place in
15   there where multiple subjects were seen running to
16   that apartment.
17      Q.      Okay.  If I understand your earlier
18   testimony, just to clarify, the chart on page 4377,
19   now there is a little section that's added, like PC;
20   is that correct?
21      A.      Yes.  In that list that we normally put
22   on there we'll add PC on there.  We will check and
23   confirm with the detectives, the detectives that are
24   there, just in case something changed from the time
25   that the warrant came up or whatever the case was.
```

Page 52

1    Or if they had PC, if they're arresting them, not

2    arresting them.

3            We don't actually do the arresting.  We

4    detain the suspects or subjects that are inside.  We

5    detain everybody that's in there, and then we hand

6    them off to the detectives and they do their

7    investigation as far as what they're going to follow

8    up with.

9        Q.      And so I just want to make sure I

10    understand.

11            In terms of this incident, your

12    understanding was they didn't have PC for the

13    homicide they were executing the property search

14    warrant for, but they did have PC from other

15    investigations to arrest the suspects, had they been

16    present?

17        A.      Yes, ma'am.  That was my understanding.

18        Q.      So was this an arrest warrant, or was it

19    a search warrant for property, or both?

20        A.      The search warrant was for the evidence

21    and the property of the --

22        Q.      But the intent was also to arrest the

23    suspects; is that correct?

24        A.      Yes, ma'am.

25        Q.      I'm going to ask you to hand that to the



Page 53

1    court reporter, because she's actually going to mark

2    that as Exhibit 2.

3              (Exhibit 2 marked.)

4    BY MS. MURPHY:

5        Q.        Kerry, turning to page 4378, can you

6    tell me what that's a photo of?

7        A.        This one would be a photo of the Nellis

8    address, 3050 South Nellis.

9        Q.        And then the next page, 4379?

10       A.        4379, that would be the -- our entry and

11   lineup team, our officer page, which has all the

12   officers listed in there involved, what the vehicle

13   package is, the entry line formation.  All that

14   stuff is listed on that one.

15             And there's -- there might be -- I don't

16   know if there's another picture or if this --

17   there's somewhat of a picture of the Jimmy Durante

18   residence just to the right in this picture.  It

19   doesn't show the whole thing, but there's partial of

20   that in there.

21             The actual target to that Jimmy Durante

22   would be on the southwest corner of that Building 6

23   that's in the bottom of this picture, which is not

24   in this photo.

25       Q.        I'll represent to you, I don't think

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 54

1    that they took a picture of that one too, because

2    that warrant was never served.

3              So do you know who makes these drawings?

4    A.        I don't want to admit to it, but, yeah,

5    we make the drawings.

6    Q.        Listen, the handwriting is much nicer

7    than mine.

8              On this instance did you do these

9    charts, or do you know who did them?

10   A.        No.  The officer lineup will be done by

11   Jake Werner, who is assistant team leader.  He would

12   have done the draw -- the planning phase for that

13   and issued all the assignments for all the officers

14   involved, between him and the team leader or the

15   sergeant that night.

16             And the information page and the draw of

17   the residence would be done by the reconnaissance

18   officers.

19   Q.        And so you were part of the -- well, you

20   were part of the recon, so did you provide the

21   information for the -- did you do the Jimmy Durante

22   part?

23   A.        Yes, ma'am.

24   Q.        Okay.  On the first page.

25             But you didn't do the Nellis part;



Page 55

1    correct?

2        A.        No, ma'am.

3              MS. MURPHY:  We've been going for a

4    little while, going for about an hour.

5              THE VIDEOGRAPHER:  We are going off

6    record at 11:00 a.m.

7              (A break was taken.)

8              THE VIDEOGRAPHER:  We are back on record

9    at 11:11 a.m.

10   BY MS. MURPHY:

11       Q.        Kerry, we took a brief break, but just

12   to confirm, although we have taken a break, the oath

13   that you took at the beginning of the deposition

14   still applies.

15             Do you understand that?

16       A.        Yes, ma'am.

17       Q.        Okay.  On break I saw you talking to

18   Craig.  Did you call anyone or talk to anyone else

19   while on break?

20       A.        No, ma'am.  My phone was in here,

21   actually.

22       Q.        So we've gone over the photos that you

23   had at the briefing.

24             As we sit here today, I know that you've

25   read your own CIRT statement.  Have you read the

Page 56

1   actual CIRT report itself?

2               And it's C-I-R-T.

3     A.      I did go over that briefly just to go

4   over it, yes.

5     Q.      What parts -- listen.  It's 222 pages.

6   What parts did you go over?

7     A.      Yes.  I didn't go over the whole page of

8   everything in there, no, ma'am.

9     Q.      Did you read the conclusions?

10    A.      I went through some of those, yes, I

11  did.

12    Q.      And I'll ask you specifically about --

13  I'll ask you specifically about some of the

14  conclusions later.

15              When you did go through the conclusions,

16  were there any that you were surprised by or

17  disagreed with?

18    A.      Not that I could remember, no.

19    Q.      Do you remember that -- do you remember

20  any of the conclusions addressing that there was

21  actually a series of unknown facts about the Nellis

22  apartment?

23    A.      Yes, briefly.  And I wasn't sure if that

24  was stuff that wasn't -- I don't know if it wasn't

25  put in the warrant itself, but it was talked about

Kerry Kubla              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 57

1    amongst detectives and information from there.  I

2    don't know if that was --

3        Q.     Sorry, not about the -- not about the

4    warrant.  But when I say unknowns about the

5    apartment, like, although we looked over that photo

6    earlier that had all the items listed, like dogs,

7    no; kids, no, in fact, that stuff wasn't -- one of

8    the conclusions that CIRT came to was that that

9    stuff wasn't known; that there was insufficient

10   recon.

11           So I guess I'm asking you, did you

12   review any part of that conclusion in the CIRT

13   report, or were you aware of that?

14       A.     Just that it said about the recon

15   being -- however they worded it, whether it was

16   insufficient or -- yes, I did see that.

17       Q.     Okay.  And do you have any thoughts on

18   that?

19       A.     Some of the stuff in there I don't think

20   you're going to be able to know.  If there's not,

21   you know, power set in somebody's name, if there's

22   not different things, you know, utilities in

23   somebody's name, I don't think anybody is going to

24   know, unless you have surveillance on a residence

25   24 hours a day, if somebody's in there, not in



Page 58

1    there.  Some of the stuff, you know, you can find

2    out during a reconnaissance, but other things we

3    don't have, you know, days and days to perform this,

4    so there's some stuff that's not going to be able to

5    get on there.  But I'm not sure what all findings

6    there were that weren't, you know, found to be in

7    there.

8         Q.     So is it my understanding, based on the

9    comments you just made, that you think it's not

10   possible to have all that information before serving

11   a search warrant?

12        A.     I think some of the stuff could be done

13   by detectives.  Yes, they could spend more time out

14   there.  They could do more follow-up stuff and do

15   that prior to applying for the search warrant.  So I

16   think some of that stuff can be dug up.  You can dig

17   into that stuff a lot more.

18            I don't think that we have the ability

19   as SWAT operators conducting a recon of a residence

20   to be able to put in that much seat time, which

21   would be applicable or more for the detectives to

22   do, just due to the fact we have a very limited

23   amount of time prior to that and then whenever the

24   warrant is going to be served.

25        Q.     I think I know, but tell me, what does



Page 59

1    "seat time" mean?

2        A.      Like being out there, for instance.

3    Being able to go out there and set, you know,

4    surveillance on a residence for hours throughout the

5    night to see patterns of life, different stuff like

6    that.  We don't have that in our unit.

7            Detectives might have that.  I'm not

8    saying that they do have that time, but we really

9    don't have time to set on a place and put in that

10   amount of time to basically get a lot of that

11   patterns of life and contacting, you know, different

12   areas, whether it be schools to find out if there's

13   kids related to the target residence.

14       Q.      So do you think the CIRT conclusion

15   places an unfair burden or unrealistic expectation

16   of what the SWAT recon can know before serving a

17   search warrant?

18            MR. ANDERSON:  Object to form.

19            Go ahead and answer.

20            THE WITNESS:  I don't know exactly what

21   they had issues with.  So if it was specifically

22   certain things, there's certain things we can get,

23   certain things that we -- I would say that we can't

24   get.

25            I've been to residences before where,

Page 60

1    for instance, a door, like a target residence, it's

2    very hard or we're not going to go up to a target

3    residence door to see what that door is made out of.

4          We can -- some residences we can see by

5    looking at from a distance.  We can check other

6    doors throughout the complex.  Whenever I perform

7    reconnaissance, I take a magnet with me and I check

8    doorframes and doors to other apartments throughout

9    the complex, because I'm not going to get -- I'm not

10   going to, you know, be noticed by the suspect or

11   whoever is in that target because I'm at a different

12   apartment.

13         So we can check others to do that.  But

14   to go up to the actual target residence would be

15   very, very hard to do, and you're jeopardizing, you

16   know, losing everything as far as the mission and

17   compromising that we're out there by doing that.

18   BY MS. MURPHY:

19   Q.      So you kind of alluded to it, and I

20   wanted to make sure.

21         The door here, you know there was an

22   issue with the door here; correct?

23   A.      Yes, ma'am.

24   Q.      And what's your understanding of what

25   the issue with the door was?



Page 61

1    A.      The issue -- well, the main issue with

2    it was there was a brass wrap on the door.  The

3    brass wrap, if you were able to get up there and get

4    good eyes on the door, you would see there's a brass

5    wrap on there.  Not saying that a brass-wrapped door

6    is impenetrable.  However, it is going to be a

7    little bit harder to breach than a door that doesn't

8    have a brass wrap, because it's keeping that locking

9    mechanism from bending or deforming because of that

10   wrap that wraps around the locking mechanism.

11           Now, if that was a wooden frame, with a

12   brass wrap on a wood-framed door, more than likely

13   the wood frame -- it is not very hard to snap a wood

14   frame, and that wood frame is going to be

15   compromised prior to that door being compromised.

16           So that would have something that

17   obviously was missed or obviously would be missed in

18   there, so I see that being an issue.  Because you

19   should be able to get by that and get a closer look

20   just by walking by, without actually going up to the

21   door and being able to see that.

22           And that would -- I'm not going to say a

23   hundred percent it would change the plan, but you

24   would know that that door is going to be a little

25   bit stouter.  So it might take an extra hit on the

Page 62

1    door.  It might take a ballistic breach of -- using

2    a ballistic round from a shot clock prior to hitting

3    the door.  It could be using an explosive breach on

4    the door.  Different options that we would have.

5              We would still have to get those,

6    basically, options approved by going up through our

7    chain, but different options that we would have that

8    we could throw out there.

9              So not having that information, that

10   could have changed things.

11       Q.      Okay.  But it wasn't your responsibility

12   to determine something like -- it wasn't part of

13   your recon assignment to determine what kind of door

14   it was or if there was a brass wrap; correct?

15       A.      Correct, ma'am.

16       Q.      Okay.  And -- okay.  And so let's kind

17   of get into the incident itself.

18              And so, Kerry, I know that you were the

19   first one through the door.  If any of this

20   testimony is difficult for you to get through and

21   you want to take a break, you just tell me.  We can

22   take a break.  If it's fine for you to just power

23   through, that's good.  But if you feel at any point

24   in time like, Hey, this is a little difficult for me

25   to talk about.  I want to take a break.  You just

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 63

1    tell me.  Okay?

2         A.      Yes, ma'am.

3         Q.      We looked at it briefly.  We looked at

4    the photos -- or the drawings from Sam's Town.

5              Can you kind of walk me -- and I know

6    that you -- I'm assuming it's fresh in your memory

7    because you recently watched the video; correct?

8         A.      Yes, ma'am.

9         Q.      So if you can kind of walk me through

10   your dialogue of, okay, you arrive at Sam's Town,

11   and then what happens?

12        A.      So I left my house in my work truck,

13   arrived over there at Sam's Town to start putting up

14   the papers and get everything ready.  So I got there

15   a little bit early from whenever the actual brief

16   was, due to the fact I was a reconnaissance officer.

17              Got over there for the address 4475

18   Jimmy Durante, but I was a part of that plan.

19   Whenever I was over there, I ended up getting a

20   detective car and driving Officer Adam and Sergeant

21   Clarkson at the time, I drove them both by both

22   residences, because one was going to be a sniper or

23   a Sierra unit, so he was going to need to see that

24   target and see what would be the best location for

25   him, so he went with me.  And Sergeant Clarkson was

Page 64

1   driving one of the BearCats on the Jimmy Durante

2   target, so he was going to be driving one of the

3   BearCats over there to that -- actually, he drove

4   for the 3050 actually also.  So I drove him by so he

5   knew the route going in there, so he wasn't confused

6   with it, and he's actually seen where he's supposed

7   to land at with the vehicle and going over all that

8   stuff with them.  So I drove them by real quick to

9   do that in the morning.

10          We conducted the briefing of the ATL.

11  Assistant Team Leader Jake Werner conducted the

12  briefing.  Went over that.

13          And I believe that one of the detectives

14  was asked to talk about the -- basically the warrant

15  a little bit, because some officers that --

16  obviously you might have K-9 there.  They don't

17  know -- they haven't seen the warrant.  They don't

18  know anything about it.  So it gives them an

19  opportunity to just briefly go over what this is

20  for.  It's for a homicide due to the fact that a

21  couple months ago, I believe it was in November, two

22  suspects shot and killed somebody who ended up dying

23  at the bus stop.  Well, he left the bus stop, but he

24  ended up dying from that.

25          They briefly go over that with them, and



Page 65

1    then we go over the planning phase as far as the

2    assistant team leader goes over the plan and what

3    everybody's duties are throughout the plan.

4              Once that's done, then we basically

5    kitted up, but we got all of our gear on.

6        Q.      If it's called "kitted up," that's fine.

7        A.      We put all our gear on, whether it be

8    our vests, our helmets, all the equipment we needed.

9    We do that.  We get everything done.

10             Meet back at our location -- not our

11   location, but meet back at the vehicle package that

12   we're driving over there.  Then we basically load

13   onto the vehicle the way we're supposed to, because

14   everybody has got a certain position on there.  Then

15   we drive over to the target residence location.

16             Keep going through everything?

17       Q.      Yeah.  If you're good with keeping

18   going, keep on going.

19       A.      So we get to the target location.  We

20   unload off the BearCat, and the other vehicles get

21   in their positions.  We get into a double-stacked

22   formation.  We had an entry line on one side, who

23   consisted of Jasper Williams -- I'm sorry -- Jasper

24   Washington, who was in front of me.  He was on a

25   shield, which was going to lead up.  I was going to

Page 66

1  be number-one entry behind him.  He was going to

2  shield going up there.  And then the lineup went

3  from there back.

4          I'd have to look at the list to be a

5  hundred percent.  I know it was Jasper, myself, it

6  was Brice Clements, and then back -- from there back

7  it might have got a little bit -- I'm not a hundred

8  percent on that.  I'd have to look at that.

9          On the right side there was two takedown

10 officers that were leading up over there, which was

11 Brett Brosnahan and Blake Dixon.

12          There was also a floor side containment

13 that was going over there for the window on the

14 other side where the stun stick was being deployed,

15 which would have been Officer Rothenburg and Officer

16 Bertuccini.  Officer Rothenburg had a shield, the

17 shield up as well.

18          So we make our approach up to the

19 apartment.  We go down the sidewalk that's going to

20 it.  We come around the corner, wrap the corner.

21 Once we get to that corner wrap, the other guys get

22 set over in their position.  We're set at that

23 point.

24          Sergeant Russ Backman called out and

25 gave the announcements.  The plan was to give out



Page 67

1    two announcements, and then the stun stick was to --

2    supposed to give out two full announcements of the

3    residence, and after the full two announcements,

4    then we were going to -- was going to go off with a

5    stun stick, and the breach was going to go off of

6    that.

7        Q.      I understand that's the plan.  Tell me

8    what actually happened.

9        A.      So we came over there.  As soon as we

10   landed in that position, Jasper Washington was there

11   with the shield.  Announcements came out giving who

12   we were, we were there for the search warrant.

13   Those announcements came out.

14              Jasper Washington moved up to -- he

15   shielded the window that was just to the right,

16   which would have been to the east of the door that

17   was facing west.  So he shielded that window.  Kai

18   Hoskins, who was on the breach team, which was in

19   that other stack that was to the right, he moved up

20   with the ram.  He moved up to basically key the door

21   or hit the door with the ram.

22              So once he got to the front door, I was

23   basically held back, so I'm approximately

24   probably -- if I had to guess, probably 6 feet,

25   7 feet away from the front door, giving him room to



Page 68

1    get up there.  He went up there, and the stun stick

2    was inserted.

3           Stun stick went off, which was one --

4    the stun stick is a noise-flash diversionary device

5    which was attached to a rake that was inserted

6    through the window.  Whenever they inserted that

7    through the window, rendered the area clear in

8    there, then they initiated that.

9           Kai Hoskins stepped up to start

10   breaching the door.  He hit the door.  The plan

11   was -- in the details before, the plan was going to

12   be he was going to hit the door.  If he called for a

13   shock to come up, then Officer Hancock, Levi

14   Hancock, would step up.  He had a shot clock, which

15   is like a small shotgun, issues compressed copper.

16   He would go up there and hit the locking mechanism

17   to try and soften that up.  If that softened it up,

18   he stepped out, he was able to get the door open and

19   we still had time on our side, then we would make

20   entry into the residence.

21           So Kai hit the door a couple times.  I

22   think he hit it on the third time.  It started to --

23   I could see from where I was that whenever he hit it

24   I could see, like, a little bit of light through the

25   edge of the door, so I knew it was starting to

Page 69

1    become compromised.  So in my mind, I was thinking

2    he was going to have more likely another hit, one

3    hit at the most, to open up the door.

4              He hit the door.  At this time, whenever

5    he was hitting the door, the other, which was -- it

6    was another noise.  A flash-bang, basically, that

7    was going off, which is a nine-bang.  So those go

8    off for approximately a half second to a second.

9    One that is -- over the stun stick it's delayed

10   approximately a second to a second and a half,

11   delayed on whenever it goes off, whenever they

12   deploy it.  So you have that second and a half that

13   that goes off.  Then about every half to a second

14   after that -- they're not a hundred percent at that

15   time, it could be three-quarters, whatever, but it's

16   a half to a second -- there's nine bangs that go on.

17   So the first one, then there's eight additional.

18   They just randomly keep going consistently.  So

19   those were going off at the same time as Kai was --

20   as Hoskins was attempting to breach the door.

21             So whenever the door finally -- I seen

22   it come open, and then he just -- on the last one

23   just kind of gave it a push to open it because it

24   didn't fling open.

25             Because of the fact that the flash-bangs

Page 70

1    were still going off that were still over there, in

2    my mind we had adequate -- we still had somewhat of

3    a diversionary device that was drawing -- anybody in

4    there, it was drawing their attention to what was

5    going on out there.  So attempted to make entry.

6              With the attempt, I made entry,

7    seeing -- through the threshold of the door I could

8    see down the hallway, which was dark in there.

9    Obviously I had a light, so I illuminated the light

10   on my rifle going in.

11             As I wrapped into the door, my

12   unknown -- which the door opened up right to left.

13   My unknown corner would have been the corner to the

14   right.

15             So as I stepped in, I started to turn to

16   the right.  There was a couch that was up against

17   the wall that protruded out into the room, so that

18   kind of stopped me from going down that wall to

19   clear that corner all the way.  So whenever I came

20   in and hit that, I noticed that I was being engaged.

21   I was getting hit with -- hard to explain.  I

22   couldn't feel, like, pain.  I could just -- it was

23   almost like, I would say, a ghost smacking, like, my

24   arms and my rifle, like, out of my hand.  So I was

25   trying to engage, but it was kind of like it was

Page 71

1    getting moved around.  So I couldn't, like, get on

2    target.

3              So I kept pushing just past the couch,

4    which extended probably, if I had to guess, maybe

5    6 feet maybe.  It continued that way.  It was kind

6    of like -- the shape of the couch was kind of like

7    an L-shape-type.

8              So as I pushed to the end of that, I was

9    just -- I could tell that gunshots were going off at

10   this point.

11             Being inside, there's a lot different

12   sound than, like, flash-bangs going on outside.

13   It's a lot different.

14       Q.    How is it different?

15       A.    Well, if I dropped a firecracker right

16   here, you're probably going to -- you could probably

17   compare that.  It would sound different than if I

18   dropped one outside that door.

19             I could tell these were coming from

20   inside the residence.  They were basically shots.  I

21   could also see flashes coming from what -- I

22   couldn't -- I could see somebody curled up on a

23   couch over there facing that way, and I could see

24   flashes, a muzzle flash as the shots were coming

25   off.

LEXITAS™

Page 72

1          So once I got over there to the edge of
2   the couch, obviously I was pushed in far enough the
3   other operators behind me, the rest of the team, or
4   partial of the team -- not everybody, but partial,
5   the rest of the team that were making entry, they
6   realized the same thing, that shots were coming from
7   that location, so they started engaging from
8   behind -- not from behind me, but from towards the
9   opening of the door from where I was, because I kind
10  of paralleled along that couch.
11          Once I got over to the edge of the
12  couch, I came to a stop position, like to a
13  stationary position, and attempted to -- I was
14  thinking in my mind that I was trying to shoot
15  whenever I was moving across there, but, again, like
16  I said, my mind is telling me to shoot, but I
17  couldn't, like -- nothing was working, basically.
18          So whenever I got to the edge of the
19  couch, I got a stationary position, same thing, I
20  could see shots going; I can see flashes coming out
21  of the barrel.  I was like, Hey, address this.  You
22  know, raise my rifle.
23          Well, I couldn't see -- my rifle wasn't
24  coming up.  So I looked down, and my arm was
25  basically -- it was flopped like a fish, so it was

Page 73

1    hanging down.  Because a shot had went through

2    there, broke the bone.

3            So I took my forearm and kind of put it

4    under my rifle and lifted my rifle up to shoot, and

5    then right like immediately after that something

6    dropped me to my knees.

7            So I think at that point I took a shot

8    in my leg, which dropped me down.  So I dropped down

9    on my hands and knees.

10           Once I dropped down to my hands and my

11   knees, stuff was still going on.  And then

12   eventually I heard -- obviously somebody yelled out

13   "Tactical."  That was reverb'd a couple of times by

14   other officers yelling out, "Tactical, tactical."

15           Which on a tactical call, whenever we're

16   going in, we stop where we're at and hold position

17   and kind of slow everything down and go from there,

18   do what we need to do.

19           So rather than -- typically, if we were

20   making a CET, we would have bodies go to this room,

21   bodies go to this room, bodies go down the hall, go

22   to this room, go to this room.  We would flood the

23   apartment, and literally -- an apartment that size,

24   because it was so small, probably in, I would say,

25   eight seconds probably you'd have operators in every

Page 74

1    single room in there.

2              So a tactical call was called.  I yelled

3    out that I was hit, and somebody started to drag me,

4    because -- I can't remember who it was -- it might

5    have been Levi Hancock saying, "Hey, drag him out.

6    Drag him out."

7              So somebody grabbed me from behind me,

8    and I was on my hands -- well, my knees and my hand.

9    My rifle was, like, laying down, but my hand was --

10   it was kind of like my nub was on the ground.

11             Somebody grabbed my vest, started

12   pulling to pull me towards the door.  Well, as he's

13   pulling me, I'm trying to, like, hobble, and I'm

14   200 pounds, and with my vest I'm probably 250, so he

15   wasn't very easily dragging me, but I was kind of,

16   like, shuffling along.  I was like, "Hey, just stand

17   me up, stand me up."

18             At that point Jiyair Brown was there.

19   He helped lift me, got me back to my feet.  Then we

20   walked out through the door, went back to the

21   BearCat.

22             Once we got back to the BearCat, then

23   we -- got me back there, asked where I was hit.  I

24   told him I was hit in my right arm, hit in my left

25   arm.  Well, I told him I was hit in my left arm

Page 75

1    because I could see it was broke.  Told him I could

2    feel pressure in my right arm, my right arm was hit,

3    and then my leg was hit.

4              They basically got back to the BearCat

5    where medical was at, started pulling off

6    everything, ripping stuff off, applying tourniquets,

7    put all the tourniquet stuff on, did all that.

8              And then I think whenever they were

9    putting the tourniquet on my leg, whenever they were

10   applying that, that might have -- either that or the

11   difference of going from standing to going down to

12   laying down, one or the other, blood issues or

13   whatever, but I passed out for a minute there.

14             And then basically after that I was back

15   up, came to.  Medical was already staged in the

16   complex because they roll out with us.  So they were

17   staged just to the south of us, at the front of the

18   complex, at the front office.  So they backed up,

19   AMR backed up, loaded me onto the AMR unit, and then

20   we left there, from there, left to UMC.

21        Q.    So I'm going to go back and kind of --

22   I'm going to go back and kind of parcel that up a

23   little bit.

24        A.    Uh-huh.

25        Q.    So you were number one in the stack;



Page 76

1    correct?

2        A.        I was number one entry going into the

3    residence.

4        Q.        Yeah.

5        A.        Jasper was in front of me initially.

6    Yes, ma'am.

7        Q.        Correct.  Because Jasper was the one

8    that breached the door; correct?

9        A.        No.  Jasper Washington had a shield.  He

10   was going to shield the window to the left of the

11   door, to provide cover for -- if anybody was looking

12   out that window, to provide cover for the team and

13   then for Kai Hoskins, who was basically breaching

14   the door.

15            So he stepped over to there, which was,

16   in my lineup, like my entry, he was just in front of

17   me.  I was right behind him.

18            Then on the other side would have been

19   the first two, Brosnahan and Blake Dixon, would

20   have -- because they were takedown.  Nobody was out

21   there to take down, so they would have stepped out.

22            Then immediately behind them, I

23   believe -- I'd have to look at the lineup, but I

24   believe Kai Hoskins and Levi Hancock were behind

25   them, and that would leave room for Kai Hoskins to

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 77

1    come up -- after the announcements were given, he

2    would come up and then breach the door.

3        Q.      Just to confirm though, you were the

4    first guy through the door, but you weren't

5    breaching the door; correct?

6        A.      Correct.

7        Q.      You understand that -- we talked a

8    little about it before, the brass wrap.

9              Do you remember seeing -- strike that.

10             When you approached the door, the brass

11   wrap was physically -- you could see it; correct?

12       A.      I did not notice it, to be honest with

13   you, whenever I was up there, no.

14       Q.      Okay.  And so it's talked about quite a

15   bit in the CIRT report.  What's a "tactical"?  You

16   talked about it a little bit in your dialogue, but

17   just to confirm, what's a "tactical"?

18       A.      On a CET entry, the only thing that

19   stopped us from going in there was we have a

20   tactical call.  That can be made by anybody.

21   Whether -- anybody in the lineup that's going in,

22   whether it is something is taking too long, whether

23   we have -- overwhelmed with, like, say the structure

24   is too big, we run out of bodies and now we're at a

25   stalemate where we don't have bodies to fill the

Page 78

1    rest of the rooms.  We might see somebody that comes

2    out and runs.  If we see anybody running in there,

3    we call a tactical, because we're not going to chase

4    somebody into an unknown room that they're running

5    into, in case they're either going in there to fight

6    or going in there to arm themselves.  So we are not

7    going to run in there at that point.  We'll call

8    tactical, go back to the front door, use a shield

9    there, and then slow it down at that point into --

10   at that point it would be like a breach and hold.

11           So that tactical call can be called by

12   anybody that is in there depending on what they see

13   the need to call it for.  Whenever that person calls

14   it, he would give out the reason for it.  So it

15   might be, "Tactical, Tactical," and, "I seen a guy

16   running down the hallway to a back bedroom."

17           Everybody else relays that and starts

18   saying "Tactical, Tactical" so it's heard throughout

19   everybody that's in the lineup, the entry team and

20   also people on the outside, so they're all aware of

21   that.

22       Q.     In this case was the entry taking too

23   long?

24       A.     I don't feel -- myself, I don't feel

25   that we lost that -- that, I would say, surprise, or

Page 79

1    maybe that overwhelming action, due to the fact that

2    we still had -- those flash-bangs were still going

3    out there.

4              So to me, I felt the plan was that if we

5    went up there and Kai hit the door, if he called for

6    a shock and a shock came up, that shock would have

7    to come up, introduce a couple of rounds into that

8    lock, fall back, and if the door still came open, we

9    would still be good to go on a CET, to still make

10   that entry.

11             In my mind, that extra hit on the door

12   was going to be less time than having him step up,

13   shock that door, step back out, and then him step up

14   to hit the door again.

15   Q.       But you could have also then called a

16   tactical?  It wouldn't necessarily have been to do

17   an explosive breach through the door; you guys could

18   have also just retreated; right?  And then retreated

19   and then done a surround and callout; correct?

20   A.       We could have.  We would have had to

21   pull back all the way off the structure and down the

22   side.  We couldn't stay up there and have eyes on

23   the door.  I mean, we could, but ...

24   Q.       Is the purpose of the flash-bang to

25   disorient and confuse?



Page 80

1     A.      Well, it's a noise-flash diversionary

2   device.   Basically it's something that's flashing

3   on.  If something went off outside this window, I

4   am -- everybody in here is going to focus their

5   attention over here.  So if they're focused over

6   there and we're coming in over there, that gives a

7   perfect distraction.  That's one of the things, why

8   it's called a distract, is because it's going to

9   divert their attention to something else as we're

10  coming in over here, which is also going to put that

11  back on our side as far as having that going off

12  over there.

