# Exhibit 3

# Exhibit 3

Latia Alexander, et al.

v.

Las Vegas Metropolitan Police Department, et al.

Transcript of

**James Bertuccini**

Volume I

July 12, 2024



**Our Services**

- Court Reporting
- Record Retrieval
- Legal Talent Outsourcing
- Registered Agent
- Process Services
- Investigations
- eLaw® Case Tracking
- Alternative Dispute Resolutions

lexitaslegal.com | 702-476-4500

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3


4    LATIA ALEXANDER, individually as heir)
     of ISAIAH T. WILLIAMS and in her     )
5    capacity as Special Administrator of )
     the Estate of ISAIAH T. WILLIAMS,    )
6                                         )
                  Plaintiff,              )CASE NO.
7                                         )2:24-cv-00074-
     v.                                   )APG-NJK
8                                         )
     LAS VEGAS METROPOLITAN POLICE        )
9    DEPARTMENT, a political subdivision  )
     of the State of Nevada; KERRY KUBLA, )
10   in his individual capacity; BRICE    )
     CLEMENTS, in his individual capacity;)
11   ALEX GONZALES, in his individual     )
     capacity; RUSSELL BACKMAN, in his    )
12   individual capacity; JAMES           )
     ROTHENBURG, in his individual        )
13   capacity; JAMES BERTUCCINI, in his   )
     individual capacity; DOES I-XX,      )
14   inclusive,                           )
                                          )
15                Defendants.             )
                                          )
16

17      VIDEOTAPED DEPOSITION OF JAMES BERTUCCINI

18           Taken on Friday, July 12, 2024

19                  At 9:04 a.m.

20           At 400 South Seventh Street

21               Las Vegas, Nevada

22


23


24   Job No. 56849, Firm No. 116F

25   Reported by:  Tracy A. Manning, CCR 785

Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 4 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

2

```
 1   APPEARANCES:
 2
 3   For the Plaintiff:
 4   BREEDEN & ASSOCIATES, PLLC
     BY:  ADAM J. BREEDEN, ESQ.
 5   7432 West Sahara Avenue
     Suite 101
 6   Las Vegas, Nevada  89117
     Adam@Breedenandassociates.com
 7   (702) 819-7770
 8
 9   For the Defendants:
10   MARQUIS AURBACH
     BY:  CRAIG R. ANDERSON, ESQ.
11   10001 Park Run Drive
     Las Vegas, Nevada  89145
12   canderson@maclaw.com
     (702) 382-0711
13
14
15   The Videographer:  Dawn Beck
16
17
18
19
20
21
22
23
24
25
```

3

```
 1              I N D E X
 2   WITNESS                            PAGE
 3   JAMES BERTUCCINI
 4
 5
 6      Examination by Mr. Breeden         5
 7
 8
 9           E X H I B I T S
10   NUMBER                            PAGE
11   1    Photocopies of equipment, Bates   34
          stamped WILLIAMS 000793 -
12        WILLIAMS 000797, 5 pages
13   2    Defense Technology equipment, 1 page  40
14   3    Excerpt of State of Nevada,       81
          Commission on Peace Officer Standards
15        and Training, Performance Objective
          Reference Material, pages 12 and 13
16        of 58, 2 pages
17   4    Excerpt, photocopy of SWAT briefing,  94
          Bates stamped LVMPD 004377, 1 page,
18        Confidential
19   5    Excerpt from Las Vegas Metropolitan  150
          Police Department, Special Weapons
20        and Tactics, Bates stamped
          LVMPD 001508, 1 page
21
22
23
24
25
```

4

```
 1              JULY 12, 2024
 2
 3        THE VIDEOGRAPHER:  Good morning.  This
 4   begins digital media No. 1 in the deposition of
 5   James Bertuccini.  Today's date is July 12th, 2024.
 6   The time on the video monitor is 9:04 a.m.  We are
 7   located at 400 South Seventh Street in Las Vegas,
 8   Nevada.
 9        This case is entitled Latia Alexander, et
10   al. versus Las Vegas Metropolitan Police Department,
11   et al.  The case number is 2:24-cv-00074-APG-NJK.
12   It's being held in United States District Court,
13   District of Nevada.
14        My name is Dawn Beck, legal videographer.
15   The court reporter is Tracy Manning.  We represent
16   Lexitas.  Will counsel please state your appearance
17   for the record and who you represent.
18        MR. BREEDEN:  This is attorney Adam
19   Breeden for the plaintiffs.
20        MR. ANDERSON:  Craig Anderson for the
21   defendants.
22        THE VIDEOGRAPHER:  Thank you.  Would the
23   court reporter please swear in the witness.
24   ...
25   ...
```

5

```
 1              JAMES BERTUCCINI
 2            having been duly sworn,
 3          was examined and testified as follows:
 4
 5              EXAMINATION
 6   BY MR. BREEDEN:
 7        Q.  Morning, sir.  Can you please state your
 8   name for the court reporter, and go ahead and spell
 9   your full names as well?
10        A.  It's James Bertuccini.  That's J-a-m-e-s.
11   Bertuccini is B-e-r-t-u-c-c-i-n-i.
12        Q.  Officer Bertuccini, on January 10th of
13   2022, were you a police officer assigned to the SWAT
14   unit for Las Vegas Metropolitan Police Department?
15        A.  Yes, sir.
16        Q.  In the performance of your job as a police
17   officer, do you agree with me that you have a duty
18   to conduct yourself such that you do not violate the
19   civil rights of members of the public?
20        A.  Yes, sir.
21        Q.  You also agree with me that if you see
22   other officers violating the civil rights of the
23   public, you actually have a duty to intervene and
24   stop that officer?
25        A.  Yes, sir.
```



James Bertuccini        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6

1     Q.  Back up a little bit.
2         My name is Adam Breeden.  I'm the attorney
3     for a woman, Latia Alexander, who has filed a
4     lawsuit against you, several other officers, and the
5     Las Vegas Metropolitan Police Department, arising
6     out of a SWAT action that resulted in the death of
7     her son, Isaiah Williams, on January 10th of 2022.
8         Do you understand the reason why you're
9     here this morning is to give your deposition
10    testimony in that case?
11    A.  Yes, sir, I do.
12    Q.  Have you ever given deposition testimony
13    before?
14    A.  Yes, sir.
15    Q.  How many occasions?
16    A.  One time.
17    Q.  I'm going to ask you a little bit about
18    that later in this deposition.  I do want to go over
19    the rules or admonitions for the depositions, for
20    you at this time, even though you've been through
21    the process before.
22        The oath that was administered to you by
23    the court reporter to your left, my right, is the
24    same oath that you would take in a court of law.
25    And it obligates you to tell the truth under penalty

7

1     of perjury today; do you understand that?
2     A.  Yes, sir, I do.
3     Q.  Your deposition is also being videotaped
4     today.  And your testimony may be played or read for
5     the jury at trial; do you understand that?
6     A.  Yes, sir.
7     Q.  The court reporter is taking down
8     everything that's said today, all of my questions
9     and your answers, and any other comments that are
10    made.  And afterward, she'll put everything in a
11    booklet or a transcript form.  After the deposition,
12    you have an opportunity to review the transcript and
13    make changes to your testimony if you wish.
14        However, I would advise you in advance
15    that if you make a substantive change to your
16    testimony, as opposed to just correcting a
17    grammatical error or a typographical error, I would
18    still have the right to comment on the fact that you
19    said one thing here today during your deposition,
20    and then later you changed it; do you understand
21    that?
22    A.  Yes, sir, I do.
23    Q.  It is important for us to get a good
24    record today.  If you don't understand any of my
25    questions, please ask me to repeat or rephrase them

8

1     and I'll be happy to do that for you.
2         During today's deposition, you always need
3     to give an audible answer out loud or verbal, such
4     as a yes or a no.  You've done an excellent job so
5     far.  But please do not shake your head up and down
6     or side to side or use slang terms, such as uh-huh
7     or uh-uh if you mean yes or no.  If you do something
8     like that, I'll probably ask you to clarify what you
9     meant by your response, just so it's clear when
10    later we go back and look at the transcript what
11    your response was.
12        Also, as a general rule during today's
13    deposition, and again, you've done an excellent job
14    so far, please try not to speak at the same time
15    anyone else is speaking.  There are several reasons
16    I ask you to do that, but one is because it is
17    difficult for the court reporter to accurately take
18    down what two people are saying at the same time.
19    Can you do all that for me?
20    A.  Absolutely, yes, sir.
21    Q.  During today's deposition, one of the
22    attorneys may object to a question that's asked.  I
23    want to explain to you how objections work during a
24    deposition, because they work a little differently
25    than what people may have seen in a courtroom or on

9

1     TV.
2         During a deposition, you can see we don't
3     have a judge here to immediately rule on objections.
4     Therefore, if I ask a question that your attorney
5     thinks an objection needs to be stated for, he will
6     state the objection and the basis for the objection,
7     and then we'll still all look to you to give a
8     response.  And then later, if the judge needs to
9     rule on whether your response is admissible or not
10    in court, the judge can do so.  I explain that,
11    because it confuses many people during the
12    deposition process.  They hear an objection, and
13    they believe, oh, I'm not supposed to respond
14    because my attorney has objected.  But generally,
15    the opposite is true.
16        If I ask you some question that is truly
17    protected by a privilege and your attorney does not
18    want you to respond, I'm sure he will make that very
19    clear to you on the record, and the basis for him
20    asserting that privilege; do you understand that?
21    A.  Yes, sir.
22    Q.  Do you have any questions for me as to how
23    we're going to proceed today?
24    A.  No, sir.
25    Q.  Have you consumed any alcoholic beverages

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10

1   in the last 24 hours?
2      A.  No, sir.
3      Q.  I don't need to know a lot of your medical
4   history, and I'm not trying to pry into your
5   personal medical history, but I do want to know if
6   you have taken any sort of drug, including
7   prescription medications, in the last 48 hours?
8      A.  Prescription medication, I've taken
9   Gabapentin for nerve pain.
10     Q.  Okay.  And have you been on that
11  prescription medication for six months or longer?
12     A.  No.
13     Q.  Okay.  How long have you been on that
14  medication?
15     A.  Last four days.
16     Q.  And do you believe that medication has
17  affected your memory or your ability to testify in
18  any manner?
19     A.  No, sir.  It's not a controlled substance.
20     Q.  Do you have any medical condition, an
21  extreme example would be dementia or Alzheimer's,
22  that you believe may affect your memory or your
23  ability to accurately testify here today?
24     A.  No, sir.
25     Q.  How would you rate your memory at this

11

1   time of the events of January 10th of 2022?  Do you
2   believe you have a good memory?
3      A.  Yes, sir.
4      Q.  What, if anything, have you done
5   specifically to prepare for today's deposition?
6      A.  I sat down with my attorney, sir.
7      Q.  Okay.  When did you sit down with your
8   attorney?
9      A.  Yesterday.
10     Q.  How long did you meet with your attorney?
11     A.  Maybe an hour, sir.
12     Q.  Did you review any documents?
13     A.  Yes, sir.
14     Q.  What documents did you review?
15     A.  My statements, my CIRT and FIT statements.
16     Q.  Any other documents you reviewed?
17     A.  No, sir.
18     Q.  Other than your attorney, did you meet
19  with any other person or speak to any other person,
20  for example, some of the other officers that have
21  been sued about the fact that you're going to
22  testify and what you're going to testify to?
23     A.  To be honest, no, sir, I have not.
24     Q.  Have you reviewed any expert report that's
25  been prepared for this litigation, even if it's a

12

1   draft report?  I believe it was the CIRT final review.
2      A.  I believe it was the CIRT final review.
3      Q.  Okay.  And there's only been one other
4   deposition taken in this case.  That was of Officer
5   Gonzales earlier this week.  You didn't sit through
6   that deposition, did you?
7      A.  No, sir.
8      Q.  Did you discuss with Officer Gonzales what
9   he testified to on Monday?
10     A.  No, sir, I have not.
11     Q.  Have you reviewed a transcript of that
12  proceeding?
13     A.  I didn't read it, no, no, sir.
14     Q.  Again, before we get into your background
15  here, just to tell you, the deposition will likely
16  last three to four hours.  If you need to take a
17  break, just let me know.  I always like to admonish
18  witnesses, though, because this is a bit of an
19  unusual rule.  They treat this deposition proceeding
20  as if you were actually testifying in court.  So if
21  we take a break, exchanges that you have with your
22  attorney are not protected by attorney-client
23  privilege.  So you can't discuss anything
24  substantive or anything that you would not want
25  disclosed to me during breaks; do you understand

13

1   that?
2      A.  Yes, sir, I understand.
3      Q.  All right.  How old are you?
4      A.  I'm 45, sir.
5      Q.  And what city and state were you born in?
6      A.  Las Vegas, Nevada.
7      Q.  Have you ever lived outside of Las Vegas?
8      A.  No, sir.  Outside of going to college.
9      Q.  We'll talk about that in a minute.  But
10  your residence has always been Las Vegas, Nevada?
11     A.  Yes, sir.
12     Q.  Have you ever been convicted of a crime?
13     A.  No, sir.
14     Q.  Let's talk about your education.  What
15  year did you graduate high school?
16     A.  1997.
17     Q.  And from what high school, city and state?
18     A.  Cheyenne High School; Las Vegas, Nevada.
19     Q.  What education past high school have you
20  had?
21     A.  I have an Associate's Degree.
22     Q.  From what institution?
23     A.  CSN.
24     Q.  Is that in Clark County, Nevada?
25     A.  Yes, sir.

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

14

1    Q.   And when did you obtain that Associate's
2    Degree?
3        A.   2000, sir.
4        Q.   Did you have a particular major or area of
5    study?
6        A.   Liberal Arts and Criminal Justice.
7        Q.   After graduating from CSN, did you have
8    any other formal education?
9        A.   Yes, sir.  I went to the University of New
10   Haven.
11       Q.   Is that in New Haven, Connecticut?
12       A.   Yes, sir.
13       Q.   That's quite a shift for somebody who's
14   born and raised in Las Vegas.  Why did you choose to
15   go to the University of New Haven?
16       A.   I got offered a baseball scholarship, sir.
17       Q.   And so what years did you attend the
18   University of New Haven?
19       A.   I believe it was 2000 to 2002.
20       Q.   And did you graduate or receive a degree?
21       A.   No, sir, I did not.
22       Q.   Did you have a particular major or area of
23   study, other than the practice of baseball?
24       A.   Criminal justice, sir.
25       Q.   And what was the reason you did not

15

1    receive a degree?
2        A.   I left early.  They didn't renew my
3    scholarship, fell below GPA.  And I came home to
4    finish -- try my best to finish.  And then I ended
5    up testing with Metro.
6        Q.   Okay.  So when you returned home, and I'm
7    going to assume that's in the 2002 time frame?
8        A.   Yeah, 2002.  And then -- yeah, right
9    around there.  Because I got hired on with Metro in
10   2004.
11       Q.   Did you enroll -- before you were hired on
12   with Metro, did you enroll in any other university
13   or college to try to complete your degree?
14       A.   UNLV.
15       Q.   And what years did you attend UNLV?
16       A.   '03, '04.
17       Q.   And did you graduate?
18       A.   No.
19       Q.   Why did you not graduate?
20       A.   I was three credits short and I got hired
21   on with Metro and I just focused on that.  You'd
22   think I'd go with three credits short.
23       Q.   It's never too late.
24       A.   Never too late, yes, sir.
25       Q.   Do you have any sort of legal background

16

1    or training in the legal field?  For example, as a
2    paralegal, legal assistant, or attorney?
3        A.   No, sir.
4        Q.   And do you have any education or
5    background pertaining to the medical field?
6        A.   No, sir.
7        Q.   Okay.  Are you required to be, like,
8    emergency medicine certified?
9        A.   No, sir.  Not in SWAT, no, sir.
10       Q.   Okay.  So in 2004 you joined Metro?
11       A.   Yes, sir.
12       Q.   And why did you decide to go into law
13   enforcement with Metro.
14       A.   I've always wanted to be a police officer.
15   From the day -- the day that me and my dad sat down
16   and watched the old cop shows in Vegas, that's what
17   I wanted to do.  And what -- I've always wanted to
18   be in SWAT.
19       Q.   Okay.
20       A.   That was what -- it was a childhood dream.
21       Q.   You wanted to protect the public?
22       A.   Yes, sir.
23       Q.   Wanted to do good for the community?
24       A.   Yes, sir.
25       Q.   Did you do anything for a living before

17

1    joining Metro?
2        A.   Yeah.  I was a bartender.
3        Q.   For how many years?
4        A.   I would say two years before I got hired
5    on.
6        Q.   Where were you a bartender?
7        A.   It was at -- it's now called Mangos.  It
8    was at the time called Boomerang's Bar and Club off
9    of Vegas and Rainbow.
10       Q.   And did you voluntarily leave there to
11   join Metro?
12       A.   Yeah.  I gave my two weeks when I got
13   hired on with Metro.
14       Q.   Okay.  And so have you been continuously
15   employed with Las Vegas Metro Police Department
16   since 2004?
17       A.   Yes, sir, I have.
18       Q.   And what's your job title or position?
19       A.   I'm obviously with the SWAT section.  I am
20   the Assistant Team Leader to my Team Leader.  And
21   I'm also an entryman and explosive breacher.
22       Q.   So let's talk a little bit about the
23   structure of SWAT.  There's different SWAT teams
24   within Metro; is that correct?
25       A.   There's two of us, two teams.

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

18

1    Q.  Okay.  And how are the teams designated?
2    A.  Basically, they're broken up so we have
3  seven day a week coverage.  My team, for example, we
4  cover Wednesday to Saturday.  We are -- our shifts
5  are from 2:00 p.m. to midnight.  The other team
6  takes over at basically midnight on Saturday, and
7  they work Sunday to Wednesday.  Our common day
8  together is on Wednesday.  So we have dual team
9  training days.  The teams' makeup is basically, we
10  have two sergeants over each team, two ATLs over
11  each time, and I believe right now we're at between
12  13 and 14 operators per team.
13    Q.  Okay.  And when you use the term "ATL",
14  that's stands for Assistant Team Leader?
15    A.  Yes, sir.
16    Q.  And I think -- you did a good job of
17  answering my question, and I appreciate it.  But
18  what I was getting at was something a little
19  differently.
20      The two different SWAT teams, they're
21  designated by colors; is that right?
22    A.  Red and blue.
23    Q.  Is there a gold?  Has there ever been a
24  gold?
25    A.  No.  So right now -- so when this incident

19

1  happened, our colors were different.  We are now red
2  and blue.  Back then, I believe they were gold and
3  silver.  If I can recall correctly.
4    Q.  And at that time -- pardon me -- at that
5  time, were you on the gold team?
6    A.  No, I -- so they -- whatever the primary
7  team was, I was on the opposite team.  So if gold is
8  primary, I was on silver.
9    Q.  Okay.  And you just can't remember if you
10  were on gold or silver?
11    A.  I don't.  I don't remember what the
12  color -- how we changed it up back then.  I couldn't
13  tell you.
14    Q.  Okay.  And let's talk specifically about
15  this time here, January of 2022.  Who was your SWAT
16  leader?
17    A.  My SWAT command- -- my SWAT commander or
18  sergeant?
19    Q.  Well, why don't you give me both and
20  explain to me how those are different.
21    A.  The lieutenant, who was the commander, was
22  Lieutenant Melanie O'Daniel.  My direct supervisor
23  at the time was Sergeant James Bonkavich.
24    Q.  Can you spell that for me?
25    A.  Bonkavich is B-o-n-k-a-v-i-c-h.

20

1    Q.  And was Sergeant Bonkavich on site for the
2  January 10th, 2022 operation?
3    A.  No, sir.  He was on his RDO, as I was.  I
4  came in as -- to assist the team.
5    Q.  Okay.  And when I refer to, you know, what
6  happened there at January 10, 2022, do you use the
7  term SWAT operation?  SWAT raid?  SWAT mission?
8  What term do you use?
9    A.  It was a SWAT search warrant.  It was just
10  a search warrant.
11    Q.  Okay.  Who is your -- the current
12  lieutenant over you?
13    A.  Right now is Lieutenant Adrian Beas.
14    Q.  Can you spell that last name?
15    A.  B-e-a-s.
16    Q.  And who's the current sergeant over you?
17    A.  Sergeant Cody Thompson.
18    Q.  Now, again, on January 10 of 2022, did you
19  hold the position of Assistant Team Leader for your
20  team?
21    A.  No, I did not.
22    Q.  Okay.  When did you obtain that title or
23  position?
24    A.  I've been the Assistant Team Leader for my
25  team for the last nine years.

21

1    Q.  Okay.  So I guess maybe I misunderstood
2  your -- your answer a little bit.
3      On January 10, 2022, you were an Assistant
4  Team Leader, but for your team, not the team
5  executing the search warrant.
6    A.  Yes.  I was not the ATL for that
7  operation, that search warrant.
8    Q.  Okay.  Who was the ATL?
9    A.  Jake Werner.
10    Q.  Who was the sergeant in charge?
11    A.  There was two of them.  There was Russ
12  Backman and Garth Finley.
13    Q.  And who was the lieutenant in charge?
14    A.  Melanie O'Daniel.
15    Q.  All right.  Have you had any other
16  employment, side jobs, or side work during your
17  employment with Metro?
18    A.  No, sir.
19    Q.  I thought I saw in your personnel file
20  that you made an application to do some
21  self-employment training and consultation.
22    A.  Yeah, that -- here and there.  It's
23  nothing.  Yeah.  I'm trying.
24    Q.  Do you have a name for that business?
25    A.  We're trying Zebra Operation Group.

Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 9 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22

1    Q.   Okay.  When is the last time you did any
2    work for that company?
3    A.   We haven't yet.
4    Q.   Okay.  So this is just something that's
5    anticipated --
6    A.   I'm hoping to get going, yes.
7    Q.   Okay.  So if you hope to get going, what
8    sort of training or work would you be doing?
9    A.   Just SWAT consultations, active shooter
10   training, hostage rescue training.
11   Q.   And so would other police departments hire
12   you to do that, then, or would Metro hire you to do
13   that?
14   A.   It would be outside.  So it would be other
15   agencies, other departments.
16   Q.   Do you have any potential agencies that
17   you've discussed doing that sort of work with
18   already?
19   A.   We've talked -- we were -- I just got back
20   from the Ohio Tactical Officers Association.  But
21   that was through Metro.  That was a class that we
22   did through Metro.
23   Q.   Have you ever held, whether they're law
24   enforcement related or not, any professional
25   licenses or certifications?  And again, this could

23

1    be law enforcement related or it could be something
2    completely unrelated to law enforcement, like a real
3    estate agent or a licensed forklift operator.
4    A.   Have I?
5    Q.   Yes.
6    A.   No, sir, I have not.
7    Q.   Have you ever tested for any license or
8    accreditation and been denied?
9    A.   No, sir.
10   Q.   Have you ever applied for any position or
11   promotion within Metro and been denied?
12   A.   No, sir.
13   Q.   Okay.  Have you ever sought to -- I think
14   it's an exam you have to take to become sergeant?
15   A.   Yes.  I have never taken it.  I've never
16   wanted to be a supervisor.
17   Q.   Okay.  In looking through your personnel
18   file, I notice that you have twice been suspended
19   from Las Vegas Metropolitan Police Department for
20   causing auto accidents on duty; is that accurate?
21   A.   Long time ago, yes.
22   Q.   Is it two and only two times you've
23   been suspended?
24   A.   Yes.
25   Q.   And both times were just for automobile

24

1    accidents?
2    A.   Yes.  And they were -- I believe they were
3    suspensions where I could give vacation time in
4    lieu, in basically a trade.
5    Q.   Have you ever been given any other
6    suspension or reprimand, then --
7    A.   Not to my --
8    Q.   -- by Metro?
9    A.   Not that I recall, no.
10   Q.   Okay.  In looking through your personnel
11   file, Metro gives you annual reviews; is that
12   accurate?
13   A.   Yes, sir.
14   Q.   Tell me about the annual review process.
15   Are you interviewed?  Do you have to submit
16   documents for it?  How does that work?
17   A.   So basically, it's a review between you
18   and your sergeant.  If you're talking about my
19   personnel review.  Usually it occurs in July, so I
20   should have one coming up.  I've always gotten
21   perfect scores on that.  Never had a negligent or a
22   report that I didn't agree with.  I take that very
23   seriously.  So, I've never had a bad report in 20
24   years.
25   Q.   Even after that incident on January 10,

25

1    2022, where Mr. Williams died, you weren't given any
2    negative performance review or reprimand over that,
3    were you?
4    A.   No, sir.
5    Q.   And, in fact, you were involved in another
6    incident a year before that on January 15 of 2021
7    involving a woman, Jasmine King, where during a SWAT
8    entry, she was severely injured and blinded during a
9    SWAT entry.  You were involved in that, weren't you?
10   A.   I was involved in that, yes, sir.
11   Q.   And Metro did not give you any suspension
12   or reprimand at all because of that, did they?
13   A.   No, sir.
14   Q.   Okay.  And in fact, there was an Internal
15   Affairs investigation after that SWAT action, wasn't
16   there?
17   A.   Yes, sir, there was.
18   Q.   Okay.  And were you formally interviewed
19   as a result of that?
20   A.   I was.
21   Q.   Okay.  And so have you seen, like, a
22   transcript of your statement?
23   A.   Yes.  That was a long time ago.  Yes, sir.
24   Q.   Okay.  Well, it was -- it was three years
25   ago.  Little more than three years.



James Bertuccini                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26

1        It was specifically alleged in that case
2    that you had recommended or called for what was
3    called a short count or a quick count that violated
4    the civil rights of Ms. King and others inside the
5    apartment you were entering; do you recall that?
6        A.   Yes, sir.
7        Q.   And was that upheld or sustained by
8    Internal Affairs?
9        A.   I was not receiving any discipline for
10   that.
11       Q.   Okay.  But they found that you had called
12   for that and violated the woman's civil rights?
13       A.   I didn't call for that.  The sergeant
14   approved that.  That was the count that we utilized
15   in that operation.
16       Q.   Tell me what a short count or quick count
17   is, then.
18       A.   A short count is basically a count that,
19   when we use our breach call, is, we don't go with
20   our long standard, which is where we count off, we
21   count down.  A short count is basically stand by and
22   we give the breach command when we're ready.
23       Q.   Okay.  So -- so let's review this.
24   Explain to me what the standard long count is.
25       A.   "Stand by for breach.  Three, two, one,

27

1    breach."
2        Q.   So would that be a five-second countdown?
3        A.   I have no idea.  I mean, I don't know.  I
4    mean, we can time it real quick.
5        Q.   Well, there's, "Stand by for breach.
6    Five, four, three, two, one."
7        A.   "Three, two, one, breach."
8        Q.   Okay.  And so what is a short count, or a
9    quick count, then?
10       A.   "Stand by for breach.  Breach.  Breach.
11   Breach."
12       Q.   And when Ms. King was injured, were you
13   the officer that had recommended the short count to
14   the sergeant?
15       A.   It was basically a collective group talk
16   with the breachers.  They explained to me, hey, we
17   can go with a short count here so that we can
18   utilize the distract off the bat to draw attention
19   away from the door.  And then we can go off the
20   third, the final breach count.  I -- I went to the
21   sergeant, I explained that to him, and he approved
22   it.
23       Q.   Okay.  And do you agree that Metro later
24   found that use of that short count had violated
25   Ms. King's civil rights?

28

1        MR. ANDERSON:  Objection, form.
2        Go ahead and answer.
3        THE WITNESS:  The short -- the count, the
4    short count, had -- basically there was the
5    announcement call.  So there was announcements
6    involved in that and the short count.  So the
7    announcements is what was basically deemed not
8    enough.  We didn't give enough announcements and
9    time had nothing to do with the short count.
10   BY MR. BREEDEN:
11       Q.   So what about the announcements or
12   time was found to have violated Ms. King's civil
13   rights in that matter?
14       MR. ANDERSON:  Objection, form.
15       Go ahead and answer.
16       THE WITNESS:  I believe that it was only
17   between two and two and a half seconds before the
18   breach came.  We were going -- we -- that plan was
19   going to make sure that we had two full
20   announcements before the actual count came, before
21   the command came.  And what had happened was, it
22   ended up going after about a second and a half, or,
23   like, basically an announcement, announcement and a
24   half.
25   ...

29

1    BY MR. BREEDEN:
2        Q.   So was the intent in the King entry that
3    there would be announcements made, and then there
4    would be a breach, three, two, one count, and then
5    force would be used?
6        A.   No.  In the Jasmine King case, the plan
7    was, there would be two full announcements.  Then we
8    would say, "Stand by.  Breach, breach, breach."
9    Which would have gave us the time that we wanted.
10   The time that that happened and occurred, it was
11   a -- it was an initiation prematurely and called
12   prematurely by -- or not the call, but the charge
13   was initiated prematurely.
14       Q.   And who prematurely initiated the charge?
15       A.   The officer that was on -- I believe it
16   was Officer Singh.
17       Q.   You were personally sued by Jasmine King
18   as well for violation of her civil rights, correct?
19       A.   I believe so.  I can't recall.
20       Q.   Well, there was a federal lawsuit filed
21   against you, do you recall that?
22       A.   I remember sitting in this -- in a
23   deposition, yes.  I don't remember receiving any
24   other information after that.
25       Q.   Okay.  Has that matter been settled or



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30

1  resolved?
2      A.  I believe so.
3      Q.  Do you know how much was paid to Ms. King?
4      A.  I don't know.
5      Q.  Have you ever been sued by anyone other
6  than my client and Ms. King connected to your
7  employment with Las Vegas Metropolitan Police
8  Department?
9      A.  Have I ever been sued by anyone else
10  besides Ms. King and this --
11     Q.  Yes.
12     A.  No, sir.
13     Q.  Yes.  So those are the two and only two
14  lawsuits?
15     A.  Yeah, there's been one more.  There was
16  Garrett.  But that was -- ended up being dropped.
17  BY MR. BREEDEN:
18     Q.  Okay.  How long ago was that?
19     A.  Eight years ago, maybe a little bit less.
20     Q.  Last name was G-a-r-r-e-t-t?
21     A.  I believe so, sir.
22     Q.  And what was the basis for suing you in
23  that lawsuit?
24     A.  He was -- he -- basically, it was he had
25  committed suicide, and they said that we had shot

31

1  him.  We had a dog go in, found him underneath the
2  bed.  He had a self-inflicted gunshot wound.  The
3  dog removed him from underneath the bed.  We made
4  entry, rendered aid -- rendered aid to him, and he
5  succumbed to his injuries.
6      MR. ANDERSON:  Just so you know, there
7  were two lawsuits, two different parents sued, but
8  it was the same event.
9  BY MR. BREEDEN:
10     Q.  Okay.  Were those lawsuits filed in Clark
11  County, Nevada?
12     A.  Yes, sir.
13     Q.  And were they filed in federal court or
14  state court, if you know the difference?
15     A.  I don't know.
16     Q.  Okay.  And has Mr. Anderson or his law
17  firm represented you in all those suits we've
18  discussed?
19     A.  Yes, sir.
20     Q.  Has Mr. Anderson represented you in any
21  legal matter other than those three and a half or
22  three to four lawsuits we've already discussed?
23     A.  No, sir.
24     Q.  Okay.  Have you ever had to give courtroom
25  testimony in front of a judge and a jury?

32

1      A.  I believe one time I've actually
2  testified.  One or two times.
3      Q.  Okay.
4      A.  Not very many.
5      Q.  And was that as part of a criminal
6  prosecution?
7      A.  Yes, sir.  Like, no, not for me.  I mean,
8  me arresting someone, yes.
9      Q.  Yeah, there was another defendant.
10     A.  Yeah.
11     Q.  Okay.  And that defendant went to trial
12  and you had to testify as one of the officers.
13     A.  Yes, sir.
14     Q.  Okay.  Have you ever testified in court,
15  in a courtroom in front of a judge and jury, in any
16  of the cases where you have been personally sued?
17     A.  No, sir.
18     Q.  Okay.  Now you did mention before we
19  started that you have given another deposition.  And
20  was that in the Jasmine King case?
21     A.  Yes, sir.
22     Q.  Okay.  Do you recall when that deposition
23  was?
24     A.  Couple years ago.
25     Q.  Okay.  Do you recall the name of the

33

1  attorney that took that deposition?
2      A.  I think it's -- if I remember, maybe his
3  first name, I think it was Josh.  I can't remember.
4  I'm sorry.
5      Q.  Okay.  That's okay.  Have you ever been
6  hired as an expert witness for a lawsuit to testify
7  about police practices and procedures?
8      A.  No, sir.
9      Q.  All right.  This particular case involves
10  a tool called a stun stick.  Are you familiar with
11  that term?
12     A.  Yes, sir.
13     Q.  Okay.  Now, prior to the January 10, 2022
14  SWAT entry, had you ever used that particular stun
15  stick in an actual live event as opposed to
16  training?
17     A.  Opposed to training, no.  That was the
18  first time I've used that live.  I've trained it,
19  but I never used it in a live op.
20     Q.  How long had you trained with it?
21     A.  When we first got them, we went to the
22  range, tested them out.  We actually saw that the
23  Henderson SWAT had had a variation of that, and we
24  liked that pulling system.  Made it a lot more
25  simpler, less complex.  I would say it was a day, up



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

34

1  at the range.
2      Q.  How long, prior to January 10, 2022, did
3  you receive that type of stun stick?
4      A.  I don't know, sir.  I couldn't tell you
5  when we received it.
6      Q.  Is it -- is it within a year?
7      A.  I would say within a year, yes, sir.
8      Q.  And how many times, then, did you practice
9  deploying it before January 10, 2022?
10     A.  Me personally?
11     Q.  Yes.
12     A.  Just the day that we trained it.
13     Q.  One day.  How many different charges?
14     A.  We utilized the distracts.  I don't know.
15  A few.  I couldn't tell you.
16     Q.  Let me show you something.  We'll have it
17  marked as an exhibit here.
18         (Exhibit No. 1 was marked.)
19  BY MR. BREEDEN:
20     Q.  This will be Exhibit --
21     THE REPORTER:  Wait just a minute.
22     Hand it to the witness?
23     MR. BREEDEN:  Yeah.
24     Q.  We'll have this marked as Exhibit 1.
25     Exhibit 1 has a few different pages.  They

35

1  been Bates labeled WILLIAMS 793 through 797.  Will
2  you please take a look at all the different pages
3  there for me?
4      A.  Yes, sir.
5      Q.  So, I'll represent to you that Exhibit 1
6  are several pictures of a stun stick taken from the
7  JN Tactical website.
8      Looking at this exhibit, is that the same
9  or similar type of stun stick that you used on
10  January 10, 2022?
11     A.  Yes, sir.
12     Q.  Okay.  And do you know, is it the exact
13  same make and model?  Does it look different at all
14  from the type -- kind you used?
15     A.  No, it's pretty -- it's pretty big, right
16  on.  100 percent.
17     Q.  Okay.  And so the way that this is used,
18  just looking at 793, you're going to be holding it
19  by the two handles at the top, correct?
20     A.  Yeah.  I would be holding that handle and
21  that handle.
22     Q.  Okay.  And then at the bottom, there's,
23  like -- gosh, I don't even know how to describe it.
24  But that's where a distract charge goes, and then
25  that is the part that's used to, for example, break

36

1  a window.
2      A.  You mean the top?
3      Q.  Yes.
4      A.  The hood?  Yes.
5      Q.  The hood, okay.  And then there's a little
6  trigger that you can pull with one of your hands,
7  and it pulls a pin on the distract charge; is that
8  accurate?
9      A.  Pulls the pin back to strike the 209
10  primer that's in the initiator head.
11     Q.  Once you pull that back, if -- if the
12  charge works correctly, how long is it before that
13  charge deploys?
14     A.  Well, it's not a charge.  It's a
15  distraction device that's in the housing.  The
16  housing hood.  It should -- it's automatic.  Our
17  distracts deploy at a second and a half delay.  The
18  defensive technology 25 that we use, that is a
19  second and a half delay.  But in the hood, because
20  it's command initiated and we're utilizing HMX,
21  which is a high explosive powder in the actual 209
22  primer that's the connection piece, there's no delay
23  on it.
24     Q.  So once you pull the pin, it -- it is
25  intended to discharge right away.

37

1      A.  It should -- it should initiate
2  automatically.  It should initiate that flash powder
3  into the HMX from the strike of the 209 primer,
4  which is into the housing fuse of the Def Tech 25.
5      Q.  And when you pull the trigger, the
6  distract, does it fall out of the stun stick or it
7  stays within the hood?
8      A.  No, sir.  It stays within the housing
9  component here, and -- which is another reason why
10  we bought this actual piece.  Because we have direct
11  control of where that distract body goes.
12     Q.  And -- I guess from one end to the other,
13  in feet, how long is this?
14     A.  Well, it can extend.  It could -- I would
15  say -- and now, this is just an approximate.  I'm
16  going to say 15 to 20 feet at full extension.  I
17  would say without extension, maybe five feet.  Maybe
18  four and a half, the whole rod maybe.
19     Q.  Did you have it extended at all when you
20  used it in this case?
21     A.  No, sir.  I did not.
22     Q.  I've seen pictures of it taken afterwards,
23  sort of propped up against a wall.  And it looks
24  like, as you say, it's maybe four and a half, five
25  feet in length; you think that's fair?

