# Exhibit 6

# Exhibit 6

Case 2:24-cv-00074-APG-NJK    Document 57-7    Filed 05/16/25    Page 2 of 158

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1                   UNITED STATES DISTRICT COURT

2                        DISTRICT OF NEVADA

3    LATIA ALEXANDER,              )
     individually as heir of       )
4    ISAIAH T. WILLIAMS and in     )
     her capacity as Special       )   Case No.
5    Administrator of the          )   2:24-cv-00074-
     Estate of ISAIAH T.           )   APG-NJK
6    WILLIAMS,                      )
                                    )
7                        Plaintiff, )
                                    )
8    vs.                            )
                                    )
9    LAS VEGAS METROPOLITAN         )
     POLICE DEPARTMENT, a           )
10   political subdivision of       )
     the State of Nevada; KERRY     )
11   KUBLA, in his individual       )
     capacity; BRICE CLEMENTS,      )
12   in his individual              )
     capacity; ALEX GONZALES,       )
13   in his individual              )
     capacity; RUSSELL BACKMAN,     )
14   in his individual              )
     capacity; JAMES                )
15   ROTHENBURG, in his             )
     individual capacity; JAMES     )
16   BERTUCCINI, in his             )
     individual capacity;           )
17   MELANIE O'DANIEL, in her       )
     individual capacity; DOES      )
18   I-XX, inclusive,               )
                                    )
19                       Defendants. )
     _____ )
20

21           VIDEOTAPED DEPOSITION OF MELANIE O'DANIEL

             Taken on Tuesday, December 17, 2024
22     By a Certified Court Reporter and Legal Videographer
                        At 10:26 a.m.
23           At 400 South Seventh Street, Suite 400
                    Las Vegas, Nevada 89101
24

     Reported by:  Sarah Safier, CCR No. 808
25   Job No. 58707, Firm No. 116F

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
                                                        Page  2
 1    APPEARANCES:

 2    For the Plaintiff:

 3            CORRINE P. MURPHY, ESQ.
              Murphy's Law, PC
 4            2620 Regatta Drive
              Suite 102
 5            Las Vegas, Nevada 89128

 6    For the Defendants:

 7            CRAIG R. ANDERSON, ESQ.
              Marquis Aurbach
 8            10001 Park Run Drive
              Las Vegas, Nevada 89145
 9
      Also Present:
10
              GIANA CAMACHO, Videographer
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 3

1                    I N D E X

2   WITNESS                                    PAGE

3   MELANIE O'DANIEL

4      Examination by Ms. Murphy                  5

5

6

7

8                  E X H I B I T S

9   NUMBER              DESCRIPTION            PAGE

10  Plaintiff's

11    1 - Notice of Deposition                   6

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 4

```
 1              P R O C E E D I N G S
 2          THE VIDEOGRAPHER:  Today is December 17,
 3     2024.  The time is approximately 10:26 a.m.
 4          Your court reporter is Sarah Safier and I am
 5     your videographer, Giana Camacho.  We are here on
 6     behalf of Lexitas.
 7          The witness today is Melanie O'Daniel and we
 8     are here in the case of Latia Alexander, et al.,
 9     versus Las Vegas Metropolitan Police Department, et
10     al.
11          Will counsel state your appearances and the
12     court reporter will administer the oath.
13          MS. MURPHY:  Corrine Murphy, Bar No. 10410
14     on behalf of Plaintiff.
15          MR. ANDERSON:  Craig Anderson on behalf of
16     the Defendants.
17                    MELANIE O'DANIEL
18           having been first duly sworn, was
19            examined and testified as follows:
20          MS. MURPHY:  Let the record reflect this is
21     the time and place of the deposition of Melanie
22     O'Daniel in the matter of Latia Alexander, et al.,
23     versus Las Vegas Metropolitan Police, et al., Case
24     No. 2:24-cv-00074.
25                ///
```

LEXITAS™

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 5

```
 1                     EXAMINATION
 2   BY MS. MURPHY:
 3       Q    Ms. O'Daniel, my name is Corrine Murphy and
 4   I'm an attorney.  I represent the plaintiff, Latia
 5   Alexander, in this case.
 6            Could you please state and spell your full
 7   name for the record.
 8       A    Melanie O'Daniel.  M-E-L-A-N-I-E, O,
 9   apostrophe, D-A-N-I-E-L.
10       Q    And would you prefer that I call you
11   Melanie, Ms. O'Daniel, or Sergeant O'Daniel -- it's
12   sergeant, correct?
13       A    Lieutenant.
14       Q    Lieutenant, sorry, sorry, sorry.
15       A    Melanie is fine.
16       Q    Okay.  And Melanie, you understand that
17   you've been noticed to be here today, correct?
18       A    Yes.
19       Q    And you had an opportunity to review that
20   notice and that you understand that you are here
21   today to discuss the shooting of Isaiah Williams?
22       A    Yes.
23       Q    Okay.
24            MS. O'DANIEL:  And Madam Court Reporter, I
25   don't have it with me, but I will e-mail it to you
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 6

```
 1   later.  I would like to attach the notice of

 2   deposition as Exhibit 1.

 3              (Plaintiff's Exhibit 1 was deemed

 4              marked for identification.)

 5   BY MS. MURPHY:

 6       Q    Have you ever given a deposition before?

 7       A    Yes.

 8       Q    Which other cases have you given a

 9   deposition in?

10              MR. ANDERSON:  Jasmine King.

11              THE WITNESS:  Jasmine King.

12              MR. ANDERSON:  Is that the only one?

13              THE WITNESS:  Yes.

14              MR. ANDERSON:  Okay.

15   BY MS. MURPHY:

16       Q    And I noticed in your answers to

17   interrogatories you had identified two other cases

18   that you were involved in.

19              MR. ANDERSON:  They're the same case.

20   BY MS. MURPHY:

21       Q    Okay.  Well, one was -- one was, I think,

22   settled and one was dismissed, correct?

23              MR. ANDERSON:  What were they?

24              MS. MURPHY:  Hold on.  Let me look.

25              MR. ANDERSON:  One was King.
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 7

1    BY MS. MURPHY:

2        Q    One was Cottle versus Gillespie, and you

3    said you got a summary judgment in your favor; and

4    the other one was King versus Ubbens.

5        A    Yeah, I did not give a deposition in that.

6        Q    Okay.  Can you please tell me what the --

7    well, the -- so the King versus Ubbens, I'm assuming

8    that's Jasmine King versus Ubbens, and that one was

9    settled, correct?

10       A    Yes.

11       Q    Okay.  Can you just kind of walk me through

12   just the basic facts of the King versus Ubbens case?

13       A    We served a warrant for -- and, again, I've

14   been retired for a couple of years, so it's not top

15   of the mind -- but essentially her boyfriend at the

16   time, I believe -- I could be wrong -- but we were

17   serving a warrant for a kidnapping, sexual assault,

18   you know, holding her for several days, and -- at

19   that residence where we believed him to be.

20           We served the warrant and we did an

21   explosive breach and she, tragically, was at the door

22   looking through the peephole when the breach went, so

23   she was injured and that was what the settlement was

24   for, for her injuries.

25       Q    Okay.  And I understand having read your

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 8

 1    interview that there was a change in policy following

 2    that case as well; is that correct?

 3        A    Not necessarily a change that was written

 4    down; it was more of a verbal to not use explosive

 5    breaches on search warrants more so.  But nothing

 6    physically documented and changed in our SOPs or

 7    policy manual.

 8        Q    Okay.  Given -- how long ago was it that you

 9    gave your deposition?

10        A    I've been retired for two years.  So three,

11    four years ago.

12        Q    Okay.  So I'm just going to run through some

13    basics.  Because that was a little while ago, I'm

14    going to just run through some basic deposition

15    instructions.

16            The biggest thing being the oath that you

17    gave at the beginning of the deposition that the

18    court reporter administered, that's the same oath

19    that you would give if you were in a court of law.

20    It requires you to answer all questions that I ask

21    today truthfully under the penalty of perjury.

22            In other words, was I able to demonstrate

23    that you either lied or misled me on any material

24    fact, it would subject you to the crime of perjury.

25            Do you understand that?

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 9

1      A    Yes.

2      Q    Okay.  And I want to outline in your prior

3  answer what you did correctly and what I'm going to

4  ask you to do for the rest of the day.  Sometimes I

5  may ask you a question that you don't have a complete

6  memory of, but what you need to do is give me your

7  best answer.

8          So, for example, when I asked you about the

9  Jasmine King case, you said, hey, that was a few

10  years ago, I don't remember everything, but let me

11  tell you what I do remember.  So that was the

12  correct, truthful way to answer my question.

13          Is there any reason that you won't be able

14  to continue to do that as we go through the

15  deposition here today?

16      A    No.

17      Q    Okay.  Did you -- a couple other ground

18  rules.

19          The court reporter is taking down everything

20  we say.  For that reason -- and you're already doing

21  a very good job of it -- please let me finish

22  answering [sic] my question and then I will let you,

23  to the best of my ability, answer your question.

24          If, for any reason, I'm accidentally

25  interrupted or you had more to say, please stop me

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 10

1    and say, I'm not finished answering my question,

2    okay?

3        A    Yes.

4        Q    Your attorney may raise some objections

5    during the deposition.  Unless your attorney

6    specifically instructs you not to answer, please let

7    Craig state his objection for the record and then

8    answer the question.

9        A    (Witness nods head.)

10       Q    Are you under any medications that would

11   prevent you from giving your best and most accurate

12   testimony here today?

13       A    No.

14       Q    And I will tell you because I had this

15   happen in a case before:  Have you had any personal

16   issues that have arisen in the last few days that

17   would prevent you from giving your best and most

18   accurate testimony today?

19       A    No.

20       Q    I ask that because I had another case where

21   two weeks later he said I got served with divorce

22   papers that morning, you can't rely on any of my

23   testimony.

24            Okay.  And I'm going to ask you some

25   questions about what you did to prepare for today's

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 11

1    deposition and I'm entitled to facts such as whether

2    or not you met with Craig, how long you met with

3    Craig, what documents you reviewed; but I'm not

4    entitled to know about what you and Craig discussed.

5    That falls under the auspices of attorney-client

6    privilege; and when I ask any questions about any

7    preparation you did, I don't want you to tell me

8    about what you and Craig talked about specifically.

9         A    Okay.

10        Q    Do you understand the distinction between --

11   I'm going to ask you, hey, did you look at any

12   documents and that's a fact and you can tell me what

13   documents you looked at, but I don't want you to tell

14   me, and then Craig told me X, Y, and Z.

15             Do you understand the distinction?

16        A    I do.

17        Q    Excellent.  So I'm going to ask you, then,

18   can you please tell me what you did to prepare for

19   today's deposition?

20        A    I reviewed documents -- I met with Craig

21   twice -- in the initial meeting that a deposition was

22   going to transpire.  And then as we got closer, we

23   met yesterday again, too.

24             So I received documentation on -- I was

25   given my CERT interview transcriptions, two of them,



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 12

1    when I was a witness employee and then the subject

2    employee.  I was given the CERT report, which I

3    believe is like 225 pages and I was given the IAP,

4    the four versions of the IAP.

5        Q    Okay.  Did you review -- you had answered

6    some written questions like answers to

7    interrogatories and requests for production.

8             Did you go over those at all?

9        A    Yes.

10       Q    And how long did you meet with Craig for

11   yesterday?

12       A    40 minutes.

13       Q    Okay.  Have you reviewed any of the other

14   deposition transcripts of any of the other parties

15   that have been taken in this case?

16       A    No.

17       Q    Okay.  Have you reviewed the witness

18   statements or interviews done by any of the other

19   officers involved in this case?

20       A    No.

21       Q    Okay.  Did you bring any documents that you

22   reviewed with you here today?

23       A    No.

24       Q    Okay.  Have you discussed your deposition

25   with any of the codefendants?



Page 13

1      A     No.

2      Q     Okay.  And -- okay.  Melanie, I'm going to

3  go over just some basic background questions.  I

4  mean, I understand quite a bit from having reviewed

5  the other interviews in your written discovery, but

6  we're just going to go ahead on the record and make

7  the record here today as well, okay?

8      A     Okay.

9      Q     Are you currently working for Metro?

10     A     No, I'm retired.

11     Q     When did you retire?

12     A     December 2022.

13     Q     So approximately within -- at the end of the

14  year involved in this incident, correct?

15     A     Yeah.  December, like, 30th, I want to say.

16  I don't have the exact date.

17     Q     And I'm going to represent to you that the

18  date of this incident was January 10, 2022.  Is that

19  consistent with your memory?

20     A     Yes.

21     Q     Okay.  And what position did you retire at?

22     A     Lieutenant of SWAT.

23     Q     Okay.  And how long had you held that

24  position for?

25     A     As the primary SWAT tactical commander,

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 14

1    three and a half years.  And then I was the backup

2    SWAT commander for about 19 months.

3        Q    What is the difference -- what are the

4    differences in those two positions?

5        A    Well, you're still taught the job, you go

6    through SWAT school, you still get your credentials,

7    but it's -- I fill in that position when the primary

8    goes on vacation or if he has, you know, hey, I can't

9    make it today, can you cover for me for today for a

10   dentist appointment.

11       Q    And just so I understand, did the backup

12   position come first or after?

13       A    It was first.

14       Q    Okay.

15       A    So you're essentially learning the position

16   and then you -- I became primary.

17       Q    And I'm sorry, how long did you have that

18   backup position for?

19       A    19 months.

20       Q    19 months, okay.  And so that -- okay.  So

21   that's roughly about four or five years.

22            What position did you hold prior to that?

23       A    During that time as a backup, since that

24   wasn't my primary job, I was the Homeland Security

25   Saturation Team lieutenant.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 15

1      Q     What does that mean?

2      A     We handled protests, major events.  Say if

3   there's a UFC match and there might be a threat,

4   we'll send my team down there to handle that.

5            Laughlin River Run, anything that the

6   sheriff deems that we need extra resources.  Mainly

7   it's protests or any -- say you have the -- we do

8   dignitary protection, so if you have the president

9   come in town, vice president, any dignitaries, we

10  also handle that role, so multifunctional.

11     Q     And if I understood some of your interview

12  correctly, there was also a policy change while you

13  were holding that position, correct, about -- was

14  it -- you're nodding your head, so I think you know

15  what I'm talking about.

16     A     I remember reading about it.  I can't

17  remember exactly what the policy change was and then

18  not being -- being retired and not having access to

19  that and then, again, it's two years, I can't

20  remember what that was.  And I don't think I said

21  what it was in my interview.

22     Q     I'll refresh your recollection that my

23  understanding of having read your interview, that it

24  had something to do with doing -- with shooting

25  something into a crowd.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 16

 1      A    Oh, yes, for the protest.  So during the

 2   protest, they were shooting Ferret Rounds, gas, into

 3   the crowd and instead of just indiscriminately

 4   firing, you had to have someone who actually had a

 5   rock or some missile projectile in their hand and you

 6   had to identify that to fire that Ferret Round or

 7   throw the gas.

 8      Q    Okay.  And you've walked through some pretty

 9   specialized positions that you held.  Did you have to

10   do specialized training or certification to hold

11   those positions?  And if the answer is yes, can you

12   walk me through what was for each?

13      A    For SWAT, I had to go through the SWAT

14   school, and I had to essentially go on numerous

15   trainings as I was becoming the backup.  I had to

16   shadow the primary SWAT commander, or SWAT tactical

17   commander, at the time, go on all these events and

18   then eventually, you know, you're kind of shadowed as

19   you take primary over the incident.

20           I went to the National Tactical Officers

21   Association, you know, SWAT leadership.  I don't

22   remember the exact name, but it was a SWAT leadership

23   school for that.

24      Q    How -- sorry, I'm going to interrupt you

25   real fast.  How long was that SWAT leadership school

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 17

1    for?

2        A    A week.

3        Q    Sorry, keep going.

4        A    So about 40 hours.  And then I have attended

5    some other SWAT leadership, kind of to do with the

6    day-to-day, how to do documentation, how to write

7    your SWAT manual.  I received that training a week

8    long as well.

9            And just through those four or five --

10   several, you attend the breacher school.  You know,

11   you don't become breacher certified, but you're

12   witnessing, you're viewing, you're participating and

13   -- all the various techniques of SWAT.

14       Q    And what -- so, sorry, you did or didn't

15   attend breacher school?

16       A    I did not get a certification for breacher

17   school, but I did -- you know, you attend, you watch,

18   you observe.  It wasn't 100 percent, 99 percent

19   attendance.  It was, you know, coming and going, but

20   I have, you know, attended it.

21       Q    Okay.  Can you tell me what breacher school

22   is?

23       A    It's a long process where they learn how to,

24   you know, use forcible entry and use explosive

25   breachings, and the parameters of when you would use

Page 18

```
 1   it, when you would not.  It's very technical.
 2   There's some math involved in it, how to identify
 3   doors and which type of different breaches, how much,
 4   you know, explosives you're going to put on it.  So
 5   it's a very technical school.
 6       Q    And was that school primarily focused on the
 7   actual physical aspects of how to do the breach or
 8   did you guys go over any of -- any constitutional
 9   rules like knock and announce, Fourth Amendment?  Did
10   you guys review any of that stuff?
11       A    Yes.
12       Q    Okay.  So can you tell me what your
13   understanding of knock and announce is?
14       A    Knock and announce is essentially you're
15   there for a legal and lawful warrant and you're
16   announcing your presence, that we're police officers,
17   we have a warrant, you know, we have a right to be
18   here.  And you give the occupants, you know, that
19   time, depending on the situation, every one's --
20   every situation is different, and either come to the
21   door or we make entry into the residence.
22       Q    Okay.  And what is the -- to your
23   understanding, what is the purpose of that rule?
24       A    The purpose of a knock and -- the main
25   purpose is to let them know that this is police, that
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 19

1   we are police, we are here for a legal and lawful
2   search warrant.

3        Q    Why do you have to let them know that?

4        A    We don't want them to think that -- we want
5   them to know, "Hey, we're here, we have a legal right
6   to -- the law states that we are allowed to be here.
7   You can't deny us," so to speak, and say, "Yeah, no,
8   I'm just going to hide and not answer the door" is
9   the main reason.

10       Q    Does it have anything to do with an
11  individual's Fourth Amendment rights?

12       A    Yes, every citizen has the right to an --
13  from unreasonable searches.  And we need a search
14  warrant or there's some exigent circumstances, you
15  know, search incident to arrest, plain view, and
16  there's some others.  I don't have it in front of me,
17  but they -- we need to have a legal and lawful
18  warrant that describes the person or place to be
19  searched and the items to be seized.

20       Q    Okay.  You understand this case concerns
21  allegations of the Fourth Amendment, correct?

22       A    Yes.

23       Q    We will get into the very specifics of the
24  case and all the underlying different issues
25  surrounding what happened here, but as we sit here

Page 20

1    today, is it your opinion -- sorry, your position

2    that the way that this search warrant was

3    administered was in compliance with Mr. Williams'

4    Fourth Amendment rights?

5        A    Yes.

6        Q    Okay.  You believe that the way that the

7    knock and announce was made was in compliance with

8    the Fourth Amendment?

9        A    Yes.

10       Q    You believe that the way the window was

11   broken open with the distract device was in

12   compliance with Mr. Williams' Fourth Amendment

13   rights?

14       A    Yes.

15       Q    As we sit here today, just to -- you believe

16   that the number and the way that the announcements

17   were made was in compliance with Mr. Williams' Fourth

18   Amendment rights?

19       A    Yes.

20       Q    Okay.  And you believe that the way that the

21   door was breached was in compliance with

22   Mr. Williams' Fourth Amendment rights?

23       A    Yes.

24       Q    Okay.  Can you walk me through -- what's the

25   difference between a knock-and-announce and a

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 21

1    no-knock warrant?

2        A    A no-knock warrant is done stealth.  There's

3    no announcement, they're just going in the door, not

4    announcing, "Hey, it's the police, we have a search

5    warrant."  It's quiet and -- up until they do the

6    breach and they just go in and get hands on the

7    subjects.

8        Q    And why would one be used over the other?

9        A    Based on the crime, the violence of the

10   crime.  I know with our agency, we -- we don't do

11   knock -- we have done them in the past.  It's highly

12   discouraged not to do them and I know there was a

13   change later on that we had to go up to get a judge

14   to declare that we could do a no-knock.

15       Q    Okay.  And so just -- I wanted to clarify,

16   when you're saying that they're highly discouraged,

17   you're talking about the no-knock warrants, correct?

18       A    Yes.

19       Q    Okay.  As we sit here today -- oh, sorry,

20   and what is a -- and I keep saying it wrong, I've

21   seen CET, and that's the entirety of it, right?

22   That's controlled entry tactic?

23       A    Yes.

24       Q    But I think there was a little bit of change

25   in nomenclature right at the end, right?

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 22

1      A      Not while I was there.

2      Q      Okay.  So can you please tell me what -- and

3   just for ease of reference, we'll be saying CET for

4   the remainder of the deposition -- what is a CET?

5      A      So a CET is -- there's numerous factors that

6   go into deciding whether to do a CET.  So the threat

7   behind the door, a suspect that may be armed, the

8   suspects inside have violent tendencies, a violent

9   history.

10             We have to have the ability to dominate,

11   which essentially means that we can get in there

12   pretty quick, if it's a one-bedroom apartment, a

13   loft, a two-bedroom apartment.  We couldn't do it on

14   a 3,000 square feet home.  We wouldn't have the

15   ability to dominate and get in there quickly.

16             So those factors are what would authorize a

17   CET.

18      Q      Okay.  Can you tell me -- can you explain to

19   me what a CET is?

20      A      So a CET is essentially the officers are

21   going to have the legal and lawful search warrant.

22   They're going to make announcements that it's the

23   police, search warrant, the address and that.

24   They're going to -- depending on the situation,

25   they're going to have distracts and they're going to

Page 23

```
 1   do a breach.  It could be an explosive breach, it
 2   could be a forcible breach or the citizen could come
 3   to the door, open the door and surrender.
 4          And if that is not the case, then we go
 5   inside and we take people in the custody, clear the
 6   residence, make it safe for the detectives to come
 7   in.
 8     Q    Is there any rule about when distracts can
 9   be used in terms of -- in terms of it overlapping or
10   interrupting the announcement of a police being
11   present?
12     A    No.
13     Q    Why not?
14     A    A lot of times if we have armed and
15   dangerous subjects who want to take up arms, a
16   distract could kind of pull their attention away and
17   it's more disorienting.  So a lot of times they will
18   just -- they'll surrender.  They'll give up.  That
19   loud noise, it startles them or scares them and they
20   will just give up.  They're -- and we can take them
21   into custody.
22     Q    If somebody is disoriented or is startled,
23   how are they able to understand that the police are
24   telling them that they're there under a lawful
25   presence -- of the lawful premise of having a search
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 24

1   warrant?

2        A    Well, again, we reiterate multiple times,

3   you know, police, search warrant, we have a -- you

4   know, make those announcements over and over and

5   over, even when they're entering.

6            So 99 percent of the time, they just

7   surrender, they just freeze what they're doing and we

8   take them into custody.  Or they open the door, come

9   out, have their hands up and it's a peaceful taking

10  into custody.

11       Q    Okay.  My question was a little bit

12  different.  And so you're saying 99 percent of the

13  time.  Is it your position as we sit here today that

14  disorienting somebody doesn't violate their Fourth

15  Amendment rights if it's made in the middle of an

16  announcement?

17       A    No.

18       Q    But the purpose of the distracts is to

19  disorient, correct?

20       A    Yes, to prevent them from taking up arms, to

21  not -- if they're sleeping in bed and they have that

22  gun on that dresser, not to grab it, take up arms,

23  and to surrender.

24       Q    And as we sit here today, obviously that's

25  not what happened in this case, correct?

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 25

1      A     Correct.

2      Q     Why don't you think that it was effective in

3  this case?

4            MR. ANDERSON:  Objection.  Form.

5            Go ahead and answer.

6            THE WITNESS:  Why it wasn't effective?  I

7  think he was lying in wait there on the couch with

8  the gun in hand and he waited until Kubla entered and

9  his intent was to shoot the officers, to kill the

10  officers.  Even after he saw that the police were

11  there, he continued to fire until he was finally

12  deceased and stopped.

13  BY MS. MURPHY:

14     Q     So it's your position that he was lying in

15  wait and that he intended to kill police officers?

16     A     Yes.

17     Q     Okay.  If he is disoriented or confused, how

18  could he formulate that kind of plan that quickly?

19            MR. ANDERSON:  Objection to form.

20            Go ahead.

21            THE WITNESS:  We don't know what he was

22  thinking.  All we know is he was in the corner with

23  the gun.  A plausible explanation, if someone's

24  scared or startled right away, before police even

25  enter, you're going to have rounds being fired.

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 26

1    You're scared, you're just firing.  Those rounds go.

2           He waited for the, you know, 17, 18 seconds

3    before we got in, till he saw Kubla, and then fired

4    those rounds, even when we were still saying,

5    "Police, search warrant, officers are coming in."

6           So his intent -- and he did not stop until

7    he was injured where he can no longer return fire.  I

8    think he fired 18 rounds.

9    BY MS. MURPHY:

10       Q    And so just to confirm, though, I mean,

11   you've made a couple conflicting statements, because

12   you're saying, hey, I don't know what he was

13   thinking, but this was what I was thinking.  You

14   understand you just made those conflicting --

15       A    Yes, yes.

16       Q    And so part of you saying that, hey, this is

17   what I think he was thinking is because you want to

18   justify the actions that were taken in this case,

19   correct?

20       A    No.

21       Q    Then why are you making that conflicting

22   statement?

23       A    We took six rounds before we returned fire.

24   They made announcements over and over, even the

25   neighbors and the neighborhood heard those

Page  27

1    announcements with the distract going.

2             So when you're saying "Police, we have a

3    search warrant," and you fire rounds and you see

4    officers coming in still saying, "Search warrant,"

5    and you continue to fire those rounds, it's a logical

6    conclusion.

7        Q    Have you ever been under fire?

8        A    No.  Well, yes, I have never been in an OIS.

9    I have been under fire many times.

10       Q    Okay.  Tell me how -- when in the -- tell

11   me -- if you don't mind, if you could walk me through

12   the instances where you were under fire.

13       A    We were doing a knock and talk with a

14   domestic violence victim -- and this was years ago --

15   and a subject was in there, he was acting nervous.

16   We asked him to leave so we could talk to her to get

17   her story.  He refused to leave.  He started reaching

18   for a gun, and my partner was in a struggle with him.

19   The rounds were going off and he was able to get the

20   gun out of his hand and take him into custody.

21       Q    Okay.

22       A    And I've been on numerous barricades where

23   they're firing rounds, you're hiding behind cover.

24   And search warrants with weapons involved.  You've

25   had people with the gun, that you, you know, give

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 28

1    them commands, "Hey, drop the gun," they've dropped

2    the gun.

3            So numerous ones and I'm sure I haven't even

4    touched, you know, 50 percent of those calls.

5        Q    Okay.  Have you ever been either in your

6    home or someone else's home on a couch and had

7    somebody come in and start shooting?

8        A    Have I?

9        Q    Yeah.

10       A    No.

11       Q    Okay.  So that would be when you're -- when

12   you are -- sorry, when you are suggesting what that

13   person might be thinking, that's a hypothetical for

14   you, correct, because you've never been in that

15   situation?

16       A    No.

17       Q    Okay.  And to confirm, you were not present

18   at -- you weren't present for this, correct?

19       A    No.

20       Q    Okay.  Did you watch the body-worn camera

21   footage later?

22       A    I did see some body-worn cameras.  Not every

23   single individual, but what CERT revealed to me

24   during -- before my interviews.

25       Q    Okay.  And as we sit here today, do you

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 29

1   remember which officers they showed you?

2        A    I don't remember which officer it was

3   exactly.

4        Q    Let me ask it a little bit differently.

5   This might be easier for you to remember.

6             Do you remember, like, what positions they

7   showed you?

8        A    Yes, during the Tactical Review Board, I

9   mean, they pulled multiple body-worn cameras together

10  so you can see, you know, Kubla going in, Kubla going

11  down, Brice Clements going in, and then the return of

12  fire.  And I don't know which camera was which

13  person.

14       Q    That's fair.  I guess I asked about the

15  position because that might be a little easier to

16  remember.  So having reviewed all of that -- and

17  we'll look at it again today, I'm not asking you to

18  remember something from four years ago -- but you

19  seem to be pretty confident about the times, because

20  you've -- as we sit here today, can you walk me

21  through what your positions are like on the times?

22       A    On the times, as far as?

23       Q    In terms of when they started knocking, when

24  they entered.

25       A    I don't have that off the top of my head.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 30

1      Q    Okay.  Well, didn't you just offer

2   16 seconds?

3      A    From the time that they made entry, yeah;

4   but I don't know, you know, the distract went off at

5   this time and, you know, the -- when they were

6   breaching at what second it was that the breach went

7   in.  I just know -- and I believe it's rough, 15 to

8   18 seconds before they made entry.

9      Q    And so I just want to -- and we're going to

10  go through everything.  I just kind of want to

11  understand what your thought process is.  That's why

12  I'm asking this question.

13         When you say 15 to 18 seconds, are you

14  talking about from when they started -- what's -- is

15  it your understanding that's from when they started

16  the announcement to when they breached the door or

17  are you saying that that's when they ended the

18  announcement and then they breached the door?

19     A    The start of the announcement until they

20  breached -- the breach was successful and they went

21  inside.

22     Q    Okay.  And so let me back up a little bit.

23  And like I said, we are going to go over the videos,

24  but as we -- if you can kind of walk me through, as

25  we sit here right now, what your understanding is of

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 31

1    how this unfolded, because we've kind of -- you've

2    pulled from a couple different things, so I think

3    what would be more fair for me is just to say to you

4    walk me through what your understanding is.

5              MR. ANDERSON:  Objection to form,

6    foundation.

7              Go ahead.

8              THE WITNESS:  As far as the service of the

9    search warrant or how we got there in the first

10   place?

11   BY MS. MURPHY:

12       Q    We're going to go over everything, but as we

13   sit here right now, what I'm asking for is, like, the

14   actual service of the search warrant.

15       A    So they have surveillance done, you know, an

16   hour, two hours beforehand.  They have a briefing.

17   Text us, we're there, if anything's changed.  They go

18   over the plan, everyone understands the plan.  They

19   reiterate information during that briefing.

20              They make sure everyone knows the plan,

21   everyone knows what's going to happen, and then once

22   everyone is good with that, then they'll move to the

23   apartment.

24              They'll make their approach and they'll set

25   up at the door.  The supervisor will make the



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 32

1   announcement, "SWAT, search warrant," say the

2   address.  And they will do a distract and then they

3   will conduct the breach and breach the door.

4           Once the door is breached, then they will

5   proceed inside.

6      Q   Okay.  And so I'm actually asking you to

7   walk through what happened in this situation, to

8   your -- as we sit here today.

9      A   That's from my understanding, that's what

10  transpired.  They had the briefing.  They made the

11  announcements.  They did the distract.  They did the

12  breach.  And they went inside and then the shooting

13  occurred.

14     Q   Okay.  As we sit here today -- and I know

15  that you're retired now, but to the best of your

16  memory -- actually, sorry, let me strike that.  Let

17  me ask it differently.

18          Did you ever receive any training while you

19  were with SWAT about elements of knock and announce

20  and the CET entries in terms of the Fourth Amendment?

21     A   There is a classroom portion during SWAT

22  school that we receive, during the breachers, through

23  all the training, there is, and it always covers

24  Fourth Amendment.

25     Q   And what was that training?  What did the



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 33

1   training tell you?

