# Exhibit 7

# Exhibit 7

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1                UNITED STATES DISTRICT COURT

2                    DISTRICT OF NEVADA

3                      *  *  *  *  *

4   LATIA ALEXANDER,                )
    individually as heir of        )
5   ISAIAH T. WILLIAMS and in      )
    her capacity as special        )
6   administrator of the Estate    )
    of ISAIAH T. WILLIAMS,         )
7                                   )
         Plaintiff,                 )
8                                   )
          vs.                       )        CASE NO.
9                                   )  2:24-cv-00074-APG-NJK
    LAS VEGAS METROPOLITAN          )
10  POLICE DEPARTMENT, a            )
    political subdivision of        )
11  the State of Nevada; KERRY      )
    KUBLA, in his individual       )
12  capacity, et al.,               )
                                    )
13       Defendants.                )
    _____ )

14

15              VIDEOTAPED DEPOSITION OF

16                 RUSSELL BACKMAN

17              Taken on October 3, 2024

18                   at 1:10 p.m.

19            By a Certified Court Reporter

20                 Las Vegas, Nevada

21

22

23            Stenographically reported by:
          Heidi K. Konsten, NV CCR 845, RPR
24           JOB NO. 57948 - Firm No. 116F

25

Page 2

1              Videotaped deposition of RUSSELL BACKMAN,

2      Volume I, stenographically taken at 400 South

3      Seventh Street, Suite 300, Las Vegas, Nevada, on

4      Thursday, October 3, 2024, at 1:10 p.m., before

5      Heidi K. Konsten, Certified Court Reporter in and

6      for the State of Nevada.

7

8                    APPEARANCES OF COUNSEL

9      For the Plaintiff:

10              CORRINE MURPHY, ESQ.
                Murphy's Law
11              2620 Regatta Drive
                Suite 102
12              Las Vegas, Nevada 89128
                (702) 820-5763
13              (702) 665-7345 Fax

14      For the Defendants:

15              CRAIG R. ANDERSON, ESQ.
                Marquis Aurbach
16              10001 Park Run Drive
                Las Vegas, Nevada 89145
17              (702) 382-0711
                (702) 382-5816 Fax

18      Also present:

19              Dawn Beck, Videographer

20

21                    * * * * * *

22

23

24

25

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 3

```
 1                        INDEX

 2                                              Page

 3   RUSSELL BACKMAN

 4   Examination by Ms. Murphy                   5

 5                   *  *  *  *  *

 6

 7                     EXHIBITS

 8   No.              Description              Page

 9   Exhibit 1      Notice of deposition         6

10                   *  *  *  *  *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 4

1                    LAS VEGAS, NEVADA

2                 Thursday, October 3, 2024

3                       1:10 p.m.

4            DEPOSITION OF RUSSELL BACKMAN

5                    * * * * * *

6

7            THE VIDEOGRAPHER:  Good afternoon.  We

8     are now on the record.  This begins the videotaped

9     deposition of Russell Backman.  Today's date is

10    October 3rd, 2024.  The time on the video monitor

11    is 1:10 p.m.

12            We are located at 400 South Seventh

13    Street in Las Vegas, Nevada.  This case is

14    entitled Latia Alexander, et al., versus Las Vegas

15    Metropolitan Police Department, et al.  The case

16    number is 2:24-cv-00074-APG-NJK in the United

17    States District Court, District of Nevada.

18            My name is Dawn Beck, legal

19    videographer.  The court reporter is Heidi

20    Konsten.  We represent Lexitas.

21            Will counsel please state your

22    appearance for the record and whom you represent.

23            MS. MURPHY:  Good morning -- or good

24    afternoon.  Corrine Murphy, Bar Number 10410, on

25    behalf of plaintiff.

Page 5

1              MR. ANDERSON:  Craig Anderson for the

2    defendants.

3              THE VIDEOGRAPHER:  Will the court

4    reporter please swear in the witness.

5

6    Whereupon,

7                   RUSSELL BACKMAN,

8    was called as a witness, and having been first duly

9    sworn to testify to the truth, was examined and

10   testified as follows:

11

12                   EXAMINATION

13   BY MS. MURPHY:

14      Q    Let the record reflect this is the time

15   and place of the deposition of Russell Backman in

16   the matter of Latia Alexander, et al., versus

17   Las Vegas Metropolitan Police Department, et al.,

18   Case Number 2:24-cv-00074.

19              Mr. Backman, my name is Corrine Murphy,

20   and I'm an attorney.  I represent the plaintiff,

21   Latia Alexander, in this case.

22              Can you please state and spell your full

23   name for the record?

24      A    Yes.  It's Russell Backman.  And it's

25   R-U-S-S-E-L-L, Backman, B-A-C-K-M-A-N.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 6

```
 1        Q     Do you have a middle name?

 2        A     Yes.

 3        Q     What's your middle name?

 4        A     Leo, L-E-O.

 5        Q     And you have been -- I'm assuming that

 6   you have seen a copy of the notice of today's

 7   deposition --

 8        A     Yes.

 9        Q     -- requiring you to be here.

10              MS. MURPHY:  And I don't have that

11   with me, Madam Court Reporter, but I'll get that.

12   And if we can please mark that as Exhibit 1.

13              (Exhibit 1 was identified.)

14   BY MS. MURPHY:

15        Q     And that -- you understand that today

16   we're here to discuss the officer-involved

17   shooting of Isaiah Williams?

18        A     Yes.

19        Q     Have you ever given your deposition

20   before?

21        A     No.

22        Q     And is there any reason, as we sit here

23   today, that you would not be able to understand my

24   questions and give your best, most truthful

25   testimony?
```

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 7

1        A     No reason.

2        Q     Okay.  Are you any -- are you under any

3    medications or anything that would inhibit your

4    ability to provide truthful and reliable --

5    reliable testimony today?

6        A     No.

7        Q     Okay.  Can you please state your address

8    for the record?

9        A     It's 3681 Via Di Girolamo, Henderson,

10   Nevada 89112.

11       Q     Thank you.

12             Could you please tell me everything that

13   you did to prepare for today's deposition.

14       A     As far as preparation, I met with

15   Mr. Anderson.

16       Q     And I don't want to know how long -- I

17   don't want to know what was discussed between you

18   and Mr. Anderson.  I'm not entitled to know that.

19   That's confidential, attorney-client privilege --

20   or, sorry, privileged information.

21             But I would like to know how long you

22   met with Mr. Anderson and how many times.

23       A     I met with Mr. Anderson two times,

24   approximately 45 minutes, probably, each time.

25       Q     Okay.  And did you meet with anyone else

Page 8

1    from Mr. Anderson's office to prepare for today's

2    deposition?

3        A    No.

4        Q    Okay.  And other than meeting with

5    Mr. Anderson, what else did you do to prepare for

6    today's deposition?

7        A    I read my CIRT statement.

8        Q    And if I -- if -- just to -- I believe

9    that I have that one as well.  That was

10   approximately 75 pages.

11            Are you talking about your recorded

12   statement?

13       A    Yes, ma'am.

14       Q    Okay.  And how -- okay.  And other than

15   reviewing your -- your CIRT statement, did you

16   review anything else?

17       A    Yes.  I reviewed the final CIRT report.

18       Q    Okay.  And that report is pretty

19   lengthy.

20            Did you read that entire report?

21       A    I went through a lot of it, yes.

22       Q    Okay.  And did you read all of the

23   conclusions, which is, I think, approximately the

24   last 20 pages?

25       A    Yes, I read it.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 9

1       Q     Okay.  And I'll ask you more about those

2   later.

3             Is that a complete list of what you did

4   to prepare for today's deposition?

5       A     I also read another statement that was

6   given prior to -- by Officer Bertuccini.

7       Q     Okay.

8             THE COURT REPORTER:  I'm sorry.  I'm

9   going to have to have you speak up, sir.  By

10  officer whom?

11            THE WITNESS:  Bertuccini.  Bertuccini.

12  BY MS. MURPHY:

13      Q     And was it his CIRT statement that

14  you -- his recorded statement that you read?

15      A     It was the statement from here.

16      Q     Oh, his deposition transcript?

17      A     Yeah.

18      Q     Okay.  And having gone through

19  Officer Bertuccini's deposition transcript, was

20  there anything in there that surprised you?

21      A     No.

22      Q     Was there anything that you disagreed

23  with?

24      A     I'm not -- no.

25      Q     Okay.  Did you bring any of the

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 10

1    documents that you reviewed with you here today?

2        A    No.

3        Q    Okay.  And other than

4    Officer Bertuccini's statement -- or deposition

5    transcript, have you read any of the other

6    officers' deposition transcripts?

7        A    No.

8        Q    Okay.  Have you discussed the

9    deposition -- your deposition here today with any

10   of the codefendants?

11       A    No.

12       Q    Is your supervisor aware that you're

13   here today?

14       A    Yes.

15       Q    Is this part of your normal working

16   schedule?

17       A    Yes.

18       Q    Okay.  So you got a day off today to

19   come do this deposition?

20       A    Yeah.

21       Q    I don't know which one is better or

22   worse.

23       A    We'll find out.

24       Q    Correct.

25            Okay.  And so I'm going to ask you some



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 11

1     background questions now.

2                And do you prefer that I call you

3     Russell or Sergeant Backman?

4          A    You can call me Russ.  That's cool.

5          Q    Russ.  Okay.

6                Russ, you're currently living in

7     Henderson.

8                How long have you lived here for?

9          A    In Las Vegas or in Henderson?

10         Q    Well, both.

11         A    I've been in the valley since 1997.

12         Q    Okay.  And how long have you been at

13    your Henderson address?

14         A    Since 2019.

15         Q    And is it fair for me to assume that you

16    have no intention of moving currently?

17         A    No, I don't have any intention.

18         Q    All right.  What's your highest level of

19    education?

20         A    Some college.

21         Q    Okay.  Where did you attend some

22    college?

23         A    CSN.

24         Q    Okay.  And what -- what partial degree

25    did you obtain there?  Like, what was your focus?

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 12

 1       A     It was just general studies.

 2       Q     Okay.  And when -- are you a member of

 3  any professional organizations related to your

 4  profession?

 5       A     As far as?

 6       Q     I don't -- like a shooting club or like

 7  an officers -- you know, pride club or --

 8       A     No.

 9       Q     Okay.

10       A     No.

11       Q     All right.  And what's your current

12  position?

13       A     I'm a sergeant assigned to the SWAT

14  team.

15       Q     Okay.  And you're still on SWAT?

16       A     Yes, ma'am.

17       Q     And so is it fair for me to assume that

18  you're in the same position as you were when this

19  officer-involved shooting occurred?

20       A     Yes.

21       Q     Okay.  And can you please run me through

22  your positions prior to that.

23       A     Positions prior to that, I was a --

24  well, if you want to start backwards -- or do you

25  want to go chronologically?  I can go either.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 13

1        Q     Why don't we start at the beginning and
2    then lead up to --
3        A     Okay.
4        Q     -- your positions with --
5        A     In the beginning, obviously I started
6    off as a patrol officer, like every other officer
7    does on the police department.  I was then
8    assigned, after several years, to a
9    problem-solving unit.
10            From that problem-solving unit, I was
11   assigned to the vice section.  From the vice
12   section, I was assigned to the narcotics section,
13   where I spent five years.  And then I was also
14   assigned to the criminal intelligence section
15   after that as a detective.
16            And then after the criminal intelligence
17   section, I went back to patrol for a period.
18   After that, I went back to the major violator
19   section, which is -- used to be called repeat
20   offenders, but it's major violators now -- as a
21   detective.
22            And I promoted out of there as a
23   sergeant.  Went back to patrol for a brief period.
24   And then after my patrol time and -- my patrol
25   time, I went back to major violators as a sergeant

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 14

1    for about -- approximately 11 months.  And then

2    after that, I was assigned to the SWAT team where

3    I am currently -- currently at now.

4        Q    Okay.  And you had gone back to patrol

5    because you had a DUI issue; correct?  There were

6    some drinking issues?

7        A    (Nodding head.)

8        Q    Okay.  Is that correct?

9        A    Yeah.

10       Q    Okay.  What is -- what's a

11   problem-solving unit?

12       A    Basically it's the plainclothes unit

13   that's assigned -- is assigned to do any type of

14   follow-up investigations as far as investigative

15   issues within the area command that you work.

16   Like, you know, there's different area commands.

17   And you're assigned there to investigate anything

18   from property crimes, robberies, violent crimes,

19   street-level crimes, street-level narcotics, stuff

20   like that.  It's a plainclothes unit usually.

21       Q    Okay.  And prior to your position in

22   SWAT, is -- did you do any CET entries or serve

23   any search warrants as part of -- in part of your

24   duties in these other units?

25       A    Years ago in narcotics, yes.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 15

1      Q      Okay.  And how long -- and so narcotics,

2   based on the chronology that you have given me,

3   was very early on in your career.

4             What years did you work for narcotics

5   during?

6      A      2006 to 2010.

7      Q      Okay.  And so I asked a double question,

8   so I'm going to split it up.

9             Did you do CET entries as part of the --

10  any search warrants that you served --

11     A      Do you mean --

12     Q      -- for narcotics?

13     A      Explain --

14     Q      Sorry.  The control -- the C-E-T,

15  controlled entry tactic, the --

16     A      The controlled entry tactic, at that

17  time, I never knew anything about that.

18     Q      Okay.  And so what -- when you served

19  search warrants as part of the narcotic unit, how

20  would you serve those?

21     A      That would be done at the squad level,

22  depending on how big the structure was.  And it

23  would be under the supervisor of -- the narcotics

24  sergeant at that time and whoever was the case

25  agent and the detective.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 16

```
 1        Q     Okay.  And so I guess my -- if I worded
 2    the question poorly, like -- was it, like, knock
 3    and announce and that kind of thing?
 4        A     Yes.
 5        Q     Okay.  Did you do, like, explosive
 6    entries or --
 7        A     No.
 8        Q     Okay.
 9        A     No, no, no.
10        Q     Okay.  Do you have any specialized
11    certification?
12        A     For what?
13        Q     For your job.  Do you have any, like --
14    I mean, other than being a SWAT officer.  I know
15    that in and of itself is a specialized
16    certification.
17        A     Right.
18              Specialized certification as far as?
19        Q     So I'll give you an example.
20              Some of the other gentlemen that I have
21    deposed in this case, they've talked about they
22    had -- one gentleman, I think he had, like, a
23    specialized certification for explosive entries.
24    They had some -- that kind of specialized
25    certification.
```

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 17

```
 1        A     No, I don't have anything like as far as
 2    that, no.
 3        Q     Okay.
 4        A     I'm not -- I'm not -- no.
 5        Q     Okay.  Okay.  Can you please explain to
 6    me what "knock and announce" means to you.
 7        A     Knock and announce, are you talking --
 8    which -- which way we going, state or federal,
 9    here?
10        Q     Well, so all -- that's a really good
11    question, and I'm glad you asked me that.  And
12    that allows me to, kind of, give us some
13    groundwork for how I want you to answer the
14    questions for the deposition.
15              You were serving this at a state level;
16    correct?  I mean, the way that you were serving
17    this -- this search warrant, obviously you're
18    acting within the state of Nevada; correct?
19        A     Uh-huh.
20        Q     And so it would be the -- it would be
21    the parameters on the state level -- you tell me.
22              What -- as you were serving this
23    warrant --
24        A     Right.
25        Q     -- what parameters applied to you, state
```

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 18

1    or federal?

2        A    As far as -- for -- under both.

3        Q    Okay.

4        A    Yeah.

5        Q    Okay.  So then if you can give me both,

6    then, what does -- what does "knock and announce"

7    to you mean under the state standard and under the

8    federal standard?

9        A    Okay.  The federal standard is being a

10   reasonable amount of time for someone to come

11   to -- come answer the door.  State standard, which

12   is an NRS, and I believe it's -- which one is the

13   NRS you're talking about?  Because there's a

14   couple in there.

15       Q    You -- we can just say NRS.  I don't

16   know the code number.

17       A    Okay.  All right.

18       Q    I don't even think Craig does.

19       A    Yeah.  And for -- NRS, it means after

20   you've notified your presence and authority and

21   your intent to serve a search warrant, it would be

22   there's no answer at the door, they don't know

23   that you're there.

24       Q    Okay.  But, of course, I mean -- well,

25   you tell me.

```
                                                  Page 19
 1              Is it your understanding that ultimately
 2    the federal standard is the one that prevails?
 3         A    Federal always supersedes state, I
 4    believe, if I'm correct.
 5         Q    Okay.  So is it -- so then was it your
 6    understanding that the standard of a reasonable
 7    amount of time applied the day that you were
 8    serving this search warrant?
 9         A    Yes.
10         Q    Okay.  And by the day, of course I mean
11    January 10, 2022.
12         A    Yes, ma'am.
13         Q    Okay.  And so -- okay.  And can you tell
14    me what parameters -- and so you -- you
15    articulated both the state and the federal
16    standard really well.
17              Was that part of your training for SWAT,
18    that you were educated on that, or did you know
19    that already?
20         A    Gosh, I'm trying to think.  I was
21    assigned to the SWAT team 29 days.  If I received
22    that training while I was there, I don't -- I'm
23    trying to think if I -- I don't recall that part.
24         Q    Okay.  Would it -- let me ask the
25    question a little bit differently.
```

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 20

 1       A    You know, you would have to look at my
 2  training record.  Maybe it's on there.  I --
 3       Q    No, no, no.  That's --
 4       A    I apologize.
 5       Q    -- totally okay.  Let me ask it a little
 6  bit differently.
 7            Do you think -- as we sit here today, do
 8  you think that you were likely aware of these
 9  standards on the -- on January 10th, 2022?
10       A    Yes.
11       Q    Okay.  And you said "a reasonable amount
12  of time."
13            To your knowledge, is there any, like,
14  minimum amount of time?  Like, is there any
15  parameter of, like, hey, it can't be less than
16  this?
17       A    No.  It's a reasonable amount of time
18  based on -- you know, is there exigency or what
19  type of crime you have?  Is there a propensity of
20  violence?  Is there a violent individual in there?
21  Are they willing to take up arms -- arms?  Are
22  they heavily armed?  Are they -- can they fortify
23  themselves inside that structure with it?
24            There's -- there's a bunch of different
25  parameters that can come into play with that --

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 21

1       Q      Okay.

2       A      -- as far as, like, a hostage situation

3   or something.  That's totally different.  But

4   that's -- that's a situation where that's

5   life-threatening exigency.

6       Q      Okay.  And can you explain to me --

7   we've kind of gone over it a little bit, but I

8   kind of want -- I wanted, like, a real statement

9   from you.

10              What is your understanding of the

11   purpose of knock and announce?

12      A      The purpose of knock and announce is to

13   notify the occupants that you're there to serve a

14   search warrant and notify them of your presence,

15   authority, and your purpose.

16      Q      Do you understand that it is part of a

17   person's constitutional right to have clear notice

18   of a police officer's intent to enter?

19      A      Do I understand that?

20      Q      Yeah.

21      A      Yes.

22      Q      Okay.  What's the first and most

23   important constitutional right that any individual

24   has?

25      A      Well, they're all important.  Right?

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 22

1       Q      Uh-huh.

2       A      I think they are.

3       Q      Do you think that there's one that's the

4   most important?

5       A      Fourth Amendment.

6       Q      That's what you think is the most

7   important?

8       A      Well, I mean, Fourth Amendment and the

9   First Amendment.

10      Q      Right.

11      A      Freedom of speech, press, and religion.

12  I think that's probably the most important.

13      Q      Okay.  In performing your job as a

14  police officer, do you agree with me that you have

15  a duty to conduct yourselves such that you do not

16  violate the civil or constitutional rights of

17  members of the public?

18      A      Yes.

19      Q      Do you agree that if you see other

20  officers violating the civil or constitutional

21  rights of a member of the public, you have a duty

22  to intervene and stop that officer?

23      A      Yes.

24      Q      What is a no-knock warrant?

25      A      Well, a no-knock warrant is a search

Page 23

1   warrant -- and I'll go through the process of it,

2   of how it's actually done, because I think that's

3   where you're going with this.

4           Am I correct?

5   Q    Uh-huh, yes.

6   A    So it's -- essentially a no-knock

7   warrant is a search warrant that -- it would be --

8   on the SWAT section would be a -- an affidavit

9   would be prepared by a detective.  They would

10  articulate the verbiage in the no-knock search

11  warrant for it to be a no-knock search warrant.

12          And they would get approval from their

13  supervisor and their chain of command for a

14  no-knock search warrant.  In order for that --

15  approval for that search warrant, that goes to

16  them at their level.  And then the -- for the SWAT

17  side, it would be approved by the sergeant.  But

18  at the time, it was the captain.  So it was a

19  little -- the approval process was different.

20          But in order to have that search warrant

21  approved, it would have to be approved all the way

22  up the chain of command to the deputy chief on --

23  on the no-knock search warrant.  And then it would

24  obviously have to be DA approval and signed by a

25  judge.

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 24

1      Q    Okay.  And this may seem like a basic
2    question and in itself explanatory, but I still
3    want your answer on the record for it.
4          What's the difference between a no-knock
5    warrant and a knock warrant?
6      A    A no-knock warrant means prior to
7    entering the structure, there's no announcements.
8    It's a no-knock.  You don't make those
9    announcements until you actually enter the
10   threshold of the structure itself.
11     Q    Okay.  Can you get a no-knock warrant on
12   property-only search warrants?
13     A    No.  Not that I -- well, I -- I should
14   say depending on how it was articulated, but I
15   would say no.
16     Q    Okay.
17     A    I would say that was -- no, correct.
18     Q    And so when are no-knock warrants used
19   generally then?
20     A    No-knock warrants are used for somebody
21   that's an extremely violent individual that is
22   heavily armed, that would have the ability to
23   possibly take arms up, harm an individual inside
24   the actual structure itself or wherever it's at.
25          A no-knock could also be utilized for --

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 25

1   depending on if it's a violent individual that's

2   heavily armed or somebody that's very violent,

3   when the officers are serving it -- their

4   positions versus where the suspect would possibly

5   be located at and if they would be in harm's way

6   or not.

7        Q    Okay.  And I always say it wrong.  I

8   think it's "set," but is it actually C-E-T?  Do

9   they call it "set" or C-E-T?

10       A    C-E-T.

11       Q    CET.  All right.  I always call it

12  "set."  Sorry.

13            What is a CET?

14       A    It's a controlled entry tactic.

15       Q    And can you tell me what the purpose of

16  a CET is?

17       A    The purpose of a controlled entry

18  tactic, there's obviously some parameters -- the

19  purpose of the controlled entry tactic is to enter

20  a structure or dwelling dynamically in order to

21  overwhelm and take people into custody prior to

22  them taking up arms, destroying evidence, before

23  taking up arms.

24            It's for -- it's for a safety issue, the

25  essential part of the CET.  And that tactic is

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 26

1    utilized to flood that structure -- flood that

2    structure and deem it -- dynamically to make it

3    safe.

4         Q    In this case, was the structure flooded

5    and dynamically made safe?

6         A    Dynamically and made safe?

7         Q    Was it?

8         A    It was afterwards.  After we got shot at

9    18 times.

10        Q    Right.  But upon the entry, was this

11   dynamically made safe?

12        A    Upon entry, we were fired upon 18 times.

13        Q    Right.  So it's a yes-or-no answer.

14        A    The answer was after the shooting.

15        Q    No.  My answer -- my question is, when

16   you entered the unit, was this -- did this CET

17   entry make the unit dynamically safe?

18             MR. ANDERSON:  Objection.  Form.

19             Go ahead and answer.

20             THE WITNESS:  No.  I mean --

21   BY MS. MURPHY:

22        Q    Can you use a CET entry on a

23   knock-and-announce warrant?

24        A    A CET is a -- at that time, that was a

25   knock-and-announce warrant.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 27

1       Q     Okay.  As we sit here today, can you use

2    a CET entry -- can you use a CET entry on a

3    knock-and-announce warrant?

4       A     No.

5       Q     Okay.  In your opinion, do you think

6    that there was a conflict between knock and

7    announce and a CET?

8       A     In my opinion at the time?

9       Q     Yes.

10      A     At that time?

11      Q     Yes.

12      A     No.

13      Q     Okay.  What about your opinion today?

14      A     My opinion today, after being trained

15   and going through some other things, depending on

16   what it's for and how it's articulated and what

17   the -- what the intel sheet report would -- would

18   dictate on that exact answer.

19            It's all situational, depending on the

20   type of intelligence is there.  And is there a

21   violent person in there?  Is -- are they -- do

22   they have the ability to take up arms?  Those

23   would all be the factors of the CET with the

24   knock-and-announce part.

25      Q     Okay.  And what is a call-out and

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 28

1   announce?

2       A    A call-out -- you're talking about the
3   surround and call-out?

4       Q    Yes.

5       A    Okay.  A surround and call-out --

6       Q    And, listen, I've been in this case, but
7   I still get some of the acronyms and names mixed
8   up a little.  So feel free to correct me on
9   everything so that the record is accurate.

10      A    Okay.  So a surround and call-out -- a
11  surround and call-out is basically we will
12  surround the outer part of the structure,
13  establishing containment on it with BearCats,
14  which will be our armored vehicles.  We'll place
15  them in positions either in front of the house, on
16  both of the corners, establish containment.  We'll
17  also put officers on the rear of the residence and
18  on each side of the residence.

19          Once we have sufficient containment on
20  the exact structure itself of the residence and
21  everybody is set in place and it's -- we're not
22  seeing any movement or anything -- or anything
23  that's making us -- give us any alarms, we'll
24  start the announcement process via the PA or the
25  LRAD that's attached to the BearCat.

Page 29

1          We'll give the announcements for several

2     minutes, depending on what the case may be.  And

3     if we're not getting a response from inside, we'll

4     usually go with a plan.  We also try to telephone

5     call-in as well, if we have a phone number for the

6     individuals that are inside.

7          And that's all situational, based on the

8     intelligence that we get from the detectives.  And

9     then we just go through our progressives.  And

10    then after that, we would start our breaching plan

11    if we got no response.

12    Q    Okay.  And because you were the -- you

13    have given two very good descriptions of them.

14    But because you were the sergeant on this, I want

15    to ask you, for the record, to state, what is the

16    difference between a CET and a call-out -- or the

17    call-out?

18    A    A controlled entry tactic is a dynamic

19    movement inside the structure to where we're going

20    to take people into custody -- right?  -- after a

21    knock and announce -- after the announcements.

22          The difference between that and a

23    surround and call-out is we're trying to get

24    inside that structure to deem it safe, because we

25    know that there could be a violent individual in

Page 30

1    there that could potentially take up arms.  On a

2    surround and call-out, with that case like that

3    and as far as the CET -- let me back up here.

4         There's also some environmental factors

5    along with the CET.  You could look at the

6    positioning.  Was it -- is it a single-story

7    apartment complex?  Is it a two-story apartment

8    complex?  Is it a single-story house or a

9    two-story house?  Where is it located at?  Is it

10   an apartment complex where there's an apartment

11   with an interior hallway?

12        Those are all mitigating factors on

13   whether or not you can sufficiently contain an

14   actual structure or an actual residence or house

15   or whatever you're trying to serve the search

16   warrant at.

17        Q    And just specifically for this

18   incidence, it was a -- or incident -- sorry -- it

19   was a CET; correct?

20        A    Yes.  We utilized the controlled entry

21   tactic.

22        Q    As we sit here today, LVMPD policies

23   would not allow for this type of CET to be used

24   for this type of warrant; correct?

25        A    As it sits now, we'd have to get



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 31

1    authorization and approval from the SWAT

2    commander.

3         Q    Well, didn't you have to get

4    authorization and approval for this back in 2021?

5         A    Yes.

6         Q    Or 2022.  Sorry.

7         A    Yes.  Yes.

8         Q    Okay.  But as we sit here today, haven't

9    LVMPD policies been changed so that you could not

10   serve this type of warrant with a CET?

11        A    Correct.

12        Q    Okay.  All right.  And so now we're

13   going to -- we've kind of danced around it a

14   little bit, but now we're going to jump into the

15   actual facts.  And we'll start with -- and I know

16   you've read your statement.  You -- you gave that

17   within days of the incident itself.

18             And you were very detailed in there, so

19   I'm assuming that you're going to be detailed --

20   you've been detailed so far.  So I'm just going to

21   ask you some background questions, and we'll get

22   into the facts.

23             So when was the -- your first awareness

24   of the warrant?

25        A    First awareness of the warrant would

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 32

 1    have been a day off.  I saw it hit the SWAT
 2    warrants, but I didn't -- I just kind of figured
 3    it was being worked out by the people above me.
 4              THE COURT REPORTER:  I need you to
 5    keep your voice up, please.
 6              THE WITNESS:  Okay.
 7    BY MS. MURPHY:
 8        Q    And so you were -- would it be fair for
 9    me to say you were kind of peripherally aware?  So
10    a warrant came in, but --
11        A    Yeah, you get the email notification on
12    your phone.  It doesn't go away, even though
13    you're off.
14        Q    Okay.
15        A    It's always on.
16        Q    Fair enough.
17             And -- and then what -- when did you
18    become, like, familiar with -- with the actual
19    warrant?  Do you know what I mean by that?
20        A    When was approval to be served?  It
21    would have been, I believe, Sunday when I went
22    back into work.
23        Q    Okay.
24        A    If I recall correctly.  It was either
25    Saturday or Sunday.

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 33

