# Exhibit 8

# Exhibit 8

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 2 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3

4      LATIA ALEXANDER,              )
       individually as heir of       )
5      ISAIAH T. WILLIAMS and in     )
       her capacity as Special       )
6      Administrator of the Estate   )
       of ISAIAH T. WILLIAMS,        )
7                                    )
                    Plaintiff,       )
8                                    )
       vs.                           )Case No.
9                                    )2:24-cv-00074-APG-NJK
       LAS VEGAS METROPOLITAN        )
10     POLICE DEPARTMENT, a          )
       political subdivision of the  )
11     State of Nevada, et al.,      )
                                     )
12                  Defendants.      )
       _____)

13

14

15        VIDEOTAPED DEPOSITION OF DETECTIVE JUSTIN ROTH

16           Taken on Wednesday, January 8, 2025

17     By a Certified Stenographer and Legal Videographer

18                   At 9:12 a.m.

19             At 400 South Seventh Street

20                 Las Vegas, Nevada

21

22

23           Stenographically reported by:

24        Holly Larsen, NV CCR 680, CA CSR 12170

25           Job No. 59091 - Firm No. 116F

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
                                                    Page  2
  1      APPEARANCES:

  2      For the Plaintiff:

  3              MURPHY'S LAW, PC
                 BY:  CORRINE MURPHY, ESQ.
  4              2620 Regatta Drive
                 Suite 102
  5              Las Vegas, Nevada 89128
                 702.820.5763
  6

  7      For the Defendants:

  8              MARQUIS AURBACH
                 BY:  CRAIG ANDERSON, ESQ.
  9              10001 Park Run Drive
                 Las Vegas, Nevada 89145
 10              702.382.0711

 11

         The Legal Videographer:
 12
                 NEKITA TAYLOR
 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25
```

```
                                                        Page  3
 1                     I N D E X

 2    WITNESS                                           PAGE

 3    DETECTIVE JUSTIN ROTH

 4         Examination by Ms. Murphy                      5

 5

 6

 7

 8                   E X H I B I T S

 9    NUMBER                                           PAGE

10    Exhibit 1        Notice of Videotaped              6
                       Deposition of Detective
11                     Justin Roth

12    Exhibit 2        Critical Incident Review         28
                       Team Administrative Report
13
                       Pages 187 and 188 of            46
      Exhibit 3        Critical Incident Review
14                     Team Administrative Report
15
      Exhibit 4        NRS 179.055                      128
16
      Exhibit 5        Overall layout of Apartment     130
17                     1125

18    Exhibit 6        Tactical Review Board CIRT       248
                       Conclusions
19
      Exhibit 7        LVMPD Interoffice Memorandum     253
20

21

22

23

24

25
```

Page 4

```
 1              P R O C E E D I N G S

 2                       -oOo-

 3

 4              THE VIDEOGRAPHER:  Today is

 5    January 8, 2025.  The time is approximately

 6    9:12 a.m.  Your court reporter is Holly Larsen, and

 7    I am your videographer, Nekita Taylor.  We are here

 8    on behalf of Lexitas.

 9              The witness today is Detective Justin

10    Roth, and we are here in the case Latia Alexander,

11    et al., versus Las Vegas Metropolitan Police

12    Department, et al.

13              Will counsel please state your

14    appearances, and the court reporter will administer

15    the oath.

16              MS. MURPHY:  Good morning.  Corrine

17    Murphy, Bar Number 10410, on behalf of plaintiff.

18              MR. ANDERSON:  Craig Anderson on behalf

19    of the defendants.

20    Whereupon,

21              DETECTIVE JUSTIN ROTH,

22    having been first duly sworn to testify to the

23    truth, was examined, and testified as follows:

24

25              MS. MURPHY:  Let the record reflect this
```

Page 5

1    is the time and the place of the deposition of

2    Justin Roth in the matter of Latia Alexander,

3    et al., versus Las Vegas Metropolitan Police

4    Department, et al., Case Number 2:24-cv-00074.

5

6                     EXAMINATION

7    BY MS. MURPHY:

8        Q.      Mr. Roth, my name is Corrine Murphy, and

9    I'm an attorney.  I represent the plaintiff, Latia

10   Alexander, in this case.

11              Can you please state and spell your full

12   name for the record.

13       A.      It's Justin Roth.  J-u-s-t-i-n R-o-t-h.

14       Q.      Do you have a middle name, Mr. Roth?

15       A.      It's Ray, R-a-y.

16       Q.      And would you prefer that I call you

17   Mr. Roth or Justin?

18       A.      Justin is fine.

19       Q.      And, Justin, you've been noticed to be

20   here today; correct?

21       A.      Yes.

22              MS. MURPHY:  I'm going to attach the

23   Notice of Videotaped Deposition of Justin Roth as

24   Exhibit 1 to today's deposition.

25   ///

Page 6

1    BY MS. MURPHY:

2        Q.        And, Justin, you'll be able to look

3    at this too.  Whenever I'm going to ask you to

4    look at a document today, I'm going to first

5    ask -- hand it to the court reporter, she's going

6    to mark the exhibit number on it, and then at the

7    end of the deposition, when she compiles a

8    transcript of today's hearing, she'll attach all

9    those documents.  So make sure and don't leave with

10   any documents today.

11       A.        Okay.

12       Q.        Give them all back to her at the end of

13   the day.

14       A.        Came with nothing; I will leave with

15   nothing.

16       Q.        Okay.  Thank you.

17                 (Exhibit 1 marked.)

18   BY MS. MURPHY:

19       Q.        And, Justin, you understand that you're

20   here today to discuss the shooting of Isaiah

21   Williams?

22       A.        I do.

23       Q.        Have you ever given your deposition

24   before?

25       A.        No.

Page 7

1      Q.      Have you ever testified in court before?

2      A.      Yes.

3      Q.      Okay.  In what court cases have you

4   testified?

5      A.      I could not tell you off the top of my

6   head.  I've been on the department for 16 years, so

7   a few.  But nothing off the top of my head.

8      Q.      And so "a few" could mean a few

9   different things to a few different people.

10             Does "a few" mean -- would you say that

11   it's been more than five or less than five?

12     A.      If we're talking about full testimony

13   inside of a jury court or versus a preliminary

14   hearing testifying -- which one are we talking about

15   here?

16     Q.      Let's talk with a trial, with a jury

17   trial.

18     A.      One or two, to my recollection.

19     Q.      And in the prelims, I'm assuming that

20   you were there as an arresting officer, an

21   investigating officer.  Is that fair?

22     A.      Yes, ma'am.

23     Q.      Okay.  And how many of those do you

24   think you've testified?

25     A.      Dozens.

Page 8

1     Q.      Have you ever given testimony, either
2  in a deposition or at court, in your capacity as a
3  CIRT -- and that's C-I-R-T -- investigator?
4     A.      I have not.
5     Q.      Okay.  Is there any reason that you
6  would not be able to answer and understand my
7  questions today and give your best and most accurate
8  testimony?
9     A.      No.
10    Q.      Are you under any medications that would
11 inhibit your ability to give reliable testimony
12 today?
13    A.      No.
14    Q.      Have you had any recent personal or
15 professional issues pop up that would inhibit your
16 ability to give reliable testimony today?
17    A.      No.
18    Q.      Can you please tell me everything that
19 you did to prepare for today's deposition?
20    A.      I went over my report that was authored
21 and my conclusions that were written through the
22 section.
23    Q.      And when you say your report, I have a
24 220-page report.  Is that the report you're
25 referring to?

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 9

1        A.      Correct.

2        Q.      And you read the whole thing again from
3    start to finish?

4        A.      I did not from start to finish.  I have
5    a very good recollection of that report given that
6    the investigation took approximately a year to
7    complete on our side, an administrative
8    investigation.

9                I read over the conclusions again,
10    which, again, are the, I guess, summary of the body
11    of the report, and a few notes I took in my head
12    reference the body of the report.

13        Q.      Okay.  So is it fair -- so you said a
14    few notes that you took in your head.

15                Did you -- did you do any actual
16    handwritten notes as you reviewed?

17        A.      No.

18        Q.      And just one thing, Justin.  The court
19    reporter is taking down everything we say.  I know
20    that you're anticipating the end of my question, but
21    just let me finish it so that she can write it down.

22        A.      Yes, ma'am.

23        Q.      She has a tough time writing down what
24    two people say at the same time.

25        A.      Understandable.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

1        Q.        And I'll try to do the same for you.

2        A.        Okay.

3        Q.        If I start into a question and you have

4    not finished answering it, please let me know.

5    Because sometimes I can go kind of quickly too.  I

6    don't want to cut you off; I want to give you every

7    opportunity to give your full testimony today.

8    Okay?

9        A.        Would you like me to put up my hand

10   or -- and somehow indicate it or just speak up?

11       Q.        Just speak up.  If I start talking or

12   asking the next question and you're not finished

13   with your answer, just say, "I'm not quite done."

14   Okay?

15       A.        Yes, ma'am.

16       Q.        So other than -- were there any other

17   written documents aside from the CIRT report that

18   you reviewed in preparation for today's deposition?

19       A.        No.

20       Q.        Okay.  Did you meet with anyone in

21   preparation for today's deposition?

22       A.        Craig Anderson.

23       Q.        Okay.  And I -- how long did you meet

24   with Craig for?

25       A.        Approximately half an hour, 45 minutes.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 11

```
 1        Q.      Was that the only meeting that you had
 2    with Craig about this deposition?
 3        A.      Yes.
 4        Q.      Did you review any documents during that
 5    meeting?
 6        A.      I don't believe we did.
 7        Q.      Okay.  Other than Craig or anyone from
 8    Craig's office, was anyone else present for that
 9    meeting?
10        A.      Ruth Miller.
11        Q.      And who's Ruth Miller?
12        A.      I believe that she's the head of
13    litigation for the department, or assistant.
14                MR. ANDERSON:  She's general counsel for
15    the police department.  Assistant general counsel.
16                MS. MURPHY:  Okay.  What firm -- do you
17    know what firm -- is she, like -- does she work for
18    the --
19                MR. ANDERSON:  In-house, yeah.  So she
20    is one of four attorneys for the police department
21    that handles litigation.  So she's kind of like my
22    supervisor on these cases.
23                MS. MURPHY:  Okay.  Okay.
24    BY MS. MURPHY:
25        Q.      And I'm assuming that you probably --
```

Page 12

1  and you tell me if I'm right or wrong.  And, I mean,

2  this is a very in-depth report.  So I'm assuming you

3  had, like, notes and that kind of stuff that you had

4  compiled in order to create this final report.

5          Did you review any of those, or do you

6  even have access to them anymore?

7      A.      We do have access to our H drive.  It's

8  essentially a virtual folder that we did hand over

9  to our legal once it was completed, which also

10  entails something called IA Pro, which is kind of an

11  online resource that is -- you can't delete out of

12  it.  Essentially, once you put something in there,

13  that's where it stays.

14          And everything from my case, to include

15  transcriptions, was placed into that H drive and

16  into IA Pro.

17      Q.      And did you review any of that to

18  prepare for today's deposition?

19      A.      Outside of the report that we previously

20  mentioned, no.

21      Q.      And so the final report is also included

22  in the H drive?

23      A.      Correct.

24      Q.      Okay.  Do you know approximately how big

25  the H drive is?

LEXITAS™

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 13

```
 1        A.       No.

 2        Q.       Okay.  Is it because it's so big?

 3        A.       There's multiple sections that work out

 4   of our H drive; OIO and FIT.  OIO is our non-deadly

 5   use-of-force reviewing section.  And then FIT is our

 6   force investigation team, which does the criminal

 7   side of officer-involved shootings or critical

 8   incidents, and we all share the same H drive.

 9        Q.       And so is the H drive specific to the

10   matter, or is it just like a whole, like, inter --

11   like, inter-department thing?

12        A.       It's all of our case files for the year

13   that are open, and then there is a section for

14   closed cases up to, I believe, 2012, when the

15   inception of CIRT and OIO became existing.

16        Q.       And so how would this -- Mr. Isaiah

17   Williams' case, would that be qual -- is that -- is

18   that a closed case or an open case as we sit here

19   today?

20        A.       It is a closed case from the

21   administrative side.  I cannot speak on the criminal

22   side.  We don't handle that side of it.

23        Q.       And by "criminal side" -- I just want to

24   make sure.  Because I know that -- and we'll talk

25   about it a little bit more in depth lately -- or
```

Page 14

1    later -- there's kind of the difference between what

2    you did, which was kind of like the civil analysis,

3    and then there was a criminal investigation about

4    the officer-involved shooting; correct?

5        A.      There was a criminal investigation done

6    from the Force Investigation Team.  Our section

7    doesn't do the civil side of it.  Our section is the

8    administrative side of it.  So policy, training,

9    tactics, those sorts of things.

10              And essentially, after the end of that,

11   it goes to a use-of-force board and a tactical

12   review board, which has -- the use-of-force board --

13   four civilians and three department members voting

14   on the outcome of the use of force.

15       Q.      So when you say you don't know if it's

16   opened or closed, is it with any of those

17   departments it could still be open, or do you mean

18   the actual -- like, a different, like, underlying

19   investigation?

20       A.      The only investigations that are opened

21   up on our department as far as this case is

22   concerned, to my knowledge, is from FIT and CIRT.

23              I cannot speak on FIT's side.  I do not

24   work for FIT.

25              But on our CIRT side, yes, it is closed.

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 15

1    Q.       Okay.   And so when you're saying it may
2    still be open, you're kind of saying, I don't know
3    what's going on with FIT?
4    A.       Correct.   I can't speak one way or the
5    other.
6    Q.       Okay.   Had you ever -- okay.   I don't
7    want to jump ahead too far.
8             Can you -- I want to kind of ask some
9    questions about your professional background.
10            You mentioned earlier you've been with
11   the department for 16 years; is that correct?
12   A.       Correct.
13   Q.       Okay.   Can you tell me -- can you kind
14   of walk me through your career arc with the
15   Las Vegas Metropolitan Police Department?
16   A.       Sure.   A patrol officer for
17   approximately -- overall, approximately eight years,
18   I would say.   I did a year as an FTO, which is a
19   field training officer.
20            I also did a year in property crimes,
21   which is an old section that has now been dissolved,
22   as a detective there.
23            And then I believe it was three years in
24   PD, which is patrol detective.   It's essentially a
25   detective position within patrol.

Page 16

1              And then the last three have been in

2    CIRT -- sorry.  The last six have been in CIRT.  And

3    then -- sorry, what I previously forgot to mention

4    was PSU, which is the problem-solving unit.  I was

5    there for about a year.

6         Q.      What is PSU?

7         A.      Essentially it's a patrol function out

8    of an area command.  Goes between plainclothes and

9    uniform just depending on what the needs of the

10   station are to do either various plainclothes

11   operations or uniformed details.

12        Q.      And so how did you end up in CIRT?

13        A.      My partner in PD suggested that I come

14   do a TDY.  And this was back in -- a temporary

15   assignment.  This was back in 2019, very beginning.

16   I want to say January.

17              And he suggested I come up because they

18   were having openings.  And I came up and did a TDY

19   for approximately three months before becoming

20   full-time in July of 2019.

21        Q.      What's a TDY?

22        A.      A temporary assignment.

23        Q.      And so what's the purpose of a temporary

24   assignment?

25        A.      For our section it kind of determines if

Page 17

1    you can do the job.  We're all police officers, and

2    we should have the knowledge of department training

3    and policies, but it goes a little bit farther.  You

4    have to have the ability to write well.  You have to

5    have the ability to public speak.  A lot of our job

6    is giving long presentations.

7              In this case I gave a 12-hour

8    presentation to executive staff, to the use-of-force

9    board, tactical review board.  That is difficult for

10   some people to do, to speak in public settings,

11   especially in front of high-ranking people in our

12   department.

13             And then also just have the knowledge of

14   tactics and training and policy within the

15   department.

16       Q.    And so the 12-hour presentation, in

17   some of the -- some of the documents that Craig

18   has produced, I saw some -- some PowerPoint

19   documents.

20             Is that the 12-hour presentation

21   you did?

22       A.    Correct.

23       Q.    Okay.  And in what context did you give

24   that 12-hour presentation?

25       A.    The use-of-force board and the tactical

Page 18

1    review board.

2         Q.      And what are those two different boards?

3         A.      They're two separate boards.  They're

4    done the same day.  And essentially there's a

5    PowerPoint presentation that is completed which kind

6    of gives you the entirety of the case, which is

7    essentially the report that is given, that 222-page,

8    I believe it is, report, in a PowerPoint form, where

9    you hear the testimony from officers, or sometimes

10   civilians, but anybody that gave a quote.  That is

11   in that report.  Essentially it's presented with

12   movement slides, video to illustrate and give a full

13   picture of the essence of the report and the case.

14   And then there's a break.

15              The -- would you like me to go into,

16   like, exactly everything that happens in the

17   use-of-force board?

18        Q.      Yeah.  Absolutely, yeah.

19        A.      There's a break so the people who can

20   vote on the board, which, again, are four civilian

21   members and three department members, will have a

22   deliberation on whether or not it falls into

23   separate categories of our voting criteria.  I

24   believe it is administrative approval, tactics and

25   decision-making, policy training failure, and

Page 19

1  administrative disapproval are the four categories

2  it can fall into.

3          Once those individuals make their vote,

4  everybody comes back in, they go over the findings

5  of the use-of-force board, and then it goes into the

6  tactical review board, which are the conclusions

7  that you read in the back of that presentation -- or

8  the report.

9      Q.      Okay.  So just so that -- when you say

10  the conclusions that you read in the back of the

11  report, do you mean the CIRT report?

12      A.      Correct.

13      Q.      Okay.  Because -- so I've looked over

14  the tactical review board.

15      A.      Correct.

16      Q.      And is this -- and so is my

17  understanding -- well, walk me through -- they -- so

18  when they're saying, like, approved, like they've

19  got these checkmarks where it says, like, approve

20  [sic], modify, overturn, is this a result of your

21  presentation?

22      A.      Correct.  So the tactical review board

23  is essentially -- it's been -- not restricted but,

24  for lack of better terms, shrunk down as far as

25  time.

Page 20

```
 1                   Back in 2022, when we did this, we
 2     read every single word of the conclusion as it
 3     read on the back of the report.  As you can
 4     imagine, with the amount of conclusions that was
 5     in this case, it was a lot of reading.  And
 6     essentially I read the conclusions into the record,
 7     and then the board votes on that.  And the board in
 8     this case are no civilians because they are not
 9     expected to have any experience in our tactics,
10     training, and policy.
11         Q.      Okay.  And so -- sorry.  I'll get back
12     to it later.  I don't -- I don't want to jump around
13     too much.
14                   Other than your -- so you've got your
15     16 years coming into your -- working as a -- working
16     at LVMPD.
17                   Do you have any -- what's your highest
18     level of education?
19         A.      I have a bachelor's degree in
20     communications.
21         Q.      And where did you get that from?
22         A.      University of the Cumberlands in
23     Kentucky.
24         Q.      Okay.  And do you have any specialized
25     training or certifications related to your current
```

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 21

1    profession?

2        A.        Are you talking about profession as a

3    police officer or --

4        Q.        Yes.

5        A.        -- we've -- I can tell you there's been

6    countless hours of training that I've received in my

7    time on the department.  I couldn't tell you.

8        Q.        So let me give you a better example, and

9    perhaps it will make it easier to answer the

10   question.

11             Sometimes when people such as yourself

12   answer that they will say, Oh, I did, like, a

13   month-long course in explosive breaches or, like,

14   some other kind of, like, specialized certification

15   that's over and above.

16             I know that you guys are doing training

17   all the time.  But do you -- so do you have

18   anything, as we sit here today -- if you're like,

19   Hey, it's just so many -- but do you have any other,

20   like, specialized certifications that, like, if you

21   went and applied for a job, like, you would list

22   off?

23             Do you know what I mean?

24       A.        Kind of.  I would say that just

25   based on the description of my position of the

LEXITAS™

Page 22

1    Critical Incident Review Team, you have to have a

2    vast knowledge or access to the department

3    procedures, policy, and training that we currently

4    implement.

5              I would say that's all of my training

6    that I've received in my time in the department.

7    There's no specific training that I could say would

8    be, like, Oh, this is a qualifier, this isn't a

9    qualifier, because, in essence, everything that I've

10   done, from blue-on-blue training for plainclothes

11   operations to just your regular certification as a

12   police officer, comes into play when you're talking

13   about looking at an incident from an administrative

14   investigation in its entirety.

15        Q.      And so is that what you -- you've been

16   with CIRT for 16 years now.  Is this what you --

17        A.      Six years.

18        Q.      Sorry.  Six years.

19              Is this what you do all day every day?

20        A.      Yes, ma'am.

21        Q.      Okay.  And you touched on it a little

22   bit, but can you describe to me with more

23   particularity what exactly your position at CIRT

24   entails?

25        A.      I can give you an example.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 23

1          Essentially we do administrative

2    investigations on critical incidents, to include

3    any high-risk incidents, deadly force, in-custody

4    deaths, those sorts of things that are deemed

5    high risk and critical incidents on the department.

6          Example would be, if we have an

7    officer-involved shooting, we interview the involved

8    officers and the witnesses; we conduct briefings to

9    executive staff, subject matter experts, captains,

10   lieutenants; and then finally we do the use-of-force

11   board, tactical review board, and complete the

12   detailed report, which you have an example in front

13   of you.

14        Q.     And so -- sorry -- what's the difference

15   between the use-of-force and the tactical review

16   boards?

17        A.     So use-of-force only looks at the use of

18   force specifically, not any of the tactics or

19   training or policy that are attached to it outside

20   of our use-of-force policy.

21          Essentially it is at the moment, the

22   time that force was used, did it meet our policy

23   and law.

24        Q.     Okay.  Well, not policy; just the law.

25   Correct?

Page 24

1      A.      Well, policy is also weaved into -- or

2   law is weaved into policy.

3            So you're talking about Graham versus

4   Connor and threat assessment for ability,

5   opportunity, and then jeopardy and preclusion.

6            Those are standards that are set

7   forth from the supreme court that we have in our

8   policy.

9      Q.      And you are currently an investigator

10  with CIRT; correct?

11     A.      Yes.

12     Q.      And have you always held the position of

13  investigator for the six years you've been with

14  CIRT?

15     A.      Yes.  Detective.  I'm sorry.

16  Investigator, detective.  I guess same thing.

17     Q.      If I -- I'm not in it every day like you

18  are, and some of the nomenclature can be very

19  specific.  So if I use a term improperly, feel free

20  to correct me on it.

21     A.      Sure.  It wasn't -- if we're talking

22  about titles.

23     Q.      No, no, no.  I want the record to be as

24  accurate as possible.

25     A.      Sure.

Page 25

1    Q.       In fairness, it does list you in the

2    report as a -- like, a detective, but also an

3    investigator.

4              Yeah, Detective Roth, and you're listed

5    as the -- on the Critical Incident Review Team.

6              And my understanding is that you are

7    part of the -- you are an investigator; correct?

8    A.       Yes.

9    Q.       Okay.  Is there any -- and so what's

10   the -- what are the different -- how many other

11   people are on CIRT?

12   A.       That's a -- so are you talking about

13   current status right now or where it was in 2022?

14   Q.       Let's talk about it in 2022.

15   A.       I believe we were at that point at seven

16   detectives, one sergeant, one corrections officer

17   detective, and one corrections officer sergeant.  I

18   believe that's where we were at.

19             We also have two executive support staff

20   which are civilians.

21             That varies from time to time.  Of

22   course over the year I believe we had one TDY come

23   through because I was taken off of an assignment to

24   handle this exclusively.  So my spot in the rotation

25   with a gap, you can imagine with only six or seven

Page 26

1    people, with the amount of caseload we get usually

2    is between 52 and 70 a year, that can become pretty

3    daunting for a six-person unit.

4         Q.    Okay.  And who -- do you have a

5    supervisor within the unit?

6         A.    I do.  A sergeant and a lieutenant.  But

7    a sergeant is my direct supervisor.

8         Q.    Okay.  And who was it -- who was it at

9    the time that this was created in 2022?

10        A.    Sergeant Shawn Smaka.

11        Q.    And then who was the lieutenant?

12        A.    I believe it was Lieutenant Kurt

13    McKenzie.

14        Q.    Okay.  And I've seen a couple -- was

15    there any other -- other than the people that you

16    were directly reporting to, Sergeant Smaka and

17    Lieutenant McKenzie, were there any other CIRT

18    detectives that were working alongside of you on

19    this, or were -- was this your only -- were you solo

20    on this project?

21        A.    So there's no solo in CIRT.

22        Q.    Okay.

23        A.    When I say I was pulled off of this to

24    handle this exclusively, so I wouldn't -- because of

25    the amount of interviews -- I believe I interviewed

Page 27

1    somewhere north of 20 individuals in this case.

2    That's pretty rare.  And in all those interviews,

3    usually you have to have another detective and your

4    supervisor along that.

5            So when you're talking about our

6    workweek and then getting those interviews done,

7    preparing for those interviews, and actually doing

8    those interviews, it's a lot of work.

9            CIRT in itself is a team effort, to

10   include from our SMEs, all those individuals

11   that are listed in the left column of that

12   report that you're referencing.  It's never

13   Justin Roth's opinion.  It's never Shawn Smaka's

14   opinion.  It's collectively as a group when it comes

15   to the investigators, our chain of command, as well

16   as the SMEs that we bring in as part of the CIRT

17   process, to ensure that all bases are covered and we

18   get an accurate representation of our policy and

19   training.

20   Q.      Okay.  And I know what an SME is, but

21   just for the record can you say?

22   A.      Subject matter expert.

23   Q.      And so what are the -- what are the --

24   what's an SME?  I mean, a subject matter -- but if

25   you can kind of explain to me what it is.

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 28

1    A.    So essentially in our -- they are people

2  in our organization that we show the investigation

3  to through a PowerPoint.  The -- and they're

4  responsible for training on our department.

5          So you have AOST, which is Advanced

6  Officers Skills Training, and then RBT, which is

7  Reality-Based Training, and the academy.

8          You also have individuals from --

9  leadership from firearms that come out.  If you have

10  a specialty case like SWAT or Major Violators or

11  sections that wouldn't deal specifically with

12  patrol, then you would find somebody who had

13  recently either promoted out of there or left the

14  unit to weigh in on that.

15    Q.    Okay.  And so you referenced the left

16  side of the -- you're going to have to excuse me.

17  I'll give you the first page of this.  And it got a

18  little wrinkled in my bag.

19    A.    Sure.

20          (Exhibit 2 marked.)

21  BY MS. MURPHY:

22    Q.    You referenced the left-side column.

23          Is this the front page of the report and

24  the left-side column you were referring to?

25    A.    Correct.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 29

```
 1                    MS. MURPHY:  Let the record reflect, and
 2      we'll ask to attach this as Exhibit 2, this is the
 3      first page of the Critical Incident Review Team
 4      Administrative Report, and it's Bates LVMPD 4255.
 5      BY MS. MURPHY:
 6          Q.        And so it's -- looking down at it -- so
 7      the subject matter experts, the first grouping is
 8      "Office of Internal Oversight."
 9                    What is that?
10          A.        That is our section, CIRT and OIO.
11      Notwithstanding on FIT.  They do not have access to
12      our information.
13                    So FIT is completely separated from any
14      administrative review for purposes of their criminal
15      investigation and 289 protection.  Talking about
16      NRS 289.  Because the officers who come in, their
17      statements cannot be used against them criminally
18      because they're being compelled to give those
19      statements.  So they don't have access to our
20      information.
21          Q.        Okay.  So who is Office of Internal
22      Oversight?  Is that FIT or CIRT?
23          A.        That's CIRT and OIO.
24          Q.        Okay.  Yeah, because you're listed on
25      here as well; correct?
```

Page 30

1    A.      Yes.

2    Q.      Okay.  So the Office of Internal

3    Oversight, for lack of a better term, that's CIRT?

4    A.      CIRT and OIO.

5    Q.      What's -- okay.

6    A.      Office of Internal Oversight.

7            So they handle -- the two detectives at

8    this point would be -- looks like just one detective

9    on there.  They were probably in a transitional

10   phase.  But that would be Tim McAteer.  I'm not sure

11   how to say his name too well.  Sometimes I just call

12   him Tim.  But it's the third one from the bottom,

13   above the sheriff's office executives.  That would

14   be a detective from OIO, not from our section.  And

15   Sergeant Patrick Hughes would also be the OIO

16   sergeant that is listed on here.

17   Q.      Okay.  That's an office -- but why are

18   you listed under Office of Internal Oversight if

19   you're CIRT?

20   A.      It's the same thing.  So it's a blanket

21   section.  So our section is the Office of Internal

22   Oversight and Constitutional Policing.  That's our

23   whole umbrella section of CIRT, FIT, and OIO.  IOCP.

24           The Office of Internal Oversight,

25   because it's internal oversight, not criminal, would

Page 31

1   be OIO because they handle non-deadly-force

2   incidents such as tasers.  They review all those

3   non-deadly-force incidents.  And then Critical

4   Incident Review Team also falls under the Office of

5   Internal Oversight as far as use of deadly force and

6   critical incidences.

7       Q.      And, I'm sorry.  You said something

8   about Office of the Constitution.  Sorry.  Can you

9   say that one more time?

10      A.      It is the -- IOCP is the acronym.  It's

11  the -- now I just lost it.  I know I just said it on

12  the record.

13              Office of Internal Oversight and

14  Constitutional Policing, I believe it is.

15      Q.      And so that is the umbrella that CIRT --

16  that you operate under in CIRT; correct?

17      A.      Correct.  That would be CIRT, FIT, and

18  OIO are a part of IOCP.

19              I know Metro with their acronyms,

20  sometimes it can get confusing.

21      Q.      And so what is -- what is the overall

22  umbrella organization then?  Not the name of it, but

23  what's the purpose?

24              I think the purpose is kind of spelled

25  out in the title, but I'd like you to explain it

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 32

1    to me.

2        A.      Sure.  So I believe it was back in 2011

3    the DOJ came in and had a list of requests to -- for

4    Metro to improve themselves.  One of them was to

5    have a bifurcated system of criminal and

6    administrative review of critical incidents, to

7    include officer-involved shootings.

8            And that's when -- I believe it was

9    2011 was when CIRT was stood up.  It was either that

10   or 2012.

11       Q.      And if -- was part of the purpose to

12   determine whether or not somebody's -- to determine

13   if somebody's constitutional rights were violated

14   or not?

15       A.      No.  The purpose was to do a complete

16   administrative investigation as far as CIRT, and

17   also have a unilateral -- I guess that would be the

18   correct term maybe -- of the criminal investigation

19   with FIT.

20           So two separate investigations going at

21   the same time.  One criminal; one administrative.

22       Q.      And who does the criminal?

23       A.      FIT.  The Force Investigation Team.

24       Q.      Sorry to go through all this.

25       A.      It's fine.

Page 33

```
 1        Q.        So you don't have any involvement with

 2    FIT; is that correct?

 3        A.        Correct.

 4        Q.        Okay.  And is part -- is part of your

 5    administrative review in CIRT to determine whether

 6    the actions -- whatever actions you're investigating

 7    complied with constitutional requirements?

 8        A.        I don't know -- I'm trying to track

 9    where you're going on that.

10        Q.        Sure.  Let me -- strike that and let me

11    ask it better.

12                  Are you looking -- is part of your

13    determination whether the actions of whichever

14    police officer -- officers you're investigating,

15    if they complied with the constitutional

16    requirements of administrating -- executing their

17    job duties?

18        A.        Yes and no.

19        Q.        Okay.

20        A.        The "yes" part would be if that's woven

21    into our policy, procedures.  I'm not a lawyer, so I

22    can't speak to a lot of some of the case law.

23    That's why we do have individuals who look at that.

24                  However, my job specifically is a fact

25    finder.  I gather all the information that I have
```

Page 34

1    available, to include transcriptions, interviews,

2    what our practices were from a department procedure

3    at the time of the incident.  Not two months down

4    the road, not three months down the road, not

5    practices from two years ago; what the officers and

6    supervisors were operating on at the time of the

7    incident.  And then make a decision based on those

8    policies, training, and tactics.

9            It's not my opinion that is ever

10   interjected.  My opinion is never interjected.  It

11   is a strict fact-finding of our department policies,

12   procedures, and training.

13       Q.     But there -- we'll get to some of the

14   conclusions later on in the deposition.  There are

15   some conclusions about Fourth Amendment and "knock

16   and announce."

17           Did you have any part in developing

18   those conclusions?

19       A.     As far as being involved in the meetings

20   with -- I believe you're talking about Anthony

21   Bandiero's involvement in this from Blue to Gold is

22   that I was there present for the meeting.  We did

23   have discussions on those things.  That's why his

24   input was put in there, because he is an SME.  I

25   don't have any law training.

Page 35

```
 1        Q.        Okay.  And who is Anthony -- Anthony
 2    Bandiero?
 3        A.        I believe he is the -- I don't know
 4    his exact title, but he is a legal expert with
 5    Blue to Gold.
 6        Q.        What's Blue to Gold?
 7        A.        It's a -- I believe it's a firm that
 8    the department utilizes to go over many things as
 9    far as law when it comes -- I think his specialty is
10    Fourth Amendment.
11        Q.        Is the actual name of the firm
12    Blue to Gold?
13        A.        Correct.
14        Q.        Okay.
15        A.        To my knowledge.
16        Q.        No problem.
17                  And he was the -- was he the subject
18    matter expert on constitutionality?
19        A.        It's -- so for -- constitutionality, I'm
20    not sure what the -- how that question weaves --
21        Q.        Strike that.  Strike it.  Let me ask it
22    in a more direct way.
23                  Was Mr. Bandiero the subject matter
24    expert on the Fourth Amendment?
25        A.        Not entirely.
```

Page 36

1    Q.    Okay.

2    A.    It's, again, a collaborative effort

3  between everybody in that section, people that we

4  reached out to as SMEs.

5         One of those individuals was Anthony

6  Bandiero, who gave his legal opinion on the "knock

7  and announce" specifically.

8    Q.    And how did Mr. Bandiero provide his

9  legal opinion on "knock and announce"?

10   A.    I believe we had a meeting, and -- over

11 several meetings, and he gave me a written account

12 of it, and I -- is why it is in italics in the

13 report, as I did not write that.  So that was his

14 legal opinion.

15        And I prefaced that in the report,

16 saying this is a -- from Anthony Bandiero from

17 Blue to Gold, just how I would if I was using a

18 quote inside of a section.

19   Q.    And give me one moment.  The report's

20 long, and I've read it.

21        Do you remember what part of the report

22 Mr. Bandiero was quoted in?

23   A.    I don't.  I couldn't tell you a page

24 number.  I can tell you it's probably in the

25 mid-100s.  It's in the section prior to use of

Page 37

1    deadly force.

2        Q.      "Service of the Search Warrant - 3050

3    South Nellis Boulevard"?

4        A.      That could probably be a good starting

5    point because it goes into when the announcements

6    start to happen.  I believe that's when his section

7    is in there.

8        Q.      Okay.  Give me one moment.  I'm going to

9    pull it up on my computer, and then I can search the

10   document.

11              Do you know how to spell Mr. Bandiero's

12   last name?  Maybe I'm spelling it wrong.

13       A.      Not entirely.  But I guess if you search

14   "knock-and-announce," you'd probably get -- it would

15   probably be one of the first ones that would come up

16   reference "knock-and-announce," if you search the

17   document.

18       Q.      Okay.

19              MR. ANDERSON:  I've got his name if you

20   want.

21              MS. MURPHY:  Oh, yeah.  How do you spell

22   it?  Sorry.  Thanks, Craig.

23              MR. ANDERSON:  B-a-n-d-i-e-r-o.

24   BY MS. MURPHY:

25       Q.      Okay.  All right.  And so that's on

Page 38

1    page 187.  Give me just a moment.

2              I'll give you the pages in just a

3    moment, but it says, "CIRT consulted with

4    search-and-seizure attorney Anthony Bandiero, the

5    Senior Legal Instructor with Blue to Gold, who

6    assisted in analyzing the following."

7              Is that the section you're referring to?

8    A.        Correct, yes.

9    Q.        Okay.  And then it says -- it reviews

10   the SWAT Section Manual regarding Control Entry

11   Tactic, which we'll call "CET" for the remainder of

12   the deposition.

13             And so I'll hand you this.  Because I

14   don't see that it's in italics.  Or maybe it is.

15   Rather than -- we can pull the pages out afterwards

16   and make them part of the record.  I'm just going to

17   hand you right here.

18   A.        Okay.

19   Q.        And so where it refers to Mr. Bandiero,

20   it starts at page 187 of the report, and that's

21   Bates LVMPD 4441.

22   A.        Thank you.

23             Okay.  So this is the conclusion of

24   where you're at.  You're not in the body.  You're in

25   the conclusion table for, I believe, officers

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 39

1   approach, the general conclusion for "knock and

2   announce."

3        Q.     Okay.  So this was the only thing that

4   popped up for Mr. Bandiero.

5        A.     Do I have your permission to go through

6   this?

7        Q.     Absolutely.  Absolutely.

8               And I'll just represent to you,

9   that's the copy of the report without my notes in

10  it.  So you can do whatever you want.  That's

11  essentially your version.  You can do whatever you

12  want with it.

13       A.     I guess I'm referencing then that

14  section where we -- I made the conclusion where --

15  that was on there.  But that was referencing those

16  pages in the service of the search warrant in the

17  body.

18       Q.     Okay.  So if you could -- and take as

19  much time as you want.

20       A.     Sure.

21       Q.     If you could find the part -- because I

22  was having a little bit of difficulty with that.

23  But, yeah, I guess the part where -- I'll put in

24  "knock and announce" too.  The part where --

25       A.     So I believe I start to talk about it in

Page 40

1    the report at page 132.  It goes into the SWAT

2    Section Manual following -- referencing the use of

3    CET.  Goes into CET, and then into NRS Chapter 179,

4    Section 1, a "no knock" warrant.

5        Q.    Yes.

6        A.    Correct.  And then U.S. versus Banks,

7    which is an LVMPD Ninth Circuit Court case.

8        Q.    And so -- I'm not trying to cut you off.

9              So we're on page -- sorry?

10       A.    133.

11       Q.    -- 133.

12             And the italicized portion of that, is

13   that from Mr. Bandiero's report?

14       A.    No.  That one specifically is from the

15   findings on the court case itself.

16       Q.    So that's a direct quote from the

17   court case?

18       A.    Correct.

19       Q.    Okay.

20       A.    The same with 134 on Zabeti versus

21   State, which again is also a LVMPD jurisdiction

22   Ninth Circuit Court holding.

23             Yeah, I don't think I mention Anthony

24   Bandiero until the conclusion table.

25       Q.    Okay.  And so just going forward to

Page 41

 1   page 135 though, it's at the top of the page, "The

 2   technique is used when it is safest to dominate

 3   suspects with surprise, speed, and overwhelming

 4   action.  A dynamic flooding technique is used to

 5   clear the structure."

 6              Then it goes on to state, "However,

 7   per United States v. Banks."  Is this from -- is

 8   this -- is this -- sorry, the italicized portion of

 9   this, is this a quote from the case, or is this

10   Mr. Bandiero's -- likely his analysis?

11      A.      So whenever -- you have to read the

12   lead-in of that.

13              So specifically you were talking about

14   which paragraph?

15      Q.      I'm talking about -- I'm sorry.  On

16   page 135, it's the first full paragraph.

17      A.      I'm missing 135.

18      Q.      Oh.  Here.  You can use my page.

19      A.      I go 134 to 136.

20      Q.      I must have used it in a different

21   deposition.  My apologies.

22      A.      So I'm assuming the portion where you

23   have highlighted here?  Or which -- what were we

24   talking about again?

25      Q.      Sorry.  It's the first full paragraph at

Page  42

1    the top of the page that begins, "However, per
2    United States v. Banks."
3        A.      Yes.  So it starts with not italicized.
4    So, "However, per United States v. Banks."  Then it
5    goes into italicized once I get past "Banks."  That
6    is from the holding itself.
7        Q.      Okay.  So -- okay.  And so in reading
8    your report, if it's either in quotes or italicized,
9    that means it's pulling from a different source;
10   right?
11       A.      Correct.
12       Q.      Sorry, just to confirm.  I just want to
13   make sure I understand.
14              Although your recollection before having
15   gone through the report is that you had quoted
16   Mr. Bandiero earlier in the body of the report, but
17   now kind of flipping through -- I get how big the
18   report is --
19       A.      Sure.
20       Q.      -- and you haven't memorized it.  But
21   kind of as we're flipping through the report now,
22   you're kind of amending that statement and saying, I
23   think I just referred to Mr. Bandiero's -- you know,
24   quoted from his memo or conclusion in the conclusion
25   section of the CIRT report?

Page 43

1        A.        I believe so.  If it's not -- if you
2    searched for his name in there and it's not -- like
3    I said, three years ago, on top of being a 222-page
4    report, hard to memorize the entirety of it, and
5    sometimes it blends together, especially when you're
6    talking about the intricacies that went into this
7    investigation.
8        Q.        As we sit here today though, and
9    you've had kind of the opportunity to kind of go
10   through this, if you can kind of walk me through,
11   what do you remember Mr. Bandiero's conclusions
12   being?
13       A.        Strictly law-based.  He does not have
14   the knowledge of our policies, training, and
15   procedures.  He was strictly looking at it from a
16   legal aspect and not a department member, what
17   they're trained on, and what their department
18   manual says.
19       Q.        Thank you.
20                 And regarding his conclusions as
21   looking at it from just a legal perspective, do you
22   remember what -- do you remember what he relayed his
23   conclusions as being?
24       A.        Whatever was written in there.  I can
25   read it for you if you'd like.  I can't tell you,

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 44

1    like, a verbatim on our meeting as far as --

2        Q.      I -- sorry.  Go ahead.

3        A.      -- as far as what Mr. Bandiero said

4    specifically.  But anything that he said I took as

5    what he meant, and that was his input as an SME.  I

6    didn't change it.  I didn't -- yeah, it's exactly

7    what I wrote in there, and that's why it's in

8    italics.

9        Q.      And so if you can go to page 188.

10       A.      Okay.

11       Q.      And this kind of -- this is -- did you

12   write this report?

13       A.      I did.

14       Q.      Okay.  You authored the entire thing?

15       A.      Correct.

16       Q.      Okay.  And so -- and we're in the

17   paragraph -- it's the one, two, three -- it's the

18   fourth full paragraph, that starts with the word

19   "Looking."

20       A.      Okay.  So while this is not in

21   italics, and that's probably just an in-house

22   error, but because I said he analyzed "the

23   following" on the previous, I believe this is still

24   all his statement, up until the point where it says

25   "certain SMEs."

LEXITAS

Page 45

1      Q.      Can you just point to me on the page
2  where it says he analyzed "the following"?
3      A.      So it would be on page 187, and it is,
4  "CIRT consulted with search-and-seizure attorney
5  Anthony Bandiero, senior legal instructor with Blue
6  to Gold, who assisted in analyzing the following."
7      Q.      Okay.  And so if I understand your
8  testimony, as we're going through page 187 and 188,
9  where -- even though it's not in italics, where it
10 is doing an analysis, like looking at the totality
11 of the circumstances, like that dialogue, that is
12 actually pulled from Mr. Bandiero's opinions or
13 whatever report he provided to you?
14     A.      Correct.
15     Q.      Okay.  And as we sit here today, just so
16 I understand, as you're telling me, Hey, this is
17 pulled all from him, it should have been in italics,
18 but it's not?
19     A.      As his analysis, yes.
20     Q.      Okay.  So this was -- even though you
21 wrote -- even though you wrote the report, this
22 isn't your analysis; this is the analysis --
23 although you're incorporating it into the report,
24 this is the analysis of the subject matter expert
25 Mr. Bandiero?

Page 46

1      A.      Correct.  And the reason why it was

2   placed in there the way it was is because, again,

3   SMEs in this matter were split on what their opinion

4   was on whether or not this constituted a "no knock"

5   warrant or if it was reasonable.  And SMEs were

6   pulled from previous SWAT operators as well as

7   Mr. Bandiero.  And in fairness, and, again, in

8   fact-finding, everything that was put into those

9   were put into the report for the board to make a

10  decision, again, without my opinion.

11     Q.      And so, Justin, if you could -- I

12  apologize.  I have read this report quite a few

13  times.  But can you point out to me in this --

14             MS. MURPHY:  Actually, before we move

15  on, can we make page 187 and 188 -- we're going to

16  make that Exhibit 3 to today's deposition

17  transcript.

18             (Exhibit 3 marked.)

19  BY MS. MURPHY:

20     Q.      So, Justin, can you point me to another

21  place in the report where you quoted a different

22  SME that had come to an alternate conclusion than

23  Mr. Bandiero?

24     A.      So part of that would be the supreme

25  court cases of United States versus Banks and Zabeti

Page 47

```
 1   versus State, which, I believe -- I said, "SMEs
 2   referenced the United States Supreme Court case
 3   United States versus Banks, which held the
 4   appropriate amount of time which is deemed to be
 5   reasonable before entering with force was 15 to
 6   20 seconds.  However, this determination was
 7   case-specific to United States versus Banks."
 8            That was the first time I referenced
 9   their opinion on that.  And that's a little bit
10   higher than halfway on the page of page 187.
11            And then the next paragraph is,
12   "Further, SMEs also referenced Nevada Supreme Court
13   case Zabeti versus State, which held the totality of
14   the circumstances which were presented at the time
15   made it reasonable to wait less than 10 seconds
16   before entering the structure."
17            I then wrote, "This too was also
18   case-specific."
19            And then the next paragraph is, "It
20   should be noted that SMEs believed the totality of
21   the circumstances known to the SWAT officers and the
22   time frame allotted by SWAT operators before
23   entering 3050 South Nellis Boulevard, Apartment
24   1125, by force after giving verbal announcements via
25   the bullhorn was reasonable."
```

Page 48

1                    And that's specifically to those SWAT

2    SMEs and the SMEs that we utilized on this case.

3                    And then it goes into the analysis from

4    Anthony Bandiero in Blue to Gold, and it was why

5    there was that split of their references.

6        Q.        Okay.  And so Mr. Bandiero thought -- if

7    I understand his conclusion, he thought that it

8    wasn't a sufficient amount of time; correct?

9        A.        Correct.

10       Q.        Okay.  But when you say "SWAT SMEs," do

11   you mean that's, like, guys from SWAT?

12       A.        Not -- not -- not actively in SWAT.

13   They would have no involvement in this

14   investigation.

15       Q.        Okay.  So they are former SWAT members?

16       A.        Correct.

17       Q.        Okay.  And do you remember who those

18   were?

19       A.        I don't.  There should have been a

20   sign-in sheet that was in the record.  If there

21   wasn't, that means we didn't do them back then.

22   Again, it's six years of this.  We've changed how we

23   do things at some points.

24                   But one of them was TJ Jenkins.  He was

25   a sergeant who had just previously retired.  And I

Page 49

1    remember the other one was a retired sergeant, Andy

2    Pennucci.

3              Those were two specific individuals that

4    were called in.

5    Q.      And were they on the tactical review

6    board, or are they part of CIRT?

7    A.      No.  They are neither.  They

8    actually both were retired.  TJ Jenkins was

9    recently -- he retired out of SWAT a short time

10   after, so he had knowledge of their current

11   procedures and tactics.

12             Sergeant Pennucci had not been there for

13   five or six years, I want to say.  Maybe even

14   longer.  And we were getting his perspective just

15   from an overall aspect.

16   Q.      Okay.  But their perspective is as a

17   SWAT operator, not as trained legal analysis;

18   correct?

19   A.      Correct.

20   Q.      Can I -- as I've gone through this --

21   and I kind of want to know if you know or not.

22             Does the time that you're supposed to

23   start -- the time in these court cases and the time

24   that you start counting, do you start counting at

25   the very beginning of the announcement or when the

Page 50

1   announcement is concluded?

2       A.      There's no reasonable -- I mean, there's

3   no standard set forth.  And that's part of the

4   problem is you can look at Zabeti versus State and

5   you can look at United States versus Banks, and

6   while there are seconds and examples of when it's

7   appropriate or when it's reasonable to make an entry

8   into a structure after announcements are given,

9   there's not specifics on this is exactly when this

10  should happen, regardless of the case.

11              Like I said before in the report, Banks

12  was 15 to 20 seconds is what they found reasonable.

13  And then in Zabeti it was less than 10 seconds was

14  found reasonable.

15              So I believe when Anthony Bandiero

16  looked at this, he looked at the totality of the

17  circumstances from a legal perspective, not

18  necessarily from a department's perspective, on how

19  we have our -- or how we had our manual.

20              And that's why this conclusion, when it

21  was written at the end of this investigation, was it

22  was a policy and training failure.

23      Q.      But let me -- let me -- let me go back

24  to one statement you just said.

25              You said "after announcements are

Page 51

1    given," and that's the point of my question.

2              Do you start counting after the

3    announcements are given or from the second the

4    announcements start?

5         A.      We started ours from, I believe -- I

6    couldn't tell you exactly just from what we did.

7    But if we replayed the video, I could tell you

8    exactly.  But I believe it was from the start of

9    those announcements.  And I can maybe reference it

10   inside of the report when I lead in.

11        Q.      Sure.  We'll get to that in a minute.

12   My point was a little bit different though.

13             After having concluded this

14   investigation and having gotten the opinion from the

15   different SMEs, is it your understanding that when

16   the cases count the seconds, when you guys are

17   talking about seconds within the report -- because

18   the term you just said was "after announcements are

19   given."  So do you count from the time the

20   announcement ends, or do you count from the time

21   when the first word comes out of their mouth?

22        A.      I believe it was from the first word is

23   when we started our count on that one.

24        Q.      And where did you come up with that's

25   when you should start counting?

Detective Justin Roth     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 52

1      A.      When there is a megaphone that is

2  amplified sounds at 5:00 in the morning on a search

3  warrant.

4      Q.      I under -- thank you for that answer.  I

5  understand the factual -- I understand kind of the

6  factual outline of it.  My question is a little bit

7  different to you.

8          My question is, when you're analyzing

9  this and you start counting the seconds -- and we'll

10  go over all that.  You have written a very detailed

11  report.  I have no doubt when you started doing

12  anything on anything in this investigation.  But my

13  question is a little bit different, and I will try

14  to ask it better so that it's clearer.

15          Where did you come up -- how was it

16  determined that the counting should start when the

17  first word comes out versus when the announcements

18  are concluded?

19      A.      So I don't know what the decision was on

20  that.  My kind of recollection would be once the

21  announcements start, that is an announcement.  Just

22  because it's finished within a second or two seconds

23  doesn't mean that that's a full announcement.  The

24  announcements had started.  I believe they started

25  with "Police department, search warrant," or

Page 53

1  something along those lines.  But from the start of

2  the announcements is what we went with.

3           And -- does that answer your question?

4      Q.      Yeah.  To your recollection, was there

5  any debate or discussion of, like, do we start

6  counting when they start the announcement, or do we

7  start counting when -- like, when they get through

8  the first couple, It's the police department; we're

9  here to serve a search warrant?

10          Was there any discussion about that?

11     A.      I don't recall one way or the other.

12     Q.      Okay.  So was it fair for me to think

13  though, based on the answers that you've just given,

14  that if you don't recall, then you just kind of took

15  it as this is when we start counting?

16     A.      Sure.  In the same way that when we look

17  at a use-of-force investigation and we'll talk about

18  the start of a shooting, I don't say that the person

19  started shooting after the last round was fired.  I

20  start my investigation when -- the second the first

21  round is fired.

22          So in the same respect, that's how I

23  believe I interpreted the announcements.

24     Q.      Okay.  You understand -- what's your

25  understanding of the purpose of "knock and

Page 54

1      announce"?

2          A.      As Anthony Bandiero put in there, the

3      reasonable amount of time for a person to submit

4      to -- or give the person a reasonable amount of time

5      to submit to the service of the search warrant.  I

6      guess -- I believe he wrote in here, "to save his

7      door," which I feel is a legal term.  It's not in

8      our policies, our procedures.  But I believe "save

9      his door" was mentioned.

10         Q.      And I'll just represent to you, Justin,

11     that's a term that's kind of used through some

12     different cases.

13         A.      Sure.

14         Q.      So -- but -- so just to confirm, as we

15     sit here today, the counting starts when the first

16     word comes out of their mouth?

17         A.      Sure.  Yes.

18         Q.      And that was your understanding of

19     that's how we count, and that's consistent with the

20     case law that was -- analyzed these items?

21         A.      Correct.

22         Q.      Okay.

23         A.      And in that same, I guess, statement is

24     that was never corrected if that was not the case by

25     Anthony Bandiero.  His assumption, again, too, when

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 55

1    he analyzed it, when we talk about the 6 seconds

2    from when the stun stick goes in the window and then

3    the 16 seconds overall from a time lapse of the time

4    of announcements to time of body entry was also done

5    from that same standpoint.  So the legal expert also

6    went with that same conclusion.

7        Q.       Okay.  And so you talk about the six

8    seconds.  And we'll get into the real -- the

9    timeline that you've outlined in here.  That's when

10   the stun -- that's when the first entry is made into

11   the apartment; correct?

12       A.       That's when the stun stick is made into

13   the apartment.  There is no body entry.  However,

14   there is an entry of one of our devices, which is a

15   stun stick.

16       Q.       All right.  How long did it take you to

17   write this report?

18       A.       Roughly -- roughly a year.  There was a

19   lot -- there was a lot of interviews that were

20   completed.  I want to say 22.  But when you get

21   those interviews, especially when you're talking

22   about a five-shooter -- in this case, there were

23   five officers who shot -- those are very long

24   interviews usually.  At least two hours.

25               After you prep for those interviews,

Page 56

 1  then you complete those interviews, then you have to
 2  go back and listen to those interviews and then
 3  proof those interviews as a -- you do it usually
 4  yourself.  You do have assistance from people on the
 5  team on some of the ones that maybe necessarily I
 6  don't need to hear through its entirety again.  But
 7  I participated in every single one of the
 8  interviews.  Then those have to be determined what
 9  goes in the report, what doesn't go in the report.
10            So it's a lengthy -- it's a lengthy
11  process.
12       Q.      I'm familiar.
13            What -- you didn't lead -- did you lead
14  every single interview?
15       A.      I believe I did, yes.
16       Q.      Okay.  And about how much time would it
17  take -- just give me a ballpark.  I know each one is
18  going to be different.  I'm going to pull out a
19  couple of specific ones.
20            But on average, like, how long did it
21  take to prepare for each interview?
22       A.      When you're talking about an operator
23  who has a body-worn camera, you have to review all
24  the body-worn camera.  Go over the radio traffic
25  that was given.  Any of the prearrival stuff, when

Page 57

```
 1    you talk about the plan -- when we're talking
 2    specifically here about SWAT, go over their plan to
 3    make sure that their plan was sound when they had --
 4    on the way to make entry, to make sure everybody was
 5    on the same page.
 6            Outside of whether or not it was good,
 7    bad, or indifferent, looking at every -- all the
 8    interpersonal communications so you can ask
 9    questions on that.
10            So on these, it's probably a couple of
11    days per person on the front end.
12        Q.    And I should have asked this before.
13            How did you get assigned this case?
14        A.    I volunteered.  Very smart of me,
15    wasn't it?
16        Q.    Walk me through the -- walk me through
17    the thought process of volunteering for this and why
18    it was open to volunteer.
19        A.    It was not open to volunteer.
20        Q.    That's a two-part question.
21        A.    It never is open to volunteer.
22            In this case, I had extensive knowledge
23    of search warrants, and the person who was up in our
24    rotation did not have the same experience in search
25    warrants that I had, and it was just an executive
```

Page 58

1    decision to make me the case agent.

2        Q.      And we went through -- we went through

3    your professional background earlier in the

4    deposition.  And I am not an expert in this, so walk

5    me through.

6            What about what you've done, either in

7    CIRT or your other roles in LVMPD, what made you an

8    expert in search warrants?

9        A.      I've authored dozens of search warrants

10   for narcotics, for property, for bodies of

11   individuals through PSU, through property crimes,

12   and through PD.  So almost five years of experience.

13           And sometimes in patrol, because I had

14   that experience and then went back to patrol at a

15   certain time to be an FTO, I did utilize some of

16   those search warrant skills, to include buccal

17   swabs, those type of search warrants, when

18   detectives weren't available.  During our time when

19   I was in Bolden area command, we had three days out

20   of the four that we were in operation where we did

21   not have access to detectives, so I was de facto

22   detective and FTO.

23       Q.      So tell me if I'm right or wrong.  This

24   kind of popped -- like, it's a six- or seven-person

25   team; right?  So it's like you guys are aware of

Page 59

1    what the other ones are working on.  Is that fair?

2        A.      Yes.

3        Q.      So you were kind of aware of this

4    Alexander case and that it has to do with, you know,

5    a search warrant --

6        A.      Alexander?

7        Q.      Sorry.  Well, Isaiah Williams.

8        A.      Okay.

9        Q.      Sorry.  You were aware of the Isaiah

10   Williams case.

11              If you can tell me, if you can

12   recollect, kind of, when you then said "volunteer,"

13   what was it about Mr. Williams' case that made you

14   think it was going to be related to search warrants

15   and you would be the appropriate -- you would

16   probably be the best person on the team to handle

17   this investigation?

18       A.      It was a SWAT search warrant for a

19   homicide subject and the weapons used in a homicide.

20   And when it -- I didn't go to the callout that night

21   or that morning.  That was a different team.  Our

22   callout rotation doesn't work hand in hand with

23   who's up.

24       Q.      What's -- what's -- sorry.  I'm going to

25   interrupt you, and I'll try not to do it again.

Page 60

1                    What's the callout?

2        A.        So at that point I believe we had a

3    four-team rotation with -- because I believe we had

4    seven at the time.  We had one person that would be

5    on their own on the rotation.  So we go week-to-week

6    rotations.

7                    So for an example, last week I was up,

8    but I wasn't up for a case.  So if we had any

9    callouts for CIRT -- which we did, we had a CIRT

10   callout -- I would respond as that responding

11   detective to get a preliminary investigation, to

12   admonish any of the individuals who were involved,

13   and to review body-worn camera before, as a

14   preliminary investigation, to see if it does meet

15   our criteria to become a CIRT case.

16       Q.        Okay.  But this one, if I understand,

17   you weren't on the callout on Mr. Williams' case?

18       A.        Correct.

19       Q.        Sorry.  I interrupted you before.  You

20   were walking me through why it was -- kind of, like,

21   what your understanding of the case was and why you

22   volunteered.

23       A.        Sure.  So after that callout happens,

24   the team that went out, usually two detectives,

25   sergeant, lieutenant, and our captain, among

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 61

1    everybody else -- DA's office, FIT, DIO -- all of

2    these entities that go on an officer-involved

3    shooting came back to our office, and that's where

4    we were at during our normal course of duties.  We

5    log on at 7:00.

6              And we started reviewing what we knew of

7    the case at that point.  We knew that there was a

8    search warrant service.  And because I had

9    experience and I was next up, that we just decided

10   to swap with the detective who was currently up just

11   so I could have that knowledge and bring that

12   knowledge to the investigation.

13        Q.    So you volunteered for this.  At the

14   time you volunteered -- and I -- if you can

15   remember, did you anticipate this would be such an

16   undertaking, or did you have -- did you have kind

17   of -- do you know what I mean?

18        A.    Every officer-involved shooting that

19   we handle is an undertaking.  You're dealing with

20   an officer, worst day on their career.  Whether

21   or not -- no matter what the circumstances are,

22   that officer used deadly force.  So that's never

23   taken lightly.  That's never taken with an

24   understanding that this is an easy case or this is a

25   hard case.

Page 62

1           The fact that I looked at was, when we

2    were game-planning on how we were going to start our

3    interviews, how we were going to conduct this

4    investigation.  Because it was the SWAT service of a

5    search warrant and I had experience with that from

6    an investigator side, I -- I volunteered to take it.

7       Q.      And you just said that you were

8    game-planning on how to start the interviews.

9           What thought process goes into that, and

10   what do you mean by "game-planning"?

11      A.      Well, we're expected to do an initial --

12   we used to call it a 72-hour brief.  That's what FIT

13   does.  FIT briefs executive staff within 72 hours of

14   the investigation, and that then becomes the YouTube

15   clip you see as part of the transparency of the

16   department, where we show body-worn camera that we

17   have.  Usually it's done by an assistant sheriff or

18   the undersheriff.  Sometimes, if none of those are

19   available, a deputy chief.  But somebody

20   representing Kevin McMahill, the sheriff.  Or at

21   this time -- this time it was Joe Lombardo.  I'm

22   sorry.  Kevin was not here at that point.

23           But that's when they have the press

24   conference.  They go over the case and the details

25   as we know it at the time.  That's the 72 from the

Page 63

1    FIT side.

2                We have a 72, in quotes, on our side.

3    It's usually within a week after the initial

4    presentation from FIT.  And what we try to do is get

5    all of the shooters, at a minimum, interviewed so

6    it's fresh in their memory, and then present those

7    facts to executive staff based on the administrative

8    investigation.

9                Because in most cases, I would say

10   90 percent of cases, 95 percent of cases, officers

11   are not required to talk to FIT, and they don't.

12   However, they are required to talk to us if they're

13   given 48 hours of notice.  That's per NRS, and

14   that's also per our department policy, that they're

15   compelled to do so.

16               So we give executive staff a briefing on

17   why they made a decision to utilize deadly force.

18   That's part of the game plan is getting those

19   interviews done initially and first.

20               Again, when you're talking about five

21   officers on one shooting, it is a lot of work, a lot

22   of preparation, a lot of time, even spending your

23   off time coming in and making sure that you're

24   prepared for those.

25               Because, again, you're dealing with five

Page 64

 1    individuals who just had the worst night of their

 2    life.  They had to take someone's life.  And in this

 3    case two officers got shot, one very badly.  So

 4    it's -- you have to prepare them and prepare

 5    yourself to make that.  So that's part of that

 6    preparation.

 7        Q.      And then, Justin, I'm going to ask you

 8    just one follow-up question, and then let's take a

 9    brief break.

10        A.      Okay.

11        Q.      Okay.  You talked about, kind of, the

12    YouTube video and the initial press release or the

13    initial statement given by the police department.

14            That -- and I want to make sure I

15    understand your testimony here.  That would be

16    something that, kind of, like, FIT was more involved

17    in, not CIRT?

18        A.      Correct.  We don't even have -- we have

19    zero involvement in that.

20            I usually watch the press conferences

21    from my phone when they go live to see what their

22    presentation is.  Sometimes we are allowed in the

23    room for the FIT presentation.  But, again, we have

24    no -- it's stuff that we already know.  They're

25    looking at it from a very rudimentary point of they

Page 65

1    have no interviews from any of the officers, they

2    have no -- all they have to operate on essentially

3    is witness statements from individuals who are

4    nearby.

5              In this case I believe they went off

6    statements on the upstairs neighbors and then any

7    witness officers, who are compelled to talk to FIT.

8    But if they're deemed to be a subject, they don't

9    talk usually.

10             And this is basically their presentation

11    of what happened on the use of deadly force, not on

12    tactics, training, and policy.

13             MS. MURPHY:  Okay.

14             THE VIDEOGRAPHER:  Off the record at

15    10:22 a.m.

16             (A break was taken.)

17             THE VIDEOGRAPHER:  On the record at

18    10:36 a.m.

19    BY MS. MURPHY:

20        Q.    All right.  So, Justin, before we took a

21    break, we were talking briefly about the initial

22    press release involving FIT.

23             And I understand based on your prior

24    testimony you don't have anything -- you watched the

25    press conference too?

Page 66

1    A.    Correct.

2    Q.    Okay.  And so -- and, I'm sorry, you

3  told me before, and now I don't remember.  You have

4  a goal to get, like, the officers-involved

5  statements done within how long after the shooting

6  itself?

7    A.    So we try as soon as possible, but

8  officers are required a 48-hour notice of interview

9  per law before we interview them.  So at a minimum,

10 48 hours.  But you still have to talk about the time

11 it takes to prepare for that.  And if I have any

12 type of allegations of misconduct, I have to put

13 that on the notice that is given to them.  Again,

14 part of that 48-hour notice.  So that does take up

15 time, to see if there are any issues we see from an

16 administrative investigation.

17         So usually, to answer your question,

18 we try to do it within the week with the shooter

19 and any direct witnesses.  Sometimes after that.

20 It's just based on time and availability for our

21 section.

22    Q.    Okay.  And if I remember correctly,

23 these got all done within about a week and a half of

24 the actual shooting; correct?

25    A.    That sounds about right.  And it's

LEXITAS™

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 67

1    because they're also on administrative leave, so

2    then they become available to us Monday through

3    Friday, on our schedule, so we don't have to worry

4    about shift-adjusting people or people coming in on

5    their days off when they're not required to.

6            When they're in an administrative

7    investigation because they're involved in a

8    shooting, we have kind of carte blanche to set up

9    those interviews, as long as they have

10   representation availability.

11       Q.    And who was the -- and I -- I've

12   reviewed all the interviews, so I'm going to ask you

13   some questions just because I want to make a clean

14   record on this.

15       A.    Okay.

16       Q.    Who is it -- who is it that -- who is it

17   that's present with the officers?

18       A.    It varies.  You're talking about, in

19   this case, two different unions.  You have -- and

20   I'm not sure if one guy was not union.  I don't

21   know -- I can't remember if Rothenburg, Officer

22   Rothenburg, was union back then.  I'd have to look

23   on the record of those transcripts of who his

24   representatives were.

25            But for officers or sergeants, it can be

LEXITAS™

Page 68

1    the PPA, which is the LV -- the Las Vegas Police

2    Protective Association.  And then for supervisors,

3    in this case Sergeant Backman would have been the

4    PSMA, which is Patrol Supervisors Management

5    Association, I believe is what they are.  And that

6    can vary in whoever represents them.

7              So it's not specifically two people or

8    one person that goes every single time.  It could be

9    various individuals within those organizations.

10    Q.      Okay.  And part of the reason -- and you

11    referenced it before, but I just want to confirm.

12    Part of the reason that they have representation

13    there is because they are compelled to testify;

14    correct?

15    A.      Yes.  And everything that we notice them

16    in the lead-in to the interview in our script, which

17    says, "Anything you say can be used against you in a

18    civil proceeding," and they acknowledge that, but

19    they cannot be used against them in a criminal

20    proceeding, per Garrity.

21    Q.      And so I noticed as part of the closing

22    of either all or most of your interviews you kind of

23    went through a list of the deadly force assessment;

24    correct?

25    A.      Correct.

Page 69

1      Q.      Okay.

2      A.      If they're involved as a subject officer

3   in the shooting.

4           So if they were a witness, we do not go

5   on their perspective of what they thought the use of

6   force was.

7      Q.      And so is that part of, like -- like, do

8   you have, like, an -- do you have, like, a script

9   for that?

10          Like, every time there's an

11   officer-involved shooting, you ask them these, like,

12   delineated questions about use of force?

13     A.      Yes.  And that specifically is the

14   threat assessment, and then Graham versus Connor,

15   which are -- by law we're only required to ask the

16   three -- the first three questions of that.  But

17   we've expanded it to eight questions, five

18   additional, per LVMPD policy.

19     Q.      Okay.  And it looked like most of the

20   interviews were about an hour or two.

21          Is that accurate, to your recollection?

22     A.      Subject officers, usually around two

23   hours.

24          Witness officers, especially when you're

25   talking about SWAT operators that were on the stack

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 70

1    that didn't utilize force or were not involved in

2    the planning, then we're just trying to get their

3    perspective of what happened, probably an hour.

4    Because it was a short time lapse of time from the

5    time that they started their planning process

6    outside, they made their travel, and then they

7    landed at the apartment complex and continued with

8    the service of the search warrant.  We're talking

9    about maybe less than an hour, so it's just their

10   perspective on that.  So it usually takes less than

11   an hour for those individuals.

12        Q.      Okay.  I know from my own experience as

13   a lawyer that sometimes how a transcript reads and

14   how it seems when you're sitting there are two very

15   different things.

16        A.      Sure.

17        Q.      And so most of the interviews, with the

18   exception of Melanie O'Daniel's, seemed like they

19   were -- maybe friendly is not the right word, but

20   open perhaps is a better word, or cordial.

21             I mean, what was the -- kind of, did the

22   affect -- with the exception of Melanie O'Daniel's,

23   did the affect of any of the officers stand out to

24   you at all?

25        A.      So I'll say one thing first is that I

Page 71

```
 1    don't think Melanie O'Daniel's interviews -- we did
 2    two with her -- were adversarial at all.  Maybe it
 3    has that tone from the -- from the words.  I don't
 4    think it was adversarial.
 5              We have the responsibility to ask tough
 6    questions.  Sometimes officers or supervisors take
 7    offense to that because they believe they were doing
 8    what they believed was right.  And a lot of times
 9    that is the case.  However, our responsibility of
10    CIRT is to ask those tough questions.  So it does
11    come off sometimes that we're maybe being the bad
12    guys.  However, those questions need to be asked.
13              I don't think that -- I know for a fact
14    that this did weigh on a lot of the operators'
15    conscience a lot.  A couple of them broke down into
16    tears, especially when seeing -- I'm not sure if
17    you've seen all the video with this case, but seeing
18    Kerry Kubla shot multiple times, his arm mangled,
19    that does take a huge toll out on -- those guys, you
20    know, are all, for the most part, like best friends.
21    You know, they train together 24/7.  They go out on
22    callouts all the time together.  And to see one of
23    your friends on the verge of death after, you know,
24    doing your job is not something anybody wants to
25    see.  So it does weigh on those guys a lot.
```

LEXITAS™

Page 72

 1                    I remember specifically in this case --

 2     I don't remember who -- I remember maybe Brice

 3     Clements, I believe we had to stop his interview

 4     because he was getting emotional.

 5                    But even that, they took a human life,

 6     and that doesn't weigh -- I mean, that weighs very

 7     heavily on all those guys.  Regardless of the

 8     criminal background or the reason why they're there,

 9     it's a hard thing for a human being to -- to, you

10     know, deal with.

11        Q.       Okay.  And you talked a little bit

12     earlier about you have to ask some key questions in

13     this matter.

14                    I've read the -- I've read all the

15     interview transcripts.  But, as we sit here today,

16     if you could maybe list, like, the top two or

17     three, what did you think were really the vital

18     questions that you needed to ask the officers

19     involved in this case?

20        A.       Well, why did you fire your firearm?

21     That's the biggest one.  Why did you make the

22     decision to use deadly force?  That's the biggest

23     question.

24                    And everything else stems off of that

25     because then you have all the follow-up questions

Page 73

1    for your threat assessment and your Graham versus

2    Connor questions.  But essentially why did you make

3    the decision to utilize deadly force?

4        Q.     And in terms of Melanie O'Daniel's

5    case -- now, obviously she wasn't actually on the

6    stack.  She wasn't involved in the shooting?

7        A.     Correct.  She had COVID at the time.

8        Q.     Well, even if she hadn't had COVID, my

9    understanding is that --

10       A.     The tactical commander.

11       Q.     Right.  So she's not involved in ever

12   executing these warrants?

13       A.     Correct.

14       Q.     She came with a lot of stats to her

15   interview.  Did that surprise you?

16       A.     Not at all.  We've interviewed -- I've

17   personally been in interviews with Lieutenant

18   O'Daniel upwards of, I would say, probably ten times

19   in the time that she was there, because we do have

20   questions on every SWAT shooting of what the

21   planning was and why the planning was the way it was

22   constructed.  So a lot of times that tactical

23   commander has to be brought in either as a subject

24   or as a witness to determine that investigation's

25   tactical planning.

Page 74

1      Q.      In your experience as a CIRT

2   investigator, were there any other -- were there any

3   other cases where you came to the conclusion --

4   sorry.  I know you're not the one coming to the

5   conclusion, so let me rephrase that.  Strike that.

6           In your work as a detective, CIRT

7   investigator, were there any other reports that you

8   have drafted where the conclusion came that they

9   needed to revamp LVMPD policies, whether it had to

10  do with "knock and announce" or search warrants?

11     A.      Not in my time, no.  I believe there was

12  a case before I was up there where they did

13  recommendations.  And if you look in my report, it's

14  Section 9.  And those are associated with whatever

15  section it is.

16           So if you're talking about preplanning,

17  which is Section 3, there were a lot of

18  recommendations that were associated with those that

19  were voted on in a TRB, which I believe most of them

20  got approved.  And they actually got implemented,

21  which was good to see.  When we had different

22  leadership take over, those were implemented very

23  quickly.

24           And that's the purpose of CIRT.  And

25  what a lot of officers don't understand is we're not

Page 75

1    trying to necessarily get you in trouble.  We have

2    to ask the tough questions to make the department

3    better and to avoid officer-involved shootings.

4              If we had -- if we had a year where we

5    had zero officer-involved shootings and I was just

6    bored in my office, I did my job extremely well.  I

7    would be very less stress-free because I

8    know that -- and sometimes obviously you can't

9    control those scenarios, but at least we're limiting

10   our resources or limiting our --

11       Q.       And so, Justin, I want to ask you about

12   that a little bit more.  I want you to expand on

13   that.  Because one of the questions I was going to

14   ask you was what is the purpose of CIRT.  And so you

15   kind of, like, briefly described it right then.

16              Can you really, kind of with a little

17   bit more detail, explain to me specifically, what is

18   the purpose of this division?

19       A.       To analyze training, to analyze events

20   that happened, and determine if our current

21   practices are viable and current and practical and

22   reasonable.  And if there are any deficiencies

23   noted, make those corrections to make our department

24   a better agency and a safer agency for both the

25   department and the community.

Page 76

1      Q.      And in terms of -- you said a little bit
2   earlier -- we'll talk about it more in depth as
3   we -- when we step back into the actual report.
4            Is it my understanding -- because you
5   talked about it briefly, the implementation of the
6   recommendations.
7            My question is, if they are accepted,
8   then you are aware whether or not they're
9   implemented; is that correct?
10     A.      So that's where OIO comes into play.
11   So they'll take those recommendations, and they
12   will draft a formal, I guess, workup of that
13   recommendation.  That does come through our
14   shop.  We have a form we file for these
15   recommendations now, after this case specifically,
16   that when those recommendations are put into place,
17   that they make sure they follow up with those
18   specific sections.
19            Now, if it's patrol, it's a lot easier,
20   because that's a global aspect.  When we are talking
21   about specialized units such as SWAT, then we have
22   to make those adjustments with that deputy chief who
23   is in charge of SWAT, and then the tactical
24   commander and the captain of the section.
25     Q.      And so if I -- do I understand

Page 77

1  correctly, even how it's related to IOI has changed

2  as a result of this incident?

3        A.     OIO?

4        Q.     OIO.  Sorry.

5        A.     Yes.  We have done a -- well, I can't

6  speak very much on their side of it.  While they are

7  in the same office, just on the other side, I don't

8  really pay too much attention to what they do.

9              If they ask me, Hey, I need your

10  recommendations on this, I need to put this into

11  wording, and then how would you like to handle it?

12  then yes, I'll send it over to them, if they have

13  any questions about it.

14              But I believe when this came out and we

15  had I want to say it's 12 recommendations or

16  something like that, I don't know the exact number

17  off the top of my head, it was a lot more than we've

18  ever had previously to where something could just be

19  changed, like a policy or procedure.  We've revamped

20  our system.  So nine of them.  So it went up to 9.9.

21              We also have to look at ourselves too.

22  Again, it's Critical Incident Review Team, but

23  it's -- we still work for LVMPD.  And if we can be

24  more efficient and we can help the department in a

25  greater way, then doing stuff like recommendations

Page 78

1    in this manner where the board is voting on them and

2    it's just not our section saying, Hey, this needs to

3    change and here's why, now you have a tactical

4    review board full with an assistant sheriff, a

5    deputy chief, a captain of training, and then peer

6    officers and supervisors who are saying, Yes, we

7    should do this based on what we saw in this case.

8         Q.       And so -- and I know that the

9    recommendations are kind of laced throughout here.

10   Is it fair -- and my understanding having reviewed

11   this, but if there's another specific section

12   perhaps I missed -- the recommendations are laced

13   throughout the conclusions; correct?

14        A.       "Laced" is --

15        Q.       Well, how would --

16        A.       Included, I would say.  They're not

17   hidden.

18             After every conclusion, where usually it

19   will read certain SMEs conclude that, whether it's

20   reasonable, not reasonable, within department

21   standards, or policy failure, at the end of those

22   conclusions, before moving on to the next

23   conclusion, there will be a notation.

24             I'll find one just for example.

25             On page 208, this is dealing with

LEXITAS™

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 79

1    approval of the IAPs, just for an example.  After

2    the conclusion was listed, there is a paragraph

3    afterwards that reads: Currently, there is no

4    approval form associated with the approval of search

5    warrants or the tactics utilized.  All requests for

6    tools, et cetera, of Sierras -- all requests for

7    tools and tactics, Sierras -- which are SWAT

8    snipers -- Stun Sticks, 9-Bang, Explosive Breach,

9    CET, and SACO -- which is "surround and callout" --

10   et cetera, can be completed verbally or even via

11   text messages, as was the case in this incident.

12   CIRT recommends that LVMPD create an official

13   approval form for the service of a SWAT search

14   warrant -- it goes on with a conclusion.

15           So that's where we identify a verbal

16   affirmation of, yes, I want to -- I want all these

17   tactics, or through a text message, or whatever the

18   case may be, email.  We thought it was not

19   sufficient enough to have that.  It should be a form

20   saying, yes, check box, check box, here's a

21   signature, and go forward with your operation.  That

22   was our recommendation on that one.

23           Which, again, is a conclusion number on

24   the back of that table, which is then voted on the

25   board at the TRB.

Page 80

1    Q.    Okay.  I guess -- so that's what I was

2    trying to kind of figure out, the interplay in the

3    report.

4           So it's throughout the dialogue of the

5    report, and then it's also there's

6    recommendations -- not every conclusion has a

7    recommendation?

8    A.    Correct.  And that's done at the back of

9    those conclusions too for continuity, so you know

10   exactly what we're referencing when we talk about

11   that recommendation.

12   Q.    Okay.  Okay.

13   A.    And, again, to speak on the point of

14   what does CIRT do, that's part of our goal is to

15   make the department better.  So if those nine things

16   are implemented, we feel that that would make the

17   department better.

18          And to my knowledge I believe most of

19   them, if not all of them, were done.

20   Q.    Okay.  You said that it took you almost

21   a year to compile this report.

22          Are there any -- other than trying to

23   get the -- which sounds like it's kind of a -- it's

24   more of a goal than a hard deadline -- to get the

25   officers involved interviewed as soon as possible,

Page 81

1    are there any other, like, internal deadlines that

2    you're supposed to meet when preparing these

3    reports, or preparing this report?

4        A.      There's deadlines that are set based on

5    the availability of staff.  If you were giving an

6    initial sheriff brief, for example, it's set at X

7    date, usually a week after the FIT presentation.  In

8    this case it was probably two weeks just because

9    they knew that we had five involved officers that we

10   had to interview.  So that is something that's set

11   case-to-case basis as far as that meeting or -- that

12   meeting, that presentation.

13             However, you also then have then a date

14   set for your captain's/lieutenant's brief, which is

15   more along the lines of a global -- like, how can we

16   fix this globally.

17             In this case we didn't do a

18   captain's/lieutenant's brief because it was a SWAT

19   operation, and that's not something that needs to be

20   fixed on a patrol level, and that's the purpose of

21   that one.

22             And then the SME brief, usually we try

23   to get that done in a reasonable amount of time,

24   after all interviews are completed, to get the

25   officers back to work who are able to go back to

Page 82

1    work that are cleared by doctors at that point.

2             So once the SME brief happens, then

3    those officers can be cleared if they've been

4    cleared and properly trained for the return-to-duty

5    training.

6        Q.      Okay.  And we talked about it a little

7    bit more briefly.  I want to kind of go through --

8    based on what you testified to here today, I want to

9    go through what I think your investigation process

10   can -- like, has, and you tell me if I've left

11   anything out or if this is accurate.

12       A.      Okay.

13       Q.      So there's the initial callout; correct?

14       A.      Correct.

15       Q.      And that's when you would actually go to

16   the scene of the officer-involved shooting?

17       A.      Correct.  And that's -- just to kind of

18   piggyback on that, it's the callout team.

19             So the sergeant and lieutenant on an OIS

20   will always go out, unless they're out of town.

21   Obviously if they're in California, they can't come

22   back.  And then the callout team.

23             The next up for a case has the option to

24   respond but is not necessary.  Again, if you have

25   family things and it's 3:00 in the morning and

Page 83

1    you're not available, you're not available.

2              Once that happens, then we go to your

3    next part.  So it's a -- it's a very fluid dynamic

4    based on the amount of people we have because we

5    don't have a lot of people.

6         Q.    Okay.  So let's talk about -- like, you

7    know, I'll be asking, I guess, in a hypothetical,

8    but it really is geared towards this.

9              So there's the callout, which you didn't

10   go to?

11        A.    Correct.

12        Q.    Okay.  And then from there -- sorry.

13   Let me backtrack.

14             What -- what do you guys do at the

15   callout?  And what is -- what does a CIRT

16   investigator such -- a CIRT detective investigator

17   such as yourself, what would you do at the callout?

18        A.    So at the callout we are required by

19   state law to do breath and urine on all involved

20   officers.  So the first thing we do is we go into

21   whatever respective area the officers are being

22   held, whether it be one of the buses from the

23   unions, a patrol vehicle if they're not part of a

24   union, and we utilize our PBT that's assigned to us,

25   our preliminary breath test, to determine if they're

Page 84

1    impaired via breath.

2              After that's done, we have a call out to

3    a guy who comes out and does the urine test, usually

4    on one of the union buses.  That is a third-party

5    system.  And that's sent off to testing.  I can't

6    speak too much on the fact that he just comes out

7    and collects urine.  That's all I know from that.  I

8    don't know where it goes from that point.

9              Then we get a briefing from the

10   investigator in charge of that.  Usually it's a

11   sergeant or a PD detective who is just out there.

12   They compile everything they know at the time to

13   give a brief of who's involved and why we're out

14   there.

15             Once that brief is completed, we

16   determine who our involved officers are and who our

17   witness officers are, people who just saw the event,

18   and we admonish them.  The admonishment is

19   essentially, Don't discuss this, for anticipated

20   testimony purposes, with each other.

21             Once we admonish them, we note that on a

22   piece of paper.  We have a piece of paper that has

23   the names and it has the admonishment.  So we read

24   it to them.  We have them either sign it, or, if

25   they're not available to sign it -- like in this

Page 85

1    case Kerry Kubla got shot in both his arms.  He
2    can't sign that.  And he was at the hospital.  We
3    ended up calling him on the phone, once he was out
4    of surgery and he was coherent, and just admonished
5    him over the phone, wrote his name down, and marked
6    the time that he was admonished.
7                After that is done, we'll go through all
8    body-worn camera in the TOC, which is the tactical
9    operations center.  It's a big RV-looking thing that
10   has a bunch of TVs and computers so we can load up
11   those cameras and watch them in real time.
12               At this time FIT is also conducting
13   their investigation.  They're the leads of the
14   investigation.  We're just -- we are background.
15               FIT is doing interviews with all witness
16   officers.  And then they will do the countdown of
17   the officers' weapons and the walk-throughs with the
18   officer and their representation.  We're not there
19   for any of that.
20               So once we get the video, we see
21   everything that happens, we wait for our four
22   involved citizens.  So we have our citizen review
23   board that comes out that's part of the use-of-force
24   board that votes on it.  They come out there that
25   night, and they get a walk-through of the scene

Page 86

1    outside of the red tape.  So they're not permitted

2    to walk inside the scene, but they get as close as

3    possible, and they get the details that we know at

4    the time of the incident.

5              This is usually done by the CIRT

6    sergeant or lieutenant.  In some cases the senior

7    detective on the squad who was out there will have

8    to do it, based on availability.  But we just give

9    them an overview of, like, this is why we are out

10   here.  We had five officers fire.  And this is the

11   apartment.  Do you guys have any questions?

12             And a lot of it is preliminary

13   questions.  A lot of it is stuff we don't know, if

14   they ask any questions.

15             And then we try to keep those same

16   individuals in the use-of-force board.  Sometimes

17   from availability that's not possible.  That's why

18   we have citizens who are on, like, reserve that can

19   fill in if the citizens available is not there.

20             But that concludes pretty much our

21   investigation, outside of making our IA Pro case,

22   which is done back at the office or on a laptop on

23   the scene, and making our H drive file, which is

24   just our generic case file.  And then we start

25   loading up things like CAD, which is computer-aided

LEXITAS™

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 87

1    dispatch.

2            By that point, usually body-worn cameras

3    aren't available yet because they have to download

4    and then be available on evidence.com, which doesn't

5    happen until FIT gets back in the office and puts

6    their cameras on the dock, and usually it's a couple

7    of hours after that.

8        Q.      When you say you have to make the IA Pro

9    case, what do you mean by that?

10       A.      Essentially it's the virtual case file

11   in our systems which any -- essentially, FIT -- not

12   FIT, sorry -- any CIRT or IA investigation just

13   documents anybody's involvement in any of those.

14       Q.      And I saw some -- I've seen throughout

15   the case file there are photos where it kind of

16   recreates -- some of it you -- some of it is

17   referenced in some of your report, where it talks

18   about, like, this person was standing this far from

19   the couch and was located here.

20              Is it FIT that kind of does all that?

21       A.      No.  So that's our crime scene analysts

22   that do that.

23              So there's twofold to that.  I believe

24   in this case was one of the first cases I used

25   TruView on, which is the kind of grainy-looking

Page 88

1    photos that are on there.

2                Essentially what TruView is is every

3    scan they take is a million data points, and it

4    takes a 360-degree picture of whatever it's at.

5    Used on fatal traffic accidents, on homicides.

6    You've probably seen similar technology in, like,

7    movies and TV shows, where you're like, Oh, why

8    didn't they just scan the scene?

9                I know they did it at October 1, for

10   that scene, where they scanned the entirety of that

11   fairgrounds so they would have real-time data.

12                It gives you exact measurements of where

13   people are based on where they drop their cone

14   during that walk-through.  Or if you have body-worn

15   camera, you can put them into a certain area based

16   on their body-worn camera, kind of fly through the

17   scene, get your measurements.  It's a very useful

18   tool.

19        Q.      Okay.  And so now we're through the --

20   now we're through the callout.  You created the case

21   file.  And then what happens -- what's the next step

22   in the investigation process?

23        A.      Once the body-worn camera is uploaded --

24   usually audio from dispatch is pretty quick.

25   They're really good about putting that into a shared

Page 89

1    file.  Then we can pull it over into our H drive.

2            But in this case there was not a lot of

3    radio traffic because it was the -- I forget who.

4    It might have been Sergeant Findley who got on the

5    air and said, Hey, we're going to be in Southeast

6    serving a search warrant.

7            And then the next audio is a 444, which

8    is an emergency of an officer, officer down.

9            So there wasn't a lot of radio traffic

10   to listen to and monitor that we could do any type

11   of analysis on or determine if there's any missteps

12   or good work.

13           So we had to wait for the body-worn

14   camera in this specific case to load up.  And,

15   again, you're talking about an entire SWAT team of

16   operators, and that's, I want to say, 17 or 18

17   cameras that we had to wait to load.

18           But based on the detectives who went out

19   there, we start discussing what we know at the time

20   with the entire team.

21           Once we get the body-worn cameras, we

22   start looking at the shooters' cameras first, only

23   because they are the people we're going to interview

24   first, so we want to get a good understanding of

25   everything they did.

Page 90

1          In this case -- I'll use an example of

2    something that we would put on a notice that would

3    be a negative would be, when we were watching Kerry

4    Kubla's body-worn camera, after he got shot, he goes

5    to the ground.  Obviously his camera stays on.  They

6    ended up turning it off.  But at the time they were

7    unaware if he fired or not.

8          We have the video evidence that shows

9    that he does and his round count showed that he did.

10   But during the course of the investigation, it was

11   determined that one of the SWAT operators cleared

12   his weapon because it was dangling unsafe from his

13   body as they were trying to tend to his wounds,

14   which per policy you're not supposed to do.

15         Now, this is one of those things where

16   we talked to SMEs later on and say, Hey, was this

17   reasonable given the circumstances of Kerry being

18   shot?  And they determined it was just because they

19   wanted to get that gun out of play, and they weren't

20   necessarily sure if he shot.

21         But that would be something we'd look

22   for on a notice to where now, up top of the subject

23   notice that we would have to give these officers, if

24   we see any allegations of misconduct, not

25   necessarily saying that there's something wrong with

Page 91

1    it, but we identified it as possibly being an issue,

2    and we need to talk to you about it, but we can't do

3    so without putting it into the notice for NRS.

4            So in this case we would have -- I

5    forget who the officer was that did that.  But in

6    his notice it would read, You were the witness to

7    this.  However, you're a subject, and here's your

8    allegation of misconduct.

9            So that's kind of where we would go at

10   that point would be the involved officers' body-worn

11   cameras, and kind of breaking down all of that to

12   see if there was any allegations of misconduct

13   within those individuals outside of accusing them of

14   being in an officer-involved shooting, which is why

15   they're required to talk to us in the first place.

16       Q.    So then you get through the initial --

17   you get through the initial interviews, which I

18   think happened in about the first week and a half.

19   And then what are you doing next?

20       A.       Preparing for the sheriff brief, the

21   initial sheriff.  Preparing for that brief.  Getting

22   the threat assessment done for each of those

23   officers, and the Graham versus Connor, which are a

24   lot of -- very tenuous.  Because you have to go back

25   and listen to the interview, you have to surmise

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 92

1    their statements in a short enough time period to

2    where we're not sitting there all day reading their

3    exact transcription, and then preparing for that

4    presentation.

5              Once that's done, then I'm assuming your

6    question is after --

7    Q.      And sorry.  Just -- I'm going to

8    interrupt you just for a second.

9    A.      Yeah.

10   Q.      Is that the 12-hour presentation with

11   the slideshow?

12   A.      No.

13   Q.      Okay.  Sorry.  Keep going.

14   A.      We have multiple presentations as part

15   of CIRT investigations.  But this is the initial

16   brief.  I want to say this one probably was around

17   45 minutes to an hour.

18   Q.      If you remember, or not, at that point

19   in time were you aware that there were issues with,

20   like, the search warrant and the IAP?  Were you

21   aware of any of that?

22   A.      Yes.  So we get all those documents from

23   SWAT at that time, and we start putting together an

24   investigation.

25              But, again, this is a preliminary

Page 93

1    investigation, where we are on the investigation

2    itself.  A lot of that tactics and paperwork stuff

3    comes after.

4              The first thing that we want to -- that

5    we're required to do as CIRT is advise staff on the

6    shooters in this case and what were their responses

7    to the questions that were asked about their use of

8    deadly force.

9              In previous years, and this has not

10   happened in, I want to say, five years, we did

11   30-day updates.  I believe we did a 45-day update on

12   this one, which was just going into a lot of the

13   stuff that we were finding from the investigation

14   that you see in the report, just to update staff.

15   But initially we mentioned it as areas of concern,

16   but we hadn't fully investigated it.

17             So it's one of those things where you

18   mention, Hey, this is what we identified, but we're

19   still looking into it.  We haven't interviewed the

20   people, so we can't give the reasons why this was

21   done this way or that way.

22             But that's why we do the initial --

23   Q.       Is it fair to say that there were early

24   areas of concern in this case?

25   A.       In every case there's always areas of

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 94

1    concern.  No OIS is perfect.  On the surface it

2    could look like the absolute cleanest, and there's

3    always one minute factor -- body-worn camera,

4    someone is missing a piece of gear that's

5    nonessential -- there's always some little detail.

6            So that's our job, to make sure we find

7    those little details.  Because if we don't find

8    those little details in the case, then it never gets

9    fixed.

10   Q.      And I'm sorry if you said this before.

11   I just want to backtrack and ask again.

12           Did this have more recommendations than

13   any other case you'd ever worked on?

14   A.      Yes.

15   Q.      And they were further implemented as --

16   it not only had the most recommendations, but there

17   was the most implementations of the recommendations;

18   correct?  To your knowledge.

19   A.      I can't speak on that one way or the

20   other as far as the eight years or seven years

21   previous to CIRT.

22   Q.      I'm sorry.  I'm just talking about in

23   your experience.

24   A.      In my experience, yes.

25   Q.      Okay.  And that's a fair distinction.

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 95

1    So I'm just asking about your experience.  Okay.

2    All right.

3                So, sorry, I shouldn't have interrupted

4    you.  We're doing preliminary reports.  You know, in

5    this case it was 45 days instead of 30.

6                Then what's going on then?

7        A.      Then we're going over who needs to be

8    interviewed.  So everybody is usually helping out on

9    this process, especially when you have multiple

10   body-worn cameras.

11               If you have a simpler, quote-unquote,

12   shooting, where, let's say, it's a car stopped and

13   there's only two officers that are involved and no

14   one else gets there until the guy is in custody,

15   then obviously the list of people you need to

16   interview diminishes quite a bit.

17               But when you're talking about a SWAT

18   team here with multiple individuals being involved,

19   and then multiple individuals clearing a house,

20   medical being rendered to both the suspect and

21   officers on-scene, there's a lot of hands in there.

22   Especially when you're talking about now IAPs and

23   investigations.

24               So we determined who needs to be, like,

25   the most pressing to get the best information and

Page 96

1    where we make a determination of where we need to go

2    next.

3            In this case I believe Lieutenant

4    O'Daniel was one of those key figures.  Sergeant

5    Findley.  Officer Jake Warner because he was the

6    ATL, the assistant team leader.  Those are some

7    individuals that we would want to interview before

8    we get to somebody else who may not have as deep of

9    involvement.

10           But we're in the planning structure of

11   this and kind of work backwards from the shooting to

12   the planning to how do we operate as a department.

13   So it's kind of working backwards from the time of

14   the incident.

15   Q.      Okay.  And you had mentioned this

16   before, and I just wanted to ask you about this

17   since you brought it up.  You know, that CIRT --

18   one of the reasons that you were assigned this

19   case -- or, sorry, you volunteered for this case was

20   because you had a lot of experience with search

21   warrants.

22           And so can you kind of -- and you told

23   me, like, in what areas or departments you had the

24   experience in.  But can you tell me about, like,

25   what is your -- like, were you drafting -- like,

Page  97

1    when you say a lot of experience with search

2    warrants, can you explain that to me a little bit

3    more in terms of the actual mechanics of what you

4    were doing?

5        A.        Sure.  The affiant of the legal document

6    that is the search warrant, and then also being the

7    secondary on a lot of cases where you're required to

8    sign as the secondary on that affiant page.

9                  But, yes, authoring and being the

10   affiant of search warrants.

11       Q.        Did you have a lot of experience in your

12   prior professional background for Las -- in

13   executing search warrants?

14       A.        As being an operator in SWAT, zero.

15   I've never been in SWAT.

16       Q.        Okay.  But even -- sorry -- outside of

17   SWAT, did you ever execute search warrants as part

18   of your role in any of the other --

19       A.        No.  So the -- back in, I believe it

20   was, 2012 or '13, we stopped the practice of having

21   detectives serve their own search warrant if there

22   was minimum danger.  Any search warrant that needed

23   to be -- needed to be served on a dwelling or any

24   kind of structure that was not frozen -- and frozen

25   in this aspect of having police officers inside and

Page 98

1    it being completely secured -- would be then

2    conducted by SWAT.

3         Q.      So I guess can you explain that to me

4    a little bit more?  Because I saw some

5    conversation about why wasn't Major Violators

6    involved.  So does Major Violators serve those, or

7    is it just SWAT?

8         A.      No.  I guess maybe -- was that from my

9    testimony you're discussing?

10        Q.      It was within the report somewhere, a

11   discussion about Major Violators, in terms of them

12   executing the search warrant, and were they

13   considered or not.

14        A.      So that was not necessarily the

15   execution of the search warrant.  That would be

16   conducting the arrest of the individual.

17             So a lot of times Major Violators will

18   be tasked with getting search warrants or the body

19   for a search warrant, to include, like, an arrest

20   affidavit as well.  And then once they have that

21   probable cause and have that signed warrant for

22   arrest and search warrant, then they would go find

23   that person, whether it be through electronic

24   resources or visual resources as far as, like,

25   stakeouts, I guess would be, like, the layman's term

Page 99

1    for it.  And they would try to apprehend that

2    individual outside of the house as opposed to inside

3    the house.

4              If it had ever gone to an

5    inside-the-house, where they were either barricaded

6    or refuse to come out, always SWAT.  Major Violators

7    would never serve a search warrant.

8    Q.      Okay.  Thank you for explaining that.

9              And where in the report -- we'll get

10   back to the thing -- what your next steps are.

11             Where in the report would I find -- is

12   there, like, a listing of subject matter experts?

13   A.      The standard subject matter experts are

14   going to be on that page 1 that you gave me.  It's

15   this -- I think I have your page now.  You have it

16   there too?

17             The -- I can't remember if we started

18   implementing a sign-in list after this case, because

19   there was a little bit of controversy during the

20   use-of-force board where Lieutenant O'Daniel

21   attempted to have TJ Jenkins be her representative,

22   and he was one of the SMEs that was used for SWAT.

23             In general we don't put the specialized

24   units out of there onto that list.  Those were our

25   general people that were there for training.

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 100

1    Q.    So I guess let me ask the question a

2    little bit differently.

3          For instance, I don't see Mr. Bandiero

4    on this list.

5    A.    Correct.

6    Q.    He's a subject matter expert; right?

7    A.    Again, yes.

8    Q.    So why isn't he listed on here?

9    A.    I couldn't tell you one way or the other

10   as far as our procedural goes.  But from my

11   understanding is that that is our baseline

12   essential.  Those are our everyday SMEs that conduct

13   training, tactics throughout AOST, RBT, the academy.

14         Anything else that's mentioned as an SME

15   as far as specifics, like Anthony Bandiero on there,

16   would be mentioned as an SME in the report, but it

17   wouldn't be in that sidebar.  If we got to the

18   point, especially on this case, there wouldn't be,

19   one, enough room for it.  But, two, it's a internal

20   briefing that's not made to be -- most SME briefs

21   are not made to be on the record.  It is to assist

22   the investigating detective with the guidance on

23   tactics and training, what we do.

24   Q.    So are there any SMEs -- if they're not

25   meant to be on -- okay -- sorry --

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 101

1      A.      There should be a sign-in list that was

2    in our case file of SMEs for the SWAT side and the

3    search warrant side.  Which is how we knew that

4    TJ Jenkins was an SME and how we could prove it, why

5    he was not allowed to represent Melanie O'Daniel

6    during the use-of-force board.

7      Q.      Related to this case or related to a

8    different case?

9      A.      Related to this case.  She tried to have

10   him as an SME -- not an SME, sorry.  As a

11   representative.

12     Q.      But he was an SME on this case?

13     A.      Correct.  So we did not allow that.

14     Q.      And what does Mr. Jenkins do?

15     A.      He was a SWAT sergeant.  He is now

16   retired.

17     Q.      So when you say "represent," I guess I

18   just always assume lawyer.

19              How can a SWAT sergeant represent

20   somebody?

21     A.      Per NRS you are allotted two

22   representatives of your choosing.  It does not have

23   to be anybody.  I can be a representative of

24   somebody.  If I were to leave CIRT -- obviously it

25   would be a conflict of interest if I did it now.

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 102

1    But if I were to leave CIRT and be just a regular

2    patrol officer, and somebody would like me to

3    represent them at the use-of-force board or in an

4    interview, they could pick me.  It does not matter

5    who they pick.  Most of the times it's union

6    representatives.  Very seldom is it a lawyer.  David

7    Rogers sometimes comes in on cases.  Dan Ko, who is

8    a lawyer, but he was also a lieutenant, is a PMSA

9    representative who comes in from time to time with

10   people who are represented by the PMSA.

11          But for the most part, the officers are

12   represented by members of the LVPPA and the PMSA and

13   PPACE, which I don't know the acronym for, I'm

14   sorry, but it's the civilian union, if there's,

15   like, dispatchers or call-takers that need to be

16   represented during use-of-force boards.  But those

17   are all officers, detectives, sergeants,

18   lieutenants.

19      Q.      I'm trying to authenticate the content

20   of the report in terms of the use of the SMEs.

21          So not -- the SMEs, you know, the

22   outside experts, they're not listed on this front

23   page?  Like Mr. Bandiero, they are not listed on the

24   front page?

25      A.      Correct.

Page 103

1    Q.      If you relied on them specifically,

2    you're going to include that notation within the

3    report.  Is that fair to say?

4    A.      Fair.

5    Q.      Okay.  And we went over that one part

6    that should have been italicized.  That was from

7    Mr. Bandiero's report.

8            But as we sit here today, that was from

9    his memo or whatever you want to call it?

10   A.      Yes.  From that meeting, the list of

11   meetings or the various meetings that we've had.

12   Q.      And then it's actually the sign-in page

13   that's going to tell me exactly who the SMEs in

14   addition to the ones listed on the front page are?

15   A.      Correct.

16   Q.      And were they all present for that

17   12-hour slideshow presentation?

18   A.      No.

19   Q.      Okay.  Were they present for the other,

20   like, updates?

21   A.      No.

22   Q.      Okay.

23   A.      They're specifically brought in there as

24   they get a PowerPoint presentation of the facts that

25   we know and usually after all the interviews have

Page 104

1    been concluded.

2              In this case, I think we did a couple

3    afterwards because of orders from executive staff.

4        Q.    Sorry.  What do you mean by "a couple"?

5    A couple of interviews or a couple of updates?

6        A.    Correct.  A couple of interviews after

7    the SME briefs.  In general we try to get everyone

8    done prior to that.  It doesn't happen every single

9    time.  But for the most part, we try to get

10   everybody involved.

11             In this case, because there was such a

12   wide net of people that we needed to interview and

13   time and resources, I don't believe we got in

14   everybody.  In fact, I know we got -- we interviewed

15   Melanie O'Daniel, and then we had to re-interview

16   her based on information we learned later on.

17       Q.    Okay.  And so the SME briefing is

18   something different.  That's kind of midway point

19   through; is that correct?

20       A.    Midway is a fair way to say it.

21       Q.    Okay.

22       A.    It's just another check in the steps it

23   takes to finish one of these reports.

24       Q.    And then after they have the briefing,

25   you talked about several meetings with Mr. Bandiero.

Page 105

1    So after you have that initial briefing, then are

2    you meeting with them again to see if they have any

3    comments or --

4         A.      They -- anybody who is an SME on the

5    department, which usually goes out to everybody on

6    that list on the side column, is given a report via

7    BlueTeam, which is one of our internal resources, to

8    review.  If they have any issues with the report

9    itself, that will be notated.

10             In most cases there's nothing that is

11   said.  I don't deal with that side of it.  That's on

12   our executive staff side of it.  I just get the,

13   Hey, this is their question.  Can you answer it?

14        Q.      Oh, okay.  So you're not even part of

15   that meeting?

16        A.      As far as the --

17        Q.      You just get, like, the follow-up;

18   like, Hey, they have questions about this, this, and

19   this?

20        A.      When it comes down to sending out the

21   final report, there's no meeting.  It's sent out.

22   They read it on their own, and then they send their

23   feedback.

24             Then I'm given the feedback, and I can

25   call them up or email them and say, Here are your

Page 106

1   concerns, and here's why this decision was made

2   based on this.  If you have any questions, call me.

3      Q.      Okay.  So we're midway -- sorry.  I keep

4   pulling you around.  We're midway through.  We're

5   at, like, the SME briefing.  Then what happens from

6   there?

7      A.      You start writing the report.  In this

8   case, 222 pages, a lot.  So it took quite a lot of

9   time to, one, go through a structure of how I want

10  to present this.  And most times we want to go

11  chronological order.  And then what quotes you want

12  to use.

13         Usually I just -- the way I operate is I

14  just kind of think of how I've done it in the past

15  and how I should mirror that and how it looks as far

16  as chronological.  So I know I wanted to talk about

17  certain things first and then go into, you know, the

18  operational side of it last.  And always last would

19  be officer-involved-shooting part because it's the

20  last thing that happened.  Usually it becomes static

21  after that.

22      Q.      Okay.  And so then is it fair for me to

23  assume that you have some level of -- you can -- you

24  have some level of autonomy in how you're going to

25  organize the report?

Page 107

```
 1        A.        There's a structure we like to follow.
 2   I don't finish my report, then hand it to SMEs and
 3   say, Hey, you guys good with this?
 4                   In this case we round-tabled it, went
 5   through page by page with the entire squad.
 6                   But in general for an OIS, if my partner
 7   gets an OIS, he gets done with his report, it goes
 8   to me.  I look at it for spelling, grammar, and then
 9   also for content.
10                   After I give him my corrections, then
11   that usually goes to one more detective to see if
12   that can -- I missed anything.  Because -- sometimes
13   you read a lot of the same things over and over
14   again, sometimes you do miss things.
15                   That is then double-checked by a second
16   detective.
17                   It then goes to the sergeant of the
18   section and to one of our executive staff officers,
19   one of the civilians.  And they look -- the
20   executive staff looks for -- civilians look for
21   grammar specifically, try to get it as dialed in as
22   possible as far as grammar and spelling.
23                   We do miss things from time to time.  I
24   was reading back in this, and I get very nit-picky
25   on things, and I noticed one of my paragraphs wasn't
```

Page 108

```
 1    justified, and it drove me crazy.  It's not
 2    something that messes with the content of the
 3    report.  But as trying to be as much of a
 4    perfectionist as possible, as I was rereading this
 5    recently, I saw that I had a paragraph that was not
 6    justified, and it just absolutely drove me crazy.
 7              But then it goes to our sergeant, our
 8    lieutenant, and then our captain reads it.
 9        Q.      And so you said in this particular case
10    that it was the whole team that round-tabled this;
11    correct?
12        A.      Correct.
13        Q.      Why did the whole team round-table
14    this one?
15        A.      Just from the complexity of it.  Five
16    shooters, the IAP, the investigation itself.  All
17    the aspects that make this a 222-page report is a
18    lot for one individual to compile that information
19    themselves.  Especially when you're writing in your
20    own voice -- and I'm sure you've had similar
21    instances where you're writing in your own voice,
22    and sometimes, either when you're rereading your
23    stuff, you know what you were saying but you didn't
24    put it on paper correctly, or there might have been
25    a question on whether we're going to put both sides.
```

Page 109

1    Like, if there was any kind of divide, to make sure

2    we put both sides of that into the investigation,

3    like the "knock and announce" that we did.

4              But in this case, because it was so

5    in-depth, because at the time I only had three years

6    on in the section, I was kind of middle of the road

7    when it came to seniority there, it was important

8    for the section to -- it's always important for the

9    section to get everything right and give the best

10   work product that we can.

11             So at this point our command staff --

12   our sergeant, lieutenant, and captain -- thought it

13   would be prudent to go over it as a group and make

14   sure that we were all on the same page, as opposed

15   to handing a 222-page report to one detective and

16   wait and then to another detective and wait.

17        Q.    You said this one was particularly

18   important.  Why was this particularly important?

19        A.    Did I say important?  As far as it was

20   particularly important to get this done because of

21   the size of the investigation.  Like we've discussed

22   previously, 222 pages is not our normal work

23   product.  Usually it's between 60 and 80 pages.

24             There was a lot of deficiencies noted,

25   which were put in our recommendations, that we

Page 110

1    wanted to make sure that we were squared away on as

2    far as, when you're talking about that Section 9 of

3    our recommendations, we're changing the department.

4    We're trying to improve the department.  And we're

5    making those recommendations to be voted on by a

6    tactical review board.  So we want to make sure

7    they're articulated in a way that the reader and the

8    voting members would understand.

9        Q.    When you're recommending -- or when part

10   of the report, you know, the purpose is to change

11   the department, that assumes that things can be done

12   differently; correct?

13       A.    Yeah.

14       Q.    So if officers, when I deposed them,

15   made assertions that certain things couldn't be

16   done differently that you had recommended -- or

17   that CIRT had recommended changing, that would be

18   refuted by the fact that CIRT recommended a change;

19   correct?

20       A.    From a department standpoint, yes.

21   However, to the officer's defense, on either our

22   interviews or whatever -- I obviously don't have

23   access to your depositions of those individuals,

24   but they were operating on the information they had

25   at the time and the policy, tactics, and training

Page 111

1    that they were given that was approved by our

2    department.

3              What we're talking about as far as

4    making improvements or changing things is we saw

5    what happened, not necessarily good outcome or bad

6    outcome on this case or any other case, but how can

7    we make it so it is even better.

8    Q.       Well, I mean, you're saying "even

9    better," but there were conflicts within the

10   policies themselves; correct?

11   A.       Absolutely.

12   Q.       Okay.

13   A.       But not -- in the manual.  Not the

14   policies.  The manual.  The department manual for

15   SWAT.  Not policies.

16   Q.       What's the difference?

17   A.       One is a policy manual, and one is a

18   section manual.

19   Q.       What's the difference between a policy

20   manual and a section manual?

21   A.       Section manuals have to have -- they

22   can't violate policy, but they go into more detail

23   of what that section does.  It would -- I'm not sure

24   if you've seen our policy manual, but it's about the

25   size of that binder, if not even bigger.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 112

1              If you were to put every different
2    section into our policy manual -- vice, narcotics,
3    SWAT, air unit, everybody -- CIRT -- the manual
4    would stack up to the roof.

5              So essentially it's an extension of
6    policy with their own set of, I guess, tactics and
7    training that they utilize, whether it be from their
8    SWAT school or Major Violator school or whatever
9    they put on to train their individuals, if that
10   makes sense.

11        Q.    Yes.

12             We talked about it quite a bit, but just
13   to clarify, in the initial part of your -- of the
14   CIRT report, you make a distinction between your
15   administrative review and the review for the
16   criminal review; correct?

17        A.    Yes.

18        Q.    Okay.  And part of the administrative
19   review is to determine what we've all kind of talked
20   about globally and we're going to dig into more
21   specifically, the policies and procedures, the
22   training, and whether the officers acted reasonably
23   under those conditions; correct?

24        A.    Yes.

25        Q.    Which is different than an analysis of

Page 113

1    whether or not they were justified in shooting;

2    correct?

3        A.      Correct.

4        Q.      And one of the -- you tell me if I -- is

5    it correct that one of the parameters of

6    reasonableness is that it still must be within the

7    Constitution, their actions must be within outlines

8    of the Constitution and how they have to do

9    different --

10       A.      So, again, we don't deal with -- I'm not

11   a lawyer, so I can't speak on constitutional law.

12               What I can speak on is to the set of

13   NRS and -- or supreme court decisions of Graham

14   versus Connor that fit into what we investigate.

15               We look at specifically Graham versus

16   Connor.  That is the legal binding for use of deadly

17   force specifically.

18               Then we have our threat assessment

19   of the ability, opportunity, imminent jeopardy,

20   and preclusion that we analyze our uses of force on.

21       Q.      Sorry.  Thank you for clarifying that.

22               But I am talking -- and so -- but in

23   terms of, like, the Fourth Amendment, search

24   and seizure, people's individual rights under

25   the Fourth Amendment, that the reasonableness of

Page 114

1    an officer is still -- no matter whether or not

2    they seem reasonable, certain actions must fall

3    within the parameters of the case law and what the

4    supreme court has said officers must comply with

5    in order to recognize people's Fourth Amendment

6    rights; correct?

7         A.      If you're speaking of the Fourth

8    Amendment rights of that -- that use of deadly force

9    is what you're speaking to?

10        Q.      Yes.

11        A.      Then yes.

12        Q.      Okay.  And so we've talked a little bit

13   about -- and so, okay.  Sorry.  I'm going to loop

14   back, and then we'll go forward.

15             In terms of the investigation, you

16   issued the final CIRT report; correct?

17        A.      Correct.

18        Q.      Okay.  In this case it's been

19   round-tabled; everyone's looked it over; it gets put

20   out.

21             Then did you get any questions back

22   about this report?

23        A.      I don't recall how many questions, if I

24   got any, on this case from anybody who saw the final

25   product.  I don't recall.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 115

1        Q.        Were there drafts going out the whole

2    time?

3        A.        There's not drafts going out.  We

4    never send out a draft of the report until it's

5    final.  Once it's finalized, then it would be

6    sent out.

7                  However, the team has access to all the

8    drafts.  So as we're doing this report, if I get to

9    a certain section, Hey, how does this sound?  Can we

10   round-table this?  Or, Hey, can I get an opinion on

11   how I wrote this?  Then the team has access to those

12   drafts.

13                 But never a draft, like, unfinished

14   version of this has ever gone out to anybody outside

15   of our unit.

16       Q.        Okay.  And I understand -- you seem to

17   be an individual, Justin, that takes pride in their

18   work.  Is there -- but it seems like there has been

19   a lot -- based on what you've told me, there's been

20   a lot of focus within the CIRT unit.

21                 Why is it -- why is there such a focus

22   on the way it's drafted, to make sure that there are

23   no typo errors, to have, like, this level of review?

24   Why is that important for the department?

25       A.        I think it's important in every aspect

Page 116

1    of the department because everything that we do is a

2    legal document.  When it comes -- when we talk about

3    a traffic citation, that's a legal document.  I

4    don't want spelling errors or grammatical errors on

5    the back of a citation of why I gave this individual

6    a citation.

7              The same thing goes for an arrest report

8    or even when you deal with something as detailed as

9    a CIRT report.  There's still that aspect of not

10   turning in a sloppy product and having pride in your

11   work, because you should have, as an officer in this

12   department -- I'm not saying it happens with

13   everybody.  But for me, since I've been a member of

14   this department for 16 years, I pride myself on the

15   fact that I can write well enough to get into a unit

16   like this to where my input is valued.

17   Q.      Do you think that the primary -- do you

18   think your primary role is as a writer?

19   A.      Well, I mean, primary role is a Swiss

20   Army knife.  You can't really point to one aspect of

21   my thing, this is what you do, you are a presenter,

22   you are a writer.

23             There's definitely an aspect of it that,

24   yes, you have to be able to clearly articulate

25   whatever you are trying to convey in the report to

Page 117

1    where it is, one, able to be read by somebody who's
2    not a department member.  That's very important,
3    because civilians are reading this from a
4    use-of-force level because they're voting on it to
5    determine if it's a reasonable use of force.  So you
6    have to write in almost a simpler version, but also
7    have to write it in a way that lays out all of our
8    department policies and tactics and training and be
9    able to cite those correctly.  And also interpret
10   the investigation and utilize the quotes inside of
11   it properly.
12        Q.     Other than your prior kind of come-up
13   experience and your come-up experience through the
14   department and your communications degree, have you
15   had any other training offered through LVMPD or
16   through CIRT about writing?
17        A.     I know there's been report-writing
18   classes I've taken.  But, I mean, we're talking over
19   a span of 16 years.  There's no specific CIRT, like,
20   writing classes.  That's something that's learned
21   over time as far how to write.  We try not to use
22   the word "that" and "there."  That's one of the
23   specifications I mentioned, the justification on the
24   reports.
25             When I see anything that's not justified

Page 118

1    in any aspect of my life anymore, it triggers me a

2    bit to like, I need that justified.  But just

3    overall the sentence structure.

4                    I can see where I was at this point

5    three years in my career when I read this and I go,

6    I probably would have done something grammarly

7    different there -- grammatically.  See.  I even

8    messed up that.

9                    But it's all about growing.  And a

10   one-year CIRT detective writing a report is not

11   going to look like my report now being there six

12   years and a senior detective on the unit.

13                   MS. MURPHY:  Do you want to take another

14   break?

15                   THE VIDEOGRAPHER:  Off the record at

16   11:37 a.m.

17                   (A break was taken.)

18                   THE VIDEOGRAPHER:  On the record at

19   11:47 a.m.

20   BY MS. MURPHY:

21        Q.    Justin, I'm just going to ask you some

22   more basic background questions about the report,

23   and then we're going to get into the content of the

24   report itself.  Okay?

25        A.    Okay.

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 119

1    Q.    Okay.  Based on what you've just told

2    me, it is your understanding that this report's

3    going to be widely circulated; is that correct?

4    A.    Widely circulated how?

5    Q.    Well, that it's going to be seen by

6    civilians.  That this is considered a legal

7    document.  This is not like an internal report

8    that's only seen by CIRT or only within, like, a few

9    branches of LVMPD; is that correct?

10    A.    No.  So this is an internal report.

11    This is not a published report like a FIT report.

12    Any FIT report -- and to my knowledge,

13    you can look up online and Google it and it's on

14    there.

15    But for purposes -- when I say that

16    civilians are going to read this, those are going to

17    be the civilians that are going to be voting on the

18    use-of-force board.  So those four civilians.

19    It's not available department-wide.

20    It's not available to anybody who wants to read it.

21    It is a very secure document.

22    Q.    Okay.  But part of the purpose is to

23    determine if changes should be made; correct?

24    A.    It's part of the purpose.

25    Q.    Okay.  What's the other purpose?

Detective Justin Roth     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 120

 1        A.        To identify things that we're doing

 2    right and to just complete a full administrative

 3    investigation to see -- again, I mean, yes, there

 4    are going to be some deficiencies noted, but there

 5    are also going to be a lot of positives that come

 6    from this, where you see that things are working;

 7    that training is working; that if things are done

 8    correctly within training and policy and tactics,

 9    that those are done for a reason, and those do end

10    up mostly in successful officer-involved shootings.

11        Q.        I didn't see -- I mean, in terms of the

12    administrative aspect, not in terms of the criminal

13    aspect, I didn't really note any things where you

14    guys were saying this was done right in here.

15              I mean, can you point me out to parts of

16    the report where you were saying this was done

17    correctly?

18        A.        Any time there is a conclusion in there

19    that does not say that it was within -- that was

20    within LVMPD policy and tactics -- any of the

21    conclusions that are inside of the report that say

22    that they were within department policy, training,

23    and tactics are considered good.

24              Again, that's just from a personal

25    standard, from me saying good.  We're not saying,

Page 121

1    Oh, that's a great job there.  It's saying you were

2    within tactics, training, and policy.

3        Q.      But it's not just -- I mean, you made

4    it very clear to me earlier, this isn't your opinion

5    in here?

6        A.      Correct.

7        Q.      Okay.  This is the result of the SMEs

8    round-tabling with other people within CIRT.  It's a

9    collective assessment of the different actions

10   related to this officer-involved shooting; correct?

11       A.      Correct.

12       Q.      And so if it says -- in the conclusions

13   if it says, you know, Conclusion, this was found to

14   be within LVMPD training, policies -- or whatever

15   the verbiage is, that's the way of saying this was

16   done correctly?

17       A.      I'll call that a positive, for lack of a

18   better term.

19       Q.      Okay.  Okay.

20               And in terms of the document itself, you

21   tell me if I'm right or wrong.  This is kept in a

22   certain drive; correct?

23       A.      Yes.

24       Q.      As we sit here today -- and I've given

25   you a copy of what I have if you want to leaf

Page 122

1    through it.  But as we sit here today, to the best

2    of your knowledge, this is an accurate copy of what

3    you drafted back in 2022; correct?

4        A.    Correct.  122 [sic] pages.  I remember

5    the number pretty specifically.

6        Q.    And there's no reason to believe that

7    the content in here is not reliable in any way, in

8    terms of it being the final product of what you

9    created after a year; correct?

10       A.    Correct.

11       Q.    And you have done your best in compiling

12   this, aside from the one issue that we had with

13   Mr. Bandiero.  But for the most -- in terms of if

14   you're quoting somebody or something, or you're

15   putting it in italics, that is a cite from another

16   source that you cite within the report itself;

17   correct?

18       A.    Correct.

19       Q.    And those -- the citations for those --

20   you know, excluding, say, like, case law, the

21   citations for those -- for the interviews and stuff

22   like that, that's easily -- we're able to easily

23   authenticate that by looking at the report -- or

24   interview itself; correct?

25       A.    Yes.

Page 123

1        Q.        And you've gone to great pains to ensure

2    that if you quote something, cite something,

3    italicize it, however you do it, that that is also

4    an accurate quote or citation from whatever other

5    source you're pulling from; correct?

6        A.        Correct.

7        Q.        You tell me if I'm right or wrong.

8    Part of the round table or the administrative

9    review, do they also check that?  Like, check your

10   cites?  Do they do that kind of stuff?  Or is that

11   all on you?

12       A.        Well, if we're talking about an

13   officer quote, I'm not going to get it from

14   anywhere else.

15              So -- and the source material policy,

16   stuff that's derived from policy or manuals or case

17   law, was then put into our drive under a certain

18   folder which was put into our binders and whatever

19   is in front of you there, which would be part of

20   the, I guess, evidence as part of this case.

21       Q.        Okay.  And in terms of -- like I

22   said, we're gonna -- in a few minutes we'll get into

23   the actual content of the report and stuff like

24   that.

25              You talked to me that you are -- that,

Page 124

1    you know, part of your professional background,

2    that you're very familiar with search warrants,

3    but you had never executed one because you weren't

4    on SWAT?

5         A.         Correct.

6         Q.         Have you become -- in your execution of

7    a detective investigator through CIRT, have you now

8    become somewhat fairly or somewhat -- however you

9    want to qualify it, familiar with SWAT, the SWAT

10   manual, tactics, those types of things?

11        A.         Familiar how?  Are you saying can I join

12   a stack right now and be part of an entry team?

13        Q.         No.  And thank you for clarifying

14   because my question is a little bit different.

15             What I mean is, is, like, you're, like,

16   Yeah, the manual says this, this, and this.  This is

17   their policies.

18             Like, are you fairly familiar with those

19   types of issues now?

20        A.         Familiar in a respect of some of the

21   highlights.  But I'm not required to know it, like,

22   head to toe like they are required to know it.  I

23   use it.  I reference it.  As part of CIRT, you're

24   supposed to have access to everything in the

25   department.  I can't possibly have every section

Page 125

1    memorized.

2              So I'm familiar with what I've

3    investigated on that day.  And then if I have

4    another SWAT case, I'll become familiar with the

5    aspects related to that case that reference SWAT.

6    But to say I'm completely familiar with the

7    manual -- I believe it's 100-and-some-odd pages -- I

8    don't know it head to toe, top to bottom.

9         Q.       Is it your -- I mean, you put a lot of

10   time and effort -- part of your job -- and I'm

11   assuming on different cases, not just this one, but

12   it would appear that you put a lot of time and

13   effort into developing the recommendations and very

14   carefully analyzing the verbiage within the SWAT

15   manual; is that -- any manual you're analyzing, but

16   I guess in terms of this case, the SWAT manual; is

17   that correct?

18        A.       Can you rephrase?

19        Q.       Sure.  When you are drafting the report

20   and you're forming these recommendations, you're

21   looking very careful at the manual -- carefully at

22   the manual; correct?

23        A.       Yes.

24        Q.       And it is your expectation that, as you

25   go through and make these recommendations, that --

Page 126

1    sorry, you're not the one making the

2    recommendations -- but as recommendations are made,

3    that the other people looking at it will carefully

4    consider the changes, even if they're just slight

5    changes in the verbiage; correct?

6        A.    Well, they're not going to consider

7    changes, like, as a recommendation.  They're not

8    going to be like, Okay, we'll take that into

9    consideration.

10            At this point it was because they are

11   recommendations, because they got voted on at the

12   board, they are now going to happen.  So now it's

13   about the implementation of those recommendations

14   based on whatever they were.

15            So if there's a specific verbiage about

16   the SWAT manual needing to be updated to conform

17   with something, then that was a specific notation

18   and a recommendation that was required to because it

19   was voted on and approved as -- I forgot the three

20   categories for conclusions.  I think it's on your

21   voting sheet that you had there.  But it's

22   something, modify, and overturn.

23       Q.    And/or approve.

24       A.    Okay, so it is approve.

25       Q.    Do you expect the SWAT guys to be

Page 127

1    familiar with the SWAT manual?

2        A.        Absolutely.

3        Q.        And I guess that's a roundabout way of

4    me asking the question too.  You put so much time

5    and effort into issuing recommendations that they

6    look at.  I mean, part of that is that you expect

7    the operators to be familiar with the manual and

8    rely on it; correct?

9        A.        I would think that they would assume the

10   same for me, reference the CIRT manual.  But they

11   wouldn't have really any reference to it because

12   they don't do my job.  But they would expect that I

13   would have a vast knowledge of my CIRT manual.

14       Q.        Okay.  All right.  Let's talk about the

15   report itself.

16                 Before we get into the actual report,

17   I'm just going to do two preliminary items.

18                 You reference NRS 179.055 throughout

19   your report.

20       A.        Okay.

21                 MS. MURPHY:  If we could mark this

22   Exhibit 4.

23                 THE WITNESS:  And that's "no knock";

24   correct?

25                 MS. MURPHY:  What?

Page 128

1          THE WITNESS:  Is that "no knock"?

2          MS. MURPHY:  Yeah, officer may break

3    door to serve warrant.

4          (Exhibit 4 marked.)

5    BY MS. MURPHY:

6      Q.      So this is actually NRS 179.055.  This

7    is actually the "knock and announce" statute.

8      A.      Yeah.

9      Q.      And so I'll represent to you that I

10   pulled this off the internet.

11     A.      Okay.

12     Q.      But you cite it throughout -- a couple

13   of times in the report.  And I just wanted to

14   confirm the verbiage.

15          It says, "The officer may break open any

16   outer or inner door of a window or a house."

17          Is that what you read as well?  In

18   Section 1?

19     A.      Page number 1?  Yes.

20     Q.      Actually, sorry.  Justin, let me give

21   you a -- if you want to just take a second to just

22   read the whole thing.  It's not very long.  If you

23   want to just read it and then let me know --

24     A.      I didn't know if you were talking about

25   reading the title of it or if you were at Number 1

Page 129

1    there.

2            So you're asking if the -- if it read,

3    "The officer may break open any outer or inner door

4    or window of a house"?

5            Yes, that's what it says.

6    Q.      And so the statute itself includes both

7    the breaking of a door and a window; correct?

8    A.      Yes.

9    Q.      Okay.  So by the plain language of the

10   statute, whether it's a door or a window, once

11   there's entry made, it's being broken into; correct?

12   A.      Yes.

13   Q.      For the purpose of serving a search

14   warrant?

15   A.      Yes.

16   Q.      Okay.  And then the other thing that I

17   am going to have you -- I'm just going to kind of

18   keep this to the side.  And, Justin, I'll represent

19   to you that this is the -- basically the layout of

20   the apartment that I pulled from your report.

21   A.      Yep.

22   Q.      And I'm just going to give that to you,

23   because I think as we go through the report we talk

24   about different positions or things that happened.

25   So I think it will make it easier if we are working

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 130

1   off the same grid.

2        A.       Okay.

3                 MS. MURPHY:  So if we could please mark

4   that.  This is pulled from the report at LVMPD 4389.

5                 (Exhibit 5 marked.)

6   BY MS. MURPHY:

7        Q.       Does that look like your work?

8        A.       It is.

9        Q.       Okay.  All right.  So let's get into the

10  actual report itself.

11                So the very beginning of the report,

12  Justin -- actually, I'll skip to page 13.  That's

13  Bates 4267.

14       A.       Okay.

15       Q.       And these are photos of the officers

16  that were involved; correct?

17       A.       Correct.  Well, this one specifically is

18  Sergeant Backman.

19       Q.       Do you know where this picture came

20  from?  Was this, like, the day of the shooting, or

21  was this --

22       A.       Correct, yes.  So after officer-involved

23  shootings -- I don't remember where this was taken

24  because I wasn't out there and I wasn't told where

25  it was taken.  Usually it's taken at a secure

Page 131

1    location, usually inside one of the vans -- sorry,

2    the buses run by the unions.

3                So they take an overall -- multiple

4    pictures -- this is just one of those pictures -- of

5    how they were at the time of the incident so you can

6    show that they were readily identifiable, that they

7    had all their proper gear on.  It just shows them

8    how they were at the time.

9        Q.        Okay.  And then turning the pages to

10   page 14 and 15, they're just headshots of Officer

11   Kubla and Officer Clements; correct?

12       A.        Correct.

13       Q.        They were already -- they'd already

14   left?

15       A.        They were in the hospital.  So Officer

16   Kubla was in surgery at the time.  Officer Clements

17   was at the hospital for his abrasion to his arm.  He

18   had taken off all of his gear.  That gear was

19   photographed on the ground, inside the bag where it

20   was located at.

21       Q.        Then turning to page 16 and -- sorry.

22   16 is Officer Gonzalez?

23       A.        Correct.

24       Q.        And it's your understanding that this

25   was also taken at the scene; correct?

Page 132

1        A.        Taken at a secure location.  Either -- I
2    don't remember where it was taken.  It was at the
3    same day.
4        Q.        Thank you for that clarification.
5                  And then same thing with page 17.
6    That's Officer Rothenburg.
7                  Let me ask the question more artfully.
8                  This is the uniform he was wearing --
9    this picture represents the uniform that he was
10   wearing at the time he was involved in the shooting?
11       A.        Yes, correct.
12       Q.        And then the following pages that we
13   have, the additional employees that were involved,
14   but these aren't shooters; correct?
15       A.        These are -- so this page specifically,
16   and I believe it's the next page -- because there
17   were a lot of interviewees on this.  So the next
18   three pages are people that were interviewed by
19   CIRT.  So they're additional employees that were
20   interviewed by CIRT.
21                 If there were any other employees that
22   were not interviewed by CIRT, that were interviewed
23   by FIT only, they would be notated at the bottom
24   here as interviewed by FIT only.  However, I think
25   we did substantially more interviews than FIT did.

Page 133

1    I think we covered all of them by this point.

2        Q.        Well, most people turn down FIT;

3    correct?  Or all the --

4        A.        If you were involved as a subject -- if

5    you're notated as a subject in a shooting, then you

6    have the option to not speak with FIT.

7                  However, if you are a witness officer

8    and they deem you a witness officer, you are

9    required to give a statement to FIT.

10       Q.        And these are -- I mean, it's --

11   it's -- it's -- it's spelled out here, but just to

12   confirm.

13                 These are employees specifically; they

14   don't include civilian witnesses or anyone else?

15       A.        No.  Civilian witnesses are located on

16   page 20, and it's just the FIT report.  So see the

17   FIT report that's attached.

18       Q.        So you didn't interview any of the

19   civilian witnesses?

20       A.        No.  Because that's not our purview as

21   far as an administrative investigation goes.

22   They're not required to talk to us.

23                 There are circumstances that CIRT does

24   interview civilian witnesses, but it also would

25   hinder the criminal investigation as far as getting

Page 134

1    a sworn statement from somebody else that could

2    contradict.

3         Q.      Okay.  And then the following page,

4    page 21, this is Isaiah Williams; correct?

5         A.      Yes.

6         Q.      Okay.  And then page 22, tell me what

7    this is.

8         A.      I'm just -- curiosity for me, just

9    before, because we spoke on this was unaltered.  It

10   shows his birthday blacked out.  I did not black out

11   his birthday on there.

12        Q.      So when we get provided the document

13   from Craig, there's -- even though he's technically

14   our client, there's certain things that they always

15   black out to protect people's privacy interests.

16               So as we go through here -- I don't

17   think there's any Social Security numbers, but it's

18   just the practice of attorneys, when we have Social

19   Security numbers or birthdays, stuff like that, we

20   just -- they redact it before they provide it to us.

21        A.      Okay.  I just want to make that clear,

22   that I did not redact a birthday on here.

23        Q.      Yeah, I know.  And I don't know if there

24   will be any more.  But if we come through a passage

25   in here where it's a black mark like that, it's

Page 135

1    Craig's office that did it.

2        A.      Okay.

3        Q.      And then what's the following page, 22?

4        A.      That would be Officer Kubla's injuries

5    that he sustained during the incident.

6        Q.      And -- okay.  And then the same thing

7    on -- or, sorry.

8                What's page 23?

9        A.      Photographs of Officer Kubla's gear, to

10   include his injuries to his arms, his leg, and then

11   the bullet entries into his vest and holster.

12       Q.      And you didn't take these -- none of the

13   photos you took; correct?

14       A.      No.  That's all done by our crime scene

15   analysts.

16       Q.      And you have access to this through

17   the -- what was it called?  Not P drive.  H drive?

18       A.      So this does not go into our H drive.

19   This is on OnBase, which is a system the

20   department uses to document reports and photographs.

21               So if you are given the access to

22   critical incidences like this -- so not everybody

23   could look up this report number, this event number,

24   and see who -- or see all the pictures.  Only people

25   with certain access to certain cases could get that.

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 136

1   But it's done through a system called OnBase.

2       Q.      Okay.  And then the following page,

3   what's this?

4       A.      Officer Clements' injuries.

5       Q.      Okay.  And then the following page?

6       A.      Isaiah Williams' injuries.

7       Q.      Okay.  And, again, this is done by the

8   crime scene investigators; correct?

9       A.      So this -- the diagram that you are

10  seeing right here is done by FIT.  So this is from

11  the FIT report, as it says, I think, on the second

12  line above.  It says "Per the FIT report."

13          They attend autopsy.  We do not attend

14  autopsies.  So we are going based on the information

15  that was gathered from FIT.

16      Q.      And the autopsy -- because as we go down

17  the page, there's a toxicology report.

18          So that's straight from the autopsy;

19  correct?

20      A.      From the FIT report.  I can't speak on

21  the fact it was done specifically from the autopsy.

22  But from my understanding is that it was just in the

23  FIT report, and that's what we're going on.

24      Q.      Again, the FIT report, that is actually

25  published; correct?

Page 137

1      A.      Correct.  I believe so.  So I'll give

2  you a 90 percent sure.

3      Q.      That's fair.  All right.

4              And so then turning on to page 27, did

5  you put this chronology together?

6      A.      Yes, ma'am.

7      Q.      Okay.  How long did this take you to do?

8      A.      It's relative to the case.  I can't tell

9  you how long it took me to do.

10             As far as this is usually what I do

11 toward the end of a report, to where I make sure

12 that anything that is relevant to the actual report

13 itself is notated in the timeline.  That way if

14 there's any discussion on when something happened

15 that's referenced to the report, it's in there.

16             I don't want to put -- just for an

17 example, let's say, if we're talking about what

18 happened after this OIS, I'm not going to put when

19 Sergeant X arrived that was part of Southeast Area

20 Command because there's no relevance to it.

21             So I can't tell you exactly how long it

22 took, but this is just a culmination of the entire

23 report.

24     Q.      And so if I understand your prior -- the

25 testimony you just provided, this is also a timeline

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 138

1    of what you think relative time points are

2    throughout the case; correct?

3        A.        Throughout the report.

4        Q.        Sorry.   Throughout the report.

5        A.        Yes.

6        Q.        Okay.   And so if we now want to turn to

7    page -- we'll skip ahead to 30.   Because we're going

8    to talk about the timeline, so we won't actually go

9    through that now.

10       A.        Okay.

11       Q.        And I want to clarify.

12               So it seems like in the investigative

13   narrative, you open it by kind of making a

14   distinction between -- there's an active

15   investigation.   So I took that to mean that you

16   might have more information now, but in terms of

17   what's in this investigative report, or in this CIRT

18   report, is that you put in what was known at the

19   time?

20       A.        Correct.   And that's from -- so from my

21   understanding, I don't even know if this homicide

22   was ever closed.   We have no -- I guess jurisdiction

23   would be a term to use.   But we have no reason to

24   look into a homicide case.   We're basing everything

25   off of what these officers knew at the time.

Page 139

1    So I don't know if this homicide

2    investigation has been closed, been solved, been

3    cold-cased.  I have no idea one way or the other.

4    Q.    Okay.  And -- okay.

5    And so this photo in here, this is the

6    underlying Mr. -- sorry.  This is Mr. Thomas' --

7    this is the video from Sam's Town of Mr. Thomas'

8    homicide; correct?

9    A.    Not of the homicide.  This is at some

10   point he had walked to the casino and then

11   collapsed.  This is body-worn camera from the

12   first-arriving officer who arrived as medical units

13   or security medical were attempting to, I guess, put

14   pressure on the wound or CPR.

15   But this is not where the homicide took

16   place, or at least the shooting took place.

17   Q.    If you go to the next page, page 31 --

18   A.    Okay.

19   Q.    -- where did you pull this map from?

20   A.    This was from our understanding -- so

21   this is from Google Earth.

22   Is that the question?

23   Q.    Yes.

24   And so let's turn the page then to

25   page 32.  And this is the -- do you know if this has

Page 140

1    been -- like, is this what the officers -- the

2    officers investigating the homicide, is this the

3    quality and nature of the video they would have seen

4    at the time?

5        A.      Well, it's significantly more grainy on

6    this, which is a -- on black-and-white photograph,

7    not in the same resolution that you would see.

8              I will say that the video that was

9    obtained from that Chase Bank was put out on

10   LVMPD YouTube, and it was not at a high quality.  It

11   was the same quality in the report and in the videos

12   that we had that we released.

13             I don't know the exact quality.  I'm not

14   really proficient on P&I when it comes to clarity of

15   videos or photographs.

16       Q.      Unfortunately, I can't make it part of

17   the record.  But I will show you a color photograph

18   because I have it on my computer in color.

19       A.      Now you just turned off.  But I can tell

20   you -- I can tell you that that is a screenshot --

21       Q.      Okay.

22       A.      -- from the highest resolution available

23   to me at the time.

24       Q.      Okay.

25       A.      If that makes sense.

Page 141

1       Q.       Yes.  But I guess my question, was this

2   the highest resolution of what the officers -- like,

3   is this what the -- is this the highest resolution

4   of what the officers would have had too?

5       A.       Of -- yes, of any video.  There was no

6   clearer version of that.

7       Q.       Okay.  And so that would be the same

8   thing then on the following page; correct?

9       A.       Correct.

10      Q.       And this -- I'll turn this around and

11  show you.  This is the color version.

12               And to the best of your memory, this

13  accurately represents --

14      A.       Outside of me putting the tags on there,

15  the red tags and the circles, that is a screenshot

16  of the video itself in a still frame.

17      Q.       And so are you -- are you the one taking

18  the screenshots?

19      A.       Yes.

20      Q.       Okay.  Do you remember why you chose

21  these frames?

22      A.       It clearly, as best possible, showed the

23  subjects involved in this homicide as best possible,

24  as you said.  They're not exactly the most

25  high-definition photographs or videos.

Page 142

1              But the homicide itself, the individual

2      that is circled to the farthest right, where the

3      line is pointing to it, it says "Unknown Suspect" --

4      not the one that says "Thomas and Unknown

5      Suspect" -- "Unknown Suspect" I believe goes in

6      front of a tree right before the homicide.

7              So this just shows the same person

8      wearing the same clothing was pictured from this

9      angle, to the best of the ability to illustrate to

10     somebody that doesn't have access to the video,

11     that's just reading the report, that this is the

12     same person that was shown on the previous page, of

13     page 32.

14         Q.     But it's a different --

15         A.     Different angle from the bank.

16         Q.     Okay.  Then the following page,

17     page 35 -- sorry.  A few pages up.

18              And my -- normally, when you're doing a

19     CIRT report, would you include this much discussion

20     about the underlying homicide investigation?

21         A.     No.

22         Q.     Why was that included in this report?

23         A.     I was ordered to.

24         Q.     By whom?

25         A.     By, I'm assuming, executive staff.

Page 143

1          I explained my concerns, as being in the

2     unit for three years, of not focusing narrowly on

3     the actual application of use of force and the

4     tactics that were involved with it.  However, when

5     that was run up the chain of command -- my captain

6     at the time was Carlos Hank.  He relayed those

7     concerns, and we were told to go into the homicide

8     investigation.

9          I don't know who made that decision.  At

10    the time the executive staff was under Joe Lombardo,

11    and Chris Darcy was the undersheriff.  I can't tell

12    you who made that decision for us to do that, but

13    that was what was determined.

14    Q.      Okay.  And so then if we turn to page 35

15    of the report, that's a traffic stop; correct?

16    A.      Correct.

17    Q.      And that was based off the license?

18    A.      I believe so --

19    Q.      I don't see a license.

20    A.      So it might have been a front plate.

21    I'm not exactly sure how this was -- I know that it

22    was in their case notes as far as the homicide

23    investigation was going, completed by the IS, which

24    is investigative specialist.

25          This was maybe -- you know what this

Page 144

1    was?  It was a stop.

2             So this traffic officer probably got the

3    information of the car, whether it be a temporary

4    tag or prior registration or current insurance, and

5    then inputted that into the citation, which would

6    trigger then a previous event.

7        Q.     And then going to the next page,

8    page 36, I understand from having read the content

9    of the report -- I wanted to kind of ask though --

10   so these -- what are these called?  They're just --

11   are they cameras around town that capture people's

12   license plates?

13       A.     Automatic -- sorry.  Automatic license

14   plate readers.  They're at fixed positions.

15            A lot of tow trucks actually have

16   them on the front.  We have access to those.

17   And those get compiled into a database, and I

18   believe Fusion Watch, which is a section of our

19   department, gets notification if there's a hit on

20   the plate, whether it be a stolen vehicle or

21   anything like that.

22       Q.     But it's also searchable; correct?

23       A.     It's also searchable, yes.

24       Q.     And then if you can turn to the

25   following page, page 37, can you tell me what

Page 145

1    that is?

2        A.        This looks like a PIO, which is the

3    Office of Public Information.  Their immediate

4    release referenced the homicide detectives looking

5    for help.  It's just a one-page memo asking for help

6    from the community.

7        Q.        And then we'll skip ahead a couple of

8    pages to page 39.

9        A.        Okay.

10       Q.        I'm sorry.  If we can go back to 38,

11   please.  Sorry.

12                 Can you tell me what that is?

13       A.        So this was a call for service that

14   happened at the area of 3050 South Nellis, where the

15   service of the search warrant eventually happened.

16   This was a call for service, referenced an

17   individual in a white Ford, I believe it was.  And

18   he had an AR-15 on his back, and the person

19   reporting noted that he was wearing an ankle

20   bracelet.

21                 So this is tracking from Corvell Fisher,

22   who was the individual who was tracked on that ankle

23   bracelet, and kind of his movements per that

24   electronic monitoring system that correlated with

25   the events that the person reporting gave to

Page 146

1    officers.

2        Q.      So they were able to track Corvell's

3    location; correct?

4        A.      Yes.

5        Q.      And they --

6        A.      On that -- sorry.  On that day.  I don't

7    remember if it had gone dead or if he cut it off at

8    that point.  But I know at one point it wasn't

9    showing or something.  But at that day and time,

10   yes, it was recording.

11       Q.      Okay.  And then on page 39, you're

12   talking about the surveillance requested at

13   4475 Jimmy Durante Boulevard.  And in the center of

14   the page you state, "The surveillance objectives on

15   the surveillance request were listed as," and then

16   you list them off.

17              Why did you include that section in your

18   report?

19       A.      It was factual.  It was what they were

20   identifying they were looking for, for those

21   individuals.

22       Q.      Okay.  And then the following page,

23   what's that?

24       A.      Two photographs.  One of Ariel Soto.  I

25   believe she was the registered owner of that vehicle

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 147

1    they were looking into.  And an unknown male is the

2    second photograph with her.  And this is just going

3    to their surveillance for the days that they were

4    looking at that Jimmy Durante address.

5         Q.       And this is related to the underlying

6    homicide; correct?

7         A.       Correct.

8         Q.       Okay.  And then the next page?

9         A.       This is a photograph of an unknown male.

10   Again, related to the apartment numbers that Soto

11   was frequenting.  I'm not sure -- I think this male

12   went to the Circle K maybe, without reading it.

13            It was just outlining of the photographs

14   of the person who they were taking a photo of.

15        Q.       Okay.  And then the next page, page 42.

16        A.       This is individual, again, photographed

17   that was frequenting the car or the apartment that

18   was frequented by Soto.

19        Q.       This turned out to be somewhat of a

20   controversial photo or suspect, didn't it?

21        A.       Yes.

22        Q.       Okay.  And why was that?

23        A.       This individual had a shaved head.  I

24   have "Unknown Subject" there because there was a

25   controversy of is this a male or a female.  It's

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 148

1    undetermined from that point from investigators if

2    that was a male or a female.

3              There was also a sweatshirt that was in

4    question that was identical in nature as far as it

5    being a Puma sweatshirt, hooded sweatshirt.

6    However, it was a different color than the one that

7    was worn on the night of the homicide.

8    Q.        In your personal opinion, does that look

9    like a man or a woman?

10   A.        Are you saying as far as this report

11   goes?

12   Q.        Yeah, I'm asking for your personal

13   opinion.

14   A.        It's a shaved-head individual.  Without

15   saying -- it's hard to tell from it.  I can't say

16   one way or another if it was a male or a female or

17   not.  There's no identifying markers.  You can't

18   see.  It's not an exposed shirt.  It's a hooded

19   sweatshirt.  It's an individual with a shaved head.

20             Could I see an argument for both ways?

21   Yes.  But there's no way to definitively -- I

22   wouldn't say it's definitively a male.  I wouldn't

23   say it's definitively a female.  I would say it's

24   unknown is the way I presented it.

25   Q.        And then if you -- if you turn to

Page 149

1    page 43.

2         A.       Okay.

3         Q.       And these are just more individuals

4    that they saw coming and going from the unit;

5    correct?

6         A.       Correct.  And they identified Devonte

7    Reynolds as one of these individuals, and I don't

8    know how they identified him as that.  But that's

9    why he's not pictured as "Unknown Male."  He's

10   "Devonte Reynolds."

11        Q.       Okay.  And turning then to page 44,

12   there's an outline of a shooting at 3050 South

13   Nellis; correct?

14        A.       Correct.

15        Q.       And you talked about that briefly

16   before, when we looked over the photo of the

17   location of his ankle monitor; correct?

18        A.       These were two separate instances.

19        Q.       Okay.

20        A.       The one on the 12th was where Corvell

21   Fisher or a subject described as a black male

22   wearing a white T-shirt and black shorts, I believe

23   it was, had a rifle over his shoulder or strapped to

24   his back, and he had an ankle monitor on.  This is a

25   different case from that.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 150

1      Q.      Okay.  And what was this case?

2      A.      This was a shooting that took place I

3  believe over road rage inside that same apartment

4  complex.  The event happened six days after the

5  event that you were just speaking of on the 12th

6  with the rifle over the back.

7          And this individual, I believe it was in

8  Wattsel Rembert's car that was recovered later that

9  was involved in the road rage traffic accident,

10 where the individual that was fighting with the

11 victim of this shot up the apartment complex.

12 Multiple rounds were fired.  I believe in the 20s if

13 I had to go off memory.  I can't find it right here.

14          But in the back of that car, after a

15 search warrant was done of the vehicle, after it was

16 determined to be unoccupied, this MP5-style pistol,

17 which looks like a rifle but is legally a pistol,

18 was recovered in the back.

19     Q.      And so these -- I mean, as we kind of

20 talk about these different incidents, not including

21 the actual surveillance itself, but as we talk about

22 the different incidents and stuff, these are all

23 part of, like, public record; correct?  Because

24 there would be, like, police reports associated with

25 them?

Page 151

1      A.      Yes.

2      Q.      And so now if we can please turn to

3   page 45.

4      A.      Okay.

5      Q.      And so who is Janetta Rembert?

6      A.      That would be the stepmother of Wattsel

7   Rembert.  Or some relation.  I don't believe it's

8   her blood son, but his relation -- she says she was

9   his mother, but I think there was some confusion on

10  that.  I think eventually it was like stepmother or

11  something like that.

12     Q.      Did you listen to the actual interview

13  itself?

14     A.      I watched the whole thing.  It was a

15  video-recorded interview.

16     Q.      And my understanding is that she

17  had made some inference at the end that Wattsel

18  was saying that the police weren't going to get him.

19             I mean, did she come out and say that,

20  or did she make some inference about it?

21     A.      I don't recall.

22     Q.      Okay.  And you tell me if I'm right or

23  wrong.  If you turn to page 48 -- because you're

24  citing the interview with who we presume to be

25  Wattsel's stepmother, and she's saying she can

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 152

1    identify him from the video.  You then take the

2    snapshot of the video again; correct?  And this is

3    the same snapshot you had earlier in the report;

4    correct?

5         A.    Correct.

6         Q.    And then you also then -- I mean, you

7    interviewed -- I mean, you interviewed Detective --

8    is it Grimmett or --

9         A.    Grimmett.

10        Q.    Yeah, Grimmett.

11              You yourself interviewed Detective

12   Grimmett; correct?

13        A.    Yes.

14        Q.    Okay.  And so you talked about during

15   the CIRT interview, when you pulled this -- this

16   is -- this is excerpts from Dr. -- Detective

17   Grimmett's actual interview with you?

18        A.    Correct.

19        Q.    And it would appear that part of your

20   discussion or cross-examination, for lack of a

21   better term, with Detective Grimmett was whether or

22   not he felt that Janetta Wattsel [sic] was a

23   reliable informant; is that correct?

24        A.    Correct.

25        Q.    And why were you trying to determine

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 153

1    that?

2        A.        Because we were tasked with breaking

3    down the homicide investigation of where it was at

4    that point, and it was important for me to get the

5    full story of why he believed that individual was a

6    reliable source.

7        Q.        And then you walk through the LVMPD --

8    so this isn't the SWAT policy, though.  This is --

9        A.        Which page?

10       Q.        Sorry.  I'm sorry.  Page 50.

11       A.        Okay.

12       Q.        And this is the actual LVMPD policy

13   about relying on informants; correct?

14       A.        Correct.

15       Q.        Okay.  So if you turn to page 51, if we

16   go down, it's the -- hold on.  It's this paragraph

17   right here (indicating).

18       A.        Okay.

19       Q.        The last full paragraph before the end

20   of the page.

21            It talks about Janetta and Ty'Shawn, and

22   it says "were reliable witnesses coming forward

23   without provocation."

24            Is this your analysis?

25       A.        I believe that was the analysis of the

Page 154

1    section.  Not specifically my opinion, but it was

2    the analysis of the section that they were reliable

3    witnesses coming forward without provocation.  And

4    that met the policy and the statutes.

5        Q.      Okay.  And so then if we turn to

6    page 52 --

7        A.      Okay.

8        Q.      -- it talks about -- this talks about a

9    surveillance -- what's TASS?

10       A.      TASS is a -- the technical -- again,

11   acronyms with our department.  Essentially they do a

12   lot of -- they're responsible for the surveillance,

13   covert surveillance, with electronic devices.

14              So if you needed cameras put up

15   somewhere that were either covert or overt, they

16   would be the unit to do that.  We don't have access

17   to them as detectives just randomly.  You have to go

18   through TASS to get that equipment put up, and they

19   have procedures on how they are able to do that or

20   not do that.

21       Q.      And so is it just putting up cameras, or

22   is it also doing surveillance?

23       A.      TASS doesn't do the surveillance

24   necessarily.  Those are specialized units within the

25   department.  Criminal Intel I believe is what they

Page 155

1    are.  TASS will just get the equipment in place.

2        Q.        But no equipment was put in place

3    regarding this investigation -- sorry, regarding the

4    surveillance at 3050 South Nellis; correct?

5        A.        Correct.  And -- I'll reserve that.  If

6    you ask about it, it's more technical jargon.

7        Q.        And so then turning the page to page 53,

8    are these the photos of when the surveillance team

9    at 3050, for lack of a better term, got burned?  Is

10   that how you would say it?

11       A.        Yes.  And that was from their notes from

12   the CIS, which is that Criminal Intelligence

13   Section, while they were conducting the

14   surveillance, that an unknown male was peeking into

15   cars, and they felt like that was

16   counter-surveillance on their position.

17       Q.        And this was the rough -- this was the

18   totality of like an hour and a half of surveillance

19   on this entire -- on the South Nellis Boulevard

20   unit; correct?

21       A.        I don't remember the time exactly, but

22   it's around there.

23       Q.        You have it in your timeline.

24                 If we go to page --

25       A.        So, yeah, about an hour and a half.

Page 156

1      Q.      Yeah.

2      A.      Yep.

3      Q.      And so if you turn to page 54, the very

4   last sentence.  This is the sentence from the CIRT

5   report.

6           "This was the only surveillance

7   operation conducted at 3050 South Nellis Boulevard,

8   Apartment 1125.  Wattsel and Fisher were never

9   identified inside of or around the apartment."

10          And that's your synopsis of the outcome

11  of the surveillance; correct?

12     A.      Correct.

13          THE WITNESS:  Before we get into this

14  next section, can I take a quick break?

15          MS. MURPHY:  Absolutely.

16          THE VIDEOGRAPHER:  Off the record at

17  12:31 p.m.

18          (A break was taken.)

19          THE VIDEOGRAPHER:  On the record at

20  12:52 p.m.

21  BY MS. MURPHY:

22     Q.      And so, Justin, before we took a break,

23  I think we were roughly on page 55 -- that seems to

24  be the same page you're on -- on the CIRT report.

25          And so can you just tell me what

Page  157

1    this is?

2         A.       This is a picture I believe from the

3    second day of surveillance on the Jimmy Durante

4    address of two unknown individuals exiting one of

5    the apartments associated with the vehicle

6    belonging to Soto.

7         Q.       Okay.  And turn the page to page 56.

8         A.       Same -- same thing.  Individuals who are

9    associated with either the vehicle or the apartment,

10   that were going in and out of that apartment or

11   vehicle.

12        Q.       And the CIRT investigation didn't have a

13   problem, other than the potential misidentification

14   of the woman, but the CIRT investigation didn't have

15   a problem with the amount or -- the amount of

16   surveillance that was done on Jimmy Durante;

17   correct?

18        A.       Not necessarily.  "Problem" is maybe the

19   wrong word.  Obviously having the more surveillance

20   the better.

21             But what they determined was they had

22   sufficient evidence of that vehicle being

23   associated to Jimmy Durante because that individual

24   was going in and out of the apartment and operating

25   the vehicle they believed to be a part of the

Page 158

1    homicide.

2            As far as the other address, again,

3    perfect world, you would like to see -- and I'm not

4    sure if we've gotten to it yet.  We haven't gone

5    past it yet.  But the CIS team, Criminal Intel

6    Section, especially Team 5, I believe, is the team

7    that is the super-secret team --

8    Q.        Is that its official title?

9    A.        Not their official title.  But they're

10   people who don't even -- they don't associate with

11   cops.  They are very, very undercover.  They were

12   the team that got burnt on this.

13   Q.        "On this" you mean the 3050; right?

14   A.        On the 3050, correct.

15           And when there's -- the way that

16   apartment complex was situated, where that door was

17   situated, it was extremely difficult to get live

18   eyes on that door because of the angles.

19           It was also difficult -- not difficult,

20   but also borderline impossible, based on TASS's

21   requirements when it comes to getting cameras up,

22   because of power sources needed to be available.

23   Q.        We're going to get to all that.  Don't

24   worry.

25   A.        Okay.

Detective Justin Roth     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 159

1      Q.      It's in your report.

2      A.      Sure.  But I'm going with the --

3      Q.      Okay.

4      A.      -- surveillance part of it.

5      Q.      Okay.

6      A.      So could you have done more

7    surveillance?  I'm not sure.  I'm not -- I'm not

8    part of that CIS squad.

9      Q.      But when you talk about "more," you're

10   talking about 3050; right?

11     A.      Correct.

12     Q.      Okay.

13     A.      I'm not sure if that would be something

14   that would be reasonable.  Because of the way it's

15   angled and because they had just previously -- the

16   best team we have on the department just got burned.

17   I'm not sure if that would be reasonable enough to

18   continue to do that for officer safety purposes, if

19   that makes sense --

20     Q.      It does.

21     A.      -- as far as the surveillance goes.

22     Q.      No, I get that.  But regardless, there

23   were still a bunch of unknowns; correct?

24     A.      Sure.

25     Q.      That made their decision on the tactics

Page 160

1    improper, based on the number of unknowns they had;

2    correct?

3        A.      And there are other ways to determine

4    identities outside of surveillance.  So surveillance

5    isn't the only key.

6                So to say there wasn't enough

7    surveillance for this operation is subjective based

8    on what the outcome was.  It's not the end-all,

9    be-all of how we get intelligence of who's living

10   where.

11       Q.      But they didn't do the other

12   intelligence mechanisms either; correct?

13       A.      I guess we'll get to that when we

14   read it.

15       Q.      Correct.

16       A.      But as far as -- not all of them that

17   were available to them.

18       Q.      Okay.  And so now if we turn to

19   page 57 --

20       A.      Okay.

21       Q.      -- this has to do with the search

22   warrant itself.

23                And, again, your knowledge of

24   completing and filling out search warrants, as you

25   testified to earlier, was the foundation for you

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 161

1    volunteering to be the CIRT investigator on this
2    case; correct?
3         A.      Correct.
4         Q.      Okay.  And in where you are citing --
5    where you are citing the content of the 3050 South
6    Nellis Boulevard search warrant, you have several
7    items that are highlighted and bolded.
8                 Why did you bold those items?
9         A.      I think the "Any and all firearms" might
10   have been bolded due to them being involved in the
11   homicide.
12                "Cellular phones" would be something
13   that you could track somebody with.
14                And the "Clothing" was specifically
15   mentioned inside of the statement.
16                I'm not sure if those were bolded on the
17   actual content.  If they are -- do you have a copy
18   of the actual search warrant?  They might have been
19   bolded on there.  I might not have bolded them.
20        Q.      I don't -- I'll represent -- I am going
21   to try to refresh -- I'll see if I can find the
22   actual search warrant.
23                But my understanding of why you bolded
24   these is because there were issues with the
25   descriptions -- the descriptions themselves.

Page 162

1          Like, you go on to say why "Any and all

2     firearms" is not -- it's improperly vague, the

3     "Cellular phones" is improperly vague, and the

4     "Clothing" is improperly vague, based on the

5     standard of how somebody is supposed to fill out a

6     search warrant.

7          A.     Okay.

8          Q.     I'll refresh your recollection and keep

9     going.

10         A.     Sure.  I just wasn't sure.

11         Q.     No, that's okay.

12                And so, like, if you go down right to

13    the bottom of the page, like on the last line, last

14    paragraph -- or the second-to-last line, right, you

15    talk about Thomas -- the murder -- the body -- was a

16    small caliber, possibly a .22 or .25 caliber, per

17    the IAP and officer's reports.

18                So the understanding is the Number 1,

19    "Any and all firearms," they actually know what

20    caliber firearms they're looking for?

21         A.     Correct.

22         Q.     So in that context, would any -- "Any

23    and all firearms" is an improper way to fill out a

24    search warrant; correct?

25         A.     So improper?  No.

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 163

1              I will say this:  Is that these

2      detectives met the minimum requirements that were

3      established by policy and by their department

4      manual.

5              I will say that I did have several

6      questions about those vague mentionings of "Any and

7      all firearms," "Cellular phones," and "Clothing,"

8      which I would have loved to interview the DA that

9      approved it and the judge who signed it.  However,

10     that wasn't in our purview, being an administrative

11     investigation.

12              At the end of the day, it met the

13     minimum requirements for LVMPD as far as the content

14     of the search warrant, and it was signed by a judge

15     and a district attorney.

16              So as far as arguing the validity of the

17     search warrant, we can say that it should have been

18     more specific to those items.  And, again, I can't

19     inject my personal opinion into this.  But we're

20     just pointing out the obvious of what was mentioned

21     in those reports, like I mentioned in this report.

22     But it was determined that this was minimum

23     requirements of LVMPD, and it was signed by a judge

24     and signed by a district attorney.

25              And my assumption would be that they got

Page 164

1    the same information, they read the same search

2    warrants, and were present with the detectives when

3    those were signed.

4              So that's -- when we talk about

5    improper, if it was improper, then I feel like

6    that's more of a legal standpoint.  But as far as

7    LVMPD is concerned, they met the minimum

8    requirements.

9        Q.    So just listing off "Any and all

10   firearms" meets the requirement of describing with

11   particularity the items or things to be considered

12   under LVMPD Policy 5/200.01, Section B [sic]?

13       A.    Again, it was hard for us to say that

14   was improper when a judge and a DA said it was

15   acceptable.

16             And I get we're talking about policy

17   versus law, but a lot of our policy is constructed

18   off of NRS.  So when we're discussing those aspects,

19   I wish I could have asked those questions to the DA

20   and to the judge, because that would help me with a

21   little bit of clarity of had they known that that

22   was -- specifically when we talk about the

23   sweatshirt and -- later on in the report, and

24   firearms.

25             Now, I will say that putting "Any and

Page 165

1    all firearms" is something that is common because

2    bullets can get degraded in bodies when they go

3    through the trauma of bullets.  So they can fragment

4    off.  They can look smaller than they appear.  It's

5    not uncommon.  So "Any and all firearms" is

6    something that would be acceptable from, again, that

7    minimum standard.  Because without the gun

8    specifically there with you, you can say it's a

9    smaller caliber, but do we really know?

10       Q.      Well, you describe it as "too vague" in

11   here.

12       A.      Correct.  Our -- our unit came through

13   as saying "too vague."

14              But at the end of the day -- and I

15   believe the conclusion reflects this, and correct me

16   if I'm wrong -- it seemed to be reasonable on the

17   search warrant, if I'm correct.

18       Q.      Okay.

19       A.      So we identified that it is vague.  And

20   that's why we interviewed those two detectives.

21              And I'd like to determine that real

22   quick that that's what the conclusion meant,

23   because, again, it has been a second.

24       Q.      Justin, however you want -- that report,

25   that's your version, so however you want to flip

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 166

1    through it to give your best and most accurate

2    testimony, please feel free.

3         A.      Okay.  So my mistake.  I would like to

4    strike all that, what I said.  I was giving my

5    interpretation of that policy as it was written

6    through legal's aspect as far as being a good

7    search warrant.

8              We did say that it was not acceptable.

9         Q.      Okay.  No worries.  Listen, what I -- my

10   whole -- I'm really not trying to trick you on

11   anything.  So however you need to do this to give me

12   your best and accurate testimony -- I know I already

13   said that, but that's a -- I really want you to do

14   that.

15        A.      Sure.  And just to explain.

16             Again, team effort.  So looking at

17   things, sometimes the -- my recollection of things,

18   obviously being a -- somebody who's done search

19   warrants was why I had an issue with it being too

20   vague.

21             However, I guess where I got maybe

22   tripped up was is it a good search warrant.

23             So yes, it's still a good search

24   warrant, based on the fact that it was signed by a

25   DA and a judge.

Page 167

1      Q.      Okay.  And that's fair.

2              So if we can skip ahead to page 61.  And

3  the paragraph right over the -- I think this is --

4  right over the photo.

5      A.      Okay.  61?  I'm sorry.

6      Q.      Yeah.  You pull out the statement --

7  sorry.  You pull out the end of the probable cause

8  statement provided by Dr. Grimmett.  Open quote,

9  "One of the males was observed wearing clothing like

10  the clothing worn by the shooter, a Puma brand

11  sweatshirt with a vertical stripe down both

12  sleeves."

13      A.      Correct.

14      Q.      And so you highlight then, this is that

15  the -- as Detective Grimmett describes the male,

16  this is in fact described as a female in the

17  surveillance logs; correct?

18      A.      Correct.

19      Q.      And then the following -- the following

20  page, page 62, that's you interviewing -- or that's

21  you, yeah, interviewing Detective Grimmett about

22  that; correct?

23      A.      I was in the interview.  I'm not sure if

24  this was me actually asking the questions.  But,

25  yes, I was part of this.  It could be me asking the

Page 168

1    questions.  But yes.

2         Q.      Okay.  Well, sorry.  That's fair.

3                 This is part of the CIRT interview;

4    correct?

5         A.      Yes.

6         Q.      Yeah.  And he's essentially justifying

7    why he felt it could go either way; correct?

8         A.      Yeah.

9         Q.      Okay.  But as is later discussed within

10   the report, the sweatshirt itself is also different?

11        A.      Correct.

12        Q.      And if you turn to page 64, you created

13   this side-by-side; correct?

14        A.      Correct.

15        Q.      And what was your purpose in creating

16   the side-by-side?

17        A.      To show that the sweatshirts are

18   similar, meaning that they are from the same brand,

19   the same style, the same everything, except they are

20   reverse color-schemed.  Which -- and, again, the

21   explanation was something along the line of gang

22   members buy multiples of the same shirts in

23   different colors was, I believe, their testimony on

24   that.

25                But to show that we're talking about a

Page 169

1    specific sweatshirt here did not match the actual

2    sweatshirt that was inside of the surveillance

3    photo -- or video, sorry.

4         Q.    Correct.  Okay.  Thank you.

5              And then there's -- I'll represent -- I

6    don't think we need to go over it.  I'll represent

7    to you it's pages and pages of Detective Grimmett

8    fighting with whoever the CIRT interviewer was.

9         A.    Probably me.

10        Q.    Probably you.

11              And this is described as -- in your

12   CIRT report -- sorry, in the CIRT report, on

13   page 80 -- sorry, on page 68, it says, "The omitted

14   information was exculpatory evidence, and the color

15   of the sweatshirt and alleged sex of the unknown

16   subject, as observed by surveillance detectives in

17   the surveillance logs, should have been added in the

18   warrant."

19        A.    Correct.

20        Q.    And was that part -- and I'm sorry,

21   there's so many conclusions now, I don't remember

22   off the top of my head.

23              Was that -- was that something that was

24   effected as a recommendation, that they should start

25   including exculpatory evidence in the warrant

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page  170

1    applications?

2        A.       I don't know if that was a

3    recommendation.  I think it was something that

4    should have been done either way.  I believe it was

5    in policy.  If not, I can look through there, but

6    I'm not sure -- again, you talk about the reason why

7    I took this case is search warrant experience.  And

8    I can't put my personal of what I would have done on

9    there because I have to be very objective on what is

10   in front of me and why was it done.

11               At the end of the day, the

12   determination was that color should have been

13   added to the warrant because we don't know if the

14   judge or the DA had access to the pictures that

15   would show it otherwise not.  That was our concern,

16   but we couldn't confirm that because we weren't

17   allowed to talk to them.

18       Q.       Okay.

19       A.       I'm just trying to find your -- the

20   question referenced the --

21       Q.       We can actually put a pin in that and

22   come back to it at the end.

23       A.       No, there is.  It's Section B of 9.2,

24   "Current training and policy does not mandate

25   detectives to include exculpatory evidence when

LEXITAS™

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 171

1    completing a search warrant.  CIRT recommends

2    verbiage be added to the Search Warrant lesson plan

3    and Department policy," which I think has been done.

4    And that was obviously a concern of ours.

5         Q.        Okay.  And then if you want to turn to

6    page 70.  You can skip all the fighting between you

7    and Detective Grimmett.

8         A.        It wasn't necessarily fighting.

9         Q.        Intense discussions?

10        A.        Differences -- differences of opinion.

11        Q.        Fair enough.

12                  So page 70.  So this is the "Search

13   Warrant Incident Action Plan"?

14        A.        Correct.

15        Q.        And so this is the -- what we call --

16   this is the IAP that we refer to throughout -- I

17   mean, this is going to be the next --

18        A.        I believe this is Version 1 of the IAP.

19        Q.        Yeah.  And so, I mean, we can -- I think

20   on the IAP -- we'll weave through the report as

21   well, but it seems that you're very familiar with

22   these issues.  So if you just want to briefly walk

23   me through, what were the issues with the IAP?

24        A.        Well, specifically, the IAP had changed,

25   and there was no administrative notice to any

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 172

1    detectives that it had changed.

2              One of the people who was responsible

3    for that change was Lieutenant Johansson, who is on

4    the search warrant committee, who was one of the

5    authors or one of the signatures on this page.

6              So when this got to him to approve it, I

7    believe from his statement, just off memory, that he

8    recognized it.  Or maybe it was Captain Cole.

9    Somebody recognized that it wasn't the new 14-page

10   document, which is very similar but just asked for

11   more questions to help SWAT make a determination.

12   And this was only 11 pages long.

13             The reason why this was something,

14   11 versus 14, is there was a reproduction of

15   pages after it was denied.  Yeah, so it was

16   Captain Cole who said, Please resubmit on the new

17   SWAT IAP that was provided to all lieutenants a

18   couple weeks ago.

19             So it was just him, after he got it as

20   the SWAT commander, recognizing that it wasn't the

21   new one that was finalized but not pushed through

22   the department, just through the lieutenants.

23             So when it was returned through, what

24   caught our eye, and it was not caught by the

25   reviewers of this, was that at one point I believe

Page 173

1    it was page 7 that was duplicated, but it was page 7

2    of 11 and then page 7 of 14.

3              Which, again, if you're reading this on

4    a phone, on a tablet, you're not looking for page

5    numbers; you're looking for content.  So I can see

6    how that was missed.  But then you would have seen

7    that it was part of the old IAP.

8              So essentially what they did was, to

9    save time, they blended the old IAP with the

10   current IAP.

11       Q.    So Frankenstein?

12       A.    Frankenstein's monster.

13       Q.    And so that was one of the issues;

14   correct?

15             Like I said, we'll get to the

16   recommendations as well.  But one of the

17   recommendations was to provide training to everyone

18   on this; correct?

19       A.    Correct.  And that has happened.  We've

20   gotten several IAPs since then, which are all on the

21   document that was ...

22       Q.    Are you proud of the work that you did

23   on this case?

24       A.    In what respect?

25       Q.    Are you proud of the work product?  I

Page 174

1     mean, are you proud of the outcome of it?  Are you

2     proud of the work product?

3         A.      The -- obviously with this being such a

4     very detailed, long presentation -- 12 hours on the

5     use-of-force board and tactical review board is

6     about six hours longer than anyone has ever been

7     through CIRT -- it was extremely stressful.

8             So to say that I'm proud is a

9     double-edged sword, because I try to put my all.

10    That's why I'm still here.  I should have left, if I

11    was really smart about it, just for my own mental

12    well-being.  But I kind of put it aside and I pushed

13    through, and I'm glad I pushed through, because I

14    really care about this section.  I feel like this

15    section is one of the most important pieces of this

16    department, to make sure that our department is

17    getting better.

18            Now, the question is am I proud of

19    this report?  There are some things that I wish

20    that we would have handled differently as far as

21    some of those contentious interviews that you

22    mentioned.

23            My view from outside of our office of

24    people's view on CIRT is usually not very good.  And

25    then you hear a lot of the stories or the rumors

Page 175

1    about this case that circle around about how people

2    are being treated, which is not the case.

3              But, again, we have to ask those

4    tough questions.  So that's stressful for anybody in

5    our unit.

6        Q.    What are the rumors about how people are

7    being treated?

8        A.    Well, you said it yourself, that it

9    seemed like we were fighting on that interview.

10   Which it was a contentious interview because

11   Detective Grimmett cares about his job as well.  And

12   if somebody is asking you tough questions about your

13   performance on that job, sometimes people get

14   defensive.

15       Q.    So are there rumors that the officers

16   involved in this or the officers leading up to this

17   have been treated differently or --

18       A.    No.  No.  And every time I see the guys

19   who were involved in this, they're very friendly

20   with me.

21             It was -- the section that I believe

22   CIRT should not have handled was the homicide

23   section should have been processed through IA.  If

24   there are policy violations that are not related to

25   a use of force -- and I get it, that's why we're

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 176

1   there, but that whole section should have been
2   pushed off to IA like we requested.  That should
3   have been an internal investigations investigation,
4   and then this should have been just the tactics,
5   decision-making, and training related to the use of
6   force and the officer-involved shooting.
7        Q.      Okay.
8        A.      The fact that we were ordered to do it
9   otherwise was stressful because it's outside of the
10  scope of our investigation for the most part.
11              So when you say, Are you proud of this?
12  I'm proud of every word that I put on the page.  My
13  name is attached to it because I put my everything
14  into it.  I'll never say that I gave 90 percent.  I
15  always give a hundred percent.  So I'm proud of that
16  fact.
17       Q.      Are you proud of the changes that this
18  report has helped --
19       A.      Absolutely.  I think it's saved lives on
20  both sides of the coin.
21       Q.      Okay.  And so we can kind of skip ahead.
22  Oh, if we can go to page 80.
23              Are you the one creating -- what do you
24  call it?  The callout boxes?
25       A.      Where it says "Handgun magazine"?



Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 177

1    Q.    Yes.  Is this all your handiwork?

2    A.    Yes.

3    Q.    All right.  And the one on page 80 for

4    Corvell or -- yeah, CJ.

5    A.    Yep.

6    Q.    And so this is where they -- in the --

7    in the -- in the search -- in the IAP, they were

8    talking about he's seen with a gun.  You actually

9    circled it.

10         That's not technically a gun; that's

11   just a magazine.  Correct?

12   A.    "Handgun magazine" is what's pictured

13   there.  So, again, dealing in factual -- in the

14   factual realm, I can't say for certain that that is

15   a gun.  It is the assumption that it is a firearm

16   because it is seated in his pocket.  Like, if you

17   put a magazine in your pocket and you place it at a

18   90-degree angle, it's going to fall out of your

19   pocket.  It's attached to something, and most likely

20   it is a gun.  But that picture right there is

21   depicting a handgun magazine.

22   Q.    And it seems like you raised -- sorry.

23   If we turn to page 82, it seems like you kind of

24   raise the issue of whether there should have been

25   separate IAPs for the two different locations.  And

Page 178

1    within that, though, you kind of dismiss that,

2    saying, like, no, they're saying it should just be

3    one.

4        A.      Who?  I'm on page 82.

5        Q.      Yeah, 82.  Sorry.  This is from at the

6    end of Captain Cole's interview.  You quote him as

7    saying, "Uh, so moving forward, multiple locations,

8    separate IAPs for every location."

9              And then as we go through though, it

10   seems like you kind of -- not kind of, but through

11   your interviews with other people, they kind of say,

12   No, if it's -- if it's one matter, even if it's

13   separate locations, it should be one IAP.

14       A.      So that was me asking Captain Cole, who

15   was the SWAT commander at the time, if having

16   separate IAPs for two different locations, even

17   though later it would be beneficial for his section

18   specifically.

19              So then when he -- I believe I did

20   Captain --

21       Q.      Is it Koren?

22       A.      Koren, yes.  He's now Assistant Sheriff

23   Koren.

24              But yes, Captain Koren was then asked,

25   and he -- again, I'm doing all this based on the

Page 179

1    notion that I know that Captain Cole had told me

2    that two probably would have been better.  And these

3    are just their opinions on what they believe based

4    on their training and experience.

5           And their answers are their answers.

6    I mean, Sergeant Scott was on for 33 years, I

7    think he was, before he retired before this board

8    went.  Captain Koren has been on longer than me.

9    He's now a sheriff.  And Captain Cole is a captain

10   and SWAT commander.  So people with a lot of

11   experience, and I was just relaying their opinions

12   on the matter.

13       Q.     And then turning to page 84.  And this

14   is where you seem to start discussing alternative

15   surveillance methods to -- that could have

16   determined who was associated with the South Nellis

17   Boulevard apartment?

18       A.     Correct.

19       Q.     And as we discussed before, kind of as

20   you went through, you raised other alternative

21   surveillance options, but Detective Grimmett had not

22   availed himself of any of those; correct?

23       A.     Correct.

24       Q.     And then -- and then this is -- I

25   don't know if you remember or not.  I read -- so if

Page 180

```
1    we turn to page 90, there seems to be some
2    controversy about they split up the team to do
3    surveillance at the same time.  If you read the very
4    last of it.
5         A.      Which?  Where are you looking at?
6         Q.      Sorry.  That's fair.
7                 So this is from Detective Solano.
8    During this interview he was asked if he was
9    concerned.
10                And at the very end he says, "To me, it
11   appeared that they were kind" -- "they were
12   trying" -- sorry.  Strike it.
13                "To me, it appeared that they were kind
14   of trying to knock out two birds with one stone over
15   here on that day.  I don't know.  They are questions
16   better asked for those guys."
17                So it seems like there's some discussion
18   about that they had split up the surveillance team,
19   so when they got burned there wasn't a backup team
20   there?
21        A.      So that's not something that is
22   commonplace, to have a team fill in if one team gets
23   burnt, especially on those -- that team that does
24   those high-profile surveillances.  Once you're
25   burned -- it's an officer-safety thing -- once you
```

Page 181

1    believe you were burned anyway, you're not going to

2    replace a team with the possibility of now there's

3    harsh counter-surveillance to where that team could

4    be in jeopardy of safety, if that makes sense.

5             Does that answer your question?

6        Q.      It did.  But it seems, based on what

7    Detective Solano is saying, is that -- I mean, he

8    said, "My question is, Why was their team split up

9    that day?  They had half their team at Jimmy

10   Durante, the other half at 3050 South Nellis."

11            "Like I said, in my six years in

12   Criminal Intel, that never happened.  It was

13   always -- was usually -- 'cause the squad's a large

14   squad."

15            Do you remember this at all?

16       A.      I do remember the conversation.  When he

17   says "large squad," they're like six, I want to say.

18   That's not a large squad.

19       Q.      It's the size of your squad.

20       A.      Exactly.  It's definitely not a large

21   squad.

22            The idea of what I believe happened was

23   they probably had a tail vehicle or a chase vehicle.

24   In case somebody left the apartment and left in a

25   vehicle, one would then go off with that.  So you'd

Page 182

```
 1   have two detectives and you'd have one still on the

 2   house as an eye.

 3            However, when you're talking about a

 4   one-directional-facing apartment where there's no

 5   back door, you don't need more than two to three

 6   individuals to get surveillance on that.  So I don't

 7   understand why he would say that.  But that was

 8   essentially his answer to the question that I gave

 9   him and his explanation.  I can't speak to why he

10   believed that if they did things different six

11   years ago.

12       Q.     Okay.  If we turn to page 94, this is

13   just a Google Earth photo.

14            Did you pull this from Google Earth?

15       A.     Correct, yes.

16       Q.     Did you ever go down to the unit itself?

17       A.     I was down there at one point.

18       Q.     Okay.  Did you take any photos or --

19       A.     No.

20       Q.     What was your -- I probably know the

21   answer, but I'm going to ask it anyway.

22            What was your purpose in going down to

23   the unit?

24       A.     In general, like I said before, the case

25   agent has the option to go out night of or day of,
```

Page 183

1    of an officer-involved shooting, just to kind of get
2    an overview of the entirety of the structure.  You
3    can see enough from Google Earth and all these other
4    things, but you really can't get a full picture
5    until you put eyes on it yourself.
6             Like I said, this wasn't my case
7    initially, so I was never given the option to go out
8    there day of.  So I did make a trip over there just
9    to -- I actually went in the gas station just to see
10   how it was positioned actually based on, like, my
11   two eyes, when we were talking about the options of
12   where to go for TASS and if those were reasonable
13   options.
14       Q.       And what were your personal observations
15   when you went down there?
16       A.       So not reflective of the report?  Just
17   of what I saw from an officer's -- reasonable
18   officer's standpoint?
19       Q.       Correct.
20       A.       It was a difficult situation as far as
21   surveillance goes.
22             I know from previous operations I've
23   been a part of when I was not in CIRT that you would
24   need either permission or a court order to affix
25   your cameras to a business, which would be the gas

Page 184

1    station there.  That can get kind of dicey if there

2    are friendlies in there.  You don't want to alert a

3    potential homicide investigation of -- that they're

4    getting eyes on.  Especially when you don't have

5    them completely locked up of where they're at.  If

6    they leave, then you have no other record of where

7    they're at.  That becomes a problem.

8              I thought about the light pole there

9    because there's power at the light pole, but in

10   Clark County they run on intermittent power.  So

11   they actually don't have live power to the actual

12   power unit until it's nighttime.  So you would have

13   power, but only for nighttime surveillance on that

14   camera.  Which then you'd have to explain the lapses

15   for, you know, 12 to 13 hours of no surveillance on

16   that.

17             And still, even if you have a camera on

18   that, you're facing windows.  You still don't have a

19   look at the front door or the parking lot.  It

20   becomes very difficult to get actual video

21   surveillance of at where they were in 2022.

22        Q.    And the next five or six pages talks

23   about Major Violators, but we've already covered

24   that.

25             So on page 98, it's really SWAT who

Page 185

1    dictates the way that -- they're the ones who decide

2    how the warrant is served; correct?

3        A.      Correct.  I believe one of the quotes in

4    here was a specialized unit is not going to dictate

5    my tactics.  I forgot who said that, but it was an

6    operator or -- the information that they get from

7    the IAP is supposed to give you an idea of all the

8    threats and let you place yourself into the

9    different boxes that you have as far as your policy

10   and procedures goes.

11       Q.      Okay.  So -- and I guess we haven't

12   talked about that.

13               So that's really the purpose of the IAP

14   then?

15       A.      Yes.  To give a detailed synopsis of

16   what you're looking for, what your threats are.

17               In this case, the apartment was

18   identified to Wattsel and Fisher.  That's all the

19   operators have to work on.  They're not going to go

20   back and fact-check that.  They're not going to go

21   do their own investigation.  That is going to be

22   information that is known to the SWAT operators.

23               They're looking for things like

24   firearms.  They're looking for any mentions of

25   counter-surveillance, like cameras, bars on the

Page 186

1    window, things like that.

2        Q.      Okay.  And then now turning to

3    page 101, here it talks about the change of the

4    exigency box.

5            Because as we go through these different

6    iterations, they not just incorporated some new

7    pages in, but they also changed the exigency box;

8    correct?

9        A.      Uh-huh.  Correct.

10       Q.      And, again -- well, not again, but

11   there's no re-signing of the IAP; it's just the

12   same signature page attached again and again;

13   correct?

14       A.      Correct.

15       Q.      And there's no context under which that

16   complies with LVMPD policy; correct?

17       A.      So the -- well, can you rephrase?  The

18   context of?

19       Q.      LVMPD policy doesn't have -- LVMPD

20   policy doesn't allow -- there's nothing in LVMPD

21   policy that would enable, where a form has to be

22   signed by certain individuals, to just reuse the

23   signature page again and again; correct?

24       A.      Correct.  There's nothing there that

25   says that that is either acceptable or not

Page 187

1    acceptable.

2        Q.        Okay.  In fact, Captain Cole defended

3    that position; correct?

4        A.        I believe so.  Can you tell me what page

5    that was on, where he -- a lot of these interviews

6    kind of blend together in my head a bit.

7                 Page 104?

8        Q.        Correct.

9        A.        So yeah.  Based on his conversations

10   with Captain Koren and Lieutenant Johansson, and he

11   believed they were legitimate signed documents even

12   though they were from a previous document.

13                And I guess one of the caveats to that

14   would be the fact that Captain Koren was on COVID-19

15   and couldn't physically sign the new pages per, I

16   guess, our policy.  I think we implemented a policy

17   of -- contact policy when COVID was going around

18   that said that he couldn't have any contact with

19   individuals.  And we didn't have any documentation

20   for electronic signatures.

21       Q.        That's since been implemented though;

22   correct?

23       A.        I believe so.

24       Q.        Okay.  Is there not, like -- if somebody

25   is out, like if somebody needs to sign one of these

Page 188

1    reports is out for whatever reason, don't they have,

2    like, a backup person to sign it?

3        A.        You'd have to -- that might be more of

4    a -- like captain-to-captain thing.  That's not

5    something that's set in policy.

6                  I know that there's coverage that

7    happens between captains, lieutenants in different

8    sections, but that's a little bit over my purview,

9    as far as covering for each other and assignments on

10   who's covering.

11                 If the SWAT commander and the lieutenant

12   who is covering homicide made that determination

13   that they were okay with the signatures, and in this

14   instance that was their decision -- again, we made

15   that something that we changed to make sure that

16   doesn't happen like that again.  Doesn't mean it was

17   acceptable or unacceptable, but it just means we

18   needed to fix that problem.

19                 Because at the end of the day I don't

20   think that by him saying it was a legitimate

21   signature made the document illegitimate.  He was

22   saying that that was still their signature, and it

23   was a legitimate document based on the fact he

24   talked to them, if I recall that.

25       Q.        And then SWAT just goes by, to kind of

Page 189

1    do a quick -- I mean, they do their own

2    recognizance, but it's pretty brief; correct?

3         A.      It's not for people.  It's for

4    structure.  So they need to know if they can fit

5    armor back there.  They need to know if there's any

6    counter-surveillance or countermeasures that are a

7    part of that door.  Which in this case they ended up

8    missing because there were individuals that were

9    counter-surveilling or just hanging outside.

10        Q.      Well, they didn't -- okay.

11        A.      But the -- their surveillance is more

12    along the lines of making sure -- did you need me

13    to stop?

14        Q.      No.

15        A.      Sorry.

16                Their surveillance was to make sure that

17    they could -- where they were going to enter from;

18    where they're going to put their Sierra units, which

19    are snipers; if they were going to deploy snipers or

20    if they were going to be standing by as observers.

21                One of those things to look for was a

22    brass wrap, which in this case, like I said, was not

23    noted because the door was open the entire time.

24    And had Officer Hoskins, who was the forward

25    observer on that surveillance operation, stopped and

Page 190

1    checked that, they would have been blown and

2    potentially he would have been in a compromising

3    situation with three suspects.

4        Q.    Okay.

5        A.    Also operating on the fact that to their

6    knowledge these -- anybody who was there is a

7    possible armed homicide suspect.  So he has no body

8    armor.  He's dressed in basketball shorts and a

9    T-shirt.

10       Q.    All right.  So then we'll skip ahead

11   to page 110, where it starts discussing "SWAT Makes

12   a Plan."

13             Do you come up with these headings?

14       A.    I do.

15       Q.    Okay.  And so this is all -- sorry.  If

16   we turn to page 111, this is all in italics, so this

17   is all quoted -- this is all quoting from the SWAT

18   Section Manual; correct?

19       A.    Correct.

20       Q.    I noticed in here -- was there any part

21   of the SWAT Section Manual that gave any kind of

22   training or outline to parameters of "knock and

23   announce"?

24       A.    I can't recall.  I feel like there was a

25   section on there.  But we were specifically dealing

Page 191

1    with the CET because that's what they chose.

2             I do believe there was an aspect on that

3    iteration of "knock and announce," but the CET was

4    the method that they chose on that, so that's what

5    we focused on.

6    Q.    Okay.  And so just for -- it's -- just

7    for clarity of the record, we've got two different

8    types of entrance in this case.

9             We've got what's called the CET, which

10   is the controlled entry tactic, or the SACO,

11   S-A-C-O, which is the "surround and callout";

12   correct?

13   A.    Correct.

14   Q.    Very briefly, tell us what's the

15   difference between a CET and a SACO.

16   A.    Well, a SACO is exactly what it is.

17   It's "surround and callout."  You surround the -- in

18   this case the apartment, all of the exits that you

19   could get.  A lot of times you'll do evacuations at

20   that point.  That way this is being treated as a

21   barricade until that individual comes out of the

22   apartment.  And then you call that person out to

23   whatever unit you have, whether it be an armored

24   vehicle, operators with tactical shields for cover.

25   They call them out and secure the residence after it

Page 192

1    is confirmed all individuals are out.

2         Q.       Okay.  And looking down at the last

3    passage from the SWAT manual that you quoted here,

4    it said, "When utilizing a CET, the team leader will

5    ensure that the associated 'Knock and Announce'

6    tactic allows for a 'reasonable amount of time'

7    based upon the circumstances of the warrant."

8              Then it cites Wilson versus Arkansas at

9    1995, USSC.

10             So that's directly from the SWAT manual;

11   correct?

12        A.       Correct.

13        Q.       But earlier it says the purpose of the

14   CET is "meant to surprise and overwhelm the

15   suspects"; correct?

16        A.       Correct.  And, yes, I acknowledge that

17   that is a direct contradiction.

18        Q.       And so turning to page 112, another

19   section that you pulled out of the "no knock"

20   search warrant -- sorry.  Another section that

21   you pulled out of the LVMPD SWAT Section Manual on

22   "No Knock" states, "No-knock search warrants will

23   only be authorized for felony offenses that involve

24   a significant and imminent threat to public safety

25   and will not be used for the preservation of

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 193

1    evidence."

2            As we sit here today, at the time that

3    this warrant was served, this was for property only;

4    correct?

5        A.      Correct.

6        Q.      And is that preservation of evidence?

7        A.      I'm sorry.  What's the question?

8        Q.      So for property only, that means, like,

9    you're seeking evidence; right?

10       A.      Correct.

11       Q.      Okay.  And as we sit here -- sorry.

12               As we sit here today, if the policy is

13   that a "no knock" warrant will not be used for a

14   property-only search warrant, they could not have

15   obtained a "no knock" warrant for this search

16   warrant; correct?

17       A.      Correct.  And they did not get a

18   "no knock" warrant.  They did not receive that.

19       Q.      Right.  But if it was suggested that

20   they ought to have as an alternative, that's not a

21   viable alternative; correct?

22       A.      No.  Unless you have the body of the

23   individual on that search warrant.

24               An alternative to that would be if there

25   was probable cause to arrest Wattsel or Fisher for

LEXITAS™

Page 194

1    that homicide and you had those arrest warrants in

2    hand.

3            The difference on this would be they

4    had an arrest warrant on hand for the gang case

5    that we mentioned previously for Corvell Fisher and

6    Wattsel -- sorry, Wattsel Rembert with that

7    MP5-style pistol.

8        Q.      But not for the search warrant for the

9    property related to the homicide; correct?

10       A.      Correct.  So they had -- they had a -- I

11   guess the distinction would be they told the SWAT

12   that there was an arrest warrant for Wattsel -- and

13   I believe that was in the IAP -- for the gang case.

14   So there was a body warrant for him.  However, it

15   was not for the same case that they were referencing

16   for the homicide.

17       Q.      How often are "no knock" warrants

18   issued?

19       A.      I can't remember any since I've been up

20   at CIRT.  And I've never been a part of one in my

21   operation.

22       Q.      Okay.  So it's fair to say that they're

23   fairly uncommon; is that correct?

24       A.      That's correct.

25       Q.      And so, Justin, if we turn then to

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 195

1    page 113.

2              And is this another Google Earth?

3    A.      This is.

4    Q.      Okay.  And what is this a Google Earth

5    image of?

6    A.      That would be the apartment complex of

7    3050 South Nellis Boulevard.  And I specifically

8    have highlighted with an arrow Apartment 1125, which

9    is on the northwest corner of that building that is

10   centered in the photograph.

11   Q.      Okay.  And this was -- is this -- is

12   this to kind of depict -- because, you know, we

13   talked -- there's so much discussed in the -- in the

14   interviews from the different officers that it's

15   this kind of weird angle; is that correct?

16   A.      Yes.  It's very oddly placed into that

17   piece of property where I don't understand why

18   they would do it at an angle like that just

19   practically, which allows no room for the size of

20   the BearCats, the armored vehicles that LVMPD has,

21   to go through there.  Practically you don't have the

22   room to fit those armored vehicles through those

23   openings.

24   Q.      Okay.  And so that was part of the

25   foundation of the decision to do a CET instead of a

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 196

1    SACO; correct?

2          A.       That was Lieutenant O'Daniel's

3    explanation.

4          Q.       Okay.  But as we sit here today, with a

5    property-only search warrant, they would not get

6    authorization to do a CET; correct?

7          A.       Correct.  But we don't do CETs anymore,

8    per our recommendation.

9          Q.       They don't do them at all?

10         A.       No.  Now -- and, again, I'm going off

11   memory, but I believe we went to a "knock and

12   announce" and a surround and -- like a hold.

13                  Essentially what it is is you make entry

14   to the structure.  However, you hold, and there's a

15   viable area of entry.  You can then move your team

16   or robots through at a slower pace to clear the

17   residence of any people or threats and subsequently

18   move through the process.

19                  I think CETs are only used now for

20   crisis entries or "no knock" warrants, as part of

21   our recommendation.

22         Q.       Okay.  Thank you.

23                  And so this -- okay.

24         A.       "Breach and hold."

25         Q.       "Breach and hold"?

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 197

1        A.        "Breach and hold" is what it's called.

2        Q.        And so how would -- and so if you can

3    kind of -- because I think I understand what you

4    mean, but if you can kind of walk me through.  How

5    would a "breach and hold" -- let's say they're doing

6    a "breach and hold" on this unit today.  Right?

7    They're going to go serve this -- whenever --

8    tonight.

9             How would the "breach and hold" --

10   looking at -- I don't know if this is a good use

11   of this, but how would the "breach and hold"

12   look now?

13       A.        It would be very similar to this,

14   without the number of officers.  You'd either have a

15   water charge on the door, and you would blow that

16   door after there's already been announcements.  You

17   would give the person -- essentially it would start

18   as a "surround and callout," and then it would move

19   to a "breach and hold."

20            So if there was either no communication

21   with a potential suspect in there, whether they

22   escaped before we were able to get a perimeter or

23   they're just not responding -- sometimes this

24   happens on individuals who are barricaded and end up

25   committing suicide, where obviously we're not going

Page 198

1    to have communication with somebody who shot

2    themselves.

3              So when you "breach and hold," you

4    breach the door, whether it be manual or with a

5    water charge, and then it's more announcements to

6    try to get that person to come to the door

7    peacefully.

8              If there's no communication and there is

9    believed to be the subject's down or not in there,

10   then there's slow, methodical clearing with either

11   operators or some type of drone, whether it be

12   robots -- I think we have like a robot dog now --

13   and aerial drones that can maneuver inside of

14   apartments to get a visual of the area.

15             And then if it's determined to be clear,

16   the operators will slow and methodically clear the

17   apartment or house or whatever structure.

18             And that is, again, off of memory.

19   That's not citing the new SWAT manual that was

20   changed after this.  That is my interpretation as

21   Justin Roth as he sits in front of you from just

22   memory.

23   Q.       I get it.  But what I can rely on,

24   Justin, is that the policy -- is the policy was

25   changed as a result of this incident; correct?

Page 199

1      A.      The manual was changed.

2      Q.      Sorry.  The manual was changed?

3      A.      Correct.

4      Q.      And then kind of going on the next few

5    pages, you talk about there was a -- there was a

6    slight modification of the language of the policy

7    between -- I think it was 2020 and 2021.

8      A.      '21 and '22, I believe.

9      Q.      Okay.  And that was the inclusion of the

10   word -- what was that -- "Using a controlled entry

11   tactic for the sole purpose of recovering narcotics

12   or property will never be considered as an

13   acceptable practice."

14     A.      What page are you on?

15     Q.      I'm sorry.  Page 116.  It's the last

16   sentence in the first full paragraph at the top of

17   the page.

18     A.      Okay.  I see it.

19     Q.      That was the language that was -- that

20   was changed?

21     A.      Correct.

22     Q.      That wasn't the one that was in force at

23   the time of this incident.

24             And then if we -- and so there was a

25   minor change; correct?

LEXITAS™

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 200

1        A.        Yes.

2        Q.        I don't think it alleviated any of the

3    confusion, did it?

4        A.        What do you mean, the "confusion"

5    specifically?

6                  I'm just trying to get on the same page.

7        Q.        Correct.

8        A.        Did the word "never" being taken out

9    alleviate confusion?

10       Q.        So if you -- it's from Lieutenant

11   O'Daniel's email that she wrote.  It's saying --

12   and this is midway through -- "Now that the

13   investigation is concluded, we will make changes

14   to SOP and ensure there is clarity with the

15   explanations so that there is no misrepresentations

16   to outside entity and internal players.  Attached is

17   some of the recommended changes and the

18   clarifications that will be added to SOP."

19       A.        Okay.

20       Q.        And ultimately the recommendations --

21   according to what you have in this report, the

22   recommendation was adopted?

23       A.        Correct.

24       Q.        Okay.  There does seem to be -- if we

25   then turn to page 117.  Because it does seem that

Page 201

1    Deputy Chief Larkin was not aware of the change?

2         A.       That was their statement, yes.  And

3    there was no -- there was no checks and balances put

4    in place electronically to do that.

5                  As we were in the scenario we were in, I

6    want to say -- I forget when this interview took

7    place, but it had to be after August, I'd say maybe

8    September, October -- we were implementing a new

9    policy manual, virtual policy manual.  Any changes

10   that would be done would have to be approved with

11   electronic signatures.  And this is, of course,

12   after the fact.

13                 So any changes now that are done through

14   our department, whether it be a small change to a

15   word or two, has to be done through -- I think it's

16   called PowerDMS.  And that information -- so that

17   wasn't done at the time, so we had no way to know if

18   that was the case.  But that was her statement.

19        Q.       On 118 we start talking about the NFDDs,

20   which is the noise/flash diversionary devices?

21        A.       Correct.

22        Q.       And there were -- do you recall which

23   NFDDs were used on this warrant?

24        A.       Yes.  It was a 9-bang, a handheld

25   grenade essentially.

Page 202

1              It's not a grenade in the fact of it has

2     explosives that will injure.  It's designed not to

3     injure or fragment.  It's designed to have a loud

4     noise and loud flashes.

5              And then a stun stick, which is

6     essentially the same thing; however, it's on a pole

7     that is inserted into a house and is designed to

8     disorient individuals inside of a room.

9         Q.      And so if we can just quickly look at

10    the layout of the apartment, 1125.

11        A.      Yep.

12        Q.      If we look at this area right here,

13    you've got this large -- you've got this kind of

14    oval, and that represents Mr. Williams; correct?

15        A.      Correct.

16        Q.      Okay.  Do you want to -- if you can, for

17    the camera --

18        A.      Point to it?

19        Q.      Yes, please.

20        A.      Right here (indicating).

21        Q.      Over here to the side we have

22    Officer Rothenburg, and he was the one that

23    inserted the -- no?

24        A.      No.  Officer Bertuccini did, who is the

25    badge that is directly north of his position, on the

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 203

```
1    exterior.

2         Q.       Okay.  So Officer Rothenburg held the

3    shield?

4         A.       Correct.

5         Q.       And then Officer Bertuccini is the one

6    that inserted the stick?

7         A.       Correct.

8         Q.       And then looking at the diagram, the

9    window is right next to the sofa that Mr. Williams

10   was on; right?

11        A.       Correct.

12        Q.       Okay.  And just -- we talked about it

13   briefly in the beginning, but the stick was inserted

14   through the window; correct?

15        A.       Yes, it was.

16        Q.       On page 119 you quote the Section 11.01,

17   NFDD.  You again quote from the SWAT Section Manual,

18   and it reads -- this is your quotation --

19   "Diversionary devices are designed to gain

20   compliance, distract, or disorient an individual."

21             And that's the purpose; correct?

22        A.       Correct.

23        Q.       And so then if we then go to page 120,

24   again you're quoting from the SWAT Section Manual.

25   And I'll just read it to you.
```

Page 204

1                    "Prior to deploying NFDDs, personnel

2        shall consider available intelligence information

3        and circumstances.  This intelligence information

4        should include the presence of children, elderly

5        persons, innocent individuals, and the risk of

6        injury occurring to those not involved in the

7        arrest."

8                    And so as we sit -- one of the facts

9        that you outlined in -- that was outlined in the

10       CIRT report is that when Lieutenant O'Daniel

11       confirmed or authorized the request for this,

12       they had not ruled out presence of children; they

13       had not ruled out presence of elderly person; they

14       had not ruled out presence of innocent individuals;

15       correct?

16           A.      Correct.

17           Q.      This was, in fact, qualified as a

18       flophouse, so it was known that there was people

19       coming and going; correct?

20           A.      Correct.

21           Q.      So then the last paragraph on page 120,

22       if you -- it states, "Based on the facts, the SWAT

23       Team did not have actionable intelligence to

24       consider the use of any NFDD due to the fact that

25       there was only 90 minutes of surveillance completed

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 205

1    where only one subject was observed."

2           And so that is -- that is a part of

3    later the CIRT conclusion; correct?

4    A.    That is a part of the CIRT conclusion,

5    yes.  Specifically for Lieutenant O'Daniel's use of

6    discretion.

7    Q.    And then if you want to turn the page

8    to 123.

9    A.    Okay.

10   Q.    And the next few pages, what are

11   these -- what are these pictures of?

12   A.    This is a picture of Officer Hancock's

13   shock lock.

14          A shock lock is a device that is used

15   for defeating dead bolts or any type of locking

16   mechanism.  Essentially pushed up to the door and

17   fired, and it is a non-fragmenting round -- or a

18   fragmenting round, I believe -- minimal amount of

19   fragmentation is what is designed to penetrate the

20   locking mechanism.

21   Q.    And if we turn to page 124.

22   A.    Back?

23   Q.    Yes, please.  Sorry.

24   A.    I am without pages 123 and 124.

25   Q.    I can't give you 123, but I'll give you

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 206

1    my 124.  And if you want to read that highlighted

2    portion.

3         A.      Sure.  Out loud?

4         Q.      Sure.  Yes, please.

5         A.      "Multiple SWAT operators remembered

6    hearing Detective Grimmett brief the group that

7    there was probable cause to arrest Wattsel.  Some

8    SWAT operators perceived this statement to mean

9    they had probable cause for a homicide.  However,

10   Detective Grimmett clarified that he meant there was

11   probable cause to arrest Wattsel from a shooting

12   being investigated by GVB" -- which is the Gang Vice

13   Bureau -- "detectives."

14        Q.      When you say that he clarified, you

15   mean that he clarified that later to the CIRT;

16   correct?

17        A.      Correct.

18        Q.      Okay.  And then if you turn to page 128,

19   could you please -- it starts the discussion here,

20   but can you please explain to me the issue with the

21   amount of training Sergeant Backman had received?

22        A.      So that was essentially the operators --

23   in the section of the manual there is a lesson plan,

24   essentially, of how to indoctrinate new SWAT

25   operators and SWAT supervisors.  And part of that is

Page 207

1    to learn in training scenarios and also be a part of

2    different positions within the stack during live

3    operations.

4            Since then, I believe that has been

5    changed to include more static training prior to

6    being involved in live action when you are

7    relatively new.

8            I'm not sure how that -- how that goes

9    through with operators who have tested for sergeant,

10   having already been operators on SWAT.  I can't

11   speak to their manual of how it reads, but I know it

12   was changed to where there was more time of static

13   training.

14   Q.        But to confirm, at the time that

15   Sergeant Backman was in charge of this search

16   warrant, of executing this search warrant, he had

17   not completed SWAT school; correct?

18   A.        I believe he had not completed SWAT

19   school.

20   Q.        Yeah, sorry.  He hadn't attended it at

21   all; correct?

22   A.        Yes.

23   Q.        If we can please turn to page 133.

24            So you are citing -- I believe that

25   you're citing directly from the case United States

Detective Justin Roth     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 208

1    v. Banks here; is that correct?

2         A.     The second paragraph down?

3         Q.     Yes.  I'm sorry.  Yes.

4         A.     Yes.

5         Q.     Okay.  And one of the things that you

6    included in this was the discussion of exigency in

7    terms of entering after knocking.  And in the

8    language that you included from the case

9    United States versus Banks it states, "Once the

10   exigency had matured, the officers were not bound to

11   learn anything more or wait any longer before

12   entering, even though the entry entailed some harm

13   to the building."

14              Now, this case dealt with the exigency

15   involved in destroying cocaine; correct?

16        A.     I believe so.  I'm familiar with the

17   case, but I'm not familiar with the intricacies in

18   the case.  However, I was utilizing it for purposes

19   of entry time and reference points for that and

20   comparables.  I didn't dig too deep into the actual

21   cases themselves, if that answers your question.

22        Q.     These cases were more than likely

23   provided by Mr. Bandiero; correct?

24        A.     Yes.

25        Q.     And so if we go then to page 134,

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 209

```
 1   there's also a section, yeah -- last sentence.  "The
 2   Supreme Court has also held that a 15- to 20-second
 3   wait after police officers announced their presence
 4   was reasonable under the Fourth Amendment and
 5   Section 3109."
 6            So as we talked about it at the very
 7   beginning of the -- of the deposition, the amount of
 8   time that you have counted the seconds from when
 9   they start -- sorry.  Strike that.
10            The way that the seconds have been
11   counted in this CIRT report is from the time the
12   officers begin making their announcement; correct?
13        A.     I believe so.
14        Q.     So then going down to the lower part of
15   the page -- and I'll hand this to you, and I'll ask
16   you to read the highlighted portion at the bottom of
17   page 134.
18        A.     "By conducting a CET to surprise and
19   overwhelm the occupants of the structure, it
20   inherently contradicts the 'knock and announce' rule
21   which requires officers to wait a reasonable amount
22   of time set forth by the United States Supreme Court
23   case law and Nevada Revised Statutes."
24        Q.     And that's later -- that's later
25   outlined in the conclusions of this report as well;
```

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 210

1    correct?

2          A.        Correct.

3          Q.        And that was -- that conclusion was come

4    to based on the facts that you compiled, the round

5    tables you did, and discussions with the subject

6    matter experts; correct?

7          A.        Correct.

8          Q.        I'm going to ask you -- page 136.  I'm

9    going to ask you to read the part that is

10   highlighted in pink.

11         A.        "Six seconds elapsed from the time of

12   the first announcement by Sergeant Backman, to the

13   western window being broken out, the blinds being

14   cleared, and the stun stick being inserted.  Three

15   seconds later, Officer Hoskins began to utilize the

16   ram on the front door."

17         Q.        And as I went through the CIRT

18   investigation report, there was an issue with the

19   stun stick, the blinds being up there; correct?

20         A.        Correct.

21         Q.        They couldn't really see -- well, not

22   really.  They could not see what was on the other

23   side of the window; correct?

24         A.        No.

25         Q.        So at the time that they inserted that,

Page 211

1    they were not aware that the window was right here

2    and Mr. Williams was right here (indicating);

3    correct?

4        A.      Correct.  Did not know that at the time.

5        Q.      And according to -- as you've cited,

6    according to LVMPD policy within the CIRT report,

7    they needed to be able to see in that window to

8    insert that stun stick; correct?

9        A.      Correct.

10       Q.      Do you think that's a training failure,

11   that they didn't do that?

12       A.      Yeah, I would say so.  They are trained

13   to do a "rake and break" is what it's called.  So

14   rake the window and the blinds and then insert.

15           Now, the camera is very dark on there

16   just because of the time of day and the resolution

17   of our body-worn cameras.  I can't remember if

18   Officer Rothenburg or Bertuccini, when we

19   interviewed them, said that they did conduct a rake

20   on that.  That would have been the procedure is to

21   clear it and then insert it.  I'd have to look back

22   at their interviews again.  But yes.

23       Q.      And then if we then turn to page 137,

24   down at the bottom of the page the issue then comes

25   up to the brass wrap.

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 212

1      And based on the content of your --

2  based on the content of your report, it seems like

3  there was controversy about whether or not they

4  should have called the tactical when the brass wrap

5  was identified; correct?

6      A.      Controversy between two SMEs, two sides

7  of the table essentially.  However, it's not very

8  controversial when it comes to looking and analyzing

9  the specifics of the case.  Their manuals say it's a

10  judgment call.

11      And when I interviewed every operator on

12  that stack, they said that they felt comfortable not

13  calling a tactical at that point.  And that's what I

14  have to go off of as an investigator is their

15  judgment call based on the fact that they see --

16  they recognize that there's a brass wrap there,

17  they're seeing Officer Hoskins hit the door, and

18  they recognize that there's daylight is what they --

19  a lot of them said, and that door is giving.  So

20  they believed a tactical did not need to be called.

21      And we can have SMEs say yes/no to that,

22  but when we're talking about individuals' judgment,

23  that can't be something that -- you can't speak on

24  my judgment as long as it's something that is

25  outlined in the manual.  Like all italics should be

Page 213

1   in -- all quotes should be in italics, if your

2   judgment is I shouldn't do that but it says so in my

3   briefing --

4       Q.      Yeah.  And I think, Justin, you tell me

5   if you understand the difference or not.  The

6   difference is when you and I are talking -- and I'm

7   a lawyer.  I write things all the time.  But when

8   you and I are kind of going through the report --

9   and it's a lengthy report.  To be honest, I don't

10  think I could write a 200-page report and not have

11  some formatting errors in it, despite my best

12  efforts.

13      A.      Sure.

14      Q.      But there's a difference between that --

15  that's a subjective mistake -- and then the issues

16  about mistakes that then impinge on somebody's

17  constitutional rights for unfair search and seizure.

18  Right?  So it's like we're talking about a different

19  thing here.

20          So, you know, as you go through -- you

21  know, it's like, okay, well, the purpose of the stun

22  stick is to distract and disorient.  Correct?  And

23  at the same time, we've got banging on the door that

24  is supposed to be giving somebody their

25  constitutional right to know that it's the police

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 214

1    coming through the door.

2              You understand -- I mean, you -- you

3    have outlined in this very report that these seem to

4    be in conflict; correct?

5    A.      I've said it about an hour ago, that it

6    was a direct contradiction, and that was our finding

7    in the report.

8    Q.      Okay.

9    A.      I was more speaking on the tactical call

10   of that it wasn't so controversial as far as there

11   are documents saying that you will call a tactical

12   at this point or this point.  It is a judgment call

13   based on the operators who are at the door.

14   Q.      And if they had called a -- let's just

15   do an alternative.  Right?  So they call a tactical.

16   Then they pull back and they do a surround and

17   call -- they do a SACO; right?

18   A.      Uh-huh.

19   Q.      So a SACO is possible?

20   A.      That would be their procedure, yes.

21   Q.      Okay.  And so the "rake and break," just

22   so that I understand a little bit better, it's to

23   break open -- they take off -- I think they took off

24   a screen; correct?

25   A.      I believe so, yeah.

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 215

1    Q.      And then they break the window with the
2   actual stick; correct?
3    A.      I believe so, yeah.  That's the "rake"
4   part of that, yeah.
5    Q.      Then they're supposed to pull off the
6   blinds too; correct?
7    A.      With it, yes.
8    Q.      So that's an entry into the unit;
9   correct?
10    A.      Yes.
11    Q.      And then --
12    A.      I'm sorry.  So I will say that the entry
13   into the unit is the entry of the stun stick into
14   the apartment utilizing our tools.
15          The entry into the unit is not breaking
16   the glass and pulling it out.  I would say the entry
17   of the stun stick is entry to the unit.
18    Q.      But somebody could have stepped through
19   that broken window; correct?  If it's done the way
20   it's supposed to be done, where the screen is taken
21   off, the window is broken, the blinds are pulled
22   down -- if we're looking at page 144 -- and this is
23   well after the fact, but somebody could step through
24   that window; correct?
25    A.      Sure.  But the -- somebody could have.

Page 216

1    There was no intention for any officer or operator

2    to move through that window, period.

3        Q.      But we don't know if that was

4    Mr. Williams' perception of that; correct?

5        A.      Sure.  I don't know his perception of

6    anything.

7        Q.      And as we even see in this photo right

8    here, the broken -- I mean, this is a different

9    vantage point, but the broken-out window was right

10   next to the sofa Mr. Williams was on; correct?

11       A.      Yes.

12       Q.      And that was from page 144 of the CIRT

13   report.

14              And then for the next few pages -- I

15   mean, having reviewed this, the next few pages are

16   talking about the officers' awareness of the

17   backdrop, which we're going to skip over.

18              But what I do want to talk about is --

19   if we go to page 148.

20       A.      Okay.

21       Q.      And I think that this is -- on page 148

22   it says "Officer Rothenburg."  And then it says,

23   "When the stun stick was placed in the window,

24   the first few ignitions of the distracts caused a

25   large puff of smoke in the interior of the living

Page 217

 1    room."

 2              And so this was based on not -- I mean,

 3    not just your review of the body-worn camera

 4    footage, but also Officer Rothenburg's kind of

 5    recitation of what he perceived at the time;

 6    correct?

 7        A.      Yes.  That was his statement, that he

 8    could not see initially because of the smoke, and

 9    then once the door was breached, it kind of vacuumed

10    out to where he could see more.

11        Q.      Okay.  But he had tried to turn a

12    flashlight on, and he turned it off immediately;

13    correct?

14        A.      I believe so.

15        Q.      Okay.  So the remainder is just the

16    investigation -- is kind of the post-shooting

17    investigation, until we get up to about page 170.

18    So we'll skip through that.  That's your recitation

19    of facts about the post-scene analysis.

20        A.      Okay.

21        Q.      And turning to page 169, it discusses

22    "The Administrative Analysis of the Use of Deadly

23    Force."

24              And just to confirm, from an

25    administrative perspective, that's different than

Page 218

1    the criminal perspective, but also from an

2    administrative perspective it was found that the

3    officers' use of force was reasonable based on what

4    they were perceiving at the exact time; correct?

5         A.        Correct.

6         Q.        And so a lot of the report -- the

7    remainder of the report is the specific dialogue

8    about the conclusions.  So rather than walk through

9    that, because you've done such an excellent job of

10   creating this table at the end, I would just rather

11   go forward to the table, the conclusion section, and

12   we can talk about those.

13             Unless there's anything in there that

14   you really want to highlight for me.

15        A.        So I guess it will just be questions

16   based on what you have to respond to that -- to the

17   actual conclusion table itself.  Because the

18   conclusion table is legitimately the last paragraph

19   of every conclusion.  It does not encapsulate the

20   entirety of the body of the conclusion.

21        Q.        As we go through the conclusions, we can

22   certainly loop back to any things that you think are

23   necessary.

24        A.        Okay.

25        Q.        My understanding of what you testified

Page 219

1    to at the beginning of this deposition was that you

2    had specifically reviewed the conclusions in

3    preparation for today's deposition.

4        A.      Correct.

5        Q.      Did you review the dialogue -- because

6    you said you actually didn't review the whole

7    report.

8            Did you review the dialogue portion of

9    the conclusions?

10       A.      Yes.  But, again, we're talking about

11   50 pages of a lot of stuff that runs congruent with

12   each other.  So to get exact quotes and exact

13   recollection.

14       Q.      Well, here's what we'll do.  Some of the

15   conclusions I think are somewhat benign or -- you

16   know, they're benign.  So those ones we can kind of

17   go through.  And the ones -- the more ones that are,

18   you know, highly relevant for this case, we can then

19   loop back to the full discussion.

20       A.      Works for me.

21       Q.      Just a couple of facts I wanted to lay

22   the groundwork first.

23           There were -- some of the facts you laid

24   out so far is there were some discrepancies with the

25   search warrant; correct?

Page 220

1    A.    Yes.

2    Q.    Okay.  There was an issue with the IAP

3    kind of being put together, cobbled together, to

4    have its final version; correct?

5    A.    Yes.

6    Q.    We haven't talked about it yet, but also

7    O'Daniel, while she approved the use of the NFDDs,

8    she was actually out on COVID during that time;

9    correct?

10    A.    Correct.

11    Q.    Sergeant Backman had not attended SWAT

12    school; he had only done 29 days of essentially

13    on-the-job training.  Correct?

14    A.    Yes.

15    Q.    And there was somebody else out on

16    either vacation or --

17    A.    Sergeant Findley.

18    Q.    Okay.  And that whole lead-up, had you

19    ever -- I mean, those are a lot of, kind of, off --

20    those are a lot of -- strike that.

21    Those are a lot of unusual circumstances

22    related to the execution of a single warrant.  Would

23    that be fair to say?

24    A.    I think COVID put a strain on a lot of

25    aspects of how we did things, just on resources

Page 221

1    alone and having a lot of people out.  This was

2    different times for a couple of years when we dealt

3    with the pandemic from an operational standpoint.

4    So there were a lot of oddities with that.

5        Q.      Well, the search warrant oddity wasn't

6    related to COVID; correct?

7        A.      Sure.

8        Q.      And the issues with the IAP weren't

9    related to COVID; correct?

10       A.      To a certain extent.  Captain Koren at

11   the time was on COVID, could not re-sign those.  So

12   there was an issue of they couldn't -- one of the

13   quotes was couldn't slide it under his door and get

14   a re-signature.  Because we didn't have electronic

15   signature at that time.  So there was a certain

16   aspect to that that was relevant.

17       Q.      But he was just one of the six

18   signatures on there; correct?

19       A.      Correct.  But a mandatory signature

20   nonetheless.

21       Q.      Okay.  And Sergeant Backman only having

22   29 days and not attending SWAT school, that wasn't

23   related to COVID at all, was it?

24       A.      Correct.  But that was their operating

25   procedure prior to COVID as well.

Page 222

1    Q.        Okay.  And that has specifically been
2    changed as a result of this incident; correct?
3    A.        I believe so, yes.
4    Q.        And Lieutenant -- and just to confirm, I
5    understand that Lieutenant O'Daniel was out as a
6    result of COVID.  But also -- we've discussed it
7    already, but just to confirm -- she couldn't -- as
8    we sit here today, it would no longer be reading the
9    request on a cell phone; correct?
10   A.        I believe so.  I can't speak to that a
11   hundred percent.  But I do not believe they review
12   on cell phones.
13   Q.        But at the time they did, and she was
14   out on COVID?
15   A.        Correct.
16   Q.        Okay.  All right.  Let's get into the
17   conclusions.  And we will bounce back and forth
18   however you want.  I've stated it many times.  I'll
19   state it one more.  However you want to review the
20   document.  I'm not trying to rush you through
21   anything.  If you want time to say, Let me loop back
22   to the conclusion, or, I think we need to read this
23   section, then you tell me that.  Okay?
24   A.        Okay.
25   Q.        The "Information Sharing," I think we

Page 223

1    can go through that pretty fast.

2        A.        Okay.

3        Q.        That just has to do with the P1 case.

4                  I actually didn't even really

5    understand.  If you want to explain it to me.

6        A.        Essentially it's just communication via

7    radio traffic and -- the stuff with P1, as far as

8    the reference, that's just utilization of some of

9    our programs that weren't really relevant, but

10   that's part of the policy that it was in.

11                 This was just speaking to just radio

12   traffic communication, information-sharing

13   reference, like post-OIS procedures.

14       Q.        That's both 1 and 2; correct?  The

15   "MetroComm" is the traffic communication --

16       A.        So 1.1 is more along the lines of

17   radio communication between dispatch, other

18   supervisors.

19                 P1 is 1.2, and that deals with the

20   utilization of case notes in the homicide section,

21   which I believe there were none.

22       Q.        Sorry.  I'm talking about 2.1.

23       A.        2.1, okay.

24                 2.1 is, yes, because there's really no

25   dispatcher or call-taker.  There was no call-taker

Page 224

 1    on this.  But there was very, very little use of a

 2    dispatcher.

 3        Q.      Okay.  And then in terms of the 3.1 --

 4    and we talked about it quite a bit, and you alluded

 5    to it earlier -- that ultimately a DA and a judge

 6    signed the search warrant; right?

 7        A.      Correct.

 8        Q.      But despite that, in terms of LVMPD's

 9    search warrant policy, it still did not meet LVMPD's

10    policy; correct?

11        A.      Correct.

12        Q.      And based on my understanding, on the

13    next page, 215, the part that you have bolded and

14    italicized is that Detective Grimmett was counseled

15    on this issue; correct?

16        A.      Correct.  And the -- again, talking

17    about the purview of CIRT and what we do when it

18    comes to use of deadly force, this is the first case

19    and the only case I've dealt with in six years that

20    has gone so far outside of the actual use of deadly

21    force that he was counseled via the -- I believe it

22    was either contact or supervisor intervention.

23    That's more of a labor issue.  We don't really deal

24    with that.

25              But he got that negative conclusion.

Page 225

1    And because of the way our board is set up, it's not
2    necessarily tactics.  It wasn't -- he wasn't
3    required to be at the board.
4         Q.       And would you remember approximately the
5    timeline when you found out that you would also be
6    looking into the -- kind of the underlying homicide
7    investigation issues?
8         A.       Almost immediately.  I pled my case to
9    stay narrowly focused to the use of force and any
10   discrepancies that we found along the way that was
11   reference to a homicide investigation should have
12   been put to IAB.
13            But, again, I can only go up my chain of
14   command, and my chain of command can only send me
15   back the message that it was given.
16        Q.       Okay.  And then 3.2, I mean,
17   essentially -- 3.2, if I understand, having read it,
18   is that the underlying homicide investigation, there
19   was no issues with it?
20        A.       Correct.
21        Q.       And then 3.3 has to do with the IAP;
22   correct?
23        A.       Yes.
24        Q.       And we've talked about that quite a bit.
25            And we talked about -- according to

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 226

1    Conclusion 3.3, the IAP was not within LVMPD's

2    standards; correct?

3         A.     Correct.

4         Q.     Okay.  And then can you explain to me

5    what the conclusion -- the 3.4 conclusion was?

6         A.     I believe that was the conclusion, as I

7    read it now, of Sergeant Backman's training, in

8    reference to being new to SWAT.  I believe it was

9    within standardized LVMPD tactics, training, and

10   policy based on being in compliance with their

11   section manual.

12        Q.     And so to be fair, even though he had

13   been on for 29 days, it was in compliance with the

14   way the section manual was written at that point

15   in time?

16        A.     Correct.

17        Q.     And when we go down to 3.5, that the

18   policy was -- I mean the recommendation was that the

19   policy be -- sorry -- that the availability of SWAT

20   school be changed so that somebody who is newly -- a

21   sergeant newly on SWAT has the ability to go to SWAT

22   school; correct?

23        A.     Correct.

24        Q.     And that was actually -- I mean, that

25   was one of the things that was changed as a result

Page 227

1    of this incident; correct?

2        A.      I believe so, yes.

3        Q.      And then can you explain to me 3.6?

4        A.      So that's dealing with the verbiage

5    contained in the SWAT manual, reference the CET for

6    property, when there's a threat to -- a threat of an

7    armed and dangerous suspect was not appropriate in a

8    given time.

9            So essentially -- I'll have to go

10   back and read this in a second, but essentially that

11   was what we discussed previously, if I'm not

12   confused, about not having the actual intelligence

13   of children and -- is that a reference to the

14   tactical call?

15       Q.      3.6?

16       A.      No.  Sorry.  I skipped one.

17       Q.      No.  It's the -- it's conduct a CET for

18   property and the amount of unknowns.

19       A.      I don't know if I'm missing pages.

20       Q.      And I think it's page 183, "General -

21   SWAT Planning - Use of Control Entry Tactic."

22       A.      You said 183?

23       Q.      Yes.

24       A.      I don't want to misspeak because I

25   know we went over it.

Page 228

```
 1                 Okay.  So this is the discrepancy
 2      that we discussed between the surprise and also
 3      giving them reasonable amount of time to answer
 4      the door.
 5         Q.      Yeah, that's technically -- that's
 6      technically 3.8.  3.6 --
 7         A.      What's the question then again?  I'm
 8      sorry.
 9         Q.      We discussed what the conclusion was at
10      3.6 and the recommendations, and you said that you
11      wanted to go back.  But, yeah, it had to do with the
12      unknowns.
13         A.      Yeah, I mean, I guess -- obviously it
14      was not within standardized LVMPD training, tactics,
15      and policy, but then the recommendation attached to
16      it is that we recommend that LVMPD recategorize the
17      use of the CET to only be utilized when a "no knock"
18      search warrant is approved by the LVMPD and has
19      judicial preapproval.
20                 And CIRT recommends the current SWAT
21      training, SWAT Section Manual, and department policy
22      be updated to reflect the standard.
23         Q.      So then if we go back to the
24      conclusions, we can go -- we just did 3.6.  We can
25      go 3.7.  The approach to the door is fine, so we can
```

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 229

1    skip that.

2        A.        I'm missing -- I'm missing 216.  That's

3    why I kept on getting confused.  So I was

4    referencing the page number on this.

5        Q.        I'm sorry.

6        A.        It's hard to read page numbers

7    sometimes.

8        Q.        As we know.

9                  We'll talk about 3.8.  That's kind of

10   the big one right there.

11       A.        Okay.  3.7, approach -- good -- or

12   within standards?

13       Q.        Correct.

14       A.        I'm sorry.  Are you waiting for me to

15   respond?

16       Q.        Yes.  So explain to me the conclusion

17   of 3.8.

18       A.        3.8 was the conclusion with the

19   execution of the warrant.  We concluded that it

20   did not constitute a "no knock" warrant under Nevada

21   law because SWAT announced their authority for

22   purposes of making a forced entry.  However, SMEs

23   concluded -- sorry, consulted, were not unanimous

24   whether SWAT adhered to the "knock and announce"

25   principles.

Page 230

1          And this is where we consulted both SMEs
2    from the department and also Anthony Bandiero.
3    Yeah, I'm saying his name right.  And that's where
4    he wrote this section on page 187, reference
5    analyzing the SWAT Section Manual reference CETs.
6          Ultimately the conclusion was determined
7    to be a policy and training failure and was not
8    within LVMPD department policy.
9      Q.     And so -- and that is a result -- that
10    conclusion is a result of you outlining the facts in
11    the report, what the United -- what the other --
12    what the cases cited said, and also with -- with
13    consulting with your own -- with the subject matter
14    experts; correct?
15     A.     Correct.  Like I said before though,
16    there was split.  There were some who thought it was
17    okay.  However, in the effort of transparency, we
18    put both opinions on there.
19          However, because there's any question of
20    what we said, it was not within policy and training,
21    and it was a policy and training failure.
22     Q.     Okay.  And ultimately they changed the
23    policy itself; correct?
24     A.     Correct.
25     Q.     And so that would indicate that after

Page 231

1    review it was agreed that this is not within the

2    constitutional guidelines of how -- regarding this

3    execution of this warrant; correct?

4        A.        I'm not a part of those discussions.

5    After my report is done and my presentation is over,

6    once I give those recommendations, those are just

7    strict recommendations on how we would like it to be

8    handled.  I know that it was handled.  I don't know

9    the discussions that were made during the

10   search-and-seizure committee or any rewording of the

11   SWAT manual.  I'm not privy to that.

12       Q.        Okay.  But you are aware that it was

13   changed; correct?

14       A.        Yes.

15       Q.        Okay.  And then if we could go to 3.9.

16       A.        Okay.

17       Q.        Sorry.  If you could hand me back 3.8

18   just for a moment.  Sorry.

19       A.        3.9 is on there too.

20       Q.        Okay.  Sorry.  I'll pull it up on my

21   computer.  Give me just one moment.

22       A.        While you're opening that, I'll just

23   kind of go over that.  Is that fair?

24       Q.        Absolutely.

25       A.        So, again, this goes with the tactical

Page 232

1    call and the exterior of the apartment.

2            And, again, taking from both sides of

3    this argument of the SMEs, when the officers lost

4    the element of surprise of a CET, of utilizing speed

5    and surprise to overwhelm the suspect per their

6    manual, by being stuck on the door and hitting the

7    door multiple times by entering the residence is

8    what you had highlighted there, we call this is a

9    policy and training failure, and our conclusion was

10   based on the fact, if there was controversy on that,

11   it should not be a judgment call.  There should be

12   things outlined on it, and we need to outline that

13   in the manual of when it was appropriate to do a

14   tactical call.

15        Q.     But based on -- sorry.  Thank you.

16            And so included in this conclusion

17   though is that waiting six seconds before inserting

18   the stun stick did not provide the occupant an

19   opportunity to peaceably submit to the search, and

20   that's pursuant to United States v. Banks; correct?

21   That was part of the conclusion in 3.8?

22        A.     Oh, I was talking about 3.9.

23        Q.     I'm sorry.  I went back.  I looped back

24   to 3.8.  My apologies.

25            But that was pursuant to the analysis of

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 233

1    the controlling case law; correct?

2        A.        Correct.  From -- from Anthony Bandiero.

3        Q.        Okay.  And I'm sorry, going forward to

4    3.9.

5        A.        So, again, do you want me to repeat what

6    I just said?

7        Q.        No.  It's part of the record.

8        A.        Summation, officers were not wrong by

9    not calling a tactical, but we thought there should

10   be some kind of definition form of tactical brought.

11               And I can't tell you off the top of my

12   head if that was specifically changed.  I know our

13   recommendation was to specifically change that.  I

14   believe it was, but I can't tell you for sure on

15   that one.

16       Q.        Okay.  And so sorry.  I'm just going to

17   loop back up to 3.8 really quickly.

18               We are talking -- you are citing

19   based -- so when you talk about the LVMPD standards

20   and the opportunity to comply before a forced entry

21   is made, you cite SWAT lessons, basic SWAT school,

22   LVMPD policy, search-and-seizure Section 9,

23   no-search search warrants, SWAT Section Manual 9.0.

24               As we go -- as we've kind of looked

25   through all of this, I still haven't been able to

Page 234

1    locate a part of the -- like, the SWAT manual where

2    it talks about you have to wait this long or this is

3    the reasonable standard.

4                I mean, I just --

5        A.      There isn't.

6        Q.      Okay.

7        A.      There wasn't.  Sorry.

8        Q.      Okay.  There is now?

9        A.       I cannot tell you definitively, but I

10   believe that was part of our -- was to recommend a

11   reasonable time, but I'm not sure if that was placed

12   in there or not.  I'm not sure on that.

13               I know CET was changed, but I don't know

14   if there was a reasonable time set because there

15   still has not been a reasonable time set by the

16   courts.

17       Q.      Okay.  Okay.  And then just -- you

18   briefly summarized the 3.9.  But basically, hey,

19   being stuck at the door means that you can't

20   surprise and overwhelm; right?

21       A.      Correct.  But, again, the officers did

22   not do anything outside of their training because

23   they were trained to call a tactical when they

24   believed that there was an issue.  Every single

25   tactical operator in this said the same thing.

Page 235

1    Q.    Okay.  And so then that -- that then
2    goes to 3.10, which I don't think we need to go
3    over.  Because there was a tactical called inside
4    the apartment once the other --
5    A.    Correct.  Once they saw it.
6    Q.    Then 3.11, it's standard LVMPD.
7         And then 3.12, the cover and
8    concealment was -- and that was kind of their
9    post-shooting actions; correct?
10    A.    That deals with -- specifically 3.11 or
11    3.12?
12    Q.    Both of them actually.
13    A.    So, again, moving -- for these to be
14    general conclusions, the contact cover and cover and
15    concealment, those are -- for any OIS we look at all
16    of those.  So in order to keep a consistency we
17    include those.
18         Contact cover was really never
19    established here.  And that's along the lines of if
20    you're, like, a two-officer unit on patrol, one
21    officer is conducting the interview; the other
22    office is providing overwatch and looking for
23    threats.
24         So without taking that out, because it's
25    a part of our conclusion, it's more or less saying

Page 236

1    that everything they did leading up to it was within

2    standardized training.

3    Q.    Leading up to the cover and concealment,

4    once they're inside the unit?

5    A.    So -- so I know these are confusing.

6    Contact and cover is kind of a general

7    conclusion as far as I guess you would consider the

8    lead person into the room would be the contact

9    officer.  The cover officer would be the secondary

10   person into the room essentially, looking for

11   additional threats.

12   It's trying to stay consistent with

13   reports.  That's a general conclusion that's in

14   every one of our reports.  Making it fit into a SWAT

15   search warrant isn't exactly -- it doesn't exactly

16   fit.  However, for consistency we keep it in there.

17   It's more geared toward patrol.

18   But in this aspect, if you want to,

19   like, break it down completely, Officer Kubla was

20   the contact officer, initially contacts, and then

21   his officers who come in are the cover officers.

22   And that kind of gets confused with

23   3.12, which is cover and concealment, because you

24   see the same word in there.

25   Cover and concealment deals with what

Page 237

1    cover and concealment did you have at the time that

2    you used force.  At this point, because they're

3    entering a home on a search warrant and a CET, they

4    didn't have any contact or cover, and there was no

5    expected cover and concealment in there.

6        Q.      Okay.  So then we can go to 4.1 --

7    sorry.  All four used has to do with the threat

8    assessments at the time of -- and their assessment

9    of the backdrop; right?

10       A.      Correct.  That is all use-of-force

11   related.

12       Q.      And by then they've already come in the

13   unit?

14       A.      Correct.

15       Q.      Then if we can go to Section 5,

16   "Incident Management."

17       A.      Okay.  Sergeant Werner being the ATL,

18   assistant team leader, was within accordance of the

19   LVMPD SWAT manual in his handling of his duties as

20   the ATL.  His plan was the CET.  His plan was

21   everything that we went through, but it was approved

22   by his lieutenant.

23              And that was part of that discretion

24   with the use of those noise -- the flash bangs and

25   the stun stick.  He asked for them.  Her discretion

Page 238

1    should have been to say no.  And that's just a
2    chain-of-command thing.  So his planning was within
3    the standardized training, if that makes sense.
4        Q.      Yes, it does.
5              And then 5.2, that has to do with
6    Sergeant Findley; correct?  That's on page --
7        A.      5.2.  Correct.  I believe that -- I
8    believe that goes into the same standard that
9    in general these operators, the ATL and the
10   sergeants, make that plan, and then it is given to
11   the tactical commander.  And the tactical commander
12   is overall --
13       Q.      So where we stop seeing, like, within
14   policy is when we actually get to Lieutenant
15   O'Daniel; correct?
16       A.      Correct.
17       Q.      And that's -- sorry -- 5.3, that
18   Sergeant Scott did not -- I mean, that has to do
19   with the assessment of the IAP; correct?
20       A.      Correct.
21       Q.      Okay.
22       A.      And then 5.4 is with Sergeant Clarkson.
23   Essentially he did the public safety statement with
24   his camera, which is against policy.
25       Q.      Correct.

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 239

1          And then going to 5.5, that has -- we

2    talked about that quite a bit, but that has to do

3    with Lieutenant O'Daniel approving the NFDDs;

4    correct?

5          A.      Correct.

6          Q.      And the issue is that she had

7    insufficient information to approve the NFDDs;

8    correct?

9          A.      Correct.

10          Q.      And LVMPD policy has since been changed

11    as a result of that; correct?

12          A.      Correct.

13          Q.      And then going to 5.6 --

14          A.      I believe so.  As far as my knowledge,

15    yes.

16          Q.      And that's fair.  If you want to make

17    that qualification, that's totally fine.

18          And then 5.6, that has to do with

19    Captain Cole and also Lieutenant O'Daniel.  They

20    ought to have been aware of the issues with the IAP

21    and the search warrant; correct?

22          A.      Correct.  They should have recognized

23    the discrepancies with the page numbers and the

24    discrepancies with the search warrant.

25          Q.      And 5.7 just has to do with reusing

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 240

1    the -- the signature page; correct?

2         A.      Correct.  My apologies, I'm losing my

3    voice.  Sorry.

4         Q.      That's okay.

5              And reusing the -- although we talked

6    about -- I mean, you said it wasn't one way or the

7    other, but according to 5.7, reusing the signature

8    page was not within standardized LVMPD tactics;

9    correct?

10        A.      Correct.  And that was -- when we had

11   that discussion, that was based off Captain Cole's

12   interview of what he believed was appropriate or

13   not.  So that was his belief, but that was not the

14   conclusion.

15        Q.      Okay.  And then 5.8 is kind of like a

16   catchall basically.  You tell me if I'm right or

17   wrong.  That, like, hey, the other commanders, we

18   don't really have a problem with how they responded

19   to this?

20        A.      So response to the incident post-OIS.

21        Q.      Correct.

22        A.      So setting up command posts and doing

23   all our procedures was within standard.

24        Q.      Okay.  And then 6.1 is the medical

25   response post-OIS; correct?

Page 241

1       A.      Correct.

2       Q.      Okay.  And then we talked about this.

3   The 7.1 and 7 -- 7.1 had to do about racking Officer

4   Kubla's firearm; correct?

5       A.      Correct.  They cleared his firearm

6   because he was getting medical treatment and was

7   moving all over the place.  So in an effort to

8   secure that firearm from going off, Officer Eshe

9   made that weapon safe.

10      Q.      Okay.  And that was found that, based on

11  the totality of circumstances, that was fine;

12  correct?

13      A.      Yes.  Correct.

14      Q.      And then 7.2, the equipment, firearms,

15  and ammunition were all within LVMPD standardized

16  tactics, training, and policy; correct?

17      A.      Correct.  Everybody used department

18  ammo, and everything was okay with that.

19      Q.      Okay.  No training deficiencies.

20          And then going to 9.1, that's the P1

21  thing.  We don't really need to talk about that;

22  correct?

23      A.      Correct.  Honestly, I do not know what

24  resulted on that.  I know it was a conclusion that

25  was voted on.  I can't remember if it was voted to

Page 242

1  approve, modify, or overturn at that point.  But

2  yeah, I don't recall what the result of that one

3  was.

4      Q.      Okay.  And then going to 9.2, you

5  recommended basically that the -- that officers have

6  a search warrant refresher; correct?

7      A.      Correct.

8      Q.      I think that was -- that was accepted,

9  wasn't it?

10     A.      I believe so.

11     Q.      And then the second part is that you're

12 recommending that exculpatory evidence should be

13 included in the search warrant; correct?

14     A.      Yes.

15     Q.      And as we sit here today you don't know

16 if that was accepted or not?

17     A.      I believe it has been.  I cannot tell

18 you for certainty.  We don't -- I can tell you a lot

19 of the SWAT ones, based on just having conversations

20 with OIO sergeant and previous SWAT cases of

21 noticing its change.  But we do not -- once we make

22 those recommendations, as CIRT detectives we don't

23 get privy to what happens afterwards, to include

24 discipline and stuff like that.  We intentionally

25 get kept in the dark on that stuff.

Page 243

1    Q.    Okay.  And then one of your -- and then

2    the final, the (C), the 9.2(C), is that you just

3    said, Hey, we essentially -- and tell me if I'm

4    right or wrong -- you just said that we think they

5    should look at these two warrants as like a training

6    opportunity; is that correct?

7    A.    Yes.

8    Q.    And that's still part of the homicide

9    investigation, that you were like, I don't even want

10   to look at this?

11   A.    Not that I didn't want to look at it.  I

12   just didn't feel like it met our mission as CIRT.

13   Q.    Okay.  And then 9.3 just has to do

14   with -- you tell me if I'm right or wrong -- it has

15   to do with the recommendation that the new 14-page

16   IAP should be distributed; correct?

17   A.    Correct.  It was only distributed to

18   lieutenants of the ISD section, which is

19   Investigative Services Bureau.  And that was the

20   email that Captain Cole referenced when he said it

21   was only sent out to lieutenants.

22        We recommended that it be something that

23   is signed off on UMLV, which is our internal

24   training system.

25   Q.    And then the next one, 9.4.  I think the

Page 244

1    issue -- you tell me if I'm right or wrong on this

2    one -- is that Sergeant Backman had only been on for

3    29 days.  And based on the recommendation of this,

4    they're saying like, Hey, they shouldn't be doing

5    any live stuff within the first 30 days; is that

6    correct?

7         A.       Correct.  I believe that was the

8    understanding of that.

9         Q.       Okay.  And then the 9.5 has to do -- we

10   talked about it before, but 9.5 has to do with the

11   availability of SWAT school; correct?

12        A.       Correct, yes.

13        Q.       And then 9.6 is the one that as we sit

14   here today has been -- to your knowledge, it has

15   been adopted that CET is only to be utilized for a

16   "no knock" search warrant?

17        A.       Correct.

18        Q.       And we've gone over the reasons for

19   that.  Is there anything else you want to add to

20   that?

21        A.       No.  Just that I haven't seen a CET done

22   since then.

23        Q.       Okay.

24        A.       Outside of hostage rescues, which don't

25   count.  Those are extenuating circumstances.

Page 245

 1    Q.    Of course.  Of course.

 2          And then 9.7, in regards to "knock and

 3    announce," and we talked about this a little bit

 4    briefly, this had to do with kind of new training so

 5    that the SWAT officers are trained to do "knock and

 6    announce" in line with case law and national

 7    standards; correct?

 8    A.    Correct.

 9    Q.    And as we sit here today your

10    understanding is this has been implemented; correct?

11    A.    Yes.  And I know that one for a fact

12    because in 2023, in the middle, we got a new

13    lieutenant who organized with the new SWAT tactical

14    commander for us to do a training op with -- or go

15    do essentially like a mini SWAT school with them.

16    They were very vocal with the fact that they are

17    doing "knock and announce," and we actually were in

18    the houses of the SWAT houses when they did their

19    entries, and they were doing them in accordance.

20    They were waiting a very long time before actually

21    entering the house.

22    Q.    And then -- so 9.7 has two -- it has (A)

23    and (B).

24          And so (B) -- can you explain to me what

25    the (B) section is?

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 246

1    A.    I believe that is reverting the section

2  manual to what it was prior to them changing it to

3  the -- they changed it from the "never."  They took

4  that word out and made it -- changed the CET to

5  where they could do that if there was extenuating

6  circumstances with the -- what do you call it? --

7  threats inside the building.  Those checkmarks

8  inside the manual.

9         And from my recollection, I

10  believe all of that was incorporated almost

11  simultaneous with the 9.6 as like a full overhaul in

12  the manual.

13    Q.    And then -- okay.  And then 9.8 -- and

14  this has to -- we talked about this a little bit

15  earlier.  And your understanding as we sit here

16  today and what you testified to before is they've

17  kind of done some expanded training on how to call a

18  tactical; correct?

19    A.    Correct.

20    Q.    Okay.  And that's 9.8.

21         And then 9.9, you talk about it more in

22  the body of the report.  It's not necessarily

23  captured in here.  It seems to me there's two

24  different issues; one, how the search order is

25  actually sent over to SWAT, and then how it's

Page 247

1    approved.  Is that accurate?

2         A.      Yes.

3         Q.      And the changes that CIRT recommended in

4    terms of, Hey, it should go to the lieutenant first

5    so that they know what's being -- and then it should

6    go bottom down instead of top up, that's been

7    implemented; correct?

8         A.      I believe so.

9         Q.      All right.  Let's look at the -- and

10   so I've got some tactical review board conclusions.

11              And so kind of what -- we -- we -- we

12   talked about what happens up through creating the

13   report.  And so once the report is created, then it

14   goes to the tactical review board?

15        A.      Correct.

16        Q.      Correct?

17              And that has -- that has the SMEs and

18   civilians?

19        A.      No.

20        Q.      No.  Okay.  Who does it have on it?

21        A.      So first there's the use-of-force board.

22   It's essentially the same personnel.  The

23   use-of-force board has four civilian members and

24   three individuals from our department who vote on

25   that use of force.

LEXITAS™

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 248

1          Specifically for the officers, there's a

2     peer officer who votes -- that's an officer of the

3     same rank -- there is a tactics expert, and then

4     there is a -- I believe it's the deputy chief that

5     votes.  Those are the three voting individuals from

6     our department, and then four civilians.  That's

7     specifically only on the deadly force.

8          When it comes to the tactical review

9     board, all the same people are in there.  You still

10    have your peer officer, your peer sergeant in this

11    case.  Because Lieutenant O'Daniel was -- had

12    conclusions, there was a peer lieutenant.  And I

13    believe there was also a peer captain.  It was a

14    packed room that day.  Usually it's not that bad.

15    But because Captain Cole got conclusions, there was

16    a peer captain that was responding on this one, on

17    this tactical review board.

18    Q.     And so I actually have the Tactical

19    Review Board CIRT Conclusions for Lieutenant

20    O'Daniel.

21    A.     Okay.

22          MS. MURPHY:  And so I am going to hand

23    these over to you.  We're going to mark these as

24    Exhibit 6.

25          (Exhibit 6 marked.)

Page 249

1    BY MS. MURPHY:

2        Q.      Before you preface anything, I'm going

3    to ask the question, and you can tell me if you

4    want.

5                Have you ever seen this document before?

6        A.      No.

7        Q.      Okay.  So this is -- were you present,

8    though, for, like, whatever the tactical review

9    board meeting was?  Because you kind of talked about

10   how many people were there.

11       A.      Correct.  So I am present for that.  I

12   have no say in that.  I gave my presentation.  After

13   my presentation, every member of the board -- these

14   are the peer officers, sergeant, lieutenant,

15   captain -- get to -- and training experts, deputy

16   chief, assistant sheriff -- everybody who's on the

17   board has a chance to ask me specific questions

18   about this case.

19       Q.      It's -- sorry.

20       A.      Go ahead.

21       Q.      No.  Go ahead.

22       A.      Once that portion is done, then I am

23   done for the remainder of my involvement in this

24   case.

25       Q.      Do you actually leave the room, or --

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 250

1      A.      No.  I am there present.  I'm not there

2    for deliberations on when these conclusions are

3    made.  I exit the room for that.

4      Q.      Okay.

5      A.      So I don't have any weight on what was

6    said or why things were overturned or approved or

7    modified.

8              When they finish all their questioning

9    of all the officers, of the people that were

10   involved, everybody exits except for the board

11   members, and they go over this.

12             And then I come back in and I learn

13   the same way everybody else does what the results

14   were.

15     Q.      Okay.  And so is it, like, a closed

16   hearing?  Is it an open hearing?

17     A.      Closed hearing.

18     Q.      And sorry -- sorry.  You listed off the

19   people that can attend.  They're all

20   people related -- sorry.

21             You listed off the people that can

22   attend.  So, like, a member of the public can't

23   come?

24     A.      No.

25     Q.      Okay.  But you said that this one was

Page 251

1    much more packed than usual; correct?

2        A.      Because normally we don't have

3    conclusions for every ranking member of this

4    department outside of appointed members.

5        Q.      And so looking at the Tactical Review

6    Board CIRT Conclusions, if we were to turn to -- and

7    we'll just -- I think we'll reference what's called

8    the Bates number.

9            See the alphanumeric number down here at

10   the bottom?

11       A.      Okay.

12       Q.      So turning to page 4574, it just has

13   checked "Overturn."

14       A.      Okay.

15       Q.      But you weren't privy to the discussions

16   about what that means, how they're going to

17   implement it; nothing?

18       A.      Correct.  For the entirety of this --

19   this is all done with voting sheets, and then these

20   are for the -- I believe it's for the sheriff.  This

21   is outside of the purview of a CIRT detective.  We

22   do not see these, handle these whatsoever.

23       Q.      Okay.  And so in looking through -- even

24   though you seem to have some level of familiarity

25   with the document, although I know you can't tell me

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 252

1    about the deliberations.  So it seems like, in terms
2    of the one for Lieutenant O'Daniel, you flipped --
3    there's different signature pages.  So it's like the
4    three provisions that applied to her.
5              And are you given this at the end?  Do
6    you see this at all?
7        A.      No.
8        Q.      Okay.  And so when you come back into
9    the meeting and you hear what happened, what do
10   you hear?
11       A.      So they'll go -- they'll start the tapes
12   again, and they'll say, We had X amount of
13   conclusions for Officer Roth.  There were three
14   general conclusions.  All were validated.  They --
15   you had four specific conclusions.  Three were
16   validated; one was overturned.
17             And then they would say, The one that
18   was overturned is blah, blah, blah.  Would you like
19   an explanation of why?
20       Q.      Did you ask, when you heard that any of
21   them were overturned -- I mean, we just went through
22   Lieutenant O'Daniel's, but there's also, like --
23       A.      I don't get the opportunity to speak.  I
24   am done.  The second that they are done asking me
25   questions in the room, I sit off to the side, and my

Page 253

1    involvement, outside of stopping and starting my

2    tape recorder, from deliberations to starting the --

3    resuming the tactical review board, is completed.

4         Q.      Okay.

5         A.      And I believe these are more for the

6    board member of -- so, again, I see then Deputy

7    Chief Prosser's signature on some of these.  I saw

8    then Assistant Sheriff Walsh's, now undersheriff

9    Walsh's, signature under them.  These are given to

10   them to affirm because they are the chair and

11   co-chair.

12        Q.      Okay.

13        A.      So, again, I have zero recollection --

14   not recollection.  I have zero involvement with this

15   document.

16        Q.      And then -- so I will then -- thank you

17   for clarifying that.

18               I'll have you look at this one too.  So

19   this -- this is starting at LVMPD 4826.  This is

20   LVMPD Interoffice Memorandum.  It kind of gives a

21   summary of the findings.  But there seems -- sorry,

22   I'll give this to you and I'll ask.

23               MS. MURPHY:  Can you mark this as

24   Exhibit 7, please.

25               (Exhibit 7 marked.)

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 254

1              THE WITNESS:  Again, this is stuff that

2    is out of my purview.  I don't ever see this.  I've

3    never seen any one of these after my cases.  These

4    are specifically for what these look like.  So these

5    being struck out are the ones that are probably

6    overturned or modified.

7    BY MS. MURPHY:

8        Q.      But you're guessing on that?  You're

9    not --

10       A.      I'm guessing on that.

11       Q.      Okay.

12       A.      Like, we don't have any control over

13   this.  By this point, when this comes out and when

14   this is completed, I'm already on my next case,

15   grinding out interviews and doing my next

16   investigation.  We never see this, or we never have

17   access to this.  This is not put into our case file.

18   This is not in IA Pro, to my knowledge.

19              MS. MURPHY:  Okay.  Let me -- keep that

20   in that stack.  Give me just a couple minutes to

21   review my notes.

22              THE VIDEOGRAPHER:  Off the record at

23   2:54 p.m.

24              (A break was taken.)

25              THE VIDEOGRAPHER:  On the record at

Page 255

1    2:56 p.m.

2    BY MS. MURPHY:

3        Q.        In performing your job -- Justin, in

4    performing your job duties as a police officer,

5    do you agree with me that you have a duty to

6    conduct yourself such that you do not violate the

7    civil or constitutional rights of any members of the

8    public?

9        A.        Yes.

10        Q.        Do you also agree that if you see other

11    officers violating these civil or constitutional

12    rights of a member of the public you have a duty to

13    intervene and stop that officer?

14        A.        Yes.

15        Q.        After having conducted the detailed

16    investigation you did in this matter, do you believe

17    that Mr. Williams' civil or constitutional rights

18    were violated?

19                MR. ANDERSON:  Objection.  Form.

20                Go ahead and answer.

21                THE WITNESS:  I am not a constitutional

22    expert.  While we deal with aspects of the

23    Constitution, honestly, I don't know if I can speak

24    to that.

25                I know that we probably -- if we were

Page 256

1    conducting CETs like we do today, there possibly

2    could have been a difference in the outcome -- of

3    the outcome.  But that doesn't say that there might

4    be.  Mr. Williams could have responded in the same

5    way.  There's really no way to tell.

6            I know there were some deficiencies

7    within our department policy and procedures and how

8    SWAT operated in 2022, specifically that day and

9    prior to.  But as far as specifically speaking on

10   the constitutional knowledge, I don't have the

11   in-depth that you have.  And I hope that answers the

12   question.

13   BY MS. MURPHY:

14       Q.     Don't you think as a officer you

15   actually should have a pretty strong working

16   knowledge of search-and-seizure requirements as it

17   relates to a citizen's rights?

18            MR. ANDERSON:  Objection.  Form.

19            THE WITNESS:  And, again, I will go back

20   to my knowledge of what my policy and my training

21   goes.  Yes, there are aspects of that that have

22   legal ramifications for that, which are outlined in

23   policy, and we do go through classes for search and

24   seizure.  And yes, there is an obligation to have

25   that knowledge.

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 257

1          In that same respect, I don't have the
2    same knowledge that you have, as you don't have the
3    same knowledge that I have as far as police
4    procedures.  You have an idea having gone through
5    probably multiples of these, but I don't have the
6    vast knowledge of, say, a lawyer would have.
7    BY MS. MURPHY:
8        Q.      I'm not asking you to have a JD.  I'm
9    asking you, in your experience as a police officer,
10   do you believe that Mr. Williams' constitutional
11   rights were violated, or do you believe they were
12   not violated?
13              MR. ANDERSON:  Objection.  Form.
14              Go ahead.
15              THE WITNESS:  I don't know how to answer
16   that.  I honestly don't know how to answer that.  I
17   can't tell you one way or the other.
18              What I can tell you is my report was
19   drafted, and my conclusions met the investigation of
20   my department policies and procedures.  I do not
21   know if I can say with an absolute fact that -- one
22   way or the other.
23   BY MS. MURPHY:
24       Q.      In Section 3.8 it's written, "CIRT found
25   that under the conditions present here,

Page 258

1    six seconds" -- sorry.  Strike that.  I'll start

2    over again.

3              "CIRT found that under the conditions

4    present here, six seconds was insufficient to allow

5    occupants time to answer the door, let alone submit

6    to a search."

7              As we've discussed here today, the

8    ability to answer the door and submit to a search is

9    a constitutional right; correct?

10             MR. ANDERSON:  Objection.  Form.

11             THE WITNESS:  Can you rephrase the

12   question, please?  Or, sorry, repeat the question?

13   BY MS. MURPHY:

14        Q.     Sure.

15             "CIRT found that under the conditions

16   present here, six seconds was insufficient to allow

17   occupants time to answer the door, let alone submit

18   to the search."

19             The right to answer the door and submit

20   to a search is a constitutional right; correct?

21             MR. ANDERSON:  Objection.  Form.

22             THE WITNESS:  Yes.

23   BY MS. MURPHY:

24        Q.     Okay.  So if Mr. Williams was not given

25   sufficient time to answer the door or submit to a

Page 259

1   search, then his constitutional rights were

2   violated; correct?

3            MR. ANDERSON:  Objection.  Form.

4            THE WITNESS:  Based on your explanation

5   of how that reads in that report, then yes.

6            MS. MURPHY:  Okay.  I don't have any

7   other questions.

8            MR. ANDERSON:  No questions.

9            THE VIDEOGRAPHER:  Counsel, will anyone

10  need the video?

11           MS. MURPHY:  I won't need the video.

12           MR. ANDERSON:  No thank you at this

13  time.

14           THE VIDEOGRAPHER:  This concludes the

15  deposition of Detective Justin Roth, consisting of

16  two discs.  The time is 3:01 p.m., and we are off

17  the record.

18           THE COURT REPORTER:  Would you like the

19  transcript?

20           MR. ANDERSON:  Yes.  We'll do a

21  read-and-sign.

22           (Proceedings concluded at 3:01 p.m.)

23

24

25

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 260

```
 1                   CERTIFICATE OF REPORTER

 2      STATE OF NEVADA       )
                              )SS
 3      COUNTY OF CLARK       )

 4           I, Holly Larsen, a duly certified court
        reporter licensed in and for the State of Nevada, do
 5      hereby certify:

 6           That I reported the taking of the deposition of
        the witness, Detective Justin Roth, at the time and
 7      place aforesaid;

 8           That prior to being examined, the witness was
        by me duly sworn to testify to the truth, the whole
 9      truth, and nothing but the truth;

10           That I thereafter transcribed my shorthand
        notes into typewriting and that the typewritten
11      transcript of said deposition is a complete, true,
        and accurate record of testimony provided by the
12      witness at said time to the best of my ability.

13           I further certify (1) that I am not a relative
        or employee of counsel of any of the parties; nor a
14      relative or employee of the parties involved in said
        action; nor a person financially interested in the
15      action; nor do I have any other relationship with
        any of the parties or with counsel of any of the
16      parties involved in the action that may reasonably
        cause my impartiality to be questioned; and (2) that
17      transcript review pursuant to FRCP 30(e) was
        requested.
18
             IN WITNESS HEREOF, I have hereunto set my hand
19      in the County of Clark, State of Nevada, this 20th
        day of January, 2025.
20

21

22

23
                          
24           _____

25                        HOLLY LARSEN, CCR NO. 680
```

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 261

```
 1                      ERRATA SHEET

 2

 3    I declare under penalty of perjury that I have read

 4    the foregoing _____ pages of my testimony, taken on

 5    _____ (date) at _____ (city),

 6    _____ (state), and that the same is a true

 7    record of the testimony given by me at the time and

 8    place herein above set forth, with the following

 9    exceptions:

10

11    Page   Line   Should read:           Reason for change:

12    _____  _____  _____   _____

13    _____  _____  _____   _____

14    _____  _____  _____   _____

15    _____  _____  _____   _____

16    _____  _____  _____   _____

17    _____  _____  _____   _____

18    _____  _____  _____   _____

19    _____  _____  _____   _____

20    _____  _____  _____   _____

21    _____  _____  _____   _____

22    _____  _____  _____   _____

23    _____  _____  _____   _____

24    _____  _____  _____   _____

25    _____  _____  _____   _____
```

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
                                                              Page 262
 1                      ERRATA SHEET (Continued)

 2      Page   Line      Should read:        Reason for change:

 3      _____  _____   _____  _____

 4      _____  _____   _____  _____

 5      _____  _____   _____  _____

 6      _____  _____   _____  _____

 7      _____  _____   _____  _____

 8      _____  _____   _____  _____

 9      _____  _____   _____  _____

10      _____  _____   _____  _____

11      _____  _____   _____  _____

12      _____  _____   _____  _____

13      _____  _____   _____  _____

14      _____  _____   _____  _____

15      _____  _____   _____  _____

16      _____  _____   _____  _____

17      _____  _____   _____  _____

18      _____  _____   _____  _____

19      _____  _____   _____  _____

20

21      Date: _____    _____

22                            Signature of Witness

23                            _____

24
                              Name Typed or Printed
25
```

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**(**

**(A)**
245:22

**(B)**
245:23,
24,25

**(C)**
243:2

**-**

**-ooo-**
4:2

**1**

**1**
5:24 6:17
40:4 88:9
99:14
128:18,
19,25
162:18
171:18
223:14

**1.1**
223:16

**1.2**
223:19

**10**
47:15
50:13

**100-and-
some-odd**
125:7

**101**
186:3

**104**
187:7

**10410**
4:17

**10:22**
65:15

**10:36**
65:18

**11**
172:12,14
173:2

**11.01**
203:16

**110**
190:11

**111**
190:16

**112**
192:18

**1125**
47:24
156:8
195:8
202:10

**113**
195:1

**116**
199:15

**117**
200:25

**118**
201:19

**119**
203:16

**11:37**
118:16

**11:47**
118:19

**12**
77:15
174:4
184:15

**12-hour**
17:7,16,
20,24
92:10

103:17

**120**
203:23
204:21

**122**
122:4

**123**
205:8,24,
25

**124**
205:21,24
206:1

**128**
206:18

**12:31**
156:17

**12:52**
156:20

**12th**
149:20
150:5

**13**
97:20
130:12
184:15

**132**
40:1

**133**
40:10,11
207:23

**134**
40:20
41:19
208:25
209:17

**135**
41:1,16,
17

**136**
41:19
210:8

**137**
211:23

**14**
131:10
172:14
173:2

**14-page**
172:9
243:15

**144**
215:22
216:12

**148**
216:19,21

**15**
47:5
50:12
131:10

**15-**
209:2

**16**
7:6 15:11
20:15
22:16
55:3
116:14
117:19
131:21,22

**169**
217:21

**17**
89:16
132:5

**170**
217:17

**179**
40:3

**179.055**
127:18
128:6

**18**
89:16

**183**
227:20,22

**187**
38:1,20
45:3,8
46:15
47:10
230:4

**188**
44:9 45:8
46:15

**1995**
192:9

**2**

**2**
28:20
29:2
223:14

**2.1**
223:22,
23,24

**20**
27:1 47:6
50:12
133:16

**20-second**
209:2

**200-page**
213:10

**2011**
32:2,9

**2012**
13:14
32:10
97:20

**2019**
16:15,20

**2020**
199:7

**2021**
199:7

**2022**
20:1

25:13,14
26:9
122:3
184:21
256:8

**2023**
245:12

**2025**
4:5

**208**
78:25

**20s**
150:12

**21**
134:4
199:8

**215**
224:13

**216**
229:2

**22**
55:20
134:6
135:3
162:16
199:8

**220-page**
8:24

**222**
106:8
109:22

**222-page**
18:7 43:3
108:17
109:15

**23**
135:8

**24/7**
71:21

**25**
162:16

**27**
137:4

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 265 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**289**
29:15,16

**29**
220:12
221:22
226:13
244:3

**2:24-cv-00074**
5:4

**2:54**
254:23

**2:56**
255:1

---

**3**

**3**
46:16,18
74:17

**3.1**
224:3

**3.10**
235:2

**3.11**
235:6,10

**3.12**
235:7,11
236:23

**3.2**
225:16,17

**3.3**
225:21
226:1

**3.4**
226:5

**3.5**
226:17

**3.6**
227:3,15
228:6,10,24

**3.7**
228:25
229:11

**3.8**
228:6
229:9,17,18 231:17
232:21,24
233:17
257:24

**3.9**
231:15,19
232:22
233:4
234:18

**30**
95:5
138:7
244:5

**30-day**
93:11

**3050**
37:2
47:23
145:14
149:12
155:4,9
156:7
158:13,14
159:10
161:5
181:10
195:7

**31**
139:17

**3109**
209:5

**32**
139:25
142:13

**33**
179:6

**35**
142:17
143:14

**36**
144:8

**360-degree**
88:4

**37**
144:25

**38**
145:10

**39**
145:8
146:11

**3:00**
82:25

**3:01**
259:16,22

---

**4**

**4**
127:22
128:4

**4.1**
237:6

**42**
147:15

**4255**
29:4

**4267**
130:13

**43**
149:1

**4389**
130:4

**44**
149:11

**444**
89:7

**4441**
38:21

**4475**
146:13

**45**
10:25
92:17
95:5
151:3

**45-day**
93:11

**4574**
251:12

**48**
63:13
66:10
151:23

**48-hour**
66:8,14

**4826**
253:19

---

**5**

**5**
130:5
158:6
237:15

**5.2**
238:5,7

**5.3**
238:17

**5.4**
238:22

**5.5**
239:1

**5.6**
239:13,18

**5.7**
239:25
240:7

**5.8**
240:15

**5/200.01**
164:12

**50**
153:10
219:11

**51**
153:15

**52**
26:2
154:6

**53**
155:7

**54**
156:3

**55**
156:23

**56**
157:7

**57**
160:19

**5:00**
52:2

---

**6**

**6**
55:1
248:24,25

**6.1**
240:24

**60**
109:23

**61**
167:2,5

**62**
167:20

**64**
168:12

**68**
169:13

---

**7**

**7**
173:1,2
241:3
253:24,25

**7.1**
241:3

**7.2**
241:14

**70**
26:2
171:6,12

**72**
62:13,25
63:2

**72-hour**
62:12

**7:00**
61:5

---

**8**

**8**
4:5

**80**
109:23
169:13
176:22
177:3

**82**
177:23
178:4,5

**84**
179:13

---

**9**

**9**
74:14
110:2
233:22



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**9-bang**
79:8
201:24

**9.0**
233:23

**9.1**
241:20

**9.2**
170:23
242:4

**9.2(C)**
243:2

**9.3**
243:13

**9.4**
243:25

**9.5**
244:9,10

**9.6**
244:13
246:11

**9.7**
245:2,22

**9.8**
246:13,20

**9.9**
77:20
246:21

**90**
63:10
137:2
176:14
180:1
204:25

**90-degree**
177:18

**94**
182:12

**95**
63:10

**98**
184:25

**9:12**
4:6

---

**A**

---

**a.m.**
4:6
65:15,18
118:16,19

**ability**
8:11,16
17:4,5
24:4
113:19
142:9
226:21
258:8

**able**
6:2 8:6
81:25
116:24
117:1,9
122:22
146:2
154:19
197:22
211:7
233:25

**about**
7:12,14
11:2
13:25
14:3 15:9
16:5 21:2
22:13
24:3,22
25:12,14
27:5
29:15
31:8
34:15,20
39:25
41:13,15,
24 43:6
51:17
53:10,17
55:1,7,22

56:16,22
57:1,2
58:6
59:13
63:20
64:11
65:21
66:10,23,
25 67:4,
18 69:12,
20,25
70:9
72:12
74:16
75:11
76:2,5,21
77:13
80:10
82:6 83:6
87:18
88:25
89:15
91:2,18
93:7
94:22
95:1,17,
22 96:16,
24 98:5,
11 104:25
105:18
106:16
110:2
111:3,24
112:12,20
114:13,22
116:2
117:16
118:9,22
123:12
126:13,15
127:14
128:24
129:24
137:17
138:8
142:20
146:12
149:15
150:20,21
151:20

152:14
153:13,21
154:8
155:6,25
159:9,10
162:15
163:6
164:4,16,
22 167:21
168:25
170:6
174:6,11,
14 175:1,
6,11,12
177:8
180:2,18
182:3
183:11
184:8,23
185:12
186:3
199:5
201:19
203:12
209:6
212:3,22
213:16,18
214:5
216:16,18
217:17,19
218:8,12
219:10
220:6
223:22
224:4,17
225:24,25
227:12
229:9
232:22
233:19
234:2
239:2
240:6
241:2,3,
21 244:10
245:3
246:14,21
247:12
249:9,18
251:16

252:1

**above**
21:15
30:13
136:12

**abrasion**
131:17

**absolute**
94:2
257:21

**absolutely**
18:18
39:7
108:6
111:11
127:2
156:15
176:19
231:24

**academy**
28:7
100:13

**acceptable**
164:15
165:6
166:8
186:25
187:1
188:17
199:13

**accepted**
76:7
242:8,16

**access**
12:6,7
22:2
29:11,19
58:21
110:23
115:7,11
124:24
135:16,
21,25
142:10

144:16
154:16
170:14
254:17

**accident**
150:9

**accidents**
88:5

**accordance**
237:18
245:19

**according**
200:21
211:5,6
225:25
240:7

**account**
36:11

**accurate**
8:7 24:24
27:18
69:21
82:11
122:2
123:4
166:1,12
247:1

**accurately**
141:13

**accusing**
91:13

**acknowledge**
68:18
192:16

**acronym**
31:10
102:13

**acronyms**
31:19
154:11

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

acted
112:22

action
41:4
171:13
207:6

actionable
204:23

actions
33:6,13
113:7
114:2
121:9
235:9

active
138:14

actively
48:12

actual
9:15
14:18
35:11
66:24
76:3 97:3
123:23
127:16
130:10
137:12
143:3
150:21
151:12
152:17
153:12
161:17,
18,22
169:1
184:11,20
208:20
215:2
218:17
224:20
227:12

actually
27:7
45:12

46:14
49:8 73:5
74:20
82:15
103:12
128:6,7,
20 130:12
136:24
138:8
144:15
162:19
167:24
170:21
177:8
183:9,10
184:11
219:6
220:8
223:4
226:24
235:12
238:14
245:17,20
246:25
248:18
249:25
256:15

add
244:19

added
169:17
170:13
171:2
200:18

addition
103:14

additional
69:18
132:13,19
236:11

address
147:4
157:4
158:2

adhered
229:24

adjustments
76:22

administer
4:14

administrating
33:16

administrative
9:7 13:21
14:8
18:24
19:1
22:13
23:1
29:4,14
32:6,16,
21 33:5
63:7
66:16
67:1,6
112:15,18
120:2,12
123:8
133:21
163:10
171:25
217:22,25
218:2

admonish
60:12
84:18,21

admonished
85:4,6

admonishment
84:18,23

adopted
200:22
244:15

Advanced
28:5

adversarial
71:2,4

advise
93:5

aerial
198:13

affect
70:22,23

affiant
97:5,8,10

affidavit
98:20

affirm
253:10

affirmation
79:16

affix
183:24

after
14:10
47:24
49:10
50:8,25
51:2,13,
18 53:19
55:25
60:23
63:3
66:5,19
71:23
76:15
78:18
79:1
81:7,24
84:2 85:7
87:7 90:4
92:6 93:3
99:18
103:25
104:6,24
105:1
106:21
107:10

122:9
130:22
137:18
150:4,14,
15
172:15,19
191:25
197:16
198:20
201:7,12
208:7
209:3
215:23
230:25
231:5
249:12
254:3
255:15

afterwards
38:15
79:3
104:3
242:23

again
9:2,9,10
18:20
36:2
40:21
41:24
46:2,7,10
48:22
54:25
56:6
59:25
63:20,25
64:23
66:13
77:22
79:23
80:13
82:24
89:15
92:25
94:11
100:7
105:2
107:14
113:10

120:3,24
136:7,24
147:10,16
152:2
154:10
158:2
160:23
163:18
164:13
165:6,23
166:16
168:20
170:6
173:3
175:3
177:13
178:25
186:10,
12,23
188:14,16
196:10
198:18
203:17,24
211:22
219:10
224:16
225:13
228:7
231:25
232:2
233:5
234:21
235:13
252:12
253:6,13
254:1
256:19
258:2

against
29:17
68:17,19
238:24

agency
75:24

agent
58:1
182:25

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **ago**<br>34:5 43:3<br>172:18<br>182:11<br>214:5<br><br>**agree**<br>255:5,10<br><br>**agreed**<br>231:1<br><br>**ahead**<br>15:7 44:2<br>138:7<br>145:7<br>167:2<br>176:21<br>190:10<br>249:20,21<br>255:20<br>257:14<br><br>**air**<br>89:5<br>112:3<br><br>**alert**<br>184:2<br><br>**Alexander**<br>4:10 5:2,<br>10 59:4,6<br><br>**all**<br>6:8,12<br>13:8,12<br>17:1<br>21:17<br>22:5,19<br>27:2,10,<br>17 31:2<br>32:24<br>33:25<br>37:25<br>44:24<br>45:17<br>52:10<br>55:16<br>56:23<br>57:7 61:1<br>63:5<br>65:2,20 | 66:23<br>67:12<br>68:22<br>70:24<br>71:2,17,<br>20,22<br>72:7,14,<br>25 73:16<br>79:5,6,16<br>80:19<br>81:24<br>83:19<br>84:7<br>85:7,15<br>87:20<br>91:11<br>92:2 95:2<br>102:17<br>103:16,25<br>108:16<br>109:14<br>112:19<br>115:7<br>117:7<br>118:9<br>123:11<br>127:14<br>130:9<br>131:7,18<br>133:1,3<br>135:14,24<br>137:3<br>150:22<br>158:23<br>160:16<br>161:9<br>162:1,19,<br>23 163:7<br>164:9<br>165:1,5<br>166:4<br>171:6<br>172:17<br>173:20<br>174:9<br>177:1,3<br>178:25<br>181:15<br>183:3<br>185:7,18 | 190:10,<br>15,16,17<br>191:18<br>192:1<br>196:9<br>207:21<br>212:25<br>213:1,7<br>221:23<br>222:16<br>233:25<br>235:15<br>237:7,10<br>240:23<br>241:7,15<br>246:10<br>247:9<br>248:9<br>250:8,9,<br>19 251:19<br>252:6,14<br><br>**allegatio<br>n**<br>91:8<br><br>**allegatio<br>ns**<br>66:12<br>90:24<br>91:12<br><br>**alleged**<br>169:15<br><br>**alleviate**<br>200:9<br><br>**alleviate<br>d**<br>200:2<br><br>**allotted**<br>47:22<br>101:21<br><br>**allow**<br>101:13<br>186:20<br>258:4,16<br><br>**allowed**<br>64:22 | 101:5<br>170:17<br><br>**allows**<br>192:6<br>195:19<br><br>**alluded**<br>224:4<br><br>**almost**<br>58:12<br>80:20<br>117:6<br>225:8<br>246:10<br><br>**alone**<br>221:1<br><br>**along**<br>27:4 53:1<br>81:15<br>168:21<br>189:12<br>223:16<br>225:10<br>235:19<br><br>**alongside**<br>26:18<br><br>**alphanume<br>ric**<br>251:9<br><br>**already**<br>64:24<br>131:13<br>166:12<br>184:23<br>197:16<br>207:10<br>222:7<br>237:12<br>254:14<br><br>**also**<br>12:9,21<br>15:20<br>17:13<br>24:1<br>25:2,19<br>28:8 | 30:15<br>31:4<br>32:17<br>40:21<br>47:12,17<br>55:4,5<br>63:14<br>67:1<br>77:21<br>80:5<br>81:13<br>85:12<br>97:6<br>102:8<br>107:9<br>117:6,9<br>120:5<br>123:3,9<br>131:25<br>133:24<br>137:25<br>144:22,23<br>148:3<br>152:6<br>154:22<br>158:19,20<br>168:10<br>186:7<br>190:5<br>207:1<br>209:1,2<br>217:4<br>218:1<br>220:6<br>222:6<br>225:5<br>228:2<br>230:2,12<br>239:19<br>248:13<br>252:22<br>255:10<br><br>**alternate**<br>46:22<br><br>**alternati<br>ve**<br>179:14,20<br>193:20,<br>21,24 | 214:15<br><br>**although**<br>42:14<br>45:23<br>240:5<br>251:25<br><br>**always**<br>24:12<br>82:20<br>93:25<br>94:3,5<br>99:6<br>101:18<br>106:18<br>109:8<br>134:14<br>176:15<br>181:13<br><br>**amending**<br>42:22<br><br>**Amendment**<br>34:15<br>35:10,24<br>113:23,25<br>114:5,8<br>209:4<br><br>**ammo**<br>241:18<br><br>**ammunitio<br>n**<br>241:15<br><br>**among**<br>60:25<br><br>**amount**<br>20:4<br>26:1,25<br>47:4 48:8<br>54:3,4<br>81:23<br>83:4<br>157:15<br>192:6<br>205:18<br>206:21<br>209:7,21<br>227:18 |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

228:3
252:12

**amplified**
52:2

**analysis**
14:2
41:10
45:10,19,
22,24
48:3
49:17
89:11
112:25
153:24,25
154:2
217:19,22
232:25

**analysts**
87:21
135:15

**analyze**
75:19
113:20

**analyzed**
44:22
45:2
54:20
55:1

**analyzing**
38:6 45:6
52:8
125:14,15
212:8
230:5

**And/or**
126:23

**Anderson**
4:18
10:22
11:14,19
37:19,23
255:19
256:18
257:13
258:10,21
259:3,8,

12,20

**Andy**
49:1

**angle**
142:9,15
177:18
195:15,18

**angled**
159:15

**angles**
158:18

**ankle**
145:19,22
149:17,24

**announce**
34:16
36:7,9
39:2,24
54:1
74:10
109:3
128:7
190:23
191:3
192:5
196:12
209:20
229:24
245:3,6,
17

**announced**
209:3
229:21

**announcem
ent**
49:25
50:1
51:20
52:21,23
53:6
209:12
210:12

**announcem
ents**
37:5

47:24
50:8,25
51:3,4,9,
18 52:17,
21,24
53:2,23
55:4
197:16
198:5

**another**
27:3
46:20
78:11
104:22
109:16
118:13
122:15
125:4
148:16
192:18,20
195:2

**answer**
8:6 10:13
21:9,12
52:4 53:3
66:17
105:13
181:5
182:8,21
228:3
255:20
257:15,16
258:5,8,
17,19,25

**answering**
10:4

**answers**
53:13
179:5
208:21
256:11

**Anthony**
34:20
35:1
36:5,16
38:4
40:23

45:5 48:4
50:15
54:2,25
100:15
230:2
233:2

**anticipat
e**
61:15

**anticipat
ed**
84:19

**anticipat
ing**
9:20

**any**
6:10 8:5,
10,14
9:15
10:16
11:4
12:5,17
14:16
20:9,17,
24 21:19
23:3,18
25:9
26:15,17
29:13
33:1
34:17,25
53:5,10
56:25
60:8,12
65:1,6
66:11,15,
19 70:23
74:2,7
75:22
77:13
80:22
81:1
85:19
86:11,14
87:11,12,
13 89:10,
11 90:24

91:12
92:21
94:13
97:18,22,
23 100:24
105:2,8
106:2
109:1
111:6
114:21,24
117:15
118:1
119:12
120:13,
18,20
122:7
125:15
127:11
128:15
129:3
132:21
133:18
134:17,24
137:14
141:5
161:9
162:1,19,
22 163:6
164:9,25
165:5
171:25
179:22
182:18
185:24
187:18,19
189:5
190:20,21
194:19
196:17
200:2
201:9,13
204:24
205:15
208:11
216:1
218:22
225:9
230:19
231:10
235:15

237:4
244:5
250:5
252:20
254:3,12
255:7
259:6

**anybody**
18:10
71:24
101:23
105:4
114:24
115:14
119:20
175:4
190:6

**anybody's**
87:13

**anymore**
12:6
118:1
196:7

**anyone**
10:20
11:7,8
133:14
174:6
259:9

**anything**
21:18
44:4
52:12
65:24
68:17
82:11
100:14
107:12
117:25
137:12
144:21
166:11
208:11
216:6
218:13
222:21
234:22

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 270 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

244:19
249:2

**anyway**
181:1
182:21

**anywhere**
123:14

**AOST**
28:5
100:13

**apartment**
47:23
55:11,13
70:7
86:11
129:20
147:10,17
150:3,11
156:8,9
157:9,10,
24 158:16
179:17
181:24
182:4
185:17
191:18,22
195:6,8
198:17
202:10
215:14
232:1
235:4

**apartments**
157:5
198:14

**apologies**
41:21
232:24
240:2

**apologize**
46:12

**appear**
125:12
152:19
165:4

**appearances**
4:14

**appeared**
180:11,13

**application**
143:3

**applications**
170:1

**applied**
21:21
252:4

**appointed**
251:4

**apprehend**
99:1

**approach**
39:1
228:25
229:11

**appropriate**
47:4 50:7
59:15
227:7
232:13
240:12

**approval**
18:24
79:1,4,13

**approve**
19:19
126:23,24
172:6
239:7
242:1

**approved**
19:18
74:20
111:1
126:19
163:9

201:10
220:7
228:18
237:21
247:1
250:6

**approving**
239:3

**approximately**
4:5 9:6
10:25
12:24
15:17
16:19
225:4

**AR-15**
145:18

**arc**
15:14

**area**
16:8
58:19
83:21
88:15
137:19
145:14
196:15
198:14
202:12

**areas**
93:15,24,
25 96:23

**arguing**
163:16

**argument**
148:20
232:3

**Ariel**
146:24

**Arkansas**
192:8

**arm**
71:18

131:17

**armed**
190:7
227:7

**armor**
189:5
190:8

**armored**
191:23
195:20,22

**arms**
85:1
135:10

**Army**
116:20

**around**
20:12
69:22
92:16
106:4
141:10
144:11
155:22
156:9
175:1
187:17

**arrest**
98:16,19,
22 116:7
193:25
194:1,4,
12 204:7
206:7,11

**arresting**
7:20

**arrived**
137:19
139:12

**arrow**
195:8

**artfully**
132:7

**articulate**
116:24

**articulated**
110:7

**as**
4:23 5:23
7:20 8:2
9:16
13:18
14:21
15:18,22
19:24
20:2,3,15
21:2,11,
18 22:11
24:23,24
25:2,5
27:14,15,
16 29:2,
25 31:2,5
32:16
34:19
35:8,9
36:4,13
39:18,19
42:21
43:8,20,
23 44:1,
3,4,5
45:8,15,
16,19
46:6
49:16,17,
20 53:15
54:2,14
56:3
60:10,13
62:15,25
66:7 67:9
68:21
69:2
70:12
72:15
73:23,24
74:1,6
76:2,21

77:2
79:11
80:25
81:11
83:17
86:2
90:13
91:1
92:14
93:5,15
94:15,20
96:8,12
97:8,14,
17 98:20,
24 99:2
100:10,
14,15,16
101:10
103:8,23
105:16
106:15,16
107:21,22
108:3,4
109:13,
14,19
110:1,2
111:3
115:8
116:8,11,
18 117:21
121:24
122:1
123:20
124:23
125:24
126:2,7,
19 128:17
129:23
132:24
133:4,5,
20,21,25
134:16
136:11,16
137:10
139:12
141:22,
23,24
143:1,22
146:15
148:4,10

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

149:7,8,
9,21
150:19,21
154:17
158:2
159:21
160:16,24
163:13,16
164:6
165:10,13
166:5,6
167:15,16
168:9
169:11,
16,24
171:20
172:19
173:16
174:20
175:11
178:6,9
179:19
182:2
183:20
185:9
186:5
188:9
189:20
191:20
193:2,11,
12,20
196:4,20
197:18
198:20,
21,25
199:12
201:5
204:8,17
209:6,25
210:17
211:5
212:14,24
213:20
214:10
216:7
218:21
221:25
222:2,5,7
223:7
226:6,25

229:8
233:24
236:7
237:19
239:11,14
242:15,22
243:5,12
244:13
245:9
246:11,15
248:23
253:23
255:4
256:9,14,
16 257:2,
3,9 258:7

aside
10:17
122:12
174:12

ask
6:3,5
15:8 29:2
33:11
35:21
52:14
57:8 64:7
67:12
69:11,15
71:5,10
72:12,18
75:2,11,
14 77:9
86:14
94:11
96:16
100:1
118:21
132:7
144:9
155:6
175:3
182:21
209:15
210:8,9
249:3,17
252:20
253:22

asked
57:12
71:12
93:7
164:19
172:10
178:24
180:8,16
237:25

asking
10:12
83:7 95:1
127:4
129:2
145:5
148:12
167:24,25
175:12
178:14
252:24
257:8,9

aspect
43:16
49:15
76:20
97:25
115:25
116:9,20,
23 118:1
120:12,13
166:6
191:2
221:16
236:18

aspects
108:17
125:5
164:18
220:25
255:22
256:21

assertion
s
110:15

assessment
24:4

68:23
69:14
73:1
91:22
113:18
121:9
237:8
238:19

assessmen
ts
237:8

assigned
57:13
83:24
96:18

assignmen
t
16:15,22,
24 25:23

assignmen
ts
188:9

assist
100:21

assistanc
e
56:4

assistant
11:13,15
62:17
78:4 96:6
178:22
237:18
249:16
253:8

assisted
38:6 45:6

associate
158:10

associate
d
74:14,18
79:4
150:24

157:5,9,
23 179:16
192:5

Associati
on
68:2,5

assume
101:18
106:23
127:9

assumes
110:11

assuming
7:19
11:25
12:2
41:22
92:5
125:11
142:25

assumptio
n
54:25
163:25
177:15

at
6:3,4,6,
12 8:2
9:24
20:16
22:13,23
23:17,21
25:15,18
26:8 29:6
30:7
32:20
33:23
34:3,6
38:20,24
40:1
41:1,25
43:15,21
45:10
47:14
48:23
49:24
50:4,5,

16,21
52:2
53:17
55:24
57:7
58:14
60:2,4
61:4,5,7,
13 62:1,
20,22,25
63:5
64:25
65:14,17
66:9
70:7,24
71:2
73:7,16
75:9
77:21
78:21
79:25
80:8 81:6
82:1
83:14,17,
18 84:12
85:2,12
86:3,22
88:4,9
89:19,22
90:6 91:9
92:18,23
102:3
106:5
107:8
109:5,11
110:25
113:15
118:4,15,
18 122:23
125:21
126:3,10,
11 127:6
128:25
130:4,25
131:5,8,
16,17,20,
25 132:1,
2,10,23
138:18,25
139:9,16

Detective Justin Roth     Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

140:4,10,
23 143:6,
9 144:14
145:14
146:7,8,
9,12
147:4
149:12
151:17
153:3
155:4,9
156:7,16,
19 163:12
165:14
166:16
170:11,21
172:25
177:17
178:5,15
180:3,5,
10 181:9,
10,15
182:17
184:5,7,
9,19,21
188:19
191:19
192:2,8
193:2
194:20
195:18
196:9,16
197:10
199:16,22
201:17
202:9,12
203:8
207:14,20
209:6,16
210:25
211:4,22,
24 212:13
213:23
214:12,13
215:22
217:5
218:4,10
219:1
221:10,
15,23

222:13
225:3
226:14
228:9
234:19
235:15
237:1,2,8
242:1
243:5,10,
11 247:9
251:5,9
252:5,6
253:18,19
254:22,25
259:12,22

**ATL**
96:6
237:17,20
238:9

**attach**
5:22 6:8
29:2

**attached**
23:19
133:17
176:13
177:19
186:12
200:16
228:15

**attempted**
99:21

**attempting**
139:13

**attend**
136:13
250:19,22

**attended**
207:20
220:11

**attending**
221:22

**attention**
77:8

**attorney**
5:9 38:4
45:4
163:15,24

**attorneys**
11:20
134:18

**audio**
88:24
89:7

**August**
201:7

**authenticate**
102:19
122:23

**authored**
8:20
44:14
58:9

**authoring**
97:9

**authority**
229:21

**authorization**
196:6

**authorized**
192:23
204:11

**authors**
172:5

**Automatic**
144:13

**autonomy**
106:24

**autopsies**
136:14

**autopsy**
136:13,
16,18,21

**availability**
66:20
67:10
81:5
86:8,17
226:19
244:11

**available**
34:1
58:18
62:19
67:2 83:1
84:25
86:19
87:3,4
119:19,20
140:22
158:22
160:17
204:2

**availed**
179:22

**average**
56:20

**avoid**
75:3

**aware**
58:25
59:3,9
76:8
92:19,21
201:1
211:1
231:12
239:20

**awareness**
216:16

**away**
110:1

──────

**B**

B-A-N-D-
I-E-R-O

37:23

**bachelor's**
20:19

**back**
6:12
16:14,15
19:4,7,10
20:1,3,11
32:2
48:21
50:23
56:2
58:14
61:3
67:22
76:3
79:24
80:8
81:25
82:22
86:22
87:5
91:24
97:19
99:10
107:24
114:14,21
116:5
122:3
145:10,18
149:24
150:6,14,
18 170:22
182:5
185:20
189:5
205:22
211:21
214:16
218:22
219:19
222:17,21
225:15
227:10
228:11,23
231:17
232:23
233:17

250:12
252:8
256:19

**backdrop**
216:17
237:9

**background**
15:9 58:3
72:8
85:14
97:12
118:22
124:1

**Backman**
68:3
130:18
206:21
207:15
210:12
220:11
221:21
244:2

**Backman's**
226:7

**backtrack**
83:13
94:11

**backup**
180:19
188:2

**backwards**
96:11,13

**bad**
57:7
71:11
111:5
248:14

**badge**
202:25

**badly**
64:3

**bag**
28:18



Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

131:19

**balances**
201:3

**ballpark**
56:17

**Bandiero**
35:2,23
36:6,8,
16,22
38:4,19
39:4
40:24
42:16
44:3
45:5,25
46:7,23
48:4,6
50:15
54:2,25
100:3,15
102:23
104:25
122:13
208:23
230:2
233:2

**Bandiero's**
34:21
37:11
40:13
41:10
42:23
43:11
45:12
103:7

**banging**
213:23

**bangs**
237:24

**bank**
140:9
142:15

**Banks**
40:6  41:7
42:2,4,5

46:25
47:3,7
50:5,11
208:1,9
232:20

**Bar**
4:17

**barricade**
191:21

**barricaded**
99:5
197:24

**bars**
185:25

**based**
21:25
34:7
53:13
63:7
65:23
66:20
78:7  81:4
82:8  83:4
86:8
88:13,15
89:18
104:16
106:2
115:19
119:1
126:14
136:14
143:17
158:20
160:1,7
162:4
166:24
178:25
179:3
181:6
183:10
187:9
188:23
192:7
204:22
210:4

212:1,2,
15  214:13
217:2
218:3,16
224:12
226:10
232:10,15
233:19
240:11
241:10
242:19
244:3
259:4

**baseline**
100:11

**bases**
27:17

**basic**
118:22
233:21

**basically**
65:10
129:19
234:18
240:16
242:5

**basing**
138:24

**basis**
81:11

**basketball**
190:8

**Bates**
29:4
38:21
130:13
251:8

**be-all**
160:9

**Bearcats**
195:20

**became**
13:15

**because**
10:5
13:2,24
16:17
19:13
20:8  22:9
25:23
26:24
29:16,18,
24  30:25
31:1
34:24
37:5
38:13
39:21
44:22
46:2
51:17
52:22
58:13
60:3  61:8
62:4
63:9,25
67:1,7,13
68:13
70:4  71:7
72:4,25
73:19
75:7,13
76:4,20
81:8,18
83:4  87:3
89:3,23
90:12,18
91:24
94:7
96:5,20
98:4
99:18
104:3,11
106:19
107:12
109:4,5,
20  116:1,
11  117:3,
4  124:3,
14
126:10,
11,18
127:11

129:23
130:24
132:16
133:20
134:9
136:16
137:20
138:7
140:18
147:24
150:23
151:23
153:2
157:23
158:18,22
159:14,15
161:24
164:20
165:1,7,
23  170:9,
13,16
174:9,13
175:10
176:9,13
177:16
184:9
186:5
188:19
189:8,23
191:1
195:12
197:3
200:25
211:16
217:8
218:9,17
219:5
221:14
223:24
225:1
227:24
229:21
230:19
234:14,22
235:3,24
236:23
237:2
241:6
245:12
248:11,15

249:9
251:2
253:10

**become**
26:2
60:15
67:2
124:6,8
125:4

**becomes**
62:14
106:20
184:7,20

**becoming**
16:19

**before**
6:24  7:1
16:19
42:14
46:14
47:5,16,
22  50:11
57:12
60:13,19
65:20
66:3,9
68:11
74:12
78:22
94:10
96:7,16
127:16
134:9,20
142:6
149:16
153:19
156:13,22
179:7,19
182:24
197:22
208:11
230:15
232:17
233:20
244:10
245:20
246:16
249:2,5

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**began**
210:15

**begin**
209:12

**beginning**
16:15
49:25
130:11
203:13
209:7
219:1

**begins**
42:1

**behalf**
4:8,17,18

**belief**
240:13

**believe**
11:6,12
13:14
15:23
18:8,24
25:15,18,
22 26:12,
25 31:14
32:2,8
34:20
35:3,7
36:10
37:6
38:25
39:25
43:1
44:23
47:1
50:15
51:5,8,22
52:24
53:23
54:6,8
56:15
60:2,3
65:5 68:5
71:7 72:3
74:11,19
77:14
80:18

87:23
93:11
96:3
97:19
104:13
122:6
125:7
132:16
137:1
142:5
143:18
144:18
145:17
146:25
149:22
150:3,7,
12 151:7
153:25
154:25
157:2
158:6
165:15
168:23
170:4
171:18
172:7,25
175:21
178:19
179:3
181:1,22
185:3
187:4,23
191:2
194:13
196:11
199:8
205:18
207:4,18,
24 208:16
209:13
214:25
215:3
217:14
222:3,10,
11 223:21
224:21
226:6,8
227:2
233:14
234:10

238:7,8
239:14
242:10,17
244:7
246:1,10
247:8
248:4,13
251:20
253:5
255:16
257:10,11

**believed**
47:20
71:8
153:5
157:25
182:10
187:11
198:9
212:20
234:24
240:12

**belonging**
157:6

**beneficia**
**l**
178:17

**benign**
219:15,16

**Bertuccin**
**i**
202:24
203:5
211:18

**best**
8:7 59:16
71:20
95:25
109:9
122:1,11
141:12,
22,23
142:9
159:16
166:1,12
213:11

**better**
19:24
21:8 30:3
33:11
52:14
70:20
75:3,24
80:15,17
111:7,9
121:18
152:21
155:9
157:20
174:17
179:2
180:16
214:22

**between**
14:1 16:8
23:15
26:2 36:3
109:23
111:19
112:14
138:14
171:6
188:7
191:15
199:7
212:6
213:14
223:17
228:2

**bifurcate**
**d**
32:5

**big**
12:24
13:2
42:17
85:9
229:10

**bigger**
111:25

**biggest**
72:21,22

**binder**
111:25

**binders**
123:18

**binding**
113:16

**birds**
180:14

**birthday**
134:10,
11,22

**birthdays**
134:19

**bit**
13:25
17:3
22:22
39:22
47:9
51:12
52:6,13
72:11
75:12,17
76:1 82:7
95:16
97:2 98:4
99:19
100:2
112:12
114:12
118:2
124:14
164:21
187:6
188:8
214:22
224:4
225:24
239:2
245:3
246:14

**black**
134:10,
15,25
149:21,22

**black-**
**and-white**
140:6

**blacked**
134:10

**blah**
252:18

**blanche**
67:8

**blanket**
30:20

**blend**
187:6

**blended**
173:9

**blends**
43:5

**blinds**
210:13,19
211:14
215:6,21

**blood**
151:8

**blow**
197:15

**blown**
190:1

**Blue**
34:21
35:5,6,12
36:17
38:5 45:5
48:4

**blue-on-**
**blue**
22:10

**Blueteam**
105:7

**board**
14:11,12
17:9,25
18:1,17,

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 275 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

20 19:5,
6,14,22
20:7
23:11
46:9 49:6
78:1,4
79:25
85:23,24
86:16
99:20
101:6
102:3
110:6
119:18
126:12
174:5
179:7
225:1,3
247:10,
14,21,23
248:9,17,
19 249:9,
13,17
250:10
251:6
253:3,6

**boards**
18:2,3
23:16
102:16

**bodies**
58:10
165:2

**body**
9:10,12
38:24
39:17
42:16
55:4,13
90:13
98:18
162:15
190:7
193:22
194:14
218:20
246:22

**body-worn**
56:23,24
60:13
62:16
85:8 87:2
88:14,16,
23 89:13,
21 90:4
91:10
94:3
95:10
139:11
211:17
217:3

**bold**
161:8

**bolded**
161:7,10,
16,19,23
224:13

**Bolden**
58:19

**bolts**
205:15

**borderline**
158:20

**bored**
75:6

**both**
49:8
75:24
85:1
95:20
108:25
109:2
129:6
148:20
167:11
176:20
223:14
230:1,18
232:2
235:12

**bottom**
30:12

125:8
132:23
162:13
209:16
211:24
247:6
251:10

**Boulevard**
37:3
47:23
146:13
155:19
156:7
161:6
179:17
195:7

**bounce**
222:17

**bound**
208:10

**box**
79:20
186:4,7

**boxes**
176:24
185:9

**bracelet**
145:20,23

**branches**
119:9

**brand**
167:10
168:18

**brass**
189:22
211:25
212:4,16

**breach**
79:8
196:24,25
197:1,5,
6,9,11,19
198:3,4

**breached**

217:9

**breaches**
21:13

**break**
18:14,19
64:9
65:16,21
118:14,17
128:2,15
129:3
156:14,
18,22
211:13
214:21,23
215:1
236:19
254:24

**breaking**
91:11
129:7
153:2
215:15

**breath**
83:19,25
84:1

**Brice**
72:2

**brief**
62:12
64:9
81:6,14,
18,22
82:2
84:13,15
91:20,21
92:16
189:2
206:6

**briefing**
63:16
84:9
100:20
104:17,24
105:1
106:5
213:3

**briefings**
23:8

**briefly**
65:21
75:15
76:5 82:7
149:15
171:22
191:14
203:13
234:18
245:4

**briefs**
62:13
100:20
104:7

**bring**
27:16
61:11

**broke**
71:15

**broken**
129:11
210:13
215:19,21
216:8

**broken-
out**
216:9

**brought**
73:23
96:17
103:23
233:10

**buccal**
58:16

**building**
195:9
208:13
246:7

**bullet**
135:11

**bullets**
165:2,3

**bullhorn**
47:25

**bunch**
85:10
159:23

**Bureau**
206:13
243:19

**burned**
155:9
159:16
180:19,25
181:1

**burnt**
158:12
180:23

**buses**
83:22
84:4
131:2

**business**
183:25

**but**
7:7 9:20
14:25
17:3
18:10
19:23
21:17,19
22:22
25:2 26:6
27:20,24
30:10,12,
17 31:22,
25 34:13
35:4
37:13
38:3
39:15,23
42:16,20
44:4,22
45:18
46:13
48:10,24
49:16
50:23

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

51:7,8
52:12
53:1
54:8,14
55:20
56:6,20
60:8,16
62:19,23
64:23
65:8
66:7,10
67:25
68:11,18
69:16
70:19
71:17
72:5,15
73:2 75:9
77:14,22
78:11
82:24
83:8
86:2,8,20
89:2,18
90:6,10,
21 91:1,
2,5
92:15,25
93:15,16,
18,22
94:16
95:17
96:10,24
97:9,16
100:10,
16,19
101:12
102:1,8,
11,14,16
103:8
104:9
107:6
108:3,7,
23 109:14
110:24
111:6,9,
13,22,24
112:12
113:22
115:13,18

116:13
117:6,18
118:2,9
119:15,22
120:4
121:3
122:1,13
124:3,21
125:6,11,
15 126:2,
21
127:10,12
128:12
132:14
133:11,24
134:17,24
136:1,22
137:22
138:16,23
139:15
140:17,19
141:1
142:1,14
143:12
144:22
146:8,9
148:21
149:8
150:14,
17,21
151:8,9
154:1
155:2,21
157:14,21
158:5,9,
20 159:2,
9,22
160:11,16
161:23
163:19,22
164:6,17
165:9,14
166:13
167:24
168:1,9,
25 170:5,
16 171:21
172:10,21
173:1,6,
16 174:12

175:3
176:1
177:20
178:10,24
179:21
181:6
182:7,21
183:4
184:9,13,
23 185:5
186:7,10
188:8,17
189:2,11
190:25
191:3
192:13
193:19
194:8
196:4,7,
11 197:4,
11 198:23
201:7,18
203:13
205:25
206:20
207:11,14
208:17
211:22
212:22
213:2,7,
14
215:18,
23,25
216:3,9,
18 217:4,
11 218:1
219:10
220:6
221:17,
19,24
222:6,7,
11,13
223:9
224:1,8,
25 225:13
227:10
228:11,15
231:12
232:15,25
233:9,14

234:9,11,
13,18,21
236:18
237:21
239:2
240:7,13
242:1,21
244:10
248:15
250:25
251:15
252:22
253:21
254:8
256:3,9
257:5

**buy**
168:22

**by**
5:7 6:1,
18 11:24
13:23
28:21
29:5
37:24
46:19
47:22,24
54:24
62:10,17
64:13
65:19
69:15
82:1
83:18
86:5
87:2,9
98:2
102:10,12
104:4
107:5,15
110:5,18
111:1
117:1
118:20
119:5,8
122:23
128:5
129:9
130:6

131:2
132:18,
20,22,23,
24 133:1
135:14
136:7,10
138:13
142:24,25
143:23
147:18
156:21
163:3,14,
23,24
166:24
167:8,10
169:16
172:24
186:22
188:20,25
189:20
206:12
208:23
209:18,22
210:12
228:18
232:6,7
233:8
234:15
237:12,22
249:1
254:7,13
255:2
256:13
257:7,23
258:13,23

_____

C

_____

**C-I-R-T**
8:3
**CAD**
86:25
**caliber**
162:16,20
165:9
**California**

82:21
**call**
5:16
30:11
38:11
62:12
84:2
103:9
105:25
106:2
121:17
145:13,16
171:15
176:24
191:22,25
212:10,15
214:9,11,
12,15,17
227:14
232:1,8,
11,14
234:23
246:6,17

**call-
taker**
223:25
**call-
takers**
102:15
**called**
12:10
49:4
135:17
136:1
144:10
191:9
197:1
201:16
211:13
212:4,20
214:14
235:3
251:7

**calling**
85:3
212:13
233:9

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**callout**
59:20,22
60:1,10,
17,23
79:9
82:13,18,
22 83:9,
15,17,18
88:20
176:24
191:11,17
197:18

**callouts**
60:9
71:22

**came**
6:14
16:18
32:3 61:3
73:14
74:3,8
77:14
109:7
130:19
165:12

**camera**
56:23,24
60:13
62:16
85:8
88:15,16,
23 89:14
90:4,5
94:3
139:11
184:14,17
202:17
211:15
217:3
238:24

**cameras**
85:11
87:2,6
89:17,21,
22 91:11
95:10
144:11
154:14,21

158:21
183:25
185:25
211:17

**cannot**
13:21
14:23
29:17
68:19
234:9
242:17

**capacity**
8:2

**captain**
60:25
76:24
78:5
108:8
109:12
143:5
172:8,16
178:6,14,
20,24
179:1,8,9
187:2,10,
14 221:10
239:19
240:11
243:20
248:13,
15,16
249:15

**captain's/
lieutenant's**
81:14,18

**captain-
to-
captain**
188:4

**captains**
23:9
188:7

**capture**
144:11

**captured**
246:23

**car**
95:12
144:3
147:17
150:8,14

**care**
174:14

**career**
15:14
61:20
118:5

**careful**
125:21

**carefully**
125:14,21
126:3

**cares**
175:11

**Carlos**
143:6

**cars**
155:15

**carte**
67:8

**case**
4:10 5:4,
10 12:14
13:12,17,
18,20
14:21
17:7
18:6,13
20:5,8
27:1
28:10
33:22
40:7,15,
17 41:9
47:2,13
48:2
50:10
54:20,24
55:22

57:13,22
58:1
59:4,10,
13 60:8,
15,17,21
61:7,24,
25 62:24
64:3 65:5
67:19
68:3
71:9,17
72:1,19
73:5
74:12
76:15
78:7
79:11,18
81:8,17
82:23
85:1
86:21,24
87:9,10,
15,24
88:20
89:2,14
90:1 91:4
93:6,24,
25 94:8,
13 95:5
96:3,19
99:18
100:18
101:2,7,
8,9,12
104:2,11
106:8
107:4
108:9
109:4
111:6
114:3,18,
24 122:20
123:16,20
125:4,5,
16 137:8
138:2,24
143:22
149:25
150:1
161:2

170:7
173:23
175:1,2
181:24
182:24
183:6
185:17
189:7,22
191:8,18
194:4,13,
15 201:18
207:25
208:8,14,
17,18
209:23
212:9
219:18
223:3,20
224:18,19
225:8
233:1
245:6
248:11
249:18,24
254:14,17

**case-
specific**
47:7,18

**case-to-
case**
81:11

**caseload**
26:1

**cases**
7:3 11:22
13:14
46:25
49:23
51:16
54:12
63:9,10
74:3 86:6
87:24
97:7
102:7
105:10
125:11
135:25

208:21,22
230:12
242:20
254:3

**casino**
139:10

**catchall**
240:16

**categories**
18:23
19:1
126:20

**caught**
172:24

**cause**
98:21
167:7
181:13
193:25
206:7,9,
11

**caused**
216:24

**caveats**
187:13

**cell**
222:9,12

**Cellular**
161:12
162:3
163:7

**center**
85:9
146:13

**centered**
195:10

**certain**
44:25
58:15
78:19
88:15
106:17
110:15



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

114:2
115:9
121:22
123:17
134:14
135:25
177:14
186:22
221:10,15

**certainly**
218:22

**certainty**
242:18

**certification**
21:14
22:11

**certifications**
20:25
21:20

**CET**
38:11
40:3 79:9
191:1,3,
9,15
192:4,14
195:25
196:6
209:18
227:5,17
228:17
232:4
234:13
237:3,20
244:15,21
246:4

**cetera**
79:6,10

**CETS**
196:7,19
230:5
256:1

**chain**
27:15
143:5

225:13,14

**chain-of-command**
238:2

**chair**
253:10

**chance**
249:17

**change**
44:6 78:3
110:10,18
172:3
186:3
199:25
201:1,14
233:13
242:21

**changed**
48:22
77:1,19
171:24
172:1
186:7
188:15
198:20,25
199:1,2,
20 207:5,
12 222:2
226:20,25
230:22
231:13
233:12
234:13
239:10
246:3,4

**changes**
119:23
126:4,5,7
176:17
200:13,17
201:9,13
247:3

**changing**
110:3,17
111:4
246:2

**Chapter**
40:3

**charge**
76:23
84:10
197:15
198:5
207:15

**chase**
140:9
181:23

**check**
79:20
104:22
123:9

**checked**
190:1
251:13

**checkmarks**
19:19
246:7

**checks**
201:3

**chief**
62:19
76:22
78:5
201:1
248:4
249:16
253:7

**children**
204:4,12
227:13

**choosing**
101:22

**chose**
141:20
191:1,4

**Chris**
143:11

**chronological**
106:11,16

**chronology**
137:5

**circle**
147:12
175:1

**circled**
142:2
177:9

**circles**
141:15

**Circuit**
40:7,22

**circulated**
119:3,4

**circumstances**
45:11
47:14,21
50:17
61:21
90:17
133:23
192:7
204:3
220:21
241:11
244:25
246:6

**CIRT**
8:3 10:17
13:15
14:22,25
16:2,12
19:11
22:16,23
24:10,14
25:11
26:17,21
27:9,16
29:10,22,

23 30:3,
4,19,23
31:15,16,
17 32:9,
16 33:5
38:3
42:25
45:4 49:6
58:7
60:9,15
64:17
71:10
74:1,6,24
75:14
79:12
80:14
83:15,16
86:5
87:12
92:15
93:5
94:21
96:17
101:24
102:1
110:17,18
112:3,14
114:16
115:20
116:9
117:16,19
118:10
119:8
121:8
124:7,23
127:10,13
132:19,
20,22
133:23
138:17
142:19
152:15
156:4,24
157:12,14
161:1
168:3
169:8,12
171:1
174:7,24
175:22

183:23
194:20
204:10
205:3,4
206:15
209:11
210:17
211:6
216:12
224:17
228:20
242:22
243:12
247:3
248:19
251:6,21
257:24
258:3,15

**CIS**
155:12
158:5
159:8

**citation**
116:3,5,6
123:4
144:5

**citations**
122:19,21

**cite**
117:9
122:15,16
123:2
128:12
233:21

**cited**
211:5
230:12

**cites**
123:10
192:8

**citing**
151:24
161:4,5
198:19
207:24,25
233:18



Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

citizen
85:22

citizen's
256:17

citizens
85:22
86:18,19

civil
14:2,7
68:18
255:7,11,
17

civilian
18:20
102:14
133:14,
15,19,24
247:23

civilians
14:13
18:10
20:8
25:20
107:19,20
117:3
119:6,16,
17,18
247:18
248:6

CJ
177:4

clarifica
tion
132:4

clarifica
tions
200:18

clarified
206:10,
14,15

clarify
112:13
138:11

clarifying
113:21
124:13
253:17

clarity
140:14
164:21
191:7
200:14

Clark
184:10

Clarkson
238:22

classes
117:18,20
256:23

clean
67:13

cleanest
94:2

clear
41:5
121:4
134:21
196:16
198:15,16
211:21

cleared
82:1,3,4
90:11
210:14
241:5

clearer
52:14
141:6

clearing
95:19
198:10

clearly
116:24
141:22

Clements
72:3

131:11,16

Clements'
136:4

client
134:14

clip
62:15

close
86:2

closed
13:14,18,
20 14:16,
25 138:22
139:2
250:15,17

closing
68:21

clothing
142:8
161:14
162:4
163:7
167:9,10

co-chair
253:11

cobbled
220:3

cocaine
208:15

coherent
85:4

coin
176:20

cold-
cased
139:3

Cole
172:8,16
178:14
179:1,9
187:2
239:19
243:20

248:15

Cole's
178:6
240:11

collabora
tive
36:2

collapsed
139:11

collective
121:9

collectiv
ely
27:14

collects
84:7

color
140:17,18
141:11
148:6
169:14
170:12

color-
schemed
168:20

colors
168:23

column
27:11
28:22,24
105:6

come
16:13,17
25:22
28:9
29:16
37:15
46:22
51:24
52:15
71:11
76:13
82:21

85:24
99:6
120:5
134:24
151:19
170:22
190:13
198:6
210:3
236:21
237:12
250:12,23
252:8

come-up
117:12,13

comes
19:4
22:12
27:14
35:9
51:21
52:17
54:16
76:10
84:3,6
85:23
93:3
102:7,9
105:20
116:2
140:14
158:21
191:21
211:24
212:8
224:18
248:8
254:13

comfortab
le
212:12

coming
20:15
63:23
67:4 74:4
149:4
153:22
154:3

204:19
214:1

command
16:8
27:15
58:19
109:11
137:20
143:5
225:14
240:22

commander
73:10,23
76:24
172:20
178:15
179:10
188:11
238:11
245:14

commander
s
240:17

comments
105:3

committee
172:4
231:10

committin
g
197:25

common
165:1

commonpla
ce
180:22

communica
tion
197:20
198:1,8
223:6,12,
15,17

communica
tions



Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 280 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

20:20
57:8
117:14

**community**
75:25
145:6

**comparables**
208:20

**compelled**
29:18
63:15
65:7
68:13

**compile**
80:21
84:12
108:18

**compiled**
12:4
144:17
210:4

**compiles**
6:7

**compiling**
122:11

**complete**
9:7 23:11
32:15
56:1
120:2

**completed**
12:9 18:5
55:20
79:10
81:24
84:15
143:23
204:25
207:17,18
253:3
254:14

**completely**
29:13

98:1
125:6
184:5
236:19

**completing**
160:24
171:1

**complex**
70:7
150:4,11
158:16
195:6

**complexity**
108:15

**compliance**
203:20
226:10,13

**complied**
33:7,15

**complies**
186:16

**comply**
114:4
233:20

**compromising**
190:2

**computer**
37:9
140:18
231:21

**computer-aided**
86:25

**computers**
85:10

**concealment**
235:8,15
236:3,23,

25 237:1,
5

**concern**
93:15,24
94:1
170:15
171:4

**concerned**
14:22
164:7
180:9

**concerns**
106:1
143:1,7

**conclude**
78:19

**concluded**
50:1
51:13
52:18
104:1
200:13
229:19,23
259:22

**concludes**
86:20
259:14

**conclusion**
20:2
38:23,25
39:1,14
40:24
42:24
46:22
48:7
50:20
55:6
74:3,5,8
78:18,23
79:2,14,
23 80:6
120:18
121:13
165:15,22
205:3,4

210:3
218:11,
17,18,19,
20 222:22
224:25
226:1,5,6
228:9
229:16,18
230:6,10
232:9,16,
21 235:25
236:7,13
240:14
241:24

**conclusions**
8:21 9:9
19:6,10
20:4,6
34:14,15,
18 43:11,
20,23
78:13,22
80:9
120:21
121:12
126:20
169:21
209:25
218:8,21
219:2,9,
15 222:17
228:24
235:14
247:10
248:12,
15,19
250:2
251:3,6
252:13,
14,15
257:19

**conditions**
112:23
257:25
258:3,15

**conduct**
23:8 62:3
100:12
211:19
227:17
255:6

**conducted**
98:2
156:7
255:15

**conducting**
85:12
98:16
155:13
209:18
235:21
256:1

**cone**
88:13

**conference**
62:24
65:25

**conferences**
64:20

**confirm**
42:12
54:14
68:11
128:14
133:12
170:16
207:14
217:24
222:4,7

**confirmed**
192:1
204:11

**conflict**
101:25
214:4

**conflicts**
111:9

**conform**
126:16

**confused**
227:12
229:3
236:22

**confusing**
31:20
236:5

**confusion**
151:9
200:3,4,9

**congruent**
219:11

**Connor**
24:4
69:14
73:2
91:23
113:14,16

**conscience**
71:15

**consider**
126:4,6
204:2,24
236:7

**consideration**
126:9

**considered**
98:13
119:6
120:23
164:11
199:12

**consistency**
235:16
236:16

**consistent**
54:19



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

236:12

**consisting**
259:15

**constitute**
229:20

**constituted**
46:4

**Constitution**
31:8
113:7,8
255:23

**constitutional**
30:22
31:14
32:13
33:7,15
113:11
213:17,25
231:2
255:7,11,
17,21
256:10
257:10
258:9,20
259:1

**constitutionality**
35:18,19

**constructed**
73:22
164:17

**consulted**
38:3 45:4
229:23
230:1

**consulting**
230:13

**contact**
187:17,18
224:22
235:14,18
236:6,8,
20 237:4

**contacts**
236:20

**contained**
227:5

**content**
102:19
107:9
108:2
118:23
122:7
123:23
144:8
161:5,17
163:13
173:5
212:1,2

**contentious**
174:21
175:10

**context**
17:23
162:22
186:15,18

**continue**
159:18

**continued**
70:7

**continuity**
80:9

**contradict**
134:2

**contradiction**
192:17
214:6

**contradicts**
209:20

**control**
38:10
75:9
227:21
254:12

**controlled**
191:10
199:10

**controlling**
233:1

**controversial**
147:20
212:8
214:10

**controversy**
99:19
147:25
180:2
212:3,6
232:10

**conversation**
98:5
181:16

**conversations**
187:9
242:19

**convey**
116:25

**cops**
158:11

**copy**
39:9
121:25
122:2
161:17

**cordial**
70:20

**corner**
195:9

**correct**
5:20 9:1
12:23
14:4
15:4,11,
12 17:22
19:12,15,
22 23:25
24:10,20
25:7
28:25
29:25
31:16,17
32:18
33:2,3
35:13
38:8
40:6,18
42:11
44:15
45:14
46:1
48:8,9,16
49:18,19
54:21
55:11
60:18
64:18
66:1,24
68:14,24,
25 73:7,
13 76:9
78:13
80:8
82:13,14,
17 83:11
94:18
100:5
101:13
102:25
103:15
104:6,19
108:11,12
110:12,19
111:10

112:16,23
113:2,3,5
114:6,16,
17 119:3,
9,23
121:6,10,
11,22
122:3,4,
9,10,17,
18,24
123:5,6
124:5
125:17,22
126:5
127:8,24
129:7,11
130:16,
17,22
131:11,
12,23,25
132:11,14
133:3
134:4
135:13
136:8,19,
25 137:1
138:2,20
139:8
141:8,9
143:15,16
144:22
146:3
147:6,7
149:5,6,
13,14,17
150:23
152:2,4,
5,12,18,
23,24
153:13,14
155:4,5,
20
156:11,12
157:17
158:14
159:11,23
160:2,12,
15 161:2,
3 162:21,
24

165:12,
15,17
167:13,
17,18,22
168:4,7,
11,13,14
169:4,19
171:14
173:14,
18,19
177:11
179:18,
22,23
182:15
183:19
185:2,3
186:8,9,
13,14,16,
23,24
187:3,8,
22 189:2
190:18,19
191:12,13
192:11,
12,15,16
193:4,5,
10,16,17,
21 194:9,
10,23,24
195:15
196:1,6,7
198:25
199:3,21,
25 200:7,
23 201:21
202:14,15
203:4,7,
11,14,21,
22
204:15,
16,19,20
205:3
206:16,17
207:17,21
208:1,15,
23 209:12
210:1,2,
6,7,19,
20,23
211:3,4,

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 282 of 353

Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

8,9 212:5
213:22
214:4,24
215:2,6,
9,19,24
216:4,10
217:6,13
218:4,5
219:4,25
220:4,9,
10,13
221:6,9,
18,19,24
222:2,9,
15 223:14
224:7,10,
11,15,16
225:20,22
226:2,3,
16,22,23
227:1
229:13
230:14,
15,23,24
231:3,13
232:20
233:1,2
234:21
235:5,9
237:10,14
238:6,7,
15,16,19,
20,25
239:4,5,
8,9,11,
12,21,22
240:1,2,
9,10,21,
25 241:1,
4,5,12,
13,16,17,
22,23
242:6,7,
13 243:6,
16,17
244:6,7,
11,12,17
245:7,8,
10
246:18,19

247:7,15,
16 249:11
251:1,18
258:9,20
259:2

**corrected**
54:24

**corrections**
25:16,17
75:23
107:10

**correctly**
66:22
77:1
108:24
117:9
120:8,17
121:16

**correlated**
145:24

**Corrine**
4:16 5:8

**Corvell**
145:21
149:20
177:4
194:5

**Corvell's**
146:2

**couch**
87:19

**counsel**
4:13
11:14,15
259:9

**counseled**
224:14,21

**count**
51:16,19,
20,23
54:19
90:9

244:25

**countdown**
85:16

**counted**
209:8,11

**counter-surveillance**
155:16
181:3
185:25
189:6

**counter-surveilling**
189:9

**countermeasures**
189:6

**counting**
49:24
51:2,25
52:9,16
53:6,7,15
54:15

**countless**
21:6

**County**
184:10

**couple**
26:14
53:8
56:19
57:10
71:15
87:6
104:2,4,
5,6
128:12
145:7
172:18
219:21
221:2
254:20

**course**
21:13
25:22
61:4
90:10
201:11
245:1

**court**
4:6,14
6:5 7:1,
3,13 8:2
9:18 24:7
40:7,15,
17,22
46:25
47:2,12
49:23
113:13
114:4
183:24
209:2,22
259:18

**courts**
234:16

**cover**
191:24
235:7,14,
18 236:3,
6,9,21,
23,25
237:1,4,5

**coverage**
188:6

**covered**
27:17
133:1
184:23

**covering**
188:9,10,
12

**covert**
154:13,15

**COVID**
73:7,8
187:17
220:8,24

221:6,9,
11,23,25
222:6,14

**COVID-19**
187:14

**CPR**
139:14

**Craig**
4:18
10:22,24
11:2,7
17:17
37:22
134:13

**Craig's**
11:8
135:1

**crazy**
108:1,6

**create**
12:4
79:12

**created**
26:9
88:20
122:9
168:12
247:13

**creating**
168:15
176:23
218:10
247:12

**crime**
87:21
135:14
136:8

**crimes**
15:20
58:11

**criminal**
13:6,21,
23 14:3,5
29:14

30:25
32:5,18,
21,22
68:19
72:8
112:16
120:12
133:25
154:25
155:12
158:5
181:12
218:1

**criminally**
29:17

**crisis**
196:20

**criteria**
18:23
60:15

**critical**
13:7 22:1
23:2,5
25:5 29:3
31:3,6
32:6
77:22
135:22

**cross-examination**
152:20

**culmination**
137:22

**Cumberlands**
20:22

**curiosity**
134:8

**current**
20:25
25:13
49:10



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

75:20,21
144:4
170:24
173:10
228:20

**currently**
22:3 24:9
61:10
79:3

**custody**
95:14

**cut**
10:6 40:8
146:7

———————
D
———————

**DA**
163:8
164:14,19
166:25
170:14
224:5

**DA's**
61:1

**Dan**
102:7

**danger**
97:22

**dangerous**
227:7

**dangling**
90:12

**Darcy**
143:11

**dark**
211:15
242:25

**data**
88:3,11

**database**
144:17

**date**
81:7,13

**daunting**
26:3

**David**
102:6

**day**
6:13 18:4
22:19
24:17
61:20
92:2
125:3
130:20
132:3
146:6,9
157:3
163:12
165:14
170:11
180:15
181:9
182:25
183:8
188:19
211:16
248:14
256:8

**daylight**
212:18

**days**
57:11
58:19
67:5 95:5
147:3
150:4
220:12
221:22
226:13
244:3,5

**de**
58:21

**dead**
146:7
205:15

**deadline**
80:24

**deadlines**
81:1,4

**deadly**
23:3 31:5
37:1
61:22
63:17
65:11
68:23
72:22
73:3 93:8
113:16
114:8
217:22
224:18,20
248:7

**deal**
28:11
72:10
105:11
113:10
116:8
224:23
255:22

**dealing**
61:19
63:25
78:25
177:13
190:25
227:4

**deals**
223:19
235:10
236:25

**dealt**
208:14
221:2
224:19

**death**
71:23

**deaths**
23:4

**debate**
53:5

**decide**
185:1

**decided**
61:9

**decision**
34:7
46:10
52:19
58:1
63:17
72:22
73:3
106:1
143:9,12
159:25
188:14
195:25

**decision-
making**
18:25
176:5

**decisions**
113:13

**deem**
133:8

**deemed**
23:4 47:4
65:8

**deep**
96:8
208:20

**defeating**
205:15

**defendant
s**
4:19

**defended**
187:2

**defense**
110:21

**defensive**

175:14

**deficienc
ies**
75:22
109:24
120:4
241:19
256:6

**definitel
y**
116:23
181:20

**definitio
n**
233:10

**definitiv
ely**
148:21,
22,23
234:9

**degraded**
165:2

**degree**
20:19
117:14

**delete**
12:11

**deliberat
ion**
18:22

**deliberat
ions**
250:2
252:1
253:2

**delineate
d**
69:12

**denied**
172:15

**departmen
t**
4:12 5:4

7:6
11:13,15,
20 14:13,
21 15:11,
15 17:2,
12,15
18:21
21:7
22:2,6
23:5 28:4
34:2,11
35:8
43:16,17
52:25
53:8
62:16
63:14
64:13
75:2,23,
25 77:24
78:20
80:15,17
96:12
105:5
110:3,4,
11,20
111:2,14
115:24
116:1,12,
14 117:2,
8,14
120:22
124:25
135:20
144:19
154:11,25
159:16
163:3
171:3
172:22
174:16
201:14
228:21
230:2,8
241:17
247:24
248:6
251:4
256:7
257:20

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **department's**<br>50:18 | **deputy**<br>62:19<br>76:22<br>78:5<br>201:1<br>248:4<br>249:15<br>253:6 | **detailed**<br>23:12<br>52:10<br>116:8<br>174:4<br>185:15<br>255:15 | 30:7<br>58:18,21<br>60:24<br>89:18<br>97:21<br>102:17<br>145:4 | 179:16<br>198:15<br>230:6 | **differences**<br>171:10 |
| **department-wide**<br>119:19 | | | | **determines**<br>16:25 | **different**<br>7:9 14:18<br>18:2<br>25:10 |
| **departments**<br>14:17<br>96:23 | **derived**<br>123:16 | **details**<br>16:11<br>62:24<br>86:3<br>94:7,8 | 154:17<br>163:2<br>164:2<br>165:20<br>169:16<br>170:25 | **developing**<br>34:17<br>125:13 | 41:20<br>42:9<br>46:21<br>51:12,15<br>52:7,13 |
| **depending**<br>16:9 | **describe**<br>22:22<br>165:10 | | 172:1<br>182:1<br>206:13<br>242:22 | **device**<br>205:14 | 54:12<br>56:18<br>59:21 |
| **depict**<br>195:12 | **described**<br>75:15<br>149:21<br>167:16<br>169:11 | **detective**<br>4:9,21<br>15:22,24,<br>25 24:15,<br>16 25:2,<br>4,17 27:3<br>30:8,14 | **determination**<br>33:13<br>47:6 96:1<br>170:12<br>172:11<br>188:12 | **devices**<br>55:14<br>154:13<br>201:20<br>203:19 | 67:19<br>70:15<br>74:21<br>101:8<br>104:18<br>112:1,25 |
| **depicting**<br>177:21 | | | | | 113:9 |
| **deploy**<br>189:19 | **describes**<br>167:15 | 58:22<br>60:11<br>61:10 | | **Devonte**<br>149:6,10 | 118:7<br>121:9<br>124:14 |
| **deploying**<br>204:1 | **describing**<br>164:10 | 74:6<br>83:16<br>84:11 | **determine**<br>32:12<br>33:5 | **diagram**<br>136:9<br>203:8 | 125:11<br>129:24<br>142:14,15 |
| **deposed**<br>110:14 | **description**<br>21:25 | 86:7<br>100:22<br>107:11,16 | 73:24<br>75:20<br>83:25 | **dialed**<br>107:21 | 148:6<br>149:25<br>150:20,22 |
| **deposition**<br>5:1,23,24<br>6:7,23<br>8:2,19<br>10:18,21<br>11:2<br>12:18 | **descriptions**<br>161:25 | 109:15,16<br>118:10,12<br>124:7<br>152:7,11,<br>16,21<br>167:15,21<br>169:7 | 84:16<br>89:11<br>112:19<br>117:5<br>119:23<br>152:25<br>160:3 | **dialogue**<br>45:11<br>80:4<br>218:7<br>219:5,8 | 168:10,23<br>177:25<br>178:16<br>182:10<br>185:9<br>186:5 |
| | **designed**<br>202:2,3,7<br>203:19<br>205:19 | | | **dicey**<br>184:1 | |
| 34:14<br>38:12<br>41:21 | **despite**<br>213:11<br>224:8 | 171:7<br>175:11<br>179:21 | 165:21 | **dictate**<br>185:4 | 188:7<br>191:7<br>195:14 |
| 46:16<br>58:4<br>209:7 | | 180:7<br>181:7<br>206:6,10 | **determined**<br>52:16<br>56:8 | **dictates**<br>185:1 | 207:2<br>213:18<br>216:8 |
| 219:1,3<br>259:15 | **destroying**<br>208:15 | 224:14<br>251:21<br>259:15 | 90:11,18<br>95:24<br>143:13 | **difference**<br>14:1<br>23:14 | 217:25<br>221:2<br>246:24 |
| **depositions**<br>110:23 | **detail**<br>75:17<br>94:5<br>111:22 | **detectives**<br>25:16<br>26:18 | 150:16<br>157:21<br>163:22 | 111:16,19<br>191:15<br>194:3<br>213:5,6,<br>14 256:2 | 252:3 |
| **depth**<br>13:25<br>76:2 | | | | | |



Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 285 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**differently**
100:2
110:12,16
174:20
175:17

**difficult**
17:9
158:17,19
183:20
184:20

**difficulty**
39:22

**dig**
112:20
208:20

**diminishes**
95:16

**DIO**
61:1

**direct**
26:7
35:22
40:16
66:19
192:17
214:6

**directly**
26:16
192:10
202:25
207:25

**disapproval**
19:1

**discipline**
242:24

**discrepancies**
219:24
225:10

239:23,24

**discrepancy**
228:1

**discretion**
205:6
237:23,25

**discs**
259:16

**discuss**
6:20
84:19

**discussed**
109:21
168:9
179:19
195:13
222:6
227:11
228:2,9
258:7

**discusses**
217:21

**discussing**
89:19
98:9
164:18
179:14
190:11

**discussion**
53:5,10
98:11
137:14
142:19
152:20
180:17
206:19
208:6
219:19
240:11

**discussions**
34:23
171:9
210:5
231:4,9
251:15

**dismiss**
178:1

**disorient**
202:8
203:20
213:22

**dispatch**
87:1
88:24
223:17

**dispatcher**
223:25
224:2

**dispatchers**
102:15

**dissolved**
15:21

**distinction**
94:25
112:14
138:14
194:11

**distract**
203:20
213:22

**distracts**
216:24

**distributed**
243:16,17

**district**
163:15,24

**diversionary**
201:20
203:19

**divide**
109:1

**division**
75:18

**dock**
87:6

**doctors**
82:1

**document**
6:4
37:10,17
97:5
116:2,3
119:7,21
121:20
134:12
135:20
172:10
173:21
187:12
188:21,23
222:20
249:5
251:25
253:15

**documentation**
187:19

**documents**
6:9,10
10:17
11:4
17:17,19
87:13
92:22
187:11
214:11

**dog**
198:12

**doing**
21:16

27:7
45:10
52:11
71:7,24
77:25
85:15
91:19
95:4 97:4
115:8
120:1
142:18
154:22
178:25
197:5
240:22
244:4
245:17,19
254:15

**DOJ**
32:3

**dominate**
41:2

**done**
10:13
14:5 18:4
22:10
27:6 55:4
58:6
62:17
63:19
66:5,23
77:5
80:8,19
81:23
84:2 85:7
86:5,22
91:22
92:5
93:21
104:8
106:14
107:7
109:20
110:11,16
118:6
120:7,9,
14,16
121:16

122:11
135:14
136:1,7,
10,21
150:15
157:16
159:6
166:18
170:4,8,
10 171:3
201:10,
13,15,17
215:19,20
218:9
220:12
231:5
244:21
246:17
249:22,23
251:19
252:24

**door**
54:7,9
128:3,16
129:3,7,
10
158:16,18
182:5
184:19
189:7,23
197:15,16
198:4,6
205:16
210:16
212:17,19
213:23
214:1,13
217:9
221:13
228:4,25
232:6,7
234:19
258:5,8,
17,19,25

**double-checked**
107:15



Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**double-edged**
174:9

**doubt**
52:11

**down**
9:19,21,
23 19:24
29:6
34:3,4
71:15
85:5 89:8
91:11
105:20
133:2
136:16
153:3,16
162:12
167:11
182:16,
17,22
183:15
192:2
198:9
208:2
209:14
211:24
215:22
226:17
236:19
247:6
251:9

**download**
87:3

**dozens**
7:25 58:9

**Dr**
152:16
167:8

**draft**
76:12
115:4,13

**drafted**
74:8
115:22
122:3

**drafting**
96:25
125:19

**drafts**
115:1,3,
8,12

**dressed**
190:8

**drive**
12:7,15,
22,25
13:4,8,9
86:23
89:1
121:22
123:17
135:17,18

**drone**
198:11

**drones**
198:13

**drop**
88:13

**drove**
108:1,6

**due**
161:10
204:24

**duly**
4:22

**duplicated**
173:1

**Durante**
146:13
147:4
157:3,16,
23 181:10

**during**
11:4
58:18
61:4

257:19

88:14
90:10
99:19
101:6
102:16
135:5
152:14
180:8
207:2
220:8
231:9

**duties**
33:17
61:4
237:19
255:4

**duty**
255:5,12

**dwelling**
97:23

**dynamic**
41:4 83:3

———————
        **E**
———————

**each**
56:17,21
84:20
91:22
188:9
219:12

**earlier**
15:10
42:16
58:3
72:12
76:2
121:4
152:3
160:25
192:13
224:5
246:15

**early**
93:23

**Earth**
139:21
182:13,14
183:3
195:2,4

**easier**
21:9
76:19
129:25

**easily**
122:22

**easy**
61:24

**education**
20:18

**effected**
169:24

**efficient**
77:24

**effort**
27:9 36:2
125:10,13
127:5
166:16
230:17
241:7

**efforts**
213:12

**eight**
15:17
69:17
94:20

**either**
8:1 16:10
28:13
32:9 42:8
58:6
68:22
73:23
84:24
99:5
108:22
110:21
132:1
154:15

157:9
160:12
168:7
170:4
183:24
186:25
197:14,20
198:10
220:16
224:22

**elapsed**
210:11

**elderly**
204:4,13

**electronic**
98:23
145:24
154:13
187:20
201:11
221:14

**electronically**
201:4

**element**
232:4

**else**
11:8 61:1
72:24
95:14
96:8
100:14
123:14
133:14
134:1
220:15
244:19
250:13

**email**
79:18
105:25
200:11
243:20

**emergency**
89:8

**emotional**
72:4

**employees**
132:13,
19,21
133:13

**enable**
186:21

**encapsulate**
218:19

**end**
6:7,12
9:20
14:10
16:12
50:21
57:11
78:21
120:9
137:11
151:17
153:19
163:12
165:14
167:7
170:11,22
178:6
180:10
188:19
197:24
218:10
252:5

**end-all**
160:8

**ended**
85:3 90:6
189:7

**ends**
51:20

**enough**
79:19
92:1
100:19
116:15
159:17

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

160:6
171:11
183:3

**ensure**
27:17
123:1
192:5
200:14

**entailed**
208:12

**entails**
12:10
22:24

**enter**
189:17

**entering**
47:5,16,
23 208:7,
12 232:7
237:3
245:21

**entire**
44:14
89:15,20
107:5
137:22
155:19
189:23

**entirely**
35:25
37:13

**entirety**
18:6
22:14
43:4 56:6
88:10
183:2
218:20
251:18

**entities**
61:2

**entity**
200:16

**entrance**

191:8

**entries**
135:11
196:20
245:19

**entry**
38:10
50:7
55:4,10,
13,14
57:4
124:12
129:11
191:10
196:13,15
199:10
208:12,19
215:8,12,
13,15,16,
17 227:21
229:22
233:20

**equipment**
154:18
155:1,2
241:14

**error**
44:22

**errors**
115:23
116:4
213:11

**escaped**
197:22

**Eshe**
241:8

**especiall
y**
17:11
43:5
55:21
69:24
71:16
95:9,22
100:18
108:19

158:6
180:23
184:4

**essence**
18:13
22:9

**essential**
100:12

**essential
ly**
12:8,12
14:10
15:24
16:7
18:4,7,11
19:23
20:6
23:1,21
28:1
39:11
65:2 73:2
84:19
87:10,11
88:2
112:5
154:11
168:6
173:8
182:8
196:13
197:17
201:25
202:6
205:16
206:22,24
212:7
220:12
223:6
225:17
227:9,10
236:10
238:23
243:3
245:15
247:22

**establish
ed**
163:3

235:19

**et**
79:6,10

**et al**
4:11,12
5:3,4

**evacuatio
ns**
191:19

**even**
12:6
45:9,20,
21 49:13
63:22
64:18
72:5 73:8
77:1
79:10
97:16
105:14
111:7,8,
25 116:8
118:7
126:4
134:13
138:21
158:10
178:12,16
184:17
187:11
208:12
216:7
223:4
226:12
243:9
251:23

**event**
84:17
135:23
144:6
150:4,5

**events**
75:19
145:25

**eventuall
y**

145:15
151:10

**ever**
6:23 7:1
8:1 15:6
34:9
73:11
77:18
94:13
97:17
99:4
115:14
138:22
174:6
182:16
220:19
249:5
254:2

**every**
10:6 20:2
22:19
24:17
56:7,14
57:7
61:18
68:8
69:10
73:20
78:18
80:6 88:2
93:25
104:8
112:1
115:25
124:25
175:18
176:12
178:8
212:11
218:19
234:24
236:14
249:13
251:3

**everybody**
19:4 36:3
57:4 61:1
95:8

104:10,14
105:5
112:3
116:13
135:22
241:17
249:16
250:10,13

**everyday**
100:12

**everyone**
104:7
173:17

**everyone'
s**
114:19

**everythin
g**
8:18 9:19
12:14
18:16
22:9 46:8
68:15
72:24
84:12
85:21
89:25
109:9
116:1
124:24
138:24
168:19
176:13
236:1
237:21
241:18

**evidence**
90:8
123:20
157:22
169:14,25
170:25
193:1,6,9
242:12

**evidence.
com**

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 288 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

87:4

**exact**
35:4
77:16
88:12
92:3
140:13
218:4
219:12

**exactly**
18:16
22:23
44:6 50:9
51:6,8
80:10
103:13
137:21
141:24
143:21
155:21
181:20
191:16
236:15

**EXAMINATION**
5:6

**examined**
4:23

**example**
21:8
22:25
23:6,12
60:7
78:24
79:1 81:6
90:1
137:17

**examples**
50:6

**excellent**
218:9

**except**
168:19
250:10

**exception**

70:18,22

**excerpts**
152:16

**excluding**
122:20

**exclusively**
25:24
26:24

**exculpatory**
169:14,25
170:25
242:12

**excuse**
28:16

**execute**
97:17

**executed**
124:3

**executing**
33:16
73:12
97:13
98:12
207:16

**execution**
98:15
124:6
220:22
229:19
231:3

**executive**
17:8 23:9
25:19
57:25
62:13
63:7,16
104:3
105:12
107:18,20
142:25
143:10

**executives**
30:13

**exhibit**
5:24 6:6,
17 28:20
29:2
46:16,18
127:22
128:4
130:5
248:24,25
253:24,25

**exigency**
186:4,7
208:6,10,
14

**existing**
13:15

**exit**
250:3

**exiting**
157:4

**exits**
191:18
250:10

**expand**
75:12

**expanded**
69:17
246:17

**expect**
126:25
127:6,12

**expectation**
125:24

**expected**
20:9
62:11
237:5

**experience**
20:9

57:24
58:12,14
61:9 62:5
70:12
74:1
94:23,24
95:1
96:20,24
97:1,11
117:13
170:7
179:4,11
257:9

**expert**
27:22
35:4,18,
24 45:24
55:5
58:4,8
100:6
248:3
255:22

**experts**
23:9 29:7
99:12,13
102:22
210:6
230:14
249:15

**explain**
27:25
31:25
75:17
97:2 98:3
166:15
184:14
206:20
223:5
226:4
227:3
229:16
245:24

**explained**
143:1

**explaining**
99:8

**explanation**
168:21
182:9
196:3
252:19
259:4

**explanations**
200:15

**explosive**
21:13
79:8

**explosives**
202:2

**exposed**
148:18

**extension**
112:5

**extensive**
57:22

**extent**
221:10

**extenuating**
244:25
246:5

**exterior**
203:1
232:1

**extremely**
75:6
158:17
174:7

**eye**
172:24
182:2

**eyes**
158:18
183:5,11
184:4

_____

**F**

**facing**
184:18

**fact**
33:24
62:1
71:13
84:6
104:14
110:18
116:15
136:21
166:24
167:16
176:8,16
187:2,14
188:23
190:5
201:12
202:1
204:17,24
212:15
215:23
232:10
245:11,16
257:21

**fact-check**
185:20

**fact-finding**
34:11
46:8

**facto**
58:21

**factor**
94:3

**facts**
63:7
103:24
204:8,22
210:4
217:19
219:21,23



Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 289 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

230:10

**factual**
52:5,6
146:19
177:13,14

**failure**
18:25
50:22
78:21
211:10
230:7,21
232:9

**fair**
7:21 9:13
53:12
59:1
78:10
93:23
94:25
103:3,4
104:20
106:22
137:3
167:1
168:2
171:11
180:6
194:22
220:23
226:12
231:23
239:16

**fairgrounds**
88:11

**fairly**
124:8,18
194:23

**fairness**
25:1 46:7

**fall**
19:2
114:2
177:18

**falls**
18:22

31:4

**familiar**
56:12
124:2,9,
11,18,20
125:2,4,6
127:1,7
171:21
208:16,17

**familiarity**
251:24

**family**
82:25

**far**
14:21
15:7
19:24
31:5
32:16
34:19
35:9
44:1,3
81:11
87:18
94:20
98:24
100:10,15
105:16
106:15
107:22
109:19
110:2
111:3
117:21
133:21,25
137:10
143:22
148:4,10
158:2
159:21
160:16
163:13,16
164:6
166:6
174:20
183:20
185:9

188:9
214:10
219:24
223:7
224:20
236:7
239:14
256:9
257:3

**farther**
17:3

**farthest**
142:2

**fast**
223:1

**fatal**
88:5

**feedback**
105:23,24

**feel**
24:19
54:7
80:16
164:5
166:2
174:14
190:24
243:12

**felony**
192:23

**felt**
152:22
155:15
168:7
212:12

**female**
147:25
148:2,16,
23 167:16

**few**
7:7,8,9,
10 9:11,
14 46:12
119:8
123:22

142:17
199:4
205:10
216:14,
15,24

**field**
15:19

**fighting**
150:10
169:8
171:6,8
175:9

**figure**
80:2

**figures**
96:4

**file**
76:14
86:23,24
87:10,15
88:21
89:1
101:2
254:17

**files**
13:12

**fill**
86:19
162:5,23
180:22

**filling**
160:24

**final**
12:4,21
105:21
114:16,24
115:5
122:8
220:4
243:2

**finalized**
115:5
172:21

**finally**

23:10

**find**
28:12
39:21
78:24
94:6,7
98:22
99:11
150:13
161:21
170:19

**finder**
33:25

**finding**
93:13
214:6

**findings**
19:4
40:15
253:21

**Findley**
89:4 96:5
220:17
238:6

**fine**
5:18
32:25
228:25
239:17
241:11

**finish**
9:3,4,21
104:23
107:2
250:8

**finished**
10:4,12
52:22

**fire**
72:20
86:10

**firearm**
72:20
177:15
241:4,5,8

**firearms**
28:9
161:9
162:2,19,
20,23
163:7
164:10,24
165:1,5
185:24
241:14

**fired**
53:19,21
90:7
150:12
205:17

**firm**
11:16,17
35:7,11

**first**
4:22 6:4
28:17
29:3,7
37:15
41:16,25
47:8
51:21,22
52:17
53:8,20
54:15
55:10
63:19
69:16
70:25
83:20
87:24
89:22,24
91:15,18
93:4
106:17
199:16
210:12
216:24
219:22
224:18
244:5
247:4,21



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**first-arriving**
139:12

**Fisher**
145:21
149:21
156:8
185:18
193:25
194:5

**fit**
13:4,5
14:22,24
15:3
29:11,13,
22 30:23
31:17
32:19,23
33:2 61:1
62:12,13
63:1,4,11
64:16,23
65:7,22
81:7
85:12,15
87:5,11,
12,20
113:14
119:11,12
132:23,
24,25
133:2,6,
9,16,17
136:10,
11,12,15,
20,23,24
189:4
195:22
236:14,16

**FIT's**
14:23

**five**
7:11
49:13
55:23
58:12
63:20,25
69:17

81:9
86:10
93:10
108:15
184:22

**five-shooter**
55:22

**fix**
81:16
188:18

**fixed**
81:20
94:9
144:14

**flash**
237:24

**flashes**
202:4

**flashlight**
217:12

**flip**
165:25

**flipped**
252:2

**flipping**
42:17,21

**flooding**
41:4

**flophouse**
204:18

**fluid**
83:3

**fly**
88:16

**focus**
115:20,21

**focused**
191:5
225:9

**focusing**
143:2

**folder**
12:8
123:18

**follow**
76:17
107:1

**follow-up**
64:8
72:25
105:17

**following**
38:6 40:2
44:23
45:2,6
132:12
134:3
135:3
136:2,5
141:8
142:16
144:25
146:22
167:19

**follows**
4:23

**footage**
217:4

**for**
5:12 7:6
8:19
10:1,18,
21,24
11:8,13,
14,17,20
12:18
13:12,13
14:24
15:11,16
16:5,19,
25 17:9
19:24
21:21
22:10,16
24:4,13

26:3
27:7,21
28:4
29:14
30:3 32:3
34:22
35:19
38:11,25
39:1,4
43:2,25
46:9
49:12
52:4
53:12
54:3
55:25
56:21
57:17
58:10
59:18
60:7,8,9
61:13
63:24
64:23
66:11,20
67:25
68:2 69:9
70:11
71:13,20
72:9 73:1
75:24
76:14
77:23
78:24
79:1,5,6,
13 80:9
81:6,14
82:4,23
84:19
85:19,21
88:9
89:13
90:22
91:3,20,
21,22
92:3,8
96:19
97:12
98:19,21
99:1,8,

22,25
100:3,19
101:2
102:11,13
103:16,19
104:9
106:22
107:6,8,
9,20
108:18
109:8
111:14
112:15
113:16,21
115:24
116:7,13,
14 119:15
120:9
121:17
122:13,
19,21
124:13
126:20
127:10
129:13
131:17
132:4
134:8
137:16
143:2,12
145:5,13,
16 146:20
147:3
148:12,20
152:20
153:4
154:12
155:9
159:18
160:7,25
162:20
163:13
164:13
172:3,10
173:4,5
174:11
175:4
176:10
177:3,14,
25 178:8,

16,17
179:6
180:16
183:12
184:13,15
185:16,
23,24
187:20
188:1,9
189:3,21
191:6,7,
24 192:6,
23,25
193:3,8,
13,15,25
194:4,5,
8,12,13,
14,15,16
195:19
196:19
199:11
202:16
204:11
205:5,15
206:9
207:9
208:18,19
213:17
216:1,14
218:14
219:3,18,
20 221:2
226:13
227:5,17
229:14,21
231:18
233:14
235:13,
15,22
236:10,16
237:25
242:18
244:2,15,
18
245:11,14
248:1,19
249:8,11,
23 250:2,
3,10
251:3,18,

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

20 252:2,
13 253:5,
17 254:4
256:22,23

**force**
13:6
14:6,14
23:3,18,
22 31:5
32:23
37:1
47:5,24
61:22
63:17
65:11
68:23
69:6,12
70:1
72:22
73:3 93:8
113:17,20
114:8
117:5
143:3
175:25
176:6
199:22
217:23
218:3
224:18,21
225:9
237:2
247:25
248:7

**forced**
229:22
233:20

**Ford**
145:17

**forget**
89:3 91:5
201:6

**forgot**
16:3
126:19
185:5

**form**
18:8
76:14
79:4,13,
19 186:21
233:10
255:19
256:18
257:13
258:10,21
259:3

**formal**
76:12

**formatting**
213:11

**former**
48:15

**forming**
125:20

**forth**
24:7 50:3
209:22
222:17

**forward**
40:25
79:21
114:14
153:22
154:3
178:7
189:24
218:11
233:3

**found**
50:12,14
121:13
218:2
225:5,10
241:10
257:24
258:3,15

**foundation**
160:25
195:25

**four**
11:20
14:13
18:20
19:1
58:20
85:21
119:18
237:7
247:23
248:6
252:15

**four-team**
60:3

**fourth**
34:15
35:10,24
44:18
113:23,25
114:5,7
209:4

**fragment**
165:3
202:3

**fragmentation**
205:19

**fragmenting**
205:18

**frame**
47:22
141:16

**frames**
141:21

**Frankenstein**
173:11

**Frankenstein's**
173:12

**free**
24:19
166:2

**frequented**
147:18

**frequenting**
147:11,17

**fresh**
63:6

**Friday**
67:3

**friendlies**
184:2

**friendly**
70:19
175:19

**friends**
71:20,23

**from**
9:2,4
10:17
11:7
12:14
13:20
14:6,22
18:9
20:21
22:10,13
24:7
25:21
27:10
28:8,9
29:13
30:12,14
34:2,5,21
36:16
40:13,14,
16 41:7,9
42:6,9,24
43:15,21
45:12,17
46:6
48:3,11
49:15
50:17,18
51:3,5,6,

8,14,19,
20,22
53:1
55:2,3,5
56:4
62:5,25
63:4
64:21,25
65:1,3
66:15
70:4,12
71:3
83:12,22
84:7,8,9
86:17
87:18
88:24
90:12
92:22
93:13
96:11,13
98:8
100:10
102:9
103:6,8,
10 104:3
106:5
107:23
108:15
110:20
112:7
114:24
117:3
120:6,24,
25
122:12,15
123:4,5,
13,16
129:20
130:4,20
134:1,13
136:10,
15,18,20,
21,22
138:20
139:7,11,
19,20,21
140:9,22
142:8,15
144:8

145:6,21
148:1,15
149:4,25
152:1,16
155:11
156:4
157:2
165:6
168:18
172:7
174:23
178:5
180:7
182:14
183:3,17,
22 185:6
187:12
189:17
190:17
192:3,10
195:14
198:21
200:10
203:17,24
206:11
207:25
208:8
209:8,11
210:11
216:12
217:24
218:1
221:3
230:2
232:2
233:2
241:8
246:3,9
247:24
248:5
253:2

**front**
17:11
23:12
28:23
57:11
102:22,24
103:14
123:19

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 292 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 142:6 | game- | 238:9 | 156:13 | 241:6 | 135:21 |
| 143:20 | planning | 252:14 | 158:17,23 | **give** | 183:7 |
| 144:16 | 62:2,8,10 | **generic** | 159:22 | 6:12 8:7, | 225:15 |
| 170:10 | **gang** | 86:24 | 160:9,13 | 11,16 | 227:8 |
| 184:19 | 168:21 | **get** | 164:16 | 10:6,7 | 238:10 |
| 198:21 | 194:4,13 | 20:11,21 | 165:2 | 17:23 | 252:5 |
| 210:16 | 206:12 | 26:1 | 173:15 | 18:12 | 253:9 |
| **frozen** | **gap** | 27:18 | 175:13,25 | 21:8 | 258:24 |
| 97:24 | 25:25 | 31:20 | 182:6 | 22:25 | **gives** |
| **FTO** | **Garrity** | 34:13 | 183:1,4 | 28:17 | 18:6 |
| 15:18 | 68:20 | 37:14 | 184:1,20 | 29:18 | 88:12 |
| 58:15,22 | **gas** | 42:5,17 | 185:6 | 36:19 | 253:20 |
| **full** | 183:9,25 | 51:11 | 191:19 | 37:8 | **giving** |
| 5:11 7:12 | **gather** | 53:7 | 193:17 | 38:1,2 | 17:6 |
| 10:7 | 33:25 | 55:8,20 | 196:5 | 54:4 | 47:24 |
| 18:12 | **gathered** | 57:13 | 197:22 | 56:17 | 81:5 |
| 41:16,25 | 136:15 | 60:11 | 198:6,14, | 63:16 | 166:4 |
| 44:18 | **gave** | 63:4 66:4 | 23 200:6 | 84:13 | 212:19 |
| 52:23 | 17:7 | 70:2 75:1 | 217:17 | 86:8 | 213:24 |
| 78:4 | 18:10 | 80:23,24 | 219:12 | 90:23 | 228:3 |
| 120:2 | 36:6,11 | 81:23,24 | 221:13 | 93:20 | **glad** |
| 153:5,19 | 99:14 | 84:9 | 222:16 | 107:10 | 174:13 |
| 183:4 | 116:5 | 85:20,25 | 238:14 | 109:9 | **glass** |
| 199:16 | 145:25 | 86:2,3 | 242:23,25 | 128:20 | 215:16 |
| 219:19 | 176:14 | 88:17 | 249:15 | 129:22 | **global** |
| 246:11 | 182:8 | 89:21,24 | 252:23 | 133:9 | 76:20 |
| **full-time** | 190:21 | 90:19 | **get all** | 137:1 | 81:15 |
| 16:20 | 249:12 | 91:16,17 | 92:22 | 166:1,11 | **globally** |
| **fully** | **gear** | 95:25 | **gets** | 176:15 | 81:16 |
| 93:16 | 94:4 | 96:8 99:9 | 87:5 94:8 | 185:7,15 | 112:20 |
| **function** | 131:7,18 | 103:24 | 95:14 | 197:17 | **go** |
| 16:7 | 135:9 | 104:7,9 | 107:7 | 205:25 | 10:5 |
| **further** | **geared** | 105:12,17 | 114:19 | 231:6,21 | 18:15 |
| 47:12 | 83:8 | 107:21,24 | 144:19 | 253:22 | 19:4 |
| 94:15 | 236:17 | 109:9,20 | 180:22 | 254:20 | 32:24 |
| **Fusion** | **general** | 114:21 | 236:22 | **given** | 35:8 39:5 |
| 144:18 | 11:14,15 | 115:8,10 | **getting** | 6:23 8:1 | 41:19 |
| | 39:1 | 116:15 | 27:6 | 9:5 18:7 | 43:9 |
| **G** | 99:23,25 | 118:23 | 49:14 | 50:8 | 44:2,9 |
| | 104:7 | 123:13,22 | 63:18 | 51:1,3,19 | 50:23 |
| **gain** | 107:6 | 127:16 | 72:4 | 53:13 | 52:10 |
| 203:19 | 182:24 | 130:9 | 91:21 | 56:25 | 56:2,9,24 |
| **game** | 227:20 | 134:12 | 98:18 | 63:13 | 57:2 |
| 63:18 | 235:14 | 135:25 | 133:25 | 64:13 | 59:20 |
| | 236:6,13 | 144:17 | 158:21 | 66:13 | 60:5 61:2 |
| | | 151:18 | 174:17 | 90:17 | 62:24 |
| | | 153:4 | 184:4 | 105:6,24 | |
| | | 154:18 | 229:3 | 111:1 | |
| | | 155:1 | | 121:24 | |



Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 293 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

64:21
69:4
71:21
79:21
81:25
82:7,9,
15,20
83:2,10,
20 85:7
91:9,24
96:1
98:22
106:9,10,
17 109:13
111:22
114:14
118:5
125:25
129:23
134:16
135:18
136:16
138:8
139:17
143:7
145:10
150:13
153:16
154:17
155:24
162:1,12
165:2
168:7
169:6
176:22
178:9
181:25
182:16,25
183:7,12
185:19,20
186:5
195:21
197:7
203:23
208:25
212:14
213:20
216:19
218:11,21
219:17

223:1
225:13
226:17,21
227:9
228:11,
23,24,25
231:15,23
233:24
235:2
237:6,15
245:14
247:4,6
249:20,21
250:11
252:11
255:20
256:19,23
257:14

**goal**
66:4
80:14,24

**goes**
14:11
16:8 17:3
19:5 37:5
40:1,3
41:6 42:5
48:3 55:2
56:9 62:9
68:8
79:14
84:8 90:4
100:10
105:5
107:7,11,
17 108:7
116:7
133:21
142:5
148:11
159:21
183:21
185:10
188:25
207:8
231:25
235:2
238:8
247:14

256:21

**going**
5:22 6:3,
4,5 15:3
28:16
32:20
33:9 37:8
38:16
40:25
45:8
46:15
56:18
59:14,24
62:2,3
64:7
67:12
75:13
89:5,23
92:7,13
93:12
95:6,7
99:14
103:2,13
106:24
108:25
112:20
114:13
115:1,3
118:11,
21,23
119:3,5,
16,17
120:4,5
123:13
126:6,8,
12 127:17
129:17,22
136:14,23
137:18
138:7
143:23
144:7
147:2
149:4
151:18
157:10,24
158:23
159:2
161:20

162:9
171:17
177:18
181:1
182:21,22
185:4,19,
20,21
187:17
189:17,
18,19,20
196:10
197:7,25
199:4
204:19
209:14
210:8,9
213:8
216:17
233:3,16
239:1,13
241:8,20
242:4
248:22,23
249:2
251:16

**Gold**
34:21
35:5,6,12
36:17
38:5 45:6
48:4

**gone**
42:15
49:20
99:4
115:14
123:1
146:7
158:4
224:20
244:18
257:4

**gonna**
123:22

**Gonzalez**
131:22

**good**

4:16 9:5
37:4 57:6
74:21
88:25
89:12,24
107:3
111:5
120:23,25
166:6,22,
23 174:24
197:10
229:11

**Google**
119:13
139:21
182:13,14
183:3
195:2,4

**got**
19:19
20:14
28:17
37:19
64:3
66:23
74:20
85:1 89:4
90:4
100:17
104:13,14
114:24
126:11
144:2
155:9
158:12
159:16
163:25
166:21
172:6,19
180:19
191:7,9
202:13
213:23
224:25
245:12
247:10
248:15

**gotten**

51:14
158:4
173:20

**Graham**
24:3
69:14
73:1
91:23
113:13,15

**grainy**
140:5

**grainy-**
**looking**
87:25

**grammar**
107:8,21,
22

**grammarly**
118:6

**grammatic**
**al**
116:4

**grammatic**
**ally**
118:7

**great**
121:1
123:1

**greater**
77:25

**grenade**
201:25
202:1

**grid**
130:1

**Grimmett**
152:8,9,
10,12,21
167:8,15,
21 169:7
171:7
175:11
179:21
206:6,10

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

224:14

**Grimmett's**
152:17

**grinding**
254:15

**ground**
90:5
131:19

**groundwork**
219:22

**group**
27:14
109:13
206:6

**grouping**
29:7

**growing**
118:9

**guess**
9:10
24:16
32:17
37:13
39:13,23
54:6,23
76:12
80:1 83:7
98:3,8,25
100:1
101:17
112:6
123:20
125:16
127:3
138:22
139:13
141:1
160:13
166:21
185:11
187:13,16
194:11
218:15
228:13

236:7

**guessing**
254:8,10

**guidance**
100:22

**guidelines**
231:2

**gun**
90:19
165:7
177:8,10,
15,20

**guy**
67:20
84:3
95:14

**guys**
21:16
48:11
51:16
58:25
71:12,19,
25 72:7
83:14
86:11
107:3
120:14
126:25
175:18
180:16

**GVB**
206:12

----

**H**

**hadn't**
73:8
93:16
207:20

**half**
10:25
66:23
91:18
155:18,25

181:9,10

**halfway**
47:10

**Hancock's**
205:12

**hand**
6:5 10:9
12:8
38:13,17
59:22
107:2
194:2,4
209:15
231:17
248:22

**handgun**
176:25
177:12,21

**handheld**
201:24

**handing**
109:15

**handiwork**
177:1

**handle**
13:22
25:24
26:24
30:7 31:1
59:16
61:19
77:11
251:22

**handled**
174:20
175:22
231:8

**handles**
11:21

**handling**
237:19

**hands**
95:21

**handwritten**
9:16

**hanging**
189:9

**Hank**
143:6

**happen**
37:6
50:10
87:5
104:8
126:12
188:16

**happened**
65:11
70:3
75:20
91:18
93:10
106:20
111:5
129:24
137:14,18
145:14,15
150:4
173:19
181:12,22
252:9

**happens**
18:16
60:23
82:2 83:2
85:21
88:21
106:5
116:12
188:7
197:24
242:23
247:12

**hard**
43:4
61:25
72:9
80:24
148:15

164:13
229:6

**harm**
208:12

**harsh**
181:3

**having**
4:22
16:18
39:22
42:14
51:13,14
78:10
97:20,25
116:10
144:8
157:19
178:15
207:10
216:15
221:1,21
225:17
227:12
242:19
255:15
257:4

**head**
7:6,7
9:11,14
11:12
77:17
124:22
125:8
147:23
148:19
169:22
187:6
233:12

**headings**
190:13

**headshots**
131:10

**hear**
18:9 56:6
174:25
252:9,10

**heard**
252:20

**hearing**
6:8 7:14
206:6
250:16,17

**heavily**
72:7

**held**
24:12
47:3,13
83:22
203:2
209:2

**help**
77:24
145:5
164:20
172:11

**helped**
176:18

**helping**
95:8

**here**
4:7,10
5:20 6:20
7:15
13:18
21:18
29:25
30:16
38:17
41:18,23
43:8
45:15
53:9
54:6,15
55:9 57:2
62:22
64:15
72:15
78:9 82:8
86:10
87:19
95:18
100:8



Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

103:8
105:25
120:14
121:5,24
122:1,7
132:24
133:11
134:16,
22,25
136:10
139:5
150:13
153:17
165:11
169:1
174:10
180:15
185:4
186:3
190:20
192:3
193:2,11,
12 196:4
202:12,
20,21
206:19
208:1
211:1,2
213:19
216:8
222:8
235:19
242:15
244:14
245:9
246:15,23
251:9
257:25
258:4,7,
16

**here's**
78:3
79:20
91:7
106:1
219:14

**hey**
21:19
45:16

77:9 78:2
89:5
90:16
93:18
105:13,18
107:3
115:9,10
234:18
240:17
243:3
244:4
247:4

**hidden**
78:17

**high**
23:5
140:10

**high-
definitio
n**
141:25

**high-
profile**
180:24

**high-
ranking**
17:11

**high-risk**
23:3

**higher**
47:10

**highest**
20:17
140:22
141:2,3

**highlight**
167:14
218:14

**highlight
ed**
41:23
161:7
195:8
206:1

209:16
210:10
232:8

**highlight
s**
124:21

**highly**
219:18

**himself**
179:22

**hinder**
133:25

**hit**
144:19
212:17

**hitting**
232:6

**hold**
153:16
196:12,
14,24,25
197:1,5,
6,9,11,19
198:3

**holding**
40:22
42:6

**Holly**
4:6

**holster**
135:11

**home**
237:3

**homicide**
59:19
138:21,24
139:1,8,
9,15
140:2
141:23
142:1,6,
20 143:7,
22 145:4
147:6

148:7
153:3
158:1
161:11
175:22
184:3
188:12
190:7
194:1,9,
16 206:9
223:20
225:6,11,
18 243:8

**homicides**
88:5

**honest**
213:9

**honestly**
241:23
255:23
257:16

**hooded**
148:5,18

**hope**
256:11

**Hoskins**
189:24
210:15
212:17

**hospital**
85:2
131:15,17

**hostage**
244:24

**hour**
10:25
69:20
70:3,9,11
92:17
155:18,25
214:5

**hours**
21:6
55:24
62:13

63:13
66:10
69:23
87:7
174:4,6
184:15

**house**
95:19
99:2,3
128:16
129:4
182:2
198:17
202:7
245:21

**houses**
245:18

**how**
7:23
10:23
12:24
13:16
16:12
25:10
30:11
35:20
36:8,17
37:11,21
42:17
48:22
50:18,19
52:15
53:22
54:19
55:16
56:16,20
57:13
62:2,3,8
66:5
70:13,14
77:1,11
78:15
81:15
96:12
101:3,4,
19 106:9,
14,15,24
111:6

113:8
114:23
115:9,11
117:21
119:4
124:11
131:5,8
137:7,9,
21 143:21
149:8
154:19
155:10
160:9
162:5
173:6
175:1,6
183:10
185:2
194:17
197:2,4,
9,11
206:24
207:8,11
220:25
231:2,7
240:18
246:17,
24,25
249:10
251:16
256:7
257:15,16
259:5

**however**
33:24
41:6
42:1,4
47:6
55:13
63:12
71:9,12
81:13
91:7
110:21
115:7
123:3
124:8
132:24
133:7

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

143:4
148:6
163:9
165:24,25
166:11,21
182:3
194:14
196:14
202:6
206:9
208:18
212:7
222:18,19
229:22
230:17,19
236:16

**huge**
71:19

**Hughes**
30:15

**human**
72:5,9

**hundred**
176:15
222:11

**hypothetical**
83:7

_____

**I**

**IA**
12:10,16
86:21
87:8,12
175:23
176:2
254:18

**IAB**
225:12

**IAP**
92:20
108:16
162:17
171:16,

18,20,23,
24 172:17
173:7,9,
10 177:7
178:13
185:7,13
186:11
194:13
220:2
221:8
225:21
226:1
238:19
239:20
243:16

**IAPS**
79:1
95:22
173:20
177:25
178:8,16

**idea**
139:3
181:22
185:7
257:4

**identical**
148:4

**identifiable**
131:6

**identified**
91:1
93:18
149:6,8
156:9
165:19
185:18
212:5

**identify**
79:15
120:1
152:1

**identifying**
146:20
148:17

**identities**
160:4

**if**
7:12
10:3,11
12:1
14:15
16:25
21:18,20
23:6
24:17,19,
21 27:24
28:9
30:18
32:11,13
33:15,20
36:17
37:13,16,
19 39:18,
21 42:8
43:1,10,
25 44:9
45:7
46:5,11
48:6,20
49:21
51:7
53:14
54:24
58:23
59:11
60:8,14,
16 61:14
62:18
63:12
65:8
66:11,15,
22 67:20,
21 69:2,4
71:16
72:16
73:8
74:13,16

75:4,20,
22 76:7,
19,25
77:9,12,
23 78:11
80:15,19
81:5
82:3,10,
11,21,24
83:23,25
84:24
86:13,19
88:14
89:11
90:7,20,
23 91:12
92:18
94:7,10
95:11
97:21
99:4,17
100:17,24
101:24,25
102:1,14
103:1
105:2,8
106:2
107:6,11
109:1
110:14
111:24,25
112:1,9
113:4
114:7,23
115:8
117:5
119:23
120:7
121:12,
13,21,25
122:13
123:2,7,
12 125:3
126:4,15
127:21
128:21,
22,24,25
129:2,25
130:3
132:21

133:4,7
134:23,24
135:21
137:13,
17,24
138:6,21
139:1,17,
25 140:25
143:14
144:19,24
145:10
146:7
148:1,16,
25 150:12
151:2,22,
23 153:15
154:5,14
155:5,24
156:3
158:4
159:13,
17,18
160:18
161:16,
17,21
162:12
164:5
165:16,17
167:2,23
168:12
170:2,5,
13 171:5,
22 173:3
174:10
175:12,23
176:22
177:16,23
178:12,15
179:25
180:3,8,
22 181:4
182:10,12
183:12
184:1,5,
17
187:24,25
188:11,24
189:4,5,
19,20
190:15

193:12,
19,24
194:25
197:2,4,
10,20
198:8,15
199:24
200:10,24
201:17
202:9,12,
16 203:23
204:22
205:7,21
206:1,18
207:23
208:21,25
211:17,23
213:1,5
214:14
215:19,22
216:3,19
222:21
223:5
225:17
227:11,19
228:23
231:15,17
232:10
233:12
234:11,14
235:19
236:18
237:15
238:3
239:16
240:16
241:25
242:16
243:3,14
244:1
246:5
249:3
251:6
255:10,
23,25
257:21
258:24

**ignitions**
216:24

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**illegitimate**
188:21

**illustrate**
18:12
142:9

**image**
195:5

**imagine**
20:4
25:25

**immediate**
145:3

**immediately**
217:12
225:8

**imminent**
113:19
192:24

**impaired**
84:1

**impinge**
213:16

**implement**
22:4
251:17

**implementation**
76:5
126:13

**implementations**
94:17

**implemented**
74:20,22
76:9
80:16
94:15
187:16,21
245:10

247:7

**implementing**
99:18
201:8

**important**
109:7,8,
18,19,20
115:24,25
117:2
153:4
174:15

**impossible**
158:20

**improper**
160:1
162:23,25
164:5,14

**improperly**
24:19
162:2,3,4

**improve**
32:4
110:4

**improvements**
111:4

**in**
4:10 5:2,
10 7:1,3,
19 8:2
9:11,14
10:18,20
12:4,12,
22 13:25
15:20,23
16:1,2,
12,13,14,
15,20
17:7,10,
11,16,23
18:8,11,
16 19:4,

7,10
20:1,5,7,
9,19,22
21:6,13
22:6,9,14
23:12
24:7,17
25:1,13,
14,24
26:9,21
27:1,2,9,
11,16
28:1,2,
14,18
29:16
30:9
31:16,25
32:2,3
33:5
34:14,17,
19,21,24
35:22
36:3,12,
15,22,24,
25 37:7
38:2,6,
14,24
39:9,16,
23,25
41:20
42:7,8,
16,24
43:2,24
44:7,16,
20 45:6,
9,17
46:2,3,7,
13,21
48:4,12,
13,20
49:4,23
50:11,13
51:10,11
52:2,12
53:16,22
54:2,6,7,
23 55:2,
9,22
56:7,9
57:22,23,

24 58:3,
4,6,7,8,
13,19,20
59:19,22
63:2,6,9,
23 64:2,
17,19,22
65:5
67:4,6,7,
18 68:3,
6,16,17,
19 69:3
70:1
72:1,12,
19 73:4,
6,11,17,
19,23
74:1,6,
11,13,19
75:1,6
76:1,2,23
77:7,24
78:1,7
79:11
80:2
81:7,17,
23 82:21,
25 83:7
84:10,25
85:1,8,11
86:6,16,
19 87:5,
11,13,17,
24 88:6,
22 89:2,
5,14 90:1
91:4,5,
14,15,18
92:1,19
93:6,9,
10,14,24,
25 94:8,
22,24
95:4,14,
21 96:3,
10,23,24
97:3,11,
12,14,15,
18,19,25
98:11

99:9,11,
23
100:16,17
101:2
102:3,7,
9,20
103:13,23
104:2,7,
11,13,14,
22 105:10
106:7,14,
24 107:4,
6,21,24
108:9,19,
21 109:4,
6,25
110:7
111:13
112:13
113:1,22
114:5,15,
18
115:17,25
116:10,
11,25
117:6,7
118:1,5
120:10,
11,12,14,
18 121:5,
12,20,21
122:3,7,
11,13,15
123:19,
21,22
124:6,20,
24 125:16
126:5
128:13,17
131:15,16
132:10
133:5
134:25
136:22
137:13,15
138:12,
16,17,18
139:5
140:7,11,
18

141:16,23
142:5,22
143:1,22
145:17
146:13,17
148:3,4,8
150:7,9,
12,14,18
152:3
155:1,2,
23
157:10,24
159:1
161:4,10
162:22
163:10,21
164:23
165:2,10
167:16,23
168:15,22
169:11,
12,16,17,
25 170:5,
10,21
173:24
175:4,16,
19 177:6,
7,13,16,
17 180:22
181:4,11,
24
182:22,24
183:9,23
184:2,9,
21 185:3,
17 186:7,
20 187:2,
6 188:5,
7,13
189:7,22
190:2,8,
16,20
191:8,17
194:1,13,
20
195:10,13
197:21
198:9,21
199:16,22
200:21

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 298 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

201:4,5
202:1
203:13
204:6,9,
17 206:23
207:1,6,
15 208:6,
7,15,17
209:11,25
210:10
211:7
212:25
213:1,2,
11 214:3,
4,7
216:7,23,
25 218:13
219:2
223:10,20
224:3,8,
19 226:7,
10,13,15
227:5,7,
10
230:10,17
232:13,
16,21
234:12,25
235:16
236:13,
16,18,21,
24 237:5,
12,19
238:9
241:7
242:13,25
245:2,6,
12,17,19
246:11,
21,23
247:3
248:9,10
249:12,23
250:12
251:23
252:1,25
254:18,20
255:3,16
256:2,4,
8,22

257:1,9,
24 259:5

**in-custody**
23:3

**in-depth**
12:2
109:5
256:11

**in-house**
11:19
44:21

**inception**
13:15

**incidences**
31:6
135:22

**incident**
22:1,13
25:5 29:3
31:4
34:3,7
77:2,22
79:11
86:4
96:14
131:5
135:5
171:13
198:25
199:23
222:2
227:1
237:16
240:20

**incidents**
13:8
23:2,3,5
31:2,3
32:6
150:20,22

**include**
12:14
23:2
27:10

32:7 34:1
58:16
98:19
103:2
133:14
135:10
142:19
146:17
170:25
204:4
207:5
235:17
242:23

**included**
12:21
78:16
142:22
208:6,8
232:16
242:13

**includes**
129:6

**including**
150:20
169:25

**inclusion**
199:9

**incorporated**
186:6
246:10

**incorporating**
45:23

**indicate**
10:10
230:25

**indicating**
153:17
202:20
211:2

**indifferent**
57:7

**individual**
98:16
99:2
108:18
113:24
115:17
116:5
142:1
145:17,22
147:16,23
148:14,19
150:7,10
153:5
157:23
191:21
193:23
203:20

**individuals**
19:3
27:1,10
28:8
33:23
36:5 49:3
58:11
60:12
64:1 65:3
68:9
70:11
86:16
91:13
95:18,19
96:7
110:23
112:9
146:21
149:3,7
157:4,8
182:6
186:22
187:19
189:8
192:1
197:24
202:8
204:5,14
247:24
248:5

**individuals'**
212:22

**indoctrinate**
206:24

**inference**
151:17,20

**informant**
152:23

**informants**
153:13

**information**
29:12,20
33:25
95:25
104:16
108:18
110:24
136:14
138:16
144:3
145:3
164:1
169:14
185:6,22
201:16
204:2,3
222:25
239:7

**information-sharing**
223:12

**inherently**
209:20

**inhibit**
8:11,15

**initial**
62:11
63:3

64:12,13
65:21
81:6
82:13
91:16,17,
21 92:15
93:22
105:1
112:13

**initially**
63:19
93:15
183:7
217:8
236:20

**inject**
163:19

**injure**
202:2,3

**injuries**
135:4,10
136:4,6

**injury**
204:6

**inner**
128:16
129:3

**innocent**
204:5,14

**input**
34:24
44:5
116:16

**inputted**
144:5

**insert**
211:8,14,
21

**inserted**
202:7,23
203:6,13
210:14,25

**inserting**
232:17



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **inside**<br>7:13<br>36:18<br>51:10<br>86:2<br>97:25<br>99:2<br>117:10<br>120:21<br>131:1,19<br>150:3<br>156:9<br>161:15<br>169:2<br>198:13<br>202:8<br>235:3<br>236:4<br>246:7,8<br>**inside-the-house**<br>99:5<br>**instance**<br>100:3<br>188:14<br>**instances**<br>108:21<br>149:18<br>**instead**<br>95:5<br>195:25<br>247:6<br>**instructor**<br>38:5 45:5<br>**insufficient**<br>239:7<br>258:4,16<br>**insurance**<br>144:4<br>**Intel**<br>154:25<br>158:5<br>181:12 | **intelligence**<br>155:12<br>160:9,12<br>204:2,3,23 227:12<br>**Intense**<br>171:9<br>**intention**<br>216:1<br>**intentionally**<br>242:24<br>**inter**<br>13:10<br>**inter-department**<br>13:11<br>**interest**<br>101:25<br>**interests**<br>134:15<br>**interior**<br>216:25<br>**interjected**<br>34:10<br>**intermittent**<br>184:10<br>**internal**<br>29:8,21<br>30:2,6,18,21,24,25 31:5,13 81:1<br>100:19<br>105:7<br>119:7,10<br>176:3<br>200:16<br>243:23 | **internet**<br>128:10<br>**Interoffice**<br>253:20<br>**interpersonal**<br>57:8<br>**interplay**<br>80:2<br>**interpret**<br>117:9<br>**interpretation**<br>166:1<br>198:20<br>**interpreted**<br>53:23<br>**interrupt**<br>59:25<br>92:8<br>**interrupted**<br>60:19<br>95:3<br>**intervene**<br>255:13<br>**intervention**<br>224:22<br>**interview**<br>23:7<br>56:14,21<br>66:8,9<br>68:16<br>72:3,15<br>73:15<br>81:10<br>89:23<br>91:25<br>95:16<br>96:7 | 102:4<br>104:12<br>122:24<br>133:18,24<br>151:12,15,24<br>152:15,17<br>163:8<br>167:23<br>168:3<br>175:9,10<br>178:6<br>180:8<br>201:6<br>235:21<br>240:12<br>**interviewed**<br>26:25<br>63:5<br>73:16<br>80:25<br>93:19<br>95:8<br>104:14<br>132:18,20,22,24<br>152:7,11<br>165:20<br>211:19<br>212:11<br>**interviewees**<br>132:17<br>**interviewer**<br>169:8<br>**interviewing**<br>167:20,21<br>**interviews**<br>26:25<br>27:2,6,7,8 34:1<br>55:19,21,24,25 | 56:1,2,3,8 62:3,8<br>63:19<br>65:1<br>67:9,12<br>68:22<br>69:20<br>70:17<br>71:1<br>73:17<br>81:24<br>85:15<br>91:17<br>103:25<br>104:5,6<br>110:22<br>122:21<br>132:25<br>174:21<br>178:11<br>187:5<br>195:14<br>211:22<br>254:15<br>**into**<br>10:3<br>12:15,16<br>18:15,22<br>19:2,5<br>20:6,15<br>22:12<br>24:1,2<br>33:21<br>37:5<br>40:1,3<br>42:5 43:6<br>45:23<br>46:8,9<br>48:3 50:8<br>55:8,10,12 62:9<br>71:15<br>76:3,10,16 77:10<br>83:20<br>88:15,25<br>89:1 91:3<br>93:12,19<br>106:17 | 109:2<br>111:22<br>112:2,20<br>113:14<br>116:15<br>118:23<br>123:17,18,22<br>125:13<br>126:8<br>127:5,16<br>129:11<br>130:9<br>135:11,18<br>138:24<br>143:7<br>144:5,17<br>147:1<br>155:14<br>156:13<br>163:19<br>176:14<br>185:8<br>195:16<br>202:7<br>208:20<br>215:8,13,15 222:16<br>225:6<br>236:8,10,14 238:8<br>252:8<br>254:17<br>**intricacies**<br>43:6<br>208:17<br>**investigate**<br>113:14<br>**investigated**<br>93:16<br>125:3<br>206:12<br>**investigating** |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

7:21
33:6,14
100:22
140:2

**investigation**
9:6,8
13:6
14:3,5,6,
19 22:14
28:2
29:15
32:16,18,
23 43:7
48:14
50:21
51:14
52:12
53:17,20
59:17
60:11,14
61:12
62:4,14
63:8
66:16
67:7 82:9
85:13,14
86:21
87:12
88:22
90:10
92:24
93:1,13
108:16
109:2,21
114:15
117:10
120:3
133:21,25
138:15
139:2
142:20
143:8,23
153:3
155:3
157:12,14
163:11
176:3,10
184:3

185:21
200:13
210:18
217:16,17
225:7,11,
18 243:9
254:16
255:16
257:19

**investigation's**
73:24

**investigations**
14:20
23:2
32:20
92:15
95:23
176:3

**investigative**
138:12,17
143:24
243:19

**investigator**
8:3 24:9,
13,16
25:3,7
62:6
74:2,7
83:16
84:10
124:7
161:1
212:14

**investigators**
27:15
136:8
148:1

**involve**
192:23

**involved**
23:7

34:19
60:12
64:16
67:7 69:2
70:1
72:19
73:6,11
80:25
81:9
83:19
84:13,16
85:22
91:10
95:13,18
98:6
104:10
130:16
132:10,13
133:4
141:23
143:4
150:9
161:10
175:16,19
204:6
207:6
208:15
250:10

**involvement**
33:1
34:21
48:13
64:19
87:13
96:9
249:23
253:1,14

**involving**
65:22

**IOCP**
30:23
31:10,18

**IOI**
77:1

**Isaiah**
6:20

13:16
59:7,9
134:4
136:6

**ISD**
243:18

**issue**
91:1
122:12
166:19
177:24
206:20
210:18
211:24
220:2
221:12
224:15,23
234:24
239:6
244:1

**issued**
114:16
194:18

**issues**
8:15
66:15
92:19
105:8
124:19
161:24
171:22,23
173:13
213:15
221:8
225:7,19
239:20
246:24

**issuing**
127:5

**it**
6:5,6
9:13,21
10:4,10
12:9,12,
13 13:2,
10,20,22,
25 14:7,

8,11,16,
17,25
15:1,23
16:25
17:3
18:8,22,
24 19:2,
5,19
20:2,5,12
21:9
22:21
23:19,21,
22 24:17,
20,21
25:1,13,
14 26:8,
12 27:14,
25 28:17
29:6
31:10,11,
14,20,22,
25 32:2,
8,9 33:11
34:10
35:9,21
36:12,20
37:5,9,
12,14,22
38:3,9,
14,19,20
39:10,12,
25 40:1
41:2,6,20
42:3,4,20
43:4,5,
15,21,25
44:6,24
45:2,3,9,
17,23
46:1,2,5
47:15,19
48:3,4,7
50:13,20,
21 51:8,
9,15,22
52:6,14,
15 53:12,
15 55:1,
16 56:3,
16,20

57:6,15,
18,19,21,
25 59:4,
13,14,18,
20,25
60:14,20
62:4,6,
12,21,25
63:21
64:25
66:11,18
67:16,18,
25 68:8,
11 69:17,
19 70:4,
10,14
71:2,4,
10,25
73:21
74:9,15
75:15
76:2,4,5
77:6,11,
12,13,17,
20 78:10,
18 79:14,
18,19
80:20
81:8,18
82:6
83:8,22
84:8,23,
24,25
85:24
86:8,12,
13 87:15,
16,17,20
88:3,9,12
89:1,3,4
90:6,10,
12,18
91:1,2,3,
6 93:15,
16,19,23
94:1,8,16
95:5
96:17
97:19
98:1,7,
10,23

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 99:1,4,15 | 19 132:2 | 10,15,22 | 208:9,18 | 248:8,13 | 80:4,5,23 |
| 100:16, | 133:24 | 171:8,21 | 209:6,19 | 250:15,16 | 81:6 |
| 19,21 | 134:9,20 | 172:1,6, | 211:21 | 251:12,17 | 82:18,25 |
| 101:4,22, | 135:1,17 | 8,9,15, | 212:2,8 | 252:1 | 83:3 |
| 24,25 | 136:11, | 19,20,23, | 213:2,11 | 253:20 | 84:10 |
| 102:4,6 | 12,21,22 | 24 173:1, | 214:5,10, | 256:16 | 85:9 |
| 103:9 | 137:9,20, | 7 174:1, | 12 215:7, | **it's** | 87:6,10 |
| 104:8,20, | 21 | 7,11,12 | 16 216:22 | 5:13,15 | 88:4,17 |
| 22 | 138:12,13 | 175:8,10, | 217:9,12, | 7:11 12:7 | 93:17 |
| 105:11, | 140:10, | 21,25 | 21 218:2, | 13:2,12 | 95:12 |
| 12,13,20, | 14,16,18 | 176:8,13, | 15,19 | 14:15 | 96:13 |
| 22 106:8, | 141:22 | 14,24,25 | 220:6 | 15:24 | 99:14 |
| 14,15,18, | 142:3 | 177:9,15, | 221:13,23 | 16:7 | 100:19 |
| 20,22 | 143:4,20, | 16,17,20, | 222:6,8, | 18:11 | 102:5,14 |
| 107:2,4, | 21 144:1, | 22,23 | 18,19 | 19:23 | 103:12 |
| 7,8,17,21 | 3,20 | 178:2,9, | 223:5,10 | 21:19 | 104:22 |
| 108:1,6, | 145:17 | 13,17,21 | 224:4,5, | 27:8,12, | 105:21 |
| 7,8,10, | 146:7,8, | 180:4,10, | 9,17,21 | 13,14 | 106:19 |
| 15,24 | 10,19 | 12,13,17 | 225:2,15, | 29:4,6 | 108:1 |
| 109:4,7, | 147:12, | 181:6,12 | 17,19 | 30:12,20, | 109:8,23 |
| 12,13,19 | 13,20 | 182:21 | 226:7,8, | 25 31:10 | 111:24 |
| 111:7,23 | 148:4,6, | 183:5,10, | 13 227:25 | 32:25 | 112:5 |
| 112:7,12 | 15,16,24 | 20 184:19 | 228:11, | 34:9 | 114:18 |
| 113:5,6 | 149:23 | 185:5 | 13,16 | 35:7,19 | 115:4,5, |
| 114:19 | 150:7,13, | 186:3 | 229:19 | 36:2,24, | 22,25 |
| 115:5,18, | 15 | 188:2,16, | 230:16, | 25 38:14 | 117:5 |
| 21 116:2, | 151:10, | 17,20,22 | 20,21 | 41:1,16, | 118:9 |
| 12,23 | 14,20 | 190:11 | 231:1,7, | 25 42:8,9 | 119:5,13, |
| 117:1,4, | 152:8,19 | 191:16, | 8,12,20 | 43:1,2 | 19,20,24 |
| 7,11 | 153:3,4, | 23,25 | 232:11, | 44:6,7,17 | 121:1,3,8 |
| 118:1 | 21,22 | 192:4,8, | 12,13 | 45:9,18 | 125:7 |
| 119:2,13, | 154:1,8, | 13 193:19 | 233:14 | 48:22 | 126:12, |
| 20,21 | 21,22 | 194:14 | 234:2 | 50:6,7 | 20,21 |
| 120:19 | 155:6,10, | 195:18 | 235:5 | 52:14,22 | 128:22 |
| 121:4,12, | 23 158:4, | 196:13 | 236:1,14, | 53:8 54:7 | 129:10,11 |
| 13 122:1, | 5,17,19, | 197:13, | 15,16,19 | 56:10 | 130:25 |
| 8,15 | 21 159:4, | 17,18 | 237:21 | 57:10 | 131:24 |
| 123:3,13 | 20 160:14 | 198:4,11, | 238:4,10 | 58:24,25 | 132:16 |
| 124:9,21, | 163:9,12, | 23 199:7, | 240:6 | 62:17 | 133:10, |
| 22,23 | 14,17,22, | 18 200:2, | 241:24,25 | 63:3,6 | 11,16 |
| 125:8,9, | 23 164:5, | 3,25 | 242:9,17 | 64:4,24 | 134:17,25 |
| 12,24 | 13,14 | 201:7,14, | 243:11, | 66:20,25 | 136:1 |
| 126:3,10, | 165:10, | 24 202:1, | 12,14,17, | 68:7 70:9 | 137:8,15 |
| 18,24 | 16,19,23 | 18 | 20,22 | 72:9 | 140:5 |
| 127:8,11 | 166:1,5, | 203:12, | 244:10,14 | 74:13 | 142:14 |
| 128:12, | 8,19,22, | 15,18,25 | 245:22 | 76:19 | 144:22,23 |
| 15,23,25 | 24 167:25 | 204:18,22 | 246:2,3, | 77:1,15, | 145:5 |
| 129:2,5, | 168:7 | 205:17 | 4,6,21,23 | 22,23 | 147:25 |
| 25 130:8, | 169:6,13 | 206:19 | 247:4,5, | 78:2,19 | 148:14, |
| 25 131:7, | 170:3,4, | 207:11,20 | 13,20 | | 15,18,19, |

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 302 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 22,23 | **italicize** | 129:6 | **job** | **jury** | 90:18 |
| 151:7 | 123:3 | 130:10 | 17:1,5 | 7:13,16 | 92:7,8 |
| 153:16 | **italicize** | 137:13 | 21:21 | **just** | 93:12,14 |
| 155:6,22 | **d** | 141:16 | 33:17,24 | 9:18,21 | 94:11,22 |
| 159:1,14 | 40:12 | 142:1 | 71:24 | 10:10,11, | 95:1 |
| 160:8 | 41:8 | 150:21 | 75:6 94:6 | 13 13:10, | 96:16 |
| 162:2 | 42:3,5,8 | 151:13 | 121:1 | 23 16:9 | 98:7 |
| 165:4,8 | 103:6 | 160:22 | 125:10 | 17:13 | 101:18 |
| 166:23 | 224:14 | 168:10 | 127:12 | 19:9 | 102:1 |
| 169:7 | **italics** | 182:16 | 175:11,13 | 21:19,24 | 104:22 |
| 170:23 | 36:12 | 218:17 | 218:9 | 22:11 | 105:12,17 |
| 176:9,19 | 38:14 | 230:23 | 255:3,4 | 23:24 | 106:13,14 |
| 177:18,19 | 44:8,21 | | **Joe** | 27:21 | 108:6,15 |
| 178:12 | 45:9,17 | ───────── | 62:21 | 30:8,11 | 112:12 |
| 180:25 | 122:15 | **J** | 143:10 | 31:11 | 118:2,21 |
| 181:19,20 | 190:16 | | **Johansson** | 36:17 | 119:1 |
| 184:12,25 | 212:25 | ───────── | 172:3 | 38:1,2,16 | 120:2,24 |
| 186:11 | 213:1 | **J-U-S-T-** | 187:10 | 39:8 | 121:3 |
| 189:2,3 | **items** | **I-N** | **join** | 40:25 | 125:11 |
| 191:6,17 | 54:20 | 5:13 | 124:11 | 42:12,23 | 126:4 |
| 194:22 | 127:17 | **Jake** | **judge** | 43:21 | 127:17 |
| 195:14,16 | 161:7,8 | 96:5 | 163:9,14, | 44:21 | 128:13, |
| 197:1 | 163:18 | **Janetta** | 23 | 45:1,15 | 21,23 |
| 198:5,15 | 164:11 | 151:5 | 164:14,20 | 48:25 | 129:17,22 |
| 199:15 | **iteration** | 152:22 | 166:25 | 49:14 | 131:4,7, |
| 200:10,11 | 191:3 | 153:21 | 170:14 | 50:24 | 10 |
| 201:15 | **iterations** | **January** | 224:5 | 51:6,18 | 133:11,16 |
| 202:1,2, | **s** | 4:5 16:16 | **judgment** | 52:21 | 134:8,18, |
| 3,6 | 186:6 | **jargon** | 212:10, | 53:13,14 | 20,21 |
| 211:13 | **its** | 155:6 | 15,22,24 | 54:10,14 | 136:22 |
| 212:7,9, | 22:14 | **JD** | 213:2 | 56:17 | 137:16, |
| 24 213:9, | 56:6 | 257:8 | 214:12 | 57:25 | 22,25 |
| 18,21,25 | 158:8 | **Jenkins** | 232:11 | 61:9,10 | 140:19 |
| 214:22 | 220:4 | 48:24 | **judicial** | 62:7 | 142:7,11 |
| 215:19,20 | 242:21 | 49:8 | 228:19 | 64:1,8 | 144:10 |
| 223:6 | **itself** | 99:21 | **July** | 66:20 | 145:5 |
| 225:1 | 27:9 | 101:4,14 | 16:20 | 67:13 | 147:2,13 |
| 227:17,20 | 40:15 | **jeopardy** | **jump** | 68:11 | 149:3 |
| 229:6 | 42:6 66:6 | 24:5 | 15:7 | 70:2,9 | 150:5 |
| 233:7 | 93:2 | 113:19 | 20:12 | 75:5 | 154:17,21 |
| 235:6,24, | 105:9 | 181:4 | **jurisdict** | 77:7,18 | 155:1 |
| 25 | 108:16 | **Jimmy** | **ion** | 78:2,24 | 156:25 |
| 236:12,17 | 118:24 | 146:13 | 40:21 | 79:1 81:8 | 159:15,16 |
| 246:22,25 | 121:20 | 147:4 | 138:22 | 82:17 | 162:10 |
| 247:22 | 122:16,24 | 157:3,16, | | 84:6,11, | 163:20 |
| 248:4,14 | 127:15 | 23 181:9 | | 17 85:4, | 164:9 |
| 249:19 | | | | 14 86:8, | 166:15 |
| 251:20 | | | | 24 87:12 | 170:19 |
| 252:3 | | | | 88:8 | 171:22 |
| 257:24 | | | | | 172:7,10, |



Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 19,22 | **justified** | **kept** | 22 97:24 | **knife** | 56:17 |
| 174:11 | 108:1,6 | 121:21 | 104:18 | 116:20 | 59:4 |
| 176:4 | 113:1 | 229:3 | 106:14 | **knock** | 61:17 |
| 177:11 | 117:25 | 242:25 | 109:1,6 | 34:15 | 62:25 |
| 178:2 | 118:2 | **Kerry** | 112:19 | 36:6,9 | 64:24 |
| 179:3,11 | **justifying** | 71:18 | 117:12 | 39:1,24 | 67:21 |
| 182:13 | 168:6 | 85:1 | 123:10 | 40:4 46:4 | 70:12 |
| 183:1,8, | | 90:3,17 | 129:17 | 53:25 | 71:13,20, |
| 9,16 | **Justin** | | 138:13 | 74:10 | 21,23 |
| 186:6,11, | 4:9,21 | **Kevin** | 144:9 | 109:3 | 72:10 |
| 22 | 5:2,13, | 62:20,22 | 145:23 | 127:23 | 74:4 75:8 |
| 188:17,25 | 17,18,19, | **key** | 150:19 | 128:1,7 | 77:16 |
| 189:9 | 23 6:2,19 | 72:12 | 174:12 | 180:14 | 78:8 80:9 |
| 191:6 | 9:18 | 96:4 | 176:21 | 190:22 | 83:7 |
| 195:18 | 27:13 | 160:5 | 177:23 | 191:3 | 84:7,8,12 |
| 197:23 | 46:11,20 | **kind** | 178:1,10, | 192:5,19, | 86:3,13 |
| 198:21 | 54:10 | 10:5 | 11 179:19 | 22 | 88:9 |
| 200:6 | 64:7 | 11:21 | 180:11,13 | 193:13, | 89:19 |
| 202:9 | 65:20 | 12:3,10 | 183:1 | 15,18 | 95:4 |
| 203:12,25 | 75:11 | 14:1,2 | 184:1 | 194:17 | 96:17 |
| 211:16 | 115:17 | 15:2,8,13 | 187:6 | 196:11,20 | 102:13,21 |
| 214:14,21 | 118:21 | 16:25 | 188:25 | 209:20 | 103:25 |
| 217:3,15, | 128:20 | 18:5 | 190:21 | 228:17 | 104:14 |
| 24 | 129:18 | 21:14,24 | 195:12,15 | 229:20,24 | 106:16,17 |
| 218:10,15 | 130:12 | 27:25 | 197:3,4 | 244:16 | 108:23 |
| 219:21 | 156:22 | 31:24 | 199:4 | 245:2,5, | 110:10 |
| 220:25 | 165:24 | 42:17,21, | 202:13 | 17 | 117:17 |
| 221:17 | 194:25 | 22 43:9, | 213:8 | **knock-** | 121:13 |
| 222:4,7 | 198:21,24 | 10 44:11 | 217:4,9, | **and-** | 122:20 |
| 223:3,6, | 213:4 | 49:21 | 16 219:16 | **announce** | 124:1,21, |
| 8,11 | 255:3 | 52:5,20 | 220:3,19 | 37:14,16 | 22 125:8 |
| 228:24 | 259:15 | 53:14 | 225:6 | **knocking** | 128:23,24 |
| 231:6,18, | | 54:11 | 229:9 | 208:7 | 130:19 |
| 21,22 | | 58:24 | 231:23 | **know** | 134:23 |
| 233:6,16 | ――――― | 59:3,12 | 233:10,24 | 9:19 10:4 | 138:21 |
| 234:4,17 | **K** | 60:20 | 235:8 | 11:17 | 139:1,25 |
| 238:1 | | 61:16 | 236:6,22 | 12:24 | 140:13 |
| 239:25 | | 64:11,16 | 240:15 | 13:24 | 143:9,21, |
| 242:19 | **keep** | 67:8 | 245:4 | 14:15 | 25 146:8 |
| 243:2,4, | 86:15 | 68:22 | 246:17 | 15:2 | 149:8 |
| 12,13 | 92:13 | 70:21 | 247:11 | 21:16,23 | 162:19 |
| 244:21 | 106:3 | 75:15,16 | 249:9 | 27:20 | 165:9 |
| 251:7,12 | 129:18 | 78:9 | 253:20 | 31:11,19 | 166:12 |
| 252:21 | 162:8 | 80:2,23 | **knew** | 33:8 35:3 | 170:2,13 |
| 254:20 | 235:16 | 82:7,17 | 61:6,7 | 37:11 | 179:1,25 |
| **justifica-** | 236:16 | 87:15,20, | 81:9 | 42:23 | 180:15 |
| **tion** | 254:19 | 25 88:16 | 101:3 | 49:21 | 182:20 |
| 117:23 | **Kentucky** | 91:9,11 | 138:25 | 52:19 | 183:22 |
| | 20:23 | 96:11,13, | | | 184:15 |
| | | | | | 188:6 |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 189:4,5 | 138:18 | 208:8 | 164:23 | **lays** | **left** |
| 195:12 | 164:21 | **lapse** | 168:9 | 117:7 | 27:11 |
| 197:10 | 185:22 | 55:3 70:4 | 178:17 | **lead** | 28:13,15 |
| 201:17 | 204:18 | **lapses** | 205:3 | 51:10 | 82:10 |
| 207:11 | **Ko** | 184:14 | 206:15 | 56:13 | 131:14 |
| 211:4 | 102:7 | **laptop** | 209:24 | 236:8 | 174:10 |
| 213:20, | **Koren** | 86:22 | 210:15 | **lead-in** | 181:24 |
| 21,25 | 178:21, | **large** | **Latia** | 41:12 | **left-side** |
| 216:3,5 | 22,23,24 | 181:13, | 4:10 5:2, | 68:16 | 28:22,24 |
| 219:16,18 | 179:8 | 17,18,20 | 9 | **lead-up** | **leg** |
| 227:19,25 | 187:10,14 | 202:13 | **law** | 220:18 | 135:10 |
| 229:8 | 221:10 | 216:25 | 23:23,24 | **leader** | **legal** |
| 231:8 | **Kubla** | **Larkin** | 24:2 | 96:6 | 12:9 35:4 |
| 233:12 | 71:18 | 201:1 | 33:22 | 192:4 | 36:6,9,14 |
| 234:13 | 85:1 | **Larsen** | 34:25 | 237:18 | 38:5 |
| 236:5 | 131:11,16 | 4:6 | 35:9 | **leadership** | 43:16,21 |
| 241:23,24 | 236:19 | **Las** | 54:20 | 28:9 | 45:5 |
| 242:15 | **Kubla's** | 4:11 5:3 | 66:9 | 74:22 | 49:17 |
| 245:11 | 90:4 | 15:15 | 69:15 | **leading** | 50:17 |
| 247:5 | 135:4,9 | 68:1 | 83:19 | 175:16 | 54:7 55:5 |
| 251:25 | 241:4 | 97:12 | 113:11 | 236:1,3 | 97:5 |
| 255:23,25 | **Kurt** | **last** | 114:3 | **leads** | 113:16 |
| 256:6 | 26:12 | 16:1,2 | 122:20 | 85:13 | 116:2,3 |
| 257:15, | | 37:12 | 123:17 | **leaf** | 119:6 |
| 16,21 | ———————— | 53:19 | 164:17 | 121:25 | 164:6 |
| **knowledge** | **L** | 60:7 | 209:23 | **learn** | 256:22 |
| 14:22 | | 106:18,20 | 229:21 | 207:1 | **legal's** |
| 17:2,13 | **labor** | 153:19 | 233:1 | 208:11 | 166:6 |
| 22:2 | 224:23 | 156:4 | 245:6 | 250:12 | **legally** |
| 35:15 | **laced** | 162:13 | **law-based** | **learned** | 150:17 |
| 43:14 | 78:9,12, | 180:4 | 43:13 | 104:16 | **legitimate** |
| 49:10 | 14 | 192:2 | **lawyer** | 117:20 | 187:11 |
| 57:22 | **lack** | 199:15 | 33:21 | **least** | 188:20,23 |
| 61:11,12 | 19:24 | 204:21 | 70:13 | 55:24 | **legitimately** |
| 80:18 | 30:3 | 209:1 | 101:18 | 75:9 | 218:18 |
| 94:18 | 121:17 | 218:18 | 102:6,8 | 139:16 | **lengthy** |
| 119:12 | 152:20 | **lately** | 113:11 | **leave** | 56:10 |
| 122:2 | 155:9 | 13:25 | 213:7 | 6:9,14 | 213:9 |
| 127:13 | **laid** | **later** | 257:6 | 67:1 | **less** |
| 160:23 | 219:23 | 14:1 | **lay** | 101:24 | 7:11 |
| 190:6 | **landed** | 20:12 | 219:21 | 102:1 | 47:15 |
| 239:14 | 70:7 | 34:14 | **layman's** | 184:6 | 50:13 |
| 244:14 | **language** | 90:16 | 98:25 | 249:25 | 70:9,10 |
| 254:18 | 129:9 | 104:16 | **layout** | | |
| 256:10, | 199:6,19 | 150:8 | 129:19 | | |
| 16,20,25 | | | 202:10 | | |
| 257:2,3,6 | | | | | |
| **known** | | | | | |
| 47:21 | | | | | |

Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

75:7
235:25

**lesson**
171:2
206:23

**lessons**
233:21

**let**
4:25 9:21
10:4 21:8
29:1
33:10
35:21
50:23
74:5
83:13
100:1
128:20,23
132:7
185:8
222:21
254:19

**let alone**
258:5,17

**let's**
7:16
25:14
64:8 83:6
95:12
127:14
130:9
137:17
139:24
197:5
214:14
222:16
247:9

**level**
20:18
81:20
106:23,24
115:23
117:4
251:24

**Lexitas**
4:8

**license**
143:17,19
144:12,13

**lieutenant**
26:6,11,
12,17
60:25
73:17
82:19
86:6 96:3
99:20
102:8
108:8
109:12
172:3
187:10
188:11
196:2
200:10
204:10
205:5
222:4,5
237:22
238:14
239:3,19
245:13
247:4
248:11,
12,19
249:14
252:2,22

**lieutenants**
23:10
102:18
172:17,22
188:7
243:18,21

**life**
64:2 72:5
118:1

**light**
184:8,9

**lightly**
61:23

**like**
10:9
11:17,21
12:3
13:10,11
14:2,18
18:15,16
19:18,19
21:12,13,
14,18,20,
21 22:8
24:17
25:2
28:10
30:8
31:25
43:2,25
44:1
45:10,11
48:11
50:11
53:5,7
56:20
58:24,25
60:20
64:16
66:4
69:7,8,
10,11,19
70:18
71:20
72:16
75:15
77:11,16,
19,25
80:23
81:1,15
82:10
83:6
84:25
86:9,18,
25 87:18
88:6,7
92:20
94:2
95:24
96:23,24,
25 98:19,
24,25
99:12

**like**
100:15
102:2,15,
23 103:20
105:17,18
106:5
107:1
109:1,3,
21 113:23
115:13,
18,23
116:16
117:19
118:2,11
119:7,8,
11
122:20,22
123:9,21,
23
124:15,
18,21,22
126:7,8
130:7,20
134:19,25
135:22
138:12
140:1
141:2
144:21
145:2
148:9
150:17,
23,24
151:10,11
155:15,18
158:3
162:1,12,
13 163:21
164:5
165:21
166:3
167:9
173:15
174:14
175:9
176:2
177:16,
22,23
178:2,10
180:17
181:11,17

**like**
182:24
183:6,10
185:23,25
186:1
187:24,25
188:2,4,
16 189:22
190:24
193:8
195:18
196:12
198:12
212:2,25
213:18,21
223:13
230:15
231:7
234:1
235:20
236:19
238:13
240:15,17
242:24
243:5,9,
12 244:4
245:15
246:11
249:8
250:15,22
252:1,3,
18,22
254:4,12
256:1
259:18

**likely**
41:10
177:19
208:22

**limiting**
75:9,10

**line**
136:12
142:3
162:13,14
168:21
245:6

**lines**
53:1

**list**
81:15
189:12
223:16
235:19

**list**
21:21
25:1 32:3
68:23
72:16
95:15
99:18,24
100:4
101:1
103:10
105:6
146:16

**listed**
25:4
27:11
29:24
30:16,18
79:2
100:8
102:22,23
103:14
146:15
250:18,21

**listen**
56:2
89:10
91:25
151:12
166:9

**listing**
99:12
164:9

**litigation**
11:13,21

**little**
13:25
17:3
22:21
28:18
39:22
47:9
51:12

52:6,13
72:11
75:12,16
76:1 82:6
94:5,7,8
97:2 98:4
99:19
100:2
114:12
124:14
164:21
188:8
214:22
224:1
245:3
246:14

**live**
64:21
158:17
184:11
207:2,6
244:5

**lives**
176:19

**living**
160:9
216:25

**load**
85:10
89:14,17

**loading**
86:25

**locate**
234:1

**located**
87:19
131:20
133:15

**location**
131:1
132:1
146:3
149:17
178:8

**locations**

177:25
178:7,13,
16

**lock**
205:13,14

**locked**
184:5

**locking**
205:15,20

**log**
61:5

**logs**
167:17
169:17

**Lombardo**
62:21
143:10

**long**
10:23
17:6
36:20
55:16,23
56:20
66:5 67:9
128:22
137:7,9,
21 172:12
174:4
212:24
234:2
245:20

**longer**
49:14
174:6
179:8
208:11
222:8

**look**
6:2,4
33:23
50:4,5
53:16
67:22
74:13
77:21

90:21
94:2
107:8,19,
20 113:15
118:11
119:13
127:6
130:7
135:23
138:24
148:8
165:4
170:5
184:19
189:21
197:12
202:9,12
211:21
235:15
243:5,10,
11 247:9
253:18
254:4

**looked**
19:13
50:16
62:1
69:19
114:19
149:16
233:24

**looking**
22:13
29:6
33:12
43:15,21
44:19
45:10
57:7
64:25
89:22
93:19
122:23
125:21
126:3
145:4
146:20
147:1,4
162:20

166:16
173:4,5
180:5
185:16,
23,24
192:2
197:10
203:8
212:8
215:22
225:6
235:22
236:10
251:5,23

**looks**
23:17
30:8
106:15
107:20
145:2
150:17

**loop**
114:13
218:22
219:19
222:21
233:17

**looped**
232:23

**losing**
240:2

**lost**
31:11
232:3

**lot**
17:5 20:5
27:8
33:22
55:19
63:21,22
71:8,14,
15,25
73:14,22
74:17,25
76:19
77:17
83:5

86:12,13
89:2,9
91:24
93:2,12
95:21
96:20
97:1,7,11
98:17
106:8
107:13
108:18
109:24
115:19,20
120:5
125:9,12
132:17
144:15
154:12
164:17
174:25
179:10
184:19
187:5
191:19
212:19
218:6
219:11
220:19,
20,21,24
221:1,4
242:18

**loud**
202:3,4
206:3

**loved**
163:8

**lower**
209:14

**LV**
68:1

**LVMPD**
20:16
29:4
38:21
40:7,21
58:7
69:18

74:9
77:23
79:12
117:15
119:9
120:20
121:14
130:4
140:10
153:7,12
163:13,23
164:7,12
186:16,
19,20
192:21
195:20
211:6
226:9
228:14,
16,18
230:8
233:19,22
235:6
237:19
239:10
240:8
241:15
253:19,20

**LVMPD's**
224:8,9
226:1

**LVPPA**
102:12

_____

**M**

**ma'am**
7:22 9:22
10:15
22:20
137:6

**made**
39:14
47:15
55:10,12
58:7
59:13



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 63:17 | 96:1 | **males** | 230:5 | **matter** | 15:13,14 |
| 70:6 | 108:17 | 167:9 | 231:11 | 5:2 13:10 | 18:15 |
| 100:20,21 | 109:1,13 | **man** | 232:6,13 | 23:9 | 19:17 |
| 106:1 | 110:1,6 | 148:9 | 233:23 | 27:22,24 | 21:8 |
| 110:15 | 111:7 | **Managemen** | 234:1 | 29:7 | 22:22 |
| 119:23 | 112:14 | **t** | 237:19 | 35:18,23 | 24:20 |
| 121:3 | 115:22 | 68:4 | 246:2,8, | 45:24 | 27:25 |
| 126:2 | 125:25 | 237:16 | 12 | 46:3 | 28:16 |
| 129:11 | 129:25 | **mandate** | **manuals** | 61:21 | 32:1 |
| 143:9,12 | 134:21 | 170:24 | 111:21 | 72:13 | 33:10 |
| 151:17 | 137:11 | **mandatory** | 123:16 | 99:12,13 | 35:21 |
| 159:25 | 140:16 | 221:19 | 212:9 | 100:6 | 36:11,19 |
| 188:12, | 151:20 | **maneuver** | **many** | 102:4 | 37:8 38:1 |
| 14,21 | 172:11 | 198:13 | 7:23 | 114:1 | 43:10 |
| 231:9 | 174:16 | **mangled** | 21:19 | 178:12 | 45:1,16 |
| 233:21 | 183:8 | 71:18 | 25:10 | 179:12 | 46:13,20 |
| 241:9 | 188:15 | **manner** | 35:8 | 210:6 | 50:23 |
| 246:4 | 189:16 | 78:1 | 114:23 | 230:13 | 53:12 |
| 250:3 | 196:13 | **manual** | 169:21 | 255:16 | 56:17 |
| **magazine** | 200:13 | 38:10 | 222:18 | **matured** | 57:14,16 |
| 176:25 | 238:10 | 40:2 | 249:10 | 208:10 | 58:1,5,23 |
| 177:11, | 239:16 | 43:18 | **map** | **maybe** | 59:11 |
| 12,17,21 | 242:21 | 50:19 | 139:19 | 32:18 | 60:20 |
| **Major** | **makes** | 111:13, | **mark** | 37:12 | 66:3 74:5 |
| 28:10 | 112:10 | 14,17,18, | 6:6 | 38:14 | 75:17 |
| 98:5,6, | 140:25 | 20,24 | 127:21 | 49:13 | 77:9 |
| 11,17 | 159:19 | 112:2,3 | 130:3 | 51:9 56:5 | 82:10 |
| 99:6 | 181:4 | 124:10,16 | 134:25 | 70:9,19 | 83:13 |
| 112:8 | 190:11 | 125:7,15, | 248:23 | 71:2,11 | 96:23,24 |
| 184:23 | 238:3 | 16,21,22 | 253:23 | 72:2,16 | 97:2 98:3 |
| **make** | **making** | 126:16 | **marked** | 98:8 | 99:14 |
| 6:9 13:24 | 63:23 | 127:1,7, | 6:17 | 143:25 | 100:1 |
| 19:3 21:9 | 86:21,23 | 10,13 | 28:20 | 147:12 | 102:2,4 |
| 34:7 | 110:5 | 163:4 | 46:18 | 157:18 | 103:13 |
| 38:16 | 111:4 | 190:18,21 | 85:5 | 166:21 | 106:2,22 |
| 42:13 | 126:1 | 192:3,10, | 128:4 | 172:8 | 107:8 |
| 46:9,15, | 138:13 | 21 198:4, | 130:5 | 201:7 | 108:1,6 |
| 16 50:7 | 189:12 | 19 199:1, | 248:25 | **Mcateer** | 113:4 |
| 57:3,4 | 209:12 | 2 201:9 | 253:25 | 30:10 | 115:19 |
| 58:1 | 229:22 | 203:17,24 | **markers** | **Mckenzie** | 116:13 |
| 64:5,14 | 236:14 | 206:23 | 148:17 | 26:13,17 | 118:1 |
| 67:13 | **male** | 207:11 | **match** | **Mcmahill** | 119:2 |
| 72:21 | 147:1,9, | 212:25 | 169:1 | 62:20 | 120:15,25 |
| 73:2 | 11,25 | 226:11,14 | **material** | **me** | 121:4,21 |
| 75:2,23 | 148:2,16, | 227:5 | 123:15 | 8:18 9:21 | 123:7,25 |
| 76:17,22 | 22 149:9, | 228:21 | | 10:4,9 | 127:4,10 |
| 80:15,16 | 21 155:14 | | | 12:1 | 128:20,23 |
| 87:8 94:6 | 167:15 | | | | 132:7 |
| | | | | | 134:6,8 |
| | | | | | 137:9 |

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 140:23 | 27:24 | 193:8 | 34:19 | **memory** | **method** |
| 141:14 | 48:11 | 234:19 | 36:11 | 63:6 | 191:4 |
| 144:25 | 50:2 | 251:16 | 103:11 | 141:12 | **methodica** |
| 145:12 | 52:23 | **meant** | 104:25 | 150:13 | **l** |
| 151:22 | 61:17 | 44:5 | **meets** | 172:7 | 198:10 |
| 153:4 | 62:10 | 100:25 | 164:10 | 196:11 | **methodica** |
| 156:25 | 70:21 | 165:22 | **megaphone** | 198:18,22 | **lly** |
| 164:20 | 72:6 87:9 | 192:14 | 52:1 | **mental** | 198:16 |
| 165:15 | 104:4 | 206:10 | **Melanie** | 174:11 | **methods** |
| 166:11 | 111:8 | **measureme** | 70:18,22 | **mention** | 179:15 |
| 167:24,25 | 116:19 | **nts** | 71:1 73:4 | 16:3 | **Metro** |
| 169:9 | 117:18 | 88:12,17 | 101:5 | 40:23 | 31:19 |
| 170:10 | 120:3,11, | **mechanics** | 104:15 | 93:18 | 32:4 |
| 171:23 | 15 121:3 | 97:3 | **member** | **mentioned** | **Metrocomm** |
| 175:20 | 124:15 | **mechanism** | 43:16 | 12:20 | 223:15 |
| 178:14 | 125:9 | 205:16,20 | 116:13 | 15:10 | **Metropoli** |
| 179:1,8 | 127:6 | **mechanisms** | 117:2 | 54:9 | **tan** |
| 180:10,13 | 133:10 | | 249:13 | 93:15 | 4:11 5:3 |
| 187:4 | 138:15 | **mechanism** | 250:22 | 96:15 | 15:15 |
| 189:12 | 150:19 | **s** | 251:3 | 100:14,16 | **mid-100s** |
| 197:4 | 151:19 | 160:12 | 253:6 | 117:23 | 36:25 |
| 206:20 | 152:6,7 | **medical** | 255:12 | 161:15 | **middle** |
| 213:4 | 158:13 | 95:20 | **members** | 163:20,21 | 5:14 |
| 218:14 | 171:17,19 | 139:12,13 | 14:13 | 174:22 | 109:6 |
| 219:20 | 174:1 | 240:24 | 18:21 | 194:5 | 245:12 |
| 222:21,23 | 179:6 | 241:6 | 48:15 | **mentionin** | **midway** |
| 223:5 | 181:7 | **medicatio** | 102:12 | **gs** | 104:18,20 |
| 225:14 | 188:16 | **ns** | 110:8 | 163:6 | 106:3,4 |
| 226:4 | 189:1 | 8:10 | 168:22 | **mentions** | 200:12 |
| 227:3 | 197:4 | **meet** | 247:23 | 185:24 | **Miller** |
| 229:14,16 | 200:4 | 10:20,23 | 250:11 | **message** | 11:10,11 |
| 231:17,21 | 206:8,15 | 23:22 | 251:4 | 79:17 | **million** |
| 233:5 | 214:2 | 60:14 | 255:7 | 225:15 | 88:3 |
| 240:16 | 216:8,15 | 81:2 | **memo** | **messages** | **mini** |
| 243:3,14 | 217:2 | 224:9 | 42:24 | 79:11 | 245:15 |
| 244:1 | 220:19 | **meeting** | 103:9 | **messed** | **minimal** |
| 245:24 | 225:16 | 11:1,5,9 | 145:5 | 118:8 | 205:18 |
| 246:23 | 226:18,24 | 34:22 | **Memorandu** | **messes** | **minimum** |
| 249:3,17 | 228:13 | 36:10 | **m** | 108:2 | 63:5 66:9 |
| 251:25 | 234:4 | 44:1 | 253:20 | **met** | 97:22 |
| 252:24 | 238:18 | 81:11,12 | **memorize** | 154:4 | 163:2,13, |
| 254:19,20 | 240:6 | 103:10 | 43:4 | 163:2,12 | 22 164:7 |
| 255:5 | 252:21 | 105:2,15, | **memorized** | 164:7 | 165:7 |
| **mean** | **meaning** | 21 249:9 | 42:20 | 243:12 | |
| 7:8,10 | 168:18 | 252:9 | 125:1 | 257:19 | |
| 12:1 | **means** | **meetings** | | | |
| 14:17 | 42:9 | | | | |
| 19:11 | 48:21 | | | | |
| 21:23 | 188:17 | | | | |



Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| minor<br>199:25 | mistake<br>166:3<br>213:15 | 75:12,17<br>76:2<br>77:17,24 | 71:20<br>74:19<br>80:18 | 14,17<br>11:14,19<br>13:16 | 128:2,5<br>130:3,6<br>156:15,21 |
| minute<br>51:11<br>94:3 | mistakes<br>213:16 | 80:24<br>81:15<br>82:7 | 94:16,17<br>95:25<br>100:20 | 35:23<br>36:8,22<br>37:11,19, | 248:22<br>249:1<br>253:23 |
| minutes<br>10:25<br>92:17<br>123:22<br>204:25<br>254:20 | modificat<br>ion<br>199:6 | 94:12<br>97:3 98:4<br>107:11<br>111:22 | 102:5,11<br>104:9<br>105:10<br>106:10 | 23 38:19<br>39:4<br>40:13<br>41:10 | 254:7,19<br>255:2<br>256:13<br>257:7,23 |
| | modified<br>250:7<br>254:6 | 112:20<br>118:22<br>132:7,25 | 122:13<br>133:2<br>141:24 | 42:16,23<br>43:11<br>44:3 | 258:13,23<br>259:6,11 |
| mirror<br>106:15 | modify<br>19:20<br>126:22<br>242:1 | 134:24<br>138:16<br>140:5<br>149:3 | 166:1<br>174:15<br>176:10<br>177:19 | 45:12,25<br>46:7,23<br>48:6<br>59:13 | much<br>20:13<br>39:19<br>56:16 |
| misconduc<br>t<br>66:12<br>90:24<br>91:8,12 | moment<br>23:21<br>36:19<br>37:8 | 155:6<br>157:19<br>159:6,9<br>163:18 | mostly<br>120:10<br>mother | 60:17<br>100:3<br>101:14<br>102:23 | 77:6,8<br>84:6<br>86:20<br>108:3 |
| misidenti<br>fication<br>157:13 | 38:1,3<br>231:18,21 | 164:6<br>172:11<br>182:5 | 151:9<br>mouth<br>51:21 | 103:7<br>104:25<br>122:13 | 127:4<br>142:19<br>195:13<br>251:1 |
| misrepres<br>entations<br>200:15 | Monday<br>67:2<br>monitor<br>89:10 | 188:3<br>189:11<br>198:5<br>207:5,12 | 54:16<br>move<br>46:14 | 139:6,7<br>202:14<br>203:9<br>208:23 | multiple<br>13:3<br>71:18 |
| miss<br>107:14,23 | 149:17,24 | 208:11,22<br>214:9 | 196:15,18<br>197:18<br>216:2 | 211:2<br>216:4,10<br>255:17,19 | 92:14<br>95:9,18,<br>19 131:12 |
| missed<br>78:12<br>107:12<br>173:6 | monitorin<br>g<br>145:24 | 217:10<br>219:17<br>222:19<br>223:16 | movement<br>18:12 | 256:4,18<br>257:10,13<br>258:10, | 150:12<br>178:7<br>206:5<br>232:7 |
| missing<br>41:17 | monster<br>173:12 | 224:23<br>235:25<br>236:17 | movements<br>145:23 | 21,24<br>259:3,8,<br>12,20 | multiples<br>168:22 |
| 94:4<br>189:8<br>227:19<br>229:2 | month-<br>long<br>21:13 | 246:21<br>251:1<br>253:5 | movies<br>88:7<br>moving | MS<br>4:16,25<br>5:7,22 | 257:5<br>murder<br>162:15 |
| mission<br>243:12 | months<br>16:19<br>34:3,4 | morning<br>4:16 52:2<br>59:21 | 78:22<br>178:7<br>235:13 | 6:1,18<br>11:16,23,<br>24 28:21<br>29:1,5 | Murphy<br>4:16,17, |
| misspeak<br>227:24 | more<br>7:11 | 82:25<br>most | 241:7<br>MP5-STYLE | 37:21,24<br>46:14,19<br>65:13,19 | 25 5:7,8,<br>22 6:1,18<br>11:16,23, |
| missteps<br>89:11 | 13:25<br>22:22<br>31:9<br>35:22<br>64:16 | 8:7 63:9<br>68:22<br>69:19<br>70:17 | 150:16<br>194:7<br>Mr<br>4:18 5:8, | 118:13,20<br>127:21,25 | 24 28:21<br>29:1,5<br>37:21,24 |

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 310 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 46:14,19 | 78:10 | 252:25 | 98:14 | **negative** | 254:3,16 |
| 65:13,19 | 80:18 | 253:1 | 111:5 | 90:3 | **new** |
| 118:13,20 | 94:24 | 254:2,3, | 154:24 | 224:25 | 172:9,16, |
| 127:21,25 | 98:8 | 14,15,18, | 157:18 | **neighbors** | 21 186:6 |
| 128:2,5 | 100:10 | 21 256:20 | 171:8 | 65:6 | 187:15 |
| 130:3,6 | 107:2,6, | 257:18, | 225:2 | **neither** | 198:19 |
| 156:15,21 | 10,25 | 19,20 | 246:22 | 49:7 | 201:8 |
| 248:22 | 116:16,21 | **myself** | **necessary** | **Nekita** | 206:24 |
| 249:1 | 118:1,5, | 116:14 | 82:24 | 4:7 | 207:7 |
| 253:23 | 11 119:12 | | 218:23 | **Nellis** | 226:8 |
| 254:7,19 | 124:14 | _____ | **need** | 37:3 | 243:15 |
| 255:2 | 127:12,13 | **N** | 56:6 | 47:23 | 245:4,12, |
| 256:13 | 136:22 | | 71:12 | 145:14 | 13 |
| 257:7,23 | 138:20 | **name** | 77:9,10 | 149:13 | **newly** |
| 258:13,23 | 140:18 | 5:8,12,14 | 91:2 | 155:4,19 | 226:20,21 |
| 259:6,11 | 141:1 | 30:11 | 95:15 | 156:7 | **next** |
| **my** | 142:18 | 31:22 | 96:1 | 161:6 | 10:12 |
| 5:8 7:5, | 143:1,5 | 35:11 | 102:15 | 179:16 | 47:11,19 |
| 7,18 8:6, | 151:16 | 37:12,19 | 118:2 | 181:10 | 61:9 |
| 20,21 | 154:1 | 43:2 85:5 | 166:11 | 195:7 | 78:22 |
| 9:11,20 | 161:23 | 176:13 | 169:6 | **net** | 82:23 |
| 10:9 | 163:19,25 | 230:3 | 182:5 | 104:12 | 83:3 |
| 11:21 | 166:3,4, | **names** | 183:24 | **Nevada** | 88:21 |
| 12:14 | 9,17 | 84:23 | 189:4,5, | 47:12 | 89:7 |
| 14:22 | 169:22 | **narcotics** | 12 212:20 | 209:23 | 91:19 |
| 16:13 | 170:8 | 58:10 | 222:22 | 229:20 | 96:2 |
| 19:16 | 174:9,11, | 112:2 | 232:12 | **never** | 99:10 |
| 21:6,25 | 23 | 199:11 | 235:2 | 27:12,13 | 132:16,17 |
| 22:5,6 | 176:12,13 | **narrative** | 241:21 | 34:10 | 139:17 |
| 25:6,24 | 181:8,11 | 138:13 | 259:10,11 | 54:24 | 144:7 |
| 26:7 | 183:6,10 | **narrowly** | **needed** | 57:21 | 147:8,15 |
| 28:18 | 185:5 | 143:2 | 72:18 | 61:22,23 | 156:14 |
| 33:24 | 187:6 | 225:9 | 74:9 | 94:8 | 171:17 |
| 34:9,10 | 188:8 | **national** | 97:22,23 | 97:15 | 184:22 |
| 35:15 | 194:20 | 245:6 | 104:12 | 99:7 | 199:4 |
| 37:9 39:9 | 198:20 | **nature** | 154:14 | 115:4,13 | 203:9 |
| 41:18,21 | 206:1 | 140:3 | 158:22 | 124:3 | 205:10 |
| 46:10 | 212:24 | 148:4 | 188:18 | 156:8 | 216:10, |
| 51:1,12 | 213:2,11 | **nearby** | 211:7 | 176:14 | 14,15 |
| 52:6,8, | 218:25 | 65:4 | **needing** | 181:12 | 224:13 |
| 12,20 | 224:12 | **necessari** | 126:16 | 183:7 | 243:25 |
| 53:20 | 225:8,13, | **ly** | **needs** | 194:20 | 254:14,15 |
| 64:21 | 14 231:5, | 50:18 | 16:9 78:2 | 199:12 | **NFDD** |
| 70:12 | 20 232:24 | 56:5 75:1 | 81:19 | 200:8 | 203:17 |
| 73:8 | 233:11 | 90:20,25 | 95:7,24 | 235:18 | 204:24 |
| 74:11,13 | 239:14 | | 187:25 | 246:3 | **NFDDS** |
| 75:6 | 240:2 | | | | 201:19,23 |
| 76:4,7 | 246:9 | | | | |
| 77:17 | 249:12, | | | | |
| | 13,23 | | | | |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 204:1 | 97:19 | 228:17 | **nonethele** | 59:25 | 120:12, |
| 220:7 | 98:8 | 229:20 | **ss** | 61:21 | 19,25 |
| 239:3,7 | 103:18,21 | 233:7 | 221:20 | 62:22 | 121:3 |
| **night** | 105:21 | 237:4 | **normal** | 63:11 | 122:7 |
| 59:20 | 114:1 | 238:1 | 61:4 | 64:17 | 123:13 |
| 64:1 | 115:23 | 241:19 | 109:22 | 65:11 | 124:21 |
| 85:25 | 117:19 | 244:16,21 | **normally** | 67:5,20 | 125:11 |
| 148:7 | 119:10 | 247:19,20 | 142:18 | 68:7 69:4 | 126:1,6,7 |
| 182:25 | 122:6 | 249:6,12, | 251:2 | 70:1,19 | 128:22 |
| **nighttime** | 124:13 | 21 250:1, | **north** | 71:16,24 | 132:22 |
| 184:12,13 | 127:23 | 24 252:7 | 27:1 | 73:11,16 | 133:6,20, |
| **nine** | 128:1 | 256:5 | 202:25 | 74:4,11, | 22 |
| 77:20 | 133:15,20 | 259:8,12 | **northwest** | 25 76:8 | 134:10,22 |
| 80:15 | 135:14 | **No-knock** | 195:9 | 78:2,16, | 135:17, |
| **Ninth** | 137:20 | 192:22 | **not** | 20 79:18 | 18,22 |
| 40:7,22 | 138:22,23 | **no-search** | 7:5 8:4,6 | 80:6,19 | 136:13 |
| **nit-picky** | 139:3 | 233:23 | 9:4 10:4, | 81:19 | 137:18 |
| 107:24 | 141:5 | **noise** | 12,13 | 82:24 | 139:9,15 |
| **no** | 142:21 | 202:4 | 14:23 | 83:1,23 | 140:7,10, |
| 6:25 8:9, | 148:17,21 | 237:24 | 18:22 | 84:25 | 13 141:24 |
| 13,17 | 155:2 | **noise/** | 19:23 | 85:18 | 142:4 |
| 9:17 | 159:22 | **flash** | 20:8 | 86:1,17, | 143:2,21 |
| 10:19 | 162:11,25 | 201:20 | 23:18,24 | 19 87:11 | 147:11 |
| 12:20 | 166:9 | **nomenclat** | 24:17 | 89:2 | 148:17,18 |
| 13:1 20:8 | 170:23 | **ure** | 29:11 | 90:7,14, | 149:9 |
| 22:7 | 171:25 | 24:18 | 30:10,14, | 24 92:2, | 150:20 |
| 24:23 | 175:18 | **non-** | 25 31:22 | 18 93:9 | 152:22 |
| 26:21 | 178:2,12 | **deadly** | 32:12,14 | 94:16 | 154:1,20 |
| 32:15 | 182:4,19 | 13:4 | 33:21 | 96:8 | 157:18 |
| 33:18 | 184:6,15 | **non-** | 34:3,4,9 | 97:24 | 158:3,9, |
| 35:16 | 186:11,15 | **deadly-** | 35:20,25 | 98:13,14 | 19 159:7, |
| 40:4,14 | 189:14 | **force** | 36:13 | 100:20, | 13,17 |
| 46:4 | 190:7 | 31:1,3 | 37:13 | 21,24 | 160:8,16 |
| 48:13 | 192:19,22 | **non-** | 38:24 | 101:5,10, | 161:16,19 |
| 49:7 | 193:13, | **fragmenti** | 40:8 42:3 | 13,22 | 162:2 |
| 50:2,3 | 15,18,22 | **ng** | 43:1,2, | 102:4,21, | 165:5 |
| 52:11 | 194:17 | 205:17 | 13,16 | 22,23 | 166:8,10 |
| 55:13 | 195:19 | **none** | 44:20 | 105:14 | 167:23 |
| 61:21 | 196:10,20 | 62:18 | 45:9,18 | 108:1,5 | 169:1 |
| 64:24 | 197:20 | 135:12 | 46:4 | 109:22 | 170:5,6, |
| 65:1,2 | 198:8 | 223:21 | 48:12 | 111:5,13, | 15,24 |
| 74:11 | 200:15 | **nonessent** | 49:12,17, | 15,23,25 | 172:21,24 |
| 79:3 | 201:3,17 | **ial** | 21 50:9, | 113:1,10 | 173:4 |
| 87:21 | 202:23,24 | 94:5 | 17 54:7, | 114:1 | 174:24 |
| 92:12 | 210:24 | | 24 57:6, | 115:3 | 175:2,22, |
| 94:1 | 216:1 | | 19,24 | 116:9,12 | 24 177:10 |
| 95:13 | 222:8 | | 58:4,21 | 117:2,21, | 178:10 |
| | 223:24,25 | | | 25 118:10 | 179:21,25 |
| | 225:19 | | | 119:7,11, | 180:21 |
| | 227:16,17 | | | 19,20 | 181:1,18, |

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 312 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

20
183:16,23
185:4,19,
20 186:6,
10,25
187:24
188:4
189:3,22
192:25
193:13,
14,17,18,
20 194:8,
15 196:5
197:23,25
198:9,19
201:1
202:1,2
204:6,12,
13,14,23
207:8,17,
18
208:10,17
210:21,22
211:1,4
212:3,7,
12,20
213:5,10
215:15
217:2,3,8
218:19
220:11
221:11,22
222:11,20
224:9
225:1
226:1
227:7,11,
12 228:14
229:20,23
230:7,20
231:1,4,
11
232:11,18
233:8,9
234:11,
12,15,22
238:18
240:8,13
241:23
242:16,21

243:11
246:22
248:14
250:1
251:22
253:14
254:9,17,
18 255:6,
21 257:8,
12,20
258:24
**notated**
105:9
132:23
133:5
137:13
**notation**
78:23
103:2
126:17
**note**
84:21
120:13
**noted**
47:20
75:23
109:24
120:4
145:19
189:23
**notes**
9:11,14,
16 12:3
39:9
143:22
155:11
223:20
254:21
**nothing**
6:14,15
7:7
105:10
186:20,24
251:17
**notice**
5:23

63:13
66:8,13,
14 68:15
90:2,22,
23 91:3,6
171:25
**noticed**
5:19
68:21
107:25
190:20
**noticing**
242:21
**notificat
ion**
144:19
**notion**
179:1
**Notwithst
anding**
29:11
**now**
15:21
22:16
25:13
31:11
42:17,21
66:3 73:5
76:15,19
78:3
88:19,20
90:15,22
95:22
99:15
101:15,25
118:11
124:7,12,
19 126:12
138:6,9,
16 140:19
151:2
160:18
164:25
169:21
174:18
178:22
179:9

181:2
186:2
196:10,19
197:12
198:12
200:12
201:13
208:14
211:15
226:7
234:8
253:8
**NRS**
29:16
40:3
63:13
91:3
101:21
113:13
127:18
128:6
164:18
**number**
4:17 5:4
6:6 36:24
77:16
79:23
122:5
128:19,25
135:23
160:1
162:18
197:14
229:4
251:8,9
**numbers**
134:17,19
147:10
173:5
229:6
239:23

---

O

---

**O'DANIEL**
73:18
96:4

99:20
101:5
104:15
204:10
220:7
222:5
238:15
239:3,19
248:11,20
252:2
**O'Daniel'
s**
70:18,22
71:1 73:4
196:2
200:11
205:5
252:22
**oath**
4:15
**Objection**
255:19
256:18
257:13
258:10,21
259:3
**objective**
170:9
**objective
s**
146:14
**obligatio
n**
256:24
**observati
ons**
183:14
**observed**
167:9
169:16
205:1
**observer**
189:25
**observers**

189:20
**obtained**
140:9
193:15
**obvious**
163:20
**obviously**
73:5 75:8
82:21
90:5
95:15
101:24
110:22
157:19
166:18
171:4
174:3
197:25
228:13
**occupant**
232:18
**occupants**
209:19
258:5,17
**occurring**
204:6
**October**
88:9
201:8
**oddities**
221:4
**oddity**
221:5
**oddly**
195:16
**of**
4:8,17,19
5:1,2,23
6:7,8,12,
20 7:5,7,
13,23
9:5,10,
11,12,20
10:5



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

11:12,20,
21 12:3,
5,10,11,
17,19
13:4,7,
12,15,22
14:1,2,7,
8,9,10,
14,16
15:2,8,14
16:8,9,
20,23,25
17:2,5,
11,13,17
18:6,13,
23 19:5,
7,10,20,
24 20:2,
3,4,5,18,
22 21:6,
14,24,25
22:5
23:4,13,
17,18,20
24:12,18
25:7,21,
23 26:1,
18,23,24,
25 27:1,
8,11,15,
16,18,25
28:13,16,
17,23
29:3,8,
14,21
30:2,3,6,
18,21,23,
24 31:4,
5,8,13,
18,22,24
32:3,4,5,
6,11,18
33:4,12,
13,16,22
34:3,6,
11,13
35:11
36:5,12,
18,21,25
37:2,15

38:11,16,
20,23
39:9,16,
22 40:2,
12 41:1,
8,12
42:1,16,
17,21,22,
25 43:3,
4,9,10,14
44:11
45:11,24
46:24,25
47:4,10,
13,20
48:5,8,
22,24
49:6,9,
10,21,25
50:3,6,
10,16,21
51:1,8,
10,21
52:5,6,20
53:1,5,
14,18,25
54:3,4,5,
11,16,18
55:3,4,
14,19
56:5,7,
19,25
57:6,10,
14,17,23
58:9,10,
12,15,17,
20,24,25
59:3,9,12
60:12,20,
21 61:1,
4,6,17
62:4,13,
15,18
63:5,10,
13,18,21,
22 64:1,
5,11,16,
25 65:1,
11 66:8,
12,14,23

67:8,23
68:10,12,
21,22,23
69:5,7,
12,16,19
70:3,4,8,
17,18,21,
22,23
71:8,9,
14,15,22,
23 72:7,
24 73:4,
14,18,20,
22 74:17,
19,24,25
75:13,14,
15,16,18
76:1,5,
12,23,24
77:2,6,
17,20
78:5,9,21
79:1,4,6,
13,16,24
80:2,4,8,
13,14,18,
19,23,24
81:5,15,
20,23
82:7,16,
17,20
83:4,5,
22,23
84:4,10,
13,22
85:4,10,
13,16,19,
23,25
86:1,4,9,
12,13,21
87:7,13,
15,16,17,
20,24,25
88:4,10,
12,16
89:2,8,9,
11,15,24
90:1,10,
11,15,17,
19,22,24

91:8,9,
11,12,13,
22,24
92:15,21
93:2,7,
12,15,17,
24,25
94:4,17
95:5,15,
21 96:1,
4,8,10,
11,13,18,
20,22
97:1,3,5,
7,10,11,
16,18,20,
24,25
98:11,15,
16,17
99:2,12,
19,22,24
101:2,22,
23,25
102:5,12,
20
103:10,24
104:3,5,
6,12,18,
23 105:7,
11,12,14
106:8,9,
14,18,23,
24
107:13,
17,18,19,
25 108:2,
3,15
109:1,2,
6,20,21,
24 110:2,
10,23
111:23,25
112:5,6,
13,18,19,
25 113:4,
5,8,12,
13,16,19,
20,23,25
114:3,7,
8,15

115:4,14,
15,20,23
116:1,5,
9,13,20,
23 117:5,
7,10,12,
19,22
118:1,23
119:9,22,
24 120:5,
11,12,15,
20,21
121:7,9,
15,17,20,
25 122:2,
8,13
123:8,10,
19,20,21,
23 124:1,
6,10,12,
19,20,23
125:9,10,
12,16
126:13
127:3,6,
13
128:13,
16,25
129:4,7,
9,13,17,
19
130:11,
15,20
131:1,4,
5,10,18
132:17
133:1,18
134:18
135:9,12
137:11,
19,22
138:1,13,
16,25
139:7,9
140:3,14,
16 141:2,
4,5,6,12,
14,16
142:6,9,
12 143:2,

3,5,15
144:3,9,
15,18
145:3,7,
14,15,23
146:13,
24,25
147:9,13,
14,19,25
148:7
149:7,12,
16,17
150:5,11,
14,15,19,
23 151:6
152:2,19,
20 153:3,
5,20,25
154:2,12
155:8,9,
18 156:9,
10,11
157:3,4,
10,14,15,
22,24,25
158:18,22
159:4,8,
14,23
160:1,4,
9,16,23
161:5,15,
18,23
162:5,13
163:6,12,
14,16,20,
23 164:6,
10,17,18,
21 165:3,
14 166:5,
17 167:7,
9,25
168:3,21,
22 169:2,
7,15,22
170:8,10,
11,23
171:4,10,
18 172:2,
4,5,14,25
173:2,7,

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

13,16,22,
25 174:1,
2,12,15,
18,21,23,
25 175:25
176:5,9,
10,11,12,
15,17,20,
21
177:18,
23,24
178:1,6,
10,11
179:10,
19,22
180:4,14
181:2,4,
19,22
182:25
183:1,2,
8,11,16,
17,23
184:1,3,
5,6,15,21
185:3,7,
13,15,24
186:3,11,
18 187:5,
6,13,17,
25 188:3,
19,25
189:7,12,
21
190:21,22
191:3,7,
8,18,19,
21 192:6,
7,13,19,
21,25
193:6,22
194:20
195:5,6,
9,12,15,
17,19,24,
25
196:15,
17,20
197:3,4,
11,14
198:11,

13,14,18,
21,25
199:4,6,
9,11,16,
23 200:2,
17 201:1,
11 202:1,
8,10,13,
25 204:4,
5,8,12,
13,14,24,
25 205:2,
4,5,11,
12,15,18
206:21,
23,24,25
207:1,11,
12,15,16
208:5,6,
7,19
209:7,14,
16,19,22,
25
210:11,23
211:16,
17,24
212:1,2,
7,9,14,19
213:8,21
214:10
215:4,13,
17 216:4,
5,12,16,
24,25
217:3,4,
5,8,9,16,
19,22
218:3,6,
7,9,19,
20,25
219:1,8,
11,14,16,
21,23
220:3,7,
12,19,20,
21,22,24,
25 221:1,
2,4,12,17
222:2,6
223:8,10,

16,20
224:1,3,
8,17,18,
20,23
225:1,6,
9,13,14
226:7,19,
25 227:1,
6,13,18,
21 228:3,
17 229:9,
17,19,22
230:10,
17,19
231:2,3,
4,10,23
232:1,2,
3,4,13,
21,25
233:7,10,
11,24,25
234:1,10,
22 235:8,
12,16,19,
25 236:6,
14,22
237:8,9,
18,19,23,
24 238:19
239:11,20
240:12,15
241:11
242:2,19,
20 243:1,
8,18
244:3,8,
11,24
245:1,4,
18
246:10,
17,22
247:4,6,
11,25
248:2
249:9,13,
23 250:9,
22 251:3,
4,18,21,
24 252:2,
12,19,20

253:1,6,
7,20,21
254:2,3
255:7,12,
22 256:2,
16,20,21
257:5,6,
19 259:5,
15

**off**
7:5,7
10:6
21:22
25:23
26:23
40:8
63:23
65:5,14
67:5
71:11
72:24
77:17
84:5 90:6
118:15
128:10
130:1
131:18
138:25
140:19
143:17
146:7,16
150:13
156:16
164:9,18
165:4
169:22
172:7
176:2
181:25
196:10
198:18
212:14
214:23
215:5,21
217:12
220:19
233:11
240:11
241:8

243:23
250:18,21
252:25
254:22
259:16

**offense**
71:7

**offenses**
192:23

**offered**
117:15

**office**
11:8
29:8,21
30:2,6,
13,17,18,
21,24
31:4,8,13
61:1,3
75:6 77:7
86:22
87:5
135:1
145:3
174:23
235:22

**officer**
7:20,21
15:16,19
21:3
22:12
25:16,17
33:14
61:20,22
67:21
69:2
85:18
89:8 91:5
96:5
102:2
114:1
116:11
123:13
128:2,15
129:3
131:10,
11,15,16,

22 132:6
133:7,8
135:4,9
136:4
139:12
144:2
159:18
189:24
202:22,24
203:2,5
205:12
210:15
211:18
212:17
216:1,22
217:4
236:9,19,
20 241:3,
8 248:2,
10 252:13
255:4,13
256:14
257:9

**officer's**
110:21
162:17
183:17,18

**officer-
involved**
13:7 14:4
23:7 32:7
61:2,18
69:11
75:3,5
82:16
91:14
120:10
121:10
130:22
176:6
183:1

**officer-
involved-
shooting**
106:19

Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**officer-**
**safety**
  180:25

**officers**
  17:1 18:9
  23:8 28:6
  29:16
  33:14
  34:5
  38:25
  47:21
  55:23
  63:10,21
  64:3
  65:1,7
  66:8
  67:17,25
  69:22,24
  70:23
  71:6
  72:18
  74:25
  78:6
  80:25
  81:9,25
  82:3
  83:20,21
  84:16,17
  85:16
  86:10
  90:23
  91:23
  95:13,21
  97:25
  102:11,17
  107:18
  110:14
  112:22
  114:4
  130:15
  138:25
  140:1,2
  141:2,4
  146:1
  175:15,16
  195:14
  197:14
  208:10
  209:3,12,

  21 232:3
  233:8
  234:21
  236:21
  242:5
  245:5
  248:1
  249:14
  250:9
  255:11

**officers'**
  85:17
  91:10
  216:16
  218:3

**officers-**
**involved**
  66:4

**official**
  79:12
  158:8,9

**often**
  194:17

**OIO**
  13:4,15
  29:10,23
  30:4,14,
  15,23
  31:1,18
  76:10
  77:3,4
  242:20

**OIS**
  82:19
  94:1
  107:6,7
  137:18
  235:15

**old**
  15:21
  173:7,9

**omitted**
  169:13

**on**
  4:8,17,18

  6:6 7:6
  9:7 11:22
  13:21
  14:14,21,
  23,25
  15:3 16:9
  18:20,22
  20:3,7
  21:7,25
  22:21
  23:2,5
  24:20
  25:5,11
  26:18,20
  28:4,14
  29:11,24
  30:9,16
  31:11
  33:9
  34:6,7,
  14,23
  35:18,24
  36:6,9
  37:9,25
  39:15
  40:9,15,
  20 41:6,
  15 43:3,
  17 44:1,
  23 45:1,3
  46:3,4,15
  47:9,10
  48:2 49:5
  50:9,18
  51:23
  52:2,12,
  19 53:13
  56:4,5,20
  57:4,5,9,
  10,11
  59:1,16
  60:5,17
  61:2,5,20
  62:2,8
  63:2,7,
  16,21
  65:2,6,
  11,17,23
  66:13,20
  67:1,3,4,

  14,23
  69:5,25
  70:10
  71:14,19,
  21,23,25
  72:7
  73:5,20
  74:19
  75:12
  77:6,7,10
  78:1,7,
  22,25
  79:14,22,
  23,24
  80:13
  81:4,20
  82:8,18,
  19 83:4,
  19 84:4,
  6,21
  85:3,24
  86:7,8,
  18,22
  87:4,6,25
  88:1,5,
  13,16
  89:4,11,
  18 90:2,
  5,16,22
  93:1,5,11
  94:1,13,
  19 95:6,8
  97:7,8,23
  99:14
  100:4,8,
  15,18,21,
  22,25
  101:12
  102:7,22,
  23 103:1,
  14 104:16
  105:4,5,
  6,11,22
  106:2
  107:25
  108:24,25
  109:6,14
  110:1,5,
  21,24
  111:6

  112:9
  113:11,
  12,20
  114:24
  115:10,
  19,22
  116:4,14
  117:4,23
  118:12,18
  119:1,13,
  17 123:11
  124:4
  125:3,11
  126:11,
  14,19,20
  127:8
  131:7,19
  132:17
  133:15
  134:9,11,
  22 135:7,
  19
  136:11,
  14,20,23
  137:4,14
  139:14
  140:5,6,
  9,14,18
  141:8,14
  142:12
  143:2
  144:16,19
  145:18,22
  146:6,11,
  14 148:7
  149:20,24
  150:5
  151:9
  153:13,16
  154:19
  155:16,19
  156:19,
  23,24
  157:3,16
  158:12,
  13,14,18,
  20
  159:16,25
  160:1,8
  161:1,16,

  19 162:1,
  4,13
  164:23
  165:16
  166:10,24
  168:23
  169:12,13
  170:8,9
  171:20
  172:3,5,
  16 173:3,
  4,18,20,
  23 174:4,
  24 175:9,
  13
  176:12,19
  177:3
  178:4,25
  179:3,4,
  6,8,12
  180:15,23
  181:6
  182:1,6
  183:5,10
  184:4,10,
  13,15,17,
  25
  185:19,25
  187:5,9,
  14 188:9,
  23 189:25
  190:5,25
  191:2,4,5
  192:21
  193:23
  194:3,4
  195:9
  197:6,15,
  24 198:23
  199:4,14
  200:6
  201:19,23
  202:6,25
  203:10,16
  204:21,22
  207:10
  210:4,16,
  22
  211:15,20
  212:1,2,

Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

11,15,23
213:16,23
214:9,13
216:10,21
217:2,12
218:3,16
220:8,15,
24,25
221:11,18
222:9,12,
14 224:1,
12,15
226:10,
13,21
229:3,4
230:4,18
231:7,19,
20 232:6,
10,12,15
233:14
234:12
235:20
237:3
238:6
241:10,
24,25
242:19,25
243:23
244:1,2,3
246:17
247:20,24
248:7,16
249:16
250:2,5
253:7
254:8,10,
14,25
256:9
259:4

**on-scene**
95:21

**on-the-
job**
220:13

**Onbase**
135:19
136:1

**once**
12:9,12
19:3 42:5
52:20
82:2 83:2
84:15,21
85:3,20
88:23
89:21
92:5
98:20
115:5
129:10
180:24,25
208:9
217:9
231:6
235:4,5
236:4
242:21
247:13
249:22

**one**
7:14,18
9:18
11:20
15:4
25:16,17,
22 30:8,
12 31:9
32:4,21
36:5,19
37:8,15
40:14
44:17
48:24
49:1
50:24
51:23
53:11
55:14
56:7,17
60:4,16
63:21
64:3,8
67:20
68:8
70:25
71:22

72:21
74:4
75:13
78:24
79:22
81:21
83:22
84:4
87:24
90:11,15
92:16
93:12,17
94:3,19
95:14
96:4,18
99:22
100:9,19
103:5
104:23
105:7
106:9
107:11,
18,19,25
108:14,18
109:15,17
111:17
113:4,5
116:20
117:1,22
122:12
124:3
125:11
126:1
130:17
131:1,4
139:3
141:17
142:4
146:8,24
148:6,16
149:7,20
157:4
167:9
172:2,4,
5,21,25
173:13,16
174:15
176:23
177:3
178:3,12,

13
180:14,22
181:25
182:1,17
185:3
187:13,25
189:21
194:20
199:22
202:22
203:5
204:8
205:1
208:5
221:12,17
222:19
226:25
227:16
229:10
231:21
233:15
235:20
236:14
240:6
242:2
243:1,25
244:2,13
245:11
246:24
248:16
250:25
252:2,16,
17 253:18
254:3
257:17,21

**one-
direction
al-facing**
182:4

**one-page**
145:5

**one-year**
118:10

**ones**
37:15
56:5,19
59:1
103:14

185:1
219:16,17
242:19
254:5

**online**
12:11
119:13

**only**
11:1
14:20
23:17
25:25
26:19
39:3
69:15
89:22
94:16
95:13
109:5
119:8
132:23,24
135:24
156:6
160:5
172:12
184:13
192:23
193:3,8
196:19
204:25
205:1
220:12
221:21
224:19
225:13,14
228:17
243:17,21
244:2,15
248:7

**onto**
99:24

**op**
245:14

**open**
13:13,18
14:17
15:2

57:18,19,
21 70:20
128:15
129:3
138:13
167:8
189:23
214:23
250:16

**opened**
14:16,20

**opening**
231:22

**openings**
16:18
195:23

**operate**
31:16
65:2
96:12
106:13

**operated**
256:8

**operating**
34:6
110:24
157:24
190:5
221:24

**operation**
58:20
79:21
81:19
156:7
160:7
189:25
194:21

**operation
al**
106:18
221:3

**operation
s**
16:11
22:11

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

85:9
183:22
207:3

**operator**
49:17
56:22
97:14
185:6
212:11
216:1
234:25

**operators**
46:6
47:22
69:25
89:16
90:11
127:7
185:19,22
191:24
198:11,16
206:5,8,
22,25
207:9,10
214:13
238:9

**operators
'**
71:14

**opinion**
27:13,14
34:9,10
36:6,9,14
46:3,10
47:9
51:14
115:10
121:4
148:8,13
154:1
163:19
171:10

**opinions**
45:12
179:3,11
230:18

**opportuni
ty**
10:7 24:5
43:9
113:19
232:19
233:20
243:6
252:23

**opposed**
99:2
109:14

**option**
82:23
133:6
182:25
183:7

**options**
179:21
183:11,13

**order**
12:4
106:11
114:5
183:24
235:16
246:24

**ordered**
142:23
176:8

**orders**
104:3

**organizat
ion**
28:2
31:22

**organizat
ions**
68:9

**organize**
106:25

**organized**
245:13

**other**
10:16
11:7 15:5
20:14
21:14,19
25:10
26:15,17
49:1
53:11
58:7 59:1
74:2,3,7
77:7
80:22
81:1
84:20
94:13,20
97:18
100:9
103:19
111:6
117:12,15
119:25
121:8
123:4
126:3
129:16
132:21
139:3
157:13
158:2
160:3,11
178:11
179:20
181:10
183:3
184:6
188:9
210:22
219:12
223:17
230:11
235:4,21
240:7,17
255:10
257:17,22
259:7

**otherwise**
170:15
176:9

**ought**
193:20
239:20

**our**
9:7 12:7,
9 13:4,5,
12 14:6,
7,21,25
16:25
17:5,11
18:23
20:9
23:20,22
24:7
27:5,10,
15,18
28:1,2,4
29:10,12,
19 30:14,
21,22
33:21
34:2,11
43:14
44:1
50:19
51:23
54:8
55:14
57:23
58:18
59:21
60:15,25
61:3,4
62:2
63:2,14
66:20
67:3
68:16
71:9
75:10,20,
23 76:13
77:20
78:2
79:22
80:14
83:24,25
84:16
85:21,22
86:20,21,

23,24
87:11,21
89:1 94:6
99:24
100:10,
11,12
101:2
105:7,12
107:18
108:7,8
109:11,
12,22,25
110:3,21
111:1,24
112:2
113:18,20
115:15
117:7
123:17,18
133:20
134:14
135:14,18
139:20
144:18
154:11
163:10
164:17
165:12
170:15
172:24
174:16,23
175:5
176:10
187:16
196:8,21
201:14
211:17
214:6
215:14
223:9
225:1
232:9
233:12
234:10
235:25
236:14
240:23
243:12,23
247:24
248:6

254:17
256:7

**ours**
51:5
171:4

**ourselves**
77:21

**out**
12:11
13:3 16:7
28:9,13
31:25
36:4
38:15
46:13
49:9
51:21
52:17
54:16
56:18
58:19
60:24
70:23
71:19,21
77:14
80:2
82:11,20
84:2,3,6,
11,13
85:3,23,
24 86:7,9
89:18
90:19
95:8
99:6,24
105:5,20,
21 114:20
115:1,3,
4,6,14
117:7
120:15
130:24
133:11
134:10,15
140:9
147:19
151:19
157:10,24

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 318 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

160:24
162:5,23
163:20
167:6,7
177:18
180:14
182:25
183:7
187:25
188:1
191:21,
22,25
192:1,19,
21 200:8
204:12,
13,14
206:3
210:13
215:16
217:10
219:24
220:8,15
221:1
222:5,14
225:5
235:24
243:21
246:4
254:2,5,
13,15

**outcome**
14:14
111:5,6
156:10
160:8
174:1
256:2,3

**outer**
128:16
129:3

**outline**
52:6
149:12
190:22
232:12

**outlined**
55:9
204:9

209:25
212:25
214:3
232:12
256:22

**outlines**
113:7

**outlining**
147:13
230:10

**outside**
12:19
23:19
57:6 70:6
86:1,21
91:13
97:16
99:2
102:22
115:14
141:14
160:4
174:23
176:9
189:9
200:16
224:20
234:22
244:24
251:4,21
253:1

**oval**
202:14

**over**
8:20 9:9
12:8
19:4,13
21:15
25:22
35:8
36:10
52:10
56:24
57:2
62:24
74:22
77:12

85:5 89:1
95:7
103:5
107:13
109:13
114:19
117:18,21
149:16,23
150:3,6
167:3,4
169:6
180:14
183:8
188:8
202:21
216:17
227:25
231:5,23
235:3
241:7
244:18
246:25
248:23
250:11
254:12
258:2

**overall**
15:17
31:21
49:15
55:3
118:3
131:3
238:12

**overhaul**
246:11

**oversight**
29:8,22
30:3,6,
18,22,24,
25 31:5,
13

**overt**
154:15

**overturn**
19:20
126:22

242:1
251:13

**overturne
d**
250:6
252:16,
18,21
254:6

**overview**
86:9
183:2

**overwatch**
235:22

**overwhelm**
192:14
209:19
232:5
234:20

**overwhelm
ing**
41:3

**own**
60:5
70:12
97:21
105:22
108:20,21
112:6
174:11
185:21
189:1
230:13

**owner**
146:25

**P**

**P&i**
140:14

**p.m.**
156:17,20
254:23
255:1
259:16,22

**P1**
223:3,7,
19 241:20

**pace**
196:16

**packed**
248:14
251:1

**page**
28:17,23
29:3
36:23
38:1,20
40:1,9
41:1,16,
18 42:1
44:9
45:1,3,8
46:15
47:10
57:5
78:25
97:8
99:14,15
102:23,24
103:12,14
107:5
109:14
128:19
130:12
131:10,21
132:5,15,
16 133:16
134:3,4,6
135:3,8
136:2,5,
17 137:4
138:7
139:17,
24,25
141:8
142:12,
13,16,17
143:14
144:7,8,
25 145:8
146:11,
14,22

147:8,15
149:1,11
151:3,23
153:9,10,
15,20
154:6
155:7,24
156:3,23,
24 157:7
160:19
162:13
167:2,20
168:12
169:13
171:6,12
172:5
173:1,2,4
176:12,22
177:3,23
178:4
179:13
180:1
182:12
184:25
186:3,12,
23 187:4,
7 190:11,
16 192:18
195:1
199:14,
15,17
200:6,25
203:16,23
204:21
205:7,21
206:18
207:23
208:25
209:15,17
210:8
211:23,24
215:22
216:12,
19,21
217:17,21
224:13
227:20
229:4,6
230:4
238:6

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 319 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

239:23
240:1,8
251:12

**pages**
38:2,15
39:16
106:8
109:22,23
122:4
125:7
131:9
132:12,18
142:17
145:8
169:7
172:12,15
184:22
186:7
187:15
199:5
205:10,24
216:14,15
219:11
227:19
252:3

**pains**
123:1

**pandemic**
221:3

**paper**
84:22
108:24

**paperwork**
93:2

**paragraph**
41:14,16,
25 44:17,
18 47:11,
19 79:2
108:5
153:16,19
162:14
167:3
199:16
204:21
208:2
218:18

**paragraphs**
107:25

**parameters**
113:5
114:3
190:22

**parking**
184:19

**part**
25:7
27:16
31:18
32:11
33:4,12,
20 34:17
36:21
38:16
39:21,23,
24 46:24
49:6 50:3
62:15
63:18
64:5
66:14
68:10,12,
21 69:7
71:20
80:14
83:3,23
85:23
92:14
97:17
102:11
103:5
104:9
105:14
106:19
110:9
112:13,18
119:22,24
123:8,19,
20 124:1,
12,23
125:10
127:6
137:19

140:16
150:23
152:19
157:25
159:4,8
167:25
168:3
169:20
173:7
176:10
183:23
189:7
190:20
194:20
195:24
196:20
205:2,4
206:25
207:1
209:14
210:9
215:4
223:10
224:13
231:4
232:21
233:7
234:1,10
235:25
237:23
242:11
243:8

**participated**
56:7

**particular**
108:9

**particularity**
22:23
164:11

**particularly**
109:17,
18,20

**partner**
16:13
107:6

**parts**
120:15

**passage**
134:24
192:3

**past**
42:5
106:14
158:5

**Patrick**
30:15

**patrol**
15:16,24,
25 16:7
28:12
58:13,14
68:4
76:19
81:20
83:23
102:2
235:20
236:17

**pay**
77:8

**PBT**
83:24

**PD**
15:24
16:13
58:12
84:11

**peaceably**
232:19

**peacefully**
198:7

**peeking**
155:14

**peer**
78:5

248:2,10,
12,13,16
249:14

**penetrate**
205:19

**Pennucci**
49:2,12

**people**
7:9 9:24
17:10,11
18:19
21:11
25:11
26:1,15
28:1 36:3
56:4 67:4
68:7
83:4,5
84:17
88:13
89:23
93:20
95:15
99:25
102:10
104:12
121:8
126:3
132:18
133:2
135:24
158:10
172:2
175:1,6,
13 178:11
179:10
189:3
196:17
204:18
221:1
248:9
249:10
250:9,19,
20,21

**people's**
113:24
114:5
134:15

144:11
174:24

**per**
41:7
42:1,4
57:11
63:13,14
66:9
68:20
69:18
90:14
101:21
136:12
145:23
162:16
187:15
196:8
232:5

**perceived**
206:8
217:5

**perceiving**
218:4

**percent**
63:10
137:2
176:14,15
222:11

**perception**
216:4,5

**perfect**
94:1
158:3

**perfectionist**
108:4

**performance**
175:13

**performing**
255:3,4

Detective Justin Roth      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **perhaps**<br>21:9<br>70:20<br>78:12<br><br>**perimeter**<br>197:22<br><br>**period**<br>92:1<br>216:2<br><br>**permission**<br>39:5<br>183:24<br><br>**permitted**<br>86:1<br><br>**person**<br>53:18<br>54:3,4<br>57:11,23<br>59:16<br>60:4 68:8<br>87:18<br>98:23<br>142:7,12<br>145:18,25<br>147:14<br>188:2<br>191:22<br>197:17<br>198:6<br>204:13<br>236:8,10<br><br>**personal**<br>8:14<br>120:24<br>148:8,12<br>163:19<br>170:8<br>183:14<br><br>**personally**<br>73:17<br><br>**personnel**<br>204:1<br>247:22 | **persons**<br>204:5<br><br>**perspective**<br>43:21<br>49:14,16<br>50:17,18<br>69:5<br>70:3,10<br>217:25<br>218:1,2<br><br>**phase**<br>30:10<br><br>**phone**<br>64:21<br>85:3,5<br>173:4<br>222:9<br><br>**phones**<br>161:12<br>162:3<br>163:7<br>222:12<br><br>**photo**<br>139:5<br>147:14,20<br>149:16<br>167:4<br>169:3<br>182:13<br>216:7<br><br>**photograph**<br>140:6,17<br>147:2,9<br>195:10<br><br>**photographed**<br>131:19<br>147:16<br><br>**photographs**<br>135:9,20<br>140:15<br>141:25 | 146:24<br>147:13<br><br>**photos**<br>87:15<br>88:1<br>130:15<br>135:13<br>155:8<br>182:18<br><br>**physically**<br>187:15<br><br>**pick**<br>102:4,5<br><br>**picture**<br>18:13<br>88:4<br>130:19<br>132:9<br>157:2<br>177:20<br>183:4<br>205:12<br><br>**pictured**<br>142:8<br>149:9<br>177:12<br><br>**pictures**<br>131:4<br>135:24<br>170:14<br>205:11<br><br>**piece**<br>84:22<br>94:4<br>195:17<br><br>**pieces**<br>174:15<br><br>**piggyback**<br>82:18<br><br>**pin**<br>170:21<br><br>**pink**<br>210:10 | **PIO**<br>145:2<br><br>**pistol**<br>150:16,17<br>194:7<br><br>**place**<br>5:1 46:21<br>76:16<br>91:15<br>139:16<br>150:2<br>155:1,2<br>177:17<br>185:8<br>201:4,7<br>241:7<br><br>**placed**<br>12:15<br>46:2<br>195:16<br>216:23<br>234:11<br><br>**plain**<br>129:9<br><br>**plainclothes**<br>16:8,10<br>22:10<br><br>**plaintiff**<br>4:17 5:9<br><br>**plan**<br>57:1,2,3<br>63:18<br>171:2,13<br>190:12<br>206:23<br>237:20<br>238:10<br><br>**planning**<br>70:2,5<br>73:21,25<br>96:10,12<br>227:21<br>238:2<br><br>**plate** | 143:20<br>144:14,20<br><br>**plates**<br>144:12<br><br>**play**<br>22:12<br>76:10<br>90:19<br><br>**players**<br>200:16<br><br>**please**<br>4:13 5:11<br>8:18 10:4<br>130:3<br>145:11<br>151:2<br>166:2<br>172:16<br>202:19<br>205:23<br>206:4,19,<br>20 207:23<br>253:24<br>258:12<br><br>**pled**<br>225:8<br><br>**PMSA**<br>102:8,10,<br>12<br><br>**pocket**<br>177:16,<br>17,19<br><br>**point**<br>25:15<br>30:8 37:5<br>44:24<br>45:1<br>46:13,20<br>51:1,12<br>60:2 61:7<br>62:22<br>64:25<br>80:13<br>82:1 84:8<br>87:2<br>91:10 | 92:18<br>100:18<br>104:18<br>109:11<br>116:20<br>118:4<br>120:15<br>126:10<br>133:1<br>139:10<br>146:8<br>148:1<br>153:4<br>172:25<br>182:17<br>191:20<br>202:18<br>212:13<br>214:12<br>216:9<br>226:14<br>237:2<br>242:1<br>254:13<br><br>**pointing**<br>142:3<br>163:20<br><br>**points**<br>48:23<br>88:3<br>138:1<br>208:19<br><br>**pole**<br>184:8,9<br>202:6<br><br>**police**<br>4:11 5:3<br>11:15,20<br>15:15<br>17:1 21:3<br>22:12<br>33:14<br>52:25<br>53:8<br>64:13<br>68:1<br>97:25<br>150:24 |

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 321 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

151:18
209:3
213:25
255:4
257:3,9

**policies**
17:3
34:8,11
43:14
54:8 74:9
111:10,
14,15
112:21
117:8
121:14
124:17
257:20

**Policing**
30:22
31:14

**policy**
14:8
17:14
18:25
20:10
22:3
23:19,20,
22,24
24:1,2,8
27:18
33:21
50:22
63:14
65:12
69:18
77:19
78:21
90:14
110:25
111:17,
19,22,24
112:2,6
120:8,20,
22 121:2
123:15,16
153:8,12
154:4
163:3

164:12,
16,17
166:5
170:5,24
171:3
175:24
185:9
186:16,
19,20,21
187:16,17
188:5
193:12
198:24
199:6
201:9
211:6
223:10
224:9,10
226:10,
18,19
228:15,21
230:7,8,
20,21,23
232:9
233:22
238:14,24
239:10
241:16
256:7,20,
23

**pop**
8:15

**popped**
39:4
58:24

**portion**
40:12
41:8,22
206:2
209:16
219:8
249:22

**position**
15:25
21:25
22:23
24:12
155:16

187:3
202:25

**positione
d**
183:10

**positions**
129:24
144:14
207:2

**positive**
121:17

**positives**
120:5

**possibili
ty**
181:2

**possible**
24:24
66:7
80:25
86:3,17
107:22
108:4
141:22,23
190:7
214:19

**possibly**
91:1
124:25
162:16
256:1

**post-ois**
223:13
240:20,25

**post-
scene**
217:19

**post-
shooting**
217:16
235:9

**posts**
240:22

**potential**
157:13
184:3
197:21

**potential
ly**
190:2

**power**
158:22
184:9,10,
11,12,13

**Powerdms**
201:16

**Powerpoin
t**
17:18
18:5,8
28:3
103:24

**PPA**
68:1

**PPACE**
102:13

**practical**
75:21

**practical
ly**
195:19,21

**practice**
97:20
134:18
199:13

**practices**
34:2,5
75:21

**preapprov
al**
228:19

**prearriva
l**
56:25

**preclusio
n**
24:5
113:20

**preface**
249:2

**prefaced**
36:15

**prefer**
5:16

**prelimina
ry**
7:13
60:11,14
83:25
86:12
92:25
95:4
127:17

**prelims**
7:19

**prep**
55:25

**preparati
on**
10:18,21
63:22
64:6
219:3

**prepare**
8:19
12:18
56:21
64:4
66:11

**prepared**
63:24

**preparing**
27:7
81:2,3
91:20,21
92:3

**preplanni
ng**
74:16

**presence**
204:4,12,
13,14
209:3

**present**
11:8
34:22
63:6
67:17
103:16,19
106:10
164:2
249:7,11
250:1
257:25
258:4,16

**presentat
ion**
17:8,16,
20,24
18:5
19:7,21
63:4
64:22,23
65:10
81:7,12
92:4,10
103:17,24
174:4
231:5
249:12,13

**presentat
ions**
17:6
92:14

**presented**
18:11
47:14
148:24

**presenter**
116:21



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **preservation**<br>192:25<br>193:6 | **primary**<br>116:17,<br>18,19 | 81:8 88:6<br>92:16<br>118:6<br>144:2 | **proceeding**<br>68:18,20 | **proof**<br>56:3 | 134:12<br>137:25<br>167:8<br>172:17 |

**preservation**
192:25
193:6

**press**
62:23
64:12,20
65:22,25

**pressing**
95:25

**pressure**
139:14

**presume**
151:24

**pretty**
26:2 27:2
86:20
88:24
122:5
189:2
223:1
256:15

**previous**
44:23
46:6 93:9
94:21
142:12
144:6
183:22
187:12
242:20

**previously**
12:19
16:3
48:25
77:18
109:22
159:15
194:5
227:11

**pride**
115:17
116:10,14

**primary**
116:17,
18,19

**principles**
229:25

**prior**
36:25
65:23
97:12
104:8
117:12
137:24
144:4
204:1
207:5
221:25
246:2
256:9

**privacy**
134:15

**privy**
231:11
242:23
251:15

**Pro**
12:10,16
86:21
87:8
254:18

**probable**
98:21
167:7
193:25
206:7,9,
11

**probably**
11:25
30:9
36:24
37:4,14,
15 44:21
57:10
59:16
70:3
73:18

81:8 88:6
92:16
118:6
144:2
169:9,10
179:2
181:23
182:20
254:5
255:25
257:5

**problem**
35:16
50:4
157:13,
15,18
184:7
188:18
240:18

**problem-solving**
16:4

**procedural**
100:10

**procedure**
34:2
77:19
211:20
214:20
221:25

**procedures**
22:3
33:21
34:12
43:15
49:11
54:8
112:21
154:19
185:10
223:13
240:23
256:7
257:4,20

**proceeding**
68:18,20

**proceedings**
259:22

**process**
27:17
56:11
57:17
62:9 70:5
82:9
88:22
95:9
196:18

**processed**
175:23

**produced**
17:18

**product**
109:10,23
114:25
116:10
122:8
173:25
174:2

**profession**
21:1,2

**professional**
8:15 15:9
58:3
97:12
124:1

**proficient**
140:14

**programs**
223:9

**project**
26:20

**promoted**
28:13

**proof**
56:3

**proper**
131:7

**properly**
82:4
117:11

**property**
15:20
58:10,11
193:3,8
194:9
195:17
199:12
227:6,18

**property-only**
193:14
196:5

**Prosser's**
253:7

**protect**
134:15

**protection**
29:15

**Protective**
68:2

**proud**
173:22,25
174:1,2,
8,18
176:11,
12,15,17

**prove**
101:4

**provide**
36:8
134:20
173:17
232:18

**provided**
45:13

134:12
137:25
167:8
172:17
208:23

**providing**
235:22

**provisions**
252:4

**provocation**
153:23
154:3

**prudent**
109:13

**PSMA**
68:4

**PSU**
16:4,6
58:11

**public**
17:5,10
145:3
150:23
192:24
238:23
250:22
255:8,12

**published**
119:11
136:25

**puff**
216:25

**pull**
37:9
38:15
56:18
89:1
139:19
167:6,7
182:14
214:16
215:5
231:20

Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**pulled**
26:23
45:12,17
46:6
128:10
129:20
130:4
152:15
192:19,21
215:21

**pulling**
42:9
106:4
123:5
215:16

**Puma**
148:5
167:10

**purpose**
16:23
31:23,24
32:11,15
53:25
74:24
75:14,18
81:20
110:10
119:22,
24,25
129:13
168:15
182:22
185:13
192:13
199:11
203:21
213:21

**purposes**
29:14
84:20
119:15
159:18
208:18
229:22

**pursuant**
232:20,25

**purview**
133:20
163:10
188:8
224:17
251:21
254:2

**pushed**
172:21
174:12,13
176:2
205:16

**put**
10:9
12:12
34:24
39:23
46:8,9
54:2
66:12
76:16
77:10
88:15
90:2
99:23
108:24,25
109:2,25
112:1,9
114:19
123:17,18
125:9,12
127:4
137:5,16,
18 138:18
139:13
140:9
154:14,18
155:2
170:8,21
174:9,12
176:12,13
177:17
183:5
189:18
201:3
220:3,24
225:12
230:18
254:17

**puts**
87:5

**putting**
88:25
91:3
92:23
122:15
141:14
154:21
164:25

---

### Q

**qual**
13:17

**qualifica
tion**
239:17

**qualified**
204:17

**qualifier**
22:8,9

**qualify**
124:9

**quality**
140:3,10,
11,13

**question**
9:20
10:3,12
21:10
35:20
51:1
52:6,8,13
53:3
57:20
64:8
66:17
72:23
76:7 92:6
100:1
105:13
108:25
124:14
127:4

132:7
139:22
141:1
148:4
170:20
174:18
181:5,8
182:8
193:7
208:21
228:7
230:19
249:3
256:12
258:12

**questioni
ng**
250:8

**questions**
8:7 15:9
57:9
67:13
69:12,16,
17 71:6,
10,12
72:12,18,
25 73:2,
20 75:2,
13 77:13
86:11,13,
14 93:7
105:18
106:2
114:21,23
118:22
163:6
164:19
167:24
168:1
172:11
175:4,12
180:15
218:15
249:17
252:25
259:7,8

**quick**
88:24

156:14
165:22
189:1

**quickly**
10:5
74:23
202:9
233:17

**quite**
10:13
46:12
95:16
106:8
112:12
224:4
225:24
239:2

**quotation**
203:18

**quote**
18:10
36:18
40:16
41:9
123:2,4,
13 167:8
178:6
203:16,17

**quote-
unquote**
95:11

**quoted**
36:22
42:15,24
46:21
190:17
192:3

**quotes**
42:8 63:2
106:11
117:10
185:3
213:1
219:12
221:13

**quoting**
122:14
190:17
203:24

---

### R

**R-A-Y**
5:15

**R-O-T-H**
5:13

**racking**
241:3

**radio**
56:24
89:3,9
223:7,11,
17

**rage**
150:3,9

**raise**
177:24

**raised**
177:22
179:20

**rake**
211:13,
14,19
214:21
215:3

**ram**
210:16

**ramificat
ions**
256:22

**randomly**
154:17

**rank**
248:3

**ranking**
251:3

**rare**
27:2

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **rather**<br>38:15<br>218:8,10<br><br>**Ray**<br>5:15<br><br>**RBT**<br>28:6<br>100:13<br><br>**re-interview**<br>104:15<br><br>**re-sign**<br>221:11<br><br>**re-signature**<br>221:14<br><br>**re-signing**<br>186:11<br><br>**reached**<br>36:4<br><br>**read**<br>9:2,9<br>19:7,10<br>20:2,3,6<br>36:20<br>41:11<br>43:25<br>46:12<br>72:14<br>78:19<br>84:23<br>91:6<br>105:22<br>107:13<br>117:1<br>118:5<br>119:16,20<br>128:17,<br>22,23<br>129:2<br>144:8<br>160:14<br>164:1<br>179:25 | 180:3<br>203:25<br>206:1<br>209:16<br>210:9<br>222:22<br>225:17<br>226:7<br>227:10<br>229:6<br><br>**read-and-sign**<br>259:21<br><br>**reader**<br>110:7<br><br>**readers**<br>144:14<br><br>**readily**<br>131:6<br><br>**reading**<br>20:5 42:7<br>92:2<br>107:24<br>117:3<br>128:25<br>142:11<br>147:12<br>173:3<br>222:8<br><br>**reads**<br>70:13<br>79:3<br>108:8<br>203:18<br>207:11<br>259:5<br><br>**real**<br>55:8<br>85:11<br>165:21<br><br>**real-time**<br>88:11<br><br>**Reality-based**<br>28:7 | **really**<br>72:17<br>75:16<br>77:8 83:8<br>88:25<br>116:20<br>120:13<br>127:11<br>140:14<br>165:9<br>166:10,13<br>174:11,14<br>183:4<br>184:25<br>185:13<br>210:21,22<br>218:14<br>223:4,9,<br>24 224:23<br>233:17<br>235:18<br>240:18<br>241:21<br>256:5<br><br>**realm**<br>177:14<br><br>**reason**<br>8:5 46:1<br>68:10,12<br>72:8<br>120:9<br>122:6<br>138:23<br>170:6<br>172:13<br>188:1<br><br>**reasonable**<br>46:5<br>47:5,15,<br>25 50:2,<br>7,12,14<br>54:3,4<br>75:22<br>78:20<br>81:23<br>90:17<br>114:2 | 117:5<br>159:14,17<br>165:16<br>183:12,17<br>192:6<br>209:4,21<br>218:3<br>228:3<br>234:3,11,<br>14,15<br><br>**reasonableness**<br>113:6,25<br><br>**reasonably**<br>112:22<br><br>**reasons**<br>93:20<br>96:18<br>244:18<br><br>**recall**<br>53:11,14<br>114:23,25<br>151:21<br>188:24<br>190:24<br>201:22<br>242:2<br><br>**recategorize**<br>228:16<br><br>**receive**<br>193:18<br><br>**received**<br>21:6 22:6<br>206:21<br><br>**recent**<br>8:14<br><br>**recently**<br>28:13<br>49:9<br>108:5<br><br>**recitation** | 217:5,18<br><br>**recognizance**<br>189:2<br><br>**recognize**<br>114:5<br>212:16,18<br><br>**recognized**<br>172:8,9<br>239:22<br><br>**recognizing**<br>172:20<br><br>**recollect**<br>59:12<br><br>**recollection**<br>7:18 9:5<br>42:14<br>52:20<br>53:4<br>69:21<br>162:8<br>166:17<br>219:13<br>246:9<br>253:13,14<br><br>**recommend**<br>228:16<br>234:10<br><br>**recommendation**<br>76:13<br>79:22<br>80:7,11<br>126:7,18<br>169:24<br>170:3<br>196:8,21<br>200:22<br>226:18<br>228:15<br>233:13<br>243:15 | 244:3<br><br>**recommendations**<br>74:13,18<br>76:6,11,<br>15,16<br>77:10,15,<br>25 78:9,<br>12 80:6<br>94:12,16,<br>17 109:25<br>110:3,5<br>125:13,<br>20,25<br>126:2,11,<br>13 127:5<br>173:16,17<br>200:20<br>228:10<br>231:6,7<br>242:22<br><br>**recommended**<br>110:16,<br>17,18<br>200:17<br>242:5<br>243:22<br>247:3<br><br>**recommending**<br>110:9<br>242:12<br><br>**recommends**<br>79:12<br>171:1<br>228:20<br><br>**record**<br>4:25 5:12<br>20:6<br>24:23<br>27:21<br>29:1<br>31:12<br>38:16<br>48:20 |

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 325 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

65:14,17
67:14,23
100:21
118:15,18
140:17
150:23
156:16,19
184:6
191:7
233:7
254:22,25
259:17

**recorder**
253:2

**recording**
146:10

**recovered**
150:8,18

**recovering**
199:11

**recreates**
87:16

**red**
86:1
141:15

**redact**
134:20,22

**refer**
171:16

**reference**
9:12
37:16
51:9
124:23
125:5
127:10,
11,18
208:19
223:8,13
225:11
226:8
227:5,13
230:4,5
251:7

**referenced**
28:15,22
47:2,8,12
68:11
87:17
137:15
145:4,16
170:20
243:20

**references**
48:5

**referencing**
27:12
39:13,15
40:2
80:10
194:15
229:4

**referred**
42:23

**referring**
8:25
28:24
38:7

**refers**
38:19

**reflect**
4:25 29:1
228:22

**reflective**
183:16

**reflects**
165:15

**refresh**
161:21
162:8

**refresher**
242:6

**refuse**
99:6

**refuted**
110:18

**regarding**
38:10
43:20
155:3
231:2

**regardless**
50:10
72:7
159:22

**regards**
245:2

**registered**
146:25

**registration**
144:4

**regular**
22:11
102:1

**related**
20:25
59:14
77:1
101:7,9
121:10
125:5
147:5,10
175:24
176:5
194:9
220:22
221:6,9,
23 237:11
250:20

**relates**
256:17

**relation**
151:7,8

**relative**
137:8

138:1

**relatively**
207:7

**relayed**
43:22
143:6

**relaying**
179:11

**release**
64:12
65:22
145:4

**released**
140:12

**relevance**
137:20

**relevant**
137:12
219:18
221:16
223:9

**reliable**
8:11,16
122:7
152:23
153:6,22
154:2

**relied**
103:1

**rely**
127:8
198:23

**relying**
153:13

**remainder**
38:11
217:15
218:7
249:23

**Rembert**
151:5,7
194:6

**Rembert's**
150:8

**remember**
36:21
43:11,22
48:17
49:1
61:15
66:3,22
67:21
72:1,2
92:18
99:17
122:4
130:23
132:2
141:20
146:7
155:21
169:21
179:25
181:15,16
194:19
211:17
225:4
241:25

**remembered**
206:5

**rendered**
95:20

**repeat**
233:5
258:12

**rephrase**
74:5
125:18
186:17
258:11

**replace**
181:2

**replayed**
51:7

**report**
8:20,23,
24 9:5,

11,12
10:17
12:2,4,
19,21
18:7,8,
11,13
19:8,11
20:3
23:12
25:2
27:12
28:23
29:4
36:13,15,
21 38:20
39:9
40:1,13
42:8,15,
16,18,21,
25 43:4
44:12
45:13,21,
23 46:9,
12,21
50:11
51:10,17
52:11
55:17
56:9
74:13
76:3
80:3,5,21
81:3
87:17
93:14
98:10
99:9,11
100:16
102:20
103:3,7
105:6,8,
21 106:7,
25 107:2,
7 108:3,
17 109:15
110:10
112:14
114:16,22
115:4,8
116:7,9,



Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 25<br>118:10,<br>11,22,24<br>119:7,10,<br>11,12<br>120:16,21<br>122:16,23<br>123:23<br>125:19<br>127:15,<br>16,19<br>128:13<br>129:20,23<br>130:4,10,<br>11<br>133:16,17<br>135:23<br>136:11,<br>12,17,20,<br>23,24<br>137:11,<br>12,15,23<br>138:3,4,<br>17,18<br>140:11<br>142:11,<br>19,22<br>143:15<br>144:9<br>146:18<br>148:10<br>152:3<br>156:5,24<br>159:1<br>163:21<br>164:23<br>165:24<br>168:10<br>169:12<br>171:20<br>174:19<br>176:18<br>183:16<br>200:21<br>204:10<br>209:11,25<br>210:18<br>211:6<br>212:2<br>213:8,9, | 10 214:3,<br>7 216:13<br>218:6,7<br>219:7<br>230:11<br>231:5<br>246:22<br>247:13<br>257:18<br>259:5<br>**report's**<br>36:19<br>119:2<br>**report-<br>writing**<br>117:17<br>**reporter**<br>4:6,14<br>6:5 9:19<br>259:18<br>**reporting**<br>26:16<br>145:19,25<br>**reports**<br>74:7 81:3<br>95:4<br>104:23<br>117:24<br>135:20<br>150:24<br>162:17<br>163:21<br>188:1<br>236:13,14<br>**represent**<br>5:9 39:8<br>54:10<br>101:5,17,<br>19 102:3<br>128:9<br>129:18<br>161:20<br>169:5,6<br>**represent<br>ation**<br>27:18 | 67:10<br>68:12<br>85:18<br>**represent<br>ative**<br>99:21<br>101:11,23<br>102:9<br>**represent<br>atives**<br>67:24<br>101:22<br>102:6<br>**represent<br>ed**<br>102:10,<br>12,16<br>**represent<br>ing**<br>62:20<br>**represent<br>s**<br>68:6<br>132:9<br>141:13<br>202:14<br>**reproduct<br>ion**<br>172:14<br>**request**<br>146:15<br>204:11<br>222:9<br>**requested**<br>146:12<br>176:2<br>**requests**<br>32:3<br>79:5,6<br>**required**<br>63:11,12<br>66:8 67:5<br>69:15<br>83:18 | 91:15<br>93:5 97:7<br>124:21,22<br>126:18<br>133:9,22<br>225:3<br>**requireme<br>nt**<br>164:10<br>**requireme<br>nts**<br>33:7,16<br>158:21<br>163:2,13,<br>23 164:8<br>256:16<br>**requires**<br>209:21<br>**rereading**<br>108:4,22<br>**rescues**<br>244:24<br>**reserve**<br>86:18<br>155:5<br>**residence**<br>191:25<br>196:17<br>232:7<br>**resolutio<br>n**<br>140:7,22<br>141:2,3<br>211:16<br>**resource**<br>12:11<br>**resources**<br>75:10<br>98:24<br>104:13<br>105:7<br>220:25<br>**respect**<br>53:22 | 124:20<br>173:24<br>257:1<br>**respectiv<br>e**<br>83:21<br>**respond**<br>60:10<br>82:24<br>218:16<br>229:15<br>**responded**<br>240:18<br>256:4<br>**respondin<br>g**<br>60:10<br>197:23<br>248:16<br>**response**<br>240:20,25<br>**responses**<br>93:6<br>**responsib<br>ility**<br>71:5,9<br>**responsib<br>le**<br>28:4<br>154:12<br>172:2<br>**restricte<br>d**<br>19:23<br>**resubmit**<br>172:16<br>**result**<br>19:20<br>77:2<br>121:7<br>198:25<br>222:2,6<br>226:25<br>230:9,10 | 239:11<br>242:2<br>**resulted**<br>241:24<br>**results**<br>250:13<br>**resuming**<br>253:3<br>**retired**<br>48:25<br>49:1,8,9<br>101:16<br>179:7<br>**return-<br>to-duty**<br>82:4<br>**returned**<br>172:23<br>**reuse**<br>186:22<br>**reusing**<br>239:25<br>240:5,7<br>**revamp**<br>74:9<br>**revamped**<br>77:19<br>**reverse**<br>168:20<br>**reverting**<br>246:1<br>**review**<br>11:4<br>12:5,17<br>14:12<br>17:9 18:1<br>19:6,14,<br>22 22:1<br>23:11,15<br>25:5<br>29:3,14<br>31:2,4<br>32:6 33:5 |



49:5
56:23
60:13
77:22
78:4
85:22
105:8
110:6
112:15,
16,19
115:23
123:9
174:5
217:3
219:5,6,8
222:11,19
231:1
247:10,14
248:8,17,
19 249:8
251:5
253:3
254:21

**reviewed**
9:16
10:18
67:12
78:10
216:15
219:2

**reviewers**
172:25

**reviewing**
13:5 61:6

**reviews**
38:9

**Revised**
209:23

**rewording**
231:10

**Reynolds**
149:7,10

**rifle**
149:23
150:6,17

**right**
12:1
25:13
37:25
38:17
42:10
55:16
58:23,25
65:20
66:25
70:19
71:8
73:11
75:15
95:2
100:6
109:9
120:2,14
121:21
123:7
124:12
127:14
130:9
136:10
137:3
142:2,6
150:13
151:22
153:17
158:13
159:10
162:12,14
167:3,4
177:3,20
190:10
193:9,19
197:6
202:12,20
203:9,10
211:1,2
213:18,25
214:15,17
216:7,9
222:16
224:6
229:10
230:3
234:20
237:9
240:16

243:4,14
244:1
247:9
258:9,19,
20

**rights**
32:13
113:24
114:6,8
213:17
255:7,12,
17 256:17
257:11
259:1

**risk**
23:5
204:5

**road**
34:4
109:6
150:3,9

**robot**
198:12

**robots**
196:16
198:12

**Rogers**
102:7

**role**
97:18
116:18,19

**roles**
58:7

**roof**
112:4

**room**
64:23
100:19
195:19,22
202:8
217:1
236:8,10
248:14
249:25
250:3

252:25

**rotation**
25:24
57:24
59:22
60:3,5

**rotations**
60:6

**Roth**
4:10,21
5:2,8,13,
14,17,23
25:4
198:21
252:13
259:15

**Roth's**
27:13

**Rothenburg**
67:21,22
132:6
202:22
203:2
211:18
216:22

**Rothenburg's**
217:4

**rough**
155:17

**roughly**
55:18
156:23

**round**
53:19,21
90:9
123:8
205:17,18
210:4

**round-table**
108:13
115:10

**round-tabled**
107:4
108:10
114:19

**round-tabling**
121:8

**roundabout**
127:3

**rounds**
150:12

**rudimentary**
64:25

**rule**
209:20

**ruled**
204:12,
13,14

**rumors**
174:25
175:6,15

**run**
131:2
143:5
184:10

**runs**
219:11

**rush**
222:20

**Ruth**
11:10,11

**RV-LOOKING**
85:9

---
**S**
---

**S-A-C-O**
191:11

**SACO**
79:9
191:10,
15,16
196:1
214:17,19

**safe**
241:9

**safer**
75:24

**safest**
41:2

**safety**
159:18
181:4
192:24
238:23

**said**
9:13
31:7,11
43:3
44:3,4,22
47:1
50:11,24,
25 51:18
59:12
62:7 76:1
80:20
89:5
94:10
105:11
108:9
109:17
114:4
123:22
141:24
164:14
166:4,13
172:16
173:15
175:8
181:8,11
182:24
183:6
185:5
187:18
189:22



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 192:4 | 194:15 | 63:9 | 222:21 | 180:10 | **screenshot** |
| 211:19 | 200:6 | 68:17 | 238:1 | 181:17 | 140:20 |
| 212:12,19 | 202:6 | 70:25 | 249:12 | 186:25 | 141:15 |
| 214:5 | 213:23 | 73:18 | 252:12,17 | 192:13 | **screenshots** |
| 219:6 | 234:25 | 77:15 | 256:3 | 213:2 | 141:18 |
| 227:22 | 236:24 | 78:16 | 257:6,21 | 216:22 | **script** |
| 228:10 | 238:8 | 87:8 | **saying** | **scan** | 68:16 |
| 230:12, | 247:22 | 89:16 | 15:1,2 | 88:3,8 | 69:8 |
| 15,20 | 248:3,9 | 90:16 | 19:18 | **scanned** | **search** |
| 233:6 | 250:13 | 92:16 | 36:16 | 88:10 | 37:2,9, |
| 234:25 | 256:4 | 93:10,23 | 42:22 | **scenario** | 13,16 |
| 240:6 | 257:1,2,3 | 95:12 | 78:2,6 | 201:5 | 39:16 |
| 243:3,4, | **save** | 97:1 | 79:20 | **scenarios** | 52:2,25 |
| 20 250:6, | 54:6,8 | 101:17 | 90:25 | 75:9 | 53:9 54:5 |
| 25 | 173:9 | 103:3 | 108:23 | 207:1 | 57:23,24 |
| **Sam's** | **saved** | 104:20 | 111:8 | **scene** | 58:8,9, |
| 139:7 | 176:19 | 105:25 | 116:12 | 82:16 | 16,17 |
| **same** | **saw** | 107:3 | 120:14, | 85:25 | 59:5,14, |
| 9:24 10:1 | 17:18 | 109:19 | 16,25 | 86:2,23 | 18 61:8 |
| 13:8 18:4 | 78:7 | 119:15 | 121:1,15 | 87:21 | 62:5 70:8 |
| 24:16 | 84:17 | 120:19,21 | 124:11 | 88:8,10, | 74:10 |
| 30:20 | 87:14 | 122:20 | 148:10,15 | 17 131:25 | 79:4,13 |
| 32:21 | 98:4 | 125:6 | 151:18,25 | 135:14 | 89:6 |
| 40:20 | 108:5 | 137:17 | 165:13 | 136:8 | 92:20 |
| 53:16,22 | 111:4 | 140:8 | 178:2,7 | **schedule** | 96:20 |
| 54:23 | 114:24 | 148:15, | 181:7 | 67:3 | 97:1,6, |
| 55:5,6 | 149:4 | 22,23 | 188:20,22 | **school** | 10,13,17, |
| 57:5,24 | 183:17 | 151:19 | 200:11 | 112:8 | 21,22 |
| 77:7 | 235:5 | 155:10 | 214:11 | 207:17,19 | 98:12,15, |
| 86:15 | 253:7 | 160:6 | 230:3 | 220:12 | 18,19,22 |
| 107:13 | **say** | 162:1 | 235:25 | 221:22 | 99:7 |
| 109:14 | 7:10 8:23 | 163:1,5, | 244:4 | 226:20,22 | 101:3 |
| 116:7 | 9:19,24 | 17 | **says** | 233:21 | 113:23 |
| 127:10 | 10:13 | 164:13,25 | 19:19 | 244:11 | 124:2 |
| 130:1 | 14:15 | 165:8 | 38:3,9 | 245:15 | 129:13 |
| 132:3,5 | 15:18 | 166:8 | 43:18 | **scope** | 145:15 |
| 135:6 | 16:16 | 174:8 | 44:24 | 176:10 | 150:15 |
| 140:7,11 | 19:9 | 176:11,14 | 45:2 | **Scott** | 160:21,24 |
| 141:7 | 21:12,24 | 177:14 | 68:17 | 179:6 | 161:6,18, |
| 142:7,8, | 22:5,7 | 178:11 | 121:12,13 | 238:18 | 22 162:6, |
| 12 150:3 | 26:23 | 181:17 | 124:16 | **screen** | 24 |
| 152:3 | 27:21 | 182:7 | 128:15 | 214:24 | 163:14,17 |
| 156:24 | 30:11 | 194:22 | 129:5 | 215:20 | 164:1 |
| 157:8 | 31:9 | 197:5 | 136:11,12 | | 165:17 |
| 164:1 | 48:10 | 201:6,7 | 142:3,4 | | 166:7,18, |
| 168:18, | 49:13 | 206:14 | 151:8 | | 22,23 |
| 19,22 | 53:18 | 211:12 | 153:22 | | |
| 180:3 | 55:20 | 212:9,21 | 169:13 | | |
| 186:12 | | 215:12,16 | 176:25 | | |
| | | 220:23 | | | |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

170:7
171:1,2,
12 172:4
177:7
192:20,22
193:14,
15,23
194:8
196:5
207:15,16
213:17
219:25
221:5
224:6,9
228:18
232:19
233:23
236:15
237:3
239:21,24
242:6,13
244:16
246:24
256:23
258:6,8,
18,20
259:1

**search-and-seizure**
38:4 45:4
231:10
233:22
256:16

**searchable**
144:22,23

**searched**
43:2

**seated**
177:16

**second**
51:3
52:22
53:20
92:8
107:15

128:21
136:11
147:2
157:3
165:23
208:2
227:10
242:11
252:24

**second-to-last**
162:14

**secondary**
97:7,8
236:9

**seconds**
47:6,15
50:6,12,
13 51:16,
17 52:9,
22 55:1,
3,8
209:8,10
210:11,15
232:17
258:1,4,
16

**section**
8:22
13:5,13
14:6,7
15:21
16:25
29:10
30:14,21,
23 36:3,
18,25
37:6
38:7,10
39:14
40:2,4
42:25
66:21
74:14,15,
17 76:24
78:2,11
107:18
109:6,8,9

110:2
111:18,
20,21,23
112:2
115:9
124:25
128:18
144:18
146:17
154:1,2
155:13
156:14
158:6
164:12
170:23
174:14,15
175:21,23
176:1
178:17
190:18,
21,25
192:19,
20,21
203:16,
17,24
206:23
209:1,5
218:11
222:23
223:20
226:11,14
228:21
230:4,5
233:22,23
237:15
243:18
245:25
246:1
257:24

**sections**
13:3
28:11
76:18
188:8

**secure**
119:21
130:25
132:1
191:25

241:8

**secured**
98:1

**security**
134:17,19
139:13

**see**
38:14
60:14
62:15
64:21
66:15
71:22,25
74:21
85:20
90:24
91:12
93:14
100:3
105:2
107:11
117:25
118:4,7
120:3,6,
11 133:16
135:24
140:7
143:19
148:18,20
158:3
161:21
173:5
175:18
183:3,9
199:18
210:21,22
211:7
212:15
216:7
217:8,10
236:24
251:9,22
252:6
253:6
254:2,16
255:10

**seeing**
71:16,17

136:10
212:17
238:13

**seeking**
193:9

**seem**
114:2
115:16
179:14
200:24,25
214:3
251:24

**seemed**
70:18
165:16
175:9

**seems**
70:14
115:18
138:12
156:23
171:21
177:22,23
178:10
180:1,17
181:6
212:2
246:23
252:1
253:21

**seen**
26:14
71:17
87:14
88:6
111:24
119:5,8
140:3
173:6
177:8
244:21
249:5
254:3

**seizure**
113:24
213:17
256:24

**seldom**
102:6

**send**
77:12
105:22
115:4
225:14

**sending**
105:20

**senior**
38:5 45:5
86:6
118:12

**seniority**
109:7

**sense**
112:10
140:25
159:19
181:4
238:3

**sent**
84:5
105:21
115:6
243:21
246:25

**sentence**
118:3
156:4
199:16
209:1

**separate**
18:3,23
32:20
149:18
177:25
178:8,13,
16

**separated**
29:13

**September**
201:8

**sergeant**

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 25:16,17<br>26:6,7,<br>10,16<br>30:15,16<br>48:25<br>49:1,12<br>60:25<br>68:3<br>82:19<br>84:11<br>86:6 89:4<br>96:4<br>101:15,19<br>107:17<br>108:7<br>109:12<br>130:18<br>137:19<br>179:16<br>206:21<br>207:9,15<br>210:12<br>220:11,17<br>221:21<br>226:7,21<br>237:17<br>238:6,18,<br>22 242:20<br>244:2<br>248:10<br>249:14<br>**sergeants**<br>67:25<br>102:17<br>238:10<br>**serve**<br>53:9<br>97:21<br>98:6 99:7<br>128:3<br>197:7<br>**served**<br>97:23<br>185:2<br>193:3<br>**service**<br>37:2<br>39:16 | 54:5 61:8<br>62:4 70:8<br>79:13<br>145:13,<br>15,16<br>**Services**<br>243:19<br>**serving**<br>89:6<br>129:13<br>**set**<br>24:6 50:3<br>67:8<br>81:4,6,<br>10,14<br>112:6<br>113:12<br>188:5<br>209:22<br>225:1<br>234:14,15<br>**setting**<br>240:22<br>**settings**<br>17:10<br>**seven**<br>25:15,25<br>60:4<br>94:20<br>**seven-<br>person**<br>58:24<br>**several**<br>36:11<br>104:25<br>161:6<br>163:5<br>173:20<br>**sex**<br>169:15<br>**share**<br>13:8<br>**shared**<br>88:25 | **Sharing**<br>222:25<br>**shaved**<br>147:23<br>148:19<br>**shaved-<br>head**<br>148:14<br>**Shawn**<br>26:10<br>27:13<br>**she'll**<br>6:8<br>**sheet**<br>48:20<br>126:21<br>**sheets**<br>251:19<br>**sheriff**<br>62:17,20<br>78:4 81:6<br>91:20,21<br>178:22<br>179:9<br>249:16<br>251:20<br>253:8<br>**sheriff's**<br>30:13<br>**shield**<br>203:3<br>**shields**<br>191:24<br>**shift-<br>adjusting**<br>67:4<br>**shirt**<br>148:18<br>**shirts**<br>168:22<br>**shock**<br>205:13,14 | **shooter**<br>66:18<br>167:10<br>**shooters**<br>63:5 93:6<br>108:16<br>132:14<br>**shooters'**<br>89:22<br>**shooting**<br>6:20 14:4<br>23:7<br>53:18,19<br>61:3,18<br>63:21<br>66:5,24<br>67:8<br>69:3,11<br>73:6,20<br>82:16<br>91:14<br>95:12<br>96:11<br>113:1<br>121:10<br>130:20<br>132:10<br>133:5<br>139:16<br>149:12<br>150:2<br>176:6<br>183:1<br>206:11<br>**shootings**<br>13:7 32:7<br>75:3,5<br>120:10<br>130:23<br>**shop**<br>76:14<br>**short**<br>49:9 70:4<br>92:1<br>**shorts**<br>149:22 | 190:8<br>**shot**<br>55:23<br>64:3<br>71:18<br>85:1<br>90:4,18,<br>20 150:11<br>198:1<br>**shoulder**<br>149:23<br>**show**<br>28:7<br>62:16<br>131:6<br>140:17<br>141:11<br>168:17,25<br>170:15<br>**showed**<br>90:9<br>141:22<br>**showing**<br>146:9<br>**shown**<br>142:12<br>**shows**<br>88:7 90:8<br>131:7<br>134:10<br>142:7<br>**shrunk**<br>19:24<br>**sic**<br>19:20<br>122:4<br>152:22<br>164:12<br>**side**<br>9:7 13:7,<br>21,22,23<br>14:7,8,<br>23,25<br>28:16<br>62:6 | 63:1,2<br>77:6,7<br>101:2,3<br>105:6,11,<br>12 106:18<br>129:18<br>202:21<br>210:23<br>252:25<br>**side-by-<br>side**<br>168:13,16<br>**sidebar**<br>100:17<br>**sides**<br>108:25<br>109:2<br>176:20<br>212:6<br>232:2<br>**Sierra**<br>189:18<br>**Sierras**<br>79:6,7<br>**sign**<br>84:24,25<br>85:2 97:8<br>187:15,25<br>188:2<br>**sign-in**<br>48:20<br>99:18<br>101:1<br>103:12<br>**signature**<br>79:21<br>186:12,23<br>188:21,22<br>221:15,19<br>240:1,7<br>252:3<br>253:7,9<br>**signature<br>s**<br>172:5 |



187:20
188:13
201:11
221:18

**signed**
98:21
163:9,14,
23,24
164:3
166:24
186:22
187:11
224:6
243:23

**significa
nt**
192:24

**significa
ntly**
140:5

**similar**
88:6
108:20
168:18
172:10
197:13

**simpler**
95:11
117:6

**simultane
ous**
246:11

**since**
96:17
116:13
173:20
187:21
194:19
207:4
239:10
244:22

**single**
20:2
56:7,14
68:8

104:8
220:22
234:24

**sit**
13:18
21:18
43:8
45:15
54:15
72:15
103:8
121:24
122:1
193:2,11,
12 196:4
204:8
222:8
242:15
244:13
245:9
246:15
252:25

**sits**
198:21

**sitting**
70:14
92:2

**situated**
158:16,17

**situation**
183:20
190:3

**six**
16:2
22:17,18
24:13
25:25
48:22
49:13
55:7
118:11
150:4
174:6
181:11,17
182:10
184:22
210:11

221:17
224:19
232:17
258:1,4,
16

**six-**
58:24

**six-
person**
26:3

**size**
109:21
111:25
181:19
195:19

**skills**
28:6
58:16

**skip**
130:12
138:7
145:7
167:2
171:6
176:21
190:10
216:17
217:18
229:1

**skipped**
227:16

**sleeves**
167:12

**slide**
221:13

**slides**
18:12

**slideshow**
92:11
103:17

**slight**
126:4
199:6

**sloppy**
116:10

**slow**
198:10,16

**slower**
196:16

**Smaka**
26:10,16

**Smaka's**
27:13

**small**
162:16
201:14

**smaller**
165:4,9

**smart**
57:14
174:11

**SME**
27:20,24
34:24
44:5
46:22
81:22
82:2
100:14,
16,20
101:4,10,
12 104:7,
17 105:4
106:5

**SMES**
27:10,16
36:4
44:25
46:3,5
47:1,12,
20 48:2,
10 51:15
78:19
90:16
99:22
100:12,24
101:2
102:20,21

103:13
107:2
121:7
212:6,21
229:22
230:1
232:3
247:17

**smoke**
216:25
217:8

**snapshot**
152:2,3

**snipers**
79:8
189:19

**Social**
134:17,18

**sofa**
203:9
216:10

**Solano**
180:7
181:7

**sole**
199:11

**solo**
26:19,21

**solved**
139:2

**some**
15:8
17:10,17,
18 21:14
24:18
33:22
34:13,15
48:23
54:11
56:5
58:15
67:13
72:12
86:6
87:14,16,

17 94:5
96:6 98:4
106:23,24
118:21
120:4
124:20
139:9
151:7,9,
17,20
174:19,21
180:1,17
186:6
198:11
200:17
206:7
208:12
213:11
219:14,
23,24
223:8
230:16
233:10
246:17
247:10
251:24
253:7
256:6

**somebody**
28:12
62:19
96:8
101:20,24
102:2
117:1
122:14
134:1
142:10
161:13
162:5
166:18
172:9
175:12
181:24
187:24,25
198:1
213:24
215:18,
23,25
220:15

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 226:20 | 43:5 | 66:2 74:4 | 229:5,14, | **Southeast** | **specific** |
| **somebody'** | 58:13 | 77:4 | 23 | 89:5 | 13:9 22:7 |
| **s** | 62:18 | 83:12 | 231:17, | 137:19 | 24:19 |
| 32:12,13 | 64:22 | 87:12 | 18,20 | **span** | 49:3 |
| 213:16 | 66:19 | 92:7,13 | 232:15,23 | 117:19 | 56:19 |
| **somehow** | 70:13 | 94:10,22 | 233:3,16 | **speak** | 76:18 |
| 10:10 | 71:6,11 | 95:3 | 234:7 | 10:10,11 | 78:11 |
| **someone** | 75:8 | 96:19 | 237:7 | 13:21 | 89:14 |
| 94:4 | 86:16 | 97:16 | 238:17 | 14:23 | 117:19 |
| **someone's** | 102:7 | 100:25 | 240:3 | 15:4 | 126:15,17 |
| 64:2 | 107:12,14 | 101:10 | 249:19 | 17:5,10 | 163:18 |
| **something** | 108:22 | 102:14 | 250:18,20 | 33:22 | 169:1 |
| 12:10,12 | 166:17 | 104:4 | 253:21 | 77:6 | 218:7 |
| 31:7 53:1 | 175:13 | 106:3 | 258:1,12 | 80:13 | 249:17 |
| 64:16 | 197:23 | 113:21 | **sorts** | 84:6 | 252:15 |
| 71:24 | 229:7 | 114:13 | 14:9 23:4 | 94:19 | **specifica** |
| 77:16,18 | **somewhat** | 126:1 | **Soto** | 113:11,12 | **lly** |
| 81:10,19 | 124:8 | 128:20 | 146:24 | 133:6 | 23:18 |
| 90:2,21, | 147:19 | 131:1,21 | 147:10,18 | 136:20 | 28:11 |
| 25 104:18 | 219:15 | 135:7 | 157:6 | 182:9 | 33:24 |
| 108:2 | **somewhere** | 138:4 | **sound** | 207:11 | 36:7 |
| 116:8 | 27:1 | 139:6 | 57:3 | 212:23 | 40:14 |
| 117:20 | 98:10 | 142:17 | 115:9 | 222:10 | 41:13 |
| 118:6 | 154:15 | 144:13 | **sounds** | 252:23 | 44:4 48:1 |
| 122:14 | **son** | 145:10,11 | 52:2 | 255:23 | 57:2 68:7 |
| 123:2 | 151:8 | 146:6 | 66:25 | **speaking** | 69:13 |
| 126:17,22 | **soon** | 153:10 | 80:23 | 114:7,9 | 72:1 |
| 137:14 | 66:7 | 155:3 | **source** | 150:5 | 75:17 |
| 146:9 | 80:25 | 167:5,7 | 42:9 | 214:9 | 76:15 |
| 151:11 | **SOP** | 168:2 | 122:16 | 223:11 | 103:1,23 |
| 159:13 | 200:14,18 | 169:3,12, | 123:5,15 | 256:9 | 107:21 |
| 161:12 | **sorry** | 13,20 | 153:6 | **specialis** | 112:21 |
| 165:1,6 | 16:2,3 | 177:22 | **sources** | **t** | 113:15,17 |
| 168:21 | 20:11 | 178:5 | 158:22 | 143:24 | 122:5 |
| 169:23 | 22:18 | 180:6,12 | **South** | **specializ** | 130:17 |
| 170:3 | 23:14 | 189:15 | 37:3 | **ed** | 132:15 |
| 172:13 | 24:15 | 190:15 | 47:23 | 20:24 | 133:13 |
| 177:19 | 31:7,8 | 192:20 | 145:14 | 21:14,20 | 136:21 |
| 180:21 | 32:24 | 193:7,11 | 149:12 | 76:21 | 154:1 |
| 188:5,15 | 37:22 | 194:6 | 155:4,19 | 99:23 | 161:14 |
| 212:23,24 | 40:9 | 199:2,15 | 156:7 | 154:24 | 164:22 |
| 243:22 | 41:8,15, | 205:23 | 161:5 | 185:4 | 165:8 |
| **sometimes** | 25 42:12 | 207:20 | 179:16 | **specialty** | 171:24 |
| 10:5 18:9 | 44:2 | 208:3 | 181:10 | 28:10 | 178:18 |
| 21:11 | 59:7,9,24 | 209:9 | 195:7 | 35:9 | 190:25 |
| 30:11 | 60:19 | 215:12 | | | 195:7 |
| 31:20 | 62:22 | 223:22 | | | 200:5 |
| | | 226:19 | | | 205:5 |
| | | 227:16 | | | 219:2 |
| | | 228:8 | | | |

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

222:1
233:12,13
235:10
248:1,7
254:4
256:8,9

**specifica
tions**
117:23

**specifics**
50:9
100:15
212:9

**speed**
41:3
232:4

**spell**
5:11
37:11,21

**spelled**
31:24
133:11

**spelling**
37:12
107:8,22
116:4

**spending**
63:22

**split**
46:3 48:5
180:2,18
181:8
230:16

**spoke**
134:9

**spot**
25:24

**squad**
86:7
107:5
159:8
181:14,
17,18,19,
21

**squad's**
181:13

**squared**
110:1

**stack**
69:25
73:6
112:4
124:12
207:2
212:12
254:20

**staff**
17:8 23:9
25:19
62:13
63:7,16
81:5
93:5,14
104:3
105:12
107:18,20
109:11
142:25
143:10

**stakeouts**
98:25

**stand**
70:23

**standard**
50:3
99:13
120:25
162:5
165:7
228:22
234:3
235:6
238:8
240:23

**standardi
zed**
226:9
228:14
236:2
238:3

240:8
241:15

**standards**
24:6
78:21
226:2
229:12
233:19
245:7

**standing**
87:18
189:20

**standpoin
t**
55:5
110:20
164:6
183:18
221:3

**start**
9:3,4
10:3,11
37:6
39:25
49:23,24
51:2,4,8,
25 52:9,
16,21
53:1,5,6,
7,15,18,
20 62:2,8
86:24
89:19,22
92:23
106:7
169:24
179:14
197:17
201:19
209:9
252:11
258:1

**started**
51:5,23
52:11,24
53:19
61:6 70:5

99:17

**starting**
37:4
253:1,2,
19

**starts**
38:20
42:3
44:18
54:15
190:11
206:19

**state**
4:13 5:11
40:21
41:6
47:1,13
50:4
83:19
146:14
222:19

**stated**
222:18

**statement**
42:22
44:24
50:24
54:23
64:13
133:9
134:1
161:15
167:6,8
172:7
201:2,18
206:8
217:7
238:23

**statement
s**
29:17,19
65:3,6
66:5 92:1

**states**
41:7
42:2,4

46:25
47:2,3,7
50:5
192:22
204:22
207:25
208:9
209:22
232:20

**static**
106:20
207:5,12

**station**
16:10
183:9
184:1

**stats**
73:14

**status**
25:13

**statute**
128:7
129:6,10

**statutes**
154:4
209:23

**stay**
225:9
236:12

**stays**
12:13
90:5

**stems**
72:24

**step**
76:3
88:21
215:23

**stepmothe
r**
151:6,10,
25

**stepped**
215:18

**steps**
99:10
104:22

**stick**
55:2,12,
15 202:5
203:6,13
210:14,19
211:8
213:22
215:2,13,
17 216:23
232:18
237:25

**Sticks**
79:8

**still**
14:17
15:2
44:23
66:10
77:23
93:19
113:6
114:1
116:9
141:16
159:23
166:23
174:10
182:1
184:17,18
188:22
224:9
233:25
234:15
243:8
248:9

**stolen**
144:20

**stone**
180:14

**stood**
32:9

**stop**
72:3

Detective Justin Roth       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

143:15
144:1
189:13
238:13
255:13

**stopped**
95:12
97:20
189:25

**stopping**
253:1

**stories**
174:25

**story**
153:5

**straight**
136:18

**strain**
220:24

**strapped**
149:23

**stress-free**
75:7

**stressful**
174:7
175:4
176:9

**strict**
34:11
231:7

**strictly**
43:13,15

**strike**
33:10
35:21
74:5
166:4
180:12
209:9
220:20
258:1

**stripe**

167:11

**strong**
256:15

**struck**
254:5

**structure**
41:5
47:16
50:8
96:10
97:24
106:9
107:1
118:3
183:2
189:4
196:14
198:17
209:19

**stuck**
232:6
234:19

**stuff**
12:3
56:25
64:24
77:25
86:13
93:2,13
108:23
122:21
123:10,
16,23
134:19
150:22
219:11
223:7
242:24,25
244:5
254:1

**stun**
55:2,10,
12,15
79:8
202:5
210:14,19
211:8

213:21
215:13,17
216:23
232:18
237:25

**style**
168:19

**subject**
23:9
27:22,24
29:7
35:17,23
45:24
59:19
65:8
69:2,22
73:23
90:22
91:7
99:12,13
100:6
133:4,5
147:24
149:21
169:16
205:1
210:5
230:13

**subject's**
198:9

**subjective**
160:7
213:15

**subjects**
141:23

**submit**
54:3,5
232:19
258:5,8,
17,19,25

**subsequently**
196:17

**substantially**
132:25

**successful**
120:10

**such**
21:11
31:2
61:15
76:21
83:16,17
104:11
115:21
174:3
218:9
255:6

**sufficient**
48:8
79:19
157:22
258:25

**suggested**
16:13,17
193:19

**suicide**
197:25

**summarized**
234:18

**summary**
9:10
253:21

**Summation**
233:8

**super-secret**
158:7

**supervisor**
11:22
26:5,7
27:4

224:22

**supervisors**
34:6
68:2,4
71:6 78:6
206:25
223:18

**support**
25:19

**supposed**
49:22
81:2
90:14
124:24
162:5
185:7
213:24
215:5,20

**supreme**
24:7
46:24
47:2,12
113:13
114:4
209:2,22

**sure**
6:9 13:24
15:16
24:21,25
28:19
30:10
32:2
33:10
35:20
39:20
42:13,19
51:11
53:16
54:13,17
57:3,4
60:23
63:23
64:14
67:20
70:16
71:16

76:17
90:20
94:6 97:5
108:20
109:1,14
110:1,6
111:23
115:22
125:19
137:2,11
143:21
147:11
158:4
159:2,7,
13,17,24
161:16
162:10
166:15
167:23
170:6
174:16
188:15
189:12,16
206:3,4
207:8
213:13
215:25
216:5
221:7
233:14
234:11,12
258:14

**surface**
94:1

**surgery**
85:4
131:16

**surmise**
91:25

**surprise**
41:3
73:15
192:14
209:18
228:2
232:4,5
234:20

Case 2:24-cv-00074-APG-NJK   Document 57-9   Filed 05/16/25   Page 335 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**surround**
79:9
191:11,17
196:12
197:18
214:16

**surveilla
nce**
146:12,
14,15
147:3
150:21
154:9,12,
13,22,23
155:4,8,
14,18
156:6,11
157:3,16,
19 159:4,
7,21
160:4,7
167:17
169:2,16,
17
179:15,21
180:3,18
182:6
183:21
184:13,
15,21
189:11,
16,25
204:25

**surveilla
nces**
180:24

**suspect**
95:20
142:3,5
147:20
190:7
197:21
227:7
232:5

**suspects**
41:3
190:3
192:15

**sustained**
135:5

**swabs**
58:17

**swap**
61:10

**SWAT**
28:10
38:10
40:1 46:6
47:21,22
48:1,10,
11,12,15
49:9,17
57:2
59:18
62:4
69:25
73:20
76:21,23
79:7,13
81:18
89:15
90:11
92:23
95:17
97:14,15,
17 98:2,7
99:6,22
101:2,15,
19 111:15
112:3,8
124:4,9
125:4,5,
14,16
126:16,25
127:1
153:8
172:11,
17,20
178:15
179:10
184:25
185:22
188:11,25
190:11,
17,21
192:3,10,

21 194:11
198:19
203:17,24
204:22
206:5,8,
24,25
207:10,
17,18
220:11
221:22
226:8,19,
21 227:5,
21
228:20,21
229:21,24
230:5
231:11
233:21,23
234:1
236:14
237:19
242:19,20
244:11
245:5,13,
15,18
246:25
256:8

**sweatshir
t**
148:3,5,
19 164:23
167:11
168:10
169:1,2,
15

**sweatshir
ts**
168:17

**Swiss**
116:19

**sword**
174:9

**sworn**
4:22
134:1

**synopsis**
156:10

185:15
**system**
32:5
77:20
84:5
135:19
136:1
145:24
243:24

**systems**
87:11

―――――

**T**

―――――

**T-SHIRT**
149:22
190:9

**table**
38:25
40:24
79:24
123:8
212:7
218:10,
11,17,18

**tables**
210:5

**tablet**
173:4

**tactic**
38:11
191:10
192:6
199:11
227:21

**tactical**
14:11
17:9,25
19:6,14,
22 23:11,
15 49:5
73:10,22,
25 76:23
78:3 85:8
110:6
174:5

191:24
212:4,13,
20 214:9,
11,15
227:14
231:25
232:14
233:9,10
234:23,25
235:3
238:11
245:13
246:18
247:10,14
248:8,17,
18 249:8
251:5
253:3

**tactics**
14:9
17:14
18:24
20:9
23:18
34:8
49:11
65:12
79:5,7,17
93:2
100:13,23
110:25
112:6
117:8
120:8,20,
23 121:2
124:10
143:4
159:25
176:4
185:5
225:2
226:9
228:14
240:8
241:16
248:3

**tag**
144:4

**tags**
141:14,15

**tail**
181:23

**take**
39:18
55:16
56:17,21
62:6
64:2,8
66:14
71:6,19
74:22
76:11
88:3
118:13
126:8
128:21
131:3
135:12
137:7
152:1
156:14
182:18
214:23

**taken**
25:23
61:23
65:16
117:18
118:17
130:23,25
131:18,25
132:1,2
156:18
200:8
215:20
254:24

**takes**
66:11
70:10
88:4
104:23
115:17

**taking**
9:19
141:17



Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 147:14 | 195:13 | 164:16 | 22:1 25:5 | 21:5,7 | **term** |
| 232:2 | 203:12 | 168:25 | 27:9 29:3 | 36:23,24 | 24:19 |
| 235:24 | 209:6 | 177:8 | 31:4 | 43:25 | 30:3 |
| **talk** | 220:6 | 182:3 | 32:23 | 51:6,7 | 32:18 |
| 7:16 | 224:4 | 183:11 | 56:5 | 58:23 | 51:18 |
| 13:24 | 225:24,25 | 201:19 | 58:25 | 59:11 | 54:7,11 |
| 25:14 | 239:2 | 212:22 | 59:16,21 | 82:10 | 98:25 |
| 39:25 | 240:5 | 213:6,18 | 60:24 | 96:24 | 121:18 |
| 53:17 | 241:2 | 216:16 | 77:22 | 100:9 | 138:23 |
| 55:1,7 | 244:10 | 219:10 | 82:18,22 | 103:13 | 152:21 |
| 57:1 | 245:3 | 223:22 | 89:15,20 | 113:4 | 155:9 |
| 63:11,12 | 246:14 | 224:16 | 95:18 | 121:21 | |
| 65:7,9 | 247:12 | 232:22 | 96:6 | 123:7 | **terms** |
| 66:10 | 249:9 | 233:18 | 108:10,13 | 134:6 | 19:24 |
| 76:2 | | | 115:7,11 | 137:8,21 | 73:4 76:1 |
| 80:10 | **talking** | **talks** | 124:12 | 140:19,20 | 97:3 |
| 83:6 | 7:12,14 | 87:17 | 155:8 | 143:11 | 98:11 |
| 91:2,15 | 10:11 | 153:21 | 158:5,6, | 144:25 | 102:20 |
| 106:16 | 21:2 | 154:8 | 7,12 | 145:12 | 113:23 |
| 116:2 | 22:12 | 184:22 | 159:16 | 148:15 | 114:15 |
| 127:14 | 24:3,21 | 186:3 | 166:16 | 151:22 | 120:11,12 |
| 129:23 | 25:12 | 234:2 | 180:2,18, | 156:25 | 121:20 |
| 133:22 | 27:5 | | 19,22,23 | 187:4 | 122:8,13 |
| 138:8 | 29:15 | **tape** | 181:2,3, | 191:14 | 123:21 |
| 150:20,21 | 34:20 | 86:1 | 8,9 192:4 | 213:4 | 125:16 |
| 159:9 | 41:13,15, | 253:2 | 196:15 | 222:23 | 138:16 |
| 162:15 | 24 43:6 | | 204:23 | 233:11,14 | 208:7 |
| 164:4,22 | 51:17 | **tapes** | 237:18 | 234:9 | 224:3,8 |
| 170:6,17 | 55:21 | 252:11 | | 240:16 | 247:4 |
| 199:5 | 56:22 | | **tears** | 242:17,18 | 252:1 |
| 216:18 | 57:1 | **tasers** | 71:16 | 243:3,14 | |
| 218:12 | 63:20 | 31:2 | | 244:1 | **test** |
| 229:9 | 65:21 | | **technical** | 249:3 | 83:25 |
| 233:19 | 67:18 | **tasked** | 154:10 | 251:25 | 84:3 |
| 241:21 | 69:25 | 98:18 | 155:6 | 256:5 | |
| 246:21 | 70:8 | 153:2 | | 257:17,18 | **tested** |
| | 74:16 | | **technical** | | 207:9 |
| **talked** | 76:20 | **TASS** | **ly** | **telling** | |
| 64:11 | 89:15 | 154:9,10, | 134:13 | 45:16 | **testified** |
| 72:11 | 94:22 | 18,23 | 177:10 | | 4:23 7:1, |
| 76:5 82:6 | 95:17,22 | 155:1 | 228:5,6 | **temporary** | 4,24 82:8 |
| 90:16 | 110:2 | 183:12 | | 16:14,22, | 160:25 |
| 104:25 | 111:3 | | **technique** | 23 144:3 | 218:25 |
| 112:12,19 | 113:22 | **TASS's** | 41:2,4 | | 246:16 |
| 114:12 | 117:18 | 158:20 | | **ten** | |
| 123:25 | 123:12 | | **technolog** | 73:18 | **testify** |
| 149:15 | 128:24 | **Taylor** | **y** | | 4:22 |
| 152:14 | 137:17 | 4:7 | 88:6 | **tend** | 68:13 |
| 185:12 | 146:12 | | | 90:13 | |
| 188:24 | 159:10 | **TDY** | **tell** | | **testifying** |
| | | 16:14,18, | 7:5 8:18 | **tenuous** | 7:14 |
| | | 21 25:22 | 12:1 | 91:24 | |
| | | | 15:13 | | |
| | | **team** | | | |
| | | 13:6 14:6 | | | |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **testimony**<br>7:12 8:1,<br>8,11,16<br>10:7 18:9<br>45:8<br>64:15<br>65:24<br>84:20<br>98:9<br>137:25<br>166:2,12<br>168:23<br><br>**testing**<br>84:5<br><br>**text**<br>79:11,17<br><br>**than**<br>7:11<br>10:16<br>11:7<br>20:14<br>26:15<br>38:15<br>46:22<br>47:10,15<br>50:13<br>70:9,10<br>77:17<br>80:22,24<br>94:12<br>112:25<br>117:12<br>132:25<br>148:6<br>157:13<br>165:4<br>174:6<br>179:8<br>182:5<br>208:22<br>217:25<br>218:8<br>251:1<br><br>**thank**<br>6:16<br>38:22<br>43:19<br>52:4 99:8 | 113:21<br>124:13<br>132:4<br>169:4<br>196:22<br>232:15<br>253:16<br>259:12<br><br>**Thanks**<br>37:22<br><br>**that's**<br>8:3 12:13<br>21:15<br>22:5<br>25:12,18<br>27:2<br>29:23<br>30:3,17,<br>22 32:8<br>33:20,23<br>34:23<br>37:6,25<br>38:20<br>39:9,10<br>40:16<br>44:7,21<br>47:9<br>48:1,11<br>50:3,20<br>51:1,24<br>52:23<br>53:22<br>54:11,19<br>55:9,10,<br>12 57:20<br>61:3,22,<br>23 62:12,<br>23,25<br>63:13,14,<br>18 64:5<br>67:17<br>72:21,22<br>74:24<br>76:10,20<br>79:15<br>80:1,8,14<br>81:10,19,<br>20 82:15,<br>17 83:24 | 84:2,5,7<br>85:23<br>86:17<br>87:21<br>89:16<br>91:9 92:5<br>93:22<br>94:4,6,25<br>100:14,20<br>103:13<br>104:18<br>105:11<br>116:3<br>117:2,20,<br>22,25<br>119:8<br>120:24<br>121:1,15<br>122:22<br>123:16<br>127:3,23<br>129:5<br>130:12<br>132:6<br>133:17,20<br>135:14<br>136:18,23<br>137:3,15<br>138:20<br>142:11<br>143:15<br>149:8<br>156:10<br>162:11<br>164:4,6<br>165:20,<br>22,25<br>166:13<br>167:1,20<br>168:2<br>174:10<br>175:4,25<br>177:10<br>180:6,21<br>181:18<br>185:13,18<br>187:21<br>188:4,5,8<br>191:1,4<br>192:10 | 193:20<br>194:24<br>198:19<br>203:21<br>209:24<br>211:10<br>212:13<br>213:15<br>215:3,8<br>217:18,25<br>223:8,10,<br>14 224:23<br>227:4<br>228:5<br>229:2,9<br>230:3<br>232:20<br>235:19<br>236:13<br>238:1,6,<br>17<br>239:16,17<br>240:4<br>241:20<br>243:8<br>246:20<br>247:6<br>248:2,6<br><br>**them**<br>6:12 12:6<br>29:17<br>32:4<br>38:16<br>48:21,24<br>64:4<br>66:9,13<br>68:6,15,<br>19 69:11<br>71:15<br>74:19<br>77:12,20<br>78:1<br>80:19<br>84:18,21,<br>24 85:11<br>86:9<br>88:15<br>91:13<br>98:11 | 102:3<br>103:1<br>105:2,25<br>110:14<br>131:7<br>133:1<br>144:16<br>146:16<br>150:25<br>154:17<br>160:16,17<br>161:10,19<br>170:17<br>184:5<br>188:24<br>191:25<br>196:9<br>211:19<br>212:19<br>228:3<br>235:12<br>237:25<br>245:15,19<br>246:2<br>252:21<br>253:9,10<br><br>**themselves**<br>32:4<br>108:19<br>111:10<br>161:25<br>198:2<br>208:21<br><br>**then**<br>6:6 13:5,<br>13 14:3<br>15:23<br>16:1,3<br>17:13<br>18:14<br>19:5 20:7<br>23:10<br>24:5<br>26:11<br>27:6<br>28:6,12<br>31:3,22<br>34:7 37:9 | 38:9<br>39:13<br>40:3,6<br>41:6 42:4<br>47:11,17,<br>19 48:3,<br>21 50:13<br>53:14<br>55:2<br>56:1,2,8<br>58:14<br>59:12<br>62:14<br>63:6<br>64:7,8<br>65:6<br>67:2,22<br>68:2<br>69:14<br>70:2,6<br>72:25<br>75:15<br>76:8,21,<br>23 77:11,<br>12,25<br>78:5<br>79:24<br>80:5<br>81:13,22<br>82:2,22<br>83:2,12<br>84:9<br>85:16<br>86:15,24<br>87:4<br>88:21<br>89:1,7<br>91:16,19<br>92:3,5<br>94:8<br>95:6,7,<br>15,19<br>97:6<br>98:1,20,<br>22 103:12<br>104:15,24<br>105:1,22,<br>24 106:5,<br>11,17,22<br>107:2,8, |

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 10,15,17 | 188:25 | 246:13, | 181:2 | 20,22 | 116:7,21 |
| 108:7,8 | 190:10 | 21,25 | 182:4 | 155:8 | 128:22 |
| 109:16 | 191:22 | 247:5,13 | 184:9 | 161:24 | 129:16 |
| 113:18 | 192:8 | 248:3,6 | 186:11, | 163:1 | 132:5 |
| 114:11, | 194:25 | 249:22 | 15,20,24 | 171:22 | 135:6 |
| 14,21 | 196:15 | 250:12 | 188:6 | 179:2 | 141:8 |
| 115:5,11 | 197:18 | 251:19 | 189:5 | 183:3 | 151:14 |
| 118:23 | 198:5,10, | 252:17 | 195:13 | 186:5 | 157:8 |
| 123:17 | 15 199:4, | 253:6,8, | 196:14 | 187:5,25 | 180:25 |
| 125:3 | 24 200:25 | 16 259:1, | 197:16 | 190:6,13 | 188:4 |
| 126:17 | 202:5 | 5 | 198:8,10 | 205:11 | 202:6 |
| 128:23 | 203:5,8, | | 209:1 | 208:22 | 213:19 |
| 129:16 | 23 204:21 | **there's** | 212:16,18 | 214:3 | 234:25 |
| 131:9,21 | 205:7 | 13:3 14:1 | 213:14 | 235:13 | 238:2 |
| 132:5,12 | 206:18 | 18:4,14, | 218:13 | 236:5 | 241:21 |
| 133:5 | 207:4 | 19 21:5 | 223:24 | 238:9 | |
| 134:3,6 | 208:25 | 22:7 | 227:6 | 243:5 | **things** |
| 135:3,6, | 209:14 | 26:21 | 230:19 | 248:23 | 7:9 14:9 |
| 10 136:2, | 211:14, | 50:2,9 | 246:23 | 249:13 | 23:4 |
| 5 137:4 | 21,23,24 | 69:10 | 247:21 | 250:2 | 34:23 |
| 139:10,24 | 213:15,16 | 78:11 | 248:1 | 251:19,22 | 35:8 |
| 141:8 | 214:16 | 80:5 81:4 | 252:3,22 | 253:5,7,9 | 48:23 |
| 142:16 | 215:1,5, | 82:13 | 256:5 | 254:3,4 | 70:15 |
| 143:14 | 11 | 83:9 | | 255:11 | 80:15 |
| 144:5,6, | 216:14,22 | 87:23 | **these** | 257:5 | 82:25 |
| 7,24 | 217:9 | 89:11 | 11:22 | | 86:25 |
| 145:7 | 219:18 | 90:25 | 19:19 | **they'd** | 90:15 |
| 146:11, | 222:23 | 93:25 | 49:23 | 131:13 | 93:17 |
| 15,22 | 224:3 | 94:2,5 | 54:20 | | 106:17 |
| 147:8,15 | 225:16,21 | 95:13,21 | 57:10 | **they'll** | 107:13, |
| 148:25 | 226:4 | 102:14 | 61:2 | 76:11 | 14,23,25 |
| 149:11 | 227:3 | 105:10,21 | 66:23 | 252:11,12 | 110:11,15 |
| 152:1,6 | 228:7,15, | 107:1 | 69:11 | | 111:4 |
| 153:7 | 23 231:15 | 115:3,19 | 73:12 | **they've** | 120:1,6, |
| 154:5 | 234:17 | 116:9,23 | 76:14 | 19:18 | 7,13 |
| 155:7 | 235:1,6,7 | 117:17,19 | 79:16 | 82:3 | 124:10 |
| 164:5 | 236:20 | 122:6 | 81:2 | 237:12 | 129:24 |
| 167:14,19 | 237:6,12, | 126:15 | 90:23 | 246:16 | 134:14 |
| 169:5 | 15 238:5, | 129:11 | 104:23 | | 164:11 |
| 171:5 | 10,22 | 134:13, | 125:20,25 | **thing** | 166:17 |
| 173:2,6, | 239:1,13, | 14,17 | 130:15 | 9:2,18 | 174:19 |
| 20 174:25 | 18 | 136:17 | 132:14,15 | 13:11 | 182:10 |
| 176:4 | 240:15,24 | 137:14,20 | 133:10,13 | 24:16 | 183:4 |
| 178:9,19, | 241:2,14, | 138:14 | 135:12 | 30:20 | 185:23 |
| 24 | 20 242:4, | 144:19 | 138:25 | 39:3 | 186:1 |
| 179:13,24 | 11 243:1, | 148:17,21 | 141:21 | 44:14 | 189:21 |
| 181:25 | 13,25 | 149:12 | 144:10 | 70:25 | 208:5 |
| 184:6,14 | 244:9,13, | 158:15 | 149:3,7, | 72:9 | 213:7 |
| 185:14 | 22 245:2, | 169:5,21 | 18 | 83:20 | 218:22 |
| 186:2 | 22 | 180:17 | 150:19, | 85:9 93:4 | 220:25 |
| | | | | 99:10 | |
| | | | | 106:20 | |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 226:25 | 216:21 | 22 49:20 | 12 102:22 | 6,7,9,11, | 11,17 |
| 232:12 | 218:22 | 50:9,16, | 104:2,11 | 15,19,20, | 177:1,6 |
| 250:6 | 219:15 | 20,21 | 105:13, | 21,25 | 178:5,25 |
| **think** | 220:24 | 51:13 | 18,19 | 140:1,2,6 | 179:7,13, |
| 7:24 | 222:22,25 | 52:9,12 | 106:1,2, | 141:1,3, | 24 180:7, |
| 31:24 | 227:20 | 53:15 | 7,10 | 10,11,12, | 8 181:15 |
| 35:9 | 235:2 | 55:17,22 | 107:3,4, | 23 142:7, | 182:12,14 |
| 40:23 | 242:8 | 57:12,13, | 24 108:4, | 8,11,19, | 183:6 |
| 42:23 | 243:4,25 | 17,22 | 9,10,14, | 22 | 185:17 |
| 53:12 | 251:7 | 58:4,23 | 17 109:4, | 143:21,25 | 188:13 |
| 59:14 | 256:14 | 59:3,17 | 11,17,18, | 144:2 | 189:7,22 |
| 71:1,4,13 | | 60:16 | 20 111:6 | 145:2,13, | 190:15, |
| 72:17 | **third** | 61:13,15, | 114:18, | 16,21 | 16,17 |
| 82:9 | 30:12 | 24 62:3, | 22,24 | 147:2,5, | 191:8,18, |
| 91:18 | | 21 64:2 | 115:8,9, | 9,11,16, | 20 193:3, |
| 99:15 | **third-** | 65:5,10 | 10,11,14, | 19,23,25 | 15 194:3 |
| 104:2 | **party** | 67:14,19 | 23 116:5, | 148:10 | 195:2,3, |
| 106:14 | 84:4 | 68:3 | 11,14,16, | 149:24 | 4,11,12, |
| 115:25 | | 71:14,17 | 21 117:3 | 150:1,2, | 15 196:23 |
| 116:17,18 | **this** | 72:1,13, | 118:4,5 | 7,11,16 | 197:6,7, |
| 126:20 | 4:25 5:10 | 19 75:18 | 119:2,6, | 152:2,15, | 10,11,13, |
| 127:9 | 6:3 11:2 | 76:15 | 7,10,11, | 16 153:8, | 23 |
| 129:23,25 | 12:2,4 | 77:2,10, | 16 120:6, | 12,16,24 | 198:20,25 |
| 132:24 | 13:16 | 14 78:1, | 14,16 | 154:8 | 199:23 |
| 133:1 | 14:21 | 2,7,11,25 | 121:4,7, | 155:3,17, | 200:12,21 |
| 134:17 | 16:14,15 | 79:11 | 10,13,15, | 19 156:4, | 201:6,11, |
| 136:11 | 17:7 | 80:21 | 21 122:2, | 6,13 | 23 |
| 138:1 | 19:16,20 | 81:3,8, | 12 123:20 | 157:1,2 | 202:12,13 |
| 147:11 | 20:1,5,8 | 16,17 | 124:16 | 158:12,13 | 203:18 |
| 151:9,10 | 22:8,16, | 82:11 | 125:11,16 | 160:7,21 | 204:3,11, |
| 156:23 | 19 25:24 | 83:8 | 126:10 | 161:1 | 17 205:12 |
| 161:9 | 26:9,19, | 84:19,25 | 127:21 | 163:1,19, | 206:8 |
| 167:3 | 20,23,24 | 85:12 | 128:6,10 | 21,22 | 207:15,16 |
| 169:6 | 27:1 | 86:5,9,10 | 129:18,19 | 165:15 | 208:6,14 |
| 170:3 | 28:17,23 | 87:18,24 | 130:4,17, | 166:11 | 209:11, |
| 171:3,19 | 29:2 30:8 | 89:2,14 | 19,20,21, | 167:3,14, | 15,25 |
| 176:19 | 32:24 | 90:1,15, | 23 131:4, | 16,24,25 | 214:3,12 |
| 179:7 | 34:21 | 16 91:4,7 | 24 132:8, | 168:3,13 | 215:22 |
| 187:16 | 36:16 | 92:15,16, | 9,15,17 | 169:11 | 216:7,8, |
| 188:20 | 38:13,23 | 25 93:6, | 133:1 | 170:7 | 15,21 |
| 196:19 | 39:3,6 | 9,12,18, | 134:4,7,9 | 171:12, | 217:2 |
| 197:3 | 41:7,8,9 | 20,21,24 | 135:16, | 15,16,17, | 218:10 |
| 198:12 | 43:6,10 | 94:10,12 | 18,19,22, | 18 172:5, | 219:1,18 |
| 199:7 | 44:11,12, | 95:5,9 | 23 136:3, | 6,12,13, | 221:1 |
| 200:2 | 20,23 | 96:3,11, | 7,9,10 | 25 173:3, | 222:2,22 |
| 201:15 | 45:16,20, | 15,16,18, | 137:5,7, | 18,23 | 223:11 |
| 211:10 | 21,22,24 | 19 97:25 | 10,18,22, | 174:3,14, | 224:1,15, |
| 213:4,10 | 46:3,4, | 99:15,18 | 25 | 15,19 | 18 227:1, |
| 214:23 | 12,13 | 100:4,18 | 138:17,21 | 175:1,16, | 10 228:1 |
| | 47:6,17 | 101:7,9, | 139:1,5, | 19 176:4, | 229:4 |
| | 48:2,13, | | | | |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

230:1,4
231:1,2,
3,25
232:3,8,
16 233:25
234:2,25
236:18
237:2
240:19
241:2
243:10
244:1,3
245:3,4,
10 246:14
248:10,
16,17
249:5,7,
18,23
250:11,25
251:3,18,
19,20
252:5,6
253:14,
18,19,22,
23 254:1,
2,13,14,
16,17,18
255:16
259:12,14

**Thomas**
142:4
162:15

**Thomas'**
139:6,7

**those**
6:9 7:23
12:5
14:9,16
18:2 19:3
23:4 24:6
27:2,6,7,
8,10
29:18
31:2
34:7,18,
23 36:5
39:15
46:8

48:1,17
49:3 51:9
53:1
55:21,23,
25 56:1,
2,3,8
58:16,17
62:18
63:6,18,
24 67:9,
23 68:9
70:11
71:10,12,
19,25
72:7
74:14,18,
22 75:9,
23 76:11,
16,17,22
78:21
80:9,15
82:3
85:11
86:15
87:13
90:15
91:13,22
92:22
93:17
94:7,8
96:4,6
98:6
99:24
100:12
102:16
110:5,23
112:23
115:11
117:9
119:16,18
120:9
122:19,21
124:10,18
126:13
131:4
143:6
144:16,17
146:20
154:24
161:8,16

163:6,18,
21 164:3,
18,19
165:20
174:21
175:3
179:22
180:16,
23,24
183:12
189:21
194:1
195:22
204:6
218:12
219:16
220:19,
20,21
221:11
231:4,6
235:15,
16,17
237:24
242:22
244:25
246:7
248:5

**though**
41:1 43:8
45:9,20,
21 51:12
53:13
134:13
144:9
153:8
178:1,9,
17
187:12,21
208:12
226:12
230:15
232:17
249:8
251:24

**thought**
48:6,7
57:17
62:9 69:5
79:18

109:12
184:8
230:16
233:9

**threat**
24:4
69:14
73:1
91:22
113:18
192:24
227:6
237:7

**threats**
185:8,16
196:17
235:23
236:11
246:7

**three**
14:13
15:23
16:1,19
18:21
34:4 43:3
44:17
58:19
69:16
72:17
109:5
118:5
126:19
132:18
143:2
182:5
190:3
210:14
247:24
248:5
252:4,13,
15

**through**
8:21
15:14
19:17
25:23
28:3
32:24

39:5
42:15,17,
21 43:10
45:8
49:20
53:7
54:11
56:6
57:16
58:2,5,
11,12
60:20
67:2
68:23
76:13
79:17
82:7,9
85:7
88:16,19,
20 91:16,
17 98:23
104:19
106:4,9
107:5
117:13,
15,16
122:1
124:7
125:25
129:23
134:16,24
135:16
136:1
138:9
153:7
154:18
165:3,12
166:1,6
170:5
171:20,23
172:21,
22,23
174:7,13
175:23
178:9,10
179:20
186:5
195:21,22
196:16,18
197:4

200:12
201:13,15
203:14
207:9
210:17
213:8,20
214:1
215:18,23
216:2
217:18
218:8,21
219:17
222:20
223:1
233:25
237:21
247:12
251:23
252:21
256:23
257:4

**throughou
t**
78:9,13
80:4
87:14
100:13
127:18
128:12
138:2,3,4
171:16

**Tim**
30:10,12

**time**
4:5 5:1
9:23,24
19:25
21:7,17
22:6
23:22
25:21
26:9 31:9
32:21
34:3,6
39:19
47:4,8,
14,22
48:8

Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 341 of 353

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

49:9,22,
23 51:19,
20 54:3,4
55:3,4
56:16
58:15,18
60:4
61:14
62:21,25
63:22,23
66:10,15,
20 68:8
69:10
70:4,5
71:22
73:7,19
74:11
81:23
84:12
85:6,11,
12 86:4
89:19
90:6
92:1,19,
23 96:13
102:9
104:9,13
106:9
107:23
109:5
110:25
115:2
117:21
120:18
125:10,12
127:4
131:5,8,
16 132:10
138:1,19,
25 140:4,
23 143:6,
10 146:9
155:21
173:9
175:18
178:15
180:3
189:23
192:6
193:2

199:23
201:17
207:12,14
208:19
209:8,11,
22
210:11,25
211:4,16
213:7,23
217:5
218:4
220:8
221:11,15
222:13,21
226:15
227:8
228:3
234:11,
14,15
237:1,8
245:20
258:5,17,
25
259:13,16

**timeline**
55:9
137:13,25
138:8
155:23
225:5

**times**
46:13
71:8,18
73:18,22
98:17
102:5
106:10
128:13
191:19
221:2
222:18
232:7

**title**
31:25
35:4
128:25
158:8,9

**titles**
24:22

**TJ**
48:24
49:8
99:21
101:4

**to**
4:22
5:19,22,
24 6:2,3,
4,5,6,12,
20 7:9,18
8:6,11,
16,19,25
9:3,4,6
10:1,6,7,
9 12:4,6,
7,9,14,17
13:9,14,
23 14:11,
22 15:7,8
16:3,10,
16 17:4,
5,8,10
18:12,15
20:9,12,
25 21:9
22:1,2,
11,22
23:2,8,19
24:20,23
25:21,23
26:16,23
27:3,9,
15,17,25
28:3,14,
16,24
29:2,11,
18,19
30:11
31:25
32:1,3,4,
6,11,12,
15,24
33:5,8,22
34:1,13,
21 35:5,
6,8,12,15

36:4,17,
25 37:6,
8,11
38:5,7,
16,19
39:5,8,25
40:8,25
41:2,4,6,
11,19
42:12,23
43:4,9
44:9
45:1,6,13
46:9,13,
15,16,20,
22 47:4,
5,7,15,21
48:1,4
49:13,21,
22 50:7,
12,24
51:11
52:7,14
53:4,9,12
54:3,4,5,
6,10,14
55:4,16,
20 56:1,
2,6,8,18,
21,23
57:2,4,
18,19,21
58:1,14,
15,16,21
59:4,14,
16,20,24,
25 60:11,
13,14,15
61:3,10,
12 62:2,
3,6,8,11,
12 63:4,
7,11,12,
15,17
64:2,4,5,
7,14,21
65:2,7,8
66:4,10,
11,12,13,
15,17,18

67:2,3,5,
8,12,13,
22 68:11,
13,16
69:15,17,
21 70:2,
23 71:5,
7,10,12,
22,24
72:3,9,
12,18,22
73:3,14,
23,24
74:3,4,9,
21 75:1,
2,3,11,
12,13,17,
19,23
76:22
77:1,8,
10,11,12,
15,18,20,
21 78:2,
22 79:16,
19 80:2,
13,14,18,
21,22,24
81:2,10,
19,23,24,
25 82:7,
8,15,17,
23 83:2,
10,19,24,
25 84:2,
5,12,24,
25 86:2,
8,15
87:3,8,23
89:5,10,
13,14,16,
17,23,24
90:5,13,
14,16,19,
22,23
91:2,6,
11,15,24,
25 92:1,
7,16,17
93:4,5,7,
10,14,23

94:6,11,
18,21
95:7,15,
20,24,25
96:1,7,8,
11,12,16
97:2,7,23
98:3,19
99:1,2,4,
6,10,14,
21
100:17,
20,21,25
101:5,7,
9,23,24
102:1,2,
9,15,19
103:2,3,
9,13,14
104:7,8,
9,12,15,
20,23
105:2,5,
7,20
106:9,10,
12,16,22,
24 107:1,
2,8,11,
17,18,21,
23 108:3,
7,18,25
109:1,7,
8,9,13,
15,16,20
110:1,4,
5,6,10,
21,23
111:21
112:1,4,
9,13,19,
20 113:8,
12 114:5,
9,13
115:7,8,
11,14,16,
22,23
116:15,
16,20,24,
25 117:1,
4,6,7,9,

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

21 118:2,
11,13,21,
23 119:3,
5,12,16,
17,20,22
120:1,2,
3,4,5,15
121:4,10,
13,25
122:1,6,
22 123:1,
13,25
124:9,21,
22,24
125:5,6,8
126:6,8,
12,16,18,
25 127:7,
11,17
128:3,9,
13,21,23
129:17,
18,19,22
130:12
131:9,17,
21 133:6,
9,11,22
134:15
20,21
135:9,10,
16,20,21,
25 137:4,
7,8,9,11,
12,15,16,
18,20
138:6,7,
8,11,15,
23
139:10,
13,17,24
140:14,23
141:12
142:2,3,
9,10,23
143:7,12,
14 144:7,
9,16,24
145:8,10,
25 146:2
147:3,5,

10,12,19
148:15,
21,25
149:11,23
150:13,16
151:2,12,
18,23,24
152:25
153:4,15
154:5,16,
17,18,19
155:7,24
156:3,23
157:6,7,
23,25
158:3,4,
17,21,22,
23
159:17,18
160:3,6,
13,17,18,
21,25
161:1,10,
21 162:1,
5,12,23
163:8,18
164:11,
13,19,20
165:16,
21,25
166:1,3,
10,11,13,
15 167:2
168:12,
17,25
169:6,7
170:9,13,
14,17,19,
22,25
171:2,5,
16,17,22,
25 172:6,
11,17
173:8,15,
17 174:8,
9,16
175:3,16,
24 176:2,
5,8,13,22
177:18,

19,23
179:13,
14,15
180:1,2,
10,13,14,
22 181:1,
3,17
182:5,6,
8,9,12,
16,21,22,
25 183:1,
7,9,12,
24,25
184:2,11,
14,15,20
185:4,7,
15,18,19,
20,21,22
186:2,21,
22
187:13,25
188:2,3,
15,18,24,
25 189:4,
5,13,16,
17,18,19,
20,21
190:5,11,
16,22
191:22
192:14,
18,24
193:20,
24,25
194:9,22,
25
195:12,
21,22,25
196:6,11,
14,16
197:7,13,
19,22
198:1,5,
6,9,14,15
200:6,14,
16,18,21,
24,25
201:4,6,
7,10,14,
15,17

202:2,3,
7,16,18,
21 203:9,
19,23,25
204:1,6,
23,24
205:7,8,
16,19,21
206:1,7,
8,11,15,
18,20,24
207:1,5,
11,12,14,
23
208:10,
13,25
209:2,14,
15,16,18,
21 210:4,
8,9,12,15
211:5,6,
7,13,20,
21,23,25
212:8,14,
20,21
213:9,22,
24,25
214:3,22
215:5,17,
20 216:2,
10,17,18,
19
217:10,
11,17,21,
24
218:11,
14,16,22
219:1,12,
19,21
220:3,22,
23 221:6,
9,10,16,
23,25
222:4,7,
10,19,20,
21,22
223:3,5,
11 224:5,
18 225:3,
8,9,11,

12,21,25
226:4,8,
12,17,21
227:3,6,
9,13,24
228:3,11,
15,17,22,
23,25
229:6,14,
16,24
230:7
231:7,11,
15 232:5,
12,13,19,
20,24,25
233:3,5,
13,16,17,
20,25
234:2,10,
23 235:2,
13,16
236:1,3,
12,18
237:6,7,
15 238:1,
5,10,14,
18 239:1,
2,7,13,
16,18,20,
25 240:7,
19,20
241:3,7,
20,21,25
242:4,23
243:10,
11,13,15,
17,21
244:9,10,
14,15,19
245:2,4,
5,14,24
246:2,4,
14,16,17,
23,25
247:4,14
248:8,22,
23 249:3,
15,17
251:6,12,
15,16,24

252:4,23,
25 253:2,
9,10,22
254:17,
18,20
255:5,12,
24 256:5,
9,17,20,
24 257:8,
15,16
258:4,5,
6,8,16,
17,18,19,
20,25

**TOC**
85:8

**today**
4:4,9
5:20 6:4,
10,20
8:7,12,16
10:7
13:19
21:18
43:8
45:15
54:15
72:15
82:8
103:8
121:24
122:1
193:2,12
196:4
197:6
222:8
242:15
244:14
245:9
246:16
256:1
258:7

**today's**
5:24 6:8
8:19
10:18,21
12:18
46:16

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

219:3

**toe**
124:22
125:8

**together**
43:5
71:21,22
92:23
137:5
187:6
220:3

**told**
66:3
96:22
115:19
119:1
130:24
143:7
179:1
194:11

**toll**
71:19

**tone**
71:3

**tonight**
197:8

**too**
6:3 10:5
15:7
20:13
30:11
39:24
47:17
54:25
65:25
77:8,21
80:9 84:6
99:16
127:4
141:4
165:10,13
166:19
208:20
215:6
231:19
253:18

**took**
9:6,11,14
44:4
53:14
65:20
72:5
80:20
106:8
135:13
137:9,22
138:15
139:15,16
150:2
156:22
170:7
201:6
214:23
246:3

**tool**
88:18

**tools**
79:6,7
215:14

**top**
7:5,7
41:1 42:1
43:3
72:16
77:17
90:22
125:8
169:22
199:16
233:11
247:6

**totality**
45:10
47:13,20
50:16
155:18
241:11

**totally**
239:17

**touched**
22:21

**tough**

9:23
71:5,10
75:2
175:4,12

**tow**
144:15

**toward**
137:11
236:17

**towards**
83:8

**town**
82:20
139:7
144:11

**toxicology**
136:17

**track**
33:8
146:2
161:13

**tracked**
145:22

**tracking**
145:21

**traffic**
56:24
88:5
89:3,9
116:3
143:15
144:2
150:9
223:7,12,
15

**train**
71:21
112:9

**trained**
43:17
49:17
82:4
211:12

234:23
245:5

**training**
14:8
15:19
17:2,14
18:25
20:10,25
21:6,16
22:3,5,7,
10 23:19
27:19
28:4,6,7
34:8,12,
25 43:14
50:22
65:12
75:19
78:5 82:5
99:25
100:13,23
110:25
112:7,22
117:8,15
120:7,8,
22 121:2,
14 170:24
173:17
176:5
179:4
190:22
206:21
207:1,5,
13 211:10
220:13
226:7,9
228:14,21
230:7,20,
21 232:9
234:22
236:2
238:3
241:16,19
243:5,24
245:4,14
246:17
249:15
256:20

**transcript**
6:8 46:17
70:13
259:19

**transcription**
92:3

**transcriptions**
12:15
34:1

**transcripts**
67:23
72:15

**transitional**
30:9

**transparency**
62:15
230:17

**trauma**
165:3

**travel**
70:6

**TRB**
74:19
79:25

**treated**
175:2,7,
17 191:20

**treatment**
241:6

**tree**
142:6

**trial**
7:16,17

**trick**
166:10

**tried**
101:9
217:11

**trigger**
144:6

**triggers**
118:1

**trip**
183:8

**tripped**
166:22

**trouble**
75:1

**trucks**
144:15

**truth**
4:23

**Truview**
87:25
88:2

**try**
10:1
52:13
59:25
63:4
66:7,18
81:22
86:15
99:1
104:7,9
107:21
117:21
161:21
174:9
198:6

**trying**
33:8 40:8
70:2 75:1
80:2,22
90:13
102:19
108:3
110:4
116:25
152:25



Case 2:24-cv-00074-APG-NJK    Document 57-9    Filed 05/16/25    Page 344 of 353

Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

166:10
170:19
180:12,14
200:6
222:20
236:12

turn
133:2
138:6
139:24
141:10
143:14
144:24
148:25
151:2,23
153:15
154:5
156:3
157:7
160:18
168:12
171:5
177:23
180:1
182:12
190:16
194:25
200:25
205:7,21
206:18
207:23
211:23
217:11
251:6

turned
140:19
147:19
217:12

turning
90:6
116:10
131:9,21
137:4
149:11
155:7
179:13
186:2
192:18

217:21
251:12

TV
88:7

TVS
85:10

two
7:18 9:24
18:2,3
25:19
30:7
32:20
34:3,5
44:17
49:3
52:22
55:24
60:24
64:3
67:19
68:7
69:20,22
70:14
71:2
72:16
81:8
95:13
100:19
101:21
127:17
146:24
149:18
157:4
165:20
177:25
178:16
179:2
180:14
182:1,5
183:11
191:7
201:15
212:6
243:5
245:22
246:23
259:16

two-
officer
235:20

two-part
57:20

twofold
87:23

Ty'shawn
153:21

type
58:17
66:12
89:10
198:11
205:15

types
124:10,19
191:8

typo
115:23

———————

U

U.S.
40:6

Uh-huh
186:9
214:18

ultimately
200:20
224:5
230:6,22

umbrella
30:23
31:15,22

UMLV
243:23

unaccepta
ble
188:17

unaltered
134:9

unanimous
229:23

unaware
90:7

uncommon
165:5
194:23

under
8:10
30:18
31:4,16
52:4
112:23
113:24
123:17
143:10
164:12
186:15
209:4
221:13
229:20
253:9
257:25
258:3,15

undercove
r
158:11

underlyin
g
14:18
139:6
142:20
147:5
225:6,18

undersher
iff
62:18
143:11
253:8

understan
d
6:19 8:6
42:13
45:7,16
48:7 52:5
53:24

60:16
64:15
65:23
74:25
76:25
110:8
115:16
137:24
144:8
182:7
195:17
197:3
213:5
214:2,22
222:5
223:5
225:17

Understan
dable
9:25

understan
ding
19:17
25:6
51:15
53:25
54:18
60:21
61:24
73:9 76:4
78:10
89:24
100:11
119:2
131:24
136:22
138:21
139:20
151:16
161:23
162:18
218:25
224:12
244:8
245:10
246:15

undertaki
ng
61:16,19

undetermi
ned
148:1

unfair
213:17

unfinishe
d
115:13

Unfortuna
tely
140:16

uniform
16:9
132:8,9

uniformed
16:11

unilatera
l
32:17

union
67:20,22
83:24
84:4
102:5,14

unions
67:19
83:23
131:2

unit
16:4
26:3,5
28:14
112:3
115:15,20
116:15
118:12
143:2
149:4
154:16
155:20
165:12



Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

175:5
182:16,23
184:12
185:4
191:23
197:6
215:8,13,
15,17
235:20
236:4
237:13

**United**
41:7
42:2,4
46:25
47:2,3,7
50:5
207:25
208:9
209:22
230:11
232:20

**units**
76:21
99:24
139:12
154:24
189:18

**University**
20:22

**unknown**
142:3,4,5
147:1,9,
24 148:24
149:9
155:14
157:4
169:15

**unknowns**
159:23
160:1
227:18
228:12

**unless**
82:20
193:22

218:13

**unoccupied**
150:16

**unsafe**
90:12

**until**
40:24
44:24
87:5
95:14
115:4
183:5
184:12
191:21
217:17

**unusual**
220:21

**up**
8:15
10:9,10,
11 13:14
14:21
16:12,17,
18 32:9
37:9,15
39:4
44:24
51:24
52:15
57:23
59:23
60:7,8
61:9,10
66:14
67:8
74:12
76:17
77:20
82:23
85:3,10
86:25
89:14
90:6,22
96:17
105:25
112:4

118:8
119:13
120:10
135:23
142:17
143:5
150:11
154:14,
18,21
158:21
166:22
175:16
180:2,18
181:8
184:5
189:7
190:13
194:19
197:24
205:16
210:19
211:25
217:17
225:1,13
231:20
233:17
236:1,3
240:22
247:6,12

**update**
93:11,14

**updated**
126:16
228:22

**updates**
93:11
103:20
104:5

**uploaded**
88:23

**upon**
192:7

**upstairs**
65:6

**upwards**
73:18

**urine**
83:19
84:3,7

**us**
63:12
67:2
83:24
91:15
133:22
134:20
143:12
164:13
191:14
245:14

**use**
14:14
23:17
24:19
31:5
36:25
40:2
41:18
65:11
69:5,12
72:22
90:1 93:7
102:20
106:12
113:16
114:8
117:5,21
124:23
138:23
143:3
175:25
176:5
197:10
204:24
205:5
217:22
218:3
220:7
224:1,18,
20 225:9
227:21
228:17
237:24
247:25

**use-of-force**
13:5
14:11,12
17:8,25
18:17
19:5
23:10,15,
17,20
53:17
85:23
86:16
99:20
101:6
102:3,16
117:4
119:18
174:5
237:10
247:21,23

**used**
23:22
29:17
41:2,4,20
54:11
59:19
61:22
62:12
68:17,19
87:24
88:5
99:22
192:25
193:13
196:19
201:23
205:14
237:2,7
241:17

**useful**
88:17

**uses**
113:20
135:20

**using**
36:17
199:10

**USSC**
192:9

**usual**
251:1

**usually**
26:1 27:3
55:24
56:3
60:24
62:17
63:3
64:20
65:9
66:17
69:22
70:10
78:18
81:7,22
84:3,10
86:5
87:2,6
88:24
95:8
103:25
105:5
106:13,20
107:11
109:23
130:25
131:1
137:10
174:24
181:13
248:14

**utilization**
223:8,20

**utilize**
58:15
63:17
70:1 73:3
83:24
112:7
117:10
210:15

**utilized**
48:2 79:5

Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

228:17
244:15

**utilizes**
35:8

**utilizing**
192:4
208:18
215:14
232:4

—————

**v**

**vacation**
220:16

**vacuumed**
217:9

**vague**
162:2,3,4
163:6
165:10,
13,19
166:20

**validated**
252:14,16

**validity**
163:16

**valued**
116:16

**vans**
131:1

**vantage**
216:9

**varies**
25:21
67:18

**various**
16:10
68:9
103:11

**vary**
68:6

**vast**
22:2

127:13
257:6

**Vegas**
4:11  5:3
15:15
68:1

**vehicle**
83:23
144:20
146:25
150:15
157:5,9,
11,22,25
181:23,25
191:24

**vehicles**
195:20,22

**verbal**
47:24
79:15

**verbally**
79:10

**verbatim**
44:1

**verbiage**
121:15
125:14
126:5,15
128:14
171:2
227:4

**verge**
71:23

**version**
39:11
115:14
117:6
141:6,11
165:25
171:18
220:4

**versus**
4:11  5:3
7:13  24:3
40:6,20

46:25
47:1,3,7,
13  50:4,5
52:17
69:14
73:1
91:23
113:14,15
164:17
172:14
192:8
208:9

**vertical**
167:11

**very**
9:5  12:2
16:15
24:18
49:25
52:10
55:23
57:14
64:3,25
70:14
72:6
74:22
75:7  77:6
83:3
88:17
91:24
102:6
107:24
117:2
119:21
121:4
124:2
125:13,21
128:22
130:11
156:3
158:11
170:9
171:21
172:10
174:4,24
175:19
180:3,10
184:20
191:14

195:16
197:13
209:6
211:15
212:7
214:3
224:1
245:16,20

**vest**
135:11

**via**
47:24
79:10
84:1
105:6
223:6
224:21

**viable**
75:21
193:21
196:15

**vice**
112:2
206:12

**victim**
150:11

**video**
18:12
51:7
64:12
71:17
85:20
90:8
139:7
140:3,8
141:5,16
142:10
152:1,2
169:3
184:20
259:10,11

**video-
recorded**
151:15

**videograp
her**
4:4,7
65:14,17
118:15,18
156:16,19
254:22,25
259:9,14

**videos**
140:11,15
141:25

**Videotape
d**
5:23

**view**
174:23,24

**violate**
111:22
255:6

**violated**
32:13
255:18
257:11,12
259:2

**violating**
255:11

**violation
s**
175:24

**Violator**
112:8

**Violators**
28:10
98:5,6,
11,17
99:6
184:23

**virtual**
12:8
87:10
201:9

**visual**
98:24
198:14

**vital**
72:17

**vocal**
245:16

**voice**
108:20,21
240:3

**volunteer**
57:18,19,
21  59:12

**volunteer
ed**
57:14
60:22
61:13,14
62:6
96:19

**volunteer
ing**
57:17
161:1

**vote**
18:20
19:3
247:24

**voted**
74:19
79:24
110:5
126:11,19
241:25

**votes**
20:7
85:24
248:2,5

**voting**
14:13
18:23
78:1
110:8
117:4
119:17
126:21
248:5
251:19



Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**W**

**wait**
47:15
85:21
89:13,17
109:16
208:11
209:3,21
234:2

**waiting**
229:14
232:17
245:20

**walk**
15:14
19:17
43:10
57:16
58:4 86:2
153:7
171:22
197:4
218:8

**walk-through**
85:25
88:14

**walk-throughs**
85:17

**walked**
139:10

**walking**
60:20

**Walsh's**
253:8,9

**want**
10:6
13:23
15:7,8
16:16
20:12
24:23

37:20
39:10,12,
19 42:12
49:13,21
55:20
64:14
67:13
68:11
75:11,12
77:15
79:16
82:7,8
89:16,24
92:16
93:4,10
94:11
96:7
103:9
106:9,10,
11 110:6
116:4
118:13
121:25
124:9
128:21,23
134:21
137:16
138:6,11
165:24,25
166:13
171:5,22
181:17
184:2
201:6
202:16
205:7
206:1
216:18
218:14
222:18,
19,21
223:5
227:24
233:5
236:18
239:16
243:9,11
244:19
249:4

**wanted**
90:19
96:16
106:16
110:1
128:13
144:9
219:21
228:11

**wants**
71:24
119:20

**Warner**
96:5

**warrant**
37:2
39:16
40:4 46:5
52:3,25
53:9 54:5
58:16
59:5,18
61:8 62:5
70:8
79:14
89:6
92:20
97:6,21,
22 98:12,
15,19,21,
22 99:7
101:3
128:3
129:14
145:15
150:15
160:22
161:6,18,
22 162:6,
24
163:14,17
165:17
166:7,22,
24
169:18,25
170:7,13
171:1,2,
13 172:4

185:2
192:7,20
193:3,13,
14,15,16,
18,23
194:4,8,
12,14
196:5
201:23
207:16
219:25
220:22
221:5
224:6,9
228:18
229:19,20
231:3
236:15
237:3
239:21,24
242:6,13
244:16

**warrants**
57:23,25
58:8,9,17
59:14
73:12
74:10
79:5
96:21
97:2,10,
13,17
98:18
124:2
160:24
164:2
166:19
192:22
194:1,17
196:20
233:23
243:5

**watch**
64:20
85:11
144:18

**watched**
65:24

151:14

**watching**
90:3

**water**
197:15
198:5

**Wattsel**
150:8
151:6,17
152:22
156:8
185:18
193:25
194:6,12
206:7,11

**Wattsel's**
151:25

**way**
15:4
35:22
46:2
53:11,16
57:4
73:21
77:25
93:21
94:19
100:9
104:20
106:13
110:7
115:22
117:7
121:15
122:7
127:3
137:13
139:3
148:16,
21,24
158:15
159:14
162:23
168:7
170:4
185:1
191:20

201:17
209:10
215:19
225:1,10
226:14
240:6
250:13
256:5
257:17,22

**ways**
148:20
160:3

**we**
4:7,10
7:14 9:19
11:6
12:7,8,19
13:8,18,
22 17:2
20:1
21:18
22:3
23:1,6,7,
8,10 24:7
25:15,18,
19,22
26:1
27:16,17
28:2
33:23
34:22
36:3,10
38:15
39:14
41:23
43:8
45:15
46:14,15
48:2,21,
22 49:14
50:19
51:5,6,7,
23 53:2,
5,6,15,16
54:14,19
55:1
58:2,19,
20 60:2,
3,4,5,8,9

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 61:4,6,7, 9,19 | 94:6,7 95:24 | 158:4 159:16 | 216:3,7, 19 217:17 | **we'll** 13:24 | 108:25 110:3,4 |
| 62:1,2,3, 12,16,25 | 96:1,7,8, 12 97:20 | 160:9,13, 18 163:17 | 218:12,21 219:16,18 | 29:2 34:13 | 111:3 112:20 |
| 63:2,4,16 | 99:17,23 | 164:4,22 | 220:6,25 | 38:11 | 115:8 |
| 64:18,22, 23,24 | 100:17,23 101:3,4, | 165:9,19, 20 166:8 | 221:2,14 222:8,17, | 51:11 52:9 | 117:18 118:23 |
| 65:20,21 | 13 103:5, | 167:2 | 22,25 | 53:17 | 120:1,25 |
| 66:7,9, 15,18 | 8,25 104:2,7, | 169:6 170:13, | 224:4,17, 23 | 55:8 76:2 85:7 99:9 | 122:22 123:12,22 |
| 67:3,8 | 9,12,13, | 16,21 | 225:10,25 | 114:14 | 136:23 |
| 68:15 | 14,15,16 | 171:15, | 226:17 | 123:22 | 137:17 |
| 69:4 | 106:10 | 16,19 | 227:11,25 | 126:8 | 138:7,24 |
| 71:1,5 | 107:1,4, | 174:20 | 228:2,9, | 138:7 | 158:23 |
| 72:3,15 | 23 109:2, | 175:3,9 | 16,23,24, | 145:7 | 163:19 |
| 73:19 | 3,10,14, | 176:2,8, | 25 229:8, | 160:13 | 164:16,18 |
| 74:21 | 25 110:1, | 21,22 | 19 230:1, | 171:20 | 168:25 |
| 75:1,4 | 6 111:4,7 | 177:23 | 17,20 | 173:15 | 175:25 |
| 76:3,14, 20,21 | 112:12 113:10, | 178:9 179:19 | 231:7,15 232:8,12 | 190:10 217:18 | 197:25 212:22 |
| 77:5,14, | 14,15,18, | 180:1 | 233:9,18, | 219:14 | 213:18 |
| 21,23,24 | 20 115:3, | 182:12 | 24 235:2, | 229:9 | 215:22 |
| 78:6,7 | 9 116:1,2 | 183:11 | 15,16 | 251:7 | 216:17 |
| 79:15,18 | 117:21 | 185:11 | 236:16 | 259:20 | 219:10 |
| 80:10,16 | 121:24 | 186:5 | 237:6,15, | | 248:23 |
| 81:9,15, 17,22 | 122:1,12 127:16,21 | 187:16,19 188:14, | 21 238:13,14 | **we're** 7:12 17:1 | |
| 82:6 | 129:23,25 | 15,17 | 239:1 | 24:21 | **we've** 21:5 |
| 83:2,4, | 130:3 | 190:16,25 | 240:5,10, | 40:9 | 48:22 |
| 18,20,24 | 132:12,25 | 191:5 | 17 241:2, | 42:21 | 69:17 |
| 84:2,9, | 133:1 | 193:2,11, | 21 | 44:16 | 73:16 |
| 15,18,21, | 134:9,12, | 12 194:5, | 242:15, | 45:8 | 77:17,19 |
| 22,23,24 | 16,18,19, | 25 195:12 | 18,21,22, | 46:15 | 103:11 |
| 85:2,10, | 24 | 196:4,7, | 24 243:3, | 53:8 57:1 | 109:21 |
| 14,20,21, | 136:13, | 11 197:22 | 4,22 | 62:11 | 112:19 |
| 22 86:3, | 14,16 | 198:12 | 244:9,13 | 69:15 | 114:12 |
| 8,9,10, | 138:6,8, | 199:24 | 245:3,9, | 70:2,8 | 158:4 |
| 13,15,18, | 22,23 | 200:13,24 | 12,17 | 71:11 | 173:19 |
| 24 89:1, | 140:12 | 201:5,8, | 246:14,15 | 74:25 | 184:23 |
| 10,13,17, | 143:7,14 | 17,19 | 247:11 | 75:9 | 191:7,9 |
| 19,21,24 | 144:16 | 202:9,12, | 251:2,6, | 80:10 | 213:23 |
| 90:2,3,8, | 145:10 | 21 | 21 | 84:13 | 222:6 |
| 16,23,24 | 149:16 | 203:12,23 | 252:12,21 | 85:14,18 | 225:24 |
| 91:1,2,4, | 150:19,21 | 204:8 | 254:12,16 | 88:19,20 | 233:24 |
| 9 92:14, | 151:2,24 | 205:21 | 255:22,25 | 89:5,23 | 244:18 |
| 22,23 | 153:2,15 | 207:23 | 256:1,23 | 92:2 | 258:7 |
| 93:1,4, | 154:5,16 | 208:25 | 259:16 | 93:5,18 | |
| 10,11,13, | 155:24 | 209:6 | | 95:4,7 | **weapon** |
| 15,16,18, | 156:13, | 211:18,23 | **we'd** | 96:10 | 90:12 |
| 19,20,22 | 22,23 | 212:21 | 90:21 | 106:3,4 | 241:9 |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| **weapons**<br>59:19<br>85:17 | 46:6 59:7<br>62:11<br>72:20<br>73:8 75:6 | 196:11<br>210:17<br>227:25<br>232:23 | 71:8<br>72:17<br>73:20<br>74:25 | 157:21<br>160:8<br>162:19<br>163:20 | 247:11,12<br>250:5,13<br>251:16<br>252:9 |
| **wearing**<br>132:8,10<br>142:8<br>145:19<br>149:22<br>167:9 | 77:5<br>78:15<br>98:20<br>111:8<br>116:15,19<br>119:5 | 237:21<br>252:21<br>**Werner**<br>237:17<br>**western** | 75:14,17<br>77:8 78:7<br>80:1,10,<br>14 82:8,9<br>83:14,15,<br>17 87:9 | 165:22<br>166:4,9<br>168:15<br>170:8,9<br>171:15,23<br>172:23 | 254:4<br>256:20<br>257:18<br>**what's**<br>15:3 |
| **weave**<br>171:20 | 123:12<br>126:6 | 210:13<br>**what** | 88:2,21<br>89:19 | 173:8,24<br>175:6 | 16:21,23<br>20:17 |
| **weaved**<br>24:1,2 | 128:17<br>130:17<br>133:2 | 7:3 9:23<br>11:16,17<br>14:1 | 91:19<br>93:6,18<br>96:23,25 | 176:23<br>179:3<br>181:6,22 | 23:14<br>25:9<br>27:24 |
| **weaves**<br>35:20 | 140:5<br>165:10<br>168:2 | 16:3,6,9<br>17:23<br>18:2 | 97:3<br>99:10<br>100:23 | 182:20,22<br>183:14,17<br>185:16 | 30:5<br>31:23<br>35:6 |
| **week**<br>60:7 63:3<br>66:18,23<br>81:7<br>91:18 | 171:21,24<br>173:16<br>175:8,11<br>186:10,17<br>189:10 | 21:23<br>22:15,16,<br>19,23<br>25:10<br>27:20,23, | 101:14<br>104:4<br>106:5,11<br>108:23<br>111:3,5, | 187:4<br>191:1,4,<br>16 195:4<br>196:13<br>197:1,3 | 53:24<br>59:24<br>60:1<br>88:21<br>95:6 |
| **week-to-<br>week**<br>60:5 | 191:16<br>209:25<br>210:21 | 25 29:9<br>31:21<br>34:2,5 | 23 112:19<br>113:12,14<br>114:3,9 | 198:23<br>199:10,14<br>200:4,21 | 111:16,19<br>119:25<br>135:3,8 |
| **weeks**<br>81:8<br>172:18 | 213:21<br>215:23<br>219:14<br>221:5,25 | 35:20<br>36:21<br>41:23<br>43:11,16, | 115:19<br>116:21<br>119:1<br>121:25 | 205:10,<br>11,19<br>210:22<br>211:13 | 136:3<br>138:17<br>146:23<br>154:9 |
| **weigh**<br>28:14<br>71:14,25<br>72:6 | **well-<br>being**<br>174:12 | 17,22<br>44:3,5,7<br>46:3<br>50:12 | 122:2,8<br>124:15<br>125:2<br>127:25 | 212:13,18<br>216:18<br>217:5<br>218:3,16, | 177:12<br>191:9,14<br>193:7<br>228:7 |
| **weighs**<br>72:6 | **went**<br>8:20<br>21:21 | 51:6<br>52:19<br>53:2 | 128:17<br>129:5<br>134:6 | 25 219:14<br>224:17<br>226:5 | 247:5<br>251:7 |
| **weight**<br>250:5 | 43:6 53:2<br>55:6<br>58:2,14 | 56:8,9,13<br>58:6,7<br>59:1,13 | 135:17<br>136:23<br>137:10,17 | 227:11<br>228:9<br>230:11, | **whatever**<br>33:6<br>39:10,11 |
| **weird**<br>195:15 | 60:24<br>65:5 | 60:21<br>61:6,17, | 138:1,18,<br>25 140:1 | 12,20<br>232:8 | 43:24<br>45:13 |
| **well**<br>17:4<br>19:17<br>23:24<br>24:1<br>27:15<br>29:25<br>30:11 | 68:23<br>77:20<br>89:18<br>103:5<br>107:4<br>147:12<br>179:8,20<br>183:9,15 | 21 62:9,<br>10,12<br>63:4<br>64:21<br>65:11<br>68:5 69:5<br>70:3,21 | 141:2,3,4<br>143:13,25<br>144:10,25<br>145:12<br>146:19<br>150:1<br>154:25<br>156:25 | 233:5<br>236:25<br>240:12<br>241:23<br>242:2,23<br>245:24<br>246:2,6,<br>16 | 74:14<br>79:17<br>83:21<br>88:4<br>103:9<br>110:22<br>112:8<br>116:25<br>121:14 |

Detective Justin Roth          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 123:4,18 | 74:21 | 209:8 | 79:15 | 215:20 | 13,14 |
| 126:14 | 76:3,16, | 211:18 | 84:8 | 217:10 | 54:7 |
| 188:1 | 20 77:14 | 212:4,8, | 87:15,17 | 230:1,3 | 55:14 |
| 191:23 | 80:10 | 11,22 | 88:7,10, | 234:1 | 60:9 |
| 198:17 | 81:2 | 213:6,7 | 12,13 | 238:13 | 68:1,4,16 |
| 249:8 | 82:15 | 216:23 | 90:15,22 | 246:5 | 69:15 |
| **whatsoever** | 87:8 90:3 | 221:2 | 91:9 92:2 | **Whereupon** | 74:17,19, |
| | 95:9,17, | 224:17 | 93:1,17 | 4:20 | 21 79:7, |
| 251:22 | 22 97:1 | 225:5 | 95:12 | | 9,23,24 |
| **when** | 101:17 | 226:17 | 96:1 97:7 | **whether** | 80:23 |
| 6:7 8:23 | 105:20 | 227:6 | 99:5,9, | 18:22 | 81:14 |
| 13:14 | 108:19,22 | 228:17 | 11,20 | 32:12 | 83:9 85:8 |
| 14:15 | 109:7 | 232:3,13 | 108:21 | 33:5,13 | 86:22,23, |
| 15:1 | 110:2,9, | 233:19 | 116:16 | 46:4 57:6 | 25 87:4, |
| 19:9,18 | 14 116:2, | 234:23 | 117:1 | 61:20 | 11,25 |
| 20:1 | 8 117:25 | 238:14 | 118:4 | 74:9 76:8 | 89:7 |
| 21:11 | 118:5 | 240:10 | 120:6,13, | 78:19 | 90:14 |
| 22:12 | 119:15 | 243:20 | 16 | 83:22 | 91:14,17, |
| 26:23 | 125:19 | 245:18 | 130:19, | 98:23 | 23 93:12 |
| 27:5,14 | 134:12,18 | 248:8 | 23,24 | 108:25 | 101:3 |
| 32:8,9 | 137:14,18 | 250:2,8 | 131:19 | 112:7,22 | 102:13 |
| 35:9 | 140:14 | 252:8,20 | 132:2 | 113:1 | 105:5,7 |
| 37:5,6 | 142:18 | 254:13 | 134:25 | 114:1 | 109:25 |
| 41:2 43:5 | 143:4 | **whenever** | 137:11 | 129:10 | 112:25 |
| 48:10 | 149:16 | 6:3 41:11 | 139:15,19 | 144:3,20 | 123:18,19 |
| 49:25 | 152:15 | 197:7 | 142:2 | 152:21 | 135:19 |
| 50:6,7,9, | 155:8 | **where** | 145:14 | 177:24 | 140:6 |
| 15,20 | 158:15,21 | 12:13 | 149:20 | 191:23 | 143:23 |
| 51:10,15, | 159:9 | 18:8 | 150:10 | 197:21 | 144:5,18 |
| 16,21,23, | 160:13 | 19:19 | 153:3 | 198:4,11 | 145:2 |
| 25 52:1, | 164:2,4, | 20:21 | 158:16 | 201:14 | 150:17 |
| 8,11,16, | 14,18,22 | 25:13,18 | 160:10 | 212:3 | 153:9 |
| 17 53:6, | 165:2 | 33:9 | 161:4,5 | 229:24 | 155:12 |
| 7,15,16, | 170:25 | 38:19,24 | 166:21 | | 163:8 |
| 20 54:15, | 172:6,23 | 39:14,23, | 176:25 | **which** | 168:20 |
| 25 55:1, | 176:11 | 24 41:22 | 177:6 | 7:14 9:10 | 171:3 |
| 2,9,10, | 178:19 | 44:24 | 179:14 | 12:9,10 | 172:10 |
| 12,20,21 | 180:19 | 45:2,9 | 180:5 | 13:6 | 173:3,20 |
| 56:22,25 | 181:16 | 46:21 | 181:3 | 14:2,12 | 175:2,10 |
| 57:1,3 | 182:3 | 51:24 | 182:4 | 15:18,21, | 180:5 |
| 58:17,18 | 183:11, | 52:15 | 183:12 | 24 16:4 | 183:25 |
| 59:12,20 | 15,23 | 58:20 | 184:5,6, | 18:5,6,20 | 184:14 |
| 62:1,23 | 184:4 | 61:3 | 21 186:21 | 19:6 | 186:15 |
| 63:20 | 187:17 | 62:16 | 187:5 | 23:12 | 189:7,18, |
| 64:21 | 192:4 | 74:3,8,12 | 189:17,18 | 25:20 | 22 191:9, |
| 67:5,6 | 198:3 | 75:4 | 190:11 | 28:5,6 | 11 195:8, |
| 69:24 | 201:6 | 76:10 | 195:17 | 38:11 | 19 |
| 70:14 | 204:10 | 77:18 | 197:25 | 40:7,21 | 201:20,22 |
| 71:16 | 206:14 | 78:1,18 | 205:1 | 41:14,23 | 202:5 |
| | 207:6 | | 207:12 | 47:1,3,4, | 206:12 |

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

209:21
216:17
223:21
235:2
236:23
238:24
243:18,23
244:24
256:22

**whichever**
33:13

**while**
44:20
50:6 77:6
155:13
220:7
231:22
255:22

**white**
145:17
149:22

**who**
18:19
26:4,8,11
28:12
29:16,21
32:22
33:23
35:1 36:6
38:5 45:6
48:17,25
55:23
56:23
57:23
60:12
61:10
64:1
65:3,7
67:11,16,
23 72:2
76:22
78:6
81:25
84:3,11,
16,17
86:7,18
89:3,4,18
91:5

95:7,24
96:8
102:5,7,
9,10
103:13
105:4
114:24
119:20
135:24
139:12
143:9,12
145:22
147:14
151:5,24
157:8
158:10
163:9
172:2,3,
4,16
175:19
178:4,14
179:16
184:25
185:1,5
188:12
189:24
190:6
197:24
198:1
202:24
207:9
214:13
226:20
230:16
236:21
245:13
247:20,24
248:2

**who's**
11:11
59:23
84:13
117:1
160:9
166:18
188:10
249:16

**whoever**
68:6

169:8
**whole**
9:2 13:10
30:23
108:10,13
115:1
128:22
151:14
166:10
176:1
219:6
220:18

**whom**
142:24

**why**
30:17
33:23
34:23
36:12
44:7 46:1
48:4
50:20
57:17
60:20,21
63:17
72:8,20,
21 73:2,
21 78:3
84:13
86:9,17
88:7
91:14
93:20,22
98:5
100:8
101:4
106:1
108:13
109:18
115:21,24
116:5
141:20
142:22
146:17
147:22
149:9
152:25
153:5

161:8,23
162:1
165:20
166:19
168:7
170:6,10
172:13
174:10
175:25
181:8
182:7,9
195:17
229:3
250:6
252:19

**wide**
104:12

**widely**
119:3,4

**Williams**
6:21
59:7,10
134:4
202:14
203:9
211:2
216:10
256:4
258:24

**Williams'**
13:17
59:13
60:17
136:6
216:4
255:17
257:10

**Wilson**
192:8

**window**
55:2
128:16
129:4,7,
10 186:1
203:9,14
210:13,23
211:1,7,

14 215:1,
19,21,24
216:2,9,
23

**windows**
184:18

**wish**
164:19
174:19

**with**
6:9,14
7:16
10:13,20,
24 11:2
14:16
15:3,10,
14 18:11
20:4
22:16,22
24:10,13
25:25
26:1
28:11
31:19
32:19
33:1,7,15
34:20
35:4
38:3,5
39:12,22
40:20
41:3 42:3
44:18
45:4,5
47:5
51:24
52:25
53:2
54:19
55:6
59:4,22
60:3
61:10,19,
23 62:5
63:25
66:18
67:17
70:7,17,

22 71:2,
17 72:10
73:14,17
74:10,14,
18 75:16
76:17,22
78:4,25
79:4,14,
21 84:20
85:15,17
89:20
90:25
92:10,19
95:18
96:20
97:1
98:18
100:22
102:9
104:25
105:2,8,
11 107:3,
5,7 108:2
112:6
113:10
114:4
116:8,12
121:8
122:12
124:2,9,
18 125:2,
4,6
126:17
127:1,7
132:5
133:6
135:25
143:4
145:24
147:2
148:19
150:6,10,
24 151:24
152:17,21
153:2
154:11,13
157:5,9,
15 158:10
159:2
160:21

Detective Justin Roth        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | |
|---|---|---|---|---|---|
| 161:13,24 | 238:5,19, | 230:8,20 | **won't** | 59:1 | 21 213:7, |
| 164:2,10, | 22,23 | 231:1 | 138:8 | 96:13 | 10 |
| 20 165:8 | 239:3,18, | 236:1 | 259:11 | 120:6,7 | **writer** |
| 166:19 | 20,23,24, | 237:18 | **word** | 129:25 | 116:18,22 |
| 167:11 | 25 240:18 | 238:2,13 | 20:2 | 256:15 | **writing** |
| 169:8 | 241:18 | 240:8,23 | 44:18 | **Works** | 9:23 |
| 171:21,23 | 242:20 | 241:15 | 51:21,22 | 219:20 | 106:7 |
| 173:9 | 243:14,15 | 244:5 | 52:17 | **workup** | 108:19,21 |
| 174:3 | 244:10 | 256:7 | 54:16 | 76:12 | 117:16,20 |
| 175:20 | 245:4,6, | **without** | 70:19,20 | **workweek** | 118:10 |
| 177:8 | 13,14,15, | 39:9 | 117:22 | 27:6 | **written** |
| 178:11 | 16 246:6, | 46:10 | 157:19 | **world** | 8:21 |
| 179:10,16 | 11 | 91:3 | 176:12 | 158:3 | 10:17 |
| 180:14 | 251:19,25 | 147:12 | 199:10 | **worn** | 36:11 |
| 181:2,25 | 253:14 | 148:14 | 200:8 | 148:7 | 43:24 |
| 186:16 | 255:5,22 | 153:23 | 201:15 | 167:10 | 50:21 |
| 187:10,18 | 257:21 | 154:3 | 236:24 | **worries** | 52:10 |
| 188:13 | **within** | 165:7 | 246:4 | 166:9 | 166:5 |
| 190:3,13 | 15:25 | 197:14 | **wording** | **worry** | 226:14 |
| 191:1,24 | 17:14 | 205:24 | 77:11 | 67:3 | 257:24 |
| 194:6 | 26:5 | 235:24 | **words** | 158:24 | **wrong** |
| 195:8 | 51:17 | **witness** | 71:3 | **worst** | 12:1 |
| 196:4 | 52:22 | 4:9 65:3, | **work** | 61:20 | 37:12 |
| 197:21 | 62:13 | 7 69:4,24 | 11:17 | 64:1 | 58:23 |
| 198:1,4, | 63:3 | 73:24 | 13:3 | **wound** | 90:25 |
| 10 200:14 | 66:5,18, | 84:17 | 14:24 | 139:14 | 121:21 |
| 201:10 | 23 68:9 | 85:15 | 27:8 | **wounds** | 123:7 |
| 206:20 | 78:20 | 91:6 | 59:22 | 90:13 | 151:23 |
| 207:9 | 91:13 | 127:23 | 63:21 | **woven** | 157:19 |
| 208:14, | 98:10 | 128:1 | 74:6 | 33:20 | 165:16 |
| 16,17 | 103:2 | 133:7,8 | 77:23 | **wrap** | 233:8 |
| 210:5,18 | 111:9 | 156:13 | 81:25 | 189:22 | 240:17 |
| 215:1,7 | 113:6,7 | 254:1 | 82:1 | 211:25 | 243:4,14 |
| 219:11,24 | 114:3 | 255:21 | 89:12 | 212:4,16 | 244:1 |
| 220:2 | 115:20 | 256:19 | 96:11 | **wrinkled** | **wrote** |
| 221:3,4,8 | 119:8 | 257:15 | 109:10,22 | 28:18 | 44:7 |
| 223:3,7, | 120:8,19, | 258:11,22 | 115:18 | **write** | 45:21 |
| 19 | 20,22 | 259:4 | 116:11 | 9:21 17:4 | 47:17 |
| 224:19,24 | 121:2,8, | **witnesses** | 130:7 | 36:13 | 54:6 85:5 |
| 225:19,21 | 14 122:16 | 23:8 | 173:22,25 | 44:12 | 115:11 |
| 226:10,13 | 125:14 | 66:19 | 174:2 | 55:17 | 200:11 |
| 227:4 | 154:24 | 133:14, | 185:19 | 116:15 | 230:4 |
| 228:11 | 168:9 | 15,19,24 | **worked** | 117:6,7, | |
| 229:18 | 178:1 | 153:22 | 94:13 | | |
| 230:12,13 | 207:2 | 154:3 | **working** | | **Y** |
| 231:25 | 211:6 | **woman** | 20:15 | | |
| 235:10 | 226:1,9 | 148:9 | 26:18 | | **yeah** |
| 236:12, | 228:14 | 157:14 | | | 11:19 |
| 22,25 | 229:12 | | | | |
| 237:7,24 | | | | | |



Detective Justin Roth    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | |
|---|---|---|---|---|
| 18:18 | 48:22 | 17,24 | 225:23 | 253:13,14 |
| 25:4 | 49:13 | 114:10,11 | 227:2,23 | |
| 29:24 | 58:12 | 116:24 | 229:16 | |
| 37:21 | 93:9,10 | 120:3 | 231:14 | |
| 39:23 | 94:20 | 121:23 | 238:4 | |
| 40:23 | 109:5 | 122:25 | 239:15 | |
| 44:6 53:4 | 116:14 | 125:23 | 241:13 | |
| 92:9 | 117:19 | 128:19 | 242:14 | |
| 110:13 | 118:5,12 | 129:5,8, | 243:7 | |
| 124:16 | 143:2 | 12,15 | 244:12 | |
| 128:2,8 | 179:6 | 130:22 | 245:11 | |
| 134:23 | 181:11 | 132:11 | 247:2 | |
| 148:12 | 182:11 | 134:5 | 255:9,14 | |
| 152:10 | 221:2 | 137:6 | 256:21,24 | |
| 155:25 | 224:19 | 138:5 | 258:22 | |
| 156:1 | | 139:23 | 259:5,20 | |
| 167:6,21 | **Yep** | 141:1,5, | | |
| 168:6,8 | 129:21 | 19 144:23 | **yes/no** | |
| 171:19 | 156:2 | 146:4,10 | 212:21 | |
| 172:15 | 177:5 | 147:21 | | |
| 177:4 | 202:11 | 148:21 | **yet** | |
| 178:5 | | 151:1 | 87:3 | |
| 187:9 | **yes** | 152:13 | 158:4,5 | |
| 207:20 | 5:21 7:2, | 155:11 | 220:6 | |
| 209:1 | 22 9:22 | 166:23 | | |
| 211:12 | 10:15 | 167:25 | **yourself** | |
| 213:4 | 11:3 | 168:1,5 | 21:11 | |
| 214:25 | 14:25 | 177:1,2 | 56:4 64:5 | |
| 215:3,4 | 21:4 | 178:22,24 | 83:17 | |
| 228:5,11, | 22:20 | 182:15 | 152:11 | |
| 13 230:3 | 24:11,15 | 185:15 | 175:8 | |
| 242:2 | 25:8 30:1 | 192:16 | 183:5 | |
| | 33:18,20 | 195:16 | 185:8 | |
| **year** | 38:8 40:5 | 200:1 | 255:6 | |
| 9:6 13:12 | 42:3 | 201:2,24 | | |
| 15:18,20 | 45:19 | 202:19 | **Youtube** | |
| 16:5 | 54:17 | 203:15 | 62:14 | |
| 25:22 | 56:15 | 205:5,23 | 64:12 | |
| 26:2 | 59:2 | 206:4 | 140:10 | |
| 55:18 | 68:15 | 207:22 | | |
| 75:4 | 69:13 | 208:3,4, | ———— | |
| 80:21 | 77:5,12 | 24 211:22 | **Z** | |
| 122:9 | 78:6 | 214:20 | ———— | |
| | 79:16,20 | 215:7,10 | | |
| **years** | 92:22 | 216:11 | **Zabeti** | |
| 7:6 | 94:14,24 | 217:7 | 40:20 | |
| 15:11,17, | 97:9 | 219:10 | 46:25 | |
| 23 20:15 | 100:7 | 220:1,5, | 47:13 | |
| 22:16,17, | 103:10 | 14 222:3 | 50:4,13 | |
| 18 24:13 | 110:20 | 223:24 | | |
| 34:5 43:3 | 112:11, | | **zero** | |
| | | | 64:19 | |
| | | | 75:5 | |
| | | | 97:14 | |

