# Exhibit 11

# Exhibit 11

Case 2:24-cv-00074-APG-NJK    Document 57-12    Filed 05/16/25    Page 2 of 118

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

1              UNITED STATES DISTRICT COURT

2                   DISTRICT OF NEVADA

3                   *  *  *  *  *

4    LATIA ALEXANDER,                )
     individually as heir of        )
5    ISAIAH T. WILLIAMS and in      )
     her capacity as special        )
6    administrator of the Estate    )
     of ISAIAH T. WILLIAMS,         )
7                                    )
          Plaintiff,                 )
8                                    )
          vs.                        )          CASE NO.
9                                    )  2:24-cv-00074-APG-NJK
     LAS VEGAS METROPOLITAN          )
10   POLICE DEPARTMENT, a            )
     political subdivision of        )
11   the State of Nevada; KERRY     )
     KUBLA, in his individual       )
12   capacity, et al.,               )
                                     )
13        Defendants.                )
     _____)

14

15              VIDEOTAPED DEPOSITION OF

16                 BRICE CLEMENTS

17              Taken on October 7, 2024

18                  at 10:04 a.m.

19           By a Certified Court Reporter

20              Las Vegas, Nevada

21

22

23           Stenographically reported by:
           Heidi K. Konsten, NV CCR 845, RPR
24           JOB NO. 57949 - Firm No. 116F

25

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
                                                      Page 2
 1               Videotaped deposition of BRICE CLEMENTS,

 2      Volume I, stenographically taken at 400 South

 3      Seventh Street, Las Vegas, Nevada, on

 4      Monday, October 7, 2024, at 10:04 a.m., before

 5      Heidi K. Konsten, Certified Court Reporter in and

 6      for the State of Nevada.

 7

 8                   APPEARANCES OF COUNSEL

 9      For the Plaintiff:

10              CORRINE MURPHY, ESQ.
                Breeden & Associates, PLLC
11              7432 West Sahara Avenue
                Suite 101
12              Las Vegas, Nevada 89117
                (702) 508-9250
13              (702) 508-9365 Fax

14      For the Defendants:

15              CRAIG R. ANDERSON, ESQ.
                Marquis Aurbach
16              10001 Park Run Drive
                Las Vegas, Nevada 89145
17              (702) 382-0711
                (702) 382-5816 Fax
18
        Also present:
19
                Dawn Beck, Videographer
20

21                   *  *  *  *  *  *

22

23

24

25
```



```
                                                             Page  3
 1                          INDEX
 2                                                Page
 3    BRICE CLEMENTS
 4    Examination by Ms. Murphy                      5
 5                      *  *  *  *  *
 6
 7                        EXHIBITS
 8    No.                 Description            Page
 9    Exhibit 1      Notice of Deposition          6
10                      *  *  *  *  *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

1                    LAS VEGAS, NEVADA

2                  Monday, October 7, 2024

3                       10:04 a.m.

4               DEPOSITION OF BRICE CLEMENTS

5                     * * * * * *

6

7               THE VIDEOGRAPHER:  Good morning.  We

8    are now on the record.  This begins the

9    video-recorded deposition of Brice Clements.

10   Today's date is October 7, 2024.  The time on the

11   video monitor is 10:04 a.m.  We are located at 400

12   South Seventh Street in Las Vegas, Nevada.

13               This case is entitled Latia Alexander,

14   et al., versus Las Vegas Metropolitan Police

15   Department, et al.  The case number is

16   2:24-cv-00074-APG-NJK in the United States

17   District Court, District of Nevada.

18               My name is Dawn Beck, legal video

19   specialist.  The court reporter is Heidi Konsten.

20   We're representing Lexitas.

21               Will counsel please state your

22   appearance for the record and whom you represent.

23               MS. MURPHY:  Good morning.  Corrine

24   Murphy, Bar Number 10410, on behalf of plaintiff.

25               MR. ANDERSON:  Craig Anderson on

Page 5

1    behalf of defendants.

2              THE VIDEOGRAPHER:  Thank you.

3              Will the court reporter please swear

4    in the witness.

5

6    Whereupon,

7                    BRICE CLEMENTS,

8    was called as a witness, and having been first duly

9    sworn to testify to the truth, was examined and

10   testified as follows:

11

12                    EXAMINATION

13   BY MS. MURPHY:

14     Q    Good morning, Mr. Clements.  My name is

15   Corrine Murphy.

16              Let the record reflect this is the time

17   and place for the deposition of Brice Clements in

18   the matter of Latia Alexander, et al., versus Las

19   Vegas Metropolitan Police Department, et al., Case

20   number 2:24-cv-00074.

21              Would you prefer that I call you

22   Mr. Clements or Brice?

23     A    Brice is fine.

24     Q    Okay.  Can you please state and spell

25   your full name for the record?

Brice Clements        Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 6

1        A    Yes.  Brice John Rollin Clements.

2   That's B-R-I-C-E, J-O-H-N, R-O-L-L-I-N,

3   C-L-E-M-E-N-T-S.

4        Q    And, Brice, you have been -- you had

5   your deposition noticed for today.

6             Did you have an opportunity to review

7   the deposition notice?

8        A    Yes.

9             MS. MURPHY:  Okay.  And I'm going to

10  ask the court reporter -- this is the first

11  amended notice of videotaped deposition --

12  videotaped deposition of Brice Clements.  Can we

13  please mark that as Exhibit 1 to today's

14  deposition transcript.

15             (Exhibit 1 was identified.)

16  BY MS. MURPHY:

17       Q    And you understand that you're here

18  today to discuss the officer-involved shooting of

19  Isaiah Williams?

20       A    Yes.

21       Q    Have you ever given your deposition

22  before?

23       A    No.

24       Q    Okay.  I'm not going to go -- I'm sure

25  that you've been prepared by your attorney.  I'm

Page  7

1    not going to go into a lot of instructions.  The

2    only instruction I'm going to provide is that the

3    oath that you just took is the same oath that you

4    would give if you were in a court of law and the

5    same penalties of perjury apply, even though we're

6    not in a court of law.

7             Do you understand that instruction?

8       A    I understand.

9       Q    Okay.  Is there any reason that you

10   would not be able to understand my questions and

11   give your best and truthful testimony today?

12      A    No.

13      Q    Are you under any medications or any

14   other issue that would inhibit your ability to

15   provide reliable testimony today?

16      A    No.

17      Q    Okay.  Can you please tell me everything

18   you did to prepare for today's deposition.

19      A    Spoke with Craig Anderson, read my CIRT

20   interview, and just reflected on the actual call

21   through memory.

22      Q    Okay.  And I don't -- I'm not entitled

23   to know what you spoke about with Craig.  That's

24   attorney-client privilege.  But I am entitled to

25   know how long you met with Craig for and how many

Page 8

1    times.

2         A     I believe two times.  The first one was

3    a group setting at his office for approximately an

4    hour to an hour and a half.  The second one was in

5    his office for approximately 30, 40 minutes.

6         Q     And what date was the 30- to 40-minute

7    meeting on?

8         A     That was last week on Wednesday, I

9    believe.

10        Q     And the group setting meeting,

11   approximately how long ago was that?

12        A     That was back in probably June.

13        Q     And I know that you -- I can see that

14   you brought your CIRT statement with you, and you

15   just listed that as one of the things that you

16   reviewed for today's deposition.

17             Are there any other documents that you

18   reviewed in preparation for today's deposition?

19        A     Yes.  I was given the court info and I

20   think just the litigation as far as why we're

21   here.

22        Q     Okay.  And, Brice, you completed what

23   are called interrogatories and requests for

24   production of documents.

25             Do you remember doing those at all?

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 9

1       A    Yes.

2       Q    Okay.  Did you review those in

3   preparation for today's deposition?

4       A    Yes.

5       Q    Okay.  Are there any other documents

6   that you may have reviewed -- that you did review

7   for -- in preparation for today's deposition?

8       A    No.

9       Q    Okay.  Other than your own statement,

10  have you reviewed the statements of any of the

11  other police officers?

12      A    Yes.

13      Q    Okay.  Who else's statement did you

14  review?

15      A    Gonzales.  Alex Gonzales.

16      Q    Okay.  And when you say "statement," do

17  you mean his CIRT -- his recorded CIRT statement,

18  or did you review his deposition transcript?

19      A    His deposition transcript.

20      Q    Okay.  And did you read the entire

21  deposition transcript?

22      A    No.

23      Q    Okay.  How much of it did you read?

24      A    Bits and pieces.  I didn't read the

25  whole thing.

Page 10

1       Q      Okay.  In reviewing Officer Gonzales's

2    deposition transcript, was there any information

3    that you found surprising?

4       A      No.

5       Q      Okay.  Did you agree -- with the items

6    that you read in Officer Gonzalez's deposition

7    transcript, were you mostly in agreement with

8    them?

9       A      Yes.

10      Q      Can you give me a brief description of

11   what parts of Officer Gonzalez's deposition

12   transcript you reviewed?

13      A      The first couple of questions

14   reference -- the questions that you're asking

15   right now, and a little bit into questions related

16   to the actual shooting.

17      Q      Okay.  Anything else?

18      A      No.

19      Q      Did you read any parts of Officer

20   Gonzalez's deposition transcript where he talked

21   about what he might have done differently or what

22   the cause of this incident was, in his opinion?

23      A      No.

24      Q      Okay.  And so we've kind of gone over

25   some stuff.  Every time I ask you, you're giving

1  me more items that you reviewed.

2       It is your responsibility in this

3  deposition to give me complete and whole answers,

4  so I'm going to ask you one last time.  And if you

5  want to take a moment to think about it, please do

6  that.

7       Did you review anything else to prepare

8  for today's deposition?

9    A   That was the only extra thing.

10      MR. ANDERSON:  Well, you said

11  documents.  We watched body cam.

12      MS. MURPHY:  Okay.  Okay.

13  BY MS. MURPHY:

14    Q   Why did you not list off the body cam

15  when I asked you what you did to prepare for

16  today's depositions?

17    A   I just figured documents.  I mean, I've

18  reviewed the --

19    Q   Well, my first question was "tell me

20  everything you did to prepare for today's

21  deposition."

22      Is that fair?

23    A   Yes.

24    Q   So why didn't you tell me you reviewed

25  the body cam?

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 12

```
 1        A     It didn't pop up into my head.

 2        Q     Okay.  And I'm going to go over the

 3   instruction one more time.

 4              It is your responsibility today to give

 5   me your best, whole answers.

 6              Do you understand the nature of that

 7   instruction?

 8        A     Yes, I do.

 9        Q     Okay.  Is your -- what are your normal

10   work hours?  As we sit here today, what are your

11   normal work hours?

12        A     My work hours as we sit today are 6:30

13   to 4:30, Monday through Friday -- Monday through

14   Thursday.

15        Q     Okay.  Is that 6:30 a.m.?

16        A     Yes.

17        Q     Okay.  And Monday through Thursday, so

18   this would normally be during your working time;

19   is that correct?

20        A     That is correct.

21        Q     Okay.  And you got today off to do the

22   deposition?

23        A     No.  I was actually in class.

24        Q     What kind of class were you in?

25        A     Supervisor's class.
```

Page 13

```
 1      Q    What's a supervisor's class?

 2      A    It's a POST two-week class basically to

 3   give insight on how to be a good leader.

 4      Q    Okay.  Are you up for a promotion

 5   currently?

 6      A    Already promoted.

 7      Q    Oh, congratulations.

 8      A    Thank you.

 9      Q    What were you promoted to?

10      A    Sergeant.

11      Q    And when did that happen?

12      A    May 13 of '23.

13      Q    Okay.  And are you -- as we sit here

14   today, are you still with SWAT?

15      A    No, I'm not.

16      Q    Who are you with now?

17      A    Patrol.

18      Q    So you are a sergeant in a patrol -- in

19   the patrol unit.

20           Am I saying that accurately, or should

21   it be said differently?

22      A    No, patrol.

23      Q    Okay.

24      A    Yeah, patrol division.

25      Q    Did your transfer out of SWAT, was that
```

Page 14

1    in any way related to this incident?

2         A    No.

3         Q    Okay.  And so why did you transfer out

4    of SWAT?

5         A    To promote.

6         Q    Okay.  And so I'm going to -- Brice, I'm

7    going to go over some background.  And so let me

8    ask you, at the time of the incident, do you

9    remember what your work schedule was?  And I --

10   just for the record, I know you know, but I have

11   to say it for the record.

12           When I refer to "the incident," I'm

13   talking about the officer-involved shooting on

14   January 10th, 2022.

15        A    Yes.

16        Q    Okay.  At the time of the incident, what

17   was your work schedule?

18        A    I worked Sunday through Wednesday and

19   swing shift.  It changed a couple of times.  If I

20   remember correctly, I believe it was 2:00 to

21   midnight at that time.

22        Q    Okay.  Was it almost like a -- if I call

23   it a wobbler schedule --

24        A    I mean, I was on call 24/7.

25        Q    Okay.  And so was the -- it's a little

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 15

1    early in the morning for me.

2          Was the execution of this warrant during

3    your normal work hours?

4    A    No.

5    Q    Okay.  So you were -- if I say "called

6    in" for this, is that accurate?

7    A    Called out.

8    Q    Called out.

9          That's what you call it, a call-out?

10   A    Uh-huh.

11   Q    Okay.  Why were you called out for this?

12   A    Because it wasn't during our regular

13   work hours.

14   Q    Okay.  And do you have the option of,

15   like, accepting a call-out, or do you just get

16   called out and you have to show up?

17   A    When it's on your workdays, which this

18   was, you have no -- there's no option.  You --

19   those are your workdays.  You go in.

20   Q    Okay.  All right.  So if I understand

21   correctly, you have, like, normal shift hours, but

22   any -- for something like this, a search warrant

23   like this, if it falls on your workday, then you

24   get called -- you get called out for it?

25   A    Yes.

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 16

1      Q     Okay.  All right.  Now, Brice, I'm going

2   to ask you some background questions.

3           What's your highest level of education?

4      A     I have a bachelor's degree in chemistry,

5   biochemistry, with an emphasis in forensic

6   chemistry.

7      Q     Is it a dumb question for me to ask how

8   you ended up being a police officer?  Because that

9   seems like headed towards med school.

10     A     I came down here to do forensics with

11  the department.  It was 2007.  So the fall of --

12  if you remember, in 2008, we had a major issue

13  with the government and jobs were hard to find.

14  In 2007 I decided to try law enforcement, and I'm

15  happy that I did.

16     Q     Okay.  And where did you receive your

17  BA?

18     A     Eastern Washington University.

19     Q     Okay.

20     A     I also have an associate's degree from

21  Columbia Basin College, which I got at the same

22  time that I graduated high school.

23     Q     And what was your -- what was your

24  associate's degree in?

25     A     Just general associate's.

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 17

1        Q     Okay.  Are you a member of any

2    professional organizations related to your

3    profession currently?

4        A     In what -- like examples?

5        Q     Yeah.  So sometimes when I ask that

6    question, some people will tell me, you know, oh,

7    I'm -- I belong to, like, an officer -- like, a --

8    like an officer support group or, like, with

9    sometimes in military and stuff -- what's it

10   called?  The -- oh, gosh.  The organization for

11   veterans or like a -- sometimes -- sometimes

12   officers are maybe involved in, like, a shooting

13   club or something like that.

14       A     No.

15       Q     Okay.  And we went over this briefly.

16             So I understand your current position is

17   sergeant in patrol, and you were promoted in May

18   of 2023; correct?

19       A     Correct.

20       Q     Okay.  How is that going?

21       A     Good.

22       Q     Okay.  Can you kind of walk me through

23   your -- your professional background with LVMPD

24   leading up to this incident?

25       A     Sure.  I was hired in -- June 18th,

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 18

1    2009.  Finished the academy and graduated in
2    December of same year.  Did patrol up until
3    approximately four years on, where I tested for
4    field training officer.  Passed that.  Was a field
5    training officer for approximately five to five
6    and a half years before I went to SWAT.
7          Q    And what does a field training officer
8    do?
9          A    They train the officers that come out of
10   the academy.  So they get their, like, on-the-job
11   training.
12         Q    Okay.  And so you're going to -- if some
13   of my questions seem a little awkward, it's
14   because I'm not a police officer, so I don't know
15   what --
16         A    I understand.
17         Q    Yeah.  So is it -- if I understand
18   the -- the chronology that you just gave me, you
19   were a field training officer.  And from that,
20   where you're training other officers, you then
21   went into SWAT; is that --
22         A    That is correct.
23         Q    So you weren't, like, on patrol or part
24   of, like, a narcotics unit or anything like that
25   prior to being on SWAT?



Page 19

```
 1        A    No.  Patrol.
 2        Q    Okay.  And so can you kind of tell me,
 3   like -- you have given me a little bit of a
 4   description.  But can you kind of walk me through,
 5   like, what kind of stuff would you do field
 6   training for?  Like, what did the training look
 7   like or provide for?  You weren't training.
 8        A    The field training would provide the new
 9   officers on-the-job training for various calls,
10   paperwork, understanding criminal law,
11   understanding the defensive tactics, understanding
12   the use of force, and any questions related to
13   that.
14        Q    And so that's actually really
15   interesting.  You're the first police officer that
16   I've talked to that has a background in training
17   other officers in criminal law and use of force.
18             So can you kind of walk me through,
19   like, what would that training look like?
20        A    You go through some of the laws that
21   pertain to an officer using force like -- related
22   to, you know, a fleeing felon, things like that.
23        Q    Okay.  And how would you train officers
24   in that?
25        A    By reading the laws.
```

Page 20

 1        Q      Okay.

 2        A      Which they have already been -- to be

 3    honest, been trained on in the academy.

 4        Q      I would hope so.

 5               So I guess I'm trying to figure out --

 6    and I'm trying to figure out, like, would you

 7    actually -- like, out in the field would you say,

 8    "Okay.  You need to do X, Y, and Z in order to --

 9    you know, comply with this case law"?  Or is it

10    more, like, you would sit down and have a study

11    session?  I guess that --

12        A      Study sessions.  But also the department

13    puts on study sessions via -- what we call our

14    UMLV.

15        Q      What's UMLV?

16        A      University of Metro Las Vegas.  So it's

17    a program that the department puts out with

18    various training videos or training in general.

19        Q      And as part of UMLV or your training of

20    other officers, did you go over what knock and

21    announce means?

22        A      In patrol, you don't do search warrants.

23    So briefed over things like that, but that's not

24    what a daily patrol officer does.

25        Q      And so -- and, I'm sorry, I know you

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 21

1   told me, but I -- I didn't make a note of it as

2   well as I should have.

3           How long had you been in SWAT before

4   this incident occurred?

5       A   Approximately three years.  But I was

6   doing training with SWAT, meaning role-playing

7   and/or going through SWAT schools and testing.

8   I've been through, I believe, four SWAT schools.

9   And the last one that I went through was

10  completely graded.

11      Q   What does "completely graded" mean?

12      A   It means for the four weeks of the SWAT

13  school, every day you are graded on it.  And that

14  was to be placed on the list.

15      Q   And what does "the list" mean?

16      A   The list is the -- is ranked.  And then

17  dependent on where you are in positions opening

18  wise, then you get pulled from that list.

19      Q   And how were your grades?

20      A   I was number one on the list.

21      Q   And is that the normal way that you

22  would qualify for SWAT?

23      A   It has changed over my career, but for

24  the most part, yes.  You have a physical test,

25  a -- which is an obstacle course to include



Page 22

1    shooting.  And you also have a qualification for

2    your handgun and your rifle.

3            Then you move on to an actual, like,

4    physical fitness test.  And then after that are

5    scenarios, and then the SWAT school.

6        Q    Okay.  And so you -- had you been

7    through four SWAT schools by the time of this

8    innocent -- incident?

9        A    Yes.

10       Q    Okay.  And can you tell me -- I'm going

11   to ask the question in two parts, and if it's the

12   same, then tell me it's the same.

13           I'm going to ask you what knock and

14   announce mean to you, what your understanding as a

15   SWAT officer is, what that knock-and-announce rule

16   means.  And I'm going to ask you what it means for

17   you here today.  And if that is different, than

18   how -- what it meant for you in 2022 at the time

19   of this incident.

20       A    Okay.  So knock and announce is a tactic

21   that we use where we would announce our intentions

22   to somebody inside of a building/residence related

23   to the search warrant.

24       Q    Okay.  To your -- and I'm assuming that

25   that's the same as what you understood it to be as



Page 23

1    in 2022?

2        A    Absolutely.

3        Q    Okay.  To your knowledge, is there any

4    amount of time that you must wait before entering

5    the unit after you've made your -- your first

6    knock and announce?

7        A    There's time that is wished it to be,

8    but time varies.

9        Q    Okay.  And I think I understand what you

10   mean by "wished it to be," which means -- these

11   are called dynamic entries, right, where there's a

12   lot of stuff changing?

13       A    Yes.

14       Q    So can you tell me what the "wished for"

15   amount of time is?

16       A    At the time, I think it was

17   approximately around ten seconds.  And if I

18   remember correctly, entry was at 17 and a half

19   seconds.

20       Q    Okay.  But entry was at 17 and a half

21   seconds through the window; correct?

22       A    I have no idea.

23       Q    Okay.  And can you tell me, what is the

24   purpose of knock and announce?

25       A    To announce our intentions, that we have

Page 24

1    a search warrant, which is why we announce

2    "Police, search warrant."

3         Q    And why do you have to do that?

4         A    To announce our intentions to the people

5    that are inside.

6         Q    And why does the person inside get to

7    understand -- get to -- sorry.  Strike that.

8              Why does the person inside get to hear

9    the announcement of your intention?

10        A    Because we're going into their

11   residence.

12        Q    Okay.  Are there any rights that are

13   triggered -- does the person inside have any kind

14   of rights or do you have any type of duties to

15   make those announcements?

16        A    Yeah, through the Fourth Amendment.

17        Q    Okay.  And can you kind of walk me

18   through what your understanding of that is?

