# Exhibit 12

# Exhibit 12

Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 2 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 1

```
 1                 UNITED STATES DISTRICT COURT

 2                     DISTRICT OF NEVADA

 3
     LATIA ALEXANDER, individually  )
 4   as heir of ISAIAH T. WILLIAMS   )
     and in her capacity as Special  )
 5   Administrator of the Estate     )
     of ISAIAH T. WILLIAMS,          )
 6                                    )
                   Plaintiff,        ) CASE NO.
 7                                    )
             vs.                     ) 2:24-cv-00074-APG-NJK
 8                                    )
     LAS VEGAS METROPOLITAN POLICE   )
 9   DEPARTMENT, a political         )
     subdivision of the State of     )
10   Nevada; KERRY KUBLA, in his     )
     individual capacity; BRICE      )
11   CLEMENTS, in his individual     )
     capacity; ALEX GONZALES, in     )
12   his individual capacity;        )
     . . . . . .                     )
13   . . . . . .                     )
                                      )
14

15

              VIDEO RECORDED DEPOSITION OF GARTH FINDLEY
16
              Taken on Wednesday, February 5, 2025
17
                        At 9:05 a.m.
18
                   At the Offices of Lexitas
19
                   400 South Seventh Street
20
                       Las Vegas, Nevada
21

22

23

24   REPORTED BY:   DANA TAVAGLIONE, RPR, CCR 841

25                   Job No. 59730, Firm No. 116F
```

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
                                                           Page  2
 1      .  .  .  .  .  .
        .  .  .  .  .  .
 2
     RUSSELL BACKMAN, in his         )
 3   individual capacity; JAMES      )
     ROTHENBURG, in his individual   )
 4   capacity; JAMES BERTUCCINI,     )
     in his individual capacity;     )   CASE NO.
 5   MELANIE O'DANIEL, in her        )
     individual capacity; DOES       )   2:24-cv-00074-APG-NJK
 6   I-XX, inclusive,                )
                                     )
 7            Defendants.            )
                                     )
 8

 9
            VIDEO RECORDED DEPOSITION OF GARTH FINDLEY
10
                Taken on Wednesday, February 5, 2025
11
                        At 9:05 a.m.
12
                   At the Offices of Lexitas
13
                  400 South Seventh Street
14
                      Las Vegas, Nevada
15

16

17

18

19

20

21

22

23

24   REPORTED BY:    DANA TAVAGLIONE, RPR, CCR 841

25                   Job No. 59730, Firm No. 116F
```

Page 3

```
 1    APPEARANCES:

 2
      For the Plaintiff:
 3
                  BREEDEN & ASSOCIATES, PLLC
 4                BY:  ADAM J. BREEDEN, ESQ.
                  7432 West Sahara Avenue
 5                Suite 101
                  Las Vegas, Nevada 89117
 6                702.819.7770
                  adam@breedenandassociates.com
 7

 8    For the Defendants:

 9                MARQUIS AURBACH, CHTD
                  BY:  CRAIG ANDERSON, ESQ.
10                10001 Park Run Drive
                  Las Vegas, Nevada 89145
11                702.382.0711
                  canderson@maclaw.com
12

13    Also Present:

14                Samuel Camacho, Videographer

15

16

17

18

19

20

21

22

23

24

25
```

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 4

1                          I N D E X

2
     WITNESS:  GARTH FINDLEY
3
     EXAMINATION                                          PAGE
4
     Examination by Mr. Breeden                              6
5

6

7
                        E X H I B I T S
8

9    FINDLEY/PLAINTIFF'S                                  PAGE

10   1       LVMPD Special Weapons and Tactics             95
             printout, Bates No. LVMPD-001490
11
     2       Commission on Peace Officer                  109
12           Standards and Training
             Performance Objective Reference
13           Material, Bates WILLIAMS-000809

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1        LAS VEGAS, NEVADA; WEDNESDAY, FEBRUARY 5, 2025;

2                          9:05 A.M.

3                           -oOo-

4   Thereupon --

5           THE VIDEOGRAPHER:  Today is January 5th,

6   2025.  The time is approximately 9:05 a.m.  The

7   court reporter is Dana Jo Tavaglione; and I'm your

8   videographer, Samuel Camacho.  We are here on behalf

9   of Lexitas.  The witness today is Officer Garth

10  Findley, and we are here in the case of Latia

11  Alexander, et al., vs. Las Vegas Metro Police

12  Department, et al.

13          Will Counsel please state your appearances,

14  and the court reporter will administer the oath.

15          MR. BREEDEN:  This is Adam Breeden for the

16  plaintiff.

17          MR. ANDERSON:  Craig Anderson on behalf of

18  the defendants.

19

20  Thereupon --

21                   GARTH FINDLEY,

22  having been first duly sworn to testify to the

23  truth, was examined and testified as follows:

24  / / /

25  / / /

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 6

```
 1                    EXAMINATION
 2   BY MR. BREEDEN:
 3       Q.   Okay.  Good morning, sir.  Can you please
 4   state your full name, for the record, and go ahead
 5   and spell your first and last name as well.
 6       A.   It's Garth Findley.  And it's G-A-R-T-H,
 7   Findley, F-I-N-D-L-E-Y.
 8       Q.   Okay.  Is it Officer Findley?  Sergeant
 9   Findley?
10       A.   Sergeant.
11       Q.   Okay.  Sergeant Findley, on January 10th of
12   2022, you were a officer assigned to the Las Vegas
13   Metropolitan Police Department SWAT team; correct?
14       A.   Correct.
15       Q.   And on that date, you were the team leader
16   at a SWAT operation that was performed at
17   3050 South Nellis Boulevard, Apartment 1125; correct?
18       A.   Correct.
19       Q.   All right.  You agree, in your performance
20   as a law enforcement officer, you have a duty to
21   conduct yourself such that you do not violate the
22   civil rights of members of the public?
23       A.   Yes.
24       Q.   And you also agree that if you see other
25   officers violating civil rights of the public, you
```

Page 7

```
 1    have a duty to intervene?

 2         A.   Yes.

 3         Q.   Okay.  Have you ever given deposition

 4    testimony before?

 5         A.   Yes.

 6         Q.   How many times?

 7         A.   One time.

 8         Q.   And I may as well just ask you, since

 9    there's only one other time.  I'll ask you right now,

10    why -- how long ago was that?

11         A.   That was about three years ago.

12              Right?

13              MR. ANDERSON:  Yeah.

14    BY MR. BREEDEN:

15         Q.   And what kind of case was that?

16         A.   That was a search warrant that we conducted

17    for narcotics.

18         Q.   Was that the Jasmine King matter?

19         A.   Yes.

20         Q.   Okay.  All right.  Even though you've been

21    deposed before, I want to go some of the ground rules

22    to today's deposition so you know what to expect.

23    The oath that you were just administered by the court

24    reporter is the same oath that you would take in a

25    court of law, as if we were in front of a judge and a
```

LEXITAS™

Page 8

1   jury today.  It obligates you to tell the truth under

2   penalty of perjury.

3           Do you understand that?

4       A.   Yes.

5       Q.   Your deposition today is also being

6   videotaped, and your testimony may be played or read

7   for the jury at trial.

8           Do you understand that?

9       A.   Yes.

10      Q.   The court reporter is taking down everything

11  that is said during today's deposition, all of my

12  questions and your answers and any other objections

13  or comments, and after today's deposition, she'll put

14  everything in a booklet or a transcript form.  After

15  the deposition, you can review that transcript, and

16  you can make changes to your testimony, if you wish.

17          But I'd like to caution you in advance that

18  if you choose to make a change, I can comment on the

19  fact that you said one thing here during your

20  deposition and then, later, you changed your

21  testimony.

22          Do you understand that?

23      A.   Yes.

24      Q.   It's important for us to make a good record

25  today for this court proceeding.  So there's several

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 9

1    things I will ask you to do:  If you don't understand
2    any of my questions, please just ask me to repeat or
3    rephrase them, and I'll be happy to do so for you.
4            During today's deposition, you always need
5    to give a audible or out loud or verbal answer to my
6    questions, such as a "yes" or a "no."  If you do
7    things like you shake your head up and down or side
8    to side, if you mean "yes" or "no," or if you use
9    slang terms such as "uh-huh" or "huh-uh," those sort
10   of responses do not show up well, if at all, on the
11   transcript.  So we may ask you "Did you mean 'yes' or
12   did you mean 'no'" if you use some sort of nonverbal
13   response.
14           Do you understand that?
15       A.   Yes.
16       Q.   Also, you've done a good job so far.
17   But as a general rule, during the deposition, try not
18   to speak at the time, at the same time anyone else is
19   speaking.  We will all afford you the same courtesy.
20   One of the many reasons why we ask you to do that is
21   it is difficult for the court reporter to accurately
22   take down what two people are saying at the same
23   time.  So please try not to speak over anybody else
24   during the deposition.
25           Do you understand that?

Page 10

1        A.    Yes.

2        Q.    During today's deposition, the attorney,

3    Mr. Anderson, may have an objection to one or more of

4    my questions.  I want to explain to you how

5    objections work during a deposition because they work

6    a little differently than what you may have seen on

7    TV or in a courtroom.

8            As you can see, today we don't have a judge

9    here present to immediately rule on objections.  So

10    what we do during a deposition, I ask a question, if

11    Mr. Anderson wants to make an objection, he will

12    state the objection, for the record.  We then still

13    look to you to give a response; and then later, if a

14    judge needs to review the transcript and rule on the

15    objection as to whether your response is admissible

16    in court, the judge can do so.

17            But I explain this to you because it

18    confuses many people.  They hear an objection and

19    they think they are not supposed to respond.

20    Generally speaking, the opposite is true during a

21    deposition.

22            Do you understand that?

23        A.    Yes.

24        Q.    Okay.  Do you have any questions for me

25    before we begin the deposition?

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 11

1       A.    No.

2       Q.    Have you consumed any alcoholic beverages in

3    the last 24 hours?

4       A.    No.

5       Q.    Have you taken any sort of drug, including

6    prescription medication, in the last 48 hours?

7       A.    No.

8       Q.    Okay.  Do you have any medical condition?

9       A.    No.  Sorry.

10      Q.    An extreme example would be -- that's

11   all right.  An extreme example would be dementia or

12   Alzheimer's disease that may affect your memory or

13   your ability to testify here today.

14      A.    No.

15      Q.    What, if anything, have you done to prepare

16   for today's deposition?

17      A.    I was given the CIRT recommendations, and

18   then I was also given Sergeant Backman's statements.

19      Q.    Who were you given those by?

20      A.    By Craig Anderson.

21      Q.    Okay.  Does Mr. Anderson, is it your

22   understanding he is acting as your attorney here

23   today?

24      A.    Yes.

25      Q.    Okay.  You said that you were provided the

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 12

1    CIRT report.  How long ago was that?

2         A.   Well, we met last week.

3         Q.   Is that the first time you had ever read the

4    CIRT report regarding this incident?

5         A.   Yes.

6              MR. ANDERSON:  And just to clarify, I -- he

7    just had the Conclusions and Findings, not the

8    report.

9              MR. BREEDEN:  Okay.  So --

10             MR. ANDERSON:  That's what he said, but I

11   just want to make sure you understood.

12   BY MR. BREEDEN:

13        Q.   So the full report is 222 pages.  You did

14   not review the full report?

15        A.   No.

16        Q.   Okay.  And you've not reviewed any of the

17   other witness statements or depositions, other than

18   Mr. Backman's?

19        A.   Correct.

20        Q.   I should say "Sergeant Backman," shouldn't

21   I?

22        A.   Yes.

23        Q.   And did you read his deposition transcript

24   taken in this case?

25        A.   Yes.

Page 13

1      Q.    Did you review any of the other interviews

2   he gave, like his CIRT interview, regarding this

3   incident?

4      A.    No.

5      Q.    Okay.  Have you discussed what you recall or

6   your anticipated testimony with any of the other

7   officer defendants?

8      A.    No.

9      Q.    How -- how well do you know the defendants

10  in this case?  So let's see if I can recall them, off

11  the top of my head:  There's Rothenburg, Bertuccini,

12  Kubla, Backman, and I'm sorry.  I'm forgetting at

13  least one other one.

14          MR. ANDERSON:  Gonzales.

15          THE WITNESS:  Alex Gonzales.

16              (Reporter request.)

17          THE WITNESS:  Sorry.  Alex Gonzales.

18          MR. BREEDEN:  Gonzales, and then who?

19          MR. ANDERSON:  Melanie O'Daniel.

20          MR. BREEDEN:  Melanie O'Daniel.

21          MR. ANDERSON:  That's it.

22  BY MR. BREEDEN:

23      Q.    And then there's -- well, there's one that

24  was the primary shooter as well.  I'm sorry.  I

25  can't -- I can't think of his name here.

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 14

```
 1              Do you -- are these people that you know
 2    well?  You worked with them for some time?
 3         A.   Yes.
 4         Q.   Okay.  You all work together on SWAT; right?
 5         A.   Yes.
 6         Q.   Well, I think one of the other officers said
 7    "SWAT is like a band of brothers."  Those are your
 8    brothers that you work with; right?
 9         A.   Yes.
10         Q.   Okay.  Have you been to some of their
11    houses, personally?
12         A.   Yes.
13         Q.   And have you met their families?
14         A.   Yes.
15         Q.   Okay.  So, in fairness, you probably don't
16    want to see the outcome of this lawsuit be that your
17    brothers that you work with every day are forced to
18    pay a lot of money; is that fair?
19              MR. ANDERSON:  Objection.  Form.  Go ahead
20    and answer.
21              THE WITNESS:  That's correct.
22    BY MR. BREEDEN:
23         Q.   Okay.  But, also, you understand what
24    perjury is and that you need to testify honestly
25    today; right?
```

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 15

```
 1      A.   Yes.

 2      Q.   Okay.  I'm just going to start with some

 3   background information as to you.  What's your age?

 4      A.   45.

 5      Q.   How long have you lived in Las Vegas?

 6      A.   Since 2002.

 7      Q.   And where did you live prior to 2002?

 8      A.   Washington state.

 9      Q.   And were you born and raised in Washington

10   state?

11      A.   Yes.

12      Q.   You ever been convicted of a crime?

13      A.   No.

14      Q.   Can you summarize your education for me?

15      A.   Graduated from high school.

16           MR. ANDERSON:  Sorry.  Sorry.  Okay.

17           THE WITNESS:  Went on to attend Western

18   Washington University, graduated with a Bachelor of

19   Science degree in Sociology, minored in Psychology.

20   BY MR. BREEDEN:

21      Q.   Do you have any, I would say formal

22   education or college classes past that?

