1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

LATIA ALEXANDER, individually as heir
of ISAIAH T. WILLIAMS, and in her
capacity as Special Administrator of the
Estate of ISAIAH T. WILLIAMS,

      Plaintiff

v.

LAS VEGAS METROPOLITAN POLICE
DEPARTMENT, KERRY KUBLA, BRICE
CLEMENTS, ALEX GONZALES,
RUSSELL BACKMAN, JAMES
ROTHENBURG, JAMES BERTUCCINI,
and MELANIE O'DANIEL,

      Defendants

Case No.: 2:24-cv-00074-APG-NJK

**Order (1) Granting Defendants' Motion
for Summary Judgment in Part,
(2) Denying Defendants' Motion for
Summary Judgment in Part, and
(3) Denying Plaintiffs' Motion for Partial
Summary Judgment**

[ECF Nos. 55, 57]

In the early morning of January 10, 2022, officers of defendant Las Vegas Metropolitan

Police Department (LVMPD) served a search warrant on an apartment at 3050 South Nellis

Boulevard. The officers announced their presence and intention of serving a search warrant

outside the front door of the apartment, and soon after they forced entry inside. Almost

immediately, Isaiah Williams, who was laying on the couch near the front door, began shooting

a firearm at the entering officers. Some of the officers fired back and killed Williams.

Williams' mother, plaintiff Latia Alexander, filed this suit on her own behalf as

Williams' heir and in her capacity as Special Administrator of Williams' estate. She asserts

against LVMPD officers Kerry Kubla, Brice Clements, Alex Gonzales, Russell Backman,

James Rothenburg, James Bertuccini, and Melanie O'Daniel claims under 42 U.S.C. § 1983

alleging Fourth Amendment violations of using excessive force to conduct the search, not

complying with the knock and announce rule, shooting and killing Williams; and a § 1983 claim

1  alleging a Fourteenth Amendment violation of depriving her of the right to associate with her

2  son, Williams.  Against all defendants, she asserts claims for Nevada constitutional torts

3  alleging violations of Article I, § 18 and Article I, § 8; battery; intentional and negligent

4  infliction of emotional distress; and negligence.  Finally, she brings several claims under *Monell*

5  *v. Department of Social Services*, 436 U.S. 658 (1978), against LVMPD alleging

6  unconstitutional municipal policy and training.  Both parties have moved for summary

7  judgment.  I grant the defendants' motion in part and deny it in part.  I deny Alexander's motion

8  in full.

9  **I.   BACKGROUND**

10     **A.  The Investigation**

11        LVMPD received report of a murder in November 2021. ECF No. 55-12 at 3-4.  Video

12  surveillance showed two suspects confronting the victim at a bus stop and one of them shooting

13  the victim. *Id.* at 4-5.  LVMPD released the video to the public asking for assistance identifying

14  the suspects. *Id.* at 5.

15        On December 21, 2021, Janetta Rembert contacted LVMPD stating that she believed

16  that one of the suspects was Wattsel Rembert (Wattsel), her stepson, and that the other was

17  Corvell Fisher, one of Wattsel's friends. *Id.* at 5-6; ECF No. 38-1 at 46.  Ty'Shawn Rembert,

18  another member of Wattsel's family, told LVMPD that he "believed" that Wattsel last resided at

19  3050 South Nellis Boulevard, Apartment 1125. ECF No. 38-1 at 47.  Janetta Rembert informed

20  LVMPD that her family believed the apartment was a "flop house." *Id.*  LVMPD officers

21  interpreted this to mean Apartment 1125 was a residence where "different people come and go"

22  and "use[] it to transition through," often using it as a staging area to store guns and drugs, and

23  that it is usually associated with gang members. ECF Nos. 57-6 at 20; 57-8 at 44, 53-54; 64-14

2

1  at 8.  In short, they believed it to be a transient "drug house" with "violent individuals inside."

2  ECF No. 57-13 at 69.

3      Janetta Rembert told officers she last spoke to Wattsel in December prior to contacting

4  LVMPD and that she refused to contact him anymore. ECF No. 38-1 at 100.  She did not report

5  that any other conversations occurred between them after she contacted LVMPD. *See id.*

6      LVMPD then began to investigate Fisher, Wattsel, and Apartment 1125.  LVMPD

7  officers surveilled Apartment 1125 for an hour and a half on December 30, 2021. *Id.* at 53-55;

8  66-18 at 4.  They saw only one person enter or leave the apartment, and they did not identify

9  him as Wattsel or Fisher. ECF No. 38-1 at 54-55.  No officers identified either Wattsel or Fisher

10  inside of or around the apartment on that day, nor did they see any weapons or drugs at the

11  apartment. ECF No. 38-1 at 55; 57-7 at 52.  LVMPD officers conducted no other surveillance at

12  3050 South Nellis Boulevard. ECF No. 38-1 at 91.  They did not check whether either Wattsel's

13  or Fisher's name was on the lease or any bills for Apartment 1125. *Id.* at 85.  They did not try to

14  verify with the property manager whether either suspect lived at Apartment 1125 out of concern

15  that the manager would inform the suspects of the police investigation. *Id.*

16      Other witnesses reported to LVMPD that Wattsel had shot a firearm at a parked vehicle

17  at 3050 South Nellis Boulevard on December 18, 2021, and officers recovered an MP5 style

18  pistol from inside a vehicle that was registered to Wattsel and parked at 3050 South Nellis

19  Boulevard. *Id.* at 45; 57-7 at 51.  Additionally, Fisher's ankle tracking monitor placed him at

20  Apartment 1125 on December 12, 2021, and a call to LVMPD on that day described a person

21  matching Fisher's description at 3050 South Nellis Boulevard with a rifle strapped to his back

22  and wearing an ankle monitor. ECF No. 38-1 at 79.  Fisher's Facebook page had a photo of him

23  from November 2021 appearing to possess a firearm. *Id.* at 80-81.  Fisher had a prior criminal

1  history, including possessing and selling narcotics, robbery, and burglary. ECF No. 55-15 at 3.

2  Wattsel's prior criminal history included possessing and selling narcotics. *Id.*

3      LVMPD applied for and received a property-only search warrant of Apartment 1125.

4  ECF. No. 55-12.  The warrant's purpose was to seize firearms and other evidence. *Id.* at 9-10.

5  The warrant and its accompanying application and affidavit said three separate times that it was

6  "not a no-knock warrant." *Id.* at 7, 10.  It authorized service "anytime day or night." *Id.* at 11.

7      An LVMPD SWAT team would serve the warrant. ECF No. 55-15 at 2.  Defendant

8  Sergeant Backman had a leading role in the planning and execution of the search warrant and

9  was chosen to announce the officers' presence at the apartment. ECF Nos. 38-1 at 133; 57-8 at

10  51-52.  By the date of the raid, he had been on SWAT for 29 days and had not undergone

11  SWAT school training yet. ECF Nos. 38-1 at 128; 57-8 at 51.  At the time, SWAT school was

12  normally offered once a year in March, and Sergeant Backman had yet to have the opportunity

13  to start it. ECF Nos. 38-1 at 128; 57-7 at 42.

14      Sergeant Backman requested permission from defendant Lieutenant O'Daniel to use a

15  Controlled Entry Tactic (CET) to serve the warrant. ECF No. 57-8 at 51-52.  As defined in the

16  SWAT Section Manual, CET is a tactic:

17      meant to surprise and overwhelm the suspect(s), and to quickly take them into custody
        and thereby prevent them from taking up arms, hardening their defensive position,
18      fleeing the premises and possibly endangering others, harming hostages or destroying
        evidence.  A CET utilizes surprise and speed to overwhelm the occupants which can be
19      very effective in de-escalating a possible violent situation.

20  ECF No. 55-14 at 22.  This still is a "Knock and Announce" entry, where "[o]fficers will make

21  entry after announcements have been given that identify [them] as police officers and advise the

22  occupants that [they] have a search warrant and a lawful right to be on the premises." *Id.* at 22-

23  23.  Under LVMPD policy, CET was not supposed to be "used for the sole purpose of

1  recovering . . . property" if there was no "threat of an armed and dangerous subject inside" the

2  residence. *Id.* at 23.

3       CET is different from a "surround and call-out" tactic where officers "surround the outer

4  part of the structure, establishing containment on it with . . . armored vehicles." ECF No. 57-8 at

5  29. There, the officers "start the announcement process via the [public announcement system]"

6  that is attached to their armored vehicle "for several minutes," and they go into the residence

7  only if they are "not getting a response from inside." *Id.* at 29-30. The defendants decided

8  against using a surround and call-out tactic because they could not get their armored vehicles in

9  position to contain Apartment 1125 and they knew that people inside could have weapons. *Id.* at

10  53.

11       Through September 2021, however, LVMPD's policy did not allow the use of CET in a

12  property-only search warrant like this one. ECF No. 57-10 at 98. LVMPD changed that policy

13  in September 2021 to allow CET in property-only search warrants in limited circumstances,

14  where there was a "threat of an armed and dangerous subject inside" the residence and the

15  officers obtained approval to do so. *Id.* at 98-99, 101; ECF No. 57-7 at 80-81. This policy was

16  in effect when LVMPD executed the property-only search warrant at Apartment 1125.

17       The officers decided to use two Noise Flash Diversionary Devices (NFDDs) in the

18  SWAT raid. ECF No. 57-8 at 55-56. The first was a Def Tec 25 situated at the end of a "stun

19  stick" (stun stick NFDD). ECF No. 57-11 at 69. When the Def Tec 25 is deployed, it emits a

20  single loud sound of about 175 decibels and a bright white light. *Id*; ECF No. 57-4 at 14. The

21  stun stick itself is a five-foot-long implementation tool where the user holds the stick at one end

22  and the Def Tec 25 is attached at the other end. ECF No. 57-4 at 12-13. The user can pull a

23  trigger on the stun stick to deploy the Def Tec 25. ECF Nos. 55-10 at 14; 57-11 at 69. The

officers planned to deploy the stun stick NFDD inside Apartment 1125's living room by using the stun stick to break a window and insert the NFDD inside. ECF No. 57-4 at 14.  The second NFDD was a "nine-banger," a small canister that emits a bright white light and a loud popping sound at 180 decibels nine times in half-second intervals. ECF Nos. 55-10 at 43; 57-11 at 69-70. They planned to deploy the nine-banger NFDD outside the window to Apartment 1125. ECF No. 57-4 at 42.

The officers decided to serve the warrant in the early morning of January 10, 2022. ECF Nos. 55-15 at 2; 57-3 at 16-17.  They planned to give two announcements and then deploy the NFDDs before entering Apartment 1125 through force. ECF No. 57-3 at 67-68.  The defendants did not know that decedent Isaiah Williams was staying at Apartment 1125 that morning.  He did not usually stay there, but he had missed curfew the night before. ECF No. 57-5 at 58-59. He was lying on the couch on the northern side of the living room close to the front door of Apartment 1125. ECF No. 38-1 at 136.  Williams was not a suspect in the murder nor related to the investigation in any way.

**B. The SWAT Raid[1]**

The SWAT team of fourteen LVMPD officers arrived at 3050 South Nellis Boulevard in the early morning of January 10, 2022. ECF No. 38-1 at 126; *Clements 0449* at 09:15-09:22.[2]

---

[1] In setting forth the facts of the service of the warrant on January 10, 2022, I rely primarily on the video recordings from the defendants' body-worn cameras (BWC) because the parties do not dispute that these videos accurately portray the events at issue. *See Est. of Hernandez by and through Hernandez v. City of L.A.*, 139 F.4th 790, 795 n.1 (9th Cir. 2025).  I cite the BWC videos by officer name, video number, and the approximate time stamp on the video exhibit's runtime (not the time of day indicated in the video).

[2] All officers' BWC footage is in "Zulu" time, which is eight hours ahead of U.S. Pacific time at that time of year.  The times in this order are converted to U.S. Pacific Standard Time.  The times on the BWC videos are not synchronized across the officers.  Sometimes, the difference of when events occur is approximately 15 seconds.  For example, in Officer Clements's BWC

Because of Fisher's ankle monitor, they knew he was not at Apartment 1125 at the time. ECF Nos. 38-1 at 79; 57-8 at 41. At 4:59:21 a.m., they began walking to Apartment 1125 to serve the warrant. *Clements 0449* at 10:05. Apartment 1125 is on the ground floor. Sergeant Backman began announcing the officers' presence using a bullhorn at 4:59:54 a.m., when the leading SWAT officers were a few feet away from the front door of Apartment 1125. *Id.* at 10:37. His full announcement, up until Officer Kai Hoskins broke open Apartment 1125's front door, was: "[o]ccupants of 3050 South Nellis, police department, search warrant, 1125, police department, search warrant, Metro police, search warrant, occupants of 3050 South Nellis, police department, search warrant." *Backman 0448* at 11:06-11:20; *Kubla 0449* at 10:36-10:51. He finishes saying "1125" at approximately 5:00:00 a.m. *Clements 0449* at 10:42-10:43.

A few seconds before Sergeant Backman begins his announcement, defendants Officer Bertuccini and Officer Rothenburg jogged to the western facing window of Apartment 1125 that looked into the living room, where Williams was laying on the couch. *Bertuccini 0447* at 12:21-12:30; ECF No. 38-1 at 136. Officer Bertuccini was carrying the stun stick NFDD. ECF No. 57-4 at 12. They reached the window at 4:59:57 a.m., and blinds were covering the window from the inside, offering no visibility into the apartment. *Bertuccini 0449* at 12:27.

---

footage, Sergeant Backman's announcements begin at 4:59:54 a.m. *Clements 0449* at 10:37. But in Officer Bertuccini's BWC footage, Sergeant Backman's announcements begin at 4:59:37 a.m. *Bertuccini 0447* at 12:25. LVMPD's Force Investigative Team Report describes this as "time drift," where a BWC's "internal clock drifts from actual time based on when the cameras are synced when the camera is docked." ECF No. 55-23 at 44. For the purposes of this order, I pick a single officer's BWC's time of day to base the timing of the events of January 10, 2022. The parties do not argue that there is a substantive difference in the analysis of their arguments depending on which officer's BWC's time of day I choose. Therefore, I adjust all times to align with Officer Clements's BWC footage because his BWC offers a relatively good view of Apartment 1125's front door when the officers begin ramming it and when the first officer enters the apartment. For example, when I cite to Officer Bertuccini's BWC footage, the time of day I say events happen will be 17 seconds ahead of the video's listed time of day, because Officer Clements's BWC time of day is 17 seconds ahead of Officer Bertuccini's.