13          We wouldn't necessarily -- we wouldn't

14  drop and do a distract outside the front door unless

15  it was a surround and callout because we don't want

16  to draw attention to where we are making entry at.

17  So that's why it is put on another location, to draw

18  somebody's attention to that.  It might be a back

19  bedroom window that's towards the back of the

20  residence, to get their attention out there.  It

21  might be -- just to take their attention away from

22  where we're coming in at.

23     Q.      In this instance it was put through a

24  window that was right next to where Mr. Williams

25  was; correct?



Page 81

1      A.        Ultimately, yes.  Unknown that he was

2  going to be in that room.  But it ended up, yes,

3  being in that room is where that first one was

4  deployed.  Which was the first distract.  It's one

5  bang.  That's inserted, it's pushed up to the

6  ceiling, so it's against the ceiling up there, and

7  it's flashed off in a high corner of a room.

8          That's where we train putting it is in

9  the high corner of the room where somebody -- the

10  most likelihood, nobody is going to be up in that

11  corner, up in a room up there, and it's

12  approximately -- I'd say 8 feet or the height of the

13  ceiling is where it is up there.

14          It's also attached to that pole so it

15  doesn't come down, it doesn't land on the ground, it

16  doesn't emit any flash or anything that can cause

17  fire, because it's up away from everything, up by

18  the corner of the wall.

19          And then the additional, the nine-bang

20  flash-bang that was going off outside, was another

21  distraction that was diverting attention outside of

22  that side of the house, which would have been where

23  the sliding door was that might have been related --

24  the sliding door and the other window that was out

25  there, that was outside.

Kerry Kubla                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 82

1       Q.       But the purpose of these devices, the
2    nine-bang or the other one, it's also to disorient
3    whoever's inside the apartment; correct?
4       A.       Yeah.  I would say it's going to
5    disorient you, yes.
6       Q.       And, Kerry, when you talked a little bit
7    earlier about kind of coming through the residence
8    and, you know, what was going on with your arm and
9    how you felt you were being hit by a ghost, is it
10   fair for me to say that it took you a few seconds to
11   figure out what was going on?
12      A.       It took -- I mean, I would say we're
13   talking like a second to realize.  I mean, literally
14   within one to two steps of going through that
15   threshold, the doorway.  It wasn't like I entered a
16   room and went all the way across the room.  It was
17   literally within one to two steps that I was -- I
18   knew I was getting engaged by something over there.
19   And then I could -- like I said, I could see that
20   the flashes were going.  I just couldn't address
21   that.  I was trying to address it, but I couldn't
22   address it at that point.  I kept moving across
23   there, across the couch, another probably maybe
24   4 more feet to get to the edge of that, to get to
25   the edge of the couch.



Page 83

1      Q.      And your ability even within one or two
2  steps, which is a few seconds, like, that's also
3  based on your years and years and years of training
4  as a SWAT officer; correct?
5      A.      As far as how far I went, or --
6      Q.      No.  As far as how long it took you to
7  assess what was going on inside the apartment.
8      A.      Well, whenever we make an entry on a
9  CET, it's a very dynamic entry into the -- into the
10  threshold.  So whenever you're making that move in
11  through the threshold, it's very dynamic in nature.
12  We're moving very fast.
13            And then we are moving -- from there
14  we're moving at a pace that we can fire from.  So we
15  train that we can shoot as we're moving.  Obviously
16  you can only move so fast whenever you're doing
17  that.  But you're not -- you're not just a walking
18  pace.  It's a little bit faster than a walking pace
19  going through there.
20      Q.      So my question was a little bit
21  different.  You kind of hit on it a little bit.  But
22  part of your ability to walk in, to assess, to
23  figure out, to respond, that's also based on your
24  years of training as a SWAT officer; correct?
25      A.      Yes, ma'am.

Page 84

1      Q.      And you would agree with me that you
2  have SWAT training and ability to respond that is
3  far in excess of what a normal person would have;
4  correct?
5      A.      Yes.  100 percent.
6      Q.      Okay.  And just to kind of loop back
7  again, we talked about it a little bit before, but,
8  again, part of the -- you talked about the
9  diversionary element of these devices.  But, again,
10  it is also to disorient and confuse; correct?
11      A.      Yes.
12      Q.      So that you can overwhelm them; correct?
13      A.      Yes.
14      Q.      Do you think that the delay in getting
15  through the door caused essentially a failure to
16  overwhelm and instead just disoriented and confused?
17      A.      I think it would have given us more time
18  to get through the door.  Obviously if we didn't
19  have those going off and the door was still getting
20  hit multiple times and there was nothing else,
21  somebody might have been coming to the door at that
22  point.
23              I think it could disorient somebody in
24  there.  I mean, it is -- you know, it's a loud
25  audible in there.  Outside it's not quite as loud

Page 85

1    because it's outside the residence.

2              But that's what they're designed for is

3    to disorient and ...

4        Q.      Kerry, I'm going to read you a section

5    of the CIRT report.  And it says, "If after

6    notice" -- it talks about the legal elements for

7    knock-and-announce.  And it says, "If after notice

8    of his authority and purpose an officer is refused

9    admittance."  It talks about kind of like what the

10   purpose of what knock-and-announce is.

11             Can you tell me what Mr. Williams did to

12   refuse admittance while the door was closed?

13       A.      While the door was closed?

14       Q.      Correct.

15       A.      We had no -- we weren't aware that he

16   was in there at that point, so he did nothing.

17       Q.      Okay.  And do you think there was

18   sufficient time between the announcement and when

19   the side window's broken to allow Mr. Williams to

20   get up and walk to the front door to allow the

21   officers admittance, including yourself?

22       A.      It might have.  But he could also call

23   out.  So it doesn't take very long, if you're laying

24   there, to say, Hey -- you know, to say anything in

25   there.  Hey, I'm in here.  Who are you?

Page 86

1                      There was nothing of any of that.

2                      And like I said before, somebody else

3     came out and approached before we went in there that

4     got -- they came out and had enough time to come to

5     their door or stick their head out.

6         Q.      But they weren't inside the apartment

7     like Mr. Williams was; correct?

8         A.      Yeah.

9         Q.      Because you even pointed -- you even

10    pointed out a little bit earlier that how it's going

11    to sound and feel inside the apartment is going to

12    be very different from what it is outside the

13    apartment.

14        A.      Yes.  It wouldn't be as loud in a

15    neighboring apartment.  They are going to hear

16    something going on out there, but they're not going

17    to hear it as much as somebody inside there if we're

18    hitting on that door and the stun stick that was

19    introduced in there going off.

20        Q.      And so I'm going to -- I'm going to read

21    to you part of what was quoted in the CIRT report

22    about a reasonable amount of time based on the items

23    sought.

24                      Because we've gone over the type of

25    arrest warrant.  I just want to make sure I

Page 87

1    understand correctly -- sorry, not arrest warrant,

2    search warrant -- that this was a search warrant for

3    items.

4              You looked at the warrant itself;

5    correct?

6        A.     Yes, ma'am.

7        Q.     Because you were part of the recon team,

8    so you knew which items were sought out?

9        A.     Yes, ma'am.

10       Q.     Based on my understanding of your prior

11   testimony, you thought -- this was also kind of like

12   an arrest warrant too; you thought you were going to

13   find suspects and detain them.  Correct?

14       A.     Yes.

15       Q.     You thought that, based on what the

16   homicide officers had told you, was that they didn't

17   have PC for this incident, but they did have PC for

18   other incidents, so they were going to be arrested;

19   correct?

20       A.     Yes.

21       Q.     And so let's kind of parcel out that, in

22   terms of just the warrant itself for the items,

23   there was nothing in the warrant that you would have

24   been concerned about being able to be destroyed or

25   in some other way altered before entry in the unit;

Page 88

1    correct?

2         A.      To be honest with you -- step back on

3    there -- one, the detectives, I'm not a hundred

4    percent that it was a homicide detective that said

5    they had PC.  Just because I want to be clear on I

6    don't know a hundred percent it was a homicide

7    detective.  It could have been a gang detective,

8    because they were involved with the investigation

9    there as well.

10        Q.      We can just say "detective" for the

11   record.

12        A.      Okay.  The other was the items that were

13   sought to be found, that they were looking for, I'm

14   not a hundred percent, so I'd have to see that again

15   to see.  But I believe it was for a small-caliber

16   firearm and for clothing.

17        Q.      And so I'm going to read to you some

18   case law that's cited in the CIRT report, and it

19   talks about the standard for what is a reasonable

20   amount of time based on the items sought.

21              What it says is, "After 15 to 20 seconds

22   without a response, officers could fairly have

23   suspected that Banks would flush away the cocaine if

24   they remained reticent."  That's from page 133 of

25   the CIRT report.

Page 89

1                    In this case you guys weren't trying to
2       execute a search warrant for any items that you were
3       concerned could be destroyed or flushed away;
4       correct?
5            A.       Correct.
6            Q.       As we sit here today, do you have any
7       knowledge or memory or any position on how long you
8       think was between the first announcement and when
9       entry was made into the unit?
10           A.       How long it was?
11           Q.       Uh-huh.
12           A.       I would say six to -- I thought it was
13      nine seconds whenever I viewed something before.
14      But around there.
15           Q.       In your professional opinion as a SWAT
16      officer, do you think that that was a reasonable
17      amount of time?
18           A.       Based on the circumstances and what we
19      were going for -- it wasn't that we were -- I
20      understand that we were going for -- the search
21      warrant was for property that could have been, you
22      know, the evidence.  The other mitigating factors
23      would have been the fact that there were known
24      firearms that were associated to the residence.
25      They were known to be armed.  Not only armed, but

Page 90

1    they were known to have shot, you know, possibly

2    from that residence in illegal shootings.  And, you

3    know, that they used a firearm to basically fire at

4    somebody and commit, you know, a homicide.

5             So those mitigating factors I think is

6    where part of that comes into the effect of how long

7    it takes.

8             I know, like, talking U.S. v. Banks,

9    you're talking about somebody that was in there for

10   selling drugs or whatnot and he was in the shower

11   and there's -- yeah, that time might not be.

12            But not knowing that he's in the shower,

13   on a small apartment, to be honest with you,

14   depending on the size of the apartment, it doesn't

15   take very long at all to come and answer the door.

16            We have people that go up -- detectives

17   that go to doors, and whenever they do buys on

18   targets, the person is coming to the door within

19   three to five seconds a lot of times.  So that's

20   somebody knocking, them coming to the door, and then

21   bringing them in to sell them narcotics.

22            So depending on the size of the

23   structure, which this wasn't an overwhelmingly large

24   structure.  It was a very small apartment.  So I

25   guess to what you're saying, I don't know that it

Page 91

1  was too short of an amount of time.

2                I think that's subject to the mitigating

3  factors and our articulation as far as what all is

4  involved.

5                I know typically the search warrant

6  is -- like you're saying, it's for evidence that

7  we're looking for.  However, the evidence that's in

8  there is related to subjects that are known to

9  shoot, that have firearms, and they're able to shoot

10  back at us.

11      Q.      So this warrant was being served like an

12  arrest warrant; correct?

13      A.      That somebody was in there?

14      Q.      Yes.

15      A.      In my mind -- like I said, I don't know

16  a hundred -- my mind, they had probable cause for

17  the two suspects, and we didn't know if those

18  suspects were in there or they were not in there.

19                And then there were other subjects

20  involved that were known to also be affiliated, like

21  gang affiliation, and known to carry firearms.

22                So unknown on who all was going to be in

23  there.  It was just a flophouse for a lot of gang

24  members.

25      Q.      But this warrant was being served like

Page 92

1     an arrest warrant; correct?

2          A.     Yes.

3          Q.     And if I understand your dialogue

4     before, it's your position that six to nine seconds

5     was a reasonable amount of time; correct?

6          A.     For that size of a structure, I would

7     say.

8          Q.     Okay.  So that's a yes?

9          A.     Yes.

10         Q.     Okay.  Prior to serving the search

11    warrant, had you received any training about what

12    elements you had to comply with under both U.S. law

13    and Nevada law for a proper knock-and-announce

14    entry?

15         A.     What requirements?

16         Q.     Yes.

17         A.     We give out two full announcements, and

18    it's an articulated amount of time, a reasonable

19    amount of time for somebody to come to the door --

20         Q.     Okay.  And -- sorry.

21         A.     -- or refusal.  Unless that person --

22    unless somebody basically comes out and they refuse

23    by running back in.  You know, they see the door,

24    they open the door, they close the door, and they

25    refuse.  At that time it's a refusal.

Page 93

1      Q.      So is it your position that, based on

2   your training leading up to this incident on

3   January 10, 2022, that two what you would call "full

4   announcements" meets the standard for the elements

5   for knock-and-announce?

6      A.      The two full announcements and then the

7   amount of time it took after that, after the

8   announcements.

9      Q.      Well, what if there's no amount of time?

10  Do you think that two full announcements is

11  sufficient?

12     A.      If that time was adequate for the size

13  of the structure and everything that was going on,

14  two full announcements and then making entry,

15  there's -- we're also not making -- those

16  announcements continue to go on.  So even after

17  those first two announcements, it's not two full

18  announcements and then everything is stopped at that

19  point.  We're still continuing to make

20  announcements:  "Police department, search warrant;

21  police department, search warrant."

22             Everybody even up until that point that

23  that door was opened -- which that's where I think I

24  said it was six seconds to possibly nine seconds.  I

25  think the door came open, possibly might have

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 94

1    been -- and I'd have to review again to see a

2    hundred percent, but I believe that whenever the

3    door actually opened was around nine seconds,

4    because it was six seconds for the starting of that

5    and then nine seconds for the door to open, and at

6    that time we're still giving announcements.  I'm

7    giving an announcement before I walk through the

8    door.  Everybody else in the line is giving

9    announcements, the same thing.  And as we're going

10   in, we're still giving those announcements.

11        Q.      And so let me ask the question a little

12   bit differently then.

13             Prior to the search warrant, what

14   training had you received about what elements you

15   had to comply with under U.S. and Nevada law for

16   proper knock-and-announce entry?

17        A.      To give our attention -- to state who we

18   are, what the address was, to give our attention of

19   why we're there, serving a search warrant.  We

20   obviously identify ourselves, and then give a

21   reasonable amount of time for somebody to answer the

22   door or refuse.

23        Q.      And so what was your training about what

24   a reasonable amount of time was?

25             I don't want you to walk me through what



Page 95

1   you consider it based on the circumstances here.

2   But what I'm asking more specifically is what

3   training were you provided to say this is what a

4   reasonable amount of time is?

5       A.        Just going over the overall factors.  If

6   the house is very large, it's going to need a little

7   bit more time.

8               When it is, what time it is, what time

9   of the day it is.

10              Whether -- I would say the structure,

11  the size of the structure, adds a big factor of it,

12  where somebody could be deep in a bedroom if it's a

13  five-bedroom house, or it might be upstairs.  It

14  might be a two-story residence.  It's going to take

15  longer.  So you're not going to use that same amount

16  of time on that as you are a one-bedroom studio

17  Segal Suite or something.  That time is going to be

18  a lot shorter.

19      Q.        And how did you receive this training,

20  Kerry?

21      A.        Just through training through our TSD

22  section, our training coordinators, which would have

23  been senior officers that are in our division.

24      Q.        And as we sit here today, do you think

25  that the amount of time that the team waited before



Page 96

1    entering the unit, do you think that was reasonable

2    and in compliance with controlling case law?

3                    MR. ANDERSON:  Objection.  Form.

4                    Go ahead and answer.

5                    THE WITNESS:  I think with what we had

6    as far as the factors, I don't think it was too

7    short -- you know, that it was not long enough or

8    too short of an amount of time, just from my opinion

9    from serving warrants.

10   BY MS. MURPHY:

11       Q.      So it's your opinion that the amount of

12   time between the announcements and the entry into

13   the unit was reasonable based on controlling law; is

14   that correct?

15       A.      Yes.

16               MS. MURPHY:  Actually, before I get into

17   some of the CIRT conclusions, were you placed on

18   administrative leave following this incident?

19               THE WITNESS:  I was off that time, yes,

20   ma'am.

21   BY MS. MURPHY:

22       Q.      Okay.  How long were you off for?

23       A.      I don't know exactly -- I mean, I was

24   off for a year.  But I'm not aware -- because

25   administrative leave, I was also off because of

Kerry Kubla          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 97

1    injuries.  So I don't know what the parameter was

2    where you'd be off at this time but I wasn't

3    because --

4         Q.      Let me ask the question a little

5    differently.

6         A.      I came back a year after.  Right at a

7    year after the incident is when I came back to work.

8         Q.      Okay.  And what is -- you kind of talked

9    about it when you walked through it.

10              Can you walk me through what injuries

11   you sustained?

12        A.      Yes.  I took a gunshot wound to my left

13   arm, the middle of my forearm, which shattered the

14   radius bone on my arm.  That came out the top of my

15   arm, which tore all the tendons -- dislocated or

16   tore all the tendons that were in that arm.

17              And then the right arm I was shot, which

18   was probably about 6 to 8 inches down from my wrist.

19   That round entered my arm, and it traveled up my arm

20   to the rear of my tricep, the upper of my tricep.

21   That one caused just a lot of -- I know it caused a

22   lot of nerve damage going up that far, and the

23   swelling was obviously, like, enormous because of it

24   going up there.  That bullet stayed lodged in the

25   back of my arm.



Page 98

1           The bullet that was in this arm
2     (indicating), part of it is still lodged in -- it
3     could be all of it.  I don't know.  Just from an
4     X-ray, you can see that the round is still inside
5     there.
6           I took a round that was through my inner
7     thigh, just -- I don't know how far down that is.
8     But my inner thigh, it entered there, and it came
9     out the outer of that leg, which caused damage to
10    muscle and tendons that were in there.  But it went
11    through there.  That came out the outside of my leg,
12    which ultimately hit my firearm holster, and it also
13    came -- I think because there was a wallet in my
14    pocket, like a metal money clip, and the bullet
15    went, it hit that and went through it.  So whenever
16    it hit that, it basically shrap -- basically the
17    bullet broke up into pieces, so there's a lot of
18    pieces that are still inside there in my hip and leg
19    area that are small fragments that they can't go in
20    there -- it would cause more damage to try and go in
21    there and fish them out.
22           Same with the left arm.
23           The right arm they were able to go in
24    through the back of my tricep like six months or so
25    after that and make an incision, because it was

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 99

1    close enough to the surface to make an incision to

2    extract that.

3              I was hit once in the chest, which was

4    probably a couple inches above the middle of my

5    chest, on the left side, but that was stopped by my

6    ballistic vest.

7              I was hit on my left side, where I had a

8    knife that was in a holster that was on there, and

9    that hit off my vest and hit the holster and the

10   knife and broke the knife, which was just in the

11   threshold of the door, after -- at least whenever I

12   was walking out, whenever we were going out, I

13   remember seeing it on the ground there in the

14   doorway.  And pictures afterwards from the CI that

15   came out there to take all the photographs, I seen

16   it laying there.  It was actually hit and broke in

17   half.

18             Then I had a round that hit the front of

19   my rifle, the very tip of my rifle.  It hit straight

20   on with that and indented that.  Didn't cause it to

21   break, but it indented -- you can see where it

22   indented the front of that from deflecting off the

23   very front of my rifle.

24             Those were the ones that I had from

25   there.



Page 100

1          So I have a lot of nerve damage.

2    Obviously they connected all the tendons back

3    together on this arm, on the left arm.

4          Bone, there's a rod, titanium rod,

5    that's in there from my wrist to my forearm crease,

6    which is -- I think it's around 9 inches, something

7    like that.  So that's in there for the radius.

8          And then the right arm has significant

9    amount of nerve damage.  I lost the use of my -- not

10   the use, but my index finger has no -- I would say

11   no feeling.  I could stick it on a stove right now,

12   and I wouldn't -- I think there's a superhero that

13   had that, or some people have that.  But I've burned

14   it multiple times not knowing.  Just later in the

15   evening I'll find it's got a big huge ball on there

16   because I blistered it because I set it on something

17   too hot.  So there's no feeling in this finger

18   (indicating).  It's kind of dead.  Like, smack it

19   with a hammer, it doesn't -- and it doesn't -- and

20   the way the tendon is, it doesn't operate -- like, I

21   can't make a complete fist with it.

22          So due to that fact, I primarily

23   switched hands to my left hand to be able to operate

24   with that hand as my primary firearm with my pistol.

25          I can still shoot with this hand, but I

Page 101

1    can't use my index finger.  I use my middle finger.

2    So I can still shoot my rifle with my middle finger.

3    I can shoot with my left hand as well, but I just

4    transitioned my primary firearm to my left hand.

5              Those are pretty much -- a lot of nerve

6    damage.

7              Hip area, same thing.  A lot of -- I

8    don't know if it's like a type of an arthritis or

9    nerve injury stuff, but same thing.  Like, that -- I

10   guess it's -- hard to explain nerve damage, but it's

11   like an electric burn.  So, like, my leg feels -- my

12   thigh just feels sunburnt all the time, like a

13   burning -- burning feeling.

14             Both arms are the same way.

15             These two -- my index finger and my

16   middle finger and my thumb, same thing.  Those burn

17   all the time.  There's no -- and there's slight --

18   not as much as the middle finger.  I can still feel

19   on these.  But it's very -- it's almost like if you

20   wake up and your arm is asleep, it's got that

21   feeling on the other fingers.  That's always there.

22   It never goes away.

23   Q.     How many times were you shot?

24   A.     Technically, a total, I guess, six times

25   I was hit.  Whether it be me, the tip of my rifle,



Page 102

1    that was six times that I was hit.

2         Q.      How many times was your body hit?

3         A.      My body was it -- well, three that

4    entered.  I had one that was in my chest, but that

5    didn't enter.  But I had three that entered.  One

6    through this arm, one through this arm, and then one

7    through my leg (indicating).

8         Q.      Okay.  And did you -- have you received

9    any psychological or mental health treatment related

10   to this incident?

11        A.      Oh, yeah.  For the full year or whatever

12   I was off, yeah.  I was seen --

13        Q.      Are you still -- sorry.

14        A.      -- immediately.

15               No, go ahead.

16        Q.      Are you still undergoing any of that?

17        A.      No.  I still have the ability to.  I

18   just don't really find -- I haven't had anything

19   that's came up that I need to see anybody about or

20   talk to about.  So ...

21        Q.      Okay.  And then is it your position that

22   you believe that Mr. Williams knew he was firing on

23   police officers?

24        A.      I don't know what his thoughts were.

25               I mean, we were -- everybody that was

Page 103

1    there was yelling, "Police department, search

2    warrant."

3              I had -- you know, my ballistic vest has

4    "Police" and "SWAT" patches on the front.  It's got

5    a "Police SWAT" patch on the shoulder.  We have a

6    helmet.  We stand out pretty well, I would say, with

7    the gear that we wear.

8              And, again, like I said, we were --

9    everybody that was coming in that door -- I'm sure

10   pretty much everybody, because that's normally how

11   we train -- we yell out "Police department, search

12   warrant" before we make entry into the front door or

13   other doors going into other rooms back in the

14   residence.

15   Q.      To confirm, though -- and I appreciate

16   that you've made that distinction.

17             To confirm, as you sit here today,

18   you're saying, Hey, I don't know if he knew or not;

19   that would be speculation on my part?

20   A.      I have no idea what his thought process

21   was, other than that whenever he was shooting, he

22   was -- he didn't stop shooting.  He kept shooting

23   until, you know, he was stopped.

24   Q.      Until he was dead; correct?

25   A.      But he didn't stop shooting.  He shot



Page 104

1    rounds through the wall, through the ceiling, to the

2    upstairs apartment, through the -- both walls, and

3    just continued to shoot.  So -- and it was a -- you

4    know, continual shots going off.  So it wasn't

5    something that he stopped.

6        Q.        He wasn't, like, a marksman; right?

7    Like even how you're describing it, it's a spray of

8    bullets; correct?

9        A.        No, he doesn't -- well, obviously, I

10   mean, most people in that -- they're not accountable

11   for where their rounds are going.  So disregard for

12   anybody that's in the, you know, apartment that's

13   neighboring or the apartment upstairs.  Which I know

14   rounds went through both walls, that wall, the

15   ceiling, up into the neighboring apartment.

16            But there was no -- it was just a

17   continual shots going off.

18            But I can't attest to what his thinking

19   was other than, you know, he was -- he might have

20   been thinking that he's just going out with a fight,

21   or he might have -- I don't know.

22       Q.        Been confused and not know who was

23   coming through the door; correct?

24       A.        I have no idea of what his capacity was.

25   He could be blind or deaf for all I'm aware of.  I



Page 105

1    have no idea.

2         Q.      And so that's actually an interesting

3    point.  I'd like to ask you about that.

4                 As we sit here today, do you have any

5    knowledge of who Mr. Williams is, or was?

6         A.      Leading up to, no.

7         Q.      Not leading up to the incident.

8                 Like, so since the incident have you

9    come to learn anything about Mr. Williams?

10        A.      No.  I don't dig into people.  I

11   don't -- it's not in my -- you know, I'm not going

12   to look into or dig into anything.

13                I knew what it was at that time.  And --

14   I don't know.  I'm just not -- there's nothing for

15   me to dig into --

16        Q.      Okay.  Let me ask it a little bit

17   differently.

18                As we sit here today, do you have any

19   knowledge about whether Mr. Williams was or wasn't

20   associated with the crimes that were associated with

21   these search warrants?

22        A.      To be honest, I have no idea.

23        Q.      So you have no idea at all?

24        A.      No.

25        Q.      Okay.  Have you been involved in any

Page 106

1    other officer-involved shootings?

2        A.      Not as a shooter, no, ma'am.

3        Q.      How have you been involved?

4        A.      Like, witness officer.  I mean, we've

5    been in other shootings.  As a witness officer,

6    where I was on-scene.  I didn't shoot, but I

7    witnessed, you know, whenever somebody was shot.

8        Q.      And what were those other incidents?

9        A.      We've had a few.  We had one that was a

10   hostage rescue, a vehicle hostage rescue, where one

11   of our sniper units ended up shooting.  That was --

12   I can't give you the exact timeline.  It was

13   probably a year or so ago or a couple of years ago.

14       Q.      So was it before or after this incident?

15   Because we're -- what are we?  Two years out?

16       A.      Yeah.  You know, I'm not a hundred

17   percent on that, to be honest with you.  I think it

18   was after.  I think it was after.  I think the last

19   one was after that, after the incident.

20               We had one, same thing, in Laughlin,

21   where, you know, incident officer -- I didn't shoot,

22   but I was right there, where there was a guy that

23   basically shot at security in Laughlin, robbed a

24   casino, shot at officers, was in a barricade in the

25   vehicle.

Page 107

1             We were out there.  He came running

2      towards us, and officers shot that were literally,

3      like, right in front of me and to the side of me,

4      and a sniper ultimately took a shot as well that

5      stopped him.

6             But there were officers in front of me.

7      I had no shot because of where they were located at.

8             I don't know.  There's multiple times

9      where I witnessed somebody or, you know, been there.

10     Not where I've actually fired, though.

11     Q.     Have you been named in any other

12     lawsuits?

13     A.     No, ma'am.

14     Q.     Okay.  Did you receive any retraining

15     following this incident?  Related to this incident.

16     I'm sure you've had training since this incident.

17     But related to this incident have you received any

18     retraining?

19     A.     Yeah, I received training.  We receive

20     training all the time.  But I received -- coming

21     back I received training.  After the interview we go

22     through a training process and we run through

23     different scenarios.  Some are based somewhat the

24     same.  Like, I don't know what they are.  They run

25     me through scenarios before I, you know, come back

Page 108

1    to work basically.  So they'd run me through

2    scenarios before I came back.  And then continuing

3    from then, you know, we train all the time.

4                So I couldn't tell you exactly this

5    training's for this incident or is not for this

6    incident.  I know that after the incident, whenever

7    I came back, those were specifically -- not every

8    one of them, but some of them were related the same

9    way.  You know, related.  Kind of like the same.

10   Obviously it wasn't completely reenacted, but that

11   kind of enactment there is kind of the training we

12   do on a day-to-day basis.

13        Q.     Okay.  And I'm going to review some of

14   the CIRT conclusions, and I want to ask your

15   opinions about them.

16                In terms of listing off the unknown

17   factors related to the Nellis apartment, they

18   included who was actually staying at the apartment;

19   if there were children, elderly, or vulnerable

20   individuals present inside the apartment.

21                Were you able to -- you were able to

22   identify those items related to the Jimmy Durante

23   apartment; correct?

24        A.     Who was in there?

25        Q.     Yeah.



Page 109

1    A.       I don't know who was in there.  I can't

2    confirm that this is --

3    Q.       Sorry.  Let me ask it a little bit

4    differently then.

5            In terms of your recon -- not the Nellis

6    apartment, but the Jimmy Durante apartment, the one

7    you were tasked with doing recon on -- you were able

8    to identify whether there were children, elderly, or

9    vulnerable individuals within the apartment;

10   correct?

11   A.       I could go off what I seen at that time.

12   So the time that I had out there, yes, I could

13   confirm that there was a child related -- well,

14   confirm that there was a child related, one, because

15   there was children-type toy stuff that was directly

16   in front of that, like bicycles and stuff like that,

17   that there would be a child in there.