James Bertuccini        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

38

1    A.  I think that's fair, yes.
2    Q.  Okay.  Now, let me -- let me ask you,
3  then, because you use the word -- you know, when
4  we're talking about the distract, I've -- I've
5  called it a charge, but I'll use your terminology.
6  The distract that's loaded and it's behind the hood
7  on this stun stick.  Is that something you prepare
8  yourself or does it -- is it purchased from a
9  company and it's already loaded?
10    A.  You're asking about the actual distract?
11    Q.  Yes.
12    A.  The flash tube and all that?  No.  So, the
13  way that it's kept in our truck is the way that you
14  see it here.  So, prior to every mission, if we're
15  going to utilize this tool, it will be loaded there.
16  It would be basically constructed prior to us
17  leaving the operation, the breach spot.  So, yes,
18  there will be guys that will prepare that.
19    Q.  And I think you used the term a Def Tech
20  25?
21    A.  Yes.
22    Q.  What is that?
23    A.  That stands for Defense Technology.  That
24  is the actual brand and the name of the distract
25  that we're using.

39

1    Q.  And so that -- the term Def Tech 25, does
2  that refer to, like, a prepackaged, presold
3  distract, or just a canister that can be loaded in
4  different ways so the distract behaves in different
5  ways?
6    A.  No.  So, the actual distract -- the reason
7  why it's called a 25 is because this housing body
8  can be reused 25 times before they deem it to be
9  unsafe.  It's a pistol -- it's gun steel that it's
10  made out of.  So you can load the normal 25, which
11  is 12 gram or 4 gram distract, into the fuse head --
12  or sorry, into the body to where -- hand deployment,
13  or you can run it command initiated, which is the
14  way it's ran here.  With the nonelectric shock tube
15  logged -- clicked into the flash tube, which the HMX
16  powder mixes with the flash powder, which is loaded
17  into the 209 primer for the strike, which initiates
18  everything.
19    Q.  And so, if you deploy one of these
20  distracts, there's someone at Metro who is in charge
21  of sort of reloading them and reusing the cartridge?
22    A.  We -- we actually purchase reloads.  We
23  have them in our equipment truck.  So when they are
24  utilized on an operation, we can reload them
25  ourselves.

40

1    Q.  Okay.  And so, the particular distract
2  that was used on January 10, 2022, was that brand
3  new from Def Tech or had that been reloaded and
4  reused?
5    A.  That was right out of the box.  We
6  don't -- we don't reuse a -- once we reload -- once
7  we've shot -- utilized a distract, that fuse head is
8  gone.  The only thing that we can actually reuse is
9  that body that you have a picture of.
10    Q.  Yeah.  So let me show you -- we'll have
11  this marked as Exhibit 2.
12      (Exhibit No. 2 was marked.)
13    THE WITNESS:  Thank you, ma'am.
14  BY MR. BREEDEN:
15    Q.  So, looking here at Exhibit 2, I'll
16  represent to you that this is a document that I
17  pulled from the Def Tech website, specifications is
18  what I'm looking for.
19      Is this the same type of distract that you
20  deployed in the stun stick on January 10, 2022?
21    A.  Well, I mean, it's a -- it's like a
22  cartoon drawing of it.  This isn't the actual -- I
23  mean, it doesn't show what it looks like.  It's
24  actually a black body, it says Defensive Technology
25  on it.  It says 25 at the bottom.  But -- and then

41

1  it's a screwed in fuse head.  So I'd say it's
2  basically it.
3    Q.  Okay.  So, yeah, this is -- the
4  illustration shows a cross section of it.
5    A.  Yeah, yeah.
6    Q.  And then -- so, I guess some product
7  specifications there on the left in terms of flash
8  powder and sound level and light level.
9      Was it loaded with that type of explosive
10  content when you deployed it?
11    A.  I'll be honest with you, it was probably
12  the command initiated ones that come premade.  Which
13  is a -- I believe, you know, it's already set up
14  with the -- with the shock tube already attached to
15  it.  So it's not this.
16    Q.  Okay.  So how would you describe, then, if
17  you're telling me, "Hey, I want you to go to the Def
18  Tech website and order one of these for me," how
19  would you explain to me how to order one?
20    A.  Our logistics guys would do all that.  We
21  just tell them what we need.
22    Q.  Okay.  And so what would you tell your
23  logistics person?
24    A.  I would just say, "Hey, we need new
25  command initiated reload defuse --



Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 14 of 85

James Bertuccini            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42

1      THE REPORTER: Wait, excuse me. Command
2  initiated reload?
3      THE WITNESS: I'm sorry, ma'am. Command
4  initiated reloads for the stun stick. And they
5  would know that. I apologize ma'am.
6      That's how we would do that. We would
7  tell them, hey, we need new -- we need more Low Roll
8  bodies, or if we need more housing bodies we would
9  just tell them and they would order it.
10 BY MR. BREEDEN:
11     Q.  What do you mean by "command initiated"?
12     A.  Basically, we have control when it's going
13 to go off. It's off of us. It's off of when we
14 send the primer.
15     Q.  As opposed to, like, a delay?
16     A.  A hand thrown, hand deployed and a delay,
17 yes.
18     Q.  Okay. Now, just generally speaking, why
19 are these types of distracts used during SWAT
20 operations?
21     A.  Which one, sir? The stun stick or just
22 hand deployment?
23     Q.  Let's talk about the stun stick that was
24 actually deployed on January 10, 2022.
25     A.  The stun stick that we used that night can

43

1  be utilized in two ways. We can obviously utilize
2  that tool to insert through a window. We can
3  utilize that tool because it can extend. We can
4  actually extend it up to air burst outside of a
5  window on a second floor or something that's a
6  little bit, you know, elevated.
7      But for that particular night, we utilized
8  the stun stick in this case to break a window,
9  insert that, extend it as high as we can to disrupt
10 and disorient the people that are inside. Causing a
11 major -- a large flash and an initiation explosive.
12     Q.  Does it also cause a pressure wave a
13 person can feel?
14     A.  Over pressure? It could, yes.
15     Q.  Okay. So, the purpose of -- of this
16 device, and I'm sorry, I'm not going to recall the
17 exact phrasing you used, I don't think, but it's to
18 disorient people?
19     A.  Disorient, cause disruption. It's -- it
20 basically, just like it says, it distracts, causing
21 attention away from -- from where we're trying to
22 come in from. We utilize that in a way to also
23 create an opening as well, to see through -- we --
24 for the window.
25     My job that night was to not only initiate

44

1  the stun stick, but to also break out the window in
2  case the team had any issues at the front door, so
3  at least we had eyes in to the target. To see -- so
4  what we could see.
5      Q.  And when you deploy this type of distract,
6  there's an extremely bright flash, correct?
7      A.  Yes, sir.
8      Q.  And there's a single, loud noise, right?
9      A.  One noise, yes.
10     Q.  Do you agree that that noise sounds like a
11 an explosion?
12     A.  I would say it's a very loud bang, yes.
13     Q.  Would you agree with me that that might
14 sound to somebody like some sort of gun or weapon
15 that's been fired?
16     A.  It's been known to -- for people to say
17 that it sounds like that, yes.
18     Q.  Okay. You say it's been known for people
19 to say that. Who has told you that?
20     A.  Just when we've arrested people and
21 they -- you know, as we're -- as we deployed
22 distracts, like, "Oh, we thought those were
23 gunshots."
24     Q.  Okay. So, before January 10, 2022, you
25 were aware that some people that you had used these

45

1  distractions on had actually confused them for
2  gunshots.
3      A.  People outside, yes.
4      Q.  Okay. But you're aware that it can have
5  that impression on people.
6      A.  Yes.
7      Q.  That they are already being fired on.
8      A.  Yes.
9      Q.  So, this thing creates a pretty loud
10 flash. What do you do so that that flash doesn't
11 affect you when you deploy it?
12     A.  So, when we deployed into the structure,
13 obviously it's going to be deployed as high as
14 possible.
15     There's three SOPs that I have to abide by
16 when I deploy a stun stick, or any operator deploys
17 a stun stick. Is we have to clear the area. We
18 have to make sure that there's nobody within the
19 vicinity of the area. When we break glass or
20 anything like that. We also have to make sure that
21 there is nothing flammable or hazardous that's going
22 to be remotely within the vicinity of the area
23 before we initiate the 25 to go.
24     So to answer your question, yes, it
25 creates a very large light. We look away to avoid



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

46

1  the brightness and the intensity of the
2  illumination.  Because it does cause a very bright
3  light.  Def Tech or -- talks about 40- to 50,000 of
4  candela.  I mean, I'm not Thomas Edison.  I didn't
5  invent the light bulb.  I don't know what a candela
6  is, but it's a very intense light.  I've actually
7  been caught looking at it during training, and
8  it's -- yes, it causes people to look away.
9  Temporarily incapacitate, disorient, disrupt, all
10 those things.
11     Q.  When you actually deploy it, then, you
12 know, just using January 10, 2022 as the example,
13 did you turn your head to the side and close your
14 eyes to minimize the effect of the flash --
15     A.  In this -- I apologize.  I didn't mean to
16 step on you.
17         In this situation I didn't need to.
18 Because I was able to get it as high and basically
19 touching the ceiling.  So I didn't have to.  I just
20 basically stood back and leaned back and angled my
21 body to the left side of the window.
22     Q.  But you weren't looking at it when you
23 deployed it, were you?
24     A.  No, I didn't.
25     Q.  Did you have your eyes open or closed?

47

1      A.  Yes, my eyes were open.
2      Q.  Okay.  In the situations where you say
3  you -- during training the flash has caught your
4  eyes open, how has that affected you?
5      A.  Just a quick little -- you know, I would
6  say half a second little -- obscuring my vision.
7      Q.  Okay.  And how long did that effect last
8  for you?
9      A.  Like I said, maybe half a second.
10     Q.  But you would agree that it's confusing
11 and disorienting on people?
12     A.  I would agree, yes, sir.
13     Q.  Okay.  And then, were you wearing any
14 goggles or eye protection?
15     A.  I was, sir, yes.
16     Q.  Okay.  What were you wearing?
17     A.  Ballistic -- well, not ballistic, that's
18 what they're called.  Just an Oakley clear lens.
19     Q.  Okay.  It's not shaded in any manner?
20     A.  No, sir, it is not shaded.
21     Q.  Okay.  And why -- is there some reason
22 it's not shaded?
23     A.  My lenses?  Well, our operation was dark
24 at night.  And I'm -- I want to be able to see.  I'm
25 not -- I don't need any tint.  I want them to be

48

1  clear.
2      Q.  And in terms of the -- the sound that it's
3  creating, I think you described it as a very long
4  (sic) bang that some people have confused with
5  gunfire.  Do you wear any hearing protection for
6  that deployment?
7      A.  Yes, sir.  They're attached to my helmet.
8      Q.  Okay.  And so have you been around these
9  not wearing hearing protection when they're
10 deployed?
11     A.  Have I been around them?  No.  We
12 always -- if we're training with distracts or
13 anything, we're always making sure that we have
14 hearing protection on.
15     Q.  Why is that?
16     A.  Protect our ears.
17     Q.  And do you agree with me that it would
18 have a confusing and distracting effect on a
19 person's hearing if they were to be around one of
20 those when it deployed without hearing protection?
21     A.  I would agree, yes.
22     Q.  And what -- you know, there's different
23 kinds of hearing protection that you can have.  I
24 mean, there's the -- there's those little, like,
25 foam earbuds that you can put in, or if you were at

49

1  a rifle range you can wear, like, noise canceling
2  headphones.  What is the hearing protection that you
3  had on that day?
4      A.  I had headphones.  The ones you're talking
5  about, the noise, auditory.  Yeah.
6      Q.  You had noise canceling headphones on.
7      A.  Uh-huh, yes.
8      Q.  All right.  And are those -- is that sort
9  of standard practice when you're using a stun stick,
10 to wear hearing protection of that kind?
11     A.  It's standard practice for us to have
12 hearing protection no matter what job we're doing.
13     Q.  Now, I know Officer Rothenburg was close
14 by.  Do you -- did I pronounce that name correctly?
15     A.  Rothenburg, yes, sir.
16     Q.  Did Officer Rothenburg have hearing
17 protection on as well?
18     A.  I believe he did, yes, sir.
19     Q.  Did all the officers on the SWAT team have
20 hearing protection?
21     A.  To my knowledge, yes, sir.  They should
22 have.
23     Q.  Okay.  Noise canceling?
24     A.  Yes, sir.
25     Q.  Wouldn't that impair your ability to speak



50

1  to people or hear people on the inside?
2      A.  No.  No.  We can still talk, we can still
3  communicate with our headphones on.
4      Q.  Okay.  To each other or to anyone?
5      A.  We have radios, we have -- our radios and
6  our communication pieces are all hooked into our
7  headphones with our mikes.  That's how we can
8  communicate.
9      Q.  Okay.  Well, members of the public like
10 Mr. Williams, he wasn't miked up and he didn't have
11 access to your radios, right?
12     A.  No.
13     Q.  Okay.  So, if Mr. Williams had tried to
14 say something, don't you think the hearing
15 protection you're wearing would have impaired your
16 ability to hear that?
17     A.  No.
18     Q.  Noise canceling headphones --
19     A.  If he was saying something to us, no, we
20 would be able to hear him.  Our -- our headphones --
21 basically, we have -- we have devices where we
22 can -- they cancel out -- we can hear.  We can hear
23 just fine.
24     Q.  Well, you would agree -- I mean, the
25 purpose of noise canceling headphones is to impair

51

1  your hearing somewhat, right?
2      A.  Just kind of cancels out some of the
3  noise, like, when we're utilizing, like, distracts
4  and large bangs.  Like, we can hear just fine.
5      Q.  Would you agree with me that if one of
6  these distracts is going off and someone is speaking
7  at the same time, it would be difficult to hear or
8  understand them over the distract noise?
9      A.  I'm sorry, can you repeat that?
10     Q.  Yeah, I'm sorry.  It was kind of a long
11 question.
12         The question is, would you agree with me
13 that if somebody was speaking, like we're speaking
14 during this deposition, if we were doing this while
15 one of these distracts is going off, do you agree
16 with me that it would be more difficult to
17 understand me?
18     A.  It would be a loud bang.  I mean, it
19 depends on where it would be deployed.  If it was
20 deployed on the outside, you and I would -- you and
21 I would -- we would hear a loud bang, but we could
22 still easily talk and communicate with each other.
23         That door comes open, we -- they deploy a
24 distract in here, and we hear a loud bang,
25 there's -- there's probably going to be a second and

52

1  a half of while that thing -- when that thing is
2  deployed, that we're probably not going to hear each
3  other, yes.
4      Q.  Have you ever been to a concert or, you
5  know, something else.  Like, you've been around a
6  jet plane and there's some very loud noise and
7  you're exposed to it, and then you notice that even
8  when the noise stops, you're hearing is still
9  affected.
10     A.  I can honestly tell you, I've never been
11 to a concert.  Yes, I've been around planes.  When
12 we do dignitary protection details.  I don't -- I've
13 never been affected by it.  So I don't understand
14 the -- I don't know the example that you're giving.
15 I apologize.
16     Q.  Okay.  Well, as far as you know, who was
17 the person who made the decision to use the stun
18 stick on January 10, 2022?
19     A.  It was basically -- the option was given
20 by the recon officers to the Assistant Team Leader.
21 That was also then given to -- the Assistant Team
22 Leader presented that to the sergeants, the team
23 leaders.  The team leader then, per policy, has to
24 get that approved by the lieutenant, because it's
25 going to be an insertion into the structure.  And so

53

1  lieutenant O'Daniel approved that.  The ATL -- ATL
2  Werner brought that to Sergeant Backman and Sergeant
3  Finley.
4      Q.  Okay.  So thank you for providing the
5  names to those folks.  But as far as you are
6  concerned, who's the person ultimately in charge of
7  that decision?  Even if it's recommended by
8  somebody, who -- who's that decision ultimately fall
9  on?
10     A.  To use it?
11     Q.  Yes.
12     A.  The lieutenant.
13     Q.  O'Daniel?
14     A.  Yes.
15     Q.  And you're aware she approved it in this
16 case?
17     A.  Yes.
18     Q.  Do you know why she approved it?
19     A.  I do not.
20     Q.  Okay.  If you had designed this squad --
21 SWAT action, the IAP, would you have recommended the
22 use of a stun stick?
23     A.  The IAP?
24     Q.  Yes.
25     A.  We don't fill out the IAP.  You mean the



James Bertuccini        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54

1   actual -- the planning phase, the tactical --
2       Q.  Yes, if you planned it.
3       A.  If I would have planned it, would I have
4   utilized the stun stick; is that what you're asking
5   me?
6       Q.  Correct?
7       A.  At the ATL, yes, I would have.
8       Q.  Okay.  Why?
9       A.  I feel it gave the team a very tactical
10  advantage because it was on the opposite side of the
11  door.  If the team did get hung up during the
12  breach, if they were delayed, by utilizing the stun
13  stick and breaking the window, it allowed us eyes in
14  to see into the structure, to see what's going on.
15  If people are arming themselves, if the door is
16  barricaded, it allows us to at least hold that area
17  and explain to the team what's happening and what --
18  what the problem is.  So, yes.
19      Q.  I want to talk a little bit about your
20  training to be a SWAT officer.  I assume when you're
21  originally hired as an officer, you have to undergo
22  some sort of basic training or education to work for
23  the department; is that accurate?
24      A.  Yes, sir.  You go through, obviously, a
25  police academy.

55

1       Q.  And so assuming you -- you've passed the
2   police academy, you've been hired as an -- as an
3   officer.  What sort of additional training or
4   qualifications do you have to have to join the SWAT?
5       A.  So, to join SWAT, basically you only need
6   to be a police officer for six years.  We have best
7   candidates will kind -- title thing -- in our
8   announcement.  Firearm instructor, defensive tactic
9   instructor.  All officers are now CIT certified, the
10  crisis intervention for -- you know, to be able to
11  talk to people.  Everyone is now certified in the
12  academy.  That was not something that was given when
13  we first -- when I first went through back in '04.
14      We are also, they -- the best candidates
15  look to have instructor development certifications,
16  any outside tactical training.  Those are some of
17  the things that we look at when new SWAT operators
18  are looking to come up.  It's not mandate -- I mean,
19  it's not something you have to have, but it's
20  something we like to see.
21      Q.  Well, let me ask you.  Isn't there a
22  120-hour SWAT training course that you have to
23  undergo?
24      A.  Well, that's when you first come up to
25  SWAT.  That's the SWAT school they give.  And I

56

1   believe, yes, now it's around 120.  I believe
2   they're going to extend that training.
3       Q.  And is that conducted by Metro or some
4   sort of outside agency?
5       A.  No, that's conducted by Metro.  That's by
6   our training section, our training support detail.
7   There are three operators over that and a sergeant.
8       Q.  And when did you go through that SWAT
9   training?
10      A.  I made SWAT in October of 2010.  So
11  probably October -- I actually know my date when I
12  got my call was October 10, 2010.  And my SWAT
13  school probably started that next week.
14      Q.  And at that time, was it the 120-hour
15  course?
16      A.  I believe it was 80 at the time, sir.
17      Q.  Okay.  And who were your instructors
18  during that course?
19      A.  It was Officer Kevin McCord, Officer Troy
20  Wilson, and I believe Officer Mills, Bob Mills was
21  still in the unit.  I could be wrong, and I
22  apologize.
23      Q.  And I know it's -- you know, in terms of
24  hours it's 120 hours, but how many days, weeks, or
25  months does that take to complete?

57

1       A.  Maybe it's a four-week or -- it depends,
2   sir.  It really does, on what -- how the breakup is.
3   I mean, because those operators are still full-time
4   operators that assist us with callouts.  So I don't
5   know.  Like, that could take four weeks, it could
6   take five.  I know that their last one took around
7   four weeks.
8       Q.  Now, when you did that training course,
9   was it all classroom hours or was there some stuff
10  in the field training?
11      A.  When I went through, we did a little bit
12  of classroom stuff in the morning, and then
13  everything else was practical application throughout
14  the rest of the day.  Like entry training, vehicle
15  assaults, bus assaults, manual ballistic breaching
16  training.  Just like that.
17      Q.  Okay.  Were you allowed to go on live SWAT
18  actions before you completed that -- I think you
19  said it was an 80-hour course at that time?
20      A.  At the time I -- basically what you're
21  asking me is -- no.  I was focused on -- we were
22  basically new guys, we were on SWAT school.
23      Q.  Okay.  So you were new, you were full-time
24  SWAT school, you were not allowed to go on live or
25  actual SWAT missions until you completed that



58

1 course.
2      A. Until we completed the course, yes, sir.
3      Q. Okay. Do you agree that that SWAT
4 training course added value to your training as an
5 officer to do SWAT?
6      A. Absolutely. It's -- our training is
7 different than just basic patrol stuff.
8      And so you agree that anybody who wants to
9 be on SWAT should undergo that training first?
10      A. Through SWAT school?
11      Q. Yes.
12      A. I mean, if you're talking about -- are you
13 talking about making live entries and stuff like
14 that? Or are you just talking if you want to come
15 to SWAT -- you want to go to SWAT school, you have
16 to go through our process. I guess I'm confused by
17 your question.
18      Q. Yeah. Well, the question is, you know, do
19 you think people should complete that additional
20 SWAT training before they go on live SWAT actions?
21      A. I see what you're saying. Yes. So
22 when -- your training needs to be completed, yes. I
23 see what you're saying, yes.
24      Q. So you agree with my statement?
25      A. Yes.

59

1      Q. Okay.
2      A. I thought you were talking about, like,
3 some just random patrol guy wanting to go through
4 SWAT school. No, sorry.
5      Q. Well, I mean, yeah. So a random -- random
6 patrol guy says, "Hey, I want to be on SWAT. You
7 guys are doing a SWAT thing tomorrow. Can I go with
8 you?" What do you tell them?
9      A. We don't offer that. Like, we offer our
10 role playing. So, like, if you want to come observe
11 our training, 100 percent. But we don't just allow
12 them to just jump in. There are classes we offer
13 them, guys that are interested in SWAT. But to run
14 a full-blown SWAT school, you have to have tested
15 and been one of the guys in our selection, yes.
16      Q. Well, why wouldn't you want somebody who
17 has not undergone that full SWAT training to be part
18 of the SWAT team? In a live --
19      A. Just inexperience, very new. They need to
20 have the training. They need to be able to be
21 comfortable. Stuff like that.
22      Q. Okay. What do you know about Sergeant
23 Backman's SWAT training prior to January 10, 2022?
24      A. What do I know about it?
25      Q. Yeah.

60

1      A. I don't know -- I don't know.
2      Q. You had no idea if he had undergone the
3 120-hour SWAT training?
4      A. I didn't -- I don't know -- I don't know.
5      Q. You just didn't know one way or another.
6      A. I know he went through some type of
7 training. I don't know exactly what his SWAT school
8 entailed. I don't know everything that was done
9 with that.
10      Q. Okay. In the SWAT training, you talked
11 about what's called a CET or CET entry, correct?
12      A. Controlled Entry Tactics, CET, yes, sir.
13      Q. And what is that and how is that
14 distinguished from a no-knock warrant or a surround
15 and call-out?
16      A. Okay. So, we'll start from each one, all
17 right?
18      So Surround and Call-Out is basically
19 where you're going to surround a structure. We're
20 going to park armored vehicles in certain tactical
21 positions, off of corners of the -- of the house.
22 We're going to completely surround it, we're going
23 to completely contain it. Make sure that we have
24 all of our SWAT assets in line. We're going to
25 start with verbal announcements over a PA, loud --

61

1 LRAD bullhorn. Allow them ample opportunities to
2 come out. If they do not come out after
3 announcements, we go to a distract plan. More
4 announcements. Go to a breach plan. That's the
5 Surround and Call-Out. We're giving them that time
6 to come out.
7      Now going to -- you asked about a CET.
8 Controlled Entry Tactic. That is more of a dynamic
9 movement. It's a dynamic approach to the door.
10 We're utilizing announcements, announce -- several
11 announcements before we end up breaching the door
12 and we are all then making a dynamic movement into
13 the structure to fill it. We would use a CET tactic
14 to utilize speed, surprise, and overwhelming action.
15 For suspects that are inside known to be violent,
16 known to be armed. The -- also, the reasons why we
17 would do CET tactics -- or CET entries is
18 environmental factors. Consisting of, can we
19 contain the structure? Are we able to bring armored
20 vehicles up? Are we able to be able to limit their
21 movement?
22      So, by getting on -- by making entry and
23 using that speed, surprise, and overwhelming action.
24 And we would also use it because it's a smaller
25 structure that we know that we can dominate and fill



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

62

1  with manpower.
2      Now, the no-knock is -- basically if we
3  have a no-knock, if we are authorized a no-knock
4  search warrant, we would not utilize announcements.
5  We would just basically make our approach, breach
6  the door, and make entry. Once we would -- did make
7  entry at that time, we would sound off police search
8  warrant.
9      Q. So, when we talk about the January 10,
10 2022 SWAT mission, that was not a no-knock warrant.
11     A. That was not a no-knock search warrant.
12     Q. So, if that had been a no-knock, what
13 would you have done differently from the CET entry
14 you actually used?
15     A. If it was a no-knock?
16     Q. Yes.
17     A. If it was a no-knock, basically what would
18 have -- happen with that, if we had the approval, we
19 would have made our approach. I would have probably
20 been given the command over the radio to communicate
21 to breach the window, initiate the stun stick, and
22 then they probably would have breached the door.
23 Just like -- we just wouldn't have announced. Once
24 the door came open, announcements would have
25 started, police search warrant.

63

1      Q. And have there been any changes to CET
2  policies for SWAT over the last five years?
3      A. In just anything?
4      Q. Yeah, in -- when it is allowed to be used?
5      A. Oh, CET?
6      Q. Yeah, CET.
7      A. Yes. It still needs to be -- obviously it
8  has to be -- are you talking about CET no-knock?
9  What are you -- which one are you referring to, sir?
10     Q. Yeah. So I'm talking specifically
11 about -- do you use C-E-T or CET?
12     A. I don't call it -- we don't call it CET.
13 CET.
14     Q. CET.
15     A. Controlled Entry Tactic.
16     Q. Okay. So I'll use the same terminology
17 you do so we don't confuse each other.
18     A. Cool.
19     Q. Over the last five years, have there been
20 any changes to SWAT's policies and procedures
21 regarding when CET entry is permitted and when it is
22 not?
23     A. It still -- it still has to go through the
24 entire authorization process. So it's still going
25 to be through the sergeant, through the lieutenant,

64

1  through the commander, and up to the deputy chief.
2  So, we haven't been utilizing it much. But mainly,
3  the only time we would use -- utilize it now is if
4  we're going to receive and we have the approval for
5  a no-knock.
6      Q. Okay. So it's your understanding that as
7  of today, CET entry is only permitted when there's a
8  no-knock warrant.
9      A. Yes, sir.
10     Q. Okay. And when did that policy change
11 occur?
12     A. I would say within the last year, since
13 Commander Peterson has taken over. He is our
14 director of SWAT.
15     Q. Between the Jasmine King incident and this
16 incident involving Mr. Williams, were you aware of
17 or retrained on any changes in SWAT policy that had
18 been made for CET entries?
19     A. Not to my knowledge, sir. I believe
20 everything was still the way it's written.
21     Q. Do you believe that that change regarding
22 CET entry only for no-knock warrants, do you believe
23 that happened specifically because of Mr. Williams'
24 death on January 10 of 2022?
25     MR. ANDERSON: Objection, form

65

1  (indiscernible).
2      THE REPORTER: Form -- wait. Form?
3      MR. ANDERSON: Just form. Whatever I say
4  is form.
5      THE WITNESS: So the -- do I feel that our
6  change came because of this case?
7  BY MR. BREEDEN:
8      Q. Yes.
9      A. No, I do not.
10     Q. Okay. Are you aware of another reason why
11 that change was made, or you just do not know the
12 exact reason for the change?
13     A. I do not know the exact reason, sir.
14     Q. Okay. Now, no-knock warrants. You've
15 been on SWAT since what, October 2010. How many
16 no-knock warrants have you executed on SWAT?
17     A. One.
18     Q. When was that?
19     A. Sergeant Bonkavich was still here, so I
20 would say within, if I want to give you the best
21 guess I can, sir, I'm going to say within the last
22 three years.
23     Q. And would you agree with me that no-knock
24 warrants are quite rare, then?
25     A. They're quite rare. It is intel based,



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

66

1  suspect, violent tendencies, access to, you know,
2  certain weapon systems, flight risk, possibility of
3  hostage situation. Yes. To answer your question,
4  quite rare.
5     Q.  Are you aware of the Brianna Taylor case
6  in Kentucky?
7     A.  I'm going to be honest with you. I don't
8  know everything about the Brianna Taylor case. I do
9  not.
10    Q.  Would you agree with me, though, that that
11  case and that shooting shined a light on no-knock
12  warrants and how dangerous they might be?
13       MR. ANDERSON: Objection, form.
14       Go ahead.
15       THE WITNESS: I would agree with your
16  question -- with what you're saying, is that that
17  did bring up no-knocks, controlled -- making dynamic
18  entries and stuff. But I don't know anything about
19  that case. I don't even know -- I don't know
20  anything. So I can't -- I can't really elaborate on
21  that.
22  BY MR. BREEDEN:
23    Q.  Okay. The CET entry in this case was
24  performed at approximately 5:00 a.m. Is it common
25  practice for SWAT to perform missions during early

67

1  morning hours where it's likely people will be
2  asleep?
3     A.  Yes. It is common.
4     Q.  Okay. Has that policy changed at all in
5  the last five years?
6     A.  Has it changed?
7     Q.  Yes.
8     A.  No.
9     Q.  So you're still routinely serving warrants
10  in hours where people are likely to be asleep?
11    A.  Yes, sir, we are.
12    Q.  As far as you know, the time for this
13  warrant, 5:00 a.m., that was selected specifically
14  because it was hoped that people inside the
15  apartment would be asleep, right?
16    A.  Yes, sir. That's a very active complex
17  with people moving around. They wanted to make sure
18  that we, on our approach, were not compromised. So
19  they utilized that time of 5:00 a.m. to make sure
20  that we could have everybody inside.
21    Q.  As far as you are aware, was there any
22  reason, other than the hope that people would be
23  inside asleep, that the 5:00 a.m. time was selected?
24    A.  No, I do not.
25    Q.  And would you describe that as a formal or

68

1  informal policy of Metro, to serve warrants at that
2  hour?
3     A.  It's more informal. I mean, I don't think
4  it's -- it's all intel-based, intel-driven. You
5  know. If there's a reason -- like, to give you an
6  example. If there's a reason -- we get an IAP for a
7  narcotics raid. They want a 5:00 a.m. hit. We're
8  going to ask why. Hey, that's when the suspect
9  leaves. We plan on trying to take him away.
10  There's reasons why, that we would utilize that.
11    Q.  And for the particular SWAT action on
12  January 10, 2022, as far as you know, who made the
13  decision to execute that at 5:00 a.m.?
14    A.  I do not know, sir.
15    Q.  What's your understanding of Metro's
16  policy, whether it be formal or informal, about
17  whether a CET entry is permitted to be used for a
18  property only search warrant?
19    A.  If it's going to be utilized for property
20  only, it has to be approved by the commander. The
21  lieutenant. And there has to be circumstances
22  regarding why. The suspect has access to weapons,
23  violent tendencies -- I thought we were getting
24  attacked. Violent tendencies, severity of the --
25  severity of the crime. What is -- his prior

69

1  criminal history is, his flight risk. Stuff like
2  that. All those things have to go into play and
3  they have to be articulated and explained to the
4  lieutenant, and she gives the ultimate authorization
5  if we're going to utilize a CET on property crime.
6     Q.  Has -- have the policies or procedures,
7  whether formal or informal, for use of a CET entry
8  on a property only search warrant, have those
9  changed over time?
10    A.  There has been different changes in our
11  SWAT policies about that. Those decisions have been
12  made by the SWAT commander.
13    Q.  Were you trained on any change in policy
14  in that regard between the Jasmine King and the
15  Isaiah Williams incidents?
16    A.  No, there was -- no.
17    Q.  Okay. And so, is it your understanding
18  that at any time use of CET entry for a property
19  only search warrant has been banned?
20    A.  If it's going to be utilized, it would
21  have to be approved. But right now, that's -- it
22  wouldn't be something we would do. It would have --
23  there would have to be circumstances involving the
24  suspect inside. Like, there would have to be a
25  reason that we would go CET on a property crime.



70

1  And I highly doubt that would happen now.
2      Q.  Well -- and so, when you say, "I doubt
3  that would happen now," when did that change come
4  about?
5      A.  Within the last year, two years.
6      Q.  Do you know, was that change precipitated
7  by the shooting of Mr. Williams, the change in
8  policy?
9      A.  I think it's a just a change in
10 everything.  The world, you know, and the nation
11 with policing and search warrants and no-knocks.  I
12 think it's -- it's kind of all been out there.
13 Which is to make -- you know, have changes with it
14 to -- change policies (indiscernible).
15         THE REPORTER:  Change policies?
16         THE WITNESS:  Sorry.  Change policies and
17 procedures.
18         THE REPORTER:  Thank you.
19         THE WITNESS:  So, yeah.
20 BY MR. BREEDEN:
21     Q.  And so have you been retrained on any
22 changes in use of CET entry since Mr. Williams'
23 shooting?
24     A.  Retrained?
25     Q.  Yes.

71

1      A.  So, are you asking me, have we -- have I
2  been retrained in the way that we do our tactics or
3  just in policies and procedures?
4      Q.  On any -- well, either, really.
5      A.  No, we still -- we're still training and
6  doing our normal -- doing our normal stuff that we
7  do.  Now, we're just really making sure that we're
8  looking at all the documentation that we're -- being
9  sent to -- getting sent from detectives.
10         Now, on our IAPs, there are check boxes
11 of -- that consist of, is this a body of search
12 warrant?  Is this evidence only?  Is this high risk?
13 A low level?  A lot of those -- those are the types
14 of changes that has occurred.  To answer your
15 question, yes.
16     Q.  When those changes come about to a formal
17 SWAT policy, how are you as a SWAT officer notified?
18     A.  How am I notified?  There is an -- are you
19 talking about -- oh, changes.
20         Basically what will happen is, if we get a
21 change in our policy, our director or director
22 secretary will send us an update and let us know
23 that, hey, there's been an update in regards to
24 this.  Our sergeants will then review it with us.
25     Q.  Can you recall receiving any updates like

72

1  that for changes in CET entry policy since the
2  Jasmine King incident?
3      A.  We -- during meetings, you know, we've --
4  I don't -- I mean, I don't know if anything was
5  changed in policy at the time.  I think it was still
6  all the same.  But, like, we -- you know, we
7  discussed it.  But...
8      Q.  What has been discussed in meetings
9  specifically?
10     A.  Just make sure that we're reviewing and
11 making sure we're looking at the IAPs and asking the
12 proper questions of, you know, they added -- the
13 extra added in boxes of when was the last time
14 suspect was seen at this location, stuff like that.
15 They just added extra information on the IAPs for us
16 to review.
17     Q.  Okay.  So, you mentioned an example of
18 when a suspect was last seen as a location -- as a
19 change to the IAPs.  What other changes to IAPs have
20 occurred in the last five years?
21     A.  That's all I can recall at the time, right
22 now.
23     Q.  Okay.  And the additional box about the
24 last time a suspect was seen at a location.  Do you
25 think that change was made in response to

73

1  Mr. Williams' shooting?
2      A.  No, I think that was also -- that's with
3  everything -- we've -- we've had a lot of, you know,
4  warrants that we've served where all the sudden,
5  nobody's there, nobody's home.  We want to make sure
6  when they -- you know, when was the last time the
7  suspect was physically seen here at this location.
8      Q.  Yeah.  And do you know much about the
9  underlying suspect here, Wattsel Rembert, and when
10 he was last seen at the 3050 South Nellis apartment?
11     A.  I do not, sir.
12     Q.  Okay.  In terms of SWAT actions and
13 training, what is calling a tactical?  What does
14 that mean?
15     A.  What does tactical mean when we're going
16 into an -- okay.  So, during our CET operation, the
17 tactical call is made for a variety of reasons.
18 Delayed breach, we've ran out of manpower, the
19 structure is larger than we expected it to be,
20 somebody runs.  Gunfire.  We get into some type of
21 shooting.
22         An operator has the ability to call, make
23 a tactical call if he just flat out doesn't like
24 something.  Meaning, hey, I think, you know, we're
25 being overwhelmed.  Multiple people inside of the

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

74

1   structure.  We'll put the -- we will immediately
2   stop momentum, pull back, hold containment, and
3   pull -- start pulling everybody out safely, take
4   them into custody.  And then we would end up
5   clearing the structure slowly and methodically.  So
6   that is -- we have the ability to go dynamic and
7   then slow things down.
8       Q.   Is that anybody on the SWAT team can
9   call --
10      A.   Anybody can make that call.
11      Q.   Okay.  Have you personally ever made a
12  tactical call during a SWAT entry?
13      A.   I've been on the team 15 years.  I could
14  tell you I've made thousands -- in the thousands of
15  entries.  I'm sure there's been a time where I've
16  called tactical, yes.
17      Q.   Can you remember any specific times?
18      A.   Not to my knowledge, sir.
19      Q.   Did you ever call tactical on January 10,
20  2022?
21      A.   I already heard the call being stated and
22  I heard it being reiterated by numerous officers.
23      Q.   Okay.  We'll talk about that a little
24  later.  But you did not personally call?
25      A.   I did not personally call tactical, no.