2        A    I can't remember verbatim.

3        Q    And that's okay if you can't remember

4   verbatim.  If you just want to walk me through what

5   you do remember.

6        A    As far as --

7        Q    The Fourth Amendment training that you

8   received.

9        A    Fourth Amendment, like I said, people are

10  protected from unreasonable searches.  You can't --

11  you need the exception and then you need a search

12  warrant, a legal and lawful search warrant,

13  describing the place to be searched and items to be

14  seized.

15       Q    Okay.  And so that has more to do with the

16  underlying -- and I'll fine-tune my question, then,

17  because what you've answered, I think, is about the

18  actual, like, mechanics of the warrant itself and

19  what needs to be in there.

20            Were you ever provided any training, to your

21  memory?  And if so, what was it, in terms of, hey,

22  this is how long you have to wait, or this is the

23  kind of announcement that you need to make in order

24  to provide the person or persons on the other side of

25  the door appropriate notice under the Fourth



Page 34

1   Amendment?

2      A    During that -- we're aware of the U.S. v

3   Banks, you know, and it's based on the totality of

4   the circumstances.  There's even another case -- I

5   don't know if it's U.S. -- it's McCracken.  I don't

6   know the other -- if it's U.S. or someone else versus

7   that, but essentially they said 10 seconds.

8          But it's also based on the totality of the

9   circumstances.  It could be five seconds based on the

10  crime, what they're seeing, what the guys are

11  observing, weapons involved, that violent history,

12  the surrounding areas.

13         So it's based on the circumstances out

14  there.

15     Q    Okay.  And the 10 seconds or five seconds

16  that vary in time, is that from the end of the

17  announcement or is that from the beginning of the

18  announcement?

19     A    I don't think we've covered that

20  specifically.

21     Q    Okay.  And in covering that, did you guys

22  ever discuss using distracts during the announcement

23  and how that might implicate somebody's fair warning?

24     A    No, the guys are shouting loud enough,

25  sometimes the distract is done on the rear side --

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 35

1   which I think they did it on the rear side.  I wasn't

2   out there on the scene.

3           But we've served in -- you know, we have

4   documentation that we've served like 1,487 warrants;

5   90 percent of those warrants or 57 percent of those

6   warrants were CETs.  So we've had success in this,

7   this is how we're trained, they've modified -- we

8   never had a, hey, they didn't hear because of the

9   distract.

10          And 99.9 percent of those, the individuals

11  surrender, peacefully taken into custody.  We've had

12  no officer-involved shootings or no mistakes on

13  those, so to speak.

14      Q    There was a lot of -- well, you tell me if

15  I'm right or wrong, because you're listing off, hey,

16  we did all these other ones.  My understanding of

17  having reviewed this is there were a lot of things

18  that were a little bit different along the way in

19  this incident.  And I'll walk you through what some

20  of them were.

21          You were out on COVID, correct?

22      A    Yes.

23      Q    Okay.  And then was it Findley, he was also

24  out on vacation, correct?

25      A    Yeah, the night of the warrant, he was

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 36

1    there.

2        Q    Okay.  But during the buildup and the

3    authorization and all this other stuff, he was on

4    vacation, correct?

5        A    Yes.

6        Q    So you were out sick, he was on vacation.

7    And then Sergeant Backman, this was his first time

8    out running a SWAT team on a CET, correct?

9        A    No.

10       Q    No?

11       A    He -- during December, we had been on 22

12   barricades with him --

13       Q    Mm-hm.

14       A    -- two hostage rescue incidents with him.

15       Q    Okay.

16       A    He was in major violator, so they serve

17   warrants all the time.  They do surrounded calls all

18   the time.  So I believe this -- we had several

19   warrants, I can't -- if you know the number, please

20   share.

21       Q    No, I'm not trying to trip you up on the

22   number.

23       A    So he wasn't new by any sense.  He wasn't in

24   charge.  He was in the steps -- he's taken the

25   overall inside, but Garth Findley was in charge.  He

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 37

1    was aware.  That's why we do the briefing as well.

2              You could have -- say I was on vacation.  I

3    come in that day.  I get everything I need to know at

4    that briefing and I review materials.

5              So you don't have to have been there when

6    the plan was being formed.  And the plan could have

7    changed at briefing.  Something changed, some other

8    new information could stop, halt, either we're not

9    serving the warrant, we could take a different

10   approach, we could do something else.

11             So him being fully briefed at that and he

12   knew ahead of time was right in line with -- I had no

13   problems with that.

14        Q    Okay.  My question was a little bit

15   different, though.

16             MR. ANDERSON:  Slow down a little bit for

17   the court reporter.

18             THE WITNESS:  Okay.

19   BY MS. MURPHY:

20        Q    My question was a little bit different.  So

21   Sergeant Backman was the one that kind of created the

22   plan, did the IAP, and all that stuff, correct?

23        A    The assistant team leaders, the ATLs, create

24   the plan.

25        Q    Okay.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 38

1      A    And they approve it and go over it and then
2    I give the final authority on it.
3      Q    Okay.  This was Sergeant Backman's first CET
4    as part of SWAT, correct?
5      A    I don't have that for sure.  I don't.  I
6    can't recall.
7      Q    Okay.  So you had listed off some barricades
8    and surrounds and callouts.  Those are different,
9    correct?
10     A    Not necessarily, no.
11     Q    Why aren't they different?
12     A    Well, we had two hostage rescues, which
13   essentially your patrol is out there.  We have, you
14   know, someone in danger of their life being lost and
15   we breach the door, we go in, and we take people into
16   custody.
17     Q    Well, those are essentially no-knock, right?
18     A    No, the police are out there, bull-horning,
19   they've been talking to them on the phone, they've
20   had full notice, "Hey, I'm not coming out," and
21   they've had communication.  And the police had been
22   surrounding it until we get there.
23     Q    Okay.  Here there was no communication
24   beforehand, correct?
25     A    No, they'd made the announcement, "Metro

Page 39

1    Police, search warrant."

2        Q    I guess -- and so let me refine my question.

3            In the hostage situation, there was no doubt

4    that the person on the other side of the door knew

5    that it was the police coming through, correct?

6        A    Hopefully.

7        Q    Yeah.  And that there was some kind of --

8    there was communication beyond a 10-second

9    announcement, correct?

10       A    Well, I would have to have the information

11   on those hostage rescues.  Not all the time as

12   police -- there are sometimes we're called ahead of

13   time that we're told, "Hey, I've got information on

14   this tip line that this lady is being there," and we

15   will do it just -- and there will be no

16   announcements, and we'll breach the door, make the

17   announcements once we're inside, "Police sergeant,"

18   and go in and save the life.

19           So it depends.  I don't recall what those

20   two hostage rescue situations were.

21       Q    Okay.  So when you're offering that these

22   would be sufficient training for Sergeant Backman in

23   order to do this CET, that's actually speculation,

24   now, correct?  Because you don't know what the

25   underlying factors were in the hostage situation, so

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 40

1    you can't make a direct line and say, hey, this

2    properly prepped him for this, correct?

3        A    The training we give them as well?

4        Q    No, I'm talking about those -- the

5    instances --

6        A    I believe he went on another CET.  I think

7    it's in one of my documents that he did go on one or

8    two more CETs that he had been on.

9        Q    Okay.

10       A    It's in my transcripts.

11       Q    Did he go to SWAT school?

12       A    No.

13       Q    Okay.  And so you're out on COVID, Findley

14   is on vacation, and Sergeant Backman had never been

15   to SWAT school?

16       A    SWAT school was not a parameter to go on any

17   barricades; the training was, and he did receive that

18   training that I denoted in my transcripts.

19       Q    And now they have to do more training,

20   correct?  That was another policy change after that,

21   correct?

22       A    I don't know.  I wasn't there.

23       Q    Okay.  So there was definitely some things

24   that were different about this than would normally

25   happen, correct?

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 41

1       A     No.

2       Q     No?  So that's normal for Findley to be on

3   vacation, you to be out on COVID, and for the person

4   running it not to have ever been to SWAT school?

5   Those are normal parameters?

6       A     Yes, because SWAT school is only given once

7   a year.  And, like I said, maybe it's in March, and

8   maybe he gets there in May, so what we do is

9   extensive one-on-one tutoring and training, which is

10  even better, Listed in my transcripts is -- it's more

11  one-on-one.

12      Q     That's your opinion, correct?

13      A     It's absolutely.  When I get one-on-one

14  training, it's absolutely better because he is the

15  focus of everything.  He also had those 22 barricades

16  where he shadowed a little bit and then he was given

17  authorization to go in as he improved.

18            He is in next step.  So we're reviewing him

19  and as I stated he was far and beyond.  It was a busy

20  December.

21            When I took over as SWAT commander, I only

22  hard 13 barricades under my belt; he had 22 in one

23  month.  Not to mention he was in major violators,

24  which everything they -- they have arrest warrants

25  where they're going after a suspect.  So he was well

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 42

1    above-and-beyond trained.

2          So being on vacation doesn't -- and not

3    being part of the plan, he is still reviewing the

4    plan.  You can change things in that moment that can

5    stop and negate it.

6          I spoke to Russ on the phone, and I knew

7    from talking to other individuals that the plan was

8    going to be a CET.  I wanted to hear because he was

9    new that he fully understood what a CET was.  Just

10   say, "Hey, it's a training moment, tell me why we're

11   doing a CET.  Explain to me why we can't do a

12   surround and callout."

13         So we spent time on that phone and he

14   articulated everything, didn't need help, he fully

15   understood.  And once he understood, I said, "Okay,

16   put that in a text message," and he sent it to me and

17   the approval was given.

18         Garth, when he shows up on scene, he has to

19   read the search warrant, he has to get familiarized

20   with everything going on, looks at the plan, and he

21   okays it or not okays it.  He can say yep, nope,

22   we're not doing that.  Or he can continue and he

23   continued.

24         No one there had a problem with doing the

25   CET and it was the best tactic to use at the time.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 43

1    Q    Why do you say "at the time"?

2    A    Well, I haven't been there, I've been

3  retired for two years, so I don't know what they're

4  doing now, if things have changed, if tactics have

5  changed.  But in that moment, that was the best

6  tactic to use at the time.

7    Q    Do you have any understanding that they

8  have, in fact, changed it?  If they were to serve a

9  similar warrant today, it would be a surround and

10  callout?

11    A    No, like I said, I'm retired.  I don't keep

12  in touch with the gentlemen still on the team.  I

13  know a lot of them have promoted and retired.

14    Q    Okay.  And so is it your position that the

15  CET was optimal or the only way that this could have

16  been served?

17        Do you understand the difference?

18    A    The CET was the only way you could serve

19  that warrant.  And there had been, in the history of

20  serving warrants at that apartment complex, 3050

21  South Nellis, has always been a CET.

22    Q    Okay.  And so if I told you that as we sit

23  here today, that the Metro policy changed and today

24  that would be -- I'll stop saying surround and call,

25  they call it an SACO, if that's easier.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 44

```
 1      A    SACO.

 2      Q    SACO.  If I represented to you that as we

 3  sit here today, that this would be served as a SACO

 4  and not a CET, would that change your opinion at all

 5  whether it could only be served via CET?

 6           MR. ANDERSON:  Objection to form.

 7           Go ahead.

 8           THE WITNESS:  SACO is not the safer way to

 9  do that.  And based on the parameters of -- that they

10  could not land BearCats, there was that metal

11  fencing, the ARCO gas station there and a

12  non-friendly apartment complex, numerous people

13  going.

14           So it is -- today the CET should be the

15  optimal method to use.  I know -- just because they

16  change policy doesn't take away that that's still the

17  better way to serve that warrant.

18  BY MS. MURPHY:

19      Q    Okay.  I guess my question is -- and so I'm

20  going to refine my question -- is it your position as

21  we sit here today that a SACO could not have been

22  done on that?

23      A    No.  If we were going to do a SACO, I would

24  have turned it into a barricade and we would have

25  handled it as a barricade.  So we could take that
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 45

1    fence down, evacuate people, cause damage inside the

2    apartment, get the neighboring residents out and take

3    them out.  And it would have been more of a package.

4    It would have been handled as a barricade.

5         Q    Mr. Williams is dead and a police officer

6    was shot.  Do you think this was a safe way to serve

7    this warrant?

8              MR. ANDERSON:  Objection to form.

9              Go ahead.

10             THE WITNESS:  Yes.  As I stated, the CET is

11   the safer method.  The surround and callout is not

12   feasible.  We would have had to do it as a barricade,

13   so if you're serving a warrant, the CET is the best

14   method.  Yes, it's tragic that the individual died,

15   it's tragic that my officer was shot --

16   BY MS. MURPHY:

17        Q    His name is Isaiah Williams.

18        A    My apologies.  That Mr. Williams is deceased

19   and that Officer Kubla has, you know -- his injuries,

20   and not to mention the toll, the mental toll and the

21   psychological toll on the families and the officers.

22             But CET is the safer method to serve that

23   warrant.

24        Q    But it wasn't in this case, correct?

25             MR. ANDERSON:  Objection to form.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 46

1          THE WITNESS:  Mr. Williams decided to fire

2     at officers coming in the door.  So he made that

3     decision and continued to fire until he was no longer

4     able to.

5     BY MS. MURPHY:

6          Q    Well, just to confirm your earlier

7     testimony, Mr. Williams obviously decided to fire,

8     but whether or not he knew that those were police

9     officers is speculation, correct?

10         A    Yes, we -- he is deceased.  He was not able

11    to give a statement.

12         Q    Okay.  All right.  And so as we sit here

13    today, do you have any understanding of how -- of any

14    of the policy changes that were implemented following

15    this incident?

16         A    No.

17         Q    Okay.  Do you have any understanding of the

18    recommendations that CERT made to change policy?

19         A    I think CERT, and this is from reading

20    the --

21         Q    I'm sorry, CERT is C-E-R-T.

22         A    CERT made some recommendations that the CET

23    would only be done for no-knocks.  And I know at the

24    time they were saying SWAT should be used as the last

25    resort; and when I left, I think SWAT was serving

Page 47

1    everything again.

2              And those are the ones that I'm familiar

3    with.

4       Q    Do you have any understanding about their

5    recommendations about changing the use of distracts?

6       A    No.

7       Q    Okay.  Do you have any understanding about

8    their criticisms of any of the work that you did on

9    this case?

10      A    Not directly.

11      Q    What is your understanding, then, directly

12   or indirectly?

13      A    I know when we went to the Tactical Review

14   Board and they had the -- they said we should not

15   have done a stun stick and that we shouldn't have

16   done a CET, I went through the Tactical Review Board,

17   defended that position and I was not sustained on any

18   of that.  I did not receive any discipline or --

19   essentially, they agreed with the conclusion that

20   after the explanation, CET was good at the time and

21   the stun stick was good at the time.

22              And I believe one of the officers said that

23   saved his life, too, the distraction, because Isaiah

24   started shooting at -- I believe it was Rothenburg

25   and Bertuccini at the window.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 48

1    Q    Yeah, where the window was broken and what

2  sounded a lot like gunshots came through, correct?

3          MR. ANDERSON:  Objection to form.

4          THE WITNESS:  I wasn't there.  I don't know

5  that.

6  BY MS. MURPHY:

7    Q    All right.  Have you heard these stun sticks

8  go off before?

9    A    Yes.

10   Q    What does it sound like to you?

11   A    It's a noise, loud noise, that -- I don't

12  know how many decibels it is, but it's a loud noise

13  that goes off like every half a second.  I believe

14  that was nine loud noises that go off.

15   Q    Okay.  And I'm sorry, I'm going to loop back

16  to something you just said.  So you defended all

17  the positions.  You defended the various positions

18  during the tactical review and you understood that

19  none of your -- that your positions weren't

20  sustained, correct?

21   A    Yeah.

22   Q    Okay.  But as we sit here today, that

23  doesn't -- you're still defending everything and that

24  doesn't change your position on anything, correct?

25   A    No, that was the training that I received at

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 49

1    the time, the information that we had at the time,

2    and it basically stops right there.  I was retired

3    afterwards.  The TRB was, like, my last day at work

4    and then I was retired.

5        Q    Sorry.  What was --

6        A    The Tactical Review Board.  When they

7    finished their report and then they present their

8    findings and then we're able to go in.

9        Q    And I know what most of the acronyms mean,

10   but I'm just trying to keep it a clean record.

11   Sorry.

12       A    Sorry.

13       Q    That's okay.  All right.

14            Can you kind of walk me through what was

15   your understanding of the purpose of the warrant?

16       A    So the search warrant was to further an

17   investigation of a homicide.  The detectives had a

18   homicide that occurred, Mr. Thomas.  He was at a bus

19   stop and two subjects went up there and shot him.  He

20   died of his gunshot wounds.

21            The homicide investigators did a Crime

22   Stoppers, a tip came out, and the stepmom asked to

23   speak with homicide and revealed that she believes

24   her stepson, Wattsel Rembert, and Corvell Fischer

25   were involved.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 50

  1          So they did a lengthy interview with that

  2   and why she thinks it was him.  And she said she had

  3   a phone call with him and fronted him out and while

  4   she was talking to Wattsel, he said, "They captured

  5   us on film," which, to her, alluded to the fact that

  6   he didn't say, "Hey, it wasn't me, I was in Texas."

  7   He said, "Hey, they captured us on film," while she

  8   was on the phone.  And the other family members also

  9   said yes, that's Wattsel.  They recognized his walk

 10   and then Corvell Fischer.

 11          So she said he is living at 3050 South

 12   Nellis, Apartment 1125.  I believe she showed a photo

 13   of that apartment complex.

 14          Shortly after that homicide, there was a

 15   shooting, a 415A, which is assault with a gun; and it

 16   was at that same complex.  Approximately 20 rounds

 17   were fired and they found Wattsel's BMW with an MP5.

 18          They did photo lineups with the two victims

 19   there, a female and a male, and apparently this was

 20   over a traffic accident that happened a few days

 21   prior at the complex.  They both were shown the photo

 22   lineup at the same time, and they both identified

 23   Wattsel as the suspect, so they had probable cause

 24   for Wattsel, in addition to also being a person of

 25   interest in the homicide of Thomas.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 51

 1          Corvell Fischer was also seen in the

 2    complex.  There was a report of a guy with an assault

 3    rifle on his back and that lined up with the house

 4    arrest information.  They actually can show you a

 5    photo and he had an ankle bracelet on that really

 6    shows he was really in Apartment 1125.

 7          So that corroborated Wattsel being there.

 8    They said it was a flophouse, that numerous subjects

 9    were coming and going, and they were using drugs.

10    And this is per stepmom and family.  And that they

11    were armed, and that they had weapons.  And, again,

12    we saw Corvell Fischer with the assault rifle and it

13    all lined up.

14          So they had the search warrant.  They had

15    probable cause for Wattsel for that shooting and they

16    had the search warrant for that residence.  They did

17    surveillance and they saw numerous people coming and

18    going.

19      Q    But none of them were Corvell or Wattsel,

20    the actual suspects, correct?

21      A    Yeah.

22      Q    Sorry, go ahead.

23      A    And so they had the probable cause based on

24    the mom, based on the -- I was able to corroborate

25    that.  And I do believe when they took Rembert into

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 52

1    custody a few days later, he did admit to being at

2    3050 South Nellis as well.

3        Q    Obviously he wasn't there when they executed

4    the warrant, correct?

5        A    So they the PC for that, but they were

6    looking for the -- the evidence was a gun and

7    clothing.

8        Q    And what is the difference between a warrant

9    for property and an arrest warrant?

10       A    Arrest warrant is for that individual.  They

11   are -- they have the -- take him into custody.

12            For property, they're going to look for, you

13   know, items listed for that property.

14       Q    Does how the warrant is executed change

15   based on whether it's an arrest warrant or a warrant

16   for property?

17       A    No.  I've spoken extensively on this.  And

18   the warrant being served is based on the threat

19   behind the door, armed subjects, having guns -- it's

20   corroborated -- unfriendly police presence.

21            The suspects or other individuals involved,

22   their violent tendencies, their violent history,

23   having a gun involved in the commission of a crime

24   and that they're still outstanding.

25            So that's what we're looking for before we



Page 53

1    serve the warrant.

2           Now, I've explained thoroughly, I'm sure

3    you've read it, that it is for property, but it is

4    not strictly for property.  It's what else is going

5    on inside that apartment.  And let me give you an

6    example.

7           If we were just doing for a pedophile and we

8    just wanted his laptop for evidence and the pedophile

9    was not home -- or a drug dealer, an armed and

10   dangerous drug dealer, who is walking into 7-Eleven

11   and we take him into custody, we interview him and

12   he's like, "My grandma is inside," we still need to

13   get the narcotics or whatever else, but we do not

14   believe she's a threat.  We just want to go in there

15   and get the property, whether it's dope, laptop, a

16   gun.  We're not going to do a CET for that because

17   she is not a threat.

18          Now, if the subject is in there and he has a

19   violent history, violent tendencies, they -- Rembert

20   told his stepmom that "They'll never get me,"

21   something along those lines and that he had -- he

22   knew that we were after him as well, to willfully

23   surrender, and he was still a threat to the public.

24   And him having a traffic accident a few days ahead of

25   time showing that he lives there, him having a

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 54

1    shooting there with other residents, he is a threat
2    to that public.

3           So it's not just for the property solo,
4    absent anyone inside; it's who else is inside that
5    door, inside that residence.

6      Q    But when they went to go serve the warrant,
7    they didn't have any reliable information on who was
8    there; isn't that correct?

9      A    We don't need to have 100 percent.  It's not
10   in case law, 100 percent reliability.

11     Q    They didn't even have 50 percent reliable.

12     A    We had him committing crimes, told by his
13   family that he is staying there, that it's a
14   flophouse, and he had a shooting there.  So it
15   corroborates it.  We need probable cause.  We don't
16   need beyond a reasonable doubt.

17          You're asking for beyond a reasonable doubt.
18   We don't need that, we need probable cause.

19     Q    And one of the individuals did have an ankle
20   monitor, correct?

21     A    Yes.

22     Q    And it was pinged that he wasn't there at
23   the time that the warrant was executed, correct?

24     A    Correct.  But we were still told it was a
25   flophouse and numerous subjects armed and dangerous



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 55

1    and Wattsel was still outstanding, meaning not in

2    custody.

3        Q    What was your understanding of how much

4    recon they did on this beforehand?

5        A    I can't give you a time frame.  I know we

6    recon every place they go and they get an eye and

7    they try and get as much information as they could.

8            I know that the criminal intelligence

9    section, surveillance team, did some surveillance on

10   there and they felt uncomfortable.  I think they

11   believe they were made, that they were discovered,

12   and they stopped doing the surveillance.

13       Q    Okay.  And so -- sorry, this is kind of --

14   why don't we just take a quick break.

15           THE VIDEOGRAPHER:  Going off the record at

16   11:19 a.m.

17           (Whereupon, a recess was taken.)

18           THE VIDEOGRAPHER:  We're back on the record.

19   The time is 11:28 a.m.

20   BY MS. MURPHY:

21       Q    All right.  We took a brief break and having

22   taken a brief break, I'm pretty sure I know the

23   answer to this, but I'll ask anyway.

24           Is there any of the testimony that you gave

25   before our break that now you've had a chance to take

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 56

1    a break or think about it that you want to change or

2    amend at all?

3        A    No.

4        Q    Okay.  I'm going to try to pull up some of

5    the videos because I wanted to ask you some questions

6    about those.

7            And if you'll just bear with me, I also had

8    brought these on the zip drive, but something is

9    wrong with my Zip drive reader on my laptop.  I'm

10   going to try to cue it up to the best of my

11   abilities, but if it pauses or skips, we'll just redo

12   it.

13       A    Okay.

14       Q    And I don't want to watch the whole video,

15   there's just really only about a minute and a half I

16   would like to go over.

17           And I'm just going to make sure it runs

18   through cued up and then I'll turn it around and

19   you'll watch it.

20       A    Okay.

21       Q    And so Melanie, if it's okay, I'm going to

22   move this over right next to you.

23           Is it okay if I stand next to you?

24       A    Yes.

25       Q    I'm going to hit pause.  I just want to make

Page 57

1    sure you're not uncomfortable.

2              MR. ANDERSON:  She's armed.

3              THE WITNESS:  No, I'm not, actually.  I'm

4    retired.  But I was leery about not having anything.

5    BY MS. MURPHY:

6        Q    And I'm just going to play it through just

7    to kind of walk you through it.  I'm just going to

8    play it through this spot, this minute.  And this is

9    the approach as they come up and then the shooting.

10             MR. ANDERSON:  Whose camera is this?

11             MS. MURPHY:  This is Rothenburg.  I'm going

12   to look at two different.  This one is -- actually,

13   I'm sorry, I think this is --

14             THE WITNESS:  It's Rothenburg.

15             MS. MURPHY:  Yeah, it's Rothenburg.

16             (Video played/video stopped.)

17   BY MS. MURPHY:

18       Q    So now I'm going to go through and stop it

19   at a couple critical points, because that kind of

20   gets up to the entry and the breach.

21             Okay.  So hold on.  Okay.  And so we're

22   going to play up through another couple seconds and

23   then when we first hear the announcement, I'm going

24   to pause it and then we're going to look at the

25   timestamp, okay.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 58

```
 1              (Video played/video paused.)

 2   BY MS. MURPHY:

 3      Q    So my understanding -- and I'm trying to get

 4   it as close as I can to this -- but what does that

 5   timestamp say up there?

 6      A    13:00.09.

 7      Q    Okay.  And so that, would you agree with me,

 8   that's when you can kind of first hear?

 9      A    Yeah, maybe a little bit before.

10      Q    Yeah, either 08, or 09, right?

11      A    Yeah.

12      Q    Okay.

13              (Video played/video paused.)

14   BY MS. MURPHY:

15      Q    And so then we have the glass breaking and

16   what's the timestamp say up there?

17      A    13 and then 16.

18      Q    So it was probably like 15 or 16, correct?

19      A    (Witness nods head.)

20      Q    Okay.  So either taking it from 09 to 15 or

21   08 to 16, that's six to seven seconds, correct?

22      A    Yes.

23      Q    Okay.  It's not -- if you want a pen and a

24   piece of paper to do the math, that's okay.

25              And so do you have any understanding as we
```

Page 59

1  sit here today where that window was relative to

2  where Mr. Williams was?

3      A    No.

4      Q    Okay.  Would it surprise you to learn that

5  that window was essentially right next to the sofa

6  that he was on?

7      A    No.

8      Q    Okay.  As we sit here today, do you think

9  that entry at six or seven seconds after the

10 announcement first starts being made, do you think

11 that complies with Mr. Williams' Fourth Amendment

12 rights?

13         MR. ANDERSON:  Objection to form.

14         THE WITNESS:  Depends on the totality of the

15 circumstances.  So Bertuccini could explain why he

16 did it at that time based on what he's seen.  I was

17 not there, so I could not give an opinion on that.

18 BY MS. MURPHY:

19     Q    Sorry, just for clarity, this was

20 Rothenburg.

21     A    But Bertuccini was the one that had the stun

22 stick.

23     Q    Okay.  So as we sit here today, I just want

24 to make sure I understand, because my only next time

25 to ever talk to you again is going to be at trial.

Page 60

 1          When you go to trial, you're going to say "I

 2   have no position on whether entering the unit, the

 3   apartment at six to seven seconds from the beginning

 4   of the announcement violates Mr. Williams' Fourth

 5   Amendment rights"?

 6      A    No, I would have to know what Bertuccini was

 7   thinking, what they saw, what made that decision.  So

 8   it would have to come from there.  I'm not there, I'm

 9   home with COVID.  So if I was on the scene, I would

10   have, you know, the mics cued up, information.  I do

11   not know.  So I cannot make an informed decision.

12      Q    Okay.  All right.

13          (Video played/video paused.)

14   BY MS. MURPHY:

15      Q    And so you hear him say, "Hit it, hit it,

16   pull," correct?

17      A    Uh-huh.

18      Q    Okay.  And so that's either at -- I'm sorry,

19   can you read the timestamp up there for me?

20      A    13 and 20.

21      Q    Okay.  So it's -- I'm not perfect at

22   stopping.

23      A    Yeah, I understand.

24      Q    Okay.  And so, "Hit it, hit it, pull, pull,"

25   that is not a police presence announcement, correct?

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 61

1      A    No, the announcements are coming from the

2  sergeant.

3      Q    Right.  But you understand, as we look --

4  and I'm just asking you, I know that you're saying,

5  hey, I wasn't there, but what we're viewing on this

6  body-worn camera is the window being broken and then

7  the announcement of, "Pull, pull, hit it, hit it,"

8  being made next to the broken window, correct?

9      A    Yes.

10     Q    Okay.  And I'm going to ask you the same

11  question and if you answer me the same every single

12  time, that's fine.  As we sit here -- and so I'm

13  going to -- that's approximately 10 to 11 seconds

14  after the first -- after the announcement is starting

15  to be made, okay.  Would you agree with that math?

16     A    Yeah.  And announcements should be done

17  throughout, as they enter, search warrant.

18     Q    And so as we sit here today, do you believe

19  that 10 seconds from the beginning of an announcement

20  to breaking open a window and making nonpolice

21  announcements, do you think that that complies with

22  Mr. Williams' Fourth Amendment right to be given an

23  opportunity and awareness that police are trying to

24  enter the unit?

25          MR. ANDERSON:  Objection to form.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 62

1          THE WITNESS:   You can hear the announcements

2     being made.   So the announcements were being made

3     by -- I believe it's Sergeant Backman.   So, again, I

4     cannot comment.   I wasn't there.   I don't know what

5     they were thinking, what they saw, or the decisions

6     that were made.

7     BY MS. MURPHY:

8          Q     Okay.   Okay.   And can you read that

9     timestamp up there for me?

10         A     23.   So 13 and 23.

11         Q     Okay.   So it's 22, 23, okay.

12              So looking at that, then we know whether

13     it's, you know, eight or nine when the announcement

14     starts being made.   We then have within 23 seconds

15     and the announcement's still being made.   And then

16     the flashbang goes off, correct?

17         A     Yes.

18         Q     Okay.   And your earlier testimony was the

19     purpose of the flashbang is to disorient and

20     surprise, correct?

21         A     Yes.

22         Q     Okay.   Do you think that a flashbang going

23     off while an announcement of police presence is still

24     going off complies with my client's Fourth Amendment

25     right to be given -- to first notice that police are

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 63

1    present and the opportunity to answer the door?

2            MR. ANDERSON:  Objection to form.

3            Go ahead.

4            THE WITNESS:  Yes.

5    BY MS. MURPHY:

6        Q    Okay.  All right.  Now, we're going to look

7    at Officer Kubla.

8            Thanks for bearing with me on my slow

9    computer.

10       A    It's all good.

11       Q    Craig will tell you, I've tried to do this

12   eight different ways and each way has been slow.

13       A    You could get an AP or an Apple.

14       Q    Oh, yeah.

15           And I'm going to cue this up.  I'm going to

16   put it just --

17           (Video played/video paused.)

18   BY MS. MURPHY:

19       Q    Sorry, I know you can see it down here, but

20   just for the record, I think I said it, but I want to

21   make it clear, we're looking at Kerry Kubla's

22   body-worn camera.

23       A    Correct.

24           (Video played/video paused.)

25           ///



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 64

```
 1   BY MS. MURPHY:

 2        Q    Similar to last time, I'm going to let this

 3   minute run through and then we'll go back and stop,

 4   okay?

 5        A    Okay.

 6             (Video played/video paused.)

 7   BY MS. MURPHY:

 8        Q    Okay.  So I'm going to scroll back.  We're

 9   going to look at the announcement.  Sorry.

10             Okay.

11             (Video played/video paused.)