```
 1        Q    Okay.  And at that time, were you part
 2   of the -- there was recon that was done on this;
 3   correct?
 4        A    Yes.  We went into work.  We knew that
 5   we had a search warrant to serve.  I got with the
 6   ATL, Jake Warner -- because I was a
 7   sergeant-in-training, and the actual sergeant --
 8   team sergeant at the time was Garth Findley.
 9             He was off that day, so I was getting
10   the warrant preparation parts done.  So Jake
11   Warner -- I talked to Jake Warner and said we had
12   a warrant to serve.  And then we got recon
13   officers assigned to go out and conduct the
14   recon --
15        Q    And --
16        A    -- for that --
17        Q    Sorry.
18        A    -- for that -- yeah.
19        Q    I'll try not to interrupt you.
20        A    Go ahead.
21        Q    Sorry.
22        A    Go ahead.
23        Q    No, no, no.  I don't want to interrupt
24   you ever.
25        A    Go ahead.
```

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 34

1        Q     If you're not done answering, say "I'm

2    not done."

3        A     Go ahead.

4        Q     So in terms of -- so when you say

5    "ATL" -- does that mean assistant team leader?

6        A     Yes, assistant team leader, and that

7    assistant team leader --

8              THE COURT REPORTER:  Okay.  I need you

9    both to slow down and talk one at a time.

10   BY MS. MURPHY:

11       Q     When I say "ATL," does that mean

12   assistant team leader?

13       A     Yes.

14       Q     Sorry.  I know.  Sorry.

15             All right.  And, so, for the record, can

16   you please just make that statement one more time

17   so the court reporter can get it?

18       A     Assistant team leader is ATL.

19       Q     Okay.

20       A     Yes.

21       Q     And so explain to me kind of what

22   position the -- what does ATL mean?

23       A     It's an assistant to the team leader.

24       Q     Sorry.  That was a bad question.

25             What is their role in terms of, like,

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 35

1   functioning with what you're doing and how they're

2   involved with --

3       A     They assist with the day-to-day planning

4   and operational -- anything that comes in

5   operationally, they -- they assist with putting --

6   they put the plans together.  They get guys

7   moving.  They assist with the team and the actual

8   assignments of where the guys are going and what

9   needs to be done.

10      Q     Okay.  And so the ATL was working with

11  you to come up with a plan on how to serve this

12  warrant; is that --

13      A     The ATL formulated the plan.

14      Q     The ATL formulated the plan?

15      A     Yeah, essentially, and then I sat -- go

16  ahead.

17      Q     No, no, no.  Go ahead.

18      A     Follow up with your question.

19      Q     No, no, no.  Go ahead.

20      A     The ATL assigned the recon guys to go

21  out before we came up with the plan, yes.

22      Q     Okay.  And so we've kind of gone over it

23  a few times, but I like to sometimes rephrase

24  stuff, because I want to make sure I understand it

25  exactly.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 36

1        A    Okay.

2        Q    You -- at this point in time, you had

3   only been a sergeant in SWAT for a couple of

4   weeks; correct?

5        A    Yes.

6        Q    Okay.  And so you're sitting down with

7   the ATL to kind of say, "Hey, this warrant's come

8   in.  We're going to get a plan together for it";

9   correct?

10       A    Correct.

11       Q    Okay.  If you had been out of the

12  training period, would you have also still sat

13  down with the ATL to put the plan together?

14       A    Of course.

15       Q    Okay.  I'm just trying to figure out

16  exactly what the functions look like.

17            And so would you have been the one that

18  was kind of saying, "Hey, this is how I'm going to

19  put it together," or would it still have been the

20  ATL that said, "This is how we're going to put it

21  together"?

22       A    They come back -- they go out and they

23  do the recon.  They go out.  They look at the

24  structure.  They look at all of the -- the

25  environmental factors:  Where the doors are at,

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 37

1    where it's located at, all of that stuff like

2    that.

3            And they bring it back, and then they

4    start formulating the draws and they start putting

5    it together, the recon guys do.  And then they

6    give that information to the ATL, and then we look

7    at -- the ATL looks at, kind of, like, how to

8    approach that structure from a tactical position.

9        Q    Okay.  And at the time that you were

10   formulating the plan with the ATL or the ATL was

11   formulating the plan with you, did you understand

12   that -- what the search warrant was looking for?

13       A    Yes.

14       Q    What was your understanding?

15       A    The search warrant -- my understanding

16   of the search warrant, it was a murder

17   investigation, and they were looking for firearms.

18   There was clothing listed on the search warrant

19   itself.  There was a -- I think a cell phone that

20   was listed on -- I -- I would have to look at the

21   search warrant again to go over all the items that

22   we searched.

23            But there was also information that

24   there was a suspect inside that residence that

25   would -- that was involved in a shooting prior to

Page 38

1    from the gang unit.  And there was also a

2    potential -- suspects in there that were heavily

3    armed with the intelligence that we had.

4        Q    And what intelligence was it that you

5    had that indicated there were -- could potentially

6    be heavily armed suspects inside the unit?

7        A    There was a statement given -- there

8    was -- the homicide detectives received -- on the

9    search warrant itself, it said that it was a

10   narcotic flophouse, that there -- people were

11   armed in there.  And it also mentioned that the

12   affidavit -- in the affidavit, the search warrant

13   itself, that Rembert -- Rembert was involved in a

14   shooting -- involved in an illegal shooting.

15       Q    Okay.  And Rembert, Wattsel, also had

16   a -- was he the one that had the ankle monitor;

17   correct?

18       A    I believe it was Corvel Fisher.

19       Q    Okay.  So did you believe that Rembert

20   was likely inside the unit?

21       A    From reading the search warrant, yeah.

22       Q    Okay.  But the indication for the search

23   warrant, it was a property-only search warrant;

24   correct?

25       A    It was a property-only search warrant

LEXITAS™

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 39

1    for that part, right.

2         Q    But my understanding -- you tell me if

3    I'm right or wrong -- the way that it was actually

4    administered or executed -- or whatever word you

5    want to use -- was that it was really an arrest

6    warrant.

7              You were going to arrest individuals

8    that you felt were involved in a homicide;

9    correct?

10        A    It was the understanding at the briefing

11   that there was no -- there was two suspects

12   involved in a shooting prior to.  There was a

13   couple of other incidents where we knew that these

14   two individuals that were involved in it had

15   access to weapons.  One of them was a -- they were

16   each both documented gang members.

17             These gang members were documented with

18   having a MP5 style rifle removed from their

19   vehicle prior to -- prior to this.  And there was

20   another incident where there was an AR-15 that was

21   recovered from another incident too, as well, by

22   the gang unit.

23             The individuals that were supposed --

24   that were -- we thought that would be inside the

25   structure were Rembert and a Corvel Fisher.

Page 40

1      Q     Okay.

2      A     And they were both documented gang

3   members, and they had a prior criminal history for

4   narcotics.  And Rembert's stepmother had told the

5   homicide detective that that was a narcotics

6   flophouse and they were armed.

7      Q     But for one of them, you had pinned his

8   ankle monitor right before this incident; correct?

9      A     Correct.

10     Q     And he was not located inside this --

11   what you want to call a flophouse; correct?

12     A     Correct.

13     Q     Okay.  But I -- let me loop back to my

14   prior question.

15           The way that it was being served was

16   more akin to an arrest warrant; correct?

17     A     I would say we -- no.  I would say

18   that -- that that warrant was being served because

19   of the propensity of violence, them having arms

20   inside that structure itself.  And knowing that

21   Rembert was also involved in an illegal shooting,

22   but there was not an arrest warrant.  Detectives

23   just had probable cause to arrest him.  And that's

24   what we were notified of prior to the brief.

25     Q     Sorry.  Back up.  So -- just because I

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 41

1    want to understand this a little bit better.

2            Prior to the briefing on this incident,

3    you guys were informed right before the -- the

4    briefing on this incident that they did have

5    probable cause to arrest him?

6       A    They had probable cause on one of the

7    individuals, being Rembert, that he was involved

8    in an illegal shooting.

9       Q    Okay.  But you guys weren't actually

10   executing an arrest warrant; correct?

11      A    We didn't have an arrest warrant.

12      Q    Okay.  Why -- did you think it was weird

13   you didn't have an arrest warrant?

14      A    At the time, the detectives said if he's

15   there, we're going to arrest him.  They didn't

16   explain to us why.

17      Q    Okay.  And you thought he would be

18   there; correct?

19      A    Correct.

20      Q    Okay.  So this property search warrant

21   was being looked at similar to an arrest warrant;

22   correct?

23      A    I would say that the property search

24   warrant was looked at -- no.  I would say it was

25   looked at because we had violent individuals

Page 42

1    inside that apartment complex -- inside that

2    apartment that was a 650-square-foot apartment,

3    one bedroom, one bath.  And they were heavily

4    armed inside there.

5              And that's how we looked at that search

6    warrant, who -- what we thought would -- we knew

7    that we'd -- we'd encounter -- that could be a

8    possibility to encounter, and that's why we served

9    that -- that's how we served that search warrant.

10    Q    Okay.  But you were aware that it was a

11    property only search warrant; correct?

12    A    For firearms, yes.

13    Q    Okay.  Were there -- obviously this

14    went -- this didn't go as you guys had planned for

15    a variety of reasons.

16              In terms of when you're serving a -- a

17    warrant like this, with this type of entry, are

18    there certain things that you need to know or rule

19    out about the -- like whatever -- whatever

20    structure you're going into?

21    A    Know or rule out?  Can you please --

22    Q    Sure.

23    A    -- explain?

24    Q    Do you need to know or rule out if

25    there's kids present?  If there's elderly present?

Page 43

1    If there's animals present?  Like, are there

2    certain things that you're supposed to rule out

3    before doing this type of --

4        A    Right.  You would also take into

5    consideration, for tactical purposes, whether or

6    not there's children there, vicious dogs, elderly,

7    stuff like that, absolutely.

8        Q    Was any of that known prior to serving

9    this warrant?

10       A    What we do -- did know prior to serving

11   the warrant per -- pursuant to what the detectives

12   had told me, that they had never seen any kids

13   there while any surveillance was conducted by the

14   surveillance teams.  And that it was a narcotics

15   flophouse, and that there were numerous gang

16   members that were associated with that place, is

17   what I was told by detectives.

18       Q    Okay.  And as we sit here today, do you

19   know how much surveillance was done on this unit,

20   what -- in a buildup to serving this warrant?

21       A    I know there were several dates where

22   there was a squad out there -- a surveillance

23   squad specifically that was out there doing

24   surveillance on that apartment.  I don't -- I

25   can't -- I don't recall the exact specific dates.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 44

 1          I can recall and I can tell you that

 2   while they were out there doing surveillance, they

 3   were burned.  And I believe somebody came out from

 4   the area of where that apartment was and went over

 5   to the surveillance vehicle and knocked on the

 6   window.

 7      Q    Okay.  And so my earlier question still

 8   stands, though:  Do you know how much -- well, do

 9   you know how much time was spent actually

10   surveilling the unit?

11      A    Look, I would have to refer to that

12   report.  But I would say it was probably -- there

13   were several days that they went out there.  I

14   think several different occasions they went out

15   there.

16      Q    Okay.  But I guess my question --

17      A    Maybe a couple -- a couple shifts.  I

18   don't know exactly how much -- how long they

19   spent.  You would have to ask the detective

20   that -- that led the case on that.  I was just

21   there for the -- to serve the actual search

22   warrant.

23      Q    Okay.  So it's -- so it's fair for me to

24   assume, then, as we sit here today -- and probably

25   it was the same way back then -- you didn't -- you

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 45

1    don't know if they went out there and sat there

2    for ten minutes or eight hours?

3         A    Right.  I was -- that wasn't relayed to

4    me by the -- the detective.  He just told -- he

5    just relayed to me that they had surveillance out

6    there before.

7         Q    Would that have made a difference to

8    you?

9         A    Would it have made a difference to me as

10   far as what?

11        Q    In relying on their information.

12        A    As far as what information?

13        Q    That there weren't kids present.  There

14   wasn't dogs present.  That there was -- that there

15   was -- potentially that the actual suspects you

16   were looking for were there?

17        A    Yeah.  I mean, obviously you're going to

18   always take that information for what they give

19   you, and you're going to use that as actionable

20   intelligence, absolutely.

21        Q    Okay.  And in terms of the actual

22   physical structure itself, are there certain key

23   items that you want to know about the physical

24   structure?  For instance, like, is there a

25   barricade on the door?  Are there window blinds?

Page 46

1    Those types of things.

2          A    Of course.

3          Q    Okay.  And it's -- as we sit here today,

4    were there a few different unknowns that were not

5    known when you approached the unit, you can --

6    that you're now aware of in hindsight?

7          A    Where at on the unit are you

8    specifically asking?

9          Q    Well, was it known that there was a --

10   that there was a kick plate on the door?

11         A    You mean a brass wrap?

12         Q    I'm sorry.  A brass wrap.

13         A    Yes.  Not -- not at the time of --

14   actually at the recon.  Actually, once the guys

15   got up to the door as far as the breaching

16   element, I'm sure they noticed it.

17         Q    Yeah, was that something that ought to

18   have been known beforehand?

19         A    Ought to be known?

20         Q    Yes.

21         A    Usually most cases, you always want to

22   look at the front door, absolutely, and get a good

23   look at it.  I do -- I did understand that while

24   they were conducting the recon, that the suspects

25   had hopped the wall and actually went into the

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 47

1    door, and I think the door was open at the time

2    that they did their walk-by on the --

3         Q    I'm sorry.  When you say "suspects," are

4    you talking about --

5         A    I mean -- I'm sorry.  Individuals, but

6    they -- they called them that to me.  I'm sorry.

7    It's -- I'm just recalling the verbiage that was

8    sent to me.

9            But there were several males that hopped

10   the wall and went inside that apartment, 1125,

11   while they were doing the actual walk-by of the

12   recon of the structure.

13        Q    Okay.  And why would that be relevant or

14   important for you to know that information?

15        A    Because our apartment was occupied.

16        Q    Okay.  All right.  So now I'm going to

17   get into the actual, kind of, mechanics of it.

18            So you arrive at Sam's Town; correct?

19   What is it?  Around 4:00 a.m.?

20        A    Sam's Town, yes.

21        Q    Isn't that where you guys, like --

22        A    Briefed, yeah.

23        Q    -- briefed.  Yeah.  I'm sorry.

24            So you arrived at Sam's Town.

25            And can you, kind of, walk me through

Page 48

1    what happens there?

2        A    That's where -- you know, the whole team

3    showed up.  We had our personnel, our manpower

4    there.  And we put our drawings up.  The guys put

5    their drawings up, and we had everybody together

6    and we did the briefing --

7        Q    Okay.

8        A    -- along with the detectives.

9        Q    And to the best of your knowledge, can

10   you walk me through what the briefing entailed?

11   The best of your memory, as we sit here today, can

12   you walk me through what the briefing entailed?

13       A    Obviously the briefing entailed the

14   address, the structure we were going to.  It went

15   down the potential targets that would be in there:

16   Their names, their criminal histories.

17            And during that, there was Corvel

18   Fisher, who had the ankle monitor on.  And then

19   there was Rembert.  His prior history was there.

20   They were both -- they're documented gang members.

21   And it went into whether there were kids there,

22   dogs there -- et cetera, et cetera, et cetera --

23   on the draw itself.

24            And then there was also another draw

25   with -- where there was the planning of how we

Page 49

1   were going to arrive and the route we were taking.

2   And everybody's role and assignments was also up

3   there as well, about who was doing what.

4            And then there was an actual briefing

5   to -- what everybody's assignments were, and there

6   was a brief back, everybody understanding it as

7   well.  And then there was detectives present, too,

8   to enlighten everybody there on what their case

9   was about.

10       Q    Okay.  And what was your role on the

11  team?

12       A    I was the -- I was the sergeant on the

13  team in training.  My role for the search warrant

14  was I was operating the bullhorn.

15       Q    Okay.  And were you -- were you in

16  charge of this operation?

17       A    Sergeant Findley was in charge of the

18  actual tactical operation.

19       Q    Okay.  And so then what was -- so were

20  you there just for training purposes?

21       A    I was there in training.

22       Q    Okay.

23       A    Yeah.  He was -- he was the trainer.

24       Q    Okay.

25       A    But, yes, I was there.



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 50

1      Q    Sorry.  I know I'm saying "okay" over
2   and over again.
3           And so would it be fair for me to say,
4   then, that it was actually -- I'm just going to
5   repeat back what you said to me.
6           It was actually Sergeant Findley that
7   was in charge of this operation?
8      A    Yes.
9      Q    Okay.  And so -- and I think -- I know
10  I've read it in your report several times.
11          But how long had you been on SWAT for
12  when you -- for this incident?
13     A    29 days.
14     Q    29 days?
15     A    Somewhere where it's --
16     Q    Okay.  But it -- you were the one doing,
17  kind of, the communicating; correct?  Like, you
18  were the one that sat down with the team -- the
19  ATL.  You were the one that said, "We're going to
20  do this kind of unit."  You're the one -- or this
21  kind of entry.
22          You're the one that was contacting
23  different people to get authority to -- for
24  different items; correct?
25     A    Yes.  And I believe I assisted -- I

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 51

1    can't speak for them, but I thought Jake Warner

2    also contacted Garth, who was off that day, and

3    talked to him and spoke with him on the phone of

4    what the -- what the plan was.

5         Q    Okay.

6         A    So Garth was aware of what -- of it, as

7    well.

8         Q    Okay.  So leading up to the actual

9    execution of the -- of the search warrant, you

10   were taking the command role; correct?

11        A    Prior to the execution of the search

12   warrant?

13        Q    Yeah.  So sorry.  And let me ask it --

14        A    The day before I was there helping

15   facilitate, getting manpower, getting certain

16   things done.  And then I requested the CET to the

17   SWAT lieutenant.  Yes, I did.

18        Q    So let's back up a little bit.

19             Can you walk me through the -- the

20   process of -- of requesting the CET?

21        A    Requesting the CET?

22        Q    Yeah.

23        A    Yes.  In order to request for the CET,

24   you have to notify your lieutenant, and the

25   lieutenant approves whether or not the CET is

Page 52

1    approved or not per section policy.

2         Q    And who was your lieutenant at the time?

3         A    That would have been Lieutenant Melanie

4    O'Daniel.

5         Q    And to the best of your memory, as we

6    sit here today, can you walk me through the

7    communications that you had with Lieutenant

8    O'Daniel regarding getting the CET authorized?

9         A    I spoke with Lieutenant O'Daniel on the

10   phone, and I -- we explained to her that it was a

11   small apartment; we couldn't contain it with

12   BearCats due to the environmental factors.

13        Q    Sorry.  Who is "we"?

14        A    I did.  But that was because of -- we

15   had gathered from the recon guys and the ATL, we

16   had received that information that we couldn't

17   sufficiently contain that structure itself.  The

18   propensity of violence of the individuals that

19   were in there, knowing that they were heavily

20   armed potentially, with the prior weapon stops

21   that they had with the AR-15 and the MP5.

22             And due to the fact that Wattsel

23   Rembert's mother said that there was a narcotics

24   flophouse -- I know through my training and

25   experience, a narcotics flophouse means that

Page 53

1    there's going to be guns in there usually.  That's

2    usually how it rolls.

3            Narcotic sellers and dealers are --

4    protect their product, and they have guns.  That's

5    just -- that's -- that's what happens in --

6    sometimes in these cases.

7            So that was the explanation that I gave

8    to Lieutenant O'Daniel, was there was the

9    violent -- propensity of violence, and we were

10   going after a murder suspect.  And there was a --

11   there was an outstanding gun.

12       Q    Okay.  And so I'm glad that you brought

13   that up, because I want to understand your point

14   of view as well.

15           So part of your point of view, as having

16   worked these prior units, is that if you hear

17   narcotic flophouse, you think automatically

18   there's going to be guns --

19       A    I didn't say automatically.

20       Q    Oh, well, I --

21       A    I said I knew -- I knew from my training

22   and experience that there's a possibility they

23   could be there.

24       Q    And so if I say possibility or

25   probability, do you understand the difference

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 54

1    between those two?

2        A    I would say probability, because drug

3    dealers, they protect their product.  And how are

4    they going to protect their products?  They

5    protect them with guns.

6        Q    So in the day before executing the

7    search warrant, you thought that it would be a

8    probability that there would be armed and

9    dangerous individuals in the unit; is that

10   correct?

11       A    Due to the intelligence that we had,

12   absolutely, with the prior stops and the -- the

13   two suspects that were listed on the incident and

14   accident plan.

15       Q    And that is part --

16       A    They were documented gang members as

17   well.

18       Q    And that is part of what -- what you --

19   that is part of what you communicated to

20   Lieutenant O'Daniel when you were discussing your

21   request to have a CET; correct?

22       A    Yes.

23       Q    And in addition to the CET, you also had

24   some distraction device -- they're called

25   distraction devices; right?

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 55

```
 1        A     Yes.
 2        Q     Okay.  Can you walk me through what
 3    you -- what you also had on this -- for the -- to
 4    execute the search warrant?
 5        A     I also had to have approval from
 6    lieutenant -- Lieutenant O'Daniel to utilize a
 7    stun stick, which is a distract device on a stick.
 8              MS. MURPHY:  We've been going a little
 9    under an hour.  Why don't we take a short break.
10              THE VIDEOGRAPHER:  We are going off
11    record at 1:52 p.m.
12                   (Whereupon, a recess was taken.)
13              THE VIDEOGRAPHER:  We are back on
14    record at 1:59 p.m.
15    BY MS. MURPHY:
16        Q     And, Russ, we just took a short break.
17    But I just want to confirm, the -- the oath that
18    you took before we went on break still applies.
19              You understand you're still under oath;
20    correct?
21        A     Yes, ma'am.
22        Q     Okay.  And we were -- we had just begun
23    talking about the distract devices that you got
24    approval for to use on this -- this search
25    warrant.
```

Page 56

```
 1              Can -- can we kind of go back to that,
 2    and can you walk me through what -- what -- what
 3    distracts you got and what approvals were
 4    necessary for those?
 5         A    Okay.  Yes.  We used the distract on a
 6    stun stick, 25 -- Def Tec 25 on the stun stick.
 7    And then we also used the -- it's called the
 8    9 bang distract, which is essentially a 25 that
 9    goes off nine times as -- as well on this
10    operation.  And the stun stick had to have
11    approval from Lieutenant O'Daniel.
12         Q    And did the 9 bang have to have
13    approval?
14         A    The nine bang itself?
15         Q    Yeah.
16         A    No.  It was just a -- it's just a
17    normal -- it's just a distract that we use.
18         Q    Okay.  Why does the stun stick have to
19    have approval and the nine bang doesn't?
20         A    The stun stick itself was inserted into
21    the residence.  So any time that you insert a stun
22    stick into a residence, you have to have approval
23    from the lieutenant, which would be, at the time,
24    the SWAT commander.
25         Q    Okay.  And why did you -- why did you
```

Page 57

1    think that it was necessary to have a stun stick

2    for this search warrant?

3        A    Well, looking at the structure itself

4    and then looking at the -- the people that

5    potentially we thought would be in there, as far

6    as we're going after a murder suspect.  We know

7    that they have -- they're heavily armed.  We have

8    intelligence that they're heavily armed.

9            We're going after the crime of murder.

10   They have priors -- violent priors, and they also

11   are documented gang members.

12           In order to insert that stun stick and

13   clear out that window, the window that we used

14   would -- we knew that that would be the living

15   room.  And that living room itself, if we can

16   clear that out, we had a breach point, which would

17   have been the front door, which would have

18   assisted us in -- with clearing out that window

19   and letting us know, if we got hung up at the

20   door, where -- you know, the guys there could

21   actually provide cover for us, and then also

22   provide intelligence of what we had inside if we

23   got hung up at the door or anything like that as

24   well.

25           And the purpose of the stun stick would

Page 58

1    be if there was somebody in there that was trying

2    to do something that was violent or whatever,

3    there was that distract device itself in there

4    that could go off and that would disorient them if

5    they were -- if they were going to do something,

6    whether they were trying to run deep into the

7    structure, into another room, or they were trying

8    to move, grab something, or do anything like that.

9        Q    So your understanding of the purpose of

10   the stun stick is, in fact, to disorient; correct?

11       A    The stun stick, yeah, it emits a --

12   yeah, it disorientates -- disorientate -- excuse

13   me -- disorients somebody, yes.

14       Q    Okay.  And so I'm going to actually ask

15   you, to the best of your knowledge, like, can you

16   kind of walk me through what a stun stick

17   actually, like, looks like?  Like, how it's

18   employed?

19       A    It's a device that has a hood.  It has

20   the actual dis -- 25 depth -- 25 distract on it.

21   And it can extend out.  And it is utilized to

22   insert through a window.  And you insert it up at

23   a high angle.  And whoever is operating it itself,

24   prior to would attempt to clear the area.

25            And then if they see somebody that is



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 59

1    right there or whatever -- if there's a kid or

2    something, obviously they're not going to utilize

3    it.  And utilize that device in order to help the

4    entry team basically disorientate or distract

5    those individuals and draw their attention back

6    towards that in order to go in there and actually

7    safely take them into custody.

8        Q    Okay.  And you weren't the one that

9    actually had the stun stick at the --

10       A    No.

11       Q    Okay.  And so tell me then also, can

12   you -- the title is a little self-explanatory, but

13   I'm going to ask you to walk me through it anyway.

14            What's the nine bang?

15       A    The nine bang is essentially a distract

16   device that has nine ports, and it lets off nine

17   distracts -- 25 distracts.  It's a -- repetitive.

18       Q    And so what's the bang -- what's the --

19   I mean, we've got the video, so I know.

20            But how would you describe the bang?

21       A    It's -- it's -- it's similar to the

22   Def Tec 25.  It's -- it's just nine ports, and it

23   just goes off nine times in a rhythm, boom, boom,

24   you know.

25       Q    Okay.  And what did you -- what was your

LEXITAS™

Page 60

1    conversation with the lieutenant -- to the best of

2    your memory, what was your conversation with the

3    lieutenant in order to get the use of the stun

4    stick authorized?

5          A    Just like I explained before.

6          Q    Okay.

7          A    We had those two -- we had the

8    intelligence of the violent individuals inside the

9    apartment itself, that they were heavily armed,

10   and we were also looking for a murder suspect.

11   And the mother -- stepmother of those two -- one

12   of those individuals had identified both of them

13   as being the ones that were involved in the

14   murder.

15         Q    Okay.  So is it fair for me to assume,

16   the reason to do this CET and the reason to use

17   the stun stick were the same?

18         A    Correct, essentially.  I mean --

19         Q    Yeah.

20         A    -- the -- insert a stun stick is not

21   necessarily on any CET or all CETs, so -- I mean,

22   that is utilized in order to help out the entry

23   team, whether they get hung up or if there's

24   somebody in there, to distract them or to, you

25   know, keep them from fleeing, going into a back

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 61

 1    room, or gathering something like that itself.

 2              It's there to disorient somebody, if

 3    needed, and that's also on the individual operator

 4    itself --

 5         Q    Okay.

 6         A    -- on who is operating it.

 7         Q    What's a break and rake?

 8         A    A break and rake?

 9         Q    Uh-huh.

10         A    That's a device that's used to clear out

11    an actual window itself.

12         Q    Okay.  And so what is inserted first

13    through the window for this?  Is it the stun stick

14    or the break and rake?

15         A    I wasn't back there.  I don't know

16    exactly what -- what they used or how they cleared

17    the out that window --

18         Q    Okay.

19         A    -- in the back.

20         Q    All right.  And so -- and so let's

21    actually walk through the -- sorry.  We went

22    through the -- the briefing.

23              Then can you kind of walk me through

24    what happened after that?  So did you guys have

25    the briefing at Sam's Town?

Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 62

1       A     Okay.

2       Q     And then what happens next?

3       A     After the briefing, we loaded up on the

4  BearCats.

5       Q     Okay.

6       A     Got dressed, got our tactical equipment

7  or.  And we got on the BearCats, and we started

8  heading towards 3050 South Nellis, 1125.

9       Q     And what -- what tactical equipment did

10  you have -- sorry.

11            What tactical equipment did you have on?

12      A     A ballistic helmet, a ballistic vest,

13  belt, gloves, tourniquet, stuff like that.

14      Q     What were you armed with?

15      A     I had two guns on me at that time.  I

16  had a GLOCK 34, and I was also armed with an M4.

17      Q     Is that standard?

18      A     What do you mean "standard"?

19      Q     Is that what's standard -- like, if

20  you're -- if you were serving -- that's a fair

21  question.

22            If you were serving this kind of

23  warrant, is that, like, what you would wear as a

24  standard?

25      A     Could be, depending on the operation,

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 63

1    depending on what type of tactic we're using,

2    where you're at in the line.  Depending on what

3    type of operation it is, you could utilize two

4    handguns instead -- instead of having a M4.  It's

5    just -- it's situational.

6        Q    And, sorry, we talked about --

7        A    And that's up to the operator itself --

8    the SWAT operator itself on what they prefer.

9        Q    Okay.  And, sorry, we kind of -- I just

10   wanted to -- this goes back a little -- goes back

11   a little bit.

12            But in terms of the CET -- the CET, the

13   time that you had been on SWAT, you had never done

14   a CET before; is that correct?

15       A    Not on the SWAT team, no.

16       Q    Okay.  Had you done it not on SWAT?

17       A    No.  Because that tactic didn't --

18   that's the first time I had ever heard of the

19   tactic, is when I was assigned to SWAT.

20       Q    Okay.  So -- okay.  So I want to make

21   sure I understand that statement correctly.

22            You had never even heard of this tactic

23   before until you had been assigned to SWAT; is

24   that correct?

25       A    Essentially, right.  Yeah, I didn't know

Page 64

1    that that's what it was called.

2        Q    Okay.

3        A    Dynamic -- yeah.

4        Q    Okay.  And so you get on the BearCats.

5    And then kind of -- I mean, I -- it's -- I'm going

6    to ask you to give me the dialogue.  Obviously --

7    like, you get on the BearCats.

8             Then what?

9        A    We started heading towards -- we had

10   body cams.  Everybody -- I think I came on the

11   radio and said, "Hey, everybody activate their

12   body cameras."  Everybody activated their body

13   cameras, and we proceeded the route that was on

14   the draw itself to the location.

15       Q    Okay.  And why did you activate -- is

16   there, like, a certain policy for LVMPD of -- as a

17   point in time when you have to activate the body

18   cams?

19       A    There's a certain point, I guess, when

20   everybody is ready to go and you're starting the

21   tactical operations and you're loading on the

22   BearCats, in SWAT, we activate our body cameras.

23       Q    Okay.  And so you load on the BearCats.

24   And you get to the actual apartment building.

25            Can you walk me through what happens

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 65

1    then?

2        A    We disembarked the BearCats and got in

3    the line.

4        Q    Okay.  And can you walk me through, to

5    your memory, what -- what -- what did the line

6    consist of?

7        A    The actual stack itself, we had our

8    breaching element with Officer Hoskins and Levi

9    Hancock.  And then we had our line, which was --

10   Officer Kubla was number one.  Number two was

11   Brice Clements.  Number three was Jake Warner.  I

12   was number four, myself.  And then Alex Gonzalez,

13   who is now a sergeant, was number five.

14           Number six -- I would have to look back

15   at the draw, but, I mean, for -- it's -- all of

16   the rest -- the rest of the guys on the team --

17       Q    Okay.

18       A    -- were in that line too.

19       Q    And where were you relative to everyone

20   else?

21       A    I was number four.

22       Q    Okay.  So were you in actually the

23   lineup in front of the door, or were you off to

24   the side?

25       A    At that point in time, because of the --

Page 66

1    how we lined up, the door was recessed back.  I

2    was off to the side.

3         Q    Okay.  And who gave the announcement?

4         A    For the target apartment, I did.  I had

5    the bullhorn.

6         Q    Okay.  Why don't we stop here, and then

7    we'll actually play the video.

8         A    Okay.

9              MS. MURPHY:  Okay.  Give me just -- if

10   we want to go off the record, give me just a

11   minute to pull up the video.

12             THE VIDEOGRAPHER:  We are going off

13   the record at 2:09 p.m.

14                  (Whereupon, a recess was taken.)

15             THE VIDEOGRAPHER:  We are back on

16   record at 2:11 p.m.

17             THE WITNESS:  Is that mine?

18   BY MS. MURPHY:

19        Q    Yeah.  Tell me -- it should be yours.

20        A    I'm asking you.

21        Q    Okay.  It's the one that's marked as

22   yours.

23        A    It was two years ago.

24        Q    The sound should be coming on.  Give me

25   one second.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 67

 1      A    Okay.

 2                 (Video played.)

 3            THE WITNESS:  I didn't touch it.  It

 4   stopped.  My hands are right here.

 5   BY MS. MURPHY:

 6      Q    Were you on the BearCat?

 7      A    Yes.

 8            MS. MURPHY:  Did it stop again?

 9   Yikes.  All right.  Thank you.

10                 (Video played.)

11   BY MS. MURPHY:

12      Q    Are you okay?  Do you want to take a

13   break?

14      A    I'm good.

15      Q    Are you sure?

16      A    Yeah.

17      Q    Okay.  We can -- we can totally take a

18   break.  There's no problem at all.

19            THE WITNESS:  Do you need to take a

20   break?

21            MR. ANDERSON:  I don't need to take

22   one.  But if you do, take it.

23            THE WITNESS:  No.

24   BY MS. MURPHY:

25      Q    Do you want to take a break?

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 68