19        A    Yes.  You can't just enter somebody's

20   house just to enter somebody's house.

21        Q    Why not?

22        A    Because it's an intrusion on their

23   liberties.

24        Q    Okay.  And so I asked a little bit

25   earlier about the time that you need to provide.

Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 25

1    What's your understanding of why you need to

2    provide time?  We talked about the difference

3    between the wished-for time and what actually

4    happens in the field.

5              What is your understanding of why that

6    has to occur?

7         A    To allow that person to hear and

8    understand the intention of the police that are

9    coming in and that they have a search warrant.

10        Q    And so as we sit here today, you

11   understand, correct, that it is a person's

12   constitutional right to have clear notice of a

13   police officer's intent to enter?

14        A    Yes.

15        Q    Okay.  Do you -- and we will get into

16   the specifics of this actual incident itself.

17             In terms of the young man that was shot,

18   Isaiah Williams, do you think that he had a clear

19   notice of your -- your unit's intent to enter the

20   apartment?

21        A    Absolutely.

22        Q    Why do you say that?

23        A    Because the patrons in the apartment

24   above heard our announcements.

25        Q    How do you know that?



Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 26

1      A     Because they testified to it.

2      Q     When did they testify to it?

3      A     When they were interviewed by -- I'm

4   assuming CIRT or FED.

5      Q     And what was your understanding of their

6   testimony?

7      A     That they heard us yelling and yelling

8   "Police, search warrant" and the apartment and the

9   apartment number.

10     Q     Okay.  The apartment number was yelled?

11     A     Uh-huh.

12     Q     Okay.  And, Brice, as we sit here today,

13   do you think that perhaps the experience of the

14   people above you could be different than the

15   experience of Mr. Williams?

16             MR. ANDERSON:  Objection.  Form.

17             You can answer.  When I object, always

18   answer --

19             THE WITNESS:  Okay.

20             MR. ANDERSON:  -- unless I tell you

21   not to.

22             THE WITNESS:  What's that now?  Can

23   you repeat the question?

24             MS. MURPHY:  Would you mind rereading

25   the question?

LEXITAS™

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page  27

 1              THE COURT REPORTER:  Sure.

 2              MS. MURPHY:  I ask her to re-read it

 3  because -- sorry.  Off the record for just a

 4  second.

 5                  (Discussion off the record.)

 6                  (Whereupon, the record was read.)

 7              MR. ANDERSON:  Absolutely.

 8  BY MS. MURPHY:

 9      Q    Okay.  And that could be also because

10  their windows weren't being broken; correct?

11      A    Yes.

12      Q    They didn't have a distraction device

13  being inserted through their windows; correct?

14      A    Correct.

15      Q    They didn't have a 9 banger going off in

16  close proximity to them; correct?

17      A    Yes.

18      Q    Okay.  In -- in your opinion, what is

19  the first and most important constitutional right

20  that any individual has?

21      A    A right to their person and property.

22      Q    In performing your job as a police

23  officer, do you agree with me that you have a duty

24  to conduct yourselves such that you do not violate

25  the civil or constitutional rights of members of

Page 28

1    the public?

2        A    Absolutely.

3        Q    Do you also agree that if you see other

4    officers violating the civil or constitutional

5    rights of a member of the public, you have a duty

6    to intervene and stop that officer?

7        A    Absolutely.

8        Q    And can you please tell me, Brice -- and

9    if it's -- when I ask questions about, like,

10   definitions, it will be a standing instruction,

11   but I'll clarify it each time.

12           If your understanding of a definition or

13   parameter that I'm asking you for is different

14   today than it was in 2022, can you please identify

15   what differences they may be?

16       A    Sure.

17       Q    Okay.  So I'm going to ask you, what is

18   a no-knock warrant?

19       A    A no-knock warrant would be essentially

20   a no-knock warrant.  You're not knocking.  You're

21   not announcing.  You're immediately going in.

22       Q    And I'm going to ask the question,

23   because I want a -- because I want it for the

24   record, although I know it's somewhat

25   self-explanatory.

Page 29

 1            What's the -- what are -- what's the
 2    difference between a no-knock and a knock and
 3    announce?
 4         A    You're announcing.
 5         Q    And what type of warrants would you get
 6    a no-knock warrant for?
 7         A    Something high profile, I would say.
 8    Something that would be extremely dangerous to the
 9    officers or it could be extremely dangerous for
10    the person who is inside.
11         Q    And to clarify, this was a knock and
12    announce warrant; correct?
13         A    Yes, it was.
14         Q    Can you get a no-knock warrant for a
15    property-only search warrant?
16         A    Not that I know -- not that -- I
17    couldn't tell you, off the top of my head right
18    now.
19         Q    Okay.  That's fair.  If you -- if you
20    don't know the answer, then just -- thank you for
21    being candid about that.
22            And I'm going to ask you some more
23    specifics about it later.  But as we sit here
24    today, do you have an understanding of what type
25    of search warrant you were executing that day?

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 30

1        A     Yes.  It was a homicide warrant.

2        Q     Was it a property or person?

3        A     Both.

4        Q     Okay.  And, Brice, can you please tell

5    me -- I always say this wrong -- what is a CET?

6        A     It is a controlled entry tactic.

7        Q     Okay.  And can you tell me, what is a

8    controlled entry tactic?

9        A     Yes.  You use speed and surprise in

10   order to safely get into an apartment and clear it

11   quickly and safely.

12       Q     In this case, did you think that the --

13   that yourself and the other officers got into this

14   unit safely?

15       A     When the door opened?

16       Q     Yes.

17       A     Yes.

18       Q     Okay.  And why do you think that you got

19   in safely?

20       A     Because the door opened and --

21       Q     I'm trying -- I'm sorry.  She can only

22   take down one person at a time, and I'm trying not

23   to interrupt you.  So if I interrupt you, I'm

24   going to pull back.  And please finish saying what

25   you're saying.

LEXITAS™

Page 31

1      A    Okay.  At the time of the door opening,
2  yes, I believe it was a safe entry.  As of the
3  time that I entered, it was not safe.
4      Q    And so why do you -- Brice, why do you
5  distinguish between those two -- those two --
6  because those seem pretty close in proximity
7  time-wise to me.  So why do you make that -- that
8  distinguishing comment?
9      A    Because we weren't fired upon until we
10  entered.
11      Q    Do you think there was a possibility you
12  could have been fired on before entering?
13      A    Yes.  There's always that possibility.
14      Q    Okay.  And so upon entering, though,
15  once the doors opened, you would make the -- you
16  would make the change in your assessment of safety
17  as it being unsafe; correct?
18      A    Based off the circumstances as you
19  enter.
20      Q    Okay.  So in this case, the CET did not
21  meet its intention of allowing you to safely be in
22  the unit; correct?
23      A    Due to Mr. Williams.
24      Q    Okay.  And you place all of that blame
25  on Mr. Williams.  Is that fair to say?



Page 32

```
 1        A    I believe that we made enough of an
 2   announcement and -- and any reasonable person
 3   would understand that announcement.
 4        Q    And as we sit here today, I know that
 5   you've read your CIRT statement.
 6             Have you read the CIRT report itself?
 7        A    I was there when they presented it.
 8        Q    And you understand that CIRT does not
 9   believe that this was a proper entry; is that
10   correct?
11        A    Not that I remember.
12        Q    Okay.
13        A    It was a long time ago.
14        Q    Okay.  And later on in the deposition,
15   I'll read some of their conclusions for you, and
16   we'll get into that a little bit more.
17        A    Okay.
18        Q    Can you use a CET on a
19   knock-and-announce warrant?
20        A    Yes.
21        Q    Okay.  As we sit here today, there's
22   been no policy change on that?
23        A    They have changed the policy, I
24   believe --
25        Q    What --
```

Page 33

1    A    -- within the department.

2    Q    What's your -- and it doesn't need to be

3  a perfect --

4    A    What I will say is that at the time, a

5  CET was appropriate for the apartment.  And the

6  reasoning for that is that we could not safely

7  surround it, based off of our tactics at the time.

8         When you think about doing a surround

9  and call-out, the whole purpose of that is to be

10  able to surround it safely on all sides.  We

11  couldn't do that with the apartment.  The

12  apartment was down below a little bit from street

13  level, and there was a business behind.  There's

14  also an apartment above.

15    Q    Okay.

16    A    BearCats are not able to get in there,

17  which is a tool that we use in order to call

18  people out.

19    Q    Okay.  And you have made the -- you've

20  made the distinction between then and now.

21         As we sit here today, this would -- if

22  you had a similar -- and I understand that I'm

23  asking you to look backwards, and sometimes that

24  can be an unfair, you know, standard.

25         But as we sit here today, if you're --

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 34

1    if SWAT were -- were tasked with serving this

2    search warrant again today -- the same type of

3    search warrant, the same type of physical

4    parameters of the unit -- would they be able to do

5    a CET, or would they have to do a surround and

6    call-out?

7         A    That would be a decision not made by me.

8         Q    Okay.  Based on your understanding of

9    what the current policies of what LVMPD are, do

10   you have any position on what it would be?

11        A    No.

12        Q    Okay.  So if I were to represent to you

13   that, as we sit here today, based on the policies

14   of LVMPD, this would have to be a surround and

15   call-out, that's new information to you?

16        A    Again, I haven't been in SWAT, so the

17   policies have changed since I've been there.

18        Q    Okay.  That's fair.

19             Do you believe that there's any conflict

20   between knock and announce and a CET?

21        A    Any conflict?

22        Q    Yeah.

23        A    In what meaning?

24        Q    That the purpose of knock and announce

25   is to -- based on how you've just described it to

Page 35

1    me, the purpose of knock and announce is to give

2    the person on the other side of the door the --

3    the information or knowledge of the police

4    officer's intention to enter the unit.

5          And so my question to you is, being --

6    and you've described what the purpose of knock and

7    announce is, being -- what your understanding of

8    that is.

9          Do you think that there is a conflict

10   between that intention and doing a CET?

11        A    At the time, no.

12        Q    Okay.  What about as we sit here today?

13        A    I wouldn't change what we -- I wouldn't

14   change the CET.

15        Q    And so my question was a little bit

16   different.  It's not whether you would change it

17   or not.  I'm not asking you to rewrite history.

18          I'm just asking, in your personal

19   opinion, based on your training, your field

20   experience, everything that you have gone through

21   as a police officer, do you think that there's any

22   type of conflict between knock and announce and a

23   CET, or do you believe that those two things can

24   coexist?

25        A    I think they can coexist.

Page 36

1      Q    Okay.  Okay.  And, Brice, I'm going to
2   ask you -- now I'm going to kind of go through,
3   more in a chronological way, about what happened.
4           Can you please give me your -- your
5   first awareness of when -- your first awareness of
6   this warrant.
7      A    Yes.  It was put out on Sunday that
8   there was a possible warrant being worked on by
9   homicide.
10     Q    Okay.  And how did you become aware of
11  that?
12     A    Through text message.  That's how we'd
13  communicate through the team.  We have a group
14  text message.
15     Q    Okay.  If I call it a group thread --
16     A    A group thread.
17     Q    Okay.  And so what kind of information
18  comes through on the group thread?
19     A    It can be anything from what we are
20  tasked with for that day, who gets tasked with a
21  search warrant if we have it.  And by that I mean,
22  who goes out and does a recon.
23          It could be, "Hey, meet at this place,
24  because we're training.  Hey, be at the office,
25  because we have to do this, this, or that."  It

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 37

1    just depends.

2        Q    Okay.  And were you part of the recon

3    team on this -- on this warrant?

4        A    I was not.

5        Q    Can you kind of tell me what -- were you

6    ever on the recon -- are you ever on a recon

7    team -- sorry.  Strike that.

8            In terms of executing warrants, did

9    you -- were you -- not just this warrant, but

10   warrants in general -- were you ever tasked with

11   being part of the recon team?

12       A    Yes.

13       Q    Okay.  But you weren't on this one;

14   correct?

15       A    It's not considered a recon -- there's

16   not specific people that do recons.  We, as SWAT

17   operators, we all do recons.  It just depends on

18   who gets tasked with it.

19       Q    Okay.  And so -- but on this particular

20   one, you were not tasked with it; correct?

21       A    I was not.

22       Q    Okay.  Prior to meeting at Sam's Town,

23   did you have any interaction with whomever did the

24   recon or any awareness?

25       A    Nope.

Page 38

```
 1       Q     Okay.  So you get the text message
 2  Sunday.  You find out that you've got to be at
 3  Sam's Town very, very early in the morning; is
 4  that fair?
 5       A     Yes.
 6       Q     Okay.  And did you ever see the warrant?
 7       A     No.
 8       Q     Did you ever -- and it's -- I'll ask it
 9  duplicatively.
10             Did you ever read the warrant?
11       A     No.
12       Q     Did you ever have any understanding of
13  what it was you were going in there to look for?
14       A     Just people and evidence.
15       Q     Okay.  And what made you -- what --
16  what -- what foundation did you have -- what were
17  you relayed that made you think that you were
18  looking for people too?
19       A     Because there was suspects put on the --
20  on the brief.
21       Q     Okay.
22       A     So -- so before every warrant, we have a
23  brief, which consists of why we're there, where
24  we're going, apartment or house number, what we're
25  looking for, what the warrant is actually for.
```

Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 39

1             But as officers that aren't on the recon

2      team, we're not looking at the -- the warrant.

3         Q    And so did you have an understanding of

4      whether this was a property only or an arrest

5      warrant, or did you think it was both?

6         A    We had two properties that we were going

7      to search -- that we had search warrants for from

8      homicide, and there's a possibility that the

9      suspects were at either one.

10        Q    Okay.  And if the suspects had been at

11     either one, they would have been arrested; is that

12     correct?

13        A    Yes.

14        Q    Okay.  And so at -- I guess I'm trying

15     to -- I'll try to phrase my question better.

16             At the time that you were getting ready

17     to execute this warrant, did you have any

18     understanding of whether there was a -- it was

19     just an arrest warrant or it was just a search and

20     seizure warrant?  Am I saying that correctly?

21        A    A search warrant for property.

22        Q    Okay.  Did you have any understanding if

23     it was one, both, or --

24        A    At the time, I believed it was both,

25     because there was two -- two properties, so -- and

LEXITAS

Page 40

1    the suspects were associated with both.

2         Q    Okay.  Did you -- were you -- were you

3    relayed any information that one of the suspects

4    had an ankle monitor?

5         A    I believe that may have been brought up

6    in the brief.  But that was homicide that was

7    dealing with that portion.

8         Q    Okay.  And do you have -- and so if

9    you -- and so that's kind of one of the things, is

10   if you remember, you remember.  If you don't, then

11   just say "I don't remember."

12            Do you have -- did you have any

13   awareness that they had pinged the -- the ankle

14   monitor shortly before?

15        A    For one of them?

16        Q    Yes.

17        A    I believe so, yes.

18        Q    Okay.  Did you have any information

19   about what that ping showed up as?

20        A    It was somewhere else than the first

21   warrant.

22        Q    Okay.  And did that -- did you -- and I

23   know sometimes when you're in high-stress

24   situations -- which I'm assuming executing a

25   search warrant is a high-stress situation.

Page 41

1        A     Yeah.

2        Q     Sometimes you get information and you

3    just kind of think, "Okay, that's the

4    information," and then sometimes you assess it.

5             When you found out that the -- the guy's

6    ankle monitor had been pinged somewhere else, did

7    you assess that?  Like, "Okay.  Well, that rules

8    him out for being at the unit."  Or was it just,

9    kind of, like, "Okay, that's one piece of

10   information, but I'm still proceeding as if he

11   were in there"?

12       A     There's two suspects.  So, yeah, I'm

13   proceeding as if somebody is still going to be in

14   there --

15       Q     Okay.

16       A     -- or other people.

17             I've served search warrants that people

18   were supposed to be in there and nobody was there,

19   and I've served search warrants where nobody was

20   supposed to be in there and there's people in

21   there.  So I don't assume anything when it comes

22   to search warrants.

23       Q     What's the difference, then, between,

24   like, executing a search warrant and executing an

25   arrest warrant?

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 42

1       A    Well, you need a search warrant to
2    execute an arrest warrant if somebody is inside.
3       Q    Okay.  And in this case, it was your
4    understanding that you had a search warrant and an
5    arrest warrant?
6       A    Again, I didn't read the search
7    warrants, but that's what I assumed.
8       Q    Okay.  If it had been a search warrant
9    only, would that have changed anything you had
10   done?
11      A    No, because we're still entering the
12   residence.
13      Q    Okay.  And can you -- I know that you
14   weren't on the recon team, but can you walk me
15   through, what is the purpose of the recon team?
16      A    Absolutely.  So you get tasked with the
17   recon.  You search -- or you read the search
18   warrant.  You ensure that everything in the search
19   warrant, as far as information goes, is accurate.
20           So we go out and we ensure that the
21   residence is correct, the numbers are correct, the
22   description of the residence is correct.
23           But also we are looking for whether or
24   not the house has bars on windows.  Where are the
25   windows located?  How many doors?  Is the door

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 43

1    barricaded or is it -- does it have a, like,

2    screen on it?  And there's various screens.

3          There's a simple screen that is very

4    easy to open up, and then there's barred screens

5    which are very hard to open up.  That determines

6    basically what tactics we are going to use in

7    order to execute the search warrant.

8        Q    And are there any things that you --

9    you've talked about it a little bit, but I'm going

10   to use the concept of "rule out."

11         Are there any things that you need to

12   rule out in order to make sure that the entry team

13   is safe?  And, sorry, not the entry team, but the

14   potential occupants are safe.

15       A    Yeah.  I mean, you're looking at various

16   instances that -- you know, are we able to use

17   certain tools effectively?  Can we surround it?

18   Are we -- you know, is there dogs that we see?  Is

19   there any inclination that there's kids or

20   children in the residence, elderly?

21         Just because, again, we're going to

22   utilize various tools, depending on the structure.

23       Q    Okay.  And as we sit here today, do you

24   have any understanding about there being

25   additional unknowns that -- that the recon team



Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 44

1    had not ruled out?

2         A    In reference to?

3         Q    The door.  The brass wrap on the door.

4    Whether there were elderly.  Whether there were

5    kids.  Whether there was a dog.

6         A    From what I gathered from the brief,

7    normally all of that stuff is put down.

8         Q    Okay.  All right.  So you arrive at

9    Sam's Town very early in the morning on Monday

10   morning.  We talked about the briefing a little

11   bit.

12              But to the best of your memory, can you

13   walk me through what occurred at the briefing?

14        A    Absolutely.  So normally at briefings,

15   you look at where you are in stack or what your

16   job is, and then we go through an actual brief.

17   So the recon officers go over what our tasks are,

18   what -- you know, where we're going, who is going

19   to lead, who is driving, what tools we need, and

20   who we're going after or what we're going after.

21        Q    Okay.  And so to your -- thank you for

22   clarifying for me what the briefing goes over.

23              In this particular instance -- I know it

24   was several years ago, but can you tell me, to the

25   best of your memory, what they discussed in the

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

1    brief?

2         A    Yes.  They discussed a little bit of --

3    I believe homicide discussed a little bit about

4    their case, suspect description, the residences,

5    obviously.  The tactics that we're going to use,

6    which, again, is -- that's determined by the

7    assistant team leader and the team leader --

8         Q    And do you remember --

9         A    -- and the recon officers.

10        Q    Do you remember who the ATL, the team

11   leader, and the recon officers were in this

12   instance?

13        A    I believe it was -- Jake Werner was the

14   ATL.  Garth Findley was the TL, and Kerry Kubla

15   was one of the recon officers.  And I also believe

16   that the other one was -- just give me a second --

17   Kia Hoskins.

18        Q    Okay.  And they went over who was going

19   to do what.

20             What was your role on the team?

21        A    I was a -- I was number two entry behind

22   Kubla.  I was also a low-lethal officer.

23        Q    And what does that means?

24        A    It means I carried low-lethal tools,

25   which could be a TASER, which I carry all the

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 46

1    time.  In this case, it was a 40 mil -- 40mm

2    less-lethal launcher.

3        Q    I'm sorry.  What was the last part?

4        A    Like, launcher.

5        Q    What's a -- what's a -- what's a 40mm

6    less-lethal launcher?

7        A    So it's a -- we utilize that tool at a

8    certain distance.  It's got basically a foam tip.

9    There's different rounds that we utilize,

10   depending on -- depending on distances and/or what

11   we want to accomplish.

12       Q    In this case, you did discharge your

13   weapon; correct?

14       A    Firearm.

15       Q    Firearm.  Sorry.

16            You did discharge your firearm; correct?

17       A    Yes.

18       Q    You did not discharge any of your

19   low-lethal tools, weapons?

20       A    Didn't have an opportunity.  I was being

21   shot --

22       Q    Okay.

23       A    -- and shot at.

24       Q    And so you told me that you're number

25   two entry.

LEXITAS™

Page 47

1          So what's the purpose of number two

2    entry?

3      A    Number two entry is a safeguard to the

4    number one.  Meaning that as number one enters,

5    I'm looking for any -- anything that's behind his

6    back or further on into a room, depending on the

7    structure.

8          In this case, I was looking back

9    towards, like, a kitchen/dining room area.

10     Q    Okay.  All right.  So I've been -- we're

11   going to get back to the chronology I said we were

12   going to do before.

13         So you do the briefing.  And then if you

14   want to just do it in a full dialogue -- if you

15   want to walk me through, like, "Hey, we did the

16   briefing, and then this is what happened" or you

17   want to cut it up, however you're more comfortable

18   testifying about it.

19     A    Yeah, I'll start with the -- the

20   briefing.

21         Show up and look at where my job is.

22   Look who I'm paired up with.  Address, description

23   of the address, windows, doors.  Is it a, you

24   know, one-bedroom apartment, two-bedroom

25   apartment?

Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 48

1          And then you go through the actual brief
2    that the recon officers did.  They go through what
3    they saw and what the plan is to best execute the
4    search warrant.
5          After that, they go through and ask
6    everybody -- they basically, again, go through
7    what your task is and ask if there's any
8    questions.  Once you ask or don't ask questions,
9    depending on the search warrant or whatever you're
10   tasked with, you go and get dressed out.
11         And "dressed out" meaning you don your
12   protective wear, like your heavy vest, helmet.
13   You ensure that your camera is working.  You
14   ensure that your radio is working.  You ensure
15   that all of your tools are functioning in the
16   sense of, hey, I have a round in the chamber.
17   My -- my magazine is seated correctly.
18         I have the low-lethal tools.  The
19   low-lethal tools are operational.  Does my light
20   work on my firearm?  Does the light work -- or the
21   red dot on my low-lethal work?
22         And then you head to the BearCats.
23   Because they went over where your position is on
24   the BearCat and the route.  Once you get on the
25   BearCat, they ensure that everybody is ready to

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 49

1    go.  If there's people that need to go out and do

2    observation on the apartment or the house, those

3    people are usually sent out early.

4              In this case, I can't remember who it

5    is, but I believe we sent out a two-man team to

6    observe the apartment to see if anybody is coming

7    in or out.

8              Once we get on the BearCat, they say,

9    "Hey, we're ready to go."  We turned on our

10   cameras, and we start rolling to the apartment or

11   house or wherever we're serving the search

12   warrant -- serving the search warrant.

13             When we are one minute out from entry,

14   that's where you're basically, like, honing in on

15   what your job is and knowing that, hey, it's

16   coming up.  Get ready to disembark off the

17   BearCat.

18             We show up into the apartment complex

19   and head straight to where our drop-off is.  We

20   walk up quietly to the apartment, get into

21   positions so everybody is in position.  Once we

22   are all in position, then we do our announcements.

23             Once we do a couple of announcements --

24   and it's usually determined at the briefing

25   whether it's, hey, we're going to start to work

Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 50

1    the door off of the -- you know, the second or

2    third announcement or, hey, off of this

3    announcement, we're going to use a flash bang or a

4    9 bang, depending on every search warrant.

5          In this case, we had a stun stick that

6    goes through the window, which had a flash bang

7    attached to it.  We also had a 9 bang that was to

8    be tossed on the outside, all of which -- those

9    help provide us with a little bit of time to

10   safely enter just in case there is people inside

11   or whether or not we know people inside.

12         In this case, we didn't know who or if

13   anybody was inside, but we still used the tactics

14   to safely go in.

15         Officer Hoskins started to work the door

16   with the ram.  It took a few hits.  During that

17   entire time, we're announcing, "Hey, we're the

18   police.  We have a search warrant."  Officer

19   Hoskins gets the door open.  As Kerry enters, I

20   immediately hear what sounds to be gunshots.

21         I don't go in front of him.  I looked

22   behind him, just in case there's anybody that is

23   behind him or us or if anybody is in the dining

24   room.  As that happens, I feel Kerry starting to

25   move in a -- in a not normal way, and I'm still

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 51

1    hearing gunshots.

2              I feel something hit my right forearm as

3    I perceived to be what was a bullet.  As I look

4    over, I see a muzzle flashes.  As that's

5    happening, Officer Kubla is starting to move to

6    his left.  And at that point, I engage the subject

7    on the couch.

8              As I am engaging, the subject is still

9    shooting.  As that happens, I see Officer Kubla

10   fall to the ground.  I start to approach slowly to

11   the couch while still rounds from the subject on

12   the couch are being fired.

13             I observe officers to my right starting

14   to engage, so I back up a couple of steps and

15   continue to engage, because rounds are still being

16   fired.  When rounds stop, I holster, I look down.

17   Kerry Kubla is bleeding.  At the time, I believed

18   that I was also shot in the forearm.

19             And immediately I tend to Officer Kubla,

20   not worried about my forearm at the time.  We get

21   Officer Kubla outside, and he is shot in both

22   forearms and one in his leg.

23             I helped to apply a tourniquet.  We have

24   tac docs that come with us on every search warrant

25   just in case something like this does happen.



Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 52

1    They start working on Kerry.  At that time, I

2    started self-assessing, along with Sergeant

3    Clarkson, who was driving one of the BearCats.

4              He assessed and notices that I have a

5    perfect circle of a round on my forearm, and my

6    forearm is starting to swell up.

7              Since then, I've had nerve damage, and

8    my pinky stays (indicating) from the nerve damage

9    of that round being hit on my forearm.  I tore my

10   labrum pulling Officer Kerry out.

11             And once that happened, everything got

12   shut down because it was a shooting.  Medical, I

13   believe -- I wasn't inside, but I believe they

14   attempted medical on Mr. Williams, and he was

15   pronounced deceased on the scene.

16             I was sent to the hospital, got

17   evaluated along with Kerry.

18             MS. MURPHY:  I'm going to ask you some

19   follow-up questions on that, but we've been going

20   a little while.  We've been going about an hour.

21             Why don't we take just a quick

22   ten-minute break, and we can give the reporter --

23             THE VIDEOGRAPHER:  We are going off

24   record at 10:57 a.m.

25                     (Whereupon, a recess was taken.)

Page 53

1          THE VIDEOGRAPHER:  We are back on

2   record at 11:05 a.m.

3   BY MS. MURPHY:

4       Q    And so, Brice, before we took a brief

5   break, you walked me through the entire process

6   of -- of executing this search warrant and the

7   officer-involved shooting.  I want to kind of loop

8   back and ask you some specific questions about

9   some of it now.  And later we'll probably review

10  the video from your body-worn camera as well.

11      A    Okay.

12      Q    And so there's been some discussion in

13  this case about the brass wrap on the door.

14           Are you familiar with that?

15      A    Yes.

16      Q    Okay.  Can you tell me, as we sit here

17  today, what's your understanding of the issue with

18  the brass wrap on the door?

19      A    That the brass wrap adds a little bit

20  more of a rigidity to the door, making it a little

21  bit more difficult to get in.

22      Q    And is that something that the recon

23  team should have picked up on, that there was a

24  brass wrap, prior to executing this warrant?

25      A    I would say yes.

Page 54

1      Q    Okay.  But, in fact, they didn't pick up

2   on it; correct?

3      A    No.

4      Q    Okay.  And there was a delay getting

5   through the door because of that brass wrap;

6   correct?

7      A    A delay?  I wouldn't say necessarily a

8   delay.  I've had warrants where there was no brass

9   wrap, and it took three to four hits to get in

10  still.

11     Q    How many hits did it take here?

12     A    I believe four.

13     Q    Okay.  And in your experience as an

14  LVMPD officer, a tactical training -- or a field

15  training officer, a member of the SWAT team, do

16  you think that the amount of time it took to get

17  through the door here was appropriate?

18     A    Yes.

19     Q    Okay.  Do you think a tactical should

20  have been called at all?

21     A    No.

22     Q    What's a tactical?

23     A    A tactical would be there is something

24  that an officer sees that would hinder or disrupt

25  the -- hinder or disrupt the execution of the

Page 55

1    search warrant to be safe.

2        Q    Okay.  And you don't think that the

3    delay of getting the door open here hindered the

4    safety?

5        A    No.

6        Q    Okay.  And would you have been able to

7    call a tactical?

8        A    Anybody can call a tactical.

9        Q    Okay.  And so you talked a little bit

10   about going through -- kind of going through the

11   door.

12           Can you -- can you kind of -- you walked

13   me through what you saw and -- like, in terms of

14   Officer Kubla going down and everything.

15           Can you kind of tell me, like, when you

16   first became aware of gunfire.  Was it from the

17   flash of the muzzle, or was it from hearing it?

18       A    Hearing it.

19       Q    Okay.  And in your mind, do you think

20   that there's a distinction -- did you have -- did

21   it take a second to identify what it was, or did

22   you know immediately?

23       A    Once I entered the door, yeah, I knew

24   that Officer Kubla was taking fire.

25       Q    And so did you know that from the muzzle

Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 56

1   flash?  From the sound?  From seeing him go down?

2   Like, how were you able to immediately assess

3   that?

4        A    His body language as we went in and the

5   sound.

6        Q    And what was his body language as you

7   went in?

8        A    He put himself into a posture and just

9   his movements.  Officer Kubla and I have worked

10  together for the entire time that I was in SWAT --

11       Q    And so --

12       A    -- and he came up the same day as me.

13       Q    And what was it about his movements and

14  your familiarity with Officer Kubla that made you

15  know that his body language indicated he was being

16  shot -- that he had been shot?

17       A    Based off of his platform, his movements

18  were definitely different than if it was just a --

19  go in and there was nobody inside the room.

20       Q    Okay.  And so I know sometimes it's hard

21  to paint a picture with words, but you're on video

22  too, so you can -- if you want to use your body to

23  kind of demonstrate to me, that's fine as well.

24            What was it about his movements exactly

25  that was, like, nonstandard that made you think,



Page 57

```
 1    like, "Hey, I think he's been shot"?
 2         A    He pushed a little bit back on me.
 3         Q    And he'd never done that before?
 4         A    No.
 5         Q    And just for the record, you had never
 6    been in an officer-involved shooting with Officer
 7    Kubla before; correct?
 8         A    No.
 9         Q    Okay.  All right.  And so him just
10    pushing back on you made you know, "Hey, I
11    think" -- made you know -- or made you suspect
12    that he had been shot?
13         A    I believed that he was -- what we call
14    "going to work," which means that something has
15    caused him to react differently than he normally
16    would.  I was also hearing gunfire.
17         Q    And so normally he would keep going.  Is
18    it -- you tell me if I'm right or wrong.
19              Based on what you're telling me, what
20    kind of -- I'm putting --
21         A    It's a smooth movement through a room.
22         Q    Yeah.
23              And the fact that he was recoiling, for
24    lack of a better term, made you know, like, "Hey,
25    he's been" --
```

Brice Clements                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 58

```
 1        A     Something was up.
 2        Q     Okay.  And how many -- to your memory,
 3   how many announcements were made before you
 4   entered the unit?
 5        A     Numerous, because every officer in the
 6   stack was announcing.
 7        Q     Okay.  And as we sit here today, your
 8   prior testimony is that you believe that there was
 9   17 seconds that elapsed from the -- from the first
10   announcement to entry of the unit; is that
11   correct?
12        A     Yes.
13        Q     Okay.  If I were to represent to you
14   that it was actually six seconds, would that -- or
15   that it could be around six seconds, would that be
16   a surprise to you?
17        A     Yes.
18        Q     Okay.  Had you -- and I know you'd been
19   on SWAT for three years.
20              Had you done this type of search warrant
21   execution -- if I'm saying "execution," is that
22   the right way to describe it?
23        A     Uh-huh.
24        Q     Okay.  Had you done this type of search
25   warrant execution before?
```

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 59

1      A    A few hundred times.

2      Q    Okay.  Had you ever had an outcome like

3   this before?

4      A    Not one.

5      Q    Okay.  Why do you think the outcome here

6   was different than the other instances?

7      A    Because of the person on the couch.

8      Q    Okay.  That's the -- that's the total

9   difference, is that it was Mr. Williams on the

10  couch?

11     A    I believe that somebody who is sleeping

12  with a firearm next to them, with an extended mag

13  in an apartment that's associated with homicide

14  suspects, yeah, I don't think that that's a normal

15  person.

16     Q    But hadn't you executed -- well, to be

17  clear, Mr. Williams was not a homicide suspect;

18  correct?

19     A    No, he was not on the homicide warrant.

20     Q    He's not a -- he's not a suspect in any

21  type of homicide; correct?

22     A    Unknown.

23     Q    Okay.  And so hadn't you executed this

24  type of warrant on an actual homicide -- actual

25  homicide suspects before?

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 60

1       A    I would have to go back and look and see
2  what those warrants were, but I would probably say
3  yes.
4       Q    Okay.  And so -- okay.
5            How many times did you fire your weapon?
6       A    Thirteen times.
7       Q    And how do you know that?
8       A    Because of my CIRT interview.
9       Q    What was it about -- did they inform you
10  in the CIRT interview?
11       A    Nope.  We download our weapons after a
12  shooting to count the amount of rounds.  The
13  reason we do that is just in case -- an example,
14  you fire down the road and there's cars and people
15  and houses.  If there is an officer that says,
16  "Hey, I only shot this amount of times," but he
17  shot more, then we've got to look for those extra
18  rounds.
19       Q    Okay.  And you talked a little bit
20  earlier about your -- the -- the injury that you
21  sustained in this officer-involved shooting.
22            Can you tell me, was the -- the
23  bullet -- do you know what bullet hit you?  Let me
24  ask it --
25       A    Out of the 18 rounds that were fired?

Page 61

1    Q    As soon as I said the question, I

2    realized that it wasn't a good question.  Let me

3    ask it slightly differently.

4          Do you know if it was a -- was it a

5    direct hit?

6    A    No.

7    Q    Okay.  What was it, to the best of your

8    knowledge?  I mean, I know that you --

9    A    It was a ricochet from Officer Kubla's

10   suppressor.

11   Q    Okay.  And I'm going to jump around just

12   a little bit.

13         As we -- did you have to do a workers'

14   comp claim because of the nerve damage?

15   A    I did a workers' comp claim for my

16   shoulder, my finger, and -- well, my forearm and

17   PTSD.

18   Q    Okay.  And as we sit here today, are you

19   still receiving treatment for any of those three

20   items that you just mentioned:  The labrum, the

21   nerve damage, or the PTSD?

22   A    Yes, I still see a therapist for my

23   PTSD.

24   Q    Okay.  And I want to be delicate in how

25   I ask these questions.  I want to be respectful of

Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 62

1    what you've gone through, and I don't want you to

2    feel like I'm not understanding or trying to be

3    sensitive to it.

4           Can you -- to the best of your ability

5    and however you're comfortable, can you kind of

6    explain to me what it is about this incident that

7    has you still struggling with PTSD a few years

8    later?

9       A    It's traumatic.  You're dealing with

10   people's lives.  I saw a partner that came up with

11   me the same day, who I worked with every day

12   because we were on the same squad, and I saw him

13   bleeding out.  And I saw him pass out, and I

14   thought he died.

15          And I took a human life.  And that's

16   tough.  And you have the residual damage of

17   something that I can see every day, which is a

18   memory that something traumatic happened.

19      Q    And where -- you're on camera, but I

20   just want to make sure.  You say you have the

21   residual damage that you can see every day.

22          Are you referring to the ongoing nerve

23   damage that you have in your hand?

24      A    My pinky, yeah.

25      Q    Okay.  Has that --

Page 63

1       A    And -- and constant pain in my shoulder.
2    Even though it's fixed, you still always will have
3    pain.
4       Q    And so you have -- so you have -- so
5    okay.  So you have chronic pain in your shoulder;
6    is that correct?
7       A    Uh-huh.
8       Q    On a scale of one to ten, where would
9    you put that pain scale?
10      A    Depending on the day, depending on the
11   workout, anywhere from a one to a three.
12   Sometimes maybe a little bit higher than that.
13      Q    Okay.  And so is it fair -- based on
14   what you've just testified to, I'm assuming that
15   that also is a constant reminder of this incident;
16   is that correct?
17      A    Absolutely.
18      Q    Okay.  And so as we sit here today, you
19   know, some of the other officers have testified
20   that they were unaffected long-term by this
21   incident.
22           My understanding of your testimony --
23   and you tell me if I'm right or wrong -- is that
24   you were deeply affected by this incident; is that
25   correct?

Page 64

1        A      Yes.

2        Q      And you continue to be affected by it

3    to -- to this day; correct?

4        A      Those officers didn't see Officer Kubla.

5    They were still inside.  So I can't attest to

6    whether or not -- what their affectedness is, but

7    I can tell you that I was affected.

8        Q      Okay.  And we talked about it a little

9    bit earlier.  In terms of -- when you went through

10   the door, did you assess the information, or did

11   you think the person in the unit must be one of

12   the murder suspects we're looking for?  Did you

13   even go through that, or were you just reacting to

14   your --

15       A      I was reacting to somebody firing their

16   weapon or firing a weapon at not only me,

17   Officer Kubla, and the other members of the entry

18   team, to include out the window.

19       Q      Do you have guilt over Mr. Williams'

20   death?

21       A      Guilt?

22       Q      Yeah.

23       A      No.  I did what I had to do to protect

24   not only my life, but the lives of my team

25   members.

Page 65

1      Q     But you're still affected by having

2   taken a human life; is that correct?

3      A     I don't think that you go through life

4   and that is not something that is affected.  I --

5   I am affected by taking somebody's life, yeah.

6   It's not what I signed up to do this job.  But I

7   know that that's part of the job, and I did what I

8   needed to do.

9      Q     Okay.  And we've kind of jumped around a

10  little bit, but I want to confirm, as we sit here

11  today, despite this outcome, is there anything

12  that you would have done differently?

13     A     No.

14     Q     Okay.  And so I'm going to give you the

15  legal element for knock and announce.  And this is

16  from page 133 of the CIRT report.  Open quote, "If

17  after notice of his authority and purpose of an

18  officer is refused admittance," close quote.

19           Prior to entering into the unit, what

20  did Mr. Williams do to refuse admittance while the

21  door was closed?

22     A     Reask the question.

23     Q     Sure.

24           Was there any indication, prior to going

25  through the door, that Mr. Williams was going to

LEXITAS™

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 66

1    refuse entry?

2        A    At the time, no.

3        Q    Okay.  Do you think that Mr. Williams

4    had sufficient time to indicate whether he would

5    or would not allow entry?

6        A    Yes.

7        Q    Why do you -- do you think that -- and

8    why do you think that?

9        A    Because the police are announcing

10   outside, they give the apartment number, and that

11   it's a search warrant.

12       Q    Okay.  So what could Mr. Williams have

13   done from inside the unit within those few seconds

14   to indicate that he would or wouldn't -- what

15   could he have done to either allow or deny entry?

16       A    I mean, sufficient time to possibly come

17   to the door or be compliant.

18       Q    So you think that Mr. Williams had

19   enough time to wake up, get up, and walk to the

20   door to allow the police entry?

21       A    Based off the 17 and a half seconds,

22   yes, or comply.

23       Q    What about six seconds?

24       A    I think that's enough time to understand

25   that the police are outside your door.

Page 67

1      Q    Okay.  As we sit here today -- this is

2   my only opportunity to talk with you, absent

3   trial.

4           As we sit here today, is it your

5   intention to -- if we go to trial, is it your

6   intention to appear at trial and testify that it

7   is your opinion that Mr. Williams knew it was

8   police officers coming through the door?

9      A    Yes.

10     Q    What's that based on?

11     A    Based off the numerous announcements,

12  based off early morning and normal people don't --

13  meaning the public don't inset a stun stick with a

14  flash bang on it.

15     Q    What's the purpose of a stun stick?

16     A    Provide time for the officers, but also

17  to stun anybody on the inside to make it not only

18  safe for them, but safe for us in a sense of if

19  somebody wants to grab a firearm or attempt to

20  grab a firearm, they're stunned and/or blinded

21  temporarily.

22     Q    They would also be confused; correct?

23     A    I mean, you would have to ask somebody

24  who has experienced that.

25     Q    I'm asking you as a police officer

Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 68

1    that's executed hundreds of these warrants and has

2    done CET, has done surround and call-outs, has

3    used these distraction devices, is it your

4    experience as a police officer that sometimes

5    people are confused by use of these distraction

6    devices?

7         A    I mean, you want them to be distracted.

8    So I guess, yes, confusion could be a word used.

9         Q    Okay.  Do you think confusion would make

10   it difficult for somebody to assess clearly that

11   it's being announced that police officers are

12   seeking entry into a unit?

13        A    In this case, no, because we announced

14   numerous times outside, including using a

15   bullhorn.  And it's 5:00 in the morning and it's

16   very quiet.  There's not, you know, kids yelling,

17   traffic going by.  It's very quiet, and it was

18   very quiet up until we announced.

19        Q    What if the person is sleeping?

20        A    The people upstairs were also sleeping,

21   and they were woken up.

22        Q    They didn't have their windows broken

23   open though, did they?

24        A    We didn't break the windows until after

25   we made announcements.

Page 69

1        Q      How many announcements do you think you

2    made before the window was broken open?

3        A      I couldn't tell you.

4        Q      What if I represented to you it was half

5    of one?

6        A      I don't think that that -- again, I

7    couldn't tell you what the amount of time was.

8        Q      Okay.  And just to loop back to your

9    earlier testimony, you've never received training

10   that you had to wait a certain amount of time

11   before -- before entering on a knock and announce;

12   correct?

13       A      We -- we were trained to give a couple

14   of announcements.  That depended on the ATL, or

15   assistant team leader, and the TL, based off of

16   the search warrant, based off of, you know,

17   whatever deemed necessary through the recon.

18       Q      Okay.  And we talked about it a little

19   bit earlier.  We talked about it a little bit

20   earlier in terms of -- you said, you know, wished

21   for and you talked about, hey, there's different

22   circumstances that go into these entries and what

23   you're supposed to do.

24              Do you have any understanding that

25   there's a standard for a reasonable time based on

Page 70

1    the items that are sought?

2        A    I know that there's a reasonable time.

3    I didn't -- I couldn't tell you if the Supreme

4    Court has defined what that time is.

5        Q    Okay.

6        A    Just "reasonable."

7        Q    All right.  What if I told you that

8    there's a case that indicated that a reasonable

9    response time would also be linked to what type of

10   evidence they're seeking?

11       A    Okay.

12       Q    Okay.  And so I'm going to read to you a

13   snippet from case -- a case that was cited in the

14   CIRT report.  It said, "After 15 to 20 seconds

15   without a response, officers could fairly have

16   suspected that Banks would flush away the cocaine

17   if they remained reticent."  And that's from

18   page 133 of the CIRT report.

19             As we sit here today, you didn't think

20   that you guys were seeking anything that could

21   have been easily destroyed; correct?

22       A    That referenced drugs.  I don't believe

23   we were looking -- I couldn't tell you what -- if

24   that was --

25       Q    Let me ask the question, though -- let

Page 71

1  me ask the question a little more artfully.