23      A.   No.

24      Q.   Okay.  Do you have any legal background,

25   such as a paralegal or legal assistant?
```

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 16

1      A.    No.

2      Q.    Do you have any medical background?

3      A.    No.

4      Q.    You have to receive some sort of medical

5   training to be on SWAT?

6      A.    Correct.  We'll take like a basic medical

7   class, Patrol Medicine.

8      Q.    CPR.

9      A.    CPR, yes.

10      Q.    Okay.  At what point in your life did you

11   join Las Vegas Metro Police Department?

12      A.    It was 2007.

13      Q.    And what did you do for a living prior to

14   joining Metro?

15      A.    I'm sorry.  Two-thousand -- 03/05 is 2005.

16      Q.    Well, you know, I'll be honest with you, I

17   was surprised by your response because I thought

18   that, in your CIRT interview, you had said that you

19   worked for Metro for 16 years prior to this incident.

20      A.    Correct.  So I'm coming up on 20 years now.

21      Q.    Okay.  Great.  And I'm sorry.  So 2004?

22      A.    So it was 03/05.  So March of 2005.

23      Q.    And what did you do for a living prior to

24   joining the force?

25      A.    When I came down to Vegas, I ended up

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 17

1    working at RC Willey.

2         Q.    What made you want to become a police

3    officer?

4         A.    Something that I was always looking at

5    doing even when I was young.

6         Q.    Any members of your family in law

7    enforcement?

8         A.    No.

9         Q.    What attracted you to the Las Vegas

10   Metropolitan Police Department then?

11        A.    When I was down here, I was doing

12   ride-alongs with them and decided it was a good

13   career choice.

14        Q.    Okay.  Well, that's a bit unusual that you

15   would do ride-alongs before you joined the force.

16   How did that happen?

17        A.    It was something, like I said, that I was

18   wanting to get into for a career.  I was deciding

19   whether I was going to go through Henderson or

20   Las Vegas Metropolitan Police Department.  I ended

21   up choosing Metro.

22        Q.    Okay.  So when you first joined Metro, I

23   assume you have to go to some sort of basic officer

24   training course?

25        A.    Yes.

Page 18

1    Q.    And how long does that last?

2    A.    So your academy lasts a pretty long time.

3    It's like six, six months.

4    Q.    And I just want to talk about sort of your

5    progression through Metro.  So when you originally

6    completed the academy, what was your first

7    assignment?  Were you patrol, or?

8    A.    First assignment was patrol.

9    Q.    Okay.  How long were you on patrol?

10    A.    I was in patrol for quite, quite a long

11    time.  So just to kind of break it down, I was on

12    graveyard for about two years; and then after that,

13    I went to a dayshift squad for probably about six

14    months.  From there I ended up going to a saturation

15    team where I spent a good four years there.  That is

16    a proactive unit still on patrol; and from there, I

17    went to the homeland team and spent a year there.

18    That's still in patrol.

19        And then from there, I ended up becoming a

20    field training officer.  So I spent a year doing

21    that; and then from there, I ended up promoting to

22    sergeant, where I worked regular patrol for another

23    almost a year there, took over a neighborhood

24    engagement team, still working patrol.  I took over

25    gangs, did that for two and a half years.  Again,

Page 19

1    all that's pretty much patrol.  Gangs is -- took

2    over more of a investigative aspect to it; and then

3    from there, I ended up moving over to SWAT.

4        Q.    What year did you move over to SWAT?

5        A.    So that was 2019, July.

6        Q.    When you joined SWAT, what additional

7    training did you have to go through?

8        A.    So it's quite a bit of training.  I tested

9    for, I would say three times, and then the third

10   time, I actually ended up getting it.  But there is

11   quite a bit of a very intensive regiment as far as

12   the training that you do once you are assigned to

13   SWAT and then completing that.

14       Q.    So -- so tell me how that works.  You said

15   there -- there was testing and you actually had to do

16   it three times before you were accepted into SWAT.

17   Is this physical testing?  Classroom testing?

18   What kind of testing?

19       A.    So testing starts with a, a shoot, which is

20   pistol, rifle.  From there, you go on to a physical

21   test and then which is an obstacle course; and then

22   from there, you go over to another obstacle course;

23   and then from that, you do some, it was some

24   scenarios; and the last part of it is going to be an

25   oral board.



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 20

1       Q.    All right.  Was there any particular reason
2   why the first two times you applied for SWAT, you
3   were not accepted?
4       A.    So first time, I ended up failed it,
5   failing the oral board, and so that was just I -- I
6   was brand new to it, and so someone from the outside
7   that has limited knowledge on it.  Then, you know,
8   that's what you're expected -- it's you need to know
9   a lot of the policy that's involved because you have
10  Metro's policy, and then you have the SWAT policy as
11  well.
12      Q.    Yeah, there's very different SWAT policies;
13  right?
14      A.    Correct.
15      Q.    Okay.  And even then, once you're accepted
16  onto the SWAT team, you have to go undergo more
17  specific SWAT training; right?
18      A.    Yes.
19      Q.    Okay.  And how long does that take in terms
20  of hours or months?
21      A.    Well, you're always training and then
22  always qualifying every year.  So you always have to
23  stay up on that.
24      Q.    Okay.  But how about when you're initially
25  accepted into SWAT?

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 21

 1        A.    Initially accepted into SWAT, you're going
 2   to be taking a -- a -- several classes, just to be
 3   proficient before you become operational; and then
 4   within that year time frame, you're going to be
 5   completing a SWAT school.
 6        Q.    Okay.  And is the SWAT school, is that just
 7   classroom hours, or does it include classroom and
 8   field?
 9        A.    It's classroom and training.  It's not like
10   you're going to be going on a live mission and
11   that's counting as a SWAT school.  So it's
12   specifically classroom portion, training.
13        Q.    Okay.  And do you teach any of those
14   classes?
15        A.    No.
16        Q.    Okay.  Who's the -- who's the primary SWAT
17   instructor then?
18        A.    Back then?
19        Q.    Yes.
20        A.    So back then, it was quite a few
21   instructors.  So one of them was Dwayne Ferrin.  We
22   had Carl Knolls.  Those were some of the instructors.
23        Q.    Okay.  Do you think that additional SWAT
24   training, that that has value?
25        A.    Yes.

Page 22

1      Q.    Do you think that it's important that

2   officers be specifically trained on SWAT policies and

3   procedures before they join SWAT?

4      A.    Yes.

5      Q.    Okay.  Would you recommend that they undergo

6   that and complete that training before they go on

7   live missions?

8      A.    So, yes.

9      Q.    Okay.  I want to talk a little bit about the

10   structure of SWAT.  First of all, though, I guess,

11   let me ask an additional background.

12          Within -- well, okay, the structure of SWAT.

13   Okay.  There are people on SWAT, and then amongst

14   those officers, some are team leaders and assistant

15   team leaders; is that accurate?

16      A.    Yes.

17      Q.    And so how is a team leader and assistant

18   team leader selected?

19      A.    So team leaders are going to be your

20   sergeants, and so what you do is you go through that

21   testing process.  So if an individual, a prior

22   sergeant, ends up leaving, moving on to some --

23   something else or ends up promoting, then we always,

24   every year, will have a, basically a selection

25   process.  So that hiring process, testing for it.

Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 23

1    So then that team leader, whoever is chosen, will

2    fill that vacancy.  Same things goes for operators

3    as well.  So it's a testing process.

4         Q.   Okay.  And at what point did you become a

5    team leader for SWAT?

6         A.   So July of 2019 is when I was selected.  I

7    was one of several other sergeants that tested.

8         Q.   Okay.  So essentially you beat out other

9    sergeants for the position?

10        A.   Yes.

11        Q.   Okay.  Were any of the other people then

12   that were -- you were promoted over, did they remain

13   on SWAT in other capacities?

14        A.   Say that again.

15        Q.   Well, yeah.  So these people who were not

16   given a team leader position on SWAT, did they remain

17   on SWAT?

18        A.   No.  So if you're testing for SWAT, you're

19   not on SWAT.

20        Q.   Okay.

21        A.   Yeah.

22        Q.   So, again, just to talk a little bit about

23   the structure.  My understanding is, at this time, in

24   January of 2022, there was a Silver Team and a

25   Gold Team for SWAT; is that correct?



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 24

1       A.   Correct.

2       Q.   All right.  Just two teams?

3       A.   Correct.

4       Q.   And I don't know how familiar you are with

5    this, but not every police department in the country

6    has full-time SWAT officers; correct?

7       A.   Correct.

8       Q.   Okay.  Are you aware that Las Vegas is

9    considered a Tier 1 SWAT team?  Have you ever heard

10   that term before?

11      A.   Yes.

12      Q.   Okay.  What does Tier 1 indicate?

13      A.   Tier 1 is basically you are going to be,

14   that is your primary position.  So other agencies,

15   whether they're small in size and they have regional

16   teams, so you have multiple areas that comprise and

17   make up a SWAT team.  So they can be regular patrol,

18   and if they need to serve a warrant, then everybody

19   gets together who is part of that team, and that's

20   your regional team.

21      Q.   But a Tier 1 team, like Las Vegas Metro

22   Police Department has, those are all full-time SWAT

23   officers?

24      A.   Correct.

25      Q.   And there -- there's actually two teams so

Page 25

1    that there's 24 hour SWAT coverage for the police

2    force; correct?

3        A.    Correct.

4        Q.    Now, as the team leader then and a sergeant,

5    when there's a SWAT operation -- I would call it a

6    "SWAT raid."  Do you call it a "SWAT operation"?

7    What do you call it?

8        A.    SWAT operation, SWAT mission.

9        Q.    Okay.  Well, we'll say "mission."  When

10   there's a SWAT mission, as the team leader, are you

11   the most senior SWAT person onsite when the mission

12   happens?

13       A.    No.

14       Q.    Okay.  Who would that be, and how is that

15   determined then?

16       A.    So there's roughly -- and I don't know the

17   exact number right now because I've been out of SWAT

18   for six months.  So there's 33, 34 SWAT operators,

19   and then you have your four sergeants.  So within

20   that team, there's a wide range of experience and

21   wide range of who's been on.  You know, some have

22   been on over ten years.  So for me, back then, you

23   know, I was only on for two-and-a-half years.

24   There -- there's operators who have been on ten,

25   ten-plus years in SWAT.

Page 26

 1      Q.   Oh, okay.  But -- but I mean, in terms of
 2   chain of command, would you, as the sergeant team
 3   leader, be the person in charge?
 4      A.   Yes.  Unless there's a lieutenant there or
 5   if there's a senior sergeant there.
 6      Q.   Is it unusual for a lieutenant to be there
 7   for a typical SWAT mission?
 8      A.   No, it's not unusual.
 9      Q.   Okay.  For this particular operation, on
10   January 10th of 2022, was there any lieutenant
11   physically present?
12      A.   Not a SWAT lieutenant.
13      Q.   Yeah, you're right.  I should have limited
14   it to SWAT.  So limited to SWAT, you -- you were the
15   sergeant in charge; is that correct?
16      A.   Correct.
17      Q.   All right.  And, in particular, there was
18   another sergeant who had recently joined SWAT, and
19   that was Sergeant Backman; correct?
20      A.   Correct.
21      Q.   And were you the direct supervisor of
22   Sergeant Backman during the operation?
23      A.   Correct.  And then there was one other
24   sergeant, Sergeant Casey Clarkson.
25      Q.   Okay.  And so talking, again, a little bit

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 27

1    more about the structure, above you, in the chain of

2    command, as a sergeant, would be a SWAT lieutenant;

3    correct?

4        A.    Yes.

5        Q.    And is the only lieutenant, at that time,

6    Lieutenant O'Daniel?

7        A.    Yes.

8        Q.    Okay.  And what was her actual title at that

9    time?

10       A.    Lieutenant, and then they also call

11   "tactical commander."

12       Q.    So she was tactical commander at that time.

13   What does that mean to you?

14       A.    In charge of SWAT missions, when you're out

15   there, tactical commander.

16       Q.    And then going up the chain, above

17   Lieutenant O'Daniel, who was that, at the time?

18       A.    It would be Captain Brian Cole.

19       Q.    And Captain Cole, is he then the most senior

20   officer at LVMPD, at that time, that is exclusively a

21   SWAT, assigned to SWAT?

22       A.    Correct.  It would be the highest ranking.

23       Q.    Okay.  And if we went over Captain Cole,

24   would -- would we get to the undersheriffs at that

25   point?

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 28

1        A.    Deputy chiefs.

2        Q.    Deputy chief.  Then undersheriff?

3        A.    Correct.

4        Q.    Then sheriff?

5        A.    Yes.

6        Q.    Okay.  Do you happen to know who the deputy

7    chief that Captain Cole would report to at that time?

8        A.    No.

9        Q.    Now, by the way, I just wanted to back-up a

10   moment or two.  You said that you are no longer on

11   the SWAT; is that accurate?

12       A.    Correct.

13       Q.    And when did you leave SWAT?

14       A.    Back in July.

15       Q.    July of 2024?

16       A.    Correct.

17       Q.    Why did you leave SWAT?

18       A.    There's a five year cap for sergeants, and

19   they have a ten year cap for operators.  So my time

20   there expired.  So I had to leave.

21       Q.    And so where were you reassigned?

22       A.    Currently, I'm at the airport right now.

23       Q.    All right.  Have you ever held any

24   professional licenses or certifications?

25       A.    No.

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 29

1    Q.   Have you ever tested for some kind of
2    promotion and it was denied?  And I think we talked
3    about there were twice that you applied for SWAT
4    and -- and that was denied.  Is there anything else?
5    A.   No.
6    Q.   Have you ever been suspended or reprimanded
7    at Las Vegas Metro Police Department?
8    A.   No.
9    Q.   Not even over the Jasmine King incident?
10   A.   Received a contact, which is just a
11   informal conversation.
12   Q.   And what was the contact regarding?
13   A.   Regards to like a chain of command.
14   Q.   And how about over this incident, I mean, it
15   was a fatal shooting of Mr. Williams.  Were you given
16   any suspension, reprimand, or contact over that?
17   A.   No.
18   Q.   Let's talk a little about the Jasmine King
19   incident.  Just for the record, that happened on
20   January 15, 2021, almost exactly one year before the
21   fatal shooting of Mr. Williams.  What happened?
22   A.   Served a search warrant for narcotics at
23   that location.  We ended up utilizing a Control
24   Entry Tactic with a -- with a explosive breach.  As
25   soon as we conducted the explosive breach,

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 30

1    Ms. Jasmine King was right next to the door.  She

2    sustained a little bit of injury to her eye; and

3    then ended up clearing the residence and got Jasmine

4    King out there, got her her medical.

5        Q.   Okay.  And Ms. King, she was not a suspect

6    and she was committing no crime at the time; right?

7        A.   No.

8        Q.   Do you mean I'm correct?

9        A.   Oh.  Correct.

10       Q.   Okay.  And so you were also the team leader

11   on that operation; correct?

12       A.   Correct.

13       Q.   And you had called for what you called a

14   "short count" or a "quick count" on that CET entry;

15   right?

16       A.   Correct.

17       Q.   And what does that mean to you?

18       A.   So that is a -- how we're going to go

19   through the breach count, which you need to make

20   sure that -- because we have a couple different

21   types of breaches.  So whether it's a long breach;

22   whether it's a breach, 3-2-1 breach; or just stand

23   by, breach-breach-breach.  So that's the person who

24   has the plunger to detonate the charge.

25       Q.   Okay.  And that was a Property-Only Search



Page 31

1    Warrant you were executing at that time; right?

2        A.   Correct.

3        Q.   Through SWAT?

4        A.   Correct.

5        Q.   And that was also investigated by Internal

6    Affairs; correct?

7        A.   Yes.

8        Q.   And what conclusions did Internal Affairs

9    come to regarding what SWAT had done on that

10   occasion?

11            MR. ANDERSON:  Objection.  Form.  Go ahead

12   and answer.

13            THE WITNESS:  So as far as I.A. goes, I

14   don't know what the conclusion was, the findings

15   that they -- they produced.  It was, through SWAT,

16   how it affected us was limited the times that we

17   would utilize a explosive breach on search warrants.

18   BY MR. BREEDEN:

19       Q.   Okay.  So that was a regular search warrant

20   as opposed to a No Knock Warrant; correct?

21       A.   Correct.  That was a Knock and Announce

22   warrant.

23       Q.   Yeah.  And so you understand that, during a

24   regular warrant, you must abide by Knock and Announce

25   principles?



Garth Findley            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 32

 1        A.    Correct.

 2        Q.    Is it your understanding that Knock and

 3    Announce is part of Nevada State law?

 4        A.    Correct.

 5        Q.    Is it your understanding that Knock and

 6    Announce is actually part of federal constitutional

 7    requirements under the Fourth Amendment?

 8        A.    Correct.

 9        Q.    Okay.  And so did Internal Affairs conclude

10    that you had violated the Knock and Announce rule in

11    the King matter?

12        A.    I don't -- like I said, I don't remember

13    what I.A., their conclusions were.

14        Q.    Okay.  And Ms. King was blinded, at least

15    temporarily, in -- in one of her eyes as a result,

16    wasn't she?

17        A.    From what I was told, yes.

18        Q.    And did she also have a burst eardrum?

19        A.    I don't know.

20        Q.    Did it appear to you that Ms. King was

21    attempting to answer the door at the time the

22    explosive went off?

23              MR. ANDERSON:  Objection.  Form.  Go ahead.

24              THE WITNESS:  Standing at that door, at

25    that time frame, probably, yes, she was getting

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 33

1    ready to answer the door.

2    BY MR. BREEDEN:

3         Q.    Okay.  So you were actually personally sued,

4    along with several other members of the SWAT team, by

5    Ms. King following the incident; correct?

6         A.    Yes.

7         Q.    And you're aware of that part of her lawsuit

8    was that you and other members of the SWAT team

9    failed to abide by the Knock and Announce rule?

10        A.    Correct.

11        Q.    And that case was resolved on your behalf,

12    wasn't it?

13        A.    Yes.

14        Q.    And do you know the amount that was paid to

15    Ms. King?

16        A.    No.

17        Q.    Do you know, was there any finding in the

18    lawsuit that the officers had violated the Knock and

19    Announce rule?

20        A.    I don't remember the findings.

21        Q.    Looking back on it, do you believe you

22    failed to abide by the Knock and Announce rule in

23    that case?

24             MR. ANDERSON:  Objection.  Form.  Go ahead

25    and answer.

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 34

1          THE WITNESS:  Looking back, I think we
2    could have gave more announcements, more time.
3    BY MR. BREEDEN:
4          Q.   Okay.  And you were actually the -- the team
5    leader that helped plan that and the -- the explosive
6    short count; right?
7          A.   No.
8          Q.   Who was it?
9          A.   That was Sergeant Young, who was in charge
10    of that operation.
11          Q.   Okay.  Was that operation, was the IAP, was
12    that also approved by Lieutenant O'Daniel?
13          A.   Yes.
14          Q.   Okay.  Would Lieutenant O'Daniel have to
15    approve all SWAT IAPs at that time?
16          A.   Yes.
17          Q.   And explain to me your understanding of what
18    changes to SWAT policies and procedures were made as
19    a result of the King incident.
20          A.   So as far as the policies, we would need
21    higher approval as far as utilization of a explosive
22    breach; and we, at that point in time, from that
23    result, were limited on using explosive breach for
24    that type of search warrant.
25          Q.   Meaning a Property-Only Search Warrant?

Garth Findley             Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 35

1        A.    Correct.

2        Q.    And by the way, it's your understanding that

3    the search warrant for this incident that we're

4    discussing today, on January 10th of 2022, where

5    Mr. Williams was sought -- shot, that was a

6    Property-Only Search Warrant as well; right?

7        A.    Correct.  Accompanied with the subjects

8    listed in the PC statement.

9        Q.    Okay.  But the warrant was a Property-Only

10    Search Warrant?

11        A.    Correct.  Recover the evidence of the

12    homicide.

13        Q.    There was no arrest warrant; correct?

14        A.    No.

15        Q.    I'm sorry.  When I say "correct" and you say

16    "no" --

17        A.    Oh.

18        Q.    -- some people might interpret that as you

19    believe my statement is incorrect.  So we just need

20    to clean that up a little bit.

21            Is it correct that there was not a arrest

22    warrant?

23        A.    That is correct.  There was no arrest

24    warrant.

25        Q.    All right.  And is it your understanding



Page 36

1    that, as a result of the King incident, that CET

2    entries for property-only search warrants were banned

3    by Metro?

4          A.    They weren't banned by Metro.  We were

5    still allowed to do CETs for that type of search

6    warrant, and as long as there -- their -- the

7    factors met that there was violent individuals

8    inside who had access to weapons.

9          Q.    That's your understanding of the policy

10   change?

11         A.    From that point in time, yes, that we could

12   utilize a CET for that type of a search warrant.

13         Q.    So your understanding was that, as a result

14   of the King incident, Metro's policies and procedures

15   changed such that CET entry was only allowed on

16   property-damage search warrants if there were violent

17   individuals with weapons inside?

18         A.    So if it met the -- the requirement of a

19   high risk search warrant.  So if there is a forced

20   entry that we're going to be utilizing, if it's

21   unknown or violent individuals outside, if there's

22   likelihood that they'll have access to weapons, then

23   yes, we can utilize a CET for that service of the

24   search warrant.

25         Q.    Is it your understanding that using

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 37

1    explosives to knock down a door, that that was banned

2    for property-only search warrants?

3         A.    I don't think it was absolutely,

4    100 percent, banned.  But we would need a higher

5    level of approval in order to utilize a CET -- or

6    sorry -- that explosive breach.

7         Q.    Okay.  Did anyone come to you, at some point

8    after the Jasmine King incident, and say:  "Look, as

9    a result of this incident, our SWAT policies and

10   procedures have changed, here's how they're different

11   today"?

12        A.    No.

13        Q.    So how did you learn that there was any

14   change in the policies and procedures?

15        A.    Just conversations that we had with our

16   lieutenant and because we're having to make those

17   policy changes within our SWAT policy.

18        Q.    That would be Lieutenant O'Daniel?

19        A.    Correct.

20        Q.    Okay.  And what did -- what did Lieutenant

21   O'Daniel explain to you?

22        A.    That following the incident were your --

23   the CIRT recommendations from that incident, we're

24   having to change some of the verbiage in the -- into

25   the policy.



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 38

1        Q.    Okay.  And did that policy change take
2    effect prior to the incident in this case, on
3    January 10th of 2022?
4        A.    So prior to this incident, yes, it
5    occurred.
6        Q.    Okay.  Do you recall how long before the
7    Williams' incident the policy change was?
8        A.    No.
9        Q.    Okay.  Have you ever been sued by anyone
10   else in connection with your employment at LVMPD?
11       A.    No.
12       Q.    Are you aware of any times, other than the
13   Williams' incident or the King incident, that it's
14   been alleged that you violated Knock and Announce or
15   used excessive force in conducting a SWAT mission?
16       A.    No.
17       Q.    Did Mr. Anderson also represent you in the
18   King matter?
19       A.    Yes.
20       Q.    Has he represented you for any other legal
21   matters, other than the King matter and this matter?
22       A.    No.
23       Q.    Explain the concept of a CTE entry and how
24   that, "CET" entry I should say, and how that differs
25   from a SACO.

Page 39

1        A.    So Controlled Entry Tactic, we are going to

2    be utilizing that on a servicing of a search

3    warrant, as I mentioned before, if it's a high risk

4    search warrant.  So if there's the indication that

5    we have or the intel that we have, that we're going

6    to be using a forced entry if it's a unknown or

7    violent individual inside, if they have access to

8    any type of weapons, we also take those

9    considerations into account.

10            Also, besides the structure, the location,

11   the time of day, what type of evidence is involved,

12   the likelihood of that destruction of evidence, and

13   then if we can safely use that speed, surprise,

14   overwhelming action to get in there and dominate a

15   structure very quickly.

16            And then -- and then you said you wanted a

17   SACO, a Surround and Callout?

18        Q.    Yes.

19        A.    So exactly -- it's exactly what it sounds

20   like or what it says is you're calling the person

21   out to us.  So with a SACO, you're going to be

22   safely surrounding the structure, if we can.  And a

23   good example is, on a large house, maybe like a

24   two-story house, we cannot safely dominate that

25   structure very quickly.  It would take too long, too

Page 40

1    many bodies.  If there is enough room around the

2    structure to where we can put our armor, whether on

3    the 1-2, 1-4, and then on the backside of the

4    structure, we can utilize those armored vehicles as

5    our protection, once we have the residence safely

6    contained, and then we can call the person out to us.

7         Q.   Now, for this particular incident with

8    Mr. Williams, the decision to use a CET entry, had

9    that already been made by the time you got involved?

10        A.   Yes.

11        Q.   And, ultimately, was that Lieutenant

12   O'Daniel that made that decision?

13        A.   Correct.

14        Q.   Okay.  Are you aware of anyone else that

15   assisted her in that decision?

16        A.   Sergeant Backman was relaying the

17   information with his assistant team leader; that was

18   Jake Warner, with all the intel that they gathered

19   from that, that residence and that search warrant,

20   and they relayed that information to Lieutenant

21   O'Daniel.

22        Q.   Why was Sergeant Backman involved as opposed

23   to yourself?  You were the team leader or intended

24   team leader.

25        A.   Correct.  I was out of town.

Garth Findley             Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 41

1        Q.    Okay.   That's the only reason?

2        A.    Well, once I was out of town, I advised

3    Sergeant Back- -- Sergeant Bonkavich and also

4    Sergeant Casey Clarkson that I'd be leaving on

5    vacation; they would be helping assist with

6    Sergeant Backman.   And, again, going back to this is

7    a team environment.   He's not solo.   And so Sergeant

8    Backman is 20-some years of a sergeant, or an

9    officer and then as a sergeant.   So he has a lot of

10   experience, a lot of experience in narcotics, a lot

11   of experience with dealing with search warrants.   He

12   came from major violators.   He's dealt with

13   Surround and Call Out incidences before.

14            And then as far as him being operational,

15   so he had quite a bit of experience with that

16   because as soon as he came to the team, he was given

17   a 40 hour SWAT school.   So with that, he became

18   operational.   He had a very good ATL, which is that

19   Assistant Team Leader, Jake Warner.   He also had the

20   rest of the team, so additional ATLs, Levi Hancock,

21   all those subjects were there to assist him in the

22   intel gathering, the recommendations, and then

23   giving that information to Lieutenant O'Daniel.

24       Q.    Okay.   So I've heard your CIRT interview

25   that you gave in this case, and I'm just going to

Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 42

 1    kind of summarize some of these things here.  You

 2    tell me if I'm wrong.  My understanding is you first

 3    learn about this search warrant and SWAT mission on a

 4    Friday and then the mission was to occur the

 5    following Monday, after the weekend; is that correct?

 6         A.   Yes.

 7         Q.   Okay.  And you had just preplanned to be out

 8    of town with your family.  You were going hunting

 9    that weekend; right?

10         A.   Correct.

11         Q.   All right.  So instead of you being

12    personally involved in some of these issues with the

13    IAP, instead, that was deferred to Sergeant Backman;

14    right?

15         A.   Correct.

16         Q.   And Sergeant Backman, at that time, had not

17    even been on SWAT for 30 days; correct?

18         A.   Correct.

19         Q.   And he had not completed the basic SWAT

20    training at that time either, had he?

21         A.   The -- that would be incorrect.  So for

22    him, in his first week, he was introduced with a

23    one-on-one modified SWAT school specifically for

24    him.  That was December 13th through the 16th.  So

25    40 hours.  In that class, he gets search warrant

Page 43

1    training.  He gets close quarter tactics.  He gets
2    an NFDD, which is a Noise Flash Diversionary
3    Devices.  He gets patrol medicine.  Everything that
4    he needs in order to be operational at that point in
5    time.
6        Q.    Okay.  But the Williams' SWAT mission, that
7    was going to be the very first SWAT mission he ever
8    went on in the field; right?
9        A.    No.
10       Q.    No?  How many other SWAT missions had he
11   been on before Williams?
12       A.    So during his time frame, he was being sent
13   out, he was supposed to respond to any barricade,
14   any search warrant that came up.  He was also --
15   went on a hostage rescue situation where we use a
16   CET tactic.  So he had, has done quite a bit of the
17   missions and tactics before this incident.
18       Q.    My understanding is this incident with
19   Mr. Williams was the first time he had been involved
20   with a SWAT mission using a CET tactic.  Do you
21   believe that to be untrue?
22       A.    So as far as an H.R., hostage rescue, he
23   was on that incident, and we used a CET.  That is
24   that, that tactic that we use in order to make entry
25   on a hostage rescue.  So, more than likely, confused

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 44

1    but forgot about the same tactic that's being used

2    on hostage rescue.

3        Q.   Okay.  Do you agree that he had not

4    completed his SWAT training at the time this incident

5    occurred?

6        A.   Well, he completed that modified SWAT

7    school for him.  And then what you're referring to

8    as far as a "SWAT school" would have been later on

9    in his time frame.

10       Q.   And so he had not completed that additional

11   training at the time this occurred?

12       A.   Not that long SWAT school.

13       Q.   Okay.  Is that 120 hour course?  How many

14   hours?

15       A.   Yes.  About.  I would have to guess, but

16   yes, about that time frame.

17       Q.   And did you have any concerns about allowing

18   somebody who had not completed all the SWAT training

19   and had been on SWAT for less than 30 days to have

20   such a crucial role in the planning and

21   implementation of this?

22       A.   No.  Because as far as his role in planning

23   it, again, this is that team environment where you

24   have your recon teams who have been there for

25   five-plus years, which was Kai, and the rest of the



Page 45

1    team that are going out doing the recon, doing the

2    planning, giving that information to Jake Warner,

3    who's the assistant team leader, who has over five

4    years of -- of being up in SWAT, as long -- as well

5    as you have Levi Hancock, who has been in SWAT for,

6    back then, almost ten years.

7              So this is a lot of planning that they do,

8    and then they had the assistant of Sergeant Clarkson

9    and Sergeant Bonkavich as well, if they needed to.

10   So this isn't Sergeant Backman being all his

11   mission.  This is a -- that team environment which

12   they create.  Here's the plan.  This is the safest

13   plan.  There you go, so.

14        Q.   Well, knowing how this turns out, do you

15   think this was a safe SWAT operation?

16             MR. ANDERSON:  Objection.  Form.  Go ahead.

17             THE WITNESS:  At the time, it would be the

18   safest that we did.

19   BY MR. BREEDEN:

20        Q.   Well, you mentioned a SACO.  It was

21   certainly feasible to do a SACO for service of this

22   search warrant, wasn't it?

23        A.   No.

24        Q.   Okay.  What are all the reasons why you

25   don't think it was feasible?

Garth Findley            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 46

1          A.    The reason why we couldn't do a Surround

2    and Callout is because on a multi-housing complex,

3    the person has a lot of avenues of escape.  So

4    whether internally, if you give them that

5    opportunity to escape, because it's been -- I've

6    been on a bunch of missions before where people

7    start burrowing through walls, and that's what we

8    don't want is murder suspects who have guns going

9    into other apartments.

10              Now, as far as that internally, then you

11   look externally, then he has more access into other

12   apartments.  There is that brick wall, wrought iron

13   fence that goes around the entire complex.  So we

14   couldn't get our armor into position.  Now, if you

15   sit there and say:  Well, it's a busy road on Nellis

16   to park armor in, well, that's too far away, and if

17   the subject does come out and resist in any way, we

18   can't implement that lethal plan.  You have that

19   barrier there.  You can't put our guys directly in

20   there, on the inside, without any type of armor and

21   protection.  That's the reason why we couldn't do a

22   Surround and Callout on that.

23         Q.    Okay.  So you believe it was not feasible to

24   do a Surround and Callout on that particular

25   apartment at 3050 South Nellis, No. 1125?

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 47

1    A.    No.

2        Q.    Has SWAT ever done Surround and Callout for

3    apartments?

4        A.    We have.

5        Q.    It's probably happened in the history of

6    SWAT, hasn't it?

7        A.    Correct.

8        Q.    Even if there's some risk of tunneling,

9    right, going into another apartment?

10        A.    Correct.  Then, again, you evaluate the

11    circumstances of who you're dealing with.  So what

12    type of search warrant is it; are we dealing with

13    someone who is not a flight risk, that is not going

14    to be doing that type of burrowing through the

15    Walls, he doesn't have access to weapons at all?

16    Then you can sit there and evaluate that.

17        Q.    Okay.  Let me ask you, this search warrant

18    was intended to be performed at 5:00 a.m.; correct?

19        A.    Yes.

20        Q.    Who made that decision?

21        A.    The assistant team leader, Jake Warner,

22    decided this would be a good opportunity, at that

23    time frame, to do it at that point, and then as well

24    as Sergeant Backman reviewing it and saying yes.

25        Q.    And then Lieutenant O'Daniel also reviewed

Page 48

1    it and approved it?

2        A.   Correct.  They review it as well.  There's

3    also the recommendations from the person that, the

4    affiants, who is homicide, their saying it would be

5    a good time frame to do it at that time.

6        Q.   And so first of all, let's -- let's talk a

7    little bit about that.  Homicide doesn't tell SWAT

8    how to do their job, does they?

9        A.   No.  What they do is they give

10   recommendations going for time frames, this is when

11   we observe this person being most active, and so we

12   could sit there and say, okay, most active at this

13   time and they could maybe give a time frame around

14   there.

15       Q.   What's the purpose of doing this at

16   5:00 a.m.?  Why -- why was it approved in that

17   manner?

18       A.   So what you have to do is take into

19   consideration the location.  Nellis is very busy at

20   that, at that intersection.  So at 5:00 in the

21   morning, you're not going to have that much traffic

22   on the roadway.  You're -- you're limiting the -- as

23   far as like the time of -- time of day for school,

24   the kids be out and about, that is -- I'm very

25   familiar with the complex.  It's very active

Page 49

1    throughout the day.  So at 5:00 a.m., it's less
2    active.  So we want to keep people out.  That was
3    the reason why.
4        Q.   Was it part of the purpose that you wanted
5    to do this SWAT mission at a time of day when you
6    thought people inside the apartment were likely to be
7    asleep?
8        A.   Either asleep or less active.
9        Q.   Okay.  And that would make it easier to
10   surprise and overwhelm them with the CET?
11       A.   Correct.
12       Q.   And so was that formal or informal policy of
13   LVMPD, at that time, to perform search warrants on a
14   CET at those times of day, for that purpose?
15       A.   That's not like a SOP where it's like we do
16   it at a certain time frame to, like you said:
17   "They're going to be asleep; let's surprise them,
18   overwhelm them," that's not in our standard
19   operating procedures.
20       Q.   Well, why isn't it?  Is that because it's
21   more dangerous to do it that way?
22            MR. ANDERSON:  Objection.  Form.
23            THE WITNESS:  I don't think it's more
24   dangerous to do it at that time.
25   / / /

Page 50

1    BY MR. BREEDEN:

2        Q.    Why, for this particular operation, was that

3    selected then?

4        A.    Because it's less opportunity for people on

5    the outside.  They're not going to be as active.

6    That complex, like I said, is very busy, and you

7    keep people out that way.

8        Q.    Well, why not -- why not perform it at

9    9:00 p.m. then?

10       A.    That's when it starts to become busy, and

11   especially on Nellis.  That's where people are

12   heading to work.

13       Q.    Okay.  How has the policies and procedures

14   for SWAT and CET entry, particularly as it relates to

15   search warrants, changed since the Williams'

16   incident?

17       A.    So it would be accompanied with a No-Knock

18   Warrant.

19       Q.    I'm sorry?

20       A.    For now?

21       Q.    For --

22       A.    From this incident?

23       Q.    Yeah, as a result of this incident.

24       A.    So you're going to, in order to conduct a

25   CET, you're going to need a No-Knock Warrant.

LEXITAS™

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 51

1     Q.    So as we sit here today, to your knowledge,
2     CET is reserved only for no-knock warrants?
3     A.    Correct.
4     Q.    And when did that change?
5     A.    After this incident.  I don't know when it
6     was implemented though, like a time fame.
7     Q.    Do you believe it changed specifically
8     because of the Williams' incident?
9     A.    I believe so.
10    Q.    And why do you believe that?
11    A.    Because the individual that was killed, the
12    family that is in the process of suing it, that's
13    the reason why.
14    Q.    Okay.  Was there ever any training or
15    instruction provided by Metro, to SWAT on the new
16    policy then?
17    A.    We would talk about it, as far as the
18    policy that was implemented with Lieutenant
19    O'Daniel, and then make sure that all the guys knew
20    about it.
21    Q.    And so what did Lieutenant O'Daniel then
22    relay to you about the policy change?
23    A.    As far as at what time frame though?
24    Q.    Well, after the Williams' incident.
25          In other words, do you remember a specific

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 52

1    conversation you had with Lieutenant O'Daniel?

2        A.    No.

3        Q.    Okay.  So there was never any specific

4    verbal or written retraining on the new policy?

5        A.    No.  As far as the policy that is now in

6    effect, that we will not be utilizing a CET for a

7    Knock and Announce, that wasn't in effect or took --

8    took effect until I was gone.

9        Q.    So to the best of your understanding, when

10   would -- when did that policy change happen?

11       A.    I don't know.  Because I know it was

12   recent, but I've been gone for about seven months.

13       Q.    Okay.  You mentioned earlier in your

14   testimony that you felt a Surround and Callout, or a

15   SACO, was not feasible for this particular apartment;

16   but due to the policy change, if this warrant were

17   served today, you would have to use SACO, wouldn't

18   you?

19       A.    You would have to, or you would find a

20   different way or just not serve the search warrant.

21       Q.    Right.  But when we talk about what would

22   happen with this warrant today, if you -- you could

23   not do a CET, if it was done today?

24       A.    Correct.

25            MR. ANDERSON:  Objection.  Form.

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 53

1            THE WITNESS:  So as it stands today, yeah,

2      you wouldn't be able to utilize a CET for this type

3      of search warrant, unless you get a no-knock service

4      of a warrant.

5      BY MR. BREEDEN:

6            Q.   Can you explain to me what calling a

7      "tactical" is in SWAT jargons.

8            A.   So calling "tactical," that can be utilized

9      during a Controlled Entry Tactic, and that is

10     slowing the momentum or stopping the momentum of

11     your team, and that's when you have some type of

12     recognition or that a danger is occurring.  So

13     preventing your team from moving further down, say,

14     a hallway.  So you're stopping that momentum.  Your

15     officers are taking up cover and positions of

16     advantage, and so once that occurs, then you gather

17     the intel.  So who called the tactical and -- and

18     what are the reasons why.  So gather the intel, work

19     the problem; utilize your resources, so get your

20     shields up, if you need to.

21            Calling a tactical, anybody can call it.

22     So once it's called, the momentum stops.  Everybody

23     reverberates that tactical call.  So an example

24     would be is if you make entry into a residence, you

25     see a subject that was on the couch take off down

Page 54

1    the hallway and ducks into the last room, we're

2    going to call "tactical" because maybe a continued

3    movement down there would be dangerous for your

4    team.  Maybe the subject's back there grabbing a

5    firearm.  He's doing something that could harm your

6    team, harm others, or harm that person who's back

7    there.

8         So, again, that's where you work the

9    problem.  You could sit there, once you have it

10   safely contained.  As far as on the outside, you

11   give announcements.  Maybe that person does come

12   out, or if you hear maybe a gun rack or something

13   like that, we can slowly back the team out and work

14   it from the outside.  So that would be an example of

15   calling a tactical.  And so once we do call a

16   tactical, that's when that spree, that speed,

17   surprise, and overwhelming action has stopped.

18   We're not going to reengage that CET, at that point,

19   and that is your tactical call.

20        Q.   On January 10th, 2022, during the SWAT

21   mission at 3050 South Nellis Boulevard, did you ever

22   hear any officer, at any time, call a tactical?

23        A.   Once the shooting was over, the tactical

24   call came out.

25        Q.   Okay.  So prior to the fatal shooting of

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 55

1    Mr. Williams, no tactical was ever called?

2        A.    Prior to the shooting, no.

3        Q.    Okay.  And then I assume someone called for

4    a tactical just because, at that point, it appears

5    there's been a fatality and so somebody called it?

6        A.    Because of the shooting that occurred, we

7    called a tactical.

8        Q.    Do you know which officer was the first to

9    call the tactical?

10       A.    Don't know.

11       Q.    During the SWAT mission, and I brought some

12   pictures to illustrate the point, Metro officers

13   appear to be wearing what I would call "blackout" or

14   dark SWAT and Police information on their uniform as

15   opposed to an alternate uniform where there's a

16   bright gold.

17          Who made the decision that the darker or

18   blackout uniforms would be used?

19       A.    Don't know.  When I came up, we were

20   utilizing the black.  We also had a -- like a,

21   almost like a purple, and then we ended up going to

22   these.  So I don't know.  I wasn't on SWAT, at that

23   time, for that.

24       Q.    So at no time that you served on SWAT they

25   were using the -- the brighter gold lettering?

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 56

1      A.    No.

2      Q.    Do you agree with me that in, you know, what

3    I would call the -- the black or the "blackout"

4    version, it's more difficult to see the word "SWAT"

5    or "Police" on the uniform?

6            MR. ANDERSON:   Objection.   Form.   Go ahead.

7            THE WITNESS:   Yes.

8    BY MR. BREEDEN:

9      Q.    Would there be any reason why SWAT officers

10   wouldn't want to clearly identify themselves as

11   police officer?

12     A.    Don't know why.

13     Q.    Certainly wouldn't be a reason on a Knock

14   and Announce Warrant, would there?

15     A.    No.

16     Q.    Okay.  Are you saying, then, that the dark

17   or the blackout uniforms were the only uniforms in

18   use at that time?

19     A.    Those are your uniforms that we had, that

20   were supplied to us, along with the patches that

21   were supplied to us.

22           MR. BREEDEN:   Okay.  Can you push that my

23   direction.

24           Just for the record, we could attach it as

25   an exhibit, if opposing counsel wants.  But I was

Page 57

1    showing the witness what's been Bates-labeled as

2    MELTON-14 and 15.  There's just some pictures of

3    alternate SWAT uniforms on those pages.

4    BY MR. BREEDEN:

5        Q.   Let's talk about Knock and Announce.

6             What are the requirements under the law of

7    Knock and Announce?

8        A.   Reasonable amount of time, as well as

9    you're letting the individual comply or submit.

10       Q.   And did you receive training on Knock and

11   Announce as part of your SWAT training?

12       A.   Yes.

13       Q.   Who trained you on it?

14       A.   We had classes, PowerPoints, that were

15   taught throughout the time frame.

16       Q.   Okay.  And, specifically, what were you

17   taught about the amount of time that's reasonable to

18   wait after the Knock and Announce?

19       A.   So as far as reasonable amount of time,

20   what you're going to be doing is considering the --

21   who you're dealing with, the location, size of the

22   structure, the violent history.  You're also taking

23   in consideration access to weapons.  So all those

24   factors come into play when you're looking at what

25   is a reasonable amount of time and then as



Page 58

1    accompanied with the submitting or the complying.

2          Q.    Have you ever heard any time limit, like

3    1 minute or 30 seconds or 10 seconds, that's like a

4    rule of thumb to be applied?

5          A.    So you're not going to find any hard fast

6    rule.  I know certain cases, they've talked about a

7    10 second rule on up, as far as, say, 30 seconds.

8    But, again, when it comes to a hard fast rule on --

9    on which one we're going to utilize, we went with a

10   reasonable amount of time.

11         Q.    Okay.  So has -- has there ever been any

12   formal or informal policy at Metro regarding like a

13   minimum number of seconds you should wait?

14               (Reporter clarification.)

15   BY MR. BREEDEN:

16         Q.    A minimum number of seconds you should wait

17   after knocking and announcing before using force.

18         A.    Prior to me coming up to SWAT, they

19   utilized a 10 Second Rule, and then when I was

20   there, we and Melanie O'Daniel ended up changing it

21   to a reasonable amount of time.

22         Q.    Okay.  So the 10 Second Rule, was that

23   actually in writing?

24         A.    Yes.

25         Q.    Okay.  And to your knowledge, Melanie



Page 59

1    O'Daniel personally made the decision to change that?

2         A.   I believe she ended up changing it.

3         Q.   Okay.  Why?

4         A.   I don't -- I don't know.

5         Q.   Okay.  Prior to this SWAT mission -- I don't

6    know, I may not use the right terminology.  But there

7    was a "staging" or a "briefing" at the parking lot of

8    the Sam's Town Hotel & Casino; right?

9         A.   Correct.

10        Q.   I'm kind of curious, what's the reason

11   Sam's Town was chosen?

12        A.   What we ended up using or the reason we

13   used Sam's Town is we -- we want a, kind of a large

14   structure that can kind of conceal us.  So if we're

15   serving search warrants within a certain area that

16   is a high crime area and if they see SWAT trucks,

17   the armor, then everybody within that neighborhood

18   starts letting other people know.  So it could tip

19   that person off.

20            So what we do is we try to select areas

21   that have a large parking lot because there is quite

22   a bit of vehicles that we -- that we bring.  Our

23   own -- the -- our own work trucks as well as the --

24   the armor.  Plus we have the Search and Rescue comes

25   out with us.  You also have detectives who come out

Page 60

1    there as well.  So we need a large area that we can

2    put all of our vehicles, and then we were in that

3    parking lot of Sam's Town.  So we're pretty much

4    concealed in there.

5        Q.   Is it just a coincidence that the underlying

6    murder that was being investigated also happened at

7    Sam's Town?

8        A.   Coincidence.  It was -- what we do is we

9    take in consideration what would be a good route as

10   well.  So from that point, it's a good location,

11   which it being at the Sam's Town, in that parking

12   garage, and from there, we can just exit and go

13   straight up Nellis.

14       Q.   Did you conduct any portion of the -- the

15   briefing?

16       A.   No.

17       Q.   Who did?

18       A.   That was going to be the assistant team

19   leader, Jake Warner, and then he was working that

20   with Sergeant Backman.

21       Q.   Okay.  Did any of the homicide people speak

22   as well?

23       A.   They did.

24       Q.   Would that be Detective Grimmett?

25       A.   Yes.

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 61

1        Q.    Is there anyone you could recall, other than

2    Detective Grimmett?

3        A.    You had gang detectives there.  Edgar

4    Nahum.

5        Q.    How long was the briefing in terms of

6    minutes?

7        A.    I'd -- I'd be guessing.  Maybe 20 minutes.

8        Q.    I've not seen any body camera video of

9    briefing.  Are you aware of anybody who had their

10   body-worn camera activated during the briefing?

11       A.    No.  Because that's on our helmets.

12       Q.    Well, why would it not be activated during a

13   briefing?

14       A.    Because we don't record the briefings, and

15   those are -- those recording devices are attached to

16   our helmets.

17       Q.    Well, I mean, it's sort of part of your

18   investigation or mission, the briefing.  So why

19   wouldn't a record be made of that?

20       A.    It's on paper.

21       Q.    You mean the IAP?

22       A.    IAP, as well as the -- the draw as well.

23       Q.    Yeah, so when you refer to "the draw," I've

24   seen a photograph somewhere that there's like a giant

25   piece of paper, and there's a bunch of handwritten

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 62

1    notes on it.  Is that what you're referring to?

2         A.    Correct.

3         Q.    So who did the draw?  Whose handwriting is

4    on that?

5         A.    That is going to be the recon team.  So

6    they create the draw, and then the assistant team

7    leader, Jake Warner, is going to position people as

8    far as the lineup goes, and then where the

9    containment positions are as well.

10        Q.    What happened to the draw?  Where is it

11   today?

12        A.    It should have been just photographed and

13   then put into -- on base.

14        Q.    Would it physically be destroyed, or is it

15   sitting somewhere?  Do you know?

16        A.    I don't know what they do with it, if it's

17   just destroyed, but we have a photo, photograph of

18   it.

19        Q.    Okay.  Who took that photograph?

20        A.    It would be the person who had the camera.

21   I don't know who it was.

22        Q.    Okay.  You don't know if it was Backman or

23   Warner or another officer?

24        A.    No.

25        Q.    How long have you known Lieutenant O'Daniel?



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 63

1      A.    I've worked a short period of time at
2    South Central when I was new, not with her.  I knew
3    she was on another squad.  I just knew her by face,
4    by name; and then when I went to SWAT, it was that
5    time frame, from the July '19 until she left.
6      Q.    When did she leave?
7      A.    I don't know the exact date.
8      Q.    Do you know why she left?
9      A.    I would say for personal reasons.  She had
10   time to retire.
11     Q.    Did she feel that she might be terminated if
12   she didn't retire?
13         MR. ANDERSON:  Objection.  Form.
14         THE WITNESS:  I don't know.
15   BY MR. BREEDEN:
16     Q.    Are you aware of any discipline, reprimand,
17   or contact that she received because of the Williams'
18   incident?
19     A.    No.
20     Q.    What -- when you first met her, what squad
21   was she on, if not SWAT?
22     A.    Your -- say that again.
23     Q.    When you first met her, was she assigned to
24   SWAT, SWAT?
25     A.    No.  When I first met her, I remember her

Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 64

1    being at South Central Area Command when I was

2    there.

3        Q.    How many SWAT missions were you ever on

4    where Lieutenant O'Daniel was onsite, onsite when the

5    mission was performed?

6        A.    Quite a few.

7        Q.    Okay.  Was that typical for her to be

8    onsite?

9        A.    For barricades, hostage rescues, yes.

10           For search warrants, that would be a "yes"

11   and a "no" to where she would only come out if there

12   was a high likelihood that like the subject would be

13   fighting us or resisting us or it was a major case

14   is what it would be for.

15       Q.    Was she ever a ser- -- a SWAT sergeant

16   before she was made lieutenant?

17       A.    No.

18       Q.    Was she ever one of the SWAT operators, like

19   somebody in the line, before she became SWAT

20   lieutenant?

21       A.    No.

22       Q.    Are you aware of anyone else who applied for

23   the position of SWAT lieutenant and wasn't selected?

24       A.    No.

25       Q.    Okay.  So when the job of SWAT lieutenant

Page 65

1    comes open, you're not aware of anybody, other than

2    Lieutenant O'Daniel, who applied?

3        A.    From what I remember is the position that

4    she held was over the homeland saturation team, and

5    they were the backup lieutenant to SWAT, and so she

6    was getting those repetitions in that now the

7    current lieutenant, I believe, ended up leaving, and

8    then she filled that position.

9        Q.    Okay.  But are you aware of anybody else who

10   wanted the position or applied for it?

11       A.    I don't know.

12       Q.    Okay.  Did you think she was the most

13   qualified person for that position?

14       A.    She had the reps, yes.

15       Q.    Okay.  What did you think of her as a

16   lieutenant, her ability?

17            MR. ANDERSON:  Objection to form.  Go ahead.

18            THE WITNESS:  It was good.

19   BY MR. BREEDMAN:

20       Q.    Do you think that the fact that she was

21   female played a role in her getting that position?

22            MR. ANDERSON:  Objection to form.

23            THE WITNESS:  No.

24   BY MR. BREEDEN:

25       Q.    No?  At any point, prior to the SWAT

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 66

1    mission, did Detective Grimmett tell you that there

2    was probable cause to make an arrest?

3          A.    Yes.

4          Q.    Okay.  And why wasn't there an arrest

5    warrant then?

6          A.    Because we had a search warrant for that

7    residence.  He was listed in the PC statement, as

8    far as our two subjects that were involved, which is

9    Rembert and Fisher.

10         Q.    Okay.  Do you believe better reconnaissance

11   or surveillance could have occurred on this mission?

12               MR. ANDERSON:  Objection.  Form.

13               THE WITNESS:  We -- we could have done or

14   homicide could have done more.  But, again, we're

15   limited on a time frame of dealing who -- with the

16   subject because it is kind of the, I wouldn't

17   necessarily say it's exigent circumstances, but you

18   have someone who is a violent individual that

19   committed a homicide, and those two subjects, the

20   intel that we had, were in those apartments.

21               And there was prior incidences leading up

22   to that to where, even in that specific location at

23   3050 Nellis, there was prior incidences of shootings

24   that were occurring, and those two subjects were

25   involved.

Page 67

1    BY MR. BREEDEN:

2        Q.   All right.  But on the morning in question

3    that this happened, SWAT had no idea who was inside;

4    right?

5        A.   We had intel that those two subjects, which

6    was Rembert and Fisher, were inside.  And then right

7    before the brief, they gave an update saying Fisher,

8    who was on an ankle monitor, was not in there.

9        Q.   Okay.  So who specifically told you that

10   they believed that the subjects were inside?

11       A.   Homicide detectives were saying that, that

12   those subjects were inside.  That was the intel that

13   they had.

14       Q.   Okay.  And, you know, I just ask a very

15   specific question.  Were -- were they -- was it your

16   understanding that they were telling you they had

17   specific information that, at that time, when SWAT

18   was going to arrive, they were inside or just that,

19   generally, they believe they might be inside?

20       A.   Per the IAP, also listed in the search

21   warrant is the family members who were indicating

22   that that is the apartment that Rembert and Fisher

23   were in.  So that was the information that we were

24   given.

25       Q.   Were you aware that one of those suspects

Page 68

1    was wearing an ankle monitor?

2         A.    Yes.

3         Q.    So pretty easy to figure out where that

4    gentleman is, isn't it?

5         A.    Correct.

6         Q.    And it wasn't that apartment; right?

7         A.    No.  So prior to us serving the search

8    warrant, they gave us an update saying Fisher was

9    not pinging inside that apartment.

10        Q.    Well, what was your understanding then about

11   whether there could be other people inside the

12   apartment -- women, children, innocent people?

13        A.    We were given no information that there was

14   any children, no elderly, no dogs, as far as at that

15   apartment.  We were given information that this was

16   a flophouse, indications of, you know, it's a drug

17   house, violent individuals inside, as well as access

18   to weapons.  There was evidence of a homicide that

19   was inside that residence.

20        Q.    Well, let's -- let's talk about the access

21   to weapons.  I mean, it's easy to say:  "Oh, I think

22   this guy is a drug dealer so he probably has a gun";

23   right?  That's just kind of a general statement.

24              For the particular time that you were there

25   on January 10th of 2022, in that morning, did anyone

Page  69

1   actually see any weapons or firearms from prior to

2   entry of the apartment?

3        A.   Prior to entry, no.

4        Q.   Okay.  Also, this particular apartment had a

5   brass wrap on the front door; right?

6        A.   Correct.

7        Q.   And that affects what you do as SWAT because

8   that means it's going to be much harder to do a

9   forced entry on the front door, knock it down; right?

10       A.   Correct.

11       Q.   Okay.  Do you think that was a failure of

12  surveillance or reconnaissance, not to notice that

13  there was a brass wrap prior to when you're actually

14  there in front of the door?

15            MR. ANDERSON:  Objection to form.  Go ahead.

16            THE WITNESS:  So going up to the residence,

17  obviously that would have been a good indicator.

18  But I recognize that, during the recon, found out

19  later that -- again, that's going back to how busy

20  of a time frame that apartment is with those

21  individuals, a bunch of individuals walking through

22  there.  I know that Officer Hoskins tried to get a

23  good look at that door and was almost confronted by

24  subjects that were walking into that apartment.  So

25  he ended up walking by.

Page 70

1   BY MR. BREEDEN:

2        Q.   Well, okay.  But don't you think that would

3   be part of basic reconnaissance, if your IAP says

4   we're going to use a battering device to knock down

5   the front door, to know whether that's a reinforced

6   door?

7        A.   Yes.

8             MR. BREEDEN:  Okay.  You know, I think I'm

9   at a decent stopping point.

10             Let's take a five minute break.

11             MR. BREEDEN:  Going off the record at

12   10:21 a.m.

13             (Pause in the proceedings.)

14             THE VIDEOGRAPHER:  We're back on the

15   record.  Time is 10:33 a.m.

16   BY MR. BREEDEN:

17        Q.   All right.  Sergeant Findley, I want to talk

18   a little bit about NFDDs or Noise Flash Diversionary

19   Devices.  Is it your understanding that SWAT has

20   total discretion to use them whenever they wish?

21             MR. ANDERSON:  Objection.  Form.

22             THE WITNESS:  So we don't just use them

23   whenever we wish.  There's going to be a certain

24   purpose for utilizing a NFDD.

25   / / /

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 71

1    BY MR. BREEDEN:

2        Q.    What was the purpose for using NFDDs on

3    January 10th of 2022?

4        A.    So we used a stun stick, and that was going

5    to be inserted into the window, on that fourth side

6    of the residence, and then we used a nine banger on

7    that fourth side as well.

8        Q.    Yeah, but what's the purpose of those?

9        A.    It's to distract, disorient the people that

10   are involved.

11       Q.    Okay.  And we can agree that those NFDDs,

12   they were deployed before anyone said or did anything

13   or moved or reacted at all inside the apartment;

14   right?

15       A.    I don't know.

16       Q.    Okay.  Well, was it planned that they would

17   be automatically deployed, or was somebody in charge

18   of whether or not they were deployed?

19       A.    Yeah, so whoever's in charge of the stun

20   stick, once they insert it, make sure that you

21   clear, visually clear, and then you can set the

22   distract off.

23       Q.    Now, in your CIRT interview, you refer to

24   NFDDs as an "Option 2."  Do you recall that?

25       A.    Correct.

Page 72

1      Q.    So "Option" implies to me that they may or

2   may not be used.  Is that what you mean?

3      A.    No.

4      Q.    Oh, okay.  So how do you use that term?

5      A.    That's the way it's written on our card is

6   called a, just our "options" that we have.  I don't

7   know.  I wasn't in charge of making the verbiage for

8   that.

9      Q.    Okay.  So when it says Option 2, it wasn't

10  meant an option that -- that somebody had discretion

11  whether or not they would be used; they were

12  preplanned to be used?

13     A.    Preplanned.  And then, again, whoever's

14  deploying them, especially on the insertion, you

15  have to make sure it's safe to do so.  So in that

16  instant, you put it through the window, up high,

17  into the ceiling.

18     Q.    And those had been preplanned to be used on

19  the IAP; correct?

20     A.    Not on the IAP, just on the tactical plan.

21     Q.    Okay.  But Lieutenant O'Daniel had approved

22  NFDDs, didn't she?

23     A.    Correct.

24     Q.    Okay.  And would Warner and Backman have

25  also been aware of that and approved it?

Page 73

1    A.    Correct.  So they developed the plan, which
2    was Officer Warner, Sergeant Backman, and then they
3    relayed that information to Lieutenant O'Daniel, who
4    gave the authorization for that.
5    Q.    Okay.  If this is a Knock and Announce
6    Warrants, why are we using NFDDs at all?
7    A.    We're using NFDDs as a distraction device.
8    So depending on who the individual it is inside, if
9    we're dealing with a violent individual homicide
10   warrant, in this case, who does have those access
11   for weapons, then what we want to do is to, in a
12   way, distract that person so if they do decide to
13   take up arms and try to shoot at officers coming
14   through the door, it's going to disrupt their
15   OODA loop and take away from that fine motor skills
16   of doing fire.
17   Q.    Well, why are you trying to distract anyone
18   on the inside of the apartment if you're required to
19   give that person time to wake up and go to the front
20   door and ascertain it's police and provide them
21   admittance so -- into the apartment?
22   A.    So give them a reasonable amount of time.
23   We give them announcements.  We give them
24   opportunity to comply, to surrender within that time
25   frame.  So if they do decide to do the opposite

Page 74

1    which, in a lot of cases, we deal with people who

2    are unreasonable.  So what we do is, to prevent them

3    from doing any type of harm, then we use a distract.

4    And then in this case, we ended up doing a distract

5    to the inside, up high.

6        Q.    So it was preplanned, wasn't it, during the

7    briefing, that Officer Bertuccini would have the

8    stun stick and then immediately upon the end of the

9    second announcement, he would break the rear window

10   and deploy the stun stick inside the apartment?

11   Wasn't that preplanned?

12       A.    Correct.

13       Q.    And so by preplanning that, how does that

14   give somebody time to comply and wake up and walk to

15   the door and open the door and allow police to come

16   inside?

17       A.    Well, again, your -- your question is kind

18   of loaded to where you're saying that they will

19   comply; and, again, what we deal with, people who

20   are unreasonable, who are not going to comply.

21   "Complying" in my regards is to -- they don't

22   necessarily have to come to the door.  "Complying"

23   means sitting in place with your hands up.

24   "Complying" means announcing "Hey, I'm here."  That

25   is compliance to us.  So they don't necessarily have



Page 75

1    to come to the door.  Compliance is exactly that,

2    they can sit in place and with their hands up.

3    That's compliance.

4        Q.    Okay.  Well, Jasmine King appears to have

5    been trying to comply and let officers into her

6    living structure, and she was injured when the

7    explosives went off in that case; right?

8        A.    Correct.  And we don't know that's what

9    she's trying to do.

10       Q.    And you realize, don't you, that -- that

11   it's unlawful or it violates Knock and Announce if

12   people are not given a reasonable amount of time to

13   come to the front door and allow the police entry?

14           MR. ANDERSON:  Objection.

15   BY MR. BREEDEN:

16       Q.    Is that your understanding?

17           MR. ANDERSON:  Objection.  Form.  Answer.

18           THE WITNESS:  So my understanding is a

19   reasonable amount of time.  So what is a reasonable

20   amount of time for, in this instance, Isaiah

21   Williams to come to the door, who's sitting on the

22   couch, who's five feet away?  Again, I don't --

23   didn't know that, but you're saying six seconds, and

24   that's just on the assertion; right?

25           So in six seconds, you can get up off the



Page 76

1    couch, walk five feet to the door.  In six seconds,

2    you can sit there and say "Hey, I'm complying.  I'm

3    here."  "Compliance" is, like I said, sitting still

4    with your hands up.  "Compliance" isn't, to me,

5    where you grab a gun and start shooting.

6    BY MR. BREEDEN:

7         Q.   So --

8         A.   He also had 17 seconds to get up and walk

9    to the door if, if he wanted to, to comply.  But,

10   again, we deal with people who are not reasonable

11   and will not cooperate.

12        Q.   So you had preplanned this operation with

13   the assumption that people inside the apartment would

14   not comply; right?

15        A.   We --

16             MR. ANDERSON:  Objection.  Form.  Go ahead.

17             THE WITNESS:  So what we do is work off of

18   experience.  So a lot of these plans are what type

19   of experience we have with dealing with this type of

20   situation.  We're dealing with someone who is wanted

21   for murder, who has those access to weapons.  So

22   what we do is try to plan the safest route, to have

23   those contingency plans in place.  So if the person

24   does come to the door with a gun, we have that

25   option to distract them.



Page 77

1          So, again, the law says, well, giving the

2    person a reasonable amount to comply, to come to the

3    door.  But, again, in our world that we deal with,

4    we don't deal with reasonable people.  We deal with

5    violent individuals who will do quite the opposite.

6    So we have to have those mitigating factors,

7    those -- those contingency plans to prevent that to

8    be safe.

9    BY MR. BREEDEN:

10         Q.   Are you saying then that you think

11   Knock and Announce doesn't require you -- because you

12   talk about compliance.  Are you saying you think

13   that's satisfied, not by an amount of time for

14   somebody to come to the front door and allow entry

15   but enough time for somebody to yell out "Okay.  Come

16   in?  Something like that?

17         A.   Correct.  In my reasonable amount of time,

18   it doesn't take that long to say "Okay.  I give up.

19   I'm coming to the door"; or to comply, just to stand

20   there, sit there, have their hands up.  That's

21   compliance.

22         Q.   Well, so since much of this, of what was

23   done was preplanned in terms of the use of force,

24   how much time was preplanned to allow any occupant

25   inside that apartment to come to the front door,

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 78

1    ascertain it was police with a warrant, and provide

2    them entry?

3        A.   Sounds like it was, from videotapes, all

4    that, it was 17 seconds to the time of entry.

5        Q.   Well, now, that -- that's very interesting

6    that -- that you say 17 seconds.  I think the video

7    is very clearly going to disprove that.

8        A.   Uh-huh.

9        Q.   But the -- the time that was planned, it was

10   planned that, immediately on the end of the second

11   announcement, the -- the back window would break and

12   the stun stick would be inserted and simultaneously

13   at the front door, that would be knocked down with a

14   battering device.  That's what the plan was; right?

15       A.   Correct.

16       Q.   Okay.  So as fast as I can yell "Police,

17   search warrant, police search warrant," (Counsel

18   snaps fingers), that was the preplanned amount of

19   time; right?

20           MR. ANDERSON:  Objection to form.

21           THE WITNESS:  It's longer than that because

22   he gave out the entire address.

23   BY MR. BREEDEN:

24       Q.   Okay.  So going to ask you some more

25   questions specifically on Knock and Announce.



Page 79

1    All right.  Well, actually, first of all, let me

2    back-up and finish with the NFDDs.

3              Okay.  The stun stick, have you ever been in

4    the same room when a stun stick was deployed?

5        A.    Yes.

6        Q.    Okay.  Would you agree with me that it's

7    quite bright?

8        A.    If you're looking at it, yes.

9        Q.    Would you agree to me that, even if your

10   eyes are closed, you're -- you're going to see a

11   bright flash?

12       A.    You'll see not obviously a bright flash,

13   but you're going to have a little bit of a flash,

14   yes.

15       Q.    Okay.  And if your eyes happened to be open,

16   would you agree with me that that, that would be

17   blinding?

18       A.    If you're looking at it, you'll have a

19   bright spot for momentarily, few seconds.

20       Q.    Yeah.  And would you agree with me that it's

21   quite loud when it deploys?

22       A.    Yes.

23       Q.    Would you agree with me that it's so loud

24   that it would temporarily impair your hearing?

25       A.    I don't know how long "temporarily" would

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 80

1    be.  Are you talking seconds?

2        Q.   At least seconds.

3        A.   I could see it being for a couple seconds,

4    yeah.

5        Q.   Okay.  And would you agree with me that

6    there's also like a physical element to it, like you

7    feel a pressure wave?

8        A.   You'll have a little bit of a pressure

9    wave.

10       Q.   Yeah.  And before a stun stick is deployed,

11   the person deploying it is supposed to make sure that

12   the area is clear, right, because we don't want it to

13   be deployed too close to a person?

14       A.   Correct.

15       Q.   And what's your understanding of how far

16   "clear" is?  Does "clear" mean no one in the same

17   room?

18       A.   Immediate area, within like a three-foot

19   radius.

20       Q.   So you think it's three feet?

21       A.   Immediate area, yeah.

22       Q.   So you think it's safe to deploy one of

23   those within three feet of somebody?

24       A.   It's going to be up high.  That was the

25   plan, into the ceiling.

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 81

1    Q.    Well, doesn't matter if it's up high or up

2    low.  You're saying it's just three feet?

3    A.    I've been standing next to distracts as

4    they go off, yes.

5    Q.    Okay.  Now, there was also a nine banger

6    used.  Why use a nine banger and a stun stick?

7    A.    So part of the plan was to implement that

8    nine banger; and it's, again, to distract that

9    person.

10   Q.    Who actually deployed the nine banger?

11   A.    I don't remember who.

12   Q.    And was it deployed only on the outside of

13   the apartment, or was it thrown inside?

14   A.    No.  Outside.

15   Q.    Okay.  Would you agree with me that a nine

16   banger sounds like gunfire?

17   A.    To the untrained, yes.

18   Q.    Okay.  Well, even sometimes to the trained,

19   right, because actually in the video in this case,

20   Officer Bertuccini, I believe, has to ask Rothenburg

21   "Was that a nine banger?"  And he was confused about

22   when the gunshots started.

23        Have you seen that?

24   A.    No, I didn't see that.

25   Q.    Okay.  But you certainly agree, at least to

LEXITAS

Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 82

1    layperson like Mr. Williams, if he hears a nine

2    banger going off, he might believe he was already

3    under gunfire?

4         A.   Possibly.

5         Q.   Okay.  I mean, do you think for a layperson,

6    that would be a logical assumption?

7              MR. ANDERSON:  Objection.  Form.

8              THE WITNESS:  For a who person?

9    BY MR. BREEDEN:

10        Q.   For a layperson.

11        A.   A "lay"?

12        Q.   Nonlaw, nonlaw enforcement.

13        A.   Oh.

14        Q.   Who does not have experience with nine

15   bangers.

16        A.   Yes.

17        Q.   Okay.  Now, I think what you're saying is --

18   you correct me if I'm wrong.  You're saying he was a

19   law enforcement person, you could tell the difference

20   if we had some sort of experiment where we threw a

21   nine banger and then we just had somebody fire a gun

22   nine times, you could tell the difference between

23   those two.

24             But for an ordinary member of the public,

25   without your law enforcement experience, they might

Page 83

1    confuse a nine banger for gunfire?

2        A.    Possibly, yes.

3        Q.    Okay.  And, in fact, especially if a window

4    had been broken out simultaneous with deployment of

5    that nine banger, that might lead somebody to believe

6    that they were actually shooting through the window;

7    right?

8            MR. ANDERSON:  Objection to form.

9            THE WITNESS:  I don't know.

10   BY MR. BREEDEN:

11       Q.    Okay.  Well, do you think that's one

12   possible assumption somebody could make?  Their

13   window explodes right next to them and they hear nine

14   sounds that sound like gunfire, do you think somebody

15   might believe, in a few seconds that they have to

16   ascertain the situation, that they could be being

17   shot at through the window?

18       A.    Possibly.

19       Q.    Okay.  So Knock and Announce.  First part of

20   Knock and Announce is the knock part.  Okay.  Who was

21   in charge of the knock part?

22       A.    Nobody was.

23       Q.    Okay.  Is it formal or informal policy of

24   Metro that somebody, when doing Knock and Announce,

25   should physically knock on the front door?

Page 84

1       A.    There's no policy that says that we need to
2    physically knock on the door.  So I would say it was
3    informal, like you said.
4       Q.    So you believe there was, at least, an
5    informal policy that somebody should physically knock
6    on the door?
7       A.    We never physically knocked on door.
8       Q.    Okay.  So you're saying the informal policy
9    was not to physically knock on the door?
10      A.    Like I said, we've never gone up and
11   knocked on the door.  We announced or identified
12   ourselves and our intentions every time.
13      Q.    Okay.  So would you say that Standard
14   Operating Procedure for SWAT, at that time, was to
15   never physically knock on the door?
16      A.    Correct.  We never physically knocked on
17   the door.
18      Q.    So it was preplanned then that no physical
19   knock on the front door would occur?
20      A.    Correct.
21      Q.    All right.  Do you know why that is?
22      A.    From case law, what they're saying is that
23   we don't need to physically go up there and knock on
24   the door once announcements have been made because
25   you have announced who you are; you have identified

Page 85

1    yourself and as -- as far as your intentions go.  So

2    that is Peterson vs. U.S. Ninth Circuit up in

3    Washington state.

4        Q.   Okay.  And was there anything specific about

5    Apartment 1125 that morning, though, that led any

6    officer to believe that it would be unsafe to knock?

7        A.   No.

8        Q.   And, in fact, on the video, we could see

9    officers are staging right out in front of the front

10   door.  Would you agree with me that it wouldn't have

11   taken a lot of effort for one of those officers just

12   to rap on the door?

13       A.   They could have.

14       Q.   Okay.  But Metro chooses, Metro SWAT chooses

15   not to do that; right?

16       A.   Correct.

17       Q.   Okay.  Now, after "knock," there's

18   "announce."  So let's -- let's talk about "announce."

19   For the SWAT operation when Mr. Williams was killed,

20   who was in charge of the announcements?

21       A.   Sergeant Backman.

22       Q.   And we've already talked about Sergeant

23   Backman.  He's got less than 30 days on SWAT, and he

24   hasn't even completed the full SWAT training;

25   correct?



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 86

1            MR. ANDERSON:  Objection.  Form.

2            THE WITNESS:  So you're almost implying

3    that he's like a brand new person, a brand new

4    officer.  So Sergeant Backman's been 23-plus years,

5    and he's been a sergeant for a long time.  He's been

6    in a lot of different units, specialized units.  So

7    narcotics.  He's been in major violators.  He's --

8    he's done surround and callouts numerous times.

9            He, when he came up to SWAT, he was given

10   that 40-hour class, one on one.  So he had that

11   training, and he was competent in that position.  He

12   was in Phase 2 of our SWAT policy in regards to a

13   new sergeant program, and at that time frame, he is

14   at the position of little to no supervision as far

15   as me.  So he's being almost on his own, very

16   competent in -- in the position.  And it's not

17   difficult to be on a bullhorn and call out an

18   address.  So any officer, a brand new officer, is

19   able to do that.

20   BY MR. BREEDEN:

21       Q.   Okay.  Now, to your knowledge, was this the

22   first time, during a SWAT where a CET was used, that

23   Sergeant Backman would conduct the announcement?

24       A.   For that position, yes.  And then in

25   training, bunch of times, we do that.

Page 87

1      Q.    Okay.  Now, a bullhorn was used, but is --

2   is that official or informal policy of Metro SWAT to

3   use a bullhorn for the announcement?

4      A.    It wasn't in our policy, and what we were

5   doing is we wanted to make sure, with the bullhorn

6   that's very loud, verbal announcements -- kind of

7   the issue that we always had with bullhorns is that,

8   during the CETs, the guys would just drop them and

9   they would constantly break.  So we're always

10  constantly replacing those.  But in that instant,

11  yes, this is part of the plan.  We utilized a

12  bullhorn.

13     Q.    Okay.  So was there anything particular

14  about that morning that caused the bullhorn to be

15  used or that was just Standard Operating Procedure?

16     A.    We started to implement the bullhorn due to

17  the fact that, again, we did have a brand new

18  bullhorn and then it was not broken.

19     Q.    Okay.  Now, what announcement was intended

20  to be given?

21     A.    So the announcements are going to be

22  "Police, search warrant," address of this, and then

23  the -- that was -- that's your full announcement.

24  So "Police, search warrant," the residence, whatever

25  it's going to be.

Page 88

1    Q.    Okay.  And so for an apartment, is it the
2    official or unofficial or Standard Operating
3    Procedure that when you're doing a search warrant on
4    an apartment, that the announcements should include
5    the apartment number?
6    A.    I don't think you're going to find it in
7    the, like an SOP or in a policy.  But as far as what
8    should happen if it is an apartment, then yes, give
9    the correct apartment number.
10   Q.    Yeah, because if you just walk around in the
11   middle of an apartment complex and you scream
12   "Police officer, search warrant" or you just say, you
13   give the address but not the apartment number, well,
14   there's people in a dozen different apartments that
15   could hear you; right?
16   A.    Correct.
17   Q.    Okay.  Was it intended that day that when
18   Sergeant Backman gave his announcements, that he
19   would also give the apartment number in the
20   announcement?
21   A.    So, yes, it would be intended to give the
22   number.
23   Q.    Are you aware that when he did the first
24   announcement, he did not include the apartment
25   number?

Page 89

1      A.    No.

2      Q.    Okay.  Now, when an officer is giving the

3   announcement, like let's say I get up there, I'm

4   doing the announcement and I say:  "Everyone, this is

5   Sergeant Adam Breeden of the Las Vegas Metropolitan

6   Police Department, occupants of 3050 South Nellis

7   Boulevard, Apartment 1125, we have a search warrant,

8   please open the door," let's say that that's the

9   announcement, that's given.

10          In terms of how long you wait for somebody

11   to come to the door, the reasonable amount of time,

12   would you start that time from the beginning of the

13   announcement, when I first start speaking, or you

14   would you judge that from the end of the

15   announcement?

16      A.    So once you start the announcements is

17   you're, basically, would be starting the clock of

18   when we're going to go.  So if we're going to get

19   about two announcements, that's your first

20   announcement, second announcement, conclusion.

21   Conclusion.

22      Q.    Okay.  So are you saying that's written,

23   unwritten, SOP, or informal policy of Metro as to how

24   they assess that time, from the beginning of the

25   announcement rather than the end?

Page 90

1      A.    So yes.  You're not going to find it in a

2   SOP.  Your -- what we go off of is the reasonable

3   amount of time.  So what we're going to do with part

4   of the tactical plan is going to be, we're going to

5   give out a couple of these announcements, and then

6   after that, this is what we're going to do, so

7   following that.

8      Q.    Okay.  So why would it make any sense to

9   start that time from the beginning because I haven't

10  finished speaking?  I haven't announced the apartment

11  number; I haven't said "Police, search warrant" yet.

12  How could somebody understand what was intended if

13  you measure that time in seconds from the beginning?

14     A.    I would say that if you're dealing with

15  someone who is a homicide suspect, they know they

16  just committed a murder and they hear police outside

17  their door, yelling on a bullhorn, they would

18  probably have a good indication that they -- we're

19  there for them.

20     Q.    All right.  But it wasn't a homicide suspect

21  in this time.  It was an innocent young man who

22  hadn't committed any homicide; right?

23     A.    Well, he wasn't innocent.  He had several

24  shooting cases that North Town was looking at.

25     Q.    You believe he had shooting cases?

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 91

1    A.   Yeah.

2    Q.   Who told you that?

3    A.   That was after the fact, yes.  So he --
4    you're saying he's innocent.  He -- he was linked to
5    a couple of shooting cases up in North Town.  So our
6    gang investigations team was able to give that
7    information out.

8    Q.   Do you believe he was part of a gang?

9    A.   I don't know.

10   Q.   Okay.  Well, you didn't know anything about
11   Mr. Williams being inside before he was shot; right?

12   A.   No.

13   Q.   And, in fact, even after he was shot, you
14   assumed it was one of the suspects, Mr. Rembert or
15   Mr. Fisher, and then it turned out not to be; right?

16   A.   Correct.

17   Q.   Okay.  So in terms -- going back to Knock
18   and Announce, so the third requirement of Knock and
19   Announce is for a reasonable amount of time to pass
20   for somebody to come to the door and ascertain that
21   it truly is officers and provide them admittance.
22   Who was in charge of that that day?

23   A.   You say that I can be.  I'm the team leader
24   on that incident.

25   Q.   Okay.  And you -- you had not preplanned for

Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 92

1    there to be any certain amount of time in seconds;
2    correct?
3        A.    As far as seconds go, no.  We're going off
4    of the size of the structure, how small it was, the
5    apartment, who we're dealing with, all those
6    mitigating factors; and then, again, applying that
7    to case law, which is a reasonable amount of time to
8    come to the door or to comply.
9        Q.    Regarding the announcement, do you believe
10   that the announcement requirement is met?  Let's
11   assume this was just a single family residence, not
12   an apartment.  Do you think that's met by the simple
13   announcement "Police, search warrant"?
14       A.    So say that question again.
15       Q.    Yeah.  So if -- if I were doing, executing a
16   search warrant of a single family residence and I
17   just walked up to the front door and I announced
18   "Police, search warrant," do you think that is a
19   legally sufficient announcement?
20       A.    No.  I mean, you're going to have to
21   identify the address of a police search warrant,
22   residence of this location.
23       Q.    Okay.  So if the announcement in this case
24   were just "3050 South Nellis Boulevard, No. 1125,
25   police, search warrant," do you think that's

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 93

1    sufficient?

2        A.    Yes.

3        Q.    So do you believe as fast as I can yell that

4    two times, that immediately upon the ending of the

5    second announcement, that force can be used to enter

6    that apartment?

7        A.    Depending on the structure that you're

8    applying and who you're dealing with, those would be

9    the factors that you also have to consider.

10       Q.    So let's say it's a super dangerous person

11   wanted for a homicide, you think you do not have to

12   wait any longer than however fast you can yell

13   "3050 South Nellis Boulevard, No. 1125, police,

14   search warrant"?

15       A.    And what's the size of this apartment?

16       Q.    Well, we'll assume it's like a 700-square

17   foot apartment.

18       A.    Yes.

19       Q.    Okay.  And your testimony earlier was that,

20   at least at one time, there was a ten second waiting

21   requirement.

22       A.    Correct.

23       Q.    Okay.  And then it just changed to

24   "reasonable"?

25       A.    Correct.



Page 94

1    Q.   And I mean, just hypothetically, do you

2    think one second is a reasonable amount of time to

3    wait?

4    A.   No.

5    Q.   How about three seconds?

6    A.   No.

7    Q.   How about seven seconds?

8    A.   Now you're getting into small apartment, so

9    yeah.

10   Q.   Okay.  So I'm trying to figure out where you

11   draw the line in terms of seconds.  Do you draw the

12   line at five seconds?

13   A.   You're saying "seconds," and so what we do

14   is go off of your announcement.  So what is a

15   reasonable amount of time, again, going back to

16   compliance, surrendering, submitting, all those

17   factors.  You're assuming every time that you ask

18   this question that someone does come to the door.  I

19   don't know that.  A lot of times they don't come to

20   the door.

21        So how long do a give a murder suspect to

22   sit inside?  Because that's what we have to consider

23   is our safest tactic for our officers as well as

24   everybody else.  So the more time you give a murder

25   suspect to figure out if he wants to resist, grab a

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 95

1    weapon, run away, take someone hostage, you also

2    have to apply those factors.  You just can't sit

3    there and look at a reasonable amount of time to

4    come to the door.  There's other factors that we

5    take in consideration.

6        Q.   But under Knock and Announce, don't you have

7    to provide the people inside with the same reasonable

8    amount of time, whether it's a murder suspect or a

9    littering suspect?

10       A.   So we give them that reasonable amount of

11   time, and then we also apply those factors that I

12   mentioned before.

13           MR. BREEDEN:  All right.  I'd like to

14   provide you, we'll have this marked as Exhibit 1 to

15   this deposition.

16           (Whereupon Findley/Plaintiff's Exhibit

17           No. 1 was marked for identification.)

18   BY MR. BREEDEN:

19       Q.   Have you ever seen this before?

20       A.   So it's going to be our SWAT policies.

21       Q.   And just for the record, these are SWAT

22   policies and procedures related to Controlled Entry

23   Tactics, and it's LVMPD-1490 and 1491.

24           Now, I will represent to you that, you know,

25   there's probably been 20,000 pages of documents

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 96

1    produced in this litigation, and these two pages are

2    really the only thing that I would describe as

3    written training on Controlled Entry Tactics and

4    Knock and Announce that I've been able to find in

5    SWAT's training materials.  Are you aware of

6    something other than this?

7         A.   No.

8         Q.   Okay.  Now, it does mention one case,

9    Wilson vs. Arkansas.  This is on 1491.  Do you happen

10   to know Wilson vs. Arkansas and what the holding was

11   in that case?

12        A.   Not the exact court case and the details of

13   it, but I remember reading it.  I just can't say

14   "recall" because there's a bunch of them.

15        Q.   Were you ever trained on the Ninth Circuit

16   case of United States vs. Banks?

17        A.   So I've heard that case before.

18        Q.   Okay.  Can you tell me, from memory, what

19   that case said or what it required?

20        A.   Not to my recollection.

21        Q.   There's another case United States vs.

22   Granville.  Have you ever been trained on that case?

23        A.   No.  I haven't heard of Granville.

24        Q.   Okay.  So you wouldn't be able to tell me

25   what the decision was in United States vs. Granville



Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 97

1    and how that relates to Knock and Announce?

2         A.    No.

3         Q.    Okay.  Would you agree with me that, prior

4    to officers using force to enter the apartment, that

5    no one inside the apartment said or did anything or

6    reacted in any way?

7         A.    So prior to entry, we did not hear anybody

8    say anything.  No announcements from inside of the

9    apartment.

10        Q.    So no one can come along in this case and

11   say:  "Oh, heard a guy yell 'Get a gun'; I heard a

12   guy yell 'Police, run out the back'"?

13              Nothing like that happened; right?

14        A.    We did not hear that.

15        Q.    And other than a generalized suspicion,

16   there was nothing any officer actually observed that

17   morning to lead them to believe that there were any

18   weapons inside?

19        A.    I wouldn't say that you're -- the way you

20   say it, as far as a "general suspicion."  It's

21   your -- you got the entire SWAT team that's been --

22   has a lot of experience in not only the SWAT tactics

23   but as -- as in patrol and then dealing with these

24   type of situations where you're dealing with a

25   flophouse, dealing with someone who has, say,

Page 98

 1    committed that homicide.  So you have those

 2    indications that there is access to weapons.

 3            You're being told by the detectives that

 4    there's prior cases of these two individuals who

 5    were in that specific complex on with Fisher, having

 6    a rifle slung to his back.  You have Rembert with

 7    his vehicle being towed where there was an MP5 that

 8    was in the vehicle.  You have that shooting that

 9    occurred, accompanied with the homicide.  So there

10    is a lot of indication that there is going to be

11    some access to weapons inside.

12            Plus it's a flophouse.  It's a narcotics

13    house.  So going off our experience, that's what we

14    go off of.  So it's just not a general suspicion.

15    It's -- it's we go off of, yeah, it's a pretty good,

16    going off our experience, that there's going to be

17    some type of weapon inside, and we were correct

18    because there was a gun in there.

19    Q.    Well, with due respect though, I think that

20    you've legally just described what is literally

21    called "general suspicion."  I mean, for example, the

22    mere fact that I saw on somebody's Facebook page a

23    picture of them with a gun, two or three months

24    earlier, that doesn't mean that they automatically

25    have that gun with them at all times; right?

Garth Findley            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 99