Officer Bertuccini stood against the wall of Apartment 1125, and, unbeknownst to him, Williams was inside directly on the other side of that wall. ECF No. 38-1 at 136. Officer Bertuccini broke one of the windows with the stun stick at 5:00:01 a.m., about 1-2 seconds after Sergeant Backman finished saying "1125" for the first time. *Id.* at 12:32. He then pushed the stun stick up to the ceiling of Apartment 1125, which pushed away the blinds so that part of the southern half of the front living room was somewhat visible. *Id.* at 12:33-12:37. Officer Bertuccini stated that he looked for "a second" into Apartment 1125 but that he did not see Williams. ECF No. 55-10 at 39-40. Officer Bertuccini deployed the stun stick NFDD inside Apartment 1125 at 5:00:07 a.m., which set off a bright white light and a loud bang in the living room. *Id.* at 12:37. Immediately afterward, another officer deployed the nine-banger NFDD outside Apartment 1125's window, which went off for about six seconds from 5:00:07 a.m. to about 5:00:13 a.m. *Bertuccini 0447* at 12:38-12:44.

At the front door of Apartment 1125, more officers begin shouting with Sergeant Backman, announcing their presence, at 5:00:01 a.m. *Clements 0449* at 10:45-10:49. Officer Hoskins began ramming the front door with a battering ram at 5:00:04 a.m., about four seconds after Sergeant Backman finished saying "1125" for the first time. *Id.* at 10:47. It took him five hits to break open the door, succeeding at 5:00:09 a.m. *Id.* at 10:47-10:51. The first officer, defendant Officer Kubla, entered Apartment 1125 at 5:00:11 a.m. *Id.* at 10:54. No officer knocked on Apartment 1125's door.

Inside Apartment 1125, Williams, who was lying on the couch, began firing a pistol at the entering officers. *Kubla 0449* at 10:53-11:00. He fired at least four shots before any officer fired a shot at him. *Kubla 0449.* at 10:53-10:56; ECF No. 57-11 at 75. Williams' gunfire hit Officer Kubla, and Officer Kubla fell to the floor against a wall. *Clements 0449* at 10:56-11:06;

8

1  ECF No. 57-3 at 103.  Several officers returned fire.  In the 8 second firefight, Williams fired 18

2  times, and Sergeant Backman and Officers Clements, Gonzales, Kubla, and Rothenburg fired

3  cumulatively 23 times. *Kubla* 0449 at 10:53-11:01; ECF Nos. 55-23 at 39-43; 57-8 at 27.

4      Williams suffered 17 gunshot wounds, and an autopsy confirmed Williams died from

5  these wounds. ECF Nos. 38-1 at 26; 55-23 at 52.  In total, Williams' fire hit the officers six

6  times.  Officer Kubla suffered three gunshot wounds: one in his right arm, left arm, and right

7  leg. ECF Nos. 55-23 at 35; 57-3 at 98-99.  He was also hit in his chest, but his ballistic vest

8  stopped the shot. ECF No. 57-3 at 100.  Officer Clements suffered a gunshot wound to his

9  forearm where a bullet grazed him, leaving an abrasion without breaking the skin. ECF No. 38-

10  1 at 25.  Officer Rothenburg's ballistic shield was struck by a bullet. ECF No. 57-6 at 25.  In

11  total, about 26 seconds passed from when Sergeant Backman started his announcements to

12  when the last officer fired a shot at Williams. *Clements 0449* at 10:36-11:02.

13  **II.    DISCUSSION**

14      The defendants move for summary judgment on all of Alexanders' claims.  Alexander

15  moves for summary judgment on her claims under the Fourth and Fourteenth Amendments, her

16  Nevada constitutional claims, her battery claim, and her *Monell* claims.

17      Summary judgment is appropriate if the movant shows "there is no genuine dispute as to

18  any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

19  56(a).  A fact is material if it "might affect the outcome of the suit under the governing law."

20  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is genuine if "the

21  evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

22      The party seeking summary judgment bears the initial burden of informing the court of

23  the basis for its motion and identifying those portions of the record that demonstrate the absence

of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The

burden then shifts to the non-moving party to set forth specific facts demonstrating there is a

genuine issue of material fact for trial. *Sonner v. Schwabe N. Am., Inc.*, 911 F.3d 989, 992 (9th

Cir. 2018) ("To defeat summary judgment, the nonmoving party must produce evidence of a

genuine dispute of material fact that could satisfy its burden at trial.").  I view the evidence and

reasonable inferences in the light most favorable to the non-moving party. *Zetwick v. Cnty. of

Yolo*, 850 F.3d 436, 440-41 (9th Cir. 2017).  "[T]o the extent that the uncontested video

evidence from the officers' body cameras establishes the timing and occurrence of events," I

"view the facts in the light depicted by the videotape." *Spencer v. Pew,* 117 F.4th 1130, 1133

(9th Cir. 2024) (simplified).  Where the video recordings leave factual ambiguity, however, I

follow the "usual practice of drawing reasonable inferences in the light most favorable" to the

non-moving party. *Est. of Hernandez by and through Hernandez v. City of L.A.,* 139 F.4th 790,

795 n.1 (9th Cir. 2025).

**A. For purposes of this order, I consider LVMPD's Critical Incident Review Team Administrative Report only for the facts of the investigation and of the SWAT raid.**

After the shooting, LVMPD conducted an internal review of the officer decisions

surrounding the incident, as it does with all officer-involved shootings. ECF No. 57-10 at 21-22.

One report LVMPD produced during this review process was the Critical Incident Review

Team Administrative Report (CIRT report). ECF No. 38-1 at 2.  The CIRT report includes a

general summary of the incident, including descriptions of the persons involved; relevant

LVMPD policies; a narrative of the investigation leading up to the raid; and a summary of the

execution of the search warrant. ECF No. 38-1 at 3-5.  In later sections, it analyzes the officers'

1  conduct in the incident, determines whether the conduct violated the law and internal LVMPD

2  policy, and recommends changes in LVMPD policy. ECF No. 38-1 at 5-8.

3            As an initial matter, the defendants argue that I cannot consider the CIRT report because

4  its findings of LVMPD wrongdoing contain inadmissible legal opinions from expert and lay

5  witnesses under Federal Rule of Evidence (FRE) 701, its conclusions and opinions are

6  irrelevant, and it constitutes an inadmissible remedial measure under FRE 407.  However, "[a]t

7  the summary judgment stage, [I] do not focus on the admissibility of the evidence's form" but

8  rather "on the admissibility of its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir.

9  2003).  The CIRT report contains more information than opinions on the lawfulness of the

10 defendants' conduct and recommendations for policy changes.  The first 169 pages are mostly a

11 detailed summary of the murder investigation that prompted the police to seek a search warrant,

12 how LVMPD determined they needed to search Apartment 1125, and the execution of the

13 search warrant. ECF No. 38-1 at 1-169.  Pages 170 to 223 contain conclusions on the lawfulness

14 of the defendants' conduct and recommendations for policy changes. *Id.* at 170-223.

15           LVMPD's internal policies are relevant to determining if its officers' conduct violated

16 the Constitution or Nevada state law. *See Hope v. Pelzer*, 536 U.S. 730, 744-45 (2002); *K-mart*

17 *Corp. v. Washington*, 866 P.2d 274, 280 (Nev. 1993).  The facts of LVMPD's investigation are

18 relevant.  Therefore, I will consider the CIRT report's first 169 pages only for the facts it

19 presents, specifically its narrative of the incident in this case and for its comprehensive quotes

20 of LVMPD policies.  Because these portions are not legal opinions or subsequent remedial

21 measures, they are not inadmissible under FRE 701 or 407.  And presumably witnesses can

22 testify at trial to the facts contained within the report.  While there are questions of the

23 admissibility of the CIRT report, the facts within that report are not inadmissible under the

1  challenges the defendants raise.  To the extent there are opinions or recommendations for

2  subsequent remedial measures in the first 169 pages, I will not consider them.  I consider the

3  CIRT report only for establishing the factual record of this incident.

4       Additionally, without ruling on their ultimate admissibility, I will not consider pages

5  170-223 of the CIRT report for the purposes of this order.  Because they contain legal opinions

6  and recommendations for subsequent remedial measures, they raise legitimate questions of

7  admissibility, as the defendants note.  I do not decide on their admissibility for this order

8  because it does not change my ruling on any claim.

9  **B.  I deny both sides' summary judgment motions on Alexander's claim that the**

10     **defendants deploying the stun stick NFDD was excessive force.**

11     Alexander argues that the defendants' use of NFDDs constitutes excessive force under

12  the Fourth Amendment, citing to *Boyd v. Benton County*, 374 F.3d 773, 779 (9th Cir. 2004).

13  The defendants argue their use of the stun stick NFDD did not violate the Fourth Amendment

14  because Officer Bertuccini, the officer who deployed it, visually cleared the area first and

15  because they took all appropriate and available measure to reduce the risk of injury.  They also

16  argue they are entitled to qualified immunity because their conduct does not violate clearly

17  established law.

18     *i.    Alexander is not entitled to summary judgment on her stun stick NFDD claim*

19          *because a reasonable jury could find that Officer Bertuccini's deployment of the*

20          *stun stick NFDD was not excessive force under the Fourth Amendment.*

21     I first consider Alexander's summary judgment motion on her stun stick NFDD claim.

22  Under the Fourth Amendment, officers may use only such force as is "objectively reasonable in

23  light of the facts and circumstances confronting them." *Graham v. Connor*, 490 U.S. 386, 397

1  (1989); *Boyd*, 374 F.3d at 778.  Determining whether force is reasonable requires a "careful

2  balancing of the nature and quality of the intrusion on the individual's Fourth Amendment

3  interests against the countervailing government interests at stake." *Graham*, 490 U.S. at 396

4  (simplified).  I must do this balancing "from the perspective of a reasonable officer on the

5  scene, rather than with the 20/20 vision of hindsight." *Id.*  Under *Boyd*, it is not a reasonable use

6  of force to deploy a "flash-bang device . . . blind into a room occupied by innocent bystanders

7  absent a strong governmental interest, careful consideration of alternatives and appropriate

8  measures to reduce the risk of injury." 374 F.3d at 779 (simplified). The defendants

9  acknowledge that the stun stick NFDD is a "flash-bang" device like that used in *Boyd*. ECF No.

10  55 at 22, 53.

11        Viewing the facts in the light most favorable to the defendants, a reasonable jury could

12  find that Officer Bertuccini's deployment of the stun stick NFDD was lawful under *Boyd*.  The

13  Apartment 1125 window blinds were down when Officer Bertuccini approached the window

14  with the stun stick, initially offering no visibility into the apartment. *Bertuccini 0449* at 12:27.

15  But after he smashed one of the windows with the stun stick and pushed the end of the stick

16  toward the ceiling, it pushed the blinds aside so that he could see into the southern side of the

17  living room. *Id.* at 12:33-12:37.  Officer Bertuccini testified that he looked into Apartment 1125

18  for "a second" after he broke the living room window with the stun stick and before deploying

19  it. ECF No. 55-10 at 39.  He acknowledges though that he did not see Williams before he

20  deployed the stun stick NFDD, even though Williams was just on the other side of the wall from

21  him. *Id.* at 40; ECF No. 38-1 at 136.

22        Even though Offer Bertuccini did not see the entirety of Apartment 1125's living room,

23  the defendants argue that the design and use of the stun stick itself "solve[s] the problem of

blind insertion that *Boyd* identified." ECF No. 55 at 55.  By inserting the 5-feet long stun stick

high enough to touch the ceiling, Officer Bertuccini had "direct control" as to where the NFDD

detonated. ECF No. 55-10 at 12.  Defendants' expert, a former police officer and current

National Tactical Officers Association trainer, stated that deploying the NFDD against the

ceiling ensured it detonated more than five feet away from any individuals in the apartment,

complying with industry standards. ECF Nos. 55-20 at 6, 14; 66-10 at 17.  Accordingly, a

reasonable jury could find that the length of the stun stick is an "appropriate measure[] to reduce

the risk of injury." *Boyd*, 374 F.3d at 779.  Therefore, a reasonable jury could find that Officer

Bertuccini's deployment of the stun stick NFDD was not excessive force under the Fourth

Amendment because Officer Bertuccini looked where he deployed it and because the stun

stick's design facilitates the NFDD's detonation away from people, reducing the risk of injury.

I deny Alexander summary judgment on this claim.

        ii.     *The defendants are not entitled to summary judgment or qualified immunity on Alexander's stun stick NFDD claim.*

        I next consider the defendants' summary judgment motion on Alexander's NFDD claim

and their argument that they are shielded by qualified immunity.  "[A]n officer may be denied

qualified immunity at summary judgment in a Section 1983 case only if (1) the facts alleged,

taken in the light most favorable to the party asserting injury, show that the officer's conduct

violated a constitutional right, and (2) the right at issue was clearly established at the time of the

incident such that a reasonable officer would have understood his conduct to be unlawful in that

situation." *Isayeva v. Sacramento Sheriff's Dep't*, 872 F.3d 938, 945 (9th Cir. 2017)

(simplified).  I may decide either prong of the qualified immunity analysis first. *Pearson v.

Callahan,* 555 U.S. 223, 236 (2009).