18           As far as the occupants in there, other

19   than what we knew of as far as, like, who was

20   related to that residence, I can't say a hundred

21   percent, like, yeah, I know that this male, this

22   female, is inside this residence or, you know, a

23   hundred percent in there.

24           And I don't think you could at any place

25   really a hundred percent, unless you really had eyes

Page 110

 1  on, positively identified the suspect, and you know

 2  they're going in there and you don't lose track of

 3  that or lose sight of that until an operation was

 4  performed.

 5      Q.     Give me just one second.

 6             I'll read you the specific language from

 7  the CIRT conclusion.

 8             "While the SWAT section manual contained

 9  verbiage allowing for SWAT operators to conduct a

10  CET for property when there is a threat of an armed

11  and dangerous subject, it was not appropriate given

12  the amount of unknowns associated with

13  Apartment 1125.  There were numerous amount of

14  unknown factors, to include who was actually staying

15  in the apartment and if there were children,

16  elderly, or vulnerable individuals present inside

17  the apartment.  SWAT's decision to serve the 350

18  South Nellis Boulevard search warrant as a CET was a

19  policy/training failure and not within standardized

20  LVMPD tactics, training, and policy."

21             And so we looked over a little bit

22  earlier the photos that were drawn out of the plan.

23  And in fact in terms of elderly, children, who was

24  associated with the apartment, those items were all

25  written into that -- into the -- what do you call



Kerry Kubla                   Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 111

1    it?

2        A.        Information page.

3        Q.        Information page.

4        A.        Yes, ma'am.

5        Q.        But, in fact, after having now reviewed

6    everything, those were actually not known.  You

7    understand that; right?

8        A.        Yes.  Hundred percent.

9        Q.        Okay.  And so do you agree or disagree

10   with CIRT's conclusion that to serve the CET was a

11   policy/training failure related in part to the

12   amount of unknowns actually associated with this

13   apartment?

14       A.        It's hard to say that because I don't

15   know where it says that we can't do a controlled

16   entry if there's an elderly person in there or if

17   there's a child in there.

18       Q.        Well, and the way that I read this,

19   Kerry, is a little bit different.  It wasn't just

20   one of those things.  It was a variety of unknown

21   factors, to the point where it becomes, like -- I

22   don't know if you're familiar with appellate law.

23   They talk about, like, one error by itself, even if

24   it doesn't affect the outcome of the case, isn't a

25   big deal.  But when you have a variety of errors,

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 112

1    even if they're small errors, after a while the

2    number of small errors itself becomes voluminous and

3    becomes its own error.

4              Do you understand that concept?

5     A.      Yes.

6     Q.      Okay.  And so here, the way I read this,

7    although I'm not the CIRT conclusion -- and I really

8    am asking for your opinion -- it says -- it says

9    specifically there were numerous amount of unknown

10   factors.

11             So it's not each individual factor on

12   its own; it's that there were all these unknown

13   factors.

14             Do you have a position or an opinion on

15   that?

16             MR. ANDERSON:  Objection.  Form.

17             Go ahead and answer.

18             MS. MURPHY:  That was a terrible-worded

19   question.  It's a good objection.  I don't know how

20   else to frame it.

21             THE WITNESS:  I'm sorry.  I don't

22   know -- like, the CIRT, whenever they're putting out

23   their stuff, I don't know that they have the

24   information or they knew these other factors that

25   were in there as far as, like, the suspects that

Page 113

1    were stopped from there that were coming and going.
2    I don't know what all they had prior to that.
3    BY MS. MURPHY:
4        Q.      Kerry, I'll represent to you they had
5    everything.
6        A.      No, I understand that.  After the
7    incident was -- after the incident took place and
8    everything, they had all that.
9               But I'm aware that they -- you know, if
10   they said that was a policy failure and that is --
11   you know, we need more than that, then that's what
12   it is.  We're going to have to add those.
13       Q.      Okay.  And I guess I'm asking, what's
14   your opinion on that?  Do you agree or disagree?
15       A.      I think a lot of factors can change that
16   to where you wouldn't need all of those factors
17   listed for a controlled entry.
18               If we had a homicide suspect or whatever
19   the case was, we had that suspect that was in a
20   place and we didn't know all this, you know,
21   different pertinent information that was related to
22   that, I guess that's where it comes down to I think
23   that we definitely need more -- like I said
24   before -- I don't want to say seat time again, but
25   something the detectives probably need to follow up



Page 114

1    more on as far as on their investigation to be able

2    to list that stuff to say, Hey, we have this, that.

3              Which is kind of what we do now.  We

4    have -- if they don't have seat time out there, if

5    they don't have certain things that are locked in

6    place that, Hey, we know that this person comes and

7    goes.  He's been seen in here -- a lot of times

8    we'll know, Hey, we have him in there right now.

9    He's in there.  We have a positive ID on him.  We

10   seen him enter.  We've had the place, you know,

11   under surveillance, and they're doing the search

12   warrant at that time.  Those I think are the things

13   that we've changed as far as, you know, making sure

14   that all that stuff is done and not just, you know,

15   pushed up on other -- doing a warrant, especially

16   due to the fact this was a CET.  So that wouldn't be

17   done again from that.

18        Q.     And so how it's done today is different

19   than how it was done at this point in time back in

20   2022; right?

21        A.     Yes.  I'd say that we're much more

22   thorough in vetting that and pushing back on units

23   to have that stuff done.  If they don't have

24   something in there, then we push it back.  Hey, you

25   need to get this.  You need more time out there.



Kerry Kubla                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 115

1    You need a PID.  You might need to do a phone pin.

2    There's different things that we might push back.

3              Not that I'd push back.  That's above my

4    pay grade.  But I know that we do vet that stuff a

5    lot more now.

6    Q.       And to your knowledge is that change in

7    how it's vetted, is that related in part or at all

8    to this incident?

9    A.       I'm sure part of it is, yes.

10   Q.       Okay.

11   A.       That, and I think the overall -- the

12   world, the way everything's going now, it's not --

13   everything is getting pushed back as far as some of

14   that stuff, where we're not doing the same things.

15   Q.       And I'm going to ask you about

16   Conclusion 3.8, just part of it.  I'll read it to

17   you.

18              "CIRT found that under the conditions

19   present here, six seconds was insufficient to allow

20   occupants time to answer the door, let alone submit

21   to the search."

22              Do you have any position on that

23   statement?

24   A.       Nah.  If that's what they found, that's

25   what they're assigned to do, and that's what they



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 116

1    found in their mind, it was not sufficient.  So I

2    don't have anything.

3        Q.      And then it goes on to say,

4    "Additionally, deployment of the CET contradicted

5    the knock-and-announce principles.  The CET is

6    intended in part to surprise and overwhelm occupants

7    inside the residence.  Yet, the intent of

8    knock-and-announce is to provide an opportunity to

9    comply before a forced entry is made; thus, is a

10   policy and training failure and not within LVMPD

11   standards."

12              I asked you about it a little bit

13   before, but I'm going to ask you about it now more

14   specifically.

15              Do you have an opinion on CIRT's

16   conclusion that CET contradicts knock-and-announce

17   principles?

18       A.      I think it -- depending on the timeline

19   that's there, I wouldn't say that it contradicts it.

20   But depending on the timeline and what the

21   articulable facts are there, I think that what

22   they're going with is a no-knock warrant -- you

23   know, if we did a no-knock warrant on that, then

24   that would bypass the whole thing.  So --

25       Q.      Absolutely.  But they didn't go through



Page 117

 1    the steps of getting a no-knock warrant here, did

 2    they?

 3        A.      No, they did not.  No.

 4        Q.      Okay.  And you agree, though, that CET

 5    is intended in part to surprise and overwhelm

 6    occupants inside the residence; correct?

 7        A.      Yes, ma'am.

 8        Q.      Okay.  And you agree too that the

 9    purpose, though, of knock-and-announce is to allow

10    somebody the opportunity to comply before forced

11    entry is made; correct?

12        A.      Yes, ma'am.

13        Q.      And do you understand and see the

14    contradiction between surprise and overwhelm and

15    allow opportunity to comply?

16            MR. ANDERSON:  Objection.  Form.

17            Go ahead.

18            THE WITNESS:  Yes.  I see that there's a

19    difference of somebody not coming up to comply.  But

20    complying can be different than coming to the door

21    and answering the door.

22            We've done CET warrants.  I've done

23    hundreds of them.  And I've went into a residence

24    where there's a guy with a gun sitting on his lap

25    and his hands are up, put his hands behind his head.

Page 118

1          He obviously didn't come to the door and

2     answer the door.  But he was armed, he was sitting

3     there, and we made a controlled entry tactic on

4     that, and we went in.  That's happened numerous

5     times.

6          Sitting on the coffee table there's a

7     firearm.  On their lap is a firearm.  In the seat

8     cushion next to them.  But -- I've taken people into

9     custody that had a firearm in their hand.  They

10    weren't pointing it at us, but they had it in their

11    hand.

12         So I think that they are still -- at

13    that point they're still complying; they're just

14    caught, overwhelmed.  But they're caught there, and

15    they're still complying with us stating we're the

16    police and we're there serving a search warrant.

17    BY MS. MURPHY:

18       Q.     I'm going to read you from 3.9, part of

19    it.

20         "Officers immediately lost the elements

21    of a CET of utilizing speed to surprise and

22    overwhelm the suspect per their manual by being

23    stuck at the door and hitting it multiple times

24    prior to entering the residence."

25         Do you think that -- do you agree or

Page 119

1    disagree with that statement?

2        A.      Well, it's hard to -- I mean, it's hard

3    to -- I don't think that we were stuck there overly

4    long or for too long.

5        Q.      So is it fair for me to say then that

6    you disagree with that conclusion?

7        A.      Well, it kind of goes back and forth.

8    Because you have one turn they're saying we're out

9    there -- we're not giving enough time, but on the

10   other hand we're going too fast.  So what is it?

11   Are they saying that those knocks on the door, those

12   are breaches because we haven't opened the door yet?

13   Or are we able to go up there and hit that ram 15

14   times on the door and then they're going to say,

15   Well, that's too long?

16            Well, it took 15 seconds to hit the

17   thing 15 times.  We didn't open it, but we opened it

18   on that 15th time.  That would give more time.  But

19   did that leave us out of there?

20            My mind was -- to that fact as far as

21   having that time on our side still was because we

22   were still -- distracts were still going off at that

23   time, and I thought that we were still providing

24   that diversion out there.

25            Now, if those distracts weren't going



Page 120

1    off and they were just hitting that door and hitting

2    the door and hitting the door and there was nothing

3    else going on that would have been able to do that,

4    I would say, yeah, that might have been a time to

5    shut it down at that point.

6         Q.      Do you think that Mr. Williams'

7    constitutional rights were violated?

8              MR. ANDERSON:  Objection to form.

9              Go ahead and answer.

10             THE WITNESS:  No, I do not, ma'am.  I

11   received multiple gunshots before anybody even fired

12   on him.  So I don't know that we acted in a way --

13   that we acted on him other than that.

14   BY MS. MURPHY:

15        Q.      And then in terms of the recommendation,

16   we talked about it quite a bit, but I'll just kind

17   of -- I'll close the loop.

18             From the CIRT report, Conclusion 9.6, it

19   was a recommendation that CET to only be used when a

20   no-knock search warrant is approved by the LVMPD and

21   has judicial preapproval.

22             As we sit here today you understand that

23   that has been a policy change related to this

24   incident; correct?

25        A.      Yes, ma'am.



Page 121

1      Q.      Okay.  Do you think anything could have
2   been done differently here?
3              MR. ANDERSON:  Objection.  Form.
4              Go ahead and answer.
5              THE WITNESS:  I mean, a lot of things
6   could have been done differently.  I don't disagree
7   with the plan of conducting a controlled entry on
8   this residence due to the factors.  So I don't think
9   that could have been changed as far as that.
10  BY MS. MURPHY:
11     Q.      Well, to be clear, LVMPD disagrees with
12  you, because they have in fact changed the policy.
13  You understand that; right?
14             MR. ANDERSON:  Objection.  Form.
15             THE WITNESS:  Yes.
16  BY MS. MURPHY:
17     Q.      But as we're sitting here today, it's
18  your testimony that you would not have done anything
19  differently; correct?
20     A.      I mean, we could have done a lot of
21  things differently.  You know, hindsight, we could
22  have done a lot of things, after the fact.
23             But during that time -- I mean, we could
24  have tried to do a surround and callout on there,
25  and somebody might have came out, and they might

Page 122

1   have done something.  However, somebody could have

2   came out and went into a neighboring apartment and

3   caused an issue or we could have hurt a citizen by

4   doing that.

5       Q.     Today you would have to do a surround

6   and callout; correct?

7       A.     No.  They could have applied for a

8   no-knock warrant.

9       Q.     Sorry.  Okay, correct.

10              If taking the hypothesis that it was a

11  knock-and-announce, you would have to do a surround

12  and callout; correct?

13      A.     I can't speak because I don't make those

14  decisions.  But I think today, if this warrant came

15  in and they had all the seat time and everything was

16  in there, that they would go for a no-knock warrant,

17  and we would go that route to serve the warrant.

18              That's on this circumstance.  That's

19  what I am --

20      Q.     No problem.  So that's a really fair

21  answer.  I'm going to close the loop on that as

22  well.

23              When I asked you if you would do

24  anything differently, your answer then is, Hey, I

25  think this should have been a no-knock warrant.  Is



Page 123

 1    that fair to say?

 2              MR. ANDERSON:  Objection.  Form.

 3              THE WITNESS:  At this time, yes.

 4    BY MS. MURPHY:

 5        Q.    Do you consider this operation a

 6    failure?

 7        A.    Yeah, it's a failure.

 8        Q.    I know it seems like an obvious

 9    question, but I need to ask it.

10        A.    Yeah.

11        Q.    Why do you think it was a failure?

12        A.    Well, there's the circumstances.  I'm

13    living proof.  I got hurt as an officer.  Somebody

14    lost their life.  Other people that were in that

15    neighborhood could have lost their life.  He could

16    have shot other people as well.  He was shooting

17    recklessly throughout the complex, other apartments

18    that were occupied at that time.  So somebody else

19    could have been hurt as well.  So I believe that was

20    a failure.

21              The brass wrap on the door, things

22    could have changed as far as that.  Because we might

23    have -- if we knew that that brass wrap was there,

24    there might have been other plans that we could have

25    pushed up that might have been approved.  I can't

Page 124

1    say a hundred percent they would have.  But we could

2    have pushed up the fact that we could go up there

3    quietly, we could have placed a charge on there, we

4    could pull back, and then we could make

5    announcements.  Then if nobody is coming to the

6    door, we can give more time there.

7            We could also place -- whenever we do

8    those with ballistic breaches, we have trackers that

9    we put on the wall that they'll light up if somebody

10   is on the other side of the door.

11           So with those in place, we could have

12   effectively placed that charge, pulled back, gave an

13   amount of time, and then moved in the door and went

14   that route.

15     Q.      And, Kerry, you talked a little bit

16   earlier about when you're actually walking, like,

17   the units and you are the one doing the recon that

18   it's your habit to bring magnets and to check other

19   doors.

20           So you think -- I understand that this

21   is a hypothetical question, but do you think that if

22   you would have been tasked with doing the recon on

23   Nellis that you would have been able -- that you

24   would have figured out there was a brass wrap on the

25   door prior to SWAT showing up to serve the warrant?



Page 125

```
1              MR. ANDERSON:  Objection.  Form.
2              THE WITNESS:  I can't speculate that I
3    would have.  If I didn't get a good look at the
4    door, I'd probably try, if I didn't know a hundred
5    percent, do something to go out there and try and
6    get close enough to where I could identify something
7    that was there.
8    BY MS. MURPHY:
9         Q.      Because your earlier testimony was that
10   it's your practice that, if you can't get to the
11   actual door -- which I understand is not advisable
12   for a variety of reasons -- that you'd probably go
13   look at another door in the complex; correct?
14        A.      Well, I think on every recon I've done
15   I've checked like doors.  So I always check the like
16   door.  I check the frame, I check the door, just to
17   see.  Because nine times out of ten -- a brass wrap
18   is not the same, because anybody -- you can install
19   one in your house in, you know, probably 15 minutes.
20   So anybody can install that themselves.  It's not
21   something that's standard protocol on apartments.
22   But you have certain things that are.
23              The metal doors -- and that's not a
24   hundred percent, but a metal door, if it's a metal
25   door and a metal frame, nine out of ten every door
```

Page 126

1    in there is going to be metal on metal.  You're

2    going to know that by checking those.

3              There might be somebody that put up a

4    dead man behind it or they might have put a brass

5    wrap on there or did something on their own to

6    reinforce that door.

7              But that takes a lot of that out of

8    there -- you know, I wouldn't say a hundred

9    percent -- by not checking the actual apartment

10   door, but I would have 90 percent going in knowing,

11   okay, these doors are all, you know, metal.

12             Now, if every single one that I checked

13   had a brass wrap, that would change things as well.

14             And I don't believe -- well, I can't

15   attest to that.  I don't think that there was brass

16   wraps on every door in there, but I'm not going to

17   say a hundred percent because I didn't go and walk

18   it and look at it.

19   Q.        Okay.  But you don't know if the recon

20   officers did a check for like doors either; correct?

21   A.        To be honest, no, I don't.

22             MS. MURPHY:  Okay.  All right.  If you

23   want to give me just a minute, I'm going to go over

24   my notes.  I think we might be done.

25             THE VIDEOGRAPHER:  We are going off



Page 127

1    record at 12:35 p.m.

2              (A break was taken.)

3              THE VIDEOGRAPHER:  We are back on record

4    at 12:39 p.m.

5    BY MS. MURPHY:

6        Q.      Kerry, this is just to clean up the

7    record a little bit.

8              We talked about your position relative

9    to it, and I was able to find a diagram within the

10   CIRT report which kind of shows the various

11   individuals.

12             And that's --

13       A.      LVMPD 04389?

14       Q.      Correct.  And based on how you kind of

15   described that to me before, the diagram within the

16   CIRT report is consistent with how you described it;

17   correct?

18             I think you may have identified some

19   different officers.  But in terms of, like, the

20   actual positioning of the officers, irrespective of

21   their names, that is consistent with how you kind of

22   described to me the different positioning of the

23   SWAT officers around the unit and the actual layout

24   of the unit itself; correct?

25       A.      Yes, ma'am.  There's just -- Bertuccini

Page 128

1  is not listed, but he's over here.

2      Q.      So I'm going to hand you a pen.

3      A.      And somebody else is over here.

4      Q.      I'm going to hand you this pen.  If you

5  want to just draw in who is missing.  And we're

6  going to make this an exhibit to the report as well,

7  or the transcript.

8              There's a couple that aren't identified.

9      A.      That aren't identified?

10     Q.      That are not identified.  They don't

11 identify everybody.  Like, they've got all the

12 badges to indicate police officers, but they don't

13 identify all of them.

14     A.      Okay.  Yeah, that's what I was looking

15 for on here.

16             I don't a hundred percent know.  He's on

17 the lineup on here.  Do you still want me to put

18 him?

19     Q.      Yeah, go ahead.

20     A.      Those are the only two I see listed that

21 aren't on there.

22             MS. MURPHY:  So we'll just mark this as

23 Exhibit 3.

24             (Exhibit 3 marked.)

25             MS. MURPHY:  That will be an exhibit.

Page 129

1    BY MS. MURPHY:

2        Q.        Kerry, thank you so much for your

3    testimony here today.  At this time I don't have any

4    other questions except to say did I allow you the

5    opportunity to answer all my questions?

6        A.        Yes, ma'am.

7                  MS. MURPHY:  Excellent.

8                  MR. ANDERSON:  I have no questions.

9                  THE VIDEOGRAPHER:  This concludes the

10   video-recorded deposition of Kerry Kubla taken on

11   October 11, 2024.  We're going off the video record,

12   and the time is 12:43 p.m.

13                 THE COURT REPORTER:  Do you want a copy?

14                 MR. ANDERSON:  Yes.  No video.  Waive.

15                 (Proceedings concluded at 12:44 p.m.)

16

17

18

19

20

21

22

23

24

25

Kerry Kubla                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 130

1                    CERTIFICATE OF REPORTER

2     STATE OF NEVADA        )
                             )SS
3     COUNTY OF CLARK        )

4          I, Holly Larsen, a duly certified court reporter
      licensed in and for the State of Nevada, do hereby
5     certify:

6          That I reported the taking of the deposition of
      the witness, Kerry Kubla, at the time and place
7     aforesaid;

8          That prior to being examined, the witness was by
      me duly sworn to testify to the truth, the whole
9     truth, and nothing but the truth;

10         That I thereafter transcribed my shorthand notes
      into typewriting and that the typewritten transcript
11    of said deposition is a complete, true, and accurate
      record of testimony provided by the witness at said
12    time to the best of my ability.

13         I further certify (1) that I am not a relative or
      employee of counsel of any of the parties; nor a
14    relative or employee of the parties involved in said
      action; nor a person financially interested in the
15    action; nor do I have any other relationship with any
      of the parties or with counsel of any of the parties
16    involved in the action that may reasonably cause my
      impartiality to be questioned; and (2) that transcript
17    review pursuant to FRCP 30(e) was waived.