75

1       Q.   I want to talk generally about your SWAT
2   training regarding knock and announce principles.
3       What does knock and announce mean to you?
4       A.   Knock and announce is basically, we are
5   giving the amount of time that the officer feels
6   reasonable to let them know that we are the police,
7   we are outside, stating their intent -- or stating
8   our intent that we are going to -- that we have a
9   warrant and that we will be making entry.  We would
10  like them to cease what they're doing, stop, and
11  basically comply with our action.
12      Q.   Okay.  Is there any other part of knock
13  and announce that you're aware of?
14      A.   That we're giving them ample -- that we're
15  going to give them a reasonable amount of time --
16  we're giving them a reasonable amount of time for
17  them to basically comply with our lawful order.
18      Q.   Okay.  Is that all you can recall from
19  your training?
20      A.   At the moment, yeah.
21      Q.   Would you agree with me that it would be
22  important for Las Vegas Metro to train you on knock
23  and announce principles if you're going to be part
24  of SWAT?
25      A.   Yeah.

76

1       Q.   Do you recall a specific lesson plan
2   during your SWAT training for knock and announce?
3       A.   An actual lesson plan for knock and
4   announce?  I'm sure it's in our CET -- I would -- I
5   would assume Zoom it's in there.  I haven't read it
6   lately.
7       Q.   Okay.  Do you recall --
8       A.   There is actually -- you know what?  There
9   is -- actually, the last time I have reviewed it is,
10  there is court -- there is case laws in there and it
11  does describe that, yes.
12      Q.   Do you remember the applicable case?
13      A.   Not off the top of my head.
14      Q.   Okay.  Have you ever been trained on the
15  case of -- I believe it's Wilson versus Arkansas?
16      A.   (Indiscernible.)
17      THE REPORTER:  Pardon me?
18      THE WITNESS:  Yes.
19      THE REPORTER:  Thank you.
20  BY MR. BREEDEN:
21      Q.   How about -- who do you recall
22  specifically training you regarding knock and
23  announce principles?
24      A.   It's been discussed with us.  Kevin
25  McCord, Dewane Ferrin.  The guys that have, you

77

1   know, put on that -- that were holding those spots.
2   Those lead spots in the training section.
3       Q.   Are you aware that under Nevada state law,
4   it states that officers cannot use force to enter on
5   a warrant until they have been refused admittance by
6   the occupants of where they're going to search?
7   Were you aware of that?
8       A.   Have I been aware of that?
9       Q.   Yes.
10      A.   Yes.
11      Q.   When were you first aware of that?
12      A.   Can -- actually, I'm confused on what you
13  just said.
14      Q.   Yeah, let me rephrase it for you.
15      A.   Yeah.
16      Q.   Okay.  Are you aware that under Nevada
17  state statutes, or statute, officers are not
18  permitted to use force to enter a structure to serve
19  a warrant until they have been refused admittance?
20      A.   That statement, no, I have not been made
21  aware of that statement.  No.
22      Q.   So you have never been trained on that
23  statement?
24      A.   No.
25      Q.   Okay.  Are you aware that under federal



Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 23 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78

1  law, officers are not permitted to use force to
2  enter a structure for a warrant until following the
3  announcements, they have waited a reasonable amount
4  of time for persons inside to come to the door,
5  ascertain the officer's identity and purpose, and
6  provide them admittance willfully?
7      MR. ANDERSON:  Objection, form.
8      THE WITNESS:  I've been made aware of
9  that, yes.
10 BY MR. BREEDEN:
11     Q.  Okay.  When were you first made aware of
12 that?
13     A.  I couldn't -- I -- I don't know.  That's
14 stuff that has been discussed with us, you know --
15 I've been in the unit 15 years.  Those are things
16 that have -- discussed with us over the time.  I
17 couldn't give you the exact date and time we
18 discussed that.
19     Q.  Well, were you aware of that legal
20 requirement prior to the incident with Mr. Williams?
21     A.  Yes.
22     Q.  Okay.  Do you recall who specifically
23 trained you on that requirement?
24     A.  No, I do not, sir.
25     Q.  Okay.  Now, it states a reasonable amount

79

1  of time.  Is there a rule of thumb or a guide that
2  you use to determine what is reasonable?
3      A.  What we use, basically, is, it's going to
4  come down to environmental factors of where we're
5  at.  Are we in an enclosed hallway?  Do we have
6  somewhere to pull back to?  So those things are some
7  of the -- the reason why the time -- how long we're
8  going to wait.  The suspect's actions.  His -- the
9  severity of the crime.  His access to weapons.
10 Those are some of the things that we look at that
11 will dictate our reasonable amount of time.
12     And for an example, like I said is, if
13 we're in an enclosed hallway.  Are there occupants
14 in this -- let's say an interior hallway apartment
15 complex that are going to be at risk if this guy
16 starts shooting through the door or becomes
17 noncompliant.  Are these -- are we putting these
18 people that are surrounding us at risk?  So those
19 are some of the factors that we take into
20 consideration of our reasonable amount of time of
21 how long we're going to wait and continue to
22 announce before we actually push forward with any
23 type of SWAT action.
24     Q.  Are you aware of any rule of thumb,
25 though, in terms of seconds or minutes that should

80

1  elapse?
2      A.  There's no -- no, there's no set time.  I
3  mean, you know, six seconds, eight seconds.  It's
4  what we feel is reasonable.
5      Q.  Now, you mentioned one of the factors is
6  how much room officers have around them, right?
7  Whether you're in an enclosed hallway or --
8      A.  If we're in that fatal funnel, stuff like
9  that.
10     Q.  Would you admit to me that with
11 Mr. Williams, you were not in what would be called a
12 fatal funnel?
13     A.  Me personally, no, I was not.  They were
14 in a -- they had space where they were working from.
15     Q.  It was outside the apartment.
16     A.  They were outside, yes.
17     Q.  There were ways to retreat safely if
18 something went wrong for officers.
19     A.  If they needed to, yes.
20     Q.  Okay.  Have you ever heard that there's a
21 standard that in most cases, one minute will be a
22 reasonable time for officers to wait after
23 announcing?
24     A.  Have I ever -- sorry.
25     MR. ANDERSON:  Objection, form.

81

1      Go ahead.
2      THE WITNESS:  Have I ever heard that
3  personally, one minute?  No, I have not.
4      THE REPORTER:  When it's a good time to
5  take a short break.  I mean, if you need to go
6  longer, that's fine.
7      MR. BREEDEN:  Yeah, let me just ask him --
8  I'll take a break within five minutes.
9      THE REPORTER:  Perfect, thanks.
10     (Exhibit No. 3 was marked.)
11     THE REPORTER:  Exhibit 3.
12 BY MR. BREEDEN:
13     Q.  Handing you Exhibit 3.  This is an excerpt
14 of the State of Nevada Commission on Peace Officer
15 Standards and Training, Performance Objective
16 Reference Material.
17     Have you ever seen this before I just
18 handed it to you?
19     A.  I've never seen this document.
20     Q.  Has Metro ever provided this to you, as
21 far as you're aware?
22     A.  Not to -- that I'm aware, no.
23     Q.  Okay.  And at the bottom, you'll see it
24 says note -- I'll just read it as a quote.  Quote,
25 "Note.  The amount of time that is considered



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82

1 reasonable will depend on all the circumstances.
2 Approximately one minute would be a safe period in
3 most cases, but it can be less, especially if peace
4 officers know that someone is inside and awake," end
5 quote.
6        So you have not heard this one-minute
7 standard before reviewing this document?
8    A.  I've never heard this, no.
9    Q.  Okay.  And when it refers to, you know,
10 the time can be less, additionally if peace officers
11 know that someone is inside and awake.  You did not
12 know who was inside the apartment or whether they
13 were awake on January 10 of 2022, did you?
14    A.  No, I did not.
15    Q.  Let's go ahead and take a break at this
16 time.
17    A.  Okay.
18        THE VIDEOGRAPHER:  We are going off the
19 record at 10:32 a.m.
20        (Off record.)
21        THE VIDEOGRAPHER:  We are back on record
22 at 10:39 a.m.
23 BY MR. BREEDEN:
24    Q.  Officer Bertuccini, we've taken a short
25 break.  We're back on the record now, and you're

83

1 still under oath.
2        Have you ever heard, when we talk about
3 knock and announce, that there's an informal
4 ten-second rule applied by Metro?
5    A.  No.
6    Q.  I want to talk to you a little bit about
7 the tactical briefing before the January 10th
8 action.
9        When was the first time you ever heard
10 there was going to be a SWAT event there on the
11 morning of January 10th and you were going to be
12 involved?
13    A.  So, we have -- any search warrant that
14 comes in, comes through our SWAT warrants e-mail.
15 So all of us get it.  So I knew that there was a
16 warrant that was going to be coming in.  So I looked
17 at it to see if it was actually going to be on my
18 days.
19        Once I read the IAP and saw that the date
20 was going to be on the other team's days, I was,
21 like, okay, then it's really not my concern.  They
22 ended up calling for additional bodies for manpower,
23 so I volunteered to go and help.
24    Q.  Okay.  So when was that, then, that they
25 called for volunteers and you agreed?

84

1    A.  Probably the night before the operation.
2    Q.  Okay.  And when you say the night before,
3 I mean, the operation was at basically 5:00 a.m., so
4 are we talking about ten or five --
5    A.  I would say I got at least a 12-hour
6 notice -- about eight- to ten-hour notice.  I
7 couldn't tell you the exact time I got the call
8 that, "Hey, can you come help?"  I couldn't tell
9 you.
10    Q.  And then when you originally received an
11 e-mail about it, did it include the IAP?
12    A.  Yes.  The whole entire package was
13 submitted, I believe.  I know that there was some --
14 some -- I recall some documentation, mishaps going
15 back and forth with signatures and stuff like that.
16 But I wasn't involved in any of that.  That's the
17 captains and lieutenants handle all that stuff.  I
18 know that there was a delayed process in some of the
19 signatures and stuff like that.  And authorizations.
20 But I don't -- I don't know any further than that.
21    Q.  So, how long before January 10th was this,
22 then?  Because I think -- even going back into
23 December of 2021, there were at least applications
24 for warrants going on at that time.  So how close
25 was it that you saw these e-mails regarding the IAP?

85

1    A.  I couldn't tell you.  I apologize, sir.  I
2 don't know.
3    Q.  Just for some background, by the way, so
4 it's on the record, what does IAP stand for?
5    A.  Incident Action Plan.
6    Q.  Is that required, to have an approved IAP
7 or Incident Action Plan every time SWAT is deployed?
8    A.  Yes.
9    Q.  And ultimately, at least for this action
10 concerning Mr. Williams, Lieutenant O'Daniel was the
11 lieutenant who approved the IAP?
12    A.  Yes, she approved it.
13    Q.  Who's actually responsible for drafting
14 the IAP?
15    A.  The detective, sir.
16    Q.  And in this case, who was the detective?
17    A.  I'll be honest with you, sir.  I can't
18 remember.  I do not know.
19    Q.  Do you remember -- I think it was a
20 Detective Grimmett; does that refresh your memory?
21    A.  Jarrod Grimmett?  That does refresh --
22 yes, he's in homicide.
23    Q.  So, you had seen -- is it fair to say that
24 maybe within a week or so of this, that there was an
25 IAP, but it was on a day you were not regularly



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

86

1    scheduled, so you didn't think you were going to be
2    involved?
3         A.  I think that's fair, yeah.  I would say
4    within a week I saw it.
5         Q.  Okay.  And then within 12 hours of the
6    actual operation, somebody contacted you and asked
7    if you would volunteer.
8         A.  That's just an estimated time.  But, yes,
9    someone contacted me -- my boss contacted me and
10   said, "Hey, the other team needs some additional
11   bodies to help out with this warrant.  Can you get
12   some guys?"
13        Q.  That's Sergeant Bronkavich (sic)?
14        A.  Bonkavich, yes, he advised -- yes, sir.
15        Q.  And so, was your intention that day, then,
16   like, you would essentially go to work early, do
17   this SWAT action, and then work your regular shift,
18   which I think you said started at 2:00?
19        A.  2:00 p.m.  That was my -- the day of the
20   operation was my RDO, my day off.  So I went in on
21   my day off.  So what would have occurred is, I would
22   have went in, done the operation, and gone home.
23        Q.  And when you use the abbreviation RDO,
24   does that mean Regular Day Off?
25        A.  Yes.

---

87

1         Q.  And so, an IAP had circulated by e-mail.
2    Did you read the IAP?
3         A.  No, I did not.
4         Q.  Did you read it at all before you went to
5    the tactical review?
6         A.  No, I did not.  I'll be honest with you,
7    sir.  I skimmed through it, I looked -- once I
8    looked at the date and saw that they -- our team was
9    not needed, I was, like, hey -- I did not.
10        Q.  So just to be clear, then, before, you
11   know, 5:00 a.m. on January 10, 2022, when the
12   shooting occurred, approximately, you had not
13   reviewed the IAP.
14        A.  No, sir.
15        Q.  And you had not reviewed the actual search
16   warrant.
17        A.  No, sir, I did not.
18        Q.  And you had not reviewed the detective's
19   application for a search warrant.
20        A.  No, sir, I did not.
21        Q.  Okay.  Is it fair to say, then, that all
22   of your information about what was to be done and
23   how, came from the SWAT tactical briefing?
24        A.  What I did is, the minute that I arrived,
25   I went up, read the information page so I knew the

---

88

1    address we were going to, I knew that we were going
2    after the investigation of a homicide.  I saw the
3    suspects that were identified.  I familiarized
4    myself with that.  I familiarized myself with the
5    tactical plan prior to the brief.  Looked at my job,
6    seeing what my roles and responsibilities were.
7    Made sure that the stun stick was prepped.  It was
8    already done for me.  That's how I familiarized
9    myself with the actual operation.
10        Q.  Who prepped the stun stick for you?
11        A.  I don't -- I don't recall.  Whoever the --
12   so basically, our stun stick resides inside of the
13   equipment truck.  So whoever was driving the
14   equipment truck at that time, he -- he probably did
15   it.
16        Q.  Now, the SWAT tactical briefing actually
17   occurred in a parking lot at Sam's Town; is that
18   accurate?
19        A.  Yeah.  I believe it was the south lot.
20        Q.  Okay.  I think the underlying murder they
21   were investigating also occurred at Sam's Town.
22   Were you aware of that?
23        A.  I wasn't aware of that.
24        Q.  As far as you know, is that just a
25   coincidence?  Did they select that intentionally?

---

89

1         A.  I believe that maybe -- I guess.  I don't
2    know.  I'm sure that incident happened well before
3    that, they selected that brief -- I don't know.
4         Q.  Yeah.  The crime that they were
5    investigating occurred several months prior, and it
6    was -- it was a shooting outside of a casino.
7              Were you aware of any of the facts of the
8    underlying crime before you took part in this search
9    warrant?
10        A.  I was not aware of it until I took part in
11   the search warrant and Detective Grimmett gave the
12   prebrief before they started the tactical plan.
13        Q.  Okay.  And so you indicated that Detective
14   Grimmett did the briefing.  Did he take the lead on
15   the briefing?
16        A.  They asked him to do it.  He basically
17   explained everything.
18        Q.  Okay.  Was Sergeant Garth Finley also
19   present?
20        A.  Sergeant Garth Finley was there, yes, sir.
21        Q.  And did he also conduct the briefing?
22        A.  He didn't do anything.  He was one of the
23   team leaders at the time.  I don't believe he spoke.
24   I can't recall.
25        Q.  So, if I wanted to sit down and talk to

---

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90

1  the person who actually was in charge of doing the
2  tactical briefing, that was Detective Grimmett?
3      A.  The tactical briefing?
4      Q.  Yes.
5      A.  He just basically briefed the information
6  and the circumstances surrounding the case and why
7  we were there.  The tactical briefing was done by
8  the reconnaissance officers and then Assistant Team
9  Leader Warren -- Werner.
10      Q.  Okay.  And who were the reconnaissance
11  officers?
12      A.  It was several.  Because we were going to
13  hit -- we were actually going to serve two warrants,
14  I believe, simultaneously.  But then they decided to
15  only do one structure.  So I believe there was four
16  officers that were involved in that recon.  I
17  believe it was Officer Brosnahan, who is now
18  Sergeant Brosnahan, Officer Kubla was involved,
19  Officer Hoskins, who is now a sergeant was involved.
20  I know that Officer Werner, I believe, did go.  And
21  I'll be honest with you, sir, if anyone else went, I
22  don't -- I don't know.  Those are the four I can
23  honestly tell you were involved.
24      Q.  The person that conducted the SWAT portion
25  of the tactical briefing, though, that was Assistant

91

1  Team Leader Warren (sic)?
2      A.  The reconnaissance officers went over the
3  information page, the intel.  They displayed -- they
4  explained the diagram, the structure.  And then it
5  was turned over to Officer Werner.
6      Q.  When you talk about the information page,
7  is that a single page?
8      A.  It's one page consisting of our event
9  number, the address of the location that we're going
10  to, the detective that submitted the search warrant,
11  the crime, any weapons that are involved, any
12  suspects that are involved, kids are involved, dogs,
13  cameras, fortifications, our route, and I already
14  covered the location.
15      Q.  Is it on, like, a little 8 by 10 sheet of
16  paper?
17      A.  I would say -- we use poster paper, like,
18  large white paper.  I mean -- you know.
19      Q.  Who's responsible for drafting the
20  information page?
21      A.  Usually the reconnaissance officers.
22  That's their responsibility.
23      Q.  Okay.  So what do you remember being told
24  by Officer Warren -- it's officer, not sergeant?
25      A.  He's Officer Werner, yes.

92

1      Q.  Werner, sorry.  W-a-r-n-e-r?
2      A.  No, sir.  W-e-r-n-e-r.
3      Q.  Okay.  So, as best as you can recall, you
4  know, even verbatim if you can recall, what were you
5  told by Officer Werner?
6      A.  Officer Werner, when I went over, we
7  actually started talking about the diagram.  Being
8  an ATL, I'm actually the senior ATL.  I was talking
9  to him about his approach and looking at things,
10  asking questions.  Just like, hey, what is your
11  thoughts with, you know, breach and all this.
12          I was, like, "Hey, where do you need me to
13  be?"  He showed me in the stack where he wanted me
14  to be.  We just kind of went over the diagram
15  together, went over where I was going to be in the
16  stack.  And then where I would be placing the stun
17  stick.
18      Q.  And when you say "the stack," you just
19  mean --
20      A.  Our entry line.
21      Q.  The order of --
22      A.  The order of our entry line, yes, sir.
23  Sorry.  SWAT, then go.  My bad.
24      Q.  Were you told whether you were there to
25  serve a search warrant or an arrest warrant?

93

1      A.  I believe that we were doing a -- just a
2  search warrant, not an arrest warrant.
3      Q.  Property only.
4      A.  I was not told that.  I know that we were
5  going after two people that are inside that were
6  involved in a murder case, or a murder
7  investigation.  And that there were weapons inside.
8  That it was just not a search warrant for property.
9  I mean, it was a search warrant for property, but we
10  had two heavily armed suspects inside that were
11  possibly wanted for homicide.
12      Q.  Okay.  But were you aware that there was
13  no arrest warrant at the time for either suspect?
14      A.  Yes, I was aware of that.
15      Q.  Okay.  And just to put names to these
16  people.  The names of the suspects were Wattsel
17  Rembert and Corvel Fisher?
18      A.  I believe so, yes, those were the names.
19      Q.  Okay.  Were there any other suspects that
20  you can recall being discussed?
21      A.  Unless I saw the information page, I can't
22  remember.
23      Q.  I have it here in a minute or two --
24      A.  Okay.
25      Q.  -- and we'll look at it.



James Bertuccini                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

94

1      In fact, why don't I -- let's go ahead and
2  do that now.
3           (Exhibit No. 4 was marked.)
4      THE WITNESS:  Thank you, ma'am.
5  BY MR. BREEDEN:
6      Q.  So this will be labeled Exhibit 3, I
7  believe.
8      THE REPORTER:  4.
9  BY MR. BREEDEN:
10     Q.  4, sorry, to this deposition.  And I'll
11  just say for the record, this is Bates labeled LVMPD
12  4377.  This is a page from the CIRT report
13  investigating this incident.
14          You see a picture there.  Is this the
15  information page you were referring to?
16     A.  Yes.
17     Q.  Okay.  Now, do you know who took this
18  picture?
19     A.  I don't remember who took this picture.
20     Q.  Did you see anyone taking pictures during
21  the briefing?
22     A.  I'm sorry, sir?
23     Q.  Did you see anyone taking pictures during
24  the briefing?
25     A.  Yeah, we always have one of our guys take

95

1  photos after.  One of our -- it depends.  Equipment
2  truck guy.  Someone always takes photos of the
3  briefings.
4      Q.  Okay.  Did anyone have their body-worn
5  camera on during the briefing?
6      A.  No.
7      Q.  Okay.  And why are you so certain of that?
8      A.  We don't do that.
9      Q.  Why not?
10     A.  We don't video our briefings.  We don't --
11  we don't do that.  We just don't.
12     Q.  Okay.  Is it policy not to record the
13  briefings?
14     A.  It's not policy, we just don't.  I don't
15  know -- I mean, I can't give you an exact answer why
16  we don't, we just don't.
17     Q.  Okay.  Have you ever seen a tactical
18  briefing where it was recorded on the body camera
19  video?
20     A.  As long as I've been in SWAT, no.  I've
21  done -- I've done operations with the FBI, I've done
22  operations with North Las Vegas, Henderson, I've
23  been around other SWAT teams.  I've never seen a
24  briefing filmed.
25     Q.  Okay.  So you mentioned there were --

96

1  there were actually intended to be two locations.
2  The 3050 South Nellis and 4475 Jimmy Durante
3  Boulevard.  And it is a bit difficult to read the
4  information page from the picture.  But if you look
5  above it, it's summarized, and it indicates that on
6  the information page, kids, elderly, surveillance,
7  and fortification were listed as no.  Dogs were
8  listed as unknown.  And guns were listed as unknown.
9  With -- to the next -- beside the guns unknown, was
10  in parentheses, small caliber used in crime.  Do you
11  see that?
12     A.  I can -- I mean, you can't read it, but I
13  can see that, yes.
14     Q.  Do you recall all of that from the
15  briefing?
16     A.  Yeah.  I mean, it's right here, yes.
17     Q.  Okay.  Did anything about that strike you
18  as unusual?
19     A.  Anything strike -- reading that?  No, not
20  to my -- I mean, no.
21     Q.  If it says surveillance no, how could
22  anyone know whether kids or the elderly were inside?
23     A.  So basically, there is questions that are
24  asked from the -- you know, the detectives.  We also
25  look for any type of signs of kids.  Kids' toys

97

1  outside, curtains, child curtains, you know, a
2  Barney curtain or something like that.  We look for
3  ramps.  You know, ramps at the doorway for
4  wheelchair access or something like that.  Elderly,
5  they said based on the detectives' surveillance,
6  they've never seen any elderly or children come or
7  go from that target residence.  That's why they
8  probably put no.
9      Q.  Well, it says surveillance no.  Doesn't
10  that mean to you that they didn't do surveillance?
11     A.  Their surveillance in here is cameras.
12  That's what they're talking about, surveillance of
13  cameras.  Any cameras that would obstruct our
14  approach.  That's what that means.
15     Q.  And what was your understanding of what
16  was meant by guns unknown, parentheses, small
17  caliber used in crime, close parentheses?
18     A.  That basically would let me know that
19  there is a weapon that is outstanding, a small
20  caliber handgun, that was used in the commission of
21  a crime.
22          We also were -- you know, now that as I'm
23  kind of getting a little bit more reacclimated to
24  it, I recall them also briefing out Rumpert (ph) was
25  his name?  Shumpert?

98

1    Q.  Rembert.
2    A.  Rembert.  Had photos posted, I believe, of
3  him holding an MP5 assault rifle.  I remember that
4  now that I'm getting refreshed with some of this
5  stuff, is that that information was given to us.
6    Q.  Do you remember who gave you that specific
7  information?
8    A.  I believe -- I can't -- I'm going to be
9  honest with you, I don't remember -- I can't
10  remember if it was Officer Grimmett -- or Detective
11  Grimmett or if it was the recon officers when they
12  went through their information page.  But I remember
13  that information being passed to us.
14    Q.  Was it your understanding that if during
15  the search warrant you were to encounter either
16  suspect, Mr. Fisher or Mr. Rembert, that you were to
17  arrest them, take them into custody?
18    A.  We basically were going to detain them.
19  If they were located inside, they would be detained.
20  They would be passed off to detectives.  They would
21  be doing the investigations and/or arrests at that
22  time.  Our job is to basically make entry into the
23  structure, take anyone into custody or detain them
24  that is inside, render it safe for the detectives to
25  do their investigation.  If they're going to make

99

1  arrests, that's -- I don't -- I don't deal with
2  that.
3    Q.  Okay.  Well, what -- did you have an
4  expectation that the suspects were going to be
5  arrested if they were found inside?
6    A.  If there -- if they were going to be found
7  inside, that was going to be the detectives'
8  decision if they were going to be arrested or not.
9  We were never told that -- you know, I don't recall
10  there being any PC on them at the time.  I don't --
11  I don't know.  I don't want to just misspeak on
12  something that I don't remember or recall.
13    Q.  Okay.  Well, I want to be clear about
14  what -- what you do recall.  Were you told there was
15  an arrest warrant?
16    A.  I'm reading here.  I -- that someone -- I
17  don't know if that was -- who had the answer here,
18  if this was me or Officer Werner.  But I know
19  that -- I don't recall.  I don't recall.
20    Q.  Yeah.  Because I want to know what you
21  recall, not what's on some CIRT report or somebody
22  else testified --
23    A.  If that was -- I mean, you know, I had
24  that CIRT report or CIRT interview two years ago.  I
25  mean, if it was in front of me I could help that,

100

1  but I don't recall --
2    Q.  Okay --
3    A.  -- at this moment.
4    Q.  Do you remember what property was to be
5  searched for?
6    A.  A firearm.  And I can't remember -- if
7  it's on here, if there was clothing or anything.
8  But I remember it was a firearm and possibly
9  clothing.  It would have to be -- I would have to
10  look to see what the evidence was.
11    Q.  Do you remember what type of firearm?
12    A.  All I remember they briefed was a small
13  caliber.
14    Q.  Small caliber handgun?
15    A.  Yeah.
16    Q.  And -- so you were assigned to deploy the
17  stun stick.  Who informed you of that?
18    A.  Officer Werner.  That's -- that was in his
19  tactical plan.
20    Q.  And who made that decision that you
21  specifically would deploy the stun stick?  Was that
22  also Officer Werner?
23    A.  Yeah.  He just needed extra -- additional
24  bodies for those positions.
25    Q.  Okay.  Now, when you do these, is it

101

1  typical that, you know, one officer will have the
2  battering ram, he's, like, the battering ram
3  specialist; one will be, like, the stun stick
4  specialist; one will be a ballistic shield person.
5  Or do the roles change?
6    A.  We are all -- we are all very, you know,
7  confident in all of it.  All the guys can do every
8  job.  When we go into explosive work, we have
9  breachers that mainly do that.  So there's no, like,
10  hey, this is the superstar stun stick guy.  This is
11  the best ram guy.  We're all capable doing all jobs.
12  And that usually is decided by the ATL.  So we don't
13  have, like, specific guys that only ram doors, only
14  utilize Shok Lock, only use stun stick.  No.
15    Q.  Is there any reason you're aware of why
16  you were specifically selected for the stun stick?
17    A.  I do not know.
18    Q.  Okay.  And then during the tactical
19  briefing, what was decided as to when you would
20  deploy the stun stick?
21    A.  After the second announcement.
22    Q.  Okay.  So when you say the announcement,
23  was it discussed specifically what the announcement
24  would be, like, the exact language?
25    A.  The exact language would be the entire

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102

1 address and then police department, search warrant.
2 Full two announcements of that.
3    Q.  Okay.  So after the second time, police
4 officer, search warrant is stated, it was preplanned
5 that you would insert the stun stick and deploy it
6 at that time?
7    A.  Including the address.  With the --
8 including the address, yes.  So after all that was
9 put out two times, I would then deploy the stun
10 stick, I would insert it through the window, yes.
11    Q.  And was the -- when the address was
12 announced, was it also intended that that would
13 include the apartment number?
14    A.  Yes, sir.
15    Q.  Okay.  Why would it be important to
16 include the apartment number with that announcement?
17    A.  So that the people know that are inside.
18 And also surrounding areas.  Because 5:00 in the
19 morning, now people are going to start hearing this,
20 waking up, and want to come out.
21    Q.  Okay.  So there were a lot of apartments
22 within earshot.  And the purpose of announcing the
23 specific apartment number is to -- to make sure
24 people know what apartment police are there for,
25 right?

103

1    A.  Yes, sir.  There's an apartment directly
2 above him.
3    Q.  Was it discussed at all, any factors that
4 might stop or delay deploying the stun stick?
5    A.  Any factors that would stop it?
6    Q.  Yes.
7    A.  So, basically, if I made an approach, and
8 I could see that there was any signs of kids, any
9 signs of -- anything that would cause any type of
10 safety issue, I would immediately call out "no bang"
11 or I would air burst it above.  And I would
12 basically just explain and articulate to them why I
13 didn't do it.  For safety reasons or I observed a
14 child.  There could be a bassinet on the other side.
15 Yeah.  I'm allowed -- I mean, we are all given
16 that -- that reason if we need to put a stop to
17 that.
18    Q.  Okay.  But it was preplanned that there
19 would be no delay between the second announcement of
20 police officer, search warrant and deployment of the
21 stun stick.
22    A.  Unless I saw something, no.
23    Q.  Hypothetically, what if they had done the
24 first announcement, you know, they finish police
25 officer search -- the address, police officer,

104

1 search warrant, and you heard somebody inside
2 saying, all right, I'll be there in a second.
3 Hypothetically, what would you have done?
4    A.  If I heard someone say that?
5    Q.  Yes.
6    A.  Coming out.  Like, hey, I'm walking out?
7    Q.  Yeah.
8    A.  I would advise that.  I would advise that
9 on the radio, what I'm hearing.
10    Q.  Would you have still inserted the stun
11 stick after the second announce?
12    A.  It would depend.  It would -- the
13 situation would depend.  I mean, what if he's just
14 baiting us?  It would depend.  If I could see that,
15 I don't know.  I would allow them -- I would let
16 them know what I'm hearing.  I would let -- hey, do
17 you still -- I would advise, do you still want the
18 stun stick to go?  If I'm able to see something, he
19 tries to arm himself, maybe he's trying to flee,
20 then I would have probably inserted the stun stick
21 to draw attention away from the team.
22    Q.  Was it discussed at the tactical briefing
23 who would make the initial announcement?
24    A.  Yes.  Officer Werner told that -- I
25 believe it was going to be Sergeant Backman that

105

1 made all verbal announcements from the bullhorn.
2    Q.  Now, and we can listen to this later if
3 you really wanted to.  But I'll represent to you
4 that I do think it was Sergeant Backman, and he had
5 a bullhorn.
6    A.  Yeah.
7    Q.  And he does an initial announcement with
8 an address and police officer, search warrant.  And
9 then after that, all the other officers also begin
10 saying police officer, search warrant.  Was that
11 discussed at tactical briefing, that the other
12 officers would also say police officer, search
13 warrant?
14    A.  That's basically an SOP for us.  Is once
15 the announcements start and we're getting ready to
16 make entry, we will continue to verbalize that as
17 we're making entry.
18    Q.  You didn't verbalize that, did you?
19    A.  No.
20    Q.  Why not?
21    A.  Because the guys were already at that
22 point inside.  I don't -- that's -- I don't say
23 police, search warrant.  My job is to stun the
24 window.
25    Q.  Is part of the reason because you did not



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

106

1  want to disclose your presence at the window?
2      A.  No, I pretty much -- once I was up there,
3  he's going to know that we're there once I broke the
4  window anyway.  Or someone is going to -- my
5  presence is known by the insertion of the stun
6  stick.
7      Q.  Was this specifically discussed, that you
8  would not take part in the announcements?
9      A.  No, it wasn't discussed.  But usually the
10 guys that are on the stun stick are not making the
11 verbal announcements.  Because we are within close
12 proximity of each other, the announcements portion
13 of it would be covered by the -- the entry team.
14     Q.  Okay.  Did anyone discuss at the tactical
15 briefing the amount of time in seconds that should
16 elapse after the announcements to allow somebody to
17 either admit or deny the officers' entry?
18     A.  To answer your question, are we talking
19 about timing, how many seconds?  No.  That never was
20 discussed, sir.
21     Q.  Okay.  Well, the plan was to not allow
22 that, wasn't it?
23     A.  Not allow what, sir?
24     Q.  Not allow any time for somebody to come to
25 the door and admit or refuse entry, right?  That was

107

1  the plan, wasn't it?
2      A.  The plan was basically for them to
3  verbalize, allow them -- letting them know that the
4  police is outside and we're only going to wait, like
5  we said, a reasonable amount of time.  And at that
6  point, we end up breaching the door and go.
7      Q.  Well, I mean, you said, and I wrote it
8  down, in your earlier testimony, the very point of
9  the CET entry is to use speed, surprise, and
10 overwhelming action.  You said that earlier, right?
11     A.  Yeah.
12     Q.  So, if you're using speed, surprise, and
13 overwhelming action, how can a person inside have
14 any reasonable amount of time to come to the door
15 and respond to the officers?
16     A.  That's once -- speed, surprise, and
17 overwhelming action is as we're making our entry in.
18 That's -- that's what our speed is, is inside.
19 Our -- our surprise is that, you know, basically
20 utilizing the stuns and distracts to disorient and
21 drive their attention away from us.  And then that
22 overwhelming action is, you know, the overwhelming
23 presence of police department, search warrant, the
24 distracts continuing to go, you know, the dynamic
25 movement inside of the house.

108

1      Q.  Your act of breaking the window with the
2  stun stick is the first act of physical force to
3  enter that apartment, isn't it?
4      A.  Yes, sir.
5      Q.  Okay.  It happened even before the first
6  use of the battering ram on the front door, correct?
7      A.  And that was the plan, yes, sir.
8      Q.  Okay.  So that was preplanned?
9      A.  Yes, sir.
10     Q.  So how long was it planned before you
11 entered the stun stick before they would use the
12 battering ram at the front door?
13     A.  So, the plan was, is it would be two full
14 announcements.  I would insert the stun, clear it,
15 initiate the stun, and then the breach would start
16 to work.
17     Q.  And no amount of time between the second
18 announcement and insertion of the stun stick.  It
19 was supposed to happen simultaneously?
20     A.  No.  Distract would go, breach would then
21 start.  That was the plan.
22     Q.  I'm sorry, I think you may have
23 misunderstood my question.
24     A.  Okay.
25     Q.  The plan was, after the second

109

1  announcement, no additional time would be allowed to
2  the people inside.  Immediately after the second
3  announcement, you would insert the stun stick.
4      A.  Immediately after the second announcement
5  my job was to insert the stun stick, yes.
6      Q.  Who told you that?
7      A.  The ATL and the sergeant who approved it.
8      Q.  Okay.  So you're talking about Werner and
9  Backman?
10     A.  Yes, sir.
11     Q.  Are you talking also about Sergeant
12 Finley?
13     A.  Sergeant Finley, I'm sure he was involved
14 in it.  I know that he was the primary sergeant
15 there, but I know that Sergeant Backman, Sergeant
16 Werner discussed the tactical plan.  Sergeant Finley
17 then kind of approved -- like, not approved it,
18 because he doesn't have that authorization to
19 approve it.  He over- -- he was more of the
20 oversight of that.
21     Q.  Did Sergeant Backman deliver any portion
22 of the tactical briefing?
23     A.  Any portion of it?
24     Q.  Yes.
25     A.  No, sir.



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

110

1    Q.  Okay.  And it was preplanned that you
2  would use -- or the SWAT team was going to use a CET
3  entry as opposed to a Surround and Call-Out, or SACO
4  entry, right?
5    A.  Surround and Call-Out, yes, sir.
6    Q.  Okay.  And so, to your knowledge, who made
7  that decision?
8    A.  So basically, the reconnaissance officers
9  would go back to Officer Werner, discuss what they
10  saw, and then Officer Werner would basically present
11  a CET plan to the sergeant, who would then push that
12  up to the lieutenant, and it would get approved.
13    Q.  Did you ever question why a CET entry was
14  being used as opposed to a Surround and Call-Out?
15    A.  No, I did not.  The reason why I did not
16  is, I was able to -- I saw the aerial photos.  I saw
17  the structure that they were looking at.  I
18  understood why they were doing what -- a CET opposed
19  to Surround and Call-Out.
20    Q.  And so, in your opinion, what did you see
21  that led you to believe that CET was better than
22  Surround and Call-Out?
23    A.  It was going to be very, very difficult
24  for them to pull up armored vehicles.  They had --
25  they basically had a -- I believe it was an ARCO

111

1  station.  I don't know if -- I can't remember if it
2  was to the north or to the south.  But there was an
3  ARCO gas station that was -- you know, it's 5:00
4  a.m., people are going to get coffee, people are
5  going to get gas, there was active people over
6  there.
7        We would literally have to put a piece of
8  armor in that parking lot.  We would have to shut
9  down and put a piece of armor off of -- I can't
10  recall what the back street was, if that was Pecos
11  or Nellis.  It was wide open back there.  There was
12  so much space to where we couldn't actively contain
13  the individuals without cutting down some wrought
14  iron gates and pushing the armor in.
15        So I understood their thought process and
16  their logic behind utilizing a CET versus a Surround
17  and Call-Out.  Because of the environmental factors
18  of trying to contain the structure.
19    Q.  And is that the only basis for your
20  opinion?
21    A.  Right now, yes.  Oh, yeah.  And basically,
22  they opted to go with the CET because of the two
23  suspects inside.  The violent tendencies, the
24  severity of the crime, access to weapons.  All
25  those.