12   BY MS. MURPHY:

13        Q    All right.  What does that timestamp say

14   over there?

15        A    12:59 and 57.

16        Q    And I'm going to say -- I think it starts at

17   around 56 or 57.

18        A    Correct.

19        Q    And so we agree that that's the time of the

20   announcement, based on this --

21        A    Yeah, and it could be within a second margin

22   or millisecond.

23        Q    And I'll represent to you that I've watched

24   all of these a few times and I like to go by the

25   timestamp on each individual because I think a couple
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 65

1    of them are off by a couple of seconds.

2        A    Okay.

3        Q    Based on this one, though, we agree that

4    Kerry Kubla is at 56 or 57?

5        A    Yes.

6        Q    Okay.  And that's when the announcement

7    starts being made, correct?

8        A    Yes.

9        Q    Okay.

10            (Video played/video paused.)

11   BY MS. MURPHY:

12       Q    Can you -- did you hear the glass break

13   around the corner?  Did you want me to replay that?

14       A    No, I believe I heard it.

15       Q    Okay.  And that's -- what time is that at?

16       A    13 and 04.

17       Q    Okay.  And if you want me to replay it, it's

18   fine.

19       A    No.

20       Q    Well, I'm going to ask you the next

21   question.  You may say, hey, hey, I want to re-watch

22   it again.

23            Had they made two full announcements when

24   the glass broke?

25       A    I believe so.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 66

 1     Q    All right.  Let's watch it one more time.
 2   And let me ask you this foundational question:  What
 3   does an announcement have to have in it?
 4     A    That we're the police and that we have a
 5   search warrant.
 6     Q    Do you have to list the address?
 7     A    We do do that and they have, but it's not
 8   the requirement.  We want them to know, hey, it's
 9   police, we have a search warrant.
10     Q    Okay.  So if you -- and how many times do
11   you -- is there a requirement of how many times?
12     A    I believe they say it all throughout, even
13   when we're, you know, on other incidents.  They just
14   continue to say, "Police, police, Metro Police.
15     Q    Okay.  All right.
16         (Video played/video paused.)
17   BY MS. MURPHY:
18     Q    Sorry, I did it a little slow again, but we
19   agree, right, that he starts hitting the door?
20     A    Yes.
21     Q    Okay.  And can you tell me what that
22   timestamp is up there?
23     A    13 and 08.
24     Q    Okay.
25         (Video played/video paused.)



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 67

```
 1   BY MS. MURPHY:

 2        Q    Do you know what that noise was?

 3        A    No.

 4        Q    Okay.

 5             (Video played/video paused.)

 6   BY MS. MURPHY:

 7        Q    And, sorry, so then the door -- I did that a

 8   little slow.  I'll go back from when the door comes

 9   open.  Sorry about that.

10             (Video played/video paused.)

11   BY MS. MURPHY:

12        Q    Do you know what that was?

13        A    No.

14        Q    Okay.  But it seems to be a flash from

15   inside the unit, correct -- inside the apartment,

16   correct?

17        A    Yeah.

18             (Video played/video paused.)

19   BY MS. MURPHY:

20        Q    Okay.  Can you read me the timestamp up

21   there?

22        A    13 and 12.

23        Q    Okay.  And that seems to be -- in that one

24   or two seconds, that's when the door comes open,

25   correct?
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 68

1       A    Yes.

2       Q    Okay.  So as we sit here today, based on the

3    totality of circumstances, we've got the announcement

4    being made; we've got the window being broken within

5    six to seven seconds; we've got an announcement of,

6    "Pull, pull, pull, get it in," within 10 seconds; and

7    then based on this video, we have the entry at about

8    15 seconds there at the very beginning of the

9    announcement.

10           That totality of circumstances, do you

11    believe that that complied with my client's --

12    Mr. Williams' Fourth Amendment rights?

13           MR. ANDERSON:  Objection to form.

14           THE WITNESS:  Yes.

15    BY MS. MURPHY:

16       Q    Okay.  At any point here, do you think my

17    client had an opportunity to submit to the police?

18       A    I wasn't out there, so I can't make an

19    informed decision on that or in his mindset and he

20    wasn't interviewed.

21       Q    Okay.  So I just want to make sure, when we

22    go to trial, that's going to be your same position,

23    correct?

24       A    Yes.

25       Q    Okay.  Fine.  Thank you for bearing with me

Page 69

1    on that.

2         A    No problem.

3         Q    Give me one second to get reorganized over

4    here.

5              And we've gone over -- we've kind of brushed

6    on it, but I want to really kind of dig into it.  In

7    terms of -- we know that you weren't out there.  Can

8    you please explain to me your position and what that

9    entailed relative to this incident?  What were you in

10   charge of, what were you doing?  If you could kind of

11   walk me through that.

12        A    I'm in charge of approving the tactics,

13   obviously reading the warrant and approving the

14   tactics.

15        Q    Okay.  And so I kind of asked it to you

16   before in a kind of a compound way, but I'll ask it

17   for you again.

18             I will represent to you that one of the

19   legal elements of knock and announce is after notice

20   of his authority and purpose, an officer is refused

21   admittance.

22             Having reviewed those videos -- we can watch

23   them all over again if you want and the other ones as

24   well if you feel like you need more information --

25   but based on watching those videos, what did

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 70

1    Mr. Williams do to refuse admittance while the door

2    was closed?

3        A    Not answering the door or saying, "Hey, I

4    give up, I surrender," something along those lines.

5        Q    And you think that he could have done that

6    in under 10 seconds?

7        A    Absolutely.

8        Q    Okay.  How could he have done that in under

9    10 seconds?

10       A    I had UPS at the door the other day.  I'm

11   sitting there right by the couch, boom, he knocks, I

12   get up, it's half a second, one second, 1.5 seconds,

13   I answer the door.

14       Q    Was he at your door at 5 a.m.?

15       A    No.  But he also wasn't in the back bedroom,

16   he was right there by the door as well, on the couch

17   by the door in the front room.

18       Q    No, he was by the window.

19       A    Yeah, but he is still -- he is not upstairs

20   in the bedroom or on the bathroom down the way.

21       Q    Why are these warrants served at 5 a.m.?

22       A    Because it's much safer for us.  If you have

23   a vehicle pursuit, it's much safer to have a vehicle

24   pursuit at 3 a.m. where there's no road traffic,

25   people aren't out, citizens are usually in bed

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 71

1    sleeping.  So it's safer for us as opposed to doing

2    it during rush hour.  You don't want a vehicle

3    pursuit during rush hour when people are out,

4    vehicles are out, it's just too many --

5         Q    But this isn't a vehicle pursuit case.

6         A    Correct, this is just an analogy.

7         Q    Okay.  So why are these warrants served at 5

8    a.m.?

9         A    This particular warrant was served at 5 a.m.

10   because we believed Wattsel committed the crime at

11   like 3 a.m. or somewhere in the early morning hours,

12   the other day, too, but it's also safer.  This was a

13   very active complex that had several people coming

14   and going.

15            So that's not safe to have people out and

16   about.  And that was the time that they believed that

17   he would possibly be there, so to lessen the risk to

18   the community, having people safely inside the

19   residence and not out walking and about.

20            It's also Nellis is a major road, cars

21   coming and going.  There's less likely to have that,

22   and that ARCO is not going to be as occupied as it is

23   going to be at noon, in the middle of the day.

24        Q    Is part of the purpose also to catch people

25   asleep?

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 72

1      A     Not necessarily asleep, home.  But it's

2  really the major factor is the threat to the

3  community.

4      Q     Okay.  I'm going to -- you referenced U.S. v

5  Banks a little bit earlier and I'm going to read you

6  a passage from that.

7            And it says, "After 15 to 20 seconds without

8  a response, officers could have fairly have suspected

9  that Banks would flush away the cocaine if they

10 remained reticent."

11           Here there was no 15 to 20 seconds between

12 the announcements and the entry, correct?

13     A     There was -- say that one more time.

14     Q     Sure.

15     A     Just the last part.

16     Q     Sure.  Here there was no 15 to 20 seconds

17 between the end of the announcements and the entry,

18 correct?

19     A     I think they made entry at 15 seconds is

20 what we said.

21     Q     I think so, yeah.

22     A     So, yeah, they made the entry at 15 seconds.

23     Q     From the beginning of the announcement,

24 correct?

25     A     Yes.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 73

```
 1     Q    Okay.  So there was no pause during any --
 2   there was no pause.  There was no time frame from
 3   which they stopped making the announcements to where
 4   they waited, correct?
 5     A    No.  I mean, they're moving through, so it's
 6   not -- it's fluid.
 7     Q    Right.  And here, I understand -- you know,
 8   one of the -- you know, one of the issues with U.S. v
 9   Banks -- you said you were familiar with the case and
10   I'll represent to you --
11     A    I don't know it 100 percent, like I said.
12   It's been a while.
13     Q    If you don't know any part of it, you can
14   just tell me.  And if I'm lying, Craig will call me
15   out on it, too.
16          So in U.S. v Banks, one of the issues --
17   I'll represent to you one of the issues they were
18   concerned about was the destruction of evidence
19   because they were going after cocaine.
20          Here there was no -- well, you tell me, do
21   you think there was any concern about potential
22   destruction of evidence when they were serving this
23   warrant?  Given that they were going after a gun, a
24   gun can't be flushed down a toilet?
25     A    No.  No.
```



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 74

```
1       Q     Okay.  And so is it fair for me to -- is it
2   fair to say that destruction of evidence wasn't a
3   concern serving this warrant?
4       A     Correct.
5       Q     Okay.  Now, I'm going to go over some stuff.
6   Hold on.  Some of the CERT stuff.
7             And as we sit here today, do you understand
8   that CERT had -- we'll go over a number of their
9   criticisms, but do you understand that one of the
10  criticisms that CERT had was the limited amount of
11  recon that was done before this search warrant was
12  served?
13      A     That their concern was, yes.
14      Q     Yes.  And do you understand what elements
15  that CERT felt that they had not kind of ruled out
16  before serving this warrant?
17      A     No.  Police --
18      Q     Okay.  So according to CERT, that for the
19  3050 South Nellis Boulevard warrants --
20      A     Yeah.
21      Q     -- and I'm quoting directly from the report,
22  it's at Page LVMPD 4461, "Additionally, in the 3050
23  South Nellis Boulevard warrant, the suspects were
24  never physically seen or confirmed in the apartment."
25            Do you understand?
```

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 75

1       A    Yeah, I understand.

2       Q    "Further, there was never a determination of

3    the possibility of kids, elderly, pets, or vulnerable

4    persons present in the apartment.  While it was

5    determined there were enough factors from the

6    homicide investigation to place the suspects and/or

7    the evidence of the homicide, there were enough

8    unknown factors to cause Captain Cole and Lieutenant

9    O'Daniel to recognize the most prudent tactics to

10   serve this warrant should have been a SACO."

11          Do you have a position on CERT's conclusion

12   on that?

13      A    Yeah, they're wrong.  And one of the issues

14   we've always had is CERT's making these

15   recommendations and they have no idea what a -- I

16   have to go into the meeting and explain what a SACO

17   is or explain what a CET is.

18          So the surveillance, so they tried to do

19   surveillance.  It's not a requirement.  We don't

20   have, you must -- we've tried in the past, hey, you

21   must do eight hours of surveillance or you must --

22   it's not an arrest warrant where it has something

23   that says beyond a reasonable doubt, he will be in

24   there.  We don't have that in our policy or SOP.

25          So what's a reasonable amount of time?  And

Page 76

1   it was tried.  We were unable to continue the

2   surveillance because the officers felt they were at

3   risk.  So not having kids or elderly, we were

4   correct, there was no kids, there was no elderly

5   based on the information we had.

6          So there's no set time and I don't know of

7   any case law that says you must do this amount of

8   surveillance or you must know this.  We had probable

9   cause.  We had a mom coming in unprovoked, the crime

10  of the assault with the gun shooting, him being

11  there.  So we had enough probable cause that the

12  subject was there.

13         We also had the crimes continuing to be

14  happening, the threat to the community.  We have a

15  responsibility to, you know, serve the search

16  warrant, get him into custody, or prove or disprove

17  that he is actually the one involved with Mr. Thomas'

18  death.

19     Q    But to be clear, you didn't arrest

20  either Wattsel -- you didn't arrest either one of the

21  suspects, correct?

22     A    No, they weren't there at the time.

23     Q    And there was also -- none of the evidence

24  related to the homicide was there either, correct?

25     A    No, but we still have a duty to check that,

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 77

1    to further the investigation.

2      Q    And so you essentially ruled out that any of

3    the evidence was there or that the suspects were

4    there?

5      A    I don't know exactly what they found or

6    anything.  Obviously, you know, SWAT is there to

7    serve the warrant.  What the detectives found or what

8    they determined or their conclusion -- and, again, I

9    did retire, so I didn't stay on top of that.

10          But for CERT to say that they didn't feel we

11   had enough and based on, what, did we violate a

12   policy?  Did they say you must have that subject in

13   that apartment before you can serve it?

14          We believed we had probable cause that he

15   was in that apartment.

16     Q    Okay.  And so I will say that according to

17   CERT, they did find that there was a violation and

18   I'll read this to you.  And this is 3.6 from the

19   report Bates LVMPD 4469.

20          "CERT concluded while the SWAT section

21   manual contained verbiage allowing for SWAT operators

22   to conduct a CET for property when there is a threat

23   of an armed and dangerous subject, it was not

24   appropriate given the amount of unknowns associated

25   with Apartment 1125.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 78

1          "There were numerous amounts of unknown

2    factors to include who was actually staying in the

3    apartment and if there were children, elderly, or

4    vulnerable individuals present inside the apartment.

5          "SWAT's decision to serve the 3050 South

6    Nellis Boulevard search warrant as a CET was a policy

7    training failure and not within standardized LVMPD

8    tactics, training, and policy."

9          And then they cite LVMPD SWAT section manual

10   1.0, 3.14, and 9.01, Pages 183 to 186.

11         It was your decision and your authorization

12   to do the CET, correct?

13       A    Correct.

14       Q    So when CERT is saying that it was a

15   violation -- a policy violation training, they're

16   talking about your decision, correct?

17       A    Correct.  And that was the same information

18   I had to go into my Tactical Review Board and I was

19   able to explain why we did it to the board -- there's

20   two civilian citizens on there -- and I was not found

21   sustained on those.

22       Q    Sorry, what does "not found sustained" mean?

23       A    Basically I proved to them that we were

24   authorized CET.  It was within our policy and

25   procedures.  It did meet it.  And that's why that

Page 79

1  tactic was used.  They didn't overrule it, they

2  didn't say nope.

3          If they did anything, they could change

4  policy later, but that wasn't saying it was a policy

5  violation at the time.  That was their conclusion

6  that I was able to disprove at the Tactical Review

7  Board.

8      Q    You were the one that wrote the policy,

9  right?

10     A    No, this policy came from years on down the

11 line.  The thing I added was "absent a threat,"

12 because there was confusion.

13     Q    Okay.  Sorry.  Let me state that better,

14 then.

15          You were the one who rewrote the policy,

16 correct?

17     A    I didn't rewrite it.  I just wrote that

18 "absent a threat" inside that policy because they

19 weren't understanding.

20          Again, we have people interviewing us who

21 have no idea about SWAT tactics and that came up in a

22 previous incident, so we had to clarify it.  So it

23 was clarified, not changed.

24     Q    Okay.  And so just for the sake of the

25 record, I mean, I know the facts, but I want to make

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 80

1    sure the record is clear.

2          You were involved in modifying or

3    amending -- I'm not trying to parse words or get you

4    to say a certain way, but you had added -- sorry, you

5    had added or changed some verbiage and I think it was

6    in September of 2021, correct?

7    A    Possibly, yeah.  I don't have the exact

8    date, but I'll --

9    Q    I'm not trying to trip you up.

10   A    I was ordered and as part of my duty as a

11   lieutenant and tactical commander to clarify that

12   policy.  Not change it, but clarify it.

13   Q    Why did it need to be clarified?

14   A    Because people were thinking, like, we serve

15   narcotics, they were just thinking, oh, dope is

16   property and you can't do a CET for dope.  And we

17   were saying yeah, you can, because everyone in SWAT

18   understood that you can serve that warrant for dope

19   and do it as a CET because there was a threat, the

20   guy was armed and dangerous.  We had to have some

21   other factors, it wasn't clarified.

22         So we knew what was going on, but these

23   outside entities, again, who have no SWAT training

24   are reading and they're like "Oh, wait, you can't do

25   it for property."  Yeah, we can, because there's a

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 81

1    threat.

2         And I explained that to them, they

3    understood it, and it was not sustained.

4    Q    Okay.  And you were the one that kind of

5    amended that in 2021, related to a different

6    incident.  What was the other incident?

7    A    I think it was -- I believe it was the

8    Jasmine King incident.

9    Q    Okay.  Okay.  And as we sit here -- I know

10   I've asked you this a couple of times, but in this

11   line of questioning I just want to make it clear, as

12   we sit here today, you're unaware if they have or

13   have not changed or further amended --

14   A    I don't know what's going on there.

15   Q    And so it's fair for me to assume if there

16   was, that you weren't involved?

17   A    Yeah, I wasn't involved in that.

18   Q    Okay.  But you do understand as we sit here

19   today that CERT said, one, it wasn't within LVMPD

20   training and policy; and two, that they recommended

21   changing some of the policies, correct?

22   A    Yes, and I was able to disprove that.

23   Q    You were able to disprove that how?

24   A    That it was within policy and it was within

25   the SOP.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 82

```
 1      Q    Okay.  But you can't disprove that they
 2  modified the policy after?
 3      A    Yeah, they can make any changes they want
 4  later on, unbeknownst to me.
 5      Q    Right.
 6      A    And just because they change it doesn't mean
 7  it was wrong.  They -- like we used to have the LVNR,
 8  they took it away.  Doesn't mean it was the wrong
 9  tactic.  It was just used in the wrong way and
10  tragically, someone died.
11      Q    And so then we had gone over the timing and
12  I will read to you some of CERT's conclusions about
13  the timing in terms of inserting the stun sick,
14  breaching the door, that kind of thing.  And this is
15  3.8 and it's LVMPD 4470.
16           "The question was whether waiting six
17  seconds before inserting the stun stick and then
18  waiting another 10 seconds before making a forced
19  entry satisfied the requirement that officers wait a
20  reasonable amount of time to provide occupants an
21  opportunity to peaceably submit to a search."
22           And they say, "See United States v Banks and
23  the Betty v State."  I think that's the Nevada case.
24      A    Yeah, I don't know that one.
25      Q    CERT found that, "Under the conditions
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 83

1   present here, six seconds was insufficient to allow

2   occupants time to answer the door, let alone to

3   submit to a search."

4          And my understanding of your prior

5   testimony -- you tell me if I'm right or wrong -- is

6   that you actually think that was sufficient time, but

7   you are not willing to provide an opinion on this

8   specific set of events because you weren't there.

9      A    Correct.

10     Q    Okay.  So it's a distinction where you're

11  saying, hey, I think in a vacuum, you know, based on

12  circumstances it could be enough, but I'm not going

13  to give an opinion on this specific issue because I

14  wasn't there?

15     A    Yeah.  And I don't know what's going on in

16  the officers' minds.  You'd have to ask those

17  officers why they did it in that moment.

18     Q    Okay.  They also said, "Additionally,

19  deployment of the CET contradicted the

20  knock-and-announce principles."

21         Do you understand what they mean by that?

22     A    Do they further elaborate?

23     Q    Yes.

24     A    Okay.

25     Q    "The CET is intended, in part, to surprise

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 84

1    and overwhelm occupants inside the residence.  Yet

2    the intent of a knock and announce is to provide an

3    opportunity to comply before a forced entry is made,

4    thus is a policy and training failure and not within

5    LVMPD standards."

6         A    So the surprise and overwhelm is where they

7    surrender.  They're not going take up arms, they're

8    not going to take hostages, they're not going to

9    flee.  They're just going to surrender, so...

10        Q    Well, it's also to confuse and distract

11   them, correct?

12        A    To, one, so they're, "You got me, I'm not

13   going to do anything, I surrender," as opposed to

14   saying -- you know, without that distract, there's a

15   potential for the suspects to go, "I'm going to go

16   down with a gun, I'm going to take them out."

17             So the distract causes that confusion that

18   they'll just surrender.  And that has happened

19   99.9 percent of the time.

20        Q    I'm going to read to you part of your CERT

21   interview when you described the purpose of the

22   distraction.  And this is from -- because there's

23   two -- sorry, give me one second.

24             This is from your first interview and this

25   is Page 12 of the document Bates LVMPD 718.

www.lexitaslegal.com                    702-476-4500

Page 85

1          You said, "And that's to give that
2     distraction that, for your senses, that deprivation,
3     that not knowing what's going on, where they just
4     kind of freeze.  It's almost like spotlighting an
5     animal where they just freeze.  They don't know
6     what's going on and -- and that was authorized based
7     on the crime at hand."
8          Do you think it's appropriate to liken a
9     suspect to an animal?
10     A    No.
11     Q    Okay.  But based on this statement in here,
12    the intention is to freeze them, right, to surprise
13    them, to overwhelm them?
14     A    Yes.  And then, again, based on our training
15    and experience, based on the, you know, over 1,400
16    warrants we served, they just surrender.  Like, "I'm
17    just going to give up, I'm not going to fight you,
18    I'm not going to run, I'm not going to shoot at you,
19    I'm going to surrender."
20     Q    Okay.  And so I'm just going to loop back to
21    my original question, though.  Do you understand --
22    first, I want to make sure that you understand the
23    CERT's conclusion and then I want to ask you if you
24    agree or disagree with it.
25          So what CERT is saying, based on my

Page 86

1    understanding -- and I've read it to you -- is that

2    the distractions, because they can confuse, that it

3    contradicts the concept of knock and announce,

4    because the purpose of knock and announce is to give

5    somebody fair notice.

6            Are you with me?

7    A    Yes.

8    Q    So if you distract and confuse them, that

9    contradicts giving somebody fair notice?

10   A    It's not meant to -- the distract and

11   confuse doesn't make them so oblivious that they're

12   not able to make a decision.

13           And what we see is when we throw the

14   distract, when we use the distract, they hear it and

15   they, instead of running, instead of fleeing, instead

16   of shooting, they JUST give up.  They see we're the

17   police and they understand.

18           So it's not to oblivion of a distract, but

19   it's just to stop them from thinking to take all --

20   something where we need to use less lethal, something

21   where they're going fight us, they just give up.

22   Q    But that didn't work here, right?

23   A    No, he decided to shoot at Officer Kubla.

24   Q    As you sit here today, you don't know if he

25   was aware that it was police officers coming through

LEXITAS™

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 87

1    the door?

2        A     Nor do you guys know.

3        Q     What we do know, and you'll agree with me,

4    right, is he was on a couch that was next to a window

5    that was broken open within six seconds of an

6    announcement made outside of a locked door?

7        A     Correct.

8        Q     And that within a few seconds of that, what

9    he would have heard closest to him is not, "Hey, this

10   is the police," it would have been, "Pull, pull,

11   pull, go."  Correct?

12       A     We don't know that.

13             MR. ANDERSON:  Objection to form.

14             THE WITNESS:  We do not -- because they were

15   making announcements beforehand.  For that six

16   seconds he did hear those announcements.

17   BY MS. MURPHY:

18       Q     But we agree the window was broken and that

19   that's what the officers were saying right next to

20   the window?

21       A     Yeah, but we don't know what he heard.  You

22   don't know and we don't know.

23       Q     Is "Pull, pull, pull, go," part of a police

24   announcement?

25       A     They were shouting and you can hear them --

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 88

1    Q    That wasn't --

2    A    -- during a search warrant.  That was

3    communication between the two operators right there.

4    Q    Correct.  Being yelled outside a broken

5    window, correct?

6    A    Yes, between Bertuccini and Rothenburg.

7    Q    Okay.  Is that part of a police

8    announcement?

9    A    No.  The announcements were being made by

10   the people who were entering.

11   Q    Is there any way, as we sit here today,

12   based on your years of experience -- I understand you

13   have lots of SWAT experience, you've done hundreds of

14   these search warrants -- is there any way that -- in

15   your vast experience, is there any way that, "Pull,

16   pull, pull, go," could be interpreted by anybody to

17   be informative that the police were trying to come

18   through the door?

19   A    We've had much success as I've stated.

20   We've never had that incident.  So what he was

21   thinking, you don't know and I don't know; but what

22   we do know is once the police entered the door,

23   shouting "Police, search warrant," that he fired six

24   rounds before we even returned fire.

25   Q    So my question was a little bit different.

Melanie O'Daniel            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 89

1    My question was:  Based on your years of experience,

2    is "Pull, pull, pull, go," would that give anyone

3    reasonable notice that police were on the other side

4    of a broken window?

5        A    "Police, search warrant," would let them

6    know that.

7        Q    I didn't ask about that.  I asked about --

8        A    I don't know.

9        Q    -- "Pull, pull, pull, go."

10       A    I don't know.  I know that the announcements

11   were being made, so I can't make that determination.

12       Q    You can't tell me whether or not --

13       A    I don't know if he heard that on the inside

14   or not.  I know these two operators are communicating

15   and they're able to communicate.  That's authorized.

16   And that they were saying it's a search warrant,

17   Metro Police at the front.

18           So they're allowed to communicate.  They're

19   allowed to have words and to talk.  So we don't know

20   what Isaiah heard or what he was thinking.

21       Q    And I'm not asking you to qualify what

22   Isaiah heard or not.  What I'm asking you is based on

23   your years of experience -- and you have served all

24   kinds of warrants like this -- is the term "Pull,

25   pull, pull, go," based on your years of experience,

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 90

1    would that indicate to somebody -- if they did hear

2    it -- that it was police officers?

3        A    It's conversation between those two guys.

4        Q    That's not what I asked.

5        A    Well, I can't answer to that.  It's a

6    nonsensical question to me.

7        Q    Okay.

8        A    These guys are having a conversation.  We

9    don't know what he heard or he didn't hear.  But I

10   know they were making announcements as that was going

11   on.

12       Q    So your position is that --

13       A    So they're not allowed to just be numb and

14   don't say anything.  They have to communicate.  So

15   the announcements were being made.  That wasn't the

16   only thing going on at that time.

17            So I can't answer.  They're allowed to

18   communicate.  That's within policy, common sense, to

19   communicate.

20            We don't know if he heard that.  We don't

21   know.  So how can I make a solid decision on that?

22   We don't know.

23       Q    So as we sit here today, the question I've

24   asked four times now is whether or not "Pull, pull,

25   pull, go" would give, based on your experience, a

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 91

1  citizen fair notice that it was police on the other

2  side and you're saying "I can't take a position on

3  that"?

4      A    I'm saying to let them know that the police

5  are on the other side, they're hearing, "Police,

6  search warrant."

7      Q    I'm asking you about "Pull, pull, pull, go."

8      A    I'm saying that's a conversation.  You're

9  saying he wouldn't know that.  I'm saying that's a

10  private conversation.  We don't know if he heard it

11  or not.  They're allowed to have private

12  conversation.

13      Q    Melanie, let me correct you here.  I'm not

14  asking you to take a position on what Isaiah did or

15  didn't hear.  What I'm asking you is, based on your

16  years of experience and all these things serving, if

17  someone did hear it, if someone heard "Pull, pull,

18  pull, go," based on your years of experience --

19      A    I would say yeah, several warrants we've had

20  we say, "Hey, watch out for that brick" while they're

21  still making announcements.  There's a multitude of

22  angles you could go with that.

23          So you saying that Isaiah was right there at

24  the window and he heard, "Pull, pull, go, go," and

25  that's not police language or a "Police, search

LEXITAS

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 92

1    warrant" is wrong.  They were making announcements.

2    These guys are allowed to have conversation.

3           And suspects, a lot of them have had

4    experience and they know what's going on.  They know

5    when they hear certain things, they hear us walking

6    on the rocks, oh, police are coming.

7           We don't know that, but I do know

8    announcements were being made and that several

9    subjects around the complex heard, "Police, search

10   warrant.  Metro Police, search warrant."

11       Q    And so it's your position that "Pull, pull,

12   pull, go," is part of the police announcement?

13       A    It's a conversation, a private conversation

14   between those guys.

15       Q    Okay.  All right.

16       A    And that's my position.  It's a conversation

17   between them at the same time "Police, search

18   warrant" was being made.

19       Q    Okay.  All right.

20           You understand that there was -- if I

21   told -- if I represented to you that one of CERT's --

22   well, were you aware that one of CERT's

23   recommendations was that CET only be utilized when a

24   no-knock search warrant was approved?

25       A    After?



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 93

1      Q      Yeah.

2      A      No, I wasn't aware of that.

3      Q      Okay.  We didn't watch the video for this

4    specific issue, but do you understand that -- and if

5    you want to re-watch it, you can tell me -- do you

6    understand there was an issue with them breaching the

7    door because of the brass wrap?

8      A      Yes.

9      Q      What's your understanding of that?

10     A      I wasn't out there, so I am not going -- all

11   I know is during some officer testimony they said

12   they weren't aware that there was a brass wrap.

13     Q      We watched the video and I'm happy to play

14   it for you again.

15     A      That's okay.

16     Q      You see them hitting the door multiple

17   times, right?

18     A      Yes.

19     Q      If you had been present that day, would you

20   have called a tactical and withdrawn?

21     A      No.

22     Q      Why not?

23     A      It's not my decision.  I would have been in

24   the command post.  It's something they would do in

25   that moment, that the officers there would do at that

Melanie O'Daniel         Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 94

```
 1   moment.  So there's nothing, no line in the sand
 2   absolutely you have to call a tactical on this.  It's
 3   a judgment call.
 4       Q    And so, Melanie let me ask you, have
 5   you been at --
 6       A    No.
 7       Q    You've never been at the front --
 8       A    I'm in the command post, in the RV, if you
 9   will, at a distance.
10       Q    Okay.
11       A    And I don't have access to the body-worn
12   camera.  I'm on the outskirts with a camera up above
13   and sometimes I have drone or robot footage, but I
14   don't have that.  So, therefore, it's a decisions
15   that those officers make in that moment and it's up
16   to them.
17       Q    And so that I actually didn't understand.
18   So I just kind of want to make sure.  That part I
19   didn't understand.
20            I had assumed that you were -- I want to --
21   like, have you ever been, like, part of that group
22   that serves it?
23       A    No.
24       Q    Okay.
25       A    I'm stepped back at the command post.
```

LEXITAS™

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 95

1      Q    Okay.

2      A    Most of the time it's two blocks away down

3    the street.

4      Q    Okay.  So then that's a very fair question.

5    So when I'm saying, hey, would you have called a

6    tactical, that's a -- you say, "Hey, I've never been

7    in that position, so I don't want to give an opinion

8    on that"?

9      A    Correct.

10     Q    Okay.  All right.  Even -- and so let me ask

11   you, as part of your training for the position that

12   you took, had you ever, like, gone with the group to

13   serve these warrants?

14     A    No.  That's not my role.  I would -- you

15   should never be -- you should have that distance.  I

16   am a lieutenant, I'm the incident commander or the

17   tactical commander.  I'm always stepped aside so you

18   have that overall perspective.

19          I'm not wearing a vest, I don't have a gun,

20   I'm never issued -- besides my police duty weapon,

21   but I am not a SWAT operator; I'm the incident

22   commander.

23     Q    Okay.  You guys know the ins and outs of

24   this and I don't know.

25     A    Okay.

Page 96

1      Q    So now I understand a little bit better the

2    distinction between operations and then you're

3    tactical?

4      A    Yes.

5      Q    Okay.  All right.  Sorry, I'm just going

6    over my notes.