```
 1              And so, Russ, I think you gave me the
 2    list of things that you had reviewed beforehand.
 3    And I don't remember, I'm sorry, even though it
 4    was just a couple of hours ago.
 5              Had you reviewed that video to prepare
 6    for today's deposition?
 7         A    Yes, I --
 8         Q    Okay.
 9         A    -- reviewed it before.  Yeah.
10         Q    Okay.  All right.  Okay.  Is it hard for
11    you to watch that video?
12         A    Hard?
13         Q    Yeah.
14         A    Unfortunately, there's a human life
15    involved.  Anybody in -- in any type of incident
16    like that -- would be probably hard for them.
17    Absolutely, it's hard, yeah.
18         Q    Okay.
19         A    But, I mean, it's just lucky to know
20    that I'm alive and the rest of the team guys
21    are -- letting them -- you know, it brings back a
22    lot of emotions.  But, yeah, I'm glad that we came
23    out of there alive.
24         Q    Okay.  And can you kind of tell me -- if
25    it's not too hard for you, can you kind of tell
```

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 69

1    me, like, what kind of emotions is it bringing up
2    for you to watch that video?
3        A    To know that we all took a -- that --
4    all of those rounds, 18 of them, I believe, and
5    none of us got hit.  And then looking at that
6    muzzle flash pointed directly at me, I was able to
7    go to work, do my job, and then come out alive.
8        Q    Okay.
9        A    Very fortunate.
10       Q    And did you do any -- did you do any,
11   like, treatment following this incident?  Like any
12   treatment with a therapist, a psychologist,
13   anything like that?
14       A    Yes, I went to --
15       Q    Okay.  How long did you do that for?
16       A    Oh, gosh.  I forget the exact length of
17   it, but it was -- I don't know, standard time,
18   whatever -- whatever that was.  Like a month and a
19   half, two months.
20       Q    And did you have any -- were you -- were
21   you put on, like, administrative leave or anything
22   like that?
23       A    Yes.
24       Q    How long were you put on leave for?
25       A    Oh, I was on administrative leave, I

LEXITAS

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 70

1    believe, almost four months.

2         Q    Okay.  And since coming back, have you

3    had any -- do you have any, like, ongoing mental

4    health or psychological issues related to being

5    involved in this officer-involved shooting?

6         A    No.

7         Q    Okay.  Does it change how -- what

8    happened -- does what happened here change how you

9    serve search warrants today?

10        A    You mean what happened on that incident?

11        Q    Correct.

12             MR. ANDERSON:  Can I just clarify?

13   Are you asking the department, or him personally?

14             MS. MURPHY:  Him personally.  That's a

15   fair clarification.  Thank you, Craig.

16             THE WITNESS:  Yeah, because I was

17   confused.  Thank you.

18             Me personally, you know, when you look

19   at anything like that and you look -- at any time

20   you go into the unknown, you want to always be

21   prepared as much as you can.  And with my training

22   and -- that day, I relied on it and it came

23   through.

24             Does that change anything as far as my

25   opinion?  I'm there to do a job, regardless if

LEXITAS™

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 71

1    it's serving a search warrant, a hostage rescue,

2    whatever.  So when I have to go to work and I do

3    my job, I have to be as most -- I have to be as

4    proficient as possible and have a clear head.

5              So does it change my opinion on my job

6    and my tactics and what I do?  No.

7    BY MS. MURPHY:

8        Q     And, sorry, maybe I asked the question a

9    little unartfully.  I'm not asking if it changed

10   your opinion on things.  But I'm asking if it --

11   well, maybe you answered it, the last part, but I

12   just want to clarify.

13             In, kind of, like how -- how you do --

14   how you execute search warrants today, did -- did

15   this incident change anything, the way that you --

16   you actually, like, do anything?  Like, some of

17   the other officers have answered, like, that --

18   they have answered, like, they modified certain

19   things or they're more aware.  Like, it has had an

20   impact on how they serve search warrants today.

21             Is that question more clear, or do you

22   want me to rephrase it?

23       A     Yes.  Yeah, it's -- you know -- you

24   know, I see your -- do you modify things?

25   Absolutely.  Any time you have a tragic event like

Page 72

1   that, you always go back to the -- go back and

2   look at what -- you know, what you can improve on,

3   how you get better.  Not individually, but also as

4   my position as -- the team.

5           So you have to take all of those -- all

6   of that into consideration and always learn from

7   the outcome of that.  There was -- unfortunately,

8   there was a human life involved, and it's tragic

9   that there's a gentleman that's deceased now.  And

10  for his family, I feel bad for his family.

11          Doing things differently?  I would say

12  you train harder.  You work harder and make sure

13  to be always prepared for the unknown and never to

14  give up.  And don't let off the gas pedal just

15  because you think you know everything.  That would

16  be -- you need to always train and keep training

17  harder, because you never know what you're going

18  to encounter when you go through a door.

19          And obviously right there, we

20  encountered a gentleman that shot at us 18 times

21  and tried to kill us.

22     Q    And one of the -- we can back up and

23  kind of talk about the actual mechanics of it as

24  well.

25          There was an issue with getting through

Page 73

1    the door; correct?

2        A    After watching the video, yeah.

3        Q    Yeah.

4        A    It took a little while.

5        Q    And so what was the issue with getting

6    through the door?

7        A    After reading the reports and seeing

8    that, the brass wrap obviously kept us from

9    ramming that door -- can somebody ram the door one

10   time?  Yes, depending on their technique, how big

11   and strong they are.  But, you know, it's also

12   technique.

13          I don't know what -- you know, he used

14   the best technique he could, and that door -- door

15   got opened after five hits.

16       Q    Okay.  When I say "call a tactical,"

17   what does that mean to you?

18       A    So tactical -- tactical --

19       Q    That -- sorry.  In terms of this

20   incident.  It may have meaning in a variety of

21   other ways that I'm unaware of.

22       A    Yeah, because I was, like -- okay.  Yes.

23          So in that incident right there, for

24   that particular part at the door, calling tactical

25   would mean we would pull back.  That would -- that

Page 74

1    would be a -- absolutely, that's -- and anybody

2    can call it in the line, whoever is seeing

3    whatever -- you need somebody behind -- you know,

4    if there was somebody squirting out the window or

5    somewhere else or something else going on, anybody

6    on the operation could call tactical.

7            And that's where we pull back to cover.

8    We reassess, we find out what's going on, slow

9    things down, and then formulate a plan from there.

10   Q    Okay.  And having seen the video,

11   knowing everything that you know now, do you think

12   that a tactical ought to have been called that

13   day?

14   A    Yeah, I think that we -- that would have

15   been -- looking at it now, yes, I would agree with

16   that, yeah.

17   Q    And I want to read you the legal element

18   for knock and announce.  And it is that if after

19   notice of its authority and purpose, an officer is

20   refused admittance.

21           Can you tell me, having watched that

22   video, what Mr. Williams did to refuse admittance

23   while the door was closed?

24   A    Refuse admittance --

25   Q    Yeah.



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 75

1      A      -- while the door was closed?

2             He didn't answer the door.  We made our

3      announcement.

4      Q      Okay.  Do you think that there was

5      sufficient time for Mr. Williams to wake up, get

6      up, walk to the door, and open the door within the

7      amount of time between your announcement and the

8      window being broken open?

9      A      You say wake up?

10     Q      Yeah.

11     A      How do you know he was sleeping?

12     Q      Well --

13     A      I'm asking.

14     Q      Okay.  That's fair.

15            We know that he was lying on the couch

16     in a reposed position; correct?

17     A      I would say he was -- he was in a

18     defensive position in a deep corner of a room when

19     we entered and ambushed us, yeah.  I would say --

20     he shot at us 18 times.

21     Q      Okay.  So you think that there's a

22     potential that he might have been awake at the

23     time?

24     A      I would say -- I would -- from what I

25     can gather, after watching that, absolutely.  I

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 76

1    think it was an ambush.

2        Q    Okay.  And so walk me through your --

3    your thought process on that a little bit more.

4        A    The minute Officer Kubla went through

5    that door, he started taking rounds immediately.

6    That gun was pointed directly at him.  There's --

7    I mean, you can see the muzzle flash.

8        Q    Had --

9        A    Anybody that's in a dead sleep -- and

10   I -- I mean, I've -- I've never been in this.  But

11   anybody that's startled in a -- or comes out of --

12   awake from a dead sleep and can shoot like that

13   and place rounds like that that fast, they're one

14   hell of a marksman.

15       Q    Have you watched -- have you watched

16   the -- have you watched the videos from the other

17   angles?

18       A    I've watched a couple.

19       Q    Which other videos have you watched?

20       A    I think I've seen Kubla's.  I saw

21   Alex -- Sergeant Gonzalez's, and I think I saw

22   Officer Clements' -- sorry.  No.

23       Q    Okay.

24            MR. ANDERSON:  And Rothenburg; right?

25            THE WITNESS:  Yes, and Roth.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page  77

1    BY MS. MURPHY:

2         Q     Okay.

3         A     Yes, I'm sorry.  James.

4         Q     Okay.

5         A     He's a sergeant too, as well, now.

6         Q     Right.  And so, listen, this is my only

7    chance to speak to you until we go to trial, and I

8    really do want to understand what you're going to

9    go -- what you're going to -- what your intention

10   is, if the case goes to trial, what you're going

11   to say.  And so I want to be really clear.

12              Is it your testimony, as we sit here

13   today, that you think that Mr. Williams was awake

14   at the time that knock and announce was made?

15              MR. ANDERSON:  Objection.  Form.

16              Go ahead and answer.

17              THE WITNESS:  I don't know if the man

18   was awake or not.

19   BY MS. MURPHY:

20        Q     Okay.

21        A     But you said he was sleeping.

22        Q     Correct.

23        A     I'm just answering it, like, how do we

24   know he was sleeping?

25        Q     Okay.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 78

1      A    Because of where he was positioned at in
2    that corner and the time it -- those rounds
3    started firing off as we made entry, that was
4    pretty fast.  That guy was there -- that guy was
5    actively shooting at us.  He was there to kill us.
6      Q    Okay.  And do you think that there's any
7    possibility -- but you -- okay.  So there's the
8    possibility he was either awake or asleep.
9          Being either awake or asleep, do you
10    think that he had sufficient -- was there any
11    indication before the door was -- was -- before
12    the door was rammed open that he was going to
13    refuse admittance to the officers?
14      A    We gave a reasonable -- a reasonable
15    amount of time to serve the search warrant.
16      Q    Okay.
17      A    That's a 650-square-foot apartment, one
18    bedroom.  He was right there in that front
19    bedroom.  He never announced or said, "Hey, I'm
20    coming to the door."
21      Q    Do you think that that was his duty, to
22    say "I'm coming to the door"?
23      A    I wouldn't say it's his duty, but most
24    people -- I've seen it happen before, that most
25    people said, yeah, I'm to the -- I mean --

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 79

1       Q      Okay.

2       A      I mean, that's unless you have something

3    to hide or you're, you know, setting something up.

4    Then obviously you wouldn't.  I mean --

5       Q      And so I'm going to go back to my

6    earlier question, because I just want to clarify

7    this one more time.

8              Before the door -- while the door was

9    closed, other than Mr. Williams saying, "Hey, I'm

10   coming to the door," did he provide any indication

11   to any of you or the other officers outside that

12   he was going to refuse admittance?

13      A      Refuse admittance?

14      Q      Yes.

15      A      I didn't hear him say anything, no.

16      Q      Okay.  And so we talked a little bit

17   about what the reasonable amount of time is.  And

18   as we sit here today, my understanding is that you

19   don't -- based on your training, your experience,

20   you don't think that there's, like, a guideline

21   for a number of seconds or anything like that;

22   correct?

23      A      I've never seen anything that's a

24   guideline that says that there's a certain amount

25   of time.

LEXITAS™

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 80

1      Q    Okay.  Do you think that -- we talked

2  about it a little bit before, but I want to, kind

3  of, grind into it a little bit more.

4           One of the issues that you talked about

5  in terms of reasonability of time was what the

6  search warrant was seeking; correct?

7      A    We were going after a murderer.

8      Q    You were -- and, sorry.  And in this

9  case, I just want to clarify.  I understand your

10  comment, but sometimes it comes out a little bit

11  different on paper.

12          That part of your assessment of what a

13  reasonable time was, because you were going after

14  a murderer; correct?

15     A    The totality of the circumstances, the

16  size of the structure.

17     Q    Okay.

18     A    Right?  The -- knowing that there are

19  gang members in there.  Knowing that the

20  stepmother said it's a narcotics flophouse.

21  Knowing that they're heavily armed, that they've

22  been -- they've recovered firearms previously from

23  them on previous stops, knowing all of that.

24     Q    Okay.  And so, Russ, I'm going to

25  represent to you that there's some case law out

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 81

```
 1   there that indicates that a reasonable amount of

 2   time can also be based on what the search warrant

 3   is seeking.  And so, for example -- and I'll read

 4   you an excerpt from a -- from a -- from a case.

 5              "After 15 to 20 seconds without a

 6   response, officers could fairly have suspected

 7   that Banks would flush away the cocaine if they

 8   remained reticent."  And for the record, that's

 9   from page one -- that's case law cited from

10   page 133 of the CIRT report.

11              And so one of the issues that it talked

12   about in the CIRT report was a reasonable amount

13   of time is also predicated on what type of

14   evidence they're going after.  So a reasonable

15   amount of time will be lesser for something that

16   could -- like cocaine, that can be flushed away in

17   a toilet, or otherwise destroyed.

18        A    Correct.

19        Q    Is that consistent with your knowledge,

20   or am I telling you something new?

21        A    That's consistent.

22        Q    Okay.  Because you were -- you were on

23   units before where you were going for narcotics;

24   correct?

25        A    Yes, ma'am, that's correct.  I worked
```



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 82

1    there for five years.

2        Q    Yeah.  And so you're aware that somebody

3    can run to the bathroom and dump cocaine in the

4    toilet and flush it?

5        A    I've seen all kinds of crazy things,

6    yes.

7        Q    All right.

8        A    I've seen that, actually, yes.

9        Q    Okay.

10       A    I've seen run somebody to the back

11   bathroom.

12       Q    Okay.  But to confirm, in this case,

13   although you had said that part of the totality of

14   circumstances was that you believed that you were

15   also going after a murderer, there was no evidence

16   on that search warrant that could have been

17   destroyed; correct?  The gun can't be destroyed.

18   The cell phone can't be destroyed.  So there were

19   no concerns like that; correct?

20       A    No, there was not.

21       Q    Okay.  And the totality of the

22   circumstances and the reasonableness of the amount

23   of time goes back to the elements that you listed

24   earlier; correct?

25       A    Right.  The size of the structure, the

Page 83

1    propensity for violence, the violent individuals

2    being inside, yes, all of that stuff.

3        Q    Prior to this search warrant, had you

4    received any training about what elements you had

5    to comply with under both U.S. and Nevada law for

6    a proper knock-and-announce entry?

7        A    Proper knock-and-announce entry?

8    Specific training?  I would have to refer back to

9    my training record.  I know the -- I know that

10   with the -- how that goes.  But official training,

11   I think there was training in SWAT.  I don't know

12   if it was before this incident, but I know we had

13   some training afterwards.

14       Q    What was the subsequent training you

15   had?

16       A    The subsequent training was -- it went

17   over the CETs, the surround and call-outs, the

18   announcements, all of that stuff.

19       Q    And how do they go over it?  Can you

20   give me a little more --

21       A    Just went over it on a PowerPoint.

22       Q    And what did the PowerPoint -- what

23   information did the PowerPoints contain?

24       A    Captain Cole went over it after he came

25   back from NTOA.



Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 84

1        Q     What's NTOA?

2        A     National Tactical Officers Association.

3        Q     And how soon after this incident did

4    Captain Cole come back and give training on CET?

5        A     He went to a conference, and I don't

6    know the exact date.  I was out of work.  I don't

7    know.

8        Q     You don't have to give me exact date.

9    If you can give me a time frame, to the best of

10    your knowledge, like within --

11        A     I don't -- I don't have the specific

12    time he went.

13        Q     If I said within a month or two --

14        A     I don't know.

15        Q     Okay.

16        A     I was off work.

17        Q     So -- so if you were off work, then it

18    was within that four months; correct?

19        A     Or maybe it was directly right after he

20    went, and then he put it on.  I -- I don't

21    remember.

22        Q     That's okay.

23        A     Yes.

24        Q     Were -- were you part of that -- did you

25    participate in that, or did you hear about it

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 85

1   after?

2       A    The whole team was there.  We

3   participated in part of it.  Yeah, I think --

4   yeah, I sat through some of it.

5       Q    To the best of your memory, was there

6   any new information that was relayed about CETs or

7   knock and announces during Capital Cole's

8   presentation?

9       A    I don't -- no, I don't think so.

10      Q    Okay.  Then so what was the purpose --

11  to your understanding, what was the purpose of the

12  presentation?

13      A    It was just to refresh everybody.

14      Q    Okay.  Was there any discussion about

15  a -- what a reasonable amount of time constitutes?

16      A    I don't recall.

17      Q    Okay.  Was there any discussion about

18  when a CET can be used -- or C-E-T can be used?

19      A    A CET?  There was discussions --

20  discussions about the CET and why we used the

21  tactic, but it's still the same stuff that we've

22  talked about.

23      Q    Okay.  And so obviously -- I mean, my

24  next question is, what was your training about CET

25  before this incident?

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 86

 1        A     The training before, you know, was -- it
 2    was all about notifying our presence out front,
 3    verbalizing everybody in the stack, you know,
 4    that's out in front of the structure.  In training
 5    it was, you know, prior to making entry, everybody
 6    would verbalize very loudly, "Police department,
 7    search warrant" so that way the occupants inside
 8    would know, and also it would let the surrounding
 9    citizens know as well.
10        Q     Okay.
11        A     And to that point, CET also protects not
12    only people inside a residence, but it could also
13    protect citizens in -- in other -- other places
14    too, as well.
15        Q     Okay.  And so do you think that there
16    was any possibility that Mr. Williams could have
17    been confused by the distracts and not been aware
18    that it was police officers coming through the
19    door?
20              MR. ANDERSON:  Objection.  Form.
21              THE WITNESS:  I -- I wasn't -- I
22    don't -- I don't know what the man thought.
23    BY MS. MURPHY:
24        Q     Okay.
25        A     I couldn't tell you if he was -- I don't

LEXITAS

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 87

 1    know.

 2        Q    Okay.  So then it goes both ways.  You

 3    don't know if he was intending to murder police

 4    officers; correct?

 5        A    What I saw is, he was shooting at me.

 6        Q    Okay.  But I -- and that's fair.  So let

 7    me ask it a little bit differently.

 8             There was no indication -- he never gave

 9    you --

10        A    I wouldn't say he was trying to shoot

11    me.  I'm sorry.  He was trying to kill me --

12        Q    Okay.

13        A    -- straight up.

14        Q    Okay.  But as we sit here today, do you

15    have any knowledge -- can you identify or say

16    anything that he was aware that you were a police

17    officer?

18        A    Can he say?

19        Q    Could he -- sorry.  Let me ask the

20    question a little bit better.  I know I'm skipping

21    over my words a little bit.

22             What you -- what you have testified to

23    up to this point in time was that your feeling --

24    and I don't mean like that pejoratively.  I'm

25    really saying, like, your thought, your feeling --

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 88

1        A     When you asked me my opinion --

2        Q     Yes, was that he was trying to kill you

3    and your team members; correct?

4        A     That was my opinion, yes.

5        Q     Yes.

6              And so my question is, as we sit here

7    today, are you able to give me any information

8    that would indicate that Mr. Williams was aware

9    that you were police officers at the time of that

10   shooting?

11       A     We gave him the announcements on the

12   bullhorn.

13       Q     While also detonating distracts;

14   correct?

15       A     Well, the announcements were made prior

16   to the distracts going off, some of them.

17       Q     One announcement was made; correct?

18       A     I would have -- you would have to put

19   back and -- and if you're going to be specific,

20   you know, and how many exact announcements were

21   made, but there were a lot of announcements being

22   made.

23       Q     Okay.  And I'm going to -- I'm going to

24   cite to your -- your statement that you made, the

25   recorded statement.

Page 89

1          And so you were reading from your

2     statement on page 35, Bates LVMPD802.  This is

3     from your statement, open quote, "The combination

4     of these effects produce a psychological or

5     sensory overload that can temporarily stun an

6     individual," close quote.

7          What does stun -- to your understanding,

8     what does stun mean?

9          A    Stun -- having been around these

10    distracts in training, there's a lot of

11    overpressure from the distract itself.  The light

12    itself, if you look at the distract, will cause

13    you to look away.  That would be -- most people

14    would be stunned from that.  And that's also part

15    of the manufacturer -- it comes from the

16    manufacturer that it's a -- it's called a stun

17    stick.  It's for a stun.

18          It's to disorientate somebody.  To get

19    them to stop what they're doing, to temporarily

20    disorientate them, and then actually safely take

21    them into custody and get them to stop doing

22    whatever they're trying to do -- like, whatever

23    violent type of thing they're trying to do while

24    you're deploying it.

25          Q    It can also confuse them; correct?

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 90

```
 1      A    Very temporarily.
 2      Q    Okay.  And what's your definition of
 3   "very temporarily"?  I know it's hard to quantify
 4   these amounts, but I have to ask you --
 5      A    Each -- each person is different.
 6      Q    Right.
 7      A    And I would say I can't really put a
 8   specific time on that, because what would affect
 9   me would affect you differently or it would affect
10   anybody in this room differently.
11           A second, half second, you know, two
12   seconds.  It's just -- everybody -- it's -- it's
13   to temporarily disorientate somebody,
14   temporarily -- it's -- I don't have a set time I
15   can give you.
16      Q    Okay.  In this case, it would be fair to
17   say that this did not cause Mr. Williams to become
18   compliant; correct?
19      A    I would say that he was not compliant.
20   He was shooting at us after they went off.  He
21   shot at us 18 times.
22      Q    And do you think that being stunned
23   could interfere with somebody's ability to
24   understand that it was police coming through the
25   door?
```

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 91

```
 1      A    Prior to that, we gave him announcements
 2  that we were the police; we were serving a search
 3  warrant.  Could it?  I mean, I -- we won't know
 4  because -- I don't know.
 5      Q    So my question was a little bit
 6  different, though.  It was "could it."  Could
 7  it -- could being stunned prevent somebody from
 8  understanding that it's the police coming through
 9  the door?
10      A    It's a possibility, yeah.  It could,
11  yeah.
12      Q    Okay.  All right.  All right.  And so,
13  Russ, I'm going to -- I'm going to skip around a
14  little bit, but I'm going to read some of the
15  conclusions in the CIRT report --
16      A    Okay.
17      Q    -- and I'm going to ask your opinion on
18  them.
19           And just to clarify, you read -- we
20  discussed at the very beginning of the deposition,
21  you did read the -- read most of the CIRT report;
22  correct?
23      A    Yes, ma'am, that's correct.
24      Q    Yeah.  And I'm assuming -- you tell me
25  if I'm right or wrong.  It's a thick report, and
```

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 92

1    it's hard to get through.

2         A    It is quite long, yes, it is.

3         Q    Yeah.  But you probably read the -- all

4    the conclusions.  Is that fair to say?

5         A    It's fair to say, yes.  Yes, ma'am.

6         Q    Okay.  All right.  So I'm going to read

7    to you the part -- it's the 3.6, and it's page

8    215.

9         A    Okay.

10        Q    CIRT concluded, "While the SWAT section

11   manual contained verbiage allowing for SWAT

12   operators to conduct a CET for property when there

13   is a threat of an armed and dangerous subject, it

14   was not appropriate, given the amount of unknowns

15   associated with Apartment 1125.  There were

16   numerous amounts of unknown factors, to include

17   who was actually staying in the apartment and if

18   there were children, elderly, or vulnerable

19   individuals present inside the apartment.

20             "SWAT's decision to serve the 3050 South

21   Nellis Boulevard search warrant as a CET was a

22   policy/training failure and not within the

23   standardized LVMPD tactics training and policy,"

24   end quote.

25             And so, Russ, I want to ask you about a

Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 94 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 93

1   couple of things.  We talked earlier in the

2   deposition about some of the unknowns.  And what

3   you had indicated to me was that your memory was

4   that the recon had ruled out that there was no

5   children, no elderly, no vulnerable.  And, in

6   fact, based on the CIRT report, they had not ruled

7   any of those things out.

8       A    I would say on the recon, they didn't

9   see a kid's toy out front; being a small bike, a

10  tricycle, a Big Wheel, something like that, or any

11  toys -- any children's toys on the patio or

12  anything like that that would indicate that there

13  were children there.  That's what the recon

14  brought back.

15      Q    Okay.  In terms of elderly or vulnerable

16  individuals, they had also not ruled those out

17  either; correct?

18      A    Well, you could say that would be more

19  on the investigative side on whether that was

20  ruled out or not, not on the SWAT section, on the

21  recon guys.

22      Q    Okay.  And then also who was actually

23  staying in the apartment, there was no knowledge

24  of who was actually staying there; correct?

25      A    Except for the statement that the



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 94

1    homicide detectives got in reference -- Rembert's

2    stepmother saying that's where he lived.

3        Q    And hadn't she said that he had stayed

4    there months earlier, and she wasn't sure where he

5    was now?

6        A    If that's what it says in the search

7    warrant.

8        Q    Okay.  Not in the -- okay.

9             And then what's your opinion where it

10   concludes that this was a policy training failure

11   and not within standardized LVMPD tactics?

12       A    Well, and that's obviously the SMEs, and

13   I don't know who they were or how they drew all of

14   their conclusions to those certain factors that

15   you just pointed out.

16            I would say everybody has an opinion.

17   Right?

18       Q    I think I know where you're going with

19   the rest of that statement, but let's keep it

20   clean for the transcript.

21       A    You know, in -- looking at this as an

22   opinion, were we within policy of the section at

23   the time of the section?  Everything that I did

24   that I relayed to my boss was within section

25   policy, yes.



Page 95

1      Q     Okay.  All right.

2      A     I did -- and I relayed everything to

3   her, the information that I had, and said, "Hey,

4   this is what we have and this is where -- this is

5   the tactic that we want to use," and she approved

6   it.

7            Was that within -- without being in

8   standards of LVMPD policy?  I don't -- that's --

9   that's the question -- that's a million-dollar

10  question there.  I mean, that's very, very

11  debatable there.

12     Q     Okay.

13     A     I mean, different people are going to

14  have different -- you know, different viewpoints.

15  And I would say it's the -- we'll use the word

16  viewpoints.

17            But my -- my viewpoint on this is, we

18  can always get better.  And there's some things

19  that you can -- you always learn from any incident

20  that you're a part of or on.  And we could have

21  sent the recon team back out again.  They could

22  have said, "Hey we did this and" -- you know, that

23  could have happened again, stuff like that.

24            So, I mean, there are some things that

25  could be done better, yes.  There's some things --

LEXITAS™

Page 96

1   I mean, and that's looking at it now after the

2   fact.  That's not knowing, you know, after this

3   had happened before.

4        Q    And so my --

5        A    As far as the brass wrap door, I mean,

6   there's other stuff too, you know.

7        Q    What's the other stuff?

8        A    That's -- that's it.  You know, the

9   brass wrap door, knowing that.

10       Q    And so part of my -- my -- part of my

11  understanding about what you've just said is that

12  you kind of -- if we're going to call this, like,

13  a -- to use a simple analogy, this whole thing is

14  a pie.  Right?

15       A    Right.

16       Q    And you're saying, hey, for my slice of

17  the pie, I operated within policy and procedure.

18  Is that fair to say?

19       A    I did the best I could with all of the

20  facts that I had.

21       Q    Okay.  And I'm going to read you another

22  conclusion, and it's 3.8 from page 216.  Open

23  quote, "Under the conditions present here, six

24  seconds was insufficient time to allow occupants

25  time to answer the door, let alone submit to a

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 97

1    search," end quote.

2            Having -- you have extensive experience

3    working for LVMPD.  Although this was the first

4    time you had done a CET, I think that you

5    testified earlier that you have served search

6    warrants and other -- you know, in other areas and

7    other units.

8            Do you agree or disagree that six

9    seconds was insufficient to allow time -- to allow

10   sufficient time for an occupant to answer the

11   door?

12       A    That structure was a one-bedroom,

13   one-bath apartment, a narcotics flophouse where

14   people are up 24/7.  From my experience --

15       Q    And --

16       A    -- of being narcotics, dealers, gang

17   members, six seconds, knowing now how -- how this

18   transpired, that was a -- we did what we could

19   under a reasonable amount of time, and there's no

20   set time.  It's what's objectively reasonable at

21   that time with the facts that you have.

22            So I don't -- whoever came up with that,

23   is that -- was that an SME?  Or where did that

24   come from?

25       Q    That -- and I'm happy to show it to you

Page 98

1   too.  It's -- give me one second.  Let me pull up

2   the -- it's conclusion --

3       A   Because that seems like an opinion-based

4   thing as well.  Right?

5       Q   Give me one second.

6           CIRT and SMEs.  So it was both CIRT and

7   SMEs that concluded that.

8       A   Okay.

9       Q   Okay.  And that's from Section 3.8, and

10  it cites case law as well.  I'm happy to let

11  you --

12      A   Okay.  I understand what you're saying.

13      Q   Trust me, I'm not trying to misrepresent

14  anything to you.

15      A   Right.  Yeah.

16      Q   All right.  And so if understand your --

17  sometimes I like to read -- like I explained to

18  you before, I like to read and write things,

19  because I want to make sure I really understand

20  them.

21          As we sit here today, it's your position

22  that six seconds was -- based on the totality of

23  circumstances, including the size of the

24  apartment, that six seconds was sufficient time to

25  allow him to -- to allow whomever inside the

Page 99

1    apartment to let you guys gain access

2    nonforcefully?  I don't know if that's the right

3    term.

4         A    Six -- we went inside the door at 15

5    seconds.  The six seconds -- and you're asking an

6    opinion-based question.

7         Q    Uh-huh.

8         A    Could it have been reasonable for what

9    the person saw there at the time when they did

10   that?  Knowing that there was a -- we're going

11   after a murderer and a murder suspect and they're

12   heavily armed, it could be reasonable, yeah.

13        Q    Okay.  And then conclusion three -- part

14   of Conclusion 3.9, open quote, "Officers

15   immediately lost the elements of a CET, of

16   utilizing speed to surprise and overwhelm the

17   subject per their manual by being stuck at the

18   door and hitting it multiple times prior to

19   entering the residence," close quote.

20             And we talked about that a little bit

21   before.  And as we sit here today, you agree with

22   that, don't you?

23        A    Well, that's an opinion from an SME.

24   Right?  A viewpoint, you would say.

25        Q    Correct.



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 100