2          If I have a bag of cocaine, I can flush

3  it down the toilet.  I probably can't flush a gun

4  down the toilet; correct?

5      A    No, you can't flush a gun down the

6  toilet.

7      Q    Right.  And so it was your

8  understanding -- I understand that you didn't look

9  at the search warrant, but that you had a basic

10 concept of what you guys were looking for;

11 correct?

12     A    Uh-huh.

13     Q    And so you guys -- as -- sorry.  I

14 shouldn't say "you guys."

15         You, Brice, didn't have a concern about,

16 hey, we need to get in there in a certain amount

17 of time, because there's potentially evidence on

18 the other side of this door that they could

19 destroy?

20     A    No.  We used the CET tactic to be safe,

21 not only for officers, but for people inside.

22     Q    In this instance, the CET wasn't safe

23 for the person inside or the officers; correct?

24             MR. ANDERSON:  Objection.  Form.

25             Go ahead.

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 72

1              THE WITNESS:  Well, there was another
2     person inside who didn't come out firing at us.
3     BY MS. MURPHY:
4         Q    That wasn't my question though.
5              My question was, in this instance, the
6     CET wasn't safe for the officers or for the
7     person -- or for Mr. Williams; correct?
8              MR. ANDERSON:  Same objection.
9              THE WITNESS:  This would be the first
10    time in my time in SWAT -- and I believe even
11    years prior -- that we executed a CET warrant and
12    somebody fired at us.
13    BY MS. MURPHY:
14        Q    Okay.  So that doesn't quite answer the
15    question I asked.
16             My question was, in this --
17        A    It's the safest tactic at the time.
18        Q    Okay.  It wasn't safe in this instance,
19    was it?
20        A    Well, I mean, that -- I would say that
21    that's kind of Monday-morning quarterbacking.  At
22    the time, that was the safest, and I would use the
23    same tactic again today.
24        Q    But you can't use the same tactic again
25    today, can you?  Haven't they -- hasn't LVMPD

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 73

1   changed their policy so you could not use a CET on

2   this kind of search warrant anymore?

3        A    Again, that's not a decision that I

4   made.

5        Q    Okay.

6        A    And I can't say what happens after that.

7   At the time, that was the best tactic at the time.

8        Q    Okay.  And I understand the distinction

9   between best and safest, but I'm going to ask you

10  to answer my question.

11       A    Yes.  Go ahead.

12       Q    Was this safe for Officer Kubla?

13       A    It's the safest tactic used and utilized

14  at the time.

15       Q    Okay.  You're not answering my question.

16  I'm going to ask it again.

17            Was this safe for Officer Kubla, yes or

18  no?

19       A    I mean, he got shot, yes.  So safe?

20  That's kind of a weird question, I -- I would say.

21  In my opinion, I believe Officer Kubla, even being

22  shot, would have said that's the safest tactic to

23  utilize.

24       Q    Okay.  Do you think that being shot is

25  safe?

Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 74

1              MR. ANDERSON:  Objection.  Form.

2              THE WITNESS:  We get shot at every

3    day.  So, you know, that's -- as a police officer,

4    and especially being a SWAT officer, yeah, there's

5    the notion that you might get shot at.  And I have

6    been.

7    BY MS. MURPHY:

8       Q    Okay.  I'm asking you one -- I'm going

9    to ask you again.

10             Was Officer Kubla being shot at safe for

11   Officer Kubla?

12      A    Well, no.  I don't think being shot at

13   is safe at all.

14      Q    Okay.  And so was Mr. Williams being

15   killed inside that apartment, was that safe for

16   him?

17             MR. ANDERSON:  Objection.  Form.

18             THE WITNESS:  He shot first.

19   BY MS. MURPHY:

20      Q    That wasn't my question.

21      A    Okay.  What do you -- what is your

22   question again?

23      Q    Was Mr. Williams being killed inside

24   that apartment safe for him?

25      A    I mean, he got shot and he died, so, you

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 75

1    know, his own personal safety, I guess no, it

2    wasn't safe.

3         Q    Okay.  I'm going to read you some other

4    conclusions from the CIRT report, and I'm going to

5    ask your opinion about them.

6              So -- and this is from page 215, 3.6.

7    CIRT concluded, "While the SWAT section manual

8    contained verbiage allowing for SWAT operators to

9    conduct a CET for property when there is a threat

10   of an armed and dangerous subject, it was not

11   appropriate, given the amount of unknowns

12   associated with Apartment 1125.

13             "There were numerous amount of unknown

14   factors, to include who was actually staying in

15   the apartment and if there were children, elderly,

16   or vulnerable individuals present inside the

17   apartment.  SWAT's decision to serve the 3050

18   South Nellis Boulevard search warrant as a CET was

19   a policy/training failure and not within the

20   standardized LVMPD tactics training and policy."

21        A    Okay.

22        Q    Okay.  It's a -- it's a loaded

23   statement, and there's a lot in there, and so I

24   want to ask you, Brice, your opinion on CIRT's

25   conclusion.

Page 76

```
 1       A    That's an after-the-fact -- after the
 2   fact.  I believe that the people making those
 3   decisions are the lieutenant and captain, and also
 4   in conjunction with homicide.
 5       Q    I'm sorry.  In conjunction with what?
 6       A    Like, homicide detectives.
 7       Q    Okay.
 8       A    Because they're the ones that got the
 9   search warrant.
10       Q    And so I think I understand what you
11   mean by that, but I'm going to ask you to draw it
12   out a little bit more.
13            You don't agree with that conclusion, do
14   you?
15       A    Which part?
16       Q    The part that -- well, yeah, let's break
17   it up.  So we'll start at the bottom.
18            That serving -- that serving the search
19   warrant as a CET was a policy/training failure, do
20   you agree or disagree with that statement?
21       A    I disagree.  I believe that the CET at
22   the time was the best tactic to use.
23       Q    Okay.  And what about CIRT's conclusion
24   that the -- it was not within standardized LVMPD
25   tactics training and policy?
```

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 77

```
 1        A     I would have to see what training
 2   tactics and policy they're referring to.
 3        Q     Don't you already know as a SWAT
 4   officer?
 5        A     Our training policy and tactics --
 6        Q     Regarding --
 7        A     -- with the department --
 8        Q     Yes.
 9        A     -- is like 1500 pages, and it's even
10   more -- no, I don't know it by heart.
11        Q     What about for a CET?
12        A     In reference to the CET, what are you
13   asking?
14        Q     That they're saying that serving this as
15   a -- serving this search warrant as a CET was not
16   within LVMPD tactics training and policy.
17        A     I disagree.
18        Q     Okay.  And then let's also talk about
19   the amount of unknowns, that there was -- that
20   the -- and this is the CIRT conclusion, that there
21   were the unknown factors to include who was
22   actually in the apartment, if there were children,
23   elderly, vulnerable individuals.
24              As a SWAT officer, did you think that
25   there was a failure to have not assessed any of
```

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 78

1    those?

2        A    I wasn't on the recon.

3        Q    Okay.  And so I know that you weren't on

4    the recon, so I'm not asking you to talk about

5    your -- I understand you're not on the recon.

6            But having been the officer that was

7    number two in the stack, seeing officer go --

8    Officer Kubla go down, do you think the recon team

9    ought to have ruled those out or known those

10   before you guys went in there?

11       A    I mean, even if they did rule those out,

12   I don't think the outcome would have changed.

13       Q    So even if they had known who was in the

14   apartment, you don't think the outcome would have

15   changed?

16       A    Based off of our tactics at the time, we

17   still would have conducted a CET.

18       Q    Okay.  I'm going to read you another --

19   another conclusion.  This is Conclusion 3.8, page

20   216.  "Under the conditions present here, six

21   seconds was insufficient to allow occupants time

22   to answer the door, let alone submit to a search."

23           Do you think that six seconds was enough

24   time to answer the door or submit to a search?

25       A    Yes, I believe that's a reasonable time.

LEXITAS™

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 79

1      Q     Okay.  I'm going to ask you about
2  Conclusion 3.9.  "Officers immediately lost the
3  elements of a CET, of utilizing speed to surprise
4  and overwhelm the suspect, per their manual, by
5  being stuck at the door and hitting it multiple
6  times prior to entering the residence."
7           Do you agree or disagree with that
8  statement?
9      A     I disagree.  And I'll say that I've been
10 on numerous CETs where it took more than one hit
11 to get through the door, and we still executed it
12 as a CET.
13     Q     Okay.  And then from page 220, "CET only
14 to be utilized when a no-knock search warrant is
15 approved by the LVMPD and has judicial
16 preapproval."
17          Now, you and I talked about it.  As we
18 sit here today -- as we as you sit here today,
19 you're not aware of any policy change; correct?
20     A     Reference to?
21     Q     Allowing a CET to be used on a -- on a
22 knock-and-announce warrant.
23     A     I believe that the department went away
24 from CETs and utilized a different tactic.
25     Q     As a result of this incident; correct?

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 80

1        A     Yes.

2        Q     Okay.  And so then I'm going to read you

3   the Conclusion 5.5.  "CIRT and SMEs concluded

4   Lieutenant O'Daniel did not use proper discretion

5   when she approved the use of a stun stick through

6   the west-facing window."

7            Do you think that use of the stun stick

8   through the west-facing window was appropriate?

9        A     Yes.

10       Q     Why?

11       A     Because it allows a little extra time

12  for officers to be safe, make a safe entry.  And,

13  again, the -- the stun stick is used to disorient

14  anybody who is on the inside.  Which is safe for

15  them, because it usually means that they don't

16  grab a weapon.

17       Q     Okay.  Lieutenant -- and I'll -- this

18  was another part of it.  "Lieutenant O'Daniel's

19  management of tactics for the requested approval

20  of tactics and tools, as the tactical commander,

21  was not within standardized LVMPD tactics training

22  and policy."

23            Do you have a position on whether or not

24  Lieutenant O'Daniel's approval was within the

25  standardized LVMPD tactics training and policy?

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 81

1        A    I do not have an opinion on that.

2        Q    All right.  5.6, "Captain Cole and

3   Lieutenant O'Daniel should have recognized the

4   unknown factors involved in this case and assured

5   their team utilized the proper tactics when

6   serving the search warrant.

7             "Captain Cole and Lieutenant O'Daniel's

8   approval of homicide IAP and search warrant for

9   the use of the SWAT service was not within

10  standardized LVMPD tactics training and policy."

11            Do you have any opinion on that?

12       A    No opinion.

13       Q    Conclusion 9.7, page 220, "CIRT

14  recommends SWAT structure new training to be in

15  line with case law and national standards."

16            Did you ever undergo any updated

17  training to -- from your understanding, that was

18  to be in line with case law or national standards?

19       A    They were going through a process as I

20  was off for five months from the shooting, while I

21  was testing for sergeant, which was a, like,

22  two-month process.  And then I had shoulder

23  surgery.

24            But, yes, they were starting to revamp

25  things while I was there.  And then I left, so I

Page 82

1    couldn't tell you exactly what they do now.

2        Q    You had a lot going on.  Is that fair to

3    say?

4        A    Yes.

5        Q    Yeah.  Okay.

6             Do you think that they should have used

7    an explosive device on the door?

8        A    No opinion on that.

9        Q    No opinion on that?

10       A    No.

11       Q    Because in your CIRT statement, you

12   actually said "no."

13            So now your position is no opinion?

14       A    Using an explosive breach I do not

15   believe would have changed the outcome.

16       Q    Okay.

17       A    I don't make those decisions on the

18   explosive breach.  That is the ATL, the TL, and

19   the officers on the recon.

20       Q    And so my understanding, Brice -- and

21   you tell me if I'm right or wrong.  Kind of what

22   I've learned through deposing some other officers

23   is although those types of tactics and, you know,

24   what they should or shouldn't use are developed by

25   the ATL and the team leader, that part of the

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 83

1    briefing is if anyone has an issue or thinks

2    anything should be done differently, they're

3    supposed to voice their concerns; correct?

4        A    Yes.

5        Q    And when you went through the briefing

6    and you had all of the information, I'm assuming

7    that you didn't voice any concerns; correct?

8        A    I was confident with the plan.

9        Q    Okay.  And I know that you went over it

10   in your CIRT statement, but I just want to

11   confirm.  As we sit here today -- you've testified

12   to it over and over again, but I just want a plain

13   statement about it.

14           As we sit here today, knowing everything

15   that we know, everything that's happened to you,

16   you still wouldn't do anything differently;

17   correct?

18       A    No.

19           MS. MURPHY:  Okay.  If we -- can we go

20   off the record?

21           THE VIDEOGRAPHER:  One moment.

22           We are going off record at 11:41 a.m.

23           (Whereupon, a recess was taken.)

24           THE VIDEOGRAPHER:  We are back on

25   record at 11:55 a.m.

Page 84

1    BY MS. MURPHY:

2        Q    And so just so the record reflects, we

3    watched a portion -- a couple of different

4    portions of the video.  There were some issues

5    downloading it, but we did watch the portion of

6    the video where, Brice, you come up to the door,

7    the announcements are made, and then there's entry

8    into the unit; correct?

9        A    Correct.

10       Q    Okay.  And you had watched that video,

11   as well, in preparation for today's deposition;

12   correct?

13       A    Yes.

14       Q    Okay.  So there wasn't anything that

15   jogged your memory or you didn't remember, because

16   you recently watched that entire video?

17       A    Yes.

18       Q    Okay.  And so your video, your body-worn

19   camera, you are -- you were, like, number two

20   behind Officer Kubla entering into the unit;

21   correct?

22       A    Correct.

23       Q    So you're -- if I understand the actual,

24   like, physical layout of the building, it's kind

25   of like a little entryway; correct?

Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 85

1        A     Correct.

2        Q     Okay.  And then, like, for instance, the

3    other officer -- and now I can't remember his

4    name -- oh, Officer -- Sergeant Backman, he made

5    the announcements.  He was kind of around the

6    corner a little bit; correct?

7        A     He was number six in the stack, if I

8    remember correctly.

9        Q     So he wasn't in that little, tiny front

10   alcove with you; right?  If you don't remember,

11   that's fine.

12       A     I don't -- I couldn't tell you how far

13   back he was, based off of spacing.  I just know

14   that he was number six in the stack.

15       Q     Fair enough.

16             And then the other -- there was also an

17   officer kind of around on the side where the

18   window was; correct?

19       A     Yes.

20       Q     But that was on the other side of the

21   unit from you; correct?

22       A     There was an officer that had a shield

23   on the window next to the front door, and then

24   there was a team of officers on the other side.

25       Q     Okay.  And they were at the side -- kind

Page 86

1    of the side wall where there was another window

2    leading into the unit; correct?

3         A    Correct.

4         Q    Okay.  All right.  Do you think that

5    Mr. Williams' constitutional rights were violated

6    here?

7                   MR. ANDERSON:  Objection.  Form.

8                   Go ahead.

9                   THE WITNESS:  No.

10                   MS. MURPHY:  I don't think I have

11    anything else to ask.

12                   Craig, do you have any follow-up

13    questions?

14                   MR. ANDERSON:  No questions.

15                   MS. MURPHY:  All right.  Thank you

16    very much, Brice.

17                   THE WITNESS:  Appreciate it.

18                   THE VIDEOGRAPHER:  This concludes the

19    video-recorded deposition of Brice Clements taken

20    on October 7, 2024.  We're going off record, and

21    the time is 11:57 a.m.

22                   THE COURT REPORTER:  Counsel, do you

23    need a copy of the transcript?

24                   MR. ANDERSON:  Yes.

25         (The deposition concluded at 11:57 a.m.)

Page 87

```
 1              CERTIFICATE OF COURT REPORTER

 2
    STATE OF NEVADA       )
 3                        )  ss:
    COUNTY OF CLARK        )
 4

 5        I, Heidi K. Konsten, Certified Court Reporter

 6   licensed by the State of Nevada, do hereby certify

 7   that I reported the deposition of BRICE CLEMENTS,

 8   commencing on October 7, 2024, at 10:04 a.m.

 9         Prior to being deposed, the witness was duly

10   sworn by me to testify to the truth.  I thereafter

11   transcribed my said stenographic notes via

12   computer-aided transcription into written form,

13   and that the transcript is a complete, true and

14   accurate transcription and that a request was not

15   made for a review of the transcript.

16        I further certify that I am not a relative,

17   employee or independent contractor of counsel or

18   any party involved in the proceeding, nor a person

19   financially interested in the proceeding, nor do I

20   have any other relationship that may reasonably

21   cause my impartiality to be questioned.

22        IN WITNESS WHEREOF, I have set my hand in my

23   office in the County of Clark, State of Nevada,

24   this October 21, 2024.

25        _____
             Heidi K. Konsten, RPR, CCR No. 845
```



Brice Clements            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 88

```
 1              DECLARATION OF DEPONENT
 2              I, BRICE CLEMENTS, deponent herein, do
 3    hereby declare under penalty of perjury that I have
 4    read the within and foregoing transcription of my
 5    testimony taken on October 7, 2024, at Las Vegas,
 6    Nevada, and that the same is a true record of the
 7    testimony given by me at the time and place
 8    hereinabove set forth, with the following
 9    exceptions:
10
11              ERRATA SHEET
12    PAGE  LINE   SHOULD READ:        REASON FOR CHANGE:
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25
```

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 89

 1                    ERRATA SHEET

 2    PAGE   LINE   SHOULD READ:        REASON FOR CHANGE:

 3    _____

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21

22

23    Date: _____    _____
                              BRICE CLEMENTS
24

25



Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---
**1**
---

**1**
  6:13,15

**10:57**
  52:24

**10th**
  14:14

**1125**
  75:12

**11:05**
  53:2

**11:41**
  83:22

**11:55**
  83:25

**11:57**
  86:21,25

**13**
  13:12

**133**
  65:16
  70:18

**15**
  70:14

**1500**
  77:9

**17**
  23:18,20
  58:9
  66:21

**18**
  60:25

**18th**
  17:25

---
**2**
---

**20**
  70:14

**2007**
  16:11,14

**2008**
  16:12

**2009**
  18:1

**2022**
  14:14
  22:18
  23:1
  28:14

**2023**
  17:18

**2024**
  86:20

**215**
  75:6

**216**
  78:20

**220**
  79:13
  81:13

**23**
  13:12

**24/7**
  14:24

**2:00**
  14:20

**2:24-cv-00074**
  5:20

---
**3**
---

**3.6**
  75:6

**3.8**
  78:19

**3.9**
  79:2

**30**
  8:5

**30-**
  8:6

**3050**
  75:17

---
**4**
---

**40**
  8:5  46:1

**40-minute**
  8:6

**40mm**
  46:1,5

**4:30**
  12:13

---
**5**
---

**5.5**
  80:3

**5.6**
  81:2

**5:00**
  68:15

---
**6**
---

**6:30**
  12:12,15

---
**7**
---

**7**
  86:20

---
**9**
---

**9**
  27:15
  50:4,7

**9.7**
  81:13

---
**A**
---

**a.m.**
  12:15
  52:24
  53:2
  83:22,25
  86:21,25

**ability**
  7:14 62:4

**able**
  7:10
  33:10,16
  34:4
  43:16
  55:6 56:2

**about**
  7:23
  10:21
  11:5
  14:13
  24:25
  25:2 28:9
  29:21,23
  33:8
  35:12
  36:3
  40:19
  43:9,24
  44:10
  45:3
  47:18
  51:20
  52:20
  53:8,13
  55:10
  56:13,24
  60:9,20
  62:6 64:8
  66:23
  69:18,19,
  21 71:15
  75:5
  76:23
  77:11,18
  78:4
  79:1,17

**83:13**

**above**
  25:24
  26:14
  33:14

**absent**
  67:2

**Absolutely**
  23:2
  25:21
  27:7
  28:2,7
  42:16
  44:14
  63:17

**academy**
  18:1,10
  20:3

**accepting**
  15:15

**accomplish**
  46:11

**accurate**
  15:6
  42:19

**accurately**
  13:20

**actual**
  7:20
  10:16
  22:3
  25:16
  44:16
  48:1
  59:24
  84:23

**actually**
  12:23
  19:14
  20:7 25:3
  38:25

**58:14**
  75:14
  77:22
  82:12

**additional**
  43:25

**address**
  47:22,23

**adds**
  53:19

**admittance**
  65:18,20

**affected**
  63:24
  64:2,7
  65:1,4,5

**affectedness**
  64:6

**after**
  22:4 23:5
  44:20
  48:5
  60:11
  65:17
  68:24
  70:14
  73:6 76:1

**after-the-fact**
  76:1

**again**
  34:2,16
  42:6
  43:21
  45:6 48:6
  69:6
  72:23,24
  73:3,16
  74:9,22
  80:13
  83:12

Case 2:24-cv-00074-APG-NJK    Document 57-12    Filed 05/16/25    Page 92 of 118

Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

ago
    8:11
    32:13
    44:24
agree
    10:5
    27:23
    28:3
    76:13,20
    79:7
agreement
    10:7
ahead
    71:25
    73:11
    86:8
alcove
    85:10
Alex
    9:15
Alexander
    5:18
all
    8:25
    15:20
    16:1
    31:24
    33:10
    37:17
    44:7,8
    45:25
    47:10
    48:15
    49:22
    50:8
    54:20
    57:9 70:7
    74:13
    81:2 83:6
    86:4,15
allow
    25:7
    66:5,15,
    20 78:21
allowing

31:21
75:8
79:21
allows
    80:11
almost
    14:22
along
    52:2,17
already
    13:6 20:2
    77:3
also
    16:20
    20:12
    22:1 27:9
    28:3
    33:14
    42:23
    45:15,22
    50:7
    51:18
    57:16
    63:15
    67:16,22
    68:20
    70:9 76:3
    77:18
    85:16
although
    28:24
    82:23
always
    26:17
    30:5
    31:13
    63:2
amended
    6:11
Amendment
    24:16
amount
    23:4,15
    54:16
    60:12,16