```
 1              MR. ANDERSON:  Objection to the form of the
 2       question.  Go ahead and answer.
 3              THE WITNESS:  Well, I would say if
 4       they're -- if they have pictures of a gun, then
 5       they're going to be associated with the gun.
 6       There's going to be access to that gun.
 7       BY MR. BREEDEN:
 8          Q.   You -- you would admit that, before police
 9       used force to enter the apartment, no gun was
10       specifically seen or heard?
11          A.   We had information that both of those
12       subjects, Fisher and Rembert, both, were in
13       possessions of firearms.  So Fisher had a firearm
14       strapped to his back; and then on the secondary
15       date, there was a gun, MP5, that was in his BMW that
16       was towed later.
17          Q.   But you're talking about things that were
18       observed weeks or months earlier.  You're not talking
19       about anything that particular day; correct?
20          A.   Not that specific day.
21          Q.   Okay.  And, in fact, neither of the suspects
22       was even inside the house or the apartment that day;
23       right?
24          A.   After the fact, no.  We found out they
25       weren't in there.
```

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 100

```
 1        Q.    Now, you're aware that, under the -- the
 2   reasonable amount of time analysis for Knock and
 3   Announce, that what is reasonable can vary depending
 4   on certain factors.  For example, you've already
 5   mentioned one of them, which is the size of the
 6   apartment; right?
 7        A.    Correct.
 8        Q.    Okay.  And isn't one of the factors whether
 9   or not someone is likely to be asleep inside?
10        A.    I don't think that's necessary that if
11   they're asleep.
12        Q.    So do you believe that one of the factors
13   affecting the reasonableness is that, if a person is
14   likely to be asleep inside, they should be given a
15   longer time to respond?
16             MR. ANDERSON:  Objection.  Form.  Go ahead.
17             THE WITNESS:  Well, it depends on what
18   their actions are going to be.  Are they going to
19   come to the door?  I don't know.  So give them a
20   reasonable amount of time.  I give them a reasonable
21   amount of time.
22   BY MR. BREEDEN:
23        Q.    Have you been trained on that, that the --
24   the amount of time that is considered reasonable
25   should be longer if people inside are likely asleep?
```

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 101

1       A.    Not formal training.

2       Q.    Okay.  How about informal?

3       A.    Not informal training.

4       Q.    All right.  So as far as your personal

5    experience is, Las Vegas Metro Police Department has

6    never trained you on that issue?

7       A.    As far as if someone's asleep and comes to

8    the door, no.  Just going off the case law as far as

9    what we have here, which is give them a reasonable

10   amount of time, and also the other factors of if

11   they can submit, if they can comply.

12      Q.    Now, you would agree with me that,

13   hypothetically, if somebody were asleep, first of

14   all, you would need just kind of some general time to

15   wake up; right?  And then, second of all, you would

16   need some time maybe to make yourself decent.  I

17   mean, you might be sleeping without clothes or in

18   your underwear and you don't want to come to the door

19   in that way; and then, third, you might be moving a

20   little slower, in general, when you first wake up.

21           Would you just agree that all that is kind

22   of generally accurate?

23           MR. ANDERSON:  Objection to form.  Go ahead.

24           THE WITNESS:  So in this case, I don't

25   know.  I don't know if they're asleep.  I don't know

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 102