1        1.  <u>Viewing the facts in the light most favorable to Alexander, Officer Bertuccini's</u>

2             <u>deployment of the stun stick constituted excessive force.</u>

3        Officer Bertuccini's deployment of the stun stick NFDD was unreasonable force under

4    *Boyd* when viewing the facts in the light most favorable to Alexander.  Officer Bertuccini had

5    no visibility into most of the apartment, making his deployment mostly "blind." *Boyd*, 374 F.3d

6    at 779.  While the stun stick was designed to be detonated against a ceiling away from people,

7    the design alone is not a sufficient "measure[] to reduce the risk of injury" unless the officer

8    ensures no bystanders are too close to the NFDD. *Id.*  Here, blinds covered the window as

9    Officer Bertuccini ran up to it, and the stun stick pushed only some of them aside when he

10   inserted it into Apartment 1125.  A reasonable jury could conclude that Officer Bertuccini did

11   not sufficiently scan the room for bystanders before deploying the stun stick NFDD.  Officer

12   Bertuccini acknowledged he did not see Williams before detonation, raising a dispute about

13   whether he fully scanned the room.  Further, a reasonable jury could find that Officer

14   Bertuccini's body-worn camera footage did not move closer to the window after he broke it,

15   indicating he did not attempt to scan the rest of Apartment 1125's living room beyond the

16   section that breaking the window made visible.  A reasonable fact finder could conclude that

17   Officer Rothenburg's body-worn camera footage shows that Officer Bertuccini was away from

18   the window, against the wall, and not scanning the rest of Apartment 1125's living room in the

19   second before the NFDD deployment. *Rothenburg 0448* at 12:22-12:27.  Therefore, viewing the

20   facts in the light most favorable to Alexander, a reasonable jury could conclude that Officer

21   Bertuccini did not ensure that bystanders in Apartment 1125 were far enough away from the

22   stun stick such that his deployment was unreasonable under *Boyd*.

23

The defendants argue that there is no evidence Williams was injured by the NFDDs, and therefore they are entitled to summary judgment on this claim. The defendants' argument fails for two reasons. First, Alexander cites to her "Human Factors" expert, Dr. Nancy Grugle, who states that "LVMPD SWAT's deployment of flash bang devices impaired Williams' hearing and vision." ECF No. 57-24 at 2, 18. Second, "injuries are not a precondition to § 1983 liability" for excessive force claims, so Williams' potential lack of injury does not preclude this claim. *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018).

        2.  <u>Viewing the facts in the light most favorable to Alexander, Officer Bertuccini's deployment of the stun stick NFDD violated clearly established law.</u>

"Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (simplified). I first look to Supreme Court and Ninth Circuit precedent to determine if a right is clearly established. *Ballentine v. Tucker*, 28 F.4th 54, 64 (9th Cir. 2022). Though this "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quotation omitted). I can rely on the "intersection of multiple cases when holding that a constitutional right has been clearly established." *Polanco v. Diaz*, 76 F.4th 918, 930 (9th Cir. 2023). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Rivas-Villegas*, 595 U.S. at 5 (simplified). "Specificity is especially important in the Fourth Amendment context, where it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* at 6 (simplified). The plaintiff bears the burden of proving the right was clearly

1    established at the time of the alleged violation. *Shooter v. Ariz.*, 4 F.4th 955, 961 (9th Cir.

2    2021).

3        Under the Fourth Amendment, "*Boyd* . . . established that a flash bang cannot be blind

4    deployed into a room with innocent bystanders 'absent a strong governmental interest, careful

5    consideration of alternatives and appropriate measures to reduce the risk of injury.'" *Cuevas v.*

6    *City of Tulare*, 107 F.4th 894, 900 (9th Cir. 2024) (quoting *Boyd*, 374 F.3d at 779).  In *Boyd*,

7    police officers executed a search warrant on an apartment in the early morning, announced their

8    presence, then tossed a flash-bang device into the apartment without looking. 374 F.3d at 777.

9    They did this despite knowing that several people unrelated to the investigation may be sleeping

10   in the apartment at the time. *Id.*  The flash-bang device detonated next to where the plaintiff was

11   sleeping, and the plaintiff sued the officers for using excessive force. *Id.* at 777-78.  The Ninth

12   Circuit found that, taking the plaintiff's version of facts as true, this was unreasonable force

13   under the Fourth Amendment. *Id.* at 779.

14       The similarities between the facts of this case and *Boyd* are such that a reasonable officer

15   would know Officer Bertuccini's conduct, viewed in the light most favorable to Alexander,

16   violated the Fourth Amendment.  Here, before the officers executed the search warrant, they

17   knew that individuals unrelated to the murder investigation may be in Apartment 1125.

18   Apartment 1125 was first reported to them as a "flop house," a place where individuals

19   frequently transitioned in and out of living.  LVMPD's surveillance of the apartment confirmed

20   that someone other than the two murder suspects entered and used the apartment.  Further, a

21   reasonable jury could find that Officer Bertuccini deployed the stun stick NFDD in Apartment

22   1125 without sufficiently scanning the room for innocent bystanders, undermining the stun

23   stick's design to promote safety.  Therefore, *Boyd* clearly established that Officer Bertuccini's

use of the stun stick NFDD here violates the Fourth Amendment. Accordingly, the defendants are not entitled to qualified immunity. Therefore, I deny the defendants' summary judgment motion on Alexander's excessive force claim arising out of Officer Bertuccini deploying the stun stick NFDD.[3]

### C. I deny both sides' summary judgment motions on Alexander's claim that the defendants violated the knock and announce rule under the Fourth Amendment.

Both sides move for summary judgment on Alexander's claim that the defendants violated the knock and announce rule under the Fourth Amendment.[4] ECF No. 26 at 10. The defendants also assert they are entitled to qualified immunity on this claim.

"The common-law principle that law enforcement officers should 'knock and announce' their presence and authority before forcibly entering a dwelling is part of the reasonableness inquiry under the United States Constitution's Fourth Amendment guarantee against unreasonable searches and seizures." *United States v. Combs*, 394 F.3d 739, 743 (9th Cir. 2005). "The general practice of physically knocking on the door, announcing law enforcement's presence and purpose, and receiving an actual refusal or waiting a sufficient

---

[3] The defendants also deployed a nine banger NFDD outside Apartment 1125. It is unclear whether Alexander alleges this also constitutes unreasonable force. If she does, the defendants are entitled to summary judgment on that claim because the deployment of the nine banger was not "blind." *See Boyd*, 374 at 779. The officers deployed it in front of them in the yard outside Apartment 1125's living room window.

[4] In her complaint, Alexander alleges "both" "unlawful entry by officers and unlawful mode of entry by use of force." ECF No. 26 at 10. In her summary judgment briefing, it appears she does not consider these to be two separate claims. She derives the "unlawful mode of entry" language from *Mendez v. Cnty. of L.A.*, which distinguished officers' "unlawful entry" (entering without a warrant) from their "unlawful mode of entry" (failure to knock and announce). 897 F.3d 1067, 1074 (9th Cir. 2018) (simplified). In Alexander's summary judgment motion, she argues the defendants' entry violated the knock and announce rule, but she does not challenge the defendants' warrant nor state a separate legal standard for "unlawful entry." Accordingly, I consider Alexander's allegations of "unlawful entry" and "unlawful mode of entry" to be the same claim of a violation of the knock and announce rule.

1    amount of time to infer refusal is the preferred method of entry." *Id.* at 744. A purpose behind

2    the knock and announce rule "is to give a person inside the chance to save his door." *United*

3    *States v. Banks*, 540 U.S. 31, 41 (2003).

4         An officer's forcible entry into a residence complies with the knock and announce rule

5    if, "considering the particular circumstances of the situation," they wait a reasonable amount of

6    time before entering. *United States v. Chavez-Miranda*, 306 F.3d 973, 980 (9th Cir. 2002).[5]

7    "[T]here is no fixed minimum amount of time officers must wait before entering" to comply

8    with the rule. *United States v. Granville*, 222 F.3d 1214, 1218 (9th Cir. 2000). Because

9    "reasonableness [is] a function of the facts of" the case, I must examine "the totality of the

10   circumstances in a given case" to determine whether the entry was lawful under the Fourth

11   Amendment. *United States v. Banks*, 540 U.S. 31, 36 (2003). Specifically, "the facts known to

12   the police are what count in judging [a] reasonable waiting time." *Id.* at 39. Such facts include

13   but are "not limited to, officer safety, time of day, destructibility of evidence, the size of the

14   residence, the nature of the offense," whether the officers knocked, the notice "the police gave

15   before entry," and "any other observations by law enforcement that would support a forced

16   entry." *Combs*, 394 F.3d at 744-45 (simplified).

17        However, "officers may be excused from the knock and announce requirement . . . when

18   they are faced with exigent circumstances." *Granville*, 222 F.3d at 1218; *Banks*, 540 U.S. at 37.

19   The "obligation" to knock and announce "gives way" and officers may attempt a forcible entry

20

21   [5] The Ninth Circuit in *Chavez-Miranda* decided whether the officers complied with the federal
     knock and announce statute, 18 U.S.C. § 3109. 306 F.3d at 980. The Supreme Court has held

22   that § 3109 is the statutory codification of same common-law knock and announce principle
     under the Fourth Amendment, and the result whether an entry was reasonable "should be the

23   same" under the Fourth Amendment and § 3109. *Banks*, 540 U.S. at 42; *United States v.*
     *Ramirez*, 523 U.S. 65, 73 (1998). Therefore, cases that analyze the reasonableness of forced
     entries under § 3109 are relevant to my analysis.

when they "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or . . . would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." *Banks*, 540 U.S. at 36 (quotation omitted). "Once the exigency ha[s] matured, . . . the officers [are] not bound to learn anything more or wait any longer before going in" the residence, even when serving a knock and announce warrant. *Id*. 36-37, 40. For an exigency alone to "justif[y] an immediate entry," the officers must cite to "specific facts" of the "threat to the officers" and not to "generalizations and stereotypes." *Granville*, 222 F.3d at 1219.

    *i.*      *Genuine disputes of material fact remain on Alexander's Fourth Amendment knock and announce claim such that a reasonable jury could find for either side.*

    A reasonable jury could come to different conclusions of how long the officers waited before forcing entry and whether that wait was reasonable under the Fourth Amendment. As such, summary judgment on this claim is not appropriate. [6]

    First, several factors support finding that the officers' entry was unreasonable, such as the defendants' early morning entry. An entry is more likely to be unreasonable when the warrant is "executed early in the morning when it was likely the occupants of the [residence to be searched] would be asleep." *Granville*, 222 F.3d at 1218 (where the officers forced entry at 7 a.m.). One of the defendant officers acknowledged that they chose to serve the warrant at 5 a.m. because that is when they expected Apartment 1125's residents to be asleep and at home. ECF No. 55-10 at 20. The defendants were searching for the firearm used in the murder and its

---

[6] The defendants argue that this is a "high-risk" warrant and therefore a certain legal standard applies to it. The Supreme Court and Ninth Circuit cases that the defendants cite for a "high-risk" warrant do not support their position. The defendants' proposed standard for "high-risk" warrants is the exigency exception for complying with the knock and announce requirement, which I analyze. *See Banks*, 540 U.S. at 36-37.

related paraphernalia, which are not easily destroyed. ECF No. 55-12 at 9; *cf. Banks*, 540 U.S. at 40 (finding drugs are easily destroyed by flushing them down a toilet or sink). There was little, if any, need to enter quickly to prevent the potential destruction of evidence.

Second, several factors favor finding the entry to have been reasonable. Apartment 1125 was relatively small as a 650 square foot one bedroom apartment, meaning its occupants would need less time to answer the door. ECF No. 38-1 at 154; *see Banks*, 540 U.S. at 40. The serious nature of the offense, murder, also supported a shorter wait time.

Third, there is a genuine dispute as to how much danger the officers faced when serving the warrant, thus affecting how long a reasonable wait time would be under the circumstances. The defendants were serving a warrant in search of a murder weapon on an apartment reported to house drugs, weapons, and gang members. They had reports that one of the murder suspects, Wattsel, resided at Apartment 1125 and that he fired a gun in the apartment complex recently. The ankle monitor of the other murder suspect, Fisher, placed him at the apartment a few weeks before the raid. Both suspects had criminal histories. A reasonable jury, viewing these facts in the light most favorable to the defendants, could draw the inference that the officers were in sufficient danger to necessitate a short wait time.

But viewing the facts in the light most favorable to Alexander, a reasonable jury could find that the danger did not rise to the level of exigency to justify dispensing with the knock and announce requirement. The defendants argue that the officers had a reasonable belief that Apartment 1125's residents posed a threat to their safety, creating an exigency justifying a "relatively short delay" before entering. ECF No. 55 at 14 (quotation omitted). The defendants had reports that Apartment 1125 was a flop house, but LVMPD's surveillance did not confirm any illegal activity happening there. Without specific facts of illegal activity happening there,

its classification as a flop house is a "generalization[] and stereotype[]" that cannot establish exigency. *Granville*, 222 F.3d at 1219. Though LVMPD had ankle monitor data putting murder suspect Fisher at Apartment 1125 weeks before the raid, they also knew the ankle monitor showed he was not there on the morning of the raid.

The defendants claim that Wattsel, with his criminal history and known access to weapons, created a danger for the officers to justify their entry. The fact that an "armed and dangerous" suspect might be at a residence does not by itself create an exigency to justify dispensing with the knock and announce requirement. *See Mendez v. Cnty. of L.A.*, 815 F.3d 1178, 1192 (9th Cir. 2016), *overturned in part by Cnty. of L.A. v. Mendez*, 581 U.S. 420 (2017). Typically, for an exigency to justify dispensing with the knock and announce requirement, something changes after the officers arrive to serve the warrant, such as the occupants of the residence seeing the officers gather outside. *E.g.*, *Richards v. Wis.*, 520 U.S. 385, 395 (1997); *Jama v. City of Seattle*, 446 F. App'x 865, 866 (9th Cir. 2011); *see also* ECF No. 66-19 at 20. The defendants do not cite to any such changes at Apartment 1125 before they entered.