18         IN WITNESS HEREOF, I have hereunto set my hand in
      the County of Clark, State of Nevada, this 23rd day of
19    October, 2024.

20

21

22

23                              

24            _____

25                HOLLY LARSEN, CCR NO. 680

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 132 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**0**

**0000**
  11:7
**004377**
  48:19
**04389**
  127:13

**1**

**1**
  6:4,5
**1/9**
  33:12
**10**
  12:7 93:3
**100**
  24:4 84:5
**11**
  129:11
**1125**
  110:13
**11:00**
  55:6
**11:11**
  55:9
**12**
  11:5
**123**
  47:7
**12:00**
  15:18
**12:35**
  127:1
**12:39**
  127:4
**12:43**
  129:12

**12:44**
  129:15
**133**
  88:24
**1400**
  11:7
**15**
  21:1
  88:21
  119:13,
  16,17
  125:19
**15th**
  119:18
**1:00**
  15:21,22

**2**

**2**
  11:5,25
  53:2,3
**20**
  20:25
  21:1
  88:21
**200**
  74:14
**2008**
  12:18
**2022**
  12:7
  15:17
  16:16
  93:3
  114:20
**2024**
  129:11
**22**
  33:12
**222**
  47:7 56:5

**24**
  57:25
**24-hour**
  20:14
**24/7**
  15:12
**250**
  74:14
**2:00**
  11:6
  15:18

**3**

**3**
  11:4
  14:15,20,
  25 20:12
  128:23,24
**3.8**
  115:16
**3.9**
  118:18
**300**
  14:17
**3050**
  34:3
  36:6,20
  48:13
  53:8 64:4
**3350**
  36:4,18,
  21
**350**
  110:17
**3550**
  34:14,16
**3:00**
  15:21,22

**4**

**4**
  15:25
  82:24
**4,378**
  47:22
**400**
  14:15,17,
  20,25
**424**
  7:11
**4377**
  47:10
  48:17,23
  51:18
**4378**
  47:6 53:5
**4379**
  53:9,10
**4475**
  34:1
  35:25
  63:17

**5**

**5-foot**
  20:11
**5:00**
  16:3,4

**6**

**6**
  53:22
  67:24
  71:5
  97:18

**7**

**7**
  67:25
**77**
  48:21
**78**
  48:21
**79**
  48:21

**8**

**8**
  81:12
  97:18
**89138**
  7:12

**9**

**9**
  100:6
**9.6**
  120:18
**90**
  12:25
  126:10

**A**

**a.m.**
  15:22
  16:3,4
  55:6,9
**ability**
  7:6 58:18
  83:1,22
  84:2
  102:17
**able**
  6:24 9:10

  20:15
  21:3,16
  24:10
  26:13
  41:9
  44:23
  46:20
  57:20
  58:4,20
  59:3
  61:3,19,
  21 68:18
  87:24
  91:9
  98:23
  100:23
  108:21
  109:7
  114:1
  119:13
  120:3
  124:23
  127:9
**about**
  7:20 8:23
  10:9
  11:15
  17:6,8
  20:11
  22:19
  23:3,15
  26:8
  27:24
  32:21
  33:8
  36:12
  39:10,24
  44:5 45:1
  46:6 47:1
  48:1,3,22
  49:1 55:4
  56:12,13,
  21,25
  57:3,4,14
  62:25
  64:14,18
  69:13
  77:8,14,
  16 82:7

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

84:7,8
85:6,9
86:22
87:24
88:19
90:9
92:11
94:14,23
97:9,18
102:19,20
105:3,9,
19 108:15
111:23
115:15
116:12,13
120:16
124:16
127:8

**above**
20:2,3
27:8
32:12
99:4
115:3

**Absolutely**
116:25

**academy**
12:18,19

**access**
21:15
28:16

**accident**
13:11

**accountable**
104:10

**accurate**
6:25

**acronym**
21:7

**across**
20:10
35:10
42:16

72:15
82:16,22,
23

**acted**
120:12,13

**action**
79:1

**active**
14:16

**actively**
37:2

**actual**
53:21
56:1
60:14
63:15
125:11
126:9
127:20,23

**actually**
8:22 9:6
33:7,22
48:12
52:3 53:1
55:21
56:21
61:20
64:3,4,6
67:8 94:3
96:16
99:16
105:2
107:10
108:18
110:14
111:6,12
124:16

**Adam**
63:20

**add**
44:19
48:2
51:22
113:12

**added**

51:19

**additional**
40:19
69:17
81:19

**Additionally**
116:4

**address**
7:9 8:7
34:3
45:8,12
53:8
63:17
72:21
82:20,21,
22 94:18

**addressing**
56:20

**adds**
95:11

**adequate**
70:2
93:12

**administrative**
96:18,25

**admit**
54:4

**admittance**
85:9,12,
21

**advisable**
125:11

**affect**
111:24

**affiliated**
91:20

**affiliation**
91:21

**after**
12:20
35:8
40:7,10
67:3
69:14
73:5
75:14
77:1
85:5,7
88:21
93:7,16
97:6,7
98:25
99:11
106:14,
18,19
107:21
108:6
111:5
112:1
113:6,7
121:22

**afterwards**
40:8
99:14

**again**
23:13
72:15
79:14
84:7,8,9
88:14
94:1
103:8
113:24
114:17

**against**
70:16
81:6

**ago**
8:1 9:3
10:19
43:19

64:21
106:13

**agree**
25:23
26:3
31:17
84:1
111:9
113:14
117:4,8
118:25

**ahead**
25:4,14
34:11
38:11
59:19
96:4
102:15
112:17
117:17
120:9
121:4
128:19

**Alexander**
5:18

**all**
7:3 14:17
27:11
28:23,25
31:1
34:24
35:3 37:5
44:18
45:16
46:22
47:18
48:10
49:9,18,
21 53:11,
13 54:13
57:6
58:5,10
64:7
65:5,7,8
70:19
75:7
78:20
79:21

82:16
90:15
91:3,22
97:15,16
98:3
99:15
100:2
101:12,17
104:25
105:23
107:20
108:3
110:24
112:12
113:2,8,
16,20
114:14
115:7
122:15
126:11,22
128:11,13
129:5

**allow**
32:24
33:4
85:19,20
115:19
117:9,15
129:4

**allowing**
110:9

**alluded**
60:19

**almost**
70:23
101:19

**along**
20:20
46:10
72:10
74:16

**alphanumeric**
47:19

**already**
47:13



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

75:15

**also**
20:10
23:16
26:3
41:25
44:19
50:4,5,8
52:22
64:4
66:12
71:21
78:20
79:15,18
80:10
81:14
82:2
83:2,23
84:10
85:22
87:11
91:20
93:15
96:25
98:12
124:7

**altered**
87:25

**although**
6:19
18:11
37:1
55:12
57:5
112:7

**always**
13:22
50:20
101:21
125:15

**amongst**
57:1

**amount**
18:5,7,8,
14,15
19:9
23:15

24:20,23
58:23
59:10
86:22
88:20
89:17
91:1
92:5,18,
19 93:7,9
94:21,24
95:4,15,
25 96:8,
11 100:9
110:12,13
111:12
112:9
124:13

**AMR**
75:19

**Anderson**
7:17
25:3,13
47:5,8
59:18
96:3
112:16
117:16
120:8
121:3,14
123:2
125:1
129:8,14

**announce**
16:9
17:24
26:17

**announcement**
85:18
89:8 94:7

**announcements**
21:13,20,
22 31:4,
5,6 66:25
67:1,2,3,
11,13

77:1
92:17
93:4,6,8,
10,14,16,
17,18,20
94:6,9,10
96:12
124:5

**announcing**
21:5
26:18
30:11,16

**another**
13:3
21:17
49:25
53:16
69:2,6
80:17
81:20
82:23
125:13

**answer**
7:3 9:4,
6,11
16:22
22:6
23:13
24:5,12
25:4,14
59:19
90:15
94:21
96:4
112:17
115:20
118:2
120:9
121:4
122:21,24
129:5

**answered**
38:2

**answering**
117:21

**answers**
8:10

**any**
6:23 7:5
9:19,22
10:2,22
18:4 22:4
25:18
27:17,24
29:6 32:4
33:13,15
34:16
36:2
44:16
56:16,20
57:12,17
62:19,23
81:16
86:1
89:2,6,7
92:11
102:9,16
105:4,18,
25
107:11,
14,17
109:24
115:22
129:3

**anybody**
57:23
70:3
76:11
77:20,21
78:2,12
102:19
104:12
120:11
125:18,20

**anyone**
11:1
55:18

**anything**
7:6 9:2
10:13
24:2
31:20
51:5

64:18
81:16
85:24
102:18
105:9,12
116:2
121:1,18
122:24

**apartment**
18:21
19:22,24
20:4,7
21:18
22:21,23
23:9,17,
18,24
30:17
35:13,15,
16 37:1,3
38:18,21
41:12
42:4,5,20
50:25
51:16
56:22
57:5
60:12
66:19
73:23
82:3 83:7
86:6,11,
13,15
90:13,14,
24 104:2,
12,13,15
108:17,
18,20,23
109:6,9
110:13,
15,17,24
111:13
122:2
126:9

**apartments**
60:8
123:17
125:21

**appear**
38:15

**appeared**
50:10

**appellate**
111:22

**applicable**
58:21

**applied**
26:10
122:7

**applies**
55:14

**apply**
6:20
26:11,15
27:10

**applying**
58:15
75:6,10

**appreciate**
103:15

**approach**
31:3
39:4,5
66:18

**approached**
77:10
86:3

**appropriate**
9:11
110:11

**approval**
27:7 29:2

**approved**
28:24
62:6
120:20
123:25



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

approxima
tely
  7:22
  12:24
  13:17
  20:11,25
  38:3,8
  67:23
  69:8,10
  81:12

AR-STYLE
  50:12

Arco
  20:14
  35:19
  36:16

area
  12:21
  19:16
  28:11,12
  45:20
  51:10
  68:7
  98:19
  101:7

areas
  37:8
  59:12

arm
  72:24
  74:24,25
  75:2 78:6
  82:8
  97:13,14,
  15,16,17,
  19,25
  98:1,22,
  23 100:3,
  8 101:20
  102:6

armed
  17:19,20
  89:25
  110:10
  118:2

armor

19:23
20:15
41:23

armored
19:20
41:8

arms
70:24
101:14

around
19:25
21:15
35:19
36:17
37:16
38:8
41:24
61:10
66:20
71:1
89:14
94:3
100:6
127:23

arrest
43:3
52:15,18,
22 86:25
87:1,12
91:12
92:1

arrested
87:18

arresting
43:6
52:1,2,3

arrive
63:10

arrived
63:13

artfully
23:21

arthritis
101:8

articulab
le
  116:21

articulat
e
  26:13

articulat
ed
  24:24
  92:18

articulat
ion
  91:3

as
  6:3 12:21
  13:24
  14:2,18
  16:14,16,
  24 17:16
  18:2
  19:4,17
  21:5
  22:16
  23:14
  25:22
  28:21
  29:5,13
  30:24
  31:4
  32:23,24
  33:2,5
  37:18,22
  38:23
  41:10,15,
  17,18
  43:14,20
  44:20
  46:21
  47:17
  48:9
  49:15
  50:14,15
  52:7 53:2
  55:24
  58:19
  60:16
  65:1

66:17
67:9
69:19,20
70:11,15
71:8,24
74:12
80:9,11
83:4,5,6,
15,24
84:25
86:14,17
88:9
89:6,15
91:3 94:9
95:16,24
96:6
100:24
101:3,18
103:17
105:4,18
106:2,5
107:4
109:18,19
110:18
112:25
114:1,13
115:13
119:20
120:22
121:9,17
122:21
123:13,
16,19,22
126:13
128:6,22

ask
11:14
23:5,12,
21 33:7
42:17
52:25
56:12,13
94:11
97:4
105:3,16
108:14
109:3
115:15
116:13

123:9

asked
32:15
38:1 47:3
64:14
74:23
116:12
122:23

asking
10:8
30:4,18
57:11
95:2
112:8
113:13

asleep
101:20

assess
83:7,22

assigned
13:12
34:1,2
115:25

assignmen
t
  62:13

assignmen
ts
  54:13

assistant
22:10
33:19
35:1
54:11
64:11
65:2

associate
d
  50:25
  89:24
  105:20
  110:12,24
  111:12

assume

14:5,11

assuming
63:6

at
6:17 12:6
13:15
14:4,8,
12,15
15:16,20,
21 16:12
17:15
19:3,17
20:22
31:19
32:12,14
33:22,23
35:20,24
36:4,6
37:4,18
39:1,20
40:11
44:24
47:19
49:1
55:6,9,
13,23
60:5,11
62:23
63:3,10,
13,21
64:7,23
65:10,11
66:4,8,22
69:3,4,
14,19
71:9
73:7,16
74:18
75:5,17,
18 76:23
77:24
78:7,9,10
80:16,22
82:22
83:14
84:21
85:16
87:4
90:3,15

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 136 of 177

Kerry Kubla                  Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

91:10
92:25
93:18
94:5
97:2,6
99:11
105:13,23
106:23,24
107:7
108:18
109:11,24
114:12,19
115:7
118:10,
12,23
119:22
120:5
123:3,18
125:3,13
126:18
127:1,4
129:3,15

**ATL**
64:10

**attached**
68:5
81:14

**attempt**
70:6

**attempted**
70:5
72:13

**attempting**
20:18
69:20

**attention**
70:4
80:5,9,
16,18,20,
21 81:21
94:17,18

**attest**
104:18
126:15

**attorney**
5:17 6:14

**audible**
84:25

**aunt**
50:16,17

**authority**
85:8

**aware**
29:5 32:3
33:10
50:19
57:13
78:20
85:15
96:24
104:25
113:9

**awareness**
50:18

**away**
34:15
67:25
80:21
81:17
88:23
89:3
101:22

_____
B
_____

**back**
13:19
19:23
22:18
29:11
30:19
31:12
32:9
35:14,17,
18,22
36:3,8
37:23
40:3,11
47:25
55:8

65:10,11
66:3,6
67:23
74:19,20,
22,23
75:4,14,
21,22
78:8,16
79:8,13,
21 80:11,
18,19
84:6 88:2
91:10
92:23
97:6,7,25
98:24
100:2
103:13
107:21,25
108:2,7
114:19,
22,24
115:2,3,
13 119:7
124:4,12
127:3

**backed**
75:18,19

**background**
11:15
12:14
32:4

**Backman**
66:24

**bad**
34:9

**badges**
128:12

**ball**
100:15

**ballistic**
22:17
26:23
62:1,2
99:6

103:3
124:8

**bang**
81:5

**bangs**
69:16

**Banks**
88:23
90:8

**barrel**
72:21

**barricade**
24:6
106:24

**base**
19:8

**based**
33:2
49:16
58:8
83:3,23
86:22
87:10,15
88:20
89:18
93:1 95:1
96:13
107:23
127:14

**basic**
6:15

**basically**
11:4 15:5
19:21
20:21
21:14
26:16,20
28:12
59:10
62:6
64:14
65:4,12
67:20,23
69:6
71:20

72:17,25
75:4,14
76:13
80:2 90:3
92:22
98:16
106:23
108:1

**basis**
23:14
108:12

**Bates**
47:5,18,
23 48:17

**Bearcat**
65:20
74:21,22
75:4

**Bearcats**
64:1,3

**became**
33:9

**because**
10:6
14:17
19:10,24
22:18
23:13
24:10
29:10
31:25
34:17,18,
22 35:11
36:13
37:5,11
39:19
41:9
43:19
45:12
46:4,15
48:15,20
49:19
50:1
51:14
53:1 54:1
60:9,11
61:8,9,18

63:7,22
64:15
65:13
69:23,25
72:9
73:1,24
74:4
75:1,16
76:7,20
78:3
80:8,15
81:17
85:1
86:9,24
87:7
88:5,8
94:4
96:24,25
97:3,23
98:13,25
100:16
103:10
106:15
107:7
109:14
111:14
119:8,12,
21 121:12
122:13
123:22
125:9,17,
18 126:17

**become**
69:1

**becomes**
111:21
112:2,3

**bedroom**
78:16
80:19
95:12

**before**
6:12
10:1,5,10
18:6 28:6
33:11
47:4
50:18



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

58:10
59:16,25
68:11
77:8 84:7
86:2,3
87:25
89:13
92:4 94:7
95:25
96:16
103:12
106:14
107:25
108:2
113:24
116:9,13
117:10
120:11
127:15

**beginning**
6:17
55:13

**behind**
66:1
72:3,8
74:7
76:17,22,
24 117:25
126:4

**believe**
7:24
15:20
19:11
30:1
36:20
46:25
64:13,21
76:23,24
88:15
94:2
102:22
123:19
126:14

**bending**
61:9

**Bertuccini**

66:16
127:25

**best**
7:3,7
63:24

**better**
44:14
46:8

**between**
8:25
21:7,9
27:1 30:1
54:14
85:18
89:8
96:12
117:14

**bicycles**
109:16

**big**
15:5
19:13
77:24
95:11
100:15
111:25

**bit**
22:4 31:2
33:8
41:21,24
47:13
49:22
61:7,25
63:15
64:15
66:7
68:24
75:23
77:15,16
82:6
83:18,20,
21 84:7
86:10
94:12
95:7
105:16
109:3

110:21
111:19
116:12
120:16
124:15
127:7

**Blake**
66:11
76:19

**blind**
104:25

**blistered**
100:16

**block**
20:12

**blood**
75:12

**bodies**
73:20,21
77:24,25

**body**
102:2,3

**body-worn**
9:25
10:3,8,
11,12
31:1
44:24

**bone**
73:2
97:14
100:4

**both**
33:23
34:20
38:8,24
41:13,14
52:19
63:21
92:12
101:14
104:2,14

**bottom**
35:15

47:5,9,20
48:7,11
49:1
53:23

**Boulevard**
20:21
110:18

**box**
46:8

**brass**
61:2,3,4,
8,12
62:14
77:8,10
123:21,23
124:24
125:17
126:4,13,
15

**brass-
wrapped**
61:5

**breach**
22:12
26:21,23,
24 61:7
62:1,3
67:5,18
69:20
77:2
78:10
79:17

**breached**
76:8

**breaches**
119:12
124:8

**breaching**
22:17
68:10
76:13
77:5

**break**
21:16,17
55:7,11,

12,17,19
62:21,22,
25 99:21
127:2

**Brett**
34:1 35:3
66:11

**Brice**
8:18 66:6

**brief**
34:22
55:11
63:15

**briefing**
48:1
55:23
64:10,12

**briefly**
8:24 10:5
21:11
56:3,23
63:3
64:19,25

**bring**
44:23
124:18

**bringing**
90:21

**broke**
73:2 75:1
98:17
99:10,16

**broken**
85:19

**Brosnahan**
35:3
66:11
76:19

**brotherho
od**
13:23

**brought**
30:21

**Brown**
74:18

**building**
18:21
41:13
53:22

**bullet**
97:24
98:1,14,
17

**bullets**
104:8

**burden**
59:15

**bureau**
12:1,2

**burn**
101:11,16

**burned**
100:13

**burning**
101:13

**bus**
64:23

**business**
37:14

**but**
7:20 8:18
9:12 10:8
11:18
14:18
18:10
20:3 22:5
26:9,20
27:9,20
30:12
31:6,19
32:3,22
36:16
37:9
39:7,12
40:13
41:5

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 138 of 177

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42:2,6,19
43:9
44:9,14,
24 45:6
48:7
49:3,14
50:5,11
51:9
52:14,22
53:19
54:4,25
55:11
56:25
57:4
58:2,5,25
59:8
60:13
61:23
62:7,11,
23 63:18
64:23
65:5,11
69:15
70:25
72:4,8,
15,16
74:9,15
75:13
76:23
77:4,16
79:15,23
81:2
82:1,21
83:17,21
84:7,9
85:2,22
86:6,16
87:17
88:15
89:14,25
90:12
91:25
94:2 95:2
96:24
97:2
98:8,10
99:5,21
100:10,
13,25
101:3,9,

10,19
102:4,5
103:25
104:16,18
106:6,22
107:6,17,
20 108:8,
10 109:6
111:5,25
113:9,24
115:4
116:13,
20,25
117:19
118:2,8,
10,14
119:9,17,
18 120:16
121:17,23
122:14
123:9
124:1,21
125:22,24
126:7,10,
16,19
127:19
128:1,12

**buys**
90:17

**by**
5:15 6:6
22:2
25:7,16
26:11,21
35:6
42:14
47:11
53:4
54:10,17
55:10
56:16
58:13
60:4,10,
17,18
61:19,20
62:6
63:21
64:4,8
73:13

77:20
78:11
81:17
82:9,18
92:23
96:10,21
99:5
111:23
113:3
118:17,22
120:14,20
121:10,16
122:3
123:4
125:8
126:2,9
127:5
129:1

**bypass**
116:24

---

**C**

**C-I-R-T**
56:2

**call**
9:15
15:12
21:20
27:17
36:23
47:18,23
50:6,16
55:18
73:15
74:2
77:20
78:3,7,
11,13
85:22
93:3
110:25

**called**
65:6
66:24
68:12
74:2

78:11
79:5,15
80:8

**callout**
21:10,11
39:4 46:1
79:19
80:15
121:24
122:6,12

**calls**
15:15
24:16
78:13

**came**
31:6
33:17
35:22
51:10,25
57:8
67:9,11,
13 70:19
72:12
75:15
79:6,8
86:3,4
93:25
97:6,7,14
98:8,11,
13 99:15
102:19
107:1
108:2,7
121:25
122:2,14

**camera**
9:25
10:3,8,
11,12

**cameras**
31:1
44:16,24

**capacity**
104:24

**captain**
32:14

**car**
37:2
38:12
42:15
45:3 51:8
63:20

**carry**
91:21

**case**
5:18 7:18
42:11
45:8
47:13,21
51:24,25
78:5,22
88:18
89:1 96:2
111:24
113:19

**casino**
106:24

**catch**
38:2

**caught**
7:18
118:14

**cause**
22:3
43:11
81:16
91:16
98:20
99:20

**caused**
84:15
97:21
98:9
122:3

**ceiling**
81:6,13
104:1,15

**center**
13:15,16

**certain**
22:13

23:23
24:16
59:22,23
65:14
114:5
125:22

**CET**
21:8
29:2,7,9,
14 30:2
32:25
33:5
73:20
77:18
79:9 83:9
110:10,18
111:10
114:16
116:4,5,
16 117:4,
22 118:21
120:19

**chain**
27:11
28:25
32:9 62:7

**change**
29:6
32:21
33:3 44:9
61:23
113:15
115:6
120:23
126:13

**changed**
44:4,6
51:24
62:10
114:13
121:9,12
123:22

**changing**
34:5

**charge**
124:3,12



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 139 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

chart
48:23
51:18

charts
54:9

chase
78:3

check
46:8
51:22
60:5,7,13
124:18
125:15,16
126:20

checked
125:15
126:12

checking
39:19
126:2,9

cherry-
pick
37:20

chest
99:3,5
102:4

child
39:20
41:15,20
109:13,
14,17
111:17

children
44:15,18
48:10
108:19
109:8
110:15,23

children-
type
109:15

CI
99:14

cinderblo
ck
20:12

circumsta
nce
29:17
122:18

circumsta
nces
9:12
22:14
24:24
26:13
37:17
89:18
95:1
123:12

CIRT
8:6 9:18,
22 10:19
38:14
42:2
46:5,24
55:25
56:1
57:8,12
59:14
77:15
85:5
86:21
88:18,25
96:17
108:14
110:7
112:7,22
115:18
120:18
127:10,16

CIRT's
111:10
116:15

cited
88:18

citizen
122:3

citizens
19:15
20:1,8,17
24:12

civil
25:25
26:4

clarifica
tion
25:8

clarified
27:12

clarify
24:19
29:10,13
51:18

Clark
11:22

Clarkson
63:21,25

classes
11:18

clean
127:6

clear
25:1,11
68:7
70:19
88:5
121:11

Clements
66:6

Clements'
8:18

clip
98:14

clock
62:2
68:14

close
13:7
19:15
41:9,10

92:24
99:1
120:17
122:21
125:6

closed
85:12,13

closer
61:19

clothing
88:16

cocaine
88:23

codefenda
nts
10:22

coffee
118:6

collectin
g
40:19

college
11:18,20,
22

come
16:13,22
21:22
23:1,9
28:18
33:14
49:18
66:20
68:13
69:22
77:1,2
79:7
81:15
86:4
90:15
92:19
105:9
107:25
118:1

comes
78:1 90:6

92:22
113:22
114:6

comfortab
le
23:7

coming
12:11
23:7
71:19,21,
24 72:6,
20,24
80:6,10,
22 82:7
84:21
90:18,20
103:9
104:23
107:20
113:1
117:19,20
124:5

Command
12:21

comment
50:19

comments
58:9

commit
90:4

common
14:24

community
11:18,20,
22

comp-
related
13:13

compare
71:17

complete
35:7
100:21

completed
12:22
40:2

completel
y
108:10

complex
18:20
35:9
60:6,9
75:16,18
123:17
125:13

complianc
e
96:2

comply
92:12
94:15
116:9
117:10,
15,19

complying
117:20
118:13,15

compresse
d
68:15

compromis
ed
61:15
69:1

compromis
ing
60:17

computer
10:7
44:23

comradery
13:23

concept
112:4



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

concern
22:19
23:16

concerned
87:24
89:3

concluded
129:15

concludes
129:9

conclusion
42:1
57:12
59:14
110:7
111:10
112:7
115:16
116:16
119:6
120:18

conclusions
56:9,14,
15,20
57:8
96:17
108:14

conditions
115:18

conduct
25:24
32:19
34:7
110:9

conducted
64:10,11

conducting
37:13
58:19
121:7

confirm
32:22
42:6 46:7
48:17
51:23
55:12
77:3,17
103:15,17
109:2,13,
14

confirmed
41:17
50:19

conflict
30:1,7,8

confuse
79:25
84:10

confused
50:21
64:5
84:16
104:22

confusing
39:21
47:16

connect
38:21

connected
100:2

consent
23:10

consider
18:14
95:1
123:5

consisted
65:23

consistent
10:18
127:16,21

consistently
69:18

constitutional
25:1,11,
18,25
26:4
120:7

contact
24:11

contacting
59:11

contain
19:21
21:3,12
41:13,23

contained
110:8

containing
41:8

containment
21:14
66:12

continual
104:4,17

continue
21:21
93:16

continued
71:5
104:3

continuing
93:19
108:2

contradicted
116:4

contradiction
117:14

contradicts
116:16,19

controlled
19:19
21:10
111:15
113:17
118:3
121:7

controlling
96:2,13

coordinators
95:22

copper
68:15

copy
129:13

corner
53:22
66:20,21
70:13,19
81:7,9,
11,18

corners
20:3

correct
11:12
15:1
16:2,22
19:12
24:22
27:7,18,
19,21
29:3,15
31:18,23
32:25
33:5,6
36:19

38:18
40:14,20,
22 42:9
44:10
46:8
48:18
49:6,10,
20 51:20
52:23
55:1
60:22
62:14,15
63:7
76:1,7,8
77:5,6,11
79:19
80:25
82:3
83:4,24
84:4,10,
12 85:14
86:7
87:5,13,
19 88:1
89:4,5
91:12
92:1,5
96:14
103:24
104:8,23
108:23
109:10
117:6,11
120:24
121:19
122:6,9,
12 125:13
126:20
127:14,
17,24

correctly
16:19
19:7 87:1

Corrine
5:16

Corvell
50:6,20

couch
70:16
71:3,6,23
72:2,10,
12,19
82:23,25

County
11:22

couple
11:17,19
13:10
19:1 31:6
32:10,11
40:11
46:24
64:21
68:21
73:13
79:7 99:4
106:13
128:8

course
29:20
43:23

court
6:18
36:25
53:1
129:13

courtroom
6:19

cover
14:23
15:6
17:18
19:16,17
76:11,12

coverage
14:17,23
15:6,7,8,
9

Craig
7:17,20
10:25
47:22
55:18



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 141 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

crease
100:5

create
20:8

credits
11:19

crime
17:22
18:25
28:5,7
33:24
46:20

crimes
105:20

curled
71:22

current
11:23

currently
12:1,16

cushion
118:8

custody
118:9

cut
19:22

D

damage
97:22
98:9,20
100:1,9
101:6,10

dangerous
110:11

dark
70:8

date
8:9

day
14:24

17:13
24:10
33:20
57:25
95:9

day-to-
day
37:14
108:12

days
8:1 11:8,
9,11
14:18
32:11
58:3

de-
escalatin
g
22:1

dead
100:18
103:24
126:4

deaf
104:25

deal
111:25

decided
26:21

deciding
27:15

decision
110:17

decisions
122:14

deep
95:12

definitel
y
113:23

deflectin
g
99:22

deforming
61:9

delay
84:14

delayed
69:9,11

departmen
t
12:17
14:1
26:19
27:11
93:20,21
103:1,11

depending
24:23
37:17
45:24
46:19
78:12
90:14,22
116:18,20

depends
32:11

deploy
46:16
69:12

deployed
66:14
81:4

deploymen
t
116:4

depositio
n
5:24 6:1,
11,17
7:14 9:19
10:22,24
11:1 17:7
55:13
129:10

described
127:15,

16,22

describin
g
104:7

designed
85:2

destroyed
87:24
89:3

detailed
38:16,17

details
68:11

detain
52:4,5
87:13

detective
13:5
43:21
63:20
88:4,7,10

detective
s
26:11
27:6,9
39:14
43:8,9,10
44:20
49:24,25
51:6,23
52:6 57:1
58:13,21
59:7
64:13
88:3
90:16
113:25

determine
62:12,13

device
68:4 70:3
80:2

devices
22:2 82:1

84:9

diagram
127:9,15

diagrams
45:2

dialogue
36:12
37:20
63:10
77:16
92:3

differenc
e
8:25
21:7,9
27:1
75:11
117:19

different
8:7,16
12:5,15
15:15
16:23
18:1
22:16
24:10
26:24
28:20
32:5,14,
15 40:6
48:21
57:22
59:5,11
60:11
62:4,7
71:11,13,
14,17
83:21
86:12
107:23
111:19
113:21
114:18
115:2
117:20
127:19,22

different
ly
94:12
97:5
105:17
109:4
121:2,6,
19,21
122:24

difficult
62:20,24

dig
58:16
105:10,
12,15

diligence
30:11

directly
20:2
109:15

disagree
111:9
113:14
119:1,6
121:6

disagreed
56:17

disagrees
121:11

discuss
6:8

discussed
10:5,21,
24,25
33:3

dislocate
d
97:15

disorient
79:25
82:2,5
84:10,23
85:3



disoriented
84:16

disregard
104:11

distance
60:5

distinction
103:16

distract
22:1
80:8,14
81:4

distraction
80:7
81:21