112

1    Q.  Were you told during the tactical briefing
2  that suspect Fisher was wearing an ankle bracelet?
3    A.  I was aware of that -- or not aware of
4  that, I was briefed that, yes.
5    Q.  And so did that, then, lead you to believe
6  that Fisher was not actually inside the apartment?
7    A.  We -- made us believe that Fisher was not,
8  but -- I apologize for saying his name incorrectly.
9  Shumpert, Rumpert.
10    Q.  Wattsel Rembert.
11    A.  Rembert.  That was still outstanding and
12  could possibly still be inside.
13    Q.  Did anyone brief you on the last time he
14  was seen at that apartment?
15    A.  No, sir.
16    Q.  Did anyone brief you on whether he had
17  ever been seen at that apartment?
18    A.  No, sir.  It was actually -- I take that
19  back.  I believe officer -- the recon officers
20  did -- did state that -- to my recollection, they
21  did state that he was seen, you know, several weeks
22  prior.
23    Q.  What advantages would a Surround and
24  Call-Out have over a CET entry?
25    A.  What advantages would it --

113

1    Q.  Yes.
2    A.  -- have had?
3        Well, basically, we would -- like I said,
4  in a Surround and Call-Out, we would have landed
5  armored vehicles.  It would have been very tough to
6  contain and utilize low lethality options if he was
7  to come out and try to flee.  Especially running
8  towards a -- you know, Pecos.  He had a lot of
9  avenues of escape.  It would have -- you know,
10  you're talking about, you know, what advantage it
11  would have gave us.  The only thing it would have
12  really gave us is us slowing the action down and
13  trying to attempt to get anyone in custody -- take
14  anyone out of the residence and get them into
15  custody.
16    Q.  Would have provided more time for people
17  inside, wouldn't it?
18    A.  Would have provided more time for people,
19  also, that if they're committed to arm themselves
20  and fortify their position and location.  Because at
21  some point in time, we were going to have to go up
22  there and breach that door.
23    Q.  You would concede this is a small
24  apartment with only a patio door, a front entrance,
25  and a couple of windows, right?



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114

1    A. Yes.
2    Q. It's not a huge warehouse, is it?
3    A. No, it's not a huge warehouse. But I've
4 also, sir, I've been involved in a lot of operations
5 where we have done Surround and Call-Outs and people
6 have tunneled through sheetrock. That was just
7 drywall and sheetrock that separated apartment to
8 apartment.
9        So if these guys were looking to escape
10 and go through -- we've seen this happen. We've had
11 this happen to us. And now we have a potential
12 hostage situation, with the potential of an armed
13 suspect that's wanted for homicide. So that's
14 another reason why they opted to go with the CET,
15 sir.
16    Q. Did the briefing indicate who was actually
17 inside the apartment?
18    A. Who could have been inside the apartment?
19 No.
20    Q. Did it indicate that anyone had actually
21 been seen inside the apartment?
22    A. Did the briefing?
23    Q. Yes.
24    A. They -- you know, at, like, the moment of
25 us going, is that what you're asking me?

115

1    Q. Yes. Who was currently --
2    A. I can't recall, sir.
3    Q. Was it your understanding that you might
4 do this and the apartment would just be vacant?
5    A. We've -- we've hit vacant apartments
6 several times where people say that they're in
7 there. We've -- we've had a warrant just a couple
8 weeks ago where people have said, hey, he's
9 100 percent in there. And it was completely empty.
10 It happens.
11    Q. Do you believe that using a Surround and
12 Call-Out entry technique as opposed to a CET entry
13 was feasible for this?
14    A. Could it have been done?
15    Q. Yes.
16    A. Can we -- we can do anything in SWAT. We
17 find ways to get things done. We will find a way to
18 make it work. Do I feel it was -- it was the
19 best -- the best tactic at the time? No. It just
20 just -- it would have been very hard for us to land
21 an armored vehicle and put it in a position to give
22 us any type of tactical advantage at that time.
23        I wasn't on the recon, I wasn't the ATL, I
24 couldn't tell if there was enough spacing. So if
25 this was the apartment, this is the door, this is

116

1 that ARCO station, this is the parking lot, I don't
2 know if they would have been able to get a BearCat
3 or any piece of armor around that to provide them
4 adequate cover and still be able to see the door.
5        Because from their distance from that
6 parking lot to the door was a good 20, 30 yards,
7 maybe more. And that's just -- I'm just trying to
8 speculate now off the top of my head.
9        The guys that were on the back, the rear
10 containment where I was off the stun stick, the guys
11 that were off the 3-4 corner, --
12        THE REPORTER: The guys?
13        THE WITNESS: -- which --
14        THE REPORTER: -- off the 3-4 corner?
15        THE WITNESS: I'm sorry. 3-4 corner,
16 which would be the furthest north corner. I don't
17 know if we would have been able to -- there's no
18 room. The buildings were so tight together, we
19 couldn't get a piece of armor back there. So any
20 type of armored vehicles for protection would have
21 been in an ARCO station with people that are
22 continuously moving and an open business. And then
23 another vehicle off of that street, which if it was
24 Pecos or Nellis, I can't recall.
25        And now there's a gate with a block wall

117

1 that completely obstructs them from even being able
2 to contain that. All that was, is going to be a
3 show of force at that time.
4        So those guys would have been on foot just
5 behind shields. So if he presented himself out in a
6 Surround and Call-Out and wanted to flee or -- or
7 utilize any type of force -- deadly force towards
8 us, we would have been at a disadvantage. So that's
9 why they went with the CET.
10 BY MR. BREEDEN:
11    Q. For officer safety?
12    A. For officer safety as well, yes. And
13 citizen safety.
14    Q. Is it public safety?
15    A. I just said that. And citizen safety.
16    Q. So, which do you think the safer entry
17 technique is for people inside the apartment? A CET
18 entry or a Surround and Call-Out?
19    A. In that situation, which what was briefed,
20 based on the severity of the crime and what these
21 guys were -- could potentially do, a CET would have
22 been.
23    Q. So, is it your testimony that a Surround
24 and Call-Out simply was not feasible?
25    A. It's not that it was not feasible, it's

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

118

1   just -- based off of those subjects that we're going
2   after, the access to weapons, the location itself,
3   that's why they utilized the CET tactic. Could we
4   have down a Surround and Call-Out? Possibly. We
5   can -- we find ways to do a lot of things in SWAT.
6       Q. If this SWAT action was taken today, under
7   the current policies and procedures for a property
8   only search warrant, would a CET entry be permitted?
9       A. At this time, possibly not. Especially --
10  if we had to, we know -- like I said, I wasn't
11  there. I don't -- I mean, I was there, but I wasn't
12  a part of the planning process. We would have tried
13  to find a way to get a BearCat closer, if we can.
14  So to answer your question, yes.
15      Q. So you're saying yes, if this same event
16  occurred today, CET would not be approved?
17      A. No.
18      Q. I'm sorry, we're answering each other so
19  that your response might be a little -- a little
20  misleading. So let me rephrase it again.
21          If this same SWAT action occurred today,
22  would CET entry be approved?
23      A. If we got this warrant today for a -- that
24  they were going after a property crime and possibly
25  a suspect inside, we would have probably done a

119

1   Surround and Call-Out on that in this environment
2   right now. Yes, to answer your question. Is that
3   correct?
4       Q. Yeah, I can understand your response.
5       A. Okay.
6       Q. I just wanted to make sure it was clear.
7          So what has changed, then, since when
8   Mr. Williams was killed in January of 2022 and
9   today?
10      A. Well, what has changed is, you know, the
11  IAP has obviously added a lot more information that
12  is needed for the service of these warrants. And
13  these are some of the things I've already kind of
14  touched on, was when was the last time you've seen
15  the surveillance? Observations of anybody inside?
16  Coming and going. Like, stuff like that. Time of
17  day, patterns of life. Those are things that have
18  also been added. And these are the things that we
19  are forcing -- not forcing. We are asking the
20  detectives to do to make sure that the investigation
21  is solid. Because once we are utilized, we're such
22  a show of force that if we are there, we need to be
23  able to make sure that we're doing the tactics
24  safely and efficiently.
25      Q. Now, at the beginning of this deposition,

120

1   I asked you if you believe that if you saw other
2   officers that were violating the civil rights of the
3   public, whether you felt you had a duty to intervene
4   and you said yes. You understand that you have that
5   duty, correct?
6       A. Yes, sir, I understand that.
7       Q. So, when you observed the tactical
8   briefing, and you heard that the plan was to do two
9   announcements and then you were to use force, did
10  you raise any concerns that you were not allowing a
11  reasonable amount of time for occupants to come to
12  the door and allow entry to the officers willingly?
13      A. No. I did not feel that I was -- no. I
14  was comfortable with it. I understood why they
15  wanted it done. I was good with the plan.
16      Q. Okay. And would you agree with me that
17  because whoever is in there is likely asleep, a
18  person who is asleep would probably need a little
19  longer time to wake up and ascertain things than
20  somebody who was wide awake?
21      A. I could -- yeah, I could understand that,
22  too. But we also want to make sure that we are
23  catching them by surprise as well. To disorient,
24  disrupt anything that they're trying to do inside as
25  well. So -- especially when we're going after

121

1   someone that's involved in a homicide.
2       Q. Well, if you're planning on surprising and
3   disorienting them, how is the person going to tell
4   that you're police officers and have time to come to
5   the door and say, "Oh, yeah, you're here to serve a
6   warrant? Come on in."
7       A. Well, we're also going to continue to make
8   announcements, let them know. And we're also
9   looking to get them to a point to where if we're
10  making entry or we're about to make entry, we want
11  them to basically stop any type of action and be
12  able to comply with us as we're coming in.
13      Q. Well, you don't want them to stop
14  willfully allowing you entry, do you?
15      A. We don't want them to what? I'm sorry,
16  I --
17      Q. Well, look, if the person is in the
18  process of coming to the door to say, "Oh, you're
19  police officers with a search warrant. Sure, come
20  on in. Here, you know, it's an open book. Do
21  whatever you need to do." You don't want to
22  interrupt that process, do you?
23      A. Not necessarily. We don't want to
24  interrupt it. But we're also not necessarily -- in
25  a CET, we're wanting them -- we are wanting to -- we



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

122

1  want them to just stop action, too, as well.
2      Q.  Do you remember any officer raising any
3  concern that a reasonable amount of time was not
4  being planned for somebody to come to the door and
5  provide the officers entry?
6      A.  No, sir, I do not recall that.
7      Q.  Wasn't the planning of this essentially a
8  no-knock warrant?  You were just going to do
9  announcements and burst in?
10     A.  This was -- this was not a no-knock
11 warrant.  No, sir.
12     Q.  Well, I know legally it wasn't a no-knock
13 warrant.  But there wasn't any reasonable amount of
14 time to allow somebody to get up from a sleeping
15 position and come to the door, was there?
16        MR. ANDERSON:  Objection, form.
17        Go ahead.
18        THE WITNESS:  The other -- the thing,
19 also, with knock and announce, and, you know, we've
20 already covered it and you mentioned it yourself, is
21 that we're also officer safety.  The amount of time
22 that we're going to wait there is also a factor of
23 how -- that we take into consideration, too.
24        So whether it's two seconds, six seconds,
25 eight seconds, fifteen, is it's also going to be --

123

1  you know, is it a safety concern for us just waiting
2  outside.  Especially dealing with, you know,
3  continue to harp on it, someone that's possibly
4  armed inside.
5  BY MR. BREEDEN:
6      Q.  Okay.  But you guys are wearing body armor
7  and helmets, and some of you have ballistic shields.
8  And you can take defensive positions.  Nobody inside
9  the apartment has any of that, do they?
10        MR. ANDERSON:  Objection, form.
11        THE WITNESS:  No, we don't.  But we also
12 had an officer that was shot six times.  And we
13 also -- we also had a gentleman next to me who took
14 two rounds into his shield.  So I understand -- I
15 understand my -- my role as a SWAT officer and being
16 willing to wear that equipment and make entry.
17 But -- and we're risking things.  But we're also --
18 we also was just shot at, I believe, 18 times by
19 this gentleman.
20 BY MR. BREEDEN:
21     Q.  When you were deciding for this to be --
22 or when it was decided this would be a CET entry,
23 was the primary consideration, then, officer safety?
24     A.  Officer safety, citizen safety, anyone
25 else inside.  Like I told you, people around.  I

124

1  mean, all -- everyone -- all of that goes into our
2  concern when we're planning.
3      Q.  Do you remember any officer asking any
4  questions during the briefing about any topic?
5      A.  Any topic?  Topic of -- could you
6  elaborate?
7      Q.  Yeah.  Any topic in terms of what are
8  these people wanted for?  You know, how many seconds
9  should we wait?  Who's going to do the
10 announcements?
11     A.  That's all -- that was all discussed in
12 the -- in the briefing.  Those things were discussed
13 in the briefing.  Nothing about time and -- no, like
14 your -- to answer -- nothing about time and how many
15 seconds.  That wasn't discussed.  But who's doing
16 the bullhorning and why we're here, yes.
17     Q.  Okay.  But was that -- was that a one-way?
18 In other words, the person doing the briefing just
19 said, "Hey, look, Bertuccini.  You're going to do
20 the stun stick."  Or did anybody on any topic reach
21 out to ask a follow-up question to the person doing
22 the briefing?
23     A.  No, sir.
24     Q.  Now, I notice during one of your
25 interviews, you indicated that as part of the

125

1  briefing, there was going to be a quote,
2  "contingency" end quote, plan, if a quote "breach
3  longer than expected" end quote, occurred.  Do you
4  recall that?
5      A.  Yes.  I mean, that's a -- that's a very
6  common thing that they'll talk about, a delayed
7  breach.
8      Q.  What was the contingency?
9      A.  So, if they were going to -- if there was
10 going to be any type of delayed breach at the door
11 with the ram, our ballistic breach officer would
12 step up and -- and basically start to utilize
13 ballistic breach compressed copper rounds into the
14 lock to continue to get the door open.
15     Q.  Is that the Shok Lock?
16        THE WITNESS:  The Shok Lock, yes, sir.
17        THE REPORTER:  The what?  Shock?
18        THE WITNESS:  Shok.  It's actually not
19 actually s-h-o-c-k, it's actually S-h-o-k, and then
20 Lock.
21 BY MR. BREEDEN:
22     Q.  So, the contingency plan was to use a Shok
23 Lock?
24     A.  That was our ballistic breach contingency
25 plan, yes, sir.



126

1     Q.   And if further you couldn't obtain a
2 breach, would you revert into a Surround and
3 Call-Out?
4     A.   We would at that point -- Jake, I believe
5 he stated that he would fall back to that corner so
6 that we still had eyes on, and I would continue to
7 work the window.   Because at that point, the stun
8 would have already been initiated.   I would have had
9 that window completely raked out and I would have
10 had eyes into the target.
11     Q.   Did any part of the plan involve a
12 scenario where you would actually enter the
13 apartment through the window?
14     A.   No, sir.   We would not do that on a -- on
15 a search warrant, sir.
16     Q.   Why not?   I mean --
17     A.   It's not -- it's just not an entry point
18 for us.   If would cause -- it could cause safety,
19 harm, risk to us.   We could get cut.   We could get
20 hung up.   It's going to -- it's an obstacle.   It's
21 an elevated obstacle.   So, no.   We would only do
22 that on a crisis entry in a hostage situation if
23 need be.
24     Q.   Okay.   And you indicated in one of your
25 interviews that in the past during some of these

127

1 briefings you have made tactical suggestions.
2     A.   Yes, sir.
3     Q.   Did you do anything like that during this
4 briefing?
5     A.   I just asked J K what your -- what was
6 your thought process for the stun stick here.   He
7 basically told me that he was able to pull up photos
8 of the interior, of the layout, and saw that that
9 window put us right into the living room.   So that
10 as they were working the front door, if they got
11 hung up, I would be able to basically see inside.
12 Me and Roth would be able to see the inside of the
13 entire apartment.
14       So if we did, you know, see people, we
15 could see what was going on beside the door.   If we
16 needed to tell them, hey, you got a chair behind the
17 door and there's -- hey, there's a guy coming to the
18 door, like, we'd be able to do that.
19     Q.   When you said you discussed that with J K,
20 who --
21     A.   Sorry, Officer Werner.   My apologies.
22     Q.   So, let's talk a little bit more, then,
23 about the SWAT entry itself.   And we'll look at some
24 video here.   But let me ask you a couple questions
25 first.

128

1       In the 24 hours before that January 10,
2 2022 SWAT action, had you consumed any alcoholic
3 beverages?
4     A.   No.
5     Q.   Had you used any drug of any kind,
6 including prescription medication?
7     A.   No, sir.
8     Q.   Okay.   And were those your normal waking
9 hours that time of day?   They weren't, right?   Your
10 normal shift was noon to 2:00?
11     A.   I mean, I get up usually 6:00, 7:00 to go
12 to the gym every morning.
13     Q.   I mean, this occurred -- the tactical
14 briefing, what time did that start?
15     A.   I believe it started at 5:00.
16     Q.   Well, the action started at 5:00, so the
17 tactical briefing must have been before then.
18     A.   I -- like I said, two years ago, you have
19 better knowledge of it than me.   I just remember
20 around 5:00 a.m.
21     Q.   And how long did the tactical briefing
22 last?
23     A.   Usually, anywhere between 20 minutes -- I
24 mean, I don't know an exact time.   Sometimes some
25 are shorter, some are longer, some plans are a

129

1 little bit more elaborate and longer and more in
2 depth than others.   Some can be just more standard.
3 It just would depend.
4     Q.   Let's assume the tactical briefing
5 happened around 4:30 a.m.
6     A.   Okay.
7     Q.   On your regular day off, would you
8 normally be awake at that hour?
9     A.   Not at that hour, no.
10     Q.   Physically, how did you get to the
11 tactical briefing, and who rode with you?
12     A.   How did I get to the tactical -- I drove
13 myself.   I came from my home, I got to the brief, I
14 drove my personal -- not my personal truck, my work
15 truck where all my equipment is.   Got dressed --
16     Q.   Did you pick anyone up on the way?
17     A.   No, sir.
18     Q.   I'm going to review some -- some video
19 now.   This comes from a body camera that I believe
20 was yours.
21     A.   Okay.
22     Q.   And just for the record here, so this
23 would be the body camera video labeled as Officer
24 Bertuccini's.   And we're going to start it at the
25 time 12:58.   But we should make clear that doesn't



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

130

1  mean this happened at 12:58 a.m., does it?
2      A.  No.
3      Q.  That's Zulu time, correct?
4      A.  Sure, yeah.  You know better -- more than
5  me.  But, yeah.  No, it did not happen at 12:58 a.m.
6      Q.  Do you use that term, Zulu time, when you
7  talk about --
8      A.  I'm going to be honest with you, that's
9  the first time I ever heard that.  So, no, I do not.
10     Q.  Okay.  All right.  So -- but it's your
11  understanding that basically, there is a seven-hour
12  time difference here.  So we're going to use the
13  translated time, then, and I will tell you that this
14  video then starts at 4:58 a.m.  I got that wrong.
15  It's an eight-hour difference, isn't it?  This is
16  going to start at 4:58 a.m.  And I'm going to play
17  it for a little bit and then I'll stop it and ask
18  you some questions.
19     A.  Yes, sir.
20         (Video playing.)
21         THE WITNESS:  If you wanted me to hear
22  something, I can't hear it.
23  BY MR. BREEDEN:
24     Q.  It's pretty faint right now.
25     A.  Okay.

131

1      Q.  Okay.  I'm going to stop it at 4:58:50.
2  And so I'm going to ask you, and I know we haven't
3  looked at this too much yet, but do you believe that
4  is the video from your body camera?
5      A.  Yes, sir.
6      Q.  Okay.  And who were you arriving with at
7  the beginning of the video?
8      A.  Like I said, I drove myself to the brief.
9  We briefed.  I rode with Roth in his truck.  That
10  was the plan.  Just Jake told us to -- Officer
11  Werner told us, hey, just buddy up.  Take one truck,
12  limit the vehicle package, the number of guys on the
13  rails.
14     Q.  And you drove?
15     A.  I did not -- I don't recall driving.  I
16  believe Roth drove.
17     Q.  Oh, okay.  And why was it you were not on
18  the BearCat, then?
19     A.  Why was I not on the BearCat?  It was just
20  easier for us to drive in our truck, because how
21  tight the parking lot was.  They wanted to try to
22  limit the number of vehicles in there.  In case we
23  did have a down officer, we had a good ingress and
24  egress for medical.
25     Q.  And at the time, then, when you exited and

132

1  began to approach the apartment, are you wearing a
2  helmet?
3      A.  Yes, sir, I'm wearing my helmet.
4      Q.  Is that, like, a tactical or bulletproof
5  helmet?
6      A.  It's a ballistic helmet, yes, sir.
7      Q.  Did you have a taser on you?
8      A.  Yes, sir, I did.
9      Q.  And you had your body camera on and it was
10  activated?
11     A.  Yes, sir.
12     Q.  Were you wearing a bulletproof vest?
13     A.  Yes, sir, I was.
14     Q.  Okay.  Would you use a different term
15  other than bulletproof vest, like a tactical vest?
16     A.  It's a tactical ballistic vest.
17     Q.  And did you have a handgun with you?
18     A.  Yes, sir.
19     Q.  What type, caliber?
20     A.  It was a 9mm Glock 17.
21     Q.  Did you have any other firearms?
22     A.  I did.  I had a secondary firearm with me.
23  Another Glock 17.
24     Q.  Okay.  Did you have flex cuffs?
25     A.  I did.

133

1      Q.  And we saw on the video, and if you need
2  me to replay it, but we saw that you retrieved the
3  stun stick from the rear of the vehicle.
4      A.  Yes, sir.
5      Q.  Okay.  And it was already loaded at that
6  time?
7      A.  Loaded and ready to go, yes, sir.
8      Q.  Okay.  Did you have anything else on your
9  person, then, that we haven't already discussed?
10     A.  Just everything on my kit, whatever my --
11  you know, my kit, which is my -- my tactical vest.
12  It's what we refer to as our kit.
13     Q.  What -- what else would be on it?
14     A.  Explosives, radio, medical pouch, medical
15  kit, notebooks, stuff like that.  Initiators.
16     Q.  I'm going to play the video here for a
17  little bit, and then we're going to stop it, sort of
18  as you round the corner --
19     A.  Okay.
20     Q.  -- to get to the rear window, okay?
21         (Playing video.)
22  BY MR. BREEDEN:
23     Q.  Okay.  We're going to stop the video at
24  this point.  I stopped it at -- what on this video
25  is 4:59 a.m. and 38 seconds.  And I think as I



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

134

1  stopped it, you could actually hear.  And the time
2  on the video varies from video -- camera to camera.
3      A.  I understand.
4      Q.  But at least on your body camera video,
5  you can already hear the beginning of the first
6  announcement at this time --
7      A.  Yes, sir --
8      Q.  -- correct?
9      A.  -- I do.
10     Q.  And did you recognize the voice as that,
11  in fact, Sergeant Backman?
12     A.  Sergeant Backman, yes, sir.
13     Q.  Okay.  Now, you're in the line of
14  officers.  And you walked by the front door to this
15  apartment, didn't you?
16     A.  I was shielded -- once that door was
17  shielded, I went -- I went past it, yes.
18     Q.  Could you see that the front door had a
19  brass plate?
20     A.  From my vantage point, no, I could not
21  tell if it had a brass wrap.
22     Q.  Let me ask you hypothetically, if you had
23  observed a brass wrap on the door, what would you
24  have done?
25     A.  If I was on the recon and I observed a

135

1  brass wrap, I would inform my sergeant.  I would let
2  him know, hey, this could be -- and this is a thing
3  with doors.  And I'm not going to get long-winded
4  with this.  Here's the thing with doors
5  (indiscernible).
6          THE REPORTER:  What kind of doors?
7          THE WITNESS:  Metal foam filled doors.
8  Standard metal foam filled door in an apartment.
9          And a brass wrap is an additional metal
10  plate that wraps around the locking mechanism, okay?
11         On the frame, if the door -- if the frame
12  is wood, it's -- it's very simple to break that
13  piece.  You're going to get -- you're going to get
14  that flex on it.  It's going to -- you know, you're
15  going to bust that one by two.  It's not going to be
16  a problem.
17         With a metal frame door, and that lock
18  that -- you're not going to really get the flex with
19  it unless you've got a guy that can really -- can
20  really hit.  You know, utilize the ram to its -- the
21  most out of it, best efficiency.
22         So in that situation, I would have
23  actually talked with my sergeant about possibly
24  placing an explosive charge on that door.  Or, I
25  would have had told the breachers that, hey, look.

136

1  No more than one or two hits on the door and we'd go
2  right to Shok Lock.  That's -- that's me.  That's,
3  you know, my, you know, tactical assessment of that
4  door.
5          And it would also come down to the frame.
6  I don't recall if the frame was wood or metal.  I
7  don't remember them stating that.  So would, if --
8  would that have changed my breach plan as the ATL?
9  Yes.  I believe it -- if you asked Officer Werner
10  that question, maybe it changes his breach plan,
11  too.  But at the time, they did not see the wrap.
12  BY MR. BREEDEN:
13     Q.  And would you agree with me that the fact
14  that there's a brass wrap is important when planning
15  the entry into this apartment?
16     A.  100 percent.  Especially when it comes to
17  the breach plan.
18     Q.  And that should have been recognized at
19  the reconnaissance phase, shouldn't it?
20     A.  I feel, yes, it should have been seen.
21     Q.  Do you feel that's a failure of the
22  reconnaissance officers?
23     A.  I wouldn't say it's a failure.  I would
24  say it's something that if they didn't feel they
25  got -- if they weren't able to get a good pass on

137

1  the door, then maybe it needed to be redone.  I
2  wouldn't call it a failure.  I would -- I would
3  definitely state that that would need to be redone.
4  So those are questions that the ATL asked.  Is there
5  a wrap?  If they say, I don't know, then we'll --
6  there's -- another pass is going to need to be done
7  at some point.
8      Q.  Because, look, anybody doing
9  reconnaissance, not only can they plainly see a
10  brass wrap on the door, but they should be looking
11  for that, right?
12     A.  They should be looking for it.  But I will
13  say this, sir.  Is that there are times in certain
14  apartment complexes that do have brass wraps.
15  They'll paint that the same color as the door.  So
16  unless you're able to see those screws that, you
17  know, are now painted that is holding that brass
18  wrap in, it's tough to see.
19         Now, in his -- another thing, too, is,
20  what we also do is, if we can't get a good pass on
21  that door, we'll look at like apartments.  Like
22  apartments did not have that wrap.  So this was a
23  door that was -- that was placed on by either
24  maintenance or the owner.  The occupant, sorry.
25     Q.  Well, I'll let you know, I've seen



138

1 pictures of it, and this brass was -- was not
2 painted.
3     A. Okay.
4     Q. But that's an important factor here, isn't
5 it?
6     A. It is.
7     Q. And this was not discussed in the tactical
8 briefing at all, was it?
9     A. No.
10     Q. In fact, did you even have -- well, you
11 had somebody with a Shok Lock. But you didn't have
12 anybody with other explosives, did you?
13     A. No, we did not utilize an explosive breach
14 on this door, sir.
15     Q. Now, we've talked about sort of at the
16 reconnaissance phase, you know, what -- what
17 probably should have been done. But now, the
18 question is slightly different. Let's just say
19 hypothetically, look, you're the first officer in
20 the line. Coming right up on that door. You can
21 see a brass wrap clear as day on it, and no one has
22 discussed that before. Hypothetically, what should
23 have happened with that additional information?
24     A. If that gets noticed -- I mean, this is --
25 being -- with my experience, as that -- if that was

139

1 noticed, what should have happened was, is once the
2 breach was started to work, if they were -- if they
3 were getting -- you know, getting resistance or the
4 door wasn't breaching, that Shok Lock officer or
5 even the No. 1 guy needed to call up that ballistic
6 breacher faster. That should have been done
7 quicker, in my opinion.
8     Q. I'm going to play the video for just a
9 couple of seconds longer, as you approach the window
10 so that we have a good view of the window and then
11 I'm going to stop it and ask you some questions
12 again.
13     So, if I didn't state it before, we
14 stopped at 4:59 and 38 seconds. And I'm just going
15 to play the video a little more here.
16     (Playing video.)
17 BY MR. BREEDEN:
18     Q. Okay. So I've stopped it rather quickly
19 at 4:59 and 41 seconds.
20     At this time, you are at what is the
21 living room video -- or I'm sorry, the living room
22 window of the apartment, correct?
23     A. Yes, sir.
24     Q. And you have the stun stick, and it is
25 loaded with a distraction and you're ready to deploy

140

1 it.
2     A. I'm ready, yes.
3     Q. Okay. Now, the window is a double pane
4 window, correct?
5     A. Yes, sir.
6     Q. And there's nothing like iron bars on it.
7     A. No. But there's a solar screen on the
8 left side, which is why I opted to go to the right.
9     Q. Yeah. There's two things that you should
10 notice about this window immediately, right? And
11 the one is the solar screen on the left side. Why
12 is that important to you?
13     A. The thing is, believe it or not, the solar
14 screen could add an obstruction and a barrier into
15 the window and could, you know, put a delay on
16 getting a good breach into that. And it also could
17 be a fire hazard. Which is why I opted to go to the
18 opposite side.
19     Has it been done? Has -- does it happen
20 all the time? No. Could it happen? Yes. And I
21 want to avoid that.
22     Q. Did anybody at the tactical briefing or
23 anybody in reconnaissance give you a head's up
24 before you rounded that corner, hey, there's going
25 to be a solar screen on part of the window?

141

1     A. No. I'm planning for it. I mean, I'm --
2 I have a fire extinguisher in my backpack if I opted
3 to go to that. Could I have gone to that? Yes.
4 Did I want to have any type of obstruction and delay
5 the breaching of the window? No. That's why I
6 opted to go to the right side.
7     Q. Okay. And what's the second thing that is
8 pretty readily noticeable about this window that's
9 of importance to you?
10     A. The blinds are closed.
11     Q. Why is that important?
12     A. Because now, if I do opt to break the
13 window, I need to make sure that once I clear it, or
14 if I clear it before I initiate the stun stick.
15     Q. The problem is, you can't see in, right?
16     A. Yeah.
17     Q. So, when you break out the window and you
18 deploy the stun stick, you have no idea at this
19 point, is anyone on the other side? How close are
20 they? You just don't know, do you?
21     A. I do not.
22     Q. And it's official policy to know those
23 things before you deploy the stun stick, isn't it?
24     A. Uh-huh. I didn't see any shadow, I didn't
25 see any, you know, toys in the -- in the, you know,

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

142

1  framing or anything like that. So I was comfortable
2  with my decision to go ahead and at least break the
3  window. If I saw anything else that would have
4  caused a safety issue, I would not have initiated
5  it.
6      Q. And a couple issues are, you don't want to
7  hit people inside with flying glass, right?
8      A. It's not going to -- I mean, yes.
9      Q. And the other issue is, you don't want to
10 employ the distract device too close to them,
11 correct?
12     A. Of course.
13     Q. And, in fact, even manufacturer's
14 recommendations say, hey, you've got to watch out.
15 You can't deploy these too close to people.
16     A. That's more of hand-held. This is in a
17 housing, which we are controlling the port. And my
18 job is to put that into the ceiling as high as
19 possible. So it's not going to harm anyone.
20     Q. Did you have any expectation at all before
21 you rounded that corner whether the blinds would be
22 opened or closed?
23     A. I did not know if they'd be opened or
24 closed, sir.
25     Q. I mean, somebody could have driven by from

143

1  the street and probably told you that in advance,
2  couldn't they?
3      A. They could have. I'm sure they could
4  have, or someone could have been sitting out there.
5  But they didn't.
6      Q. Okay. So, the first time you learned
7  either of the solar screen or the closed blinds was
8  literally when you rounded that corner and were
9  seconds away from deploying the stun stick; is that
10 accurate?
11     A. Yes.
12     Q. Okay. So there was so little intelligence
13 information or reconnaissance here that you didn't
14 know that until seconds before you had to make a
15 decision, right?
16     A. Yeah. I didn't know that there was a
17 solar screen until I wrapped it, yes, sir.
18     Q. Okay. We're going to go ahead and play
19 the video here. We'll probably play it for a minute
20 or so --
21     A. Okay.
22     Q. -- and then I'll ask you some additional
23 questions.
24         (Playing video.)
25 ...

144

1  BY MR. BREEDEN:
2      Q. Okay. I've stopped the video here at 5:02
3  a.m. and five seconds, okay? And just going to ask
4  you some questions here.
5          But first of all, what is last time you
6  saw your body camera video from -- from that
7  morning?
8      A. I saw it yesterday.
9      Q. Okay. And before that time yesterday,
10 when was the last time?
11     A. Probably when I did my CIRT statement.
12 Two years ago.
13     Q. Okay. So prior to yesterday, it had been
14 a couple years.
15     A. Yes, sir.
16     Q. All right. Now, we see on the video, you
17 deploy the stun stick to the right pane.
18     A. Uh-huh.
19     Q. And so is it fair to say that there's kind
20 of two actions here. No. 1 is, you insert it and
21 you break out the window, and then you're going to
22 pull it to trigger the distraction device.
23     A. Well, I'm going to insert it, break the
24 window, and I'm going to look first. So that was --
25 I'm looking first. I know he's calling pull. Well,

145

1  I'm going to look first. On the first pull I got a
2  soft primer strike. It didn't go the first time.
3  It went the second time.
4      Q. Okay. Well, I mean, how long are you
5  going to look?
6      A. I'm going to make sure that there's not,
7  like, a child or some type of safety issue on the
8  other side. I mean, that's -- it's my job to do
9  that. So it's going to be a second, you know, and
10 that's -- and that pull. So I'm going to make sure.
11 It was an open, clear area. I believe there was --
12 it was right by the TV that was mounted where I put
13 it.
14     Q. Now, before you broke the window by
15 inserting the stun stick, did you ever see anyone
16 moving inside the apartment?
17     A. No, sir, I did not.
18     Q. Did you ever hear anyone inside, whether
19 they were speaking or moving around?
20     A. Prior -- after I broke the window?
21     Q. Prior to breaking the window.
22     A. No, sir, I did not.
23     Q. And prior to breaking the window, did you
24 believe that most likely the occupants inside were
25 asleep at 5:00 a.m.?

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

146

1  A.  I mean, I don't know if they were
2  sleeping, if they were awake, if they were sitting.
3  I don't know.
4  Q.  Okay.  But you and I can agree that most
5  people are still sleeping at 5:00 a.m.
6  A.  I know I would be.
7  Q.  And prior to breaking the window, did you
8  know exactly how many people were inside the
9  apartment?
10  A.  No, sir, I did not.
11  Q.  Okay.  As far as you knew, there could
12  have been women and children and people unrelated to
13  the warrant in the underlying crime inside.
14  A.  Well, per based off the recon, there was
15  no elderly or children, so I don't know -- you know,
16  that could have changed.  But not to my knowledge,
17  no.
18  Q.  And you didn't know the identity of any
19  people inside the apartment, right?
20  A.  I mean, the only people that were listed
21  that we knew names of were the people that were
22  listed on the -- on the information page.  But that
23  was it.
24  Q.  I'm talking about people actually inside.
25  A.  No.

147

1  Q.  You didn't even know whether anybody was
2  actually inside or not, right?
3  A.  No.
4  Q.  Let alone who they were.
5  A.  Correct.
6  Q.  All right.  And before you broke the
7  window, did anyone inside indicate to you in any way
8  that they were going to refuse the officers
9  admittance?
10  A.  Can you -- I'm sorry, I lost you half way
11  there.  Could you repeat that, please?
12  Q.  Before you used the stun stick to break
13  the window, did anyone inside the apartment indicate
14  to you that they were not going to provide the
15  officers admittance?  In other words, open the door?
16  A.  No, no.
17  Q.  Okay.  Let's see here.  And if there were
18  occupants inside, before you broke that window, you
19  had no idea who they were or where they were in the
20  apartment, right?
21  A.  No.
22  Q.  Okay.  And you would agree with me that
23  the SWAT manual for deploying the stun stick, it
24  requires you to be assured that the area is clear
25  before you -- you use it, correct?