7      A    It's okay.  Gives me a chance to drink

8    water.

9      Q    Do you want to -- can we just take a --

10     A    No.  Or do you need --

11         MR. ANDERSON:  I'm good.  Don't worry about

12    me.

13   BY MS. MURPHY:

14     Q    All right.  And so we talked about it a

15   little bit before, but I will represent to you

16   another one of the -- another one of the

17   recommendations that CERT made -- and I'll read it to

18   you.  I'm just going to read part of it.  If you want

19   me to read the whole paragraph, I can.

20         But it says, "Any involvement of a new

21   sergeant in FTEP during a live mission will only be

22   in the capacity of a supervisory role and under the

23   guidance of an on-scene sergeant."

24         My understanding is that they had criticisms

25   about Russ Backman -- if I say running it, but do you

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 97

1   disagree with me if I say running it?

2       A    He wasn't running it.

3       Q    Okay.

4       A    Garth Findley was running it and he is like

5   me, on the outside, getting the overall picture and

6   then we send Russ in to kind of control the inside.

7       Q    But do you understand that they're saying

8   that essentially he didn't have enough training or

9   that they wouldn't have done it that way again?

10      A    They could have changed it after the fact,

11  but, again, I was able to provide the evidence and

12  prove -- and there was never a policy violation that

13  said he will absolutely go through SWAT -- SWAT

14  school is a big to-do task to get individuals

15  through.  Especially they have to be new.

16      Q    Okay.  Do you understand that one of the

17  recommendations was that LVMPD created an official

18  approval form for the service of a SWAT search

19  warrant service?

20      A    Approval form for like -- no, I'm not aware

21  of that, so I can't speak to it.  I would have to

22  ask, like, okay, who's approving because we already

23  had Captain Cole approve the serve warrant service.

24      Q    And I'll represent to you I think part of it

25  was the unstructured way that it went back and forth

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 98

1   between, like, text messages and e-mails.  And there

2   was stuff -- you understood --

3        A    Yeah.  So we have official documentation,

4   yeah, but that wasn't there when I was doing it.

5        Q    I understand.  And you understand that there

6   was an issue with the IAP, kind of being, for lack of

7   a better term, like Frankensteined together?

8        A    Yes, that was Captain Cole.  I don't approve

9   the IAP.  That's up to the SWAT commander.

10       Q    Anything regarding the IAP, you're like,

11  hey, that's --

12       A    Yeah, at that time, they said the captain

13  will do it and does approval, as you know, you've

14  read it, speaks through the chain, has the

15  conversation, does all that.

16       Q    Okay.  One of the things that you talked

17  about in one of your CERT interviews -- and I wanted

18  to ask you about this -- is that you refer to a

19  YouTube video by, what is it, the National

20  Tactical -- is it NTOA?

21       A    Yeah, National Tactical Officers

22  Association.

23       Q    Yeah, I tried to find it myself and

24  couldn't.  So I was wondering if maybe you could give

25  me some cues, because I really -- because I know that



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 99

1    you played the video during this and you were saying,

2    "Hey, look, they did this, this, and this like this,

3    and this is why I think we're in line with it."

4          So I wanted to ask your help today to see if

5    I could figure out which video you were looking at.

6    A    I just Googled it, "NTOA" and "methods to

7    serve a search warrant."

8    Q    That's not the search thing I put in.  So

9    let me -- if you'll just bear with me, I wanted to

10   try that.

11   A    But I'm not going to remember -- you know,

12   you could have 15 things that come up.  I'm not going

13   to remember verbatim what that video was.

14   Q    And I'll say to you mostly what came up was

15   a bunch of plaintiffs' lawyers stuff, so I'm pretty

16   sure we can -- that you weren't relying on there.

17   A    No, no.  It was just an example because, you

18   know, NTOA does things differently than we do.  Like

19   I said, they actually throw blind -- at that time, I

20   don't know what they're doing today, tactics

21   change -- but at that time, they call it a bang,

22   which is a distract, and they would actually throw it

23   inside the residence, which is something we don't do.

24   Our distracts are -- you know, we throw it on the

25   ground or we use the stun stick.  But we're not just



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 100

1    in the back bedroom throwing a flashbang in there.

2        Q    And so sorry, if you could -- what search

3    term did you put, it was "NTOA" --

4        A    "Service of a search warrant."  And, you

5    know, I don't know the specifics at the time, but I

6    know -- like I said, I had to in the interview to

7    show them, like, here, here is how they were doing it

8    to give them an example.

9        Q    Right.

10       A    And searches from -- and I don't know if I

11   named like, hey, when that video was.  So you might

12   get something for today, which isn't applicable to

13   what we were doing in 2023.

14       Q    I was just -- yeah, no, no, no, and I get

15   that, but you had talked about the YouTube video

16   quite a bit and I had gone directly to YouTube and

17   put in some search stuff.  All that came up was,

18   like, plaintiffs' lawyers stuff and I was positive

19   that's not what you were citing in your standards.

20       A    Yeah.

21       Q    Sorry.

22       A    CERT would have all that.  I mean, you know,

23   you do the interview and you show them stuff, so they

24   should -- yeah.

25       Q    I was just wondering if you could help me,



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 101

1    if we can find it, but I can look for it afterwards,

2    too, on YouTube.

3        A    And that would be the main thing that you

4    would see, is, you know, they make the announcements,

5    do the distract, breach, go in, and then you'll see

6    those bangs.  So if you find that video.

7        Q    Yeah.  Give me one second.  And I know this

8    was years ago and all the algorithms change.

9        A    And I don't even know if I did it on

10   YouTube.  You know, you can Google and it shows you

11   YouTube and stuff like that.

12       Q    You said YouTube in here several times.  I

13   get it.

14       A    The video comes out on YouTube, but you know

15   when you're doing the search engine.

16       Q    Yeah.

17       A    I could have been using that search engine

18   of Google, and then Google can provide you -- say,

19   hey, here is actually a YouTube video.

20            But I wasn't searching on YouTube for that

21   video, if that helps.

22       Q    Okay.  That does.  Yeah, I don't see

23   anything that seems to be -- I was hoping something

24   would pop up.

25       A    Yeah, I know I did extensive research in



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 102

1   preparation for my interview, so I can't give you the

2   100 percent.

3        Q    If you brought the video with you, do you

4   think it's maybe -- do you have it saved anywhere?

5   Did you e-mail it to anyone?

6        A    No, it would have been just pulled up on a

7   department laptop, "Hey, here it is," and that's it.

8   Nothing of my own.

9        Q    Yeah, I mean, because based on the

10  interview -- and, I mean, I can find out if CERT

11  still has the video, too -- but based on what you

12  said during the interview, my understanding was that

13  you were kind of like, "Hey, watch this video and how

14  the guys did it was in line with that."  So I was

15  wanting to see the video.

16       A    Yeah, and we're not 100 percent in line with

17  it.  We're actually more restrictive.  Like I said,

18  we don't throw those flashbangs into the room.

19       Q    And one of the other things, one of the

20  criticisms was that it was a covered window.

21            Did you understand the criticisms on that?

22       A    Yes.

23       Q    What was your understanding of that

24  criticism?

25       A    Again, CERT doesn't have the training in



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 103

1    tactics.  We do the stun sick on a distract, put it
2    up to the -- you know, 10 feet, 11 feet so it's away
3    from individuals.  The guys can rake out those blinds
4    and it's up to the operators there to clear that
5    area, too, you know, as they see it.
6           The authorization of a stun stick, like I
7    said in my interview, it can stop -- if you went up
8    there and something changed, if they were doing that
9    surveillance ahead of time and, "Hey, the subject
10   left," there's other parameters in place.  But the
11   officer has to make that decision.  He has
12   authorization, but something could change that he
13   could say, "Yeah, I'm not going to it, it doesn't
14   meet the -- I don't feel comfortable, we tipped a guy
15   off," or they gained some additional intelligence
16   right before the service.
17      Q    Okay.  And one of the things -- sorry, I'm
18   just kind of jumping around because I'm looking at my
19   notes here.
20          We talked about the Jasmine King case, and
21   one of the things is that you said in your CERT
22   interview, one of the reasons that you amended or
23   modified the policy in 2021 is because you said
24   internal investigation was doing an investigation on
25   tactics.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 104

 1       A    Exactly.

 2       Q    What was your understanding of why IA was

 3  doing an investigation on tactics?

 4       A    It came from someone higher up.  They're not

 5  supposed to do tactics.  That was one thing that was

 6  wrong from the beginning.  That's not their job, and

 7  it may have even -- I know I did in the post

 8  conversations with the administration, like why is IA

 9  doing this?  This is clearly wrong.  CERT should be

10  doing it and did not agree with that.  None of us

11  did, because it's not their job.

12       Q    And if I -- you know, I've read a lot, so,

13  and if this is incorrect, this is just pulled from my

14  memory.  I do remember you saying in here somewhere,

15  where they kind of also asked you, "Hey, why is IA

16  doing this?"  You were like, "I can't comment on an

17  active investigation."

18            As we sit here today, I mean, I doubt

19  there's still an active investigation, but you're

20  saying -- which is kind of what I thought, although

21  I'm not educated like you are -- what was your

22  understanding of why IA was looking at this?

23       A    They were ordered to --

24       Q    Do you know --

25       A    -- look at it.

LEXITAS™

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 105

1      Q    I'm sorry.  I shouldn't have interrupted

2   you.  I'm sorry.

3      A    They were ordered to do the

4   investigation from -- CERT is fully aware of what

5   happened beforehand.  They didn't feel the need to

6   review it or take on that investigation.  Some of the

7   upper administration was not happy with that, so --

8   and they were also in charge of internal affairs, so

9   they ordered internal affairs to do it.

10     Q    Okay.  And as we sit here today, because

11  this didn't kind of come through clearly for me, what

12  was IA looking at?

13     A    If there was -- obviously, if there was

14  something we did that was contrary to policy, that

15  contradicted policy, that was a violation of --

16  because basically that's all they can look at.  They

17  look at our SOPs, our manual, and see if we violated

18  it.

19          Again, we weren't sustained on any of that.

20  I think there was -- I can't remember -- something

21  minor that was sustained on, like having a beard or

22  something, you know, frivolous, not something, you

23  know, you violated this SOP.

24     Q    Okay.

25     A    And then again, they, at that time, they

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 106

1    were like, "Well, you clearly can't serve this for

2    property."  I'm like, "Yes, we can, and this is why."

3    And they're like, "Well, it doesn't say that."

4          So that's why when the investigation was

5    over, I said, "I need to fix that so you guys

6    understand when you read it."  And they said

7    "Absolutely," and once the -- everything was

8    finished, we changed -- I was ordered to change that

9    so it was more clear for those outsiders who don't

10   understand SWAT tactics.

11       Q    Okay.  One of the things that you talked

12   about, and I'll read you your exact sentence -- and

13   this is from your second interview, Page 21, Bates

14   LVMPD 690, "And the majority of the recommendations

15   that have been changed since I've been there have

16   come from CERT."

17          And so, and I kind of wanted to ask you a

18   little bit about that more.  So you have been -- and

19   I don't want to get into the actual background of

20   other policy changes that are in no way related to

21   this case -- but part of my understanding is when you

22   were talking about your role, part of your role is

23   that you would at times rewrite or modify policies,

24   correct?

25       A    I would be ordered to rewrite it based on

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 107

1    conclusions of executive staff or CERT findings or

2    even IOCP.  I know we had some assistant sheriffs

3    that went to those conferences and they make

4    recommendations, so they would review our manual and

5    say change that, and I would change it.

6        Q    And just for the record, what is IOCP?

7        A    It's international -- it's a chiefs

8    conference.  I don't know all of that.  I haven't

9    been to any of them, but it's basically training and

10   learning, these conferences, at the chief level, the

11   higher-up level.

12       Q    Okay.  But based on this, this testimony you

13   just gave, that "the majority of the recommendations

14   that have been changed" -- that's what you said --

15   "since I've been here," have come from CERT?

16       A    Correct.

17       Q    Okay.  And that didn't -- I mean, this was

18   within so close -- I mean, I think this second

19   interview was -- was December -- or, sorry,

20   October 12th, so it was literally 45 days before you

21   retired?

22       A    Yeah.

23       Q    Okay.  And so if even 45 days before you

24   retired, most of the time when there's, like, a

25   tweaking or amendment to a policy, it comes from

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 108

1   CERT?

2        A    Yeah, and that's their role.  They see if

3   there's something that needs clarification, taken

4   out, and we abide.

5        Q    Okay.  And one of the policy changes that

6   you talked about as well is, I think that there --

7   you tell me if I'm right or wrong -- you had a long

8   paragraph of dialogue, I'm trying to understand it.

9             You talked about a policy change from FNUs

10  and LNUs?

11       A    First name unknown, last name unknown.

12       Q    Okay.  And you kind of -- do you remember

13  talking about that?

14       A    Yes.

15       Q    Okay.  Can you kind of walk me through -- I

16  didn't completely -- I didn't completely understand

17  what you were talking about.  Could you kind of

18  explain that to me a little bit?

19       A    In the past, we had -- mainly for

20  narcotics -- that we would serve a -- they would want

21  a search warrant for a particular place, but they

22  didn't know who was inside.  And they would do a --

23  they call it LNU/FNU, last name unknown, first name

24  unknown.  And we changed from that and said, no, we

25  need to know, you know, who's the occupants here.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 109

1    Give us as much as you can.

2          Now, it didn't totally exclude serving the

3    search warrant, it's depending on the crime.

4    Narcotics, yeah, we're going to ask more from you.

5    Pedophilia, we may not have all that.  Maybe they're

6    just going after the computer hard drive.  So we

7    would still serve that warrant.

8          So it just would depend on what we were

9    going after, but we would not just take that as a --

10   you show us your due diligence, show us that you did

11   X, Y, and Z, and you absolutely -- all they know him

12   as is Scooby-Doo.  Hey, what's Scooby-Doo's name?  We

13   don't know, but we know Scooby-Doo.

14         So we would put more -- okay, we're going to

15   need to have this, this, this, and this.  And they

16   can go through all that and they still may not know.

17   We still may serve it, we may not serve it.  But that

18   wasn't just a catchall, boom, and we wouldn't ask any

19   further questions.

20   Q    Okay.  All right.  Have you come to learn

21   anything about Mr. Williams since this incident?

22   A    Since I've been retired on this?

23   Q    Well, since the officer-involved shooting.

24   Since the officer-involved shooting until today.

25   A    I think the mother -- there was video, North



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 110

1    Las Vegas came forward and said, hey, we were looking

2    for him for some robberies, I believe.  And there was

3    some interview from the mom on body-worn camera that

4    she was talking not in a good light, saying, you

5    know, he's a problem, he's kicked out, I only have a

6    few items.

7             So that came forward after the fact, once

8    North Las Vegas Police Department found out that we

9    had this officer-involved shooting with Isaiah

10   Williams.

11       Q    And did North Las Vegas give that to Metro?

12       A    Yes.

13       Q    Okay.  When did that happen?

14       A    Oh, I can't tell you.  I know it was

15   afterwards.  All I know it was after the OIS.

16       Q    Sorry, let me ask the question more

17   artfully.

18            Were you still working there?

19       A    Yes.

20       Q    Okay.  And do you remember how it was

21   transmitted to you guys?

22       A    I can't recall specifically.

23       Q    Okay.  All right.  Have you come to learn

24   anything else about Mr. Williams?

25       A    No.



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 111

```
 1      Q    Do you think, as we sit here today, is there
 2   anything that you would have changed about how -- is
 3   there anything that you would have changed regarding
 4   your role in this?  Not that you wouldn't be involved
 5   at all, that's not what I mean.
 6           Do you understand the nature of my question?
 7      A    Yeah.  Make no mistake, it's a tragedy.
 8   Someone lost their life.  It's the last thing we want
 9   to do.  And we have officers that hold that mental
10   trauma, PTSD, from that event.  And we have one who's
11   debilitated from -- but based on the information we
12   had at the time, it was a homicide, the search
13   warrant needed to be served, and that was the best
14   tactic at the time.
15           So based on everything we know, yeah, it's
16   tragic.  We needed to go forward, they needed to
17   further their investigation.  They were a threat to
18   the community, there was an assault with a weapon,
19   him shooting out in public, 20 rounds.
20           So we needed to further that investigation,
21   whether it exonerates him or gives him the evidence
22   they need for justice of Mr. Thomas.
23           So based on everything we knew at the time,
24   I would still approve the CET, I would still approve
25   the stun stick.  Yes, it's a tragedy.  It's
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 112

1    unfortunate.  It wasn't a mistake-of-fact shooting,

2    though.  He fired at us six times and ultimately

3    fired 18 rounds at us.

4        Q    Okay.  We went over the video.  Does it look

5    like he is aiming at anyone?  We can re-watch it.

6            Does it look like he is aiming or does it

7    look like he's covering himself?

8        A    It looks like he is aiming at -- he is not

9    like, hey, there's Kerry Kubla, let me shoot Kerry

10   Kubla.  So he is firing at the officer and he hit

11   Kubla.  Kubla went down.  Kubla can't get a round

12   off.  He hit the police officers.

13       Q    Do you see him covering his own face?

14       A    Probably from when they returned fire,

15   trying not to get the rounds at him, but he continued

16   to fire and fire 18 rounds from that weapon.  He

17   fired at the officers.

18       Q    Let me ask you the other question a little

19   bit differently.

20           Based on everything that you know today --

21   and I'm asking you to do the unfair thing of looking

22   back with 20/20 vision with everything that

23   happened -- do you feel that any of the policies

24   of -- any of the Metro policies ought to have been

25   changed following this incident?



Melanie O'Daniel            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 113

1          MR. ANDERSON:  Objection to form.

2          Go ahead.

3          THE WITNESS:  I would say no.  I'd say

4    sometimes they have a knee-jerk reaction and take

5    something away from you, a tool away from you.  But

6    all our decisions are calculated decisions.  There is

7    risk, it's not an absolute.  There is risk with that.

8    We're SWAT, we're serving a homicide warrant with a

9    violent subject, there's a victim there.

10          So based on all the facts that we had known

11    at the time -- I don't do 20/20 hindsight.  There are

12    a few things, yeah, we can change policies.  But

13    based on CET needed to be served; SACO was not

14    optimal, having Russ go in, that's part of -- I've

15    had a sergeant go in number two in the stack.

16          So everything was in line with what we did.

17    We didn't say, oh, whoopsie, it was remote control,

18    not a gun.  There wasn't any of that whoopsie stuff.

19          Now, those officers, they might have a

20    different perspective, but based on me, at home,

21    COVID, approving that warrant, approving those

22    tactics, that was the best decision with the training

23    and policies in place that we had at the time.

24    BY MS. MURPHY:

25          Q    Let me ask the question a little bit

Page 114

1  differently, then.  If the answer is the same, the

2  answer is the same.

3           Based on what happened here, did you change

4  how you did anything?

5      A    No.

6           MS. MURPHY:  Okay.  All right.  I don't have

7  any more questions.

8           THE WITNESS:  Okay.

9           MR. ANDERSON:  No questions.

10          THE VIDEOGRAPHER:  Before we go off the

11  record, does anyone want the video?

12          MS. MURPHY:  No, thank you.

13          MR. ANDERSON:  No, thank you.

14          THE VIDEOGRAPHER:  This concludes the

15  deposition of Melanie O'Daniel, consisting of one

16  disc.  The time is 12:38 p.m. and we are off the

17  record.

18          THE REPORTER:  Did you want a copy of the

19  transcript?

20          MR. ANDERSON:  Yes.

21          THE REPORTER:  And read?

22          MR. ANDERSON:  So you have the opportunity

23  to read this and make sure everything is transcribed

24  right, whether it's --

25          THE WITNESS:  Maybe before trial.

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 115

1              MR. ANDERSON:  So, you know, if there's

2    anything wrong you can change it now.  Like, if they

3    spell your name wrong or something, but if they said

4    you said you didn't but you said you did, something

5    like that -- do you have any interest in reading it

6    or you're fine going with the transcript?

7              THE WITNESS:  I'm fine with going with the

8    transcript.

9              MR. ANDERSON:  We will waive.

10             (Thereupon, the videotaped deposition

11              was concluded at 12:38 p.m.)

12

13                        *    *    *    *    *

14

15

16

17

18

19

20

21

22

23

24

25

Melanie O'Daniel         Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 116

1                         CERTIFICATE OF WITNESS

2       PAGE    LINE       CHANGE                      REASON

3       _____

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19                          *  *  *  *  *

20          I, MELANIE O'DANIEL, witness herein, do hereby
        certify and declare under penalty of perjury the
21      within and foregoing transcription to be my
        deposition in said action; that I have read,
22      corrected and do hereby affix my signature to said
        deposition.

23

24          _____    _____
                MELANIE O'DANIEL                  DATE
25



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
                                                     Page 117
 1                    REPORTER'S CERTIFICATE

 2
     STATE OF NEVADA        )
 3                          )   SS
     COUNTY OF CLARK         )
 4

 5          I, Sarah Safier, a duly certified court
     reporter licensed in and for the State of Nevada, do
 6   hereby certify:

 7          That I reported the taking of the deposition
     of the witness, MELANIE O'DANIEL, at the time and
 8   place aforesaid;

 9          That prior to being examined, the witness was
     by me duly sworn to testify to the truth, the whole
10   truth, and nothing but the truth;

11          That I thereafter transcribed my shorthand
     notes into typewriting and that the typewritten
12   transcript of said deposition is a complete, true and
     accurate record of testimony provided by the witness
13   at said time to the best of my ability.

14          I further certify (1) that I am not a
     relative, employee or independent contractor of
15   counsel of any of the parties; nor a relative,
     employee or independent contractor of the parties
16   involved in said action; nor a person financially
     interested in the action; nor do I have any other
17   relationship with any of the parties or with counsel
     of any of the parties involved in the action that may
18   reasonably cause my impartiality to be questioned;
     and (2) that transcript review pursuant to NRCP 30(e)
19   was not requested.

20          IN WITNESS WHEREOF, I have hereunto set my
     hand in the County of Clark, State of Nevada, this
21   6th day of January, 2025.

22

23
                              
24           _____
                   SARAH SAFIER, CCR 808
25
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| 0 | 11 | 18 | 2:24-cv- | 5 | A |

**0**

**04**
65:16

**08**
58:10,21
66:23

**09**
58:10,20

**1**

**1**
6:2,3

**1,400**
85:15

**1,487**
35:4

**1.0**
78:10

**1.5**
70:12

**10**
13:18
34:7,15
61:13,19
68:6
70:6,9
82:18
103:2

**10-second**
39:8

**100**
17:18
54:9,10
73:11
102:2,16

**10410**
4:13

**10:26**
4:3

**11**
61:13
103:2

**1125**
50:12
51:6
77:25

**11:19**
55:16

**11:28**
55:19

**12**
67:22
84:25

**12:38**
114:16
115:11

**12:59**
64:15

**12th**
107:20

**13**
41:22
58:17
60:20
62:10
65:16
66:23
67:22

**13:00.09**
58:6

**15**
30:7,13
58:18,20
68:8
72:7,11,
16,19,22
99:12

**16**
30:2
58:17,18,
21

**17**
4:2 26:2

**18**
26:2,8
30:8,13
112:3,16

**183**
78:10

**186**
78:10

**19**
14:2,19,
20

**2**

**20**
50:16
60:20
72:7,11,
16 111:19

**20/20**
112:22
113:11

**2021**
80:6 81:5
103:23

**2022**
13:12,18

**2023**
100:13

**2024**
4:3

**21**
106:13

**22**
36:11
41:15,22
62:11

**225**
12:3

**23**
62:10,11,
14

**2:24-cv-
00074**
4:24

**3**

**3**
70:24
71:11

**3,000**
22:14

**3.14**
78:10

**3.6**
77:18

**3.8**
82:15

**3050**
43:20
50:11
52:2
74:19,22
78:5

**30th**
13:15

**4**

**40**
12:12
17:4

**415A**
50:15

**4461**
74:22

**4469**
77:19

**4470**
82:15

**45**
107:20,23

**5**

**5**
70:14,21
71:7,9

**50**
28:4
54:11

**56**
64:17
65:4

**57**
35:5
64:15,17
65:4

**6**

**690**
106:14

**7**

**7-eleven**
53:10

**718**
84:25

**9**

**9.01**
78:10

**90**
35:5

**99**
17:18
24:6,12

**99.9**
35:10
84:19

**A**

**a.m.**
4:3
55:16,19
70:14,21,
24 71:8,
9,11

**abide**
108:4

**abilities**
56:11

**ability**
9:23
22:10,15

**able**
8:22 9:13
23:23
27:19
46:4,10
49:8
51:24
78:19
79:6
81:22,23
86:12
89:15
97:11

**about**
9:8 10:25
11:4,6,8
14:2,21
15:13,15,
16 17:4
21:17
23:8
29:14,19
30:14
32:19
33:17
40:4,24
47:4,5,7
56:1,6,15
57:4 67:9
68:7
71:16,19



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 73:18,21 | 77:16 | 32:2 66:6 | 15:19 | 103:9 | 107:8 |
| 78:16 | **accurate** | **administe** | 24:2 | 113:2 | 109:5,11, |
| 79:21 | 10:11,18 | **r** | 29:17 | **aiming** | 16,20 |
| 82:12 | **acronyms** | 4:12 | 47:1 | 112:5,6,8 | 110:15,23 |
| 89:7 91:7 | 49:9 | **administe** | 51:11 | **al** | 111:5 |
| 96:11,14, | **acting** | **red** | 59:25 | 4:10 | 113:6,10 |
| 25 98:17, | 27:15 | 8:18 20:3 | 62:3 | **Alexander** | 114:6 |
| 18 100:15 | **actions** | **administr** | 65:22 | 4:8,22 | **allegatio** |
| 103:20 | 26:18 | **ation** | 66:18 | 5:5 | **ns** |
| 106:12, | **active** | 104:8 | 69:17,23 | **algorithm** | 19:21 |
| 18,22 | 71:13 | 105:7 | 77:8 | **s** | **allow** |
| 108:6,9, | 104:17,19 | **admit** | 79:20 | 101:8 | 83:1 |
| 13,17 | **actual** | 52:1 | 80:23 | **all** | **allowed** |
| 109:21 | 18:7 | **admittanc** | 85:14 | 8:20 12:8 | 19:6 |
| 110:24 | 31:14 | **e** | 93:14 | 16:17 | 89:18,19 |
| 111:2 | 33:18 | 69:21 | 97:9,11 | 17:13 | 90:13,17 |
| **above** | 51:20 | 70:1 | 102:25 | 19:24 | 91:11 |
| 94:12 | 106:19 | **affairs** | 105:19,25 | 25:22 | 92:2 |
| **above-** | **actually** | 105:8,9 | **agency** | 29:16 | **allowing** |
| **and-** | 16:4 | **after** | 21:10 | 32:23 | 77:21 |
| **beyond** | 32:6,16 | 14:12 | **ago** | 35:16 | **alluded** |
| 42:1 | 39:23 | 25:10 | 8:8,11,13 | 36:3,17 | 50:5 |
| **absent** | 51:4 | 40:20 | 9:10 | 37:22 | **almost** |
| 54:4 | 57:3,12 | 41:25 | 27:14 | 39:11 | 85:4 |
| 79:11,18 | 76:17 | 47:20 | 29:18 | 44:4 | **along** |
| **absolute** | 78:2 83:6 | 50:14 | 101:8 | 46:12 | 35:18 |
| 113:7 | 94:17 | 53:22 | **agree** | 48:7,16 | 53:21 |
| **absolutel** | 99:19,22 | 59:9 | 58:7 | 49:13 | 70:4 |
| **y** | 101:19 | 61:14 | 61:15 | 51:13 | **already** |
| 41:13,14 | 102:17 | 69:19 | 64:19 | 55:21 | 9:20 |
| 70:7 94:2 | **added** | 72:7 | 65:3 | 56:2 | 97:22 |
| 97:13 | 79:11 | 73:19,23 | 66:19 | 60:12 | **also** |
| 106:7 | 80:4,5 | 82:2 | 85:24 | 63:6,10 | 15:10,12 |
| 109:11 | **addition** | 92:25 | 87:3,18 | 64:13,24 | 34:8 |
| **access** | 50:24 | 97:10 | 104:10 | 66:1,12, | 35:23 |
| 15:18 | **additiona** | 109:6,9 | **agreed** | 15 69:23 | 41:15 |
| 94:11 | **l** | 110:7,15 | 47:19 | 86:19 | 50:8,24 |
| **accident** | 103:15 | **afterwards** | **ahead** | 89:23 | 51:1 56:7 |
| 50:20 | **Additiona** | **s** | 13:6 | 91:16 | 70:15 |
| 53:24 | **lly** | 49:3 | 25:5,20 | 92:15,19 | 71:12,20, |
| **accidenta** | 74:22 | 101:1 | 31:7 | 93:10 | 24 76:13, |
| **lly** | 83:18 | 110:15 | 37:12 | 95:10 | 23 83:18 |
| 9:24 | **address** | **again** | 39:12 | 96:5,14 | 84:10 |
| **according** | 22:23 | 7:13 | 44:7 45:9 | 98:15 | 104:15 |
| 74:18 | | 11:23 | 51:22 | 100:17,22 | 105:8 |
| | | | 53:24 | 101:8 | |
| | | | 63:3 | 105:16 | |

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

although
104:20

always
32:23
43:21
75:14
95:17

amend
56:2

amended
81:5,13
103:22

amending
80:3

amendment
18:9
19:11,21
20:4,8,
12,18,22
24:15
32:20,24
33:7,9
34:1
59:11
60:5
61:22
62:24
68:12
107:25

amount
74:10
75:25
76:7
77:24
82:20

amounts
78:1

analogy
71:6

and/or
75:6

Anderson
4:15
6:10,12,
14,19,23,

25 25:4,
19 31:5
37:16
44:6
45:8,25
48:3
57:2,10
59:13
61:25
63:2
68:13
87:13
96:11
113:1
114:9,13,
20,22
115:1,9

angles
91:22

animal
85:5,9

ankle
51:5
54:19

announce
18:9,13,
14 20:7
32:19
69:19
84:2
86:3,4

announcement
21:3
23:10
24:16
30:16,18,
19 32:1
33:23
34:17,18,
22 38:25
39:9
57:23
59:10
60:4,25
61:7,14,
19 62:13,

23 64:9,
20 65:6
66:3
68:3,5,9
72:23
87:6,24
88:8
92:12

announcement's
62:15

announcements
20:16
22:22
24:4
26:24
27:1
32:11
39:16,17
61:1,16,
21 62:1,2
65:23
72:12,17
73:3
87:15,16
88:9
89:10
90:10,15
91:21
92:1,8
101:4

announcing
18:16
21:4

another
10:20
34:4
40:6,20
57:22
82:18
96:16

answer
8:20 9:3,
7,12,23
10:6,8

16:11
19:8 25:5
55:23
61:11
63:1
70:13
83:2
90:5,17
114:1,2

answered
12:5
33:17

answering
9:22 10:1
70:3

answers
6:16 12:6

any
8:23
9:13,24
10:10,15,
22 11:6,
11 12:13,
14,18,21,
25 15:7,9
18:8,10
23:8
32:18
33:20
36:23
40:16
43:7
46:13,17
47:4,7,8,
17,18
54:7
55:24
58:25
68:16
73:1,13,
21 76:7
77:2 82:3
88:11,14,
15 96:20
105:19
107:9
109:18
112:23,24

113:18
114:7
115:5

anybody
88:16

anyone
54:4 89:2
102:5
112:5
114:11

anything
15:5
19:10
48:24
57:4 77:6
79:3
84:13
90:14
98:10
101:23
109:21
110:24
111:2,3
114:4
115:2

anything's
31:17

anyway
55:23

anywhere
102:4

AP
63:13

apartment
22:12,13
31:23
43:20
44:12
45:2
50:12,13
51:6 53:5
60:3
67:15
74:24
75:4

77:13,15,
25 78:3,4

apologies
45:18

apostrophe
5:9

apparently
50:19

appearances
4:11

Apple
63:13

applicable
100:12

appointment
14:10

approach
31:24
37:10
57:9

appropriate
33:25
77:24
85:8

approval
42:17
97:18,20
98:13

approve
38:1
97:23
98:8
111:24

approved
92:24

approving
69:12,13



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
97:22              articulat           90:10,23           31:13              31:25              111:5,12,
113:21             ed                  95:11              32:6               37:3,7,11          14,23
                     42:14             98:13              54:17              42:20,25           112:2,3,
approxima                              103:5              61:4               43:1,6,20          5,8,10,
tely               as                  104:18             89:21,22           44:4               15,17
  4:3 13:13          4:19 6:2          105:10             91:7,14,           46:2,23            113:11,
  50:16              8:2 9:14          108:6              15 112:21          47:20,21,          20,23
  61:13              11:1,22           109:1,9,                              24,25              115:11
                     13:7,25           12 111:1           asleep            48:25
ARCO                 14:23                                  71:25            49:1,3,18          ATLS
  44:11              16:15,18          aside               72:1             50:11,16,            37:23
  71:22              17:8              95:17                                 21,22
                     19:25                                aspects           52:1               attach
area                 20:15            ask                   18:7             54:22                6:1
  103:5              21:19              8:20 9:4,                            55:15
                     24:13,24          5 10:20,           assault           56:2               attend
areas                28:25             24 11:6,            7:17             57:12,19,            17:10,15,
  34:12              29:20,22          11,17               50:15            24 59:9,           17
                     30:24             29:4                51:2,12          16,25
arisen               31:8,12           32:17               76:10            60:3,18,           attendanc
  10:16              32:8,14           55:23               111:18           21 62:12           e
                     33:6 37:1         56:5                                 63:7,21              17:19
armed                38:4              61:10              assistant         64:9,16
  22:7               39:11             65:20               37:23            65:4,15            attended
  23:14              40:3              66:2                 107:2            68:7,8,16            17:4,20
  51:11              41:17,19,         69:16                                70:10,14,
  52:19              21 43:22          83:16             associate          21,24              attention
  53:9               44:2,3,           85:23             d                  71:7,9,              23:16
  54:25              20,25             89:7 94:4            77:24            10,23
  57:2               45:4,10,          95:10                                72:19,22           attorney
  77:23              12 46:12,         97:22             Associati          74:22                5:4 10:4,
  80:20              24 48:22          98:18             on                 76:2,22            5
                     50:23             99:4                16:21            79:5,6
arms                 52:2              106:17              98:22            85:7,18            attorney-
  23:15              53:22             109:4,18                             86:23              client
  24:20,22           55:7 57:9         110:16            assume            89:17                11:5
  84:7               58:4,25           112:18             81:15            90:16
                     59:8,23           113:25                              91:23              auspices
around               61:3,12,                            assumed          92:17                11:5
  56:18              17,18            asked                94:20            93:25
  64:17              68:2              9:8 27:16                            94:5,7,9,          authority
  65:13              69:23             29:14             assuming          25 98:12             38:2
  92:9               70:16             49:22              7:7              99:5,19,             69:20
  103:18             71:1,22           69:15                               21 100:5
                     74:7 78:6         81:10             at                103:18             authoriza
arrest               80:10,19          89:7               7:15,18,         104:22,25          tion
  19:15              81:9,11,          90:4,24            21 8:17          105:12,              36:3
  41:24              18 84:13          104:15             11:11,13         16,17,25             41:17
  51:4               86:24                               12:8             106:23               78:11
  52:9,10,           88:11,19         asking             13:13,21         107:10               103:6,12
  15 75:22                             29:17              16:17
  76:19,20          artfully           30:12             21:25                                authorize
                     110:17                              28:18                                  22:16
artfully                                                 29:17
  110:17                                                 30:4,6
```