```
 1        A     That is a call that's not -- that is a
 2   call that you make at the time while you're there.
 3   And the point I would make is, okay, there's been
 4   one hit on the door with the ram.  Is it flexing?
 5   Is -- are they getting flexion?  Does it look like
 6   it's going to get ready to get open?  Do you -- do
 7   you understand what I'm saying?
 8        Q     I do understand.
 9              And based on the video, I don't think it
10   was flexing.
11        A     Okay.  That was -- that was my video.
12        Q     Right.
13        A     That I watched, I didn't see that.
14        Q     Okay.
15        A     Fair?
16        Q     Yeah, no, no, no.  Fair.
17              I'm telling you, from my point of view,
18   I didn't see that it looked like --
19        A     The guys up front would make that call.
20        Q     Okay.  And so -- okay.  So then -- so
21   then is it your position that the guys that are
22   really right at the door, you would rely on them
23   to call the tactical?
24        A     Absolutely.
25        Q     Okay.
```

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 101

1       A    You've got to rely on your people to do
2    their jobs.
3       Q    Okay.  And so going back to the
4    statement itself, though, do you agree or disagree
5    that you lost the elements of the CET by not doing
6    an immediate breach?
7       A    Any time that you have an immediate
8    breach, you're obviously going to have the element
9    of speed, surprise, and overwhelming action on
10   your side when it's -- when it's -- when it comes
11   open with one hand.  It was delayed.
12      Q    And, Russ, based on -- having read
13   your -- the statement that you gave as part of
14   this, one of the issues -- and you -- you read
15   your statement recently.
16      A    Yeah.
17      Q    That you thought -- looking back on it
18   now, one of the things that you would have changed
19   is you thought this should have been an explosive
20   entry; correct?  I'm telling you what you gave --
21   what statement you gave in your -- in your -- in
22   your recorded statement.
23      A    With a brass-wrapped door with a tactic
24   like that, knowing -- if we would have known that
25   there was a brass wrap on that door, that would

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 102

1    have been definitely an option for a better tactic

2    and a safer tactic for us.  And also for the

3    people there, to get that door down without

4    having -- putting officers up front of it in

5    harm's way, knowing that there's automatic weapons

6    inside that residence with the possibility -- and

7    we're going after a murder suspect too, you know.

8            So, yes, a brass wrap on that door

9    would -- there -- a better tactic would be to

10   utilize an explosive breach on that, after the

11   fact, knowing this now.

12       Q    Right.  And so in your -- in your

13   recorded statement, you said -- and I'm not trying

14   to -- one of the statements, there was

15   explosive -- when they asked you, "What you would

16   do differently?" and your response was -- part of

17   it was, "Explosive breach is the main one."

18       A    That's one of the things -- and I guess

19   I was answering that from an after-the-fact

20   tactical spot of what I knew then and with the

21   door having the brass wrap, after the fact.

22       Q    Okay.  And -- okay.  And I -- if I've

23   already asked this, you're going to have to --

24   you're going to have to excuse me.  I'm going to

25   ask it one more time.



Page 103

1          Do you think that a tactical ought to
2    have been called?
3        A    Ought to have been called?
4        Q    Yes.
5        A    In this situation?
6        Q    Yes.
7        A    It could have been.  But the guys up
8    front that saw it didn't make the tactical call.
9    I was at the back, so I couldn't see what they
10   were seeing.  So for me to sit here and say -- to
11   give it what they saw and what -- I can't say --
12   yeah, five hits is a lot, because there's a lot of
13   time on target.
14          However, I was -- they were trusted by
15   Sergeant Findley, because he was the team leader
16   at the time, that, hey, we're going to -- he --
17   he's trusting them to make the call up front.
18   Different SMEs, different peoples of opinion will
19   probably say, yeah, that's a lot of time on
20   target.  That's a lot of time up front.
21          Other people would say, hey, no.  We
22   were there.  We saw the door.  We saw we were
23   getting -- we were making headway, and they --
24   they saw the door flexing, and they knew that it
25   would come open.

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 104

1            It's -- it's all based on the person's

2     thought and what they thought at the time and what

3     they knew at the time based on what they saw at

4     that time, which I didn't see.

5            Q    Okay.  The other thing that you said in

6     terms of when -- during your recorded statement,

7     the things that you thought they should do

8     differently, is you thought this should have been

9     a no-knock search warrant; is that correct?

10           A    Yes, ma'am, that's correct.

11           Q    Okay.  Could -- could this type of

12    property-only search warrant have been approved

13    for a no-knock warrant?

14           A    Well, I'll back up on that.

15           Q    You tell me -- like I said, other than

16    trial, this is my only opportunity to talk to you.

17    So you tell me exactly what you think and what

18    your opinions are, because I want to know.

19           A    Opinions of the case, I would say that

20    the gang unit had probable cause for a shooting

21    with Mr. Rembert, and he was a shooter, which

22    would take that and actually be a -- that's a

23    felony, shoot -- you know, shooting at somebody.

24    You know, there's a victim, whether it's, you

25    know, assault with a deadly weapon, shooting at --

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 105

1    you know, we could go on and on and on.

2        Q    Okay.

3        A    So that would -- that could have changed

4    some things with the case, knowing the

5    relationship of the violent individuals in there,

6    that we're also investigating a murderer, there's

7    an outstanding murder weapon, that they have a

8    high propensity of violence, and they're gang

9    members, you know, on a drive-by recon that there

10   was a brass wrap door on some stuff, yeah,

11   absolutely, this could have been -- you know, this

12   could have been a possibility on the investigative

13   side, not on the SWAT side.

14       Q    To do a no-knock -- to do a no-knock --

15       A    They would have drafted that.  We don't

16   do that.  That's -- that's -- that's -- that's on

17   the investigative end.

18       Q    Do you think that they ought to have

19   done that?

20       A    Do I think they ought to have?

21       Q    Yeah.

22       A    I don't have all of the facts --

23       Q    Okay.

24       A    -- pursuant to everything as far as the

25   investigative side, because I wasn't there.  I'm

Page 106

1    saying it could have been an option.

2         Q    Okay.  So -- but as we sit here today,

3    based on the type of search warrant that this was,

4    it -- and I -- maybe you said it to me, and I just

5    don't understand.

6             Based on the type of search warrant, is

7    it your understanding that they could have

8    obtained a no-knock warrant?

9         A    They -- you would -- I would -- you

10   would have to ask the investigative detail on

11   that, specifically on what they had --

12        Q    Okay.

13        A    -- and all of the facts.  Because, like

14   I said, I don't know all of their facts on what

15   crimes and -- and all the details of all of the

16   actual specifics on that -- you know, on that

17   part.  I do -- you know, and even on the murder

18   part, you know.  There's -- there's probably some

19   facts there that could have been articulated as

20   well.

21        Q    And then also from 3.9 on page 220, open

22   quote, "CET only to be utilized when a no-knock

23   search warrant is approved by the LVMPD and has

24   judicial preapproval," close quote.

25             As we sit here today, is it your



Page 107

1    understanding that the policy at LVMPD has been

2    altered so that a CET can only be utilized when --

3    when executing a no-knock warrant?

4         A    Yes.

5         Q    All right.  And so if this same search

6    warrant were to be executed today, it would be a

7    surround and call-out; correct?

8         A    Yes.

9         Q    And then from the conclusion, 5.5, page

10   218, "CIRT and SMEs concluded Lieutenant O'Daniel

11   did not use proper discretion when she approved

12   the use of a stun stick through the west-facing

13   window."  Portion omitted.  "Lieutenant O'Daniel's

14   management of tactics for the requested approval

15   of tactics and tools, as the tactical commander,

16   was not within standardized LVMPD tactics training

17   and policy."

18              And, Russ, I understand that you may not

19   want to comment on whether or not Lieutenant

20   O'Daniel did her job correctly.

21              But do you have any position on that

22   statement?

23        A    Position as far as what?

24        Q    Opinion on it.

25        A    Opinion.  Viewpoint/opinion.



Page 108

1      Q     Correct.

2      A     I think Lieutenant O'Daniel got the

3  facts relayed to her, and I thought she made the

4  decision based off of what she knew at the time.

5  And I -- I think that she did her job and the --

6  that's obviously a very opinionated question

7  coming from somebody on there as far as SME.

8            Am I correct on that?

9      Q     Yeah, it's from the -- it's from the

10  CIRT conclusion, so I think it's certain --

11                (Indiscernible crosstalk.)

12      A     Yeah, you would have to ask more

13  in-depth of Lieutenant O'Daniel of what she

14  thought and why she -- why she, you know, did what

15  she did with that and made -- made the calls that

16  she made.  I can't give you an exact explanation

17  of what she thought and what she knew at the

18  time -- you know, what her thought was.

19      Q     Okay.  And then I will -- from Section

20  5.5, "Captain Cole and Lieutenant O'Daniel's

21  approval of homicide IAP and search warrant for

22  the use of SWAT service was not within

23  standardized LVMPD tactics training and policy."

24            Do you have any position or opinion on

25  that?

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 109

1      A    You would have to refer to what they did

2   and -- what they did at the time.  They made the

3   decisions that they made because they were in

4   those positions, about information that they were

5   given, either through the affiant or through the

6   affiant supervision or the case agent from

7   homicide.

8          So I don't know exactly, you know, how

9   they came to that conclusion or what all the facts

10  are.  I don't know on that one.

11     Q    Okay.  And as we sit here today, have

12  you come to learn anything about Mr. Williams

13  since this incident?

14     A    Learned anything about Mr. Williams

15  since this incident?

16     Q    Let me ask a -- a better predicate

17  question.

18          As we sit here today, you probably

19  assumed that that was either Wattsel or -- is it

20  Corvel?

21     A    Fisher.

22     Q    -- Fisher at the time that you were

23  executing the search warrant; correct?

24     A    Yeah.

25     Q    If you even had that thought.

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 110

1          Did you?

2      A    I thought -- yeah, I thought that was --

3      Q    Okay.

4      A    You're getting shot at when you roll

5    into a room.  I mean, yeah.

6      Q    And so as we sit here today, you

7    understand that it was actually Isaiah Williams,

8    not either of the two murder suspects?

9      A    After the fact, yes.

10     Q    Okay.  Other than understanding that he

11   was neither -- he was not one of the two murder

12   suspects, do you know anything else about

13   Mr. Williams, as we sit here today?

14     A    I know that he had a mother.  I feel bad

15   for her, the family.  Yeah.  I mean, he's got --

16   he's -- I mean, there's a mother involved here

17   that doesn't have her son.

18     Q    Yeah.

19     A    But we're all alive as well.

20     Q    Aside from Mr. Williams having a mother,

21   do you know anything else about Mr. Williams?

22     A    I've seen a picture of him, you know, I

23   had -- after the fact.  I knew nothing about him

24   though.

25     Q    Okay.  And as we sit here today, in

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 111

1   fact, having gone to execute this search warrant,

2   none of the items that were being sought in that

3   search warrant were actually present in the unit;

4   correct?

5       A    You would have to ask the homicide

6   detectives that did the search warrant.  I don't

7   know what --

8       Q    You have no knowledge about whether or

9   not they recovered anything?

10      A    I don't have firsthand knowledge of what

11  they recovered right now, no.

12      Q    Okay.  So -- okay.  Okay.  You do have

13  firsthand knowledge that neither of the two murder

14  suspects were within the unit; correct?  The

15  apartment unit.

16      A    Obviously, yeah.

17      Q    Okay.  As we sit here today, would you

18  qualify the execution of this -- this warrant,

19  would you qualify it as a -- as a success or a

20  failure?

21          MR. ANDERSON:  Objection.  Form.

22          Go ahead.

23          THE WITNESS:  There's a human life

24  here.  What's successful about that, a mother that

25  doesn't have her kid?  That's an absolute failure.

Page 112

1          The success is, I'm sitting here today

2     to be able to tell you about it, because I came

3     out alive.  Because I got shot at numerous times

4     by that man.  My kid still has a dad.  Those other

5     cops that I was in that room with, my partners, my

6     teammates are still alive, who are all dads.  And

7     they're able to go home to their kids.

8          That's a success there.  Because we're

9     still alive.  He chose that.  He made that happen

10    as a failure.  He shot at us.  That failure is

11    him.  He failed us.  He shot at us 18 times.

12    BY MS. MURPHY:

13         Q    Okay.  Other than the items that we have

14    already discussed, whether it is using the -- an

15    explosive breach, having a no-knock warrant, is

16    there anything else that you would have done -- in

17    hindsight, that you would have done differently?

18         A    Prayed more for that kid not to be there

19    and shot at us.

20         Q    Okay.  That's fair.  If that's your

21    answer, that's your answer.

22         A    Yeah, I wish that kid wouldn't have been

23    in there and shot at us.  If he wouldn't have shot

24    at us, this wouldn't have happened.

25         Q    Yeah.  All right.  I'm just going to go



Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 113

1    through -- I think I might -- oh, the other thing

2    I wanted to ask you about is -- and we have -- you

3    know, we need to cover it, Russ, is that you had

4    not attended SWAT school; correct?

5        A    Correct.

6        Q    Okay.  And can you -- as we sit here

7    today, did you ever attend SWAT school?

8        A    After the fact, yes.

9        Q    Okay.  And did you have to attend that

10   before you went back on SWAT?

11       A    Yeah.  I attended it right when I came

12   off administrative leave.

13       Q    Okay.  And can you kind of walk me

14   through why you didn't -- why you had not attended

15   SWAT at the time of this -- SWAT school, sorry, at

16   the time of this incident?

17       A    That would -- that was Lieutenant

18   O'Daniel.  They run a -- at that time, how the

19   training section worked -- and this is -- this was

20   at that time -- what was revealed to me by her was

21   we run the SWAT school every March, and it was a

22   timing thing.

23            Because according to what

24   Lieutenant O'Daniel explained to me -- because I

25   even asked her -- was it was because it's

Page 114

1    labor-intensive.  There's a lot of bodies.  It

2    takes -- it's a manpower-intensive school.

3    It's -- you know, it's very intense, and they did

4    it every March.  And it just was the timing issue,

5    because I transferred to the unit in December.

6         Q    Why -- why did you transfer -- why did

7    you transfer in December?

8         A    Because that's when the opening was

9    there.

10        Q    Okay.  Did you -- did you fill in

11   somebody else's position?

12        A    Yes.

13        Q    Okay.  And had you -- I mean, had you --

14   I mean, I know that SWAT is very prestigious.

15             Had you wanted -- obviously, had you

16   wanted to join SWAT?

17        A    Of course.

18        Q    Okay.  I'm going to ask you -- I'm going

19   to -- I think I've covered almost everything.  I

20   just wanted to ask you about some of the stuff in

21   your discovery responses.

22             Did you -- for -- in preparation for

23   today's deposition, did you go over -- let me show

24   it to you too.  We call them interrogatories and

25   requests for production.



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 115

1        A    Yes, I've seen that.

2        Q    Okay.  All right.  And I'm going to ask

3   you about the citizen complaints.  I'm just going

4   to allow you a little bit more time and space

5   to -- you've outlined them in response to Request

6   for Production Number 17, which asks, "Produce a

7   copy of all citizen complaints regarding the

8   defendant" -- that's you -- "to which these

9   requests were -- were directed."

10            And so I have -- one, two, three,

11   four -- I have four citizen complaints.

12            Do you remember all of these, or did you

13   want this to refresh your recollection?

14       A    I might need to look at that to

15   refresh --

16       Q    Part of it is highlighted on the second

17   page.

18       A    Okay.

19       Q    I'll just hand you those right now.

20   Sorry, that's the first page.  You just flip them.

21   That's the page before.  No, no, no.  Sorry.

22       A    You got two of them here.  You said

23   there's four.

24       Q    No, no, no.  Sorry.  There's four

25   incidents.  So one, two, three, four, in response

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 116

1    to Request Number 17.  One, two, three, four.

2         A    Okay.

3         Q    Can you kind of briefly explain those

4    different incidents for me?

5         A    Oh, yeah.  Embarrassing, at least two of

6    them are.

7              I got an off-duty incident where I was

8    intoxicated and found in possession of a firearm

9    was one.  That was embarrassing.  And then I

10   received an off-duty DUI in 2015 while I was

11   assigned to the organized crime bureau, criminal

12   intelligence section.  And that's when I was

13   returned to patrol, and I gave you that statement

14   in chronological order of my timeline in my

15   career.

16             The next one, the citizen complaint that

17   I stole money and whatnot, I'm trying to recall

18   that.  The defendant was one of the officers.

19   That was the Larry Ronetti [phonetic spelling]

20   incident.  I think that was -- I had nothing to do

21   with that.  I don't think I was actually there for

22   that.  I don't know how my name is -- but -- but

23   okay.

24             And then the property owner complained

25   about being on his property, and we -- there was



Page 117

1    no policy violation, obviously, on that.  That was

2    a patrol incident when I was a patrol sergeant

3    with one of the guys.

4         Q    Okay.

5         A    But, yeah, those -- the first two are

6    embarrassing, and I grew and learned from them.

7    And I made a mistake, but that was over almost ten

8    years ago.  One of them was over ten years, and

9    the one is almost going to be ten years next

10   February.

11             MS. MURPHY:  Okay.  All right.  Can I

12   take those back?  Thank you.

13             All right.  And if you can just --

14   hopefully I'm going to wrap up.  Why don't we go

15   off for five minutes.  I'm just going to review my

16   notes.

17             THE VIDEOGRAPHER:  We are going off

18   record at 3:19 p.m.

19                  (Whereupon, a recess was taken.)

20             THE VIDEOGRAPHER:  We are back on

21   record at 3:24 p.m.

22   BY MS. MURPHY:

23        Q    Russ, one of the things you talked about

24   in your recorded statement was you being on the

25   stack.  And they asked you if you were aware of

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 118

1    any policy that said you couldn't -- standard
2    operating procedure that you cannot be on an entry
3    team until you've completed SWAT school.
4                As we sit here today, do you have any
5    knowledge of that?
6        A    That you can't complete entry unless
7    you've completed the SWAT school?  I had no
8    knowledge of that, no.
9        Q    Okay.  And also, Russ, you talked about
10   providing some screenshots of text messages
11   between you and Lieutenant O'Daniel regarding
12   getting authorization for this -- this -- this
13   search warrant.
14               Did you ever provide those?
15       A    I believe I gave them -- oh, God, it's
16   been so long.  I believe I gave them to the CIRT
17   guys.  It would have been Roth.
18       Q    Okay.
19       A    I think I gave them to him.  I
20   thought -- I thought I did.  But I know that he --
21   it's been so long, I can't tell -- I don't -- I
22   thought I did is my answer.  Yeah.
23       Q    So, Russ, you talked about -- and quite
24   a few people have talked about it.
25               One of the reasons to use the CET was an



Page 119

 1    incident where a guy kicked through an

 2    apartment -- the apartment stucco into another

 3    unit.

 4          Do you remember talking about that?

 5      A    Can you -- refer a little bit more,

 6    please?

 7      Q    Sure.  I'll read you a quick quote.  And

 8    it's from page 42 --

 9      A    Okay.

10      Q    -- of your statement.  "I've seen it

11    even in NV.  Guys will kick through -- through the

12    apartment stucco and go into the next apartment,

13    and then we could create a potential hostage

14    situation."

15      A    Okay.

16      Q    End quote.

17      A    Okay.

18      Q    Can you explain -- several of the SWAT

19    guys have brought up that situation.

20          Can you tell me more about that?

21      A    That situation or, like, are you

22    implying, like, that we have seen that happen

23    before on previous operations?

24      Q    Yes.

25      A    So -- and I think I'm referring to the

Page 120

1    statement when I was in major violators as a

2    detective, and I was also there as a sergeant.

3    Any time that you have a wanted, armed individual

4    that does not want to be apprehended or captured

5    that's in an apartment complex or even sometimes

6    in a condominium, where there's two different

7    types of structures -- a townhouse -- you can

8    see -- we have seen and we do know from our

9    experience, and we have seen it live, where people

10   will actually kick through an apartment wall to

11   escape and go into another apartment or dwelling.

12           And you could potentially create a

13   hostage situation with something like that,

14   because they're trying to flee.  They are armed.

15   They have a gun.  Those people don't know them.

16   You don't know what that individual's mindset is

17   going to be.

18           So that -- that -- that's a very, very,

19   very critical piece there, to ensure that you try

20   to avoid having that happen, because of those poor

21   people that are there in that other residence.

22   That's a safety issue.  Especially when you know

23   you're dealing with somebody that's got a

24   propensity for violence, that's also committed the

25   crime of murder or -- and we're looking for a



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 121

1    murder weapon and they're gang members, so --

2        Q    In your -- so have you seen that more

3    than one time?

4        A    Oh, yes.  I've seen somebody kick

5    through a wall more than once, yeah.

6        Q    How long does that take?

7        A    Depends on how good they are and how --

8    if they can tunnel through -- if they hit the

9    studs, they might have to kick it again.  Because

10   you know how houses are built in Las Vegas or

11   apartment homes.  You -- usually they're -- you

12   know, depending on how they frame it and, you

13   know, how the walls are built -- I can't tell you,

14   because I'm not in construction.

15          But, you know, if -- they can kick

16   through and they can tunnel through anything.  If

17   someone wants to escape bad enough, they can get

18   through -- they can create a hole and get through,

19   especially skinny guys.  They can -- they can

20   really tunnel through some stuff and -- and create

21   some serious havoc.

22       Q    And so my question was -- if you know,

23   you know; if you don't, you don't -- what's the

24   fastest you have seen somebody tunnel through --

25   kick through a wall?



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 122

1        A    I couldn't tell you how fast it took

2    them, because I didn't know how -- I didn't -- I

3    wasn't there to see them actually do it.  But I

4    can say that they can move ratherly [sic] quick if

5    needed in order to escape and flee.

6        Q    Okay.  I wanted to ask you really

7    briefly about the second individual in the unit.

8             Do you remember there being a second

9    individual?

10       A    Yes, I do.

11       Q    And what happened with that individual?

12       A    As far as?

13       Q    Did you -- was it you who apprehended

14   him, or somebody else?

15       A    I grabbed him off the wall.

16       Q    Okay.

17       A    I apprehended him.

18       Q    And as you sit here today, do you have

19   any idea who he is?

20       A    No.

21       Q    Okay.  Russ, I don't think I have any

22   other questions.

23            Russ, having -- now we've sat here for a

24   couple of hours.  Are there any answers that you

25   have given today that you wanted to go back or

Page 123

1    change or modify?

2        A    No.

3        Q    I've allowed you time to answer all of

4    my questions; correct?

5        A    Correct.

6            MS. MURPHY:  All right.

7            MR. ANDERSON:  No questions.

8            THE VIDEOGRAPHER:  Okay.  One moment.

9            This concludes the video-recorded

10   deposition of Russell Backman taken on

11   October 3rd, 2024.  We are going off the video

12   record, and the time is 3:30 p.m.

13           THE COURT REPORTER:  Counsel, do you

14   need a copy of the transcript?

15           MR. ANDERSON:  Yes, please.

16               (Whereupon, the deposition

17               concluded at 3:30 p.m.)

18               * * * * *

19

20

21

22

23

24

25

Russell Backman              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 124

1                CERTIFICATE OF COURT REPORTER

2

    STATE OF NEVADA        )
3                          )   ss:
    COUNTY OF CLARK         )

4

5        I, Heidi K. Konsten, Certified Court Reporter

6    licensed by the State of Nevada, do hereby certify

7    that I reported the deposition of RUSSELL BACKMAN,

8    commencing on October 3, 2024, at 1:10 p.m.

9         Prior to being deposed, the witness was duly

10   sworn by me to testify to the truth.  I thereafter

11   transcribed my said stenographic notes via

12   computer-aided transcription into written form,

13   and that the transcript is a complete, true and

14   accurate transcription and that a request was not

15   made for a review of the transcript.

16       I further certify that I am not a relative,

17   employee or independent contractor of counsel or

18   any party involved in the proceeding, nor a person

19   financially interested in the proceeding, nor do I

20   have any other relationship that may reasonably

21   cause my impartiality to be questioned.

22       IN WITNESS WHEREOF, I have set my hand in my

23   office in the County of Clark, State of Nevada,

24   this October 21, 2024.

25            _____
             Heidi K. Konsten, RPR, CCR No. 845

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 125

1          DECLARATION OF DEPONENT

2               I, RUSSELL BACKMAN, deponent herein,

3   do hereby declare under penalty of perjury that I

4   have read the within and foregoing transcription of

5   my testimony taken on October 3, 2024, at Las

6   Vegas, Nevada, and that the same is a true record

7   of the testimony given by me at the time and place

8   hereinabove set forth, with the following

9   exceptions:

10

11               ERRATA SHEET

12   PAGE  LINE   SHOULD READ:        REASON FOR CHANGE:

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 126

 1                        ERRATA SHEET

 2   PAGE  LINE    SHOULD READ:        REASON FOR CHANGE:

 3   _____

 4   _____

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21

22

23   Date: _____    _____
                            RUSSELL BACKMAN
24

25



Russell Backman                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| 1 | 2 | 2:24-cv-00074 | 4 | A | 115:3 |
|---|---|---|---|---|---|

**1**
6:12,13

**10**
19:11

**10410**
4:24

**10th**
20:9

**11**
14:1

**1125**
47:10
62:8
92:15

**133**
81:10

**15**
81:5 99:4

**17**
115:6
116:1

**18**
26:9,12
69:4
72:20
75:20
90:21
112:11

**1997**
11:11

**1:10**
4:3,11

**1:52**
55:11

**1:59**
55:14

**20**
8:24 81:5

**2006**
15:6

**2010**
15:6

**2015**
116:10

**2019**
11:14

**2021**
31:4

**2022**
19:11
20:9 31:6

**2024**
4:2,10
123:11

**215**
92:8

**216**
96:22

**218**
107:10

**220**
106:21

**24/7**
97:14

**25**
56:6,8
58:20
59:17,22

**29**
19:21
50:13,14

**2:09**
66:13

**2:11**
66:16

**2:24-cv-00074**
5:18

**2:24-cv-00074-apg-njk**
4:16

___

**3**

**3**
4:2

**3.6**
92:7

**3.8**
96:22
98:9

**3.9**
99:14
106:21

**3050**
62:8
92:20

**34**
62:16

**35**
89:2

**3681**
7:9

**3:19**
117:18

**3:24**
117:21

**3:30**
123:12,17

**3rd**
4:10
123:11

**400**
4:12

**42**
119:8

**45**
7:24

**4:00**
47:19

___

**5**

**5.5**
107:9
108:20

___

**6**

**650-square-foot**
42:2
78:17

___

**7**

**75**
8:10

___

**8**

**89112**
7:10

___

**9**

**9**
56:8,12

**a.m.**
47:19

**ability**
7:4 24:22
27:22
90:23

**able**
6:23 69:6
88:7
112:2,7

**about**
8:11 9:1
14:1
15:17
16:21
18:13
27:13
28:2
42:19
45:23
47:4
49:3,9
55:23
63:6
72:23
79:17
80:2,4
81:12
83:4
84:25
85:6,14,
17,20,22,
24 86:2
92:25
93:2
96:11
99:20
109:4,12,
14
110:12,
21,23
111:8,24
112:2
113:2
114:20

116:25
117:23
118:9,23,
24 119:4,
20 122:7

**above**
32:3

**absolute**
111:25

**absolutely**
43:7
45:20
46:22
54:12
68:17
71:25
74:1
75:25
100:24
105:11

**access**
39:15
99:1

**accident**
54:14

**according**
113:23

**accurate**
28:9

**acronyms**
28:7

**acting**
17:18

**action**
101:9

**actionable**
45:19

**activate**
64:11,15,
17,22

Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 129 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

activated
  64:12

actively
  78:5

actual
  24:24
  30:14
  31:15
  32:18
  33:7 35:7
  44:21
  45:15,21
  47:11,17
  49:4,18
  51:8
  58:20
  61:11
  64:24
  65:7
  72:23
  106:16

actually
  23:2 24:9
  25:8 39:3
  41:9 44:9
  46:14,25
  50:4,6
  57:21
  58:14,17
  59:6,9
  61:21
  65:22
  66:7
  71:16
  82:8
  89:20
  92:17
  93:22,24
  104:22
  110:7
  111:3
  116:21
  120:10
  122:3

addition
  54:23

address

7:7 11:13
  48:14

administe
red
  39:4

administr
ative
  69:21,25
  113:12

admittanc
e
  74:20,22,
  24 78:13
  79:12,13

affect
  90:8,9

affiant
  109:5,6

affidavit
  23:8
  38:12

after
  13:8,15,
  16,18,24
  14:2
  18:19
  26:8,14
  27:14
  29:10,20,
  21 53:10
  57:6,9
  61:24
  62:3
  73:2,7,15
  74:18
  75:25
  80:7,13
  81:5,14
  82:15
  83:24
  84:3,19
  85:1
  90:20
  96:1,2
  99:11
  102:7,10,

21 110:9,
  23 113:8

after-
the-fact
  102:19

afternoon
  4:7,24

afterwards
  26:8
  83:13

again
  37:21
  50:2 67:8
  95:21,23
  121:9

agent
  15:25
  109:6

ago
  14:25
  66:23
  68:4
  117:8

agree
  22:14,19
  74:15
  97:8
  99:21
  101:4

ahead
  26:19
  33:20,22,
  25 34:3
  35:16,17,
  19 77:16
  111:22

akin
  40:16

alarms
  28:23

Alex
  65:12
  76:21

Alexander
  4:14
  5:16,21

alive
  68:20,23
  69:7
  110:19
  112:3,6,9

all
  8:22
  11:18
  12:11
  17:10
  18:17
  21:25
  23:21
  25:11
  27:19,23
  29:7
  30:12
  31:12
  34:15
  36:24
  37:1,21
  47:16
  60:21
  61:20
  65:15
  67:9,18
  68:10
  69:3,4
  72:5
  80:23
  82:5,7
  83:2,18
  86:2
  91:12
  92:3,6
  94:13