69:7,10
71:16
75:11,13
77:19
and/or
    21:7
    46:10
    67:20
Anderson
    7:19
    11:10
    26:16,20
    27:7
    71:24
    72:8
    74:1,17
    86:7,14,
    24
ankle
    40:4,13
    41:6
announce
    20:21
    22:14,20,
    21 23:6,
    24,25
    24:1,4
    29:3,12
    34:20,24
    35:1,7,22
    65:15
    69:11
announced
    68:11,13,
    18
announcem
ent
    24:9
    32:2,3
    50:2,3
    58:10
announcem
ents
    24:15
    25:24
    49:22,23

58:3
67:11
68:25
69:1,14
84:7 85:5
announcin
g
    28:21
    29:4
    50:17
    58:6 66:9
another
    72:1
    78:18,19
    80:18
    86:1
answer
    26:17,18
    29:20
    72:14
    73:10
    78:22,24
answering
    73:15
answers
    11:3 12:5
any
    7:9,13
    8:17 9:5,
    10 10:2,
    19 14:1
    15:22
    17:1
    19:12
    23:3
    24:12,13,
    14 27:20
    32:2
    34:10,19,
    21 35:21
    37:23,24
    38:12
    39:17,22
    40:3,12,
    18 43:8,
    11,19,24
    46:18

47:5 48:7
59:20
61:19
65:24
69:24
77:25
79:19
81:11,16
83:7
86:12
anybody
    49:6
    50:13,22,
    23 55:8
    67:17
    80:14
anymore
    73:2
anyone
    83:1
anything
    10:17
    11:7
    18:24
    36:19
    41:21
    42:9 47:5
    65:11
    70:20
    83:2,16
    84:14
    86:11
anywhere
    63:11
apartment
    25:20,23
    26:8,9,10
    30:10
    33:5,11,
    12,14
    38:24
    47:24,25
    49:2,6,
    10,18,20
    59:13
    66:10
    74:15,24

75:12,15,
17 77:22
78:14
appear
    67:6
apply
    7:5 51:23
Appreciat
e
    86:17
approach
    51:10
appropria
te
    33:5
    54:17
    75:11
    80:8
approval
    80:19,24
    81:8
approved
    79:15
    80:5
approxima
tely
    8:3,5,11
    18:3,5
    21:5
    23:17
area
    47:9
armed
    75:10
around
    23:17
    58:15
    61:11
    65:9
    85:5,17
arrest
    39:4,19
    41:25
    42:2,5



Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**arrested**
39:11

**arrive**
44:8

**artfully**
71:1

**as**
6:13
8:15,20
12:10,12
13:13
20:19
21:1,2
22:14,25
25:10
26:12
27:22
29:23
31:2,17,
18 32:4,
21 33:21,
25 34:13
35:12,21
37:16
39:1
40:19
41:10,13
42:19
43:23
47:4
50:19,24
51:2,3,4,
8,9
53:10,16
54:13
56:4,6,
12,23
58:7
61:1,13,
18 63:18
65:10
67:1,4,25
68:4
70:19
71:13
74:3
75:18
76:19

77:3,14,
15,24
79:12,17,
18,25
80:20
81:19
83:11,14
84:11

**ask**
6:10
10:25
11:4 14:8
16:2,7
17:5
22:11,13,
16 27:2
28:9,17,
22 29:22
36:2 38:8
48:5,7,8
52:18
53:8
60:24
61:3,25
67:23
70:25
71:1
73:9,16
74:9
75:5,24
76:11
79:1
86:11

**asked**
11:15
24:24
72:15

**asking**
10:14
28:13
33:23
35:17,18
67:25
74:8
77:13
78:4

**assess**
41:4,7

56:2
64:10
68:10

**assessed**
52:4
77:25

**assessment**
31:16

**assistant**
45:7
69:15

**associate's**
16:20,24,
25

**associated**
40:1
59:13
75:12

**assume**
41:21

**assumed**
42:7

**assuming**
22:24
26:4
40:24
63:14
83:6

**assured**
81:4

**at**
8:3,25
14:8,16,
21 16:21
22:18
23:16,18,
20 30:22
31:1
33:4,7
35:11
36:23,24

37:22
38:2
39:2,9,
10,14,16,
24 41:8
43:15
44:8,13,
14,15
46:7,23
47:21
49:24
51:6,17,
20 52:1,
24 53:2
54:20
64:16
66:2 67:6
71:9
72:2,12,
17,21
73:7,14
74:2,5,
10,12,13
76:17,21
78:16
79:5
83:22,25
85:25
86:25

**ATL**
45:10,14
69:14
82:18,25

**attached**
50:7

**attempt**
67:19

**attempted**
52:14

**attest**
64:5

**attorney**
6:25

**attorney-client**
7:24

**authority**
65:17

**aware**
36:10
55:16
79:19

**awareness**
36:5
37:24
40:13

**away**
70:16
79:23

**awkward**
18:13

───────

**B**

**B-R-I-C-E**
6:2

**BA**
16:17

**bachelor's**
16:4

**back**
8:12
30:24
47:6,8,11
51:14
53:1,8
57:2,10
60:1 69:8
83:24
85:13

**background**
14:7 16:2
17:23
19:16

**Backman**
85:4

**backwards**
33:23

**bag**
71:2

**bang**
50:3,4,6,
7 67:14

**banger**
27:15

**Banks**
70:16

**barred**
43:4

**barricaded**
43:1

**bars**
42:24

**based**
31:18
33:7
34:8,13,
25 35:19
56:17
57:19
63:13
66:21
67:10,11,
12 69:15,
16,25
78:16
85:13

**basic**
71:9

**basically**
13:2 43:6
46:8 48:6
49:14

**Basin**
16:21

**Bearcat**
48:24,25
49:8,17

**Bearcats**
33:16
48:22



Brice Clements       Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Case 2:24-cv-00074-APG-NJK   Document 57-12   Filed 05/16/25   Page 94 of 118

52:3

**became**
55:16

**because**
15:12
16:8
18:14
24:10,22
25:23
26:1
27:3,9
28:23
30:20
31:6,9
36:24,25
38:19
39:25
42:11
43:21
48:23
51:15
52:12
54:5 58:5
59:7 60:8
61:14
62:12
66:9
68:13
71:17
76:8
80:11,15
82:11
84:15

**become**
36:10

**before**
6:22 18:6
21:3 23:4
31:12
38:22
40:14
47:12
53:4
57:3,7
58:3,25
59:3,25
69:2,11
78:10

**behind**
33:13
45:21
47:5
50:22,23
84:20

**believe**
8:2,9
14:20
21:8 31:2
32:1,9,24
34:19
35:23
40:5,17
45:3,13,
15 49:5
52:13
54:12
58:8
59:11
70:22
72:10
73:21
76:2,21
78:25
79:23
82:15

**believed**
39:24
51:17
57:13

**belong**
17:7

**below**
33:12

**best**
7:11 12:5
44:12,25
48:3 61:7
62:4
73:7,9
76:22

**better**
39:15
57:24

**between**

25:3 29:2
31:5
33:20
34:20
35:10,22
41:23
73:9

**biochemis**
**try**
16:5

**bit**
10:15
19:3
24:24
32:16
33:12
35:15
43:9
44:11
45:2,3
50:9
53:19,21
55:9 57:2
60:19
61:12
63:12
64:9
65:10
69:19
76:12
85:6

**Bits**
9:24

**blame**
31:24

**bleeding**
51:17
62:13

**blinded**
67:20

**body**
11:11,14,
25 56:4,
6,15,22

**body-worn**
53:10

84:18

**both**
30:3
39:5,23,
24 40:1
51:21

**bottom**
76:17

**Boulevard**
75:18

**brass**
44:3
53:13,18,
19,24
54:5,8

**breach**
82:14,18

**break**
52:22
53:5
68:24
76:16

**Brice**
5:17,22,
23 6:1,4,
12 8:22
14:6 16:1
26:12
28:8 30:4
31:4 36:1
53:4
71:15
75:24
82:20
84:6
86:16,19

**brief**
10:10
38:20,23
40:6
44:6,16
45:1 48:1
53:4

**briefed**
20:23

**briefing**
44:10,13,
22 47:13,
16,20
49:24
83:1,5

**briefings**
44:14

**briefly**
17:15

**broken**
27:10
68:22
69:2

**brought**
8:14 40:5

**building**
84:24

**building/**
**residence**
22:22

**bullet**
51:3
60:23

**bullhorn**
68:15

**business**
33:13

**but**
7:24
14:10
15:21
19:4
20:12,23
21:1,5,23
23:8,20
28:11
29:23
33:25
37:9,13,
19 39:1
40:6
41:10
42:7,14,
23 43:9,

13 44:12,
24 49:5
50:13
52:13,19
54:1
56:21
59:16
60:2,16
62:19
64:6,24
65:1,6,10
67:16,18
71:9,21
72:24
73:9
76:11
78:6
81:24
83:10,12
84:5
85:20

**by**
5:13
6:16,25
11:13
19:25
22:7
23:10
26:3 27:8
34:7
36:8,21
45:6 53:3
63:20,24
64:2
65:1,5
68:5,17
72:3,13
74:7,19
76:11
77:10
79:4,15
82:24
84:1

---

**C**

**C-L-E-M-**
**E-N-T-S**



Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

6:3

**call**
5:21 7:20
14:22,24
15:9
20:13
33:17
36:15
55:7,8
57:13

**call-out**
15:9,15
33:9
34:6,15

**call-outs**
68:2

**called**
8:23
15:5,7,8,
11,16,24
17:10
23:11
54:20

**calls**
19:9

**cam**
11:11,14,
25

**came**
16:10
56:12
62:10

**camera**
48:13
53:10
62:19
84:19

**cameras**
49:10

**candid**
29:21

**captain**
76:3
81:2,7

**career**
21:23

**carried**
45:24

**carry**
45:25

**cars**
60:14

**case**
5:19 20:9
30:12
31:20
42:3 45:4
46:1,12
47:8 49:4
50:5,10,
12,22
51:25
53:13
60:13
68:13
70:8,13
81:4,15,
18

**cause**
10:22

**caused**
57:15

**certain**
43:17
46:8
69:10
71:16

**CET**
30:5
31:20
32:18
33:5
34:5,20
35:10,14,
23 68:2
71:20,22
72:6,11
73:1
75:9,18
76:19,21

77:11,12,
15 78:17
79:3,12,
13,21

**CETS**
79:10,24

**chamber**
48:16

**change**
31:16
32:22
35:13,14,
16 79:19

**changed**
14:19
21:23
32:23
34:17
42:9 73:1
78:12,15
82:15

**changing**
23:12

**chemistry**
16:4,6

**children**
43:20
75:15
77:22

**chronic**
63:5

**chronological**
36:3

**chronology**
18:18
47:11

**circle**
52:5

**circumstances**
31:18
69:22

**CIRT**
7:19 8:14
9:17 26:4
32:5,6,8
60:8,10
65:16
70:14,18
75:4,7
77:20
80:3
81:13
82:11
83:10

**CIRT's**
75:24
76:23

**cited**
70:13

**civil**
27:25
28:4

**claim**
61:14,15

**clarify**
28:11
29:11

**clarifying**
44:22

**Clarkson**
52:3

**class**
12:23,24,
25 13:1,2

**clear**
25:12,18
30:10
59:17

**clearly**
68:10

**Clements**
5:14,17,
22 6:1,12
86:19

**close**
27:16
31:6
65:18

**closed**
65:21

**club**
17:13

**cocaine**
70:16
71:2

**coexist**
35:24,25

**Cole**
81:2,7

**College**
16:21

**Columbia**
16:21

**come**
18:9
51:24
66:16
72:2 84:6

**comes**
36:18
41:21

**comfortable**
47:17
62:5

**coming**
25:9
49:6,16
67:8

**commander**
80:20

**comment**
31:8

**communicate**
36:13

**comp**
61:14,15

**complete**
11:3

**completed**
8:22

**completely**
21:10,11

**complex**
49:18

**compliant**
66:17

**comply**
20:9
66:22

**concept**
43:10
71:10

**concern**
71:15

**concerns**
83:3,7

**concluded**
75:7 80:3
86:25

**concludes**
86:18

**conclusion**
75:25
76:13,23
77:20
78:19
79:2 80:3
81:13

**conclusions**
32:15
75:4

**conditions**



78:20

**conduct**
27:24
75:9

**conducted**
78:17

**confident**
83:8

**confirm**
65:10
83:11

**conflict**
34:19,21
35:9,22

**confused**
67:22
68:5

**confusion**
68:8,9

**congratul
ations**
13:7

**conjuncti
on**
76:4,5

**considere
d**
37:15

**consists**
38:23

**constant**
63:1,15

**constitut
ional**
25:12
27:19,25
28:4 86:5

**contained**
75:8

**continue**
51:15
64:2

**controlle
d**
30:6,8

**copy**
86:23

**corner**
85:6

**correct**
12:19,20
17:18,19
18:22
23:21
25:11
27:10,13,
14,16
29:12
31:17,22
32:10
37:14,20
39:12
42:21,22
46:13,16
54:2,6
57:7
58:11
59:18,21
63:6,16,
25 64:3
65:2
67:22
69:12
70:21
71:4,11,
23 72:7
79:19,25
83:3,7,17
84:8,9,
12,21,22,
25 85:1,
6,18,21
86:2,3

**correctly**
14:20
15:21
23:18
39:20
48:17
85:8

**Corrine**
5:15

**couch**
51:7,11,
12 59:7,
10

**Counsel**
86:22

**count**
60:12

**couple**
10:13
14:19
49:23
51:14
69:13
84:3

**course**
21:25

**court**
6:10 7:4,
6 8:19
27:1 70:4
86:22

**Craig**
7:19,23,
25 86:12

**criminal**
19:10,17

**current**
17:16
34:9

**currently**
13:5 17:3

**cut**
47:17

---

**D**

**daily**
20:24

**damage**
52:7,8

61:14,21
62:16,21,
23

**dangerous**
29:8,9
75:10

**date**
8:6

**day**
21:13
29:25
36:20
56:12
62:11,17,
21 63:10
64:3 74:3

**dealing**
40:7 62:9

**death**
64:20

**deceased**
52:15

**December**
18:2

**decided**
16:14

**decision**
34:7 73:3
75:17

**decisions**
76:3
82:17

**deemed**
69:17

**deeply**
63:24

**defensive**
19:11

**defined**
70:4

**definitel
y**

56:18

**definitio
n**
28:12

**definitio
ns**
28:10

**degree**
16:4,20,
24

**delay**
54:4,7,8
55:3

**delicate**
61:24

**demonstra
te**
56:23

**deny**
66:15

**departmen
t**
5:19
16:11
20:12,17
33:1 77:7
79:23

**depended**
69:14

**dependent**
21:17

**depending**
43:22
46:10
47:6 48:9
50:4
63:10

**depends**
37:1,17

**deposing**
82:22

**depositio
n**
5:17 6:5,
7,11,12,
14,21
7:18
8:16,18
9:3,7,18,
19,21
10:2,6,
11,20
11:3,8,21
12:22
32:14
84:11
86:19,25

**depositio
ns**
11:16

**describe**
58:22

**described**
34:25
35:6

**descripti
on**
10:10
19:4
42:22
45:4
47:22

**despite**
65:11

**destroy**
71:19

**destroyed**
70:21

**detective
s**
76:6

**determine
d**
45:6
49:24



determines
43:5

developed
82:24

device
27:12
82:7

devices
68:3,6

dialogue
47:14

died
62:14
74:25

difference
25:2 29:2
41:23
59:9

differences
28:15

different
22:17
26:14
28:13
35:16
46:9
56:18
59:6
69:21
79:24
84:3

differently
10:21
13:21
57:15
61:3
65:12
83:2,16

difficult
53:21

68:10

dining
50:23

direct
61:5

disagree
76:20,21
77:17
79:7,9

discharge
46:12,16,
18

discretion
80:4

discuss
6:18

discussed
44:25
45:2,3

discussion
27:5
53:12

disembark
49:16

disorient
80:13

disrupt
54:24,25

distance
46:8

distances
46:10

distinction
33:20
55:20
73:8

distinguish
31:5

distinguishing
31:8

distracted
68:7

distraction
27:12
68:3,5

division
13:24

docs
51:24

documents
8:17,24
9:5
11:11,17

dog
44:5

dogs
43:18

doing
8:25 21:6
33:8
35:10

don
48:11

done
10:21
42:10
57:3
58:20,24
65:12
66:13,15
68:2 83:2

door
30:15,20
31:1 35:2
42:25
44:3
50:1,15,
19 53:13,
18,20

54:5,17
55:3,11,
23 64:10
65:21,25
66:17,20,
25 67:8
71:18
78:22,24
79:5,11
82:7 84:6
85:23

doors
31:15
42:25
47:23

dot
48:21

down
16:10
20:10
30:22
33:12
44:7
51:16
52:12
55:14
56:1
60:14
71:3,4,5
78:8

download
60:11

downloading
84:5

draw
76:11

dressed
48:10,11

driving
44:19
52:3

drop-off
49:19

drugs
70:22

Due
31:23

dumb
16:7

duplicatively
38:9

during
12:18
15:2,12
50:16

duties
24:14

duty
27:23
28:5

dynamic
23:11

---

E

---

each
28:11

earlier
24:25
60:20
64:9
69:9,19,
20

early
15:1 38:3
44:9 49:3
67:12

easily
70:21

Eastern
16:18

easy
43:4

education
16:3

effectively
43:17

either
39:9,11
66:15

elapsed
58:9

elderly
43:20
44:4
75:15
77:23

element
65:15

elements
79:3

else
10:17
11:7
40:20
41:6
86:11

else's
9:13

emphasis
16:5

ended
16:8

enforcement
16:14

engage
51:6,14,
15

engaging
51:8

enough
32:1
66:19,24
78:23
85:15



Case 2:24-cv-00074-APG-NJK   Document 57-12   Filed 05/16/25   Page 98 of 118

Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**ensure**
42:18,20
48:13,14,
25

**enter**
24:19,20
25:13,19
31:19
35:4
50:10

**entered**
31:3,10
55:23
58:4

**entering**
23:4
31:12,14
42:11
65:19
69:11
79:6
84:20

**enters**
47:4
50:19

**entire**
9:20
50:17
53:5
56:10
84:16

**entitled**
7:22,24

**entries**
23:11
69:22

**entry**
23:18,20
30:6,8
31:2 32:9
43:12,13
45:21
46:25
47:2,3
49:13
58:10

64:17
66:1,5,
15,20
68:12
80:12
84:7

**entryway**
84:25

**especially**
74:4

**essentially**
28:19

**et al**
5:18,19

**evaluated**
52:17

**even**
7:5 63:2
64:13
72:10
73:21
77:9
78:11,13

**ever**
6:21
37:6,10
38:6,8,
10,12
59:2
81:16

**every**
10:25
21:13
38:22
50:4
51:24
58:5
62:11,17,
21 74:2

**everybody**
48:6,25
49:21

**everything**
7:17
11:20
35:20
42:18
52:11
55:14
83:14,15

**evidence**
38:14
70:10
71:17

**exactly**
56:24
82:1

**EXAMINATION**
5:12

**example**
60:13

**examples**
17:4

**execute**
39:17
42:2 43:7
48:3

**executed**
59:16,23
68:1
72:11
79:11

**executing**
29:25
37:8
40:24
41:24
53:6,24

**execution**
15:2
54:25
58:21,25

**exhibit**
6:13,15

**experience**
26:13,15
35:20
54:13
68:4

**experienced**
67:24

**explain**
62:6

**explosive**
82:7,14,
18

**extended**
59:12

**extra**
11:9
60:17
80:11

**extremely**
29:8,9

---

**F**

---

**fact**
54:1
57:23
76:2

**factors**
75:14
77:21
81:4

**failure**
75:19
76:19
77:25

**fair**
11:22
29:19
31:25
34:18
38:4
63:13

82:2
85:15

**fairly**
70:15

**fall**
16:11
51:10

**falls**
15:23

**familiar**
53:14

**familiarity**
56:14

**far**
8:20
42:19
85:12

**FED**
26:4

**feel**
50:24
51:2 62:2

**felon**
19:22

**few**
50:16
59:1 62:7
66:13

**field**
18:4,7,19
19:5,8
20:7 25:4
35:19
54:14

**figure**
20:5,6

**figured**
11:17

**find**
16:13
38:2

**Findley**
45:14

**fine**
5:23
56:23
85:11

**finger**
61:16

**finish**
30:24

**Finished**
18:1

**fire**
55:24
60:5,14

**firearm**
46:14,15,
16 48:20
59:12
67:19,20

**fired**
31:9,12
51:12,16
60:25
72:12

**firing**
64:15,16
72:2

**first**
6:10 8:2
10:13
11:19
19:15
23:5
27:19
36:5
40:20
55:16
58:9 72:9
74:18

**fitness**
22:4

**five**
18:5



81:20

**fixed**
63:2

**flash**
50:3,6
55:17
56:1
67:14

**flashes**
51:4

**fleeing**
19:22

**flush**
70:16
71:2,3,5

**foam**
46:8

**follow-up**
52:19
86:12

**for**
5:17,25
6:5 7:18,
25 8:3,5,
16,18,23
9:3,7
11:8,15,
20 13:4
14:10,11
15:1,6,
11,22,24
16:7
17:10
18:3,5
19:6,7,9
21:12,22,
23 22:1,
16,18
23:14
27:3
28:13,23
29:6,9,
14,20
32:15
33:5,6
36:20

38:13,18,
25 39:7,
21 40:15
41:8
42:23
44:21,22
47:5
56:10
57:5,23
58:19
60:17
61:15,19,
22 64:12
65:15
67:16,18
68:10
69:21,25
71:10,21,
23 72:6,7
73:12,17
74:10,15,
24 75:8,9
77:11
80:12,14,
19 81:8,
20,21
84:11
85:2