```
1    what their condition is.
2    BY MR. BREEDEN:
3        Q.   Okay.  That -- that kind of leads me to my
4    next point.  Do you think it is more likely than not
5    that Mr. Williams was asleep when this SWAT mission
6    began?
7             MR. ANDERSON:  Objection.  Form.
8             THE WITNESS:  I don't know his condition.
9    BY MR. BREEDEN:
10       Q.   Well, you say that.  But, first of all, the
11   very fact that it's 5:00 a.m. suggests that the
12   occupants inside would probably be asleep; right?
13       A.   I don't know.  This is a 24-hour town.
14   People have all sorts of odd shifts.
15       Q.   You agree with me that the majority of
16   people are still sleeping at 5:00 a.m. in a county?
17       A.   I wouldn't agree with you.
18       Q.   Okay.  And then as it actually turns out,
19   the way that Mr. Williams was found inside the
20   apartment, he was laying down.  He had his head on a
21   pillow, on a futon.  He had a blanket over him.
22            Did he appear that he had been sleeping,
23   based on those facts?
24            MR. ANDERSON:  Objection.
25            THE WITNESS:  I don't know.  I didn't see
```

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 103

1    him.

2    BY MR. BREEDEN:

3        Q.    When you assessed the reasonable amount of

4    time that it would take somebody to come to the door,

5    ascertain that it was police and provide them entry

6    for that search warrant, did you consider at all the

7    fact that people were likely to be asleep inside?

8        A.    So we're not going to -- I'm not going to

9    sit there and say that the subject is going to be

10   automatically sleeping or sleeping at the time.

11   Again, like I referred to, a 24-hour day town.  So I

12   don't know what the -- if that person is, what their

13   condition is, if they're sleeping or not.  So we

14   let -- as far as the reasonable amount of time,

15   that's what we're going off of, the policy.

16       Q.    Okay.  Incidentally, not everybody who bangs

17   on the front door and says "Police, open up" are

18   actually police; right?

19       A.    I don't know.

20       Q.    Well, have you ever heard of incidents where

21   maybe somebody, a burglar or a home invasion, to get

22   people to open the doors, claimed they were police

23   and they were not?

24       A.    They've probably done that before.

25       Q.    Yeah.  So if you lived in a rough



Page 104

1    neighborhood, you might not automatically assume that

2    people at the front door are police merely because

3    they say "Police"; right?

4        A.   And I don't think they'd be using a

5    bullhorn.

6        Q.   Do you think this was a rough neighborhood

7    or a rough apartment complex?

8        A.   Yes.

9        Q.   Are you aware of gang activity in that area?

10       A.   Yes.

11       Q.   Do you believe it might be reasonable for a

12   young man to have a firearm for his own self-defense?

13           MR. ANDERSON:  Objection to form.

14           THE WITNESS:  I would say, within that

15   neighborhood, a lot of people carry guns.  A lot of

16   people who are criminals carry guns.

17   BY MR. BREEDEN:

18       Q.   Some of them carry the guns because they're

19   criminals, and some of them carry guns for

20   self-defense; right?

21       A.   Correct.

22       Q.   I don't know that I've ever met a law

23   enforcement officer that didn't frequently carry a

24   gun for their own self-defense.  Do you do that?

25       A.   Yes.



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 105

1      Q.   At your own home, do you sleep in an area

2    where maybe you have a gun in a nightstand or a gun

3    that you could easily access if intruders came into

4    your home?

5      A.   Yes.

6      Q.   And that's loaded?

7      A.   Yes.

8      Q.   And if somebody believes that someone is

9    unlawfully breaking into their home, they do have a

10   right, in the State of Nevada, to use deadly force,

11   don't they?

12          MR. ANDERSON:   Objection.   Form.

13          THE WITNESS:   Yes.

14   BY MR. BREEDEN:

15     Q.   Have you ever been trained on Nevada Revised

16   Statute 179.055?

17     A.   What's the -- what is it?

18     Q.   Well, and that was kind of my first

19   question, and I -- I know, you probably don't have

20   the entire Nevada Revised Statutes memorized.

21     A.   No.

22     Q.   But -- but does that ring a bell when I say

23   that?

24     A.   Not just a number, no.

25     Q.   Okay.   So that is a statute pertaining to

Page 106

1    when officers can use force to enter a dwelling to

2    execute a warrant.  Are you aware that that statute

3    contains the specific phrase that officers cannot use

4    force until they are, quote, "refused admittance,"

5    end quote?

6        A.   Yes.

7        Q.   In this particular case with the search

8    warrant and Mr. Williams, what actions of

9    Mr. Williams led you to believe that he was refusing

10   admittance to officers?

11       A.   Well, first off, we didn't know Mr. Williams

12   was in there.  Second of all, we did not hear

13   anybody inside actually comply, saying that they

14   were inside, that they're coming to the door.  We

15   re- -- we waited a reasonable amount of time and

16   then conducted the breach of the door.

17       Q.   Okay.  But there isn't anything specific you

18   could point to that any occupant inside did or said

19   that led you to believe that they would refuse

20   admittance, is there?

21       A.   Not anything specific.

22       Q.   For example, no one inside yelled "We're not

23   coming out"; right?

24       A.   No.

25                (Reporter request.)



Page 107

 1          THE WITNESS:  I said "no."

 2     BY MR. BREEDEN:

 3          Q.   That particular morning, did you know how

 4     many people, specifically, were inside the apartment?

 5          A.   We were being told by homicide that it

 6     would be Rembert inside.  We were advised, prior to

 7     the servicing, that Fisher, who had the ankle

 8     monitor, was pinging not there.  Going off of

 9     factors that it's a flophouse, going off the recon

10     that Officer Hoskins conducted prior to several

11     subjects walking by him going into that apartment,

12     we had a safe indicator and I would say experience

13     that there would be multiple subjects inside.

14          Q.   And it actually turned out to be wrong.

15     Mr. Rembert was not inside; right?

16          A.   Correct.

17          Q.   And individuals inside the apartment, other

18     than Mr. Rembert, you had no idea who those

19     individuals were; right?

20          A.   Correct.  I didn't know who Mr. Williams

21     was or the secondary subject.

22          Q.   Did you have any idea of the floor plan or

23     the layout of the apartment?

24          A.   We had a floor plan, two floor plans we

25     were considering.  We had the -- the printout of

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 108

1    both of them and were looking that it was possibly

2    the larger floor plan.

3        Q.   As far as you knew, could the occupants

4    inside have been women or children?

5            MR. ANDERSON:   Objection.  Form.

6            THE WITNESS:   So we had no indication from

7    the homicide detectives that there would be women or

8    children inside there.

9    BY MR. BREEDEN:

10       Q.   But don't you have to consider that that

11   might be the case, that there might be innocent

12   people -- women, children, elderly people -- inside

13   when you serve these warrants?

14       A.   Again, going off of what they provided us,

15   there was no indication of, positive indication that

16   there was any women or children, elderly inside.

17   You can always kind of have that factor in mind, in

18   the back of your head, that there could be.

19       Q.   Well, I mean, literally a year before this,

20   Ms. King was inside her apartment.  She was in there

21   with her children; right?

22       A.   Correct.

23       Q.   And you believed there were dangerous

24   suspects inside, and there were none; right?

25       A.   Correct.



Page 109

1    Q.   And she was pretty severely injured because

2    of that, wasn't she?

3    A.   Yes.

4    Q.   In -- in terms of use of force, you never

5    used any kind of force or deployed your firearm that

6    morning, did you?

7    A.   I had my firearm out.  I wouldn't say like

8    I deployed it.  It was -- it was out and I didn't

9    use it.

10           MR. ANDERSON:  I'd like to show you what

11   we'll have marked as Exhibit 2 for your deposition.

12           (Whereupon Findley/Plaintiff's Exhibit

13           No. 2 was marked for identification.)

14   BY MR. BREEDEN:

15   Q.   Take just a second, look that over, and let

16   me know if you've ever seen that document before.

17   A.   (Witness complies.)  Haven't seen that, but

18   the material that's in it is familiar from policy.

19   Q.   Okay.  So this is a policy from the

20   State of Nevada Commission on Peace Officers

21   Standings (sic) and Training.  It's Performance

22   Objective Reference Material, and it refers

23   specifically to the Knock and Announce requirement.

24           It's your testimony that you've never seen

25   this document prior to today?

Page 110

1        A.    No, not this document.

2        Q.    And would you agree with me that you've

3    never been given any training by Las Vegas Metro

4    Police Department on Knock and Announce, at least as

5    this specific document describes it?

6        A.    No.  As far as someone coming in and -- and

7    showing this document and -- no.

8        Q.    Yeah.  So if we go down to this Wait/Refusal

9    requirement, it says refusal could be based on a

10   verbal statement.  But in this case with

11   Mr. Williams, nobody gave any verbal statement of any

12   kind, refusing officers entry before force was used;

13   correct?

14       A.    Correct.

15       Q.    And it says that individual conduct -- you

16   know, for example, if you saw maybe somebody inside

17   running to grab a gun or take a defensive position,

18   you know, that that might justify a shorter amount of

19   time.  But nothing like that occurred for this

20   particular search warrant; correct?

21       A.    Prior to, no.

22       Q.    Yeah.  And then so the last one is the

23   passage of a reasonable amount of time.  And here,

24   the Commission on Peace Officer Standards and

25   Training give some guidance, and it says, quote:

Garth Findley            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 111

1              "Note:  The amount of time that is

2      considered reasonable will depend on all the

3      circumstances.  Approximately one minute would be a

4      safe period in most cases, but it can be less,

5      especially if police officers know that someone is

6      inside and awake," end quote.

7              Have you ever, until this deposition, heard

8      that one minute rule?

9          A.   No.

10         Q.   Can we agree with you that when officers

11     showed up, when SWAT showed up to serve this warrant,

12     they did not intend to wait one minute after

13     announcements were given?

14         A.   Correct.

15         Q.   The example that it gives when that time

16     might be less is when peace officers know that

17     someone is inside and awake in the dwelling.  But in

18     Mr. Williams' particular case, you had no information

19     whether he was asleep or awake at the time; right?

20         A.   Correct.

21         Q.   So at least on under this standard, you

22     would not be able to argue that the time could be

23     less than a minute because officers knew someone was

24     inside and awake because you had no such information;

25     correct?



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