Additionally, "the presence of a gun, standing alone, is insufficient to justify noncompliance with the knock and announce rule." *Bynum*, 362 F.3d at 581. But the "presence of a firearm coupled with evidence that a suspect is willing and able to use the weapon will often justify noncompliance with the knock and announce requirement." *Id.* at 581-82. Here, a reasonable jury could find the defendants did not have sufficient information that Wattsel was at Apartment 1125 on January 10 and therefore able to use a weapon against them. The officers surveilling Apartment 1125 did not see Wattsel there. *Cf Bynum*, 263 F.3d at 577, 582 (finding an exigency justified dispensing with the knock and announce requirement where officers saw the occupant at the residence holding a pistol hours before the officers' entry). The last date

22

that the defendants had evidence that Wattsel was at the apartment complex was over three weeks prior to the raid.  Their only information that he was at Apartment 1125 was that his stepmom and family member "believed" he was there a month before. *Id.* at 47.  The fact that Apartment 1125 was a reported flop house, where people came and went, was further reason for the defendants to believe that Wattsel might have left by the date of the raid.  Therefore, a reasonable jury could find that there was no exigency at Apartment 1125 justifying the defendants' entrance and that the threat to officer safety was not so great as to necessitate a short waiting time.

Fourth, there is a genuine dispute of material fact as to when the occupants of Apartment 1125 perceived that the officers' announcements showed the officers' intention of entering Apartment 1125.  This affects the start time of the officers' waiting period.  The defendants argue that the start time of the waiting period between when the officers announced their presence and when they entered the apartment was the moment Sergeant Backman first started his announcement at 4:59:54 a.m.  Alexander argues that Williams would not have understood the officers intended to enter Apartment 1125 because they served the warrant in the early morning when he was asleep and that the officers failed to state the apartment number early in their announcement.

I must examine the likelihood that the police's notice alerted those inside the residence to the officer's presence and purpose. *Combs*, 394 F.3d at 745.  "[T]he focus of the 'knock and announce' rule is properly not on what 'magic words' are spoken by the police, . . . but rather on how these words and other actions of the police will be perceived by the occupant." *Id*. at 744 (simplified).  The words of Sergeant Backman's announcements, standing alone, are sufficient to give notice to Apartment 1125's occupants.  Sergeant Backman's full

announcement, given a few feet outside Apartment 1125's front door, was: "[o]ccupants of 3050 South Nellis, police department, search warrant, 1125, police department, search warrant, Metro police, search warrant, occupants of 3050 South Nellis, police department, search warrant." It identified the address, the police's identity, and their purpose. Sergeant Backman used a bullhorn to project his voice, increasing the likelihood that Apartment 1125's occupants would hear his announcement. *See id.* at 745; *United States v. Spikes*, 158 F.3d 913, 927 (6th Cir. 1998). A reasonable jury could thus find that the Apartment 1125 occupants, who may have known they were in a flop house where illicit drugs and guns passed through, perceived the officers intended to enter their apartment at the beginning of the announcements, soon after 4:59:54 a.m.

But a reasonable jury could also find that Apartment 1125's occupants would not have perceived the officers intended to enter their unit right as Sergeant Backman started announcing LVMPD's presence. Sergeant Backman began his announcement by stating the address for the entire apartment complex, which applies to all apartments in the area. He did not state the specific apartment number of the unit until 5:00:00 a.m., approximately six seconds after he started the announcements. The officers also did not knock. While knocking is not necessary, it helps alert the occupants that the police intend to enter their specific residence as opposed to others nearby. *See Combs*, 394 F.3d at 745. If the officers had knocked on Apartment 1125's door as Sergeant Backman started his announcement, its occupants may have been able to perceive that the officers were going to search their apartment at the start of the announcements. For example, in *Chavez-Miranda*, police served a warrant on an apartment in an apartment complex, and their announcement did not include the apartment number. 306 F.3d at 977. But they knocked while they announced their presence. *Id.* The Ninth Circuit agreed with the

district court's finding that the officers' wait time "includ[ed] the time it took to complete the announcement." *Id.* at 980-81.  Here, the defendants did not knock.  Therefore, viewing the evidence in the light most favorable to Alexander, a reasonable jury could find Apartment 1125's occupants would not have perceived the officers intended to enter their apartment until they heard the apartment number.

More factors could lead a reasonable jury to decide it was even later when Apartment 1125's occupants perceived the purpose of Sergeant Backman's announcements.  The officers served the warrant "early in the morning when it was likely the occupants . . . would be asleep," further decreasing how quickly the occupants could have perceived the defendants' announcements applied to their apartment. *Granville*, 222 F.3d at 1218.  At 5:00:01 a.m., one second after Sergeant Backman stated the apartment number, Officer Bertuccini broke an apartment window with the stun stick NFDD and other officers at the front door began shouting to announce their presence.  A reasonable jury could find these additional sounds made it more difficult for Apartment 1125's occupants to perceive what the officers were saying.

The parties also dispute when the officers' wait time ended.  The Ninth Circuit has consistently indicated that police officers' wait time ends when they start using force to attempt to enter a residence and not when an officer actually crosses the threshold into the residence. *See United States v. Taylor*, 239 F.3d 994, 999 (9th Cir. 2001) (noting that "the police knocked, announced their presence, and waited approximately a minute before attempting to enter Taylor's residence forcefully"); *Granville*, 222 F.3d at 1217 & n.2 (determining the officers' wait time was five seconds because one officer stated that "he waited five seconds before kicking in the door"); *Howell v. Polk*, 532 F.3d 1025, 1026-28 (9th Cir. 2008) (evaluating the district court's decision to send the reasonableness of an entry into a home to the jury where

1  "the police waited only five to eight seconds before starting to break down the door"); *United*

2  *States v. Bynum*, 362 F.3d 574 (9th Cir. 2004) (characterizing an entry as "no-knock" where the

3  officers did not announce their presence until after they used a battering ram on the occupant's

4  door). As a matter of law, officers serving a warrant cease waiting for an occupant to answer

5  his door when the officers begin forcing entry into the residence.

6       To resolve the parties' motions for summary judgment, I need not decide whether the

7  defendants' forcible entry began when they broke Apartment 1125's window with the stun stick

8  or when they started ramming the front door with a battering ram because either way, when

9  viewing the facts in the light most favorable to the non-moving party, a reasonable jury could

10  find for the non-moving party. As noted above, the Ninth Circuit has found officers' wait ends

11  when they begin to apply force to the door of the residence they are trying to enter. *Taylor*, 239

12  F.3d at 999; *Granville*, 222 F.3d at 1217 n.2. The federal knock and announce statute allows

13  officers to "break open any outer or inner . . . window . . . to execute a search warrant." 18

14  U.S.C § 3109. And in *United States v. Ramirez*, where officers broke a window to aim a gun

15  into a residence while serving a warrant, the Supreme Court noted that "[a]s for the manner in

16  which the entry was accomplished, the police here broke a single window in respondent's

17  garage." 523 U.S. 65, 71 (1998).

18       For the purposes of Alexander's summary judgment motion, viewing the facts in the

19  light most favorable to the defendants, the officers waited either seven or ten seconds before

20  forcing entry, measured from when Officer Backman started his announcements (at 4:59:54

21  a.m.) to when Officer Bertuccini broke the window (at 5:00:01 a.m.) and to when Officer

22  Hoskins began ramming the front door (at 5:00:04 a.m.). The Ninth Circuit has found a ten

23  second wait time to be reasonable where officers were serving a warrant on an apartment,

knocked, loudly announced their presence, and heard noises inside the apartment. *United States*

*v. Allende*, 486 F.2d 1351, 1353 (9th Cir. 1973).  Here, a reasonable jury could find the same or

slightly shorter wait time was reasonable due to Sergeant Backman's announcement on a

bullhorn, the small size of the apartment, the serious nature of the offense, and the danger the

officers faced.

For the purposes of the defendants' summary judgment motion, viewing the facts in the

light most favorable to Alexander, the officers waited at most four seconds before forcing entry,

measured from when Sergeant Backman said "1125" (at 5:00:00 a.m.) to when Officer Haskins

began ramming the front door.  A reasonable jury could find they waited even less time because

only one second passed from when Sergeant Backman said "1125" to when Officer Bertuccini

broke the window.  A reasonable jury could conclude that, by the time Officer Haskins began

ramming the door, Apartmnt 1125's residents had not woken up and thus were unable to

comprehend Sergeant Backman's announcements, especially as more officers began shouting.

The Ninth Circuit has found that a five second wait at 7 a.m. was unreasonable when officers

served a warrant at an apartment where they previously saw the suspect several times, they

knocked and announced their presence, and there was no exigent threat to officer safety.

*Granville*, 222 F.3d at 1216-19.  Therefore, a reasonable jury could find that the defendants'

entry was unreasonable when, viewing the facts in the light most favorable to Alexander, they

waited a shorter time at an early hour, did not knock, the evidence sought was not easily

destructible, and there was no exigency.[7]

---

[7] The defendants cite no Ninth Circuit case where a one or four second wait time was held reasonable.  The cases they cite with short wait times are either distinguishable or do not answer the question of whether the officers waited a reasonable amount of time. *Howell*, 532 F.3d at 1026-27 (where officers waited five to eight seconds, but the Ninth Circuit held it was a jury question whether the officers' conduct was reasonable); *Millender v. Cnty of L.A.*, 620 F.3d

1   Because a reasonable jury could find for either side, summary judgment is not

2   appropriate.  I deny summary judgment to Alexander on this claim, and, as discussed below, I

3   deny the defendants' motion because they are not shielded by qualified immunity.

4      ii.    *The defendants are not entitled to qualified immunity on Alexander's Fourth*

5              *Amendment knock and announce claim.*

6       Though a genuine issue of material fact remains on Alexander's knock and announce

7   claim, the defendants argue they are nevertheless entitled to qualified immunity.  To defeat that

8   defense, Alexander must show the defendants' conduct violated a constitutional right and the

9   right at issue was clearly established. *See Isayeva*, 872 F.3d at 945.  I have already found that,

10  taking the facts in the light most favorable to Alexander, a reasonable jury could find that the

11  defendants violated the Fourth Amendment's knock and announce rule.  Thus, Alexander has

12  satisfied the first prong of qualified immunity.

13      The Fourth Amendment right at issue here was clearly established at the time of the

14  defendants' conduct.  *Granville* established that a wait of five seconds or less in the early

15  morning when serving a search warrant on an apartment is unreasonable and violates the knock

16  and announce rule. 222 F.3d at 1216, 1218.  Here, when the facts are viewed in Alexander's

17  favor, the defendants waited four seconds or less at 5 a.m. when serving a search warrant on an

18  apartment.

19      And *Mendez* established that the possible but unverified presence of an "armed and

20  dangerous" suspect at a residence does not by itself create an exigency that justifies dispensing

21

22

23

---

1016, 1030 (9th Cir. 2010) (en banc) (the Ninth Circuit addressed whether the warrant was supported by probable cause); *Jama*, 446 F. App'x at 866 (9th Cir. 2011) (where officers waited eight to ten seconds, but then decided to enter because the occupants saw the officers from a window before the officers began their announcements).

with the knock and announce requirement. 815 F.3d at 1189-90.[8]  In *Mendez*, police were

searching for an "armed and dangerous" parolee, a standard classification for all parolees-at-

large, and received a tip he was seen biking outside a residence. *Id.* at 1184-85.  That same day,

they went to the residence and cleared it in search of the parolee. *Id*. at 1185.  They did not see

him there. *Id.*  They entered a shack in the residence's back yard without knocking or

announcing their presence, despite being told that people with no ties to the parolee lived in the

shack. *Id.*  The Ninth Circuit assumed the officers had probable cause to believe the parolee was

in the shack. *Id.* at 1188.  But it nevertheless held no exigency existed to justify dispensing with

the knock and announce requirement because all the officers knew about the parolee was a

"stereotypical characterization of all parolee-at-large as a threat without pointing to any specific

facts known about" the parolee. *Id.* at 1192.

Here, the defendants similarly had information that Wattsel was at Apartment 1125, but

their most recent tip was from over three weeks prior to the raid, far less recent than the tip in

*Mendez*.  They knew Wattsel had a criminal history, like the wanted parolee in *Mendez*.  They

also knew that people unrelated to the murder investigation stayed at Apartment 1125, and they

never saw Wattsel at the apartment.  Therefore, without sufficient information placing Wattsel

at Apartment 1125, and the knowledge that others would likely be there during the raid, clearly

established law put the defendants on notice that exigent circumstances did not exist to justify

entering Apartment 1125 without complying with the knock and announce requirement.

---

[8] The Supreme Court overturned the Ninth Circuit's holding in *Mendez* that the officers' use of force was automatically unreasonable because they committed a separate Fourth Amendment violation that provoked a violent confrontation. *Cnty. of L.A.*, *Cal. v. Mendez*, 581 U.S. 420, 422-23 (2017).  It did not overturn the Ninth Circuit's holding that the officers violated the knock and announce rule. *See id.*

1    Therefore, the defendants are not entitled to qualified immunity on this claim, and I deny them

2    summary judgment.

3    **D.  I deny both sides' motions for summary judgment on Alexander's claim that the**

4        **defendants' conduct violated the knock and announce rule under the Nevada**

5        **Constitution.**

6        Both parties move for summary judgment on Alexander's claim that the defendants

7    violated the knock and announce rule under Article 1, § 18 of the Nevada Constitution.  Article

8    1, § 18 states that:

9        The right of the people to be secure in their persons, houses, papers and effects
         against unreasonable seizures and searches shall not be violated; and no warrant
10       shall issue but on probable cause, supported by Oath or Affirmation, particularly
         describing the place or places to be searched, and the person or persons, and thing
11       or things to be seized.

12   "[A] private right of action against state actors for retrospective monetary relief exists to

13   enforce search-and-seizure rights under Article 1, Section 18 of the Nevada Constitution."

14   *Mack v. Williams*, 522 P.3d 434, 451 (Nev. 2022) (en banc).

15       "Article 1, Section 18 of the Nevada Constitution uses almost the same words as the

16   Fourth Amendment does to prohibit unreasonable searches and seizures" such that "[i]t is hard

17   to ascribe substantive significance to [the] minor variations" between the two provisions. *Cortes*

18   *v. State*, 260 P.3d 184, 190-91, 191 n.6 (Nev. 2011).  Because the federal and Nevada rights

19   against unreasonable searches and seizures are substantively identical, and because the parties

20   treat the knock and announce claim under Nevada Constitution no differently than the claim

21   under the Fourth Amendment, I apply the same standard to both claims. *See DeCastro v. Las*

22   *Vegas Metro. Police Dep't*, No. 2:23-cv-00580-APG-EJY, 2024 WL 4189939, at *15 (D. Nev.