distracts
119:22,25

diversion
119:24

diversionary
22:2 68:4
70:3 80:1
84:9

divert
80:9

diverting
81:21

divided
14:22

division
12:4 15:4
95:23

Dixon
66:11
76:19

document
47:17,21

documents
8:12
47:15,18

dog
46:14,16,
21

dogs
44:17
49:8 57:6

doing
22:4,7
27:16
30:11
37:3,9
40:9,13,
18 41:17
60:17
83:16
109:7
114:11,15
115:14
122:4
124:17,22

done
28:6
32:16,17
34:10,13
42:3
43:14,15
54:10,12,
17 58:12
65:4,9
79:19
114:14,
17,18,19,
23 117:22
121:2,6,
18,20,22
122:1
125:14
126:24

door
16:11,13,
21,22
19:11
22:13
23:25

24:2,12
26:21,22
31:4,16
60:1,3,
21,22,25
61:2,4,5,
7,12,15,
21,24
62:1,3,4,
13,19
67:16,20,
21,22,25
68:10,12,
18,21,25
69:3,4,5,
20,21
70:7,11,
12 71:18
72:9
74:12,20
76:8,11,
14 77:2,
4,5,10
78:8
79:5,8,
11,13,14,
17,23
80:14
81:23,24
84:15,18,
19,21
85:12,13,
20 86:5,
18 90:15,
18,20
92:19,23,
24 93:23,
25 94:3,
5,8,22
99:11
103:9,12
104:23
115:20
117:20,21
118:1,2,
23
119:11,
12,14
120:1,2
123:21

124:6,10,
13,25
125:4,11,
13,16,24,
25 126:6,
10,16

doorframes
60:8

doors
22:20
45:21
60:6,8
90:17
103:13
124:19
125:15,23
126:11,20

doorway
82:15
99:14

double-
stacked
65:21

down
20:24
30:18,19
41:21
44:14,15
47:19
48:11
49:1
66:19
70:8,18
72:24
73:1,8,
10,17,21
74:9
75:11,12
76:21
78:9,16
79:21
81:15
97:18
98:7
113:22
120:5

downstairs
31:12

drag
74:3,5,6

dragging
74:15

draw
40:6
44:13,14
45:19
54:12,16
80:16,17
128:5

drawing
45:2
70:3,4

drawings
54:3,5
63:4

drawn
110:22

drew
13:21

drive
34:24
35:19
65:15

drive-by
40:9

driving
63:20
64:1,2
65:12

drop
80:14

dropped
71:15,18
73:6,8,10

dropping
22:2

drove
35:4,8

63:21
64:3,4,8

drugs
90:10

due
13:12
18:16
19:19,22
30:11
34:4 39:3
41:19
43:11
51:13
58:22
63:16
64:20
79:1
100:22
114:16
121:8

dug
58:16

dumb
23:2

Durante
34:2 36:1
38:17,21
39:2,10,
11,24,25
40:14,25
48:14
49:4
53:17,21
54:21
63:18
64:1
108:22
109:6

during
13:11
30:3 38:5
43:15
58:2
121:23

duties
65:3



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

duty
  13:16
  25:24
  26:5 42:8
dying
  64:22,24
dynamic
  83:9,11

——— E ———

each
  48:14
  112:11
earlier
  33:3
  49:17
  51:17
  57:6 82:7
  86:10
  110:22
  124:16
  125:9
early
  63:15
easier
  36:25
easily
  20:5,6
  74:15
east
  67:16
easy
  41:23
edge
  68:25
  72:1,11,
  18 82:24,
  25
education
  11:16
effect
  90:6

effective
ly
  124:12
eight
  69:17
  73:25
either
  19:9
  22:12
  50:11
  75:10
  78:5
  126:20
elderly
  44:15
  48:10
  108:19
  109:8
  110:16,23
  111:16
electric
  101:11
element
  84:9
elements
  85:6
  92:12
  93:4
  94:14
  118:20
else
  10:11
  11:1
  23:12
  30:17
  46:16
  51:5
  55:18
  78:17
  80:9
  84:20
  86:2 94:8
  112:20
  120:3
  123:18
  128:3

emit
  81:16
enactment
  108:11
end
  32:10
  47:14
  71:8
ended
  34:5
  63:19
  64:22,24
  81:2
  106:11
enforceme
nt
  13:4,6,8
engage
  70:25
engaged
  70:20
  82:18
engaging
  72:7
enormous
  97:23
enough
  41:9 72:2
  86:4 96:7
  99:1
  119:9
  125:6
enter
  25:2,12
  102:5
  114:10
entered
  82:15
  97:19
  98:8
  102:4,5
entering
  18:6 96:1
  118:24

entire
  15:11
  19:22
  47:20
entitled
  7:2,19,20
entry
  16:11
  19:19
  21:10
  24:15,17
  26:17,18
  45:24
  46:1
  53:10,13
  65:22
  66:1
  68:20
  70:5,6
  72:5
  76:2,16
  77:18
  78:19,22
  79:10
  80:16
  83:8,9
  87:25
  89:9
  92:14
  93:14
  94:16
  96:12
  103:12
  111:16
  113:17
  116:9
  117:11
  118:3
  121:7
environme
ntal
  19:14
equipment
  65:8
error
  111:23
  112:3

errors
  111:25
  112:1,2
Eshe
  34:3
  35:2,5
especiall
y
  114:15
essential
ly
  42:3
  84:15
evacuate
  24:6
even
  32:13
  83:1 86:9
  93:16,22
  104:7
  111:23
  112:1
  120:11
evening
  33:20
  100:15
event
  30:3
  45:9,10,
  11
eventuall
y
  22:8,9
  73:12
ever
  6:11
  50:19,24
every
  47:21
  69:13
  73:25
  108:7
  125:14,25
  126:12,16

everybody
  13:23
  52:5
  65:14
  72:4
  78:17,19
  80:4
  93:22
  94:8
  102:25
  103:9,10
  128:11
everybody
's
  65:3
Everyone
  23:3
everythin
g
  7:13
  10:10
  15:11
  43:23
  56:8
  60:16
  63:14
  65:9,16
  73:17
  75:6
  81:17
  93:13,18
  111:6
  113:5,8
  115:13
  122:15
everythin
g's
  115:12
evidence
  52:20
  89:22
  91:6,7
exact
  39:14
  106:12



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

exactly
  17:9
  18:11
  48:25
  59:20
  96:23
  108:4

EXAMINATI
ON
  5:14

Excellent
  129:7

except
  129:4

excess
  84:3

execute
  89:2

executing
  24:21
  52:13

execution
  42:19

exhibit
  6:4,5
  53:2,3
  128:6,23,
  24,25

exigent
  29:17,19

exited
  35:5

exiting
  41:11

expectati
on
  59:15

explain
  17:3,9
  21:12
  70:21
  101:10

explosive
  26:23
  62:3
  79:17

extended
  71:4

extra
  61:25
  79:11

extract
  99:2

eyes
  39:12
  61:4
  79:22
  109:25

——————
        F
——————

facing
  67:17
  71:23

fact
  18:17
  19:20,22
  34:4
  37:11
  39:3
  41:19
  43:11
  48:15
  57:7
  58:22
  63:16
  64:20
  69:25
  79:1
  89:23
  100:22
  110:23
  111:5
  114:16
  119:20
  121:12,22
  124:2

factor
  95:11
  112:11

factors
  16:24
  17:2
  19:15
  22:1  28:7
  89:22
  90:5  91:3
  95:5  96:6
  108:17
  110:14
  111:21
  112:10,
  13,24
  113:15,16
  121:8

facts
  56:21
  116:21

failure
  84:15
  110:19
  111:11
  113:10
  116:10
  123:6,7,
  11,20

fair
  14:4,11
  37:24
  38:22
  82:10
  119:5
  122:20
  123:1

fairly
  14:12
  88:22

fall
  79:8

fallen
  42:7

familiar
  14:5,13

23:4
  111:22

far
  16:24
  17:16
  18:2
  19:17
  21:5
  22:16
  28:21
  30:24
  37:7
  41:17
  43:14,20
  44:20
  48:9  52:7
  60:16
  65:1  72:2
  80:11
  83:5,6
  84:3  91:3
  96:6
  97:22
  98:7
  109:18,19
  112:25
  114:1,13
  115:13
  119:20
  121:9
  123:22

fast
  83:12,16
  119:10

faster
  83:18

fatal
  28:18

fatal-
funnel-
type
  28:14

February
  12:17

feel
  62:23

70:22
  75:2
  78:24
  86:11
  101:18

feeling
  100:11,17
  101:13,21

feels
  101:11,12

feet
  20:12
  67:24,25
  71:5
  74:19
  81:12
  82:24

felt
  79:4  82:9

female
  109:22

few
  14:14
  82:10
  83:2
  106:9

field
  12:22
  23:15

fight
  78:5
  104:20

figure
  82:11
  83:23

figured
  124:24

fill
  77:25

finally
  69:21

find
  41:4  46:4
  58:1

59:12
  87:13
  100:15
  102:18
  127:9

findings
  58:5

fine
  9:17
  62:22
  65:6

finger
  100:10,17
  101:1,2,
  15,16,18

fingers
  101:21

fire
  20:17
  81:17
  83:14
  90:3

firearm
  50:8
  88:16
  90:3
  98:12
  100:24
  101:4
  118:7,9

firearms
  18:18
  50:7
  51:11
  89:24
  91:9,21

firecrack
er
  71:15

fired
  107:10
  120:11

firing
  102:22



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **first** | **flashing** | 13:17,20, | 69:8 | 112:16 | 21:1,16 |
| 25:17 | 80:2 | 25 14:5, | 75:13 | 117:16 | 22:19 |
| 33:9,22 | **fling** | 9,11,21 | 76:11,12, | 120:8 | 23:14 |
| 45:5,6 | 69:24 | 15:6,10 | 13,25 | 121:3,14 | 30:17 |
| 54:24 | **flood** | 16:3,9,10 | 78:13,14 | 123:2 | 31:9 |
| 62:19 | 73:22 | 17:22 | 79:5 | 125:1 | 34:22,23 |
| 69:17 | **floor** | 18:10,17, | 82:10 | **formal** | 35:10 |
| 76:19 | 66:12 | 23 19:2, | 85:2,6 | 6:19 17:6 | 36:12 |
| 77:4 | **flophouse** | 3,17 21:7 | 87:2,17, | **formation** | 37:7 |
| 81:3,4 | 18:22 | 22:18 | 22 88:10, | 53:13 | 41:11,22 |
| 89:8 | 51:3 | 25:8 | 13,15,16, | 65:22 | 42:15 |
| 93:17 | 91:23 | 26:10,11, | 19 89:2, | **forth** | 44:19 |
| **fish** | **flopped** | 14,15 | 19,20,21 | 32:9 | 46:24 |
| 72:25 | 72:25 | 27:4,10 | 90:9 | 119:7 | 49:18,22, |
| 98:21 | **flush** | 28:8,22 | 91:6,7, | **fortifica** | 24 51:10, |
| **Fisher** | 88:23 | 29:2,18, | 16,23 | **tion** | 24 52:14 |
| 50:22,23 | **flushed** | 24 30:4 | 92:6,13, | 44:16 | 57:1 60:5 |
| **fist** | 89:3 | 32:1,15 | 19 93:4, | 45:22 | 61:9 62:2 |
| 100:21 | **focus** | 33:4 | 5,12 | **found** | 63:4,15 |
| **five** | 80:4 | 34:21 | 94:4,5, | 46:22 | 64:24 |
| 37:15 | **focused** | 35:13 | 15,21 | 58:6 | 66:3,6 |
| 90:19 | 31:15 | 36:25 | 96:22,24 | 88:13 | 67:25 |
| **five-** | 36:9 80:5 | 37:1,15 | 100:7 | 115:18,24 | 68:23 |
| **bedroom** | **follow** | 38:4,7,22 | 102:11 | 116:1 | 70:18 |
| 95:13 | 41:25 | 39:5,17 | 104:11,25 | **four** | 71:19,21 |
| **flash** | 52:7 | 40:14,16, | 105:14 | 14:9 | 72:6,7,8, |
| 71:24 | 113:25 | 25 41:2 | 108:5 | 37:15 | 9 73:17 |
| 81:16 | **follow-up** | 42:18,20, | 110:9,10 | **fragments** | 74:7 |
| **flash-** | 40:18 | 25 43:4, | 112:8 | 98:19 | 75:11,20 |
| **bang** | 41:2 51:5 | 22 44:15 | 113:17 | **frame** | 77:19 |
| 69:6 | 58:14 | 45:10,12 | 119:4,5 | 61:11,13, | 80:21 |
| 79:24 | **following** | 46:7,10, | 122:7,16 | 14 112:20 | 81:17 |
| 81:20 | 18:5 34:8 | 12 47:20, | 125:12 | 125:16,25 | 83:13,14 |
| **flash-** | 96:18 | 21 48:11, | 126:20 | **freedom** | 86:12 |
| **bangs** | 107:15 | 12,14 | 128:15 | 25:21 | 88:24 |
| 69:25 | **footprint** | 49:9,11, | 129:2 | **fresh** | 90:2 |
| 71:12 | 37:18 | 17 50:7 | **forced** | 63:6 | 96:8,9 |
| 79:2 | **for** | 52:12,14, | 116:9 | **Friday** | 97:18 |
| **flashed** | 5:20 | 19,20 | 117:10 | 11:10 | 98:3 |
| 81:7 | 7:10,14, | 54:12,13, | **forearm** | 15:18 | 99:14,22, |
| **flashes** | 21 8:11, | 21 55:3,4 | 73:3 | **from** | 24 100:5 |
| 71:21,24 | 16,19,23 | 58:15,21 | 97:13 | 8:6 12:5, | 108:3 |
| 72:20 | 12:10,23 | 59:2,4 | 100:5 | 18 13:7 | 110:6 |
| 82:20 | | 60:1 | **form** | 17:9 | 113:1 |
| | | 62:20,22, | 25:3,13 | | 114:17 |
| | | 24 63:17, | 44:6,9,11 | | 118:18 |
| | | 24 64:4, | 59:18 | | 120:18 |
| | | 20 66:13 | 96:3 | | **front** |
| | | 67:12 | | | 21:1 31:4 |
| | | 68:12 | | | |

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 146 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

35:4,11
41:8
65:24
67:22,25
75:17,18
76:5,16
78:8
80:14
85:20
99:18,22,
23 103:4,
12 107:3,
6 109:16

**full**
5:20
14:23
21:15
67:2,3
92:17
93:3,6,
10,14,17
102:11

**full-week**
14:17

**fullest**
7:3

**fully**
41:23

**funnel**
28:19

**fusion**
13:15,16

———————

**G**

**gang**
13:4,6,8
18:23
43:9 88:7
91:21,23

**gang-
affiliate
d**
19:5

**gas**
20:14,15
35:9,20,
21

**gave**
66:25
69:23
124:12

**gear**
65:5,7
103:7

**general**
30:4

**generate**
46:14

**get**
10:10
19:23
21:16,22
22:6,9,20
23:8,18
24:17,18
26:24
27:7,14,
23 28:11
32:7,17
34:18
35:14,24
41:9,10,
25 47:25
50:20
58:5
59:10,22,
24 60:9
61:3,19
62:5,17,
20 63:14
65:9,19,
20,21
66:21
68:1,18
71:1
80:20
82:24
84:18
85:20
96:16

114:25
125:3,6,
10

**gets**
39:21
46:12
47:16

**getting**
36:12
41:12
63:19
70:21
71:1
82:18
84:14,19
115:13
117:1

**ghost**
70:23
82:9

**give**
6:24 9:10
16:20
23:10
39:14
46:3
66:25
67:2
78:14
92:17
94:17,18,
20 106:12
110:5
119:18
124:6
126:23

**given**
6:11 8:6
14:6
23:17
77:1
84:17
110:11

**gives**
64:18
80:6

**giving**
16:11,12
67:11,25
94:6,7,8,
10 119:9

**glad**
27:13

**go**
8:24 9:9
13:2
22:8,11,
16,22
23:8,24
24:17
25:4,14
27:6,10
28:21
30:19
31:12
33:25
34:8,11
38:11
41:22
45:12,19
46:19
47:8 51:8
56:3,6,7,
15 59:3,
19 60:2,
14 64:19,
25 65:1
66:19
67:4,5
68:16
69:7,16
73:17,20,
21,22
75:21,22
78:8 79:9
90:16,17
93:16
96:4
98:19,20,
23 102:15
107:21
109:11
112:17
116:25
117:17

119:13
120:9
121:4
122:16,17
124:2
125:5,12
126:17,23
128:19

**goes**
27:8
32:11,19
65:2
69:11,13
101:22
114:7
116:3
119:7

**going**
6:16
11:14
17:22,24
18:2,12,
16,20
20:16,23
21:12,14,
19 22:1,
8,12
23:5,9
24:1,12,
13 27:15
28:11,15
30:14,21
31:3,11,
23 33:7,
22 34:4,
6,21,22
35:13
37:5,20
39:3
40:1,12
41:24
44:23
45:7,25
46:11,16,
20 49:23
52:7,25
53:1
55:3,4,5
57:20,23

58:4,24
60:2,9,10
61:6,14,
20,22,24
62:6
63:22,23
64:2,5,7
65:16,18,
25 66:1,
2,13,19
67:4,5
68:11,12
69:2,7,
18,19
70:1,5,
10,18
71:9,12,
16 72:20
73:11,16
75:11,21,
22 76:2,
10 77:19,
21 78:3,
5,6,7
79:2,12
80:4,8,
10,11
81:2,10,
20 82:4,
8,11,14,
20 83:7,
19 84:19
85:4
86:10,11,
15,16,19,
20 87:12,
18 88:17
89:19,20
91:22
93:13
94:9
95:5,6,
14,15,17
97:22,24
99:12
103:13
104:4,11,
17,20
105:11
108:13



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
110:2<br>113:1,12<br>115:12,15<br>116:13,22<br>118:18<br>119:10,<br>14,22,25<br>120:3<br>122:21<br>126:1,2,<br>10,16,23,<br>25 128:2,<br>4,6<br>129:11<br><br>**gone**<br>32:8<br>55:22<br>86:24<br><br>**good**<br>8:2 61:4<br>62:23<br>65:17<br>79:9<br>112:19<br>125:3<br><br>**got**<br>10:6<br>11:19<br>12:15<br>31:25<br>32:3<br>34:20<br>35:20,21<br>63:14,17<br>65:5,14<br>66:7<br>67:22<br>72:1,11,<br>18,19<br>74:19,22,<br>23 75:4<br>86:4<br>100:15<br>101:20<br>103:4<br>123:13<br>128:11 | **grabbed**<br>74:7,11<br><br>**grade**<br>32:12<br>115:4<br><br>**Graduated**<br>11:17<br><br>**grandma**<br>50:16,17<br><br>**graveyard**<br>12:25<br>13:1<br><br>**ground**<br>74:10<br>81:15<br>99:13<br><br>**guess**<br>9:1 57:11<br>67:24<br>71:4<br>90:25<br>101:10,24<br>113:13,22<br><br>**guessing**<br>9:12<br><br>**gun**<br>50:1<br>117:24<br><br>**guns**<br>18:24<br>28:6<br>45:16<br>48:10<br>49:12<br><br>**gunshot**<br>97:12<br><br>**gunshots**<br>71:9<br>120:11<br><br>**guy**<br>77:4<br>78:15<br>106:22<br>117:24 | **guys**<br>36:15<br>38:15,17<br>45:2<br>66:21<br>79:17<br>89:1<br><br>**guys'**<br>23:14<br><br>――― **H** ―――<br><br>**habit**<br>124:18<br><br>**hadn't**<br>39:16<br><br>**half**<br>69:8,10,<br>12,13,16<br>99:17<br><br>**hall**<br>73:21<br><br>**hallway**<br>28:16<br>70:8<br>78:16<br><br>**hammer**<br>100:19<br><br>**Hancock**<br>68:13,14<br>74:5<br>76:24<br><br>**hand**<br>52:5,25<br>70:24<br>74:8,9<br>100:23,<br>24,25<br>101:3,4<br>118:9,11<br>119:10<br>128:2,4<br><br>**handed**<br>47:4 | **handgun**<br>50:3,13<br><br>**hands**<br>73:9,10<br>74:8<br>100:23<br>117:25<br><br>**handwriti<br>ng**<br>54:6<br><br>**hanging**<br>73:1<br><br>**happened**<br>9:3 30:23<br>40:16<br>67:8<br>118:4<br><br>**happens**<br>32:9<br>63:11<br><br>**hard**<br>35:12,14<br>48:6 49:3<br>60:2,15<br>61:13<br>70:21<br>101:10<br>111:14<br>119:2<br><br>**harder**<br>61:7<br><br>**harm**<br>22:4<br><br>**having**<br>38:14<br>62:9<br>79:12<br>80:11<br>111:5<br>119:21<br><br>**head**<br>86:5<br>117:25<br><br>**health** | 102:9<br><br>**hear**<br>30:20<br>86:15,17<br><br>**heard**<br>22:19<br>23:13<br>49:25<br>73:12<br>78:18<br><br>**hearing**<br>31:9,15<br>49:24<br><br>**height**<br>81:12<br><br>**held**<br>12:15<br>67:23<br><br>**helmet**<br>103:6<br><br>**helmets**<br>65:8<br><br>**helped**<br>74:19<br><br>**here**<br>5:23 6:7<br>10:7,24<br>11:19<br>14:2<br>16:14<br>23:2<br>24:1,14<br>29:5,13,<br>20 30:18,<br>19 32:23<br>33:2<br>37:7,22<br>47:8<br>48:12<br>50:5,15<br>51:2<br>55:20,24<br>60:21,22<br>71:16<br>80:4,5,10 | 85:25<br>89:6<br>95:1,24<br>103:17<br>105:4,18<br>112:6<br>114:7<br>115:19<br>117:1<br>120:22<br>121:2,17<br>128:1,3,<br>15,17<br>129:3<br><br>**Hey**<br>22:25<br>23:24<br>24:13<br>30:18<br>31:12<br>62:24<br>72:21<br>74:5,16<br>85:24,25<br>103:18<br>114:2,6,<br>8,24<br>122:24<br><br>**high**<br>11:17<br>37:12<br>81:7,9<br><br>**highest**<br>11:16<br><br>**hindsight**<br>121:21<br><br>**hip**<br>98:18<br>101:7<br><br>**hired**<br>12:15,17<br><br>**hit**<br>26:8<br>33:23<br>61:25<br>67:21 |



Case 2:24-cv-00074-APG-NJK     Document 57-3     Filed 05/16/25     Page 148 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

68:10,12,
16,21,22,
23 69:2,
3,4
70:20,21
74:3,23,
24,25
75:2,3
79:5,11,
14 82:9
83:21
84:20
98:12,15,
16 99:3,
7,9,16,
18,19
101:25
102:1,2
119:13,16

**hitting**
62:2 69:5
86:18
118:23
120:1,2

**hobble**
74:13

**hold**
12:16
14:7
73:16
78:10

**holding**
14:3

**holster**
98:12
99:8,9

**Homeland**
12:4

**homicide**
18:17,25
27:6
33:24
43:1,2,4,
5 52:13
64:20
87:16

88:4,6
90:4
113:18

**honest**
9:4 24:11
44:8 48:6
51:4
77:12
88:2
90:13
105:22
106:17
126:21

**Hoskins**
34:2
35:2,5
67:18
68:9
69:20
76:13,24,
25

**hostage**
20:9
24:16
29:17,21
106:10

**hot**
100:17

**hour**
38:7 40:9
55:4

**hours**
7:23 11:7
15:21
16:2
40:11
57:25
59:4

**house**
63:12
81:22
95:6,13
125:19

**how**
7:21,22
12:5,9

13:7
17:3,15,
23 18:2
23:12
33:14,17
37:7 38:3
71:14
82:9
83:5,6
86:10
89:7,10
90:6
95:19
96:22
98:7
101:23
102:2
103:10
104:7
106:3
112:19
114:18,19
115:7
127:14,
16,21

**however**
43:7
57:15
61:6 91:7
122:1

**huge**
100:15

**hundred**
14:14
20:5 38:9
43:18,25
50:11
51:9
61:23
66:5,7
69:14
88:3,6,14
91:16
94:2
106:16
109:20,
23,25
111:8

124:1
125:4,24
126:8,17
128:16

**hundreds**
117:23

**hurt**
122:3
123:13,19

**hypothesis**
122:10

**hypothetical**
18:12
124:21

——————

**I**

**IAP**
27:17
31:18,25
32:3

**ID**
114:9

**idea**
103:20
104:24
105:1,22,
23

**identified**
110:1
127:18
128:8,9,
10

**identify**
94:20
108:22
109:8
125:6
128:11,13

**if**
6:18 8:20

9:2,6,9
15:14
16:18
17:1,17
19:7
21:24
22:15
23:16,23
24:5 26:3
27:4
28:6,16
29:8 34:9
35:16
36:2,3,8,
13 37:22
38:1,2,16
42:11,17
44:11,20
46:6,11,
17 47:1
50:17,19
51:4,6,7,
17 52:1
53:16
56:23,24
57:2,20,
21,25
59:12,21
61:3,11
62:14,19,
22,23
63:9
65:6,17
67:24
68:12,17
71:4,15,
17 73:19
76:11
78:2
79:4,5,8
80:3,5
84:18
85:5,7,23
86:17
88:23
91:17
92:3
93:9,12
95:5,12
101:8,19

103:18
108:19
110:15
111:16,
22,23
112:1
113:9,18
114:4,23
115:24
116:23
119:25
122:10,
14,23
123:23
124:5,9,
21 125:3,
4,10,24
126:12,
19,22
128:4

**illegal**
90:2

**illuminated**
70:9

**immediately**
34:8 73:5
76:22
102:14
118:20

**impenetrable**
61:6

**important**
25:17

**in**
5:18
6:18,19
11:18
12:4,9,
11,17
13:7,10
14:24
15:16,25
16:16



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 17:7,12,<br>17 18:11,<br>13,23<br>19:3,5,<br>16,20<br>20:4,7,8,<br>15,17,22<br>22:9,13,<br>15,20,22<br>23:2,7,<br>10,15<br>24:1,6,17<br>25:20,22<br>26:21<br>27:15,17,<br>20,23<br>28:12,15,<br>18 29:14,<br>23 30:4,<br>23 31:18,<br>20,23<br>32:21<br>33:14,17<br>34:25<br>35:3,15,<br>23 36:16<br>37:2,6,12<br>38:20<br>39:8,9,<br>15,17<br>40:16,18<br>41:7,8,<br>15,16,20<br>42:15<br>43:4,6,22<br>44:6,9,18<br>45:8 46:5<br>47:1,13<br>49:8<br>50:5,9<br>51:2,5,<br>10,11,14,<br>21,24<br>52:5,11<br>53:12,18,<br>20,23,24<br>55:20<br>56:8,25<br>57:7,12,<br>19,21,22, | 25 58:6,<br>20 59:6,9<br>60:11<br>61:17<br>62:24<br>63:6,12<br>64:5,9,21<br>65:21,24<br>66:22<br>67:10,18<br>68:7,11<br>69:1<br>70:1,3,8,<br>10,15,20<br>72:2,14<br>73:8,16,<br>24,25<br>74:1,24,<br>25 75:2,<br>15,25<br>76:5,16<br>77:15,16,<br>19,21<br>78:2,5,6,<br>7,12,19,<br>22 79:11<br>80:4,6,<br>10,22,23<br>81:2,3,7,<br>8,10,11<br>83:10,11,<br>22 84:3,<br>14,23,25<br>85:16,24,<br>25 86:3,<br>14,19,21<br>87:21,23,<br>25 88:18<br>89:1,15<br>90:2,9,<br>10,12,21<br>91:7,13,<br>15,18,22<br>92:23<br>94:8,10<br>95:12,23<br>96:2<br>97:16,24<br>98:1,2,<br>10,13,18, | 19,20,23<br>99:3,8,<br>10,13,16<br>100:5,7,<br>14,17<br>102:4<br>103:9,13<br>104:10,12<br>105:11,25<br>106:5,20,<br>23,24<br>107:3,6,<br>11<br>108:16,24<br>109:1,5,<br>16,17,18,<br>23 110:2,<br>15,23<br>111:5,11,<br>16,17<br>112:25<br>113:19<br>114:5,7,<br>8,9,19,<br>22,24<br>115:6,7<br>116:1,6<br>117:5<br>118:4,7,<br>9,10<br>120:12,15<br>121:12<br>122:15,16<br>123:14<br>124:11,13<br>125:13,19<br>126:1,10,<br>16 127:19<br>128:5<br>**inches**<br>97:18<br>99:4<br>100:6<br>**incident**<br>10:13<br>12:6<br>14:4,8,12<br>15:16<br>19:9,10 | 29:2<br>30:15,23<br>44:7<br>52:11<br>62:17<br>87:17<br>93:2<br>96:18<br>97:7<br>102:10<br>105:7,8<br>106:14,<br>19,21<br>107:15,<br>16,17<br>108:5,6<br>113:7<br>115:8<br>120:24<br>**incidents**<br>18:19<br>87:18<br>106:8<br>**incision**<br>98:25<br>99:1<br>**include**<br>110:14<br>**included**<br>108:18<br>**including**<br>85:21<br>**incriminated**<br>43:13<br>**indented**<br>99:20,21,<br>22<br>**independent**<br>33:15<br>**index**<br>100:10<br>101:1,15 | **indicate**<br>128:12<br>**indicating**<br>98:2<br>100:18<br>102:7<br>**individual**<br>25:18<br>112:11<br>**individuals**<br>108:20<br>109:9<br>110:16<br>127:11<br>**information**<br>40:19<br>43:21<br>45:4,7,17<br>49:17<br>54:16,21<br>57:1<br>58:10<br>62:9<br>111:2,3<br>112:24<br>113:21<br>**inhibit**<br>7:6<br>**initially**<br>76:5<br>**initiated**<br>68:8<br>**injuries**<br>97:1,10<br>**injury**<br>13:13<br>101:9<br>**inner**<br>98:6,8 | **inserted**<br>68:2,5,6<br>81:5<br>**inside**<br>17:20<br>30:12,19<br>31:12<br>35:21<br>52:4<br>71:11,20<br>82:3 83:7<br>86:6,11,<br>17 98:4,<br>18 108:20<br>109:22<br>110:16<br>116:7<br>117:6<br>**install**<br>125:18,20<br>**instance**<br>18:11,13<br>27:20<br>46:11<br>54:8 59:2<br>60:1<br>80:23<br>**instead**<br>84:16<br>**instructions**<br>6:15<br>**insufficient**<br>42:3<br>57:9,16<br>115:19<br>**intel**<br>39:7<br>43:21<br>45:18<br>**intended**<br>116:6<br>117:5 |

Kerry Kubla                     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**intent**
25:2,12
52:22
116:7

**interesting**
105:2

**internal**
47:17

**interrogatories**
8:11,19

**interrupter**
34:9

**intervene**
26:6

**interview**
8:5,6
10:19
107:21

**into**
10:10
13:3
14:22
15:5
21:17
22:8,14,
24 23:18
24:18
26:25
28:21
35:9
41:12,25
46:11
58:17
62:17
65:21
68:20
70:11,17
76:2
78:4,5,9
79:7 83:9
89:9 90:6
96:12,16
98:17

103:12,13
104:15
105:10,
12,15
110:25
117:23
118:8
122:2

**introduce**
79:7

**introduced**
86:19

**investigation**
43:16
52:7 88:8
114:1

**investigations**
52:15

**involved**
18:18
27:15,17
28:6
31:7,22
40:4,18
41:19
45:16
46:2 50:3
53:12
54:14
88:8
91:4,20
105:25
106:3

**involvement**
31:18,20

**involving**
18:19

**iron**
20:12

**irrespective**
127:20

**Isaiah**
6:9

**issue**
60:22,25
61:1,18
122:3

**issued**
54:13

**issues**
17:16
59:21
68:15
75:12

**it**
10:5,9
13:5,10
14:4,11
15:8
16:3,16
17:3,8,
10,13,14
18:1,22
19:10,13,
16 20:5,
8,13 21:7
23:4,12
24:9,25
25:10
26:8,9,
22,23
27:4
28:9,12,
24 29:9,
11,14
31:19,20
32:4,10,
11,17
33:11,17,
21,22
34:5,6,18
35:12,14,
24 36:5,
16,17,23
37:7,14,

17 38:2,
7,15
39:5,11,
12,13,16,
21 40:10,
25 41:4,
5,6,9,13,
22 42:2,
12 43:4,
8,9,10,
16,19,20,
24 44:12,
13,25
45:8,9,14
46:1,9,22
47:13,16,
23 49:3
50:9,11,
17,19
51:2
52:18
53:18
54:4
56:4,24,
25 57:14,
15 58:8
59:12,21
60:19
61:2,6,
13,23,25
62:1,3,
11,12,14
63:3
64:6,18,