148

1  A.  Yes.
2  Q.  Okay.  And you're saying that you did that
3  in a second or so after you -- you broke the window
4  but before you tried to deploy the distract; is that
5  your testimony?
6  A.  Yes.  I have to look.
7  Q.  Did you see Mr. Williams before you
8  deployed the distract?
9  A.  No.  He was off to the far left side.
10  Q.  But literally, in terms of how close he
11  was to you, I mean, your left hip is probably only
12  three or four feet from his head where he was in the
13  apartment?
14  A.  I don't know.  Maybe.  I don't know.
15  Q.  Okay.  Well, you would agree, where you're
16  standing, he was in a reclining position, like, on a
17  sofa or a futon just on the other side of the wall,
18  right?
19  A.  On the left side, yes.
20  Q.  Yeah.  Are you aware that the SWAT manual
21  states that the stun stick is not to be used merely
22  to preserve evidence?
23  A.  I'm aware of the utilization of the stun
24  stick, yes.  It's -- if we're going to insert a stun
25  stick, no matter what the crime is, it would be

149

1  off -- we have to get authorization from the
2  lieutenant to use it no matter what the search
3  warrant is or what it is.
4  Q.  But what does that mean -- I mean, look,
5  you're here on a property only search warrant.  In
6  other words, there's not a warrant for the arrest or
7  a person, it's property only.  And yet the SWAT
8  manual says, look, you're not supposed to use these
9  stun sticks just in order to preserve evidence.  So
10  what does that mean to you?
11  A.  Our SWAT manual states we're not allowed
12  to use stun sticks for -- is that what it states,
13  what you're telling me?  Because we're allowed to
14  utilize our tools for -- for warrants.  If we're
15  going to insert -- the only thing that we need
16  authorization for, the only thing that we need
17  authorization for is if we're going to insert it, no
18  matter what the crime is.  If we're going to utilize
19  a stun stick on a property crime, there's -- there's
20  artic- -- reasons behind that.  Meaning, the
21  suspects inside have access to weapons.  The
22  suspects inside have violent tendencies.  They have
23  a violent criminal past.  That's why we would
24  utilize that.  And that would be authorized and
25  approved by the lieutenant.

James Bertuccini    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

150

1          (Exhibit No. 5 was marked.)
2          THE WITNESS:  So if it states --
3          THE REPORTER:  Wait, wait.  Sorry.
4    BY MR. BREEDEN:
5          Q.  So, looking at what's been marked as
6    Exhibit 5 for this deposition, this is an excerpt
7    from the SWAT policy manual.  Its LVMPD 1508.
8          And if you look in the second paragraph
9    from the bottom, it states, quote, "Whenever
10   possible, the device shall only be deployed when
11   area is visibly cleared," end quote.  Do you see
12   that?
13         A.  Uh-huh.  But it also --
14         Q.  Was that a yes?
15         A.  Yes, sir.  It is.  But it also states it
16   should only be considered when tactics dictate that.
17   And those tactics and the severity of the crime and
18   the access to weapons as the articulation that we
19   were able to use, and basically state to Lieutenant
20   O'Daniel for that authorization.
21         Q.  So you would admit to me, though, it says,
22   shall only be deployed when the area is visibly
23   cleared.  You clearly used the stun stick to break
24   the window before you knew it had been visibly
25   cleared, right?

151

1          A.  I would -- I will say that, yes.  But I
2    don't have to visibly clear to break the window.  I
3    have to visibly clear in order to -- to initiate the
4    stun stick.
5          If I saw something and -- I broke the
6    window and I saw something, I don't have to utilize
7    the stun.  I don't have to call out.  I don't have
8    to initiate the bang.
9          Q.  So, it's your understanding or your
10   reading of this, that this -- this refers only to
11   deployment of the distract and not the breaking of
12   the window itself?
13         A.  This is deployment of the insertion of the
14   distract.
15         Q.  Wouldn't you also want to not physically
16   hit somebody with the stun stick itself when you're
17   breaking the window?
18         A.  That's why we have to visibly clear --
19   that's why we have to be able to clear what's on the
20   other side.  Yes, the blinds were closed.  But we
21   didn't -- I didn't see any shadows or anything that
22   highlighted a reason for me not to break the window.
23         Q.  And you had so little visibility you
24   couldn't see Mr. Williams, who was just feet from
25   you when you deployed the stun stick, the distract,

152

1    right?
2          A.  Yes, sir.
3          Q.  It continues quote, "These devices shall
4    not be deployed solely for the prevention of
5    evidence destruction," ends quote.  What does that
6    mean to you?
7          A.  I mean, what you said is, it shouldn't be
8    used for evidence destruction.
9          But the other -- the other thing is, once
10   again, I'll continue to say this, is that -- is
11   we're going to utilize our tactics to give us this
12   most safest and tactical advantage.  So we utilize
13   that stun stick because of the people that we may
14   encounter inside of the target.  Including the
15   weapons that were outstanding.  That's why we
16   presented that to the lieutenant, who gave us the
17   authorization for it.
18         Q.  Now, the purported murder weapon that was
19   sought in the search warrant was listed as a small
20   caliber handgun, correct?
21         A.  Yes, sir.
22         Q.  Similar to a Glock or something like that?
23         A.  Doesn't matter what size the weapon is or
24   how big it is, a bullet is a bullet.
25         Q.  That's not my question.

153

1          The question is:  Would you agree with me
2    that if that gun is in the apartment, it's not
3    something that can be easily disposed of, for
4    example, like flushing narcotics down the toilet?
5          A.  No.
6          Q.  Why wouldn't you agree with that?
7          A.  You can't flush -- it's hard to flush a
8    gun.
9          Q.  Okay.  So you do -- you agree with my
10   statement --
11         A.  Yeah.
12         Q.  -- that there's really nothing anybody is
13   going to be able to do in less than a minute to
14   dispose of the gun if it's in there.
15         A.  No, they can't dispose of a weapon.  They
16   can't get rid of it.  But they can also reach for it
17   and grab it.
18         Q.  So why was the stun stick being deployed
19   then?
20         A.  Why -- why was it being deployed?
21         Q.  Yeah.  Why was it being used at all?  I
22   mean, this policy says you're not supposed to use it
23   just merely to prevent evidence destruction.  And
24   the evidence in this case, the gun, anyway, would be
25   difficult to dispose of.  So why are we using the



154

1  stun stick at all?
2     A.  Once again, we utilize the stun stick for
3  tactical advantage.  For anyone inside, to
4  disorient, disrupt any type of action inside, to
5  basically utilize that to once -- like I told you,
6  is to -- if the guys got hung up at the door, we
7  would be able to use that as a breaching tool for
8  the window to assist them on the -- on what's
9  hanging them up.  If they needed to pull back, we at
10  least had eyes into the apartment and we could then
11  continue with verbal commands if anybody -- to come
12  out, lay down, get on the ground, while they
13  continue to work the door.
14     Q.  Okay.  But I mean, you continued to talk
15  about -- you know, we talk about one thing, which is
16  announcements are given at the front door.  Police
17  officer, search warrant.  You know, we're here to
18  execute a warrant.
19        But then on the other hand, we're talking
20  about a desire to confuse and disorient people
21  inside so they can't understand or comprehend those
22  instructions.  Doesn't that seem to conflict with
23  you?
24     A.  Yes.  But it also is causing them to not
25  continue with any type of reaching for weapons or

155

1  trying to flee.  Those are -- those are some of the
2  reasons why we utilize the stun stick for the
3  disruption, for the disorient, for -- to kind of get
4  them out of their little loop.
5     Q.  Now, the manual, and I'm not sure it's on
6  this particular page, but the manual states that
7  when you're deploying the stun stick, you should
8  generally yell distract, distract, distract.
9     A.  That's incorrect.  We only utilize -- we
10  only verbalize that over the radio when we are hand
11  deploying a distract.  And that's more of on --
12  during a Surround and Call-Out.
13     Q.  Why are you not yelling it, then, on
14  January 10, 2022?
15     A.  Because I'm utilizing the stun stick.  I
16  didn't need to.  We don't do -- like I said, we only
17  verbalize when we're deploying a stun -- when we're
18  deploying a distract on a Surround and Call-Out, or
19  if we're rendering a distract safe, which means it
20  didn't go off.  So we don't verbalize that once
21  we're on scene, no.
22     Q.  And initially, you tried to deploy it and
23  it didn't fire, right?
24     A.  Yes, sir.
25     Q.  And do you have any theory about why that

156

1  was?
2     A.  I believe it was a soft primer strike
3  with -- just the way the pin pulled back.
4     Q.  Has that ever happened to you before with
5  this stun stick?
6     A.  It has happened -- not to me personally,
7  it has happened to other guys.
8     Q.  Okay.  And aren't you trained to yell no
9  discharge in the event that happens?
10     A.  No.  Basically, we -- we're -- with
11  that -- if that was to happen, if I did it twice,
12  two or three times, I would have yelled out no bang,
13  no bang, no bang.  But that first one, I was, like,
14  I must have just got a soft primer strike.  I'll try
15  it again.  If I don't get it on this one, I will
16  verbalize no bang, no bang.
17     Q.  Now, somebody is also deploying a nine
18  banger around the same time, right?
19     A.  Yes, sir.
20     Q.  Was it intended that the stun stick and
21  the nine banger were going to be deployed at around
22  the same time, or was one supposed to come after the
23  other?
24     A.  No, it's supposed to be simultaneously.
25  The reason for the nine banger is there was that

157

1  balcony behind where Rothenburg was standing, and
2  then there was another window that was in question.
3  We did not know if that secondary window and that
4  balcony belonged to us.  So the nine banger was
5  basically utilized as a deterrent if anyone was
6  trying to flee out of that -- out of that window.
7  Or that door.  So that's why we utilize that, to
8  basically, like -- to let them know, hey, stop.  You
9  know, basically just to kind of stop their actions,
10  if that was someone.
11     Q.  What officer deployed the nine banger?
12     A.  I just -- the only person I remember over
13  there was (indiscernible).  I can't remember who his
14  partner was.
15        THE REPORTER:  Was who?  I'm sorry.
16        THE WITNESS:  Collingwood.  I don't
17  remember who his partner was, so I don't know if it
18  was Collingwood or his partner that deployed it.
19  BY MR. BREEDEN:
20     Q.  And would you agree with me that a nine
21  banger also makes sounds similar to a gunshot.
22     A.  Yes.
23     Q.  And, in fact, your partner, Officer
24  Rothenburg, had to ask you afterward whether that
25  was a nine banger going off, right?



158

1 A. Uh-huh. It was in the plan. It was
2 discussed.
3 Q. Yeah. Shouldn't he have known it was a
4 nine banger? That should have been discussed in the
5 tactical briefing, right?
6 A. It was discussed in the tactical briefing.
7 Q. Why do you think he was confused then?
8 A. I have no idea.
9 Q. Okay. So even a trained SWAT officer
10 couldn't necessarily tell the difference between
11 that nine banger and gunshots, right?
12 A. Yeah. He should have known that. That
13 was in the brief. That was put out in the tactical
14 brief. That was briefed back. That was well-known.
15 Everyone knew that was going on.
16 Q. Okay. And then the nine banger deploys
17 nine different sounds of that.
18 A. Yes, sir.
19 Q. Do you know what the interval time is in
20 terms of seconds? Half a second?
21 A. Half a second. It's -- it's nine
22 munitions in there, nine different ports, within
23 seconds.
24 Q. So, at least would you agree with me, from
25 Mr. Williams' perspective, he has heard multiple

159

1 sounds that sound like somebody is shooting at him
2 before he does anything to deploy his weapon.
3 MR. ANDERSON: Objection, form.
4 THE WITNESS: I don't know what his
5 thought process would be. I mean, I could
6 understand, but I don't know.
7 BY MR. BREEDEN:
8 Q. You could understand how a person could
9 perceive those noises, just like Officer Rothenburg
10 did, and think they were gunshots?
11 A. I agree with you, yes. I could see how he
12 could perceive that.
13 Q. And, in fact, the window had just broken.
14 It might seem like somebody was firing through the
15 window at him, right?
16 A. I could -- I could agree to that.
17 Q. Okay. Were you shot?
18 A. No. I don't know what had happened. I
19 don't know, but some of the stucco came off the
20 wall at a high velocity and struck me in the leg.
21 So I didn't know if I was hit or not. But I wasn't
22 going to stop until I knew my guys were good.
23 Q. As far as you know, did Mr. Williams
24 attempt to shoot at you directly?
25 A. I don't know, sir. Once I -- I

160

1 distinctly -- and I stated this in my statement with
2 CIRT. I distinctly can tell the sounds of -- the
3 differential between gunshots and distracts. They
4 sound similar, but I can tell when there's gunfire
5 going on inside of a structure. I've made entries,
6 several entries where I've been involved, and I've
7 been next to guys that have shot. I know the
8 distinction between it. Once I heard the gunfire
9 going, I made sure -- I put myself in a position of
10 concealment because I was -- I was armed, but I
11 didn't display my weapon at the time. My job was to
12 rake out the window. So yes, I don't know if he
13 was shooting at me or not, sir. I know he shot at
14 Officer Rothenburg.
15 Q. Did you observe Officer Rothenburg shoot
16 at Mr. Williams?
17 A. I did. When I -- when he took the first
18 two rounds in the shield and stepped back, that's
19 when I actually drew out my weapon. And then that's
20 when Roth closed the distance, covered that window,
21 and then engaged.
22 Q. How many times did you observe Officer
23 Rothenburg shoot at Mr. Williams?
24 A. I -- at least two rounds. I believe at
25 least two rounds.

161

1 Q. Did you personally see any other officer
2 shoot at Mr. Williams?
3 A. No, sir, I did not.
4 Q. Okay. Did you personally see Mr. Williams
5 fire any shots?
6 A. Did I personally see Mr. Williams fire
7 shots? No, I did not.
8 Q. Okay. Not including the stun stick, did
9 you ever discharge your firearm or any other device?
10 A. No. I never discharged my firearm, sir.
11 Q. When the shooting initially occurred, you
12 had never heard of Mr. Williams before, had you?
13 A. No. He was never discussed.
14 Q. Did you assume that the person who had
15 been shot was one of the suspects?
16 A. Did I -- I assume that -- obviously we
17 encountered someone that was armed and putting us in
18 a deadly force situation. I don't know who it was.
19 I didn't -- there was obviously someone in there
20 that was shooting at us.
21 Q. When did you first find out that it was
22 somebody other than either one of the suspects?
23 A. Honestly, probably not until -- I don't
24 know. I couldn't tell you, sir. I know it wasn't
25 within several -- it wasn't within that day. It

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

162

1  wasn't -- I don't recall.
2      Q.   Who told you?  How did you find out about
3  who it was?
4      A.   I believe it was during my CIRT interview.
5  And that was it.
6      Q.   The CIRT interview was approximately a
7  month after the shooting?
8      A.   Something like that, yes, sir.
9      Q.   Okay.  Well, had you read newspaper
10 articles or --
11     A.   No, sir.
12     Q.   -- anything about it?
13     A.   I don't watch the news.
14     Q.   After the event, as it turned out, neither
15 suspect, either Corvel Fisher or Wattsel Rembert
16 were actually inside the apartment, correct?
17     A.   No, sir.
18     Q.   Meaning that that statement is correct?
19     A.   Your statement is correct, sir, they were
20 not located inside the apartment.
21     Q.   And was any of the property described in
22 the search warrant ever found?
23     A.   I do not know, sir.
24     Q.   Okay.  As far as you knew, was there any
25 warrant to arrest Mr. Williams outstanding?

163

1      A.   No, sir, I do not know.
2      Q.   Again, after the shooting, was there any
3  evidence of any ongoing criminal activity in the
4  apartment that was taking place before the SWAT
5  entry?
6      A.   No, sir.
7      Q.   It was just two guys in the apartment
8  sleeping, right?
9      A.   From what I know, yes.
10     Q.   Did you ever see Mr. Williams move after
11 he had been shot?
12     A.   Did I ever see him move?
13     Q.   Yes.
14     A.   No, I did not see him move.
15     Q.   Did you ever hear Mr. Williams make any
16 sounds, like, words or moaning from him after he was
17 shot?
18     A.   Sounds from Mr. Williams?
19     Q.   Yes.
20     A.   No, sir, I did not.
21     Q.   Okay.  We see a time -- I don't know if
22 you're physically present or not when he's moved
23 from the couch to the floor.  Were you there to
24 observe that?
25     A.   No.  I was checking on my guy that was

164

1  shot.
2      Q.   Okay.  At some point, I believe it's in
3  your CIRT interview, you indicate that you heard an
4  officer yelling "tactical".  Do you recall that?
5      A.   Yes, sir.
6      Q.   And so, when did you hear an officer
7  yelling tactical?
8      A.   When the shots were being fired.
9      Q.   And do you recognize whose voice that was?
10     A.   Jake Werner.
11     Q.   And what response, if any, was there to
12 the tactical call?
13     A.   So, I'm not going to put my head -- I
14 mean, I'm obviously not going to start looking into
15 the window.  I heard it called.  I heard everyone
16 back up.  I heard everyone ask Alex if he was okay.
17 I heard suspect down.  So I knew that the threat
18 was -- there was no longer a threat.  I heard one of
19 the guys say, hey, Levi, what do you need?  And he
20 goes, I need this area cleared, which was the
21 kitchen.  And then we immediately -- I -- they must
22 have already had taken Officer Kubla out.  Because I
23 didn't even know that we had an officer shot.
24     Q.   And we do hear that prominently, somebody
25 yells, Levi, what do you need?  Who is that yelling,

165

1  and who is Levi?
2      A.   Levi was on the Shok Lock.  He was also a
3  senior ATL, Assistant Team Leader.  But he was just
4  not the ATL for that operation.
5      Q.   And do you know who was yelling at him,
6  what do you need?
7      A.   I do not know who that was.  If you played
8  the -- I could -- I know everyone's voice, but I
9  don't know.
10     Q.   What, if anything, did you do differently
11 when you heard tactical called?
12     A.   When I heard tactical, I just basically
13 backed -- I knew that something had happened.  I
14 knew they got into a shooting at that point.  And
15 they're going to slow things down.  I'm going to
16 stay calm.  That's when I knew Roth had gotten hit.
17 Jonathan and his partner had came up, took our
18 spots.  And I wanted to check on Roth, to make sure
19 he wasn't hit.
20     Q.   Okay.  So, you were there to serve a copy
21 of the search warrant, or the SWAT team was.  Do you
22 know who had the physical copy of the warrant?
23     A.   So, usually, you know, the detectives have
24 the hard copy that was signed.  They'll always
25 provide us a copy for our after action report.  So I

LEXITAS

James Bertuccini                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

166

1   would assume at the time, either Detective Grimmett
2   had it or his sergeant or -- I know that one of our
3   sergeants might have had a copy of it.  I don't
4   know, sir.
5       Q.  Do you know if it was left at the property
6   after everything was cleared?
7       A.  That's a detective thing.  Once it became
8   a crime scene at that point, you know, that ID techs
9   came out, that was a very large, dynamic scene.  So
10  I'd assume that it was left.  But I don't know.
11      Q.  We know now that at the time you broke out
12  the window, Mr. Williams was sleeping on a couch in
13  the same room, right?
14      A.  Yes.
15      Q.  And do you agree with me that it would be
16  logical for a person, if they're asleep and they
17  hear the sound of a window breaking near them, that
18  they would wake up and look at the window?
19      A.  I would agree to that, yes.
20      Q.  And so that would be about the same time
21  that the large flash from the distract ignited as
22  well, right?
23      A.  Yes, sir.
24      Q.  And would you agree with me that that
25  would affect Mr. Williams' vision?

---

167

1       A.  Yes.
2       Q.  In fact, that's the very purpose of that
3   bright flash, isn't it?
4       A.  Yes, sir.
5       Q.  And in your CIRT interview, I believe it
6   was, you refer to that as a blinding flash, right?
7       A.  It's a very high candela, intense flash,
8   yes.
9       Q.  And you've also agreed with me in this
10  deposition that the sounds from the stun stick
11  distract, as well as the nine banger, those can be
12  mistaken for gunfire?
13      A.  Yes, sir.
14      Q.  And would you agree with me that the stun
15  stick and the -- stun stick distract and the
16  nine banger, those could also impair a person's
17  hearing?
18      A.  I -- yes, depending on how close the
19  proximity is, yes.
20      Q.  You're aware that there was a CIRT
21  investigation into this event, right?
22      A.  Yes.
23      Q.  Are you aware of what the conclusions or
24  findings were?
25      A.  I was made aware of them.  Yes.

---

168

1       Q.  When?
2       A.  Yesterday.
3       Q.  Prior to yesterday, had you ever reviewed
4   any portion of the CIRT report?
5       A.  No, sir.
6       Q.  Did you review it yesterday?
7       A.  Yes.  I looked -- I read through it a
8   little bit.
9       Q.  Was there anything that surprised you
10  about it?
11      A.  A little bit.
12      Q.  What surprised you?
13      A.  That there was, you know, talking about
14  the -- you know, the knock and announce stuff.
15      Q.  So even after the CIRT report came out, it
16  wasn't provided to you to read, and nobody spoke to
17  you or provided you any sort of retraining regarding
18  the issues that the CIRT report found?
19      A.  So, every time that we have an OIS or a
20  major incident or something, we'll always have a
21  debrief, a large debrief.  Especially after -- so if
22  you know, when we have an OIS, a lot of those
23  conversations and stuff can't be talked about
24  because they've been admonished while it's under
25  investigation.  So once that was done, they did do

---

169

1   a -- like, a larger debrief of it and kind of talked
2   about some of the findings.
3           I was out of town.  But I was made aware
4   of some of the things that they had discussed.  But
5   like I said, that was two years ago.  And then
6   Mr. Anderson kind of provided me a copy of some of
7   the highlighted things.  I can't recall every one of
8   them off the top of my head.
9       Q.  So there was a debrief at some point, but
10  you were out of town and did not attend.
11      A.  Yeah, I wasn't there.
12      Q.  Do you know who conducted the debrief?
13      A.  Usually what happens on those larger
14  events or OISs, it will be the entire section.  And
15  usually, the sergeant and the ATL will go through
16  everything.  I know that Lieutenant O'Daniel was
17  admonished in that, so I -- you know, she wasn't
18  allowed to speak on a lot of that stuff until the
19  full CIRT investigation was over.
20      Q.  But who actually conducted the debrief?
21      A.  It would have been Jake or Sergeant Finley
22  or Sergeant Backman, one of those three.  It's
23  usually those three.  And then it would be taken
24  around to anybody if they have questions or
25  concerns.

---



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

170

1    Q.   At this point, maybe we should take a
2  five-minute break or so for everybody.  We'll come
3  back and I might have another hour of questioning.
4    A.   Okay.
5       THE VIDEOGRAPHER:  We are going off record
6  at 12:19 p.m.
7            (Off record.)
8       THE VIDEOGRAPHER:  We are back on record
9  at 12:25 p.m.
10  BY MR. BREEDEN:
11    Q.   Officer Bertuccini, we took a short break.
12  We're back on the record now and you're under oath.
13       We were speaking a little bit about the
14  CIRT report that was created over this incident.
15  And according to the CIRT report that was prepared
16  by Metro, they stated this.  And, you know, they're
17  talking about announcements made.  Not by you, but
18  by Sergeant Backman at the front door.  But the CIRT
19  report states, quote, six seconds after starting his
20  announcement, Officer Bertuccini inserted the stun
21  stick through the western facing window, end quote.
22       Now, I don't know if it was three seconds
23  or six seconds or whatever it was.  But do you have
24  any reason to disagree with Metro's conclusion that
25  it was no more than six seconds?

171

1    A.   Yeah, I'm not disagreeing with it.
2    Q.   Okay.  Do you believe that six seconds was
3  a reasonable amount of time for Mr. Williams to
4  arise from a sleeping state, hear and comprehend
5  officers, go to the front door, ascertain that they
6  are, in fact, officers and that they have a search
7  warrant, and allow them entry into the apartment?
8  Do you think that's a reasonable amount of time for
9  that?
10    A.   I do, because we were breaking a window.
11  Obviously he's going to know, and they -- the plan
12  was that they wouldn't start breaching the door
13  until after the stun was initiated, which allowed
14  more time.
15    Q.   Okay.  In fact, and you can probably see
16  it in the video, the amount of time wasn't even
17  sufficient for him to stand up, was it?
18       MR. ANDERSON:  Objection, form.
19       Go ahead.
20       THE WITNESS:  No.
21  BY MR. BREEDEN:
22    Q.   He was -- when he was shot, he was still
23  laying down, wasn't he?
24    A.   I don't know the exact position he was in.
25  When he was -- I -- I'll be honest with you, I've

172

1  never watched the body camera of any of the
2  shooters.  So I don't know the exact position that
3  he was in when he decided to fire upon officers.
4    Q.   Well, let's talk about that.
5    Mr. Williams drew a handgun.  And he fired
6  it on a group of a dozen or more police officers
7  that were in full tactical gear, had him surrounded
8  and outgunned.  Do you agree with me that that's a
9  pretty dangerous thing to do?
10    A.   Pretty dangerous thing of him to do, yes.
11    Q.   Him to do, yes.
12    A.   To shoot upon officers, yes.
13    Q.   Yes.  It implies, don't you believe, that
14  maybe he didn't really understand what was going on?
15       MR. ANDERSON:  Objection, form.
16       THE WITNESS:  I don't feel he didn't
17  understand.  I feel he understood exactly what was
18  going on.  They were sounding short -- search
19  warrant numerous times.  And then he was
20  immediately -- our guys were immediately met with
21  gunfire.
22  BY MR. BREEDEN:
23    Q.   Okay.  Do you believe, then, that
24  Mr. Williams was simply suicidal?
25    A.   No, I do not believe he was suicidal.

173

1    Q.   Okay.
2    A.   Because the gun was pointed to our --
3  towards our officers.
4    Q.   If he -- well, but -- but what I'm saying
5  is, he's -- sometimes the phrase is suicide by cop.
6  I mean, anybody who fully understands the situation,
7  would not fire on officers under those conditions
8  unless they expected to be shot back, right?
9       MR. ANDERSON:  Objection, form.
10       THE WITNESS:  I don't know if he was
11  suicide by a cop.  I don't know.  I do not know.
12  BY MR. BREEDEN:
13    Q.   Okay.  And you are not Mr. Williams, so
14  you can't say for certain what he saw, can you?
15    A.   No.
16    Q.   You can say what you testified earlier,
17  that he was hit with a blinding flash to his vision
18  around this time from the stun stick, right?
19    A.   I know that I said that I -- the stun
20  stick delivers a blinding flash.  I don't know if he
21  was directly looking at it, I don't know.
22    Q.   Okay.  And we discussed that even though
23  there are announcements going on, there are also
24  distraction -- noise devices that are designed to
25  confuse and disorient him, right?



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

174

1    A.  The additional ones, the nine banger?
2  Yes, they were being -- they were being deployed on
3  the exterior, yes.  That shouldn't have -- shouldn't
4  have inhibited his hearing to hear that -- the
5  police and the search warrant.
6    Q.  So why do you think a young man of
7  approximately 20 years old would choose to fire on
8  officers?  I mean, this seems like it's suicidal, it
9  seems very foolish and very dangerous, unless he did
10  not fully comprehend what was going on.
11    A.  I don't know what his mindset was, sir.  I
12  don't know.
13    Q.  But you think -- and I'm not going to do
14  this.  I'm not saying this to make it personal.  But
15  if I went to your home this evening and I started
16  knocking on your door when you were dead asleep, you
17  think you could make it to your front door and have
18  a discussion with me in a period of six seconds from
19  a dead sleep?
20    A.  From a dead sleep, I don't know.  It would
21  depend.  My -- my front door and my bedroom door are
22  very close together.
23    Q.  Maybe not.
24    A.  Maybe not.  I don't know.
25    Q.  Would you agree that that might be

175

1  difficult?
2    A.  It could be difficult, yes, sir.
3    Q.  I want to talk a little bit about the
4  aftermath of the shooting.
5    A.  Yes, sir.
6    Q.  Did you see anyone provide any type of
7  medical aid to Mr. Williams at all?
8    A.  No.  I knew that they were getting medical
9  aid to him.  I know that they were -- we had medical
10  aid, also, to Officer Kubla.  So I don't know how
11  long it took, sir.
12    Q.  Looking back and knowing the end result,
13  which was that a young man was fatally shot and
14  killed when he really wasn't even under
15  investigation for the crime that was being
16  investigated, and really wasn't even expected to be
17  there, is there anything you would change about how
18  this SWAT operation was done?
19    MR. ANDERSON:  Objection, form.
20    THE WITNESS:  No, sir.
21  BY MR. BREEDEN:
22    Q.  Do you have -- any remorse or does it
23  bother you that Mr. Williams was shot and killed?
24    A.  It's unfortunate that a mother lost her
25  son.  But this gentleman decided to put himself in a

176

1  situation with officers where he fired 18 rounds and
2  struck an officer that almost lost his life.  But I
3  do feel for his mother, sir.
4    Q.  And do you think he did that fully
5  understanding that there were officers there with a
6  legal search warrant?
7    A.  I do not know, sir.  I don't know what his
8  mindset was.
9    Q.  Wouldn't you think it would be reasonable
10  for him, after hearing your stun stick distraction
11  device and the nine banger going off, that he was
12  already being fired at by someone?
13    MR. ANDERSON:  Objection, form.
14    THE WITNESS:  I do not know.
15  BY MR. BREEDEN:
16    Q.  You would agree with me, that if a person
17  is in their home or their apartment, and intruders
18  come into their home, that that person is legally
19  entitled to use lethal force to defend themselves;
20  would you agree with that?
21    A.  I would agree with that, yes, sir.
22    Q.  Okay.  Are there any changes to the IAP or
23  the way the SWAT operation was performed, that you
24  think could have been made to make it safer for
25  officers?

177

1    A.  We have -- like I said, if we -- I like
2  the fact that we have added the surveillance of how
3  long, last time we've seen them.  I do like making
4  sure that, you know, we have done -- all detectives
5  have done their due diligence utilizing -- whether
6  it's covert, additional units for extra
7  surveillance, takeaways, stuff like that.  So those
8  are things that we have implemented to make sure
9  that the detectives are doing their due diligence.
10  To make sure that they have a strong investigation
11  for the individuals that we're going after, yes.
12    Q.  And would you agree that the
13  reconnaissance could have been better on this
14  apartment?
15    A.  I will -- I will -- I will say that the
16  door, the missing of the brass wrap, was -- was very
17  important.  And that needed to be a re-look, a
18  re-pass on that, yes.  And we've -- and we discussed
19  that.
20    Q.  And is there anything -- just again
21  hypothetically, that you can think of that you could
22  change to make that SWAT operation safer for the
23  occupants inside, such as Mr. Williams?
24    A.  No, not that I know of.
25    Q.  Were you disciplined by Metro in any way



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

178

1  over this incident?
2      A.  No, sir, I was not.
3      Q.  Were you given any retraining on any
4  issue, for example, CET entry, as a result of this
5  incident?
6      A.  No, sir, no.
7      Q.  Were you aware that the CIRT team found
8  that CET entries were only constitutionally
9  consistent with no-knock warrants, and were
10  inconsistent with circumstances where knock and
11  announced had to be used?
12      A.  No.
13      Q.  Today during the deposition is the first
14  time you're aware of that?
15      A.  It was -- reading their -- going through
16  their -- whatever their conclusion was, that was the
17  first time I read that.
18      Q.  That was yesterday.
19      A.  Yeah.
20      Q.  So even though CIRT concluded that well
21  over a year ago, you were not retrained or advised
22  of that conclusion?
23      A.  We've been advised of it.  I mean, we
24  haven't done a controlled entry since -- since that
25  happened.  Actually, we did one shortly after

179

1  Officer Kubla's incident.  But we have not done a
2  controlled entry since then.
3      Now there is a higher criteria for it.
4  And usually we're only going to make a CET now if
5  it's going to be a no-knock.
6      Q.  And these changes are because of
7  Mr. Williams' shooting, aren't they?
8      A.  I think it's that, along with other things
9  that have happened around the nation with search
10  warrants and tactical teams.
11      Q.  Have you ever asserted your Fifth
12  Amendment right to remain silent when asked about
13  this incident?
14      A.  No.
15      Q.  Have you ever asserted any rights under
16  your Collective Bargaining Agreement with the Police
17  Protective Association to refuse to speak to anyone
18  regarding this incident?
19      A.  The only time was when I was admonished,
20  you know, we weren't allowed to talk about it.  But
21  that was it.
22      Q.  So when was that?
23      A.  That was the day -- I think I was
24  admonished shortly after, about a week after I got a
25  phone call just not to talk about it until we do our

180

1  interview.
2      Q.  Who admonished you?
3      A.  I couldn't -- whoever did the interview.
4  Maybe it was -- I think his last name is Roth,
5  Jeremy Roth.  I can't remember.
6      Q.  Was it a union representative --
7      A.  No.
8      Q.  -- or it was one of the --
9      A.  One of the investigators.
10      Q.  I don't want to talk over you.  Frustrates
11  the court reporter.
12      A.  I'm sorry.
13      Q.  So, I've reviewed documents that Las Vegas
14  Metropolitan Police Department has produced as part
15  of this litigation.  They have produced a brief
16  statement that you gave at approximately 8:57 a.m.
17  on the morning of the shooting.  Do you recall
18  giving that statement?
19      A.  That would have been my FIT statement,
20  yeah.
21      Q.  Your FIT statement.  And do you recall who
22  took that statement from you?
23      A.  I don't know his name.  If he was sitting
24  here, I know what his face is.  I don't know his
25  name off the top of my head.

181

1      Q.  Okay.  And then you gave a CIRT interview
2  on February 2nd of 2022; is that correct?
3      A.  Yes.
4      Q.  I realize you may not remember the
5  exact --
6      A.  I don't remember the dates, but if you
7  have it, I trust you, yes.
8      Q.  Okay.  So you gave a FIT statement, and
9  then was it after the FIT statement that someone
10  advised you not to make any additional statements
11  about the incident?
12      A.  Yeah.  We usually get admonished by CIRT
13  to make sure that we don't discuss any other -- you
14  know, with anyone else involving the incident until
15  after the entire investigation has been done.
16      Q.  And in the CIRT interview, they -- they
17  actually say that your interview at that time on
18  February 2nd, 2022 is being compelled.  Had you
19  refused to give a statement at any time prior to
20  February 2nd?
21      A.  I've never refused to give a statement.
22      Q.  Okay.  Other than the FIT statement and
23  the CIRT statement, have you given any other
24  statement verbally or in writing about what
25  happened?



Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 49 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

182

1     A.  No, sir.
2     Q.  I want to ask you briefly about Officer
3  Kubla.  Is he still employed with Las Vegas
4  Metropolitan Police Department?
5     A.  Yes, sir, he is.
6     Q.  Do you still work with him?
7     A.  Yes, sir, I do.
8     Q.  And is he still assigned to SWAT?
9     A.  He is.
10     Q.  Okay.  So whatever his injuries are, he is
11  not considered so disabled that he cannot still be
12  on SWAT.
13     A.  No.  But he -- due to his nerve damage in
14  his right hand he had to train himself to be a
15  left-handed shooter for his handgun because of the
16  dexterity -- finger dexterity in his right hand.
17     Q.  Okay.  So let me ask you, and I realize,
18  look, the real source on this issue is going to be
19  Officer Kubla.  But as far as you are aware, what
20  are the injuries that Officer Kubla sustained?
21     A.  Like I said, I haven't -- you know, I
22  don't know his entire medical, you know, printout or
23  anything.  But he had nerve damage in his hand, arm,
24  and hip.  Where he was shot.  And if that's
25  incorrect, I'm sorry, but those are the -- what I

183

1  know.
2     Q.  I'm just asking as far as you have
3  observed --
4     A.  Yeah --
5     Q.  -- and what you know.
6     A.  That's it.
7     Q.  Okay.  Are any of the defendants in this
8  case -- I mean, you work with people and you've
9  probably worked for many of them for years; is that
10  right?
11     A.  Yes, sir.
12     Q.  And there's kind of a difference between
13  somebody who's a personal friend of yours versus a
14  work acquaintance.
15        Are there any of the other officers who
16  are involved that you consider them to be personal
17  friends of yours, just beyond somebody that you work
18  with?
19     A.  They're all personal friends.  We're
20  brothers.
21     Q.  So have you been to, like -- the other
22  defendants in this case, have you been to their
23  home?
24     A.  All of them.
25     Q.  You've met their families?

184

1     A.  Yes.
2     Q.  So you would describe yourself close with
3  them.
4     A.  Yes.
5     Q.  You're part of the SWAT team.
6     A.  Yes.
7     Q.  Okay.  I think those are all the questions
8  that I have.
9        MR. ANDERSON:  I have no questions.
10        MR. BREEDEN:  Mr. Anderson, do you have
11  any?
12        MR. ANDERSON:  No questions.
13        MR. BREEDEN:  At this time we will go off
14  the record.  But there are a couple of things I
15  think the court reporter usually asks us to put on
16  the record.
17        I know that I will take a copy, and I've
18  actually ordered an expedited copy of the
19  transcript.
20        Mr. Anderson?
21        MR. ANDERSON:  I'll take a copy.
22        THE REPORTER:  Do you need it expedited?
23        MR. ANDERSON:  No, I don't need it
24  expedited.  I don't need the video right at this
25  point.