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**authorized**
78:24
85:6
89:15

**aware**
34:2 37:1
86:25
92:22
93:2,12
97:20
105:4

**awareness**
61:23

**away**
23:16
25:24
44:16
72:9 82:8
95:2
103:2
113:5

---

**B**

**back**
30:22
48:15
51:3
55:18
64:3,8
67:8
70:15
85:20
94:25
97:25
100:1
112:22

**background**
13:3
106:19

**Backman**
36:7
37:21
39:22

40:14
62:3
96:25

**Backman's**
38:3

**backup**
14:1,11,
18,23
16:15

**bang**
99:21

**bangs**
101:6

**Banks**
34:3
72:5,9
73:9,16
82:22

**Bar**
4:13

**barricade**
44:24,25
45:4,12

**barricades**
27:22
36:12
38:7
40:17
41:15,22

**based**
21:9
34:3,8,9,
13 44:9
51:23,24
52:15,18
59:16
64:20
65:3
68:2,7
69:25
76:5
77:11
83:11
85:6,11,

14,15,25
88:12
89:1,22,
25 90:25
91:15,18
102:9,11
106:25
107:12
111:11,
15,23
112:20
113:10,
13,20
114:3

**basic**
7:12 8:14
13:3

**basically**
49:2
78:23
105:16
107:9

**basics**
8:13

**Bates**
77:19
84:25
106:13

**bathroom**
70:20

**bear**
56:7 99:9

**Bearcats**
44:10

**beard**
105:21

**bearing**
63:8
68:25

**became**
14:16

**because**
8:13
10:14,20

26:11,17
28:14
29:15,19
31:1
33:17
35:8,15
39:24
41:6,14
42:8
44:15
47:23
53:16
56:5
57:19
59:24
64:25
70:22
71:10
73:19
76:2
79:12,18
80:14,17,
19,25
82:6
83:8,13
84:22
86:2,4
87:14
93:7
97:22
98:25
99:17
102:9
103:18,23
104:11
105:10,16

**become**
17:11

**becoming**
16:15

**bed**
24:21
70:25

**bedroom**
70:15,20
100:1

**before**

6:6 10:15
25:24
26:3,23
28:24
30:8 48:8
52:25
55:25
58:9
69:16
74:11,16
77:13
82:17,18
84:3
88:24
96:15
103:16
107:20,23
114:10,25

**beforehand**
31:16
38:24
55:4
87:15
105:5

**beginning**
8:17
34:17
60:3
61:19
68:8
72:23
104:6

**behalf**
4:6,14,15

**behind**
22:7
27:23
52:19

**believe**
7:16 12:3
20:6,10,
15,20
30:7
36:18
40:6
47:22,24

48:13
50:12
51:25
53:14
55:11
61:18
62:3
65:14,25
66:12
68:11
81:7
110:2

**believed**
7:19
71:10,16
77:14

**believes**
49:23

**belt**
41:22

**Bertuccini**
47:25
59:15,21
60:6 88:6

**besides**
95:20

**best**
9:7,23
10:11,17
32:15
42:25
43:5
45:13
56:10
111:13
113:22

**better**
41:10,14
44:17
79:13
96:1 98:7

**Betty**
82:23

**between**



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

11:10
20:25
52:8
72:11,17
88:3,6
90:3
92:14,17
96:2 98:1

**beyond**
39:8
41:19
54:16,17
75:23

**big**
97:14

**biggest**
8:16

**bit**
13:4
21:24
24:11
29:4
30:22
35:18
37:14,16,
20 41:16
58:9 72:5
88:25
96:1,15
100:16
106:18
108:18
112:19
113:25

**blind**
99:19

**blinds**
103:3

**blocks**
95:2

**BMW**
50:17

**board**
29:8
47:14,16

49:6
78:18,19
79:7

**body-worn**
28:20,22
29:9 61:6
63:22
94:11
110:3

**boom**
70:11
109:18

**both**
50:21,22

**Boulevard**
74:19,23
78:6

**boyfriend**
7:15

**bracelet**
51:5

**brass**
93:7,12

**breach**
7:21,22
18:7 21:6
23:1,2
30:6,20
32:3,12
38:15
39:16
57:20
101:5

**breached**
20:21
30:16,18,
20 32:4

**breacher**
17:10,11,
15,16,21

**breachers**
32:22

**breaches**
8:5 18:3

**breaching**
30:6
82:14
93:6

**breaching
s**
17:25

**break**
55:14,21,
22,25
56:1
65:12

**breaking**
58:15
61:20

**Brice**
29:11

**brick**
91:20

**brief**
55:21,22

**briefed**
37:11

**briefing**
31:16,19
32:10
37:1,4,7

**bring**
12:21

**broke**
65:24

**broken**
20:11
48:1
61:6,8
68:4
87:5,18
88:4 89:4

**brought**
56:8
102:3

**brushed**
69:5

**buildup**
36:2

**bull-
horning**
38:18

**bunch**
99:15

**bus**
49:18

**busy**
41:19

**but**
5:25
7:15,16
8:5 9:6,
10 11:3,
13 13:5
14:7
16:22
17:11,17,
19 19:17,
25 21:24
24:18
26:13
28:23
29:18
30:4,24
31:12
32:15
34:7,8
35:3
36:2,25
43:5
45:22,24
46:8
48:12,22
49:10
51:19
52:5
53:3,13
54:6,24
55:23
56:8,11
57:4 58:4
59:21
61:3,5
63:19,20

66:7,18
67:14
69:6,16,
25 70:15,
19 71:5,
12 72:1
74:9
76:19,25
77:10
79:4,25
80:4,8,
12,22
81:10,18
82:1
83:6,12
85:11
86:18,22
87:18,21
88:21
90:9 92:7
93:4
94:13
95:21
96:15,20,
25 97:7,
11 98:4
99:11,21,
25 100:5,
15 101:1,
14,20
102:11
103:10,12
104:19
106:21
107:9,12
108:21
109:9,13,
17 111:11
112:15
113:5,12,
20 115:3,
4

**by**
5:2 6:5,
15,20 7:1
12:18
25:13
26:9
31:11

36:23
37:19
44:18
45:16
46:5 48:6
54:12
55:20
57:5,17
58:2,14
59:18
60:14
62:3,7
63:5,18
64:1,7,
12,24
65:1,11
66:17
67:1,6,
11,19
68:15
70:11,16,
17,18
83:21
87:17
88:9,16
96:13
98:19
113:24

---

**C**

**C-E-R-T**
46:21

**calculate
d**
113:6

**call**
5:10
43:24,25
50:3
73:14
94:2,3
99:21
108:23

**called**
39:12
93:20



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

95:5

**callout**
42:12
43:10
45:11

**callouts**
38:8

**calls**
28:4
36:17

**Camacho**
4:5

**came**
48:2
49:22
79:10,21
99:14
100:17
104:4
110:1,7

**camera**
28:20
29:12
57:10
61:6
63:22
94:12
110:3

**cameras**
28:22
29:9

**cannot**
60:11
62:4

**capacity**
96:22

**captain**
75:8
97:23
98:8,12

**captured**
50:4,7

**cars**
71:20

**case**
4:8,23
5:5 6:19
7:12 8:2
9:9
10:15,20
12:15,19
19:20,24
23:4
24:25
25:3
26:18
34:4
45:24
47:9
54:10
71:5 73:9
76:7
82:23
103:20
106:21

**cases**
6:8,17

**catch**
71:24

**catchall**
109:18

**cause**
45:1
50:23
51:15,23
54:15,18
75:8
76:9,11
77:14

**causes**
84:17

**CERT**
11:25
12:2
28:23
46:18,19,
21,22
74:6,8,
10,15,18
77:10,17,
20 78:14

81:19
82:25
84:20
85:25
96:17
98:17
100:22
102:10,25
103:21
104:9
105:4
106:16
107:1,15
108:1

**CERT's**
75:11,14
82:12
85:23
92:21,22

**certain**
80:4 92:5

**certifica
tion**
16:10
17:16

**certified**
17:11

**CET**
21:21
22:3,4,5,
6,17,19,
20 32:20
36:8 38:3
39:23
40:6
42:8,9,
11,25
43:15,18,
21 44:4,
5,14
45:10,13,
22 46:22
47:16,20
53:16
75:17
77:22
78:6,12,

24 80:16,
19 83:19,
25 92:23
111:24
113:13

**CETS**
35:6 40:8

**chain**
98:14

**chance**
55:25
96:7

**change**
8:1,3
15:12,17
21:13,24
40:20
42:4
44:4,16
46:18
48:24
52:14
56:1 79:3
80:12
82:6
99:21
101:8
103:12
106:8
107:5
108:9
113:12
114:3
115:2

**changed**
8:6 31:17
37:7
43:4,5,8,
23 79:23
80:5
81:13
97:10
103:8
106:8,15
107:14
108:24
111:2,3

112:25

**changes**
46:14
82:3
106:20
108:5

**changing**
47:5
81:21

**charge**
36:24,25
69:10,12
105:8

**check**
76:25

**chief**
107:10

**chiefs**
107:7

**children**
78:3

**circumsta
nces**
19:14
34:4,9,13
59:15
68:3,10
83:12

**cite**
78:9

**citing**
100:19

**citizen**
19:12
23:2 91:1

**citizens**
70:25
78:20

**civilian**
78:20

**clarifica
tion**
108:3

**clarified**
79:23
80:13,21

**clarify**
21:15
79:22
80:11,12

**clarity**
59:19

**classroom**
32:21

**clean**
49:10

**clear**
23:5
63:21
76:19
80:1
81:11
103:4
106:9

**clearly**
104:9
105:11
106:1

**Clements**
29:11

**client**
68:17

**client's**
62:24
68:11

**close**
58:4
107:18

**closed**
70:2

**closer**
11:22

**closest**
87:9

**clothing**
52:7



Melanie O'Daniel                  Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

cocaine
72:9
73:19

codefendants
12:25

Cole
75:8
97:23
98:8

come
14:12
15:9
18:20
23:2,6
24:8 28:7
37:3 57:9
60:8
88:17
99:12
105:11
106:16
107:15
109:20
110:23

comes
67:8,24
101:14
107:25

comfortable
103:14

coming
17:19
26:5 27:4
38:20
39:5 46:2
51:9,17
61:1
71:13,21
76:9
86:25
92:6

command
93:24
94:8,25

commander
13:25
14:2
16:16,17
41:21
80:11
95:16,17,
22 98:9

commands
28:1

comment
62:4
104:16

commission
52:23

committed
71:10

committing
54:12

common
90:18

communicate
89:15,18
90:14,18,
19

communicating
89:14

communication
38:21,23
39:8 88:3

community
71:18
72:3
76:14
111:18

complete
9:5

completely
108:16

complex
43:20
44:12
50:13,16,
21 51:2
71:13
92:9

compliance
20:3,7,
12,17,21

complied
68:11

complies
59:11
61:21
62:24

comply
84:3

compound
69:16

computer
63:9
109:6

concept
86:3

concern
73:21
74:3,13

concerned
73:18

concerns
19:20

concluded
77:20
115:11

concludes
114:14

conclusion
27:6
47:19
75:11
77:8 79:5
85:23

conclusions
82:12
107:1

conditions
82:25

conduct
32:3
77:22

conference
107:8

conferences
107:3,10

confident
29:19

confirm
26:10
28:17
46:6

confirmed
74:24

conflicting
26:11,14,
21

confuse
84:10
86:2,8,11

confused
25:17

confusion
79:12
84:17

consistent
13:19

consisting
114:15

constitutional
18:8

contained
77:21

continue
9:14 27:5
42:22
66:14
76:1

continued
25:11
42:23
46:3
112:15

continuing
76:13

contradicted
83:19
105:15

contradicts
86:3,9

contrary
105:14

control
97:6
113:17

controlled
21:22

conversation
90:3,8
91:8,10,

12 92:2,
13,16
98:15

conversations
104:8

copy
114:18

corner
25:22
65:13

correct
5:12,17
6:22 7:9
8:2 9:12
13:14
15:13
19:21
21:17
24:19,25
25:1
26:19
28:14,18
35:21,24
36:4,8
37:22
38:4,9,24
39:5,9,24
40:2,20,
21,25
41:12
45:24
46:9
48:2,20,
24 51:20
52:4
54:8,20,
23,24
58:18,21
60:16,25
61:8
62:16,20
63:23
64:18
65:7
67:15,16,
25 68:23
71:6



Case 2:24-cv-00074-APG-NJK    Document 57-7    Filed 05/16/25    Page 127 of 158

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

72:12,18,
24 73:4
74:4
76:4,21,
24 78:12,
13,16,17
79:16
80:6
81:21
83:9
84:11
87:7,11
88:4,5
91:13
95:9
106:24
107:16

**correctly**
9:3 15:12

**Corrine**
4:13 5:3

**corroborate**
51:24

**corroborated**
51:7
52:20

**corroborates**
54:15

**Corvell**
49:24
50:10
51:1,12,
19

**Cottle**
7:2

**couch**
25:7 28:6
70:11,16
87:4

**counsel**
4:11

**couple**
7:14 9:17
26:11
31:2
57:19,22
64:25
65:1
81:10

**court**
4:4,12
5:24
8:18,19
9:19
37:17

**cover**
14:9
27:23

**covered**
34:19
102:20

**covering**
34:21
112:7,13

**covers**
32:23

**COVID**
35:21
40:13
41:3 60:9
113:21

**Craig**
4:15 10:7
11:2,3,4,
8,14,20
12:10
63:11
73:14

**create**
37:23

**created**
37:21
97:17

**credentials**
14:6

**crime**
8:24
21:9,10
34:10
49:21
52:23
71:10
76:9 85:7
109:3

**crimes**
54:12
76:13

**criminal**
55:8

**critical**
57:19

**criticism**
102:24

**criticisms**
47:8
74:9,10
96:24
102:20,21

**crowd**
15:25
16:3

**cue**
56:10
63:15

**cued**
56:18
60:10

**cues**
98:25

**currently**
13:9

**custody**
23:5,21
24:8,10
27:20
35:11
38:16
52:1,11

53:11
55:2
76:16

---

**D**

**D-A-N-I-E-L**
5:9

**damage**
45:1

**danger**
38:14

**dangerous**
23:15
53:10
54:25
77:23
80:20

**date**
13:16,18
80:8

**day**
9:4 37:3
49:3
70:10
71:12,23
93:19

**day-to-day**
17:6

**days**
7:18
10:16
50:20
52:1
53:24
107:20,23

**dead**
45:5

**dealer**
53:9,10

**death**
76:18

**debilitated**
111:11

**deceased**
25:12
45:18
46:10

**December**
4:2
13:12,15
36:11
41:20
107:19

**decibels**
48:12

**decided**
46:1,7
86:23

**deciding**
22:6

**decision**
46:3
60:7,11
68:19
78:5,11,
16 86:12
90:21
93:23
103:11
113:22

**decisions**
62:5
94:14
113:6

**declare**
21:14

**deemed**
6:3

**deems**
15:6

**Defendants**
4:16

**defended**
47:17
48:16,17

**defending**
48:23

**definitely**
40:23

**demonstrate**
8:22

**denoted**
40:18

**dentist**
14:10

**deny**
19:7

**department**
4:9 102:7
110:8

**depend**
109:8

**depending**
18:19
22:24
109:3

**depends**
39:19
59:14

**deployment**
83:19

**deposition**
4:21 6:2,
6,9 7:5
8:9,14,17
9:15 10:5
11:1,19,
21 12:14,
24 22:4
114:15



Melanie O'Daniel                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

115:10

**deprivation**
85:2

**described**
84:21

**describes**
19:18

**describing**
33:13

**destruction**
73:18,22
74:2

**detectives**
23:6
49:17
77:7

**determination**
75:2
89:11

**determined**
75:5 77:8

**device**
20:11

**dialogue**
108:8

**died**
45:14
49:20
82:10

**difference**
14:3
20:25
43:17
52:8

**differences**
14:4

**different**
18:3,20
19:24
24:12
31:2
35:18
37:9,15,
20 38:8,
11 40:24
57:12
63:12
81:5
88:25
113:20

**differently**
29:4
32:17
99:18
112:19
114:1

**dig**
69:6

**dignitaries**
15:9

**dignitary**
15:8

**diligence**
109:10

**direct**
40:1

**directly**
47:10,11
74:21
100:16

**disagree**
85:24
97:1

**disc**
114:16

**discipline**
47:18

**discouraged**
21:12,16

**discovered**
55:11

**discovery**
13:5

**discuss**
5:21
34:22

**discussed**
11:4
12:24

**dismissed**
6:22

**disorient**
24:19
62:19

**disoriented**
23:22
25:17

**disorienting**
23:17
24:14

**disprove**
76:16
79:6
81:22,23
82:1

**distance**
94:9
95:15

**distinction**
11:10,15
83:10
96:2

**distract**
20:11
23:16
27:1 30:4
32:2,11
34:25
35:9
84:10,14,
17 86:8,
10,14,18
99:22
101:5
103:1

**distraction**
47:23
84:22
85:2

**distractions**
86:2

**distracts**
22:25
23:8
24:18
34:22
47:5
99:24

**divorce**
10:21

**document**
84:25

**documentation**
11:24
17:6 35:4
98:3

**documented**
8:6

**documents**
11:3,12,
13,20
12:21
40:7

**doing**
9:20
15:24
24:7
27:13
42:11,22,
24 43:4
53:7
55:12
69:10
71:1 98:4
99:20
100:7,13
101:15
103:8,24
104:3,9,
10,16

**domestic**
27:14

**dominate**
22:10,15

**done**
12:18
21:2,11
31:15
34:25
44:22
46:23
47:15,16
61:16
70:5,8
74:11
88:13
97:9

**door**
7:21
18:21
19:8
20:21
21:3 22:7
23:3 24:8
30:16,18
31:25
32:3,4
33:25
38:15
39:4,16
46:2

52:19
54:5 63:1
66:19
67:7,8,24
70:1,3,
10,13,14,
16,17
82:14
83:2
87:1,6
88:18,22
93:7,16

**doors**
18:3

**dope**
53:15
80:15,16,
18

**doubt**
39:3
54:16,17
75:23
104:18

**down**
8:4 9:19
15:4
29:11
37:16
45:1
63:19
70:20
73:24
79:10
84:16
95:2
112:11

**dresser**
24:22

**drink**
96:7

**drive**
56:8,9
109:6

**drone**
94:13



Case 2:24-cv-00074-APG-NJK    Document 57-7    Filed 05/16/25    Page 129 of 158

Melanie O'Daniel            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

drop
28:1

dropped
28:1

drug
53:9,10

drugs
51:9

due
109:10

duly
4:18

during
10:5
14:23
16:1
28:24
29:8
31:19
32:21,22
34:2,22
36:2,11
48:18
71:2,3
73:1 88:2
93:11
96:21
99:1
102:12

duty
76:25
80:10
95:20

_____ E _____

e-mail
5:25
102:5

e-mails
98:1

each
16:12
63:12
64:25

earlier
46:6
62:18
72:5

early
71:11

ease
22:3

easier
29:5,15
43:25

educated
104:21

effective
25:2,6

eight
62:13
63:12
75:21

either
8:23
18:20
28:5 37:8
58:10,20
60:18
76:20,24

elaborate
83:22

elderly
75:3
76:3,4
78:3

elements
32:19
69:19
74:14

else
34:6
37:10
53:4,13
54:4
110:24

else's
28:6

employee
12:1,2

end
13:13
21:25
34:16
72:17

ended
30:17

engine
101:15,17

enough
34:24
75:5,7
76:11
77:11
83:12
97:8

entailed
69:9

enter
25:25
61:17,24

entered
25:8
29:24
88:22

entering
24:5 60:2
88:10

entirety
21:21

entities
80:23

entitled
11:1,4

entries
32:20

entry
17:24
18:21
21:22
30:3,8
57:20

59:9 68:7
72:12,17,
19,22
82:19
84:3

Especially
97:15

essentially
7:15
14:15
16:14
18:14
22:11,20
34:7
38:13,17
47:19
59:5 77:2
97:8

et
4:9

et al
4:8,22,23

evacuate
45:1

even
24:5
25:10,24
26:4,24
28:3 34:4
41:10
54:11
66:12
88:24
95:10
101:9
104:7
107:2,23

event
111:10

events
15:2
16:17
83:8

eventually
16:18

ever
6:6 27:7
28:5
32:18
33:20
34:22
41:4
59:25
94:21
95:12

every
18:19,20
19:12
28:22
48:13
55:6
61:11

everyone
31:18,20,
21,22
80:17

everything
9:10,19
30:10
31:12
37:3
41:15,24
42:14,20
47:1
48:23
106:7
111:15,23
112:20,22
113:16
114:23

evidence
52:6 53:8
73:18,22
74:2 75:7
76:23
77:3
97:11
111:21

exact
13:16
16:22
80:7
106:12

exactly
15:17
29:3 77:5
104:1

EXAMINATION
5:1

examined
4:19

example
9:8 53:6
99:17
100:8

Excellent
11:17

exception
33:11

exclude
109:2

executed
52:3,14
54:23

executive
107:1

Exhibit
6:2,3

exigent
19:14

exonerates
111:21

experience
85:15
88:12,13,
15 89:1,
23,25
90:25



Melanie O'Daniel                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

91:16,18
92:4

**explain**
22:18
42:11
59:15
69:8
75:16,17
78:19
108:18

**explained**
53:2 81:2

**explanation**
25:23
47:20

**explosive**
7:21 8:4
17:24
23:1

**explosives**
18:4

**extensive**
41:9
101:25

**extensively**
52:17

**extra**
15:6

**eye**
55:6

_____

**F**

_____

**face**
112:13

**fact**
8:24
11:12
43:8 50:5
97:10
110:7

**factor**
72:2

**factors**
22:5,16
39:25
75:5,8
78:2
80:21

**facts**
7:12 11:1
79:25
113:10

**failure**
78:7 84:4

**fair**
29:14
31:3
34:23
74:1,2
81:15
86:5,9
91:1 95:4

**fairly**
72:8

**falls**
11:5

**familiar**
47:2 73:9

**familiarized**
42:19

**families**
45:21

**family**
50:8
51:10
54:13

**far**
29:22
31:8 33:6
41:19

**fast**
16:25

**favor**
7:3

**feasible**
45:12

**feel**
69:24
77:10
103:14
105:5
112:23

**feet**
22:14
103:2

**felt**
55:10
74:15
76:2

**female**
50:19

**fence**
45:1

**fencing**
44:11

**Ferret**
16:2,6

**few**
9:9 10:16
50:20
52:1
53:24
64:24
87:8
110:6
113:12

**fight**
85:17
86:21

**figure**
99:5

**fill**
14:7

**film**
50:5,7

**final**
38:12

**finally**
25:11

**find**
77:17
98:23
101:1,6
102:10

**findings**
49:8
107:1

**Findley**
35:23
36:25
40:13
41:2 97:4

**fine**
5:15
61:12
65:18
68:25
115:6,7

**fine-tune**
33:16

**finish**
9:21

**finished**
10:1 49:7
106:8

**fire**
16:6
25:11
26:7,23
27:3,5,7,
9,12
29:12
46:1,3,7
88:24
112:14,16

**fired**
25:25
26:3,8
50:17
88:23

112:2,3,
17

**firing**
16:4 26:1
27:23
112:10

**first**
4:18
14:12,13
31:9 36:7
38:3
57:23
58:8
59:10
61:14
62:25
84:24
85:22
108:11,23

**Fischer**
49:24
50:10
51:1,12

**five**
14:21
17:9
34:9,15

**fix**
106:5

**flash**
67:14

**flashbang**
62:16,19,
22 100:1

**flashbangs**
102:18

**flee**
84:9

**fleeing**
86:15

**flophouse**
51:8
54:14,25

**fluid**
73:6

**flush**
72:9

**flushed**
73:24

**FNUS**
108:9

**focus**
41:15

**focused**
18:6

**following**
8:1 46:14
112:25

**follows**
4:19

**footage**
28:21
94:13

**for**
5:7 6:4
7:13,14,
17,18,24
8:10 9:4,
8,20,24
10:7,25
11:18
12:7,10
13:9,24
14:2,9,18
16:1,12,
13,23
17:1,16
18:15
19:1 22:3
23:6 26:2
27:18
28:13,18
29:5
31:3,13
37:16
38:5
39:22
40:2



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

41:2,3
43:3
46:23
50:24
51:15,16
52:5,6,9,
10,12,13,
16,25
53:3,4,7,
8,16
54:3,17
59:19
60:19
62:9
63:8,20
68:25
69:17
70:22
71:1
74:1,18
77:10,21,
22 79:24
80:16,18,
25 81:15
84:15
85:2
87:15
91:20
93:3,14
95:11
97:18,20
98:6
100:12
101:1,20
102:1
105:11
106:1,9
107:6
108:19,21
110:2
111:22

**forced**
82:18
84:3

**forcible**
17:24
23:2

**form**

25:4,19
31:5 44:6
45:8,25
48:3
59:13
61:25
63:2
68:13
87:13
97:18,20
113:1

**formed**
37:6

**formulate**
25:18

**forth**
97:25

**forward**
110:1,7
111:16

**found**
50:17
77:5,7
78:20,22
82:25
110:8

**foundatio**
**n**
31:6

**foundatio**
**nal**
66:2

**four**
8:11 12:4
14:21
17:9
29:18
90:24

**Fourth**
18:9
19:11,21
20:4,8,
12,17,22
24:14
32:20,24

33:7,9,25
59:11
60:4
61:22
62:24
68:12

**frame**
55:5 73:2

**Frankenst**
**eined**
98:7

**freeze**
24:7
85:4,5,12

**frivolous**
105:22

**from**
10:11,17
13:4
19:13
24:20
29:18
30:3,14,
15 31:2
32:9
33:10
34:16,17
42:7
46:19
58:20
60:3,8
61:1,19
67:8,14
72:6,23
73:2
74:21
75:5
77:18
79:10
84:22,24
86:19
100:10
103:3
104:4,6,
13 105:4
106:13,16
107:15,25

108:9,24
109:4
110:3
111:10,11
112:14,16
113:5

**front**
19:16
70:17
89:17
94:7

**fronted**
50:3

**FTEP**
96:21

**full**
5:6 38:20
65:23

**fully**
37:11
42:9,14
105:4

**further**
49:16
75:2 77:1
81:13
83:22
109:19
111:17,20

---

**G**

**gained**
103:15

**Garth**
36:25
42:18
97:4

**gas**
16:2,7
44:11

**gave**
8:9,17
55:24
107:13

**gentlemen**
43:12

**get**
14:6
17:16
19:23
21:6,13
22:11,15
27:16,19
37:3
38:22
41:13
42:19
45:2
53:13,15,
20 55:6,7
58:3
63:13
68:6 69:3
70:12
76:16
80:3
97:14
100:12,14
101:13
106:19
112:11,15

**gets**
41:8
57:20

**getting**
97:5

**Giana**
4:5

**Gillespie**
7:2

**give**
7:5 8:19
9:6 18:18
23:18,20
27:25
38:2 40:3
46:11
53:5 55:5
59:17
69:3 70:4
83:13

84:23
85:1,17
86:4,16,
21 89:2
90:25
95:7
98:24
100:8
101:7
102:1
109:1
110:11

**given**
6:6,8 8:8
11:25
12:2,3
41:6,16
42:17
61:22
62:25
73:23
77:24

**gives**
96:7
111:21

**giving**
10:11,17
86:9

**glass**
58:15
65:12,24

**go**
9:14 12:8
13:3,6
14:5
16:13,14,
17 18:8
21:6,13
22:6 23:4
25:5,20
26:1
30:10,23
31:7,12,
17 38:1,
15 39:18
40:7,11,
16 41:17