  95:1
  96:19
  98:16
  104:1
  105:22
  106:13,
  14,15
  107:5
  109:9
  110:19

112:6,25
  115:2,7,
  12
  117:11,13
  123:3,6

allow
  30:23
  96:24
  97:9
  98:25
  115:4

allowed
  123:3

allowing
  92:11

allows
  17:12

almost
  70:1
  114:19
  117:7,9

along
  30:5 48:8

already
  19:19
  102:23
  112:14

also
  9:5 13:13
  24:25
  28:17
  29:4 30:4
  36:12
  37:23
  38:1,11,
  15 40:21
  43:4
  48:24
  49:2 51:2
  54:23
  55:3,5
  56:7
  57:10,21
  59:11
  60:10
  61:3

62:16
  72:3
  73:11
  81:2,13
  82:15
  86:8,11,
  12 88:13
  89:14,25
  93:16,22
  102:2
  105:6
  106:21
  118:9
  120:2,24

altered
  107:2

although
  82:13
  97:3

always
  19:3
  25:7,11
  32:15
  45:18
  46:21
  70:20
  72:1,6,
  13,16
  95:18,19

ambush
  76:1

ambushed
  75:19

Amendment
  22:5,8,9

amount
  18:10
  19:7
  20:11,14,
  17 75:7
  78:15
  79:17,24
  81:1,12,
  15 82:22
  85:15
  92:14

Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 130 of 166

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

97:19

**amounts**
90:4
92:16

**analogy**
96:13

**Anderson**
5:1 7:15,
18,22,23
8:5 26:18
67:21
70:12
76:24
77:15
86:20
111:21
123:7,15

**Anderson'
s**
8:1

**angle**
58:23

**angles**
76:17

**animals**
43:1

**ankle**
38:16
40:8
48:18

**announce**
16:3
17:6,7
18:6
21:11,12
27:7 28:1
29:21
74:18
77:14

**announced**
78:19

**announcem
ent**
28:24

66:3
75:3,7
88:17

**announcem
ents**
24:7,9
29:1,21
83:18
88:11,15,
20,21
91:1

**announces**
85:7

**another**
9:5
39:20,21
48:24
58:7
96:21
119:2
120:11

**answer**
17:13
18:11,22
24:3
26:13,14,
15,19
27:18
75:2
77:16
96:25
97:10
112:21
118:22
123:3

**answered**
71:11,17,
18

**answering**
34:1
77:23
102:19

**answers**
122:24

**any**
6:22 7:2

9:25
10:5,9
11:17
12:3
14:13,22,
23 15:10
16:10,13
20:13,14
21:23
28:22,23
43:8,12,
13 56:21
60:21
68:15
69:10,11,
20 70:3,
19 71:25
78:6,10
79:10,11
83:4
85:6,14,
17 86:16
87:15
88:7
93:7,10,
11 95:19
101:7
107:21
108:24
118:1,4
120:3
122:19,
21,24

**anybody**
68:15
74:1,5
76:9,11
90:10

**anyone**
7:25

**anything**
7:3 8:16
9:20,22
14:17
15:17
17:1
28:22
35:4

57:23
58:8
69:13,21
70:19,24
71:15,16
79:15,21,
23 87:16
93:12
98:14
109:12,14
110:12,21
111:9
112:16
121:16

**anyway**
59:13

**apartment**
30:7,10
42:1,2
43:24
44:4
47:10,15
52:11
60:9
64:24
66:4
78:17
92:15,17,
19 93:23
97:13
98:24
99:1
111:15
119:2,12
120:5,10,
11 121:11

**apologize**
20:4

**appearanc
e**
4:22

**applied**
17:25
19:7

**applies**
55:18

**apprehend
ed**
120:4
122:13,17

**approach**
37:8

**approache
d**
46:5

**appropria
te**
92:14

**approval**
23:12,15,
19,24
31:1,4
32:20
55:5,24
56:11,13,
19,22
107:14
108:21

**approvals**
56:3

**approved**
23:17,21
52:1 95:5
104:12
106:23
107:11

**approves**
51:25

**approxima
tely**
7:24
8:10,23
14:1

**AR-15**
39:20
52:21

**area**
14:15,16
44:4
58:24

**areas**
97:6

**armed**
20:22
24:22
25:2
38:3,6,11
40:6 42:4
52:20
54:8
57:7,8
60:9
62:14,16
80:21
92:13
99:12
120:3,14

**armored**
28:14

**arms**
20:21
24:23
25:22,23
27:22
30:1
40:19

**around**
31:13
47:19
89:9
91:13

**arrest**
39:5,7
40:16,22,
23 41:5,
10,11,13,
15,21

**arrive**
47:18
49:1

**arrived**
47:24

**articulat
e**
23:10



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**articulated**
19:15
24:14
27:16
106:19
**as**
5:8,10
6:12,22
7:14 8:9
12:5,18
13:6,15,
20,22,25
14:14,23
15:9,19
16:18
17:1,22
18:2 20:7
21:2
22:13
27:1 29:5
30:3,22,
25 31:8
39:21
42:14
43:18
44:24
45:9,10,
12,19
46:3,15
48:11
49:3,6
51:6 52:5
53:14,15
54:16
56:9
57:5,6,23
60:13
62:23
64:16
66:21
70:21,24
71:3,4
72:3,4,23
77:5,12
78:3
79:18
86:9,14
87:14

88:6
92:21
94:21
96:5
98:4,10,
21 99:21
101:13
105:24
106:2,19,
25
107:15,23
108:7
109:11,18
110:6,13,
19,25
111:17,19
112:10
113:6
118:4
120:1,2
122:12,18
**Aside**
110:20
**ask**
9:1 10:25
19:24
20:5
29:15
31:21
44:19
51:13
58:14
59:13
64:6
87:7,19
90:4
91:17
92:25
102:25
106:10
108:12
109:16
111:5
113:2
114:18,20
115:2
122:6
**asked**

15:7
17:11
71:8 88:1
102:15,23
113:25
117:25
**asking**
46:8
66:20
70:13
71:9,10
75:13
99:5
**asks**
115:6
**asleep**
78:8,9
**assault**
104:25
**assessment**
80:12
**assigned**
12:13
13:8,11,
12,14
14:2,13,
17 19:21
33:13
35:20
63:19,23
116:11
**assignments**
35:8
49:2,5
**assist**
35:3,5,7
**assistant**
34:5,6,7,
12,18,23
**assisted**
50:25
57:18

**associated**
43:16
92:15
**Association**
84:2
**assume**
11:15
12:17
44:24
60:15
**assumed**
109:19
**assuming**
6:5 31:19
91:24
**at**
4:12
11:12
13:1 14:3
15:16,21,
24 17:15
18:22
20:1
23:16,18
24:24
25:5
26:8,24
27:8,10
30:5,9,16
33:1,8
34:9
36:2,23,
24,25
37:1,7,9,
20 39:10
41:14,21,
24,25
42:5
46:7,13,
14,22,23
47:1,18,
24 52:2
55:11,14
56:23
57:3,4,

19,23
58:22
59:9
61:25
62:15
63:2
65:15,25
66:13,16
67:18
69:5,6
70:19
72:2,20
73:24
74:15
75:20,22
76:6
77:14
78:1,5
87:5 88:9
89:12
90:20,21
91:20
94:21,22
96:1
97:20
99:4,9,17
100:2,22
103:9,16
104:2,3,
23,25
107:1
108:4,17
109:2,22
110:4
112:3,10,
11,19,23,
24
113:15,
18,20
115:14
116:5
117:18,21
123:17
**ATL**
33:6
34:5,11,
18,22
35:10,13,
14,20

36:7,13,
20 37:6,
7,10
50:19
52:15
**attached**
28:25
**attempt**
58:24
**attend**
11:21
113:7,9
**attended**
113:4,11,
14
**attention**
59:5
**attorney**
5:20
**attorney-client**
7:19
**authority**
18:20
21:15
50:23
74:19
**authorization**
31:1,4
118:12
**authorized**
52:8 60:4
**automatic**
102:5
**automatically**
53:17,19
**avoid**
120:20
**awake**

Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 132 of 166

Russell Backman                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

75:22
76:12
77:13,18
78:8,9

**aware**
10:12
20:8 32:9
42:10
46:6 51:6
71:19
82:2
86:17
87:16
88:8
117:25

**awareness**
31:23,25

**away**
32:12
81:7,16
89:13

---

**B**

---

**B-A-C-K-M-A-N**
5:25

**back**
13:17,18,
23,25
14:4 30:3
31:4
32:22
36:22
37:3
40:13,25
44:25
49:6 50:5
51:18
55:13
56:1 59:5
60:25
61:15,19
63:10
65:14
66:1,15
68:21

70:2
72:1,22
73:25
74:7 79:5
82:10,23
83:8,25
84:4
88:19
93:14
95:21
101:3,17
103:9
104:14
113:10
117:12,20
122:25

**background**
11:1
31:21

**Backman**
4:4,9
5:7,15,
19,24,25
11:3
123:10

**backwards**
12:24

**bad**
34:24
72:10
110:14
121:17

**ballistic**
62:12

**bang**
56:8,12,
14,19
59:14,15,
18,20

**Banks**
81:7

**Bar**
4:24

**barricade**

45:25

**based**
15:2
20:18
29:7
79:19
81:2 93:6
98:22
100:9
101:12
104:1,3
106:3,6
108:4

**basic**
24:1

**basically**
14:12
28:11
59:4

**Bates**
89:2

**bath**
42:3

**bathroom**
82:3,11

**Bearcat**
28:25
67:6

**Bearcats**
28:13
52:12
62:4,7
64:4,7,
22,23
65:2

**because**
14:5
18:13
23:2
29:12,14,
24 33:6
35:24
40:18,25
41:25
47:15

52:14
53:13
54:2
63:17
65:25
70:16
72:15,17
73:22
78:1 79:6
80:13
81:22
90:8 91:4
98:3,19
103:12,15
104:18
105:25
106:13
109:3
112:2,3,8
113:23,
24,25
114:5,8
120:14,20
121:9,14
122:2

**Beck**
4:18

**become**
32:18
90:17

**bedroom**
42:3
78:18,19

**before**
6:20
25:22
35:21
40:8 41:3
43:3 45:6
51:14
54:6
55:18
60:5
63:14,23
68:9
78:11,24
79:8 80:2
81:23

83:12
85:25
86:1 96:3
98:18
99:21
113:10
115:21
119:23

**beforehand**
46:18
68:2

**beginning**
13:1,5
91:20

**begins**
4:8

**begun**
55:22

**behalf**
4:25

**behind**
74:3

**believe**
8:8 18:12
19:4
32:21
38:18,19
44:3
50:25
69:4 70:1
118:15,16

**believed**
82:14

**belt**
62:13

**Bertuccini**
9:6,11

**Bertuccini's**
9:19 10:4

**best**
6:24

48:9,11
52:5
58:15
60:1
73:14
84:9 85:5
96:19

**better**
10:21
41:1 72:3
87:20
95:18,25
102:1,9
109:16

**between**
7:17 24:4
27:6
29:16,22
54:1 75:7
118:11

**big**
15:22
73:10
93:10

**bike**
93:9

**bit**
19:25
20:6 21:7
31:14
41:1
51:18
63:11
76:3
79:16
80:2,3,10
87:7,20,
21 91:5,
14 99:20
115:4
119:5

**blinds**
45:25

**bodies**
114:1



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**body**
64:10,12,
17,22

**boom**
59:23

**boss**
94:24

**both**
11:10
18:2,5
19:15
28:16
34:9
39:16
40:2
48:20
60:12
83:5 87:2
98:6

**Boulevard**
92:21

**brass**
46:11,12
73:8
96:5,9
101:25
102:8,21
105:10

**brass-
wrapped**
101:23

**breach**
57:16
101:6,8
102:10,17
112:15

**breaching**
29:10
46:15
65:8

**break**
55:9,16,
18 61:7,
8,14
67:13,18,

20,25

**Brice**
65:11

**brief**
13:23
40:24
49:6

**briefed**
47:22,23

**briefing**
39:10
41:2,4
48:6,10,
12,13
49:4
61:22,25
62:3

**briefly**
116:3
122:7

**bring**
9:25 37:3

**bringing**
69:1

**brings**
68:21

**broken**
75:8

**brought**
53:12
93:14
119:19

**building**
64:24

**buildup**
43:20

**built**
121:10,13

**bullhorn**
49:14
66:5
88:12

**bunch**
20:24

**bureau**
116:11

**burned**
44:3

**but**
6:11 7:21
13:20
18:24
21:3,7
23:17,20
24:2,14
25:8
26:10
28:6
29:14
31:8,14
32:2,10
35:23
37:23
38:22
39:2
40:7,13,
22 41:9
42:10
44:12,16
47:5,9
49:25
50:11,16
51:1
52:14
55:17
59:12,20
63:12
65:15
67:22
68:19,22
69:17
71:10,11
72:3
73:11
76:10
77:21
78:7,23
80:2,10
82:12
83:10,12

85:21
86:12
87:6,14
88:21
90:4
91:14
92:3
94:19
95:17
103:7
106:2
107:21
110:19
116:22
117:5,7
118:20
121:15
122:3

**by**
5:13 6:14
9:6,9,12
19:10
23:9,17,
24 26:21
32:3,7,19
34:10
39:21
43:13,17
45:4
55:15
66:18
67:5,11,
24 71:7
77:1,19
86:17,23
99:17
101:5
103:14
106:23
112:4,12
113:20
117:22

_____
**C**
_____

**C-E-T**
15:14
25:8,9,10

85:18

**call**
11:2,4
25:9,11
40:11
73:16
74:2,6
96:12
100:1,2,
19,23
103:8,17
114:24

**call-in**
29:5

**call-out**
27:25
28:2,3,5,
10,11
29:16,17,
23 30:2
107:7

**call-outs**
83:17

**called**
5:8 13:19
47:6
54:24
56:7 64:1
74:12
89:16
103:2,3

**calling**
73:24

**calls**
108:15

**came**
32:10
35:21
44:3
64:10
68:22
70:22
83:24
97:22
109:9
112:2

113:11

**cameras**
64:12,13,
22

**cams**
64:10,18

**cannot**
118:2

**Capital**
85:7

**captain**
23:18
83:24
84:4
108:20

**captured**
120:4

**career**
15:3
116:15

**case**
4:13,15
5:18,21
15:24
16:21
26:4 28:6
29:2 30:2
44:20
49:8
77:10
80:9,25
81:4,9
82:12
90:16
98:10
104:19
105:4
109:6

**cases**
46:21
53:6

**cause**
40:23
41:5,6
89:12

Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 134 of 166

Russell Backman            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

90:17
104:20

**cell**
37:19
82:18

**certain**
42:18
43:2
45:22
51:15
64:16,19
71:18
79:24
94:14
108:10

**certification**
16:11,16,
18,23,25

**CET**
14:22
15:9
25:11,13,
16,25
26:16,22,
24 27:2,
7,23
29:16
30:3,5,
19,23
31:10
51:16,20,
21,23,25
52:8
54:21,23
60:16,21
63:12,14
84:4
85:18,19,
20,24
86:11
92:12,21
97:4
99:15
101:5
106:22
107:2
118:25

**cetera**
48:22

**CETS**
60:21
83:17
85:6

**chain**
23:13,22

**chance**
77:7

**change**
70:7,8,24
71:5,15
123:1

**changed**
31:9 71:9
101:18
105:3

**charge**
49:16,17
50:7

**chief**
23:22

**children**
43:6
92:18
93:5,13

**children's**
93:11

**chose**
112:9

**chronological**
116:14

**chronologically**
12:25

**chronology**
15:2

**circumstances**
80:15
82:14,22
98:23

**CIRT**
8:7,15,17
9:13
81:10,12
91:15,21
92:10
93:6 98:6
107:10
108:10
118:16

**cite**
88:24

**cited**
81:9

**cites**
98:10

**citizen**
115:3,7,
11 116:16

**citizens**
86:9,13

**civil**
22:16,20

**clarification**
70:15

**clarify**
70:12
71:12
79:6 80:9
91:19

**clean**
94:20

**clear**
21:17
57:13,16
58:24
61:10
71:4,21

77:11

**cleared**
61:16

**clearing**
57:18

**Clements**
65:11

**Clements'**
76:22

**close**
89:6
99:19
106:24

**closed**
74:23
75:1 79:9

**clothing**
37:18

**club**
12:6,7

**cocaine**
81:7,16
82:3

**code**
18:16

**codefendants**
10:10

**Cole**
83:24
84:4
108:20

**Cole's**
85:7

**college**
11:20,22

**combination**
89:3

**come**
10:19
18:10,11

20:25
35:11
36:7,22
69:7 84:4
97:24
103:25
109:12

**comes**
35:4
76:11
80:10
89:15
101:10

**coming**
66:24
70:2
78:20,22
79:10
86:18
90:24
91:8
108:7

**command**
14:15
23:13,22
51:10

**commander**
31:2
56:24
107:15

**commands**
14:16

**comment**
80:10
107:19

**committed**
120:24

**communicated**
54:19

**communicating**
50:17

**communications**
52:7

**complained**
116:24

**complaint**
116:16

**complaints**
115:3,7,
11

**complete**
9:3 118:6

**completed**
118:3,7

**complex**
30:7,8,10
42:1
120:5

**compliant**
90:18,19

**comply**
83:5

**concerns**
82:19

**concluded**
92:10
98:7
107:10
123:17

**concludes**
94:10
123:9

**conclusion**
96:22
98:2
99:13,14
107:9
108:10
109:9



Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 135 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**conclusions**
8:23
91:15
92:4
94:14

**conditions**
96:23

**condominium**
120:6

**conduct**
22:15
33:13
92:12

**conducted**
43:13

**conducting**
46:24

**conference**
84:5

**confidential**
7:19

**confirm**
55:17
82:12

**conflict**
27:6

**confuse**
89:25

**confused**
70:17
86:17

**consideration**
43:5 72:6

**consist**
65:6

**consistent**
81:19,21

**constitutes**
85:15

**constitutional**
21:17,23
22:16,20

**construction**
121:14

**contacted**
51:2

**contacting**
50:22

**contain**
30:13
52:11,17
83:23

**contained**
92:11

**containment**
28:13,16,19

**control**
15:14

**controlled**
15:15,16
25:14,17,19 29:18
30:20

**conversation**
60:1,2

**cool**
11:4

**cops**
112:5

**copy**
6:6 115:7
123:14

**corner**
75:18
78:2

**corners**
28:16

**correct**
10:24
14:5,8
17:16,18
19:4 23:4
24:17
28:8
30:19,24
31:11
33:3
36:4,9,10
38:17,24
39:9
40:8,9,11,12,16
41:10,18,19,22
42:11
47:18
50:17,24
51:10
54:10,21
55:20
58:10
60:18
63:14,24
70:11
73:1
75:16
77:22
79:22
80:6,14
81:18,24,25 82:17,19,24
84:18
87:4
88:3,14,

17 89:25
90:18
91:22,23
93:17,24
99:25
101:20
104:9,10
107:7
108:1,8
109:23
111:4,14
113:4,5
123:4,5

**correctly**
32:24
63:21
107:20

**Corrine**
4:24 5:19

**Corvel**
38:18
39:25
48:17
109:20

**couch**
75:15

**counsel**
4:21
123:13

**couple**
18:14
36:3
39:13
44:17
68:4
76:18
93:1
122:24

**course**
18:24
19:10
36:14
46:2
114:17

**court**
4:17,19

5:3 6:11
9:8 32:4
34:8,17
123:13

**cover**
57:21
74:7
113:3

**covered**
114:19

**Craig**
5:1 18:18
70:15

**crazy**
82:5

**create**
119:13
120:12
121:18,20

**crime**
20:19
57:9
116:11
120:25

**crimes**
14:18,19
106:15

**criminal**
13:14,16
40:3
48:16
116:11

**critical**
120:19

**crosstalk**
108:11

**CSN**
11:23

**current**
12:11

**currently**
11:6,16
14:3

**custody**
25:21
29:20
59:7
89:21

_____

**D**

_____

**DA**
23:24

**dad**
112:4

**dads**
112:6

**danced**
31:13

**dangerous**
54:9
92:13

**date**
4:9 84:6,8

**dates**
43:21,25

**Dawn**
4:18

**day**
10:18
19:7,10
32:1 33:9
51:2,14
54:6
70:22
74:13

**day-to-day**
35:3

**days**
19:21
31:17
44:13
50:13,14

**dead**



Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 136 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

76:9,12

**deadly**
104:25

**dealers**
53:3 54:3
97:16

**dealing**
120:23

**debatable**
95:11

**deceased**
72:9

**December**
114:5,7

**decision**
92:20
108:4

**decisions**
109:3

**deem**
26:2
29:24

**deep**
58:6
75:18

**Def**
56:6
59:22

**defendant**
115:8
116:18

**defendants**
5:2

**defensive**
75:18

**definitely**
102:1

**definition**
90:2

**degree**
11:24

**delayed**
101:11

**department**
4:15 5:17
13:7
70:13
86:6

**depending**
15:22
24:14
25:1
27:15,19
29:2
62:25
63:1,2
73:10
121:12

**Depends**
121:7

**deploying**
89:24

**deposed**
16:21

**deposition**
4:4,9
5:15 6:7,
19 7:13
8:2,6
9:4,16,19
10:4,6,9,
19 17:14
68:6
91:20
93:2
114:23
123:10,16

**depth**
58:20

**deputy**
23:22

**describe**
59:20

**descriptions**
29:13

**destroyed**
81:17
82:17,18

**destroying**
25:22

**detail**
106:10

**detailed**
31:18,19,
20

**details**
106:15

**detective**
13:15,21
15:25
23:9 40:5
44:19
45:4
120:2

**detectives**
29:8 38:8
40:22
41:14
43:11,17
48:8 49:7
94:1
111:6

**detonating**
88:13

**device**
54:24
55:7
58:3,19
59:3,16
61:10

**devices**
54:25
55:23

**Di**
7:9

**dialogue**
64:6

**dictate**
27:18

**difference**
24:4
29:16,22
45:7,9
53:25

**different**
14:16
20:24
21:3
23:19
44:14
46:4
50:23,24
80:11
90:5 91:6
95:13,14
103:18
116:4
120:6

**differently**
19:25
20:6
72:11
87:7
90:9,10
102:16
104:8
112:17

**directed**
115:9

**directly**
69:6 76:6
84:19

**dis**
58:20

**disagree**
97:8
101:4

**disagreed**
9:22

**discovery**
114:21

**discretion**
107:11

**discuss**
6:16

**discussed**
7:17 10:8
91:20
112:14

**discussing**
54:20

**discussion**
85:14,17

**discussions**
85:19,20

**disembarked**
65:2

**disorient**
58:4,10
61:2

**disorientate**
58:12
59:4
89:18,20
90:13

**disorientates**
58:12

**disorients**
58:13

**distract**
55:7,23
56:5,8,17
58:3,20
59:4,15
60:24
89:11,12

**distraction**
54:24,25

**distracts**
56:3
59:17
86:17
88:13,16
89:10

**District**
4:17

**documented**
39:16,17
40:2
48:20
54:16
57:11

**documents**
10:1

**dogs**
43:6
45:14
48:22

**doing**
35:1
43:3,23
44:2
47:11
49:3
50:16
72:11
89:19,21
101:5



Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 137 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**done**
15:21
23:2
33:2,10
34:1,2
35:9
43:19
51:16
63:13,16
95:25
97:4
105:19
112:16,17

**door**
18:11,22
45:25
46:10,15,
22 47:1
57:17,20,
23 65:23
66:1
72:18
73:1,6,9,
14,24
74:23
75:1,2,6
76:5
78:11,12,
20,22
79:8,10
86:19
90:25
91:9
96:5,9,25
97:11
99:4,18
100:4,22
101:23,25
102:3,8,
21
103:22,24
105:10

**doors**
36:25

**double**
15:7

**down**
34:9

36:6,13
48:15
50:18
74:9
102:3

**drafted**
105:15

**draw**
48:23,24
59:5
64:14
65:15

**drawings**
48:4,5

**draws**
37:4

**dressed**
62:6

**drew**
94:13

**drinking**
14:6

**drive-by**
105:9

**drug**
54:2

**due**
52:12,22
54:11

**DUI**
14:5
116:10

**duly**
5:8

**dump**
82:3

**during**
15:5
48:17
85:7
104:6

**duties**
14:24

**duty**
22:15,21
78:21,23

**dwelling**
25:20
120:11

**dynamic**
29:18
64:3

**dynamically**
25:20
26:2,5,6,
11,17

———————

**E**

**each**
7:24
28:18
39:16
90:5

**earlier**
44:7 79:6
82:24
93:1 94:4
97:5

**early**
15:3

**educated**
19:18

**education**
11:19

**effects**
89:4

**eight**
45:2

**either**
12:25
28:15
32:24
78:8,9
93:17
109:5,19

110:8

**elderly**
42:25
43:6
92:18
93:5,15

**element**
46:16
65:8
74:17
101:8

**elements**
82:23
83:4
99:15
101:5

**else**
7:25 8:5,
16 65:20
74:5
110:12,21
112:16
122:14

**else's**
114:11

**email**
32:11

**embarrassing**
116:5,9
117:6

**emits**
58:11

**emotions**
68:22
69:1

**employed**
58:18

**encounter**
42:7,8
72:18

**encountered**
72:20

**end**
92:24
97:1
105:17
119:16

**enlighten**
49:8

**enough**
32:16
121:17

**ensure**
120:19

**entailed**
48:10,12,
13

**enter**
21:18
24:9
25:19

**entered**
26:16
75:19

**entering**
24:7
99:19

**entire**
8:20

**entitled**
4:14 7:18

**entries**
14:22
15:9
16:6,23

**entry**
15:15,16
25:14,17,
19 26:10,
12,17,22
27:2
29:18
30:20
42:17
50:21
59:4

60:22
78:3
83:6,7
86:5
101:20
118:2,6

**environmental**
30:4
36:25
52:12

**equipment**
62:6,9,11

**escape**
120:11
121:17
122:5

**especially**
120:22
121:19

**essential**
25:25

**essentially**
23:6
35:15
56:8
59:15
60:18
63:25

**establish**
28:16

**establishing**
28:13

**et**
48:22

**et al**
4:14,15
5:16,17

**even**
18:18
32:12



Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 138 of 166

Russell Backman                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

63:22
68:3
106:17
109:25
113:25
119:11
120:5

event
71:25

ever
6:19
33:24
63:18
113:7
118:14

every
13:6
113:21
114:4

everybody
28:21
48:5
49:6,8
64:10,11,
12,20
85:13
86:3,5
90:12
94:16

everybody
's
49:2,5

everyone
65:19

everything
7:12 28:9
72:15
74:11
94:23
95:2
105:24
114:19

evidence
25:22
81:14

82:15

exact
27:18
28:20
43:25
69:16
84:6,8
88:20
108:16

exactly
35:25
36:16
44:18
61:16
104:17
109:8

EXAMINATI
ON
5:12

examined
5:9

example
16:19
81:3

Except
93:25

excerpt
81:4

excuse
58:12
102:24

execute
55:4
71:14
111:1

executed
39:4
107:6

executing
41:10
54:6
107:3
109:23

execution
51:9,11
111:18

exhibit
6:12,13

exigency
20:18
21:5

experienc
e
52:25
53:22
79:19
97:2,14
120:9

explain
15:13
17:5 21:6
34:21
41:16
42:23
116:3
119:18

explained
52:10
60:5
98:17
113:24

explanati
on
53:7
108:16

explanato
ry
24:2

explosive
16:5,23
101:19
102:10,
15,17
112:15

extend
58:21

extensive

97:2

extremely
24:21

──────

F

──────

facilitat
e
51:15

fact
52:22
58:10
93:6 96:2
102:11,21
110:9,23
111:1
113:8

factors
27:23
30:4,12
36:25
52:12
92:16
94:14

facts
31:15,22
96:20
97:21
105:22
106:13,
14,19
108:3
109:9

failed
112:11

failure
92:22
94:10
111:20,25
112:10

fair
11:15
12:17
32:8,16
44:23

50:3
60:15
62:20
70:15
75:14
87:6
90:16
92:4,5
96:18
100:15,16
112:20

fairly
81:6

familiar
32:18

family
72:10
110:15

far
7:14 12:5
14:14
16:18
17:1 18:2
21:2 30:3
31:20
45:10,12
46:15
57:5
70:24
96:5
105:24
107:23
108:7
122:12

fast
76:13
78:4
122:1

fastest
121:24

February
117:10

federal
17:8
18:1,8,9
19:2,3,15

feel
28:8
72:10
110:14

feeling
87:23,25

felony
104:23

felt
39:8

few
35:23
46:4
118:24

figure
36:15

figured
32:2

fill
114:10

final
8:17

find
10:23
74:8

Findley
33:8
49:17
50:6
103:15

firearm
116:8

firearms
37:17
42:12
80:22

fired
26:12

firing
78:3

first
5:8 21:22
22:9



Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 139 of 166

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

31:23,25
61:12
63:18
97:3
115:20
117:5

**firsthand**
111:10,13

**Fisher**
38:18
39:25
48:18
109:21,22

**five**
13:13
65:13
73:15
82:1
103:12
117:15

**flash**
69:6 76:7

**flee**
120:14
122:5

**fleeing**
60:25

**flexing**
100:4,10
103:24

**flexion**
100:5

**flip**
115:20

**flood**
26:1

**flooded**
26:4

**flophouse**
38:10
40:6,11
43:15
52:24,25
53:17

80:20
97:13

**flush**
81:7 82:4

**flushed**
81:16

**focus**
11:25

**Follow**
35:18

**follow-up**
14:14

**following**
69:11

**follows**
5:10

**for**
4:22 5:1,
23 7:8,13
8:1,5 9:4
11:8,15
12:17
13:17,23
14:1
15:4,12
16:12,13,
23 17:13,
14 18:2,
10,19
19:17
23:11,13,
14,15,16
24:3,20,
25 25:24
27:16
29:1,5,15
30:17,23,
24 31:4
32:8
33:16,18
34:15
36:3,8
37:12,17
38:22
39:1
40:3,7

42:12,14
43:5
44:21,23
45:2,16,
18,24
47:14
49:13,20
50:3,11,
12,23
51:1,23
55:3,24
56:4
57:2,21
60:10,15
61:13
64:16
65:15
66:4
68:6,10,
16,25
69:2,15,
24 72:10,
13 73:23
74:18
75:5
79:21
81:3,8,
15,23
82:1
83:1,5
89:17
92:11,12
93:25
94:20
96:16
97:3,10
99:8
102:1,2
103:10
104:13,20
107:14
108:21
110:15
112:18
114:22,25
115:6
116:4,21
117:15
118:12
120:24,25

122:23

**forget**
69:16

**Form**
26:18
77:15
86:20
111:21

**formulate**
74:9

**formulated**
35:13,14

**formulating**
37:4,10,
11

**fortify**
20:22

**fortunate**
69:9

**found**
116:8

**four**
65:12,21
70:1
84:18
115:11,
23,24,25
116:1

**Fourth**
22:5,8

**frame**
84:9
121:12

**free**
28:8

**Freedom**
22:11

**from**
8:1 9:15
13:10,11
14:18

21:9
23:12
29:3,8
31:1 37:8
38:1,21
39:18,21
44:3
52:15
53:21
55:5
56:11,23
60:25
72:6 73:8
74:9
75:24
76:12,16
80:22
81:4,9
83:25
89:1,3,
11,14,15
91:7
95:19
96:22
97:14,24
98:9
99:23
100:17
102:19
106:21
107:9
108:7,9,
19 109:6
110:20
117:6
119:8
120:8

**front**
28:15
46:22
57:17
65:23
78:18
86:2,4
93:9
100:19
102:4
103:8,17,
20

**full**
5:22

**functioning**
35:1

**functions**
36:16

———————

G

**gain**
99:1

**gang**
38:1
39:16,17,
22 40:2
43:15
48:20
54:16
57:11
80:19
97:16
104:20
105:8
121:1

**Garth**
33:8
51:2,6

**gas**
72:14

**gather**
75:25

**gathered**
52:15

**gathering**
61:1

**gave**
31:16
53:7 66:3
68:1
78:14
87:8
88:11
91:1



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

101:13,
20,21
116:13
118:15,
16,19

**general**
12:1

**generally**
24:19

**gentleman**
16:22
72:9,20

**gentlemen**
16:20

**get**
6:11
23:12
24:11
28:7
29:8,23
30:25
31:3,21
32:11
34:17
35:6 36:8
46:22
47:17
50:23
60:3,23
64:4,7,24
72:3 75:5
89:18,21
92:1
95:18
100:6
102:3
121:17,18

**getting**
29:3 33:9
51:15
52:8
72:25
73:5
100:5
103:23
110:4
118:12

**Girolamo**
7:9

**give**
6:24
16:19
17:12
18:5
28:23
29:1 37:6
45:18
64:6
66:9,10,
24 72:14
83:20
84:4,8,9
88:7
90:15
98:1,5
103:11
108:16

**given**
6:19 9:6
15:2
29:13
38:7
92:14
109:5
122:25

**glad**
17:11
53:12
68:22

**GLOCK**
62:16

**gloves**
62:13

**go**
12:25
23:1
26:19
29:4,9
32:12
33:13,20,
22,25
34:3
35:15,17,
19,20

36:22,23
37:21
42:14
56:1 58:4
59:6
64:20
66:10
69:7
70:20
71:2
72:1,18
77:7,9,16
79:5
83:19
105:1
111:22
112:7,25
114:23
117:14
119:12
120:11
122:25

**God**
118:15

**goes**
23:15
56:9
59:23
63:10
77:10
82:23
83:10
87:2

**going**
9:9 10:25
15:8 17:8
23:3
27:15
29:19
31:13,14,
19,20
35:8
36:8,18,
20 39:7
41:15
42:20
45:17,19
47:16

48:14
49:1
50:4,19
53:1,10,
18 54:4
55:8,10
57:6,9
58:5,14
59:2,13
60:25
64:5
66:12
72:17
74:5,8
77:8,9,10
78:12
79:5,12
80:7,13,
24 81:14,
23 82:15
88:16,19,
23 91:13,
14,17
92:6
94:18
95:13
96:12,21
99:10
100:6
101:3,8
102:7,23,
24 103:16
112:25
114:18
115:2,3
117:9,14,
15,17
120:17
123:11

**gone**
9:18 14:4
21:7
35:22
111:1

**Gonzalez**
65:12

**Gonzalez'
s**

76:21

**good**
4:7,23
17:10
29:13
46:22
67:14
121:7

**gosh**
19:20
69:16

**got**
10:18
26:8
29:11
33:5,12
46:15
55:23
56:3
57:19,23
59:19
62:6,7
65:2 69:5
73:15
94:1
101:1
108:2
110:15
112:3
115:22
116:7
120:23

**grab**
58:8

**grabbed**
122:15

**grew**
117:6

**grind**
80:3

**groundwor
k**
17:13

**guess**
16:1

44:16
64:19
102:18

**guideline**
79:20,24

**gun**
53:11
76:6
82:17
120:15

**guns**
53:1,4,18
54:5
62:15

**guy**
78:4
119:1

**guys**
35:6,8,20
37:5
41:3,9
42:14
46:14
47:21
48:4
52:15
57:20
61:24
65:16
68:20
93:21
99:1
100:19,21
103:7
117:17
118:17
119:11,19
121:19

---

**H**

**hadn't**
94:3

**half**
69:19
90:11

Russell Backman                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

hallway
30:11

Hancock
65:9

hand
101:11
115:19

handguns
63:4

hands
67:4

happen
78:24
112:9
119:22
120:20

happened
61:24
70:8,10
95:23
96:3
112:24
122:11

happens
48:1 53:5
62:2
64:25

happy
97:25
98:10

hard
68:10,12,
16,17,25
90:3 92:1

harder
72:12,17

harm
24:23

harm's
25:5
102:5

hell
76:14

having
5:8 9:18
39:18

40:19
53:15
63:4
74:10,21
89:9 97:2
101:12
102:4,21
110:20
111:1
112:15
120:20
122:23

havoc
121:21

head
14:7 71:4

heading
62:8 64:9

headway
103:23

health
70:4

hear
53:16
79:15
84:25

heard
63:18,22

heavily
20:22
24:22
25:2
38:2,6
42:3
52:19
57:7,8
60:9
80:21
99:12

Heidi
4:19

hell
76:14

helmet

62:12

help
59:3
60:22

helping
51:14

Henderson
7:9 11:7,
9,13

here
6:9,16,22
9:15
10:1,9,13
11:8 17:9
20:7 27:1
30:3,22
31:8
43:18
44:24
46:3
48:11
52:6 66:6
67:4 70:8
77:12
79:18
87:14
88:6
96:23
98:21
99:21
103:10
106:2,25
109:11,18
110:6,13,
16,25
111:17,24
112:1
113:6
115:22
118:4
122:18,23

hey
20:15
36:7,18
64:11
78:19
79:9

95:3,22
96:16
103:16,21

hide
79:3

high
58:23
105:8

highest
11:18

highlight
ed
115:16

hindsight
46:6
112:17

histories
48:16

history
40:3
48:19

hit
32:1 69:5
100:4
121:8

hits
73:15
103:12

hitting
99:18

hole
121:18

home
112:7

homes
121:11

homicide
38:8 39:8
40:5 94:1
108:21
109:7
111:5

hood
58:19

hopefully
117:14

hopped
46:25
47:9

Hoskins
65:8

hostage
21:2 71:1
119:13
120:13

hour
55:9

hours
45:2 68:4
122:24

house
28:15
30:8,9,14

houses
121:10

how
7:16,21,
22 8:14
11:8,12
15:1,19,
22 17:13
23:2
24:14
27:16
35:1,11
36:18,20
37:7
42:5,9
43:19
44:8,9,18
48:25
50:11
53:2 54:3
58:17
59:20
61:16
66:1

69:15,24
70:7,8
71:13,14,
20 72:3
73:10
75:11
77:23
83:10,19
84:3
88:20
94:13
97:17
109:8
113:18
116:22
121:6,7,
10,12,13
122:1,2

However
103:14

human
68:14
72:8
111:23

hung
57:19,23
60:23

_____

I

IAP
108:21

idea
122:19

identifie
d
6:13
60:12

identify
87:15

if
6:12 8:8
12:24
16:1 18:5
19:4,21,



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

23 22:19
25:1,5
29:3,5,11
32:24
34:1
36:11
39:2
41:14
42:24,25
43:1 45:1
53:16,24
57:15,19,
22 58:1,
4,5,25
59:1
60:23
61:2
62:19,20,
22 66:9
67:22
68:24
70:25
71:9,10
74:4,18
77:10,17
81:7
83:12
84:9,13,
17 86:25
87:3
88:19
89:12
91:25
92:17
94:6
96:12
98:16
99:2
101:24
102:22
107:5
109:25
112:20,23
117:13,25
121:8,15,
16,22,23
122:4

**illegal**
38:14

40:21
41:8

**immediate**
101:6,7

**immediately**
76:5
99:15

**impact**
71:20

**implying**
119:22

**important**
21:23,25
22:4,7,12
47:14

**improve**
72:2

**in**
4:13,16
5:4,15,21
9:20
11:6,9,11
12:18
13:5
14:21,23,
24,25
15:3
16:15,21
18:14
20:20
22:13
23:10,14,
20 24:2
25:5,20
26:4
27:5,8,21
28:6,15,
21 29:25
31:4,18
32:10
34:4,25
35:4
36:2,3,8
37:25
38:2,11,

12,13,14
39:8,12,
14 40:21
41:8
42:16
43:20
45:11,21
46:6
48:15
49:13,15,
17,21
50:7,10
51:23
52:19
53:1,5,6
54:6,9,23
57:5,12,
18 58:1,
3,10
59:3,6,23
60:3,13,
22,24
61:19
63:2,12
64:17,22
65:2,18,
22,23,25
68:15
70:5
71:13
73:19,20,
23 74:2
75:16,17,
18 76:9,
10,11
78:1,18
80:5,8,19
81:12,16
82:3,12
83:11
84:25
85:3
86:3,4,13
87:23
89:10
90:10,16
91:15
92:17
93:1,5,
15,23

94:1,6,8,
21 95:7
97:6
101:21
102:4,12
103:5
104:5
105:5
109:3
110:25
111:2,3
112:5,16,
23 114:5,
7,10,20,
22 115:5,
25 116:8,
10,14
117:24
119:11
120:1,5,
6,21
121:2,10,
14 122:5,
7

**in-depth**
108:13

**incidence**
30:18

**incident**
30:18
31:17
39:20,21
40:8
41:2,4
50:12
54:13
68:15
69:11
70:10
71:15
73:20,23
83:12
84:3
85:25
95:19
109:13,15
113:16
116:7,20

117:2
119:1

**incidents**
39:13
115:25
116:4

**include**
92:16

**including**
98:23

**indicate**
88:8
93:12

**indicated**
38:5 93:3

**indicates**
81:1

**indication**
38:22
78:11
79:10
87:8

**indiscernible**
108:11

**individual**
20:20
21:23
24:21,23
25:1
29:25
61:3 89:6
120:3
122:7,9,
11

**individual's**
120:16

**individually**
72:3

**individuals**
29:6
39:7,14,
23 41:7,
25 47:5
52:18
54:9 59:5
60:8,12
83:1
92:19
93:16
105:5

**information**
7:20
37:6,23
45:11,12,
18 47:14
52:16
83:23
85:6 88:7
95:3
109:4

**informed**
41:3

**inhibit**
7:3

**insert**
56:21
57:12
58:22
60:20

**inserted**
56:20
61:12

**inside**
20:23
24:23
29:3,6,
19,24
37:24
38:6,20
39:24
40:10,20
42:1,4
47:10

Russell Backman                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
    57:22            interroga       investiga       18,21,23        10,21           24 115:16
    60:8 83:2        tories          tive            24:3,14         69:1,17         118:17,24
    86:7,12            114:24          14:14         25:3,7,8,       70:7,22         119:10
    92:19                              93:19         9,11            71:5,9,         120:9
    98:25            interrupt         105:12,       26:2,7,8        10,11,19,       121:9,12
    99:4              33:19,23         17,25         28:13           22 72:23        122:1,3,
    102:6                              106:10        29:24           73:4,20         13
                     intervene                      30:6,7,8,       74:2,15,
instance              22:22          involved        9,18,25        18 76:1         it's
    45:24                              35:2          31:13           77:12,23         5:24 7:9
                     into             37:25         32:1,3,8,        78:2,24         13:20
instead               20:25           38:13,14      12,20,24        80:2,3,10       14:12,20
    63:4              25:21           39:8,12,       34:17           81:11          18:12
                     29:20            14 40:21       35:22,24        82:4           20:2,17
insuffici            31:14,22         41:7          36:8,19,        83:12,16,       23:2,6
ent                  32:22           60:13          20 37:3,        19,21,24        24:8,24
    96:24            33:4             68:15          5,16           84:17,19,       25:1,8,
    97:9             42:20           70:5 72:8       38:4,9,         20,25          14,24
                     43:4            110:16          11,18,23,      85:3,4,13       26:13
intel                46:25                           25 39:3,       86:1,5,8,       27:16,19
    27:17            47:17          Isaiah           5,10,14        12,18          28:21
                     48:21            6:17          40:15           87:2,7         32:15
intellige            56:20,22        110:7          41:12,24       89:15,24,       34:23
nce                  58:6,7                         42:10           25 90:9,       37:1
    13:14,16         59:7            issue          43:14           16,24          44:23
    27:20            60:25            14:5          44:12,25       91:3,6,7,       46:3 47:7
    29:8             70:20            25:24         45:9            10 92:2,        50:15
    38:3,4           72:6 80:3        72:25         46:9,16,        13 94:6,        56:7,16,
    45:20            89:21            73:5          23 47:17,       9,19 95:6       17 58:17,
    54:11            110:5            114:4         19 48:14,       96:1,8          19 59:17,
    57:8,22          119:2,12         120:22        21 49:6         97:25          21,22
    60:8             120:11                         50:3,4,6,       98:6,10        61:2
    116:12                          issues          10,16           99:8,12,       63:4,5
                     intoxicat        14:6,15       51:6,13         18 100:4,       64:5
intending            ed               70:4 80:4     52:10,11        5,9,18,21      65:15
    87:3              116:8           81:11         53:2 54:7       101:10,        66:21
                                      101:14        56:16           11,17         68:17,19,
intense             investiga                      57:1            102:4,17,       25 71:1,
    114:3           te               it            58:11,12,        25 103:7,      23 72:8
                     14:17            8:21,25       19,20,21,        8,11,24       73:11
intent                               9:13,15       22,23           106:1,4,       78:23
    18:21           investiga         11:15        59:3,13,        7,25          80:20
    21:18           ting              12:1,17       16,22          107:6,24       85:21
                     105:6            15:8,22       60:15           109:19        89:16,17,
intention                             16:2          61:6,13        110:7          18 90:3,
    11:16,17        investiga         17:20         63:3,16        111:19         12,14
    77:9            tion              18:19,21      64:1            112:2,14       91:8,10,
                     37:17            19:1,5,24     66:19,23        113:3,11,       25 92:1,
interfere                             20:5,15,      67:3,8,22       21,25          5,7 95:15
    90:23           investiga         23 21:7,      68:3,9,         114:1,4,       96:22
                    tions             16 23:1,
interior             14:14            7,11,17,
    30:11
```