**force**
19:12,17,
21

**forearm**
51:2,18,
20 52:5,
6,9 61:16

**forearms**
51:22

**forensic**
16:5

**forensics**
16:10

**Form**
26:16
71:24
74:1,17
86:7

**found**
10:3 41:5

**foundatio
n**
38:16

**four**
18:3
21:8,12
22:7
54:9,12

**Fourth**
24:16

**Friday**
12:13

**from**
16:20
18:19
21:18
33:12
36:19
39:7 44:6
49:13
51:11
52:8
53:10
55:16,17,
25 56:1
58:9 61:9
63:11
65:16
66:13
70:13,17
75:4,6
79:13,24
81:17,20
85:21

**front**
50:21
85:9,23

**full**
5:25
47:14

**functioni
ng**
48:15

**further**
47:6

---
G
---

**Garth**
45:14

**gathered**
44:6

**gave**
18:18

**general**
16:25
20:18
37:10

**get**
15:15,24
18:10
21:18
24:6,7,8
25:15
29:5,14
30:10
32:16
33:16
38:1 41:2
42:16
47:11
48:10,24
49:8,16,
20 51:20
53:21
54:9,16
66:19
71:16
74:2,5
79:11

**gets**
36:20
37:18
50:19

**getting**
39:16
54:4 55:3

**give**
7:4,11

10:10
11:3 12:4
13:3 35:1
36:4
45:16
52:22
65:14
66:10
69:13

**given**
6:21 8:19
19:3
75:11

**giving**
10:25

**go**
6:24 7:1
12:2 14:7
15:19
19:20
20:20
36:2
42:20
44:16,17
48:1,2,5,
6,10
49:1,9
50:14,21
56:1,19
60:1
64:13
65:3 67:5
69:22
71:25
73:11
78:7,8
83:19
86:8

**goes**
36:22
42:19
44:22
50:6

**going**
6:9,24
7:1,2
11:4 12:2

14:6,7
16:1
17:20
18:12
21:7
22:10,13,
16 24:10
27:15
28:17,21,
22 29:22
30:24
36:1,2
38:13,24
39:6
41:13
43:6,9,21
44:18,20
45:5,18
47:11,12
49:25
50:3
52:18,19,
20,23
55:10,14
57:14,17
61:11
65:14,24,
25 68:17
70:12
73:9,16
74:8
75:3,4
76:11
78:18
79:1 80:2
81:19
82:2
83:22
86:20

**gone**
10:24
35:20
62:1

**Gonzales**
9:15

**Gonzales'
s**
10:1

Brice Clements    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**Gonzalez's**
10:6,11,
20

**good**
5:14 13:3
17:21
61:2

**gosh**
17:10

**got**
12:21
16:21
30:13,18
38:2 46:8
52:11,16
60:17
73:19
74:25
76:8

**government**
16:13

**grab**
67:19,20
80:16

**graded**
21:10,11,
13

**grades**
21:19

**graduated**
16:22
18:1

**ground**
51:10

**group**
8:3,10
17:8
36:13,15,
16,18

**guess**
20:5,11
39:14

68:8 75:1

**guilt**
64:19,21

**gun**
71:3,5

**gunfire**
55:16
57:16

**gunshots**
50:20
51:1

**guy's**
41:5

**guys**
70:20
71:10,13,
14 78:10

———————

**H**

**hadn't**
59:16,23

**half**
8:4 18:6
23:18,20
66:21
69:4

**hand**
62:23

**handgun**
22:2

**happen**
13:11
51:25

**happened**
36:3
47:16
52:11
62:18
83:15

**happening**
51:5

**happens**
25:4
50:24
51:9 73:6

**happy**
16:15

**hard**
16:13
43:5
56:20

**having**
65:1 78:6

**he'd**
57:3

**head**
12:1
29:17
48:22
49:19

**headed**
16:9

**hear**
24:8 25:7
50:20

**heard**
25:24
26:7

**hearing**
51:1
55:17,18
57:16

**heart**
77:10

**heavy**
48:12

**helmet**
48:12

**help**
50:9

**helped**
51:23

**here**
6:17 8:21

12:10
13:13
16:10
22:17
25:10
26:12
29:23
32:4,21
33:21,25
34:13
35:12
43:23
53:16
54:11,17
55:3 58:7
59:5
61:18
63:18
65:10
67:1,4
70:19
78:20
79:18
83:11,14
86:6

**hey**
36:23,24
47:15
48:16
49:9,15,
25 50:2,
17 57:1,
10,24
60:16
69:21
71:16

**high**
16:22
29:7

**high-
stress**
40:23,25

**higher**
63:12

**highest**
16:3

**himself**
56:8

**hinder**
54:24,25

**hindered**
55:3

**hired**
17:25

**history**
35:17

**hit**
51:2 52:9
60:23
61:5
79:10

**hits**
50:16
54:9,11

**hitting**
79:5

**holster**
51:16

**homicide**
30:1 36:9
39:8 40:6
45:3
59:13,17,
19,21,24,
25 76:4,6
81:8

**honest**
20:3

**honing**
49:14

**hope**
20:4

**Hoskins**
45:17
50:15,19

**hospital**
52:16

**hour**
8:4 52:20

**hours**
12:10,11,
12 15:3,
13,21

**house**
24:20
38:24
42:24
49:2,11

**houses**
60:15

**how**
7:25 8:11
9:23 13:3
16:7
17:20
19:23
21:3,19
22:18
25:25
34:25
36:10,12
42:25
54:11
56:2
58:2,3
60:5,7
61:24
69:1
85:12

**however**
47:17
62:5

**human**
62:15
65:2

**hundred**
59:1

**hundreds**
68:1

———————

**I**

**IAP**
81:8



idea
23:22

identifie
d
6:15

identify
28:14
55:21

if
7:4 11:4
14:19,22
15:5,20,
23 16:12
18:12,17
22:11,17
23:17
28:3,9,12
29:19
30:23
33:21,25
34:1,12
36:15,21
39:10,22
40:8,10
41:10,13
42:2,8
47:13,14
48:7
49:1,6
50:12,23
56:18,22
57:18
58:13,21
60:15
61:4
63:23
65:16
67:5,18
68:19
69:4
70:3,7,
17,23
71:2
75:15
77:22
78:11,13
82:21
83:1,19

84:23
85:7,10

immediate
ly
28:21
50:20
51:19
55:22
56:2 79:2

important
27:19

in
5:17 7:4,
6 8:4,12,
18 9:2,7
10:1,6,7,
22 11:2
12:23,24
13:18
14:1
15:1,6,19
16:4,5,
12,14,24
17:4,9,
12,17,25
18:1
19:16,17,
24 20:3,
7,8,18,22
21:3,17
22:11,18
23:1
25:4,9,
17,23
27:15,18,
22 28:14,
21 30:9,
12,19
31:6,16,
20,21
32:14
33:16,17
34:16,23
35:18
36:3
37:8,10
38:3,13
40:6,23

41:11,13,
18,20
42:3,18
43:6,12,
20 44:2,
9,15,23,
25 45:11
46:1,12
47:8,14
48:15,16
49:4,7,
14,21,22
50:5,10,
12,14,21,
22,23,25
51:18,21,
22,25
53:12,21
54:1,9,13
55:13,19
56:4,7,
10,19
57:6 58:5
59:13,20
60:10,13,
21 61:24
62:23
63:1,5
64:9,11
67:18
68:13,15
69:20
70:13
71:16,22
72:5,10,
16,18
73:21
75:14,23
76:4,5
77:12,22
78:7,10,
13 81:4,
14,18
82:11
83:10
84:11
85:7,9,14

incident
10:22

14:1,8,
12,16
17:24
21:4
22:8,19
25:16
62:6
63:15,21,
24 79:25

inclinati
on
43:19

include
21:25
64:18
75:14
77:21

including
68:14

indicate
66:4,14

indicated
56:15
70:8

indicating
52:8

indication
65:24

individual
27:20

individuals
75:16
77:23

info
8:19

inform
60:9

informati
on
10:2
34:15
35:3
36:17
40:3,18
41:2,4,10
42:19
64:10
83:6

inhibit
7:14

injury
60:20

innocent
22:8

inserted
27:13

inset
67:13

inside
22:22
24:5,6,8,
13 29:10
42:2
50:10,11,
13 52:13
56:19
64:5
66:13
67:17
71:21,23
72:2
74:15,23
75:16
80:14

insight
13:3

instance
44:23
45:12
71:22
72:5,18
85:2

instances
43:16
59:6

instruction
7:2,7
12:3,7
28:10

instructions
7:1

insufficient
78:21

intent
25:13,19

intention
24:9 25:8
31:21
35:4,10
67:5,6

intentions
22:21
23:25
24:4

interaction
37:23

interesting
19:15

interrogatories
8:23

interrupt
30:23

intervene
28:6

interview
7:20
60:8,10



Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**interviewed**
26:3

**into**
7:1 10:15
12:1
18:21
24:10
25:15
30:10,13
32:16
47:6
49:18,20
56:8
65:19
68:12
69:22
84:8,20
86:2

**intrusion**
24:22

**involved**
17:12
81:4

**Isaiah**
6:19
25:18

**issue**
7:14
16:12
53:17
83:1

**issues**
84:4

**it**
9:23
11:2,5
12:1,4
13:21
14:11,19,
20,22,23
15:9,12,
23,24
16:7,11
17:9
18:17

20:9
21:1,12,
13,23
22:16,18,
25 23:7,
10,16
25:11
26:1,2
27:2
28:10,11,
14,23
29:9,13,
23 30:1,
2,6,10
31:2,3,17
32:7,13
33:2,7,10
34:10,25
35:16
36:7,15,
19,21,23,
25 37:17,
18,20
38:8,13
39:5,18,
19,23,24
40:20
41:4,8,21
42:3,8
43:1,2,9,
17 44:23
45:13,24
46:1
47:14,17,
18,23
49:4
50:7,16
52:12
53:9,20
54:2,9,
11,16
55:16,17,
18,21
56:13,18,
24 57:18
58:14,15,
22 59:9
60:9,24
61:2,3,4,
7,9 62:3,

6 63:13
64:2,8
67:4,5,6,
7,14,17
68:3,10,
17 69:4,
18,19
70:14
71:3,7
72:18,19
73:16
75:1,10
76:11,17,
24 77:10
79:5,10,
11,17
80:11,15,
18 83:9,
12,13
84:5
86:17

**it's**
13:2
14:25
15:17
18:13
20:16
22:11,12
24:22
28:9,24
35:16
37:15
38:8
46:7,8
49:15,24,
25 56:20
57:21
62:9 63:2
65:6
66:11
68:11,15,
17 72:17
73:13
75:22
77:9
84:24

**items**
10:5 11:1
61:20

70:1

**its**
31:21

**itself**
25:16
32:6

---

**J**

**J-O-H-N**
6:2

**Jake**
45:13

**January**
14:14

**job**
27:22
44:16
47:21
49:15
65:6,7

**jobs**
16:13

**jogged**
84:15

**John**
6:1

**judicial**
79:15

**jump**
61:11

**jumped**
65:9

**June**
8:12
17:25

**just**
7:3,20
8:15,20
11:17
14:10
15:15
16:25

18:18
24:19,20
27:3
29:20
34:25
35:18
37:1,9,17
38:14
39:19
40:11
41:3,8
43:21
45:16
47:14
50:10,22
51:25
52:21
56:8,18
57:5,9
60:13
61:11,20
62:20
63:14
64:13
69:8 70:6
83:10,12
84:2
85:13

---

**K**

**keep**
57:17

**Kerry**
45:14
50:19,24
51:17
52:1,10,
17

**Kia**
45:17

**kids**
43:19
44:5
68:16

**killed**
74:15,23

**kind**
10:24
12:24
17:22
19:2,4,5,
18 24:13,
17 36:2,
17 37:5
40:9
41:3,9
53:7
55:10,12,
15 56:23
57:20
62:5 65:9
72:21
73:2,20
82:21
84:24
85:5,17,
25

**kitchen/
dining**
47:9

**knew**
55:23
67:7

**knock**
20:20
22:13,20
23:6,24
29:2,11
34:20,24
35:1,6,22
65:15
69:11

**knock-
and-
announce**
22:15
32:19
79:22

**knocking**
28:20

**know**
7:23,25



```
8:13
14:10
17:6
18:14
19:22
20:9,25
25:25
28:24
29:16,20
32:4
33:24
40:23
42:13
43:16,18
44:18,23
47:24
50:1,11,
12 55:22,
25 56:15,
20 57:10,
11,24
58:18
60:7,23
61:4,8
63:19
65:7
68:16
69:16,20
70:2 74:3
75:1
77:3,10
78:3
82:23
83:9,15
85:13
knowing
49:15
83:14
knowledge
23:3 35:3
61:8
known
78:9,13
Kubla
45:14,22
51:5,9,
17,19,21
55:14,24
```

```
56:9,14
57:7
64:4,17
73:12,17,
21 74:10,
11 78:8
84:20
Kubla's
61:9

        L

labrum
52:10
61:20
lack
57:24
language
56:4,6,15
Las
5:18
20:16
last
8:8 11:4
21:9 46:3
later
29:23
32:14
53:9 62:8
Latia
5:18
launcher
46:2,4,6
law
7:4,6
16:14
19:10,17
20:9
81:15,18
laws
19:20,25
layout
84:24
```

```
lead
44:19
leader
13:3
45:7,11
69:15
82:25
leading
17:24
86:2
learned
82:22
left
51:6
81:25
leg
51:22
legal
65:15
less-
lethal
46:2,6
let
5:16 14:7
60:23
61:2
70:25
let alone
78:22
let's
76:16
77:18
level
16:3
33:13
liberties
24:23
lieutenan
t
76:3
80:4,17,
18,24
81:3,7
```

```
life
62:15
64:24
65:2,3,5
light
48:19,20
like
14:22
15:15,21,
22,23
16:9
17:4,7,8,
11,12,13
18:10,23,
24 19:3,
5,6,7,19,
21,22
20:6,7,
10,23
22:3 28:9
41:7,9,24
43:1 46:4
47:9,15
48:12
49:14
51:25
55:13,15
56:2,25
57:1,24
59:2 62:2
76:6 77:9
81:21
84:19,24,
25 85:2
line
81:15,18
linked
70:9
list
11:14
21:14,15,
16,18,20
listed
8:15
litigatio
n
```

```
8:20
little
10:15
14:25
18:13
19:3
24:24
32:16
33:12
35:15
43:9
44:10
45:2,3
50:9
52:20
53:19,20
55:9 57:2
60:19
61:12
63:12
64:8
65:10
69:18,19
71:1
76:12
80:11
84:25
85:6,9
lives
62:10
64:24
loaded
75:22
located
42:25
long
7:25 8:11
21:3
32:13
long-term
63:20
look
19:6,19
33:23
38:13
44:15
```

```
47:21,22
51:3,16
60:1,17
71:8
looked
50:21
looking
38:18,25
39:2
42:23
43:15
47:5,8
64:12
70:23
71:10
loop
53:7 69:8
lost
79:2
lot
7:1 23:12
75:23
82:2
low-
lethal
45:22,24
46:19
48:18,19,
21
LVMPD
17:23
34:9,14
54:14
72:25
75:20
76:24
77:16
79:15
80:21,25
81:10

        M

made
23:5 32:1
```



Brice Clements                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

33:19,20
34:7
38:15,17
56:14,25
57:10,11,
24 58:3
68:25
69:2 73:4
84:7 85:4

**mag**
59:12

**magazine**
48:17

**major**
16:12

**make**
21:1
24:15
31:7,15,
16 43:12
62:20
67:17
68:9
80:12
82:17

**making**
53:20
76:2

**man**
25:17

**management**
80:19

**manual**
75:7 79:4

**many**
7:25
42:25
54:11
58:2,3
60:5 69:1

**mark**
6:13

**matter**

5:18

**maybe**
17:12
63:12

**me**
7:17
10:10
11:1,3,
19,24
12:5 14:7
15:1 16:7
17:6,22
18:18
19:2,3,4,
18 21:1
22:10,12
23:14,23
24:17
27:23
28:8
30:5,7
31:7 34:7
35:1 36:4
37:5
42:14
44:13,22,
24 45:16
46:24
47:15
53:5,16
55:13,15
56:12,23
57:2,18,
19 60:22,
23 61:2
62:6,11
63:23
64:16
70:25
71:1
82:21

**mean**
9:17
11:17
14:24
21:11,15
22:14
23:10

36:21
43:15
61:8
66:16
67:23
68:7
72:20
73:19
74:25
76:11
78:11

**meaning**
21:6
34:23
47:4
48:11
67:13

**means**
20:21
21:12
22:16
23:10
45:23,24
57:14
80:15

**meant**
22:18

**med**
16:9

**medical**
52:12,14

**medications**
7:13

**meet**
31:21
36:23

**meeting**
8:7,10
37:22

**member**
17:1 28:5
54:15

**members**
27:25

64:17,25

**memory**
7:21
44:12,25
58:2
62:18
84:15

**mentioned**
61:20

**message**
36:12,14
38:1

**met**
7:25

**Metro**
20:16

**Metropolitan**
5:19

**midnight**
14:21

**mil**
46:1

**military**
17:9

**mind**
26:24
55:19

**minute**
49:13

**minutes**
8:5

**moment**
11:5
83:21

**Monday**
12:13,17
44:9

**Monday-morning**
72:21

**monitor**
40:4,14
41:6

**months**
81:20

**more**
11:1 12:3
20:10
29:22
32:16
36:3
47:17
53:20,21
60:17
71:1
76:12
77:10
79:10

**morning**
5:14 15:1
38:3
44:9,10
67:12
68:15

**most**
21:24
27:19

**mostly**
10:7

**move**
22:3
50:25
51:5

**movement**
57:21

**movements**
56:9,13,
17,24

**Mr**
5:14,22
11:10
26:15,16,
20 27:7
31:23,25
52:14

59:9,17
64:19
65:20,25
66:3,12,
18 67:7
71:24
72:7,8
74:1,14,
17,23
86:5,7,
14,24

**MS**
5:13 6:9,
16 11:12,
13 26:24
27:2,8
52:18
53:3
72:3,13
74:7,19
83:19
84:1
86:10,15

**much**
9:23
86:16

**multiple**
79:5

**murder**
64:12

**Murphy**
5:13,15
6:9,16
11:12,13
26:24
27:2,8
52:18
53:3
72:3,13
74:7,19
83:19
84:1
86:10,15

**muzzle**
51:4
55:17,25



Case 2:24-cv-00074-APG-NJK    Document 57-12    Filed 05/16/25    Page 105 of 118

Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**my**
5:14
7:10,19
11:19
12:1,12
18:13
21:23
29:17
35:5,15
39:15
47:21
48:17,19,
20,21
51:2,13,
20 52:5,
8,9 60:8
61:15,16,
22 62:24
63:1,22
64:24
67:2
72:4,5,
10,16
73:10,15,
21 74:20
82:20

---

**N**

**name**
5:14,25
85:4

**narcotics**
18:24

**national**
81:15,18

**nature**
12:6

**necessarily**
54:7

**necessary**
69:17

**need**
20:8
24:25

25:1 33:2
42:1
43:11
44:19
49:1
71:16
86:23

**needed**
65:8

**Nellis**
75:18

**nerve**
52:7,8
61:14,21
62:22

**never**
57:3,5
69:9

**new**
19:8
34:15
81:14

**next**
59:12
85:23

**no**
6:23
7:12,16
9:8,22
10:4,18,
23 12:23
13:15,22
14:2
15:4,18
17:14
19:1
23:22
32:22
34:11
35:11
38:7,11
42:11
54:3,8,21
55:5
57:4,8
59:19

61:6
64:23
65:13
66:2
68:13
71:5,20
73:18
74:12
75:1
77:10
81:12
82:8,9,
10,12,13
83:18
86:9,14

**no-knock**
28:18,19,
20 29:2,
6,14
79:14

**nobody**
41:18,19
56:19

**nonstandard**
56:25

**Nope**
37:25
60:11

**normal**
12:9,11
15:3,21
21:21
50:25
59:14
67:12

**normally**
12:18
44:7,14
57:15,17

**not**
6:24 7:1,
6,10,22
11:14
13:15
18:14

20:23
24:21
26:21
27:24
28:20,21
29:16
30:22
31:3,20
32:8,11
33:6,16
34:7
35:16,17
37:4,9,
15,16,20,
21 39:2
42:24
43:13
44:1
46:18
50:11,25
51:20
59:4,17,
19,20
62:2
64:6,16,
24 65:4,6
66:5
67:17
68:16
71:21
73:1,3,15
75:10,19
76:24
77:15,25
78:4,5
79:19
80:4,21,
23 81:1,9
82:14

**note**
21:1

**notice**
6:7,11
25:12,19
65:17

**noticed**
6:5

**notices**
52:4

**notion**
74:5

**now**
10:15
13:16
16:1
26:22
29:18
33:20
36:2 53:9
79:17
82:1,13
85:3

**number**
5:20
21:20
26:9,10
38:24
45:21
46:24
47:1,3,4
66:10
78:7
84:19
85:7,14

**numbers**
42:21

**numerous**
58:5
67:11
68:14
75:13
79:10

---

**O**

**O'DANIEL**
80:4 81:3

**O'Daniel's**
80:18,24
81:7

**oath**

7:3

**object**
26:17

**objection**
26:16
71:24
72:8
74:1,17
86:7

**observation**
49:2

**observe**
49:6
51:13

**obstacle**
21:25

**obviously**
45:5

**occupants**
43:14
78:21

**occur**
25:6

**occurred**
21:4
44:13

**October**
86:20

**of**
5:17,18
6:11,12,
18 7:1,4,
5,6 8:15,
24 9:10,
23 10:10,
11,13,19,
22,24
12:6,24
13:12,25
14:4,8,
16,19
15:2,14
16:3,11