```
                                                      Page 112
  1              MR. ANDERSON:  Objection.  Form.
  2              THE WITNESS:  Correct.  We didn't know
  3    Mr. Williams was in there.
  4    BY MR. BREEDEN:
  5        Q.   Would you agree that, at least under this
  6    written standard, SWAT did not wait a reasonable
  7    amount of time before using force to enter?
  8              MR. ANDERSON:  Objection.  Form.  Go ahead.
  9              THE WITNESS:  We did not wait a minute,
 10    which is according to this document here.  I believe
 11    we waited a reasonable amount of time.
 12    BY MR. BREEDEN:
 13        Q.   Okay.  So you waited what you believe was a
 14    reasonable amount of time, but according to that
 15    written standard, what was not the minute that was
 16    recommended; is that what your testimony is?
 17              MR. ANDERSON:  Objection.  Form.
 18              THE WITNESS:  Correct.  We did not wait a
 19    minute, but I -- we waited what a reasonable amount
 20    of time is and after the two announcements.
 21    BY MR. BREEDEN:
 22        Q.   I think we mentioned earlier in this
 23    deposition that neither suspect, Fisher or Rembert,
 24    were actually found inside the apartment after all
 25    the dust cleared; right?
```

Page 113

 1      A.   Correct.

 2      Q.   And, in fact, you were there to execute a

 3   search warrant for certain property, and none of that

 4   property was found inside the apartment either;

 5   correct?

 6      A.   I don't know about it.

 7      Q.   You don't know, one way or another?

 8      A.   No.  I wasn't told if there was a gun in

 9   there or any evidence that was found in there.

10   We -- I never was -- that was homicide's thing.

11      Q.   The firearm that Mr. Williams used, was that

12   the firearm used in the homicide that was being

13   investigated?

14      A.   I don't know.

15      Q.   And you agree that prior to January 10th of

16   2022, you had never heard of Isaiah Williams or

17   investigated him; correct?

18      A.   Correct.

19      Q.   Do you recall what type of property was

20   sought in the search warrant?

21      A.   There was going to be the clothing that was

22   worn during that, that day.  They were looking for a

23   firearm, paraphernalia related to firearms, like

24   ammo, and as well as cellular devices.

25      Q.   Okay.  Now, in some search warrants, like a

Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 114

1    search warrant for narcotics, there's a concern by

2    police that the narcotics could be easily disposed

3    of.  For example, they could be flushed down a

4    toilet.

5         A.   Yes.

6         Q.   Well, was there any such concerns for the

7    items listed in this search warrant?

8         A.   Yes.

9         Q.   Okay.  Have you ever heard of a .22 or a

10   .32 caliber handgun being flushed down a toilet?

11        A.   You probably couldn't flush it down the

12   toilet, but you could definitely alter it to where

13   it wouldn't be matched towards any type of evidence

14   relating to -- to the crime.

15        Q.   Okay.  Well, let me ask you that just the

16   nature of the things that you are searching for,

17   clothing and a handgun, would you agree with me that

18   those could not be as easily disposed of as, for

19   example, narcotics?

20        A.   Clothing, you could definitely destroy

21   fairly quickly as well as cellular devices, you

22   could destroy pretty quick.

23        Q.   Well, how?  How would you destroy clothing?

24        A.   Burn it.

25        Q.   Any other -- any other way you could think

Garth Findley              Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 115

1    of?

2        A.    You could throw them in the oven and start

3    burning it.  You could throw some type of acid on

4    there, some type of bleach, to get rid of that some

5    of that DNA that could link you to the crime.

6        Q.    When you say the cellular devices, that

7    somebody could destroy them, you just mean maybe they

8    could step on them?  Smash them?

9        A.    Yeah.  I mean, cellphones can be destroyed.

10   Hilary Clinton was able to do pretty good.  But yes,

11   cell, cellular devices can be destroyed.

12       Q.    Okay.  Give me just a second to look over my

13   notes here.  Did you ever see a physical copy of the

14   search warrant?

15       A.    Yes.

16       Q.    To your knowledge, was it ever left at the

17   apartment scene?

18       A.    I don't know.

19       Q.    Who would be in charge of that?

20       A.    Would be homicide.

21       Q.    The CIRT report contains the following

22   statement here, quote:  "Six seconds after starting

23   his announcement, Officer Bertuccini inserted the

24   stun stick through the western facing window," end

25   quote.  That's actually contained at LVMPD-4386.

LEXITAS™

Page 116

1          Now, it says "six seconds" there.  I believe

2     that's in dispute.  I believe that the video shows it

3     was even fewer amount of seconds.  But would you

4     agree that it was no longer than six seconds?

5          MR. ANDERSON:  Objection to form.

6          THE WITNESS:  I don't know as far as the

7     time frame.  I know that Officer Bertuccini was

8     supposed to, by the plan, insert it after that

9     announcement.

10    BY MR. BREEDEN:

11         Q.   All right.  Well, let -- let me phrase it a

12    little differently:  Las Vegas Metro Police's own

13    CIRT report concluded that the wait time had only

14    been six seconds.  Do you disagree with that?  Do you

15    think it was longer?

16         A.   As far as the insertion?

17         Q.   As far as the amount of time, from when the

18    announcement started, to when the stun stick was

19    inserted through the window.

20         A.   So they -- yes, it was -- I've read that

21    report.  It said six seconds.  Yes.

22         Q.   And do you believe that six seconds was a

23    long enough time for Mr. Williams to wake up, walk to

24    the door, ascertain that it was police, and provide

25    them lawful entry?

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 117

1      A.   You're saying that he needs to wake up.  I

2    don't know if he needs to wake up.  Right next to

3    the door is where he was at, which is just several

4    feet away.  So six seconds is plenty of time to

5    announce, to comply, and to come to the door, and

6    that was just off a insertion of a -- the stun

7    stick.

8      Q.   I'm not going to do this, okay, because I'm

9    not going to personalize this.  But if I came to your

10   home at 5:00 a.m. and you were sleeping somewhere in

11   your home and I started knocking, wanting you to come

12   to the door, do you think you would do that within

13   six seconds?

14          MR. ANDERSON:  Objection.  Form.

15          THE WITNESS:  Not at my house.

16   BY MR. BREEDEN:

17     Q.   When we look at this, Mr. Williams did draw

18   a firearm, and he fired it on a group of people.  It

19   turned out to be police officers.  Would you agree

20   with me that, if Mr. Williams believed those were

21   police officers, that would be a pretty dumb thing

22   for him to do?

23     A.   I would say that he had full intentions on

24   what his plans were, given the fact that he was a

25   violent individual.  And, again, this is learning

Page 118

1   after the fact and learning that he's wanted for

2   robberies up in North Town, that he probably thought

3   that we were coming for him, and so that was his

4   intention was to shoot at officers as they came in.

5        Q.   Well, would you agree with me that that

6   would essentially be suicide by cop?

7        A.   I don't think it would be suicide by cop.

8   I think he -- he figured that he was going to shoot

9   officers as they came in.  I don't know what his

10  plan was, if it was suicide by cop.

11       Q.   Well, I mean, look, if I opened fire on a

12  group of probably 12 SWAT officers who are fully

13  armed, coming into my home, don't you think that

14  that's suicidal to do?

15            MR. ANDERSON:  Objection to form.

16            THE WITNESS:  It could be suicide by cop.

17  BY MR. BREEDEN:

18       Q.   Would you agree with me that the fact that

19  Mr. Williams did that tends to suggest that he did

20  not properly understand who was coming through the

21  front door?

22            MR. ANDERSON:  Objection.  Form.

23            THE WITNESS:  No.

24  BY MR. BREEDEN:

25       Q.   Did you ever see any officer providing

Page 119

1   medical aid to Mr. Williams?

2        A.   Yes.

3        Q.   Who?

4        A.   It would be our TAC medical doctors.

5        Q.   Who is that?

6        A.   We had Will Bridges, and then we also had a

7   trauma doctor as well, but I believe the SAR, one of

8   the SAR guys ended up attending to him.

9        Q.   What, if anything, did they do?

10       A.   I don't know.  I didn't see what they did.

11   I just saw guys, which was looked like SAR, working

12   on Mr. Williams.

13       Q.   At some point, did you enter the apartment

14   and see Mr. Williams?

15       A.   I stepped in, saw that Mr. Williams was

16   down, right at the living room area, and I was

17   stepping out because I was very busy, running dual

18   cons, which is dual radios, talking to the area

19   command, coordinating that, as well as talking with

20   the guys, all the SWAT officers.

21       Q.   So when you saw Mr. Williams, he had been

22   placed on the floor?

23       A.   Correct.

24       Q.   Were -- were you ever made aware, or when

25   were you made aware of the fact that when he was

Page 120

1  actually shot, he was laying down on the couch or

2  futon?

3       A.   I was made aware of that after the fact.

4       Q.   Okay.  When you saw Mr. Williams, how many

5  seconds or minutes was it after the shooting?

6       A.   I would say probably about 30, 40 seconds.

7  It took -- it took quite a bit of time because the

8  team got bogged down coming into the threshold of

9  the residence.  I was at the -- the back.  They

10 ended up taking Officer Kubla out of there, and I

11 had to verify to make sure that he was injured, that

12 he was shot, and so then I stood outside and started

13 coordinating that there was an officer down.  They

14 advised me that the subject inside was shot, which

15 was Mr. Williams.

16          So as far as that time frame, I don't know

17 how long that was, and then I was able to peak my

18 head in and see that Mr. Williams' head now was at

19 the -- in the living room.

20      Q.   And he was laying on his back, on the floor?

21      A.   Yes.

22      Q.   Did he appear to be deceased to you?

23      A.   I don't know.  I didn't get a good look.

24      Q.   Looking back on this operation that you were

25 the team leader, is there anything that you would

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 121

1    change about it?

2               MR. ANDERSON:  Objection.  Form.

3               THE WITNESS:  So there's -- there's quite a

4    few things that we would change.  And after every

5    mission, you know, we sit there and debrief what we

6    could have done better, and there's obviously some

7    stuff that -- that we need to look at and do better.

8               I know that homicide is kind of constrained

9    on what they could do.  And but looking up some

10   surveillance, making sure that the target is in

11   there; utilization of different techniques, whether

12   it's a shock lock or something on the locking

13   mechanism or even a breach going after a No Knock

14   Warrant so we could go with the breaching capability.

15   So those are just some things that we could throw

16   out there; or if it comes down to it, you don't

17   serve it.  You can do a take -- takeaway with

18   different units, so.

19   BY MR. BREEDEN:

20        Q.   Is one technique to get some surveillance on

21   the apartment, wait until everybody leaves, and then

22   go to serve it?

23        A.   No.  But if you see maybe the target that

24   you're looking for, again, take him away.  If you

25   have information that he is the only person inside,

Page 122

1    that would be a good, good technique, and then you

2    know that nobody else is inside.  You can safely

3    serve that search warrant.

4         Q.    Now, you know, I asked you if you thought

5    there were things that could be done better or could

6    have been changed, and you mentioned:  Well, we could

7    have done surveillance a little differently; we could

8    have possibly used a shock lock; we could have

9    applied for a No Knock Warrant.

10             Have you ever served a No Knock Warrant?

11        A.    No.

12        Q.    Would you agree with me that they are very

13   rarely, if ever, used by Las Vegas Metro Police

14   Department?

15        A.    I know that kind of the -- as far as what

16   SWAT has to do now is go through the application of

17   a No-Knock Warrant.  Just because we get a No-Knock

18   Warrant doesn't mean that we serve it as a No Knock.

19   We can still put out those announcements as well.

20        Q.    Okay.  So do you believe that if you had

21   applied for a No-Knock Warrant for this search

22   warrant, it would have been granted?

23        A.    I have no idea.

24        Q.    Okay.  Do -- is there an informal policy at

25   Metro, right now, that no-knock warrants will not be

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 123

 1    issued?

 2         A.   No.  There's no --

 3         Q.   Or sought?

 4         A.   Yeah, there's no like a formal policy,

 5    informal policy, that no knocks will not --

 6    that's -- what they're doing now is, if they, if --

 7    nowadays, they will need to get a No Knock in order

 8    to utilize a Controlled Entry Tactic.

 9         Q.   So did you ever use a Controlled Entry

10    Tactic for a No Knock when you were on SWAT?

11         A.   No.

12         Q.   Who is the lieutenant that replaced

13    Lieutenant O'Daniel?

14         A.   Adrian Beas.

15         Q.   Can you spell the last name for me?

16         A.   B-E-A-S?

17              MR. ANDERSON:  Not sure.

18              THE WITNESS:  I'd have to look at my phone.

19              MR. ANDERSON:  I think you're right,

20    B-E-A-S.

21    BY MR. BREEDEN:

22         Q.   So we mentioned surveillance.  We mentioned

23    possible use of a shock lock.  Possible application

24    for a No-Knock Warrant or possibly just don't serve

25    it.  What other things do you think could have been

Page 124

1   changed about service of this warrant that would have

2   made it safer for officers or the member of the

3   public?

4        A.   That would be, probably be my -- my picks

5   right there.

6        Q.   Is it your understanding that Las Vegas

7   Metro Police Department now considers CET entry to be

8   in conflict with the constitutional Knock and

9   Announce requirement?

10            MR. ANDERSON:   Objection to form.

11            THE WITNESS:   I don't know if they view it

12   as in conflict.   I just know that what they're doing

13   is going away and going towards if you are going to

14   utilize that technique, you'll have to get a

15   No-Knock service.   And, again, going off of that

16   doesn't mean that we'll serve it as a No Knock.

17   BY MR. BREEDEN:

18        Q.   You gave a CIRT interview.   Have you

19   given -- and this deposition obviously.

20            Have you given out any other recorded

21   statements about what occurred?

22        A.   No.

23        Q.   Have you ever asserted your Fifth Amendment

24   right to remain silent, to refuse to answer questions

25   about this incident?

Garth Findley            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 125

 1       A.    No.

 2       Q.    Do you have any remorse or regrets about

 3   what happened to Mr. Williams?

 4       A.    Yes.   I'm sure that, you know, looking at

 5   this, this mission, there was some good things and

 6   bad things that occurred.   Obviously, an individual

 7   was killed; and then obviously some officers were

 8   injured.   So looking at hindsight, you're -- we're

 9   always trying to do better, better tactics, and

10   learn from it and -- and move on.

11       Q.    Do you agree that this was preventable and

12   Mr. Williams didn't have to die?

13            MR. ANDERSON:   Objection to form.

14            THE WITNESS:   I wouldn't be able to answer

15   that.

16   BY MR. BREEDEN:

17       Q.    You just have no opinion on it or -- or you

18   think that -- I don't understand your response.

19       A.    My personal opinion is that learning from

20   his prior history, what he was doing, carrying the

21   firearm, I know that our gang unit was actively

22   looking for him.   I know that North Town had active

23   cases on him.   I believe that Mr. Williams, going

24   off of just kind of history, experiences, that he

25   would have been hurt by someone out there.   He would

Page 126

1    have been involved in some type of shooting.  I

2    think -- I think the safest thing would have been

3    for North Town to put a case on him and him to be in

4    jail at that time.

5         Q.   Hypothetically, if instead of believing

6    that Mr. Rembert was inside that apartment and,

7    instead, the information was that two unknown black

8    males were inside, what would have been done

9    differently?

10             MR. ANDERSON:  Objection to form.  Go ahead.

11   BY MR. BREEDEN:

12        Q.   Would CET have been used at all?

13        A.   Going off of we have no idea who these

14   people are and we're going after their property?

15        Q.   Correct.

16        A.   That would be up to the tactical commander.

17   I mean, we could sit there and give the options of

18   like we can go the CET route.  We don't know who

19   these people are inside, or we can wait a little bit

20   further and see if homicide, or whoever in this

21   scenario is, is to figure out who these people are

22   inside.

23        Q.   Well, which would you have recommended

24   hypothetically?  Would you have recommended "Let's do

25   this anyway with a CET," or would you have

Page 127

1    recommended a different route?

2        A.    I think we could have dug a little bit more

3    and figured out who was inside.

4        Q.    Because it was -- it was dangerous to do

5    this on a CET without knowing for certain who was

6    inside, wasn't it?

7        A.    Correct.  But we had the -- the only

8    information that we had was saying, from homicide,

9    that subjects were inside, which was Fisher,

10   Rembert; and then we also had their family, a step

11   mother, advising that's where they were at.

12       Q.    And that, that turned out to be bad

13   information, at least for this particular morning?

14       A.    For this particular morning, correct.

15       Q.    Do you know if either of the suspects

16   were -- were actually the lessor of the apartment?

17       A.    I don't know if they were.  But in the IAP,

18   it was saying it was just a flophouse, and I believe

19   that they weren't the lessee to it.

20       Q.    Why wouldn't all the officers in the line

21   have a ballistic shield?

22       A.    Because we, how we train, we'll just

23   usually have it up, up front or on the containment

24   positions.  It's very large, cumbersome.  So you

25   have to position it in a certain way that would be

Page 128

1    best for the team.

2        Q.   Officer Kubla was intended to be the first

3    man in; right?

4        A.   Correct.

5        Q.   Why wouldn't he have a ballistic shield?

6        A.   Again, that -- that's -- he was carrying a

7    rifle.  So it wouldn't have been possible to -- to

8    carry a shield.  It could have been part of the plan

9    to where the first subject goes in is carrying a

10   shield.  But more than likely, what you want to do

11   is carry a shield going through some type of

12   hallway, not necessarily through the entry point of

13   a residence like that.  So with a shield, again,

14   you're -- you're limited; you're cumbersome, and

15   then your -- your vision is limited.

16       Q.   Is it common for the first man in to have a

17   ballistic shield?

18       A.   No, it's not common.

19            MR. BREEDEN:  Okay.  Sergeant Findley, I

20   think those are all my questions.

21            Do you have anything, Mr. Anderson?

22            MR. ANDERSON:  No questions.

23            MR. BREEDEN:  All right.  We will go off

24   the record at this time.

25            THE VIDEOGRAPHER:  Before we go off, Craig,

Page 129

1    are you going to need the video?

2             MR. ANDERSON:  I do not need the video, but

3    I will order a copy.

4             THE REPORTER:  Thank you.

5             THE VIDEOGRAPHER:  This concludes today's

6    deposition given by Garth Findley, consisting of one

7    disc.  The time is 11:45 a.m.  Thank you.

8             MR. BREEDEN:  All right.  Craig.

9             MR. ANDERSON:  Appreciate it.

10            MR. BREEDEN:  I'll see you around.

11            THE REPORTER:  Do you have to leave so

12   quickly?  I have some questions.

13            Is an e-tran good for you?

14            MR. ANDERSON:  Yes, that's fine.

15            THE REPORTER:  Thank you.

16

17       (The deposition concluded at 11:45 a.m.)

18                        -oOo-

19

20

21

22

23

24

25

Garth Findley            Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 130

1                        CERTIFICATE OF DEPONENT

2       PAGE      LINE     CHANGE                     REASON

3       _____

4       _____

5       _____

6       _____

7       _____

8       _____

9       _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16                   *     *     *     *     *

17          I, GARTH FINDLEY, deponent herein, do hereby
        certify and declare the within and foregoing
18      transcription to be my deposition in said action;
        under penalty of perjury; that I have read,
19      corrected and do hereby affix my signature to said
        deposition.

20

21

22      _____
        GARTH FINDLEY            Deponent        Date

23

24

25

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

Page 131

1                    CERTIFICATE OF REPORTER

2

3        I, Dana J. Tavaglione, a Certified Court
    Reporter, licensed by the State of Nevada, do hereby
4    certify:

5        That I reported the deposition of the witness,
    GARTH FINDLEY, commencing on February 5, 2025, at
6    9:05 a.m.;

7        That prior to being examined, the witness was by
    me first duly sworn to testify to the truth, the
8    whole truth, and nothing but the truth; that I
    thereafter transcribed my related shorthand notes
9    into typewriting and that the typewritten transcript
    of said deposition is a complete, true and accurate
10   record of testimony provided by the witness at said
    time.
11
        I further certify (1) that I am not a relative
12   or employee of an attorney or counsel of any of the
    parties, nor a relative or employee of any attorney
13   or counsel involved in said action, nor a person
    financially interested in the action; and (2) that
14   pursuant to Rule 30(e), transcript review by the
    witness was requested.
15
        IN WITNESS HEREOF, I have hereunto set my hand,
16   in my office in the County of Clark, State of
    Nevada, this 14th day of February 2025.
17

18   _____

19   DANA J. TAVAGLIONE, RPR, CCR NO. 841

20

21

22

23

24

25

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

---

**–**

---

**-oOo-**
  5:3
  129:18

---

**0**

---

**03/05**
  16:15,22

---

**1**

---

**1**
  24:9,12,
  13,21
  58:3
  95:14,17

**1-2**
  40:3

**1-4**
  40:3

**10**
  58:3,7,
  19,22

**100**
  37:4

**10:21**
  70:12

**10:33**
  70:15

**10th**
  6:11
  26:10
  35:4 38:3
  54:20
  68:25
  71:3
  113:15

**1125**
  6:17
  46:25
  85:5 89:7

92:24
93:13

**11:45**
  129:7,17

**12**
  118:12

**120**
  44:13

**13th**
  42:24

**1491**
  95:23
  96:9

**15**
  29:20
  57:2

**16**
  16:19

**16th**
  42:24

**17**
  76:8
  78:4,6

**179.055**
  105:16

**19**
  63:5

---

**2**

---

**2**
  71:24
  72:9
  86:12
  109:11,13

**20**
  16:20
  61:7

**20,000**
  95:25

**20-some**
  41:8

**2002**
  15:6,7

**2004**
  16:21

**2005**
  16:15,22

**2007**
  16:12

**2019**
  19:5 23:6

**2021**
  29:20

**2022**
  6:12
  23:24
  26:10
  35:4 38:3
  54:20
  68:25
  71:3
  113:16

**2024**
  28:15

**2025**
  5:1,6

**22**
  114:9

**222**
  12:13

**23-plus**
  86:4

**24**
  11:3 25:1

**24-hour**
  102:13
  103:11

---

**3**

---

**3-2-1**
  30:22

**30**
  42:17
  44:19
  58:3,7
  85:23
  120:6

**3050**
  6:17
  46:25
  54:21
  66:23
  89:6
  92:24
  93:13

**32**
  114:10

**33**
  25:18

**34**
  25:18

---

**4**

---

**40**
  41:17
  42:25
  120:6

**40-hour**
  86:10

**45**
  15:4

**48**
  11:6

---

**5**

---

**5**
  5:1

**5:00**
  47:18
  48:16,20
  49:1
  102:11,16
  117:10

**5th**
  5:5

---

**7**

---

**700-
square**
  93:16

---

**9**

---

**9:00**
  50:9

**9:05**
  5:2,6

---

**A**

---

**a.m.**
  5:2,6
  47:18
  48:16
  49:1
  70:12,15
  102:11,16
  117:10
  129:7,17

**abide**
  31:24
  33:9,22

**ability**
  11:13
  65:16

**able**
  53:2
  86:19
  91:6
  96:4,24
  111:22
  115:10
  120:17
  125:14

**about**
  7:11
  18:4,12,

13 20:24
22:9
23:22
27:1
29:3,14,
18 42:3
44:1,15,
16,17
48:7,24
51:17,20,
22 52:12,
21 57:5,
17 58:6
68:10,20
70:18
77:12
81:21
85:4,18,
22 87:14
89:19
91:10
94:5,7
99:17,19
101:2
113:6
120:6
121:1
124:1,21,
25 125:2

**above**
  27:1,16

**absolutel
y**
  37:3

**academy**
  18:2,6

**accepted**
  19:16
  20:3,15,
  25 21:1

**access**
  36:8,22
  39:7
  46:11
  47:15
  57:23
  68:17,20



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 134 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

73:10
76:21
98:2,11
99:6
105:3

**accompanied**
35:7
50:17
58:1 98:9

**according**
112:10,14

**account**
39:9

**accurate**
22:15
28:11
101:22

**accurately**
9:21

**acid**
115:3

**acting**
11:22

**action**
39:14
54:17

**actions**
100:18
106:8

**activated**
61:10,12

**active**
48:11,12,
25 49:2,8
50:5
125:22

**actively**
125:21

**activity**
104:9

**actual**
27:8

**actually**
19:10,15
24:25
32:6 33:3
34:4
58:23
69:1,13
79:1
81:10,19
83:6
97:16
102:18
103:18
106:13
107:14
112:24
115:25
120:1
127:16

**Adam**
5:15 89:5

**additional**
19:6
21:23
22:11
41:20
44:10

**address**
78:22
86:18
87:22
88:13
92:21

**administer**
5:14

**administered**
7:23

**admissible**
10:15

**admit**
99:8

**admittance**
73:21
91:21
106:4,10,
20

**Adrian**
123:14

**advance**
8:17

**advantage**
53:16

**advised**
41:2
107:6
120:14

**advising**
127:11

**Affairs**
31:6,8
32:9

**affect**
11:12

**affected**
31:16

**affecting**
100:13

**affects**
69:7

**affiants**
48:4

**afford**
9:19

**after**
8:13,14
18:12
37:8 42:5
51:5,24
57:18
58:17
85:17

90:6
91:3,13
99:24
111:12
112:20,24
115:22
116:8
118:1
120:3,5
121:4,13
126:14

**again**
18:25
23:14,22
26:25
41:6
44:23
47:10
54:8 58:8
63:22
66:14
69:19
72:13
74:17,19
75:22
76:10
77:1,3
81:8
87:17
92:6,14
94:15
103:11
108:14
117:25
121:24
124:15
128:6,13

**age**
15:3

**agencies**
24:14

**ago**
7:10,11
12:1

**agree**
6:19,24
44:3 56:2

71:11
79:6,9,
16,20,23
80:5
81:15,25
85:10
97:3
101:12,21
102:15,17
110:2
111:10
112:5
113:15
114:17
116:4
117:19
118:5,18
122:12
125:11

**ahead**
6:4 14:19
31:11
32:23
33:24
45:16
56:6
65:17
69:15
76:16
99:2
100:16
101:23
112:8
126:10

**aid**
119:1

**airport**
28:22

**alcoholic**
11:2

**Alex**
13:15,17

**Alexander**
5:11

**all**
6:19 7:20

8:11
9:10,19
11:11
14:4 19:1
20:1
22:10
24:2,22
26:17
28:23
34:15
35:25
40:18
41:21
42:11
44:18
45:10,24
47:15
48:6
51:19
57:23
60:2 67:2
70:17
71:13
73:6 78:3
79:1
84:21
90:20
92:5
94:16
95:13
98:25
101:4,14,
15,21
102:10,14
103:6
106:12
111:2
112:24
116:11
119:20
126:12
127:20
128:20,23
129:8

**alleged**
38:14

**allow**
74:15
75:13



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

77:14,24

**allowed**
36:5,15

**allowing**
44:17

**almost**
18:23
29:20
45:6
55:21
69:23
86:2,15

**along**
33:4
56:20
97:10

**already**
40:9 82:2
85:22
100:4

**also**
6:24 8:5
9:16
11:18
14:23
27:10
30:10
31:5
32:18
34:12
38:17
39:8,10
41:3,19
43:14
47:25
48:3
55:20
57:22
59:25
60:6
67:20
69:4
72:25
76:8 80:6
81:5
88:19
93:9

95:1,11
101:10
119:6
127:10

**alter**
114:12

**alternate**
55:15
57:3

**always**
9:4 17:4
20:21,22
22:23
87:7,9
108:17
125:9

**Alzheimer 's**
11:12

**Amendment**
32:7
124:23

**ammo**
113:24

**amongst**
22:13

**amount**
33:14
57:8,17,
19,25
58:10,21
73:22
75:12,19,
20 77:2,
13,17
78:18
89:11
90:3
91:19
92:1,7
94:2,15
95:3,8,10
100:2,20,
21,24
101:10
103:3,14

106:15
110:18,23
111:1
112:7,11,
14,19
116:3,17

**analysis**
100:2

**Anderson**
5:17 7:13
10:3,11
11:20,21
12:6,10
13:14,19,
21 14:19
15:16
31:11
32:23
33:24
38:17
45:16
49:22
52:25
56:6
63:13
65:17,22
66:12
69:15
70:21
75:14,17
76:16
78:20
82:7 83:8
86:1 99:1
100:16
101:23
102:7,24
104:13
105:12
108:5
109:10
112:1,8,
17 116:5
117:14
118:15,22
121:2
123:17,19
124:10
125:13

126:10
128:21,22
129:2,9,
14

**ankle**
67:8 68:1
107:7

**announce**
31:21,24
32:3,6,10
33:9,19,
22 38:14
52:7
56:14
57:5,7,
11,18
73:5
75:11
77:11
78:25
83:19,20,
24 85:18
91:18,19
95:6 96:4
97:1
100:3
109:23
110:4
117:5
124:9

**announced**
84:11,25
90:10
92:17

**announcem ent**
74:9
78:11
86:23
87:3,19,
23 88:20,
24 89:3,
4,9,13,
15,20,25
92:9,10,
13,19,23
93:5
94:14

115:23
116:9,18

**announcem ents**
34:2
54:11
73:23
84:24
85:20
87:6,21
88:4,18
89:16,19
90:5 97:8
111:13
112:20
122:19

**announcing**
58:17
74:24

**another**
18:22
19:22
26:18
47:9
62:23
63:3
96:21
113:7

**answer**
9:5 14:20
31:12
32:21
33:1,25
75:17
99:2
124:24
125:14

**answers**
8:12

**anticipated**
13:6

**any**
8:12 9:2
10:24