23   Sept. 12, 2024).

30

1    Therefore, I incorporate my analysis above regarding the Fourth Amendment's knock

2  and announce requirement.[9]  Alexander makes no further argument why she should receive

3  summary judgment on her knock and announce claim under the Nevada Constitution, so I deny

4  her summary judgment on this claim.

5      The defendants' motion for summary judgment cites to *Zabeti v. State of Nevada* to

6  argue the officers did not violate the knock and announce rule under the Nevada Constitution.

7  96 P.3d 773 (Nev. 2004).[10]  But due to factual differences between this case and *Zabeti*, a

8  reasonable jury could find the defendants violated the knock and announce rule under the

9  Nevada Constitution.  In *Zabeti*, SWAT officers served a search warrant in the daytime on a

10 two-story house with an open garage door. *Id*. at 775.  The officers knew the occupants had

11 criminal histories. *Id.* at 774-75.  The officers waited "less than 10 seconds"[11] after announcing

12 their presence and did not knock before entering. *Id.* at 774, 776.  The Supreme Court of

13 Nevada found that, "under the totality of the circumstances," this did not violate the knock and

14 announce rule. *Id.* at 777.  The court cited the danger to the officers because the open garage

15 door and house's second story gave the suspects "obscured angles" and an "easy" vantage point

16 from which to shoot them. *Id.* at 775-77.  Because of these "concerns for officer safety," the

17 announcement along with the wait time, though "very brief," was sufficient. *Id.* at 777.

18

---

19 [9] Qualified immunity is not available for private damages actions under the Nevada
   Constitution, so I do not incorporate my analysis regarding qualified immunity here. *Mack*, 522
20 P.3d at 451.

21 [10] Because the Supreme Court of Nevada's *Zabeti* opinion is not binding precedent in this court
   on Alexander's Fourth Amendment claim, I consider it only with regard to Alexander's Nevada
   constitutional claim.

22 [11] The officers' wait time is not entirely clear.  One officer testified he "waited no more than 10
   seconds," but his police report stated the officers "waited either 4 to 10 seconds or 5 to 10
23 seconds" before entering. *Zabeti*, 96 P.3d at 775.  But the Supreme Court of Nevada's analysis
   described the wait as "less than 10 seconds," so that is the time I consider. *Id.* at 776.

Here, though suspect Wattsel also had a criminal history, the defendants faced less danger than the officers in *Zabeti* because Apartment 1125 did not offer the same "obscured angles" for its residents to fire at the defendants. *See id.* at 775. Apartment 1125 was a one-story apartment on the ground floor with no garage door. Additionally, the defendants served this warrant early in the morning, when the residents needed more time to respond because they were likely asleep, and the defendants waited even less time before attempting forced entry when viewing the facts in the light most favorable to Alexander. Thus, a reasonable jury could find the defendants' conduct violated Article 1, § 18 of the Nevada Constitution despite *Zabeti.*

The defendants also argue they are entitled to discretionary function immunity under Nevada Revised Statutes (NRS) § 41.032 for this claim. "[T]o fall within the scope of discretionary-act immunity, a decision must (1) involve an element of individual judgment or choice and (2) be based on considerations of social, economic, or political policy." *Martinez v. Maruszczak*, 168 P.3d 720, 729 (Nev. 2007) (en banc) (adopting the *Berkovitz-Gaubert* test for discretionary-act immunity under the Federal Tort Claims Act (FTCA)). "[T]he discretionary function exception does not apply" where government officials "violate constitutional rights." *Galvin v. Hay*, 374 F.3d 739, 744, 758 (9th Cir. 2004) (simplified) (analyzing discretionary function immunity under FCTA); *Est. of Sauceda v. City of N. Las Vegas*, 380 F. Supp. 3d 1068, 1086 (D. Nev. 2019) (applying *Galvin*, 374 F.3d 739, to NRS § 41.032). Because a reasonable jury could find that the defendants violated the Fourth Amendment knock and announce rule, they are not shielded by discretionary function immunity. *See Galvin*, 374 F.3d at 758 (finding that defendants are not entitled to discretionary function immunity on plaintiffs' false arrest claim under the FTCA because the Ninth Circuit previously found the defendants' conduct violated the First Amendment). Therefore, I deny the defendants summary judgment

on Alexander's claim that they violated the knock and announce rule under Article 1, § 18 of the Nevada Constitution.

**E.  I deny both sides summary judgment on Alexander's deadly force claim under the Nevada Constitution and on her battery claim, but the defendants are shielded from Alexander's Fourth Amendment deadly force claim by qualified immunity.**

Both sides move for summary judgment on Alexander's Fourth Amendment deadly force claim, her deadly force claim under Article 1, § 18 of the Nevada Constitution, and her state law battery claim.

"A police officer's use of deadly force violates the Fourth Amendment when it is not objectively reasonable." *Barnes v. Felix*, 605 U.S. 73, 76 (2025) (quotation omitted).  As I explained above, Article 1, § 18 of the Nevada Constitution is substantively identical to the Fourth Amendment, and it provides a private right of action to enforce search-and-seizure rights. *Cortes*, 260 P.3d at 190-91, 191 n.6; *Mack*, 522 P.3d at 451.  Because of this, and because the parties treat the deadly force claims under the Fourth Amendment and the Nevada Constitution identically, I do the same. *DeCastro*, 2024 WL 4189939, at *15.

For Alexander's battery claim, "[t]he standard for common-law assault and battery by a police officer . . . mirrors the federal civil rights law standard" for excessive force. *Williams v. City of Sparks*, 112 F.4th 635, 647 (9th Cir. 2024) (applying Nevada law).  I therefore apply the same standard to Alexander's battery claim as to her deadly force claims under the U.S. Constitution and Nevada Constitution. *DeCastro*, 2024 WL 4189939, at * 15.

/ / / /

/ / / /

/ / / /

1      *i.      Viewing the facts in the light most favorable to Alexander, a reasonable jury*

2              *could find that the officers' shooting of Williams was unreasonable.*

3      I first analyze the defendants' summary judgment motion on Alexander's deadly force

4  and battery claims.  The defendants argue their use of deadly force was justified as self-defense

5  in response to Williams shooting at them first.  Alexander argues that the defendants are trying

6  to justify the officers' shooting under the recently rejected "moment of threat" rule, which asks

7  "whether an officer was in danger at the moment of the threat that resulted in his use of deadly

8  force." *Barnes*, 605 U.S. at 78 (simplified).  Alexander further argues I must consider the

9  officers' unreasonable entry and how it influenced Williams' decision to fire at the officers.

10     Deciding whether use of force was objectively reasonable demands analyzing the

11 "totality of the circumstances" with "careful attention to the facts and circumstances relating to

12 the incident, as then known to the officer." *Id.* at 80 (simplified).  This requires me to balance

13 "the nature and quality of the intrusion on the individual's Fourth Amendment interests against

14 the countervailing government interests at stake." *Graham*, 490 U.S. at 396 (quotation omitted).

15 "The use of deadly force implicates the highest level of Fourth Amendment interests." *Vos v.*

16 *City of Newport Beach*, 892 F.3d 1024, 1031 (9th Cir. 2018) (quotation omitted).  Williams'

17 Fourth Amendment interests are "even greater" because he was a "non-suspect" in the murder

18 investigation. *Bernal v. Sacramento Cnty. Sheriff's Dep't,* 73 F.4th 678, 693 (9th Cir. 2023).

19     The Supreme Court has provided several non-exclusive factors for determining the

20 strength of the government's interest: "the severity of the crime at issue, whether the suspect

21 poses an immediate threat to the safety of the officers or others, and whether he is actively

22 resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  The "most

23 important" of these factors is "whether the suspect posed an immediate threat to the safety of

34

1  the officers or others." *Hart v. City of Redwood City*, 99 F.4th 543, 549 (9th Cir. 2024)

2  (quotation omitted).  The reasonableness analysis must consider the fact that "police officers are

3  often forced to make split-second judgments—in circumstances that are tense, uncertain, and

4  rapidly evolving—about the amount of force that is necessary in a particular situation."

5  *Graham*, 490 U.S. at 397.  While "the situation at the precise time of the shooting will often be

6  what matters most," the "totality of the circumstances inquiry into a use of force has no time

7  limit." *Barnes*, 605 U.S. at 80 (simplified).  "[E]arlier facts and circumstances may bear on how

8  a reasonable officer would have understood and responded to later ones." *Id.*  "While a Fourth

9  Amendment violation cannot be established based merely on bad tactics that result in a deadly

10  confrontation that could have been avoided, the events leading up to the shooting, including the

11  officers [sic] tactics, are encompassed in the facts and circumstances for the reasonableness

12  analysis." *Vos*, 892 F.3d at 1034 (simplified).  I may consider if the officers' "poor judgment or

13  lack of preparedness caused [them] to act unreasonably, with undue haste." *S. R. Nehad v.*

14  *Browder*, 929 F.3d 1125, 1134-35 (9th Cir. 2019) (simplified).  I may also consider "the

15  availability of alternative methods of capturing or subduing a suspect." *Davis v. City of Las*

16  *Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007).

17          Here, a reasonable jury may find that the defendants' tactics created an avoidable deadly

18  confrontation by surprising Williams as he slept, giving him insufficient time to realize officers

19  were at his door, and inducing him to fire at perceived intruders.  While Sergeant Backman

20  announced the officers' presence with a search warrant, several other officers started yelling

21  announcements about halfway into his announcement. *Clements 0449* at 10:45-10:55.  The jury

22  could find that the total effect was that all the voices drowned each other out, so that it would be

23

35

1  difficult for any resident of Apartment 1125 to clearly understand the defendants identifying

2  themselves as police.

3      Further, the officers detonated several NFDDs with the intention of stunning and

4  disorienting the residents of Apartment 1125. Officer Bertuccini broke the window and inserted

5  the stun stick NFDD only seven seconds after Sergeant Backman's announcements began. He

6  detonated it a few feet away from Williams six seconds later, filling the room where Williams

7  slept with a loud bang and bright flash before the other officers broke open the front door. *Id.* at

8  10:50-52; *Bertuccini 0447* at 12:32-38; ECF No. 55-10 at 14. Alexander's human factors expert

9  states that this would have impaired Williams' ability to understand the situation, specifically

10  that law enforcement officers were attempting to enter the apartment. ECF No. 57-24 at 9.

11  Another officer deployed the nine banger NFDD outside the window, which emitted a bright

12  white light and loud popping sound nine times in half-second intervals. ECF No. 55-10 at 43.

13  Alexander's human factors expert states this also would have impaired Williams' ability to

14  understand the situation. ECF No. 57-24 at 9. Several of the defendant officers have

15  acknowledged NFDDs sound like gunfire or an explosion. ECF Nos. 55-10 at 14, 43; 55-11 at

16  33; 55-18 at 19. The NFDDs detonated several times before any officer entered Apartment

17  1125 or Williams started shooting at them. *Bertuccini 0447* at 12:37-12:43; ECF No. 55-18 at

18  21.

19      The officers also wore "subdued patches" on their uniforms. ECF No. 55-18 at 44.

20  Instead of yellow letters spelling "SWAT," these patches had black letters. *Id.* This would have

21  made it more difficult for Williams to identify the defendants as law enforcement officers as

22  they entered the apartment.

23

If the jury finds Williams was asleep, his confusion would only be compounded by the fact that the defendants did all of this at 5:00 a.m. An officer acknowledges that they served the warrant at 5:00 a.m. to surprise the residents because they knew the residents were likely asleep. ECF No. 55-10 at 20. Alexander's human factors expert states that if Williams was sleeping, he would have taken longer to understand that the individuals entering the apartment were law enforcement officers. ECF No. 57-24 at 8-9. The jury thus could find that serving the warrant in the early morning contributed to the danger that the officers experienced.

Williams also was not trying to resist or evade arrest. *See Graham*, 490 U.S. at 396. In totality, a reasonable jury could find the officers' tactics leading up to the shooting played a substantial role in creating a dangerous situation with a non-suspect, decreasing the government's interest in using deadly force here.

Nonetheless, this is still a close question. The first two *Graham* factors weigh in the defendants' favor. The crime at issue, murder, was severe. The immediate threat to the defendants' safety, the "most important factor" in my analysis, was undeniably great. *See Hart*, 99 F.4th at 546. Williams was actively firing at the officers as they entered Apartment 1125 and hit Officer Kubla three times. Their ability to capture or subdue Williams at this point was significantly limited. The Ninth Circuit has held that when someone simply "reaches for a gun or aims a weapon at officers, responding with deadly force does not violate the Constitution." *Sabbe v. Wash. Cnty. Bd. of Comm'rs*, 84 F.4th 807, 828 (9th Cir. 2023). Williams not only aimed a firearm at the defendants but fired at them. But to find the officers' deadly force was reasonable because Williams was shooting at them, without considering how the officers' tactics may have induced his shooting, is close to the rejected "moment of the threat" rule. *Barnes*, 605 U.S. at 83. Indeed, *Sabbe* did not analyze how an officer-created emergency that

1   induces a suspect to try to shoot at officers out of confusion may decrease the government's

2   interest in using deadly force. *See* 84 F.4th at 827-29.

3        I acknowledge that the defendants had to make "split-second judgments" in deciding

4   how to respond to Williams shooting at them. *Graham*, 490 U.S. at 397.  At the same time, a

5   reasonable officer on the scene could have anticipated that forcing entry into an apartment

6   known to house individuals unrelated to the murder investigation, at 5:00 a.m., seconds after

7   announcing their presence, while devices that sound like gunshots detonate inside and right

8   outside the apartment, would "result in a deadly confrontation that could have been avoided."