21 65:7
66:5,7,20
68:17,22,
23,25
69:5,11,
12,15,22,
23 70:4,
22,25
71:5,14,
17 72:25
73:3,24
74:4,10
75:1
77:8,11,
12,16,22
78:9,10,

13,14
79:16
80:15,17,
18,20,23
81:2,8,
13,14,15
82:9,10,
12,15,16,
21,22
83:6,21
84:7,10,
17,23,24
85:5,6,7,
9,22,23
86:12,14,
17 88:4,
6,7,15,
18,21
89:10,12,
19 90:7,
14,24,25
91:23
93:1,7,24
94:4
95:1,8,9,
11,13
96:6,7
97:9,19,
21,23
98:2,3,8,
10,12,15,
16,20,25
99:13,16,
19,20,21
100:11,
14,16,18,
19,20,21
101:22,25
102:3,21
104:3,4,
7,16
105:13,16
106:12,
14,17,18
108:10
109:3
110:11
111:1,15,
19,20,21,
24 112:8,

20
113:12,22
114:19,24
115:9,16
116:1,3,
12,13,18,
19
118:10,
19,23
119:5,7,
10,16,17
120:5,16,
18 122:10
123:8,9,
11 126:4,
18 127:9,
16

**it's**
5:21 8:8
9:3 12:8
14:16
18:8
23:23
27:15
28:14
32:8,12,
17 37:11
39:16
44:11
45:25
46:1,15
47:19,20
48:6,8,9,
21 49:8
50:22
56:2,5
58:9 60:1
61:8
62:22
63:6
64:20
65:6
69:9,15
71:13
77:14
78:18
80:1,2,8
81:4,5,6,
7,11,14,

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 151 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

17 82:2,4
83:9,11,
18 84:24,
25 85:1
86:10
91:6
92:4,18,
25 93:17
95:6,12,
14 96:11
100:6,15,
18 101:8,
10,19,20
103:4
104:7
105:11
111:14
112:11,
12,19
114:18
115:7,12
119:2
121:17
123:7
124:18
125:10,
20,24

**items**
57:6
86:22
87:3,8,22
88:12,20
89:2
108:22
110:24

**its**
112:3,12

**itself**
7:18
56:1,25
62:17
87:4,22
111:23
112:2
127:24

———————————
**J**

**Jake**
33:19
35:2
54:11
64:11

**January**
12:7 93:3

**Jasper**
65:23
66:5
67:10,14
76:5,7,9

**jeopardiz
ing**
60:15

**Jimmy**
34:2 36:1
38:17,21
39:1,10,
11,24,25
40:14,25
48:13
49:4
53:17,21
54:21
63:18
64:1
108:22
109:6

**Jiyair**
74:18

**job**
25:22

**jogged**
10:13

**judge**
6:20

**judicial**
27:7
120:21

**just**

7:17 8:1,
7 11:19
13:22
15:9
17:7,9
18:12
22:22
23:9,25
24:12,19,
23 26:8
27:12,14
28:9,15,
18 29:10,
13 30:14
31:15
32:11,22
34:10
35:10,11,
24 36:23
37:11
38:10,12
39:2 40:9
42:15
46:3,5,7
47:2,25
48:17
49:16
50:5
51:1,18,
24 52:9
53:18
55:11
56:3
57:14
58:9,22
61:20
62:21,22,
25 64:19
67:15
69:18,22,
23 70:22
71:3,9
74:16
75:17
76:16
77:3,17
79:18
80:21
82:20
83:17

84:6,16
86:25
87:22
88:5,10
91:23
95:5,21
96:8
97:21
98:3,7
99:10
100:14
101:3,12
102:18
104:3,16,
20 105:14
110:5
111:19
114:14
115:16
118:13
120:1,16
125:16
126:23
127:6,25
128:5,22

**justify**
28:23

———————————
**K**

**K-9**
46:10,13
64:16

**K-E-R-R-Y**
5:21

**K-U-B-L-A**
5:22

**Kai**
34:2
35:2,5
67:17
68:9,21
69:19
76:13,24,
25 79:5

**keep**
22:7

37:17
40:1
41:11
65:16,18
69:18

**keeping**
21:15
61:8
65:17

**kept**
71:3
82:22
103:22

**Kerry**
5:21
9:15,17
11:14
16:6 17:1
18:4,10
27:3,13
46:23
47:12
53:5
55:11
62:18
82:6 85:4
95:20
111:19
113:4
124:15
127:6
129:2,10

**key**
67:20

**kick**
20:6
23:17,23

**kick-
through**
24:8

**kicking**
22:20

**kicks**
24:1

**kids**

49:8 57:7
59:13

**killed**
19:2
64:22

**kind**
7:17
8:17,18
10:10
12:13
13:4 22:3
27:5,12
30:14
31:22
32:4,5
33:14
34:14
35:10,24
36:11,18
45:1
49:21
60:19
62:13,16
63:5,9
69:23
70:18,25
71:5,6
72:9
73:3,17
74:10,15
75:21,22
82:7
83:21
84:6 85:9
87:11,21
97:8
100:18
108:9,11
114:3
119:7
120:16
127:10,
14,21

**kitted**
65:5,6

**knees**
73:6,9,11
74:8



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 152 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**knew**
50:1 64:5
68:25
82:18
87:8
102:22
103:18
105:13
109:19
112:24
123:23

**knife**
99:8,10

**knock**
18:6
26:16
27:16

**knock-and-announce**
16:7,8,
15,20
17:25
24:21
25:9 27:2
28:1
29:3,7
30:2
85:7,10
92:13
93:5
94:16
116:5,8,
16 117:9
122:11

**knocking**
21:5
30:16
90:20

**knocks**
16:10
119:11

**know**
7:19,21
8:8 9:11
18:9 19:4
21:7,14

22:15
23:3,12
28:5,11,
13,24
30:13,14,
15,18
32:18
33:13,14
36:2,3,8
37:22,24,
25 38:3
40:24
44:8
46:4,10
53:16
54:3,9
55:24
56:24
57:2,20,
21,22,24
58:1,3,6,
25 59:3,
11,16,20
60:10,16,
21 61:24
62:18
63:5
64:17,18
66:5
72:22
82:8
84:24
85:24
88:6
89:22
90:1,3,4,
8,25
91:5,15,
17 92:23
96:7,23
97:1,21
98:3,7
101:8
102:24
103:3,18,
23 104:4,
12,13,19,
21,22
105:11,14
106:7,16,

21 107:8,
9,24,25
108:3,6,9
109:1,21,
22 110:1
111:15,22
112:19,
22,23
113:2,9,
11,20
114:6,8,
10,13,14
115:4
116:23
120:12
121:21
123:8
125:4,19
126:2,8,
11,19
128:16

**knowing**
41:20
90:12
100:14
126:10

**knowledge**
18:4
24:20
50:24
89:7
105:5,19
115:6

**known**
18:22
39:20
41:16
50:14
57:9
89:23,25
90:1
91:8,20,
21 111:6

**KOZ**
34:1

**Kubla**
5:16,21

9:16
46:23
129:10

_____

**L**

_____

**L-SHAPE-TYPE**
71:7

**lack**
46:7

**land**
64:7
81:15

**landed**
67:10

**landing**
31:11

**language**
17:6
110:6

**lap**
117:24
118:7

**large**
90:23
95:6

**Las**
7:11

**last**
69:22
106:18

**later**
42:1
56:14
100:14

**Latia**
5:18

**Laughlin**
106:20,23

**law**
6:19
88:18

92:12,13
94:15
96:2,13
111:22

**lawsuits**
107:12

**lawyers**
47:17

**laying**
74:9
75:12
85:23
99:16

**layout**
127:23

**lead**
65:25

**leader**
22:10,11
33:19
35:1
54:11,14
64:11
65:2

**leading**
66:10
93:2
105:6,7

**learn**
105:9

**least**
14:15
40:11
99:11

**leave**
76:25
96:18,25
119:19

**leaving**
24:13

**left**
13:12,18
35:8,25
45:7

48:7,11
63:12
64:23
70:12
74:24,25
75:20
76:10
97:12
98:22
99:5,7
100:3,23
101:3,4

**leg**
73:8
75:3,9
98:9,11,
18 101:11
102:7

**legal**
85:6

**less**
39:1
79:12

**let**
14:7
22:18
23:9,21
94:11
97:4
105:16
109:3

**let alone**
115:20

**let's**
23:12
62:16
87:21

**lets**
46:10

**letting**
30:12

**level**
11:16
32:13,14



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 153 of 177

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**Levi**
68:13
74:5
76:24

**lieutenant**
32:13

**life**
59:5,11
123:14,15

**lift**
74:19

**lifted**
73:4

**light**
13:16
68:24
70:9
124:9

**like**
8:17,18
12:14
13:3,5
14:21
17:7,9
18:6,11
21:17
22:3,25
23:4 24:2
29:16,17
30:15
31:10
37:8,10
38:19,20,
22 39:5,
11 40:8,
18 41:17
42:25
43:18
44:5 45:1
46:5,10
47:20
49:1,8,9,
24 50:12,
17,24
51:19
57:5,6

59:2,5
60:1
62:12,24
68:15,24
70:22,23,
24,25
71:1,6,12
72:12,15,
17,21,25
73:5
74:9,10,
13,16
76:16
77:23
78:10
82:13,15,
19 83:2
85:9
86:2,7
87:11
90:8
91:6,11,
15,20,25
97:23
98:14,24
100:7,18,
20 101:8,
9,11,12,
19 103:8
104:6,7
105:3,8
106:4
107:3,24
108:9
109:16,
19,21
111:21,23
112:22,25
113:23
123:8
124:16
125:15
126:20
127:19
128:11

**likelihood**
81:10

**likely**
37:12
46:19
61:12
69:2

**limited**
58:22

**line**
20:17
53:13
65:22
94:8

**lineup**
45:24
53:11
54:10
66:2
76:16,23
77:21
78:19
128:17

**list**
44:14,17
48:14
51:21
66:4
114:2

**listed**
44:18
45:14,15,
16 48:8,
9,10
49:14
53:12,14
57:6
113:17
128:1,20

**listen**
54:6 56:5

**listing**
108:16

**lists**
46:1

**literally**
73:23

82:13,17
107:2

**little**
7:18
22:4,5
24:9
29:11
31:2 33:8
39:21
41:24
46:8
47:13,16
49:3,22
51:19
55:4
61:7,24
62:24
63:15
64:15
66:7
68:24
75:23
77:8,16
82:6
83:18,20,
21 84:7
86:10
94:11
95:6 97:4
105:16
109:3
110:21
111:19
116:12
124:15
127:7

**living**
123:13

**load**
65:12

**loaded**
75:19

**located**
17:17
107:7

**location**
19:21

34:23
35:4
63:24
65:10,11,
15,19
72:7
80:17

**lock**
79:8

**locked**
114:5

**locking**
61:8,10
68:16

**lodged**
97:24
98:2

**long**
7:22 12:9
17:23
28:16
38:3
43:19
77:22
78:23
83:6
85:23
89:7,10
90:6,15
96:7,22
119:4,15

**longer**
21:5 29:7
95:15

**look**
8:17,18
9:3 29:11
35:24
37:8,15
44:24
61:19
66:4,8
76:23
105:12
125:3,13
126:18

**looked**
39:11
57:5 63:3
72:24
87:4
110:21

**looking**
13:25
18:17
19:3
31:16,19
35:23
37:4,6,9
42:25
47:2 60:5
76:11
88:13
91:7
128:14

**loop**
22:18
84:6
120:17
122:21

**lose**
110:2,3

**losing**
60:16

**lost**
78:25
100:9
118:20
123:14,15

**lot**
14:18
17:23
18:16
19:8
20:16,23,
24 21:4
22:19
28:7,20
37:19
38:20
39:8,10,
16,17
40:4,5



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 154 of 177

Kerry Kubla                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

41:10
42:4,13,
15 58:17
59:10
71:11,13
90:19
91:23
95:18
97:21,22
98:17
100:1
101:5,7
113:15
114:7
115:5
121:5,20,
22 126:7

**loud**
22:3
84:24,25
86:14

**low-
lethal**
46:21

**LVMPD**
29:6
32:23
33:4
47:6,9
48:19
110:20
116:10
120:20
121:11
127:13

---

**M**

---

**ma'am**
6:2,10,
13,22
7:1,4,8
8:21 9:8,
14,17,21,
24 10:1,
4,16,20,
23 11:2,

13 12:8
14:10,14
15:2,20,
23 16:5,
17,23
18:8
23:20
24:4
25:15
26:2,7
27:8,9,
19,22
29:4,8,
16,22
30:24
31:21,24
32:2,7
36:20
37:25
38:13
39:25
40:15,21,
23 42:10,
21 45:4
46:9
47:24
48:4,19,
24 49:7,
21 52:17,
24 54:23
55:2,16,
20 56:8
60:23
62:15
63:2,8
76:6
83:25
87:6,9
96:20
106:2
107:13
111:4
117:7,12
120:10,25
127:25
129:6

**made**
58:9 60:3
70:6

77:20
89:9
103:16
116:9
117:11
118:3

**magnet**
60:7

**magnets**
124:18

**main**
61:1

**make**
16:10
21:21
22:11
23:2
24:1,7,15
26:18
37:19,21
52:9 54:5
60:20
66:18
68:19
70:5 79:9
83:8
86:25
93:19
98:25
99:1
100:21
103:12
122:13
124:4
128:6

**makes**
54:3

**making**
8:8,9
16:11
21:13
25:8
26:17
31:5 72:5
73:20
80:16
83:10

93:14,15
114:13

**male**
109:21

**man**
126:4

**manual**
110:8
118:22

**manually**
22:12

**many**
7:21
17:15
29:24,25
101:23
102:2

**mark**
6:3 34:3
35:2,5
47:18
53:1
128:22

**marked**
6:5 53:3
128:24

**marksman**
104:6

**math**
14:7

**maybe**
7:23
13:18
20:25
22:1
34:17
44:24
71:4,5
79:1
82:23

**me**
7:13 8:4
9:5 10:7
12:13

14:5,7,11
16:6
17:2,7,8
18:9,10
21:6
22:18
23:21
25:23
27:4,9
30:25
31:2
34:10,18
36:13
38:16,22
40:13
46:3 49:5
53:6
58:25
60:7
62:21,24
63:1,5,9,
25 65:24
67:7
70:18
72:3,8,16
73:6,8
74:3,7,
12,13,15,
17,19,23
75:19
76:5,17
79:4
82:10
84:1
85:11
94:11,25
97:4,10
101:25
105:15,16
107:3,6,
25 108:1
109:3
110:5
119:5
126:23
127:15,22
128:17

**mean**
14:15,20

16:7
33:13
38:24
49:21
59:1
79:23
82:12,13
84:24
96:23
102:25
104:10
106:4
119:2
121:5,20,
23

**means**
26:21

**meant**
16:15
23:11

**mechanism**
61:9,10
68:16

**medical**
75:5,15

**medications**
7:5

**meet**
65:10,11

**meets**
93:4

**member**
26:5

**members**
18:23
26:1
91:24

**memory**
10:14
63:6 89:7

**mental**
102:9



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 155 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**met**
7:17,21,
23

**metal**
98:14
125:23,
24,25
126:1,11

**Metro**
11:24
12:14

**middle**
17:17
97:13
99:4
101:1,2,
16,18

**mind**
17:1 37:6
47:1 69:1
70:2
72:14,16
79:11
91:15,16
116:1
119:20

**mine**
54:7

**minimal**
37:18

**minimum**
18:6
24:20

**minute**
27:23
47:2
75:13
126:23

**minutes**
32:10
125:19

**missed**
61:17

**missing**

128:5

**mission**
60:16

**mistaken**
36:19

**misunders
tand**
36:14

**mitigate**
17:23

**mitigatin
g**
16:24
17:2 28:7
89:22
90:5 91:2

**moment**
46:3

**money**
98:14

**month**
50:18

**months**
19:1
64:21
98:24

**more**
22:4,5
23:21
31:2 36:4
37:11,23
40:4,7
46:19
58:13,14,
17,21
61:12
69:2
82:24
84:17
95:2,7
98:20
113:11,23
114:1,21,
25 115:5
116:13

119:18
124:6

**morning**
15:25
20:23
64:9

**Mosa**
7:11

**most**
25:17
69:3
81:10
104:10

**move**
83:10,16

**moved**
39:16
67:14,19,
20 71:1
124:13

**moving**
72:15
82:22
83:12,13,
14,15

**MP5**
50:11

**Mr**
5:16
25:3,13
47:5,8
59:18
80:24
85:11,19
86:7 96:3
102:22
105:5,9,
19 112:16
117:16
120:6,8
121:3,14
123:2
125:1
129:8,14

**MS**

5:15 6:3,
6 25:7,16
47:11
53:4
55:3,10
60:18
96:10,16,
21 112:18
113:3
118:17
120:14
121:10,16
123:4
125:8
126:22
127:5
128:22,25
129:1,7

**much**
13:25
23:17
32:17,18
54:6
58:20
86:17
101:5,18
103:10
114:21
129:2

**multiple**
18:18
31:23
51:15
84:20
100:14
107:8
118:23
120:11

**Murphy**
5:15,16
6:3,6
25:7,16
47:11
53:4
55:3,10
60:18
96:10,16,
21 112:18

113:3
118:17
120:14
121:10,16
123:4
125:8
126:22
127:5
128:22,25
129:1,7

**muscle**
98:10

**muzzle**
71:24

**my**
5:16 6:24
7:3 8:5,6
10:6
11:4,9
12:22
13:19
27:3 29:1
37:6 43:5
44:23
52:17
55:20
58:8
63:12
69:1
70:2,10,
11,13,23,
24 72:14,
16,22,23,
24 73:3,
4,6,8,9,
10 74:8,
9,10,11,
14,19,24,
25 75:2,
3,9 76:16
79:11
83:20
87:10
91:15,16
96:8
97:12,13,
14,18,19,
20,25

98:6,8,
11,12,13,
18,24
99:4,5,7,
9,19,23
100:5,9,
10,23,24
101:1,2,
3,4,11,
15,16,25
102:3,4,7
103:3,19
105:11
115:3
119:20
126:24
129:5

**myself**
34:1 35:2
42:12
66:5
78:24

_____

**N**

_____

**Nah**
115:24

**name**
5:16,20
39:14
57:21,23

**named**
107:11

**names**
8:16
127:21

**narcotics**
90:21

**nature**
28:4
83:11

**necessari
ly**
79:16
80:13



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**need**
9:10 23:1
25:6
26:12,16
39:4
63:23
73:18
78:13
95:6
102:19
113:11,
16,23,25
114:25
115:1
123:9

**needed**
33:21,25
35:7
41:11
65:8

**neighborh ood**
37:16
41:12
123:15

**neighbori ng**
20:7
21:18
23:8
30:17
86:15
104:13,15
122:2

**neighbors**
30:12

**Nellis**
20:21
34:3,14
36:4,23
37:1,3
40:14,17
42:4,5,20
48:13
49:2,4,9,
20 53:7,8
54:25

56:21
108:17
109:5
110:18
124:23

**nerve**
97:22
100:1,9
101:5,9,
10

**Nevada**
7:12
11:22
92:13
94:15

**never**
54:2
101:22

**next**
12:24
23:19,25
34:24
45:18
53:9
80:24
118:8

**nice**
41:4

**nicer**
54:6

**night**
33:11
54:15
59:5

**nine**
69:16
89:13
92:4
93:24
94:3,5
125:17,25

**nine-bang**
69:7
81:19
82:2

**no**
6:13 7:1,
8 9:5,12,
21,24
10:16,23
11:2 15:2
17:18
19:23
24:20
28:16
29:6,8,
20,22
30:7,10
31:17,19,
21,24
32:7
34:11
35:13
37:4
38:11
40:21,23
42:10
49:9
54:10
55:2,20
56:8,18
57:7 76:9
77:13
83:6
85:15
93:9
100:10,
11,17
101:17
102:15,17
103:20
104:9,16,
24 105:1,
6,10,22,
23,24
106:2
107:7,13
113:6
117:3
120:10
122:7,20
126:21
129:8,14

**no-knock**

25:5
26:9,10,
12 27:2,
5,16,25
28:8,21,
22 29:9,
15
116:22,23
117:1
120:20
122:8,16,
25

**nobody**
24:1
76:20
81:10
124:5

**noes**
49:15

**noise**
22:3 69:6

**noise-flash**
22:2 68:4
80:1

**normal**
9:3 11:4
16:1
17:11
84:3

**normally**
32:7
37:10
51:21
103:10

**Northeast**
12:21

**not**
6:19,23
7:19 8:15
9:3 14:16
18:11
20:2
22:22,25
23:9,11,
22 24:13

25:6,24
26:16
27:15,16,
17 29:8,
18 30:11
32:24
33:4
34:10,16
36:8,9
37:25
38:9,25
40:14
42:6,10,
19 43:6,
9,18,25
44:2,6,
11,20,23
46:16
50:10
52:1
53:23
56:18
57:3,20,
22,25
58:4,5,9
59:7
60:2,9
61:5,13,
22 62:9
65:10
66:7
69:14
72:4,8
77:12
78:3,6
83:17
84:25
86:16
87:1
88:3,14
89:25
90:11,12
91:18
93:15,17
95:15
96:7,24
100:9,14
101:18
103:18
104:10,22

105:7,11,
14 106:2,
16 107:10
108:5,7
109:5
110:11,19
111:6
112:7,11
114:14
115:3,12,
14 116:1,
10 117:3,
19 119:9
120:10
121:18
125:11,
18,20,23
126:9,16
128:1,10

**notes**
126:24

**nothing**
11:18
72:17
84:20
85:16
86:1
87:23
105:14
120:2

**notice**
6:1 25:1,
11 77:12
85:6,7

**noticed**
60:10
70:20

**notified**
33:20

**November**
64:21

**now**
11:14
14:16
20:6
26:17

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

33:7
44:1,19
46:7 48:2
51:19
61:11
77:24
100:11
111:5
114:3,8
115:5,12
116:13
119:25
126:12

**nub**
74:10

**number**
45:9,10,
20,21
47:4,8,
19,20,23
75:25
76:2
112:2

**number-
one**
66:1

**numbers**
47:19

**numerous**
110:13
112:9
118:4

―――――――

O

**o'clock**
11:5
15:25

**oath**
6:16,18
7:17,19,20
9:9 55:12

**Object**
59:18

**objection**
25:3,13

96:3
112:16,19
117:16
120:8
121:3,14
123:2
125:1

**obligated**
16:9

**obvious**
123:8

**obviously**
21:4 31:5
61:17
64:16
70:9 72:2
73:12
83:15
84:18
94:20
97:23
100:2
104:9
108:10
118:1

**occupants**
45:15
109:18
115:20
116:6
117:6

**occupied**
123:18

**October**
129:11

**odd**
37:15

**of**
6:1,8,16,
17,19,20
7:3,15,18
8:11,17,
18 9:19,
22 10:2,
10,22
11:11,16,

18 12:6,
13,18,25
13:5,10,
23 14:4,
6,8,12,
18,25
15:14,16,
24 16:15,
19,21
17:10,12,
13,23
18:1,5,7,
10,14,15,
23 19:1,
5,8,9,10,
11,13,24
20:3,12,
13,17,20,
23,24
21:1,2
22:1,3,19
23:14,16,
18 24:10,
20,25
25:2,10,
11,25
26:1,5
27:5,12,
17,20
28:2,4,7,
20 29:1,
5,6,20
30:11,14
31:22
32:4,6,24
33:3,4,
10,12,14,
16,24
34:14,16,
20 35:10,
24 36:2,
5,11,18
37:11,12,
15,19
38:19
40:3,5,7,
12,16,22
41:7,8,13
42:2,4,7,
13,17,18,

19,22,23,
24 43:23
44:12,13,
25 45:1,
3,8,19,
20,21
46:8,24
47:1,7,15
48:7,14,
15 49:8,
18,22
50:1
51:14
52:11,21
53:6,7,
17,19,22,
23 54:1,
16,19,20
55:13
56:7,10,
13,20,21
57:7,12,
13,19
58:1,12,
16,19,23
59:5,10,
11,16
60:3,19,
24 61:9
62:1,12,
13,17,19
63:5,9,
10,18
64:1,2,
10,13
65:5,23,
24 67:2,
5,16
68:24,25
69:23,25
70:2,7,
18,24,25
71:6,8
72:1,3,4,
5,9,10,
11,18,21
73:3,13,
17 74:10,
15 75:11,
17,21,22

76:5,10,
16 77:24
78:1,20
79:7,24
80:7,19
81:7,9,
12,18,21,
22 82:1,
7,14,24,
25 83:3,
21,22,24
84:3,6,8,
9 85:5,8,
9,10
86:1,21,
22,24
87:7,10,
11,21,22
88:20,24
89:17
90:6,14,
19,22
91:1,23
92:5,6,
18,19
93:7,9,13
94:4,18,
21,24
95:4,9,
11,16,25
96:8,11,
17,25
97:8,13,
14,20,21,
22,23,25
98:2,3,9,
11,17,24
99:4,11,
18,19,22,
23 100:1,
9,18
101:5,7,
8,25
102:16
104:7,24,
25 105:5
106:11,13
107:3,6,7
108:8,9,
11,13,16

109:5,16,
19 110:2,
3,10,12,
13,22,23
111:12,
20,24,25
112:2,9
113:15,16
114:3,7
115:9,13,
16 116:4,
7 117:1,
9,19,23
118:18,21
119:7,19
120:15,17
121:5,7,
20,22
124:10,13
125:12,
17,25
126:7
127:10,
14,19,20,
21,22,24
128:13
129:10

**off**
11:9,11
14:18
15:14,19
19:22
31:8 52:6
55:5
65:20
67:4,5
68:3
69:7,8,
11,13,19
70:1
71:9,25
75:5,6
79:21
80:3,11
81:7,20
84:19
86:19
96:19,22,
24,25



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

97:2
99:9,22
102:12
104:4,17
108:16
109:11
119:22
120:1
126:25
129:11

**office**
75:18

**officer**
9:16
11:25
12:21
17:16
25:23
26:6
46:23
53:11
54:10
63:16,20
66:15,16
68:13
83:4,24
85:8
89:16
106:4,5,
21 123:13

**officer's**
25:2,12

**officer-
involved**
6:8 106:1

**officers**
9:20,23
22:19
23:15
26:4
28:15
33:25
36:3,17
37:23
40:17
49:18
53:12

54:13,18
64:15
66:10
73:14
85:21
87:16
88:22
95:23
102:23
106:24
107:2,6
118:20
126:20
127:19,
20,23
128:12

**officers'**
10:3

**oftentime
s**
47:14

**on**
7:18 8:9
9:10 10:6
12:6,11,
17,24,25
13:4
14:7,18
15:12,14
16:10,21
17:24
18:15
19:11,18,
19 20:3,
12,21
22:5
24:5,9,
15,23
25:5,9
26:8,12
29:2,7,8,
11,24
30:14,15,
22 31:3,
10,11,15
32:9,11
33:2
34:7,13,

16 36:9,
10,18,19
37:3,14,
17 38:9,
10,12,17
39:12,14,
22 41:13,
22 42:1,
3,10,12,
14 43:6,
19,23,24,
25 44:1,
2,4,19
45:3,16,
22,24
46:2,9,
14,16,17,
18,19,20
47:8,25
48:7,8,9,
11,12,15,
23 49:11,
16,19,23
50:13
51:8,18,
22 53:14,
22 54:8,
24 55:8,
17,19
57:17,24
58:5,8
59:4,9
61:2,4,5,
12,25
62:3 64:1
65:5,7,
14,18,22,
24 66:8,
9,13
67:18
68:19,22
69:11,16,
22 70:5,
10 71:1,
12,22
73:9,11,
15 74:8,
10 75:7,9
76:18
77:18

78:12,20
79:9,11,
22 80:3,
11,17
81:15
82:8,11
83:3,7,8,
21,23
86:16,18,
22 87:10,
15 88:2,
5,20
89:7,18
90:13,14,
17,22
91:22
93:1,2,
13,16
95:1,16
96:13,17
97:14
99:5,7,8,
13,20
100:3,11,
15,16
101:19,21
102:22
103:4,5,
19 106:17
108:12
109:7
110:1
112:11,14
113:14
114:1,9,
15,22
115:22
116:3,15,
18,20,23
117:24
118:3,6,7
119:9,11,
14,18,21
120:3,12,
13 121:7,
24
122:18,21
123:21
124:3,9,
10,22,24

125:14,21
126:1,5,
16 127:3,
14
128:15,
16,17,21
129:10

**on-scene**
106:6

**once**
7:23
21:19
26:17
32:17
40:2 65:4
66:21
67:22
72:1,11
73:10
74:22
99:3

**one**
6:16 7:23
11:11
12:16
14:24
15:5 17:5
18:15
23:6
34:7,21,
25 40:25
41:21
46:2
48:12,22
49:2,25
53:7,14
54:1 57:7
62:19
63:22
64:1,2,13
65:22
68:3
69:2,9,
17,22
71:18
75:12,25
76:2,7
80:7

81:3,4
82:2,14,
17 83:1
88:3
97:21
102:4,5,6
106:9,10,
19,20
108:8
109:6,14
110:5
111:20,23
119:8
124:17
125:19
126:12

**one-
bedroom**
95:16

**ones**
99:24

**only**
6:15
15:13
20:2,14
30:12
77:18
83:16
89:25
120:19
128:20

**onto**
65:13
75:19

**open**
28:12
41:10
68:18
69:3,22,
23,24
79:8
92:24
93:25
94:5
119:17

**opened**
70:12

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 159 of 177

Kerry Kubla                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

93:23
94:3
119:12,17

**opening**
72:9

**operate**
100:20,23

**operation**
37:14
110:3
123:5

**operators**
46:1
58:19
72:3
73:25
110:9

**opinion**
25:20
29:23
30:5
89:15
96:8,11
112:8,14
113:14
116:15

**opinions**
108:15

**opportuni
ty**
5:25
16:13,21
64:19
116:8
117:10,15
129:5

**option**
45:25
46:21

**options**
22:16
62:4,6,7

**order**
29:14

**other**
9:18,19,
23 10:3,
25 15:14
16:21
18:19
19:4,11,
14,15
20:20
21:25
22:22
23:18,24
26:3
28:16
31:19
36:3,17
37:23
40:17
41:5,17
43:10
45:12,14
48:13
49:18
50:15,18
52:14
58:2
60:5,8
65:20
66:14,21
67:19
69:5 72:3
73:14
75:12
76:18
81:24
82:2
87:18,25
88:12
89:22
91:19
101:21
103:13,21
104:19
106:1,5,8
107:11
109:18
112:24
114:15
119:10
120:13

123:14,
16,17,24
124:10,18
129:4

**others**
18:16
44:14
46:10
49:14
60:13

**our**
14:18,22
15:4,21
19:16
21:16,21
26:21
27:11
32:12
34:22
35:1
43:23,24
44:1
45:23,24
53:10,11
59:6 62:6
65:5,7,8,
10 66:18
68:19
80:11
91:3
94:17,18
95:21,22,
23 106:11
119:21

**ourselves**
30:11
94:20

**out**
15:14
17:12,17,
24 18:23
19:5
20:17,18,
23 21:16,
21,23
23:8
28:18
30:13,16,

18,20,21,
22 31:6,
10 32:19
34:1,19
35:20,21,
22 36:8,
15 37:13,
15 39:8
41:4 43:8
46:12,19,
24 49:5
51:2
58:2,13
59:2,3,12
60:3,17
62:8
66:24,25
67:2,11,
13 68:18
70:5,17,
24 72:20
73:12,14
74:3,5,6,
20 75:13,
16 76:12,
20,21
77:24
78:2,14
79:3,13
80:20
81:24
82:11
83:23
85:23
86:3,4,5,
10,16
87:8,21
92:17,22
97:14
98:9,11,
21 99:12,
15 103:6,
11 104:20
106:15
107:1
109:12
110:22
112:22
114:4,25
119:8,19,

24 121:25
122:2
124:24
125:5,17,
25 126:7

**outcome**
111:24

**outer**
98:9

**outside**
16:1
17:15
37:8
71:12,18
78:20
80:3,14
81:20,21,
25 84:25
85:1
86:12
98:11

**over**
7:15 8:5,
7,24
12:23
13:2,8
21:21
23:13
35:23
37:13
39:2,4,
12,15,17
40:12
41:18,19
45:19
47:2
49:25
50:17
51:2,6,7,
8 55:22
56:3,4,6,
7 57:5
63:13,17,
19 64:3,
7,12,19,
25 65:1,
2,12,15
66:10,13,

22 67:9
69:9 70:1
71:23
72:1,11
76:15
80:5,6,
10,12
82:18
86:24
95:5
110:21
126:23
128:1,3

**overall**
95:5
115:11

**overly**
119:3

**overwhelm**
84:12,16
116:6
117:5,14
118:22

**overwhelm
ed**
77:23
118:14

**overwhelm
ing**
79:1

**overwhelm
ingly**
90:23

**own**
9:18
46:14
55:25
112:3,12
126:5

_____

**P**

**P-A-U-L**
5:22



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 160 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

p.m.