185

1  BY MR. BREEDEN:
2     Q.  And Officer Bertuccini, are you going to
3  exercise your right to review the transcript and
4  make changes, or do you want to waive that right?
5        MR. ANDERSON:  So, you have the right to
6  read it and then make sure it's all accurate.
7  Because it's videoed, I think you're fine.  But if
8  you want to read it to make sure it's accurate, that
9  she took everything down right, you can do that.
10     A.  I trust it.  I'm good.
11        MR. ANDERSON:  We'll waive.
12        MR. BREEDEN:  So he'll waive.  And so with
13  that, we'll go off the record.
14        THE WITNESS:  Do you want these back,
15  ma'am?
16        MR. ANDERSON:  Yes, she needs those back.
17  Anything with a sticker on it, make sure she gets.
18  Those are hers.
19        THE VIDEOGRAPHER:  One moment.
20        This concludes the video-recorded
21  deposition of James Bertuccini taken on July 12th,
22  2024.  We're going off record, and the time is
23  12:43 p.m.
24        (Proceedings concluded at 12:43 p.m.)
25



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

186

```
1              CERTIFICATE OF DEPONENT.
2      PAGE      LINE     CHANGE
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19                       * * * * *
        I, James Bertuccini, deponent herein, do hereby
20     certify and declare under penalty of perjury the
       within and foregoing transcription to be my
21     deposition in said action; that I have read,
       corrected and do hereby affix my signature to said
22     deposition.
23
                   James Bertuccini
24                 Witness
25
```

187

```
1              REPORTER'S CERTIFICATE
2      STATE OF NEVADA      )
                            ) ss
3      COUNTY OF CLARK      )
4
5          I, Tracy A. Manning, a duly certified court
       reporter licensed in and for the State of Nevada, do
6      hereby certify:
7          That I reported the taking of the deposition of
       the witness, James Bertuccini, at the time and place
8      aforesaid;
9          That prior to being examined, the witness was
       by me duly sworn to testify to the truth, the whole
10     truth, and nothing but the truth;
11         That I thereafter transcribed my shorthand
       notes into typewriting and that the typewritten
12     transcript of said deposition is a complete, true
       and accurate record of testimony provided by the
13     witness at said time to the best of my ability.
14         I further certify (1) that I am not a relative,
       employee or independent contractor of counsel of any
15     of the parties; nor a relative, employee or
       independent contractor of the parties involved in
16     said action; nor a person financially interested in
       the action; nor do I have any other relationship
17     with any of the parties or with counsel of any of
       the parties involved in the action that may
18     reasonably cause my impartiality to be questioned;
       and (2) that transcript review pursuant to
19     NRCP 30(e) was waived.
20         IN WITNESS WHEREOF, I have hereunto set my hand
       in the County of Clark, State of Nevada, this 18th
21     day of July 2024.
22
23
24
                   Tracy A. Manning, CCR 785
25
```



James Bertuccini                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**0**

**03**
15:16

**04**
15:16 55:13

**1**

**1**
4:4 34:18,24,25 35:5
139:5 144:20

**10**
20:6,18 21:3 24:25
33:13 34:2,9 35:10
40:2,20 42:24 44:24
46:12 52:18 56:12
59:23 62:9 64:24
68:12 74:19 82:13
87:11 91:15 128:1
155:14

**100**
35:16 59:11 115:9
136:16

**10:32**
82:19

**10:39**
82:22

**10th**
5:12 6:7 11:1 20:2
83:7,11 84:21

**12**
4:1 39:11 86:5

**12-hour**
84:5

**120**
56:1,24

**120-hour**
55:22 56:14 60:3

**12:19**
170:6

**12:25**
170:9

**12:43**
185:23,24

**12:58**
129:25 130:1,5

**12th**
4:5 185:21

**13**
18:12

**14**
18:12

**15**
25:6 37:16 74:13
78:15

**1508**
150:7

**17**
132:20,23

**18**
123:18 176:1

**1997**
13:16

**2**

**2**
40:11,12,15

**20**
24:23 37:16 116:6
128:23 174:7

**2000**
14:3,19

**2002**
14:19 15:7,8

**2004**
15:10 16:10 17:16

**2010**
56:10,12 65:15

**2021**
25:6 84:23

**2022**
5:13 6:7 11:1 19:15
20:2,6,18 21:3 25:1

33:13 34:2,9 35:10
40:2,20 42:24 44:24
46:12 52:18 59:23
62:10 64:24 68:12
74:20 82:13 87:11
119:8 128:2 155:14
181:2,18

**2024**
4:1,5 185:22

**209**
36:9,21 37:3 39:17

**24**
10:1 128:1

**25**
36:18 37:4 38:20 39:1,
7,8,10 40:25 45:23

**2:00**
18:5 86:18,19 128:10

**2:24-cv-00074-apg-njk**
4:11

**2nd**
181:2,18,20

**3**

**3**
81:10,11,13 94:6

**3-4**
116:11,14,15

**30**
116:6

**3050**
73:10 96:2

**38**
133:25 139:14

**4**

**4**
39:11 94:3,8,10

**40-**
46:3

**400**
4:7

**41**
139:19

**4377**
94:12

**4475**
96:2

**45**
13:4

**48**
10:7

**4:30**
129:5

**4:58**
130:14,16

**4:58:50**
131:1

**4:59**
133:25 139:14,19

**5**

**5**
150:1,6

**50,000**
46:3

**5:00**
66:24 67:13,19,23
68:7,13 84:3 87:11
102:18 111:3 128:15,
16,20 145:25 146:5

**5:02**
144:2

**6**

**6:00**
128:11

**7**

**793**



Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 52 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

35:1,18

**797**
35:1

**7:00**
128:11

___

**8**

**8**
91:15

**80**
56:16

**80-hour**
57:19

**8:57**
180:16

___

**9**

**9:04**
4:6

**9mm**
132:20

___

**A**

**a.m.**
4:6 66:24 67:13,19,23
68:7,13 82:19,22 84:3
87:11 111:4 128:20
129:5 130:1,5,14,16
133:25 144:3 145:25
146:5 180:16

**abbreviation**
86:23

**abide**
45:15

**ability**
10:17,23 49:25 50:16
73:22 74:6

**Absolutely**
8:20 58:6

**academy**

54:25 55:2,12

**access**
50:11 66:1 68:22 79:9
97:4 111:24 118:2
149:21 150:18

**accidents**
23:20 24:1

**accreditation**
23:8

**accurate**
23:20 24:12 36:8
54:23 88:18 143:10
185:6,8

**accurately**
8:17 10:23

**acquaintance**
183:14

**act**
108:1,2

**action**
6:6 25:15 53:21 61:14,
23 68:11 75:11 79:23
83:8 85:5,7,9 86:17
107:10,13,17,22
113:12 118:6,21
121:11 122:1 128:2,16
154:4 165:25

**actions**
57:18 58:20 73:12
79:8 144:20 157:9

**activated**
132:10

**active**
22:9 67:16 111:5

**actively**
111:12

**activity**
163:3

**actual**
28:20 33:15 36:21
37:10 38:10,24 39:6
40:22 54:1 57:25 76:3
86:6 87:15 88:9

**Adam**
4:18 6:2

**add**
140:14

**added**
58:4 72:12,13,15
119:11,18 177:2

**additional**
55:3 58:19 72:23
83:22 86:10 100:23
109:1 135:9 138:23
143:22 174:1 177:6
181:10

**additionally**
82:10

**address**
88:1 91:9 102:1,7,8,11
103:25 105:8

**adequate**
116:4

**administered**
6:22

**admissible**
9:9

**admit**
80:10 106:17,25
150:21

**admittance**
77:5,19 78:6 147:9,15

**admonish**
12:17

**admonished**
168:24 169:17 179:19,
24 180:2 181:12

**admonitions**
6:19

**Adrian**
20:13

**advance**
7:14 143:1

**advantage**
54:10 113:10 115:22

152:12 154:3

**advantages**
112:23,25

**advise**
7:14 104:8,17

**advised**
86:14 178:21,23
181:10

**aerial**
110:16

**Affairs**
25:15 26:8

**affect**
10:22 45:11 166:25

**affected**
10:17 47:4 52:9,13

**aftermath**
175:4

**afterward**
7:10 157:24

**agencies**
22:15,16

**agency**
56:4

**agent**
23:3

**agree**
5:17,21 24:22 27:23
44:10,13 47:10,12
48:17,21 50:24 51:5,
12,15 58:3,8,24 65:23
66:10,15 75:21 120:16
136:13 146:4 147:22
148:15 153:1,6,9
157:20 158:24 159:11,
16 166:15,19,24
167:14 172:8 174:25
176:16,20,21 177:12

**agreed**
83:25 167:9

**Agreement**
179:16



Case 2:24-cv-00074-APG-NJK   Document 57-4   Filed 05/16/25   Page 53 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**ahead**
5:8 28:2,15 66:14 81:1
82:15 94:1 122:17
142:2 143:18 171:19

**aid**
31:4 175:7,9,10

**air**
43:4 103:11

**alcoholic**
9:25 128:2

**Alex**
164:16

**Alexander**
4:9 6:3

**alleged**
26:1

**allowed**
54:13 57:17,24 63:4
103:15 109:1 149:11,
13 169:18 171:13
179:20

**allowing**
120:10 121:14

**Alzheimer's**
10:21

**Amendment**
179:12

**amount**
75:5,15,16 78:3,25
79:11,20 81:25 106:15
107:5,14 108:17
120:11 122:3,13,21
171:3,8,16

**ample**
61:1 75:14

**and/or**
98:21

**Anderson**
4:20 28:1,14 31:6,16,
20 64:25 65:3 66:13
78:7 80:25 122:16
123:10 159:3 169:6
171:18 172:15 173:9

175:19 176:13 184:9,
10,12,20,21,23 185:5,
11,16

**angled**
46:20

**ankle**
112:2

**announce**
61:10 75:2,3,4,13,23
76:2,4,23 79:22 83:3
104:11 122:19 168:14

**announced**
62:23 102:12 178:11

**announcement**
28:5,23 55:8 101:21,
22,23 102:16 103:19,
24 104:23 105:7
108:18 109:1,3,4
134:6 170:20

**announcements**
28:5,7,8,11,20 29:3,7
60:25 61:3,4,10,11
62:4,24 78:3 102:2
105:1,15 106:8,11,12,
16 108:14 120:9 121:8
122:9 124:10 154:16
170:17 173:23

**announcing**
80:23 102:22

**annual**
24:11,14

**answering**
18:17 118:18

**answers**
7:9

**anticipated**
22:5

**apartment**
26:5 67:15 73:10
79:14 80:15 82:12
102:13,16,23,24 103:1
108:3 112:6,14,17
113:24 114:7,8,17,18,
21 115:4,25 117:17

123:9 126:13 127:13
132:1 134:15 135:8
136:15 137:14 139:22
145:16 146:9,19
147:13,20 148:13
153:2 154:10 162:16,
20 163:4,7 171:7
176:17 177:14

**apartments**
102:21 115:5 137:21,
22

**apologies**
127:21

**apologize**
42:5 46:15 52:15
56:22 85:1 112:8

**appearance**
4:16

**applicable**
76:12

**application**
21:20 57:13 87:19

**applications**
84:23

**applied**
23:10 83:4

**approach**
61:9 62:5,19 67:18
92:9 97:14 103:7
132:1 139:9

**approval**
62:18 64:4

**approve**
109:19

**approved**
26:14 27:21 52:24
53:1,15,18 68:20
69:21 85:6,11,12
109:7,17 110:12
118:16,22 149:25

**approximate**
37:15

**approximately**

66:24 82:2 87:12
162:6 174:7 180:16

**ARCO**
110:25 111:3 116:1,21

**area**
14:4,22 45:17,19,22
54:16 145:11 147:24
150:11,22 164:20

**areas**
102:18

**arise**
171:4

**arising**
6:5

**Arkansas**
76:15

**arm**
104:19 113:19 182:23

**armed**
61:16 93:10 114:12
123:4 160:10 161:17

**arming**
54:15

**armor**
111:8,9,14 116:3,19
123:6

**armored**
60:20 61:19 110:24
113:5 115:21 116:20

**arrest**
92:25 93:2,13 98:17
99:15 149:6 162:25

**arrested**
44:20 99:5,8

**arresting**
32:8

**arrests**
98:21 99:1

**arrived**
87:24

**arriving**
131:6



Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 54 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**artic-**
149:20

**articles**
162:10

**articulate**
103:12

**articulated**
69:3

**articulation**
150:18

**Arts**
14:6

**ascertain**
78:5 120:19 171:5

**asks**
184:15

**asleep**
67:2,10,15,23 120:17,
18 145:25 166:16
174:16

**assault**
98:3

**assaults**
57:15

**asserted**
179:11,15

**asserting**
9:20

**assessment**
136:3

**assets**
60:24

**assigned**
5:13 100:16 182:8

**assist**
20:4 57:4 154:8

**assistant**
16:2 17:20 18:14
20:19,24 21:3 52:20,
21 90:8,25 165:3

**Associate's**

13:21 14:1

**Association**
22:20 179:17

**assume**
15:7 54:20 76:5 129:4
161:14,16 166:1,10

**assuming**
55:1

**assured**
147:24

**ATL**
18:13 21:6,8 53:1 54:7
92:8 101:12 109:7
115:23 136:8 137:4
165:3,4 169:15

**ATLS**
18:10

**attached**
41:14 48:7

**attacked**
68:24

**attempt**
113:13 159:24

**attend**
14:17 15:15 169:10

**attention**
27:18 43:21 104:21
107:21

**attorney**
4:18 6:2 9:4,14,17
11:6,8,10,18 12:22
16:2 33:1

**attorney-client**
12:22

**attorneys**
8:22

**audible**
8:3

**auditory**
49:5

**authorization**
63:24 69:4 109:18

149:1,16,17 150:20
152:17

**authorizations**
84:19

**authorized**
62:3 149:24

**auto**
23:20

**automatic**
36:16

**automatically**
37:2

**automobile**
23:25

**avenues**
113:9

**avoid**
45:25 140:21

**awake**
82:4,11,13 120:20
129:8 146:2

**aware**
44:25 45:4 53:15
64:16 65:10 66:5
67:21 75:13 77:3,7,8,
11,16,21,25 78:8,11,
19 79:24 81:21,22
88:22,23 89:7,10
93:12,14 101:15 112:3
148:20,23 167:20,23,
25 169:3 178:7,14
182:19

---

**B**

**B-E-A-S**
20:15

**B-E-R-T-U-C-C-I-N-I**
5:11

**B-O-N-K-A-V-I-C-H**
19:25

**back**
6:1 8:10 19:2,12 22:19

36:9,11 46:20 55:13
74:2 79:6 82:21,25
84:15,22 110:9
111:10,11 112:19
116:9,19 126:5 154:9
156:3 158:14 160:18
164:16 170:3,8,12
173:8 175:12 185:14,
16

**backed**
165:13

**background**
12:14 15:25 16:5 85:3

**Backman**
21:12 53:2 104:25
105:4 109:9,15,21
134:11,12 169:22
170:18

**Backman's**
59:23

**backpack**
141:2

**bad**
24:23 92:23

**baiting**
104:14

**balcony**
157:1,4

**ballistic**
47:17 57:15 101:4
123:7 125:11,13,24
132:6,16 139:5

**bang**
44:12 48:4 51:18,21,
24 103:10 151:8
156:12,13,16

**banger**
156:18,21,25 157:4,
11,21,25 158:4,11,16
167:11,16 174:1
176:11

**bangs**
51:4



Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 55 of 85

James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**banned**
69:19

**Bar**
17:8

**Bargaining**
179:16

**Barney**
97:2

**barricaded**
54:16

**barrier**
140:14

**bars**
140:6

**bartender**
17:2,6

**baseball**
14:16,23

**based**
65:25 97:5 117:20
118:1 146:14

**basic**
54:22 58:7

**basically**
18:2,6,9 24:4,17
26:18,21 27:15 28:4,7,
23 30:24 38:16 41:2
42:12 43:20 46:18,20
50:21 52:19 55:5
57:20,22 60:18 62:2,5,
17 71:20 75:4,11,17
79:3 84:3 88:12 89:16
90:5 96:23 97:18
98:18,22 103:7,12
105:14 107:2,19
110:8,10,25 111:21
113:3 121:11 125:12
127:7,11 130:11
150:19 154:5 156:10
157:5,8,9 165:12

**basis**
9:6,19 30:22 111:19

**bassinet**
103:14

**bat**
27:18

**Bates**
35:1 94:11

**battering**
101:2 108:6,12

**Bearcat**
116:2 118:13 131:18,
19

**Beas**
20:13

**Beck**
4:14

**bed**
31:2,3

**bedroom**
174:21

**began**
132:1

**begin**
105:9

**beginning**
119:25 131:7 134:5

**begins**
4:4

**behaves**
39:4

**belonged**
157:4

**Bertuccini**
4:5 5:1,10,11,12 82:24
124:19 170:11,20
185:2,21

**Bertuccini's**
129:24

**beverages**
9:25 128:3

**big**
35:15 152:24

**bit**
6:1,17 12:18 17:22

**21:2 30:19 43:6 54:19
57:11 83:6 96:3 97:23
127:22 129:1 130:17
133:17 168:8,11
170:13 175:3**

**black**
40:24

**blinded**
25:8

**blinding**
167:6 173:17,20

**blinds**
141:10 142:21 143:7
151:20

**block**
116:25

**blue**
18:22 19:2

**Bob**
56:20

**bodies**
42:8 83:22 86:11
100:24

**body**
37:11 39:7,12 40:9,24
46:21 71:11 95:18
123:6 129:19,23 131:4
132:9 134:4 144:6
172:1

**body-worn**
95:4

**Bonkavich**
19:23,25 20:1 65:19
86:14

**book**
121:20

**booklet**
7:11

**Boomerang's**
17:8

**born**
13:5 14:14

**boss**
86:9

**bother**
175:23

**bottom**
35:22 40:25 81:23
150:9

**bought**
37:10

**Boulevard**
96:3

**box**
40:5 72:23

**boxes**
71:10 72:13

**bracelet**
112:2

**brand**
38:24 40:2

**brass**
134:19,21,23 135:1,9
136:14 137:10,14,17
138:1,21 177:16

**breach**
26:19,22,25 27:1,5,7,
10,11,20 28:18 29:4,8
38:17 54:12 61:4 62:5,
21 73:18 92:11
108:15,20 113:22
125:2,7,10,11,13,24
126:2 136:8,10,17
138:13 139:2 140:16

**breached**
62:22

**breacher**
17:21 139:6

**breachers**
27:16 101:9 135:25

**breaching**
57:15 61:11 107:6
139:4 141:5 154:7
171:12



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**break**
12:17,21 35:25 43:8
44:1 45:19 81:5,8
82:15,25 135:12
141:12,17 142:2
144:21,23 147:12
150:23 151:2,22
170:2,11

**breaking**
54:13 108:1 145:21,23
146:7 151:11,17
166:17 171:10

**breaks**
12:25

**breakup**
57:2

**Breeden**
4:18,19 5:6 6:2 28:10
29:1 30:17 31:9 34:19,
23 40:14 42:10 65:7
66:22 70:20 76:20
78:10 81:7,12 82:23
94:5,9 117:10 123:5,
20 125:21 130:23
133:22 136:12 139:17
144:1 150:4 157:19
159:7 170:10 171:21
172:22 173:12 175:21
176:15 184:10,13
185:1,12

**Brianna**
66:5,8

**briefed**
90:5 100:12 112:4
117:19 131:9 158:14

**briefing**
83:7 87:23 88:16
89:14,15,21 90:2,3,7,
25 94:21,24 95:5,18,
24 96:15 97:24 101:19
104:22 105:11 106:15
109:22 112:1 114:16,
22 120:8 124:4,12,13,
18,22 125:1 127:4
128:14,17,21 129:4,11
138:8 140:22 158:5,6

**briefings**
95:3,10,13 127:1

**briefly**
182:2

**bright**
44:6 46:2 167:3

**brightness**
46:1

**bring**
61:19 66:17

**broke**
106:3 145:14,20
147:6,18 148:3 151:5
166:11

**broken**
18:2 159:13

**Bronkavich**
86:13

**Brosnahan**
90:17,18

**brothers**
183:20

**brought**
53:2

**buddy**
131:11

**buildings**
116:18

**bulb**
46:5

**bullet**
152:24

**bulletproof**
132:4,12,15

**bullhorn**
61:1 105:1,5

**bullhorning**
124:16

**burst**
43:4 103:11 122:9

**bus**
57:15

**business**
21:24 116:22

**bust**
135:15

---

**C**

**C-E-T**
63:11

**caliber**
96:10 97:17,20
100:13,14 132:19
152:20

**call**
26:13,19 28:5 29:12
56:12 63:12 73:17,22,
23 74:9,10,12,19,21,
24,25 84:7 103:10
137:2 139:5 151:7
164:12 179:25

**call-out**
60:15,18 61:5 110:3,5,
14,19,22 111:17
112:24 113:4 115:12
117:6,18,24 118:4
119:1 126:3 155:12,18

**Call-outs**
114:5

**called**
17:7,8 26:2,3,11 29:11
33:10 38:5 39:7 47:18
60:11 74:16 80:11
83:25 164:15 165:11

**calling**
73:13 83:22 144:25

**callouts**
57:4

**calm**
165:16

**camera**
95:5,18 129:19,23
131:4 132:9 134:2,4

144:6 172:1

**cameras**
91:13 97:11,13

**cancel**
50:22

**canceling**
49:1,6,23 50:18,25

**cancels**
51:2

**candela**
46:4,5 167:7

**candidates**
55:7,14

**canister**
39:3

**capable**
101:11

**captains**
84:17

**cartoon**
40:22

**cartridge**
39:21

**case**
4:9,11 6:10 12:4 26:1
29:6 32:20 33:9 37:20
43:8 44:2 53:16 65:6
66:5,8,11,19,23 76:10,
12,15 85:16 90:6 93:6
131:22 153:24 183:8,
22

**cases**
32:16 80:21 82:3

**casino**
89:6

**catching**
120:23

**caught**
46:7 47:3

**caused**
142:4



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**causing**
23:20 43:10,20 154:24

**cease**
75:10

**ceiling**
46:19 142:18

**certifications**
22:25 55:15

**certified**
16:8 55:9,11

**CET**
60:11,12 61:7,13,17
62:13 63:1,5,6,8,11,
12,13,14,21 64:7,18,
22 66:23 68:17 69:5,7,
18,25 70:22 72:1
73:16 76:4 107:9
110:2,11,13,18,21
111:16,22 112:24
114:14 115:12 117:9,
17,21 118:3,8,16,22
121:25 123:22 178:4,8
179:4

**chair**
127:16

**change**
7:15 64:10,21 65:6,11,
12 69:13 70:3,6,7,9,
14,15,16 71:21 72:19,
25 101:5 175:17
177:22

**changed**
7:20 19:12 67:4,6 69:9
72:5 119:7,10 136:8
146:16

**charge**
21:10,13 29:12,14
35:24 36:7,12,13,14
38:5 39:20 53:6 90:1
135:24

**charges**
34:13

**check**
71:10 165:18

**checking**
163:25

**Cheyenne**
13:18

**chief**
64:1

**child**
97:1 103:14 145:7

**childhood**
16:20

**children**
97:6 146:12,15

**choose**
14:14 174:7

**circulated**
87:1

**circumstances**
68:21 69:23 82:1 90:6
178:10

**CIRT**
11:15 12:2 94:12
99:21,24 144:11 160:2
162:4,6 164:3 167:5,
20 168:4,15,18 169:19
170:14,15,18 178:7,20
181:1,12,16,23

**CIT**
55:9

**citizen**
117:13,15 123:24

**city**
13:5,17

**civil**
5:19,22 26:4,12 27:25
28:12 29:18 120:2

**clarify**
8:8

**Clark**
13:24 31:10

**class**
22:21

**classes**
59:12

**classroom**
57:9,12

**clear**
8:9 9:19 45:17 47:18
48:1 87:10 99:13
108:14 119:6 129:25
138:21 141:13,14
145:11 147:24 151:2,
3,18,19

**cleared**
150:11,23,25 164:20
166:6

**clearing**
74:5

**clicked**
39:15

**client**
30:6

**close**
46:13 49:13 84:24
97:17 106:11 141:19
142:10,15 148:10
167:18 174:22 184:2

**closed**
46:25 141:10 142:22,
24 143:7 151:20
160:20

**closer**
118:13

**clothing**
100:7,9

**Club**
17:8

**Cody**
20:17

**coffee**
111:4

**coincidence**
88:25

**collective**
27:15 179:16

**college**
13:8 15:13

**Collingwood**
157:16,18

**color**
19:12 137:15

**colors**
18:21 19:1

**comfortable**
59:21 120:14 142:1

**command**
26:22 28:21 36:20
39:13 41:12,25 42:1,3,
11 62:20

**command-**
19:17

**commander**
19:17,21 64:1,13
68:20 69:12

**commands**
154:11

**comment**
7:18

**comments**
7:9

**commission**
81:14 97:20

**committed**
30:25 113:19

**common**
18:7 66:24 67:3 125:6

**communicate**
50:3,8 51:22 62:20

**communication**
50:6

**community**
16:23

**company**
22:2 38:9

**compelled**
181:18



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

complete
15:13 56:25 58:19

completed
57:18,25 58:2,22

completely
23:2 60:22,23 115:9
117:1 126:9

complex
33:25 67:16 79:15

complexes
137:14

comply
75:11,17 121:12

component
37:9

comprehend
154:21 171:4 174:10

compressed
125:13

compromised
67:18

concealment
160:10

concede
113:23

concern
83:21 122:3 123:1
124:2

concerned
53:6

concerns
120:10 169:25

concert
52:4,11

concluded
178:20 185:24

concludes
185:20

conclusion
170:24 178:16,22

conclusions
167:23

condition
10:20

conditions
173:7

conduct
5:18 89:21

conducted
56:3,5 90:24 169:12,
20

confident
101:7

conflict
154:22

confuse
63:17 154:20 173:25

confused
45:1 48:4 58:16 77:12
158:7

confuses
9:11

confusing
47:10 48:18

connected
30:6

Connecticut
14:11

connection
36:22

consideration
79:20 122:23 123:23

considered
81:25 150:16 182:11

consist
71:11

consistent
178:9

consisting
61:18 91:8

constitutionally
178:8

constructed
38:16

consultation
21:21

consultations
22:9

consumed
9:25 128:2

contacted
86:6,9

containment
74:2 116:10

content
41:10

contingency
125:2,8,22,24

continue
79:21 105:16 121:7
123:3 125:14 126:6
152:10 154:11,13,25

continued
154:14

continues
152:3

continuing
107:24

continuously
17:14 116:22

control
37:11 42:12

controlled
10:19 60:12 61:8
63:15 66:17 178:24
179:2

controlling
142:17

conversations
168:23

convicted

13:12

Cool
63:18

cop
16:16 173:5,11

copper
125:13

copy
165:20,22,24,25 166:3
169:6 184:17,18,21

corner
116:11,14,15,16 126:5
133:18 140:24 142:21
143:8

corners
60:21

correct
17:24 29:18 35:19
44:6 54:6 60:11 108:6
119:3 120:5 130:3
134:8 139:22 140:4
142:11 147:5,25
152:20 162:16,18,19
181:2

correcting
7:16

correctly
19:3 36:12 49:14

Corvel
93:17 162:15

couch
163:23 166:12

counsel
4:16

count
26:3,14,16,18,20,21,
24 27:8,9,13,17,20,24
28:3,4,6,9,20 29:4

countdown
27:2

County
13:24 31:11

James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**couple**
32:24 113:25 115:7
127:24 139:9 142:6
144:14 184:14

**court**
4:12,15,23 5:8 6:23,24
7:7 8:17 9:10 12:20
31:13,14 32:14 76:10
180:11 184:15

**courtroom**
8:25 31:24 32:15

**cover**
18:4 116:4

**coverage**
18:3

**covered**
91:14 106:13 122:20
160:20

**covert**
177:6

**Craig**
4:20

**create**
43:23

**created**
170:14

**creates**
45:9,25

**creating**
48:3

**credits**
15:20,22

**crime**
13:12 68:25 69:5,25
79:9 89:4,8 91:11
96:10 97:17,21 111:24
117:20 118:24 146:13
148:25 149:18,19
150:17 166:8 175:15

**criminal**
14:6,24 32:5 69:1
149:23 163:3

**crisis**
55:10 126:22

**criteria**
179:3

**cross**
41:4

**CSN**
13:23 14:7

**cuffs**
132:24

**current**
20:11,16 118:7

**curtain**
97:2

**curtains**
97:1

**custody**
74:4 98:17,23 113:13,
15

**cut**
126:19

**cutting**
111:13

---

**D**

**dad**
16:15

**damage**
182:13,23

**dangerous**
66:12 172:9,10 174:9

**dark**
47:23

**date**
4:5 56:11 78:17 83:19
87:8

**dates**
181:6

**Dawn**
4:14

**day**
16:15 18:3,7 33:25
34:12,13 49:3 57:14
85:25 86:15,19,20,21,
24 119:17 128:9 129:7
138:21 161:25 179:23

**days**
10:15 18:9 56:24
83:18,20

**dead**
174:16,19,20

**deadly**
117:7 161:18

**deal**
99:1

**dealing**
123:2

**death**
6:6 64:24

**debrief**
168:21 169:1,9,12,20

**December**
84:23

**decide**
16:12

**decided**
90:14 101:12,19
123:22 172:3 175:25

**deciding**
123:21

**decision**
52:17 53:7,8 68:13
99:8 100:20 110:7
142:2 143:15

**decisions**
69:11

**deem**
39:8

**deemed**
28:7

**Def**
37:4 38:19 39:1 40:3,

17 41:17 46:3

**defend**
176:19

**defendant**
32:9,11

**defendants**
4:21 183:7,22

**Defense**
38:23

**defensive**
36:18 40:24 55:8
123:8

**defuse**
41:25

**degree**
13:21 14:2,20 15:1,13

**delay**
36:17,19,22 42:15,16
103:4,19 140:15 141:4

**delayed**
54:12 73:18 84:18
125:6,10

**deliver**
109:21

**delivers**
173:20

**dementia**
10:21

**denied**
23:8,11

**deny**
106:17

**department**
4:10 5:14 6:5 17:15
23:19 30:8 54:23
102:1 107:23 180:14
182:4

**departments**
22:11,15

**depend**
82:1 104:12,13,14
129:3 174:21



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**depending**
167:18

**depends**
51:19 57:1 95:1

**deploy**
36:17 39:19 44:5
45:11,16 46:11 51:23
100:16,21 101:20
102:5,9 139:25
141:18,23 142:15
144:17 148:4 155:22
159:2

**deployed**
40:20 41:10 42:16,24
44:21 45:12,13 46:23
48:10,20 51:19,20
52:2 85:7 148:8
150:10,22 151:25
152:4 153:18,20
156:21 157:11,18
174:2

**deploying**
34:9 103:4 143:9
147:23 155:7,11,17,18
156:17

**deployment**
39:12 42:22 48:6
103:20 151:11,13

**deploys**
36:13 45:16 158:16

**deposition**
4:4 6:9,12,18 7:3,11,
19 8:2,13,21,24 9:2,12
11:5 12:4,6,15,19
29:23 32:19,22 33:1
51:14 94:10 119:25
150:6 167:10 178:13
185:21

**depositions**
6:19

**depth**
129:2

**deputy**
64:1

**describe**
35:23 41:16 67:25
76:11 184:2

**designated**
18:1,21

**designed**
53:20 173:24

**desire**
154:20

**destruction**
152:5,8 153:23

**detail**
56:6

**details**
52:12

**detain**
98:18,23

**detained**
98:19

**detective**
85:15,16,20 89:11,13
90:2 91:10 98:10
166:1,7

**detective's**
87:18

**detectives**
71:9 96:24 98:20,24
119:20 165:23 177:4,9

**detectives'**
97:5 99:7

**determine**
79:2

**deterrent**
157:5

**development**
55:15

**device**
36:15 43:16 142:10
144:22 150:10 161:9
176:11

**devices**
50:21 152:3 173:24

**Dewane**
76:25

**dexterity**
182:16

**diagram**
91:4 92:7,14

**dictate**
79:11 150:16

**died**
25:1

**difference**
31:14 130:12,15
158:10 183:12

**differential**
160:3

**differently**
8:24 18:19 62:13
165:10

**difficult**
8:17 51:7,16 96:3
110:23 153:25 175:1,2

**digital**
4:4

**dignitary**
52:12

**diligence**
177:5,9

**direct**
19:22 37:10

**directly**
103:1 159:24 173:21

**director**
64:14 71:21

**disabled**
182:11

**disadvantage**
117:8

**disagree**
170:24

**disagreeing**
171:1

**discharge**
36:25 156:9 161:9

**discharged**
161:10

**discipline**
26:9

**disciplined**
177:25

**disclose**
106:1

**disclosed**
12:25

**discuss**
12:8,23 106:14 110:9
181:13

**discussed**
22:17 31:18,22 72:7,8
76:24 78:14,16,18
93:20 101:23 103:3
104:22 105:11 106:7,
9,20 109:16 124:11,
12,15 127:19 133:9
138:7,22 158:2,4,6
161:13 169:4 173:22
177:18

**discussion**
174:18

**disorient**
43:10,18,19 46:9
107:20 120:23 154:4,
20 155:3 173:25

**disorienting**
47:11 121:3

**display**
160:11

**displayed**
91:3

**dispose**
153:14,15,25

**disposed**
153:3

**disrupt**
43:9 46:9 120:24



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

154:4

**disruption**
43:19 155:3

**distance**
116:5 160:20

**distinction**
160:8

**distinctly**
160:1,2

**distinguished**
60:14

**distract**
27:18 35:24 36:7 37:6,
11 38:4,6,10,24 39:3,
4,6,11 40:1,7,19 44:5
51:8,24 61:3 108:20
142:10 148:4,8
151:11,14,25 155:8,
11,18,19 166:21
167:11,15

**distracting**
48:18

**distraction**
36:15 139:25 144:22
173:24 176:10

**distractions**
45:1

**distracts**
34:14 36:17 39:20
42:19 43:20 44:22
48:12 51:3,6,15
107:20,24 160:3

**District**
4:12,13

**document**
40:16 81:19 82:7

**documentation**
71:8 84:14

**documents**
11:12,14,16 24:16
180:13

**dog**
31:1,3

**dogs**
91:12 96:7

**dominate**
61:25

**door**
27:19 44:2 51:23
54:11,15 61:9,11 62:6,
22,24 78:4 79:16
106:25 107:6,14
108:6,12 113:22,24
115:25 116:4,6 120:12
121:5,18 122:4,15
125:10,14 127:10,15,
17,18 134:14,16,18,23
135:8,11,17,24 136:1,
4 137:1,10,15,21,23
138:14,20 139:4
147:15 154:6,13,16
157:7 170:18 171:5,12
174:16,17,21 177:16

**doors**
101:13 135:3,4,6,7

**doorway**
97:3

**double**
140:3

**doubt**
70:1,2

**dozen**
172:6

**draft**
12:1

**drafting**
85:13 91:19

**draw**
27:18 104:21

**drawing**
40:22

**dream**
16:20

**dressed**
129:15

**drew**

160:19 172:5

**drive**
107:21 131:20

**driven**
142:25

**driving**
88:13 131:15

**dropped**
30:16

**drove**
129:12,14 131:8,14,16

**drug**
10:6 128:5

**drywall**
114:7

**dual**
18:8

**due**
177:5,9 182:13

**duly**
5:2

**Durante**
96:2

**duty**
5:17,23 23:20 120:3,5

**dynamic**
61:8,9,12 66:17 74:6
107:24 166:9

---

**E**

---

**e-mail**
83:14 84:11 87:1

**e-mails**
84:25

**earbuds**
48:25

**earlier**
12:5 107:8,10 173:16

**early**
15:2 66:25 86:16

**ears**
48:16

**earshot**
102:22

**easier**
131:20

**easily**
51:22 153:3

**Edison**
46:4

**education**
13:14,19 14:8 16:4
54:22

**effect**
46:14 47:7 48:18

**efficiency**
135:21

**efficiently**
119:24

**egress**
131:24

**eight-**
84:6

**eight-hour**
130:15

**elaborate**
66:20 124:6 129:1

**elapse**
80:1 106:16

**elderly**
96:6,22 97:4,6 146:15

**elevated**
43:6 126:21

**emergency**
16:8

**employ**
142:10

**employed**
17:15 182:3

**employment**
21:16,17 30:7



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**empty**
115:9

**enclosed**
79:5,13 80:7

**encounter**
98:15 152:14

**encountered**
161:17

**end**
37:12 61:11 74:4 82:4
107:6 125:2,3 150:11
170:21 175:12

**ended**
15:4 28:22 30:16
83:22

**ends**
152:5

**enforcement**
16:13 22:24 23:1,2

**engaged**
160:21

**enroll**
15:11,12

**entailed**
60:8

**enter**
77:4,18 78:2 108:3
126:12

**entered**
108:11

**entering**
26:5

**entire**
63:24 84:12 101:25
127:13 169:14 181:15
182:22

**entitled**
4:9 176:19

**entrance**
113:24

**entries**
58:13 61:17 64:18

66:18 74:15 160:5,6
178:8

**entry**
25:8,9 29:2 31:4 33:14
57:14 60:11,12 61:8,
22 62:6,7,13 63:15,21
64:7,22 66:23 68:17
69:7,18 70:22 72:1
74:12 75:9 92:20,22
98:22 105:16,17
106:13,17,25 107:9,17
110:3,4,13 112:24
115:12 117:16,18
118:8,22 120:12
121:10,14 122:5
123:16,22 126:17,22
127:23 136:15 163:5
171:7 178:4,24 179:2