Case 2:24-cv-00074-APG-NJK    Document 57-7    Filed 05/16/25    Page 132 of 158

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

44:7 45:9
48:8,14
49:8
51:22
53:14
54:6 55:6
56:16
57:18
60:1 63:3
64:3,24
67:8
68:22
74:5,8
75:16
78:18
84:15
87:11,23
88:16
89:2,9,25
90:25
91:7,18,
22,24
92:12
97:13
101:5
109:16
111:16
113:2,14,
15 114:10

**goes**
14:8
48:13
62:16

**going**
8:12,14
9:3 10:24
11:11,17,
22 13:2,
6,17
16:24
17:3,19
18:4 19:8
21:3
22:21,22,
24,25
25:25
27:1,19
29:10,11
30:9,23

31:12,21
41:25
42:8,20
44:13,20,
23 48:15
51:9,18
52:12
53:4,16
55:15
56:4,10,
17,21,25
57:6,7,
11,18,22,
23,24
59:25
60:1
61:10,13
62:22,24
63:6,15
64:2,8,9,
16 65:20
68:22
71:14,21,
22,23
72:4,5
73:19,23
74:5
80:22
81:14
83:12,15
84:7,8,9,
13,15,16,
20 85:3,
6,17,18,
19,20
86:21
90:10,16
92:4
93:10
96:5,18
99:11,12
103:13
109:4,6,
9,14
115:6,7

**gone**
69:5
82:11
95:12

100:16

**good**
9:21
31:22
47:20,21
63:10
96:11
110:4

**Google**
101:10,18

**Googled**
99:6

**got**
7:3 10:21
11:22
26:3 31:9
39:13
68:3,4,5
84:12

**grab**
24:22

**grandma**
53:12

**ground**
9:17
99:25

**group**
94:21
95:12

**guess**
29:14
39:2
44:19

**guidance**
96:23

**gun**
24:22
25:8,23
27:18,20,
25 28:1,2
50:15
52:6,23
53:16
73:23,24

76:10
84:16
95:19
113:18

**guns**
52:19

**gunshot**
49:20

**gunshots**
48:2

**guy**
51:2
80:20
103:14

**guys**
18:8,10
34:10,21,
24 87:2
90:3,8
92:2,14
95:23
102:14
103:3
106:5
110:21

---

**H**

**half**
14:1
48:13
56:15
70:12

**halt**
37:8

**hand**
16:5 25:8
27:20
85:7

**handle**
15:4,10

**handled**
15:2
44:25
45:4

**hands**
21:6 24:9

**happen**
10:15
31:21
40:25
110:13

**happened**
19:25
24:25
32:7
50:20
84:18
105:5
112:23
114:3

**happening**
76:14

**happy**
93:13
105:7

**hard**
41:22
109:6

**having**
4:18 7:25
13:4
15:18,23
23:25
29:16
35:17
52:19,23
53:24,25
55:21
57:4
69:22
71:18
76:3 90:8
105:21
113:14

**head**
10:9
15:14
29:25
58:19

**hear**
35:8 42:8
57:23
58:8
60:15
62:1
65:12
86:14
87:16,25
90:1,9
91:15,17
92:5

**heard**
26:25
48:7
65:14
87:9,21
89:13,20,
22 90:9,
20 91:10,
17,24
92:9

**hearing**
91:5

**held**
13:23
16:9

**help**
42:14
99:4
100:25

**helps**
101:21

**here**
4:5,8
5:17,20
9:15
10:12
12:22
13:7
18:18
19:1,5,6,
25 20:15
21:19
24:13,24
28:25
29:20



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30:25
31:13
32:8,14
38:23
43:23
44:3,21
46:12
48:22
59:1,8,23
61:12,18
63:19
68:2,16
69:4
72:11,16
73:7,20
74:7
81:9,12,
18 83:1
85:11
86:22,24
88:11
90:23
91:13
100:7
101:12,19
102:7
103:19
104:14,18
105:10
107:15
108:25
111:1
114:3

**hey**
9:9 11:11
14:8 19:5
21:4
26:12,16
28:1
33:21
35:8,15
38:20
39:13
40:1
42:10
50:6,7
61:5
65:21
66:8 70:3

75:20
83:11
87:9
91:20
95:5,6
98:11
99:2
100:11
101:19
102:7,13
103:9
104:15
109:12
110:1
112:9

**hide**
19:8

**hiding**
27:23

**higher**
104:4

**higher-up**
107:11

**highly**
21:11,16

**himself**
112:7

**hindsight**
113:11

**history**
22:9
34:11
43:19
52:22
53:19

**hit**
56:25
60:15,24
61:7
112:10,12

**hitting**
66:19
93:16

**hold**

6:24
14:22
16:10
57:21
74:6
111:9

**holding**
7:18
15:13

**home**
22:14
28:6 53:9
60:9 72:1
113:20

**Homeland**
14:24

**homicide**
49:17,18,
21,23
50:14,25
75:6,7
76:24
111:12
113:8

**Hopefully**
39:6

**hoping**
101:23

**hostage**
36:14
38:12
39:3,11,
20,25

**hostages**
84:8

**hour**
31:16
71:2,3

**hours**
17:4
31:16
71:11
75:21

**house**

51:3

**how**
8:8 11:2
12:10
13:23
14:17
16:24,25
17:6,23
18:2,3,7
23:23
25:17
27:10
31:1,9
33:22
34:23
35:7
46:13
48:12
52:14
55:3
66:10,11
70:8
81:23
90:21
100:7
102:13
110:20
111:2
114:4

**hundreds**
88:13

**hypotheti
cal**
28:13

-----

**I**

**IA**
104:2,8,
15,22
105:12

**IAP**
12:3,4
37:22
98:6,9,10

**idea**

75:15
79:21

**identific
ation**
6:4

**identifie
d**
6:17
50:22

**identify**
16:6 18:2

**if**
8:19 9:24
14:8
15:2,8,11
16:11
22:12
23:4,14,
22 24:15,
21 25:17,
23 27:11
30:24
31:17
33:3,4,21
34:5,6
35:14
36:19
43:4,8,
22,25
44:2,23
45:13
53:7,18
56:7,11,
21,23
58:23
60:9
61:11
65:17
66:10
69:10,23,
24 70:22
72:9
73:13,14
78:3 79:3
81:12,15
83:5
85:23
86:8,24

89:13
90:1,20
91:10,16,
17 92:20,
21 93:4,
19 94:8
96:18,25
97:1
98:24
99:4,9
100:2,10,
25 101:1,
6,9,21
102:3,10
103:7,8
104:12,13
105:13,17
107:23
108:2,7
114:1
115:1,2,3

**implement
ed**
46:14

**implicate**
34:23

**improved**
41:17

**in**
4:8,22
5:5 6:9,
16,18
7:3,5
8:1,6,19,
22 9:2
10:15,16
11:21
12:15,19
13:5,14
14:4,7
15:9,21
16:5 18:2
19:16
20:3,7,
11,17,21
21:3,6,
11,25
22:11,15

Case 2:24-cv-00074-APG-NJK   Document 57-7   Filed 05/16/25   Page 134 of 158

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

23:5,7,9
24:15,21,
25 25:2,
7,8,14,22
26:3,5,18
27:4,8,
10,15,18
28:5,7,14
29:10,11,
23 30:7
31:9
32:7,20
33:19,21,
23 34:16,
21 35:3,
6,18
36:16,23,
24,25
37:3,12
38:14,15
39:3,18,
22,25
40:7,10,
18 41:7,
8,10,17,
18,22,23
42:4,16
43:5,8,
12,19
45:24
46:2 49:8
50:6,24,
25 51:1,6
52:23
53:14,18
54:10
55:1 66:3
67:23
68:6,19
69:6,9,
12,16
70:6,8,
15,17,20,
25 71:11,
23 73:16
74:22,24
75:4,20,
23,24
76:9
77:12,15

78:2
79:21
80:2,6,17
81:5,10,
17 82:9,
13 83:11,
15,17,25
85:11
88:14
93:23,24
94:1,8,15
95:7
96:21,22
97:6
98:17
99:3,8
100:1,6,
13,17,19
101:5,12,
25
102:14,
16,25
103:7,10,
21,23
104:7,14
105:8
106:20
108:19
110:4
111:4,19
113:14,
15,16,23
115:5

**incident**
13:14,18
16:19
19:15
35:19
46:15
69:9
79:22
81:6,8
88:20
95:16,21
109:21
112:25

**incidents**
36:14
66:13

**include**
78:2

**incorrect**
104:13

**indicate**
90:1

**indirectly**
47:12

**indiscriminately**
16:3

**individual**
28:23
45:14
52:10
64:25

**individual's**
19:11

**individuals**
35:10
42:7
52:21
54:19
78:4
97:14
103:3

**information**
31:19
37:8
39:10,13
49:1 51:4
54:7 55:7
60:10
69:24
76:5
78:17
111:11

**informative**

88:17

**informed**
60:11
68:19

**initial**
11:21

**injured**
7:23 26:7

**injuries**
7:24
45:19

**ins**
95:23

**inserting**
82:13,17

**inside**
22:8 23:5
30:21
32:5,12
36:25
39:17
45:1
53:5,12
54:4,5
67:15
71:18
78:4
79:18
84:1
89:13
97:6
99:23
108:22

**instances**
27:12
40:5

**instead**
16:3
86:15

**instructions**
8:15

**instructs**
10:6

**insufficient**
83:1

**intelligence**
55:8
103:15

**intended**
25:15
83:25

**intent**
25:9 26:6
84:2

**intention**
85:12

**interest**
50:25
115:5

**internal**
103:24
105:8,9

**international**
107:7

**interpreted**
88:16

**interrogatories**
6:17 12:7

**interrupt**
16:24

**interrupted**
9:25
105:1

**interrupting**
23:10

**interview**
8:1 11:25
15:11,21,

23 50:1
53:11
84:21,24
100:6,23
102:1,10,
12 103:7,
22 106:13
107:19
110:3

**interviewed**
68:20

**interviewing**
79:20

**interviews**
12:18
13:5
28:24
98:17

**into**
15:25
16:2
18:21
19:23
22:6
23:21
24:8,10
27:20
35:11
38:15
44:24
51:25
52:11
53:10,11
69:6
75:16
76:16
78:18
102:18
106:19

**investigation**
49:17
75:6 77:1
103:24

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

104:3,17,
19 105:4,
6 106:4
111:17,20

**investiga
tors**
49:21

**involved**
6:18
12:19
13:14
18:2
27:24
34:11
49:25
52:21,23
76:17
80:2
81:16,17
111:4

**involveme
nt**
96:20

**IOCP**
107:2,6

**Isaiah**
5:21
45:17
47:23
89:20,22
91:14,23
110:9

**issue**
83:13
93:4,6
98:6

**issued**
95:20

**issues**
10:16
19:24
73:8,16,
17 75:13

**it**
5:25 8:4,

8,20,24
9:21
14:9,13
15:14,16,
21,23
16:22
17:18,19,
20 18:1,
2,4
19:10,16
20:1
21:20,21
22:13
23:1,6,9,
19 24:13,
22 25:2,6
29:2,4,17
30:6,15
32:17,23
33:21
34:9
35:1,23
38:1,2,22
39:5,15,
19 41:4,
19 42:5,
16,21,25
43:8,9,
14,25
44:5,14,
20,24,25
45:3,4,
12,24
47:24
48:10,12
49:2,10
50:2,6,15
51:8,12
53:3
54:14,15,
22,24
56:1,10,
11,12,17,
18,19,23
57:6,7,8,
18,24
58:4,18,
20 59:4,
16 60:8,
15,24

61:7
63:16,19,
20,21
64:16,21
65:14,17,
22 66:1,
3,12,18
67:14
68:6
69:6,15,
16 71:2,
22 72:7
73:11,13,
15 74:1
75:4,22
76:1
77:13,23
78:11,14,
19,24,25
79:1,4,
17,22
80:5,12,
13,19,21,
25 81:3,
7,11,19,
24 82:6,
7,8,9
83:12,17
85:24
86:1,2,
14,25
87:10
90:2
91:1,10,
17 93:5,
14 94:22
96:14,17,
18,20,25
97:1,2,4,
9,10,21,
24,25
98:4,13,
14,19,20,
23 99:3,
6,17,21,
22,24
100:3,7
101:1,9,
10,13
102:4,5,

6,7,14,
17,20
103:1,5,
7,13
104:4,7,
10,25
105:6,9,
18 106:3,
6,9,25
107:5,20,
25 108:8,
23 109:2,
8,17
110:14,
15,20
111:12,21
112:1,4,
5,6,8
113:17
115:2,5

**it's**
5:11 7:14
14:7
15:7,19
17:23
18:1,5
21:4,5,11
22:12,22
23:17
24:9,15
25:14
27:5 30:7
34:3,5,6,
8,13
40:7,10
41:7,10,
13,14
42:10
45:14,15
48:11,12
52:15,19
53:4,15
54:3,4,9,
13 56:21
57:14,15
58:23
60:21
62:3,11,
13 63:10

65:17
66:7,8
70:12,22,
23 71:1,
4,12,20
72:1
73:5,6,12
74:22
75:19,22
81:15
82:15
83:10
84:10
85:4,8
86:10,18,
19 89:16
90:3,5
92:11,13,
16 93:23,
24 94:2,
14,15
95:2 96:7
102:4
103:2,4
104:11
107:7,9
109:3
111:7,8,
15,25
113:7
114:24

**items**
19:19
33:13
52:13
110:6

**itself**
33:18

_____

**J**

_____

**January**
13:18

**Jasmine**
6:10,11
7:8 9:9
81:8

103:20

**job**
9:21
14:5,24
104:6,11

**judge**
21:13

**judgment**
7:3 94:3

**jumping**
103:18

**just**
7:11,12
8:12,14
13:3,6
14:11
16:3 17:9
19:8
20:15
21:3,6,15
22:3
23:18,20
24:6,7
26:1,10,
14 30:1,
7,9,10
31:3 33:4
39:15
42:9
44:15
46:6
48:16
49:10
53:7,8,14
54:3
55:14
56:7,11,
15,17,25
57:6,7
59:19,23
61:4
63:16,20
66:13
68:21
71:4,6
72:15
73:14

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

79:17,24
80:15
81:11
82:6,9
84:9,18
85:3,5,
16,17,20
86:16,19,
21 90:13
94:18
96:5,9,18
99:6,9,
17,25
100:14,25
102:6
103:18
104:13
107:6,13
109:6,8,
9,18

**justice**
111:22

**justify**
26:18

---

**K**

**keep**
17:3
21:20
43:11
49:10

**Kerry**
63:21
65:4
112:9

**kicked**
110:5

**kidnapping**
7:17

**kids**
75:3
76:3,4

**kill**

25:9,15

**kind**
7:11
16:18
17:5
23:16
25:18
30:10,24
31:1
33:23
37:21
39:7
49:14
55:13
57:7,19
58:8
69:5,6,
10,15,16
74:15
81:4
82:14
85:4
94:18
97:6 98:6
102:13
103:18
104:15,20
105:11
106:17
108:12,
15,17

**kinds**
89:24

**King**
6:10,11,
25 7:4,7,
8,12 9:9
81:8
103:20

**knee-jerk**
113:4

**knew**
37:12
39:4 42:6
46:8
53:22
80:22

111:23

**knock**
18:9,13,
14,24
20:7
21:11
27:13
32:19
69:19
84:2
86:3,4

**knock-
and-
announce**
20:25
83:20

**knocking**
29:23

**knocks**
70:11

**know**
7:18 11:4
14:8
15:14
16:18,21
17:10,17,
19,20,24
18:4,17,
18,25
19:3,5,15
21:10,12
24:3,4
25:21,22
26:2,12
27:25
28:4
29:10,12
30:4,5,7
31:15
32:14
34:3,5,6
35:3
36:19
37:3
38:14
39:24
40:22

43:3,13
44:15
45:19
46:23
47:13
48:4,12
49:9
52:13
55:5,8,22
60:6,10,
11 61:4
62:4,12,
13 63:19
66:8,13
67:2,12
69:7
73:7,8,
11,13
76:6,8,15
77:5,6
79:25
81:9,14
82:24
83:11,15
84:14
85:5,15
86:24
87:2,3,
12,21,22
88:21,22
89:6,8,
10,13,14,
19 90:9,
10,20,21,
22 91:4,
9,10
92:4,7
93:11
95:23,24
98:13,25
99:11,18,
20,24
100:5,6,
10,22
101:4,7,
9,10,14,
25 103:2,
5 104:7,
12,24
105:22,23

107:2,8
108:22,25
109:11,
13,16
110:5,14,
15 111:15
112:20
115:1

**knowing**
85:3

**known**
113:10

**knows**
31:20,21

**Kubla**
25:8 26:3
29:10
45:19
63:7 65:4
86:23
112:9,10,
11

**Kubla's**
63:21

---

**L**

**lack**
98:6

**lady**
39:14

**land**
44:10

**language**
91:25

**laptop**
53:8,15
56:9
102:7

**Las**
4:9,23
110:1,8,
11

**last**
10:16
46:24
49:3 64:2
72:15
108:11,23
111:8

**later**
6:1 10:21
21:13
28:21
52:1 79:4
82:4

**Latia**
4:8,22
5:4

**Laughlin**
15:5

**law**
8:19 19:6
54:10
76:7

**lawful**
18:15
19:1,17
22:21
23:24,25
33:12

**lawyers**
99:15
100:18

**leaders**
37:23

**leadership**
16:21,22,
25 17:5

**learn**
17:23
59:4
109:20
110:23

**learning**
14:15
107:10



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**leave**
27:16,17

**leery**
57:4

**left**
46:25
103:10

**legal**
18:15
19:1,5,17
22:21
33:12
69:19

**lengthy**
50:1

**less**
71:21
86:20

**lessen**
71:17

**let**
4:20 6:24
9:10,21,
22 10:6
18:25
19:3 29:4
30:22
32:16
39:2 53:5
64:2 66:2
79:13
89:5
91:4,13
94:4
95:10
99:9
110:16
112:9,18
113:25

**let alone**
83:2

**Let's**
66:1

**lethal**
86:20

**level**
107:10,11

**Lexitas**
4:6

**lied**
8:23

**lieutenan
t**
5:13,14
13:22
14:25
75:8
80:11
95:16

**life**
38:14
39:18
47:23
111:8

**light**
110:4

**like**
6:1 12:3,
6 13:15
18:9
29:6,21
30:23
31:13
33:9,18
35:4 41:7
43:11
48:2,10,
13 49:3
53:12
56:16
58:18
64:24
69:24
71:11
73:11
80:14,24
82:7
85:4,16
89:24
94:21
95:12
97:4,20,

22 98:1,
7,10
99:2,18
100:6,7,
11,18
101:11
102:13,17
103:6
104:8,16,
21 105:21
106:1,2,3
107:24
112:5,6,
7,8,9
115:2,5

**likely**
71:21

**liken**
85:8

**limited**
74:10

**line**
37:12
39:14
40:1
79:11
81:11
94:1 99:3
102:14,16
113:16

**lined**
51:3,13

**lines**
53:21
70:4

**lineup**
50:22

**lineups**
50:18

**list**
66:6

**listed**
38:7
41:10
52:13

**listing**
35:15

**literally**
107:20

**little**
8:13
21:24
24:11
29:4,15
30:22
35:18
37:14,16,
20 41:16
58:9
66:18
67:8 72:5
88:25
96:1,15
106:18
108:18
112:18
113:25

**live**
96:21

**lives**
53:25

**living**
50:11

**LNU/FNU**
108:23

**LNUS**
108:10

**locked**
87:6

**loft**
22:13

**logical**
27:5

**long**
8:8 11:2
12:10
13:23
14:17
16:25

17:8,23
33:22
108:7

**longer**
26:7 46:3

**look**
6:24
11:11
29:17
52:12
57:12,24
61:3 63:6
64:9 99:2
101:1
104:25
105:16,17
112:4,6,7

**looked**
11:13

**looking**
7:22
52:6,25
62:12
63:21
99:5
103:18
104:22
105:12
110:1
112:21

**looks**
42:20
112:8

**loop**
48:15
85:20

**lost**
38:14
111:8

**lot**
23:14,17
35:14,17
43:13
48:2 92:3
104:12

**lots**
88:13

**loud**
23:19
34:24
48:11,12,
14

**LVMPD**
74:22
77:19
78:7,9
81:19
82:15
84:5,25
97:17
106:14

**LVNR**
82:7

**lying**
25:7,14
73:14

—————————

**M**

**M-E-L-A-
N-I-E**
5:8

**Madam**
5:24

**made**
20:7,17
24:15
26:11,14,
24 30:3,8
32:10
38:25
46:2,18,
22 55:11
59:10
60:7
61:8,15
62:2,6,
14,15
65:7,23
68:4
72:19,22



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

84:3 87:6
88:9
89:11
90:15
92:8,18
96:17

**main**
18:24
19:9
101:3

**mainly**
15:6
108:19

**major**
15:2
36:16
41:23
71:20
72:2

**majority**
106:14
107:13

**make**
13:6 14:9
18:21
22:22
23:6 24:4
31:20,24,
25 33:23
39:16
40:1
56:17,25
59:24
60:11
63:21
68:18,21
79:25
81:11
82:3
85:22
86:11,12
89:11
90:21
94:15,18
101:4
103:11
107:3

111:7
114:23

**making**
26:21
61:20
73:3
75:14
82:18
87:15
90:10
91:21
92:1

**male**
50:19

**manual**
8:7 17:7
77:21
78:9
105:17
107:4

**many**
27:9
48:12
66:10,11
71:4

**March**
41:7

**margin**
64:21

**marked**
6:4

**match**
15:3

**material**
8:23

**materials**
37:4

**math**
18:2
58:24
61:15

**matter**
4:22

**maybe**
41:7,8
58:9
98:24
102:4
109:5
114:25

**Mccracken**
34:5

**me**
5:25 6:24
7:6,11
8:23 9:6,
10,21,25
11:7,12,
14,18
14:9
16:12
17:21
18:12
19:16
20:24
22:2,18,
19 27:10,
11 28:23
29:4,20
30:22,24
31:3,4
32:16,17
33:4
35:14
39:2
42:10,11,
16 49:14
50:6
53:5,20
56:7 58:7
60:19
61:11
62:9 63:8
65:13,17
66:2,21
67:20
68:25
69:3,8,11
73:14,20
74:1
79:13
81:15

82:4 83:5
84:12,23
86:6 87:3
89:12
90:6
91:13
93:5 94:4
95:10
96:7,12,
19 97:1,5
98:25
99:9
100:25
101:7
105:11
108:7,15,
18 110:16
112:9,18
113:20,25

**mean**
13:4 15:1
26:10
29:9 49:9
73:5
78:22
79:25
82:6,8
83:21
100:22
102:9,10
104:18
107:17,18
111:5

**meaning**
55:1

**means**
22:11

**meant**
86:10

**mechanics**
33:18

**medications**
10:10

**meet**
12:10

78:25
103:14

**meeting**
11:21
75:16

**Melanie**
4:7,17,21
5:8,11,
15,16
13:2
56:21
91:13
94:4
114:15

**members**
50:8

**memory**
9:6 13:19
32:16
33:21
104:14

**mental**
45:20
111:9

**mention**
41:23
45:20

**message**
42:16

**messages**
98:1

**met**
11:2,20,
23

**metal**
44:10

**method**
44:15
45:11,14,
22

**methods**
99:6

**Metro**
13:9

38:25
43:23
66:14
89:17
92:10
110:11
112:24

**Metropolitan**
4:9,23

**mics**
60:10

**middle**
24:15
71:23

**millisecond**
64:22

**mind**
7:15
27:11

**minds**
83:16

**mindset**
68:19

**minor**
105:21

**minute**
56:15
57:8 64:3

**minutes**
12:12

**misled**
8:23

**missile**
16:5

**mission**
96:21

**mistake**
111:7

**mistake-of-fact**



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

112:1

**mistakes**
35:12

**Mm-hm**
36:13

**modified**
35:7 82:2
103:23

**modify**
106:23

**modifying**
80:2

**mom**
51:24
76:9
110:3

**moment**
42:4,10
43:5
83:17
93:25
94:1,15

**monitor**
54:20

**month**
41:23

**months**
14:2,19,
20

**more**
8:4,5
9:25
23:17
31:3
33:15
40:8,19
41:10
45:3 66:1
69:24
72:13
102:17
106:9,18
109:4,14
110:16

**114:7**

**morning**
10:22
71:11

**most**
10:11,17
49:9 75:9
95:2
107:24

**mostly**
99:14

**mother**
109:25

**move**
31:22
56:22

**moving**
73:5

**MP5**
50:17

**Mr**
4:15
6:10,12,
14,19,23,
25 20:3,
12,17,22
25:4,19
31:5
37:16
44:6
45:5,8,
18,25
46:1,7
48:3
49:18
57:2,10
59:2,11,
13 60:4
61:22,25
63:2
68:12,13
70:1
76:17
87:13
96:11
109:21

110:24
111:22
113:1
114:9,13,
20,22
115:1,9

**Ms**
4:13,20
5:2,3,11,
24 6:5,
15,20,24
7:1 25:13
26:9
31:11
37:19
44:18
45:16
46:5 48:6
55:20
57:5,11,
15,17
58:2,14
59:18
60:14
62:7
63:5,18
64:1,7,12
65:11
66:17
67:1,6,
11,19
68:15
87:17
96:13
113:24
114:6,12

**much**
18:3
55:3,7
70:22,23
88:19
109:1

**multifunc
tional**
15:10

**multiple**
24:2 29:9
93:16

**multitude**
91:21

**Murphy**
4:13,20
5:2,3
6:5,15,
20,24 7:1
25:13
26:9
31:11
37:19
44:18
45:16
46:5 48:6
55:20
57:5,11,
15,17
58:2,14
59:18
60:14
62:7
63:5,18
64:1,7,12
65:11
66:17
67:1,6,
11,19
68:15
87:17
96:13
113:24
114:6,12

**my**
5:3 9:12,
22,23
10:1,22
11:25
14:24
15:4,21,
22 24:11
27:18
28:24
29:25
32:9
33:16
35:16
37:14,20
39:2
40:7,10,

18 41:10,
22 44:19,
20 45:15,
18 49:3
53:12
56:9,10
58:3
59:24
62:24
63:8
68:11,16
78:18
80:10
83:4
85:21,25
88:25
89:1
92:16
93:23
95:14,20
96:6,24
102:1,8,
12 103:7,
18 104:13
106:21
111:6

**myself**
98:23

———————

**N**

**name**
5:3,7
16:22
45:17
108:11,23
109:12
115:3

**named**
100:11

**narcotics**
53:13
80:15
108:20
109:4

**National**
16:20

98:19,21

**nature**
111:6

**necessari
ly**
8:3 38:10
72:1

**need**
9:6 15:6
19:13,17
33:11,23
37:3
42:14
53:12
54:9,15,
16,18
69:24
80:13
86:20
96:10
105:5
106:5
108:25
109:15
111:22

**needed**
111:13,
16,20
113:13

**needs**
33:19
108:3

**negate**
42:5

**neighborh
ood**
26:25

**neighbori
ng**
45:2

**neighbors**
26:25

**Nellis**
43:21



Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50:12
52:2
71:20
74:19,23
78:6

**nervous**
27:15

**Nevada**
82:23

**never**
27:8
28:14
35:8
40:14
53:20
74:24
75:2
88:20
94:7
95:6,15,
20 97:12

**new**
36:23
37:8 42:9
96:20
97:15

**next**
41:18
56:22,23
59:5,24
61:8
65:20
87:4,19

**night**
35:25

**nine**
48:14
62:13

**no**
4:13,24
9:16
10:13,19
12:16,20,
23 13:1,
10 19:7
21:3

23:12
24:17
26:7,20
27:8
28:10,16,
19 34:24
35:12
36:9,10,
21 37:12
38:10,18,
23,25
39:3,15
40:4,12
41:1,2
42:24
43:11
44:23
46:3,16
47:6
48:25
52:17
56:3 57:3
59:3,7
60:2,6
61:1
65:14,19
67:3,13
69:2
70:15,18,
24 72:11,
16 73:1,
2,5,20,25
74:17
75:15
76:4,6,
22,25
79:10,21
80:23
85:10
86:23
88:9
93:2,21
94:1,6,23
95:14
96:10
97:20
99:17
100:14
102:6
106:20

108:24
110:25
111:7
113:3
114:5,9,
12,13

**no-knock**
21:1,2,
14,17
38:17
92:24

**no-knocks**
46:23

**nodding**
15:14

**nods**
10:9
58:19

**noise**
23:19
48:11,12
67:2

**noises**
48:14

**nomenclat
ure**
21:25

**non-
friendly**
44:12

**none**
48:19
51:19
76:23
104:10

**nonpolice**
61:20

**nonsensic
al**
90:6

**noon**
71:23

**nope**
42:21
79:2

**Nor**
87:2

**normal**
41:2,5

**normally**
40:24

**North**
109:25
110:8,11

**not**
7:5,14
8:3,4
10:1,6
11:2,3
15:18
17:16
18:1 19:8
21:3,12
22:1
23:4,13
24:21,22,
25 26:6
28:17,22
29:17
36:21
37:8
38:10,20
39:11
40:16
41:4,23
42:2,21,
22 44:4,
8,10,21
45:11,20
46:8,10
47:10,14,
17,18
53:4,9,
13,16,17
54:3,9
55:1
57:1,3,4
58:23
59:17

60:8,11,
21,25
66:7
70:3,19
71:15,19,
22 72:1
73:6
74:15
75:19,22
76:3
77:23
78:7,20,
22 79:23
80:3,9,12
81:3,13
83:7,12
84:4,7,8,
12 85:3,
17,18
86:10,12,
18 87:9,
14 89:12,
14,21,22
90:4,13,
24 91:11,
13,25
93:10,22,
23 95:14,
19,21
97:20
99:8,11,
12,25
100:19
102:16
103:13
104:4,6,
10,11,21
105:7,22
109:5,9,
16,17
110:4
111:4,5
112:8,15
113:7,13,
18

**notes**
96:6
103:19

**nothing**
8:5 94:1
102:8

**notice**
5:20 6:1
33:25
38:20
62:25
69:19
86:5,9
89:3 91:1

**noticed**
5:17 6:16

**now**
30:25
31:13
32:15
39:24
40:19
43:4
53:2,18
55:25
57:18
63:6 74:5
90:24
96:1
109:2
113:19
115:2

**NTOA**
98:20
99:6,18
100:3

**numb**
90:13

**number**
20:16
36:19,22
74:8
113:15

**numerous**
16:14
22:5
27:22
28:3
44:12



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

51:8,17
54:25
78:1

**O**

**O'DANIEL**
4:7,17,22
5:3,8,11,
24 75:9
114:15

**oath**
4:12
8:16,18

**objection**
10:7
25:4,19
31:5 44:6
45:8,25
48:3
59:13
61:25
63:2
68:13
87:13
113:1

**objections**
10:4

**oblivion**
86:18

**oblivious**
86:11

**observe**
17:18

**observing**
34:11

**obviously**
24:24
46:7 52:3
69:13
77:6
105:13

**occupants**

18:18
82:20
83:2 84:1
108:25

**occupied**
71:22

**occurred**
32:13
49:18

**October**
107:20

**of**
4:6,8,14,
15,21,22
5:21 6:1
7:11,12,
14,15
8:4,17,
19,21,24
9:4,6,21,
23 10:22
11:5,25
12:4,13,
14,18,25
13:13,18,
22 15:11,
23 16:3,
18 17:5,
13,25
18:3,7,8,
10,13,23,
24 19:16,
21,23
21:9,21,
24 22:3,4
23:9,10,
14,16,17,
25 24:6,
12,15,18
25:18
26:16
27:20
28:4
29:11,16,
23,25
30:10,19,
24,25
31:1,8,14