Russell Backman              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

97:20
98:1,2,21
100:6
101:10
104:1,24
108:9,10
113:25
114:2,3
118:15,21
119:8

**items**
37:21
45:23
50:24
111:2
112:13

**its**
74:19

**itself**
16:15
24:2,10,
24 28:20
31:17
37:19
38:9,13
40:20
45:22
48:23
52:17
56:14,20
57:3,15
58:3,23
60:9
61:1,4,11
63:7,8
64:14
65:7
89:11,12
101:4

---

**J**

**Jake**
33:6,10,
11 51:1
65:11

**James**
77:3

**January**
19:11
20:9

**job**
16:13
22:13
69:7
70:25
71:3,5
107:20
108:5

**jobs**
101:2

**join**
114:16

**judge**
23:25

**judicial**
106:24

**jump**
31:14

**just**
8:8 12:1
18:15
29:9
30:17
31:20
32:2
34:16
36:15
40:23,25
44:20
45:4,5
47:7
49:20
50:4 53:5
55:16,17,
22 56:16,
17 59:22,
23 60:5
63:5,9
66:9,10
68:4,19
70:12

71:12
72:14
77:23
79:6 80:9
83:21
85:13
90:12
91:19
94:15
96:11
106:4
112:25
114:4,20
115:3,19,
20
117:13,15

---

**K**

**keep**
32:5
60:25
72:16
94:19

**kept**
73:8

**key**
45:22

**kick**
46:10
119:11
120:10
121:4,9,
15,25

**kicked**
119:1

**kid**
59:1
111:25
112:4,18,
22

**kid's**
93:9

**kids**
42:25
43:12

45:13
48:21
112:7

**kill**
72:21
78:5
87:11
88:2

**kind**
16:3,24
17:12
21:7,8
31:13
32:2,9
34:21
35:22
36:7,18
37:7
47:17,25
50:17,20,
21 56:1
58:16
61:23
62:22
63:9 64:5
68:24,25
69:1
71:13
72:23
80:2
96:12
113:13
116:3

**kinds**
82:5

**knew**
15:17
33:4
39:13
42:6
53:21
57:14
102:20
103:24
104:3
108:4,17
110:23

**knock**
16:2
17:6,7
18:6
21:11,12
24:5 27:6
29:21
74:18
77:14
85:7

**knock-
and-
announce**
26:23,25
27:3,24
83:6,7

**knocked**
44:5

**know**
7:16,17,
18,21
10:21
12:7
14:16
16:14
18:16,22
19:18
20:1,18
29:25
31:15
32:19
34:14
42:18,21,
24 43:10,
19,21
44:8,9,18
45:1,23
47:14
48:2
50:1,9
52:24
57:6,19,
20 59:19,
24 60:25
61:15
63:25
68:19,21
69:3,17

70:18
71:23,24
72:2,15,
17 73:11,
13 74:3,
11 75:11,
15 77:17,
24 79:3
83:9,11,
12 84:6,
7,14
86:1,3,5,
8,9,22
87:1,3,20
88:20
90:3,11
91:3,4
94:13,18,
21 95:14,
22 96:2,
6,8 97:6
99:2
102:7
104:18,
23,24,25
105:1,9,
11
106:14,
16,17,18
108:14,18
109:8,10
110:12,
14,21,22
111:7
113:3
114:3,14
116:22
118:20
120:8,15,
16,22
121:10,
12,13,15,
22,23
122:2

**knowing**
40:20
52:19
74:11
80:18,19,

Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 145 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

21,23
96:2,9
97:17
99:10
101:24
102:5,11
105:4

**knowledge**
20:13
48:9
58:15
81:19
84:10
87:15
93:23
111:8,10,
13 118:5,
8

**known**
43:8
46:5,9,
18,19
101:24

**Konsten**
4:20

**Kubla**
65:10
76:4

**Kubla's**
76:20

_____

L

_____

**L-E-O**
6:4

**labor-
intensive**
114:1

**Larry**
116:19

**Las**
4:1,13,14
5:17 11:9
121:10

**last**
8:24
71:11

**later**
9:2

**Latia**
4:14
5:16,21

**law**
80:25
81:9 83:5
98:10

**lead**
13:2

**leader**
34:5,6,7,
12,18,23
103:15

**leading**
51:8

**learn**
72:6
95:19
109:12

**learned**
109:14
117:6

**least**
116:5

**leave**
69:21,24,
25 113:12

**led**
44:20

**legal**
4:18
74:17

**length**
69:16

**lengthy**
8:19

**Leo**
6:4

**less**
20:15

**lesser**
81:15

**let**
5:14
19:24
20:5 30:3
40:13
51:13
72:14
86:8
87:6,19
98:1,10
99:1
109:16
114:23

**let alone**
96:25

**let's**
51:18
61:20
94:19

**lets**
59:16

**letting**
57:19
68:21

**level**
11:18
15:21
17:15,21
23:16

**Levi**
65:8

**Lexitas**
4:20

**lieutenant**
51:17,24,
25 52:2,
3,7,9
53:8
54:20
55:6

56:11,23
60:1,3
107:10,
13,19
108:2,13,
20
113:17,24
118:11

**life**
68:14
72:8
111:23

**life-
threatening**
21:5

**light**
89:11

**like**
7:21
11:25
12:6 13:6
14:16,20
16:2,5,
13,22
17:1
20:13,14,
15 21:2,8
24:1 30:2
32:18
34:25
35:23
36:16
37:1,7
42:17,19
43:1,7
45:24
47:21
50:17
57:23
58:8,15,
17 60:5
61:1
62:13,19,
23 64:7,
16 68:16
69:1,11,
13,18,21,

22 70:3,
19 71:13,
16,17,18,
19,25
73:22
76:12,13
77:23
79:20,21
81:16
82:19
84:10
87:24,25
89:22
93:10,12
95:23
96:12
98:3,17,
18 100:5,
18 101:24
104:15
106:13
119:21,22
120:13

**likely**
20:8
38:20

**line**
63:2
65:3,5,9,
18 74:2

**lined**
66:1

**lineup**
65:23

**list**
9:3 68:2

**listed**
37:18,20
54:13
82:23

**listen**
28:6 77:6

**little**
19:25
20:5 21:7
23:19

28:8
31:14
41:1
51:18
55:8
59:12
63:10,11
71:9 73:4
76:3
79:16
80:2,3,10
83:20
87:7,20,
21 91:5,
14 99:20
115:4
119:5

**live**
120:9

**lived**
11:8 94:2

**living**
11:6
57:14,15

**load**
64:23

**loaded**
62:3

**loading**
64:21

**located**
4:12 25:5
30:9 37:1
40:10

**location**
64:14

**long**
7:16,21
11:8,12
15:1
44:18
50:11
69:15,24
92:2
118:16,21



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

121:6

**look**
20:1 30:5
36:16,23,
24 37:6,
20 44:11
46:22,23
65:14
70:18,19
72:2
89:12,13
100:5
115:14

**looked**
41:21,24,
25 42:5
100:18

**looking**
37:12,17
45:16
57:3,4
60:10
69:5
74:15
94:21
96:1
101:17
120:25

**looks**
37:7
58:17

**loop**
40:13

**lost**
99:15
101:5

**lot**
8:21
68:22
88:21
89:10
103:12,
19,20
114:1

**loudly**
86:6

**LRAD**
28:25

**lucky**
68:19

**LVMPD**
30:22
31:9
64:16
92:23
94:11
95:8 97:3
106:23
107:1,16
108:23

**LVMPD802**
89:2

**lying**
75:15

---

**M**

**M4**
62:16
63:4

**ma'am**
8:13
12:16
19:12
55:21
81:25
91:23
92:5
104:10

**Madam**
6:11

**made**
26:5,6,11
45:7,9
75:2
77:14
78:3
88:15,17,
21,22,24
108:3,15,
16 109:2,
3 112:9

117:7

**main**
102:17

**major**
13:18,20,
25 120:1

**make**
24:8
26:2,17
34:16
35:24
63:20
72:12
98:19
100:2,3,
19 103:8,
17

**making**
28:23
86:5
103:23

**males**
47:9

**man**
77:17
86:22
112:4

**management**
107:14

**manpower**
48:3
51:15

**manpower-
intensive**
114:2

**manual**
92:11
99:17

**manufactu
rer**
89:15,16

**many**
7:22

88:20

**March**
113:21
114:4

**mark**
6:12

**marked**
66:21

**marksman**
76:14

**matter**
5:16

**maybe**
20:2
44:17
71:8,11
84:19
106:4

**me**
6:11 7:12
11:4,15
12:17,21
15:2
17:6,11,
12,21
18:5,25
19:14,24
20:5 21:6
22:14
25:15
28:8 30:3
32:3,9
34:21
39:2
40:13
43:12
44:23
45:4,5,9
47:6,8,25
48:10,12
50:3,5
51:13,19
52:6 55:2
56:2
58:13,16
59:11,13

60:15
61:23
62:15
64:6,25
65:4
66:9,10,
19,24
68:1,24
69:1,6
70:18
71:22
74:21
76:2
83:20
84:8,9
87:5,7,
11,19
88:1,7
90:9
91:24
93:3
98:1,5,13
102:24
103:10
104:15,17
106:4
109:16
113:13,
20,24
114:23
116:4
119:20

**mean**
15:11
16:14
17:16
18:7,24
19:10
22:8
26:20
32:19
34:5,11,
22 45:17
46:11
47:5
59:19
60:18,21
62:18
64:5

65:15
68:19
70:10
73:17,25
76:7,10
78:25
79:2,4
85:23
87:24
89:8 91:3
95:10,13,
24 96:1,5
110:5,15,
16
114:13,14

**meaning**
73:20

**means**
17:6
18:19
24:6
52:25

**mechanics**
47:17
72:23

**medicatio
ns**
7:3

**meet**
7:25

**meeting**
8:4

**Melanie**
52:3

**member**
12:2
22:21

**members**
22:17
39:16,17
40:3
43:16
48:20
54:16
57:11



Russell Backman                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

80:19
88:3
97:17
105:9
121:1

memory
48:11
52:5 60:2
65:5 85:5
93:3

mental
70:3

mentioned
38:11

messages
118:10

met
7:14,22,
23

Metropolitan
4:15 5:17

middle
6:1,3

million-
dollar
95:9

mindset
120:16

mine
66:17

minimum
20:14

minute
66:11
76:4

minutes
7:24 29:2
45:2
117:15

misrepresent
98:13

mistake
117:7

mitigating
30:12

mixed
28:7

modified
71:18

modify
71:24
123:1

moment
123:8

money
116:17

monitor
4:10
38:16
40:8
48:18

month
69:18
84:13

months
14:1
69:19
70:1
84:18
94:4

more
9:1 34:16
40:16
71:19,21
76:3 79:7
80:3
83:20
93:18
102:25
108:12
112:18
115:4
119:5,20
121:2,5

morning
4:23

most
6:24
21:22
22:4,6,12
46:21
71:3
78:23,24
89:13
91:21

mother
52:23
60:11
110:14,
16,20
111:24

move
58:8
122:4

movement
28:22
29:19

moving
11:16
35:7

MP5
39:18
52:21

Mr
5:1,19
7:15,18,
22,23
8:1,5
26:18
67:21
70:12
74:22
75:5
76:24
77:13,15
79:9
86:16,20
88:8
90:17
104:21

109:12,14
110:13,
20,21
111:21
123:7,15

MS
4:23 5:13
6:10,14
9:12
26:21
32:7
34:10
55:8,15
66:9,18
67:5,8,
11,24
70:14
71:7
77:1,19
86:23
112:12
117:11,22
123:6

much
43:19
44:8,9,18
70:21

multiple
99:18

murder
37:16
53:10
57:6,9
60:10,14
87:3
99:11
102:7
105:7
106:17
110:8,11
111:13
120:25
121:1

murderer
80:7,14
82:15
99:11

105:6

Murphy
4:23,24
5:13,19
6:10,14
9:12
26:21
32:7
34:10
55:8,15
66:9,18
67:5,8,
11,24
70:14
71:7
77:1,19
86:23
112:12
117:11,22
123:6

muzzle
69:6 76:7

my
4:18 5:19
6:23 8:7
13:24
16:1 20:1
26:15
27:8,14
37:15
39:2
40:13
44:7,16
49:13
52:24
53:21
67:4 69:7
70:21,24
71:3,5,6
72:4 77:6
79:5,18
83:9
85:23
87:21
88:1,4,6
91:5
94:24
95:17

96:4,10,
16 97:14
100:11,17
104:16
112:4,5
116:14,22
117:15
118:22
121:22
123:4

myself
65:12

_____

N

name
4:18
5:19,23
6:1,3
116:22

names
28:7
48:16

narcotic
15:19
38:10
53:3,17

narcotics
13:12
14:19,25
15:1,4,
12,23
40:4,5
43:14
52:23,25
80:20
81:23
97:13,16

National
84:2

necessarily
60:21

necessary
56:4 57:1



Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 148 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**need**
32:4 34:8
42:18,24
67:19,21
72:16
74:3
113:3
115:14
123:14

**needed**
61:3
122:5

**needs**
35:9

**neither**
110:11
111:13

**Nellis**
62:8
92:21

**Nevada**
4:1,13,17
7:10
17:18
83:5

**never**
15:17
43:12
63:13,22
72:13,17
76:10
78:19
79:23
87:8

**new**
81:20
85:6

**next**
62:2
85:24
116:16
117:9
119:12

**nine**
56:9,14,

19 59:14,
15,16,22,
23

**no**
6:21 7:1,
6 8:3
9:21,24
10:2,7,11
11:16,17
12:8,10
16:7,9
17:1,2,4
18:22
20:3,17
24:7,13,
15,17
26:15,20
27:4,12
29:11
33:23
35:17,19
39:11
40:17
41:24
56:16
59:10
63:15,17
67:18,23
70:6 71:6
76:22
79:15
82:15,19,
20 85:9
87:8
93:4,5,23
97:19
100:16
103:21
111:8,11
115:21,24
117:1
118:7,8
122:20
123:2,7

**no-knock**
22:24,25
23:6,10,
11,14,23
24:4,6,8,

11,18,20,
25 104:9,
13 105:14
106:8,22
107:3
112:15

**nodding**
14:7

**none**
69:5
111:2

**nonforcef
ully**
99:2

**normal**
10:15
56:17

**not**
6:23 7:18
9:24 17:4
22:15
24:13
25:6
28:21
29:3
30:13,23
31:9
33:19
34:1,2
40:10,22
43:6
46:4,13
51:25
52:1 59:2
60:20
63:15,16
68:25
71:9 72:3
77:18
82:20
86:11,17
90:17,19
92:14,22
93:6,16,
20 94:8,
11 96:2
98:13

100:1
101:5
102:13
105:13
107:11,
16,18,19
108:22
110:8,11
111:9
112:18
113:4,14
120:4
121:14

**notes**
117:16

**nothing**
110:23
116:20

**notice**
6:6 21:17
74:19

**noticed**
46:16

**notificat
ion**
32:11

**notified**
18:20
40:24

**notify**
21:13,14
51:24

**notifying**
86:2

**now**
4:8 11:1
13:20
14:3
30:25
31:12,14
46:6
47:16
65:13
72:9
74:11,15

77:5 94:5
96:1
97:17
101:18
102:11
111:11
115:19
122:23

**NRS**
18:12,13,
15,19

**NTOA**
83:25
84:1

**number**
4:16,24
5:18
18:16
29:5
65:10,11,
12,13,14,
21 79:21
115:6
116:1

**numerous**
43:15
92:16
112:3

**NV**
119:11

─────────

**O**

─────────

**O'DANIEL**
52:4,8,9
53:8
54:20
55:6
56:11
107:10,20
108:2,13
113:18,24
118:11

**O'Daniel'
s**
107:13

108:20

**oath**
55:17,19

**Objection**
26:18
77:15
86:20
111:21

**objective
ly**
97:20

**obtain**
11:25

**obtained**
106:8

**obviously**
13:5
17:17
23:24
25:18
42:13
45:17
48:13
59:2 64:6
72:19
73:8 79:4
85:23
94:12
101:8
108:6
111:16
114:15
117:1