Case 2:24-cv-00074-APG-NJK   Document 57-12   Filed 05/16/25   Page 106 of 118

Brice Clements          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

17:1,18,
22 18:2,
9,13,24
19:2,3,4,
5,12,17,
18,20
20:16,19
21:1,12
22:7,19,
22 23:4,
12,15,24
24:9,14,
17,18
25:1,5,8,
12,16,17,
19 26:5,
13,15
27:25
28:5,12
29:5,17,
24,25
31:1,2,
16,21,24
32:1,15
33:7,9
34:2,3,4,
8,9,14,24
35:1,2,3,
6,7,22
36:2,5,
10,17
37:2,5,8,
11 38:12,
23 39:3,
18 40:3,
9,15
41:3,9
42:15,22
43:10
44:7,12,
25 45:2,
15 46:18
47:1,23
48:15,16
49:23
50:1,2,8,
9,21
51:14
52:3,5,9
53:6,7,9,

17,20
54:5,15,
16,25
55:3,10,
12,13,15,
16,17
56:17,23
57:20,24
58:10,20,
24 59:7,
21,24
60:8,12,
16,25
61:7,14,
19,25
62:4,5,16
63:8,15,
19,22
64:9,11,
17,24
65:7,9,
16,17
67:15,18
68:1,5
69:5,7,
10,14,15,
16,20
70:9,18
71:2,10,
17,18
72:21
73:2,20
75:10,11,
13 77:19,
25 78:16
79:3,19,
25 80:5,
7,18,19,
20 81:8,9
82:21,23,
25 83:6
84:3,4,5,
24,25
85:5,13,
17,20,24
86:1,19,
23

**off**
11:14

12:21
27:3,5,15
29:17
31:18
33:7
49:16
50:1,2
52:23
56:17
66:21
67:11,12
69:15,16
78:16
81:20
83:20,22
85:13
86:20

**office**
8:3,5
36:24

**officer**
10:1,6,
11,19
16:8
17:7,8
18:4,5,7,
14,19
19:15,21
20:24
22:15
27:23
28:6
35:21
45:22
50:15,18
51:5,9,
19,21
52:10
54:14,15,
24 55:14,
24 56:9,
14 57:6
58:5
60:15
61:9
64:4,17
65:18
67:25
68:4

73:12,17,
21 74:3,
4,10,11
77:4,24
78:6,7,8
84:20
85:3,4,
17,22

**officer's**
25:13
35:4

**officer-
involved**
6:18
14:13
53:7 57:6
60:21

**officers**
9:11
17:12
18:9,20
19:9,17,
23 20:20
28:4 29:9
30:13
39:1
44:17
45:9,11,
15 48:2
51:13
63:19
64:4
67:8,16
68:11
70:15
71:21,23
72:6 79:2
80:12
82:19,22
85:24

**on**
7:20 8:7,
8 13:3
14:13,24
15:17,23
18:3,23,
25 20:3,
13 21:13,

14,17,20
22:3
24:22
31:12,25
32:14,18,
22 33:10
34:8,10,
13,25
35:2,19
36:7,8,18
37:3,6,
13,17,19
38:19,20
39:1
42:14,24
43:2,22
44:3,9
45:20
46:10
47:6
48:9,20,
21,23,24
49:2,8,9,
14 50:4,8
51:7,11,
24 52:1,
5,9,14,
15,19
53:1,13,
18,23
54:2
56:21
57:2,10,
19 58:19
59:7,9,
19,24
62:12,19
63:8,10,
13 67:10,
14,17
69:11,14,
25 71:17
73:1
75:24
78:2,3,5
79:10,21
80:14,23
81:1,11
82:2,7,8,
9,17,19

83:24
85:17,20,
23,24
86:20

**on-the-
job**
18:10
19:9

**once**
31:15
48:8,24
49:8,21,
23 52:11
55:23

**one**
8:2,4,15
11:4 12:3
21:9,20
30:22
37:13,20
39:9,11,
23 40:3,
9,15 41:9
45:15,16
47:4
49:13
51:22
52:3 59:4
63:8,11
64:11
69:5 74:8
79:10
83:21

**one-
bedroom**
47:24

**ones**
76:8

**ongoing**
62:22

**only**
7:2 11:9
30:21
39:4 42:9
60:16
64:16,24



Case 2:24-cv-00074-APG-NJK    Document 57-12    Filed 05/16/25    Page 107 of 118

Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

67:2,17
71:21
79:13

**open**
43:4,5
50:19
55:3
65:16
68:23
69:2

**opened**
30:15,20
31:15

**opening**
21:17
31:1

**operational**
48:19

**operators**
37:17
75:8

**opinion**
10:22
27:18
35:19
67:7
73:21
75:5,24
81:1,11,
12 82:8,
9,13

**opportunity**
6:6 46:20
67:2

**option**
15:14,18

**order**
20:8
30:10
33:17
43:7,12

**organization**
17:10

**organizations**
17:2

**other**
7:14 8:17
9:5,9,11
18:20
19:17
20:20
28:3
30:13
35:2
41:16
45:16
59:6
63:19
64:17
71:18
75:3
82:22
85:3,16,
20,24

**ought**
78:9

**our**
15:12
20:13
22:21
23:25
24:4
25:24
33:7
44:17
49:9,19,
22 60:11
77:5
78:16

**out**
13:25
14:3
15:7,8,
11,16,24
18:9
20:5,6,7,

17 33:18
36:7,22
38:2
41:5,8
42:20
43:10,12
44:1
48:10,11
49:1,3,5,
7,13
52:10
60:25
62:13
64:18
72:2
76:12
78:9,11

**outcome**
59:2,5
65:11
78:12,14
82:15

**outside**
50:8
51:21
66:10,25
68:14

**over**
10:24
12:2 14:7
17:15
20:20,23
21:23
44:17,22
45:18
48:23
51:4
64:19
83:9,12

**overwhelm**
79:4

**own**
9:9 75:1

———————
**P**
———————

**page**
65:16
70:18
75:6
78:19
79:13
81:13

**pages**
77:9

**pain**
63:1,3,5,
9

**paint**
56:21

**paired**
47:22

**paperwork**
19:10

**parameter**
28:13

**parameters**
34:4

**part**
18:23
20:19
21:24
37:2,11
46:3 65:7
76:15,16
80:18
82:25

**particular**
37:19
44:23

**partner**
62:10

**parts**
10:11,19
22:11

**pass**
62:13

**Passed**
18:4

**patrol**
13:17,18,
19,22,24
17:17
18:2,23
19:1
20:22,24

**patrons**
25:23

**penalties**
7:5

**people**
17:6 24:4
26:14
33:18
37:16
38:14,18
41:16,17,
20 49:1,3
50:10,11
60:14
67:12
68:5,20
71:21
76:2

**people's**
62:10

**per**
79:4

**perceived**
51:3

**perfect**
33:3 52:5

**performing**
27:22

**perhaps**
26:13

**perjury**
7:5

**person**
24:6,8,13
25:7
27:21
29:10
30:2,22
32:2 35:2
59:7,15
64:11
68:19
71:23
72:2,7

**person's**
25:11

**personal**
35:18
75:1

**pertain**
19:21

**phrase**
39:15

**physical**
21:24
22:4 34:3
84:24

**pick**
54:1

**picked**
53:23

**picture**
56:21

**piece**
41:9

**pieces**
9:24

**ping**
40:19

**pinged**
40:13
41:6

**pinky**
52:8
62:24



Case 2:24-cv-00074-APG-NJK    Document 57-12    Filed 05/16/25    Page 108 of 118

Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | | | Q |
|---|---|---|---|---|---|

place
5:17
31:24
36:23
placed
21:14
plain
83:12
plan
48:3 83:8
platform
56:17
please
5:24 6:13
7:17 11:5
28:8,14
30:4,24
36:4
point
51:6
police
5:19 9:11
16:8
18:14
19:15
24:2
25:8,13
26:8
27:22
35:3,21
50:18
66:9,20,
25 67:8,
25 68:4,
11 74:3
policies
34:9,13,
17
policy
32:22,23
73:1
75:20
76:25
77:2,5,16
79:19

80:22,25
81:10
policy/
training
75:19
76:19
pop
12:1
portion
40:7
84:3,5
portions
84:4
position
17:16
34:10
48:23
49:21,22
80:23
82:13
positions
21:17
49:21
possibili
ty
31:11,13
39:8
possible
36:8
possibly
66:16
POST
13:2
posture
56:8
potential
43:14
potential
ly
71:17
preapprov
al

79:16
prefer
5:21
preparati
on
8:18 9:3,
7 84:11
prepare
7:18
11:7,15,
20
prepared
6:25
present
75:16
78:20
presented
32:7
pretty
31:6
prior
18:25
37:22
53:24
58:8
65:19,24
72:11
79:6
privilege
7:24
probably
8:12 53:9
60:2 71:3
proceedin
g
41:10,13
process
53:5
81:19,22
productio
n
8:24

professio
n
17:3
professio
nal
17:2,23
profile
29:7
program
20:17
promote
14:5
promoted
13:6,9
17:17
promotion
13:4
pronounce
d
52:15
proper
32:9 80:4
81:5
propertie
s
39:6,25
property
27:21
30:2
39:4,21
75:9
property-
only
29:15
protect
64:23
protectiv
e
48:12
provide
7:2,15
19:7,8

24:25
25:2 50:9
67:16
proximity
27:16
31:6
PTSD
61:17,21,
23 62:7
public
28:1,5
67:13
pull
30:24
pulled
21:18
pulling
52:10
purpose
23:24
33:9
34:24
35:1,6
42:15
47:1
65:17
67:15
pushed
57:2
pushing
57:10
put
36:7
38:19
44:7 56:8
63:9
puts
20:13,17
putting
57:20

qualifica
tion
22:1
qualify
21:22
quarterba
cking
72:21
question
11:19
16:7 17:6
22:11
26:23,25
28:22
35:5,15
39:15
61:1,2
65:22
70:25
71:1
72:4,5,
15,16
73:10,15,
20 74:20,
22
questions
7:10
10:13,14,
15 16:2
18:13
19:12
28:9 48:8
52:19
53:8
61:25
86:13,14
quick
52:21
quickly
30:11
quiet
68:16,17,
18



Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

quietly
  49:20

quite
  72:14

quote
  65:16,18

————————

R

R-O-L-L-
I-N
  6:2

radio
  48:14

ram
  50:16

ranked
  21:16

re-read
  27:2

react
  57:15

reacting
  64:13,15

read
  7:19
  9:20,23,
  24 10:6,
  19 27:6
  32:5,6,15
  38:10
  42:6,17
  70:12
  75:3
  78:18
  80:2

reading
  19:25

ready
  39:16
  48:25
  49:9,16

realized
  61:2

really
  19:14

Reask
  65:22

reason
  7:9 60:13

reasonable
  32:2
  69:25
  70:2,6,8
  78:25

reasoning
  33:6

receive
  16:16

received
  69:9

receiving
  61:19

recently
  84:16

recess
  52:25
  83:23

recognized
  81:3

recoiling
  57:23

recommends
  81:14

recon
  36:22
  37:2,6,
  11,15,24
  39:1
  42:14,15,
  17 43:25
  44:17

45:9,11,
  15 48:2
  53:22
  69:17
  78:2,4,5,
  8 82:19

recons
  37:16,17

record
  5:16,25
  14:10,11
  27:3,5,6
  28:24
  52:24
  53:2 57:5
  83:20,22,
  25 84:2
  86:20

recorded
  9:17

red
  48:21

refer
  14:12

reference
  10:14
  44:2
  77:12
  79:20

referenced
  70:22

referring
  62:22
  77:2

reflect
  5:16

reflected
  7:20

reflects
  84:2

refuse
  65:20
  66:1

refused
  65:18

Regarding
  77:6

regular
  15:12

related
  10:15
  14:1 17:2
  19:12,21
  22:22

relayed
  38:17
  40:3

reliable
  7:15

remained
  70:17

remember
  8:25
  14:9,20
  16:12
  23:18
  32:11
  40:10,11
  45:8,10
  49:4
  84:15
  85:3,8,10

reminder
  63:15

repeat
  26:23

report
  32:6
  65:16
  70:14,18
  75:4

reporter
  6:10 27:1
  52:22
  86:22

represent
  34:12

58:13

represented
  69:4

requested
  80:19

requests
  8:23

rereading
  26:24

residence
  24:11
  42:12,21,
  22 43:20
  79:6

residences
  45:4

residual
  62:16,21

respectful
  61:25

response
  70:9,15

responsibility
  11:2 12:4

result
  79:25

reticent
  70:17

revamp
  81:24

review
  6:6 9:2,
  6,14,18
  11:7 53:9

reviewed
  8:16,18
  9:6,10
  10:12

11:1,18,
  24

reviewing
  10:1

rewrite
  35:17

ricochet
  61:9

rifle
  22:2

right
  10:15
  15:20
  16:1
  23:11
  25:12
  27:19,21
  29:17
  44:8
  47:10
  51:2,13
  57:9,18
  58:22
  63:23
  70:7 71:7
  81:2
  82:21
  85:10
  86:4,15

rights
  24:12,14
  27:25
  28:5 86:5

rigidity
  53:20

road
  60:14

role
  45:20

role-
playing
  21:6

Rollin
  6:1



Case 2:24-cv-00074-APG-NJK    Document 57-12    Filed 05/16/25    Page 110 of 118

Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**rolling**
49:10

**room**
47:6,9
50:24
56:19
57:21

**round**
48:16
52:5,9

**rounds**
46:9
51:11,15,
16 60:12,
18,25

**route**
48:24

**rule**
22:15
43:10,12
78:11

**ruled**
44:1 78:9

**rules**
41:7

──────────

S

──────────

**safe**
31:2,3
43:13,14
55:1
67:18
71:20,22
72:6,18
73:12,17,
19,25
74:10,13,
15,24
75:2
80:12,14

**safeguard**
47:3

**safely**
30:10,11,

14,19
31:21
33:6,10
50:10,14

**safest**
72:17,22
73:9,13,
22

**safety**
31:16
55:4 75:1

**said**
11:10
13:21
47:11
61:1
69:20
70:14
73:22
82:12

**Sam's**
37:22
38:3 44:9

**same**
7:3,5
16:21
18:2
22:12,25
34:2,3
56:12
62:11,12
72:8,23,
24

**saw**
48:3
55:13
62:10,12,
13

**say**
9:16
14:11
15:5 20:7
25:22
29:7 30:5
31:25
33:4

40:11
49:8
53:25
54:7 60:2
62:20
71:14
72:20
73:6,20
79:9 82:3

**saying**
13:20
30:24,25
39:20
58:21
77:14

**says**
60:15

**scale**
63:8,9

**scenarios**
22:5

**scene**
52:15

**schedule**
14:9,17,
23

**school**
16:9,22
21:13
22:5

**schools**
21:7,8
22:7

**screen**
43:2,3

**screens**
43:2,4

**search**
15:22
20:22
22:23
24:1,2
25:9 26:8
29:15,25

34:2,3
36:21
39:7,19,
21 40:25
41:17,19,
22,24
42:1,4,6,
8,17,18
43:7
48:4,9
49:11,12
50:4,18
51:24
53:6 55:1
58:20,24
66:11
69:16
71:9 73:2
75:18
76:9,18
77:15
78:22,24
79:14
81:6,8

**seated**
48:17

**second**
8:4 27:4
45:16
50:1
55:21

**seconds**
23:17,19,
21 58:9,
14,15
66:13,21,
23 70:14
78:21,23

**section**
75:7

**see**
8:13 28:3
38:6
43:18
49:6
51:4,9
60:1

61:22
62:17,21
64:4 77:1

**seeing**
56:1 78:7

**seeking**
68:12
70:10,20

**seem**
18:13
31:6

**seems**
16:9

**sees**
54:24

**seizure**
39:20

**self-
assessing**
52:2

**self-
explanato
ry**
28:25

**sense**
48:16
67:18

**sensitive**
62:3

**sent**
49:3,5
52:16

**sergeant**
13:10,18
17:17
52:2
81:21
85:4

**serve**
75:17

**served**
41:17,19

**service**
81:9

**serving**
34:1
49:11,12
76:18
77:14,15
81:6

**session**
20:11

**sessions**
20:12,13

**setting**
8:3,10

**several**
44:24

**shield**
85:22

**shift**
14:19
15:21

**shooting**
6:18
10:16
14:13
17:12
22:1 51:9
52:12
53:7 57:6
60:12,21
81:20

**shortly**
40:14

**shot**
25:17
46:21,23
51:18,21
56:16
57:1,12
60:16,17
73:19,22,
24 74:2,
5,10,12,
18,25



| | | | | | |
|---|---|---|---|---|---|
| **shoulder** | 65:10 | 41:13 | **sought** | **start** | 61:19,22 |
| 61:16 | 67:1,4 | 42:2 | 70:1 | 47:19 | 62:7 63:2 |
| 63:1,5 | 70:19 | 59:11 | **sound** | 49:10,25 | 64:5 65:1 |
| 81:22 | 79:18 | 64:15 | 56:1,5 | 51:10 | 78:17 |
| **show** | 83:11,14 | 67:19,23 | **sounds** | 52:1 | 79:11 |
| 15:16 | **situation** | 68:10 | 50:20 | 76:17 | 83:16 |
| 47:21 | 40:25 | 72:12 | **South** | **started** | **stop** |
| 49:18 | **situations** | **somebody's** | 75:18 | 50:15 | 28:6 |
| **showed** | 40:24 | 24:19,20 | **spacing** | 52:2 | 51:16 |
| 40:19 | **six** | 65:5 | 85:13 | **starting** | **straight** |
| **shut** | 58:14,15 | **something** | **specific** | 50:24 | 49:19 |
| 52:12 | 66:23 | 15:22 | 37:16 | 51:5,13 | **street** |
| **side** | 78:20,23 | 17:13 | 53:8 | 52:6 | 33:12 |
| 35:2 | 85:7,14 | 29:7,8 | **specifics** | 81:24 | **Strike** |
| 71:18 | **sleeping** | 51:2,25 | 25:16 | **state** | 24:7 37:7 |
| 85:17,20, | 59:11 | 53:22 | 29:23 | 5:24 | **structure** |
| 24,25 | 68:19,20 | 54:23 | **speed** | **statement** | 43:22 |
| 86:1 | **slightly** | 57:14 | 30:9 79:3 | 8:14 9:9, | 47:7 |
| **sides** | 61:3 | 58:1 | **spell** | 13,16,17 | 81:14 |
| 33:10 | **slowly** | 62:17,18 | 5:24 | 32:5 | **struggling** |
| **signed** | 51:10 | 65:4 | **spoke** | 75:23 | 62:7 |
| 65:6 | **SMES** | **sometimes** | 7:19,23 | 76:20 | **stuck** |
| **similar** | 80:3 | 17:5,9,11 | **squad** | 79:8 | 79:5 |
| 33:22 | **smooth** | 33:23 | 62:12 | 82:11 | **study** |
| **simple** | 57:21 | 40:23 | **stack** | 83:10,13 | 20:10,12, |
| 43:3 | **snippet** | 41:2,4 | 44:15 | **statements** | 13 |
| **since** | 70:13 | 56:20 | 58:6 78:7 | 9:10 | **stuff** |
| 34:17 | **some** | 63:12 | 85:7,14 | **staying** | 10:25 |
| 52:7 | 10:25 | 68:4 | **somewhat** | 75:14 | 17:9 19:5 |
| **sit** | 14:7 16:2 | **somewhat** | 28:24 | **stays** | 23:12 |
| 12:10,12 | 17:6 | 28:24 | **standard** | 52:8 | 44:7 |
| 13:13 | 18:12 | **somewhere** | 33:24 | **steps** | **stun** |
| 20:10 | 19:20 | 40:20 | 69:25 | 51:14 | 50:5 |
| 25:10 | 29:22 | 41:6 | **standardized** | **stick** | 67:13,15, |
| 26:12 | 32:15 | **soon** | 75:20 | 50:5 | 17 80:5, |
| 29:23 | 52:18 | 61:1 | 76:24 | 67:13,15 | 7,13 |
| 32:4,21 | 53:8,9,12 | **sorry** | 80:21,25 | 80:5,7,13 | **stunned** |
| 33:21,25 | 63:19 | 20:25 | 81:10 | **still** | 67:20 |
| 34:13 | 75:3 | 24:7 27:3 | **standards** | 13:14 | **subject** |
| 35:12 | 82:22 | 30:21 | 81:15,18 | 41:10,13 | 51:6,8,11 |
| 43:23 | 84:4 | 37:7 | **standing** | 42:11 | 75:10 |
| 53:16 | **somebody** | 43:13 | 28:10 | 50:13,25 | **submit** |
| 58:7 | 22:22 | 46:3,15 | | 51:8,11, | |
| 61:18 | | 71:13 | | 15 54:10 | |
| 63:18 | | 76:5 | | | |



Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

78:22,24

**such**
27:24

**sufficient**
66:4,16

**Sunday**
14:18
36:7 38:2

**supervisor's**
12:25
13:1

**support**
17:8

**supposed**
41:18,20
69:23
83:3

**suppressor**
61:10

**Supreme**
70:3

**sure**
6:24
17:25
27:1
28:16
43:12
62:20
65:23

**surgery**
81:23

**surprise**
30:9
58:16
79:3

**surprising**
10:3

**surround**
33:7,8,10

34:5,14
43:17
68:2

**suspect**
45:4
57:11
59:17,20
79:4

**suspected**
70:16

**suspects**
38:19
39:9,10
40:1,3
41:12
59:14,25
64:12

**sustained**
60:21

**SWAT**
13:14,25
14:4
18:6,21,
25 21:3,
6,7,8,12,
22 22:5,
7,15
34:1,16
37:16
54:15
56:10
58:19
72:10
74:4
75:7,8
77:3,24
81:9,14