11:2,5,8
12:16
13:1,6
15:21,24
16:2 17:6
20:1
21:13
23:11
26:10
28:23
29:16
33:17
37:13
38:12,20
39:8
43:13,14
44:17
46:17,20
51:14
52:3
54:22
56:9
58:2,5,11
60:14,21
61:8
63:16
65:25
68:14
69:1 74:3
77:24
85:5
86:18
90:8,22
92:1
93:12
97:6,16,
17 106:18
107:22
108:16
109:5
110:3,11
113:9
114:6,13,
25 118:25
124:20
125:2

**anybody**
9:23
53:21

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

61:9
65:1,9
97:7
106:13

**anyone**
9:18 37:7
38:9
40:14
61:1
64:22
68:25
71:12
73:17

**anything**
11:15
29:4
71:12
85:4
87:13
91:10
97:5,8
99:19
106:17,21
119:9
120:25
128:21

**anyway**
126:25

**apartment**
6:17
46:25
47:9 49:6
52:15
67:22
68:6,9,
12,15
69:2,4,
20,24
71:13
73:18,21
74:10
76:13
77:25
81:13
85:5
88:1,4,5,
8,9,11,
13,19,24

89:7
90:10
92:5,12
93:6,15,
17 94:8
97:4,5,9
99:9,22
100:6
102:20
104:7
107:4,11,
17,23
108:20
112:24
113:4
115:17
119:13
121:21
126:6
127:16

**apartments**
46:9,12
47:3
66:20
88:14

**appear**
32:20
55:13
102:22
120:22

**appearances**
5:13

**appears**
55:4 75:4

**application**
122:16
123:23

**applied**
20:2 29:3
58:4
64:22
65:2,10
122:9,21

**apply**
95:2,11

**applying**
92:6 93:8

**Appreciate**
129:9

**approval**
34:21
37:5

**approve**
34:15

**approved**
34:12
48:1,16
72:21,25

**approximately**
5:6 111:3

**area**
59:15,16
60:1 64:1
80:12,18,
21 104:9
105:1
119:16,18

**areas**
24:16
59:20

**argue**
111:22

**Arkansas**
96:9,10

**armed**
118:13

**armor**
40:2
46:14,16,
20 59:17,
24

**armored**
40:4

**arms**
73:13

**around**
40:1
46:13
48:13
88:10
129:10

**arrest**
35:13,21,
23 66:2,4

**arrive**
67:18

**as**
5:23 6:5,
20 7:8,25
9:6,9,17
10:8,15
11:22
13:24
15:3,25
19:11
20:10
21:11
23:3
25:4,10
26:2 27:2
29:24,25
31:13,20
32:15
34:18,20,
21 35:6,
18 36:1,
6,13 37:8
39:3
40:4,22
41:9,14,
16 43:22
44:8,22
45:4,5,9
46:10
47:23,24
48:2,22,
23 50:5,
14,23
51:1,17,
23 52:5
53:1

54:10
55:14
56:10,24
57:1,8,
11,19,25
58:7
59:23
60:1,9,22
61:22
62:7,8,9
65:15
66:7,8
68:14,17
69:7
71:7,24
73:7
78:16
81:3 85:1
86:14,15
88:7
89:23
92:3 93:3
94:23
95:14
96:2
97:20,23
101:4,7,8
102:18
103:14
108:3
109:11
110:4,6
113:24
114:18,21
116:6,16,
17 118:4,
9 119:7,
19 120:16
122:15,
18,19
124:12,16

**ascertain**
73:20
78:1
83:16
91:20
103:5
116:24

**ask**
7:8,9
9:1,2,11,
20 10:10
22:11
47:17
67:14
78:24
81:20
94:17
114:15

**asked**
122:4

**asleep**
49:7,8,17
100:9,11,
14,25
101:7,13,
25 102:5,
12 103:7
111:19

**aspect**
19:2

**asserted**
124:23

**assertion**
75:24

**assess**
89:24

**assessed**
103:3

**assigned**
6:12
19:12
27:21
63:23

**assignment**
18:7,8

**assist**
41:5,21

**assistant**
15:25
22:14,17



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 137 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

40:17
41:19
45:3,8
47:21
60:18
62:6

**assisted**
40:15

**associated**
99:5

**assume**
17:23
55:3
92:11
93:16
104:1

**assumed**
91:14

**assuming**
94:17

**assumption**
76:13
82:6
83:12

**at**
6:16 8:7
9:10,18,
22 13:12
16:10
17:1,4
23:4,23
27:5,8,
12,17,20,
24 28:7,
22 29:7,
22 30:6
31:1
32:14,21,
24 34:15,
22 37:7
38:10
42:16,20
43:4
44:4,11

45:17
46:25
47:15,18,
22,23
48:5,12,
15,19,20
49:1,5,
13,14,16,
24 50:8
51:23
54:18,21,
22 55:4,
22,24
56:18
57:24
58:12
59:7
60:6,11
63:1 64:1
65:25
66:22
67:17
68:14
69:23
70:9,11
71:13
73:6,13
78:13
79:8,18
80:2
81:25
83:17
84:4,14
86:13,14
90:24
93:20
94:12
95:3
98:25
102:16
103:6,10
104:2
105:1
110:4
111:19,21
112:5
115:16,25
117:3,10,
15,17
118:4

119:13,16
120:9,18
121:7
122:24
123:18
125:4,8
126:4,12
127:11,13
128:24
129:17

**ATL**
41:18

**ATLS**
41:20

**attach**
56:24

**attached**
61:15

**attempting**
32:21

**attend**
15:17

**attending**
119:8

**attorney**
10:2
11:22

**attracted**
17:9

**audible**
9:5

**authorization**
73:4

**automatically**
71:17
98:24
103:10
104:1

**avenues**
46:3

**awake**
111:6,17,
19,24

**aware**
24:8 33:7
38:12
40:14
61:9
63:16
64:22
65:1,9
67:25
72:25
88:23
96:5
100:1
104:9
106:2
119:24,25
120:3

**away**
46:16
73:15
75:22
95:1
117:4
121:24
124:13

---

**B**

**B-E-A-S**
123:16,20

**Bachelor**
15:18

**back**
21:18,20
25:22
28:14
33:21
34:1 41:6
45:6
54:4,6,13
69:19
70:14
78:11
91:17

94:15
98:6
99:14
108:18
120:9,20,
24

**back'**
97:12

**Back-**
41:3

**back-up**
28:9 79:2

**background**
15:3,24
16:2
22:11

**Backman**
12:20
13:12
26:19,22
40:16,22
41:6,8
42:13,16
45:10
47:24
60:20
62:22
72:24
73:2
85:21,23
86:23
88:18

**Backman's**
11:18
12:18
86:4

**backside**
40:3

**backup**
65:5

**bad**
125:6
127:12

**ballistic**
127:21
128:5,17

**band**
14:7

**banger**
71:6
81:5,6,8,
10,16,21
82:2,21
83:1,5

**bangers**
82:15

**bangs**
103:16

**Banks**
96:16

**banned**
36:2,4
37:1,4

**barricade**
43:13

**barricades**
64:9

**barrier**
46:19

**base**
62:13

**based**
102:23
110:9

**basic**
16:6
17:23
42:19
70:3

**basically**
22:24
24:13
89:17



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**Bates-labeled**
 57:1

**battering**
 70:4
 78:14

**Beas**
 123:14

**beat**
 23:8

**became**
 41:17
 64:19

**because**
 10:5,17
 16:17
 20:9
 25:17
 30:20
 37:16
 41:16
 44:22
 46:2,5
 49:20
 50:4
 51:8,11
 52:11
 54:2
 55:4,6
 59:21
 61:11,14
 63:17
 66:6,16
 69:7
 77:11
 78:21
 80:12
 81:19
 84:24
 88:10
 90:9
 94:22
 96:14
 98:18
 104:2,18
 109:1
 111:23,24

 117:8
 119:17
 120:7
 122:17
 127:4,22

**become**
 17:2 21:3
 23:4
 50:10

**becoming**
 18:19

**before**
 7:4,21
 10:25
 17:15
 19:16
 21:3
 22:3,6
 24:10
 29:20
 38:6 39:3
 41:13
 43:11,17
 46:6
 58:17
 64:16,19
 67:7
 71:12
 80:10
 91:11
 95:12,19
 96:17
 99:8
 103:24
 108:19
 109:16
 110:12
 112:7
 128:25

**began**
 102:6

**begin**
 10:25

**beginning**
 89:12,24
 90:9,13

**behalf**
 5:8,17
 33:11

**believe**
 33:21
 35:19
 43:21
 46:23
 51:7,9,10
 59:2 65:7
 66:10
 67:19
 81:20
 82:2
 83:5,15
 84:4 85:6
 90:25
 91:8 92:9
 93:3
 97:17
 100:12
 104:11
 106:9,19
 112:10,13
 116:1,2,
 22 119:7
 122:20
 125:23
 127:18

**believed**
 67:10
 108:23
 117:20

**believes**
 105:8

**believing**
 126:5

**bell**
 105:22

**Bertuccini**
 13:11
 74:7
 81:20
 115:23
 116:7

**besides**
 39:10

**best**
 52:9
 128:1

**better**
 66:10
 121:6,7
 122:5
 125:9

**between**
 82:22

**beverages**
 11:2

**bit**
 17:14
 19:8,11
 22:9
 23:22
 26:25
 30:2
 35:20
 41:15
 43:16
 48:7
 59:22
 70:18
 79:13
 80:8
 120:7
 126:19
 127:2

**black**
 55:20
 56:3
 126:7

**blackout**
 55:13,18
 56:3,17

**blanket**
 102:21

**bleach**
 115:4

**blinded**
 32:14

**blinding**
 79:17

**BMW**
 99:15

**board**
 19:25
 20:5

**bodies**
 40:1

**body**
 61:8

**body-worn**
 61:10

**bogged**
 120:8

**Bonkavich**
 41:3 45:9

**booklet**
 8:14

**born**
 15:9

**both**
 99:11,12
 108:1

**Boulevard**
 6:17
 54:21
 89:7
 92:24
 93:13

**brand**
 20:6
 86:3,18
 87:17

**brass**
 69:5,13

**breach**
 29:24,25
 30:19,21,
 22 31:17
 34:22,23
 37:6
 106:16

 121:13

**breach-breach-breach**
 30:23

**breaches**
 30:21

**breaching**
 121:14

**break**
 18:11
 70:10
 74:9
 78:11
 87:9

**breaking**
 105:9

**Breeden**
 5:15 6:2
 7:14
 12:9,12
 13:18,20,
 22 14:22
 15:20
 31:18
 33:2 34:3
 45:19
 50:1 53:5
 56:8,22
 57:4
 58:15
 63:15
 65:24
 67:1
 70:1,8,
 11,16
 71:1
 75:15
 76:6 77:9
 78:23
 82:9
 83:10
 86:20
 89:5
 95:13,18
 99:7
 100:22



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 139 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

102:2,9
103:2
104:17
105:14
107:2
108:9
109:14
112:4,12,
21 116:10
117:16
118:17,24
121:19
123:21
124:17
125:16
126:11
128:19,23
129:8,10

**BREEDMAN**
65:19

**Brian**
27:18

**brick**
46:12

**Bridges**
119:6

**brief**
67:7

**briefing**
59:7
60:15
61:5,9,
10,13,18
74:7

**briefings**
61:14

**bright**
55:16
79:7,11,
12,19

**brighter**
55:25

**bring**
59:22

**broken**
83:4
87:18

**brothers**
14:7,8,17

**brought**
55:11

**bullhorn**
86:17
87:1,3,5,
12,14,16,
18 90:17
104:5

**bullhorns**
87:7

**bunch**
46:6
61:25
69:21
86:25
96:14

**burglar**
103:21

**Burn**
114:24

**burning**
115:3

**burrowing**
46:7
47:14

**burst**
32:18

**busy**
46:15
48:19
50:6,10
69:19
119:17

**but**
8:17 9:17
10:17
12:10
14:23
19:10

20:24
24:5,21
26:1 35:9
37:4 43:6
44:1,15
52:12,16,
21 56:25
58:8 59:6
62:17
65:9
66:14,17
67:2
69:18
70:2 71:8
72:21
75:23
76:9
77:3,15
78:9
79:13
81:25
82:24
85:14
87:1,10
88:7,13
90:20
95:6
96:13
97:23
99:17
102:10
105:22
106:17
108:10
109:17
110:10,19
111:4,17
112:14,19
114:12
115:10
116:3
117:9
119:7
121:9,23
127:7,17
128:10
129:2

**by**
6:2 7:14,

23 11:19,
20 12:12
13:22
14:22
15:20
16:17
28:9
30:23
31:5,18,
24 33:2,
4,9,22
34:3,12
35:2
36:3,4
38:9 40:9
45:19
50:1
51:15
53:5 56:8
57:4
58:15
63:3,4,15
65:19,24
67:1
69:23,25
70:1,16
71:1
74:13
75:15
76:6
77:9,13
78:23
82:9
83:10
86:20
92:12
95:18
98:3 99:7
100:22
102:2,9
103:2
104:17
105:14
107:2,5,
11 108:9
109:14
110:3
112:4,12,
21 114:1
116:8,10

117:16
118:6,7,
10,16,17,
24 121:19
122:13
123:21
124:17
125:16,25
126:11
129:6

---

**C**

**caliber**
114:10

**call**
25:5,6,7
27:10
40:6
41:13
53:21,23
54:2,15,
19,22,24
55:9,13
56:3
86:17

**called**
30:13
53:17,22
55:1,3,5,
7 72:6
98:21

**calling**
39:20
53:6,8,21
54:15

**Callout**
39:17
46:2,22,
24 47:2
52:14

**callouts**
86:8

**Camacho**
5:8

**came**
16:25
41:12,16
43:14
54:24
55:19
86:9
105:3
117:9
118:4,9

**camera**
61:8,10
62:20

**cannot**
39:24
106:3

**cap**
28:18,19

**capability**
121:14

**capacities**
23:13

**Captain**
27:18,19,
23 28:7

**card**
72:5

**career**
17:13,18

**Carl**
21:22

**carry**
104:15,
16,18,19,
23 128:8,
11

**carrying**
125:20
128:6,9

**case**
5:10 7:15
12:24



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 140 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

13:10
33:11,23
38:2
41:25
64:13
73:10
74:4 75:7
81:19
84:22
92:7,23
96:8,11,
12,16,17,
19,21,22
97:10
101:8,24
106:7
108:11
110:10
111:18
126:3

**cases**
58:6 74:1
90:24,25
91:5 98:4
111:4
125:23

**Casey**
26:24
41:4

**Casino**
59:8

**cause**
66:2

**caused**
87:14

**caution**
8:17

**ceiling**
72:17
80:25

**cell**
115:11

**cellphones**
115:9

**cellular**
113:24
114:21
115:6,11

**Central**
63:2 64:1

**certain**
49:16
58:6
59:15
70:23
92:1
100:4
113:3
127:5,25

**certainly**
45:21
56:13
81:25

**certifications**
28:24

**CET**
30:14
36:1,12,
15,23
37:5
38:24
40:8
43:16,20,
23 49:10,
14 50:14,
25 51:2
52:6,23
53:2
54:18
86:22
124:7
126:12,
18,25
127:5

**CETS**
36:5 87:8

**chain**
26:2
27:1,16

29:13

**change**
8:18
36:10
37:14,24
38:1,7
51:4,22
52:10,16
59:1
121:1,4

**changed**
8:20
36:15
37:10
50:15
51:7
93:23
122:6
124:1

**changes**
8:16
34:18
37:17

**changing**
58:20
59:2

**charge**
26:3,15
27:14
30:24
34:9
71:17,19
72:7
83:21
85:20
91:22
115:19

**chief**
28:2,7

**chiefs**
28:1

**children**
68:12,14
108:4,8,
12,16,21

**choice**
17:13

**choose**
8:18

**chooses**
85:14

**choosing**
17:21

**chosen**
23:1
59:11

**Circuit**
85:2
96:15

**circumstances**
47:11
66:17
111:3

**CIRT**
11:17
12:1,4
13:2
16:18
37:23
41:24
71:23
115:21
116:13
124:18

**civil**
6:22,25

**claimed**
103:22

**clarification**
58:14

**clarify**
12:6

**Clarkson**
26:24
41:4 45:8

**class**

16:7
42:25
86:10

**classes**
15:22
21:2,14
57:14

**classroom**
19:17
21:7,9,12

**clean**
35:20

**clear**
71:21
80:12,16

**cleared**
112:25

**clearing**
30:3

**clearly**
56:10
78:7

**Clinton**
115:10

**clock**
89:17

**close**
43:1
80:13

**closed**
79:10

**clothes**
101:17

**clothing**
113:21
114:17,
20,23

**coincidence**
60:5,8

**Cole**
27:18,19,

23 28:7

**college**
15:22

**come**
31:9 37:7
46:17
54:11
57:24
59:25
64:11
74:15,22
75:1,13,
21 76:24
77:2,14,
15,25
89:11
91:20
92:8
94:18,19
95:4
97:10
100:19
101:18
103:4
117:5,11

**comes**
58:8
59:24
65:1
101:7
121:16

**coming**
16:20
58:18
73:13
77:19
106:14,23
110:6
118:3,13,
20 120:8

**command**
26:2 27:2
29:13
64:1
119:19

**commander**
27:11,12,



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

15 126:16

**comment**
8:18

**comments**
8:13

**Commissio
n**
109:20
110:24

**committed**
66:19
90:16,22
98:1

**committin
g**
30:6

**common**
128:16,18

**competent**
86:11,16

**complete**
22:6

**completed**
18:6
42:19
44:4,6,
10,18
85:24

**completin
g**
19:13
21:5

**complex**
46:2,13
48:25
50:6
88:11
98:5
104:7

**complianc
e**
74:25
75:1,3

76:3,4
77:12,21
94:16

**complies**
109:17

**comply**
57:9
73:24
74:14,19,
20 75:5
76:9,14
77:2,19
92:8
101:11
106:13
117:5

**complying**
58:1
74:21,22,
24 76:2

**comprise**
24:16

**conceal**
59:14

**concealed**
60:4

**concept**
38:23

**concern**
114:1

**concerns**
44:17
114:6

**conclude**
32:9

**concluded**
116:13
129:17

**concludes**
129:5

**conclusio
n**
31:14

89:20,21

**conclusio
ns**
12:7 31:8
32:13

**condition**
11:8
102:1,8
103:13

**conduct**
6:21
50:24
60:14
86:23
110:15

**conducted**
7:16
29:25
106:16
107:10

**conductin
g**
38:15

**conflict**
124:8,12

**confronte
d**
69:23

**confuse**
83:1

**confused**
43:25
81:21

**confuses**
10:18

**connectio
n**
38:10

**cons**
119:18

**consider**
93:9
94:22

103:6
108:10

**considera
tion**
48:19
57:23
60:9 95:5

**considera
tions**
39:9

**considere
d**
24:9
100:24
111:2

**consideri
ng**
57:20
107:25

**considers**
124:7

**consistin
g**
129:6

**constantl
y**
87:9,10

**constitut
ional**
32:6
124:8

**constrain
ed**
121:8

**consumed**
11:2

**contact**
29:10,12,
16 63:17

**contained**
40:6
54:10
115:25

**containme
nt**
62:9
127:23

**contains**
106:3
115:21

**contingen
cy**
76:23
77:7

**continued**
54:2

**Control**
29:23

**Controlle
d**
39:1 53:9
95:22
96:3
123:8,9

**conversat
ion**
29:11
52:1

**conversat
ions**
37:15

**convicted**
15:12

**cooperate**
76:11

**coordinat
ing**
119:19
120:13

**cop**
118:6,7,
10,16

**copy**
115:13
129:3

**correct**
6:13,14,
17,18
12:19
14:21
16:6,20
20:14
23:25
24:1,3,6,
7,24
25:2,3
26:15,16,
19,20,23
27:3,22
28:3,12,
16 30:8,
9,11,12,
16 31:2,
4,6,20,21
32:1,4,8
33:5,10
35:1,7,
11,13,15,
21,23
37:19
40:13,25
42:5,10,
15,17,18
47:7,10,
18 48:2
49:11
51:3
52:24
59:9 62:2
68:5
69:6,10
71:25
72:19,23
73:1
74:12
75:8
77:17
78:15
80:14
82:18
84:16,20
85:16,25
88:9,16
91:16
92:2



Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

93:22,25
98:17
99:19
100:7
104:21
107:16,20
108:22,25
110:13,
14,20
111:14,
20,25
112:2,18
113:1,5,
17,18
119:23
126:15
127:7,14
128:4

**couch**
53:25
75:22
76:1
120:1

**counsel**
5:13
56:25
78:17

**count**
30:14,19
34:6

**counting**
21:11

**country**
24:5

**county**
102:16

**couple**
30:20
80:3 90:5
91:5

**course**
17:24
19:21,22
44:13

**court**

5:7,14
7:23,25
8:10,25
9:21
10:16
96:12

**courtesy**
9:19

**courtroom**
10:7

**cover**
53:15

**coverage**
25:1

**CPR**
16:8,9

**Craig**
5:17
11:20
128:25
129:8

**create**
45:12
62:6

**crime**
15:12
30:6
59:16
114:14
115:5

**criminals**
104:16,19

**crucial**
44:20

**CTE**
38:23

**cumbersome**
127:24
128:14

**curious**
59:10

**current**
65:7

**Currently**
28:22

————————

**D**

————————

**Dana**
5:7

**danger**
53:12

**dangerous**
49:21,24
54:3
93:10
108:23
127:4

**dark**
55:14
56:16

**darker**
55:17

**date**
6:15 63:7
99:15

**day**
14:17
39:11
48:23
49:1,5,14
88:17
91:22
99:19,20,
22 103:11
113:22

**days**
42:17
44:19
85:23

**dayshift**
18:13

**deadly**
105:10

**deal**
74:1,19
76:10
77:3,4

**dealer**
68:22

**dealing**
41:11
47:11,12
57:21
66:15
73:9
76:19,20
90:14
92:5 93:8
97:23,24,
25

**dealt**
41:12

**debrief**
121:5

**deceased**
120:22

**December**
42:24

**decent**
70:9
101:16

**decide**
73:12,25

**decided**
17:12
47:22

**deciding**
17:18

**decision**
40:8,12,
15 47:20
55:17
59:1
96:25

**defendants**
5:18

13:7,9

**defensive**
110:17

**deferred**
42:13

**definitely**
114:12,20

**degree**
15:19

**dementia**
11:11

**denied**
29:2,4

**department**
5:12 6:13
16:11
17:10,20
24:5,22
29:7 89:6
101:5
110:4
122:14
124:7

**depend**
111:2

**depending**
73:8 93:7
100:3

**depends**
100:17

**deploy**
74:10
80:22

**deployed**
71:12,17,
18 79:4
80:10,13
81:10,12
109:5,8

**deploying**
72:14

80:11

**deployment**
83:4

**deploys**
79:21

**deposed**
7:21

**deposition**
7:3,22
8:5,11,
13,15,20
9:4,17,24
10:2,5,
10,21,25
11:16
12:23
95:15
109:11
111:7
112:23
124:19
129:6,17

**depositions**
12:17

**deputy**
28:1,2,6

**describe**
96:2

**described**
98:20

**describes**
110:5

**destroy**
114:20,
22,23
115:7

**destroyed**
62:14,17
115:9,11



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

destruction
39:16

details
96:12

Detective
60:24
61:2 66:1

detectives
59:25
61:3
67:11
98:3
108:7

determined
25:15

detonate
30:24

developed
73:1

device
70:4 73:7
78:14

devices
43:3
61:15
70:19
113:24
114:21
115:6,11

die
125:12

difference
82:19,22

different
20:12
30:20
37:10
52:20
86:6
88:14

121:11,18
127:1

differently
10:6
116:12
122:7
126:9

differs
38:24

difficult
9:21 56:4
86:17

direct
26:21

direction
56:23

directly
46:19

disagree
116:14

disc
129:7

discipline
63:16

discretion
70:20
72:10

discussed
13:5

discussing
35:4

disease
11:12

disorient
71:9

disposed
114:2,18

disprove
78:7

dispute
116:2

disrupt
73:14

distract
71:9,22
73:12,17
74:3,4
76:25
81:8

distraction
73:7

distracts
81:3

Diversionary
43:2
70:18

DNA
115:5

doctor
119:7

doctors
119:4

document
109:16,25
110:1,5,7
112:10

documents
95:25

dogs
68:14

doing
17:5,11
18:20
45:1
47:14
48:15
54:5
57:20

73:16
74:3,4
83:24
87:5 88:3
89:4
92:15
123:6
124:12
125:20

dominate
39:14,24

done
9:16
11:15
31:9
43:16
47:2
52:23
66:13,14
77:23
86:8
103:24
121:6
122:5,7
126:8

door
30:1
32:21,24
33:1 37:1
69:5,9,
14,23
70:5,6
73:14,20
74:15,22
75:1,13,
21 76:1,
9,24
77:3,14,
19,25
78:13
83:25
84:2,6,7,
9,11,15,
17,19,24
85:10,12
89:8,11
90:17
91:20

92:8,17
94:18,20
95:4
100:19
101:8,18
103:4,17
104:2
106:14,16
116:24
117:3,5,
12 118:21

doors
103:22

down
8:10 9:7,
22 16:25
17:11
18:11
37:1
53:13,25
54:3 69:9
70:4
78:13
102:20
110:8
114:3,10,
11 119:16
120:1,8,
13 121:16

dozen
88:14

draw
61:22,23
62:3,6,10
94:11
117:17

drop
87:8

drug
11:5
68:16,22

dual
119:17,18

ducks
54:1

due
52:16
87:16
98:19

dug
127:2

duly
5:22

dumb
117:21

during
8:11,19
9:4,17,24
10:2,5,
10,20
26:22
31:23
43:12
53:9
54:20
55:11
61:10,12
69:18
74:6
86:22
87:8
113:22

dust
112:25

duty
6:20 7:1

Dwayne
21:21

dwelling
106:1
111:17

_____

E

e-tran
129:13

eardrum
32:18



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

earlier
52:13
93:19
98:24
99:18
112:22

easier
49:9

easily
105:3
114:2,18

easy
68:3,21

Edgar
61:3

education
15:14,22

effect
38:2
52:6,7,8

effort
85:11

either
42:20
49:8
113:4
127:15

elderly
68:14
108:12,16

element
80:6

else
9:18,23
22:23
29:4
38:10
40:14
64:22
65:9
94:24
122:2

employment
38:10

end
74:8
78:10
89:14,25
106:5
111:6
115:24

ended
16:25
17:20
18:14,19,
21 19:3,
10 20:4
29:23
30:3
55:21
58:20
59:2,12
65:7
69:25
74:4
119:8
120:10

ending
93:4

ends
22:22,23

enforcement
6:20 17:7
82:12,19,
25 104:23

engagement
18:24

enough
40:1
77:15
116:23

enter
93:5 97:4
99:9

106:1
112:7
119:13

entire
46:13
78:22
97:21
105:20

entries
36:2

entry
29:24
30:14
36:15,20
38:23,24
39:1,6
40:8
43:24
50:14
53:9,24
69:2,3,9
75:13
77:14
78:2,4
95:22
96:3 97:7
103:5
110:12
116:25
123:8,9
124:7
128:12

environment
41:7
44:23
45:11

escape
46:3,5

especially
50:11
72:14
83:3
111:5

essentially
23:8
118:6

et al
5:11,12

evaluate
47:10,16

even
7:20 17:5
20:15
29:9
42:17
47:8
66:22
79:9
81:18
85:24
91:13
99:22
116:3
121:13

ever
7:3 12:3
15:12
24:9
28:23
29:1,6
38:9 43:7
47:2
51:14
54:21
55:1
58:2,11
64:3,15,
18 79:3
95:19
96:15,22
103:20
104:22
105:15
109:16
111:7
114:9
115:13,16
118:25
119:24
122:10,13

123:9
124:23

every
14:17
20:22
22:24
24:5
84:12
94:17
121:4

everybody
24:18
53:22
59:17
94:24
103:16
121:21

Everyone
89:4

everything
8:10,14
43:3

evidence
35:11
39:11,12
68:18
113:9
114:13

exact
25:17
63:7
96:12

exactly
29:20
39:19
75:1

EXAMINATION
6:1

examined
5:23

example
11:10,11
39:23

53:23
54:14
98:21
100:4
106:22
110:16
111:15
114:3,19

excessive
38:15

exclusively
27:20

execute
106:2
113:2

executing
31:1
92:15

exhibit
56:25
95:14,16
109:11,12

exigent
66:17

exit
60:12

expect
7:22

expected
20:8

experience
25:20
41:10,11,
15 76:18,
19 82:14,
25 97:22
98:13,16
101:5
107:12

experiences
125:24



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**experiment**
  82:20

**expired**
  28:20

**explain**
  10:4,17
  34:17
  37:21
  38:23
  53:6

**explodes**
  83:13

**explosive**
  29:24,25
  31:17
  32:22
  34:5,21,
  23 37:6

**explosives**
  37:1 75:7

**externally**
  46:11

**extreme**
  11:10,11

**eye**
  30:2

**eyes**
  32:15
  79:10,15

————————

**F**

————————

**F-I-N-D-**
**L-E-Y**
  6:7

**face**
  63:3

**Facebook**
  98:22

**facing**
  115:24

**fact**
  8:19
  65:20
  83:3 85:8
  87:17
  91:3,13
  98:22
  99:21,24
  102:11
  103:7
  113:2
  117:24
  118:1,18
  119:25
  120:3

**factor**
  108:17

**factors**
  36:7
  57:24
  77:6 92:6
  93:9
  94:17
  95:2,4,11
  100:4,8,
  12 101:10
  107:9

**facts**
  102:23

**failed**
  20:4
  33:9,22

**failing**
  20:5

**failure**
  69:11

**fair**
  14:18

**fairly**
  114:21

**fairness**
  14:15

**fame**
  51:6

**familiar**
  24:4
  48:25
  109:18

**families**
  14:13

**family**
  17:6 42:8
  51:12
  67:21
  92:11,16
  127:10

**far**
  9:16
  19:11
  31:13
  34:20,21
  41:14
  43:22
  44:8,22
  46:10,16
  48:23
  51:17,23
  52:5
  54:10
  57:19
  58:7 62:8
  66:8
  68:14
  80:15
  85:1
  86:14
  88:7 92:3
  97:20
  101:4,7,8
  103:14
  108:3
  110:6
  116:6,16,
  17 120:16
  122:15

**fast**
  58:5,8
  78:16
  93:3,12

**fatal**
  29:15,21
  54:25

**fatality**
  55:5

**feasible**
  45:21,25
  46:23
  52:15

**FEBRUARY**
  5:1

**federal**
  32:6

**feel**
  63:11
  80:7

**feet**
  75:22
  76:1
  80:20,23
  81:2
  117:4

**felt**
  52:14

**female**
  65:21

**fence**
  46:13

**Ferrin**
  21:21

**few**
  21:20
  64:6
  79:19
  83:15
  121:4

**fewer**
  116:3

**field**
  18:20
  21:8 43:8

**Fifth**
  124:23

**fighting**
  64:13

**figure**
  68:3
  94:10,25
  126:21

**figured**
  118:8
  127:3

**fill**
  23:2

**filled**
  65:8

**find**
  52:19
  58:5 88:6
  90:1 96:4

**finding**
  33:17

**findings**
  12:7
  31:14
  33:20

**Findley**
  5:10,21
  6:6,7,8,
  9,11
  70:17
  128:19
  129:6

**Findley/**
**plaintiff**
**'s**
  95:16
  109:12

**fine**
  73:15
  129:14

**fingers**
  78:18

**finish**
  79:2

**finished**

**90:10**

**fire**
  73:16
  82:21
  118:11

**firearm**
  54:5
  99:13
  104:12
  109:5,7
  113:11,
  12,23
  117:18
  125:21

**firearms**
  69:1
  99:13
  113:23

**fired**
  117:18

**first**
  5:22 6:5
  12:3
  17:22
  18:6,8
  20:2,4
  22:10
  42:2,22
  43:7,19
  48:6 55:8
  63:20,23,
  25 79:1
  83:19
  86:22
  88:23
  89:13,19
  101:13,20
  102:10
  105:18
  106:11
  128:2,9,
  16

**Fisher**
  66:9
  67:6,7,22
  68:8
  91:15



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 146 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

98:5
99:12,13
107:7
112:23
127:9

**five**
28:18
45:3
70:10
75:22
76:1
94:12

**five-plus**
44:25

**flash**
43:2
70:18
79:11,12,
13

**flight**
47:13

**floor**
107:22,24
108:2
119:22
120:20

**flophouse**
68:16
97:25
98:12
107:9
127:18

**flush**
114:11

**flushed**
114:3,10

**following**
33:5
37:22
42:5 90:7
115:21

**follows**
5:23

**foot**

93:17
**for**
5:15 6:4
7:17 8:7,
24,25
9:3,21
10:12,24
11:16
14:2
15:14
16:13,19,
23 17:18
18:10,12,
13,22,25
19:9 20:2
22:25
23:2,5,9,
18,25
25:1,18,
22,23
26:6,7,9
28:18,19
29:1,3,
19,22
30:13
34:23
35:3
36:2,5,
12,23
37:2
38:20
40:7
42:17,21,
23 44:7,
19,24
45:5,21
47:2
48:10,23
49:14
50:2,4,
14,20,21
51:2
52:6,12,
15 53:2
54:3
55:3,23
56:24
63:9
64:7,9,

10,14,22
65:10,13
66:6
68:24
70:24
71:2 72:7
73:4,11
75:20
76:21
77:13,15
79:19
80:3
82:5,8,
10,24
83:1
84:14
85:11,19
86:5,24
87:3 88:1
89:10
90:19
91:19,20,
25 93:11
94:23
95:17,21
98:21
100:2,4
103:6
104:11,
12,19,24
106:22
109:11,13
110:16,19
113:3,22
114:1,3,
6,16,18
116:23
117:22
118:1,3
121:24
122:9,21
123:10,
15,24
124:2
125:22
126:3
127:5,13,
14 128:1,
16 129:13

**force**
16:24
17:15
25:2
38:15
58:17
77:23
93:5 97:4
99:9
105:10
106:1,4
109:4,5
110:12
112:7

**forced**
14:17
36:19
39:6 69:9

**forgetting**
13:12

**forgot**
44:1

**form**
8:14
14:19
31:11
32:23
33:24
45:16
49:22
52:25
56:6
63:13
65:17,22
66:12
69:15
70:21
75:17
76:16
78:20
82:7 83:8
86:1 99:1
100:16
101:23
102:7
104:13
105:12

108:5
112:1,8,
17 116:5
117:14
118:15,22
121:2
124:10
125:13
126:10

**formal**
15:21
49:12
58:12
83:23
101:1
123:4

**found**
69:18
99:24
102:19
112:24
113:4,9

**four**
18:15
25:19

**fourth**
32:7
71:5,7

**frame**
21:4
32:25
43:12
44:9,16
47:23
48:5,13
49:16
51:23
57:15
63:5
66:15
69:20
73:25
86:13
116:7
120:16

**frames**
48:10

**frequently**
104:23

**Friday**
42:4

**from**
15:15
18:14,16,
19,21
19:3,20,
22,23
20:6
32:17
34:22
36:11
37:23
38:25
40:19
41:12
48:3
50:22
53:13
54:14
60:10,12
63:5 65:3
69:1
73:15
74:3 78:3
84:22
89:12,14,
24 90:9,
13 96:18
97:8
108:6
109:18,19
116:17
125:10,19
127:8

**front**
7:25
69:5,9,14
70:5
73:19
75:13
77:14,25
78:13
83:25
84:19



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

85:9
92:17
103:17
104:2
118:21
127:23

**full**
6:4
12:13,14
85:24
87:23
117:23

**full-time**
24:6,22

**fully**
118:12

**further**
53:13
126:20

**futon**
102:21
120:2

---

**G**

**G-A-R-T-H**
6:6

**gang**
61:3
91:6,8
104:9
125:21

**gangs**
18:25
19:1

**garage**
60:12

**Garth**
5:9,21
6:6 129:6

**gather**
53:16,18

**gathered**
40:18

**gathering**
41:22

**gave**
13:2 34:2
41:25
67:7 68:8
73:4
78:22
88:18
110:11
124:18

**general**
9:17
68:23
97:20
98:14,21
101:14,20

**generalized**
97:15

**generally**
10:20
67:19
101:22

**gentleman**
68:4

**get**
17:18
27:24
39:14
46:14
53:3,19
69:22
75:25
76:8
89:3,18
97:11
103:21
115:4
120:23
121:20
122:17
123:7
124:14

**gets**
24:19

42:25
43:1,3

**getting**
19:10
32:25
65:6,21
94:8

**giant**
61:24

**give**
9:5 10:13
46:4
48:9,13
54:11
73:19,22,
23 74:14
77:18
88:8,13,
19,21
90:5 91:6
94:21,24
95:10
100:19,20
101:9
110:25
115:12
126:17

**given**
7:3
11:17,18,
19 23:16
29:15
41:16
67:24
68:13,15
75:12
86:9
87:20
89:9
100:14
110:3
111:13
117:24
124:19,20
129:6

**gives**
111:15

**giving**
41:23
45:2 77:1
89:2

**go**
6:4 7:21
14:19
17:19,23
19:7,20,
22 20:16
22:6,20
30:18
31:11
32:23
33:24
45:13,16
56:6
60:12
65:17
69:15
73:19
76:16
81:4
84:23
85:1
89:18
90:2 92:3
94:14
98:14,15
99:2
100:16
101:23
110:8
112:8
121:14,22
122:16
126:10,18
128:23,25

**goes**
23:2
31:13
46:13
62:8
128:9

**going**
15:2
17:19
18:14

19:24
21:1,4,10
22:19
24:13
27:16
30:18
36:20
39:1,5,21
41:6,25
42:8 43:7
45:1 46:8
47:9,13
48:10,21
49:17
50:5,24,
25 54:2,
18 55:21
57:20
58:5,9
60:18
62:5,7
67:18
69:8,16,
19 70:4,
11,23
71:4
73:14
74:20
78:7,24
79:10,13
80:24
82:2
87:21,25
88:6
89:18
90:1,3,4,
6 91:17
92:3,20
94:15
95:20
98:10,13,
16 99:5,6
100:18
101:8
103:8,9,
15 107:8,
9,11
108:14
113:21
117:8,9

118:8
121:13
124:13,15
125:23
126:13,14
128:11
129:1

**gold**
23:25
55:16,25

**gone**
52:8,12
84:10

**Gonzales**
13:14,15,
17,18

**good**
6:3 8:24
9:16
17:12
18:15
39:23
41:18
47:22
48:5
60:9,10
65:18
69:17,23
90:18
98:15
115:10
120:23
122:1
125:5
129:13

**got**
30:3,4
40:9
85:23
97:21
120:8

**grab**
76:5
94:25
110:17

**grabbing**



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 148 of 176

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

54:4

**graduated**
15:15,18

**granted**
122:22

**Granville**
96:22,23,
25

**graveyard**
18:12

**Great**
16:21

**Grimmett**
60:24
61:2 66:1

**ground**
7:21

**group**
117:18
118:12

**guess**
22:10
44:15

**guessing**
61:7

**guidance**
110:25

**gun**
54:12
68:22
76:5,24
82:21
98:18,23,
25 99:4,
5,6,9,15
104:24
105:2
110:17
113:8

**gun'**
97:11

**gunfire**
81:16

82:3
83:1,14

**guns**
46:8
104:15,
16,18,19

**gunshots**
81:22

**guy**
68:22
97:11,12

**guys**
46:19
51:19
87:8
119:8,11,
20

_____

**H**

**H.R.**
43:22

**hadn't**
90:22

**half**
18:25

**hallway**
53:14
54:1
128:12

**Hancock**
41:20
45:5

**handgun**
114:10,17

**hands**
74:23
75:2 76:4
77:20

**handwriti
ng**
62:3

**handwritt
en**
61:25

**happen**
17:16
28:6
52:10,22
88:8 96:9

**happened**
29:19,21
47:5 60:6
62:10
67:3
79:15
97:13
125:3

**happens**
25:12

**happy**
9:3

**hard**
58:5,8

**harder**
69:8

**harm**
54:5,6
74:3

**having**
5:22
37:16,24
98:5

**head**
9:7 13:11
102:20
108:18
120:18

**heading**
50:12

**hear**
10:18
54:12,22
83:13
88:15
90:16

97:7,14
106:12

**heard**
24:9
41:24
58:2
96:17,23
97:11
99:10
103:20
111:7
113:16
114:9

**hearing**
79:24

**hears**
82:1

**held**
28:23
65:4

**helmets**
61:11,16

**helped**
34:5

**helping**
41:5

**Henderson**
17:19

**here**
5:8,10
8:19 10:9
11:13,22
13:25
17:11
42:1 51:1
74:24
76:3
101:9
110:23
112:10
115:13,22

**here's**
37:10
45:12

**Hey**
74:24
76:2

**high**
15:15
36:19
39:3
59:16
64:12
72:16
74:5
80:24
81:1

**higher**
34:21
37:4

**highest**
27:22

**Hilary**
115:10

**hindsight**
125:8

**hiring**
22:25

**history**
47:5
57:22
125:20,24

**holding**
96:10

**home**
103:21
105:1,4,9
117:10,11
118:13

**homeland**
18:17
65:4

**homicide**
35:12
48:4,7
60:21
66:14,19
67:11

68:18
73:9
90:15,20,
22 93:11
98:1,9
107:5
108:7
113:12
115:20
121:8
126:20
127:8

**homicide'
s**
113:10

**honest**
16:16

**honestly**
14:24

**Hoskins**
69:22
107:10

**hostage**
43:15,22,
25 44:2
64:9 95:1

**Hotel**
59:8

**hour**
25:1
41:17
44:13

**hours**
11:3,6
20:20
21:7
42:25
44:14

**house**
39:23,24
68:17
98:13
99:22
117:15



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 149 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**houses**
14:11

**how**
7:6,10
10:4 12:1
13:9 15:5
17:16
18:1,9
19:14
20:19,24
22:17
24:4
25:14
29:14
30:18
31:16
37:10,13
38:6,23,
24 43:10
44:13
45:14
48:8
50:13
61:5
62:25
64:3
69:19
72:4
74:13
77:24
79:25
80:15
89:10,23
90:12
92:4
94:5,7,21
97:1
101:2
107:3
114:23
120:4,17
127:22

**however**
93:12

**huh-uh**
9:9

**hunting**
42:8

**hurt**
125:25

**hypothetically**
94:1
101:13
126:5,24

_____

**I**
_____

**I.A.**
31:13
32:13

**IAP**
34:11
42:13
61:21,22
67:20
70:3
72:19,20
127:17

**IAPS**
34:15

**idea**
67:3
107:18,22
122:23
126:13

**identification**
95:17
109:13

**identified**
84:11,25

**identify**
56:10
92:21

**if**
6:24 7:25
8:16,18
9:1,6,8,
10,12
10:10,13
11:15

13:10
22:21
23:18
24:18
26:5
27:23
36:16,18,
19,20,21
39:3,4,6,
7,13,22
40:1 42:2
45:9
46:4,14,
16 47:8
52:16,22,
23 53:20,
24 54:12
56:25
59:14,16
62:16,22
63:11,21
64:11
70:3
73:5,8,
12,18,25
75:11
76:9,23
79:8,9,
15,18
81:1
82:1,18,
20 83:3
88:8,10
89:18
90:12,14
92:15,23
94:25
99:3,4
100:10,
13,25
101:7,10,
11,13,25
103:12,
13,25
105:3,8
109:16
110:8,16
111:5
113:8
117:2,9,

20
118:10,11
119:9
121:16,
23,24
122:4,13,
20 123:6
124:11,13
126:5,20
127:15,17

**illustrate**
55:12