9   *Vos*, 892 F.3d at 1034 (simplified).  A reasonable jury could place sufficient weight on the

10  defendants' role in creating the danger such that the government's interest in using deadly force

11  was less than non-suspect Williams' individual interest in his life.  Therefore, I deny the

12  defendants summary judgment on Alexander's deadly force claim under the Nevada

13  Constitution and her battery claim.

14        *ii.    The defendants are shielded by qualified immunity on Alexander's Fourth*

15               *Amendment deadly force claim.*

16        The defendants argue that they are entitled to qualified immunity on Alexander's Fourth

17  Amendment deadly force claim because there is no clearly established law holding that their

18  conduct was unconstitutional.  "The dispositive question is whether the violative nature of

19  particular conduct is clearly established" such that "the officer's conduct in the situation she

20  confronted" has been found to violate the Fourth Amendment. *Mullenix v. Luna*, 577 U.S. 7, 12-

21  13 (2015) (simplified).[12]

22

23

---

[12] The "general rules" of *Graham* and *Tennessee v. Garner*, 471 U.S. 1 (1985), which
established that excessive force violates the Fourth Amendment, create clearly established law

1       Alexander fails to meet her burden that the defendants' conduct clearly violated the

2  Fourth Amendment at the time of the SWAT raid.  She cites to *Barnes* when responding to the

3  defendants' summary judgment motion on her deadly force claim, but *Barnes* fails to satisfy the

4  second prong of qualified immunity.  First, *Barnes* was decided in 2025, after the defendants'

5  raid on Apartment 1125 in 2022, so it could not have put the defendants "on notice" that "their

6  conduct was unlawful." *Pearson*, 555 U.S. at 244 (simplified).  Second, the premise that courts

7  must look beyond the "moment of the threat" and to the "facts and events leading up to the

8  climactic moment" is "a broad general proposition" that cannot satisfy the second prong of

9  qualified immunity. *Barnes*, 605 U.S. at 76, 83 (quotation omitted); *Mullenix*, 577 U.S. at 12;

10 *see In City of Tahlequah, Okla. v. Bond*, 595 U.S. 9, 11-14 (2021) (finding that the defendants'

11 conduct did not violate clearly established law even though Tenth Circuit caselaw "allows an

12 officer to be held liable for a shooting that is itself objectively reasonable if the officer's

13 reckless or deliberate conduct created a situation requiring deadly force" because the facts of

14 prior cases did not involve similar circumstances).  "[S]pecificity is especially important in the

15 Fourth Amendment context" of the clearly established law inquiry, yet Alexander cites no case

16 that has "placed the . . . constitutional question beyond debate." *Rivas-Villegas*, 595 U.S. at 5-6

17 (simplified).  Therefore, I "cannot say that only someone plainly incompetent or who knowingly

18 violates the law" would have fired back at Williams while he was shooting at them. *Mullenix*,

19 577 U.S. at 15 (simplified).  The defendants are entitled to qualified immunity and summary

20 judgment on Alexander's Fourth Amendment deadly force claim.  In turn, I deny Alexander's

21 summary judgment motion on her Fourth Amendment deadly force claim.

22

23

only in an "obvious case." *Kisela*, 584 U.S. at 105-06.  Alexander has not argued this is an
obvious case, and thus I will not analyze whether it is.

1          *iii.*     *A reasonable jury could find that the officers' use of deadly force was*

2                      *reasonable.*

3          Alexander also moves for summary judgment on her deadly force claim under the

4   Nevada Constitution and on her battery claim.  Because Williams fired at the officers before

5   they fired at him, a reasonable jury could find that the officers faced an extreme and immediate

6   threat to their safety which justified deadly force as self-defense. *See Graham*, 490 U.S. at 396;

7   *Hart*, 99 F.4th at 549.  A reasonable jury could find that Williams shooting at the officers made

8   it not "possible" for the officers to use de-escalation techniques and alternatives. *See* NRS

9   § 171.1455.  Though the defendants' tactics may have contributed to the deadly confrontation, a

10  reasonable jury could find that the defendants' entry was reasonable.  If a reasonable jury finds

11  Williams had sufficient time to perceive that Sergeant Backman's announcements indicated

12  police officers intended to enter the apartment, they could also find that Williams shot at them

13  knowing they were law enforcement officers, necessitating the defendants' use of deadly force.

14  In cases where the Ninth Circuit held that an officer's bad tactics allowed a reasonable jury to

15  find his deadly force was unreasonable, those officers faced less of an immediate threat to their

16  safety than the defendants here. *See Vos*, 892 F.3d at 1029, 1034 (where the victim was holding

17  scissors and "charging towards the officers" who were positioned behind parked police cars for

18  cover); *Nehad*, 929 F.3d at 1131, 1133, 1135 (where the victim was walking toward the officer

19  with what the officer believed was a knife).  Therefore, I deny Alexander summary judgment on

20  her deadly force claim under the Nevada Constitution and on her battery claim.

21  / / / /

22  / / / /

23  / / / /

40

**F.  The defendants are entitled to qualified immunity on Alexander's Fourteenth Amendment claim.**

Alexander argues that the defendants deprived her of the companionship of her son, Williams, in violation of the Fourteenth Amendment by planning an unconstitutional SWAT raid into Apartment 1125 that resulted in the officers shooting Williams.  The defendants argue they are shielded by qualified immunity on this claim.

Viewing the facts in the light most favorable to Alexander, the officers' conduct did not violate her Fourteenth Amendment right. *See Isayeva*, 872 F.3d at 945.  "In the Ninth Circuit, an adult decedent's parents have the right to assert a substantive due process claim for the deprivation of the companionship of their child." *Napouk v. Las Vegas Metro. Police Dep't*, 123 F.4th 906, 923 (9th Cir. 2024).  "[O]nly official conduct that shocks the conscience in depriving parents of that interest is cognizable as a violation of due process." *Id.* (simplified).  This is a "more demanding standard than the 'reasonableness' test that governs excessive-force claims under the Fourth Amendment." *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022).  "Where actual deliberation by the officers is practical, then an officer's deliberate indifference may suffice to shock the conscience." *Napouk*, 123 F.4th at 923 (simplified).  But where "a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Id.* (quotation omitted).

Here, I apply the "purpose to harm" standard because the defendants faced "fast paced circumstances presenting competing public safety obligations." *Porter v. Osborn*, 546 F.3d 1131, 1139 (9th Cir. 2008).  The defendants' decision to fire back at Williams qualifies as a "snap judgment" in response to an "escalating situation." *Napouk*, 123 F.4th at 923 (quotation

41

omitted).  In *Moreland v. Las Vegas Metropolitan Police Department*, the Ninth Circuit applied

the "purpose to harm" standard where officers shot someone while responding to an active

shooter because of the "immediate risk of serious harm or death" the shooter posed. 159 F.3d

365, 372 (9th Cir. 1998); *cf. Nicholson v. City of L.A.*, 935 F.3d 685, 694 (9th Cir. 2019)

(applying the "deliberate indifference" standard to a police shooting where the victim "was not

pointing the toy gun at anyone and had not given any indication that he was likely to harm

anyone").  Similar to *Moreland*, here the defendants fired at Williams after he created an

immediate risk of serious harm or death by firing at them and hitting Officer Kubla.

In *Porter*, the Ninth Circuit found a five-minute interaction between the defendant

police officers and the victim to be sufficiently "fast paced" to qualify for the "purpose to harm"

standard. 546 F.3d at 1139.  Here, from the time Sergeant Backman began his announcements

in front of Apartment 1125 to when the last officer fired at Williams, about 26 seconds elapsed.

While the defendants planned the raid ahead of time, carrying it out involved an "evolving set

of circumstances that took place over a short time period necessitating fast action." *Porter*, 546

F.3d at 1139 (quotation omitted).  Even if the defendants' conduct contributed to Williams'

decision to fire at them, the "purpose to harm" standard can apply where "the officer may have

helped to create an emergency situation by his own excessive actions." *Id.* at 1132.

Under the "purpose to harm" standard, a police officer violates the Fourteenth

Amendment "only if the officer acts with the purpose to harm a civilian for reasons unrelated to

the legitimate law enforcement objectives of arrest, self-defense, or the defense of others." *Est.*

*of Soakai v. Abdelaziz*, 137 F.4th 969, 977 (9th Cir. 2025) (simplified).  Illegitimate objectives

include intending "to induce lawlessness, to terrorize, to cause harm, to kill, to teach the suspect

42

1  a lesson, or to get even." *Id.* at 977.  "[T]he purpose-to-harm test turns on the officer's

2  subjective intent." *Id.* (emphasis removed).

3      Alexander has not provided any evidence of the defendants' illegitimate motive for

4  shooting Williams.  While the raid itself was pre-planned, she gave no evidence that the officers

5  pre-planned to shoot Williams, much less that they intended to induce lawlessness, terrorize,

6  cause harm, kill, teach a lesson, or get even.  Instead, the officers who fired at Williams stated

7  in the immediate aftermath of the incident that they shot him to protect themselves and the other

8  officers. ECF No. 55-23 at 36-38.  The "need for self-defense" is a legitimate law enforcement

9  objective. *Peck*, 51 F.4th at 894; *see Moreland*, 159 F.3d at 373.

10     Alexander argues that courts in the Ninth Circuit rule for defendant officers in

11  Fourteenth Amendment claims only in hot pursuit or shootout cases where a bystander is

12  accidently killed.  This is incorrect.  In *Peck*, the Ninth Circuit found that officers did not violate

13  the "purpose to harm" standard when they surrounded a house, determined the suspect inside

14  was close to a gun, and shot him as a result. 51 F.4th at 883-84, 894.  Here, not only was

15  Williams close to a firearm, but he was actively firing at the officers.  Additionally, the officers

16  were at Apartment 1125 in the first place to serve a legal search warrant, another legitimate law

17  enforcement objective. ECF No. 55-12.

18     Therefore, the defendants' conduct did not violate Alexander's Fourteenth Amendment

19  rights, they are entitled to qualified immunity, and I grant summary judgment to the defendants

20  on this claim.  Because the defendants receive qualified immunity, I deny Alexander summary

21  judgment on this claim.

22  / / / /

23  / / / /

43

**G.  I will allow the parties to move for summary judgment on Alexander's claim under Article 1, § 8 of the Nevada Constitution.**

Alexander moves for summary judgment on her "Third Cause of Action (state Constitution violations)," which includes an allegation that the defendants violated Article I, § 8 of the Nevada Constitution. ECF Nos. 57 at 10; 26 at 13-14.  Article I, § 8 of the Nevada Constitution mirrors the Fourteenth Amendment, stating that "[n]o person shall be deprived of life, liberty, or property, without due process of law."  Alexander states in her complaint that there is an independent cause of action for substantive due process violations under Article 1, § 8 of the Nevada Constitution, like the private cause of action under Article 1, § 18 of the Nevada Constitution. ECF No. 26 at 14.  The defendants do not move for summary judgment on this claim.

The Supreme Court of Nevada has not addressed whether there is an independent cause of action under Article 1, § 8 of the Nevada Constitution.  In the absence of controlling state law, I must use my best judgment to predict how the state's highest court would decide the issue. *Takahashi v. Loomis Armored Car Serv.*, 625 F.2d 314, 316 (9th Cir. 1980).  I may look to intermediate appellate court decisions, statutes, and well-reasoned decisions from other jurisdictions for guidance. *Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003).

In *Mack*, the Supreme Court of Nevada created a three-part framework to determine whether a provision of the Nevada Constitution creates a private cause of action. 522 P.3d at 445.  First, I look to the "language and history of the constitutional provision at issue to ascertain whether an affirmative intent either to authorize or to withhold a damages action to remedy a violation exists." *Id.* at 444 (quotation omitted).  Second, I do a "constitutional tort

analysis" to determine on a "case-by-case basis" whether a civil remedy is (1) "in furtherance of the purpose of the provision" and (2) "is needed to assure the effectiveness of the provision." *Id.* at 444-45 (simplified). Finally, I determine if there are "any special factors that counsel hesitation in recognizing a damages action." *Id*. at 445 (simplified).

Alexander makes no argument why Article 1, § 8 of the Nevada Constitution provides a private cause of action under the *Mack* framework. Therefore, she has not met her "initial responsibility of informing [me] of the basis for [her] motion," and I deny her summary judgment on this claim. *Celotex Corp.*, 477 U.S. at 323.

But in an effort to address this claim prior to trial, I will permit the parties to file new motions for summary judgment on the Article I, § 8 claim. Specifically, they may brief the following issues related to the claim:

(1) Whether Article 1, § 8 of the Nevada Constitution provides a private cause of action under the *Mack* framework?

(2) If there is such a private cause of action, what is the standard and how does it apply to this case?

**H. I grant the defendants summary judgment on Alexander's claim of intentional infliction of emotional distress (IIED).**

The defendants move for summary judgment on Alexander's IIED claim, arguing that there is no evidence they committed extreme or outrageous conduct. Alexander responds that the defendants used "overwhelming force," that Williams experienced emotional distress from being shot, and Alexander experienced emotional distress from the loss of her son. ECF No. 66 at 82.

1    To prove IIED, Alexander must first prove the defendants engaged in "(1) extreme and

2 outrageous conduct with either the intention of, or reckless disregard for, causing emotional

3 distress." *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999) (en banc)

4 (quotation omitted).  Extreme and outrageous conduct "is that which is outside all possible

5 bounds of decency and is regarded as utterly intolerable in a civilized community." *Maduike v.*

6 *Agency Rent-A-Car*, 953 P.2d 24, 26 (Nev. 1998) (simplified).

7    The Supreme Court of Nevada has referred to the Restatement (Second) of Torts § 46 as

8 relevant authority for IIED claims under Nevada law. *See, e.g.*, *Olivero v. Lowe*, 995 P.2d 1023,

9 1027 (Nev. 2000); *Selsnick v. Horton*, 620 P.2d 1256, 1257 (Nev. 1980).  A police officer's

10 conduct may rise to the level of extreme and outrageous when he engages in an "extreme abuse"

11 of his position. Restatement (Second) of Torts § 46, cmt. e.  The Restatement's comments offer

12 examples of when a police officer's conduct may be so outrageous as to support an IIED claim,

13 such as where the officer attempts to extort money through threat of arrest or extort a confession

14 by falsely telling the accused her child has been injured in an accident and she cannot go to the

15 hospital until she confesses. *Id.* cmt. e, cmt. k. illus. 19.