  11:6
  15:18,22
  127:1,4
  129:12,15
PA
  21:21
pace
  83:14,18
package
  53:13
  65:11
page
  45:4,5,6,
  7,17,23
  47:4,7,
  17,20,22
  51:18
  53:5,9,11
  54:16,24
  56:7
  88:24
  111:2,3
pages
  46:24
  47:15
  56:5
pain
  70:22
paper
  29:11
  39:22
papers
  63:14
paralleled
  72:10
parameter
  97:1
parameters
  18:10
parcel
  75:22

87:21
park
  19:20
  20:15
  41:7
parked
  39:8,15,
  17
parking
  20:16
  38:20
  39:8,9,16
  41:6,10
  42:15
part
  16:19
  19:13
  23:14
  24:25
  25:10
  27:20
  40:22
  42:2,7,
  17,18
  54:19,20,
  22,25
  57:12
  62:12
  63:18
  83:22
  84:8
  86:21
  87:7 90:6
  98:2
  103:19
  111:11
  115:7,9,
  16 116:6
  117:5
  118:18
partial
  53:19
  72:4
particular
  19:18

parts
  37:20
  56:5,6
passed
  75:13
past
  10:13
  71:3
patch
  103:5
patches
  103:4
patrol
  12:20,21
patterns
  59:5,11
Paul
  5:21
pay
  115:4
PC
  43:6,22,
  24 44:2,
  3,6,19,
  20,21
  46:8,9,
  12,13,14,
  17 48:2
  51:19,22
  52:1,12,
  14 87:17
  88:5
pen
  128:2,4
penalties
  6:20
people
  16:20
  17:15
  20:24
  22:20
  24:6,11
  37:12,13
  38:21

78:20
90:16
100:13
104:10
105:10
118:8
123:14,16
per
  44:11
  118:22
percent
  12:25
  24:4 38:9
  43:18,25
  50:11
  51:9
  61:23
  66:5,8
  69:14
  84:5
  88:4,6,14
  94:2
  106:17
  109:21,
  23,25
  111:8
  124:1
  125:5,24
  126:9,10,
  17 128:16
perfect
  36:24
  80:7
perform
  58:3 60:6
performed
  110:4
performing
  25:22
perimeter
  21:15,17
perjury
  6:20
person

16:20
23:18
46:14,18
50:7
78:13
84:3
90:18
92:21
111:16
114:6
person's
  25:1,10
personally
  36:16
  37:4
pertinent
  113:21
Pets
  44:17
phase
  40:12
  54:12
  65:1
phone
  50:16
  55:20
  115:1
photo
  53:6,7,24
  57:5
photographs
  99:15
photos
  40:5
  55:22
  63:4
  110:22
physically
  28:10
  77:11

picked
  42:14
picture
  48:7,8
  53:16,17,
  18,23
  54:1
pictures
  38:19
  44:12,13,
  25 99:14
PID
  115:1
pieces
  98:17,18
pin
  115:1
pistol
  50:12
  100:24
place
  17:18
  19:1
  20:14
  21:24
  51:14
  59:9
  109:24
  113:7,20
  114:6,10
  124:7,11
placed
  96:17
  124:3,12
places
  59:15
plaintiff
  5:17
plan
  22:2,11
  26:22
  40:6
  43:23,25
  47:1



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 161 of 177

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 48:16<br>61:23<br>63:18<br>65:2,3<br>66:25<br>67:7<br>68:10,11<br>79:4<br>110:22<br>121:7<br><br>**planned**<br>16:3<br><br>**planning**<br>40:5,12<br>54:12<br>65:1<br><br>**plans**<br>18:2<br>44:1,4<br>123:24<br><br>**please**<br>5:19 6:4<br>7:9,13<br><br>**plenty**<br>41:7<br><br>**pocket**<br>98:14<br><br>**point**<br>17:10<br>22:9<br>23:14<br>62:23<br>66:23<br>71:10<br>73:7<br>74:18<br>78:7,9,10<br>82:22<br>84:22<br>85:16<br>93:19,22<br>105:3<br>111:21<br>114:19<br>118:13<br>120:5 | **pointed**<br>86:9,10<br><br>**pointing**<br>49:5<br>118:10<br><br>**points**<br>24:18<br><br>**poking**<br>31:10<br><br>**pole**<br>81:14<br><br>**police**<br>11:25<br>25:2,12,<br>23 26:19<br>93:20,21<br>102:23<br>103:1,4,<br>5,11<br>118:16<br>128:12<br><br>**policies**<br>32:23<br>33:3,4<br><br>**policy**<br>29:6<br>32:21<br>110:20<br>113:10<br>116:10<br>120:23<br>121:12<br><br>**policy/<br>training**<br>110:19<br>111:11<br><br>**position**<br>11:23<br>12:8,10,<br>11 13:12,<br>19 14:3<br>21:4<br>65:14<br>66:22<br>67:10 | 72:12,13,<br>19 73:16<br>89:7 92:4<br>93:1<br>102:21<br>112:14<br>115:22<br>127:8<br><br>**position-<br>wise**<br>13:25<br><br>**positioni<br>ng**<br>127:20,22<br><br>**positions**<br>12:15<br>65:21<br><br>**positive**<br>114:9<br><br>**positivel<br>y**<br>110:1<br><br>**possible**<br>37:18<br>58:10<br><br>**possibly**<br>90:1<br>93:24,25<br><br>**post**<br>45:3<br><br>**potential**<br>38:19<br><br>**pounds**<br>74:14<br><br>**power**<br>57:21<br>62:22<br><br>**practice**<br>125:10<br><br>**preapprov<br>al**<br>120:21 | **prefer**<br>9:15<br><br>**prepare**<br>7:14 41:2<br><br>**present**<br>52:16<br>108:20<br>110:16<br>115:19<br><br>**pressure**<br>22:5 75:2<br><br>**pretty**<br>13:24<br>32:17,18<br>101:5<br>103:6,10<br><br>**previous**<br>50:13<br><br>**primarily**<br>12:24<br>100:22<br><br>**primary**<br>100:24<br>101:4<br><br>**principle<br>s**<br>116:5,17<br><br>**prior**<br>7:16 8:3<br>16:11<br>18:24<br>19:1<br>21:13<br>26:17,20<br>29:18<br>50:9<br>58:15,23<br>61:15<br>62:2<br>87:10<br>92:10<br>94:13<br>113:2<br>118:24<br>124:25 | **priors**<br>17:21<br>28:5<br>45:15<br>50:7<br><br>**probable**<br>91:16<br><br>**probably**<br>12:25<br>23:6<br>35:17<br>38:7,8<br>39:1<br>40:11<br>41:18<br>43:11<br>47:12<br>67:24<br>71:4,16<br>73:24,25<br>74:14<br>82:23<br>97:18<br>99:4<br>106:13<br>113:25<br>125:4,12,<br>19<br><br>**problem**<br>122:20<br><br>**proceedin<br>gs**<br>129:15<br><br>**process**<br>103:20<br>107:22<br><br>**produced**<br>47:22<br><br>**producing**<br>47:14<br><br>**productio<br>n**<br>8:11,19 | **professio<br>nal**<br>11:15<br>12:14<br>29:23<br>30:5<br>89:15<br><br>**prohibite<br>d**<br>50:7<br><br>**proof**<br>123:13<br><br>**proper**<br>92:13<br>94:16<br><br>**property**<br>52:13,19,<br>21 89:21<br>110:10<br><br>**protocol**<br>125:21<br><br>**protruded**<br>70:17<br><br>**provide**<br>7:6 17:18<br>22:4<br>54:20<br>76:11,12<br>116:8<br><br>**provided**<br>95:3<br><br>**providing**<br>119:23<br><br>**proximity**<br>19:15<br><br>**psycholog<br>ical**<br>102:9<br><br>**public**<br>26:1,5<br><br>**pull**<br>40:5,6<br>45:11 |



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 162 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74:12
79:21
124:4

**pulled**
35:4,9
124:12

**pulling**
45:11
46:24
74:12,13
75:5

**purpose**
16:19
79:24
82:1
85:8,10
117:9

**push**
28:23
69:23
114:24
115:2,3

**pushed**
71:8 72:2
81:5
114:15
115:13
123:25
124:2

**pushing**
71:3
114:22

**put**
18:2
20:25
22:5
44:15,17
46:9
51:21
56:25
58:20
59:9 65:7
73:3 75:7
80:10,17,
23 117:25
124:9

126:3,4
128:17

**putting**
31:20
63:13
75:9 81:8
112:22

**Q**

**question**
19:3
23:21
24:3,5
83:20
94:11
97:4
112:19
123:9
124:21

**questions**
6:24 7:3
10:9
11:15
129:4,5,8

**quick**
35:9,24
64:8

**quietly**
124:3

**quite**
14:16
23:12
39:17
77:14
84:25
120:16

**quoted**
86:21

**R**

**radius**
97:14
100:7

**raise**
72:22

**rake**
68:5

**Ralph**
7:11

**ram**
67:20,21
119:13

**ramble**
34:11

**rambling**
34:17

**ramming**
26:22

**randomly**
69:18

**rather**
73:19

**RDOS**
11:9

**reach**
28:8

**read**
8:5 9:19,
22 29:11
47:5 49:3
55:25
56:9 85:4
86:20
88:17
110:6
111:18
112:6
115:16
118:18

**reading**
49:23
50:2

**ready**
32:18
63:14

**real**
35:9,24
64:8

**realize**
82:13

**realized**
72:6

**really**
8:22 9:2
23:2
36:16
44:22
59:8
102:18
109:25
112:7
122:20

**rear**
20:3
97:20

**reason**
6:23
35:13
78:14

**reasonable**
18:8,14,
15 19:8
23:15
24:3,23
86:22
88:19
89:16
92:5,18
94:21,24
95:4
96:1,13

**reasons**
26:14
125:12

**receive**
95:19
107:14,19

**received**
92:11

94:14
102:8
107:17,
19,20,21
120:11

**recently**
10:12
63:7

**recklessly**
123:17

**recollection**
33:15

**recommendation**
120:15,19

**recon**
27:21
32:1,19
34:13,16
36:4,18
37:3,23
38:17
41:1
42:3,18
49:19
54:20
57:10,14
58:19
59:16
62:13
87:7
109:5,7
124:17,22
125:14
126:19

**reconnaissance**
32:20
33:25
34:20
35:7
36:10
37:10
38:5

40:2,4,8
42:11,14
54:17
58:2 60:7
63:16

**record**
5:20 7:10
10:6 51:8
55:6,8
88:11
127:1,3,7
129:11

**recounting**
10:18

**reenacted**
108:10

**refer**
47:16

**referring**
47:23

**refusal**
92:21,25

**refuse**
85:12
92:22,25
94:22

**refused**
85:8

**reinforce**
126:6

**related**
33:24
41:6 42:8
43:1 44:7
50:4,5
51:8
59:13
81:23
91:8
102:9
107:15,17
108:8,9,
17,22
109:13,



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14,20
111:11
113:21
115:7
120:23

**relationship**
51:13

**relative**
127:8

**relays**
78:17

**rely**
9:10

**remained**
88:24

**Rembert**
50:8,9,
20,22,23

**remember**
8:20,21,
25 9:2,4,
5,7 10:18
30:24
31:9,15
33:9
43:20
45:11
50:17
51:4
56:18,19
74:4 77:9
99:13

**remind**
6:16

**rendered**
68:7

**repeat**
33:1

**report**
38:15
42:2
46:5,24
56:1

57:13
77:15
85:5
86:21
88:18,25
120:18
127:10,16
128:6

**reporter**
36:25
53:1
129:13

**represent**
5:17
53:25
113:4

**request**
8:11

**requested**
5:23
32:15

**requests**
8:19

**requirements**
92:15

**rescue**
29:17
106:10

**rescues**
24:16

**residence**
17:12,20
19:3,6
20:2,21
21:1 22:9
24:18
26:25
28:10
34:7,8
35:6,12
36:1,9
39:2,19,
20,23
40:3,7

41:15,22
45:8
53:18
54:17
57:24
58:19
59:4,13
60:1,3,14
65:15
67:3
68:20
71:20
76:3
80:20
82:7 85:1
89:24
90:2
95:14
103:14
109:20,22
116:7
117:6,23
118:24
121:8

**residences**
24:7
33:23
34:20
38:8 45:9
59:25
60:4
63:22

**residents**
16:12
22:25

**respond**
15:11
83:23
84:2

**responding**
15:15
21:25

**response**
88:22

**responsibility**
62:11

**rest**
72:3,5
78:1

**reticent**
88:24

**retraining**
107:14,18

**retreated**
79:18

**reverb'd**
73:13

**review**
8:10 9:25
10:2
57:12
94:1
108:13

**reviewed**
6:1 7:15,
16 8:2
10:1,12,
14 38:14
111:5

**reviewing**
10:8,11,
17

**rifle**
50:12
70:10,24
72:22,23
73:4 74:9
99:19,23
101:2,25

**right**
17:9
20:10
25:18
27:4,14
36:13,20
38:12,16
46:22

47:9
53:18
66:9
67:15,19
70:12,14,
16 71:15
73:5
74:24
75:2
76:17
79:18
80:24
97:6,17
98:23
100:8,11
104:6
106:22
107:3
111:7
114:8,20
121:13
126:22

**rights**
25:1,11,
25 26:5
120:7

**rigorous**
27:5

**ripping**
23:7 75:6

**robbed**
106:23

**rod**
100:4

**roll**
75:16

**room**
41:7
67:25
70:17
73:20,21,
22 74:1
76:25
78:4
81:2,3,7,
9,11

82:16

**rooms**
78:1
103:13

**Rothenburg**
66:15,16

**rough**
35:24

**roughly**
15:25

**round**
62:2
97:19
98:4,6
99:18

**rounds**
28:17
79:7
104:1,11,
14

**route**
34:22,24
64:5
122:17
124:14

**run**
77:24
78:7
107:22,24
108:1

**running**
51:15
78:2,4,16
92:23
107:1

**runs**
46:13
78:2

**Russ**
66:24



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **S** | 14:14,20<br>22:25<br>23:12,24<br>24:13<br>28:4<br>29:17<br>37:14<br>38:7,22,<br>24 39:9,<br>23 43:24<br>49:25<br>50:6,8<br>51:8 57:4<br>59:23<br>61:22<br>70:23<br>73:24<br>77:23<br>78:25<br>81:12<br>82:4,10,<br>12 85:24<br>88:10<br>89:12<br>92:7<br>95:3,10<br>100:10<br>103:6<br>109:20<br>111:14<br>113:24<br>114:2,21<br>116:3,19<br>119:5,14<br>120:4<br>123:1<br>124:1<br>126:8,17<br>129:4 | 119:8,11<br>**says**<br>49:4<br>85:5,7<br>88:21<br>111:15<br>112:8<br>**scenarios**<br>107:23,25<br>108:2<br>**schedule**<br>11:3,4<br>15:17<br>**school**<br>11:17<br>**schools**<br>59:12<br>**se**<br>44:11<br>**search**<br>15:1<br>19:18<br>23:1,22,<br>25 24:9<br>26:19<br>34:7 42:8<br>52:13,19,<br>20 58:11,<br>15 59:17<br>67:12<br>87:2<br>89:2,20<br>91:5<br>92:10<br>93:20,21<br>94:13,19<br>103:1,11<br>105:21<br>110:18<br>114:11<br>115:21<br>118:16<br>120:20 | 113:24<br>114:4<br>118:7<br>122:15<br>**second**<br>8:23<br>22:18<br>69:8,10,<br>12,13,16<br>82:13<br>110:5<br>**seconds**<br>73:25<br>82:10<br>83:2<br>88:21<br>89:13<br>90:19<br>92:4<br>93:24<br>94:3,4,5<br>115:19<br>119:16<br>**section**<br>15:4 44:5<br>51:19<br>85:4<br>95:22<br>110:8<br>**security**<br>12:4<br>106:23<br>**see**<br>20:13<br>26:3<br>30:21<br>31:11<br>35:10<br>37:7 46:6<br>48:6,25<br>57:16<br>59:5<br>60:3,4<br>61:4,18,<br>21 63:23,<br>24 68:23,<br>24 70:8 | 71:21,22,<br>23 72:20,<br>23 75:1<br>77:11<br>78:1,2,12<br>82:19<br>88:14,15<br>92:23<br>94:1 98:4<br>99:21<br>102:19<br>117:13,18<br>125:17<br>128:20<br>**seeing**<br>70:7 77:9<br>99:13<br>**seem**<br>23:4<br>**seems**<br>123:8<br>**seen**<br>17:12<br>18:20,24<br>20:5<br>35:16<br>39:17<br>44:12,13<br>46:4<br>47:13<br>51:7,15<br>64:6,17<br>69:21<br>78:15<br>99:15<br>102:12<br>109:11<br>114:7,10<br>**sees**<br>46:15<br>**Segal**<br>95:17<br>**self-<br>incrimina<br>ted**<br>43:12 | **sell**<br>90:21<br>**selling**<br>90:10<br>**semi-<br>barricade<br>d**<br>22:14<br>**send**<br>46:14<br>**senior**<br>95:23<br>**separated**<br>48:12<br>**sergeant**<br>32:13<br>54:15<br>63:20,25<br>66:24<br>**series**<br>56:21<br>**serve**<br>18:3<br>20:18<br>32:18<br>110:17<br>111:10<br>122:17<br>124:25<br>**served**<br>29:25<br>32:24<br>33:5,21<br>54:2<br>58:24<br>91:11,25<br>**service**<br>15:1,24<br>**serving**<br>14:5,13<br>16:12<br>23:1,22,<br>25 30:13,<br>19 37:5 |

**safety**
17:16
**said**
8:2 21:17
43:18
57:14
72:16
82:19
86:2 88:4
91:15
93:24
103:8
113:10,23
**Sam's**
63:4,10,
13
**same**
6:18,20
12:8 14:3
15:17
16:16
33:24
35:3
39:17
46:6
69:19
72:6,19
94:9
95:15
98:22
101:7,9,
14,16
106:20
107:24
108:8,9
115:14
125:18
**Saturday**
11:10
15:19
**saw**
55:17
**say**
13:17

**saying**
17:8
31:12
36:21
49:9 59:8
61:5 74:5
78:18
90:25
91:6
103:18

**seat**
58:20
59:1

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

41:2
58:10
59:16
92:10
94:19
96:9
118:16

**set**
21:14
57:21
59:3,9
66:22
100:16

**seven-**
**week**
14:23
15:7,8

**several**
32:5

**shape**
71:6

**shattered**
97:13

**sheet**
45:18

**shield**
65:25
66:2,16,
17 67:11
76:9,10
78:8

**shielded**
67:15,17

**shock**
68:13
79:6,13

**shoot**
72:14,16
73:4
83:15
91:9
100:25
101:2,3
104:3
106:6,21

**shooter**
106:2

**shooting**
6:8
28:17,18
51:14
103:21,
22,25
106:11
123:16

**shootings**
18:19
90:2
106:1,5

**short**
31:5 91:1
96:7,8

**short-**
**barrel**
50:12

**shorter**
18:16
95:18

**shot**
19:2 62:2
64:22
68:14
73:1,7
90:1
97:17
101:23
103:25
106:7,23,
24 107:2,
4,7
123:16

**shotgun**
68:15

**shots**
71:20,24
72:6,20
104:4,17

**shoulder**
103:5

**show**
53:19

**shower**
90:10,12

**showing**
124:25

**shows**
127:10

**shrap**
98:16

**shuffling**
74:16

**shut**
120:5

**sic**
34:14

**side**
13:5
16:21
19:11
20:3,20
45:3
48:12
65:22
66:9,12,
14 68:19
76:18
79:22
80:11
81:22
85:19
99:5,7
107:3
119:21
124:10

**sides**
41:13,14

**sidewalk**
20:24
66:19

**Sierra**
63:23

**sight**
110:3

**sighted**
51:6

**significa**
**nt**
100:8

**similar**
18:13
19:10

**simultane**
**ous**
33:23
34:5,6

**since**
105:8
107:16

**single**
47:21
74:1
126:12

**sit**
14:2
16:14
17:24
29:5,13
32:23
33:2
37:22
50:15
55:24
89:6
95:24
103:17
105:4,18
120:22

**sitting**
117:24
118:2,6
121:17

**situation**
20:9
29:21

**six**
12:12
89:12
92:4

93:24
94:4
98:24
101:24
102:1
115:19

**six-month**
12:19

**size**
73:23
90:14,22
92:6
93:12
95:11

**skip**
41:24

**sliding**
81:23,24

**slight**
101:17

**slow**
41:21
73:17
78:9

**smack**
100:18

**smacking**
70:23

**small**
68:15
73:24
90:13,24
98:19
112:1,2

**small-**
**caliber**
88:15

**small-**
**framed**
50:2

**smaller**
15:6

**snap**

61:13

**sniper**
63:22
106:11
107:4

**soften**
68:17

**softened**
68:17

**some**
7:15
11:15
18:10
24:11
27:5
37:20
38:15,17
43:10
44:13
56:10,13
57:19
58:1,4,
12,16
60:4
64:15
87:25
88:17
96:17
100:13
107:23
108:8,13
115:13
127:18

**somebody**
19:2 23:7
28:16
29:24
30:17,20
31:9,10,
11 35:16,
21 46:17
64:22
71:22
73:12
74:3,7,11
78:1,4
81:9

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 166 of 177

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

84:21,23
86:2,17
90:4,9,20
91:13
92:19,22
94:21
95:12
106:7
107:9
117:10,19
121:25
122:1
123:13,18
124:9
126:3
128:3

**somebody's**
57:21,23,
25 80:18

**someplace**
17:17

**something**
8:20
13:22
29:18
32:8
46:5,16
51:24
61:16
62:12
73:5
77:22
80:2,3,9
82:18
86:16
89:13
95:17
100:6,16
104:5
113:25
114:24
122:1
125:5,6,
21 126:5

**sometimes**
9:4 24:14
34:9

36:14

**somewhat**
18:22
53:17
70:2
107:23

**soon**
67:9

**sorry**
8:13 14:6
15:3 16:4
23:11
30:6 33:1
36:21,23
38:1,10
39:9,21
40:1
44:22
46:23
47:3 50:6
57:3
65:23
87:1
92:20
102:13
109:3
112:21
122:9

**sought**
86:23
87:8
88:13,20

**sound**
71:12,17
86:11

**south**
34:3,14
36:4,23
48:13
53:8
75:17
110:18

**southwest**
53:22

**speak**
43:8

122:13

**special**
12:3

**specific**
10:9
41:25
42:1
110:6

**specifica
lly**
42:19
48:23
56:12,13
59:21
95:2
108:7
112:9
116:14

**speculate**
125:2

**speculati
on**
103:19

**speed**
118:21

**spell**
5:19

**spend**
58:13

**spent**
39:1

**split**
15:5

**spoke**
43:20

**spot**
34:23
44:2

**spray**
104:7

**squad**
13:3,4
14:25

**squads**
14:22

**stack**
67:19
75:25

**stacks**
49:2

**staged**
75:15,17

**stalemate**
77:25

**stamps**
47:6

**stand**
74:16,17
103:6

**standard**
88:19
93:4
125:21

**standardi
zed**
110:19

**standards**
116:11

**standing**
28:15
75:11

**start**
21:20
28:17
63:13
68:9

**started**
13:19
31:4
68:22
70:15
72:7
74:3,11
75:5

**starting**
68:25

94:4

**starts**
78:17

**state**
5:19 7:9
94:17

**stated**
51:1

**statement**
9:18
55:25
115:23
119:1

**statements**
9:22

**stating**
118:15

**station**
20:14,16
35:9,20,
22

**stationary**
72:13,19

**stay**
79:22

**stayed**
12:23
35:23
97:24

**staying**
24:14
108:18
110:14

**step**
30:21
68:14
79:12,13
88:2

**stepmother**
43:13

51:1

**stepped**
30:17
68:9,18
70:15
76:15,21

**steps**
27:5
82:14,17
83:2
117:1

**stick**
31:7
41:18
66:14
67:1,5
68:1,3,4
69:9
86:5,18
100:11

**still**
14:3
30:10
40:5
55:14
62:5
68:19
70:1,2
73:11
79:2,8,9
84:19
93:19
94:6,10
98:2,4,18
100:25
101:2,18
102:13,
16,17
118:12,
13,15
119:21,
22,23
128:17

**stop**
26:6
50:14
64:23



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 167 of 177

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

72:12
73:16
103:22,25

**stopped**
35:20
50:9,13
51:10,11
70:18
77:19
93:18
99:5
103:23
104:5
107:5
113:1

**stouter**
61:25

**stove**
100:11

**straight**
99:19

**street**
7:11
20:22

**strike**
77:9

**strolling**
37:16

**structure**
21:13
45:19,20
46:11
77:23
79:21
90:23,24
92:6
93:13
95:10,11

**stuck**
28:18
118:23
119:3

**studio**
95:16

**stuff**
7:15 8:3,
7,8,16
9:4 13:6
33:14
40:6
45:16
48:10
53:14
56:24
57:7,9,19
58:1,4,
12,14,16,
17 59:5
64:8
73:11
75:6,7
101:9
109:15,16
112:23
114:2,14,
23 115:4,
14

**stun**
31:7
41:18
66:14
67:1,5
68:1,3,4
69:9
86:18

**subject**
17:19
20:4
22:15
28:9
46:18
91:2
110:11

**subject's**
17:21

**subjects**
18:20
51:15
52:4
91:8,19

**submit**

115:20

**submitted**
32:4

**such**
25:24

**sufficient**
41:3
85:18
93:11
116:1

**Suite**
95:17

**sunburnt**
101:12

**superhero**
100:12

**supplied**
49:17

**supposed**
64:6
65:13
67:2

**sure**
6:14 8:8,
9,15 23:2
24:1,7
33:2
37:19,21
44:12
52:9
56:23
58:5
60:20
86:25
103:9
107:16
114:13
115:9

**surface**
99:1

**surprise**
78:25
116:6

117:5,14
118:21

**surprised**
10:14
56:16

**surround**
21:10,11,
12 39:3
45:25
79:19
80:15
121:24
122:5,11

**surrounding**
37:8 42:5
45:20

**surveillance**
57:24
59:4
114:11

**suspect**
16:11
20:7
21:16,22
23:16
39:7
46:12
60:10
110:1
113:18,19
118:22

**suspect's**
28:5

**suspected**
88:23

**suspects**
18:17
19:2
21:21
23:23
38:20
41:11
43:1,4,6,
12,22

45:14
52:4,15,
23 64:22
87:13
91:17,18
112:25

**sustained**
97:11

**SWAT**
12:1,2
13:9,20,
21 14:3,
9,13,21,
22 29:24
58:19
59:16
83:4,24
84:2
89:15
103:4,5
110:8,9
124:25
127:23

**SWAT's**
110:17

**swelling**
97:23

**swing**
45:21

**swing-shift**
13:3

**switched**
100:23

**system**
10:7
21:21

---

T

---

**table**
118:6

**tactic**
21:10

118:3

**tactical**
18:1
26:22
45:24
73:13,14,
15 74:2
77:15,17,
20 78:3,
8,11,15,
18 79:16

**tactics**
12:4
26:24
110:20

**take**
6:18
21:4,24
32:10,11
34:21
60:7
61:25
62:1,21,
22,25
76:21
80:21
85:23
90:15
95:14
99:15

**takeaway**
36:12

**takedown**
66:9
76:20

**taken**
5:24
18:25
48:8
55:7,12
118:8
127:2
129:10

**takes**
90:7
126:7



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**taking**
47:2
77:22
78:22
122:10

**talk**
8:23
55:18
62:25
64:14
102:20
111:23

**talked**
7:20 23:3
26:8
32:21
39:13
43:13,17
48:1
56:25
77:7,14,
16 82:6
84:7,8
97:8
120:16
124:15
127:8

**talking**
34:10
39:10,24
45:1
46:6,25
48:3,22,
25 49:23
55:17
82:13
90:8,9

**talks**
85:6,9
88:19

**target**
24:18
35:11
45:8
53:21
59:13
60:1,2,

11,14
63:24
64:2
65:15,19
71:2

**target's**
20:2

**targets**
90:18

**task**
36:18
40:22

**tasked**
49:19
109:7
124:22

**tasks**
42:7

**team**
13:4,24
15:5
22:10,11
33:19
35:1
42:18
45:24
49:19
53:11
54:11,14
64:11
65:2
67:18
72:3,4,5
76:12
78:19
87:7
95:25

**teams**
15:6

**Technically**
101:24

**tell**
7:13 8:4
9:5 16:6

17:7 18:9
27:4
31:14
34:10
36:13
38:16
40:13
42:2
47:12
53:6
58:25
62:21
63:1 67:7
71:9,19
85:11
108:4

**telling**
72:16

**ten**
12:24
125:17,25

**tendon**
100:20

**tendons**
97:15,16
98:10
100:2

**term**
46:8

**terms**
40:16
47:1 49:8
52:11
87:22
108:16
109:5
110:23
120:15
127:19

**terrible-
worded**
112:18

**testimony**
6:25 7:7
9:10
16:19

49:17
51:18
62:20
87:11
121:18
125:9
129:3

**testing**
13:19

**than**
9:18
10:25
15:15
18:16
31:19
37:12
39:2 41:5
44:14
46:19
50:15,18
54:7
61:7,12
71:12,17
73:19
79:12
83:18
103:21
104:19
109:19
113:11
114:19
117:20
120:13

**thank**
25:8
129:2

**that's**
8:14,22
11:6
23:11
29:19
32:12
34:12,14
36:11,25
38:10,12
44:18
45:6
47:21,22

48:17,23
49:5
51:19
52:5
53:6,23
58:4
62:23
65:4,6
66:19
67:7
77:21
78:19
80:2,7,
17,19
81:5,8
83:2,23
85:2
88:18,24
90:19
91:2,7
92:8
93:23
100:5,7
101:21
102:19
103:10
104:12
105:2
113:11,22
115:3,24,
25 116:19
118:4
119:15
122:18,20
125:21,23
127:12
128:14

**them**
20:3,25