**entryman**
17:21

**environment**
119:1

**environmental**
61:18 79:4 111:17

**equipment**
39:23 88:13,14 95:1
123:16 129:15

**error**
7:17

**escape**
113:9 114:9

**essentially**
86:16 122:7

**estate**
23:3

**estimated**
86:8

**et al**
4:11

**evening**
174:15

**event**
31:8 33:15 83:10 91:8
118:15 156:9 162:14

167:21

**events**
11:1 169:14

**everyone's**
165:8

**evidence**
71:12 100:10 148:22
149:9 152:5,8 153:23,
24 163:3

**exact**
35:12 43:17 65:12,13
78:17 84:7 95:15
101:24,25 128:24
171:24 172:2 181:5

**exam**
23:14

**EXAMINATION**
5:5

**examined**
5:3

**excellent**
8:4,13

**excerpt**
81:13 150:6

**exchanges**
12:21

**excuse**
42:1

**execute**
68:13 154:18

**executed**
65:16

**executing**
21:5

**exercise**
185:3

**exhibit**
34:17,18,20,24,25
35:5,8 40:11,12,15
81:10,11,13 94:3,6
150:1,6

**exited**
131:25

**expectation**
99:4 142:20

**expected**
73:19 125:3 173:8
175:16

**expedited**
184:18,22,24

**experience**
138:25

**expert**
11:24 33:6

**explain**
8:23 9:10 19:20 26:24
41:19 54:17 103:12

**explained**
27:16,21 69:3 89:17
91:4

**explosion**
44:11

**explosive**
17:21 36:21 41:9
43:11 101:8 135:24
138:13

**explosives**
133:14 138:12

**exposed**
52:7

**extend**
37:14 43:3,4,9 56:2

**extended**
37:19

**extension**
37:16,17

**exterior**
174:3

**extinguisher**
141:2

**extra**
72:13,15 100:23 177:6

James Bertuccini                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**extreme**
10:21

**extremely**
44:6

**eye**
47:14

**eyes**
44:3 46:14,25 47:1,4
54:13 126:6,10 154:10

**F**

**face**
180:24

**facing**
170:21

**fact**
7:18 11:21 25:5,14
94:1 134:11 136:13
138:10 142:13 157:23
159:13 167:2 171:6,15
177:2

**factor**
122:22 138:4

**factors**
61:18 79:4,19 80:5
103:3,5 111:17

**facts**
89:7

**failure**
136:21,23 137:2

**faint**
130:24

**fair**
37:25 38:1 85:23 86:3
87:21 144:19

**fall**
37:6 53:8 126:5

**familiar**
33:10

**familiarized**
88:3,4,8

**families**
183:25

**faster**
139:6

**fatal**
80:8,12

**fatally**
175:13

**FBI**
95:21

**feasible**
115:13 117:24,25

**February**
181:2,18,20

**federal**
29:20 31:13 77:25

**feel**
43:13 54:9 65:5 80:4
115:18 120:13 136:20,
21,24 172:16,17 176:3

**feels**
75:5

**feet**
37:13,16,17,25 148:12
151:24

**fell**
15:3

**felt**
120:3

**Ferrin**
76:25

**field**
16:1,5 57:10

**fifteen**
122:25

**file**
21:19 23:18 24:11

**filed**
6:3 29:20 31:10,13

**fill**
53:25 61:13,25

**filled**
135:7,8

**filmed**
95:24

**final**
12:2 27:20

**find**
115:17 118:5,13
161:21 162:2

**findings**
167:24 169:2

**fine**
50:23 51:4 81:6 185:7

**finger**
182:16

**finish**
15:4 103:24

**Finley**
21:12 53:3 89:18,20
109:12,13,16 169:21

**fire**
140:17 141:2 155:23
161:5,6 172:3 173:7
174:7

**firearm**
55:8 100:6,8,11
132:22 161:9,10

**firearms**
132:21

**fired**
44:15 45:7 164:8
172:5 176:1,12

**firing**
159:14

**firm**
31:17

**Fisher**
93:17 98:16 112:2,6,7
162:15

**FIT**
11:15 180:19,21
181:8,9,22

**five-minute**
170:2

**five-second**
27:2

**flammable**
45:21

**flash**
37:2 38:12 39:15,16
41:7 43:11 44:6 45:10
46:14 47:3 166:21
167:3,6,7 173:17,20

**flat**
73:23

**flee**
104:19 113:7 117:6
155:1 157:6

**flex**
132:24 135:14,18

**flight**
66:2 69:1

**floor**
43:5 163:23

**flush**
153:7

**flushing**
153:4

**flying**
142:7

**foam**
48:25 135:7,8

**focused**
15:21 57:21

**folks**
53:5

**follow-up**
124:21

**foolish**
174:9

**foot**
117:4

**force**



James Bertuccini                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

29:5 77:4,18 78:1
108:2 117:3,7 119:22
120:9 161:18 176:19

**forcing**
119:19

**forklift**
23:3

**form**
7:11 28:1,14 64:25
65:2,3,4 66:13 78:7
80:25 122:16 123:10
159:3 171:18 172:15
173:9 175:19 176:13

**formal**
14:8 67:25 68:16 69:7
71:16

**formally**
25:18

**fortification**
96:7

**fortifications**
91:13

**fortify**
113:20

**forward**
79:22

**found**
26:11 27:24 28:12
31:1 99:5,6 162:22
168:18 178:7

**four-week**
57:1

**frame**
15:7 135:11,17 136:5,
6

**framing**
142:1

**friend**
183:13

**friends**
183:17,19

**front**

31:25 32:15 44:2
99:25 108:6,12 113:24
127:10 134:14,18
154:16 170:18 171:5
174:17,21

**Frustrates**
180:10

**full**
5:9 28:19 29:7 37:16
59:17 102:2 108:13
169:19 172:7

**full-blown**
59:14

**full-time**
57:3,23

**fully**
173:6 174:10 176:4

**funnel**
80:8,12

**furthest**
116:16

**fuse**
37:4 39:11 40:7 41:1

**futon**
148:17

---

### G

**G-A-R-R-E-T-T**
30:20

**Gabapentin**
10:9

**Garrett**
30:16

**Garth**
21:12 89:18,20

**gas**
111:3,5

**gate**
116:25

**gates**
111:14

**gave**
17:12 29:9 54:9 89:11
98:6 113:11,12 152:16
180:16 181:1,8

**gear**
172:7

**general**
8:12

**generally**
9:14 42:18 75:1 155:8

**gentleman**
123:13,19 175:25

**give**
6:9 8:3 9:7 19:19 24:3
25:11 26:22 28:8
31:24 55:25 65:20
68:5 75:15 78:17
95:15 115:21 140:23
152:11 181:19,21

**giving**
52:14 61:5 75:5,14,16
180:18

**glass**
45:19 142:7

**Glock**
132:20,23 152:22

**goggles**
47:14

**gold**
18:23,24 19:2,5,7,10

**Gonzales**
12:5,8

**good**
4:3 7:23 11:2 16:23
18:16 81:4 116:6
120:15 131:23 136:25
137:20 139:10 140:16
159:22 185:10

**gosh**
35:23

**GPA**
15:3

**grab**
153:17

**graduate**
13:15 14:20 15:17,19

**graduating**
14:7

**gram**
39:11

**grammatical**
7:17

**Grimmett**
85:20,21 89:11,14
90:2 98:10,11 166:1

**ground**
154:12

**group**
21:25 27:15 172:6

**guess**
21:1 37:12 41:6 58:16
65:21 89:1

**guide**
79:1

**gun**
39:9 44:14 153:2,8,14,
24 173:2

**gunfire**
48:5 73:20 160:4,8
167:12 172:21

**guns**
96:8,9 97:16

**gunshot**
31:2 157:21

**gunshots**
44:23 45:2 158:11
159:10 160:3

**guy**
59:3,6 79:15 95:2
101:10,11 127:17
135:19 139:5 163:25

**guys**
38:18 41:20 57:22
59:7,13,15 76:25



James Bertuccini                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86:12 94:25 101:7,13
105:21 106:10 114:9
116:9,10,12 117:4,21
123:6 131:12 154:6
156:7 159:22 160:7
163:7 164:19 172:20

**gym**
128:12

---

**H**

**half**
28:17,22,24 31:21
36:17,19 37:18,24
47:6,9 52:1 147:10
158:20,21

**hallway**
79:5,13,14 80:7

**hand**
34:22 39:12 42:16,22
154:19 155:10 182:14,
16,23

**hand-held**
142:16

**handed**
81:18

**handgun**
97:20 100:14 132:17
152:20 172:5 182:15

**Handing**
81:13

**handle**
35:20,21 84:17

**handles**
35:19

**hands**
36:6

**hanging**
154:9

**happen**
62:18 70:1,3 71:20
108:19 114:10,11
130:5 140:19,20
156:11

**happened**
19:1 20:6 28:21 29:10
64:23 89:2 108:5
129:5 130:1 138:23
139:1 156:4,6,7
159:18 165:13 178:25
179:9 181:25

**happening**
54:17

**happy**
8:1

**hard**
115:20 153:7 165:24

**harm**
126:19 142:19

**harp**
123:3

**Haven**
14:10,11,15,18

**hazard**
140:17

**hazardous**
45:21

**he'll**
185:12

**head**
8:5 36:10 39:11 40:7
41:1 46:13 76:13
116:8 148:12 164:13
169:8 180:25

**head's**
140:23

**headphones**
49:2,4,6 50:3,7,18,20,
25

**hear**
9:12 50:1,16,20,22
51:4,7,21,24 52:2
130:21,22 134:1,5
145:18 163:15 164:6,
24 166:17 171:4 174:4

**heard**
74:21,22 80:20 81:2

82:6,8 83:2,9 104:1,4
120:8 130:9 158:25
160:8 161:12 164:3,
15,16,17,18 165:11,12

**hearing**
48:5,9,14,19,20,23
49:2,10,12,16,20
50:14 51:1 52:8
102:19 104:9,16
167:17 174:4 176:10

**heavily**
93:10

**held**
4:12 22:23

**helmet**
48:7 132:2,3,5,6

**helmets**
123:7

**Henderson**
33:23 95:22

**hey**
27:16 41:17,24 42:7
59:6 68:8 71:23 73:24
84:8 86:10 87:9 92:10,
12 101:10 104:6,16
115:8 124:19 127:16,
17 131:11 135:2,25
140:24 142:14 157:8
164:19

**high**
13:15,17,18,19 36:21
43:9 45:13 46:18
71:12 142:18 159:20
167:7

**higher**
179:3

**highlighted**
151:22 169:7

**highly**
70:1

**hip**
148:11 182:24

**hire**
22:11,12

**hired**
15:9,11,20 17:4,13
33:6 54:21 55:2

**history**
10:4,5 69:1

**hit**
68:7 90:13 115:5
135:20 142:7 151:16
159:21 165:16,19
173:17

**hits**
136:1

**HMX**
36:20 37:3 39:15

**hold**
20:19 54:16 74:2

**holding**
35:18,20 77:1 98:3
137:17

**home**
15:3,6 73:5 86:22
129:13 174:15 176:17,
18 183:23

**homicide**
85:22 88:2 93:11
114:13 121:1

**honest**
11:23 41:11 66:7
85:17 87:6 90:21 98:9
130:8 171:25

**honestly**
52:10 90:23 161:23

**hood**
36:4,5,16,19 37:7 38:6

**hooked**
50:6

**hope**
22:7 67:22

**hoped**
67:14

**hoping**
22:6



James Bertuccini            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**Hoskins**
90:19

**hostage**
22:10 66:3 114:12
126:22

**hour**
11:11 68:2 129:8,9
170:3

**hours**
10:1,7 12:16 56:24
57:9 67:1,10 86:5
128:1,9

**house**
60:21 107:25

**housing**
36:15,16 37:4,8 39:7
42:8 142:17

**huge**
114:2,3

**hung**
54:11 126:20 127:11
154:6

**hypothetically**
103:23 104:3 134:22
138:19,22 177:21

———————

**I**

**IAP**
53:21,23,25 68:6
83:19 84:11,25 85:4,6,
11,14,25 87:1,2,13
119:11 176:22

**IAPS**
71:10 72:11,15,19

**ID**
166:8

**idea**
27:3 60:2 141:18
147:19 158:8

**identified**
88:3

**identity**

**ignited**
166:21

**illumination**
46:2

**illustration**
41:4

**immediately**
9:3 74:1 103:10 109:2,
4 140:10 164:21
172:20

**impair**
49:25 50:25 167:16

**impaired**
50:15

**implemented**
177:8

**implies**
172:13

**importance**
141:9

**important**
7:23 75:22 102:15
136:14 138:4 140:12
141:11 177:17

**impression**
45:5

**incapacitate**
46:9

**incident**
18:25 24:25 25:6
64:15,16 72:2 78:20
85:5,7 89:2 94:13
168:20 170:14 178:1,5
179:1,13,18 181:11,14

**incidents**
69:15

**include**
84:11 102:13,16

**including**
10:6 102:7,8 128:6
152:14 161:8

**inconsistent**
178:10

**incorrect**
155:9 182:25

**incorrectly**
112:8

**indiscernible**
65:1 70:14 76:16
135:5 157:13

**individuals**
111:13 177:11

**inexperience**
59:19

**inform**
135:1

**informal**
68:1,3,16 69:7 83:3

**information**
29:24 72:15 87:22,25
90:5 91:3,6,20 93:21
94:15 96:4,6 98:5,7,
12,13 119:11 138:23
143:13 146:22

**informed**
100:17

**ingress**
131:23

**inhibited**
174:4

**initial**
104:23 105:7

**initially**
155:22 161:11

**initiate**
37:1,2 43:25 45:23
62:21 108:15 141:14
151:3,8

**initiated**
29:13,14 36:20 39:13
41:12,25 42:2,4,11
126:8 142:4 171:13

**initiates**

39:17

**initiation**
29:11 43:11

**initiator**
36:10

**Initiators**
133:15

**injured**
25:8 27:12

**injuries**
31:5 182:10,20

**insert**
43:2,9 102:5,10
108:14 109:3,5
144:20,23 148:24
149:15,17

**inserted**
104:10,20 170:20

**inserting**
145:15

**insertion**
52:25 106:5 108:18
151:13

**inside**
26:4 43:10 50:1 61:15
67:14,20,23 69:24
73:25 78:4 82:4,11,12
88:12 93:5,7,10 96:22
98:19,24 99:5,7
102:17 104:1 105:22
107:13,18,25 109:2
111:23 112:6,12
113:17 114:17,18,21
117:17 118:25 119:15
120:24 123:4,8,25
127:11,12 142:7
145:16,18,24 146:8,
13,19,24 147:2,7,13,
18 149:21,22 152:14
154:3,4,21 160:5
162:16,20 177:23

**institution**
13:22

**instructions**



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

154:22

**instructor**
55:8,9,15

**instructors**
56:17

**intel**
65:25 91:3

**intel-based**
68:4

**intel-driven**
68:4

**intelligence**
143:12

**intended**
36:25 96:1 102:12
156:20

**intense**
46:6 167:7

**intensity**
46:1

**intent**
29:2 75:7,8

**intention**
86:15

**intentionally**
88:25

**interested**
59:13

**interior**
79:14 127:8

**Internal**
25:14 26:8

**interrupt**
121:22,24

**interval**
158:19

**intervene**
5:23 120:3

**intervention**
55:10

**interview**
99:24 162:4,6 164:3
167:5 180:1,3 181:1,
16,17

**interviewed**
24:15 25:18

**interviews**
124:25 126:25

**intruders**
176:17

**invent**
46:5

**investigated**
175:16

**investigating**
88:21 89:5 94:13

**investigation**
25:15 88:2 93:7 98:25
119:20 167:21 168:25
169:19 175:15 177:10
181:15

**investigations**
98:21

**investigators**
180:9

**involve**
126:11

**involved**
25:5,9,10 28:6 83:12
84:16 86:2 90:16,18,
19,23 91:11,12 93:6
109:13 114:4 121:1
160:6 183:16

**involves**
33:9

**involving**
25:7 64:16 69:23
181:14

**iron**
111:14 140:6

**Isaiah**
6:7 69:15

**issue**
103:10 142:4,9 145:7
178:4 182:18

**issues**
44:2 142:6 168:18

---

**J**

---

**J-A-M-E-S**
5:10

**Jake**
21:9 126:4 131:10
164:10 169:21

**James**
4:5 5:1,10 19:23
185:21

**January**
5:12 6:7 11:1 19:15
20:2,6,18 21:3 24:25
25:6 33:13 34:2,9
35:10 40:2,20 42:24
44:24 46:12 52:18
59:23 62:9 64:24
68:12 74:19 82:13
83:7,11 84:21 87:11
119:8 128:1 155:14

**Jarrod**
85:21

**Jasmine**
25:7 29:6,17 32:20
64:15 69:14 72:2

**Jeremy**
180:5

**jet**
52:6

**Jimmy**
96:2

**JN**
35:7

**job**
5:16 8:4,13 17:18
18:16 43:25 49:12
88:5 98:22 101:8
105:23 109:5 142:18

145:8 160:11

**jobs**
21:16 101:11

**join**
17:11 55:4,5

**joined**
16:10

**joining**
17:1

**Jonathan**
165:17

**Josh**
33:3

**judge**
9:3,8,10 31:25 32:15

**July**
4:1,5 24:19 185:21

**jump**
59:12

**jury**
7:5 31:25 32:15

**justice**
14:6,24

---

**K**

---

**Kentucky**
66:6

**Kevin**
56:19 76:24

**kids**
91:12 96:6,22,25
103:8

**Kids'**
96:25

**killed**
119:8 175:14,23

**kind**
35:14 49:10 51:2,10
55:7 70:12 92:14
97:23 109:17 119:13
128:5 135:6 144:19



James Bertuccini              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

155:3 157:9 169:1,6
183:12

**kinds**
48:23

**King**
25:7 26:4 27:12 29:2,
6,17 30:3,6,10 32:20
64:15 69:14 72:2

**King's**
27:25 28:12

**kit**
133:10,11,12,15

**kitchen**
164:21

**knew**
83:15 87:25 88:1
146:11,21 150:24
158:15 159:22 162:24
164:17 165:13,14,16
175:8

**knock**
75:2,3,4,12,22 76:2,3,
22 83:3 122:19 168:14
178:10

**knocking**
174:16

**knowing**
175:12

**knowledge**
49:21 64:19 74:18
110:6 128:19 146:16

**Kubla**
90:18 164:22 175:10
182:3,19,20

**Kubla's**
179:1

——————————

——————————

**L**

**labeled**
35:1 94:6,11 129:23

**land**
115:20

**landed**
113:4

**language**
101:24,25

**large**
43:11 45:25 51:4
91:18 166:9,21 168:21

**larger**
73:19 169:1,13

**Las**
4:7,10 5:14 6:5 13:6,7,
10,18 14:14 17:15
23:19 30:7 75:22
95:22 180:13 182:3

**late**
15:23,24

**Latia**
4:9 6:3

**law**
6:24 16:12 22:23 23:1,
2 31:16 77:3 78:1

**lawful**
75:17

**laws**
76:10

**lawsuit**
6:4 29:20 30:23 33:6

**lawsuits**
30:14 31:7,10,22

**lay**
154:12

**laying**
171:23

**layout**
127:8

**lead**
77:2 89:14 112:5

**leader**
17:20 18:14 19:16
20:19,24 21:4 52:20,
22,23 90:9 91:1 165:3

**leaders**
52:23 89:23

**leaned**
46:20

**learned**
143:6

**leave**
17:10

**leaves**
68:9

**leaving**
38:17

**led**
110:21

**left**
6:23 15:2 41:7 46:21
140:8,11 148:9,11,19
166:5,10

**left-handed**
182:15

**leg**
159:20

**legal**
4:14 15:25 16:1,2
31:21 78:19 176:6

**legally**
122:12 176:18

**length**
37:25

**lens**
47:18

**lenses**
47:23

**lesson**
76:1,3

**Let alone**
147:4

**lethal**
176:19

**lethality**
113:6

**letting**
107:3

**level**
41:8 71:13

**Levi**
164:19,25 165:1,2

**Lexitas**
4:16

**Liberal**
14:6

**license**
23:7

**licensed**
23:3

**licenses**
22:25

**lieu**
24:4

**lieutenant**
19:21,22 20:12,13
21:13 52:24 53:1,12
63:25 68:21 69:4
85:10,11 110:12
149:2,25 150:19
152:16 169:16

**lieutenants**
84:17

**life**
119:17 176:2

**light**
41:8 45:25 46:3,5,6
66:11

**limit**
61:20 131:12,22

**listed**
96:7,8 146:20,22
152:19

**listen**
105:2

**literally**
111:7 143:8 148:10



James Bertuccini                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**litigation**
11:25 180:15

**live**
33:15,18,19 57:17,24
58:13,20 59:18

**lived**
13:7

**living**
16:25 127:9 139:21

**load**
39:10

**loaded**
38:6,9,15 39:3,16 41:9
133:5,7 139:25

**located**
4:7 98:19 162:20

**location**
72:14,18,24 73:7 91:9,
14 113:20 118:2

**locations**
96:1

**lock**
101:14 125:14,15,16,
20,23 135:17 136:2
138:11 139:4 165:2

**locking**
135:10

**logged**
39:15

**logic**
111:16

**logical**
166:16

**logistics**
41:20,23

**long**
10:13 11:10 23:21
25:23 26:20,24 30:18
33:20 34:2 36:12
37:13 47:7 48:3 51:10
79:7,21 84:21 95:20
108:10 128:21 145:4
175:11 177:3

**long-winded**
135:3

**longer**
10:11 81:6 120:19
125:3 128:25 129:1
139:9 164:18

**looked**
83:16 87:7,8 88:5
131:3 168:7

**loop**
155:4

**lost**
147:10 175:24 176:2

**lot**
10:3 33:24 71:13 73:3
88:17,19 102:21 111:8
113:8 114:4 116:1,6
118:5 119:11 131:21
168:22 169:18

**loud**
8:3 44:8,12 45:9
51:18,21,24 52:6
60:25

**low**
42:7 71:13 113:6

**LRAD**
61:1

**LVMPD**
94:11 150:7

---

**M**

**made**
7:10 21:20 29:3 31:3
33:24 39:10 52:17
56:10 62:19 64:18
65:11 68:12 69:12
72:25 73:17 74:11,14
77:20 78:8,11 88:7
100:20 103:7 105:1
110:6 112:7 127:1
160:5,9 167:25 169:3
170:17 176:24

**maintenance**
137:24

**major**
14:4,22 43:11 168:20

**make**
7:13,15 9:18 28:19
35:13 45:18,20 60:23
62:5,6 67:17,19 70:13
72:10 73:5,22 74:10
98:22,25 102:23
104:23 105:16 115:18
119:6,20,23 120:22
121:7,10 123:16
129:25 141:13 143:14
145:6,10 163:15
165:18 174:14,17
176:24 177:8,10,22
179:4 181:10,13
185:4,6,8,17

**makes**
157:21

**makeup**
18:9

**making**
48:13 58:13 61:12,22
66:17 71:7 72:11 75:9
105:17 106:10 107:17
121:10 177:3

**man**
174:6 175:13

**mandate**
55:18

**Mangos**
17:7

**manner**
10:18 47:19

**Manning**
4:15

**manpower**
62:1 73:18 83:22

**manual**
57:15 147:23 148:20
149:8,11 150:7 155:5,
6

**manufacturer's**
142:13

**marked**
34:17,18,24 40:11,12
81:10 94:3 150:1,5

**Material**
81:16

**matter**
28:13 29:25 31:21
49:12 148:25 149:2,18
152:23

**Mccord**
56:19 76:25

**Meaning**
73:24 149:20 162:18

**means**
97:14 155:19

**meant**
8:9 97:16

**mechanism**
135:10

**media**
4:4

**medical**
10:3,5,20 16:5 131:24
133:14 175:7,8,9
182:22

**medication**
10:8,11,14,16 128:6

**medications**
10:7

**medicine**
16:8

**meet**
11:10,18

**meetings**
72:3,8

**Melanie**
19:22 21:14

**members**
5:19 50:9

**memory**
10:17,22,25 11:2
85:20



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

mention
32:18

mentioned
72:17 80:5 95:25
122:20

met
172:20 183:25

metal
135:7,8,9,17 136:6

methodically
74:5

Metro
15:5,9,12,21 16:10,13
17:1,11,13,15,24
21:17 22:12,21,22
23:11 24:8,11 25:11
27:23 39:20 56:3,5
68:1 75:22 81:20 83:4
170:16 177:25

Metro's
68:15 170:24

Metropolitan
4:10 5:14 6:5 23:19
30:7 180:14 182:4

midnight
18:5,6

miked
50:10

mikes
50:7

Mills
56:20

mindset
174:11 176:8

minimize
46:14

minute
13:9 34:21 80:21 81:3
82:2 87:24 93:23
143:19 153:13

minutes
79:25 81:8 128:23

mishaps
84:14

misleading
118:20

missing
177:16

mission
20:7 38:14 62:10

missions
57:25 66:25

misspeak
99:11

mistaken
167:12

misunderstood
21:1 108:23

mixes
39:16

moaning
163:16

model
35:13

moment
75:20 100:3 114:24
185:19

momentum
74:2

Monday
12:9

monitor
4:6

month
162:7

months
10:11 56:25 89:5

morning
4:3 5:7 6:9 57:12 67:1
83:11 102:19 128:12
144:7 180:17

mother
175:24 176:3

mounted
145:12

move
163:10,12,14

moved
163:22

movement
61:9,12,21 107:25

moving
67:17 116:22 145:16,
19

MP5
98:3

multiple
73:25 158:25

munitions
158:22

murder
88:20 93:6 152:18

_____

N

names
5:9 53:5 93:15,16,18
146:21

narcotics
68:7 153:4

nation
70:10 179:9

necessarily
121:23,24 158:10

needed
80:19 87:9 100:23
119:12 127:16 137:1
139:5 154:9 177:17

negative
25:2

negligent
24:21

Nellis
73:10 96:2 111:11
116:24

nerve
10:9 182:13,23

Nevada
4:8,13 13:6,10,18,24
31:11 77:3,16 81:14

news
162:13

newspaper
162:9

night
42:25 43:7,25 47:24
84:1,2

no-knock
60:14 62:2,3,10,11,12,
15,17 63:8 64:5,8,22
65:14,16,23 66:11
122:8,10,12 178:9
179:5

no-knocks
66:17 70:11

nobody's
73:5

noise
44:8,9,10 49:1,5,6,23
50:18,25 51:3,8 52:6,8
173:24

noises
159:9

noncompliant
79:17

nonelectric
39:14

noon
128:10

normal
39:10 71:6 128:8,10

north
95:22 111:2 116:16

note
81:24,25

notebooks
133:15



Case 2:24-cv-00074-APG-NJK   Document 57-4   Filed 05/16/25   Page 71 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**notice**
23:18 52:7 84:6
124:24 140:10

**noticeable**
141:8

**noticed**
138:24 139:1

**notified**
71:17,18

**number**
4:11 91:9 102:13,16,
23 131:12,22

**numerous**
74:22 172:19

---

**O**

**O'DANIEL**
19:22 21:14 53:1,13
85:10 150:20 169:16

**Oakley**
47:18

**oath**
6:22,24 83:1 170:12

**object**
8:22

**objected**
9:14

**objection**
9:5,6,12 28:1,14 64:25
66:13 78:7 80:25
122:16 123:10 159:3
171:18 172:15 173:9
175:19 176:13

**objections**
8:23 9:3

**Objective**
81:15

**obligates**
6:25

**obscuring**
47:6

**Observations**
119:15

**observe**
59:10 160:15,22
163:24

**observed**
103:13 120:7 134:23,
25 183:3

**obstacle**
126:20,21

**obstruct**
97:13

**obstruction**
140:14 141:4

**obstructs**
117:1

**obtain**
14:1 20:22 126:1

**obviousy**
63:7

**occasions**
6:15

**occupant**
137:24

**occupants**
77:6 79:13 120:11
145:24 147:18 177:23

**occur**
64:11

**occurred**
29:10 71:14 72:20
86:21 87:12 88:17,21
89:5 118:16,21 125:3
128:13 161:11

**occurs**
24:19

**October**
56:10,11,12 65:15

**offer**
59:9,12

**offered**
14:16

**officer**
5:12,13,17,24 12:4,8
16:14 27:13 29:15,16
49:13,16 54:20,21
55:3,6 56:19,20 58:5
71:17 75:5 81:14
82:24 90:17,18,19,20
91:5,24,25 92:5,6
98:10 99:18 100:18,22
101:1 102:4 103:20,25
104:24 105:8,10,12
110:9,10 112:19
117:11,12 122:2,21
123:12,15,23,24 124:3
125:11 127:21 129:23
131:10,23 136:9
138:19 139:4 154:17
157:11,23 158:9 159:9
160:14,15,22 161:1
164:4,6,22,23 170:11,
20 175:10 176:2 179:1
182:2,19,20 185:2

**officer's**
78:5

**officers**
5:22 6:4 11:20 22:20
32:12 49:19 52:20
55:9 74:22 77:4,17
78:1 80:6,18,22 82:4,
10 90:8,11,16 91:2,21
98:11 105:9,12 107:15
110:8 112:19 120:2,12
121:4,19 122:5 134:14
136:22 147:8,15
171:5,6 172:3,6,12
173:3,7 174:8 176:1,5,
25 183:15

**officers'**
106:17

**official**
141:22

**Ohio**
22:20

**OIS**
168:19,22

**OISS**

169:14

**one-minute**
82:6

**one-way**
124:17

**ongoing**
163:3

**op**
33:19

**open**
46:25 47:1,4 51:23
62:24 111:11 116:22
121:20 125:14 145:11
147:15

**opened**
142:22,23

**opening**
43:23

**operation**
20:2,7 21:7,25 26:15
38:17 39:24 47:23
73:16 84:1,3 86:6,20,
22 88:9 165:4 175:18
176:23 177:22

**operations**
42:20 95:21,22 114:4

**operator**
23:3 45:16 73:22

**operators**
18:12 55:17 56:7 57:3,
4

**opinion**
110:20 111:20 139:7

**opportunities**
61:1

**opportunity**
7:12

**opposed**
7:16 33:15,17 42:15
110:3,14,18 115:12

**opposite**
9:15 19:7 54:10



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

140:18

**opt**
141:12

**opted**
111:22 114:14 140:8,
17 141:2,6

**option**
52:19

**options**
113:6

**order**
41:18,19 42:9 75:17
92:21,22 149:9 151:3

**ordered**
184:18

**originally**
54:21 84:10

**outgunned**
172:8

**outstanding**
97:19 112:11 152:15
162:25

**over-**
109:19

**oversight**
109:20

**overwhelmed**
73:25

**overwhelming**
61:14,23 107:10,13,
17,22

**owner**
137:24

―――――――

**P**

**p.m.**
18:5 86:19 170:6,9
185:23,24

**PA**
60:25

**package**
84:12 131:12

**pages**
34:25 35:2

**paid**
30:3

**pain**
10:9

**paint**
137:15

**painted**
137:17 138:2

**pane**
140:3 144:17

**paper**
91:16,17,18

**paragraph**
150:8

**paralegal**
16:2

**pardon**
19:4 76:17

**parentheses**
96:10 97:16,17

**parents**
31:7

**park**
60:20

**parking**
88:17 111:8 116:1,6
131:21

**part**
32:5 35:25 59:17
75:12,23 89:8,10
105:25 106:8 118:12
124:25 126:11 140:25
180:14 184:5

**partner**
157:14,17,18,23
165:17

**pass**
136:25 137:6,20

**passed**
55:1 98:13,20

**past**
13:19 126:25 134:17
149:23

**patio**
113:24

**patrol**
58:7 59:3,6

**patterns**
119:17

**PC**
99:10

**peace**
81:14 82:3,10

**Pecos**
111:10 113:8 116:24

**penalty**
6:25

**people**
8:18,25 9:11 43:10,18
44:16,18,20,25 45:3,5
46:8 47:11 48:4 50:1
54:15 55:11 58:19
67:1,10,14,17,22
73:25 79:18 93:5,16
102:17,19,24 109:2
111:4,5 113:16,18
114:5 115:6,8 116:21
117:17 123:25 124:8
127:14 142:7,15
146:5,8,12,19,20,21,
24 152:13 154:20
183:8

**perceive**
159:9,12

**percent**
35:16 59:11 115:9
136:16

**perfect**
24:21 81:9

**perform**
66:25

**performance**
5:16 25:2 81:15

**performed**
66:24 176:23

**period**
82:2 174:18

**perjury**
7:1

**permitted**
63:21 64:7 68:17
77:18 78:1 118:8

**person**
11:19 41:23 43:13
52:17 53:6 90:1,24
101:4 107:13 120:10
121:3,17 124:18,21
133:9 149:7 157:12
159:8 161:14 166:16
176:16,18

**person's**
48:19 167:16

**personal**
10:5 129:14 174:14
183:13,16,19

**personally**
29:17 32:16 34:10
74:11,24,25 80:13
81:3 156:6 161:1,4,6

**personnel**
21:19 23:17 24:10,19

**persons**
78:4

**perspective**
158:25

**pertaining**
16:5

**Peterson**
64:13

**ph**
97:24

**phase**
54:1 136:19 138:16

James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**phone**
179:25

**photos**
95:1,2 98:2 110:16
127:7

**phrase**
173:5

**phrasing**
43:17

**physical**
108:2 165:22

**physically**
73:7 129:10 151:15
163:22

**pick**
129:16

**picture**
40:9 94:14,18,19 96:4

**pictures**
35:6 37:22 94:20,23
138:1

**piece**
36:22 37:10 111:7,9
116:3,19 135:13

**pieces**
50:6

**pin**
36:7,9,24 156:3

**pistol**
39:9

**place**
163:4

**placing**
92:16 135:24

**plainly**
137:9

**plaintiffs**
4:19

**plan**
28:18 29:6 61:3,4 68:9
76:1,3 85:5,7 88:5
89:12 100:19 106:21

107:1,2 108:7,13,21,
25 109:16 110:11
120:8,15 125:2,22,25
126:11 131:10 136:8,
10,17 158:1 171:11

**plane**
52:6

**planes**
52:11

**planned**
54:2,3 108:10 122:4

**planning**
54:1 118:12 121:2
122:7 124:2 136:14
141:1

**plans**
128:25

**plate**
134:19 135:10

**play**
69:2 130:16 133:16
139:8,15 143:18,19

**played**
7:4 165:7

**playing**
59:10 130:20 133:21
139:16 143:24

**point**
105:22 107:6,8 113:21
121:9 126:4,7,17
133:24 134:20 137:7
141:19 164:2 165:14
166:8 169:9 170:1
184:25

**pointed**
173:2

**police**
4:10 5:13,14,16 6:5
16:14 17:15 22:11
23:19 30:7 33:7 54:25
55:2,6 62:7,25 75:6
102:1,3,24 103:20,24,
25 105:8,10,12,23
107:4,23 121:4,19

154:16 172:6 174:5
179:16 180:14 182:4

**policies**
63:2,20 69:6,11 70:14,
15,16 71:3 118:7

**policing**
70:11

**policy**
52:23 64:10,17 67:4
68:1,16 69:13 70:8
71:17,21 72:1,5 95:12,
14 141:22 150:7
153:22

**port**
142:17

**portion**
90:24 106:12 109:21,
23 168:4

**ports**
158:22

**position**
17:18 20:19,23 23:10
113:20 115:21 122:15
148:16 160:9 171:24
172:2

**positions**
60:21 100:24 123:8

**possibility**
66:2

**possibly**
93:11 100:8 112:12
118:4,9,24 123:3
135:23

**posted**
98:2

**poster**
91:17

**potential**
22:16 114:11,12

**potentially**
117:21

**pouch**
133:14

**powder**
36:21 37:2 39:16 41:8

**practical**
57:13

**practice**
14:23 34:8 49:9,11
66:25

**practices**
33:7

**prebrief**
89:12

**precipitated**
70:6

**premade**
41:12

**prematurely**
29:11,12,13,14

**prepackaged**
39:2

**prepare**
11:5 38:7,18

**prepared**
11:25 170:15

**preplanned**
102:4 103:18 108:8
110:1

**prepped**
88:7,10

**prescription**
10:7,8,11 128:6

**presence**
106:1,5 107:23

**present**
89:19 110:10 163:22

**presented**
52:22 117:5 152:16

**preserve**
148:22 149:9

**presold**
39:2



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**pressure**
43:12,14

**pretty**
35:15 45:9 106:2
130:24 141:8 172:9,10

**prevent**
153:23

**prevention**
152:4

**primary**
19:6,8 109:14 123:23

**primer**
36:10,22 37:3 39:17
42:14 145:2 156:2,14

**principles**
75:2,23 76:23

**printout**
182:22

**prior**
33:13 34:2 38:14,16
59:23 68:25 78:20
88:5 89:5 112:22
144:13 145:20,21,23
146:7 168:3 181:19

**privilege**
9:17,20 12:23

**problem**
54:18 135:16 141:15

**procedures**
33:7 63:20 69:6 70:17
71:3 118:7

**proceed**
9:23

**proceeding**
12:12,19

**proceedings**
185:24

**process**
6:21 9:12 24:14 58:16
63:24 84:18 111:15
118:12 121:18,22
127:6 159:5

**produced**
180:14,15

**product**
41:6

**professional**
22:24

**prominently**
164:24

**promotion**
23:11

**pronounce**
49:14

**proper**
72:12

**property**
68:18,19 69:5,8,18,25
93:3,8,9 100:4 118:7,
24 149:5,7,19 162:21
166:5

**propped**
37:23

**prosecution**
32:6

**protect**
16:21 48:16

**protected**
9:17 12:22

**protection**
47:14 48:5,9,14,20,23
49:2,10,12,17,20
50:15 52:12 116:20

**Protective**
179:17

**provide**
78:6 116:3 122:5
147:14 165:25 175:6

**provided**
81:20 113:16,18
168:16,17 169:6

**providing**
53:4

**proximity**
106:12 167:19

**pry**
10:4

**public**
5:19,23 16:21 50:9
117:14 120:3

**pull**
36:6,11,24 37:5 74:2,3
79:6 110:24 127:7
144:22,25 145:1,10
154:9

**pulled**
40:17 156:3

**pulling**
33:24 74:3

**pulls**
36:7,9

**purchase**
39:22

**purchased**
38:8

**purported**
152:18

**purpose**
43:15 50:25 78:5
102:22 167:2

**push**
79:22 110:11

**pushing**
111:14

**put**
7:10 48:25 74:1 77:1
93:15 97:8 102:9
103:16 111:7,9 115:21
127:9 140:15 142:18
145:12 158:13 160:9
164:13 175:25 184:15