32:15,19,
20 33:18,
21,23,24
34:2,3,8,
16,17
35:5,8,
10,14,16,
17,20,25
37:12,21
38:4,14
39:4,7,12
40:7
41:15
42:3
43:13,19
44:9 45:3
46:13,14,
17 47:5,
8,18,22
48:19
49:9,14,
15,17,20
50:13,24,
25 51:2,
19 52:23
53:24
54:19
55:3,13,
24 56:4,
10 57:7,
19 58:8,
24 59:14
60:4
61:7,19
62:19,23
64:19,24
65:1
66:11
68:3,5,8,
10 69:5,
6,7,10,
12,15,16,
18,19,20
71:23,24
72:17,23
73:8,13,
16,17,18,
22 74:2,
6,8,9,10,
15 75:2,

3,7,13,
21,25
76:6,7,
10,20,23
77:2,9,
23,24
78:1
79:24
80:6,10
81:4,10,
11,21
82:12,13,
14,20
83:4,8,19
84:2,19,
20,21,25
85:4
86:3,4,
15,16,18
87:5,6,8,
23 88:7,
12,13
89:1,4,
23,24,25
91:16,18,
21 92:3,
12,21,22
93:2,7,9
94:18,21
95:2,11,
23 96:16,
18,20,22,
23 97:6,
16,18,21,
24 98:6,
16,17
99:15
100:4
101:18
102:8,13,
19,23
103:6,9,
17,18,21,
22 104:2,
10,15,20,
22 105:4,
6,8,11,
15,19
106:11,
14,17,19,

21,22
107:1,8,
9,13,24
108:5,8,
12,15,17
111:6,22
112:21,
23,24
113:14,18
114:15,18

**off**
27:19
29:25
30:4
35:15
38:7
48:8,13,
14 55:15
62:16,23,
24 65:1
103:15
112:12
114:10,16

**offer**
30:1

**offering**
39:21

**officer**
29:2
45:5,15,
19 63:7
69:20
86:23
93:11
103:11
112:10

**officer-involved**
35:12
109:23,24
110:9

**officers**
12:19
16:20
18:16
22:20
25:9,10,

15 26:5
27:4 29:1
45:21
46:2,9
47:22
72:8 76:2
82:19
83:17
86:25
87:19
90:2
93:25
94:15
98:21
111:9
112:12,17
113:19

**officers'**
83:16

**official**
97:17
98:3

**OIS**
27:8
110:15

**okays**
42:21

**on**
4:5,14,15
6:24 8:5,
23 10:22
11:24
13:6 14:8
16:14,17
18:4,6,19
21:6,9,13
22:13,24
24:22
25:7
27:22
28:6
29:21,22
33:24
34:3,8,9,
13,25
35:1,2,
12,21,24

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 36:3,6,8,<br>11,21<br>37:2<br>38:2,19<br>39:4,11,<br>13 40:6,<br>7,8,13,<br>14,16<br>41:2,3<br>42:2,6,<br>13,18,20<br>43:12<br>44:9,22<br>45:21<br>47:8,17<br>48:24<br>50:5,7,8<br>51:3,5,<br>23,24<br>52:15,17,<br>18 53:5<br>54:7<br>55:4,9,18<br>56:8,9<br>57:21<br>59:6,14,<br>16,17<br>60:2,9<br>61:5 63:8<br>64:20,25<br>65:3<br>66:13<br>68:2,7,19<br>69:1,6,25<br>70:16,20<br>73:15<br>74:6<br>75:11,12<br>76:5<br>77:9,11<br>78:20,21<br>79:10<br>80:22<br>81:14<br>82:4<br>83:7,11,<br>13,15<br>85:3,6,7,<br>11,14,15,<br>25 87:4 | 88:12<br>89:1,3,<br>13,22,25<br>90:11,16,<br>21,25<br>91:1,2,5,<br>14,15,18<br>92:4,6<br>94:2,12<br>95:8 97:5<br>99:16,24<br>101:2,9,<br>14,20<br>102:6,9,<br>11,21<br>103:1,24<br>104:3,16<br>105:6,19,<br>21 106:25<br>107:12<br>109:3,8,<br>22 110:3<br>111:11,<br>15,23<br>112:20<br>113:10,<br>13,20<br>114:3<br><br>**on-scene**<br>96:23<br><br>**once**<br>31:21<br>32:4<br>39:17<br>41:6<br>42:15<br>88:22<br>106:7<br>110:7<br><br>**one**<br>6:12,21,<br>22,25<br>7:2,4,8<br>21:8<br>37:21<br>40:7<br>41:22<br>42:24 | 47:22<br>54:19<br>57:12<br>59:21<br>65:3 66:1<br>67:23<br>69:3,18<br>70:12<br>72:13<br>73:8,16,<br>17 74:9<br>75:13<br>76:17,20<br>79:8,15<br>81:4,19<br>82:24<br>84:12,23<br>92:21,22<br>96:16<br>97:16<br>98:16,17<br>101:7<br>102:19<br>103:17,<br>21,22<br>104:5<br>106:11<br>108:5<br>111:10<br>114:15<br><br>**one's**<br>18:19<br><br>**one-<br>bedroom**<br>22:12<br><br>**one-on-<br>one**<br>41:9,11,<br>13<br><br>**ones**<br>28:3<br>35:16<br>47:2<br>69:23<br><br>**only**<br>6:12<br>41:6,21 | 43:15,18<br>44:5<br>46:23<br>56:15<br>59:24<br>90:16<br>92:23<br>96:21<br>110:5<br><br>**open**<br>20:11<br>23:3 24:8<br>61:20<br>67:9,24<br>87:5<br><br>**operations**<br>96:2<br><br>**operator**<br>95:21<br><br>**operators**<br>77:21<br>88:3<br>89:14<br>103:4<br><br>**opinion**<br>20:1<br>41:12<br>44:4<br>59:17<br>83:7,13<br>95:7<br><br>**opportunity**<br>5:19<br>61:23<br>63:1<br>68:17<br>82:21<br>84:3<br>114:22<br><br>**opposed**<br>71:1<br>84:13<br><br>**optimal**<br>43:15 | 44:15<br>113:14<br><br>**order**<br>33:23<br>39:23<br><br>**ordered**<br>80:10<br>104:23<br>105:3,9<br>106:8,25<br><br>**original**<br>85:21<br><br>**other**<br>6:8,17<br>7:4 8:22<br>9:17<br>12:13,14,<br>18 13:5<br>17:5 21:8<br>33:24<br>34:6<br>35:16<br>36:3 37:7<br>39:4 42:7<br>50:8<br>52:21<br>54:1<br>66:13<br>69:23<br>70:10<br>71:12<br>80:21<br>81:6 89:3<br>91:1,5<br>102:19<br>103:10<br>106:20<br>112:18<br><br>**others**<br>19:16<br><br>**ought**<br>112:24<br><br>**our**<br>8:6 21:10<br>55:25<br>75:24 | 78:24<br>85:14<br>99:24<br>105:17<br>107:4<br>113:6<br><br>**out**<br>24:9<br>27:20<br>34:13<br>35:2,21,<br>24 36:6,8<br>38:13,18,<br>20 40:13<br>41:3<br>45:2,3<br>49:22<br>50:3<br>68:18<br>69:7<br>70:25<br>71:3,4,<br>15,19<br>73:15<br>74:15<br>77:2<br>84:16<br>91:20<br>93:10<br>99:5<br>101:14<br>102:10<br>103:3<br>108:4<br>110:5,8<br>111:19<br><br>**outline**<br>9:2<br><br>**outs**<br>95:23<br><br>**outside**<br>80:23<br>87:6 88:4<br>97:5<br><br>**outsiders**<br>106:9 |



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

outskirts
94:12

outstanding
52:24
55:1

over
12:8 13:3
16:19
18:8 21:8
24:4,5
26:24
30:23
31:12,18
38:1
41:21
50:20
56:16,22
64:14
69:3,5,23
74:5,8
82:11
85:15
96:6
106:5
112:4

overall
36:25
95:18
97:5

overlapping
23:9

overrule
79:1

overwhelm
84:1,6
85:13

own
102:8
112:13

_____

P

_____

p.m.

114:16
115:11

package
45:3

Page
74:22
84:25
106:13

pages
12:3
78:10

paper
58:24

papers
10:22

paragraph
96:19
108:8

parameter
40:16

parameters
17:25
41:5 44:9
103:10

parse
80:3

part
26:16
38:4 42:3
71:24
72:15
73:13
80:10
83:25
84:20
87:23
88:7
92:12
94:18,21
95:11
96:18
97:24
106:21,22
113:14

participating
17:12

particular
71:9
108:21

parties
12:14

partner
27:18

passage
72:6

past
21:11
75:20
108:19

patrol
38:13

pause
56:25
57:24
73:1,2

paused
58:1,13
60:13
63:17,24
64:6,11
65:10
66:16,25
67:5,10,
18

pauses
56:11

PC
52:5

peaceably
82:21

peaceful
24:9

peacefully
35:11

pedophile
53:7,8

Pedophilia
109:5

peephole
7:22

pen
58:23

penalty
8:21

people
23:5
27:25
33:9
38:15
44:12
45:1
51:17
70:25
71:3,13,
15,18,24
79:20
80:14
88:10

per
51:10

percent
17:18
24:6,12
28:4
35:5,10
54:9,10,
11 73:11
84:19
102:2,16

perfect
60:21

perjury
8:21,24

person
19:18
28:13
29:13
33:24

39:4 41:3
50:24

personal
10:15

persons
33:24
75:4

perspective
95:18
113:20

pets
75:3

phone
38:19
42:6,13
50:3,8

photo
50:12,18,
21 51:5

physical
18:7

physically
8:6 74:24

picture
97:5

piece
58:24

pinged
54:22

place
4:21
19:18
31:10
33:13
55:6 75:6
103:10
108:21
113:23

plain
19:15

plaintiff
4:14 5:4

plaintiff's
6:3

plaintiffs'
99:15
100:18

plan
25:18
31:18,20
37:6,22,
24 42:3,
4,7,20

plausible
25:23

play
57:6,8,22
93:13

played
99:1

played/
video
57:16
58:1,13
60:13
63:17,24
64:6,11
65:10
66:16,25
67:5,10,
18

please
5:6 7:6
9:21,25
10:6
11:18
22:2
36:19
69:8

point
68:16

points



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

57:19

**police**
4:9,23
18:16,25
19:1 21:4
22:23
23:10,23
24:3
25:10,15,
24 26:5
27:2
38:18,21
39:1,5,
12,17
45:5 46:8
52:20
60:25
61:23
62:23,25
66:4,9,14
68:17
74:17
86:17,25
87:10,23
88:7,17,
22,23
89:3,5,17
90:2
91:1,4,5,
25 92:6,
9,10,12,
17 95:20
110:8
112:12

**policies**
81:21
106:23
112:23,24
113:12,23

**policy**
8:1,7
15:12,17
40:20
43:23
44:16
46:14,18
75:24
77:12

78:6,8,
15,24
79:4,8,
10,15,18
80:12
81:20,24
82:2 84:4
90:18
97:12
103:23
105:14,15
106:20
107:25
108:5,9

**pop**
101:24

**portion**
32:21

**position**
13:21,24
14:7,12,
15,18,22
15:13
20:1
24:13
25:14
29:15
43:14
44:20
47:17
48:24
60:2
68:22
69:8
75:11
90:12
91:2,14
92:11,16
95:7,11

**positions**
14:4
16:9,11
29:6,21
48:17,19

**positive**
100:18

**possibili
ty**
75:3

**possibly**
71:17
80:7

**post**
93:24
94:8,25
104:7

**potential**
73:21
84:15

**prefer**
5:10

**premise**
23:25

**preparati
on**
11:7
102:1

**prepare**
10:25
11:18

**prepped**
40:2

**presence**
18:16
23:25
52:20
60:25
62:23

**present**
23:11
28:17,18
49:7 63:1
75:4 78:4
83:1
93:19

**president**
15:8,9

**pretty**
16:8
22:12

29:19
55:22
99:15

**prevent**
10:11,17
24:20

**previous**
79:22

**primarily**
18:6

**primary**
13:25
14:7,16,
24 16:16,
19

**principles**
83:20

**prior**
9:2 14:22
50:21
83:4

**private**
91:10,11
92:13

**privilege**
11:6

**probable**
50:23
51:15,23
54:15,18
76:8,11
77:14

**probably**
58:18
112:14

**problem**
42:24
69:2
110:5

**problems**
37:13

**procedure
s**
78:25

**proceed**
32:5

**process**
17:23
30:11

**productio
n**
12:7

**projectile**
16:5

**promoted**
43:13

**properly**
40:2

**property**
52:9,12,
13,16
53:3,4,15
54:3
77:22
80:16,25
106:2

**protected**
33:10

**protectio
n**
15:8

**protest**
16:1,2

**protests**
15:2,7

**prove**
76:16
97:12

**proved**
78:23

**provide**
33:24

82:20
83:7 84:2
97:11
101:18

**provided**
33:20

**prudent**
75:9

**psycholog
ical**
45:21

**PTSD**
111:10

**public**
53:23
54:2
111:19

**pull**
23:16
56:4
60:16,24
61:7 68:6
87:10,11,
23 88:15,
16 89:2,
9,24,25
90:24,25
91:7,17,
18,24
92:11,12

**pulled**
29:9 31:2
102:6
104:13

**purpose**
18:23,24,
25 24:18
49:15
62:19
69:20
71:24
84:21
86:4

**pursuit**
70:23,24



Case 2:24-cv-00074-APG-NJK    Document 57-7    Filed 05/16/25    Page 145 of 158

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

71:3,5

**put**
18:4
42:16
63:16
99:8
100:3,17
103:1
109:14

---

**Q**

**qualify**
89:21

**question**
9:5,12,
22,23
10:1,8
24:11
30:12
33:16
37:14,20
39:2
44:19,20
61:11
65:21
66:2
82:16
85:21
88:25
89:1
90:6,23
95:4
110:16
111:6
112:18
113:25

**questioning**
81:11

**questions**
8:20
10:25
11:6 12:6
13:3 56:5
109:16
114:7,9

**quick**
22:12
55:14

**quickly**
22:15
25:18

**quiet**
21:5

**quite**
13:4
100:16

**quoting**
74:21

---

**R**

**raise**
10:4

**rake**
103:3

**re-watch**
65:21
93:5
112:5

**reaching**
27:17

**reaction**
113:4

**read**
7:25
15:23
42:19
53:3
60:19
62:8
67:20
72:5
77:18
82:12
84:20
86:1
96:17,18,
19 98:14
104:12
106:6,12

114:21,23

**reader**
56:9

**reading**
15:16
46:19
69:13
80:24
115:5

**real**
16:25

**really**
51:5,6
56:15
69:6 72:2
98:25

**rear**
34:25
35:1

**reason**
9:13,20,
24 19:9

**reasonable**
54:16,17
75:23,25
82:20
89:3

**reasons**
103:22

**recall**
38:6
39:19
110:22

**receive**
32:18,22
40:17
47:18

**received**
11:24
17:7 33:8
48:25

**recess**
55:17

**recognize**
75:9

**recognized**
50:9

**recollection**
15:22

**recommendations**
46:18,22
47:5
75:15
92:23
96:17
97:17
106:14
107:4,13

**recommended**
81:20

**recon**
55:4,6
74:11

**record**
4:20 5:7
10:7
13:6,7
49:10
55:15,18
63:20
79:25
80:1
107:6
114:11,17

**redo**
56:11

**refer**
98:18

**reference**
22:3

**referenced**
72:4

**refine**
39:2
44:20

**reflect**
4:20

**refresh**
15:22

**refuse**
70:1

**refused**
27:17
69:20

**regarding**
98:10
111:3

**reiterate**
24:2
31:19

**related**
76:24
81:5
106:20

**relative**
59:1 69:9

**reliability**
54:10

**reliable**
54:7,11

**rely**
10:22

**relying**
99:16

**remainder**
22:4

**remained**
72:10

**Rembert**
49:24
51:25
53:19

**remember**
9:10,11
15:16,17,
20 16:22
29:1,2,5,
6,16,18
33:2,3,5
99:11,13
104:14
105:20
108:12
110:20

**remote**
113:17

**reorganized**
69:3

**replay**
65:13,17

**report**
12:2 49:7
51:2
74:21
77:19

**reporter**
4:4,12
5:24 8:18
9:19
37:17
114:18,21

**represent**
5:4 13:17
64:23
69:18
73:10,17
96:15
97:24

**represented**
44:2
92:21

**requests**
12:7



Melanie O'Daniel                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**requirement**
  66:8,11
  75:19
  82:19

**requires**
  8:20

**rescue**
  36:14
  39:20

**rescues**
  38:12
  39:11

**research**
  101:25

**residence**
  7:19
  18:21
  23:6
  51:16
  54:5
  71:19
  84:1
  99:23

**residents**
  45:2 54:1

**resort**
  46:25

**resources**
  15:6

**response**
  72:8

**responsibility**
  76:15

**rest**
  9:4

**restrictive**
  102:17

**reticent**
  72:10

**retire**
  13:11,21
  77:9

**retired**
  7:14 8:10
  13:10
  15:18
  32:15
  43:3,11,
  13 49:2,4
  57:4
  107:21,24
  109:22

**return**
  26:7
  29:11

**returned**
  26:23
  88:24
  112:14

**revealed**
  28:23
  49:23

**review**
  5:19 12:5
  18:10
  29:8 37:4
  47:13,16
  48:18
  49:6
  78:18
  79:6
  105:6
  107:4

**reviewed**
  11:3,20
  12:13,17,
  22 13:4
  29:16
  35:17
  69:22

**reviewing**
  41:18
  42:3

**rewrite**
  79:17

  106:23,25

**rewrote**
  79:15

**rifle**
  51:3,12

**right**
  18:17
  19:5,12
  21:21,25
  25:24
  30:25
  31:13
  35:15
  37:12
  38:17
  46:12
  48:7
  49:2,13
  55:21
  56:22
  58:10
  59:5
  60:12
  61:3,22
  62:25
  63:6
  64:13
  66:1,15,
  19 70:11,
  16 73:7
  79:9 82:5
  83:5
  85:12
  86:22
  87:4,19
  88:3
  91:23
  92:15,19
  93:17
  95:10
  96:5,14
  100:9
  103:16
  108:7
  109:20
  110:23
  114:6,24

**rights**
  19:11
  20:4,13,
  18,22
  24:15
  59:12
  60:5
  68:12

**risk**
  71:17
  76:3
  113:7

**River**
  15:5

**road**
  70:24
  71:20

**robberies**
  110:2

**robot**
  94:13

**rock**
  16:5

**rocks**
  92:6

**role**
  15:10
  95:14
  96:22
  106:22
  108:2
  111:4

**room**
  70:17
  102:18

**Rothenburg**
  47:24
  57:11,14,
  15 59:20
  88:6

**rough**
  30:7

**roughly**
  14:21

**round**
  16:6
  112:11

**rounds**
  16:2
  25:25
  26:1,4,8,
  23 27:3,
  5,19,23
  50:16
  88:24
  111:19
  112:3,15,
  16

**rule**
  18:23
  23:8

**ruled**
  74:15
  77:2

**rules**
  9:18 18:9

**run**
  8:12,14
  15:5 64:3
  85:18

**running**
  36:8 41:4
  86:15
  96:25
  97:1,2,4

**runs**
  56:17

**rush**
  71:2,3

**Russ**
  42:6
  96:25
  97:6
  113:14

**RV**
  94:8

——————
      **S**

**SACO**
  43:25
  44:1,2,3,
  8,21,23
  75:10,16
  113:13

**safe**
  23:6 45:6
  71:15

**safely**
  71:18

**safer**
  44:8
  45:11,22
  70:22,23
  71:1,12

**Safier**
  4:4

**said**
  7:3 9:9
  10:21
  15:20
  30:23
  33:9 34:7
  41:7
  42:15
  43:11
  47:14,22
  48:16
  50:2,4,7,
  9,11 51:8
  63:20
  72:20
  73:9,11
  81:19
  83:18
  85:1
  93:11
  97:13
  98:12
  99:19
  100:6
  101:12
  102:12,17

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

103:7,21,
23 106:5,
6 107:14
108:24
110:1
115:3,4

**sake**
79:24

**same**
6:19 8:18
50:16,22
61:10,11
68:22
78:17
92:17
114:1,2

**sand**
94:1

**Sarah**
4:4

**satisfied**
82:19

**Saturatio
n**
14:25

**save**
39:18

**saved**
47:23
102:4

**saw**
25:10
26:3
51:12,17
60:7 62:5

**say**
9:20,25
10:1
13:15
15:2,7
19:7
30:13
31:3 32:1
37:2 40:1
42:10,21

43:1 50:6
58:5,16
60:1,15
64:13,16
65:21
66:12,14
72:13
74:2
77:10,12,
16 79:2
80:4
82:22
90:14
91:19,20
95:6
96:25
97:1
99:14
101:18
103:13
106:3
107:5
113:3,17

**saying**
21:16,20
22:3
24:12
26:4,12,
16 27:2,4
30:17
43:24
46:24
61:4 70:3
78:14
79:4
80:17
83:11
84:14
85:25
87:19
89:16
91:2,4,8,
9,23 95:5
97:7 99:1
104:14,20
110:4

**says**
72:7
75:23

76:7
96:20

**scared**
25:24
26:1

**scares**
23:19

**scene**
35:2
42:18
60:9

**school**
14:6
16:14,23,
25 17:10,
15,17,21
18:5,6
32:22
40:11,15,
16 41:4,6
97:14

**Scooby-
doo**
109:12,13

**Scooby-
doo's**
109:12

**scroll**
64:8

**search**
8:5 19:2,
13,15
20:2 21:4
22:21,23
23:25
24:3 26:5
27:3,4,24
31:9,14
32:1
33:11,12
39:1
42:19
49:16
51:14,16
61:17
66:5,9

74:11
76:15
78:6
82:21
83:3
88:2,14,
23 89:5,
16 91:6,
25 92:9,
10,17,24
97:18
99:7,8
100:2,4,
17
101:15,17
108:21
109:3
111:12

**searched**
19:19
33:13

**searches**
19:13
33:10
100:10

**searching**
101:20

**second**
30:6
48:13
64:21
69:3
70:12
84:23
101:7
106:13
107:18

**seconds**
26:2
30:2,8,13
34:7,9,15
57:22
58:21
59:9 60:3
61:13,19
62:14
65:1

67:24
68:5,6,8
70:6,9,12
72:7,11,
16,19,22
82:17,18
83:1
87:5,8,16

**section**
55:9
77:20
78:9

**Security**
14:24

**see**
27:3
28:22
29:10
63:19
82:22
86:13,16
93:16
99:4
101:4,5,
22 102:15
103:5
105:17
108:2
112:13

**seeing**
34:10

**seem**
29:19

**seems**
67:14,23
101:23

**seen**
21:21
51:1
59:16
74:24

**seized**
19:19
33:14

**send**

15:4 97:6

**sense**
36:23
90:18

**senses**
85:2

**sent**
42:16

**sentence**
106:12

**September**
80:6

**sergeant**
5:11,12
36:7
37:21
38:3
39:17,22
40:14
61:2 62:3
96:21,23
113:15

**serve**
36:16
43:8,18
44:17
45:6,22
53:1 54:6
75:10
76:15
77:7,13
78:5
80:14,18
95:13
97:23
99:7
106:1
108:20
109:7,17

**served**
7:13,20
10:21
35:3,4
43:16
44:3,5
52:18

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 70:21<br>71:7,9<br>74:12<br>85:16<br>89:23<br>111:13<br>113:13<br><br>**serves**<br>94:22<br><br>**service**<br>31:8,14<br>97:18,19,<br>23 100:4<br>103:16<br><br>**serving**<br>7:17 37:9<br>43:20<br>45:13<br>46:25<br>73:22<br>74:3,16<br>91:16<br>109:2<br>113:8<br><br>**set**<br>31:24<br>76:6 83:8<br><br>**settled**<br>6:22 7:9<br><br>**settlement**<br>7:23<br><br>**seven**<br>58:21<br>59:9 60:3<br>68:5<br><br>**several**<br>7:18<br>17:10<br>36:18<br>71:13<br>91:19<br>92:8<br>101:12<br><br>**sexual** | 7:17<br><br>**shadow**<br>16:16<br><br>**shadowed**<br>16:18<br>41:16<br><br>**share**<br>36:20<br><br>**sheriff**<br>15:6<br><br>**sheriffs**<br>107:2<br><br>**shoot**<br>25:9<br>85:18<br>86:23<br>112:9<br><br>**shooting**<br>5:21<br>15:24<br>16:2 28:7<br>32:12<br>47:24<br>50:15<br>51:15<br>54:1,14<br>57:9<br>76:10<br>86:16<br>109:23,24<br>110:9<br>111:19<br>112:1<br><br>**shootings**<br>35:12<br><br>**Shortly**<br>50:14<br><br>**shot**<br>45:6,15<br>49:19<br><br>**shouting**<br>34:24<br>87:25<br>88:23 | **show**<br>51:4<br>100:7,5<br>109:10<br><br>**showed**<br>29:1,7<br>50:12<br><br>**showing**<br>53:25<br><br>**shown**<br>50:21<br><br>**shows**<br>42:18<br>51:6<br>101:10<br><br>**sic**<br>9:22<br><br>**sick**<br>36:6<br>82:13<br>103:1<br><br>**side**<br>33:24<br>34:25<br>35:1 39:4<br>89:3<br>91:2,5<br><br>**similar**<br>43:9 64:2<br><br>**since**<br>14:23<br>106:15<br>107:15<br>109:21,<br>22,23,24<br><br>**single**<br>28:23<br>61:11<br><br>**sit**<br>19:25<br>20:15<br>21:19<br>24:13,24<br>28:25 | 29:20<br>30:25<br>31:13<br>32:8,14<br>43:22<br>44:3,21<br>46:12<br>48:22<br>59:1,8,23<br>61:12,18<br>68:2 74:7<br>81:9,12,<br>18 86:24<br>88:11<br>90:23<br>104:18<br>105:10<br>111:1<br><br>**sitting**<br>70:11<br><br>**situation**<br>18:19,20<br>22:24<br>28:15<br>32:7<br>39:3,25<br><br>**situations**<br>39:20<br><br>**six**<br>26:23<br>58:21<br>59:9 60:3<br>68:5<br>82:16<br>83:1<br>87:5,15<br>88:23<br>112:2<br><br>**skips**<br>56:11<br><br>**sleeping**<br>24:21<br>71:1<br><br>**slow**<br>37:16 | 63:8,12<br>66:18<br>67:8<br><br>**sofa**<br>59:5<br><br>**solid**<br>90:21<br><br>**solo**<br>54:3<br><br>**some**<br>8:12,14<br>10:4,24<br>12:6 13:3<br>15:11<br>16:5,8<br>17:5 18:2<br>19:14,16<br>28:22<br>35:19<br>37:7 38:7<br>39:7<br>40:23<br>46:22<br>55:9<br>56:4,5<br>74:5,6<br>80:5,20<br>81:21<br>82:12<br>93:11<br>98:25<br>100:17<br>103:15<br>105:6<br>107:2<br>110:2,3<br><br>**somebody**<br>23:22<br>24:14<br>28:7<br>86:5,9<br>90:1<br><br>**somebody's**<br>34:23<br><br>**someone** | 16:4 28:6<br>34:6<br>38:14<br>82:10<br>91:17<br>104:4<br>111:8<br><br>**someone's**<br>25:23<br><br>**something**<br>15:24,25<br>29:18<br>37:7,10<br>48:16<br>53:21<br>56:8 70:4<br>75:22<br>86:20<br>93:24<br>99:23<br>100:12<br>101:23<br>103:8,12<br>105:14,<br>20,22<br>108:3<br>113:5<br>115:3,4<br><br>**sometimes**<br>9:4 34:25<br>39:12<br>94:13<br>113:4<br><br>**somewhere**<br>71:11<br>104:14<br><br>**SOP**<br>75:24<br>81:25<br>105:23<br><br>**SOPS**<br>8:6<br>105:17<br><br>**sorry**<br>5:14<br>14:17 |



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

16:24
17:3,14
20:1
21:19
28:12
32:16
46:21
48:15
49:5,11,
12 51:22
55:13
57:13
59:19
60:18
63:19
64:9
66:18
67:7,9
78:22
79:13
80:4
84:23
96:5
100:2,21
103:17
105:1,2
107:19
110:16

**sound**
48:10

**sounded**
48:2

**South**
43:21
50:11
52:2
74:19,23
78:5

**speak**
19:7
35:13
49:23
97:21

**speaks**
98:14

**specialized**
16:9,10

**specific**
83:8,13
93:4

**specifically**
10:6 11:8
34:20
110:22

**specifics**
19:23
100:5

**speculation**
39:23
46:9

**spell**
5:6 115:3

**spent**
42:13

**spoke**
42:6

**spoken**
52:17

**spot**
57:8

**spotlighting**
85:4

**square**
22:14

**stack**
113:15

**staff**
107:1

**stand**
56:23

**standardized**
78:7

**standards**
84:5
100:19

**start**
28:7
30:19

**started**
27:17
29:23
30:14,15
47:24

**starting**
61:14

**startled**
23:22
25:24

**startles**
23:19

**starts**
59:10
62:14
64:16
65:7
66:19

**state**
4:11 5:6
10:7
79:13
82:23

**stated**
41:19
45:10
88:19

**statement**
26:22
46:11
85:11

**statements**
12:18
26:11

**states**
19:6
82:22

**station**
44:11

**stay**
77:9

**staying**
54:13
78:2

**stealth**
21:2

**step**
41:18

**stepmom**
49:22
51:10
53:20

**stepped**
94:25
95:17

**steps**
36:24

**stepson**
49:24

**stick**
47:15,21
59:22
82:17
99:25
103:6
111:25

**sticks**
48:7

**still**
14:5,6
26:4 27:4
42:3
43:12
44:16
48:23
52:24
53:12,23
54:24
55:1
62:15,23
70:19

76:25
91:21
102:11
104:19
109:7,16,
17 110:18
111:24

**stop**
9:25 26:6
37:8 42:5
43:24
49:19
57:18
64:3
86:19
103:7

**stopped**
25:12
55:12
57:16
73:3

**Stoppers**
49:22

**stopping**
60:22

**stops**
49:2

**story**
27:17

**street**
95:3

**strictly**
53:4

**strike**
32:16

**struggle**
27:18

**stuff**
18:10
36:3
37:22
74:5,6
98:2
99:15

100:17,
18,23
101:11
113:18

**stun**
47:15,21
48:7
59:21
82:13,17
99:25
103:1,6
111:25

**subject**
8:24 12:1
27:15
53:18
76:12
77:12,23
103:9
113:9

**subjects**
21:7
23:15
49:19
51:8
52:19
54:25
92:9

**submit**
68:17
82:21
83:3

**success**
35:6
88:19

**successful**
30:20

**such**
11:1

**sufficient**
39:22
83:6

Melanie O'Daniel                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

suggesting
 28:12
summary
 7:3
supervisor
 31:25
supervisory
 96:22
supposed
 104:5
sure
 28:3
 31:20
 38:5 53:2
 55:22
 56:17
 57:1
 59:24
 68:21
 72:14,16
 80:1
 85:22
 94:18
 99:16
 114:23
surprise
 59:4
 62:20
 83:25
 84:6
 85:12
surrender
 23:3,18
 24:7,23
 35:11
 53:23
 70:4
 84:7,9,
 13,18
 85:16,19
surround
 42:12