**occasions**
44:14

**occupant**
97:10

**occupants**
21:13
86:7
96:24

**occupied**
47:15

**occurred**



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

12:19

**October**
4:2,10
123:11

**of**
4:4,9,17,
25 5:15,
16 6:6,17
8:21,22
9:3,25
10:5,10,
15 11:16,
18 12:2
13:22
14:13,23
15:9,19,
23 16:3,
15,20,24
17:12,18
18:10,24
19:6,7,
10,17
20:8,12,
14,15,17,
19,24
21:7,8,
10,11,12,
14,16,18
22:11,16,
17,21
23:1,2,
13,22
24:10
25:15,17,
19,25
27:20,23
28:7,12,
15,16,17,
18,20
29:13
30:23,24
31:10,13,
17,24,25
32:2,9
33:2
34:4,21,
25 35:8,
22 36:3,
7,11,14,

18,24
37:1,7,16
39:13,15
40:7,19,
24 41:6
42:15,16,
17 43:3,8
44:4
45:21
46:1,2,6,
13 47:11,
12,17,25
48:9,11,
25 49:16,
17 50:7,
17,20,21
51:3,6,9,
11,20
52:5,14,
18 53:9,
14,15
54:18,19
56:1
57:9,22,
25 58:9,
15,16
60:1,3,8,
11,12
61:23
62:22
63:1,3,4,
9,12,18,
22 64:5,
16 65:6,
15,16,23,
25 68:2,
4,15,20,
22,23,24,
25 69:1,
4,5,16
71:13,16
72:5,6,7,
22,23
73:19,20,
21 74:19
75:7,18
76:11,14
78:1,15
79:11,17,
21,25

80:3,4,5,
12,15,16,
23 81:1,
10,11,13,
15 82:5,
13,21,22,
23,25
83:2,18
84:6,9,24
85:3,4,5,
11,15
86:4
88:9,16,
21 89:4,
10,15,23
90:2
91:14,20,
21 92:13,
14,16
93:1,2,7,
15,24
94:13,19,
22,23
95:8,20
96:10,12,
16,19
97:16,19
98:22,23
99:14,15
100:17
101:5,9,
13,14,18
102:4,14,
16,18,20
103:12,
18,19,20
104:6,11,
19 105:5,
8,22
106:3,6,
13,14,15
107:12,
14,15
108:4,13,
17,21,22
110:8,11,
22 111:2,
10,13,18
113:13,
15,16

114:1,17,
20 115:7,
12,16,22
116:3,5,
8,14,18
117:3,8,
23,25
118:5,8,
10,25
119:10,18
120:7,20,
25 122:24
123:3,10,
14

**off**
10:18
13:6
32:1,13
33:9 51:2
55:10
56:9 58:4
59:16,23
65:23
66:2,10,
12 72:14
78:3
84:16,17
88:16
90:20
108:4
113:12
117:15,17
122:15
123:11

**off-duty**
116:7,10

**offenders**
13:20

**office**
8:1

**officer**
9:6,10,19
10:4 13:6
16:14
22:14,22
65:8,10
74:19

76:4,22
87:17

**officer's**
21:18

**officer-involved**
6:16
12:19
70:5

**officers**
12:7
22:20
25:3
28:17
33:13
71:17
78:13
79:11
81:6 84:2
86:18
87:4 88:9
99:14
102:4
116:18

**officers'**
10:6

**official**
83:10

**omitted**
107:13

**on**
4:8,10,24
12:15
13:7
15:2,3,22
17:21
19:18
20:2,9,18
23:8,22,
23 24:3,
11,14
25:1
26:22
27:2,15,
18,19
28:8,13,

15,17,18,
19 29:2,
7,14
30:1,12
32:11,15
33:2
35:11
37:18,20
38:8
41:2,4,6
43:19,24
44:5,20
45:11,25
46:7,10
47:2
48:18,23
49:8,10,
12 50:11
51:3 52:9
54:13
55:3,7,
13,18,24
56:5,6,9
58:20
60:21
61:3,6
62:3,7,
11,15,25
63:1,2,8,
13,15,16
64:4,7,
10,13,21,
23 65:16
66:15,24
67:6
69:21,24,
25 70:10,
22 71:5,
10,20
72:2
73:10
74:5,6,8
75:15
76:3
79:19
80:11,23
81:2,13,
22 82:16
83:21
84:4,20

Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 150 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

88:11
89:2 90:8
91:17
93:6,8,
11,19,20
95:17,20
98:22
100:4,9,
22 101:1,
9,12,17,
25 102:8,
10
103:13,19
104:1,3,
14 105:1,
9,10,12,
13,16
106:3,6,
10,11,14,
16,17,21
107:19,
21,24
108:7,8,
24 109:10
113:10
115:16
116:25
117:1,20,
24 118:2
119:23
121:7,12
123:10

**once**
28:19
46:14
121:5

**one**
8:9 10:21
16:22
18:12
19:2 22:3
34:9,16
36:17
38:16
39:15
40:7 41:6
42:3
50:16,18,
19,20,22

59:8
60:11
65:10
66:21,25
67:22
72:22
73:9
76:13
78:17
79:7 80:4
81:9,11
88:17
98:1,5
100:4
101:11,
14,18
102:14,
17,18,25
109:10
110:11
115:10,25
116:1,9,
16,18
117:3,8,
9,23
118:25
121:3
123:8

**one-bath**
97:13

**one-bedroom**
97:12

**ones**
60:13

**ongoing**
70:3

**only**
36:3
42:11
77:6
86:12
104:16
106:22
107:2

**open**
47:1

75:6,8
78:12
89:3
96:22
99:14
100:6
101:11
103:25
106:21

**opened**
73:15

**opening**
114:8

**operated**
96:17

**operating**
49:14
58:23
61:6
118:2

**operation**
49:16,18
50:7
56:10
62:25
63:3 74:6

**operational**
35:4

**operationally**
35:5

**operations**
64:21
119:23

**operator**
61:3
63:7,8

**operators**
92:12

**opinion**
27:5,8,
13,14

70:25
71:5,10
88:1,4
91:17
94:9,16,
22 99:23
103:18
107:24,25
108:24

**opinion-based**
98:3 99:6

**opinionated**
108:6

**opinions**
104:18,19

**opportunity**
104:16

**option**
102:1
106:1

**order**
23:14,20
25:20
51:23
57:12
59:3,6
60:3,22
116:14
122:5

**organizations**
12:3

**organized**
116:11

**other**
8:4,14
10:3,5
13:6
14:24
16:14,20
22:19
27:15

39:13
71:17
73:21
76:16,19
79:9,11
86:13
96:6,7
97:6,7
103:21
104:5,15
110:10
112:4,13
113:1
120:21
122:22

**otherwise**
81:17

**ought**
46:17,19
74:12
103:1,3
105:18,20

**our**
28:14
29:9,10
47:15
48:3,4
62:6
64:22
65:7,9
75:2 86:2
120:8

**out**
10:23
13:22
32:3
33:13
35:21
36:11,15,
22,23
42:19,21,
24 43:2,
22,23
44:2,3,
13,14
45:1,5
57:13,16,
18 58:21

60:22
61:10,17
68:23
69:7
74:4,8
76:11
80:10,25
84:6
86:2,4
93:4,7,9,
16,20
94:15
95:21
112:3

**outcome**
72:7

**outer**
28:12

**outlined**
115:5

**outside**
79:11

**outstanding**
53:11
105:7

**over**
21:7
35:22
37:21
44:4
50:1,2
83:17,19,
21,24
87:21
114:23
117:7,8

**overload**
89:5

**overpressure**
89:11

**overwhelm**
25:21
99:16



Russell Backman        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**overwhelming**
101:9

**owner**
116:24

---

**P**

**p.m.**
4:3,11
55:11,14
66:13,16
117:18,21
123:12,17

**PA**
28:24

**page**
81:9,10
89:2 92:7
96:22
106:21
107:9
115:17,
20,21
119:8

**pages**
8:10,24

**paper**
80:11

**parameter**
20:15

**parameters**
17:21,25
19:14
20:25
25:18

**part**
10:15
14:23
15:9,19
19:17,23
21:16
25:25
27:24

28:12
33:1 39:1
53:15
54:15,18,
19 71:11
73:24
80:12
82:13
84:24
85:3
89:14
92:7
95:20
96:10
99:13
101:13
102:16
106:17,18
115:16

**partial**
11:24

**participate**
84:25

**participated**
85:3

**particular**
73:24

**partners**
112:5

**parts**
33:10

**patio**
93:11

**patrol**
13:6,17,
23,24
14:4
116:13
117:2

**pedal**
72:14

**pejoratively**
87:24

**people**
25:21
29:20
32:3
38:10
50:23
57:4
78:24,25
86:12
89:13
95:13
97:14
101:1
102:3
103:21
118:24
120:9,15,
21

**peoples**
103:18

**per**
43:11
52:1
99:17

**performing**
22:13

**period**
13:17,23
36:12

**peripherally**
32:9

**person**
27:21
90:5 99:9

**person's**
21:17
104:1

**personally**
70:13,14,

18

**personnel**
48:3

**phone**
29:5
32:12
37:19
51:3
52:10
82:18

**phonetic**
116:19

**physical**
45:22,23

**picture**
110:22

**pie**
96:14,17

**piece**
120:19

**pinned**
40:7

**place**
5:15
28:14,21
43:16
76:13

**places**
86:13

**plainclothes**
14:12,20

**plaintiff**
4:25 5:20

**plan**
29:4,10
35:11,13,
14,21
36:8,13
37:10,11
51:4
54:14
74:9

**planned**
42:14

**planning**
35:3
48:25

**plans**
35:6

**plate**
46:10

**play**
20:25
66:7

**played**
67:2,10

**please**
4:21 5:4,
22 6:12
7:7,12
12:21
17:5 32:5
34:16
42:21
119:6
123:15

**point**
36:2
53:13,15
57:16
64:17,19
65:25
86:11
87:23
100:3,17

**pointed**
69:6 76:6
94:15

**police**
4:15 5:17
13:7
21:18
22:14
86:6,18
87:3,16
88:9
90:24

**91:2,8**

**policies**
30:22
31:9

**policy**
52:1
64:16
92:23
94:10,22,
25 95:8
96:17
107:1,17
108:23
117:1
118:1

**policy/training**
92:22

**poor**
120:20

**poorly**
16:2

**Portion**
107:13

**ports**
59:16,22

**position**
12:12,18
14:21
34:22
37:8 72:4
75:16,18
98:21
100:21
107:21,23
108:24
114:11

**positioned**
78:1

**positioning**
30:6



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

positions
  12:22,23
  13:4 25:4
  28:15
  109:4
possession
  116:8
possibility
  42:8
  53:22,24
  78:7,8
  86:16
  91:10
  102:6
  105:12
possible
  71:4
possibly
  24:23
  25:4
potential
  38:2
  48:15
  75:22
  119:13
potentially
  30:1 38:5
  45:15
  52:20
  57:5
  120:12
Powerpoint
  83:21,22
Powerpoints
  83:23
Prayed
  112:18

preapproval
  106:24
predicate
  109:16
predicated
  81:13
prefer
  11:2 63:8
preparation
  7:14
  33:10
  114:22
prepare
  7:13 8:1,
  5 9:4
  68:5
prepared
  23:9
  70:21
  72:13
presence
  18:20
  21:14
  86:2
present
  42:25
  43:1
  45:13,14
  49:7
  92:19
  96:23
  111:3
presentation
  85:8,12
press
  22:11
prestigious
  114:14

pretty
  8:18 78:4
prevails
  19:2
prevent
  91:7
previous
  80:23
  119:23
previously
  80:22
pride
  12:7
prior
  9:6
  12:22,23
  14:21
  24:6
  25:21
  37:25
  39:12,19
  40:3,14,
  24 41:2
  43:8,10
  48:19
  51:11
  52:20
  53:16
  54:12
  58:24
  83:3 86:5
  88:15
  91:1
  99:18
priors
  57:10
privilege
  7:19
privileged
  7:20
probability

53:25
54:2,8
probable
  40:23
  41:5,6
  104:20
probably
  7:24
  22:12
  44:12,24
  68:16
  92:3
  103:19
  106:18
  109:18
problem
  67:18
problem-
solving
  13:9,10
  14:11
procedure
  96:17
  118:2
proceeded
  64:13
process
  23:1,19
  28:24
  51:20
  76:3
produce
  89:4
  115:6
product
  53:4 54:3
production
  114:25
  115:6
products
  54:4
provide

profession
  12:4
professional
  12:3
proficient
  71:4
progressives
  29:9
promoted
  13:22
propensity
  20:19
  40:19
  52:18
  53:9 83:1
  105:8
  120:24
proper
  83:6,7
  107:11
property
  14:18
  41:20,23
  42:11
  92:12
  116:24,25
property-
only
  24:12
  38:23,25
  104:12
protect
  53:4
  54:3,4,5
  86:13
protects
  86:11
provide

7:4
  57:21,22
  79:10
  118:14
providing
  118:10
psychological
  70:4 89:4
psychologist
  69:12
public
  22:17,21
pull
  66:11
  73:25
  74:7 98:1
purpose
  21:11,12,
  15 25:15,
  17,19
  57:25
  58:9
  74:19
  85:10,11
purposes
  43:5
  49:20
pursuant
  43:11
  105:24
put
  28:17
  35:6
  36:13,19,
  20 48:4
  69:21,24
  84:20
  88:18
  90:7
putting
  35:5 37:4
  102:4



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**Q**

---

**qualify**
 111:18,19

**quantify**
 90:3

**question**
 15:7 16:2
 17:11
 19:25
 24:2
 26:15
 34:24
 35:18
 40:14
 44:7,16
 62:21
 71:8,21
 79:6
 85:24
 87:20
 88:6 91:5
 95:9,10
 99:6
 108:6
 109:17
 121:22

**questions**
 6:24 11:1
 17:14
 31:21
 122:22
 123:4,7

**quick**
 119:7
 122:4

**quite**
 92:2
 118:23

**quote**
 89:3,6
 92:24
 96:23
 97:1
 99:14,19
 106:22,24

---

 119:7,16

---

**R**

---

**R-U-S-S-**
**E-L-L**
 5:25

**radio**
 64:11

**rake**
 61:7,8,14

**ram**
 73:9
 100:4

**rammed**
 78:12

**ramming**
 73:9

**ratherly**
 122:4

**read**
 8:7,20,
 22,25
 9:5,14
 10:5
 31:16
 50:10
 74:17
 81:3
 91:14,19,
 21 92:3,6
 96:21
 98:17,18
 101:12,14
 119:7

**reading**
 38:21
 73:7 89:1

**ready**
 64:20
 100:6

**real**
 21:8

---

**really**
 17:10
 19:16
 39:5
 77:8,11
 87:25
 90:7
 98:19
 100:22
 121:20
 122:6

**rear**
 28:17

**reason**
 6:22 7:1
 60:16

**reasonabi**
**lity**
 80:5

**reasonabl**
**e**
 18:10
 19:6
 20:11,17
 78:14
 79:17
 80:13
 81:1,12,
 14 85:15
 97:19,20
 99:8,12

**reasonabl**
**eness**
 82:22

**reasons**
 42:15
 118:25

**reassess**
 74:8

**recall**
 19:23
 32:24
 43:25
 44:1
 85:16

---

 116:17

**recalling**
 47:7

**received**
 19:21
 38:8
 52:16
 83:4
 116:10

**recently**
 101:15

**recess**
 55:12
 66:14
 117:19

**recessed**
 66:1

**recollect**
**ion**
 115:13

**recon**
 33:2,12,
 14 35:20
 36:23
 37:5
 46:14,24
 47:12
 52:15
 93:4,8,
 13,21
 95:21
 105:9

**record**
 4:8,22
 5:14,23
 7:8 20:2
 24:3 28:9
 29:15
 34:15
 55:11,14
 66:10,13,
 16 81:8
 83:9
 117:18,21
 123:12

---

**recorded**
 8:11 9:14
 88:25
 101:22
 102:13
 104:6
 117:24

**recovered**
 39:21
 80:22
 111:9,11

**refer**
 44:11
 83:8
 109:1
 119:5

**reference**
 94:1

**referring**
 119:25

**reflect**
 5:14

**refresh**
 85:13
 115:13,15

**refuse**
 74:22,24
 78:13
 79:12,13

**refused**
 74:20

**regarding**
 52:8
 115:7
 118:11

**regardles**
**s**
 70:25

**related**
 12:3 70:4

**relations**
**hip**
 105:5

---

**relative**
 65:19

**relayed**
 45:3,5
 85:6
 94:24
 95:2
 108:3

**relevant**
 47:13

**reliable**
 7:4,5

**relied**
 70:22

**religion**
 22:11

**rely**
 100:22
 101:1

**relying**
 45:11

**remained**
 81:8

**Rembert**
 38:13,15,
 19 39:25
 40:21
 41:7
 48:19
 104:21

**Rembert's**
 40:4
 52:23
 94:1

**remember**
 68:3
 84:21
 115:12
 119:4
 122:8

**removed**
 39:18

**repeat**
 13:19



Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 154 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

50:5

**repetitive**
59:17

**rephrase**
35:23
71:22

**report**
8:17,18,
20 27:17
44:12
50:10
81:10,12
91:15,21,
25 93:6

**reporter**
4:19 5:4
6:11 9:8
32:4
34:8,17
123:13

**reports**
73:7

**reposed**
75:16

**represent**
4:20,22
5:20
80:25

**request**
51:23
54:21
115:5
116:1

**requested**
51:16
107:14

**requesting**
51:20,21

**requests**
114:25
115:9

**requiring**
6:9

**rescue**
71:1

**residence**
28:17,18,
20 30:14
37:24
56:21,22
86:12
99:19
102:6
120:21

**response**
29:3,11
81:6
102:16
115:5,25

**responses**
114:21

**rest**
65:16
68:20
94:19

**reticent**
81:8

**returned**
116:13

**revealed**
113:20

**review**
8:16
117:15

**reviewed**
8:17 10:1
68:2,5,9

**reviewing**
8:15

**rhythm**
59:23

**rifle**
39:18

**right**
11:18
12:11
16:17
17:24
18:17
21:17,23,
25 22:10
25:11
26:10,13
29:20
31:12
34:15
39:1,3
40:8 41:3
43:4 45:3
47:16
54:25
59:1
61:20
63:25
67:4,9
68:10
72:19
73:23
76:24
77:6
78:18
80:18
82:7,25
84:19
90:6
91:12,25
92:6
94:17
95:1
96:14,15
98:4,15,
16 99:2,
24
100:12,22
102:12
107:5
111:11
112:25
113:11
115:2,19
117:11,13
123:6

**rights**
22:16,21

**robberies**
14:18

**role**
34:25
49:2,10,
13 51:10

**roll**
110:4

**rolls**
53:2

**Ronetti**
116:19

**room**
57:15
58:7 61:1
75:18
90:10
110:5
112:5

**Roth**
76:25
118:17

**Rothenburg**
76:24

**rounds**
69:4
76:5,13
78:2

**route**
49:1
64:13

**rule**
42:18,21,
24 43:2

**ruled**
93:4,6,
16,20

**run**
12:21
58:6

82:3,10
113:18,21

**Russ**
11:4,5,6
55:16
68:1
80:24
91:13
92:25
101:12
107:18
113:3
117:23
118:9,23
122:21,23

**Russell**
4:4,9
5:7,15,24
11:3
123:10

---

**S**

**safe**
26:3,5,6,
11,17
29:24

**safely**
59:7
89:20

**safer**
102:2

**safety**
25:24
120:22

**said**
20:11
33:11
36:20
38:9
41:14
50:5,19
52:23
53:21
64:11
77:21

78:19,25
80:20
82:13
84:13
94:3
95:3,22
96:11
102:13
104:5,15
106:4,14
115:22
118:1

**Sam's**
47:18,20,
24 61:25

**same**
12:18
44:25
60:17
85:21
107:5

**sat**
35:15
36:12
45:1
50:18
85:4
122:23

**Saturday**
32:25

**saw**
32:1
76:20,21
87:5 99:9
103:8,11,
22,24
104:3

**say**
18:15
24:14,15,
17 25:7
32:9
34:1,4,11
36:7
40:17
41:23,24
44:12



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

47:3 50:3
53:19,24
54:2
72:11
73:16
75:9,17,
19,24
77:11
78:22,23
79:15
87:10,15,
18 90:7,
17,19
92:4,5
93:8,18
94:16
95:15
96:18
99:24
103:10,
11,19,21
104:19
122:4

**saying**
36:18
50:1 79:9
87:25
94:2
96:16
98:12
100:7
106:1

**says**
79:24
94:6

**schedule**
10:16

**school**
113:4,7,
15,21
114:2
118:3,7

**screenshots**
118:10

**search**
14:23

15:10,19
17:17
18:21
19:8
21:14
22:25
23:7,10,
11,14,15,
20,23
24:12
30:15
33:5
37:12,15,
16,18,21
38:9,12,
21,22,23,
25 41:20,
23 42:5,
9,11
44:21
49:13
51:9,11
54:7
55:4,24
57:2 70:9
71:1,14,
20 78:15
80:6 81:2
82:16
83:3 86:7
91:2
92:21
94:6
97:1,5
104:9,12
106:3,6,
23 107:5
108:21
109:23
111:1,3,6
118:13

**searched**
37:22

**second**
66:25
90:11
98:1,5
115:16
122:7,8

**seconds**
79:21
81:5
90:12
96:24
97:9,17
98:22,24
99:5

**section**
13:11,12,
14,17,19
23:8 52:1
92:10
93:20
94:22,23,
24 98:9
108:19
113:19
116:12

**see**
22:19
58:25
71:24
76:7 93:9
100:13,18
103:9
104:4
120:8
122:3

**seeing**
28:22
73:7 74:2
103:10

**seeking**
80:6 81:3

**seem**
24:1

**seems**
98:3

**seen**
6:6 43:12
74:10
76:20
78:24
79:23
82:5,8,10

110:22
115:1
119:10,22
120:8,9
121:2,4,
24

**self-explanatory**
59:12

**sellers**
53:3

**sensory**
89:5

**sent**
47:8
95:21

**sergeant**
11:3
12:13
13:23,25
15:24
23:17
29:14
33:7,8
36:3
49:12,17
50:6
65:13
76:21
77:5
103:15
117:2
120:2

**sergeant-in-training**
33:7

**serious**
121:21

**serve**
14:22
15:20
18:21
21:13

30:15
31:10
33:5,12
35:11
44:21
70:9
71:20
78:15
92:20

**served**
15:10,18
32:20
40:15,18
42:8,9
97:5

**service**
108:22

**serving**
17:15,16,
22 19:8
25:3
42:16
43:8,10,
20 62:20,
22 71:1
91:2

**set**
25:8,9,12
28:21
90:14
97:20

**setting**
79:3

**Seventh**
4:12

**several**
13:8 29:1
43:21
44:13,14
47:9
50:10
119:18

**sheet**
27:17

**shifts**

44:17

**shoot**
76:12
87:10
104:23

**shooter**
104:21

**shooting**
6:17
12:6,19
26:14
37:25
38:14
39:12
40:21
41:8 70:5
78:5 87:5
88:10
90:20
104:20,
23,25

**short**
55:9,16

**shot**
26:8
72:20
75:20
90:21
110:4
112:3,10,
11,19,23

**show**
97:25
114:23

**showed**
48:3

**sic**
122:4

**side**
23:17
28:18
65:24
66:2
93:19
101:10

105:13,25

**signed**
23:24

**similar**
41:21
59:21

**simple**
96:13

**since**
11:11,14
70:2
109:13,15

**single-
story**
30:6,8

**sir**
9:9

**sit**
6:22 20:7
27:1
30:22
31:8
43:18
44:24
46:3
48:11
52:6
77:12
79:18
87:14
88:6
98:21
99:21
103:10
106:2,25
109:11,18
110:6,13,
25 111:17
113:6
118:4
122:18

**sits**
30:25

**sitting**
36:6

112:1

**situation**
21:2,4
103:5
119:14,
19,21
120:13

**situation
al**
27:19
29:7 63:5

**six**
65:14
96:23
97:8,17
98:22,24
99:4,5

**size**
80:16
82:25
98:23

**skinny**
121:19

**skip**
91:13

**skipping**
87:20

**sleep**
76:9,12

**sleeping**
75:11
77:21,24

**slice**
96:16

**slow**
34:9 74:8

**small**
52:11
93:9

**SME**
97:23
99:23
108:7

**SMES**
94:12
98:6,7
103:18
107:10

**some**
10:25
11:20,21
14:6
16:20,24
17:12
25:18
27:15
28:7 30:4
31:21
54:24
71:16
80:25
83:13
85:4
88:16
91:14
93:2
95:18,24,
25 105:4,
10 106:18
114:20
118:10
121:20,21

**somebody**
24:20
25:2 44:3
58:1,13,
25 60:24
61:2 73:9
74:3,4
82:2,10
89:18
90:13
91:7
104:23
108:7
114:11
120:23
121:4,24
122:14

**somebody'
s**

90:23

**someone**
18:10
121:17

**something**
21:3
46:17
58:2,5,8
59:2 61:1
74:5
79:2,3
81:15,20
93:10
120:13

**sometimes**
35:23
53:6
80:10
98:17
120:5

**somewhere**
50:15
74:5

**son**
110:17

**soon**
84:3

**sorry**
7:20 9:8
15:14
25:12
30:18
31:6
33:17,21
34:14,24
40:25
46:12
47:3,5,6,
23 50:1
51:13
52:13
61:21
62:10
63:6,9
68:3 71:8
73:19

76:22
77:3 80:8
87:11,19
113:15
115:20,
21,24

**sought**
111:2

**sound**
66:24

**South**
4:12 62:8
92:20

**space**
115:4

**speak**
9:9 51:1
77:7

**specializ
ed**
16:10,15,
18,23,24

**specific**
43:25
83:8
84:11
88:19
90:8

**specifica
lly**
30:17
43:23
46:8
106:11

**specifics**
106:16

**speech**
22:11

**speed**
99:16
101:9

**spell**
5:22

**spelling**
116:19

**spent**
13:13
44:9,19

**split**
15:8

**spoke**
51:3 52:9

**spot**
102:20

**squad**
15:21
43:22,23

**squirting**
74:4

**stack**
65:7 86:3
117:25

**standard**
18:7,8,9,
11 19:2,
6,16
62:17,18,
19,24
69:17
118:1

**standardi
zed**
92:23
94:11
107:16
108:23

**standards**
20:9 95:8

**stands**
44:8

**start**
12:24
13:1
28:24
29:10
31:15
37:4



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

started
13:5 62:7
64:9 76:5
78:3

starting
64:20

startled
76:11

state
4:21 5:22
7:7 17:8,
15,18,21,
25 18:7,
11 19:3,
15 29:15

statement
8:7,12,15
9:5,13,
14,15
10:4 21:8
31:16
34:16
38:7
63:21
88:24,25
89:2,3
93:25
94:19
101:4,13,
15,21,22
102:13
104:6
107:22
116:13
117:24
119:10
120:1

statements
102:14

States
4:17

stayed
94:3

staying
92:17

93:23,24

stepmother
40:4
60:11
80:20
94:2

stick
55:7
56:6,10,
18,20,22
57:1,12,
25 58:10,
11,16
59:9
60:4,17,
20 61:13
89:17
107:12

still
12:15
24:2 28:7
36:12,19
44:7
55:18,19
85:21
112:4,6,9

stole
116:17

stop
22:22
66:6 67:8
89:19,21

stopped
67:4

stops
52:20
54:12
80:23

straight
87:13

Street
4:13

street-
level
14:19

strong
73:11

structure
15:22
20:23
24:7,10,
24 25:20
26:1,2,4
28:12,20
29:19,24
30:14
36:24
37:8
39:25
40:20
42:20
45:22,24
47:12
48:14
52:17
57:3 58:7
80:16
82:25
86:4
97:12

structures
120:7

stucco
119:2,12

stuck
99:17

studies
12:1

studs
121:9

stuff
14:19
35:24
37:1 43:7
62:13
83:2,18
85:21

95:23
96:6,7
105:10
114:20
121:20

stun
55:7
56:6,10,
18,20,21
57:1,12,
25 58:10,
11,16
59:9
60:3,17,
20 61:13
89:5,7,8,
9,16,17
107:12

stunned
89:14
90:22
91:7

style
39:18

subject
92:13
99:17

submit
96:25

subsequent
83:14,16

success
111:19
112:1,8

successful
111:24

such
22:15

sufficient
28:19
75:5

78:10
97:10
98:24

sufficiently
30:13
52:17

Sunday
32:21,25

supersedes
19:3

supervision
109:6

supervisor
10:12
15:23
23:13

supposed
39:23
43:2

sure
35:24
42:22
46:16
63:21
67:15
72:12
94:4
98:19
119:7

surprise
99:16
101:9

surprised
9:20

surround
28:3,5,
10,11,12
29:23
30:2
83:17

107:7

surrounding
86:8

surveillance
43:13,14,
19,22,24
44:2,5
45:5

surveilling
44:10

suspect
25:4
37:24
53:10
57:6
60:10
99:11
102:7

suspected
81:6

suspects
38:2,6
39:11
45:15
46:24
47:3
54:13
110:8,12
111:14

SWAT
12:13,15
14:2,22
16:14
19:17,21
23:8,16
31:1 32:1
36:3
50:11
51:17
56:24
63:8,13,
15,16,19,
23 64:22

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

83:11
92:10,11
93:20
105:13
108:22
113:4,7,
10,15,21
114:14,16
118:3,7
119:18

**SWAT's**
92:20

**swear**
5:4

**sworn**
5:9

---

**T**

**tactic**
15:15,16
25:14,18,
19,25
29:18
30:21
63:1,17,
19,22
85:21
95:5
101:23
102:1,2,9

**tactical**
37:8 43:5
49:18
62:6,9,11
64:21
73:16,18,
24 74:6,
12 84:2
100:23
102:20
103:1,8
107:15

**tactics**
71:6
92:23
94:11

107:14,
15,16
108:23

**take**
20:21
24:23
25:21
27:22
29:20
30:1 43:4
45:18
55:9 59:7
67:12,17,
19,21,22,
25 72:5
89:20
104:22
117:12
121:6

**taken**
55:12
66:14
117:19
123:10

**takes**
114:2

**taking**
25:22,23
49:1
51:10
76:5

**talk**
34:9
72:23
104:16

**talked**
16:21
33:11
51:3 63:6
79:16
80:1,4
81:11
85:22
93:1
99:20
117:23
118:9,23,

24

**talking**
8:11 17:7
18:13
28:2 47:4
55:23
119:4

**target**
66:4
103:13,20

**targets**
48:15

**team**
12:14
14:2
19:21
33:8
34:5,6,7,
12,18,23
35:7 48:2
49:11,13
50:18
59:4
60:23
63:15
65:16
68:20
72:4 85:2
88:3
95:21
103:15
118:3