**SWAT's**
75:17

**swell**
52:6

**swing**
14:19

---
**T**
---

**tac**
51:24

**tactic**
22:20
30:6,8
71:20
72:17,23,
24 73:7,
13,22
76:22
79:24

**tactical**
54:14,19,
22,23
55:7,8
80:20

**tactics**
19:11
33:7 43:6
45:5
50:13
75:20
76:25
77:2,5,16
78:16
80:19,20,
21,25
81:5,10
82:23

**take**
11:5
30:22
52:21
54:11
55:21

**taken**
52:25
65:2
83:23
86:19

**taking**
55:24
65:5

**talk**
67:2
77:18
78:4

**talked**
10:20
19:16
25:2 43:9
44:10
55:9
60:19
64:8
69:18,19,
21 79:17

**talking**
14:13

**TASER**
45:25

**task**
48:7

**tasked**
34:1
36:20
37:10,18,
20 42:16
48:10

**tasks**
44:17

**team**
36:13
37:3,7,11
39:2
42:14,15
43:12,13,
25 45:7,
10,20
49:5
53:23
54:15
64:18,24
69:15
78:8 81:5
82:25
85:24

**tell**
7:17

11:19,24
17:6 19:2
22:10,12
23:14,23
26:20
28:8
29:17
30:4,7
37:5
44:24
53:16
55:15
57:18
60:22
63:23
64:7
69:3,7
70:3,23
82:1,21
85:12

**telling**
57:19

**temporarily**
67:21

**ten**
23:17
63:8

**ten-minute**
52:22

**tend**
51:19

**term**
57:24

**terms**
25:17
37:8
55:13
64:9
69:20

**test**
21:24
22:4

**tested**
18:3

**testified**
26:1
63:14,19
83:11

**testify**
26:2 67:6

**testifying**
47:18

**testimony**
7:11,15
26:6 58:8
63:22
69:9

**testing**
21:7
81:21

**text**
36:12,14
38:1

**than**
9:9 22:17
26:14
28:14
40:20
56:18
57:15
59:6
63:12
79:10

**thank**
13:8
29:20
44:21
86:15

**that's**
6:2 7:23
15:9
19:14
20:23
22:25
29:19
34:15,18



Brice Clements                 Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

36:12
40:9
41:3,9
42:7 45:6
47:5
49:14
51:4
56:23
59:8,13,
14 62:15
65:7
66:24
68:1
70:17
72:21
73:3,20,
22 74:3
76:1
78:25
83:15
85:11

**them**
10:8
27:16
40:15
59:12
67:18
68:7 75:5
80:15

**then**
15:23
18:20
21:16,18
22:3,4,5,
12 29:20
33:20
40:10
41:4,23
43:4
44:16
47:13,16
48:1,22
49:22
52:7
60:17
77:18
79:13
80:2
81:22,25

84:7
85:2,16,
23

**therapist**
61:22

**there's**
15:18
23:7,11
31:13
32:21
33:13
34:19
35:21
37:15
39:8
41:12,20
43:2,3,4,
19 46:9
48:7 49:1
50:22
53:12
55:20
60:14
68:16
69:21,25
70:2,8
71:17
74:4
75:23
84:7

**these**
23:10
61:25
68:1,3,5
69:22

**thing**
9:25 11:9

**things**
8:15
19:22
20:23
35:23
40:9
43:8,11
81:25

**think**
8:20 11:5

23:9,16
25:18
26:13
30:12,18
31:11
33:8
35:9,21,
25 38:17
39:5 41:3
54:16,19
55:2,19
56:25
57:1,11
59:5,14
64:11
65:3
66:3,7,8,
18,24
68:9
69:1,6
70:19
73:24
74:12
76:10
77:24
78:8,12,
14,23
80:7 82:6
86:4,10

**thinks**
83:1

**third**
50:2

**Thirteen**
60:6

**this**
5:16 6:10
10:22
11:2
12:18
14:1
15:2,6,
11,17,22,
23 17:15,
24 20:9
21:4
22:7,19
25:16

29:11
30:5,12,
13 31:20
32:9
33:21
34:1,14
36:6,23,
25 37:3,
9,13,19
39:4,17
42:3
44:23
45:11
46:1,12
47:8,16
49:4
50:2,5,12
51:25
53:6,13,
24 58:20,
24 59:3,
23 60:16,
21 62:6
63:15,20,
24 64:3
65:6,11,
15 67:1
68:13
71:18,22
72:5,9,
16,18
73:2,12,
17 75:6
77:14,15,
20 78:19
79:25
80:17
81:4
86:18

**those**
8:25 9:2
15:19
24:15
31:5,6
35:23
49:2 50:8
60:2,17
61:19
64:4

66:13
76:2
78:1,9,11
82:17,23

**though**
7:5 31:14
63:2
68:23
70:25
72:4

**thought**
62:14

**thread**
36:15,16,
18

**threat**
75:9

**three**
21:5 54:9
58:19
61:19
63:11

**through**
7:21
12:13,17
14:18
17:22
19:4,18,
20 21:7,
8,9 22:7
23:21
24:16,18
27:13
35:20
36:2,12,
13,18
42:15
44:13,16
47:15
48:1,2,5,
6 50:6
53:5
54:5,17
55:10,13
57:21
62:1
64:9,13

65:3,25
67:8
69:17
79:11
80:5,8
81:19
82:22
83:5

**Thursday**
12:14,17

**time**
5:16
10:25
11:4
12:3,18
14:8,16,
21 16:22
22:7,18
23:4,7,8,
15,16
24:25
25:2,3
28:11
30:22
31:1,3
32:13
33:4,7
35:11
39:16,24
46:1
50:9,17
51:17,20
52:1
54:16
56:10
66:2,4,
16,19,24
67:16
69:7,10,
25 70:2,
4,9 71:17
72:10,17,
22 73:7,
14 76:22
78:16,21,
24,25
80:11
86:21



| | | | | |
|---|---|---|---|---|
| **time-wise**<br>31:7<br><br>**times**<br>8:1,2<br>14:19<br>59:1<br>60:5,6,16<br>68:14<br>79:6<br><br>**tiny**<br>85:9<br><br>**tip**<br>46:8<br><br>**TL**<br>45:14<br>69:15<br>82:18<br><br>**to**<br>6:6,9,13,<br>18,24<br>7:1,2,10,<br>14,18,23,<br>24 8:4,6<br>10:16<br>11:3,4,5,<br>7,15,20<br>12:2,4,<br>13,21<br>13:2,3,9<br>14:1,5,6,<br>7,11,12,<br>20 15:16<br>16:2,7,<br>10,13,14<br>17:2,7,24<br>18:5,6,<br>12,25<br>19:12,16,<br>21,22<br>20:2,5,6,<br>8 21:14,<br>25 22:3,<br>11,13,14,<br>16,22,23,<br>24,25<br>23:3,7,<br>10,25 | 24:3,4,6,<br>7,8,14,<br>20,25<br>25:1,6,7,<br>12,13,19<br>26:1,2,21<br>27:2,16,<br>21,24<br>28:6,17,<br>22 29:8,<br>11,22<br>30:10,23,<br>24 31:7,<br>21,23,25<br>33:2,9,<br>10,16,17,<br>23 34:4,<br>5,12,14,<br>15,25<br>35:1,4,5,<br>17 36:1,<br>2,25<br>37:22<br>38:2,13<br>39:7,15,<br>17 41:13,<br>18,20,22<br>42:1<br>43:4,5,6,<br>7,10,11,<br>12,16,21<br>44:2,12,<br>19,21,24<br>45:5,19<br>46:11<br>47:3,11,<br>12,14,15,<br>17 48:3,<br>22,25<br>49:1,5,6,<br>9,10,16,<br>19,20,25<br>50:3,7,9,<br>14,15,20,<br>24 51:3,<br>5,10,13,<br>14,15,19,<br>23 52:6,<br>16,18<br>53:7,20, | 21,24<br>54:9,16<br>55:1,6,21<br>56:2,21,<br>22,23<br>57:14,15<br>58:2,10,<br>13,16,22<br>59:12,16<br>60:1,12,<br>17 61:7,<br>11,13,24,<br>25 62:1,<br>2,3,4,6,<br>20,22<br>63:8,11,<br>14 64:2,<br>3,5,13,<br>15,18,23<br>65:6,8,<br>10,14,19,<br>20,24,25<br>66:4,14,<br>15,16,17,<br>19,20,24<br>67:2,5,6,<br>17,19,23<br>68:7,10<br>69:4,8,<br>10,13,23<br>70:9,12,<br>14 71:16,<br>20 73:9,<br>10,16,22<br>74:9<br>75:3,4,8,<br>14,17,24<br>76:11,22<br>77:1,2,<br>12,21,25<br>78:4,9,<br>18,21,22,<br>24 79:1,<br>3,6,11,<br>14,20,21<br>80:2,12,<br>13 81:14,<br>17,18,24<br>82:2<br>83:3,10, | 12,15<br>84:6<br>85:23<br>86:11<br><br>**today**<br>6:5,18<br>7:11,15<br>12:4,10,<br>12,21<br>13:14<br>22:17<br>25:10<br>26:12<br>28:14<br>29:24<br>32:4,21<br>33:21,25<br>34:2,13<br>35:12<br>43:23<br>53:17<br>58:7<br>61:18<br>63:18<br>65:11<br>67:1,4<br>70:19<br>72:23,25<br>79:18<br>83:11,14<br><br>**today's**<br>6:13 7:18<br>8:16,18<br>9:3,7<br>11:8,16,<br>20 84:11<br><br>**together**<br>56:10<br><br>**toilet**<br>71:3,4,6<br><br>**told**<br>21:1<br>46:24<br>70:7<br><br>**too**<br>38:18<br>56:22 | **took**<br>7:3 50:16<br>53:4<br>54:9,16<br>62:15<br>79:10<br><br>**tool**<br>33:17<br>46:7<br><br>**tools**<br>43:17,22<br>44:19<br>45:24<br>46:19<br>48:15,18,<br>19 80:20<br><br>**top**<br>29:17<br><br>**tore**<br>52:9<br><br>**tossed**<br>50:8<br><br>**total**<br>59:8<br><br>**tough**<br>62:16<br><br>**tournique<br>t**<br>51:23<br><br>**towards**<br>16:9 47:9<br><br>**Town**<br>37:22<br>38:3 44:9<br><br>**traffic**<br>68:17<br><br>**train**<br>18:9<br>19:23<br><br>**trained**<br>20:3<br>69:13 | **training**<br>18:4,5,7,<br>11,19,20<br>19:6,7,8,<br>9,16,19<br>20:18,19<br>21:6<br>35:19<br>36:24<br>54:14,15<br>69:9<br>75:20<br>76:25<br>77:1,5,16<br>80:21,25<br>81:10,14,<br>17<br><br>**transcrip<br>t**<br>6:14<br>9:18,19,<br>21 10:2,<br>7,12,20<br>86:23<br><br>**transfer**<br>13:25<br>14:3<br><br>**traumatic**<br>62:9,18<br><br>**treatment**<br>61:19<br><br>**trial**<br>67:3,5,6<br><br>**triggered**<br>24:13<br><br>**truthful**<br>7:11<br><br>**try**<br>16:14<br>39:15<br><br>**trying**<br>20:5,6<br>30:21,22<br>39:14<br>62:2 |

turned
49:9

two
8:2 22:11
31:5
35:23
39:6,25
41:12
45:21
46:25
47:1,3
78:7
84:19

two-bedroom
47:24

two-man
49:5

two-month
81:22

two-week
13:2

type
24:14
29:5,24
34:2,3
35:22
58:20,24
59:21,24
70:9

types
82:23

---

U

---

Uh-huh
15:10
26:11
58:23
63:7
71:12

UMLV
20:14,15,
19

unaffected
63:20

under
7:13
78:20

undergo
81:16

understand
6:17 7:7,
8,10 12:6
15:20
17:16
18:16,17
23:9 24:7
25:8,11
32:3,8
33:22
66:24
71:8 73:8
76:10
78:5
84:23

understanding
19:10,11
22:14
24:18
25:1,5
26:5
28:12
29:24
34:8 35:7
38:12
39:3,18,
22 42:4
43:24
53:17
62:2
63:22
69:24
71:8
81:17
82:20

understood
22:25

unfair
33:24

unit
13:19
18:24
23:5
30:14
31:22
34:4 35:4
41:8
58:4,10
64:11
65:19
66:13
68:12
84:8,20
85:21
86:2

unit's
25:19

University
16:18
20:16

unknown
59:22
75:13
77:21
81:4

unknowns
43:25
75:11
77:19

unless
26:20

unsafe
31:17

until
18:2 31:9
68:18,24

up
12:1 13:4

15:16
16:8
17:24
18:2
40:5,19
43:4,5
47:17,21,
22 49:16,
18,20
51:14
52:6
53:23
54:1
56:12
58:1
62:10
65:6
66:19
68:18,21
76:17
84:6

updated
81:16

upon
31:9,14

upstairs
68:20

us
26:7
50:9,23
51:24
67:18
72:2,12

use
19:12,17
22:21
30:9
32:18
33:17
43:6,10,
16 45:5
50:3
56:22
68:5
72:22,24
73:1
76:22

80:4,5,7
81:9
82:24

used
50:13
68:3,8
71:20
73:13
79:21
80:13
82:6

using
19:21
68:14
82:14

usually
49:3,24
80:15

utilize
43:22
46:7,9
73:23

utilized
73:13
79:14,24
81:5

utilizing
79:3

---

V

---

varies
23:8

various
19:9
20:18
43:2,15,
22

Vegas
5:19
20:16

verbiage
75:8

versus
5:18

very
38:3
43:3,5
44:9
68:16,17,
18 86:16

vest
48:12

veterans
17:11

via
20:13

video
53:10
56:21
84:4,6,
10,16,18

video-recorded
86:19

VIDEOGRAPHER
52:23
53:1
83:21,24
86:18

videos
20:18

videotaped
6:11,12

violate
27:24

violated
86:5

violating
28:4

voice
83:3,7



Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**vulnerable**
75:16
77:23

---

**W**

**wait**
23:4
69:10

**wake**
66:19

**walk**
17:22
19:4,18
24:17
42:14
44:13
47:15
49:20
66:19

**walked**
53:5
55:12

**wall**
86:1

**want**
11:5
28:23
46:11
47:14,15,
17 53:7
56:22
61:24,25
62:1,20
65:10
68:7
75:24
83:10,12

**wants**
67:19

**warrant**
15:2,22
22:23
24:1,2

25:9 26:8
28:18,19,
20 29:6,
12,14,15,
25 30:1
32:19
34:2,3
36:6,8,21
37:3,9
38:6,10,
22,25
39:2,5,
17,19,20,
21 40:21,
25 41:24,
25 42:1,
2,4,5,8,
18,19
43:7
48:4,9
49:12
50:4,18
51:24
53:6,24
55:1
58:20,25
59:19,24
66:11
69:16
71:9
72:11
73:2
75:18
76:9,19
77:15
79:14,22
81:6,8

**warrants**
20:22
29:5
37:8,10
39:7
41:17,19,
22 42:7
54:8 60:2
68:1

**Washingto**
**n**
16:18

**watch**
84:5

**watched**
11:11
84:3,10,
16

**way**
14:1
21:21
36:3
50:25
58:22

**we**
6:12
11:11
12:10,12
13:13
16:12
17:15
20:13
22:21
23:25
24:1
25:2,10,
15 26:12
29:23
31:9
32:1,4,21
33:6,10,
17,21,25
34:13
35:12,13
36:13,19,
21,25
37:16,17
38:22
39:6,7
42:20,23
43:6,16,
17,18,23
44:10,16,
19 46:7,
9,11
47:11,15
49:5,8,9,
10,13,18,
19,21,22,
23 50:5,

7,11,12,
13,18
51:20,23
52:21,22,
23 53:1,
4,16 56:4
57:13
58:7
60:11,13
61:13,18
62:12
63:18
64:8
65:10
67:1,4,5
68:13,18,
24,25
69:13,18,
19 70:19,
23 71:16,
20 72:11
74:2
78:16
79:11,17,
18 83:11,
14,15,19,
22,24
84:2,5

**we'd**
36:12

**we'll**
32:16
53:9
76:17

**we're**
7:5 8:20
24:10
36:24
38:23,24
39:2
42:11
43:21
44:18,20
45:5
47:10
49:9,11,
25 50:3,
17 64:12

86:20

**we've**
10:24
52:19,20
60:17
65:9

**weapon**
46:13
60:5
64:16
80:16

**weapons**
46:19
60:11

**wear**
48:12

**Wednesday**
8:8 14:18

**week**
8:8

**weeks**
21:12

**weird**
73:20

**well**
11:10,19
21:2 41:7
42:1
53:10
56:23
59:16
61:16
72:1,20
74:12
76:16
84:11

**went**
17:15
18:6,21
21:9
45:18
48:23
56:4,7
64:9
78:10

79:23
83:5,9

**Werner**
45:13

**west-**
**facing**
80:6,8

**what**
7:23 8:6,
22 10:11,
21 11:15
12:9,10,
24 13:9
14:9,16
15:9
16:23
17:4
18:7,15
19:5,6,19
20:13,20,
24 21:11,
15 22:13,
14,15,16,
18,25
23:9,14,
23 24:18
25:3,5
26:5
27:18
28:15,17
29:1,5,24
30:5,7,24
32:25
33:4
34:9,10,
23 35:6,
7,12,13
36:3,17,
19 37:5
38:13,15,
16,24,25
40:19
42:7,15
43:6
44:6,13,
15,17,18,
19,20,22,
25 45:19,



Case 2:24-cv-00074-APG-NJK   Document 57-12   Filed 05/16/25   Page 117 of 118

Brice Clements                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

20,23
46:3,10
47:16
48:2,3,7
49:15
50:20
51:3
55:13,21
56:6,13,
24 57:13,
19 60:2,
9,23 61:7
62:1,6
63:14
64:6,23
65:6,7,19
66:12,14,
23 68:19
69:4,7,22
70:4,7,9,
23 71:10
73:6
74:21
76:5,10,
23 77:1,
11,12
82:1,21,
24

**what's**
13:1 16:3
17:9
20:15
25:1
26:22
29:1 33:2
41:23
46:5 47:1
53:17
54:22
67:10,15

**whatever**
48:9
69:17

**when**
9:16
11:15
13:11
14:12

15:17
17:5
26:2,3,17
28:9
30:15
32:7 33:8
36:5
40:23
41:5,21
49:13
51:16
55:15
64:9 75:9
79:14
80:5 81:5
83:5

**where**
10:20
16:16
18:3,20
21:17
22:21
23:11
38:23
41:19
42:24
44:15,18
47:21
48:23
49:14,19
54:8
62:19
63:8
79:10
84:6
85:17
86:1

**whereupon**
27:6
52:25
83:23

**wherever**
49:11

**whether**
35:16
39:4,18
42:23
44:4,5

49:25
50:11
64:6 66:4
80:23

**which**
15:17
16:21
20:2
21:25
23:10
24:1
33:17
38:23
40:24
43:5
45:6,25
50:6,8
57:14
62:17
76:15
80:14
81:21

**while**
51:11
52:20
65:20
75:7
81:20,25

**who**
9:13
13:16
29:10
36:20,22
37:18
44:18,19,
20 45:10,
18 47:22
49:4
50:12
52:3
59:11
62:11
67:24
72:2
75:14
77:21
78:13
80:14

**whole**
9:25 11:3
12:5 33:9

**wise**
21:18

**whomever**
37:23

**why**
8:20
11:14,24
14:3
15:11
24:1,3,6,
8,21
25:1,5,22
30:18
31:4,7
38:23
52:21
59:5
66:7,8
80:10

**Williams**
6:19
25:18
26:15
31:23,25
52:14
59:9,17
65:20,25
66:3,12,
18 67:7
72:7
74:14,23

**Williams'**
64:19
86:5

**window**
23:21
50:6
64:18
69:2
80:6,8
85:18,23
86:1

**windows**
27:10,13
42:24,25
47:23

68:22,24
**wise**
21:18
**wished**
23:7,10,
14 69:20
**wished-
for**
25:3
**with**
7:19,23,
25 8:14
10:5,7
13:14,16
16:5,10,
13 17:8,
23 20:9,
17 21:6
27:23
33:11
34:1
36:20
37:10,18,
20,23
40:1,7
42:16
47:19,22
48:10
50:9,16
51:24
52:2,17
53:14,17
56:14,21
57:6
59:12,13
62:7,9,
10,11
67:2,13
75:12
76:4,5,
13,20
77:7 79:7
81:15,18
83:8
85:10
**within**
33:1

66:13
75:19
76:24
77:16
80:21,24
81:9

**without**
70:15

**WITNESS**
26:19,22
72:1,9
74:2,18
86:9,17

**wobbler**
14:23

**woken**
68:21

**word**
68:8

**words**
56:21

**work**
12:10,11,
12 14:9,
17 15:3,
13 48:20,
21 49:25
50:15
57:14

**workday**
15:23

**workdays**
15:17,19

**worked**
14:18
36:8 56:9
62:11

**workers'**
61:13,15

**working**
12:18
48:13,14
52:1

Brice Clements                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**workout**
   63:11

**worried**
   51:20

**wrap**
   44:3
   53:13,18,
   19,24
   54:5,9

**wrong**
   30:5
   57:18
   63:23
   82:21

_____

         **Y**
_____

**yeah**
   13:24
   17:5
   18:17
   24:16
   34:22
   41:1,12
   43:15
   47:19
   55:23
   57:22
   59:14
   62:24
   64:22
   65:5 74:4
   76:16
   82:5

**year**
   18:2

**years**
   18:3,6
   21:5
   44:24
   58:19
   62:7
   72:11

**yelled**
   26:10

**yelling**
   26:7
   68:16

**yes**
   6:1,8,20
   8:19 9:1,
   4,12 10:9
   11:23
   12:8,16
   14:15
   15:25
   21:24
   22:9
   23:13
   24:19
   25:14
   27:11,17
   29:13
   30:1,9,
   16,17
   31:2,13
   32:20
   36:7
   37:12
   38:5
   39:13
   40:16,17
   45:2
   46:17
   53:15,25
   54:18
   58:12,17
   60:3
   61:22
   64:1
   66:6,22
   67:9 68:8
   73:11,17,
   19 77:8
   78:25
   80:1,9
   81:24
   82:4 83:4
   84:13,17
   85:19
   86:24

**young**
   25:17

**yourself**
   30:13

**yourselve
s**
   27:24