**Immediate**
80:18,21

**immediately**
10:9 74:8
78:10
93:4

**impair**
79:24

**implement**
46:18
81:7
87:16

**implementation**
44:21

**implemented**
51:6,18

**implies**
72:1

**implying**
86:2

**important**
8:24 22:1

**in**
5:10 6:19
7:24,25
8:14,17
10:7,16
11:2,6

12:24
13:10
14:15
15:5,9,19
16:10,18
17:6
18:10,18
20:19
23:13,23
24:5,15
25:25
26:1,3,
15,17
27:1,14
28:14
32:10,15
33:17,22
34:9,22
35:8
36:11
37:5,14,
24 38:2,
10,15,17
39:14
40:15
41:10,21,
25 42:12,
22,25
43:4,8,24
44:9,20,
22 45:4,5
46:16,17,
19 47:5
48:16,20
49:18
50:24
51:12,25
52:5,7,13
53:7
56:2,17
57:23
58:23
60:2,4,9,
11 61:5
64:19
65:6,21
66:7,20,
22 67:2,
8,20,23
68:25

69:14
70:13
71:17,19,
23 72:7,
15 73:10,
11 74:1,
4,21,23
75:2,7,
20,25
76:1,23
77:3,16,
17,23
79:3
80:16
81:19
83:3,15,
21 85:2,
8,9,20
86:6,7,
11,12,16,
24 87:4,
10 88:6,
7,10,14,
19 89:10
90:1,13,
21 91:5,
13,17,22
92:1,23
94:11
95:5
96:1,4,
11,25
97:6,10,
22,23
98:5,8,18
99:12,15,
21,25
101:17,
19,20,24
102:16
103:25
104:9
105:1,2,
10 106:7,
12
108:17,20
109:4,18
110:6,10
111:4,17
112:3,22



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 150 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

113:2,8,
9,12,20,
25 114:7
115:2,19
116:2
117:10
118:2,4,9
119:15
120:18,19
121:10
123:7
124:8,12
126:1,3,
20
127:17,
20,25
128:3,9,
16

**incidences**
41:13
66:21,23

**incident**
12:4 13:3
16:19
29:9,14,
19 33:5
34:19
35:3
36:1,14
37:8,9,
22,23
38:2,4,7,
13 40:7
43:17,18,
23 44:4
50:16,22,
23 51:5,
8,24
63:18
91:24
124:25

**Incidenta lly**
103:16

**incidents**
103:20

**include**
21:7
88:4,24

**including**
11:5

**incorrect**
35:19
42:21

**indicate**
24:12

**indicatin g**
67:21

**indicatio n**
39:4
90:18
98:10
108:6,15

**indicatio ns**
68:16
98:2

**indicator**
69:17
107:12

**individua l**
22:21
39:7
51:11
57:9
66:18
73:8,9
110:15
117:25
125:6

**individua ls**
36:7,17,
21 68:17
69:21
77:5 98:4
107:17,19

**informal**
29:11
49:12
58:12
83:23
84:3,5,8
87:2
89:23
101:2,3
122:24
123:5

**informati on**
15:3
40:17,20
41:23
45:2
55:14
67:17,23
68:13,15
73:3 91:7
99:11
111:18,24
121:25
126:7
127:8,13

**initially**
20:24
21:1

**injured**
75:6
109:1
120:11
125:8

**injury**
30:2

**innocent**
68:12
90:21,23
91:4
108:11

**insert**
71:20
116:8

**inserted**
71:5

78:12
115:23
116:19

**insertion**
72:14
116:16
117:6

**inside**
36:8,17
39:7
46:20
49:6
67:3,6,
10,12,18,
19 68:9,
11,17,19
71:13
73:8,18
74:5,10,
16 76:13
77:25
81:13
91:11
94:22
95:7
97:5,8,18
98:11,17
99:22
100:9,14,
25
102:12,19
103:7
106:13,
14,18,22
107:4,6,
13,15,17
108:4,8,
12,16,20,
24 110:16
111:6,17,
24 112:24
113:4
120:14
121:25
122:2
126:6,8,
19,22
127:3,6,9

**instance**
75:20

**instant**
72:16
87:10

**instead**
42:11,13
126:5,7

**instructi on**
51:15

**instructo r**
21:17

**instructo rs**
21:21,22

**intel**
39:5
40:18
41:22
53:17,18
66:20
67:5,12

**intend**
111:12

**intended**
40:23
47:18
87:19
88:17,21
90:12
128:2

**intensive**
19:11

**intention**
118:4

**intention s**
84:12
85:1
117:23

**interesti ng**
78:5

**Internal**
31:5,8
32:9

**internall y**
46:4,10

**interpret**
35:18

**intersect ion**
48:20

**intervene**
7:1

**interview**
13:2
16:18
41:24
71:23
124:18

**interview s**
13:1

**into**
17:18
19:16
20:25
21:1
37:24
39:9
46:9,11,
14 47:9
48:18
53:24
54:1
57:24
62:13
69:24
71:5
72:17
73:21
75:5
80:25



94:8
105:3,9
107:11
118:13
120:8

**introduced**
42:22

**intruders**
105:3

**invasion**
103:21

**investigated**
31:5 60:6
113:13,17

**investigation**
61:18

**investigations**
91:6

**investigative**
19:2

**involved**
20:9
39:11
40:9,22
42:12
43:19
66:8,25
71:10
126:1

**iron**
46:12

**Isaiah**
75:20
113:16

**issue**
87:7
101:6

**issued**
123:1

**issues**
42:12

**it**
6:8 8:1
9:21
10:17
11:21
13:21
16:12,22
17:12,17
18:11
19:2,10,
16,23,24
20:4,6,7
21:7,20
22:25
25:5,6,7
26:6,14
27:18,22
29:2,14
31:15,16
32:2,5,20
33:12,21
34:8
35:21,25
36:18,25
37:3 38:4
39:19,20,
25 44:23
45:17,20,
22,25
46:23
47:6,12,
23,24
48:1,2,4,
5,16
49:4,9,
16,20,21,
24 50:8,
10,14,17
51:5,7,
12,17,20
52:11,23
53:1,21
54:9,14
55:4,5
56:24

57:13
58:8,20
59:2,18
60:5,8,11
61:12
62:1,10,
12,14,16,
18,20,21,
22 63:4
64:13,14
65:10,18
66:16
67:15
68:4,6
69:9
70:19
71:16,20
72:9,16,
25 73:8
74:6
75:11
77:18
78:1,3,4,
9 79:8,
18,21,24
80:3,6,
11,12
81:12,13
83:23
84:2,18
85:6,10
87:4,18
88:1,6,8,
17,21
90:1,8,
20,21
91:14,15,
21 92:4
93:23
96:8,13,
19 97:20
100:17
102:4,18
103:4,5
104:11
105:17
107:5,14
108:1
109:8,9,
18,22

110:5,9,
15,25
111:4,15
113:6
114:11,
12,13,24
115:3,16
116:1,2,
4,8,11,
15,20,21,
24 117:18
118:7,10,
16 119:4
120:5,7
121:1,16,
17,22
122:18,22
123:25
124:2,6,
11,16
125:10,17
127:4,6,
18,19,23,
25 128:7,
8,16
129:9

**it's**
6:6 8:24
18:3 19:8
20:8
21:9,11
22:1 23:3
26:8
30:21,22
35:2
36:20
38:13
39:3,6,19
46:5,15
47:5
48:25
49:1,15,
20,23
50:4
53:22
56:4
60:10
61:17,20
62:16

66:17
68:16,21
69:8 71:9
72:5,15
73:14,20
75:11
78:21
79:6,20,
23 80:20,
22,24
81:1,2,8
86:16
87:25
93:10,16
95:8,20,
23 97:20
98:12,14,
15 102:11
107:9
109:21,24
121:12
127:24
128:18

**items**
114:7

---

**J**

**jail**
126:4

**Jake**
40:18
41:19
45:2
47:21
60:19
62:7

**January**
5:5 6:11
23:24
26:10
29:20
35:4 38:3
54:20
68:25
71:3
113:15

**jargons**
53:7

**Jasmine**
7:18
29:9,18
30:1,3
37:8 75:4

**Jo**
5:7

**job**
9:16 48:8
64:25

**join**
16:11
22:3

**joined**
17:15,22
19:6
26:18

**joining**
16:14,24

**judge**
7:25
10:8,14,
16 89:14

**July**
19:5 23:6
28:14,15
63:5

**jury**
8:1,7

**just**
7:8,23
9:2 12:6,
7,11 15:2
18:4,11
20:5
21:2,6
23:22
24:2 28:9
29:10,19
30:22
35:19
37:15
41:25

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

42:7
52:20
55:4
56:24
57:2
60:5,12
62:12,17
63:3
67:14,18
68:23
70:22
72:6,20
75:24
77:19
81:2
82:21
85:11
87:8,15
88:10,12
90:16
92:11,17,
24 93:23
94:1
95:2,21
96:13
98:14,20
101:8,14,
21 105:24
109:15
114:15
115:7,12
117:3,6
119:11
121:15
122:17
123:24
124:12
125:17,24
127:18,22

**justify**
110:18

_____

**K**

**Kai**
44:25

**keep**
49:2 50:7

**kids**
48:24

**killed**
51:11
85:19
125:7

**kind**
7:15
18:11
19:18
29:1 42:1
59:10,13,
14 66:16
68:23
74:17
87:6
101:14,21
102:3
105:18
108:17
109:5
110:12
121:8
122:15
125:24

**King**
7:18
29:9,18
30:1,4,5
32:11,14,
20 33:5,
15 34:19
36:1,14
37:8
38:13,18,
21 75:4
108:20

**knew**
51:19
63:2,3
108:3
111:23

**knock**
31:20,21,
24 32:2,
5,10
33:9,18,

22 37:1
38:14
52:7
56:13
57:5,7,
10,18
69:9 70:4
73:5
75:11
77:11
78:25
83:19,20,
21,24,25
84:2,5,9,
15,19,23
85:6,17
91:17,18
95:6 96:4
97:1
100:2
109:23
110:4
121:13
122:9,10,
18 123:7,
10 124:8,
16

**knocked**
78:13
84:7,11,
16

**knocking**
58:17
117:11

**knocks**
123:5

**Knolls**
21:22

**know**
7:22 13:9
14:1
16:16
20:7,8
24:4
25:16,21,
23 28:6
31:14

32:19
33:14,17
51:5
52:11
55:8,10,
19,22
56:2,12
58:6
59:4,6,18
62:15,16,
21,22
63:7,8,14
65:11
67:14
68:16
69:22
70:5,8
71:15
72:7
75:8,23
79:25
83:9
84:21
90:15
91:9,10
94:19
95:24
96:10
100:19
101:25
102:8,13,
25
103:12,19
104:22
105:19
106:11
107:3,20
109:16
110:16,18
111:5,16
112:2
113:6,7,
14 115:18
116:6,7
117:2
118:9
119:10
120:16,23
121:5,8
122:2,4,

15
124:11,12
125:4,21,
22 126:18
127:15,17

**knowing**
45:14
127:5

**knowledge**
20:7 51:1
58:25
86:21
115:16

**known**
62:25

**Kubla**
13:12
120:10
128:2

_____

**L**

**large**
39:23
59:13,21
60:1
127:24

**larger**
108:2

**Las**
5:1,11
6:12 15:5
16:11
17:9,20
24:8,21
29:7 89:5
101:5
110:3
116:12
122:13
124:6

**last**
6:5 11:3,
6 12:2
18:1
19:24

54:1
110:22
123:15

**lasts**
18:2

**later**
8:20
10:13
44:8
69:19
99:16

**Latia**
5:10

**law**
6:20 7:25
17:6 32:3
57:6 77:1
82:19,25
84:22
92:7
101:8
104:22

**lawful**
116:25

**lawsuit**
14:16
33:7,18

**lay**
82:11

**laying**
102:20
120:1,20

**layout**
107:23

**layperson**
82:1,5,10

**lead**
83:5
97:17

**leader**
6:15
22:17,18
23:1,5,18
25:4,10



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 153 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

26:3
30:10
34:5
40:17,23,
24 41:19
45:3
47:21
60:19
62:7
91:23
120:25

**leaders**
22:14,15,
19

**leading**
66:21

**leads**
102:3

**learn**
37:13
42:3
125:10

**learning**
117:25
118:1
125:19

**least**
13:13
32:14
80:2
81:25
84:4
93:20
110:4
111:21
112:5
127:13

**leave**
28:13,17,
20 63:6
129:11

**leaves**
121:21

**leaving**
22:22

41:4 65:7

**led**
85:5
106:9,19

**left**
63:5,8
115:16

**legal**
15:24,25
38:20

**legally**
92:19
98:20

**less**
44:19
49:1,8
50:4
85:23
111:4,16,
23

**lessee**
127:19

**lessor**
127:16

**let**
22:11
47:17
75:5 79:1
103:14
109:15
114:15
116:11

**let's**
13:10
29:18
48:6
49:17
57:5
68:20
70:10
85:18
89:3,8
92:10
93:10
126:24

**lethal**
46:18

**lettering**
55:25

**letting**
57:9
59:18

**level**
37:5

**Levi**
41:20
45:5

**Lexitas**
5:9

**licenses**
28:24

**lieutenant**
26:4,6,
10,12
27:2,5,6,
10,17
34:12,14
37:16,18,
20 40:11,
20 41:23
47:25
51:18,21
52:1
62:25
64:4,16,
20,23,25
65:2,5,7,
16 72:21
73:3
123:12,13

**life**
16:10

**like**
8:17 9:7
13:2 14:7
16:6
17:17
18:3 21:9
24:21

29:13
32:12
39:20,23
48:23
49:15,16
50:6 51:6
54:13
55:20,21
58:2,3,12
61:24
64:12,18
76:3
77:16
78:3
80:6,18
81:16
82:1
83:14
84:3,10
86:3 88:7
89:3
93:16
95:13
97:13
103:11
109:7,10
110:19
113:23,25
119:11
123:4
126:18
128:13

**likelihood**
36:22
39:12
64:12

**likely**
43:25
49:6
100:9,14,
25 102:4
103:7
128:10

**limit**
58:2

**limited**
20:7

26:13,14
31:16
34:23
66:15
128:14,15

**limiting**
48:22

**line**
64:19
94:11,12
127:20

**lineup**
62:8

**link**
115:5

**linked**
91:4

**listed**
35:8 66:7
67:20
114:7

**literally**
98:20
108:19

**litigation**
96:1

**littering**
95:9

**little**
10:6 22:9
23:22
26:25
29:18
30:2
35:20
48:7
70:18
79:13
80:8
86:14
101:20
116:12
122:7
126:19

127:2

**live**
15:7
21:10
22:7

**lived**
15:5
103:25

**living**
16:13,23
75:6
119:16
120:19

**loaded**
74:18
105:6

**location**
29:23
39:10
48:19
57:21
60:10
66:22
92:22

**lock**
121:12
122:8
123:23

**locking**
121:12

**logical**
82:6

**long**
7:10 12:1
15:5
18:1,2,9,
10 20:19
30:21
36:6 38:6
39:25
44:12
45:4 61:5
62:25
77:18
79:25



Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

86:5
89:10
94:21
116:23
120:17

**longer**
28:10
78:21
93:12
100:15,25
116:4,15

**look**
10:13
37:8
46:11
69:23
95:3
109:15
115:12
117:17
118:11
120:23
121:7
123:18

**looked**
119:11

**looking**
17:4
33:21
34:1
57:24
79:8,18
90:24
108:1
113:22
120:24
121:9,24
125:4,8,
22

**loop**
73:15

**lot**
14:18
20:9
41:9,10
45:7 46:3
59:7,21

60:3 74:1
76:18
85:11
86:6
94:19
97:22
98:10
104:15

**loud**
9:5
79:21,23
87:6

**low**
81:2

**LVMPD**
27:20
38:10
49:13

**LVMPD-1490**
95:23

**LVMPD-4386**
115:25

_____

**M**
_____

**made**
17:2
34:18
40:9,12
47:20
55:17
59:1
61:19
64:16
84:24
119:24,25
120:3
124:2

**major**
41:12
64:13
86:7

**majority**

102:15

**make**
8:16,18,
24 10:11
12:11
24:17
30:19
37:16
43:24
49:9
51:19
53:24
66:2
71:20
72:15
80:11
83:12
87:5 90:8
101:16
120:11

**making**
72:7
121:10

**males**
126:8

**man**
90:21
104:12
128:3,16

**manner**
48:17

**many**
7:6 9:20
10:18
40:1
43:10
44:13
64:3
107:4
120:4

**March**
16:22

**marked**
95:14,17
109:11,13

**matched**
114:13

**material**
109:18,22

**materials**
96:5

**matter**
7:18
32:11
38:18,21
81:1

**matters**
38:21

**maybe**
39:23
48:13
54:2,4,
11,12
61:7
101:16
103:21
105:2
110:16
115:7
121:23

**me**
9:2 10:24
15:14
19:14
22:11
25:22
34:17
42:2
47:17
53:6 56:2
58:18
72:1 76:4
79:1,6,9,
16,20,23
80:5
81:15
82:18
85:10
86:15
96:18,24
97:3
101:12

102:3,15
109:16
110:2
114:15,17
115:12
116:11
117:20
118:5,18
120:14
122:12
123:15

**mean**
9:8,11,12
26:1
27:13
29:14
30:8,17
61:17,21
68:21
72:2
80:16
82:5
92:20
94:1
98:21,24
101:17
108:19
115:7,9
118:11
122:18
124:16
126:17

**Meaning**
34:25

**means**
69:8
74:23,24

**meant**
72:10

**measure**
90:13

**mechanism**
121:13

**medical**
11:8
16:2,4,6

30:4
119:1,4

**medication**
11:6

**medicine**
16:7 43:3

**Melanie**
13:19,20
58:20,25

**MELTON-14**
57:2

**member**
82:24
124:2

**members**
6:22 17:6
33:4,8
67:21

**memorized**
105:20

**memory**
11:12
96:18

**mention**
96:8

**mentioned**
39:3
45:20
52:13
95:12
100:5
112:22
122:6
123:22

**mere**
98:22

**merely**
104:2

**met**
12:2
14:13
36:7,18



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 155 of 176

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

63:20,23,
25 92:10,
12 104:22

**Metro**
5:11
16:11,14,
19 17:21,
22 18:5
24:21
29:7
36:3,4
51:15
55:12
58:12
83:24
85:14
87:2
89:23
101:5
110:3
116:12
122:13,25
124:7

**Metro's**
20:10
36:14

**Metropolitan**
6:13
17:10,20
89:5

**middle**
88:11

**mind**
108:17

**minimum**
58:13,16

**minored**
15:19

**minute**
58:3
70:10
111:3,8,
12,23
112:9,15,
19

**minutes**
61:6,7
120:5

**mission**
21:10
25:8,9,
10,11
26:7
38:15
42:3,4
43:6,7,20
45:11
49:5
54:21
55:11
59:5
61:18
64:5
66:1,11
102:5
121:5
125:5

**missions**
22:7
27:14
43:10,17
46:6 64:3

**mitigating**
77:6 92:6

**modified**
42:23
44:6

**moment**
28:10

**momentarily**
79:19

**momentum**
53:10,14,
22

**Monday**
42:5

**money**
14:18

**monitor**
67:8 68:1
107:8

**months**
18:3,14
20:20
25:18
52:12
98:23
99:18

**more**
10:3 19:2
20:16
27:1 34:2
43:25
46:11
49:21,23
56:4
66:14
78:24
94:24
102:4
127:2
128:10

**morning**
6:3 48:21
67:2
68:25
85:5
87:14
97:17
107:3
109:6
127:13,14

**most**
25:11
27:19
48:11,12
65:12
111:4

**mother**
127:11

**motor**
73:15

**move**
19:4

125:10

**moved**
71:13

**movement**
54:3

**moving**
19:3
22:22
53:13
101:19

**MP5**
98:7
99:15

**Mr**
5:15,17
6:2 7:13,
14 10:3,
11 11:21
12:6,9,
10,12,18
13:14,18,
19,20,21,
22 14:19,
22 15:16,
20 29:15,
21 31:11,
18 32:23
33:2,24
34:3 35:5
38:17
40:8
43:19
45:16,19
49:22
50:1
52:25
53:5 55:1
56:6,8,22
57:4
58:15
63:13,15
65:17,19,
22,24
66:12
67:1
69:15
70:1,8,

11,16,21
71:1
75:14,15,
17 76:6,
16 77:9
78:20,23
82:1,7,9
83:8,10
85:19
86:1,20
91:11,14,
15 95:13,
18 99:1,7
100:16,22
101:23
102:2,5,
7,9,19,24
103:2
104:13,17
105:12,14
106:8,9,
11 107:2,
15,18,20
108:5,9
109:10,14
110:11
111:18
112:1,3,
4,8,12,
17,21
113:11
116:5,10,
23
117:14,
16,17,20
118:15,
17,19,22,
24 119:1,
12,14,15,
21 120:4,
15,18
121:2,19
123:17,
19,21
124:10,17
125:3,12,
13,16,23
126:6,10,
11
128:19,

21,22,23
129:2,8,
9,10,14

**Ms**
30:1,5
32:14,20
33:5,15
108:20

**much**
19:1
48:21
60:3 69:8
77:22,24

**multi-housing**
46:2

**multiple**
24:16
107:13

**murder**
46:8 60:6
76:21
90:16
94:21,24
95:8

**my**
8:11 9:2,
5 10:4
13:11
23:23
28:19
35:19
42:2
43:18
56:22
74:21
75:18
77:17
96:20
102:3
105:18
109:7
115:12
117:15
118:13
120:17
123:18



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 156 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

124:4
125:19
128:20

_____

**N**

**Nahum**
61:4

**name**
6:4,5
13:25
63:4
123:15

**narcotics**
7:17
29:22
41:10
86:7
98:12
114:1,2,
19

**nature**
114:16

**necessarily**
66:17
74:22,25
128:12

**necessary**
100:10

**need**
9:4 14:24
20:8
24:18
30:19
34:20
35:19
37:4
50:25
53:20
60:1
84:1,23
101:14,16
121:7
123:7
129:1,2

**needed**
45:9

**needs**
10:14
43:4
117:1,2

**neighborhood**
18:23
59:17
104:1,6,
15

**neither**
99:21
112:23

**Nellis**
6:17
46:15,25
48:19
50:11
54:21
60:13
66:23
89:6
92:24
93:13

**Nevada**
5:1 32:3
105:10,
15,20
109:20

**never**
52:3
84:7,10,
15,16
101:6
109:4,24
110:3
113:10,16

**new**
20:6
51:15
52:4 63:2
86:3,13,
18 87:17

**next**
30:1 81:3
83:13
102:4
117:2

**NFDD**
43:2
70:24

**NFDDS**
70:18
71:2,11,
24 72:22
73:6,7
79:2

**nightstand**
105:2

**nine**
71:6
81:5,6,8,
10,15,21
82:1,14,
21,22
83:1,5,13

**Ninth**
85:2
96:15

**no**
9:6,8
11:1,4,7,
9,14
12:15
13:4,8
15:13,23
16:1,3
17:8
21:15
23:18
25:13
26:8
28:8,10,
25 29:5,
8,17
30:6,7
31:20
33:16
34:7

35:13,14,
16,23
37:12
38:8,11,
16,22
43:9,10
44:22
45:23
46:25
47:1 48:9
52:2,5
55:1,2,24
56:1,15
60:16
61:11
62:24
63:19,25
64:11,17,
21,24
65:23,25
67:3
68:7,13,
14 69:3
72:3
80:16
81:14,24
84:1,18
85:7
86:14
89:1
91:12
92:3,20,
24 93:13
94:4,6
95:17
96:7,23
97:2,5,8,
10 99:9,
24 101:8
105:21,24
106:22,24
107:1,18
108:6,15
109:13
110:1,6,
7,21
111:9,18,
24 113:8
116:4
118:23

121:13,23
122:9,10,
11,18,23
123:2,4,
5,7,10,11
124:16,22
125:1,17
126:13
128:18,22

**no'**
9:12

**no-knock**
50:17,25
51:2 53:3
122:17,
21,25
123:24
124:15

**nobody**
83:22
110:11
122:2

**Noise**
43:2
70:18

**none**
108:24
113:3

**nonlaw**
82:12

**nonverbal**
9:12

**North**
90:24
91:5
118:2
125:22
126:3

**not**
6:21
9:10,17,
23 10:19
12:7,14,
16 20:3
21:9

23:15,19
24:5
26:8,12
29:9 30:5
35:21
41:7
42:16,19
44:3,10,
12,18
46:23
47:13
48:21
49:15,18
50:5,8
52:6,15,
20,23
54:18
58:5 59:6
61:8,12
63:2,21
65:1 67:8
68:9
69:12
71:18
72:2,11,
20 74:20
75:12
76:10,11,
14 77:13
79:12
82:14
84:9
85:15
86:16
87:18
88:13,24
90:1
91:15,25
92:11
93:11
96:12,20
97:7,14,
22 98:14
99:18,20
100:9
101:1,3
102:4
103:8,13,
16,23
104:1



Garth Findley      Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

105:24
106:12,
21,22
107:8,15
110:1
111:12,22
112:6,9,
15,18
114:18
117:8,9,
15 118:20
122:25
123:5,17
128:12,18
129:2

**Note**
111:1

**notes**
62:1
115:13

**nothing**
97:13,16
110:19

**notice**
69:12

**now**
7:9 16:20
25:4,17
28:9,22
40:7
46:10,14
50:20
52:5 65:6
71:23
78:5 81:5
82:17
85:17
86:21
87:1,19
89:2 94:8
95:24
96:8
100:1
101:12
113:25
116:1
120:18

122:4,16,
25 123:6
124:7

**nowadays**
123:7

**number**
25:17
58:13,16
88:5,9,
13,19,22,
25 90:11
105:24

**numerous**
86:8

————————

**O**

**O'DANIEL**
13:19,20
27:6,17
34:12,14
37:18,21
40:12,21
41:23
47:25
51:19,21
52:1
58:20
59:1
62:25
64:4 65:2
72:21
73:3
123:13

**oath**
5:14
7:23,24

**objection**
10:3,11,
12,15,18
14:19
31:11
32:23
33:24
45:16
49:22
52:25

56:6
63:13
65:17,22
66:12
69:15
70:21
75:14,17
76:16
78:20
82:7 83:8
86:1 99:1
100:16
101:23
102:7,24
104:13
105:12
108:5
112:1,8,
17 116:5
117:14
118:15,22
121:2
124:10
125:13
126:10

**objections**
8:12
10:5,9

**Objective**
109:22

**obligates**
8:1

**observe**
48:11

**observed**
97:16
99:18

**obstacle**
19:21,22

**obviously**
69:17
79:12
121:6
124:19
125:6,7

**occasion**
31:10

**occupant**
77:24
106:18

**occupants**
89:6
102:12
108:3

**occur**
42:4
84:19

**occurred**
38:5
44:5,11
55:6
66:11
98:9
110:19
124:21
125:6

**occurring**
53:12
66:24

**occurs**
53:16

**odd**
102:14

**of**
5:9,10,17
6:11,22,
25 7:15,
21,25
8:2,11
9:2,10,
12,20
10:3 11:5
12:16
13:1,6,
11,25
14:6,7,
10,16,18
15:12,18
16:4,22
17:6,23
18:4,11

19:2,8,
11,18,24
20:9,20
21:13,21,
22 22:10,
12 23:6,
7,11,24
24:19
25:17,20,
21 26:1,
2,10,21
27:1,14
28:15
29:1,13,
15,21
30:2,21
32:3,6,15
33:4,7,8
34:10,17,
19,21,24
35:4,11
36:1,5,9,
12,14,18,
23 37:5,
9,24
38:3,12,
23 39:2,
8,11,12
40:3,14,
25 41:2,
8,9,10,
11,15,20
42:1,8,
11,12
43:16
44:21,25
45:4,7,8,
21 46:3,
6,20
47:5,8,
11,12,14
48:6,15,
23 49:4,
5,12,14
50:23
51:8,12
52:9
53:3,4,
10,11,15
54:14,25

55:6
57:2,6,8,
11,17,19,
21,25
58:4,10,
13,16,21
59:7,10,
13,14,22
60:2,3,
14,21
61:5,8,9,
17,19,25
62:17
63:1,16,
17 64:18,
22,23,25
65:1,9,15
66:15,16,
23 67:25
68:16,18,
23,25
69:2,11,
14,20,21
70:3
71:3,6,8,
18,19
72:7,25
73:16,18,
22 74:1,
3,8,18
75:12,19,
20 76:17,
18,19
77:13,17,
22,23
78:4,10,
18 79:1,
13 80:8,
15,22,23
81:7,12
82:20,24
83:4,19,
21,23
85:9,11,
20 86:6,
12,14,25
87:2,6,
11,22
88:11
89:5,6,



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

10,11,12,
14,17,23,
24 90:2,
3,4,5
91:5,8,
14,18,19,
22 92:1,
4,7,16,
21,22
93:4,15
94:2,11,
14,15,19
95:3,8,
10,25
96:5,12,
14,16,23
97:8,22,
24 98:4,
10,14,15,
17,23
99:1,4,
11,13,21
100:2,5,
8,12,20,
21,24
101:10,
13,14,15,
22 102:3,
10,14,15
103:3,14,
15,20
104:9,15,
18,19
105:10,18
106:8,12,
15,16
107:8,22,
23,25
108:1,14,
15,17,18
109:2,4,
5,20
110:11,
18,23
111:1
112:7,11,
14,20
113:3,15,
16,19
114:3,9,

13,16,18
115:1,3,
4,5,13,19
116:3,17
117:4,6,
18 118:12
119:7,25
120:3,7,
8,10
121:8,11
122:15,16
123:23
124:1,2,
15 125:24
126:1,5,
13,17
127:15,16
128:8,11,
12 129:6

**off**
13:10
32:22
53:25
59:19
70:11
71:22
75:7,25
76:17
81:4 82:2
90:2 92:3
94:14
98:13,14,
15,16
101:8
103:15
106:11
107:8,9
108:14
117:6
124:15
125:24
126:13
128:23,25

**officer**
5:9 6:8,
12,20
13:7
17:3,23
18:20

27:20
41:9
54:22
55:8
56:11
62:23
69:22
73:2 74:7
81:20
85:6
86:4,18
88:12
89:2
97:16
104:23
107:10
110:24
115:23
116:7
118:25
120:10,13
128:2

**officers**
6:25 14:6
22:2,14
24:6,23
33:18
53:15
55:12
56:9
73:13
75:5
85:9,11
91:21
94:23
97:4
106:1,3,
10 109:20
110:12
111:5,10,
16,23
117:19,21
118:4,9,
12 119:20
124:2
125:7
127:20

**official**
87:2 88:2

**on**
5:8,17
6:11,15
8:18 9:10
10:6,9,14
14:4
15:17
16:5,20
18:9,11,
16 19:20
20:7,23
21:10
22:2,6,
13,22
23:13,16,
17,19
25:21,22,
23,24
26:9
28:10
29:19
30:11,14
31:9,17
33:11,21
34:23
35:4
36:15
38:2
39:2,23
40:2,3
41:4
42:3,17
43:8,11,
15,23,25
44:2,8,19
46:2,6,
15,20,22,
24 48:22
49:13
50:4,11
51:15
52:4
53:25
54:10,20
55:14,22,
24 56:5,
13 57:3,
10,13
58:7,8,9
61:11,20

62:1,4,13
63:3,21
64:3
66:11,15
67:2,8
68:25
69:5,9
70:14
71:2,5,6
72:5,14,
18,20
73:8,18
75:21,24
78:10,25
81:12
83:25
84:2,6,7,
9,11,15,
16,19,23
85:8,12,
23 86:10,
15,17
88:3
90:17
91:24
93:7
96:3,9,
15,22
98:5,22
99:14
100:4,17,
23 101:6
102:20,
21,23
103:17
105:15
109:20
110:4,9,
24 111:2,
21 115:3,
8 117:18,
23 118:11
119:12,22
120:1,20,
24 121:9,
12,20
123:10
125:10,
17,23
126:3

127:5,23

**once**
19:12
20:15
40:5 41:2
53:16,22
54:9,15,
23 71:20
84:24
89:16

**one**
7:7,9
8:19 9:20
10:3
13:13,23
14:6
21:21
23:7
26:23
29:20
32:15
58:9
64:18
67:25
80:16,22
83:11
85:11
86:10
91:14
93:20
94:2 96:8
97:5,10
100:5,8,
12 106:22
110:22
111:3,8,
12 113:7
119:7
121:20
129:6

**one-on-
one**
42:23

**only**
7:9 25:23
27:5
36:15
41:1 51:2

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

56:17
64:11
81:12
96:2
97:22
116:13
121:25
127:7

**onsite**
25:11
64:4,8

**onto**
20:16

**OODA**
73:15

**open**
65:1
74:15
79:15
89:8
103:17,22

**opened**
118:11

**operating**
49:19
84:14
87:15
88:2

**operation**
6:16
25:5,6,8
26:9,22
30:11
34:10,11
45:15
50:2
76:12
85:19
120:24

**operational**
21:3
41:14,18
43:4

**operators**

23:2
25:18,24
28:19
64:18

**opinion**
125:17,19

**opportunity**
46:5
47:22
50:4
73:24

**opposed**
31:20
40:22
55:15

**opposing**
56:25

**opposite**
10:20
73:25
77:5

**option**
71:24
72:1,9,10
76:25

**options**
72:6
126:17

**oral**
19:25
20:5

**order**
37:5
43:4,24
50:24
123:7
129:3

**ordinary**
82:24

**originally**
18:5

**other**
6:24 7:9
8:12
12:17
13:1,6,13
14:6
23:7,8,
11,13
24:14
26:23
33:4,8
38:12,20,
21 43:10
46:9,11
51:25
59:18
61:1 65:1
68:11
95:4 96:6
97:15
101:10
107:17
114:25
123:25
124:20

**others**
54:6

**our**
37:9,15,
17 40:2,5
46:14,19
49:18
59:22,23
60:2
61:11,16
66:8
72:5,6
77:3
84:12
86:12
87:4 91:5
94:23
95:20
98:13,16
119:4
125:21

**ourselves**
84:12

**out**
9:5 23:8
25:17
27:14
30:4
39:21
40:6,25
41:2,13
42:7
43:13
45:1,14
46:17
48:24
49:2 50:7
54:12,13,
24 59:25
64:11
68:3
69:18
77:15
78:22
83:4 85:9
86:17
90:5
91:7,15
94:10,25
97:12
99:24
102:18
106:23
107:14
109:7,8
117:19
119:17
120:10
121:16
122:19
124:20
125:25
126:21
127:3,12

**outcome**
14:16

**outside**
20:6
36:21
50:5
54:10,14
81:12,14

90:16
120:12

**oven**
115:2

**over**
9:23
18:23,24
19:2,3,4,
22 23:12
25:22
27:23
29:9,14,
16 45:3
54:23
65:4
102:21
109:15
115:12

**overwhelm**
49:10,18

**overwhelming**
39:14
54:17

**own**
59:23
86:15
104:12,24
105:1
116:12

———————

**P**

**p.m.**
50:9

**page**
98:22

**pages**
12:13
57:3
95:25
96:1

**paid**
33:14

**paper**
61:20,25

**paralegal**
15:25

**paraphernalia**
113:23

**park**
46:16

**parking**
59:7,21
60:3,11

**part**
19:24
24:19
32:3,6
33:7 49:4
57:11
61:17
70:3 81:7
83:19,20,
21 87:11
90:3 91:8
128:8

**particular**
20:1
26:9,17
40:7
46:24
50:2
52:15
68:24
69:4
87:13
99:19
106:7
107:3
110:20
111:18
127:13,14

**particularly**
50:14

**pass**



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 160 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

91:19

**passage**
110:23

**past**
15:22

**patches**
56:20

**patrol**
16:7
18:7,8,9,
10,16,18,
22,24
19:1
24:17
43:3
97:23

**pause**
70:13

**pay**
14:18

**PC**
35:8 66:7

**peace**
109:20
110:24
111:16

**peak**
120:17

**penalty**
8:2

**people**
9:22
10:18
14:1
22:13
23:11,15
35:18
46:6
49:2,6
50:4,7,11
59:18
60:21
62:7
68:11,12

71:9
74:1,19
75:12
76:10,13
77:4
88:14
95:7
100:25
102:14,16
103:7,22
104:2,15,
16 107:4
108:12
117:18
126:14,
19,21

**Per**
67:20

**percent**
37:4

**perform**
49:13
50:8

**performan
ce**
6:19
109:21

**performed**
6:16
47:18
64:5

**period**
63:1
111:4

**perjury**
8:2 14:24

**person**
25:11
26:3
30:23
39:20
40:6 46:3
48:3,11
54:6,11
59:19
62:20

65:13
73:12,19
76:23
77:2
80:11,13
81:9
82:8,19
86:3
93:10
100:13
103:12
121:25

**personal**
63:9
101:4
125:19

**personalize**
117:9

**personally**
14:11
33:3
42:12
59:1

**pertaining**
105:25

**Peterson**
85:2

**Phase**
86:12

**phone**
123:18

**photo**
62:17

**photograph**
61:24
62:17,19

**photographed**
62:12

**phrase**
106:3
116:11

**physical**
19:17,20
80:6
84:18
115:13

**physically**
26:11
62:14
83:25
84:2,5,7,
9,15,16,
23

**picks**
124:4

**picture**
98:23

**pictures**
55:12
57:2 99:4

**piece**
61:25

**pillow**
102:21

**pinging**
68:9
107:8

**pistol**
19:20

**place**
74:23
75:2
76:23

**placed**
119:22

**plaintiff**
5:16

**plan**
34:5
45:12,13

46:18
72:20
73:1
76:22
78:14
80:25
81:7
87:11
90:4
107:22,24
108:2
116:8
118:10
128:8

**planned**
71:16
78:9,10

**planning**
44:20,22
45:2,7

**plans**
76:18,23
77:7
107:24
117:24

**play**
57:24

**played**
8:6 65:21

**please**
5:13 6:3
9:2,23
89:8

**plenty**
117:4

**plunger**
30:24

**Plus**
59:24
98:12

**point**
16:10
23:4
27:25
34:22

36:11
37:7 43:4
47:23
54:18
55:4,12
60:10
65:25
70:9
102:4
106:18
119:13
128:12

**police**
5:11 6:13
16:11
17:2,10,
20 24:5,
22 25:1
29:7
55:14
56:5,11
73:20
74:15
75:13
78:1,16,
17 87:22,
24 88:12
89:6
90:11,16
92:13,18,
21,25
93:13
97:12
99:8
101:5
103:5,17,
18,22
104:2,3
110:4
111:5
114:2
116:24
117:19,21
122:13
124:7

**Police's**
116:12

**policies**



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 161 of 176

Garth Findley          Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

20:12
22:2
34:18,20
36:14
37:9,14
50:13
95:20,22

**policy**
20:9,10
36:9
37:17,25
38:1,7
49:12
51:16,18,
22 52:4,
5,10,16
58:12
83:23
84:1,5,8
86:12
87:2,4
88:7
89:23
103:15
109:18,19
122:24
123:4,5

**portion**
21:12
60:14

**position**
23:9,16
24:14
46:14
62:7
64:23
65:3,8,
10,13,21
86:11,14,
16,24
110:17
127:25

**positions**
53:15
62:9
127:24

**positive**

108:15

**possessio
ns**
99:13

**possible**
83:12
123:23
128:7

**possibly**
82:4
83:2,18
108:1
122:8
123:24

**Powerpoin
ts**
57:14

**prepare**
11:15

**preplanne
d**
42:7
72:12,13,
18 74:6,
11 76:12
77:23,24
78:18
84:18
91:25

**preplanni
ng**
74:13

**prescript
ion**
11:6

**present**
10:9
26:11

**pressure**
80:7,8

**pretty**
18:2 19:1
60:3 68:3
98:15

109:1
114:22
115:10
117:21

**prevent**
74:2 77:7

**preventab
le**
125:11

**preventin
g**
53:13

**primary**
13:24
21:16
24:14

**principle
s**
31:25

**printout**
107:25

**prior**
15:7
16:13,19,
23 22:21
38:2,4
54:25
55:2
58:18
59:5
65:25
66:21,23
68:7
69:1,3,13
97:3,7
98:4
107:6,10
109:25
110:21
113:15
125:20

**proactive**
18:16

**probable**
66:2

**probably**
14:15
18:13
32:25
47:5
68:22
90:18
95:25
102:12
103:24
105:19
114:11
118:2,12
120:6
124:4

**problem**
53:19
54:9

**Procedure**
84:14
87:15
88:3

**procedure
s**
22:3
34:18
36:14
37:10,14
49:19
50:13
95:22

**proceedin
g**
8:25

**proceedin
gs**
70:13

**process**
22:21,25
23:3
51:12

**produced**
31:15
96:1

**professio
nal**
28:24

**proficien
t**
21:3

**program**
86:13

**progressi
on**
18:5

**promoted**
23:12

**promoting**
18:21
22:23

**promotion**
29:2

**properly**
118:20

**property**
113:3,4,
19 126:14

**property-
damage**
36:16

**property-
only**
30:25
34:25
35:6,9
36:2 37:2

**protectio
n**
40:5
46:21

**provide**
73:20
78:1
91:21
95:7,14
103:5
116:24

**provided**
11:25
51:15
108:14

**providing**
118:25

**Psycholog
y**
15:19

**public**
6:22,25
82:24
124:3

**purple**
55:21

**purpose**
48:15
49:4,14
70:24
71:2,8

**push**
56:22

**put**
8:13 40:2
46:19
60:2
62:13
72:16
122:19
126:3

---

**Q**

**qualified**
65:13

**qualifying**
20:22

**quarter**
43:1

**question**
10:10
67:2,15
74:17



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 162 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

92:14
94:18
99:2
105:19

questions
8:12 9:2,
6 10:4,24
78:25
124:24
128:20,22
129:12

quick
30:14
114:22

quickly
39:15,25
114:21
129:12

quite
18:10
19:8,11
21:20
41:15
43:16
59:21
64:6 77:5
79:7,21
120:7
121:3

quote
106:4,5
110:25
111:6
115:22,25

––––––––––
R
––––––––––

rack
54:12

radios
119:18

radius
80:19

raid
25:6

raised
15:9

range
25:20,21

ranking
27:22

rap
85:12

rarely
122:13

rather
89:25

RC
17:1

re-
106:15

reacted
71:13
97:6

read
8:6 12:3,
23 116:20

reading
96:13

ready
33:1

realize
75:10

really
96:2

rear
74:9

reason
20:1 41:1
46:1,21
49:3
51:13
56:9,13
59:10,12

reasonable
57:8,17,

19,25
58:10,21
73:22
75:12,19
76:10
77:2,4,17
89:11
90:2
91:19
92:7
93:24
94:2,15
95:3,7,10
100:2,3,
20,24
101:9
103:3,14
104:11
106:15
110:23
111:2
112:6,11,
14,19

reasonableness
100:13

reasons
9:20
45:24
53:18
63:9

reassigned
28:21

recall
13:5,10
38:6 61:1
71:24
96:14
113:19

receive
16:4
57:10

received
29:10
63:17

recent
52:12

recently
26:18

recognition
53:12

recognize
69:18

recollection
96:20

recommend
22:5

recommendations
11:17
37:23
41:22
48:3,10

recommended
112:16
126:23,24
127:1

recon
44:24
45:1 62:5
69:18
107:9

reconnaissance
66:10
69:12
70:3

record
6:4 8:24
10:12
29:19
56:24
61:14,19
70:11,15
95:21
128:24

recorded
124:20

recording
61:15

Recover
35:11

reengage
54:18

refer
61:23
71:23

Reference
109:22

referred
103:11

referring
44:7 62:1

refers
109:22

refusal
110:9

refuse
106:19
124:24

refused
106:4

refusing
106:9
110:12

regarding
12:4 13:2
29:12
31:9
58:12
92:9

regards
29:13
74:21
86:12

regiment
19:11

regional
24:15,20

regrets
125:2

regular
18:22
24:17
31:19,24

reinforced
70:5

related
95:22
113:23

relates
50:14
97:1

relating
114:14

relay
51:22

relayed
40:20
73:3

relaying
40:16

remain
23:12,16
124:24

Rembert
66:9
67:6,22
91:14
98:6
99:12
107:6,15,
18 112:23
126:6
127:10

remember
32:12
33:20
51:25
63:25



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

65:3
81:11
96:13

**remorse**
125:2

**repeat**
9:2

**repetitions**
65:6

**rephrase**
9:3

**replaced**
123:12

**replacing**
87:10

**report**
12:1,4,8,
13,14
28:7
115:21
116:13,21

**reporter**
5:7,14
7:24 8:10
9:21
13:16
58:14
106:25
129:4,11,
15

**represent**
38:17
95:24

**represented**
38:20

**reprimand**
29:16
63:16

**reprimanded**
29:6

**reps**
65:14

**request**
13:16
106:25

**require**
77:11

**required**
73:18
96:19