16    Here, the defendants' conduct was not sufficiently extreme and outrageous to constitute

17 IIED.  The IIED standard is higher than the reasonableness standard under the Fourth

18 Amendment. *See Cerros v. N. Las Vegas Police Dep't*, No. 206-CV-00647-LRH-PAL, 2007

19 WL 2325161, at *5-6 (D. Nev. Aug. 10, 2007) (allowing plaintiff to amend his § 1983 claim

20 alleging violations of the Fourth Amendment but dismissing his IIED claim).  Though a

21 reasonable jury could find that the officers shooting Williams was unreasonable due to their role

22 in creating the urgent situation, no reasonable jury could find that it was extreme or outrageous

23 conduct.  Returning gunfire after being shot at several times is not outside all bounds of decency

nor is it an extreme abuse of a police officer's position. Thus, I grant the defendants summary judgment on Alexander's IIED claim.

**I. I allow the parties to move for summary judgment on Alexander's claim of negligent infliction of emotional distress (NIED).**

In her first amended complaint, Alexander alleges that the defendants' conduct also constitutes NIED. Neither party moved for summary judgment or addressed this claim in their motions. Therefore, I will re-open the briefing schedule to allow the parties to move for summary judgment on this claim, if they choose.

**J. I grant summary judgment to the defendants on some of Alexander's negligence claims and deny it on others.**

Alexander argues that the defendants are liable for common law negligence due to their 1) training of the officers; 2) tactical conduct, planning of the raid, use of CET, and failing to perform a legal knock and announce; 3) use of NFDDs and other force techniques to enter the apartment; 4) failure to confirm the murder suspects were in the apartment when serving the warrant; and 5) violation of internal LVMPD policies. Alexander also argues that the defendants are liable for negligence per se for violating NRS § 171.1455 (prescribing an officer's use of deadly force) and NRS § 179.055 (Nevada's knock and announce requirement). The defendants move for summary judgment, arguing that internal LVMPD policy cannot establish the standard of care for negligence and that they are entitled to discretionary function immunity.

/ / / /

/ / / /

/ / / /

      *i.*      *Internal LVMPD policy is admissible and relevant to the standard of care because Alexander also submits supporting expert reports.*

To the extent Alexander's negligence claims rely on the defendants' violation of internal LVMPD policies, "internal policies are often admissible as relevant on the issue of failure to exercise due care." *K-mart Corp.*, 866 P.2d at 280.  The defendants cite *Estate of Wilson by Wilson v. Las Vegas Metropolitan Police Department*, No. 2:18-cv-01702-APG-VCF, 2021 WL 4395045 (D. Nev. Sept. 23, 2021) to argue that a police department's internal policies cannot establish a duty of care for a negligence claim.  In *Estate of Wilson by Wilson*, I found that LVMPD internal policy along with expert testimony could establish the duty of care. *Id.* at *2-3. Here, Alexander submits reports from two former police officers as expert witnesses. ECF Nos. 66-18; 66-19.  Thus, the defendants are not entitled to summary judgment simply because Alexander cites internal LVMPD policy on the issue of the duty of care.

      *ii.*     *The defendants are entitled to discretionary function immunity for their training of LVMPD officers.*

The Supreme Court of Nevada has stated that "decisions relating to the . . . training . . . of employees usually involve policy judgments of the type" that discretionary function immunity shields. *Paulos v. FCH1, LLC*, 456 P.3d 589, 595 (Nev. 2020) (en banc) (quoting *Vickers v. United States,* 228 F.3d 944, 950 (9th Cir. 2000).  In *Paulos*, the Supreme Court of Nevada found that LVMPD was entitled to discretionary function immunity on a negligent training claim. *Id.* at 596.  LVMPD's decision to train the officer in question "involved an element of choice under prong one" of the discretionary function immunity test, and "a decision on whether to train officers . . . is subject to policy analysis" under prong two. *Id.*  Similarly here, the decision of whether and how to train the officers in this case also meets both prongs of

1   the discretionary function immunity test, and the defendants are entitled to summary judgment

2   on Alexander's negligent training claim.[13]

3       *iii.    I deny the defendants summary judgment on the plaintiff's negligent tactical conduct*

4               *claim.*

5           Alexander argues that the defendants are liable for negligence due to their planning of

6   the SWAT raid, their tactical conduct serving the warrant, their use of CET, and their violation

7   of the knock and announce rule.[14]  Because all of these actions are tied to the defendants'

8   conduct serving the warrant, I analyze them together as a single claim of "negligent tactical

9   conduct . . . by failing to perform a legal knock and announce" as Alexander stated in her First

10  Amended Complaint. ECF No. 26 at 18.

11          The defendants argue they are entitled to discretionary function immunity for these

12  actions.  "An officer's decision as to how to accomplish a particular . . . search is generally

13  considered a discretionary determination under Nevada law, and officers are therefore immune

14  from suit as to state law claims arising therefrom in most cases." *Davis v. City of Las Vegas,*

15  478 F.3d 1048, 1059 (9th Cir. 2007).  However, "the discretionary function exception does not

16  apply" where government officials "violate constitutional rights." *Galvin*, 374 F.3d at 744; *Est.*

17  *of Sauceda*, 380 F. Supp. 3d at 1086.  Here, a reasonable jury viewing the facts in the light most

18  favorable to Alexander could find CET is inconsistent with the constitutional knock and

19

20  [13] Alexander does not allege negligent training in her First Amended Complaint. *See* ECF No.
    26 at 18-19.  She raises it for the first time in her response to the defendants' motion for

21  summary judgment. ECF No. 66 at 81.  Regardless of whether it is proper to consider this as a
    separate negligence claim, the defendants are entitled to discretionary function immunity for
    their training of the officers.

22  [14] Alexander also asserts, without further explanation, the defendants were negligent because

23  they committed a "violation of statute/Constitutional rights." ECF No. 66 at 81.  For this order, I
    assume she refers to the First Amended Complaint where Alexander alleges the defendants
    breached their duty "by failing to perform a legal knock and announce." ECF No. 26 at 18.

1  announce rule and the officers failed to wait a reasonable time under the circumstances before

2  forcing entry into Apartment 1125.[15]  Therefore, the defendants are not entitled to discretionary

3  function immunity for their tactical conduct because the jury could find the warrant's service

4  violates the Constitution.

5      The defendants argue that a violation of constitutional rights cannot be based on a

6  negligent act, citing to *Daniels v. Williams*, 474 U.S. 327 (1986).  But *Daniels* holds that

7  negligence cannot be the sole basis for a § 1983 claim alleging violation of due process rights.

8  *Id.* at 328.  It does not hold that a constitutional violation cannot also constitute negligence

9  under state law, so the defendants' argument fails.  I therefore deny the defendants' summary

10  judgment motion on Alexander's claim of negligent tactical conduct.

11      iv.    *I deny the defendants' summary judgment motion without prejudice on Alexander's*

12          *claim that the NFDD deployment was negligent.*

13      Alexander argues that the "deployment of NFDDs, which violated both Ninth Circuit

14  precedent and LVMPD's own policies," constitutes negligence. ECF No. 66 at 81.  The

15  defendants argue they are entitled to discretionary function immunity on this claim.  However,

16  they are not shielded by discretionary function immunity because, as explained above, the

17  deployment of the stun stick violated the Fourth Amendment when I view the facts in the light

18  most favorable to Alexander.

19      The defendants also argue that deploying the NFDDs was an intentional act and thus

20  cannot form the basis for a negligence claim.  Earlier this year, in a similar case where a

21  plaintiff raised claims of excessive force and negligence, the Ninth Circuit certified a question

22

23

---

[15] These circumstances include the time of day the officers served the warrant, failing to
confirm the suspects were in Apartment 1125 at the time, deploying NFDDs, and not knocking.

to the Supreme Court of Nevada on this issue. *K.C. by and through Navarro v. Las Vegas Metro. Police Dep't*, 163 F.4th 702 (9th Cir. 2026). Specifically, they certified the question: "Under Nevada law, can a plaintiff raise a theory of negligence based on an officer's intentional use of force?" *Id.* While we wait for a decision from either the Supreme Court of Nevada or the Ninth Circuit, I deny without prejudice the defendants' summary judgment motion on this claim. A new motion can be filed on this issue after either or both of those courts rule.

v.    *I grant summary judgment to the defendants on the claim that they negligently violated their internal policies.*

Alexander argues that the "violation of internal LVMPD policies" also forms the basis for a common law negligence claim. ECF No. 66 at 81. The defendants argue that Alexander has not specified which LVMPD policies the officers violated.

This issue is separate from Alexander's claim that the "deployment of the NFDDs, which violated . . . LVMPD's own policies," constitutes negligence. *Id.* Except for the deployment of the NFDDs, Alexander has not specified which LVMPD policies the defendants violated in the negligence sections of her response to the defendants' summary judgment motion or her reply in support of her summary judgment motion. *See id.* at 80-81; ECF No. 73 at 21-22. Instead, she nakedly argues that the defendants violated LVMPD policies generally. "[J]udges are not like pigs, hunting for truffles buried in briefs." *Greenwood v. Fed. Aviation Admin.*, 28 F.3d 971, 977 (9th Cir. 1994) (quotation omitted). As such, Alexander has not raised a genuine dispute of material fact, and I grant summary judgment to the defendants on Alexander's negligence claim that the defendants committed a "violation of internal LVMPD policies." ECF No. 66 at 81.

*/ / / /*

51

1       *vi.      I deny summary judgment to the defendants on the negligence per se claims.*

2             Alexander argues that the defendants are not entitled to summary judgment on her

3 negligence claim because they committed negligence per se by violating NRS § 171.1455

4 (prescribing when officers can use deadly force) and NRS § 179.055(1) (Nevada's knock and

5 announce statute).[16]  A violation of a statute establishes negligence per se "only if the injured

6 party belongs to the class of persons that the statute was intended to protect, and the injury is of

7 the type against which the statute was intended to protect." *Ashwood v. Clark Cnty.*, 930 P.2d

8 740, 744 (Nev. 1997) (emphasis omitted).

9             The defendants argue that Alexander's negligence per se claims fail because NRS

10 §§ 171.1455 and 179.055(1) do not mention any particular class of citizens, but the defendants

11 cite no authority for the argument that the relevant statute must explicitly do so.  Additionally,

12 NRS § 171.1455 and NRS § 179.055(1) intend to protect people who interact with law

13 enforcement officers. *See Barnes v. Delta Lines, Inc.*, 669 P.2d 709, 710-11 (Nev. 1983)

14 (finding traffic statutes were enacted to protect motorists from other motorists).  NRS

15 § 171.1455 limits how and when peace officers can use force against those they encounter.

16 NRS § 179.055 is Nevada's codification of the federal knock and announce requirement, which

17 provides for "the protection of human life and limb, because an unannounced entry may

18 provoke violence in supposed self-defense by the surprised resident." *Hudson v. Mich.*, 547

19 U.S. 586, 594 (2006); *Zabeti*, 96 P.3d at 776.

20

21

---

22 [16] Alexander does not allege negligence per se in her First Amended Complaint. *See* ECF No.
26 at 18-19.  She raises it for the first time in her response to the defendants' motion for
23 summary judgment. ECF No. 66 at 81.  The defendants do not argue I should refuse to consider
this claim for this reason, so I will consider it as being under the umbrella of her negligence
claims.

1       The defendants also argue that NRS §§ 171.1455 and 179.055(1) are criminal statutes

2 and therefore are unenforceable through a negligence per se claim.  It is true that "in the absence

3 of evidence of legislative intent to impose civil liability, a violation of a penal statute is not

4 negligence per se." *Hinegardner v. Marcor Resorts, L.P.V.*, 844 P.2d 800, 803 (Nev. 1992).

5 But neither NRS § 171.1455 nor § 179.055(1) are penal statutes.  Neither creates criminal

6 penalties, such as fines or incarceration, for law enforcement officers who violate them. *See*

7 NRS §§ 171.1455, 179.055(1); *cf. Yoscovitch v. Wasson*, 645 P.2d 975, 976 (Nev. 1982)

8 (finding that the violation of a penal statute banning the sale of alcohol to minors, making such

9 conduct a misdemeanor, is not negligence per se).  Instead, both are statutes under "the Nevada

10 Criminal Procedure Law" and establish the proper process law enforcement officers must

11 follow when fulfilling their duties. NRS § 169.015.  Therefore, the defendants' arguments do

12 not show that they are entitled to judgment as a matter of law, and I deny their motion for

13 summary judgment on Alexander's negligence per se claims.

14    **K.  I grant LVMPD summary judgment on some of Alexander's *Monell* claims and**

15          **deny summary judgment to both sides on others.**

16       Both parties move for summary judgment on Alexander's *Monell* claims against

17 LVMPD.  As an initial matter, though Alexander states that "summary judgment should be

18 entered on [her] . . . Seventh Causes of Action (*Monell*)," she does not make any arguments

19 related to her *Monell* claims in her motion for partial summary judgment and raises arguments

20 for the first time in her reply brief. ECF Nos. 57 at 61; 73 at 19-20.  I "need not consider

21 arguments raised for the first time in a reply brief," and I do not do so here when analyzing

22 Alexander's motion for partial summary judgment. *Zamani v. Carnes,* 491 F.3d 990, 997 (9th

23 Cir. 2007).  Alexander therefore has not met her "initial burden of informing [me] of the basis

for [her] motion" and I deny her summary judgment on her *Monell* claims. *Celotex Corp.*, 477 U.S. at 323.

But I will consider the arguments Alexander raises when opposing LVMPD's summary judgment motion on her *Monell* claims. She asserts policy failures of (1) not abiding by the knock and announce requirement; (2) using CET on knock-and-announce warrants; and (3) deploying NFDDs into a room with unknown occupants in an unknown location. She raises training failures of (1) failing to adequately train Sergeant Backman; (2) training SWAT that CET was available on knock-and-announce warrant service; and (3) failing to adequately train on knock-and-announce procedures, including Nevada Commission on Peace Officer Standards and Training (Nevada POST standards).