22:5,6
23:8,19
30:21
37:2
40:18
43:12,13
47:4
50:20
51:6,7
52:1,2,6

54:9
63:21
64:8,18,
25 76:22,
25 84:12
87:13
90:20,21
98:21
108:8,15
117:23
118:8
128:13

**themselves**
43:14
78:6
125:20

**then**
12:23
13:18
14:12
20:10
21:19,25
22:15,23
26:15
28:22,23,
24 34:2,8
35:25
40:10
45:14,18,
23 46:19
50:4 52:5
53:9
58:23
63:11
65:1,4,
12,14
66:2,6
67:1,4
68:8,13,
19 69:13,
17,22
73:5,11
74:19,22
75:3,8,
14,19
76:13,18,
22 77:2
78:9

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 169 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

79:13,15,
18,19
81:19
82:19
83:13
90:20
91:19
93:6,14,
18 94:5,
12,20
97:17
99:18
100:8
102:6,21
108:2,3
109:4
113:11
114:24
116:3,23
119:5,14
120:15
122:24
124:4,5,
13

**there's**
16:23
17:18
20:10,23
24:20
27:5
28:6,7,20
31:5
42:13
44:14,17
45:15,22
46:7
48:14,20
49:1,2
53:15,16,
17,19
57:20,21
58:4
59:12,22
61:4
69:16,17
71:11
90:11
93:9,15
98:17

100:4,12,
17 101:17
105:14
107:8
111:16,17
115:2
117:18,24
118:6
123:12
127:25
128:8

**these**
8:17
14:6,25
33:14
46:25
54:3,8
71:19
82:1 84:9
101:15,19
105:21
112:12,24
126:11

**they'd**
108:1

**they'll**
124:9

**they've**
128:11

**thigh**
98:7,8
101:12

**thing**
8:22
19:14
28:14
32:6 46:6
48:2
49:11,25
53:19
72:6,19
77:18
94:9
101:7,9,
16 106:20
116:24
119:17

**things**
17:23
28:20
29:10
32:14,15
36:14
37:5
41:17
42:13
57:22
58:2
59:22,23
62:10
80:7
111:20
114:5,12
115:2,14
121:5,21,
22 123:21
125:22
126:13

**think**
9:6 15:25
30:10
35:20
39:12
40:24
41:1,3,5
43:8,12
44:24
51:14
53:25
57:19,23
58:9,12,
16,18,25
59:14
68:22
73:7 75:8
84:14,17,
23 85:17
89:8,16
90:5 91:2
93:10,23,
25 95:24
96:1,5,6
98:13
100:6,12
106:17,18
109:24

113:15,22
114:12
115:11
116:18,21
118:12,25
119:3
120:6
121:1,8
122:14,25
123:11
124:20,21
125:14
126:15,24
127:18

**thinking**
69:1
72:14
104:18,20

**third**
45:23
68:22

**this**
5:18 6:17
8:17,19
9:3 10:21
11:11
12:6
14:8,12
15:16
17:10
18:11,13,
15 19:9,
18 23:3,
13,16
26:18
27:20
29:1,24,
25 30:3,
15,23
32:1,24
33:4
34:4,14,
23 36:12
37:16
38:1
42:19,23
43:3 44:7
45:8,10

47:8,13
48:7,8,15
49:18
50:25
52:11,18
53:7,16,
18,23,24
54:8 58:3
62:19,24
64:19
69:4
71:10
72:21
73:20,21,
22 78:22
80:3,23
87:2,11,
17 89:1
90:23
91:11,25
93:2
95:3,19
96:18
97:2 98:1
100:3,17,
25 102:6,
10 106:14
107:15,
16,17
108:4,5
109:2,21,
22
111:12,18
112:6
113:20
114:2,6,
16,19,25
115:8
120:23
121:8
122:14,
18,25
123:3,5
124:20
127:6
128:4,6,
22 129:3,
9

**thorough**

20:22
37:10
38:23,24,
25 114:22

**those**
17:2
18:10
24:7,15
41:14
47:2
48:14
56:10
62:5
67:13
69:7,19
79:2
84:19
90:5
91:17
93:15,17
94:10
99:24
101:5,16
106:8
108:7,22
110:24
111:6,20
113:12,16
114:12
119:11,25
122:13
124:8,11
126:2
128:20

**though**
24:19
47:25
77:3
103:15
107:10
117:4,9

**thought**
34:13
43:22
51:9
87:11,12,
15 89:12
103:20

Kerry Kubla                     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

119:23

**thoughts**
57:17
102:24

**thousands**
47:14,15

**threat**
110:10

**three**
14:9,10
48:20
90:19
102:3,5

**three-
quarters**
69:15

**threshold**
70:7
82:15
83:10,11
99:11

**through**
6:15
12:13,18
13:13,14
14:13
17:2,8
18:10
20:6,13
21:6
22:20,22
23:8,17,
23 24:2,
15,17
27:6,11
28:17,25
30:25
31:2
32:8,12
35:6
37:16
39:5
56:10,15
62:6,19,
20,23
63:9

65:16
68:6,7,24
70:7 73:1
74:20
77:4
79:17
80:23
82:7,14
83:11,19
84:15,18
94:7,25
95:21
97:9,10
98:6,11,
15,24
102:6,7
104:1,2,
14,23
107:22,25
108:1
116:25

**throughou
t**
15:9,10
59:4
60:6,8
65:3
78:18
123:17

**throw**
62:8

**thumb**
101:16

**Thursday**
11:9
15:18

**thus**
116:9

**time**
12:6,25
13:7,11
14:4,8,
12,18
15:13,16,
20,21
17:13,15
18:5,7,

14,15
19:9
20:22
22:10
23:16,17
24:10,20
32:14
33:24
39:1
51:24
58:13,20,
23 59:1,
8,9,10
62:24
63:21
68:19,22
69:4,15,
19 79:12
84:17
85:18
86:4,22
88:20
89:17
90:11
91:1
92:5,18,
19,25
93:7,9,12
94:6,21,
24 95:4,
7,8,16,
17,25
96:8,12,
19 97:2
101:12,17
105:13
107:20
108:3
109:11,12
113:24
114:4,12,
19,25
115:20
119:9,18,
21,23
120:4
121:23
122:15
123:3,18
124:6,13

129:3,12

**timeline**
16:24
31:6
106:12
116:18,20

**times**
7:21
17:11
20:5 32:5
68:21
73:13
84:20
90:19
100:14
101:23,24
102:1,2
107:8
114:7
118:5,23
119:14,17
125:17

**tip**
99:19
101:25

**titanium**
100:4

**to**
5:23,24
6:8,16,24
7:2,3,6,
14,19,20,
23 8:9,
10,23,24
9:4,9,10
10:18
11:5,7,14
12:15,20
13:8,9,
12,16,19,
21,22
14:5,11,
15,17,20,
25 15:11,
15,18,21,
22 16:7,
9,11,13,

20,21
17:18,24
18:3,4,
12,13,16,
22 19:1,
8,10,11,
15,17,19,
20,22,23
20:15,16,
18,23
21:1,3,
12,13,14,
16,19,21,
22 22:1,
3,5,6,8,
9,11,12,
13,16,20,
25 23:1,
4,5,8,9,
10,12,19,
24 24:1,
5,7,10,
11,12,13,
17,18,19
25:1,2,3,
11,12,24
26:5,12,
13,16,17,
20,24
27:4,6,
10,15,23
28:8,11,
15,17,23,
24 29:10,
13,14,15,
18 30:21
31:3,11
32:18,19,
22,24
33:5,7,
21,22,24,
25 34:1,
3,4,6,7,
8,18,19,
21,22,23,
24 35:4,
7,13,14,
19,24,25
36:18
37:5,6,7,

17,19,20,
21 38:21,
22 39:3,
5,13,20
40:6
41:2,4,6,
7,9,11,
16,19,23,
24 42:6,8
43:1,7,8,
11,13,17,
20 44:4,
7,8,23
45:6,7,12
46:4,6,7,
14,16,20
47:4,8,
16,23,25
48:2,6,17
49:3,5,16
50:6,8,
10,14,18,
24 51:4,
8,13,15,
18 52:6,
7,9,15,
22,25
53:1,5,
18,21,25
54:4
55:12,17,
18 56:3
57:8,20,
23 58:3,
4,6,10,
15,20,21,
22,23,24
59:3,5,9,
10,12,13,
18,25
60:2,3,8,
9,10,13,
14,15,19
20 61:3,
6,7,13,
14,15,19,
20,21,22,
24 62:2,
5,12,13,
20,21,22,

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | |
|---|---|---|---|---|
| 25 63:13, 16,22,23 64:2,3,7, 8,14,19, 20 65:13, 15,19,25 66:1,4,8, 18,19,21, 25 67:1, 2,4,5,14, 15,16,19, 20,22,24, 25 68:5, 9,11,12, 13,17,18, 22,25 69:2,3,8, 10,13,16, 20,23 70:4,5, 12,13,15, 18,21,25 71:4,8,16 72:1,11, 12,13,14, 16,18 73:4,6, 10,18,20, 21,22 74:3,12, 13,19,20, 22 75:4, 11,15,17, 20,21,22 76:10,11, 12,15,21, 23,25 77:3,12, 17,25 78:3,5,6, 7,8,13,16 79:1,4,7, 9,12,14, 16,20,24 80:4,8,9, 10,16,17, 18,20,21, 24 81:2, 5,10,14 82:2,4, | 10,13,14, 17,21,24 83:6,22, 23 84:2, 6,10,15, 18,21 85:3,4, 11,19,20, 24 86:4, 11,15,17, 20,21,25 87:12,18, 24 88:2, 5,13,14, 15,17,21 89:1,12, 24,25 90:1,3, 13,15,17, 18,19,20, 21,25 91:2,8,9, 20,21,22 92:4,10, 12,19 93:2,16, 19,24 94:1,5, 13,15,17, 18,21,25 95:3,6, 14,15,17 97:7,12, 18,20 98:9,20, 23 99:1, 15,20 100:5,22, 23 101:4, 10 102:10, 17,19,20 103:15,17 104:1,3, 18 105:3, 6,7,9,12, 15,22 106:17 107:3,15, 17 108:1, | 13,14,17, 21,22 109:8,20 110:9,14, 17 111:10, 11,14,21 112:20 113:2,4, 12,16,21, 22,24,25 114:1,2, 16,23,25 115:1,6, 8,15,16, 19,20,21, 25 116:3, 6,8,13 117:5,9, 10,15,19, 20 118:1, 8,18,21, 24 119:2, 3,5,13, 14,16,20 120:3,4, 8,19,23 121:8,11, 24 122:5, 11,17,21 123:1,9 124:5,18, 25 125:5, 6,10,16 126:1,2, 5,15,16, 21,23 127:6,9, 15,22 128:2,4, 5,6,12,17 129:4,5 **today** 5:23 6:8, 25 7:7 9:11 10:7,25 14:2 16:14 | 29:5,14 32:23 33:2 50:15 55:24 89:6 95:24 103:17 105:4,18 114:18 120:22 121:17 122:5,14 129:3 **today's** 7:14 **together** 13:24 18:2 34:25 36:15 37:6 100:3 **told** 74:24,25 75:1 87:16 **too** 23:17 54:1 77:22,24 78:22 87:12 91:1 96:6,8 100:17 117:8 119:4,10, 15 **took** 6:17 11:17 34:15,18 38:7 51:14 54:1 55:11,13 | 73:3,7 82:10,12 83:6 93:7 97:12 98:6 107:4 113:7 119:16 **top** 20:13 35:16 97:14 **tore** 97:15,16 **total** 101:24 **totality** 36:5 **tourniquet** 75:7,9 **tourniquets** 75:6 **towards** 18:20 31:16 72:8 74:12 80:19 107:2 **town** 15:14 63:4,10, 13 **toy** 109:15 **track** 47:25 110:2 **trackers** 124:8 **traffic** 20:23 | **traffic's** 17:11 **train** 81:8 83:15 103:11 108:3 **training** 12:22 83:3,24 84:2 92:11 93:2 94:14,23 95:3,19, 21,22 107:16, 19,20,21, 22 108:11 110:20 116:10 **training's** 108:5 **transcript** 9:19 128:7 **transition** 13:8 **transitioned** 13:14 101:4 **traveled** 97:19 **treatment** 102:9 **trial** 9:9 **tricep** 97:20 98:24 |

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **tried** | 83:1 | 12 43:5 | 59:15 | **up** | 104:15 |
| 121:24 | 91:17 | 73:4 | | 7:18 8:9 | 105:6,7 |
| **trip** | 92:17 | 92:12 | **unit** | 12:11,15 | 106:11 |
| 38:12 | 93:3,6, | 94:15 | 14:21,22 | 13:17,18 | 113:25 |
| **truck** | 10,14,17 | 114:11 | 15:13 | 21:14 | 114:15 |
| 63:12 | 101:15 | 115:18 | 59:6 | 22:12 | 117:19,25 |
| **truthful** | 106:15 | | 63:23 | 27:11 | 119:13 |
| 6:24 7:7 | 128:20 | **undergoin** | 75:19 | 28:12,24, | 123:25 |
| **try** | **two-story** | **g** | 87:25 | 25 34:5 | 124:2,9, |
| 21:22 | 95:14 | 102:16 | 89:9 | 35:4 | 25 126:3 |
| 68:17 | **type** | **understan** | 96:1,13 | 40:5,6 | 127:6 |
| 98:20 | 14:6 | **d** | 127:23,24 | 42:1,14 | **upper** |
| 125:4,5 | 32:24 | 6:7,21,24 | **units** | 44:16,17 | 97:20 |
| **trying** | 33:4 | 7:2 8:15 | 106:11 | 45:3 | **upstairs** |
| 38:20 | 42:22,24 | 16:18 | 114:22 | 47:14 | 31:10 |
| 46:4,6 | 86:24 | 19:7 | 124:17 | 51:25 | 95:13 |
| 70:25 | 101:8 | 24:25 | **unknown** | 52:8 | 104:2,13 |
| 72:14 | **types** | 25:10 | 56:21 | 58:16 | **us** |
| 74:13 | 18:1 | 29:14 | 70:12,13 | 60:2,14 | 21:5 |
| 82:21 | **typically** | 37:21 | 78:4 81:1 | 61:3,20 | 33:20 |
| 89:1 | 14:15 | 51:17 | 91:22 | 62:6 | 34:21 |
| **TSD** | 73:19 | 52:10 | 108:16 | 63:13,19 | 35:6 |
| 95:21 | 91:5 | 55:15 | 110:14 | 64:22,24 | 37:15 |
| **turn** | | 67:7 77:7 | 111:20 | 65:5,6,25 | 75:16,17 |
| 22:14 | ──────── | 87:1 | 112:9,12 | 66:2,10, | 77:19 |
| 70:15 | **U** | 89:20 | **unknowns** | 17,18 | 84:17 |
| 119:8 | ──────── | 92:3 | 42:4 57:4 | 67:14,19, | 91:10 |
| **turning** | **U.S.** | 111:7 | 110:12 | 20 68:1, | 107:2 |
| 53:5 | 90:8 | 112:4 | 111:12 | 9,13,14, | 118:10,15 |
| **two** | 92:12 | 113:6 | **unless** | 16,17 | 119:19 |
| 7:23 8:1, | 94:15 | 117:13 | 29:16 | 69:3 | **use** |
| 8 9:3 | **Uh-huh** | 120:22 | 35:12,15 | 70:12,16 | 8:16 |
| 10:12,19 | 75:24 | 121:13 | 46:13 | 71:22 | 21:25 |
| 14:22 | 89:11 | 124:20 | 57:24 | 72:24 | 26:24 |
| 15:6 20:3 | **ultimatel** | 125:11 | 80:14 | 73:4 | 29:7 40:6 |
| 36:3,17 | **y** | **understan** | 92:21,22 | 74:17 | 78:8 |
| 40:17 | 81:1 | **ding** | 109:25 | 75:15,18, | 95:15 |
| 41:8 45:9 | 98:12 | 16:15 | **unload** | 19,22 | 100:9,10 |
| 48:15 | 107:4 | 27:3,24 | 65:20 | 77:1,2,13 | 101:1 |
| 49:2,18 | **UMC** | 28:2 29:1 | **unrealist** | 79:5,6,7, | **used** |
| 64:21 | 75:20 | 42:22 | **ic** | 12,13,22 | 27:25 |
| 66:9 | **unable** | 43:5 | 59:15 | 81:2,5,6, | 28:1 90:3 |
| 67:1,2,3 | 19:20 | 49:22 | **until** | 10,11,13, | 120:19 |
| 76:19 | **under** | 52:12,17 | 22:7 32:8 | 17 85:20 | **using** |
| 82:14,17 | 7:5 9:9, | 58:8 | 93:22 | 90:16 | 17:6 |
| | | 60:24 | 103:23,24 | 93:2,22 | 41:18 |
| | | 87:10 | 110:3 | 97:19,22, | 62:1,3 |
| | | **unfair** | | 24 98:17 | |
| | | | | 101:20 | |
| | | | | 102:19 | |

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 173 of 177

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**usual**
11:3

**usually**
45:6

**utilities**
57:22

**utilize**
46:20

**utilizing**
118:21

———————
**V**
———————

**vacation**
15:14

**Valley**
15:10

**van**
35:3

**variety**
111:20,25
125:12

**various**
24:17
127:10

**Vegas**
7:11

**vehicle**
13:11
34:21,25
35:3,5
39:8,15
50:10
51:9
53:12
64:7
65:11,13
106:10,25

**vehicles**
19:20
41:7,8
65:20

**verbiage**
110:9

**versions**
31:23
32:5

**versus**
27:25

**very**
10:9
20:5,6,22
30:15
35:12,14
37:15
48:6,7
58:22
60:2,15
61:13
74:15
83:9,11,
12 85:23
86:12
90:15,24
95:6
99:19,23
101:19

**vest**
74:11,14
99:6,9
103:3

**vests**
65:8

**vet**
115:4

**vetted**
32:8
115:7

**vetting**
114:22

**video**
10:15,17
63:7
129:11,14

**video-
recorded**
129:10

**VIDEOGRAP
HER**
55:5,8
126:25
127:3
129:9

**view**
17:10
23:14

**viewed**
89:13

**violate**
25:25

**violated**
120:7

**violating**
26:4

**volume**
37:12

**voluminou
s**
112:2

**vulnerabl
e**
108:19
109:9
110:16

———————
**W**
———————

**wait**
18:5
24:21

**waited**
95:25

**waiting**
29:18

**Waive**
129:14

**wake**
101:20

**walk**
12:13
17:2,8
21:6
30:25
31:2 35:6
39:5
63:5,9
83:22
85:20
94:7,25
97:10
126:17

**walk-
through**
40:10

**walked**
6:15 18:9
35:21
74:20
97:9

**walking**
20:24
36:17
37:16
42:12
61:20
83:17,18
99:12
124:16

**wall**
19:24
20:11,12
23:18,24
24:17
70:17,18
81:18
104:1,14
124:9

**wallet**
98:13

**walls**
23:8
28:17
104:2,14

**want**

8:23,24
9:12
29:13
32:22
37:19,21
42:6 43:7
49:16
50:6,8
52:9 54:4
62:21,25
80:15
86:25
88:5
94:25
108:14
113:24
126:23
128:5,17
129:13

**wanted**
13:22
60:20

**warrant**
15:1,24
16:8,13
18:3
19:18
20:19
23:1,22,
25 24:9,
21 25:5
26:9,10,
12,19
27:2,14,
25 28:1,
22 29:3,
7,9,15
30:14,19
32:19,24
33:5,8,
10,21,23
34:5,7
37:6 41:2
42:8,19,
23,24
43:3
49:23
50:1,2
51:25

52:14,18,
19,20
54:2
56:25
57:4
58:11,15,
24 59:17
64:14,17
67:12
86:25
87:1,2,4,
12,22,23
89:2,21
91:5,11,
12,25
92:1,11
93:20,21
94:13,19
103:2,12
110:18
114:12,15
116:22,23
117:1
118:16
120:20
122:8,14,
16,17,25
124:25

**warrants**
14:6,13,
15 29:25
96:9
105:21
117:22

**Washingto
n**
65:24
67:10,14
76:9

**watched**
63:7

**way**
19:23
27:8,11
28:25
42:16
45:21
65:13



Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 174 of 177

Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 70:19 | 23,25 | 20,22,23 | 127:3,8 | 114:21 | 107:4 |
| 71:5,23 | 36:9 | 80:13,15, | **We'd** | 115:14 | 109:13 |
| 79:21 | 37:17,22 | 16 81:8 | 41:9 | 118:15,16 | 111:18 |
| 82:16 | 38:23 | 83:8,13, | **we'll** | 119:8,9, | 119:2,7, |
| 87:25 | 39:1,2,3, | 14,15 | 24:17 | 10 121:17 | 15,16 |
| 100:20 | 4,7,11, | 84:7,18 | 27:23 | 128:5 | 121:11 |
| 101:14 | 13,19 | 85:15 | 51:22 | 129:11 | 122:22 |
| 108:9 | 40:2,3,4, | 86:3 | 78:7 | **we've** | 123:12, |
| 111:18 | 5,6,7,11 | 88:10 | 114:8 | 55:3,22 | 16,19 |
| 112:6 | 41:7,10, | 89:6,18, | 128:22 | 86:24 | 125:14 |
| 115:12 | 12,16,21 | 19,20 | **we're** | 106:4,9 | 126:13,14 |
| 120:12 | 43:17,20 | 90:16 | 6:19 12:4 | 114:10,13 | 128:6 |
| **we** | 44:1,13, | 91:17 | 15:5,12, | 117:22 | **went** |
| 6:3 8:16 | 15,17,19 | 92:17 | 13,14,15 | **weapon** | 7:15 8:7 |
| 9:9,10 | 45:10,12 | 94:17,19 | 16:9,10, | 46:15 | 12:18,20 |
| 10:6,7,10 | 46:9,11 | 95:24 | 12 17:17, | **weapons** | 13:13,14, |
| 13:5 | 47:14,16, | 96:5 | 22,23 | 12:3 | 16,19 |
| 14:2,15, | 17,18,23 | 99:12 | 18:2 | 50:14 | 31:8 32:1 |
| 17,18,23 | 49:21 | 102:25 | 21:12,13, | **wear** | 34:19,20, |
| 15:9,11, | 50:15 | 103:5,6, | 19 22:8, | 103:7 | 24 35:3, |
| 20 16:9, | 51:21,22 | 7,8,11,12 | 12 23:1, | **week** | 25 36:3, |
| 10,14 | 52:3,4,5 | 105:4,18 | 24,25 | 15:11 | 8,15 |
| 17:7 | 54:5 | 106:9,15, | 24:5 | **weird** | 37:23 |
| 18:2,17 | 55:5,8, | 20 107:1, | 28:11,18 | 29:11 | 40:3,11 |
| 19:2,16, | 11,12,24 | 19,21,22 | 29:18 | **well** | 56:10 |
| 19,20,21 | 57:5 | 108:3,11 | 30:10,13, | 14:19 | 63:25 |
| 20:7,14, | 58:2,18, | 109:19 | 18 31:12 | 19:4 | 64:12 |
| 18 21:3, | 22 59:6, | 110:21 | 32:18 | 25:21 | 66:2 |
| 14,19,20, | 8,22,23 | 111:15 | 37:5,18 | 27:8 29:8 | 68:1,3 |
| 25 22:7, | 60:4,5,13 | 113:11, | 44:23 | 41:16 | 73:1 |
| 9,13,15 | 62:4,5,7, | 18,19,20, | 45:25 | 45:5 | 74:20 |
| 23:1 | 8,21 63:3 | 23 114:2, | 46:6,11 | 50:14 | 79:5 80:3 |
| 24:6,14, | 64:10 | 3,6,8,9, | 60:2,17 | 54:19 | 82:16 |
| 15,16 | 65:1,4,5, | 24 115:2, | 65:12,13 | 61:1 | 83:5 86:3 |
| 26:8,16, | 7,8,9,12, | 4 116:23 | 66:22 | 64:23 | 98:10,15 |
| 17,18,20, | 15,19,21, | 118:3,4 | 73:15,16 | 66:17 | 104:14 |
| 21,24 | 22 66:18, | 119:3,12, | 77:24 | 71:15 | 117:23 |
| 28:10 | 19,20,21 | 13,17,21, | 78:3 | 72:23 | 118:4 |
| 29:5,8, | 67:4,9,12 | 23 | 80:6,9,22 | 74:8,12, | 122:2 |
| 11,13 | 68:19 | 120:12, | 82:12 | 25 80:1 | 124:13 |
| 30:16,20 | 70:2 | 13,16,22 | 83:12,14, | 83:8 88:9 | **Werner** |
| 31:3,4 | 73:16,18, | 121:20, | 15 86:17 | 93:9 | 33:20 |
| 32:7,17, | 19,20,22 | 21,23 | 91:7 | 101:3 | 35:2 |
| 21,23 | 74:19,22, | 122:3,17 | 93:15,19 | 102:3 | 54:11 |
| 33:2,3,23 | 23 75:20 | 123:22, | 94:6,9, | 103:6 | 64:11 |
| 34:6,19, | 77:7,19, | 23,24 | 10,19 | 104:9 | **west** |
| 20,21,22, | 23,24,25 | 124:1,2, | 106:15 | | 67:17 |
| 24 35:4, | 78:1,2,3, | 3,4,6,7, | 113:12 | | |
| 8,10,19, | 6,25 | 8,9,11 | | | |
| | 79:2,4,8, | 126:24,25 | | | |



Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**what**
7:19 8:4,
24 10:18
11:8,20,
23 12:5
13:21,25
14:9
15:25
16:6,9,
10,15,24
17:2,10,
11,13,21
18:13
19:8
23:11,15
25:17
26:9,21
27:16
28:5,6
30:21
31:11
32:11
34:14
35:6,11
37:7 39:2
40:16
42:22,24,
25 43:14
46:25
47:3,17,
18,22
48:2,3,25
49:5
50:10
52:7
53:6,12
56:5,6
58:5,25
59:16,20
60:3,24
62:13
63:11,24
64:19
65:2 67:8
70:4
71:21
73:18
78:12
82:8,11
83:7 84:3

85:2,9,
10,11
86:12,21
87:15
88:19,21
89:18
90:25
91:3
92:11,15
93:3,9
94:13,14,
18,23,25
95:2,3,8
96:5
97:1,8,10
102:24
103:20
104:18,24
105:13
106:8,15
107:24
109:11,19
110:25
113:2,11
114:3
115:24,25
116:20,21
119:10
122:19
128:14

**what's**
11:3,16
12:2
21:6,9
30:14
49:23
60:24
77:15,17
113:13

**whatever**
32:9
40:18
43:16
51:25
69:15
75:13
102:11
113:18

**whatnot**
90:10

**when**
7:25
10:11,14
12:14
13:7
14:20
23:22
24:21
27:24,25
28:2
29:11
31:25
32:3 33:9
39:9,23
47:16
48:1
56:15
57:4
77:10
82:6
85:18
89:8 95:8
97:7,9
110:10
111:25
120:19
122:23
124:16

**whenever**
13:11,18
26:15
30:16
31:3
34:19
39:13
40:3
58:23
60:6
63:15,19
68:6,23
69:4,11,
21 70:19
72:15,18
73:15
75:8,9
77:13
78:13

83:8,10,
16 89:13
90:17
94:2
98:15
99:11,12
103:21
106:7
108:6
112:22
124:7

**where**
13:5 16:8
17:16,18
18:20
19:1,16,
21,23
20:4,6
22:10
28:9,10,
14 33:23
35:11
37:18
41:6 48:8
49:2 50:6
51:15
59:25
64:6
66:14
68:23
72:9
73:16
74:23
75:5
77:25
80:16,22,
24 81:3,
8,9,13,22
90:6
93:23
95:12
97:2
99:7,21
104:11
106:6,10,
21,22
107:7,9,
10
111:15,21

113:16,22
115:14
117:24
125:6

**whether**
17:19
26:22,23
27:15
28:12,14
32:12
44:2,5
45:15,21,
25 46:15
57:15
59:12
65:7
77:21,22
95:10
101:25
105:19
109:8

**which**
12:19
13:3
14:23
20:11,21,
25 22:3
30:21
33:12
35:1 43:8
45:5,21,
24 48:11
53:11,23
58:20
65:25
66:10,15
67:16,18
68:3,5,14
69:5,7
70:8,12
71:4
73:8,15
76:15
80:10
81:4,22
83:2 87:8
90:23
93:23
95:22

97:13,15,
17 98:9,
12 99:3,
10 100:6
104:13
114:3
125:11
127:10

**while**
13:2,15
20:18
34:18
39:18
55:4,19
85:12,13
110:8
112:1

**who**
16:10
19:10
31:14
33:19
43:20
54:3,9,11
64:22
65:22,24
67:11,18
74:4
76:13
85:25
91:22
94:17
104:22
105:5
108:18,24
109:1,19
110:14,23
128:5

**who's**
29:24

**whoever**
16:12
43:16
60:11

**whoever's**
30:12
82:3

Case 2:24-cv-00074-APG-NJK    Document 57-3    Filed 05/16/25    Page 176 of 177

Kerry Kubla                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**whole**
14:21
15:10
53:19
56:7
116:24

**why**
15:8
22:22,25
23:22
35:17
80:7,17
94:19
123:11

**Williams**
6:9 65:23
80:24
85:11,19
86:7
102:22
105:5,9,
19

**Williams'**
120:6

**window**
66:13
67:15,17
68:6,7
76:10,12
80:3,19,
24 81:24

**window's**
85:19

**windows**
21:2
45:20

**with**
6:20
7:17,21
10:7,18,
22,25
11:1,23
12:14
14:5,9,13
15:18
18:24

20:7,12,
20 21:20
23:4,7
24:11
25:23
26:19
28:16
31:20,22
37:2,12
38:21
40:4
41:23
42:1 44:8
45:25
46:10
47:18
49:20
50:13,16,
25 51:11,
23 52:8
56:17
59:21
60:7,22,
25 61:1,
11 63:25
64:6,7,8,
25 65:17
67:4,11,
20,21
70:6,21
74:14
75:16
77:12,23
82:8 84:1
88:2,8
90:13
92:12
94:15
96:2,5
98:22
99:20
100:19,
21,24,25
101:2,3
103:6
104:20
105:20
106:17
109:7
110:12,24

111:10,
12,22
116:22
117:24
118:15
119:1,6
121:7,11
124:8,11,
22
127:16,21

**within**
13:5,25
15:13
18:19
29:6 42:7
82:14,17
83:1
90:18
109:9
110:19
116:10
127:9,15

**without**
22:4
61:20
88:22

**witness**
25:5,15
47:7,10
59:20
96:5,19
106:4,5
112:21
117:18
120:10
121:5,15
123:3
125:2

**witnessed**
39:15
106:7
107:9

**won't**
10:7 17:1
38:24

**wonder**
35:17

**wood**
61:13,14

**wood-
framed**
61:12

**wooden**
61:11

**worded**
57:15

**words**
17:9

**work**
8:6 11:3
14:18
15:17
16:2 41:2
63:12
97:7
108:1

**worked**
12:20,24

**working**
12:1,6,23
13:2,8,
18,24
29:24
72:17

**workman's**
13:13

**world**
115:12

**worry**
17:6,8

**wound**
97:12

**wrap**
61:2,3,5,
8,10,12
62:14
66:20,21
77:8,11
123:21,23
124:24
125:17

126:5,13

**wrapped**
70:11

**wraps**
61:10
126:16

**wrist**
97:18
100:5

**writing**
31:20

**written**
43:24
44:1
110:25

**wrong**
27:4
36:13
38:16,22

_____

**X**

_____

**X-RAY**
98:4

_____

**Y**

_____

**yards**
20:25
21:1

**yeah**
11:7 16:3
30:9
33:18
36:22
38:6 41:5
42:25
48:20
49:1,3
50:23
54:4
65:17
76:4 82:4
86:8
90:11

102:11,12
106:16
107:19
108:25
109:21
120:4
123:7,10
128:14,19

**year**
13:17
14:16
15:1
96:24
97:6,7
102:11
106:13

**years**
8:9 9:3
10:12,19
12:12,24
13:10
14:9,10
29:25
83:3,24
106:13,15

**yell**
103:11

**yelled**
73:12
74:2

**yelling**
73:14
103:1

**yes**
6:2,10,22
7:4 9:8,
14 10:1,
4,20
11:13
14:10,14
15:23
16:5,17,
23 23:20
24:4
25:15
26:2,7
27:8,9,22



Kerry Kubla                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

28:3,4
29:4,12,
16 30:24
32:2
36:7,20
38:13
39:25
40:15
42:21
45:4 46:9
47:24
48:4,19,
24 49:7,
11,21
51:21
52:17,24
54:23
55:16
56:4,7,
10,23
57:16
58:13
60:23
63:2,8
76:6
81:1,2
82:5
83:25
84:5,11,
13 86:14
87:6,9,
14,20
91:14
92:2,8,9,
16 96:15,
19 97:12
109:12
111:4,8
112:5
114:21
115:9
117:7,12,
18 120:25
121:15
123:3
127:25
129:6,14

**yet**
45:13

116:7
119:12

**yourself**
25:24
85:21