**putting**
79:17 161:17

<hr>

**Q**

**qualifications**
55:4

**question**
8:22 9:4,16 18:17
45:24 51:11,12 58:17,
18 66:3,16 71:15
106:18 108:23 110:13
118:14 119:2 124:21
136:10 138:18 152:25
153:1 157:2

**questioning**
170:3

**questions**
7:8,25 9:22 72:12
92:10 96:23 124:4
127:24 130:18 137:4
139:11 143:23 144:4
169:24 184:7,9,12

**quick**
26:3,16 27:4,9 47:5

**quicker**
139:7

**quickly**
139:18

**quote**
81:24 82:5 125:1,2,3
150:9,11 152:3,5
170:19,21

<hr>

**R**

**radio**
62:20 104:9 133:14
155:10

**radios**
50:5,11

**raid**
20:7 68:7

**rails**
131:13

**Rainbow**



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

17:9

**raise**
120:10

**raised**
14:14

**raising**
122:2

**rake**
160:12

**raked**
126:9

**ram**
101:2,11,13 108:6,12
125:11 135:20

**ramps**
97:3

**ran**
39:14 73:18

**random**
59:3,5

**range**
33:22 34:1 49:1

**rare**
65:24,25 66:4

**rate**
10:25

**RDO**
20:3 86:20,23

**re-look**
177:17

**re-pass**
177:18

**reacclimated**
97:23

**reach**
124:20 153:16

**reaching**
154:25

**read**
7:4 12:13 76:5 81:24
83:19 87:2,4,25 96:3,

12 162:9 168:7,16
178:17 185:6,8

**readily**
141:8

**reading**
96:19 99:16 151:10
178:15

**ready**
26:22 105:15 133:7
139:25 140:2

**real**
23:2 27:4 182:18

**realize**
181:4 182:17

**rear**
116:9 133:3,20

**reason**
6:8 14:25 37:9 39:6
47:21 65:10,12,13
67:22 68:5,6 69:25
79:7 101:15 103:16
105:25 110:15 114:14
151:22 156:25 170:24

**reasonable**
75:6,15,16 78:3,25
79:2,11,20 80:4,22
82:1 107:5,14 120:11
122:3,13 171:3,8
176:9

**reasons**
8:15 61:16 68:10
73:17 103:13 149:20
155:2

**recall**
19:3 24:9 26:5 29:19,
21 32:22,25 43:16
71:25 72:21 75:18
76:1,7,21 78:22 84:14
88:11 89:24 92:3,4
93:20 96:14 97:24
99:9,12,14,19,21
100:1 111:10 115:2
116:24 122:6 125:4
131:15 136:6 162:1
164:4 169:7 180:17,21

**receive**
14:20 15:1 34:3 64:4

**received**
34:5 84:10

**receiving**
26:9 29:23 71:25

**reclining**
148:16

**recognize**
134:10 164:9

**recognized**
136:18

**recollection**
112:20

**recommendations**
142:14

**recommended**
26:2 27:13 53:7,21

**recon**
52:20 90:16 98:11
112:19 115:23 134:25
146:14

**reconnaissance**
90:8,10 91:2,21 110:8
136:19,22 137:9
138:16 140:23 143:13
177:13

**record**
4:17 7:24 9:19 82:19,
20,21,25 85:4 94:11
95:12 129:22 170:5,7,
8,12 184:14,16
185:13,22

**recorded**
95:18

**red**
18:22 19:1

**redone**
137:1,3

**refer**
20:5 39:2 133:12
167:6

**Reference**
81:16

**referring**
63:9 94:15

**refers**
82:9 151:10

**refresh**
85:20,21

**refreshed**
98:4

**refuse**
106:25 147:8 179:17

**refused**
77:5,19 181:19,21

**regard**
69:14

**regular**
86:17,24 129:7

**regularly**
85:25

**reiterated**
74:22

**related**
22:24 23:1

**reload**
39:24 40:6 41:25 42:2

**reloaded**
40:3

**reloading**
39:21

**reloads**
39:22 42:4

**remain**
179:12

**Rembert**
73:9 93:17 98:1,2,16
112:10,11 162:15

**remember**
19:9,11 29:22,23 33:2,
3 74:17 76:12 85:18,
19 91:23 93:22 94:19



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98:3,6,9,10,12 99:12
100:4,6,8,11,12 111:1
122:2 124:3 128:19
136:7 157:12,13,17
180:5 181:4,6

**remorse**
175:22

**remotely**
45:22

**removed**
31:3

**render**
98:24

**rendered**
31:4

**rendering**
155:19

**renew**
15:2

**repeat**
7:25 51:9 147:11

**rephrase**
7:25 77:14 118:20

**replay**
133:2

**report**
11:24 12:1 24:22,23
94:12 99:21,24 165:25
168:4,15,18 170:14,
15,19

**reporter**
4:15,23 5:8 6:23 7:7
8:17 34:21 42:1 65:2
70:15,18 76:17,19
81:4,9,11 94:8 116:12,
14 125:17 135:6 150:3
157:15 180:11 184:15,
22

**represent**
4:15,17 35:5 40:16
105:3

**representative**
180:6

**represented**
31:17,20

**reprimand**
24:6 25:2,12

**required**
16:7 85:6

**requirement**
78:20,23

**requires**
147:24

**rescue**
22:10

**residence**
13:10 97:7 113:14

**resides**
88:12

**resistance**
139:3

**resolved**
30:1

**respond**
9:13,18 107:15

**response**
8:9,11 9:8,9 72:25
118:19 119:4 164:11

**responsibilities**
88:6

**responsibility**
91:22

**responsible**
85:13 91:19

**rest**
57:14

**result**
25:19 175:12 178:4

**resulted**
6:6

**retrained**
64:17 70:21,24 71:2
178:21

**retraining**
168:17 178:3

**retreat**
80:17

**retrieved**
133:2

**returned**
15:6

**reuse**
40:6,8

**reused**
39:8 40:4

**reusing**
39:21

**revert**
126:2

**review**
7:12 11:12,14 12:2
24:14,17,19 25:2
26:23 71:24 72:16
87:5 129:18 168:6
185:3

**reviewed**
11:16,24 12:11 76:9
87:13,15,18 168:3
180:13

**reviewing**
72:10 82:7

**reviews**
24:11

**rid**
153:16

**rifle**
49:1 98:3

**rights**
5:19,22 26:4,12 27:25
28:13 29:18 120:2
179:15

**risk**
66:2 69:1 71:12 79:15,
18 126:19

**risking**

123:17

**rod**
37:18

**rode**
129:11 131:9

**role**
59:10 123:15

**roles**
88:6 101:5

**Roll**
42:7

**room**
80:6 116:18 127:9
139:21 166:13

**Roth**
127:12 131:9,16
160:20 165:16,18
180:4,5

**Rothenburg**
49:13,15,16 157:1,24
159:9 160:14,15,23

**round**
133:18

**rounded**
140:24 142:21 143:8

**rounds**
123:14 125:13 160:18,
24,25 176:1

**route**
91:13

**routinely**
67:9

**rule**
8:12 9:3,9 12:19 79:1,
24 83:4

**rules**
6:19

**Rumpert**
97:24 112:9

**run**
39:13 59:13



James Bertuccini                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**running**
113:7

**runs**
73:20

**Russ**
21:11

---

**S**

---

**s-h-o-c-k**
125:19

**S-H-O-K**
125:19

**SACO**
110:3

**safe**
82:2 98:24 155:19

**safely**
74:3 80:17 119:24

**safer**
117:16 176:24 177:22

**safest**
152:12

**safety**
103:10,13 117:11,12,
13,14,15 122:21
123:1,23,24 126:18
142:4 145:7

**Sam's**
88:17,21

**sat**
11:6 16:15

**Saturday**
18:4,6

**scenario**
126:12

**scene**
155:21 166:8,9

**scheduled**
86:1

**scholarship**
14:16 15:3

**school**
13:15,17,18,19 55:25
56:13 57:22,24 58:10,
15 59:4,14 60:7

**scores**
24:21

**screen**
140:7,11,14,25 143:7,
17

**screwed**
41:1

**screws**
137:16

**search**
20:9,10 21:5,7 62:4,7,
11,25 68:18 69:8,19
70:11 71:11 77:6
83:13 87:15,19 89:8,
11 91:10 92:25 93:2,8,
9 98:15 102:1,4
103:20,25 104:1
105:8,10,12,23 107:23
118:8 121:19 126:15
149:2,5 152:19 154:17
162:22 165:21 171:6
172:18 174:5 176:6
179:9

**searched**
100:5

**secondary**
132:22 157:3

**seconds**
28:17 79:25 80:3
106:15,19 122:24,25
124:8,15 133:25
139:9,14,19 143:9,14
144:3 158:20,23
170:19,22,23,25 171:2
174:18

**secretary**
71:22

**section**
17:19 41:4 56:6 77:2
169:14

**select**
88:25

**selected**
67:13,23 89:3 101:16

**selection**
59:15

**self-employment**
21:21

**self-inflicted**
31:2

**send**
42:14 71:22

**senior**
92:8 165:3

**separated**
114:7

**sergeant**
19:18,23 20:1,16,17
21:10 23:14 24:18
26:13 27:14,21 53:2
56:7 59:22 63:25
65:19 86:13 89:18,20
90:18,19 91:24 104:25
105:4 109:7,11,13,14,
15,16,21 110:11
134:11,12 135:1,23
166:2 169:15,21,22
170:18

**sergeants**
18:10 52:22 71:24
166:3

**serve**
68:1 77:18 90:13
92:25 121:5 165:20

**served**
73:4

**service**
119:12

**serving**
67:9

**set**
41:13 80:2

**settled**
29:25

**seven-hour**
130:11

**Seventh**
4:7

**severely**
25:8

**severity**
68:24,25 79:9 111:24
117:20 150:17

**shaded**
47:19,20,22

**shadow**
141:24

**shadows**
151:21

**shake**
8:5

**she'll**
7:10

**sheet**
91:15

**sheetrock**
114:6,7

**shield**
101:4 123:14 160:18

**shielded**
134:16,17

**shields**
117:5 123:7

**shift**
14:13 86:17 128:10

**shifts**
18:4

**shined**
66:11

**shock**
39:14 41:14 125:17

**Shok**
101:14 125:15,16,18,



James Bertuccini                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22 136:2 138:11 139:4
165:2

**shoot**
159:24 160:15,23
161:2 172:12

**shooter**
22:9 182:15

**shooters**
172:2

**shooting**
66:11 70:7,23 73:1,21
79:16 87:12 89:6
159:1 160:13 161:11,
20 162:7 163:2 165:14
175:4 179:7 180:17

**short**
15:20,22 26:3,16,18,
21 27:8,13,17,24 28:3,
4,6,9 81:5 82:24
170:11 172:18

**shorter**
128:25

**shortly**
178:25 179:24

**shot**
30:25 40:7 123:12,18
159:17 160:7,13
161:15 163:11,17
164:1,23 171:22 173:8
175:13,23 182:24

**shots**
161:5,7 164:8

**show**
34:16 40:10,23 117:3
119:22

**showed**
92:13

**shows**
16:16 41:4

**Shumpert**
97:25 112:9

**shut**
111:8

**sic**
48:4 86:13 91:1

**side**
8:6 21:16 46:13,21
54:10 103:14 140:8,
11,18 141:6,19 145:8
148:9,17,19 151:20

**signatures**
84:15,19

**signed**
165:24

**signs**
96:25 103:8,9

**silent**
179:12

**silver**
19:3,8,10

**similar**
35:9 152:22 157:21
160:4

**simple**
135:12

**simpler**
33:25

**simply**
117:24 172:24

**simultaneously**
90:14 108:19 156:24

**Singh**
29:16

**single**
44:8 91:7

**sir**
5:7,15,20,25 6:11,14
7:2,6,22 8:20 9:21,24
10:2,19,24 11:3,6,11,
13,17,23 12:7,10,13
13:2,4,8,11,13,25
14:3,9,12,16,21,24
15:24 16:3,6,9,11,22,
24 17:17 18:15 20:3
21:18 23:6,9,12 24:13
25:4,10,13,17,23 26:6

30:12,21 31:12,19,23
32:7,13,17,21 33:8,12
34:4,7 35:4,11 37:8,21
42:21 44:7 47:12,15,
20 48:7 49:15,18,21,
24 54:24 56:16 57:2
58:2 60:12 63:9 64:9,
19 65:13,21 67:11,16
68:14 73:11 74:18
78:24 85:1,15,17
86:14 87:7,14,17,20
89:20 90:21 92:2,22
94:22 102:14 103:1
106:20,23 108:4,7,9
109:10,25 110:5
112:15,18 114:4,15
115:2 120:6 122:6,11
124:23 125:16,25
126:14,15 127:2 128:7
129:17 130:19 131:5
132:3,6,8,11,13,18
133:4,7 134:7,12
137:13 138:14 139:23
140:5 142:24 143:17
144:15 145:17,22
146:10 150:15 152:2,
21 155:24 156:19
158:18 159:25 160:13
161:3,10,24 162:8,11,
17,19,23 163:1,6,20
164:5 166:4,23 167:4,
13 168:5 174:11
175:2,5,11,20 176:7,
21 178:2,6 182:1,5,7
183:11

**sit**
11:7 12:5 89:25

**site**
20:1

**sitting**
29:22 143:4 146:2
180:23

**situation**
46:17 66:3 104:13
114:12 117:19 126:22
135:22 161:18 173:6
176:1

**situations**
47:2

**size**
152:23

**skimmed**
87:7

**slang**
8:6

**sleep**
174:19,20

**sleeping**
122:14 146:2,5 163:8
166:12 171:4

**slightly**
138:18

**slow**
74:7 165:15

**slowing**
113:12

**slowly**
74:5

**small**
96:10 97:16,19
100:12,14 113:23
152:19

**smaller**
61:24

**sofa**
148:17

**soft**
145:2 156:2,14

**solar**
140:7,11,13,25 143:7,
17

**solely**
152:4

**solid**
119:21

**son**
6:7 175:25

**SOP**

Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 79 of 85

James Bertuccini    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

105:14

**SOPS**
45:15

**sort**
10:6 15:25 22:8,17
37:23 39:21 44:14
49:8 54:22 55:3 56:4
133:17 138:15 168:17

**sought**
23:13 152:19

**sound**
41:8 44:14 48:2 62:7
159:1 160:4 166:17

**sounding**
172:18

**sounds**
44:10,17 157:21
158:17 159:1 160:2
163:16,18 167:10

**source**
182:18

**south**
4:7 73:10 88:19 96:2
111:2

**space**
80:14 111:12

**spacing**
115:24

**speak**
8:14 11:19 49:25
169:18 179:17

**speaking**
8:15 42:18 51:6,13
145:19 170:13

**specialist**
101:3,4

**specific**
74:17 76:1 98:6
101:13 102:23

**specifically**
11:5 19:14 26:1 63:10
64:23 67:13 72:9
76:22 78:22 100:21

101:16,23 106:7

**specifications**
40:17 41:7

**speculate**
116:8

**speed**
61:14,23 107:9,12,16,
18

**spell**
5:8 19:24 20:14

**spoke**
89:23 168:16

**spot**
38:17

**spots**
77:1,2 165:18

**squad**
53:20

**stack**
92:13,16,18

**stand**
26:21,25 27:5,10 29:8
85:4 171:17

**standard**
26:20,24 49:9,11
80:21 82:7 129:2
135:8

**Standards**
81:15

**standing**
148:16 157:1

**stands**
18:14 38:23

**start**
60:16,25 74:3 102:19
105:15 108:15,21
125:12 128:14 129:24
130:16 164:14 171:12

**started**
32:19 56:13 62:25
86:18 89:12 92:7
128:15,16 139:2

174:15

**starting**
170:19

**starts**
79:16 130:14

**state**
4:16 5:7 9:6 13:5,17
31:14 77:3,17 81:14
112:20,21 137:3
139:13 150:19 171:4

**stated**
9:5 74:21 102:4 126:5
160:1 170:16

**statement**
25:22 58:24 77:20,21,
23 144:11 153:10
160:1 162:18,19
180:16,18,19,21,22
181:8,9,19,21,22,23,
24

**statements**
11:15 181:10

**states**
4:12 77:4 78:25
148:21 149:11,12
150:2,9,15 155:6
170:19

**stating**
75:7 136:7

**station**
111:1,3 116:1,21

**statute**
77:17

**statutes**
77:17

**stay**
165:16

**stays**
37:7,8

**steel**
39:9

**step**
46:16 125:12

**stepped**
160:18

**stick**
33:10,15 34:3 35:6,9
37:6 38:7 40:20 42:4,
21,23,25 43:8 44:1
45:16,17 49:9 52:18
53:22 54:4,13 62:21
88:7,10,12 92:17
100:17,21 101:3,10,
14,16,20 102:5,10
103:4,21 104:11,18,20
106:6,10 108:2,11,18
109:3,5 116:10 124:20
127:6 133:3 139:24
141:14,18,23 143:9
144:17 145:15 147:12,
23 148:21,24,25
149:19 150:23 151:4,
16,25 152:13 153:18
154:1,2 155:2,7,15
156:5,20 161:8
167:10,15 170:21
173:18,20 176:10

**sticker**
185:17

**sticks**
149:9,12

**stood**
46:20

**stop**
5:24 74:2 75:10 103:4,
5,16 121:11,13 122:1
130:17 131:1 133:17,
23 139:11 157:8,9
159:22

**stopped**
133:24 134:1 139:14,
18 144:2

**stops**
52:8

**street**
4:7 111:10 116:23
143:1

**strike**



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

36:9 37:3 39:17 96:17, 19 145:2 156:2,14

**strong**
177:10

**struck**
159:20 176:2

**structure**
17:23 45:12 52:25 54:14 60:19 61:13,19, 25 73:19 74:1,5 77:18 78:2 90:15 91:4 98:23 110:17 111:18 160:5

**stucco**
159:19

**study**
14:5,23

**stuff**
57:9,12 58:7,13 59:21 66:18 69:1 71:6 72:14 78:14 80:8 84:15,17, 19 98:5 119:16 133:15 168:14,23 169:18 177:7

**stun**
33:10,14 34:3 35:6,9 37:6 38:7 40:20 42:4, 21,23,25 43:8 44:1 45:16,17 49:9 52:17 53:22 54:4,12 62:21 88:7,10,12 92:16 100:17,21 101:3,10, 14,16,20 102:5,9 103:4,21 104:10,18,20 105:23 106:5,10 108:2,11,14,15,18 109:3,5 116:10 124:20 126:7 127:6 133:3 139:24 141:14,18,23 143:9 144:17 145:15 147:12,23 148:21,23, 24 149:9,12,19 150:23 151:4,7,16,25 152:13 153:18 154:1,2 155:2, 7,15,17 156:5,20 161:8 167:10,14,15 170:20 171:13 173:18,

19 176:10

**stuns**
107:20

**subjects**
118:1

**submit**
24:15

**submitted**
84:13 91:10

**substance**
10:19

**substantive**
7:15 12:24

**succumbed**
31:5

**sudden**
73:4

**sued**
11:21 29:17 30:5,9 31:7 32:16

**sufficient**
171:17

**suggestions**
127:1

**suicidal**
172:24,25 174:8

**suicide**
30:25 173:5,11

**suing**
30:22

**suits**
31:17

**summarized**
96:5

**Sunday**
18:7

**superstar**
101:10

**supervisor**
19:22 23:16

**support**
56:6

**supposed**
9:13 108:19 149:8 153:22 156:22,24

**surprise**
61:14,23 107:9,12,16, 19 120:23

**surprised**
168:9,12

**surprising**
121:2

**surround**
60:14,18,19,22 61:5 110:3,5,14,19,22 111:16 112:23 113:4 114:5 115:11 117:6, 18,23 118:4 119:1 126:2 155:12,18

**surrounded**
172:7

**surrounding**
79:18 90:6 102:18

**surveillance**
96:6,21 97:5,9,10,11, 12 119:15 177:2,7

**suspect**
66:1 68:8,22 69:24 72:14,18,24 73:7,9 93:13 98:16 112:2 114:13 118:25 162:15 164:17

**suspect's**
79:8

**suspects**
61:15 88:3 91:12 93:10,16,19 99:4 111:23 149:21,22 161:15,22

**suspended**
23:18,23

**suspension**
24:6 25:11

**suspensions**
24:3

**sustained**
26:7 182:20

**SWAT**
5:13 6:6 16:9,18 17:19,23 18:20 19:15, 17 20:7,9 22:9 25:7,9, 15 33:14,23 42:19 49:19 53:21 54:20 55:4,5,17,22,25 56:8, 10,12 57:17,22,24,25 58:3,5,9,10,15,20 59:4,6,7,13,14,17,18, 23 60:3,7,10,24 62:10 63:2 64:14,17 65:15, 16 66:25 68:11 69:11, 12 71:17 73:12 74:8, 12 75:1,24 76:2 79:23 83:10,14 85:7 86:17 87:23 88:16 90:24 92:23 95:20,23 110:2 115:16 118:5,6,21 123:15 127:23 128:2 147:23 148:20 149:7, 11 150:7 158:9 163:4 165:21 175:18 176:23 177:22 182:8,12 184:5

**SWAT's**
63:20

**swear**
4:23

**sworn**
5:2

**system**
33:24

**systems**
66:2

---

**T**

**tactic**
55:8 61:8,13 63:15 115:19 118:3

**tactical**



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

22:20 35:7 54:1,9
55:16 60:20 73:13,15,
17,23 74:12,16,19,25
83:7 87:5,23 88:5,16
89:12 90:2,3,7,25
95:17 100:19 101:18
104:22 105:11 106:14
109:16,22 112:1
115:22 120:7 127:1
128:13,17,21 129:4,
11,12 132:4,15,16
133:11 136:3 138:7
140:22 152:12 154:3
158:5,6,13 164:4,7,12
165:11,12 172:7
179:10

**tactics**
60:12 61:17 71:2
119:23 150:16,17
152:11

**takeaways**
177:7

**takes**
18:6 95:2

**taking**
7:7 94:20,23 163:4

**talk**
13:9,14 17:22 19:14
27:15 42:23 50:2
51:22 54:19 55:11
62:9 74:23 75:1 83:2,6
89:25 91:6 125:6
127:22 130:7 154:14,
15 172:4 175:3
179:20,25 180:10

**talked**
22:19 60:10 135:23
138:15 168:23 169:1

**talking**
24:18 38:4 49:4 58:12,
13,14 59:2 63:8,10
71:19 84:4 92:7,8
97:12 106:18 109:8,11
113:10 146:24 154:19
168:13 170:17

**talks**

46:3

**target**
44:3 97:7 126:10
152:14

**taser**
132:7

**Taylor**
66:5,8

**team**
17:20 18:3,5,8,10,12,
14 19:5,7 20:4,19,20,
24,25 21:4 44:2 49:19
52:20,21,22,23 54:9,
11,17 59:18 74:8,13
86:10 87:8 89:23 90:8
91:1 104:21 106:13
110:2 165:3,21 178:7
184:5

**team's**
83:20

**teams**
17:23,25 18:1,20
95:23 179:10

**teams'**
18:9

**Tech**
37:4 38:19 39:1 40:3,
17 41:18 46:3

**technique**
115:12 117:17

**technology**
36:18 38:23 40:24

**techs**
166:8

**telling**
41:17 149:13

**Temporarily**
46:9

**ten**
84:4

**ten-hour**
84:6

**ten-second**
83:4

**tendencies**
66:1 68:23,24 111:23
149:22

**term**
18:13 20:7,8 33:11
38:19 39:1 130:6
132:14

**terminology**
38:5 63:16

**terms**
8:6 41:7 48:2 56:23
73:12 79:25 124:7
148:10 158:20

**tested**
23:7 33:22 59:14

**testified**
5:3 12:9 32:2,14 99:22
173:16

**testify**
10:17,23 11:22 32:12
33:6

**testifying**
12:20

**testimony**
6:10,12 7:4,13,16
31:25 107:8 117:23
148:5

**testing**
15:5

**theory**
155:25

**thing**
7:19 40:8 45:9 52:1
55:7 59:7 113:11
122:18 125:6 135:2,4
137:19 140:13 141:7
149:15,16 152:9
154:15 166:7 172:9,10

**things**
46:10 55:17 69:2 74:7
78:15 79:6,10 92:9
115:17 118:5 119:13,

17,18 120:19 123:17
124:12 140:9 141:23
165:15 169:4,7 177:8
179:8 184:14

**thinks**
9:5

**Thomas**
46:4

**Thompson**
20:17

**thought**
21:19 44:22 59:2
68:23 111:15 127:6
159:5

**thoughts**
92:11

**thousands**
74:14

**threat**
164:17,18

**thrown**
42:16

**thumb**
79:1,24

**tight**
116:18 131:21

**time**
4:6 6:16,20 8:14,18
11:1 15:7 17:8 18:11
19:4,5,15,23 22:1
23:21 24:3 25:23 27:4
28:9,12 29:9,10 32:1
33:18 51:7 56:14,16
57:19,20 61:5 62:7
64:3 67:12,19,23 69:9,
18 72:5,13,21,24 73:6
74:15 75:5,15,16 76:9
78:4,16,17 79:1,7,11,
20 80:2,22 81:4,25
82:10,16 83:9 84:7,24
85:7 86:8 88:14 89:23
93:13 98:22 99:10
102:3,6 106:15,24
107:5,14 108:17 109:1



Case 2:24-cv-00074-APG-NJK    Document 57-4    Filed 05/16/25    Page 82 of 85

James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

112:13 113:16,18,21
115:19,22 117:3 118:9
119:14,16 120:11,19
121:4 122:3,14,21
124:13,14 128:9,14,24
129:25 130:3,6,9,12,
13 131:25 133:6
134:1,6 136:11 139:20
140:20 143:6 144:5,9,
10 145:2,3 156:18,22
158:19 160:11 163:21
166:1,11,20 168:19
171:3,8,14,16 173:18
177:3 178:14,17
179:19 181:17,19
184:13 185:22

**times**
23:22,25 32:2 34:8
39:8 74:17 102:9
115:6 123:12,18
137:13 156:12 160:22
172:19

**timing**
106:19

**tint**
47:25

**title**
17:18 20:22 55:7

**today**
7:1,4,8,19,24 9:23
10:23 64:7 118:6,16,
21,23 119:9 178:13

**today's**
4:5 8:2,12,21 11:5

**toilet**
153:4

**told**
44:19 91:23 92:5,24
93:4 99:9,14 104:24
109:6 112:1 123:25
127:7 131:10,11
135:25 143:1 154:5
162:2

**tomorrow**
59:7

**tool**
33:10 38:15 43:2,3
154:7

**tools**
149:14

**top**
35:19 36:2 76:13
116:8 169:8 180:25

**topic**
124:4,5,7,20

**touched**
119:14

**touching**
46:19

**tough**
113:5 137:18

**town**
88:17,21 169:3,10

**toys**
96:25 141:25

**Tracy**
4:15

**trade**
24:4

**train**
75:22 182:14

**trained**
33:18,20 34:12 69:13
76:14 77:22 78:23
156:8 158:9

**training**
16:1 18:9 21:21 22:8,
10 33:16,17 46:7 47:3
48:12 54:20,22 55:3,
16,22 56:2,6,9 57:8,
10,14,16 58:4,6,9,20,
22 59:11,17,20,23
60:3,7,10 71:5 73:13
75:2,19 76:2,22 77:2
81:15

**transcript**
7:11,12 8:10 12:11
25:22 184:19 185:3

**translated**
130:13

**treat**
12:19

**trial**
7:5 32:11

**trigger**
36:6 37:5 144:22

**Troy**
56:19

**truck**
38:13 39:23 88:13,14
95:2 129:14,15 131:9,
11,20

**true**
9:15

**trust**
181:7 185:10

**truth**
6:25

**tube**
38:12 39:14,15 41:14

**tunneled**
114:6

**turn**
46:13

**turned**
91:5 162:14

**TV**
9:1 145:12

**type**
34:3 35:9,14 40:19
41:9 44:5 60:6 73:20
79:23 96:25 100:11
103:9 115:22 116:20
117:7 121:11 125:10
132:19 141:4 145:7
154:4,25 175:6

**types**
42:19 71:13

**typical**
101:1

**typographical**
7:17

---

**U**

**uh-huh**
8:6 49:7 141:24
144:18 150:13 158:1

**uh-uh**
8:7

**ultimate**
69:4

**ultimately**
53:6,8 85:9

**undergo**
54:21 55:23 58:9

**undergone**
59:17 60:2

**underlying**
73:9 88:20 89:8
146:13

**underneath**
31:1,3

**understand**
6:8 7:1,5,20,24 9:20
12:25 13:2 51:8,17
52:13 119:4 120:4,6,
21 123:14,15 134:3
154:21 159:6,8
172:14,17

**understanding**
64:6 68:15 69:17
97:15 98:14 115:3
130:11 151:9 176:5

**understands**
173:6

**understood**
110:18 111:15 120:14
172:17

**unfortunate**
175:24

**union**
180:6



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**unit**
5:14 56:21 78:15

**United**
4:12

**units**
177:6

**university**
14:9,15,18 15:12

**unknown**
96:8,9 97:16

**UNLV**
15:14,15

**unrelated**
23:2 146:12

**unsafe**
39:9

**unusual**
12:19 96:18

**update**
71:22,23

**updates**
71:25

**upheld**
26:7

**utilization**
148:23

**utilize**
27:18 38:15 43:1,3,22
61:14 62:4 64:3 68:10
69:5 101:14 113:6
117:7 125:12 135:20
138:13 149:14,18,24
151:6 152:11,12
154:2,5 155:2,9 157:7

**utilized**
26:14 34:14 39:24
40:7 43:1,7 54:4 67:19
68:19 69:20 118:3
119:21 157:5

**utilizing**
36:20 51:3 54:12
61:10 64:2 107:20
111:16 155:15 177:5

**― V ―**

**vacant**
115:4,5

**vacation**
24:3

**vantage**
134:20

**variation**
33:23

**varies**
134:2

**variety**
73:17

**Vegas**
4:7,10 5:14 6:5 13:6,7,
10,18 14:14 16:16
17:9,15 23:19 30:7
75:22 95:22 180:13
182:3

**vehicle**
57:14 115:21 116:23
131:12 133:3

**vehicles**
60:20 61:20 110:24
113:5 116:20 131:22

**velocity**
159:20

**verbal**
8:3 60:25 105:1
106:11 154:11

**verbalize**
105:16,18 107:3
155:10,17,20 156:16

**verbally**
181:24

**verbatim**
92:4

**versus**
4:10 76:15 111:16
183:13

**vest**
132:12,15,16 133:11

**vicinity**
45:19,22

**video**
4:6 95:10,19 127:24
129:18,23 130:14,20
131:4,7 133:1,16,21,
23,24 134:2,4 139:8,
15,16,21 143:19,24
144:2,6,16 171:16
184:24

**video-recorded**
185:20

**videoed**
185:7

**view**
139:10

**violate**
5:18

**violated**
26:3,12 27:24 28:12

**violating**
5:22 120:2

**violation**
29:18

**violent**
61:15 66:1 68:23,24
111:23 149:22,23

**visibility**
151:23

**visibly**
150:11,22,24 151:2,3,
18

**vision**
47:6 166:25 173:17

**voice**
134:10 164:9 165:8

**voluntarily**
17:10

**volunteer**
86:7

**volunteered**
83:23

**volunteers**
83:25

**― W ―**

**W-A-R-N-E-R**
92:1

**W-E-R-N-E-R**
92:2

**wait**
34:21 42:1 65:2 79:8,
21 80:22 107:4 122:22
124:9 150:3

**waited**
78:3

**waiting**
123:1

**waive**
185:4,11,12

**wake**
120:19 166:18

**waking**
102:20 128:8

**walked**
134:14

**walking**
104:6

**wall**
37:23 116:25 148:17
159:20

**wanted**
16:14,17,21,23 23:16
29:9 67:17 89:25
92:13 93:11 105:3
114:13 117:6 119:6
120:15 124:8 130:21
131:21 165:18

**wanting**
59:3 121:25

**warehouse**
114:2,3



James Bertuccini          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**warrant**
20:9,10 21:5,7 60:14
62:4,8,10,11,25 64:8
67:13 68:18 69:8,19
71:12 75:9 77:5,19
78:2 83:13,16 86:11
87:16,19 89:9,11
91:10 92:25 93:2,8,9,
13 98:15 99:15 102:1,
4 103:20 104:1 105:8,
10,13,23 107:23 115:7
118:8,23 121:6,19
122:8,11,13 126:15
146:13 149:3,5,6
152:19 154:17,18
162:22,25 165:21,22
171:7 172:19 174:5
176:6

**warrants**
64:22 65:14,16,24
66:12 67:9 68:1 70:11
73:4 83:14 84:24
90:13 119:12 149:14
178:9 179:10

**Warren**
90:9 91:1,24

**watch**
142:14 162:13

**watched**
16:16 172:1

**Wattsel**
73:9 93:16 112:10
162:15

**wave**
43:12

**ways**
39:4,5 43:1 80:17
115:17 118:5

**weapon**
44:14 66:2 97:19
152:18,23 153:15
159:2 160:11,19

**weapons**
68:22 79:9 91:11 93:7
111:24 118:2 149:21

150:18 152:15 154:25

**wear**
48:5 49:1,10 123:16

**wearing**
47:13,16 48:9 50:15
112:2 123:6 132:1,3,
12

**website**
35:7 40:17 41:18

**Wednesday**
18:4,7,8

**week**
12:5 18:3 56:13 85:24
86:4 179:24

**weeks**
17:12 56:24 57:5,7
112:21 115:8

**well-known**
158:14

**Werner**
21:9 53:2 90:9,20
91:5,25 92:1,5,6 99:18
100:18,22 104:24
109:8,16 110:9,10
127:21 131:11 136:9
164:10

**western**
170:21

**wheelchair**
97:4

**white**
91:18

**wide**
111:11 120:20

**willfully**
78:6 121:14

**Williams**
6:7 25:1 35:1 50:10,13
64:16 69:15 70:7
78:20 80:11 85:10
119:8 148:7 151:24
159:23 160:16,23
161:2,4,6,12 162:25

163:10,15,18 166:12
171:3 172:5,24 173:13
175:7,23 177:23

**Williams'**
64:23 70:22 73:1
158:25 166:25 179:7

**willingly**
120:12

**Wilson**
56:20 76:15

**window**
36:1 43:2,5,8,24 44:1
46:21 54:13 62:21
102:10 105:24 106:1,4
108:1 126:7,9,13
127:9 133:20 139:9,
10,22 140:3,4,10,15,
25 141:5,8,13,17
142:3 144:21,24
145:14,20,21,23 146:7
147:7,13,18 148:3
150:24 151:2,6,12,17,
22 154:8 157:2,3,6
159:13,15 160:12,20
164:15 166:12,17,18
170:21 171:10

**windows**
113:25

**witnesses**
12:18

**woman**
6:3 25:7

**woman's**
26:12

**women**
146:12

**wood**
135:12 136:6

**word**
38:3

**words**
124:18 147:15 149:6
163:16

**work**
8:23,24 18:7 21:16
22:2,8,17 24:16 54:22
86:16,17 101:8 108:16
115:18 126:7 129:14
139:2 154:13 182:6
183:8,14,17

**worked**
183:9

**working**
80:14 127:10

**works**
36:12

**world**
70:10

**wound**
31:2

**wrap**
134:21,23 135:1,9
136:11,14 137:5,10,
18,22 138:21 177:16

**wrapped**
143:17

**wraps**
135:10 137:14

**writing**
181:24

**written**
64:20

**wrong**
56:21 80:18 130:14

**wrote**
107:7

**wrought**
111:13

---

**Y**

---

**yards**
116:6

**year**
13:15 25:6 34:6,7
64:12 70:5 178:21



James Bertuccini                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**years**
  14:17 15:15 17:3,4
  20:25 24:24 25:24,25
  30:19 32:24 55:6 63:2,
  19 65:22 67:5 70:5
  72:20 74:13 78:15
  99:24 128:18 144:12,
  14 169:5 174:7 183:9

**yell**
  155:8 156:8

**yelled**
  156:12

**yelling**
  155:13 164:4,7,25
  165:5

**yells**
  164:25

**yesterday**
  11:9 144:8,9,13 168:2,
  3,6 178:18

**young**
  174:6 175:13

---

**Z**

**Zebra**
  21:25

**Zoom**
  76:5

**Zulu**
  130:3,6