43:9,24
45:11
surrounded
 36:17
surrounding
 19:25
 34:12
 38:22
surrounds
 38:8
surveillance
 31:15
 51:17
 55:9,12
 75:18,19,
 21 76:2,8
 103:9
suspect
 22:7
 41:25
 50:23
 85:9
suspected
 72:8
suspects
 22:8
 51:20
 52:21
 74:23
 75:6
 76:21
 77:3
 84:15
 92:3
sustained
 47:17
 48:20
 78:21,22
 81:3
 105:19,21
SWAT
 13:22,25

14:2,6
 16:13,16,
 21,22,25
 17:5,7,13
 32:1,19,
 21 36:8
 38:4
 40:11,15,
 16 41:4,
 6,21
 46:24,25
 77:6,20,
 21 78:9
 79:21
 80:17,23
 88:13
 95:21
 97:13,18
 98:9
 106:10
 113:8
SWAT's
 78:5
sworn
 4:18

_____
   T
_____

tactic
 21:22
 42:25
 43:6 79:1
 82:9
 111:14
tactical
 13:25
 16:16,20
 29:8
 47:13,16
 48:18
 49:6
 78:18
 79:6
 80:11
 93:20
 94:2
 95:6,17

96:3
 98:20,21
tactics
 43:4
 69:12,14
 75:9 78:8
 79:21
 99:20
 103:1,25
 104:3,5
 106:10
 113:22
take
 16:19
 23:5,15,
 20 24:8,
 22 27:20
 37:9
 38:15
 44:16,25
 45:2
 52:11
 53:11
 55:14,25
 84:7,8,16
 86:19
 91:2,14
 96:9
 105:6
 109:9
 113:4
taken
 12:15
 26:18
 35:11
 36:24
 55:17,22
 108:3
taking
 9:19
 24:9,20
 58:20
talk
 27:13,16
 59:25
 89:19

talked
 11:8
 96:14
 98:16
 100:15
 103:20
 106:11
 108:6,9
talking
 15:15
 21:17
 30:14
 38:19
 40:4 42:7
 50:4
 78:16
 106:22
 108:13,17
 110:4
task
 97:14
taught
 14:5
team
 14:25
 15:4 36:8
 37:23
 43:12
 55:9
technical
 18:1,5
techniques
 17:13
tell
 7:6 9:11
 10:14
 11:7,12,
 13,18
 17:21
 18:12
 22:2,18
 27:10
 33:1
 35:14
 42:10

63:11
 66:21
 73:14,20
 83:5
 89:12
 93:5
 108:7
 110:14
telling
 23:24
tendencies
 22:8
 52:22
 53:19
term
 89:24
 98:7
 100:3
terms
 23:9
 29:23
 32:20
 33:21
 69:7
 82:13
testified
 4:19
testimony
 10:12,18,
 23 46:7
 55:24
 62:18
 83:5
 93:11
 107:12
Texas
 50:6
text
 31:17
 42:16
 98:1
than
 40:24
 99:18



Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**thank**
68:25
114:12,13

**Thanks**
63:8

**that's**
7:8 8:18
11:12
14:21
21:21,22
24:24
28:13
29:14
30:11,15,
17 32:9
33:3 37:1
39:23
41:2,12
43:25
44:16
49:13
50:9
52:25
58:8,21,
24 60:18
61:12,13
64:19
65:6,15
67:24
68:22
71:15
78:25
82:23
85:1
87:19
89:15
90:4,18
91:8,9,25
92:16
93:15
95:4,6,14
98:9,11
99:8
100:19
102:7
104:6
105:16
106:4
107:14

108:2
111:5
113:14

**them**
11:25
18:25
19:3,4,5
21:11,12
23:19,20,
24 24:8,
20 28:1
35:20
38:19
40:3
43:13
45:3
51:19
65:1 66:8
69:23
78:23
81:2
84:11,16
85:12,13
86:8,11,
19 87:25
89:5 91:4
92:3,17
93:6,16
94:16
100:7,8,
23 107:9

**then**
9:22 10:7
11:14,17,
22 12:1
14:1,16
15:17,19
16:18
17:4 23:4
26:3,21
29:11
30:18
31:21,22
32:2,4,12
33:11,16
35:23
36:7 38:1
41:16
47:11

49:4,7,8
50:10
56:18
57:9,23,
24 58:15,
17 61:6
62:12,14,
15 64:3
67:7 68:7
78:9
79:14
82:11,17
85:14,23
95:4 96:2
97:6
101:5,18
105:25
114:1

**there's**
15:3 18:2
19:14,16
21:2 22:5
34:4
56:15
70:24
71:21
76:6
78:19
80:25
84:14,22
91:21
94:1
103:10
104:19
107:24
108:3
112:9
113:9
115:1

**therefore**
94:14

**thereupon**
115:10

**these**
16:17
35:16
39:21
48:7 56:8

64:24
70:21
71:7
75:14
80:22
88:14
89:14
90:8
91:16
92:2
95:13
107:10

**they'd**
38:25

**they'll**
23:18
31:22,24
53:20
84:18

**they've**
28:1 35:7
38:19,21

**thing**
8:16
79:11
82:14
90:16
99:8
101:3
104:5
111:8
112:21

**things**
31:2
35:17
40:23
42:4 43:4
91:16
92:5
98:16
99:12,18
102:19
103:17,21
106:11
113:12

**think**
6:21

15:14,20
19:4
21:24
25:2,7
26:8,17
31:2
33:17
34:19
35:1 40:6
45:6
46:19,25
55:10
56:1
57:13
59:8,10
61:21
62:22
63:20
64:16,25
68:16
70:5
72:19,21
73:21
80:5 81:7
82:23
83:6,11
85:8
97:24
99:3
102:4
105:20
107:18
108:6
109:25
111:1

**thinking**
25:22
26:13,17
28:13
60:7 62:5
80:14,15
86:19
88:21
89:20

**thinks**
50:2

**this**
4:20 5:5

10:14
12:15,19
13:14,18
18:25
19:20
20:2
24:25
25:3
26:13,16,
18 27:14
28:18
29:5
30:5,12
31:1 32:7
33:22
35:6,7,
17,19
36:3,7,18
38:3
39:14,23
40:1,2,24
43:15
44:3
45:6,7,24
46:15,19
47:9
50:19
51:10
52:17
55:4,13,
23 56:22
57:8,10,
11,12,13
58:4
59:19
61:5
63:11,15
64:2,20
65:3 66:2
68:7 69:9
71:5,6,9,
12 73:22
74:3,11,
16 75:10
76:7,8
77:18
79:10
81:10
82:14
83:7,13

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

84:22,24
85:11
87:9
89:24
93:3 94:2
95:24
98:18
99:1,2,3
101:7
102:13
104:9,13,
16,22
105:11,23
106:1,2,
13,21
107:12,
17,18
109:15,
21,22
110:9
111:4
112:25
114:14,23

**Thomas**
49:18
50:25
111:22

**Thomas'**
76:17

**thoroughly**
53:2

**those**
12:8 14:4
16:11
17:9
22:16
24:4
26:1,4,
14,25
27:5 28:4
35:5,10,
13 38:8,
17 39:11,
19 40:4
41:5,15
46:8 47:2
53:21

56:6
69:22,25
70:4
78:21
83:16
87:16
90:3
92:14
94:15
101:6
102:18
103:3
106:9
107:3
113:19,21

**though**
26:10
37:15
65:3
85:21
112:2

**thought**
30:11
104:20

**threat**
15:3 22:6
52:18
53:14,17,
23 54:1
72:2
76:14
77:22
79:11,18
80:19
81:1
111:17

**three**
8:10 14:1

**through**
7:11,22
8:12,14
9:14 14:6
16:8,12,
13 17:9
20:24
27:11
29:21

30:10,24
31:4
32:7,22
33:4
35:19
39:5
47:16
48:2
49:14
56:18
57:6,7,8,
18,22
64:3
69:11
73:5
86:25
88:18
97:13,15
98:14
105:11
108:15
109:16

**throughout**
61:17
66:12

**throw**
16:7
86:13
99:19,22,
24 102:18

**throwing**
100:1

**thus**
84:4

**till**
26:3

**time**
4:3,21
7:16
14:23
16:17
18:19
24:6,13
30:3,5
34:16
36:7,17,

18 37:12
39:11,13
42:13,25
43:1,6
46:24
47:20,21
49:1
50:22
53:25
54:23
55:5,19
59:16,24
61:12
64:2,19
65:15
66:1
71:16
72:13
73:2
75:25
76:6,22
79:5
82:20
83:2,6
84:19
90:16
92:17
95:2
98:12
99:19,21
100:5
103:9
105:25
107:24
111:12,
14,23
113:11,23
114:16

**times**
23:14,17
24:2 27:9
29:19,21,
22 64:24
66:10,11
81:10
90:24
93:17
101:12
106:23

112:2
**timestamp**
57:25
58:5,16
60:19
62:9
64:13,25
66:22
67:20

**timing**
82:11,13

**tip**
39:14
49:22

**tipped**
103:14

**to**
5:17,19,
21,25
6:1,16
7:19 8:4,
12,14,20,
22,24
9:2,3,4,
6,12,14,
23,25
10:6,24,
25 11:1,
4,7,11,
13,17,18,
22 12:6
13:2,6,
15,17
14:22
15:4,18,
24 16:4,
6,9,10,
13,14,15,
20,24
17:5,6,23
18:2,4,7,
17,20,22,
25 19:3,
4,5,6,7,
8,10,12,
15,17,18,
19 20:15

21:12,13,
14,15
22:6,10,
15,18,21,
22,24,25
23:3,6,
15,23
24:18,20,
22,23
25:9,11,
15,19,25
26:10,17
27:5,16,
17,19
28:17,23
29:5,15,
17,19
30:7,9,
10,13,16,
23 31:3,
5,12,21,
22 32:6,
7,15
33:4,13,
15,19,20,
22,23,24
35:13
36:21
37:3,5
38:19
39:10,23
40:11,15,
16,19
41:2,3,4,
17,23
42:6,7,8,
11,16,18,
19,25
43:6,8
44:2,6,8,
15,17,20,
23 45:6,
8,12,20,
22,25
46:1,3,4,
6,7,11,18
47:13
48:3,10,
15,16
49:8,10,

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 16,22 | 24,25 | 100:6,8, | 90:23 | **totality** | 97:8 |
| 50:4,5,24 | 77:1,6, | 12,16 | 99:4,20 | 34:3,8 | 102:25 |
| 51:24 | 10,16,18, | 101:23 | 100:12 | 59:14 | 107:9 |
| 52:1,12 | 22 78:2, | 102:5,15 | 104:18 | 68:3,10 | 113:22 |
| 53:12,14, | 5,10,12, | 103:2,4, | 105:10 | **totally** | **trainings** |
| 16,22,23 | 18,19,23 | 11,13 | 109:24 | 109:2 | 16:15 |
| 54:2,6,9 | 79:6,22, | 104:5,23 | 111:1 | **touch** | **transcrib** |
| 55:23,25 | 25 80:3, | 105:3,5, | 112:20 | 43:12 | **ed** |
| 56:1,4,5, | 4,9,11, | 9,14 | **today's** | **touched** | 114:23 |
| 10,14,16, | 13,20 | 106:5,8, | 10:25 | 28:4 | **transcrip** |
| 17,21,22, | 81:2,5, | 17,19,20, | 11:19 | **town** | **t** |
| 23,25 | 11,15,22, | 25 107:3, | **together** | 15:9 | 114:19 |
| 57:6,7, | 23 82:4, | 9,25 | 29:9 98:7 | **traffic** | 115:6,8 |
| 12,18,20, | 7,12,20, | 108:8,18, | **toilet** | 50:20 | **transcrip** |
| 22,24 | 21 83:1, | 25 109:4, | 73:24 | 53:24 | **tions** |
| 58:3,4, | 2,3,7,13, | 14,15,20 | **told** | 70:24 | 11:25 |
| 20,21,24 | 16,25 | 110:11, | 11:14 | **tragedy** | **transcrip** |
| 59:1,4,5, | 84:2,3,8, | 21,23 | 39:13 | 111:7,25 | **ts** |
| 13,24,25 | 9,10,12, | 111:9,13, | 43:22 | **tragic** | 12:14 |
| 60:1,3,6, | 13,15,16, | 16,17,20 | 53:20 | 45:14,15 | 40:10,18 |
| 8 61:8, | 20 85:1, | 112:15, | 54:12,24 | 111:16 | 41:10 |
| 10,13,15, | 8,9,12, | 16,21,24 | 92:21 | **tragically** | **transmitt** |
| 20,22,23, | 13,17,18, | 113:1,13 | **toll** | **y** | **ed** |
| 25 62:19, | 19,20,22, | 114:23 | 45:20,21 | 7:21 | 110:21 |
| 25 63:1, | 23 86:1, | **to-do** | **too** | 82:10 | **transpire** |
| 2,6,11, | 4,10,12, | 97:14 | 11:23 | **trained** | 11:22 |
| 15,20 | 18,19,20, | **today** | 47:23 | 35:7 42:1 | **transpire** |
| 64:2,8,9, | 23 87:4, | 4:2,7 | 71:4,12 | **training** | **d** |
| 16,23,24 | 9,13,19 | 5:17,21 | 73:15 | 16:10 | 32:10 |
| 65:13,17, | 88:16,17 | 8:21 9:15 | 101:2 | 17:7 | **trauma** |
| 20,21 | 89:15,18, | 10:12,18 | 102:11 | 32:18,23, | 111:10 |
| 66:3,6,8, | 19,21 | 12:22 | 103:5 | 25 33:1, | **TRB** |
| 14 67:14, | 90:1,5,6, | 13:7 14:9 | **took** | 7,20 | 49:3 |
| 23 68:5, | 13,14,17, | 20:1,15 | 26:23 | 39:22 | **trial** |
| 13,17,21, | 18 91:4, | 21:19 | 41:21 | 40:3,17, | 59:25 |
| 22 69:3, | 11,14 | 24:13,24 | 51:25 | 18,19 | 60:1 |
| 6,8,9,15, | 92:2,21 | 28:25 | 55:21 | 41:9,14 | 68:22 |
| 18 70:1, | 93:5,13 | 29:17,20 | 82:8 | 42:10 | 114:25 |
| 23 71:1, | 94:2,11, | 32:8,14 | 95:12 | 48:25 | **tried** |
| 15,17,21, | 16,18,20 | 43:9,23 | **tool** | 78:7,8,15 | 63:11 |
| 22,23,24 | 95:7,12 | 44:3,14, | 113:5 | 80:23 | 75:18,20 |
| 72:2,4,5, | 96:7,9, | 21 46:13 | **top** | 81:20 | 76:1 |
| 7,11,16 | 15,17,18, | 48:22 | 7:14 | 84:4 | 98:23 |
| 73:3,10, | 19 97:6, | 59:1,8,23 | 29:25 | 85:14 | |
| 17 74:1, | 11,14,15, | 61:18 | 77:9 | 95:11 | |
| 2,5,18 | 21,24 | 68:2 74:7 | | | |
| 75:6,8,9, | 98:9,18, | 81:12,19 | | | |
| 16,18 | 23 99:4, | 86:24 | | | |
| 76:1,13, | 6,9,11, | 88:11 | | | |
| 14,15,19, | 13,14 | | | | |

Melanie O'Daniel        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**trip**
36:21
80:9

**truthful**
9:12

**truthfully**
8:21

**try**
55:7
56:4,10
99:10

**trying**
36:21
49:10
58:3
61:23
80:3,9
88:17
108:8
112:15

**turn**
56:18

**turned**
44:24

**tutoring**
41:9

**tweaking**
107:25

**twice**
11:21

**two**
6:17 8:10
10:21
11:25
14:4
15:19
31:16
36:14
38:12
39:20
40:8 43:3
49:19
50:18
57:12

65:23
67:24
78:20
81:20
84:23
88:3
89:14
90:3 95:2
113:15

**two-
bedroom**
22:13

**type**
18:3

_____

**U**

_____

**U.S.**
34:2,5,6
72:4
73:8,16

**Ubbens**
7:4,7,8,
12

**UFC**
15:3

**Uh-huh**
60:17

**ultimately**
112:2

**unable**
76:1

**unaware**
81:12

**unbeknownst**
82:4

**uncomfortable**
55:10
57:1

**under**
8:21
10:10
11:5
23:24
27:7,9,12
33:25
41:22
70:6,8
82:25
96:22

**underlying**
19:24
33:16
39:25

**understand**
5:16,20
7:25 8:25
11:10,15
13:4
14:11
19:20
23:23
26:14
30:11
43:17
59:24
60:23
61:3 73:7
74:7,9,
14,25
75:1
81:18
83:21
85:21,22
86:17
88:12
92:20
93:4,6
94:17,19
96:1
97:7,16
98:5
102:21
106:6,10
108:8,16

111:6

**understanding**
15:23
18:13,23
30:15,25
31:4 32:9
35:16
43:7
46:13,17
47:4,7,11
49:15
55:3
58:3,25
79:19
83:4 86:1
93:9
96:24
102:12,23
104:2,22
106:21

**understands**
31:18

**understood**
15:11
42:9,15
48:18
80:18
81:3 98:2

**unfair**
112:21

**unfolded**
31:1

**unfortunate**
112:1

**unfriendly**
52:20

**unit**
60:2
61:24
67:15

**United**
82:22

**unknown**
75:8 78:1
108:11,
23,24

**unknowns**
77:24

**Unless**
10:5

**unprovoked**
76:9

**unreasonable**
19:13
33:10

**unstructured**
97:25

**until**
21:5
25:8,11
26:6
30:19
38:22
46:3
109:24

**up**
21:5,13
23:15,18,
20 24:9,
20,22
30:22
31:25
36:21
42:18
49:19
51:3,13
56:4,10,
18 57:9,
20,22
58:5,16
60:10,19
62:9

63:15
66:22
67:20
70:4,12
79:21
80:9 84:7
85:17
86:16,21
94:12,15
98:9
99:12,14
100:17
101:24
102:6
103:2,4,7
104:4

**upper**
105:7

**UPS**
70:10

**upstairs**
70:19

**us**
19:7
31:17
50:5,7
70:22
71:1
79:20
86:21
92:5
104:10
109:1,10
112:2,3

**use**
8:4
17:24,25
42:25
43:6
44:15
47:5
86:14,20
99:25

**used**
21:8 23:9
46:24
79:1



Melanie O'Daniel                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

82:7,9

**using**
34:22
51:9
101:17

**usually**
70:25

**utilized**
92:23

---

**V**

**vacation**
14:8
35:24
36:4,6
37:2
40:14
41:3 42:2

**vacuum**
83:11

**various**
17:13
48:17

**vary**
34:16

**vast**
88:15

**Vegas**
4:9,23
110:1,8,
11

**vehicle**
70:23
71:2,5

**vehicles**
71:4

**verbal**
8:4

**verbatim**
33:2,4
99:13

**verbiage**
77:21
80:5

**versions**
12:4

**versus**
4:9,23
7:2,4,7,
8,12 34:6

**very**
9:21
18:1,5
19:23
68:8
71:13
95:4

**vest**
95:19

**via**
44:5

**vice**
15:9

**victim**
27:14
113:9

**victims**
50:18

**video**
56:14
57:16
58:1,13
60:13
63:17,24
64:6,11
65:10
66:16,25
67:5,10,
18 68:7
93:3,13
98:19
99:1,5,13
100:11,15
101:6,14,
19,21
102:3,11,

13,15
109:25
112:4
114:11

**videograp
her**
4:2,5
55:15,18
114:10,14

**videos**
30:23
56:5
69:22,25

**videotape
d**
115:10

**view**
19:15

**viewing**
17:12
61:5

**violate**
24:14
77:11

**violated**
105:17,23

**violates**
60:4

**violation**
77:17
78:15
79:5
97:12
105:15

**violator**
36:16

**violators**
41:23

**violence**
21:9
27:14

**violent**
22:8

34:11
52:22
53:19
113:9

**vision**
112:22

**vulnerable**
75:3 78:4

---

**W**

**wait**
25:7,15
33:22
80:24
82:19

**waited**
25:8 26:2
73:4

**waiting**
82:16,18

**waive**
115:9

**walk**
7:11
16:12
20:24
27:11
29:20
30:24
31:4 32:7
33:4
35:19
49:14
50:9 57:7
69:11
108:15

**walked**
16:8

**walking**
53:10
71:19
92:5

**want**
9:2 11:7,
13 13:15
19:4
23:15
26:17
30:9,10
33:4
53:14
56:1,14,
25 58:23
59:23
63:20
65:13,17,
21 66:8
68:21
69:6,23
71:2
79:25
81:11
82:3
85:22,23
93:5
94:18,20
95:7
96:9,18
106:19
108:20
111:8
114:11,18

**wanted**
21:15
42:8 53:8
56:5
98:17
99:4,9
106:17

**wanting**
102:15

**warning**
34:23

**warrant**
7:13,17,
20 18:15,
17 19:2,
14,18
20:2
21:1,2,5

22:21,23
24:1,3
26:5
27:3,4
31:9,14
32:1
33:12,18
35:25
37:9 39:1
42:19
43:9,19
44:17
45:7,13,
23 49:15,
16 51:14,
16 52:4,
8,9,10,
14,15,18
53:1
54:6,23
61:17
66:5,9
69:13
71:9
73:23
74:3,11,
16,23
75:10,22
76:16
77:7 78:6
80:18
88:2,23
89:5,16
91:6
92:1,10,
18,24
97:19,23
99:7
100:4
108:21
109:3,7
111:13
113:8,21

**warrants**
8:5 21:17
27:24
35:4,5,6
36:17,19
41:24

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

43:20
70:21
71:7
74:19
85:16
88:14
89:24
91:19
95:13

**watch**
17:17
28:20
56:14,19
66:1
69:22
91:20
93:3
102:13

**watched**
64:23
93:13

**watching**
69:25

**water**
96:8

**Wattsel**
49:24
50:4,9,
23,24
51:7,15,
19 55:1
71:10
76:20

**Wattsel's**
50:17

**way**
9:12
20:2,6,
10,16,20
35:18
43:15,18
44:8,17
45:6
63:12
69:16
70:20

80:4 82:9
88:11,14,
15 97:9,
25 106:20

**ways**
63:12

**we**
4:5,7
7:13,16,
19,20
9:14,20
11:22
15:2,6,7,
9 18:17,
21 19:1,
4,5,6,13,
17,23,25
20:15
21:4,10,
11,13,14,
19 22:10,
11,13,14
23:4,5,
14,20
24:2,3,7,
13,24
25:21,22
26:3,4,23
27:2,13,
16 28:25
29:20
30:23,24,
25 31:9,
12 32:8,
14,22
35:3,7,16
36:11,18
37:1,9,10
38:12,13,
15,22
39:14
40:3 41:8
42:11,13
43:22
44:2,21,
23,24,25
45:12
46:10,12
47:13,14,

15 48:22
49:1
51:12
52:25
53:7,11,
12,13,14,
22 54:9,
12,15,18,
24 55:5,
14,21
57:23
58:15,25
59:8,23
61:3,12,
18 62:12,
14 64:19
65:3
66:4,7,8,
9,18
68:2,7,21
69:7,22
71:10
72:20
74:7
75:19,24
76:1,3,5,
8,9,11,
13,14,25
77:10,11,
14 78:19,
23 79:20,
22 80:14,
16,20,22,
25 81:9,
12,18
82:7,11
85:16
86:13,14,
20 87:3,
12,14,18,
21,22
88:11,22,
24 89:19
90:8,20,
22,23
91:10,20
92:7
93:3,13
96:9,14
97:6,22

98:3
99:16,18,
23,24,25
100:13
101:1
102:18
103:1,14,
20 104:18
105:10,
14,17,19
106:2,8
107:2
108:4,19,
20,24
109:5,6,
8,9,12,
13,14,17,
18 110:1,
8 111:1,
8,9,10,
11,15,16,
20,23
112:4,5
113:10,
12,16,17,
23
114:10,16
115:9

**we'll**
15:4 22:3
29:17
39:16
56:11
64:3 74:8

**we're**
13:6
18:16
19:5 30:9
31:12,17
34:2 35:7
37:8
39:12,13,
17 41:18
42:10,22
49:8
52:25
53:16
55:18
57:21,24

61:5
63:6,21
64:8
66:4,13
86:16
99:3,25
102:16,17
109:4,14
113:8

**we've**
31:1
34:19
35:3,4,6,
11 68:3,
4,5 69:5
75:14,20
88:19,20
91:19

**weapon**
95:20
111:18
112:16

**weapons**
27:24
34:11
51:11

**wearing**
95:19

**week**
17:2,7

**weeks**
10:21

**well**
6:21 7:7
8:2 13:7
14:5 17:8
24:2 27:8
30:1
35:14
37:1
38:12,17
39:10
40:3
41:25
43:2 46:6
52:2

53:22
65:20
69:24
70:16
73:20
84:10
90:5
92:22
106:1,3
108:6
109:23

**went**
7:22
16:20
30:4,6,20
32:12
40:6
47:13,16
49:19
54:6
97:25
103:7
107:3
112:4,11

**what**
6:23 7:6,
23 9:3,6,
11 10:25
11:3,4,8,
12,18
13:21
14:3,22
15:1,15,
17,20,21
16:12
17:14,21
18:12,22,
23 19:25
21:20
22:2,4,
16,19
24:7,25
25:21
26:12,13,
17 28:12,
23 29:6,
21 30:6,
11,25
31:3,4,13

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
32:7,9,25        109:8           71:3            22:11           23:13           20 88:5
33:4,17,         111:5           73:22           29:1,2,12       25:2,6          89:4
19,21            113:16          77:22           35:1            26:21           91:24
34:10            114:3           78:14           38:12           30:11           102:20
35:19          what's           84:21           41:9,24         37:1
39:19,24         20:24           86:13,14        50:5,15         38:11         with
41:8 42:9        30:14           92:5,23         73:3            42:10,11        5:25
43:3             31:21           95:5 98:4       99:5,22,        43:1 50:2       10:21
47:11            58:16           100:11          23 100:12       55:14           11:2,20
48:1,10          75:25           101:15          104:20          59:15           12:10,22,
49:5,9,14        81:14           106:4,6,                        70:21           25 13:19
52:8,25          83:15           21 107:24     while             71:7            15:24
53:4 55:3        85:3,6          110:13          8:13            78:19,25        17:5
58:4             92:4 93:9       112:14          15:12           80:13           19:10
59:16            109:12                          22:1            83:17           20:3,7,
60:6,7         whatever        where             32:18           93:22           11,12,17,
61:5             53:13           7:19            50:3,7          99:3            21 21:10
62:4,5                           10:20           62:23           104:2,8,        25:7,22
64:13          when              17:23           70:1            15,22           27:1,13,
65:15            7:22 9:8        26:7            73:12           106:2,4         18,24,25
66:2,21          11:6 12:1       27:12,22        75:4                            31:22
67:2,12          13:11           41:16,25        77:20         willfully        32:19
69:8,9,          14:7            48:1            91:20           53:22           33:15
10,25            17:25           59:1,2                        Williams         36:12,14
72:20            18:1            70:24         who               5:21            37:12,13
74:14            21:16           73:3            16:4            45:5,17,        42:20,24
75:15,16,        23:8 24:5       75:22           23:15           18 46:1,7       43:12
17 77:5,         26:4            83:10           53:10           59:2 70:1       47:3,19
7,11             27:2,10         84:6            54:4,7          109:21          49:23
78:22            28:11,12        85:3,5          78:2            110:10,24       50:1,3,
80:22            29:23           86:20,21        79:15,20      Williams'         15,17,18
81:6             30:5,13,        104:15          80:23           20:3,12,        51:2,3,12
83:21            14,15,16,                       88:10           17,22           54:1
85:25            17 37:5       whereupon         106:9           59:11           56:7,9
86:13            39:21           55:17           108:22          60:4            58:7
87:3,8,          41:13,21                                        61:22           59:11
19,21            42:18         whether         who's             68:12           60:9
88:20,21         46:25           11:1 22:6       97:22                           61:15,21
89:20,21,        47:13           44:5 46:8       108:25        willing           62:24
22 90:4,9        49:6            52:15           111:10          83:7            63:8
91:14,15         51:25           53:15                                           68:11,25
98:19            52:3 54:6       60:2          whole           window            73:8,9
99:13,14,        57:23           62:12           56:14           20:10           76:10,17
20 100:2,        58:8 60:1       82:16           96:19           47:25           77:25
13,19            62:13           89:12                           48:1            84:16
102:11,23        65:6,23         90:24         whoopsie          59:1,5          85:24
104:2,20,        66:13           111:21          113:17,18       61:6,8,20       86:6 87:3
21 105:4,        67:8,24         114:24                          68:4            91:22
11 107:6,        68:21                         Whose             70:18           93:6
14 108:17                      which            57:10           87:4,18,        94:12
                                 6:8 12:2      why
                                 18:3           19:3 21:8
```

Melanie O'Daniel          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

95:12
97:1 98:6
99:3,9
102:3,14,
16 104:8,
10 105:7
110:9
111:18
112:22
113:7,8,
16,22
115:6,7

**withdrawn**
93:20

**within**
13:13
62:14
64:21
68:4,6
78:7,24
81:19,24
84:4
87:5,8
90:18
107:18

**without**
72:7
84:14

**witness**
4:7 6:11,
13 10:9
12:1,17
25:6,21
31:8
37:18
44:8
45:10
46:1 48:4
57:3,14
58:19
59:14
62:1 63:4
68:14
87:14
113:3
114:8,25
115:7

**witnessin
g**
17:12

**won't**
9:13

**wondering**
98:24
100:25

**words**
8:22 80:3
89:19

**work**
47:8 49:3
86:22

**working**
13:9
110:18

**worry**
96:11

**wounds**
49:20

**wrap**
93:7,12

**write**
17:6

**written**
8:3 12:6
13:5

**wrong**
7:16
21:20
35:15
56:9
75:13
82:7,8,9
83:5 92:1
104:6,9
108:7
115:2,3

**wrote**
79:8,17

---
**Y**
---

**yeah**
7:5 13:15
19:7 28:9
30:3
35:25
39:7
48:1,21
51:21
57:15
58:9,10,
11 60:23
61:16
63:14
64:21
67:17
70:19
72:21,22
74:20
75:1,13
80:7,17,
25 81:17
82:3,24
83:15
87:21
91:19
93:1
98:3,4,
12,21,23
100:14,
20,24
101:7,16,
22,25
102:9,16
103:13
107:22
108:2
109:4
111:7,15
113:12

**year**
13:14
41:7

**years**
7:14
8:10,11

9:10
14:1,21
15:19
27:14
29:18
43:3
79:10
88:12
89:1,23,
25 91:16,
18 101:8

**yelled**
88:4

**yep**
42:21

**yes**
5:18,22
6:7,13
7:10 9:1
10:3 12:9
13:20
16:1,11
18:11
19:12,22
20:5,9,
14,19,23
21:18,23
24:20
25:16
26:15
27:8 29:8
35:22
36:5 41:6
45:10,14
46:10
48:9 50:9
54:21
56:24
58:22
61:9
62:17,21
63:4
65:5,8
66:20
68:1,14,
24 72:25
74:13,14
81:22

83:23
85:14
86:7 88:6
93:8,18
96:4 98:8
102:22
106:2
108:14
110:12,19
111:25
114:20

**yesterday**
11:23
12:11

**Yet**
84:1

**Youtube**
98:19
100:15,16
101:2,10,
11,12,14,
19,20

---
**Z**
---

**zip**
56:8,9