**teammates**
112:6

**teams**
43:14

**Tec**
56:6
59:22

**technique**
73:10,12,
14

**telephone**
29:4

**tell**
7:12
17:21
18:25
19:13
25:15
39:2 44:1
59:11
66:19
68:24,25
74:21
86:25
91:24
104:15,17
112:2
118:21
119:20
121:13
122:1

**telling**
81:20
100:17
101:20

**temporari
ly**
89:5,19
90:1,3,
13,14

**ten**
45:2
117:7,8,9

**term**
99:3

**terms**
34:4,25
42:16
45:21
63:12
73:19
80:5
93:15
104:6

**testified**
5:10
87:22
97:5

**testify**
5:9

**testimony**
6:25 7:5
77:12

**text**
118:10

**than**
8:4,14
10:3
16:14
20:15
79:9
104:15
110:10
112:13
121:3,5

**Thank**
7:11 67:9
70:15,17
117:12

**that's**
7:19 11:4
14:13
17:10
20:3
21:3,4
22:3,6,12
23:2
24:21
25:1,2
28:23,25
29:7
40:23
42:5,8,9
48:2
53:1,4,5
61:3,10
62:20
63:7,18
64:1
66:21
70:14
72:9
74:1,7
75:14
76:9,11

78:17
79:2,23
81:8,9,
21,25
84:22
86:4 87:6
89:14
91:23
93:13
94:2,6,12
95:8,9,10
96:1,2,8
98:9
99:2,23
100:1
102:18
103:19,20
104:10,22
105:16
108:6
111:25
112:8,20,
21 114:8
115:8,20,
21 116:12
120:5,18,
22,23,24

**them**
21:14
23:16
25:22
28:15
29:13
39:15
40:7,19
47:6 51:1
54:5 58:4
59:7
60:12,24,
25 68:16,
21 69:4
80:23
88:16
89:19,20,
21,25
91:18
98:20
100:22
103:17



Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114:24
115:5,20,
22 116:6
117:6,8
118:15,
16,19
120:15
122:2,3

**themselves**
20:23

**then**
13:2,7,
13,16,24
14:1
18:5,6
19:5
23:16,23
24:19
29:9,10
32:17
33:12
35:15
37:3,5,6
44:24,25
48:18,24
49:4,7,19
50:4
51:16
56:7
57:4,21
58:25
59:11
61:23
62:2
64:5,8
65:1,9,12
66:6
69:5,7
74:9 79:4
84:17,20
85:10
87:2
89:20
93:22
94:9
99:13
100:20,21
102:20

106:21
107:9
108:19
116:9,24
119:13

**therapist**
69:12

**there's**
14:16
18:13,22
20:24
22:3 24:7
25:18
30:4,10
42:25
43:1,6
53:1,18,
22 59:1
60:23
64:19
67:18
68:14
72:9
75:21
76:6
78:6,7
79:20,24
80:25
89:10
95:18,25
96:6
97:19
100:3
102:5
103:12
104:24
105:6
106:18
110:16
111:23
114:1
115:23,24
120:6

**these**
14:24
20:8
39:13,17
53:6,16

89:4,9
90:4
115:8,12

**they've**
16:21
80:21,22

**thick**
91:25

**thing**
16:3
89:23
96:13
98:4
104:5
113:1,22

**things**
27:15
42:18
43:2 46:1
51:16
68:2
71:10,19,
24 72:11
74:9 82:5
93:1,7
95:18,24,
25 98:18
101:18
102:18
104:7
105:4
117:23

**think**
8:23
16:22
18:18
19:20,23
20:7,8
22:2,3,6,
12 23:2
25:8 27:5
37:19
41:12
44:14
47:1 50:9
53:17
57:1

64:10
68:1
72:15
74:11,14
75:4,21
76:1,20,
21 77:13
78:6,10,
21 79:20
80:1
83:11
85:3,9
86:15
90:22
94:18
97:4
100:9
103:1
104:17
105:18,20
108:2,5,
10 113:1
114:19
116:20,21
118:19
119:25
122:21

**this**
4:8,13
5:14,21
10:15,19
12:18
16:21
17:15,17,
22 19:8
20:16
23:3 24:1
26:4,10,
16 28:6
29:14
30:17,23,
24 31:4,
10 33:2
35:11
36:2,7,
18,20
39:19
40:8,10
41:1,2,4,

20 42:13,
14,17
43:3,9,
19,20
49:16
50:7,12,
20 55:3,
24 56:9
57:2
60:16
61:13
62:22
63:10,22
69:11
70:5
71:15
73:19
76:10
77:6 79:7
80:8
82:12
83:3,12
84:3
85:25
87:23
89:2
90:10,16,
17 94:10,
21 95:4,
17,22
96:2,12,
13 97:3,
17
101:14,19
102:11,23
103:5
104:8,11,
16 105:11
106:3
107:5
109:13,15
111:1,18
112:24
113:15,
16,19
115:13
118:12
123:9

**those**

9:1 15:20
24:8
27:22
30:12
46:1 54:1
56:4 59:5
60:7,11,
12 69:4
72:5 78:2
93:7,16
94:14
109:4
112:4
115:19
116:3
117:5,12
118:14
120:15,20

**though**
32:12
44:8 68:3
91:6
101:4
110:24

**thought**
39:24
41:17
42:6 51:1
54:7 57:5
76:3
86:22
87:25
101:17,19
104:2,7,8
108:3,14,
17,18
109:25
110:2
118:20,22

**threat**
92:13

**three**
65:11
99:13
115:10,25
116:1

**threshold**



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 24:10 | 34:9,16 | 116:14 | 20,21,22, | 10,12,22 | 12,23 |
| **through** | 36:2 37:9 | **times** | 24 24:6, | 53:1,8, | 83:3,5,8 |
| 8:21 9:18 | 41:14 | 7:22,23 | 22 25:19, | 13,18 | 84:5,8,9 |
| 12:21 | 44:9 | 26:9,12 | 20,21 | 54:4,11, | 85:5,11, |
| 23:1 | 46:13 | 35:23 | 26:1,2 | 19,21,23 | 13 86:5, |
| 27:15 | 47:1 52:2 | 50:10 | 27:22 | 55:3,5,6, | 11 87:3, |
| 29:9 | 56:21,23 | 56:9 | 28:8,25 | 17,24 | 10,11,22, |
| 47:25 | 62:15 | 59:23 | 29:4,15, | 56:1,10, | 23 88:2, |
| 48:10,12 | 63:13,18 | 72:20 | 19,20,23, | 12,18,22 | 7,16,18, |
| 51:19 | 64:17 | 75:20 | 24 30:15, | 57:1,12 | 19,23,24 |
| 52:6,24 | 65:25 | 90:21 | 23,25 | 58:2,5,6, | 89:7,13, |
| 55:2 56:2 | 69:17 | 99:18 | 31:3,13, | 8,10,14, | 18,19,21, |
| 58:16,22 | 70:19 | 112:3,11 | 14,19,20 | 15,21,24 | 22,23 |
| 59:13 | 71:25 | | 32:4,9,20 | 59:2,3,6, | 90:3,4, |
| 61:13,21, | 73:10 | **timing** | 33:5,11, | 13,21 | 13,16,17, |
| 22,23 | 75:5,7,23 | 113:22 | 12,13,19, | 60:1,3, | 23 91:1, |
| 64:25 | 77:14 | 114:4 | 23 34:9, | 15,16,22, | 13,14,17, |
| 65:4 | 78:2,15 | | 21,23 | 24 61:2, | 19 92:1, |
| 70:23 | 79:7,17, | **title** | 35:9,11, | 10 63:7, | 4,5,6,7, |
| 72:18,25 | 25 80:5, | 59:12 | 20,23,24 | 10,19,20, | 12,16,20, |
| 73:6 | 13 81:2, | | 36:7,8, | 23 64:6, | 25 93:3 |
| 76:2,4 | 13,15 | **to** | 13,15,18, | 14,17,20, | 94:14,24 |
| 85:4 | 82:23 | 5:9 6:9, | 20 37:6, | 24 65:4, | 95:2,5,13 |
| 86:18 | 84:9,12 | 16,23 | 7,20,21, | 14,19,23 | 96:12,13, |
| 90:24 | 85:15 | 7:4,13, | 25 39:5, | 66:2,10, | 18,21,24, |
| 91:8 92:1 | 87:23 | 16,17,18, | 7,12,15, | 11 67:12, | 25 97:9, |
| 107:12 | 88:9 | 21 8:1,5, | 19 40:11, | 19,21,25 | 10,25 |
| 109:5 | 90:8,14 | 8 9:4,6,9 | 13,16,23, | 68:5,11, | 98:10,13, |
| 113:1,14 | 94:23 | 10:18,25 | 24 41:1, | 19 69:2, | 14,17,18, |
| 119:1,11 | 96:24,25 | 11:15 | 2,5,15, | 3,6,7,14 | 19,24,25 |
| 120:10 | 97:4,9, | 12:3,13, | 16,21 | 70:4,20, | 99:1,16, |
| 121:5,8, | 10,19,20, | 17,22,23, | 42:8,18, | 25 71:2, | 18 100:6, |
| 16,18,20, | 21 98:24 | 24,25 | 24 43:2, | 3,12,22 | 23 101:1, |
| 24,25 | 99:9 | 13:2,8, | 8,10,11, | 72:1,5, | 3,8 |
| | 100:2 | 11,12,14, | 20 44:5, | 13,16,18, | 102:3,9, |
| **Thursday** | 101:7 | 17,18,19, | 11,19,21, | 21 73:17 | 14,23,24 |
| 4:2 | 102:25 | 23,25 | 23 45:3, | 74:7,12, | 103:1,3, |
| | 103:13, | 14:2,4, | 5,7,9,17, | 17,22 | 10,16,17 |
| **time** | 16,19,20 | 13,17,21 | 19,23 | 75:5,6 | 104:16,18 |
| 4:10 5:14 | 104:2,3,4 | 15:6,8 | 46:15,17, | 77:7,8,9, | 105:14, |
| 7:24 | 108:4,18 | 17:5,6, | 19,21 | 10,11 | 18,20,24 |
| 13:24,25 | 109:2,22 | 12,13,25 | 47:6,8, | 78:5,12, | 106:4,10, |
| 15:17,24 | 113:15, | 18:7,10, | 14,16 | 13,15,20, | 22 107:6, |
| 18:10 | 16,18,20 | 11,21 | 48:9,14 | 21,22,25 | 19 108:3, |
| 19:7 | 115:4 | 19:20,21, | 49:1,5,8 | 79:3,5,6, | 12 109:1, |
| 20:12,14, | 120:3 | 23 20:1, | 50:3,4,5, | 10,11,12 | 9,12 |
| 17 23:18 | 121:3 | 13,21 | 19,23 | 80:2,9, | 111:1,5 |
| 26:24 | 123:3,12 | 21:6,12, | 51:3,8, | 24,25 | 112:2,7, |
| 27:8,10 | | 13,17,18 | 11,16,23, | 81:5 | 18,25 |
| 33:1,8 | **timeline** | 22:15,22 | 24 52:5, | 82:3,10, | 113:2,3, |
| | | 23:11,15, | | | |

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

9,20,23,
24 114:5,
16,18,19,
20,24
115:2,4,
5,8,13,14
116:1,11,
13,17,20
117:9,14,
15
118:16,
19,25
119:25
120:4,10,
14,17,19,
20 121:9,
17 122:3,
5,6,25
123:3

**today**
6:15,23
7:5 10:1,
9,13,18
20:7
27:1,13,
14 30:22
31:8
43:18
44:24
46:3
48:11
52:6 70:9
71:14,20
77:13
79:18
87:14
88:7
98:21
99:21
106:2,25
107:6
109:11,18
110:6,13,
25 111:17
112:1
113:7
118:4
122:18,25

**today's**
4:9 6:6
7:13 8:1,
6 9:4
68:6
114:23

**together**
35:6
36:8,13,
19,21
37:5 48:5

**toilet**
81:17
82:4

**told**
40:4
43:12,17
45:4

**too**
39:21
49:7
65:18
68:25
77:5
86:14
96:6 98:1
102:7
114:24

**took**
55:16,18
69:3 73:4
122:1

**tools**
107:15

**totality**
80:15
82:13,21
98:22

**totally**
20:5 21:3
67:17

**touch**
67:3

**tournique
t**
62:13

**towards**
59:6 62:8
64:9

**Town**
47:18,20,
24 61:25

**townhouse**
120:7

**toy**
93:9

**toys**
93:11

**tragic**
71:25
72:8

**train**
72:12,16

**trained**
27:14

**trainer**
49:23

**training**
19:17,22
20:2
36:12
49:13,20,
21 52:24
53:21
70:21
72:16
79:19
83:4,8,9,
10,11,13,
14,16
84:4
85:24
86:1,4
89:10
92:23
94:10
107:16
108:23

113:19

**transcrip
t**
9:16,19
10:5
94:20
123:14

**transcrip
ts**
10:6

**transfer**
114:6,7

**transferr
ed**
114:5

**transpire
d**
97:18

**treatment**
69:11,12

**trial**
77:7,10
104:16

**tricycle**
93:10

**tried**
72:21

**Trust**
98:13

**trusted**
103:14

**trusting**
103:17

**truth**
5:9

**truthful**
6:24 7:4

**try**
29:4
33:19
120:19

**trying**
19:20,23
29:23
30:15
36:15
58:1,6,7
87:10,11
88:2
89:22,23
98:13
102:13
116:17
120:14

**tunnel**
121:8,16,
20,24

**two**
7:23
29:13
39:11,14
54:1,13
60:7,11
62:15
63:3
65:10
66:23
69:19
84:13
90:11
110:8,11
111:13
115:10,
22,25
116:1,5
117:5
120:6

**two-story**
30:7,9

**type**
14:13
20:19
27:20
30:23,24
31:10
42:17
43:3
63:1,3
68:15

81:13
89:23
104:11
106:3,6

**types**
46:1
120:7

---

U

---

**U.S.**
83:5

**Uh-huh**
17:19
22:1 23:5
61:9 99:7

**ultimatel
y**
19:1

**unartfull
y**
71:9

**unaware**
73:21

**under**
7:2 15:23
18:2,7
55:9,19
83:5
96:23
97:19

**understan
d**
6:15,23
21:16,19
35:24
37:11
41:1
46:23
53:13,25
55:19
63:21
77:8 80:9
90:24
98:12,16,



Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 162 of 166

Russell Backman          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

19 100:7,
8 106:5
107:18
110:7

**understanding**
19:1,6
21:10
37:14,15
39:2,10
49:6 58:9
79:18
85:11
89:7 91:8
96:11
106:7
107:1
110:10

**unfortunately**
68:14
72:7

**unit**
13:9,10
14:11,12,
20 15:19
26:16,17
38:1,6,20
39:22
43:19
44:10
46:5,7
50:20
54:9
104:20
111:3,14,
15 114:5
119:3
122:7

**United**
4:16

**units**
14:24
53:16
81:23
97:7

**unknown**
70:20
72:13
92:16

**unknowns**
46:4
92:14
93:2

**unless**
79:2
118:6

**until**
24:9
63:23
77:7
118:3

**up**
9:9 13:2
15:8
20:21
23:22
24:23
25:22,23
27:22
28:8
30:1,3
32:5
35:11,18,
21 40:25
46:15
48:3,4,5
49:2
51:8,18
53:13
57:19,23
58:22
60:23
62:3 63:7
66:1,11
69:1
72:14,22
75:5,6,9
79:3
87:13,23
97:14,22
98:1
100:19
102:4

103:7,17,
20 104:14
117:14
119:19

**upon**
26:10,12

**us**
17:12
28:23
41:16
57:18,19,
21 69:5
72:20,21
73:8
75:19,20
78:5
90:20,21
102:2
112:10,
11,19,23,
24

**use**
26:22
27:1,2
39:5
45:19
55:24
56:17
60:3,16
95:5,15
96:13
107:11,12
108:22
118:25

**used**
13:19
24:18,20
30:23
56:5,7
57:13
61:10,16
73:13
85:18,20

**using**
63:1
112:14

**usually**
14:20
29:4
46:21
53:1,2
121:11

**utilize**
55:6
59:2,3
63:3
102:10

**utilized**
24:25
26:1
30:20
58:21
60:22
106:22
107:2

**utilizing**
99:16

---

**V**

---

**valley**
11:11

**variety**
42:15
73:20

**Vegas**
4:1,13,14
5:17 11:9
121:10

**vehicle**
39:19
44:5

**vehicles**
28:14

**verbalize**
86:6

**verbalizing**
86:3

**verbiage**
23:10
47:7
92:11

**versus**
4:14 5:16
25:4

**very**
15:3 25:2
29:13
31:18
69:9 86:6
90:1,3
91:20
95:10
108:6
114:3,14
120:18,19

**vest**
62:12

**via**
7:9 28:24

**vice**
13:11

**vicious**
43:6

**victim**
104:24

**video**
4:10
59:19
66:7,11
67:2,10
68:5,11
69:2 73:2
74:10,22
100:9,11
123:11

**video-recorded**
123:9

**videographer**
4:7,19
5:3

55:10,13
66:12,15
117:17,20
123:8

**videos**
76:16,19

**videotaped**
4:8

**view**
53:14,15
100:17

**viewpoint**
95:17
99:24

**Viewpoint/opinion**
107:25

**viewpoints**
95:14,16

**violate**
22:16

**violating**
22:20

**violation**
117:1

**violator**
13:18

**violators**
13:20,25
120:1

**violence**
20:20
40:19
52:18
53:9 83:1
105:8
120:24

**violent**
14:18
20:20
24:21



Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 25:1,2 | 7:16,17 | 21:14 | 118:13 | 27:1 | 78:3,14 |
| 27:21 | 12:24,25 | 22:24,25 | **warrant's** | 28:11,19 | 79:16,18 |
| 29:25 | 17:13 | 23:1,7, | 36:7 | 29:4,5,8, | 80:1,7 |
| 41:25 | 21:8 24:3 | 11,14,15, | **warrants** | 9,10,11, | 83:12 |
| 53:9 | 29:14 | 20,23 | 14:23 | 24 30:20, | 85:2,20 |
| 57:10 | 33:23 | 24:5,6,11 | 15:10,19 | 22 31:8 | 87:14 |
| 58:2 60:8 | 35:24 | 26:23,25 | 24:12,18, | 33:4,5, | 88:6,11 |
| 83:1 | 39:5 | 27:3 | 20 32:2 | 11,12 | 91:1,2,3, |
| 89:23 | 40:11 | 30:16,24 | 70:9 | 35:21 | 19 93:1 |
| 105:5 | 41:1 | 31:10,24, | 71:14,20 | 37:6,22 | 94:22 |
| **voice** | 45:23 | 25 32:10, | 97:6 | 38:3 | 95:4,5, |
| 32:5 | 46:21 | 19 33:5, | **watch** | 39:13,24 | 17,20,22 |
| **vulnerabl** | 53:13 | 10,12 | 68:11 | 40:17,24 | 97:18 |
| **e** | 55:17 | 35:12 | 69:2 | 41:11,25 | 98:21 |
| 92:18 | 63:20 | 37:12,15, | **watched** | 42:5,6,8, | 99:4,20, |
| 93:5,15 | 66:10 | 16,18,21 | 74:21 | 9 43:10, | 21 101:24 |
| | 67:12,25 | 38:9,12, | 76:15,16, | 18 44:24 | 103:21, |
| ─────── | 70:20 | 21,23,25 | 18,19 | 46:3 | 22,23 |
| **W** | 71:12,22 | 39:6 | 100:13 | 48:3,4,5, | 105:1,15 |
| | 74:17 | 40:16,18, | **watching** | 6,11,14, | 106:2,25 |
| **wake** | 77:8,11 | 22 41:10, | 73:2 | 25 49:1 | 109:11,18 |
| 75:5,9 | 79:6 | 11,13,20, | 75:25 | 52:5,10, | 110:6,13, |
| **walk** | 80:2,9 | 21,24 | **Wattsel** | 11,13,14, | 25 111:17 |
| 47:25 | 92:25 | 42:6,9, | 38:15 | 15,16 | 112:13 |
| 48:10,12 | 95:5 | 11,17 | 52:22 | 53:9 | 113:2,3, |
| 51:19 | 98:19 | 43:9,11, | 109:19 | 54:11 | 6,21 |
| 52:6 55:2 | 104:18 | 20 44:22 | **way** | 55:9,10, | 114:24 |
| 56:2 | 107:19 | 49:13 | 17:8,16 | 13,16,18, | 116:25 |
| 58:16 | 115:13 | 51:9,12 | 23:21 | 22 56:1, | 117:14, |
| 59:13 | 120:4 | 54:7 | 25:5 39:3 | 5,7,17 | 17,20 |
| 61:21,23 | | 55:4,25 | 40:15 | 57:5,6,7, | 118:4 |
| 64:25 | **wanted** | 57:2 | 44:25 | 13,14,15, | 119:13,22 |
| 65:4 75:6 | 21:8 | 62:23 | 71:15 | 16,19,22 | 120:8,9 |
| 76:2 | 63:10 | 71:1 | 86:7 | 60:7,10 | 123:11 |
| 113:13 | 113:2 | 78:15 | 102:5 | 61:21 | |
| **walk-by** | 114:15, | 80:6 81:2 | **ways** | 62:3,7 | **we'd** |
| 47:2,11 | 16,20 | 82:16 | 73:21 | 63:6,9 | 30:25 |
| **wall** | 120:3 | 83:3 86:7 | 87:2 | 64:9,13, | 42:7 |
| 46:25 | 122:6,25 | 91:3 | | 22 65:2, | **we'll** |
| 47:10 | **wants** | 92:21 | **we** | 7,9 66:1, | 10:23 |
| 120:10 | 121:17 | 94:7 | 4:7,12,20 | 6,10,12, | 28:14,16, |
| 121:5,25 | **Warner** | 104:9,12, | 6:12,22 | 15 67:17 | 23 29:1,3 |
| 122:15 | 33:6,11 | 13 106:3, | 13:1 17:8 | 68:22 | 31:15,21 |
| **walls** | 51:1 | 6,8,23 | 18:15 | 69:3 | 66:7 |
| 121:13 | 65:11 | 107:3,6 | 20:7 | 72:19,22 | 95:15 |
| **want** | **warrant** | 108:21 | 26:8,12 | 73:25 | **we're** |
| | 17:17,23 | 109:23 | | 74:7,8,14 | 6:16 |
| | 18:21 | 111:1,3, | | 75:2,15, | 28:21 |
| | 19:8 | 6,18 | | 19 77:7, | 29:3,19, |
| | | 112:15 | | 12,23 | |

Case 2:24-cv-00074-APG-NJK    Document 57-8    Filed 05/16/25    Page 164 of 166

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

23 31:12,
14 36:8,
20 41:15
50:19
57:6,9
63:1
96:12
99:10
102:7
103:16
105:6
110:19
112:8
120:25

**we've**
21:7
31:13
35:22
55:8
59:19
85:21
122:23

**weapon**
52:20
104:25
105:7
121:1

**weapons**
39:15
102:5

**wear**
62:23

**weeks**
36:4

**weird**
41:12

**well**
8:9 11:10
12:24
17:10
18:24
19:16
21:25
22:8,25
24:13
29:5 31:3

39:21
44:8 46:9
49:3,7
51:7
53:14,20
54:17
56:9
57:3,24
71:11
72:24
75:12
77:5
86:9,14
88:15
93:18
94:12
98:4,10
99:23
104:14
106:20
110:19

**went**
8:21
13:17,18,
23,25
32:21
33:4
42:14
44:4,13,
14 45:1
46:25
47:10
48:14,21
55:18
61:21
69:14
76:4
83:16,21,
24 84:5,
12,20
90:20
99:4
113:10

**west-
facing**
107:12

**what**
7:17 8:5

9:3
11:24,25
14:10
15:4,18
16:12
17:6,22,
25 18:6
19:14
20:18
21:10
22:6,24
25:13,15
27:13,16,
17,25
29:2,15
32:17,19
34:21,22,
25 35:1,8
36:16
37:12,14
38:4
40:11,24
42:6
43:10,11,
17,20
45:10,12,
18 47:19
48:1,10,
12 49:3,
5,8,10,19
50:5
51:4,6
53:5
54:18,19
55:2,3
56:2,3
57:22
58:16
59:25
60:2
61:12,16,
24 62:2,
9,11,14,
18,23
63:1,2,8
64:1,8,25
65:5 69:1
70:7,8,10
71:6
72:2,17

73:5,13,
17 74:22
75:24
77:8,9,10
79:17
80:5,12
81:2,13
83:4,14,
22 85:10,
11,15,24
86:22
87:5,22
89:7,8,19
90:8
93:2,13
94:6 95:4
96:11
97:18
98:12
99:8
100:7
101:20,21
102:15,20
103:9,11
104:2,3,
17
106:11,14
107:23
108:4,13,
14,17,18
109:1,2,9
111:7,10
113:20,23
120:16
122:11

**what's**
6:3 11:18
12:11
14:10
21:22
24:4
59:14,18
61:7
62:19
74:8 84:1
90:2 94:9
96:7
97:20
111:24

121:23

**whatever**
30:15
39:4
42:19
58:2 59:1
69:18
71:2 74:3
89:22

**whatnot**
116:17

**Wheel**
93:10

**when**
12:2,18
15:18
24:18
25:3
26:15
31:23
32:17,20,
21 34:4,
11 42:16
46:5 47:3
50:12
54:20
63:19
64:17,19
70:18
71:2
72:18
73:16
75:18
85:18
88:1
92:12
99:9
101:10
102:15
104:6
106:22
107:2,3,
11 110:4
113:11
114:8
116:12
117:2
120:1,22

**where**
11:21
13:13
14:2 21:4
23:3 25:4
29:19
30:9,10
35:8
36:25
37:1
39:13,20
43:21
44:4 46:7
47:21
48:2,25
50:15
57:20
63:2
65:19
74:7 78:1
81:23
94:2,4,9,
18 95:4
97:13,23
116:7
119:1
120:6,9

**whereupon**
5:6 55:12
66:14
117:19
123:16

**wherever**
24:24

**whether**
30:13
43:5
48:21
51:25
58:6
60:23
93:19
104:24
107:19
111:8
112:14

**which**
8:23

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10:21
13:19
17:8
18:11,12
28:14
55:7
56:8,23
57:16,17
65:9
76:19
104:4,21
115:6,8

**while**
19:22
43:13
44:2
46:23
47:11
73:4
74:23
75:1 79:8
88:13
89:23
92:10
100:2
116:10

**who**
42:6
48:18
49:3 51:2
52:2,13
61:6
65:13
66:3
92:17
93:22,24
94:13
112:6
122:13,19

**whoever**
15:24
58:23
74:2
97:22

**whole**
48:2 85:2
96:13

**whom**
4:22 9:10

**whomever**
98:25

**why**
13:1
41:12,16
42:8
47:13
55:9
56:18,25
64:15
66:6
85:20
108:14
113:14
114:6
117:14

**Williams**
6:17
74:22
75:5
77:13
79:9
86:16
88:8
90:17
109:12,14
110:7,13,
20,21

**willing**
20:21

**window**
44:6
45:25
57:13,18
58:22
61:11,13,
17 74:4
75:8
107:13

**wish**
112:22

**with**
6:11
7:14,22,

23,25 8:4
9:23
10:1,9
13:4
20:23,25
22:14
23:3
27:23
28:13
29:4
30:2,5,11
31:10,15
32:18
33:5
35:1,2,3,
5,7,10,
11,18,21
36:6,13
37:10,11
38:3
39:17
42:17
43:16
48:8,25
50:18
51:3
52:7,9,
11,20,21
54:5,12
57:18
60:1,2
62:14,16
65:8
69:12
70:21
72:25
73:5
74:15
81:19
83:5,10
90:23
92:15
94:18
96:19
97:21,22
99:21
100:4
101:11,23
102:6,20
104:21,25

105:4
108:15
112:5
116:21
117:3
120:13,23
122:11

**within**
14:15
17:18
31:17
75:6
84:10,13,
18 92:22
94:11,22,
24 95:7
96:17
107:16
108:22
111:14

**without**
81:5 95:7
102:3

**witness**
5:4,8
9:11
26:20
32:6
66:17
67:3,19,
23 70:16
76:25
77:17
86:21
111:23

**won't**
91:3

**word**
39:4
95:15

**worded**
16:1

**words**
87:21

**work**
14:15

15:4
32:22
33:4 69:7
71:2
72:12
84:6,16,
17

**worked**
32:3
53:16
81:25
113:19

**working**
10:15
35:10
97:3

**worse**
10:22

**wrap**
46:11,12
73:8
96:5,9
101:25
102:8,21
105:10
117:14

**write**
98:18

**wrong**
25:7 39:3
91:25

———————

**Y**

**yeah**
9:17
10:20
14:9
18:4,19
21:20
32:11
33:18
35:15
38:21
45:17
46:17

47:22,23
49:23
51:13,22
56:15
58:11,12
60:19
63:25
64:3
66:19
67:16
68:9,13,
17,22
70:16
71:23
73:2,3,22
74:14,16,
25 75:10,
19 78:25
82:2
85:3,4
91:10,11,
24 92:3
98:15
99:12
100:16
101:16
103:12,19
105:10,21
108:9,12
109:24
110:2,5,
15,18
111:16
112:22,25
113:11
116:5
117:5
118:22
121:5

**years**
13:8,13
14:25
15:4
66:23
82:1
117:8,9

**yes**
5:24 6:2,
8,18

Russell Backman                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
8:13,17,          107:4,8
21,25             110:9
10:14,17          113:8
12:16,20          114:12
14:25             115:1
16:4              119:24
19:9,12           121:4
20:10             122:10
21:21             123:15
22:18,23
23:5              yes-or-no
27:9,11             26:13
28:4
30:20             Yikes
31:5,7              67:9
33:4
34:6,13,          yourselve
20 35:21          s
36:5                22:15
37:13
42:12
46:13,20
47:20
49:25
50:8,25
51:17,23
54:22
55:1,21
56:5
58:13
67:7 68:7
69:14,23
71:23
73:10,22
74:15
76:25
77:3
79:14
81:25
82:6,8
83:2
84:23
88:2,4,5
91:23
92:2,5
94:25
95:25
102:8
103:4,6
104:10
```