**requirement**
36:18
91:18
92:10
93:21
109:23
110:9
124:9

**requirements**
32:7 57:6

**rescue**
43:15,22,
25 44:2
59:24

**rescues**
64:9

**reserved**
51:2

**residence**
30:3
40:5,19
53:24
66:7
68:19
69:16
71:6
87:24
92:11,16,
22 120:9
128:13

**resist**
46:17
94:25

**resisting**
64:11

**resolved**
33:11

**resources**
53:19

**respect**
98:19

**respond**
10:19
43:13
100:15

**response**
9:13
10:13,15
16:17
125:18

**responses**
9:10

**rest**
41:20
44:25

**result**
32:15
34:19,23
36:1,13
37:9
50:23

**retire**
63:10,12

**retraining**
52:4

**reverberates**
53:23

**review**
8:15
10:14
12:14
13:1 48:2

**reviewed**
12:16

47:25

**reviewing**
47:24

**Revised**
105:15,20

**rid**
115:4

**ride-alongs**
17:12,15

**rifle**
19:20
98:6
128:7

**right**
6:19 7:9,
12,20
11:11
14:4,8,25
20:1,13,
17 24:2
25:17
26:13,17
28:22,23
30:1,6,15
31:1 34:6
35:6,25
42:9,11,
14 43:8
47:9
52:21
59:6,8
67:2,4,6
68:6,23
69:5,9
70:17
71:14
75:7,24
76:14
78:14,19
79:1
80:12
81:19
83:7,13
84:21
85:9,15
88:15

90:20,22
91:11,15
95:13
97:13
98:25
99:23
100:6
101:4,15
102:12
103:18
104:3,20
105:10
106:23
107:15,19
108:21,24
111:19
112:25
116:11
117:2
119:16
122:25
123:19
124:5,24
128:3,23
129:8

**rights**
6:22,25

**ring**
105:22

**risk**
36:19
39:3
47:8,13

**road**
46:15

**roadway**
48:22

**robberies**
118:2

**role**
44:20,22
65:21

**room**
40:1 54:1
79:4
80:17

119:16
120:19

**Rothenburg**
13:11
81:20

**rough**
103:25
104:6,7

**roughly**
25:16

**route**
60:9
76:22
126:18
127:1

**rule**
9:17
10:9,14
32:10
33:9,19,
22 58:4,
6,7,8,19,
22 111:8

**rules**
7:21

**run**
95:1
97:12

**running**
110:17
119:17

---

**S**

**SACO**
38:25
39:17,21
45:20,21
52:15,17

**safe**
45:15
72:15
77:8



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

80:22
107:12
111:4

**safely**
39:13,22,
24 40:5
54:10
122:2

**safer**
124:2

**safest**
45:12,18
76:22
94:23
126:2

**said**
8:11,19
11:25
12:10
14:6
16:18
17:17
19:14
28:10
32:12
39:16
49:16
50:6
71:12
76:3
84:3,10
90:11
96:19
97:5
106:18
107:1
116:21

**Sam's**
59:8,11,
13 60:3,
7,11

**same**
7:24
9:18,19,
22 23:2
44:1 79:4
80:16

95:7
**Samuel**
5:8
**SAR**
119:7,8,
11
**satisfied**
77:13
**saturatio**
**n**
18:14
65:4
**saw**
98:22
110:16
119:11,
15,21
120:4
**say**
12:20
15:21
19:9
23:14
25:9
35:15
37:8
38:24
46:15
48:12
53:13
58:7
63:9,22
66:17
68:21
76:2
77:18
78:6
84:2,13
88:12
89:3,4,8
90:14
91:23
92:14
93:10
96:13
97:8,11,
19,20,25

99:3
102:10
103:9
104:3,14
105:22
107:12
109:7
115:6
117:23
120:6
**saying**
9:22
47:24
48:4
56:16
67:7,11
68:8
74:18
75:23
77:10,12
81:2
82:17,18
84:8,22
89:22
91:4
94:13
106:13
117:1
127:8,18
**says**
39:20
70:3 72:9
77:1 84:1
103:17
110:9,15,
25 116:1
**scenario**
126:21
**scenarios**
19:24
**scene**
115:17
**school**
15:15
21:5,6,11
41:17
42:23

44:7,8,12
48:23
**Science**
15:19
**scream**
88:11
**search**
7:16
29:22
30:25
31:17,19
34:24,25
35:3,6,10
36:2,5,
12,16,19,
24 37:2
39:2,4
40:19
41:11
42:3,25
43:14
45:22
47:12,17
49:13
50:15
52:20
53:3
59:15,24
64:10
66:6
67:20
68:7
78:17
87:22,24
88:3,12
89:7
90:11
92:13,16,
18,21,25
93:14
103:6
106:7
110:20
113:3,20,
25 114:1,
7 115:14
122:3,21

**searching**
114:16
**second**
58:7,19,
22 74:9
78:10
89:20
93:5,20
94:2
101:15
106:12
109:15
115:12
**secondary**
99:14
107:21
**seconds**
58:3,7,
13,16
75:23,25
76:1,8
78:4,6
79:19
80:1,2,3
83:15
90:13
92:1,3
94:5,7,
11,12,13
115:22
116:1,3,
4,14,21,
22 117:4,
13 120:5,
6
**see**
6:24 10:8
13:10
14:16
53:25
56:4
59:16
69:1
79:10,12
80:3
81:24
85:8
102:25

115:13
118:25
119:10,14
120:18
121:23
126:20
129:10
**seen**
10:6
61:8,24
81:23
95:19
99:10
109:16,
17,24
**select**
59:20
**selected**
22:18
23:6 50:3
64:23
**selection**
22:24
**self-**
**defense**
104:12,
20,24
**senior**
25:11
26:5
27:19
**sense**
90:8
**sent**
43:12
**ser-**
64:15
**sergeant**
6:8,10,11
11:18
12:20
18:22
22:22
25:4
26:2,5,



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 165 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

15,18,19,
22,24
27:2 34:9
40:16,22
41:3,4,6,
7,8,9
42:13,16
45:8,9,10
47:24
60:20
64:15
70:17
73:2
85:21,22
86:4,5,
13,23
88:18
89:5
128:19

**sergeants**
22:20
23:7,9
25:19
28:18

**serve**
24:18
52:20
108:13
111:11
121:17,22
122:3,18
123:24
124:16

**served**
29:22
52:17
55:24
122:10

**service**
36:23
45:21
53:3
124:1,15

**servicing**
39:2
107:7

**serving**
59:15
68:7

**set**
71:21

**seven**
52:12
94:7

**several**
8:25 21:2
23:7 33:4
90:23
107:10
117:3

**severely**
109:1

**shake**
9:7

**she'll**
8:13

**sheriff**
28:4

**shield**
127:21
128:5,8,
10,11,13,
17

**shields**
53:20

**shifts**
102:14

**shock**
121:12
122:8
123:23

**shoot**
19:19
73:13
118:4,8

**shooter**
13:24

**shooting**
29:15,21

54:23,25
55:2,6
76:5 83:6
90:24,25
91:5 98:8
120:5
126:1

**shootings**
66:23

**short**
30:14
34:6 63:1

**shorter**
110:18

**shot**
35:5
83:17
91:11,13
120:1,12,
14

**show**
9:10
109:10

**showed**
111:11

**showing**
57:1
110:7

**shows**
116:2

**sic**
109:21

**side**
9:7,8
71:5,7

**silent**
124:24

**Silver**
23:24

**simple**
92:12

**simultane
ous**
83:4

**simultane
ously**
78:12

**since**
7:8 15:6
50:15
77:22

**single**
92:11,16

**sir**
6:3

**sit**
46:15
47:16
48:12
51:1 54:9
75:2 76:2
77:20
94:22
95:2
103:9
121:5
126:17

**sitting**
62:15
74:23
75:21
76:3

**situation**
43:15
76:20
83:16

**situation
s**
97:24

**six**
18:3,13
25:18
75:23,25
76:1
115:22
116:1,4,

14,21,22
117:4,13

**size**
24:15
57:21
92:4
93:15
100:5

**skills**
73:15

**slang**
9:9

**sleep**
105:1

**sleeping**
101:17
102:16,22
103:10,13
117:10

**slower**
101:20

**slowing**
53:10

**slowly**
54:13

**slung**
98:6

**small**
24:15
92:4 94:8

**Smash**
115:8

**snaps**
78:18

**Sociology**
15:19

**solo**
41:7

**some**
7:21 9:12
14:2,10
15:2 16:4
17:23

19:23
21:22
22:14,22
25:21
29:1
35:18
37:7,24
42:1,12
47:8
53:11
55:11
57:2
78:24
82:20
98:11,17
101:14,16
104:18,19
110:25
113:25
115:3,4
119:13
121:6,9,
15,20
125:5,7
126:1
128:11
129:12

**somebody**
44:18
55:5
64:19
71:17
72:10
74:14
77:14,15
80:23
82:21
83:5,12,
14,24
84:5
89:10
90:12
91:20
101:13
103:4,21
105:8
110:16
115:7



**somebody's**
98:22

**someone**
20:6
47:13
55:3
66:18
76:20
90:15
94:18
95:1
97:25
100:9
105:8
110:6
111:5,17,
23 125:25

**someone's**
101:7

**something**
17:4,17
22:23
54:5,12
77:16
96:6
121:12

**sometimes**
81:18

**somewhere**
61:24
62:15
117:10

**soon**
29:25
41:16

**SOP**
49:15
88:7
89:23
90:2

**sorry**
11:9
13:12,17,
24 15:16
16:15,21

35:15
37:6
50:19

**sort**
9:9,12
11:5 16:4
17:23
18:4
61:17
82:20

**sorts**
102:14

**sought**
35:5
113:20
123:3

**sound**
83:14

**sounds**
39:19
78:3
81:16
83:14

**South**
6:17
46:25
54:21
63:2 64:1
89:6
92:24
93:13

**speak**
9:18,23
60:21

**speaking**
9:19
10:20
89:13
90:10

**specialized**
86:6

**specific**
20:17
51:25

52:3
66:22
67:15,17
85:4 98:5
99:20
106:3,17,
21 110:5

**specifically**
21:12
22:2
42:23
51:7
57:16
67:9
78:25
99:10
107:4
109:23

**speed**
39:13
54:16

**spell**
6:5
123:15

**spent**
18:15,17,
20

**spot**
79:19

**spree**
54:16

**squad**
18:13
63:3,20

**staging**
59:7 85:9

**stand**
30:22
77:19

**standard**
49:18
84:13
87:15
88:2

111:21
112:6,15

**Standards**
110:24

**standing**
32:24
81:3

**Standings**
109:21

**stands**
53:1

**start**
15:2 46:7
76:5
89:12,13,
16 90:9
115:2

**started**
81:22
87:16
116:18
117:11
120:12

**starting**
89:17
115:22

**starts**
19:19
50:10
59:18

**state**
5:13 6:4
10:12
15:8,10
32:3 85:3
105:10
109:20

**statement**
35:8,19
66:7
68:23
110:10,11
115:22

**statements**
11:18
12:17
124:21

**States**
96:16,21,
25

**statute**
105:16,25
106:2

**Statutes**
105:20

**stay**
20:23

**step**
115:8
127:10

**stepped**
119:15

**stepping**
119:17

**stick**
71:4,20
74:8,10
78:12
79:3,4
80:10
81:6
115:24
116:18
117:7

**still**
10:12
18:16,18,
24 36:5
76:3
102:16
122:19

**stood**
120:12

**stopped**
54:17

**stopping**
53:10,14
70:9

**stops**
53:22

**straight**
60:13

**strapped**
99:14

**structure**
22:10,12
23:23
27:1
39:10,15,
22,25
40:2,4
57:22
59:14
75:6 92:4
93:7

**stuff**
121:7

**stun**
71:4,19
74:8,10
78:12
79:3,4
80:10
81:6
115:24
116:18
117:6

**subject**
46:17
53:25
64:12
66:16
103:9
107:21
120:14
128:9

**subject's**
54:4

**subjects**
35:7



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 167 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

41:21
66:8,19,
24 67:5,
10,12
69:24
99:12
107:11,13
127:9

**submit**
57:9
101:11

**submitting**
58:1
94:16

**such**
6:21 9:6,
9 15:25
36:15
44:20
111:24
114:6

**sued**
33:3 38:9

**sufficient**
92:19
93:1

**suggest**
118:19

**suggests**
102:11

**suicidal**
118:14

**suicide**
118:6,7,
10,16

**suing**
51:12

**summarize**
15:14
42:1

**super**
93:10

**supervision**
86:14

**supervisor**
26:21

**supplied**
56:20,21

**supposed**
10:19
43:13
80:11
116:8

**sure**
12:11
30:20
51:19
71:20
72:15
80:11
87:5
120:11
121:10
123:17
125:4

**surprise**
39:13
49:10,17
54:17

**surprised**
16:17

**surrender**
73:24

**surrendering**
94:16

**surround**
39:17
41:13
46:1,22,
24 47:2
52:14
86:8

**surrounding**
39:22

**surveillance**
66:11
69:12
121:10,20
122:7
123:22

**suspect**
30:5
90:15,20
94:21,25
95:8,9
112:23

**suspects**
46:8
67:25
91:14
99:21
108:24
127:15

**suspended**
29:6

**suspension**
29:16

**suspicion**
97:15,20
98:14,21

**sustained**
30:2

**SWAT**
6:13,16
14:4,7
16:5
19:3,4,6,
13,16
20:2,10,
12,16,17,
25 21:1,
5,6,11,
16,23
22:2,3,

10,12,13
23:5,13,
16,17,18,
19,25
24:6,9,
17,22
25:1,5,6,
8,10,11,
17,18,25
26:7,12,
14,18
27:2,14,
21 28:11,
13,17
29:3
31:3,9,15
33:4,8
34:15,18
37:9,17
38:15
41:17
42:3,17,
19,23
43:6,7,
10,20
44:4,6,8,
12,18,19
45:4,5,15
47:2,6
48:7 49:5
50:14
51:15
53:7
54:20
55:11,14,
22,24
56:4,9
57:3,11
58:18
59:5,16
63:4,21,
24 64:3,
15,18,19,
23,25
65:5,25
67:3,17
69:7
70:19
84:14
85:14,19,

23,24
86:9,12,
22 87:2
95:20,21
97:21,22
102:5
111:11
112:6
118:12
119:20
122:16
123:10

**SWAT's**
96:5

**sworn**
5:22

---

**T**

**TAC**
119:4

**tactic**
29:24
39:1
43:16,20,
24 44:1
53:9
94:23
123:8,10

**tactical**
27:11,12,
15 53:7,
8,17,21,
23 54:2,
15,16,19,
22,23
55:1,4,7,
9 72:20
90:4
126:16

**tactics**
43:1,17
95:23
96:3
97:22
125:9

**take**
7:24 9:22
16:6
20:19
38:1
39:8,25
48:18
53:25
60:9
70:10
73:13,15
77:18
95:1,5
103:4
109:15
110:17
121:17,24

**takeaway**
121:17

**taken**
11:5
12:24
85:11

**taking**
8:10 21:2
53:15
57:22
120:10

**talk**
18:4 22:9
23:22
29:18
48:6
51:17
52:21
57:5
68:20
70:17
77:12
85:18

**talked**
29:2 58:6
85:22

**talking**
26:25
80:1
99:17,18



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 168 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

119:18,19

target
121:10,23

taught
57:15,17

Tavaglione
5:7

teach
21:13

team
6:13,15
18:15,17,
24 20:16
22:14,15,
17,18,19
23:1,5,
16,24,25
24:9,17,
19,20,21
25:4,10,
20 26:2
30:10
33:4,8
34:4
40:17,23,
24 41:7,
16,19,20
44:23
45:1,3,11
47:21
53:11,13
54:4,6,13
60:18
62:5,6
65:4
91:6,23
97:21
120:8,25
128:1

teams
24:2,16,
25 44:24

technique
121:20
122:1

124:14

techniques
121:11

tell
8:1 19:14
42:2 48:7
66:1
82:19,22
96:18,24

telling
67:16

temporarily
32:15
79:24,25

ten
25:22,24
28:19
45:6
93:20

ten-plus
25:25

tends
118:19

term
24:10
72:4

terminated
63:11

terminology
59:6

terms
9:9 20:19
26:1 61:5
77:23
89:10
91:17
94:11
109:4

test

19:21

tested
19:8 23:7
29:1

testified
5:23

testify
5:22
11:13
14:24

testimony
7:4 8:6,
16,21
13:6
52:14
93:19
109:24
112:16

testing
19:15,17,
18,19
22:21,25
23:3,18

than
10:6
12:17
38:12,21
43:25
44:19
61:1 65:1
78:21
85:23
89:25
93:12
96:6
97:15
102:4
107:18
111:23
116:4
128:10

Thank
129:4,7,
15

that's
11:10

12:10
13:21
14:21
17:14
18:18
19:1
20:8,9
21:11
24:19
30:23
36:9 41:1
44:1
46:7,16,
21 49:15,
18 50:10,
11 51:12
53:11
54:8,16
57:17
58:3
61:11
68:23
69:19
70:5 72:5
75:3,8,24
77:13,20
78:5,14
83:11
87:6,23
89:8,9,
19,22
92:12,25
94:22
97:21
98:13
100:10
103:15
105:6
109:18
115:25
116:2
118:14
123:6
127:11
128:6
129:14

them
9:3 13:10
14:2

17:12
21:21
46:4
49:10,17,
18 70:20,
22 72:14
73:20,22,
23 74:2
76:25
78:2
83:13
87:8
90:19
91:21
95:10
96:14
97:17
98:23,25
100:5,19,
20 101:9
103:5
104:18,19
108:1
115:2,7,8
116:25

themselves
56:10

then
8:20
10:12,13
11:18
13:18,23
17:10
18:12,19,
21 19:2,
9,13,21,
23 20:7,
10,15,21
21:3,17,
18,20
22:13,23
23:1,11
24:18
25:4,15,
19,22
26:23
27:10,16,
19 28:2,4

30:3
36:22
39:13,16
40:3,6
41:9,14,
22 42:4
44:7
45:6,8
46:10,11
47:10,16,
23,25
50:3,9
51:16,19,
21 53:16
55:3,21
56:16
57:25
58:19
59:17
60:2,19
62:6,8,13
63:4 65:8
66:5 67:6
68:10
71:6,21
72:13
73:2,11
74:3,4,8
77:10
82:21
84:18
86:24
87:18,22
88:8 90:5
91:15
92:6
93:23
95:11
97:23
99:4,14
101:15,19
102:18
106:16
110:22
119:6
120:12,17
121:21
122:1
125:7
127:10



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 169 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

128:15

**there's**
7:9 8:25
13:11,23
20:12
24:25
25:1,5,
10,16,18,
20,24
26:4,5
28:18
36:21
39:4 47:8
48:2
55:5,15
57:2
61:24,25
70:23
80:6 84:1
85:17
88:14
95:4,25
96:14,21
98:4,16
99:6
114:1
121:3,6
123:2,4

**Thereupon**
5:4,20

**these**
14:1
23:15
42:1,12
55:22
76:18
90:5
95:21
96:1
97:23
98:4
108:13
126:13,
19,21

**they'd**
104:4

**they'll**

36:22

**they've**
58:6
103:24

**thing**
8:19 96:2
113:10
117:21
126:2

**things**
9:1,7
23:2 42:1
99:17
114:16
121:4,15
122:5
123:25
125:5,6

**think**
10:19
13:25
14:6
21:23
22:1 29:2
34:1 37:3
45:15,25
49:23
65:12,15,
20 68:21
69:11
70:2,8
77:10,12
78:6
80:20,22
82:5,17
83:11,14
88:6
92:12,18,
25 93:11
94:2
98:19
100:10
102:4
104:4,6
112:22
114:25
116:15
117:12

118:7,8,
13
123:19,25
125:18
126:2
127:2
128:20

**third**
19:9
91:18
101:19

**this**
5:15 8:25
10:17
12:4,24
13:2,10
14:16
16:19
19:17
23:23
24:5 26:9
29:14
35:3 37:9
38:2,4,21
40:7
41:6,25
42:3
43:17,18
44:4,11,
21,23
45:7,10,
11,12,14,
15,21
47:17,22
48:10,11,
12,15
49:5
50:2,22,
23 51:5
52:15,16,
22 53:2
59:5
66:11
67:3
68:15,22
69:4
73:5,10
74:4
75:20

76:12,19
77:22
81:19
86:21
87:11,22
89:4
90:6,21
92:11,22,
23 93:15
94:18
95:14,15,
19 96:1,
6,9 97:10
101:24
102:5,13
104:6
106:7
108:19
109:19,25
110:1,5,
7,8,10,19
111:7,11,
21 112:5,
10,22
114:7
117:8,9,
17,25
120:24
122:21
124:1,19,
25 125:5,
11
126:20,25
127:5,13,
14 128:24
129:5

**those**
9:9 11:19
14:7
21:13,22
22:14
24:22
37:16
39:8 40:4
41:21
49:14
56:19
57:3,23
61:15

65:6
66:19,20,
24 67:5,
12,25
69:20
71:8,11
72:18
73:10
76:21,23
77:6,7
80:23
82:23
85:11
87:10
92:5 93:8
94:16
95:2,11
98:1
99:11
102:23
107:18
114:18
117:20
121:15
122:19
128:20

**though**
7:20
22:10
51:6,23
85:5
98:19

**thought**
16:17
49:6
118:2
122:4

**three**
7:11
19:9,16
80:20,23
81:2 94:5
98:23

**three-
foot**
80:18

**threshold**

120:8

**threw**
82:20

**through**
17:19
18:5 19:7
22:20
30:19
31:3,15
42:24
46:7
47:14
69:21
72:16
73:14
83:6,17
115:24
116:19
118:20
122:16
128:11,12

**throughou
t**
49:1
57:15

**throw**
115:2,3
121:15

**thrown**
81:13

**thumb**
58:4

**Tier**
24:9,12,
13,21

**time**
5:6 7:7,9
9:18,23
12:3 14:2
18:2,11
19:10
20:4 21:4
23:23
27:5,9,
12,17,20
28:7,19

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

30:6 31:1
32:21,25
34:2,15,
22 36:11
39:11
40:9
42:16,20
43:5,12,
19 44:4,
9,11,16
45:17
47:23
48:5,10,
13,23
49:5,13,
16,24
51:6,23
54:22
55:23,24
56:18
57:8,15,
17,19,25
58:2,10,
21 63:1,
5,10
66:15
67:17
68:24
69:20
70:15
73:19,22,
24 74:14
75:12,19,
20 77:13,
15,17,24
78:4,9,19
84:12,14
86:5,13,
22 89:11,
12,24
90:3,9,
13,21
91:19
92:1,7
93:20
94:2,15,
17,24
95:3,8,11
100:2,15,
20,21,24

101:10,
14,16
103:4,10,
14 106:15
110:19,23
111:1,15,
19,22
112:7,11,
14,20
116:7,13,
17,23
117:4
120:7,16
126:4
128:24
129:7

times
7:6 19:9,
16 20:2
31:16
38:12
49:14
82:22
86:8,25
93:4
94:19
98:25

tip
59:18

title
27:8

to
5:22
6:12,20
7:1,21,22
8:1,16,
17,18,24
9:1,2,3,
5,8,18,
20,21,23
10:3,4,9,
11,13,14,
15,17,19
11:13,15
12:6,11
14:10,16,
17,24
15:2,3,7,

17 16:4,
5,13,19,
23,25
17:2,9,
18,19,23
18:4,11,
13,14,17,
21 19:2,
3,4,7,12,
15,20,22,
24 20:6,
8,16,22
21:2,4,10
22:9,19,
22 23:22
24:13,18
26:6,14
27:13,21,
24 28:6,
7,9,20
29:13
30:1,2,
17,18,19,
24 31:9,
20 32:20,
21 33:1,
9,14,22
34:14,17,
18 35:20
36:5,8,
20,22
37:1,5,7,
16,21,24
38:2,4
39:1,6,7,
14,21
40:2,6,8,
20,23
41:6,16,
21,23,25
42:4,7,13
43:4,7,
13,21,24
44:7,15,
19 45:2,
9,21
46:5,16,
23 47:14,
15,18,23
48:5,8,

18,21
49:2,5,6,
9,13,16,
17,21,24
24,25
50:5,10,
12,14,24,
25 51:1,
15,22
52:9,16,
17,19
53:2,6,20
54:2,18,
25 55:2,
8,12,13,
15,21
56:4,10,
20,21
57:17,20,
23 58:4,
5,8,9,18,
21,25
59:1,5,20
60:18
61:15,23
62:1,5,7,
10 63:4,
10,23
64:7,11
65:5,17,
22,25
66:2,22
67:18
68:3,7,
18,21
69:1,3,8,
12,13,15,
16,19,22
70:4,5,
17,20,23
71:5,9,23
72:1,12,
15,18
73:3,11,
12,13,14,
17,18,19,
24,25
74:2,5,
14,15,18,
20,21,22,
25 75:1,

18,21
49:2,5,6,
9,13,16,
17,21,24
13,21
76:1,4,8,
9,21,22,
24,25
77:2,6,7,
14,15,18,
19,24,25
78:4,7,
20,24
79:9,10,
13,15
80:6,11,
12,13,22,
24 81:3,
7,8,17,
18,20,25
83:5,8,
13,15
84:1,9,
14,23
85:6,12,
15 86:9,
12,14,17,
19,21
87:2,5,
14,16,20,
21,25
88:6,21
89:11,18,
23 90:1,
3,4,6,8
91:4,6,
15,17,19,
20 92:1,
7,8,17,20
93:5,9,
11,23
94:2,10,
15,18,19,
21,22,25
95:2,3,4,
7,13,14,
20,22,24
96:4,10,
20,24
97:1,4,7,
17 98:2,
6,10,11,
16 99:1,

5,6,9,14
100:9,14,
15,18,19
101:7,14,
16,18,23
102:3
103:4,7,
8,9,11,
21,22
104:12,13
105:10,25
106:1,9,
10,14,18,
19 107:6,
10,14
108:10
109:10,
23,25
110:8,17,
21
111:11,
12,22
112:7,10,
14 113:2,
15,21,23
114:12,14
115:4,5,
10,12,16
116:5,8,
18,23
117:1,2,
4,5,8,9,
11,12,19,
22 118:4,
8,14,15,
19 119:1,
8,18
120:11,
17,22
121:7,16,
20,22
122:16
123:7,8,
18 124:7,
10,13,14,
24 125:3,
9,12,13,
14 126:3,
10,16,21
127:4,12,

Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 171 of 176

Garth Findley                Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

19,25
128:2,7,
9,10,16
129:1,11

**today**
5:5,9
8:1,5,25
10:8
11:13,23
14:25
35:4
37:11
51:1
52:17,22,
23 53:1
62:11
109:25

**today's**
7:22
8:11,13
9:4 10:2
11:16
129:5

**together**
14:4
24:19

**toilet**
114:4,10,
12

**told**
32:17
67:9 91:2
98:3
107:5
113:8

**too**
39:25
46:16
80:13

**took**
18:23,24
19:1
52:7,8
62:19
120:7

**top**
13:11

**total**
70:20

**towards**
114:13
124:13

**towed**
98:7
99:16

**town**
40:25
41:2 42:8
59:8,11,
13 60:3,
7,11
90:24
91:5
102:13
103:11
118:2
125:22
126:3

**traffic**
48:21

**train**
127:22

**trained**
22:2
57:13
81:18
96:15,22
100:23
101:6
105:15

**training**
16:5
17:24
18:20
19:7,8,12
20:17,21
21:9,12,
24 22:6
42:20
43:1
44:4,11,

18 51:14
57:10,11
85:24
86:11,25
96:3,5
101:1,3
109:21
110:3,25

**transcript**
8:14,15
9:11
10:14
12:23

**trauma**
119:7

**trial**
8:7

**tried**
69:22

**trucks**
59:16,23

**true**
10:20

**truly**
91:21

**truth**
5:23 8:1

**try**
9:17,23
59:20
73:13
76:22

**trying**
73:17
75:5,9
94:10
125:9

**tunneling**
47:8

**turned**
91:15
107:14
117:19

127:12

**turns**
45:14
102:18

**TV**
10:7

**twice**
29:3

**two**
9:22
18:12,25
20:2
24:2,25
28:10
66:8,19,
24 67:5
82:23
89:19
93:4 96:1
98:4,23
107:24
112:20
126:7

**two-and-a-half**
25:23

**two-story**
39:24

**Two-thousand**
16:15

**type**
34:24
36:5,12
39:8,11
46:20
47:12,14
53:2,11
74:3
76:18,19
97:24
98:17
113:19
114:13
115:3,4
126:1

128:11

**types**
30:21

**typical**
26:7 64:7

------

**U**

**U.S.**
85:2

**uh-huh**
9:9 78:8

**ultimately**
40:11

**under**
8:1 32:7
57:6 82:3
95:6
100:1
111:21
112:5

**undergo**
20:16
22:5

**underlying**
60:5

**undersheriff**
28:2

**undersheriffs**
27:24

**understand**
8:3,8,22
9:1,14,25
10:22
14:23
31:23
90:12
118:20

125:18

**understanding**
11:22
23:23
32:2,5
34:17
35:2,25
36:9,13,
25 42:2
43:18
52:9
67:16
68:10
70:19
75:16,18
80:15
124:6

**understood**
12:11

**underwear**
101:18

**uniform**
55:14,15
56:5

**uniforms**
55:18
56:17,19
57:3

**unit**
18:16
125:21

**United**
96:16,21,
25

**units**
86:6
121:18

**University**
15:18

**unknown**
36:21



Case 2:24-cv-00074-APG-NJK    Document 57-13    Filed 05/16/25    Page 172 of 176

Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

39:6
126:7

**unlawful**
75:11

**unlawfully**
105:9

**unless**
26:4 53:3

**unofficial**
88:2

**unreasonable**
74:2,20

**unsafe**
85:6

**until**
52:8 63:5
106:4
111:7
121:21

**untrained**
81:17

**untrue**
43:21

**unusual**
17:14
26:6,8

**unwritten**
89:23

**up**
9:7,10
16:20,25
17:21
18:14,19,
21 19:3,
10 20:4,
23 22:22,
23 24:17
27:16
29:23
30:3
35:20

43:14
45:4
53:15,20
55:19,21
58:7,18,
20 59:2,
12 60:13
65:7
66:21
69:16,25
72:16
73:13,19
74:4,5,
14,23
75:2,25
76:4,8
77:18,20
80:24
81:1
84:10,23
85:2 86:9
89:3 91:5
92:17
101:15,20
103:17
111:11
116:23
117:1,2
118:2
119:8
120:10
121:9
126:16
127:23

**update**
67:7 68:8

**upon**
74:8 93:4

**us**
8:24
31:16
39:21
40:6
56:20,21
59:14,25
64:13
68:7,8
74:25

108:14

**use**
9:8,12
39:13
40:8
43:15,24
52:17
56:18
59:6
70:4,20,
22 72:4
74:3
77:23
81:6 87:3
105:10
106:1,3
109:4,9
123:9,23

**used**
38:15
43:23
44:1
55:18
59:13
71:4,6
72:2,11,
12,18
81:6
86:22
87:1,15
93:5 99:9
109:5
110:12
113:11,12
122:8,13
126:12

**using**
34:23
36:25
39:6
43:20
55:25
58:17
59:12
71:2
73:6,7
97:4
104:4

112:7

**usually**
127:23

**utilization**
34:21
121:11

**utilize**
31:17
36:12,23
37:5 40:4
53:2,19
58:9
123:8
124:14

**utilized**
53:8
58:19
87:11

**utilizing**
29:23
36:20
39:2 52:6
55:20
70:24

---

**V**

**vacancy**
23:2

**vacation**
41:5

**value**
21:24

**vary**
100:3

**Vegas**
5:1,11
6:12 15:5
16:11,25
17:9,20
24:8,21
29:7 89:5
101:5

110:3
116:12
122:13
124:6

**vehicle**
98:7,8

**vehicles**
40:4
59:22
60:2

**verbal**
9:5 52:4
87:6
110:10,11

**verbiage**
37:24
72:7

**verify**
120:11

**version**
56:4

**very**
19:11
20:12
39:15,25
41:18
43:7
48:19,24,
25 50:6
67:14
78:5,7
86:15
87:6
102:11
119:17
122:12
127:24

**video**
61:8 78:6
81:19
85:8
116:2
129:1,2

**videographer**

5:5,8
70:14
128:25
129:5

**videotaped**
8:6

**videotapes**
78:3

**view**
124:11

**violate**
6:21

**violated**
32:10
33:18
38:14

**violates**
75:11

**violating**
6:25

**violators**
41:12
86:7

**violent**
36:7,16,
21 39:7
57:22
66:18
68:17
73:9 77:5
117:25

**vision**
128:15

**visually**
71:21

**vs**
5:11 85:2
96:9,10,
16,21,25



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**W**

**wait**
57:18
58:13,16
89:10
93:12
94:3
111:12
112:6,9,
18 116:13
121:21
126:19

**Wait/**
**refusal**
110:8

**waited**
106:15
112:11,
13,19

**waiting**
93:20

**wake**
73:19
74:14
101:15,20
116:23
117:1,2

**walk**
74:14
76:1,8
88:10
116:23

**walked**
92:17

**walking**
69:21,24,
25 107:11

**wall**
46:12

**walls**
46:7
47:15

**want**
7:21 10:4
12:11
14:16
17:2 18:4
22:9 46:8
49:2
56:10
59:13
70:17
73:11
80:12
101:18
128:10

**wanted**
28:9
39:16
49:4
65:10
76:9,20
87:5
93:11
118:1

**wanting**
17:18
117:11

**wants**
10:11
56:25
94:25

**Warner**
40:18
41:19
45:2
47:21
60:19
62:7,23
72:24
73:2

**warrant**
7:16
24:18
29:22
31:1,19,
20,22,24
34:24,25
35:3,6,9,

10,13,22,
24 36:6,
12,19,24
39:3,4
40:19
42:3,25
43:14
45:22
47:12,17
50:18,25
52:16,20,
22 53:3,4
56:14
66:5,6
67:21
68:8
73:10
78:1,17
87:22,24
88:3,12
89:7
90:11
92:13,16,
18,21,25
93:14
103:6
106:2,8
110:20
111:11
113:3,20
114:1,7
115:14
121:14
122:3,9,
10,17,18,
21,22
123:24
124:1

**warrants**
31:17
36:2,16
37:2
41:11
49:13
50:15
51:2
59:15
64:10
73:6

108:13
113:25
122:25

**Washingto**
**n**
15:8,9,18
85:3

**wave**
80:7,9

**way**
28:9 35:2
46:17
49:21
50:7
52:20
72:5
73:12
97:6,19
101:19
102:19
113:7
114:25
127:25

**we**
5:8,10
7:16,25
9:11,19,
20 10:8,
10,12,25
12:2
21:21
22:23
27:23,24
29:2,23,
25 30:20
31:16
34:1,20,
22 35:19
36:4,11,
23 37:4,
15 39:1,
5,8,13,
22,24
40:2,4,5,
6 43:15,
23,24
45:18
46:1,7,

13,17,21
47:4,12
48:11
49:2,15
51:1,17
52:6,21
54:13,15
55:6,19,
20,21
56:19,24
57:14
58:9,20
59:12,13,
20,22,24
60:1,2,8,
12 61:14
62:17
66:6,13,
20 67:5,
23 68:13,
15 70:22,
23 71:4,
6,11 72:6
73:6,11,
23 74:1,
2,3,4,19
75:8
76:10,15,
17,19,22,
24 77:3,
4,6 80:12
82:20,21
84:1,7,
11,16,23
85:8
86:25
87:4,5,7,
11,16,17
89:7 90:2
94:13,22
95:4,10,
11 97:7,
14 98:13,
15,17
99:11,24
101:9
103:13
106:11,
12,14,15
107:5,6,

12,24,25
108:6
110:8
111:10
112:2,9,
11,18,19,
22 113:10
117:17
118:3
119:6
121:4,5,
7,14,15
122:6,7,
8,17,18,
19 123:22
126:13,
17,18,19
127:2,7,
8,10,22
128:23,25

**we'll**
16:6 25:9
93:16
95:14
109:11
124:16
127:22

**we're**
30:18
35:3
36:20
37:16,23
39:5
54:1,18
58:9
59:14
60:3
66:14
70:4,14
73:7,9
76:20
87:9
89:18
90:3,4,6,
18 92:3,5
103:8,15
106:22
125:8
126:14



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

**we've**
84:10
85:22

**weapon**
95:1
98:17

**weapons**
36:8,17,
22 39:8
47:15
57:23
68:18,21
69:1
73:11
76:21
97:18
98:2,11

**wearing**
55:13
68:1

**WEDNESDAY**
5:1

**week**
12:2
42:22

**weekend**
42:5,9

**weeks**
99:18

**well**
6:5 7:8
9:10 12:2
13:9,23,
24 14:2,6
16:16
17:14
20:11,21
22:12
23:3,15
25:9 35:6
41:2 44:6
45:4,9,
14,20
46:15,16
47:23
48:2

49:20
50:8
51:24
57:8
59:23
60:1,10,
22 61:12,
17,22
62:9
68:10,17,
20 70:2
71:7,16
73:17
74:17
75:4
77:1,22
78:5 79:1
81:1,18
83:11
88:13
90:23
91:10
93:16
94:23
98:19
99:3
100:17
102:10
103:20
105:18
106:11
108:19
113:24
114:6,15,
21,23
116:11
118:5,11
119:7,19
122:6,19
126:23

**went**
15:17
18:13,17
27:23
32:22
43:8,15
58:9 63:4
75:7

**western**
15:17
115:24

**what**
7:15,22
9:22
10:6,10
11:15
12:10
13:5
14:23
16:10,13,
23 17:2,9
18:6
19:4,6,18
20:8
22:20
23:4
24:12
25:7
27:8,13
29:12,21
30:13,17
31:8,9,14
32:13,17
34:17
37:20
39:11,19,
20 44:7
45:24
46:7
47:11
48:9,18
51:21,23
52:21
53:6,18
55:13
56:2
57:6,16,
20,24
59:12,20
60:8,9
62:1,10,
16 63:20
64:14
65:3,15
68:10
69:7 71:2
72:2

73:11
74:2,19
75:8,19
76:17,18,
22 77:22
78:14
82:17
84:22
87:4,19
88:7
90:2,3,6,
12 94:13,
14,22
96:10,18,
19,25
98:13,20
100:3,17
101:9
102:1
103:12,15
105:17
106:8
108:14
109:10
112:13,
15,16,19
113:19
117:24
118:9
119:9,10
121:5,9
122:15
123:6,25
124:12,21
125:3,20
126:8
128:10

**what's**
15:3
48:15
57:1
59:10
71:8
80:15
93:15
105:17

**whatever**
87:24

**when**
16:25
17:5,11,
22 18:5
19:6
20:24
23:6
25:5,9,11
27:14
28:13
35:15
48:10
49:5
50:10
51:4,5
52:9,10,
21 53:11
54:16
55:19
57:24
58:8,19
61:23
63:2,4,6,
20,23,25
64:1,4,25
67:17
69:13
72:9 75:6
79:4,21
81:22
83:24
85:19
86:9
88:3,17,
23 89:2,
13,18
101:20
102:5
103:3
105:22
106:1
108:13
111:10,
11,15,16
115:6
116:17,18
117:17
119:21,
24,25
120:4

123:10

**whenever**
70:20,23

**where**
15:7
18:15,22
28:21
35:4 40:2
43:15
44:23
46:6
49:15
50:11
54:8
55:15
62:8,10
64:4,11
66:22
68:3
74:18
76:5
82:20
86:22
94:10
97:24
98:7
103:20
105:2
114:12
117:3
127:11
128:9

**whereupon**
95:16
109:12

**whether**
10:15
17:19
24:15
30:21,22
40:2 46:4
68:11
70:5
71:18
72:11
95:8
100:8
111:19



121:11

**which**
19:19,21
29:10
30:19
41:18
43:2
44:25
45:11
55:8 58:9
60:11
66:8 67:5
73:1 74:1
92:7
100:5
101:9
112:10
117:3
119:11,18
120:14
126:23
127:9

**who**
11:19
13:18
23:15
24:19
25:14,24
26:18
27:17
28:6
30:23
34:8,9
36:8
44:18,24
45:3,5
46:8
47:11,13,
20 48:4
53:17
55:17
57:13,21
59:25
60:17
61:9
62:3,19,
20,21
64:22
65:2,9

66:15,18
67:3,8,9,
21 73:3,
8,10
74:1,19,
20 76:10,
20,21
77:5
81:10,11
82:8,14
83:20
84:25
85:20
90:15,21
91:2,22
92:5 93:8
97:25
98:4
103:16
104:16
107:7,18,
20 115:19
118:12,20
119:3,5
123:12
126:13,
18,21
127:3,5

**who's**
21:16
25:21
45:3 54:6
75:21,22

**whoever**
23:1
126:20

**whoever's**
71:19
72:13

**Whose**
62:3

**why**
7:10 9:20
20:2
28:17
40:22
45:24

46:1,21
48:16
49:3,20
50:2,8
51:10,13
53:18
56:9,12
59:3
61:12,18
63:8 66:4
73:6,17
81:6
84:21
90:8
127:20
128:5

**wide**
25:20,21

**Willey**
17:1

**Williams**
29:15,21
35:5 40:8
43:11,19
55:1
75:21
82:1
85:19
91:11
102:5,19
106:8,9,
11 107:20
110:11
112:3
113:11,16
116:23
117:17,20
118:19
119:1,12,
14,15,21
120:4,15
125:3,12,
23

**Williams'**
38:7,13
43:6
50:15
51:8,24

63:17
111:18
120:18

**Wilson**
96:9,10

**window**
71:5
72:16
74:9
78:11
83:3,6,
13,17
115:24
116:19

**wish**
8:16
70:20,23

**with**
13:6
14:2,8,17
15:2,18
16:16
17:12
19:19
24:4
29:24
33:4 35:7
36:17
37:15
38:10
39:21
40:7,17,
18 41:5,
11,12,15,
17 42:8,
12,22
43:18,20
47:11,12
48:25
49:10
50:17
51:18
52:1,22
56:2,20
57:21
58:1,9
59:25
60:20

62:16
63:2
66:15
69:20
73:9
74:1,19,
23 75:2
76:4,10,
12,19,20,
24 77:3,4
78:1,13
79:2,6,
16,20,23
80:5
81:15
82:14
83:4
85:10
87:5,7
90:3,14
92:5 93:8
95:7
97:3,23,
24,25
98:5,6,9,
19,23,25
99:5
101:12
102:15,17
106:7
108:21
110:2,10
111:10
114:17
116:14
117:20
118:5,18
119:19
121:14,17
122:12
124:8
126:25
128:13

**within**
21:4
22:12
25:19
37:17
59:15,17

73:24
80:18,23
104:14
117:12

**without**
46:20
82:25
101:17
127:5

**witness**
5:9 12:17
13:15,17
14:21
15:17
31:13
32:24
34:1
45:17
49:23
53:1 56:7
57:1
63:14
65:18,23
66:13
69:16
70:22
75:18
76:17
78:21
82:8 83:9
86:2 99:3
100:17
101:24
102:8,25
104:14
105:13
107:1
108:6
109:17
112:2,9,
18 116:6
117:15
118:16,23
121:3
123:18
124:11
125:14

**women**



Garth Findley                    Latia Alexander, et al. v. Las Vegas Metropolitan Police Department, et al.

| | | | |
|---|---|---|---|
| 68:12 | **wrought** | 78:16 | 81:4,17 |
| 108:4,7, | 46:12 | 93:3,12 | 82:16 |
| 12,16 | | 97:11,12 | 83:2 |
| **word** | | | 86:24 |
| 56:4 | **Y** | **yelled** | 87:11 |
| | | 106:22 | 88:8,21 |
| **words** | | | 90:1 91:3 |
| 51:25 | **yeah** | **yelling** | 93:2,18 |
| | 7:13 | 90:17 | 104:8,10, |
| **work** | 20:12 | | 25 105:5, |
| 10:5 | 23:15,21 | **yes** | 7,13 |
| 14:4,8,17 | 26:13 | 6:23 7:2, | 106:6 |
| 50:12 | 31:23 | 5,19 8:4, | 109:3 |
| 53:18 | 50:23 | 9,23 9:6, | 114:5,8 |
| 54:8,13 | 53:1 | 8,11,15 | 115:10,15 |
| 59:23 | 61:23 | 10:1,23 | 116:20,21 |
| 76:17 | 71:8,19 | 11:24 | 119:2 |
| | 79:20 | 12:5,22, | 120:21 |
| **worked** | 80:4,10, | 25 14:3, | 125:4 |
| 14:2 | 21 88:10 | 5,9,12,14 | 129:14 |
| 16:19 | 91:1 | 15:1,11 | |
| 18:22 | 92:15 | 16:9 | **yet** |
| 63:1 | 94:9 | 17:25 | 90:11 |
| | 98:15 | 20:18 | |
| **working** | 103:25 | 21:19,25 | **young** |
| 17:1 | 110:8,22 | 22:4,8,16 | 17:5 34:9 |
| 18:24 | 115:9 | 23:10 | 90:21 |
| 60:19 | 123:4 | 24:11 | 104:12 |
| 119:11 | | 26:4 | |
| | **year** | 27:4,7 | **yourself** |
| **works** | 18:17,20, | 28:5 31:7 | 6:21 |
| 19:14 | 23 19:4 | 32:17,25 | 40:23 |
| | 20:22 | 33:6,13 | 85:1 |
| **world** | 21:4 | 34:13,16 | 101:16 |
| 77:3 | 22:24 | 36:11,23 | |
| | 28:18,19 | 38:4,19 | |
| **worn** | 29:20 | 39:18 | |
| 113:22 | 108:19 | 40:10 | |
| | | 42:6 | |
| **wrap** | **years** | 44:15,16 | |
| 69:5,13 | 7:11 | 47:19,24 | |
| | 16:19,20 | 56:7 | |
| **writing** | 18:12,15, | 57:12 | |
| 58:23 | 25 25:22, | 58:24 | |
| | 23,25 | 60:25 | |
| **written** | 41:8 | 64:9,10 | |
| 52:4 72:5 | 44:25 | 65:14 | |
| 89:22 | 45:4,6 | 66:3 68:2 | |
| 96:3 | 86:4 | 70:7 | |
| 112:6,15 | | 79:5,8, | |
| | **yell** | 14,22 | |
| **wrong** | 77:15 | | |
| 42:2 | | | |
| 82:18 | | | |
| 107:14 | | | |