*Monell* "established that municipalities can be liable for infringement of constitutional rights, under certain circumstances." *Williams v. City of Sparks*, 112 F.4th 635, 646 (9th Cir. 2024) (simplified). "[M]unicipalities may be liable under § 1983 for constitutional injuries pursuant to (1) an official policy; (2) a pervasive practice or custom; (3) a failure to train, supervise, or discipline; or (4) a decision or act by a final policymaker." *Id.* (quotation omitted). A plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989). Where an action does not constitute a violation of the plaintiff's constitutional rights, the municipality is not liable under *Monell*. *Hayes v. Cnty. of S.D.*, 736 F.3d 1223, 1231 (9th Cir. 2013).

1. *I grant LVMPD summary judgment on Alexander's claim that it has a policy of not abiding by the knock and announce requirement.*

Alexander alleges that LVMPD has an unconstitutional policy of not abiding by the knock-and-announce requirement, specifically by executing search warrants in the early

54

morning and by not requiring a physical knock at the door.  LVMPD argues that the

Constitution does not prohibit early-morning entries nor mandate a physical knock on a door

when executing warrants.

The LVMPD SWAT's written policy regarding a knock and announce entrance is

constitutional on its face.  Regarding the use of CET tactics for a knock and announce entry, it

states:

> [D]eciding when to enter the premises . . . will be based on the totality of the
> circumstances to include the following:
> - Size and location of the residence
> - Location of the officers in relation to the suspect
> - Time of day
> - Nature of the suspected offense, suspect priors, associated weapons
> - Other observations triggering the senses of the officers that reasonably
>   would lead one to believe that immediate entry was necessary.

ECF No. 55-14 at 23 (simplified).  It further states that the "'Knock and Announce' tactic

allows for a 'reasonable amount of time' based upon the circumstances of the warrant."

*Id.*  LVMPD officers echoed this policy, stating that they were trained to wait a

"reasonable amount of time" before entering while looking at "everything in totality."

ECF Nos. 55-18 at 22; 57-3 at 19, 25; 57-8 at 21, 81.  This policy, as written, follows

Ninth Circuit and Supreme Court caselaw establishing that officers must wait a

reasonable amount of time considering the totality of the circumstances before forcing

entry while serving a knock and announce warrant. *Banks*, 540 U.S. at 36; *Combs*, 394

F.3d at 744-45.  It lists many of the same factors the Ninth Circuit considers in the

reasonableness analysis. *Compare* ECF No. 55-14 at 23, *with Combs*, 394 F.3d at 744-45.

Ninth Circuit caselaw allows for entries early in the morning and entries where officers

do not knock; both are non-dispositive factors to consider when determining whether an

1  entry was reasonable. *Combs*, 394 F.3d at 745; *United States v. Roots*, 52 F. App'x 12, 14

2  (9th Cir. 2002) (finding that officers did not violate the knock and announce rule when

3  they entered "in the early morning hours").  Therefore, no reasonable jury could find that

4  LVMPD's knock and announce policy as written is unconstitutional.

5       *2.  I deny LVMPD summary judgment on the claim that its CET policy is*

6         *unconstitutional.*

7       Alexander argues that LVMPD's policy of allowing CET while executing knock-and-

8  announce warrants contradicts the knock and announce rule under the Fourth Amendment.

9  LVMPD argues that the Constitution does not prohibit using CET when sufficient exigencies

10  exist and that the use of CET was lawful here.  CET is "meant to surprise and overwhelm the

11  suspect(s), and to quickly take them into custody." ECF No. 55-14 at 22.  It "utilizes surprise

12  and speed to overwhelm the occupants which can be very effective in de-escalating a possible

13  violent situation." *Id.*  But it could only be used for property-only search warrants when there

14  was a "threat of an armed and dangerous subject inside" the residence. *Id.* at 23.

15       A reasonable jury could find that CET's "surprise and speed" to "overwhelm the

16  suspect(s) and . . . take them into custody" is contrary to the knock and announce rule. *Id.*  The

17  Ninth Circuit has described the knock and announce rule to require "[t]he general practice of

18  physically knocking on the door, announcing law enforcement's presence and purpose, and

19  receiving an actual refusal or waiting a sufficient amount of time to infer refusal is the preferred

20  method of entry." *Combs*, 394 F.3d at 744.  One purpose behind this is to give the resident "the

21  chance to save his door." *Banks*, 540 U.S. at 41.  But a reasonable jury could interpret CET's

22  focus on speed to not give the resident sufficient time to answer his door.  While the Fourth

23  Amendment allows dispensing with the knock and announce requirement due to exigent

circumstances, a reasonable jury could find that CET primes law enforcement officers, fitted with military-grade equipment, to force entry before an exigency ripens.  Therefore, I deny LVMPD summary judgment on this claim.

> 3.  *I grant summary judgment to the defendants on Alexander's claim that the defendants had an unconstitutional policy of deploying NFDDs.*

Alexander alleges that LVMPD has a policy of "deployment of NFDDs into a room with unknown occupants in unknown location[s]." ECF No. 66 at 78.[17]  LVMPD argues that Alexander has offered no evidence that LVMPD's policies were unconstitutional.

"[B]lind" deployment of an NFDD "into a room occupied by innocent bystanders absent a strong governmental interest, careful consideration of alternatives and appropriate measures to reduce the risk of injury" is an unconstitutional use of force. *Boyd*, 374 F.3d at 779.  But Alexander does not cite to any LVMPD policy allowing such deployment. *See* ECF No. 66 at 77-78.  On the contrary, Officer Bertuccini, the officer who deployed the stun stick, testified about LVMPD's policy, which shows how it is consistent with *Boyd*.  He stated that there are several standard operating procedures stun stick operators "have to abide by" when deploying the NFDD. ECF No. 55-10 at 14.  First, they "clear the area" to ensure there are no people nearby and then they "make sure that there is nothing flammable or hazardous that's going to be remotely within the vicinity of the area." *Id.*  Because Alexander has not created a genuine dispute of material fact that LVMPD's policy on NFDD deployment is unconstitutional, I grant summary judgment to LVMPD on the claim.

---

[17] Alexander does not allege in her First Amended Complaint that LVMPD has an unconstitutional policy of deploying NFDDs. *See* ECF No. 26 at 19-21.  She raises it for the first time in her response to the defendants' motion for summary judgment. ECF No. 66 at 78. Regardless of whether it is proper to consider this as a separate *Monell* claim, the defendants are entitled to summary judgment.

1    *4.    I grant summary judgment to the defendants on Alexander's claim that LVMPD*

2    *unconstitutionally failed to train Sergeant Backman.*

3         Alexander claims that LVMPD unconstitutionally failed to train Sergeant Backman, as

4    he had not completed the basic SWAT school before serving this warrant on Apartment 1125.

5    LVMPD argues that Backman had sufficient training and experience serving warrants and that

6    failure to train a single officer does not create *Monell* liability.

7         Because the policy Alexander complains of is a failure to train, she must show that

8    (1) she or Williams was deprived of a constitutional right; (2) LVMPD "had a training policy

9    that amounts to deliberate indifference to the constitutional rights of the persons with whom its

10   police officers are likely to come into contact;" and (3) her "constitutional injury would have

11   been avoided had [LVMPD] properly trained those officers." *Blankenhorn v. City of Orange*,

12   485 F.3d 463, 484 (9th Cir. 2007) (simplified).  Municipal liability "is at its most tenuous where

13   a claim turns on a failure to train." *Perez v. City of Fresno*, 98 F.4th 919, 931 (9th Cir. 2024)

14   (quotation omitted).  "That a particular officer may be unsatisfactorily trained will not alone

15   suffice to fasten liability on the [entity]." *City of Canton, Ohio*, 489 U.S. at 390.  "[A]bsent

16   evidence of a program-wide inadequacy in training, any shortfall in a single officer's training

17   can only be classified as negligence on the part of the municipal defendant—a much lower

18   standard of fault than deliberate indifference."[18] *Blankenhorn*, 485 F.3d at 484-85 (simplified).

19

20

21

22   [18] A single incident of failing to train an officer may support liability in "the rare case where
     'the unconstitutional consequences of failing to train' are 'patently obvious.'" *Perez*, 98 F.4th at
     932 (quoting *Connick v. Thompson*, 563 U.S. 51, 64 (2011)).  Neither party raises this

23   exception, so I do not address it.

While LVMPD offered the SWAT school only once a year, Alexander has offered no proof that any other officer besides Sergeant Backman failed to complete the training before participating in or leading any SWAT raids. ECF No. 38-1 at 128. Because she has limited her proof to LVMPD's failure to train only Sergeant Backman, Alexander does not meet her burden to withstand LVMPD's motion for summary judgment. *See Blankenhorn*, 485 F.3d at 485. I therefore grant LVMPD summary judgment on this claim.

   5. *I deny LVMPD summary judgment on Alexander's unconstitutional CET training claim.*

Alexander claims LVMPD's training that CET was allowed while serving knock and announce warrants is a separate ground for *Monell* liability.[19] LVMPD argues that the Constitution does not prohibit CET entries when sufficient exigencies exist. But I have ruled that a reasonable jury could find that LVMPD's CET policy violates the Fourth Amendment's knock and announce requirement. Therefore, I also deny LVMPD summary judgment that its training on when CET is allowed is unconstitutional.

   6. *I will allow the parties to file summary judgment motions on Alexander's claim that the defendants failed to train on knock and announce procedures and Nevada POST standards.*

In her response to the defendants' summary judgment motion, Alexander argues that LVMPD is liable under *Monell* for failing to adequately train its officers on knock and

---

[19] Alexander does not allege LVMPD unconstitutionally trained its officers on CET in her First Amended Complaint. *See* ECF No. 26 at 19-21. She raises it for the first time in her response to the defendants' motion for summary judgment. ECF No. 66 at 78. But defendants do not argue it is improper for me to consider the claim, so I consider it.

1  announce procedures, including the Nevada POST standards.[20]  The defendants did not reply to

2  this argument.

3       The Nevada POST standards set out knock and announce requirements that an officer

4  must comply with before "entering a private dwelling to execute a search warrant." ECF No.

5  57-21 at 2.  It describes how the officers should announce themselves, gives guidance on how

6  long they must wait, and explains the exigency exception to the knock and announce rule. *Id.* at

7  2-3.  Some of the defendant officers stated they were not trained on the Nevada POST standards

8  for the knock and announce requirement, so this is not an incident of a single officer being

9  allegedly unsatisfactorily trained. ECF Nos. 57-4 at 23; 57-13 at 110-11.  But neither party

10 addresses how the Nevada POST standards relate to whether a municipality's training is

11 unconstitutional or whether other standards are sufficient to properly train LVMPD officers.

12 Therefore, I will allow the parties to move for summary judgment on this claim, where they

13 may address:

14      1)  Whether LVMPD's failure to train its officers on the Nevada POST standards

15          constitutes unconstitutional training under *Monell*.

16      2)  Whether the LVMPD officers were properly trained on the knock and announce rule.

17      At this time, I deny without prejudice the defendants summary judgment on Alexander's

18 *Monell* claim that LVMPD did not train its officers on the relevant Nevada POST standard for

19 the knock and announce requirement.

20 / / / /

21

22 [20] Alexander does not allege LVMPD unconstitutionally trained its officers by not training on
   the Nevada POST standards in her First Amended Complaint. *See* ECF No. 26 at 19-21.  She
23 raises it for the first time in her response to the defendants' motion for summary judgment. ECF
   No. 66 at 78.  But defendants do not argue it is improper for me to consider the claim, so I
   consider it.

1    **III.    CONCLUSION**

2        I THEREFORE ORDER that the defendants' summary judgment motion **(ECF No. 55)**

3    **is GRANTED in part**.  I grant summary judgment in the defendants' favor on the following:

4    (1) § 1983 claim that the defendants used excessive force in deploying the nine-bang flash

5    grenade; (2) § 1983 claim that the defendants used unreasonable deadly force under the Fourth

6    Amendment; (3) § 1983 claim that the defendants unlawfully deprived Alexander of the

7    companionship of her son under the Fourteenth Amendment; (4) intentional infliction of

8    emotional distress; (5) negligent training of LVMPD officers; (6) negligent violation of internal

9    LVMPD policies; (7) *Monell* claim that LVMPD has an unconstitutional policy of not abiding

10   by the knock and announce requirement; (8) *Monell* claim that LVMPD has an unconstitutional

11   policy of deploying NFDDs; and (9) *Monell* claim that Sergeant Backman was

12   unconstitutionally trained.  The remainder of the defendants' summary judgment motion is

13   denied.[21]

14       I FURTHER ORDER that plaintiff Alexander's motion for partial summary judgment

15   **(ECF No. 57) is DENIED.**

16

17

18   _____
     [21] Specifically, I deny the defendants' summary judgment motion on the following: (1) § 1983
19   claim that the defendants used excessive force in deploying the stun stick NFDD; (2) § 1983
     claim that the defendants' entry was unreasonable under the Fourth Amendment's knock and
20   announce rule; (3) claim that the defendants' entry was unreasonable under the Nevada
     Constitution's knock and announce rule; (4) claim that the defendants used unreasonable deadly
21   force under the Nevada Constitution; (5) battery claim; (6) negligent tactical conduct claim; (7)
     negligent deployment of NFDDs claim; (8) negligence per se claim under NRS § 171.1455; (9)
22   negligence per se claim under NRS § 179.055(1); (10) *Monell* claim that LVMPD has an
     unconstitutional policy allowing CET while serving knock and announce warrants; (11) *Monell*
23   claim that LVMPD unconstitutionally trained its officers that CET was allowed during knock
     and announce warrants; and (12) *Monell* claim that the defendants failed to train their officers
     on the knock and announce requirement, including on the Nevada POST standards.

I FURTHER ORDER that the parties may file new summary judgment motions by April 3, 2026. Timing for responses and replies are governed by Local Rule 7-2(b). Specifically, the parties may move for summary judgment, as limited by my instructions above, on the following: (1) claim that the defendants unlawfully deprived Alexander of the companionship of her son under the Nevada Constitution; (2) negligent infliction of emotional distress; and (3) *Monell* claim that LVMPD failed to train its officers on the knock and announce requirement, including on the Nevada POST standards. If no party files a motion for summary judgment by April 3, 2026, then the proposed joint pretrial order is due May 1, 2026.

DATED this 2nd day of March, 2026.

_____
ANDREW P. GORDON
CHIEF UNITED STATES DISTRICT JUDGE